UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| MID-AMERICA CARPENTERS REGIONAL COUNCIL PENSION FUND; *et al.,* <br><br> Plaintiffs, <br> v. <br><br> DOCK & DOOR INSTALL, INC., *et al.*, <br><br> Defendants. | 24-cv-06428 <br><br> Judge Andrea R. Wood <br><br> Magistrate Judge Jeannice W. Appenteng |

**PLAINTIFFS' COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY AND SUPPORTING MEMORANDUM OF LAW**

**TABLE OF CONTENTS**

I. UNDISPUTED FACTS............................................................................................1

    A. The Trust Funds And The Audit Findings. ............................................................2

    B. The Formation Of MDS And Its Entry Into New Construction Union Work........2

    C. D&D Formed So MDS Could Bid Union Jobs But Avoid Union Obligations.....2

    D. D&D Is A Pass-Through Payroll Entity For MDS To Avoid Union Obligations. ..............................................................................................................4

    E. D&D's Employees Come From MDS Or Are Hired By Zarlengo/Richert. .........4

    F. D&D Has No Existence Apart From MDS. ...........................................................6

        (1) D&D Uses MDS's Office, Pays No Rent Or Utilities, And Uses MDS's Vendors. ....................................................................................6

        (2) D&D Uses MDS's Trucks, Equipment, Inventory And Its Employees Wear MDS-Branded Clothes On Jobsites. ...................................6

        (3) D&D Does Not Provide COI's.......................................................................6

        (4) D&D Has No Sales Or Office Staff. ..............................................................7

        (5) MDS Collects D&D's Mail............................................................................7

        (6) D&D Has No Market Presence, But MDS Does. .........................................8

        (7) MDS Provides D&D Employees With Credit Cards. ................................8

        (8) Brutti Is Treated Like An Employee Of MDS. ...............................................8

    G. MDS Holds Itself Out As The Union Company. ...................................................9

II. ARGUMENT..............................................................................................................10

    A. MDS's And D&D's Operations Are Entirely Interrelated. .................................10

    B. Common Management And Centralized Control Of Labor Relations. ..............13

    C. Common Ownership Among Family Members. .................................................15

III. CONCLUSION..........................................................................................................15

Plaintiffs Mid-America Carpenters Regional Council Pension Fund *et al.* ("Trust Funds") move this Court pursuant to Federal Rule of Civil Procedure 56 to enter partial summary judgment against defendants Dock & Door Install, Inc. ("D&D") and Midwest Dock Solutions, Inc. ("MDS") (collectively "Companies") holding that MDS is bound to the collective bargaining agreement ("CBA") with the Mid-America Carpenters Regional Council ("Union") because the undisputed facts prove that there is no arm's length relationship between these two interrelated companies. *See, e.g., Chi. Reg'l Council of Carpenters Pension Fund v. Carlson Constructors Corp.*, 2022 U.S. Dist. LEXIS 53163, *16, 60 (Valderama, J.) (granting partial summary judgment on the issue of single employer liability).

I. UNDISPUTED FACTS.

    A. The Trust Funds And The Audit Findings.

The Trust Funds are multi-employer funded fringe benefit funds that provide retirement, health, and other benefits to Union members and others. **(¶1)**[1] The Trust Funds collect contributions from employers bound to the CBA. **(*Id.*)** Employers bound by the CBA pay contributions for hours worked by employees performing bargaining unit work like dock leveler and overhead door installation and service and for hours worked by the employer's non-union subcontractors. **(¶5, 6)**

The Trust Funds engaged Legacy Professionals LLP ("Legacy"), a CPA and auditing firm, to conduct an audit of D&D's contributions for the period from January 1, 2020 through December 31, 2024 ("Audit Period"). **(¶7)** Legacy identified MDS as a related company, and Legacy conducted an audit of the Companies' records. **(¶7)** Legacy's Audit Report concluded that the Companies owe $4,037,546.06 in unpaid contributions. **(¶7)**

---

[1] References to "(¶__)" are to Trust Funds' Local Rule 56.1 Statement of Undisputed Fact.

**B. The Formation Of MDS And Its Entry Into New Construction Union Work.**

MDS was formed in 2006 by Tony Zarlengo ("Zarlengo"), who had a degree in business, and Michael Richert ("Richert"), who had experience installing and servicing dock levelers and overhead doors. (¶9) Zarlengo and Richert are brothers in law. (¶8) MDS is in the business of installing and servicing dock levelers and overhead doors. (¶10, 16, 46, 50, 51-53) In 2011, Zarlengo submitted a bid to Principle Construction, a general contractor, to perform installation of dock levelers and overhead doors in a new construction warehouse or "logistics" type building called the WinPak Portion Processing project in Sauk Village. (¶11) This was a union project meaning that Principle required union contractors and workers. (¶12) MDS was awarded the contract and signed a One Jobsite Agreement with the Union agreeing to be bound to the CBA as a union employer for this one project. (¶12) MDS union employees completed this new construction project and MDS reported and paid fringe benefit contributions to the Trust Funds on behalf of those employees, including David Green ("Green"). (¶12)

After this, Zarlengo and Richert saw an opportunity to get into the new construction business bidding for installation of dock levelers and overhead doors with general contractors building new warehouse buildings like the Winpak project, but general contractors generally require subcontractors to use union workers. (¶17, 19) MDS submitted a bid to Krusinski Construction, another general contractor, to perform installation of dock levelers for a warehouse project and, on June 14, 2014, Krusinski notified Zarlengo that MDS was the successful bidder on a $252,000 contract to install dock levelers at the Heritage Crossing project ("Heritage") in Lockport. (¶13) The project required union labor. (¶13)

**C. D&D Formed So MDS Could Bid Union Jobs But Avoid Union Obligations.**

MDS was non-union and Zarlengo and Richert did not want MDS to be bound by the

CBA on a permanent basis so they discussed with Tony Brutti ("Brutti"), who is Richert's cousin, forming a company that would sign an agreement with the Union and employ workers to work on MDS's projects like Heritage. (¶8, 14) Brutti had no training in the trades, no experience installing dock levelers and overhead doors, and he is incapable of doing such installations. (¶20) Brutti had a degree in education, had worked as a substitute teacher, and was working full time as a manager at Interstate Truck & Trailer Repair and part time at an auto parts store, which he continues to do to this day. (¶20) He is also a competitive race car driver which he does 20-25 hours a week from March to October. (¶21)

A month after Krusinski awarded MDS the Heritage contract, Brutti formed D&D with $15,000 start-up money from Zarlengo and Richert using MDS's attorney on Zarlengo's recommendation; D&D thereafter signed an agreement with Union. (¶19, 22, 25, 28) The startup funds were falsely recorded on D&D's financial records as a loan from JD Brutti (Brutti's father) to make the companies appear separate. (¶25) On D&D's application to the Union, Brutti listed Green—who at the time worked for MDS—as D&D's first employee. (¶45) D&D then employed Green at Zarlengo and Richert's direction without Brutti ever having interviewed him. (¶45) After he started being paid through D&D, Green continued doing the same type of work for D&D he did for MDS. (¶46)

After MDS completed the Heritage project using union employees paid through D&D, it continued to bid for similar projects with general contractors including Krusinski Construction Company, Clayco Construction, Pepper Construction Company, Meridian Design Build, Opus Design Build, and Power Construction that require union labor. (¶17, 23, 24, 26, 27, 36) When MDS is awarded a bid, it enters into a contract with the general contractor to perform the work and then employees paid through D&D perform the work. (¶23, 26) D&D is not part of the

contract, and there is no written contract between MDS and D&D. (¶23) Brutti never reviews the contracts between MDS and its clients and does not know the terms of the contracts. (¶23)

### D. D&D Is A Pass-Through Payroll Entity For MDS To Avoid Union Obligations.

D&D functions as a pass-through union payroll entity for MDS. D&D bids no jobs and D&D has no clients, and D&D's only source of income is MDS. (¶37) D&D exists solely to employ workers for MDS projects. (¶23, 26) D&D workers give their timesheets to Brutti either by text or by leaving them in the lunchroom of MDS's office. (¶75) Brutti has a laptop and a desk in MDS's office where he then prepares "invoices" to MDS using Xero, a software program used by both D&D and MDS. (¶76) The invoices are essentially daily timesheets of the hours worked by each D&D employee with the job location and an hourly rate. (¶75) The hourly rate used by D&D is intended to cover costs, *i.e.,* wages, fringe benefits, FICA, Medicare, insurance, and Brutti's pay. D&D makes little money and often loses money, despite having no vehicles, rent, utility, equipment, materials, or inventory expenses. (¶64, 74-76) Brutti then sends a link to MDS's in-house bookkepper Sherri Webber ("Webber") who uses Xero to import the invoices directly into MDS's accounting records so she does not have to enter the information herself, she prepares a check to D&D for the amount of the invoices and hands it to Brutti who takes it to the bank and deposits it so D&D can pay its ADP payroll and other mandated expenses like insurance. (¶76)

### E. D&D's Employees Come From MDS Or Are Hired By Zarlengo/Richert.

Many of D&D employees were either moved from MDS to D&D or they were hired by Zarlengo or Richert to work for D&D. MDS and D&D have shared at least 7 employees who worked for MDS and then went to work for D&D (*i.e.,* Green, David Rickert, Jose Aguirre, Nicolas Kelly, Brandon Bishop, Zachery Corrigan, and Donald Cruikshank) performing the same

4

work for D&D that they performed for MDS. **(¶45, 48-53)** The decision to move the workers from MDS to D&D was made by or with the consultation of Zarlengo and Richert. **(*Id.*)** Cruikshank testified that he moved from MDS to D&D when Richert approached him and "asked me if I wanted to be in the union." **(¶53)** Bishop testified that he was hired by Richert to work for MDS and then moved to D&D from MDS because he asked Richert "for a union job." **(¶51)** Corrigan testified that he was hired to work for MDS by Richert and Zarlengo and then switched to D&D after Richert told him that they needed more "union guys" to work on union jobs. **(¶52)** Anthony Tattini and Quinten Williams, who were hired to work for D&D but did not previously work for MDS; both testified that they were hired by Zarlengo and Richert, not Brutti. **(¶56, 59)** Employees refer to D&D as the "union side" of MDS. **(¶50)** D&D employees are also terminated by Zarlengo and Richert. Corrigan testified that Richert fired him from D&D when he stopped showing up for work. **(¶52)** Tattini testified that Richert fired him from D&D, and MDS paid Tattini his final severance pay. **(¶59)**

On a day to day basis, Zarlengo and MDS's salesperson Ira Sugar ("Sugar") direct D&D employees where to go and what to do. **(¶47, 54, 57-61)** Despite working at D&D for nearly 3 years, Tattini testified that Zarlengo and Richert (<u>not</u> Brutti) were his bosses and that they gave him his daily assignments. **(¶52)** Cruikshank worked for MDS from 2009 to 2017 and for D&D from 2017 to 2023 and testified that he considered Zarlengo and Richert his bosses for all 14 years, he <u>never</u> considered Brutti his boss. **(¶54)** Employees described Brutti as someone who would unload and stage overhead doors and dock levelers at the jobsites and collect the employees' timesheets. **(¶73)** Tattini described Brutti's role this way, "Like everybody knew he didn't do nothing. Everybody knew--everybody knew he was the--the face or the--or straw man or whatever you want to call it." **(¶59)** In addition, non-union MDS employees also assist on

union jobs where D&D employees are working by delivering or staging materials. (¶18)

### F. D&D Has No Existence Apart From MDS.

**(1) D&D Uses MDS's Office (Pays No Rent Or Utilities) And Uses MDS's Vendors.** D&D has no existence apart from MDS. D&D uses MDS's office for its business location. Every time MDS moved office locations, D&D changed office locations with it. (¶38) D&D never had a lease or paid rent or utilities, and Brutti uses MDS's office equipment and supplies without cost. (¶38, 39) D&D uses MDS's attorney, accountant, and insurance agents; after MDS changed insurance agents from Assured Partners to Holden Insurance, D&D also changed from Assured to Holden based on Zarlengo's recommendation. (¶29, 30, 33) D&D also uses the same bank, payroll service and insurance carriers as MDS. (¶31, 32)

**(2) D&D Uses MDS's Trucks, Equipment, Inventory And Its Employees Wear MDS-Branded Clothes.** Although dock leveler and overhead door installation requires trucks, equipment, and other supplies, D&D has never owned any trucks, equipment or inventory. (¶42, 63) Instead, D&D employees use trucks, welding equipment and inventory that belong to MDS at no cost. (*Id.*) Many trucks are branded with "Midwest Dock Solutions" and D&D uses these trucks on D&D union jobsites. (¶71) Workers on union jobsites are often required to wear high visibility clothing for safety, so MDS provides D&D workers with bright clothing bearing the name "Midwest Dock Solutions" to wear on union jobsites. (¶72) D&D provides no such clothing. (¶72) Based on the "Midwest Dock Solutions" branded trucks and clothes, the D&D employees would look like MDS employees.

**(3) D&D Does Not Provide COI's.** The contracts that MDS signs with its general contractors require that any subcontractor working on the jobsite must provide a certificate of insurance ("COI") naming the general contractor and typically the owner as additional insured's

6

under the subcontractor's insurance policies before the subcontractor's employees are allowed on the jobsite. (¶34) Zarlengo acknowledged that general contractors take this requirement seriously. (¶34) Employees are not allowed to work on a jobsite until the subcontractor provides a COI. (¶34, 35) MDS provides these certificates of insurance to the general contractors, but D&D does not. (¶35) Although Pepper's contracts with MDS required the use of union labor, only MDS and not D&D provided certificates of insurance for the Pepper jobsites. Shawna Oertley, Pepper's Senior Contract Specialist testified:

> According to Pepper's records, Pepper received the required Certificates of Insurance from Midwest Dock … Under the Subcontract Agreements, Midwest Dock's employees were permitted to work on the jobsites. Pepper did not locate any Certificate of Insurance from Dock & Door and, therefore, under the Subcontract Agreements, Dock & Door's employees were not permitted to work on the jobsites.

(¶35) MDS's use of employees paid through D&D based upon MDS's COI's shows that MDS and D&D act as a single employer. MDS's contracts also either prohibit MDS from subcontracting work to another company or require it to notify the general contractor if MDS intends to do so, but MDS does not inform the general contractors that D&D employees will perform the work further showing that MDS treats D&D's employees as its own. (¶36)

**(4) D&D Has No Sales Or Office Staff.** D&D has no sales or administrative staff. (¶62) MDS employs the sales staff that sells the jobs worked by D&D employees. (¶62) Until 2024, Zarlengo prepared bids and performed sales of dock levelers for MDS, including for union general contractors. (¶62) Sugar is also employed by MDS to prepare bids and sell jobs to union general contractors for installation of overhead doors. (¶60, 62) MDS also employed other sales persons and administrative support staff. (¶62)

**(5) MDS Collects D&D's Mail.** MDS collects D&D's mail. Beginning in 2021, MDS rented a post office. Only Zarlengo, Richert, and Webber are authorized to access the mail box.

**(¶40)** D&D's mail, including insurance bills and <u>Trust Fund contributions reports</u>, are delivered to MDS's post office box. **(¶41)** Brutti has no access to the mailbox; MDS retrieves D&D's mail, including its contribution reports, and brings it to MDS's office. **(¶41)**

    **(6) D&D Has No Market Presence, But MDS Does.** D&D does no advertising, it has no website, it maintains no company email account, and it has no logo on Brutti's own race car. **(¶20, 67-68)** MDS maintains a website, a Facebook page, company email accounts for employees (*i.e.*, [NAME]@midwestdocksolutions.com), MDS advertised in at least one industry trade publication, and it has a sponsorship logo on Brutti's race car. **(¶20, 67-68)** MDS's website and Facebook page promote that it performs new installation of dock levelers and overhead doors and related products. **(¶10, 14)**

    **(7) MDS Provides D&D Employees With Credit Cards.** D&D has no company credit cards, but MDS provides D&D employees with MDS credit cards. **(¶43)** D&D employees use MDS credit cards for D&D work (*e.g.,* to pay for parts, supplies, hotels, meals, and gas). **(¶44)** D&D employees give their receipts to Webber or to Brutti (who then passes them to Webber) and MDS pays the statements. **(¶43)**

    **(8) Brutti Is Treated Like An Employee Of MDS.** Brutti's work for D&D is more like he is an employee of MDS. Brutti works only part time for D&D, he also works a part-time automotive parts job, and he races competitively. **(¶20, 21)** His work for D&D is either manual labor (*e.g.*, unloading trucks, staging materials, or running parts to jobsites) or clerical (*e.g.*, preparing D&D's invoices to MDS). **(¶73)** Brutti is paid a salary and makes substantially less than many of his own employees. **(¶65)** On a rare occasion when Brutti received a distribution, it was first approved by Zarlengo and Richert who told Brutti to take a distribution as a "bonus", and when Gineris, the Companies' joint accountant becomes aware that Brutti is receiving a

8

distribution, it notifies Zarlengo. **(¶66)**

MDS holds Brutti out as its employee. MDS gave Brutti an MDS company email account tonyb@midwestdocksolutions.com, which Zarlengo testified is only given to MDS employees. **(¶77)** Brutti used his MDS email to communicate with the general contractors that MDS contracted with. At Zarlengo or Sugar's direction, Brutti prepares closing documents for MDS's projects, including MDS warranties, which are then signed by Zarlengo. **(¶77-79)** D&D provides no warranty. **(¶79)** Brutti also prepared safety plans for MDS, which are required by the general contractors like Pepper. **(¶80)** Brutti used his MDS email account to request COI's for MDS to provide to the general contractors and to send the general contractors MDS safety plans or MDS closeout documents that Brutti prepared for MDS. **(¶77-79)** Brutti signed emails sent to MDS's general contractors, "Yours, Tony Brutti / Midwest Dock Solutions". **(¶77-80)**

### G. MDS Holds Itself Out As The Union Company.

MDS holds itself out as a union company. MDS advertised in trade publication "The Blue Book Building & Construction Network" promoting itself as a "union" company that performs "new construction" installation. **(¶68)** When MDS completed its prequalification form to bid on union contracts with Pepper, it identified itself as a "union" company. **(¶69)** When Pepper was considering a bid from MDS, Pepper's project manager asked Sugar from MDS whether the quote included union labor and he responded, "Yes, thats *[sic]* correct, we are union." **(¶69)** MDS's bid for a project to Opus Design Build identified it as a union company. **(¶70)** MDS's website and Facebook page also promote that it completed new construction warehouse union projects. MDS's Facebook page features photos of the Heritage project with MDS-branded trucks on the jobsite and a photo showing the new construction warehouse and stating "Midwest Dock Solutions October 15, 2016 Another job well done! Install of 64 dock

9

levelers, dock seals and 68 overhead doors." **(¶14)** MDS's website also features the Heritage project completed by D&D employees. **(¶15)**

II.  **ARGUMENT.**

Where two companies constitute a single employer, a company that is not signatory to a CBA is bound to the CBA as though it had signed the CBA. *Moriarty v. Svec*, 164 F.3d 323, 332 (7th Cir. 1998); *Carlson Constructors Corp.*, 2022 U.S. Dist. LEXIS 53163, *35, *citing Board of Trs. of The Pipe Fitters Ret. Fund, Local 597 v. American Weathermakers, Inc*., 150 F. Supp. 3d 897, 905 (N.D. Ill. 2015). To determine whether two companies are a single employer, courts consider the following four factors: (1) interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership. *Lippert Tile Co. v. Int'l Union of Bricklayers & Allied Craftsmen*, 724 F.3d 939, 946 (7th Cir. 2013). No single factor is conclusive; instead, courts must weigh the totality of the circumstances. *Id*. at 946-947. "[A] single employer finding does not require every factor to be met." C*hi. Reg'l Council of Carpenters Pension Fund v. TMG Corp*., 206 F. Supp. 3d 1351, 1360 (N.D. Ill. 2016). "Ultimately, single employer status... is characterized by the absence of an arm's length relationship found among unintegrated companies." *Lippert Tile Co.,* 724 F.3d at 947. The overwhelming undisputed evidence above establishes as a matter of law that there is a complete absence of an arm's length relationship between the Companies and that they are a single employer.

A.  **MDS's And D&D's Operations Are Entirely Interrelated.**

D&D was formed because Zarlengo and Richert saw an opportunity for MDS to bid for dock leveler/overhead door installation work in new construction buildings with general contractors that require union labor and did not want MDS to be permanently bound to the CBA.

10

D&D was formed by Richert's cousin with funds from Zarlengo and Richert using MDS's attorney, and D&D operates using MDS's attorney, accountant, insurance agent, insurance carriers, bank, and payroll service. *TMG Corp.,* 206 F. Supp. 3d at 1357 (interrelated operations because companies shared the same attorney, registered agent, insurance broker, bank, and operated out of the same office); *Carlson Constructors Corp.*, 2022 U.S. Dist. LEXIS 53163, *38 (interrelatedness shown by companies use of common "attorney, registered agent, common insurance program, banks").

 D&D operates from MDS's office moving offices with MDS. MDS pays all rent, utilities, or other office expenses; D&D pays none. D&D's mail is delivered to MDS's post office box and collected by MDS. MDS provides D&D with MDS-branded trucks, equipment, supplies, and inventory and provides D&D employees with MDS-branded clothes. If the jobs require equipment that MDS does not own, then Zarlengo and Sugar rent the equipment at MDS's expense. MDS also provides D&D employees with MDS credit cards that MDS pays, so the expenses incurred by D&D employees are paid by MDS. *See TMG Corp.,* 206 F. Supp. 3d at 1357 (interrelated operations shown by companies operating out of the same office, and non-union company providing union company employees with credit cards and collecting union company's mail from non-union company's post office box); *Automobile Mechs.' Local No. 701 Union & Industry Pension Fund.* 2018 U.S. Dist. LEXIS 168571, at *15-19 (N.D. Ill. Sep. 30, 2018) (Chang, J.) (interrelated operations shown by common office with rent paid by only one company and only one company employing administrative staff); *Laborers' Pension Fund v. RAI Concrete, Inc.*, 2021 U.S. Dist. LEXIS 172729, at *16-17 (N.D. Ill. Sep. 11, 2021) (Chang, J.) ("Both companies are run by substantially the same people, doing substantially the same work, out of the same location."); *Laborers' Pension Fund v. Surface Dimensions, Inc.*, 2011 U.S. Dist.

11

LEXIS 23229, at *24-25 (N.D. Ill. Mar. 8, 2011) (Lefkow, J.) (interrelated relations because one company directed work of employees of both companies, companies operated out of common location, both companies used the same work materials); *Midwest Operating Engineers Welfare Fund v. Grove Excavation, LLC*, 2025 U.S. Dist. LEXIS 222497, at *12-13 (N.D. Ill. Nov. 12, 2025) (Perry, J.) (interrelated operations shown by companies operating out of the same address, using the same logo, engaged in the same work, using shared equipment, and one company paying the expenses of the other).

      D&D has no clients and bids no jobs; all of D&D's jobsites are MDS's contracts with its clients, and 100% of D&D's revenue comes from MDS. MDS bids and signs all contracts, so jobsites worked by employees paid by D&D are identical to MDS's business. D&D does no advertising and has no website sales or administrative staff. Employees for D&D are hired by Zarlengo and Richert, MDS employees are moved to D&D by Zarlengo and Richert, and MDS employees assist on D&D union jobsites. D&D employees are directed by Zarlengo and Sugar. Brutti also works for MDS obtaining MDS COI's, preparing closing documents, and sending closing documents to general contractors using his MDS-provided email account and holding himself out as a representative of MDS. *See RAI Concrete, Inc.*, 2021 U.S. Dist. LEXIS 172729, at *16-17 (interrelated operations because "both companies are run by substantially the same people, doing substantially the same work, out of the same location"); *Carlson Constructors Corp.*, 2022 U.S. Dist. LEXIS 53163, *37 (interrelatedness shown by companies' use of a common company e-mail address).

      Here the facts are even more overwhelming because MDS holds itself out to general contractors as a union employer by promoting itself in the Blue Book as a union company and by representing to general contractors like Pepper that it is a union company. MDS represents work

12

completed by D&D employees as its own work. MDS provides the general contractors with COI's for the projects it contracts for, D&D does not, and MDS does not disclose D&D to the general contractors, even though its contracts require it. MDS itself acts as though D&D and MDS are one and the same entity.

### B. Common Management And Centralized Control Of Labor Relations.

Common management focuses on one company's actual control over the other's day to day operations and centralized control of labor relations is about who hires and fires employees. *Laborers' Pension Fund v. Total Home Restoration 1*, 2022 U.S. Dist. LEXIS 160174, *27 (Seeger, J.). Courts consider similar facts when examining these factors. *Lippert Tile Co.*, 724 F.3d at 947; *N.L.R.B. v. Emsing's Supermarket, Inc.*, 872 F.2d 1279, 1288-89 (7th Cir. 1989); *Carlson Constructors Corp.*, 2022 U.S. Dist. LEXIS 53163, *45, *citing Auto. Mechanics' Loc. No. 701 Union & Indus. Pension Fund*, 2018 U.S. Dist. LEXIS 168571, *16-17;

D&D was formed after Zarlengo and Richert discussed with Brutti forming a company so MDS could obtain union work without MDS signing the CBA. *See Lippert Tile Co.*, 724 F.3d 939, 947 ("we find that there was centralized control of labor relations because it was the Lippert brothers' decision in the first place to create a new company that would give room to a new, non-union labor system solely to serve the non-union market."). MDS does all the bidding; D&D does none. *See id.* (because one entity controls the bidding process the "common management" factor weighs in favor of a single-employer finding).

There have never been any written contracts between MDS and D&D, and MDS pays all of D&D's expenses. *Central States, Southeast & Southwest Areas Pension Fund v. George W. Burnett, Inc.*, 451 F. Supp. 2d 969, 976-77 (N.D. Ill. 2006) (centralized management because there has never been written contracts between the companies, one company paid the expenses of

13

the other's employees, and there was no formal allocation of expenses between the companies).

Zarlengo, Richert, and Sugar—all MDS—were the *de facto* day-to-day decision makers for D&D. Zarlengo and Richert hired employees of D&D, including Tattini and Williams, and they were responsible for hiring employees for MDS and then moving them over to D&D. D&D employees testified that they took their direction from Zarlengo, Richert, and Sugar and that they considered Zarlengo and Richert to be their "bosses." Moreover, Richert and Zarlengo also terminated D&D employees. Corrigan and Tattini were both terminated from D&D by Richert and MDS paid Tattini his final severance pay. *Total Home Restoration 1*, 2022 U.S. Dist. LEXIS 160174, at *25-28 (common labor relations shown by one company directing daily work assignments and hiring and firing workers of companies); *Automobile Mechs.' Local No. 701 Union & Industry Pension Fund*, 2018 U.S. Dist. LEXIS 168571, at *15-19 (same).[2]

Brutti's work for MDS is either labor like the other D&D employees (*e.g.*, running supplies to jobsites or unloading equipment) or clerical in nature (*e.g.,* collecting timesheets from his workers, imputed the timesheets into the Xero system to generate daily timesheet invoices to be incorporated into MDS's financial records, or depositing checks). Brutti does not make managerial decisions for D&D—like what new markets D&D should explore, what jobs D&D should bid, etc.—because there are no managerial decisions for him to make given that D&D is purely a captive entity of MDS. In sum, Brutti had no genuine "managerial" duties because as a wholly captive entity of MDS there *is* no managerial role. He is a straw man. Brutti works less than full time for D&D, works another part time job for an auto parts store, and spends a good part of March through October racing.

---

[2] D&D's only employees were the union workers and the wage rates for D&D employees are set by the CBA, so there was no decision making for setting the wages of D&D employees. **(¶74)**

14

### C. Common Ownership Among Family Members.

Common ownership is the least important factor where there is undisputed evidence of interrelated operations, common management and centralized control of labor relations. *NECA-IBEW Pension Trust Fund, NECA-IBEW Welfare Trust Fund, & IBEW Local Union No. 725 v. Bays Elec., Inc.*, 894 F. Supp. 2d 1071, 1085, 1087 (C.D. Ill. 2012) (single employer found despite different ownership because evidence satisfying the other factors is shown). In this case, however, there is common ownership through family members insofar as Brutti and Richert are cousins. *See Central States, Southeast & Southwest Areas Pension Fund v. Sloan*, 902 F.2d 593, 597 (7th Cir. Ill. 1990) (related-employer liability found where owners of two companies were related family members); *Laborers' Pension Fund v. RAI Concrete, Inc.,* 2021 U.S. Dist. LEXIS 172729, at *20-21 (N.D. Ill. Sep. 11, 2021) ("the familial relationship" is evidence of "the other myriad ways in which the two companies operate as one.")

### III. CONCLUSION.

Because no reasonable fact finder could find that MDS and D&D conducted their day-to-day operations separately, this Court should grant summary judgment in favor of Trust Funds finding that D&D and MDS constitute a single employer bound by the CBA. *TMG Corp.*, 206 F. Supp. 3d at 1357 (granting summary judgment because "[n]o reasonable fact finder could find that the two companies conducted their day-to-day operations separately.").

                                                MID-AMERICA CARPENTERS REGIONAL
                                                COUNCIL PENSION FUND *et al.*

                                                By:  Kevin P. McJessy

Kevin P. McJessy
John Soptata, Of Counsel
McJessy, Ching & Thompson, LLC
3759 N. Ravenswood, Ste. 231
Chicago, Illinois  60613
(773) 880-1260  //
mcjessy@mcandt.com
sopata@mcandt.com

## **CERTIFICATE OF SERVICE**

I, Kevin P. McJessy, an attorney, certify that I caused the foregoing **Plaintiffs' Combined Motion for Summary Judgment And Memorandum Of Law** to be served electronically upon all counsel of record via the CM/ECF service for the Northern District of Illinois on January 16, 2026.

                    By: Kevin P. McJessy

17