UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

MID-AMERICA CARPENTERS REGIONAL
COUNCIL PENSION FUND; *et al.,*

                              Plaintiffs,

        v.

DOCK & DOOR INSTALL, INC., *et al.,*

                              Defendants.

24-cv-06428

Judge Andrea R. Wood

Magistrate Judge Jeannice W. Appenteng

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACT IN
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT
<u>PURSUANT TO LOCAL RULE 56.1</u>**

## TABLE OF CONTENTS

I.  The Audit of Defendants' Fringe Benefit Contributions For The Period
    January 1, 2020 through December 31, 2024 ("Audit Period"). ..................................1

    A.  Organization Of The Trust Funds. ............................................................1

    B.  Contributions For Bargaining Unit Work. ...............................................2

    C.  Employer Liability For Subcontracting Bargaining Unit Work To Non-Union
        Subcontractors.    ...............................................................................4

    D.  Legacy Professionals, LLP's Audit And The Trust Funds' Damages.  ...................5

II. Relationship Between Dock & Door And Midwest Dock. ............................................6

    A.  Familial Relationship Between The Owner Of Dock & Door And The
        Owners Of Midwest Dock. ....................................................................6

    B.  Formation Of Midwest Dock By Zarlengo And Richert On May 16, 2006. ...........7

    C.  Nature of Midwest Dock's Business And Its History Performing Union
        Installation Of Overhead Doors and Dock Levelers In A New Construction
        Logistics-Type Building........................................................................8

    D.  Union General Contractors Require The Use Of Union Labor On The
        Jobsite.    ..........................................................................................22

    E.  Dock & Door Was Formed A Month After Krusinski Construction Notified
        Midwest Dock It Was Awarded The Heritage Crossing Project. ..........................26

    F.  The Funds To Start Dock & Door Came From Midwest Dock. ..........................33

    G.  Type/Scope Of Work Dock & Door Performs: Dock & Door Does Services
        Work And Take Down And Replace. .......................................................34

    H.  Common Vendors...............................................................................38

        1.  Common Vendors: Legal, Lawrence Kamin Saunders & Uhlenhop, LLC......38

        2.  Common Vendors: Insurance, Esser Hayes And Assured Partners And
            Then Holden Insurance Agency. .....................................................39

        3.  Common Vendors: Cincinnati Insurance, ICW Group, And Liberty
            Mutual................................................................................40

4. Common Vendors: Midwest Bank And ADP Payroll. ....................................41

5. Common Vendors: Midwest Bank And ADP Payroll. ....................................42

III. Midwest Dock's And Dock & Door's Interrelated Operations.....................................44

A. Midwest Dock Provides The General Contractors With Certificates Of Insurance Where Dock & Door's Employees Work--Dock & Door Does Not. ...44

B. Midwest Dock Did Not Inform General Contractors That Dock & Door Would Perform The Work. .........................................................................49

C. Dock & Door Is A Captive Entity. ............................................................52

D. Dock & Door And Midwest Dock Shared Office Space But Dock & Door Paid No Rent.............................................................................................54

E. Brutti's Office And Use Of Office Equipment At No Charge. ..............................56

F. Dock & Door's Mail Is Delivered To Post Office Box 363 Which Is Leased And Controlled By Midwest Dock. ...........................................................56

G. Dock & Door Used Midwest Dock Solutions' Trucks, Equipment, Tools, And Inventory At No Cost. .......................................................................58

H. Midwest Dock Provided Dock & Door Employees With Midwest Dock's Company Credit Cards To Use; Dock & Door Did Not Provide Credit Cards. ....61

I. Employees...............................................................................................65

1. David Green ......................................................................................65

2. David Richert ....................................................................................68

3. Jose Aguirre ......................................................................................69

4. Nicolas Kelly .....................................................................................70

5. Branden Bishop...................................................................................72

6. Zachary Corrigan ................................................................................72

7. Donald Cruikshank ..............................................................................74

8. Quinten Williams ................................................................................76

    9.  Anthony Tattini ...........................................................................80

    10. Ira Sugar .................................................................................82

J.  Dock & Door Has No Sales Staff Or Office Support Staff—Midwest Dock Employs The Sales Staff Who Sell The Projects Worked By Dock & Door. ........84

K.  Dock & Door Has No Suppliers; All Supplies Are Purchased By Midwest Dock. .......................................................................................85

L.  Dock & Door Install Often Lost Money In Any Given Year. Between 2016 And 2023, Dock & Door Lost $70,069.00...........................................86

M.  Brutti Makes Much Less Than Many Of Dock & Door's Employees..................88

N.  Dock & Door Has No Market Presence. ..........................................90

O.  Midwest Dock Maintains A Market Presence And Holds Itself Out As A Union Company. ......................................................................91

P.  D&D Holds Itself Out As Midwest Dock. ..........................................94

Q.  Brutti Works As If He Were An Employee of Midwest Dock. ...........................99

R.  Brutti Works For Midwest Dock And Holds Himself Out To General Contractors As An Employee Of Midwest Dock..................................103

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MID-AMERICA CARPENTERS REGIONAL
COUNCIL PENSION FUND; *et al.,*

                            Plaintiffs,

   v.

DOCK & DOOR INSTALL, INC., an Illinois
corporation and MIDWEST DOCK SOLUTIONS,
INC., an Illinois corporation,

                            Defendants.

Case No 1:24-cv-06428

Judge Andrea R. Wood

Magistrate Judge Jeannice
W. Appenteng

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACT
IN SUPPORT OF THEIR MOTION FOR SUMMARY
<u>JUDGMENT PURSUANT TO LOCAL RULE 56.1</u>**

Plaintiffs Mid-America Carpenters Regional Council Pension Fund et al. ("Trust Funds")

pursuant to Local Rule 56.1 of the General Rules of the District Court for the Northern District

of Illinois, hereby submit the following statement of undisputed material fact as to which there is

no genuine issue and which entitle the Trust Funds to judgment against Dock & Door Install, Inc.

("Dock & Door") and Midwest Dock Solutions, Inc. ("Midwest Dock") as a matter of law.

**I.  The Audit of Defendants' Fringe Benefit Contributions For The Period January 1, 2020
through December 31, 2024 ("Audit Period").**

   **A.  Organization Of The Trust Funds.**

<u>**STATEMENT OF FACT NO. 1:**</u>

The Mid-America Carpenters Regional Council Pension Fund ("Pension Fund"), the Mid-
America Carpenters Regional Council Health Fund ("Health Fund"), the Mid-America
Carpenters Regional Council Apprentice and Trainee Program ("Trainee Fund"), and the Mid-
America Carpenters Regional Council Supplemental Retirement Fund ("Retirement Fund")
hereinafter collectively referred to as the "Trust Funds," are multi-employer funded trust funds
that collect fringe benefit contributions from employers bound by an agreement with the Mid-
America Carpenters Regional Council ("Union") and then provide pension, welfare, training and
promotional benefits to members of the Union and their families.

1

**SUPPORT FOR STATEMENT OF FACT NO. 1:**

Decl. of J. Conklin ¶¶1, 2 & Exhibits A-D (Pension Fund Trust Agreement, Art. III §3.1, Ex. A; Welfare Fund Trust Agreement, Art. III §3.1, Ex. B; Trainee Program Fund Trust Agreement, Art. III, Art. IV §1, Art. VI §2, Ex. C; Supplemental Retirement Fund Trust Agreement, Art. 3 §3.1, Art. VII, Ex. D), EX. 1

**STATEMENT OF FACT NO. 2:**

The Pension Fund, Welfare Fund, Trainee Fund and Labor/Management Fund are each organized, administered and governed according to a trust agreement which are hereinafter referred to respectively as the "Pension Fund Trust Agreement," the "Welfare Fund Trust Agreement," the "Trainee Program Fund Trust Agreement," and the "Labor/Management Fund Trust Agreement" and are collectively referred to as the "Trust Agreements." The Trust Funds are also administered according to the terms of the Carpenters Agreement ("CBA") negotiated between the Union and the employers' representatives. The Trust Funds are administered by a board of trustees selected by management and labor and the Trustees collect and manage contributions from employers bound by the Carpenters Agreements and trust agreements. Copies of these Trust Agreements are attached as Exhibits A-D and copies of the Carpenters Agreement for the period June 1, 2019 through May 31, 2024 and for the period June 1, 2024 through May 31, 2029 are attached as Exhibits E and F to the Declaration of John Conklin.

**SUPPORT FOR STATEMENT OF FACT NO. 2:**

Decl. of J. Conklin ¶¶1, 3-5 & Exhibits A-F (Pension Fund Trust Agreement, Art. II, Art. III §3.1, Art. VIII, Ex. A; Welfare Fund Trust Agreement, Art. II, Art. III §3.1, Art. IV, Art. VIII, Ex. B; Trainee Program Fund Trust Agreement, Art. III, Art. IV §1, Art. VI §2, Ex. C; Supplemental Retirement Fund Trust Agreement, Art. 3 §3.1, Art. VII, Ex. D; Carpenters Agreement, §§12.2, 13.2, 14.2, Ex. E; Carpenters Agreement, §§12.2, 13.2, 14.2, Ex. F), EX. 1

**B. Contributions For Bargaining Unit Work.**

**STATEMENT OF FACT NO. 3:**

The Area Agreement provides as follows:

The Employer agrees to be bound by the Agreement and Declaration of Trust establishing the [Chicago Regional Council of Carpenters Welfare Fund / Pension Fund / Apprentice Training Fund] [Mid-America Carpenters Regional Council Health and Welfare Fund / Pension Fund / Apprentice Training Fund] by any present and future amendments thereto and irrevocably designates as its representative on the Board of Trustees such Trustees as are named in said Agreement and Declaration of Trust, as Employer Trustees, together with their successors selected in a manner provided in said Agreement and Declaration of Trust as it may be amended from time to time, and agrees to be bound by all action

2

taken by said Employer Trustees pursuant to said Agreement and Declaration of Trust as amended from time to time.

**SUPPORT FOR STATEMENT OF FACT NO. 3:**

Decl. of J. Conklin ¶5 & Exhibits E, F (Carpenters Agreement, §§12.2, 13.2, 14.2), EX. 1

**STATEMENT OF FACT NO. 4:**

The Carpenters Agreements defines work falling within the jurisdiction of the Union ("bargaining unit work") to include the following:

> 1.1 The Bargaining Unit shall consist of all Journeymen, Foremen, Apprentices and Trainees engaged in work at the construction site covered by the occupational jurisdiction of the "Union" including, but not limited to, the milling, fashioning, joining, assembling, erection, fastening or dismantling of all material of wood, plastic, metal, fiber, cork, and composition, and all other substitute materials; scaffolding; <u>overhead sectional doors</u>; concrete forming, gang forms; <u>the handling, erecting, installing and dismantling of machinery and equipment,</u> hydraulic jacking and raising, and the manufacturing of all materials where the skill, knowledge and training of the Employees are required, either through the operation of machine or hand tools. <u>The Bargaining Unit shall also consist of all Journeymen, Foremen, Apprentices and Trainees engaged in work as Carpenters and</u> Joiners, <u>Millwrights,</u> … Millmen, … regardless of material used; and all those engaged in the operation of wood working or the machinery required in the fashioning, milling or manufacturing of products used in the trade, or engaged as helpers to any of the above divisions or subdivisions, and the handling, erecting and installing material on any of the above divisions or sub-divisions; burning, <u>welding,</u> rigging and the use of any instrument or tool for layout work, incidental to the trade. When the term "Carpenter and Joiner" is used, it shall mean all the subdivisions of the Trade. However, the Union agrees that it will not interfere with existing practices of other unions affiliated with the Building Trades.

Dock leveler and overhead door service and installation work is bargaining unit work.

**SUPPORT FOR STATEMENT OF FACT NO. 4:**

Decl. of J. Conklin ¶¶3, 6 & Exhibits E &F (Carpenters Agreements §1.1), EX. 1 (emphasis added)

**STATEMENT OF FACT NO. 5:**

Sections 12.1, 13.1 and 14.1 of the Carpenters Agreement state that "Each EMPLOYER shall pay into" the Welfare Fund, the Pension Fund and the Trainee Fund "an amount per hour for each of the first one hundred and seventy-five (175) hours worked for an EMPLOYER during each calendar month by all of its Employees who are covered by this Agreement in amounts

3

determined and allocated by the Executive Committee of the Union effective June 1, 2014, June 1, 2015, June 1, 2016, June 1, 2017 and June 1, 2018."

### SUPPORT FOR STATEMENT OF FACT NO. 5:

Decl. of J. Conklin ¶5 & Exhibits E, F (Carpenters Agreements §§12.1, 13.1 and 14.1), EX. 1

### C. Employer Liability For Subcontracting Bargaining Unit Work To Non-Union Subcontractors.

### STATEMENT OF FACT NO. 6:

Under the Carpenters Agreements, an employer is prohibited from subcontracting bargaining unit work to nonunion subcontractors and if an employer subcontracts bargaining unit work to a nonunion person or company that is not bound by the Carpenters Agreement, then the employer shall either (i) require the subcontractor to become a signatory to the Carpenters Agreement or, (ii) the employer shall maintain daily records of the employees who perform the work and then pay the requisite fringe benefit contributions for the work performed by those employees. If the employer fails to do so, then the employer is liable for the amount of unpaid fringe benefit contributions found due by the audit.

### SUPPORT FOR STATEMENT OF FACT NO. 6:

Decl. of J. Conklin ¶5 & Exhibits E, F (Carpenters Agreements §3.2), EX. 1 ("EMPLOYER shall not contract or subcontract any work coming within the jurisdictional claims of the UNION to any person, firm or corporation not covered by a Collective Bargaining Agreement with the UNION, provided, however, that the provisions of this paragraph shall apply only to the contracting and subcontracting of work to be done at the site of construction, alteration, painting or repair of a building, structure or other work")

Decl. of J. Conklin ¶5 & Exhibits E, F (Carpenters Agreements §3.3), EX. 1 ("EMPLOYER shall not contract or subcontract any work coming within the jurisdictional claims of the UNION to any person, firm or corporation not covered by a Collective Bargaining Agreement with the UNION, provided, however, that the provisions of this paragraph shall apply only to the contracting and subcontracting of work to be done at the site of construction, alteration, painting or repair of a building, structure or other work") EMPLOYER, in recognition of the territorial and occupational jurisdiction of the UNION, shall not subcontract or contract out jobsite work coming within the jurisdiction of the Carpenters Union nor utilize on the jobsite the services of any other person, company or concern to perform such work that does not observe the same wages, fringe benefits, hours and conditions of employment as enjoyed by the Employees covered by this Agreement.")

Decl. of J. Conklin ¶5 & Exhibits E, F (Carpenters Agreements §3.3), EX. 1 ("If an Employer, bound by this Agreement, contracts or subcontracts any work covered by this Agreement to be done at the jobsite of the construction, alteration, painting or repair of a building, structure or other work to any person or proprietor who is not signatory to this Agreement, the Employer shall require such subcontractor to be bound by all provisions of this Agreement, or the Employer shall maintain daily records of the subcontractor's or the subcontractor's Employees jobsite hours and be liable for payments to the Chicago Regional Council of Carpenters Welfare Fund, the Chicago Regional Council of Carpenters Pension Fund and the Chicago Regional Council of Carpenters Apprentice and Trainee Program, as provided in Articles XII, XIII, and XIV of this Agreement.")

*Trustees of the Chicago Regional Council of Carpenters Pension Fund et al v. Riteway-Huggins Construction Services, Inc.*, 2010 U.S. Dist. LEXIS 25243 *2 (N.D. Ill. Mar. 15, 2010) (Kennelly, J.)

*Chicago District Council of Carpenters v. Simpson Construction*, 2006 U.S. Dist. LEXIS 92163 *23-29 (N.D. Ill. Dec. 18, 2006) (Brown, J.)

*Chicago District Council of Carpenters Pension Fund v. Faith Builders*, 2001 U.S. Dist. LEXIS 1046, 2001 WL 99839 at *2, *3 (N.D. Ill. Jan. 30, 2001) (Gettleman, J.)

**D. Legacy Professionals, LLP's Audit And The Trust Funds' Damages.**

**STATEMENT OF FACT NO. 7:**

Legacy Professionals, LLP ("Legacy"), an independent auditing firm hired by the Trust Funds to conduct an audit of Dock & Door's fringe benefit contribution's for the period from October 20, 2020 through December 31, 2024, identified Midwest Dock as a related company of Dock & Door. After reviewing the records of Dock & Door and Midwest Dock, Legacy determined that there are unpaid fringe benefit contributions owed to the Trust Funds of $4,037,546.06, of which $994,000.45 is for hours worked by workers with a union history or affiliation who were not reported, $2,840,546.63 was for non-union workers identified as "technicians" who perform bargaining unit work, and $202,998.98 was for bargaining unit work subcontracted to non-union subcontractors. As a result, under the Trust Agreements and the Employee Retirement Income Security Act, Dock & Door and Midwest Dock are also liable for auditor's fees of $13,040.40, attorneys' fees, liquidated damages, and interest.

**SUPPORT FOR STATEMENT OF FACT NO. 7:**

Decl. of J. Conklin ¶¶9, 10 & Exhibit I (Audit Report) at pp. 6-10, 12, EX. 1

Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Interrogatory No. 1, (Exhibit 40), EX. 24 (identifying persons employed by Midwest Dock as "technicians" and the period of their employment)

5

Richert 16:16- (testifying that a technician does service calls, works on overhead doors and dock levelers, and also installs overhead doors and dock levelers)

Declaration of J. Conklin ¶3 & Exhibits A-F (Pension Fund Trust Agreement, Art. VII §7.3(r), Art. VIII, §8.3(a), Ex. A; Welfare Fund Trust Agreement, Art. VII, §7.3(r), §8.3(a), Ex. B; Trainee Program Fund Trust Agreement, Art. IV, §4, Art. VI, Ex. C; Supplemental Retirement Trust Agreement, Art. VIII §8.3(a), Ex. D; Carpenters Agreements §§12.10, 13.8, 14.8, Exs. E, F), EX. 1 (under the Trust Agreements an employer is liable for attorney's fees and costs and auditor's fees)

29 U.S.C. §1132(g)(2)(B) (interest damages)

29 U.S.C. §1132(g)(2)(C) (interest or liquidated damages whichever is greater)

29 U.S.C. §1132 (g)(2)(D) (attorney's fees)

## II. Relationship Between Dock & Door And Midwest Dock.

### A. Familial Relationship Between The Owner Of Dock & Door And The Owners Of Midwest Dock.

**STATEMENT OF FACT NO. 8:**

Tony Zarlengo and Michael Richert, the two owners of Midwest Dock, are related; Richert has been Zarlengo's brother-in-law for approximately the past 10-15 years. Richert and Tony Brutti, the sole owner of Dock & Door, are also related; Brutti and Richert are cousins.

**SUPPORT FOR STATEMENT OF FACT NO. 8:**

Zarlengo 7:20-8:11, EX. 2 (testifying to his relationship with Richert)

Brutti 17:2-13, EX. 3 (testifying to his relationship with Richert)

Richert 6:14-20, 7:12-8:7; EX. 4 ("Q. Okay. Sir, are you related to Anthony Brutti? A. Yes. Q. All right. He's here in our conference room today, correct? A. Yes. Q. And how are you related to Anthony Brutti? A. Cousins. … Q. And are you related to Anthony Zarlengo? A. No. Q. He's not your brother-in-law? A. No, not anymore. Q. Was he your brother-in-law? A. Yes. Q. For what period of time? A. 17 years. Q. And from what time to what time? A. 2006. Q. That's when he married your sister? A. That's when I married his sister. Q. I'm sorry. Strike that. That's when you married his sister? A. Correct. Q. And you got divorced, I take it? A. We're not legally divorced just yet, but have been separated for three years. Q. So legally he's still your brother-in-law? A. Yes.)

### B.  Formation Of Midwest Dock By Zarlengo And Richert On May 16, 2006.

**STATEMENT OF FACT NO. 9:**

On May 16, 2006 Michael Richert, who is a former member of the Union and had extensive experience working in the overhead door and dock leveler industry, and Tony Zarlengo, who had a degree in business management from St. Louis University, formed Midwest Dock with each owning fifty percent.  Zarlengo is principally responsible for Midwest Dock's financials, sales, business development, the insurance, ordering parts, managing payroll, making sure accounts receivable and accounts payable were paid, and Richert was principally responsible for work in the field, including installation of dock levelers and overhead doors and servicing dock levelers and overhead doors, but his job has gradually changed since 2015 to managing and troubleshooting jobs in the field, assessing jobs in the field to assist the sales persons, maintaining Midwest Dock's vehicles, and keeping the warehouse organized.

### SUPPORT FOR STATEMENT OF FACT NO. 9:

Zarlengo 31:11-32:6, EX. 2 (testifying that he is a college graduate from St. Louis University with a degree in business management)

Zarlengo 36:2-37:5, EX. 2 (testifying that Midwest Dock was formed in 2006 by himself and Michael Richert and they have both always been equal 50% owners of the company)

Zarlengo 82:14-85:23; 86:17-91:8, EX. 2 (testifying that he is responsible for all of Midwest Dock's financials, including sales, invoicing, managing accounts payable and receivable, dispatching, scheduling, ordering parts, payroll, insurance, and Michael Richert was responsible for working in the field installing and serving overhead doors and dock levelers to more recently troubleshooting jobs in the field, assessing jobs in the field to assist the salespersons, maintaining Midwest Dock's vehicles, and keeping the warehouse organized)

Zarlengo 291:22-292:18, EX. 2 (testifying that Richert had experience working in the overhead door and dock leveler industry before starting Midwest Dock, including union work)

Richert 90:14-24; 94:12-95:23; 97:11-98:6, EX. 4 (testifying that he and Tony Zarlengo started Midwest Dock, that he does not know his title with Midwest Dock other than "owner", and that he owns 50% of Midwest Dock)

Richert 68:15-70:8; 74:10-79:2; 84:14-85:7;  EX. 4 (testifying he is a former 9-year member of the Union, to his extensive experience working in the overhead door and dock leveler industry)

Richert 126:5-14; 126:22-127:1, EX. 4 ("Q. Okay. What was the -- what's the division of labor between you and Tony Zarlengo at Midwest Dock Solutions? A. I don't understand the question. Q. Are there things that you're primarily responsible for and things that he's

primarily responsible for? A Yes. Q What are you primarily responsible for? A Everything outside the office. … Q. What's the division of labor between you and Tony say over the last five years? A. Tony Zarlengo handles the office and inside and I handle anything outside.")

Richert 128:1-23, EX. 4 (testifying that he fixes overhead doors and dock levelers as part of his work for Midwest Dock, that he worked for J&B Ventures a company that did dock leveler installation in new construction projects, and now he troubleshoots retrofit repair and replacement work for dock levelers and overhead doors)

Midwest Dock Solutions, Inc. Articles of Incorporation, May 16, 2006 (Exhibit 79), EX. 5

C. **Nature of Midwest Dock's Business And Its History Performing Union Installation Of Overhead Doors and Dock Levelers In A New Construction Logistics-Type Building.**

## STATEMENT OF FACT NO. 10:

Midwest Dock's business includes installation of new dock levelers and overhead doors and related products in new and existing construction.  The following from Midwest Dock's Facebook page promotes that Midwest Dock performs the following work—*i.e.,* dock levelers, dock seals, dock lights, dock restraints, dock shelters, overhead doors, door operators, and high speed doors, and new and existing construction—and Tony Zarlengo and others testified this accurately reflects the work that Midwest Dock does.



## SUPPORT FOR STATEMENT OF FACT NO. 10:

Midwest Dock Solutions, Inc.'s Facebook Page at p.7, (Exhibit 53), EX. 6

Zarlengo 239:21-240:10, EX. 2 ("Q. And then if you turn to the next page, there's a listing on the Facebook page dated October 15, 2016, that says your complete Dock & Door experts. Do you see that? A. Yes. Q. And then it's got the website for Midwest Dock

Solutions underneath it, correct? A. Yes. Q. All right. Is that all work that Midwest Dock Solutions performs? A. Yes.")

Zarlengo 247:12-23, EX. 2 ("Q. And if you turn -- if you turn to the page that ends with clients and testimonials -- A. Yes. Q. -- do you see where it says, Midwest Dock Solutions specializes in the service, supply, and installation of loading dock equipment and overhead doors? A. Yes. Q. All right. Would you agree that that's an accurate statement? A. Yes.")

Corrigan 39:3-40:13, EX. 7 ("Q. And how about -- you mentioned installs. What's involved in an install? A. Going to the job -- you would have new doors, usually, on site, or bring it from the shop, and taking down the old doors and installing new doors. Q. Okay. And how about openers? A. The same. Just bring an opener from the shop over there -- or they'd already, you know, be there -- and take down old openers and replace with new ones. Q. Okay. And that would be on commercial jobs? A. Yes. Q. Okay. All right. How about installation of tracks? A. I've done that, yes. Q. Would that be work that you would have done as part of the installation of new -- of new doors? A. Yes. Q. All right. And I'm trying to think of the other components. How about track guards? Would that be something you'd also install? A. Sometimes, yes. Q. Okay. And that would be part of the installation of the doors? A. Yes.")

Corrigan 42:14-43:5, EX. 7 ("Q. No. The first sentence that says Midwest Dock Solutions specializes in the service, supply, and installation of loading dock equipment and overhead doors. A. Yes. Q. Okay. Now, that says loading dock equipment. Do you see that? A. Yes. Q. What kind of loading dock equipment does Midwest install? A. Dock levelers and the seals that go around the opening. Q. Okay. And would you do that kind of work also? Yes. Q. All right. And that was part of your work for Midwest, correct? A. Correct. Q. You said dock seals. What are dock seals? A. If you have the picture, it's the it's the -- it's the black seal that goes on the outside of the opening that the trucks back up into. It seals between the building and the truck -- Q. Okay. A. -- so they don't get any, you know, rain and snow and stuff inside the building. Q. I see. So on Exhibit 3, in that first page, the photo on the bottom, it's the black square around the door? A. Yes. Q. Okay. Would you also repair dock levelers? A. Yes.")

Corrigan 49:10-50:19, EX. 7 ("Q. Did your work change over that period of four years, or was it pretty much the same work? A. I mostly did doors. Q. Okay. A. Sometimes docks, but not -- mostly -- I'd say 90/10 -- mostly doors and openers. Q. Okay. And was that consistent from the time you started until the time you left? A. Yes. Q. Okay. So it was 90/10 the whole time? A. Yes. Q. Okay. And of the service work and installation work for the doors, what percentage, would you say? A. Maybe 70 service 30 install. Q. Okay. And, again, was that roughly the same the whole time you were there? A. Yes. Q. Okay. So 30 percent of the time you were doing new installation, and 70 percent of the time for doors you're doing service work? A. Yes. The new installation would be take down old doors, install new doors.")

9

Cruikshank 38:1-17, EX. 8 (testifying that when he worked for Midwest Dock he performed installation work in new construction buildings—*e.g*., "Q. Did you do any new installation for Midwest when you were working – A. Yes. Q. -- getting paid through them? A. Yes. Q. Okay. And what kind of projects would that be on? A. Commercial buildings, you know. I mean -- or actually, sometimes firehouses, you know. I mean, it was -- sometimes -- we did a police station one time. You know, commercial buildings. Q. Okay. New -- new construction? A. Yeah.")

Cruikshank 40:9-18, EX. 8 ("Q. Well, you said Midwest Dock also did installation of new doors, correct? A. Yes. Q. And new construction; is that right? A. Yes. Q. Okay. And -- and I understand you were paid through Midwest, and then you were eventually paid through Dock & Door, correct? A. Yes. Q. Okay. And Dock & Door was -- if you were being paid through there, it was only -- you had to be union, right? A. Yes.")

Cruikshank 41:4-42:11, EX. 8 (testifying that there was no difference between a Midwest Dock job and a Dock & Door job: "Q. … Once you started being paid by Dock & Door and you went out to a project, how do you know it's a Dock & Door project and not a project that Midwest Dock Solutions sold and contracted for? A. I wouldn't have a way of knowing that. Q. Okay.  A. It's -- I mean, it's just -- I mean, when you were working for Dock & Door, you were going to companies that -- like Krusinski and -- you know, if it was a big Krusinski job, you knew it was a union job. There was no -- no debating that. Q. It required union labor to be on the job? A. Yes. Q. Okay. So if it required -- basically, if it required union labor, then it had to be a Dock & Door job? A. Yes. Q. Okay.")

Defendant Midwest Dock Solutions, Inc.'s Answer at ¶19, [ECF#18], (Exhibit 120), EX. 9 (Midwest Dock admits that "MIDWEST DOCK is in the business of installing and/or repairing loading dock equipment including dock levelers and doors.")

**STATEMENT OF FACT NO. 11:**

Midwest Dock performed dock leveler and overhead door installation on a new construction building for a union employer when Midwest Dock was awarded a contract by a large general contractor, Principle Construction Corp., that required the use of union labor to install 20 dock levelers and overhead doors for the Winpak Portion Packaging project in Sauk Village, Illinois, a new construction warehouse building that looks like this:



And Midwest Dock also installed overhead doors and dock accessories at a new construction project in Crete Illinois.

**SUPPORT FOR STATEMENT OF FACT NO. 11:**

GoogleMaps Screenshot, (Exhibit 81), EX. 10

Zarlengo 67:16-68:3; 68:12-23, EX. 2 (testifying that he signed the one jobsite agreement on behalf of Midwest Dock agreeing to be bound by the collective bargaining agreement with the Chicago Regional Council of Carpenters (*i.e.*, the carpenters union) to perform the work for Principle Construction Corp. on the Winpak Portion Packaging project)

Zarlengo 56:9-57:11; 65:3-66:18, EX. 2 (testifying that Midwest Dock performed the installation of 20 overhead doors and dock levelers at the Winpak Portion Packaging Center for Principle Construction Company which was a new construction project that required the use of union workers, that the work was performed by Midwest Dock's employees, and that the GoogleMaps image is an accurate photograph of the Winpak Portion Packaging project—*e.g.*, "Q. And in 2014, Midwest Dock Solutions was awarded a contract with Principal Construction to perform work at the Winpak Portion Packaging facility in Sauk Village, correct? A. Correct. Q. All right. And that was a union project, correct? A. Correct…. Q. All right. And how is it that it – this was a new construction installation project, correct? A. Correct…. Q. And this Exhibit 81, is this a -- and I just want to talk about the first two pages of Exhibit 81 -- is that the one job site agreement that Midwest Dock Solutions signed with the carpenters union? A. Yes…. Q. And this refers to a -- the Winpak Portion Packaging manufacturing facility in Sauk Village at

1111 Winpak Way. Do you see that? A. Yes. Q. And it says, Principal Construction has begun work on the project and will complete the building envelope by November 2011. Do you see that? A. Yes. Q. Was Principal Construction the contractor that you contracted with for the Winpak Portion Packaging Center? A. Yes. Q. All right. And then if you turn to the very last page of this exhibit, does that look to be a -- you have to open it up. Yeah. Does that look to be a photograph of the Winpak Portion Packaging Center? A. Yes. Q. All right. And that's where you did the work, correct? A. Yes….")

Richert 142:6-22, EX. 4 ("Q. Were you ever at the jobsite that was done by Midwest Dock Solutions? MR. HUGHES: And before you answer, I'm going to object to foundation on this as well. MR. McJESSY: Okay. BY MR. McJESSY: Q. For this project? A. Yes. Q. And does this look like the facility? A. Yes. Q. And it's a little hard to see, but down the left-hand side of this it looks like it shows trucks pulled up to loading docks. Do you see that? A. Yes. Q. Is that where the work was done? A. Yes.")

Richert 187:17-189:2 ("Q. So the picture on the first page here, did you take that? A. Yes. 20 Q. Where is that taken at? A. Crete, Illinois. Q. Where at in Crete, Illinois? A. In Crete. Q. Where at? I mean, it's a location, correct? A. Like a street? Q. It's a facility, isn't it? A. Yes. Route 1. Q. And what's the facility? A. Al-Amin. … Q. And this is a project that Midwest Dock Solutions did? A. Yes. Q. And what did it do? A. I put the enclosures up, the doors up and the verticals in. Q. And was this a new construction project? A. Yes. Q. And you did the work? A. Yes. And you say you put the enclosures up. Those are the black things there? A. Correct. Q. And what else did you put up? The doors? A. The doors.")

Zarlengo 217:2-219:24 (testifying that he sold the A-Amin project which was new construction in 2018 and the work was performed by employees paid through Dock & Door—e.g., "Q. 2 Q. And what was it? A. Al-Amin Brothers. … Q. All right. And do you know who sold that project? A. I did. Q. Okay. But you don't -- do you remember what you sold as part of that project? A. I sold the dock levelers. Q. All right. So installation of dock levelers? A. Correct. Yes. Q. All right. And was that new -- that was new construction installation of dock levelers, then, correct? A. Yes. … Q. All right. Do you know when that was done, approximately? A. 2018. Q. Okay. And would Midwest Dock employees have done that work? A. No. Q. Okay. This would have been work done by Dock & Door? A. Yes. Q. And -- oh, where is it located? A. Crete. Q. On Route 1? A. Yes.")

One Jobsite Agreement Between Midwest Dock Solutions, Inc. and Chicago Regional Council of Carpenters [now known as Mid-America Carpenters Regional Council], Nov. 11, 2011 and Photograph of Winpak Portion Packaging project in Sauk Village, Illinois (Exhibit 81), EX. 10

## STATEMENT OF FACT NO. 12:

In order for Midwest Dock to perform the work on the Winpak Portion Packaging project for Principle Construction Corp., Midwest Dock signed a One Jobsite Agreement with the Chicago

Regional Council of Carpenters, *i.e.*, the carpenters union ("Union") agreeing to be bound by the collective bargaining agreement with the Union, the trust agreements establishing the Trust Funds, and Midwest Dock agreed to report fringe benefit contributions to the Trust Funds for the hours worked by its carpenter employees performing dock leveler and overhead door installation work. Midwest Dock submitted fringe benefit contribution reports and paid fringe benefit contributions to the Trust Funds for hours worked by its union employees at the Winpak Portion Packaging project, including hours worked by its employees David Green and David Richert.

### **SUPPORT FOR STATEMENT OF FACT NO. 12:**

Zarlengo 67:16-73:12, EX. 2 (testifying that Midwest Dock signed the One Jobsite Agreement, that it agreed to be bound by the collective bargaining agreement with the carpenters union and the trust agreement establishing the Trust Funds, and that it agreed to and did report fringe benefit contributions to the Trust Funds—*e.g*., "Q. Well, you agreed to be bound by the Collective Bargaining Agreement for purposes of this project, correct? A. For one job. Q. Correct. A. Yeah, for one job. Q. Right. I understand. But you had to -- you had to be bound by the Collective Bargaining Agreement in order to do this one job, correct? A. Yes. I'm a little confused on the question, but -- Q. All right. Well, let's go back to Exhibit 81. And I'm not trying to trap you into saying that you were a permanent member of the union when you signed this one job site agreement. The agreement says what it says. So if that's -- there was a long pause when I asked my question. You signed this one job site agreement, correct? A. Yes. Q. And this agreement was entered into between the Chicago Regional Council of Carpenters, Cook, DuPage, Grundy, Iroquois, Kane, Kankakee, Kendall, Lake County, and Will County, Illinois, referred to as the union, correct? A. Yes. Q. And Midwest Dock Solutions, correct? A. Yes. Q. All right. So it's an agreement between you -- your company and the carpenters union, correct? A. For one job, yes…. Q. And so Midwest Dock had to also report fringe benefit contributions to the trust funds referred to for the work performed on this project, correct? A. Yes…. Q. All right. So you submitted these reports and paid the fringe benefit contributions that are identified on these reports, correct? A. Yes. Q. And by that, I mean Midwest Dock Solutions did that, correct? A. Yes.")

One Jobsite Agreement Between Midwest Dock Solutions, Inc. and Chicago Regional Council of Carpenters [now known as Mid-America Carpenters Regional Council], Nov. 11, 2011 (Exhibit 81), EX. 10

Fringe Benefit Contribution Reports by Midwest Dock Solutions, Inc., (Exhibit 85), EX. 11 (reporting fringe benefit contributions for David Richert (November and December 2011) and Green (February to June 2012))

Green 38:10-39:10, EX. 12 (testifying that he was hired by Zarlengo as an employee of Midwest Dock)

Zarlengo 72:5-74:18, EX. 2 (testifying that Midwest Dock reported fringe benefit contributions to the Trust Funds on behalf of Green as an employee of Midwest Dock)

Richert 153:5-154:1 ("Q. 5 So you know he [David Green] was at Midwest Dock Solutions? A. Yes. He did work at Midwest Dock Solutions. Q. And what kind of work did he do for Midwest Dock Solutions? A. Service work. Q. Did he also do installation of overhead doors? A. Yes. Q. New construction? A. No. Q. Would Midwest Dock have been reporting hours on his behalf for any purpose other than work at a jobsite that it signed an agreement for? A. That's what it looks like. Q. It's reporting hours on his behalf, correct? A. Yes. Q. Okay. And that would have been for an agreement with the union, correct? A. Yes. Q. And do you believe that would have been for the work at the Winpak Portion Packaging project? A. Yes.")

**STATEMENT OF FACT NO. 13:**

On June 11, 2014, Krusinski Construction Company notified Midwest Dock that it was the successful bidder on the contract to install dock levelers at the Heritage Crossing Building #8 project, which was another new construction warehouse building in Lockport, Illinois. The contract was valued at $252,000 for the installation of dock levelers, bumpers, and seals, and required the use of union labor on the project. The contract specifically stated:

> 11.2 ACCEPT ABILITY OF LABOR. All work performed by the Subcontractor under th.is Agreement shall be by appropriate union labor acceptable to the Contractor.
> …
> 15.B The Subcontractor shall provide sufficient union manpower to maintain the Contractor's construction schedule.
> …
> 15.D Subcontractor shall be responsible for his own cleanup with the proper union labor.

**SUPPORT FOR STATEMENT OF FACT NO. 13:**

Letter from Michael Metz, Krusinski Construction Company, to Tony Zarlengo, Midwest Dock Solutions, Inc., Jun. 11, 2014, (Exhibit 104), EX. 13 ("We are pleased that your firm is the successful Subcontractor, subject to your agreement with the terms and conditions contained in the enclosed subcontractor agreement, and we are looking forward to working with you on the referenced project. Enclosed is a copy our Subcontractor Agreement, which should be initialed on each page and executed by an officer of your company.")

Subcontract Agreement between Krusinski Construction Company and Midwest Dock Solutions, Inc. at pp. 5, 15, 21, Jun. 11, 2014, (Exhibit 104), EX. 13

Zarlengo 221:16-222:24, EX. 2 (testifying that the contract for the work at Heritage Crossing was awarded to Midwest Dock by Krusinski Construction Company and authenticating award letter and contract)

**STATEMENT OF FACT NO. 14:**

After Tony Brutti formed Dock & Door, one of the first jobs where the workers paid through Dock & Door worked was the Heritage Crossing project, which was a project bid by Midwest Dock and awarded to Midwest Dock but which required union labor.  On its Facebook page, Midwest Dock promotes the Heritage Crossing project as a project completed by Midwest Dock even though the work on that project was performed by employees paid through Dock & Door. One Facebook post states, "Midwest Dock Solutions October 15, 2016 Another job well done! Install of 64 dock levelers, dock seals and 68 overhead doors" and another Facebook post advertises that Midwest Dock is hiring "Loading Dock & Overhead Door Technicians" and both posts feature the same images of the Heritage Crossing project.



(Exhibit 53), EX. 6



(Exhibit 53), EX. 6



(Exhibit 19 & Exhibit 53), EX. 14, EX. 6

## SUPPORT FOR STATEMENT OF FACT NO. 14:

Midwest Dock Solutions, Inc. Facebook Page www.facebook.com/midwestdocksolutions at p.1, (Exhibit 19), EX. 14

Midwest Dock Solutions, Inc. Facebook Page www.facebook.com/midwestdocksolutions at pp. 2, 8, (Exhibit 53), EX. 6

Brutti 43:1-20, EX. 3 ("Q. Okay.·And you said there were one or two jobs that were really cooking. What did you mean -- A. Yeah, I'm pretty sure we were doing a job at a college in -- oh, Malcolm X College, I believe, is one of my first jobs right off the bat and that, the one we were talking about in the previous deposition in Lockport.·That was a while ago, so I can't remember every job that we were... Q. You mentioned the job that we were talking about in the prior deposition.·Was that the -- A. Heritage Crossing. Q. -- Heritage Crossing? A. Yeah. Q. Okay. So that was also your recollection one of the early jobs? A. Early, yeah. Q. Okay. And that was one of the jobs that was being considered at the time that you were signing up with the union? A. Yes.")

Tattini 109:9-111:1, EX. 15 ("Q. Okay. And then Exhibit 8, does that look like -- do you recognize that project, by any chance?



A. Oh, wow. It's so hard. They all look the same, but, let's see. This looks like – Q. If you turn to the next page -- A. Ah-huh. Q. -- you can see that it comes from a Facebook post? A. Okay. Q. That's dated July 26, 2016, and it says Midwest Dock Solutions is in Lockport, Illinois. A. Yeah. Well, that's -- well, that's probably -- that's probably more of the job I was talking about off of 355, but not Lockport. I think it was Lemont. July – Q. So this could be an interior photo of the space that we looked at earlier that was the exterior photo, which was -- I can't find it now. A. Six? Q. Yeah. I think you said it was off 355? A. Oh, no. That was a different picture. Yeah, yeah. Most likely, yes. Especially at that time because that's exactly when I started. Wow, yeah. I think I started -- I think I started on like July 6 of 2016, so that makes total sense that we were over there at that time. Q. And -- and -- oh, as a matter of fact, it's here. I know you -- let's see. Were you at that facility, going off of – A. Yes. Q. All right. A. I think there was two of them -- two of them at that time right there.")

Zarlengo 215:2-11, EX. 2 (testifying that Exhibit 53 is Midwest Dock's Facebook Page)

Zarlengo 220:5-19, EX. 2 ("Q. And then if you turn the page, do you see where it says, we are hiring? A. Yes. Q. Is -- is that a picture of a building that Midwest did? A. It is, yes. Q. And where is this building? A. Lockport. Q. And what is this building? A. It's a distribution center. It was a stock distribution center. Q. Was this on Gougar Road? A. Yes. Q. Was this a Krusinski building? A. Yes.")

Zarlengo 225:17-228:7, EX. 2 (testifying the work was performed by Dock & Door for the Heritage Crossing project for Krusinski Construction Company)

Zarlengo 226:10-226:18, EX. 2 ("Q. All right. And if you turn to the next page, this is one -- the screenshot of one of the pages from Midwest Dock Solutions Facebook page. Do you see that? A. Yes. Q. And are those photographs of the ML Realty Heritage Crossing No. 8 project? A. Yes.")

Zarlengo 234:22-235:13; 236:21-24, EX. 2 (testifying that the following photograph in a post dated July 26, 2014 was taken at the Heritage Crossing project where the workers were being paid through Dock & Door: ("Q. And if you turn to the next page in that exhibit, it says Midwest Dock Solutions, July 26, 2016. Do you see that?



A. Yes. Q. And it's another post by Mike Richert, and it says Midwest Dock Solutions is in Lockport, Illinois. Do you see that? A. Yes. Q. July 26, 2016, correct? A. Yes. Q. All right. Is that the Heritage Crossing building? A. One of them, yes…. Q. Would this work have been work performed by employees paid through Dock & Door? A. Yes.")

Krusinski Construction Company Cover Letter, Jun. 11, 2014, Subcontract Agreement, Midwest Dock Solutions, Inc. Certificates of Insurance, Compstak Webpage, Midwest Dock Solutions, Inc. Facebook Page, and GoogleMaps Images of 14907 Gougar Road at p.35, (Group Exhibit 104), EX. 13

**STATEMENT OF FACT NO. 15:**

Midwest Dock's website also features a photograph of the Heritage Crossing project.  Directly under the photograph it states "Midwest Dock Solutions specializes in the services, supply & installation of loading dock equipment and overhead doors. … We offer a free quote or consultation on any new project."



Midwest Dock's website photograph is an excerpt of the same photograph as shown on Midwest Dock's Facebook page—the excerpt of the Facebook page photograph used on the website is shown by the red rectangle:



**SUPPORT FOR STATEMENT OF FACT NO. 15:**

*See* Support for Statement of Fact No. 14.

19

Midwest Dock Solutions, Inc. Facebook Page
www.facebook.com/midwestdocksolutions, Oct. 15, 2016, (Exhibit 19), EX. 14

Midwest Dock Solutions, Inc.'s Website www.midwestdocksolutions.com at p.5, Oct. 15, 2016, (Exhibit 57), EX. 16 ("Products" page photograph)

Krusinski Construction Company Subcontract Agreement with Midwest Dock Solutions, Inc. for ML Realty Heritage Crossing #8 at p.35 (of 37), (Exhibit 104), EX. 13

Zarlengo 240:18-241:2; 243:11-18, EX. 2 ("Q. I'm going to hand you what was previously marked as Exhibit 57. Do you recognize what this is? A. Yeah, a website.  Q. All right. And it's a Midwest Dock Solutions website? A. Correct. Yes. … Q. All right. And do you review and approve what goes on the website? A. Yes. Q. Okay. So you would have reviewed and approved this before it went on, correct? A. Yes.")

Zarlengo 222:6-223:7, EX. 2 ("Q. And this appears to be a letter to you from Krusinski Construction concerning ML Realty Heritage Crossing No. 8, correct? A. Yes. Q. All right. And it looks like Midwest Dock Solutions was awarded that contract, correct? A. Yes. Q. Okay.  And then it refers to a subcontract agreement. Do you see that? A. Yes. Q. And if you turn two pages in, does that look like the subcontract agreement for Heritage Crossing No. 8? A. Yes. Q. All right. And there's pages that have initials on them where it says subcontractor, and it looks likes it's printed AZ. Does that look like your initials? A. It is, yes.")

Zarlengo 227:10-228:7, EX. 2 ("Q. All right. And what was the work that Midwest Dock Solutions did at this location [Heritage Crossing #8]?  A. We did 64 dock levelers, dock seals, and 68 doors. Q. All right. And that's what the entry there that says October 15 says, correct? On the right-hand side of the Facebook page? A. Yes. Q. All right. And you believe that to be accurate, correct? A. Yes. Q. All right. And that would have been done by employees of Midwest Dock Solutions, correct? A. No. Q. And this -- who would this have been done by? A. Dock & Door.")

Zarlengo 229:16-230:20; 231:2-22, EX. 2 (testifying that Midwest Dock's contract with Krusinski Construction Company for the Heritage Crossing project required it to use union workers)

Zarlengo 248:1-249:18, EX. 2 ("Q. And then if you turn to the next page where it says, Products, do you know what -- where that picture came from that's superimposed on the word 'Products'? A. I do not. Q. And if you could turn back to the Facebook page for Midwest Dock Solutions that has the Heritage Crossing building on it -- MR. HUGHES: Go back. Go back. MR. McJESSY: 104. No, 104 will work. THE WITNESS: Okay. BY MR. McJESSY: Q. It's part of Exhibit 104. Do you see that photograph? A. Yes. Q. And do you see the top photograph? A. Yes. Q. Does that look to be the same photograph that's shown as 'Products'? A. Yes. Q. Okay. So that photograph looks to be the Heritage Crossing No. 8 building, correct? A. One of the ones at Heritage Crossing, yes. Q. And

underneath that picture, it says, Midwest Dock Solutions specializes in the service, supply, and installation of loading dock equipment and overhead doors, correct? A. Yes. Q. And, again, it says -- a little further along in that sentence -- we also offer a free quote or consultation on any new project, correct? A. Yes. Q. And the picture above is construction of a new project that you worked on, correct? A. Yes.")

Brutti 42:23-43:20, EX. 3 ("Q. Okay.  So were there jobs that were being bid on at that time? A. I believe there were. Q. Okay.·And you said there were one or two jobs that were really cooking. What did you mean -- A. Yeah, I'm pretty sure we were doing a job at a college in -- oh, Malcolm X College, I believe, is one of my first jobs right off the bat and that, the one we were talking about in the previous deposition in Lockport.·That was a while ago, so I can't remember every job that we were... Q. You mentioned the job that we were talking about in the prior deposition.·Was that the -- A. Heritage Crossing. Q. -- Heritage Crossing? A. Yeah. Q. Okay.·So that was also your recollection one of the early jobs? A. Early, yeah. Q. Okay. And that was one of the jobs that was being considered at the time that you were signing up with the union? A. Yes.")

Zarlengo 225:7-226:18, EX. 2 ("Q. No. Okay. This shows the Heritage Crossing Corporate Center Building 8, and it shows that the property address is 14908 South Gougar Road? Do you see that? A. Yes. … Q. Does that address sound right for this project? A. Yes. Q. All right. And if you turn to the next page, this is one -- the screenshot of one of the pages from Midwest Dock Solutions Facebook page. Do you see that? A. Yes. Q. And are those photographs of the ML Realty Heritage Crossing No. 8 project? A. Yes.")

## STATEMENT OF FACT NO. 16:

The products and manufacturers that Midwest Dock promotes on its website—including Blue Giant brand dock levelers, dock seals, dock shelters, dock lights, dock restraints and steel canopies, Clopay brand overhead doors, Hormann brand high speed doors, Cornell rolling steel doors, Gateway Industrial Products bug barriers, LiftMaster brand overhead door openers—are the same products and manufacturers of products that Dock & Door employees install on jobsites.

### SUPPORT FOR STATEMENT OF FACT NO. 16:

Midwest Dock Solutions, Inc. Website www.midwestdocksolutions.com at pp. 6-12 (Exhibit 57), EX. 16

Midwest Dock Solutions, Inc.'s Website www.midwestdocksolutions.com at pp.6-11, (Exhibit 57), EX. 16 (showing products of Blue Giant, Clopay, Hormann, Gateway Industrial Products, and LiftMaster)

Zarlengo 249:22-255:2, EX. 2 (testifying that Blue Giant brand dock levelers, dock seals, dock shelters, dock lights, dock restraints and steel canopies, Clopay brand overhead doors, Hormann brand high speed doors, Gateway Industrial Products bug barriers,

21

LiftMaster brand overhead door openers as shown on Midwest Dock's website are all products installed by both Midwest Dock's employees and Dock & Door's employees)

Tattini 52:11-54:21, EX. 15 (testifying that while working for Dock & Door he installed the bug barriers, guardrails, Hormann high speed doors, Cornell rolling doors, and Clopay overhead doors advertised on Midwest Dock' website)

Williams 93:8-100:22, EX. 18 (testifying that while working for Dock & Door he installed Clopay overhead doors, high speed rolling doors, and LiftMaster door operators, like those shown on Midwest Dock's website)

Williams 96:11-16, EX. 18 (working for Dock & Door he installed Clopay doors); 97:17-22, 98:4-6 (installed high speed doors); 98:21-99:23 (installed LiftMaster door openers); 100:15-22 (installing bug barriers); 121:11-122:20, 126:18-127:5 (installing dock seals); 128:5-20 (installing dock lights)

### D. Union General Contractors Require The Use Of Union Labor On The Jobsite.

**STATEMENT OF FACT NO. 17:**

General contractors like Krusinski Construction Company, Clayco Construction, Pepper Construction Company, Meridian Design Build, Opus Design Build, Power Construction that build new construction warehouses require their subcontractors who install overhead doors and dock levelers and related accessories to use union labor on the jobsites and many other large general contractors like ARCO/Murray, Morgan/Harbour, and Peak Construction often require their subcontractors to use union labor. So, when Midwest Dock is awarded a contract with a general contractor that requires union labor, Dock & Door employees are used to perform the work.

**SUPPORT FOR STATEMENT OF FACT NO. 17:**

Zarlengo 52:16-55:24, EX. 2 (testifying that some general contractors that Midwest Dock contracts with that always require the use of union workers on their jobsites, such as Krusinski Construction Company, Clayco Construction, Pepper Construction Company, Meridian Design Build, Opus Design Build, Power Construction, and other general contractors sometimes require the use of union workers on their jobsites, such as ARCO/Murray, Morgan/Harbour, and Peak Construction)

Pepper Construction Company: Subcontract Agreement Between Pepper Construction Company and Midwest Dock Solutions, Inc. for North American Warehouse Expansion, Glenview, Illinois at 21, 22, May 15, 2020, (Exhibit 61), EX. 19 ("Union Installations are required for all work performed on the jobsite" and "All clean up shall be performed by union labor as required by the union having jurisdiction")

Declaration of S. Oertley, Senior Contract Specialist, Pepper Construction Company, Nov. 4, 2025 at ¶8, EX. 20 (Pepper Construction Company requires the work on the job sites to be performed by union employers)

Krusinski Construction Company: Subcontract Agreement; Jun. 11, 2014; Midwest Dock Solutions, Inc. for ML Realty Heritage Crossing #8 Project at p.17, (Exhibit 104), EX. 13 ("11.2 ACCEPT ABILITY OF LABOR. All work performed by the Subcontractor under th.is Agreement shall be by appropriate union labor acceptable to the Contractor.")

Meridian Design Build: Subcontract between Meridian Design Build and Midwest Dock Solutions, Inc. for 1303 Jack Court Facility Upgrades, Bartlett, IL, May 28, 2024, (Exhibit 65), EX. 21 ("12. All dock equipment and overhead doors shall be installed by union labor.")

Opus Design Build LLC. Subcontract Agreement between Midwest Dock Solutions, Inc. and Opus Design Build LLC for Mokena Industrial Supply Spec Building A at pp. 9, 11, Dec. 9, 2019, EX. 22 ("'22. Includes all union labor' and 'Subcontractor acknowledges that Contractor is a signator to certain collective bargaining agreements entered into between the Associated General Contractors – Mid-America Regional Bargaining Association and local trade unions.'").

Sugar 96:2-98:5, EX 23 ("Q. Huge congratulations on winning Project Nexus Elwood in Elwood, Illinois. Thank you for your cooperation through a long bidding process. Do you see that? A. Yes. Q. And then if you continue down, it looks like the information that's there is information for the project you were bidding on, correct? A. Yes. Q. Okay. And if you go to the last page, it says -- at the very top of it -- paragraph A says, all labor is to be performed by union laborers, correct? A. Yes. Q. Right. So this is a project that Midwest Dock was bidding on, correct? A. Yes. Q. All right. So the union laborers that it's going to use on this project are the employees who are paid through Dock & Door, correct? A. correct. Q. Okay. Is it unusual to get contracts where the company is requiring labor to be performed by union laborers? A. I wouldn't say unusual. Q. Okay. That's sometimes a requirement of the contracts? A. Yes. Q. And is that particularly true of the large general contractors that we were talking about? A. Yes. Q. Okay. And Midwest Dock regularly bids work that requires union labor? A. Yes. Q. Okay. And although this says union laborers -- and I know that the laborers union is a particular union -- you understand that this means like union carpenters doing carpentry work, union electricians doing electrical work, that sort of thing, correct? A. Correct.")

## STATEMENT OF FACT NO. 18:

Midwest Dock's employees also work on job sites where Dock & Door employees work, including making adjustments to doors, bringing materials to the job sites, and staging overhead doors. Jane Graham, a Midwest Dock employee, would deliver materials to the job sites for Dock & Door employees. Zachery Torkelsen, another Midwest Dock employee, testified that he and other Midwest Dock employees would go with Tony Brutti to union jobsites to deliver and stage materials (*i.e.*, "We would just stage them in the general area of where they would -- like if

there was twenty-five doors on the northwest side of the building, we would put twenty-five doors on one side. You know, we would spread them out to set the guys up at the union to do the work."). Corrigan, who worked for both Midwest Dock and Dock & Door, testified that when he worked for Midwest Dock he would go to Dock & Door jobsites to adjust doors after they were installed.

**SUPPORT FOR STATEMENT OF FACT NO. 18:**

Williams: 53:5-13; 56:13-57:1, EX. 18 (testifying that Janie from Midwest Dock would bring things to the jobsite)

Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Interrogatory No. 1, (Exhibit 40), EX. 24 (identifying Jane Graham, Torkelsen, and Corrigan as employees of Midwest Dock)

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, Interrogatory No. 1, (Exhibit 221), EX. 25 (identifying Corrigan as an employee of Midwest Dock)

Torkelsen 42:6-18, EX. 26 ("Q. And are you familiar with A. company called Dock & Door Install? A. Yes. Q. Okay. And how are you familiar with that company? A. That was the union side of Midwest Dock. Q. And what do you mean by that? A. There was A. side that was union and A. side that was non-union. The non-union would do repairs and new installs on pre-existing buildings. And the union side would do the installs of new construction of warehouses.")

Torkelsen 54:18-55:11, EX. 26 ("Q. When you were sent to new construction jobsites like you see on Exhibit 19 [Heritage Crossing project] there to do the offloading and staging of the material as you described, who would send you to the location to do that? A. Generally we would get the -- the order would come from Tony. Q. Zarlengo? A. Zarlengo, yes. Q. Okay. He would tell you where to go and what to do? A. Yes. Q. Okay. A. And that would be told to, I believe, Anthony Brutti who would be -- when we did the offloads, Anthony Brutti is who, I guess, the lead would be in our group. It would generally be me, Anthony Brutti. Janie Graham would go. And they may have one other person there, depending on who's in the area, if they needed extra. help. Q. So it would be like four people? A. Yes. Q. And Tony Brutti would be one of the people who would be there? A. Correct. Yes.")

Torkelsen 92:16-18, EX. 26 ("Q. You did do offloading and staging at Dock & Door jobsites, correct, at union jobsites? A. Yes.")

Torkelsen 51:18-54:10, EX. 26 ("Q. Now, what is your understanding of the nature of the work that the union side did? A. The union side, to the best of my knowledge, would do installations of newly built warehouses. Q. Like -- A. Like that was on the picture of the Blue Giant that you had showed me in the previous thing. Q. Okay. Let me show you

24

what was previously marked as Exhibit 19 [Heritage Crossing]. Do you see the picture on the right there? A. Yes. Q. Is that the kind of building you're talking about? A. Yes. Newly constructed buildings like this. Q. And have you ever been on jobsites where workers were doing this kind of installation work? A. Have I physically been there? Q. Yes. A. Yes. Q. And what kind of work did you do? And you were on jobsites like this when you were working for Midwest Dock, is that right? A. Correct. Yes. Q. Okay. And what kind of work did you do? A. It would be just to drop off material or anything that the union guys would need. I would do no kind of work as far as any -- you know, any work with tools on union jobs, I didn't do anything with that. It would just be delivery of products. You know, something happened, A. couple pieces got damaged. I would go to -- I can't remember what it was called, but it was the store for door parts. Q. And would you do -- would you also unload items at the jobsite? A. Yes. At these kind of buildings? Q. Yes. A. Yes. Q. Okay. And would it be like unloading like overhead doors and things like that that are going to be installed there? A. Correct. Yes. Q. All right. Any other kind of products that you would unload at these kind of jobsites? A. Docks. I mean, doors, docks, the pads. Anything that you would see in the picture could be in the truck. Q. And those would be the kind of things you would unload at the jobsite? A. Yes. For the new builds it would be sometimes where it would be just the shell of the building that's put up and it would be dirt floor. So just A. completely brand new building. Q. And where would you put things then? A. We would just stage them in the general area of where they would -- like if there was twenty-five doors on the northwest side of the building, we would put twenty-five doors on one side. You know, we would spread them out to set the guys up at the union to do the work. Q. Okay. And would other Midwest Dock employees do the same kind of work? A. Yes.")

Williams 53:2-24, EX. 18 ("Q. And the service people, did you mention -- did you identify them to me or -- A. Really, there was only one that I remember. And that was because she was the only female service worker, and that's Janie --Q. Okay. A. -- or Jane. Q. Did she work on any jobs with you? A. She would do like delivery. So she had to drop off material, but that was about it. A. Travis, I want to say. Travis is a -- a service guy. He has worked on jobs with me. Q. Okay. And what kind of work would he do on jobs with you? A. If they would send him out, it was probably welding, I believe. Q. Okay. He was a welder? A. Yes.")

Williams 59:4-21, EX. 18 ("Q. Did he [Ryan Mead] work at any of the job locations where you worked, as far as you recall? A. He may have been in one, possibly. But I mostly knew Travis to be the one who come out. Q. To do the service work? A. Right, or to weld. Q. To do the welding? A. Yeah. He should have been doing the service work. But they would send him out to weld, too. Q. All right. And then you mentioned – and that was Travis Woff? A. I believe so. I believe that was his last name.")

Williams 191:23-192:15, EX. 18 ("Q. And the guys who did service did service only? A. They were supposed to. But some of them started -- weren't union guys, and they was coming to do union work, like welding. Q. And where did you learn that from? A. Talking to Collin and learning the relationships of others and what they did for work. Q. What did Collin say, as far as nonunion guys doing union work? A. So -- so seeing

certain guys come onto a job site -- well, I mean, I didn't know he was union. And then he was like, no, he was on the service side. But then I talked to the dude, and he was like, you know, I'm here to weld and get up out of here.")

Williams 56:13-18, EX. 18 ("Q What kind of materials did he and Jane bring to the work site? A. So they would bring the actual dock doors, springs and shafts. Q. Anything else? A. Maybe like welding, welding material.")

Corrigan 205:20-206:7, EX. 7 ("Q. When you worked for Midwest Dock during the first time, did you go -- are you saying that you went to logistic big box new construction install jobs and worked? A. I believe so. Q. And what did you do? A. Maybe some small adjustments on doors. Q. Okay. So a repair to the -- to the job needed to be done after the install had been done? A. Yes.")

Green 84:16-86:14, EX. 12 ("Q. How about would anybody show up to deliver tools or supplies, anybody from either Midwest Dock or Dock & Door? A. Yes. Q. And tell me about that. A. If you need a -- need some type of supply, screws, anchors, anything of that sort, I would call Ira, and he would have somebody deliver something. Q. Okay. If the shipment's missing something that you didn't get and you need it to install whatever it is you're doing, you'd call the office, and they would send somebody out with it? A. Yes. Q. Okay. And does it still work that way? A. Yes. Q. Okay. And you'd still call Ira and say, hey, I need whatever fasteners, and he'd send somebody out with them? A. Yes. … Q. Okay. Can you -- can you give me some examples of people who have brought stuff to you at job sites in the last five years? A. Janie. Tony -- Tony Brutti. I think, Josh. I've seen Josh drop something off. I don't know his last name. Alphabetical order would be -- Q. The last names are alphabetical. A. Oh, all right. Q. Oh, there's a Joshua Sichterman, number 67. A. Yeah. I think that's it.")

### E. Dock & Door Was Formed A Month After Krusinski Construction Notified Midwest Dock It Was Awarded The Heritage Crossing Project.

**STATEMENT OF FACT NO. 19:**

Dock & Door was formed on July 11, 2014 with Tony Brutti as the sole owner and officer so that Midwest Dock could bid for installation of overhead doors, dock levelers, and related products with general contractors building new construction logistics buildings and warehouses and avoid becoming signatory to the collective bargaining agreement with the Union. Tony Zarlengo testified as follows regarding the formation of Dock & Door:

> we [*i.e.*, Tony Zarlengo and Michael Richert] saw an opportunity in an area to get in new construction. And as a nonunion company, Midwest Dock Solutions, we couldn't do the installation of the equipment. So we were looking for ideas of -- you know, a subcontractor to do the installation work, union work, and so we -- we reached out to Tony Brutti to see if he'd be interested in starting up a subcontracting company. And that's how it got formed.

Midwest Dock could have signed an agreement with the union to become a union contractor but it did not want to be bound by the collective bargaining agreement for work performed by its employees.

**SUPPORT FOR STATEMENT OF FACT NO. 19:**

Articles of Incorporation of Dock & Door Install, Inc., Jul. 11, 2014, (Exhibit 214), EX. 27

Brutti 19:11-22, EX. 3 (testifying that he is and always has been the sole owner, officer, and director of Dock & Door)

Brutti 22:2-14, EX. 3 ("Q. All right. Now, you were here for Mr. Zarlengo's testimony; correct? A. Yes. Q. And you heard him say that he and Mr. Richert had approached you about starting a company to provide union labor so that Midwest Dock Solutions could bid on jobs; correct? … A. Sort of, yeah. Me and Michael talked more about it beforehand, and then later on when we got very serious about it, yeah, obviously, Tony was involved in talks.")

Zarlengo 289:10-290:3, EX. 2 (" Q. What do you know about the decision to start Dock & Door? A. So Dock & Door, I guess you'd say -- in, you know, the 2015 range -- we saw an opportunity in an area to get in new construction. And as a nonunion company, Midwest Dock Solutions, we couldn't do the installation of the equipment. So we were looking for ideas of -- you know, a subcontractor to do the installation work, union work, and so we -- we reached out to Tony Brutti to see if he'd be interested in starting up a subcontracting company. And that's how it got formed. You know, Mike Richert had knowledge of this kind of stuff knowing that, you know, he worked as a subcontractor in his past. You know, there's a lot of other nonunion dock and door companies out there who sub out their union installation work. And so we wanted to start selling new construction work, and that's how Dock & Door got founded. Q. Okay. So it was -- Midwest Dock wanted to try to take advantage of this -- this new type of business. Is that fair? A. Yes. … Q. And so did you and Mr. Richert approach Mr. Brutti with the proposal? A. Yes. Q. Okay. A. I wouldn't say it was a proposal. We talked to him about it and to see his interest, gauge his interest. We didn't give him a proposal and say, oh, we're going to pay you this much money. Like it wasn't like that. It was, you know, would you be interested in owning a union subcontracting company. It wasn't a proposal like, okay, we're going to pay you this much money to start a company.")

Zarlengo 289:23-290:14, EX. 2 ("Q. Midwest Dock wanted to try to take advantage of this -- this new type of business. Is that fair? A. Yes. Q. Okay. And you said you couldn't do the installation of the equipment. Why not? A. Midwest Dock is not union. All of the employees are nonunion. Q. Okay. Well, Midwest Dock could have signed an agreement and become union, correct? A. Yes. But we were more of a service company with service employees who knew how to do service work –")

27

Zarlengo 77:4-78:9, EX. 2 ("Q. Did you understand -- do you understand that Midwest Dock Solutions, by signing the one job site agreement, had to pay fringe benefit contributions on the workers who worked on the Winpak Portion Packaging Center? A. Yes. Q. And did you understand that if you would have signed up with the union generally that you would have had to pay fringe benefit contributions on any carpenters working for Midwest Dock Solutions? MR. HUGHES: Objection. Competency. Foundation. Competency. BY MR. McJESSY: Q. You can answer. A. Yes. Q. Okay. And a lot of the work that Midwest Dock Solutions did didn't require union labor, correct, at this time? A. Correct. Q. In fact, most of it didn't require union labor, correct? A. Basically all of it, yes, correct. Q. Okay. So you wouldn't want to be bound to pay union obligations and fringe benefit contributions for all of that work, correct? A. For the service work, no.")

## STATEMENT OF FACT NO. 20:

Prior to starting Dock & Door, Tony Brutti had no training in the trades, no training as a carpenter, and was not capable of doing overhead door installation work himself. Brutti graduated from Eastern Illinois University in 2007 with a degree in education and spent some time student teaching and substitute teaching in approximately 2008. Since 2006 through the date of his deposition in this case in 2025, Brutti has also been employed in the retail automotive parts business part time during the entire past 20 years as either a driver, a counterman, or an assistant manager at Carquest Auto Parts, Lincoln Plaza Auto Parts (which became NAPA Auto Parts), and he currently works at Lang's Auto Parts. From 2009 to 2015 he also worked full time at Interstate Truck and Trailer Repair as a manager from 2009 until 2015.

### SUPPORT FOR STATEMENT OF FACT NO. 20:

Brutti 10:8-11, EX. 3 ("Q. Okay. Have you received any training in the trades, like, you know, plumber, electrician, carpenter, that kind of thing? A. No.")

Brutti 15:25-18:4; 21:14-21, EX. 3 ("Q. All right. And prior to 2014, other than the four days over Christmas [in 2006 or 2007] that you described for me working for Midwest Dock Solutions, did you have any other experience in the dock and door industry? A. No. Q. Any other experience that would be similar to work in dock and door industry? A. No.")

Brutti 7:19-22; 8:4-11; 8:24-9:3; 10-20-24; 11:2-15, EX. 3 (testifying that he graduated in 2007 with a degree in education from Eastern Illinois University, that he spent some time student teaching and substitute teaching, that he worked in the automotive parts industry, that he worked for Carquest Auto Parts, and that he has no training as a carpenter)

Brutti 11:16-20; 12:20-24, EX. 3 (testifying that he worked for Carquest Auto Parts as a counterman and driver while he was in college, he worked at Lincoln Plaza Auto which later became NAPA Auto Parts as a counterman for approximately 20 years through 2024, he worked full time as a manager with Interstate Truck & Trailer from 2009 through 2015.

28

Brutti 13:1-14:9, EX. 3 (testifying that he continued working for Lincoln Plaza Auto Part part-time on weekends and occasionally on weekdays until it became NAPA Auto Parts and then he continued working for NAPA Auto Parts until 2024)

Brutti 19:23-20:7; 20:20-22; 21:8-9, EX. 3 (testifying that in 2024, he left NAPA Auto Parts and went to work for Lang's Auto Parts working on Saturdays and occasionally during the week)

**STATEMENT OF FACT NO. 21:**

Tony Brutti is also a competitive race car driver. He started racing in 2003 and continues to race cars competitively through today, racing approximately 10 times per year from March through October which consumes approximately 20 to 25 hours a week of his time. His racing activities generate purse money and sponsorship money, from sponsors such as McDonalds Corporation. Brutti's race cars carry a "Midwest Dock Solutions" branding promotional decal on it across the hood, but his race cars do not carry any "Dock & Door Install" branding or promotional decal of any sort:



(Exhibit 118)

**SUPPORT FOR STATEMENT OF FACT NO. 21:**

Brutti 11:23-12:4; 12:18-19, EX. 3

Brutti 12:11-14, EX. 3

Brutti 99:3-17; 100:9-10; 101:7-10; 101:21-25, EX. 3 (testifying that his race cars have a sponsorship logo for "Midwest Dock Solutions" on them but no logo for Dock & Door)

Brutti 103:5-11; 103:18-104:1, EX. 3 (testifying that from March to October he spends 20 to 25 hours a week on his racing program)

Zarlengo 359:12-19, EX. 2 ("Q. Do you know anything about how Midwest Dock's name came to be on his car? A. I'm going to assume he asked me if you'd like to sponsor the

race. Whether I, you know, sponsored and gave him money or didn't or if he asked if I can shoot the logo, I don't know the answer.")

Photograph of Brutti race car, (Exhibit 118), EX. 28

## STATEMENT OF FACT NO. 22:

After Dock & Door was formed, Tony Brutti submitted an application to the Union and then signed the collective bargaining agreement with the union on behalf of Dock & Door and Dock & Door reaffirmed its agreement with the union in 2019. The agreements bind Dock & Door to the terms of the trust agreements establishing the Trust Funds, and to the rules and regulations adopted by the trustees of the Trust Funds. Dock & Door is still bound by to its agreement with the union.

### SUPPORT FOR STATEMENT OF FACT NO. 22:

Dock & Door Install, Inc. Answer at ¶¶11-13, [ECF#17], (Exhibit 265), EX. 29

Memorandum of Agreement between Dock & Door Install, Inc. and the Chicago Regional Council of Carpenters, Sep. 18, 2014, (Exhibit 219), EX. 30

Memorandum of Agreement between Dock & Door Install, Inc. and the Chicago Regional Council of Carpenters, Aug. 15, 2019, EX. 31

Brutti ¶¶44:24-45:25; 47:21, EX. 3 (testifying he signed the agreement with the Union and that it is still in effect)

Dock & Door Install Inc. Employer Questionnaire / Application to Chicago Regional Council of Carpenters, Aug. 5, 2014, (Exhibit 218), EX. 37

Brutti 37:15-23, EX. 3 (Q. … I will hand you Exhibit 218.·So you have the questionnaire that's Exhibit 218 in front of you; correct? A. Correct. Q. And is this the questionnaire that you referred to that you filled out when you went to meet with somebody at the union? A. Yes.")

## STATEMENT OF FACT NO. 23:

Dock & Door does not sign any contracts with the general contractors for the projects where employees paid through Dock & Door work, and there are no written contracts between Midwest Dock and Dock & Door for the work performed by Dock & Door. Midwest Dock enters into the contracts with the general contractors like ARCO/Murray, Clayco, Krusinski Construction, Meridian Design Build, Morgan Harbour Construction, Opus Design Build, Peak Construction, Pepper Construction, and Principle Construction, and then union member employees paid through Dock & Door work on the job sites installing overhead doors dock levelers, and related products. Midwest Dock does not use any other "union" company to perform the installation work on projects with general contractors. Tony Brutti testified that he does not get the contracts

between Midwest Dock and the general contractors, does not look at the contracts, and he does not maintain a record of the projects that Dock & Door employees have worked on:

> Q.    Okay. You never looked at the contracts, you said, between Midwest Dock Solutions and the general contractors; correct?
> A.    I did not.
> Q.    Okay. So you also don't know the terms of those contracts; is that correct?
> A     I would not.")
> Q.    Okay. And do you get copies of those contracts or is it --
> A.    I do not.
> …
> Q.    Okay. Do you have a list of exactly how many projects Dock & Door has done for each of those general contractors?
> A.    I don't.
> Q.    Okay. You don't maintain any record that would show that?
> A.    No.

## SUPPORT FOR STATEMENT OF FACT NO. 23:

Brutti 68:2-23, 160:6-12; EX. 3 ("Q.·Okay. Now, Dock & Door also performs new installations; correct? A.·Correct. Q.·And installations in new structures; correct?·A.·Correct. Q.·Describe for me the work that you would say Dock & Door principally does. A.·Principally, it definitely does new construction where I believe that in the contract it says union labor is required.·Q.·Okay.·And do you get copies of those contracts or is it ---A.·I do not.·Q.·Okay. So those are contracts that Midwest Dock Solutions has with its customers? A.·Yes.·Q.·Would you refer to them as clients? Customers?·How would you refer to them?·A.·Yeah, clients, yeah.·Q.·Okay. So those are contracts that Midwest Dock Solutions has with its clients? A.·Yes.")

Brutti 160:6-12, EX. 3 ("Q.·Okay. Do you have a list of exactly how many projects Dock & Door has done for each of those general contractors? A.·I don't. Q.·Okay. You don't maintain any record that would show that? A. No.")

Brutti 69:7-71:12, EX. 3 ("Q. Sir, I've handed you what's previously marked in this case as Exhibit 65.· And it's a contract or subcontract, rather, between Midwest Dock Solutions and Meridian Design Build; do you see that? A. I do. Q. All right. And if you turn in this document to the page, it's page 3 of Exhibit B, which it says up here (indicating). A. I'm there. Q. Okay. Page 3 of Exhibit B.·It's got a highlighted paragraph 12; do you see that? And paragraph 12 says: 'All dock equipment and overhead doors shall be installed by union labor.' Do you see that? [Objection] Q. So if this is a contract between Midwest Dock and Meridian Design Build requiring union labor, would Dock & Door provide the labor for that project? [Objection,] A. They would. … Q. Okay. But if Midwest Dock contracted to perform the work in this contract with Meridian Design Build and it required union labor, Dock & Door would have been the company to provide that union labor; correct? A. Correct. Q. Okay. To your knowledge, does Midwest Dock

31

<u>Solutions use any other company to provide union labor on its job sites? A. Not that I'm aware."</u>)

Brutti 150:23-152:3, EX. 3 ("Q. Okay. All right.·Dock & Door employees work on job sites for large general contractors; correct? A. Correct. Q. And that was for ARCO/Murray, Clayco, Krusinski Construction, Meridian Design Build, Morgan Harbour Construction, Opus Design Build, Peak Construction, Pepper Construction, and Principle Construction; correct? A. Yes. Q. Okay. Do you know what a certificate of insurance is? A. Yes. Q. All right. And what's a certificate of insurance? A. I believe it's just proof that you have insurance, if I'm not mistaken. Q. And are you aware that the general contractors require a certificate of insurance for subcontractors to get on to their job sites? A. Not always. I mean, I'm not aware, no. Q. Okay. A. Not always. Q. Are you aware that that's sometimes the case? A. I am. Q. <u>Okay. You never looked at the contracts, you said, between Midwest Dock Solutions and the general contractors; correct?</u> A. <u>I did not.</u> Q. <u>Okay. So you also don't know the terms of those contracts; is that correct?</u> A. <u>I would not."</u>)

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' Document Requests, Request No. 53, EX. 32 ("53. Produce all contracts or agreements between Dock & Door on the one hand and Midwest Dock on the other hand. <u>RESPONSE: There are no documents that are responsive to this Request No. 53</u>.")

Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Document Request No. 52 (Exhibit 40), EX. 24 ("52. Produce all contracts or agreements between Midwest Dock on the one hand and Dock & Door on the other hand. **RESPONSE:** Midwest Dock objects to this Request on the grounds it is vague and ambiguous regarding the terms "contracts or agreements." <u>Subject to and without waiving this objection, none.</u>")

## <u>STATEMENT OF FACT NO. 24:</u>

Approximately 50% to 55% of Midwest Dock's revenue comes from new construction work that is bid by Midwest Dock and then the work is performed by employees paid through Dock & Door. For example, in 2022 Midwest Dock had revenue of approximately $20 million. Tony Zarlengo testified as follows:

> Q.     You seem to be -- there are two issues, or you seem to be referencing two things, the revenue, and if I understand correctly, the revenue to Midwest Dock Solutions. About 50 to 55 percent of that comes from new construction work, correct?
> A.     Correct.
> Q.     And that would be work that would -- if I understand your position on how the arrangement works -- would be work performed by employees paid through Dock & Door, correct?
> A.     Correct

**SUPPORT FOR STATEMENT OF FACT NO. 24:**

Zarlengo 200:24-201:12; 203:4-8; 205;14-20, EX. 2 ("Q. You seem to be -- there are two issues, or you seem to be referencing two things, the revenue, and if I understand correctly, the revenue to Midwest Dock Solutions. About 50 to 55 percent of that comes from new construction work, correct? A. Correct. Q. And that would be work that would -- if I understand your position on how the arrangement works -- would be work performed by employees paid through Dock & Door, correct? A. Correct. … Q. All right. And that percentage, the 50 to 55 percent, has that been fairly consistent over, maybe, the last five years? A. Five years, yes. … Q. Does that -- and I have the -- I mean, I can show you your tax return for 2022. We'll mark this later. But I think the tax return shows revenue of that year of how much? The first line. A. Twenty million, yeah, five twenty-four.")

**F. The Funds To Start Dock & Door Came From Midwest Dock.**

**STATEMENT OF FACT NO. 25:**

The start-up funds for Dock & Door came from Tony Zarlengo and Michael Richert and were recorded in Dock & Door's accounting records as a loan from J.D. Brutti, Brutti's father, in order to make it appear that Dock & Door and Midwest Dock are as separate as possible.  Brutti sent his accountant Callie Stephens at Gineris & Associates, Ltd. a text message on January 14, 2024 informing her that the loan recorded in Dock & Door's general ledger as "loan from J.D. Brutti" was actually the start-up money from Richert and Zarlengo for Dock & Door and that it was recorded in Dock & Door's general ledger as a loan from J.D. Brutti because they wanted to keep the two businesses as separate as possible.  The money was not a loan from J.D. Brutti.  The text message exchange between Stephens and Brutti was as follows:



**SUPPORT FOR STATEMENT OF FACT NO. 25:**

Text Message Exchange Between Callie Stephens (Gineris & Associates) and Tony Brutti (Dock & Door) (Exhibit 106), EX. 33

Brutti 204:22-205:21, EX. 3 ("Q. I'm going to show you what was previously marked as Exhibit 107 -- I'm sorry, 106.·And it's a text message exchange between you and Callie

Stephens at Gineris. Can you read to me the exchange that's circled. A. Yeah. So Callie is saying: 'Hey, Tony, we have a loan from J.D. Brutti on the books since the company's inception. Do you know about this?'·And I said yeah, I didn't know the details of it, but I had seen it in -- Just read your response into the record, please. A. 'Yeah, it's the original start-up money from Mike and Tony back when I first started.·I think they wanted to keep the two businesses as separate as possible, so they just put my dad's name on it.' Q. Were you lying to Callie when you said that? A. No. Q. Okay. That's what you believed at the time you wrote that; right? A. I – Q. Is that what you believed when you wrote that? [Objection] A. Yeah, it was,·if you want to call it start-up money, okay.·It would be the first couple of weeks of pay that would be needed for the business. Q. <u>Okay. You referred to it as start-up money; right?</u> A. <u>I did. I was probably being vague at the time.</u> … Q. <u>All right. You said: "It's the original start-up money from Mike and Tony back when I first started;" correct?</u> A. <u>Correct.</u> Q. <u>All right. And this is a text message you sent to Callie; correct?</u> A. <u>Correct.</u> Q. <u>But it wasn't a loan from your father; correct?</u> A. <u>No, it was definitely not a loan from my father.</u>")

## G. Type/Scope Of Work Dock & Door Performs: Dock & Door Does Services Work And Take Down And Replace.

## STATEMENT OF FACT NO. 26:

Employees paid through Dock & Door perform installation of loading dock equipment and overhead doors and dock levelers, and related products including those shown on Midwest Dock's website on union jobsites pursuant to contracts that Midwest Dock has with its clients. Dock & Door also performs service work and retrofit work as well as installation of dock leveler, overhead doors, and related products at new construction buildings and existing buildings.  The work performed by Dock & Door does not require different skills than the work performed by Midwest Dock.

### SUPPORT FOR STATEMENT OF FACT NO. 26:

Defendant, Dock & Door Install, Inc.'s Answer To Plaintiffs' Complaint at ¶18, [ECF#17], (Exhibit 265), EX. 29

Brutti 40:20-41:5, EX. 3 (testifying that Dock & Door's application to the Union described its work as installation of loading dock equipment and doors.)

Brutti 68:2-17, EX. 3 ("Q. Okay. Now, Dock & Door also performs new installations; correct? A. Correct. Q. And installations in new structures; correct? A. Correct. Q. Describe for me the work that you would say Dock & Door principally does. A. Principally, it definitely does new construction where I believe that in the contract it says union labor is required. Q. Okay. And do you get copies of those contracts or is it -- A. I do not. Q. Okay. So those are contracts that Midwest Dock Solutions has with its customers? A. Yes.")

Brutti 65:18-25, EX. 3 ("Q. All right. What is service work? A. Service work they generally refer to as just repair work. It's kind of all-encompassing on fixing and swapping out panels and hinges and rollers and springs and any other parts that might be needed. Q. Okay. Is that work that Dock & Door does? A. Dock & Door will on a rare occasion do some service work when it's he really slow.")

Brutti 67:13-68:1, EX. 3 (testifying that invoices from Dock & Door to Midwest Dock for "Service Work" are for repairing overhead doors--*e.g.*, "Q. Okay. But Service Work would mean to you what you just described to me when I asked you what Service Work meant? A. Yes.")

Dock & Door Install, Inc. Invoices to Midwest Dock Solutions, Inc. (Exhibit 223), EX. 34, (sampling of invoices showing "service work")

Williams 133:22-134:16, EX. 18 (testifying that he performed retrofit work while working for Dock & Door Install—*e.g.*, "Q. Okay. What was the Woodfield Mall? A. We went there to install like four new dock doors that were old…. So we would take down the old ones and put up new ones at the Woodfield Mall. Q. Oh, I see. So this wasn't a new construction project? A. No. Q. Okay. You were replacing old doors with new ones? A. Correct. Q. Okay. Was that work that you also did? A. Yes.")

Email from Tony Brutti, Dock & Door, to Tom Downs, Holden Insurance, Jul. 1, 2025, (Exhibit 151), EX. 35 (stating "We [Dock & Door Install] mostly do work at precast concrete storage warehouses but occasionally do work at manufacturing facilities and small businesses.")

Tattini 51:17-52:7, EX. 15 (Anthony Tattini who was only employed by Dock & Door which he knew by the name Midwest Dock testified as follows: "Q. So you and he did dock work together? A. In the beginning, yes. Q. Installation of dock levelers? A. Yes. Q. All right. Tell me, what kind – what kind of work did you do when you were working? A. For Midwest Dock? Q. Yeah. A. Strictly -- 90 percent of the time -- strictly installs. Q. Of what? A. Installs of overhead doors, rolling steel doors, high-speed doors, loading docks. That's pretty much it.")

Tattini 85:3-17, EX. 15 ("Q. All right. Did you also do installations on older buildings? A. Yes, sir. Q. All right. And would the installations involve taking out old stuff and putting in new stuff? A. Yes, sir. Q. All right. And that was part of the work you did -- A. Yes, sir. Q. -- for Dock & Door? A. Yes, sir.")

Cruikshank 31:18-32:14, EX. 8 ("Q. The Dock & Door didn't do any door replacement, correct? A. No. Q. Okay. That was all new construction buildings? A. Yeah. For -- for the most part, yes. Q. Okay. And is the installation of a new garage door, tracks, opener, for -- for a new construction building essentially the same work as the installation of a new door, tracks, and opener in an old building once you've taken out the old door? A. Yes. Q. Okay. Basically, you're using the same skills? A. Yes. Q. All right. A. Same tools. Same skill.")

35

Cruikshank 41:4-42:11, EX. 8 (testifying that there was no difference between a Midwest Dock job and a Dock & Door job: "Q. … Once you started being paid by Dock & Door and you went out to a project, how do you know it's a Dock & Door project and not a project that Midwest Dock Solutions sold and contracted for? A. I wouldn't have a way of knowing that. Q. Okay. A. It's -- I mean, it's just -- I mean, when you were working for Dock & Door, you were going to companies that -- like Krusinski and -- you know, if it was a big Krusinski job, you knew it was a union job. There was no -- no debating that. Q. It required union labor to be on the job? A. Yes. Q. Okay. So if it required -- basically, if it required union labor, then it had to be a Dock & Door job? A. Yes. Q. Okay.")

Corrigan 196:12-20, EX. 7 ("Q. That type of work is different than installation of doors and docks and new construction, correct? A. Yes. I mean, after you get the old -- after you get the old door or dock out, they're installed the exact same. But starting off -- as far as the new construction, you know -- obviously, you don't have to take anything down.")

Corrigan 200:17-201:1, EX. 7 ("Q. Would you say the installs done on – for Midwest Dock are different, then, in that regard from the installs for Dock & Door? A. For the most part. You, obviously, need to take the -- you know, cut the old stuff out. As far as putting the new stuff in, as long as you don't have any obstacles, everything is the same, so –")

## STATEMENT OF FACT NO. 27:

Employees paid through Dock & Door performed work for a contract between Meridian Design Build, Inc. and Midwest Dock at the 1303 Jack Court Facility Upgrade project in Bartlett, Illinois, including installing Z guards, removing and reinstalling dock seals and dock levelers, and installing Clopay overhead doors. These are products that Midwest Dock sells and this is the same work that Midwest Dock's employees can and do perform. The work was only performed by employees paid through Dock & Door because the contract required the use of union labor.

### SUPPORT FOR STATEMENT OF FACT NO. 27:

Zarlengo 159:9-162:5, EX. 2 ("Q. And the first paragraph [of Exhibit 65, Exhibit B Overhead Doors] says, subcontractor shall remove one -- one existing nine by ten door and one twelve by fourteen foot drive-in door, including associated track, springs, and operator. Do you see that? A. Yes. Q. All right. So -- so this is retrofit work, correct? A. Yes. That's retrofit work. Q. All right. And is this work that Dock & Door did? A. Yes. Q. Okay. And it says, subcontractor shall furnish and install Z guards at nine dock positions. What are Z guards? A. They protect the door track from getting hit by forklifts. Q. Okay. A. They're 48 inches tall, and they're just metal that protects the door tracks from getting hit. Q. Okay. And are those products that Midwest Dock sells? A. Yes. Q. And are they products that Midwest Dock employees install? A. Yes. Q. All right. And it also says, paragraph four, subcontractor shall remove dock leveler and dock seal from existing dock position and reinstall at new dock position. Do you see that? A. Yes. All right. What does that work describe? A. Torching the dock out, taking it out of the pit, and applying the

dock seal and -- taking the anchors out of the dock seal and taking it down. Q. Okay. And that's work that Dock & Door did on this contract? A. Yes. Q. Okay. But Midwest Dock Solutions, does it also do that kind of work? A. Yes. Q. And if you go down to paragraph 12, paragraph 12 says, all dock equipment and overhead doors shall be installed by union labor, correct? A. Yes. Q. All right. So this was one of those contracts that required union workers on the job site? A. Yes. Q. So the work in this contract is work that could be done by Midwest Dock Solutions, correct, except for the fact that it requires union labor? A. Yes.")

Brutti 69:7-70:5; 71:3-12, EX. 3 ("Q. Sir, I've handed you what's previously marked in this case as Exhibit 65. And it's a contract or subcontract, rather, between Midwest Dock Solutions and Meridian Design Build; do you see that? A. I do. Q. All right. And if you turn in this document to the page, it's page 3 of Exhibit B, which it says up here (indicating). A. I'm there. Q. Okay. Page 3 of Exhibit B. It's got a highlighted paragraph 12; do you see that? And paragraph 12 says:· 'All dock equipment and overhead doors shall be installed by union labor.' Do you see that?  MR. HUGHES: I'm going to object to the use of this exhibit with this witness. He's not a party to this, and no foundation, lack of competence. BY MR. McJESSY: Q. So if this is a contract between Midwest Dock Page 70 and Meridian Design Build requiring union labor, would Dock & Door provide the labor for that project? MR. HUGHES: Objection, foundation. BY THE WITNESS: A. They would. … Q. Okay. But if Midwest Dock contracted to perform the work in this contract with Meridian Design Build and it required union labor, Dock & Door would have been the company to provide that union labor; correct? A. Correct. Q. Okay. To your knowledge, does Midwest Dock Solutions use any other company to provide union labor on its job sites? A. Not that I'm aware.")

Brutti 72:2-21, EX. 3 ("Q. And it says in paragraph 1:· 'Subcontractor shall remove 1 (one) existing 9 foot by 10 foot dock door and 1 (one) 12 foot by 14 foot Drive-in door, including associated tracks, springs, and operator;' do you see that? A. I do. Q. Okay. So that's a take-down two existing doors; correct? A. Yes. Q. And the operators and the tracks and the springs; correct? A. Correct. Q. All right. And then it says in paragraph 2: 'Subcontractor shall furnish and install 1 21 foot by 16 foot overhead door and drive-in ramp.'· Do you see that? I do. Q. 'Door to be Clopay Model 3720,' and then it goes on from there and talks about a 3 inch vertical track, weather seal and operator; correct? A. Correct.")

Brutti 71:3-73:9, EX. 3 (testifying that Dock & Door provided the workers who performed the take-down-and-replace retrofit work for the contract between Midwest Dock and Meridian Design Build for the Jack Court Facility Upgrades project—*e.g.*, "Q. Okay. But if Midwest Dock contracted to perform the work in this contract with Meridian Design Build and it required union labor, Dock & Door would have been the company to provide that union labor; correct? A. Correct.")

Brutti 73:22-75:10, EX. 3 (testifying that when Midwest Dock contracted to provide overhead door installation work and dock leveler installation work at existing businesses, such as manufacturing facilities and small businesses that were not new construction but

the work required union labor, employees paid through Dock & Door Install would perform that work)

### H. Common Vendors.

#### 1. Common Vendors: Legal, Lawrence Kamin Saunders & Uhlenhop, LLC.

__STATEMENT OF FACT NO. 28:__

Tony Brutti hired the law firm of Lawrence Kamin Saunders & Uhlenhop, LLC at the recommendation of Tony Zarlengo and Michael Richert because Lawrence Kamin Saunders & Uhlenhop, LLC is also Midwest Dock's attorney.  Brutti hired Midwest Dock's attorney as his "general attorney" to help him form Dock & Door and that firm prepared and arranged for the filing of the papers to incorporate Dock & Door, and filed Dock & Door's Annual Reports

__SUPPORT FOR STATEMENT OF FACT NO. 28:__

Brutti 28:11-29:2, EX. 3 ("Q. And you describe -- I'm going to refer, the law firm is Lawrence, Kamin, Saunders & Uhlenhop, U H L E N H O P; correct? A. Correct. Q. But you refer to them as Lawrence Kamin; is that fair? A. Yeah. Q. And did you know Thomas Bennington, Jr.? He's the attorney who signed this letter. Did you know him at this time? A. No, that was when I met him. Q. Okay. How did you come to meet him? A. I knew that we needed a lawyer to do the Articles.·And I asked Tony and Mike or I think I asked probably Tony, 'Who would you recommend I use?' And he said 'Well, use Lawrence Kamin. They can do that for you.' Q. Okay. So you were aware at this time that he represented them? A. Yes.")

Brutti 24:12-29:14, EX. 3 (hired to act as general attorney and filed Articles of Incorporation), EX. 3

Brutti 29:15-30:21; 31:10-33:16, EX. 3 (prepared and filed Annual Reports); 33:17-34:24 (registered agent services)

Brutti 26:18-28:10, EX. 3 (Brutti, Zarlengo, and Richert all signed the engagement letter from Lawrence Kamin Saunders & Uhlenhop, LLC when Brutti hired that law firm to form Dock & Door)

Zarlengo 313:6-314:17, EX. 2 (testifying that Lawrence Kamin Saunders & Uhlenhop, LLC is Midwest Dock's attorney)

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, Interrogatory No. 5, (Exhibit 221), EX. 25

Defendant Midwest Dock Solutions, Inc.'s Answer And Defenses To Plaintiffs' Complaint at ¶31, [ECF#18], (Exhibit 120), EX. 9 ("Defendant Midwest Dock admits

38

that it utilizes Lawrence Kamin Saunders & Uhlenhop, LLC from time to time for certain legal services")

Letter from Thomas Bennington, Jr. (Lawrence Kamin Saunders & Uhlenhop, LLC) to Anthony Zarlengo, Michael Richert, and Anthony Brutti, Jul. 9, 2014, (Exhibit 215), EX. 36, (engagement letter)

## STATEMENT OF FACT NO. 29:

When Tony Brutti hired Lawrence Kamin Saunders & Uhlenhop, LLC, the firm sent a conflict letter to Brutti, Tony Zarlengo, and Michael Richert advising them that the firm represented Midwest Dock and Zarlengo in various matters, that it was being engaged by Brutti to start Dock & Door, and that a potential for a conflict of interest could exist between them in the event of any litigation against the companies.

### SUPPORT FOR STATEMENT OF FACT NO. 29:

Letter from Thomas Bennington, Jr. (Lawrence Kamin Saunders & Uhlenhop, LLC) to Anthony Zarlengo, Michael Richert, and Anthony Brutti, Jul. 9, 2014, (Exhibit 215), EX. 36

2. **Common Vendors: Insurance, Esser Hayes And Assured Partners And Then Holden Insurance Agency.**

## STATEMENT OF FACT NO. 30:

When Dock & Door was formed, Tony Brutti used Esser Hayes Insurance Company as its insurance agent at the recommendation of Tony Zarlengo or Michael Richert because it was also Midwest Dock's insurance agent. Esser Hayes subsequently became Assured Partners which continued to be the insurance agent for Dock & Door and Midwest Dock providing them with the same insurance services. After Midwest Dock changed its insurance agent to Holden Insurance Agency, Dock & Door also moved its insurance business to Holden Insurance Agency based on Zarlengo's recommendation and both companies have the same account executive which provides the same services to both companies.

### SUPPORT FOR STATEMENT OF FACT NO. 30:

Brutti 40:6-14, EX. 3 (testifying that Dock & Door hired Esser Hayes Insurance Company as its insurance agency at Zarlengo's and Richert's recommendation—*e.g*., "Q. And were you aware that Esser Hayes was the insurance agency also for Midwest Dock Solutions? A. Yes. Q. And did Tony or Mike refer you to them? A. They did.")

Brutti 147:11-148:7, EX. 3 (testifying that Dock & Door used Esser Hayes Insurance Agency which then became Assured Partners at Zarlengo's recommendation)

Brutti 149:10-23, EX. 3 ("Q. Why did you switch to Holden Insurance? A. My general liability rates were going to go up 86 percent.·And I said well, I'm going to have to shop. So I asked -- I asked Tony if he recommended a different insurance agency, not necessarily to switch insurances, but just to get to get a price and to say 'This is where I'd like you to be.'·So I contacted Holden and got their quote, and it was about $12,000 or $15,000 cheaper than Assured and I showed it to them, and they said okay.·So it didn't really work out like I planned. So I switched to Holden. Q. Okay. So you contacted Holden at Tony Zarlengo's recommendation? A. I did, yeah.")

Zarlengo 285:19-2861; 308:2-313:1, EX. 2 (testifying that Midwest Dock used the Esser Hayes Insurance Agency which then became Assured Partners, and then Midwest Dock moved to Holden Insurance)

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, Interrogatory No. 5, (Exhibit 221), EX. 25, (insurance agent is Rose Couch of Assured Partners formerly Esser Hayes)

O'Connor (Assured Partners) 74:17-7 ("Q. So all of the same work that it provided to Dock & Door was also provided to Midwest Dock Solutions, correct? A. Yes. Q. Do you know who Assured Partners contact was for Dock & Door? A. Tony Brutti, I believe, is how you say his last name. Q. Anybody else? A. No. Q. And who was Assured Partners' contact for Midwest Dock? A. Tony Brutti as well. Q. Tony Brutti as well? A. Yes.")

Olson (Holden Insurance) 21:4-17, 32:1-6, EX. 125 ("Q. All right. How were you chosen to be the designee for Holden Insurance for this deposition? A. I'm the account executive for Midwest Dock Solutions. Q. Who is the account executive for Dock & Door? A. Myself. Q. So you're the account executive for both Midwest Dock Solutions and Dock & Door? A. Yes…. Q. Are you the one who is principally responsible for preparing the Certificates of Insurance for the Midwest Dock account? A. Yes. Q. And is the same true for Dock & Door now? A. Yes.")

Olson (Holden Insurance) 44:15-23, EX. 125 ("Q. What services does Holden Insurance provide to Dock & Door? A. Marketing, certificates, handling of claims, answering coverage questions, providing policies. Q. All right. So Holden provides the same services to Midwest Dock Solutions that it provides to Dock & Door, is that correct? A. Yes.")

### 3. Common Vendors: Cincinnati Insurance, ICW Group, And Liberty Mutual.

## STATEMENT OF FACT NO. 31:

Dock & Door and Midwest Dock have the same insurance companies. Dock & Door has been insured through Cincinnati Insurance, ICW Group, and Liberty Mutual. Likewise, Midwest Dock has been insured through Cincinnati Insurance, ICW Group, and Liberty Insurance.

**SUPPORT FOR STATEMENT OF FACT NO. 31:**

Brutti 150:3-16, EX. 3 ("Q. Who actually are you insured by? A. ICW. Q. Okay. And were you insured by somebody else before them for workers' comp? A. Yeah. Q. Do you remember who? A. First Cincinnati, then BerkleyNet. Q. And how about for general liability? A. Cincinnati and -- oh, shoot, what is it called now?·It's not ICW, it's -- I can't remember the name of the company now. Q. Is it Liberty Insurance? A. It is Liberty. I could see the little mascot guy on the paper.")

Zarlengo 285:10-286:1, EX. 2 ("A. MD Marketing, marketing. Gineris & Associates are accountants. Koru Consulting, HR work. Lawrence Kamin, attorneys. ADP, bank roll. Media Monkey, consultant work, Amundsen Davis, attorneys. Liberty Mutual, general liability. State Farm, auto insurance. ICW Group, they're our workmen's comp. Cincinnati Insurance, general liability. Holden Insurance is our insurance agent.")

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, Interrogatory No. 5, (Exhibit 221), EX. 25 (Cincinnati Insurance for general liability insurance)

Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Interrogatory No. 2, (Exhibit 40), EX. 24, (Cincinnati Insurance, ICW Group, Liberty Mutual Insurance)

Olson (Holden Insurance) 58:1-59:5, EX. 125 ("Q. And do you know who the workers' comp carrier is for Midwest Dock Solutions? A. Yes. Q. Who is it? A. ICW. Q. And do you know who the workers' comp carrier is for Dock & Door? A. Yes. Q. Who is it? A. ICW. Q. And who's the commercial general liability insurance carrier for Midwest Dock Solutions? A. Liberty Mutual. Q. And who is the commercial general liability carrier for Dock & Door? A. Liberty Mutual. Q. And who's the umbrella carrier for Midwest Dock Solutions? A. Liberty Mutual. Q. And who is the umbrella coverage for Dock & Door? A. Liberty Mutual. Q. And who is the employment practices carrier for Midwest Dock Solutions? A. Liberty Mutual. Q. And who is the employment practices carrier for Dock & Door? A. Liberty Mutual.")

Olson (Holden Insurance) 60:14-62:4, EX. 125 ("Q. Okay. How about in this instance with Dock & Door, were you responsible at all for obtaining insurance quotes or for assisting Mr. Downs in obtaining insurance quotes? A. Yes. Q. And did you use this information that was provided by Mr. Brutti to do that? A. Yes. Q. Is it your understanding that Midwest Dock Solutions provides similar work? A. Yes.")

### 4. Common Vendors: Midwest Bank And ADP Payroll.

**STATEMENT OF FACT NO. 32:**

Midwest Dock and Dock & Door signed agreements with ADP Payroll Service on the same day—*i.e.,* October 6, 2016—agreeing to use ADP as a payroll service provider and both

applications identified First Midwest Bank which subsequently became Old National Bank as each company's bank, both applications identified each company's address as 1249 E. Burville Road, Crete, Illinois.

**SUPPORT FOR STATEMENT OF FACT NO. 32:**

Defendant Midwest Dock Solutions, Inc.'s Answer And Defenses To Plaintiffs' Complaint at ¶30, [ECF#18], (Exhibit 120), EX. 9 ("Defendant Midwest Dock admits that it utilizes First Midwest Bank for banking services.")

Brutti 39:24-40:1, EX. 3 (testifying that Dock & Door banks at First Midwest Bank)

Brutti 175:18-20, EX. 3 ("Q. Okay. And do you have any reason to think -- and ADP is Dock & Door's payroll provider; correct? A. Correct.")

Zarlengo 285:10-286:1, EX. 2 ("A. MD Marketing, marketing. Gineris & Associates are accountants. Koru Consulting, HR work. Lawrence Kamin, attorneys. ADP, bank roll. Media Monkey, consultant work….Amundsen Davis, attorneys. Liberty Mutual, general liability. State Farm, auto insurance. ICW Group, they're our workmen's comp. Cincinnati Insurance, general liability. Holden Insurance is our insurance agent.")

Dock & Door Install Inc. Employer Questionnaire / Application to Chicago Regional Council of Carpenters at p.1, Aug. 5, 2024, (Exhibit 218), EX. 37

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, Interrogatory Nos. 4, 5 (Exhibit 221), EX. 25 (ADP Payroll Service and First Midwest Bank/Old National Bank)

Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Interrogatory Nos. 2, 4, 6 (Exhibit 40), EX. 24 (ADP used for payroll services and maintained accounts at First Midwest Bank/Old National Bank)

ADP Client Account Agreement and Authorization to Debit/Credit for Midwest Dock Solutions, Inc. at pp. 1-2, Oct. 6, 2016, EX. 38

ADP Client Account Agreement and Authorization to Debit/Credit for Dock & Door at pp. 1-2, Oct. 6, 2016, EX. 39

**5. Common Vendors: Midwest Bank And ADP Payroll.**

**STATEMENT OF FACT NO. 33:**

Tony Brutti hired the accounting firm of Gineris & Associates at the recommendation of Tony Zarlengo and Michael Richert because it was also Midwest Dock's accountant. Gineris handles Midwest Dock's and Dock & Door's business taxes, it handles both companies' payrolls, and it

maintains both companies' general ledgers. In responding to the Trust Funds' document production requests, both Midwest Dock and Dock & Door responded to numerous requests that the documents would be produced by Gineris. Midwest Dock and Dock & Door also both use Xero accounting software.

**SUPPORT FOR STATEMENT OF FACT NO. 33:**

Brutti 61:15-62:13, EX. 3 ("Q. Okay. Now, when Dock & Door started out, its accountant was Gineris & Associates; correct? A. Correct. Q. Still Gineris & Associates? A. It is. Q. So it's always been -- strike that.·Has Gineris always been Dock & Door's accountant? A. It has. Q. Okay. And how did you come to hire Gineris to act as Dock & Door's accountant? A. I took the advice of Tony and Michael. Q. Okay. They recommended him? A. Yeah. I did not know any accountants. Q. And who is your primary contact at Gineris? A. I'll usually talk to Callie Stephens. Q. Okay. And do they also prepare your personal taxes? A. They do. Q. And they prepare your business taxes? A. They do. Q. What other work do they handle for Dock & Door? A. The payroll, and I believe they just maintain the general ledger, if you want to call it that.")

Zarlengo 305:7-307:4, EX. 2 (testifying that Gineris & Associates, Ltd. was Midwest Dock's accountant from the beginning and that it performs all work not performed in-house by Webber, including preparation of all of the taxes corporate and individually, ADP payroll, maintaining the general ledger, daily ledger balance, financials, and monthly balance sheet)

Stephens (Gineris & Associates) 40:10-24, EX. 62 ("Q. And how about what does the bookkeeping staff do for Midwest Dock Solutions? A. For Midwest Dock our bookkeeping staff reconciles transactions in the bank that Sherry hasn't handled. They reconcile the payroll as it comes in from ADP, and then we review it to make sure that everything is coded properly. Q. And what does your bookkeeping staff do for Dock & Door? A. We reconcile transactions that Anthony hasn't taken care of and, again, reconciling the payroll with the transactions from the bank and then review it for coding errors. Q. So the same work? A. Yep.")

Stephens (Gineris & Associates) 46:2-8, EX. 62 (Q. And now among the documents that Gineris produced in this case were general ledgers for Midwest Dock Solutions and Dock & Door, correct? A. Yes. Q. Are you responsible for maintaining the general ledgers for those companies? A. Yes.")

Stephens (Gineris & Associates) 54:21-55:3, EX. 62 ("Q. All right. And do you get the same information for both Midwest Dock Solutions and Dock & Door? A. Yes. Q. And is it imported into their general ledger accounts the same way? A. Yes.")

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, Interrogatory No. 5, (Exhibit 221), EX. 25 ("Accountant, Bookkeeper, Tax Preparer Gineris & Associates")

Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Interrogatory No. 2, (Exhibit 40), EX. 24 (Gineris & Associates for accounting and tax services)

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' Document Requests, Request Nos. 1-9, 18-23, 25, 26, 29, 31, 33, 35, 56-60, 67, 70-82, 84, 89, EX. 32 (responding that documents available for inspection and copying at Gineris & Associates, Ltd.)

Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Request Nos. 1-10, 12-25, 27, 29, 31-33, 35, 36, 39, 40, 42-44, 46, 48, 53, 54, 57-60, 63-66, 69-80, 87, (Exhibit 40), EX. 24 (responding that documents available for inspection and copying at Gineris & Associates, Ltd.)

Defendant Midwest Dock Solutions, Inc.'s Answer And Defenses To Plaintiffs' Complaint at ¶29, [ECF #18], (Exhibit 120), EX. 9

Brutti 166:18-169:12, EX. 3 (describing use of Xero software which is also used by Midwest Dock to prepare daily invoices for hours worked by each employee)

Webber 104:5-106:23, EX. 63 (testifying about her use of Xero software at Midwest Dock to import the invoices prepared and sent to her by Brutti)

## III. Midwest Dock's And Dock & Door's Interrelated Operations.

### A. Midwest Dock Provides The General Contractors With Certificates Of Insurance Where Dock & Door's Employees Work--Dock & Door Does Not.

## STATEMENT OF FACT NO. 34:

General contractors require that subcontractors working on the general contractor's job sites provide certificates of insurance ("COI") naming the general contractor as an additional insured on the subcontractor's insurance policy before the subcontractor's employees are allowed on a jobsite. Any subcontractor that does not provide the general contractor with a certificate of insurance is not allowed to have its employees on the jobsite. Tony Zarlengo acknowledged that general contractors take this requirement very seriously.

### SUPPORT FOR STATEMENT OF FACT NO. 34:

Zarlengo 124:125:17, EX. 2 ("Q. For these new construction contracts with large general contractors like Pepper Construction, are those insurance requirements fairly standard, that you have to have a Certificate of Insurance on file before you can begin work? A. Yes. … Q. Now, the Certificate of Insurance provisions that you get typically requires that you list the general contractor as an additional insured on your policy, correct? A. Yes. Q. Is that something that's just part and parcel of getting the Certificate of Insurance

issued, or is that something that you do separate from getting the insurance certificate issued? Do you understand my question? Do you understand my question? A. Yeah. They -- they put – my insurance agents adds all of that on the COI.")

Zarlengo 145:18-155:23, EX. 2 ("Q. The contract [with Principle Construction Exhibit 64] says, under subsection A, services and acknowledgements provided by the subcontractor to obtain, maintain, and pay for such insurance as may be required by the general contract, rider A attached hereto or by law. To furnish the contractor satisfactory evidence that subcontractor has complied with this paragraph. Do you see that? A. Yes. Q. And, again, that's the standard sort of sub -- Certificate of Insurance language that's in pretty much all of these general contractor/subcontract agreements for a new contract -- or new door installation, correct? A. Correct. Q. And if you turn to the next page -- well, let me ask you. Would Midwest Dock Solutions' employees have performed the work on this project? A. No. Q. Who would have? A. Dock & Door Install employees.")

Zarlengo 137:5-10, EX. 2 ("Q. Is that a -- a requirement you take pretty seriously [to provide a COI]? A. Yes. Q. And is that because the general contractors take it pretty seriously? A. Very seriously.")

Declaration of S. Oertley, Senior Contract Specialist, Pepper Construction Company, Nov. 4, 2025 at ¶¶9-10, EX. 20 (testifying that any company working on a Pepper Construction job site must provide Pepper Construction with a certificate of insurance)

Pepper Construction Company: Subcontract Agreement Between Pepper Construction Company and Midwest Dock Solutions Inc. for North American Warehouse Expansion, Glenview, Illinois, May 15, 2020, (Exhibit 61), EX. 19 ("A COPY OF SUBCONTRACTOR'S UP-TO-DATE INSURANCE CERTIFICATE MUST BE ON FILE WITH PEPPER's SUPERINTENDENT AT THE JOB SITE BEFORE WORK CAN BE STARTED. PLEASE REFER TO ARTICLE 10 AND EXHIBIT C FPR FURTHER INSTRUCTIONS.") (emphasis in original)

Krusinski Construction Company: Subcontract Agreement; Jun. 11, 2014; Midwest Dock Solutions, Inc. for ML Realty Heritage Crossing #8 project, (Exhibit 104), EX. 13 ("13.2.2 CERTIFICATES. Prior to starting the Work and within ten (10) days after execution of the Subcontract Agreement or notice or award, the Subcontractor shall furnish to the Contractor, certificates of insurance from itself and all its subcontractors with additional insured endorsement attached, indicating all required coverages, and also indicating the deductibles on all policies. The Work at the site shall not be started and no payment on the Subcontract Agreement shall be made until all insurance certificates have been delivered to and accepted by the Contractor.")

Clayco Inc.: Subcontract Agreement Between Clayco, Inc. and Midwest Dock Solutions, Inc. for Project Bluepoint, Pleasant Prairie, WI, Jun. 10, 2019, (Exhibit 99), EX. 40 ("B. Certificates of insurance showing required coverage to be in force shall be filed with Contractor prior to commencement of the Subcontract Work, and no payments shall be made to Subcontractor until such time as Subcontractor provides Contractor with a valid

certificate of insurance for its coverage and for compliant coverage of its tiered subcontractors.")

Meridian Design Build: Subcontract between Meridian Design Build and Midwest Dock Solutions, Inc. for 1303 Jack Court Facility Upgrades, Bartlett, IL, May 28, 2024, (Exhibit 65), EX. 21 ("6) Subcontractor shall obtain, maintain and pay for such insurance as may be required by law, the Contract Documents, or any exhibit or rider attached hereto, and shall furnish the Contractor satisfactory evidence that it has complied with this paragraph prior to commencing any portion of the Work; and shall obtain and furnish to the Contractor an undertaking by the insurance company issuing each such policy that such policy will not be canceled except after at least thirty (30) days written notice to the Contractor of its intention to so do.")

Opus Design Build LLC: Subcontract Agreement between Midwest Dock Solutions Inc. and Opus Design Build LLC for the Euclid Beverage Expansion Project, Mar. 26, 2024, EX. 41 ("EVIDENCE OF INSURANCE COVERAGE. Fully compliant and complete certificates of insurance (clearly indicating all required additional insured, primary and non-contributory, notice of cancellation and non-renewal, and waiver of subrogation endorsements) for the Applicable Insurance must be uploaded to Contractor's third-party insurance compliance vendor software platform prior to (i) Subcontractor starting the Subcontract Work on the Project Site….")

ARCO/Murray Construction Company: Subcontract Agreement between Midwest Dock Solutions, Inc. and ARCO/Murray National Construction Company, Inc. at p.1, Feb. 27, 2023, EX. 42 ("Contracts will not be considered executed if your Certificate of Insurance is not submitted at the time of signature!")

## STATEMENT OF FACT NO. 35:

For the period from January 1, 2020 through December 31, 2024, Dock & Door obtained no certificates of insurance for projects where employees paid through Dock & Door worked on the job sites for contracts between Midwest Dock and large general contractors, such as Pepper Construction Company, Krusinski Construction Company, Opus Design Build LLC, Meridian Design Build LLC, ARCO/Murray Construction Company, and Principle Construction Corp. For example, Midwest Dock obtained 18 COI's to Pepper and Dock & Door obtained none; Midwest Dock obtained 24 COIs to Krusinski and Dock & Door obtained 1; Midwest Dock obtained 18 COI's to Opus and Dock & Door obtained none; and Midwest Dock obtained 23 COI's to Meridian and Dock & Door obtained 1; Midwest Dock obtained 95 COI's for ARCO/Murray and Dock & Door obtained none; and, Midwest Dock obtained 49 COI's to Principle and Dock & Door obtained none. Shawna Oertley, Pepper Construction's Senior Contract Specialist testified in her declaration:

> According to Pepper's records, Pepper received the required Certificates of Insurance from Midwest Dock for the Subcontract Agreements above. Copies of the Certificates of Insurance listing Pepper as a certificate holder are attached as group Exhibit 4. Under the Subcontract Agreements, Midwest Dock's employees

were permitted to work on the jobsites. Pepper did not locate any Certificate of Insurance from Dock & Door and, therefore, under the Subcontract Agreements, Dock & Door's employees were not permitted to work on the jobsites.

**SUPPORT FOR STATEMENT OF FACT NO. 35:**

Declaration of S. Oertley, Senior Contract Specialist, Pepper Construction Company at ¶¶9-10, Nov. 4, 2025, EX. 20

Sugar 86:12-87:15, EX. 23 ("Q. Now, the -- the labor on these projects is for the -- is provided by the guys who are paid through Dock & Door, correct? A. Yeah. Dock & Door provides the labor for those jobs, yes. Q. Okay. So -- and you're providing a Certificate of Insurance for Midwest Dock Solutions, correct? A. Correct.")

Sugar 105:4-106:15, EX. 23 ("Q. Okay. And, in fact, below that, there's another highlighted section that says a copy of subcontractor's up-to-date insurance certificate must be on file with Pepper's superintendent at the job site before work can be started. Please see article ten in Exhibit C for further instructions. Do you see that? A. Yes. Q. Okay. Do you know, is that also a fairly common provision, that the -- the work can't proceed at the job site before the certificate of service -- strike that. Do you know, is that a fairly common provision, that work cannot proceed at the job site unless the Certificate of Insurance is submitted? A. Yes. Q. Okay. And then if I remember earlier, you described that was one of your functions, was to get that Certificate of Insurance on file, correct? A. Yes. Q. All right. And you would have done that -- or somebody at Midwest Dock would have provided the Certificates of Insurance for Midwest Dock on this job, correct? A. Yes. Q. Okay. Would you have provided a Certificate of Insurance for Dock & Door? A. No. I wouldn't have done that.")

Brutti 152:4-14, EX. 3 ("Q. Okay. From January of 2020 to the present, who was responsible for obtaining certificates of insurance on behalf of Dock & Door for the projects that its employees worked on? A. I believe -- like a person's name? Q. Well, who at Dock & Door was responsible -- A. Oh, I'm sorry, me, yeah. I thought you meant the agency. Q. Oh, no, I meant like who at Dock & Door would be responsible for getting the certificate of insurance? A. Me.")

Brutti 153:5-156:1, EX. 3 (testifying that Holden Insurance had issued no certificates of insurance for Dock & Door as of October 9, 2025 and that from January 1, 2020 to the date of his deposition there may have only been 26 certificates of insurance that were issued on behalf of Dock & Door)

Brutti 156:4-157:2, EX. 3 ("Q. … And I hand you what's been marked as Exhibit 259, which are -- MR. HUGHES: Object to foundation. BY MR. McJESSY: Q. -- which are the Certificates of Insurance that were produced to us by Assured Partners for Midwest Dock Solutions and ARCO/Murray projects. Do you see that the name on the bottom is ARCO/Murray? A. Correct, yes. Q. And since 2020, Dock & Door has done quite a number of projects for ARCO/Murray; correct? A. Correct. Q. Okay. And you have, for

Dock & Door there is one Certificate of Insurance that was issued in March of 2025.·
And for Midwest Dock Solutions there is, I'll represent to you, 94 Certificates of
Insurance for projects that are ARCO/Murray projects. Would Dock & Door have
provided the labor on those projects? A. I would have to read through this, but I'm sure
some of these. Q. Okay.·Has provided labor on a lot of ARCO/Murray projects; correct?
A. Correct.")

Brutti 158:21-160:5, EX. 3 ("Q. I've handed you what is marked as Exhibit 260, and I'll
represent to you that those are Certificates of Insurance produced by Assured Partners
that were issued on behalf of Midwest Dock Solutions to Pepper Construction; do you see
that? A. I do. Q. And Dock & Door provided the labor for the work that was performed
on those projects that are referred to there in the description of where it says Description?
A. Yeah, probably. Q. You did work for Pepper Construction? A. I have, yeah. Q. On a
number of projects? A. I have. Q. Okay. And to your knowledge, did Dock & Door
provide Certificates of Insurance for those projects? A. I don't recall. Q. All right. Fair to
say Dock & Door has done work on a significant number of projects for Krusinski
Construction? A. It is. Q. And for Meridian Design Build same thing? A. It is. Q. And for
Morgan Harbour Construction same thing? A. Yes. Q. And for Opus Design Build same
thing? A. Yes. Q. Okay. And for Peak Construction same thing? A. Yes. Q. And for
Pepper Construction same thing? A. Yes. Q. And for Principle Construction same thing?
A. Yes.")

Brutti 153:19-156:1, EX. 3 (testifying that from January 2020 through the present Dock
& Door may have only obtained 26 certificates of insurance for its work—*e.g*., "Q. All
right. Well, I guess my question is does the volume, does the number of them-- A. Oh. Q.
-- look like the approximate number of Certificates of Insurance that -- A. Yeah, yeah, I
would say so. Q. Okay. You think you probably over the last five years maybe asked for
26 Certificates of Insurance to be issued? A. Yeah, that's -- I feel like there could be some
more, but I guess that might be true. Q. Okay. You don't think that there were like
hundreds of them, for example? A. No, no.")

O'Connor (Assured Partners) 35:20-36:4; 49:1-50:18; 68:21-69:4, EX. 113 (testifying
that the number of certificates of insurance produced by Assured Partners for Dock &
Door for the period from January 1, 2020 to the date of the subpoena was 26—*e.g*., "Q.
And -- now, do you know offhand approximately how many certificates of insurance
you've provided for -- provided in  response to the subpoena for Dock & Door? A.
Offhand, I do not know. Q. Okay. If I told you the number was 26, does that sound about
right? A. Yes.")

O'Connor (Assured Partners) 35:20-36:4; 49:1-50:18; 68:21-69:4, EX. 113 (testifying
that the number of certificates of insurance produced by Assured Partners for Midwest
Dock (for contractors such as Pepper Construction Company, Meridian Design Build,
Krusinski Construction Company, Clayco, Opus Design Build, Peak Construction, and
Morgan/Harbour Construction) for just 2020 and part of 2021 was nearly 800—*e.g*., "Q.
And -- now, do you know offhand approximately how many certificates of insurance
you've provided for--provided in response to the subpoena for Dock & Door? A. Offhand,

I do not know. Q. Okay. If I told you the number was 26 does that sound about right? A. Yes."… Q. All right. Well, you would agree with me, at the very least, that there are hundreds of certificates of insurance produced for Midwest Dock Solutions -- if not 800, certainly getting close to that number -- during 2020 and part of 2021, correct? A. Yes.")

Email from Mara Spring, Counsel for Holden Insurance, to Kevin McJessy, Plaintiffs' Counsel, Oct. 6, 2025, (Exhibit 253), EX. 124 ("As of today there have been none [no certificates] issued for Dock & Door.")

Midwest Dock Solutions, Inc. Certificates of Insurance to Krusinski Construction Company, (Exhibit 280), EX. 47

Dock & Door Install, Inc. Certificates of Insurance to Krusinski Construction Company, (Exhibit 256), EX. 44

Midwest Dock Solutions, Inc. Certificates of Insurance to Opus Design Build LLC, (Exhibit 282), EX. 48

Midwest Dock Solutions, Inc. Certificates of Insurance to Meridian Design Build LLC, (Exhibit 279), EX. 49

Dock & Door Install, Inc. Certificates of Insurance to Meridian Design Build LLC, (Exhibit 257), EX. 45

Midwest Dock Solutions, Inc. Certificates of Insurance to ARCO/Murray LLC, (Exhibit 259), EX. 50

Dock & Door Install, Inc. Certificates of Insurance to ARCO/Murray LLC, (Exhibit 254), EX. 51 (dated March 20, 2025, after this lawsuit was filed)

Midwest Dock Solutions, Inc. Certificates of Insurance to Principle Construction Company, Inc., (Exhibit 284), EX. 52

**B. Midwest Dock Did Not Inform General Contractors That Dock & Door Would Perform The Work.**

**STATEMENT OF FACT NO. 36:**

The contracts that Midwest Dock signed with various general contractors—such as Pepper Construction, Krusinski Construction Company, Clayco, Inc., Meridian Design Build LLC, ARCO/Murray, Principle Construction—prohibit subcontracting the work to another company without their prior written consent, and Midwest Dock did not disclose to the general contractors that Dock & Door would perform the contracted-for work.

**SUPPORT FOR STATEMENT OF FACT NO. 36:**

Zarlengo 156:1-12, EX. 2 ("Q. And if you look at the second page of this document [Exhibit 64 contract between Principle Construction and Midwest Dock Solutions], paragraph 11 says, not to assign or sublet this subcontract or any part thereof and not to assign any money due or to become due hereunder without first obtaining the written consent of contractor. Do you see that? A. Yes. Q. Did Midwest Dock Solutions get the written consent of Principal Construction to have Dock & Door do this work? A. No.")

Standard Form of Subcontract Agreement Between Principal Construction Corp. and Midwest Dock Solutions, Inc. for work at General RV Showroom, Huntley, IL, Jan. 25, 2021, (Exhibit 64), EX. 53 ("A. SERVICES & ACKNOWLEDGMENTS PROVIDED BY THE SUBCONTRACTOR…11. Not to assign or sub-let this Subcontract or any part thereof and not to assign any money due or to become due hereunder without first obtaining the written consent of the Contractor.")

Zarlengo 128:12-23, EX. 2 ("Q. And do you see that -- do you see paragraph 22 there? A. Yes. Q. And it refers to sub-subcontractors. Do you see that? A. Yes. Q. And it says, subcontractor agrees not to sub-subcontract more than five percent of this subcontract agreement without the written consent of Pepper. For all proposed sub-subcontractors in excess of five percent, subcontractor shall furnish Pepper an AIA document A-305 or equal subcontractor's qualification statement not less than five business days prior to the final execution of any sub-subcontractor agreement. Do you see that? A. Yes. Q. Did I read that right? A. Yes. MR. HUGHES: Kevin, objection. Foundation and competency on this document. BY MR. McJESSY: Q. All right. And do you know, did Midwest Dock Solutions' employees perform the work on this subcontractor agreement? A. No. Q. Okay. Who would have done that? A. Dock & Door Install. Q. Okay. And did Dock & Door -- did Midwest Dock Solutions give Pepper written notice of that? A. No.")

Sugar 110:3-111:4, EX. 23 ("Q. Okay. Did Midwest, do you know, sign a document with Pepper advising it that it was subcontracting more than five percent of this subcontract to any other company? A. I don't know. Q. Okay. Are you aware of whether that ever happened, whether any of the general contractors were notified about the subcontract -- about any subcontracting to Dock & Door? A. No.")

Pepper Construction Company: Subcontract Agreement Between Pepper Construction Company and Midwest Dock Solutions Inc. for North American Warehouse Expansion, Glenview, Illinois, May 15, 2020, (Exhibit 61), EX. 19 ("22. Sub-Subcontractors Subcontractor agrees not to sub-subcontract more than Five Percent (5%) of this Subcontract Agreement without the written consent of PEPPER.")

Declaration of S. Oertley, Senior Contract Specialist, Pepper Construction Company, Nov. 4, 2025 at ¶¶7-8, EX. 20 (testifying that Pepper Construction Company's contracts with Midwest Dock required it to obtain written consent of Pepper if Midwest Dock were going to subcontract more than 5% of the work to another company and Midwest Dock Solutions gave Pepper no such notice)

Zarlengo 162:13-170:21, EX. 2 ("Q. I'm going to hand you what I've marked as Exhibit 99. And this is a subcontract agreement between Midwest Dock Solutions and Clayco, correct? A. Yes. Q. And Clayco, I think you said, is one of those general contractors that requires union labor; is that right? A. Yes…. Q. Okay. If -- let's see. If you look at the Clayco contract and you go to the fourth page, it says here, list of lower-tier subcontractors and supplies and designer, if any. Do you see that? A. Yes. Q. And it says, within five days of execution of this subcontract agreement and prior to payment by contractor on any application for payment defined herein, subcontractor shall complete and return to contractor Exhibit B, list of lower-tier subcontractors and suppliers and designer, if any, identifying all of subcontractors, lower-tier subcontractors and suppliers and designer, if any, that subcontractor intends to use on the project together with any union trade and local with whom subcontractor or its lower-tier subcontractors are affiliated. Did I read that right? A. Yes. Q. And then it says, contact information, friends, including address, phone number, contract -- contact person, and other available information -- shall be provided for each entity identified. Do you see that? A. Yes. Q. And then it says, subcontractor shall not engage a lower-tier subcontractor with an EMR greater or equal to 1.0 without first obtaining the consent in writing of contractor to such engagement. Do you see that? A. Yes. … All right. And if you turn to Exhibit B, which is, maybe, five or six pages from the back of this document, it's a document entitled, Exhibit B, list of lower-tier subcontractors, suppliers, designers. A. Oh, it's five from the back? Q. Yeah. A. I thought five forward. Okay. Q. Do you see that page? A. Yes. … Q. And there's no sub-subcontractor listed there, correct? A. Correct. Q. All right. And it's a form that says, list all of your sub-subcontractors, including contact information, with the actual or estimated dollar value you will pay them for this project, correct? A. Correct. Q. And then if you continue on, there's a page that says list all union trades and locals which you will use on this project. Do you see that? A. Yes. Q. And you list carpenters, correct? A. Yes. Q. All right. And you understand that the people who are doing this work are carpenters, correct? They fall under that trade? A. The people doing the work? Q. Yeah. A. Yes.")

Zarlengo 172:14-176:6, EX. 2 ("Q. Sir, if you could look at Exhibit 100 in front of you there, it – it looks like this is a document produced by Midwest Dock Solutions. Do you see the number on the bottom there? A. Yes. Q. And the first three pages look to be a contract -- or a bid summary or something -- well, strike that. What are the first three pages? Tell me what they are. A. A bid. Q. Okay. It's a bid? A. Yes. Q. A bid that you prepared? A. I did prepare this. … Q. All right. And if you look at the bottom of this, it says union or open shop field labor, question mark. Do you see that? Yes. Q. What is an open shop? A. That is union or nonunion. Q. Okay. So open shop is nonunion? A. Yes. Q. All right. And you circled union, correct? A. Yes. Q. All right. So -- well, did you know, was union -- was union labor required for this project? A. Yes. Q. All right. Who are you bidding on this? Is it -- A. Opus. Q. Opus? Okay. And then if you turn to the next page, the third page, which is labeled four of four on the bid, it says, list any subcontractors to be hired and describe the scope of work and EMR? Do you see that? A. Yes. Q. And there's no nobody listed there, correct? A. Correct. … Q. This work – This was an awarded bid, correct? A. It was an awarded bid. Q. All right. And did Midwest Dock Solutions' employees perform the work on this project? A. No. Q. Okay. Who did? A.

Dock & Door employees. Q. Okay. And is there a reason Dock & Door isn't disclosed on here? A. No.")

Krusinski Construction Company: Subcontract Agreement; Jun. 11, 2014; Midwest Dock Solutions, Inc. for ML Realty Heritage Crossing #8 project (Exhibit 104), EX. 13 ("2.2 ASSIGNMENT. Subcontractor shall not assign this subcontract, or the rights and obligations of this subcontract, to any other entity without the express written consent of Contractor.")

Clayco Inc.: Subcontract Agreement Between Clayco, Inc. and Midwest Dock Solutions, Inc. for Project Bluepoint, Pleasant Prairie, WI, Jun. 10, 2019, (Exhibit 99), EX. 40 ("Subcontractor shall not engage a lower tier subcontractor with an EMR >= 1.0 without first obtaining the consent in writing of Contractor to such engagement. The notification requirements for Exhibit B is intended to include unions, and collective bargaining unit fringe benefit funds for any lower-tier subcontractor utilized by Subcontractor to complete the Subcontract Work.")

Meridian Design Build: Subcontract between Meridian Design Build and Midwest Dock Solutions, Inc. for 1303 Jack Court Facility Upgrades, Bartlett, IL, May 28, 2024, (Exhibit 65), EX. 21 ("Subcontractor ma not assign or sublet this Subcontract Agreement or any art thereof or assign any money due or to become due hereunder without first obtaining the written consent of the Contractor hereto, which consent may be withheld by Contractor in its sole and absolute discretion.")

### C. Dock & Door Is A Captive Entity.

## STATEMENT OF FACT NO. 37:

Tony Brutti admitted in his deposition that Dock & Door has, since it was formed, only ever performed work for Midwest Dock. Since Dock & Door started, its revenue came from solely from Midwest Dock. From 2016 through 2023, Dock & Door was paid each year by Midwest Dock approximately $443,905, $652,445, $813,572, $826,099, $966,443, $935,652, $1,595,662, and $1,633,467 respectively.

### SUPPORT FOR STATEMENT OF FACT NO. 37:

Brutti 52:19-53:12, EX. 3 ("Q. Okay. Now, when Dock & Door started out, all of its revenue came from Midwest Dock Solutions; correct? A. Correct. Q. Okay. And that was the plan when Dock & Door started out; correct? A. Partially. I can go after other work if I want to.·But Midwest would be my 99 percent account, sure. Q. Okay. Well, at least through December 2024, all of Dock & Door's revenue came from Midwest Dock Solutions; correct? A. Correct. Q. Okay. And is that still true today? A. Correct, yes. Q. Okay. All right, so from the time Dock & Door started out until today, all of its revenue comes from Midwest Dock Solutions; correct? A. It does.")

Stephens (Gineris & Associates) 82:12-83:19, 85:1-4, EX. 62 (testifying that all of Dock & Door's income comes from Midwest Dock, which is also Dock & Door's only accounts receivable)

Stephens (Gineris & Associates) 88:5-11, EX. 62 ("Q. Okay. And then going to Dock & Door it doesn't have a similar account. Is there a reason for that? A. They don't have overpayments. Q. Okay. Its only customer is Midwest Dock Solutions, correct? A Yes.")

Dock & Door Install, Inc. 2016 IRS Form 1120-S, (Exhibit 172), EX. 54 (First page only, redacted)

Dock & Door Install, Inc. 2017 IRS Form 1120-S, (Exhibit 175), EX. 55 (First page only, redacted)

Dock & Door Install, Inc. 2018 IRS Form 1120-S, (Exhibit 178), EX. 56 (First page only, redacted)

Dock & Door Install, Inc. 2019 IRS Form 1120-S, (Exhibit 181), EX. 57 (First page only, redacted)

Dock & Door Install, Inc. 2020 IRS Form 1120-S, (Exhibit 184), EX. 58 (First page only, redacted)

Dock & Door Install, Inc. 2021 IRS Form 1120-S, (Exhibit 187), EX. 59 (First page only, redacted)

Dock & Door Install, Inc. 2022 IRS Form 1120-S, (Exhibit 190), EX. 60 (First page only, redacted)

Dock & Door Install, Inc. 2023 IRS Form 1120-S, (Exhibit 193), EX. 61 (First page only, redacted)

Stephens (Gineris & Associates) 84:7-85:4, EX. 62 (testifying that in 2023 all of Dock & Door's revenue came from Midwest Dock)

Dock & Door Install, Inc. Answer at ¶¶24, 25, [ECF#17], (Exhibit 265), EX. 29 (admitting that during the period October 1, 2020 to December 31, 2022, Dock & Door received approximately $473,514.50 from Midwest Dock and during the period July 1, 2017 to December 31, 2018, Dock & Door received approximately $1,149,080.75 from Midwest Dock; during those periods, Dock & Door did not receive payments from other companies for work)

**D. Dock & Door And Midwest Dock Shared Office Space But Dock & Door Paid No Rent.**

**STATEMENT OF FACT NO. 38:**

Midwest Dock and Dock & Door have operated from the same office locations since Dock & Door was formed. Dock & Door moved from location to location with Midwest Dock, *i.e.,* from Burville Road, Crete, Illinois to 3211 Holeman, South Chicago Heights, Illinois to 27 West 36th Place, Steger, Illinois, with each location being rented by Midwest Dock, the rent and utilities being paid by Midwest Dock, and with Dock & Door paying no rent or utilities. Dock & Door has never had a lease. The invoices issued by Dock & Door to Midwest Dock show both businesses at the same address:





**SUPPORT FOR STATEMENT OF FACT NO. 38:**

Brutti 105:23-108:15, EX. 3 (testifying that Dock & Door has occupied the same space as Midwest Dock since it was formed, that the offices have always been leased by Midwest Dock, and that Dock & Door has never paid any rent or utilities for any of the office locations it occupied with Midwest Dock)

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set of Interrogatories, Interrogatory No. 3, (Exhibit 221), EX. 25

Corrigan 53:22, EX. 7 ("Q. They're [i.e., Midwest Dock Solutions and Dock & Door Install] both working out of the same location? A. Yes. Q. Okay. Same buildings? A. Yes. Q. All right. And when the buildings change from location to location, there was no difference, correct? A. Correct. Q. Okay.")

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' Document Requests, Request No. 28, EX. 32 ("28. Produce any lease for any space where Dock & Door either maintained an office or operated its business at any time during the period from January 1, 2016 to the present. **RESPONSE:** There are no documents that are responsive to this Request No. 28.")

Dock & Door Install, Inc. Answer To Plaintiffs' Complaint at ¶34, [ECF#17], (Exhibit 265), EX. 29 ("Defendant Dock & Door admits it and MIDWEST DOCK used the same street address listed above in Paragraph 34 [*i.e.,* 1249 E. Burville Road, Crete, Illinois] at the same time.")

Defendant Midwest Dock Solutions, Inc.'s Answer And Defenses To Plaintiffs' Complaint at ¶34, [ECF#18], (Exhibit 120), EX. 9 ("Defendant Midwest Dock admits that both it and Defendant Dock & Door utilized the street address listed in the above paragraph [*i.e.,* 1249 E. Burville Road, Crete, Illinois] at the same time")

Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Interrogatory No. 3, (Exhibit 40), EX. 24

Corrigan 53:16-54:13, EX. 7 ("Q. Okay. And if -- if Dock & Door is going to install doors at those locations, they would use Midwest trucks, correct? A. Correct. Q. Okay. And when you were doing service work or install work for Midwest, you would use the same trucks, correct? A. Correct. Q. Okay. And you said it's really two different groups of guys. One is nonunion, and one is union, correct? A. Yes. Q. Okay. They're both working out of the same location? A. Yes. Q. Okay. Same buildings? A. Yes. Q. All right. And when the buildings change from location to location, there was no difference, correct? A. Correct. Q. Okay. The companies continued to -- the guys continued to work out of the same locations, correct?")

Dock & Door Install, Inc. Answer To Plaintiffs' Complaint at ¶¶37, 38, [ECF#17], (Exhibit 265), EX. 29

Defendant Midwest Dock Solutions, Inc.'s Answer And Defenses To Plaintiffs' Complaint at ¶¶37, 38, [ECF#18], (Exhibit 120), EX. 9

### E.  Brutti's Office And Use Of Office Equipment At No Charge.

**STATEMENT OF FACT NO. 39:**

Tony Brutti operated Dock & Door out of Midwest Dock's office using Midwest Dock's office equipment such as the copier and printer and using Midwest Dock's office supplies like paper, at no cost.

**SUPPORT FOR STATEMENT OF FACT NO. 39:**

Brutti 116:8-14, EX. 3 ("Q. Okay. And your computer can print to the office printer; correct? A. It can, yeah. Q. Okay. There's a shared office copier printer? A. Yes. Q. And you can print to that? A. I can.")

Brutti 182:14-21, EX. 3 ("Q. Okay. And you can print them out from the Xero software program? A. I can. Q. Okay. And again, you do that at the office, I take it? A. I do. Q. Okay. On the copier printer that's there? A. Yes.")

Zarlengo 334:23-335:9, EX. 2 ("Q. And Mr. Brutti has a desk in the offices at 27 East 36th Place, correct? A. Yes. Q. All right. And Mr. Richert has a desk also in the same office as Mr. Brutti, correct? A. Table, desk, yes. Q. Okay. Q. And can Mr. Brutti, do you know, print to the printer copier? A. Yes, he can.")

Webber 79:18-80:11, EX. 63 ("Q. Just one. And can other people print to that same printer? A. Yes. Q. Okay. Do you have a copier in the office? A. It is one in the same, yeah. It's a big one. Q. Okay. That's what I was going to ask. It's all of the rage. So everybody can like print to that same copier? A. Yes. Q. Okay. Does that include Mr. Brutti? A. Yes.")

### F.  Dock & Door's Mail Is Delivered To Post Office Box 363 Which Is Leased And Controlled By Midwest Dock.

**STATEMENT OF FACT NO. 40:**

On January 1, 2021, Midwest Dock opened Post Office Box 363 ("P.O. Box 363") at the Steger Post Office and the only persons authorized to access P.O. Box 363 were Tony Zarlengo, Michael Richert, and Sherri Webber; Tony Brutti was not authorized to access P.O. Box 363 and Brutti did not have a key to P.O. Box 363. Midwest Dock paid for the Post Office Box rental; Dock & Door did not pay for the Post Office Box.

**SUPPORT FOR STATEMENT OF FACT NO. 40:**

Brutti 112:25-113:8, EX. 3 ("Q. Okay. Did you ever retrieve mail from the post office box in Steger, the Post Office Box 363? A. No. Q. You don't have a key to that post office box; correct? A. I don't. Q. Did you ever have any other post office box for Dock & Door? A. I did not.")

Webber 141:12-15, EX. 63 ("Q. Fair to say that Midwest Dock Solutions pays and maintains that post office box? A. Yes.")

Steger, IL Application for Post Office Box Service, Jan. 11, 2021, (Exhibit 49), EX. 64 (stating that only Zarlengo, Richert, and Webber are authorized users of the post office box)

P.O. Box Service Fee Notice to Midwest Dock and Credit Card Payment Receipts, (Exhibit 50), EX. 65

## STATEMENT OF FACT NO. 41:

Dock & Door's mail was directed to P.O. Box 363, including its Cincinnati Insurance Policy billing statements, and the blank monthly Fringe Benefit Contribution Reports from the Chicago Carpenters Fringe Benefit Funds that Dock & Door had to complete and submit. Dock & Door's insurance policy with Cincinnati Insurance Company was endorsed to change the address for Dock & Door to P.O. Box 363. Because Tony Brutti did not have access to P.O. Box 363, he depended on Sherri Webber to retrieve Dock & Door's mail from Midwest Dock's P.O. Box 363 and bring it to him at Midwest Dock's office where Brutti also had a desk.

### SUPPORT FOR STATEMENT OF FACT NO. 41:

Cincinnati Insurance Company Endorsement for Change of Address, Mar. 24, 2021, (Exhibit 240), EX. 66 (effective change date March 24, 2021)

Cincinnati Insurance Company Billing Statements to P.O. Box 363 from Feb. 28, 2022 to Aug. 29, 2024, (Exhibit 48), EX. 67 (for the sake of brevity, only the first two and last two pages of the original 101-page exhibit are attached here showing statements from February 2022 through December 2024)

Dock & Door Install, Inc. Fringe Benefit Contribution Reports, (Exhibit 47), EX. 68 (showing address of Dock & Door at P.O. Box 363)

Brutti 109:2-112:14, EX. 3 ("Q. Okay.·Did you change Dock & Door's address to that post office box? A. No. Q. I'm going to hand you what's been marked as Exhibit 240.·This is a document that was produced to us pursuant to a subpoena to Cincinnati Insurance Companies. And this is a Change of Endorsement form that's dated March 24th, 2021.·Do you see that it says Effective Change Date on it? A. Yeah. … Q. Okay. And this is a general Change of Endorsement form that changes the address for Dock & Door to Post Office Box 363, Steger, Illinois; do you see that? A. I do. Q. Did you make that change? A. I don't remember making that change. Q. Okay. Do you know how that change would have come to be made? A. I do not. Q. Let me show you what was previously marked as Exhibit 48, and if you can just sort of flip through those documents just to be familiar with what they are, I'll represent to you that they appear to be monthly invoices issued from Cincinnati insurance to Dock & Door. A. Yes.… Q. And do you see

that they're addressed, each one is addressed to Post Office Box 363? A. I do. Q. But that's not a change you recall making; is that correct? A. I don't recall, no. Q. Okay. Would you receive those invoices? A. Yes. Q. All right. And how would you receive them? A. Sherri would hand them to me. Q. Okay. Sherri would leave them on your desk -- A. Yes. Q. or give them to you at the office? A. Correct. Q. Okay. And if you turn to Exhibit 47, and those are Fringe Benefit Contribution Reports; do you see that? A. Yes. … Q. And the form that you get to fill out, that was mailed to Dock & Door; correct? A. Correct. Q. All right. And it was mailed to the Post Office Box 363; is that correct? A. Correct. Q. All right. So did you make the change to the post office box for Dock & Door with the fringe benefit funds that sent you those contribution reports? A. No. Q. Okay. Do you know who did make that change? A. I do not. Q. Okay. But you would get those Fringe Benefit Contribution Reports; correct? A. Yes. Q. To fill out and send in? A. Yes….")

### G. Dock & Door Used Midwest Dock Solutions' Trucks, Equipment, Tools, And Inventory At No Cost.

**STATEMENT OF FACT NO. 42:**

Dock & Door and Midwest Dock's business requires the use of trucks, forklifts, equipment (such as welders and scissor lifts), and inventory of parts and supplies. Dock & Door has <u>no</u> truck, forklift, scissor lift, trailer, equipment (such as welders or scissor lifts), or inventory of parts and supplies. Midwest Dock owns trucks, a forklift, a trailer for transporting equipment, equipment (including welding equipment and a scissor lift), and inventory of parts and supplies. The same trucks and equipment are used by both companies. Dock & Door uses Midwest Dock's trucks, trailer, scissor lift, forklift, welding equipment, tools and inventory at no cost. If Dock & Door needs equipment on its jobsite that Midwest Dock cannot provide then someone at Midwest Dock, such as Tony Zarlengo or Ira Sugar, rents the equipment and has it delivered to the jobsite, and then Midwest Dock pays for the rental.

**SUPPORT FOR STATEMENT OF FACT NO. 42:**

Brutti 75:15-76:3, EX. 3 ("Q. Dock & Door uses Midwest Dock Solutions trucks and equipment for its work; correct? A. It does. Q. Okay. The employees use trucks owned by Midwest Dock for its works? A. It does. Q. And Dock & Door doesn't have any trucks of its own; correct? A. Correct. Q. It never has; correct? A. No. Q. So since Dock & Door has been operating, it's always used Midwest Dock's trucks; correct? A. It has.")

Brutti 163:12-15, EX. 3 ("Q. Does Dock & Door pay Midwest Dock Solutions anything to use its vehicles, forklifts, scissor lifts, welding equipment? A. It does not.")

Brutti 79:1-9, EX. 3 ("Q. Dock & Door employees use welders in their work? A. They do. Q. And are those also owned by Midwest Dock Solutions? A. Yes. Q. Okay. And that's always been the case; correct? A. Correct.")

58

Brutti 80:24-81:13, EX. 3 (testifying that Dock & Door uses Midwest Dock's trailer and forklift on its jobsites)

Brutti 85:18-86:19, EX. 3 (testifying that Dock & Door uses Midwest Dock's trailer and scissor lift for its work)

Brutti 92:5-93:10, 95:17-24, EX. 3 (testifying that Dock & Door would use Midwest Dock's scissor lift on its jobs)

Brutti 87:4-24, 90:19-91:13, EX. 3 (testifying about taking supplies kept at Midwest Dock's warehouse to use for Dock & Door work, including such items as propane, paint, and angle brackets)

Brutti 88:4-9, EX. 3 (testifying that employees would leave their timesheets for on the break room table at Midwest Dock's office)

Brutti 78:17-22, EX. 3 (testifying that the vehicles identified in Dock & Door's interrogatory responses that it uses in its work are owned by Midwest Dock)

Zarlengo 347:6-349:6, EX. 2 ("Q. You mentioned why your equipment rental is so high. There's a category here, under other deductions, for equipment rental. Do you see that? A. A hundred and twenty-three thousand? Q. Yeah, nine hundred and two dollars. A. Yes. Q. Yeah. $123,902. Is that the equipment rental expense you were referring to? A. Yes. Q. All right. And why is that so high? A. Because the majority of the Dock & Door jobs we need boom lifts and forklifts. Q. Okay. And Midwest Dock supplies those -- that equipment? It rents the equipment? A. Correct. Q. Who makes -- who makes the arrangements for the rental so that the equipment is out on the job site? A. Whoever sells the job. Q. Okay. So it would be either you or Ira, for example? A. Yes. Q. All right. So if you sold a job for installation of loading docks to one of the large general contractors that we've been talking about for a new construction job and you needed to have a forklift out there to move around the large dock levelers, you would -- you personally would make the arrangements for that equipment to be there on the job site? A. Yes. I know when stuff's getting delivered to the job, so I'm the one who arranges the rental equipment. Q. Okay. And if Ira were doing garage doors and he needed a boom lift to do that, he would make those arrangements? A. Yes. Q. And then Midwest Dock would pay for that? A. Yes.")

Sugar 65:2-66:1, EX. 23 ("Q. Okay. And I take it that the supplies for the -- the, like, drill bits and the anchors and things like that, even on the -- for the projects for the larger general contractors, the Dock & Door guys would pick the -- pick those up at the 36th Place, Steger office. Is that fair? A. Yes. Q. Okay. And then they would take them out to the job site, correct? A. Yes. Q. And I take it, those same kind of anchors and hardware and drill bits would also be used even on the smaller jobs for PSI and Chicago Heights, correct? A. Yes. Q. So those -- those materials that are also used by the Dock & Door guys would be picked up from the Midwest Dock Solutions office at 36th Place, correct? A. Yes.")

Dock & Door Install, Inc. Answer To Plaintiffs' Complaint at ¶27, [ECF#17], (Exhibit 265), EX. 29 ("Defendant Dock & Door admits it has no expenses for trucks like that shown above [and] Defendant Dock & Door admits it has used trucks and equipment belonging to MIDWEST DOCK to perform work.")

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' Document Requests, Request Nos. 54, 55, EX. 32 ("54. Produce all documents showing any money transferred by Dock & Door to Midwest Dock. **RESPONSE:** There are no documents that are responsive to this Request No. 54. 55. Produce all documents related to any transfer of money by Dock & Door to Midwest Dock. **RESPONSE:** There are no documents that are responsive to this Request No. 55.")

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, Interrogatory No. 9, (Exhibit 221), EX. 25 ("ANSWER: Vehicles owned by Dock and Door: None" and "Vehicles Leased by Dock & Door: None" and listing vehicles owned by Midwest Dock that Dock & Door uses)

Williams 122:13-125:15, EX. 18 (testifying that Sugar would arrange to rent equipment like scissor lifts and arial lifts and make sure it was at the jobsites worked by Dock & Door employees when they needed that equipment for their work)

Corrigan 51:22-52:11, EX. 7 ("Q. And what -- what is your understanding of the relationship between those two companies? A. Midwest does mostly all -- there's, you know, a different group of guys. There was two different groups. Midwest would go do the service. And then the guys in Dock & Door would go to the -- like the bigger box buildings and do the big installs on the union side. Q. Okay. And they're using the same trucks, right? A. Yes.")

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' Document Requests, Request Nos. 42, 44-46, EX. 32 ("42. Produce all documents showing tools and equipment (including for example welding equipment and hand tools) owned or leased by Dock & Door, including for example, any depreciation schedules, insurance schedules, or loan application schedule of assets. **RESPONSE:** There are no documents that are responsive to this Request No. 42.… 44. Produce all documents showing vehicles owned or leased by Dock & Door, including for example, any depreciation schedules, insurance schedules, or loan application schedule of assets. **RESPONSE:** There are no documents that are responsive to this Request No. 44. 45. Produce all documents showing lists of tools and equipment (including for example welding equipment and hand tools), office equipment (including office equipment such as computers, desks, furniture and ), and vehicles owned or leased by Dock & Door. **RESPONSE:** There are no documents that are responsive to this Request No. 45. 46. Produce documents sufficient to show Dock & Door's inventory. **RESPONSE:** There are no documents that are responsive to this Request No. 46.")

Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Interrogatory No. 9, (Exhibit 40), EX. 24 (listing trucks owned by Midwest Dock)

Defendant Midwest Dock Solutions, Inc.'s Answer And Defenses To Plaintiffs' Complaint at ¶27, [ECF#18], (Exhibit 120), EX. 9

Brutti 148:17-22, EX. 3 ("Q. Okay. And how about automobile insurance? A. No. Q. Does Dock & Door have an automobile insurance policy? A. You know, I've seen it on my policies. I don't know why I have it. I don't have any vehicles.")

Corrigan 53:7-15, EX. 7 ("Q. And if -- if Dock & Door is going to install doors at those locations, they would use Midwest trucks, correct? A. Correct. Q. Okay. And when you were doing service work or install work for Midwest, you would use the same trucks, correct? A. Correct.")

Corrigan 128:17-22, EX. 7 ("Q. And so the trucks are used by -- for both service work and for new install work, correct? A. Yes. Q. Including at the logistics buildings? A. Yes")

Green 76:23-77:78:6, EX. 12 (testifying that he would pick up materials and supplies for his work with Dock & Door at Midwest Dock's warehouse, including items such as doors, dock levelers, track guards, small items, or small orders—*e.g.*, "if you're installing 16 overhead doors at a job site, those will be delivered to the job site. If you're installing three dock seals, you might have to pick those up at the warehouse, something like that.")

Mantoan 56:18-57:3, EX. 69 (testifying that he would load up with supplies from Midwest Dock's warehouse before going out to do work for Dock & Door)

Kelly 58:5-59:2, EX. 70 ("Q. And if you were on a job site and needed concrete anchors or something or drill bits, concrete drill bits, things like that, would you use the credit card to purchase those kind of items? A. No. Q. Okay. Where would you get those kind of items? A. Tony Brutti. Q. Okay. He'd bring them to the job site? A. Yes. Yeah. Q. All right. Would you pick those kind of things up sometimes at the shop? A. Yes. Q. Okay. And that's the -- again, the Midwest Dock Solutions' shop, correct? A. Yes.")

### H. Midwest Dock Provided Dock & Door Employees With Midwest Dock's Company Credit Cards To Use; Dock & Door Did Not Provide Credit Cards.

## STATEMENT OF FACT NO. 43:

Midwest Dock provided Dock & Door employees, including Richard Mantoan, Nicolas Kelly, David Green, Donald Cruikshank, and Collin Zarlengo, with Midwest Dock company credit cards to use for their work for Dock & Door. Dock & Door provided no credit cards. Tony Brutti was not made aware of which persons employed through Dock & Door carried Midwest Dock credit cards. Brutti was only aware that Green had a Midwest Dock credit card because Green would give Brutti receipts to turn in to Sherri Webber, Midwest Dock's in-house

bookkeeper. Dock & Door employees would give their receipts to Brutti to pass through to Webber or they would give their receipts directly to Webber. Midwest Dock pays all the credit card statements.

**SUPPORT FOR STATEMENT OF FACT NO. 43:**

Brutti 113:15-115:12, EX. 3 ("Q. Okay. How about credit cards? Does Dock & Door supply its employees with credit cards? A. It does not. … Q. Some of Dock & Door's employees do carry Midwest Dock Solutions credit cards; correct? A. Correct. Q. Okay. And that's Richard Mantone, Nicolas Kelly, David Green, Donald Cruikshank, and Collin Zarlengo, they've all had credit cards that were from Midwest Dock Solutions; correct? A. I'm not a hundred percent sure who, but -- Q. Okay. Do you know anybody who for a hundred percent did have them? A. David. Q. David Green? A. David Green, yeah. Q. Anybody else? A. I know Nico has one. Q. Okay. A. I'm not aware who else would. Q. Okay. You weren't responsible for coordinating to provide them with the credit cards? A. No. Q. Okay. So if I told you that Richard Mantone had a credit card, you don't know that? A. I don't know that. Q. Okay. And if I told you Donald Cruikshank had a credit card, you don't know that? A. No. Q. And if I told you that Collin Zarlengo had a credit card, you don't know that? A. I don't know that, no. Q. Okay. How do you know that Nicolas Kelly and David Green did or do? A. I know David Green will give me gas receipts if he is on the road. I guess I don't know that Nico has one for sure. Q. Okay. A. Yeah. Q. All right. So if they charge and have receipts, they don't give them to you? A. No. Correct. Q. Okay. Who would they give their receipts to? A. David does give his receipts to me. Q. Okay. Do you know why he does? A. He texts them to me and I give them to Sherri. Q. Okay. That's what I was going to ask you, who they ultimately go to. Do you do anything with the receipts other than give them to Sherri? A. I print them or yeah, or just give them to Sherri.")

Zarlengo 355:5-23, EX. 2 ("Q. Midwest Dock Solutions issues credit cards to some of its employees, correct? A. Yes. Q. And those -- it also issues credit cards to -- or among the parties – strike that. Among the parties the credit cards are issued to include Collin Zarlengo, Donald Cruikshank, David, Nicolas Kelly, and Richard Mantoan, correct? A. Correct. Q. All right. And those are all employees of Dock & Door? A. Correct. Q. All right. And does Midwest Dock Solutions pay those credit card bills? A. Yes.")

Stephens (Gineris & Associates) 70:3-71:18, EX. 62 ("Q. Okay. Does Midwest -- I'm sorry. Strike that. Does Dock & Door pay any of the credit card accounts, either the subaccounts or any amounts toward the main account for this Chase Ink credit card? A. No. Q. The Chase Ink credit card is solely paid by Midwest Dock Solutions, correct? A. Yes. … Q. Okay. And does it make any difference for payment of the credit card invoices whether there has been a receipt provided for the individual expenses? A. That's Sherry's call. Q. What do you mean by that? A. Whether or not she requires the receipt.")

Stephens (Gineris & Associates) 32:13-15, EX. 62 ("Q. To your knowledge, does Dock & Door maintain credit card accounts? A. They do not.")

Bishop 67:3-19, EX. 71 (testifying that he has a credit card that he used for his work at Midwest Dock and that he uses for his work at Dock & Door and that he has always turned in his credit card receipts for charges to Webber at Midwest Dock)

Mantoan 37:1-24, EX. 69 (testifying that he has a credit card from Midwest Dock that he uses that Tony Brutti told him to pick up at Midwest Dock's office)

Mantoan 42:11-43:3, EX. 69 (testifying that he gives the credit card receipts for his Midwest Dock credit card used to make purchases for his work for Dock & Door to Webber, Midwest Dock's in-house bookkeeper)

Kelly 47:4-15; 54:10-22, EX. 70 (testifying that he received a Midwest Dock credit card after his employer changed from Midwest Dock to Dock & Door and that Brutti told him to pick it up at Midwest Dock's office)

Kelly 56:10-23, EX. 70 (testifying that he gives the credit card receipts for his Midwest Dock credit card used to make purchases for his work for Dock & Door to Webber, Midwest Dock's in-house accountant)

Cruikshank 104:13-105:10, EX. 8 (testifying that he received a Midwest Dock credit card that he used when he worked for Dock & Door)

## STATEMENT OF FACT NO. 44:

Employees paid through Dock & Door use the Midwest Dock credit cards to purchase supplies and equipment and to pay for hotels and per diem expenses when they are working out of town. Midwest Dock pays the credit card charges; Dock & Door never pays the credit card charges and does not reimburse Midwest Dock. David Green uses his credit card to purchase materials and supplies for jobs and to put fuel in Midwest Dock trucks that he uses for Dock & Door. Although Green is paid through Dock & Door, Tony Brutti described those expenses as Midwest Dock expenses, not Dock & Door expenses.

### SUPPORT FOR STATEMENT OF FACT NO. 44:

Brutti 117:7-20, EX. 3 ("Q. Okay. And to your knowledge, does David Green use his credit card for Dock & Door expenses? A. No. Q. What does he use it for? A. Generally material and fuel. Q. Okay. And what is the material for? A. Those would be for the jobs. Q. Okay. A. If they're short on anchors or caulk or whatever, Dave would run to the hardware store and buy that stuff. Q. Okay. And he'd put it on the Midwest Dock Solutions credit card? A. Yeah.")

Brutti 118:3-12, EX. 3 ("Q. No, no, I'm sorry, maybe any question wasn't clear. Does Dock & Door pay the charges on the Midwest Dock Solutions credit card? A. Oh, no, no. Q. Okay. That was my question. A. Sorry. Q. Does Dock & Door ever reimburse Midwest Dock Solutions for expenses on the Midwest Dock Solutions credit card? A. No.")

Williams 66:16-68:9, EX. 18 ("A. Collin had one. That's who I used to work with the most going out of town with. So that's how we would get our per diems, so like our eating and everything, our hotel rooms. Q. Okay. He would put it on the company credit card? A. Either him or Ira. Q. Oh, Ira would sometimes pay for it? A. Pay for like the room in advance. Q. Okay. He would take care of that. Any other expenses that he would take care of when you were working out of town? A. Him, himself, the hotel was the most one, commonly. Me and Collin or me and Nico would order food while we were out with the credit card, company credit card. Q. Okay. And how do you know Ira took care of the hotel? A. Because Collin would call Ira to make sure he had the room available. Q. So you'd be there with him, and Collin would call Ira and say, hi, Ira, have you got the room taken care of, that kind of thing? A. We were going to stay in Wisconsin for a time, so, yeah. Q. Okay. And you would -- I take it, you would see the company credit card used to make purchases for food and sometimes -- A. Correct. Q. -- pay for hotels if Ira hadn't taken care of it and that kind of thing? A. Correct.")

Cruikshank 104:15-107:15, EX. 8 (testifying he received a Midwest Dock credit card when he went to work for Midwest Dock and continued to use the credit card after he starting being paid through Dock & Door and that he used the credit card to purchase supplies—*e.g.* "Q. And did you use that card when you worked for Dock & Door Install? A. Yes. .. Q. All right. And would you get the bills for that credit card? Would they come to your house, or would they go to the company? A. The company. Q. Okay. And what kind of purchases would you make using the company credit card? A. Fuel. Fuel and anchors and, you know, hardware stuff. Q. Okay. Whatever supplies you needed for the job and fuel for the company vehicle? A. Yes.")

Kelly 47:5-51:19; 55:4-6, EX. 70 (testifying that he did not have a Midwest Dock credit card when he worked for Midwest Dock but then Brutti gave him a Midwest Dock credit card when Kelly was working for Dock & Door—*e.g.*, ("Q. You have a credit card from Midwest Dock Solutions, correct? A. Yes. Q. Okay. And how long have you had  that credit card? A. About three, four years, maybe. Q. Okay. Did you have it when you were being paid through Midwest Dock Solutions? A. No.  … Q. And who gave you the credit card? A. Nobody specifically. It was kind of just go pick it up. Q. Okay. And where did you go pick it up? A. At the shop. Q. Then you just show up at Steger and find a credit card sitting somewhere, and you just take it? A. Well, I was told that they set it there. Q. Okay. Who told you that? A. Brutti. Q. Okay. A. Tony Brutti. Q. Tony Brutti told you that who put it there? A. Oh, I guess he gave it to me, then, yes. He left it there. Q. Okay. A. He left it by the back door. Q. And what did Tony Brutti say about the credit card? A. He's like the card's by the back door…. And the credit card is a Midwest Dock Solutions' credit card, correct? A. Yes.")

**I. Employees.**

**1. David Green**

**STATEMENT OF FACT NO. 45:**

The first employee who was listed on Dock & Door's Employer Questionnaire/Application with the Union when Dock & Door was applying to sign an agreement with the Union was David Green, who was at that time an employee of Midwest Dock. Green had been hired by Michael Richert, and he was employed by Midwest Dock doing installation of overhead doors, dock seals, dock bumpers, dock locks, track guards, dock lights, and door operators. Green became an employee of Dock & Door because Richert and Tony Zarlengo told Tony Brutti that he needed to hire Green. Brutti put Green on Dock & Door's payroll without interviewing him. Green went to work for Dock & Door performing the same work he performed for Midwest Dock.

**SUPPORT FOR STATEMENT OF FACT NO. 45:**

Brutti 43:21-44:7; 47:22-48:14, EX. 3 ("Q. Okay.·And if you turn to the second to last page, it's page 340, it shows -- it shows 'List Names of Carpenter Employees;' do you see that? A. I do. Q. Okay. And who is listed there? A. David Green. Q. And he worked for Midwest Dock Solutions at that time; correct? A. I do not know that. Q. Well, how did you come to know Mr. Green? A. He was my first employee.·And I was referred to him by Mike and Tony. Q. Okay. A. I don't know, like I said, I don't know if he worked at Midwest Dock, but they said 'We need – you need to have him to start off with for sure.' Q. Okay. And did they tell you why? A. He's good. Q. Okay. A. He knows what he's doing.")

Brutti 53:13-22, EX. 3 ("Q. Now, did you hire Dave Green to work for Dock & Door? A. I did. Q. Did you interview him? A. I believe -- I don't believe I did, no. Q. Okay. You just put him on the payroll? A. Yeah. Q. Okay. And you did that solely at the recommendation of Mr. Zarlengo and Mr. Richert? A. Yes.")

Dock & Door Install Inc. Employer Questionnaire / Application to Chicago Regional Council of Carpenters, p.7, Aug. 5, 2014, (Exhibit 218), EX. 37

Dock & Door Install Inc. Contribution Reports, (Exhibit 220), EX. 72

Green 38:9-39:10, EX. 12 ()"Q. … So explain to me how it came about that you went to work for Midwest Dock. A. I was out of work and talked to Ira one day, just about anything, and mentioned to him that I was out of work and trying to find a job. The union didn't have anything going on. And he mentioned his neighbor, Mike, had a business and basically asked me if he could give him my number, and he did. And Mike called me, and I went to work for him. … Q. Okay. And was it Mike Richert who hired you? A. Yes. Q. All right. Did you meet with Tony Zarlengo before you were hired? A. No. Q. Okay. Just Mike? A. Yes.")

Green 39:16-20; 41:12-22; 61:21-62:24; 71:4-17, EX. 12 (testifying that he worked for Midwest Dock installing new overhead doors, dock seals, dock bumpers, dock locks, track guards, dock lights, and door operators and the work he does for Dock & Door includes installation of dock seals, dock bumpers, dock locks, track guards, dock lights, overhead doors, and dock levelers—*e.g.,* "Q. And just so I'm clear, the work that you did for Midwest Dock included installation of dock seals, bumpers, dock locks, track guards, dock lights, overhead doors, dock levelers, but it often involved removal of old before you put in the new? A. Correct. Q. Okay. And just so I'm clear, with Dock & Door, do you install dock seals, dock bumpers, dock locks, track guards, dock lights, overhead doors, and dock levelers? A. Yes.")

Green 71:4-17, EX. 12 ("Q. Okay. And just so I'm clear, the work that you did for Midwest Dock included installation of dock seals, bumpers, dock locks, track guards, dock lights, overhead doors, dock levelers, but it often involved removal of old before you put in the new? A. Correct. Q. Okay. And just so I'm clear, with Dock & Door, do you install dock seals, dock bumpers, dock locks, track guards, dock lights, overhead doors, and dock levelers? A. Yes.")

Green 69:17-70:9, EX. 12 (testifying that the installation for retrofit work and new construction is "pretty much the same" after the old items are removed and that he did not receive any new training when he went from Midwest Dock to work for Dock & Door)

Green 47:21-24, EX. 12 ("Q. Okay. Now, eventually your employment changed, and you weren't paid by Midwest Dock. You were paid by Dock & Door, correct? A. Yes. Q. Okay. Tell me when that happened and how that came about. A. It had to be -- I think it was about 2014 -- Q. Okay. A. -- ish. I was wanting to get back into the union because I was working for Midwest Dock basically temporarily to keep money coming in because the carpenters didn't have work. Q. Sure. A. And I didn't know that Dock & Doors were -- that there was union companies that did that. I didn't know what a dock was when I started at Midwest Dock, but there's a training in that. I started with Dock & Door Install. Q. Okay. So you were working for Midwest Dock, and you were doing door installation, loading dock installation. How -- how did you come to be working for Dock & Door? A. Mike knew Tony and gave him my name, and he hired me and –")

## STATEMENT OF FACT NO. 46:

David Green was doing installation of overhead sectional doors, loading docks, and coiling doors for Midwest Dock when he started working for Dock & Door. Green had also been employed by Midwest Dock, and Midwest Dock reported and paid contributions to the Trust Funds on behalf of Green when he was working for Midwest Dock on a new construction project installing dock levelers and overhead doors in February, March, April, and June 2012.

## SUPPORT FOR STATEMENT OF FACT NO. 46:

Brutti at 48:15-25, EX. 3 ("Q. And do you know what work he was doing for Dock & Door? A. It was new construction.· I couldn't tell you the exact job. Q. Well, aside from

new construction, do you know what kind of work he was doing? A. He would do sectional doors, loading docks, and coiling doors. Q. And is that installation of overhead sectional doors? A. Correct.")

Zarlengo 66:6-18, EX. 2 ("Q. And -- and this was -- this was a new construction project; is that right? A. Yes. Q. And did Dock & Door -- I'm sorry. Did Midwest Dock Solutions install docks and doors at this location? A. I believe so, yeah. I believe so. Q. Okay. And do you have any idea of how many? A. Yes. Q. How many? A. Twenty. I've got a good memory.")

Zarlengo 73:4-18, EX. 2 ("Q. So you submitted these reports and paid the fringe benefit contributions that are identified on these reports, correct? A. Yes. Q. And by that, I mean Midwest Dock Solutions did that, correct? A. Yes. Q. All right. Do you know who Rodney Platt is? A. No. Q. All right. And do you know who John Leavitt is, L-e-a-v-i-t-t? A. No. Q. And do you know who David Green is? A. Yes. Q. All right. He's one of the people reported on these reports, correct? A. Yes. Q. All right. Did he work for Midwest Dock Solutions? A. Yes, he did. Q. All right. Does he still work for Midwest Dock Solutions? A. No. Q. Do you know who he works for now? A. Yes. Q. Who does he work for now? A. Dock & Door Install. Q. Did he move to Dock -- from Midwest Dock Solutions to Dock & Door Install when Dock & Door Install was formed? A. Yes.")

Midwest Dock Solutions, Inc. Fringe Benefit Contribution Reports at pp.7-10, (Exhibit 85), EX. 11

## STATEMENT OF FACT NO. 47:

Tony Zarlengo, Ira Sugar, and Joe Sheridan, all sales persons from Midwest Dock, would direct David Green's work while he was employed through Dock & Door, including where to go and what to do. Green referred to Zarlengo as his "boss."

### SUPPORT FOR STATEMENT OF FACT NO. 47:

Green 72:73:19; 74:20-80:8, EX. 12 (testifying that when he worked for Midwest Dock, Zarlengo or another Midwest Dock sales person would give him directions on where to go and what to do for different jobs and that when he went to work for Dock & Door he continued to take his directions from Zarlengo and from Sugar and Sheridan who were Midwest Dock sales persons where to go for his work—*e.g.*, "Q. Who from the sales staff would tell you? A. Well, I think Tony was also -- Tony Zarlengo was also part of sales. Q. Okay. A. So whosever's job it was is usually who you heard from. Q. All right. And when you say 'whoever's job it was,' you mean whoever sold that job? A. As far as I know, yes. Q. Okay. So if a particular salesperson was responsible for having sold a particular job, they might be the one to call you and say, hey, go here? A. Yes. Q. Okay. And do you -- now, you mentioned when Ira Sugar was -- you knew Ira Sugar. A. Ah-huh. Q. Is that a yes? A. Yes…. Q. Okay. And do you know what position he was hired for? A. Sales, I believe, the title would be. Q. Okay. Is he somebody who you would get direction from, where to go on particular jobs? A. Yes. Q. Okay. And is that still the case? A. Yes. Q. All

right. He will call you and say, hey, go to this job location? A. Ah-huh. Yes…. Q. Anybody else who you can think of that would give you directions, where to go sort of day to day, like your job assignment? A. Sometimes Tony Zarlengo. Q. Okay. Does he still do that? A. On occasion.")

Green 75:12-22; 80:1-8, EX. 12 ("Q. Is he [Ira Sugar] somebody who you would get direction from, where to go on particular jobs? A. Yes. Q. Okay. And is that still the case? A. Yes. Q. All right. He will call you and say, hey, go to this job location? A. Ah-huh. Yes…. Q. Okay. And Anthony Zarlengo, we talked about that he's the owner of Midwest Dock, correct? A. Yes. Q. All right.  And he gives you directions on what job sites to go to? A. Yes.")

Green 193:19-194:12, EX. 12 (testifying that his how Zarlengo, who Green described as his boss, was responsible for trying to figure out a problem at a Dock & Door job site—*e.g.*, "A. Kevin would have been on the job site. Just basically letting my boss know that I spent an hour basically doing nothing. You know, I wasn't installing anything because I'm waiting for Tony and Kevin to figure out where the stuff is going. Q. Okay. Tony Zarlengo? A. Yes.")

Green 112:7-16, EX. 12 (although Green testified Brutti was his boss because he was the owner of Dock & Door, Green testified that his only interaction with Brutti was that he keeps track of time and payroll: "Q. And what -- who is Anthony Brutti? A. He's my boss, as far as the owner of Dock & Door Install as far as I know. Q. Okay. And when you say he's your boss, what did -- what interaction do you have with him on a day-to-day basis? A. He keeps track of time, payroll. And that's about it, as far as I know.")

## 2. David Richert

### STATEMENT OF FACT NO. 48:

David Richert who previously worked for Midwest Dock as a Union carpenter performing dock leveler installation on new construction projects and who is also the brother of Michael Richert (the half owner of Midwest Dock) was also employed by Dock & Door to perform the same dock leveler installation work on new construction projects.

### SUPPORT FOR STATEMENT OF FACT NO. 48:

Brutti 54:11-55:1, EX. 3 (testifying that David Richert is his cousin and that he was reported by Dock & Door as an employee)

Green 144:3-20, EX. 12 ("How about David Richert? A. Yes. I know him. Q. And who's David Richert? A. A carpenter, or he might be millwrights. Q. Millwrights? A. Yes. Q. All right. Do you work with him at Dock & Door? A. I have. Q. All right. And what kind of work does he do? A. Same thing. Doors, docks. Q. Okay. Does he still work there?  A. No. Q. How long ago did he leave? A. He's kind of been the same, on and off over the last years.")

Dock & Door Install, Inc. Fringe Benefit Contribution Reports June 2016, (Exhibit 220), EX. 72

Midwest Dock Solutions, Inc. Fringe Benefit Contribution Reports, (Exhibit 85), EX. 11 (reporting fringe benefit contributions for David Richert (November and December 2011))

### 3. Jose Aguirre

**STATEMENT OF FACT NO. 49:**

Jose Aguirre was also working for Midwest Dock performing installation of overhead doors when he was then employed by Dock & Door to perform installation of overhead doors. When Aguirre was moved from Midwest Dock's payroll to Dock & Door's payroll, it was a matter of Tony Brutti contacting Callie Stephens at Gineris & Associates, the companies' common accounting firm, and having her transfer over his paperwork from one company to the other.

**SUPPORT FOR STATEMENT OF FACT NO. 49:**

Brutti 55:5-56:4, EX. 3 ("Q. And do you see that Jose Aguirre Garcia is reported there? A. I do. Q. Dock & Door came to employ him in October of 2017; correct? A. Correct. Q. All right. And he was also working for Midwest Dock Solutions at the time that Dock & Door hired him; correct? A. Correct. Q. And what was he doing for Midwest Dock & Door -- or I'm sorry, what was he doing for Midwest Dock Solutions? A. He was doing some service work, and I believe he was also doing some installation work. … Q. Okay.· And installation work, installation of what? A. Like also taking down and installing overhead doors, yeah. Q. Okay. And what was the work that he did for Dock & Door? A. He would do new installations of overhead doors.")

Brutti 56:5 -57:4, EX. 3 ("Q. Okay. I hand you what I've marked as Exhibit 222.· And this appears to be on the bottom an e-mail from you to Callie Stephens; correct, Stephens? A. Correct. Q. All right. And it looks like an e-mail dated October 17th, 2016; do you see that? A. Correct. Q. And it says:· 'Hi, Callie. I have a new employee starting this pay period for me. Jose from Midwest Dock is going to work for Dock & Door now.· Can you just transfer over all the paperwork or do you need me to get all his info from him?'· Do you see that? A. Correct. Q. And Callie responds to you, it looks like on the same day, saying 'What's his hourly rate?' Do you see that? A. Yes. A. It does. Q. Okay. And does that look like the date you would have hired Jose to work for Dock & Door? A. Yes. Q. All right. So is this e-mail on the bottom, does that -- well, strike that. Does this look like an e-mail exchange between you and Callie Stephens? A. It does. Q. Okay. And does that look like the date you would have hired Jose to work for Dock & Door? A. Yes.")

Callie Stephens (Gineris & Associates) Email to Tony Brutti regarding New Employee, Oct. 17, 2016, (Exhibit 222), EX. 73

### 4. Nicolas Kelly

**STATEMENT OF FACT NO. 50:**

Nicolas Kelly is a welder and he was employed by Midwest Dock principally doing loading dock leveler work, which requires an ability to weld. When he was employed by Dock & Door, he continued to do principally loading dock leveler work. When Kelly was moved from Midwest Dock' payroll to Dock & Door's payroll, it was a matter of Sherri Webber contacting Callie Stephens at Gineris & Associates, the companies' common accounting firm, and having her transfer over his paperwork from Midwest Dock to "the union side" *i.e.*, Dock & Door. Webber sent Stephens an email on September 26, 2018 advising her that "Nico Kelly is on the union side now…":



Tony Brutti understood that when Callie Stephens referred to the "union side" of Midwest Dock, she was referring to Dock & Door and other employees referred to Dock & Door as the "union side" of Midwest Dock.

**SUPPORT FOR STATEMENT OF FACT NO. 50:**

Email from Sherri Webber to Callie Stephens (Gineris & Associates) regarding Payroll changes, Sep. 26, 2018, (Exhibit 211), EX. 74

Brutti 57:5-59:2, EX. 3 ("Q. Okay. The e-mail from Sherri Weber to Callie Stephens says:·'Hi, Callie,' and there is a paragraph talking about James Kelly. And then she says: 'Also, Nico Kelly is on the union side now, so I won't be paying him any longer through ADP. Should I change anything in ADP so he doesn't show up on the payroll list any longer?'·Do you see that? A. I see it. Q. And Nico Kelly, is that Nicolas Kelly? A. It is. Q. Does he go by Nico? A. Yeah. Q. Okay. And when she says 'union side now,' do you know what she's referring to? MR. HUGHES:·Objection foundation, objection competency. BY THE WITNESS: A. She would be referring to Dock & Door Install.")

Brutti 59:10-60:19, EX. 3 (testifying that Kelly is a welder who did dock leveler work for Midwest Dock and that he performed dock leveler work for Dock & Door)

Richert 31:9-17 ("Q Okay. How about Nicholas Kelly? It says he's a service technician. Is that right? A When he worked at Midwest Dock Solutions. Q He also worked for Dock & Door? A Correct. Q And who hired Nicholas Kelly? A For Midwest Dock it would have been me and Tony Zarlengo.")

Kelly 33:18-22, EX. 70 (testifying that he performed overhead door installation work for Midwest Dock)

Kelly 36:4-38:10; 44:10-24, EX. 70 (testifying that he was employed by Midwest Dock and then became employed by Dock & Door—*e.g.*, "Q. You stopped working for Midwest Dock Solutions and went to work for Dock & Door, correct? A. Yes. Q. Okay. Did you have to submit a resumé or job application or anything like that? A. No. Q. All right. It was simply Tony Brutti coming to you and saying, hey, do you want to work on the union side? A. Yes.")

Email from Sherri Webber to Callie Stephens (Gineris & Associates) regarding Payroll change, Sep. 26, 2018, (Exhibit 211), EX. 74

Donald Cruikshank 102:1-103:7, EX. 8 ("Q. And you know Anthony Zarlengo who's here today, correct? A. Ah-huh.  Q. Is that a yes?  A. Yes. Q. Okay. And what was his job with the company? A. He's the owner. Q. Okay. And how about Mike Richert? You didn't mention him, but he's on the list. And you know him, right? A. Yes. They're --Q. What did he do? A. He's also an owner. Q. Okay.  And then Anthony Brutti was on the list. You know him as well, correct? A. Yes. Q. What kind of work did he do? A. He was in charge of hours for the union side and paying -- you now, payroll. Q. For the union side? A. Yeah. Yeah. Q. Okay. Okay. Anything else that he did that you're aware of? A. No.")

Kelly 40:16-19:2, EX. 70 ("Q. And then you may have to do other things to prep the space to put in the new door, correct?  A. For -- on the union side, no.")

Mantoan 64:2-65, EX. 69 ("Q. And then you sent a text on Thursday. Is that Thursday of last week? A. I'd assume so. Q. Okay. It would be after October 6, so I would assume so, too. It says, so there's zero work on union side, correct? A. Yes. Q. Okay. And what does "union side" mean? A. Like Dock & Door install. Q. Okay. Is there a nonunion side? A. Not for us, but Midwest. Q. That's nonunion? A. Yes. Q. Okay. So when you say there's zero work on the union side, you mean for Dock & Door, correct? 2 A. Correct.")

Text message from R. Mantoan to T. Brutti (Exhibit 273), EX. 123 (Mantoan to Brutti: "So there's 0 work on the union side?")

Tattini 50:10-18, EX. 15 ("Q. And -- all right. Who hired you? A. Mike Richert. Mike Richert. Q. And how did that come about? A. My neighbor at the time was good friends

with him, and they were starting the <u>union side of the -- of the company</u>. And my neighbor knew I was a good worker and recommended me.")

Tattini 95:9-96:5, EX. 15 ("Q. Anybody else you can recall that worked in the office at the Steger facility? A. I don't know if Joe -- I don't know if Joe Sheridan was working at the -- at the Steger facility, but -- … Q. What did he do? A. Joe? He was -- he was a salesman on the <u>union side</u>, so I think he just went on Dodge reports and like construction -- bid construction or whatever. Just threw out bids. Q. Okay. A. Ah-huh. Salesman.")

### 5. Branden Bishop

**<u>STATEMENT OF FACT NO. 51:</u>**

Branden Bishop was hired to work for Midwest Dock by Richert. Bishop worked for non-union Midwest Dock installing dock levelers and loading dock equipment and then he went to work for union Dock & Door doing installation of dock levelers and loading dock equipment after asking Michael Richert for a union job.

#### <u>SUPPORT FOR STATEMENT OF FACT NO. 51:</u>

Bishop 48:1-3, EX. 71 (testifying that he was hired to work for Midwest Dock by Richert)

Bishop 10:4-12; 34:7-11, EX. 71 (testifying that he was employed by Midwest Dock and then by Dock & Door)

Bishop 51:6-15; 55:4-9, EX. 71 (testifying that he did installation of loading dock equipment and overhead doors and dock seals for Midwest Dock but mostly installation of dock levelers and dock equipment)

Bishop 29:16-21, EX. 71 ("Q. And how did you come to join the carpenters union? A. I asked Mike Richert for a union job. Q. Okay. And he said yes? A. He did.")

Brutti 60:20-61:2, EX. 3 ("Q. Okay. Dock & Door also employed Brandon Bishop; correct? A. Correct. Q. And still does? A. It does. Q. Okay. He worked for Midwest Dock Solutions also before going to work for Dock & Door; correct? A. He might have for a very short time.")

Zarlengo 101:7-21, EX. 2 (testifying that Bishop worked for Midwest Dock)

### 6. Zachary Corrigan

**<u>STATEMENT OF FACT NO. 52:</u>**

Zachary Corrigan was hired by Tony Zarlengo and Michael Richert to work for Midwest Dock where he worked on overhead doors. Then in 2018, Richert told Corrigan that "Midwest needed

more guys to do – union guys" to work on the union jobs so Corrigan got a permit from the Iron Workers Union Local 63 so that he would be union and could work on union projects. At that time, he switched from Midwest Dock to Dock & Door where he did overhead door installation installing doors, door tracks, and door openers. After Corrigan's employment was switched to Dock & Door, Corrigan was not showing up for work for a period of time, and Richert terminated him.

## SUPPORT FOR STATEMENT OF FACT NO. 52:

Zarlengo 101:23-102:1, EX. 2 (testifying that Corrigan worked for Midwest Dock for a couple of years)

Brutti 61:3-7, EX. 3 (testifying that Corrigan worked for Midwest Dock and Dock & Door)

Richert 21:7-10, EX. 4 ("Q How about Zachary Corrigan, who hired him? A When he worked for Midwest Dock? Q Yes. A Me and/or Tony.")

Richert 57:9-13 ("Q. And Zachary Corrigan, did he start out as a service tech or was he a helper for a period of time? A He came from another company with experience. Q So he started right out as a service tech? A Yes.")

Richert 19:8-12 ("Q Zachary Corrigan, you were here for his testimony you said, correct? A Correct. Q Was he a technician? A Yes.")

Corrigan 19:6-20:7, EX. 7 (testifying that he went from Midwest Dock to Dock & Door because they needed more workers to do union work)

Corrigan 20:22-21:17, EX. 7 (testifying that he had to be in the union to go on the "bigger install jobs—*e.g.*, "Q. Okay. And what does that mean, to go on the bigger install jobs? A. Instead of running service, I guess, through Midwest, I would be doing the big box -- bigger box buildings, longer jobs with Dock & Door Install.")

Corrigan 30:22-32:24; 35:15-23, 36:5-7, EX. 7 (testifying that he was hired by Midwest Dock in approximately 2015 after interviewing with Zarlengo and that Zarlengo and Richert made the decision to hire him to work for Midwest Dock)

Corrigan 54:15-56:2, EX. 7 ("Q. And -- but you understood, to work on the big box jobs, you had to be a union member, correct? A. Yes. Q. And then you'd get paid through Dock & Door, correct? A. Yes. Q. Okay. And they needed more guys to work on the big box doors, correct? A. Correct. Q. Okay. That was your understanding? A. Yes. Q. Who told you that? A. I believe, Mike Richert. Q. Okay. A. I probably talked to -- you know, with Tony Zarlengo also and Tony Brutti. Q. Okay. A. But I'm not sure exactly what individual person I talked to to get in there. Q. Okay. But, collectively, it was sort of agreed you'd switch from Midwest to Dock & Door, correct? A. Yes. Q. Okay. And it was collective

<u>amongst those three individuals, correct? A. Yes. Q. Okay. And so in order to do that, though, you had to be a union member. Is that fair? A. Yes.</u>")

Corrigan 61:1-64:15, EX. 7 ("Q. And some point you had a conversation with Tony Brutti, Tony Zarlengo, and Mike Richert. You think the three of them. And they said they needed more guys to do work for Dock & Door, correct? A. Ah-huh. Yes. Q. Okay. And so you went – you started going to work for Dock & Door, correct? A. Yes. Q. Okay. And so you started getting paid through Dock & Door; is that right? A. Yes. Q. Okay. And that was because you were working on union projects, correct? A. Yes.")

Corrigan 64:10-66:3, EX. 7 ("Q. And why did you leave? A. I wasn't showing up to work. Q. Pardon? A. I kind of was calling off a bit and not being a star employee. Q. All right. Did -- did you leave, or did they ask you to leave? A. I was asked to leave. Q. Okay. And who -- who asked you to leave? A. Mike. Mike Richert. Q. Mike Richert. Okay. And I appreciate your honesty. A. Yep. Q. And what did Mike say? Can you just tell me how it came about? A. Pretty much that was my last day because I wasn't -- I wasn't working up to their par, let's say. Q. Okay. And did -- was it a face-to-face conversation, or was it over the phone? A. I think, over the phone. Q. All right. And just as best you recall, what did -- what did Mike say to you, and what did you -- A. Just that that was my last day. Q. Okay. He just said, essentially, you're done? A. Yes.")

### 7. Donald Cruikshank

**<u>STATEMENT OF FACT NO. 53:</u>**

Donald Cruikshank was hired by Tony Zarlengo in 2009 to perform commercial overhead door installations for Midwest Dock, and Michael Richert made the decision to move Cruikshank to work for Midwest Dock. Cruikshank testified that Richert approached him and asked: "He asked me if I wanted to be in the union." Cruikshank then worked for Dock & Door until October 2023.

**<u>SUPPORT FOR STATEMENT OF FACT NO. 53:</u>**

Cruikshank 19:12-21:5, EX. 8 (testifying that he had experience performing commercial overhead doors and was hired by Zarlengo to work for Midwest Dock)

Cruikshank 60:7-61:14, EX. 8 (testifying that he was moved from Midwest Dock to Dock & Door by Richert because Dock & Door was busy and needed more workers— ("Q. … And how did it come about that you made the switch from Midwest Dock to -- to Dock & Door? A. They got overwhelmed with -- with work, and they needed another head, another hand. Q. Okay. They were just -- they were just busy? A. Yep. Yes. <u>Q. And did -- who approached you about that, or who did you approach or how did it happen? A. It was Mike Richert. Q. Okay. And what did he say or do? A. He asked me if I wanted to be in the union.</u> Q. And what did you say? A. Yes. Q. Okay. And is that -- that's when you joined Local 272? A. Yes. Q. All right. And is that when you started getting paid through Dock & Door? A. Yes.")

Cruikshank 19:16-20:22; 22:21-23:3, EX. 8 (testifying that he was hired by Zarlengo in 2009 to work for Midwest Dock)

Cruickshank 34:23-35:3, EX. 8 (testifying he worked for Midwest Dock and then Dock & Door from 2009 to 2023)

Richert 21:20-21, EX. 4 ("Q And who would have hired Donald Cruikshank? A Me and/or Tony.)

Brutti 61:8-14, EX. 3 ("Q. And Donald Cruikshank, he worked for Midwest Dock Solutions; correct? A. Correct. Q. And does he still work for Dock & Door? A. He does not. Q. Okay. But he also did work for Dock & Door? A. Yes, he did.")

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, Response to Interrogatory No. 1, (Exhibit 221), EX. 25, (Dock & Door stated that Cruikshank worked for Dock & Door for over five years from October 2017 to January 2023)

## STATEMENT OF FACT NO. 54:

Tony Zarlengo gives Donald Cruikshank his daily job assignments and that has been true the entire time that Cruikshank worked for Midwest Dock and after he became an employee of Dock & Door. Cruikshank always considered Zarlengo and Michael Richert to be his bosses, even when he worked for Dock & Door. Cruikshank testified as follows:

> Q. Okay. So from the time you – what I'm trying to do is just set up the time period I'm going to ask you about. So you worked there from pretty much 2009 to 2023, either Midwest or then Dock & -- Dock & Door straight through, correct?
> A. Yes.
> Q. Okay. And -- and you didn't go back and forth between the companies – between those companies?
> A. No.
> Q. Okay. You just switched, at some point, and went from Midwest to Dock & Door, correct?
> A. Yes.
> Q. Okay. And during that – during those -- almost 14 years; is that right?
> A. Yes.
> Q. Okay. During that 14 years, was -- was Mr. Zarlengo, Tony Zarlengo, your boss?
> A. Yes.
> Q. Okay. And Mike Richert was your boss during those 14 years?
> A. Yes.
> Q. And Tony Brutti, was he your boss at any point during those 14 years?
> A. No. No.

**SUPPORT FOR STATEMENT OF FACT NO. 54:**

Cruikshank 34:19-36:4, EX. 8

Cruikshank 35:15-36:4, EX. 8 ("Q. And during that – during those -- almost 14 years; is that right? A. Yes. Q. Okay. During that 14 years, was -- was Mr. Zarlengo, Tony Zarlengo, your boss? A. Yes. Q. Okay. And Mike Richert was your boss during those 14 years? A. Yes. Q. And Tony Brutti, was he your boss at any point during those 14 years? A. No. No.")

Cruikshank 27:11-23; 28:17-22, EX. 8 ("Q. Okay. All right. And tell me about your job with Midwest. Did it change over time? A. No. Q. No? Who did you -- who did you report to? Do you have a boss? A. Tony Zarlengo. Q. Okay. And do you know Mike Richert? A. Yes. Q. Was he your boss? A. Yes. … Q.  If you can remember. Was Tony Brutti your boss? A. No. Q. Okay. At any time? A. No.")

Cruikshank 36:5-22, EX. 8 ("Q. Okay. And when you first started there, how would you get your job assignments, like how would you know where to go on a day-to-day basis? A. Probably text or phone calls. Q. Somebody would call you and tell you where to go or -- A. Texting most of the time, but, yes, phone. Q. Okay. And who would send you those texts, or who would make those calls? A. Tony Zarlengo. Q. Okay. And was that true pretty much for the full 14 years? A. Yes.")

8. **Quinten Williams**

**STATEMENT OF FACT NO. 55:**

Quinten Williams was a member of the Union who was only paid through Dock & Door (not Midwest Dock) for over a year from August 2022 through September 2023, but he listed his employer on his LinkedIn page as Midwest Dock because he was unaware that Midwest Dock and Dock & Door were two separate companies.  Williams testified as follows:

> Q.    And are you familiar with the companies, Dock & Door Install and Midwest Dock Solutions?
> A.    I know it as Midwest Dock & Door Solutions.
> Q.    Okay. That's how you -- that's what you know the company as?
> A.    Right.
> Q.    Okay.  Say that name again?
> A.    Midwest Dock & Doors.
> Q.    Midwest Dock & Doors Solutions?
> A.    Right.
> Q.    Okay. All right. Are you aware that there's two separate companies?
> A.    No, not formally.
> Q.    Not formally?
> A.    Yeah.
> Q.    Okay.  You sort of know it as one company?

A.    Yes.

…

Q.    And I'm going to show you -- now, you mentioned from your perspective, as far as you understood, there was just one company, correct?

A.    Yes, sir.

…

Q.    …  The company you were working for, can you tell me what kind of work it did?

A.    Midwest Dock & Doors?

Q.    Yeah.

A.    We would install dock doors, which are dock doors and operation doors, so the bigger dock doors, basically.

**SUPPORT FOR STATEMENT OF FACT NO. 55:**

Williams 35:4-36:3; 46:15-19; 47:17-23; 187:23-188:10, EX. 18

Williams 19:10-14; 20:14-21:8; 23:19-20, EX. 18

Quinten Williams LinkedIn Page, (Exhibit 2), EX. 75

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, Interrogatory No. 1, (Exhibit 221), EX. 25 ("Williams, Quinten 8-12-2022 — 9-29-2023 Carpenter Direct Deposit Dock & Door")

**STATEMENT OF FACT NO. 56:**

Quinten Williams only spoke to Tony Zarlengo, from Midwest Dock, on the phone and then personally met with Zarlengo and filled out some paper work at the office in Steger, Illinois before he was hired.  Williams testified that Zarlengo was the only one he met with when he was hired and that Zarlengo hired him.  Williams testified:

Q.    You said you believed that you gave the job application to Tony Zarlengo?

A.    Tony was the only one that was in my -- it wasn't really an interview. It was just a proper introduction.

Q.    Okay.  And you're -- you're certain that was Tony Zarlengo?

A.    Yes.

Q.    Okay.  Was Mike Richert involved in any of that hiring process?

A.    No, not in the in-person part.

Q.    Okay.  Was Tony Brutti involved?

A.    Tony Brutti? No.

Q.    No?  You're sure about that?

A.    Positive.

**SUPPORT FOR STATEMENT OF FACT NO. 56:**

Williams 36:10-37:9; 38:8-40:21, EX. 18 ("Q. How did you come to be employed at Midwest Dock & Door Solutions? A. I was referred by my BA, my business rep. Q. All right. And who is your BA? A. Joe. Joe Willis. Q. And after he referred you to them, what did you do? A. I believe the next step was calling -- I believe I talked to Tony Zarlengo over the phone about my start date. Q. Okay. Did you have to introduce yourself to him or anything like that, or did he just know who you were when you called or -- A. I believe that they sent over my information already, so he -- he knew my name. I'm not going to say he knew who I was right off the bat." … "Q. And tell me about that process. I'm going to call it the onboarding process. Tell me about the onboarding process. How did you -- A. So I had an introduction at their home facility in Steger. Q. Okay. A. Came in. Did my paperwork the first day. I believe I started the following week after, if I'm not mistaken. Q. Okay. A. So, yeah, after that -- Q. All right. Let me stop you there. So when you came in to do your paperwork, what paperwork do you recall you had to fill out? Zarlengo. Q. Okay. And did he give it to you to complete? A. Yeah. I completed it in the office. Q. Okay. But I mean, was he the one who gave it -- when you showed up at the office, did you meet with Tony? A. Yeah. That's the only person I met with. Q. Okay. Tony Zarlengo was the only one you met with? A. Yes. Q. Okay. Okay. So he had to have given you the papers to fill out? A. Right. Q. And you gave them back to him? A. Right.")

Williams 42:4-10, EX. 18 ("Q. All right. So from the time that you got the call from the union until the time that you started working and Ira sent you the text, was the only person that you had spoken with Tony Zarlengo? A. Yeah. Higher up, yes. Q. Okay. Is it fair to say he hired you? A. Yeah. You can say that.")

Williams 157:19-23, EX. 18 ("Q. And when he says that's what Michael said that's what you said in your interview -- A. Correct. Q. -- he's referring to your interview when you were hired, correct? A. Correct. Which was with Tony Zarlengo. Q. Okay.")

Williams 158:10-12, EX. 18 ("Q. Okay. But the only person you interviewed with was Tony Zarlengo? A. Correct.")

Williams 235:18-236:15, EX. 18 ("Q And do you remember, was Michael there also? A. No. It was just me and him. Q. It was just you and Tony Zarlengo? A. Correct.")

Williams 181:3-9, EX. 18 ("Q. Who -- what is your understanding of who the owners were of the company you worked for? A. Mike and Tony. Q. Okay. Tony Zarlengo? A. Right")

**STATEMENT OF FACT NO. 57:**

Quinten Williams received his job assignments from Ira Sugar. Williams described Sugar as his supervisor and testified that Sugar would text him his job locations every day consistently during the entire time he worked there. Sugar was employed by Midwest Dock.

**SUPPORT FOR STATEMENT OF FACT NO. 57:**

Williams 36:10-37:9; 38:8-40:21, EX. 18

Williams 60:24-61:11, EX. 18 ("Q. And then how about Ira Sugar? A. Ira was the super who would give me my destinations. Q. And would you say he was your supervisor? A. Right. Q. And was that true the entire time you were there? A. Yes. Q. He'd give you your instructions, where to go for work? A. Right.")

Williams 202:9-202:23, EX. 18 (testifying that it was Sugar who was the only one who told him what jobs to go to and what he would be doing)

Williams 204:16-205:12, EX. 18 ("Q. And what did you understand, from him telling you where to go, what his job duties were? A. He was my supervisor because that's where we reported everything to. Q. What did you -- you say you reported everything to him? A. So like if we needed a new lift, if we needed materials dropped off, if we needed anything missing that we don't have, Ira. Ira's the guy. Q. Okay. And how did you communicate that to Ira? A. Collin. Q. So you didn't communicate that to Ira? A. Not all of the time. Sometimes I have. Q. Okay. A. Damaged -- damaged parts and stuff like that")

**STATEMENT OF FACT NO. 58:**

Even though Quinten Williams was employed through Dock & Door, Williams understood that the owners of the company he was working for were Tony Zarlengo and Michael Richert. Williams did not meet or communicate with Tony Brutti—who he knew as "payroll Tony"— prior to being hired. Williams knew Brutti as the person he should give his timesheets to. Williams had Brutti's name stored in his cell phone as "Tony Payroll", and he had Zarlengo's name stored in his cell phone as "Tony Midwest Dock Boss" and Richert stored in his cell phone as "Mike Midwest Dock Boss". Williams had the other Dock & Door employees he worked with stored in his phone as "Collin Midwest Dock," "RJ Midwest Dock," "Nico Midwest Dock," "Don Midwest Dock," "Dave Midwest Dock" and "Chris Midwest Dock."

**SUPPORT FOR STATEMENT OF FACT NO. 58:**

Williams 180:9-181:9, EX. 18 ("Q. What was your understanding of Tony Zarlengo's role with the company? A. That was Collin's uncle, and he was one of the owners of the company. Q. Okay. So overall operation of the company? A. Right. Q. Okay. Anything else? A. That was about it. Q. Okay. And how about Michael Richert? What was your understanding of what he did? A. What he did? I just knew that he was one of the owners through Collin. Q. All right. Who -- what is your understanding of who the owners were of the company you worked for? A. Mike and Tony. Q. Okay. Tony Zarlengo? A. Right.")

Williams 11:1-20, EX. 18 ("When was the last time -- do you know who Tony Brutti is? ' A. Tony Brutti? I believe that's Payroll Tony. Q. Okay. When you say 'Payroll Tony,' what's that mean? A. That's the person we would send our time sheets, too, I believe. Q. Okay. And you believe -- you called him Payroll Tony? A. Yes. Q. Okay. Do you know

79

his last name? A. Not off the record. Q. Okay. So you're just guessing that that's who you—who that is? A. Yes.")

Williams 142:4-144:17, EX. 18 (testifying as to how the Brutti, Zarlengo, and Richert's numbers were stored in his cell phone)

Williams 145:1-147:15, EX. 18 (testifying as to how the names of the employees he worked with were stored in his cell phone)

### 9. Anthony Tattini

**STATEMENT OF FACT NO. 59:**

Anthony Tattini was employed by Dock & Door, and he was hired and eventually terminated by Michael Richert. Tattini knew the company as "Midwest" or "Midwest Dock", the name that was on the trucks that he used. Tattini understood that there was really just one company. He received his daily job assignments and critiques of his work while working for Dock & Door from Tony Zarlengo, who he described as the person "who ran everything." Tattini's final paycheck came from Midwest Dock. Tattini testified his bosses were Zarlengo and Richert but not Tony Brutti who he described a "straw man":

> Q. And then how about Tony Brutti?
> …
> A. Yeah. Like everybody knew he didn't do nothing. Everybody knew -- everybody knew he was the -- the face or the -- or straw man or whatever you want to call it.

**SUPPORT FOR STATEMENT OF FACT NO. 59:**

Tattini 36:16-37:3, EX. 15 ("Q. Okay. And when you say 'the operation,' what are you referring to? A. The company. Q. Okay. Meaning both Dock & Door and Midwest Dock? A. Yes, sir. Q. Okay. Which you take as one company, in essence? A. Yes, sir.")

Tattini 50:9-12, EX. 15 ("Q. Okay. And -- all right. Who hired you? A. Mike Richert. Mike Richert.")

Tattini 67:24-69:14, EX. 15 ("Q. Okay. All right. All right. Once you were hired -- and what do you -- I'm sorry. What do you refer to the company as? Do you refer to it as Midwest? A. Yeah. Q. Okay. So when -- when you were hired by Midwest, how would you get your job assignments day to day? How did you know where you were going? A. Tony Zarlengo. Q. Okay. And he would give you your job assignments? A. Yes, sir. Q. And what would he tell you? A. He would say -- he would say, in the beginning, take -- come to the shop, take this truck, pick up Jose or Nico, and -- and load up -- load up. Q. Would he tell you what to load? A. Oh, yeah. Q. Okay. A. Oh, yeah. I mean, he -- he even had -- he had -- I'm sure he still does. He has cameras in the shop. So he would be texting us, like what's going on? It's taking too long to load. You guys should be out of there. So, yeah, I mean, he knew what was going on. Yeah, I mean -- and I received all of my work

assignments from Tony Zarlengo. I mean, yeah, yeah. All of the time. Q. So he would tell you what -- so would he tell you what you were going to be installing? A. Oh, yeah. Q. Like you're installing a lot of different stuff? A. Oh, yeah.")

Tattini 47:15-48:1215, EX. 15 ("Q. What do you know the company as? You know it as Midwest Dock Solutions, Dock & Door? A. We know it as both, but like the -- the face and branding of it is Midwest Dock. We would show up in Midwest Dock, you know, labeled trucks, but we all knew we were getting paid from Dock & Door Install or whatever it was. Q. Okay. A. Yeah. So we all knew that. Q. Okay. So when you were hired, the first company you were paid through, was it Dock & Door? A. Yes.")

Tattini 96:12-15, EX. 15 ("Q. Okay. And what is your understanding of what Tony Zarlengo did? A. Ran everything.")

Tattini 14:17-15:19, EX. 15 ("Q. Okay. And when was the last time you spoke with Tony Zarlengo? A. The same day Mike fired me. The day I was terminated, yeah. Q. Okay. And when you say 'Mike,' is that Mike Richert? A. Yes. Q. Okay. When was the last time you spoke to Mike Richert? A. The same time. Q. Okay. And you said he fired you? A. Yes, sir.")

Tattini 17:16-20:3, EX. 15 ("Q. Ah-huh. A. And I was like, okay, I'll be back at the shop, get my check, and I'm gone. He tried calling me back on the individual's phone because they brought that individual to the job site, another employee did. I'm like that's it, I'm fired, get in the truck. And then he's trying to call me and communicate through the individual that I had to drive every day. I'm like I have nothing to say. You fired me. I had enough of this. This is fine. You fire me. I go back to the shop. Mike -- Mike's there. I walk in. And Tony's there. Tony's like what's up. Q. Tony? A. Zarlengo. And Mike said, yeah, we need to give him -- Tony -- his check. And he's like what's going on? He's like -- he's like I fired him. And -- Q. That's Mike who said that? A. Yeah. And Tony's like, well, we can't give him a check right now. We don't have no money. And Mike said, yeah, you can, and like hold on. So I get all of my tools. I had my wife at the time -- ex-wife -- pick me up. I put my tools in. They gave me a check. I go to the bank. I try cashing it. It bounces. Then I go back -- I call Mike. I was like, hey, Mike, the check just bounced. He said, oh, come back to the shop. I go back to the shop. He -- he meets me in the lobby, won't let me in like. And he's like -- he's like here's another check. He goes, but you just I can't go to my bank and cash that. I go, excuse me? I go, yeah, I can. And -- I know, like -- like I'm like that ignorant? You know what I'm saying? Like -- so whatever. So they gave me a good check, I cash it, and that was it. (WHEREUPON, the document was marked Plaintiff's Exhibit 34 for identification, as of 4/11/25.) BY MR. McJESSY: Q. Okay. And I'm going to show you what I've marked as Exhibit 34 and ask you could those be the checks? A. That bounced? Q. That you got. A. That day? Q. Yes. They're dated, it looks like, September 24, 2019. A. September 24, 2019. Yeah, let me see. How much was it for? Yeah. These are like handwritten checks. What are the dates? Are the days in sequence here? I'm having a hard time seeing this.")

Tattini 25:2-12, EX. 15 ("Q. All right. I'm handing you what's marked as Exhibit 35 just because it's a little easier to see. It's the same two checks that we were looking at -- A. Yeah. Makes total sense. Q. -- but blown up. So you think that the check -- that these checks were related to your last pay? A. Yes, sir. Most definitely.")

Tattini 26:12-14, EX. 15 ("Q. And who gave you these [Midwest Dock Solutions] checks, then, that we've marked as Exhibits 34 and 35? A. Mike [Richert] gave me those in the lobby, in the foyer. Q. Okay. And those are -- that's his signature on the checks? A. Yeah. Q. All right. And this was for your -- basically, your last two weeks of work for Dock & Door? A. Yes, sir.")

Tattini 72:21-73:9, EX. 15 ("Q. Did you consider him [Tony Brutti] your boss? A. No. No. Not at all. Q. Okay. Who -- who did you consider your boss? A. Mike and Tony. Q. Okay. And Tony, you mean Zarlengo? A. Zarlengo. Q. Okay. There's two Tonys, so I just want to be clear. A. Yeah.")

Tattini 98:11-23, EX. 15 ("Q. And then how about Tony Brutti? A. He sat in the office and shot flies with that little salt gun. Q. With a little what? A. Like you ever see that -- like it looks like a little gun? It shoots like a blast of salt, and you're supposed to like kill the flies. Q. Oh, no. A. Yeah. Like everybody knew he didn't do nothing. Everybody knew -- everybody knew he was the -- the face or the -- or straw man or whatever you want to call it.")

Check from Midwest Dock Solutions to Tony Tattini for $1,324.68, Sep. 24, 2019 and Check from Midwest Dock Solutions to Tony Tattini for $827.88, Sep. 24, 2019, (Exhibit 35), EX. 76

### 10. Ira Sugar

## STATEMENT OF FACT NO. 60:

Ira Sugar is a sales person employed by Midwest Dock. He would assign specific crews of Dock & Door employees to work on the job sites when Midwest Dock contracted to perform work for general contractors to make sure that the people he was sending out were qualified to do the work and he would instruct them on what the installation for a project involves.

### SUPPORT FOR STATEMENT OF FACT NO. 60:

Sugar 75:21-76:23, EX. 23 ("Q. Okay. And then you said you scheduled the labor with Dock & Door, correct? A. Yes. Q. And what does that entail? A. Assigning crews to specific jobs and providing any useful information. That's about it. Q. Okay. And is that something you would do also? A. Yeah, I did. Q. Okay. And does that involve like picking out who you want to do the installations? A. Yeah. Q. All right. A. Yeah. Q. And you need to make sure that the people you're sending out are qualified, correct? A. Correct. Q. Okay. And would you actually talk to them about what the installation involves? A. If I felt it was needed, yes.")

Sugar 108:18-109:16, EX. 23 ("Q. Okay. And then how do you make sure the guys get there to be there for the orientation? A. When they're scheduled for work, they -- I just notify them that they report to the job trailer and meet with so-and-so at a specific time. Q. Okay. And that's a regular part of your job? A. Yes.")

Sugar 147:15-23, EX. 23 ("Q. Okay. How -- how would you know who to send the text to? You'd know who was on the job? A. Right. Q. Okay. Because you assigned them to the job? A. Right.")

Corrigan 174:2-20, EX. 7 (Q. How about Ira Sugar? A. He did sales. Q. Okay. And did you work with him at all? A. If he sold a job, you would kind of talk to him about material or what needs to be done. Q. Okay. So he would -- he would ask you about that? A. Yes. Q. Okay. Or would you ask him about it? I'm trying to understand the dynamics. A. If he sold a job and if we were sent to that job, we might report to him or call him and see exactly what needs to be done or what exactly he sold them so we can install it.")

Green 157:2-18, EX. 12 ("Q. And Anthony Zarlengo, we talked about that he's the owner of Midwest Dock, correct? A. Yes. Q. All right. And he gives you directions on what job sites to go to? A. Yes. Q. All right. And he still does that, right? A. Yes. Q. And does he -- like with Ira Sugar, would he also tell you like what the project is and whether you need to pick up any materials before you go there? A. Yes.")

Green 167:20-169:11, EX. 12 (testifying that Ira Sugar would authorize him to put 8 hours on his timesheet for a day even if he worked less than 8 hours)

Williams 41:12-42:3, EX. 18, ("Q. Okay. And how did you get your job assignment? Like how did you know where to go that first week? A. Ira. They have a guide, a superintendent, Ira -- I believe his last name is Sugar, I believe. Q. Okay. A. He -- he would text our locations every day for where we were going. Q. Okay. He would send you a text message? A. Yes, sir. Q. And was that pretty consistent during the entire time you were there? A. Yes. Q. All right.")

Williams 61:1-11, EX. 18 ("A. Ira was the super who would give me my destinations. Q. And would you say he was your supervisor? A. Right. Q. And was that true the entire time you were there? A. Yes. Q. He'd give you your instructions, where to go for work? A. Right.")

## STATEMENT OF FACT NO. 61:

Ira Sugar would be the main point of contact on behalf of Dock & Door for general contractor jobs that he sold for Midwest Dock for work being performed on the job site by employees of Dock & Door and he would communicate with the employees paid through Dock & Door while they were on the job sites.

### SUPPORT FOR STATEMENT OF FACT NO. 61:

Sugar 111:5-22, EX. 23 ("Q. Okay. And I'm going ask you to turn back through that document. You're going to come across to a page called Exhibit E, scope of work. And if you look at that -- are you on the first -- yes. Excellent. Thank you. Do you see where it says Midwest Dock Solutions/Ira Sugar at the upper right-hand corner? A. Yes. Q. Okay. Are you the person designated there because you're sort of the main contact on behalf of Dock & Door for this project? Is that what your understanding would be? A. I'm the main point of contact for Pepper, as far as material and installation, yes.")

Sugar 147:4-23, EX. 23 ("Q. Okay. That's what I thought. And -- and if they communicate to you, how do you communicate with somebody at Dock & Door to make sure they're out there? A. By text, usually. Q. Okay. And do you have the text numbers for -- or the phone numbers for the workers from Dock & Door? A. Yes. Q. Okay. How -- how would you know who to send the text to? You'd know who was on the job? A. Right. Q. Okay. Because you assigned them to the job? A. Right.")

**J.  Dock & Door Has No Sales Staff Or Office Support Staff—Midwest Dock Employs The Sales Staff Who Sell The Projects Worked By Dock & Door.**

### STATEMENT OF FACT NO. 62:

Dock & Door has never employed any office support staff, for example a receptionist, secretary, bookkeeper, and Dock & Door has never employed any sales staff, such as salespersons or estimators.  The sales staff that bids for the new construction union projects performed by employees paid through Dock & Door is employed by Midwest Dock.  Since July 2014 Midwest Dock has employed Joe Sheridan, Ira Sugar, and Tony Zarlengo who bid and sold new construction projects  with union general contractors.  In addition, Midwest Dock employed other sales persons, like Steven French and James Johnson, and administrative staff, including Sherri Webber, Amber Toigio-Sichterman, and Danny Lietz.

### SUPPORT FOR STATEMENT OF FACT NO. 62:

Brutti 62:25, EX. 3 ("Q. Okay. Dock & Door does not employ any sales staff; correct? A. Correct. Q. And who are the salespersons that sell the contracts that Dock & Door ultimately works on? A. Ira Sugar. Q. Okay. And anyone else? A. Currently, no. Q. How about in the past? A. Tony Zarlengo. Q. Anybody else in the past? A. No, just those two. Q. Were you here for -- A. Oh, no, Joe Sheridan, I'm sorry, Joe Sheridan. Q. Who? A. Joseph Sheridan, going back further. Q. S H E R I D A N? A. I believe so. Q. All right. And he's no longer there? A. He is not. Q. Okay. So Ira Sugar, Tony Zarlengo, and Joseph Sheridan, they're the three, they're the only three that you're aware of as sales staff that have sold projects that Dock & Door has worked on; correct? A. I believe so, yeah. Q. Has Dock & Door ever paid them any compensation for their work? A. No. Q. And Dock & Door has never employed any sales staff; correct? A. Correct.")

Zarlengo 82:21-83:3; 93:23-95:10; 95:22-96:20; 98:20-99:23, 117:22-24, EX. 2 (testifying that he (*i.e.,* Zarlengo) works as sales for Midwest Dock, Sugar works as sales for Midwest Dock, Sheridan worked as sales for Midwest Dock, French works as sales for Midwest Dock, David Mortel works as sales for Midwest Dock, and Johnson worked as sales for Midwest Dock—including (Q. And so if you look at Ira Sugar there -- A. Yeah. Q. -- it says -- it says, roughly -- well, it doesn't say roughly -- it says employment from June 28, 2017, to the present. Does that sound about right to you? A. Yes. Q. All right. And was he hired to do new construction overhead door sales? A. Yes. Q. Was there somebody else who was doing that before him? A. Yes. Q. And who was that? A. Joseph Sheridan. … Q. Okay. All right…. But there were employment issues, and he was terminated? A. Yes. Q. And Mr. Sugar was hired in his place? A. Yes.")

Zarlengo 93:23-96:20, EX. 2 (testifying that he performed sales of new construction installation of dock levelers)

Zarlengo 117:22-121:6, EX. 2 (testifying that Midwest Dock hired Sugar, French, Mortel, and Johnson as sales persons)

Zarlengo 306:24-307:4, EX. 2 (testifying that Webber is Midwest Dock's in-house bookkeeper)

Richert 49:6-11; 50:1-5, EX. 4 ("Q. …Ira Sugar, is he sales? A. Inside sales. Q. What's inside sales? A. He bids off of a computer screen. Q. And he bids new construction jobs? A. Yes. Q. Okay. Has Ira always bid those kind of jobs? A. Yes. Q. Does Tony Zarlengo also bid those kind of jobs? A. Yes.")

Webber 66:3-67:4; 76:12-15; 55:13-20; 61:22-62:20, EX. 63 (testifying that Toigio was hired in approximately 2022 and handles billing for service work using the Xero accounting software and entry of bills that Midwest Dock receives as part of its accounts payable, that Lietz works in the office managing service calls and ordering parts, and Johnson who worked in sales)

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, Response to Interrogatory No. 1, (Exhibit 221), EX. 25

Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Interrogatory No. 1, (Exhibit 40), EX. 24 (identifying salespersons and administrative staff and dates of employment by Midwest Dock and periods of employment)

## K. Dock & Door Has No Suppliers; All Supplies Are Purchased By Midwest Dock.

## STATEMENT OF FACT NO. 63:

Dock & Door has no suppliers of materials. All supplies are purchased and maintained by Midwest Dock, which identified at least 95 suppliers. Supplies are kept in the warehouse and

both Midwest Dock's employees and Dock & Door's employees take supplies from there.

**SUPPORT FOR STATEMENT OF FACT NO. 63:**

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, Interrogatory No. 6, (Exhibit 221), EX. 25 ("Interrogatory No. 6: Identify each material supplier for Dock & Door from January 1, 2016 to the present (including for example, every supplier of welding equipment and supplies, dock plates, dock levelers, overhead doors, dock canopies, dock shelters, dock seals, overhead door openers, jackshaft operators, trolley operators, slide operators, and parts for any of the forgoing, etc.). **ANSWER:** Dock & Door has not purchased materials from any material suppliers between January 1, 2016 and the present so there are no suppliers to identify for this Interrogatory No. 6.")

Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Interrogatory No. 6, (Exhibit 40), EX. 24 (identifying approximately 95 suppliers of materials and equipment)

Sugar 65:2-66:1, EX. 23 ("Q. Okay. And I take it that the supplies for the -- the, like, drill bits and the anchors and things like that, even on the -- for the projects for the larger general contractors, the Dock & Door guys would pick the -- pick those up at the 36th Place, Steger office. Is that fair? A. Yes. Q. Okay. And then they would take them out to the job site, correct? A. Yes. Q. And I take it, those same kind of anchors and hardware and drill bits would also be used even on the smaller jobs for PSI and Chicago Heights, correct? A. Yes. Q. So those -- those materials that are also used by the Dock & Door guys would be picked up from the Midwest Dock Solutions office at 36th Place, correct? A. Yes.")

## STATEMENT OF FACT NO. 64:

L. **Dock & Door Install Often Lost Money In Any Given Year. Between 2016 And 2023, Dock & Door Lost $70,069.00.**

**SUPPORT FOR STATEMENT OF FACT NO. 64:**

Summary of tax returns and profits/losses and dividend payments.

Dock & Door Install, Inc. 2016 Federal Tax Return (first page only), (Exhibit 172), EX. 54 (loss of $5,174.00)

Dock & Door Install, Inc. 2017 Federal Tax Return (first page only), (Exhibit 175), EX. 55 (loss of $1,791.00)

Dock & Door Install, Inc. 2018 Federal Tax Return (first page only), (Exhibit 178), EX. 56 (income of $6,011.00)

Dock & Door Install, Inc. 2019 Federal Tax Return (first page only) (Exhibit 181), EX. 57 (income $27,419.00)

Dock & Door Install, Inc. 2020 Federal Tax Return (first page only), (Exhibit 184), EX. 58 (loss of $101,409.00)

Dock & Door Install, Inc. 2021 Federal Tax Return (first page only), (Exhibit 187), EX. 59 (income $33,371.00)

Dock & Door Install, Inc. 2022 Federal Tax Return (first page only), (Exhibit 190), EX. 60 (loss of $40,504.00)

Dock & Door Install, Inc. 2023 Federal Tax Return (first page only) (Exhibit 193), EX. 61 (income $12,008.00)

Brutti 195:16-197:5, EX. 3 ("Q. If you could get out Exhibits 184, 187, 190, and 193, they're the tax returns. And if you just look at line 21 on each one of those where it says Ordinary Business Income or Loss; do you see that? A. Which line? Q. Line 22.·For example, for 2020 it shows Ordinary Business Loss, Income Loss minus $101,000; do you see that? A. Yeah. Q. All right. And then if you look at the same line for 2021 on Exhibit 187, it shows 33,000 to the positive; do you see that? A. Correct, yeah. Q. And then if you look at 2022, it shows on that line that's Exhibit 190 a loss of $40,000; do you see that? A. Correct. Q. And then 2023 It shows $12,000 to the good, that's Exhibit 193; correct? A. Correct. Q. All right. So what kind of profit were you looking to make in setting the unit price? A. I wouldn't have any kind of number in my head, but wanting to, like I said, cover costs and hopefully grow the business slowly. That always hasn't been the case. Q. So your hope was as long as you could cover costs and pay yourself the salary you were taking, you were good with that? A. Well, yeah, I would hope to take dividend checks and be able to, yeah. Q. Do you have any idea how much you took in dividends in the last five years? A. I don't know that number off the top of my head. Q. Okay. Would it be $50,000, do you think? A. I don't know. Q. You have no idea? A. I don't.")

**M. Brutti Makes Much Less Than Many Of Dock & Door's Employees.**

**STATEMENT OF FACT NO. 65:**

Tony Brutti is paid a salary through payroll using ADP payroll service like the other employees of Dock & Door, and he is paid every week.  His total salary for each year from 2017 through 2023 is as follows compared to some of Dock & Door's other employees:

| | Tony Brutti | Don Cruikshank | David Green | Anthony Tattini | Jose Aguirre | Eric Jansma | Nicolas Kelly | Collin Zarlengo |
|---|---|---|---|---|---|---|---|---|
| 2017 | 51,950.00 | | 73,062.20 | 78,814.95 | | | | |
| 2018 | 58,352.92 | 66,087.48 | 65,798.72 | 76,718.88 | | | | |
| 2019 | 61,172.49 | | | | | | | |
| 2020 | 63,098.36 | | 93,228.18 | | | | | |
| 2021 | 64,396.56 | | 70,654.94 | | | | | |
| 2022 | 71,594.48 | 116,229.74 | 104,170.15 | | 104,805.85 | 87,796.20 | 93,127.05 | 88,307.40 |
| 2023 | 71,031.76 | | 98,661.38 | | 100,892.60 | 93,901.02 | 96,111.72 | 93,227.25 |

Tony Brutti conceded that every year there are employees paid through Dock & Door who make considerably more than he does and work more hours than he does.

**SUPPORT FOR STATEMENT OF FACT NO. 65:**

Brutti 177:17-178:3; 178:24-179:1, EX. 3 ("Q. Okay. Is there any reason as the owner of the company that you don't make more than your employees? A. I never really thought about it. I mean, it's never really been an issue with me. Q. And I have W-2s here for the other years, but would you agree that every year there are employees who work for Dock & Door that make considerably more than you do? A. It appears that way. Q. Would you say they [your employees] work more hours than you do? A. Yeah.")

Brutti 170:15-171:17, EX. 3 (testifying that he is paid a salary every week through ADP payroll service)

Anthony Tattini and David Green W-2s for 2017, (Exhibit 261), EX. 81

Anthony Brutti W-2 for 2017, (Exhibit 173), EX. 82

Anthony Brutti W-2 for 2018, (Exhibit 176), EX. 83

Donald Cruikshank, David Green and Anthony Tattini W-2s for 2018, (Exhibit 262), EX. 84

Anthony Brutti W-2 for 2019, (Exhibit 179), EX. 85

Anthony Brutti W-2 for 2020 (Exhibit 182), EX. 86

Anthony Brutti W-2 for 2021 (Exhibit 185), EX. 87

Anthony Brutti W-2 for 2022 (Exhibit 188), EX. 88

Jose Aguirre, Don Cruikshank, David Green, Eric Jansma, Nicolas Kelly and Collin Zarlengo W-2s for 2022, (Exhibit 264), EX. 89

Anthony Brutti W-2 for 2023, (Exhibit 191), EX. 90

Jose Aguirre, David Green, Eric Jansma, Nicolas Kelly, and Collin Zarlengo W-2s for 2023, (Exhibit 263), EX. 91

David Green W-2s for 2020-2024, (Exhibit 28), EX. 92

**STATEMENT OF FACT NO. 66:**

Tony Zarlengo and Michael Richert made the decision for Tony Brutti to a distribution as a "bonus" and Zarlengo is notified by Callie Stephens from Gineris & Associates, Ltd., Midwest Dock Solutions and Dock & Door Install's shared accounting firm when Brutti takes a distribution from Dock & Door Install. Zarlengo testified as follows regarding this text message exchange between him and Stephens:



**SUPPORT FOR STATEMENT NO. 66:**

Zarlengo 302:10-303:12; 304:8-13, EX. 2 ("Q. I'm handing you what I've marked as Exhibit 107, and I'll represent to you that this is a text message between you and Callie Stephens, and I'd like for you to take a look at the one dated June 13, 2023. Do you see that? A. Yes. Q. And it says, hey, Tony, long time no talk. I hope you're well. I'm reviewing Dock & Door for May. I saw that Tony took a $5,000 distribution. Do you understand that would be Tony Brutti? A. Yes. Q. Were you aware of this? Do you want me to notify you in the future? And you respond, yes, we told him to. No issue. Thanks. We are working on this mile thing, also, for sales guys. Do you see that? A. Yes. Q. <u>All right. Why -- why did you tell Tony Brutti to take a distribution?</u> A. <u>For a bonus.</u> Q.

Okay. A. I don't know. I mean, for a bonus. … Q. <u>Are you ordinarily notified when Mr. Brutti takes a distribution?</u> A. <u>Yes.</u> Q. Okay. And why is that? A. I don't know why that is.

Text Message Between Callie Stephens, Gineris & Associates, Ltd., and Tony Zarlengo, Midwest Dock Solutions, Jun. 13, 2023 (Exhibit 107), EX. 122.

## N. Dock & Door Has No Market Presence.

## STATEMENT OF FACT NO. 67:

Dock & Door has never maintained a website, a Facebook marketing page, a dedicated email address, it does not advertise in any industry publications, and it has no sponsorship logo on Tony Brutti's race car.

### SUPPORT FOR STATEMENT OF FACT NO. 67:

Brutti 98:13-17, EX. 3 ("Q. Okay. Sir, Dock & Door doesn't have a website; correct? A. Correct. Q. It has never had a website; correct? A. No.")

Brutti 98: 18-21, EX. 3 ("Q. And Dock & Door has no Facebook page; correct? A. Correct. Q. And has never had a Facebook page; correct? A. Correct.")

Brutti 98:22-99:2, EX. 3 ("Q. And Dock & Door doesn't advertise in trade publications; is that correct? A. Correct. Q. All right. Has Dock & Door ever advertised in trade publications? A. Not to my knowledge, no.")

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' Document Requests, Request Nos. 47-51, EX. 32 ("47. Produce all documents related to any social media pages maintained by Dock & Door, including but not limited to Facebook, Instagram, or LinkedIn. **RESPONSE:** There are no documents that are responsive to this Request No. 47; 48. Produce all documents related to the creation, design, maintenance, updating and hosting of any website owned or controlled by Dock & Door, including but not limited to agreements, invoices, payment records, and the like. **RESPONSE:** There are no documents that are responsive to this Request No. 48; 49. Produce documents sufficient to show any website maintained by Dock & Door at any time during the period from January 1, 2016 to the present. **RESPONSE:** There are no documents that are responsive to this Request No. 49; 50. Produce all documents related to any internet URL owned, controlled, or used by Dock & Door. **RESPONSE:** There are no documents that are responsive to this Request No. 50; 51. Produce all documents related to any email address owned, controlled, or used by Dock & Door. **RESPONSE:** There are no documents that are responsive to this Request No. 51.")

Brutti 99:3-17; 100:9-10; 101:7-10; 101:21-25, EX. 3 (testifying that his race cars have a sponsorship logo for "Midwest Dock Solutions" on them but no logo for Dock & Door)

**O. Midwest Dock Maintains A Market Presence And Holds Itself Out As A Union Company.**

**STATEMENT OF FACT NO. 68:**

Midwest Dock maintains a website, a Facebook marketing page, and a dedicated email address @midwestdocksolutions.com, it advertises in the Blue Book Building & Construction Network, an industry trade publication, and it even has its company logo across the hood of Tony Brutti's race car. Midwest Dock advertised itself in the Blue Book as a "union" company that performs work on new projects:





**SUPPORT FOR STATEMENT OF FACT NO. 68:**

Zarlengo 259:3-260:10, EX. 2 ("Q. Are you familiar with the Blue Book Construction Network? A. Yes. Q. Okay. What is it? A. Advertising, but for subcontractors. … So you filled it out about 15 years ago, you think? A. At least, 10. We haven't used it in three years, I don't think. We haven't paid for it. But, yeah, I signed up with that very early on. Q. When you say 'very early on,' very early on when in the formation of Midwest Dock Solutions? A. I'm trying to think what year ballpark. I think I was at Burville Road. Q. Well, let me direct your attention to -- A. I'm going to guess 2013 or '14.")

Blue Book Building & Construction Network ProView Worksheet and Contract at p.3, EX. 93 ("Labor Affiliation: Union") (emphasis added)

The Blue Book Webpage for Midwest Dock Solutions, Inc. at pp. 1, 2, (Exhibit 105), EX. 94 (highlighting added)

The Blue Book Building & Construction Network Contract For The Period August 2021 through July 2023, Apr. 14, 2021, EX. 95 (signed by Zarlengo)

Zarlengo 267:13-268-24, EX. 2 ("Q. Is all of the -- let me ask my question in a different way. Is all of the information on here -- strike that. Is any of the information on this contact page not accurate? A. No. Q. Okay. And -- let's see. And if you could go to the first page, do you see where it says, project experience, on the right side? A. Yes. Q. The first statement there is – says union. Do you see that? A. Yes. Q. And then it also says, public, private, new projects, alterations/renovations, interior fit-ups. Do you see that? A. Yes. Q. All right. Would you say Midwest Dock Solutions has experience with union projects? A. As of this date -- like I don't know what this date is. Q. As of the last time that the listing was updated by Midwest Dock Solutions for the Blue Book. A. Since it was updated, we've done -- yeah, we have experience with new projects.")

## STATEMENT OF FACT NO. 69:

Midwest Dock identified itself a "union" when it filled out the Subcontractor Prequalification form with Pepper Construction Company, something Midwest Dock had to do in order to bid on subcontracts for installation of overhead doors and dock levelers with Pepper Construction Company.  Moreover, when Zack Adkins, a senior project manager with Pepper Construction asked Ira Sugar from Midwest Dock whether Midwest Dock would use union labor on its job, Sugar responded, "Yes, thats [sic] correct, we are union."

### SUPPORT FOR STATEMENT OF FACT NO. 69:

Email from Ira Sugar, Midwest Dock, to Zach Adkins, Pepper Construction Company, Nov. 4, 2019, (Exhibit 60), EX. 96

Sugar 100:19-101:13, EX. 23 ("Q. All right. And then on the first page of this, there's a -- an email from Zach Atkins to you dated May 1, 2020, and he asks, Ira, union install, correct? Do you see that? A. Yes. Q. And what do you understand him to be asking? A. If I'm going to be using union labor on this job. Q. Okay. And then you respond to him in the email -- that's the first email on this page, May 1, 2020 -- saying, hi, Zach. Yes, that's correct. We are union, correct? A. Yes. That's what it says. Q. Okay. That was your email to him? A. Yes.")

Declaration of S. Oertley, Senior Contract Specialist, Pepper Construction Company, at ¶¶3, 4, Nov. 4, 2025, EX. 20

Zarlengo 185:19-187-20, EX. 2 (testifying that he completed the prequalification form for Pepper Construction Company)

## STATEMENT OF FACT NO. 70:

Midwest Dock submitted a bid proposal to Opus Design Build LLC dated January 3, 2022 signed by Tony Zarlengo where it states that Midwest Dock is bidding the job as a Union company and

fails to disclose that Midwest Dock will use Dock & Door as a subcontractor to perform any work.

**SUPPORT FOR STATEMENT OF FACT NO. 70:**

Bid Proposal by Midwest Dock Solutions, Inc. to Opus Design Build LLC at p.3, Jan. 3, 2022, (Exhibit 100), EX. 97

Zarlengo 172:14-176:6, EX. 2 ("Q. Sir, if you could look at Exhibit 100 in front of you there, it – it looks like this is a document produced by Midwest Dock Solutions. Do you see the number on the bottom there? A. Yes. Q. And the first three pages look to be a contract -- or a bid summary or something -- well, strike that. What are the first three pages? Tell me what they are. A. A bid. Q. Okay. It's a bid? A. Yes. Q. A bid that you prepared? A. I did prepare this. … Q. All right. And if you look at the bottom of this, it says union or open shop field labor, question mark. Do you see that? Yes. Q. What is an open shop? A. That is union or nonunion. Q. Okay. So open shop is nonunion? A. Yes. Q. All right. And you circled union, correct? A. Yes. Q. All right. So -- well, did you know, was union -- was union labor required for this project? A. Yes. Q. All right. Who are you bidding on this? Is it -- A. Opus. Q. Opus? Okay. And then if you turn to the next page, the third page, which is labeled four of four on the bid, it says, list any subcontractors to be hired and describe the scope of work and EMR? Do you see that? A. Yes. Q. And there's no nobody listed there, correct? A. Correct.")

**P. D&D Holds Itself Out As Midwest Dock.**

<u>**STATEMENT OF FACT NO. 71:**</u>

Employees of Dock & Door used trucks like the one shown below branded with the name "Midwest Dock Solutions" on union jobsites where Dock & Door employees were working. Testifying about the Facebook post for Midwest Dock showing the "Midwest Dock Solutions" truck on the job site, Tony Zarlengo testified that this was one of the jobs at the Heritage Crossing development that would have been performed by employees of Dock & Door:



(Exhibit 53), EX. 6



(Exhibit 8), EX. 98

## SUPPORT FOR STATEMENT OF FACT NO. 71:

Zarlengo 234:22-236:24, EX. 2 ("Q. And if you turn to the next page in that exhibit, it says Midwest Dock Solutions, July 26, 2016. Do you see that? A. Yes. Q. And it's another post by Mike Richert, and it says Midwest Dock Solutions is in Lockport, Illinois. Do you see that? A. Yes. Q. July 26, 2016, correct? A. Yes. Q. All right. Is that the Heritage Crossing building? A. One of them, yes. … And if the date of the picture is in July of 2016 -- and we had looked at the Krusinski contract earlier and the Certificates of Insurance, and I think they were actually dated 2014 and '15 -- do you know when -- do you know approximately when these pictures would have been taken? A. No, I don't. I would assume – I would think about the same time as they were posted, but I can't confirm that. Q. Would this work have been work performed by employees paid through Dock & Door? A. Yes.")

Cruikshank 43:11-44:9, EX. 8 (testifying that he drove trucks that said Midwest Dock on the side when he worked on job sites for Midwest Dock and when he worked for Dock & Door; and, there were no trucks that said Dock & Door on the side)

Bishop 73:2-10, EX. 71 ("Q. Okay. And does -- do employees of Dock & Door use trucks like this that have the Midwest Dock branding on the side? A. We do. Q. Okay. And you use those on Dock & Door job sites, correct? A. We do.")



Midwest Dock Solutions Truck, (Exhibit 8), EX. 98 (showing a "Midwest Dock Solutions" truck parked at a new construction jobsite)

Midwest Dock Solutions Truck, (Exhibit 5), EX. 99

Midwest Dock Solutions Truck, (Exhibit 6), EX. 100

Williams 79:17-80:2; 80:22-81:5, EX. 18 ("Q. And you would use a truck like this in your work? A. Yes. Q. Okay. And it would have the Midwest Dock Solutions on the side of it like this? A. Yes.")

**STATEMENT OF FACT NO. 72:**

It is often a requirement at union jobsites that the workers on the jobsite wear brightly colored clothing. Midwest Dock purchased brightly colored company branded clothing, including tee-shirts and sweat shirts for employees of both Midwest Dock and Dock & Door to wear on jobsites. Dock & Door does not purchase any company branded clothing. Accordingly, employees of Dock & Door wore shirts like the one shown below branded with "Midwest Dock Solutions" while they were working on union jobsites:



(Exhibit 15), EX. 101

**SUPPORT FOR STATEMENT OF FACT NO. 72:**

Photograph of Midwest Dock Solutions, Inc. Shirt, (Exhibit 15), EX. 101

Opus Design Build LLC Bid Proposal Requirements at p.9, (Exhibit 100), EX. 97 ("Our subcontract agreement requires you to comply with the safety policies and requirements of Opus Design Build, L.L.C., and those of all local, state and federal agencies. … 2. You are required to actively participate in the project safety program. Please note the following points: … b. We require proper work clothing to include high visibility clothing for earthmoving operations.")

Pepper Construction Company: Subcontract Agreement Between Pepper Construction Company and Midwest Dock Solutions, Inc. for North American Warehouse Expansion, Glenview, Illinois at 20, May 15, 2020, (Exhibit 61), EX. 19 ("Subcontractor understands that 100% of all protection, hard hats, protective eye wear, and high visibility clothes are required.")

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' Second Set Of Interrogatories And Document Production Requests, Document Request No. 14, EX. 102

("Defendant [Dock & Door Install] does not purchase any company branded clothing therefore it does not possess any documents responsive to this request.")

Cruikshank 122:13-123:16, EX. 8 ("Q. And if you -- and if you turn – if you turn to Exhibit 15, do you see the [Midwest Dock Solutions] shirt that Mr. Kelly has on there? A. Yes. Q. Did you have shirts like that? A. Yes. Q. All right. And would you wear those shirts on job sites? A. Yes. Q. And would you wear those same shirts, including when you were on Dock & Door job sites? A. Yes. Q. All right. And the shirts, are they worn, in part, because of the bright color for safety reasons? A. Yes. Q. Okay. Is that a job site requirement -- A. Yes. Q. -- do you know? It is. Okay. And there were no shirts like that for Dock & Door, correct? A. No.")

Bishop 98:24-99:24, EX. 71 ("Q. Okay. And so have you worn the Midwest Dock Solutions shirts when you've been working on Dock & Door jobs? A. Yes. Q. All right. And part of that is to comply with that requirement of wearing brightly-colored clothing, correct? A. Yeah. As long as you have like -- I mean, it doesn't matter what's on the shirt on those jobs. It's just as long as it's a high vis, so it can also be an orange. Q. Okay. Does Midwest Dock Solutions have orange shirts? A. They have had them before. I don't have any, though. Q. Okay. You have the green ones? A. I do, yes. Q. All right. Are there shirts that are Dock & Door Install branded shirts? A. Not that I know of, no.")

Tattini 47:15-48:12, EX. 15 ("Q. And when did -- did you go -- did you -- strike that. Did you work for Midwest Dock Solutions directly, like -- well, strike that. When did you first go to work for -- strike that. What do you know the company as? You know it as Midwest Dock Solutions, Dock & Door? A. We know it as both, but like the -- the face and Branding of it is Midwest Dock. <u>We would show up in Midwest Dock, you know, labeled trucks, but we all knew we were getting paid from Dock & Door Install or whatever it was.</u> Q. Okay. A. Yeah. So we all knew that. Q. Okay. So when you were hired, the first company you were paid through, was it Dock & Door? A. Yes.")

Tattini 144:6-145:3, EX. 15 ("Q. Were you required to wear Midwest Dock branded shirts on your jobs? A. Yes. Q. You couldn't wear just some like high vis shirt? A. You could. Q. You could wear kind of -- you could wear any high vis shirt -- A. Yes. Q. -- if you wanted to? A. According to meet the compliance of the contractor, yes. Q. Right. A. But to be compliant with my boss, I'd have to wear the Midwest attire. Q. Okay. And when you say your boss, who are you talking about? A. Mike and Tony. Q. Tony who? A. Zarlengo.")

Green 94:15-95:1, EX. 12 ("Q. All right. And do you sometimes wear the Midwest Dock shirts like that that are brightly colored? A. Yes. Q. All right. And are there -- does Dock & Door supply you with shirts like that at all that are bright colored with Dock & Door's name on them? A. No.")

Green 96:19-97:6, EX. 12 ("Q. All right. And do you have sweatshirts like that, also? A. I do have a couple. Q. Okay. And do you wear those on the job site in colder temperatures? A. Yes. Q. Okay. And you do that with your work for Dock & Door, Correct? A. Yes.")

**Q.    Brutti Acts As An Employee of Midwest Dock.**

## STATEMENT OF FACT NO. 73:

Tony Brutti works 32-35 hours a week for Dock &Door.  Brutti "might do a little bit of field measuring," he brings supplies from Midwest Dock's shop to the jobsite, unloads and stages materials at the jobsites even though he is not a Union member, prepares safety plans, certified payrolls, gets material at the shop ready for his guys for the next day (*e.g.*, loading the materials on to the trailer), gathers workers' time sheets, prepares invoices to Midwest Dock using the Xero accounting software based on the workers timesheets, and writes checks.

### SUPPORT FOR STATEMENT OF FACT NO. 73:

Brutti 161:21-169:25, EX. 3 (testifying as to the work that he performs, including "I might do a little bit of field measuring and making sure the openings are the actual right size and making the job site is actually safe. I've run into some jobs where I didn't really feel that it was safe for us to be working there.·So I would maybe bring things up to the superintendent what needs to be done. And then I would do, I would generally go there one more time to offload the trucks. And then if just anything arised where I didn't want them leaving the job site, I would just -- I would say I'll just give it to you, anchors, material, whatever, safety stuff, you know. Q. All right. And would you bring some of those items from the shop? A. Yeah, generally. Q. Anchors and other materials or supplies? A. Yeah. Q. And when you say "offload the trucks," you mean offload the overhead doors and dock levelers? A. I would, yeah. Q. And how would you do that? A. Usually with a forklift. Q. Okay. And would that be the forklift from Midwest Dock Solutions? A. Sometimes. Q. And would sometimes you use one that's at the job site? A. Or a rental, yeah. Q. Rental. Now, if it's a rental, would the rental be arranged by Midwest Dock Solutions? A. Yes. Q. And it would be paid for by Midwest Dock Solutions? A. Yes.")

Brutti 160:13-16, EX. 3 ("Q. How many hours would you say you work on average for Dock & Door?  A. Oh, 35, 32, something like that. I mean, it varies.")

Cruikshank 90:6-8, EX. 8 (testifying that Brutti collected the timesheets)

Cruikshank 102:18-103:11, EX. 8 ("Q. And then Anthony Brutti was on the list. You know him as well, correct? A. Yes. Q. What kind of work did he do? A. He was in charge of hours for the union side and paying -- you know, payroll. Q. For the union side? A. Yeah. Yeah. Q. Okay. Okay. Anything else that he did that you're aware of? A. No. Q. Okay. Would Anthony Brutti work on the job sites? A. No")

Tattini 71:3-12, EX. 15 ("Q. So he would be at the job site, too? A. Tony Brutti? Q. Yeah. A. Yes. He would even -- I mean, he would -- he would unload. His job was supposedly to unload the semis with the dock levelers, so he would always be doing that. So when we showed up on a job, most of the time the dock levelers would be in the pits because he was out there putting them in there.")

99

Williams 11:1-13, EX. 18 ("When was the last time – do you know who Tony Brutti is? A. Tony Brutti? I believe that's Payroll Tony. Q. Okay. When you say 'Payroll Tony,' what's that mean? A. That's the person we would send our time sheets, too, I believe.")

Bishop 122:12-19, EX. 71 ("Q. What does Tony Brutti do for Dock & Door? A. As far as I know, he's the president, and he just makes sure we work and make sure like if we have anything, like school wise or anything like that, he lets us know of it. Q. Anything else? A. No.")

Green 111:23-112:21, EX. 12 ("Q. And Anthony Brutti, do you do work with him? A. No. Q. Okay. And did you -- you never worked with him? A. Not on a job site, no. Q. And what -- who is Anthony Brutti? A. He's my boss, as far as the owner of Dock & Door Install as far as I know. Q. Okay. And when you say he's your boss, what did -- what interaction do you have with him on a day-to-day basis? A. He keeps track of time, payroll. And that's about it, as far as I know. Q. All right. And you said he's -- he's delivered stuff to the job site before that you've been on, correct? A. Yes.")

## STATEMENT OF FACT NO. 74:

Tony Brutti testified that the amount that Dock & Door charged Midwest Dock for the hours worked by Dock & Door employees was based upon the union scale that Dock & Door workers were paid, including additional expenses that Dock & Door also had to pay as a result of its existence such as fringe benefit contributions, accounting fees, legal fees, unemployment compensation insurance, and employer's share of social security taxes and Medicare. When union scale increased, the billing rates to Midwest Dock increased accordingly.

### SUPPORT FOR STATEMENT OF FACT NO. 74:

Brutti 193:9-195:15, EX. 3 (testifying as to how the hourly rate was set for Dock & Door employees)

Brutti 197:5-201:21, EX. 3 (testifying that hourly rates for Dock & Door employees would change when contribution or wage rates for the unions increased or insurance and accounting costs increased: "Q. Okay. What did your negotiations for the unit price consist of? A. It wasn't much of a negotiation. I would basically just tell him I'm going to have to raise this price. Q. Okay. And that was because the number went up for the fringe benefit contribution and the hourly rate? A. Among others. Among others. And also as, so the more work we had, the more employees we had, the more billable hours we had, which also helped make it easier to make money, as business declined, less billable hours, so the pricing had to go up also. Q. Well, your costs also went down; correct? A. Not -- yes, the cost of employment did, but things like insurance and accounting costs and things like that don't go down. Q. They -- A. They usually go up, yeah. Q. Okay. So other than -- how about when you first started out, how was the unit price negotiated? A. Well, I mean, we were kind of flying at the hip, but I think we started at about 100 or 90, 90 or

100

a 100. Q. Okay. A. But we just agreed to that, said let's see how this goes, I mean, we'll change it fast if we need to change it, but let's try this and see how it goes.")

## STATEMENT OF FACT NO. 75:

The timesheets used by Dock & Door employees were kept at Midwest Dock's office in the breakroom and when the timesheets were completed by the Dock & Door employees the employees either texted them to Tony Brutti or left them in the lunchroom to be picked up. Brutti would collect the timesheets and then use those timesheets to prepare individual daily invoices to Midwest Dock for each Dock & Door employee. The daily invoices prepared by Brutti are essentially daily timecards for the hours worked by each employee each day; a separate invoice is issued for each employee for each day stating the date, describing the project where the employee worked that day, and the number of hours the employee worked that day:

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| Don Cruikshank 8-2-22: Clopay Belle Tire Yorkville, Installation of sectional overhead doors. | 8.00 | 105.00 | 840.00 |
| | | Subtotal | 840.00 |
| | | **TOTAL USD** | **840.00** |

## SUPPORT FOR STATEMENT OF FACT NO. 75:

Williams 101:11-103:1, EX. 18 (the blank timesheets for the Dock & Door employees were kept in the lunchroom right off the warehouse part of the building leased by Midwest Dock); 114:2-19 (completed timesheets were left on a table in the lunchroom)

Brutti 187:4-17, EX. 3 ("Q. Okay. Now, to create -- you said when it's payroll day -- you said when it's payroll day, you're in the office for three or four hours; correct? A. It could be, yeah. Q. And that's generating these invoices? A. Yeah. Q. And entering the information that's on them? A. Yes. Q. Okay. And you do that from the timesheets that all the Dock & Door employees e-mail to you or leave in the break room; correct? A. Correct. Q. Okay. So you gather all the timesheets? A. Yeah.")

Cruikshank 89:24-90:8, EX. 8 ("Q. And do you know how you forwarded these time sheets to the company? A. I think, at this point, we were, you know, maybe taking pictures of them and sending them. Q. Okay. And do you know who you would have sent them to? A. It would have gone to Tony Brutti.")

Green 120:10-20, EX, 12 ("Q. And then where would you return the completed time sheets to? A. I'd put them back on the lunchroom table. Q. Okay. And somebody would pick them up there? A. Yes. Q. All right. And do you know who picked them up? A. No.")

Dock & Door, Inc. Deposit Summary, Sep. 1, 2022, (Exhibit 168), EX. 103 (Midwest Dock Solutions Inc. Payment of $10,972, Dock & Door Install Inc. Invoices to Midwest Dock Solutions Inc.)

101

Dock & Door Install Inc. Invoices to Midwest Dock Solutions Inc., (Exhibit 223), EX. 34 ("service work")

Brutti 166:18-169:12, EX. 3 (describing the daily invoices for each employee and the information in the daily invoice, including the following: "Q. Okay. And then when you're done entering in the information for the invoices, and the invoices generally include, each invoice is a separate employee on a specific day; correct? A. Yes. Q. So you have a separate invoice for each employee for each day? A. Yes. Q. Okay.·And essentially it includes their name and the hours they worked; correct? A. Correct. Q. That's like the quantity is the hour worked? A. Hourly, yeah. Q. Okay. So each invoice is like a separate charge bases on each day they have on their timesheets? A. It's a bill to Midwest Dock Solutions. Q. But you're billing Midwest Dock like for each day for each employee right off like their timesheets? A. Correct.")

## STATEMENT OF FACT NO. 76:

Sherri Webber at Midwest Dock uses the Xero software program to incorporate Dock & Door's deposit summary and invoices directly into Midwest Dock accounting data which is also maintained using the Xero software for Dock & Door to which Gineris & Associates has access. Webber hands Tony Brutti Midwest Dock's check to pay Dock & Door's invoices when Brutti is in the office, Brutti prepares a deposit summary using Xero, prints the deposit summary, attaches the deposit summary to the invoices, an email is generated from the Xero software to Webber for the deposit summary, and Brutti then deposits the check into Dock & Door's account.

### SUPPORT FOR STATEMENT OF FACT NO. 76:

Dock & Door, Inc. Deposit Summary, Sep. 1, 2022, (Exhibit 168), EX. 103 (Midwest Dock Solutions Inc. Payment of $10,972, Dock & Door Install Inc. Invoices to Midwest Dock Solutions Inc.)

Webber 104:5-106:23, EX. 63 (" Q. … You do have Zero. And when you click on it, it does copy the invoice in your system? A. Because I log into our system, and it will transfer over, yes. Q. I see. So -- but who does the email come from? A. The email? Q. With the link. A. That comes from Tony Brutti. … Q. And when -- then when Midwest Dock sends out invoices, when it creates an invoice in Zero, how does that invoice get sent out? A. That invoice is saved as -- like in a Word document or a -- well, a PDF. I'm sorry. Not a Word document. And then that's attached to an email that's outgoing. Q. I see. So you just -- and it's like you're sherri@midwestdocksolutions.com -- A. Yes. Q. -- or amber@midwestdocksolutions.com, that's her email address for your email that's going out? A. Yes. And we're attaching that file to the email. Q. As a PDF? A. Yes. Q. I see. And when the customer gets that invoice, if they have Zero, can they click on it and download it into their system? A. No. Q. Oh, because you're not sending it out that way? A. Right. Q. I see. But Tony Brutti, when he sends the invoices, he does send them in a manner that they can be added to your system if you open them in Zero? A. Yes…. Q. All right. And so -- so Mr. Brutti forwards the invoices, a group of invoices to you in like a single PDF or -- A. He sends those through Zero. So that's where I was saying before, I would have

the invoice, and then I can log into my account since I do have Zero. Q. I see. Okay. So you get an email from him, and it has like a tab or something you click on in order to go to Zero and download the invoices into your system? A. Yes.")

Brutti 180:7-183:1, EX. 3 (testifying to the process by which Midwest Dock pays Dock & Door invoices)

Brutti 184:1-21, EX. 3 (Brutti testifying that when the deposit summaries are prepared in Xero, an email is generated and sent to Webber)

Brutti 186:14-187:3, EX. 3 (Brutti testifying that when he takes the check to the bank he generates the deposit summary in Xero to which Gineris & Associates has access through the Xero account)

Brutti 181:4-11, EX. 3 ("Q. Does she [Sherri Webber] generally just hand it to you in the office? A. Yes. Q. Okay. And what do you do with the check when you receive it? A. Deposit it.")

### R. Brutti Works For Midwest Dock And Holds Himself Out To General Contractors As An Employee Of Midwest Dock.

## STATEMENT OF FACT NO. 77:

Midwest Dock gave Tony Brutti the Midwest Dock email account "tonyb@midwestdocksolutions.com" which Brutti used when he was performing work for Midwest Dock, including sending emails on behalf of Midwest Dock to general contractors like Pepper Construction and emails to Esser Hayes asking for insurance certificates for Midwest Dock. Those emails included a signature block for Brutti identifying him as a representative of Midwest Dock:



Tony Zarlengo testified that only employees of Midwest Dock were given email addresses with the extension of [name]@midwestdocksolutions.com and Midwest Dock failed to identify Tony Brutti as someone with a Midwest Dock email account in its discovery responses.

## SUPPORT FOR STATEMENT OF FACT NO. 77:

Zarlengo 21:13-17; 23:1-4; 23:14-19, EX. 2 ("Q. We'll get more into this later in the deposition, but you're aware that Tony Brutti has an email account tonyb@midwestdocksolutions.com? A. Yes. … Are you aware that Tony Brutti has had

that email for more than five years? A. I would think so, yes. … Q. And has he had that email address ever since Midwest Dock Solutions started using the domain midwestdocksolutions.com? A. Like the day we started it? Q. No, but around that time. A. I would say it was around that time.")

Sugar 150:10-160:7, EX. 23 ("Q. All right. And if you look at the next page in Exhibit 57, where it says high-speed doors, Hormann -- do you see that? A. Yes. Q. Okay. Is that also a product that Midwest Dock promotes on its website? A. Yes. Q. All right. And it's basically a similar door that's being promoted to Pepper Construction, correct? A. Correct. Q. All right. And your proposal says, a fast opening speed of 80 inches per second. Like six feet a second? A. More than six feet, yeah. Q. All right. So the kind of items that you're going to install for Pepper Construction on this job are the kind of items that are shown on Midwest Dock Solutions' website, correct? A. Yes. Q. And if you look at the email below -- below -- if you go back to Exhibit 71 and look at the second email on this page, it's from Christi Adams dated March 28, 2024, at 12:50 p.m. Do you see that? A. Yep. Q. And it's addressed to Tony Brutti, and his email address is tonyb@midwestdocksolutions.com. Do you see that? A. I do. Q. All right. Is that an email address you're aware that Mr. Brutti uses? A. Yes. Q. Okay. And has he used that email for a long time? A. He did.")

Brutti 119:21-120:11, EX. 3 ("Q.·Now, you had an e-mail address of tonyb@midweststocksolutions.com; correct? A.·I did. Q.·All right. Do you still have that? A.·I do not.·Q.·When did it change?·A.·I believe in August of 2024.·Q.·And do you know why?·A.·I do not.·Q.·Do you know when you got that e-mail account·A.·I couldn't tell you the date or the...·Q.·Can you tell me the year?·A.·No.·2000.·It would be a guess.·Q.·What would be your best approximation, even if it were a couple of year period?·A.·Maybe '18.")

Brutti 121:24-122:3, EX. 3 ("Q. Okay. Now, you used that e-mail account to communicate with some of the general contractors that Page 122 Midwest Dock Solutions was hired to perform work for; right? A. Yes.")

O'Connor 75:16-79:15, EX. 113 (authenticating email exchange between Tony Brutti on behalf of Midwest Dock using his tonyb@midwestdocksolutions.com email and Margaret Stredde on behalf of Esser Hayes where Brutti is asking Stredde for a certificate of insurance on behalf of Midwest Dock for the Principle Construction project and she is sending it to him)

Email from Tony Brutti, Midwest Dock Solutions, to Margaret Stredde, Esser Hayes, Oct. 22, 2020, (Exhibit 287), EX. 114 ("re: COI Needed – Hi Margaret, I am in need of a COI for this Principle Job. See attached for details."); Email from Margarett Stredde, Esser Hayes, to Tony Brutti, Oct. 22, 2020, (Exhibit 288), EX. 115 ("RE: COI Needed – Attachments: Midwest Dock Principle Construction #2020-05.pdf (435.02KB) Tony, here is the COI that Ira ordered on 10/15/20."); Midwest Dock Solutions, Inc. Certificate of Insurance for Principle Construction Corp., Oct. 16, 2020, EX. 116 ("Re: Job #2020-05)

O'Connor 80:-13-86:7, EX. 113 (authenticating email exchange between Tony Brutti on behalf of Midwest Dock using his tonyb@midwestdocksolutions.com email and Margaret Stredde on behalf of Esser Hayes where Brutti is asking Stredde for a certificate of insurance for the Village of Hazel Crest on behalf of Midwest Dock and she is sending it to him)

Email from Tony Brutti, Midwest Dock Solutions, to Margaret Stredde, Esser Hayes, Oct. 23, 2020 (Exhibit 290), EX. 117 ("Subject: COI needed Attachments: Hazel Crest permit.pdf (321.71 KB) Hi Margaret, I am in need of a COI for the village of Hazel Crest. See attached for criteria. Yours, Tony Brutti, Midwest Dock Solutions"); Village of Hazel Crest Department of Building & Inspectional Services, Application for Contractor's Registration Certificate, Company Name: Midwest Dock Solutions, EX. 118

Email from Margarett Stredde, Esser Hayes to Margarett Stredde, Oct. 23, 2020 (Exhibit 291), EX. 119 ("Subject: Certificate of Insurance was Issued for Midwest Dock Solutions, Inc. Attachments: Certificate.pdf (90.25 KB) … Delivery Method(s) Issued By: Margaret Stredde Viewed On Screen View (View) Emailed To Tony Brutti (tonyb@midwestdocksolutions.com)..."); Midwest Dock Solutions, Inc. Certificate of Insurance for Village of Hazel Crest, Oct. 23, 2020, EX. 120

Email from Tony Brutti, Midwest Dock Solutions, to Cathie Demitropoulos, Assured Partners, Jan. 11, 2021 (Exhibit 293), EX. 121 ("Subject: COI and Bond needed - I am in need of a COI and bond for the town of Merrillville, IN. See attached for details. Yours, Tony Brutti, Midwest Dock Solutions")

Email from Tony Brutti to Margaret Stredde (Esser Hayes), Apr. 20, 2021, (Exhibit 52), EX. 104

Declaration of S. Oertley, Senior Contract Specialist, Pepper Construction Company at ¶11 and Exhibit 5 at pp.2, 7, 11, 15, 18, 21, Nov. 4, 2025, EX. 20 ("Mr. Brutti held himself out to Pepper as a representative of Midwest Dock by using the email address tonyb@midwestdocksolutions.com, by using a signature block identifying him with 'Midwest Dock Solutions', and by forwarding closeout warranty documents to Pepper on behalf of Midwest Dock.")

Zarlengo 106:13-108:16, EX. 2 (testifying that Midwest Dock failed to disclose in its discovery responses that Brutti had an email address from Midwest Dock—*e.g.*, "Q. And if you go back to the response to interrogatory one, which we've been looking at, you'll see it's the -- it's the list of employee names, and then for many of them, it has email addresses. Do you see that? A. Yes. Q. Tony Brutti isn't listed there as somebody with an email address of @midwestdocksolutions.com, correct? A. Yes. Q. Is there a reason he wasn't identified in response to interrogatory eight as somebody with an email extension @midwestdocksolutions.com? A. He's not -- he's not even on the list. I don't know that answer. He's not even on the list as an employee. Q. All right. Well, he should have been disclosed as somebody with an @midwestdocksolutions.com email address, correct? A. Yes…. Q. And everybody else other than Mr. Brutti who has an email extension at

midwestdocksolutions.com, they are an employee of Midwest Dock Solutions, correct? A. Yes. Correct.")

Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Interrogatory No. 1, (Exhibit 40), EX. 24

Decl. of S. Oertley, Senior Contract Specialist, Pepper Construction Company at ¶11 and Exhibit 5 pp.2, 7, 11, 15, 18, 21, EX. 20

## STATEMENT OF FACT NO. 78:

Tony Brutti would receive instructions emails from others at Midwest Dock, including Ira Sugar, at his Midwest Dock email address (*i.e.,* tonyb@midwestdocksolutions.com) to send out the closing documents (such as Midwest Dock's warranty letters) to the general contractors that Midwest Dock had contracted with.  Brutti prepared Midwest Dock's closeout documents, including Midwest Dock's warranty letters, Brutti would then have Tony Zarlengo sign the warranty letters, and then Brutti would email the closing documents to Midwest Dock's general contractor customers using his tonyb@midwestdocksolutions.com email address with a signature block identifying him as a representative of "Midwest Dock Solutions."  Dock & Door never provided the general contractors with warranty letters.

## SUPPORT FOR STATEMENT OF FACT NO. 78:

Brutti 125:3-21, EX. 3 ("Q. Is there -- now, you also have an e-mail address ajbrutti@gmail.com; is that right? A. Yes. Q. Okay. Is there a reason you use the tonyb@midwestdocksolutions e-mail address instead of the Gmail address? A. The only reason would be because in the chain, I believe this came from Ira, and Ira sent it to me on the Midwest Dock e-mail address. Q. Okay. And as a matter of fact, the e-mail there directly below yours is from Ira; correct? Well, it says 'On Thursday, October 10th.' A. Yeah. Q. All right. He's forwarding this list to you and then you're sending it to Pepper; is that it? A. Yeah. Q. So he would have sent it to you at that e-mail address; is that it? A. Right. Yes.")

Brutti 122:15-124:25; 130:6-21, EX. 3 (testifying that he prepared warranty letters for Midwest Dock, he had Zarlengo sign them, and he sent closeout documents including Midwest Dock's warranty letters to the general contractors, including for example Pepper Construction, using his tonyb@midwestdocksolutions.com account)

Brutti 130:6-21, EX. 3

Brutti 125:22-126:23, EX. 3 (testifying that he prepared and emailed the warranty letter that is part of Exhibit 243 to Zack Adkins at Pepper Construction Company for the Matteson Commerce Center project using his Midwest Dock email address)

Brutti 125:22-126:23, EX. 3 (testifying that he prepared and emailed the warranty letter

that is part of Exhibit 244 to Zack Adkins at Pepper Construction Company using his Midwest Dock email address)

Brutti 144:23-145:47, EX. 3 ("Q. Okay.·I hand you what I have marked Exhibit 250.·Now, this is an e-mail from you on August 2nd, 2024; correct?·A. Correct. Q. And again, it's from your tonyb@midwestdocksolutions.com e-mail address; correct? A. Correct. Q. And you're forwarding the closeout documents for the McMaster-Carr project; correct? A. Correct. Q. And if you turn to the last page of this, this is the warranty letter that Midwest Dock supplies the template for; correct? A. Yeah. Q. Okay. So you prepared this warranty letter using Midwest Dock Solutions template? A. I did.")

Email Exchange Between Tony Brutti (Midwest Dock), Zack Adkins (Pepper Construction), and Ira Sugar (Midwest Dock), Nov. 4, 2021, (Exhibit 241), EX. 105 (Tony Brutti forwarding Midwest Dock's warranty letter and other closeout documents for Green Era project using his Midwest Dock email account tonyb@midwestdocksolutions.com)

Email Exchange Between Tony Brutti and Zack Adkins (Pepper Construction), Dec. 21, 2021, (Exhibit 242), EX. 106 (Brutti forwarding revised Midwest Dock's warranty letter for Green Era project using his Midwest Dock email account tonyb@midwestdocksolutions.com)

Email Exchange Between Tony Brutti and Christi Adams (Pepper Construction), Aug. 4, 2023, (Exhibit 243), EX. 107 (Brutti forwarding Midwest Dock's warranty letter and other closeout documents for Matteson Commerce Center project using his Midwest Dock email account tonyb@midwestdocksolutions.com)

Email communication between Sherri Webber and Tony Brutti and Tony Zarlengo all using their common @midwestdocksolutions.com email address, Sep. 9, 2022, (Exhibit 244), EX. 108 (directing Brutti to prepare Midwest Dock's warranty papers for the Crow Holdings Joliet Truck Terminal project for ARCO/Murray)



From: **Sherri Webber** <sherri@midwestdocksolutions.com>
Date: Fri, Sep 9, 2022 at 11:29 AM
Subject: Fwd: Crow Holdings Joliet Truck Terminal
To: Tony Brutti <tonyb@midwestdocksolutions.com>
Cc: Tony Zarlengo <tony@midwestdocksolutions.com>


They need a warranty letter please for the attached contract.

Please email it to:  lgeorge@arcomurray.com

Thanks!

Brutti 128:13-129:13, EX. 3

Email Exchange Between Tony Brutti and Christi Adams (Pepper Construction), (Exhibit 246), EX. 109

Brutti 134:9-16, EX. 3 ("Q. Dock & Door never provided a warranty; correct? A. No, we never -- we never provided -- I would send them from my e-mail address, but not provide an actual warranty. Q. Okay. But in sending them, the ones you'd send would be Midwest Dock Solutions warranties; correct? A. Yeah, they would be.")

## STATEMENT OF FACT NO. 79:

Tony Brutti prepared warranty letters for all union companies that Midwest Dock contracted with—including ARCO/Murray, Clayco, Krusinski, Meridian Design Build, Morgan Harbour, Opus Design Build, Peak Construction, Pepper Construction, Principle Construction.  Brutti would use Midwest Dock's warranty templates to prepare the warranties on behalf of Midwest Dock, he would have Tony Zarlengo sign the warranty letters, and then Brutti would forward the warranty letters to Midwest Dock's customers on behalf of Midwest Dock using his tonyb@midwestdocksolutions.com email account.  Dock & Door never provided a warranty for the projects it worked on for Midwest Dock.

## SUPPORT FOR STATEMENT OF FACT NO. 79:

Brutti 137:10-138:21, EX. 3 ("Q. Okay. And let me hand you what's been marked as Exhibit 247. And if you look at the last -- this is  another one -- this is another's e-mail from you to Cecil Kidenda at Pepper Construction forwarding another warranty letter; correct -- actually, the warranty letter and the other closeout documents; correct? A. Yes. … Q. Would a letter like this be prepared by Midwest Dock or again, would you get the form text from Pepper and then put it on a Midwest Dock letterhead? A. This is Midwest Dock's template. Q. Okay. So you would have used Midwest Dock's  template to prepare this warranty letter? A. Yes. Q. And then again, you'd have given it to Anthony  Zarlengo to sign? A. Correct. …… Q. Okay. And this is an e-mail from you forwarding the document to Pepper Construction; correct? A. Yes.")

Brutti 134:20-137:9, EX. 3 (testifying he sent closeout documents to Christi Adams at Pepper Construction using his tonyb@midwestdocksolutions.com e-mail address, and that it was a standard process for him to do the same thing for other large general contractors like ARCO/Murray, Clayco, Krusinski, Meridian Design Build, and Morgan Harbour)

Brutti 134:9-16, EX. 3 ("Q. Dock & Door never provided a warranty; correct? A. No, we never -- we never provided -- I would send them from my e-mail address, but not provide an actual warranty. Q. Okay. But in sending them, the ones you'd send would be Midwest Dock Solutions warranties; correct? A. Yeah, they would be.")

Brutti 144:23-145:14, EX. 3 ("Q.·Okay. I hand you what I have marked Exhibit 250.·Now, this is an e-mail from you on August 2nd, 2024; correct? A.·Correct. Q.·And

again, it's from your tonyb@midwestdocksolutions.com e-mail address; correct?·A.·Correct. Q.·And you're forwarding the closeout documents for the McMaster-Carr project; correct?·A.·Correct.·Q.·And if you turn to the last page of this, this is the warranty letter that Midwest Dock supplies the template for; correct? A.·Yeah. Q.·Okay. So you prepared this warranty letter using Midwest Dock Solutions template?·A.·I did.")

Email Exchange Between Tony Brutti and Thomas Braun, Pepper Construction, (Exhibit 250), EX. 110

Declaration of S. Oertley, Senior Contract Specialist, Pepper Construction Company at ¶11 and Exhibit 5, Nov. 4, 2025, EX. 20 (testifying regarding emails sent by Brutti to Pepper Construction holding himself out as a representative of Midwest Dock)

## STATEMENT OF FACT NO. 80:

Tony Brutti prepared Midwest Dock's "Site Specific Safety Plan" for Pepper Construction Company for the Subcontract Agreement that Midwest Dock signed with Pepper Construction Company to install overhead doors at the RR Donnelley Wallace project in St. Charles, Illinois. The Site Specific Safety Plan does not identify Dock & Door anywhere but provides that Midwest Dock's contacts for the project are Tony Zarlengo, Michael Richert, and David Green (who was a Dock & Door employee) and states that the work will be provided by "Midwest Dock".  Brutti then signed Zarlengo's name to the Site Specific Safety Plan as "President Midwest Dock Solutions" and then Brutti emailed the SSSP to Christi Adams at Pepper Construction Company on March 28, 2024 using his tonyb@midwestdocksolutions.com email address with a signature block stating "Yours, Tony Brutti, Midwest Dock Solutions Phone: 815-922-5258 Email: tonyb@midwestdocksolutions.com."

### SUPPORT FOR STATEMENT OF FACT NO. 80:

Site Specific Safety Plan Midwest for Pepper Construction RR Donnelley Wallace for Subcontractor Midwest Dock Solutions, Mar. 27, 2024, (Exhibit 249), EX. 111

Email from Tony Brutti, Midwest Dock, to Christi Adams, Pepper Construction Company, Mar. 28, 2024, (Exhibit 98), EX. 112

Declaration of S. Oertley, Senior Contract Specialist, Pepper Construction Company at, ¶11 and Exhibit 5, Nov. 4, 2025, EX. 20 (testifying that Brutti sent an email and Site Specific Safety Plan to Pepper Construction Company along with numerous other email communications forwarding closeout documents, holding himself out as a representative of Midwest Dock)

Zarlengo 149:4-150:4, EX. 2 (testifying that of the persons identified in the Site Specific Safety Plan, Zarlengo and Richert are employees of Midwest Dock and Green is an employee of Dock & Door)

Zarlengo 150:15-151:4, EX. 2 ("Q. Now, if you look at the email that's on pages one and two, if you look on the second page, it looks like the signature block for Tony Brutti's email is at the bottom on the second page. Do you see that? A. Yes. Q. And it says, Tony Brutti, Midwest Dock Solutions, and then it also has his email, tonyb@midwestdocksolutions.com, correct? A. Yes. Q. And that email address was an email that Tony Brutti had in March of 2024, correct? A. Correct.")

Brutti 140:1-142:20, EX. 3 (testifying that the SSSP provides the "basic rules of the job site and then also like where your nearest hospital would be and then where, the scope of work that we're doing… and that he was given a template that he used to prepare the Site Specific Safety Plan for Midwest Dock Solutions, that he prepared the SSSP, and that he emailed it to Christi Adams at Pepper Construction using his Midwest Dock Solutions email account tonyb@midwestdocksolutions.com")

MID-AMERICA CARPENTERS REGIONAL COUNCIL PENSION FUND *et al.*

By: Kevin P. McJessy

Kevin P. McJessy
John Soptata, Of Counsel
McJessy, Ching & Thompson, LLC
3759 N. Ravenswood, Ste. 231
Chicago, Illinois  60613
(773) 880-1260  //
mcjessy@mcandt.com
sopata@mcandt.com

<u>**CERTIFICATE OF SERVICE**</u>

I, Kevin P. McJessy, an attorney, certify that I caused the foregoing **Plaintiffs' Statement Of Undisputed Fact In Support Of Their Motion For Summary Judgment Pursuant To Local Rule 56.1** to be served electronically upon all counsel of record via the CM/ECF service for the Northern District of Illinois on January 16, 2026.


By: _Kevin P. McJessy_____

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOI
EASTERN DIVISION

MID-AMERICA CARPENTERS REGIONAL
COUNCIL PENSION FUND; *et al.,*

                Plaintiffs,

    v.

DOCK & DOOR INSTALL, INC., an Illinois
corporation and MIDWEST DOCK SOLUTIONS,
INC., an Illinois corporation,

                Defendants.

Case No 1:24-cv-06428

Judge Andrea R. Wood

Magistrate Judge Jeannice
W. Appenteng

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACT
IN SUPPORT OF THEIR MOTION FOR SUMMARY
<u>JUDGMENT PURSUANT TO LOCAL RULE 56.1</u>**

**<u>LIST OF EXHIBITS</u>**

| | |
|---|---|
| 1 | Declaration of John Conklin |
| 2 | Deposition Transcript of Anthony Zarlengo |
| 3 | Deposition Transcript of Anthony Brutti |
| 4 | Deposition Transcript of Michael Richert |
| 5 | Midwest Dock Solutions Inc. Articles of Incorporation, May 16, 2006, (Exhibit 79) |
| 6 | Midwest Dock Solutions Inc. Facebook Page, (Exhibit 53) |
| 7 | Deposition Transcript of Zachary Corrigan |
| 8 | Deposition Transcript of Donald Cruikshank |
| 9 | Defendant Midwest Dock Solutions, Inc.'s Answer, [ECF#18], (Exhibit 120) |
| 10 | One Jobsite Agreement Between Midwest Dock Solutions, Inc. and Chicago Regional Council of Carpenters n/k/a Mid-America Carpenters Regional Council, Nov. 11, 2011 and GoogleMaps Screenshot of Winpak Portion Packaging Facility, Sauk Village, IL, (Exhibit 81) |
| 11 | Midwest Dock Solutions, Inc.'s Fringe Benefit Contribution Reports (Exhibit 85) |
| 12 | Deposition Transcript of David Green |
| 13 | Krusinski Construction Company Cover Letter, Jun. 11, 2014, Subcontract Agreement, Midwest Dock Solutions, Inc. Certificates of Insurance, Compstak Website, Midwest Dock Solutions, Inc. Facebook Page, and GoogleMaps Images of 14907 Gougar Road, (Exhibit 104) |
| 14 | Midwest Dock Solutions, Inc.'s Facebook Page, (Exhibit 19) |

| 15 | Deposition Transcript of Anthony Tattini |
|----|------------------------------------------|
| 16 | Midwest Dock Solutions, Inc.'s Website, (Exhibit 57) |
| 17 | Intentionally Omitted |
| 18 | Deposition Transcript of Quinten Williams |
| 19 | Subcontract Agreement Between Pepper Construction Company and Midwest Dock Solutions Inc. for North American Warehouse Expansion, Glenview, Illinois, May 15, 2020, (Exhibit 61) |
| 20 | Declaration of S. Oertley, Senior Contract Specialist, Pepper Construction Company, Nov. 4, 2025 |
| 21 | Meridian Design Build: Subcontract between Meridian Design Build and Midwest Dock Solutions, Inc. for 1303 Jack Court Facility Upgrades, Bartlett, IL, May 28, 2024, (Exhibit 65) |
| 22 | Opus Design Build LLC Subcontract Agreement between Midwest Dock Solutions, Inc. and Opus Design Build LLC for Mokena Industrial Supply Spec Building A, Dec. 9, 2019 |
| 23 | Deposition Transcript of Ira Sugar |
| 24 | Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, (Exhibit 40) |
| 25 | Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, (Exhibit 221) |
| 26 | Deposition Transcript of Zachary Torkelson |
| 27 | Articles of Incorporation of Dock & Door Install, Inc., Jul. 11, 2014, (Exhibit 214) |
| 28 | Photograph of Anthony Brutti Race Car, (Exhibit 118) |
| 29 | Dock & Door Install, Inc. Answer, [ECF#17], (Exhibit 265) |
| 30 | Memorandum of Agreement between Dock & Door Install, Inc. and the Chicago Regional Council of Carpenters, Sep. 18, 2014, (Exhibit 219) |
| 31 | Memorandum of Agreement between Dock & Door Install, Inc. and the Chicago Regional Council of Carpenters, Aug. 15, 2019 |
| 32 | Defendant Dock & Door Install, Inc.'s Responses to Plaintiffs' Document Requests, Dec. 2, 2024 |
| 33 | Text Message Exchange between Callie Stephens (Gineris & Associates) and Tony Brutti, (Exhibit 106) |
| 34 | Dock & Door Install Inc. Invoices to Midwest Dock Solutions, Inc., (Exhibit 223) |
| 35 | Email from Tony Brutti, Dock & Door Install, to Tom Downs, Holden Insurance, Jul. 1, 2025, (Exhibit 151) |
| 36 | Letter from Thomas Bennington, Jr. (Lawrence Kamin Saunders & Uhlenhop, LLC) to Anthony Zarlengo, Michael Richert, and Anthony Brutti, Jul. 9, 2014, (Exhibit 215) |
| 37 | Dock & Door Install Inc. Employer Questionnaire / Application to Chicago Regional Council of Carpenters, Aug. 5, 2014, (Exhibit 218) |

| 38 | ADP Client Account Agreement and Authorization to Debit/Credit for Midwest Dock Solutions Inc., Oct. 6, 2016 |
|---|---|
| 39 | ADP Client Account Agreement and Authorization to Debit/Credit for Dock &Door Install, Inc., Oct. 6, 2016 |
| 40 | Subcontract Agreement Midwest Dock Solutions Inc. and Clayco Inc., (Exhibit 99) |
| 41 | Subcontract Agreement between Midwest Dock Solutions, Inc. and Opus Design Build LLC for Euclid Beverage Expansion Product, Mar. 26, 2024 |
| 42 | ARCO/Murray Construction Company: Subcontract Agreement between Midwest Dock Solutions, Inc. and ARCO/Murray National Construction Company, Inc., Feb. 27, 2023  SUBJECT TO PROTECTIVE ORDER - TO BE FILED SEPARATELY |
| 43 | Intentionally Omitted |
| 44 | Dock & Door Install Inc. Certificate of Insurance for Krusinski Construction Company, Aug 6, 2020, (Exhibit 256) |
| 45 | Dock & Door Install Inc. Certificate of Insurance for Meridian Design Build, Inc., Apr 14, 2025, (Exhibit 257) |
| 46 | Intentionally Omitted |
| 47 | Midwest Dock Solutions, Inc. Certificates of Insurance to Krusinski Construction Company, (Exhibit 280) |
| 48 | Midwest Dock Solutions, Inc. Certificates of Insurance to Opus Design Build LLC, (Exhibit 282) |
| 49 | Midwest Dock Solutions, Inc. Certificates of Insurance to Meridian Design Build LLC, (Exhibit 279) |
| 50 | Midwest Dock Solutions, Inc. Certificate of Insurance for ARCO/Murray, LLC, (Exhibit 259) |
| 51 | Dock & Door Install Inc. Certificate of Insurance for ARCO/Murray National Holdings, Inc., Mar. 20, 2020, (Exhibit 254) |
| 52 | Midwest Dock Solutions, Inc. Certificates of Insurance to Principle Construction Company, Inc., (Exhibit 284) |
| 53 | Standard Form of Subcontract Agreement Between Principle Construction Corp. and Midwest Dock Solutions, Inc. for General RV Showroom Huntley, IL, Jan. 26, 2022, (Exhibit 64) |
| 54 | Dock & Door Install, Inc. 2016 IRS Form 1120-S (First page only), (Exhibit 172) |
| 55 | Dock & Door Install, Inc. 2017 IRS Form 1120-S (First page only), (Exhibit 175) |
| 56 | Dock & Door Install, Inc. 2018 IRS Form 1120-S (First page only), (Exhibit 178) |
| 57 | Dock & Door Install, Inc. 2019 IRS Form 1120-S (First page only), (Exhibit 181) |
| 58 | Dock & Door Install, Inc. 2020 IRS Form 1120-S (First page only), (Exhibit 184) |
| 59 | Dock & Door Install, Inc. 2021 IRS Form 1120-S (First page only), (Exhibit 187) |
| 60 | Dock & Door Install, Inc. 2022 IRS Form 1120-S (First page only), (Exhibit 190) |
| 61 | Dock & Door Install, Inc. 2023 IRS Form 1120-S (First page only), (Exhibit 193) |

| 62 | Deposition Transcript of Callie Stephens |
|----|----|
| 63 | Deposition Transcript of Sherri Webber |
| 64 | Steger, IL Application for Post Office Box Service, Jan. 11, 2021, (Exhibit 49) |
| 65 | Steger, IL P.O. Box Service Fee Notice of Midwest Dock Solutions and Credit Card Payment Receipts, (Exhibit 50) |
| 66 | Cincinnati Insurance Company Endorsement for Change of Address, Mar. 24, 2021, (Exhibit 240) |
| 67 | Cincinnati Insurance Company Billing Statements to P.O. Box 363 from Feb. 28, 2022 to Aug. 29, 2024, (Exhibit 48) |
| 68 | Dock & Door Install, Inc. Fringe Benefit Contribution Reports March 2021 to October 2023, (Exhibit 47) |
| 69 | Deposition Transcript of Richard Mantoan |
| 70 | Deposition Transcript of Nicolas Kelly |
| 71 | Deposition Transcript of Branden Bishop |
| 72 | Dock & Door Install Inc.'s Fringe Benefit Contribution Reports September 2014 to July 2019, (Exhibit 220) |
| 73 | Email from Callie Stephens (Gineris & Associates) to Tony Brutti, Oct. 17, 2016, (Exhibit 222) |
| 74 | Email from Sherri Webber to Callie Stephens (Gineris & Associates), Sep. 26, 2018, (Exhibit 211) |
| 75 | Quinten Williams LinkedIn Page (Exhibit 2) |
| 76 | Tony Tattini Checks from Midwest Dock Solutions, (Exhibit 35) |
| 77 | Intentionally Omitted |
| 78 | Intentionally Omitted |
| 79 | Intentionally Omitted |
| 80 | Intentionally Omitted |
| 81 | David Green and Anthony Tattini W-2s for 2017, (Exhibit 261) |
| 82 | Anthony Brutti W-2 for 2017, (Exhibit 173) |
| 83 | Anthony Brutti W-2 for 2018, (Exhibit 176) |
| 84 | Don Cruikshank, David Green, and Anthony Tattini W-2s for 2018, (Exhibit 262) |
| 85 | Anthony Brutti W-2 for 2019, (Exhibit 179) |
| 86 | Anthony Brutti W-2 for 2020, (Exhibit 182) |
| 87 | Anthony Brutti W-2 for 2021, (Exhibit 185) |
| 88 | Anthony Brutti W-2 for 2022, (Exhibit 188) |
| 89 | Jose Aguirre, Don Cruikshank, David Green, Eric Jansma, Nicolas Kelly and Collin Zarlengo W-2s for 2022, (Exhibit 264) |
| 90 | Anthony Brutti W-2 for 2023 (Exhibit 191) |

| 91 | Jose Aguirre, David Green, Eric Jansma, Nicolas Kelly and Collin Zarlengo W-2s for 2023, (Exhibit 263) |
|-----|-----|
| 92 | David Green W-2s for 2020-2024, (Exhibit 28) |
| 93 | Blue Book Building & Construction Network ProView Worksheet and Contract |
| 94 | The Blue Book Building & Construction Network Contract for the Period August 2021 through July 2023, Apr. 14, 2021, (Exhibit 105) |
| 95 | The Blue Book Building & Construction Network Contract for the Period August 2021 through July 2023, Apr. 14, 2021 |
| 96 | Email from Ira Sugar, Midwest Dock Solutions Inc., to Zach Adkins, Pepper Construction Company, Nov. 4, 2019, (Exhibit 60) |
| 97 | Bid Proposal by Midwest Dock Solutions, Inc. to Opus Design Build LLC, Jan. 21, 2022 for MTC Kenosha 2021, (Exhibit 100) |
| 98 | Photograph of Midwest Dock Solutions Truck, (Exhibit 8) |
| 99 | Photograph of Midwest Dock Solutions Truck, (Exhibit 5) |
| 100 | Photograph of Midwest Dock Solutions Truck, (Exhibit 6) |
| 101 | Photograph of Midwest Dock Solutions Shirt (Exhibit 15) |
| 102 | Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' Second Set Of Interrogatories And Document Production Requests |
| 103 | Dock & Door, Inc. Deposit Summary, Sep. 1, 2022, Midwest Dock Solutions Inc. Payment of $10,972, Dock & Door Install Inc. Invoices to Midwest Dock Solutions Inc., (Exhibit 168) |
| 104 | Email from Tony Brutti to Margaret Stredde (Esser Hayes), Apr. 20, 2021, (Exhibit 52) |
| 105 | Email Exchange Between Tony Brutti, Zack Adkins (Pepper Construction) and Ira Sugar, (Exhibit 241) |
| 106 | Email Exchange Between Tony Brutti and Zack Adkins (Pepper Construction), (Exhibit 242) |
| 107 | Email Exchange Between Tony Brutti and Christi Adams (Pepper Construction), (Exhibit 243) |
| 108 | Email Communications from Sherri Webber to Tony Brutti and Tony Zarlengo, (Exhibit 244) |
| 109 | Email Exchange Between Tony Brutti and Christi Adams (Pepper Construction), (Exhibit 246) |
| 110 | Email Exchange Between Tony Brutti and Thomas Braun (Pepper Construction), (Exhibit 250) |
| 111 | Email from Tony Brutti (Midwest Dock Solutions Inc.) to Christi Adams (Pepper Construction), Mar. 28, 2024, (Exhibit 249) |
| 112 | Email from Tony Brutti, Midwest Dock Solutions Inc., to Christi Adams, Pepper Construction, Mar. 28, 2024, (Exhibit 98) |

| 113 | Deposition Transcript of Veronica O'Connor |
| 114 | Email from Tony Brutti (Midwest Dock Solutions Inc.) to Margaret Stredde (Esser Hayes), Oct. 22, 2020, (Exhibit 287) |
| 115 | Email from Margaret Stredde (Esser Hayes) to Tony Brutti (Midwest Dock Solutions Inc.), Oct. 22, 2020, (Exhibit 288) |
| 116 | Midwest Dock Solutions, Inc. Certificate of Insurance for Principle Construction Corp., Oct. 16, 2020 |
| 117 | Email from Tony Brutti (Midwest Dock Solutions Inc.) to Margaret Stredde (Esser Hayes), Oct. 23, 2020, (Exhibit 290) |
| 118 | Village of Hazel Crest Department of Building & Inspectional Services, Application for Contractor's Registration Certificate, Company Name: Midwest Dock Solutions |
| 119 | Email from Margaret Stredde, Esser Hayes, to Margaret Stredde, Oct. 23, 2020, (Exhibit 291) |
| 120 | Midwest Dock Solutions, Inc. Certificate of Insurance for Village of Hazel Crest, Oct. 23, 2020 |
| 121 | Email from Tony Brutti, Midwest Dock Solutions, to Cathie Demitropoulos, Assured Partners, Jan. 11, 2021, (Exhibit 293) |
| 122 | Text Message Between Callie Stephens, Gineris & Associates, Ltd. and Tony Zarlengo, Midwest Dock Solutions, Jun. 13, 2023, (Exhibit 107), EX. 122 |
| 123 | Text Message from Richard Mantoan to Tony Brutti (Exhibit 273) |
| 124 | Email from Mara Spring, Counsel for Holden Insurance, to Kevin McJessy, Plaintiffs' Counsel, Oct. 6, 2025, (Exhibit 253) |
| 125 | Deposition Transcript of Jacie Olson |

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MID-AMERICA CARPENTERS REGIONAL COUNCIL PENSION FUND; MID-AMERICA CARPENTERS REGIONAL COUNCIL HEALTH FUND; MID-AMERICA CARPENTERS REGIONAL COUNCIL APPRENTICE AND TRAINEE PROGRAM; and MID-AMERICA CARPENTERS REGIONAL COUNCIL SUPPLEMENTAL RETIREMENT FUND, | Case No 1:24-cv-06428<br><br>Judge Andrea R. Wood<br><br>Magistrate Judge Jeannice W. Appenteng |
| Plaintiffs, | |
| v. | |
| DOCK & DOOR INSTALL, INC., an Illinois corporation and MIDWEST DOCK SOLUTIONS, INC., an Illinois corporation, | |
| Defendants. | |

## DECLARATION OF JOHN CONKLIN

I, John Conklin, hereby declare as follows:

1.     I am the Contributions Department Manager ("Contributions Manager") for the

Mid-America Carpenters Regional Council Pension Fund which was formerly known as the

Chicago Regional Council of Carpenters Pension Fund, the Mid-America Carpenters Regional

Council Health Fund which was formerly known as the Chicago Regional Council of Carpenters

Welfare Fund, the Mid-America Carpenters Regional Council Apprentice And Trainee Program

which was formerly known as the Chicago District Council of Carpenters Apprentice and

Trainee Program, and the Mid-America Carpenters Regional Council Supplemental Retirement

Fund (collectively "Trust Funds").

2.     As the Contributions Manager for the Trust Funds, I am familiar with the trust

agreements that govern the Trust Funds.  True and accurate copies of the trust agreements

governing the Pension Fund, the Health Fund, the Trainee Fund and the Supplemental Retirement Fund are attached hereto as Exhibits A, B, C, and D.

3. As part of my duties, I am responsible for supervising and enforcing collection of contributions for medical, pension and other benefits due from numerous employers pursuant to the Carpenters Agreement (also referred to as the "collective bargaining agreement") between the employers' association known as the Mid-America Regional Bargaining Association ("MARBA") and the Mid-America Carpenters Regional Council formerly known as the Chicago Regional Council of Carpenters ("Union").

4. I am also responsible for managing the Trust Funds' audit program whereby the Trust Funds use independent auditing firms to audit the fringe benefit contributions made by employers that are signatory to the Carpenters Agreement with the Union and for overseeing the audit coordinators that work for the Trust Funds.

5. Because of my responsibilities, I am also familiar with the terms of the Carpenters Agreement. True and accurate copies of the Carpenters Agreement in effect for the period June 1, 2019 to May 31, 2024 and for the period June 1, 2024 to May 31, 2029 are attached hereto as Exhibits E and F.

6. The Trust Funds routinely audit employers bound by the collective bargaining agreement, including employers who employ members of the Union in the overhead door and dock leveler industry. These employers typically employ Union members to perform service and installation of overhead doors and dock levelers, which is work falling within the scope of the bargaining unit of the Union as set forth in the Carpenters Agreement.

7. Pursuant to the Area Agreement and the trust agreements, the Trust Funds engaged the certified public accounting firm Legacy Professionals LLP ("Legacy"). The Trust

Funds directed Legacy to review the records necessary to determine whether Dock & Door Install, Inc. paid the fringe benefit contributions to the Trust Funds as required by the Area Agreement and the Trust Agreements for the period October 1, 2020 through the present and to prepare a report of Legacy's findings. A true and accurate copy of the audit initiation letter to Legacy is attached as Exhibit G.

8.    As part of its audit of Dock & Door Install, Inc., Legacy requested records of Midwest Dock Solutions, Inc. because it was identified as a potentially related employer. These companies did not produce the requested records. Legacy produced a report that it could not render final findings because it had not received the records of the related non-signatory company Midwest Dock Solutions, Inc. A true and accurate copy of the report from Legacy is attached as Exhibit H.

9.    Thereafter, the Trust Funds engaged McJessy Ching & Thompson, LLC ("MC&T") to compel production of the records necessary to complete the audit. After the lawsuit was filed, Midwest Dock Solutions, Inc. produced records. Thereafter, Legacy produced a final audit report ("Audit Report"), a true and accurate copy of which is attached as Exhibit I.

10.    The Audit Report states that the amount of unpaid fringe benefit contributions owed to the Trust Funds is $4,037,546.06 based on hours worked by employees of Midwest Dock Solutions, Inc. and based on hours worked by employees of non-union subcontractors hired by Midwest Dock Solutions, Inc. to perform bargaining unit work. A list of the hours worked by the employees of Midwest Dock Solutions, Inc. and the corresponding contributions owed as well as the payments made to the identified subcontractors and the corresponding contributions owed is identified by Legacy in the Audit Report.

11. The amount above does not include additional amounts owed to the Trust Funds for attorneys' fees, auditor's fees, interest, and liquidated damages.

12. The Trust Funds incurred $13,040.40 in auditors' fees charged by Legacy for its audit services in this matter.

I hereby declare under penalty of perjury pursuant to the laws of the United States that the foregoing statements are true and correct.

FURTHER DECLARANT SAYETH NOT.

_____          _____1/9/2026_____
John Conklin                                              Date

24 CV 6428

EXHIBIT A

# CHICAGO REGIONAL COUNCIL OF CARPENTERS PENSION FUND TRUST AGREEMENT

## Effective as of January 1, 2017

## ARTICLE IV

### Designation of Trustees

| | | |
|---|---|---|
| 4.1 | Number of Trustees | IV-1 |
| 4.2 | Qualification of Trustees | IV-1 |
| 4.3 | Acceptance of Appointment | IV-1 |
| 4.4 | Tenure | IV-1 |
| 4.5 | Resignation of a Trustee | IV-1 |
| 4.6 | Appointment and Removal of Trustees | IV-2 |
| 4.7 | Selection of Successor Trustees | IV-2 |
| 4.8 | Power to Act in Case of Vacancy | IV-3 |

## ARTICLE V

### Organization and Operation of Trustees

| | | |
|---|---|---|
| 5.1 | Office | V-1 |
| 5.2 | Meetings | V-1 |
| 5.3 | Action by Trustees Without Meeting | V-1 |
| 5.4 | Quorum | V-2 |
| 5.5 | Voting | V-2 |
| 5.6 | Officers of Trustees | V-2 |
| 5.7 | Committees | V-3 |
| 5.8 | Arbitration | V-5 |
| 5.9 | Immunity of the Trustees | V-6 |
| 5.10 | Compensation of Individual Trustees | V-7 |
| 5.11 | Service in More Than One Fiduciary Capacity | V-7 |

## ARTICLE VI

### Control and Management of Trust

| | | |
|---|---|---|
| 6.1 | Control of Trust | VI-1 |
| 6.2 | Management of Trust | VI-1 |
| 6.3 | Trust Responsibilities | VI-2 |
| 6.4 | Trust Powers | VI-2 |

## ARTICLE VII

### Operation and Administration of Plan

| | | |
|---|---|---|
| 7.1 | Authority of Trustees | VII-1 |
| 7.2 | Plan Responsibilities | VII-1 |
| 7.3 | Plan Powers | VII-2 |

## ARTICLE VIII

### Contributions and Collections

| | | |
|---|---|---|
| 8.1 | Contributions to Plan | VIII-1 |
| 8.2 | Transmission of Reports and Contributions | VIII-1 |
| 8.3 | Delinquent Contributions and Reports | VIII-2 |
| 8.4 | Amount of Contributions | VIII-2 |

## ARTICLE IX

### Controversies and Disputes

| | | |
|---|---|---|
| 9.1 | Reliance Upon Records | IX-1 |
| 9.2 | Determination by Trustees Binding | IX-1 |
| 9.3 | Compromise | IX-1 |
| 9.4 | Right to Obtain Adjudication of Disputes | IX-1 |

## ARTICLE X

### Amendments

| | | |
|---|---|---|
| 10.1 | Method of Amendment | X-1 |
| 10.2 | Limitation on Amendments | X-1 |

## ARTICLE XI

### Termination

| | | |
|---|---|---|
| 11.1 | Term of Plan | XI-1 |
| 11.2 | Procedures on Termination | XI-1 |
| 11.3 | Notification of Termination | XI-1 |

11.4     Distribution Upon Termination                                              XI-2

## ARTICLE XII

## General Provisions

12.1     Title to the Trust                                                          XII-1
12.2     Liability of the Associations, Council and Employers                         XII-1
12.3     Nonalienation of Benefits                                                    XII-1
12.4     Prohibition of Diversion of Trust                                            XII-1
12.5     Incompetency and Minors                                                      XII-2
12.6     Merger of the Plan                                                           XII-2
12.7     Execution of Documents                                                       XII-2
12.8     Notice and Delivery of Documents                                             XII-2
12.9     Gender and Number                                                            XII-2
12.10    Headings                                                                     XII-3
12.11    Information to be Furnished by Employers                                     XII-3
12.12    Qualification                                                                XII-3
12.13    Construction                                                                 XII-3
12.14    Counterparts                                                                 XII-4

CHICAGO REGIONAL COUNCIL OF CARPENTERS PENSION FUND
TRUST AGREEMENT

Effective January 1, 2017

W I T N E S S E T H:

WHEREAS, the Chicago District Council of the United Brotherhood of Carpenters and Joiners of America (the "Council") and the Builders Association of Chicago entered into collective bargaining agreements to provide for the establishment of the Chicago Regional Council of Carpenters Pension Fund (the "Plan");

WHEREAS, effective May 31, 1957, the Council and Association established a trust agreement to implement the Plan;

WHEREAS, the original trust agreement has been amended and restated from time to time; and

WHEREAS, the Trustees desire to amend and restate the trust agreement;

NOW, THEREFORE, effective as of January 1, 2017, for and in consideration of the premises and mutual covenants herein contained, it is mutually understood and agreed as follows:

ARTICLE I

Definitions

1.1    Agreement.  The Trust Agreement, the agreement set forth herein, as amended from time to time.

1.2    Associations.  The Builders Association of Chicago and the Residential Construction Employers Council.

1.3    BAC.  The Builders Association of Chicago.

1.4    Council.  The Chicago Regional Council of Carpenters, United Brotherhood of Carpenters and Joiners of America, formerly known as the "Chicago and Northeast Illinois District Council of the United Brotherhood of Carpenters and Joiners of America."

I-1

1.5     Employee.  Any employee of an Employer on whose behalf an Employer is required to contribute to the Plan pursuant to a collective bargaining or other written agreement with the Council or with the Trustees but not including any person who is prohibited by law from being covered under the Plan or whose inclusion would cause the Plan to lose its tax-exempt status.

1.6     Employer.  Any employer which:

(a)     on or after the effective date of this Plan has a collective bargaining or other written agreement with the Council either directly or as a member of an Association, or the Trustees requiring the employer to make periodic contributions to the Plan;

(b)     signs a copy of this Agreement, any predecessor agreement or a Participation Agreement;

(c)     is accepted for participation in the Plan by the Trustees or was a party to any predecessor trust agreement; and

(d)     makes contributions to the Plan as required by the agreement providing for such contributions.

The term "Employer" may also include the Council and any affiliate of the Council, and any state, national or international labor organization of which the Council is an affiliate, the Plan, or any other jointly-administered pension, health and welfare or other type of employee benefit plan to which the Council is a party; if such organization becomes obligated pursuant to a Participation Agreement with the Trustees to contribute to the Plan on behalf of its employees and is accepted for participation in the Plan by the Trustees. The Plan, the Council or any other employee benefit plan becoming an Employer pursuant to the provisions of this paragraph shall not in any event participate in the selection or replacement of Employer Trustees or have any vote as an Employer on any matter and its Employees shall not be considered in connection with any determination required to be made by Employers of a stated percentage or majority of Employees.

1.7     Geographical Area.  The area included within the geographical limits of the Council's jurisdiction.

1.8     Local Union.  Any local union affiliated with the Council.

1.9     Participant.  Any Employee or former Employee who is eligible to participate in the Plan.

1.10   Participation Agreement.  An agreement in form and content acceptable to the Trustees which evidences the commitment of the signatory thereto to be bound by the adoption of the Plan and the Agreement, and to become an Employer obligated to contribute to the Plan on behalf of certain employees of the Employer whether or not subject to the terms of a collective bargaining agreement.

1.11   Plan.  The Chicago Regional Council of Carpenters Pension Plan, established and maintained pursuant to the terms of this Agreement.

1.12   RCEC.  The Residential Construction Employers Council or its successor by consolidation or merger which represents Employers in collective bargaining negotiations with the Council.

1.13   Trust.  The assets of the Plan held in trust by the Trustees.

1.14   Trustees.  Those persons who are appointed pursuant to the provisions of Article IV hereof and who have authority to control and manage the operation and administration of the Plan and who also have authority to control and manage the Trust.

ARTICLE II

Creation and Acceptance of Trust

All payments made by Employers on behalf of their Employees to the Plan pursuant to collective bargaining or other written agreements and such other payments as shall from time to time be made to the Plan by or on behalf of Employers and Employees, and all other money or property as shall lawfully become a part of the Trust, together with the income, gains and all other increments of any nature whatsoever, if any, therefrom, shall be held, managed and administered in trust pursuant to the terms of this Agreement. The Trust shall be known as the Chicago Regional Council of Carpenters Pension Trust. The Trustees hereby accept the trust created hereunder and agree to perform the duties, responsibilities and obligations under this Agreement on their part to be performed.

ARTICLE III

Purpose of and Payments To and From Plan

3.1     Purpose.  The purpose of the Plan is to apply the assets of the Plan to provide retirement and related benefits to Participants and their beneficiaries consistent with applicable law and the tax-exempt status of the Trust as may from time to time be determined by the Trustees for the benefit of Participants and their beneficiaries.  Except as otherwise provided herein, nothing in this Agreement shall increase or decrease the rights of any party to any collective bargaining agreement.

3.2     Payments To and From Plan.  Each Employer shall be required to contribute to the Trust in accordance with the applicable collective bargaining or other written agreements and rules of the Trustees.  Payments from the Trust shall be made without limitation by reason of enumeration, for the following purposes:

(a)     To provide for:

(i)     the payment of all reasonable and necessary expenses of establishing the Plan, collecting the contributions and operating, administering, controlling or managing the Plan or Trust, regardless of whether such activities are deemed to be subject to the fiduciary requirements of ERISA or are deemed to be settlor in nature; including payment of membership dues in educational and other organizations operated for purposes related to this Plan and the payment of expenses incurred by the Trustees in connection with attending and participating in educational conferences, seminars and similar meetings;

(ii)     the employment of such administrative, legal, expert and clerical assistance as may be reasonably necessary;

(iii)     the purchase or leasing of such premises as may be necessary for the operation of the affairs of the Plan; and

(iv)     the purchase or leasing of such materials, supplies and equipment as the Trustees, in their discretion, find necessary or appropriate to the performance of their duties.

(b)     To pay or provide for pension benefits to Participants or their beneficiaries in accordance with the terms, provisions and conditions of the Plan.

ARTICLE IV

Designation of Trustees

4.1     Number of Trustees.  There shall be ten regular Trustees, five of whom shall be representatives of the Employers (the "Employer Trustees") and five of whom shall be representatives of the Council (the "Council Trustees").  In addition to the regular Trustees, the Associations and the Council may designate such number of alternate Employer or alternate Council Trustees respectively, as BAC, RCEC and the Council may deem advisable provided that BAC, RCEC and the Council may not designate more alternate Trustees than the number that they are permitted to appoint as regular Trustees.  An alternate Trustee shall only be authorized to act in the place and stead of a regular Trustee, appointed by the same entity that designated the alternate Trustee, who is unable to act because of death, incapacity, resignation or absence from a meeting of the Trustees, and an alternate Trustee shall have no duty or responsibility to act unless so authorized to act.  As to matters presented when he/she is so authorized to act, an alternate Trustee shall be vested with all the rights, powers, duties and responsibilities of a regular Trustee.  Any regular Trustee who is unable to act shall not be responsible for any acts taken by or omitted to be taken by an alternate Trustee in his/her place and stead.  Such a regular Trustee who is unable to act shall be treated as if he/she has resigned in connection with any action taken or omitted to be taken by alternate Trustee.

4.2     Qualification of Trustees.  No person shall serve or be appointed to serve as a Trustee in contradiction of the terms of section 411 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA" or the "Act").  No person shall be disqualified from being a Trustee hereunder by reason of the fact that he/she is or hereafter becomes a Participant hereunder.

4.3     Acceptance of Appointment.  Each Trustee shall consent to and accept his/her appointment as a Trustee in writing.

4.4     Tenure.  Each Trustee shall continue to serve during the existence of the Plan and Trust until his/her death, incapacity, resignation or removal.

4.5     Resignation of a Trustee.  A Trustee may resign and subsequent thereto shall be discharged from any further duty or responsibility hereunder by giving written or electronic notice to the Chairman and Secretary of the Trustees or to the entire Board of Trustees in care of the Plan administrative office if the resigning Trustee is the Chairman or Secretary, which notice shall state the date such resignation shall take effect and such resignation shall take effect on said date unless a successor Trustee shall have been appointed at an

IV-1

earlier date in accordance with the provisions of section 4.8 hereof, in which event such resignation shall take effect immediately upon the appointment of such successor Trustee.

Any Trustee, upon leaving office, shall forthwith turn over and deliver to the Chairman or Secretary of the Trustees (or the Plan administrative office if the resigning Trustee is the Chairman or Secretary) any and all property in his/her possession or under his/her control which belongs to the Plan.

4.6     Appointment and Removal of Trustees. BAC may appoint three Employer Trustees, the RCEC may appoint two Employer Trustees and the Council may appoint five Council Trustees pursuant to the terms of its governing bylaws. Those Employer Trustees appointed by BAC may be removed by BAC, and those Employer Trustees appointed by the RCEC may be removed by the RCEC. Any Council Trustee may be removed from office at any time by the Council pursuant to the terms of its governing bylaws. Any notice of removal of a regular Trustee, in order to be effective, shall be delivered to the remaining regular Trustees, shall specify the date the removal shall take effect and name the Trustee removed, and shall be signed by a duly authorized representative of the respective Association or the Council.

An alternate Employer Trustee or Council Trustee may be removed at any time in the same manner as a regular Trustee.

4.7     Selection of Successor Trustees. If any Trustee shall become disqualified to serve, die, resign, be removed, become incapacitated or refuse to act, a successor Trustee shall be appointed forthwith by written instrument signed by those authorized to appoint the successor.

BAC shall appoint the successor Employer Trustee (or alternate Employer Trustee) for an Employer Trustee (or alternate Employer Trustee) that it appointed, and the RCEC shall appoint the successor Employer Trustee (or alternate Employer Trustee) for an Employer Trustee (or alternate Employer Trustee) that it appointed.

Council Trustees (or alternate Council Trustees) shall be appointed by the Council pursuant to the terms of its governing bylaws.

Any written instrument appointing a successor Employer or Council Trustee (or alternate) shall state the date appointment shall take effect and shall be delivered to the Chairman and Secretary of the Trustees.

     If a successor Trustee shall fail to be appointed within 90 days after the position becomes vacant, then any remaining Trustee may petition the United States District Court for the district in which the principal office of the Plan is located, to appoint a successor Trustee, which appointment shall be as fully effective as if made by the party originally entitled to appoint such Trustee and shall be considered to have been made on behalf of such party.

     4.8 <u>Power to Act in Case of Vacancy</u>.  Pending the appointment of a successor Trustee in accordance with the provisions of section 4.7 hereof, no vacancy or vacancies in the Board of Trustees shall impair the power of the remaining Trustees to administer the affairs of the Plan and Trust.

ARTICLE V

Organization and Operation of Trustees

5.1     Office.  The Trustees shall establish an office at any such location as the Trustees may approve for the transaction of the business of the Plan, the exact location of which is to be made known to the parties interested in said Plan.  At such office there shall be maintained the books, reports and records pertaining to the Plan and its administration.

5.2     Meetings.  The Trustees shall meet whenever required to provide for the orderly and timely administration of the business of the Plan at such location as may be acceptable to the Trustees.  The Chairman, Secretary or any two Trustees may call meetings of the Trustees.  Any meeting shall be called upon at least fourteen (14) days' written or electronic notice to all Trustees, which notice shall specify the date, time and place of such meeting and may specify the purpose thereof and any action proposed to be taken thereat.  Attendance at Trustees' meetings shall be limited to the Trustees and other persons invited by the Trustees.

Whenever any notice is required to be given to any Trustee hereunder, a waiver thereof in writing, signed at any time, whether before or after the time of meeting by the Trustees entitled to such notice, shall be deemed equivalent to the giving of such notice.  The attendance of a Trustee at a meeting or his/her approval of actions taken at a meeting shall constitute a waiver of notice of such meeting, except where a Trustee attends a meeting and objects thereat to the transaction of any business because the meeting is not lawfully called or convened.

5.3     Action by Trustees Without Meeting.

(a)     Unanimous Consent in Writing.  Provided at least one Employer Trustee and one Council Trustee is then serving, any action which may be taken at a meeting of the Trustees may be taken without a meeting if a consent in writing setting forth the action so taken shall be signed by all of the Trustees (including facsimile and electronic signatures) then serving in accordance with section 5.3(c).

(b)     Through the Use of Communications Equipment.  Any action which may be taken at an in-person meeting of the Trustees may be taken without an in-person meeting through the use of any means of communication by which all participating Trustees may simultaneously hear each other; for example, a telephone conference call.  The notice, quorum and voting requirements of

sections 5.2, 5.4 and 5.5 shall apply to such meetings as if they were held in person. A written record of any action so taken by the Trustees pursuant to this section shall be prepared and provided to each of the Trustees.

(c)    <u>Unanimous Action</u>. Any action taken by the Trustees in accordance with section 5.3(a) shall require the unanimous agreement of the Trustees then serving unless a Trustee abstains from participation in the action due to a possible or perceived prohibited transaction under ERISA. If such a Trustee abstains from participating, the consent of such Trustee shall not be required for such action taken in accordance with section 5.3(a).

5.4    <u>Quorum</u>. A quorum for the transaction of business at a duly called meeting shall consist of two Council Trustees and two Employer Trustees who are present in person (or electronically pursuant to Section 5.3), provided that at least one Employer Trustee appointed by BAC and one Employer Trustee appointed by RCEC are present. Once a quorum has been established, said quorum shall continue to exist until the meeting has been adjourned provided at least one Council Trustee, one Employer Trustee appointed by the BAC and one Employer Trustee appointed by the RCEC remain in attendance.

5.5    <u>Voting</u>. Except as otherwise specifically provided for herein, all actions by and decisions of the Trustees shall be by the vote of a majority of votes cast by Trustees who are in attendance at a duly called meeting of the Trustees at which there is a quorum present. Each Trustee shall have one vote; provided, however, that: (a) at any meeting at which there is a lesser number of Employer Trustees than Council Trustees present, the Employer Trustees shall in the aggregate have that number of votes which equals the number of Council Trustees present and vice versa and (b) Employer Trustee votes shall be divided between the BAC-appointed and RCEC-appointed Employer Trustees proportionate to the number of Employer Trustees that BAC and RCEC are entitled to appoint relative to the total number of Employer Trustees regardless of the number of BAC-appointed or RCEC-appointed Employer Trustees that are present at a meeting (as of January 1, 2017, the BAC is authorized to appoint three of the five Employer Trustees and RCEC is authorized to appoint two; as a result, the BAC-appointed Trustees would possess 60% of the Employer Trustee votes and RCEC-appointed Trustees would possess 40% of the Employer Trustee votes). The foregoing to the contrary notwithstanding, the unanimous written consent of the Trustees shall be required for any action pursuant to section 5.3(a).

5.6    <u>Officers of Trustees</u>. At the commencement of each fiscal year of the Plan, the Trustees shall select from among them a Chairman and a Secretary. In the alternative, the Trustees may take no action and the previously selected Chairman and Secretary shall continue to serve in their roles. If a Chairman or Secretary shall cease serving as a Trustee during the year, or resign

from serving as an officer, the Trustees shall select a successor. One officer shall be a Council Trustee and one officer shall be an Employer Trustee.

### 5.7 Committees.

(a) The Trustees may, by resolution or by-law or by provisions of this Trust Agreement, allocate fiduciary responsibilities and various administrative duties to committees or subcommittees of the Board of Trustees and such resolutions may grant the committee or subcommittee full power to act on behalf of the Trustees. The committees or subcommittees formed by the Trustees may delegate such responsibilities and duties to other individuals as they may deem appropriate or necessary in their sole discretion and consistent with the Act.

Among others, the Trustees may assign the following responsibilities to committees or subcommittees:

(i) the responsibility for managing the Trust investments (if not otherwise delegated to an investment manager);

(ii) the responsibility for reviewing and determining benefit claims, including appeals (described further at section 5.7(b));

(iii) the responsibility for implementing the Trust's payroll auditing duties and for resolving questions or problems arising out of such duties, and for overseeing other aspects of the Plan's audit and reporting responsibilities;

(iv) the responsibility for resolving questions or problems that may be encountered in connection with the collection of delinquent Employer accounts;

(v) the responsibility for resolving questions or problems that may be encountered in connection with the day-to-day work of the administrative office maintained by the Trust;

(vi) the responsibility for approving the Trust auditor's engagement and annual audit plan, reviewing the auditor's preliminary audit findings and management letters, and taking all other action necessary to enable the Trust to satisfy its audit and government reporting duties; and

(vii) the responsibility for reviewing the performance of the professionals, vendors and employees retained by the Trustees.

The Trustees shall establish committees or subcommittees through the adoption of a motion or resolution that establishes the committee and that allocates stated responsibilities and authority to the committee or subcommittee. All committees and subcommittees shall consist of an equal number of Council Trustees and Employer Trustees. The Employer Trustees shall have authority to appoint and remove Employer Trustee members of Committees, and the Council Trustees shall have the authority to appoint and remove Council Trustee members of Committees. The resolution shall identify the quorum and voting requirements for the committee and subcommittee. If the resolution does not identify the quorum and voting requirements, then a quorum shall consist of at least one Employer Trustee and one Council Trustee in attendance at a meeting, and action shall be taken by majority vote. If the committee or subcommittee deadlocks on any matter submitted to it, such matter shall be referred to the Board of Trustees for review and action. Nothing contained herein shall in any way limit the authority of the Trustees to create additional committees or subcommittees for the purpose of assisting with or expediting the affairs of the Trust.

(b) Appeals Committee. At the first meeting of each calendar year, the Chairman and Secretary of the Board of Trustees shall appoint from among the Trustees two (2) regular members and two (2) alternate members of the Appeals Committee. If no action is taken at the beginning of the calendar year, then the prior appointments shall continue. The Appeals Committee shall consist of two (2) members, one (1) chosen from among the Employer Trustees and one (1) from among the Council Trustees, and two (2) alternate members, one (1) chosen from among the Employer Trustees and one (1) from among the Council Trustees. The administrator and members of the administrator's staff, as well as other Plan advisors, may also attend meetings.

The Appeals Committee shall select from among their membership a Chairman and a Secretary, each of whom shall be selected from different groups, i.e., the Employer Trustees and the Council Trustees Group, it being the intention of the Trustees that at no time shall both offices be held by individuals from among the same group. The Chairman shall preside at all meetings of the Appeals Committee. The Secretary or his/her delegate shall keep accurate minutes of the proceedings and cause to be prepared such documents and correspondence as may be required from time to time. Each alternate member of the Appeals Committee shall have full authority to act in the place of the regular member appointed from his/her group at any meeting at which said regular member is unable to attend.

The Appeals Committee shall review all appeals of benefit denials and shall make such a determination as in its sole discretion it deems proper. Its decision shall be binding on the Board of Trustees of the Plan, being

the intention of the Board of Trustees that the Appeals Committee has the sole responsibility and authority in all matters of appeals of benefit denial.

The Appeals Committee shall meet upon ten (10) days written or electronic notice from its Chairman or administrator at such times and places as he/she shall determine unless the Committee members otherwise agree. Decisions of the Appeals Committee shall be by majority of those members present at any meeting at which a quorum is present. A quorum of the Appeals Committee shall consist of two (2) Trustees in attendance at a meeting, one (1) of whom is an Employer Trustee and one (1) of whom is a Council Trustee. In the event that there is no majority on a vote to reverse an appealed decision of benefit denial, that decision shall be affirmed and be the decision of the Appeals Committee.

In the event that any member of the Appeals Committee shall resign or be unable to serve by reason of death or incapacity, the Officer who appointed the member shall appoint his/her successor from among the then-serving Council Trustees or Employer Trustees (depending on the designation of the departing Committee member). The Chairman shall not have the power to remove any member of the Appeals Committee, nor to appoint a successor) except as set forth this section 5.7(b).

(c)     Additional Committees. As of the date of this restatement, the following Committees (in addition to the Appeals Committee) had been established: Investment Committee; Financial Audit Committee. The Chairman and Secretary shall be members of the Investment Committee by virtue of their position.

5.8     Arbitration. In the event the Trustees attending a duly called meeting at which there is a quorum present are unable to agree in accordance with the majority voting requirements of section 5.5 hereof upon any matter in connection with the administration or operation of the Plan or Trust, or in the event the Trustees fail to obtain a quorum for a meeting after three consecutive notices thereof, a deadlock shall be deemed to exist and the Trustees may then select a neutral person as an impartial arbitrator who is willing to act in the resolution of such deadlock. In the event the Trustees are unable to agree by majority vote upon the selection of an impartial arbitrator within 30 days after such deadlock or after the third meeting at which a quorum was not present, then an impartial arbitrator shall be appointed in accordance with the Impartial Umpire Rules for Arbitration of Impasses Between Trustees of Joint Employee Benefit Trust Funds as administered by the American Arbitration Association. Any expenses, costs and attorneys' fees in connection with the foregoing shall be paid by the Plan, including any reasonable compensation to the arbitrator. The impartial arbitrator shall have no power to alter, delete, amend, add to, take away from or disregard any of the provisions of this Agreement and shall have no power

to cause the Trustees to alter, delete, amend, add to, take away from or disregard any provision of this Agreement. The decision of the impartial arbitrator shall be final and binding upon the Trustees, all parties hereto, the Employees and their beneficiaries. The Trustees shall take or omit taking any action or actions that may be indicated in order to give effect to the decision of the impartial arbitrator.

Differences arising as to the interpretation or application of the provisions of this Agreement, or relating to the benefits provided for Participants hereunder shall not be subject to the grievance or arbitration procedures established in any collective bargaining agreement.

5.9    Immunity of the Trustees.

(a)    Exculpation of Trustees and Plan Employees From Liability. No Trustee or Plan employee shall incur any liability individually or on behalf of other individuals for any act or failure to act unless such act or failure to act is due to his/her own negligence or willful misconduct or lack of good faith; provided, however, the foregoing shall not relieve a Trustee or Plan employee from liability if such is precluded by paragraph 5.9(c). A Trustee or Plan employee may act or rely upon any of the following:

(i)    Any instrument, application, notice, request, signed letter or other paper or document believed by him/her to be genuine and to contain a true statement of facts and to be signed or sent by the proper person; or

(ii)    The advice, opinion, records, reports or recommendations of any accountant, actuary, administrator, attorney, consultant, co-trustee, investment agent or investment manager or any other advisor selected by the Trustees with reasonable care.

(b)    Indemnification of Trustees and Plan Employees. The Trustees shall cause any person who is or has served as a Trustee or employee of the Plan to be indemnified out of the Trust against all damages, liabilities and expenses incurred by or imposed on him/her in connection with any claim, suit, action or proceeding concerning the Plan or his/her acts or omissions as a Trustee or employee thereof, including, without limitation, legal fees and amounts paid in any compromise or settlement unless such acts or omissions constitute negligence, willful misconduct or lack of good faith; provided, however, the foregoing shall not relieve a Trustee or a Plan employee from liability if such is precluded by paragraph 5.9(c). Any indemnification provided herein shall be limited to amounts not collected pursuant to valid and enforceable liability insurance policies.

V-6

To the extent permitted by law, the Trustees, in their discretion, may also cause the Plan to indemnify any person who is rendering services to the Plan against all damages, liabilities and expenses incurred by or imposed upon such a person in connection with any claim, suit, action or proceeding concerning the Plan or the acts or omissions of such a person, including without limitation, legal fees and amounts paid in any compromise or settlement unless such act or omission constitutes gross negligence, willful misconduct or lack of good faith.

(c)     Compliance With Employee Retirement Income Security Act of 1974.  Anything herein to the contrary notwithstanding, nothing in subparagraphs (a) and (b) above shall relieve a Trustee or other person rendering service to the Plan of any responsibility or liability for any responsibility, obligation or duty under Part IV of Title I of the ERISA.  Further, notwithstanding anything in this Agreement to the contrary, if any provision of this Agreement is voided by section 410 of ERISA, such provision shall be of no force or effect only to the extent that it is voided by such section.

5.10     Compensation of Individual Trustees.  An individual Trustee shall not be paid any compensation from the Trust for his/her services hereunder, but the Trustees may authorize reimbursement to a Trustee from the Trust for reasonable expenses incurred on behalf of the Plan or Trust in connection with their duties hereunder.

5.11     Service in More Than One Fiduciary Capacity.  Any individual, entity or group of persons may serve in more than one fiduciary capacity with respect to the Plan, the Trust or both to the extent such is permitted by law; provided, however, a Trustee shall not be paid any compensation for providing professional services to the Plan.

ARTICLE VI

Control and Management of Trust

6.1     Control of Trust.  The Trustees shall be the named fiduciaries of the Trust and shall have the power to control the Trust and to perform all such acts, to take all such proceedings, and to exercise all such rights and privileges, although not specifically mentioned herein, as the Trustees may deem necessary or advisable to administer the Trust or to carry out the purposes of this Agreement.

6.2     Management of Trust.  The management, including the acquisition and disposition of property comprising the Trust, shall be as follows:

(a)     General Authority.  The Trustees shall have exclusive authority and responsibility with respect to the custody and management of the Trust, except to the extent any such authority has been delegated pursuant to the provisions of subparagraph (b), (c) or (d) below and subparagraphs (c) and (d) of section 7.3.

(b)     Delegation of Custody.  The Trustees are authorized to delegate custody of all or any portion of the Trust.  Such custodian shall hold the Trust as directed in writing by the Trustees.

(c)     Delegation of Investment Control.  The Trustees may appoint one or more investment managers to supervise and direct the investment and reinvestment of a portion or all of the Trust in accordance with the provisions of the Agreement and in the same manner and with the same powers, duties, obligations, responsibilities and limitations as apply to the Trustees as set forth herein.  Any investment manager so appointed shall be an investment advisor registered under the Investment Advisers Act of 1940, a bank as defined in such Act or an insurance company which is qualified to manage the assets of employee benefit plans under the laws of more than one state.  As a condition to its appointment, an investment manager shall acknowledge in writing that it is a fiduciary with respect to the Plan.  The Trustees may furnish an investment manager with written investment guidelines for investment, which guidelines may include directions with respect to the diversification of the investments.  The Trustees may also delegate to an investment manager the authority to retain other investment managers.  Investment managers who are delegated authority for retaining other investment managers shall serve as "named fiduciaries" (within the meaning of ERISA section 402) to the extent necessary to delegate investment responsibility to another investment manager.  Any investment manager shall receive such reasonable compensation chargeable against the Trust as shall be agreed upon with the Trustees.

(d)     Co-Trustee Agreement. The Trustees may enter into one or more agreements with corporations or national banking associations authorized by law to act in a trust or fiduciary capacity, whereby any such corporation or national banking association shall become a co-trustee ("Corporate Trustee"). The Trustees may delegate to the Corporate Trustee all or any part of the authority and responsibility with respect to the control and management of the Trust, provided the Corporate Trustee shall not be a representative of either the Employers or the Council and shall have no right to vote as a Trustee. Any such Corporate Trustee shall receive such reasonable compensation chargeable against the assets delivered to it as shall be agreed upon with the Trustees. Further, any bank selected shall have a combined capital and surplus of one million dollars ($1,000,000) and shall have been in the general banking business for not less than ten (10) years.

6.3     Trust Responsibilities. In connection with their management and control of the Trust unless the following responsibilities are allocated or delegated in accordance with the procedures set forth in section 7.3(c) or (d) or elsewhere herein, the Trustees shall:

(a)     cause the assets of the Plan to be held and administered in trust or by an insurance company authorized to do business in more than one state and pursuant to contracts or policies issued by such insurance company;

(b)     cause accounts of all investment, receipts, disbursements and all other transactions affecting all or any portion of the Trust to be maintained; and

(c)     pay from the Trust all taxes of any and all kinds whatsoever that may be levied or assessed under existing or future laws upon, or in respect of, the Trust or its income.

6.4     Trust Powers. The Trustees shall have such powers as may be necessary to discharge their responsibilities in managing and controlling the Trust. The Trustees shall have full and complete authority and control over the Trust unless such authority or control is allocated or delegated by the Trustees in accordance with the procedures set forth in section 7.3(c) or (d), or elsewhere herein. Any determination made by the Trustees in the exercise of these powers shall be binding on all persons. In addition to such powers as are conferred by law or as set forth elsewhere in this Agreement, the powers of the Trustees in connection with their managing and controlling the Trust shall include, but shall not be limited to, the following:

VI-2

(a)     To invest and reinvest all or part of the principal and income of the Trust, without distinction between principal and income as the Trustees determine, in such securities or in such property, real or personal, or share or part thereof, or part interest therein, wherever situated, as the Trustees shall deem advisable, including but not limited to, governmental, corporate or personal obligations, shares of stock, common or preferred, whether or not listed on any exchange, participation in partnerships, mutual investment funds, bonds and mortgages, and other evidences of indebtedness or ownership, including stocks, bonds or other obligations secured by personal property, participation in any common trust fund exempt under section 584 of the Internal Revenue Code established or maintained for the collective investment of fiduciary funds and participation in any trust fund qualified under section 401(a) and exempt under section 501(a) of the Internal Revenue Code.

During the time that any part of the Trust is held in a common or collective trust exempt under Code section 501(a) or 584, the declarations of trust of such common or collective trust shall be part of this Agreement provided such declaration of trust meets the requirements of Revenue Ruling 81-100 (as amended), if necessary, and the declarations of trust comply with the Rules and Regulations of the Comptroller of the Currency, if necessary, and comply with the laws of any state having jurisdiction thereover and have, where appropriate, been approved by the Internal Revenue Service.

(b)     To apply for and procure from responsible insurance companies retirement annuity, retirement income contracts or other contracts to provide all or part of the benefits hereunder as the Trustees shall deem proper. Such contracts may be either for the general benefit of the Trust or for the particular benefit of a particular Employee; provided, however, no Employee shall derive any greater right than any other Employee by reason of the fact that an insurance company contract has been purchased on his life as a general investment of the Trust nor shall any such rights of any Employee be diminished by such purchase. The Trustees may exercise at any time, and from time to time, whatever rights and privileges may be granted under such contracts and may collect, receive and settle for the proceeds of all such contracts as and when entitled to do so under the provisions thereof.

(c)     To sell, convey, transfer, exchange, partition, lease for any term, mortgage, pledge or otherwise dispose of any and all property, real or personal, or to grant options with respect to any property held by the Trustees by private contract or at public auction or to surrender for cash value any contracts issued by an insurance company and held by the Trustees. Any sale, option or other disposition of property may be at such time and on such terms as the Trustees see fit. Any sale, option or other disposition of property may be made for

cash or upon credit, or partly in cash and partly on credit. No person dealing with the Trustees shall be bound to see to the application of the purchase money or to inquire into the validity, expedience or propriety of any such sale, option or other disposition.

(d)　　To receive, hold, manage, invest, reinvest, improve, repair and control all monies and property, real or personal, at any time forming part of the Trust.

(e)　　To purchase and sell contracts or other properties through such broker or brokers as the Trustees may choose.

(f)　　To vote or refrain from voting upon any stocks, bonds or other securities; to give general or special proxies or powers of attorney with or without power of substitution; to appoint one or more individuals or corporations as voting trustees under voting trust agreements and pursuant to such voting agreements to delegate to such voting trustees' discretion to vote; to exercise any conversion privileges, subscription rights, or other options, and to make any payments incidental thereto; to oppose, or to consent to, or otherwise participate in, corporate reorganizations or other changes affecting corporate securities, and to pay any assessments or charges in connection therewith; and generally to exercise any of the powers of an owner with respect to property held as part of the Trust; to delegate voting authority to an investment manager.

(g)　　To cause any securities or other property to be registered in the name of the Plan, the Trustees, a Corporate Trustee, a custodian or in the name of a nominee without designating the same as trust property, and to hold any investments in bearer form or otherwise in such form that title passes by delivery, but the books and records of the Trustees shall at all times show that all such investments are part of the Trust.

(h)　　To exercise or dispose of any right they may have as the holders of any security to convert the same into another or other securities, or to acquire an additional security or securities, to make any payments, exchange any security or do any act with reference thereto which they may deem advisable.

(i)　　To consent to take any action in connection with (including the deposit of any property with and participation with respect to any protective or similar committee) and receive and retain any securities or other property resulting from any reorganization, consolidation, merger, readjustment of the financial structure, sale, lease or other disposition of assets of any corporation or other organization, the securities of which may constitute a portion of the Trust, and the Trustees may delegate to any such protective or similar committee such

VI-4

power and authority as they may deem proper in the premises and may pay such portion of the expenses and compensation of such committee as they deem proper.

(j)     To borrow or raise money for the purposes of the Plan in such amount, and upon such terms and conditions as the Trustees shall deem advisable; and for any sum so borrowed to issue the promissory note of the Plan, and to secure the repayment thereof by creating a security interest in all or any part, of the Trust; and no person lending such money shall be obligated to see that the money lent is applied to Trust purposes or to inquire into the validity, expedience or propriety of any such borrowing.

(k)     To hold cash, uninvested, for such length of time as the Trustees may determine without liability for interest thereon.

(l)     To make, execute, acknowledge and deliver any and all documents of transfer and conveyance, including but not limited to, deeds, leases, mortgages, conveyances, contracts, waivers and releases, and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted.

(m)     To renew or extend or participate in the renewal or extension of any mortgage, upon such terms as may be deemed advisable, and to agree to a reduction in the rate of interest on any mortgage or to any other modification or change in the terms of any mortgage, or of any guarantee pertaining thereto, in any manner and to any extent that may be deemed advisable for the protection of the Trust or the preservation of the value of the investment; to waive any default whether in the performance of any covenant or conditions of any mortgage or in the performance of any guarantee or to enforce any such default in such manner and to such extent as may be deemed advisable; to exercise and enforce any and all rights of foreclosure, to bid on property on foreclosure, to take a deed in lieu of foreclosure with or without paying any consideration therefor, and in connection therewith to release the obligation on the bond secured by such mortgage and to exercise and enforce in any action, suit or proceeding at law or in equity any rights or remedies in respect of any such mortgage or guarantee.

(n)     To employ suitable agents, advisors and counsel as they may deem necessary and advisable for the efficient operation and administration of the Trust and to charge the expense thereof to the Plan to the extent permitted by applicable law.

(o)     To form a corporation or corporations under the laws of any jurisdiction, to participate in the forming of any such corporation or corporations or acquire an interest in or otherwise make use of any corporation or

corporations already formed, for the purpose of investing in and holding title to any property.

(p)     To continue to have and to exercise after the termination of the Plan and until final distribution, all of the title, powers, discretions, rights and duties conferred or imposed upon the Trustees hereunder, or by law.

(q)     To establish an administrative office and to retain employees and other professionals, and to purchase equipment and enter into leases and take all other actions necessary to operate an administrative office; to enter into arrangements with other entities under office sharing, expense sharing or similar sharing features intended to improve operational efficiencies or reduce costs; to form a corporation or corporations under the laws of any jurisdiction to serve as the administrative office.

Notwithstanding any provision set forth in this paragraph 6.4 to the contrary, the Trustees shall exercise any power in a manner which is consistent with the applicable provisions of Title I of ERISA.

With respect to an investment in any contract issued by an insurance company, such contract may provide for the allocation of amounts received by the insurance company thereunder to said insurance company's general account and/or one or more of its separate accounts. Such accounts may include separate accounts maintained for the collective investment of assets. The insurance company, under any such contract, shall have exclusive responsibility for the investment and management of any amounts held under such contract, free of any requirements of state laws limiting investments by fiduciaries.

ARTICLE VII

Operation and Administration of Plan

       7.1   <u>Authority of Trustees</u>.  The Trustees shall be the named fiduciary for the Plan and shall have authority to and shall be responsible for the operation and administration of the Plan and shall conduct the business and activities of the Plan in accordance with the provisions of this Agreement.

       7.2   <u>Plan Responsibilities</u>.  The Trustees shall have full and complete authority and control over the Plan.  In connection with their operation and administration of the Plan, unless the following responsibilities are allocated or delegated in accordance with the procedures set forth in sections 7.3(d) and (e), the Trustees shall:

       (a)   Formulate and adopt a written instrument describing those benefits to be provided by the Plan consistent with the purposes set forth in section 3.1 hereof.

       (b)   Determine the right of any person to a benefit.  In the exercise of this responsibility, the Trustees shall provide every applicant whose application for a benefit is denied wholly or partially with a written notice setting forth the reason or reasons for the denial and any additional information required by applicable law.  Further, the Trustees shall adopt a written appeal procedure which shall provide a claimant with a reasonable opportunity to appeal a full or partial denial of a benefit application.

       (c)   Establish and maintain a funding policy and method consistent with the Plan's objectives and in accordance with any law applicable to the Plan.

       (d)   Maintain books of account, records and other data as may be necessary for the proper administration and operation of the Plan, and a record of all their transactions, meetings and the actions taken at meetings or by informal action of the Trustees including minutes of all Trustees' meetings.  A copy of the minutes of all Trustees' meetings shall be retained as a record of the Plan.  All of said books, records and data shall be available at the office of the Plan during business hours for inspection by any Trustee.

       (e)   Prepare, execute, file and retain a copy for the Plan records of all reports required by law or deemed by them to be necessary or appropriate for the proper administration and operation of the Plan.

(f)     Procure an audit of the books of the Plan by a Certified Public Accountant not less frequently then once each year.  A copy of each such audit shall be made available upon request, to each Employer, the Council and the Trustees as soon as is reasonably possible after it has been prepared, and a copy of such audit shall be kept available for inspection by authorized persons during business hours at the office of the Plan.

(g)     Procure and maintain at the expense of the Plan such bonds as are required by law, together with such additional bonding coverage as they may determine for the Trustees, employees of the Plan, any agents acting on behalf of or retained by the Trustees and persons to whom fiduciary responsibilities have been delegated.

7.3     Plan Powers.  The Trustees shall have such powers as may be necessary to discharge their responsibilities in managing and controlling the general operations and administration of the Plan.  The Trustees shall have full and complete authority and control with respect to the operations and administration of the Plan unless such authority or control is allocated or delegated by the Trustees in accordance with the procedures set forth in subparagraphs (c) and (d) below.  Any determination by the Trustees in the exercise of these powers shall be binding on all persons.  In addition to such other powers as are conferred by law or are set forth elsewhere in this Agreement, the powers of the Trustees in connection with their operation and administration of the Plan shall include, but shall not be limited to, the following:

(a)     To determine, from time to time, who shall be Employers, Employees or Participants; who shall be eligible for benefits under the Plan; the nature, type, character and amount of benefits to be provided and the medium by which such benefits shall be provided.  In determining who shall be eligible for benefits under the Plan, the Trustees may establish standards for granting or denying such eligibility to Employees.

(b)     To employ such actuaries, consultants, accountants, counsel or other persons as they deem necessary or desirable in connection with the administration of the Plan and to employ one or more persons to render advice with regard to any responsibility or power of the Trustees.  The costs of such services and other administrative expenses shall be paid by the Plan.

(c)     To designate in writing persons who are not Trustees to carry out fiduciary or nonfiduciary responsibilities or duties of the Trustees, and in the event of such a designation the Trustees shall not be liable for any act or omission of such a person.

VII-2

(d)     To allocate, in writing by unanimous agreement, fiduciary or nonfiduciary responsibilities or duties among Trustees. Those persons to whom such responsibilities have not been allocated shall not be liable for any act or omission of those persons to whom such responsibilities have been allocated.

(e)     To construe and interpret the Agreement and Plan.

(f)     To request and receive from the Employers, the Council, the Employees or their beneficiaries or dependents such information as shall be necessary for the proper administration of the Plan.

(g)     To furnish the Employers and the Council, upon request, such annual reports with respect to the administration of the Plan as are reasonable and appropriate.

(h)     To maintain such bank accounts as they deem appropriate for the administration of the Plan; provided, however, all checks, drafts, vouchers or other withdrawals of funds from the Plan shall be signed by at least one Council Trustee and one Employer Trustee, or if the Trustees unanimously so provide by contract or resolution, by a person to whom such responsibility has been delegated.

(i)     To receive and review reports of the financial condition and of the receipts and disbursements of the Trust.

(j)     To prescribe procedures to be followed by any persons in applying for any benefits under the Plan; and to designate the forms or documents, evidence and such other information as the Trustees may reasonably deem necessary, desirable or convenient to support an application for benefits under the Plan.

(k)     To adopt such by-laws, rules, regulations, actuarial tables, forms and procedures from time to time as they deem advisable and appropriate in the proper administration of the Plan, provided the same are consistent with the terms of this Agreement and do not modify or increase the burdens or obligations of any Employer or Council under the terms of its collective bargaining agreement. Any construction of this Trust Agreement or the Plan and all rules and regulations adopted by action of the Trustees for the administration of the Trust shall be binding upon all parties dealing with the Trust and all persons claiming benefits hereunder.

(l)     To have a judicial settlement of the Trust's accounts and judicial determination of any questions in connection with their duties and

obligations hereunder, or in connection with the administration or distribution thereof. The costs and expenses, including accounting and legal fees, for such judicial settlement of accounts or other judicial determination shall be paid by the Plan as a general administration expense to the extent permitted by applicable law.

(m) To file, from time to time, with the Council and the Employers a statement of the Trust's accounts and such other reports as the Trustees deem necessary or appropriate and the Council and Employers may enter into an agreement approving and allowing such statement, account or report and any such agreement shall be binding and conclusive upon all persons whomsoever, and shall constitute a full discharge and acquittance of the Trustees with respect to the matters set forth in such statement, account or report, except to the extent such discharge or relief from liability is precluded by Part 4 of Title I of ERISA.

(n) To the extent such is consistent with the provisions of section 410(b) of ERISA, to purchase out of the assets of the Plan, insurance for the benefit of the Plan and/or the protection of the Trustees, Plan employees or other fiduciaries or service providers of the Plan against any losses by reason of errors or omissions or breach of fiduciary duty.

(o) To enter into any and all contracts and agreements for carrying out the terms of this Plan and for the administration and operation of the Plan and to do all acts as they, in their discretion, may deem necessary or advisable, and such contracts and agreements and acts shall be binding and conclusive on the parties hereto and on the Participants involved.

(p) To borrow money, with or without security, for the Plan.

(q) To extend the time of payment of any obligation and to compromise and accept either total or partial satisfaction, or write off as uncollectible any Employer contribution to the Plan or any other indebtedness or other obligation as the Trustees may deem appropriate, provided such action is consistent with applicable law. An extension of time of payment, compromise or a decision to write off as uncollectible shall be deemed appropriate if the Trustees determine that the likelihood of collection or the anticipated expense of collecting justifies such action.

(r) To inspect and review the records of any Employer (either at the Employer's place of business or through the mail/wire transfer of documents, whatever is deemed by the Plan to be most efficient) to the extent necessary to determine whether the proper contributions required to be made to the Plan have been made. The Trustees may, based upon all relevant circumstances, assess all or a portion of the cost of the audit to the Employer if an underpayment

is disclosed by the audit, or the Employer fails timely to pay following demand for payment. Also, in the event the Employer resists the Plan Auditor's attempt to conduct the audit or obstructs completion of the audit (e.g., refuses timely to provide all records it possesses which the Plan Auditor believes are necessary to complete the audit), the Trustees may assess the Employer for all or a portion of the audit costs. If the Plan is required to initiate litigation to compel completion of the payroll audit, the Trustees may assess the Employer for the costs of the payroll audit plus all fees and costs that the Plan incurs in compelling the audit, including legal fees.

(s)     To extend the coverage of the Plan to Employers who satisfy the conditions set forth in section 1.6 and their Employees upon such terms and conditions as the Trustees consider necessary to preserve the actuarial soundness of the Plan and to preserve an equitable relationship between the contributions made by the Employers then participating in the Plan and the benefits payable to their Participants.

(t)     To enter into reciprocal arrangements for the recognition of credits and/or transfer of assets to or from other similar retirement plans now or hereinafter in existence, provided that such arrangements are consistent with applicable law, do not alter or detract from the benefits provided hereunder for the Participants of the Plan, and further provided, that such arrangements are equitable and consistent with sound actuarial and accounting principles and practices.

(u)     To amend the plan of benefits described in the written instrument provided for in section 7.2(a) hereof or any other provisions of such written instrument, including any amendment which affects the nature, amount, condition and duration of any benefit based on what in their opinion the Plan can reasonably provide after adequate provision for the Plan's funding requirements and the costs of administration. To the extent permitted by applicable law the Trustees are authorized to reduce benefits under the Plan. Any amendment to such written instrument shall be in accordance with the amendment provisions thereof.

(v)     To receive contributions or payments from any source whatsoever to the extent permitted by law.

(w)     To attend and participate in conferences, seminars and similar educational meetings, which the Trustees deem helpful to them in the operation, administration, control or management of the Plan or Trust and to cause payment for all reasonable expenses therefor by the Plan.

(x)     To pay membership dues in educational and other organizations operated for purposes related to the Plan.

(y)     To establish and accumulate as part of the Trust a reserve or reserves adequate, in the opinion of the Trustees, to carry out the purposes of the Plan after taking into consideration, among other things, future benefit obligations, contingencies, expenses of administration and obligations of the Plan.

(z)     To do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary or proper in connection with the Plan, although the power to do such acts is not specifically set forth herein.

Notwithstanding any provision set forth in this section 7.3 to the contrary, the Trustees shall exercise any power in a manner which is consistent with Title I of ERISA.

ARTICLE VIII

Contributions and Collections

8.1     Contributions to Plan.  Each Employer shall make continuing and proper payments to the Plan as required by the collective bargaining or other written agreement to which each such Employer is a party, and as required by the National Labor Relations Act as described in section 8.4.  In no event shall any Employer, directly or indirectly, receive any refund of contributions made to the Plan, unless all of the following conditions are satisfied:

(a)     The contributions are made due to a bona fide mistake of law or fact as determined by the Trustees; and

(b)     A refund in such circumstances is permitted by applicable law and will not adversely affect the tax-qualified status of the Plan or tax-exempt status of the Trust; and

(c)     The Trustees, in their sole discretion, approve the refund.

In lieu of providing a refund, the Trustees may establish a credit to be applied against the Employer's obligations owed to the Plan.

Upon payment to the Trustees, all responsibilities of each Employer for each of its contributions shall cease.  No Employer shall be liable for contributions required to be made by any other Employer and subject to timely payment of contributions required by its collective bargaining or other agreement requiring it to contribute to the Plan, an Employer shall have no liability for funding or paying the benefits provided under the Plan.  The Employer's obligation under the collective bargaining agreement to contribute to the Plan shall not be subject to setoff or counterclaim by the Employer for any liability, including, but not limited to a liability of the Council, Local Union or an Employee of the Employer.  No contributions received by the Plan shall be deemed wages due to Employees; provided, however, in the event of an Employer's insolvency or liquidation the preceding shall not act to preclude the collection of contributions pursuant to a priority allowed for "wages" if the law recognizes such contributions as "wages" for such purposes.

8.2     Transmission of Reports and Contributions.  The Trustees shall establish a uniform system among the Employers for the timely transmission of such reports and contributions, as the Trustees deem necessary, and shall also establish a periodic date on which such reports and contributions shall be due;

provided, any such reporting and contribution dates so established shall be consistent with the Employers' collective bargaining agreements.

8.3    Delinquent Contributions and Reports.  The Trustees, upon knowledge thereof, shall notify any Employer of a delinquency, mistake or discrepancy in its report or contribution.  Any Employer contributions shall be considered delinquent if not received in the Plan office on or before the fifteenth (15th) day of the month or placed in the U.S. Mail on or before the fifteenth (15th) day of the month, as evidenced by postmark, following the month for which the payment is being made.   With respect to Employers that fail to timely contribute or submit a contribution report, the Trustees shall have authority to take any one or more of the following actions:

(a)    Establish rules and regulations providing for the assessment of interest, costs, fees and liquidated damages to be added to any delinquent contributions and to take such legal action, including proceedings at law, in equity or, if the Trustees so choose to submit the issue, in arbitration, as in their discretion may be necessary to collect contributions and liquidated damages assessed by them and to recover from any delinquent contributor on behalf of the Plan all costs and reasonable attorney's fees incurred in connection therewith.  The Trustees may, in their sole discretion, assess a delinquent Employer the cost of a payroll audit if it is determined that the Employer is delinquent in its contributions to the Plan.

(b)    Require an Employer who has been delinquent in its contributions to the Plan to deposit with the Trustees in advance as a guarantee of the payment of monthly contributions, an amount not to exceed three times the estimated monthly contribution of such Employer as a condition of such Employer's continuing to participate in the Plan, and may require that said guarantee be continuously maintained by such Employer as a condition of continuing to participate in the Plan.  In the event any such Employer ceases to participate in this Plan, any excess in such guarantee over the contributions or other amounts required of such Employer to be paid to the Plan shall be returned to him.

(c)    Terminate the Employer from further participation in the Plan by giving notice of termination to the Employer and the Employees of such Employer.  Such notice shall state the cause for termination and shall state the date on which the benefits provided by the Plan for the Employer's Employees shall cease.

8.4    Amount of Contributions.  Each Employer shall make continuing and proper payments to the Plan as required by the collective bargaining agreement, Participation Agreement or other agreement to which each

such Employer is a party. The aforementioned obligation to contribute to the Plan as required by the collective bargaining agreement shall include periods beyond the expiration of the term of the collective bargaining agreement during which the obligation to contribute under the collective bargaining agreement has been extended by the National Labor Relations Act; provided there is no dispute over the existence or extent of the obligation to contribute beyond the term of such agreement. The Trustees may enforce such a contribution obligation in a United States District Court.

ARTICLE IX

Controversies and Disputes

9.1    Reliance Upon Records.  In any controversy, claim, demand, suit at law, or other proceeding between any Participant or any other person and the Trustees, the Trustees shall be entitled to rely upon any facts appearing in the records of the Trustees, certified to the Trustees by the Council or the Employers, any facts which are of public record and any other evidence pertinent to the issue involved.

9.2    Determination by Trustees Binding.  All questions or controversies, of whatsoever character, arising in any manner or between any parties or persons in connection with the Plan or Trust or their operation, whether as to any claim for benefits, or as to the construction of language or meaning of this Agreement, the Plan, or rules and regulations adopted by the Trustees, or as to any writing, decision, instrument or account in connection with the operation of the Plan or Trust or otherwise, shall be submitted to the Trustees or, where Trustee responsibility has been delegated to others, to such delegates for decision.  The decision of the Trustees or their delegates shall be binding upon all persons dealing with the Plan or Trust or claiming any benefit thereunder, except to the extent that such decision may be determined to be arbitrary or capricious by a court having jurisdiction over such matter.

9.3    Compromise.  The Trustees may, in their sole discretion, compromise or settle any claim or controversy, and any decision made by the Trustees in compromise or settlement of a claim or controversy or any compromise or settlement agreement entered into by the Trustees, shall be conclusive and binding on all parties.

9.4    Right to Obtain Adjudication of Disputes.  In the event any question or dispute shall arise as to the proper person or persons to whom any payments shall be made hereunder, the Trustees may withhold such payment until an adjudication of such question or dispute, satisfactory to the Trustees, in their sole discretion, shall have been made, or the Trustees shall have been adequately indemnified against loss to their satisfaction.

IX-1

ARTICLE X

Amendments

10.1    Method of Amendment.  This Agreement may be amended in writing at any time by the Trustees in accordance with the voting provisions of section 5.5.

10.2    Limitation on Amendments.  No amendment shall be adopted which alters the basic purpose of the Plan, conflicts with any applicable law or government regulation, causes the use or diversion of any part of the Trust for purposes other than those authorized herein, retroactively deprives anyone of a vested right or interest, increases the burdens or obligations of any Council or Employer except to the extent provided herein or permitted in its collective bargaining or other written agreement, affects the tax-exempt status of the Trust or the deductibility for income tax purposes of Employer contributions to the Plan. Further, no amendment shall (1) provide for an unequal number of Council Trustees and Employer Trustees or (2) change the method of voting.

ARTICLE XI

Termination

11.1   Term of Plan.  The Plan shall continue until all the collective bargaining agreements providing for contributions to the Plan have expired, and negotiations for extension thereof have ceased.  The Plan may be terminated at an earlier date by written agreement of all of the Council and Employers, which agreement shall be served upon each of the Trustees by registered mail.  The termination shall not be effective until 60 days after mailing of such agreement to the Trustees.

11.2   Procedures on Termination.  In the event of the termination of the Plan, the Trustees shall apply the Trust to pay or to provide for the payment of any and all obligations of the Plan and shall distribute and allocate all assets of the Trust in accordance with the then provisions of the Plan; provided, however, that any Plan provision to the contrary, notwithstanding, the assets of the Trust shall be allocated and distributed in the priorities and according to the categories required by applicable law, and no part of the corpus or income of the Trust shall be used for or diverted to purposes other than for the exclusive benefit of the Participants, former Participants or their beneficiaries or dependents, or the administrative expenses of the Plan or for other payments in accordance with the provisions of this Agreement.  Under no circumstances shall any portion of the corpus or income of the Trust, directly or indirectly, revert or accrue to the benefit of any contributing Employer prior to all obligations having been satisfied or provided for.  The Trustees may, after all the obligations of the Plan have been satisfied as provided in the Plan upon termination of the Plan, transfer any surplus monies and property in the Trust to any other fund that may exist or be created by and between the Council and the Employers or Associations for the same uses and purposes herein set forth; provided, however, that such surplus monies and property shall be for the purpose of providing benefits to Employees or former Employees on whose behalf contributions were made by Employers and, further provided, that any fund to which the Trustees transfer any surplus monies and property shall constitute a tax-exempt plan eligible to receive the transfer qualified under section 401(a) of the Internal Revenue Code of 1986, and similar subsequent statutes, and that the trust forming a part thereof shall be exempt under section 501(a) of the Internal Revenue Code of 1986, and similar subsequent statutes.

11.3   Notification of Termination.  Upon termination of the Plan in accordance with this Article, the Trustees shall forthwith notify the Council, the Associations and each Employer and also all other necessary parties, and the Trustees shall continue as Trustees for the purpose of liquidating the affairs of the Plan.

11.4   <u>Distribution Upon Termination</u>.  Any total or partial distribution after termination of the Plan may be made at any time, and from time to time, in whole or in part, to the extent that no discrimination in value results, in cash, in securities or other assets of kind, or in annuity contracts, as the Trustees, in their discretion, shall determine.  The Trustees may defer any distribution upon termination pending receipt of a favorable determination letter from the Internal Revenue Service that the termination will not adversely affect the tax qualification of the Plan or the tax-exempt status of the Trust.  In making such distribution, any and all determination, divisions, appraisals, apportionments and allotments so made, shall be final and conclusive and not subject to question by any person.

ARTICLE XII

General Provisions

12.1   Title to the Trust.  Title to the Trust shall be vested in and remain exclusively in the Trustees and no Employer, Council, Association, Employee or any beneficiary shall have any right, title or interest in the Trust nor any right to contributions to be made thereto, nor any claim against any Employer on account thereof, except only as provided from time to time by this Agreement or under the Plan, and then only to the extent of the benefits payable to such person out of the Trust.

12.2   Liability of the Associations, Council and Employers.  Except to the extent required by law, the Council, Associations and Employers shall not be responsible for the acts of the Trustees or for any debts, liabilities, obligations, benefits or insufficiency of the Trust.

12.3   Nonalienation of Benefits.  Except for payments required by a qualified domestic relations order (as defined by the Internal Revenue Code and ERISA), tax levy required to be paid under the Internal Revenue Code, garnishment order under the Mandatory Victims Restitution Act, any indebtedness owed to the Plan or as otherwise permitted by law, the Trust shall not be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, garnishment, execution, or levy of any kind, either voluntary or involuntary, including any such liability which is for alimony or other payments for the support of a spouse, former spouse or any relative, until such payment has been actually received by the person entitled to it.  Any attempt to anticipate, alienate, settle, transfer, assign, pledge, encumber, charge or otherwise dispose of the same shall be void.  The Plan shall not in any manner be liable for, or subject to, the debts, contracts, liabilities, engagements or torts of any person entitled to pension benefits under the Plan.

12.4   Prohibition of Diversion of Trust.  It shall be impossible by operation of the Trust or by its natural termination, by power of revocation or amendment, by the happening of any contingency, by collateral arrangement or by any other means, for any part of the corpus or income of the Trust or any funds contributed thereto to be used for, or diverted to purposes other than the exclusive benefit of Participants, former Participants, their beneficiaries or dependents prior to all obligations having been satisfied or provided for.  No part of net earnings of the Trust shall inure (other than benefit payments as outlined above) to the benefit of any Employer, Association, Council or individual; provided, however, a contribution made by an Employer as the result of a mistake may be returned to the Employer if the Trustees so direct provided the repayment is not prohibited by applicable law and will not adversely affect the tax-exempt status of the Trust and in a manner consistent with section 8.1.

12.5    Incompetency and Minors.  In the event it is determined that any person entitled to receive benefits is unable to care for his affairs because of mental or physical incapacity, or because the person is a minor, the benefits due such person may be paid to his legal guardian or conservator, or to any relative by blood or by marriage to be used and applied for the benefit of such person. Payment to such legal representative or relative of the persons on whose account benefits are payable shall operate to discharge the payor from any liability to such person or to anyone representing him or his interest and the Trustees shall have no duty or obligation to see that the funds are used or applied for the benefit of such person.

12.6    Merger of the Plan.  The Trustees are authorized to merge or consolidate the Plan with another tax-qualified retirement plan or to be party to a transfer of assets or liabilities with another tax-qualified retirement plan; provided such merger, consolidation or transfer of assets or liabilities complies with all applicable laws and provided such merger, consolidation or transfer of assets or liabilities does not affect the qualification of the Plan under section 401(a) of the Internal Revenue Code and the tax-exempt status of the Trust under section 501(a) of the Internal Revenue Code.  Any provision herein to the contrary notwithstanding, in accordance with ERISA section 4231(b)(2) (which is hereby incorporated by reference), if another pension plan and trust merges or transfers its assets and liabilities into this Plan and Trust, or if this Plan and Trust merges or transfers its assets and liabilities into another pension plan and trust, no participant's or beneficiary's accrued benefit will be lower immediately after the effective date of the merger or transfer of assets and liabilities than the benefit immediately before the date of such transaction.

12.7    Execution of Documents.  The Trustees, by resolution, may authorize any Employer Trustee and any Council Trustee or any joint group, comprised equally of Employer and Council Trustees, to jointly execute any notice, certificate or other written instrument relating to the Plan and all persons, partnerships, corporations or associations may rely upon any such notice or instrument so executed as having been duly authorized and as binding on the Plan and the Trustees.  The Trustees may also authorize agents of the Plan, including the administrator, to execute documents on behalf of the Plan.

12.8    Notice and Delivery of Documents.  Any notice required to be given hereunder may be given in person or by first class mail.  Also, the parties may consent to electronic delivery of notices required hereunder.  When notice is given by mail, it shall be deemed to have been given as of the date of posting to the last known address of the addressee available from the Plan records.

12.9    Gender and Number.  Wherever any words are used herein in the masculine gender they shall be construed as though they were also used in the feminine gender in all cases where they would so apply, and wherever any words

are used herein in the singular form they shall be construed as though they were also used in the plural form in all cases where they would so apply.

12.10 Headings. Titles of articles and headings of sections and subsections are inserted for convenience of reference. They constitute no part of this Agreement and are not to be considered in the construction hereof.

12.11 Information to be Furnished by Employers. Each Employer shall furnish the Trustees such records with respect to each of his Employees sufficient to determine the benefits due or which may become due hereunder as the Trustees may require in connection with the administration of the Plan. In the event of an alleged discrepancy in Employer contributions to the Plan or in any other data required for the Employer by this Agreement or by the Plan, the Trustees shall, in writing, notify the Employer of such alleged discrepancy and the period of time that the discrepancy is claimed to cover. On receipt of such written notice, the Employer shall promptly furnish to the Trustees any data requested that pertains to such alleged discrepancy.

12.12 Qualification. The Trust shall be tax-exempt under section 501(a) of the Internal Revenue Code and the Plan shall be qualified under section 401(a) of the Internal Revenue Code. The Trustees are authorized to take all actions consistent with this Trust Agreement and applicable collective bargaining agreements to do whatever is necessary to enable the Plan to make whatever applications are necessary with the Internal Revenue Service to receive and maintain a favorable determination from the Internal Revenue Service respecting the tax-qualified status of the Plan and tax-exempt status of the Trust.

12.13 Construction. This Agreement is created and accepted in the State of Illinois. All questions pertaining to its validity or construction not otherwise preempted by federal law shall be determined in accordance with the laws of the State of Illinois. If any provision contained in this Agreement or in any collective bargaining agreement pursuant to which this Agreement is created should be held unlawful, such provision shall be of no force and effect and this Agreement or any such collective bargaining agreement shall be treated as if such provision had not been contained therein.

12.14 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement.

IN WITNESS WHEREOF, the undersigned, as the duly appointed Trustees of the Chicago Regional Council of Carpenters Pension Fund, do hereby accept the trust created hereunder and agree to perform the duties, responsibilities and obligations under this Agreement as of the day, month and year first above written. Further, the undersigned Trustees do hereby adopt the Chicago Regional Council of Carpenters Pension Fund Trust Agreement in the form of this Agreement and agree to be bound by the terms of this Agreement.

Employer Trustees                    Council Trustees

Date: 11/30/2016                     Date: 11-30-2016

Date: 11.30.2016                     Date: 11/30/16

Date: 11/30/2016                     Date: 11-30-16

Date: 11/30/2016                     Date: 11/30/2016

Date:                                Date: 11/30/2016

XII-4

AMENDMENT 1
to the
AGREEMENT AND DECLARATION OF TRUST
of the
CHICAGO REGIONAL COUNCIL OF CARPENTERS
PENSION FUND

The undersigned Trustees of the Chicago Regional Council of Carpenters Pension Fund ("Fund") hereby verify that the following reflects action taken by a majority of the Trustees at their February 28, 2018 meeting:

WHEREAS, under Article VII of said Agreement and Declaration of Trust, the Trustees by majority vote have the power and authority to amend such Agreement and Declaration of Trust from time to time as therein provided; and

WHEREAS, the Builders Association of Chicago ("BAC") is now known as the Chicagoland Association of General Contractors ("CAGC"), effective January 1, 2018;

WHEREAS, it is determined to be desirable to amend said Agreement and Declaration of Trust to reflect the change in name of the BAC to the CAGC.

NOW, THEREFORE, BE IT RESOLVED: Effective January 1, 2018, that the Agreement and Declaration of Trust be amended by the restatement of section 1.2, Associations, in its entirety, to read as follows:

1.2   Associations.  The Chicagoland Association of General Contractors and the Residential Construction Employers Council.

FURTHER RESOLVED:  Effective January 1, 2018, that the Agreement and Declaration of Trust be amended by the restatement of section 1.3, BAC, in its entirety, to read as follows.

1.3   CAGC.  Chicagoland Association of General Contractors, successor to the Builders Association of Chicago effective January 1, 2018.

FURTHER RESOLVED:  Effective January 1, 2018, that the Agreement and Declaration of Trust be amended by the restatement of section 4.1, Number of Trustees, to read as follows:

4.1   Number of Trustees.  There shall be ten regular Trustees, five of whom shall be representatives of the Employers (the "Employer Trustees") and five of whom shall be representatives of the Council (the "Council Trustees").  In addition to the regular Trustees, the Associations and the Council may designate such number of alternate Employer or alternate Council Trustees respectively, as CAGC, RCEC and the Council may deem advisable provided that CAGC, RCEC and the Council may not designate more alternate Trustees than the number that they are

permitted to appoint as regular Trustees. An alternate Trustee shall only be authorized to act in the place and stead of a regular Trustee, appointed by the same entity that designated the alternate Trustee, who is unable to act because of death, incapacity, resignation or absence from a meeting of the Trustees, and an alternate Trustee shall have no duty or responsibility to act unless so authorized to act. As to matters presented when he/she is so authorized to act, an alternate Trustee shall be vested with all the rights, powers, duties and responsibilities of a regular Trustee. Any regular Trustee who is unable to act shall not be responsible for any acts taken by or omitted to be taken by an alternate Trustee in his/her place and stead. Such a regular Trustee who is unable to act shall be treated as if he/she has resigned in connection with any action taken or omitted to be taken by alternate Trustee.

FURTHER RESOLVED: Effective January 1, 2018, that the Agreement and Declaration of Trust be amended by the restatement of section 4.6, <u>Appointment and Removal of Trustees</u>, to read as follows:

4.6     <u>Appointment and Removal of Trustees</u>. CAGC may appoint three Employer Trustees, the RCEC may appoint two Employer Trustees and the Council may appoint five Council Trustees pursuant to the terms of its governing bylaws. Those Employer Trustees appointed by CAGC may be removed by CAGC, and those Employer Trustees appointed by the RCEC may be removed by the RCEC. Any Council Trustee may be removed from office at any time by the Council pursuant to the terms of its governing bylaws. Any notice of removal of a regular Trustee, in order to be effective, shall be delivered to the remaining regular Trustees, shall specify the date the removal shall take effect and name the Trustee removed, and shall be signed by a duly authorized representative of the respective Association or the Council.

An alternate Employer Trustee or Council Trustee may be removed at any time in the same manner as a regular Trustee.

FURTHER RESOLVED: Effective January 1, 2018, that the Agreement and Declaration of Trust be amended by the restatement of section 4.7, <u>Selection of Successor Trustees</u>, to read as follows:

4.7     <u>Selection of Successor Trustees</u>. If any Trustee shall become disqualified to serve, die, resign, be removed, become incapacitated or refuse to act, a successor Trustee shall be appointed forthwith by written instrument signed by those authorized to appoint the successor.

2

CAGC shall appoint the successor Employer Trustee (or alternate Employer Trustee) for an Employer Trustee (or alternate Employer Trustee) that it appointed, and the RCEC shall appoint the successor Employer Trustee (or alternate Employer Trustee) for an Employer Trustee (or alternate Employer Trustee) that it appointed.

Council Trustees (or alternate Council Trustees) shall be appointed by the Council pursuant to the terms of its governing bylaws

Any written instrument appointing a successor Employer or Council Trustee (or alternate) shall state the date appointment shall take effect and shall be delivered to the Chairman and Secretary of the Trustees.

If a successor Trustee shall fail to be appointed within 90 days after the position becomes vacant, then any remaining Trustee may petition the United States District Court for the district in which the principal office of the Plan is located, to appoint a successor Trustee, which appointment shall be as fully effective as if made by the party originally entitled to appoint such Trustee and shall be considered to have been made on behalf of such party.

FURTHER RESOLVED: Effective January 1, 2018, that the Agreement and Declaration of Trust be amended by the restatement of section 5.4, Quorum, to read as follows:

5.4     Quorum.  A quorum for the transaction of business at a duly called meeting shall consist of two Council Trustees and two Employer Trustees who are present in person (or electronically pursuant to Section 5.3), provided that at least one Employer Trustee appointed by CAGC and one Employer Trustee appointed by RCEC are present.  Once a quorum has been established, said quorum shall continue to exist until the meeting has been adjourned provided at least one Council Trustee, one Employer Trustee appointed by the CAGC and one Employer Trustee appointed by the RCEC remain in attendance.

FURTHER RESOLVED: Effective January 1, 2018, that the Agreement and Declaration of Trust be amended by the restatement of section 5.5, Voting, to read as follows:

5.5     Voting.  Except as otherwise specifically provided for herein, all actions by and decisions of the Trustees shall be by the vote of a majority of votes cast by Trustees who are in attendance at a duly

3

called meeting of the Trustees at which there is a quorum present. Each Trustee shall have one vote; provided, however, that: (a) at any meeting at which there is a lesser number of Employer Trustees than Council Trustees present, the Employer Trustees shall in the aggregate have that number of votes which equals the number of Council Trustees present and vice versa and (b) Employer Trustee votes shall be divided between the CAGC-appointed and RCEC-appointed Employer Trustees proportionate to the number of Employer Trustees that CAGC and RCEC are entitled to appoint relative to the total number of Employer Trustees regardless of the number of CAGC-appointed or RCEC-appointed Employer Trustees that are present at a meeting (as of January 1, 2017, the CAGC is authorized to appoint three of the five Employer Trustees and RCEC is authorized to appoint two; as a result, the CAGC-appointed Trustees would possess 60% of the Employer Trustee votes and RCEC-appointed Trustees would possess 40% of the Employer Trustee votes). The foregoing to the contrary notwithstanding, the unanimous written consent of the Trustees shall be required for any action pursuant to section 5.3(a).

Employer Trustee                    Union Trustee

4

AMENDMENT 2
to the
AGREEMENT AND DECLARATION OF TRUST
of the
CHICAGO REGIONAL COUNCIL OF CARPENTERS
PENSION FUND

The undersigned Trustees of the Chicago Regional Council of Carpenters Pension Fund ("Fund") hereby verify that the following reflects action taken by a majority of the Trustees at their August 22, 2018 meeting:

WHEREAS, under Article VII of said Agreement and Declaration of Trust, the Trustees by majority vote have the power and authority to amend such Agreement and Declaration of Trust from time to time as therein provided; and

WHEREAS, the Trustees desire to amend the Trust Agreement to specify circumstances in which an Employer ceases to qualify as an Employer.

NOW, THEREFORE, BE IT RESOLVED: Effective August 22, 2018, that the Agreement and Declaration of Trust be amended by the restatement of section 1.6, <u>Employer</u>, in its entirety, to read as follows:

1.6    <u>Employer</u>.  Any employer which:

(a)    on or after the effective date of this Plan has a collective bargaining or other written agreement with the Council either directly or as a member of an Association, or the Trustees requiring the employer to make periodic contributions to the Plan;

(b)    signs a copy of this Agreement, any predecessor agreement or a Participation Agreement;

(c)    is accepted for participation in the Plan by the Trustees or was a party to any predecessor trust agreement; and

(d)    makes contributions to the Plan as required by the agreement providing for such contributions.

An Employer contributing pursuant to a collective bargaining agreement shall cease to qualify as an Employer on the date the NLRB certifies the result of an election that terminates the Local Union's or the Council's representative status, the date that the Employer lawfully withdraws recognition from the Local Union or the Council, or the date on which the Local Union's or the Council's representative status terminates through a valid disclaimer of interest.  The term "Employer" may also include the Council and any affiliate of the Council, and any state, national or international labor organization of which the Council is an affiliate, the Plan, or any other jointly-administered pension, health

and welfare or other type of employee benefit plan to which the Council is a party; if such organization becomes obligated pursuant to a Participation Agreement with the Trustees to contribute to the Plan on behalf of its employees and is accepted for participation in the Plan by the Trustees. The Plan, the Council or any other employee benefit plan becoming an Employer pursuant to the provisions of this paragraph shall not in any event participate in the selection or replacement of Employer Trustees or have any vote as an Employer on any matter and its Employees shall not be considered in connection with any determination required to be made by Employers of a stated percentage or majority of Employees.

The undersigned hereby attest that the Trustees took unanimous action at their August 22, 2018 meeting to amend the Trust Agreement in the manner noted above.

Employer Trustee                                Union Trustee

2

24 CV 6428

EXHIBIT B

# CHICAGO REGIONAL COUNCIL OF CARPENTERS WELFARE FUND TRUST AGREEMENT

## Effective as of January 1, 2017

ARTICLE IV

Designation of Trustees

| 4.1 | Number of Trustees | IV-1 |
| 4.2 | Qualification of Trustees | IV-1 |
| 4.3 | Acceptance of Appointment | IV-1 |
| 4.4 | Tenure | IV-1 |
| 4.5 | Resignation of a Trustee | IV-1 |
| 4.6 | Appointment and Removal of Trustees | IV-2 |
| 4.7 | Selection of Successor Trustees | IV-2 |
| 4.8 | Power to Act in Case of Vacancy | IV-3 |

ARTICLE V

Organization and Operation of Trustees

| 5.1 | Office | V-1 |
| 5.2 | Meetings | V-1 |
| 5.3 | Action by Trustees Without Meeting | V-1 |
| 5.4 | Quorum | V-2 |
| 5.5 | Voting | V-2 |
| 5.6 | Officers of Trustees | V-2 |
| 5.7 | Committees | V-3 |
| 5.8 | Arbitration | V-5 |
| 5.9 | Immunity of the Trustees | V-6 |
| 5.10 | Compensation of Individual Trustees | V-7 |
| 5.11 | Service in More Than One Fiduciary Capacity | V-7 |

ARTICLE VI

Control and Management of Trust

| 6.1 | Control of Trust | VI-1 |
| 6.2 | Management of Trust | VI-1 |
| 6.3 | Trust Responsibilities | VI-2 |
| 6.4 | Trust Powers | VI-2 |

ii

## ARTICLE IV

### Designation of Trustees

| | | |
|---|---|---|
| 4.1 | Number of Trustees | IV-1 |
| 4.2 | Qualification of Trustees | IV-1 |
| 4.3 | Acceptance of Appointment | IV-1 |
| 4.4 | Tenure | IV-1 |
| 4.5 | Resignation of a Trustee | IV-1 |
| 4.6 | Appointment and Removal of Trustees | IV-2 |
| 4.7 | Selection of Successor Trustees | IV-2 |
| 4.8 | Power to Act in Case of Vacancy | IV-3 |

## ARTICLE V

### Organization and Operation of Trustees

| | | |
|---|---|---|
| 5.1 | Office | V-1 |
| 5.2 | Meetings | V-1 |
| 5.3 | Action by Trustees Without Meeting | V-1 |
| 5.4 | Quorum | V-2 |
| 5.5 | Voting | V-2 |
| 5.6 | Officers of Trustees | V-2 |
| 5.7 | Committees | V-3 |
| 5.8 | Arbitration | V-5 |
| 5.9 | Immunity of the Trustees | V-6 |
| 5.10 | Compensation of Individual Trustees | V-7 |
| 5.11 | Service in More Than One Fiduciary Capacity | V-7 |

## ARTICLE VI

### Control and Management of Trust

| | | |
|---|---|---|
| 6.1 | Control of Trust | VI-1 |
| 6.2 | Management of Trust | VI-1 |
| 6.3 | Trust Responsibilities | VI-2 |
| 6.4 | Trust Powers | VI-2 |

## ARTICLE VII

## Operation and Administration of Plan

| 7.1 | Authority of Trustees | VII-1 |
| 7.2 | Plan Responsibilities | VII-1 |
| 7.3 | Plan Powers | VII-2 |

## ARTICLE VIII

## Contributions and Collections

| 8.1 | Contributions to Plan | VIII-1 |
| 8.2 | Transmission of Reports and Contributions | VIII-1 |
| 8.3 | Delinquent Contributions | VIII-2 |
| 8.4 | Amount of Contributions | VIII-2 |

## ARTICLE IX

## Controversies and Disputes

| 9.1 | Reliance Upon Records | IX-1 |
| 9.2 | Determination by Trustees Binding | IX-1 |
| 9.3 | Compromise | IX-1 |
| 9.4 | Right to Obtain Adjudication of Disputes | IX-1 |

## ARTICLE X

## Amendments

| 10.1 | Method of Amendment | X-1 |
| 10.2 | Limitation on Amendments | X-1 |

## ARTICLE XI

## Termination

| 11.1 | Term of Plan | XI-1 |
| 11.2 | Procedure on Termination | XI-1 |
| 11.3 | Notification of Termination | XI-1 |

11.4    Distribution Upon Termination                                    XI-2

## ARTICLE XII

### General Provisions

12.1    Title to the Trust                                              XII-1
12.2    Liability of the Associations, Council and Employers            XII-1
12.3    Nonalienation of Benefits                                       XII-1
12.4    Prohibition of Diversion of Trust                               XII-1
12.5    Incompetency and Minors                                        XII-2
12.6    Merger of the Plan                                             XII-2
12.7    Execution of Documents                                          XII-2
12.8    Notice and Delivery of Documents                               XII-2
12.9    Gender and Number                                              XII-2
12.10   Headings                                                       XII-3
12.11   Information to be Furnished by Employers                        XII-3
12.12   Qualification                                                  XII-3
12.13   Construction                                                   XII-3
12.14   Counterparts                                                   XII-3

CHICAGO REGIONAL COUNCIL OF CARPENTERS WELFARE FUND
TRUST AGREEMENT

Effective January 1, 2017

W I T N E S S E T H:

WHEREAS, the Chicago District Council of the United Brotherhood of Carpenters and Joiners of America (the "Council") and the Builders Association of Chicago entered into collective bargaining agreements to provide for the establishment of the Chicago District Council of Carpenters Welfare Fund (the "Fund");

WHEREAS, effective June 1, 1973, the Council and the Builders Association of Chicago established a trust agreement to implement the Fund;

WHEREAS, the original trust agreement has been amended and updated from time to time;

WHEREAS, the entities serving as settlors of the trust have changed from time to time; and

WHEREAS, the Trustees desire to amend and restate the trust agreement;

NOW, THEREFORE, effective as of January 1, 2017, for and in consideration of the premises and mutual covenants herein contained, it is mutually understood and agreed as follows:

ARTICLE I

Definitions

1.1     Agreement.  The Trust Agreement, the agreement set forth herein, as amended from time to time.

1.2     Associations.  The Builders Association of Chicago, the Residential Construction Employers Council and the Fox Valley Associated General Contractors Association.

1.3     BAC.  Builders Association of Chicago.

1.4     Council.  The Chicago Regional Council of Carpenters, United Brotherhood of Carpenters and Joiners of America, formerly known as the "Chicago and Northeast Illinois District Council of the United Brotherhood of Carpenters and Joiners of America."

1.5     Employee.  Any employee of an Employer on whose behalf an Employer is required to contribute to the Plan pursuant to a collective bargaining or other written agreement with the Council or with the Trustees but not including any person who is prohibited by law from being covered under the Plan or whose inclusion would cause the Plan to lose its tax-exempt status.

1.6     Employer.  Any employer which:

(a)     on or after the effective date of this Plan has a collective bargaining or other written agreement with the Council or the Trustees requiring periodic contributions to be made to the Plan;

(b)     signs a copy of this Agreement, any predecessor agreement or a Participation Agreement;

(c)     is accepted for participation in the Plan by the Trustees or was a party to any predecessor trust agreement; and

(d)     makes contributions to the Plan as required by the agreement providing for such contributions.

The term "Employer" may also include the Council and any affiliate of the Council, and any state, national or international labor organization of which the Council is an affiliate, the Plan, or any other jointly-administered pension, health and welfare or other type of employee benefit plan to which the Council or any Employer participating in the Plan is a party, if such organization becomes obligated pursuant to a Participation Agreement with the Trustees to

I-1

contribute to the Plan on behalf of its employees on substantially the same basis upon which other participating Employers are contributing to the Plan, is accepted for participation in the Plan by the Trustees and makes contributions to the Plan as required by the Participation Agreement. The Plan, the Council or any other employee benefit plan becoming an Employer pursuant to the provisions of this paragraph shall not in any event participate in the selection or replacement of Employer Trustees or have any vote as an Employer on any matter and its Employees shall not be considered in connection with any determination required to be made by Employers of a stated percentage or majority of Employees.

        1.7    FVAGC. Fox Valley Associated General Contractors Association.

        1.8    Local Union. Any local union affiliated with the Council.

        1.9    Participant. Any Employee or former Employee who is eligible for benefits provided hereunder.

        1.10    Participation Agreement. An agreement in form and content acceptable to the Trustees which evidences the commitment of the signatory thereto to be bound by the adoption of the Plan and the Agreement, and to become an Employer obligated to contribute to the Plan on behalf of certain employees of the Employer whether or not subject to the terms of a collective bargaining agreement.

        1.11    Plan. The Chicago Regional Council of Carpenters Welfare Plan, established and maintained pursuant to the terms of this Agreement.

        1.12    RCEC. The Residential Construction Employers Council or its successor by consolidation or merger which represents Employers in collective bargaining negotiations with the Council.

        1.13    Trust. The assets of the Plan held in trust pursuant to this Agreement.

        1.14    Trustees. Those persons who are appointed pursuant to the provisions of Article IV hereof and who have authority to control and manage the operation and administration of the Plan and who also have authority to control and manage the Trust.

## ARTICLE II

### Creation and Acceptance of Trust

All payments made by Employers on behalf of their Employees to the Plan pursuant to collective bargaining or other written agreements and such other payments as shall from time to time be made to the Plan by or on behalf of Employers and Employees, and all other money or property as shall lawfully become a part of the Trust, together with the income, gains and all other increments of any nature whatsoever, if any, therefrom, shall be held, managed and administered in trust pursuant to the terms of this Agreement. The Trust shall be known as the Chicago Regional Council of Carpenters Welfare Trust. The Trustees hereby accept the trust created hereunder and agree to perform the duties, responsibilities and obligations under this Agreement on their part to be performed.

ARTICLE III

Purpose of and Payments To and From Plan

3.1     Purpose.  The purpose of the Plan is to apply the assets of the
Plan to provide health and welfare and related benefits to Participants and their
beneficiaries consistent with applicable law and the tax-exempt status of the Trust
as may from time to time be determined by the Trustees for the benefit of
Participants and their beneficiaries.  Except as otherwise provided herein, nothing
in this Agreement shall increase or decrease the rights of any party to any
collective bargaining agreement.

3.2     Payments To and From Plan.  Each Employer shall be
required to contribute to the Trust in accordance with the applicable collective
bargaining or other written agreements and rules of the Trustees.  Payments from
the Plan shall be made without limitation by reason of enumeration, for the
following purposes:

(a)     To provide for:

(i)     the payment of all reasonable and necessary
expenses of establishing the Plan, collecting the contributions and operating,
administering, controlling or managing the Plan or Trust, regardless of whether
such activities are deemed to be subject to the fiduciary requirements of ERISA or
are deemed to be settlor in nature; including payment of membership dues in
educational and other organizations operated for purposes related to this Plan and
the payment of expenses incurred by the Trustees in connection with attending and
participating in educational conferences, seminars and similar meetings;

(ii)     the employment of such administrative, legal,
expert and clerical assistance as may be reasonably necessary;

(iii)     the purchase or leasing of such premises as may
be necessary for the operation of the affairs of the Plan; and

(iv)     the purchase or leasing of such materials,
supplies and equipment as the Trustees, in their discretion, find necessary or
appropriate to the performance of their duties.

(b)     To pay or provide for health and welfare benefits to
Participants or their beneficiaries in accordance with the terms, provisions and
conditions of the Plan.

ARTICLE IV

Designation of Trustees

4.1     Number of Trustees.  There shall be twelve regular Trustees, six of whom shall be representatives of the Employers (the "Employer Trustees") and six of whom shall be representatives of the Council (the "Council Trustees"). In addition to the regular Trustees, the Associations and the Council may designate such number of alternate Employer or alternate Council Trustees respectively, as the BAC, RCEC, FVAGC and the Council may deem advisable provided that BAC, RCEC, FVAGC and the Council may not designate more alternate Trustees than the number that they are permitted to appoint as regular Trustees.  An alternate Trustee shall only be authorized to act in the place and stead of a regular Trustee, appointed by the same entity that designated the alternate Trustee, who is unable to act because of death, incapacity, resignation or absence from a meeting of the Trustees, and an alternate Trustee shall have no duty or responsibility to act unless so authorized to act.  As to matters presented when he/she is so authorized to act, an alternate Trustee shall be vested with all the rights, powers, duties and responsibilities of a regular Trustee.  Any regular Trustee who is unable to act shall not be responsible for any acts taken by or omitted to be taken by an alternate Trustee in his/her place and stead.  Such a regular Trustee who is unable to act shall be treated as if he/she has resigned in connection with any action taken or omitted to be taken by an alternate Trustee.

4.2     Qualification of Trustees.  No person shall serve or be appointed to serve as a Trustee in contradiction of the terms of section 411 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA" or the "Act").  No person shall be disqualified from being a Trustee hereunder by reason of the fact that he/she is or hereafter becomes a Participant hereunder.

4.3     Acceptance of Appointment.  Each Trustee shall consent to and accept his appointment as a Trustee in writing.

4.4     Tenure.  Each Trustee shall continue to serve during the existence of the Plan and Trust until his/her death, incapacity, resignation or removal.

4.5     Resignation of a Trustee.  A Trustee may resign and subsequent thereto shall be discharged from any further duty or responsibility hereunder by giving written or electronic notice to the Chairman and Secretary of the Trustees or to the entire Board of Trustees in care of the Plan administrative office if the resigning Trustee is the Chairman or Secretary, which notice shall state the date such resignation shall take effect and such resignation shall take effect on said date unless a successor Trustee shall have been appointed at an

IV-1

earlier date in accordance with the provisions of section 4.8 hereof, in which event such resignation shall take effect immediately upon the appointment of such successor Trustee.

Any Trustee, upon leaving office, shall forthwith turn over and deliver to the Chairman or Secretary of the Trustees (or the Plan administrative office if the resigning Trustee is the Chairman or Secretary) any and all property in his/her possession or under his control which belongs to the Plan.

4.6     Appointment and Removal of Trustees. BAC may appoint three Employer Trustees, the RCEC may appoint two Employer Trustees, the FVAGC may appoint one Employer Trustee and the Council may appoint six Council Trustees pursuant to the terms of its governing bylaws. Those Employer Trustees appointed by the BAC may be removed by the BAC, those Employer Trustees appointed by the RCEC may be removed by the RCEC, and those Employer Trustees appointed by the FVAGC may be removed by the FVAGC. Any Council Trustee may be removed from office at any time by the Council pursuant to the terms of its governing bylaws. Any notice of removal of a regular Trustee, in order to be effective, shall be delivered to the remaining regular Trustees, shall specify the date the removal shall take effect and name the Trustee removed, and shall be signed by a duly authorized representative of the respective Association or the Council.

An alternate Employer Trustee or Council Trustee may be removed at any time in the same manner as a regular Trustee.

4.7     Selection of Successor Trustees. If any Trustee shall become disqualified to serve, die, resign, be removed, become incapacitated or refuse to act, a successor Trustee shall be appointed forthwith by written instrument signed by those authorized to appoint the successor.

The BAC shall appoint the successor Employer Trustee (or alternate Employer Trustee) for an Employer Trustee (or alternate Employer Trustee) that it appointed, the RCEC shall appoint the successor Employer Trustee (or alternate Employer Trustee) for an Employer Trustee (or alternate Employer Trustee) that it appointed, and the FVAGC shall appoint the successor Employer Trustee (or alternate Employer Trustee) for an Employer Trustee (or alternate Employer Trustee) that it appointed.

Council Trustees (or alternate Council Trustees) shall be appointed by the Council pursuant to the terms of its governing bylaws.

IV-2

Any written instrument appointing a successor Employer or Council Trustee (or alternate) shall state the date appointment shall take effect and shall be delivered to the Chairman and Secretary of the Trustees.

If a successor Trustee shall fail to be appointed within 90 days after the position becomes vacant, then any remaining Trustee may petition the United States District Court for the district in which the principal office of the Plan is located, to appoint a successor Trustee, which appointment shall be as fully effective as if made by the party originally entitled to appoint such Trustee and shall be considered to have been made on behalf of such party.

4.8 <u>Power to Act in Case of Vacancy</u>. Pending the appointment of a successor Trustee in accordance with the provisions of section 4.7 hereof, no vacancy or vacancies in the Board of Trustees shall impair the power of the remaining Trustees to administer the affairs of the Plan and Trust.

ARTICLE V

Organization and Operation of Trustees

5.1    Office.  The Trustees shall establish an office at such location as the Trustees may approve for the transaction of the business of the Plan, the exact location of which is to be made known to the parties interested in said Plan. At such office there shall be maintained the books, reports and records pertaining to the Plan and its administration.

5.2    Meetings.  The Trustees shall meet whenever required to provide for the orderly and timely administration of the business of the Plan at such location as may be acceptable to the Trustees.  The Chairman, Secretary or any two Trustees may call meetings of the Trustees.  Any meeting shall be called upon at least fourteen (14) days' written or electronic notice to all Trustees, which notice shall specify the date, time and place of such meeting and may specify the purpose thereof and any action proposed to be taken thereat.  Attendance at Trustees' meetings shall be limited to the Trustees and other persons invited by the Trustees.

Whenever any notice is required to be given to any Trustee hereunder, a waiver thereof in writing, signed at any time, whether before or after the time of meeting by the Trustees entitled to such notice, shall be deemed equivalent to the giving of such notice.  The attendance of a Trustee at a meeting or his/her approval of actions taken at a meeting shall constitute a waiver of notice of such meeting, except where a Trustee attends a meeting and objects thereat to the transaction of any business because the meeting is not lawfully called or convened.

5.3    Action by Trustees Without Meeting.

(a)    Unanimous Consent in Writing.  Provided at least one Employer Trustee and one Council Trustee is then serving, any action which may be taken at a meeting of the Trustees may be taken without a meeting if a consent in writing setting forth the action so taken shall be signed by all of the Trustees (including facsimile and electronic signatures) then serving in accordance with section 5.3(c).

(b)    Through the Use of Communications Equipment.  Any action which may be taken at an in-person meeting of the Trustees may be taken without an in-person meeting through the use of any means of communication by which all participating Trustees may simultaneously hear each other; for example, a telephone conference call.  The notice, quorum and voting requirements of sections 5.2, 5.4 and 5.5 shall apply to such meetings as if they were held in

person. A written record of any action so taken by the Trustees pursuant to this section shall be prepared and provided to each of the Trustees.

(c)    Unanimous Action. Any action taken by the Trustees in accordance with section 5.3(a) shall require the unanimous agreement of the Trustees then serving unless a Trustee abstains from participation in the action due to a possible or perceived prohibited transaction under ERISA. If such a Trustee abstains from participating, the consent of such Trustee shall not be required for such action taken in accordance with section 5.3(a).

5.4    Quorum. A quorum for the transaction of business at a duly called meeting shall consist of two Council Trustees and two Employer Trustees who are present in person (or electronically pursuant to Section 5.3), provided that at least one Employer Trustee appointed by the BAC and one Employer Trustee appointed by RCEC are present. Once a quorum has been established, said quorum shall continue to exist until the meeting has been adjourned provided at least one Council Trustee, one Employer Trustee appointed by the BAC and one Employer Trustee appointed by the RCEC remain in attendance.

5.5    Voting. Except as otherwise specifically provided for herein, all actions by and decisions of the Trustees shall be by the vote of a majority of votes cast by Trustees who are in attendance at a duly called meeting of the Trustees at which there is a quorum present. Each Trustee shall have one vote; provided, however, that: (a) at any meeting at which there is a lesser number of Employer Trustees than Council Trustees present, the Employer Trustees shall in the aggregate have that number of votes which equals the number of Council Trustees present and vice versa and (b) Employer Trustee votes shall be divided among the BAC-appointed, RCEC-appointed and FVAGC-appointed Employer Trustees proportionate to the number of Employer Trustees that BAC, RCEC and FVAGC are entitled to appoint relative to the total number of Employer Trustees regardless of the number of BAC-appointed, RCEC-appointed or FVAGC-appointed Employer Trustees that are present at a meeting (as of _____, 2016, the BAC is authorized to appoint three of the six Employer Trustees, the RCEC is authorized to appoint two and the FVAGC is authorized to appoint one; as a result, the BAC-appointed Trustees would possess 50% of the Employer Trustee votes, RCEC-appointed Trustees would possess 33% of the Employer Trustee votes and the FVAGC-appointed Trustees would possess 17% of the Employer Trustee votes). The foregoing to the contrary notwithstanding, the unanimous written consent of the Trustees shall be required for any action pursuant to section 5.3(a).

5.6    Officers of Trustees. At the commencement of each fiscal year of the Plan, the Trustees shall select from among them a Chairman and a Secretary. In the alternative, the Trustees may take no action and the previously

selected Chairman and Secretary shall continue to serve in their roles. If a Chairman or Secretary shall cease serving as a Trustee during the year, or resign from serving as an officer, the Trustees shall select a successor. One officer shall be a Council Trustee and one officer shall be an Employer Trustee.

      5.7   <u>Committees</u>.

      (a)   <u>General Authority</u>. The Trustees may, by resolution or by-law or by provisions of this Trust Agreement, allocate fiduciary responsibilities and various administrative duties to committees or subcommittees of the Board of Trustees and such resolutions may grant the committee or subcommittee full power to act on behalf of the Trustees. The committees or subcommittees formed by the Trustees may delegate such responsibilities and duties to other individuals as they may deem appropriate or necessary in their sole discretion and consistent with the Act.

      Among others, the Trustees may assign the following responsibilities to committees or subcommittees:

      (i)   the responsibility for managing the Trust investments (if not otherwise delegated to an investment manager);

      (ii)   the responsibility for reviewing and determining benefit claims, including appeals (described further at section 5.7(b));

      (iii)   the responsibility for implementing the Trust's payroll auditing duties and for resolving questions or problems arising out of such duties, and for overseeing other aspects of the Plan's audit and reporting responsibilities;

      (iv)   the responsibility for resolving questions or problems that may be encountered in connection with the collection of delinquent Employer accounts;

      (v)   the responsibility for resolving questions or problems that may be encountered in connection with the day-to-day work of the administrative office maintained by the Trust;

      (vi)   the responsibility for approving the Trust auditor's engagement and annual audit plan, reviewing the auditor's preliminary audit findings and management letters, and taking all other action necessary to enable the Trust to satisfy its audit and government reporting duties; and

      (vii)   the responsibility for reviewing the performance of the professionals, vendors and employees retained by the Trustees; and

(viii) the responsibility for analyzing and implementing Plan benefit design changes.

The Trustees shall establish committees or subcommittees through the adoption of a motion or resolution that establishes the committee and that allocates stated responsibilities and authority to the committee or subcommittee. All committees and subcommittees shall consist of an equal number of Council Trustees and Employer Trustees. The Employer Trustees shall have authority to appoint and remove Employer Trustee members of Committees, and the Council Trustees shall have the authority to appoint and remove Council Trustee members of Committees. The resolution shall identify the quorum and voting requirements for the committee and subcommittee. If the resolution does not identify the quorum and voting requirements, then a quorum shall consist of at least one Employer Trustee and one Council Trustee in attendance at a meeting, and action shall be taken by majority vote. If the committee or subcommittee deadlocks on any matter submitted to it, such matter shall be referred to the Board of Trustees for review and action. Nothing contained herein shall in any way limit the authority of the Trustees to create additional committees or subcommittees for the purpose of assisting with or expediting the affairs of the Trust.

(b)   Appeals Committee. At the first meeting of each calendar year, the Chairman and Secretary of the Board of Trustees shall appoint from among the Trustees two (2) regular members and two (2) alternate members of the Appeals Committee. If no action is taken at the beginning of the calendar year, then the prior appointments shall continue. The Appeals Committee shall consist of two (2) members, one (1) chosen from among the Employer Trustees and one (1) from among the Council Trustees, and two (2) alternate members, one (1) chosen from among the Employer Trustees and one (1) from among the Council Trustees. The administrator and members of the administrator's staff, as well as other Plan advisors, may also attend meetings.

The Appeals Committee shall select from among their membership a Chairman and a Secretary, each of whom shall be selected from different groups, *i.e.*, the Employer Trustees and the Council Trustees, it being the intention of the Trustees that at no time shall both offices be held by individuals from among the same group. The Chairman shall preside at all meetings of the Appeals Committee. The Secretary or his/her delegate shall keep accurate minutes of the proceedings and cause to be prepared such documents and correspondence as may be required from time to time. Each alternate member of the Appeals Committee shall have full authority to act in the place of the regular member appointed from his/her group at any meeting at which said regular member is unable to attend.

V-4

The Appeals Committee shall review all appeals of benefit denials and shall make such a determination as in its sole discretion it deems proper. Its decision shall be binding on the Board of Trustees of the Plan, being the intention of the Board of Trustees that the Appeals Committee has the sole responsibility and authority in all matters of appeals of benefit denial.

The Appeals Committee shall meet upon ten (10) days written notice from its Chairman or the administrator at such times and places as he/she shall determine unless the Committee members otherwise agree. Decisions of the Appeals Committee shall be by majority of those members present at any meeting at which a quorum is present. A quorum of the Appeals Committee shall consist of two (2) Trustees in attendance at a meeting, one (1) of whom is an Employer Trustee and one (1) of whom is a Council Trustee. In the event that there is no majority on a vote to reverse an appealed decision of benefit denial, that decision shall be affirmed and be the decision of the Appeals Committee.

In the event that any member of the Appeals Committee shall resign or be unable to serve by reason of death or incapacity, the Officer who appointed the member shall appoint his successor from among the then-serving Council Trustees or Employer Trustees (depending on the designation of the departing Committee member). The Chairman shall not have the power to remove any member of the Appeals Committee, nor to appoint a successor) except as set forth this section 5.7(b).

(c)     Additional Committees. As of the date of this restatement, the following Committees (in addition to the Appeals Committee) had been established: Investment Committee; Financial Audit Committee; Benefit Study Committee. The Chairman and Secretary shall be members of the Investment Committee by virtue of their position.

5.8     Arbitration. In the event the Trustees attending a duly called meeting at which there is a quorum present are unable to agree in accordance with the majority voting requirements of section 5.5 hereof upon any matter in connection with the administration or operation of the Plan or Trust, or in the event the Trustees fail to obtain a quorum for a meeting after three consecutive notices thereof, a deadlock shall be deemed to exist and the Trustees may then select a neutral person as an impartial arbitrator who is willing to act in the resolution of such deadlock. In the event the Trustees are unable to agree by majority vote upon the selection of an impartial arbitrator within 30 days after such deadlock or after the third meeting at which a quorum was not present, then an impartial arbitrator shall be appointed in accordance with the Impartial Umpire Rules for Arbitration of Impasses Between Trustees of Joint Employee Benefit Trust Funds as administered by the American Arbitration Association. Any expenses, costs and attorneys' fees in connection with the foregoing shall be paid

by the Plan, including any reasonable compensation to the arbitrator. The impartial arbitrator shall have no power to alter, delete, amend, add to, take away from or disregard any of the provisions of this Agreement and shall have no power to cause the Trustees to alter, delete, amend, add to, take away from or disregard any provision of this Agreement. The decision of the impartial arbitrator shall be final and binding upon the Trustees, all parties hereto, the Employees and their beneficiaries. The Trustees shall take or omit taking any action or actions that may be indicated in order to give effect to the decision of the impartial arbitrator.

Differences arising as to the interpretation or application of the provisions of this Agreement, or relating to the benefits provided for Participants hereunder shall not be subject to the grievance or arbitration procedures established in any collective bargaining agreement.

5.9     Immunity of the Trustees.

(a)     Exculpation of Trustees and Plan Employees From Liability. No Trustee or Plan employee shall incur any liability individually or on behalf of other individuals for any act or failure to act unless such act or failure to act is due to his/her own negligence or willful misconduct or lack of good faith; provided, however, the foregoing shall not relieve a Trustee or Plan employee from liability if such is precluded by paragraph 5.9(c). A Trustee or Plan employee may act or rely upon any of the following:

(i)     Any instrument, application, notice, request, signed letter or other paper or document believed by him to be genuine and to contain a true statement of facts and to be signed or sent by the proper person; or

(ii)     The advice, opinion, records, reports or recommendations of any accountant, actuary, administrator, attorney, consultant, co-trustee, investment agent or investment manager or any other advisor selected by the Trustees with reasonable care.

(b)     Indemnification of Trustees and Plan Employees. The Trustees shall cause any person who is or has served as a Trustee or employee of the Plan to be indemnified out of the Trust against all damages, liabilities and expenses incurred by or imposed on him in connection with any claim, suit, action or proceeding concerning the Plan or his/her acts or omissions as a Trustee or employee thereof, including, without limitation, legal fees and amounts paid in any compromise or settlement unless such acts or omissions constitute negligence, willful misconduct or lack of good faith; provided, however, the foregoing shall not relieve a Trustee or a Plan employee from liability if such is precluded by paragraph 5.9(c). Any indemnification provided herein shall be limited to

V-6

amounts not collected pursuant to valid and enforceable liability insurance policies.

To the extent permitted by law, the Trustees, in their discretion, may also cause the Plan to indemnify any person who is rendering services to the Plan against all damages, liabilities and expenses incurred by or imposed upon such a person in connection with any claim, suit, action or proceeding concerning the Plan or the acts or omissions of such a person, including without limitation, legal fees and amounts paid in any compromise or settlement unless such act or omission constitutes gross negligence, willful misconduct or lack of good faith.

(c)    Compliance With Employee Retirement Income Security Act of 1974.  Anything herein to the contrary notwithstanding, nothing in subparagraphs (a) and (b) above shall relieve a Trustee or other person rendering service to the Plan of any responsibility or liability for any responsibility, obligation or duty under Part IV of Title I of ERISA.  Further, notwithstanding anything in this Agreement to the contrary, if any provision of this Agreement is voided by section 410 of the ERISA, such provision shall be of no force or effect only to the extent that it is voided by such section.

5.10    Compensation of Individual Trustees.  An individual Trustee shall not be paid any compensation from the Trust for his services hereunder, but the Trustees may authorize reimbursement to a Trustee from the Trust for reasonable expenses incurred on behalf of the Plan or Trust in connection with their duties hereunder.

5.11    Service in More Than One Fiduciary Capacity.  Any individual, entity or group of persons may serve in more than one fiduciary capacity with respect to the Plan, the Trust or both to the extent such is permitted by law; provided, however, a Trustee shall not be paid any compensation for providing professional services to the Plan.

ARTICLE VI

Control and Management of Trust

6.1    Control of Trust.  The Trustees shall be the named fiduciaries of the Trust and shall have the power to control the Trust and to perform all such acts, to take all such proceedings, and to exercise all such rights and privileges, although not specifically mentioned herein, as the Trustees may deem necessary or advisable to administer the Trust or to carry out the purposes of this Agreement.

6.2    Management of Trust.  The management, including the acquisition and disposition of property comprising the Trust, shall be as follows:

(a)    General Authority.  The Trustees shall have exclusive authority and responsibility with respect to the custody and management of the Trust, except to the extent any such authority has been delegated pursuant to the provisions of subparagraph (b), (c) or (d) below and subparagraphs (c) and (d) of section 7.3.

(b)    Delegation of Custody.  The Trustees are authorized to delegate custody of all or any portion of the Trust.  Such custodian shall hold the Trust as directed in writing by the Trustees.

(c)    Delegation of Investment Control.  The Trustees may appoint one or more investment managers to supervise and direct the investment and reinvestment of a portion or all of the Trust in accordance with the provisions of the Agreement and in the same manner and with the same powers, duties, obligations, responsibilities and limitations as apply to the Trustees as set forth herein.  Any investment manager so appointed shall be an investment advisor registered under the Investment Advisers Act of 1940, a bank as defined in such Act or an insurance company which is qualified to manage the assets of employee benefit plans under the laws of more than one state.  As a condition to its appointment, an investment manager shall acknowledge in writing that it is a fiduciary with respect to the Plan.  The Trustees may furnish an investment manager with written investment guidelines for investment, which guidelines may include directions with respect to the diversification of the investments.  The Trustees may also delegate to an investment manager the authority to retain other investment managers.  Investment managers who are delegated authority for retaining other investment managers shall serve as "named fiduciaries" (within the meaning of ERISA section 402) to the extent necessary to delegate investment responsibility to another investment manager.  Any investment manager shall receive such reasonable compensation chargeable against the Trust as shall be agreed upon with the Trustees.

VI-1

(d)     Co-Trustee Agreement.  The Trustees may enter into one or more agreements with corporations or national banking associations authorized by law to act in a trust or fiduciary capacity, whereby any such corporation or national banking association shall become a co-trustee ("Corporate Trustee").  The Trustees may delegate to the Corporate Trustee all or any part of the authority and responsibility with respect to the control and management of the Trust, provided the Corporate Trustee shall not be a representative of either the Employers or the Council and shall have no right to vote as a Trustee.  Any such Corporate Trustee shall receive such reasonable compensation chargeable against the assets delivered to it as shall be agreed upon with the Trustees.  Further, any bank selected shall have a combined capital and surplus of one million dollars ($1,000,000) and shall have been in the general banking business for not less than ten (10) years.

6.3     Trust Responsibilities.  In connection with their management and control of the Trust unless the following responsibilities are allocated or delegated in accordance with the procedures set forth in section 7.3(c) or (d) or elsewhere herein, the Trustees shall:

(a)     cause the assets of the Plan to be held and administered in trust or by an insurance company authorized to do business in more than one state and pursuant to contracts or policies issued by such insurance company;

(b)     cause accounts of all investment, receipts, disbursements and all other transactions affecting all or any portion of the Trust to be maintained; and

(c)     pay from the Trust all taxes of any and all kinds whatsoever that may be levied or assessed under existing or future laws upon, or in respect of, the Trust or its income.

6.4     Trust Powers.  The Trustees shall have such powers as may be necessary to discharge their responsibilities in managing and controlling the Trust.  The Trustees shall have full and complete authority and control over the Trust unless such authority or control is allocated or delegated by the Trustees in accordance with the procedures set forth in section 7.3(c) or (d), or elsewhere herein.  Any determination made by the Trustees in the exercise of these powers shall be binding on all persons.  In addition to such powers as are conferred by law or as set forth elsewhere in this Agreement, the powers of the Trustees in connection with their managing and controlling the Trust shall include, but shall not be limited to, the following:

(a)  To invest and reinvest all or part of the principal and income of the Trust, without distinction between principal and income as the Trustees determine, in such securities or in such property, real or personal, or share or part thereof, or part interest therein, wherever situated, as the Trustees shall deem advisable, including but not limited to, governmental, corporate or personal obligations, shares of stock, common or preferred, whether or not listed on any exchange, participation in partnerships, mutual investment funds, bonds and mortgages, and other evidences of indebtedness or ownership, including stocks, bonds or other obligations secured by personal property, participation in any common trust fund exempt under section 584 of the Internal Revenue Code established or maintained for the collective investment of fiduciary funds and participation in any trust fund qualified under section 401(a) and exempt under section 501(a) of the Internal Revenue Code.

During the time that any part of the Trust is held in a common or collective trust exempt under Code section 501(a) or 584, the declarations of trust of such common or collective trust shall be part of this Agreement provided such declaration of trust meets the requirements of Revenue Ruling 81-100 (as amended), if necessary, and the declarations of trust comply with the Rules and Regulations of the Comptroller of the Currency, if necessary, and comply with the laws of any state having jurisdiction thereover and have, where appropriate, been approved by the Internal Revenue Service.

(b)  To apply for and procure from responsible insurance companies contracts to provide all or part of the benefits hereunder as the Trustees shall deem proper.  Such contracts may be either for the general benefit of the Trust or for the particular benefit of a particular Employee; provided, however, no Employee shall derive any greater right than any other Employee by reason of the fact that an insurance company contract has been purchased on his life as a general investment of the Trust nor shall any such rights of any Employee be diminished by such purchase.  The Trustees may exercise at any time, and from time to time, whatever rights and privileges may be granted under such contracts and may collect, receive and settle for the proceeds of all such contracts as and when entitled to do so under the provisions thereof.

(c)  To sell, convey, transfer, exchange, partition, lease for any term, mortgage, pledge or otherwise dispose of any and all property, real or personal, or to grant options with respect to any property held by the Trustees by private contract or at public auction or to surrender for cash value any contracts issued by an insurance company and held by the Trustees.  Any sale, option or other disposition of property may be at such time and on such terms as the Trustees see fit.  Any sale, option or other disposition of property may be made for cash or upon credit, or partly in cash and partly on credit.  No person dealing with

the Trustees shall be bound to see to the application of the purchase money or to inquire into the validity, expedience or propriety of any such sale, option or other disposition.

      (d)     To receive, hold, manage, invest, reinvest, improve, repair and control all monies and property, real or personal, at any time forming part of the Trust.

      (e)     To purchase and sell contracts or other properties through such broker or brokers as the Trustees may choose.

      (f)     To vote or refrain from voting upon any stocks, bonds or other securities; to give general or special proxies or powers of attorney with or without power of substitution; to appoint one or more individuals or corporations as voting trustees under voting trust agreements and pursuant to such voting agreements to delegate to such voting trustees' discretion to vote; to exercise any conversion privileges, subscription rights, or other options, and to make any payments incidental thereto; to oppose, or to consent to, or otherwise participate in, corporate reorganizations or other changes affecting corporate securities, and to pay any assessments or charges in connection therewith; and generally to exercise any of the powers of an owner with respect to property held as part of the Trust; to delegate voting authority to an investment manager.

      (g)     To cause any securities or other property to be registered in the name of the Plan, the Trustees, a Corporate Trustee, a custodian or in the name of a nominee without designating the same as trust property, and to hold any investments in bearer form or otherwise in such form that title passes by delivery, but the books and records of the Trustees shall at all times show that all such investments are part of the Trust.

      (h)     To exercise or dispose of any right they may have as the holders of any security to convert the same into another or other securities, or to acquire an additional security or securities, to make any payments, exchange any security or do any act with reference thereto which they may deem advisable.

      (i)     To consent to take any action in connection with (including the deposit of any property with and participation with respect to any protective or similar committee) and receive and retain any securities or other property resulting from any reorganization, consolidation, merger, readjustment of the financial structure, sale, lease or other disposition of assets of any corporation or other organization, the securities of which may constitute a portion of the Trust, and the Trustees may delegate to any such protective or similar committee such power and authority as they may deem proper in the premises and may pay such portion of the expenses and compensation of such committee as they deem proper.

(j)     To borrow or raise money for the purposes of the Plan in such amount, and upon such terms and conditions as the Trustees shall deem advisable; and for any sum so borrowed to issue the promissory note of the Plan, and to secure the repayment thereof by creating a security interest in all or any part, of the Trust; and no person lending such money shall be obligated to see that the money lent is applied to Trust purposes or to inquire into the validity, expedience or propriety of any such borrowing.

(k)     To hold cash, uninvested, for such length of time as the Trustees may determine without liability for interest thereon.

(l)     To make, execute, acknowledge and deliver any and all documents of transfer and conveyance, including but not limited to, deeds, leases, mortgages, conveyances, contracts, waivers and releases, and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted.

(m)     To renew or extend or participate in the renewal or extension of any mortgage, upon such terms as may be deemed advisable, and to agree to a reduction in the rate of interest on any mortgage or to any other modification or change in the terms of any mortgage, or of any guarantee pertaining thereto, in any manner and to any extent that may be deemed advisable for the protection of the Trust or the preservation of the value of the investment; to waive any default whether in the performance of any covenant or conditions of any mortgage or in the performance of any guarantee or to enforce any such default in such manner and to such extent as may be deemed advisable; to exercise and enforce any and all rights of foreclosure, to bid on property on foreclosure, to take a deed in lieu of foreclosure with or without paying any consideration therefor, and in connection therewith to release the obligation on the bond secured by such mortgage and to exercise and enforce in any action, suit or proceeding at law or in equity any rights or remedies in respect of any such mortgage or guarantee.

(n)     To employ suitable agents, advisors and counsel as they may deem necessary and advisable for the efficient operation and administration of the Trust and to charge the expense thereof to the Plan to the extent permitted by applicable law.

(o)     To form a corporation or corporations under the laws of any jurisdiction, to participate in the forming of any such corporation or corporations or acquire an interest in or otherwise make use of any corporation or corporations already formed, for the purpose of investing in and holding title to any property.

(p)     To continue to have and to exercise after the termination of the Plan and until final distribution, all of the title, powers, discretions, rights and duties conferred or imposed upon the Trustees hereunder, or by law.

(q)     To establish an administrative office and to retain employees and other professionals, and to purchase equipment and enter into leases and take all other actions necessary to operate an administrative office; to enter into arrangements with other entities under office sharing, expense sharing or similar sharing features intended to improve operational efficiencies or reduce costs; to form a corporation or corporations under the laws of any jurisdiction to serve as the administrative office.

Notwithstanding any provision set forth in this paragraph 6.4 to the contrary, the Trustees shall exercise any power in a manner which is consistent with the applicable provisions of Title I of ERISA.

With respect to an investment in any contract issued by an insurance company, such contract may provide for the allocation of amounts received by the insurance company thereunder to said insurance company's general account and/or one or more of its separate accounts.  Such accounts may include separate accounts maintained for the collective investment of assets.  The insurance company, under any such contract, shall have exclusive responsibility for the investment and management of any amounts held under such contract, free of any requirements of state laws limiting investments by fiduciaries.

ARTICLE VII

Operation and Administration of Plan

       7.1    <u>Authority of Trustees</u>.  The Trustees shall be the named fiduciary for the Plan and shall have authority to and shall be responsible for the operation and administration of the Plan and shall conduct the business and activities of the Plan in accordance with the provisions of this Agreement.

       7.2    <u>Plan Responsibilities</u>.  The Trustees shall have full and complete authority and control over the Plan.  In connection with their operation and administration of the Plan, unless the following responsibilities are allocated or delegated in accordance with the procedures set forth in sections 7.3(d) and (e), the Trustees shall:

       (a)    Formulate and adopt a written instrument describing those benefits to be provided by the Plan consistent with the purposes set forth in section 3.1 hereof.

       (b)    Determine the right of any person to a benefit.  In the exercise of this responsibility, the Trustees shall provide every applicant whose application for a benefit is denied wholly or partially with a written notice setting forth the reason or reasons for the denial and any additional information required by applicable law.  Further, the Trustees shall adopt a written appeal procedure which shall provide a claimant with a reasonable opportunity to appeal a full or partial denial of a benefit application.

       (c)    Establish and maintain a funding policy and method consistent with the Plan's objectives and in accordance with any law applicable to the Plan.

       (d)    Maintain books of account, records and other data as may be necessary for the proper administration and operation of the Plan, and a record of all their transactions, meetings and the actions taken at meetings or by informal action of the Trustees including niinutes of all Trustees' meetings.  A copy of the minutes of all Trustees' meetings shall be retained as a record of the Plan.  All of said books, records and data shall be available at the office of the Plan during business hours for inspection by any Trustee.

       (e)    Prepare, execute, file and retain a copy for the Plan records of all reports required by law or deemed by them to be necessary or appropriate for the proper administration and operation of the Plan.

(f)     Procure an audit of the books of the Plan by a Certified Public Accountant not less frequently then once each year.  A copy of each such audit shall be made available upon request, to each Employer, the Council and the Trustees as soon as is reasonably possible after it has been prepared, and a copy of such audit shall be kept available for inspection by authorized persons during business hours at the office of the Plan.

(g)     Procure and maintain at the expense of the Plan such bonds as are required by law, together with such additional bonding coverage as they may determine for the Trustees, employees of the Plan, any agents acting on behalf of or retained by the Trustees and persons to whom fiduciary responsibilities have been delegated.

7.3     Plan Powers.  The Trustees shall have such powers as may be necessary to discharge their responsibilities in managing and controlling the general operations and administration of the Plan.  The Trustees shall have full and complete authority and control with respect to the operations and administration of the Plan unless such authority or control is allocated or delegated by the Trustees in accordance with the procedures set forth in subparagraphs (c) and (d) below.  Any determination by the Trustees in the exercise of these powers shall be binding on all persons.  In addition to such other powers as are conferred by law or are set forth elsewhere in this Agreement, the powers of the Trustees in connection with their operation and administration of the Plan shall include, but shall not be limited to, the following:

(a)     To determine, from time to time, who shall be Employers, Employees or Participants; who shall be eligible for benefits under the Plan; the nature, type, character and amount of benefits to be provided and the medium by which such benefits shall be provided.  In determining who shall be eligible for benefits under the Plan, the Trustees may establish standards for granting or denying such eligibility to Employees.

(b)     To employ such actuaries, consultants, accountants, counsel or other persons as they deem necessary or desirable in connection with the administration of the Plan and to employ one or more persons to render advice with regard to any responsibility or power of the Trustees.  The costs of such services and other administrative expenses shall be paid by the Plan.

(c)     To designate in writing persons who are not Trustees to carry out fiduciary or nonfiduciary responsibilities or duties of the Trustees, and in the event of such a designation the Trustees shall not be liable for any act or omission of such a person.

(d) To allocate, in writing by unanimous agreement, fiduciary or nonfiduciary responsibilities or duties among Trustees. Those persons to whom such responsibilities have not been allocated shall not be liable for any act or omission of those persons to whom such responsibilities have been allocated.

(e) To construe and interpret the Agreement and Plan.

(f) To request and receive from the Employers, the Council, the Employees or their beneficiaries or dependents such information as shall be necessary for the proper administration of the Plan.

(g) To furnish the Employers and the Council, upon request, such annual reports with respect to the administration of the Plan as are reasonable and appropriate.

(h) To maintain such bank accounts as they deem appropriate for the administration of the Plan; provided, however, all checks, drafts, vouchers or other withdrawals of funds from the Plan shall be signed by at least one Council Trustee and one Employer Trustee, or if the Trustees unanimously so provide by contract or resolution, by a person to whom such responsibility has been delegated.

(i) To receive and review reports of the financial condition and of the receipts and disbursements of the Trust.

(j) To prescribe procedures to be followed by any persons in applying for any benefits under the Plan; and to designate the forms or documents, evidence and such other information as the Trustees may reasonably deem necessary, desirable or convenient to support an application for benefits under the Plan.

(k) To adopt such by-laws, rules, regulations, actuarial tables, forms and procedures from time to time as they deem advisable and appropriate in the proper administration of the Plan, provided the same are consistent with the terms of this Agreement and do not modify or increase the burdens or obligations of any Employer or Council under the terms of its collective bargaining agreement. Any construction of this Trust Agreement or the Plan and all rules and regulations adopted by action of the Trustees for the administration of the Trust shall be binding upon all parties dealing with the Trust and all persons claiming benefits hereunder.

(l) To have a judicial settlement of the Trust's accounts and judicial determination of any questions in connection with their duties and

obligations hereunder, or in connection with the administration or distribution thereof. The costs and expenses, including accounting and legal fees, for such judicial settlement of accounts or other judicial determination shall be paid by the Plan as a general administration expense to the extent permitted by applicable law.

(m)     To file, from time to time, with the Council and the Employers a statement of the Trust's accounts and such other reports as the Trustees deem necessary or appropriate and the Council and Employers may enter into an agreement approving and allowing such statement, account or report and any such agreement shall be binding and conclusive upon all persons whomsoever, and shall constitute a full discharge and acquittance of the Trustees with respect to the matters set forth in such statement, account or report, except to the extent such discharge or relief from liability is precluded by Part 4 of Title I of ERISA.

(n)     To the extent such is consistent with the provisions of section 410(b) of ERISA, to purchase out of the assets of the Plan, insurance for the benefit of the Plan and/or the protection of the Trustees, Plan employees or other fiduciaries or service providers of the Plan against any losses by reason of errors or omissions or breach of fiduciary duty.

(o)     To enter into any and all contracts and agreements for carrying out the terms of this Plan and for the administration and operation of the Plan and to do all acts as they, in their discretion, may deem necessary or advisable, and such contracts and agreements and acts shall be binding and conclusive on the parties hereto and on the Participants involved.

(p)     To borrow money, with or without security, for the Plan.

(q)     To extend the time of payment of any obligation and to compromise and accept either total or partial satisfaction, or write off as uncollectible any Employer contribution to the Plan or any other indebtedness or other obligation as the Trustees may deem appropriate, provided such action is consistent with applicable law. An extension of time of payment, compromise or a decision to write off as uncollectible shall be deemed appropriate if the Trustees determine that the likelihood of collection or the anticipated expense of collecting justifies such action.

(r)     To inspect and review the records of any Employer (either at the Employer's place of business or through the mail/wire transfer of documents, whatever is deemed by the Plan to be most efficient) to the extent necessary to determine whether the proper contributions required to be made to the Plan have been made. The Trustees may, based upon all relevant circumstances, assess all or a portion of the cost of the audit to the Employer if an underpayment

is disclosed by the audit, or the Employer fails timely to pay following demand for payment. Also, in the event the Employer resists the Plan Auditor's attempt to conduct the audit or obstructs completion of the audit (e.g., refuses timely to provide all records it possesses which the Plan Auditor believes are necessary to complete the audit), the Trustees may assess the Employer for all or a portion of the audit costs. If the Plan is required to initiate litigation to compel completion of the payroll audit, the Trustees may assess the Employer for the costs of the payroll audit plus all fees and costs that the Plan incurs in compelling the audit, including legal fees.

(s)     To extend the coverage of the Plan to Employers who satisfy the conditions set forth in section 1.6 and their Employees upon such terms and conditions as the Trustees consider necessary to preserve the actuarial soundness of the Plan and to preserve an equitable relationship between the contributions made by the Employers then participating in the Plan and the benefits payable to their Participants.

(t)     To enter into reciprocal arrangements for the recognition of credits and/or transfer of assets to or from other similar health and welfare plans, now or hereinafter in existence, provided that such arrangements are consistent with applicable law, do not alter or detract from the benefits provided hereunder for the Participants of the Plan, and further provided, that such arrangements are equitable and consistent with sound actuarial and accounting principles and practices.

(u)     To amend the plan of benefits described in the written instrument provided for in section 7.2(a) hereof or any other provisions of such written instrument, including any amendment which affects the nature, amount, condition and duration of any benefit based on what in their opinion the Plan can reasonably provide after adequate provision for the Plan's funding requirements and the costs of administration. To the extent permitted by applicable law the Trustees are authorized to reduce benefits under the Plan. Any amendment to such written instrument shall be in accordance with the amendment provisions thereof.

(v)     To receive contributions or payments from any source whatsoever to the extent permitted by law.

(w)     To attend and participate in conferences, seminars and similar educational meetings, which the Trustees deem helpful to them in the operation, administration, control or management of the Plan or Trust and to cause payment for all reasonable expenses therefor by the Plan.

(x)     To pay membership dues in educational and other organizations operated for purposes related to the Plan.

(y)      To establish and accumulate as part of the Trust a reserve or reserves adequate, in the opinion of the Trustees, to carry out the purposes of the Plan after taking into consideration, among other things, future benefit obligations, contingencies, expenses of administration and obligations of the Plan.

(z)      To do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary or proper in connection with the Plan, although the power to do such acts is not specifically set forth herein.

Notwithstanding any provision set forth in this section 7.3 to the contrary, the Trustees shall exercise any power in a manner which is consistent with Title I of ERISA.

ARTICLE VIII

Contributions and Collections

8.1    Contributions to Plan.  Each Employer shall make continuing and proper payments to the Plan as required by the collective bargaining or other written agreement to which each such Employer is a party, and as required by the National Labor Relations Act as described in section 8.4.  In no event shall any Employer, directly or indirectly, receive any refund of contributions made to the Plan, unless all of the following conditions are satisfied:

(a)    The contributions are made due to a bona fide mistake of law or fact as determined by the Trustees; and

(b)    A refund in such circumstances is permitted by applicable law and will not adversely affect the tax-qualified status of the Plan or tax-exempt status of the Trust; and

(c)    The Trustees, in their sole discretion, approve the refund.

In lieu of providing a refund, the Trustees may establish a credit to be applied against the Employer's obligations owed to the Plan.

Upon payment to the Trustees, all responsibilities of each Employer for each of its contributions shall cease.  No Employer shall be liable for contributions required to be made by any other Employer and subject to timely payment of contributions required by its collective bargaining or other agreement requiring it to contribute to the Plan, an Employer shall have no liability for funding or paying the benefits provided under the Plan.  The Employer's obligation under the collective bargaining agreement to contribute to the Plan shall not be subject to setoff or counterclaim by the Employer for any liability, including, but not limited to a liability of the Council, Local Union or an Employee of the Employer.  No contributions received by the Plan shall be deemed wages due to Employees; provided, however, in the event of an Employer's insolvency or liquidation the preceding shall not act to preclude the collection of contributions pursuant to a priority allowed for "wages" if the law recognizes such contributions as "wages" for such purposes.

8.2    Transmission of Reports and Contributions.  The Trustees shall establish a uniform system among the Employers for the timely transmission of such reports and contributions, as the Trustees deem necessary, and shall also establish a periodic date on which such reports and contributions shall be due;

provided, any such reporting and contribution dates so established shall be consistent with the Employers' collective bargaining agreements.

8.3     Delinquent Contributions. The Trustees, upon knowledge thereof, shall notify any Employer of a delinquency, mistake or discrepancy in its report or contribution. Any Employer contributions shall be considered delinquent if not received in the Plan office on or before the fifteenth (15th) day of the month or placed in the U.S. Mail on or before the fifteenth (15th) day of the month, as evidenced by postmark, following the month for which the payment is being made. With respect to Employers that fail to timely contribute or submit a contribution report, the Trustees shall have authority to take any one or more of the following actions:

(a)     Establish rules and regulations providing for the assessment of interest, costs, fees and liquidated damages to be added to any delinquent contributions and to take such legal action, including proceedings at law, in equity or, if the Trustees so choose to submit the issue, in arbitration, as in their discretion may be necessary to collect contributions and liquidated damages assessed by them and to recover from any delinquent contributor on behalf of the Plan all costs and reasonable attorney's fees incurred in connection therewith. The Trustees may, in their sole discretion, assess a delinquent Employer the cost of a payroll audit if it is determined that the Employer is delinquent in its contributions to the Plan.

(b)     Require an Employer who has been delinquent in its contributions to the Plan to deposit with the Trustees in advance as a guarantee of the payment of monthly contributions, an amount not to exceed three times the estimated monthly contribution of such Employer as a condition of such Employer's continuing to participate in the Plan, and may require that said guarantee be continuously maintained by such Employer as a condition of continuing to participate in the Plan. In the event any such Employer ceases to participate in this Plan, any excess in such guarantee over the contributions or other amounts required of such Employer to be paid to the Plan shall be returned to him.

(c)     Terminate the Employer from further participation in the Plan by giving notice of termination to the Employer and the Employees of such Employer. Such notice shall state the cause for termination and shall state the date on which the benefits provided by the Plan for the Employer's Employees shall cease.

8.4     Amount of Contributions. Each Employer shall make continuing and proper payments to the Plan as required by the collective bargaining agreement, Participation Agreement or other agreement to which each

such Employer is a party. The aforementioned obligation to contribute to the Plan as required by the collective bargaining agreement shall include periods beyond the expiration of the term of the collective bargaining agreement during which the obligation to contribute under the collective bargaining agreement has been extended by the National Labor Relations Act; provided there is no dispute over the existence or extent of the obligation to contribute beyond the term of such agreement. The Trustees may enforce such a contribution obligation in a United States District Court.

ARTICLE IX

Controversies and Disputes

9.1     Reliance Upon Records.  In any controversy, claim, demand, suit at law, or other proceeding between any Participant or any other person and the Trustees, the Trustees shall be entitled to rely upon any facts appearing in the records of the Trustees, certified to the Trustees by the Council or the Employers, any facts which are of public record and any other evidence pertinent to the issue involved.

9.2     Determination by Trustees Binding.  All questions or controversies, of whatsoever character, arising in any manner or between any parties or persons in connection with the Plan or Trust or their operation, whether as to any claim for benefits, or as to the construction of language or meaning of this Agreement, the Plan, or rules and regulations adopted by the Trustees, or as to any writing, decision, instrument or account in connection with the operation of the Plan or Trust or otherwise, shall be submitted to the Trustees or, where Trustee responsibility has been delegated to others, to such delegates for decision.  The decision of the Trustees or their delegates shall be binding upon all persons dealing with the Plan or Trust or claiming any benefit thereunder, except to the extent that such decision may be determined to be arbitrary or capricious by a court having jurisdiction over such matter.

9.3     Compromise.  The Trustees may, in their sole discretion, compromise or settle any claim or controversy, and any decision made by the Trustees in compromise or settlement of a claim or controversy or any compromise or settlement agreement entered into by the Trustees, shall be conclusive and binding on all parties.

9.4     Right to Obtain Adjudication of Disputes.  In the event any question or dispute shall arise as to the proper person or persons to whom any payments shall be made hereunder, the Trustees may withhold such payment until an adjudication of such question or dispute, satisfactory to the Trustees, in their sole discretion, shall have been made, or the Trustees shall have been adequately indemnified against loss to their satisfaction.

ARTICLE X

Amendments

10.1  <u>Method of Amendment</u>.  This Agreement may be amended in writing at any time by the Trustees in accordance with the voting provisions of section 5.5.

10.2  <u>Limitation on Amendments</u>.  No amendment shall be adopted which alters the basic purpose of the Plan, conflicts with any applicable law or government regulation, causes the use or diversion of any part of the Trust for purposes other than those authorized herein, retroactively deprives anyone of a vested right or interest, increases the burdens or obligations of any Council or Employer except to the extent provided herein or permitted in its collective bargaining or other written agreement, affects the tax-exempt status of the Trust or the deductibility for income tax purposes of Employer contributions to the Plan. Further, no amendment shall (1) provide for an unequal number of Council Trustees and Employer Trustees or (2) change the method of voting.

ARTICLE XI

Termination

11.1 <u>Term of Plan</u>. The Plan shall continue until all the collective bargaining agreements providing for contributions to the Plan have expired, and negotiations for extension thereof have ceased. The Plan may be terminated at an earlier date by written agreement of all of the Council and Employers, which agreement shall be served upon each of the Trustees by registered mail. The termination shall not be effective until 60 days after mailing of such agreement to the Trustees.

11.2 <u>Procedure on Termination</u>. In the event of the termination of the Plan, the Trustees shall apply the Trust to pay or to provide for the payment of any and all obligations of the Plan and shall distribute and allocate all assets of the Trust in accordance with the then provisions of the Plan; provided, however, that any Plan provision to the contrary, notwithstanding, the assets of the Trust shall be allocated and distributed in the priorities and according to the categories required by applicable law, and no part of the corpus or income of the Trust shall be used for or diverted to purposes other than for the exclusive benefit of the Participants, former Participants or their beneficiaries or dependents, or the administrative expenses of the Plan or for other payments in accordance with the provisions of this Agreement. Under no circumstances shall any portion of the corpus or income of the Trust, directly or indirectly, revert or accrue to the benefit of any contributing Employer prior to all obligations having been satisfied or provided for. The Trustees may, after all the obligations of the Plan have been satisfied as provided in the Plan upon termination of the Plan, transfer any surplus monies and property in the Trust to any other fund that may exist or be created by and between the Council and the Employers or Associations for the same uses and purposes herein set forth; provided, however, that such surplus monies and property shall be for the purpose of providing benefits to Employees or former Employees on whose behalf contributions were made by Employers and, further provided, that any fund to which the Trustees transfer any surplus monies and property shall constitute a tax-exempt plan eligible to receive the transfer, and that the trust forming a part thereof shall be exempt under section 501(a) of the Internal Revenue Code of 1986, and similar subsequent statutes.

11.3 <u>Notification of Termination</u>. Upon termination of the Plan in accordance with this Article, the Trustees shall forthwith notify the Council, the Associations and each Employer and also all other necessary parties, and the Trustees shall continue as Trustees for the purpose of liquidating the affairs of the Plan.

11.4   Distribution Upon Termination.  Any total or partial distribution after termination of the Plan may be made at any time, and from time to time, in whole or in part, to the extent that no discrimination in value results, in cash, in securities or other assets of kind, or in annuity contracts, as the Trustees, in their discretion, shall determine.  The Trustees may defer any distribution upon termination pending receipt of a favorable determination letter from the Internal Revenue Service that the termination will not adversely affect the tax qualification of the Plan or the tax-exempt status of the Trust.  In making such distribution, any and all determination, divisions, appraisals, apportionments and allotments so made, shall be final and conclusive and not subject to question by any person.

ARTICLE XII

General Provisions

12.1    Title to the Trust.  Title to the Trust shall be vested in and remain exclusively in the Trustees and no Employer, Council, Association, Employee or any beneficiary shall have any right, title or interest in the Trust nor any right to contributions to be made thereto, nor any claim against any Employer on account thereof, except only as provided from time to time by this Agreement or under the Plan, and then only to the extent of the benefits payable to such person out of the Trust.

12.2    Liability of the Associations, Council and Employers.  Except to the extent required by law, the Council, Association and Employers shall not be responsible for the acts of the Trustees or for any debts, liabilities, obligations, benefits or insufficiency of the Trust.

12.3    Nonalienation of Benefits.  Except for payments required by a qualified domestic relations order (as defined by the Internal Revenue Code and ERISA), tax levy required to be paid under the Internal Revenue Code, garnishment order under the Mandatory Victims Restitution Act, any indebtedness owed to the Plan or as otherwise permitted by law, the Trust shall not be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, garnishment, execution, or levy of any kind, either voluntary or involuntary, including any such liability which is for alimony or other payments for the support of a spouse, former spouse or any relative, until such payment has been actually received by the person entitled to it.  Any attempt to anticipate, alienate, settle, transfer, assign, pledge, encumber, charge or otherwise dispose of the same shall be void.  The Plan shall not in any manner be liable for, or subject to, the debts, contracts, liabilities, engagements or torts of any person entitled to health and welfare benefits under the Plan.

12.4    Prohibition of Diversion of Trust.  It shall be impossible by operation of the Trust or by its natural termination, by power of revocation or amendment, by the happening of any contingency, by collateral arrangement or by any other means, for any part of the corpus or income of the Trust or any funds contributed thereto to be used for, or diverted to purposes other than the exclusive benefit of Participants, former Participants, their beneficiaries or dependents prior to all obligations having been satisfied or provided for.  No part of net earnings of the Trust shall inure (other than benefit payments as outlined above) to the benefit of any Employer, Association, Council or individual; provided, however, a contribution made by an Employer as the result of a mistake may be returned to the Employer if the Trustees so direct provided the repayment is not prohibited by

applicable law and will not adversely affect the tax-exempt status of the Trust and in a manner consistent with section 8.1.

12.5    Incompetency and Minors. In the event it is determined that any person entitled to receive benefits is unable to care for his affairs because of mental or physical incapacity, or because the person is a minor, the benefits due such person may be paid to his legal guardian or conservator, or to any relative by blood or by marriage to be used and applied for the benefit of such person. Payment to such legal representative or relative of the persons on whose account benefits are payable shall operate to discharge the payor from any liability to such person or to anyone representing him or his interest and the Trustees shall have no duty or obligation to see that the funds are used or applied for the benefit of such person.

12.6    Merger of the Plan. The Trustees are authorized to merge or consolidate the Plan with another tax-exempt health and welfare plan or to be party to a transfer of assets or liabilities with another tax-exempt health and welfare plan; provided such merger, consolidation or transfer of assets or liabilities complies with all applicable laws and provided such merger, consolidation or transfer of assets or liabilities does not affect the tax-exempt status of the Trust under section 501(a) of the Internal Revenue Code.

12.7    Execution of Documents. The Trustees, by resolution, may authorize any Employer Trustee and any Council Trustee or any joint group, comprised equally of Employer and Council Trustees, to jointly execute any notice, certificate or other written instrument relating to the Plan and all persons, partnerships, corporations or associations may rely upon any such notice or instrument so executed as having been duly authorized and as binding on the Plan and the Trustees. The Trustees may also authorize agents of the Plan, including the administrator, to execute documents on behalf of the Plan.

12.8    Notice and Delivery of Documents. Any notice required to be given hereunder may be given in person or by first class mail. Also, the parties may consent to electronic delivery of notices required hereunder. When notice is given by mail, it shall be deemed to have been given as of the date of posting to the last known address of the addressee available from the Plan records.

12.9    Gender and Number. Wherever any words are used herein in the masculine gender they shall be construed as though they were also used in the feminine gender in all cases where they would so apply, and wherever any words are used herein in the singular form they shall be construed as though they were also used in the plural form in all cases where they would so apply.

XII-2

12.10  Headings.  Titles of articles and headings of sections and subsections are inserted for convenience of reference.  They constitute no part of this Agreement and are not to be considered in the construction hereof.

12.11  Information to be Furnished by Employers.  Each Employer shall furnish the Trustees such records with respect to each of his Employees sufficient to determine the benefits due or which may become due hereunder as the Trustees may require in connection with the administration of the Plan.  In the event of an alleged discrepancy in Employer contributions to the Plan or in any other data required for the Employer by this Agreement or by the Plan, the Trustees shall, in writing, notify the Employer of such alleged discrepancy and the period of time that the discrepancy is claimed to cover.  On receipt of such written notice, the Employer shall promptly furnish to the Trustees any data requested that pertains to such alleged discrepancy.

12.12  Qualification.  The Trust shall be tax-exempt under section 501(c)(9) of the Internal Revenue Code.  The Trustees are authorized to take all actions consistent with this Trust Agreement and applicable collective bargaining agreements to do whatever is necessary to enable the Plan to make whatever applications are necessary with the Internal Revenue Service to receive and maintain a favorable determination from the Internal Revenue Service respecting the tax-qualified status of the Plan and tax-exempt status of the Trust.

12.13  Construction.  This Agreement is created and accepted in the State of Illinois.  All questions pertaining to its validity or construction not otherwise preempted by federal law shall be determined in accordance with the laws of the State of Illinois.  If any provision contained in this Agreement or in any collective bargaining agreement pursuant to which this Agreement is created should be held unlawful, such provision shall be of no force and effect and this Agreement or any such collective bargaining agreement shall be treated as if such provision had not been contained therein.

12.14  Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement.

IN WITNESS WHEREOF, the undersigned, as the duly appointed Trustees of the Chicago Regional Council of Carpenters Welfare Fund, do hereby accept the trust created hereunder and agree to perform the duties, responsibilities and obligations under this Agreement as of the day, month and year first above written. Further, the undersigned Trustees do hereby adopt the Chicago Regional Council of Carpenters Welfare Fund Trust Agreement in the form of this Agreement and agree to be bound by the terms of this Agreement.

<u>Employer Trustees</u>                    <u>Council Trustees</u>

Date  11/30/2016                    Date  11-30-2016

Date  11.30.2016                    Date  11/30/16

Date  11/30/2016                    Date  11-30-2016

Date  11/30/2016                    Date  11/30/2016

Date _____                    Date  11/30/2016

Date _____                    Date  1/19/17

XII-4

AMENDMENT 1
to the
AGREEMENT AND DECLARATION OF TRUST
of the
CHICAGO REGIONAL COUNCIL OF CARPENTERS
WELFARE FUND

The undersigned Trustees of the Chicago Regional Council of Carpenters Welfare Fund ("Fund") hereby verify that the following reflects action taken by a majority of the Trustees at their February 28, 2018 meeting:

WHEREAS, under Article VII of said Agreement and Declaration of Trust, the Trustees by majority vote have the power and authority to amend such Agreement and Declaration of Trust from time to time as therein provided;

WHEREAS, the Builders Association of Chicago ("BAC") is now known as the Chicagoland Association of General Contractors ("CAGC"), effective January 1, 2018;

WHEREAS, the Fox Valley Associated General Contractors Association ("FVAGC") merged into the BAC (now known as the CAGC), effective January 1, 2018;

WHEREAS, it is determined to be desirable to amend said Agreement and Declaration of Trust to reflect the change in name of the BAC to the CAGC; and

WHEREAS, it is determined to be desirable to amend said Agreement and Declaration of Trust to reflect the change in composition of the Board of Trustees as a result of the merger of the FVAGC into the CAGC.

NOW, THEREFORE, BE IT RESOLVED: Effective January 1, 2018, that the Agreement and Declaration of Trust be amended by the restatement of section 1.2, Associations, in its entirety, to read as follows:

    1.2    Associations. The Chicagoland Association of General Contractors and the Residential Construction Employers Council.

FURTHER RESOLVED: Effective January 1, 2018, that the Agreement and Declaration of Trust be amended by the restatement of section 1.3, BAC, in its entirety, to read as follows:

    1.3    CAGC. Chicagoland Association of General Contractors, successor to the Builders Association of Chicago and the Fox Valley Associated General Contractors Association effective January 1, 2018.

FURTHER RESOLVED: Effective January 1, 2018, that the Agreement and Declaration of Trust be amended by the deletion of section 1.7, FVAGC. Sections 1.8 through 1.14, and cross-references to same, shall be re-numbered accordingly.

FURTHER RESOLVED: Effective January 1, 2018, that the Agreement and Declaration of Trust be amended by the restatement of section 4.1, <u>Number of Trustees</u>, to read as follows:

4.1    <u>Number of Trustees</u>. There shall be twelve regular Trustees, six of whom shall be representatives of the Employers (the "Employer Trustees") and six of whom shall be representatives of the Council (the "Council Trustees"). In addition to the regular Trustees, the Associations and the Council may designate such number of alternate Employer or alternate Council Trustees respectively, as the CAGC, RCEC and the Council may deem advisable provided that the CAGC, RCEC and the Council may not designate more alternate Trustees than the number that they are permitted to appoint as regular Trustees. An alternate Trustee shall only be authorized to act in the place and stead of a regular Trustee, appointed by the same entity that designated the alternate Trustee, who is unable to act because of death, incapacity, resignation or absence from a meeting of the Trustees, and an alternate Trustee shall have no duty or responsibility to act unless so authorized to act. As to matters presented when he/she is so authorized to act, an alternate Trustee shall be vested with all the rights, powers, duties and responsibilities of a regular Trustee. Any regular Trustee who is unable to act shall not be responsible for any acts taken by or omitted to be taken by an alternate Trustee in his/her place and stead. Such a regular Trustee who is unable to act shall be treated as if he/she has resigned in connection with any action taken or omitted to be taken by an alternate Trustee.

FURTHER RESOLVED: Effective January 1, 2018, that the Agreement and Declaration of Trust be amended by the restatement of section 4.6, <u>Appointment and Removal of Trustees</u>, to read as follows:

4.6    <u>Appointment and Removal of Trustees</u>. The CAGC may appoint four Employer Trustees, the RCEC may appoint two Employer Trustees and the Council may appoint six Council Trustees pursuant to the terms of its governing bylaws. Those Employer Trustees appointed by the CAGC may be removed by the CAGC and those Employer Trustees appointed by the RCEC may be removed by the RCEC.. Any Council Trustee may be removed from office at any time by the Council pursuant to the terms of its governing bylaws. Any notice of removal of a regular Trustee, in order to be effective, shall be delivered to the remaining regular Trustees, shall specify the date the removal shall take effect and name the Trustee removed, and shall be signed by a duly authorized representative of the respective Association or the Council.

An alternate Employer Trustee or Council Trustee may be removed at any time in the same manner as a regular Trustee.

FURTHER RESOLVED: Effective January 1, 2018, that the Agreement and Declaration of Trust be amended by the restatement of section 4.7, Selection of Successor Trustees, to read as follows:

4.7    Selection of Successor Trustees. If any Trustee shall become disqualified to serve, die, resign, be removed, become incapacitated or refuse to act, a successor Trustee shall be appointed forthwith by written instrument signed by those authorized to appoint the successor.

The CAGC shall appoint the successor Employer Trustee (or alternate Employer Trustee) for an Employer Trustee (or alternate Employer Trustee) that it appointed and the RCEC shall appoint the successor Employer Trustee (or alternate Employer Trustee) for an Employer Trustee (or alternate Employer Trustee) that it appointed.

Council Trustees (or alternate Council Trustees) shall be appointed by the Council pursuant to the terms of its governing bylaws.

Any written instrument appointing a successor Employer or Council Trustee (or alternate) shall state the date appointment shall take effect and shall be delivered to the Chairman and Secretary of the Trustees.

If a successor Trustee shall fail to be appointed within 90 days after the position becomes vacant, then any remaining Trustee may petition the United States District Court for the district in which the principal office of the Plan is located, to appoint a successor Trustee, which appointment shall be as fully effective as if made by the party originally entitled to appoint such Trustee and shall be considered to have been made on behalf of such party.

FURTHER RESOLVED: Effective January 1, 2018, that the Agreement and Declaration of Trust be amended by the restatement of section 5.4, Quorum, to read as follows:

5.4    Quorum. A quorum for the transaction of business at a duly called meeting shall consist of two Council Trustees and two Employer Trustees who are present in person (or electronically pursuant to Section 5.3), provided that at least one Employer Trustee appointed by the CAGC and one Employer Trustee appointed by RCEC are present. Once a quorum has been

established, said quorum shall continue to exist until the meeting has been adjourned provided at least one Council Trustee, one Employer Trustee appointed by the CAGC and one Employer Trustee appointed by the RCEC remain in attendance.

FURTHER RESOLVED: Effective January 1, 2018, that the Agreement and Declaration of Trust be amended by the restatement of section 5.5, Voting, to read as follows:

5.5　　Voting. Except as otherwise specifically provided for herein, all actions by and decisions of the Trustees shall be by the vote of a majority of votes cast by Trustees who are in attendance at a duly called meeting of the Trustees at which there is a quorum present. Each Trustee shall have one vote; provided, however, that: (a) at any meeting at which there is a lesser number of Employer Trustees than Council Trustees present, the Employer Trustees shall in the aggregate have that number of votes which equals the number of Council Trustees present and vice versa and (b) Employer Trustee votes shall be divided among the CAGC appointed and RCEC appointed Employer Trustees proportionate to the number of Employer Trustees that the CAGC and RCEC are entitled to appoint relative to the total number of Employer Trustees regardless of the number of CAGC appointed or RCEC appointed Employer Trustees that are present at a meeting (as of January 1, 2018, the CAGC is authorized to appoint four of the six Employer Trustees and the RCEC is authorized to appoint two; as a result, the CAGC appointed Trustees would possess 67% of the Employer Trustee votes and the RCEC appointed Trustees would possess 33% of the Employer Trustee votes). The foregoing to the contrary notwithstanding, the unanimous written consent of the Trustees shall be required for any action pursuant to section 5.3(a).

Employer Trustee　　　　　　　　　　　Union Trustee

AMENDMENT 2
to the
AGREEMENT AND DECLARATION OF TRUST
of the
CHICAGO REGIONAL COUNCIL OF CARPENTERS
WELFARE FUND

The undersigned Trustees of the Chicago Regional Council of Carpenters Welfare Fund ("Fund") hereby verify that the following reflects action taken by a majority of the Trustees at their November 28, 2018 meeting:

WHEREAS, under Article VII of said Agreement and Declaration of Trust, the Trustees by majority vote have the power and authority to amend such Agreement and Declaration of Trust from time to time as therein provided;

WHEREAS, the Trustees desire to amend said Agreement and Declaration of Trust to clarify that an entity will cease to qualify as an "Employer" immediately upon removal of the Council or a Local Union as the recognized bargaining unit representative notwithstanding continuation of the Collective Bargaining Agreement;

NOW, THEREFORE, BE IT RESOLVED: Effective November 28, 2018, that the Agreement and Declaration of Trust be amended by the restatement of section 1.6, Employer, in its entirety, to read as follows:

      1.6     Employer. Any employer which:

    (a)    on or after the effective date of this Plan has a collective bargaining or other written agreement with the Council or the Trustees requiring periodic contributions to be made to the Plan;

    (b)    signs a copy of this Agreement, any predecessor agreement or a Participation Agreement;

    (c)    is accepted for participation in the Plan by the Trustees or was a party to any predecessor trust agreement; and

    (d)    makes contributions to the Plan as required by the agreement providing for such contributions.

An Employer contributing pursuant to a Collective Bargaining Agreement shall cease to qualify as an Employer on the date the NLRB certifies the result of an election that terminates the Council's or Local Union's representative status, the date that the Employer lawfully withdraws recognition from the Council or Local Union, or the date on which the Council's or Local Union's representative status terminates through a valid disclaimer of interest. The term "Employer" may also include the Council and any affiliate of the Council, and any state, national or international labor organization of which the Council is an affiliate, the Plan, or any other jointly-administered pension, health and welfare or other type of employee benefit plan to which the Council or any Employer participating in the Plan is a party, if such organization

1

becomes obligated pursuant to a Participation Agreement with the Trustees to contribute to the Plan on behalf of its employees on substantially the same basis upon which other participating Employers are contributing to the Plan, is accepted for participation in the Plan by the Trustees and makes contributions to the Plan as required by the Participation Agreement.  The Plan, the Council or any other employee benefit plan becoming an Employer pursuant to the provisions of this paragraph shall not in any event participate in the selection or replacement of Employer Trustees or have any vote as an Employer on any matter and its Employees shall not be considered in connection with any determination required to be made by Employers of a stated percentage or majority of Employees.


_____          _____
Employer Trustee                                        Union Trustee

2

24 CV 6428

EXHIBIT C

CHICAGO DISTRICT COUNCIL OF CARPENTERS
APPRENTICE AND TRAINEE PROGRAM
TRUST AGREEMENT

THIS AGREEMENT made and entered into the 1st day of June,

1965 and as amended and restated through August 20, 1974, in the

City of Chicago, County of Cook and State of Illinois by and

between CHICAGO DISTRICT COUNCIL OF THE UNITED BROTHERHOOD OF

CARPENTERS AND JOINERS OF AMERICA, hereinafter called the

"Council", representing the members and Local Unions affiliated

therewith, the BUILDERS ASSOCIATION OF CHICAGO, hereinafter called

the "Association", representing its members, together with the

individual Trustees composing the Board of Trustees, hereinafter

referred to as "the Trustees", selected as hereinafter described,

who have affixed their respective signatures hereto, accepting

the Trust obligations herein declared;

WITNESSETH:

WHEREAS, the Council and the Association have heretofore

entered into a collective bargaining agreement requiring contri-

butions by employers for the purpose of financing the creation

and maintenance of an Apprentice and Trainee Program for the

benefit of persons desiring to become carpenters; and

WHEREAS, there was an agreement creating a Trust made and

entered into on the 1st day of June, 1965, in the City of Chicago,

County of Cook, State of Illinois, by and between the CHICAGO
DISTRICT COUNCIL OF THE UNITED BROTHERHOOD OF CARPENTERS AND
JOINERS OF AMERICA, herein called the "Council", representing
the local unions affiliated therewith and their individual
members; the BUILDERS' ASSOCIATION OF CHICAGO, herein called the
"Association", representing its members, and TED KENNEY, CHARLES
A. TOMPSON, RICHARD PEPPER and DONALD FETTERS, herein called the
"Trustees"; and

WHEREAS, the original agreement has been amended from time to
time; and

WHEREAS, it is the desire of the Council, the Association and
the Trustees to amend and restate said agreement;

NOW, THEREFORE, in consideration of the premises and the
mutual promises and agreements hereinafter contained and to
effectuate the desire of the parties hereto, it is agreed as
follows:


ARTICLE I

NAME OF THE TRUST

The Trust hereby created shall be known as the CHICAGO
DISTRICT COUNCIL OF CARPENTERS APPRENTICE AND TRAINEE PROGRAM
and the business and affairs of the Trust shall be conducted in
that name.

## ARTICLE II

## DEFINITIONS

Section 1. The term "APPRENTICE" shall mean any person accepted for training as a carpenter under the Rules and Regulations adopted and promulgated by the trustees, pursuant to the power and authority given them by this instrument.

Section 2. The term "CARPENTER" shall mean any employee engaged in doing work of the character falling within the jurisdiction of affiliates of the Council and represented for collective bargaining purposes by any such affiliate.

Section 3. The term "COLLECTIVE BARGAINING AGREEMENT" shall mean the agreement entered into between an Association and the Council regarding the terms and conditions of employment of carpenters and any amendments, renewals, or modifications or extentions thereof and any similar agreement made between the Council and any Employer not a member of the Association.

Section 4. The term "EMPLOYER" shall mean:

(a) All members of any association of employers with whom the Council is signatory to a Collective Bargaining Agreement; and

(b) Any person, firm or corporation employing carpenters, who or which, as the case may be, become a party to this agreement by signing a written agreement to be bound by the terms

- 3 -

and conditions hereof and all amendments hereto, and all rules and regulations adopted hereunder; and

(c)  Any person, firm or corporation employing carpenters, who or which, as the case may be, enters into any collective bargaining agreement with any local union affiliated with the Council, providing for contributions to the fund hereby created, provided no person, firm or corporation who does not employ carpenters within the geographic area shall become a party hereto, except as herein specifically otherwise permitted.

Section 5.  The term "EMPLOYER CONTRIBUTIONS" shall mean payments due from, or made by employers to the trust hereby created, pursuant to the provisions of this agreement, or any collective bargaining agreement between the Council and any Association, or any Employer who becomes a party hereto.

Section 6.  The term "EMPLOYEE" shall mean and include:

(a)  Any carpenter who is employed by an employer as defined herein; and

(b)  Superintendent and other management personnel for whom contributions to the Training Fund were made heretofore when such individuals were employed as journeymen carpenters and for whom contributions are currently paid by their employer to the Health and Welfare and Pension Funds.

Section 7.  The term "GEOGRAPHIC AREA" shall mean the area included with the geographic limits of the Council's jurisdiction.

- 4 -

Section 8. The term "HOURS OF WORK DONE", by this agreement shall have the same meaning as is given to this phrase in the collective bargaining agreement covering the employee for whom contribution is being computed.

Section 9. The term "TRUST AGREEMENT" shall mean this instrument, together with any and all amendments to, or modifications of it, adopted in accordance with the provisions hereof.

Section 10. The terms "TRUSTEE" and "TRUSTEES", as used herein, shall mean a Trustee or Trustees herein designated, together with such trustee's successor or such trustees' successors, designated in the manner hereinafter provided. The term "EMPLOYER TRUSTEE" shall mean any trustee selected by the Association, or by the RESIDENTIAL CONSTRUCTION EMPLOYERS COUNCIL. The term "COUNCIL TRUSTEE" shall mean a trustee selected by the Council, as well as the President of the Council serving as a Trustee by virtue of his office.

Section 11. The terms "TRUST FUND", "TRUST ESTATE", or "FUND" shall mean all assets of any and every kind and nature, constituting property of the trustees in their trust capacity and subject to administration by them hereunder, including all employer contributions made or due to the trustees; all income from the investment of funds belonging to the trust and any and all property, of every kind and nature, received from any

source whatever and held by the trustees for the uses and pur-
poses in this agreement set forth.

Section 12.  The term "UNION" shall mean any local union
affiliated with the Council.

Section 13.  The term "TRAINEE" shall mean any person accepted
for training in the specialty branches of the Trade under the
Rules and Regulations adopted and promulgated by the Trustees,
pursuant to the power and authority given them by this instrument.

## ARTICLE III

### THE PURPOSE OF THE TRUST

The trust hereby created and fund constituting the subject
matter thereof shall be used solely and exclusively for providing
Training, under the rules and regulations promulgated by the
trustees; payment to such persons for the period of their training,
on the basis or in the manner prescribed by said rules and regula-
tions, and the expenses necessarily incident to the creation,
maintenance and administration of the trust and the fund.

## ARTICLE IV

### CONTRIBUTIONS TO THE FUND

Section 1.

(a)  Each Employer shall pay to the trustees an amount as
set forth in the applicable Collective Bargaining Agreement for

-6-

each hour of work done within or without the Geographic Area for
any Employer party hereto by any Employee on whose behalf the
Council acts as collective bargaining agent.

(b)  In the case of work done outside of the Geographic
Area where another apprentice program is operative, no Employer
shall be required to make duplicate, simultaneous contributions
for the same man-hours.  If any Employer is required to make
payments to another Apprentice program for work done outside the
Geographic Area, such payment shall relieve said Employer from
making contribution to the trust hereby created for the same
man-hours.  The primary duty of employers shall be to make payment
to the trust hereby created for work performed within the Geographic
Area.  It shall be the responsibility of the trustees, if possible,
to make appropriate reciprocal agreements with the trustees of
other Apprentice programs, to obviate duplication of payment and
to insure contributions to the trust hereby created, in accordance
with the intention of the parties, as stated herein.

(c)  Contributions shall be made to the trustees monthly,
on or before the date determined by the trustees, after reason-
able notice has been given by the trustees to each Employer as
to the periodic payment date selected by them.  Each monthly
contribution shall be computed, as to employees defined in
Article II 6(a) hereof, on the basis of hours of work performed
during the preceding month and as to employees defined in Article

- 7 -

II 6(b) hereof, on the basis of 40 hours per week of employment, holidays and vacations of not to exceed two weeks annually excepted.

Section 2. Subject to any provisions to the contrary in any applicable collective bargaining agreement, no employer shall be responsible for the contributions or other obligations imposed hereby on any other employer. No Association shall be responsible for the contributions or other obligations imposed on its respective individual employer members imposed hereby or by any collective bargaining agreement.

Section 3. The Trustees herein designated and their successors in trust appointed, as herein provided, are hereby designated as the persons to collect, receive and receipt for Employer contributions. The trustees are hereby vested with all rights, title and interest in and to all money arising from Employers' contributions due and unpaid at any time, and all such money and rights to receive contributions shall be held by them in trust for the purposes and on the conditions herein set forth.

Section 4. The Trustees may, by resolution, impose liquidated damages for failure to make prompt payment of contributions to cover the costs of accounting, auditing, collecting, legal fees and loss of investment income and may require security deposits or surety bonds to insure payment of contributions, as herein more specifically provided.

Section 5. Every Employer shall, at the time of making contribution, furnish the trustees with a report in such form as they may prescribe, showing the manner in which such contribution is computed.

## ARTICLE V

### PURPOSE FOR WHICH TRUST IS TO BE CREATED

The Trustees shall use and apply the Trust Estate for the following purposes, and no others:

To pay, or provide for the payment of, all reasonable and necessary expenses incurred in the establishment and creation of the trust, collecting Employer contributions and administering the assets and afairs of the trust, including, but not limited to, employment of such administrative, legal, accounting, invest-ment, actuarial, expert or technical personnel, as may be reason-ably required to establish, administer and maintain a well-rounded program of Training, and to defray the reasonable and necessary expense of leasing or purchasing such space, material, equipment and supplies as the trustees, in their discretion find necessary, expedient or appropriate to the proper performance of their duties and the efficient, sound administration of the Program for which the trust hereby created was established and providing for the reasonable compensation of persons being trained under the Program contemplated hereby.

ARTICLE VI

GENERAL POWERS AND DUTIES OF THE TRUSTEES

The Trustees shall have and are hereby given the following powers and duties:

Section 1.  The complete right, title, control and supervision of the Trust Estate, subject only to the limitations imposed on them hereby or by any applicable law.

Section 2.  Power to demand, collect, receive, receipt for and hold all Employers' contributions, money, property, of every kind, right in action and interests of any kind, belonging or due to the Trust Estate and the power to take any and every appropriate action by legal proceeding, or otherwise, necessary to exercise and enforce the power vested in them.

Section 3.  Any Trustee or any authorized representative of the trustees shall have the right, at all reasonable times during business hours, to enter upon the premises of any Employer and to examine and copy such books, records, papers and reports of the Employer as may be necessary to determine the number of employees, the hours of work performed, the place of performance and that the employer is complying with the rules and regulations promulgated by the trustees governing the use of apprentices and/or trainees in training under the Program being administered by the trustees and any other information necessary to enable the trustees to perform their duties in accordance with the provisions of this agreement.

- 10 -

Each Employer shall make these books, records, papers
and reports available to any Trustee or any authorized repre-
sentative of the trustees for such purposes.  In the event
that the trustees utilize legal counsel to aid them in securing
compliance by any Employer with the provisions of this Section,
such Employer shall be liable for all costs incurred, including,
but not limited to, reasonable attorneys' fees, even though no
legal actions are actually initiated, and court costs.

In the event the audit discloses that any Employer during
the period of the audit, has underpaid its contributions the
Employer shall be liable for the costs of the examination.  The
Trustees shall have the authority, however, to waive all or
part of such costs for good cause shown.

Section 4.  It is recognized and acknowledged by all
parties, including the participating employers, that the regular
and prompt payment of contributions is essential to the main-
tenance of an employee benefit plan and that it would be extremely
difficult, if not impracticable, to fix the actual expense and
damage to the plan which would result from the failure of an individ-
ual employer to pay the required contributions within the time
provided.  Therefore, if any individual employer shall fail to
pay the required contribution by the due date, such employer
shall be liable, in addition, for liquidated damages (of $25.00
for each delinquency or liquidated damages) in the amount of 1 1/2%

- 11 -

per month on the whole amount of contributions remaining from time to time unpaid (whichever is greater.)

In the event the Trustees place the account in the hands of legal counsel for collection, the delinquent employer shall be liable for reasonable attorney's fees, and for all reasonable costs incurred in the collection process, including but not limited to, Court fees and audit fees.  The Trustees shall have the authority, however, to waive all or part of the liquidated damages, interest, attorneys' fees, or collection costs, for good cause shown.

Section 5.  Power to require any Employer as a condition to becoming a party to this agreement, to deposit with the trustees, at the time of election to become a party hereto, as a guarantee of prompt payment of contributions due from such an Employer, an amount equal to three times the monthly contribution of such Employer, as estimated by the Trustees, or to furnish the Trustees with a surety bond for not less than such amount, which bond shall be in addition to any other bond required under the provisions of any collective bargaining agreement between such Employer and the Council.  The Trustees may require that the guarantee fund or surety bond be continuously maintained by such Employer as a condition to continued participation herein.

Section 6.    Power to invest and reinvest such funds as in their sole judgment are not required to defray the current expenses of the trust, in such securities as are legal for the investment of trust funds in the State of Illinois.

Section 7.    Power to provide for the disbursement of funds by any depository by check, draft, voucher, or other form of withdrawal, signed by any two Trustees, providing one is an Employer Trustee and the other a Council Trustee.

Section 8.    Power to establish, by transfer, from the general trust fund, and in no other way, special accounts of limited amount out of which expenses of operation of the trust may be disbursed, on the signature of any individual authorized so to do, by resolution of the Trustees.    Any depository permitting withdrawals from any such special account in reliance on resolution of the Trustees, authorizing withdrawals by an individual shall be as fully protected as though such withdrawal was made by all Trustees.

Section 9.    Power to sell, exchange, lease, convey, or otherwise dispose of any property, real or personal, at any time forming part of the Trust Estate, upon such terms and conditions as they deem proper and to execute and deliver any and all documents required, in connection therewith.

Section 10.  Power to exercise options, conversion privileges, or right to subscribe for additional securities and to make payments therefor.

Section 11.  Power to consent to, or to participate in, dissolutions, reorganizations, consolidations, mergers, sales, leases, mortgages, transfer, or other changes affecting investments held by them and, in connection therewith, to pay any assessment, subscription or other charges.

Section 12.  Power to enter into any and all contracts and agreements in their opinion necessary or desirable, to carry out the purposes of the trust.

Section 13.  Power to compromise, settle, arbitrate and release claims or demands in favor of or against the trust estate, on such terms and conditions as they deem advisable.

Section 14.  Power to keep property or securities registered in the names of the trustees, or any nominee selected by them, and to place any property or securities in the custody of any bank or trust company for safekeeping.

Section 15.  Power to borrow money in such amount and upon such terms, conditions and security as they deem advisable or necessary in carrying out the purposes of the trust and to mortgage or pledge any property of the trust to secure repayment of any such loans.

Section 16. Power to pay any taxes for which the trust estate or the trustees, in their capacity as trustees, are liable.

Section 17. The duty to keep true and accurate books of accounts and records of all their transactions, meetings and actions of the trustees. They shall procure an audit of the books of the trust by a Certified Public Accountant not less frequently than once each year and a copy of each such audit shall be furnished each trustee, the Association, the R.C.E.C. and the Council, and a copy of such audit shall be kept available for inspection by any interested person during business hours at the office of the trustees.

Section 18. In general, the trustees shall have the power to do any and every act which may be reasonably necessary to accomplish the purposes for which the trust is created, whether or not such action is expressly authorized hereby.

Section 19. Authority to reimburse themselves for all reasonable and necessary expenses incurred by them, in the performance of their duties.

Section 20. Power to formulate and promulgate an Apprentice and Trainee Program and any and all rules and regulations which they deem necessary or desirable to facilitate the proper administration of such program and the accomplishment of its purposes, so long as such rules and regulations are not inconsistent with the provisions of this instrument and are not contrary to law. Such rules and regulations shall set forth the

terms, conditions and manner in which persons seeking to be trained as carpenters may become apprentices or trainees and shall specify the terms and conditions under which such persons shall be trained and employed, and the physical, mental and moral standards which must be met by apprentices and trainees. Such rules and regulations shall specifically provide that there shall be no discrimination between applicants for training, based upon race, color, creed, sex, national origin or any qualification other than mental, physical and educational ability, to adhere to and profit by the standards of training established by the trustees.

Section 21. Power to construe the provisions of this instrument and any amendment of it, as well as the rules and regulations formulated by them and any amendments thereof. The construction adopted by the trustees acting in good faith shall be binding upon the Council, the Association, the Union, all Employers, all Employees and all persons accepted for training under the plan.

Section 22. No trustee shall be personally liable for the payment, performance or discharge of any obligation, debt, contract, or liability of the trust. All contracts, debts, obligations and liabilities contracted or incurred by the trustees, in the proper discharge of their duties, shall be

paid and discharged out of the trust estate. Each trustee is hereby given a first lien on all assets of the trust estate, to indemnify him for any amounts paid or incurred in the performance of his duties. Nothing in this instrument shall exempt any trustee from liability arising by reason of his willful misfeasance, nonfeasance, or malfeasance in office, or his gross negligence in the discharge of his duties, nor shall any trustee be entitled to be indemnified by the trust estate from any liability arising from such causes.

Section 23. No trustee shall be liable for any error of judgment or loss sustained by the trust estate, as a result of any act or failure to act, in the execution of the trust, including losses resulting from investments, so long as the trustee acted or refrained from acting in good faith, nor shall any trustee be personally liable in the absence on his part of willful malfeasance, nonfeasance, misfeasance or gross negligence for the acts or omissions of any other trustee, or any person employed by the trustees, selected by the trustees, in good faith and exercising reasonable business judgment.

Section 24. Each trustee may rely on, and shall be fully protected in acting, on any instrument in writing which such trustee reasonably believes to be genuine and transmitted, executed or delivered by the person or persons purporting to have transmitted, executed or delivered the same. Each trustee may

- 17 -

rely on and shall be fully protected in acting on the advice of legal counsel or any other professional advisor selected by the trustees, in good faith. No trustee shall be obligated to make independent inquiry as to the truth, accuracy or correctness of any facts contained in such an instrument, or the validity of any such advice.

Section 25. Each successor trustee appointed in accordance with the provisions of this instrument, upon accepting in writing the terms hereof, shall be vested with all the rights, powers and duties of his predecessor and be entitled to the same protection and exemptions from liability as his predecessor.

ARTICLE VII

OBLIGATIONS OF EMPLOYERS AND OTHERS
DEALING WITH THE TRUSTEES

Section 1. No person dealing with the trustees shall be (1) obliged to see to the application of any money or property paid or delivered to the trustees; (2) to see the terms of this instrument are complied with, or (3) privileged to inquire into the necessity or expedience of any act of the trustees.

Section 2. Every instrument executed by the trustees, or executed by another in accordance with authority granted by the trustees shall be conclusive evidence, in favor of each person

relying thereon that (1) at the time of delivery of the instrument this agreement was in full force and effect; (2) the instrument was executed in accordance with the terms and conditions hereof and (3) the trustees were duly authorized and empowered to execute or cause the instrument to be executed.

Section 3. The receipt of the trustees for any money or property due the trust estate and received by the trustees shall operate as a complete discharge of the person or persons paying, conveying or delivering such money or property.

Section 4. Each Employer shall, when so required by the trustees, furnish such information and reports as the trustees may deem necessary to the proper performance of their duties.

Section 5. Each Employer shall annually furnish to the trustees a statement showing whether such Employer is (1) a corporation; (2) a partnership; (3) a sole proprietorship and (1) if it is a corporation, the names of all its officers; (2) if it is a partnership, the names of all partners; (3) if it is a sole proprietorship operating under an assumed or trade name, the true name of the sole proprietor. Such statement shall also designate the address to which the trustees shall direct any notices and at which the records relating to employer contributions are kept, and the name of the employee, officer or partner in charge of such records.

Section 6. Each employer shall be obligated to pay contributions as provided herein, or in any collective bargaining agreement providing for contributions to the trust estate.

Section 7. Failure of any Employer, after reasonable notice by the trustees so to do, to furnish reports, pay contributions or comply with the rules and regulations formulated and promulgated by the trustees, may be considered a violation of the terms and conditions of the collective bargaining agreement under which such Employer's employees are working.

ARTICLE VIII

SELECTION, REMOVAL, VOTING
AND COMPENSATION OF TRUSTEES

Section 1. The original Board of Trustees shall consist of TED KENNEY and CHARLES A. THOMPSON as Council Trustees, and RICHARD PEPPER and DONALD FETTERS as Association Trustees. Commencing August 20, 1974, the Board of Trustees shall consist of eight (8) persons, four (4) of whom shall be Council Trustees, the President of the CHICAGO DISTRICT COUNCIL OF THE UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA shall be a Trustee by virtue of his office and the Council will select three (3) other Trustees; and four (4) of whom shall be Employer Trustees, three (3) Trustees shall be selected by the BUILDERS' ASSOCIATION OF CHICAGO and one (1) Trustee shall be selected by the RESIDENTIAL CONSTRUCTION EMPLOYERS COUNCIL.

- 20 -

Section 2. The Board of Trustees may select a person to act as impartial trustee. The impartial trustee shall become party to this agreement by executing the same before engaging in the performance of his duties as trustee. The impartial trustee shall not be directly affiliated with the building industry or be a member of any union. The remaining trustees shall determine his term of office at the time of selection and he shall hold office until his successor shall have been duly selected and have accepted the office by executing this agreement. The impartial trustee may attend meetings of the trustees, but shall vote only in case of deadlock between Employer and Council trustees. The impartial trustee shall be obligated to attend meetings only when requested so to do by the Board of Trustees and shall have no responsibility for routine administration of the trust. If it becomes necessary, due to a deadlock, to appoint an impartial trustee and the trustees are unable to agree on an impartial trustee, or if the impartial trustee selected is for any reason unable to act when requested so to do, the trustees shall appoint a neutral person to act in his place and stead. If the trustees fail to appoint such neutral person within a reasonable time, then, on petition of the Council Trustees, the Employer Trustees, or both, the Senior Judge of the United States District Court for the Northern District of Illinois, Eastern Division, shall appoint an impartial umpire to break

- 21 -

the deadlock, as provided by law.

Section 3.  No regular member of the Board of Trustees shall receive any compensation whatever for services rendered hereunder.  When the impartial trustee actually attends any meeting at the request of the Board of Trustees, he shall be paid such reasonable per diem compensation as the Board of Trustees shall determine.

Section 4.  The term of each trustee shall be three (3) years and until a successor has been duly designated.

Section 5.  The trustees shall select a Chairman, and Secretary-Treasurer.  Each shall serve for one year and until their successors are duly selected and qualified.

Section 6.  A quorum of the Trustees shall consist of four (4) trustees, provided two (2) are Employer Trustees and two (2) are Council Trustees.

If a Trustee who is absent elects to vote by absentee ballot, as provided, such Trustee may be counted as present, for the purpose of determining the existence of a quorum.

Section 7.  It is the intention of the parties that the trust estate shall at all times be administered by an equal number of Employer and Council Trustees.  Whenever a vacancy exists, or a trustee is absent from a meeting and not voting by absentee ballot, if the vacancy or absence results from lack of a Council Trustee, an Employer Trustee shall be disqualified

- 22 -

from voting until the vacancy or absence terminates.  If the
vacancy or absence results from an Employer Trustee, a Council
Trustee shall be disqualified from voting, until the vacancy or
absence terminates.

Section 8.  No vacancy or vacancies in the Board of
Trustees shall impair the power of the remaining trustees
acting in accordance with the agreement to administer the affairs
of the trust, in spite of such vacancy or vacancies.

Section 9.  Any Council Trustee, except that Council
Trustee serving by virtue of his office as President of the
Council, may be removed at any time by the Council.  Any
Association Trustee may be removed at any time by the
Assoication.  Any RCEC Trustee may be removed at any time
by RCEC.  Removal shall be accomplished by the filing with
the remaining Trustees of a certificate in writing to such
effect, signed by the President or Vice-President of the
Council, Association or RCEC.

Section 10.  A trustee may resign and be fully discharged
from all further duties and responsibility hereunder by giving
ten days notice in writing, of a desire so to do, to the other
trustees.  The trustees may waive such ten day notice in any in-
stance where they deem such waiver desirable.  The notice, when
given, shall designate the date upon which the resignation is to
become effective and the resignation shall become effective on the
date specified.

Section 11.  If any trustee dies, resigns, becomes incapable of acting or is removed, a successor trustee shall be selected by the body which designated the predecessor trustee.  Such selection shall become effective as soon as the selecting body files with the remaining trustees a certificate signed by the President or Vice-President of the selecting organization, designating the successor trustee selected.

Section 12.  Meetings of the trustees shall be held at such time and place as the trustees determine.  The Chairman, Secretary-Treasurer, or any two trustees may call a meeting of the trustees at any time by giving at least five days written notice of the time, place and purpose of the meeting, to each trustee.  Such notice may be delivered in person, by mail or telegram.  A meeting so called, shall be adjourned for a reasonable time, upon request of any trustee showing a justifiable cause therefor, to the other trustees.  Meetings, may be held at any time without notice, if all trustees consent.  Any action of the trustees may be taken by informal concurrence of all trustees in writing, without a meeting.  The trustees may vote in person or by written instrument signed by them or by telegram.

Section 13.  Decisions of the Board of Trustees shall be determined by a majority of the votes cast at the meeting.

- 24 -

ARTICLE IX

## RESTRICTIONS ON INTEREST OF CERTAIN
## PERSONS AND POWERS OF THE TRUSTEES

Section 1. Neither any Association, any Employer, any Employee, the Council, any union or trustee or any person claiming by, through or under any of the aforementioned shall have any right, title or interest in or to the trust estate or any part thereof, except as expressly stated in this agreement.

Section 2. The Council, an association, the Trustees, the unions, the Employers and the members of the Council and officers of any Association, and Employers shall not receive any part of the contributions, assets, or property of the trust estate, either directly or indirectly. Neither the Council, any Association, any Employer or any Union shall have any responsibility for the acts of the Trustees, or any of them. No person admitted to training under the Program shall have any individual right, title, interest or claim against any Employer, any Employer's contributions, the Council, any Association or the trust fund.

Section 3. The trustees, in addition to the duty to maintain books and records, as hereinbefore provided, shall at any time upon demand of the Council or the Association furnish such additional accounting as may be required.

- 25 -

## ARTICLE X

### FIDELITY BONDS

The trustees shall, by resolution, provide for fidelity bonds with such companies and in such amounts as they may determine for all persons, including trustees, who are authorized to receive, withdraw or otherwise deal with funds from the trust estate.

## ARTICLE XI

### APPROVAL OF TRUSTEES'ACTS

The trustees may at any time file with the Council and the Association, a statement of their accounts hereunder and request approval of the acts reflected in such account and when such accounting has been approved by the Council and the Association, such approval shall constitute a full discharge and acquittance to the trustees up to the date covered by the accounting and such approval shall be binding on all parties interested in the trust estate. Any trustee resigning may, upon reasonable request, ask for and receive a similar approval of all actions taken by the Board of Trustees, up to the date of his resignation.

## ARTICLE XII

## MISCELLANEOUS

Section 1. <u>Construction of Language</u>. The personal pronouns in this instrument shall be read and construed as singular or plural and all words of masculine gender shall be construed as feminine and all words in the singular shall be read and construed as though plural wherever such construction is necessary to give a reasonable meaning to the provisions of the instrument.

Section 2. <u>Captions not Part of Agreement</u>. The titles of the articles in this instrument are included solely for convenience and not to be construed as part of the substance of the instrument.

Section 3. <u>Illinois Law Governs</u>. This Agreement and the Apprentice and Trainee Program formulated by the Trustees hereunder and any Rules or Regulations adopted by the Trustees shall be construed in accordance with the laws of the State of Illinois.

Section 4. <u>Partial Invalidity</u>. If any provision of this Agreement is declared illegal or invalid by any court, legislative enactment or administrative rule, the invalidity of such provision shall not impair the validity of the remaining provisions.

- 27 -

ARTICLE XIII

QUALIFICATION FOR TAX EXEMPTION

The Trustees are authorized to make such applications and disclosures to the United States Treasury Department as may be necessary to secure and retain rulings that this Trust and Apprentice and Trainee Program formulated by the Trustees are qualified under the pertinent provisions of the Internal Revenue Code.


ARTICLE XIV

RESTRICTIONS ON AMENDMENT

Section 1. This Agreement may be amended at any time and from time to time by a majority vote of the trustees, except that (1) no amendment shall divert the fund or any part thereof to a purpose other than that set forth herein; (2) no amendment shall provide for an unequal number of Employer and Council Trustees; (3) no amendment shall change the method of voting as set forth herein; (4) no amendment shall contravene any collective bargaining agreement in existence at the time of adoption of the amendment between any of the parties hereto; (5) no amendment shall violate the terms and provisions of the Labor Management Relations Act of 1947, as amended, or contain any provision which would result in destroying the qualification of this trust

under the provisions of the Internal Revenue Act or result in the disallowance of contributions to the trust estate as a deduction for tax purposes on the part of the contributor; (6) no amendment shall alter the provisions of Sections 20, Article VI, or Section 1, of Article IX, of this Agreement unless such amendment is approved by all parties to this Agreement at the time such amendment is adopted, as well as by the trustees.

Section 2. No person shall have any vested right or interest in the Trust Fund or in any payment to be made out of the Trust Fund. The eligibility requirements for entering into the Apprentice and Trainee Program may be changed or altered in any way not inconsistent with the provisions of Article VI, Section 20.

## ARTICLE XV

### TERMINATION OF THE TRUST

Section 1. Termination for Lack of Collective Bargaining Agreement. The trust hereby created may be terminated when there is no longer in force any agreement between the Association and the Council, or any Employer and any Union requiring Employer contributions to the trust fund for the purposes hereinbefore set forth.

Section 2. Termination by Mutual Consent. The trust hereby created may be terminated at any time by unanimous consent of

- 29 -

all trustees and all employers and union parties hereto and the Association and Council.

Section 3. Effect of Termination. If the trust hereby created is terminated, the trustees shall apply the trust fund in payment of, or provision for the payment of, any and all obligations of the trust and they shall then distribute and apply any remainder of the trust fund in such manner as will, in their opinion, best effectuate the purposes of the trust.

Section 4. Notice of Termination. Upon termination of the trust hereby created, the trustees shall notify the Association, the Council and all other interested parties and shall continue as trustees for the purpose of winding up the affairs of the trust.

IN WITNESS WHEREOF, the Association and the Council have caused this instrument to be executed on behalf of each of them by their duly authorized officers and the trustees have also executed this instrument, all on the 12 day of _November_, 1974.

CHICAGO DISTRICT COUNCIL OF THE UNITED
BROTHERHOOD OF CARPENTERS AND JOINERS
OF AMERICA

By _____

THE BUILDERS ASSOCIATION OF CHICAGO

By _____

EMPLOYER TRUSTEES:

COUNCIL TRUSTEES:



- 30 -

24 CV 6428

EXHIBIT D

# CHICAGO REGIONAL COUNCIL OF CARPENTERS SUPPLEMENTAL RETIREMENT FUND TRUST AGREEMENT

## Effective January 1, 2017

MACRC-00108

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
# SUPPLEMENTAL RETIREMENT FUND TRUST AGREEMENT

## Table of Contents

Page

### ARTICLE I

#### Definitions

| | | |
|---|---|---|
| 1.1 | Agreement | I-1 |
| 1.2 | Associations | I-1 |
| 1.3 | Council | I-1 |
| 1.4 | Employee | I-1 |
| 1.5 | Employer | I-1 |
| 1.6 | Local Union | I-2 |
| 1.7 | MARBA | I-2 |
| 1.8 | Participant | I-2 |
| 1.9 | Participation Agreement | I-2 |
| 1.10 | Plan | I-2 |
| 1.11 | RCEC | I-2 |
| 1.12 | Trust | I-2 |
| 1.13 | Trustees | I-2 |

### ARTICLE II

#### Creation and Acceptance of Trust

### ARTICLE III

#### Purpose of and Payments To and From Plan

| | | |
|---|---|---|
| 3.1 | Purpose | III-1 |
| 3.2 | Payments To and From Plan | III-1 |

i

Page

## ARTICLE IV

### Designation of Trustees

| | | |
|---|---|---|
| 4.1 | Number of Trustees | IV-1 |
| 4.2 | Qualification of Trustees | IV-1 |
| 4.3 | Acceptance of Appointment | IV-1 |
| 4.4 | Tenure | IV-1 |
| 4.5 | Resignation of a Trustee | IV-1 |
| 4.6 | Appointment and Removal of Trustees | IV-2 |
| 4.7 | Selection of Successor Trustees | IV-2 |
| 4.8 | Power to Act in Case of Vacancy | IV-3 |

## ARTICLE V

### Organization and Operation of Trustees

| | | |
|---|---|---|
| 5.1 | Office | V-1 |
| 5.2 | Meetings | V-1 |
| 5.3 | Action by Trustees Without Meeting | V-1 |
| 5.4 | Quorum | V-2 |
| 5.5 | Voting | V-2 |
| 5.6 | Officers of Trustees | V-2 |
| 5.7 | Committees | V-3 |
| 5.8 | Arbitration | V-5 |
| 5.9 | Immunity of the Trustees | V-5 |
| 5.10 | Compensation of Individual Trustees | V-7 |
| 5.11 | Service in More Than One Fiduciary Capacity | V-7 |

## ARTICLE VI

### Control and Management of Trust

| | | |
|---|---|---|
| 6.1 | Control of Trust | VI-1 |
| 6.2 | Management of Trust | VI-1 |
| 6.3 | Trust Responsibilities | VI-2 |
| 6.4 | Trust Powers | VI-2 |

MACRC-00110

Page

## ARTICLE VII

### Operation and Administration of Plan

| | | |
|---|---|---|
| 7.1 | Authority of Trustees | VII-1 |
| 7.2 | Plan Responsibilities | VII-1 |
| 7.3 | Plan Powers | VII-2 |

## ARTICLE VIII

### Contributions and Collections

| | | |
|---|---|---|
| 8.1 | Contributions to Plan | VIII-1 |
| 8.2 | Transmission of Reports and Contributions | VIII-1 |
| 8.3 | Delinquent Contributions and Reports | VIII-2 |
| 8.4 | Amount of Contributions | VIII-2 |

## ARTICLE IX

### Controversies and Disputes

| | | |
|---|---|---|
| 9.1 | Reliance Upon Records | IX-1 |
| 9.2 | Determination by Trustees Binding | IX-1 |
| 9.3 | Compromise | IX-1 |
| 9.4 | Right to Obtain Adjudication of Disputes | IX-1 |

## ARTICLE X

### Amendments

| | | |
|---|---|---|
| 10.1 | Method of Amendment | X-1 |
| 10.2 | Limitation on Amendments | X-1 |

## ARTICLE XI

### Termination

| | | |
|---|---|---|
| 11.1 | Term of Plan | XI-1 |
| 11.2 | Procedures on Termination | XI-1 |
| 11.3 | Notification of Termination | XI-1 |

MACRC-00111

Page

11.4    Distribution Upon Termination                                      XI-1

## ARTICLE XII

### General Provisions

| | | |
|---|---|---|
| 12.1 | Title to the Trust | XII-1 |
| 12.2 | Liability of the Associations, Council and Employers | XII-1 |
| 12.3 | Nonalienation of Benefits | XII-1 |
| 12.4 | Prohibition of Diversion of Trust | XII-1 |
| 12.5 | Incompetency and Minors | XII-2 |
| 12.6 | Merger of the Plan | XII-2 |
| 12.7 | Execution of Documents | XII-2 |
| 12.8 | Notice and Delivery of Documents | XII-2 |
| 12.9 | Gender, Number and Headings | XII-2 |
| 12.10 | Information to be Furnished by Employers | XII-3 |
| 12.11 | Qualification | XII-3 |
| 12.12 | Construction | XII-3 |
| 12.13 | Counterparts | XII-3 |

MACRC-00112

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
# SUPPLEMENTAL RETIREMENT FUND TRUST AGREEMENT

### Effective January 1, 2017

### W I T N E S S E T H:

WHEREAS, the Mid-America Regional Bargaining Association and the Residential Construction Employers Council (the "Associations") and the Chicago Regional Council of Carpenters, United Brotherhood of Carpenters and Joiners of America (the "Council") entered into collective bargaining agreements to provide for a profit sharing plan for employees employed under the collective bargaining agreements; and

WHEREAS, the Council and Associations signatory hereto adopted a profit sharing plan and trust agreement to implement the profit sharing plan and to appoint the Trustees;

WHEREAS, the original trust agreement may be amended and restated from time to time; and

WHEREAS, the Trustees desire to amend and restate the trust agreement;

NOW, THEREFORE, effective as of January 1, 2017, for and in consideration of the premises and mutual covenants herein contained, it is mutually understood and agreed as follows:

MACRC-00113

ARTICLE I

Definitions

      1.1    <u>Agreement</u>.  The Trust Agreement, the agreement set forth herein, as amended from time to time.

      1.2    <u>Associations</u>.  The Association members of the Mid-America Regional Bargaining Association, the Residential Construction Employers Council and any other employer association that has entered into a written agreement with the Council requiring contributions to the Plan.

      1.3    <u>Council</u>.  The Chicago Regional Council of Carpenters, United Brotherhood of Carpenters and Joiners of America, formerly known as the "Chicago and Northeast Illinois District Council of the United Brotherhood of Carpenters and Joiners of America."

      1.4    <u>Employee</u>.  Any employee of an Employer on whose behalf an Employer is required to contribute to the Plan pursuant to a collective bargaining or other written agreement with the Council or with the Trustees but not including any person who is prohibited by law from being covered under the Plan or whose inclusion would cause the Plan to lose its tax exempt status.

      1.5    <u>Employer</u>.  Any employer which:

      (a)    on or after the effective date of the Plan has a collective bargaining or other written agreement with the Council, either directly or as a member of an Association, or the Trustees requiring the employer to make contributions to the Plan;

      (b)    signs a copy of this Agreement, any predecessor agreement or a Participation Agreement;

      (c)    is accepted for participation in the Plan by the Trustees or was a party to any predecessor trust agreement; and

      (d)    makes contributions to the Plan as required by the agreement providing for such contributions.

      The term "Employer" may also include the Council and any affiliate of the Council, and any state, national or international labor organization of which the Council is an affiliate; the Plan, or any other jointly-administered pension, health and welfare or other type of employee benefit plan to which the Council is a party; if such organizations become obligated pursuant to a Participation Agreement with the Trustees to contribute to the Plan on behalf of its employees on substantially the same basis upon which other participating Employers are contributing to the Plan, is accepted for

MACRC-00114

participation in the Plan by the Trustees and makes contributions to the Plan as required by the Participation Agreement. The Plan, the Council or any other employee benefit plan becoming an Employer pursuant to the provisions of this paragraph shall not in any event participate in the selection or replacement of Employer Trustees or have any vote as an Employer on any matter and its Employees shall not be considered in connection with any determination required to be made by Employers of a stated percentage or majority of Employees.

      1.6   <u>Local Union</u>. Any local union affiliated with the Council.

      1.7   <u>MARBA</u>. The Mid-America Regional Bargaining Association (and its constituent associations) or its successor by consolidation or merger, which represents Employers in collective bargaining negotiations with the Council.

      1.8   <u>Participant</u>. Any Employee or former Employee who is eligible to participate in the Plan.

      1.9   <u>Participation Agreement</u>. An agreement in form and content acceptable to the Trustees which evidences the commitment of the signatory thereto to be bound by the adoption of the Plan and the Agreement, and to become an Employer obligated to contribute to the Plan on behalf of certain employees of the Employer whether or not subject to the terms of a collective bargaining agreement.

      1.10   <u>Plan</u>. The Chicago Regional Council of Carpenters Supplemental Retirement Plan, established and maintained pursuant to the terms of this Agreement.

      1.11   <u>RCEC</u>. The Residential Construction Employers Council or its successor by consolidation or merger, which represents Employers in collective bargaining negotiations with the Council.

      1.12   <u>Trust</u>. The assets of the Plan, held in trust by the Trustees.

      1.13   <u>Trustees</u>. Those persons who are appointed pursuant to the provisions of Article IV hereof and who have authority to control and manage the operation and administration of the Plan and who also have authority to control and manage the Trust.

MACRC-00115

# ARTICLE II

## Creation and Acceptance of Trust

All payments made by Employers on behalf of their Employees to the Plan pursuant to collective bargaining or other written agreements and such other payments as shall from time to time be made to the Plan by or on behalf of Employers and Employees, and all other money or property as shall lawfully become a part of the Trust, together with the income, gains and all other increments of any nature whatsoever, if any, therefrom, shall be held, managed and administered in trust pursuant to the terms of this Agreement. The Trust shall be known as the Chicago Regional Council of Carpenters Supplemental Retirement Fund Trust. The Trustees hereby accept the trust created hereunder and agree to perform the duties, responsibilities and obligations under this Agreement on their part to be performed.

MACRC-00116

ARTICLE III

Purpose of and Payments To and From Plan

        3.1    <u>Purpose</u>.  The purpose of the Plan is to allow Employers to make profit sharing contributions to the Plan on behalf of their Employees in an amount specified in their collective bargaining agreements or other written agreements.  Except as otherwise provided herein, nothing in this Agreement shall increase or decrease the rights of any party to any collective bargaining agreement.

        3.2    <u>Payments To and From Plan</u>.  Each Employer shall be required to contribute to the Trust in accordance with the applicable collective bargaining or other written agreements and rules of the Trustees.  Payments from the Trust shall be made without limitation by reason of enumeration, for the following purposes:

        (a)    To provide for:

        (i)    the payment of all reasonable and necessary expenses of establishing the Plan, collecting the contributions and operating, administering, controlling or managing the Plan or Trust; regardless of whether such activities are deemed to be subject to the fiduciary requirements of ERISA or are deemed to be settlor in nature; including payment of membership dues in educational and other organizations operated for purposes related to this Plan and the payment of expenses incurred by the Trustees in connection with attending and participating in educational conferences, seminars and similar meetings;

        (ii)    the employment of such administrative, legal, expert and clerical assistance as may be reasonably necessary;

        (iii)    the purchase or leasing of such premises as may be necessary for the operation of the affairs of the Plan; and

        (iv)    the purchase or leasing of such materials, supplies and equipment as the Trustees, in their discretion, find necessary or appropriate to the performance of their duties.

        (b)    To pay benefits to Participants or their beneficiaries in accordance with the terms, provisions and conditions of the Plan.

MACRC-00117

ARTICLE IV

Designation of Trustees

4.1    Number of Trustees.  There shall be ten regular Trustees, five of whom shall be representatives of the Employers (the "Employer Trustees") and five of whom shall be representatives of the Council (the "Union Trustees").  In addition to the regular Trustees, the Associations and the Council may designate such number of alternate Employer or alternate Union Trustees respectively, as MARBA, RCEC and the Council may deem advisable provided that MARBA, RCEC and the Council may not designate more alternate Trustees than that MARBA, RCEC and the Council are permitted to appoint as regular Trustees.  An alternate Trustee shall only be authorized to act in the place and stead of a regular Trustee, appointed by the same entity that designated the alternate Trustee, who is unable to act because of death, incapacity, resignation or absence from a meeting of the Trustees, and an alternate Trustee shall have no duty or responsibility to act unless so authorized to act.  As to matters handled when he/she is so authorized to act, an alternate Trustee shall be vested with all the rights, powers, duties and responsibilities of a regular Trustee.  Any regular Trustee who is unable to act shall not be responsible for any acts taken by or omitted to be taken by an alternate Trustee in his/her place and stead.  Such a regular Trustee who is unable to act shall be treated as if he/she has resigned in connection with any action taken or omitted to be taken by alternate Trustee.

4.2    Qualification of Trustees.  No person shall serve or be appointed to serve as a Trustee in contradiction of the terms of section 411 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA" or the "Act").  No person shall be disqualified from being a Trustee hereunder by reason of the fact that he is or hereafter becomes a Participant hereunder.

4.3    Acceptance of Appointment.  Each Trustee shall consent to and accept his/her appointment as a Trustee in writing.

4.4    Tenure.  Each Trustee shall continue to serve during the existence of the Plan and Trust until his/her death, incapacity, resignation or removal.

4.5    Resignation of a Trustee.  A Trustee may resign and subsequent thereto shall be discharged from any further duty or responsibility hereunder by giving prior written or electronic notice to the Chairman and Secretary of the Trustees or to the entire Board of Trustees in care of the Plan administrative office if the resigning Trustee is the Chairman or Secretary, which notice shall state the date such resignation shall take effect and such resignation shall take effect on said date unless a successor Trustee shall have been appointed at an earlier date in accordance with the provisions of section 4.7 hereof, in which event such resignation shall take effect immediately upon the appointment of such successor Trustee.

IV-1

Any Trustee, upon leaving office, shall forthwith turn over and deliver to the Chairman or Secretary of the Trustees (or the Plan administrative office if the resigning Trustee is the Chairman or Secretary) any and all property in his/her possession or under his/her control which belongs to the Plan.

4.6     Appointment and Removal of Trustees.  MARBA may appoint three Employer Trustees, the RCEC may appoint two Employer Trustees and the Council may appoint five Union Trustees pursuant to the terms of its governing bylaws. Those Employer Trustees appointed by MARBA may be removed by MARBA, and those Employer Trustees appointed by the RCEC may be removed by the RCEC. Any Union Trustee may be removed from office at any time by the Council pursuant to the terms of its governing bylaws. Any notice of removal of a regular Trustee, in order to be effective, shall be delivered to the remaining regular Trustees, shall specify the date the removal shall take effect and name the Trustee removed, and shall be signed by a duly authorized representative of the respective Association or the Council.

An alternate Employer Trustee or Union Trustee may be removed at any time in the same manner as a regular Trustee.

4.7     Selection of Successor Trustees.  If any Trustee shall become disqualified to serve, die, resign, be removed, become incapacitated or refuse to act, a successor Trustee shall be appointed forthwith by written instrument signed by those authorized to appoint the successor.

MARBA shall appoint the successor Employer Trustee (or alternate Employer Trustee) for an Employer Trustee (or alternate Employer Trustee)  that it appointed, and the RCEC shall appoint the successor Employer Trustee (or alternate Employer Trustee) for an Employer Trustee (or alternate Employer Trustee)  that it appointed.

Union Trustees (or alternate Union Trustees) shall be appointed by the Council pursuant to the terms of its governing bylaws.

Any written instrument appointing a successor Employer or Union Trustee (or alternate) shall state the date appointment shall take effect and shall be delivered to the Chairman and Secretary of the Trustees.

If a successor Trustee shall fail to be appointed within 90 days after the position becomes vacant, then any remaining Trustee may petition the United States District Court for the district in which the principal office of the Plan is located, to appoint a successor Trustee, which appointment shall be as fully effective as if made by the party originally entitled to appoint such Trustee and shall be considered to have been made on behalf of such party.

MACRC-00119

4.8    Power to Act in Case of Vacancy.  Pending the appointment of a successor Trustee in accordance with the provisions of section 4.7 hereof, no vacancy or vacancies in the Board of Trustees shall impair the power of the remaining Trustees to administer the affairs of the Plan and Trust.

MACRC-00120

ARTICLE V

Organization and Operation of Trustees

5.1     Office.  The Trustees shall establish an office at such location as the Trustees may approve for the transaction of the business of the Plan, the exact location of which is to be made known to the parties interested in said Plan.  At such office there shall be maintained the books, reports and records pertaining to the Plan and its administration.

5.2     Meetings.  The Trustees shall meet whenever required to provide for the orderly and timely administration of the business of the Plan at such location as may be acceptable to the Trustees.  The Chairman, Secretary or any two Trustees may call meetings of the Trustees.  Any meeting called shall be called upon at least fourteen (l4) days' written or electronic notice to all Trustees, which notice shall specify the date, time and place of such meeting and may specify the purpose thereof and any action proposed to be taken thereat.  Attendance at Trustees' meetings shall be limited to the Trustees and other persons invited by the Trustees.

Whenever any notice is required to be given to any Trustee hereunder, a waiver thereof in writing, signed at any time, whether before or after the time of meeting by the Trustees entitled to such notice, shall be deemed equivalent to the giving of such notice.  The attendance of a Trustee at a meeting or his/her approval of the actions taken at a meeting shall constitute a waiver of notice of such meeting, except where a Trustee attends a meeting and objects thereat to the transaction of any business because the meeting is not lawfully called or convened.

5.3     Action by Trustees Without Meeting.

(a)     Unanimous Consent in Writing.  Provided at least one Employer Trustee and one Union Trustee is then serving, any action which may be taken at a meeting of the Trustees may be taken without a meeting if a consent in writing setting forth the action so taken shall be signed by all of the Trustees (including facsimile and electronic signatures) then serving in accordance with 5.3(c).

(b)     Through the Use of Communications Equipment.  Any action which may be taken at an in-person meeting of the Trustees may be taken without an in-person meeting through the use of any means of communication by which all participating Trustees may simultaneously hear each other; for example, a telephonic conference call.  The notice, quorum and voting requirements of sections 5.2, 5.4 and 5.5 shall apply to such meetings as if they were held in person.  A written record of any action so taken by the Trustees pursuant to this section shall be prepared and provided to each of the Trustees.

MACRC-00121

(c)  Unanimous Action.  Any action taken by the Trustees in accordance with section 5.3(a) shall require the unanimous agreement of the Trustees then serving unless a Trustee abstains from participation in the action due to a possible or perceived prohibited transaction under ERISA.  If such a Trustee abstains from participating, the consent of such Trustee shall not be required for such action taken in accordance with section 5.3(a).

5.4  Quorum.  A quorum for the transaction of business at a duly called meeting shall consist of two Employer Trustees and two Union Trustees who are present in person (or electronically pursuant to section 5.3) provided that at least one Employer Trustee appointed by MARBA and one Employer Trustee appointed by RCEC are present.  Once a quorum has been established, said quorum shall continue to exist until the meeting has been adjourned provided at least one Union Trustee, one Employer Trustee appointed by MARBA and one Employer Trustee appointed by RCEC remain in attendance.

5.5  Voting.  Except as otherwise specifically provided for herein, all actions by and decisions of the Trustees shall be by the vote of a majority of votes cast by Trustees who are in attendance at a duly called meeting of the Trustees at which there is a quorum present.  Each Trustee shall have one vote; provided, however, that:  (a) at any meeting at which there is a lesser number of Employer Trustees than Union Trustees present, the Employer Trustees shall in the aggregate have that number of votes which equals the number of Union Trustees present and vice versa and (b) Employer Trustee votes shall be divided between the MARBA-appointed and RCEC-appointed Employer Trustees proportionate to the number of Employer Trustees that MARBA and RCEC are entitled to appoint relative to the total number of Employer Trustees regardless of the number of MARBA-appointed or RCEC-appointed Employer Trustees that are present at a meeting (as of January 1, 2017, , MARBA was authorized to appoint three of the five Employer Trustees and RCEC was authorized to appoint two; as a result, MARBA-appointed Trustees would possess 60% of the Employer Trustee votes and RCEC-appointed Trustees would possess 40% of the Employer Trustee votes).  The foregoing to the contrary notwithstanding, the unanimous written consent of the Trustees shall be required for any action pursuant to section 5.3(a).

5.6  Officers of Trustees.  At the commencement of each fiscal year of the Plan, the Trustees shall select from among them a Chairman and a Secretary.  In the alternative, the Trustees may take no action and the previously selected Chairman and Secretary shall continue to serve in their roles.  If a Chairman or Secretary shall cease serving as a Trustee during the year, or resign from serving as an officer, the Trustees shall select a successor.  One officer shall be a Union Trustee and one officer shall be an Employer Trustee.

V-2

5.7    Committees.

(a)    The Trustees may, by resolution or by-law or by provisions of this Trust Agreement, allocate fiduciary responsibilities and various administrative duties to committees or subcommittees of the Board of Trustees and such resolutions may grant the committee or subcommittee full power to act on behalf of the Trustees. The committees or subcommittees formed by the Trustees may delegate such responsibilities and duties to other individuals as they may deem appropriate or necessary in their sole discretion and consistent with the Act.

Among others, the Trustees may assign the following responsibilities to committees or subcommittees:

(i)    the responsibility for managing the Trust investments (if not otherwise delegated to an investment manager);

(ii)    the responsibility for reviewing and determining benefit claims, including appeals (described further at section 5.7(b));

(iii)    the responsibility for implementing the Trust's payroll auditing duties and for resolving questions or problems arising out of such duties, and for overseeing other aspects of the Plan's audit and reporting responsibilities;

(iv)    the responsibility for resolving questions or problems that may be encountered in connection with the collection of delinquent Employer accounts;

(v)    the responsibility for resolving questions or problems that may be encountered in connection with the day-to-day work of the administrative office maintained by the Trust;

(vi)    the responsibility for approving the Trust auditor's engagement and annual audit plan, reviewing the auditor's preliminary audit findings and management letters, and taking all other action necessary to enable the Trust to satisfy its audit and government reporting duties; and

(vii)    the responsibility for reviewing the performance of the professionals, vendors and employees retained by the Trustees.

The Trustees shall establish committees or subcommittees through the adoption of a motion or resolution that establishes the committee and that allocates stated responsibilities and authority to the committee or subcommittee. All committees and subcommittees shall consist of an equal number of Union Trustees and Employer Trustees. The Employer Trustees shall have authority to appoint and remove Employer Trustee members of Committees, and the Council Trustees shall have authority to appoint

V-3

and remove Council Trustee members of Committees. The resolution shall identify the quorum and voting requirements for the committee and subcommittee. If the resolution does not identify the quorum and voting requirements, then a quorum shall consist of at least one Employer Trustee and one Council Trustee in attendance at a meeting, and action shall be taken by majority vote. If the committee or subcommittee deadlocks on any matter submitted to it, such matter shall be referred to the Board of Trustees for review and action. Nothing contained herein shall in any way limit the authority of the Trustees to create additional committees or subcommittees for the purpose of assisting with or expediting the affairs of the Trust.

(b) Appeals Committee. At the first meeting of each calendar year, the Chairman and Secretary of the Board of Trustees shall appoint from among the Trustees two (2) regular members and two (2) alternate members of the Appeals Committee. If no action is taken at the beginning of the calendar year, then the prior appointments shall continue. The Appeals Committee shall consist of two (2) members, one (1) chosen from among the Employer Trustees and one (1) from among the Union Trustees, and two (2) alternate members, one (1) chosen from among the Employer Trustees and one (1) from among the Union Trustees. The administrator and members of the administrator's staff, as well as other Plan advisors, may also attend meetings.

The Appeals Committee shall select from among their membership a Chairman and a Secretary, each of whom shall be selected from different groups, i.e., the Employer Trustees and the Union Trustees Group, it being the intention of the Trustees that at no time shall both offices be held by individuals from among the same group. The Chairman shall preside at all meetings of the Appeals Committee. The Secretary or his/her delegate shall keep accurate minutes of the proceedings and cause to be prepared such documents and correspondence as may be required from time to time. Each alternate member of the Appeals Committee shall have full authority to act in the place of the regular member appointed from his/her group at any meeting at which said regular member is unable to attend.

The Appeals Committee shall review all appeals of benefit denials and shall make such a determination as in its sole discretion it deems proper. Its decision shall be binding on the Board of Trustees of the Plan, being the intention of the Board of Trustees that the Appeals Committee has the sole responsibility and authority in all matters of appeals of benefit denial.

The Appeals Committee shall meet upon ten (10) days written or electronic notice from its Chairman or administrator at such times and places as he/she shall determine unless the Committee members otherwise agree. Decisions of the Appeals Committee shall be by majority of those members present at any meeting at which a quorum is present. A quorum of the Appeals Committee shall consist of two (2) Trustees in attendance at a meeting, one (1) of whom is an Employer Trustee and one (1) of whom is a Union Trustee. In the event that there is no majority on a vote to reverse an

V-4

appealed decision of benefit denial, that decision shall be affirmed and be the decision of the Appeals Committee.

In the event that any member of the Appeals Committee shall resign or be unable to serve by reason of death or incapacity, the Officer who appointed the member shall appoint his/her successor from among the then-serving Union Trustees or Employer Trustees (depending on the designation of the departing Committee member). The Chairman shall not have the power to remove any member of the Appeals Committee, nor to appoint a successor) except as set forth this section 5.7(b).

(c)     Additional Committees.  As of the date of this restatement, the following Committees (in addition to the Appeals Committee) had been established: Investment Committee; Financial Audit Committee.  The Chairman and Secretary shall be members of the Investment Committee by virtue of their position.

5.8     Arbitration.  In the event the Trustees attending a duly called meeting at which there is a quorum present are unable to agree in accordance with the majority voting requirements of section 5.5 hereof upon any matter in connection with the administration or operation of the Plan or Trust, or in the event the Trustees fail to obtain a quorum for a meeting after three consecutive notices thereof, a deadlock shall be deemed to exist and the Trustees may then select a neutral person as an impartial arbitrator who is willing to act in the resolution of such deadlock.  In the event the Trustees are unable to agree by majority vote upon the selection of an impartial arbitrator within 30 days after such deadlock or after the third meeting at which quorum was not present, then  an impartial arbitrator shall be appointed in accordance with the  Impartial Umpire Rules for Arbitration of Impasses Between Trustees of Joint Employee Benefit Trust Funds as administered by the American Arbitration Association.  Any expenses, costs and attorneys' fees in connection with the foregoing shall be paid by the Plan, including any reasonable compensation to the arbitrator.  The impartial arbitrator shall have no power to alter, delete, amend, add to, take away from or disregard any of the provisions of this Agreement and shall have no power to cause the Trustees to alter, delete, amend, add to, take away from or disregard any provision of this Agreement.  The decision of the impartial arbitrator shall be final and binding upon the Trustees, all parties hereto, the Employees and their beneficiaries.  The Trustees shall take or omit taking any action or actions that may be indicated in order to give effect to the decision of the impartial arbitrator.

Differences arising as to the interpretation or application of the provisions of this Agreement, or relating to the benefits provided for Participants hereunder shall not be subject to the grievance or arbitration procedures established in any collective bargaining agreement.

5.9     Immunity of the Trustees.

MACRC-00125

(a)     Exculpation of Trustees and Plan Employees From Liability.
No Trustee or Plan employee shall incur any liability individually or on behalf of other
individuals for any act or failure to act unless such act or failure to act is due to his/her
own gross negligence or willful misconduct or lack of good faith; provided, however, the
foregoing shall not relieve a Trustee or Plan employee from liability if such is precluded
by paragraph 5.9(c). A Trustee or Plan employee may act or rely upon any of the
following:

(i)     Any instrument, application, notice, request, signed
letter or other paper or document believed by him/her to be genuine and to contain a true
statement of facts and to be signed or sent by the proper person; or

(ii)     The advice, opinion, records, reports or
recommendations of any accountant, administrator, attorney, consultant, co-trustee,
investment agent or investment manager or any other advisor selected by the Trustees
with reasonable care.

(b)     Indemnification of Trustees and Plan Employees. The
Trustees shall cause any person who is or has served as a Trustee or employee of the Plan
to be indemnified out of the Trust against all damages, liabilities and expenses incurred
by or imposed on him/her in connection with any claim, suit, action or proceeding
concerning the Plan or his/her acts or omissions as a Trustee or employee thereof,
including, without limitation, legal fees and amounts paid in any compromise or
settlement unless such acts or omissions constitute negligence, willful misconduct or lack
of good faith; provided, however, the foregoing shall not relieve a Trustee or a Plan
employee from liability if such is precluded by paragraph 5.9(c). Any indemnification
provided herein shall be limited to amounts not collected pursuant to valid and
enforceable liability insurance policies.

To the extent permitted by law, the Trustees, in their
discretion, may also cause the Plan to indemnify any person who is rendering services to
the Plan against all damages, liabilities and expenses incurred by or imposed upon such a
person in connection with any claim, suit, action or proceeding concerning the Plan or the
acts or omissions of such a person, including without limitation, legal fees and amounts
paid in any compromise or settlement unless such act or omission constitutes gross
negligence, willful misconduct or lack of good faith.

(c)     Compliance With Employee Retirement Income Security
Act of 1974. Anything herein to the contrary notwithstanding, nothing in
subparagraphs (a) and (b) above shall relieve a Trustee or other person rendering service
to the Plan of any responsibility or liability for any responsibility, obligation or duty
under Part 4 of Title I of ERISA. Further, notwithstanding anything in this Agreement to
the contrary, if any provision of this Agreement is voided by section 410 of ERISA, such
provision shall be of no force or effect only to the extent that it is voided by such section.

V-6

5.10 <u>Compensation of Individual Trustees</u>. An individual Trustee shall not be paid any compensation from the Trust for his/her services hereunder, but the Trustees may authorize reimbursement to a Trustee from the Trust for reasonable expenses incurred on behalf of the Plan or Trust in connection with their duties hereunder.

5.11 <u>Service in More Than One Fiduciary Capacity</u>. Any individual, entity or group of persons may serve in more than one fiduciary capacity with respect to the Plan, the Trust or both to the extent such is permitted by law; provided, however, a Trustee shall not be paid any compensation for providing professional services to the Plan.

V-7

MACRC-00127

ARTICLE VI

Control and Management of Trust

6.1    Control of Trust.  The Trustees shall be the named fiduciaries of the Trust and shall have the power to control the Trust and to perform all such acts, to take all such proceedings, and to exercise all such rights and privileges, although not specifically mentioned herein, as the Trustees may deem necessary or advisable to administer the Trust or to carry out the purposes of this Agreement.

6.2    Management of Trust.  The management, including the acquisition and disposition of property comprising the Trust, shall be as follows:

(a)    General Authority.  The Trustees shall have exclusive authority and responsibility with respect to the custody and management of the Trust, except to the extent any such authority has been delegated pursuant to the provisions of subparagraph (b), (c), (d) or (e) below and subparagraph (c) or (d) of section 7.3.

(b)    Delegation of Custody.  The Trustees are authorized to delegate custody of all or any portion of the Trust.  Any custodian so designated shall hold the Trust as directed in writing by the Trustees.

(c)    Delegation of Investment Control to Investment Manager.  The Trustees may appoint one or more investment managers to supervise and direct the investment and reinvestment of a portion or all of the Trust in accordance with the provisions of the Agreement and in the same manner and with the same powers, duties, obligations, responsibilities and limitations as apply to the Trustees as set forth herein. Any investment manager so appointed shall be an investment advisor registered under the Investment Advisers Act of 1940, a bank as defined in such Act or an insurance company which is qualified to manage the assets of employee benefit plans under the laws of more than one state.  As a condition to its appointment, an investment manager shall acknowledge in writing that it is a fiduciary with respect to the Plan.  The Trustees may furnish an investment manager with written investment guidelines for investment, which guidelines may include directions with respect to the diversification of the investments. The Trustees may also delegate to an investment manager the authority to retain other investment managers.  Investment managers who are delegated authority for retaining other investment managers shall serve as "named fiduciaries" (within the meaning of ERISA section 402) to the extent necessary to delegate investment responsibility to another investment manager.  Any investment manager shall receive such reasonable compensation chargeable against the Trust as shall be agreed upon with the Trustees.

(d)    Delegation of Investment Control to Participants.  The Trustees may authorize Participants to direct the investment of that portion of the Trust allocated to their accounts.  The Participants must direct investments in a manner

VI-1

MACRC-00128

consistent with this Agreement, the Plan and applicable law. The Trustees shall invest the principal and income of each Participant's account as directed by the Participant, provided the direction accords with this Agreement, the Plan and applicable law and is in a form agreed to by the Trustees. The Trustees shall have no further duties or obligations with respect to any investment made pursuant to such direction.

(e) <u>Co-Trustee Agreement</u>. The Trustees may enter into one or more agreements with corporations or national banking associations authorized by law to act in a trust or fiduciary capacity, whereby any such corporation or national banking association shall become a co-trustee ("Corporate Trustee"). The Trustees may delegate to the Corporate Trustee all or any part of the authority and responsibility with respect to the control and management of the Trust provided the Corporate Trustee shall not be a representative of either the Employers or the Council and shall have no right to vote as a Trustee. Any such Corporate Trustee shall receive such reasonable compensation chargeable against the assets delivered to it as shall be agreed upon with the Trustees. Further, any bank selected shall have a combined capital and surplus of one million dollars ($1,000,000) and shall have been in the general banking business for not less than ten (10) years.

6.3 <u>Trust Responsibilities</u>. In connection with their management and control of the Trust unless the following responsibilities are allocated or delegated in accordance with the procedures set forth in sections 7.3(c) and (d) or elsewhere herein, the Trustees shall:

(a) cause the assets of the Plan to be held and administered in trust;

(b) cause accounts of all investment, receipts, disbursements and all other transactions affecting all or any portion of the Trust to be maintained; and

(c) pay from the Trust all taxes of any and all kinds whatsoever that may be levied or assessed under existing or future laws upon, or in respect of, the Trust or its income.

6.4 <u>Trust Powers</u>. The Trustees shall have such powers as may be necessary to discharge their responsibilities in managing and controlling the Trust. The Trustees shall have full and complete authority and control over the Trust unless such authority or control is allocated or delegated by the Trustees in accordance with the procedures set forth in sections 7.3(c) and (d) or elsewhere herein. Any determination made by the Trustees in the exercise of these powers shall be binding on all persons. In addition to such powers as are conferred by law or as set forth elsewhere in this

MACRC-00129

Agreement, the powers of the Trustees in connection with their managing and controlling the Trust shall include, but shall not be limited to, the following:

(a) To invest and reinvest all or part of the principal and income of the Trust, without distinction between principal and income as the Trustees determine, in such securities or in such property, real or personal, or share or part thereof, or part interest therein, wherever situated, as the Trustees shall deem advisable, including, but not limited to, governmental, corporate or personal obligations, shares of stock, common or preferred, whether or not listed on any exchange, participation in partnerships, mutual investment funds, bonds and mortgages, and other evidences of indebtedness or ownership, including stocks, bonds or other obligations secured by personal property and participation in any common trust fund qualified under section 401(a) and exempt under section 501(a) of the Internal Revenue Code established or maintained for the collective investment of fiduciary funds as set forth herein or a common trust fund exempt under Code section 584.

During the time that any part of the Trust is held in a common or collective trust exempt under Code section 501(a) or 584, the declarations of trust of such common or collective trust shall be part of this Agreement provided such declaration of trust meets the requirements of Revenue Ruling 81-100 (as amended), if necessary, and the declarations of trust comply with the Rules and Regulations of the Comptroller of the Currency, if necessary, and comply with the laws of any state having jurisdiction thereover and have, where appropriate, been approved by the Internal Revenue Service.

If required by the bank, prior to investing in a common trust fund the Trustees and the bank maintaining the common trust fund shall execute an agreement designating the common trust fund and providing that during the time that any part or all of the Trust is held in such common trust fund the declarations of trust creating the common trust fund shall be part of this Agreement; provided that said declarations of trust comply with the Rules and Regulations of the Comptroller of the Currency, if necessary, and the laws of any state having jurisdiction thereover and have, where appropriate, been approved by the Internal Revenue Service.

(b) To sell, convey, transfer, exchange, partition, lease for any term, mortgage, pledge or otherwise dispose of any and all property, real or personal or to grant options with respect to any property held by the Trustees by private contract or at public auction or to surrender for cash value any contracts issued by an insurance company and held by the Trustees. Any sale, option or other disposition of property may be at such time and on such terms as the Trustees see fit. Any sale, option or other disposition of property may be made for cash or upon credit, or partly in cash and partly on credit. No person dealing with the Trustees shall be bound to see to the application of the purchase money or to inquire into the validity, expedience or propriety of any such sale, option or other disposition.

VI-3

MACRC-00130

(c)    To receive, hold, manage, invest, reinvest, improve, repair and control all monies and property, real or personal, at any time forming part of the Trust.

(d)    To purchase and sell contracts or other properties through such broker or brokers as the Trustees may choose.

(e)    To vote or refrain from voting upon any stocks, bonds or other securities; to give general or special proxies or powers of attorney with or without power of substitution; to appoint one or more individuals or corporations as voting trustees under voting trust agreements and pursuant to such voting agreements to delegate to such voting trustees' discretion to vote; to exercise any conversion privileges, subscription rights, or other options, and to make any payments incidental thereto; to oppose, or to consent to, or otherwise participate in, corporate reorganizations or other changes affecting corporate securities, and to pay any assessments or charges in connection therewith; and generally to exercise any of the powers of an owner with respect to property held as part of the Trust; to delegate voting authority to an investment manager.

(f)    To cause any securities or other property to be registered in the name of the Plan, the Trustees, a custodian, a Corporate Trustee or in the name of a nominee without designating the same as trust property, and to hold any investments in bearer form or otherwise in such form that title passes by delivery, but the books and records of the Trustees shall at all times show that all such investments are part of the Trust.

(g)    To exercise or dispose of any right they may have as the holders of any security to convert the same into another or other securities, or to acquire an additional security or securities, to make any payments, exchange any security or do any act with reference thereto which they may deem advisable.

(h)    To consent to take any action in connection with (including the deposit of any property with and participation with respect to any protective or similar committee) and receive and retain any securities or other property resulting from any reorganization, consolidation, merger, readjustment of the financial structure, sale, lease or other disposition of assets of any corporation or other organization, the securities of which may constitute a portion of the Trust, and the Trustees may delegate to any such protective or similar committee such power and authority as they may deem proper in the premises and may pay such portion of the expenses and compensation of such committee as they deem proper.

(i)    To borrow or raise money for the purposes of the Plan in such amount, and upon such terms and conditions as the Trustees shall deem advisable; and for any sum so borrowed to issue the promissory note of the Plan, and to secure the

MACRC-00131

repayment thereof by creating a security interest in all or any part, of the Trust; and no person lending such money shall be obligated to see that the money lent is applied to Trust purposes or to inquire into the validity, expedience or propriety of any such borrowing.

(j)     To hold cash, uninvested, for such length of time as the Trustees may determine without liability for interest thereon.

(k)     To make, execute, acknowledge and deliver any and all documents of transfer and conveyance, including but not limited to, deeds, leases, mortgages, conveyances, contracts, waivers and releases, and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted.

(l)     To renew or extend or participate in the renewal or extension of any mortgage, upon such terms as may be deemed advisable, and to agree to a reduction in the rate of interest on any mortgage or to any other modification or change in the terms of any mortgage, or of any guarantee pertaining thereto, in any manner and to any extent that may be deemed advisable for the protection of the Trust or the preservation of the value of the investment; to waive any default whether in the performance of any covenant or conditions of any mortgage or in the performance of any guarantee or to enforce any such default in such manner and to such extent as may be deemed advisable; to exercise and enforce any and all rights of foreclosure, to bid in property on foreclosure, to take a deed in lieu of foreclosure with or without paying any consideration therefor, and in connection therewith to release the obligation on the bond secured by such mortgage and to exercise and enforce in any action, suit or proceeding at law or in equity any rights or remedies in respect of any such mortgage or guarantee.

(m)     To employ suitable agents, advisors and counsel as they may deem necessary and advisable for the efficient operation and administration of the Trust and to charge the expense thereof to the Plan to the extent permitted by applicable law.

(n)     To continue to have and to exercise after the termination of the Plan and until final distribution, all of the title, powers, discretions, rights and duties conferred or imposed upon the Trustees hereunder, or by law.

(o)     To establish an administrative office and to retain employees and other professionals, and to purchase equipment and enter into leases and take all other actions necessary to operate an administrative office; to enter into arrangements with other entities under office sharing, expense sharing or similar sharing features intended to improve operational efficiencies or reduce costs; to form a corporation or corporations under the laws of any jurisdiction to serve as the administrative office.

MACRC-00132

Notwithstanding any provision set forth in this paragraph 6.4 to the contrary, the Trustees shall exercise any power in a manner which is consistent with the applicable provisions of Title I of ERISA.

MACRC-00133

ARTICLE VII

Operation and Administration of Plan

     7.1    <u>Authority of Trustees</u>.  The Trustees shall be the named fiduciary for the Plan and shall have the authority and shall be responsible for the operation and administration of the Plan and shall conduct the business and activities of the Plan in accordance with the provisions of this Agreement.

     7.2    <u>Plan Responsibilities</u>.  The Trustees shall have full and complete authority and control over the Plan.  In connection with their operation and administration of the Plan, unless the following responsibilities are allocated or delegated in accordance with the procedures set forth in sections 7.3(d) and (e), the Trustees shall:

     (a)    Formulate and adopt a written instrument describing those benefits to be provided by the Plan consistent with the purposes set forth in section 3.1 hereof.

     (b)    Determine the right of any person to a benefit.  In the exercise of this responsibility, the Trustees shall provide every applicant whose application for a benefit is denied wholly or partially with a written notice setting forth the reason or reasons for the denial and any additional information required by applicable law. Further, the Trustees shall adopt a written appeal procedure which shall provide a claimant with a reasonable opportunity to appeal a full or partial denial of a benefit application.

     (c)    Establish and maintain a funding policy and method consistent with the Plan's objectives and in accordance with any law applicable to the Plan.

     (d)    Maintain books of account, records and other data as may be necessary for the proper administration and operation of the Plan, and a record of all their transactions, meetings and the actions taken at meetings or by informal action of the Trustees including minutes of all Trustees' meetings.  A copy of the minutes of all Trustees' meetings shall be retained as a record of the Plan.  All of said books, records and data shall be available at the office of the Plan during business hours for inspection by any Trustee.

     (e)    Prepare, execute, file and retain a copy for the Plan records of all reports required by law or deemed by them to be necessary or appropriate for the proper administration and operation of the Plan.

     (f)    Procure an audit of the books of the Plan by a Certified Public Accountant not less frequently than once each year.  A copy of each such audit shall be

VII-1

MACRC-00134

made available upon request to each Employer, the Council and the Trustees as soon as is reasonably possible after it has been prepared, and a copy of such audit shall be kept available for inspection by authorized persons during business hours at the office of the Plan.

(g)     Procure and maintain at the expense of the Plan such bonds as are required by law, together with such additional bonding coverage as they may determine for the Trustees, employees of the Plan, any agents acting on behalf of or retained by the Trustees and persons to whom fiduciary responsibilities have been delegated.

7.3     <u>Plan Powers</u>.  The Trustees shall have such powers as may be necessary to discharge their responsibilities in managing and controlling the general operations and administration of the Plan.  The Trustees shall have full and complete authority and control with respect to the operations and administration of the Plan unless such authority or control is allocated or delegated by the Trustees in accordance with the procedures set forth in subparagraphs (c) and (d) below.  Any determination by the Trustees in the exercise of these powers shall be binding on all persons.  In addition to such other powers as are conferred by law or are set forth elsewhere in this Agreement, the powers of the Trustees in connection with their operation and administration of the Plan shall include, but shall not be limited to, the following:

(a)     To determine, from time to time,, who shall be Employers, Employees or Participants; who shall be eligible for benefits under the Plan; the nature, type, character and amount of benefits to be provided and the medium by which such benefits shall be provided.  In determining who shall be eligible for benefits under the Plan, the Trustees may establish standards for granting or denying such eligibility to Employees.

(b)     To employ such consultants, accountants, counsel or other persons as they deem necessary or desirable in connection with the administration of the Plan and to employ one or more persons to render advice with regard to any responsibility or power of the Trustees.  The costs of such services and other administrative expenses shall be paid by the Plan.

(c)     To designate in writing persons who are not Trustees to carry out fiduciary or nonfiduciary responsibilities or duties of the Trustees, and in the event of such a designation the Trustees shall not be liable for any act or omission of such a person.

(d)     To allocate, in writing by unanimous agreement, fiduciary or nonfiduciary responsibilities or duties among Trustees.  Those persons to whom such responsibilities have not been allocated shall not be liable for any act or omission of those persons to whom such responsibilities have been allocated.

VII-2

MACRC-00135

(e)     To construe and interpret the Agreement and Plan.

(f)     To request and receive from the Employers, the Council, the Participants or their beneficiaries or dependents such information as shall be necessary for the proper administration of the Plan.

(g)     To furnish the Employers and the Council, upon request, such annual reports with respect to the administration of the Plan as are reasonable and appropriate.

(h)     To maintain such bank accounts as they deem appropriate for the administration of the Plan; provided, however, all checks, drafts, vouchers or other withdrawals of funds from the Plan shall be signed by at least one Union Trustee and one Employer Trustee, or if the Trustees unanimously so provide by contract or resolution, by a person to whom such responsibility has been delegated.

(i)     To receive and review reports of the financial condition and of the receipts and disbursements of the Trust.

(j)     To prescribe procedures to be followed by any persons in applying for any benefits under the Plan; and to designate the forms or documents, evidence and such other information as the Trustees may reasonably deem necessary, desirable or convenient to support an application for benefits under the Plan.

(k)     To adopt such by-laws, rules, regulations, forms and procedures from time to time as they deem advisable and appropriate in the proper administration of the Plan, provided the same are consistent with the terms of this Agreement and do not modify or increase the burdens or obligations of any Employer or Council under the terms of its collective bargaining agreement.  Any construction of this Trust Agreement or the Plan and all rules and regulations adopted by action of the Trustees for the administration of the Trust shall be binding upon all parties dealing with the Trust and all persons claiming benefits hereunder.

(l)     To have a judicial settlement of the Trust's accounts and judicial determination of any questions in connection with their duties and obligations hereunder, or in connection with the administration or distribution thereof.  The costs and expenses, including accounting and legal fees, for such judicial settlement of accounts or other judicial determination shall be paid by the Plan as a general administration expense to the extent permitted by applicable law.

(m)     To file, from time to time, with the Council and the Employers a statement of the Trust's accounts and such other reports as the Trustees deem necessary or appropriate, and the Council and Employers may enter into an agreement approving and allowing such statement, account or report and any such

VII-3

MACRC-00136

agreement shall be binding and conclusive upon all persons whomsoever, and shall constitute a full discharge and acquittance of the Trustees with respect to the matters set forth in such statement, account or report, except to the extent such discharge or relief from liability is precluded by Part 4 of Title I of the ERISA.

(n)     To the extent such is consistent with the provisions of section 410(b) of ERISA, to purchase out of the assets of the Plan, insurance for the benefit of the Plan and/or the protection of the Trustees, Plan employees or other fiduciaries or service providers of the Plan against any losses by reason of errors or omissions or breach of fiduciary duty.

(o)     To enter into any and all contracts and agreements for carrying out the terms of this Plan and for the administration and operation of the Plan and to do all acts as they, in their discretion, may deem necessary or advisable, and such contracts and agreements and acts shall be binding and conclusive on the parties hereto and on the Participants involved.

(p)     To borrow money, with or without security, for the Plan.

(q)     To extend the time of payment of any obligation and to compromise and accept either total or partial satisfaction, or write off as uncollectible any Employer contribution or any other indebtedness or other obligation as the Trustees may deem appropriate, provided such action is consistent with applicable law. An extension of time of payment, compromise or a decision to write off as uncollectible shall be deemed appropriate if the Trustees determine that the likelihood of collection or the anticipated expense of collecting justifies such action.

(r)     To inspect and review the records of any Employer (either at the Employer's place of business or through the mail/wire transfer of documents, whatever is deemed by the Plan to be most efficient) to the extent necessary to determine whether the proper contributions required to be made to the Plan have been made. The Trustees may, based upon all relevant circumstances, assess all or a portion of the cost of the audit to the Employer if an underpayment is disclosed by the audit, or the Employer fails to timely pay following demand for payment. Also, in the event the Employer resists the Plan Auditor's attempt to conduct the audit or obstructs completion of the audit (e.g., refuses to timely provide all records it possesses which the Plan Auditor believes are necessary to complete the audit), the Trustees may assess the Employer for all or a portion of the audit costs. If the Plan is required to initiate litigation to compel completion of the payroll audit, the Trustees may assess the Employer for the costs of the payroll audit plus all fees and costs that the Plan incurs in compelling the audit, including legal fees.

(s)     To extend the coverage of the Plan to Employers who satisfy the conditions set forth in section 1.5 and their Employees upon such terms and

VII-4

MACRC-00137

conditions as the Trustees consider necessary to preserve an equitable relationship between the contributions made by the Employers then participating in the Plan and the benefits payable to their Participants.

(t)     To enter into reciprocal arrangements for the transfer of assets to or from other defined benefit or defined contribution retirement plans now or hereinafter in existence, provided that such arrangements are consistent with applicable law, do not alter or detract from the benefits provided hereunder for the Participants of the Plan, and further provided, that such arrangements are equitable and consistent with sound accounting principles and practices.

(u)     To amend the plan of benefits described in the written instrument provided for in section 7.2(a) hereof or any other provisions of such written instrument.  Any amendment to such written instrument shall be in accordance with the amendment provisions thereof.

(v)     To receive contributions or payments from any source whatsoever to the extent permitted by law.

(w)     To attend and participate in conferences, seminars and similar educational meetings, which the Trustees deem helpful to them in the operation, administration, control or management of the Plan or Trust and to cause payment for all reasonable expenses therefor by the Plan.

(x)     To pay membership dues in educational and other organizations operated for purposes related to the Plan.

(y)     To establish and accumulate as part of the Trust a reserve or reserves adequate, in the opinion of the Trustees, to carry out the purposes of the Plan after taking into consideration, among other things, future benefit obligations, contingencies, expenses of administration and obligations of the Plan.

(z)     To do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary or proper in connection with the Plan, although the power to do such acts is not specifically set forth herein.

Notwithstanding any provision set forth in this section 7.3 to the contrary, the Trustees shall exercise any power in a manner which is consistent with Title I of the ERISA

MACRC-00138

## ARTICLE VIII

## Contributions and Collections

8.1    <u>Contributions to Plan</u>.  Each Employer shall make continuing and proper payments to the Plan as required by the collective bargaining or other written agreement to which each such Employer is a party (including allowing its Employees to make elective contributions to the extent authorized by such agreement).  In no event shall any Employer, directly or indirectly, receive any refund on contributions made to the Plan, unless all of the following conditions are satisfied:

(a)    The contributions are made due to a bona fide mistake of law or fact as determined by the Trustees; and

(b)    A refund in such circumstance is permitted by applicable law and will not adversely affect the tax-qualified status of the Plan or tax-exempt status of the Trust or the accounts maintained under the Plan; and

(c)    The Trustees, in their sole discretion, approve the refund.

In lieu of providing a refund, the Trustees may establish a credit to be applied against the Employer's obligations owed to the Plan.

Upon payment to the Trustees, all responsibilities of each Employer for making contributions to the Trust shall cease.  No Employer shall be liable for contributions required to be made by any other Employer and subject to timely payment of contributions as required by its collective bargaining or other agreement requiring it to contribute to the Plan, an Employer shall have no liability for funding or paying the benefits provided under the Plan.  The Employer's obligation under the collective bargaining agreement to contribute to the Plan shall not be subject to setoff or counterclaim by the Employer for any liability, including, but not limited to a liability of the Council, Local Union or an Employee of the Employer.  No contributions received by the Plan shall be deemed wages due to Employees; provided, however, in the event of an Employer's insolvency or liquidation, the preceding shall not act to preclude the collection of Employer contributions pursuant to a priority allowed for "wages" if the law recognizes such contributions as "wages" for such purposes.

8.2    <u>Transmission of Reports and Contributions</u>.  The Trustees shall establish a uniform system among the Employers for the timely transmission of such reports and elective contributions, as the Trustees deem necessary, and shall also establish a periodic date on which such reports and contributions shall be due; provided, any such reporting and contribution dates so established shall be consistent with the Employers' collective bargaining agreements.

MACRC-00139

8.3　Delinquent Contributions and Reports.　The Trustees, upon knowledge thereof, shall notify any Employer of a delinquency, mistake or discrepancy in its report or contribution.  Any Employer contributions shall be considered delinquent if not received in the Plan office on or before the fifteenth (15th day) of the month or placed in the U.S. Mail on or before the fifteenth (15th) day of the month, as evidenced by postmark, following the month for which the payment is being made.  With respect to Employers that fail to timely contribute or submit a contribution report, the Trustees shall have authority to take any one or more of the following actions:

　　(a)　Establish rules and regulations providing for the assessment of interest, costs, fees and liquidated damages to be added to any delinquent contributions and to take such legal action, including proceedings at law, in equity or, if the Trustees so choose to submit the issue, in arbitration, as in their discretion may be necessary to collect contributions and liquidated damages assessed by them and to recover from any delinquent contributor on behalf of the Plan all costs and reasonable attorney's fees incurred in connection therewith.  The Trustees may, in their sole discretion, assess a delinquent Employer the cost of a payroll audit if it is determined that the Employer is delinquent in its contributions to the Plan.

　　(b)　Require an Employer who has been delinquent in its contributions to the Plan to deposit with the Trustees in advance as a guarantee of the payment of monthly contributions, an amount not to exceed three times the estimated monthly contribution of such Employer as a condition of such Employer's continuing to participate in the Plan, and may require that said guarantee be continuously maintained by such Employer as a condition of continuing to participate in the Plan.  In the event any such Employer ceases to participate in this Plan, any excess in such guarantee over the contributions or other amounts required of such Employer to be paid to the Plan shall be returned to him.

　　(c)　Terminate the Employer from further participation in the Plan by giving notice of termination to the Employer and the Employees of such Employer. Such notice shall state the cause for termination and shall state the date on which the benefits provided by the Plan for the Employer's Employees shall cease.

8.4　Amount of Contributions.　Each Employer shall make continuing and proper payments to the Plan as required by the collective bargaining agreement, Participation Agreement or other agreement to which each such Employer is a party.  The aforementioned obligation to contribute to the Plan as required by the collective bargaining agreement shall include periods beyond the expiration of the term of the collective bargaining agreement during which the obligation to contribute under the collective bargaining agreement has been extended by the National Labor Relations Act; provided there is no dispute over the existence or extent of the obligation to contribute beyond the term of such agreement.  The Trustees may enforce such a contribution obligation in a United States District Court.

VIII-2

MACRC-00140

# ARTICLE IX

## Controversies and Disputes

      9.1   <u>Reliance Upon Records</u>.  In any controversy, claim, demand, suit at law, or other proceeding between any Participant or any other person and the Trustees, the Trustees shall be entitled to rely upon any facts appearing in the records of the Trustees, certified to the Trustees by the Council or the Employers, any facts which are of public record and any other evidence pertinent to the issue involved.

      9.2   <u>Determination by Trustees Binding</u>.  All questions or controversies, of whatsoever character, arising in any manner or between any parties or persons in connection with the Trust or Plan or the operation, whether as to any claim for benefits, or as to the construction of language or meaning of this Agreement, the Plan, or the rules and regulations adopted by the Trustees, or as to any writing, decision, instrument or account in connection with the operation of the Trust or Plan or otherwise, shall be submitted to the Trustees or, where Trustee responsibility has been delegated to others, to such delegates for decision.  The decision of the Trustees or their delegates shall be binding upon all persons dealing with the Trust or Plan or claiming any benefit thereunder, except to the extent that such decision may be determined to be arbitrary or capricious by a court having jurisdiction over such matter.

      9.3   <u>Compromise</u>.  The Trustees may, in their sole discretion, compromise or settle any claim or controversy, and any decision made by the Trustees in compromise or settlement of a claim or controversy or any compromise or settlement agreement entered into by the Trustees, shall be conclusive and binding on all parties.

      9.4   <u>Right to Obtain Adjudication of Disputes</u>.  In the event any question or dispute shall arise as to the proper person or persons to whom any payments shall be made hereunder, the Trustees may withhold such payment until an adjudication of such question or dispute, satisfactory to the Trustees, in their sole discretion, shall have been made, or the Trustees shall have been adequately indemnified against loss to their satisfaction.

MACRC-00141

ARTICLE X

Amendments

10.1  <u>Method of Amendment</u>.  This Agreement may be amended in writing at any time by the Trustees, in accordance with the voting provisions of section 5.5.

10.2  <u>Limitation on Amendments</u>.  No amendment shall be adopted which alters the basic purpose of the Plan, conflicts with any applicable law or government regulation, causes the use or diversion of any part of the Trust for purposes other than those authorized herein, retroactively deprives anyone of a vested right or interest, increases the burdens or obligations of any Council or Employer except to the extent provided herein or permitted in its collective bargaining or other written agreement, affects the tax-exempt status of the Trust or the deductibility for income tax purposes of Employer contributions to the Plan.  Further, no amendment shall (1) provide for an unequal number of Union Trustees and Employer Trustees or (2) change the method of voting.

X-1

MACRC-00142

ARTICLE XI

Termination

11.1   Term of Plan.  The Plan shall continue until all the collective bargaining agreements providing for contributions to the Plan have expired, and negotiations for extension thereof have ceased.  The Plan may be terminated at an earlier date by written agreement of the Council and all Employers, which agreement shall be served upon each of the Trustees by registered mail.  The termination shall not be effective until 60 days after mailing of such agreement to the Trustees.

11.2   Procedures on Termination.  In the event of the termination of the Plan, the Trustees shall apply the Trust to pay or to provide for the payment of any and all obligations of the Plan and shall distribute and allocate all assets of the Trust in accordance with the then provisions of the Plan; provided, however, that no part of the corpus or income of the Trust shall be used for or diverted to purposes other than for the exclusive benefit of the Participants, former Participants or their beneficiaries or dependents, or the administrative expenses of the Plan or for other payments in accordance with the provisions of this Agreement.  Under no circumstances shall any portion of the corpus or income of the Trust, directly or indirectly, revert or accrue to the benefit of any contributing Employer prior to all obligations having been satisfied or provided for.  The Trustees may, after all the obligations of the Plan have been satisfied as provided in the Plan upon termination of the Plan, transfer any surplus monies and property in the Trust to any other fund that may exist or be created by and between the Council and the Employers or Associations for the same uses and purposes herein set forth; provided, however, that such surplus monies and property shall be for the purpose of providing benefits to Employees or former Employees on whose behalf contributions were made by Employers and, further provided, that any fund to which the Trustees transfer any surplus monies and property shall constitute a tax-exempt plan eligible to receive the transfer qualified under section 401(a) of the Internal Revenue Code of 1986, and similar subsequent statutes, and that the trust forming a part thereof shall be exempt under section 501(a) of the Internal Revenue Code of 1986, and similar subsequent statutes.

11.3   Notification of Termination.  Upon termination of the Plan in accordance with this Article, the Trustees shall forthwith notify the Council, the Associations and each Employer and also all other necessary parties, and the Trustees shall continue as Trustees for the purpose of liquidating the affairs of the Plan.

11.4   Distribution Upon Termination.  Any total or partial distribution after termination of the Plan may be made at any time, and from time to time, in whole or in part, to the extent no discrimination in value results, in cash in securities or other assets of kind, as the Trustees, in their discretion, shall determine.  The Trustees may defer any

MACRC-00143

distribution upon termination pending receipt of a favorable determination letter from the Internal Revenue Service that the termination will not adversely affect the tax qualification of the Plan or the tax-exempt status of the Trust. In making such distribution, any and all determination, divisions, appraisals, apportionments and allotments so made, shall be final and conclusive and not subject to question by any person.

MACRC-00144

## ARTICLE XII

## General Provisions

12.1 <u>Title to the Trust</u>. Title to the Trust shall be vested in and remain exclusively in the Trustees and no Employer, Council, Association, Employee or any beneficiary shall have any right, title or interest in the Trust nor any right to contributions to be made thereto, nor any claim against any Employer on account thereof, except only as provided from time to time by this Agreement or under the Plan, and then only to the extent of the benefits payable to such person out of the Trust.

12.2 <u>Liability of the Associations, Council and Employers</u>. Except to the extent required by law, the Council, Local Union, Associations and Employers shall not be responsible for the acts of the Trustees or for any debts, liabilities, obligations, benefits or insufficiency of the Trust.

12.3 <u>Nonalienation of Benefits</u>. Except for payments required by a qualified domestic relations order (as defined by the Internal Revenue Code and ERISA), tax levy required to be paid under the Internal Revenue Code, garnishment order under the Mandatory Victims Restitution Act, any indebtedness owed to the Plan or as otherwise permitted by law, the Trust shall not be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, garnishment, execution, or levy of any kind, either voluntary or involuntary, including any such liability which is for alimony or other payments for the support of a spouse, former spouse or any relative, until such payment has been actually received by the person entitled to it. Any attempt to anticipate, alienate, settle, transfer, assign, pledge, encumber, charge or otherwise dispose of the same shall be void. The Plan shall not in any manner be liable for, or subject to, the debts, contracts, liabilities, engagements or torts of any person entitled to payments hereunder.

12.4 <u>Prohibition of Diversion of Trust</u>. It shall be impossible by operation of the Trust or by its natural termination, by power of revocation or amendment, by the happening of any contingency, by collateral arrangement or by any other means, for any part of the corpus or income of the Trust or any funds contributed thereto to be used for, or diverted to purposes other than the exclusive benefit of Participants, former Participants, their beneficiaries or dependents prior to all obligations having been satisfied or provided for. No part of net earnings of the Trust shall inure (other than benefit payments as outlined above) to the benefit of any Employer, Association, Council or individual; provided, however, a contribution made by an Employer as the result of a mistake a mistake may be returned to the Employer if the Trustees so direct provided the repayment is not prohibited by applicable law and will not adversely affect the tax-exempt status of the Trust and in a manner consistent with section 8.1.

MACRC-00145

12.5    Incompetency and Minors.  In the event it is determined that any person entitled to receive benefits is unable to care for his affairs because of mental or physical incapacity, or because the person is a minor, the benefits due such person may be paid to his legal guardian or conservator, or to any relative by blood or by marriage to be used and applied for the benefit of such person.  Payment to such legal representative or relative of the persons on whose account benefits are payable shall operate to discharge the payor from any liability to such person or to anyone representing him or his interest and the Trustees shall have no duty or obligation to see that the funds are used or applied for the benefit of such person.

12.6    Merger of the Plan.  The Trustees are authorized to merge or consolidate the Plan with another tax-qualified retirement plan or to be party to a transfer of assets or liabilities with another tax-qualified retirement plan; provided such merger, consolidation or transfer of assets or liabilities complies with all applicable laws and provided such merger, consolidation or transfer of assets or liabilities does not affect the qualification of the Plan under section 401(a) of the Internal Revenue Code and the tax-exempt status of the Trust under section 501(a) of the Internal Revenue Code.  Any provision herein to the contrary notwithstanding, and only to the extent law applicable to the Plan and Trust at the time of merger, consolidation or transfer requires, there shall be no merger or consolidation of the Plan nor a transfer of the Plan's assets or liabilities to another retirement plan and trust unless each Employee is entitled to receive a benefit immediately after such event (if the plan in which the Employee is participating after such event then terminated) which is equal to or greater than benefits he would have been entitled to receive if the Plan and Trust in which he had participated prior to such event had terminated immediately prior to such event.

12.7    Execution of Documents.  The Trustees, by resolution, may authorize any Employer Trustee and any Union Trustee or any joint group, comprised equally of Employer and Union Trustees, to jointly execute any notice, certificate or other written instrument relating to the Plan and all persons, partnerships, corporations or associations may rely upon any such notice or instrument so executed as having been duly authorized and as binding on the Plan and the Trustees.  The Trustees may also authorize agents of the Plan, including the administrator, to execute documents on behalf of the Plan.

12.8    Notice and Delivery of Documents.  Any notice required to be given hereunder may be given in person or by first class mail.  Also, the parties may consent to electronic delivery of notices required hereunder.  When notice is given by mail, it shall be deemed to have 4been given as of the date of posting to the last known address of the addressee available from the Plan records.

12.9    Gender, Number and Headings.  Wherever any words are used herein in the masculine gender they shall be construed as though they were also used in the feminine gender in all cases where they would so apply, and wherever any words are

XII-2

used herein in the singular form they shall be construed as though they were also used in the plural form in all cases where they would so apply. Titles of articles and headings of sections and subsections are inserted for convenience of reference. They constitute no part of this Agreement and are not to be considered in the construction hereof.

12.10 <u>Information to be Furnished by Employers</u>. Each Employer shall furnish the Trustees such records with respect to each of his Employees sufficient to determine the benefits due or which may become due hereunder as the Trustees may require in connection with the administration of the Plan. In the event of an alleged discrepancy in Employer contributions to the Plan or in any other data required for the Employer by this Agreement or by the Plan, the Trustees shall, in writing, notify the Employer of such alleged discrepancy and the period of time that the discrepancy is claimed to cover. On receipt of such written notice, the Employer shall promptly furnish to the Trustees any data requested that pertains to such alleged discrepancy.

12.11 <u>Qualification</u>. The Trust shall be tax-exempt under section 50l(a) of the Internal Revenue Code and the Plan shall be qualified under section 40l(a) of the Internal Revenue Code. The Trustees are authorized to take all actions consistent with this Trust Agreement and applicable collective bargaining agreements to do whatever is necessary to enable the Plan to make whatever applications are necessary with the Internal Revenue Service to receive and maintain a favorable determination from the Internal Revenue Service respecting the tax-qualified status of the Plan and tax-exempt status of the Trust.

12.12 <u>Construction</u>. This Agreement is created and accepted in the State of Illinois. All questions pertaining to its validity or construction not otherwise preempted by federal law shall be determined in accordance with the laws of the State of Illinois. If any provision contained in this Agreement or in any collective bargaining agreement pursuant to which this Agreement is created should be held unlawful, such provision shall be of no force and effect and this Agreement or any such collective bargaining agreement shall be treated as if such provision had not been contained therein.

12.13 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement.

MACRC-00147

IN WITNESS WHEREOF, the undersigned, as the duly appointed Trustees of the Chicago Regional Council of Carpenters Supplemental Retirement Fund, do hereby accept the trust created hereunder and agree to perform the duties, responsibilities and obligations under this Agreement as of the day, month and year first above written. Further the undersigned Trustees do hereby adopt the Chicago Regional Council of Carpenters Supplemental Retirement Fund Trust Agreement in the form of this Agreement and agree to be bound by the terms of this Agreement.

<u>Employer Trustees</u>                          <u>Union Trustees</u>

Date   11/30/2016                          Date   11-30-2016

Date   11-30-2016                          Date   11/30/2016

Date   11/30/2016                          Date   11-30-2016

Date   11/30/2016                          Date   11/30/2016

Date                                        Date   11/30/2016

XII-4

MACRC-00148

MACRC-00149

AMENDMENT 1
to the
AGREEMENT AND DECLARATION OF TRUST
of the
CHICAGO REGIONAL COUNCIL OF CARPENTERS
SUPPLEMENTAL RETIREMENT FUND

The undersigned Trustees of the Chicago Regional Council of Carpenters Supplemental Retirement Fund ("Fund") hereby verify that the following reflects action taken by a majority of the Trustees at their February 28, 2018 meeting:

WHEREAS, under Article VII of said Agreement and Declaration of Trust ("Trust Agreement"), the Trustees by majority vote have the power and authority to amend the Trust Agreement from time to time as therein provided;

WHEREAS, the Trust Agreement has identified the Mid-America Regional Bargaining Association ("MARBA") as a sponsoring Association;

WHEREAS, the Builders Association of Chicago ("BAC") was an association member of MARBA and participated in the Fund as an Association;

WHEREAS, the BAC merged into the Chicagoland Association of General Contractors ("CAGC") effective January 1, 2018; and

WHEREAS, it is determined to be desirable to amend the Trust Agreement to reflect that the CAGC, rather than MARBA, is the entity that participates in the Fund as an Association.

NOW, THEREFORE, BE IT RESOLVED: Effective January 1, 2018, that the Agreement and Declaration of Trust be amended by the restatement of section 1.2, Associations, in its entirety, to read as follows:

    1.2    Associations. The Association members of the Chicagoland Association of General Contractors, the Residential Construction Employers Council and any other employer association that has entered into a written agreement with the Council requiring contributions to the Plan.

FURTHER RESOLVED: Effective January 1, 2018, that the Agreement and Declaration of Trust be amended by the restatement of section 1.7, MARBA, in its entirety, to read as follows.

    1.7    CAGC. The Chicagoland Association of General Contractors or its successor by consolidation or merger, which represents Employers in collective bargaining negotiations with the Council.

FURTHER RESOLVED: Effective January 1, 2018, that the Agreement and Declaration of Trust be amended by the restatement of section 4.1, <u>Number of Trustees</u>, to read as follows:

4.1     <u>Number of Trustees</u>. There shall be ten regular Trustees, five of whom shall be representatives of the Employers (the "Employer Trustees") and five of whom shall be representatives of the Council (the "Union Trustees"). In addition to the regular Trustees, the Associations and the Council may designate such number of alternate Employer or alternate Union Trustees respectively, as CAGC, RCEC and the Council may deem advisable provided that CAGC, RCEC and the Council may not designate more alternate Trustees than that CAGC, RCEC and the Council are permitted to appoint as regular Trustees. An alternate Trustee shall only be authorized to act in the place and stead of a regular Trustee, appointed by the same entity that designated the alternate Trustee, who is unable to act because of death, incapacity, resignation or absence from a meeting of the Trustees, and an alternate Trustee shall have no duty or responsibility to act unless so authorized to act. As to matters handled when he/she is so authorized to act, an alternate Trustee shall be vested with all the rights, powers, duties and responsibilities of a regular Trustee. Any regular Trustee who is unable to act shall not be responsible for any acts taken by or omitted to be taken by an alternate Trustee in his/her place and stead. Such a regular Trustee who is unable to act shall be treated as if he/she has resigned in connection with any action taken or omitted to be taken by alternate Trustee.

FURTHER RESOLVED: Effective January 1, 2018, that the Agreement and Declaration of Trust be amended by the restatement of section 4.6, <u>Appointment and Removal of Trustees</u>, to read as follows:

4.6     <u>Appointment and Removal of Trustees</u>. CAGC may appoint three Employer Trustees, the RCEC may appoint two Employer Trustees and the Council may appoint five Union Trustees pursuant to the terms of its governing bylaws. Those Employer Trustees appointed by CAGC may be removed by CAGC, and those Employer Trustees appointed by the RCEC may be removed by the RCEC. Any Union Trustee may be removed from office at any time by the Council pursuant to the terms of its governing bylaws. Any notice of removal of a regular Trustee, in order to be effective, shall be delivered to the remaining regular Trustees, shall specify the date the removal shall take effect and name the Trustee removed, and shall be signed by a duly authorized representative of the respective Association or the Council.

2

An alternate Employer Trustee or Union Trustee may be
removed at any time in the same manner as a regular Trustee.

FURTHER RESOLVED: Effective January 1, 2018, that the Agreement and
Declaration of Trust be amended by the restatement of section 4.7, <u>Selection of Successor
Trustees</u>, to read as follows:

4.7    <u>Selection of Successor Trustees</u>. If any Trustee shall become
disqualified to serve, die, resign, be removed, become
incapacitated or refuse to act, a successor Trustee shall be
appointed forthwith by written instrument signed by those
authorized to appoint the successor.

CAGC shall appoint the successor Employer Trustee (or
alternate Employer Trustee) for an Employer Trustee (or
alternate Employer Trustee) that it appointed, and the RCEC
shall appoint the successor Employer Trustee (or alternate
Employer Trustee) for an Employer Trustee (or alternate
Employer Trustee) that it appointed.

Union Trustees (or alternate Union Trustees) shall be appointed
by the Council pursuant to the terms of its governing bylaws.

Any written instrument appointing a successor Employer or
Union Trustee (or alternate) shall state the date appointment shall
take effect and shall be delivered to the Chairman and Secretary
of the Trustees.

If a successor Trustee shall fail to be appointed within 90 days
after the position becomes vacant, then any remaining Trustee
may petition the United States District Court for the district in
which the principal office of the Plan is located, to appoint a
successor Trustee, which appointment shall be as fully effective
as if made by the party originally entitled to appoint such Trustee
and shall be considered to have been made on behalf of such
party.

FURTHER RESOLVED: Effective January 1, 2018, that the Agreement and
Declaration of Trust be amended by the restatement of section 5.4, <u>Quorum</u>, to read as
follows:

5.4    A quorum for the transaction of business at a duly called meeting
shall consist of two Employer Trustees and two Union Trustees
who are present in person (or electronically pursuant to section
5.3) provided that at least one Employer Trustee appointed by
CAGC and one Employer Trustee appointed by RCEC are
present. Once a quorum has been established, said quorum shall
continue to exist until the meeting has been adjourned provided

3

MACRC-00152

at least one Union Trustee, one Employer Trustee appointed by CAGC and one Employer Trustee appointed by RCEC remain in attendance.

FURTHER RESOLVED: Effective January 1, 2018, that the Agreement and Declaration of Trust be amended by the restatement of section 5.5, Voting, to read as follows:

5.5 Voting. Except as otherwise specifically provided for herein, all actions by and decisions of the Trustees shall be by the vote of a majority of votes cast by Trustees who are in attendance at a duly called meeting of the Trustees at which there is a quorum present. Each Trustee shall have one vote; provided, however, that: (a) at any meeting at which there is a lesser number of Employer Trustees than Union Trustees present, the Employer Trustees shall in the aggregate have that number of votes which equals the number of Union Trustees present and vice versa and (b) Employer Trustee votes shall be divided between the CAGC appointed and RCEC appointed Employer Trustees proportionate to the number of Employer Trustees that CAGC and RCEC are entitled to appoint relative to the total number of Employer Trustees regardless of the number of CAGC appointed or RCEC appointed Employer Trustees that are present at a meeting (as of January 1, 2017, CAGC was authorized to appoint three of the five Employer Trustees and RCEC was authorized to appoint two; as a result, CAGC appointed Trustees would possess 60% of the Employer Trustee votes and RCEC appointed Trustees would possess 40% of the Employer Trustee votes). The foregoing to the contrary notwithstanding, the unanimous written consent of the Trustees shall be required for any action pursuant to section 5.3(a).

Employer Trustee                    Union Trustee

4

AMENDMENT 2
to the
AGREEMENT AND DECLARATION OF TRUST
of the
CHICAGO REGIONAL COUNCIL OF CARPENTERS
SUPPLEMENTAL RETIREMENT FUND

The undersigned Trustees of the Chicago Regional Council of Carpenters Supplemental Retirement Fund ("Fund") hereby verify that the following reflects action taken by a majority of the Trustees at their November 28, 2018 meeting:

WHEREAS, under Article VII of said Agreement and Declaration of Trust, the Trustees by majority vote have the power and authority to amend such Agreement and Declaration of Trust from time to time as therein provided;

WHEREAS, the Trustees desire to amend said Agreement and Declaration of Trust to clarify that an entity will cease to qualify as an "Employer" immediately upon removal of the Council or a Local Union as the recognized bargaining unit representative notwithstanding continuation of the collective bargaining agreement;

NOW, THEREFORE, BE IT RESOLVED: Effective November 28, 2018, that the Agreement and Declaration of Trust be amended by the restatement of section 1.5, Employer, in its entirety, to read as follows:

      1.5     Employer. Any employer which:

      (a)     on or after the effective date of the Plan has a collective bargaining or other written agreement with the Council, either directly or as a member of an Association, or the Trustees requiring the employer to make contributions to the Plan;

      (b)     signs a copy of this Agreement, any predecessor agreement or a Participation Agreement;

      (c)     is accepted for participation in the Plan by the Trustees or was a party to any predecessor trust agreement; and

      (d)     makes contributions to the Plan as required by the agreement providing for such contributions.

An Employer contributing pursuant to a collective bargaining agreement shall cease to qualify as an Employer on the date the NLRB certifies the result of an election that terminates the Council's or Local Union's representative status, the date that the Employer lawfully withdraws recognition from the Council or Local Union, or the date on which the Council's or Local Union's representative status terminates through a valid disclaimer of interest.

The term "Employer" may also include the Council and any affiliate of the Council, and any state, national or international labor organization of which the Council is an affiliate; the Plan, or any other jointly-administered pension, health and welfare or other type of

MACRC-00154

employee benefit plan to which the Council is a party; if such organizations become obligated pursuant to a Participation Agreement with the Trustees to contribute to the Plan on behalf of its employees on substantially the same basis upon which other participating Employers are contributing to the Plan, is accepted for participation in the Plan by the Trustees and makes contributions to the Plan as required by the Participation Agreement. The Plan, the Council or any other employee benefit plan becoming an Employer pursuant to the provisions of this paragraph shall not in any event participate in the selection or replacement of Employer Trustees or have any vote as an Employer on any matter and its Employees shall not be considered in connection with any determination required to be made by Employers of a stated percentage or majority of Employees.


_____                    _____
Employer Trustee                            Union Trustee


2

MACRC-00155

AMENDMENT NO. 3

CHICAGO REGIONAL COUNCIL OF CARPENTERS
SUPPLEMENTAL RETIREMENT FUND
TRUST AGREEMENT
(restated effective January 1, 2017)

WHEREAS, section 10.1 of the Chicago Regional Council of Carpenters Supplemental Retirement Fund Trust Agreement, restated January 1, 2017 ("Trust Agreement"), authorizes the Board of Trustees ("Trustees") of the Chicago Regional Council of Carpenters Supplemental Retirement Fund ("Fund") to amend the Trust Agreement at any time; and

WHEREAS, the undersigned Trustees hereby verify that the following reflects action taken by a majority of the Trustees at their December 16, 2021 meeting; and

WHEREAS, the St. Louis-Kansas City Regional Council of the United Brotherhood of Carpenters and Joiners of America merged into the Chicago Regional Council of the United Brotherhood of Carpenters and Joiners of America ("Council") in September 2021; and

WHEREAS, the Council has been renamed and is now known as the "Mid-America Carpenters Regional Council of the United Brotherhood of Carpenters and Joiners of America" to reflect the aforementioned merger; and

WHEREAS, the Trustees took action at their December 16, 2021 meeting to change the name of the Fund to "Mid-America Carpenters Regional Council Supplemental Retirement Fund" to reflect the Council's new name, effective January 1, 2022; and

WHEREAS, the Trustees desire to amend the Trust Agreement to reflect the Fund's new name and the Council's new name.

NOW, THEREFORE, BE IT RESOLVED, effective January 1, 2022, the Trust Agreement shall be renamed the "Mid-America Carpenters Regional Council Supplemental Retirement Fund."

IT IS FURTHER RESOLVED, effective January 1, 2022, the Fund's name is changed to "Mid-America Carpenters Regional Council Supplemental Retirement Fund," and applicable references to the Fund's name within the Trust Agreement are updated accordingly.

IT IS FURTHER RESOLVED, effective January 1, 2022, the Trust Agreement is amended as follows:

1.      Section 1.3 is amended and restated in its entirety as follows:

1.3     Council. The Mid-America Carpenters Regional Council, United Brotherhood of Carpenters and Joiners of America, formerly known as the "Chicago Regional Council of Carpenters, United Brotherhood of Carpenters and Joiners of

46512913v2

MACRC-00156

America," and earlier, the "Chicago and Northeast Illinois District Council of the United Brotherhood of Carpenters and Joiners of America."

2.      Section 1.10 is amended and restated in its entirety as follows:

    1.10    Plan. The Mid-America Carpenters Regional Council Supplemental Retirement Plan (prior to January 1, 2022, the "Chicago Regional Council of Carpenters Supplemental Retirement Plan"), established and maintained pursuant to the terms of this Agreement.

3.      Article II is amended and restated in its entirety as follows:

Creation and Acceptance of Trust

        All payments made by Employers on behalf of their Employees to the Plan pursuant to collective bargaining or other written agreements and such other payments as shall from time to time be made to the Plan by or on behalf of Employers and Employees, and all other money or property as shall lawfully become a part of the Trust, together with the income, gains and all other increments of any nature whatsoever, if any, therefrom, shall be held, managed and administered in trust pursuant to the terms of this Agreement. The Trust shall be known as the Mid-America Carpenters Regional Council Supplemental Retirement Fund Trust (prior to January 1, 2022, the "Chicago Regional Council of Carpenters Supplemental Retirement Fund Trust"). The Trustees hereby accept the Trust created hereunder and agree to perform the duties, responsibilities and obligations under this Agreement on their part to be performed.

        IT IS FURTHER RESOLVED, this Amendment No. 3 to the Trust Agreement may be executed in any number of counterparts and in separate counterparts, each of which when so executed shall be deemed an original, but all of such counterparts together shall constitute but one and the same instrument. Signatures affixed and transmitted by facsimile, e-mail or other electronic means shall be deemed original signatures. Upon delivery via facsimile, e-mail or other electronic means, a signature shall be deemed an original and shall be admissible evidence.

        The undersigned hereby attest that the Trustees took action at their December 16, 2021 meeting to amend the Trust Agreement in the manner set forth above.

Employer Trustee                              Council Trustee

46512913v2

MACRC-00157

24 CV 6428

EXHIBIT E

# MID-AMERICA REGIONAL

# BARGAINING ASSOCIATION



## CARPENTERS AGREEMENT

BETWEEN

**MID-AMERICA REGIONAL BARGAINING ASSOCIATION (MARBA)**

AND

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**

**TERM OF AGREEMENT**

**<u>JUNE 1, 2019 TO MAY 31, 2024</u>**

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
**Term of Agreement**
**6/1/19 - 5/31/24**

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| **JOINT AGREEMENT** | | 1 |
| **ARTICLE I** | **BARGAINING UNIT** | 1 |
| | Recognition | 1 |
| **ARTICLE II** | **UNION SECURITY** | 2 |
| **ARTICLE III** | **SUB-CONTRACTING** | 2 |
| **ARTICLE IV** | **WAGES** | 3 |
| | Show Up Time | 4 |
| | Minimum Hours after Work Commenced | 4 |
| **ARTICLE V** | **PAY DAY** | 4 |
| | Pay on Termination of Employment | 5 |
| | By Discharge | 5 |
| | By Lay-Off | 5 |
| **ARTICLE VI** | **HOURS OF LABOR** | 6 |
| | Transportation | 7 |
| **ARTICLE VII** | **SHIFT WORK** | 7 |
| **ARTICLE VIII** | **INSURANCE** | 9 |
| **ARTICLE IX** | **SAFETY** | 9 |
| **ARTICLE X** | **JOB STEWARD** | 9 |
| **ARTICLE XI** | **FOREMAN** | 10 |
| **ARTICLE XII** | **HEALTH AND WELFARE FUND** | 10 |
| **ARTICLE XIII** | **PENSION FUND AND SUPPLEMENTAL RETIREMENT FUND** | 12 |
| **ARTICLE XIV** | **TRAINING FUND** | 14 |
| **ARTICLE XV** | **BONDING** | 15 |
| **ARTICLE XVI** | **TOOLS** | 15 |
| **ARTICLE XVII** | **APPRENTICES** | 16 |
| **ARTICLE XVIII** | **SETTLEMENT OF DISPUTES** | 17 |
| **ARTICLE XIX** | **USE OF MACHINERY, TOOLS AND FACTORY MADE PRODUCTS** | 18 |
| **ARTICLE XX** | **MISCELLANEOUS PROVISIONS** | 19 |

**ARTICLE XXI**     **MOST FAVORED NATIONS** ...................................................21

**ARTICLE XXII**     **PILE DRIVING-SCOPE OF WORK** ..............................22
Pile Driving - Work Rules .................................................22
Pile Driving - Territorial Jurisdiction .................................24

**ARTICLE XXIII**     **MILLWRIGHT-WORKING RULES** .............................24

**ARTICLE XXIV**     **SHINGLING, SIDING AND INSULATING MECHANICS-GENERAL** ...........25
Claims and Jurisdiction of the Shingling Mechanic........................25
Claims and Jurisdiction of the Siding Mechanic .........................25
Claims and Jurisdiction of the Insulating Mechanic .....................25

**ARTICLE XXV**     **INSTALLERS OF FLOOR AND WALL PRODUCTS** ................26

**ARTICLE XXVI**     **LATHERS-SCOPE OF WORK** ..................................26
Lathers - Working Rules-Local Dues ....................................27
Registration Day.........................................................27
Rocklath ...............................................................27
Lathers - Territorial Jurisdiction......................................28

**ARTICLE XXVII**     **DUES CHECK-OFF** ...........................................28

**ARTICLE XXVIII**     **INDUSTRY ADVANCEMENT FUND**.............................28

**ARTICLE XXIX**     **CHICAGOLAND CONSTRUCTION SAFETY COUNCIL** ..........29

**ARTICLE XXX**     **CONSTRUCTION INDUSTRY SERVICE CORPORATION** ........29

**ARTICLE XXXI**     **MARKET AND GEOGRAPHIC AREA COMMITTEE** .............29

**ARTICLE XXXII**     **SUBSTANCE ABUSE AND RECOVERY PROGRAM** .................30

**ARTICLE XXXIII**     **DIVERS AND DIVER TENDERS** ..............................34
Scope of Work...........................................................34
Rates of Pay............................................................34
Working Conditions .....................................................34
Training and Safety ....................................................35

**ARTICLE XXXIV**     **UBC NATIONAL FUNDS** .....................................35

**ARTICLE XXXV**     **LABOR/MANAGEMENT UNION CARPENTRY COOPERATION PROMOTION FUND** ......................................................35

**ARTICLE XXXVI**     **SAVINGS CLAUSE** .........................................36

**ARTICLE XXXVII**     **WORK RULES COMMITTEE** ..................................36

**SIGNATURE PAGE** .....................................................37

**CHICAGO REGIONAL COUNCIL
OF CARPENTERS**

**TERM OF AGREEMENT
JUNE 1, 2019 through MAY 31, 2024**

THIS AGREEMENT is effective June 1, 2019 through May 31, 2024, by and between MID-AMERICA REGIONAL BARGAINING ASSOCIATION for and on behalf of the present and future members, together with such other employers who become signatory to this Agreement (referred to herein as "Employer or Employers") and the CHICAGO REGIONAL COUNCIL OF CARPENTERS, for and on behalf of the Local Unions under its jurisdiction in Cook, Lake and DuPage Counties, Illinois (hereinafter referred to as the "Union').

This Agreement shall be in full force and effect from June 1, 2019 through May 31, 2024.

NOW, THEREFORE, it is hereby agreed as follows:

**ARTICLE I
BARGAINING UNIT**

**1.1** The Bargaining Unit shall consist of all Journeymen, Foremen, Apprentices and Trainees engaged in work at the construction site covered by the occupational jurisdiction of the "Union" including, but not limited to, the milling, fashioning, joining, assembling, erection, fastening or dismantling of all material of wood, plastic, metal, fiber, cork, and composition, and all other substitute materials; scaffolding; overhead sectional doors; concrete forming, gang forms; the handling, erecting, installing and dismantling of machinery and equipment, hydraulic jacking and raising, and the manufacturing of all materials where the skill, knowledge and training of the Employees are required, either through the operation of machine or hand tools. The Bargaining Unit shall also consist of all Journeymen, Foremen, Apprentices and Trainees engaged in work as Carpenters and Joiners, Millwrights, Pile Drivers; Bridge Dock and Wharf Carpenters, Divers, Underpinners, and Timbermen and Core drillers; Ship Wrights, Boat Builders and Ship Carpenters, Joiners and Caulkers, Cabinet Makers, Bench Hands, Stair Builders, Millmen, Wood and Resilient Floor Layers, and Finishers, Carpet Layers, Shinglers, Siders, Insulators, Acoustic and Dry Wall Applicators; Shorers and House Movers; Loggers, Lumber and Sawmill Workers; Casket and Coffin Makers; Furniture Workers, Reed and Rattan Workers; Shingle Weavers, Box Makers, Railroad Carpenters and Car Builders, and Show, Display, and Exhibition Workers and Lathers, regardless of material used; and all those engaged in the operation of wood working or the machinery required in the fashioning, milling or manufacturing of products used in the trade, or engaged as helpers to any of the above divisions or subdivisions, and the handling, erecting and installing material on any of the above divisions or sub-divisions; burning, welding, rigging and the use of any instrument or tool for layout work, incidental to the trade. When the term "Carpenter and Joiner" is used, it shall mean all the subdivisions of the Trade. However, the Union agrees that it will not interfere with existing practices of other unions affiliated with the Building Trades.

**RECOGNITION**

**1.2** The Association and the Employer recognizes the Union as the sole and exclusive Bargaining Representative for the Employees, now or hereafter employed in the Bargaining Unit for the purpose of Collective Bargaining in respect to pay, wages, hours of employment, or other conditions of employment. All work covered by this Agreement shall be performed by the Employees in this Bargaining Unit.

**1.3** Any Employee of this Bargaining Unit may perform any or all of the work described herein provided he observes the special rules as described for the particular subdivision or specialty of the trade.

**1.4** The Employer and the Union agree that neither party shall discriminate against any person directly or indirectly, in such matters as race, creed, color, sex, national origin, age or religion.

## ARTICLE II
## UNION SECURITY

**2.1** Maintenance of Membership: All Employees now included in the Bargaining Unit represented by the Union and having a membership therein must, during the term hereof, as a condition of employment maintain their membership in the Union.

**2.2** All other Employees covered by this Agreement shall, as a condition of employment, become members of the Union after the seventh (7) day of, but not later than the eighth (8) day following the beginning of, such employment, or the effective date of this Agreement, whichever is later and they shall maintain such membership as a condition of continued employment as hereinafter provided.

**2.3** Any Employee who refuses or fails to become a member of the Union or refuses or fails to maintain his membership therein in accordance with the provisions of Sections 1 and 2 of this Article, shall forfeit his right of employment, and the Employer shall, within three (3) working days of being notified by the Union in writing as to the failure of an Employee to join the Union or to maintain his membership therein, discharge such Employee. For this purpose the requirements of membership and maintaining membership shall be in accordance with State and Federal Laws. The Employer shall not be in default unless it fails to act within the required period after receipt of written notice.

**2.4** The Employer shall, on the day that he hires an Employee who is not a member of the Union, notify the Union, or the Job Steward of the name, address and date of initial employment of such Employee, as well as the jobsite. In the absence of a Job Steward, the Employer also agrees to advise the Employee of the provisions of this Article.

## ARTICLE III
## SUB-CONTRACTING

**3.1** The parties hereto being in the Construction Industry qualify under the proviso of Section 8(e) of the National Labor Relations Act, 1947 as amended.

**3.2** Employer shall not contract or subcontract any work coming within the jurisdictional claims of the Union to any person, firm or corporation not covered by a Collective Bargaining Agreement with the Union, provided, however, that the provisions of this paragraph shall apply only to the contracting and subcontracting of work to be done at the site of construction, alteration, painting or repair of a building, structure or other work.

**3.3** Employer, in recognition of the territorial and occupational jurisdiction of the Union, shall not subcontract or contract out jobsite work coming within the jurisdiction of the Carpenters Union nor utilize on the jobsite the services of any other person, company or concern to perform such work that does not observe the same wages, fringe benefits, hours and conditions of employment as enjoyed by the Employees covered by this Agreement.

**3.4** Any Employer who sublets any of the work coming within the jurisdiction of Carpenters shall assume the obligations of any subcontractor to the extent of Carpenter labor employed on work under contract with the Employer for prompt payment of Employee's Wages, Health and Welfare, Pension and Apprentice Training Contributions, including reasonable attorney's fees incurred in enforcing the provisions hereof, provided the subcontractor is not bonded as provided for in Article XV hereof. The Union will, upon written request, furnish written certification to any Employer as to whether a

subcontractor is adequately bonded including expiration date of bond, and that wages and payments to Health and Welfare, Pension and Apprentice Contributions are current.  The Union also agrees to notify MARBA of any subcontractor whose bond is being terminated.  If the Employees are withdrawn from any job in order to collect contributions to the Carpenters Health and Welfare, Pension and Apprentice Training Program, the Employees who are affected by such stoppage of work shall be paid for lost time up to sixteen (16) hours, provided that two (2) days notice of the intention to remove Employees from the job is given to the Employer and the subcontractor by the Union by registered mail.

The Employer shall furnish the Union with the names of its subcontractor(s) on each jobsite and with a copy of the subcontractors' surety or cash bond agreement evidencing that such subcontractor(s) is obligated to this Agreement and has posted the bond required by Article XV.  Such Employer, from the date the Union receives such information and for the work performed on the specific referenced jobsite, will not be liable for the subcontractor's wage or fringe benefit obligation.  If the Union notifies the Employer in writing that the subcontractor is no longer properly bonded, then from that date and for work subsequently performed in the specific referenced jobsite the Employer's liability under this section for such subsequent work will resume until such time as the proper bond has been replaced.

**3.5**  If an Employer, bound by this Agreement, contracts or subcontracts any work covered by this Agreement to be done at the jobsite of the construction, alteration, painting or repair of a building, structure or other work to any person or proprietor who is not signatory to this Agreement, the Employer shall require such subcontractor to be bound by all provisions of this Agreement, or the Employer shall maintain daily records of the subcontractor's or the subcontractor's Employees jobsite hours and be liable for payments to the Chicago Regional Council of Carpenters Welfare Fund, the Chicago Regional Council of Carpenters Pension Fund and the Chicago Regional Council of Carpenters Apprentice and Trainee Program, as provided in Articles XII, XIII, and XIV of this Agreement.

## ARTICLE IV
## WAGES

**4.1**  The economic package will increase as follows:

| | | |
|---|---|---|
| (a) | Effective June 1, 2019 | $2.63 (3.25%) Increase per hour |
| (b) | Effective June 1, 2020 | $2.71 (3.25%) Increase per hour |
| (c) | Effective June 1, 2021 | $2.58 (3.00%) Increase per hour |
| (d) | Effective June 1, 2022 | $2.66 (3.00%) Increase per hour |
| (e) | Effective June 1, 2023 | $2.74 (3.00%) Increase per hour |

If the pension funding requirements under the applicable schedule of a FIP or the applicable schedule of a Rehabilitation Plan adopted by the Pension Plan Trustees under the Pension Protection Act of 2006, or any successor legislation, and agreed to/adopted by the bargaining parties, requires additional pension contributions greater than fifty cents ($0.50) per hour, those additional pension contribution amounts shall be allocated first from the total package increase scheduled for that year before any allocations to wages or the health & welfare plan or other benefits.

In the event the Pension Fund is not at or above 90% funded in accord with the Pension Protection Act of 2006 or other successor legislation as of May 1st of each contract year, the Union shall allocate a minimum of fifty cents ($0.50) per hour to the Pension Fund and commit that its allocation of wages will not exceed 1.5 % of the total package.

Subject to the foregoing, the allocation among the wages and any other contributions shall be at the discretion of the Executive Committee of the Union.  Notice in writing of the allocation shall be given to the Employer by the Union thirty (30) days prior to the effective date.

(b)  The Apprentice rates of wages shall be as follows:
1st Year    40% of Journeyman's Wages
2nd Year    50% of Journeyman's Wages
3rd Year    65% of Journeyman's Wages
4th Year    80% of Journeyman's Wages

## SHOW UP TIME

**4.2**  Any Employee reporting for work on direction of the Employer or in the course of the regular job schedule and not being put to work for any reason shall receive two (2) hours' pay.  Employees who are notified by the Employer not to report for work shall not be entitled to any pay under this provision.  Employers may notify Employees by telephone at least two (2) hours prior to the start of work not to report for work.  Employees will be required to provide the Employer with a telephone number that can be used to notify them not to report for work.

## MINIMUM HOURS AFTER WORK COMMENCED

**4.3**  If an Employee commences work on a job the minimum pay he shall receive for that day shall be four (4) hours pay, except for conditions such as weather, fire, accident or other unavoidable cause beyond the control of the Employer.

**4.4**  Employer further agrees upon request of the Chicago Regional Council of Carpenters to provide copies of payroll checks prior to their being delivered to any Employee to the business representative by facsimile or delivered to his office.

**4.5**  Employer agrees that, by appointment, and within forty-eight (48) hours of notice during the normal working days, he or his representative will meet with, at Employer's office or shop, anyone designated by the President of the Union for the purpose of inspecting lists of Employees, payroll records, and time cards solely to determine whether the provisions of this Agreement are being complied with.

## ARTICLE V
## PAY DAY

**5.1**  Employees shall be paid once each week, not later than 3:30 p.m. on the regularly established payday, except in cases of holidays in which case they may be paid on the following workday.  Wages are to be paid in full up to two (2) workdays preceding the regular designated payday.  Wages may be paid by mail or by electronic deposit as directed in writing by the Employee.  If wages are to be paid by mail or by electronic deposit the paycheck must be received on or before the regularly established payday.  If the Employer fails to have sufficient funds for wages due, or for pay checks issued, he shall pay in addition thereto a sum equal to the costs incurred in collecting same, including reasonable attorney's fees.  If the Employer issues a check for the payment of wages or fringe benefits which is returned due to a lack of sufficient funds, the Employer shall be required to make all payments of wages and fringe benefits in cash or by certified check, and in addition the Employer will be required to reimburse each Employee for any charges assessed.

## PAY ON TERMINATION OF EMPLOYMENT

**5.2**  (a) Involuntary Dismissal.

### BY DISCHARGE

Employer may discharge any Employee at any time on any working day provided, however, Employee is given fifteen (15) minutes with pay to gather his tools, and is immediately tendered in hand on the job all wages due him.  The parties hereto agree that the payment procedure upon discharge, as outlined above, is a condition precedent to lawful discharge.

### BY LAY-OFF

When an Employee is laid off due to lack of work, he shall be paid immediately all wages due him to date and he shall receive at least one-hour notice prior to 3:30 p.m.  In the event such notice is not given, Employer shall pay one (1) hour of wages in addition to all wages due him.  However, when the one (1) hour penalty is in effect, then in that event the one-hour wages shall be mailed to the home of the Employee within a twenty-four (24) hour period.  If he is not paid on the job at the time he is laid off, he shall be paid four (4) hours of additional pay all of which shall be included in his last paycheck.

(b)  Voluntary Termination of Employment:  When an Employee quits his job on his own accord, he may be required to wait, at the option of the Employer, until the next regular pay day for the wages due him.

**5.3**  In the event that an Employee does not receive the wages according to the foregoing, then in that event he shall be paid in addition thereto at the regular rate, all time he spends, (1) waiting to be paid, and/or (2) all time expended by him to receive his pay, but in no event less than one (1) hour of pay nor more than four (4) hours for any time so spent.  Saturdays, Sundays and National Holidays are excluded.

**5.4**  (a) Employees working from a "Bos'ns Chair", or suspended from cables or ropes shall receive not less than twenty-five ($0.25) cents per hour above the applicable rate of journeyman's pay.

(b)  Employees required to work on or with any materials that are treated with any creosote materials, or acid that may cause rashes, burns, or toxic reaction, or are required to wear any type of special breathing apparatus as protection against inhalation of noxious gas or dust, shall not receive less than twenty-five ($0.25) cents per hour above the applicable rate of journeyman's pay.

(c)  The Employer shall furnish any necessary protective medication such as petroleum jelly, to prevent burns from said creosote or chemicals which may prove injurious to the skin.  Gloves shall also be furnished by the Employer.

(d)  Nothing in this section of this Agreement (premium pay) shall be so construed as to prohibit the opening to arbitration between the Employer and the Union at any time during the term of this Agreement of any work to be performed by Employees, of such nature as the Union deems hazardous or which makes exceptional demands on an Employee's health and safety and thereby qualify for premium pay, which is not covered by Articles in this section.

(e)  In the event that the Union notifies the Employer that certain work is hazardous in nature, as defined in sub-section (b) above, a determination shall be made to establish the wage scale as well as working conditions and such scale shall be retroactive to commencement of such hazardous work

**5.5**  Employer agrees to provide Employee with a statement each payday setting forth the following information:

(1)  Hourly rate and number of hours worked in payroll period;
(2)  Gross Salary;
(3)  Itemization of each and every deduction being made against Gross Salary.
Said statement can be part of a stub attached to Employee's payroll check.

## ARTICLE VI
## HOURS OF LABOR

**6.1** (a) Eight (8) hours shall constitute a regular day's work, Monday thru Friday, beginning at 7:00 A.M. and ending at 3:30 P.M. with one-half (1/2) hour off from 12:00 noon to 12:30 P.M. for lunch. The Employer, without an adjusted workday in place, may begin work at 6:00 A.M. provided that the first hour of work is paid at the rate of time and one-half and all hours worked after 3:30 P.M. are paid at the rate of double time. The lunch period may be adjusted at the Employer's option during placement of concrete only, in any one-half (1/2) hour period between 12:00 noon and 1:00 P.M.

(b) Provided, however, upon twenty-four (24) hours written notice to the Business Representative of the District or the Regional Council, the Union will grant an adjusted workday (starting times from 6:00 A.M. to 9:00 A.M. at straight time) which shall be at the option of the Employees upon certification of the job steward or Business Representative and, provided further, that the adjusted start time is the uniform start time established for the project. Adjusted workdays must remain in effect for the duration of contractor's work unless otherwise agreed to by the Business Representative. In no case should a job begin before 6:00 A.M.

**6.2** There shall be no work done on the following holidays designated herein or days celebrated as such, except with written approval of the Union and when work is authorized, the rate of pay shall be at the rate of double time:

NEW YEAR'S DAY, MEMORIAL DAY, FOURTH OF JULY, LABOR DAY, THANKSGIVING DAY, CHRISTMAS DAY.

**6.3** Overtime shall be paid for work done before and after the regular workday or the adjusted workday as defined above, except where shift work has been approved. Work performed between 7:00 A.M. and 3:30 P.M. on Saturday or during the first eight (8) hours of an approved adjusted workday on Saturday shall be paid at the rate of time and one-half. Overtime pay for work performed after 3:30 P.M. on Saturday or after the first eight (8) hours of an approved adjusted workday on Saturday and the start of the regular or adjusted workday on Monday, shall be paid at the rate of double time except where shift work has been approved. In the event that there is more than one (1) shift of work on Saturday, without shift work approved by the Union, overtime pay for all hours of work on Saturday shall be paid at the rate of double time.

**6.4** The first two (2) hours of overtime work after working a regular eight (8) hour work day or an approved adjusted work day, Monday through Friday, shall be paid for at the rate of time and one-half and shall not be mandatory but shall be at the option of the Employee. All other overtime shall be paid for at the rate of double time. At the discretion of the Employer overtime will be permitted for work as required for emergencies such as for the protection of life or property, weather protection, completion of work caused by breakdown of deliveries or failures in concrete form work. In all other cases, overtime work shall require permission of the Business Representative of the District or the Regional Council, for each such case.

**6.5** All Employees shall be given time in which to gather their tools prior to quitting time.

**6.6** The hours of work for which an Employee shall receive pay shall commence and terminate at the facility provided for Carpenters to change their clothes, provided however, that said facility is at ground level. In the event that such facility is other than at ground level, "time" shall commence and terminate at ground level.

**6.7** When an Employee is directed either expressly or impliedly to go from one jobsite to another, he shall be paid for all time spent in traveling from the initial site to any other site.

**6.8**  Employees who are required to work during the regularly defined lunch hour period shall eat not later than one (1) hour after the normal lunch period.

**6.9**  If an Employee covered by this Agreement sustains an accidental injury arising out of his employment which requires immediate medical care off the premises, during working hours, such Employee shall be paid his regular wages for the time necessarily spent in going to a physician's office, medical center or hospital, as well as the time required to return to the jobsite.  Except in unusual circumstances, this provision shall be effective only on the date of the injury, unless subsequent visits during working hours are required by Employer's physician(s).  When it is necessary for an Employee to be taken to a hospital immediately following an injury, he shall be taken to the hospital nearest to the jobsite at the Employer's expense.

**6.10**  Safe and adequate transportation from a jobsite following an injury other than for a minor injury, shall be furnished by the Employer.  The Job Steward shall be notified of all such injuries.  If the Steward determines that someone must accompany the injured Employee to the hospital, medical center, physician's office, or Employee's home, the Employer shall select such person, who shall be compensated at the regular rate for such services.  However, nothing contained in this Section 6.9 and Section 6.10 shall prevent an Employer from discharging an Employee for adequate cause.

In the event an Employee is injured in the course of his employment, he shall not be dismissed from such employment because of his injury, nor shall he be dismissed during the period of medical care required by said injury, unless there is no work available with his Employer of which he is capable to perform, or unless his dismissal is due to conditions beyond the control of the Employer.

## TRANSPORTATION

**6.11**  An Employee who is required to travel to a jobsite shall be reimbursed for lodging when required to remain away from his home overnight.  The expense allowance for lodging for each night shall be a minimum of fifty dollars ($50.00) per night.

**6.12**  On all mill jobs or other jobs where the men cannot drive to the jobsite the Employer shall furnish transportation to the jobsite when the distance is greater than three-tenths (3/10ths) of a mile.

**6.13**  On all jobs where the Employees are required to use Employer transportation to the jobsite, wages shall commence at 7:00 a.m.

**6.14**   In the event that the Employees are required to work outside the geographic jurisdiction of their home local, they shall be paid the higher rate of wages and fringe benefit contribution rates under the agreement covering the Employee's home local or the agreement covering the area where the work is being performed.

In the event that the Employees are required to perform work outside the geographic jurisdiction of the Union and the Employer is not covered by an agreement with an affiliate of the United Brotherhood of Carpenters and Joiners of America, the terms and conditions of this Agreement shall be binding with respect to the Employee being required to work outside the geographic jurisdiction of the Union.

## ARTICLE VII
## SHIFT WORK

**7.1**  There shall not be more than one (1) shift of work (7:00 A.M. to 3:30 P.M.) performed in any one (1) day and at any one (1) jobsite, except with Union permission.

**7.2**  A pre-job conference shall take place between the President of the Chicago Regional Council of Carpenters and the Business Representative of the District, wherein the work will be performed, and with the Employer or his representative before shift work will be allowed.

**7.3**  No shift work shall be permissible unless the shifts shall run a minimum of five (5) consecutive working days.  When a jobsite qualifies for the use of a second and third shift the following shall be applicable:

(1)  The First Shift shall start at 7:00 A.M. and end at 3:30 P.M., which shall be eight (8) hours.
(2)  The Second Shift shall start at 3:30 P.M. and end at 11:00 P.M..
(3)  The Third Shift shall start at 11:00 P.M. and end at 6:30 A.M.
(4)  The Second and Third Shifts shall receive eight (8) hours pay for seven (7) hours worked.
(5)  Lunch hours for shift work shall be:
      First Shift--12:00 noon to 12:30 p.m.
      Second Shift--8:30 p.m. to 9:00 p.m.
      Third Shift--4:00 a.m. to 4:30 a.m.

**7.4**  Employees required to work through their specified lunch hour shall be paid double time for that period.

**7.5**  Any work done in excess of eight (8) hours on the first shift and in excess of seven (7) hours on the second shift and third shift shall be paid wages at the rate of double time.

**7.6**  All approved shifts falling entirely on Saturday shall be paid wages at the rate of time and one-half.  All approved shifts falling entirely on Sunday shall be paid wages at the rate of double time.

**7.7**  No Employee shall work more than one (1) shift in any twenty-four (24) hour period.

**7.8**  In the event permissible shift work does not fulfill the requirements as stated above, except for conditions beyond  Employer's control, time worked will revert to premium wages for the second and third shift.

**7.9**  In the event that Davis Bacon/prevailing wage projects require shifts to occur at times other than those specified in the Article because of traffic congestion, public safety, municipal requirements or other situations; different shifts and starting times can be established upon mutual agreement by the contractor and Union.  Contractors utilizing this provision shall notify the Chicago Regional Council of Carpenters by requesting the pre-job conference on the form provided by the Chicago Regional Council of Carpenters. By mutual consent of the Employer and the Union, the starting and quitting times of any shift, including day work, may be changed for all or any portion of a particular job. However, the adjusted shift shall run a minimum of three (3) consecutive days. All Employees working under this provision shall be paid under the shift work provision contained in Section 7.3(4). Any and all work in excess of seven (7) hours under this provision shall be paid at a rate of double time. An Employer who violates this section shall pay as a penalty double time for all hours worked.

**7.10**  When work to be performed in occupied buildings is of such a nature that it is not appropriate or practical during the regular work day, such as renovation, alteration and modernization, such work may be performed at an adjusted time; provided a pre-job conference takes place between the Chicago Regional Council of Carpenters and the Employer and permission is granted by the Chicago Regional Council of Carpenters.  Contractors utilizing the provision shall notify the Chicago Regional Council of Carpenters by requesting the pre-job conference on the form provided by the Chicago Regional Council of Carpenters.  BY mutual consent of the Employer and the Union, the starting and quitting times of any shift, including day work, may be changed for all or any portion of a particular job. However, the adjusted shift shall run a minimum of three (3) consecutive days.  All Employees working under this provision shall be paid under the shift work provision contained in Section 7.3(4).  Any and all

work in excess of seven (7) hours under this provision shall be paid at a rate of double time. An Employer who violates this section shall pay as a penalty double time for all hours worked.

# ARTICLE VIII
# INSURANCE

**8.1** Employer agrees to furnish to the Union a Certificate of Insurance from an insurance company authorized to do business in the State of Illinois covering liability under the provisions of the Illinois Worker's Compensation Act.

**8.2** It is agreed that all Employers not otherwise required to pay contributions under the Illinois Unemployment Compensation Act, and regardless of the number of men employed, shall voluntarily elect to become subject thereto and liable for the payment of contributions thereunder.

# ARTICLE IX
# SAFETY

**9.1** The Employer agrees to adhere to and comply with the provisions of OSHA, the Illinois Health and Safety Act; standards of the American National Standards Institute; the Safety Provision of the Walsh Healy Public Contracts Act; Local Building and Safety Codes and shall also comply with manufacturers' specifications for safe operation of equipment.

**9.2** Should a Carpenter be required by law to accompany any Safety Inspector, City, State or Federal (O.S.H.A.) on a Safety Inspection of the jobsite, he shall do so with pay.

**9.3** The Employer shall furnish at all times and places suitable drinking water and sanitary facilities.

# ARTICLE X
# JOB STEWARD

**10.1** The parties agree that the following basic principles apply to the selection of a Job Steward:

(1) The Union requires that a Steward must fully protect the interest of the Union.
(2) The Employer requires that a Steward be a Carpenter who can efficiently perform his duties as a Carpenter and who will not disrupt the job unnecessarily in discharging his duties as a Steward.
(3) To meet the two basic principles agreed to by the parties, it is further agreed:
    (a) The Job Steward shall be a working Carpenter;
    (b) The Steward shall be selected by the Business Representative of the Union;
    (c) In selecting a Steward preference shall be given Union Members presently employed in the Bargaining Unit of the Employer on the specific site, provided, however, that if, in the judgment of the Business Representative, no presently employed Union Member is competent to act as Steward, the Steward shall be selected from outside the Bargaining Unit. A reason shall be given by the Business Representative why no member is competent. However, the reason shall not infringe upon the right of the Business Representative to select the Steward;
    (d) The Union shall have the right to replace any Steward at any time;
    (e) So long as he is competent to perform the work to be done on the job, the Steward shall be the last Carpenter laid off, except for the Foreman;
    (f) These provisions shall not apply to the work of Pile Driving where the work is performed by a small crew. In the Pile Driving crew, one (1) in the crew shall be designated by the Business Representative as a Steward;

(g) A Millwright Steward shall be appointed by the Millwright Business Representative on any job where Millwright work is being performed;

(h) If there is a dispute as to any of the Sections or Sub-Sections of this Article, the provisions of Article XVIII will apply.

**10.2** The duties of the Job Steward shall be to report to the Business Representative of the Union:

(a) Members' dues delinquencies;

(b) Violations of Collective Bargaining Agreement;

(c) Carpenters employed seven (7) days or more, who have not become members of the Union;

(d) Disputes and grievances of members.

He shall not have authority to:

(1) Adjust violations of the Collective Bargaining Agreement;

(2) Collect any money due the Union from any person or applicant for membership or any other person.

**10.3** Whenever one (1) or more Carpenters are required to work overtime, one (1) of their members shall be the regularly designated Steward, or someone designated by him.

# ARTICLE XI
# FOREMAN

**11.1** Where there are three (3) or more Carpenters on any one (1) jobsite, and one (1) journeyman, one shall be assigned the duties of Foreman, and shall receive the wages of a Foreman.

**11.2** The wages of a Foreman shall be computed as follows:

(a) In the case of a Foreman who directs up to four (4) Carpenters, the Foreman wage shall be two dollars ($2.00) per hour above the rate of wages for a journeyman.

(b) In the case of a Foreman who directs five (5) or more Carpenters, the Foreman wage shall be two dollars and fifty cents ($2.50) per hour above the rate of wages for a journeyman.

**11.3** Where there are ten (10) or more Carpenters on any one (1) jobsite, one (1) must be designated a Foreman, and he shall receive Foreman's wages, he shall devote his time to supervision of the work and he shall not work with the tools.

**11.4** Whenever a Foreman or General Foreman is chosen by the Employer, he shall be a person from the unit described in Article I, Paragraph 1.1.

# ARTICLE XII
# HEALTH AND WELFARE FUND

**12.1** Unless otherwise directed herein, each Employer shall pay into the Chicago Regional Council of Carpenters Welfare Fund (hereinafter referred to as "Health and Welfare Fund") an amount per hour for each hour worked for an Employer during each calendar month by all of its Employees who are covered by this Agreement in amounts determined and allocated by the Executive Committee of the Union effective June 1, 2019, June 1, 2020, June 1, 2021, June 1,2022 and June 1, 2023.

**12.2**  The Employer agrees to be bound by the Agreement and Declaration of Trust establishing the Chicago Regional Council of Carpenters Health and Welfare Fund, by any present and future Amendments thereto and irrevocably designates as his representative on the Board of Trustees such Trustees as are named in said Agreement and Declaration of Trust, as Employer Trustees, together with their successors selected in the manner provided in said Agreement and Declaration of Trust as it may be amended from time to time, and agrees to be bound by all action taken by said Employer Trustees pursuant to the said Agreement and Declaration of Trust as amended from time to time.

**12.3**  The contributions of the Employers covered by this Agreement shall be used exclusively to provide group insurance and other related Health and Welfare Benefits for eligible Employees and/or their families in such form or amount as the Trustees of the Health and Welfare Fund may determine.

**12.4**  Payment of Employer contributions to the Health and Welfare Fund shall be made on the dates and in the manner and form prescribed by the Trust Agreement or as designated by the Trustees.

**12.5**  The said Health and Welfare Fund is and shall continue to be administered by an equal number of representatives of the Employers and of the Union pursuant to the Agreement and Declaration of Trust heretofore signed by the Employers and the Union, as now in effect and as it may be amended from time to time, in the manner provided in the Agreement and Declaration of Trust.  Said Agreement and Declaration of Trust and any present and future amendments thereto are made a part of the Agreement as if set forth herein at length.

**12.6**  The Employer shall furnish the Trustees with such information as the names of the Employees, classifications, Social Security numbers, wages, and/or hours worked, and such other information as may be required for the proper and efficient administration of the Health and Welfare Fund.

**12.7**  The Employer representatives serving as Trustees, with their successors selected in the manner provided by the Agreement and Declaration of Trust, shall represent all Employers in the administration of the Health and Welfare Fund.

**12.8**  The Employer may make contributions for all hours worked by the Superintendents and other management personnel for whom contributions to the Health and Welfare Fund were heretofore made when such individuals were employed as journeyman Carpenters.  Such contributions shall be made in a monthly amount equal to at least one hundred and sixty (160) times the hourly contribution rate specified in this Article.

**12.9**  Failure of any Employer after reasonable written notice by the Administrative Fund Office to furnish reports, pay contributions or comply with the rules and regulations formulated and promulgated by the Trustees of the Chicago Regional Council of Carpenters Health and Welfare Fund, shall be considered a violation of the terms and conditions of this Collective Bargaining Agreement and shall subject this Agreement to cancellation as to such Employer.

**12.10**  In the event that an Employer becomes delinquent in making any of the aforesaid reports and payments and is so advised by formal notification in writing by the Administrative Fund Office, the Employer shall pay in addition to the amount due, reasonable fees of Certified Public Accountants as expressly used to establish the amount due, reasonable fees of Attorney in effectuating payment, and liquidated damages in amount as determined in accordance with the Agreement and Declaration of Trust.

**12.11**  The Employer shall make contributions on behalf of each of its Employees employed by Employer in a management or supervisory position who is also engaged in work of a character falling within the jurisdiction covered by this Collective Bargaining Agreement in an amount of no less than one hundred and sixty (160) hours per month.  Each such Employer shall execute a Participation Agreement with the Trustees of the Chicago Regional Council of Carpenters Welfare Fund, upon the request of such Trustees, for such greater or lesser amounts of hours as the Trustees may deem appropriate.

**12.12**  The contributions referred to in this Article shall be paid with respect to all hours worked by an Employee covered by this Agreement irrespective of the geographical area where work is performed or the geographical jurisdiction of the Union,  provided that Employer shall not be required to pay contributions to the Chicago Regional Council of Carpenters Welfare Fund for hours outside the geographical jurisdiction of the Union, if Employer is required to pay contributions to another multi-employer welfare benefit fund based on such hours.

**12.13**  The collection of amounts due under this Article shall not be subject to the Settlement of Disputes procedure established in Article XVIII.

**12.14**  The parties recognize the importance of reducing the operational costs to their affiliated fringe benefits trust funds or other funds established under the parties' collective bargaining agreements and agree to review all options available and take appropriate action consistent with the determinations of the trustees of the funds to reduce operational costs.

## ARTICLE XIII
## PENSION FUND AND SUPPLEMENTAL RETIREMENT FUND

**13.1**  Unless otherwise directed, each Employer shall pay into the Chicago Regional Council of Carpenters Pension Fund and the Supplemental Retirement Fund an amount per hour for each hour worked for an Employer during each calendar month by all Employees who are covered by this Agreement in amounts determined and allocated by the Executive Committee of the Union effective June 1, 2019, June 1, 2020, June 1, 2021, June 1, 2022 and June 1, 2023.

**13.2**  The Employer agrees to be bound by the Agreement and Declaration of Trust establishing the Chicago Regional Council of Carpenters Pension Fund and the Supplemental Retirement Fund and by any present and future amendments thereto and irrevocably designates as his representative on the Board of Trustees such Trustees as are named in said Agreement and Declaration of Trust, as Employer Trustees, together with their successors selected in the manner provided in said Agreement and Declaration of Trust as it may be amended from time to time, and agrees to be bound by all action taken by said Employer Trustees pursuant to the said Agreement and Declaration of Trust as amended from time to time.

**13.3**  The said Pension Fund and the Supplemental Retirement Fund are and shall continue to be administered by an equal number of representatives of the Employers and the Union, pursuant to the Agreement and Declaration of Trust heretofore signed by the Employers and Union, and now in effect and as it may be amended from time to time in the manner provided in the Agreement and Declaration of Trust.  Said Agreement and Declaration of Trust and any present or future amendments thereto are made a part of this Agreement as if set forth herein at length.

**13.4**   The Employer shall furnish the Trustees with information such as the names of the Employees, classifications, Social Security numbers, wages and/or hours worked, and such other information as may be required for the proper and efficient administration of the Pension Fund and the Supplemental Retirement Fund.

**13.5**  The Employer representatives serving as Trustees, with their successors selected in the manner provided by the Agreement and Declaration of Trust, shall represent all Employers in the administration of the Pension Fund and the Supplemental Retirement Fund.

**13.6**  The Employer may make contributions for all hours worked by Superintendents and other management personnel for whom contributions to the Pension Fund and the Supplemental Retirement Fund were heretofore made when such individuals were employed as journeymen Carpenters.  Such

contributions shall be made in a monthly amount equal to at least one hundred and sixty (160) times the hourly contribution rate specified in this Article.

**13.7**  Failure of any Employer after reasonable written notice by the Administrative Fund Office so to do, to furnish reports, pay contributions, or comply with the rules and regulations formulated and promulgated by the Trustees of the Chicago Regional Council of Carpenters Pension Fund and the Supplemental Retirement Fund, shall be considered a violation of the terms and conditions of the Collective Bargaining Agreement and shall subject this Agreement to cancellation as to such Employer.

**13.8**  In the event that an Employer becomes delinquent in making any of the aforesaid reports and payments and is so advised by formal notification in writing by the Administrative Fund Office, the Employer shall pay in addition to the amount due, reasonable fees of Certified Public Accountants as expressly used to establish the amount due, reasonable fees of Attorney in effectuating payment, and liquidated damages in an amount as determined in accordance with the Agreement and Declaration of Trust.

**13.9**  The Employer shall make contributions on behalf of each of its Employees employed by Employer in a management or supervisory position who is also engaged in work of a character falling within the jurisdiction covered by this Collective Bargaining Agreement in an amount no less than one hundred and sixty (160) hours per month.  Each such Employer shall execute a Participation Agreement with the Trustees of the Chicago Regional Council of Carpenters Pension Fund and the Supplemental Retirement Fund, upon the request of such Trustees, for such greater or lesser amounts of hours as the Trustees may deem appropriate.

**13.10**  The contributions referred to in this Article shall be paid with respect to all hours worked by an Employee covered by this Agreement irrespective of the geographical area where work is performed or the geographical jurisdiction of the Union, provided that Employer shall not be required to pay contributions to the Chicago Regional Council of Carpenters Pension Fund and the Supplemental Retirement Fund for hours worked outside the geographical jurisdiction of the Union if Employer is required to pay contributions to another multi-employer pension benefit fund based on such hours.

**13.11**  The collection of amounts due under this Article shall not be subject to the Settlement of Disputes procedures established in Article XVIII.

**13.12**  The parties hereby acknowledge the creation of a separate multi-employer trust fund for the administration of the Supplemental Retirement Fund, previously known as the Annuity Fund. Contributions to the Annuity Fund previously had been allocated from the Employer's contributions to the Pension Fund and had been part of the pension calculation for Prevailing Wage purposes.  It is the parties' intent that contributions to the Supplemental Retirement Fund pursuant to Articles IV and XIII of the parties' Collective Bargaining Agreement continue to be part of the pension calculation for Prevailing Wage purposes, and not a separate category for Prevailing Wage.  In addition, contributions to the Supplemental Retirement Fund shall be part of the overall economic increases set forth in Article IV of the Collective Bargaining Agreement, and shall be part of, and not in addition to, the allocations determined by the Union of said economic increases.

**13.13**  The parties recognize the importance of reducing the operational costs to their affiliated fringe benefits trust funds or other funds established under the parties' collective bargaining agreements and agree to review all options available and take appropriate action consistent with the determinations of the trustees of the funds to reduce operational costs.

**ARTICLE XIV**
**TRAINING FUND**

**14.1**  Unless otherwise directed, each Employer shall pay into the Chicago Regional Council of Carpenters Apprentice Training Fund (hereafter referred to as "Training Fund") an amount per hour for each hour worked for an Employer during each calendar month by all Employees who are covered under this Agreement in amounts determined and allocated by the Executive Committee of the Union effective June 1, 2019, June 1, 2020, June 1, 2021, June 1, 2022 and June 1, 2023.

**14.2**  The Employer agrees to be bound by the Agreement and Declaration of Trust establishing the Chicago Regional Council of Carpenters Apprentice Training Fund and by any present and future amendments thereto and irrevocably designates as his representative on the Board of Trustees such Trustees as are named in said Agreement and Declaration of Trust, as Employer Trustees, together with their successors selected in the manner provided in said Agreement and Declaration of Trust as it may be amended from time to time, and agrees to be bound by all action taken by said Employer Trustees pursuant to the said Agreement and Declaration of Trust as amended from time to time.

**14.3**  The said Training Fund is and shall continue to be administered by an equal number of representatives of the Employer and the Union, pursuant to the Agreement and Declaration of Trust heretofore signed by the Employer and the Union, as now in effect and as it may be amended from time to time, in the manner provided in the Agreement and Declaration of Trust.  Said Agreement and Declaration of Trust and any present and future amendments thereto are made a part of this Agreement as if set forth herein at length.

**14.4**  The Employer shall furnish the Trustees with information such as the names of the Employees, classifications, Social Security numbers, wages and/or hours worked, and such other information as may be required for the proper and efficient administration of the Training Fund.

**14.5**  The Employer representatives serving as Trustees, with their successors selected in the manner provided by the Agreement and Declaration of Trust, shall represent all Employers in the administration of the Training Fund.

**14.6**  The Employer may make contributions for all hours worked by Superintendents and other management personnel for whom contributions to the Training Fund were heretofore made when such individuals were employed as journeyman Carpenters.  Such contributions shall be made in a monthly amount equal to at least one hundred and sixty (160) times the hourly contribution rate specified in this Article.

**14.7**  Failure of any Employer after reasonable written notice by the Administrative Fund Office so to do, to furnish reports, pay contributions or comply with the rules and regulations formulated and promulgated by the Trustees of the Chicago Regional Council of Carpenters Apprentice Training Fund, shall be considered a violation of the terms and conditions of this Collective Bargaining Agreement and shall subject this Agreement to cancellation as to such Employer.

**14.8**  In the event that an Employer becomes delinquent in making any of the aforesaid reports and payments and is so advised by formal notification in writing by the Administrative Fund Office, the Employer shall pay in addition to the amount due, reasonable fees of Certified Public Accountants as expressly used to establish the amount due, reasonable fees of Attorney in effectuating payment, and liquidated damages in an amount as determined in accordance with the Agreement and Declaration of Trust.

**14.9**  The Employer shall make contributions on behalf of each of its Employees employed by Employer in a management or supervisory position who is also engaged in work of a character falling within the jurisdiction covered by this Collective Bargaining Agreement in an amount of no less than one

hundred and sixty (160) hours per month. Each such Employer shall execute a Participation Agreement with the Trustees of the Chicago Regional Council of Carpenters Apprentice Training Fund, upon the request of such Trustees, for such greater or lesser amounts of hours as the Trustees may deem appropriate.

**14.10**  The contributions referred to in this Article shall be paid with respect to all hours worked by an Employee covered by this Agreement irrespective of the geographical area where work is performed or the geographical jurisdiction of the Union,  provided that Employer shall not be required to pay contributions to the Chicago Regional Council of Carpenters Apprentice Training Fund for hours worked outside the geographical jurisdiction of the Union if Employer is required to pay contributions to another multi-employer Apprentice Training Fund based on such hours.

**14.11**  The collection of amounts due under this Article shall not be subject to the Settlement of Disputes procedure established in Article XVIII.

**14.12**  The parties recognize the importance of reducing the operational costs to their affiliated fringe benefits trust funds or other funds established under the parties' collective bargaining agreements and agree to review all options available and take appropriate action consistent with the determinations of the trustees of the funds to reduce operational costs.

## ARTICLE XV
## BONDING

**15.1**  Each Employer signatory to this Agreement agrees at the time of execution of this Agreement the Employer shall have procured a cash bond or Surety Bond in the Principal sum as indicated below.  Such bond shall be written by an insurance carrier authorized, licensed, or permitted to do business in the State of Illinois.  The surety bond and/or cash bond shall be payable to the Union as Trustee for the benefit of Employees employed by the Employer and for those acting on the Employees' behalf to insure prompt payment of wages and contributions to the Health and Welfare, Pension and Apprentice Training Funds.  Such surety bond and/or cash bond shall be executed only on a uniform bond form furnished by the Union and must be filed with the Union.  Unless otherwise increased by the President of the Union, the principal amount of the bond shall be:

| | |
|---|---|
| One (1) to Five (5) Employees | $10,000.00 |
| Six (6) to Ten (10) Employees | $15,000.00 |
| Eleven (11) to Fifteen (15) Employees | $20,000.00 |
| For those Employees in excess of Fifteen (15) | $50,000.00 |

The Association may furnish a blanket bond for all of its members, each of which is to be bonded for the sum of $50,000.00.  The Union may withdraw bargaining unit Employees from Employers who fail to maintain the bond required by this Article.

**15.2**  The Employer assigns all right, title and interest in the surety bond and/or cash bond to the Union and Fringe Benefit Trust Funds, which shall have a priority interest to such Funds, and supersede the claims of all Employer's creditors.

**15.3**  This Article shall not be subject to the Settlement of Disputes provisions contained in Article XVIII.

## ARTICLE XVI
## TOOLS

**16.1**  Each Employee is required to furnish, for his individual use only, all of those tools customarily required of a Carpenter to perform his duties.  Employee shall not own, transport, furnish or

rent any power operated tools, machinery, or equipment, to be used on any work to be performed by his Employer.  In the event that the Employer knowingly permits or requires the Employees to provide their own power operated tools, machinery or equipment in violation of the terms of this Article, the Employer shall be liable for all costs associated with enforcing this Article including, but not limited to, reasonable attorney fees and reasonable arbitration fees.

**16.2**  Employer shall provide, for the exclusive use of Carpenters, suitable lighted and heated places for them to eat and change their clothes.

**16.3**  Employer shall also provide a safe and secure place, on the job, for the storage of tools, shoes and clothing, both during and after working hours, however, the Employer shall replace or pay for the loss of any tools, shoes, clothing, but in no event shall the Employer pay more than Two Thousand Five Hundred ($2,500.00) Dollars for each Employee.  On the request of the Employer it shall be the responsibility of the Employee, when storing tools, to furnish a list of tools and indicate the estimated value of such tools on forms supplied by the Employer.  A duplicate copy of said list shall be given to the Employee signed by Management.

**16.4**  Employer shall furnish and make available at the jobsite all equipment generally and customarily used to sharpen the various tools used by Employees hereunder, but not including handsaws.  Except for handsaws, sharpening of his own tools shall be the choice of the Employee at all times although the Employee may, if he chooses, permit his tools to be sharpened other than at the jobsite by and at the expense of the Employer.  Employees may sharpen tools during working hours, and the time thereby used shall be considered time worked.  Handsaws may be sharpened other than at the jobsite by and at the expense of the Employer.  Any automatic equipment provided by the Employer on the jobsite for the purpose of sharpening tools, (e.g. Foley Filer), shall be operated by a member of the Bargaining Unit.

## ARTICLE XVII
## APPRENTICES

**17.1**  Every Employer who employs an average of five (5) Journeymen during six (6) months of a twelve (12) month period may employ one (1) Apprentice for every three (3) Carpenters  employed by the company without regard to jobsites.  However, in no event shall an Employer exceed the ratio of one (1) Journeyman to one (1) Apprentice on any single jobsite.

**17.2**  Any Employer who averages less than three (3) carpenters during six (6) months of a twelve (12) month period, may be granted one (1) Apprentice upon proper application to the above-mentioned Trustees.

**17.3**  Employer agrees to be bound by rules and regulations promulgated by the aforementioned Trustees.

**17.4**  Employer agrees that there shall be no discrimination in the employment of Apprentices based on race, creed, color, sex, national origin or religion, and that Apprentices shall be a minimum age of seventeen (17).  The Employer and the Union agree to be bound by all of the applicable provisions of the United States Code, Title 29, Part 5 and Part 30.

**17.5**  Employer who needs Certification of Apprentice for federally funded projects must request and receive such Certification from the Bureau of Apprenticeship and Training of the U.S. Department of Labor.

**17.6**  Any Employer notified by the Apprentice Program that an Apprentice has been dropped from Apprenticeship for violations of rules and regulations governing Apprentices, must terminate employment of said Apprentice.  The Apprentice or Employer may appeal the decision to drop him from

Apprenticeship by filing an appeal in accordance with the provisions of Section 5 of his Indenture Agreement.

**17.7**   Employer agrees to train an Apprentice in ALL phases of the carpentry trade in which the Employer is engaged.  Upon refusal by Employer to comply with request by Apprentice to have his work assignment changed to another phase of carpentry, the Apprentice program may assign Apprentice to new Employer.  Employer agrees not to abuse the privilege of having the services of Apprentices by using them to do work that does not come under the jurisdiction of Carpenters.

**17.8**   Employer who employs trainees in the specialty branches of the Trade:  (1) drywall and ceiling systems and (2) shingle, siding and insulators, agrees to use said trainees only for work which comes under the specialty branch of the trade for which he is indentured as stated herein.

## ARTICLE XVIII
## SETTLEMENT OF DISPUTES

**18.1**   Except as provided in Sections 12, 13, 14, 15, 27, 28, 34 and 35, any dispute concerning the proper interpretation and application of this Agreement shall be handled in the first instance by a meeting between a representative of the Union and the Employer within seven (7) days after the dispute has been initiated.  In the event the dispute involves an issue concerning wages or other issues wherein the Union must have information or documentation in order to proceed, the Employer must provide such requested information within ten (10) working days of receipt of the request.  Failure of the Employer to timely provide such information or seek an extension from the arbitrator for good cause shall be deemed an admission of the Union or Employee's claim.  An admission of the claim for failure to provide information of documents shall only occur after the appointment of an arbitrator.  This limitation period will only be extended by mutual agreement between the Union and the Employer.  Disputes must be raised within thirty (30) days of the date the Employee or the Employer become aware of the events giving rise to the dispute.  However, the Union may file a grievance under this provision for a violation of the collective bargaining agreement within thirty (30) days of a representative of the Union first being made aware of the alleged violation.  A representative of the Union is defined as any elected Regional Council officer or any appointed Business Representative.

**18.2**   In the event that the dispute is not resolved within seven (7) calendar days after the parties' first meeting, the matter shall be referred to the Permanent Arbitration Board ("PAB") in writing by the grieving party within seven (7) calendar days after the expiration of the seven (7) calendar day period. This limitation period will only be extended by mutual written agreement between the Union and the Employer.

**18.3**   The arbitration hearing shall begin not later than thirty (30) days after the date of referral to arbitration.  Upon completion of the arbitration hearing, the parties may elect to submit written briefs to the arbitrator no later than seven (7) calendar days after the close of the arbitration hearing.  The arbitrator shall issue a written decision and findings fourteen (14) calendar days after the completion of the arbitration hearing unless the arbitrator requests written briefs from the parties, in which the time for the arbitrator's decision shall be twenty-one (21) calendar days after the completion of the hearing.  This limitation period may only be extended by mutual written agreement of the Union and the Employer.

**18.4**   The PAB shall consist of the following five (5) arbitrators mutually agreed upon between the Union and the MID-AMERICA REGIONAL BARGAINING ASSOCIATION ("MARBA"):

Jeanne Vonhof
Donald Peterson
Elliott Goldstein
Ed Benn

MARBA Carpenters Cook, Lake & DuPage - 17

Ann Kenis

In the event that any designated arbitrator shall be unable or unwilling to act on the PAB, the Union and MID-AMERICA REGIONAL BARGAINING ASSOCIATION shall mutually agree and designate a substitute.  The grievance shall be sent to the arbitrators in rotation, each grievance being submitted to the next arbitrator on the list following the one to whom the most recently submitted grievance has been sent.  Upon submission of the grievance, the arbitrator shall be requested to advise both parties promptly as to his earliest available hearing date or dates.  If an arbitrator to whom a submission has been made shall be unable to offer a hearing date earlier than thirty (30) calendar days from the date of delivery of the letter of submittal of a grievance, then, unless the parties agree otherwise, such grievance shall be sent to the next arbitrator in the rotational sequence.  If no arbitrator on the list is able to meet the thirty (30) calendar day deadline, then, unless the parties agree otherwise, submission shall be submitted to the listed arbitrator with the earliest available hearing date.  The expense of the Arbitrator shall be shared by the parties in equal proportions.  The decision of the Arbitrator shall be final and binding upon both parties.  The Arbitrator shall have no authority to add to, subtract from or modify any provision of this Agreement.  There shall be no strikes, slow downs or withdrawal of men by the Union while the dispute is being processed through this procedure.

**18.5**   The parties shall mutually exchange all documentation that is relevant to the dispute and requested prior to the arbitration hearing.

**18.6**   In the event that a party refuses to arbitrate or fails to comply with the decision of the Arbitrator, the other party has the right to avail itself of any lawful means necessary to compel compliance, including but not limited to, judicial intervention, work stoppage by withdrawing bargaining unit Employees from the Employer who violates this article, and strike activities.

**18.7**   In any arbitration hearing brought pursuant to this Article, the arbitrator shall have the authority to award the prevailing party its reasonable attorney fees and costs incurred in the action.

**18.8**   The administration of the PAB, including the selection of the arbitrators shall be by mutual agreement of the Union and MARBA.  The administrative procedures will be determined by mutual agreement of the Union and MARBA and set forth in a separate document.

**18.9**   The Union agrees to furnish the Association with copies of all requests for arbitration simultaneously with any request sent to the PAB.  In addition, the Union shall notify the Association of hearing dates at least ten (10) days in advance of the PAB hearing and will provide the Association with a copy of any arbitration decision within seven (7) days of receipt of any decision.  The Union's failure to provide the notices and arbitration decision as required herein shall make any award issued by the arbitrator inapplicable to and inadmissible in any future arbitrations for any purpose.

## ARTICLE XIX
## USE OF MACHINERY, TOOLS AND FACTORY MADE PRODUCTS

**19.1**   There shall be no restriction on the use of machinery or tools, or use of factory made products.

**19.2**   Nothing in this Article shall be construed to assign the installation or assembly of factory made products to a person or persons outside the Bargaining Unit.

**ARTICLE XX**
**MISCELLANEOUS PROVISIONS**

**20.1**  Employer shall give notice to the Union and the appropriate Fund Office in writing not later than ten (10) days after the occurrence of any of the events relating to the Employer, occurring after the date hereof:
(1)  Formation of partnerships;
(2)  Termination of business;
(3)  Changes of name commonly used in business operation;
(4)  Change in form of business organization;
(5)  Incorporation of business;
(6)  Dissolution of corporation;
(7)  Name and business organization of successor;
(8)  Admission to or withdrawal from any association operating as a multi-employer bargaining agent;
(9)  Name and identity of any parent company, subsidiary company or division.

**20.2**  The Employer shall maintain an office and a telephone where he can be contacted during the usual working hours.

**20.3**  Whenever the Employer party to this agreement is a partnership, it is agreed as follows:
(1)  That one partner will execute the Agreement for the partnership and he shall be the only partner of that firm who shall work with the tools.
(2)  In the case of a partnership which is a part of a multi-employer Bargaining Unit, only one partner may work with the tools and his name shall be supplied to the Union on request.
(3)  All other parties are specifically prohibited from working with the tools and shall not become Carpenter Employees of the firm to circumvent the provisions hereof.

**20.4**  Business Representatives of the Union have the right to enter, go upon, or inspect any construction site, whether or not Carpenters are actually employed thereon, to effectuate the purpose of this Agreement but they shall not in any way interfere with the Employer's affairs thereon.

**20.5**  Employees covered by this Agreement shall not perform work on a piecework basis.

**20.6**  The Employer agrees that he will not sublet any work to any Employee or Employees.

**20.7**  This Agreement shall not be transferable by any Employer either by action of such Employer or by operation of law.  In the event any Employer, whether an individual, partnership, or corporation covered by this Agreement, merges, consolidates or transfers a controlling interest in his, their, or its business, this contract may be canceled as to such Employer by the Union.

**20.8**  The breach by an Employer of any of the provisions of this Agreement may, by written notice, be declared by the Union to be a breach of the entire Agreement.

**20.9**  Before Employer commences work on any job, he must first give the Union reasonable advance notice of that fact, unless the Steward is on the job.  The notice can be given by mail or telephone and must include the location of the work.

**20.10**  Notwithstanding any other provision of this Agreement, the Employer shall have the right to take such action as shall be necessary to comply with Federal or State legislation, lawful regulations or requirements set forth in proposal documents by Federal or State users of construction services, with respect to providing equal employment opportunity.

**20.11** When Employer is engaged in work within the geographical jurisdiction of the Regional Council, not less than sixty-six percent (66%) of the carpenters employed by such Employer shall be from among the members of the bargaining unit who are represented by Local Unions within such geographic jurisdiction or counties bordering such geographic jurisdiction.

The Employer may at its sole option request that the Union refer applicants to fulfill the Employer's obligation in Article 20.11.

If the Union is unable to refer such applicants as required by the Employer within forty-eight (48) hours, then the Employer may hire carpenters without respect to geographic jurisdiction or geographic area. All carpenters employed under this paragraph shall be classified as permanent Employees, subject to the provisions of Articles 2.1, 2.2, 2.3, and 2.4.

**20.12** No Employer who first becomes signatory to or bound by this Agreement after May 31, 1984 shall work with the tools of the trade unless he is currently employing at least one (1) journeyman who is working for such Employer full time.

**20.13** (a) Peak Demand Permits: The provisions of this subsection shall be limited to periods when there are no journeymen or apprentices reasonably available for employment as determined by the President of the Regional Council.

(b) Notwithstanding any other provisions in the Agreement, the Employer may not employ Employees other than journeymen and apprentices except by Union permit. When the following conditions are met, the Union shall issue the requested permits for permit Employees:

(1) The Employer regularly employs apprentices or trainees; and

(2) The Employer notifies the Union of the name, address, phone number, if available, and social security number of each permit Employee; and

(3) The established permit fee is submitted to the Union; and

(4) The Employer has notified the Union of an unmet need for Employees and the location of the jobsite(s), if available, and the Union cannot provide Employees within forty-eight (48) hours of such notice. Provided, however, that the President of the Regional Council or his designee shall have the authority to waive such forty-eight (48) hour notice in his discretion for good cause shown.

(c) Employer shall notify the Union upon the termination of the employment of such permit Employee.

(d) An Employer may, unless determined otherwise by the President of the Regional Council or his designee in his discretion for good cause shown, hire not more than one (1) Employee on permit for each three (3) journeymen employed by the Employer.

(e) No journeyman or apprentice shall be laid off for lack of work while any Employee on permit is employed.

(f) Journeymen and apprentices shall be given preference to all overtime work.

(g) The Employer may request the enrollment of any Employee working on permit into the apprentice program in accordance with procedures established by the Board of Trustees.

(h) Permits shall only be issued by the President of the Regional Council or his designee for a thirty (30) day period and shall be renewed for an additional thirty (30) day period upon the request of the Employer. Failure of the Employer to renew the permit after the thirty (30) day period shall entitle the Employee to full payment of the journeymen wages for all the hours worked after the expiration of the permit. The Employer may request additional thirty (30) day periods. Failure of the Union to deny the request in writing within five (5) workdays shall constitute the issuance of a permit for an additional thirty (30) days.

(i) Employer shall make contributions to the fringe benefit funds for each hour worked under this Agreement by Employees, including Employees on permit. Employees working under a permit issued in accordance with this subsection 20.13 shall receive wages at a rate of pay equal to that of a first year apprentice.

**20.14** (a) Apprentice Applicant Permits: This subsection shall apply only when an Employer has requested the enrollment of an Employee in the Apprentice program in accordance with procedures

established by the Board of Trustees. A permit shall be issued to such Employee pursuant to this subsection provided that:

(1) The Employer regularly employs apprentices or trainees; and

(2) The Employer notifies the Union of the name, address, phone number, if available, and social security number of each Employee for whom a permit is requested under this subsection; and

(3) The established permit fee is submitted to the Union.

(b) An Employer may, unless determined otherwise by the President of the Regional Council or his designee in his discretion for good cause shown, hire not more than one (1) such Employee on permit for each three (3) journeymen employed by the Employer.

(c) Employer shall make contributions to the fringe benefit funds for each hour worked under this Agreement by Employees, including Employees on permit. Employees working under a permit issued in accordance with this subsection 20.14 shall receive wages at no less than the rate of pay of a first year apprentice.

(d) Permits shall only be issued by the President of the Regional Council or his designee for a thirty (30) day period and shall be renewed for an additional thirty (30) day period upon the request of the Employer. The Employer may request additional thirty (30) day periods. Failure of the Employer to renew the permit after the thirty (30) day period shall entitle the Employee to full payment of journeymen wages for all hours worked after the expiration of the permit. Failure of the Union to deny the request in writing within five (5) workdays shall constitute the issuance of a permit for an additional thirty (30) days.

(e) No Employee to whom a permit has been granted under this subsection shall be eligible to have such a permit renewed unless he or she continues to be employed by the Employer.

(f) No permit shall be renewed, except for renewal requests by the Board of Trustees of the Training Fund, under this subsection at any time during which the President of the Regional Council finds that there are a significant number of unemployed apprentices who are reasonably available for employment.

## ARTICLE XXI
## MOST FAVORED NATIONS

**21.1** (a) In no event shall any Employer be required to pay higher wage rates or be subject to more unfavorable wage rates, contract terms or work rules, than those agreed to by the Union in any executed Collective Bargaining Agreement with any other construction industry employer within Cook, Lake, and DuPage Counties, Illinois. In no event, shall wage rates, contract terms or work rules granted any sub-trade (including sub-trades whether or not dealt with in Articles I, XXII, XXIII, XXIV and XXV) be applied to general carpentry or any other sub-trade. However all Employers operating within a sub-trade shall have the benefit of this provision within that sub-trade. This paragraph shall not apply to the terms and conditions of any national or international agreement, nor the terms and conditions of any contract involving shop, stair shops, in-plant, industrial, municipal, factory, millmen, component parts, maintenance agreements, project labor agreements, CEDA and such other similar governmentally funded community programs and governmental agreements, nor to the terms and conditions in effect for the first one hundred and eighty (180) days of an agreement with an Employer who had not been bound to an agreement with the Union during the prior twelve (12) month period. (Agreements lasting more than one hundred and eighty (180) days must be approved by the Labor-Management Committee established under this Article.)

Notwithstanding anything to the contrary above, in the event the Union shall establish prior to bidding or award for a particular contract, or identifiable sector or specialty work, any wage rates, contract terms or work rules that will be applicable to that contract, sector or specialty work which are more favorable to the Employer than those contained in this Agreement, then all Employers bidding on that project, sector or specialty work shall be entitled to the benefit of such more favorable terms. The Union shall promptly provide the Labor-Management Committee established under this Article with written notice of the establishment of such more favorable terms. In the event that subsequent to the award of a particular contract, the Union through the President of the Regional Council or his designee for good cause desires to establish more favorable wage rates, contract terms or work rules for that contract, said

more favorable terms shall become effective with the concurrence of the Labor-Management Committee established under this Article.

(b)   The Labor-Management Committee established under this Article shall consist of the President of the Regional Council and one representative appointed by the Association.

(c)  Notwithstanding anything to the contrary above in this Article XXI, the terms and conditions of any Amendment which results from the application of or pursuant to Article XXXI of this Agreement (or any counterpart thereof in any other Agreement with the Union) shall not be subject to the prior subsections of this Article XXI except as may be specifically provided in such Amendment(s).


## ARTICLE XXII
## PILE DRIVING - SCOPE OF WORK

**22.1**   Employer recognizes that the Union claims jurisdiction of the work performed on all Pile Driving operations, the driving of wood pile and the heading and the pointing of same, including:  (1) the driving of all steel piling, including pipe sheeting, H beams, I beams and caissons; (2) the driving  of concrete pile, pre-cast or cast in place, mini piles and bulb piles; (3) the driving of all composite pile; (4) the driving of cofferdams, installation, and removal of all bracing and walers in cofferdams; (5) the erection of all trestles, falsework and docks; (6) the jobsite erecting and dismantling of derricks, A frames, cranes and gin poles, when used in conjunction with pile driving work; (7) the cribbing, shoring and underpinning of buildings when pile driving is involved; (8) the erection, dismantling and jacking of pile load tests and all jacking for and during tests; (9) the jobsite loading, unloading and distribution of all pile driving equipment and piling except when truck drivers can roll off or dump load; (10) the jobsite maintenance of pile driving equipment; (11) "all burning, welding and splicing of piling, including field welding of all end plates and bearing plates prior to driving and after installation of piling, and the first weld off of piling in all cases, except for Mill fabrication and manufacturing, including but not limited to pile tips and end plates;" (12) the jobsite preparation of all barges, scows, rafts, floats, and pontoons to be used in pile driving work; (13) the operation of spud engines and deck engines or rigs doing pile driving work; (14) crane signaling pertaining to all pile driving work; (15) the firing of boilers on derricks or barges being used on pile driving work; (16) the jobsite positioning, repositioning, flooding, refloating, to such point as is the final floating position of watertight midsection hulls used as temporary breakwaters on pile driving work; (17) the installation of all skimmer plates when attached to piles; (18) the installation of mooring buttons, bollards, cleats, bumpers, chains, fenders and barge deflectors; (19) installation of hog rods, anchors and tie backs; and (20) any work pertaining to pile driving from ground level down to portal on tunnels and shafts; (21) setting of rocks or boulders for jetties and/or break waters working off of floating equipment when a signal man is required; (22) if signaling of land crabs or fork lifts is required, it shall be the work of the journeyman/apprentice; and (23) all other work hereafter awarded to pile drivers.


## PILE DRIVING - WORK RULES

**22.2**   On all rigs engaged in installing and removing piles, there shall be no less than three (3) journeymen/apprentices and a working foreman to constitute a crew.  However, there shall be a minimum of two (2) journeymen/apprentices and a working foreman for piling work with the following equipment: fixed or telescoping mast type piling rigs and/or excavator/forklift mounted piling attachments.

**22.3**   On cranes engaged in driving of bearing piles, soldier piles and sheeting and extracting sheeting and piles, there shall be no less than three (3) journeymen/apprentices and a foreman to constitute a crew.  When driving or extracting occurs, two (2) Employees can be used to do pile driving work within 200 feet of the crew.

**22.4**   When loading and/or unloading piling or pile driving equipment on a jobsite, there shall be a crew size of carpenters/pile drivers as necessary to perform the work safely.

**22.5** All pile load tests shall be erected, dismantled, initial loading and final unloading by no less than one (1) carpenter/pile driver.

**22.6** A crew shall consist of two (2) journeymen/apprentice or more as needed for cutting of wood piling underneath existing building.

**22.7** On caisson work when pile hammer or extractor is used installing or removing caisson, one (1) journeyman shall be included in the regular crew.
The Employer shall encourage the use of not less than one (1) journeyman carpenter/pile driver on caisson work.

**22.8** There shall be one (1) journeyman used only on rigs to pre-drill holes for bearing piling.
There shall be a minimum of two (2) journeymen/apprentice and working foreman on any type of auger cast pile, tie back operation, mini pile, pin pile, cast pile, soil nails and secant piles.
Two (2) journeymen/apprentice and a working foreman shall be used to drill for, prepare, and set soldier piles. If the drill is more than 200 feet from the installation, one (1) journeyman will be added to the crew and shall remain with the drill rig.

**22.9** When there is steady welding during driving of piling an additional journeyman will be required in a crew. When bearing pile are being spiced in a horizontal position, and the set fabricated pile are to be driven by the same crew, there shall be an additional journeyman in the crew. This extra journeyman can also be used to install end plates or pile points. The above provisions shall in no way restrict the regular crewmembers from helping the extra journeyman.

**22.10** When a crew of two (2) or more welders is employed on a job operation one (1) shall be designated as a working foreman and shall receive the current foreman's rate of pay so long as there is no other pile driver foreman on the job.

**22.11** The installation of lagging will be a composite crew including a journeyman/apprentice whose size and composition will be determined by the Contractor.

**22.12** Not withstanding the provisions of Section 17.1 of the Area Agreement, the Employer may employ one pile-driving apprentice for each three (3) journeymen employed on a crew size. Pile driver apprentices will be given preference.

**22.13** Minimum crew size may be increased if efficiency and safety conditions require with mutual consent of the Employer and the Union.

**22.14** Pile driver Employees shall carry with them on the job a twenty-five foot (25') steel tape measure, twelve inch (12") adjustable end wrench, claw hammer, channel locks, speed square, two foot (2') framing square, side cutters, end cutters, and bolt bag or side pouch. This shall include safety toed and/or metatarsal boots, if required by the Employer. Employer will reimburse the Employee for fifty percent (50%) of the purchase price of the boots after one thousand (1,000) hours worked in a twelve-month period for that Employer. The Employer may require written documentation of the purchase price.

**22.15** In the event the Employer decides it is necessary to work at any time during inclement weather, the Employer shall make foul weather gear available for the Employees. All safety equipment shall be supplied by the Employer (hard hat, welding hood, burning goggles, welding gloves, safety glasses, leather sleeves and/or jackets) plus all other perishables.

**22.16** When an Employee is working in water where hip boots are insufficient the Employer shall pay the man a premium of twenty-five cents ($0.25) an hour for straight time and fifty cents ($0.50) an hour for overtime.

**22.17**  All Employees directed to work for the Employer must be qualified and skilled in their trade.

**22.18**  Any special certification test of a qualified pile driver-welder, taken for the convenience of the Employer, shall be paid for by the Employer.  Before a qualified pile driver-welder commences the welding test, he shall be placed on the payroll of the Employer and be paid pile driver's wages.  A qualified pile driver-welder is one who passed a qualification test given by a recognized testing laboratory within the area covered by this Agreement.  When an Employee is laid off or terminated they shall receive copies of any certifications they have received with their final check or within forty-eight (48) hours by mail.

**22.19**  When a welder is transferring, his/her certification papers may be sent to the Carpenters Union.  The Carpenters Union will maintain the papers for future use by contractors.

### PILE DRIVING TERRITORIAL JURISDICTION

**22.20**  The pile driving territorial jurisdiction of the Chicago Regional Council of Carpenters, as determined by the United Brotherhood of Carpenters and Joiners of America, includes Cook, Lake and DuPage Counties, Illinois.
All waterfront pile driving work on the Lake Michigan Shores of Lake, Porter and LaPorte Counties, Indiana.  Waterfront pile driving work shall include all pile driving work on any building, structure or project, any part of which is in or over water.  This shall include reclaimed land in the areas previously part of the Lake Michigan waterfront.
All pile driving work in Lake and Porter Counties, Indiana other than highway work.

### ARTICLE XXIII
### MILLWRIGHT-WORKING RULES

**23.1**  Employer shall furnish, if required, all precision levels over twelve (12") inches, all calipers over eight (8") inches, outside micrometers over one (1") inch, inside micrometers over eight (8") inches, all adjustable wrenches over twelve (12") inches, all socket wrenches over one half (1/2") inch drive, box socket and open end wrenches over one and one fourth (1 1/4") inches, all drills, taps, files, emery cloth, sand paper, hack saw blades and all hammers over two (2) pounds.

**23.2**  When it is necessary for Millwrights to furnish any precision tools, the Contractor shall be responsible for the repair, or replacement if necessary, of any of these tools which are damaged while being used on the job.  These tools shall include: Dial Indicators and Magnetic Bases, Precision Levels, Calipers, Outside Micrometers, Inside Micrometers, Precision Feeler Gauges, and Precision Plumb Bobs.  Upon initial employment, Employee shall furnish an inventory in duplicate to Employer, of any of the above-mentioned tools he may have on the jobsite.

**23.3**  When it is necessary to store Employee tools on the jobsite during his non-working hours, the Contractor shall be responsible for loss due to fire or burglary at seventy percent (70%) of the cost to a maximum of Two Thousand Five Hundred Dollars ($2,500.00).  On the request of the Employer, it shall be the responsibility of the Employee when storing tools, to furnish a list in duplicate to the Employer to obtain this protection.

**23.4**  Any special certification test of a qualified Millwright welder, taken for the convenience of the Employer, shall be paid for by the Employer.  Before Qualified Millwright welder commences the welding test, he shall be placed on the payroll of the Employer and be paid Millwrights wages.

**23.5**  An Employee who is required to travel to a jobsite shall be reimbursed for lodging when required to remain away from his home overnight.  The expense allowance for lodging for each night shall be fifty dollars ($50.00) per night.

**23.6**  Where there are two (2) or more Millwrights on any one jobsite and one (1) journeyman assumes responsibility other than that of a journeyman, the one (1) assuming the duties shall be designated a foreman, and shall receive the wages of a foreman.

**23.7**  Where there are eight (8) or more Millwrights on any one jobsite one (1) must be designated a non-working foreman, who shall devote his time to supervision of the work and shall not work with the tools.

**23.8**  Before a Millwright commences attending any special schooling or training, such as radiation school, upon the request of the Employer, he shall be placed on the payroll of the Employer and be paid Millwrights wages.

## ARTICLE XXIV
## SHINGLING, SIDING AND INSULATING MECHANICS
### GENERAL

**24.1**  All scaffolding shall be inspected to determine that such scaffolding is in safe condition and meets all safety standards.

**24.2**  An Employee shall not transport, or in any way, carry any equipment or materials in the automobile or truck of such Employee, with the exception of sundry material items which are necessary for the uninterrupted continuance of the job.  Nor shall such Employee own, furnish, or rent any equipment to be used on any work to be performed for the Employer.

### CLAIMS AND JURISDICTION OF THE SHINGLING MECHANIC

**24.3**  All asphalt, wood, plastic, metal or composition roofing applied to any and every type of roof shall be the work of the shingler.

**24.4**  A shingler shall not carry any material weighing over sixty (60) pounds to a height in excess of a two (2) story building.

**24.5**  Roof jacks and stages or planks shall be provided on all roof jobs with eight-twelfths (8/12) or greater pitch as the bottom scaffold.  Unfavorable weather conditions on roofs with a pitch less than eight-twelfths (8/12) shall require sufficient roof jacks and staging or planks to provide safe working conditions.

### CLAIMS AND JURISDICTION OF THE SIDING MECHANIC

**24.6**  All asphalt, insulated asphalt, asbestos, cement, aluminum and other metals or plastics applied to the outside wall of any building; underlying materials, such as aluminum foil, building paper, plastic or asphalt felt, shall be the work of the siding mechanic.

### CLAIMS AND JURISDICTION OF THE INSULATING MECHANIC

**24.7**  All insulation, batts laid, tacked or stapled, glued or cemented on the building in any form; all blown insulation, wet or dry to walls, ceilings, or floors, shall be the work of the insulator.

**24.8**   One (1) Journeyman or Apprentice Carpenter shall be in attendance of the blowing machine, and all men on batts or blown jobs shall be provided with masks at all times by the Employer.

## ARTICLE XXV
## INSTALLERS OF FLOOR AND WALL PRODUCTS

**25.1**  An Employee who is required to use his automobile to carry the Employer's materials or the Employer's tools shall be compensated at the rate of three dollars ($3.00) per day.

**25.2**  The Employer shall pay for all business calls made by the Employee as well as for all parking fees and toll charges.

**25.3**  No Employer of Floor or Wall Installers shall work with the tools of the trade unless he is currently employing two (2) journeymen who are working for such Employer full time.

**25.4**  An Employee shall not transport Employer's materials, with the exception of sundry items which are necessary for the uninterrupted continuance of the job, in any conveyance owned by the Employee nor shall the Employee rent or lease such conveyance to the Employer for such purpose.

**25.5**  By way of illustration and not limitation, the work of installers of Floor and Wall Products consists of preparation and/or forming of all materials, whether accomplished by hot iron, cemented, cemented tape, tacked, stapled or sewed method, for installing on floors, walls, stairs, ceilings, fixtures, furnishings or exterior applications on structures, patios, pool perimeters, area ways, all other like or similar applications and as simulated turf.
Installation of all resilient floor, wall, ceiling and simulated turf materials to include linoleum, rubber, asphalt, mastipave, vinyl, plastic, metal, cork, wood and all similar materials in sheet, interlocking tile, preformed or seamless compound form of liquid, plastic, epoxy, urethane or materials of like nature.
Installation of carpet, carpet tiles, rugs or runners and cutting or fitting of same, whether installed by tacked, tackless, glue-down, self-adhering, any manner of tape adhesion, stapled, or loose-lay method on wood, steel, concrete, plaster, plastic or base of like or similar composition.
Installation of all lining felt, carpet pad, underlayment compositions, matting, linen crash and/or like or similar materials.
Installation of all resilient type and carpet type material on floors, walls, stairs, ceilings, fixtures, furnishings or exterior applications on structures, patios, pool perimeters, area ways, all
other like and similar applications and as simulated turf.
The take-up and relaying, spreading of all adhesives, priming of all surfaces, sanding and necessary patching and preparation, removal of old material, finishing where required to complete Manufacturers' process, handling, distributing and unpacking, drilling of holes and insertions of sockets, pins, dowels or similar fastening device, placing or stripping, fitting of all devices for the attachment of material and the installation of all metal, rubber, vinyl, wood and/or plastic trim or accessory materials, the aforementioned to cover materials listed in above jurisdiction.

## ARTICLE XXVI
## LATHERS - SCOPE OF WORK

**26.1**  The Employer recognizes that the Union claims jurisdiction of work performed on all lathing operations.
It shall have jurisdiction over the following work: Handling, erecting, installing and welding of all light iron construction, furring, making and erecting of brackets, clips and hangers; wood, wire and metal lath; plasterboard or other material which takes the place of same to which plastic or acoustical materials is adhered; corner beads; all floor construction; arches erected for the purpose of holding plaster, cement, concrete, or any other plastic or acoustical material.

**26.2**  All carrying bars, purlins and furring regardless of size:  light iron and metal furring of all descriptions such as rods, channels, flat iron, Nailock, Screwlock, Pomeroy, T-bar; all light iron and metal studs such as Stran steel, Penn metal, Soule, Truscon, and all other types of light iron and metal studs, no matter what the manufacturer, when such studs are to receive metal lath, rock lath or other material for the application of plaster or other sprayed on wet material; and all other light iron furring erected to receive lath and plastic or acoustic materials.

**26.3**  The nailing, tying, or screwing of all wires and metallic lath such as wirecloth, wire mesh, expanded metal lath, hyrib lath and all ribs and flat expanded metal lath and wire of all descriptions as well as the placing of all hangers and all inserts used for the purpose of supporting suspended ceilings of any of the above types of floor lath, such as hyrib lath, paperback Steeltex floor lath, Penn metal rib, and all other appurtenances connected therewith.

**26.4**  The nailing, screwing, clipping or fastening by any other means, of all types of plasterboards and stripping, to all types of studs, which is to act as a base for plaster

**26.5**  The erection of all metal, vinyl or plastic plastering accessories such as metal corner beads, door and window casing beads, metal picture mould, metal chair rail, metal base and base screed, and any and all other metal plastering accessories which are covered and/or serve as a ground, steel corner guard, vinyl or plastic corner guard, or screed for plastic material.

**26.6**  The prefabrication by the contractor, of furring iron and metal lath, whether fabricated on the job or in a warehouse or shop operation, will be fabricated by Employees covered by these Working Rules.

**26.7**  All other work hereafter awarded to Lathers.

**26.8**  The Working Rules in this Agreement shall be interpreted and applied in a matter consistent with the intent and purpose of this Agreement.

## LATHERS WORKING RULES
## LOCAL DUES

**26.9**  It is agreed that each Employer will withhold from the wages of a member of Local Union No. 74-L in his employ that amount per hour for each hour worked as is set forth in a signed authorization received by the Employer from the member.  It is further agreed that the Employer will forward the withholding to the office of Local Union No. 74-L by the fifteenth (15th) day of the month following the month for which the withholding is made, with an itemized return form listing the name of each Employee. Such forms to be furnished to the Employer by the Union.

The Union agrees that it will secure from each of the members of Local Union No. 74-L a written assignment executed by such member authorizing an Employer to deduct the amount hereinabove fixed from his wages and to transmit such amount to the Local Union in payment of membership dues.

Copies of such assignments shall be sent to Employer by the Union upon Employer request.

## REGISTRATION DAY

**26.10**  No work will be permitted on the first Saturday in June of each election year (Local 74-L Registration Day) except in emergency.

## ROCKLATH

**26.11**  Rocklath or similar substitutes must be erected with broken joints, or straight joint stripped with metal lath not less than four (4) inches wide.

**LATHERS TERRITORIAL JURISDICTION**

**26.12**  The recognized territorial jurisdiction of Local No. 74-L shall be established by the United Brotherhood of Carpenters and Joiners of America which is as follows:

Starting at a point where the Indiana-Illinois State lines meet at Lake Michigan, then South along the Indiana-Illinois State line to Route 24.  West on Route 24 to Route 52.  Northwest on Route 52 to where it becomes Route 52, 45 and 116.  West on Routes 52, 45 and 116 to the northern outskirts of Pontiac to Route 23.  North, West and North again on Route 23 to the western outskirts of Ottawa to Route 6.  West on Route 6 to Route 51 and 52.  North on Route 51 to Route 64.  East on Route 64 to Route 23.  North on Route 23 to Route 173.  East on Route 173 to the Lake County line.  North on the Lake County line to the Illinois-Wisconsin State line.  Then east on the Illinois-Wisconsin state line to Lake Michigan.

**26.13**  The terms and conditions of this Agreement shall only be effective in that portion of the territorial jurisdiction described in 26.12 which lies within Cook, Lake and DuPage Counties.

**ARTICLE XXVII**
**DUES CHECK-OFF**

**27.1**  It is agreed by the parties that after May 31, 1977, by written notice to Employer, a Union Dues Check-off may be required at the option of the Union.  The Employer shall deduct current Union dues as certified by the Union from the pay of each Employee who furnishes him with a signed and valid "Check-Off Authorization Form."  This amount shall be set by the Union.  A change in this amount will be communicated in writing by the Union.

NOTE:  EFFECTIVE June 1, 2002, a three percent (3%) Union Dues Check Off was established.

**27.2**  The aforesaid deductions shall be remitted monthly by Employer to the Union on the form customarily used for submitting monthly Welfare and Pension Contributions.

**27.3**  The Union shall indemnify, defend, and save Employer harmless against any and all claims, demands, suits or other forms of liability including the payment of costs and reasonable fees of Attorney that shall arise out of or by reason of action taken, or not taken by Employer for the purpose of complying with any provision of this Article, or in reliance upon any lists, notices or assessments furnished under this Article.  The collection of amounts due under this Article shall not be subject to the Settlement of Disputes procedures established in Article XVIII.

**ARTICLE XXVIII**
**INDUSTRY ADVANCEMENT FUND**

**28.1**  Each Employer shall contribute six ($0.06) cents for each hour worked for the Employer by those of his Employees covered by this Agreement to the MID-AMERICA REGIONAL BARGAINING ASSOCIATION INDUSTRY ADVANCEMENT FUND (MIAF) or such other fund as MARBA in its sole discretion may direct at any time during the term of this Agreement.  Inasmuch as the existence and utilization of the Industry Fund should result in increased construction and greater job opportunities, the Union agrees to cooperate in assuring that the contributions required by this Article are in fact made by Employers bound by this Agreement.

**28.2**  The collection of amounts due under this Article shall not be subject to the Settlement of Disputes procedures established in Article XVIII.

**ARTICLE XXIX**
**CHICAGOLAND CONSTRUCTION SAFETY COUNCIL**

**29.1**  Each Employer shall contribute one cent ($0.01) for each hour worked for the Employer by those of his Construction Employees covered by this Agreement to the CHICAGOLAND CONSTRUCTION SAFETY COUNCIL, a not-for-profit corporation.

**ARTICLE XXX**
**CONSTRUCTION INDUSTRY SERVICE CORPORATION**

**30.1**  Each Employer shall contribute one cent ($0.01) for each hour worked for the Employer by those of his Construction Employees covered by this Agreement to the CONSTRUCTION INDUSTRY SERVICE CORPORATION, a not-for-profit corporation.

**ARTICLE XXXI**
**MARKET AND GEOGRAPHIC AREA COMMITTEE**

**31.1**  Purpose:  The purpose of the Committee shall be to provide a mechanism to assist signatory Employers in remaining competitive in certain market and/or geographic areas so as to protect and assure continued work opportunities for Employees covered by the Area Agreement.

**31.2**  Scope and Authority:  (a) The Market and Geographic Area Committee is authorized and created pursuant to this Article XXXI of the Area Agreement.
(b) The Committee shall review only formal Employer requests for changes or modifications to the Area Agreement believed necessary to meet market or geographic area competition, or formal requests for multi-craft project agreements initiated by the National Heavy and Highway Committee and/or the National Building and Construction Trades Department, and it shall determine if adequate economic justification is present to warrant recommending any changes, modifications, or project agreement(s).
(c) Unless otherwise mutually agreed to, the Committee shall review Employer requests involving private work and Project agreement requests from the National Heavy and Highway Committee and/or National Building and Construction Trades Department.
(d) The Committee shall not be authorized to add to, subtract from or otherwise modify terms of the Area Agreement, except as provided in this Article.
(e) The Committee shall not act in an arbitrary or capricious manner.

**31.3**  Definitions:  (a) Market Area - A "market area" is considered to be a type or category of work.
(b) Geographic Area - Geographic Area means a particular geographic area within the ten (10) county territorial jurisdiction of the Chicago Regional Council of Carpenters Area Agreement.
(c) Adequate Economic Justification - As used in 31.2(b) of the Area Agreement, it means the request must be supported by VERIFIABLE data.  The Committee may accept the data as presented, or request that it be verified and substantiated by the Union, which shall have authority to do so.

**31.4**  Committee Composition:  The Committee shall be composed of three (3) representatives of the Employer and three (3) representatives of the Union.

**31.5**  Meetings and Voting:  (a) A Committee meeting may be called by any two (2) members of the Committee at the request of any party to the Area Agreement, and such requests shall be made by mail to all participants at least ten (10) days prior to the desired meeting date.  However, the ten (10) day notice requirement may be waived upon mutual agreement if the circumstances so dictate.
(b) The Committee at its meeting shall ascertain whether a market area has been substantially lost, or is rapidly being lost.  If an affirmative determination is made, the Committee may recommend an addendum to the Master Agreement, the content of which will be subject to a majority vote of the

Committee. Any Addendum would become effective upon approval of the Council and the Association party to the Area Agreement and becomes effective on the date specified in any such Addendum as to each Employer only within those portions of the Geographic Area(s) in which such Employer is bound to a collective bargaining agreement with the Union and only as to those portions of the Geographic Area and/or Market Area as specifically described in any such Addendum.

(c) The Committee shall also determine from time to time whether or not to recommend that any addendum shall continue to apply, be terminated or otherwise modified. Provided, however, that any job or project covered by an addendum shall remain covered until job/project completion.

## ARTICLE XXXII
## SUBSTANCE ABUSE AND RECOVERY PROGRAM

**32.1** The parties recognize the problems created by drug and alcohol abuse and the need to develop prevention and treatment programs. The Employer and the Union seek to protect people and property, and to provide a safe working environment. The purpose of the following program is to establish and maintain a drug free, alcohol free, safe, healthy work environment for all its Employees.

### 32.2 Definitions

a. Company Premises - The term "Company Premises" as used in this policy includes all property, facilities, land, buildings, structures, automobiles, trucks and other vehicles owned, leased or used by the company. Construction job sites for which the company has responsibility are included.

b. Prohibited Items & Substances - Prohibited substances include illegal drugs (including controlled substances, look alike drugs and designer drugs), alcoholic beverages, and drug paraphernalia in the possession of or being used by an Employee on the job.

c. Employee - Individuals, who perform work for the Employer, including, but not limited to, management, supervision, engineering, craft workers and clerical personnel.

d. Accident - Any event resulting in injury to a person or property to which an Employee, or contractor/contractor's Employee, contributed as a direct or indirect cause.

e. Incident - An event which has all the attributes of an accident, except that no harm was caused to person or property.

f. Reasonable Cause - Reasonable cause shall be defined as excessive tardiness, excessive absenteeism, and erratic behavior such as noticeable imbalance, incoherence, and disorientation.

### 32.3 Confidentiality

a. All parties to this policy and program have only the interests of Employees in mind, therefore, encourage any Employee with a substance abuse problem to come forward and voluntarily accept our assistance in dealing with the illness. An Employee assistance program will provide guidance and direction for you during your recovery period. If you volunteer for help, the company will make every reasonable effort to return you to work upon your recovery. The company will also take action to assure that your illness is handled in a confidential manner.

b. All actions taken under this policy and program will be confidential and disclosed only to those with a "need to know".

c. When a test is required, the specimen will be identified by a code number, not by name, to insure confidentiality of the donor. Each specimen container will be properly labeled and made tamper proof. The donor must witness this procedure.

d. Unless an initial positive result is confirmed as positive, it shall be deemed negative and reported by the laboratory as such.

e. The handling and transportation of each specimen will be properly documented through the strict chain of custody procedures.

### 32.4 Rules - Disciplinary Actions – Grievance Procedures

1.  Rules - All Employees must report to work in a physical condition that will enable them to perform their jobs in a safe and efficient manner.  Employees shall not:

a.  Use, possess, dispense or receive prohibited substances on or at the job site; or

b.  Report to work with any measurable amount of prohibited substances in their system.

2.  Discipline - When the company has reasonable cause to believe an Employee is under the influence of a prohibited substance, for reasons of safety, the Employee may be suspended until test results are available.  If no test results are receive after three (3) work days, the Employee, if available, shall be returned to work with back pay.  If the test results prove negative, the Employee shall be reinstated with back pay.  In all other cases:

a.  Applicants testing positive for drug use will not be hired.

b.  Employees who have not voluntarily come forward, and who test positive for a drug use, will be terminated.

c.  Employees who refuse to cooperate with testing procedures will be terminated.

d.  Employees found in possession of drugs or drug paraphernalia will be terminated.

e.  Employees found selling or distributing drugs will be terminated.

f.  Employees found under the influence of alcohol while on duty, or while operating a company vehicle, will be subject to termination.

3.  Prescription Drugs - Employees using a prescribed medication which may impair the performance of job duties, either mental or motor functions, must immediately inform their supervisor of such prescription drug use.  For the safety of all Employees, the company will consult with you and your physician to determine if a re-assignment of duties is necessary.  The company will attempt to accommodate your needs by making an appropriate re-assignment.  However, if a re-assignment is not possible, you will be placed on temporary medical leave until released as fit for duty by the prescribing physician.

4.  Grievance - All aspects of this policy and program shall be subject to the grievance procedure of the applicable collective bargaining agreement.

### 32.5  Drug/Alcohol Testing

The parties to this policy and program agree that under certain circumstances, the company will find it necessary to conduct drug and alcohol testing as follows:

a.  A pre-employment drug and alcohol test may be administered to all applicants for employment;

b.  A test may be administered in the event a supervisor has a reasonable cause to believe that the Employee has reported to work under the influence, or is or has been under the influence while on the job; or has violated this drug policy.  During the process of establishing reasonable cause for testing, the Employee has the right to request his on-site representative to be present;

c.  Testing may be required if an Employee is involved in a workplace accident/incident or if there is a workplace injury;

d.  Testing may be required as part of a follow-up to counseling or rehabilitation for substance abuse, for up to a one (1) year period;

e.  Employees may also be tested on a voluntary basis.

f.  Random drug testing conducted under the policy and procedure contained in Section 32.7.

Each Employee will be required to sign a consent and chain of custody form, assuring proper documentation and accuracy.  If an Employee refuses to sign a consent form authorizing the test, ongoing employment by the company will be terminated.

Drug testing will be conducted by an independent accredited laboratory (National Institute on Drug Abuse and/or College of American Pathology), and may consist of either blood or urine tests, or both as required.  Blood test will be utilized for post accident investigation only.

The company will bear the costs of all testing procedures.

### 32.6  Rehabilitation and Employee Assistance Program

a.  Employees are encouraged to seek help for a drug or alcohol problem before it deteriorates into a disciplinary matter.  If an Employee voluntarily notifies supervision that he or she may have a

substance abuse problem, the company will assist in locating a suitable Employee assistance program for that treatment, and will counsel the Employee regarding medical benefits available under the company or union health and welfare/insurance program.

b. If treatment necessitates time away from work, the company shall provide for the Employee an unpaid leave of absence for purposes of participation in an agreed upon treatment program. An Employee who successfully completes a rehabilitation program shall be reinstated to his/her former employment status, if work for which he/she is qualified exists.

c. Employees returning to work after successfully completing the rehabilitation program will be subject to drug tests without prior notice for a period of one year. A positive test will then result in disciplinary action as previously outlined in this policy and program.

### 32.7 Random Drug Testing Policy and Procedure

The Random Drug Testing Policy and Procedure are as follows:

1. Employees Subject to Testing

The parties agree to the establishment of a random testing program that shall include all current Employees and future Employees.

2. Random Rate

Random testing may be conducted as follows:

a. Once per calendar month the employer may randomly test a portion of the bargaining unit members working for the company.

b. The employer shall maintain sufficient records of testing to allow the Union to determine whether the provisions of this Article are in compliance.

3. Selection Period

a. The selection period is an interval within the program period for which a given number of random selections are performed. The frequency of selection shall be once during each calendar month, although the actual specimen collection may occur on any working day within that calendar month.

b. Each individual company shall submit a current Employee list for each selection period to a Third Party Administrator that will computer-generate a list of randomly-selected Employees.

c. Each individual company shall designate the specific day and time within the selection period the sample is to be collected for each Employee selected. To ensure the deterrent effect of random testing, testing shall be spread out through the selection period and include a representative sample of all work days, including weekends and holidays when feasible. In no event shall an Employee be required to submit to testing when the Employee is not physically present on the jobsite or employer office and engaged in bargaining unit work for the company. Moreover, in order to be tested, the Employee must be scheduled to perform bargaining unit work on a jobsite on the date the testing is      to occur.

4. Testing Procedures

a. The cost of all tests, specimen collection and random selection shall be borne by each individual company. Each company shall pay the Employee for all time spent complying with Section 32.7, including travel to and from the collection location and time spent for testing. Each randomly-selected Employee shall be responsible for getting to and from the collection site in a timely manner. Failure of the Employee to get to the testing site in a timely manner shall be deemed a refusal to be tested unless the Employee can demonstrate by clear and convincing evidence that the failure to so appear was outside the Employee's control. The Employer shall be responsible for transporting any Employee who does not have an individual means of transportation.

b. Each individual company may elect to have the Employee finish his work day at the collection location. Overtime provisions of the Agreement shall apply.

c. Employees are required to cooperate in all specimen collection and/or testing procedures. This shall include providing a sample either on the job-site or collection location and having in their possession valid picture identification and any testing paperwork given to the Employee by the company.

5. Testing

a. The laboratory performing all tests will be certified for Federal Workplace Drug Testing Programs by the Department of Health and Human Services - Substance Abuse and Mental Health

Service Administration (SAMHSA).

  b. Specimen samples shall be collected at the third party administrator collection location or at the job-site by a third party administrator who has been properly trained to collect specimen samples to meet guidelines established by the Department of Transportation.

  c. A split sample shall be secured from each Employee tested. When a urine sample is taken, the sample will be collected in a single container and then split into two containers by the collector. When an oral swab is taken, the collector shall swipe into two separate swabs and keep each swab separate.

  d. All initial tests will be tested by the accepted industry standard screening methodology appropriate for the type of specimen. All initial positive tests shall be confirmed by gas chromatography/mass spectrometry (GC/MS) or the appropriate industry standard confirmatory methodology appropriate for the type of specimen.

  e. Urine and/or oral fluids may be tested.

  f. Testing for alcohol shall be at the option of the company. Testing for alcohol shall follow 49 CFR Part 40 Subparts J and K Procedures for Transportation Workplace Drug and Alcohol Testing Programs for the Department of Transportation, as that provision may from time to time be amended.

  g. All illegal drugs, controlled substances, look-alike drugs, and designer drugs, may be tested for.

  h. Use of prescription drugs outside the parameters of the prescription and physician's advice may be tested for.

  i. The United States Department of Transportation levels for "positive" or "negative" drug test results shall be the standard where applicable. Alcohol test results of .02 and higher shall be treated the same as a positive test result.

  j. All confirmed positive test results shall be reviewed, verified and reported to each company by a Medical Review Officer (MRO). The MRO shall not review positive alcohol tests reported from a breathalyzer.

 6. Test Results

  a. Test results that are verified by the MRO as positive or positive dilute shall be handled in accordance with the Agreement, including termination of employment.

  b. Test results that are verified by the MRO as adulterated or substituted as determined by the laboratory and verified by the MRO shall be treated as a positive test result.

  c. Test results that are verified by the MRO as negative dilute shall allow for a new specimen collection and test at the company's discretion. The second test result shall be considered the test of record and the first result disregarded.

  d. Test results that indicate misuse of prescription drugs shall be treated as a positive test result.

  e. A refusal to provide a sample shall be treated as a positive test result.

  f. Specimen samples that cannot be collected, or collected properly due to an uncooperative Employee shall be treated as a positive test result and handled in accordance with the Agreement.

  g. In the case of a specimen sample that cannot be collected because an Employee does not provide a sufficient amount of urine for the drug test (i.e., 45 ml of urine), the following procedures shall be followed:

   1. The collector must discard the insufficient specimen, except where the insufficient specimen was out of temperature range or showed evidence of adulteration or tampering, in which case the test is treated as a positive or positive dilute test result;

   2. The Employee shall be given the opportunity to drink fluids but shall not be forced to drink fluids. The Employee shall be informed that he or she has up to three hours to produce an adequate urine specimen, and when that three hour period begins and ends.

   3. If the Employee refuses to attempt to provide a new urine specimen or leaves the collection site before the collection process is complete, it is treated as a refusal to test.

   4. If the Employee is unable to provide an adequate urine specimen after the conclusion of the three hour period, the collector must immediately inform the employer and follow 49 CFR Part 40.193 Procedures for Transportation Workplace Drug and Alcohol Testing Programs from the

Department of Transportation, as that provision may be from time to time amended. The company, at its option, can require testing by an alternate method, including blood or oral fluids.

h.  Test results that indicate a fatal flaw, invalid sample, cancelled test, damage in shipment, defect in collection procedures, laboratory errors shall result in a new specimen collection and test at the company's option.

7.  Indemnification and Hold Harmless

The Employer shall release, indemnify and hold the Union including its officers and agents completely harmless from any claims and allegations of loss, damage and injury resulting from the implementation of random testing which is not specifically authorized by the terms of this Article.

8. Policy of Non-Discrimination and Non-Harassment

The Employer is strictly prohibited from using this random testing procedure to either harass or discriminate against any person for any reason.


# ARTICLE XXXIII
# DIVERS AND DIVER TENDERS

## SCOPE OF WORK

**33.1**  Employer recognizes that the Union claims jurisdiction of the work performed by divers and diver tenders on diving operations, the maintenance of all equipment including submarine diving in all its branches and phases, such as salvaging of all ships, vessels, barges, etc.; underwater installation, repair, maintenance and cleaning, modification and inspection of docks, bridges, breakwaters and piers, cofferdams, intake and discharge structures and conduits, locks and dams, flumes, sewerage and water systems; underwater construction and reconstruction, underwater and habitat welding and cutting; concrete forming, pouring, drilling, sawing and breaking; ariel lift and trash pump dredging and jetting requiring diver assistance; application of underwater coatings and sealants such as epoxies, paints, cement and grouts; underwater demolition and blazing rigging; and steel erection.  Also claimed herein is industrial diving of all kinds such as is found at power plants, steel mills, refineries and other heavy industries.  This is to include the underwater installation, repair, maintenance and cleaning, modification and inspection of:  intake and discharge structures and piping, tunnels, wells, forebays, flumes, water pumping and screening equipment, trash racks, stoplogs and bulkheads, valves and gates, cooling towers and canals, clarifiers and thickeners, liquid vessels of all kinds, floating booms, fish barrier nets, reactor vessels and fuel pools; all pipes; installation and burial of utility and telephone cables beneath the seabed; installation and maintenance of pond and canal liner materials such as geotextiles and polymeric textiles where a diver is required; installation and maintenance of underwater instrumentation, searches, surveys and recoveries of any kind.

## RATES OF PAY

**33.2**  A diver shall receive the regular journeyman carpenter's rate of pay as established in their area agreement; for any day or part thereof the diver is required to descend below the surface down to fifty (50) feet.

**33.3**  A tender may be paid a minimum of fifty (50) percent of the journeyman carpenter's wage rate.  When no diving takes place on a given day, then the tender will be paid for all actual hours worked.

## WORKING CONDITIONS

**33.4**  When a diver is performing diving work under the terms and conditions of the Agreement, the diver shall be tendered by a tender who is satisfactory to the diver concerned.  The tender is in the bargaining unit and therefore covered by their Agreement.

**33.5**  No tender shall tend, maintain or assist more than one (1) diver at a time and no working diver shall be left untended.

**33.6**   The minimum crew size shall be one (1) diver and one (1) tender for air diving; one (1) diver, one (1) tender, and one (1) manifold operator for mixed gas diving.

**33.7**   Divers will dress in and out as part of the workday.   Tenders will prepare, maintain, and secure equipment as part of the workday.

**33.8**   Suitable facilities will be provided, by the contractor, for divers to dress and dry their gear, with heating as needed.

## TRAINING AND SAFETY

**33.9**   Contractors and Employees with regard to diving operations must comply with OSHA - 1910.410.

Dive training achieved from field experience and classroom training in hardhat diving must be verifiable with a "dive log book" and an approved "dive certification" prior to employment.  (Military or company training records can determine Employee qualifications and technical ability.)

All dive team personnel must be properly trained in CPR and First Aid with current certifications.

**33.10**   Mixed-Gas diving, being more sophisticated, shall require a written notice and arrangements being made with the Regional Council.

**33.11**   This Article covers the geographic jurisdiction of Cook, DuPage, Grundy, Iroquois, Kane, Kankakee, Kendall, Lake, Mc Henry, and Will Counties, Illinois, as well as diving work on Lake Michigan and its waterfront in Lake, Porter, and La Porte Counties, Indiana.

## ARTICLE XXXIV
## UBC NATIONAL FUNDS

**34.1**   In addition to any contributions otherwise called for herein, there shall be a ten cent ($0.10) per hour contribution to the Carpenters International Training Fund ("Training Fund") with the Employer paying six cents ($0.06) for each hour of work performed by its Employees and four cents ($0.04) being allocated from the negotiated wage package for each hour of work performed by the Employees. Payment shall be made to the Training Fund or to such collection agent as designated by the Training Fund on or before the 20th day of the month following the month of the work performed.  The Employer hereby agrees to be bound by the Agreements and Declarations of Trust for the Training Fund as they exist and as they may be amended or restated, and to such rules, regulations and other governing documents adopted pursuant to such funds.

## ARTICLE XXXV
## LABOR/MANAGEMENT UNION CARPENTRY
## COOPERATION PROMOTION FUND

**35.1**   The parties hereby establish a Labor/Management Union Carpentry Cooperation Promotion Fund ("LMUCCP Fund") to enhance the use of Union Carpentry Construction to increase opportunities for Union members and signatory Employers.   This Fund shall be collected by the fringe benefit offices affiliated with the Chicago Regional Council of Carpenters.   This Fund shall be used solely to promote the Union Carpentry Industry and shall be governed by a Board of Trustees based on the equal representation of three (3) Union and three (3) Employer representatives.   All expenses, remuneration and salaries shall be decided by a majority vote of Fund Trustees.   Out of the increases to be allocated, each Employer shall contribute an amount per hour as determined by the Union  for each hour worked for the Employer by those of his Employees covered by this Agreement. .

In addition to the foregoing, out of the allocated increases, each Employer shall contribute the allocated amount for each hour of work performed by Employees covered in this Agreement to the LMUCCP Fund subject to the following requirements. The Union and MARBA agree, and shall direct their appointed trustees of the Fund to amend the Trust Agreement to allow for the following items

(a)  The amount contributed to this Fund under this provision shall be segregated from other contributions submitted at a different hourly contribution rate and made to a separate account which will exclusively receive the allocated contribution. The Account shall be referred to as the "Carpentry Advancement Fund".

(b)  Pursuant to Section 5.2 of the Trust Agreement, the disbursement of any funds submitted to the Carpentry Advancement Fund by Employers under this provision shall be delegated to a Committee of Trustees consisting of 1.) two Union representatives including the President/Executive Secretary/Treasurer of the Union, and 2.)  two MARBA representatives including the Chairman of the MARBA Bargaining Committee. Any disbursements from the segregated Carpentry Advancement Fund must be by joint agreement of such trustees.

(c)  (c)  MARBA or the Union may terminate participation in the Carpentry Advancement Fund with thirty (30) days written notice to the President/Executive Secretary-/Treasurer of the Union or the Chairman of the MARBA Bargaining Committee. In the event that MARBA or the Union terminates such participation, the contribution designated for the Carpentry Advancement Fund shall be allocated in the Union's discretion.

Contributions under this provision shall not commence until the Trust Agreement is amended as identified above.

The collection of amounts due under this Article shall not be subject to the Settlement of Disputes procedures established in Article XVIII.

## ARTICLE XXXVI
## SAVINGS CLAUSE

**36.1**  Should any part of or any provision herein contained be rendered or declared invalid by reason of any existing or subsequent enacted legislation, or by any decree of a court of competent jurisdiction, such invalidation of such part or portion of this Agreement shall not invalidate the remaining portions thereof; provided, however, upon such invalidation the parties signatory hereto agree to immediately meet to renegotiate such parts or provisions affected.

**36.2**  All of the provisions contained in Articles I through XXI shall be and they are hereby made a part of Article XXII through XXVI, except that if any of the provisions pertaining to the respective classifications, as set out in Articles XXII through XXVI are deemed to be inconsistent with any of the provisions of Article I through XXI, in that event, the provisions of Article XXII through XXVI shall apply, but only to the Employees referred to in Articles XXII through XXVI.

## ARTICLE XXXVII
## WORK RULES COMMITTEE

**37.1**  The Union and the Association together shall create a Work Rules Committee consisting of an equal number of members representing each party with no more than three (3) persons from each. Alternate members may be appointed. The purpose of this Committee shall be to consider, discuss, and propose, under appropriate circumstances, work rule modifications that benefit the carpentry industry and its signatory contractors

No discussions by or meetings of the Committee shall be considered a reopening of the contract.

Any work rule modifications proposed by the Committee must be ratified by the Chicago Regional Council of Carpenters and the Mid-America Regional Bargaining Association.

**IN WITNESS WHEREOF**, the parties have executed this contract effective as of the dates indicated.

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**

**MID-AMERICA REGIONAL BARGAINING ASSOCIATION,** for and on behalf of its present and future members who assign the authority to represent them for collective bargaining purposes.

Gary Perinar
Executive Secretary Treasurer

Seth Gudeman
Chairman of the Bargaining Committee

24  CV  6428

EXHIBIT F

# MID-AMERICA REGIONAL

# BARGAINING ASSOCIATION



## CARPENTERS AGREEMENT

**BETWEEN**

**MID-AMERICA REGIONAL BARGAINING ASSOCIATION (MARBA)**

**AND**

**MID-AMERICA CARPENTERS REGIONAL COUNCIL**

**TERM OF AGREEMENT**

**JUNE 1, 2024 TO MAY 31, 2029**

**MID-AMERICA CARPENTERS REGIONAL COUNCIL**
**Term of Agreement**
**6/1/24 - 5/31/29**

### TABLE OF CONTENTS

Page

JOINT AGREEMENT ........................................................................................ 1

ARTICLE I  BARGAINING UNIT ........................................................... 1
Recognition ................................................................. 1

ARTICLE II  UNION SECURITY ............................................................. 2

ARTICLE III  SUB-CONTRACTING ......................................................... 2

ARTICLE IV  WAGES .............................................................................. 3
Show Up Time ............................................................. 4
Minimum Hours after Work Commenced ...................... 4

ARTICLE V  PAY DAY ............................................................................ 4
Pay on Termination of Employment .............................. 4
By Discharge ............................................................... 5
By Lay-Off ................................................................... 5

ARTICLE VI  HOURS OF LABOR ............................................................ 6
Transportation ............................................................. 7

ARTICLE VII  SHIFT WORK .................................................................... 7

ARTICLE VIII  INSURANCE ...................................................................... 9

ARTICLE IX  SAFETY ............................................................................. 9

ARTICLE X  JOB STEWARD .................................................................. 9

ARTICLE XI  FOREMAN ......................................................................... 10

ARTICLE XII  HEALTH AND WELFARE FUND ........................................ 10

ARTICLE XIII  PENSION FUND AND SUPPLEMENTAL RETIREMENT FUND ............... 12

ARTICLE XIV  TRAINING FUND .............................................................. 14

ARTICLE XV  BONDING .......................................................................... 15

ARTICLE XVI  TOOLS .............................................................................. 16

ARTICLE XVII  APPRENTICES .................................................................. 16

ARTICLE XVIII  SETTLEMENT OF DISPUTES ........................................... 17

ARTICLE XIX  USE OF MACHINERY, TOOLS AND FACTORY MADE PRODUCTS ....... 19

ARTICLE XX  MISCELLANEOUS PROVISIONS ...................................... 19

**ARTICLE XXI**    **MOST FAVORED NATIONS** .................................................. 21

**ARTICLE XXII**    **PILE DRIVING-SCOPE OF WORK** ......................................... 22
Pile Driving - Work Rules ................................................................ 22
Pile Driving - Territorial Jurisdiction ............................................... 24

**ARTICLE XXIII**    **MILLWRIGHT-WORKING RULES** ....................................... 24

**ARTICLE XXIV**    **SHINGLING, SIDING AND INSULATING MECHANICS-GENERAL** ......... 25
Claims and Jurisdiction of the Shingling Mechanic .......................... 25
Claims and Jurisdiction of the Siding Mechanic ............................... 25
Claims and Jurisdiction of the Insulating Mechanic ......................... 26

**ARTICLE XXV**    **INSTALLERS OF FLOOR AND WALL PRODUCTS** ................. 26

**ARTICLE XXVI**    **LATHERS-SCOPE OF WORK** ............................................. 27
Lathers - Working Rules-Local Dues ............................................... 27
Registration Day ............................................................................. 28
Rocklath ......................................................................................... 28
Lathers - Territorial Jurisdiction ..................................................... 28

**ARTICLE XXVII**    **DUES CHECK-OFF** .......................................................... 28

**ARTICLE XXVIII**    **INDUSTRY ADVANCEMENT FUND** ................................... 28

**ARTICLE XXIX**    **CHICAGOLAND CONSTRUCTION SAFETY COUNCIL** ........ 29

**ARTICLE XXX**    **CONSTRUCTION INDUSTRY SERVICE CORPORATION** ...... 29

**ARTICLE XXXI**    **MARKET AND GEOGRAPHIC AREA COMMITTEE** ............ 29

**ARTICLE XXXII**    **SUBSTANCE ABUSE AND RECOVERY PROGRAM** ............ 30

**ARTICLE XXXIII**    **DIVERS AND DIVER TENDERS** ........................................ 34
Scope of Work ................................................................................ 34
Rates of Pay ................................................................................... 34
Working Conditions ......................................................................... 35
Training and Safety ......................................................................... 35

**ARTICLE XXXIV**    **UBC INTERNATIONAL TRAINING FUNDS** ...................... 35

**ARTICLE XXXV**    **LABOR/MANAGEMENT UNION CARPENTRY COOPERATION
PROMOTION FUND** ........................................................ 36

**ARTICLE XXXVI**    **SAVINGS CLAUSE** .......................................................... 36

**ARTICLE XXXVII**    **WORK RULES COMMITTEE** ............................................ 37

**SIGNATURE PAGE** ........................................................................... 37

MID-AMERICA CARPENTERS REGIONAL COUCIL

**TERM OF AGREEMENT**
**JUNE 1, 2024 through MAY 31, 2029**

THIS AGREEMENT is effective June 1, 2024 through May 31, 2029, by and between MID-AMERICA REGIONAL BARGAINING ASSOCIATION for and on behalf of the present and future members, together with such other employers who become signatory to this Agreement (referred to herein as "Employer or Employers") and the MID-AMERICA CARPENTERS REGIONAL COUNCIL, for and on behalf of the Local Unions under its jurisdiction in Cook, Lake and DuPage Counties, Illinois (hereinafter referred to as the "Union').

This Agreement shall be in full force and effect from June 1, 2024 through May 31, 2029.

NOW, THEREFORE, it is hereby agreed as follows:

## ARTICLE I
## BARGAINING UNIT

**1.1** The Bargaining Unit shall consist of all Journeymen, Foremen, Apprentices and Trainees engaged in work at the construction site covered by the occupational jurisdiction of the "Union" including, but not limited to, the milling, fashioning, joining, assembling, erection, fastening or dismantling of all material of wood, plastic, metal, fiber, cork, and composition, and all other substitute materials; scaffolding; overhead sectional doors; concrete forming, gang forms; the handling, erecting, installing and dismantling of machinery and equipment, hydraulic jacking and raising, and the manufacturing of all materials where the skill, knowledge and training of the Employees are required, either through the operation of machine or hand tools. The Bargaining Unit shall also consist of all Journeymen, Foremen, Apprentices and Trainees engaged in work as Carpenters and Joiners, Millwrights, Pile Drivers; Bridge Dock and Wharf Carpenters, Divers, Underpinners, and Timbermen and Core drillers; Ship Wrights, Boat Builders and Ship Carpenters, Joiners and Caulkers, Cabinet Makers, Bench Hands, Stair Builders, Millmen, Wood and Resilient Floor Layers, and Finishers, Carpet Layers, Shinglers, Siders, Insulators, Acoustic and Dry Wall Applicators; Shorers and House Movers; Loggers, Lumber and Sawmill Workers; Casket and Coffin Makers; Furniture Workers, Reed and Rattan Workers, Shingle Weavers, Box Makers, Railroad Carpenters and Car Builders, and Show, Display, and Exhibition Workers and Lathers, regardless of material used; and all those engaged in the operation of wood working or the machinery required in the fashioning, milling or manufacturing of products used in the trade, or engaged as helpers to any of the above divisions or subdivisions, and the handling, erecting and installing material on any of the above divisions or sub-divisions; burning, welding, rigging and the use of any instrument or tool for layout work, incidental to the trade. When the term "Carpenter and Joiner" is used, it shall mean all the subdivisions of the Trade. However, the Union agrees that it will not interfere with existing practices of other unions affiliated with the Building Trades.

## RECOGNITION

**1.2** The Association and the Employer recognizes the Union as the sole and exclusive Bargaining Representative for the Employees, now or hereafter employed in the Bargaining Unit for the purpose of Collective Bargaining in respect to pay, wages, hours of employment, or other conditions of employment. All work covered by this Agreement shall be performed by the Employees in this Bargaining Unit.

**1.3** Any Employee of this Bargaining Unit may perform any or all of the work described herein provided he observes the special rules as described for the particular subdivision or specialty of the trade.

Jun-24

**1.4** The Employer and the Union agree that neither party shall discriminate against any person directly or indirectly, in such matters as race, creed, color, sex, national origin, age or religion.

## ARTICLE II
## UNION SECURITY

**2.1** Maintenance of Membership: All Employees now included in the Bargaining Unit represented by the Union and having a membership therein must, during the term hereof, as a condition of employment maintain their membership in the Union.

**2.2** All other Employees covered by this Agreement shall, as a condition of employment, become members of the Union after the seventh (7) day of, but not later than the eighth (8) day following the beginning of, such employment, or the effective date of this Agreement, whichever is later and they shall maintain such membership as a condition of continued employment as hereinafter provided.

**2.3** Any Employee who refuses or fails to become a member of the Union or refuses or fails to maintain his membership therein in accordance with the provisions of Sections 1 and 2 of this Article, shall forfeit his right of employment, and the Employer shall, within three (3) working days of being notified by the Union in writing as to the failure of an Employee to join the Union or to maintain his membership therein, discharge such Employee. For this purpose the requirements of membership and maintaining membership shall be in accordance with State and Federal Laws. The Employer shall not be in default unless it fails to act within the required period after receipt of written notice.

**2.4** The Employer shall, on the day that he hires an Employee who is not a member of the Union, notify the Union, or the Job Steward of the name, address and date of initial employment of such Employee, as well as the jobsite. In the absence of a Job Steward, the Employer also agrees to advise the Employee of the provisions of this Article.

## ARTICLE III
## SUB-CONTRACTING

**3.1** The parties hereto being in the Construction Industry qualify under the proviso of Section 8(e) of the National Labor Relations Act, 1947 as amended.

**3.2** Employer shall not contract or subcontract any work coming within the jurisdictional claims of the Union to any person, firm or corporation not covered by a Collective Bargaining Agreement with the Union, provided, however, that the provisions of this paragraph shall apply only to the contracting and subcontracting of work to be done at the site of construction, alteration, painting or repair of a building, structure or other work.

**3.3** Employer, in recognition of the territorial and occupational jurisdiction of the Union, shall not subcontract or contract out jobsite work coming within the jurisdiction of the Carpenters Union nor utilize on the jobsite the services of any other person, company or concern to perform such work that does not observe the same wages, fringe benefits, hours and conditions of employment as enjoyed by the Employees covered by this Agreement.

**3.4** Any Employer who sublets any of the work coming within the jurisdiction of Carpenters shall assume the obligations of any subcontractor to the extent of Carpenter labor employed on work under contract with the Employer for prompt payment of Employee's Wages, Health and Welfare, Pension and Apprentice Training Contributions, including reasonable attorney's fees incurred in enforcing the provisions hereof, provided the subcontractor is not bonded as provided for in Article XV hereof. The Union will, upon written request, furnish written certification to any Employer as to whether a

subcontractor is adequately bonded including expiration date of bond, and that wages and payments to Health and Welfare, Pension and Apprentice Contributions are current. The Union also agrees to notify MARBA of any subcontractor whose bond is being terminated. If the Employees are withdrawn from any job in order to collect contributions to the Carpenters Health and Welfare, Pension and Apprentice Training Program, the Employees who are affected by such stoppage of work shall be paid for lost time up to sixteen (16) hours, provided that two (2) days notice of the intention to remove Employees from the job is given to the Employer and the subcontractor by the Union by registered mail.

The Employer shall furnish the Union with the names of its subcontractor(s) on each jobsite and with a copy of the subcontractors' surety or cash bond agreement evidencing that such subcontractor(s) is obligated to this Agreement and has posted the bond required by Article XV. Such Employer, from the date the Union receives such information and for the work performed on the specific referenced jobsite, will not be liable for the subcontractor's wage or fringe benefit obligation. If the Union notifies the Employer in writing that the subcontractor is no longer properly bonded, then from that date and for work subsequently performed in the specific referenced jobsite the Employer's liability under this section for such subsequent work will resume until such time as the proper bond has been replaced.

**3.5** If an Employer, bound by this Agreement, contracts or subcontracts any work covered by this Agreement to be done at the jobsite of the construction, alteration, painting or repair of a building, structure or other work to any person or proprietor who is not signatory to this Agreement, the Employer shall require such subcontractor to be bound by all provisions of this Agreement, or the Employer shall maintain daily records of the subcontractor's or the subcontractor's Employees jobsite hours and be liable for payments to the Mid-America Carpenters Regional Council Welfare Fund, the Mid-America Carpenters Regional Council Pension Fund and the Mid-America Carpenters Regional Council Apprentice and Trainee Program, as provided in Articles XII, XIII, and XIV of this Agreement.

## ARTICLE IV
## WAGES

**4.1** The economic package will increase as follows:

| | | |
|---|---|---|
| (a) | Effective June 1, 2024 | $3.77 (4.00%) Increase per hour |
| (b) | Effective June 1, 2025 | $3.92 (4.00%) Increase per hour |
| (c) | Effective June 1, 2026 | $4.07 (4.00%) Increase per hour |
| (d) | Effective June 1, 2027 | $4.24 (4.00%) Increase per hour |
| (e) | Effective June 1, 2028 | $4.41 (4.00%) Increase per hour |

If the pension funding requirements under the applicable schedule of a FIP or the applicable schedule of a Rehabilitation Plan adopted by the Pension Plan Trustees under the Pension Protection Act of 2006, or any successor legislation, and agreed to/adopted by the bargaining parties, requires additional pension contributions greater than fifty cents ($0.50) per hour, those additional pension contribution amounts shall be allocated first from the total package increase scheduled for that year before any allocations to wages or the health & welfare plan or other benefits.

In the event the Pension Fund is not at or above 90% funded in accord with the Pension Protection Act of 2006 or other successor legislation as of May 1st of each contract year, the Union shall allocate a minimum of fifty cents ($0.50) per hour to the Pension Fund and commit that its allocation of wages will not exceed 1.5 % of the total package.

Subject to the foregoing, the allocation among the wages and any other contributions shall be at the discretion of the Executive Committee of the Union. Notice in writing of the allocation shall be given to the Employer by the Union thirty (30) days prior to the effective date.

(b) The Apprentice rates of wages shall be as follows:

    1st Year   40% of Journeyman's Wages
    2nd Year  50% of Journeyman's Wages
    3rd Year  65% of Journeyman's Wages
    4th Year  80% of Journeyman's Wages

## SHOW UP TIME

**4.2** Any Employee reporting for work on direction of the Employer or in the course of the regular job schedule and not being put to work for any reason shall receive two (2) hours' pay. Employees who are notified by the Employer not to report for work shall not be entitled to any pay under this provision. Employers may notify Employees by telephone at least two (2) hours prior to the start of work not to report for work. Employees will be required to provide the Employer with a telephone number that can be used to notify them not to report for work.

## MINIMUM HOURS AFTER WORK COMMENCED

**4.3** If an Employee commences work on a job the minimum pay he shall receive for that day shall be four (4) hours pay, except for conditions such as weather, fire, accident or other unavoidable cause beyond the control of the Employer.

**4.4** Employer further agrees upon request of the Mid-America Carpenters Regional Council to provide copies of payroll checks prior to their being delivered to any Employee to the business representative by facsimile or delivered to his office.

**4.5** Employer agrees that, by appointment, and within forty-eight (48) hours of notice during the normal working days, he or his representative will meet with, at Employer's office or shop, anyone designated by the President of the Union for the purpose of inspecting lists of Employees, payroll records, and time cards solely to determine whether the provisions of this Agreement are being complied with.

## ARTICLE V
## PAY DAY

**5.1** Employees shall be paid once each week, not later than 3:30 p.m. on the regularly established payday, except in cases of holidays in which case they may be paid on the following workday. Wages are to be paid in full up to two (2) workdays preceding the regular designated payday. Wages may be paid by mail or by electronic deposit as directed in writing by the Employee. If wages are to be paid by mail or by electronic deposit the paycheck must be received on or before the regularly established payday. If the Employer fails to have sufficient funds for wages due, or for pay checks issued, he shall pay in addition thereto a sum equal to the costs incurred in collecting same, including reasonable attorney's fees. If the Employer issues a check for the payment of wages or fringe benefits which is returned due to a lack of sufficient funds, the Employer shall be required to make all payments of wages and fringe benefits in cash or by certified check, and in addition the Employer will be required to reimburse each Employee for any charges assessed.

## PAY ON TERMINATION OF EMPLOYMENT

**5.2** (a) Involuntary Dismissal.

## BY DISCHARGE

Employer may discharge any Employee at any time on any working day provided, however, Employee is given fifteen (15) minutes with pay to gather his tools, and is immediately tendered in hand on the job all wages due him. The parties hereto agree that the payment procedure upon discharge, as outlined above, is a condition precedent to lawful discharge.

## BY LAY-OFF

When an Employee is laid off due to lack of work, he shall be paid immediately all wages due him to date and he shall receive at least one-hour notice prior to 3.30 p.m. In the event such notice is not given, Employer shall pay one (1) hour of wages in addition to all wages due him. However, when the one (1) hour penalty is in effect, then in that event the one-hour wages shall be mailed to the home of the Employee within a twenty-four (24) hour period. If he is not paid on the job at the time he is laid off, he shall be paid four (4) hours of additional pay all of which shall be included in his last paycheck.

(b) Voluntary Termination of Employment: When an Employee quits his job on his own accord, he may be required to wait, at the option of the Employer, until the next regular pay day for the wages due him.

**5.3** In the event that an Employee does not receive the wages according to the foregoing, then in that event he shall be paid in addition thereto at the regular rate, all time he spends, (1) waiting to be paid, and/or (2) all time expended by him to receive his pay, but in no event less than one (1) hour of pay nor more than four (4) hours for any time so spent. Saturdays, Sundays and National Holidays are excluded.

**5.4** (a) Employees working from a "Bos'ns Chair", or suspended from cables or ropes shall receive not less than twenty-five ($0.25) cents per hour above the applicable rate of journeyman's pay.

(b) Employees required to work on or with any materials that are treated with any creosote materials, or acid that may cause rashes, burns, or toxic reaction, or are required to wear any type of special breathing apparatus as protection against inhalation of noxious gas or dust, shall not receive less than twenty-five ($0.25) cents per hour above the applicable rate of journeyman's pay.

(c) The Employer shall furnish any necessary protective medication such as petroleum jelly, to prevent burns from said creosote or chemicals which may prove injurious to the skin. Gloves shall also be furnished by the Employer.

(d) Nothing in this section of this Agreement (premium pay) shall be so construed as to prohibit the opening to arbitration between the Employer and the Union at any time during the term of this Agreement of any work to be performed by Employees, of such nature as the Union deems hazardous or which makes exceptional demands on an Employee's health and safety and thereby qualify for premium pay, which is not covered by Articles in this section.

(e) In the event that the Union notifies the Employer that certain work is hazardous in nature, as defined in sub-section (b) above, a determination shall be made to establish the wage scale as well as working conditions and such scale shall be retroactive to commencement of such hazardous work

**5.5** Employer agrees to provide Employee with a statement each payday setting forth the following information:

(1) Hourly rate and number of hours worked in payroll period;

(2) Gross Salary;

(3) Itemization of each and every deduction being made against Gross Salary.

Said statement can be part of a stub attached to Employee's payroll check.

## ARTICLE VI
## HOURS OF LABOR

**6.1** (a) Eight (8) hours shall constitute a regular day's work, Monday thru Friday, beginning at 7:00 A.M. and ending at 3:30 P.M. with one-half (1/2) hour off from 12:00 noon to 12:30 P.M. for lunch. The Employer, without an adjusted workday in place, may begin work at 6:00 A.M. provided that the first hour of work is paid at the rate of time and one-half and all hours worked after 3:30 P.M. are paid at the rate of double time. The lunch period may be adjusted at the Employer's option during placement of concrete only, in any one-half (1/2) hour period between 12:00 noon and 1:00 P.M.

(b) Provided, however, upon twenty-four (24) hours written notice to the Business Representative of the District or the Regional Council, the Union will grant an adjusted workday (starting times from 6:00 A.M. to 9:00 A.M. at straight time) which shall be at the option of the Employees upon certification of the job steward or Business Representative and, provided further, that the adjusted start time is the uniform start time established for the project. Adjusted workdays must remain in effect for the duration of contractor's work unless otherwise agreed to by the Business Representative. In no case should a job begin before 6:00 A.M.

**6.2** There shall be no work done on the following holidays designated herein or days celebrated as such, except with written approval of the Union and when work is authorized, the rate of pay shall be at the rate of double time:

NEW YEAR'S DAY, MEMORIAL DAY, FOURTH OF JULY, LABOR DAY, THANKSGIVING DAY, CHRISTMAS DAY.

**6.3** Overtime shall be paid for work done before and after the regular workday or the adjusted workday as defined above, except where shift work has been approved. Work performed between 7:00 A.M. and 3:30 P.M. on Saturday or during the first eight (8) hours of an approved adjusted workday on Saturday shall be paid at the rate of time and one-half. Overtime pay for work performed after 3:30 P.M. on Saturday or after the first eight (8) hours of an approved adjusted workday on Saturday and the start of the regular or adjusted workday on Monday, shall be paid at the rate of double time except where shift work has been approved. In the event that there is more than one (1) shift of work on Saturday, without shift work approved by the Union, overtime pay for all hours of work on Saturday shall be paid at the rate of double time.

**6.4** The first two (2) hours of overtime work after working a regular eight (8) hour work day or an approved adjusted work day, Monday through Friday, shall be paid for at the rate of time and one-half and shall not be mandatory but shall be at the option of the Employee. All other overtime shall be paid for at the rate of double time. At the discretion of the Employer overtime will be permitted for work as required for emergencies such as for the protection of life or property, weather protection, completion of work caused by breakdown of deliveries or failures in concrete form work. In all other cases, overtime work shall require permission of the Business Representative of the District or the Regional Council, for each such case.

**6.5** All Employees shall be given time in which to gather their tools prior to quitting time.

**6.6** The hours of work for which an Employee shall receive pay shall commence and terminate at the facility provided for Carpenters to change their clothes, provided however, that said facility is at ground level. In the event that such facility is other than at ground level, "time" shall commence and terminate at ground level.

**6.7** When an Employee is directed either expressly or impliedly to go from one jobsite to another, he shall be paid for all time spent in traveling from the initial site to any other site.

**6.8** Employees who are required to work during the regularly defined lunch hour period shall eat not later than one (1) hour after the normal lunch period

**6.9** If an Employee covered by this Agreement sustains an accidental injury arising out of his employment which requires immediate medical care off the premises, during working hours, such Employee shall be paid his regular wages for the time necessarily spent in going to a physician's office, medical center or hospital, as well as the time required to return to the jobsite. Except in unusual circumstances, this provision shall be effective only on the date of the injury, unless subsequent visits during working hours are required by Employer's physician(s). When it is necessary for an Employee to be taken to a hospital immediately following an injury, he shall be taken to the hospital nearest to the jobsite at the Employer's expense.

**6.10** Safe and adequate transportation from a jobsite following an injury other than for a minor injury, shall be furnished by the Employer. The Job Steward shall be notified of all such injuries. If the Steward determines that someone must accompany the injured Employee to the hospital, medical center, physician's office, or Employee's home, the Employer shall select such person, who shall be compensated at the regular rate for such services. However, nothing contained in this Section 6.9 and Section 6.10 shall prevent an Employer from discharging an Employee for adequate cause.

In the event an Employee is injured in the course of his employment, he shall not be dismissed from such employment because of his injury, nor shall he be dismissed during the period of medical care required by said injury, unless there is no work available with his Employer of which he is capable to perform, or unless his dismissal is due to conditions beyond the control of the Employer.

## TRANSPORTATION

**6.11** An Employee who is required to travel to a jobsite shall be reimbursed for lodging when required to remain away from his home overnight. The expense allowance for lodging for each night shall be a minimum of fifty dollars ($50.00) per night.

**6.12** On all mill jobs or other jobs where the men cannot drive to the jobsite the Employer shall furnish transportation to the jobsite when the distance is greater than three-tenths (3/10ths) of a mile.

**6.13** On all jobs where the Employees are required to use Employer transportation to the jobsite, wages shall commence at 7:00 a.m.

**6.14** In the event that the Employees are required to work outside the geographic jurisdiction of their home local, they shall be paid the higher rate of wages and fringe benefit contribution rates under the agreement covering the Employee's home local or the agreement covering the area where the work is being performed.

In the event that the Employees are required to perform work outside the geographic jurisdiction of the Union and the Employer is not covered by an agreement with an affiliate of the United Brotherhood of Carpenters and Joiners of America, the terms and conditions of this Agreement shall be binding with respect to the Employee being required to work outside the geographic jurisdiction of the Union.

## ARTICLE VII
## SHIFT WORK

**7.1** There shall not be more than one (1) shift of work (7:00 A.M. to 3:30 P.M.) performed in any one (1) day and at any one (1) jobsite, except with Union permission.

**7.2** A pre-job conference shall take place between the Executive Secretary-Treasurer of the Mid-America Carpenters Regional Council and the Business Representative of the District, wherein the work will be performed, and with the Employer or his representative before shift work will be allowed.

**7.3** No shift work shall be permissible unless the shifts shall run a minimum of five (5) consecutive working days. When a jobsite qualifies for the use of a second and third shift the following shall be applicable:

(1) The First Shift shall start at 7:00 A.M. and end at 3:30 P.M., which shall be eight (8) hours.
(2) The Second Shift shall start at 3:30 P.M. and end at 11:00 P.M..
(3) The Third Shift shall start at 11:00 P M. and end at 6:30 A.M.
(4) The Second and Third Shifts shall receive eight (8) hours pay for seven (7) hours worked.
(5) Lunch hours for shift work shall be:
    First Shift--12:00 noon to 12:30 p.m.
    Second Shift--8:30 p.m. to 9:00 p.m.
    Third Shift--4:00 a.m. to 4:30 a.m.

**7.4** Employees required to work through their specified lunch hour shall be paid double time for that period.

**7.5** Any work done in excess of eight (8) hours on the first shift and in excess of seven (7) hours on the second shift and third shift shall be paid wages at the rate of double time.

**7.6** All approved shifts falling entirely on Saturday shall be paid wages at the rate of time and one-half. All approved shifts falling entirely on Sunday shall be paid wages at the rate of double time.

**7.7** No Employee shall work more than one (1) shift in any twenty-four (24) hour period.

**7.8** In the event permissible shift work does not fulfill the requirements as stated above, except for conditions beyond Employer's control, time worked will revert to premium wages for the second and third shift.

**7.9** In the event that Davis Bacon/prevailing wage projects require shifts to occur at times other than those specified in the Article because of traffic congestion, public safety, municipal requirements or other situations; different shifts and starting times can be established upon mutual agreement by the contractor and Union. Contractors utilizing this provision shall notify the Mid-America Carpenters Regional Council by requesting the pre-job conference on the form provided by the Mid-America Carpenters Regional Council. By mutual consent of the Employer and the Union, the starting and quitting times of any shift, including day work, may be changed for all or any portion of a particular job. However, the adjusted shift shall run a minimum of three (3) consecutive days. All Employees working under this provision shall be paid under the shift work provision contained in Section 7.3(4). Any and all work in excess of seven (7) hours under this provision shall be paid at a rate of double time. An Employer who violates this section shall pay as a penalty double time for all hours worked.

**7.10** When work to be performed in occupied buildings is of such a nature that it is not appropriate or practical during the regular work day, such as renovation, alteration and modernization, such work may be performed at an adjusted time, provided a pre-job conference takes place between the Mid-America Carpenters Regional Council and the Employer and permission is granted by the Mid-America Carpenters Regional Council. Contractors utilizing the provision shall notify the Mid-America Carpenters Regional Council by requesting the pre-job conference on the form provided by the Mid-America Carpenters Regional Council. BY mutual consent of the Employer and the Union, the starting and quitting times of any shift, including day work, may be changed for all or any portion of a particular job. However, the adjusted shift shall run a minimum of three (3) consecutive days. All Employees working under this provision shall be paid under the shift work provision contained in Section 7.3(4). Any

and all work in excess of seven (7) hours under this provision shall be paid at a rate of double time. An Employer who violates this section shall pay as a penalty double time for all hours worked.

## ARTICLE VIII
## INSURANCE

**8.1** Employer agrees to furnish to the Union a Certificate of Insurance from an insurance company authorized to do business in the State of Illinois covering liability under the provisions of the Illinois Worker's Compensation Act.

**8.2** It is agreed that all Employers not otherwise required to pay contributions under the Illinois Unemployment Compensation Act, and regardless of the number of men employed, shall voluntarily elect to become subject thereto and liable for the payment of contributions thereunder

## ARTICLE IX
## SAFETY

**9.1** The Employer agrees to adhere to and comply with the provisions of OSHA, the Illinois Health and Safety Act; standards of the American National Standards Institute; the Safety Provision of the Walsh Healy Public Contracts Act; Local Building and Safety Codes and shall also comply with manufacturers' specifications for safe operation of equipment.

**9.2** Should a Carpenter be required by law to accompany any Safety Inspector, City, State or Federal (O.S.H.A.) on a Safety Inspection of the jobsite, he shall do so with pay.

**9.3** The Employer shall furnish at all times and places suitable drinking water and sanitary facilities.

## ARTICLE X
## JOB STEWARD

**10.1** The parties agree that the following basic principles apply to the selection of a Job Steward:

(1) The Union requires that a Steward must fully protect the interest of the Union.

(2) The Employer requires that a Steward be a Carpenter who can efficiently perform his duties as a Carpenter and who will not disrupt the job unnecessarily in discharging his duties as a Steward.

(3) To meet the two basic principles agreed to by the parties, it is further agreed:

(a) The Job Steward shall be a working Carpenter;

(b) The Steward shall be selected by the Business Representative of the Union;

(c) In selecting a Steward preference shall be given Union Members presently employed in the Bargaining Unit of the Employer on the specific site, provided, however, that if, in the judgment of the Business Representative, no presently employed Union Member is competent to act as Steward, the Steward shall be selected from outside the Bargaining Unit. A reason shall be given by the Business Representative why no member is competent. However, the reason shall not infringe upon the right of the Business Representative to select the Steward;

(d) The Union shall have the right to replace any Steward at any time;

(e) So long as he is competent to perform the work to be done on the job, the Steward shall be the last Carpenter laid off, except for the Foreman;

(f) These provisions shall not apply to the work of Pile Driving where the work is performed by a small crew. In the Pile Driving crew, one (1) in the crew shall be designated by the Business Representative as a Steward;

(g) A Millwright Steward shall be appointed by the Millwright Business Representative on any job where Millwright work is being performed;

(h) If there is a dispute as to any of the Sections or Sub-Sections of this Article, the provisions of Article XVIII will apply.

**10.2** The duties of the Job Steward shall be to report to the Business Representative of the Union:

(a) Members' dues delinquencies;

(b) Violations of Collective Bargaining Agreement;

(c) Carpenters employed seven (7) days or more, who have not become members of the Union;

(d) Disputes and grievances of members.

He shall not have authority to:

(1) Adjust violations of the Collective Bargaining Agreement;

(2) Collect any money due the Union from any person or applicant for membership or any other person.

**10.3** Whenever one (1) or more Carpenters are required to work overtime, one (1) of their members shall be the regularly designated Steward, or someone designated by him.

## ARTICLE XI
## FOREMAN

**11.1** Where there are three (3) or more Carpenters on any one (1) jobsite, and one (1) journeyman, one shall be assigned the duties of Foreman, and shall receive the wages of a Foreman.

**11.2** The wages of a Foreman shall be computed as follows:

(a) In the case of a Foreman who directs up to four (4) Carpenters, the Foreman wage shall be two dollars ($2.00) per hour above the rate of wages for a journeyman.

(b) In the case of a Foreman who directs five (5) or more Carpenters, the Foreman wage shall be two dollars and fifty cents ($2.50) per hour above the rate of wages for a journeyman.

**11.3** Where there are ten (10) or more Carpenters on any one (1) jobsite, one (1) must be designated a Foreman, and he shall receive Foreman's wages, he shall devote his time to supervision of the work and he shall not work with the tools.

**11.4** Whenever a Foreman or General Foreman is chosen by the Employer, he shall be a person from the unit described in Article I, Paragraph 1.1.

## ARTICLE XII
## HEALTH AND WELFARE FUND

**12.1** Unless otherwise directed herein, each Employer shall pay into the Mid-America Carpenters Regional Council Welfare Fund (hereinafter referred to as "Health and Welfare Fund") an amount per hour for each hour worked for an Employer during each calendar month by all of its Employees who are covered by this Agreement in amounts determined and allocated by the Executive Committee of the Union effective June 1, 2024, June 1, 2025, June 1, 2026, June 1, 2027 and June 1, 2028.

**12.2** The Employer agrees to be bound by the Agreement and Declaration of Trust establishing the Mid-America Carpenters Regional Council Health and Welfare Fund, by any present and future Amendments thereto and irrevocably designates as his representative on the Board of Trustees such Trustees as are named in said Agreement and Declaration of Trust, as Employer Trustees, together with their successors selected in the manner provided in said Agreement and Declaration of Trust as it may be amended from time to time, and agrees to be bound by all action taken by said Employer Trustees pursuant to the said Agreement and Declaration of Trust as amended from time to time.

**12.3** The contributions of the Employers covered by this Agreement shall be used exclusively to provide group insurance and other related Health and Welfare Benefits for eligible Employees and/or their families in such form or amount as the Trustees of the Health and Welfare Fund may determine.

**12.4** Payment of Employer contributions to the Health and Welfare Fund shall be made on the dates and in the manner and form prescribed by the Trust Agreement or as designated by the Trustees.

**12.5** The said Health and Welfare Fund is and shall continue to be administered by an equal number of representatives of the Employers and of the Union pursuant to the Agreement and Declaration of Trust heretofore signed by the Employers and the Union, as now in effect and as it may be amended from time to time, in the manner provided in the Agreement and Declaration of Trust. Said Agreement and Declaration of Trust and any present and future amendments thereto are made a part of the Agreement as if set forth herein at length.

**12.6** The Employer shall furnish the Trustees with such information as the names of the Employees, classifications, Social Security numbers, wages, and/or hours worked, and such other information as may be required for the proper and efficient administration of the Health and Welfare Fund.

**12.7** The Employer representatives serving as Trustees, with their successors selected in the manner provided by the Agreement and Declaration of Trust, shall represent all Employers in the administration of the Health and Welfare Fund.

**12.8** The Employer may make contributions for all hours worked by the Superintendents and other management personnel for whom contributions to the Health and Welfare Fund were heretofore made when such individuals were employed as journeyman Carpenters. Such contributions shall be made in a monthly amount equal to at least one hundred and sixty (160) times the hourly contribution rate specified in this Article.

**12.9** Failure of any Employer after reasonable written notice by the Administrative Fund Office to furnish reports, pay contributions or comply with the rules and regulations formulated and promulgated by the Trustees of the Mid-America Carpenters Regional Council Health and Welfare Fund, shall be considered a violation of the terms and conditions of this Collective Bargaining Agreement and shall subject this Agreement to cancellation as to such Employer.

**12.10** In the event that an Employer becomes delinquent in making any of the aforesaid reports and payments and is so advised by formal notification in writing by the Administrative Fund Office, the Employer shall pay in addition to the amount due, reasonable fees of Certified Public Accountants as expressly used to establish the amount due, reasonable fees of Attorney in effectuating payment, and liquidated damages in amount as determined in accordance with the Agreement and Declaration of Trust.

**12.11** The Employer shall make contributions on behalf of each of its Employees employed by Employer in a management or supervisory position who is also engaged in work of a character falling within the jurisdiction covered by this Collective Bargaining Agreement in an amount of no less than one hundred and sixty (160) hours per month. Each such Employer shall execute a Participation Agreement with the Trustees of the Mid-America Carpenters Regional Council Chicago Regional Council of

Carpenters Welfare Fund, upon the request of such Trustees, for such greater or lesser amounts of hours as the Trustees may deem appropriate.

12.12 The contributions referred to in this Article shall be paid with respect to all hours worked by an Employee covered by this Agreement irrespective of the geographical area where work is performed or the geographical jurisdiction of the Union, provided that Employer shall not be required to pay contributions to the Mid-America Carpenters Regional Council Welfare Fund for hours outside the geographical jurisdiction of the Union, if Employer is required to pay contributions to another multi-employer welfare benefit fund based on such hours.

12.13 The collection of amounts due under this Article shall not be subject to the Settlement of Disputes procedure established in Article XVIII.

12.14 The parties recognize the importance of reducing the operational costs to their affiliated fringe benefits trust funds or other funds established under the parties' collective bargaining agreements and agree to review all options available and take appropriate action consistent with the determinations of the trustees of the funds to reduce operational costs.

12.15 The parties have established a Vacation Savings Plan that will be administered by the Mid-America Carpenters Regional Council Health Fund. The vacation savings shall be an amount set by the Union from the economic package set forth in Section 4.1. The vacation savings shall be paid based on the total number of hours worked; there shall not be any increase in the hourly amount of vacation savings because of overtime or any other situation that involves an increased hourly wage rate. The Employer shall add the designated vacation savings amount to the Employee's gross wages and then deduct the appropriate payroll tax, including social security and withholding taxes. The full amount of vacation savings shall be deducted from the employee's net wage and remitted to the Welfare Fund on the dates and in the manner set forth in Section 12.4. The Welfare Fund shall distribute the vacation savings to the member on an annual basis.

### ARTICLE XIII
### PENSION FUND AND SUPPLEMENTAL RETIREMENT FUND

13.1 Unless otherwise directed, each Employer shall pay into the Mid-America Carpenters Regional Council Pension Fund and the Supplemental Retirement Fund an amount per hour for each hour worked for an Employer during each calendar month by all Employees who are covered by this Agreement in amounts determined and allocated by the Executive Committee of the Union effective June 1, 2024, June 1, 2025, June 1, 2026, June 1, 2027 and June 1, 2028.

13.2 The Employer agrees to be bound by the Agreement and Declaration of Trust establishing the Mid-America Carpenters Regional Council Pension Fund and the Supplemental Retirement Fund and by any present and future amendments thereto and irrevocably designates as his representative on the Board of Trustees such Trustees as are named in said Agreement and Declaration of Trust, as Employer Trustees, together with their successors selected in the manner provided in said Agreement and Declaration of Trust as it may be amended from time to time, and agrees to be bound by all action taken by said Employer Trustees pursuant to the said Agreement and Declaration of Trust as amended from time to time.

13.3 The said Pension Fund and the Supplemental Retirement Fund are and shall continue to be administered by an equal number of representatives of the Employers and the Union, pursuant to the Agreement and Declaration of Trust heretofore signed by the Employers and Union, and now in effect and as it may be amended from time to time in the manner provided in the Agreement and Declaration of Trust. Said Agreement and Declaration of Trust and any present or future amendments thereto are made a part of this Agreement as if set forth herein at length.

**13.4** The Employer shall furnish the Trustees with information such as the names of the Employees, classifications, Social Security numbers, wages and/or hours worked, and such other information as may be required for the proper and efficient administration of the Pension Fund and the Supplemental Retirement Fund.

**13.5** The Employer representatives serving as Trustees, with their successors selected in the manner provided by the Agreement and Declaration of Trust, shall represent all Employers in the administration of the Pension Fund and the Supplemental Retirement Fund.

**13.6** The Employer may make contributions for all hours worked by Superintendents and other management personnel for whom contributions to the Pension Fund and the Supplemental Retirement Fund were heretofore made when such individuals were employed as journeymen Carpenters. Such contributions shall be made in a monthly amount equal to at least one hundred and sixty (160) times the hourly contribution rate specified in this Article.

**13.7** Failure of any Employer after reasonable written notice by the Administrative Fund Office so to do, to furnish reports, pay contributions, or comply with the rules and regulations formulated and promulgated by the Trustees of the Mid-America Carpenters Regional Council Pension Fund and the Supplemental Retirement Fund, shall be considered a violation of the terms and conditions of the Collective Bargaining Agreement and shall subject this Agreement to cancellation as to such Employer.

**13.8** In the event that an Employer becomes delinquent in making any of the aforesaid reports and payments and is so advised by formal notification in writing by the Administrative Fund Office, the Employer shall pay in addition to the amount due, reasonable fees of Certified Public Accountants as expressly used to establish the amount due, reasonable fees of Attorney in effectuating payment, and liquidated damages in an amount as determined in accordance with the Agreement and Declaration of Trust.

**13.9** The Employer shall make contributions on behalf of each of its Employees employed by Employer in a management or supervisory position who is also engaged in work of a character falling within the jurisdiction covered by this Collective Bargaining Agreement in an amount no less than one hundred and sixty (160) hours per month. Each such Employer shall execute a Participation Agreement with the Trustees of the Mid-America Carpenters Regional Council Pension Fund and the Supplemental Retirement Fund, upon the request of such Trustees, for such greater or lesser amounts of hours as the Trustees may deem appropriate.

**13.10** The contributions referred to in this Article shall be paid with respect to all hours worked by an Employee covered by this Agreement irrespective of the geographical area where work is performed or the geographical jurisdiction of the Union, provided that Employer shall not be required to pay contributions to the Mid-America Carpenters Regional Council Pension Fund and the Supplemental Retirement Fund for hours worked outside the geographical jurisdiction of the Union if Employer is required to pay contributions to another multi-employer pension benefit fund based on such hours.

**13.11** The collection of amounts due under this Article shall not be subject to the Settlement of Disputes procedures established in Article XVIII.

**13.12** The parties hereby acknowledge the creation of a separate multi-employer trust fund for the administration of the Supplemental Retirement Fund, previously known as the Annuity Fund. Contributions to the Annuity Fund previously had been allocated from the Employer's contributions to the Pension Fund and had been part of the pension calculation for Prevailing Wage purposes. It is the parties' intent that contributions to the Supplemental Retirement Fund pursuant to Articles IV and XIII of the parties' Collective Bargaining Agreement continue to be part of the pension calculation for Prevailing Wage purposes, and not a separate category for Prevailing Wage. In addition, contributions to the Supplemental Retirement Fund shall be part of the overall economic increases set forth in Article IV of the

Collective Bargaining Agreement, and shall be part of, and not in addition to, the allocations determined by the Union of said economic increases.

**13.13** The parties recognize the importance of reducing the operational costs to their affiliated fringe benefits trust funds or other funds established under the parties' collective bargaining agreements and agree to review all options available and take appropriate action consistent with the determinations of the trustees of the funds to reduce operational costs.

## ARTICLE XIV
## TRAINING FUND

**14.1** Unless otherwise directed, each Employer shall pay into the Mid-America Carpenters Regional Council Apprentice Training Fund (hereafter referred to as "Training Fund") an amount per hour for each hour worked for an Employer during each calendar month by all Employees who are covered under this Agreement in amounts determined and allocated by the Executive Committee of the Union effective June 1, 2024, June 1, 2025, June 1, 2026, June 1, 2027 and June 1, 2028.

**14.2** The Employer agrees to be bound by the Agreement and Declaration of Trust establishing the Mid-America Carpenters Regional Council Apprentice Training Fund and by any present and future amendments thereto and irrevocably designates as his representative on the Board of Trustees such Trustees as are named in said Agreement and Declaration of Trust, as Employer Trustees, together with their successors selected in the manner provided in said Agreement and Declaration of Trust as it may be amended from time to time, and agrees to be bound by all action taken by said Employer Trustees pursuant to the said Agreement and Declaration of Trust as amended from time to time.

**14.3** The said Training Fund is and shall continue to be administered by an equal number of representatives of the Employer and the Union, pursuant to the Agreement and Declaration of Trust heretofore signed by the Employer and the Union, as now in effect and as it may be amended from time to time, in the manner provided in the Agreement and Declaration of Trust. Said Agreement and Declaration of Trust and any present and future amendments thereto are made a part of this Agreement as if set forth herein at length.

**14.4** The Employer shall furnish the Trustees with information such as the names of the Employees, classifications, Social Security numbers, wages and/or hours worked, and such other information as may be required for the proper and efficient administration of the Training Fund.

**14.5** The Employer representatives serving as Trustees, with their successors selected in the manner provided by the Agreement and Declaration of Trust, shall represent all Employers in the administration of the Training Fund.

**14.6** The Employer may make contributions for all hours worked by Superintendents and other management personnel for whom contributions to the Training Fund were heretofore made when such individuals were employed as journeyman Carpenters. Such contributions shall be made in a monthly amount equal to at least one hundred and sixty (160) times the hourly contribution rate specified in this Article.

**14.7** Failure of any Employer after reasonable written notice by the Administrative Fund Office so to do, to furnish reports, pay contributions or comply with the rules and regulations formulated and promulgated by the Trustees of the Mid-America Carpenters Regional Council Apprentice Training Fund, shall be considered a violation of the terms and conditions of this Collective Bargaining Agreement and shall subject this Agreement to cancellation as to such Employer.

**14.8** In the event that an Employer becomes delinquent in making any of the aforesaid reports and payments and is so advised by formal notification in writing by the Administrative Fund Office, the

Employer shall pay in addition to the amount due, reasonable fees of Certified Public Accountants as expressly used to establish the amount due, reasonable fees of Attorney in effectuating payment, and liquidated damages in an amount as determined in accordance with the Agreement and Declaration of Trust.

**14.9** The Employer shall make contributions on behalf of each of its Employees employed by Employer in a management or supervisory position who is also engaged in work of a character falling within the jurisdiction covered by this Collective Bargaining Agreement in an amount of no less than one hundred and sixty (160) hours per month. Each such Employer shall execute a Participation Agreement with the Trustees of the Mid-America Carpenters Regional Council Apprentice Training Fund, upon the request of such Trustees, for such greater or lesser amounts of hours as the Trustees may deem appropriate.

**14.10** The contributions referred to in this Article shall be paid with respect to all hours worked by an Employee covered by this Agreement irrespective of the geographical area where work is performed or the geographical jurisdiction of the Union, provided that Employer shall not be required to pay contributions to the Mid-America Carpenters Regional Council Apprentice Training Fund for hours worked outside the geographical jurisdiction of the Union if Employer is required to pay contributions to another multi-employer Apprentice Training Fund based on such hours.

**14.11** The collection of amounts due under this Article shall not be subject to the Settlement of Disputes procedure established in Article XVIII.

**14.12** The parties recognize the importance of reducing the operational costs to their affiliated fringe benefits trust funds or other funds established under the parties' collective bargaining agreements and agree to review all options available and take appropriate action consistent with the determinations of the trustees of the funds to reduce operational costs.

## ARTICLE XV
## BONDING

**15.1** Each Employer signatory to this Agreement agrees at the time of execution of this Agreement the Employer shall have procured a cash bond or Surety Bond in the Principal sum as indicated below. Such bond shall be written by an insurance carrier authorized, licensed, or permitted to do business in the State of Illinois. The surety bond and/or cash bond shall be payable to the Union as Trustee for the benefit of Employees employed by the Employer and for those acting on the Employees' behalf to insure prompt payment of wages and contributions to the Health and Welfare, Pension and Apprentice Training Funds. Such surety bond and/or cash bond shall be executed only on a uniform bond form furnished by the Union and must be filed with the Union. Unless otherwise increased by the President of the Union, the principal amount of the bond shall be:

| | |
|---|---|
| One (1) to Five (5) Employees | $10,000.00 |
| Six (6) to Ten (10) Employees | $15,000.00 |
| Eleven (11) to Fifteen (15) Employees | $20,000.00 |
| For those Employees in excess of Fifteen (15) | $50,000.00 |

The Association may furnish a blanket bond for all of its members, each of which is to be bonded for the sum of $50,000.00. The Union may withdraw bargaining unit Employees from Employers who fail to maintain the bond required by this Article.

**15.2** The Employer assigns all right, title and interest in the surety bond and/or cash bond to the Union and Fringe Benefit Trust Funds, which shall have a priority interest to such Funds, and supersede the claims of all Employer's creditors.

**15.3** This Article shall not be subject to the Settlement of Disputes provisions contained in Article XVIII.

## ARTICLE XVI
## TOOLS

**16.1** Each Employee is required to furnish, for his individual use only, all of those tools customarily required of a Carpenter to perform his duties. Employee shall not own, transport, furnish or rent any power operated tools, machinery, or equipment, to be used on any work to be performed by his Employer. In the event that the Employer knowingly permits or requires the Employees to provide their own power operated tools, machinery or equipment in violation of the terms of this Article, the Employer shall be liable for all costs associated with enforcing this Article including, but not limited to, reasonable attorney fees and reasonable arbitration fees.

**16.2** Employer shall provide, for the exclusive use of Carpenters, suitable lighted and heated places for them to eat and change their clothes.

**16.3** Employer shall also provide a safe and secure place, on the job, for the storage of tools, shoes and clothing, both during and after working hours, however, the Employer shall replace or pay for the loss of any tools, shoes, clothing, but in no event shall the Employer pay more than Two Thousand Five Hundred ($2,500.00) Dollars for each Employee. On the request of the Employer it shall be the responsibility of the Employee, when storing tools, to furnish a list of tools and indicate the estimated value of such tools on forms supplied by the Employer. A duplicate copy of said list shall be given to the Employee signed by Management.

**16.4** Employer shall furnish and make available at the jobsite all equipment generally and customarily used to sharpen the various tools used by Employees hereunder, but not including handsaws. Except for handsaws, sharpening of his own tools shall be the choice of the Employee at all times although the Employee may, if he chooses, permit his tools to be sharpened other than at the jobsite by and at the expense of the Employer. Employees may sharpen tools during working hours, and the time thereby used shall be considered time worked. Handsaws may be sharpened other than at the jobsite by and at the expense of the Employer. Any automatic equipment provided by the Employer on the jobsite for the purpose of sharpening tools, (e.g. Foley Filer), shall be operated by a member of the Bargaining Unit.

## ARTICLE XVII
## APPRENTICES

**17.1** Every Employer who employs an average of five (5) Journeymen during six (6) months of a twelve (12) month period may employ one (1) Apprentice for every three (3) Carpenters employed by the company without regard to jobsites. However, in no event shall an Employer exceed the ratio of one (1) Journeyman to one (1) Apprentice on any single jobsite.

**17.2** Any Employer who averages less than three (3) carpenters during six (6) months of a twelve (12) month period, may be granted one (1) Apprentice upon proper application to the above-mentioned Trustees.

**17.3** Employer agrees to be bound by rules and regulations promulgated by the aforementioned Trustees.

**17.4** Employer agrees that there shall be no discrimination in the employment of Apprentices based on race, creed, color, sex, national origin or religion, and that Apprentices shall be a minimum age

of seventeen (17). The Employer and the Union agree to be bound by all of the applicable provisions of the United States Code, Title 29, Part 5 and Part 30.

**17.5** Employer who needs Certification of Apprentice for federally funded projects must request and receive such Certification from the United States Department of Labor, Employment and Training Administration. .

**17.6** Any Employer notified by the Apprentice Program that an Apprentice has been dropped from Apprenticeship for violations of rules and regulations governing Apprentices, must terminate employment of said Apprentice. The Apprentice or Employer may appeal the decision to drop him from Apprenticeship by filing an appeal in accordance with the provisions of Section 5 of his Indenture Agreement.

**17.7** Employer agrees to train an Apprentice in ALL phases of the carpentry trade in which the Employer is engaged. Upon refusal by Employer to comply with request by Apprentice to have his work assignment changed to another phase of carpentry, the Apprentice program may assign Apprentice to new Employer. Employer agrees not to abuse the privilege of having the services of Apprentices by using them to do work that does not come under the jurisdiction of Carpenters.

**17.8** Employer who employs trainees in the specialty branches of the Trade: (1) drywall and ceiling systems and (2) shingle, siding and insulators, agrees to use said trainees only for work which comes under the specialty branch of the trade for which he is indentured as stated herein.

### ARTICLE XVIII
### SETTLEMENT OF DISPUTES

**18.1** Except as provided in Sections 12, 13, 14, 15, 27, 28, 34 and 35, any dispute concerning the proper interpretation and application of this Agreement shall be handled in the first instance by a meeting between a representative of the Union and the Employer within seven (7) days after the dispute has been initiated. In the event the dispute involves an issue concerning wages or other issues wherein the Union must have information or documentation in order to proceed, the Employer must provide such requested information within ten (10) working days of receipt of the request. Failure of the Employer to timely provide such information or seek an extension from the arbitrator for good cause shall be deemed an admission of the Union or Employee's claim. An admission of the claim for failure to provide information of documents shall only occur after the appointment of an arbitrator. This limitation period will only be extended by mutual agreement between the Union and the Employer. Disputes must be raised within thirty (30) days of the date the Employee or the Employer become aware of the events giving rise to the dispute. However, the Union may file a grievance under this provision for a violation of the collective bargaining agreement within thirty (30) days of a representative of the Union first being made aware of the alleged violation. A representative of the Union is defined as any elected Regional Council officer or any appointed Business Representative.

**18.2** In the event that the dispute is not resolved within seven (7) calendar days after the parties' first meeting, the matter shall be referred to the Permanent Arbitration Board ("PAB") in writing by the grieving party within seven (7) calendar days after the expiration of the seven (7) calendar day period This limitation period will only be extended by mutual written agreement between the Union and the Employer.

**18.3** The arbitration hearing shall begin not later than thirty (30) days after the date of referral to arbitration. Upon completion of the arbitration hearing, the parties may elect to submit written briefs to the arbitrator no later than seven (7) calendar days after the close of the arbitration hearing. The arbitrator shall issue a written decision and findings fourteen (14) calendar days after the completion of the arbitration hearing unless the arbitrator requests written briefs from the parties, in which the time for the

arbitrator's decision shall be twenty-one (21) calendar days after the completion of the hearing. This limitation period may only be extended by mutual written agreement of the Union and the Employer.

**18.4** The PAB shall consist of the following four (4) arbitrators mutually agreed upon between the Union and the MID-AMERICA REGIONAL BARGAINING ASSOCIATION ("MARBA"):

> Jeanne Vonhof
> Brian Clauss
> Daniel Nielsen
> Robert Perkovich

In the event that any designated arbitrator shall be unable or unwilling to act on the PAB, the Union and MID-AMERICA REGIONAL BARGAINING ASSOCIATION shall mutually agree and designate a substitute. The grievance shall be sent to the arbitrators in rotation, each grievance being submitted to the next arbitrator on the list following the one to whom the most recently submitted grievance has been sent. Upon submission of the grievance, the arbitrator shall be requested to advise both parties promptly as to his earliest available hearing date or dates. If an arbitrator to whom a submission has been made shall be unable to offer a hearing date earlier than thirty (30) calendar days from the date of delivery of the letter of submittal of a grievance, then, unless the parties agree otherwise, such grievance shall be sent to the next arbitrator in the rotational sequence. If no arbitrator on the list is able to meet the thirty (30) calendar day deadline, then, unless the parties agree otherwise, submission shall be submitted to the listed arbitrator with the earliest available hearing date. The expense of the Arbitrator shall be shared by the parties in equal proportions. The decision of the Arbitrator shall be final and binding upon both parties. The Arbitrator shall have no authority to add to, subtract from or modify any provision of this Agreement. There shall be no strikes, slow downs or withdrawal of men by the Union while the dispute is being processed through this procedure.

**18.5** The parties shall mutually exchange all documentation that is relevant to the dispute and requested prior to the arbitration hearing.

**18.6** In the event that a party refuses to arbitrate or fails to comply with the decision of the Arbitrator, the other party has the right to avail itself of any lawful means necessary to compel compliance, including but not limited to, judicial intervention, work stoppage by withdrawing bargaining unit Employees from the Employer who violates this article, and strike activities.

**18.7** In any arbitration hearing brought pursuant to this Article, the arbitrator shall have the authority to award the prevailing party its reasonable attorney fees and costs incurred in the action.

**18.8** The administration of the PAB, including the selection of the arbitrators shall be by mutual agreement of the Union and MARBA. The administrative procedures will be determined by mutual agreement of the Union and MARBA and set forth in a separate document.

**18.9** The Union agrees to furnish the Association with copies of all requests for arbitration simultaneously with any request sent to the PAB. In addition, the Union shall notify the Association of hearing dates at least ten (10) days in advance of the PAB hearing and will provide the Association with a copy of any arbitration decision within seven (7) days of receipt of any decision. The Union's failure to provide the notices and arbitration decision as required herein shall make any award issued by the arbitrator inapplicable to and inadmissible in any future arbitrations for any purpose.

## ARTICLE XIX
## USE OF MACHINERY, TOOLS AND FACTORY MADE PRODUCTS

**19.1** There shall be no restriction on the use of machinery or tools, or use of factory made products.

**19.2** Nothing in this Article shall be construed to assign the installation or assembly of factory made products to a person or persons outside the Bargaining Unit.

## ARTICLE XX
## MISCELLANEOUS PROVISIONS

**20.1** Employer shall give notice to the Union and the appropriate Fund Office in writing not later than ten (10) days after the occurrence of any of the events relating to the Employer, occurring after the date hereof:
   (1) Formation of partnerships;
   (2) Termination of business,
   (3) Changes of name commonly used in business operation;
   (4) Change in form of business organization;
   (5) Incorporation of business;
   (6) Dissolution of corporation;
   (7) Name and business organization of successor;
   (8) Admission to or withdrawal from any association operating as a multi-employer bargaining agent;
   (9) Name and identity of any parent company, subsidiary company or division

**20.2** The Employer shall maintain an office and a telephone where he can be contacted during the usual working hours.

**20.3** Whenever the Employer party to this agreement is a partnership, it is agreed as follows:
   (1) That one partner will execute the Agreement for the partnership and he shall be the only partner of that firm who shall work with the tools.
   (2) In the case of a partnership which is a part of a multi-employer Bargaining Unit, only one partner may work with the tools and his name shall be supplied to the Union on request.
   (3) All other parties are specifically prohibited from working with the tools and shall not become Carpenter Employees of the firm to circumvent the provisions hereof.

**20.4** Business Representatives of the Union have the right to enter, go upon, or inspect any construction site, whether or not Carpenters are actually employed thereon, to effectuate the purpose of this Agreement but they shall not in any way interfere with the Employer's affairs thereon.

**20.5** Employees covered by this Agreement shall not perform work on a piecework basis.

**20.6** The Employer agrees that he will not sublet any work to any Employee or Employees.

**20.7** This Agreement shall not be transferable by any Employer either by action of such Employer or by operation of law. In the event any Employer, whether an individual, partnership, or corporation covered by this Agreement, merges, consolidates or transfers a controlling interest in his, their, or its business, this contract may be canceled as to such Employer by the Union.

**20.8** The breach by an Employer of any of the provisions of this Agreement may, by written notice, be declared by the Union to be a breach of the entire Agreement.

**20.9** Before Employer commences work on any job, he must first give the Union reasonable advance notice of that fact, unless the Steward is on the job. The notice can be given by mail or telephone and must include the location of the work.

**20.10** Notwithstanding any other provision of this Agreement, the Employer shall have the right to take such action as shall be necessary to comply with Federal or State legislation, lawful regulations or requirements set forth in proposal documents by Federal or State users of construction services, with respect to providing equal employment opportunity.

**20.11** When Employer is engaged in work within the geographical jurisdiction of the Regional Council, not less than sixty-six percent (66%) of the carpenters employed by such Employer shall be from among the members of the bargaining unit who are represented by Local Unions within such geographic jurisdiction or counties bordering such geographic jurisdiction.

The Employer may at its sole option request that the Union refer applicants to fulfill the Employer's obligation in Article 20.11.

If the Union is unable to refer such applicants as required by the Employer within forty-eight (48) hours, then the Employer may hire carpenters without respect to geographic jurisdiction or geographic area. All carpenters employed under this paragraph shall be classified as permanent Employees, subject to the provisions of Articles 2.1, 2.2, 2.3, and 2.4.

**20.12** No Employer who first becomes signatory to or bound by this Agreement after May 31, 1984 shall work with the tools of the trade unless he is currently employing at least one (1) journeyman who is working for such Employer full time.

**20.13** (a) Peak Demand Permits: The provisions of this subsection shall be limited to periods when there are no journeymen or apprentices reasonably available for employment as determined by the President of the Regional Council.

(b) Notwithstanding any other provisions in the Agreement, the Employer may not employ Employees other than journeymen and apprentices except by Union permit. When the following conditions are met, the Union shall issue the requested permits for permit Employees:

(1) The Employer regularly employs apprentices or trainees; and

(2) The Employer notifies the Union of the name, address, phone number, if available, and social security number of each permit Employee; and

(3) The established permit fee is submitted to the Union; and

(4) The Employer has notified the Union of an unmet need for Employees and the location of the jobsite(s), if available, and the Union cannot provide Employees within forty-eight (48) hours of such notice. Provided, however, that the President of the Regional Council or his designee shall have the authority to waive such forty-eight (48) hour notice in his discretion for good cause shown.

(c) Employer shall notify the Union upon the termination of the employment of such permit Employee.

(d) An Employer may, unless determined otherwise by the President of the Regional Council or his designee in his discretion for good cause shown, hire not more than one (1) Employee on permit for each three (3) journeymen employed by the Employer.

(e) No journeyman or apprentice shall be laid off for lack of work while any Employee on permit is employed.

(f) Journeymen and apprentices shall be given preference to all overtime work.

(g) The Employer may request the enrollment of any Employee working on permit into the apprentice program in accordance with procedures established by the Board of Trustees.

(h) Permits shall only be issued by the President of the Regional Council or his designee for a thirty (30) day period and shall be renewed for an additional thirty (30) day period upon the request of the Employer. Failure of the Employer to renew the permit after the thirty (30) day period shall entitle the Employee to full payment of the journeymen wages for all the hours worked after the expiration of the permit. The Employer may request additional thirty (30) day periods. Failure of the Union to deny the

request in writing within five (5) workdays shall constitute the issuance of a permit for an additional thirty (30) days.

(i) Employer shall make contributions to the fringe benefit funds for each hour worked under this Agreement by Employees, including Employees on permit. Employees working under a permit issued in accordance with this subsection 20.13 shall receive wages at a rate of pay equal to that of a first year apprentice.

**20.14** (a) Apprentice Applicant Permits: This subsection shall apply only when an Employer has requested the enrollment of an Employee in the Apprentice program in accordance with procedures established by the Board of Trustees. A permit shall be issued to such Employee pursuant to this subsection provided that:

(1) The Employer regularly employs apprentices or trainees; and

(2) The Employer notifies the Union of the name, address, phone number, if available, and social security number of each Employee for whom a permit is requested under this subsection; and

(3) The established permit fee is submitted to the Union.

(b) An Employer may, unless determined otherwise by the President of the Regional Council or his designee in his discretion for good cause shown, hire not more than one (1) such Employee on permit for each three (3) journeymen employed by the Employer.

(c) Employer shall make contributions to the fringe benefit funds for each hour worked under this Agreement by Employees, including Employees on permit. Employees working under a permit issued in accordance with this subsection 20.14 shall receive wages at no less than the rate of pay of a first year apprentice.

(d) Permits shall only be issued by the President of the Regional Council or his designee for a thirty (30) day period and shall be renewed for an additional thirty (30) day period upon the request of the Employer. The Employer may request additional thirty (30) day periods. Failure of the Employer to renew the permit after the thirty (30) day period shall entitle the Employee to full payment of journeymen wages for all hours worked after the expiration of the permit. Failure of the Union to deny the request in writing within five (5) workdays shall constitute the issuance of a permit for an additional thirty (30) days.

(e) No Employee to whom a permit has been granted under this subsection shall be eligible to have such a permit renewed unless he or she continues to be employed by the Employer.

(f) No permit shall be renewed, except for renewal requests by the Board of Trustees of the Training Fund, under this subsection at any time during which the President of the Regional Council finds that there are a significant number of unemployed apprentices who are reasonably available for employment.

## ARTICLE XXI
## MOST FAVORED NATIONS

**21.1** (a) In no event shall any Employer be required to pay higher wage rates or be subject to more unfavorable wage rates, contract terms or work rules, than those agreed to by the Union in any executed Collective Bargaining Agreement with any other construction industry employer within Cook, Lake, and DuPage Counties, Illinois. In no event, shall wage rates, contract terms or work rules granted any sub-trade (including sub-trades whether or not dealt with in Articles I, XXII, XXIII, XXIV and XXV) be applied to general carpentry or any other sub-trade. However all Employers operating within a sub-trade shall have the benefit of this provision within that sub-trade. This paragraph shall not apply to the terms and conditions of any national or international agreement, nor the terms and conditions of any contract involving shop, stair shops, in-plant, industrial, municipal, factory, millmen, component parts, maintenance agreements, project labor agreements, CEDA and such other similar governmentally funded community programs and governmental agreements, nor to the terms and conditions in effect for the first one hundred and eighty (180) days of an agreement with an Employer who had not been bound to an agreement with the Union during the prior twelve (12) month period. (Agreements lasting more than one hundred and eighty (180) days must be approved by the Labor-Management Committee established under this Article.)

Notwithstanding anything to the contrary above, in the event the Union shall establish prior to bidding or award for a particular contract, or identifiable sector or specialty work, any wage rates, contract terms or work rules that will be applicable to that contract, sector or specialty work which are more favorable to the Employer than those contained in this Agreement, then all Employers bidding on that project, sector or specialty work shall be entitled to the benefit of such more favorable terms. The Union shall promptly provide the Labor-Management Committee established under this Article with written notice of the establishment of such more favorable terms. In the event that subsequent to the award of a particular contract, the Union through the President of the Regional Council or his designee for good cause desires to establish more favorable wage rates, contract terms or work rules for that contract, said more favorable terms shall become effective with the concurrence of the Labor-Management Committee established under this Article.

(b)    The Labor-Management Committee established under this Article shall consist of the President of the Regional Council and one representative appointed by the Association.

(c) Notwithstanding anything to the contrary above in this Article XXI, the terms and conditions of any Amendment which results from the application of or pursuant to Article XXXI of this Agreement (or any counterpart thereof in any other Agreement with the Union) shall not be subject to the prior subsections of this Article XXI except as may be specifically provided in such Amendment(s).

## ARTICLE XXII
## PILE DRIVING - SCOPE OF WORK

**22.1**  Employer recognizes that the Union claims jurisdiction of the work performed on all Pile Driving operations, the driving of wood pile and the heading and the pointing of same, including. (1) the driving of all steel piling, including pipe sheeting, H beams, I beams and caissons; (2) the driving of concrete pile, pre-cast or cast in place, mini piles and bulb piles; (3) the driving of all composite pile; (4) the driving of cofferdams, installation, and removal of all bracing and walers in cofferdams; (5) the erection of all trestles, falsework and docks; (6) the jobsite erecting and dismantling of derricks, A frames, cranes and gin poles, when used in conjunction with pile driving work; (7) the cribbing, shoring and underpinning of buildings when pile driving is involved; (8) the erection, dismantling and jacking of pile load tests and all jacking for and during tests; (9) the jobsite loading, unloading and distribution of all pile driving equipment and piling except when truck drivers can roll off or dump load; (10) the jobsite maintenance of pile driving equipment; (11) "all burning, welding and splicing of piling, including field welding of all end plates and bearing plates prior to driving and after installation of piling, and the first weld off of piling in all cases, except for Mill fabrication and manufacturing, including but not limited to pile tips and end plates;" (12) the jobsite preparation of all barges, scows, rafts, floats, and pontoons to be used in pile driving work; (13) the operation of spud engines and deck engines or rigs doing pile driving work; (14) crane signaling pertaining to all pile driving work; (15) the firing of boilers on derricks or barges being used on pile driving work; (16) the jobsite positioning, repositioning, flooding, refloating, to such point as is the final floating position of watertight midsection hulls used as temporary breakwaters on pile driving work, (17) the installation of all skimmer plates when attached to piles; (18) the installation of mooring buttons, bollards, cleats, bumpers, chains, fenders and barge deflectors; (19) installation of hog rods, anchors and tie backs; and (20) any work pertaining to pile driving from ground level down to portal on tunnels and shafts; (21) setting of rocks or boulders for jetties and/or break waters working off of floating equipment when a signal man is required; (22) if signaling of land crabs or fork lifts is required, it shall be the work of the journeyman/apprentice; and (23) all other work hereafter awarded to pile drivers.

## PILE DRIVING - WORK RULES

**22.2**  On all rigs engaged in installing and removing piles, there shall be no less than three (3) journeymen/apprentices and a working foreman to constitute a crew. However, there shall be a minimum of two (2) journeymen/apprentices and a working foreman for piling work with the following equipment: fixed or telescoping mast type piling rigs and/or excavator/forklift mounted piling attachments.

**22.3**  On cranes engaged in driving of bearing piles, soldier piles and sheeting and extracting sheeting and piles, there shall be no less than three (3) journeymen/apprentices and a foreman to constitute a crew.  When driving or extracting occurs, two (2) Employees can be used to do pile driving work within 200 feet of the crew.

**22.4**  When loading and/or unloading piling or pile driving equipment on a jobsite, there shall be a crew size of carpenters/pile drivers as necessary to perform the work safely.

**22.5**  All pile load tests shall be erected, dismantled, initial loading and final unloading by no less than one (1) carpenter/pile driver.

**22.6**  A crew shall consist of two (2) journeymen/apprentice or more as needed for cutting of wood piling underneath existing building.

**22.7**  On caisson work when pile hammer or extractor is used installing or removing caisson, one (1) journeyman shall be included in the regular crew.
    The Employer shall encourage the use of not less than one (1) journeyman carpenter/pile driver on caisson work.

**22.8**  There shall be one (1) journeyman used only on rigs to pre-drill holes for bearing piling.
    There shall be a minimum of two (2) journeymen/apprentice and working foreman on any type of auger cast pile, tie back operation, mini pile, pin pile, cast pile, soil nails and secant piles.
    Two (2) journeymen/apprentice and a working foreman shall be used to drill for, prepare, and set soldier piles.  If the drill is more than 200 feet from the installation, one (1) journeyman will be added to the crew and shall remain with the drill rig.

**22.9**  When there is steady welding during driving of piling an additional journeyman will be required in a crew.  When bearing pile are being spiced in a horizontal position, and the set fabricated pile are to be driven by the same crew, there shall be an additional journeyman in the crew.  This extra journeyman can also be used to install end plates or pile points.  The above provisions shall in no way restrict the regular crewmembers from helping the extra journeyman.

**22.10**  When a crew of two (2) or more welders is employed on a job operation one (1) shall be designated as a working foreman and shall receive the current foreman's rate of pay so long as there is no other pile driver foreman on the job.

**22.11**  The installation of lagging will be a composite crew including a journeyman/apprentice whose size and composition will be determined by the Contractor.

**22.12**  Not withstanding the provisions of Section 17.1 of the Area Agreement, the Employer may employ one pile-driving apprentice for each three (3) journeymen employed on a crew size.  Pile driver apprentices will be given preference.

**22.13**  Minimum crew size may be increased if efficiency and safety conditions require with mutual consent of the Employer and the Union.

**22.14**  Pile driver Employees shall carry with them on the job a twenty-five foot (25') steel tape measure, twelve inch (12") adjustable end wrench, claw hammer, channel locks, speed square, two foot (2') framing square, side cutters, end cutters, and bolt bag or side pouch.  This shall include safety toed and/or metatarsal boots, if required by the Employer.  Employer will reimburse the Employee for fifty percent (50%) of the purchase price of the boots after one thousand (1,000) hours worked in a twelve-month period for that Employer.  The Employer may require written documentation of the purchase price.

**22.15** In the event the Employer decides it is necessary to work at any time during inclement weather, the Employer shall make foul weather gear available for the Employees. All safety equipment shall be supplied by the Employer (hard hat, welding hood, burning goggles, welding gloves, safety glasses, leather sleeves and/or jackets) plus all other perishables.

**22.16** When an Employee is working in water where hip boots are insufficient the Employer shall pay the man a premium of twenty-five cents ($0.25) an hour for straight time and fifty cents ($0.50) an hour for overtime.

**22.17** All Employees directed to work for the Employer must be qualified and skilled in their trade.

**22.18** Any special certification test of a qualified pile driver-welder, taken for the convenience of the Employer, shall be paid for by the Employer. Before a qualified pile driver-welder commences the welding test, he shall be placed on the payroll of the Employer and be paid pile driver's wages. A qualified pile driver-welder is one who passed a qualification test given by a recognized testing laboratory within the area covered by this Agreement. When an Employee is laid off or terminated they shall receive copies of any certifications they have received with their final check or within forty-eight (48) hours by mail.

**22.19** When a welder is transferring, his/her certification papers may be sent to the Carpenters Union. The Carpenters Union will maintain the papers for future use by contractors.

### PILE DRIVING TERRITORIAL JURISDICTION

**22.20** The pile driving territorial jurisdiction of the Mid-America Carpenters Regional Council, as determined by the United Brotherhood of Carpenters and Joiners of America, includes Cook, Lake and DuPage Counties, Illinois.

All waterfront pile driving work on the Lake Michigan Shores of Lake, Porter and LaPorte Counties, Indiana. Waterfront pile driving work shall include all pile driving work on any building, structure or project, any part of which is in or over water. This shall include reclaimed land in the areas previously part of the Lake Michigan waterfront.

All pile driving work in Lake and Porter Counties, Indiana other than highway work.

### ARTICLE XXIII
### MILLWRIGHT-WORKING RULES

**23.1** Employer shall furnish, if required, all precision levels over twelve (12") inches, all calipers over eight (8") inches, outside micrometers over one (1") inch, inside micrometers over eight (8") inches, all adjustable wrenches over twelve (12") inches, all socket wrenches over one half (1/2") inch drive, box socket and open end wrenches over one and one fourth (1 1/4") inches, all drills, taps, files, emery cloth, sand paper, hack saw blades and all hammers over two (2) pounds.

**23.2** When it is necessary for Millwrights to furnish any precision tools, the Contractor shall be responsible for the repair, or replacement if necessary, of any of these tools which are damaged while being used on the job. These tools shall include: Dial Indicators and Magnetic Bases, Precision Levels, Calipers, Outside Micrometers, Inside Micrometers, Precision Feeler Gauges, and Precision Plumb Bobs. Upon initial employment, Employee shall furnish an inventory in duplicate to Employer, of any of the above-mentioned tools he may have on the jobsite.

**23.3** When it is necessary to store Employee tools on the jobsite during his non-working hours, the Contractor shall be responsible for loss due to fire or burglary at seventy percent (70%) of the cost to a maximum of Two Thousand Five Hundred Dollars ($2,500.00). On the request of the Employer, it shall

be the responsibility of the Employee when storing tools, to furnish a list in duplicate to the Employer to obtain this protection.

23.4  Any special certification test of a qualified Millwright welder, taken for the convenience of the Employer, shall be paid for by the Employer.  Before Qualified Millwright welder commences the welding test, he shall be placed on the payroll of the Employer and be paid Millwrights wages.

23.5  An Employee who is required to travel to a jobsite shall be reimbursed for lodging when required to remain away from his home overnight.  The expense allowance for lodging for each night shall be fifty dollars ($50.00) per night.

23.6  Where there are two (2) or more Millwrights on any one jobsite and one (1) journeyman assumes responsibility other than that of a journeyman, the one (1) assuming the duties shall be designated a foreman, and shall receive the wages of a foreman.

23.7  Where there are eight (8) or more Millwrights on any one jobsite one (1) must be designated a non-working foreman, who shall devote his time to supervision of the work and shall not work with the tools.

23.8  Before a Millwright commences attending any special schooling or training, such as radiation school, upon the request of the Employer, he shall be placed on the payroll of the Employer and be paid Millwrights wages.

### ARTICLE XXIV
### SHINGLING, SIDING AND INSULATING MECHANICS
### GENERAL

24.1  All scaffolding shall be inspected to determine that such scaffolding is in safe condition and meets all safety standards.

24.2  An Employee shall not transport, or in any way, carry any equipment or materials in the automobile or truck of such Employee, with the exception of sundry material items which are necessary for the uninterrupted continuance of the job.  Nor shall such Employee own, furnish, or rent any equipment to be used on any work to be performed for the Employer.

### CLAIMS AND JURISDICTION OF THE SHINGLING MECHANIC

24.3  All asphalt, wood, plastic, metal or composition roofing applied to any and every type of roof shall be the work of the shingler.

24.4  A shingler shall not carry any material weighing over sixty (60) pounds to a height in excess of a two (2) story building.

24.5  Roof jacks and stages or planks shall be provided on all roof jobs with eight-twelfths (8/12) or greater pitch as the bottom scaffold.  Unfavorable weather conditions on roofs with a pitch less than eight-twelfths (8/12) shall require sufficient roof jacks and staging or planks to provide safe working conditions.

### CLAIMS AND JURISDICTION OF THE SIDING MECHANIC

24.6  All asphalt, insulated asphalt, asbestos, cement, aluminum and other metals or plastics applied to the outside wall of any building; underlying materials, such as aluminum foil, building paper, plastic or asphalt felt, shall be the work of the siding mechanic.

## CLAIMS AND JURISDICTION OF THE INSULATING MECHANIC

**24.7** All insulation, batts laid, tacked or stapled, glued or cemented on the building in any form, all blown insulation, wet or dry to walls, ceilings, or floors, shall be the work of the insulator.

**24.8** One (1) Journeyman or Apprentice Carpenter shall be in attendance of the blowing machine, and all men on batts or blown jobs shall be provided with masks at all times by the Employer.

### ARTICLE XXV
### INSTALLERS OF FLOOR AND WALL PRODUCTS

**25.1** An Employee who is required to use his automobile to carry the Employer's materials or the Employer's tools shall be compensated at the rate of three dollars ($3.00) per day.

**25.2** The Employer shall pay for all business calls made by the Employee as well as for all parking fees and toll charges.

**25.3** No Employer of Floor or Wall Installers shall work with the tools of the trade unless he is currently employing two (2) journeymen who are working for such Employer full time.

**25.4** An Employee shall not transport Employer's materials, with the exception of sundry items which are necessary for the uninterrupted continuance of the job, in any conveyance owned by the Employee nor shall the Employee rent or lease such conveyance to the Employer for such purpose.

**25.5** By way of illustration and not limitation, the work of installers of Floor and Wall Products consists of preparation and/or forming of all materials, whether accomplished by hot iron, cemented, cemented tape, tacked, stapled or sewed method, for installing on floors, walls, stairs, ceilings, fixtures, furnishings or exterior applications on structures, patios, pool perimeters, area ways, all other like or similar applications and as simulated turf.
Installation of all resilient floor, wall, ceiling and simulated turf materials to include linoleum, rubber, asphalt, mastipave, vinyl, plastic, metal, cork, wood and all similar materials in sheet, interlocking tile, preformed or seamless compound form of liquid, plastic, epoxy, urethane or materials of like nature.
Installation of carpet, carpet tiles, rugs or runners and cutting or fitting of same, whether installed by tacked, tackless, glue-down, self-adhering, any manner of tape adhesion, stapled, or loose-lay method on wood, steel, concrete, plaster, plastic or base of like or similar composition.
Installation of all lining felt, carpet pad, underlayment compositions, matting, linen crash and/or like or similar materials.
Installation of all resilient type and carpet type material on floors, walls, stairs, ceilings, fixtures, furnishings or exterior applications on structures, patios, pool perimeters, area ways, all other like and similar applications and as simulated turf.
The take-up and relaying, spreading of all adhesives, priming of all surfaces, sanding and necessary patching and preparation, removal of old material, finishing where required to complete Manufacturers' process, handling, distributing and unpacking, drilling of holes and insertions of sockets, pins, dowels or similar fastening device, placing or stripping, fitting of all devices for the attachment of material and the installation of all metal, rubber, vinyl, wood and/or plastic trim or accessory materials, the aforementioned to cover materials listed in above jurisdiction.

## ARTICLE XXVI
## LATHERS - SCOPE OF WORK

**26.1** The Employer recognizes that the Union claims jurisdiction of work performed on all lathing operations.

It shall have jurisdiction over the following work: Handling, erecting, installing and welding of all light iron construction, furring, making and erecting of brackets, clips and hangers; wood, wire and metal lath; plasterboard or other material which takes the place of same to which plastic or acoustical materials is adhered; corner beads; all floor construction; arches erected for the purpose of holding plaster, cement, concrete, or any other plastic or acoustical material.

**26.2** All carrying bars, purlins and furring regardless of size: light iron and metal furring of all descriptions such as rods, channels, flat iron, Nailock, Screwlock, Pomeroy, T-bar; all light iron and metal studs such as Stran steel, Penn metal, Soule, Truscon, and all other types of light iron and metal studs, no matter what the manufacturer, when such studs are to receive metal lath, rock lath or other material for the application of plaster or other sprayed on wet material; and all other light iron furring erected to receive lath and plastic or acoustic materials.

**26.3** The nailing, tying, or screwing of all wires and metallic lath such as wirecloth, wire mesh, expanded metal lath, hyrib lath and all ribs and flat expanded metal lath and wire of all descriptions as well as the placing of all hangers and all inserts used for the purpose of supporting suspended ceilings of any of the above types of floor lath, such as hyrib lath, paperback Steeltex floor lath, Penn metal rib, and all other appurtenances connected therewith.

**26.4** The nailing, screwing, clipping or fastening by any other means, of all types of plasterboards and stripping, to all types of studs, which is to act as a base for plaster

**26.5** The erection of all metal, vinyl or plastic plastering accessories such as metal corner beads, door and window casing beads, metal picture mould, metal chair rail, metal base and base screed, and any and all other metal plastering accessories which are covered and/or serve as a ground, steel corner guard, vinyl or plastic corner guard, or screed for plastic material

**26.6** The prefabrication by the contractor, of furring iron and metal lath, whether fabricated on the job or in a warehouse or shop operation, will be fabricated by Employees covered by these Working Rules.

**26.7** All other work hereafter awarded to Lathers.

**26.8** The Working Rules in this Agreement shall be interpreted and applied in a matter consistent with the intent and purpose of this Agreement.

## LATHERS WORKING RULES
## LOCAL DUES

**26.9** It is agreed that each Employer will withhold from the wages of a member of Local Union No. 74-L in his employ that amount per hour for each hour worked as is set forth in a signed authorization received by the Employer from the member. It is further agreed that the Employer will forward the withholding to the office of Local Union No. 74-L by the fifteenth (15th) day of the month following the month for which the withholding is made, with an itemized return form listing the name of each Employee. Such forms to be furnished to the Employer by the Union.

The Union agrees that it will secure from each of the members of Local Union No. 74-L a written assignment executed by such member authorizing an Employer to deduct the amount hereinabove fixed from his wages and to transmit such amount to the Local Union in payment of membership dues.

Copies of such assignments shall be sent to Employer by the Union upon Employer request.

## REGISTRATION DAY

**26.10** No work will be permitted on the first Saturday in June of each election year (Local 74-L Registration Day) except in emergency.

## ROCKLATH

**26.11** Rocklath or similar substitutes must be erected with broken joints, or straight joint stripped with metal lath not less than four (4) inches wide.

## LATHERS TERRITORIAL JURISDICTION

**26.12** The recognized territorial jurisdiction of Local No. 74-L shall be established by the United Brotherhood of Carpenters and Joiners of America which is as follows:

Starting at a point where the Indiana-Illinois State lines meet at Lake Michigan, then South along the Indiana-Illinois State line to Route 24. West on Route 24 to Route 52. Northwest on Route 52 to where it becomes Route 52, 45 and 116. West on Routes 52, 45 and 116 to the northern outskirts of Pontiac to Route 23. North, West and North again on Route 23 to the western outskirts of Ottawa to Route 6. West on Route 6 to Route 51 and 52. North on Route 51 to Route 64. East on Route 64 to Route 23. North on Route 23 to Route 173. East on Route 173 to the Lake County line. North on the Lake County line to the Illinois-Wisconsin State line. Then east on the Illinois-Wisconsin state line to Lake Michigan.

**26.13** The terms and conditions of this Agreement shall only be effective in that portion of the territorial jurisdiction described in 26.12 which lies within Cook, Lake and DuPage Counties.

## ARTICLE XXVII
## DUES CHECK-OFF

**27.1** The Employer shall deduct current Union dues as certified by the Union from the pay of each Employee who furnishes him with a signed and valid "Check-Off Authorization Form." This amount shall be set by the Union. A change in this amount will be communicated in writing by the Union.
NOTE: EFFECTIVE June 1, 2002, a three percent (3%) Union Dues Check Off was established.

**27.2** The aforesaid deductions shall be remitted monthly by Employer to the Union on the form customarily used for submitting monthly Welfare and Pension Contributions.

**27.3** The Union shall indemnify, defend, and save Employer harmless against any and all claims, demands, suits or other forms of liability including the payment of costs and reasonable fees of Attorney that shall arise out of or by reason of action taken, or not taken by Employer for the purpose of complying with any provision of this Article, or in reliance upon any lists, notices or assessments furnished under this Article. The collection of amounts due under this Article shall not be subject to the Settlement of Disputes procedures established in Article XVIII.

## ARTICLE XXVIII
## INDUSTRY ADVANCEMENT FUND

**28.1** Each Employer shall contribute nine ($0.09) cents for each hour worked for the Employer by those of his Employees covered by this Agreement to the MID-AMERICA REGIONAL BARGAINING ASSOCIATION INDUSTRY ADVANCEMENT FUND (MIAF) or such other fund as MARBA in its sole discretion may direct at any time during the term of this Agreement. Inasmuch as the existence and

utilization of the Industry Fund should result in increased construction and greater job opportunities, the Union agrees to cooperate in assuring that the contributions required by this Article are in fact made by Employers bound by this Agreement.

**28.2** The collection of amounts due under this Article shall not be subject to the Settlement of Disputes procedures established in Article XVIII.

### ARTICLE XXIX
### CHICAGOLAND CONSTRUCTION SAFETY COUNCIL

**29.1** Each Employer shall contribute one cent ($0.01) for each hour worked for the Employer by those of his Construction Employees covered by this Agreement to the CHICAGOLAND CONSTRUCTION SAFETY COUNCIL, a not-for-profit corporation.

### ARTICLE XXX
### CONSTRUCTION INDUSTRY SERVICE CORPORATION

**30.1** Each Employer shall contribute one cent ($0.01) for each hour worked for the Employer by those of his Construction Employees covered by this Agreement to the CONSTRUCTION INDUSTRY SERVICE CORPORATION, a not-for-profit corporation.

### ARTICLE XXXI
### MARKET AND GEOGRAPHIC AREA COMMITTEE

**31.1** Purpose: The purpose of the Committee shall be to provide a mechanism to assist signatory Employers in remaining competitive in certain market and/or geographic areas so as to protect and assure continued work opportunities for Employees covered by the Area Agreement

**31.2** Scope and Authority: (a) The Market and Geographic Area Committee is authorized and created pursuant to this Article XXXI of the Area Agreement.
(b) The Committee shall review only formal Employer requests for changes or modifications to the Area Agreement believed necessary to meet market or geographic area competition, or formal requests for multi-craft project agreements initiated by the National Heavy and Highway Committee and/or the National Building and Construction Trades Department, and it shall determine if adequate economic justification is present to warrant recommending any changes, modifications, or project agreement(s).
(c) Unless otherwise mutually agreed to, the Committee shall review Employer requests involving private work and Project agreement requests from the National Heavy and Highway Committee and/or National Building and Construction Trades Department.
(d) The Committee shall not be authorized to add to, subtract from or otherwise modify terms of the Area Agreement, except as provided in this Article.
(e) The Committee shall not act in an arbitrary or capricious manner.

**31.3** Definitions: (a) Market Area - A "market area" is considered to be a type or category of work
(b) Geographic Area - Geographic Area means a particular geographic area within the ten (10) county territorial jurisdiction of the Mid-America Carpenters Regional Council Area Agreement.
(c) Adequate Economic Justification - As used in 31.2(b) of the Area Agreement, it means the request must be supported by VERIFIABLE data. The Committee may accept the data as presented, or request that it be verified and substantiated by the Union, which shall have authority to do so.

**31.4** Committee Composition: The Committee shall be composed of three (3) representatives of the Employer and three (3) representatives of the Union.

**31.5** Meetings and Voting: (a) A Committee meeting may be called by any two (2) members of the Committee at the request of any party to the Area Agreement, and such requests shall be made by mail to all participants at least ten (10) days prior to the desired meeting date. However, the ten (10) day notice requirement may be waived upon mutual agreement if the circumstances so dictate.

(b) The Committee at its meeting shall ascertain whether a market area has been substantially lost, or is rapidly being lost. If an affirmative determination is made, the Committee may recommend an addendum to the Master Agreement, the content of which will be subject to a majority vote of the Committee. Any Addendum would become effective upon approval of the Council and the Association party to the Area Agreement and becomes effective on the date specified in any such Addendum as to each Employer only within those portions of the Geographic Area(s) in which such Employer is bound to a collective bargaining agreement with the Union and only as to those portions of the Geographic Area and/or Market Area as specifically described in any such Addendum.

(c) The Committee shall also determine from time to time whether or not to recommend that any addendum shall continue to apply, be terminated or otherwise modified. Provided, however, that any job or project covered by an addendum shall remain covered until job/project completion.

## ARTICLE XXXII
## SUBSTANCE ABUSE AND RECOVERY PROGRAM

**32.1** The parties recognize the problems created by drug and alcohol abuse and the need to develop prevention and treatment programs. The Employer and the Union seek to protect people and property, and to provide a safe working environment. The purpose of the following program is to establish and maintain a drug free, alcohol free, safe, healthy work environment for all its Employees.

### 32.2 Definitions

a. Company Premises - The term "Company Premises" as used in this policy includes all property, facilities, land, buildings, structures, automobiles, trucks and other vehicles owned, leased or used by the company. Construction job sites for which the company has responsibility are included.

b. Prohibited Items & Substances - Prohibited substances include illegal drugs (including controlled substances, look alike drugs and designer drugs), alcoholic beverages, and drug paraphernalia in the possession of or being used by an Employee on the job.

c. Employee - Individuals, who perform work for the Employer, including, but not limited to, management, supervision, engineering, craft workers and clerical personnel.

d. Accident – Any event resulting in injury to a person or property to which an Employee, or contractor/contractor's Employee, contributed as a direct or indirect cause.

e. Incident - An event which has all the attributes of an accident, except that no harm was caused to person or property.

f. Reasonable Cause - Reasonable cause shall be defined as excessive tardiness, excessive absenteeism, and erratic behavior such as noticeable imbalance, incoherence, and disorientation.

### 32.3 Confidentiality

a. All parties to this policy and program have only the interests of Employees in mind, therefore, encourage any Employee with a substance abuse problem to come forward and voluntarily accept our assistance in dealing with the illness. An Employee assistance program will provide guidance and direction for you during your recovery period. If you volunteer for help, the company will make every reasonable effort to return you to work upon your recovery. The company will also take action to assure that your illness is handled in a confidential manner.

b. All actions taken under this policy and program will be confidential and disclosed only to those with a "need to know".

c. When a test is required, the specimen will be identified by a code number, not by name, to insure confidentiality of the donor. Each specimen container will be properly labeled and made tamper proof. The donor must witness this procedure.

d. Unless an initial positive result is confirmed as positive, it shall be deemed negative and reported by the laboratory as such.

e. The handling and transportation of each specimen will be properly documented through the strict chain of custody procedures.

### 32.4 Rules - Disciplinary Actions – Grievance Procedures

1. Rules - All Employees must report to work in a physical condition that will enable them to perform their jobs in a safe and efficient manner. Employees shall not:

a. Use, possess, dispense or receive prohibited substances on or at the job site; or

b. Report to work with any measurable amount of prohibited substances in their system.

2. Discipline - When the company has reasonable cause to believe an Employee is under the influence of a prohibited substance, for reasons of safety, the Employee may be suspended until test results are available. If no test results are receive after three (3) working days, the Employee, if available, shall be returned to work with back pay. If the test results prove negative, the Employee shall be reinstated with back pay. In all other cases:

a. Applicants testing positive for drug use will not be hired.

b. Employees who have not voluntarily come forward, and who test positive for a drug use, will be terminated.

c. Employees who refuse to cooperate with testing procedures will be terminated.

d. Employees found in possession of drugs or drug paraphernalia will be terminated.

e. Employees found selling or distributing drugs will be terminated.

f. Employees found under the influence of alcohol while on duty, or while operating a company vehicle, will be subject to termination.

3. Prescription Drugs - Employees using a prescribed medication which may impair the performance of job duties, either mental or motor functions, must immediately inform their supervisor of such prescription drug use. For the safety of all Employees, the company will consult with you and your physician to determine if a re-assignment of duties is necessary. The company will attempt to accommodate your needs by making an appropriate re-assignment. However, if a re-assignment is not possible, you will be placed on temporary medical leave until released as fit for duty by the prescribing physician.

4. Grievance - All aspects of this policy and program shall be subject to the grievance procedure of the applicable collective bargaining agreement.

### 32.5 Drug/Alcohol Testing

The parties to this policy and program agree that under certain circumstances, the company will find it necessary to conduct drug and alcohol testing as follows:

a. A pre-employment drug and alcohol test may be administered to all applicants for employment;

b. A test may be administered in the event a supervisor has a reasonable cause to believe that the Employee has reported to work under the influence, or is or has been under the influence while on the job; or has violated this drug policy. During the process of establishing reasonable cause for testing, the Employee has the right to request his on-site representative to be present;

c. Testing may be required if an Employee is involved in a workplace accident/incident or if there is a workplace injury;

d. Testing may be required as part of a follow-up to counseling or rehabilitation for substance abuse, for up to a one (1) year period;

e. Employees may also be tested on a voluntary basis.

f. Random drug testing conducted under the policy and procedure contained in Section 32.7.

Each Employee will be required to sign a consent and chain of custody form, assuring proper documentation and accuracy. If an Employee refuses to sign a consent form authorizing the test, ongoing employment by the company will be terminated.

Drug testing will be conducted by an independent accredited laboratory (National Institute on Drug Abuse and/or College of American Pathology), and may consist of either blood or urine tests, or both as required. Blood test will be utilized for post accident investigation only.

The company will bear the costs of all testing procedures.

### 32.6 Rehabilitation and Employee Assistance Program

a. Employees are encouraged to seek help for a drug or alcohol problem before it deteriorates into a disciplinary matter. If an Employee voluntarily notifies supervision that he or she may have a substance abuse problem, the company will assist in locating a suitable Employee assistance program for that treatment, and will counsel the Employee regarding medical benefits available under the company or union health and welfare/insurance program.

b. If treatment necessitates time away from work, the company shall provide for the Employee an unpaid leave of absence for purposes of participation in an agreed upon treatment program. An Employee who successfully completes a rehabilitation program shall be reinstated to his/her former employment status, if work for which he/she is qualified exists.

c. Employees returning to work after successfully completing the rehabilitation program will be subject to drug tests without prior notice for a period of one year. A positive test will then result in disciplinary action as previously outlined in this policy and program.

### 32.7  Random Drug Testing Policy and Procedure

The Random Drug Testing Policy and Procedure are as follows:

1. Employees Subject to Testing

The parties agree to the establishment of a random testing program that shall include all current Employees and future Employees.

2. Random Rate

Random testing may be conducted as follows:

a. Once per calendar month the employer may randomly test a portion of the bargaining unit members working for the company.

b. The employer shall maintain sufficient records of testing to allow the Union to determine whether the provisions of this Article are in compliance.

3. Selection Period

a. The selection period is an interval within the program period for which a given number of random selections are performed. The frequency of selection shall be once during each calendar month, although the actual specimen collection may occur on any working day within that calendar month.

b. Each individual company shall submit a current Employee list for each selection period to a Third Party Administrator that will computer-generate a list of randomly-selected Employees.

c. Each individual company shall designate the specific day and time within the selection period the sample is to be collected for each Employee selected. To ensure the deterrent effect of random testing, testing shall be spread out through the selection period and include a representative sample of all work days, including weekends and holidays when feasible. In no event shall an Employee be required to submit to testing when the Employee is not physically present on the jobsite or employer office and engaged in bargaining unit work for the company. Moreover, in order to be tested, the Employee must be scheduled to perform bargaining unit work on a jobsite on the date the testing is    to occur.

4. Testing Procedures

a. The cost of all tests, specimen collection and random selection shall be borne by each individual company. Each company shall pay the Employee for all time spent complying with Section 32.7, including travel to and from the collection location and time spent for testing. Each randomly-selected Employee shall be responsible for getting to and from the collection site in a timely manner. Failure of the Employee to get to the testing site in a timely manner shall be deemed a refusal to be tested unless the Employee can demonstrate by clear and convincing evidence that the failure to so

appear was outside the Employee's control. The Employer shall be responsible for transporting any Employee who does not have an individual means of transportation.

b. Each individual company may elect to have the Employee finish his work day at the collection location. Overtime provisions of the Agreement shall apply.

c. Employees are required to cooperate in all specimen collection and/or testing procedures. This shall include providing a sample either on the job-site or collection location and having in their possession valid picture identification and any testing paperwork given to the Employee by the company.

5. Testing

a. The laboratory performing all tests will be certified for Federal Workplace Drug Testing Programs by the Department of Health and Human Services - Substance Abuse and Mental Health Service Administration (SAMHSA).

b. Specimen samples shall be collected at the third party administrator collection location or at the job-site by a third party administrator who has been properly trained to collect specimen samples to meet guidelines established by the Department of Transportation.

c. A split sample shall be secured from each Employee tested. When a urine sample is taken, the sample will be collected in a single container and then split into two containers by the collector. When an oral swab is taken, the collector shall swipe into two separate swabs and keep each swab separate.

d. All initial tests will be tested by the accepted industry standard screening methodology appropriate for the type of specimen. All initial positive tests shall be confirmed by gas chromatography/mass spectrometry (GC/MS) or the appropriate industry standard confirmatory methodology appropriate for the type of specimen.

e. Urine and/or oral fluids may be tested.

f. Testing for alcohol shall be at the option of the company. Testing for alcohol shall follow 49 CFR Part 40 Subparts J and K Procedures for Transportation Workplace Drug and Alcohol Testing Programs for the Department of Transportation, as that provision may from time to time be amended.

g. All illegal drugs, controlled substances, look-alike drugs, and designer drugs, may be tested for.

h. Use of prescription drugs outside the parameters of the prescription and physician's advice may be tested for.

i. The United States Department of Transportation levels for "positive" or "negative" drug test results shall be the standard where applicable. Alcohol test results of .02 and higher shall be treated the same as a positive test result.

j. All confirmed positive test results shall be reviewed, verified and reported to each company by a Medical Review Officer (MRO). The MRO shall not review positive alcohol tests reported from a breathalyzer.

6. Test Results

a. Test results that are verified by the MRO as positive or positive dilute shall be handled in accordance with the Agreement, including termination of employment.

b. Test results that are verified by the MRO as adulterated or substituted as determined by the laboratory and verified by the MRO shall be treated as a positive test result.

c. Test results that are verified by the MRO as negative dilute shall allow for a new specimen collection and test at the company's discretion. The second test result shall be considered the test of record and the first result disregarded.

d. Test results that indicate misuse of prescription drugs shall be treated as a positive test result.

e. A refusal to provide a sample shall be treated as a positive test result.

f. Specimen samples that cannot be collected, or collected properly due to an uncooperative Employee shall be treated as a positive test result and handled in accordance with the Agreement.

g. In the case of a specimen sample that cannot be collected because an Employee does not provide a sufficient amount of urine for the drug test (i.e., 45 ml of urine), the following procedures shall be followed:

1. The collector must discard the insufficient specimen, except where the insufficient specimen was out of temperature range or showed evidence of adulteration or tampering, in which case the test is treated as a positive or positive dilute test result;

2. The Employee shall be given the opportunity to drink fluids but shall not be forced to drink fluids. The Employee shall be informed that he or she has up to three hours to produce an adequate urine specimen, and when that three hour period begins and ends.

3. If the Employee refuses to attempt to provide a new urine specimen or leaves the collection site before the collection process is complete, it is treated as a refusal to test.

4. If the Employee is unable to provide an adequate urine specimen after the conclusion of the three hour period, the collector must immediately inform the employer and follow 49 CFR Part 40.193 Procedures for Transportation Workplace Drug and Alcohol Testing Programs from the Department of Transportation, as that provision may be from time to time amended. The company, at its option, can require testing by an alternate method, including blood or oral fluids.

h. Test results that indicate a fatal flaw, invalid sample, cancelled test, damage in shipment, defect in collection procedures, laboratory errors shall result in a new specimen collection and test at the company's option.

7. Indemnification and Hold Harmless

The Employer shall release, indemnify and hold the Union including its officers and agents completely harmless from any claims and allegations of loss, damage and injury resulting from the implementation of random testing which is not specifically authorized by the terms of this Article.

8. Policy of Non-Discrimination and Non-Harassment

The Employer is strictly prohibited from using this random testing procedure to either harass or discriminate against any person for any reason.

## ARTICLE XXXIII
## DIVERS AND DIVER TENDERS

### SCOPE OF WORK

33.1 Employer recognizes that the Union claims jurisdiction of the work performed by divers and diver tenders on diving operations, the maintenance of all equipment including submarine diving in all its branches and phases, such as salvaging of all ships, vessels, barges, etc.; underwater installation, repair, maintenance and cleaning, modification and inspection of docks, bridges, breakwaters and piers, cofferdams, intake and discharge structures and conduits, locks and dams, flumes, sewerage and water systems; underwater construction and reconstruction, underwater and habitat welding and cutting; concrete forming, pouring, drilling, sawing and breaking; ariel lift and trash pump dredging and jetting requiring diver assistance; application of underwater coatings and sealants such as epoxies, paints, cement and grouts, underwater demolition and blazing rigging; and steel erection. Also claimed herein is industrial diving of all kinds such as is found at power plants, steel mills, refineries and other heavy industries. This is to include the underwater installation, repair, maintenance and cleaning, modification and inspection of: intake and discharge structures and piping, tunnels, wells, forebays, flumes, water pumping and screening equipment, trash racks, stoplogs and bulkheads, valves and gates, cooling towers and canals, clarifiers and thickeners, liquid vessels of all kinds, floating booms, fish barrier nets, reactor vessels and fuel pools; all pipes; installation and burial of utility and telephone cables beneath the seabed; installation and maintenance of pond and canal liner materials such as geotextiles and polymeric textiles where a diver is required; installation and maintenance of underwater instrumentation, searches, surveys and recoveries of any kind.

### RATES OF PAY

33.2 A diver shall receive the regular journeyman carpenter's rate of pay as established in their area agreement; for any day or part thereof the diver is required to descend below the surface down to fifty (50) feet.

**33.3** A tender may be paid a minimum of fifty (50) percent of the journeyman carpenter's wage rate. When no diving takes place on a given day, then the tender will be paid for all actual hours worked.

## WORKING CONDITIONS

**33.4** When a diver is performing diving work under the terms and conditions of the Agreement, the diver shall be tendered by a tender who is satisfactory to the diver concerned. The tender is in the bargaining unit and therefore covered by their Agreement.

**33.5** No tender shall tend, maintain or assist more than one (1) diver at a time and no working diver shall be left untended.

**33.6** The minimum crew size shall be one (1) diver and one (1) tender for air diving; one (1) diver, one (1) tender, and one (1) manifold operator for mixed gas diving.

**33.7** Divers will dress in and out as part of the workday. Tenders will prepare, maintain, and secure equipment as part of the workday.

**33.8** Suitable facilities will be provided, by the contractor, for divers to dress and dry their gear, with heating as needed.

## TRAINING AND SAFETY

**33.9** Contractors and Employees with regard to diving operations must comply with OSHA - 1910.410.

Dive training achieved from field experience and classroom training in hardhat diving must be verifiable with a "dive log book" and an approved "dive certification" prior to employment. (Military or company training records can determine Employee qualifications and technical ability.)

All dive team personnel must be properly trained in CPR and First Aid with current certifications.

**33.10** Mixed-Gas diving, being more sophisticated, shall require a written notice and arrangements being made with the Regional Council.

**33.11** This Article covers the geographic jurisdiction of Cook, DuPage, Grundy, Iroquois, Kane, Kankakee, Kendall, Lake, Mc Henry, and Will Counties, Illinois, as well as diving work on Lake Michigan and its waterfront in Lake, Porter, and La Porte Counties, Indiana.

## ARTICLE XXXIV
## UBC INTERNATIONAL TRAINING FUND

**34.1** In addition to any contributions otherwise called for herein, there shall be a contribution in the amount of no less than fourteen cents ($0.14) per hour to the Carpenters International Training Fund ("Training Fund") with the Employer paying six cents ($0.06) for each hour of work performed by its Employees and any remaining amount being allocated from the negotiated wage package for each hour of work performed by the Employees. In no event shall the Employer's obligation be more than the six cents ($0.06) for each hour of work performed by its Employees as referenced above. Payment shall be made to the Training Fund or to such collection agent as designated by the Training Fund on or before the 20th day of the month following the month of the work performed. The Employer hereby agrees to be bound by the Agreements and Declarations of Trust for the Training Fund as they exist and as they may be amended or restated, and to such rules, regulations and other governing documents adopted pursuant to such funds.

## ARTICLE XXXV
### LABOR/MANAGEMENT UNION CARPENTRY
### COOPERATION PROMOTION FUND

35.1  The parties hereby establish a Labor/Management Union Carpentry Cooperation Promotion Fund ("LMUCCP Fund") to enhance the use of Union Carpentry Construction to increase opportunities for Union members and signatory Employers.  This Fund shall be collected by the fringe benefit offices affiliated with the Mid-America Carpenters Regional Council.  This Fund shall be used solely to promote the Union Carpentry Industry and shall be governed by a Board of Trustees based on the equal representation of three (3) Union and three (3) Employer representatives.  All expenses, remuneration and salaries shall be decided by a majority vote of Fund Trustees.  Out of the increases to be allocated, each Employer shall contribute an amount per hour as determined by the Union  for each hour worked for the Employer by those of his Employees covered by this Agreement. .

In addition to the foregoing, out of the allocated increases, each Employer shall contribute the allocated amount for each hour of work performed by Employees covered in this Agreement to the LMUCCP Fund  subject to the following requirements.  The Union and MARBA agree, and shall direct their appointed trustees of the Fund to amend the Trust Agreement to allow for the following items

(a)  The amount contributed to this Fund under this provision shall be segregated from other contributions submitted at a different hourly contribution rate and made to a separate account which will exclusively receive the allocated contribution.  The Account shall be referred to as the "Carpentry Advancement Fund".

(b)  Pursuant to Section 5.2 of the Trust Agreement, the disbursement of any funds submitted to the Carpentry Advancement Fund by Employers under this provision shall be delegated to a Committee of Trustees consisting of 1.) two Union representatives including the President/Executive Secretary/Treasurer of the Union, and 2.)  two MARBA representatives including the Chairman of the MARBA Bargaining Committee.  Any disbursements from the segregated Carpentry Advancement Fund must be by joint agreement of such trustees.

(c)  (c)  MARBA or the Union may terminate participation in the Carpentry Advancement Fund with thirty (30) days written notice to the President/Executive Secretary-/Treasurer of the Union or the Chairman of the MARBA Bargaining Committee.  In the event that MARBA or the Union terminates such participation, the contribution designated for the Carpentry Advancement Fund shall be allocated in the Union's discretion.

Contributions under this provision shall not commence until the Trust Agreement is amended as identified above.

The collection of amounts due under this Article shall not be subject to the Settlement of Disputes procedures established in Article XVIII.

## ARTICLE XXXVI
### SAVINGS CLAUSE

36.1  Should any part of or any provision herein contained be rendered or declared invalid by reason of any existing or subsequent enacted legislation, or by any decree of a court of competent jurisdiction, such invalidation of such part or portion of this Agreement shall not invalidate the remaining portions thereof; provided, however, upon such invalidation the parties signatory hereto agree to immediately meet to renegotiate such parts or provisions affected.

**36.2** All of the provisions contained in Articles I through XXI shall be and they are hereby made a part of Article XXII through XXVI, except that if any of the provisions pertaining to the respective classifications, as set out in Articles XXII through XXVI are deemed to be inconsistent with any of the provisions of Article I through XXI, in that event, the provisions of Article XXII through XXVI shall apply, but only to the Employees referred to in Articles XXII through XXVI.

### ARTICLE XXXVII
### WORK RULES COMMITTEE

**37.1** The Union and the Association together shall create a Work Rules Committee consisting of an equal number of members representing each party with no more than three (3) persons from each. Alternate members may be appointed. The purpose of this Committee shall be to consider, discuss, and propose, under appropriate circumstances, work rule modifications that benefit the carpentry industry and its signatory contractors.

No discussions by or meetings of the Committee shall be considered a reopening of the contract.

Any work rule modifications proposed by the Committee must be ratified by the Mid-America Carpenters Regional Council and the Mid-America Regional Bargaining Association.

**IN WITNESS WHEREOF,** the parties have executed this contract effective as of the dates indicated.

**MID-AMERICA CARPENTERS REGIONAL COUNCIL**

Kevin McLaughlin
Executive Secretary Treasurer

**MID-AMERICA REGIONAL BARGAINING ASSOCIATION,** for and on behalf of its present and future members who assign the authority to represent them for collective bargaining purposes.

Seth Gudeman
Chairman of the Bargaining Committee

24 CV 6428

EXHIBIT G



# MID-AMERICA CARPENTERS REGIONAL COUNCIL
## Health, Pension, and Supplemental Retirement Funds

12 East Erie Street, Chicago, Illinois 60611 • (312) 787-9455 • carpenterbenefits.org

JULY 12, 2022

Legacy Professionals, L.L.P.
4 Westbrook Corporate Center
Suite 700
Westchester, IL 60154

Account No.: 25435

Re: DOCK & DOOR INSTALL, INC.
    PO BOX 363
    STEGER IL 60475-0363

Dear Mr. Ragona,

Please perform a(n) REGULAR       ERISA Employer Audit on the above account for the period
October, 2020 through present.

Very Truly Yours
Mid-America Carpenters
Regional Council Fringe Benefit Funds
Employer Contributions Department

**Kristina M. Guastaferri**          **Gary Perinar**, *Chairman*          **Gerald W. Thiel, Jr.**, *Secretary*
Administrator                         Board of Trustees                    Board of Trustees





MACRC-00309

24 CV 6428

EXHIBIT H

Legacy Professionals LLP

# Records Reviewed

| Account Number: | 25435 | | Engagement Period: | October 1, 2020 to December 31, 2022 |
|---|---|---|---|---|
| Employer: | Dock & Door Install Inc | | Contact: | Callie Stephens |
| Address: | PO Box 363 | | Title: | Outside Accountant |
| | Steger, IL 60475 | | E-mail: | callie@ginerisltd.com |
| Phone: | (815) 922-5258 | | | |

| ERISA Employer Audit Results | | Associated Account(s) |
|---|---|---|
| Discrepancy Total Hours | (4.00) | |
| Discrepancy Benefit Hours | (4.00) | |
| Discrepancy Amount | ($151.52) | |
| Liquidated Damages | $0.00 | |
| Grand Total | ($151.52) | |

| Reviewed | Employer Records |
|---|---|
| Yes | Annual Federal Unemployment Tax Return (940) |
| No | Bank Statements |
| No | Cash Disbursement Journals |
| No | Check Register / Cancelled Checks / Vouchers |
| N/A | Construction Loan Data |
| N/A | Contribution Reports to All Other Funds |
| Yes | Contribution Reports to Audited Funds |
| No | Federal Income Tax Returns (1120 or 1065) |
| Yes | General Ledgers |
| No | Individual Earnings Records |
| No | Invoices from Sub-Contractors |
| No | Job List/Job Cost Records |
| Yes | Miscellaneous Income Payment Reports (1099) |
| Yes | Payroll Journals |
| Yes | Quarterly Federal Tax Returns (941) |
| Yes | Quarterly Unemployment Wage Reports |
| Yes | Summary of Information Returns (1096) |
| No | Time Cards |
| Yes | Transmittal of Income and Tax Statements (W-3) |
| No | Vendor List |
| Yes | Wage and Tax Statements (W-2) |

| Initiation Type: | Regular | | |
|---|---|---|---|
| Date Reviewed: | 5/16/23 | Reviewer: | _G.J. Webb, CPA_ |

MACRC-00311

**Legacy Professionals LLP**

# ERISA Employer Audit Remarks

| | | | |
|---|---|---|---|
| Account Number: | 25435 | Engagement Period: | October 1, 2020 to December 31, 2022 |
| Employer: | Dock & Door Install Inc | Contact: | Callie Stephens |
| Address: | PO Box 363 | Title: | Outside Accountant |
| | Steger, IL 60475 | E-mail: | callie@ginerisltd.com |
| Phone: | (815) 922-5258 | Date of Field Work: | February 21, 2023 |
| Auditor: | Mike Curtin | Completion Date: | April 25, 2023 |

Our review of this company's records took place at the office of Legacy Professionals LLP.

We requested the records for potentially related non-signatory company, MIDWEST DOCK SOLUTIONS INC.

Common Elements:

1- Anthony Brutti is the president of the signatory company. Mike Richert is the president of the non-signatory company.

2- Both the signatory company and non-signatory company are located at 27 East 36th Place in Steger, Illinois.

3- We are unable to comment on common employees since we have not been provided with the records of Midwest Dock Solutions Inc.

4- We did not note any payments from the signatory company to the non-signatory company. We noted payments totaling $473,514.50 from the non-signatory company to the signatory company.

5- Both the signatory company and non-signatory company are said to be a dock equipment installers.

Callie Stephens, outside accountant, indicated that it will not provide the records for Midwest Dock Solutions Inc since there is no common ownership between Midwest Dock Solutions Inc and the signatory company.

Since we have not been provided with complete records for the related non-signatory company, we are submitting this report as "Preliminary Findings."

MACRC-00312

Legacy Professionals LLP

# Discrepancy Summary By Fund

| Account Number: | 25435 | | Engagement Period: | October 1, 2020 to December 31, 2022 |
|---|---|---|---|---|
| Employer: | Dock & Door Install Inc | | Contact: | Callie Stephens |
| Address: | PO Box 363 | | Title: | Outside Accountant |
| | Steger, IL 60475 | | E-mail: | callie@ginerisltd.com |
| Phone: | (815) 922-5258 | | | |

| Fund | Period Ending | Discrepancy Hours | Contribution Rate | Contributions Due |
|---|---|---|---|---|
| Health | 10/20 to 5/21 | 0.00 | $11.79 | $0.00 |
| | 6/21 to 5/22 | (4.00) | $11.79 | ($47.16) |
| | 6/22 to 12/22 | 0.00 | $11.79 | $0.00 |
| Fund Totals: | | (4.00) | | ($47.16) |
| Pension | 10/20 to 5/21 | 0.00 | $15.34 | $0.00 |
| | 6/21 to 5/22 | (4.00) | $15.76 | ($63.04) |
| | 6/22 to 12/22 | 0.00 | $15.76 | $0.00 |
| Fund Totals: | | (4.00) | | ($63.04) |
| Apprenticeship | 10/20 to 5/21 | 0.00 | $0.63 | $0.00 |
| | 6/21 to 5/22 | (4.00) | $0.68 | ($2.72) |
| | 6/22 to 12/22 | 0.00 | $0.68 | $0.00 |
| Fund Totals: | | (4.00) | | ($2.72) |
| Intl. Fund | 10/20 to 5/21 | 0.00 | $0.10 | $0.00 |
| | 6/21 to 5/22 | (4.00) | $0.11 | ($0.44) |
| | 6/22 to 12/22 | 0.00 | $0.12 | $0.00 |
| Fund Totals: | | (4.00) | | ($0.44) |
| Labor/Management | 10/20 to 5/21 | 0.00 | $0.02 | $0.00 |
| | 6/21 to 5/22 | (4.00) | $0.02 | ($0.08) |
| | 6/22 to 12/22 | 0.00 | $0.02 | $0.00 |
| Fund Totals: | | (4.00) | | ($0.08) |

Preliminary Findings

Legacy Professionals LLP

# Discrepancy Summary By Fund

| Account Number: | 25435 | Engagement Period: | October 1, 2020 to December 31, 2022 |
|---|---|---|---|
| Employer: | Dock & Door Install Inc | Contact: | Callie Stephens |
| Address: | PO Box 363 | Title: | Outside Accountant |
| | Steger, IL 60475 | E-mail: | callie@ginerisltd.com |
| Phone: | (815) 922-5258 | | |

| Fund | Period Ending | Discrepancy Hours | Contribution Rate | Contributions Due |
|---|---|---|---|---|
| Supp Ret | 10/20 to 5/21 | 0.00 | $8.00 | $0.00 |
| | 6/21 to 5/22 | (4.00) | $9.00 | ($36.00) |
| | 6/22 to 12/22 | 0.00 | $9.00 | $0.00 |
| Fund Totals: | | (4.00) | | ($36.00) |
| IND ADV / M.I.A.F. | 10/20 to 5/21 | 0.00 | $0.06 | $0.00 |
| | 6/21 to 5/22 | (4.00) | $0.06 | ($0.24) |
| | 6/22 to 12/22 | 0.00 | $0.06 | $0.00 |
| Fund Totals: | | (4.00) | | ($0.24) |
| Safety / PFI | 10/20 to 5/21 | 0.00 | $0.01 | $0.00 |
| | 6/21 to 5/22 | (4.00) | $0.01 | ($0.04) |
| | 6/22 to 12/22 | 0.00 | $0.01 | $0.00 |
| Fund Totals: | | (4.00) | | ($0.04) |
| CISCO | 10/20 to 5/21 | 0.00 | $0.01 | $0.00 |
| | 6/21 to 5/22 | (4.00) | $0.01 | ($0.04) |
| | 6/22 to 12/22 | 0.00 | $0.01 | $0.00 |
| Fund Totals: | | (4.00) | | ($0.04) |

Preliminary Findings

Legacy Professionals LLP

# Discrepancy Summary By Fund

| Account Number: | 25435 | Engagement Period: | October 1, 2020 to December 31, 2022 |
|---|---|---|---|
| Employer: | Dock & Door Install Inc | Contact: | Callie Stephens |
| Address: | PO Box 363 | Title: | Outside Accountant |
| | Steger, IL 60475 | E-mail: | callie@ginerisltd.com |
| Phone: | (815) 922-5258 | | |

| Fund | Period Ending | Discrepancy Hours | Contribution Rate | Contributions Due |
|---|---|---|---|---|
| CAF | 10/20 to 5/21 | 0.00 | $0.44 | $0.00 |
| | 6/21 to 5/22 | (4.00) | $0.44 | ($1.76) |
| | 6/22 to 12/22 | 0.00 | $0.44 | $0.00 |
| Fund Totals: | | (4.00) | | ($1.76) |
| Vacation | 6/22 to 12/22 | 0.00 | $1.50 | $0.00 |
| Fund Totals: | | 0.00 | | $0.00 |

| | |
|---|---|
| Sub-Total All Funds | ($151.52) |
| Liquidated Damages | $0.00 |
| Total Amount Due to All Funds | ($151.52) |

MACRC-00315

Legacy Professionals LLP

# Discrepancy Summary By Month

| Account Number: | 25435 | Engagement Period: | October 1, 2020 to December 31, 2022 |
| Employer: | Dock & Door Install Inc | Contact: | Callie Stephens |
| Address: | PO Box 363 | Title: | Outside Accountant |
| | Steger, IL 60475 | E-mail: | callie@ginerisltd.com |
| Phone: | (815) 922-5258 | Page: | 1 of 4 |

| Reporting Period | Discrepancy Total Hours | Discrepancy Benefit Hours | Contribution Rate | Discrepancy Amount |
|---|---|---|---|---|
| October 2021 | (4.00) | (4.00) | $37.88 | ($151.52) |

| | | | | | |
|---|---|---|---|---|---|
| Total Hours | (4.00) | Benefit Hours | (4.00) | Discrepancy Amount | ($151.52) |
| | | | | Liquidated Damages | |
| | | | | Total Amount Due | ($151.52) |

MACRC-00316

Legacy Professionals LLP

# Discrepancy Summary By Error Type

| Account Number: | 25435 | Engagement Period: | October 1, 2020 to December 31, 2022 |
|---|---|---|---|
| Employer: | Dock & Door Install Inc | Contact: | Callie Stephens |
| Address: | PO Box 363 | Title: | Outside Accountant |
| | Steger, IL 60475 | E-mail: | callie@ginerisltd.com |
| Phone: | (815) 922-5258 | Page: | 2 of 4 |

| Code | Description | Dollar Amount |
|---|---|---|
| | **SIGNATORY EMPLOYER: PAYROLL** | |
| P1 | Clerical Error | ($151.52) |

| | |
|---|---|
| Sub-Total Discrepancies From All Listed Codes | ($151.52) |
| Liquidated Damages | $0.00 |
| Total Amount Due | ($151.52) |

MACRC-00317

Legacy Professionals LLP

# Liquidated Damages Schedule

| Account Number: | 25435 | Engagement Period: | October 1, 2020 to December 31, 2022 |
|---|---|---|---|
| Employer: | Dock & Door Install Inc | Contact: | Callie Stephens |
| Address: | PO Box 363 | Title: | Outside Accountant |
| | Steger, IL 60475 | E-mail: | callie@ginerisltd.com |
| Phone: | (815) 922-5258 | Page: | 3 of 4 |

| Reporting Period | Contributions Due | Compounding Periods | Calculating Percentage | Total Liquidated Damages Owed |
|---|---|---|---|---|
| October 2021 | ($151.52) | | | |

| | | | | |
|---|---|---|---|---|
| **Total Discrepancies** | ($151.52) | **Total Damages this Schedule** **20% of Discrepancies** | | ($30.30) |
| | | **Assessed Damages** | | |

MACRC-00318

Legacy Professionals LLP

# Monthly Detail Report

| | | |
|---|---|---|
| Account Number: | 25435 | Engagement Period: October 1, 2020 to December 31, 2022 |
| Employer: | Dock & Door Install Inc | Month: **October 2021** |
| Address: | PO Box 363 | |
| | Steger, IL 60475 | Page # : 4 of 4 |
| Phone: | (815) 922-5258 | |

| Reference Number | Employee / Payee Name | Error Code | Total Hours Reported | Benefit Hours Reported | Ck Date 1-Oct | Ck Date 8-Oct | Ck Date 15-Oct | Ck Date 22-Oct | Ck Date 29-Oct | Total Hours | Capped Hours | Total Hour Difference | Benefit Hour Difference |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | \* \* \* \* \* Actual Hours Per Week \* \* \* \* \* | | | | | | | | |
| xxx-xx▆▆▆ | Aguirre Garcia Jose | P1 | 88.00 | 88.00 | 84.00 | 0.00 | 0.00 | 0.00 | 0.00 | 84.00 | | (4.00) | (4.00) |
| | | | | Total | 84.00 | 0.00 | 0.00 | 0.00 | 0.00 | 84.00 | | (4.00) | (4.00) |

MACRC-00319

24 CV 6428

EXHIBIT I

*Professional services rendered in connection with the audit of:*

Dock & Door Install Inc
27 E 36th Place
Steger, IL 60475

Account Number(s): 25435

Field Auditor: Mike Curtin

October 1, 2020 to December 31, 2024



Ms. Breanna Radtke, Administrator
Mid America Carpenters Regional Council
Fringe Benefit Funds
12 East Erie Street
Chicago, Illinois 60611

Re: Dock & Door Install, Inc. (#25435)
    Reporting Period: October 1, 2020 to December 31, 2024

 We were engaged by the Board of Trustees of the Mid America Carpenters Regional
Council Fringe Benefit Funds (the Funds) to assist you in determining whether
contributions to the Funds were made in accordance with the Collective Bargaining and
Trust Agreements during the above referenced reporting period.

The management of Dock & Door Install Inc is responsible for making contributions in
accordance with the requirements of the Collective Bargaining and Trust Agreements.

This engagement was performed in accordance with Statements on Standards for
Consulting Services issued by the American Institute of Certified Public Accountants.
We were not engaged to, and did not, conduct an audit, the objective of which would be
the expression of an opinion. Accordingly, we do not express such an opinion.  Had we
performed additional procedures, other matters might have come to our attention that
would have been reported to you.

Our procedures and findings are included in the attached schedules.

This report is intended solely for the information and use of the Trustees and
Administrator of the Mid America Carpenters Regional Council Fringe Benefit Funds and
is not intended to be and should not be used by anyone other than these specified
parties.

*Legacy Professionals LLP*

Westchester, Illinois

June 17, 2025

### *Mid-America Carpenters Regional Council Trust Funds*
### ERISA Employer Audit Procedures (2022 Rev.)

### PROCESSES

**I. GENERAL:**

a. Review the ERISA employer audit initiation request document(s) and MACRC's Employer File Inquiry reports for the specified period.

b. Review the Collective Bargaining Agreement and Addendum(s) to determine the applicable hours subject to contributions.

c. Compare the Federal Employer Identification Number (FEIN) and organizational type (i.e. proprietorship, partnership, corporation, etc.) reflected in MACRC's Employer data base to documents reviewed and/or discussions with the employer representative. Address any differences in the report.

d. Identify the records to be reviewed.

e. Discuss with the Trust Fund's Office any questionable issues that may arise such as: scope limitation(s), potential payroll fraud issues such as piece-rate, bonus/incentive wages, cash payments paid to individuals performing jurisdictional work, items addressed in the ERISA employer audit initiation request and other unusual or special circumstances.

f. If hours worked are not available or do not appear credible, alternate procedures may need to be applied, and should be discussed with the Trust Fund's Office.

g. Calculate discrepancy dollars by multiplying the discrepancy hours listed in the report findings by the appropriate contribution rates.

h. Liquidated damages should be computed at 1.5% compounded monthly on each month that discrepancy dollars are owed, not to exceed 20% of the total discrepancy dollars owed.

**II. PAYROLL:**

a. Review copies of tax and/or related documents to determine the completeness of the payroll records and to identify the individuals employed by the company.

b. Compile a list of individuals the company reported to the MACRC Trust Funds during the engagement period. Identify discrepancies that exist between the hours worked by individuals (not considered as management or superintendent) and the hours reported to the MACRC Trust Funds. Include the discrepancy hours in the report findings.

c. Compile a list of individuals the company reported to other Carpenter Trust Funds during the engagement period. From that list, identify discrepancies that exist between the hours worked by individuals (not considered as management or superintendent) and the hours reported to the other Carpenter Trust Funds. Use the criteria specified by the MACRC Trust Funds (see Criteria for Individuals) for inclusion of under and over reported hours of an individual. In months where individuals are reported exclusively to other Carpenter Trust Funds, do not include any credit discrepancies in the report findings, unless instructed otherwise by the MACRC Trust Fund's Office.

1

d. Eliminate individuals listed on this employer's contribution report(s) submitted to other Union Trade trust funds, provided those individuals were not reported by this employer to any Carpenter Trust Fund in or around the engagement period and it was reasonably determined that non-jurisdictional work was performed.

e. Identify individuals who were not listed on this employer's contribution reports, but meet criteria specified by the MACRC Trust Funds (see Criteria for Individuals) for inclusion. Include their hours in the report findings and provide the Trust Funds with each individual's address, hourly wage rate, and job description (if available).

f. Identify individuals who were not listed on this employer's contribution reports, do not meet criteria specified by the Trust Funds (see Criteria for Individuals) for inclusion, but do meet criteria that may warrant further consideration by the Trust Funds. Capture the employees' quarterly gross wages and provide the Trust Funds with a list of these individuals, as well as, their addresses, hourly wage rates, and job descriptions (if available).

g. Identify individuals who meet criteria specified by the Trust Funds (see Criteria for Individuals) for participation in the 160 hour program. Do not include their hours in the report findings, but specify those month(s) reported at less than 160 hours. Provide the Trust Funds with each individual's address, phone number, hourly wage rate or note if "salaried." Also indicate if the individual was reported, works with tools of the trade, identify and note any familial relation (if known), and note potential employee misclassification in the Trust Funds' data base. The Trust Funds will review this list and remove any individuals verified to be the 160 Hour Exempted Carpenter.

h. If the above procedures are not applicable, individuals may be eliminated based upon other criteria specified by the Trust Fund's Office (see Criteria for Individuals).

## III.  DISBURSEMENTS:

a. Peruse the disbursement records to identify payees that are known, acknowledged or appear to perform bargaining unit work and request the Employer provide a description of the goods or services provided for each payee. Disbursement records may come from a third party source such as a financial institution.

b. Review Federal Forms 1096 and Forms 1099-Misc (if available) and compare recipient names to the aforementioned payees.

c. Identify those payees who appear to meet criteria specified by the Trust Funds and record the payments issued to the payees during the engagement period. Some of the payees may be eliminated based upon criteria specified by these Trust Funds (see Criteria for Individuals and Entities).

d. Request sample invoices from the employer representative to determine the type of work performed for each payee. Additional invoices should be requested for all payments to each payee performing jurisdictional work, or who is not clearly defined and/or excludable. Payments for jurisdictional work should be included in the report findings. Payments for non-jurisdictional work should be excluded from the report findings. Jurisdictional work should be assumed if no invoice is provided.

2

*Perform the below procedures on payments to payee that have not been excluded*

Individuals:

e.  Identify individuals paid through disbursements that meet criteria specified by these Trust Funds (see Criteria for Individuals) for inclusion in the report findings. If hours are not specified, determine reportable hours based upon Trust Fund criteria (see Calculation of Hours – Individual). Also provide the Trust Funds with each individual's address, phone number, hourly wage rate, and job description (if available).

Entities:

f.  Identify entities that may have performed bargaining unit work and were not signatory to the Collective Bargaining Agreement at the time payment was issued. Include in the report findings the hours worked within the Trust Funds' geographic jurisdiction (if identifiable). If hours are not reflected on the invoices, hours should be determined based upon criteria specified by the Trust Funds (see Criteria for Entities). Also provide the Trust Funds with the entities' name, address, and a brief description of the goods/services provided (if available).

g.  Identify entities signatory to the Collective Bargaining Agreement that may have performed bargaining unit work within the Trust Funds' geographic jurisdiction and did not report individuals in or around the months that payments were issued. Address each company in the report narrative, note the total amount paid, and provide a description of the services.

h.  Identify those potentially related entities not signatory to the Collective Bargaining Agreement at the time that payment was issued. These companies may be included in the report findings or their records pursued. Contact the Trust Fund's Office for further discussion.

# Mid America Carpenters Regional Council
## Records Reviewed

| | | | |
|---|---|---|---|
| Employer: | Dock & Door Install Inc | Phone: | (815) 922-5258 |
| Address: | 27 E 36th Place | Contact: | Callie Stephens |
| | Steger, IL 60475 | Title: | Outside Accountant |
| Account Number(s): | 25435 | E-Mail: | callie@ginerisltd.com |
| Audit Period: | October 1, 2020 to December 31, 2024 | Initiation Type: | Regular |

| ERISA Employer Audit Results | |
|---|---|
| Pension Discrepancy Hours | 0.00 |
| Benefit Discrepancy Hours | 102,803.50 |
| Discrepancy Amount | $4,037,546.06 |
| Liquidated Damages | $767,539.15 |
| Grand Total | $4,805,085.21 |

| Reviewed | Employer Records |
|---|---|
| Yes | Annual Federal Unemployment Tax Return (940) |
| No | Bank Statements |
| No | Cash Disbursement Journals |
| No | Check Register / Cancelled Checks / Vouchers |
| N/A | Construction Loan Data |
| Yes | Contribution Reports to All Other Funds |
| Yes | Contribution Reports to Audited Funds |
| No | Federal Income Tax Returns (1120 or 1065) |
| Yes | General Ledgers |
| Yes | Individual Earnings Records |
| No | Invoices from Sub-Contractors |
| No | Job List/Job Cost Records |
| Yes | Miscellaneous Income Payment Reports (1099) |
| Yes | Payroll Journals |
| Yes | Quarterly Federal Tax Returns (941) |
| Yes | Quarterly Unemployment Wage Reports |
| Yes | Summary of Information Returns (1096) |
| No | Time Cards |
| Yes | Transmittal of Income and Tax Statements (W-3) |
| No | Vendor List |
| Yes | Wage and Tax Statements (W-2) |

Date Reviewed: 6/19/25     Reviewer: _(signature)_ CPA

# Mid America Carpenters Regional Council
## Compliance Audit Information Sheet

Employer's Name:    Dock & Door Install Inc

Account Number(s):    25435

FEIN #:    47-1346180

Business Address:    27 E 36th Place

City/State/ Zip Code:    Steger, IL 60475

Business Phone Number:    (815) 922-5258

Business Fax Number:    Not provided

E-Mail Address:    callie@ginerisltd.com

Contact's Name:    Callie Stephens    Title:   Outside Accountant

Person Fund is to contact:    Callie Stephens    Title:   Outside Accountant

Was there an attorney demand letter sent for this audit?    Attorney:    Kevin McJessy at McJessy, Ching & Thompson

   Yes   X

   No    Compliance Date:   March 1, 2023

Audit Site (If different from employer's address):

   Legacy Professionals LLP

   4 Westbrook Corporate Center, Suite 700

   Westchester, IL 60154

Are the Owners/Officers affiliated with any other company?

   Yes   X

   No

If yes, list the name of the company(s):

Midwest Dock Solutions, Inc.

Were any of the potential related companies pursued?

   Yes   X    If yes, see attached details.

   No

Are we including bonus payments in our report?

   Yes    If yes, see in Schedule of Amounts Due.

   No   X

Does this employer report to other Carpenter Trust Funds?

   Yes   X

   No

If yes, list the name of the Funds:

Indiana/Kentucky

Are there potential 160 violations included in our report?

   Yes    If yes, see attached details.

   No   X

If this audit was completed as "Preliminary Findings", "No Audit, No Cooperation", or "No Audit, Other", please explain why.

N/A

Is the company still in business?

   Yes   X    Date of Closure?

   No

# Mid America Carpenters Regional Council

## Compliance Audit Information Sheet

Briefly describe the nature of the delinquency, if any:

This company failed to report all hours worked.

Please see below regarding the potentially related non-signatory company.

Did your examination uncover anything special or unusual which should be brought to the attention of the fund or other interested persons?

Yes _____X_____          No _____

If yes, explain:          This company reports to the Indiana/Kentucky Carpenters.  We did not note any discrepancies relating to hours reported to

We have included the hours worked by the following electronic record individuals.  Based on the interrogatories these individuals were "Technicians" therefore we have included their hours worked in the discrepancies.

| Name | SS# | Name | SS# |
|------|-----|------|-----|
| Donnelly Thomas | xxx-xx- | Gibson Jeff | xxx-xx- |
| Mancha John | xxx-xx | Strazzabosco Michael | xxx-xx- |

We have included the hours worked [by the fol]lowing no record individuals.  Based on the interrogatories these individuals were "Technicians" therefore we have inc[luded thei]r hours worked in the discrepancies.

| Name | SS | Name | SS# |
|------|-----|------|-----|
| Cronk Ronald | xxx-xx | DeAngeles Tyler | xxx-xx- |
| Kardosh Richard | xxx-xx | Kelly Dylan | xxx-xx- |
| Leer Sean | xxx-xx | Mateja Jr Michael | xxx-xx- |
| McCartney Austin | xxx-xx | Poole Eric | xxx-xx |
| Sichterman Joshua | xxx-xx | Sparr John | xxx-xx- |
| Stanton Christopher | xxx-xx | Stawychey Ryan | xxx-xx- |
| Stoltenberg John | xxx-xx | Toigo Anthony | xxx-xx- |
| Torkelsen Zachary | xxx-xx | Woff Travis | xxx-xx |

We noted payments to the following non-signatory subcontractors.  Since we were not provided any documentation for the payments, we applied the appropriate labor factor (100%) and included the resulting hours in the discrepancies.

| Name | Name | Name |
|------|------|------|
| Industrial Commercial Services Inc | Premier Installers | Scott Overhead |

Please note that the address included in our report is the latest one supplied by the employer.

# Mid America Carpenters Regional Council

## Compliance Audit Information Sheet

**Related Company Name**                           **Common Elements**

Midwest Dock Solutions Inc

1. President- Mike Richert
2. Address- same as above
3. Shared Employees- Branden Bishop prior to engagement period. No shared employees during engagement period.
4. Payment Detail- We noted payments from the non-signatory company to the signatory company.
5. Type of Work- said to be a dock equipment installers.

# Mid America Carpenters Regional Council
## Individual and Non-Signatory Sub-Contractor List

Employer Name: Dock & Door Install Inc
Account Number: 25435
Audit Period: October 1, 2020 to December 31, 2024

| Ref Number | Name | Address | City | State | Zip | Wage Rate | Description | List Type |
|---|---|---|---|---|---|---|---|---|
| 000-0 | Donnelly Thomas | 14407 Rocklin St | Cedar Lake | IN | 46303 | $35.00 | Technician | Electronic Record |
| 000-0 | Gibson Jeff | 614 W 15th Pl | Chicago Heights | IL | 60411 | $34.00 | Technician | Electronic Record |
| 000-0 | Mancha John | 113 S Griffin St | Grant Park | IL | 60940 | $48.00 | Technician | Electronic Record |
| 000-0 | Strazzabosco Michael | 614 2nd Ave NW | Demotte | IN | 46310 | $41.00 | Technician | Electronic Record |
| 000-0 | Cronk Ronald | 15153 104th Pl | Dyer | IN | 46311 | $31.00 | Technician | No Record |
| 000-0 | Deangeles Tyler | 8544 S New Castle Ave | Burbank | IL | 60459 | $27.00 | Technician | No Record |
| 000-0 | Kardosh Richard | 201 Esson Farm Rd | Grant Park | IL | 60940 | $27.00 | Technician | No Record |
| 000-0 | Kelly Dylan | 20625 Western Ave | Chicago Heights | IL | 60411 | $23.50 | Technician | No Record |
| 000-0 | Leer Sean | 14 Laurel Ln | Grant Park | IL | 60940 | $29.50 | Technician | No Record |
| 000-0 | Mateja Jr Michael | 214 E Taylor St | Grant Park | IL | 60940 | $34.00 | Technician | No Record |
| 000-0 | McCartney Austin | 1325 W State Route 102 | Bourbonnais | IL | 60914 | $18.00 | Technician | No Record |
| 000-0 | Poole Eric | 13220 Fairbanks St | Cedar Lake | IN | 46303 | $26.00 | Technician | No Record |
| 000-0 | Sichterman Joshua | 17406 Mount St | Lowell | IN | 46356 | $30.00 | Technician | No Record |
| 000-0 | Sparr John | 13220 Fairbanks St | Cedar Lake | IN | 46303 | $39.00 | Technician | No Record |
| 000-0 | Stanton Christopher | 13023 Geyser Peak | San Antonio | TX | 78253 | $26.00 | Technician | No Record |
| 000-0 | Stawchey Ryan | 2663 N River Isle West Rd | Momence | IL | 60954 | $24.00 | Technician | No Record |
| 000-0 | Stoltenberg | 13111 Colfax St | Cedar Lake | IN | 46303 | $23.00 | Technician | No Record |
| 000-0 | Toigo Anthony | 17406 Mount St | Lowell | IN | 46356 | $13.00 | Technician | No Record |
| 000-0 | Torkelsen Zachary | 13 W Corning Rd | Beecher | IL | 60401 | $19.75 | Technician | No Record |
| 000-0 | Woff Travis | 13220 Fairbanks St | Cedar Lake | IN | 46303 | $25.00 | Technician | No Record |
| 000-0 | Conti Vincent | 1219 N Greenwood Ave | Griffith | IN | 46319 | $17.50 | Warehouse | Unverified |
| 000-0 | French Steven | 15140 W 95th Ave | Dyer | IN | 46311 | | Commission Sales | Unverified |
| 000-0 | Graham Jane | 7431 Binyon St | Cedar Lake | IN | 46303 | $20.00 | Warehouse | Unverified |
| 000-0 | Johnson James | 1501 73rd St | Darien | IL | 60561 | | Commission Sales | Unverified |
| 000-0 | Leitz Daniel | 1357 Ridgefield Cir | Carol Stream | IL | 60188 | $18.00 | Administrative | Unverified |
| 000-0 | Mortell David | 2311 N Wayne Ave | Chicago | IL | 60614 | | Commission Sales | Unverified |
| 000-0 | Sichterman Amber | 17406 Mount St | Lowell | IN | 46356 | $19.00 | Administrative | Unverified |
| 000-0 | Sugar Ira | 9442 Henry St | Dyer | IN | 46311 | | Commission Sales | Unverified |
| 000-0 | Webber Sherri | 42 Timrick Dr | Munster | IN | 46321 | $30.50 | Administrative | Unverified |
| 1 | Industrial Commercial Services Inc | Not Provided | | | | | Not Provided | Sub List |
| 2 | Premier Installers | Not Provided | | | | | Not Provided | Sub List |
| 3 | Scott Overhead | Not Provided | | | | | Not Provided | Sub List |

# Mid America Carpenters Regional Council
## Discrepancy Summary By Month

Employer Name: Dock & Door Install Inc
Account Number: 25435
Audit Period: October 1, 2020 to December 31, 2024

| Reporting Period | | Pension Discrepancy Hours | Benefit Discrepancy Hours | Discrepancy Amount |
|---|---|---|---|---|
| October 2020 | | | 1,749.00 | 63,663.60 |
| November 2020 | | | 1,485.00 | $54,054.00 |
| December 2020 | | | 1,921.00 | $69,924.40 |
| January 2021 | | | 1,520.00 | $55,328.00 |
| February 2021 | | | 1,519.50 | $55,309.80 |
| March 2021 | | | 1,892.75 | $68,896.10 |
| April 2021 | | | 2,364.25 | $86,058.70 |
| May 2021 | | | 1,920.00 | $69,888.00 |
| June 2021 | | | 1,877.50 | $71,119.70 |
| July 2021 | | | 2,287.00 | $86,631.56 |
| August 2021 | | | 1,943.25 | $73,610.31 |
| September 2021 | | | 2,344.75 | $88,819.13 |
| October 2021 | | | 2,344.00 | $88,790.72 |
| November 2021 | | | 1,970.00 | $74,623.60 |
| December 2021 | | | 2,690.00 | $101,897.20 |
| January 2022 | | | 2,218.00 | $84,017.84 |
| February 2022 | | | 2,181.00 | $82,616.28 |
| March 2022 | | | 2,144.50 | $81,233.66 |
| April 2022 | | | 2,367.00 | $89,661.96 |
| May 2022 | | | 1,939.50 | $73,468.26 |
| June 2022 | | | 2,144.50 | $84,471.86 |
| July 2022 | | | 2,457.25 | $96,791.08 |
| August 2022 | | | 2,860.00 | $112,655.40 |
| September 2022 | | | 2,566.00 | $101,074.75 |
| October 2022 | | | 2,099.00 | $82,679.61 |
| November 2022 | | | 2,004.25 | $78,947.41 |
| December 2022 | | | 2,364.00 | $93,117.96 |
| January 2023 | | | 1,774.00 | $69,877.86 |
| February 2023 | | | 1,729.50 | $68,125.01 |
| March 2023 | | | 2,598.50 | $102,354.92 |
| April 2023 | | | 2,242.75 | $88,341.92 |
| May 2023 | | | 1,966.00 | $77,440.74 |
| June 2023 | | | 2,719.00 | $110,472.97 |
| July 2023 | | | 2,050.00 | $83,291.50 |
| August 2023 | | | 1,900.50 | $77,217.32 |
| September 2023 | | | 2,099.50 | $85,302.69 |
| October 2023 | | | 1,674.00 | $68,014.63 |
| November 2023 | | | 1,650.00 | $67,039.50 |
| December 2023 | | | 2,012.00 | $81,747.57 |
| January 2024 | | | 1,506.00 | $61,188.78 |
| February 2024 | | | 1,591.00 | $64,642.33 |
| March 2024 | | | 1,932.00 | $78,497.16 |
| April 2024 | | | 1,861.25 | $75,622.59 |
| May 2024 | | | 1,876.00 | $76,221.88 |
| June 2024 | | | 1,573.75 | $67,356.50 |
| July 2024 | | | 1,654.75 | $70,823.30 |
| August 2024 | | | 1,996.50 | $85,450.20 |
| September 2024 | | | 1,674.25 | $71,657.90 |
| October 2024 | | | 1,722.25 | $73,712.30 |
| November 2024 | | | 2,178.75 | $93,250.50 |
| December 2024 | | | 1,648.25 | $70,545.10 |
| | Totals: | | 102,803.50 | $4,037,546.06 |

| | |
|---|---|
| Discrepancy Amount: | $4,037,546.06 |
| Liquidated Damages: | $767,539.15 |
| Total Amount Due: | $4,805,085.21 |

# Mid America Carpenters Regional Council

## Discrepancy Summary by Error Code

Employer Name: Dock & Door Install Inc
Account Number: 25435
Audit Period: October 1, 2020 to December 31, 2024

| Error Code | Description | Pension Disc. Hours | Benefit Disc. Hours | Discrepancy Amount |
|---|---|---|---|---|
| RCP7 | Electronic Record Identified as Carpenter Not Reported | | 25,217.00 | $ 994,000.45 |
| RCP11 | No Record Identified as Carpenter Not Reported | | 72,437.50 | $ 2,840,546.63 |
| RCD41 | Non-signatory Subcontractor 100% Labor Factor | | 5,149.00 | $ 202,998.98 |

|  |  |
|---|---|
| Discrepancy Amount: | $ 4,037,546.06 |
| Liquidated Damages: | $ 767,539.15 |
| Total Amount Due: | $ 4,805,085.21 |

# Mid America Carpenters Regional Council
## Liquidated Damages Schedule

Employer Name: Dock & Door Install Inc
Account Number: 25435
Audit Period: October 1, 2020 to December 31, 2024

| Reporting Period | Contributions Due | Compounding Periods | Calculating Percentage | Total Liquidated Damages Owed |
|---|---|---|---|---|
| October 2020 | $63,663.60 | 55 | 20.00% | $12,732.72 |
| November 2020 | $54,054.00 | 54 | 20.00% | $10,810.80 |
| December 2020 | $69,924.40 | 53 | 20.00% | $13,984.88 |
| January 2021 | $55,328.00 | 52 | 20.00% | $11,065.60 |
| February 2021 | $55,309.80 | 51 | 20.00% | $11,061.96 |
| March 2021 | $68,896.10 | 50 | 20.00% | $13,779.22 |
| April 2021 | $86,058.70 | 49 | 20.00% | $17,211.74 |
| May 2021 | $69,888.00 | 48 | 20.00% | $13,977.60 |
| June 2021 | $71,119.70 | 47 | 20.00% | $14,223.94 |
| July 2021 | $86,631.56 | 46 | 20.00% | $17,326.31 |
| August 2021 | $73,610.31 | 45 | 20.00% | $14,722.06 |
| September 2021 | $88,819.13 | 44 | 20.00% | $17,763.83 |
| October 2021 | $88,790.72 | 43 | 20.00% | $17,758.14 |
| November 2021 | $74,623.60 | 42 | 20.00% | $14,924.72 |
| December 2021 | $101,897.20 | 41 | 20.00% | $20,379.44 |
| January 2022 | $84,017.84 | 40 | 20.00% | $16,803.57 |
| February 2022 | $82,616.28 | 39 | 20.00% | $16,523.26 |
| March 2022 | $81,233.66 | 38 | 20.00% | $16,246.73 |
| April 2022 | $89,661.96 | 37 | 20.00% | $17,932.39 |
| May 2022 | $73,468.26 | 36 | 20.00% | $14,693.65 |
| June 2022 | $84,471.86 | 35 | 20.00% | $16,894.37 |
| July 2022 | $96,791.08 | 34 | 20.00% | $19,358.22 |
| August 2022 | $112,655.40 | 33 | 20.00% | $22,531.08 |
| September 2022 | $101,074.75 | 32 | 20.00% | $20,214.95 |
| October 2022 | $82,679.61 | 31 | 20.00% | $16,535.92 |
| November 2022 | $78,947.41 | 30 | 20.00% | $15,789.48 |
| December 2022 | $93,117.96 | 29 | 20.00% | $18,623.59 |
| January 2023 | $69,877.86 | 28 | 20.00% | $13,975.57 |
| February 2023 | $68,125.01 | 27 | 20.00% | $13,625.00 |
| March 2023 | $102,354.92 | 26 | 20.00% | $20,470.98 |
| April 2023 | $88,341.92 | 25 | 20.00% | $17,668.38 |
| May 2023 | $77,440.74 | 24 | 20.00% | $15,488.15 |
| June 2023 | $110,472.97 | 23 | 20.00% | $22,094.59 |
| July 2023 | $83,291.50 | 22 | 20.00% | $16,658.30 |
| August 2023 | $77,217.32 | 21 | 20.00% | $15,443.46 |
| September 2023 | $85,302.69 | 20 | 20.00% | $17,060.54 |
| October 2023 | $68,014.63 | 19 | 20.00% | $13,602.93 |
| November 2023 | $67,039.50 | 18 | 20.00% | $13,407.90 |
| December 2023 | $81,747.57 | 17 | 20.00% | $16,349.51 |
| January 2024 | $61,188.78 | 16 | 20.00% | $12,237.76 |
| February 2024 | $64,642.33 | 15 | 20.00% | $12,928.47 |
| March 2024 | $78,497.16 | 14 | 20.00% | $15,699.43 |
| April 2024 | $75,622.59 | 13 | 20.00% | $15,124.52 |
| May 2024 | $76,221.88 | 12 | 19.56% | $14,909.00 |
| June 2024 | $67,356.50 | 11 | 17.79% | $11,982.72 |
| July 2024 | $70,823.30 | 10 | 16.05% | $11,367.14 |
| August 2024 | $85,450.20 | 9 | 14.34% | $12,253.56 |
| September 2024 | $71,657.90 | 8 | 12.65% | $9,064.72 |
| October 2024 | $73,712.30 | 7 | 10.98% | $8,093.61 |
| November 2024 | $93,250.50 | 6 | 9.34% | $8,709.60 |
| December 2024 | $70,545.10 | 5 | 7.73% | $5,453.14 |

|  |  |  |  |  |
|---|---|---|---|---|
|  |  |  | Total Damages this Schedule | $767,539.15 |
| Total Discrepancies | $4,037,546.06 |  | 20% of Discrepancies | $807,509.21 |
|  |  |  |  |  |
|  |  |  | Assessed Damages | $767,539.15 |

# Mid America Carpenters Regional Council
Schedule of Amounts Due

Employer Name: Dock & Door Install Inc
Account Number: 25435
Audit Period: October 1, 2020 to December 31, 2024

| Month | Account Number | Rate Table | Reference Number | Name | Error Code | Total Hours Reported | Benefit Hours Reported | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Total Hours | Pension Capped Hours | Pension Discrepancy Hours | Pension Contribution Rate | Benefit Capped Hours | Benefit Discrepancy Hours | Benefit Contribution Rate | Discrepancy Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| March 2021 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 190.75 | | | | | 190.75 | | - | - | | 190.75 | $ 36.40 | $ 6,943.30 |
| April 2021 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 51.50 | | | | | 51.50 | | - | - | | 51.50 | $ 36.40 | $ 1,874.60 |
| May 2021 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 89.50 | | | | | 89.50 | | - | - | | 89.50 | $ 36.40 | $ 3,257.80 |
| August 2021 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 46.25 | | | | | 46.25 | | - | - | | 46.25 | $ 37.88 | $ 1,751.95 |
| September 2021 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 442.25 | | | | | 442.25 | | - | - | | 442.25 | $ 37.88 | $ 16,752.43 |
| November 2021 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 50.50 | | | | | 50.50 | | - | - | | 50.50 | $ 37.88 | $ 1,912.94 |
| December 2021 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 262.00 | | | | | 262.00 | | - | - | | 262.00 | $ 37.88 | $ 9,924.56 |
| March 2022 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 135.00 | | | | | 135.00 | | - | - | | 135.00 | $ 37.88 | $ 5,113.80 |
| May 2022 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 127.50 | | | | | 127.50 | | - | - | | 127.50 | $ 37.88 | $ 4,829.70 |
| June 2022 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 195.50 | | | | | 195.50 | | - | - | | 195.50 | $ 39.39 | $ 7,700.75 |
| July 2022 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 44.25 | | | | | 44.25 | | - | - | | 44.25 | $ 39.39 | $ 1,743.01 |
| August 2022 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 21.25 | | | | | 874.00 | | - | - | | 874.00 | $ 39.39 | $ 34,426.86 |
| September 2022 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 21.25 | | | | | 21.25 | | - | - | | 21.25 | $ 39.39 | $ 837.04 |
| November 2022 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 109.75 | | | | | 109.75 | | - | - | | 109.75 | $ 39.39 | $ 4,323.05 |
| March 2023 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 449.00 | | | | | 449.00 | | - | - | | 449.00 | $ 39.39 | $ 17,686.11 |
| April 2023 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 541.75 | | | | | 541.75 | | - | - | | 541.75 | $ 39.39 | $ 21,339.53 |
| May 2023 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 94.00 | | | | | 94.00 | | - | - | | 94.00 | $ 39.39 | $ 3,702.66 |
| June 2023 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 307.00 | | | | | 307.00 | | - | - | | 307.00 | $ 40.63 | $ 12,473.41 |
| July 2023 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 122.00 | | | | | 122.00 | | - | - | | 122.00 | $ 40.63 | $ 4,956.86 |
| August 2023 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 50.50 | | | | | 50.50 | | - | - | | 50.50 | $ 40.63 | $ 2,051.82 |
| April 2024 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 261.25 | | | | | 261.25 | | - | - | | 261.25 | $ 40.63 | $ 10,614.59 |
| May 2024 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 17.00 | | | | | 17.00 | | - | - | | 17.00 | $ 40.63 | $ 690.71 |
| June 2024 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 58.75 | | | | | 58.75 | | - | - | | 58.75 | $ 42.80 | $ 2,514.50 |
| July 2024 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 56.75 | | | | | 56.75 | | - | - | | 56.75 | $ 42.80 | $ 2,428.90 |
| September 2024 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 91.25 | | | | | 91.25 | | - | - | | 91.25 | $ 42.80 | $ 3,905.50 |
| October 2024 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 120.25 | | | | | 120.25 | | - | - | | 120.25 | $ 42.80 | $ 5,146.70 |
| November 2024 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 209.75 | | | | | 209.75 | | - | - | | 209.75 | $ 42.80 | $ 8,977.30 |
| December 2024 | 25435 | 81183 | 1 | Industrial Commercial Services Inc | RCD41 | - | - | 36.25 | | | | | 36.25 | | - | - | | 36.25 | $ 42.80 | $ 1,551.50 |
| September 2022 | 25435 | 81183 | 2 | Premier Installers | RCD41 | - | - | 54.75 | | | | | 54.75 | | - | - | | 54.75 | $ 39.39 | $ 2,156.60 |
| April 2021 | 25435 | 81183 | 3 | Scott Overhead | RCD41 | - | - | 38.75 | | | | | 38.75 | | - | - | | 38.75 | $ 36.40 | $ 1,410.50 |
| October 2020 | 25435 | 81183 | 000-00 | DONNELLY THOMAS | RCP7 | | | 45.00 | 47.50 | 50.00 | 50.00 | 18.00 | 210.50 | | - | - | | 210.50 | $ 36.40 | $ 7,662.20 |
| October 2020 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 43.00 | 43.00 | 41.00 | 44.00 | 45.00 | 216.00 | | - | - | | 216.00 | $ 36.40 | $ 7,862.40 |
| November 2020 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 48.00 | 43.00 | 49.00 | 43.00 | - | 183.00 | | - | - | | 183.00 | $ 36.40 | $ 6,661.20 |
| December 2020 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 41.00 | 45.00 | 52.00 | 44.00 | 40.00 | 222.00 | | - | - | | 222.00 | $ 36.40 | $ 8,080.80 |
| October 2020 | 25435 | 81183 | 000-00 | KELLY DYLAN | RCP11 | | | 41.00 | 40.00 | 39.00 | 41.00 | 46.00 | 207.00 | | - | - | | 207.00 | $ 36.40 | $ 7,534.80 |
| November 2020 | 25435 | 81183 | 000-00 | KELLY DYLAN | RCP11 | | | 38.00 | 39.00 | 40.00 | 40.00 | - | 157.00 | | - | - | | 157.00 | $ 36.40 | $ 5,714.80 |
| December 2020 | 25435 | 81183 | 000-00 | KELLY DYLAN | RCP11 | | | 33.00 | 40.00 | 41.00 | 41.00 | 40.00 | 195.00 | | - | - | | 195.00 | $ 36.40 | $ 7,098.00 |
| October 2020 | 25435 | 81183 | 000-00 | LEER SEAN | RCP11 | | | 39.00 | 39.00 | 39.00 | 38.00 | 45.00 | 200.00 | | - | - | | 200.00 | $ 36.40 | $ 7,280.00 |
| November 2020 | 25435 | 81183 | 000-00 | LEER SEAN | RCP11 | | | 40.00 | 43.00 | 35.00 | 30.00 | - | 148.00 | | - | - | | 148.00 | $ 36.40 | $ 5,387.20 |
| December 2020 | 25435 | 81183 | 000-00 | LEER SEAN | RCP11 | | | 8.00 | 16.00 | 38.00 | 16.00 | 40.00 | 118.00 | | - | - | | 118.00 | $ 36.40 | $ 4,295.20 |
| October 2020 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | | | 44.00 | 43.00 | 44.00 | 44.00 | 59.00 | 234.00 | | - | - | | 234.00 | $ 36.40 | $ 8,517.60 |
| November 2020 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | | | 42.50 | 44.00 | 40.00 | 40.00 | - | 166.50 | | - | - | | 166.50 | $ 36.40 | $ 6,060.60 |
| December 2020 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | | | 43.00 | 50.00 | 42.00 | 46.00 | 40.00 | 221.00 | | - | - | | 221.00 | $ 36.40 | $ 8,044.40 |
| October 2020 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | | | 27.00 | 44.00 | 53.00 | 52.00 | - | 176.00 | | - | - | | 176.00 | $ 36.40 | $ 6,406.40 |
| December 2020 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | | | 45.00 | 54.00 | 54.00 | 45.00 | 40.00 | 238.00 | | - | - | | 238.00 | $ 36.40 | $ 8,663.20 |
| October 2020 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 43.00 | 47.00 | 40.00 | 50.00 | 52.50 | 232.50 | | - | - | | 232.50 | $ 36.40 | $ 8,463.00 |
| November 2020 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 44.00 | 45.00 | 49.00 | 47.00 | - | 185.00 | | - | - | | 185.00 | $ 36.40 | $ 6,734.00 |
| December 2020 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 42.00 | 43.00 | 53.00 | 45.00 | 40.00 | 223.00 | | - | - | | 223.00 | $ 36.40 | $ 8,117.20 |
| October 2020 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 44.00 | 49.00 | 45.00 | 53.00 | 61.50 | 252.50 | | - | - | | 252.50 | $ 36.40 | $ 9,191.00 |
| November 2020 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 45.00 | 49.00 | 53.00 | 53.00 | - | 200.00 | | - | - | | 200.00 | $ 36.40 | $ 7,280.00 |
| December 2020 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 42.00 | 58.00 | 58.00 | 48.00 | 40.00 | 246.00 | | - | - | | 246.00 | $ 36.40 | $ 8,954.40 |

| Month | Account Number | Rate Table | Reference Number | Name | Error Code | Total Hours Reported | Benefit Hours Reported | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Total Hours | Pension Capped Hours | Pension Discrepancy Hours | Pension Contribution Rate | Benefit Capped Hours | Benefit Discrepancy Hours | Benefit Contribution Rate | Discrepancy Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| October 2020 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | - | - | 42.00 | 40.00 | 40.00 | 32.50 | 42.00 | 196.50 | - | - | - | - | 196.50 | $ 36.40 | $ 7,152.60 |
| November 2020 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | - | - | 42.00 | 44.50 | 43.00 | 41.00 | - | 170.50 | - | - | - | - | 170.50 | $ 36.40 | $ 6,206.20 |
| December 2020 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | - | - | 40.00 | 43.00 | 44.00 | 41.00 | 40.00 | 208.00 | - | - | - | - | 208.00 | $ 36.40 | $ 7,571.20 |
| November 2020 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | - | - | - | - | 49.00 | 50.00 | - | 99.00 | - | - | - | - | 99.00 | $ 36.40 | $ 3,603.60 |
| December 2020 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | - | - | 45.00 | 55.00 | 58.00 | 52.00 | 40.00 | 250.00 | - | - | - | - | 250.00 | $ 36.40 | $ 9,100.00 |
| March 2021 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | - | - | - | 40.00 | 39.00 | 40.00 | - | 119.00 | - | - | - | - | 119.00 | $ 36.40 | $ 4,331.60 |
| April 2021 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | - | - | 41.00 | 40.00 | 41.00 | 41.00 | 35.00 | 198.00 | - | - | - | - | 198.00 | $ 36.40 | $ 7,207.20 |
| May 2021 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | - | - | 18.00 | 24.00 | 39.00 | 35.00 | - | 116.00 | - | - | - | - | 116.00 | $ 36.40 | $ 4,222.40 |
| June 2021 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | - | - | 38.00 | 33.00 | 26.00 | 27.00 | - | 124.00 | - | - | - | - | 124.00 | $ 37.88 | $ 4,697.12 |
| July 2021 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | - | - | 34.00 | 34.00 | 38.00 | 36.00 | 30.00 | 172.00 | - | - | - | - | 172.00 | $ 37.88 | $ 6,515.36 |
| August 2021 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | - | - | 31.00 | 30.00 | 32.00 | 32.00 | - | 125.00 | - | - | - | - | 125.00 | $ 37.88 | $ 4,735.00 |
| September 2021 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | - | - | 40.00 | 40.00 | 41.00 | 41.00 | - | 162.00 | - | - | - | - | 162.00 | $ 37.88 | $ 6,136.56 |
| October 2021 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | - | - | 34.00 | 34.00 | 41.00 | 42.00 | 36.00 | 187.00 | - | - | - | - | 187.00 | $ 37.88 | $ 7,083.56 |
| November 2021 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | - | - | 42.00 | 36.00 | 35.00 | 33.00 | - | 146.00 | - | - | - | - | 146.00 | $ 37.88 | $ 5,530.48 |
| December 2021 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | - | - | 40.00 | 34.00 | 42.00 | 42.00 | 17.00 | 175.00 | - | - | - | - | 175.00 | $ 37.88 | $ 6,629.00 |
| September 2021 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | - | - | 23.00 | - | - | - | - | 23.00 | - | - | - | - | 23.00 | $ 37.88 | $ 871.24 |
| October 2021 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | - | - | 43.00 | 44.00 | 45.00 | 43.00 | 37.00 | 212.00 | - | - | - | - | 212.00 | $ 37.88 | $ 8,030.56 |
| November 2021 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | - | - | 49.00 | 44.00 | 45.00 | 42.00 | - | 180.00 | - | - | - | - | 180.00 | $ 37.88 | $ 6,818.40 |
| December 2021 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | - | - | 43.00 | 41.00 | 42.00 | 43.00 | 36.00 | 205.00 | - | - | - | - | 205.00 | $ 37.88 | $ 7,765.40 |
| January 2021 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | - | - | 40.00 | 48.00 | 42.00 | 49.00 | - | 179.00 | - | - | - | - | 179.00 | $ 36.40 | $ 6,515.60 |
| February 2021 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | - | - | 44.50 | 47.00 | 40.00 | 45.00 | - | 176.50 | - | - | - | - | 176.50 | $ 36.40 | $ 6,424.60 |
| March 2021 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | - | - | 43.00 | 43.00 | 42.00 | 47.50 | - | 175.50 | - | - | - | - | 175.50 | $ 36.40 | $ 6,388.20 |
| April 2021 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | - | - | 43.00 | 47.00 | 41.00 | 49.00 | 42.00 | 222.00 | - | - | - | - | 222.00 | $ 36.40 | $ 8,080.80 |
| May 2021 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | - | - | 40.00 | 41.00 | 40.00 | 43.00 | - | 164.00 | - | - | - | - | 164.00 | $ 36.40 | $ 5,969.60 |
| June 2021 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | - | - | 41.00 | 44.00 | 42.00 | 44.00 | - | 171.00 | - | - | - | - | 171.00 | $ 37.88 | $ 6,477.48 |
| July 2021 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | - | - | 44.00 | 42.00 | 42.00 | 42.00 | 47.00 | 217.00 | - | - | - | - | 217.00 | $ 37.88 | $ 8,219.96 |
| August 2021 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | - | - | 42.00 | 42.00 | 42.00 | 48.00 | - | 174.00 | - | - | - | - | 174.00 | $ 37.88 | $ 6,591.12 |
| September 2021 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | - | - | 44.00 | 44.00 | 41.00 | 40.00 | - | 169.00 | - | - | - | - | 169.00 | $ 37.88 | $ 6,401.72 |
| October 2021 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | - | - | 42.00 | 44.00 | 42.00 | 42.00 | 43.00 | 213.00 | - | - | - | - | 213.00 | $ 37.88 | $ 8,068.44 |
| November 2021 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | - | - | 49.00 | 45.00 | 40.00 | 51.00 | - | 185.00 | - | - | - | - | 185.00 | $ 37.88 | $ 7,007.80 |
| December 2021 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | - | - | 40.00 | 46.00 | 48.00 | 50.00 | 42.00 | 226.00 | - | - | - | - | 226.00 | $ 37.88 | $ 8,560.88 |
| January 2021 | 25435 | 81183 | 000-00 | KELLY DYLAN | RCP11 | - | - | 40.00 | 40.00 | 45.00 | 40.00 | - | 165.00 | - | - | - | - | 165.00 | $ 36.40 | $ 6,006.00 |
| February 2021 | 25435 | 81183 | 000-00 | KELLY DYLAN | RCP11 | - | - | 40.00 | 40.00 | 40.00 | 42.00 | - | 162.00 | - | - | - | - | 162.00 | $ 36.40 | $ 5,896.80 |
| March 2021 | 25435 | 81183 | 000-00 | KELLY DYLAN | RCP11 | - | - | 41.00 | 41.00 | 40.00 | 40.00 | - | 162.00 | - | - | - | - | 162.00 | $ 36.40 | $ 5,896.80 |
| April 2021 | 25435 | 81183 | 000-00 | KELLY DYLAN | RCP11 | - | - | 41.00 | 42.00 | 40.00 | 38.00 | 38.00 | 199.00 | - | - | - | - | 199.00 | $ 36.40 | $ 7,243.60 |
| May 2021 | 25435 | 81183 | 000-00 | KELLY DYLAN | RCP11 | - | - | 42.00 | 40.00 | 39.00 | 42.00 | - | 163.00 | - | - | - | - | 163.00 | $ 36.40 | $ 5,933.20 |
| June 2021 | 25435 | 81183 | 000-00 | KELLY DYLAN | RCP11 | - | - | 38.00 | 41.00 | 40.00 | 47.00 | - | 166.00 | - | - | - | - | 166.00 | $ 37.88 | $ 6,288.08 |
| July 2021 | 25435 | 81183 | 000-00 | KELLY DYLAN | RCP11 | - | - | 40.00 | 33.00 | 40.00 | 40.00 | 41.00 | 194.00 | - | - | - | - | 194.00 | $ 37.88 | $ 7,348.72 |
| August 2021 | 25435 | 81183 | 000-00 | KELLY DYLAN | RCP11 | - | - | 40.00 | 40.00 | 40.00 | 40.00 | - | 160.00 | - | - | - | - | 160.00 | $ 37.88 | $ 6,060.80 |
| September 2021 | 25435 | 81183 | 000-00 | KELLY DYLAN | RCP11 | - | - | 40.00 | 40.00 | 40.00 | 40.00 | - | 160.00 | - | - | - | - | 160.00 | $ 37.88 | $ 6,060.80 |
| October 2021 | 25435 | 81183 | 000-00 | KELLY DYLAN | RCP11 | - | - | 40.00 | 41.00 | 42.00 | 40.00 | 41.00 | 204.00 | - | - | - | - | 204.00 | $ 37.88 | $ 7,727.52 |
| November 2021 | 25435 | 81183 | 000-00 | KELLY DYLAN | RCP11 | - | - | 42.00 | 40.00 | 45.00 | 40.00 | - | 167.00 | - | - | - | - | 167.00 | $ 37.88 | $ 6,325.96 |
| December 2021 | 25435 | 81183 | 000-00 | KELLY DYLAN | RCP11 | - | - | 42.00 | 41.00 | 42.00 | 40.00 | 36.00 | 201.00 | - | - | - | - | 201.00 | $ 37.88 | $ 7,613.88 |
| January 2021 | 25435 | 81183 | 000-00 | LEER SEAN | RCP11 | - | - | - | 28.00 | 23.00 | 30.00 | - | 81.00 | - | - | - | - | 81.00 | $ 36.40 | $ 2,948.40 |
| February 2021 | 25435 | 81183 | 000-00 | LEER SEAN | RCP11 | - | - | 38.00 | 38.00 | 31.00 | 37.00 | - | 144.00 | - | - | - | - | 144.00 | $ 36.40 | $ 5,241.60 |
| January 2021 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 40.00 | 46.00 | 45.00 | 44.00 | - | 177.00 | - | - | - | - | 177.00 | $ 36.40 | $ 6,442.80 |
| February 2021 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 40.00 | 42.00 | 40.00 | 44.00 | - | 169.00 | - | - | - | - | 169.00 | $ 36.40 | $ 6,151.60 |
| March 2021 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 53.00 | 44.00 | 38.00 | 44.00 | - | 179.00 | - | - | - | - | 179.00 | $ 36.40 | $ 6,515.60 |
| April 2021 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 34.00 | 46.00 | 42.00 | 42.00 | 41.00 | 205.50 | - | - | - | - | 205.50 | $ 36.40 | $ 7,480.20 |
| May 2021 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 45.00 | 43.50 | 41.00 | 44.00 | - | 173.50 | - | - | - | - | 173.50 | $ 36.40 | $ 6,315.40 |
| June 2021 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 44.00 | 42.00 | 43.00 | 45.00 | - | 174.00 | - | - | - | - | 174.00 | $ 37.88 | $ 6,591.12 |
| July 2021 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 42.00 | 42.00 | 42.00 | 42.00 | 39.00 | 207.00 | - | - | - | - | 207.00 | $ 37.88 | $ 7,841.16 |
| August 2021 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 43.00 | 42.00 | 45.00 | 43.00 | - | 173.00 | - | - | - | - | 173.00 | $ 37.88 | $ 6,553.24 |
| September 2021 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 42.00 | 42.00 | 42.00 | 42.00 | - | 168.00 | - | - | - | - | 168.00 | $ 37.88 | $ 6,363.84 |
| October 2021 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 41.00 | 42.00 | 42.00 | 41.00 | 42.00 | 206.00 | - | - | - | - | 206.00 | $ 37.88 | $ 7,803.28 |
| November 2021 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 36.00 | 42.00 | 36.00 | 38.00 | - | 152.00 | - | - | - | - | 152.00 | $ 37.88 | $ 5,757.76 |
| December 2021 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 40.00 | 38.00 | 44.00 | 44.00 | 42.00 | 208.00 | - | - | - | - | 208.00 | $ 37.88 | $ 7,879.04 |
| January 2021 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | - | - | 40.00 | 46.00 | 49.00 | 52.00 | - | 187.00 | - | - | - | - | 187.00 | $ 36.40 | $ 6,806.80 |
| February 2021 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | - | - | 46.00 | 47.00 | 45.00 | 46.00 | - | 184.00 | - | - | - | - | 184.00 | $ 36.40 | $ 6,697.60 |

| Month | Account Number | Rate Table | Reference Number | Name | Error Code | Total Hours Reported | Benefit Hours Reported | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Total Hours | Pension Capped Hours | Pension Discrepancy Hours | Pension Contribution Rate | Benefit Capped Hours | Benefit Discrepancy Hours | Benefit Contribution Rate | Discrepancy Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| March 2021 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | | | 56.00 | 46.00 | 47.00 | 55.00 | - | 204.00 | - | - | - | | 204.00 | $ 36.40 | $ 7,425.60 |
| April 2021 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | | | 51.00 | 46.00 | 45.00 | 45.50 | 49.00 | 236.50 | - | - | - | | 236.50 | $ 36.40 | $ 8,608.60 |
| May 2021 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | | | 46.00 | 46.00 | 43.00 | 46.00 | - | 181.00 | - | - | - | | 181.00 | $ 36.40 | $ 6,588.40 |
| June 2021 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | | | 43.00 | 44.00 | 45.00 | 55.50 | - | 187.50 | - | - | - | | 187.50 | $ 37.88 | $ 7,102.50 |
| July 2021 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | | | 44.00 | 45.00 | 45.00 | 46.00 | 45.00 | 225.00 | - | - | - | | 225.00 | $ 37.88 | $ 8,523.00 |
| August 2021 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | | | 45.00 | 48.00 | 45.00 | 50.00 | - | 188.00 | - | - | - | | 188.00 | $ 37.88 | $ 7,121.44 |
| September 2021 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | | | 46.00 | 48.00 | 50.00 | 46.00 | - | 190.00 | - | - | - | | 190.00 | $ 37.88 | $ 7,197.20 |
| October 2021 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | | | 46.00 | 47.00 | 43.00 | 45.00 | 47.00 | 228.00 | - | - | - | | 228.00 | $ 37.88 | $ 8,636.64 |
| November 2021 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | | | 47.00 | 42.00 | 51.00 | 50.00 | - | 190.00 | - | - | - | | 190.00 | $ 37.88 | $ 7,197.20 |
| December 2021 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | | | 45.00 | 45.00 | 48.00 | 52.00 | 37.00 | 222.00 | - | - | - | | 222.00 | $ 37.88 | $ 8,409.36 |
| December 2021 | 25435 | 81183 | 000-00 | MCCARTNEY AUSTIN | RCP11 | | | - | - | - | 25.00 | 40.00 | 65.00 | - | - | - | | 65.00 | $ 37.88 | $ 2,462.20 |
| January 2021 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 40.00 | 50.00 | 43.00 | 47.00 | - | 180.00 | - | - | - | | 180.00 | $ 36.40 | $ 6,552.00 |
| February 2021 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 50.00 | 40.00 | 40.00 | 49.00 | - | 179.00 | - | - | - | | 179.00 | $ 36.40 | $ 6,515.60 |
| March 2021 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 58.00 | 46.00 | 46.00 | 48.00 | - | 198.00 | - | - | - | | 198.00 | $ 36.40 | $ 7,207.20 |
| April 2021 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 45.00 | 47.00 | 51.00 | 46.00 | 46.00 | 235.00 | - | - | - | | 235.00 | $ 36.40 | $ 8,554.00 |
| May 2021 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 45.00 | 40.00 | 42.00 | 46.00 | - | 173.00 | - | - | - | | 173.00 | $ 36.40 | $ 6,297.20 |
| June 2021 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 33.00 | 44.00 | 44.00 | 46.00 | - | 167.00 | - | - | - | | 167.00 | $ 37.88 | $ 6,325.96 |
| July 2021 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 45.00 | 42.00 | 42.00 | 46.00 | 47.00 | 222.00 | - | - | - | | 222.00 | $ 37.88 | $ 8,409.36 |
| August 2021 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 47.00 | 51.00 | 45.00 | 49.00 | - | 192.00 | - | - | - | | 192.00 | $ 37.88 | $ 7,272.96 |
| September 2021 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 47.00 | 46.00 | 47.00 | 43.00 | - | 183.00 | - | - | - | | 183.00 | $ 37.88 | $ 6,932.04 |
| October 2021 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 43.00 | 45.00 | 43.00 | 42.00 | 44.00 | 217.00 | - | - | - | | 217.00 | $ 37.88 | $ 8,219.96 |
| November 2021 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 40.00 | 43.00 | 46.00 | 43.50 | - | 172.50 | - | - | - | | 172.50 | $ 37.88 | $ 6,534.30 |
| December 2021 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 40.00 | 40.00 | 40.00 | 52.00 | 36.00 | 208.00 | - | - | - | | 208.00 | $ 37.88 | $ 7,879.04 |
| January 2021 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 40.00 | 55.00 | 44.00 | 49.00 | - | 188.00 | - | - | - | | 188.00 | $ 36.40 | $ 6,843.20 |
| February 2021 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 40.00 | 40.00 | 40.00 | 45.00 | - | 165.00 | - | - | - | | 165.00 | $ 36.40 | $ 6,006.00 |
| March 2021 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 40.00 | 51.00 | 50.00 | 53.00 | - | 194.00 | - | - | - | | 194.00 | $ 36.40 | $ 7,061.60 |
| April 2021 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 51.00 | 49.00 | 50.00 | 46.00 | 52.00 | 248.00 | - | - | - | | 248.00 | $ 36.40 | $ 9,027.20 |
| May 2021 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 46.00 | 45.00 | 43.00 | 46.50 | - | 180.50 | - | - | - | | 180.50 | $ 36.40 | $ 6,570.20 |
| June 2021 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 43.00 | 53.00 | 44.00 | 47.00 | - | 187.00 | - | - | - | | 187.00 | $ 37.88 | $ 7,083.56 |
| July 2021 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 45.00 | 42.00 | 44.00 | 44.00 | 52.00 | 227.00 | - | - | - | | 227.00 | $ 37.88 | $ 8,598.76 |
| August 2021 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 47.00 | 48.00 | 44.00 | 45.00 | - | 184.00 | - | - | - | | 184.00 | $ 37.88 | $ 6,969.92 |
| September 2021 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 45.00 | 44.00 | 46.00 | 46.00 | - | 181.00 | - | - | - | | 181.00 | $ 37.88 | $ 6,856.28 |
| October 2021 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 43.00 | 45.00 | 46.00 | 45.00 | 48.00 | 227.00 | - | - | - | | 227.00 | $ 37.88 | $ 8,598.76 |
| November 2021 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 55.00 | 46.00 | 51.00 | 53.00 | - | 205.00 | - | - | - | | 205.00 | $ 37.88 | $ 7,765.40 |
| December 2021 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 40.00 | 52.00 | 61.00 | 54.00 | 40.00 | 247.00 | - | - | - | | 247.00 | $ 37.88 | $ 9,356.36 |
| April 2021 | 25435 | 81183 | 000-00 | STANTON CHRISTOPHER | RCP11 | | | - | - | - | 27.00 | 40.00 | 67.00 | - | - | - | | 67.00 | $ 36.40 | $ 2,438.80 |
| May 2021 | 25435 | 81183 | 000-00 | STANTON CHRISTOPHER | RCP11 | | | 45.00 | 46.00 | 41.00 | 41.00 | - | 173.00 | - | - | - | | 173.00 | $ 36.40 | $ 6,297.20 |
| June 2021 | 25435 | 81183 | 000-00 | STANTON CHRISTOPHER | RCP11 | | | 42.00 | 44.00 | 45.00 | 55.50 | - | 186.50 | - | - | - | | 186.50 | $ 37.88 | $ 7,064.62 |
| July 2021 | 25435 | 81183 | 000-00 | STANTON CHRISTOPHER | RCP11 | | | 45.00 | 43.00 | 41.00 | 41.00 | 42.00 | 212.00 | - | - | - | | 212.00 | $ 37.88 | $ 8,030.56 |
| August 2021 | 25435 | 81183 | 000-00 | STANTON CHRISTOPHER | RCP11 | | | 43.00 | 33.00 | 40.00 | 42.00 | 42.00 | 167.00 | - | - | - | | 167.00 | $ 37.88 | $ 6,325.96 |
| September 2021 | 25435 | 81183 | 000-00 | STANTON CHRISTOPHER | RCP11 | | | 42.00 | 33.00 | 40.00 | 17.00 | - | 132.00 | - | - | - | | 132.00 | $ 37.88 | $ 5,000.16 |
| March 2021 | 25435 | 81183 | 000-00 | STAWYCHEY RYAN | RCP11 | | | - | 27.00 | 40.00 | 40.00 | - | 107.00 | - | - | - | | 107.00 | $ 36.40 | $ 3,894.80 |
| April 2021 | 25435 | 81183 | 000-00 | STAWYCHEY RYAN | RCP11 | | | 40.00 | 42.00 | 44.00 | 44.00 | 46.00 | 216.00 | - | - | - | | 216.00 | $ 36.40 | $ 7,862.40 |
| May 2021 | 25435 | 81183 | 000-00 | STAWYCHEY RYAN | RCP11 | | | 45.00 | 42.50 | 41.00 | 45.00 | - | 173.50 | - | - | - | | 173.50 | $ 36.40 | $ 6,315.40 |
| June 2021 | 25435 | 81183 | 000-00 | STAWYCHEY RYAN | RCP11 | | | 42.00 | 43.00 | 48.00 | 45.00 | - | 178.00 | - | - | - | | 178.00 | $ 37.88 | $ 6,742.64 |
| July 2021 | 25435 | 81183 | 000-00 | STAWYCHEY RYAN | RCP11 | | | 48.00 | 41.00 | 16.00 | - | - | 105.00 | - | - | - | | 105.00 | $ 37.88 | $ 3,977.40 |
| January 2021 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 40.00 | 42.00 | 42.00 | 41.00 | - | 165.00 | - | - | - | | 165.00 | $ 36.40 | $ 6,006.00 |
| February 2021 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 44.00 | 40.00 | 40.00 | 42.00 | - | 166.00 | - | - | - | | 166.00 | $ 36.40 | $ 6,042.40 |
| March 2021 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 45.00 | 43.00 | 42.00 | 41.00 | - | 171.00 | - | - | - | | 171.00 | $ 36.40 | $ 6,224.40 |
| April 2021 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 44.00 | 43.00 | 42.00 | 41.00 | 42.00 | 212.00 | - | - | - | | 212.00 | $ 36.40 | $ 7,716.80 |
| May 2021 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 42.00 | 41.00 | 40.00 | 40.00 | - | 163.00 | - | - | - | | 163.00 | $ 36.40 | $ 5,933.20 |
| June 2021 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 40.00 | 42.00 | 40.00 | 43.00 | - | 165.00 | - | - | - | | 165.00 | $ 37.88 | $ 6,250.20 |
| July 2021 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 42.00 | 40.00 | 42.00 | 42.00 | 42.00 | 208.00 | - | - | - | | 208.00 | $ 37.88 | $ 7,879.04 |
| August 2021 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 42.00 | 40.00 | 42.00 | 41.00 | - | 165.00 | - | - | - | | 165.00 | $ 37.88 | $ 6,250.20 |
| September 2021 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 41.50 | 43.00 | 43.00 | 42.00 | - | 169.50 | - | - | - | | 169.50 | $ 37.88 | $ 6,420.66 |
| October 2021 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 40.00 | 42.00 | 43.00 | 43.00 | 44.00 | 212.00 | - | - | - | | 212.00 | $ 37.88 | $ 8,030.56 |
| November 2021 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 40.00 | 42.00 | 43.00 | 43.00 | - | 168.00 | - | - | - | | 168.00 | $ 37.88 | $ 6,363.84 |
| December 2021 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 40.00 | 43.00 | 50.00 | 42.00 | 40.00 | 215.00 | - | - | - | | 215.00 | $ 37.88 | $ 8,144.20 |
| July 2021 | 25435 | 81183 | 000-00 | TORKELSEN ZACHARY | RCP11 | | | - | - | - | 29.00 | 45.00 | 74.00 | - | - | - | | 74.00 | $ 37.88 | $ 2,803.12 |

| Month | Account Number | Rate Table | Reference Number | Name | Error Code | Total Hours Reported | Benefit Hours Reported | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Total Hours | Pension Capped Hours | Pension Discrepancy Hours | Pension Contribution Rate | Benefit Capped Hours | Benefit Discrepancy Hours | Benefit Contribution Rate | Discrepancy Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| August 2021 | 25435 | 81183 | 000-00 | TORKELSEN ZACHARY | RCP11 | | | 45.00 | 48.00 | 46.00 | 49.00 | - | 188.00 | - | - | - | - | 188.00 | $ 37.88 | $ 7,121.44 |
| September 2021 | 25435 | 81183 | 000-00 | TORKELSEN ZACHARY | RCP11 | | | 45.00 | 46.00 | 47.00 | 46.00 | - | 184.00 | - | - | - | - | 184.00 | $ 37.88 | $ 6,969.92 |
| October 2021 | 25435 | 81183 | 000-00 | TORKELSEN ZACHARY | RCP11 | | | 46.00 | 46.00 | 45.00 | 48.00 | 37.00 | 222.00 | - | - | - | - | 222.00 | $ 37.88 | $ 8,409.36 |
| November 2021 | 25435 | 81183 | 000-00 | TORKELSEN ZACHARY | RCP11 | | | 47.00 | 40.00 | 45.00 | 44.00 | - | 176.00 | - | - | - | - | 176.00 | $ 37.88 | $ 6,666.88 |
| December 2021 | 25435 | 81183 | 000-00 | TORKELSEN ZACHARY | RCP11 | | | 40.00 | 44.00 | 53.00 | 51.00 | 36.00 | 224.00 | - | - | - | - | 224.00 | $ 37.88 | $ 8,485.12 |
| January 2021 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 40.00 | 57.00 | 48.00 | 53.00 | - | 198.00 | - | - | - | - | 198.00 | $ 36.40 | $ 7,207.20 |
| February 2021 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 52.50 | 36.50 | 40.00 | 45.00 | - | 174.00 | - | - | - | - | 174.00 | $ 36.40 | $ 6,333.60 |
| March 2021 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 46.00 | 46.00 | 44.50 | 56.00 | - | 192.50 | - | - | - | - | 192.50 | $ 36.40 | $ 7,007.00 |
| April 2021 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 53.00 | 46.00 | 43.00 | 44.00 | 49.00 | 235.00 | - | - | - | - | 235.00 | $ 36.40 | $ 8,554.00 |
| May 2021 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 42.00 | 40.50 | 41.50 | 46.00 | - | 170.00 | - | - | - | - | 170.00 | $ 36.40 | $ 6,188.00 |
| June 2021 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 42.00 | 41.00 | 43.00 | 45.00 | - | 171.50 | - | - | - | - | 171.50 | $ 37.88 | $ 6,496.42 |
| July 2021 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 48.00 | 42.00 | 42.00 | 43.00 | 49.00 | 224.00 | - | - | - | - | 224.00 | $ 37.88 | $ 8,485.12 |
| August 2021 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 45.00 | 45.00 | 46.00 | 45.00 | - | 181.00 | - | - | - | - | 181.00 | $ 37.88 | $ 6,856.28 |
| September 2021 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 45.00 | 46.00 | 46.00 | 44.00 | - | 181.00 | - | - | - | - | 181.00 | $ 37.88 | $ 6,856.28 |
| October 2021 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 47.00 | 45.00 | 40.00 | 42.00 | 42.00 | 216.00 | - | - | - | - | 216.00 | $ 37.88 | $ 8,182.08 |
| November 2021 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 47.00 | 42.00 | 44.00 | 45.00 | - | 178.00 | - | - | - | - | 178.00 | $ 37.88 | $ 6,742.64 |
| December 2021 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 40.00 | 51.00 | 53.00 | 52.00 | 36.00 | 232.00 | - | - | - | - | 232.00 | $ 37.88 | $ 8,788.16 |
| January 2022 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 40.00 | 41.00 | 40.00 | 43.00 | - | 164.00 | - | - | - | - | 164.00 | $ 37.88 | $ 6,212.32 |
| February 2022 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 42.00 | 41.00 | 40.00 | 41.00 | - | 164.00 | - | - | - | - | 164.00 | $ 37.88 | $ 6,212.32 |
| March 2022 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 26.00 | 27.00 | 41.00 | 35.00 | - | 129.00 | - | - | - | - | 129.00 | $ 37.88 | $ 4,886.52 |
| April 2022 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 35.00 | 35.00 | 40.00 | 41.00 | - | 187.00 | - | - | - | - | 187.00 | $ 37.88 | $ 7,083.56 |
| May 2022 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 34.00 | 32.00 | 32.00 | 34.00 | - | 132.00 | - | - | - | - | 132.00 | $ 37.88 | $ 5,000.16 |
| June 2022 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 40.00 | 42.00 | 34.00 | 42.00 | - | 156.00 | - | - | - | - | 156.00 | $ 39.39 | $ 6,144.84 |
| July 2022 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 38.00 | 40.00 | 32.00 | 43.00 | 42.00 | 195.00 | - | - | - | - | 195.00 | $ 39.39 | $ 7,681.05 |
| August 2022 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 41.00 | 36.00 | 35.00 | 35.00 | - | 147.00 | - | - | - | - | 147.00 | $ 39.39 | $ 5,790.33 |
| September 2022 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 37.00 | 36.00 | 42.00 | 43.00 | 36.00 | 194.00 | - | - | - | - | 194.00 | $ 39.39 | $ 7,641.66 |
| October 2022 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 37.00 | 36.00 | 37.00 | 38.00 | - | 148.00 | - | - | - | - | 148.00 | $ 39.39 | $ 5,829.72 |
| November 2022 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 43.00 | 42.00 | 45.00 | 18.00 | - | 148.00 | - | - | - | - | 148.00 | $ 39.39 | $ 5,829.72 |
| December 2022 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 35.00 | 46.00 | 42.00 | 44.00 | 40.00 | 207.00 | - | - | - | - | 207.00 | $ 39.39 | $ 8,153.73 |
| October 2022 | 25435 | 81183 | 000-00 | DEANGELES TYLER | RCP11 | | | - | 24.00 | 44.00 | 45.00 | - | 113.00 | - | - | - | - | 113.00 | $ 39.39 | $ 4,451.07 |
| November 2022 | 25435 | 81183 | 000-00 | DEANGELES TYLER | RCP11 | | | 38.00 | 42.50 | 40.00 | 40.00 | - | 160.50 | - | - | - | - | 160.50 | $ 39.39 | $ 6,322.10 |
| December 2022 | 25435 | 81183 | 000-00 | DEANGELES TYLER | RCP11 | | | 31.00 | 40.00 | 35.00 | 35.00 | - | 106.00 | - | - | - | - | 106.00 | $ 39.39 | $ 4,175.34 |
| January 2022 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 47.00 | 47.00 | 42.00 | 42.00 | - | 178.00 | - | - | - | - | 178.00 | $ 37.88 | $ 6,742.64 |
| February 2022 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 41.00 | 43.00 | 42.00 | 42.00 | - | 168.00 | - | - | - | - | 168.00 | $ 37.88 | $ 6,363.84 |
| March 2022 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 42.00 | 43.00 | 41.00 | 42.00 | - | 168.00 | - | - | - | - | 168.00 | $ 37.88 | $ 6,363.84 |
| April 2022 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 40.00 | 42.00 | 41.00 | 46.00 | 40.00 | 209.00 | - | - | - | - | 209.00 | $ 37.88 | $ 7,916.92 |
| May 2022 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 42.00 | 41.00 | 41.00 | 41.00 | - | 165.00 | - | - | - | - | 165.00 | $ 37.88 | $ 6,250.20 |
| June 2022 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 41.00 | 42.00 | 43.00 | 43.00 | - | 169.00 | - | - | - | - | 169.00 | $ 39.39 | $ 6,656.91 |
| July 2022 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 40.00 | 41.00 | 40.00 | 36.00 | 43.00 | 200.00 | - | - | - | - | 200.00 | $ 39.39 | $ 7,878.00 |
| August 2022 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 41.00 | 41.00 | 42.00 | 42.00 | - | 166.00 | - | - | - | - | 166.00 | $ 39.39 | $ 6,538.74 |
| September 2022 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 43.00 | 41.00 | 42.00 | 42.00 | 41.00 | 209.00 | - | - | - | - | 209.00 | $ 39.39 | $ 8,232.51 |
| October 2022 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 43.00 | 42.00 | 36.00 | 42.00 | - | 163.00 | - | - | - | - | 163.00 | $ 39.39 | $ 6,420.57 |
| November 2022 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 35.00 | 41.00 | 43.00 | 43.00 | - | 162.00 | - | - | - | - | 162.00 | $ 39.39 | $ 6,381.18 |
| December 2022 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 34.00 | 32.00 | 49.00 | 45.00 | 40.00 | 200.00 | - | - | - | - | 200.00 | $ 39.39 | $ 7,878.00 |
| January 2022 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 40.00 | 50.00 | 40.00 | 45.00 | - | 175.00 | - | - | - | - | 175.00 | $ 37.88 | $ 6,629.00 |
| February 2022 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 40.00 | 53.00 | 45.00 | 51.00 | - | 189.00 | - | - | - | - | 189.00 | $ 37.88 | $ 7,159.32 |
| March 2022 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 45.00 | 47.00 | 43.00 | 49.00 | - | 184.00 | - | - | - | - | 184.00 | $ 37.88 | $ 6,969.92 |
| April 2022 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 43.00 | 48.00 | 44.00 | 47.00 | 45.00 | 227.00 | - | - | - | - | 227.00 | $ 37.88 | $ 8,598.76 |
| May 2022 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 44.00 | 49.00 | 50.00 | 46.00 | - | 189.00 | - | - | - | - | 189.00 | $ 37.88 | $ 7,159.32 |
| June 2022 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 42.00 | 43.00 | 48.00 | 45.00 | - | 178.00 | - | - | - | - | 178.00 | $ 39.39 | $ 7,011.42 |
| July 2022 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 50.00 | 45.00 | 51.00 | 45.00 | 48.00 | 239.00 | - | - | - | - | 239.00 | $ 39.39 | $ 9,414.21 |
| August 2022 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 48.00 | 46.00 | 47.00 | 44.00 | - | 183.00 | - | - | - | - | 183.00 | $ 39.39 | $ 7,208.37 |
| September 2022 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 48.00 | 45.00 | 45.00 | 53.00 | 47.00 | 238.00 | - | - | - | - | 238.00 | $ 39.39 | $ 9,374.82 |
| October 2022 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 50.00 | 46.00 | 54.00 | 45.00 | - | 195.00 | - | - | - | - | 195.00 | $ 39.39 | $ 7,681.05 |
| November 2022 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 46.00 | 44.00 | 52.00 | 44.00 | - | 186.00 | - | - | - | - | 186.00 | $ 39.39 | $ 7,326.54 |
| December 2022 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 55.00 | 38.00 | 51.00 | 46.00 | 40.00 | 230.00 | - | - | - | - | 230.00 | $ 39.39 | $ 9,059.70 |
| January 2022 | 25435 | 81183 | 000-00 | KELLY DYLAN | RCP11 | | | 40.00 | 47.00 | 40.00 | 43.00 | - | 170.00 | - | - | - | - | 170.00 | $ 37.88 | $ 6,439.60 |
| February 2022 | 25435 | 81183 | 000-00 | KELLY DYLAN | RCP11 | | | 42.00 | 49.00 | 42.00 | 48.00 | - | 181.00 | - | - | - | - | 181.00 | $ 37.88 | $ 6,856.28 |
| March 2022 | 25435 | 81183 | 000-00 | KELLY DYLAN | RCP11 | | | 42.00 | 40.00 | 40.00 | 40.00 | - | 162.00 | - | - | - | - | 162.00 | $ 37.88 | $ 6,136.56 |

| Month | Account Number | Rate Table | Reference Number | Name | Error Code | Total Hours Reported | Benefit Hours Reported | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Total Hours | Pension Capped Hours | Pension Discrepancy Hours | Pension Contribution Rate | Benefit Capped Hours | Benefit Discrepancy Hours | Benefit Contribution Rate | Discrepancy Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| April 2022 | 25435 | 81183 | 000-00 | KELLY DYLAN | RCP11 | - | - | 42.00 | 40.00 | - | - | - | 82.00 | - | - | - | - | 82.00 | $ 37.88 | $ 3,106.16 |
| January 2022 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 51.00 | 45.00 | 45.00 | 43.00 | - | 184.00 | - | - | - | - | 184.00 | $ 37.88 | $ 6,969.92 |
| February 2022 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 42.00 | 43.00 | 42.00 | 42.00 | - | 169.00 | - | - | - | - | 169.00 | $ 37.88 | $ 6,401.72 |
| March 2022 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 40.00 | 43.00 | 43.00 | 40.00 | - | 166.00 | - | - | - | - | 166.00 | $ 37.88 | $ 6,288.08 |
| April 2022 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 36.00 | 40.00 | 46.00 | 38.00 | 51.00 | 211.00 | - | - | - | - | 211.00 | $ 37.88 | $ 7,992.68 |
| May 2022 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 40.00 | 44.00 | 40.00 | 48.00 | - | 172.00 | - | - | - | - | 172.00 | $ 37.88 | $ 6,515.36 |
| June 2022 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 43.00 | 48.00 | 36.00 | 16.00 | - | 143.00 | - | - | - | - | 143.00 | $ 39.39 | $ 5,632.77 |
| July 2022 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 28.00 | 43.00 | 45.00 | 45.00 | 38.00 | 199.00 | - | - | - | - | 199.00 | $ 39.39 | $ 7,838.61 |
| August 2022 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 43.00 | 37.00 | 43.00 | 44.00 | - | 167.00 | - | - | - | - | 167.00 | $ 39.39 | $ 6,578.13 |
| September 2022 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 50.00 | 44.00 | 45.50 | 46.00 | 36.00 | 221.50 | - | - | - | - | 221.50 | $ 39.39 | $ 8,724.89 |
| October 2022 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 50.00 | 47.00 | 40.00 | 51.00 | - | 188.00 | - | - | - | - | 188.00 | $ 39.39 | $ 7,405.32 |
| November 2022 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 26.00 | 28.00 | 46.00 | 18.00 | - | 118.00 | - | - | - | - | 118.00 | $ 39.39 | $ 4,648.02 |
| December 2022 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | - | - | 35.00 | 50.00 | 45.00 | 50.00 | 42.00 | 222.00 | - | - | - | - | 222.00 | $ 39.39 | $ 8,744.58 |
| January 2022 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | - | - | 55.00 | 53.00 | 53.00 | 50.00 | - | 211.00 | - | - | - | - | 211.00 | $ 37.88 | $ 7,992.68 |
| February 2022 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | - | - | 48.00 | 54.00 | 48.00 | 55.00 | - | 205.00 | - | - | - | - | 205.00 | $ 37.88 | $ 7,765.40 |
| March 2022 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | - | - | 50.00 | 52.00 | 48.00 | 48.00 | - | 198.00 | - | - | - | - | 198.00 | $ 37.88 | $ 7,500.24 |
| April 2022 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | - | - | 53.00 | 55.00 | 56.00 | 47.00 | 54.00 | 265.00 | - | - | - | - | 265.00 | $ 37.88 | $ 10,038.20 |
| May 2022 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | - | - | 49.00 | 52.00 | 47.00 | 47.00 | - | 195.00 | - | - | - | - | 195.00 | $ 37.88 | $ 7,386.60 |
| June 2022 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | - | - | 43.00 | 50.00 | 47.00 | 51.00 | - | 191.00 | - | - | - | - | 191.00 | $ 39.39 | $ 7,523.49 |
| July 2022 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | - | - | 50.00 | 45.00 | 43.00 | 50.00 | 42.00 | 230.00 | - | - | - | - | 230.00 | $ 39.39 | $ 9,059.70 |
| August 2022 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | - | - | 47.00 | 50.00 | 47.00 | 44.00 | - | 188.00 | - | - | - | - | 188.00 | $ 39.39 | $ 7,405.32 |
| September 2022 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | - | - | 46.00 | 43.00 | 52.00 | 47.00 | 52.00 | 240.00 | - | - | - | - | 240.00 | $ 39.39 | $ 9,453.60 |
| October 2022 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | - | - | 55.00 | 55.00 | 33.00 | - | - | 143.00 | - | - | - | - | 143.00 | $ 39.39 | $ 5,632.77 |
| January 2022 | 25435 | 81183 | 000-00 | MCCARTNEY AUSTIN | RCP11 | - | - | 43.00 | 36.00 | 40.00 | 43.00 | - | 162.00 | - | - | - | - | 162.00 | $ 37.88 | $ 6,136.56 |
| February 2022 | 25435 | 81183 | 000-00 | MCCARTNEY AUSTIN | RCP11 | - | - | 50.00 | 36.00 | 44.00 | 46.00 | - | 169.00 | - | - | - | - | 169.00 | $ 37.88 | $ 6,401.72 |
| March 2022 | 25435 | 81183 | 000-00 | MCCARTNEY AUSTIN | RCP11 | - | - | 44.00 | 25.00 | - | - | - | 69.00 | - | - | - | - | 69.00 | $ 37.88 | $ 2,613.72 |
| May 2022 | 25435 | 81183 | 000-00 | POOLE ERIC | RCP11 | - | - | - | - | - | 27.00 | - | 27.00 | - | - | - | - | 27.00 | $ 39.39 | $ 1,022.76 |
| June 2022 | 25435 | 81183 | 000-00 | POOLE ERIC | RCP11 | - | - | 40.00 | 46.00 | 54.00 | 47.00 | - | 187.00 | - | - | - | - | 187.00 | $ 39.39 | $ 7,365.93 |
| July 2022 | 25435 | 81183 | 000-00 | POOLE ERIC | RCP11 | - | - | 44.00 | 44.00 | 43.00 | 40.00 | 50.00 | 221.00 | - | - | - | - | 221.00 | $ 39.39 | $ 8,705.19 |
| August 2022 | 25435 | 81183 | 000-00 | POOLE ERIC | RCP11 | - | - | 51.00 | 47.00 | 46.00 | 53.00 | - | 197.00 | - | - | - | - | 197.00 | $ 39.39 | $ 7,759.83 |
| September 2022 | 25435 | 81183 | 000-00 | POOLE ERIC | RCP11 | - | - | 46.00 | 45.00 | 45.00 | 45.00 | 50.00 | 231.00 | - | - | - | - | 231.00 | $ 39.39 | $ 9,099.09 |
| October 2022 | 25435 | 81183 | 000-00 | POOLE ERIC | RCP11 | - | - | 47.00 | 50.00 | 43.00 | 44.00 | - | 184.00 | - | - | - | - | 184.00 | $ 39.39 | $ 7,247.76 |
| November 2022 | 25435 | 81183 | 000-00 | POOLE ERIC | RCP11 | - | - | 49.00 | 45.00 | 51.00 | 50.00 | - | 195.00 | - | - | - | - | 195.00 | $ 39.39 | $ 7,681.05 |
| December 2022 | 25435 | 81183 | 000-00 | POOLE ERIC | RCP11 | - | - | 40.00 | 45.00 | 51.00 | 51.00 | 49.00 | 236.00 | - | - | - | - | 236.00 | $ 39.39 | $ 9,296.04 |
| January 2022 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | - | - | 51.00 | 49.00 | 49.00 | 52.00 | - | 201.00 | - | - | - | - | 201.00 | $ 37.88 | $ 7,613.88 |
| February 2022 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | - | - | 41.00 | 38.00 | 47.00 | 50.00 | - | 176.00 | - | - | - | - | 176.00 | $ 37.88 | $ 6,666.88 |
| March 2022 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | - | - | 48.00 | 52.00 | 46.00 | 44.00 | - | 190.00 | - | - | - | - | 190.00 | $ 37.88 | $ 7,197.20 |
| April 2022 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | - | - | 45.00 | 42.00 | 45.00 | 49.00 | 50.00 | 231.00 | - | - | - | - | 231.00 | $ 37.88 | $ 8,750.28 |
| May 2022 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | - | - | 48.00 | 46.00 | 46.00 | 45.00 | - | 185.00 | - | - | - | - | 185.00 | $ 37.88 | $ 7,007.80 |
| June 2022 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | - | - | 44.00 | 50.00 | 47.00 | 48.00 | - | 189.00 | - | - | - | - | 189.00 | $ 39.39 | $ 7,444.71 |
| July 2022 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | - | - | 46.00 | 40.00 | 44.00 | 43.00 | 41.00 | 214.00 | - | - | - | - | 214.00 | $ 39.39 | $ 8,429.46 |
| August 2022 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | - | - | 46.00 | 48.00 | 40.00 | 46.00 | - | 180.00 | - | - | - | - | 180.00 | $ 39.39 | $ 7,090.20 |
| September 2022 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | - | - | 47.00 | 36.00 | 45.00 | 40.00 | 51.00 | 219.00 | - | - | - | - | 219.00 | $ 39.39 | $ 8,626.41 |
| October 2022 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | - | - | 51.00 | 47.00 | 52.00 | 52.00 | - | 202.00 | - | - | - | - | 202.00 | $ 39.39 | $ 7,956.78 |
| November 2022 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | - | - | 46.00 | 45.00 | 47.00 | 45.00 | - | 183.00 | - | - | - | - | 183.00 | $ 39.39 | $ 7,208.37 |
| December 2022 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | - | - | 40.00 | 54.00 | 50.00 | 51.00 | 42.00 | 237.00 | - | - | - | - | 237.00 | $ 39.39 | $ 9,335.43 |
| January 2022 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | - | - | 51.00 | 52.00 | 56.00 | 53.00 | - | 212.00 | - | - | - | - | 212.00 | $ 37.88 | $ 8,030.56 |
| February 2022 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | - | - | 52.00 | 46.00 | 47.00 | 48.00 | - | 193.00 | - | - | - | - | 193.00 | $ 37.88 | $ 7,310.84 |
| March 2022 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | - | - | 51.00 | 52.00 | 47.00 | 46.00 | - | 196.50 | - | - | - | - | 196.50 | $ 37.88 | $ 7,443.42 |
| April 2022 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | - | - | 52.00 | 52.00 | 50.00 | 51.00 | 54.00 | 259.00 | - | - | - | - | 259.00 | $ 37.88 | $ 9,810.92 |
| May 2022 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | - | - | 50.00 | 47.00 | 52.00 | 47.00 | - | 196.00 | - | - | - | - | 196.00 | $ 37.88 | $ 7,424.48 |
| June 2022 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | - | - | 44.00 | 51.00 | 48.00 | 50.00 | - | 193.00 | - | - | - | - | 193.00 | $ 39.39 | $ 7,602.27 |
| July 2022 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | - | - | 48.00 | 46.00 | 43.00 | 44.00 | 46.00 | 227.00 | - | - | - | - | 227.00 | $ 39.39 | $ 8,941.53 |
| August 2022 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | - | - | 51.00 | 48.00 | 50.00 | 48.00 | - | 197.00 | - | - | - | - | 197.00 | $ 39.39 | $ 7,759.83 |
| September 2022 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | - | - | 47.00 | 48.00 | 53.50 | 47.00 | 51.00 | 246.50 | - | - | - | - | 246.50 | $ 39.39 | $ 9,709.64 |
| October 2022 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | - | - | 53.00 | 50.00 | 48.00 | 50.00 | - | 201.00 | - | - | - | - | 201.00 | $ 39.39 | $ 7,917.39 |
| November 2022 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | - | - | 47.00 | 48.00 | 53.00 | 48.00 | - | 196.00 | - | - | - | - | 196.00 | $ 39.39 | $ 7,720.44 |
| December 2022 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | - | - | 45.00 | 58.00 | 48.00 | 54.00 | 43.00 | 248.00 | - | - | - | - | 248.00 | $ 39.39 | $ 9,768.72 |
| January 2022 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | - | - | 40.00 | 43.00 | 43.00 | 40.00 | - | 166.00 | - | - | - | - | 166.00 | $ 37.88 | $ 6,288.08 |

| Month | Account Number | Rate Table | Reference Number | Name | Error Code | Total Hours Reported | Benefit Hours Reported | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Total Hours | Pension Capped Hours | Pension Discrepancy Hours | Pension Contribution Rate | Benefit Capped Hours | Benefit Discrepancy Hours | Benefit Contribution Rate | Discrepancy Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| February 2022 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 42.00 | 43.00 | 41.00 | 43.00 | - | 169.00 | - | - | - | | 169.00 | $ 37.88 | $ 6,401.72 |
| March 2022 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 43.00 | 50.00 | 43.00 | 44.00 | - | 180.00 | - | - | - | | 180.00 | $ 37.88 | $ 6,818.40 |
| April 2022 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 41.00 | 41.00 | 43.00 | 41.00 | 48.00 | 214.00 | - | - | - | | 214.00 | $ 37.88 | $ 8,106.32 |
| May 2022 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 49.00 | 47.00 | 42.00 | 41.00 | - | 179.00 | - | - | - | | 179.00 | $ 37.88 | $ 6,780.52 |
| June 2022 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 40.00 | 42.00 | 45.00 | 43.00 | - | 170.00 | - | - | - | | 170.00 | $ 39.39 | $ 6,696.30 |
| July 2022 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 40.00 | 42.00 | 44.00 | 49.00 | 42.00 | 217.00 | - | - | - | | 217.00 | $ 39.39 | $ 8,547.63 |
| August 2022 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 44.00 | 43.00 | 45.00 | 45.00 | - | 177.00 | - | - | - | | 177.00 | $ 39.39 | $ 6,972.03 |
| September 2022 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 47.00 | 43.00 | 44.00 | 45.00 | 45.00 | 224.00 | - | - | - | | 224.00 | $ 39.39 | $ 8,823.36 |
| October 2022 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 44.00 | 43.00 | 49.00 | 45.00 | - | 181.00 | - | - | - | | 181.00 | $ 39.39 | $ 7,129.59 |
| November 2022 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 43.00 | 41.00 | 43.00 | 48.00 | - | 175.00 | - | - | - | | 175.00 | $ 39.39 | $ 6,893.25 |
| December 2022 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 44.00 | 47.00 | 42.00 | 41.00 | 40.00 | 214.00 | - | - | - | | 214.00 | $ 39.39 | $ 8,429.46 |
| January 2022 | 25435 | 81183 | 000-00 | TORKELSEN ZACHARY | RCP11 | | | 49.00 | 49.00 | 45.00 | 47.00 | - | 190.00 | - | - | - | | 190.00 | $ 37.88 | $ 7,197.20 |
| February 2022 | 25435 | 81183 | 000-00 | TORKELSEN ZACHARY | RCP11 | | | 44.00 | 52.00 | 47.00 | 52.00 | - | 195.00 | - | - | - | | 195.00 | $ 37.88 | $ 7,386.60 |
| March 2022 | 25435 | 81183 | 000-00 | TORKELSEN ZACHARY | RCP11 | | | 44.00 | 46.00 | 44.00 | 42.00 | - | 176.00 | - | - | - | | 176.00 | $ 37.88 | $ 6,666.88 |
| April 2022 | 25435 | 81183 | 000-00 | TORKELSEN ZACHARY | RCP11 | | | 45.00 | 48.00 | 43.00 | 43.00 | 50.00 | 229.00 | - | - | - | | 229.00 | $ 37.88 | $ 8,674.52 |
| May 2022 | 25435 | 81183 | 000-00 | TORKELSEN ZACHARY | RCP11 | | | 48.00 | 42.00 | 42.00 | 42.00 | - | 174.00 | - | - | - | | 174.00 | $ 37.88 | $ 6,591.12 |
| June 2022 | 25435 | 81183 | 000-00 | TORKELSEN ZACHARY | RCP11 | | | 40.00 | 48.00 | 47.00 | 48.00 | - | 183.00 | - | - | - | | 183.00 | $ 39.39 | $ 7,208.37 |
| July 2022 | 25435 | 81183 | 000-00 | TORKELSEN ZACHARY | RCP11 | | | 40.00 | 43.00 | 50.00 | 44.00 | 45.00 | 222.00 | - | - | - | | 222.00 | $ 39.39 | $ 8,744.58 |
| August 2022 | 25435 | 81183 | 000-00 | TORKELSEN ZACHARY | RCP11 | | | 45.00 | 45.00 | 45.00 | 44.00 | - | 179.00 | - | - | - | | 179.00 | $ 39.39 | $ 7,050.81 |
| September 2022 | 25435 | 81183 | 000-00 | TORKELSEN ZACHARY | RCP11 | | | 46.00 | 45.00 | 44.00 | 43.00 | 42.00 | 220.00 | - | - | - | | 220.00 | $ 39.39 | $ 8,665.80 |
| October 2022 | 25435 | 81183 | 000-00 | TORKELSEN ZACHARY | RCP11 | | | 52.00 | 51.00 | 36.00 | 40.00 | - | 179.00 | - | - | - | | 179.00 | $ 39.39 | $ 7,050.81 |
| November 2022 | 25435 | 81183 | 000-00 | TORKELSEN ZACHARY | RCP11 | | | 43.00 | 45.00 | 43.00 | 40.00 | - | 171.00 | - | - | - | | 171.00 | $ 39.39 | $ 6,735.69 |
| December 2022 | 25435 | 81183 | 000-00 | TORKELSEN ZACHARY | RCP11 | | | 40.00 | 43.00 | 41.00 | 45.00 | 40.00 | 209.00 | - | - | - | | 209.00 | $ 39.39 | $ 8,232.51 |
| January 2022 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 52.00 | 52.00 | 48.00 | 53.00 | - | 205.00 | - | - | - | | 205.00 | $ 37.88 | $ 7,765.40 |
| February 2022 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 50.00 | 53.00 | 50.00 | 50.00 | - | 203.00 | - | - | - | | 203.00 | $ 37.88 | $ 7,689.64 |
| March 2022 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 51.00 | 50.00 | 46.00 | 44.00 | - | 191.00 | - | - | - | | 191.00 | $ 37.88 | $ 7,235.08 |
| April 2022 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 50.00 | 52.00 | 46.00 | 51.00 | 54.00 | 253.00 | - | - | - | | 253.00 | $ 37.88 | $ 9,583.64 |
| May 2022 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 51.00 | 52.00 | 50.00 | 45.00 | - | 198.00 | - | - | - | | 198.00 | $ 37.88 | $ 7,500.24 |
| June 2022 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 41.00 | 50.00 | 51.00 | 48.00 | - | 190.00 | - | - | - | | 190.00 | $ 39.39 | $ 9,808.11 |
| July 2022 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 51.00 | 43.00 | 52.00 | 53.00 | 50.00 | 249.00 | - | - | - | | 249.00 | $ 39.39 | $ 9,808.11 |
| August 2022 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 50.00 | 47.00 | 55.00 | 53.00 | - | 205.00 | - | - | - | | 205.00 | $ 39.39 | $ 8,074.95 |
| September 2022 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 48.00 | 54.00 | 50.00 | 46.00 | 49.00 | 247.00 | - | - | - | | 247.00 | $ 39.39 | $ 9,729.33 |
| October 2022 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 47.00 | 50.00 | 52.00 | 53.00 | - | 202.00 | - | - | - | | 202.00 | $ 39.39 | $ 7,956.78 |
| November 2022 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 50.00 | 53.00 | 50.00 | 47.00 | - | 200.00 | - | - | - | | 200.00 | $ 39.39 | $ 7,878.00 |
| December 2022 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 56.00 | 49.00 | 54.00 | 54.00 | 42.00 | 255.00 | - | - | - | | 255.00 | $ 39.39 | $ 10,044.45 |
| January 2023 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 40.00 | 42.00 | 43.00 | 28.00 | - | 153.00 | - | - | - | | 153.00 | $ 39.39 | $ 6,026.67 |
| February 2023 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 42.00 | 41.00 | 40.00 | 34.00 | - | 157.00 | - | - | - | | 157.00 | $ 39.39 | $ 6,184.23 |
| March 2023 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 42.00 | 43.00 | 44.00 | 40.00 | 44.00 | 213.00 | - | - | - | | 213.00 | $ 39.39 | $ 8,390.07 |
| April 2023 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 40.00 | 24.00 | 42.00 | 43.00 | - | 149.00 | - | - | - | | 149.00 | $ 39.39 | $ 5,869.11 |
| May 2023 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 41.00 | 41.00 | 42.00 | 17.00 | - | 141.00 | - | - | - | | 141.00 | $ 39.39 | $ 5,553.99 |
| June 2023 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 30.00 | 38.00 | 38.00 | 40.00 | 41.00 | 187.00 | - | - | - | | 187.00 | $ 40.63 | $ 7,597.81 |
| July 2023 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 38.00 | 42.00 | 41.00 | 40.00 | - | 161.00 | - | - | - | | 161.00 | $ 40.63 | $ 6,541.43 |
| August 2023 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 40.00 | 42.00 | 36.00 | 38.00 | - | 156.00 | - | - | - | | 156.00 | $ 40.63 | $ 6,338.28 |
| September 2023 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 39.00 | 40.00 | 41.00 | 41.00 | 41.00 | 201.00 | - | - | - | | 201.00 | $ 40.63 | $ 8,166.63 |
| October 2023 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 34.00 | 40.00 | 36.00 | 40.00 | - | 150.00 | - | - | - | | 150.00 | $ 40.63 | $ 6,094.50 |
| November 2023 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 40.00 | 42.00 | 44.00 | 33.00 | - | 159.00 | - | - | - | | 159.00 | $ 40.63 | $ 6,460.17 |
| December 2023 | 25435 | 81183 | 000-00 | CRONK RONALD | RCP11 | | | 32.00 | 45.00 | 41.00 | 38.00 | 40.00 | 196.00 | - | - | - | | 196.00 | $ 40.63 | $ 7,963.48 |
| January 2023 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 40.00 | 42.00 | 41.00 | 40.00 | - | 163.00 | - | - | - | | 163.00 | $ 39.39 | $ 6,420.57 |
| February 2023 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 41.00 | 40.00 | 38.00 | 40.00 | - | 159.00 | - | - | - | | 159.00 | $ 39.39 | $ 6,263.01 |
| March 2023 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 41.00 | 42.00 | 41.00 | 41.00 | 36.00 | 200.00 | - | - | - | | 200.00 | $ 39.39 | $ 7,878.00 |
| April 2023 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 40.00 | 41.00 | 42.00 | 42.00 | - | 165.00 | - | - | - | | 165.00 | $ 39.39 | $ 6,499.35 |
| May 2023 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 41.00 | 42.00 | 41.00 | 40.00 | - | 164.00 | - | - | - | | 164.00 | $ 39.39 | $ 6,459.96 |
| June 2023 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 40.00 | 41.00 | 40.00 | 40.00 | 34.00 | 195.00 | - | - | - | | 195.00 | $ 40.63 | $ 7,922.85 |
| July 2023 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 40.00 | 42.00 | 40.00 | 40.00 | - | 162.00 | - | - | - | | 162.00 | $ 40.63 | $ 6,582.06 |
| August 2023 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 40.00 | 42.00 | 40.00 | 39.00 | - | 161.00 | - | - | - | | 161.00 | $ 40.63 | $ 6,541.43 |
| September 2023 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 40.00 | 41.00 | 32.00 | 41.00 | 38.00 | 191.00 | - | - | - | | 191.00 | $ 40.63 | $ 7,760.33 |
| October 2023 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 40.00 | 40.00 | 41.00 | 35.00 | - | 156.00 | - | - | - | | 156.00 | $ 40.63 | $ 6,338.28 |
| November 2023 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 40.00 | 42.00 | 33.00 | 15.00 | - | 130.00 | - | - | - | | 130.00 | $ 40.63 | $ 5,281.90 |
| December 2023 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 40.00 | 17.00 | 38.00 | 31.00 | 40.00 | 166.00 | - | - | - | | 166.00 | $ 40.63 | $ 6,744.58 |

| Month | Account Number | Rate Table | Reference Number | Name | Error Code | Total Hours Reported | Benefit Hours Reported | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Total Hours | Pension Capped Hours | Pension Discrepancy Hours | Pension Contribution Rate | Benefit Capped Hours | Benefit Discrepancy Hours | Benefit Contribution Rate | Discrepancy Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January 2023 | 25435 | 81183 | 000-00- | KARDOSH RICHARD | RCP11 | | | 39.00 | 49.00 | 45.00 | 50.00 | - | 183.00 | - | - | | - | 183.00 | $ 39.39 | $ 7,208.37 |
| February 2023 | 25435 | 81183 | 000-00- | KARDOSH RICHARD | RCP11 | | | 45.00 | 47.00 | 45.00 | 43.00 | - | 180.00 | - | - | | - | 180.00 | $ 39.39 | $ 7,090.20 |
| March 2023 | 25435 | 81183 | 000-00- | KARDOSH RICHARD | RCP11 | | | 42.00 | 45.00 | 44.00 | 48.00 | 45.00 | 224.00 | - | - | | - | 224.00 | $ 39.39 | $ 8,823.36 |
| April 2023 | 25435 | 81183 | 000-00- | KARDOSH RICHARD | RCP11 | | | 42.00 | 41.00 | 40.00 | 45.00 | - | 168.00 | - | - | | - | 168.00 | $ 39.39 | $ 6,617.52 |
| May 2023 | 25435 | 81183 | 000-00- | KARDOSH RICHARD | RCP11 | | | 46.00 | 41.00 | 48.00 | 45.00 | - | 180.00 | - | - | | - | 180.00 | $ 39.39 | $ 7,090.20 |
| June 2023 | 25435 | 81183 | 000-00- | KARDOSH RICHARD | RCP11 | | | 44.00 | 44.00 | 42.00 | 42.00 | 44.00 | 216.00 | - | - | | - | 216.00 | $ 40.63 | $ 8,776.08 |
| July 2023 | 25435 | 81183 | 000-00- | KARDOSH RICHARD | RCP11 | | | 41.00 | 47.00 | 45.00 | 43.00 | - | 176.00 | - | - | | - | 176.00 | $ 40.63 | $ 7,150.88 |
| August 2023 | 25435 | 81183 | 000-00- | KARDOSH RICHARD | RCP11 | | | 45.00 | 46.00 | 42.00 | 47.00 | - | 180.00 | - | - | | - | 180.00 | $ 40.63 | $ 7,313.40 |
| September 2023 | 25435 | 81183 | 000-00- | KARDOSH RICHARD | RCP11 | | | 42.00 | 44.00 | 44.00 | 50.00 | 45.00 | 225.00 | - | - | | - | 225.00 | $ 40.63 | $ 9,141.75 |
| October 2023 | 25435 | 81183 | 000-00- | KARDOSH RICHARD | RCP11 | | | 42.00 | 43.00 | 41.00 | 41.00 | - | 167.00 | - | - | | - | 167.00 | $ 40.63 | $ 6,785.21 |
| November 2023 | 25435 | 81183 | 000-00- | KARDOSH RICHARD | RCP11 | | | 43.00 | 44.00 | 47.00 | 49.00 | - | 183.00 | - | - | | - | 183.00 | $ 40.63 | $ 7,435.29 |
| December 2023 | 25435 | 81183 | 000-00- | KARDOSH RICHARD | RCP11 | | | 41.00 | 43.00 | 36.00 | 40.00 | 40.00 | 200.00 | - | - | | - | 200.00 | $ 40.63 | $ 8,126.00 |
| January 2023 | 25435 | 81183 | 000-00- | MANCHA JOHN | RCP7 | | | 42.00 | 45.00 | 45.00 | 47.00 | - | 179.00 | - | - | | - | 179.00 | $ 39.39 | $ 7,050.81 |
| February 2023 | 25435 | 81183 | 000-00- | MANCHA JOHN | RCP7 | | | 44.00 | 40.00 | 43.00 | 38.00 | - | 165.00 | - | - | | - | 165.00 | $ 39.39 | $ 6,499.35 |
| March 2023 | 25435 | 81183 | 000-00- | MANCHA JOHN | RCP7 | | | 43.00 | 45.00 | 44.00 | 43.00 | 45.00 | 220.00 | - | - | | - | 220.00 | $ 39.39 | $ 8,665.80 |
| April 2023 | 25435 | 81183 | 000-00- | MANCHA JOHN | RCP7 | | | 42.00 | 44.00 | 43.00 | 45.00 | - | 174.00 | - | - | | - | 174.00 | $ 39.39 | $ 6,853.86 |
| May 2023 | 25435 | 81183 | 000-00- | MANCHA JOHN | RCP7 | | | 44.00 | 40.00 | 47.00 | 34.00 | - | 165.00 | - | - | | - | 165.00 | $ 39.39 | $ 6,499.35 |
| June 2023 | 25435 | 81183 | 000-00- | MANCHA JOHN | RCP7 | | | 41.00 | 39.00 | 42.00 | 41.00 | 42.00 | 205.00 | - | - | | - | 205.00 | $ 40.63 | $ 8,329.15 |
| July 2023 | 25435 | 81183 | 000-00- | MANCHA JOHN | RCP7 | | | 40.00 | 45.00 | 19.00 | 25.00 | - | 129.00 | - | - | | - | 129.00 | $ 40.63 | $ 5,241.27 |
| August 2023 | 25435 | 81183 | 000-00- | MANCHA JOHN | RCP7 | | | 42.00 | 43.00 | 44.00 | 42.00 | - | 171.00 | - | - | | - | 171.00 | $ 40.63 | $ 6,947.73 |
| September 2023 | 25435 | 81183 | 000-00- | MANCHA JOHN | RCP7 | | | 40.00 | 37.00 | 43.00 | 41.00 | 32.00 | 193.00 | - | - | | - | 193.00 | $ 40.63 | $ 7,841.59 |
| October 2023 | 25435 | 81183 | 000-00- | MANCHA JOHN | RCP7 | | | 34.00 | 47.00 | 45.50 | 43.00 | - | 169.50 | - | - | | - | 169.50 | $ 40.63 | $ 6,886.79 |
| November 2023 | 25435 | 81183 | 000-00- | MANCHA JOHN | RCP7 | | | 33.00 | 45.00 | 40.00 | 36.00 | - | 154.00 | - | - | | - | 154.00 | $ 40.63 | $ 6,257.02 |
| December 2023 | 25435 | 81183 | 000-00- | MANCHA JOHN | RCP7 | | | 34.50 | 43.00 | 46.00 | 33.00 | 40.00 | 196.50 | - | - | | - | 196.50 | $ 40.63 | $ 7,983.80 |
| January 2023 | 25435 | 81183 | 000-00- | POOLE ERIC | RCP11 | | | 42.00 | 50.00 | 50.00 | 45.00 | - | 187.00 | - | - | | - | 187.00 | $ 39.39 | $ 7,365.93 |
| February 2023 | 25435 | 81183 | 000-00- | POOLE ERIC | RCP11 | | | 44.00 | 43.00 | 43.00 | 44.00 | - | 175.00 | - | - | | - | 175.00 | $ 39.39 | $ 6,893.25 |
| March 2023 | 25435 | 81183 | 000-00- | POOLE ERIC | RCP11 | | | 43.00 | 44.00 | 43.00 | 47.50 | 43.00 | 220.50 | - | - | | - | 220.50 | $ 39.39 | $ 8,685.50 |
| April 2023 | 25435 | 81183 | 000-00- | POOLE ERIC | RCP11 | | | 43.00 | 40.00 | 42.00 | 48.00 | - | 173.00 | - | - | | - | 173.00 | $ 39.39 | $ 6,814.47 |
| May 2023 | 25435 | 81183 | 000-00- | POOLE ERIC | RCP11 | | | 43.00 | 51.00 | 44.00 | 44.00 | - | 181.00 | - | - | | - | 181.00 | $ 39.39 | $ 7,129.59 |
| June 2023 | 25435 | 81183 | 000-00- | POOLE ERIC | RCP11 | | | 43.00 | 44.00 | 44.00 | 48.00 | 44.00 | 223.00 | - | - | | - | 223.00 | $ 40.63 | $ 9,060.49 |
| July 2023 | 25435 | 81183 | 000-00- | POOLE ERIC | RCP11 | | | 42.00 | 44.00 | 45.00 | 46.00 | - | 177.00 | - | - | | - | 177.00 | $ 40.63 | $ 7,191.51 |
| August 2023 | 25435 | 81183 | 000-00- | POOLE ERIC | RCP11 | | | 45.00 | 46.00 | 43.00 | 47.00 | - | 181.00 | - | - | | - | 181.00 | $ 40.63 | $ 7,354.03 |
| September 2023 | 25435 | 81183 | 000-00- | POOLE ERIC | RCP11 | | | 45.00 | 45.00 | 44.00 | 49.00 | 51.00 | 234.00 | - | - | | - | 234.00 | $ 40.63 | $ 9,507.42 |
| October 2023 | 25435 | 81183 | 000-00- | POOLE ERIC | RCP11 | | | 44.00 | 42.00 | 44.00 | 32.00 | - | 162.00 | - | - | | - | 162.00 | $ 40.63 | $ 6,582.06 |
| November 2023 | 25435 | 81183 | 000-00- | POOLE ERIC | RCP11 | | | 39.00 | 47.00 | 52.00 | 41.00 | - | 179.00 | - | - | | - | 179.00 | $ 40.63 | $ 7,272.77 |
| December 2023 | 25435 | 81183 | 000-00- | POOLE ERIC | RCP11 | | | 41.50 | 43.00 | 41.00 | 40.00 | 40.00 | 205.50 | - | - | | - | 205.50 | $ 40.63 | $ 8,349.47 |
| January 2023 | 25435 | 81183 | 000-00- | SICHTERMAN JOSHUA | RCP11 | | | 50.00 | 30.00 | 46.00 | 45.00 | - | 171.00 | - | - | | - | 171.00 | $ 39.39 | $ 6,735.69 |
| February 2023 | 25435 | 81183 | 000-00- | SICHTERMAN JOSHUA | RCP11 | | | 42.00 | 49.00 | 45.00 | 46.00 | - | 182.00 | - | - | | - | 182.00 | $ 39.39 | $ 7,168.98 |
| March 2023 | 25435 | 81183 | 000-00- | SICHTERMAN JOSHUA | RCP11 | | | 40.00 | 44.00 | 28.00 | 49.00 | 38.00 | 199.00 | - | - | | - | 199.00 | $ 39.39 | $ 7,838.61 |
| April 2023 | 25435 | 81183 | 000-00- | SICHTERMAN JOSHUA | RCP11 | | | 42.00 | 44.00 | 40.00 | 47.00 | - | 173.00 | - | - | | - | 173.00 | $ 39.39 | $ 6,814.47 |
| May 2023 | 25435 | 81183 | 000-00- | SICHTERMAN JOSHUA | RCP11 | | | 48.00 | 36.00 | 40.00 | 42.00 | - | 166.00 | - | - | | - | 166.00 | $ 39.39 | $ 6,538.74 |
| June 2023 | 25435 | 81183 | 000-00- | SICHTERMAN JOSHUA | RCP11 | | | 40.00 | 44.00 | 43.00 | 44.00 | 45.00 | 216.00 | - | - | | - | 216.00 | $ 40.63 | $ 8,776.08 |
| July 2023 | 25435 | 81183 | 000-00- | SICHTERMAN JOSHUA | RCP11 | | | 42.00 | 46.00 | 45.00 | 40.00 | - | 173.00 | - | - | | - | 173.00 | $ 40.63 | $ 7,028.99 |
| August 2023 | 25435 | 81183 | 000-00- | SICHTERMAN JOSHUA | RCP11 | | | 45.00 | 47.00 | 45.00 | 43.00 | - | 180.00 | - | - | | - | 180.00 | $ 40.63 | $ 7,313.40 |
| September 2023 | 25435 | 81183 | 000-00- | SICHTERMAN JOSHUA | RCP11 | | | 48.00 | 40.00 | 40.00 | 34.00 | 34.00 | 196.00 | - | - | | - | 196.00 | $ 40.63 | $ 7,963.48 |
| October 2023 | 25435 | 81183 | 000-00- | SICHTERMAN JOSHUA | RCP11 | | | 42.00 | 45.00 | 40.00 | 42.00 | - | 169.00 | - | - | | - | 169.00 | $ 40.63 | $ 6,866.47 |
| November 2023 | 25435 | 81183 | 000-00- | SICHTERMAN JOSHUA | RCP11 | | | 22.00 | 44.00 | 42.00 | 45.00 | - | 153.00 | - | - | | - | 153.00 | $ 40.63 | $ 6,216.39 |
| December 2023 | 25435 | 81183 | 000-00- | SICHTERMAN JOSHUA | RCP11 | | | 40.00 | 45.00 | 40.00 | 40.00 | 40.00 | 201.00 | - | - | | - | 201.00 | $ 40.63 | $ 8,166.63 |
| January 2023 | 25435 | 81183 | 000-00- | SPARR JOHN | RCP11 | | | 45.00 | 45.00 | 50.00 | 46.00 | - | 194.00 | - | - | | - | 194.00 | $ 39.39 | $ 7,641.66 |
| February 2023 | 25435 | 81183 | 000-00- | SPARR JOHN | RCP11 | | | 48.00 | 47.00 | 45.00 | 46.00 | - | 187.00 | - | - | | - | 187.00 | $ 39.39 | $ 7,365.93 |
| March 2023 | 25435 | 81183 | 000-00- | SPARR JOHN | RCP11 | | | 44.00 | 48.00 | 47.00 | 50.00 | 51.00 | 240.00 | - | - | | - | 240.00 | $ 39.39 | $ 9,453.60 |
| April 2023 | 25435 | 81183 | 000-00- | SPARR JOHN | RCP11 | | | 48.00 | 43.00 | 40.00 | 46.00 | - | 178.00 | - | - | | - | 178.00 | $ 39.39 | $ 7,011.42 |
| May 2023 | 25435 | 81183 | 000-00- | SPARR JOHN | RCP11 | | | 45.00 | 43.00 | 40.00 | 45.00 | - | 173.00 | - | - | | - | 173.00 | $ 39.39 | $ 6,814.47 |
| June 2023 | 25435 | 81183 | 000-00- | SPARR JOHN | RCP11 | | | 46.00 | 46.00 | 44.00 | 43.00 | 46.00 | 225.00 | - | - | | - | 225.00 | $ 40.63 | $ 9,141.75 |
| July 2023 | 25435 | 81183 | 000-00- | SPARR JOHN | RCP11 | | | 42.00 | 47.00 | 48.00 | 47.00 | - | 184.00 | - | - | | - | 184.00 | $ 40.63 | $ 7,475.92 |
| August 2023 | 25435 | 81183 | 000-00- | SPARR JOHN | RCP11 | | | 43.00 | 47.00 | 43.00 | 46.00 | - | 179.00 | - | - | | - | 179.00 | $ 40.63 | $ 7,272.77 |
| September 2023 | 25435 | 81183 | 000-00- | SPARR JOHN | RCP11 | | | 40.50 | 44.00 | 45.00 | 47.00 | 45.00 | 221.50 | - | - | | - | 221.50 | $ 40.63 | $ 8,999.55 |
| October 2023 | 25435 | 81183 | 000-00- | SPARR JOHN | RCP11 | | | 36.00 | 48.00 | 44.00 | 44.50 | - | 172.50 | - | - | | - | 172.50 | $ 40.63 | $ 7,008.68 |
| November 2023 | 25435 | 81183 | 000-00- | SPARR JOHN | RCP11 | | | 40.00 | 44.00 | 44.00 | 43.00 | - | 171.00 | - | - | | - | 171.00 | $ 40.63 | $ 6,947.73 |

| Month | Account Number | Rate Table | Reference Number | Name | Error Code | Total Hours Reported | Benefit Hours Reported | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Total Hours | Pension Capped Hours | Pension Discrepancy Hours | Pension Contribution Rate | Benefit Capped Hours | Benefit Discrepancy Hours | Benefit Contribution Rate | Discrepancy Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| December 2023 | 25435 | 81183 | 000-0 | SPARR JOHN | RCP11 | | | 42.00 | 51.00 | 53.00 | 43.00 | 40.00 | 229.00 | - | - | - | - | 229.00 | $ 40.63 | $ 9,304.27 |
| May 2023 | 25435 | 81183 | 000-0 | STOLTENBERG JOHN | RCP11 | | | 68.00 | 46.00 | 43.00 | 41.00 | - | 198.00 | - | - | - | - | 198.00 | $ 39.39 | $ 7,799.22 |
| June 2023 | 25435 | 81183 | 000-0 | STOLTENBERG JOHN | RCP11 | | | 40.00 | 46.00 | 43.00 | 40.00 | 43.00 | 212.00 | - | - | - | - | 212.00 | $ 40.63 | $ 8,613.56 |
| July 2023 | 25435 | 81183 | 000-0 | STOLTENBERG JOHN | RCP11 | | | 40.00 | 43.00 | 44.00 | 43.00 | - | 170.00 | - | - | - | - | 170.00 | $ 40.63 | $ 6,907.10 |
| August 2023 | 25435 | 81183 | 000-0 | STOLTENBERG JOHN | RCP11 | | | 42.00 | 43.00 | 42.00 | 42.00 | - | 169.00 | - | - | - | - | 169.00 | $ 40.63 | $ 6,866.47 |
| September 2023 | 25435 | 81183 | 000-0 | STOLTENBERG JOHN | RCP11 | | | 41.00 | 42.00 | 41.00 | 42.00 | 41.00 | 207.00 | - | - | - | - | 207.00 | $ 40.63 | $ 8,410.41 |
| October 2023 | 25435 | 81183 | 000-00 | STOLTENBERG JOHN | RCP11 | | | 43.00 | 45.00 | 44.00 | 46.00 | - | 178.00 | - | - | - | - | 178.00 | $ 40.63 | $ 7,232.14 |
| November 2023 | 25435 | 81183 | 000-0 | STOLTENBERG JOHN | RCP11 | | | 42.00 | 44.00 | 34.00 | 42.00 | - | 162.00 | - | - | - | - | 162.00 | $ 40.63 | $ 6,582.06 |
| December 2023 | 25435 | 81183 | 000-0 | STOLTENBERG JOHN | RCP11 | | | 37.00 | 43.00 | 37.00 | 40.00 | 40.00 | 197.00 | - | - | - | - | 197.00 | $ 40.63 | $ 8,004.11 |
| January 2023 | 25435 | 81183 | 000-0 | STRAZZABOSCO MICHAEL | RCP7 | | | 40.00 | 45.00 | 45.00 | 45.00 | - | 175.00 | - | - | - | - | 175.00 | $ 39.39 | $ 6,893.25 |
| February 2023 | 25435 | 81183 | 000-0 | STRAZZABOSCO MICHAEL | RCP7 | | | 45.00 | 44.00 | 45.00 | 42.00 | - | 176.00 | - | - | - | - | 176.00 | $ 39.39 | $ 6,932.64 |
| March 2023 | 25435 | 81183 | 000-0 | STRAZZABOSCO MICHAEL | RCP7 | | | 40.00 | 41.00 | 42.00 | 41.00 | 42.00 | 205.00 | - | - | - | - | 205.00 | $ 39.39 | $ 8,074.95 |
| April 2023 | 25435 | 81183 | 000-0 | STRAZZABOSCO MICHAEL | RCP7 | | | 43.00 | 45.00 | 45.00 | 38.00 | - | 168.00 | - | - | - | - | 168.00 | $ 39.39 | $ 6,617.52 |
| May 2023 | 25435 | 81183 | 000-0 | STRAZZABOSCO MICHAEL | RCP7 | | | 43.00 | 42.00 | 40.00 | 42.00 | - | 167.00 | - | - | - | - | 167.00 | $ 40.63 | $ 6,853.86 |
| June 2023 | 25435 | 81183 | 000-0 | STRAZZABOSCO MICHAEL | RCP7 | | | 41.00 | 42.00 | 40.00 | 42.00 | 42.00 | 207.00 | - | - | - | - | 207.00 | $ 40.63 | $ 8,410.41 |
| July 2023 | 25435 | 81183 | 000-0 | STRAZZABOSCO MICHAEL | RCP7 | | | 41.00 | 45.00 | 45.00 | 45.00 | - | 176.00 | - | - | - | - | 176.00 | $ 40.63 | $ 7,150.88 |
| August 2023 | 25435 | 81183 | 000-0 | STRAZZABOSCO MICHAEL | RCP7 | | | 45.00 | 45.00 | 45.00 | 40.00 | - | 175.00 | - | - | - | - | 175.00 | $ 40.63 | $ 7,110.25 |
| September 2023 | 25435 | 81183 | 000-0 | STRAZZABOSCO MICHAEL | RCP7 | | | 40.00 | 40.00 | 40.00 | 36.00 | 40.00 | 196.00 | - | - | - | - | 196.00 | $ 40.63 | $ 7,963.48 |
| October 2023 | 25435 | 81183 | 000-0 | STRAZZABOSCO MICHAEL | RCP7 | | | 41.00 | 45.00 | 44.00 | 42.00 | - | 172.00 | - | - | - | - | 172.00 | $ 40.63 | $ 6,988.36 |
| November 2023 | 25435 | 81183 | 000-0 | STRAZZABOSCO MICHAEL | RCP7 | | | 47.00 | 45.00 | 40.00 | 42.00 | - | 174.00 | - | - | - | - | 174.00 | $ 40.63 | $ 7,069.62 |
| December 2023 | 25435 | 81183 | 000-0 | STRAZZABOSCO MICHAEL | RCP7 | | | 40.00 | 42.00 | 49.00 | 40.00 | 40.00 | 211.00 | - | - | - | - | 211.00 | $ 40.63 | $ 8,572.93 |
| June 2023 | 25435 | 81183 | 000-0 | TOIGO ANTHONY | RCP11 | | | - | 18.00 | 34.00 | 26.00 | 26.00 | 104.00 | - | - | - | - | 104.00 | $ 40.63 | $ 4,225.52 |
| July 2023 | 25435 | 81183 | 000-0 | TOIGO ANTHONY | RCP11 | | | 16.00 | 34.00 | 36.00 | 34.00 | - | 120.00 | - | - | - | - | 120.00 | $ 40.63 | $ 4,875.60 |
| August 2023 | 25435 | 81183 | 000-0 | TOIGO ANTHONY | RCP11 | | | 42.00 | 43.00 | 27.00 | - | - | 112.00 | - | - | - | - | 112.00 | $ 40.63 | $ 4,550.56 |
| January 2023 | 25435 | 81183 | 000-0 | TORKELSEN ZACHARY | RCP11 | | | 40.00 | 44.00 | 46.00 | 44.00 | - | 174.00 | - | - | - | - | 174.00 | $ 39.39 | $ 6,853.86 |
| February 2023 | 25435 | 81183 | 000-0 | TORKELSEN ZACHARY | RCP11 | | | 46.00 | 44.00 | 44.00 | 42.00 | - | 176.00 | - | - | - | - | 176.00 | $ 39.39 | $ 6,932.64 |
| March 2023 | 25435 | 81183 | 000-0 | TORKELSEN ZACHARY | RCP11 | | | 43.00 | 44.00 | 41.00 | 36.00 | 41.00 | 205.00 | - | - | - | - | 205.00 | $ 39.39 | $ 8,074.95 |
| April 2023 | 25435 | 81183 | 000-0 | TORKELSEN ZACHARY | RCP11 | | | 44.00 | 43.00 | 42.00 | 42.00 | - | 171.00 | - | - | - | - | 171.00 | $ 39.39 | $ 6,735.69 |
| May 2023 | 25435 | 81183 | 000-0 | TORKELSEN ZACHARY | RCP11 | | | 40.00 | 40.00 | 42.00 | 42.00 | - | 164.00 | - | - | - | - | 164.00 | $ 39.39 | $ 6,459.96 |
| June 2023 | 25435 | 81183 | 000-0 | TORKELSEN ZACHARY | RCP11 | | | 40.00 | 42.00 | 41.00 | 40.00 | 40.00 | 203.00 | - | - | - | - | 203.00 | $ 40.63 | $ 8,247.89 |
| July 2023 | 25435 | 81183 | 000-0 | TORKELSEN ZACHARY | RCP11 | | | 40.00 | 42.00 | 37.00 | - | - | 119.00 | - | - | - | - | 119.00 | $ 40.63 | $ 4,834.97 |
| January 2023 | 25435 | 81183 | 000-0 | WOFF TRAVIS | RCP11 | | | 50.00 | 51.00 | 49.00 | 45.00 | - | 195.00 | - | - | - | - | 195.00 | $ 39.39 | $ 7,681.05 |
| February 2023 | 25435 | 81183 | 000-0 | WOFF TRAVIS | RCP11 | | | 45.00 | 50.00 | 45.50 | 32.00 | - | 172.50 | - | - | - | - | 172.50 | $ 39.39 | $ 6,794.78 |
| March 2023 | 25435 | 81183 | 000-0 | WOFF TRAVIS | RCP11 | | | 41.00 | 44.00 | 44.00 | 49.00 | 45.00 | 223.00 | - | - | - | - | 223.00 | $ 39.39 | $ 8,783.97 |
| April 2023 | 25435 | 81183 | 000-0 | WOFF TRAVIS | RCP11 | | | 40.00 | 42.00 | 45.00 | 49.00 | - | 176.00 | - | - | - | - | 176.00 | $ 39.39 | $ 6,932.64 |
| May 2023 | 25435 | 81183 | 000-0 | WOFF TRAVIS | RCP11 | | | 42.00 | 43.00 | 43.00 | 39.00 | - | 167.00 | - | - | - | - | 167.00 | $ 40.63 | $ 6,775.08 |
| July 2023 | 25435 | 81183 | 000-0 | WOFF TRAVIS | RCP11 | | | 45.00 | 43.00 | 42.00 | 44.00 | 45.00 | 219.00 | - | - | - | - | 219.00 | $ 40.63 | $ 8,897.97 |
| August 2023 | 25435 | 81183 | 000-0 | WOFF TRAVIS | RCP11 | | | 43.00 | 46.00 | 45.00 | 47.00 | - | 181.00 | - | - | - | - | 181.00 | $ 40.63 | $ 7,354.03 |
| September 2023 | 25435 | 81183 | 000-0 | WOFF TRAVIS | RCP11 | | | 46.00 | 50.00 | 46.00 | 44.00 | - | 186.00 | - | - | - | - | 186.00 | $ 40.63 | $ 7,557.18 |
| October 2023 | 25435 | 81183 | 000-0 | WOFF TRAVIS | RCP11 | | | 46.00 | 43.00 | 44.00 | 50.00 | 52.00 | 235.00 | - | - | - | - | 235.00 | $ 40.63 | $ 9,548.05 |
| November 2023 | 25435 | 81183 | 000-0 | WOFF TRAVIS | RCP11 | | | 41.00 | 50.00 | 46.00 | 51.00 | - | 178.00 | - | - | - | - | 178.00 | $ 40.63 | $ 7,232.14 |
| December 2023 | 25435 | 81183 | 000-0 | WOFF TRAVIS | RCP11 | | | 43.00 | 45.00 | 46.00 | 51.00 | - | 185.00 | - | - | - | - | 185.00 | $ 40.63 | $ 7,516.55 |
| December 2023 | 25435 | 81183 | 000-0 | WOFF TRAVIS | RCP11 | | | 38.00 | 52.00 | 40.00 | 40.00 | 40.00 | 210.00 | - | - | - | - | 210.00 | $ 40.63 | $ 8,532.30 |
| January 2024 | 25435 | 81183 | 000-0 | CRONK RONALD | RCP11 | | | 41.00 | 34.00 | 30.00 | 32.00 | - | 137.00 | - | - | - | - | 137.00 | $ 40.63 | $ 5,566.31 |
| February 2024 | 25435 | 81183 | 000-0 | CRONK RONALD | RCP11 | | | 42.00 | 41.00 | 40.00 | 36.00 | - | 159.00 | - | - | - | - | 159.00 | $ 40.63 | $ 6,460.17 |
| March 2024 | 25435 | 81183 | 000-0 | CRONK RONALD | RCP11 | | | 36.00 | 40.00 | 38.00 | 38.00 | 39.00 | 190.00 | - | - | - | - | 190.00 | $ 40.63 | $ 7,719.70 |
| April 2024 | 25435 | 81183 | 000-0 | CRONK RONALD | RCP11 | | | 38.00 | 41.00 | 41.00 | 49.00 | - | 168.00 | - | - | - | - | 168.00 | $ 40.63 | $ 6,825.84 |
| May 2024 | 25435 | 81183 | 000-0 | CRONK RONALD | RCP11 | | | 43.00 | 32.00 | 37.00 | 37.00 | 33.00 | 182.00 | - | - | - | - | 182.00 | $ 40.63 | $ 7,394.66 |
| June 2024 | 25435 | 81183 | 000-0 | CRONK RONALD | RCP11 | | | 34.00 | 34.00 | 30.00 | 38.00 | - | 136.00 | - | - | - | - | 136.00 | $ 42.80 | $ 5,820.80 |
| July 2024 | 25435 | 81183 | 000-0 | CRONK RONALD | RCP11 | | | 40.00 | 39.00 | 36.00 | 30.00 | - | 145.00 | - | - | - | - | 145.00 | $ 42.80 | $ 6,206.00 |
| August 2024 | 25435 | 81183 | 000-0 | CRONK RONALD | RCP11 | | | 30.00 | 39.00 | 30.00 | 40.00 | 34.00 | 173.00 | - | - | - | - | 173.00 | $ 42.80 | $ 7,404.40 |
| September 2024 | 25435 | 81183 | 000-0 | CRONK RONALD | RCP11 | | | 37.00 | 36.00 | 37.00 | 34.00 | - | 144.00 | - | - | - | - | 144.00 | $ 42.80 | $ 6,163.20 |
| October 2024 | 25435 | 81183 | 000-0 | CRONK RONALD | RCP11 | | | 35.00 | 15.00 | 60.00 | 30.00 | - | 140.00 | - | - | - | - | 140.00 | $ 42.80 | $ 5,992.00 |
| November 2024 | 25435 | 81183 | 000-0 | CRONK RONALD | RCP11 | | | 36.00 | 37.00 | 36.00 | 37.00 | 36.00 | 182.00 | - | - | - | - | 182.00 | $ 42.80 | $ 7,789.60 |
| December 2024 | 25435 | 81183 | 000-0 | CRONK RONALD | RCP11 | | | 37.00 | 35.00 | 36.00 | 40.00 | - | 148.00 | - | - | - | - | 148.00 | $ 42.80 | $ 6,334.40 |
| January 2024 | 25435 | 81183 | 000-0 | GIBSON JEFF | RCP7 | | | 37.00 | 40.00 | 35.00 | 38.00 | - | 143.00 | - | - | - | - | 143.00 | $ 40.63 | $ 5,810.09 |
| February 2024 | 25435 | 81183 | 000-0 | GIBSON JEFF | RCP7 | | | 37.00 | 40.00 | 38.00 | 39.00 | - | 154.00 | - | - | - | - | 154.00 | $ 40.63 | $ 6,257.02 |
| March 2024 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 37.00 | 36.00 | 37.00 | 36.00 | 37.00 | 183.00 | - | - | - | - | 183.00 | $ 40.63 | $ 7,435.29 |
| April 2024 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 37.00 | 37.00 | 38.00 | 37.00 | - | 149.00 | - | - | - | - | 149.00 | $ 40.63 | $ 6,053.87 |

| Month | Account Number | Rate Table | Reference Number | Name | Error Code | Total Hours Reported | Benefit Hours Reported | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Total Hours | Pension Capped Hours | Pension Discrepancy Hours | Pension Contribution Rate | Benefit Capped Hours | Benefit Discrepancy Hours | Benefit Contribution Rate | Discrepancy Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| May 2024 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 19.00 | 38.00 | 37.00 | 35.00 | 39.00 | 168.00 | - | - | - | | 168.00 | $ 40.63 | $ 6,825.84 |
| June 2024 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 35.00 | 31.00 | 22.00 | 30.00 | - | 118.00 | - | - | - | | 118.00 | $ 42.80 | $ 5,050.40 |
| July 2024 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 38.00 | 32.00 | 37.00 | 30.00 | - | 137.00 | - | - | - | | 137.00 | $ 42.80 | $ 5,863.60 |
| August 2024 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 37.00 | 37.00 | 30.00 | 38.00 | 27.00 | 169.00 | - | - | - | | 169.00 | $ 42.80 | $ 7,233.20 |
| September 2024 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 37.00 | 37.00 | 29.00 | 34.00 | - | 137.00 | - | - | - | | 137.00 | $ 42.80 | $ 5,863.60 |
| October 2024 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 35.00 | 30.00 | 38.00 | 36.00 | - | 139.00 | - | - | - | | 139.00 | $ 42.80 | $ 5,949.20 |
| November 2024 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 36.00 | 34.00 | 26.00 | 35.00 | 36.00 | 167.00 | - | - | - | | 167.00 | $ 42.80 | $ 7,147.60 |
| December 2024 | 25435 | 81183 | 000-00 | GIBSON JEFF | RCP7 | | | 37.00 | 22.00 | 36.00 | 40.00 | - | 135.00 | - | - | - | | 135.00 | $ 42.80 | $ 5,778.00 |
| January 2024 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 40.00 | 37.00 | 36.00 | 41.00 | - | 154.00 | - | - | - | | 154.00 | $ 40.63 | $ 6,257.02 |
| February 2024 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 40.00 | 43.00 | 39.00 | 42.00 | - | 164.00 | - | - | - | | 164.00 | $ 40.63 | $ 6,663.32 |
| March 2024 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 40.00 | 39.00 | 40.00 | 39.00 | 38.00 | 196.00 | - | - | - | | 196.00 | $ 40.63 | $ 7,963.48 |
| April 2024 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 38.00 | 40.00 | 43.00 | 45.00 | - | 166.00 | - | - | - | | 166.00 | $ 40.63 | $ 6,744.58 |
| May 2024 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 40.00 | 40.00 | 41.00 | 42.00 | 41.00 | 204.00 | - | - | - | | 204.00 | $ 40.63 | $ 8,288.52 |
| June 2024 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 41.00 | 40.00 | 40.00 | 39.00 | - | 160.00 | - | - | - | | 160.00 | $ 42.80 | $ 6,848.00 |
| July 2024 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 48.00 | 43.00 | 41.00 | 40.00 | - | 172.00 | - | - | - | | 172.00 | $ 42.80 | $ 7,361.60 |
| August 2024 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 40.00 | 32.00 | 43.50 | 52.50 | 41.00 | 209.00 | - | - | - | | 209.00 | $ 42.80 | $ 8,945.20 |
| September 2024 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 40.00 | 43.00 | 46.00 | 37.00 | - | 166.00 | - | - | - | | 166.00 | $ 42.80 | $ 7,104.80 |
| October 2024 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 47.00 | 40.00 | 47.00 | 42.00 | - | 176.00 | - | - | - | | 176.00 | $ 42.80 | $ 7,532.80 |
| November 2024 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 47.00 | 42.00 | 42.00 | 34.00 | 41.00 | 206.00 | - | - | - | | 206.00 | $ 42.80 | $ 8,816.80 |
| December 2024 | 25435 | 81183 | 000-00 | KARDOSH RICHARD | RCP11 | | | 41.00 | 40.00 | 40.00 | 40.00 | - | 161.00 | - | - | - | | 161.00 | $ 42.80 | $ 6,890.80 |
| January 2024 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | | | 41.00 | 39.00 | 26.00 | 40.00 | - | 146.00 | - | - | - | | 146.00 | $ 40.63 | $ 5,931.98 |
| February 2024 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | | | 41.00 | 41.00 | 40.00 | 40.00 | - | 162.00 | - | - | - | | 162.00 | $ 40.63 | $ 6,582.06 |
| March 2024 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | | | 31.00 | 40.00 | 39.00 | 39.00 | 40.00 | 189.00 | - | - | - | | 189.00 | $ 40.63 | $ 7,679.07 |
| April 2024 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | | | 38.00 | 39.00 | 45.00 | 48.00 | - | 170.00 | - | - | - | | 170.00 | $ 40.63 | $ 8,907.10 |
| May 2024 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | | | 34.00 | 42.00 | 43.00 | 43.00 | 43.00 | 205.00 | - | - | - | | 205.00 | $ 40.63 | $ 8,329.15 |
| June 2024 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | | | 40.00 | 41.00 | 41.00 | 41.00 | - | 163.00 | - | - | - | | 163.00 | $ 42.80 | $ 6,976.40 |
| July 2024 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | | | 42.00 | 34.00 | 42.00 | 41.00 | - | 159.00 | - | - | - | | 159.00 | $ 42.80 | $ 6,805.20 |
| August 2024 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | | | 41.00 | 34.00 | 41.00 | 41.00 | 43.50 | 200.50 | - | - | - | | 200.50 | $ 42.80 | $ 8,581.40 |
| September 2024 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | | | 40.00 | 42.00 | 40.00 | 41.00 | - | 163.00 | - | - | - | | 163.00 | $ 42.80 | $ 6,976.40 |
| October 2024 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | | | 42.00 | 17.00 | 43.00 | - | - | 102.00 | - | - | - | | 102.00 | $ 42.80 | $ 4,365.60 |
| November 2024 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | | | 44.00 | 42.00 | 24.00 | 33.00 | 39.00 | 182.00 | - | - | - | | 182.00 | $ 42.80 | $ 7,789.60 |
| December 2024 | 25435 | 81183 | 000-00 | MANCHA JOHN | RCP7 | | | 42.00 | 41.00 | 43.00 | 40.00 | - | 166.00 | - | - | - | | 166.00 | $ 42.80 | $ 7,104.80 |
| June 2024 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | | | 39.00 | 44.00 | 38.00 | 46.00 | - | 167.00 | - | - | - | | 167.00 | $ 42.80 | $ 7,147.60 |
| July 2024 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | | | 42.00 | 41.00 | 45.00 | 50.00 | - | 178.00 | - | - | - | | 178.00 | $ 42.80 | $ 7,618.40 |
| August 2024 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | | | 56.00 | 46.00 | 47.00 | 44.00 | 46.00 | 239.00 | - | - | - | | 239.00 | $ 42.80 | $ 10,229.20 |
| September 2024 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | | | 45.00 | 47.00 | 45.00 | 46.00 | - | 183.00 | - | - | - | | 183.00 | $ 42.80 | $ 7,832.40 |
| October 2024 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | | | 47.00 | 46.00 | 52.00 | 48.00 | - | 193.00 | - | - | - | | 193.00 | $ 42.80 | $ 8,260.40 |
| November 2024 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | | | 45.00 | 43.00 | 46.00 | 50.00 | 44.00 | 230.00 | - | - | - | | 230.00 | $ 42.80 | $ 9,844.00 |
| December 2024 | 25435 | 81183 | 000-00 | MATEJA JR MICHAEL | RCP11 | | | 44.00 | 47.00 | 46.00 | 40.00 | - | 177.00 | - | - | - | | 177.00 | $ 42.80 | $ 7,575.60 |
| January 2024 | 25435 | 81183 | 000-00 | POOLE ERIC | RCP11 | | | 40.00 | 32.00 | 40.00 | 40.00 | - | 152.00 | - | - | - | | 152.00 | $ 40.63 | $ 6,175.76 |
| February 2024 | 25435 | 81183 | 000-00 | POOLE ERIC | RCP11 | | | 42.00 | 39.00 | 41.00 | 40.00 | - | 162.00 | - | - | - | | 162.00 | $ 40.63 | $ 6,582.06 |
| March 2024 | 25435 | 81183 | 000-00 | POOLE ERIC | RCP11 | | | 39.00 | 41.00 | 39.00 | 39.00 | 40.00 | 198.00 | - | - | - | | 198.00 | $ 40.63 | $ 8,044.74 |
| April 2024 | 25435 | 81183 | 000-00 | POOLE ERIC | RCP11 | | | 38.00 | 38.00 | 35.00 | 45.00 | - | 156.00 | - | - | - | | 156.00 | $ 40.63 | $ 6,338.28 |
| May 2024 | 25435 | 81183 | 000-00 | POOLE ERIC | RCP11 | | | 45.00 | 46.00 | 43.00 | 39.00 | 41.00 | 214.00 | - | - | - | | 214.00 | $ 40.63 | $ 8,694.82 |
| June 2024 | 25435 | 81183 | 000-00 | POOLE ERIC | RCP11 | | | 23.00 | 38.00 | 41.00 | 41.00 | - | 144.00 | - | - | - | | 144.00 | $ 42.80 | $ 6,163.20 |
| July 2024 | 25435 | 81183 | 000-00 | POOLE ERIC | RCP11 | | | 40.00 | 43.00 | 32.00 | 32.00 | - | 147.00 | - | - | - | | 147.00 | $ 42.80 | $ 6,291.60 |
| August 2024 | 25435 | 81183 | 000-00 | POOLE ERIC | RCP11 | | | 40.00 | 43.00 | 45.00 | 42.00 | 39.00 | 208.00 | - | - | - | | 208.00 | $ 42.80 | $ 8,902.40 |
| September 2024 | 25435 | 81183 | 000-00 | POOLE ERIC | RCP11 | | | 41.00 | 43.00 | 41.00 | 42.00 | - | 167.00 | - | - | - | | 167.00 | $ 42.80 | $ 7,147.60 |
| October 2024 | 25435 | 81183 | 000-00 | POOLE ERIC | RCP11 | | | 41.00 | 43.00 | 46.00 | 43.00 | - | 173.00 | - | - | - | | 173.00 | $ 42.80 | $ 7,404.40 |
| November 2024 | 25435 | 81183 | 000-00 | POOLE ERIC | RCP11 | | | 41.00 | 42.00 | 42.00 | 32.00 | 47.00 | 204.00 | - | - | - | | 204.00 | $ 42.80 | $ 8,731.20 |
| December 2024 | 25435 | 81183 | 000-00 | POOLE ERIC | RCP11 | | | 40.00 | 40.00 | 42.00 | 40.00 | - | 162.00 | - | - | - | | 162.00 | $ 42.80 | $ 6,933.60 |
| January 2024 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 40.00 | 40.00 | 37.00 | 40.00 | - | 157.00 | - | - | - | | 157.00 | $ 40.63 | $ 6,378.91 |
| February 2024 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 40.00 | 40.00 | 39.00 | 40.00 | - | 159.00 | - | - | - | | 159.00 | $ 40.63 | $ 6,460.17 |
| March 2024 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 40.00 | 36.00 | 39.00 | 32.00 | 39.00 | 186.00 | - | - | - | | 186.00 | $ 40.63 | $ 7,557.18 |
| April 2024 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 38.00 | 39.00 | 40.00 | 43.00 | - | 160.00 | - | - | - | | 160.00 | $ 40.63 | $ 6,500.80 |
| May 2024 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 40.00 | 40.00 | 40.00 | 40.00 | 43.00 | 203.00 | - | - | - | | 203.00 | $ 40.63 | $ 8,247.89 |
| June 2024 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 41.00 | 40.00 | 39.00 | 41.00 | - | 161.00 | - | - | - | | 161.00 | $ 42.80 | $ 6,890.80 |
| July 2024 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 41.00 | 40.00 | 40.00 | 43.00 | - | 164.00 | - | - | - | | 164.00 | $ 42.80 | $ 7,019.20 |
| August 2024 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 35.00 | 42.00 | 44.00 | 42.00 | 40.00 | 203.00 | - | - | - | | 203.00 | $ 42.80 | $ 8,688.40 |

| Month | Account Number | Rate Table | Reference Number | Name | Error Code | Total Hours Reported | Benefit Hours Reported | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Total Hours | Pension Capped Hours | Pension Discrepancy Hours | Pension Contribution Rate | Benefit Capped Hours | Benefit Discrepancy Hours | Benefit Contribution Rate | Discrepancy Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| September 2024 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 42.00 | 44.00 | 40.00 | 41.00 | - | 167.00 | | - | - | - | 167.00 | $ 42.80 | $ 7,147.60 |
| October 2024 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 34.00 | 44.00 | 42.00 | 44.00 | - | 164.00 | | - | - | - | 164.00 | $ 42.80 | $ 7,019.20 |
| November 2024 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 41.00 | 40.00 | 41.00 | 42.00 | 41.00 | 205.00 | | - | - | - | 205.00 | $ 42.80 | $ 8,774.00 |
| December 2024 | 25435 | 81183 | 000-00 | SICHTERMAN JOSHUA | RCP11 | | | 42.00 | 50.00 | 45.00 | 40.00 | - | 177.00 | | - | - | - | 177.00 | $ 42.80 | $ 7,575.60 |
| January 2024 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 41.00 | 40.00 | 41.00 | 35.00 | - | 157.00 | | - | - | - | 157.00 | $ 40.63 | $ 6,378.91 |
| February 2024 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 41.00 | 40.00 | 41.00 | 39.00 | - | 161.00 | | - | - | - | 161.00 | $ 40.63 | $ 6,541.43 |
| March 2024 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 40.00 | 42.00 | 39.00 | 40.00 | 33.00 | 194.00 | | - | - | - | 194.00 | $ 40.63 | $ 7,882.22 |
| April 2024 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 38.00 | 41.00 | 40.00 | 40.00 | - | 159.00 | | - | - | - | 159.00 | $ 40.63 | $ 6,460.17 |
| May 2024 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 41.00 | 40.00 | 36.00 | 40.00 | 37.00 | 194.00 | | - | - | - | 194.00 | $ 40.63 | $ 7,882.22 |
| June 2024 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 40.00 | 40.00 | 41.00 | 43.00 | - | 164.00 | | - | - | - | 164.00 | $ 42.80 | $ 7,019.20 |
| July 2024 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 41.00 | 40.00 | 41.00 | 42.00 | - | 167.00 | | - | - | - | 167.00 | $ 42.80 | $ 7,147.60 |
| August 2024 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 40.00 | 43.00 | 43.00 | 42.50 | 44.00 | 212.50 | | - | - | - | 212.50 | $ 42.80 | $ 9,095.00 |
| September 2024 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 42.00 | 45.00 | 43.00 | 46.00 | - | 176.00 | | - | - | - | 176.00 | $ 42.80 | $ 7,532.80 |
| October 2024 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 45.00 | 45.00 | 47.00 | 45.00 | - | 182.00 | | - | - | - | 182.00 | $ 42.80 | $ 7,789.60 |
| November 2024 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 42.00 | 43.00 | 44.00 | 43.00 | 41.00 | 213.00 | | - | - | - | 213.00 | $ 42.80 | $ 9,116.40 |
| December 2024 | 25435 | 81183 | 000-00 | SPARR JOHN | RCP11 | | | 42.00 | 36.00 | 43.00 | 40.00 | - | 161.00 | | - | - | - | 161.00 | $ 42.80 | $ 6,890.80 |
| January 2024 | 25435 | 81183 | 000-00 | STOLTENBERG JOHN | RCP11 | | | 40.00 | 38.00 | 30.00 | 33.00 | - | 141.00 | | - | - | - | 141.00 | $ 40.63 | $ 5,728.83 |
| February 2024 | 25435 | 81183 | 000-00 | STOLTENBERG JOHN | RCP11 | | | 40.00 | 40.00 | 40.00 | 35.00 | - | 155.00 | | - | - | - | 155.00 | $ 40.63 | $ 6,297.65 |
| March 2024 | 25435 | 81183 | 000-00 | STOLTENBERG JOHN | RCP11 | | | 39.00 | 40.00 | 39.00 | 38.00 | 37.00 | 193.00 | | - | - | - | 193.00 | $ 40.63 | $ 7,841.59 |
| April 2024 | 25435 | 81183 | 000-00 | STOLTENBERG JOHN | RCP11 | | | 37.00 | 38.00 | 37.00 | 41.00 | - | 153.00 | | - | - | - | 153.00 | $ 40.63 | $ 6,216.39 |
| May 2024 | 25435 | 81183 | 000-00 | STOLTENBERG JOHN | RCP11 | | | 43.00 | 40.00 | 38.00 | 37.00 | - | 198.00 | | - | - | - | 198.00 | $ 40.63 | $ 8,044.74 |
| June 2024 | 25435 | 81183 | 000-00 | STOLTENBERG JOHN | RCP11 | | | 31.00 | 40.00 | 38.00 | 40.00 | - | 149.00 | | - | - | - | 149.00 | $ 42.80 | $ 6,377.20 |
| July 2024 | 25435 | 81183 | 000-00 | STOLTENBERG JOHN | RCP11 | | | 40.00 | 41.00 | 44.00 | 40.00 | - | 165.00 | | - | - | - | 165.00 | $ 42.80 | $ 7,062.00 |
| August 2024 | 25435 | 81183 | 000-00 | STOLTENBERG JOHN | RCP11 | | | 36.00 | 26.00 | 35.00 | 42.00 | 40.00 | 179.00 | | - | - | - | 179.00 | $ 42.80 | $ 7,661.20 |
| September 2024 | 25435 | 81183 | 000-00 | STOLTENBERG JOHN | RCP11 | | | 30.00 | 18.00 | 34.00 | 34.00 | - | 116.00 | | - | - | - | 116.00 | $ 42.80 | $ 4,964.80 |
| October 2024 | 25435 | 81183 | 000-00 | STOLTENBERG JOHN | RCP11 | | | 40.00 | 43.00 | 42.00 | 40.00 | - | 165.00 | | - | - | - | 165.00 | $ 42.80 | $ 7,062.00 |
| November 2024 | 25435 | 81183 | 000-00 | STOLTENBERG JOHN | RCP11 | | | 41.00 | 42.00 | 40.00 | 38.00 | 30.00 | 191.00 | | - | - | - | 191.00 | $ 42.80 | $ 8,174.80 |
| December 2024 | 25435 | 81183 | 000-00 | STOLTENBERG JOHN | RCP11 | | | 40.00 | 40.00 | 32.00 | 40.00 | - | 152.00 | | - | - | - | 152.00 | $ 42.80 | $ 6,505.60 |
| January 2024 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 40.00 | 40.00 | 40.00 | 40.00 | - | 160.00 | | - | - | - | 160.00 | $ 40.63 | $ 6,500.80 |
| February 2024 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 40.00 | 40.00 | 40.00 | 39.00 | - | 159.00 | | - | - | - | 159.00 | $ 40.63 | $ 6,460.17 |
| March 2024 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 40.00 | 47.00 | 39.00 | 40.00 | 38.00 | 204.00 | | - | - | - | 204.00 | $ 40.63 | $ 8,288.52 |
| April 2024 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 37.00 | 40.00 | 40.00 | 40.00 | - | 157.00 | | - | - | - | 157.00 | $ 40.63 | $ 6,378.91 |
| May 2024 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 33.00 | 40.00 | 41.00 | 41.00 | 37.00 | 192.00 | | - | - | - | 192.00 | $ 40.63 | $ 7,800.96 |
| June 2024 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 32.00 | 40.00 | 40.00 | 41.00 | - | 153.00 | | - | - | - | 153.00 | $ 42.80 | $ 6,548.40 |
| July 2024 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 40.00 | 41.00 | 41.00 | 42.00 | - | 164.00 | | - | - | - | 164.00 | $ 42.80 | $ 7,019.20 |
| August 2024 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 40.00 | 42.00 | 42.00 | 40.00 | 43.50 | 203.50 | | - | - | - | 203.50 | $ 42.80 | $ 8,709.80 |
| September 2024 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 40.00 | 43.00 | 41.00 | 40.00 | - | 164.00 | | - | - | - | 164.00 | $ 42.80 | $ 7,019.20 |
| October 2024 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 40.00 | 43.00 | 43.00 | 42.00 | - | 168.00 | | - | - | - | 168.00 | $ 42.80 | $ 7,190.40 |
| November 2024 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 40.00 | 27.00 | 42.00 | 40.00 | 40.00 | 189.00 | | - | - | - | 189.00 | $ 42.80 | $ 8,089.20 |
| December 2024 | 25435 | 81183 | 000-00 | STRAZZABOSCO MICHAEL | RCP7 | | | 41.00 | 40.00 | 52.00 | 40.00 | - | 173.00 | | - | - | - | 173.00 | $ 42.80 | $ 7,404.40 |
| January 2024 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 40.00 | 38.00 | 37.00 | 44.00 | - | 159.00 | | - | - | - | 159.00 | $ 40.63 | $ 6,460.17 |
| February 2024 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 39.00 | 39.00 | 40.00 | 38.00 | - | 156.00 | | - | - | - | 156.00 | $ 40.63 | $ 6,338.28 |
| March 2024 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 38.00 | 41.00 | 39.00 | 40.00 | 41.00 | 199.00 | | - | - | - | 199.00 | $ 40.63 | $ 8,085.37 |
| April 2024 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 40.00 | 32.00 | 44.00 | 46.00 | - | 162.00 | | - | - | - | 162.00 | $ 40.63 | $ 6,582.06 |
| May 2024 | 25435 | 81183 | 000-00 | WOFF TRAVIS | RCP11 | | | 42.00 | 41.00 | 16.00 | - | - | 99.00 | | - | - | - | 99.00 | $ 40.63 | $ 4,022.37 |

# Mid America Carpenters Regional Council
## Sub Sheet

Employer Name: Dock & Door Install Inc
Account Number: 25435
Audit Period: October 1, 2020 to December 31, 2024

| Payee | Ck# | Date | Amount | Job # | Ref # | Invoice | Description | Action | Rate | Labor % | Code | Ben Hrs | Tot Hrs | Cap |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Industrial Commercial Services Inc | | 3/24/2021 | $9,486.00 | 300559-001 | 1 | No | | PU | $49.76 | 100% | CD41 | 190.75 | | |
| Industrial Commercial Services Inc | | 4/6/2021 | $1,280.00 | 300645-001 | 1 | No | | PU | $49.76 | 100% | CD41 | 25.75 | | |
| Industrial Commercial Services Inc | | 4/6/2021 | $1,280.00 | 300644-001 | 1 | No | | PU | $49.76 | 100% | CD41 | 25.75 | | |
| Industrial Commercial Services Inc | | 5/24/2021 | $4,455.63 | 300611-001 | 1 | No | | PU | $49.76 | 100% | CD41 | 89.50 | | |
| Industrial Commercial Services Inc | | 8/5/2021 | $2,348.00 | 300447-001 | 1 | No | | PU | $50.86 | 100% | CD41 | 46.25 | | |
| Industrial Commercial Services Inc | | 9/20/2021 | $2,498.00 | 300989-001 | 1 | No | | PU | $50.86 | 100% | CD41 | 49.00 | | |
| Industrial Commercial Services Inc | | 9/20/2021 | $20,000.00 | 300495-001 | 1 | No | | PU | $50.86 | 100% | CD41 | 393.25 | | |
| Industrial Commercial Services Inc | | 11/23/2021 | $2,573.00 | 300621-002 | 1 | No | | PU | $50.86 | 100% | CD41 | 50.50 | | |
| Industrial Commercial Services Inc | | 12/15/2021 | $7,355.00 | 301294-001 | 1 | No | | PU | $50.86 | 100% | CD41 | 144.50 | | |
| Industrial Commercial Services Inc | | 12/27/2021 | $5,975.63 | 301259-001 | 1 | No | | PU | $50.86 | 100% | CD41 | 117.50 | | |
| Industrial Commercial Services Inc | | 3/4/2022 | $6,867.00 | 301327-00 | 1 | No | | PU | $50.86 | 100% | CD41 | 135.00 | | |
| Industrial Commercial Services Inc | | 5/4/2022 | $6,483.00 | 301790-001 | 1 | No | | PU | $50.86 | 100% | CD41 | 127.50 | | |
| Industrial Commercial Services Inc | | 6/22/2022 | $10,171.50 | 301342-001 | 1 | No | | PU | $52.01 | 100% | CD41 | 195.50 | | |
| Industrial Commercial Services Inc | | 7/19/2022 | $2,300.00 | 302003-001 | 1 | No | | PU | $52.01 | 100% | CD41 | 44.25 | | |
| Industrial Commercial Services Inc | | 8/15/2022 | $11,325.00 | 302083-001 | 1 | No | | PU | $52.01 | 100% | CD41 | 217.75 | | |
| Industrial Commercial Services Inc | | 8/17/2022 | $7,520.00 | 301986-001 | 1 | No | | PU | $52.01 | 100% | CD41 | 144.50 | | |
| Industrial Commercial Services Inc | | 8/19/2022 | $1,070.00 | 302158-001 | 1 | No | | PU | $52.01 | 100% | CD41 | 20.50 | | |
| Industrial Commercial Services Inc | | 8/24/2022 | $25,548.00 | 300686-001 | 1 | No | | PU | $52.01 | 100% | CD41 | 491.25 | | |
| Industrial Commercial Services Inc | | 9/1/2022 | $2,100.00 | 301732 | 1 | No | | PU | $52.01 | 100% | CD41 | 40.50 | | |
| Industrial Commercial Services Inc | | 9/1/2022 | -$1,000.00 | 301732 | 1 | No | | PU | $52.01 | 100% | CD41 | -19.25 | | |
| Industrial Commercial Services Inc | | 11/15/2022 | $4,810.00 | 302066-001 | 1 | No | | PU | $52.01 | 100% | CD41 | 92.50 | | |
| Industrial Commercial Services Inc | | 11/15/2022 | $900.00 | 302066-001 | 1 | No | | PU | $52.01 | 100% | CD41 | 17.25 | | |
| Industrial Commercial Services Inc | | 3/8/2023 | $23,355.00 | 302376-001 | 1 | No | | PU | $52.01 | 100% | CD41 | 449.00 | | |
| Industrial Commercial Services Inc | | 4/5/2023 | $3,250.00 | 302751-001 | 1 | No | | PU | $52.01 | 100% | CD41 | 62.50 | | |
| Industrial Commercial Services Inc | | 4/21/2023 | $2,500.00 | 302822-001 | 1 | No | | PU | $52.01 | 100% | CD41 | 48.00 | | |
| Industrial Commercial Services Inc | | 4/28/2023 | $22,428.00 | 302649-001 | 1 | No | | PU | $52.01 | 100% | CD41 | 431.25 | | |
| Industrial Commercial Services Inc | | 5/1/2023 | $2,500.00 | 302844-001 | 1 | No | | PU | $52.01 | 100% | CD41 | 48.00 | | |
| Industrial Commercial Services Inc | | 5/3/2023 | $200.00 | 302844-002 | 1 | No | | PU | $52.01 | 100% | CD41 | 3.75 | | |
| Industrial Commercial Services Inc | | 5/15/2023 | $2,200.00 | 302792-001 | 1 | No | | PU | $52.01 | 100% | CD41 | 42.25 | | |
| Industrial Commercial Services Inc | | 6/5/2023 | $1,920.00 | 302838-001 | 1 | No | | PU | $53.51 | 100% | CD41 | 36.00 | | |
| Industrial Commercial Services Inc | | 6/8/2023 | $4,800.00 | 302871-001 | 1 | No | | PU | $53.51 | 100% | CD41 | 89.75 | | |
| Industrial Commercial Services Inc | | 6/21/2023 | $3,870.00 | 302845-001 | 1 | No | | PU | $53.51 | 100% | CD41 | 72.25 | | |
| Industrial Commercial Services Inc | | 6/28/2023 | $2,500.00 | 302912-001 | 1 | No | | PU | $53.51 | 100% | CD41 | 46.75 | | |
| Industrial Commercial Services Inc | | 6/30/2023 | $3,325.00 | 302913-001 | 1 | No | | PU | $53.51 | 100% | CD41 | 62.25 | | |
| Industrial Commercial Services Inc | | 7/14/2023 | $2,500.00 | 302900 | 1 | No | | PU | $53.51 | 100% | CD41 | 46.75 | | |
| Industrial Commercial Services Inc | | 7/19/2023 | $4,030.00 | 302887-001 | 1 | No | | PU | $53.51 | 100% | CD41 | 75.25 | | |
| Industrial Commercial Services Inc | | 8/4/2023 | $2,700.00 | 302975-001 | 1 | No | | PU | $53.51 | 100% | CD41 | 50.50 | | |
| Industrial Commercial Services Inc | | 4/24/2024 | $13,981.25 | 303086-001 | 1 | No | | PU | $53.51 | 100% | CD41 | 261.25 | | |
| Industrial Commercial Services Inc | | 5/3/2024 | $912.00 | 303086-002 | 1 | No | | PU | $53.51 | 100% | CD41 | 17.00 | | |
| Industrial Commercial Services Inc | | 6/5/2024 | $3,242.00 | 303683-001 | 1 | No | | PU | $55.11 | 100% | CD41 | 58.75 | | |
| Industrial Commercial Services Inc | | 7/24/2024 | $3,127.00 | 303790-001 | 1 | No | | PU | $55.11 | 100% | CD41 | 56.75 | | |
| Industrial Commercial Services Inc | | 9/24/2024 | $5,028.00 | 30373-001 | 1 | No | | PU | $55.11 | 100% | CD41 | 91.25 | | |
| Industrial Commercial Services Inc | | 10/1/2024 | $3,168.00 | 303999-001 | 1 | No | | PU | $55.11 | 100% | CD41 | 57.50 | | |
| Industrial Commercial Services Inc | | 10/16/2024 | $3,457.00 | 304032-001 | 1 | No | | PU | $55.11 | 100% | CD41 | 62.75 | | |
| Industrial Commercial Services Inc | | 11/11/2024 | $4,200.00 | 304087-001 | 1 | No | | PU | $55.11 | 100% | CD41 | 76.25 | | |
| Industrial Commercial Services Inc | | 11/13/2024 | $2,450.00 | 304086-001 | 1 | No | | PU | $55.11 | 100% | CD41 | 44.50 | | |
| Industrial Commercial Services Inc | | 11/26/2024 | $4,900.00 | 304124-001 | 1 | No | | PU | $55.11 | 100% | CD41 | 89.00 | | |
| Industrial Commercial Services Inc | | 12/6/2024 | $2,000.00 | 304146-001 | 1 | No | | PU | $55.11 | 100% | CD41 | 36.25 | | |

# Mid America Carpenters Regional Council
## Sub Sheet

Employer Name: Dock & Door Install Inc
Account Number: 25435
Audit Period: October 1, 2020 to December 31, 2024

| Payee | Ck# | Date | Amount | Job # | Ref # | Invoice | Description | Action | Rate | Labor % | Code | Ben Hrs | Tot Hrs | Cap |
|-------|-----|------|--------|-------|-------|---------|-------------|--------|------|---------|------|---------|---------|-----|
| Premier Installers | | 9/14/2022 | $2,850.00 | | 2 | No | | PU | $52.01 | 100% | RCD41 | 54.75 | | |

# Mid America Carpenters Regional Council
## Sub Sheet

Employer Name: Dock & Door Install Inc
Account Number: 25435
Audit Period: October 1, 2020 to December 31, 2024

| Payee | Ck# | Date | Amount | Job # | Ref # | Invoice | Description | Action | Rate | Labor % | Code | Ben Hrs | Tot Hrs | Cap |
|-------|-----|------|--------|-------|-------|---------|-------------|--------|------|---------|------|---------|---------|-----|
| Scott Overhead | | 4/19/2021 | $1,925.80 | 9258780 | 3 | No | | PU | $49.76 | 100% | RCD41 | 38.75 | | |

# Mid America Carpenters Regional Council
## Schedule of Amounts Due

Employer Name: Dock & Door Install Inc
Account Number: 25435
Audit Period: October 1, 2020 to December 31, 2024

| Month | Account Number | Rate Table | Reference Number | Name | Error Code | Total Hours Reported | Benefit Hours Reported | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Total Hours | Pension Capped Hours | Pension Discrepancy Hours | Pension Contribution Rate | Benefit Capped Hours | Benefit Discrepancy Hours | Benefit Contribution Rate | Discrepancy Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| October 2021 | 25435 | 81183 | ■■■■ | Aguirre Garcia Jose | P1 | 88.00 | 88.00 | 84.00 | | | | | 84.00 | - | - | | | (4.00) | $ 37.88 | $ (151.52) |

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 2

**1**

```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
                     EASTERN DIVISION

MID-AMERICA CARPENTERS     )
REGIONAL COUNCIL PENSION   )
FUND, et al.,              )
                           )
          Plaintiffs,      )  No. 1:24-cv-02428
                           )
      vs.                  )  Judge Andrea R. Wood
                           )
DOCK & DOOR INSTALL,       )     Magistrate Judge
INC., an Illinois          )  Jeannice W. Appenteng
corporation and MIDWEST    )
DOCK SOLUTIONS, INC., an   )
Illinois corporation,      )
                           )
          Defendants.      )
```

          The deposition of ANTHONY EDWARD
ZARLENGO, called by the Defendant for
examination, taken pursuant to the Federal
Rules of Civil Procedure of the United States
District Courts pertaining to the taking of
depositions, taken before DIANE M. NULICK, a
Notary Public within and for the County of
Cook, State of Illinois, and a Certified
Shorthand Reporter of said State, at Suite 231,
3759 North Ravenswood, Chicago, Illinois, on
the 26th day of September, A.D. 2025, at 9:35
a.m.

**2**

```
 1    PRESENT:
 2      McJESSY, CHING & THOMPSON, LLC,
        BY:  MR. KEVIN P. McJESSY,
 3      mcjessy@MCandT.com,
        (3759 North Ravenswood, Suite 231,
 4       Chicago, Illinois  60613,
        (773) 880-1260),
 5
 6          appeared on behalf of the plaintiffs;
 7      ALLOCCO MILLER & CAHILL, P.C.,
        BY:  MS. KATHLEEN M. CAHILL,
        kmc@alloccomiller.com,
 8      (20 North Wacker Drive, Suite 3517,
         Chicago, Illinois 60606,
 9      (312) 675-4325),
10          appeared on behalf of the defendant,
            Dock & Door Install, Inc.;
11
        AMUNDSEN DAVIS LLC,
12      BY:  MR. MICHAEL F. HUGHES,
        mhughes@amundsendavislaw.com,
13      (3815 East Main Street, Suite A-1,
         St. Charles, Illinois  60174,
14      (630) 587-7925/(630) 217-1228 (direct),
15          appeared on behalf of the defendant,
            Midwest Dock Solutions, Inc.
16
     Also Present:
17
        Mr. Anthony Brutti,
18
19
20
21
22
23
24
```

**3**

```
                I N D E X

WITNESS:  ANTHONY EDWARD ZARLENGO

EXAMINATION BY:                      PAGE
Mr. McJessy                            4

PLAINTIFF'S EXHIBITS:
No. 40                                13
No. 95 and 96                         14
No. 40                                17
No. 79                                35
No. 80                                40
No. 58                                43
No. 59                                49
No. 81                                56
No. 82                                60
No. 83                                62
No. 81                                63
No. 85                                72
No. 86                                74
No. 40                                97
No. 61                               121
No. 63                               133
No. 69                               139
No. 70                               143
No. 97 and 98                        145
No. 64                               153
No. 65                               157
No. 99                               162
No. 100                              172
No. 101                              181
No. 102                              188
No. 103                              204
No. 53                               214
No. 104                              221
No. 92                               232
No. 93                               237
```

**4**

```
PLAINTIFF'S EXHIBITS:  (Cont.)
No. 53                    238
No. 57                    240
No. 104                   246
No. 40                    266
No. 40                    274
No. 106                   299
No. 107                   302
No. 108                   316
No. 109, 110, and 111         319
No. 112                   323
No. 113, 114, 115, and 116    328
No. 113                   335
No. 116                   350
No. 117, 118, and 119         356
No. 120                   360
```

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

5

1     MR. McJESSY:  You can go ahead and
2  swear the witness whenever you're ready.
3
4           (The witness was duly sworn.)
5
6
7
8        ANTHONY EDWARD ZARLENGO,
9  called as a witness herein, having been first
10  duly sworn, was examined and testified as
11  follows:
12
13
14           EXAMINATION
15        BY MR. McJESSY:
16
17     Q.  Sir, can you please state your name
18  for the record -- first, middle, and last --
19  and spell each?
20     A.  Anthony Edward Zarlengo,
21  A-n-t-h-o-n-y, E-d-w-a-r-d, and Zarlengo,
22  Z-a-r-l-e-n-g-o.
23     Q.  Excellent.
24           Have you ever been deposed

6

1  before, sir?
2     A.  Yes.
3     Q.  On how many occasions?
4     A.  Once.
5     Q.  And what was it for?
6     A.  It was a building owner who was in a
7  lawsuit with one of my customers I did work for
8  about repairs to a building that my customer
9  was moving out of the building, and the
10  building owner was going after them for the
11  repairs for the doors and the docks.
12     Q.  All right.
13           And how long ago was that?
14     A.  Wow.  Well, I've been around for 20.
15  Ballpark, 12 years ago.
16     Q.  All right.
17           And you've sat through
18  numerous depositions in this case, correct?
19     A.  Correct.
20     Q.  Okay.
21           So you're familiar -- you're
22  generally familiar with the process?
23     A.  Correct.
24     Q.  All right.

7

1           And -- so I won't go over the
2  ground rules.  But I will ask, is there any
3  reason today that you're unable to give
4  truthful answers to my questions?
5     A.  No.
6     Q.  For example, are you suffering from
7  any conditions or taking any medications that
8  would prevent you from either understanding my
9  questions or giving truthful answers?
10     A.  No.
11     Q.  Okay.
12           And you do understand that
13  even though this is an informal setting in a
14  conference room, that you're under oath and
15  that that oath has the same force and effect as
16  if this were a court of law?
17     A.  Yes.
18     Q.  Sir, are you related to Tony Brutti?
19     A.  No.
20     Q.  Are you related to Michael Richert?
21     A.  Yes.
22     Q.  And is he your brother-in-law?
23     A.  Yes.
24     Q.  Okay.

8

1           And how long has he been your
2  brother-in-law?
3     A.  Around 10 years.
4     Q.  Ten years.
5     A.  Maybe a little more than that.  It's
6  been more than that, but maybe -- 15 years,
7  maybe.  I don't know exactly how many years
8  they've been married for.
9     Q.  Okay.
10           Approximately 10 to 15 years?
11     A.  Ten to fifteen years.
12     Q.  Okay.
13           And, sir, you're represented
14  by counsel today?
15     A.  Yes.
16     Q.  All right.
17           Mr. Hughes is your attorney?
18     A.  Yes.
19     Q.  Okay.
20           And did you do anything to
21  prepare for your deposition today?
22     A.  Yes.
23     Q.  What did you do?
24     A.  Spoke to Mike.

2 (Pages 5 to 8)

9

1    Q.  Okay.
2        I don't want to know what you
3    said to him or what he said to you, but
4    anything else?
5    A.  No.
6    Q.  Okay.
7        Did you review any documents?
8    A.  No.
9    Q.  How long did you meet with Mr. Hughes?
10   A.  Twenty minutes.
11   Q.  All right.
12       And on how many occasions did
13   you meet with him?
14   A.  Two times.
15   Q.  All right.
16       And how many -- how long the
17   other time, or was it 20 minutes total?
18   A.  About 10 minutes the other time.
19   Q.  Okay.
20       And was anybody else present
21   during those meetings?
22   A.  No.
23   Q.  And have you spoken with anybody else
24   about your deposition here today?

10

1    A.  Mike Richert.
2    Q.  All right.
3        And what was the nature of
4    your conversation with him?
5    A.  Things he was talking about yesterday
6    in the deposition.
7    Q.  Okay.
8        So you talked with him after
9    his deposition --
10   A.  Correct.
11   Q.  -- yesterday?
12   A.  Yes.
13   Q.  All right.
14       And what -- what did he tell
15   you about his deposition yesterday?
16   A.  Just some of the questions that were
17   asked and how he answered some of them.
18   Q.  Okay.
19       And what questions were
20   those?
21   A.  Things like the office and suppliers
22   and employees, stuff he couldn't answer.  That
23   was of the majority of it.
24   Q.  Okay.

11

1    What else can you recall?
2    A.  It was mostly that.  You know, a lot
3    of the questions that he was asked he didn't
4    know the answers to and that, you know, he
5    works -- he doesn't do much office work, so the
6    majority of the questions were -- a lot of them
7    were office related, and he didn't know the
8    majority of the answers.
9    Q.  Okay.
10   A.  Because he doesn't deal with the
11   office stuff at all.  That was the majority of
12   the stuff.  And that's the majority of what we
13   talked about.  We didn't talk very long.  We
14   only talked probably 15 minutes.
15   Q.  All right.
16       And did he talk to you at all
17   about the Facebook page?
18   A.  He did mention the Facebook page.  You
19   are correct.  He mentioned the pictures in the
20   Facebook page and that he didn't know what some
21   of the pictures were.
22   Q.  Okay.
23       And did he talk to you about
24   the picture in the Facebook page that is of the

12

1    logistics warehouse?
2    A.  Yes.
3    Q.  Okay.
4        And what did he tell you
5    about that?
6    A.  He thought it was a picture that he
7    took of a warehouse, just some random
8    warehouse, but that's incorrect.
9    Q.  Okay.
10       And is that actually a --
11   well, tell me why is that incorrect?
12   A.  Because all of the pictures in the
13   Facebook page are jobs that we did.  But he
14   doesn't know a lot of the jobs that we did, and
15   I know the majority of the jobs that we've
16   done.  I can name all of those buildings and
17   where they're located and what we did on those
18   buildings.
19   Q.  Excellent.  All right.
20   A.  There's not many pictures, I don't
21   think.
22   Q.  All right.
23       Well, excellent.  We will get
24   to that, then.  Thank you.

3 (Pages 9 to 12)

13

1    **Sir, Midwest Dock Solutions**
2    **answered discovery in this case and produced**
3    **documents, correct?**
4        A.  Correct.
5
6            (WHEREUPON, the document marked
7            Plaintiff's Exhibit 40 for
8            identification was tendered to
9            the deponent.)
10
11   BY MR. McJESSY:
12       Q.  **All right.**
13           **And I'm going to bring up**
14   **Exhibit -- what we've previously marked as**
15   **Exhibit 40 and provide that to you.**
16           **And do you see Exhibit 40 in**
17   **front of you there?**
18       A.  Yeah.  I do.
19       Q.  **All right.**
20           **And if you turn to the last**
21   **page of that exhibit -- the very last page of**
22   **Exhibit 40.**
23       A.  Oh, the very last one?  I gotcha.
24   Okay.  Sorry.

14

1        Q.  **All right.**
2            **There appears to be a**
3    **verification page signed by you, correct?**
4        A.  Yes.
5        Q.  **All right.**
6            **And did you review those**
7    **responses to the discovery requests and approve**
8    **them?**
9        A.  Yes.
10       Q.  **All right.**
11           **And as far as you know, they**
12   **were true and accurate when you signed the**
13   **verification?**
14       A.  Yes.
15
16           (WHEREUPON, the document was
17           marked Plaintiff's
18           Exhibits 95 and 96 for
19           identification, as of 9/26/25.)
20
21           MR. McJESSY:  This is Exhibit 95,
22   and that's 96.
23   BY MR. McJESSY:
24       Q.  **And if you could take a look at what**

15

1    **I've handed you that's been marked as Exhibit**
2    **95.**
3        A.  Okay.
4        Q.  **That's also another set of**
5    **interrogatory responses, and that was also**
6    **verified by you, correct?**
7            **If you look at the second to**
8    **last page of that exhibit.**
9        A.  Yes.
10       Q.  **Okay.**
11           **And those answers also were**
12   **true and accurate, as far as you know, when you**
13   **signed them, correct?**
14       A.  Yes.
15       Q.  **Okay.**
16           **And then you also gathered**
17   **and produced documents in response to the**
18   **document requests that are part of Exhibit 40**
19   **and part of Exhibit 96 as well, correct?**
20       A.  Yes.
21       Q.  **All right.**
22           **Now, to gather documents**
23   **responsive to the discovery request, did you do**
24   **that, or did you assign tasks to others to do**

16

1    **that?**
2        A.  I assigned tasks to other.
3        Q.  **Okay.**
4            **And who did you assign the**
5    **tasks to, and what did you to ask them to do?**
6        A.  Sherri Webber did a lot of the tasks
7    that involved general contractors.
8        Q.  **Okay.  All right.**
9            **Anybody else?**
10       A.  Can I look through this real quick?
11       Q.  **Sure.**
12       A.  I just don't -- I think so, but I'm
13   just trying to think if anybody else would
14   have -- who else besides Sherri would have done
15   anything.
16           MR. HUGHES:  Yeah.  If you need
17   to -- I mean, if you need to familiarize
18   yourself with the document before you answer.
19           THE WITNESS:  Yeah.  I mean, it's
20   been so long.
21           Job postings.  Post office.
22   And what is this?  Health insurance.
23           I'm pretty sure me and Sherri
24   gathered all of these -- all of this

**4  (Pages 13 to 16)**

17

1  information and nobody else.
2  BY MR. McJESSY:
3      Q.  Okay.
4          And I was going to ask, did
5  Sherri do anything else other than gather
6  information related to the general contractors?
7      A.  She probably would have gathered the
8  health insurance information, 401(k)
9  information, invoices from Dock & Door.  She
10  would have gathered -- there's so much
11  information, it's hard to remember.
12          Offhand, that's what I know
13  Sherri would have gathered.
14      Q.  Okay.
15          And -- and anything else, you
16  would have gathered; is that correct?
17      A.  Yes.  Correct.
18
19          (WHEREUPON, the document marked
20          Plaintiff's Exhibit 40 for
21          identification was tendered to
22          the deponent.)
23
24

18

1  BY MR. McJESSY:
2      Q.  All right.
3          And if you look at Exhibit 40
4  that you have in front of you and you turn to
5  page 11 of that exhibit --
6      A.  Okay.
7      Q.  -- and you see there it has
8  interrogatory number 11.  It says, identify all
9  persons who assisted in answering these
10  document requests and interrogatories, and for
11  each person, identify which document requests
12  and interrogatories.
13      A.  Yeah.
14      Q.  And the answer is, other than counsel
15  prepared legal objections, the following
16  individuals assisted in answering
17  interrogatories one to ten, and then it's got
18  you and Mr. Richert, correct?
19      A.  Yes.
20      Q.  Okay.
21          Did he assist in answering
22  interrogatories?
23      A.  He assisted, yes.
24      Q.  Okay.

19

1          And what was his assistance?
2      What did he provide?
3      A.  He probably didn't get any of the
4  documents, but he might have assisted in some
5  of the questions that -- besides gathering
6  documents.
7      Q.  All right.
8      A.  What, offhand, I couldn't tell you.
9      Q.  Okay.
10          Do you think that you
11  principally provided the information for the
12  interrogatory responses?
13      A.  Yes.
14      Q.  All right.
15          And what did you do to gather
16  documents responsive to the document requests?
17      A.  Like what documents did I gather?
18      Q.  Yeah.  What did you do?
19      A.  Well, I would have told Sherri what I
20  needed to gather for the -- for the documents.
21  I may have gathered some of them, but the
22  majority of them Sherri Webber would have
23  gathered.
24      Q.  All right.

20

1          And did you review your
2  emails to produce documents that would be
3  responsive in this case?
4      A.  Yes.
5      Q.  And did you review anybody else's
6  emails?
7      A.  No.
8      Q.  Okay.
9          And where are your emails
10  kept?
11      A.  Gmail.
12      Q.  And are -- what kind of program do you
13  use to access them?
14      A.  Just Google.  I mean, I don't know
15  what you mean "program."  Like just on Google.
16  I log in, and I Google.
17      Q.  You log into the Internet?
18      A.  Yes.
19      Q.  And then you type in your password and
20  access your emails?
21      A.  Yeah.  Correct.
22      Q.  Okay.
23          So is your computer password
24  protected?

5 (Pages 17 to 20)

21

1    A.  Yes.
2    Q.  Okay.
3         And are you the only person
4    that knows the password?
5    A.  Sherri knows it also.
6    Q.  Okay.
7         Anybody else?
8    A.  I think Sherri knows my password.  No.
9    Q.  All right.
10   A.  I think Sherri knows my password.  I'm
11   not a hundred percent sure on that, though.
12   Q.  Okay.
13        We'll get more into this
14   later in the deposition, but you're aware that
15   Tony Brutti has an email account
16   tonyb@midwestdocksolutions.com?
17   A.  Yes.
18   Q.  All right.
19        And how long has he had that
20   email account?
21   A.  How long?
22   Q.  Yeah.
23   A.  I don't know that answer.
24   Q.  Would you --

22

1    A.  I'm not sure.
2    Q.  Would you have been the person to set
3    that up?
4    A.  No.
5    Q.  Who would have been the person to set
6    that up?
7    A.  My sister sets up the emails.
8    Q.  Okay.
9         And what's her name?
10   A.  Miranda Zarlengo.
11   Q.  All right.
12        And where -- do you have an
13   address for her?  Do you know her address?
14   A.  No.
15   Q.  All right.
16        Does she have a position with
17   your company?
18   A.  No.
19   Q.  Okay.
20        She's just technologically
21   savvy, so she assists you in that kind of
22   thing?
23   A.  Correct.
24   Q.  Okay.

23

1         Are you aware that Tony
2    Brutti has had that email for more than five
3    years?
4    A.  I would think so, yes.
5    Q.  Okay.
6         And do you know, has he had
7    that email since Dock & Door was formed?
8    A.  I don't think so.
9    Q.  Okay.
10        You don't think it goes back
11   that far?
12   A.  No.
13   Q.  Okay.
14        And has he had that email
15   address ever since Midwest Dock Solutions
16   started using the domain
17   midwestdocksolutions.com?
18   A.  Like the day we started it?
19   Q.  No, but around that time.
20   A.  I would say it was around that time.
21   Q.  Okay.
22   A.  But I can't -- you know, that's
23   something I wouldn't know a hundred percent,
24   but I would say it's around that time.

24

1    Q.  Okay.
2         And was any effort made to
3    search that account for documents responsive to
4    the discovery requests in this case, to your
5    knowledge?
6    A.  No.
7    Q.  Okay.
8         Have you communicated with
9    Mr. Brutti in the past by email using that
10   email address?
11   A.  I don't know.  I don't think so.
12   Q.  Okay.
13   A.  I've always used -- I've always used
14   ajbrutti at his other email.
15   Q.  Okay.
16        If you turn to Exhibit --
17   Exhibit 40 and go to page 43 --
18   A.  Okay.
19   Q.  -- there's a request there at number
20   67 that says, produce all communications
21   between Michael Richert or Anthony Zarlengo on
22   the one hand and Anthony Brutti on the other.
23        Do you see that?
24   A.  Yes.

6 (Pages 21 to 24)

25

1    Q.  And have you -- and you've -- you've
2  communicated with Mr. Brutti, I take it, by
3  email using your company email, correct?
4    A.  My company email, yes.
5    Q.  Okay.
6        And would you have
7  communications with Mr. Brutti through your
8  company email?
9    A.  Yes.
10   Q.  Okay.
11       Do you delete your emails?
12   A.  I always do.
13   Q.  You always delete your emails?
14   A.  Yeah.
15   Q.  Okay.
16   A.  I have an addiction to deleting
17  emails.
18   Q.  Okay.
19       And you've done that during
20  the course of this case as well?
21   A.  Yes.
22   Q.  Okay.
23       So after this lawsuit was
24  filed, you continued to delete your emails?

26

1    A.  Yes.
2    Q.  Okay.
3        Midwest Dock Solutions owns
4  the email extension midwestdocksolutions.com,
5  correct?
6    A.  Correct.
7    Q.  Okay.
8        And so it owns the email
9  account tonyb@midwestdocksolutions.com,
10  correct?
11   A.  Correct.
12   Q.  Okay.
13       Do you know, have the emails
14  in that email account been deleted?
15   A.  I do not know that.
16   Q.  Okay.
17       I'm going to ask --
18   A.  I've never been on his email before.
19   Q.  Okay.
20       I'm going to ask that to the
21  extent that your company has control over that
22  email account --
23   A.  Yes.
24   Q.  -- those emails not be deleted.  Okay?

27

1    A.  Not a problem, yes.
2    MR. McJESSY:  And, Mr. Hughes, I'm
3  going to ask that those emails be produced.
4    MR. HUGHES:  Which emails?
5    MR. McJESSY:  The emails in that
6  email account.
7    MR. HUGHES:  The entire email
8  account?
9    MR. McJESSY:  Yeah.  Yeah.  And in
10  particular, the email communications from that
11  account between Mr. Zarlengo and Mr. Richert,
12  but --
13   MR. HUGHES:  Wait.  Mr. -- I don't
14  know that there's been any foundation for there
15  being such.
16   MS. CAHILL:  And also I'll object,
17  too.  I mean, to the extent that you're asking
18  for every single email in that account.  But I
19  don't even know if there are --
20   MR. HUGHES:  It's broad, number one.
21   MS. CAHILL:  Right.
22   MR. HUGHES:  And, number two, I -- I
23  don't even know that he has -- that we have
24  control over that.  It's a Gmail account.

28

1  That's my understanding.  I don't know that
2  we -- the company has any control over that at
3  all or not.
4    MR. McJESSY:  Okay.
5  BY MR. McJESSY:
6    Q.  Sir, when you received the discovery
7  request in this request, did you look for email
8  communications between you and Mr. Brutti?
9    A.  Yes.
10   Q.  All right.
11       And did you gather them?
12   A.  I sent my emails between me and Tony
13  Brutti in.
14   Q.  Okay.
15       You believe that you did
16  provide those?
17   A.  I provided a lot of emails.
18   MR. HUGHES:  I can't -- I can't, you
19  know --
20   THE WITNESS:  I provided a lot of
21  emails through -- I don't know who it was to.
22  It's been a long time.  But we were going
23  through and copying emails, like all of them to
24  certain people.  And, offhand, I can't tell you

7 (Pages 25 to 28)

29

```
 1   what people it was.
 2   BY MR. McJESSY:
 3       Q.  Okay.
 4       A.  But I know that we were downloading
 5   all of my emails to certain people.  Now, I
 6   would imagine Tony B. was one of them, but I
 7   don't recall.  It's been months and months
 8   since we downloaded all of those emails.
 9           MR. McJESSY:  Okay.
10               Well, to the extent, then,
11   that those emails exist, I would ask for those
12   emails to be produced.
13           MR. HUGHES:  We produced those to
14   you.  Mr. Zarlengo sent me -- yes.  And we had
15   the vendor and everything else.  So we did
16   produce them.  There should be no implication
17   that we haven't produced them.  Plus, he said
18   he just produced them.  And so, now, you're
19   asking us to reproduce documents we've already
20   produced.
21           MR. McJESSY:  Well, I'll look.  I
22   don't recall seeing those produced, so --
23           MR. HUGHES:  Yeah.  They have been.
24           MR. McJESSY:  Okay.  All right.
```

30

```
 1           THE WITNESS:  I can't answer who
 2   they were -- who it was that I produced all of
 3   these emails from, but I know I produced a lot
 4   of emails from different people.
 5           MR. McJESSY:  Okay.
 6               Do you recall whether they
 7   were produced in like printed format or some
 8   other format?
 9           MR. HUGHES:  I don't think we
10   produced anything in printed format.  We gave
11   you everything electronically.
12           MR. McJESSY:  But it was PDFs, I'm
13   guessing?
14           MR. HUGHES:  I don't recall.  I
15   believe it was PDFs from our -- I think our
16   vendor produced the PDFs, and we produced them
17   to you.
18           MR. McJESSY:  Do you know who vendor
19   was?
20           MR. HUGHES:  I don't know why that's
21   relevant.
22           MR. McJESSY:  Well, I'm trying --
23   you said the vendor produced them.
24           MR. HUGHES:  Produced to me, and I
```

31

```
 1   produced to you.
 2           MR. McJESSY:  Oh, you produced them
 3   to us.  Okay.  All right.
 4   BY MR. McJESSY:
 5       Q.  Sir, did you graduate from high
 6   school?
 7       A.  Yes.
 8       Q.  And when?
 9       A.  1995.
10       Q.  All right.
11               And did you attend college?
12       A.  Yes.
13       Q.  And did you graduate?
14       A.  Yes.
15       Q.  And when did you graduate?
16       A.  2000.
17           MR. HUGHES:  Tony, let him finish
18   the question --
19           THE WITNESS:  Oh, I'm sorry.
20           MR. HUGHES:  -- because it's going
21   to make it really hard for her to --
22           THE WITNESS:  Okay.  I'm sorry.
23           MR. HUGHES:  That's okay.
24
```

32

```
 1   BY MR. McJESSY:
 2       Q.  And where did you graduate from
 3   college?
 4       A.  St. Louis University.
 5       Q.  And what was your field and major?
 6       A.  Business management.
 7       Q.  And what was the -- have you received
 8   any training after -- after that, any like
 9   master's degree or --
10       A.  No.
11       Q.  All right.
12               And have you received any
13   training other than formal education, like
14   training in the trades, that kind of thing?
15       A.  No.
16       Q.  All right.
17               And have you ever been a
18   union member?
19       A.  No.
20       Q.  And after graduating from college,
21   what was your first job?
22       A.  I don't know if you want to call it a
23   job.  I was a golf professional.
24       Q.  I call that a job.
```

8 (Pages 29 to 32)

33

1    And how long were you a golf
2 professional?
3    A.  I tried to play professionally for
4 about two years, and I worked as a club pro for
5 six years.
6    Q.  Did you work as a club pro while you
7 were in college?
8    A.  No.
9    Q.  Okay.
10    So that was after you
11 graduated?
12    A.  Yes.
13    Q.  And was that from approximately 2000
14 to 2006?
15    A.  2002 to 2008, I was a club pro.  2002
16 to 2002 -- I mean, 2000 to 2002, I was a
17 playing professional.  That's the difference.
18    Q.  And do you recall when you started
19 Midwest Dock Solutions with Mr. Richert?
20    A.  Yes.  2006.
21    Q.  Okay.
22    So were you working as a club
23 professional and also working for Midwest Dock
24 Solutions for a couple years at the same time?

34

1    A.  Correct.
2    Q.  All right.
3    And prior to starting Midwest
4 Dock Solutions with Mr. Richert, had you any
5 experience in the installation of dock levelers
6 or overhead doors?
7    A.  No.
8    Q.  Any experience in the overhead door or
9 dock leveler industry?
10    A.  No.
11    Q.  And other than -- between 2000 and
12 2006, did you have any other employment?
13    A.  No.
14    Q.  And other than Midwest Dock Solutions,
15 do you own any other companies?
16    A.  Midwest Angle.
17    Q.  All right.
18    And what does that company
19 do?
20    A.  We fabricate steel angles.
21    Q.  All right.
22    And are those steel angles
23 used by Midwest Dock Solutions?
24    A.  Yes.

35

1    Q.  All right.
2    And Dock & Door?
3    A.  No.
4    Q.  Dock & Door doesn't install any of
5 those -- what did you call them, angle irons?
6    A.  Steel angles.  Curb angles.
7    Q.  Curb angles?
8    A.  Yeah, no.
9    Q.  Dock & Door -- does Dock & Door
10 install any of the curb angles as part of the
11 work it does?
12    A.  No.
13    Q.  Other than Midwest Angle and Dock --
14 Midwest Dock Solutions, do you own any other
15 companies?
16    A.  No.
17    Q.  All right.
18    You can set that book in
19 front of you aside for the time being.
20
21    (WHEREUPON, the document marked
22    Plaintiff's Exhibit 79 for
23    identification was tendered to
24    the deponent.)

36

1 BY MR. McJESSY:
2    Q.  I'm going to hand you what I've
3 previously marked as Exhibit 79, and Exhibit 79
4 appears to be the Articles of Incorporation for
5 Midwest Dock Solutions, correct?
6    A.  Yes.
7    Q.  All right.
8    And they're dated May 16,
9 2016.
10    Does that sound like the time
11 that you started the corporation?
12    A.  2006.
13    Q.  Or 2006.  I'm sorry.
14    A.  Yes.  Correct.
15    Q.  Yes.  Thank you.
16    And you started the business
17 with Tony Zarlengo -- or, I'm sorry, with Mike
18 Richert?
19    A.  Yes.
20    Q.  And you two have always been the two
21 owners of that business; is that correct?
22    A.  Yes.
23    Q.  The ownership has never changed,
24 correct?

9 (Pages 33 to 36)

37

1    A.   Correct.
2    Q.   All right.
3              And have you always been
4    equal 50 percent owners?
5    A.   Yes.  Correct.
6    Q.   All right.
7              And how did -- how did you
8    make the decision to start Midwest Dock
9    Solutions?
10   A.   I wanted to get out of the golf
11   industry as a club pro, and Mike had past
12   experience in the door and dock industry.
13   Q.   Okay.
14   A.   And he approached me and said, do you
15   want to start a company together doing loading
16   docks?  I said, I don't know what a loading
17   dock is.  Are we building boat docks?  And he
18   said, no, loading docks.  And I said, don't
19   know what it is.  And he kind of gave me a
20   catalog and said, this is what we're going
21   to sell and got business cards and brochures
22   and started the company.
23   Q.   All right.
24              And did you make a capital

38

1    contribution to start the company?
2    A.   No.
3    Q.   Okay.
4              Did Mr. Richert?
5    A.   Yes.
6    Q.   Okay.
7              And what was his capital
8    contribution?
9    A.   I would be completely guessing if I
10   answer this.  I really have no answer for that.
11   Q.   Okay.
12              You don't recall?
13   A.   I'm going to -- I'm going to ballpark
14   $5,000.
15   Q.   Okay.
16              There was some amount that
17   was contributed?
18   A.   Yes.
19   Q.   Okay.
20   A.   To start.  To purchase a few items.
21   Q.   All right.
22              And in your mind, it was
23   somewhere in that neighborhood; is that
24   correct?

39

1    A.   $5,000, yeah.
2    Q.   Okay.
3              And was that -- did he also
4    purchase a truck as part of the start-up of the
5    business?
6    A.   He already owned one.
7    Q.   He already owned one.  Okay.
8              So -- and that truck was used
9    as part of the business?
10   A.   Yes.
11   Q.   Okay.
12
13              (WHEREUPON, the document marked
14              Plaintiff's Exhibit 80 for
15              identification was tendered to
16              the deponent.)
17
18   BY MR. McJESSY:
19   Q.   Now, if you turn to Exhibit 80 in the
20   binder in front of you -- all right, that
21   appears to be an annual report for the year
22   2013 for Midwest Dock Solutions, correct?
23   A.   Yes.
24        MR. HUGHES:  Objection.  There's a

40

1    lot more here in this exhibit than just that.
2        MR. McJESSY:  Fair enough.
3    BY MR. McJESSY:
4    Q.   The first two pages of Exhibit 80
5    appear to be the annual report for Midwest Dock
6    Solutions for 2013, correct?
7    A.   Yes.
8    Q.   All right.
9              And did you file this?
10   A.   My accountant, I'm going to say,
11   probably filed it.
12   Q.   Okay.
13              And you authorized your
14   accountant to sign your name to it?
15   A.   Yes.
16   Q.   Pointing out the bottom, it appears to
17   be your electronic signature on there.
18              Do you see that?
19   A.   Yes.
20   Q.   All right.
21              And it shows you as
22   president -- or, I'm sorry, it shows Michael
23   Richert as president and you as secretary.
24              Do you see that?

10  (Pages 37 to 40)

41

1     A.  Yes.
2     Q.  Was -- was there ever some sort of
3  formal decision made to put you into those
4  two -- you and Mike Richert into those two
5  positions?
6     A.  Well, there had to be a formal
7  decision.  Why the decision was like that, I
8  don't know.
9     Q.  Okay.
10        Well, that's -- I was going
11 to -- how is it that he's listed as president
12 and you're listed as secretary, do you know?
13    A.  I have no idea.
14    Q.  Okay.
15        And as far as you know, has
16 that always been the way it is?
17    A.  Yes.
18    Q.  All right.
19        And you and Mr. Richert are
20 also shown as directors on this annual report.
21        Do you see that?
22    A.  Is that right here?  Oh, yes.  Yes,
23 correct.
24    Q.  Okay.

42

1        And has that always been the
2  case as well, that you two have always been the
3  two directors?
4     A.  Yes.
5     Q.  Have there ever -- ever been any other
6  directors of the company?
7     A.  No.
8     Q.  Have you or Mr. Zarlengo made any
9  other capital contributions to the company
10 since its start-up?
11        MR. HUGHES:  Kevin, you're asking
12 him about him.
13        MR. McJESSY:  I'm sorry.
14 BY MR. McJESSY:
15    Q.  Have you and Mr. Richert ever made any
16 capital contributions to the company since its
17 start-up?
18    A.  No.
19        Sorry.  Just go back to that
20 question.  I'm not sure if this pertains to
21 that question.  But when we first got it
22 started up, I had my house on -- for our line
23 of credit.  And we did use the line of credit
24 to get started, to pay for things.

43

1     Q.  Okay.
2     A.  Which the line of credit was through
3  my house mortgage, basically, to get started.
4  So I don't know if that's a capital
5  contribution, but I did have a line of credit
6  on my house.
7     Q.  All right.
8        And -- fair enough.
9        But you paid the line -- the
10 business paid the line of credit off, correct?
11    A.  Yes.
12    Q.  All right.
13        Was the line of credit in the
14 business's name.
15    A.  Yes.
16    Q.  It was just secured by your house?
17    A.  Correct.
18
19        (WHEREUPON, the document marked
20        Plaintiff's Exhibit 58 for
21        identification was tendered to
22        the deponent.)
23
24

44

1  BY MR. McJESSY:
2     Q.  Now, I'd like you to take a look at --
3  I think, back to this binder here -- and turn
4  to Exhibit 58.
5     A.  All right.
6     Q.  And if you look at Exhibit 58 and turn
7  to the second page, there's an email there that
8  appears to be from you to Ira -- to George,
9  Leah, and it's copied to Ira Sugar.
10        Do you see that?
11    A.  Yes.
12    Q.  And it looks like an email from August
13 21, 2023, and it begins, hello, Leah.
14        Do you see that?
15    A.  Yes.
16    Q.  L-e-a-h.
17        Does that look like an email
18 from you?
19    A.  Yes, it does.
20    Q.  Okay.
21        And you've got a -- you say
22 in the second paragraph -- a few notes on
23 docks.  I've added pit steel onto the bid.
24 Hope that's okay.  And I won't do wiring for

11 (Pages 41 to 44)

45

```
 1    this project.  Unions are very strict in this
 2    area as we have found out, and it could run
 3    into an issue there.
 4              Do you see that?
 5        A.  Yes.
 6        Q.  Did I read that right?
 7        A.  Yes.
 8        Q.  And when you say -- well, let me take
 9    a step back.
10              What is this -- what is the
11    Project Saturn Dock Re-bid referring to?
12        A.  A job we were bidding on from a
13    general contractor.
14        Q.  Okay.
15              And what's the product?
16        A.  I can't -- I don't know that answer.
17        Q.  You don't recall?
18        A.  Yeah, it's been years.  I wouldn't
19    know the answer on that.
20        Q.  And this is a project you're bidding
21    on with ARCO Murray?
22        A.  Correct.
23        Q.  All right.
24              And when you say unions are
```

46

```
 1    very strict in this area, what do you mean?
 2        A.  That Dock & Door installers don't do
 3    electrical wiring.
 4        Q.  Okay.
 5        A.  That's done by the electricians.
 6        Q.  And why is that?
 7        A.  Because it's the electricians' trade.
 8        Q.  All right.
 9              When you say unions are very
10    strict in this area, what does that mean?
11              MR. HUGHES:  Objection.  Asked and
12    answered.
13              MR. McJESSY:  Well, I'm not sure
14    that it did, but --
15              THE WITNESS:  That if an
16    electrical -- electricians -- an electrical
17    union sees Dock & Door installers wiring
18    something on a project, they're going to --
19    it's claimed as their work.  And Dock & Door
20    installers, no matter who it is, shouldn't be
21    wiring product on a job site.
22    BY MR. McJESSY:
23        Q.  Okay.
24              And they'll object and insist
```

47

```
 1    they stop doing that work, correct?  The
 2    electrical union would?
 3        A.  Well, the electrical union would -- I
 4    mean, what do you mean by that?  I'm sorry.
 5        Q.  What would -- you said that -- what
 6    would happen?  Would a business agent like --
 7        A.  A BA would come out to the -- to the
 8    project --
 9        Q.  Okay.
10        A.  -- and say to the general contractor
11    that this is our work, and the Dock & Door
12    installers shouldn't be running electrical.
13        Q.  Okay.
14              And it would create problems
15    for the general contractor?
16        A.  Correct.
17        Q.  Okay.
18              And you say, "as we have
19    found out."  What do you mean by that?
20        A.  Obviously, at one point, we must have
21    done low-voltage wiring and, you know, the
22    electrical -- electrician said something about
23    it.
24        Q.  Okay.
```

48

```
 1        A.  And, yeah, I mean, they must have said
 2    something about it and said something to the
 3    general contractor.
 4        Q.  All right.
 5              And what's low-voltage
 6    wiring?
 7        A.  That's just like 24-volt wiring, not
 8    like 110 or 460.
 9        Q.  Okay.
10              And what kind -- when you
11    said we may have -- we must have done
12    low-voltage wiring at one point, what do you
13    mean by that?  Why -- what would be the
14    low-voltage wiring you would do on a job site?
15        A.  Door operators need low-voltage going
16    to pushbutton stations from the operator to the
17    pushbutton station.
18        Q.  Okay.
19              That's --
20        A.  Low-voltage.  The button you press for
21    the operator to operate.
22        Q.  Okay.
23              To make it go up or down?
24        A.  Yeah.  You -- it needs low-voltage
```

12 (Pages 45 to 48)

49

```
 1   going from the operator to the pushbutton
 2   station.
 3      Q. Okay.
 4           And it needs, I take it,
 5   high-voltage, then, to go to the opener
 6   itself --
 7      A. Yeah.
 8      Q. -- to make the door opener work; is
 9   that correct?
10      A. Yes.
11      Q. Okay.
12           But to the button that makes
13   it -- that you push to make it go up or down,
14   that's low-voltage wiring?
15      A. Yes.
16      Q. And that's work that you could do?
17      A. Yes.
18
19           (WHEREUPON, the document marked
20           Plaintiff's Exhibit 59 for
21           identification was tendered to
22           the deponent.)
23
24
```

50

```
 1   BY MR. McJESSY:
 2      Q. Okay.
 3           And if you could turn to
 4   Exhibit 59, and I'd like you to take a look at
 5   the -- if you could turn to the third from the
 6   last page of that exhibit, and there's an email
 7   there from you dated October 1, 2024, do you
 8   see that, at 8:28 a.m.?
 9      A. Yes.
10      Q. All right.
11           And it looks like it's sent
12   to Carter Hamlin at ARCO Murray?
13           Do you see that?
14      A. Yes.
15      Q. And it's copied, again, to Ira Sugar,
16   correct?
17      A. Yes.
18      Q. And it looks like this is exchanging
19   emails about a bid for a project, correct?
20      A. Yes.
21      Q. And if you look at the email that
22   begins at the bottom of that page -- it says,
23   Monday, September 30, 2024. It looks like it's
24   the email from Carter Hamlin to -- to you and
```

51

```
 1   Ira talking about, congratulations, you've been
 2   awarded this project, correct?
 3      A. Yes.
 4      Q. All right.
 5           And if you turn to the next
 6   two pages, it looks like it's sort of a summary
 7   of what the project is, correct?
 8      A. Yes.
 9      Q. And if you look at the last page of
10   this exhibit, which is the next page from where
11   you're at, it says that one of the -- the
12   conditions of this contract is that all labor
13   is to be performed by union laborers.
14           Do you see that?
15      A. Yes.
16      Q. Okay.
17           And you understand, when it
18   says union laborers, that would mean union
19   carpenters for carpentry work, union
20   bricklayers for brick laying work, that kind of
21   thing?
22      A. Yes.
23      Q. Okay.
24           You're -- are you aware that
```

52

```
 1   there's actually a laborers union?
 2      A. Yes.
 3      Q. Okay.
 4           But you understand that this
 5   doesn't mean that all work has to be done by
 6   the laborers union. It just means all of the
 7   work that's done on the project needs to be
 8   done by the appropriate unions, correct?
 9      A. Yes.
10      Q. Okay.
11           Is that a common condition
12   for general contractors?
13      A. It depends on the project and the
14   general contractor.
15      Q. Okay.
16           And describe -- what do you
17   mean by that?
18      A. Well, some general contractors are
19   like union -- in the union contractors and
20   others are not in the union.
21      Q. Okay.
22      A. And some contractors allow nonunion
23   people to work on their jobs.
24      Q. Okay.
```

13 (Pages 49 to 52)

53

1    A.   And some contractors who are in the
2  union only allow union people on the jobs.
3    Q.   Okay.
4         And can you give me some
5  examples of general contractors that Midwest
6  Dock contracts with that are union contractors?
7    A.   I can't -- I don't know any that are
8  definitely union contractors.  I could guess,
9  but I don't -- I've never physically looked and
10  made -- different contractors, I've never
11  physically looked online to see if they were
12  union or not.
13    Q.   Okay.
14    A.   Like I could take a guess and say
15  they're union contractors, but I can't -- I'm
16  not a hundred percent that they are.
17    Q.   Okay.
18         Are there some general
19  contractors that Midwest contracts with that
20  generally require the use of union labor?
21    A.   Yes.
22    Q.   Okay.
23         And who are those?
24    A.   Krusinski Construction, Clayco,

54

1  Pepper.  Offhand, those are the ones that I'm
2  kind of pretty sure always require union
3  contractors.
4    Q.   All right.
5         I'm going to go through some
6  others just in case you didn't think of them,
7  and it might help refresh your memory.
8    A.   All right.
9    Q.   How about ARCO Murray?
10    A.   No.
11    Q.   Okay.
12         They sometimes require union
13  labor and sometimes don't?
14    A.   Correct.
15    Q.   Okay.
16         And what about Meridian
17  Design Build?
18    A.   Meridian has all union labor.
19    Q.   All right.
20         And Morgan/Harbour?
21    A.   No.
22    Q.   How about Opus Design Build?
23    A.   They're always union labor.
24    Q.   And Peak Construction?

55

1    A.   No.
2    Q.   Power Construction?
3    A.   Yes.
4    Q.   They're union?
5    A.   Yes.  But we have -- I don't know how
6  many jobs we've done for Power.  Maybe one.  I
7  can't even recall one.  One job, maybe, we've
8  done for Power Construction.
9    Q.   All right.
10         Principal Construction?
11    A.   No.
12    Q.   Okay.
13         They sometimes require union?
14    A.   Yeah.  Correct.
15    Q.   Okay.
16         And Peak Construction also
17  sometimes requires union labor?
18    A.   Sometimes.  Not all of the time.  Not
19  always union.
20    Q.   Okay.
21         And Morgan/Harbour, although
22  they don't always require it, they sometimes
23  require union labor?
24    A.   Correct.

56

1    Q.   Okay.
2
3         (WHEREUPON, the document marked
4         Plaintiff's Exhibit 81 for
5         identification was tendered to
6         the deponent.)
7
8  BY MR. McJESSY:
9    Q.   Now, I would like you to turn to
10  Exhibit 81.
11    A.   Yeah.
12    Q.   And in 2014, Midwest Dock Solutions
13  was awarded a contract with Principal
14  Construction to perform work at the Winpak
15  Portion Packaging facility in Sauk Village,
16  correct?
17    A.   Correct.
18    Q.   All right.
19         And that was a union project,
20  correct?
21    A.   Correct.
22    Q.   And Midwest Dock Solutions was a
23  nonunion company, correct?
24    A.   Correct.

14 (Pages 53 to 56)

57

```
1      Q.  All right.
2          And how did Midwest Dock --
3  how was it awarded that contract?
4      A.  It was bid with Principal
5  Construction.  And we had the best price, and
6  we were awarded the project.
7      Q.  All right.
8          And how is it that it -- this
9  was a new construction installation project,
10 correct?
11     A.  Correct.
12     Q.  And had Midwest Dock Solutions done
13 that kind of work before?
14     A.  No.
15     Q.  All right.
16     A.  Not that I can recall.  This might
17 have been the first one we've done -- we did.
18     Q.  All right.
19         And so what I'm trying to get
20 a handle on is what were the circumstances that
21 sort of led to a bid on this project?  Did you
22 have a contact with Principal Construction?
23 Did you see the bid of -- you know, some sort
24 of bid announcement and just submitted a bid
```

58

```
1  randomly?  How did it come about that Midwest
2  Dock Solutions made a bid for this project?
3      A.  It's down the street from our shop,
4  and I'm pretty sure we saw a building going up.
5  Sauk Village is right next to Steger, and it's
6  on -- you know, we drove by it all of the time.
7  It's right on 394 and probably saw a sign,
8  building going up, and contacted Principal to
9  see if we could bid on it.
10     Q.  Okay.
11         That's been your
12 recollection?
13     A.  Best recollection.  It's been a long
14 time.
15     Q.  Fair enough.
16         And this Exhibit 81, is this
17 a -- and I just want to talk about the first
18 two pages of Exhibit 81 -- is that the one job
19 site agreement that Midwest Dock Solutions
20 signed with the carpenters union?
21     A.  Yes.
22     Q.  All right.
23         And you signed that, correct?
24     A.  Yes.
```

59

```
1      Q.  All right.
2          And how did you come to sign
3  this agreement, like what was -- did you reach
4  out to somebody at the carpenters union or what
5  happened?
6      A.  I'm going to assume that Mike Richert
7  reached out to the carpenters union about doing
8  a one job site agreement.  He had union
9  experience in the past, and I never did.  So
10 I'm going to assume Mike Richert reached out to
11 them about doing a one job site agreement, if
12 we can do one.
13     Q.  All right.
14         And --
15         MR. HUGHES:  I'm just going to --
16 Tony, I'm just going to advise you.  If you
17 don't know something, that's fine.  He's not
18 asking for your assumption.  It's -- it's --
19 just answer his question.  And if you know the
20 answer, answer it.
21 BY MR. McJESSY:
22     Q.  And if you -- the first two pages of
23 this exhibit, if you look at the top, do you
24 see it's got a fax line on it?
```

60

```
1      A.  Yes.
2      Q.  A fax header?
3          You remember fax headers,
4  right?
5      A.  Yeah.
6      Q.  And the fax header is dated November
7  11, 2021, at 11:06 a.m., and it says Midwest
8  Dock Solutions.
9          Do you see that?
10     A.  Yes.
11     Q.  Back in the day, was that the fax
12 header for Midwest Dock Solutions?
13     A.  Yes.
14     Q.  All right.
15         And it says page -- this
16 one's -- these two -- first two pages say page
17 three of six and four of six.
18         Do you see that?
19     A.  Yes.
20
21         (WHEREUPON, the document marked
22         Plaintiff's Exhibit 82 for
23         identification was tendered to
24         the deponent.)
```

15 (Pages 57 to 60)

61

```
1    BY MR. McJESSY:
2      Q.  All right.
3              And if you turn to Exhibit
4    82, you'll see that that's a questionnaire
5    application form for the carpenters union.
6              Do you see that?
7      A.  Yes.
8      Q.  And do you see at the top where that
9    says two of six and five of six?
10     A.  Yes.
11     Q.  At the --
12     A.  Yes.
13     Q.  -- fax header.  Yeah.
14             So this looks like it's part
15   of the same fax.
16             Would you agree?
17     A.  Yes.
18     Q.  All right.
19             And is this -- did you fill
20   this out?  Is this your handwriting?
21     A.  Yes.
22     Q.  And you signed it?
23     A.  Yes.
24     Q.  All right.
```

62

```
1              And it says name of business
2    agent referred by, and it says Gary Pennar,
3    Jr., and it has a slash, and it says Skip
4    Kramer?
5              Do you see that?
6      A.  Yes.
7      Q.  Do you know those individuals?
8      A.  No.
9      Q.  Do you recall dealing with them at
10   all?
11     A.  No.
12     Q.  And as far as you know, is the
13   information on this application, correct?
14     A.  Yes.
15
16             (WHEREUPON, the document marked
17             Plaintiff's Exhibit 83 for
18             identification was tendered to
19             the deponent.)
20
21   BY MR. McJESSY:
22     Q.  And if you turn to the next exhibit,
23   Exhibit 83, it looks like that's the first --
24   that's the cover page for this fax.
```

63

```
1              Do you see at the top where
2    it says page one of six?
3      A.  Yes.
4      Q.  All right.
5              Would you agree with that?
6      A.  Yes.
7      Q.  Okay.
8              And it says to Bob Lid.
9              Do you know who Bob Lid is?
10     A.  No.
11     Q.  All right.
12     A.  Not that I can recall.
13
14             (WHEREUPON, the document marked
15             Plaintiff's Exhibit 81 for
16             identification was tendered to
17             the deponent.)
18
19   BY MR. McJESSY:
20     Q.  Okay.
21             Now, if you go back to
22   Exhibit 81 and if you look at the third page of
23   this exhibit, it looks like it's an article
24   from something called Dermody, D-e-r-m-o-d-y?
```

64

```
1              Do you see that?
2      A.  Yes.
3      Q.  Are you familiar with Dermody?
4      A.  Yes.
5      Q.  Okay.
6              What is Dermody?
7      A.  They're a property owner -- developer.
8    Developer, I would say.
9      Q.  Okay.
10             And according to this, it
11   says the new -- it refers to -- and if you can
12   take -- well, let's do it this way.  Can you
13   read the first two paragraphs of that article
14   for me and let me know when you've had a chance
15   to do so?
16     MR. HUGHES:  Objection.  Foundation
17   to this portion of this kind of composite
18   exhibit.
19     THE WITNESS:  Okay.  I have read it.
20   BY MR. McJESSY:
21     Q.  All right.
22             And this refers to a -- the
23   Winpak Portion Packaging manufacturing facility
24   in Sauk Village at 1111 Winpak Way.
```

16 (Pages 61 to 64)

65

1    Do you see that?
2    A.  Yes.
3    Q.  And it says, Principal Construction
4  has begun work on the project and will complete
5  the building envelope by November 2011.
6    Do you see that?
7    A.  Yes.
8    Q.  Was Principal Construction the
9  contractor that you contracted with for the
10 Winpak Portion Packaging Center?
11   A.  Yes.
12   Q.  All right.
13   And then if you turn to the
14 very last page of this exhibit, does that look
15 to be a -- you have to open it up.  Yeah.
16   Does that look to be a
17 photograph of the Winpak Portion Packaging
18 Center?
19   A.  Yes.
20   Q.  All right.
21   And that's where you did the
22 work, correct?
23   A.  Yes.
24   Q.  And this was work that was done by

66

1  Midwest Dock Solutions, correct?
2    A.  Yes.
3    Q.  And it was done by Midwest Dock
4  Solutions' employees, correct?
5    A.  Yes.
6    Q.  And -- and this was -- this was a new
7  construction project; is that right?
8    A.  Yes.
9    Q.  And did Dock & Door -- I'm sorry.  Did
10 Midwest Dock Solutions install docks and doors
11 at this location?
12   A.  I believe so, yeah.  I believe so.
13   Q.  Okay.
14   And do you have any idea of
15 how many?
16   A.  Yes.
17   Q.  How many?
18   A.  Twenty.  I've got a good memory.
19   Q.  For the projects.  I appreciate that.
20   Do you know who the employees
21 were that worked on this project?
22   A.  No.
23   Q.  Okay.
24   Do you know how many

67

1  employees worked on the project?
2    A.  No.
3    Q.  Would it have been more than one?
4    A.  Yes.
5    Q.  And in order to work on this project,
6  Midwest Dock Solutions had to be a member of
7  the union for purposes of this project,
8  correct?
9    A.  No.
10   Q.  Okay.
11   Didn't it have to be a member
12 for purposes -- isn't that why it signed the
13 one job site agreement?
14   A.  It doesn't mean we're part of the --
15 members of the union.
16   Q.  Well, you agreed to be bound by the
17 Collective Bargaining Agreement for purposes of
18 this project, correct?
19   A.  For one job.
20   Q.  Correct.
21   A.  Yeah, for one job.
22   Q.  Right.  I understand.
23   But you had to -- you had to
24 be bound by the Collective Bargaining Agreement

68

1  in order to do this one job, correct?
2    A.  Yes.  I'm a little confused on the
3  question, but --
4    Q.  All right.
5    Well, let's go back to
6  Exhibit 81.  And I'm not trying to trap you
7  into saying that you were a permanent member of
8  the union when you signed this one job site
9  agreement.  The agreement says what it says.
10 So if that's -- there was a long pause when I
11 asked my question.
12   You signed this one job site
13 agreement, correct?
14   A.  Yes.
15   Q.  And this agreement was entered into
16 between the Chicago Regional Council of
17 Carpenters, Cook, DuPage, Grundy, Iroquois,
18 Kane, Kankakee, Kendall, Lake County, and Will
19 County, Illinois, referred to as the union,
20 correct?
21   A.  Yes.
22   Q.  And Midwest Dock Solutions, correct?
23   A.  Yes.
24   Q.  All right.

17 (Pages 65 to 68)

69

1    So it's an agreement between
2 you -- your company and the carpenters union,
3 correct?
4    A.  For one job, yes.
5    Q.  Right.
6         And it says, this one job
7 site agreement is made in consideration of the
8 instant promises of the union and employer, and
9 the employer refers to Midwest Dock Solutions,
10 correct?
11    A.  Yes.
12    Q.  And the parties do hereby agree as
13 follows.  And it says that this agreement's
14 intended to cover all carpentry work performed
15 by the employer at the job site known as Winpak
16 Portions Packaging, correct?
17    A.  Yes.
18    Q.  And that's this project we're talking
19 about, correct?
20    A.  It is that project.
21    Q.  Okay.
22         And, again, just for purposes
23 of this one job, the employer -- in paragraph
24 two -- it says the employer recognizes the

70

1 union as the sole and exclusive bargaining
2 agent for and on behalf of the employees of
3 employer within the territorial and
4 occupational jurisdiction of the union,
5 correct?
6    A.  Yes.
7    Q.  Okay.
8         And that's something that
9 Midwest Dock agreed to, correct?
10    A.  Yes.
11    Q.  All right.
12         And paragraph three says, the
13 employer and the union hereby incorporate by
14 reference and agree to be bound by the area
15 agreements in effect on the date the document
16 is executed through their respective expiration
17 dates.
18         Do you see that?
19    A.  Yes.
20    Q.  And then it says, those agreements
21 include but are not limited to the following,
22 and it lists a number of bargaining agreements
23 there.
24         Do you see that?

71

1    A.  Yes.
2    Q.  All right.
3         And that was also something
4 that Midwest Dock agreed to with the carpenters
5 union for purposes of this job, correct?
6    A.  Yes.
7    Q.  All right.
8         And then on the next page, it
9 says, the employer agrees to be bound by the
10 terms of the trust agreements of the fringe
11 benefit trust funds to which contributions are
12 required to be made under the agreements
13 referred to in the numbered paragraph three
14 hereof and all rules and regulations adopted by
15 the trustees hereof, correct?
16    A.  Yes.
17    Q.  All right.
18         And that was for purposes of
19 this job, correct?
20    A.  Yeah.
21    Q.  All right.
22    A.  Yes.
23    Q.  And so Midwest Dock had to also report
24 fringe benefit contributions to the trust funds

72

1 referred to for the work performed on this
2 project, correct?
3    A.  Yes.
4
5         (WHEREUPON, the document marked
6         Plaintiff's Exhibit 85 for
7         identification was tendered to
8         the deponent.)
9
10 BY MR. McJESSY:
11    Q.  And, actually, if you turn to page --
12 or Exhibit 85, and if you could look through
13 all of the pages that are part of Exhibit 85
14 and let me know when you've had a chance to do
15 so.
16    A.  Okay.
17    Q.  Those appear to be fringe benefit
18 contribution reports submitted by Midwest Dock
19 Solutions to the Chicago Regional Council of
20 Carpenters Combined Fringe Benefit Funds in
21 roughly November of 2011 through June of 2012,
22 correct?
23    A.  Yes.
24    Q.  All right.

18 (Pages 69 to 72)

73

1    And you signed those reports,
2 correct?
3    A. I did.
4    Q. All right.
5         So you submitted these
6 reports and paid the fringe benefit
7 contributions that are identified on these
8 reports, correct?
9    A. Yes.
10    Q. And by that, I mean Midwest Dock
11 Solutions did that, correct?
12    A. Yes.
13    Q. All right.
14         Do you know who Rodney Platt
15 is?
16    A. No.
17    Q. All right.
18         And do you know who John
19 Leavitt is, L-e-a-v-i-t-t?
20    A. No.
21    Q. And do you know who David Green is?
22    A. Yes.
23    Q. All right.
24         He's one of the people

74

1 reported on these reports, correct?
2    A. Yes.
3    Q. All right.
4         Did he work for Midwest Dock
5 Solutions?
6    A. Yes, he did.
7    Q. All right.
8         Does he still work for
9 Midwest Dock Solutions?
10    A. No.
11    Q. Do you know who he works for now?
12    A. Yes.
13    Q. Who does he work for now?
14    A. Dock & Door Install.
15    Q. Did he move to Dock -- from Midwest
16 Dock Solutions to Dock & Door Install when
17 Dock & Door Install was formed?
18    A. Yes.
19
20         (WHEREUPON, the document marked
21         Plaintiff's Exhibit 86 for
22         identification was tendered to
23         the deponent.)
24

75

1 BY MR. McJESSY:
2    Q. And if you could turn to Exhibit 86 --
3 and there's only a first page of this document.
4 It's also titled, One Job Site Agreement.
5         Do you see that?
6    A. Yes.
7    Q. And it refers to a project known as
8 Kapstone, K-a-p-s-t-o-n-e.
9         Do you see that?
10    A. Yes.
11    Q. In Aurora, Illinois?
12    A. Yes.
13    Q. Is that a project that Midwest Dock
14 Solutions did?
15         MR. HUGHES: I'm going to object to
16 foundation of this special document.
17 BY MR. McJESSY:
18    Q. Is that a project that Midwest Dock
19 Solutions did?
20    A. Yes.
21    Q. And where was that project? Was it in
22 Aurora?
23    A. Yes.
24    Q. And what was that project?

76

1    A. I just can't recall this project.
2    Q. All right.
3         Was it actually Kapstone
4 Paper and Packaging or something like that?
5    A. I -- I can't recall this project.
6    Q. Okay.
7         You don't recall it
8 specifically?
9    A. I don't.
10    Q. Do you remember signing a one site --
11 a one job site agreement with the carpenters
12 union for that project?
13    A. I don't recall that.
14    Q. Okay. All right.
15         Now, when Midwest Dock
16 Solutions was awarded the bid with Principal
17 Construction for the Winpak Portions Packaging
18 job -- and it signed a one job site agreement
19 with the carpenters union, correct?
20    A. Yes.
21    Q. Is there a reason it didn't just sign
22 up with the carpenters union as a regular union
23 employer?
24    A. I don't know why we didn't sign up.

19 (Pages 73 to 76)

77

1  Midwest Dock Solutions -- I don't know why we
2  didn't sign up with the union.
3       Q.  Okay.
4            Did you understand -- do you
5  understand that Midwest Dock Solutions, by
6  signing the one job site agreement, had to pay
7  fringe benefit contributions on the workers who
8  worked on the Winpak Portion Packaging Center?
9       A.  Yes.
10      Q.  And did you understand that if you
11 would have signed up with the union generally
12 that you would have had to pay fringe benefit
13 contributions on any carpenters working for
14 Midwest Dock Solutions?
15           MR. HUGHES:  Objection.  Competency.
16           Foundation.  Competency.
17 BY MR. McJESSY:
18      Q.  You can answer.
19      A.  Yes.
20      Q.  Okay.
21           And a lot of the work that
22 Midwest Dock Solutions did didn't require union
23 labor, correct, at this time?
24      A.  Correct.

78

1       Q.  In fact, most of it didn't require
2  union labor, correct?
3       A.  Basically all of it, yes, correct.
4       Q.  Okay.
5            So you wouldn't want to be
6  bound to pay union obligations and fringe
7  benefit contributions for all of that work,
8  correct?
9       A.  For the service work, no.
10      Q.  Okay.
11           Now, describe for me, when
12 Midwest Dock Solutions first started out back
13 in 2006, what was its business?
14      A.  Service and installation of loading
15 dock equipment and overhead doors.
16      Q.  Okay.
17           Both docks and doors?
18      A.  The first year or so, we just did
19 mostly dock equipment or so.  We didn't do much
20 with doors.  But after a few years, we started
21 getting doors a little more.
22      Q.  Okay.
23           You said service and
24 installation of docks and doors.

79

1            What did the service work
2  entail?
3       A.  Repairing existing equipment.
4       Q.  Okay.
5            Existing dock levelers?
6       A.  Yeah.
7       Q.  And existing doors?
8       A.  Yes.
9       Q.  Okay.
10           And do you consider service
11 work different from installation work?
12      A.  No.  It's pretty similar.
13      Q.  Okay.
14           And what -- and then you
15 said, within a few years, you were doing
16 installation of door -- or service and
17 installation of doors, correct?
18      A.  Yes.
19      Q.  Okay.
20           Right -- right from the
21 beginning, would Midwest Dock Solutions do
22 installation of dock levelers?
23      A.  Yeah.  We had replacement of dock
24 levelers.

80

1       Q.  Okay.
2            Take one out, put in a new
3  one?
4       A.  Yes.
5       Q.  All right.
6            And so it was the door work
7  that sort of grew after you started.
8            Is that fair?
9       A.  Yes.
10      Q.  Would Midwest Dock Solutions install
11 dock levelers in new construction?
12      A.  No.
13      Q.  All right.
14           So it was -- it would either
15 repair dock levelers, or if it was going to
16 install a dock leveler, it was a
17 remove-and-replace kind of situation.
18           Is that fair?
19      A.  Correct.
20      Q.  All right.
21           And did it install doors on
22 new construction?
23      A.  No.
24      Q.  Okay.

20 (Pages 77 to 80)

81

1       So same thing. If it was
2   going to install a new door, it was a take out
3   the old and put in the new, correct?
4       A. Yes. Correct.
5       Q. All right.
6           So how many employees in the
7   early -- let's say from 2010 to 2015 -- how
8   many employees did Midwest Dock Solutions have?
9       A. I mean --
10      Q. Approximately.
11      A. 2010? Four.
12      Q. All right.
13          And those four employees
14  would do service and installation of dock
15  levelers and doors?
16      A. Yes.
17      Q. All right.
18          So they -- they were capable
19  of doing an installation of a dock leveler and
20  installation of an overhead door, correct?
21      A. Some of them were.
22      Q. All right.
23          Well, between the crew --
24  between the crew of four, or however many you

82

1   had, they could do all of that work, correct?
2       A. Correct.
3       Q. Okay.
4           And from 2010 to 2015, during
5   that time period, did Midwest Dock Solutions
6   have regular customers, or were the customers
7   like one-off customers?
8       A. The majority of them were regular
9   customers.
10      Q. Okay.
11          You built up like a portfolio
12  business?
13      A. Correct.
14      Q. What was of the division of labor
15  between you and Michael Richert?
16      A. What do you mean, "division of labor"?
17      Q. Well, were there things you were
18  primarily responsible for and things he was
19  primarily responsible for?
20      A. Yes.
21      Q. And I'm talking about, now, the, you
22  know, 2010-2015 time period?
23      A. Yes.
24      Q. All right.

83

1           And what were your
2   responsibilities?
3       A. Sales.
4       Q. Okay.
5       A. All of the financials, invoicing,
6   paying bills, just keeping up with accounts,
7   any dispatching, scheduling, ordering all of
8   the parts, payroll. Anything not in the field
9   was my responsibility.
10      Q. Okay.
11          Insurance?
12      A. Yes.
13          MR. McJESSY: Can you read back to
14  me his response after keeping up with accounts?
15
16          (The record was read as follows:
17              "Q. Just keeping up with
18              accounts, any dispatching,
19              scheduling, ordering all of the
20              parts, payroll. Anything not in
21              the field was my
22              responsibility.")
23
24

84

1   BY MR. McJESSY:
2       Q. When you say "keeping up with
3   accounts," does that meaning like a -- the
4   accounts payable that you owe to suppliers?
5       A. No.
6       Q. Oh.
7       A. That means like our customers. You
8   know, just following up with our customers.
9       Q. Okay.
10          Making sure their bills get
11  paid and that the work gets done?
12      A. Yeah. Just, you know, we have a --
13  might have had 200 customers and just making
14  sure they're happy.
15      Q. Okay.
16      A. Yeah.
17      Q. All right.
18          You also, I take it, though,
19  did handle the accounts payable, whatever money
20  was owed, make sure that got paid?
21      A. Probably, received and paid bills.
22      Q. And what was Mr. Richert's
23  responsibility?
24      A. At that time, he was working in the

21 (Pages 81 to 84)

85

```
 1   field.
 2       Q.  All right.
 3           And that is -- strike that.
 4           Would he be doing
 5   installations of dock levelers, doors, and
 6   service work on dock levelers and doors?
 7       A.  Yes.
 8       Q.  All right.
 9           And you didn't do any
10   installation work or service work, I take it?
11       A.  Never.
12       Q.  Okay.
13           And Mr. Richert, fair to say,
14   he didn't do any of the sales, financials,
15   invoicing, paying the bills, dispatching,
16   scheduling, payroll, ordering of parts,
17   handling of insurance, those kind of things?
18       A.  Correct.
19       Q.  All right.
20           Has that division of labor
21   between the two of you remained pretty
22   consistent through today?
23       A.  Yes.
24       Q.  All right.
```

86

```
 1           Has it changed -- you
 2   hesitated.  Has it changed in some way?
 3       A.  Well, it's changed because now a lot
 4   of the things I usually do hands on directly
 5   I've hired people to do for us, so I overlook
 6   the stuff now.  So all of that stuff I still am
 7   in charge you of, but now I overlook the
 8   majority of that stuff.
 9       Q.  All right.  Well said.
10           So you're still responsible
11   for the same things that you described for me,
12   but now you have somebody else under you that
13   you're supervising who does the
14   boots-on-the-ground work?
15       A.  Correct.
16       Q.  All right.
17           And Mr. Richert still --
18   still works in the field?
19       A.  No.
20       Q.  Okay.
21           What does Mr. Richert do?
22       A.  He looks at jobs out in the field.  He
23   doesn't physically work on them.  He keeps up
24   with the service vehicles.  That's the majority
```

87

```
 1   of the stuff he does.
 2       Q.  All right.
 3       A.  He helps with -- helps with fixing
 4   doors and docks, like if we have a -- are
 5   troubleshooting something, where somebody
 6   doesn't know, he assists in helping them,
 7   trains them.
 8       Q.  Anything else?
 9       A.  No.  That's mostly it.
10       Q.  All right.
11           And when did Mr. Richert go
12   from working in the field, as you originally
13   said, to this other list of items?  Was it just
14   over time?
15       A.  Oh, just over time.  It just got
16   gradual that he went from working full time in
17   the field to part time in the field to not
18   working in the field at all, basically, over
19   the years.  You know, starting in what year, I
20   don't know, but it just gradually has gotten
21   where he's less and less.  The more people we
22   hired, the less he had to work in the field.
23       Q.  All right.
24           And I'm just saying, the last
```

88

```
 1   five years, do you think he was working in the
 2   field during any part of that time?
 3       A.  No.
 4       Q.  Okay.
 5           And -- and when we say
 6   working in the field, I take it, what -- well,
 7   strike that.
 8           When you say working in the
 9   field, what does that mean to you?
10       A.  Physically doing the work.
11       Q.  The service and installation of docks
12   and doors?
13       A.  Yes.
14       Q.  Okay.
15           And -- and that's different
16   from helping out with fixing doors and --
17   and -- where there's problems?
18       A.  Yes.  Correct.
19       Q.  And the same for dock levelers.
20           That's different?
21       A.  Correct.
22       Q.  Okay.
23           And when you say he looks at
24   jobs out in the field, what do you mean by
```

22 (Pages 85 to 88)

89

1 that?
2      A.  If a salesmen has a building and they
3 want to put in a new -- replace something and
4 they want to put something different in and
5 there might be some stuff in the way, like just
6 figure out different applications for jobs, or,
7 you know, going out to a job site and figuring
8 out what kind of anchors we need, remove the
9 old stuff and install the new stuff, like what
10 type of material we're going to need to
11 actually do the project.
12      Q.  Okay.
13           So sort of estimating, is
14 that fair, for service work or --
15      A.  I wouldn't say estimating.  It's more
16 of just, you know, helping out with, you know,
17 the sales guys that don't know, you know, what
18 we physically need to do to install a job, to
19 do a job.  So he goes out and helps physically
20 look at the job and determine what we're going
21 to need to physically do the job.
22      Q.  Okay.
23           And you said he keeps up with
24 service vehicles.

90

1           What do you mean by that?
2      A.  Just stuff that breaks down -- you
3 know, trucks that break down and trying to keep
4 up with, you know, just items, like making sure
5 there's safety stickers or making sure
6 there's -- insurance is in there.  You know --
7      Q.  The insurance cards, you mean?
8      A.  Insurance cards.  Making sure there's,
9 you know, adequate -- adequate tools in the
10 trucks to do the job and things like that --
11 you know, stuff like that.
12      Q.  All right.
13           So if a truck has welding
14 equipment on it, he makes sure it's working and
15 has the supplies it needs to function --
16      A.  Yeah.
17      Q.  -- that kind of thing?
18      A.  Yes.  Correct.
19      Q.  All right.
20           And if there's a problem with
21 a truck, if it breaks down or something, that's
22 sort of his domain, to get it fixed?
23      A.  Correct.
24      Q.  All right.

91

1           And is he also responsible
2 for the warehouse?
3      A.  He helps out with the warehouse.  I
4 don't know if I want to say like responsible.
5 But he helps in keeping the warehouse
6 organized, parts put in the right spots, just,
7 you know, moving stuff around.  Yes, he's
8 partially in charge of the warehouse.
9      Q.  Okay.
10           You actually have a warehouse
11 worker, I think?
12      A.  Janie.
13      Q.  Janie?
14      A.  Yes.
15      Q.  What's her name?
16      A.  Janie.
17      Q.  Janie.
18           And what's her last name?
19      A.  Graham.
20      Q.  And she's really responsible for the
21 warehouse, correct?
22      A.  Well, I don't want to say she's
23 responsible for it, but she's the one who's
24 there every day, in the warehouse every single

92

1 day.
2      Q.  Okay.
3           Is there somebody -- just so
4 I have an understanding.
5           For the organization of the
6 warehouse, making sure the parts are ordered
7 and the supplies are there for the work that
8 your -- that your company does, who does that?
9      A.  Janie.
10      Q.  Okay.
11           And then you mentioned that
12 Mr. Richert helps with fixing doors and docks
13 when there's a -- when there's a problem and
14 that he also assists in training the workers,
15 correct?
16      A.  Correct.
17      Q.  And what do you mean by that?  What do
18 you mean by those two things?
19      A.  Well, if a service tech goes to fix a
20 dock and they don't know what's wrong with it,
21 call Mike and ask Mike, you know, what's going
22 on with this, you know.  So then, you know, he
23 does some, you know, training of how to fix
24 docks and doors and, you know -- so he just

23 (Pages 89 to 92)

93

1 helps out with, you know, existing techs, just
2 to figure out what's wrong with stuff.
3 Q. Okay.
4 And he does that when you've
5 got new employees or employees who are not
6 fully experienced in --
7 A. No matter how experienced you are, you
8 will never know everything.
9 Q. All right.
10 And does he assist in
11 training new employees on Dock & Door
12 installation work?
13 A. He doesn't do a lot of training. Most
14 of the stuff is hands on in the field. So he
15 doesn't do a lot of training, but he helps out
16 new employees.
17 Q. Okay.
18 Now, when I ask you -- you
19 know what? Let's -- are you okay?
20 THE COURT REPORTER: Yes.
21 BY MR. McJESSY:
22 Q. All right.
23 I asked you about your areas
24 that you're involved in, and you mentioned that

94

1 you do sales, correct?
2 A. Correct.
3 Q. Do you still do sales?
4 A. Yes.
5 Q. And do you sell -- what do your sales
6 involve?
7 A. I have existing accounts that I've had
8 since we've almost gotten started. And I've
9 kept a lot of the accounts, so I'm still in
10 charge of a lot of accounts that I still sell
11 to.
12 Q. Okay.
13 Is any of that new
14 construction work?
15 A. No.
16 Q. All right.
17 You also do some new
18 construction work, though, correct?
19 A. Not anymore, no.
20 Q. Oh, you don't?
21 A. No.
22 Q. Oh, when did that stop?
23 A. Six months ago.
24 Q. And were you just selling new

95

1 construction for dock leveler installation?
2 A. Correct.
3 Q. And how long were you doing that?
4 A. Ballpark, eight years.
5 Q. So from, maybe, 2016 or '17 until six
6 months ago?
7 A. Six months ago.
8 Q. Okay.
9 Does that sound right?
10 A. Yeah. Yes.
11 Q. And were you also doing sales for new
12 construction for overhead door installation?
13 A. No.
14 Q. All right.
15 Who was handling that for the
16 last eight years or so?
17 A. Ira Sugar.
18 Q. Okay.
19 And Ira -- were you here for
20 Mr. Sugar's deposition?
21 A. No.
22 Q. Mr. Sugar, I understand, is the one
23 who took over the new construction sales for
24 dock levelers, correct?

96

1 A. Yes. Correct.
2 Q. All right.
3 And I think he said he hasn't
4 had a sale yet that was -- was awarded, a bid
5 that was awarded yet, and that you were helping
6 him sort of learn that area.
7 Is that fair?
8 A. Yes.
9 Q. Okay.
10 You've assisted him in
11 preparing bids for new construction dock
12 installation.
13 Is that fair?
14 A. Yes.
15 Q. All right.
16 Is there a reason that you
17 turned over that work to Mr. Sugar?
18 A. Yes.
19 Q. What was that?
20 A. The industry's slow.
21 Q. All right.
22 A. And -- the industry's slow, and there
23 wasn't as much stuff to bid on, so he took over
24 doing both.

24 (Pages 93 to 96)

97

1    Q.  Okay.
2          And other than Mr. Sugar, was
3    there anybody else in the last eight years or
4    so who was responsible for bidding new
5    construction overhead door installation work?
6    A.  I don't know offhand how long Ira
7    Sugar's been with Midwest Dock Solutions.  If
8    it was less than eight, then, yes.
9    Q.  All right.
10         Let's take a look -- I'm
11   going to take a look at Exhibit 40, and you
12   can -- if you can close the binder, the other
13   binder --
14   A.  Oh, I'm sorry.
15   Q.  -- and pull that up in front of you,
16   I'll ask.  Just because that will be easier for
17   you.
18   A.  2017.  So, no.
19
20         (WHEREUPON, the document marked
21          Plaintiff's Exhibit 40 for
22          identification was tendered to
23          the deponent.)
24

98

1    BY MR. McJESSY:
2    Q.  Now, I've handed you what's been
3    marked as Plaintiff's Exhibit 40, and those are
4    the interrogatory responses that were produced
5    by Midwest Dock Solutions, correct?
6    A.  Yes.
7    Q.  And the answer to interrogatory one
8    includes a list of employees and their
9    employment periods.
10         Do you see that?
11   A.  Yes.
12   Q.  Did you assist in the preparation of
13   this interrogatory answer?
14   A.  Yes.  I might have thought I assisted
15   in this.
16   Q.  Okay.
17         And so if you look at Ira
18   Sugar there --
19   A.  Yeah.
20   Q.  -- it says -- it says, roughly --
21   well, it doesn't say roughly -- it says
22   employment from June 28, 2017, to the present.
23         Does that sound about right
24   to you?

99

1    A.  Yes.
2    Q.  All right.
3          And was he hired to do new
4    construction overhead door sales?
5    A.  Yes.
6    Q.  Was there somebody else who was doing
7    that before him?
8    A.  Yes.
9    Q.  And who was that?
10   A.  Joseph Sheridan.
11   Q.  Okay.
12         He didn't work out, correct?
13   A.  Correct.
14   Q.  All right.
15         Was he terminated?
16   A.  Yes.
17   Q.  And was he terminated just because he
18   wasn't selling a lot, or what is -- well,
19   strike that.  Let me ask the question the other
20   way.
21         Why was he terminated?
22   A.  This is a hard one to answer.  Because
23   he drank too much alcohol.
24   Q.  Okay.  All right.

100

1          Well, we don't need to go
2    into that.  But there were employment issues,
3    and he was terminated?
4    A.  Yes.
5    Q.  And Mr. Sugar was hired in his place?
6    A.  Yes.
7    Q.  And once Mr. Sugar was hired, was
8    there anybody else doing sales for new
9    construction overhead door installation?
10   A.  No.
11   Q.  All right.
12         If you could turn to the
13   prior page on that, do you see where it says
14   the first employee is Brandon Bishop.  And it
15   says, employment period, June 3, 2029, to
16   August 12, 2020?
17   A.  Yes.
18   Q.  Do you -- do you recall what his
19   actual employment period would have been?
20   A.  No.
21   Q.  Do you recall the year he was hired?
22   A.  No.
23   Q.  All right.
24         And Zach Corrigan, it says --

25 (Pages 97 to 100)

101

1       if you look at his, it says January 11, 2027.
2               Do you see that?
3       A.  Yes.
4       Q.  Do you know what year he was actually
5   hired?
6       A.  No.
7       Q.  Do you know how long Brandon Bishop
8   was with Midwest Dock?
9       A.  Not the exact time.
10      Q.  Approximately.
11      A.  Very short.
12      Q.  Okay.
13              It was a short period of
14  time?
15      A.  Less than year.
16      Q.  All right.
17              So could that June date have
18  been June 3, 2019?  Would that make sense to
19  you?
20      A.  It would make sense, but -- not
21  guaranteed, but it would make sense.
22      Q.  Okay.
23              And do you know how long Zach
24  Corrigan was with Midwest Dock Solutions?

102

1       A.  A couple years.
2       Q.  Okay.
3               So if that was January 11,
4   2017, to March 25, 2019, that would make sense
5   to you?
6       A.  Yes.
7       Q.  All right.
8               When you say that you did
9   sales for Midwest Dock Solutions for door --
10  dock installation work, what does that entail?
11      A.  Probably, referring to general
12  contractors or referring to service work?
13      Q.  Well, tell me about both.  Did you do
14  both?
15      A.  Yes.
16      Q.  Okay.
17              And tell me about both, then.
18      A.  I mean, I started Midwest Dock
19  Solutions and, you know, did sales for existing
20  buildings and --
21      Q.  And how did that work?  I mean, how
22  did you do that, cold call?
23      A.  Knocked on doors, collected business
24  cards, created contacts for a long, long time.

103

1       Q.  All right.
2       A.  And, you know, had opportunities to
3   bid stuff to them and just grew bigger and
4   bigger.  And I don't cold call anymore, but I
5   still do my sales through my -- some of my old
6   accounts.
7       Q.  All right.
8               And when you said you
9   would -- you would bid jobs, I take it, that
10  part of the process -- not new construction,
11  but just the service work -- was sometimes
12  you'd prepare bids and submit quotes and see if
13  you'd get the job?
14      A.  Correct.
15      Q.  All right.
16              And then does that work
17  differ at all from the -- the new construction
18  sales?
19      A.  Yes.
20      Q.  Okay.
21              And if so, how?
22      A.  New construction sales, I would reach
23  out to the general contractors, try to get on
24  their bid list to bid their work.  And then

104

1   when projects came up, they would send me an
2   invitation to bid.
3       Q.  All right.
4               And the -- was the Principal
5   Construction Winpak Portion Packaging Center
6   the first new construction bid that you did?
7       A.  I can't recall.
8       Q.  Okay.
9               Was it the first one you were
10  awarded?
11      A.  I can't recall, but I think so, yes.
12      Q.  All right.
13              Well --
14      A.  I know.  It's -- I know.
15      Q.  Counsel mentioned earlier about -- I
16  don't want you to answer yes if you don't
17  recall.
18      A.  Yeah.  I can't recall.
19      Q.  Okay.
20              There could have been others
21  before that.  You just don't know?
22      A.  Correct.
23      Q.  All right.  All right.
24              Let's take a five-minute

26 (Pages 101 to 104)

105

1  break just so the court reporter can rest her
2  fingers, and then we'll pick back up.
3
4         (After a break from 11:10 a.m.
5         to 11:19 a.m., the deposition
6         was resumed as follows:)
7
8         MR. McJESSY:  All right.
9         Back on the record.
10 BY MR. McJESSY:
11     Q.  Sir, while you have Exhibit 40 open,
12 I'd like you to take a look at page 10 of that
13 exhibit.  And do you see interrogatory eight
14 there?
15     A.  Yes.
16     Q.  And interrogatory eight says,
17 regardless of date, identify all Internet URLs
18 and all email addresses owned, controlled, or
19 used by Midwest Dock, all persons who used an
20 email address extension belonging to Midwest
21 Dock or who had access to email accounts used
22 by Midwest Dock, including any email extension
23 ending in @midwestdocksolutions.com.
24         Do you see that?

106

1     A.  Yes.
2     Q.  And the answer below -- there's a
3  number of objections, and then the last line on
4  that page says, answering further, see the list
5  of employees provided in response to
6  interrogatory number one, which contains
7  Midwest Dock email addresses for any
8  individuals who have been issued, used, or had
9  access to the Midwest Dock email accounts
10 corresponding to their names.
11         Do you see that?
12     A.  Yes.
13     Q.  And if you go back to the response to
14 interrogatory one, which we've been looking at,
15 you'll see it's the -- it's the list of
16 employee names, and then for many of them, it
17 has email addresses.
18         Do you see that?
19     A.  Yes.
20     Q.  Tony Brutti isn't listed there as
21 somebody with an email address of
22 @midwestdocksolutions.com, correct?
23     A.  Yes.
24     Q.  Is there a reason he wasn't identified

107

1  in response to interrogatory eight as somebody
2  with an email extension
3  @midwestdocksolutions.com?
4     A.  He's not -- he's not even on the list.
5  I don't know that answer.  He's not even on the
6  list as an employee.
7     Q.  All right.
8         Well, he should have been
9  disclosed as somebody with an
10 @midwestdocksolutions.com email address,
11 correct?
12     A.  Yes.
13     Q.  All right.
14         Shouldn't he have been listed
15 as an employee?
16     A.  No.
17     Q.  Is there anyone else other than the
18 people identified on this list and Mr. Brutti
19 who have an email extension
20 @midwestdocksolutions.com or who had one at any
21 point?
22     A.  Travis Woff may have had one.  I don't
23 think he did, but he may have had one.  No.
24     Q.  All right.

108

1         So you don't think he had
2  one, but he might have?
3     A.  I don't think he had one.
4     Q.  Okay.
5         So Mr. Brutti was the only
6  person who had one whose name was omitted,
7  correct?
8     A.  Correct.
9         MR. HUGHES:  Objection.  Form of the
10 question.
11 BY MR. McJESSY:
12     Q.  And everybody else other than Mr.
13 Brutti who has an email extension at
14 midwestdocksolutions.com, they are an employee
15 of Midwest Dock Solutions, correct?
16     A.  Yes.  Correct.
17     Q.  When I asked you about -- well, strike
18 that.
19         When I asked you about the
20 work you did in sales for Midwest Dock
21 Solutions, have you pretty much told me all of
22 the work you do as part of sales?  Is there
23 anything that was left out?
24     A.  No.

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

109

1    Q.  Okay.
2        And when you said you handle
3    financials, what does that mean?
4    A.  Just day to day, you know, credit card
5    statements, receivables, payables, looking at
6    the checking account, you know.
7    Q.  Okay.
8        And when you say "invoicing,"
9    what does that mean?
10   A.  I do service tickets for the service
11   tickets.  I do the invoicing.  I assist in
12   invoicing for pricing.
13   Q.  Okay.
14       What's invoicing for pricing?
15   A.  Well, the part on the service ticket
16   that we sold -- the person who's in charge of
17   doing the invoices -- you know, the cost of
18   those parts.
19   Q.  Okay.
20       And do you also do the
21   invoicing for the new construction work?
22   A.  No.
23   Q.  Okay.
24       Do you supervise the person

111

1    Q.  So like 2022?
2    A.  Yeah.  Yes.
3    Q.  All right.
4        Why did that switch over to
5    her?
6    A.  Because there was too much on my plate
7    that I couldn't do everything that I needed,
8    that I was doing, and that's why.
9    Q.  All right.
10       And how about -- you
11   mentioned paying bills?
12   A.  Correct.
13   Q.  Is that something that you supervise
14   the person who does it now?
15   A.  Correct.
16   Q.  And did you used to pay the bills
17   yourself?
18   A.  Correct.
19   Q.  And when did that switch over, and who
20   does it?
21   A.  Sherri Webber does it.  How long has
22   Sherri been here for?  '17.  Gees.  Longer than
23   that.  Approximately 2019.
24   Q.  All right.

110

1    that does?
2    A.  Yes.
3    Q.  Who's -- who does the invoicing?
4    A.  The payouts are all done by Sherri
5    Webber.
6    Q.  And has she handled that ever since
7    she was hired?
8    A.  No.
9    Q.  All right.
10       Who else has handled that?
11   A.  Myself.
12   Q.  Okay.
13       You -- she was hired, and you
14   were still doing that work for some period of
15   time?
16   A.  Correct.
17   Q.  Okay.
18       And so for some period of
19   time, you were doing the invoicing for the
20   service work and for the new construction?
21   A.  Correct.
22   Q.  And when did it switch over that she
23   started doing the new construction invoicing?
24   A.  Around three years ago.

112

1        And you mentioned
2    dispatching.  What does that entail?
3    A.  Telling all of the service technicians
4    from Midwest Dock Solutions where -- where to
5    go next, who their contact is, what's the
6    address, what they're doing.  I assist -- I
7    used to do all of it.  Now, I have someone who
8    does the majority for me, but I still assist in
9    the dispatching.
10   Q.  All right.
11       Who does that now?
12   A.  Danny Lietz.
13   Q.  All right.
14       And you said scheduling.
15   What's that?
16   A.  Day to day, where, who's doing what
17   tomorrow, what their job is going to entail,
18   getting a schedule with a customer -- you know,
19   just future work on who's -- on who we're --
20   when we're going to do it and who's going to do
21   it.
22   Q.  All right.
23   A.  The service technicians.
24   Q.  And then, you said, ordering parts?

28 (Pages 109 to 112)

113

1    A. Yes.
2    **Q. All right.**
3    **And what's involved in that?**
4  **Just ordering supplies for the warehouse?**
5    A. No. Ordering parts and material for
6  jobs that I sell.
7    **Q. I see.**
8    **Things that are specific to a**
9  **project?**
10   A. Correct.
11   **Q. All right.**
12   **Are there parts and supplies**
13  **that the -- that you have to have around for**
14  **the work that -- for either door installation**
15  **or dock leveler installation that you just need**
16  **to have on site, like --**
17   A. Inventory, yes. Correct.
18   **Q. Yeah.**
19   **I think one of the examples I**
20  **can recall that Ira Sugar mentioned was wall**
21  **anchors or wedge anchors?**
22   A. Anchors. There's a lot of items that
23  we need for -- on a daily basis that we keep an
24  inventory.

114

1    **Q. And what -- what kind of items that**
2  **you need on a daily basis that you keep an**
3  **inventory?**
4    A. Shims, anchors, springs, hold down
5  assemblies.
6    **Q. Hold down?**
7    A. Yeah. Weather seal, weather brush,
8  rollers, hinges, slide locks, bumpers.
9    **Q. What are bumpers?**
10   A. For the docks. So when the truck
11  backs up, it hits the bumper.
12   **Q. All right.**
13   A. Should I keep -- keep going with stuff
14  that's in our inventory?
15   **Q. Yeah.**
16   A. Control panels. Door operators.
17   **Q. Like for -- like the overhead --**
18   A. Yes.
19   **Q. -- lifters?**
20   A. There's -- we have so much stuff in
21  there, it's -- I mean, dock springs, caulk. I
22  mean, gees. Offhand, that's -- a lot of stuff.
23   **Q. A pretty good list?**
24   A. Yeah. That we keep an inventory for

115

1  every day use.
2    **Q. All right.**
3    **And you mentioned, when you**
4  **would do ordering for parts for jobs that are**
5  **specific to what -- to a project you're**
6  **quoting, something like door operators, which**
7  **you said you keep in stock, if you're -- I take**
8  **it, you could be quoting a door operator that**
9  **you would -- that that's a part you would order**
10 **because it's not one that is an item that's in**
11 **stock.**
12   **Is that accurate, or am I --**
13   A. Well, so --
14   **Q. Like some of these things --**
15   A. Door operator, you know, there's
16  different variables of something like a door
17  operator. You know, you've got 110-volt.
18  You've got 460-volt. You've got half
19  horsepower. You've got one horsepower. We
20  stock the stuff that we sell the most of.
21   **Q. Right.**
22   A. But in cases that we run into a
23  situation where we need something we don't
24  stock, I order it for a particular -- for a

116

1  job.
2    **Q. Okay.**
3    **And that's sort of what I was**
4  **getting at.**
5    **Some of the things you said**
6  **that you have in stock are also things that you**
7  **might order special for a job because what you**
8  **need is different than what you have in stock.**
9    **Is that fair?**
10   A. Yes.
11   **Q. Okay.**
12   **You also handle payroll, you**
13  **said?**
14   A. I do.
15   **Q. What does that entail?**
16   A. Just the Midwest Dock employees'
17  hours, the people that work hourly, their
18  weekly payroll, hours.
19   **Q. All right.**
20   **And are you responsible for**
21  **collecting their hours?**
22   A. Yes.
23   **Q. And do you enter those into some**
24  **payroll programs?**

29 (Pages 113 to 116)

117

1    A.  I don't.
2    Q.  Okay.
3           Is that something Sherri
4    does?
5    A.  Yes.
6    Q.  All right.
7           And other than collecting the
8    hours that the employees work, is there -- do
9    you have any other responsibility for -- for
10   that?
11   A.  Yes.
12   Q.  And what is that?
13   A.  Commission for salesmen.
14   Q.  Okay.
15          You administer that?
16   A.  Yes.
17   Q.  Figure out what the commissions are
18   supposed to be.
19          Is that accurate?
20   A.  Yes.
21   Q.  All right.
22          And other than you, up until
23   the last six months, and Ira Sugar, what
24   other -- who are the other salesmen that work

118

1    for Midwest Dock Solutions?
2    A.  Steve French.
3    Q.  Okay.
4    A.  David Mortel.
5    Q.  Anybody else?
6    A.  No.
7    Q.  Okay.
8           And are -- have they been --
9    between Ira, you, Steve French, and David
10   Mortel, is that all of the salespeople that
11   you've had, say, in the past five years?
12   A.  Yes.
13   Q.  All right.
14   A.  No, no.  James Johnson.
15   Q.  Oh.
16   A.  James Johnson, but he doesn't work for
17   us anymore.
18   Q.  All right.
19          When did he leave?
20   A.  December of last year.
21   Q.  Okay.
22          And what kind of sales does
23   Steve French do?
24   A.  It's all enduser sales.

119

1    Q.  Enduser sales?
2    A.  Yeah.
3    Q.  What's that mean?
4    A.  Just existing facilities, existing
5    buildings, nothing new going up he sells.
6    Q.  Okay.
7    A.  It's all existing buildings.
8    Q.  Okay.
9           Could it be that it's an
10   existing building that wants to put in a new
11   dock leveler?
12   A.  Yes.
13   Q.  Could it be an existing building that
14   wants to put in new overhead doors?
15   A.  Yes.
16   Q.  Okay.
17          You're familiar with what --
18   and it's probably pretty obvious, but you're
19   familiar with like logistics buildings?
20   A.  Yes.
21   Q.  All right.
22          And so if a logistics
23   building wanted to replace its dock levelers or
24   doors, would Steve French handle that?

120

1    A.  Yes.
2    Q.  All right.
3           And, I'm sorry, did you say
4    he does dock levelers and doors?
5    A.  Yes.
6    Q.  All right.
7           And do you know, has Midwest
8    Dock Solutions sold jobs like that to replace
9    doors and dock levelers in logistics buildings?
10   A.  Yes.
11   Q.  All right.
12          And David Mortel, what kind
13   of sales does he do?
14   A.  Same as Steve French.
15   Q.  Okay.
16          And if I asked you the same
17   questions for him that I just asked you for
18   Steve French, would you give me the same
19   answers?
20   A.  Yes.
21   Q.  All right.
22          And what -- how about James
23   Johnson?  What kind of work did he do?
24   A.  Same.

30 (Pages 117 to 120)

121

1    Q.  Okay.
2         And, again, if I asked you
3   the same question for James Johnson that I
4   asked you for Steve French, would you give me
5   the same answers?
6    A.  Yes.
7    Q.  Now, you also signed contracts on
8   behalf of Midwest Dock Solutions; is that
9   correct?
10   A.  Yes.
11   Q.  All right.
12        If you could -- yeah.  The
13  binder you have in front of you would be great.
14
15        (WHEREUPON, the document marked
16         Plaintiff's Exhibit 61 for
17         identification was tendered to
18         the deponent.)
19
20  BY MR. McJESSY:
21   Q.  If you could open that to Exhibit 61.
22   A.  All right.
23   Q.  And that is a subcontract agreement
24  that Midwest Dock Solutions signed with Pepper

123

1   they're separate.  Sometimes they're the same.
2   Sometimes there's two contracts, and sometimes
3   there's just one combining both together.
4    Q.  All right.
5         But generally, if it's doors,
6   it was Ira.  If it was dock levelers, it was
7   you?
8    A.  Yes.
9    Q.  All right.
10        And this is for -- do you
11  recall this project?
12   A.  No.
13   Q.  All right.
14        This is, it looks like, for
15  North American Warehouse Expansion in Glenview,
16  correct?
17   A.  Yes.
18   Q.  And is that your signature on this
19  document?
20   A.  Yes.
21   Q.  All right.
22        And do you know who Zach
23  Atkins is?
24   A.  Yes.

122

1   Construction, correct?
2    A.  Yes.
3    Q.  And it says, attention Ira Sugar on it
4   at the top.
5         Do you see that?
6    A.  Yes.
7    Q.  Why does it say attention Ira Sugar?
8    A.  Because it's just overhead doors.
9    Q.  Okay.
10        And you're looking at Exhibit
11  B, the scope of work?
12   A.  I'm looking at scope of work, correct.
13   Q.  Okay.
14        And it says overhead doors on
15  it?
16   A.  Yes.
17   Q.  And so if it was dock levelers, do you
18  think it might say you?
19   A.  Yes.
20   Q.  I see.
21        What if it was both dock
22  levelers and doors?  Would those be separate
23  subcontracts?
24   A.  It depends on the job.  Sometimes

124

1    Q.  Is he somebody that you've dealt with
2   at Pepper Construction?
3    A.  Yes.
4    Q.  Have you ever met him?
5    A.  No.
6    Q.  Have you ever talked with him?
7    A.  Yes.
8    Q.  All right.
9         And if you look at this
10  subcontract agreement, there's a highlighted
11  sentence that says this subcontract agreement
12  must be signed and received in addition to
13  submitting an acceptable Certificate of
14  Insurance prior to working on site.
15        Do you see that?
16   A.  Yes.
17   MR. HUGHES:  And I just wanted just
18  to interject.  Anything that you recognize as
19  highlighted are highlights that you have made,
20  Mr. McJessy, correct?
21   MR. McJESSY:  Correct, except -- I
22  believe that that's true.  I don't think any of
23  this came highlighted.  Yeah.  That's correct.
24

31 (Pages 121 to 124)

125

```
 1    BY MR. McJESSY:
 2        Q.   So -- and if you look at the
 3    highlighting directly below that, it says, a
 4    copy of subcontractor's up-to-date insurance
 5    certificate must be on file with Pepper's
 6    superintendent at the job site before work can
 7    be started.  Please see article ten in Exhibit
 8    C for further instructions.
 9             Do you see that?
10        A.   Yes.
11        Q.   For these new construction contracts
12    with large general contractors like Pepper
13    Construction, are those insurance requirements
14    fairly standard, that you have to have a
15    Certificate of Insurance on file before you can
16    begin work?
17        A.   Yes.
18        Q.   All right.
19             And one of -- is one of
20    your -- is one of the -- strike that.
21             Is one of the things that you
22    do in your job also getting Certificates of
23    Insurance to the general contractors for when
24    you have a contract like this?
```

126

```
 1        A.   Currently, not much.  But in the past,
 2    yes.
 3        Q.   Okay.
 4             And has that just changed
 5    because you've gotten busy, and so other people
 6    do that work now?
 7        A.   Yes.
 8        Q.   All right.
 9             And when did -- you said in
10    the past -- strike that.
11             If I understand correctly,
12    you still do that some, but it's not something
13    you do very much.
14             Is that fair?
15        A.   Not very much, no.  I don't collect
16    COIs very often anymore.
17        Q.   Okay.
18             And when did that change?
19    Can you tell me sort of when that changed?  The
20    last five years?
21        A.   In the past five years.
22        Q.   Okay.
23             And I take it, it's a gradual
24    thing, that you just do that less and less?
```

127

```
 1        A.   Yes.
 2        Q.   All right.
 3             But you used to have, I take
 4    it, regular interaction with the insurance
 5    carriers to get those Certificates of
 6    Insurance --
 7        A.   Yes.  Correct.
 8        Q.   -- issued to the general contractors,
 9    correct?
10        A.   Yes.
11        Q.   Now, did you typically read the
12    subcontracts before you signed them?
13        A.   No.
14        Q.   Why not?
15        A.   There are a hundred -- some are a
16    hundred pages long.  I physically wouldn't have
17    enough time in the day to read these contracts.
18        Q.   All right.
19             If you could turn to -- well,
20    strike that.
21             You understand, when you
22    signed this -- strike that.
23             Do you understand, when you
24    signed the subcontract agreements, that Midwest
```

128

```
 1    Dock Solutions is supposed to comply with the
 2    terms of the contracts?
 3        A.   Yes.
 4        Q.   Okay.
 5             And if you could turn to page
 6    seven.  The pages are numbered on the bottom
 7    right.
 8             MR. HUGHES:  What number?
 9             MR. McJESSY:  Page seven, paragraph
10    22.
11    BY MR. McJESSY:
12        Q.   And do you see that -- do you see
13    paragraph 22 there?
14        A.   Yes.
15        Q.   And it refers to sub-subcontractors.
16             Do you see that?
17        A.   Yes.
18        Q.   And it says, subcontractor
19    agrees not to sub-subcontract more than five
20    percent of this subcontract agreement without
21    the written consent of Pepper.  For all
22    proposed sub-subcontractors in excess of five
23    percent, subcontractor shall furnish Pepper an
24    AIA document A-305 or equal subcontractor's
```

32 (Pages 125 to 128)

129

1  qualification statement not less than five
2  business days prior to the final execution of
3  any sub-subcontractor agreement.
4          Do you see that?
5  A.  Yes.
6  Q.  Did I read that right?
7  A.  Yes.
8          MR. HUGHES:  Kevin, objection.
9  Foundation and competency on this document.
10 BY MR. McJESSY:
11 Q.  All right.
12         And do you know, did Midwest
13 Dock Solutions' employees perform the work on
14 this subcontractor agreement?
15 A.  No.
16 Q.  Okay.
17         Who would have done that?
18 A.  Dock & Door Install.
19 Q.  Okay.
20         And did Dock & Door -- did
21 Midwest Dock Solutions give Pepper written
22 notice of that?
23 A.  No.
24 Q.  Okay.

130

1          And why not?
2  A.  I didn't even know it was in there.
3  Q.  Midwest Dock Solutions would have
4  given Pepper Construction a Certificate of
5  Insurance for this job, correct?
6  A.  Yes.
7  Q.  Okay.
8          Would Midwest Dock Solutions
9  have given Pepper Construction a Certificate of
10 Insurance for Dock & Door for this job?
11 A.  I don't know that answer.
12 Q.  Okay.
13         Would Midwest Dock Solutions
14 ever provide Certificates of Insurance to
15 general contractors on behalf of Dock & Door,
16 to your knowledge?
17 A.  Dock & Door has given Certificates of
18 Insurance to general contractors, yes.
19 Q.  Okay.
20         That's not quite my question,
21 though.
22         Would Midwest Dock Solutions
23 provide those Certificates of Insurances for
24 Dock & Door to the general contractors?

131

1          MR. HUGHES:  Objection.  Vague.
2          MR. McJESSY:  Well, let me rephrase
3  my question, then.
4  BY MR. McJESSY:
5  Q.  The general contractor requires a
6  Certificate of Insurance for Midwest Dock
7  Solutions to perform work under the
8  subcontract, correct?
9  A.  Yes.  Correct.
10 Q.  Okay.
11         And would -- if Dock & Door
12 is going to perform the work on the project,
13 would Midwest Dock Solutions ever provide the
14 general contractor with a Certificate of
15 Insurance for Dock & Door?
16         MR. HUGHES:  Objection.  Vague.
17 BY MR. McJESSY:
18 Q.  You can answer.
19 A.  I know the question.  I'm just trying
20 to think if Midwest Dock has ever given a COI
21 to a GC from Dock & Door.
22         Have they received them?
23 Yes.  But Dock & Door usually gives -- and I
24 don't know.  I can't answer that question.

132

1  Q.  Okay.
2          Now, if you turn to Exhibit
3  B, which is the scope of work that you were
4  looking at earlier -- it says page two on the
5  bottom right corner of Exhibit B --
6  A.  Okay.
7  Q.  -- do you see where it's highlighted
8  there.  It says, union installations are
9  utilized for all work performed on this job
10 site, and then it says included?
11 A.  Yes.
12 Q.  Do you understand that that means that
13 all of the work that's being done on this job
14 site needs to be performed by union workers?
15 A.  Yes.
16 Q.  Okay.
17         Now, I think you said Pepper
18 was one of the companies that regularly
19 required union work; is that right?  Union
20 contractors?
21 A.  Yes.  But I don't think we've ever
22 done -- maybe we have done three projects with
23 Pepper.  They're not one of the GCs that we
24 work for.

33 (Pages 129 to 132)

133

```
 1            (WHEREUPON, the document marked
 2        Plaintiff's Exhibit 63 for
 3        identification was tendered to
 4        the deponent.)
 5
 6   BY MR. McJESSY:
 7     Q.  All right.
 8            And if you could turn to
 9   Exhibit 63.
10            This is another subcontract
11   agreement with Pepper Construction, correct?
12     A.  Yes.
13     Q.  And this one, it says, attention Ira
14   Sugar on it.
15            Do you see that?
16     A.  Yes.
17     Q.  And it's for work at the Matteson 57
18   Commerce Center in Matteson, Illinois.
19            Do you see that?
20     A.  Yes.
21     Q.  Are you familiar with that project?
22     A.  I am.
23     Q.  And how are you familiar with that
24   project?
```

134

```
 1     A.  Ira sold the doors on that project.
 2     Q.  Okay.
 3            And did you ever go out to
 4   the job site?
 5     A.  No.
 6     Q.  All right.
 7            But you're familiar -- you
 8   know you did the project, correct?
 9     A.  Yes.
10     Q.  Okay.
11            And you'll see that this
12   document is signed -- it has an electronic
13   signature of Ira Sugar.
14            Do you see that?
15     A.  Yes.
16     Q.  All right.
17            When Mr. Sugar testified,
18   I'll represent to you that he said that he gets
19   these contracts by email and that he forwards
20   the contracts to you to review, that he doesn't
21   sign contracts generally?
22     A.  That's correct.
23     Q.  Okay.
24            And that -- that he thinks
```

135

```
 1   what happens is the contract comes with a link
 2   to sign the document.  And because he's
 3   forwarded it to you, you click on the link and
 4   go to sign, and it populates with his name, and
 5   then his name appears on the contract.
 6            Does that process sound right
 7   to you?
 8     A.  Yes.
 9     Q.  Okay.
10            So even though it's got Ira
11   Sugar's name on it, if it's a subcontract
12   agreement, you're the person who's really
13   signing the agreement?
14     A.  Yes.
15     Q.  Is that fair?
16     A.  Yes.
17     Q.  Okay.
18            Because does Ira, to your
19   knowledge, ever sign the subcontract
20   agreements?
21     A.  No.
22     Q.  All right.
23            He might -- he also testified
24   he would sign change orders.
```

136

```
 1            Does that sound right?
 2     A.  Yes.
 3     Q.  All right.
 4     A.  All of the contracts go to my desk.
 5     Q.  Okay.
 6            And you'll see in this
 7   contract I've highlighted the same provisions
 8   on the front page that I highlighted on the
 9   last one where it talks about the Certificate
10   of Insurance and not being allowed to go on the
11   job site until a Certificate of Insurance is
12   provided.
13            Do you see that?
14     A.  Yes.
15     Q.  Is that -- and again, I think I asked
16   you this, but if I didn't, for the general
17   contractors that you're doing new construction
18   work for, is that a fairly standard provision?
19     A.  Yes.
20     Q.  Do you know, have you ever been kept
21   off of a job site because you couldn't get a
22   Certificate of Insurance in time?
23     A.  No.
24     Q.  Okay.
```

34 (Pages 133 to 136)

137

1      You've always gotten the
2  Certificates of Insurance in time?
3      A.  Yes.
4      Q.  Okay.
5          Is that a -- a requirement
6  you take pretty seriously?
7      A.  Yes.
8      Q.  And is that because the general
9  contractors take it pretty seriously?
10     A.  Very seriously.
11     Q.  Do you know why that is?
12     A.  No.
13     Q.  Now, the Certificate of Insurance
14  provisions that you get typically requires that
15  you list the general contractor as an
16  additional insured on your policy, correct?
17     A.  Yes.
18     Q.  Is that something that's just part and
19  parcel of getting the Certificate of Insurance
20  issued, or is that something that you do
21  separate from getting the insurance certificate
22  issued?
23          Do you understand my
24  question?

138

1      A.  Yeah.  They -- they put -- my
2  insurance agents adds all of that on the COI.
3      Q.  Okay.
4          So like when you were -- when
5  getting insurance certificates was more a part
6  of your job, you would also make sure that the
7  general contractor was added onto that
8  certificate, correct?
9      A.  Yes.  They have the form they need to
10  fill out.
11     Q.  Okay.
12          And so now that you're doing
13  less of that, you also -- I mean, whoever's
14  getting the Certificate of Insurance makes sure
15  about that as well.
16          Is that a --
17     A.  Yes.
18     Q.  Okay.
19          And who is that that does
20  that now, mostly?
21     A.  Sherri Webber.
22     Q.  Okay.
23          And if you could take a look
24  at Exhibit 69.  Oh, actually, let me ask you

139

1  another question about Exhibit 63 before we
2  move on.
3          What was the Matteson 57
4  project?  What was being done there?
5      A.  Overhead doors.
6      Q.  Okay.
7          Do you remember how big the
8  project was?
9      A.  Yes.
10     Q.  How big was it?
11     A.  About a hundred doors.
12     Q.  About a hundred doors?
13     A.  Yeah.
14
15          (WHEREUPON, the document marked
16          Plaintiff's Exhibit 69 for
17          identification was tendered to
18          the deponent.)
19
20  BY MR. McJESSY:
21     Q.  And if you could turn to Exhibit 69.
22          And this is another
23  subcontract agreement between Midwest Dock and
24  Pepper, correct?

140

1      A.  Yes.
2      Q.  And this is, again, signed by Ira
3  Sugar, but you probably did that.
4          Is that fair?
5      A.  Yes.
6      Q.  And do you remember this project?
7      A.  A little bit.
8      Q.  This is -- it says, LPC Palatine I,
9  LP, correct?
10     A.  Yes.
11     Q.  What was that project?
12     A.  Doors.  And there was a small amount
13  of dock equipment on it.
14     Q.  All right.
15          And what was the small amount
16  of dock equipment?
17     A.  This is just overhead doors.  I'm
18  looking at the contract value.  There may have
19  been an LPC II, but this is -- this project had
20  a tenant improvement.  This was just overhead
21  doors, this contract itself.
22     Q.  Okay.
23          You think there might have
24  been another contract for dock levelers?

35 (Pages 137 to 140)

141

1    A.  For dock equipment, yes.
2    **Q.  Okay.**
3          **And you say there was a**
4  **tenant at this location?**
5    A.  I can't -- I can't recall.  We did a
6  job for Pepper that involved dock equipment.
7  And I thought this was it, but it's not.
8    **Q.  Okay.**
9          **And the project that you did**
10  **for Pepper that involved dock equipment, was**
11  **that for an existing facility?**
12    A.  Yes.
13    **Q.  All right.**
14          **And what did that involve,**
15  **the one that you're recalling?**
16    A.  They had a tenant move into the
17  building they built, and we added some dock
18  locks to it.
19    **Q.  Dock locks?**
20    A.  Yes.
21    **Q.  What's a dock lock?**
22    A.  A dock lock -- when a truck backs in,
23  it secures the -- the truck into the building
24  so it can't pull away while they're loading and

142

1  unloading.
2    **Q.  Okay.**
3    A.  So the truck can't leave when the --
4  it secures the truck to the building.
5    **Q.  I understand.**
6          **And that was for an already**
7  **existing building?**
8    A.  Well, it was -- it was existing.  But
9  it was just built, so it was empty.  It was --
10  I mean, yes, I guess you'd say it was existing,
11  but it just got done getting built, and
12  somebody moved into it.
13    **Q.  Okay.**
14          **And what was the -- do you**
15  **remember this LPC Palatine project in Palatine?**
16    A.  No.
17    **Q.  Okay.**
18          **But this is just for doors,**
19  **you believe?**
20    A.  Yes.
21
22
23
24

143

1          (WHEREUPON, the document marked
2          Plaintiff's Exhibit 70 for
3          identification was tendered to
4          the deponent.)
5
6  BY MR. McJESSY:
7    **Q.  And then if you could turn to Exhibit**
8  **70.**
9          **And this is a contract for**
10  **work performed at R. R. Donnelley Wallace**
11  **Avenue expansion.**
12          **Do you see that?**
13    A.  Yes.
14    **Q.  And do you remember this project?**
15    A.  A very small amount of it.
16    **Q.  Okay.**
17          **And what do you recall on**
18  **this project?**
19    A.  It was all doors.  It was just doors.
20    **Q.  Okay.**
21          **And this was a contract that,**
22  **again, you signed, correct?**
23    A.  Yes.
24    **Q.  All right.**

144

1          **And the contract value is**
2  **$56,838; is that correct?**
3    A.  Yes.
4    **Q.  All right.**
5          **You said it was a small**
6  **contract for doors.**
7          **Do you recall how many doors?**
8    A.  I want to say it was high-speed doors,
9  so that's why the contract amount was a lot
10  because they're more expensive.
11    **Q.  Okay.**
12    A.  But it wasn't a lot of doors.
13    **Q.  All right.**
14          **And if you turn to Exhibit B,**
15  **which is the scope of work again --**
16    MR. HUGHES:  Do you know what page
17  that follows?
18    MR. McJESSY:  It's the first page
19  that's got color on it.  It's in blue.
20          Do you see that?
21  BY MR. McJESSY:
22    **Q.  If you look at the top of it, it says,**
23  **eight thirty overhead and specialty doors.**
24          **Do you see that?**

36 (Pages 141 to 144)

145

1     A.  Yes.
2     Q.  Are high-speed doors what you would
3  call specialty doors?
4     A.  Yes.
5     Q.  Are they more complicated to install?
6     A.  Yes.
7           MR. McJESSY:  What's the last
8  exhibit you have there, 96?
9           MR. HUGHES:  Well, it's -- you were
10  in the 90s.
11          MR. McJESSY:  I've got 96 as the
12  last one we've got.
13          THE WITNESS:  Am I done with this
14  for now?
15          MR. McJESSY:  You can keep that in
16  front of you.
17
18          (WHEREUPON, the documents were
19          marked Plaintiff's
20          Exhibit 97 and 98 for
21          identification, as of 9/26/25.)
22
23  BY MR. McJESSY:
24     Q.  All right.

146

1          So I'm going to hand you what
2  I've marked as Exhibit 97.
3          MR. HUGHES:  You said 97?
4          MR. McJESSY:  Yeah, and Exhibit 98.
5  BY MR. McJESSY:
6     Q.  All right.
7          And if you look at Exhibit
8  97, it has attached to it the document that --
9  if you look at Exhibit 97, on the first page,
10  it's an email from Tony Brutti to Christi
11  Adams.
12          Do you see that?
13     A.  Yes.
14     Q.  And do you know who Christi Adams is?
15     A.  No.
16     Q.  And it has an attachment there, SSP
17  Pepper, R. R. Donnelley Wallace.
18          Do you see that?
19     A.  Yes.
20     Q.  And then the emails says, SSP for
21  R. R. Donnelly Wallace attached from Midwest
22  Dock Solutions.
23          Do you see that?
24     A.  Yes.

147

1     Q.  And if you turn to the third page of
2  this, there's a document that's titled, Site
3  Specific Safety Plan.
4          Do you see that?
5     A.  Yes.
6          MR. HUGHES:  So I'm going to object
7  to this on foundation.
8  BY MR. McJESSY:
9     Q.  And it says, subcontractor, Midwest
10  Dock Solutions.
11          Do you see that?
12     A.  Yes.
13     Q.  And it says -- and it's got contacts
14  for you and Mike Richert, correct?
15     A.  Yes.
16     Q.  Are those your phone numbers?
17     A.  That's the office and Mike's cell
18  phone.
19     Q.  Okay.
20          And if you look at that
21  document and go to the third page of that
22  document, it's got your name, Tony Zarlengo,
23  president, Midwest Dock Solutions, March 27,
24  2024, so a little over a year ago.

148

1          Do you see that?
2     A.  Yes.
3     Q.  Did you prepare this document?
4     A.  I did not.
5     Q.  You did not?
6     A.  No.
7     Q.  Do you know who prepared this
8  document?
9     A.  I do not.
10     Q.  The site specific safety plan?
11     A.  I do not.
12     Q.  Is this the kind of document you would
13  prepare?
14     A.  Myself?
15     Q.  Yeah.
16     A.  I have before for my jobs, but -- I
17  have prepared a site specific safety plan
18  before, but not this one.
19     Q.  You don't think you prepared this one?
20     A.  I can almost guarantee I did not
21  prepare this one.
22     Q.  Okay.
23          Does this look like site
24  specific safety plans you've prepared in the

149

1    past?
2    A. Similar, yes.
3    Q. Okay.
4         And if you go to the second
5    page of the site specific safety plan, it says,
6    Midwest Dock Solutions contacts.
7         Do you see that?
8    A. Yes.
9    Q. And then it says, project manager,
10   Tony Zarlengo, correct?
11   A. Yes.
12   Q. Field operations manager, Mike
13   Richert, correct?
14   A. Yes.
15   Q. And then it says, site foreman,
16   competent person, David Green.
17        Do you see that?
18   A. Yes.
19   Q. Are all of those three persons
20   employees of Midwest Dock Solutions?
21   A. No.
22   Q. Okay.
23        And Mr. Green is not,
24   correct?

150

1    A. Correct.
2    Q. He's a -- gets paid through
3    Dock & Door; is that right?
4    A. Yes.
5    Q. All right.
6         And this is for
7    installation -- if you look where it says
8    Midwest Dock scope of work, do you see where it
9    says installation of sectional doors?
10   A. Yes.
11   Q. Is that what this project was?
12   A. Yes.
13   Q. Do you know who Tim Lumpp is?
14   A. No.
15   Q. Now, if you look at the email that's
16   on pages one and two, if you look on the second
17   page, it looks like the signature block for
18   Tony Brutti's email is at the bottom on the
19   second page.
20        Do you see that?
21   A. Yes.
22   Q. And it says, Tony Brutti, Midwest Dock
23   Solutions, and then it also has his email,
24   tonyb@midwestdocksolutions.com, correct?

151

1    A. Yes.
2    Q. And that email address was an email
3    that Tony Brutti had in March of 2024, correct?
4    A. Correct.
5    Q. And if you look at Exhibit 98, that's
6    a different version of the same email. I'll
7    represent to you, both of these were produced
8    to us by Pepper Construction. And this one,
9    the top of the email shows -- whereas on
10   Exhibit 97, it just shows Tony Brutti's name,
11   this one seems to show the email address from
12   which this was sent, which is
13   tonyb@midwestdocksolutions.com.
14        Do you see that?
15   A. Yes.
16   Q. Okay.
17        And, again, that was an email
18   that he was using back in March of 2024,
19   correct?
20   A. Yes.
21   Q. Would anybody else at Midwest Dock
22   prepare site specific safety plans or something
23   like this document that's attached to this
24   email?

152

1    A. No.
2    Q. All right.
3         You said you had prepared
4    other site specific safety plans like this,
5    correct?
6    A. Yes.
7    Q. All right.
8         Was anybody else authorized
9    to send out site specific safety plans with
10   your name on them even if they didn't prepare
11   it? Is that -- in other words, for example,
12   could Ira Sugar prepare a site specific safety
13   plan for a project that he has bid and then add
14   your name to the bottom even though you didn't
15   prepare it? Would that be something that you
16   would authorize?
17   A. No.
18   Q. Okay.
19        Like your name appears on the
20   contract -- or Ira -- strike that.
21        Ira Sugar's name appears on
22   the subcontract agreements, but you actually
23   sign those, correct?
24   A. Yes.

153

1   Q.  So my question is sort of similar to
2   that.
3           Could Ira have prepared a
4   site specific safety plan and put your
5   signature on it, and that would be okay with
6   you?
7   A.  No.
8   Q.  All right.
9
10          (WHEREUPON, the document marked
11          Plaintiff's Exhibit 64 for
12          identification was tendered to
13          the deponent.)
14
15  BY MR. McJESSY:
16  Q.  The large binder that you have in
17  front of you there, if you could go to Exhibit
18  64.
19          And this is a contract with
20  Principal Construction, correct?
21  A.  Yes.
22  Q.  And it's for a project, General RV
23  Showroom TI.
24          Do you see that?

154

1   A.  Yes.
2   Q.  In Huntley, Illinois?
3   A.  Yes.
4   Q.  Do you recall that project?
5   A.  I recall it, yes.
6   Q.  And what did that project entail?
7   A.  Just overheard doors.
8   Q.  Okay.
9           And if you look at -- this
10  contract is numbered -- if you go to page four,
11  it's got a -- where it says subcontract, the
12  signature line, again, is Ira Sugar.
13          Do you see that?
14  A.  Yes.
15  Q.  But you would have reviewed this and
16  approved it, correct?
17  A.  Yes.
18  Q.  All right.
19          And if you look at the first
20  page of this contract where it says paragraph
21  seven, it says, A, services and
22  acknowledgements provided by the subcontractor
23  to furnish -- I'm sorry, to install -- strike
24  that.

155

1           The contract says, under
2   subsection A, services and acknowledgements
3   provided by the subcontractor to obtain,
4   maintain, and pay for such insurance as may be
5   required by the general contract, rider A
6   attached hereto or by law.  To furnish the
7   contractor satisfactory evidence that
8   subcontractor has complied with this paragraph.
9           Do you see that?
10  A.  Yes.
11  Q.  And, again, that's the standard sort
12  of sub -- Certificate of Insurance language
13  that's in pretty much all of these general
14  contractor/subcontract agreements for a new
15  contract -- or new door installation, correct?
16  A.  Correct.
17  Q.  And if you turn to the next page --
18  well, let me ask you.  Would Midwest Dock
19  Solutions' employees have performed the work on
20  this project?
21  A.  No.
22  Q.  Who would have?
23  A.  Dock & Door Install employees.
24  Q.  Okay.

156

1           And if you look at the second
2   page of this document, paragraph 11 says, not
3   to assign or sublet this subcontract or any
4   part thereof and not to assign any money due or
5   to become due hereunder without first obtaining
6   the written consent of contractor.
7           Do you see that?
8   A.  Yes.
9   Q.  Did Midwest Dock Solutions get the
10  written consent of Principal Construction to
11  have Dock & Door do this work?
12  A.  No.
13  Q.  And is that -- you didn't see that
14  paragraph; is that right?
15  A.  That's correct.
16  Q.  And if you turn to rider B -- which
17  these pages have a number Principal on the
18  bottom -- if you look at Principal 0235, do you
19  see that rider B?
20          Does that describe the work
21  that was done at this location?
22  A.  It does.
23  Q.  And it references 14 Clopay model
24  insulated sectional doors.

39 (Pages 153 to 156)

157

1    Do you see that?
2    A.  Yes.
3    Q.  And is Clopay a brand of door that
4  Midwest Dock Solutions carries?
5    A.  Yes.
6    Q.  And, now, if you keep turning back in
7  this document, you'll get to pages Principal
8  237 and 238 and Principal 239.  Those are the
9  change orders for the contract.
10    Now, is it likely that Ira
11  Sugar actually did electronically sign these
12  changes orders?
13    A.  Yes, it is.
14    Q.  All right.
15
16    (WHEREUPON, the document marked
17    Plaintiff's Exhibit 65 for
18    identification was tendered to
19    the deponent.)
20
21  BY MR. McJESSY:
22    Q.  And if you turn to the next exhibit,
23  Exhibit 65 -- and this is a contract with
24  Meridian Design Build, correct?

158

1    A.  Yes.
2    Q.  And is this a contract that you
3  signed?
4    A.  Yes.
5    Q.  All right.
6    And do you remember this
7  project?
8    A.  I'm pretty sure this is just doors.  I
9  don't know the name of it, but -- I don't
10  recall exactly what the project was, but I'm
11  pretty sure it was just doors.
12    Q.  Okay.
13    Now, if you turn to Exhibit
14  B, which is the scope of work, do you see that?
15    A.  Yes.
16    Q.  All right.
17    And this is a contract that
18  Midwest Dock Solutions did, right?
19    A.  Yes.
20    Q.  Okay.
21    And if you turn to Exhibit B,
22  and you'll see there's a first section that
23  says contract documents, and if you turn two
24  pages -- or to the next page -- there's a

159

1  section that says, work shall specifically
2  include but is not limited to the following,
3  and you see it says overhead doors?
4    A.  Yes.
5    Q.  All right.
6    And then this describes the
7  work to be done, correct?
8    A.  Yes.
9    Q.  And the first paragraph says,
10  subcontractor shall remove one -- one existing
11  nine by ten door and one twelve by fourteen
12  foot drive-in door, including associated track,
13  springs, and operator.
14    Do you see that?
15    A.  Yes.
16    Q.  All right.
17    So -- so this is retrofit
18  work, correct?
19    A.  Yes.  That's retrofit work.
20    Q.  All right.
21    And is this work that
22  Dock & Door did?
23    A.  Yes.
24    Q.  Okay.

160

1    And it says, subcontractor
2  shall furnish and install Z guards at nine dock
3  positions.
4    What are Z guards?
5    A.  They protect the door track from
6  getting hit by forklifts.
7    Q.  Okay.
8    A.  They're 48 inches tall, and they're
9  just metal that protects the door tracks from
10  getting hit.
11    Q.  Okay.
12    And are those products that
13  Midwest Dock sells?
14    A.  Yes.
15    Q.  And are they products that Midwest
16  Dock employees install?
17    A.  Yes.
18    Q.  All right.
19    And it also says, paragraph
20  four, subcontractor shall remove dock leveler
21  and dock seal from existing dock position and
22  reinstall at new dock position.
23    Do you see that?
24    A.  Yes.

40 (Pages 157 to 160)

161

1    Q.  All right.
2         What does that work describe?
3    A.  Torching the dock out, taking it out
4 of the pit, and applying the dock seal and --
5 taking the anchors out of the dock seal and
6 taking it down.
7    Q.  Okay.
8         And that's work that
9 Dock & Door did on this contract?
10   A.  Yes.
11   Q.  Okay.
12        But Midwest Dock Solutions,
13 does it also do that kind of work?
14   A.  Yes.
15   Q.  And if you go down to paragraph 12,
16 paragraph 12 says, all dock equipment and
17 overhead doors shall be installed by union
18 labor, correct?
19   A.  Yes.
20   Q.  All right.
21        So this was one of those
22 contracts that required union workers on the
23 job site?
24   A.  Yes.

162

1    Q.  So the work in this contract is work
2 that could be done by Midwest Dock Solutions,
3 correct, except for the fact that it requires
4 union labor?
5    A.  Yes.
6
7         (WHEREUPON, the document was
8         marked Plaintiff's
9         Exhibit 99 for identification,
10        as of 9/26/25.)
11
12 BY MR. McJESSY:
13   Q.  I'm going to hand you what I've marked
14 as Exhibit 99.
15        And this is a subcontract
16 agreement between Midwest Dock Solutions and
17 Clayco, correct?
18   A.  Yes.
19   Q.  And Clayco, I think you said, is one
20 of those general contractors that requires
21 union labor; is that right?
22   A.  Yes.
23   Q.  All right.
24        And, let's see.  I think this

163

1 is numbered as one.
2         But if you turn -- and so if
3 you turn well back in this agreement --
4    A.  Right.
5    Q.  -- you'll find the signature page.  It
6 looks like this.
7    A.  Yes.
8    Q.  All right.
9         And this is a document that
10 you electronically signed on behalf of Midwest
11 Dock Solutions, correct?
12   A.  Yes.
13   Q.  Is this a job you sold?
14   A.  No.
15   Q.  All right.
16   A.  Let me take a look at it again.
17   Q.  Yeah.
18        It says overhead coiling
19 doors.
20   A.  No.  I did not sell this.
21   Q.  Okay.
22        It's just a door agreement,
23 right?  No dock?
24   A.  No dock agreement.

164

1    Q.  I'm getting the sense, from your
2 answers to the questions, that the line between
3 you and Ira Sugar for door and -- door
4 installation work and dock installation work
5 was a pretty firm line.  Is that fair?  That
6 you really sold the dock levelers, he sold
7 doors, and it didn't overlap really at all?
8    A.  A hundred percent.
9    Q.  Okay.
10        Are there any items related
11 to the installation -- let me take a step back.
12        Midwest also installs dock
13 seals, dock locks, track guards, bug screens,
14 all of those kind of products, right?
15   A.  Yes.
16   Q.  Overhead door operators.
17        Any other kind of products
18 that are sort of accessories to dock levelers
19 and doors?
20   A.  Basically, it's dock bumpers, dock
21 seals, dock levelers, dock locks.  Those are
22 all of the dock accessories, basically, so --
23   Q.  Okay.
24        Dock bumpers.

41 (Pages 161 to 164)

165

1    A.  -- there's not a lot, yeah.
2    Q.  I forgot that.
3    A.  Yeah.  There's not a lot.
4    Q.  Are any of those items that you and
5    Ira would both deal with or --
6    A.  No.
7    Q.  Okay.
8         Stuff that goes with like
9    dock bumpers and dock locks would go with dock
10   levelers, correct?
11   A.  Yes.
12   Q.  What about the -- the canopies?  What
13   do they --
14   A.  The dock seals.
15   Q.  Yeah.  What -- what about those?
16   A.  Only I sold them.
17   Q.  Only you sold those?
18   A.  Yeah.
19   Q.  Okay.
20        And then door openers and
21   doors only he sold?
22   A.  Correct.
23   Q.  Okay.
24        If -- let's see.  If you look

166

1    at the Clayco contract and you go to the fourth
2    page, it says here, list of lower-tier
3    subcontractors and supplies and designer, if
4    any.
5         Do you see that?
6    A.  Yes.
7    Q.  And it says, within five days of
8    execution of this subcontract agreement and
9    prior to payment by contractor on any
10   application for payment defined herein,
11   subcontractor shall complete and return to
12   contractor Exhibit B, list of lower-tier
13   subcontractors and suppliers and designer, if
14   any, identifying all of subcontractors,
15   lower-tier subcontractors and suppliers and
16   designer, if any, that subcontractor intends to
17   use on the project together with any union
18   trade and local with whom subcontractor or its
19   lower-tier subcontractors are affiliated.
20        Did I read that right?
21   A.  Yes.
22   Q.  And then it says, contact information,
23   friends, including address, phone number,
24   contract -- contact person, and other available

167

1    information, close paren, shall be provided for
2    each entity identified.
3         Do you see that?
4    A.  Yes.
5    Q.  And then it says, subcontractor shall
6    not engage a lower-tier subcontractor with an
7    EMR greater or equal to 1.0 without first
8    obtaining the consent in writing of contractor
9    to such engagement.
10        Do you see that?
11   A.  Yes.
12   Q.  What is EMR?
13   A.  It's a safety rating.
14   Q.  Okay.
15        So -- and how do you get that
16   safety rating?
17   A.  Insurance company.  From a general
18   liability insurance company.
19   Q.  Okay.
20        So they issue some sort of --
21   well, do you know what it stands for, EMR?
22   A.  Yes.
23   Q.  What's it stand for?
24   A.  Employee modification rate.

168

1    Q.  Okay.
2         And so every contractor gets
3    a rating for its safety rating?
4    A.  Everybody with general liability gets
5    a safety rating, correct.
6    Q.  It says, the notification requirements
7    for Exhibit B is intended to include unions and
8    collective bargaining unit fringe -- fringe
9    benefit funds for any lower-tier subcontractor
10   utilized by subcontractor to complete the
11   subcontracted work, correct?
12   A.  All right.
13   Q.  All right.
14        And if you turn to Exhibit B,
15   which is, maybe, five or six pages from the
16   back of this document, it's a document
17   entitled, Exhibit B, list of lower-tier
18   subcontractors, suppliers, designers.
19   A.  Oh, it's five from the back?
20   Q.  Yeah.
21   A.  I thought five forward.
22        Okay.
23   Q.  Do you see that page?
24   A.  Yes.

42 (Pages 165 to 168)

169

```
 1      Q.  And there's no sub-subcontractor
 2   listed there, correct?
 3      A.  Correct.
 4      Q.  All right.
 5           And it's a form that says,
 6   list all of your sub-subcontractors, including
 7   contact information, with the actual or
 8   estimated dollar value you will pay them for
 9   this project, correct?
10      A.  Correct.
11      Q.  Do you know what Midwest Dock
12   Solutions' EMR rating is?
13      A.  Point eight three.
14      Q.  And do you know what Dock & Door's is?
15      A.  I do not.
16      Q.  And if you turn to the next page of
17   this Exhibit B, it says at the top Exhibit B
18   continued.
19           Do you see that?
20      A.  Yes.
21      Q.  And it says, list all of your material
22   suppliers, and then it continues on.  And
23   there's a material supply listed -- supplier
24   listed there, Clopay.
```

170

```
 1           Do you see that?
 2      A.  Yes.
 3      Q.  Overhead doors is the item?
 4      A.  Yes.
 5      Q.  And that's, again, the brand of door
 6   you carry?
 7      A.  Yes.
 8      Q.  And then if you continue on, there's a
 9   page that says list all union trades and locals
10   which you will use on this project.
11           Do you see that?
12      A.  Yes.
13      Q.  And you list carpenters, correct?
14      A.  Yes.
15      Q.  All right.
16           And you understand that the
17   people who are doing this work are carpenters,
18   correct?  They fall under that trade?
19      A.  The people doing the work?
20      Q.  Yeah.
21      A.  Yes.
22      Q.  And then if you go to the next page,
23   it says, Exhibit C, subcontractor scope of
24   work.
```

171

```
 1           Do you see that?
 2      A.  Yes.
 3      Q.  And then if you turn to the second
 4   page, it says, dock doors, and it -- do you see
 5   that?
 6      A.  Yes.
 7      Q.  And it looks like there's -- this is
 8   an installation of 44 manually-operated
 9   sectional doors and two motorized sectional
10   doors, correct?
11      A.  Yes.
12      Q.  Is that consistent with your
13   recollection of this project?
14      A.  It is, yes.
15           Can I go to the washroom real
16   quick, please?
17      Q.  Oh, sure.
18      A.  Thank you.
19           MR. McJESSY:  Let's go off the
20   record.
21
22
23
24
```

172

```
 1           (After a break from 12:30 p.m.
 2            to 12:35 p.m., the deposition
 3            was resumed as follows:)
 4
 5           (WHEREUPON, the document was
 6            marked Plaintiff's
 7            Exhibit 100 for identification,
 8            as of 9/26/25.)
 9
10   BY MR. McJESSY:
11      Q.  All right.
12           Well, let's -- let's finish
13   this agreement.
14           Sir, if you could look at
15   Exhibit 100 in front of you there, it -- it
16   looks like this is a document produced by
17   Midwest Dock Solutions.
18           Do you see the number on the
19   bottom there?
20      A.  Yes.
21      Q.  And the first three pages look to be a
22   contract -- or a bid summary or something --
23   well, strike that.
24           What are the first three
```

43 (Pages 169 to 172)

173

1    pages?  Tell me what they are.
2        A.  A bid.
3        Q.  Okay.
4             It's a bid?
5        A.  Yes.
6        Q.  A bid that you prepared?
7        A.  I did prepare this.
8        Q.  All right.
9             And that's your signature on
10   the third page?
11       A.  Yes.
12       Q.  All right.
13            And I take it, there's a
14   cover page to this.  This says page two of
15   four, three of four, four of four.
16            Is there a cover page?
17       A.  I don't know what the cover page would
18   have been.
19       Q.  Okay.
20            This looks like the whole bid
21   to you?
22       A.  Yes.
23       Q.  All right.
24            And if you -- what project

174

1    was this for?
2        A.  That was a job we did in Kenosha,
3    Wisconsin.
4        Q.  All right.
5             And this is for dock work,
6    correct?
7        A.  Correct.
8        Q.  Which is why you're preparing the bid
9    instead of Ira Sugar?
10       A.  That's correct.
11       Q.  Okay.
12            And if you turn to the second
13   page, it says dock leveler manufacturer, Blue
14   Giant.
15            Do you see that?
16       A.  Yes.
17       Q.  That's a manufacturer that Midwest
18   Dock Solutions carries, correct?
19       A.  Yes.
20       Q.  All right.
21            And if you look at the bottom
22   of this, it says union or open shop field
23   labor, question mark.
24            Do you see that?

175

1        A.  Yes.
2        Q.  What is an open shop?
3        A.  That is union or nonunion.
4        Q.  Okay.
5             So open shop is nonunion?
6        A.  Yes.
7        Q.  All right.
8             And you circled union,
9    correct?
10       A.  Yes.
11       Q.  All right.
12            So -- well, did you know, was
13   union -- was union labor required for this
14   project?
15       A.  Yes.
16       Q.  All right.
17            Who are you bidding on this?
18   Is it --
19       A.  Opus.
20       Q.  Opus?  Okay.
21            And then if you turn to the
22   next page, the third page, which is labeled
23   four of four on the bid, it says, list any
24   subcontractors to be hired and describe the

176

1    scope of work and EMR?
2             Do you see that?
3        A.  Yes.
4        Q.  And there's no nobody listed there,
5    correct?
6        A.  Correct.
7        Q.  All right.
8        MR. HUGHES:  And I just want to --
9    just for the record, this document has your
10   yellow highlights as well as your additional --
11   I don't know if I've got yours, Kevin.  This --
12       MR. McJESSY:  Yeah.  Let me --
13       MR. HUGHES:  This text box that's
14   been listed here.
15       MR. McJESSY:  Yeah.  I've got a
16   cleaner copy of this.  That's my mistake.  Let
17   me see if I can get a clean copy of that.
18
19            (After a brief interruption,
20             the deposition was resumed
21             as follows:)
22
23   BY MR. McJESSY:
24       Q.  Now, did Midwest Dock Solutions'

177

1  employees perform -- well, strike that.
2          This work -- this was an
3  awarded bid, correct?
4      A.  It was an awarded bid.
5      Q.  All right.
6          And did Midwest Dock
7  Solutions' employees perform the work on this
8  project?
9      A.  No.
10     Q.  Okay.
11         Who did?
12     A.  Dock & Door employees.
13     Q.  Okay.
14         And is there a reason
15  Dock & Door isn't disclosed on here?
16     A.  No.
17     Q.  And if you turn further back in this
18  document -- it's not page numbered, but the
19  actual subcontract to Opus is attached,
20  correct?
21     A.  Yes.
22     Q.  All right.
23         And on page two of the
24  subcontract, that's your signature, your

178

1  electronic signature, correct?
2      A.  Yes.
3      Q.  And there's a name on here, Ryan
4  Mahoney, I think it is.
5          Do you see that?  And it
6  says, approved by contractor/project manager?
7      A.  Yes.
8      Q.  Do you know Mr. Mahoney?
9      A.  I know who he is, yes.
10     Q.  Okay.
11         Have you interacted with him?
12     A.  Yes.
13     Q.  Have you ever met him?
14     A.  No.
15     Q.  All right.
16         Have you spoken with him?
17     A.  Yes.
18     Q.  And then there's another signature on
19  here, and I can't tell who that is.  It says
20  regional vice-president.
21         Do you see that?
22     A.  Yes.
23     Q.  Okay.
24         Is it fair to say that Mr.

179

1  Mahoney is your contact for this project?
2      A.  Yes.
3      Q.  And if you can turn to rider C of this
4  contract, paragraph -- do you see paragraph 1.1
5  there?
6      A.  Yes.
7      Q.  It says, subcontractor's insurance
8  coverage requirements and minimum limits.
9  Prior to commencing the subcontractor work,
10  subcontractor shall purchase and maintain
11  during the progress of the subcontracted work
12  any periods of warranty and additional work
13  performed by subcontractor, all in accordance
14  with paragraph 1.2 below, insurance that will
15  protect against claims for bodily injury,
16  death, damage to property, personal and
17  advertising injury liability, or other damages
18  arising out of or in connection with the
19  performance of the subcontract work, parens,
20  including warranty and additional work, close
21  parens, by subcontractor, sub-subcontractors,
22  or anyone employed by any of them or anyone for
23  whose acts any of them may be liable.
24         Do you see that?

180

1      A.  Yes.
2      Q.  This is another of the sort of
3  standard subcontract provisions that require
4  you to provide insurance to the general
5  contractor, correct?
6      A.  Correct.
7      Q.  Does -- well, strike that.
8          And then below, it lists the
9  coverages that you're required to -- to
10  provide, correct?
11     A.  Yes.
12     Q.  Is this the information you provide to
13  your insurance agent?
14     A.  Yes, it is.
15
16         (There was a discussion off
17          the record.)
18
19         MR. McJESSY:  Mike, I'd like to go
20  ahead and -- well, I'm going to go ahead and
21  replace the page MDS 004412 that's in Exhibit
22  100 with a clean copy of that same page.
23         Is that agreeable?
24         MR. HUGHES:  Yeah.

45 (Pages 177 to 180)

181

```
 1        MR. McJESSY:  Okay.
 2        Just so the exhibit is a
 3   cleaner copy.  If I can have that.
 4        THE WITNESS:  This one?
 5        MR. McJESSY:  Yeah.
 6        MR. HUGHES:  And then that will be
 7   the one that gets --
 8        MR. McJESSY:  That will be one,
 9   yeah, that gets emailed.
10        MR. HUGHES:  Yeah.
11        MR. McJESSY:  You can keep the one
12   with my note on it.  That's fine.
13        All right.  So here, for the
14   record, is Exhibit 100 that we'll use with the
15   clean page.
16
17             (WHEREUPON, the document was
18              marked Plaintiff's
19              Exhibit 101 for identification,
20              as of 9/26/25.)
21
22        MR. McJESSY:  101.
23   BY MR. McJESSY:
24        Q.  Sir, I've handed you what I've marked
```

182

```
 1   as Exhibit 101, and it's a -- sort of a group
 2   exhibit of emails, and the first email on the
 3   first page appears to be an email from Zach
 4   Atkins at Pepper Construction to Ira Sugar
 5   dated May 5, 2020.
 6             Do you see that?
 7        A.  Yes.
 8        Q.  And it says, we would like to partner
 9   with Midwest for the OH doors.
10             That probably means overhead
11   doors; is that right?
12        A.  Yes.
13        MR. HUGHES:  Objection.  Foundation.
14        MR. McJESSY:  All right.
15        MR. HUGHES:  This witness is not on
16   this document.
17   BY MR. McJESSY:
18        Q.  And it says, can you please complete
19   the Pepper pre-qualification process so I can
20   get a subcontract agreement -- get you a
21   subcontract agreement.
22             Do you see that?
23        A.  Yes.
24        Q.  And if you turn three pages -- four
```

183

```
 1   pages back, there's an email from -- at the
 2   bottom of the page -- from
 3   tonyzarlengo@midwestdocksolutions.com to
 4   prequal.
 5             Do you see that?
 6        A.  Yes.
 7        Q.  And it's -- that email is dated the
 8   same day, May 5, 2020.  And it says, hello, I
 9   need to do a prequal, p-r-e-q-u-a-l.  Can you
10   update my login and send me link where I need
11   to start at.
12             Do you see that?
13        A.  Yes.
14        Q.  What does -- and then the email above
15   that looks like it's email from prequal to you
16   forwarding a link and a -- it looks like,
17   maybe, a password for a prequal.
18             Do you see that?
19        A.  Yes.
20        Q.  What is that?
21        A.  A prequalification form.  Just fill
22   out your company name and company information,
23   address, phone number.  They usually ask for
24   insurance -- you know, proving you have
```

184

```
 1   insurance.  They might ask previous jobs that
 2   you've done in the past.  They might ask for
 3   your EMR rate, safety stuff.  That's the
 4   majority of it.
 5        Q.  Okay.
 6        MR. HUGHES:  And I just want to kind
 7   of add an objection here.  This -- this
 8   doesn't -- this doesn't seem to be like one
 9   email chain.  There's some various separate
10   emails that are part of this document.
11        MR. McJESSY:  Yes.  As I said, it's
12   a group email.  It's a group exhibit email.
13        MR. HUGHES:  Okay.  All right.
14        A group email I took to mean
15   an email with a number of people on it.
16        MR. McJESSY:  Oh, I see.  No.  I
17   mean it's a group exhibit.  There's a number of
18   separate emails attached as part of this.
19   BY MR. McJESSY:
20        Q.  And I take it -- you said it's
21   usually.  So I take it, this is a like a common
22   thing that general contractors want you to do?
23        A.  Some.  I don't want to say it's
24   common.
```

46 (Pages 181 to 184)

185

```
1    Q.  Okay.
2    A.  But there are a few that ask for
3  prequal forms.
4    Q.  Okay.
5         And you just use the same
6  short-term form.  So I take it, it's like an
7  industry term, prequal form?
8    A.  I don't want to say form.
9    Q.  Okay.
10   A.  I mean, it's an on-line link that you
11 have to go to and answer all of the questions.
12   Q.  Okay.
13        Well, if you turn to the next
14 page of this exhibit, it looks like it's
15 another email that you're not on, but it's
16 dated March 22, 2024.
17        Do you see that?
18   A.  Yes.
19   Q.  And it's an email that says, hi, Ira,
20 just wanted to let you know I noticed your
21 Pepper prequal expires 4/24/24.  Be sure to get
22 that renewed.  You can update your prequal here
23 on our website.  Thank you.  And it's got a
24 link.
```

186

```
1         Do you see that?
2    A.  Yes.
3    Q.  And if you turn to the next page, it
4  looks like it's an email from you to prequal.
5  Is it dated the same day?  Maybe dated the same
6  day.  No, dated three days later, it looks
7  like.  And it says, hello, I need a link to
8  update my prequal.  Everything I see on-line is
9  to start new.
10        Do you see that?
11   A.  Yes.
12   Q.  What do you -- what do you mean by
13 that?
14   A.  When you update your prequal, all of
15 your previous answers are in there already, so
16 all of the links I was getting didn't have my
17 previous answers.
18   Q.  I see.
19        It was to start filling it
20 out from --
21   A.  Completely.  From the start.  And, you
22 know, when you just update it, it's
23 automatically got answers, and then you just
24 change the ones that aren't the same as they
```

187

```
1  were before.
2    Q.  I got it.  Okay.
3         And do you know -- do you
4  happen to know what other employees -- strike
5  that.
6         Do you recall what other
7  general contractors that Midwest Dock Solutions
8  would bid with that required a prequal form?
9    A.  Not offhand.
10   Q.  No?
11   A.  Not offhand.  I don't know which ones
12 ask for it.  There's not many.
13   Q.  Okay.
14   A.  Not offhand.  I'm not sure.
15   Q.  All right.
16        Pepper did, obviously?
17   A.  Yes.
18   Q.  All right.
19   A.  But there were only a few that asked
20 for prequal forms.
21   Q.  Okay.
22        Would one of the -- would one
23 of the questions on the prequal form -- you
24 gave me some examples, insurance requirements,
```

188

```
1  EMR rating -- would one of the questions be
2  whether you're a union contractor or not?
3    A.  No.
4         MR. McJESSY:  All right.
5         I think this is a good place
6  to take a break, so why don't we take a half
7  hour break.
8
9         (After a break from 12:52 p.m.
10        to 1:31 p.m., the deposition
11        was resumed as follows:)
12
13        MR. McJESSY:  We can go back on the
14 record when the court reporter is ready.
15
16        (WHEREUPON, the document was
17        marked Plaintiff's
18        Exhibit 102 for identification,
19        as of 9/26/25.)
20
21 BY MR. McJESSY:
22   Q.  Sir, earlier when I asked you about
23 the general contractors, you said ARCO Murray
24 was one of the contractors that didn't always
```

47 (Pages 185 to 188)

189

1   have to be a union contractor, correct?
2       A.  Yes.  I did say that.
3       Q.  Okay.
4           And I'm going to hand you
5   what I've marked as Exhibit 102, and this
6   appears to be -- and I would like to direct
7   your attention to the email at the bottom of
8   the page from Collin Flynn to Ira Sugar.
9           Do you see that?
10          And I know you're not on
11  this, but do you see that email?
12      A.  Yes.
13      Q.  All right.
14          And this email is from
15  September of 2020, and it says --
16      MR. HUGHES:  Again, object to
17  foundation.
18  BY MR. McJESSY:
19      Q.  All right.
20          And it says in the second
21  paragraph, this email will serve as your intent
22  to hire four, and then the parentheses, four
23  rail door replacements at 7250 Santa Fe Drive
24  with nonunion, in capital letters, labor on a

190

1   Friday/Saturday install schedule.
2           Do you see that?
3       A.  Yes.
4       Q.  All right.
5           So this is an example of ARCO
6   Murray soliciting a bid for nonunion work,
7   correct?
8       A.  Yes.  It looks like it.
9       Q.  Okay.
10          Is that how would you read
11  that?
12      A.  How I would read it.  A hundred
13  percent.
14      Q.  Which is consistent with what you
15  said, that they don't always require union.
16          Fair?
17      A.  Yes.
18      Q.  All right.
19          So if -- if Midwest received
20  this job for -- for an install with nonunion
21  labor, is that work that Midwest Dock Solutions
22  would have its employees do?
23      A.  Yes.
24      Q.  All right.

191

1           I'd like to ask you about the
2   general contractors that I asked you about
3   earlier and ask you for each one of them if you
4   have specific contact -- contacts at that
5   company, either one or more persons who is sort
6   of a contact person for Midwest Dock Solutions,
7   the first one being ARCO Murray.
8           Do you have -- does Midwest
9   Dock Solutions have one or more contact persons
10  with ARCO Murray?
11      A.  Yeah.  There's a lot of different
12  contacts we have with ARCO Murray.  They're all
13  shown in these emails.  A lot of these
14  contacts -- there's not a specific person at
15  any of these places, but, you know, we work
16  with a lot of different project managers,
17  project assistants, superintendents.
18      Q.  All right.  Maybe this will help.
19          Does the contact person
20  depend on the particular contract?
21      A.  Yes.
22      Q.  Okay.
23          And I'd like to -- then let
24  me rephrase my question.

192

1           If you -- if "you," meaning
2   Midwest Dock Solutions, wanted to reach out to
3   somebody at ARCO Murray about not a specific
4   project but just we've got an issue we need to
5   address, is there somebody in particular who
6   you would reach out to?
7       A.  It would be a project manager.  We
8   don't deal with presidents, vice-presidents of
9   these contractors.  Have I ever talked to one?
10  Yeah.  I probably have.  But it has to go --
11  for me to talk to somebody way up high in the
12  chain, it would have to be over a major issue
13  going on.  We deal with project managers.  We
14  don't deal with presidents, vice-presidents.
15  You know, it's -- these companies, all of those
16  companies are very large general contractors
17  with a lot of staff.  We're talking about three
18  people on those staff.  And we don't deal with
19  VPs or presidents.
20      Q.  Okay.
21      A.  That's -- very rarely we will deal
22  with something like that.  You know, I'll reach
23  out to -- I'll reach out to a senior project
24  manager, you know, and just say -- I might say,

48 (Pages 189 to 192)

193

1    who's in charge of this project? You know,
2    estimators. You know, if I'm looking to find
3    out who's in charge of a project, I'll reach
4    out to estimators. You know, they -- the
5    estimators estimate the projects, and that's
6    who I would reach out to because they know all
7    of their jobs. The project managers are
8    focused on one job, and that's the job they are
9    working on. The majority of all of these
10   contractors have, at least, five project
11   managers, you know. So, you know, they're all
12   on different projects. They don't know what
13   the other projects are, I don't think, the
14   majority of the time. So I reach out to the
15   estimators, usually, to find out if I have a
16   question on -- maybe if they're going to award
17   a project or something.
18        Q. All right. That's helpful.
19             So there is no like one or
20   two main contact persons with each company. It
21   just depends on the project, and then your main
22   contact is the project manager?
23        A. The senior project manager on that
24   project or, you know, the project executives

194

1    who's underneath -- you know, project manager
2    or project executive -- and then there's
3    usually an assistant, and that's who we deal
4    with on each project, one of those three
5    people -- or all three of them, to be honest
6    with you,
7         Q. Okay.
8              But it's project specific?
9         A. Correct. A hundred percent.
10        Q. Okay.
11             So if you wanted to reach out
12   to ARCO Murray and say, hey, we would like to
13   know what projects you're coming up with so we
14   can make bids on them, there's really no one
15   person you would reach out to do that?
16        A. They're estimators.
17        Q. Oh, they're estimators.
18        A. They're estimators. Because the
19   majority of these GCs have an assistant
20   estimator and a main estimator. There might be
21   two main estimators who bid all of their
22   projects to these developers. And so the
23   estimators usually know all of the projects
24   they're bidding on or they've been awarded.

195

1    They have a grasp of all of the projects. But
2    the project managers, of course, focus on one
3    or two of their projects they're working on in
4    bidding. So, no, I don't -- the estimators
5    would be who I would reach out to.
6         Q. Okay.
7              And then your main contact
8    person for each general contractor just depends
9    on -- you'd say, well, tell me the project, and
10   I'll tell you who my contact is?
11        A. If I reach out to the estimator, I'll
12   say, have you guys awarded so-and-so project?
13   Who's in charge of the project, of awarding the
14   project? That's how I usually find out my
15   information, from the GCs.
16        Q. Okay.
17             The same would be true with
18   Principal Construction?
19        A. Yes.
20        Q. All right.
21             For the general contractors
22   that do both union and nonunion work, like we
23   looked at the ARCO Murray Exhibit 102, and you
24   said that was work that if it was -- do you --

196

1    do you remember this project, by any chance?
2         A. No.
3         Q. No.
4         A. Replacing four door tracks is a
5    very --
6         Q. Too small.
7         A. -- a very minor project. I wouldn't
8    happen to know what that was.
9         Q. All right.
10             If you bid a nonunion project
11   with ARCO Murray or with Morgan/Harbour or with
12   Principal Construction and it's a -- and you're
13   awarded that contract, is that -- would you
14   have Midwest Dock Solutions' workers do that
15   work?
16        A. No.
17        Q. Okay.
18             Why not?
19        A. It -- it would depend on the type of
20   work it was. To replace four rails on a door
21   on four different doors, that's just an
22   existing warehouse they must be doing an
23   improvement on or something like that, and they
24   need some door rails replaced. Any project

49 (Pages 193 to 196)

197

```
 1   that's, you know, a new tilt-up building, a new
 2   building going in, Midwest Dock employees do
 3   not do the installs on those projects.
 4        Q.  Even if it's a nonunion project?
 5        A.  Correct.
 6        Q.  All right.
 7              And is a -- wouldn't putting
 8   an overhead door up on a new construction be
 9   easier than taking down an existing door on an
10   existing structure and retrofitting a door into
11   that space?
12        A.  Taking it down is more difficult, yes.
13        Q.  Okay.
14        A.  So you're talking about a -- read
15   that.  Say that again over, please.
16        Q.  Yeah.
17              Midwest Dock Solutions will
18   take out -- take out a dock leveler and put in
19   a new one, correct?
20        A.  Yes.
21        Q.  And it will take out an existing
22   overhead door and put in a new one, correct?
23        A.  Yes.
24        Q.  Okay.
```

198

```
 1              Isn't that work more
 2   complicated and difficult than putting in a new
 3   overhead in a -- in a new existing --
 4        A.  Yes.  Yes, it is more complicated.
 5        Q.  Okay.
 6              A new warehouse, I was going
 7   to say.
 8        A.  Yeah.
 9        Q.  You knew what I was going to say.
10        A.  Yeah.
11        Q.  Do you have any idea of how much --
12   even an approximation -- how much of Midwest
13   Dock Solutions' business comes from new
14   construction installation work?
15        A.  Percentage of revenue?
16        Q.  Yes.
17        A.  Or like physical -- percentage of
18   revenue?
19        Q.  Yes.
20        A.  I have an idea, yes.
21        Q.  And how much?
22        A.  Fifty-five to sixty percent.
23        Q.  Okay.
24        A.  It's a lot easier to get a project
```

199

```
 1   contract for $500,000 for a new construction
 2   building.  Nobody spends $500,000 on their
 3   existing facility.
 4        Q.  Okay.
 5        A.  So the percentage of work is a lot
 6   less than that, but the financial dollar
 7   amount, of course, is going to be way higher
 8   because, you know, your average project for a
 9   new construction, just say, is a hundred
10   thousand dollars where an average project for
11   an average service call or a retrofit call is
12   $800.
13        Q.  Okay.
14        A.  So, of course, you've got to have a
15   lot of $800 to add up to a hundred thousand.
16   So percentage of work, it's way less.  But
17   actual revenue is about 55 to 60 percent.
18        Q.  Okay.
19              MR. McJESSY:  Can you read back that
20   answer for me?
21
22
23
24
```

200

```
 1        (The record was read as follows:
 2           "Q. So the percentage of
 3        work is a lot less than that,
 4        but the financial dollar amount,
 5        of course, is going to be way
 6        higher because, you know, your
 7        average project for a new
 8        construction, just say, is a
 9        hundred thousand dollars where
10        an average project for an
11        average service call or a
12        retrofit call is $800.
13           "Q. Okay.
14           "A. So, of course, you've
15        got to have a lot of $800 to add
16        up to a hundred thousand.  So
17        percentage of work, it's way
18        less.  But actual revenue is
19        about 55 to 60 percent.")
20
21   BY MR. McJESSY:
22        Q.  I'm sorry.  I want to unpack that
23   answer, if I can.
24              You seem to be -- there are
```

50 (Pages 197 to 200)

201

1  two issues, or you seem to be referencing two
2  things, the revenue, and if I understand
3  correctly, the revenue to Midwest Dock
4  Solutions.
5              About 50 to 55 percent of
6  that comes from new construction work, correct?
7      A.  Correct.
8      Q.  And that would be work that would --
9  if I understand your position on how the
10 arrangement works -- would be work performed by
11 employees paid through Dock & Door, correct?
12     A.  Correct.
13     Q.  Okay.
14              And -- but you also said the
15 percentage of work is a lot less, correct?
16     A.  Yes.
17     Q.  And what do you mean by that?  I
18 didn't -- I want to understand what you mean.
19     A.  Yeah, definitely.
20              So, say, in a given year we
21 give out -- I'm just going to throw out a
22 number because it's just a number -- we send
23 out 10,000 invoices.
24     Q.  Okay.

202

1      A.  Okay?
2              Of those 10,000 invoices --
3  throwing out numbers again -- maybe a thousand
4  are invoices that were done by Dock & Door,
5  where the other 9,000 were all done by Midwest
6  Dock employees.  That's what I was getting at,
7  if that clears it up.
8      Q.  It definitely helps.
9              And what you're saying is we
10 do 9,000 different -- again, I understand that
11 an invoice doesn't necessarily tie equally to a
12 job, but I think -- I just want to make sure I
13 understand what you're saying.
14              We have to do 9,000 jobs
15 through Midwest Dock Solutions to get to that
16 45 to --
17     A.  Yes.
18     Q.  -- 45 to 50 percent.  We have to do a
19 thousand jobs that are new construction that --
20 to get to the 50 to 55 percent.  Something like
21 that.
22     A.  Yes.
23     Q.  Okay.
24              We're doing a lot more work

203

1  to chase the 40 to 45 percent than we are to
2  chase the 50 to 55 percent.
3      A.  Yes.
4      Q.  All right.
5              And that percentage, the 50
6  to 55 percent, has that been fairly consistent
7  over, maybe, the last five years?
8      A.  Five years, yes.
9      Q.  How about before that?
10     A.  No.
11     Q.  How has it changed?
12     A.  Developing relationships.
13     Q.  I mean, was -- is the new construction
14 a bigger percentage now than it was more than
15 five years ago?
16     A.  Yes.
17     Q.  Okay.
18     A.  It's -- it's all relative to how many
19 buildings are going up.
20     Q.  Okay.
21     A.  You know, it's -- that's what it's
22 relative to.  I mean, '23 and '24 is
23 gangbusters, putting up precast buildings
24 everywhere.  '25, it's -- it's slow.  They're

204

1  not -- you know, there's not as much getting
2  built anymore, so -- and, you know, of course,
3  in '23 and '24, the percentages were higher
4  because there was a lot more work out there.
5  And, now, there's a lot less work.
6      Q.  Got it.
7
8              (WHEREUPON, the document was
9              marked Plaintiff's
10             Exhibit 103 for identification,
11             as of 9/26/25.)
12
13 BY MR. McJESSY:
14     Q.  All right.
15              I'm going to hand you what
16 I've marked as Exhibit -- actually, I'm going
17 to give you the one that's binder clipped.  It
18 will be scanned in later.  Exhibit 103.  And
19 I'll represent to you that this is the accounts
20 receivable account from the general ledger for
21 Midwest Dock Solutions for 2023 sorted by --
22 alphabetically by the account receivable.
23              Do you see it there?  Like it
24 begins with numbers, and then it's Triple A

205

1    Flanders, ABT, Advance Construction.
2        Do you see that?
3    A. Yes.
4    Q. Okay.
5        And if you look at the bottom
6  of this, if you go to the very last page --
7    A. Last page?
8    Q. Yep.
9    A. Okay.
10   Q. -- the total looks to be about $22
11  million.
12       Do you see that?
13   A. Yes.
14   Q. Does that -- and I have the -- I mean,
15  I can show you your tax return for 2022. We'll
16  mark this later. But I think the tax return
17  shows revenue of that year of how much? The
18  first line.
19   A. Twenty million, yeah, five
20  twenty-four.
21   Q. All right.
22       So close, not quite right on
23  point. But what I'd like to do is just -- most
24  of these, I'd like to go through the large

206

1  accounts receivable and just have you tell me
2  if the work for those companies would have been
3  work that would have been performed by
4  Dock & Door -- employees paid through
5  Dock & Door. Okay?
6    A. Yep. Yes.
7    Q. So any on the -- any on the first
8  page? Any on the -- let's just --
9    A. No.
10   Q. Why don't we flip through it. And,
11  probably, the fastest thing will be if you just
12  flip through this and tell me which ones you
13  recognize that would have been --
14   A. I can do that.
15   Q. -- Dock & Door work.
16   A. Okay.
17       Alston Construction.
18   Q. Alston?
19   A. Yes. A-l-s-t-o-n.
20   Q. Oh, A-l-s-t-o-n. Okay.
21   A. ARCO Murray, Chicago Heights
22  Construction, Clayco Construction, FCL
23  Builders, Keeley Construction, Krusinski
24  Construction.

207

1    Q. K-r-u-s-i-n-s-k-i?
2    A. Murray and Design Build, MIF
3  Construction, Morgan/Harbour.
4    Q. Did you say NIF?
5    A. MIF.
6    Q. Oh, MIF.
7    A. MIF, yeah. There's a lot.
8        I think I'm at the end of it
9  because now I only see payment. Why does it
10  say payment now? Did we ever get to the Y's
11  and Z's. I'm trying to figure this out. Well,
12  P -- oh, now it's payment. So we've got to
13  skip all of these payments because those -- I
14  don't know why.
15   Q. Hold on. Hold on. Hold on. I just
16  want to take a stop.
17       We're at Morgan/Harbour,
18  right?
19   A. Yes.
20   Q. And then I just wanted to -- we did
21  get to Opus Group.
22       Would that have been a --
23   A. We don't have a --
24       MR. HUGHES: Go back.

208

1        THE WITNESS: Oh, I missed one?
2  Yes. I'm sorry. Yes, Opus Group.
3  BY MR. McJESSY:
4    Q. Okay.
5    A. Yes.
6    Q. Okay. Let's see.
7        You're correct. Then we go
8  to payments, so we have to go through all of
9  those. Yep. And then you go down to --
10   A. And then we're going to hit, it looks
11  like -- I'm just looking to see where we're
12  going to --
13   Q. We should pick up with PBS
14  Professional Building after payment.
15   A. PBS Professional Building Services.
16   Q. Okay.
17   A. Peak Construction.
18   Q. Okay.
19   A. Pepper Construction. Premier Design
20  Build. Principal Construction. Strack
21  & Van Til. That looks like all of them.
22   Q. And looking at ARCO Murray --
23   A. Okay.
24   Q. Let's see. Some of these projects for

52 (Pages 205 to 208)

209

1   ARCO Murray, would some of them be projects
2   that would have been union projects for
3   Dock & Door and some of them be nonunion work
4   for Midwest Dock?
5       A.  Yes.  There are going to be a few,
6   probably, from Midwest Dock.
7       Q.  Okay.
8       A.  And how many?  Oh, man.  It's -- I
9   would be completely guessing.  If I had to take
10  a guess on these projects, which ones were
11  Midwest Dock and which ones were Dock & Door,
12  my assumption would be, maybe, two are Midwest
13  Dock.
14      Q.  Okay.
15      A.  You know, I'm going to add one more on
16  here.  I'm sorry.
17      Q.  Yeah.
18      A.  Apex Construction.
19      Q.  Oh.
20          And if you could turn to the
21  Morgan/Harbour listing as well, there's a --
22  fewer projects here from ARCO Murray, but a
23  number of projects listed.
24          Would some of these have been

210

1   projects for Dock & Door and some would have
2   been done by Midwest Dock Solutions?
3       A.  No.  I think all of these were done by
4   Dock & Door.
5       Q.  Okay.
6           And if -- if you could go to
7   the Ls, and there's an entry for LG slash
8   Pantos, and the amount on it is $303,990 let me
9   know when you're there.
10      A.  $313,990?
11      Q.  Yeah.
12          Is that what I said?
13      THE COURT REPORTER:  Three hundred
14  and three.
15  BY MR. McJESSY:
16      Q.  Oh.  $313,990, correct.
17      A.  Yes.  Correct.
18      Q.  Okay.
19          Do you know what that project
20  was?
21      A.  Yes, I do.
22      Q.  What was it?
23      A.  It was an installation of 64 dock
24  locks.

211

1       Q.  Okay.
2           And that was a project done
3   by Midwest Dock Solutions?
4       A.  Correct.
5       Q.  And was that at a new construction
6   building or --
7       A.  No.  That was a building -- actually,
8   it's in Lockport -- that LG was renting out,
9   and they wanted to add dock locks to the
10  facility because of safety reasons.
11      Q.  I see.
12          It was a facility -- an
13  existing facility that didn't have any dock
14  locks?
15      A.  Correct.  It's -- a lot of larger
16  corporations are making them mandatory on their
17  buildings.
18      Q.  Oh, okay.
19          For safety purposes?
20      A.  Correct.
21      Q.  All right.
22          So you weren't taking
23  anything out and adding anything.  You were
24  just installing --

212

1       A.  Correct.
2       Q.  -- new?  Okay.
3           If Midwest Dock Solutions
4   bids dock leveler work for one of the major
5   general contractors that we were talking
6   about -- Pepper, Principal, and Opus -- those
7   would be -- are dock locks sometimes part of
8   that proposal?  You just said more and more
9   parties are requiring them.
10          Well, let me -- let me
11  rephrase the question.
12          Would that -- you talked
13  about your bidding and Ira's bidding.  Up until
14  six months ago, you were responsible for the
15  dock levelers.
16          Are dock locks part of that?
17      A.  Yes.
18      Q.  Okay.
19          So if you were bidding for
20  one of those general contractors and they
21  wanted dock locks, you would be the guy who
22  would prepare that bid?
23      A.  Correct.
24      Q.  Okay.

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

213

```
1    A.  Yes.
2    Q.  Did you do that?  Were there -- did
3  some of the general contractors require
4  installation of dock locks as part of the
5  proposals that you bid in the past?
6    A.  There has been situations where
7  they've asked for dock locks for a new
8  building.  The only times that they will ask
9  for dock locks is if it's a build to suit and
10  not a spec building, and a build to suit is if
11  it's actually getting built for a company and
12  not just a spec.  So if the company that is
13  building the building requires dock locks at
14  their facility -- and there's a lot of major
15  companies who do -- then, yes, we will give
16  dock lock pricing for those buildings.
17    Q.  I get it.
18        But, otherwise, it's an
19  additional expense to the -- if it's a spec
20  building, it's an additional expense to the
21  general building they're building?
22    A.  Correct.  And they don't know who's
23  moving into these buildings, so they don't ever
24  put dock locks into a spec building.
```

214

```
1    Q.  Got it.
2        Is there a reason you
3  wouldn't want to have a dock lock?
4    A.  Yeah, because you don't want to pay
5  for them.
6    Q.  Other than that?
7    A.  No.
8    Q.  Okay.
9        I mean, for a -- for a
10  commercial loading dock situation, there
11  isn't -- there isn't, for example, a kind of
12  truck that can't pull in if it has a dock lock
13  or something like that?
14    A.  No.  Every truck can pull in if
15  there's a dock lock.  Any type of box truck,
16  refer truck, any type of truck can pull in with
17  a dock lock.
18    Q.  All right.
19
20        (WHEREUPON, the document marked
21        Plaintiff's Exhibit 53 for
22        identification was tendered to
23        the deponent.)
24
```

215

```
1  BY MR. McJESSY:
2    Q.  All right.
3        One of the binders in front
4  of you should have an Exhibit 53.
5        That's it.  You may want to
6  turn the binder because it will be easier.
7  Yeah.
8        All right.  And do you
9  recognize that as the Facebook page for Midwest
10  Dock Solutions?
11    A.  Yes.
12    Q.  Okay.
13        And these are the pictures
14  that you talked to Mike Richert about, correct?
15    A.  Yes.
16    Q.  All right.
17        Who started this Facebook
18  page?
19    A.  I think, my sister, Miranda Zarlengo.
20    Q.  Okay.
21        And if she set it up, would
22  she have done that at your direction or with
23  your knowledge and approval?
24    A.  Yes.
```

216

```
1    Q.  All right.
2        Something like that.  Like,
3  hey, let's set up a Facebook page.
4        Is that fair?
5    A.  Yes.
6    Q.  All right.
7        Are you -- having spoken with
8  Mr. Richert, I get the impression he's not
9  terribly technically adept.
10        Is that -- would you agree
11  with that?
12    A.  No.  He's not technology adept.
13    Q.  Okay.
14        Are you?
15    A.  No.
16    Q.  Oh, okay.
17        Does -- does Miranda also --
18  is she the one who would have been charged with
19  adding photos to this page?
20    A.  I would think so, yes.
21    Q.  And, let's see.  If we -- the first
22  page, do you know what project that was that's
23  shown in the first picture with the Midwest
24  Dock Solutions' truck out front?
```

54 (Pages 213 to 216)

217

1   A.  I do.
2   Q.  And what was it?
3   A.  Al-Amin Brothers.
4          I'm not sure if that was
5   doing service work or doing new installs,
6   though, with that picture.
7   Q.  Okay.
8          And -- well, that was my next
9   question.
10          Do you know what the work was
11  that was done there, and you don't?
12  A.  I don't.  We did do that building.
13  Q.  Okay.
14  A.  But I don't know what we're doing
15  there right now with that picture.
16  Q.  All right.
17          Do you know, was that a new
18  construction building?
19  A.  That is, yes.
20  Q.  Okay.
21          It is a new construction
22  building?
23  A.  Yes.  But I don't know why we're there
24  at that point, whether we were there for

219

1   dock levelers, yes.
2   Q.  Okay.
3          And -- I see.
4          So you know your company
5   installed the dock levelers there.  You just
6   don't know if this picture was taken when that
7   was happening?
8   A.  Yes, because it's one of our service
9   accounts also.
10  Q.  I understand.
11  A.  And that building was done a long time
12  ago.
13  Q.  All right.
14          Do you know when that was
15  done, approximately?
16  A.  2018.
17  Q.  Okay.
18          And would Midwest Dock
19  employees have done that work?
20  A.  No.
21  Q.  Okay.
22          This would have been work
23  done by Dock & Door?
24  A.  Yes.

218

1   repairs or that was during the installation of
2   the dock and doors.  I don't know, you know,
3   the timeline of when that truck was there.
4   Q.  All right.
5          And do you know who took this
6   photo?
7   A.  No.
8   Q.  All right.
9          And do you know who sold that
10  project?
11  A.  I did.
12  Q.  Okay.
13          But you don't -- do you
14  remember what you sold as part of that project?
15  A.  I sold the dock levelers.
16  Q.  All right.
17          So installation of dock
18  levelers?
19  A.  Correct.  Yes.
20  Q.  All right.
21          And was that new -- that was
22  new construction installation of dock levelers,
23  then, correct?
24  A.  Yes.  The original building was the

220

1   Q.  And -- oh, where is it located?
2   A.  Crete.
3   Q.  On Route 1?
4   A.  Yes.
5   Q.  And then if you turn the page, do you
6   see where it says, we are hiring?
7   A.  Yes.
8   Q.  Is -- is that a picture of a building
9   that Midwest did?
10  A.  It is, yes.
11  Q.  And where is this building?
12  A.  Lockport.
13  Q.  And what is this building?
14  A.  It's a distribution center.  It was a
15  stock distribution center.
16  Q.  Was this on Gougar Road?
17  A.  Yes.
18  Q.  Was this a Krusinski building?
19  A.  Yes.
20  Q.  And was it Heritage Crossing
21  Conference -- Heritage Crossing No. 8?
22  A.  So there's -- I don't know that
23  answer.
24  Q.  Okay.

55 (Pages 217 to 220)

221

1    A.  There's eight -- there's 10 buildings
2  in that same spot.  I don't know which number
3  this particular one is.
4    Q.  All right.
5        Did you do more than one of
6  the buildings?
7    A.  Yes.
8    Q.  How many of them did you do?
9    A.  Five or six.
10
11        (WHEREUPON, the document was
12        marked Plaintiff's
13        Exhibit 104 for identification,
14        as of 9/26/25.)
15
16  BY MR. McJESSY:
17    Q.  I'm going to hand you what I've marked
18  as Exhibit 104.
19        You know what?  Let me do
20  this one since it's paper clipped.  Let me take
21  that one back.
22        I've handed you Exhibit 104,
23  and the -- do you know when Dock & Door
24  started?

222

1    A.  No.
2    Q.  Okay.
3        Was it after 2014?
4    A.  Yes.  Yes.
5    Q.  All right.
6        And this appears to be a
7  letter to you from Krusinski Construction
8  concerning ML Realty Heritage Crossing No. 8,
9  correct?
10    A.  Yes.
11    Q.  All right.
12        And it looks like Midwest
13  Dock Solutions was awarded that contract,
14  correct?
15    A.  Yes.
16    Q.  Okay.
17        And then it refers to a
18  subcontract agreement.
19        Do you see that?
20    A.  Yes.
21    Q.  And if you turn two pages in, does
22  that look like the subcontract agreement for
23  Heritage Crossing No. 8?
24    A.  Yes.

223

1    Q.  All right.
2        And there's pages that have
3  initials on them where it says subcontractor,
4  and it looks likes it's printed AZ.
5        Does that look like your
6  initials?
7    A.  It is, yes.
8    Q.  All right.
9        And if you turn to after the
10  contract, there's a page that's called
11  certificate of liability insurance.  It looks
12  like this.  Yeah.
13        And does that look like the
14  Certificate of Liability Insurance for
15  Krusinski Construction for this project?
16    A.  Yes.
17    Q.  And it's dated June 19, 2014, correct?
18        The upper right corner.
19    A.  Oh, yes.
20    Q.  And it shows that the producer is
21  Esser Hayes Insurance Group.
22        Do you see that?
23    MR. HUGHES:  Hold on.  Let me get to
24  that page.  Okay.  Got it.

224

1  BY MR. McJESSY:
2    Q.  Do you see where it says, producer,
3  Esser Hayes Insurance Group?
4    A.  Yes.
5    Q.  Were -- were they your insurance agent
6  at the time?
7    A.  Yes.
8    Q.  All right.
9        And they would typically
10  provide these Certificates of Insurance, like
11  you said earlier, correct?
12    A.  Yes.
13    Q.  Okay.
14        And then if you turn a little
15  further in, there's another -- three pages past
16  that, there's another Certificate of Liability
17  Insurance that's dated 3/18/2015.
18        Do you see that?
19    A.  Yes.
20    Q.  All right.
21        And if your insurance expires
22  during the course of a contract, do you have to
23  provide an updated Certificate of Liability
24  Insurance?

56 (Pages 221 to 224)

225

```
1        A.  Yes.
2        Q.  Okay.
3                Is that -- is that what this
4   appears to be?
5        A.  Yes.
6        Q.  Okay.
7                And if you turn to the next
8   page, there's a screenshot of -- from Comstock,
9   a website called, property dot comstock dot
10  com?
11       A.  Yes.
12       Q.  Are you familiar with that --
13       A.  No.
14       Q.  -- publication?
15       A.  No.
16       Q.  No.  Okay.
17               This shows the Heritage
18  Crossing Corporate Center Building 8, and it
19  shows that the property address is 14908 South
20  Gougar Road?
21               Do you see that?
22       A.  Yes.
23       Q.  Does that sound right to you?
24               MR. HUGHES:  I'm just going to
```

226

```
1   object to foundation.  He said he doesn't -- he
2   doesn't know what this page is.
3               MR. McJESSY:  Okay.
4               MR. HUGHES:  Or what Comstock is.
5   BY MR. McJESSY:
6        Q.  Does that address sound right for this
7   project?
8        A.  Yes.
9        Q.  All right.
10               And if you turn to the next
11  page, this is one -- the screenshot of one of
12  the pages from Midwest Dock Solutions Facebook
13  page.
14               Do you see that?
15       A.  Yes.
16       Q.  And are those photographs of the ML
17  Realty Heritage Crossing No. 8 project?
18       A.  Yes.
19       Q.  All right.
20               And if you turn to the next
21  page, it's just a Google Street map view of the
22  same -- same building, correct?
23               MR. HUGHES:  Objection.  Foundation.
24               THE WITNESS:  It appears to be,
```

227

```
1   but -- you know, it appears to be the same
2   building.
3   BY MR. McJESSY:
4        Q.  All right.
5               Do you know who took these
6   photographs that are shown on the Facebook page
7   on the second to last page or third to last
8   page?
9        A.  I do not.
10       Q.  All right.
11               And what was the work that
12  Midwest Dock Solutions did at this location?
13       A.  We did 64 dock levelers, dock seals,
14  and 68 doors.
15       Q.  All right.
16               And that's what the entry
17  there that says October 15 says, correct?  On
18  the right-hand side of the Facebook page?
19       A.  Yes.
20       Q.  All right.
21               And you believe that to be
22  accurate, correct?
23       A.  Yes.
24       Q.  All right.
```

228

```
1               And that would have been done
2   by employees of Midwest Dock Solutions,
3   correct?
4        A.  No.
5        Q.  And this -- who would this have been
6   done by?
7        A.  Dock & Door.
8        Q.  Okay.
9               Do you know when this work
10  was done?
11       A.  I would imagine -- I do not know the
12  exact dates.
13       Q.  Okay.
14               If you go back to the
15  contract and if we can take a look at the
16  contract and turn to the third page in, it
17  shows the subcontractor is Midwest Dock
18  Solutions, correct?
19       A.  Yes.
20       Q.  Okay.
21               And then if you turn to the
22  next page, paragraph 2.2 says, Assignment, in
23  bold capital letters, subcontractor shall not
24  assign the subcontract or the rights and
```

57 (Pages 225 to 228)

229

1  obligations of this subcontract to any other
2  entity without the express written consent of
3  contractor?
4          Do you see that?
5      A.  Yes.
6      Q.  All right.
7              Did Midwest Dock Solutions
8  assign any of the rights and obligations of the
9  subcontract to any other party?
10         MR. HUGHES:  Objection.  Calls for a
11 legal conclusion.
12 BY MR. McJESSY:
13     Q.  You can answer.
14     A.  What was that question again?  I'm
15 sorry.
16     Q.  Did Midwest Dock Solutions assign any
17 of the rights or obligations under this
18 subcontract to any other party?
19         MR. HUGHES:  Same objection.
20         THE WITNESS:  No.
21 BY MR. McJESSY:
22     Q.  And if you turn to page 15 of the
23 subcontract -- they're numbered on the
24 bottom -- under paragraph -- under article 11,

230

1  paragraph 11.2, it says, Acceptability of
2  Labor, period, all in bold capital letters, all
3  work performed by the subcontractor under this
4  agreement shall be by appropriate union labor
5  acceptable to the contractor.  In the event
6  that a jurisdictional dispute should arise
7  concerning some phase of the subcontractor's
8  work, the subcontractor shall abide by the
9  decision of the joint conference board, and
10 even if said decision places the work with
11 mechanics other than those regularly employed
12 by the subcontractor, the responsibility for
13 completing this work shall remain with the
14 subcontractor.
15         Do you see that?
16     A.  Yes.
17     Q.  All right.
18             So union labor was required
19 for this job, correct?
20     A.  Yes.
21     Q.  Okay.
22             Is -- was Dock & Door formed
23 so that this work under this contract could be
24 performed?

231

1      A.  No.
2      Q.  And if you continue to article 15 on
3  page 20, it says -- let me know when you're
4  there.
5      A.  Okay.
6      Q.  Article 15 is titled, Special
7  Provisions.  And it says, provide all union
8  labor, material, equipment, insurance, taxes,
9  and supervision as required to complete all
10 dock equipment work in accordance with the
11 contract documents, including but not limited
12 to the following.
13         Do you see that?
14     A.  Yes.
15     Q.  Okay.
16             So that was another place in
17 the contract where it specifies union labor had
18 to be used, correct?
19     A.  Yes.
20     Q.  And if you turn to page 24, is that
21 your signature for this contract?
22     A.  Yes.
23     Q.  The picture where it says "we are
24 hiring" in the Facebook page which is Exhibit

232

1  53, is that this warehouse?
2      A.  I don't know that answer.
3      Q.  All right.
4      A.  All of those buildings are the exact
5  same.
6      Q.  Well, they're not exactly the same,
7  are they?
8      A.  Close.
9      Q.  All right.
10             And if you could turn further
11 back in the Facebook page to Exhibit -- or to
12 the picture that has -- well, this picture
13 here.  I think we marked it in a larger
14 version, but --
15
16             (WHEREUPON, the document marked
17             Plaintiff's Exhibit 92 for
18             identification was tendered to
19             the deponent.)
20
21 BY MR. McJESSY:
22     Q.  I'm going to hand you Exhibit 92, but
23 keeping the other one open in front of you.
24     A.  Okay.

58 (Pages 229 to 232)

233

1    Q.  That's a slightly larger version of
2  the same picture with additional comments.
3         Do you see that?
4    A.  I do.
5    Q.  And that's Mike Richert and David
6  Green; is that correct?
7    A.  That's correct.
8    Q.  All right.
9         And do you know where they're
10 working on this project?
11   A.  That's the one building I have no idea
12 what that building is.  It's -- it's just --
13 there's no building to see.
14   Q.  All right.
15   A.  That is the one I have no idea.
16   Q.  All right.
17        I take it, you looked at the
18 Facebook page to familiarize yourself with the
19 pictures?
20   A.  I haven't been on the Facebook page in
21 probably my whole life, but I've seen a couple
22 different pictures.
23   Q.  Okay.
24        And if you turn to the next

234

1  page of that exhibit, that's a picture of James
2  Kelly; is that right?
3    A.  That looks like James Kelly, yes.
4    Q.  And -- and on the right-hand side, it
5  looks like to be a post -- and it's titled,
6  Mike Richert and December 5, 2016, and it says
7  Bloomingdale.  And then it says, "The Door
8  God," with three exclamation points after it.
9         Do you see that?
10   A.  I do.
11   Q.  Huh?
12   A.  I do see it, yes.
13   Q.  Okay.
14        Do you -- do you know where
15 that picture was taken?
16   A.  I do not.
17   Q.  Do you recall any projects in
18 Bloomingdale?
19   A.  I do not recall any projects in
20 Bloomingdale.
21   Q.  All right.
22        And if you turn to the next
23 page in that exhibit, it says Midwest Dock
24 Solutions, July 26, 2016.

235

1         Do you see that?
2    A.  Yes.
3    Q.  And it's another post by Mike Richert,
4  and it says Midwest Dock Solutions is in
5  Lockport, Illinois.
6         Do you see that?
7    A.  Yes.
8    Q.  July 26, 2016, correct?
9    A.  Yes.
10   Q.  All right.
11        Is that the Heritage Crossing
12 building?
13   A.  One of them, yes.
14   Q.  Okay.
15        Is it the one that we looked
16 at the picture of just a couple minutes ago?
17   A.  I can't -- I don't know that answer.
18   Q.  Okay.
19        But it's one of the Heritage
20 Crossing buildings?
21   A.  Yes.
22   Q.  Okay.
23        So it was a Krusinski
24 project?

236

1    A.  It didn't have to be.  There was three
2  different GCs that worked in that -- that
3  business park.
4    Q.  Oh, there were.  Okay.
5    A.  There was other GCs besides Krusinski.
6    Q.  All right.
7         Would it have been one of the
8  large GCs that we've been talking about?
9    A.  A high probability, yes.
10   Q.  Okay.
11        And if the date of the
12 picture is in July of 2016 -- and we had looked
13 at the Krusinski contract earlier and the
14 Certificates of Insurance, and I think they
15 were actually dated 2014 and '15 -- do you know
16 when -- do you know approximately when these
17 pictures would have been taken?
18   A.  No, I don't.  I would assume -- I
19 would think about the same time as they were
20 posted, but I can't confirm that.
21   Q.  Would this work have been work
22 performed by employees paid through
23 Dock & Door?
24   A.  Yes.

59 (Pages 233 to 236)

237

1    Q.  And then if you can turn to the next
2 page, can you tell me where that picture was
3 taken?
4    A.  In my shop.
5    Q.  Okay.
6    A.  I know that building.
7    Q.  Was it 27 36th Place, that shop, or a
8 different shop?
9    A.  No.  It would have been Holeman
10 Avenue.
11    Q.  Okay.
12    A.  We've only been at 36th Place -- we
13 haven't been there for 10 years.
14    Q.  All right.
15
16         (WHEREUPON, the document marked
17         Plaintiff's Exhibit 93 for
18         identification was tendered to
19         the deponent.)
20
21 BY MR. McJESSY:
22    Q.  And since we're looking at Exhibit 92,
23 let's just go right to 93 and tell me if you
24 recognize what that project was.

238

1    A.  I can't confirm a hundred percent I
2 know what that project is.  I have an idea, but
3 I don't -- I can't confirm a hundred percent.
4    Q.  All right.
5         I'll take that back.
6
7         (WHEREUPON, the document marked
8         Plaintiff's Exhibit 53 for
9         identification was tendered to
10         the deponent.)
11
12 BY MR. McJESSY:
13    Q.  All right.
14         And if we -- you still have
15 in front of you the Facebook page, Exhibit 53.
16 If you could turn to the next page --
17    A.  Yes.
18    Q.  -- and tell me -- it says -- I'm
19 looking at the entry that says Midwest Dock
20 Solutions, October 15, 2016.
21         Do you see that?
22    A.  Yes.
23    Q.  And then it says, install of four
24 high-speed doors, taking care of our finest

239

1 Chicago brewery.
2         Do you see that?
3    A.  Yes.
4    Q.  Was that a project that Midwest did?
5    A.  Yes, it is.
6    Q.  All right.
7         Is that a project that was
8 done by Midwest Dock employees or employees
9 paid through Dock & Door?
10    A.  Midwest Dock employees.
11    Q.  All right.
12         And what was -- what did they
13 install?
14    A.  We installed four high-speed interior
15 high-speed doors at Goose Island.
16    Q.  All right.
17         And the picture on the lower
18 left, does that depict the high-speed door that
19 was installed?
20    A.  Yes, it is.
21    Q.  And then if you turn to the next page,
22 there's a listing on the Facebook page dated
23 October 15, 2016, that says your complete
24 Dock & Door experts.

240

1         Do you see that?
2    A.  Yes.
3    Q.  And then it's got the website for
4 Midwest Dock Solutions underneath it, correct?
5    A.  Yes.
6    Q.  All right.
7         Is that all work that Midwest
8 Dock Solutions performs?
9    A.  Yes.
10    Q.  And you can close that.
11
12         (WHEREUPON, the document marked
13         Plaintiff's Exhibit 57 for
14         identification was tendered to
15         the deponent.)
16
17 BY MR. McJESSY:
18    Q.  I'm going to hand you what was
19 previously marked as Exhibit 57.
20         Do you recognize what this
21 is?
22    A.  Yeah, a website.
23    Q.  All right.
24         And it's a Midwest Dock

241

```
1    Solutions website?
2        A.  Correct.  Yes.
3        Q.  When did you start the website?
4        A.  When we first opened up in 2006.
5        Q.  Oh, it's that old?
6        A.  I mean, it's changed over the years.
7        Q.  Okay.
8        A.  But we've had it since we founded, I
9    think.  I mean, it might have been within a
10   year or so we founded a website, yes.
11       Q.  Okay.
12              Was it updated in 2020?
13       A.  Sounds about -- yes.
14       Q.  That sounds about right?
15       A.  We changed it, yes.
16       Q.  Perfect.
17       A.  It hadn't been changed in a while,
18   maybe some tweaks to it.  But, overall, it's
19   stayed consistent.
20       Q.  All right.
21              I saw an expense in 2020 in
22   your records for about $20,000 in 2020, and I'm
23   just wondering if there was sort of a -- does
24   that sound familiar?
```

242

```
1        A.  No.
2        Q.  Okay.
3        A.  No.  But that's about when we -- it's
4    been tweaked a few times.
5        Q.  Okay.
6              And who -- looking at this
7    first page, do you know who prepared the text
8    on this first page?  And let's focus more on
9    where it says, all of your loading dock and
10   overhead door needs in one place, and from
11   there to the end.
12              Do you know who would have
13   prepared that?
14       A.  I do not.
15       Q.  Okay.
16              Did you draft any of this?
17       A.  No.
18       Q.  Did you work with anybody to draft any
19   of this?
20       A.  Yes.
21       Q.  Who did you work with?
22       A.  We've worked with -- my sister's done
23   some of this website.  And when we got started,
24   it was a lady who did our brochures and art
```

243

```
1    stuff did the website.  She was the original
2    one.  And then I also hired people to do my
3    advertising that at some point did stuff to
4    this website.
5        Q.  Okay.
6        A.  So I think I've had three different
7    people do things with the website.
8        Q.  All right.
9        A.  And the latest one, I'm not sure who
10   would have drafted these.
11       Q.  All right.
12              And do you review and approve
13   what goes on the website?
14       A.  Yes.
15       Q.  Okay.
16              So you would have reviewed
17   and approved this before it went on, correct?
18       A.  Yes.
19       Q.  All right.
20              And it says at the beginning
21   or the -- the -- strike that.
22              In the smaller text at the
23   bottom of this, it says, we pride ourselves in
24   giving the customer not only excellent service
```

244

```
1    but doing it all at an affordable price.  We
2    also offer a free quote or consultation on any
3    new project.
4              Do you see that?
5        A.  Yes.
6        Q.  All right.
7              And would "new project"
8    include new construction projects?
9        A.  If I was reading that, I would not
10   read that as new construction.
11       Q.  All right.
12              You would not?
13       A.  No.
14       Q.  How would you read that?
15       A.  It is an existing facility, a guy
16   looking to do something different to his
17   building.  That's the way I read that.
18       Q.  Okay.
19              It doesn't say anything about
20   existing facilities, though.
21              Would you agree with that?
22       A.  Yes.  Correct.
23       Q.  And if you turn to the next page --
24       A.  And the reason is, when I see
```

61 (Pages 241 to 244)

245

```
1   "consultation," the consultation is helping
2   somebody with their facility of, you know,
3   putting in something new or changing something
4   and consulting them and helping them.  For new
5   construction, you don't consult general
6   contractors in the work.  That's why
7   consultation I look at as -- as an enduser,
8   consulting them and helping them with doing
9   something to the building.
10      Q.  All right.
11             And the picture that's
12  super -- on the first page, the picture that's
13  superimposed on that first page, do you know
14  what project that was?
15      A.  I do not.
16      Q.  Was that the -- could that be the
17  Heritage Crossing facility?
18      A.  No, because of the paint colors.  The
19  paint colors on Heritage are red, I'm pretty
20  sure.
```

246

```
1            (WHEREUPON, the document marked
2            Plaintiff's Exhibit 104 for
3            identification was tendered to
4            the deponent.)
5
6   BY MR. McJESSY:
7       Q.  Okay.
8              Well, if you look at Exhibit
9   104 --
10         MR. HUGHES:  You have to go back to
11  one of these books.
12         MR. McJESSY:  No.  That's the --
13  it's separate.  There it is.
14         THE WITNESS:  Yes.
15  BY MR. McJESSY:
16      Q.  The side of the building where the
17  dock -- where the doors are doesn't have red,
18  correct?
19      A.  No.  I'm just looking at the front.
20  And then that building is blue up top, and this
21  one doesn't have any blue.  And I don't think
22  any -- I mean, I -- I can't guarantee it's not
23  Heritage.  But we've done hundreds of
24  buildings, and that does not look like a
```

247

```
1   Heritage building.
2       Q.  All right.
3              The picture that's
4   superimposed there, that looks like a new
5   construction building.
6              Would you agree with that?
7       A.  Yes.
8       Q.  The kind of work that you do for the
9   general contractors that we've been talking
10  about, correct?
11      A.  Yes.
12      Q.  And if you turn -- if you turn to the
13  page that ends with clients and testimonials --
14      A.  Yes.
15      Q.  -- do you see where it says, Midwest
16  Dock Solutions specializes in the service,
17  supply, and installation of loading dock
18  equipment and overhead doors?
19      A.  Yes.
20      Q.  All right.
21             Would you agree that that's
22  an accurate statement?
23      A.  Yes.
24      Q.  All right.
```

248

```
1             And then if you turn to the
2   next page where it says, Products, do you know
3   what -- where that picture came from that's
4   superimposed on the word "Products"?
5       A.  I do not.
6       Q.  And if you could turn back to the
7   Facebook page for Midwest Dock Solutions that
8   has the Heritage Crossing building on it --
9          MR. HUGHES:  Go back.  Go back.
10         MR. McJESSY:  104.  No, 104 will
11  work.
12         THE WITNESS:  Okay.
13  BY MR. McJESSY:
14      Q.  It's part of Exhibit 104.
15             Do you see that photograph?
16      A.  Yes.
17      Q.  And do you see the top photograph?
18      A.  Yes.
19      Q.  Does that look to be the same
20  photograph that's shown as "Products"?
21      A.  Yes.
22      Q.  Okay.
23             So that photograph looks to
24  be the Heritage Crossing No. 8 building,
```

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

249

```
1    correct?
2         A.  One of the ones at Heritage Crossing,
3    yes.
4         Q.  Okay.
5              And underneath that picture,
6    it says, Midwest Dock Solutions specializes in
7    the service, supply, and installation of
8    loading dock equipment and overhead doors,
9    correct?
10        A.  Yes.
11        Q.  And, again, it says -- a little
12   further along in that sentence -- we also offer
13   a free quote or consultation on any new
14   project, correct?
15        A.  Yes.
16        Q.  And the picture above is construction
17   of a new project that you worked on, correct?
18        A.  Yes.
19        Q.  If you flip to the next page, it's
20   talking about equipment that you sell, correct?
21        A.  Yes.
22        Q.  And one of the things that Midwest
23   Dock offers is it carries -- it's an authorized
24   dealer for Blue Giant, correct?
```

250

```
1         A.  Yes.
2         Q.  All right.
3              And is that the kind of --
4    and Blue Giant is shown on the -- on the black
5    square that's around the door, correct?
6         A.  Yes.
7         Q.  What is Blue Giant?  Is that the door,
8    or is that the -- part of the square that's
9    around the blue door?
10        A.  That's the dock equipment.
11        Q.  Okay.
12              Oh, so it's -- is it the dock
13   leveler?
14        A.  The leveler and dock seal are Blue
15   Giant.
16        Q.  Okay.
17              Is that the black part where
18   it says Blue Giant, is that on the dock seal?
19        A.  Yes.
20        Q.  Okay.
21              Are those the products that
22   were installed at the Heritage Crossing
23   location?
24        A.  Yes.  Yes.
```

251

```
1         Q.  And the list of equipment here that's
2    listed under Blue Giant, are those all types of
3    equipment that Midwest Dock Solutions installs?
4         A.  Yes.
5         Q.  All right.
6              And, also, the employees paid
7    through Dock & Door, they also installed the
8    same items?
9         A.  Yes.
10        Q.  And if you turn to the next page, it
11   shows overhead doors, Clopay.
12              Is that one of the doors that
13   Midwest Dock has sold to the general
14   contractors that we've been talking about?
15        A.  Yes.
16        Q.  All right.
17              And are those doors also
18   installed by employees of Midwest Dock
19   Solutions?
20        A.  Yes.
21        Q.  And if you turn to the next page, it
22   shows Cornell rolling steel doors.
23              Are these doors that Midwest
24   Dock carries?
```

252

```
1         A.  Yes.
2         Q.  And do they carry all of the doors
3    that are referred to, the rolling doors, fire
4    doors, traffic doors?
5         A.  We don't do traffic doors, but rolling
6    doors and fire doors, yes.
7         Q.  Okay.
8              And has Midwest Dock sold
9    these doors to some of the general contractors
10   that we've been talking about?
11        A.  Yes.
12        Q.  And do both Midwest Dock Solutions and
13   Dock & Door employees install these doors?
14        A.  Yes.
15        Q.  And then the next page refers to
16   Hormann high-speed doors.
17              Do employees of Midwest Dock
18   Solutions install these doors?
19        A.  Yes.
20        Q.  Was the -- was the -- the Goose Island
21   Brewery, was that a Midwest Dock Solutions
22   project?
23        A.  Yes.
24        Q.  Okay.
```

63 (Pages 249 to 252)

253

1    So its employees would have
2 installed the high-speed doors at that
3 location?
4    A.  Yes.
5    Q.  And does Midwest Dock Solutions sell
6 these doors to some of the large general
7 contractors that you were talking about earlier
8 as part of its projects?
9    A.  Yes.
10    Q.  And do Dock & Door employees install
11 these high-speed doors as well?
12    A.  Yes.
13    Q.  Okay.
14    And the next page shows bug
15 barriers by Gateway Industrial Products.
16    Do you see that?
17    A.  Yes.
18    Q.  Is that a product that Midwest Dock
19 employees install?
20    A.  Yes.
21    Q.  And has Midwest sold these kind of bug
22 barriers to the large general contractors that
23 we were talking about earlier as part of the
24 new construction projects as well?

254

1    A.  Yes.
2    Q.  All right.
3    And would Dock & Door
4 employees paid through Dock & Door install
5 these as well?
6    A.  Yes.
7    Q.  And then the next page is -- shows a
8 LiftMaster garage door opener, and there's
9 several types that are listed here.
10    Does LiftMaster supply all of
11 these types of door openers?
12    A.  Yes.
13    Q.  All right.
14    And, again, these types of
15 door openers are installed by employees of
16 Midwest Dock Solutions?
17    A.  Yes.
18    Q.  And LiftMaster door openers like this
19 are sold by Midwest Dock Solutions to the large
20 general contractors that we've been talking
21 about for the new construction projects as
22 well?
23    A.  Yes.
24    Q.  And they were installed by employees

255

1 paid through Dock & Door?
2    A.  Yes.
3    Q.  And if you turn to -- there's a page
4 that says, get in touch.
5    Do you see that?
6    A.  Yes.
7    Q.  And then it -- and then it gives
8 somebody an option to fill out this information
9 on this page.
10    Do you see that?
11    A.  Yes.
12    Q.  And then if you turn to the next page,
13 there's a map of -- it looks like our home base
14 radius includes Northeast Illinois, Chicago
15 Metro, Northwest Indiana, Southeast Wisconsin,
16 and Southwest Lower Michigan.
17    These are all areas where
18 Midwest Dock Solutions does work?
19    A.  Yes.
20    Q.  All right.
21    And if you turn to the next
22 page, it has service call?
23    Do you see that?
24    A.  Yes.

256

1    Q.  And, again, it has a very similar page
2 to the one we looked at two pages ago where you
3 can fill out your information, your name, your
4 phone number, that kind of thing.
5    Do you see that?
6    A.  Yes.
7    Q.  And then if you turn to the next page,
8 that one actually has a map, and it shows where
9 Midwest Dock is located.
10    Do you see that?
11    A.  Yes.
12    Q.  And if you go back to the -- I'd like
13 you to take a look at the get in touch page and
14 service call page, sort of keep those handy at
15 the same time.
16    All right.  Are you familiar
17 that if you click on the new inquiry box that's
18 at the top of the page in orange, you get this
19 page.  You get these two pages.  If you turn on
20 the -- push on the service call button, you get
21 the second two pages.
22    Does that sound right to you?
23    A.  Yes.
24    Q.  Okay.

64 (Pages 253 to 256)

257

```
 1          For your purposes internally,
 2  does it make a difference which page somebody
 3  fills out and clicks "send message" on?
 4      A.  Internally, it doesn't really matter.
 5  New inquiry is more of somebody who we haven't
 6  done work for in the past and it's a new
 7  customer possibility who ran into our website,
 8  and they have -- they're new, and we haven't
 9  done work for them.  So that's new inquiry.
10  And then, of course, service call is existing
11  customers can go on there and fill it out and
12  put in for a service call.
13      Q.  I guess what I'm asking is, when
14  somebody fills out one or the other of these,
15  do you get a message?  Do you get an email?
16      A.  Yes.
17      Q.  Does one say, you know, new customer
18  and the other one says service call, or does it
19  just flow into a common email box and --
20      A.  It flows into a -- I'm pretty sure it
21  just flows into my common email box.
22      Q.  Okay.  That's what I was asking.
23          And then on both of the --
24  the second page, behind where you fill out the
```

258

```
 1  information for both of these pages, do you see
 2  it's got Midwest Dock Solutions on the bottom
 3  of the page?
 4      A.  Yeah.  Yes.
 5      Q.  And if you look at the very bottom of
 6  the page, there's a little box -- or there's a
 7  little "F"?
 8      A.  Yes.
 9      Q.  Are you aware that that links to your
10  Facebook page?
11      A.  No.
12      Q.  Okay.
13          And if you clip on the little
14  envelope, are you aware that that sends an
15  email?
16      A.  No.
17      Q.  If I told you that if you clicked on
18  the "F" and it takes you to your Facebook page,
19  would you be surprised?
20      A.  No.  As long as it works, it's -- it's
21  there.  I don't know.  I wouldn't be surprised.
22      Q.  Got it.
23          Is MZ Marketing your -- the
24  party that maintains your website?
```

259

```
 1      A.  Yes.
 2      Q.  All right.
 3          Are you familiar with the
 4  Blue Book Construction Network?
 5      A.  Yes.
 6      Q.  Okay.
 7          What is it?
 8      A.  Advertising, but for subcontractors.
 9      Q.  All right.
10          And you --
11      A.  And general contractors.
12      Q.  Sorry.  I didn't mean to cut you off.
13          You pay a fee for it,
14  correct?
15      A.  Yes.
16      Q.  And do you have to fill something out
17  in order to get your information on the Blue
18  Book website?
19      A.  Yes.
20      Q.  All right.
21          What do you -- what do you
22  fill out?
23      A.  I haven't filled it out in probably 15
24  years, so I really don't know.
```

260

```
 1      Q.  All right.
 2          So you filled it out about 15
 3  years ago, you think?
 4      A.  At least, 10.  We haven't used it in
 5  three years, I don't think.  We haven't paid
 6  for it.  But, yeah, I signed up with that very
 7  early on.
 8      Q.  When you say "very early on," very
 9  early on when in the formation of Midwest Dock
10  Solutions?
11      A.  I'm trying to think what year
12  ballpark.  I think I was at Burville Road.
13      Q.  Well, let me direct your attention
14  to --
15      A.  I'm going to guess 2013 or '14.
16      Q.  All right.
17          Well, let's take a look at
18  the very last page, or better yet, the third
19  from the last page.
20          And do you see where it
21  says -- oh, let me know when you're there.
22      A.  Okay.
23      Q.  Do you see where qualifications is in
24  blue?
```

65 (Pages 257 to 260)

261

1    A. Yes.
2    Q. The qualifications tab. And then if
3  you look down below that, it says, general
4  liability, and there's a -- it's highlighted in
5  blue also?
6    A. Yes.
7    Q. All right.
8        And if you look at that page
9  and turn to the next page, it sort of finishes,
10  like if you scroll down, that's the second part
11  of it?
12    A. Yes.
13    Q. And I'll represent to you, if you
14  click on the blue link, you get page -- click
15  on the blue link for general liability, you get
16  the insurance certificate that's shown there.
17        Do you see it?
18    A. Yes.
19    Q. Do you see the URL line up there says,
20  thebluebook.com, Inc., dot -- you know, it's
21  got some other things, and then it says Midwest
22  Dock Solutions' insurance?
23    A. Yes.
24    Q. All right.

263

1  at that page that was qualifications. And if
2  you could turn like four pages before that, or
3  maybe six pages before that, there's a page
4  that's highlighted in blue that says --
5  portfolio is highlighted in blue?
6    A. Yes.
7    Q. That's it.
8        And there's two projects that
9  are shown there, do you see that? Toyota
10  installation of 24 truck restraints -- I'm
11  sorry. It says -- the first construction
12  project says, Toyota installation of 24 truck
13  restraints and rail guard headers, and then the
14  next one, the one next to that says Nampac,
15  N-a-m-p-a-c, installation of 13 overhead doors,
16  operators, and bug screen doors.
17        Do you see that?
18    A. Yes.
19    Q. Were those both Midwest Dock
20  Solutions' projects?
21    A. Yes.
22    Q. Okay.
23        Completed by employees of
24  Midwest Dock Solutions?

262

1        And that is -- appears to be
2  an insurance certificate.
3        You recognize that as a COI
4  or a Certificate of Insurance?
5    A. Yes.
6    Q. Okay.
7        And for Midwest Dock
8  Solutions, and then it says, Specimen
9  Certificate, and the date on it is May 10,
10  2016, I believe?
11    A. Yes. 2016.
12    Q. All right.
13        Can that be around the date
14  that you would have done this?
15    A. Yes. I thought it was a little bit
16  before that, but it could have been -- yeah,
17  it's a pretty good ballpark date when we signed
18  up with Blue Book.
19    Q. Okay.
20        And you -- do you remember
21  when you signed on for Blue Book?
22    A. No.
23    Q. All right.
24        And if -- if you -- we were

264

1    A. Yes.
2    Q. And what were those projects?
3    A. Toyota was a facility in Alsip, same
4  as LG, very strict on safety, and they wanted
5  truck restraints, so we installed 24 truck
6  restraints there.
7    Q. All right.
8        New installation of truck
9  restraints on existing docks?
10    A. Yes.
11    Q. Okay.
12        And what was Nampac?
13    A. Nampac? Valparaiso. So we took down
14  13 doors and installed 13 new doors and
15  operators and bug screen doors --
16    Q. Okay.
17    A. -- at an existing facility in
18  Valparaiso.
19    Q. All right.
20        And if you turn two pages
21  past that, it looks like it's information on
22  the Toyota installation, correct?
23    A. Yes.
24    Q. All right.

66 (Pages 261 to 264)

265

```
1              And if you turn two pages
2   past that, it looks like it's information on
3   the Valparaiso project.
4              Does that -- I mean, does
5   that information look right?
6       A.  That looks like.
7       Q.  All right.
8              So one project was completed
9   in January of '13 and the other in December of
10  '12?
11      A.  Yes.
12      Q.  All right.
13             And if you could turn to the
14  content page, which is just before the
15  portfolio tab pages -- one more page.
16             Do you see that?
17      A.  Yes.
18      Q.  Does all of that information look like
19  it would have been correct as of 2016?
20      A.  The address in 2016 -- I don't know
21  what year we moved into the Steger building.
22  It was right around '16, but I thought it was a
23  little bit after that.  We've been in the
24  Steger building for -- man, it was right around
```

266

```
1   '16, so I don't know if that's in 2016, that
2   address on that page.
3       Q.  All right.
4       A.  I don't know that answer.
5
6              (WHEREUPON, the document marked
7              Plaintiff's Exhibit 40 for
8              identification was tendered to
9              the deponent.)
10
11  BY MR. McJESSY:
12      Q.  So I'm showing you what's been marked
13  as Exhibit 40.  It's interrogatory number
14  three, and it asks Midwest Dock Solutions to
15  identify its offices and the dates that it was
16  there.
17             Do you see that?
18      A.  Yes.
19      Q.  And what -- what does it show for
20  moving into the --
21      A.  Steger, Illinois, shows January 2018.
22      Q.  Oh, January 2018.  Okay.
23      A.  That's about what I thought it was.  I
24  didn't think we were in there --
```

267

```
1       Q.  Okay.
2       A.  -- after 2016.
3       Q.  And so this would have been -- in
4   order for this -- this information is correct.
5   That is the address for Midwest Dock Solutions,
6   correct?
7       A.  Yes.
8       Q.  But that's -- that information would
9   have had to have been updated sometime after
10  January 2018, correct?
11      A.  Yes.
12      Q.  Okay.
13             Is all of the -- let me ask
14  my question in a different way.
15             Is all of the information on
16  here -- strike that.
17             Is any of the information on
18  this contact page not accurate?
19      A.  No.
20      Q.  Okay.
21             And -- let's see.
22             And if you could go to the
23  first page, do you see where it says, project
24  experience, on the right side?
```

268

```
1       A.  Yes.
2       Q.  The first statement there is -- says
3   union.
4              Do you see that?
5       A.  Yes.
6       Q.  And then it also says, public,
7   private, new projects, alterations/renovations,
8   interior fit-ups.
9              Do you see that?
10      A.  Yes.
11      Q.  All right.
12             Would you say Midwest Dock
13  Solutions has experience with union projects?
14      A.  As of this date -- like I don't know
15  what this date is.
16      Q.  As of the last time that the listing
17  was updated by Midwest Dock Solutions for the
18  Blue Book.
19      A.  Since it was updated, we've done --
20  yeah, we have experience with new projects.
21      Q.  Okay.
22             And would you say that was
23  project experience with public projects?
24      A.  Yes.
```

67 (Pages 265 to 268)

269

1    Q.   And project experience with private
2  projects?
3    A.   Yes.
4    Q.   And project experience with new
5  projects?
6    A.   Yes.
7    Q.   And project experience with
8  alterations slash renovations?
9    A.   Yes.
10   Q.   And interior fit-ups?
11   A.   Yes.
12   Q.   All right.
13        Would you say Midwest Dock
14 Solutions performs all of this kind of work?
15   A.   We sell this type of work.  We don't
16 perform all of it.
17   Q.   Okay.
18        And if you look at the next
19 page where it says, our story -- well, it looks
20 like this is a quote off of your website.
21        Would you agree with that?
22   A.   Yes.
23   Q.   Do you still have access to Midwest
24 Dock Solutions -- well, strike that.

270

1        Midwest Dock Solutions, I
2  take it, has or had, at some point, some sort
3  of login to the Blue Book website; is that
4  correct?
5    A.   Yes.
6    Q.   All right.
7        So it could update its
8  information, correct?
9    A.   Yes.
10   Q.   All right.
11        Does it still have that
12 access information?
13   A.   No.  I haven't been in a Blue Book in
14 five years, probably.
15   Q.   All right.
16        Did you try to log into the
17 Blue Book to -- to access the information that
18 you have in there?
19   A.   Maybe five years ago when I used to
20 use it, but I really never even used it.  It
21 was just an advertising thing where we signed
22 up for it in -- around 2015 --
23   Q.   All right.
24   A.   -- and never touched it afterwards.

271

1    Q.   I guess, here's what I'm -- here's
2  what I'm getting at.
3        One of the things we had
4  asked for in discovery was all information
5  related to Midwest Dock's Blue Book account or
6  page, and we got referenced to the payments
7  that were made to maintain the page.  But what
8  I'm wondering is, is there something you could
9  go into on Blue Book -- you have a Blue Book
10 account -- and see what information you filled
11 out on their screen in order get this listing?
12   A.   I don't think I filled anything out.
13 I met with -- when we originally started the
14 Blue Book, I met with the sales guy --
15   Q.   Okay.
16   A.   -- who sold the advertising to me.
17   Q.   Okay.
18   A.   And this is, like I said, 10 years
19 ago. I don't think we ever filled anything
20 out. Everything was kind of just like what do
21 you want on the page.  They created the page
22 for me. I didn't create this page.  Blue Book
23 created it.  You know, I didn't go on here and
24 create the page or anything.  I didn't fill

272

1  anything out.  They created it, and I approved
2  it.
3    Q.   Where did they get the information for
4  project experience?
5    A.   From me.  From just telling them, you
6  know, previous jobs.
7    Q.   Okay.
8        So it doesn't have an account
9  that you go into -- an account screen that you
10 log into and fill out information?
11        That's what I'm trying to
12 find out.
13   A.   Yeah.  It probably -- it probably
14 does.  But not being a client with them in
15 years, my login credentials aren't going to be
16 there.
17   Q.   Well, did you try?
18   A.   No.  I didn't try.  I don't even
19 know --
20   Q.   Well, that's what I was --
21   A.   Yeah.  I don't even know if -- I could
22 try.  I don't even know if I -- I mean, I could
23 see.  But, I mean, the chances of me still
24 having a login for something I quit three years

68 (Pages 269 to 272)

273

1    ago is -- is, I think, slim, but I could try.
2        **Q.  Okay.**
3        A.  I have no issue trying, I guess.
4        **Q.  I would ask that you would try.**
5        A.  Okay.
6        **Q.  Are you aware that the listing is**
7    **still maintained on the Blue Book?**
8        A.  What?  No.
9        **Q.  You're not aware?**
10       A.  No.  I haven't paid a bill to them
11   in -- look at my statements.  I haven't paid a
12   bill in over three years.
13       **Q.  I took these screenshots like --**
14       A.  Well, then, great.  They're
15   advertising for me, and I'm not paying.
16       **Q.  -- yesterday or the day before, so it**
17   **is still active.  So that's good for you.**
18       A.  Good for me because I haven't paid a
19   bill.  Like I said, I dumped that a long, long
20   time ago.  That's good to know, though.  Maybe
21   I can sign in.  I'm not sure.  I guess, I could
22   try.
23           MR. McJESSY:  Okay.
24               Let's take a five-minute

274

1    break.  We are getting towards the end.
2
3               (After a break from 3:05 p.m.
4                to 3:11 p.m., the deposition
5                was resumed as follows:)
6
7               (WHEREUPON, the document marked
8                Plaintiff's Exhibit 40 for
9                identification was tendered to
10               the deponent.)
11
12   BY MR. McJESSY:
13       **Q.  If you could open Exhibit 40, I've**
14   **just got a couple of quick questions about**
15   **Exhibit 40.**
16           **If you could turn to**
17   **interrogatory number six on page seven, and**
18   **interrogatory number six asks for a list of**
19   **Midwest Dock Solutions suppliers.**
20           **Do you see that?**
21       A.  Yes.
22       **Q.  And did you -- did you put together**
23   **this list of suppliers?**
24       A.  No.  Sherri Webber would have put it

275

1    together.
2        **Q.  All right.**
3            **If you could just take a look**
4    **at the list of suppliers.  I don't want to ask**
5    **you too many detailed questions about it, but**
6    **can you take a look at the list and let me know**
7    **if there's anybody on the list who you think**
8    **was not a supplier of Midwest Dock?  I'm**
9    **assuming they all are, but -- because if**
10   **they're all identified in the answer to the**
11   **interrogatory, you did sign it.  But I just --**
12       A.  So this is the one area -- I don't
13   want to say that.  This is one of the few areas
14   where, I think, within the company --
15       **Q.  Okay.**
16       A.  -- that I can't answer this question
17   well because I don't deal with a lot of the
18   ordering of non job specific parts, if that
19   makes sense.  I -- I don't do any order
20   determining for the slop, for the hardware, for
21   the installation of -- to do a job.
22       **Q.  Okay.**
23       A.  I do -- it's one of the few areas that
24   I don't have a lot of knowledge on because I

276

1    order job specific stuff, and they're
2    probably -- I haven't heard of half of these
3    people in here.
4        **Q.  Okay.**
5        A.  But that doesn't mean they're not a
6    vendor.  It's just I don't order a lot of
7    things besides job specific items.  I don't do
8    any of the stock stuff.  I don't do -- in the
9    shop.  That's all done through Mike and Janie.
10       **Q.  All right.**
11           **So you counted on Sherri**
12   **Webber to put that list together?**
13       A.  Yes.  Well, the list would have came
14   from our -- from online, from our Xero, because
15   everything we buy is put into a category, of
16   course.  And this must have been all of the
17   people under suppliers.
18       **Q.  All right.**
19           **What is Xero?**
20       A.  Xero is our accounting software.
21       **Q.  Okay.**
22           **X-e-r-o?**
23       A.  Yes.
24       **Q.  All right.**

69 (Pages 273 to 276)

277

```
1              And when did you start using
2    Xero?
3         A.   We discussed this on Monday.  It was
4    approximately seven years ago.
5         Q.   Okay.
6              And you switched over from
7    QuickBooks to Xero?
8         A.   Yes.  Our accountant is a Xero kind of
9    advertiser, so we switched from QuickBooks to
10   Xero.
11        Q.   All right.
12             They pushed Xero?
13        A.   Yes.
14        Q.   All right.
15             And it's what -- the system
16   they prefer?
17        A.   Yes.  And I'm sure she pulled this --
18   she didn't just randomly look through invoices.
19   She pulled this from Xero for everything, I'm
20   sure, under suppliers.
21        Q.   Okay.
22        A.   And so half of these people -- I don't
23   even know who half these people are --
24        Q.   All right.
```

278

```
1         A.   -- for these suppliers.
2         Q.   All right.  Fair enough.
3              Well, then, I'm not going to
4    ask --
5         A.   Like I said, I know a lot of our
6    business, but there's a few areas I don't have
7    current knowledge on.
8         Q.   Okay.
9              If you could turn to page
10   two -- or, I'm sorry, four.  All right?  And I
11   just want to point out to you what
12   interrogatory two asks.  It identifies -- it
13   asks for -- for Midwest Dock Solutions to
14   identify every company that performed work for
15   Midwest Dock Solutions.
16             Do you see that?
17        A.   Yes.
18        Q.   And there's a table attached here,
19   too.
20             Do you see that?
21        A.   Next page?  Yes.
22        Q.   And I want to ask you about a couple
23   of the parties identified there.  One is
24   Industrial Commercial Services.
```

279

```
1              Do you see that?
2         A.   Yes.
3         Q.   What kind of services do they provide?
4         A.   Concrete work.
5         Q.   Do they do anything else besides
6    concrete work?
7         A.   The company itself does, yes.
8         Q.   What else does it do?
9         A.   They do like -- they're basically a
10   small general contractor.  They do a lot of
11   stuff in-house.  They do like door framing.
12   They cut in openings.  They do excavating.
13   They're basically a small general contractor --
14        Q.   Okay.
15        A.   -- that does a variety of things, of
16   work, that --
17        Q.   So they would do -- I'm sorry.  I
18   don't mean to cut you off.  But it's getting
19   late in the day, and I know we all want to wrap
20   up.
21             So they -- they do concrete
22   work for Midwest Dock Solutions, correct?
23        A.   Yes.
24        Q.   That's what -- but they do do general
```

280

```
1    contracting, including carpentry work, from
2    what you've just described.
3              Is that fair?
4         A.   Yes.
5         Q.   All right.
6              They are -- I believe that
7    company is in the audit findings in this case,
8    and I understand from your attorney that they
9    provided concrete work.  That's what the
10   auditor picked up, was the concrete work.
11             Could you provide whatever
12   invoices you have for them --
13        A.   Ah-huh.
14        Q.   -- to your attorney --
15        A.   Yeah.
16        Q.   -- for the audit period from '20 to
17   '20 -- to the end of '24 --
18        A.   Yeah I can do that.
19        Q.   -- just so we can see that that's what
20   they are providing with you?
21        A.   Okay.
22        Q.   All right.
23             And then the other one is
24   Scott Overhead Door.
```

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

281

1        **What kind of work do they do**
2 **for you?**
3    A.  Scott Overhead Door is, of course, a
4 door company, and they've done some service
5 work for us.
6    **Q.  Okay.**
7    A.  A very small amount.  I mean, it has
8 to be very miniscule, like maybe two calls in
9 five years.
10    **Q.  Why would you hire a door company to**
11 **do service work for you?**
12    A.  Because when we're too busy and we
13 can't keep up with the customers, I use other
14 door companies.
15    **Q.  All right.**
16        **You'll send somebody else out**
17 **so that the customer is taken of?**
18    A.  A hundred percent.  I have
19 relationships with other door companies that I
20 can call and say, you know, how busy are you?
21 Can you take this call today because I can't
22 get there.
23    **Q.  Will they do the same thing with you,**
24 **or are you unique in that respect?**

282

1    A.  I'm pretty unique in that respect.
2 They don't -- they wouldn't -- they don't call
3 me to do --
4    **Q.  They don't want to lose the business.**
5    A.  They don't want to -- yeah.  I just --
6 I like to -- they don't -- they've never called
7 me to do work for them.
8    **Q.  Okay.**
9        **But if you called them, it**
10 **was probably to do work for one of your**
11 **customers?**
12    A.  Yes.  But, I mean, there might be one
13 or two calls with them.
14    **Q.  All right.**
15        **And I believe that it is a**
16 **fairly small amount of work that the auditor**
17 **picked up.**
18    A.  Yeah.
19    **Q.  But, again, could you provide whatever**
20 **invoices you have for that work during the**
21 **audit period to your attorney so that we can**
22 **take a look at that and possibly adjust that in**
23 **the audit, if necessary?**
24    A.  Yes.

283

1    **Q.  All right.**
2        **Other than those two, I take**
3 **it, you're generally familiar with the parties**
4 **that your company hires to do other work?**
5    A.  I -- I know all of these people.
6 Every single one of these companies I know.
7    **Q.  Can you --**
8    A.  Except for one, maybe.
9    **Q.  -- and it's always risky for me to say**
10 **this -- but in just a couple of words, go**
11 **through the list and tell me the company's name**
12 **and the kind of work it does?**
13    A.  A-because Electric, electrical work.
14 All Tech Decoration, painting.  Associated
15 Electric, electric.  Bear Metal Welding &
16 Fabrication, I'm not familiar with them.
17    **Q.  Okay.**
18    A.  Like I said, there's a couple I don't
19 know.
20    **Q.  Yeah.  Fair enough.**
21    A.  C & J Industries, electrical.  Dock &
22 Door Install, some work of Dock & Doors.  Ed's
23 Welding & Fabrication.  That's welding.
24 Actually, they fix our welders.  I don't know

284

1 why they're under subcontractor.  They actually
2 repair our welders.  Tony B. can't talk, but he
3 would know better than I would.
4    **Q.  Okay.**
5    A.  Fabcon Precast.  They fix like -- like
6 precast walls.  Flying Locksmith.  They do man
7 doors, hollow metal doors.  Four Seasons.  They
8 actually do electrical.  And Gunderson
9 Construction, concrete.  Hinsdale Electric,
10 electrical work.  Industrial Commercial
11 Services, concrete work.  Jennings Electric,
12 electrical work.  Joseph Craig House, I do not
13 know.  KLY Development, I do not know.  L & S
14 Electric, electrical work.  Neutral Zone,
15 electrical.  Maintenance Construction,
16 electrical.  Overhead Door of Indianapolis,
17 door work.  Premier Installers, door work.
18 Raymond Storage Concepts, door work.  S & S
19 Construction, I don't know.  Scott Overhead
20 Door, door work.  Solid Restoration Services,
21 concrete work.  The Woodshop, they shouldn't be
22 under subcontractor.
23    **Q.  What are though?**
24    A.  They do like -- they do like -- fix

71 (Pages 281 to 284)

285

 1   like walls and stuff like that. I don't know
 2   if they're even a subcontractor. I'm not sure
 3   on The Woodshop.
 4       Q. Okay.
 5       A. Is that it, or do you want me to keep
 6   going?
 7       Q. Yeah.
 8       A. Keep going?
 9       Q. Yeah.
10       A. MD Marketing, marketing. Gineris &
11   Associates are accountants. Koru HR
12   Consulting, HR work. Lawrence Kamin,
13   attorneys. ADP, bank roll. Media Monkey,
14   consultant work. Schooley Mitchell.
15       Q. S-c-h-o-o-l-e-y?
16       A. S-c-h-o-o-l-e-y. They -- I hired them
17   to bargain with people like dumpsters and --
18   our dumpsters and gas, fuel, for cheap prices.
19       Q. Oh, okay.
20       A. So I don't know what you'd consider
21   them. Amundsen Davis, attorneys. Liberty
22   Mutual, general liability. State Farm, auto
23   insurance. ICW Group, they're our workmen's
24   comp. Cincinnati Insurance, general liability.

286

 1   Holden Insurance is our insurance agent.
 2       Q. Okay.
 3       A. A couple I'm not familiar with.
 4       Q. There were a few door companies you
 5   mentioned in there --
 6       A. Yes.
 7       Q. -- Neutral Zone Overhead Door, Premier
 8   Installers, Raymond Storage Concepts.
 9           What will you hire them for,
10   to do door work when you can't get there?
11       A. Outside of the state.
12       Q. Oh.
13       A. So we've had people ask us to do jobs
14   outside of the state. Like we have multiple
15   facilities, and so Raymond Storage is based out
16   of Cincinnati. We did -- we did -- replace
17   some doors out there through a customer from
18   around here. The same with Overhead Door of
19   Indianapolis. Very minimal amounts of jobs for
20   them.
21       Q. Okay.
22           So these are companies you
23   call to have things done elsewhere when you
24   can't get to it, but you want to satisfy a

287

 1   customer?
 2       A. Yeah. If they have other facilities
 3   and they trust us as a company -- basically,
 4   you know, I trust you guys getting the job
 5   done. Do you know anybody out of this area?
 6   I'll contact somebody out of state and have
 7   them do the work.
 8       Q. All right.
 9           And you mentioned a number of
10   electricians -- quite a number of electrical
11   companies.
12           What do they do for you?
13       A. If we're having an issue -- say we
14   have an existing door operator and we are there
15   to replace it and my service technician is
16   having an issue with the wiring part of it. We
17   might call an electrician that we have a
18   contact with and say, can you go look at this
19   and see if it's actually -- the operator is an
20   electrical issue? Because we're not, you know,
21   electricians, so we call electrical companies
22   to troubleshoot some of our stuff. Hydraulic
23   dock levelers, the pumps are all electric.
24   Control panels. At times, my guys just don't

288

 1   know if it's an electrical issue or if it's an
 2   actual equipment issue, and so we do call in
 3   electricians.
 4       Q. Okay.
 5       A. Not regularly, but every once in a
 6   while.
 7       Q. Do you know who Callie Stephens is?
 8       A. Yes.
 9       Q. Do you deal with her?
10       A. Yes.
11       Q. Who's she?
12       A. She's my accountant. She does all of
13   my bookkeeping.
14       Q. Okay.
15           And is she also the
16   accountant for Dock & Door?
17       A. I don't know that.
18       Q. Do you know, does Dock & Door use
19   Gineris?
20       A. Yes.
21       Q. Okay.
22           And Callie Stephens works at
23   Gineris, correct?
24       A. Yes.

72 (Pages 285 to 288)

289

1    Q.  What do you know about the decision to
2  start Dock & Door?
3    A.  So Dock & Door, I guess you'd say --
4  in, you know, the 2015 range -- we saw an
5  opportunity in an area to get in new
6  construction.  And as a nonunion company,
7  Midwest Dock Solutions, we couldn't do the
8  installation of the equipment.  So we were
9  looking for ideas of -- you know, a
10  subcontractor to do the installation work,
11  union work, and so we -- we reached out to Tony
12  Brutti to see if he'd be interested in starting
13  up a subcontracting company.  And that's how it
14  got formed.  You know, Mike Richert had
15  knowledge of this kind of stuff knowing that,
16  you know, he worked as a subcontractor in his
17  past.  You know, there's a lot of other
18  nonunion dock and door companies out there who
19  sub out their union installation work.  And so
20  we wanted to start selling new construction
21  work, and that's how Dock & Door got founded.
22    Q.  Okay.
23         So it was -- Midwest Dock
24  wanted to try to take advantage of this -- this

290

1  new type of business.
2         Is that fair?
3    A.  Yes.
4    Q.  Okay.
5         And you said you couldn't do
6  the installation of the equipment.  Why not?
7    A.  Midwest Dock is not union.  All of the
8  employees are nonunion.
9    Q.  Okay.
10         Well, Midwest Dock could have
11  signed an agreement and become union, correct?
12    A.  Yes.  But we were more of a service
13  company with service employees who knew how to
14  do service work --
15    Q.  Okay.
16    A.  -- and we -- Midwest Dock employees
17  didn't know how to do more of the big
18  installation work.  We were a service company.
19  We didn't have the people to do that type of
20  work.  So we consigned with the carpenters.
21    Q.  Okay.
22         Well, service companies can
23  be union companies, correct?
24    A.  Yes.

291

1    Q.  All right.
2         So the fact that you were a
3  service company, that wouldn't preclude you
4  from signing up with the union, correct?
5    A.  Correct.
6    Q.  All right.
7         And Dock & Door was going to
8  have to hire employees, too, correct?
9    A.  Correct.
10    Q.  So Midwest Dock could have hired the
11  employees, too, correct?
12    A.  Midwest Dock didn't have the correct
13  employees to do the type of work that was
14  needed to be done on these job sites.
15    Q.  All right.
16         Well, prior to Dock & Door
17  being formed, it didn't either, right?  Even
18  when it was formed, it didn't have them until
19  it hired them, right?
20    A.  Correct.
21    Q.  All right.
22         And Michael Richert, you said
23  he had experience in this area.
24         What does that mean?

292

1    A.  His previous employer was a
2  subcontractor.
3    Q.  And who was his previous employer, do
4  you remember?
5    A.  No.  But I think he told you guys
6  yesterday.
7    Q.  Was it J & R Ventures?  Does that
8  sound --
9    A.  It was initials.  I know it's
10  initials.  I know that.  They're out of
11  Beecher, I think --
12    Q.  Okay.
13    A.  -- I think he told you.
14    Q.  And they're a union company, correct?
15    A.  Yes.
16    Q.  Okay.
17    A.  They do subcontracting for other dock
18  and door companies in the area.
19    Q.  Okay.
20         And so did you and Mr.
21  Richert approach Mr. Brutti with the proposal?
22    A.  Yes.
23    Q.  Okay.
24    A.  I wouldn't say it was a proposal.  We

73 (Pages 289 to 292)

293

1  talked to him about it and to see his interest,
2  gauge his interest. We didn't give him a
3  proposal and say, oh, we're going to pay you
4  this much money. Like it wasn't like that. It
5  was, you know, would you be interested in
6  owning a union subcontracting company. It
7  wasn't a proposal like, okay, we're going to
8  pay you this much money to start a company.
9     Q. All right.
10          And Mr. Brutti is Mr.
11 Richert's cousin, correct?
12    A. Correct.
13    Q. And what was he doing at the time?
14    A. I don't know that answer.
15    Q. Mr. Brutti, I mean.
16    A. I didn't -- I didn't know Mr. Brutti
17 when -- before, never met him before.
18    Q. Okay.
19    A. So I had no idea what he did before
20 that.
21    Q. All right.
22          Can you remember any more of
23 what your discussion was at the beginning with
24 Mr. Brutti regarding the startup of

294

1  Dock & Door?
2     A. Man, that was a long time ago. I
3  can't recall the conversation we had, whether
4  it was me and Mike or just Mike approached him,
5  first. I know Mike reached out to him, and I
6  know we met as a group, the three of us, to
7  talk about it. What the exact conversation
8  was, I a hundred percent couldn't tell you
9  right now. It was 10 years ago.
10    Q. All right.
11          And do you remember, even in
12 general terms, what the discussion was beyond
13 what you've already told me?
14    A. We just discussed how we could -- you
15 know, how, you know, Midwest Dock would sell
16 work, sell the work, and, you know, you're
17 going to have employees for the installation
18 and pay you, you know, based on hours worked.
19 That's basically how it went.
20    Q. Okay.
21          And when you say pay you on
22 hours work, do you mean pay Mr. Brutti based on
23 hours worked?
24    A. Pay Dock & Door Install based on an

295

1  hourly wage. You know, we set an hourly wage
2  that we're -- you know, Tony decided this is
3  how much we need to charge for the hours, how
4  much we need to charge make money. And, you
5  know, we didn't set it at what the cost was of
6  the person, you know. Dock & Door has -- you
7  know, if you look at invoices, they're making
8  money off of them -- you know, $25, $30 per
9  person, off each hour.
10    Q. Okay.
11          And how did -- can you read
12 that answer back for me?

296

1          (The record was read as follows:
2     "Q. Pay Dock & Door Install
3     based on an hourly wage. You
4     know, we set an hourly wage that
5     we're -- you know, Tony decided
6     this is how much we need to
7     charge for the hours, how much
8     we need to charge make money,
9     and, you know, we didn't set it
10    at what the cost was of the
11    person, you know. Dock & Door
12    has -- you know, if you look at
13    invoices, they're making money
14    off of them -- you know, $25,
15    $30 per person, off each hour?")
16
17 BY MR. McJESSY:
18    Q. All right.
19          How do you know they're
20 making $25 or $30 per person off each hour?
21    A. Because I know what we pay him hourly,
22 and I know how much a carpenter makes.
23    Q. Okay.
24    A. I mean, I know how much the carpenter

74 (Pages 293 to 296)

297

```
1   makes, and I know how much we pay him per hour.
2       Q.  All right.
3           And you know what the union
4   benefit scale is?
5       A.  I have a pretty -- I don't know exact
6   dollar amount, but I have a pretty good idea I
7   know what it is.
8       Q.  Okay.
9           So you know what the union
10  scale is, and you know what the benefit rate is
11  or approximate?
12      A.  Approximately.  Within a few dollars,
13  yes.
14      Q.  Okay.
15          And you know what the
16  journeyman scale and apprentice scale is,
17  correct?
18      A.  Yes.
19      Q.  Okay.
20          And somehow the pricing is
21  based upon what it costs for an hour for a
22  union carpenter, correct?
23      A.  Well, the pricing isn't based off of
24  what -- exactly what the union carpenter makes.
```

298

```
1       Q.  What's the pricing based off of?
2       A.  Well, Tony B. sets the pricing, so I
3   don't know exactly what -- how he sets it.  But
4   he sets the pricing.  I just know, from what I
5   pay him, how much he makes an hour off of it.
6       Q.  All right.
7           And how do you know that?
8       A.  Because I pay him weekly.
9       Q.  Okay.
10          Do you know -- do you know
11  what he pays for insurance and taxes and other
12  things like that?
13      A.  No.
14      Q.  All right.
15          So you mentioned that you and
16  Mike approached Mr. Brutti with this.  You
17  don't want to call it a proposal, but with --
18  you approached him about starting up a business
19  that would employ union carpenters so that it
20  can perform work for Midwest Dock Solutions,
21  correct?
22      A.  Correct.
23      Q.  Okay.
24          And -- and, eventually,
```

299

```
1   Dock & Door was formed, correct?
2       A.  Correct.
3       Q.  And you and Michael gave Mr. Brutti
4   the money to start up Dock & Door?
5       A.  No.
6       Q.  You didn't give him $15,000 to start
7   the company?
8       A.  Not that I recall, no.
9
10          (WHEREUPON, the document was
11          marked Plaintiff's
12          Exhibit 106 for identification,
13          as of 9/26/25.)
14
15  BY MR. McJESSY:
16      Q.  I'm going to hand you what's been
17  marked as Exhibit 106.  This is -- I'll
18  represent to you -- is a text message that was
19  produced by Callie Stephens that she had with
20  Tony Brutti, and you'll see it's -- I want
21  to -- there's a text message there that's
22  circled dated January 14, 2024.
23          Do you see that?
24      A.  Yes.
```

300

```
1       Q.  And she says, Tony, we have a loan
2   from J. D. Brutti on the books since the
3   company's inception.  Do you know what this is
4   about?
5           And his response is, yeah,
6   it's the original start-up money from Mike and
7   Tony back when I first started.  I think they
8   wanted to keep the two businesses as separate
9   as possible, so they just put my dad's name on
10  it.
11          Do you see that?
12      A.  Yes.
13      Q.  Is that not true?
14      A.  I don't recall giving him $15,000.
15      Q.  Okay.
16      A.  I'm not going to say it's not true,
17  but I said I don't recall it.  I didn't --
18  wasn't positive on it because I do not recall
19  it, and I don't recall it.
20      Q.  Okay.
21          But it could be true?  Maybe
22  you did give him $15,000?
23      A.  It could be true, yes.
24      Q.  Okay.
```

75 (Pages 297 to 300)

301

1    A.  But I do not recall giving him
2  $15,000.
3    Q.  All right.
4         Would you have records that
5  go back that far?
6    A.  When was it formed, '16?
7    Q.  I believe, about then.
8    A.  Maybe bank records from Midwest Dock,
9  I guess --
10   Q.  Okay.
11   A.  -- from 2016.  I mean, whenever it
12  started.
13   Q.  Well, I guess, my question is:  Would
14  you still have those records?
15   A.  I would have to ask Gineris.
16   Q.  All right.
17   A.  They're going to be the best ones who
18  would have recollection of -- from 2016, from
19  my books --
20   Q.  Okay.
21   A.  -- would be Gineris.  I don't know
22  where I would -- I could go to the bank, but I
23  don't think they're going to have records from
24  that long ago.  I don't know.  I don't know

302

1  that answer.
2    Q.  All right.
3
4         (WHEREUPON, the document was
5         marked Plaintiff's
6         Exhibit 107 for identification,
7         as of 9/26/25.)
8
9  BY MR. McJESSY:
10   Q.  I'm handing you what I've marked as
11  Exhibit 107, and I'll represent to you that
12  this is a text message between you and Callie
13  Stephens, and I'd like for you to take a look
14  at the one dated June 13, 2023.
15        Do you see that?
16   A.  Yes.
17   Q.  And it says, hey, Tony, long time no
18  talk.  I hope you're well.  I'm reviewing
19  Dock & Door for May.  I saw that Tony took a
20  $5,000 distribution.
21        Do you understand that would
22  be Tony Brutti?
23   A.  Yes.
24   Q.  Were you aware of this?  Do you want

303

1  me to notify you in the future?  And you
2  respond, yes, we told him to.  No issue.
3  Thanks.  We are working on this mile thing,
4  also, for sales guys.
5         Do you see that?
6    A.  Yes.
7    Q.  All right.
8         Why -- why did you tell Tony
9  Brutti to take a distribution?
10   A.  For a bonus.
11   Q.  Okay.
12   A.  I don't know.  I mean, for a bonus.
13   Q.  And the "we" would be you and Michael
14  Richert, correct?
15   A.  Correct.
16   Q.  All right.
17        And you say, thanks, we are
18  working on this mile thing, also, for sales
19  guys?
20        Do you see that?
21   A.  Yes.
22   Q.  What is the "mile thing"?
23   A.  An app for the sales guys.
24   Q.  Did you buy it, or you're making it?

304

1  Like --
2    A.  It's an app on your phone to keep
3  track of miles so they get reimbursed for their
4  mileage.
5    Q.  Got it.
6    A.  That's -- that's what that means.
7    Q.  Okay.
8         Are you ordinarily notified
9  when Mr. Brutti takes a distribution?
10   A.  Yes.
11   Q.  Okay.
12        And why is that?
13   A.  I don't know why that is.
14   Q.  All right.
15        When you started Midwest Dock
16  Solutions, Gineris & Associates was its
17  accountant?
18   A.  Correct.
19   Q.  And how was the decision made to use
20  Gineris?
21   A.  As our accountant?  My mom owns
22  businesses, and she uses them.
23   Q.  Oh, okay.
24        And what's your mom's name?

76 (Pages 301 to 304)

305

1    A.  Sherri Kelly.
2    Q.  Okay.
3         And so she referred you to
4    them?
5    A.  Yes.
6    Q.  All right.
7         And what kind of services
8    does Gineris provide for Midwest Dock
9    Solutions?
10    A.  Preparation of all of the taxes, our
11    ADP, general ledger of daily -- you know, daily
12    ledger balance and, you know, our penals
13    (phonetic), our balance sheet monthly.  Of
14    course, all of our tax returns, individually
15    and corporate.
16    Q.  And when you say "individually," that
17    means you and Mr. Richert?
18    A.  Yes.
19    Q.  Okay.
20         Are you also aware they also
21    prepare Mr. Brutti's tax returns -- or whether
22    they prepare Mr. Brutti's tax returns?
23    A.  Individually?
24    Q.  Yeah.

306

1    A.  I do not know that.
2    Q.  You don't know?
3    A.  No.
4    Q.  Are you aware they prepare the tax
5    returns for Dock & Door?
6    A.  Yes.
7    Q.  Okay.
8         And how are you aware of
9    that?
10    A.  Well, I mean, if Callie has reached
11    out to me in the past about Dock & Door, then
12    obviously I would know that Dock & Door uses
13    Gineris.
14    Q.  Okay.
15         And what would she reach out
16    to you about Dock & Door?
17    A.  Well, here's a text message right
18    here.  I mean, about Dock & Door.  So --
19    Q.  You're pointing to Exhibit 107?
20    A.  Yes.  You know, why he uses Gineris,
21    I'm not sure, you know.  But, yeah, from --
22    Q.  All right.
23    A.  -- interaction with Callie.
24    Q.  And they essentially perform all of

307

1    your accounting and bookkeeping needs except
2    for what Sherri Webber does in-house.
3         Is that fair?
4    A.  Yes.
5    Q.  And you use -- you've used the Xero,
6    X-e-r-o, system for approximately, you said,
7    seven or eight years?
8    A.  Yes.
9    Q.  What do you pay for that, and how do
10    you pay for it?
11    A.  I don't know.
12    Q.  Okay.
13    A.  I don't know the answer.  I --
14    Q.  All right.
15         I looked through your
16    financials, and I don't see any payments for
17    it, so I wondered if you knew.
18    A.  I do not.  I'm sure it's added onto
19    their cost.
20    Q.  To Gineris's?
21    A.  Yes.
22    Q.  You think they may just charge you for
23    it?
24    A.  Yes.

308

1    Q.  All right.
2         Who was Midwest Dock
3    Solutions' insurance agent when it started out?
4    A.  Esser Hayes.
5    Q.  Was it Esser Hayes?
6    A.  Oh, man.  No, it wasn't.  They were
7    second.  Richard Kerley was our agent.  He
8    worked for -- I know this answer -- Auto Owners
9    Insurance.
10    Q.  Oh.
11    A.  Auto Owners Insurance.
12    Q.  And then at some point, you switched
13    to Esser Hayes?
14    A.  Because Rick Kerley went to Esser
15    Hayes.
16    Q.  Oh.
17    A.  We followed him three places, I think
18    it was.
19    Q.  Well, Esser Hayes became, I believe,
20    Assured Partners.
21         Does that sound right?
22    A.  Yes.  That's when he left there,
23    actually.  And he went somewhere else.
24    Q.  And both -- so you switched from Esser

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

309

```
1  Hayes because -- to Assured Partners because
2  that was the transition of the company or --
3      A.  Yeah, and Rick left.  And I kind of
4  just followed Rick.  And he wasn't in the
5  industry anymore, so we found somebody else.
6      Q.  Okay.
7          And is that how you found
8  Holden Insurance?
9      A.  No.  Mike had a contact at Holden
10 Insurance.  Mike Richert.
11     Q.  Mike Richert did?
12     A.  Yes.
13     Q.  Okay.
14         I'm going to start over again
15 just so I understand.
16     A.  Okay.
17     Q.  What was Rick's name?
18     A.  K-e-r-l-e-y.
19     Q.  Kerley.  All right.
20         So Mike Kerley -- or Rick
21 Kerley was at Esser Hayes, and how did you find
22 him?  Oh, he was at Owners --
23     A.  Auto Owners.
24     Q.  He was at Auto Owners.
```

310

```
1          And he went to Esser Hayes,
2  and you stayed with him?
3      A.  Correct.
4      Q.  And then he -- and then Esser Hayes
5  either became or he went to Assured Partners,
6  and you stayed with him there; is that correct?
7      A.  When Esser -- when Esser Hayes became
8  Assurance, Rick left.
9      Q.  Okay.
10     A.  He left the industry.
11     Q.  Okay.
12     A.  So then we found somebody different.
13     Q.  And that's when you transitioned to
14 Holden Insurance?
15     A.  Correct.
16     Q.  Who did -- who did Mike Richert know
17 there?
18     A.  Tom Downs.
19     Q.  Downs, D-o-w-n-s?
20     A.  Yeah, D-o-w-n-s.  I'm pretty sure
21 that's his name.  Tom Downs.  I know his first
22 name is Tom.
23     Q.  All right.
24         And do you remember when you
```

311

```
1  made the transition from Assurance to Holden
2  Insurance?
3      A.  I do recall some of it, yes.  It was
4  about four years ago.
5      Q.  And did they handle -- well, strike
6  that.
7          Did Esser Hayes and Assured
8  Partners handle your liability coverage?
9      A.  Yes.
10     Q.  Did they also handle automobile?
11     A.  No.
12     Q.  Was that -- that was separate?
13     A.  State Farm does automobile.
14     Q.  Okay.
15         And you didn't go through
16 Esser Hayes or Assured Partners for that
17 policy?
18     A.  Correct.
19     Q.  Okay.
20         And then how about workers'
21 compensation?
22     A.  That's also through Holden, Esser
23 Hayes.
24     Q.  That was Esser Hayes --
```

312

```
1      A.  Yes.
2      Q.  -- and Assured Partners, originally?
3      A.  Yes.
4      Q.  And what about -- do you have property
5  coverage for like equipment and stuff in your
6  building?
7      A.  Yes, same.
8      Q.  Esser Hayes?
9      A.  Yes.
10     Q.  Assured Partners?
11     A.  Right.
12     Q.  And then it became Holden?
13     A.  Yes.
14     Q.  Okay.
15         So has the automobile
16 insurance always been separate from your
17 insurance broker?
18     A.  Yes.
19     Q.  All right.
20         But liability, property
21 coverage, and workers comp have always been
22 through your insurance broker, which was Auto
23 Owners, then Esser Hayes, then Assured
24 Partners, and then Holden Insurance?
```

78 (Pages 309 to 312)

313

1    A.  Yes.
2    Q.  Okay.
3         How did -- do you know how
4  Mr. Richert knew Tom Downs?
5    A.  I do not.
6    Q.  Midwest Dock Solutions uses Lawrence
7  Kamin Saunders & Uhlenhop, U-h-l-e-n-h-o-p,
8  LLC, as its attorneys, correct?
9    A.  Correct.
10   Q.  All right.
11        MR. HUGHES:  Sometimes.
12  BY MR. McJESSY:
13   Q.  Sometimes.
14        Not for this case, however,
15  correct?
16   A.  Correct.
17   Q.  All right.
18        And my understanding is
19  there's a Joseph Zarlengo that works at
20  Lawrence Kamin; is that correct?
21   A.  That's correct.
22   Q.  And I'm assuming some relationship to
23  you?
24   A.  Correct.

314

1    Q.  What's your relationship with Mr.
2  Zarlengo, Joseph Zarlengo?
3    A.  I guess, you'd say he's a second
4  uncle.
5    Q.  Okay.  All right.
6         And I don't want to know what
7  you talked about with people from Lawrence
8  Kamin.  All right?  Just so we're clear.  But
9  what kind of work do they do for Midwest Dock
10  Solutions?
11   A.  Helping with receivables, people who
12  don't pay, liens on buildings, the majority of
13  receivables for the customers who don't pay.
14   Q.  Okay.
15        That's predominantly what
16  they do?
17   A.  Yes.
18   Q.  Do they do some basic simple corporate
19  work, like -- actually, they don't file your
20  annual reports, do they?
21   A.  No.
22   Q.  Okay.
23        You use Gineris for that?
24   A.  Yes.

315

1    Q.  Do they do any sort of corporate work
2  for you?
3    A.  No.
4    Q.  Okay.
5    A.  It's very rarely we use them.
6    Q.  All right.
7         And why didn't they represent
8  Midwest Dock Solutions in this case?
9    A.  I don't think they specialize in
10  something like this.
11   Q.  Has -- did you, meaning you and Mr.
12  Richert, use Lawrence Kamin to get Midwest Dock
13  Solutions started?
14   A.  No.  We used to work -- when we got
15  started 20 years ago, he worked for somebody
16  else.
17   Q.  Did you use the law firm that he
18  worked with then?
19   A.  Yes.
20   Q.  All right.
21        What was the law firm then?
22  That's all right.
23   A.  That's so long ago, I don't -- I don't
24  know the answer.

316

1    Q.  That's okay.
2         When -- do you remember when
3  he moved to Lawrence Kamin?
4    A.  It's been a long time.  At least, 10
5  years.
6    Q.  Are you aware whether Lawrence Kamin
7  has represented Dock & Door?
8    A.  No.  Represented them as, like, in
9  lawsuits or like what kind of --
10   Q.  Just at all.
11   A.  I don't know that answer at all.  I
12  thought you meant like represent them in
13  lawsuits.  I don't know if they represented
14  Dock & Door.
15
16        (WHEREUPON, the document was
17         marked Plaintiff's
18         Exhibit 108 for identification,
19         as of 9/26/25.)
20
21  BY MR. McJESSY:
22   Q.  I'm going to hand you what I've marked
23  as Exhibit 108, and this is a letter jointly
24  addressed -- Anthony Zarlengo -- to you and

79 (Pages 313 to 316)

317

1  Michael Richert and also separately to Mr.
2  Brutti, correct?
3      A.  Correct.
4      Q.  All right.
5          And this appears to be a
6  conflict waiver letter saying he's going to
7  represent Mr. Brutti to form and organize
8  Dock & Door Limited while he's continuing to
9  represent Midwest Dock Solutions.
10          Do you see that?
11     A.  Yes.
12     Q.  All right.
13          And if you look at the second
14  page, is that your signature on there?
15     A.  Yes.
16     Q.  All right.
17          That's Mr. Brutti's, correct?
18     A.  It looks like it.
19     Q.  Okay.
20          And Mr. Richert's?
21     A.  Yes.
22     Q.  All right.
23          Do you recall that you were
24  given a notice that Mr. Thomas Bennington was

318

1  going to -- from the -- from the Lawrence Kamin
2  law firm -- was going to represent Mr. Brutti
3  to form Dock & Door Install?
4      A.  I don't recall, no.
5      Q.  Okay.
6      A.  It was a long time ago.  I do not
7  recall.
8      Q.  All right.
9          Do you have any reason to
10  doubt the authenticity of this letter?
11     A.  No reason at all.
12     Q.  Okay.
13          Does the Lawrence Kamin firm
14  still represent Midwest Dock Solutions in the
15  kind of matters that you described, liens and
16  receivables?
17     A.  Yes.
18     Q.  All right.
19     A.  It's been a while, but, yes.
20     Q.  All right.
21          You don't want them to have
22  to represent you for receivables in lien
23  actions?
24     A.  I don't like calling them.

319

1          (There was a discussion off
2           the record.)
3
4          (WHEREUPON, the documents were
5           marked Plaintiff's
6           Exhibits 109, 110, and 111 for
7           identification, as of 9/26/25.)
8
9  BY MR. McJESSY:
10     Q.  The first three pages of what I just
11  handed you are going to be 109.  The rest of
12  that document is going to be 111, and this is
13  110, and this is 110.
14          All right.
15          Sir, I've handed you Exhibit
16  109.  It appears to be a bill of sale.
17          Do you see that?
18     A.  Yes.
19     Q.  Is that your signature on there?
20     A.  Yes, it is.
21     Q.  All right.
22          Is this a bill of sale to --
23  to buy a 2015 pickup truck from Mr. Brutti?
24     A.  Yes, it is.

320

1      Q.  All right.
2          And this is dated May 20,
3  2024; is that correct?  And it says sale
4  date --
5      A.  Oh, yes.
6      Q.  -- highlighted in yellow.  The
7  highlighting is mine.
8      A.  Yes.
9      Q.  And the amount is $71,869.20?
10     A.  Correct.
11     Q.  All right.
12          Do you know how many miles
13  were on this nine year old pickup truck when
14  you bought it?
15     A.  A lot.  I don't know how many.
16     Q.  Okay.
17          And you did buy it, correct?
18     A.  Correct.
19     Q.  Because we also have the check that
20  shows that it was paid for, right?
21     A.  Yeah.  Correct.
22     Q.  All right.
23          Exhibit 111 is an Edmunds
24  appraisal report --

80 (Pages 317 to 320)

321

1    A. Yes.
2    Q. -- with a print date on it -- or a
3 date of today -- yesterday in the upper left
4 corner suggesting that the price -- of course,
5 on the inside, it shows what the price is for
6 outstanding condition, clean condition,
7 rough -- but somewhere in the neighborhood of,
8 I don't know, a $12,000 value of the pickup
9 truck. And you -- but you bought this almost
10 more than a year ago, so the value would have
11 presumably been higher back then. But you're
12 paying $71,000 for what is a nine year old
13 pickup truck with apparently high mileage?
14    A. Yes.
15    Q. Can you tell me -- I suspect you're an
16 incredibly good businessman.
17    A. Maybe not. I never said I was smart.
18 People like me, so that's why I do so well.
19    Q. Well, why are you paying $71,000 for a
20 pickup truck that I'm going to venture to say
21 is not worth $71,000?
22    A. To use it as a shop truck.
23    Q. Okay.
24         Was this also somehow a bonus

322

1 or a kudos to Mr. Brutti?
2    A. No.
3    Q. Okay.
4    A. His truck got destroyed.
5    Q. Okay.
6         Which truck?
7    A. His shop truck.
8    Q. Oh, this -- the 2015 Chevy Silverado?
9    A. Yes.
10    Q. It got destroyed?
11    A. Well, it's -- it's gotten -- it's in
12 bad shape.
13    Q. All right.
14         And you paid $71,000 for it?
15    A. Yeah.
16    Q. So he could buy a new pickup truck?
17    A. It got destroyed. I mean, from job
18 sites.
19    Q. Okay.
20         I still don't follow.
21    A. His truck got destroyed from job
22 sites, so we paid him for the truck.
23    Q. And it got destroyed on job sites that
24 he was working on for Dock & Door or for

323

1 Midwest Dock Solutions?
2    A. For offloading equipment.
3    Q. Okay.
4         Well, isn't that the cost of
5 doing business? Wouldn't he just charge you
6 enough so that he can by his own equipment?
7    A. No. We paid him $71,000 for the
8 truck.
9    Q. Okay.
10         And it was -- and the truck
11 when you bought it, it was, you're characterizing,
12 in destroyed condition?
13    A. It's not in good condition.
14    Q. All right.
15         And that -- that was the
16 condition you bought it in?
17    A. Correct.
18    Q. Okay.
19
20         (WHEREUPON, the document was
21          marked Plaintiff's
22          Exhibit 112 for identification,
23          as of 9/26/25.)
24

324

1 BY MR. McJESSY:
2    Q. I've handed you what I've marked as
3 Exhibit 112, and I'll represent to you that
4 this is just a number of invoices that were
5 produced to us by Gineris & Associates for
6 vehicles that Midwest Dock Solutions appears to
7 have purchased since 2018. Yeah, since 2018.
8         Do these look like -- do
9 these documents reflect vehicles that the
10 company has purchased?
11    A. Yes.
12    Q. And are these all work trucks?
13    A. It looks like they're all work trucks.
14    Q. Okay.
15    A. Unless Mike's personal truck is in
16 here, but I think these are all work trucks.
17    Q. Okay.
18         And I -- any reason -- the
19 first one shows -- is the only document that's
20 not an actual invoice. And it shows, it looks
21 like, a loan for a truck.
22         Do you see that?
23    A. Yes.
24    Q. And it says, the current principal

81 (Pages 321 to 324)

325

1   balance is $53,467.
2           Do you see that?
3     A.  The first one?
4        MR. HUGHES:  The first page.
5        THE WITNESS:  Oh, the first page.
6   Oh, I gotcha.  I'm sorry.
7   BY MR. McJESSY:
8     Q.  Yeah, $53,467.55.
9     A.  Yes.
10     Q.  It -- that was a vehicle that was
11   financed, and it shows it as a 2022 Ford F-350.
12          Do you see that?
13     A.  Yes.
14     Q.  And that vehicle -- if you look at the
15   second to the last page, that invoice is for a
16   Ford F-350 also.
17          Do you see that?
18     A.  Yes.
19     Q.  Was -- is this financing statement for
20   that vehicle?  And I'll point out that that
21   invoice at the bottom seems to show an unpaid
22   cash balance due on delivery, so it's unclear
23   if that cash balance would have been paid or
24   whether it was financed.  But do you know

326

1   whether those are two separate Ford F-350s from
2   2022 or if that financing statement is for the
3   same vehicle that's shown on that invoice?
4     A.  It looks like, to me, it's the same
5   vehicle.
6     Q.  Okay.
7     A.  But I can't confirm that a hundred
8   percent.  But it looks like the same vehicle to
9   me.
10     Q.  All right.
11        And do you know -- let me ask
12   the question a different way that might help
13   clarify.
14        Does Midwest Dock Solutions
15   have two 2022 Ford F-350s?
16     A.  It is the same vehicle.  I'm looking
17   at the VIN number right now.
18     Q.  Oh, is the VIN number on there?
19     A.  Yeah, both of them.  The first page.
20   And there's a VIN number on both of them.
21     Q.  Okay.
22        So, then, we're -- one, two,
23   three, four, five, six, seven.
24        Well, these are invoices for

327

1   seven different work vehicles, correct?
2     A.  Yes.
3     Q.  Okay.
4        Are these all vehicles that
5   Midwest Dock Solutions has?
6     A.  Yes.
7     Q.  And are some of these used by
8   Dock & Door?
9     A.  These particular ones?
10     Q.  Yes.
11     A.  Possibly, yes.
12     Q.  Okay.
13     A.  Can't confirm that these are.  But,
14   yes, there's a possibility.
15     Q.  All right.
16        And is the reason you can't
17   confirm is you're not exactly sure which
18   documents get used by Dock & Door?
19     A.  There's -- yeah, I have 14 trucks and
20   trying to keep track of -- there's seven here,
21   so there's seven other ones missing.  I don't
22   know who's driving what truck.  You know,
23   it's -- there's a lot going on, so I can't
24   confirm that any of these are driven by

328

1   Dock & Door.
2     Q.  Got it.
3        But some of them may be.  Is
4   that fair?
5     A.  Yes.
6     Q.  And Dock & Door does use Midwest Dock
7   Solutions' vehicles, correct?
8     A.  Yes.  Correct.
9     Q.  Let's see if we can get through a
10   couple of these.
11
12        (WHEREUPON, the documents were
13        marked Plaintiff's Exhibits
14        113, 114, 115, and 116 for
15        identification, as of 9/26/25.)
16
17   BY MR. McJESSY:
18     Q.  Giving you 113, 114 -- you can close
19   the binder if that helps -- 115, 116, these are
20   the tax returns for Midwest Dock Solutions that
21   I've -- well, for the years 2020, 2021, 2022,
22   and 2023 that were produced to us by Gineris &
23   Associates.
24        And do you recall in the --

329

1 do you recall -- I don't want to go back to it,
2 but do you happen to recall that when you
3 responded -- "you" meaning Midwest Dock
4 Solutions responded to the discovery in this
5 case, a large number of the responses said,
6 these documents will be produced by Gineris &
7 Associates.
8          Do you recall that?
9     A.  Yes.
10    Q.  Okay.
11          And Gineris, indeed, produced
12 these.  And what I'd like to do is take a look
13 at the first one, which is Exhibit 2020.  And
14 do you -- are you the person at Midwest Dock
15 Solutions who reviews the tax returns and does
16 the final sign-off?
17    A.  Yes.
18    Q.  Okay.
19          You understand that -- that
20 Gineris & Associates, they prepare the tax
21 returns, but they can't file them unless you
22 sign them, correct?
23    A.  Yes.  I trust what they're doing.
24    Q.  All right.  I get that.

330

1          As far as you know, all of
2 the information in these tax returns that we've
3 marked as exhibits here would be accurate?
4     A.  Yes.
5     Q.  Okay.
6          And you, ultimately, did sign
7 off and approve and file -- and the tax returns
8 got filed for 2020 through 2023; is that
9 correct?
10    A.  Yes.
11    Q.  Do you know, has Midwest Dock
12 Solutions filed its 2024 taxes?
13    A.  Yes.
14    Q.  They would have been due, I think, at
15 the latest, October of last year?
16    A.  Yes.
17    Q.  Do you know when those got filed?
18    MR. HUGHES:  October of this year
19 would be the latest.
20    MR. McJESSY:  Oh, October -- you're
21 right.
22    THE WITNESS:  I want to say April of
23 this year.
24

331

1    BY MR. McJESSY:
2     Q.  Okay.
3          But they did get filed
4 timely?
5     A.  Yes.
6     Q.  The first one, Exhibit 2020, shows
7 rents, do you see that, on line 11 --
8     A.  Yes.
9     Q.  -- of $55,000?
10    A.  Yes.
11    Q.  Did you know, is that approximately
12 the rent that -- that Midwest Dock Solutions
13 would have paid back in 2020?
14    A.  Yes.
15    Q.  Does that sound right to you?
16    A.  Yes.
17    Q.  All right.
18          And that was for the 27 East
19 37th Place address?
20    A.  36th Place, yes.
21    Q.  36th Place.  Thank you.  Oh, yeah, 27
22 East 36th Place.  It's on the tax return.
23          What do you pay there now a
24 month, do you know?

332

1     A.  More than that.  We pay approximately
2 $6,500 a month.
3     Q.  Okay.
4     A.  So we pay about seventy-five --
5 seventy-five a year ballpark.
6     MR. HUGHES:  Six or sixty-five?
7     THE WITNESS:  Right around $6,000 a
8 month.
9 BY MR. McJESSY:
10    Q.  All right.
11          Do you pay anything else
12 toward your rent, like do you have -- do you
13 know what a triple net lease is?
14    A.  No, I do not.
15    Q.  Okay.
16          Do you pay -- do you pay like
17 any portion of the property taxes or anything
18 like that?
19    A.  No.
20    Q.  Any of the expenses to operate the
21 building?
22    A.  We pay for electric.
23    Q.  Electric.
24          You pay utilities?

83 (Pages 329 to 332)

333

1    A.  Utilities.  That's it.
2    Q.  All right.
3         Do you pay gas?
4    A.  No.
5    Q.  Is there any -- how is it heated?
6    A.  They pay that.
7    Q.  Okay.
8         They pay the -- the gas for
9    heat?
10   A.  Yes.
11   Q.  Okay.
12        You pay electric?
13   A.  Correct.
14   Q.  And you pay telephone?
15   A.  Telephone.  And they pay water, also.
16   Q.  Okay.
17        And you pay the Internet?
18   A.  Yes.
19   Q.  And is the Internet at the office --
20   the computers all connect to the Internet,
21   correct?
22   A.  Yes.
23   Q.  Do they connect via cable that plugs
24   in, or is it Wi-Fi?

334

1    A.  Wi-Fi.
2    Q.  And who's your Internet service
3    provider?
4    A.  AT&T.  God, I hope it is.
5    Q.  You're not sure?
6    A.  I'm not a hundred percent, but I'm
7    pretty sure it's AT&T.
8    Q.  All right.
9         And the computers all print
10   to a common copier printer; is that correct?
11   A.  Some of them do.  Not all of them.
12   Q.  Okay.
13        Does some of them -- can you
14   just not print from some of them or --
15   A.  I have my own separate printer.
16   Q.  Oh, you have your own separate
17   printer?
18   A.  Yeah.  I'm special.
19   Q.  And does anybody else have their own
20   special printer?
21   A.  No.
22   Q.  Okay.
23        And Mr. Brutti has a desk in
24   the offices at 27 East 36th Place, correct?

335

1    A.  Yes.
2    Q.  All right.
3         And Mr. Richert has a desk
4    also in the same office as Mr. Brutti, correct?
5    A.  Table, desk, yes.
6    Q.  Okay.
7         And can Mr. Brutti, do you
8    know, print to the printer copier?
9    A.  Yes, he can.
10
11        (WHEREUPON, the document was
12        marked Plaintiff's
13        Exhibit 113 for identification,
14        as of 9/26/25.)
15
16   BY MR. McJESSY:
17   Q.  Okay.
18        And if you can turn to -- in
19   the -- in Exhibit 113, page 10 -- they're
20   numbered, but it's a page that's vertical --
21   there you go -- and it's a -- this is a 2020
22   depreciation and amortization schedule.
23        Do you see that?
24   A.  Yes, I do.

336

1    Q.  And there's a column that says
2    description -- there's an asset number, there's
3    a description, and there's a date acquired.
4         Do you see those columns?
5    A.  Yes.
6    Q.  All right.
7         And I just want to ask you
8    about the items and whether they were still
9    being used, as far as you know, in 2020.  And
10   then -- well, let's do that first.
11        There's a trash pump there.
12   Do you know what that was?
13   A.  No.
14   Q.  All right.
15        There's plasma cutters listed
16   there.
17        Do you know what those are?
18   A.  I know what they are.  Whether they're
19   being used, I don't know.
20   Q.  Okay.
21        Were those -- they say date
22   acquired 11/30/05.
23        Do you see that?
24   A.  Yes.

84 (Pages 333 to 336)

337

1    Q.  And I can't recall, but I thought
2  Midwest Dock Solutions was formed in -- we can
3  go back and look at the Articles of
4  Incorporation.
5    A.  2006.
6    Q.  I think it was 2006, yes.
7        Do you know why it would have
8  a date of 2005 there?
9    A.  I have no idea.
10    Q.  All right.
11        Tractor.  Do you know what
12  that would be referring to?
13    A.  No.
14    Q.  Dock leveler.  Do you know what that
15  would be referring to?
16    A.  No.
17    Q.  Honda utility card.  Do you know what
18  that would be referring to?
19    A.  No.
20    Q.  2005 Ford F-450.  Do you know what
21  that would be referring to?
22    A.  Possibly, our first work truck.
23    Q.  Okay.
24        Do you still have that, or

338

1  did you have it in 2020?
2    A.  We had it for a long time.  I don't
3  know if we had it in 2020, but we had that
4  truck for a long time.
5    Q.  Okay.
6        So you could have?
7    A.  Very possible, yes.
8    Q.  Okay.
9        2004 Honda Accord?
10    A.  That might have been my vehicle.
11    Q.  All right.
12        Do you use it for work?
13    A.  Yes.
14    Q.  All right.
15        Dock levelers.  Do you know
16  what that's referring to?
17    A.  No.
18    Q.  Welder --
19    A.  No.
20    Q.  -- with service in '07.  Do you know
21  what that would be referring to?
22    A.  No.
23    Q.  Chevy Econo van 2003.  Do you know
24  what that refers to?

339

1    A.  We purchased a -- our second work
2  truck.  It was a -- it's probably our second
3  work truck.
4    Q.  All right.
5        2008?
6    A.  Sounds about right, yes.
7    Q.  Do you know, was that still in service
8  in 2020?
9    A.  I wouldn't know.  Yeah.  I'm pretty
10  sure, yes.  But I wouldn't know a hundred
11  percent.
12    Q.  Okay.
13        There's a forklift listed
14  there with a 2009 --
15    A.  We still have that forklift.
16    Q.  You still use it?
17    A.  Yes.
18    Q.  Laptop computer from 2011.
19        Do you recall that item?
20    A.  No.
21    Q.  How about an F-450 2012?
22    A.  Yes.  That's our third work truck.
23    Q.  Okay.
24    A.  That was -- it went out of commission

340

1  about three years ago, a couple years ago.
2    Q.  All right.
3        And so that would have been
4  in use in 2020?
5    A.  Yes.
6    Q.  Okay.
7        And Salesforce sales
8  software?
9    A.  Yes.
10    Q.  Okay.
11        Do you still use Salesforce?
12    A.  Yes.
13    Q.  Did you -- you purchased that, I take
14  it?
15    A.  We have licenses to use it, yes.
16    Q.  Okay.
17        And then a 2012 F-550?
18    A.  That's the crane truck.  We still have
19  that truck.
20    Q.  All right.
21        The Salesforce software, what
22  does -- what is that used for?
23    A.  Service, dispatching, keeping track of
24  customers.  We run quotes off of it for --

341

1  Steve and Dave run quotes off of it for service
2  stuff, and we keep track of our -- just
3  customers and service calls and we keep track
4  of receivables, but it's just a database for
5  all of our service work.
6      Q.  Okay.
7              Would the work for the large
8  general contractors that we've talked about be
9  in the Salesforce system?
10     A.  No.  No.
11     Q.  All right.
12             The lift?
13     A.  Yes.  We still have that.
14     Q.  What's -- what is the lift?
15     A.  Scissors lift.
16     Q.  Scissor lift.  Okay.
17             And the 213 Ford F-450 --
18  2013 Ford F-450?
19     A.  We're getting into so many trucks now
20  that I wouldn't know the particular truck on
21  that one.
22     Q.  Okay.
23     A.  I would assume it's -- 2020?  Yeah, so
24  it's still being used.

342

1      Q.  All right.
2              Another welder purchased in
3  2013?
4      A.  Yes.
5      Q.  You have a lot of welders, I take it?
6      A.  Yeah.  We've got a lot.
7      Q.  All right.
8              2014 F-450.  Do you think
9  that would have still been in use?
10     A.  I would think all of these trucks were
11  still being used in 2020.
12     Q.  Okay.  Everything after 2014.
13             And do all of trucks that are
14  listed here look like trucks you would have
15  had?  You don't have any reason to doubt that
16  this is accurate, correct?
17     A.  Not accurate?  No.  I have no reason
18  it wouldn't be not accurate.
19     Q.  Okay.
20             And so all of the trucks here
21  were trucks that were acquired by Midwest Dock
22  Solutions.
23             Is that fair?
24     A.  Yeah.  I mean, there's a personal

343

1  truck in there.  My personal vehicle is in
2  there.
3      Q.  Which are those?
4      A.  Mike's.
5      Q.  What numbers?
6      A.  Twenty-eight.
7      Q.  Okay.
8      A.  And mine's 32.
9      Q.  All right.
10             Other than that, all of the
11  Ford F-450s, 350s, those were all work trucks?
12     A.  Yeah.  They would have definitely
13  still been in use.
14     Q.  Okay.
15             And there's an item there,
16  Runion bucket truck.
17             Do you see that?
18     A.  Yes.
19     Q.  What is that?
20     A.  It's a truck that has a bucket on it
21  so you can go up high with -- like, you know,
22  it has a bucket that goes up high, and you get
23  to higher spots.
24     Q.  Is Runion a make of the truck?

344

1      A.  Runion is who we purchased it off of.
2      Q.  Oh, I see.  Okay.
3      A.  We purchased it off of Runion.
4      Q.  Like it's a Ford or a Chevy or --
5  okay.
6      A.  Yes.  But they put the attachment on
7  there.
8      Q.  Got it.
9              There's a -- item 37 is
10  another scissor lift acquired in 2019.
11             Do you still have that?
12     A.  Yes.
13     Q.  There's something called a Big Tex
14  trailer that was acquired in 2020.
15             Do you still have that?
16     A.  Yes.
17     Q.  What is that?
18     A.  A trailer to pull scissors lifts and
19  forklifts.
20     Q.  All right.
21             And the 2020 Ford F-350 -- I
22  think we already talked about the vehicles.
23             All right.  And this is all
24  equipment used by Midwest Dock Solutions in its

86 (Pages 341 to 344)

345

1    business?
2        A.  Correct.
3        Q.  All right.
4            And is it also -- I know you
5    don't know which specific vehicles, but is this
6    equipment also used by Dock & Door?
7        A.  Yes.  Some of it is.
8        Q.  All right.
9            Some of the welders?
10       A.  Yes.
11       Q.  The scissor lifts?
12       A.  Not often.  The Dock & Door stuff is
13   rented for the equipment.
14       Q.  Job site specific?
15       A.  Yes.  Correct.
16       Q.  All right.
17           I take it -- you said not
18   often.  So that means sometimes, I take it?  On
19   rare occasions?
20       A.  On rare occasions, it will be used.
21   But the majority of the time, it's rented
22   equipment.
23       Q.  Okay.
24       A.  That's why our equipment rental is so

346

1    high.
2        Q.  All right.
3            Let's jump to Exhibit 116,
4    which is the 2023 tax return.
5            Oh, actually, if we can go
6    back, if we can go back to the Exhibit 113.
7        A.  Okay.
8        Q.  There's an item on there, item 26 on
9    page 11 of the depreciation schedule we were
10   talking about which refers to Procore software
11   that was put in service in 2017.  And the cost
12   on it, it looks like, was $9,000?
13       A.  Yeah.  That's Salesforce.
14       Q.  That's the same thing?
15       A.  Yes.  Procore is the company I paid to
16   start Salesforce for us.
17       Q.  Well, Salesforce is also online.
18       A.  Yeah.  I pay licenses per individual,
19   I think it is, through Salesforce.
20       Q.  Okay.
21       A.  Because they get licenses per person.
22   Procore is the company who kind of set it up,
23   the platform, if that makes sense.
24       Q.  All right.

347

1            And if you go to page 14 and
2    you look at -- do you see schedule statement
3    three there?  The statement is on the right
4    side at the top.
5        A.  Oh, yeah.
6        Q.  You mentioned why your equipment
7    rental is so high.  There's a category here,
8    under other deductions, for equipment rental.
9            Do you see that?
10       A.  A hundred and twenty-three thousand?
11       Q.  Yeah, nine hundred and two dollars.
12       A.  Yes.
13       Q.  Yeah.  $123,902.
14           Is that the equipment rental
15   expense you were referring to?
16       A.  Yes.
17       Q.  All right.
18           And why is that so high?
19       A.  Because the majority of the
20   Dock & Door jobs we need boom lifts and
21   forklifts.
22       Q.  Okay.
23           And Midwest Dock supplies
24   those -- that equipment?  It rents the

348

1    equipment?
2        A.  Correct.
3        Q.  Who makes -- who makes the
4    arrangements for the rental so that the
5    equipment is out on the job site?
6        A.  Whoever sells the job.
7        Q.  Okay.
8            So it would be either you or
9    Ira, for example?
10       A.  Yes.
11       Q.  All right.
12           So if you sold a job for
13   installation of loading docks to one of the
14   large general contractors that we've been
15   talking about for a new construction job and
16   you needed to have a forklift out there to move
17   around the large dock levelers, you would --
18   you personally would make the arrangements for
19   that equipment to be there on the job site?
20       A.  Yes.  I know when stuff's getting
21   delivered to the job, so I'm the one who
22   arranges the rental equipment.
23       Q.  Okay.
24           And if Ira were doing garage

87 (Pages 345 to 348)

349

1 doors and he needed a boom lift to do that, he
2 would make those arrangements?
3    A.  Yes.
4    Q.  And then Midwest Dock would pay for
5 that?
6    A.  Yes.
7    Q.  And then there's an expense item there
8 for software and support fees.
9         Do you see that?
10   A.  Sorry.  I got off the page.  Yes.
11   Q.  And it shows an amount of $25,144.
12        Other than Salesforce and
13 the --
14        MR. HUGHES:  I don't think that's
15 the right number.
16 BY MR. McJESSY:
17   Q.  Oh, software support fees, $25,144.
18   A.  Yeah.  That's right.
19        MR. HUGHES:  Yeah.  I'm just trying
20 to draw the line across.
21 BY MR. McJESSY:
22   Q.  You mentioned Procore and Salesforce.
23        Are there any other software
24 subscriptions or software expenses that you had

350

1 back in 2020?
2    A.  There had to be something.
3    Q.  All right.
4    A.  I mean --
5    Q.  You don't know offhand?
6    A.  I don't know offhand.
7    Q.  That's fine.
8
9         (WHEREUPON, the document was
10        marked Plaintiff's
11        Exhibit 116 for identification,
12        as of 9/26/25.)
13
14 BY MR. McJESSY:
15   Q.  All right.
16        Let's jump to 2023, which is
17 Exhibit 116.
18        This shows rent, rent
19 expenses, $85,105.
20        Does that seem high to you?
21   A.  $7,000 a month?  Maybe a little bit
22 high.  It might have been closer to
23 seventy-five to eighty, but maybe a little
24 high.

351

1    Q.  Okay.
2        But close?
3    A.  It's close, yeah.  It's a little
4 higher than I thought.
5    Q.  All right.
6        And if you could turn to --
7 if you could turn to page -- well, it doesn't
8 have a number.  It says future depreciation
9 report, and it looks like this.  Fourteen pages
10 from the back, approximately.
11   A.  From the back?  Okay.  See it.
12   Q.  And I just want to ask you about the
13 items that are dated after 20 -- after 2019.
14        So there's -- if you look at
15 the bottom where it says listed property,
16 there's a Ford Econoline van?
17   A.  Yes.
18   Q.  350.  A Ford F-350.  A Ford F-250
19 Super Duty.
20        Those vehicles -- those are
21 all work vehicles, like --
22   A.  No.
23   Q.  -- work trucks?
24   A.  No.

352

1    Q.  Okay.
2        Tell me, what are they?
3    A.  Mike Richert's, I'm pretty sure, is
4 the 2022 Ford F-250 Super Duty.  That's his
5 personal vehicle.  The other one's a work
6 truck.
7    Q.  Okay.
8        So the Ford Econoline E-350,
9 that would be a work vehicle?
10   A.  Yes.
11   Q.  And the 2022 Ford F-350, that would be
12 a work vehicle?
13   A.  I would think, yes, that would be a
14 work vehicle.
15   Q.  Okay.
16        But the 2022 Ford F-250 Super
17 Duty, you think that's Mr. Richert's personal
18 vehicle?
19   A.  I do think that's his personal.  I
20 don't think -- that's just in the price.  I
21 don't think -- that's his personal.
22   Q.  The $89,000?
23   A.  Yeah.  Yes.
24   Q.  Does the company -- he uses the

88 (Pages 349 to 352)

353

1   vehicle for work, correct?
2       A.  Yes.
3       Q.  Okay.
4           Does the company pay for the
5   vehicle?
6       A.  Yes.
7       Q.  All right.
8           And does the company pay for
9   your vehicle, also?
10      A.  Yes.
11      Q.  And it's your personal vehicle, but
12  you use it for work, also, correct?
13      A.  Yes.
14      Q.  All right.
15          And is the amount the company
16  pays for yours and Mr. Richert's personal
17  vehicle, is that part of your compensation, for
18  want of a better description?  Like do you take
19  that into account when taking distributions for
20  the company?
21      A.  Are you saying since my vehicle is a
22  lot more than his that --
23      Q.  Oh.  Which is yours?
24      A.  -- that we do the compensation --

354

1       Q.  Oh.  Yours is the Range Rover Sport?
2       A.  Yes.
3       Q.  Oh, okay.
4       A.  Are you saying like does --
5       Q.  Yeah.
6       A.  -- do we take into account that he
7   gets paid more of a dividend or --
8       Q.  Yeah.
9       A.  No.
10      Q.  Okay.
11      A.  We just buy them, whatever we want to
12  go buy.
13      Q.  Make it a Ferrari.
14          And there's an item 57 on
15  here, a 1988 Caterpillar.
16          Do you see that?
17      A.  Fifty-seven?
18      Q.  Yeah.
19      A.  Yes.
20      Q.  What is that?
21      A.  I don't know what that is.
22      Q.  Okay.
23          Do you have like a
24  Caterpillar tractor or -- I mean, Caterpillar

355

1   makes construction equipment -- a generator or
2   anything like that?
3       A.  I don't know what that is.
4       Q.  Okay.
5           Midwest Dock Solutions issues
6   credit cards to some of its employees, correct?
7       A.  Yes.
8       Q.  And those -- it also issues credit
9   cards to -- or among the parties -- strike
10  that.
11          Among the parties the credit
12  cards are issued to include Collin Zarlengo,
13  Donald Cruikshank, David, Nicolas Kelly, and
14  Richard Mantoan, correct?
15      A.  Correct.
16      Q.  All right.
17          And those are all employees
18  of Dock & Door?
19      A.  Correct.
20      Q.  All right.
21          And does Midwest Dock
22  Solutions pay those credit card bills?
23      A.  Yes.
24      Q.  All right.

356

1           One seventeen.  One eighteen.
2   One nineteen.
3
4           (WHEREUPON, the documents were
5           marked Plaintiff's
6           Exhibit 117, 118, and 119 for
7           identification, as of 9/26/25.)
8
9   BY MR. McJESSY:
10      Q.  Looking at Exhibit 117 and 118, do
11  recognize that vehicle in those pictures?
12      A.  No.
13      Q.  Really?
14      A.  I'm not driving it.  I know that.
15      Q.  All right.
16      A.  I drive like a grandma.
17      Q.  All right.
18          If you look at Exhibit 118,
19  does it look like it has a logo of Midwest Dock
20  on the hood?
21      A.  Yes, it does.
22      Q.  Okay.
23          And the same on 117, correct?
24      A.  Yes.

89 (Pages 353 to 356)

357

1  Q. The same car, I think?
2  A. Yes.
3  Q. And I don't know if you can see, but
4  Exhibit 119 -- it's a different car, but No. 9
5  looks like it also has Midwest Dock on the
6  hood.
7      Do you see that?
8  A. Yes. I see that.
9  Q. Okay.
10     Does Midwest Dock sponsor
11 this race car?
12     That's Mr. Brutti's race car,
13 right?
14 A. Yes.
15 Q. It's got his name on it?
16 A. Yes. I know that.
17 Q. Does Midwest Dock sponsor that race
18 car?
19 A. I do not know that answer.
20 Q. Okay.
21 A. I never recall giving money for
22 sponsoring this race car.
23 Q. Were you aware that Midwest Dock's
24 name was on this race car?

358

1  A. No.
2  Q. All right.
3      Did you ever give permission
4  to put Midwest Dock's name on this race car?
5  A. I don't know. It's been six years. I
6  do not know that answer.
7  Q. Okay.
8  A. If I -- if Tony Brutti asked me, I
9  would have said yes. There's no issue of doing
10 that. But I can't recall him asking me.
11 Q. All right.
12     When you say it's been six
13 years, what do you mean by that?
14 A. Well, the one said 2019, I thought it
15 said.
16 Q. Oh, the photo itself? That's what
17 you're saying to?
18 A. Yeah. Yeah. I mean, it's -- yeah.
19 Q. And if you look at the one that's
20 dated -- or Exhibit 119, there's an article
21 there referring to -- an article from -- it
22 looks like an event in 2023 that the picture
23 comes from.
24     So are you -- are you aware,

359

1  does Mr. Brutti drive a race car?
2  A. I am aware of that.
3  Q. Okay.
4      And does he still drive a
5  race car? Is he still racing?
6  A. I think he still races, yes.
7  Q. All right.
8      And has he been racing -- do
9  you know how long he's been racing?
10 A. No.
11 Q. All right.
12     Do you know anything about
13 how Midwest Dock's name came to be on his car?
14 A. I'm going to assume he asked me if
15 you'd like to sponsor the race. Whether I, you
16 know, sponsored and gave him money or didn't or
17 if he asked if I can shoot the logo, I don't
18 know the answer.
19 Q. Okay.
20     You're not aware?
21 A. I'm not aware.
22 Q. Okay.
23     And you have no recollection
24 of Midwest Dock sponsoring Mr. Brutti or his

360

1  race car?
2  A. No.
3  Q. All right.
4  A. Pretty cool picture, though.
5  Q. Does Midwest Dock Solutions provide
6  cell phones to -- to anyone?
7  A. Yes.
8  Q. To who?
9  A. Steve French.
10 Q. Okay.
11 A. Mike Strazzabosco.
12 Q. Okay.
13 A. Mike Richert, myself, Tony Zarlengo.
14 I want to say Ira Sugar. I think that's it.
15     MR. McJESSY: Okay.
16     This is Exhibit 120.
17
18     (WHEREUPON, the document was
19     marked Plaintiff's
20     Exhibit 120 for identification,
21     as of 9/26/25.)
22
23 BY MR. McJESSY:
24 Q. All right.

90 (Pages 357 to 360)

361

1    Sir, you're aware that
2  Midwest Dock Solutions filed an answer to the
3  complaint that was filed in this case.
4    Is that fair?
5  A.  Yes.
6  Q.  All right.
7    And does this appear to be a
8  copy of the answer that Midwest filed?
9  A.  Yes.
10  Q.  All right.
11    And did you review and
12  approve this answer before it was filed?
13  A.  Yes.
14  Q.  All right.
15    And as far as you know, all
16  of the answers by Midwest Dock Solutions were
17  true and accurate?
18  A.  Yes.
19  Q.  Sir, what's your current residential
20  address?
21  A.  13465 West 83rd Place, St. John,
22  Indiana.
23  Q.  All right.
24    Any current plans to move

362

1  from there?
2  A.  No.
3  Q.  The last four digits of your social
4  security number?
5  A.  7254.
6  Q.  Your date of birth?
7  A.  7/15/1977.
8  Q.  A phone number where you can be
9  reached?
10  A.  (708) 921-8950.
11  Q.  Is that your cell phone?
12  A.  It is, yes.
13  Q.  All right.
14    And who's your carrier?
15  A.  T-Mobile.
16  Q.  And have you -- how long have you had
17  T-Mobile as your telephone carrier?
18  A.  Well, it used to be Sprint, and Sprint
19  got bought out by T-Mobile.
20  Q.  Oh, I see.
21  A.  And I've had Sprint since -- I can't
22  remember how long.  Twenty years, at least.
23  Q.  All right.
24  A.  Since cell phones were created.

363

1  Q.  All right.
2    Are you -- who's responsible
3  for hiring employees for Midwest Dock
4  Solutions?
5  A.  Myself and Michael Richert.
6  Q.  Okay.
7    You do it generally together?
8  A.  Yes.
9  Q.  Who's responsible for terminating
10  employees from Midwest Dock Solutions?
11  A.  Michael Richert does the majority of
12  the terminating.
13  Q.  All right.
14    Can he make the decision to
15  terminate somebody on his own?
16  A.  Yes.
17  Q.  And could you make the decision to
18  terminate somebody on your own?
19  A.  Yes.
20  Q.  Okay.
21    Prior to coming here today,
22  did anyone suggest to you what your testimony
23  should be on any of the subjects that we have
24  covered?

364

1  A.  No.
2  Q.  Was all of the testimony that you gave
3  today truthful?
4  A.  Yes.
5  Q.  Is there anything you said today that
6  you would like to correct before we end the
7  deposition?
8  A.  No.
9  Q.  Okay.
10    And I'm going to take five
11  minutes, look through my notes.  I think I'm
12  done, but I just want to make sure.  So if you
13  can just let me sit here for five minutes and
14  let me do that, that will be great.
15
16    (After a break from 4:47 p.m.
17    to 4:51 p.m., the deposition
18    was resumed as follows:)
19
20    MR. McJESSY:  We can go back on the
21  record.
22  BY MR. McJESSY:
23  Q.  Just one or two more questions, sir.
24    How often are you in the

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

365

```
 1   office?
 2      A.  I go to the office five days a week
 3   for approximately four to five hours.
 4      Q.  A day?
 5      A.  Yes.  But I don't take a lot of
 6   vacations, so I'm gone a lot.  So if I'm home,
 7   then I'm in the office every day.
 8      Q.  And when you're -- I'm sorry.  And
 9   when you're in the office, you're there for
10   about four or five hours?
11      A.  Correct.
12      Q.  Okay.
13          And then is there something
14   in your routine where you're also working part
15   of the day outside of the office?
16      A.  All day long.
17      Q.  Okay.
18          Well, that's what I was going
19   to ask.
20          So you're in there four or
21   five hours doing management activity?
22      A.  Yes.
23      Q.  What are you doing the rest of the
24   day?
```

366

```
 1      A.  Outside of the office?
 2      Q.  For work, right.
 3      A.  I -- the first thing I do is I get up
 4   in the morning and I go on at 6:00 o'clock and
 5   I look at the GPS for all of the trucks to see
 6   where they're all located at.  And then I look
 7   at things like my credit card bill.  And then
 8   I -- I'll do proposals and quotes from home.
 9      Q.  Oh, okay.
10      A.  Then I go in the office, and I just
11   see how everything is going, look at
12   scheduling, dispatching, talk to my -- you
13   know, my service dispatcher, who I work with,
14   you know, constantly, check the jobs for the
15   following day, make sure we have all of the
16   equipment ready, talk to Sherri, see if
17   anything needs to be -- if bills need to be
18   paid.  I go through all of my service tickets
19   for everybody, see if any jobs need material
20   ordered or quotes need to be done, work with
21   accounts receivable and payables, Amber, see
22   who owes money, give her the service tickets to
23   bill jobs.  Then I usually leave around 2:00
24   o'clock and work from my phone responding to
```

367

```
 1   emails.  I do a lot of my quoting at night
 2   because I have nobody bothering me at night
 3   besides my dogs.  I go to the gym at 3:00
 4   o'clock on a daily basis, except -- except for
 5   today.  But I'm doing something constantly.
 6   I'm dedicated to -- no one replies faster than
 7   me, than I do on emails.  And so I'm very
 8   dedicated to my customers, and that's why if I
 9   don't respond back to a customer within two
10   hours, they'll think I'm probably dead
11   somewhere.
12      Q.  Or in a deposition.
13      A.  Or in a deposition.  Because I clean
14   out my emails immediately.  So, you know, I --
15   I don't want to say I work all day long because
16   I do 95 percent of the things on my phone, but
17   I have a full grasp of the business and what's
18   going on.
19      Q.  Okay.
20          So you're in the office every
21   day.
22          How often would you say Mr.
23   Brutti is in the office?
24      A.  Almost every day.
```

368

```
 1      Q.  Okay.
 2          So he's another -- and how
 3   often is Mike Richert in the office?
 4      A.  What month are we talking about?
 5      Q.  Well, I was going to say.  Let's say
 6   not during hunting season.
 7      A.  He's not in the office very often.
 8      Q.  Okay.
 9      A.  He'll pop in every once in awhile.
10   He'll pop in for an hour or two hours --
11      Q.  Okay.
12      A.  -- and just go in the shop and see how
13   the shop's going and see how dirty it is and
14   see if stuff's organized, and he'll go look at
15   job sites.  But he's not there every day.
16      Q.  Okay.
17          And you mentioned that you
18   have the GPS tracking in the -- in the
19   vehicles.
20          Is that on all of your work
21   vehicles?
22      A.  Yes.
23      Q.  And does that include vehicles that
24   are used by Dock & Door?
```

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

369

1    A.  Yes.
2    **Q.  So you can see when they're on job**
3  **sites as well?**
4    A.  Correct.
5         MR. McJESSY:  All right.
6         I don't have any other
7  questions.  I do appreciate your time.  I may
8  have some additional questions based on
9  anything that your counsel asks you or that Ms.
10 Cahill asks you.  And just for the record, I'd
11 like to reserve my right to recall the witness
12 just about emails, if we can get them.  We did
13 check.  We don't seem to have any emails.  I
14 know you said they were produced.  Maybe you
15 can give me the Bates numbers.  If I'm wrong,
16 then I'm wrong.
17        MR. HUGHES:  Yeah.  I will check.  I
18 know we produced emails, whether they made it
19 to you or whatever, because I know we used a
20 document transfer --
21        MR. McJESSY:  Okay.
22        MR. HUGHES:  -- or whatever.  So we
23 will --
24        MR. McJESSY:  I believe we have

370

1  consistently Bates numbered documents from you
2  from like one to like 6,000 something.  And we
3  did double check, so --
4         MR. HUGHES:  I'll verify -- I'll
5  double-check myself.
6         MR. McJESSY:  Okay.
7         MR. HUGHES:  Yeah.
8         MR. McJESSY:  I mean, maybe they
9  weren't Bates labeled and somehow produced, but
10 I didn't see them.
11        MR. HUGHES:  I know that those -- I
12 know that those ones were through the vendor,
13 so I'm not sure somehow if there was an issue
14 with the way they were Bates labeled or
15 something like that.
16        MR. McJESSY:  Okay.
17        MR. HUGHES:  So I will -- so I will
18 verify that.
19        MR. McJESSY:  All right.
20        Well, I appreciate Mr.
21 Zarlengo's insistence that they were -- you
22 know, somehow I think there must just be a
23 hiccup, so that would be great.
24        MR. HUGHES:  I need a few minutes

371

1  here to finish up.
2         MR. McJESSY:  Okay.
3         MR. HUGHES:  I mean, we might be --
4  we might be time pressed for me to start -- to
5  go into some of this, too, but let me -- all
6  right.  I'm going to need a few minutes.  We'll
7  take a quick break here and come back in a few
8  minutes.
9         MR. McJESSY:  Okay.
10
11        (After a break from 4:57 p.m.
12        to 5:10 p.m., the deposition
13        was resumed as follows:)
14
15        MR. McJESSY:  Are we back on the
16 record?
17        THE COURT REPORTER:  Yes.
18        MR. HUGHES:  We don't have any
19 questions.
20        MR. McJESSY:  I'll order.
21        MR. HUGHES:  And we'll reserve and
22 order.
23        MR. McJESSY:  All right.
24        Sir, subject to my

372

1  reservation to recall based on the email issue,
2  we're done today.  I appreciate your time.  I
3  appreciate your being here.  I'm sure it was --
4  not being able to respond in two hours was --
5         THE WITNESS:  I lost -- I lost all
6  of my customers.  They all left me.
7         MR. McJESSY:  We're off the record.
8
9         FURTHER DEPONENT SAITH NOT.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

93 (Pages 369 to 372)

373

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION
 3
    MID-AMERICA CARPENTERS    )
 4  REGIONAL COUNCIL PENSION  )
    FUND, et al.,             )
 5                            )
           Plaintiffs,   )  No. 1:24-cv-02428
 6                            )
           vs.           )  Judge Andrea R. Wood
 7                            )
    DOCK & DOOR INSTALL,   )  Magistrate Judge
 8  INC., an Illinois      )  Jeannice W. Appenteng
    corporation and MIDWEST  )
 9  DOCK SOLUTIONS, INC., an  )
    Illinois corporation,  )
10                            )
           Defendants.   )
11
12      This is to certify that I, ANTHONY
    EDWARD ZARLENGO, have read the transcript of my
13  Deposition taken on September 26, 2025, in the
    above-entitled cause, consisting of Pages 1
14  through 371 inclusive, and I do again subscribe
    and make oath that the same is a true, correct,
15  and complete transcript of my Deposition as
    aforesaid, with corrections, if any, appearing
16  on the attached Correction Page(s).
17          _____ Correction Pages Attached.
18
       _____
19        ANTHONY EDWARD ZARLENGO
20
    SUBSCRIBED AND SWORN to
21  before me this _____ day
    of _____, A.D. 20 ____.
22
23
    _____
24       Notary Public
```

374

```
 1  STATE OF ILLINOIS   )
 2                  )  SS:
 3  COUNTY OF C O O K   )
 4
 5      I, DIANE M. NULICK, a Notary Public
 6  within and for the County of Cook, State of
 7  Illinois, and a Certified Shorthand Reporter of
 8  said state, do hereby certify:
 9      That previous to the commencement of the
10  examination of the witness, the witness was
11  duly sworn to testify the whole truth
12  concerning the matters herein;
13      That the foregoing deposition transcript
14  was reported stenographically by me, was
15  thereafter reduced to typewriting under my
16  personal direction and constitutes a true
17  record of the testimony given and the
18  proceedings had;
19      That the said deposition was taken
20  before me at the time and place specified;
21      That the said deposition was adjourned
22  as stated herein;
23      That I am not a relative or employee or
24  attorney or counsel, nor a relative or employee
```

375

```
 1  of such attorney or counsel for any of the
 2  parties hereto, nor interested directly or
 3  indirectly in the outcome of this action.
 4      IN WITNESS WHEREOF, I do hereunto set
 5  my hand and affix my seal of office at Chicago,
 6  Illinois, this 30th day of September, 2025.
 7
 8
 9
10
11
      _____
12      Notary Public, Cook County, Illinois.
13
14  C.S.R. Certificate No. 084-002029.
15
16
17
18
19
20
21
22
23
24
```

94 (Pages 373 to 375)

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 3

Anthony Joseph Brutti
October 09, 2025

Pages 1..4

**Page 1**

1      IN THE UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF ILLINOIS

2           EASTERN DIVISION

3

   MID-AMERICA CARPENTERS    )

4   REGIONAL COUNCIL PENSION  )
   FUND, et al.,           )

5                   )
        Plaintiffs,  )

6                   )
     vs.         ) No. 1:24-cv-6428

7                 )
   DOCK & DOOR INSTALL, INC.  )

8   and MIDWEST DOCK SOLUTIONS,  )
   INC.,             )

9                 )
     Defendants.  )

10

11     The deposition of ANTHONY JOSEPH BRUTTI,

12  called by the Plaintiff for examination, taken pursuant

13  to notice and pursuant to the Federal Rules of Civil

14  Procedure for the United States District Courts

15  pertaining to the taking of depositions, taken before

16  Lois A. LaCorte, Certified Shorthand Reporter,

17  Registered Diplomate Reporter, and Notary Public, at

18  3759 North Ravenswood Avenue, Suite 231, Chicago,

19  Illinois, commencing at 10:00 a.m. on the 9th day of

20  October, 2025.

21

22

23

24

25

**Page 2**

1  APPEARANCES:

2  McJESSY CHING & THOMPSON, LLC
   MR. KEVIN P. McJESSY

3  3759 North Ravenswood Avenue
   Suite 231

4  Chicago, Illinois 60613-3881
   Phone: (773) 880-1260

5  E-Mail: mcjessy@mcandt.com

6    On behalf of Plaintiffs;

7  ALLOCCO, MILLER & CAHILL, P.C.
   MR. TODD ABRAHAM MILLER

8  20 North Wacker Drive
   Suite 3517

9  Chicago, Illinois 60606-2806
   Phone: (312) 675-4325

10  E-Mail: tam@alloccomiller.com

11    On behalf of Defendant Dock & Door Install, Inc..

12  AMUNDSEN DAVIS, LLC
   MR. MICHAEL F. HUGHES

13  3815 East Main Street
   Suite A-1

14  St. Charles, Illinois 60174
   Phone: (630) 587-7925

15  E-Mail: mhughes@amundsendavislaw.com

16    On behalf of Defendant Midwest Dock Solutions.

17        * * * * * *

18

19

20

21

22

23

24

25

**Page 3**

1        I N D E X

2  WITNESS              PAGE

3  ANTHONY JOSEPH BRUTTI

4    Direct Examination by Mr. McJessy    5

5

6

7

8       E X H I B I T S

9  PLAINTIFFS' EXHIBIT         PAGE

10  No. 214 Articles of Incorporation Dock & Door  24
   No. 215 Letter from Lawrence Kamin     25

11  No. 216 Annual Reports Dock & Door     29
   No. 217 E-Mail Bennington & Brutti     36

12  No. 218 Union Questionnaire       37
   No. 219 Agreements            45

13  No. 220 Fringe Benefit Contribution Reports  47
   No. 221 Answers to Interrogatories     49

14  No. 222 E-Mail Brutti to Stephens     56
   No. 223 Invoice Samples        66

15  No. 224 E-Mail Brutti and Tom Downs    73
   No. 225 Text Brutti and Green      79

16  No. 226 Text Brutti and Green      81
   No. 227 Text Message to Tony B      82

17  No. 228 Text Re Cable Crimpers and Tire Socks  83
   No. 229 Text Re Clayco and Bucket Truck   85

18  No. 230 Text with Partial Picture of Scissor Lift 85
   No. 231 Text Re Caution Tape       86

19  No. 232 Text Re Black Spray Paint     87
   No. 233 Text Re Timesheets and Retractable Lanyard 88

20  No. 234 Text Re Items for ABT       89
   No. 235 Text Re Ira and Scissor Lift Pictures  91

21  No. 236 Text Re Ira - Tony Bringing Lift   92
   No. 237 Text Exchange and Invoices    93

22  No. 238 Text Tony B - There's 4     97
   No. 239 Text Exchange and Invoices    97

23  No. 240 Change of Endorsement Form    109
   No. 241 E-Mail to Zack Adkins      122

24  No. 242 E-Mail to Zack Adkins      125
   No. 243 E-Mail Brutti to Christi Adams   127

25  No. 244 E-Mail Zarlengo to Brutti    128

**Page 4**

1  PLAINTIFFS' EXHIBIT (Cont'd.)     PAGE

2  No. 245 Supplemental Response to Production  131
   No. 246 E-Mail Brutti to Adams re Closeouts  134

3  No. 247 E-Mail Brutti to Kidenda     137
   No. 248 E-Mail Sugar to Kidenda     138

4  No. 249 E-Mail Brutti to Adams      140
   No. 250 E-Mail Brutti to Braun      144

5  No. 251 E-Mail Zarlengo to Brutti     145
   No. 252 E-Mail Brutti to Zarlengo    146

6  No. 253 E-Mail Spring to McJessy     153
   No. 254 Certificates of Insurance    154

7  No. 255 Certificates of Insurance    154
   No. 256 Certificates of Insurance    154

8  No. 257 Certificates of Insurance    154
   No. 258 Certificates of Insurance    154

9  No. 259 Certificates of Insurance    156
   No. 260 Certificates of Insurance    158

10  No. 261 2017 Various W-2s       174
   No. 262 2018 Various W-2s       176

11  No. 263 2023 Various W-2a       177
   No. 264 2022 Various W-2a       178

12  No. 265 Dock & Door's Answer to Complaint   190
   No. 266 General Ledger         201

13  No. 267 Text Messages         213

14

15

16

17

18

19

20

21

22

23

24

25  (Exhibits retained by Mr. McJessy.)

Anthony Joseph Brutti
October 09, 2025                                                   Pages 5..8

Page 5

(Witness sworn.)
1    WHEREUPON:
2         ANTHONY JOSEPH BRUTTI,
3    called as a witness herein, having been first duly
4    sworn, was examined and testified as follows:
5              DIRECT EXAMINATION
6    BY MR. McJESSY:
7         Q.   Mr. Brutti, can you state your full name for
8    the record, first, middle, and last, and spell each.
9         A.   Anthony Joseph Brutti, A N T H O N Y,
10   J O S E P H, B R U T T I.
11        Q.   All right. And, sir, have you ever been
12   deposed before?
13        A.   No, I have not.
14        Q.   All right. But you've sat through an awful lot
15   of depositions in this case; correct?
16        A.   I have sat through three so far.
17        Q.   Oh, just three?
18        A.   Correct.
19        Q.   Oh, I thought you'd been here for more than
20   that. Okay.
21             Well, you know how depositions go, but just
22   for the record, I'll set some ground rules.
23             First, you know you're under oath; correct?
24        A.   Correct.
25

Page 6

1         Q.   All right. And you understand that even though
2    we're here in a conference room, that oath has the same
3    force and effect as if you were testifying in court?
4         A.   Yes, sir.
5         Q.   Okay. And you know that we have a court
6    reporter here taking down what's said and we both can't
7    talk at the same time. So I'll try not to talk while
8    you're answering a question, you try not to talk while
9    I'm asking one; is that fair?
10        A.   Fair.
11        Q.   Okay. Also, you know all your answers need to
12   be verbal responses. Yeses and nos are fine, but if you
13   nod or shake your head or say "uh-huh," "uhn-uhn," I'll
14   prompt you, is that a yes, is that a no, just so the
15   record is clear. Is that fair?
16        A.   Okay.
17        Q.   All right. And I'm going to ask you a number
18   of questions today. Hopefully, you'll give me the best
19   most truthful answers you can, but if I ask a question
20   and you don't understand it because it's vague or
21   confusing or for some other reason, will you ask me to
22   explain my question?
23        A.   Yes.
24        Q.   Okay. And then if you answer a question, is it
25   fair that I can presume you think you understood my

Page 7

1    question?
2         A.   Yes.
3         Q.   And lastly, is there any reason today that you
4    cannot give truthful answers to my questions? For
5    example, are you suffering from any conditions or taking
6    any medications or anything like that that would prevent
7    you from either understanding my questions or giving
8    truthful answers?
9         A.   No.
10        Q.   Okay. And sir, when did you graduate from high
11   school?
12        A.   I graduated from high school in 2002.
13        Q.   And where did you graduate from?
14        A.   Manteno High School?
15        Q.   And where is that?
16        A.   Manteno, Illinois, just north of Kankakee.
17        Q.   Okay. And did you attend college?
18        A.   I did.
19        Q.   And where did you go to college?
20        A.   I started at Kankakee College or Kankakee
21   Community College and graduated from Eastern Illinois
22   University.
23        Q.   Excellent. And did you go straight through, in
24   other words, did you switch from Kankakee to – I'm
25   sorry, did you say –

Page 8

1         A.   Kankakee.
2         A.   Yeah, Kankakee.  And then you went to where?
3         A.   Eastern Illinois.
4         Q.   Eastern Illinois. Did you make a transition
5    directly to Eastern Illinois and continue with your
6    education?
7         A.   Yes, I did.
8         Q.   And how long did you attend college?
9         A.   I believe – well, to get my bachelor's degree
10   was like four and a half years because I had to do, I
11   did student teaching.  And that was an extra semester.
12        Q.   Oh, excellent.
13        A.   And then I did take a couple of master's level
14   classes later on.
15        Q.   All right.
16        A.   Did not get my master's, but took some
17   classes.
18        Q.   Excellent. And so you were studying to be a
19   teacher?
20        A.   I was.
21        Q.   Excellent. And you graduated with your
22   bachelor's degree?
23        A.   I did.
24        Q.   When did you graduate?
25        A.   2007.

Anthony Joseph Brutti
October 09, 2025

Pages 9..12

Page 9

1  Q. And did you start college right after high
2  school or did you take some time off?
3  A. No, right after.
4  Q. And your major field of study was education, I
5  take it?
6  A. Correct, yes.
7  Q. And then when did you take the master's
8  classes?
9  A. I don't know the exact dates. Probably
10  2010-ish.
11  Q. Okay. Were you a teacher for a period of time?
12  A. I worked at Manteno High School for one year.
13  I was the in-school suspension supervisor. I was a
14  substitute teacher and then I did a lot of odd jobs like
15  scoreboard operating and announcing, and I striped the
16  football field.
17  Q. So you did all the hard stuff, the substitute
18  teacher part.
19  A. Everything was like a little stipend, you'd be
20  paid a little bit extra. So I just said yes, I'll do it.
21  Q. Excellent. And have you received – you
22  mentioned a master's, in 2010 you took some master's
23  classes. How many semesters or quarters did you take?
24  A. Just three classes, so like nine credit hours.
25  I think I did it in one – well, I think I did one class

Page 10

1  per semester, so a year and a half.
2  Q. And so that would have been 2010-2011?
3  A. Yeah. I'm not entirely accurate, but it's
4  right in that ballpark there.
5  Q. All right. And have you received any other
6  formal training or education?
7  A. No, I don't think so.
8  Q. Okay. Have you received any training in the
9  trades, like, you know, plumber, electrician, carpenter,
10  that kind of thing?
11  A. No.
12  Q. Other than a driver's license and a firearm
13  permit, do you hold any other licenses or certifications
14  of any sort?
15  A. I have a firearm permit.
16  Q. Okay. Well, other than that?
17  A. No, I don't, no.
18  Q. Okay. Just a driver's license?
19  A. Yeah, correct.
20  Q. Now, between 2007 and 2010, where were you
21  employed?
22  A. Between 2007 and – okay. I was employed at
23  Lincoln Plaza Auto Parts and Manteno High School in I
24  want to say 2008 and 9.
25  Q. When you were in college, did you work?

Page 11

1  A. I did.
2  Q. Where did you work when you were in college?
3  A. I worked at a Carquest.
4  Q. Carquest?
5  A. Carquest Auto Parts.
6  Q. Okay.
7  A. At Eastern. I also worked at Lincoln Plaza
8  when I was at Kankakee.
9  Q. And what did you do for Lincoln Plaza Auto
10  Parts?
11  A. Started as like a parts driver and ended up
12  being a counterman and then was kind of like an
13  assistant manager.
14  Q. Okay. And what did you do Carquest Auto Parts?
15  A. Just a counterman and a driver.
16  Q. All right. So have you told me everybody that
17  you worked for through 2010?
18  A. So in – my years are foggy again, but I want
19  to say about 2009-ish I started, I was a manager at
20  Interstate Truck and Trailer Repair.
21  Q. What did you do there?
22  A. I managed the shop.
23  Q. You also race cars.
24  A. I do.
25  Q. When did you start that?

Page 12

1  A. 2003.
2  Q. And I'm guessing you do all the things that
3  well – strike that. Do you also work on your race car?
4  A. I do.
5  Q. You're adept at all sorts of mechanical
6  things, I presume?
7  A. Yes.
8  Q. Can you rebuild an engine?
9  A. I wouldn't trust it if I rebuilt it. I could,
10  but yeah, I wouldn't trust it.
11  Q. All right. Does your racing generate revenue
12  or is it more of a cost center?
13  A. Yeah, there is purse money, but we don't make
14  money.
15  Q. Would you categorize that as a job or how
16  categorize that?
17  A. A very, very devout and serious hobby.
18  Q. And do you still race?
19  A. I do.
20  Q. Prior to – well, let's go pick up from 2010.
21  Where was your next job after 2010?
22  A. I worked at Interstate for like five years.
23  Q. Okay.
24  A. So that was my last job.
25  Q. So from 2010 to 2015?

Page 13

1    A. Yeah. And I still worked at Lincoln Plaza.
2  And then when the owner of Lincoln Plaza retired, it
3  became a NAPA. And I worked part time there also. So
4  basically, I worked at that store for like 20 years
5  basically.
6    Q. Oh, at NAPA?
7    A. At Lincoln Plaza and NAPA, yeah.
8    Q. Okay.
9    A. Not all the time, but, you know, on and off.
10  I'd go to college, come back, I'd have a job, summer
11  job.
12    Q. Okay. Do you remember when it switched over
13  from Lincoln Plaza Auto Parts to NAPA?
14    A. Oh, I would say 2018 or '19-ish.
15    Q. Okay. And how long did you continue to work
16  there on and off after it became a NAPA?
17    A. Until 2024.
18    Q. Okay. And from, say, 2015 to 2018 how steady
19  was your work there?
20    A. Well, it was part time. It was 10 hours a
21  week or so.
22    Q. Okay. Any particular days of the week?
23    A. Oh, Saturdays and then occasionally on a
24  workday – I mean, a weekday, I should say.
25    Q. Okay. And then from 2018 to 2024, that's when

Page 14

1  it was a NAPA?
2    A. Right, yeah.
3    Q. And how often would you work there during that
4  period of time?
5    A. The same, just kind of kept my same shifts and
6  same hours.
7    Q. Okay. 10 hours a week and then Saturdays and
8  an occasional day during the week, same thing?
9    A. Right, yeah.
10    Q. And who was your boss between 2018 and 2024 at
11  NAPA?
12    A. His name would be Roger Dittrich.
13    Q. RODGER or ROGER?
14    A. I don't know.
15    Q. Okay. And what was the last name?
16    A. Dittrich.
17    Q. Do you know how to spell that?
18    A. No.
19    Q. All right. Where was he located?
20    A. He owned about maybe 20 NAPA stores in the
21  Southland area, and he was based out of Watseka,
22  Illinois.
23    Q. Can you spell that?
24    A. W A T S E K A.
25    Q. And he was your boss?

Page 15

1    A. Yeah, yeah. There was a manager at the store.
2  There was a myriad of managers at the store.
3    Q. They changed over time, I take it?
4    A. It was a rough experience, but yeah.
5    Q. Would you get an employee discount for working
6  there?
7    A. I would, yes.
8    Q. And would you buy auto parts there for your
9  racing hobby?
10    A. I would, yes.
11    Q. If I refer to – I don't mean it to sound
12  insulting. You described it as a very devout hobby. So
13  I refer to it as a hobby, is that fair?
14    A. That's fair, yeah.
15    Q. Okay. Do you remember who the manager was when
16  you left?
17    A. I don't know her last name, but her name was
18  Kelly.
19    Q. Kelly. And I take it the managers changed over
20  frequently there?
21    A. Yeah.
22    Q. Okay. And what did you do for NAPA from 2018
23  to 2024?
24    A. Counterman.
25    Q. Did you ever work for Midwest Dock Solutions?

Page 16

1    A. Yes, for about four days.
2    Q. And when was that?
3    A. I want to say it was Christmastime of like
4  maybe 2006, maybe 2007.
5    Q. Okay. And what did you do for those four days?
6    A. I don't really remember. I remember one day
7  we fixed a big sectional door. I think one day we were
8  working on some train shelters.
9    Q. Train shelters?
10    A. Yeah. So like on the side of a building, if a
11  train pulled up to the side of the building, the shelter
12  comes out so you can unload and load the train.
13    Q. Really?
14    A. Correct.
15    Q. All right. All right and I take it – well,
16  let me ask, had you had any experience fixing overhead
17  doors or train shelters before?
18    A. No.
19    Q. All right. And was this sort of a – strike
20  that.
21      How did you come to work there for four days
22  over Christmas?
23    A. Oh, Michael just needed some help. So I said
24  yeah, I'll tag along for a couple days.
25    Q. All right. Was that Mike Richert?

Anthony Joseph Brutti
October 09, 2025

Pages 17..20

Page 17

1    A. Yes.
2    Q. R I C H E R T. And he is your cousin; correct?
3    A. He is.
4    Q. And he is half owner of Midwest Dock
5    Solutions; is that correct?
6    A. He is.
7    Q. And did you know that at the time that you
8    worked for him for the four days?
9    A. Yes. Yeah, I thought he was the only owner at
10   that time, I think.
11   Q. Oh. Okay. Fair enough. I guess you understood
12   he was an owner of that company?
13   A. Correct, yeah.
14   Q. All right. And what was the nature of the work
15   that you did in helping the fix the large overhead door
16   and the train shelter, as best you recall?
17   A. A lot of watching and learning, first of all,
18   and then just I think we were replacing – I think we
19   were trying to pop a panel back into a track, and then
20   we had to rewind the springs and stuff like, you know,
21   just simple service call stuff that – it was my first
22   time on a lift, I remember that.
23   Q. Was your role like, you know, "Hand me this,
24   hold this"?
25   A. Yeah, basically an assistant helper, yeah.

Page 18

1    Q. Other than those four days in 2006 or 2007,
2    did you work for Midwest Dock Solutions at any other
3    time?
4    A. I did not.
5    Q. Okay. And was your service for Midwest Dock
6    Solutions during those four days over Christmas strictly
7    limited just to working one-on-one with Mike?
8    A. Yeah, I believe so, yeah.
9    Q. Have you ever been a member of a union?
10   A. No – I was – well, in my time in Manteno I
11   was with IRMF. I don't know if that's really a union.
12   Q. What's IRMF stand for?
13   A. I don't know if it's international, but
14   Municipal Retirement Funds.
15   Q. Oh, all right. And that's when you were with
16   – oh, with the high school?
17   A. The high school, yeah.
18   Q. All right. So you participated in –
19   A. Yeah, I don't remember – I can't remember if
20   it's like a union or I don't remember like paying dues
21   or anything like that.
22   Q. Okay.
23   A. But it's a retirement fund, so...
24   Q. All right.
25   A. So all municipal workers are. So I wasn't a

Page 19

1    teacher, so I didn't get TRS, which is Teacher
2    Retirement System, or something like that. So the aide
3    workers were in a different fund.
4    Q. Okay. Other than that, have you ever been a
5    member of – whether that's a union or not, we both
6    don't know.
7    A. Yeah, I'm not sure.
8    Q. But other than that, have you been a member of
9    a union?
10   A. No.
11   Q. Okay. Now, you're the owner of Dock & Door,
12   correct?
13   A. Correct.
14   Q. All right. And you've always been the sole
15   owner of Dock & Door, is that correct?
16   A. Yes.
17   Q. And you're its sole officer and director, is
18   that correct?
19   A. Yes.
20   Q. And you have always been its sole officer and
21   director; is that correct?
22   A. Yeah.
23   Q. All right. And other than working for Lincoln
24   Auto Parts and NAPA through 2024, as you described
25   earlier, from 2014 to the present have you had any other

Page 20

1    employment?
2    A. I currently work at another auto parts store
3    –
4    Q. Okay.
5    A. – on Saturdays.
6    Q. And what auto parts store is that?
7    A. Lang's Auto Parts.
8    Q. And where are they located?
9    A. South Chicago Heights.
10   Q. And how did you come to work there?
11   A. A long-time friend of mine that I've known,
12   I've known the family since grade school, he owns a lot
13   of repair shops, mechanic shops, and he bought an auto
14   parts store. And he said "Why don't you come work for
15   me on the weekends." And I said yeah, that would be
16   great because I was looking to get out of NAPA.
17   Q. All right. So when you left NAPA you went to
18   work for Lang's Auto Parts?
19   A. Yes.
20   Q. And same thing, work on Saturdays and an
21   occasional day during the week?
22   A. Yeah.
23   Q. And who would you say is your boss there?
24   A. Bill Sampognaro.
25   Q. Can you spell that?

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

Anthony Joseph Brutti
October 09, 2025

Pages 21..24

Page 21

1    A. SAMPOGNARO.
2    Q. All right. And is Mr. Sampognaro, is that your
3  family friend who goes way back?
4    A. Yes.
5    Q. And where does he reside?
6    A. I think he still lives in Green Garden,
7  Illinois.
8    Q. And you're still employed there?
9    A. I am.
10    Q. Okay. So other than Lincoln Auto Parts, NAPA
11  Auto Parts, and Lang's Auto Parts, have you had any
12  other employment since you started Dock & Door?
13    A. No.
14    Q. All right. And prior to 2014, other than the
15  four days over Christmas that you described for me
16  working for Midwest Dock Solutions, did you have any
17  other experience in the dock and door industry?
18    A. No.
19    Q. Any other experience that would be similar to
20  work in dock and door industry?
21    A. No.
22    Q. So how did you come to start Dock & Door in
23  2014?
24    A. Casual conversations between Michael and I
25  over time led to us – led to them expanding and me

Page 22

1  opening my own business.
2    Q. All right. Now, you were here for Mr.
3  Zarlengo's testimony; correct?
4    A. Yes.
5    Q. And you heard him say that he and Mr. Richert
6  had approached about starting a company to provide
7  union labor so that Midwest Dock Solutions could bid on
8  jobs; correct?
9    MR. HUGHES:  Objection, misstates prior testimony.
10  BY THE WITNESS:
11    A. Sort of, yeah. Me and Michael talked more
12  about it beforehand, and then later on when we got very
13  serious about it, yeah, obviously, Tony was involved in
14  talks.
15  BY MR. McJESSY:
16    Q. Okay. And so when you and Michael were
17  talking, what did you – before Michael and Tony both
18  approached you, what did you and Michael discuss?
19    A. I mean, our conversations would start with me
20  learning about his business and everything in just
21  casual conversations.  And he mentioned that he would
22  like to get into doing new construction work and just
23  inquisitive, I'm like, how does that, you know, why
24  can't you do that?  And he said "Well, usually, we have
25  to have union labor doing it. And we're not signed with

Page 23

1  the union."  So I asked "Okay, so what – can you have a
2  union company do that work for you?"  And he said "Well,
3  yeah, we could."  And that kind of led to it.
4    Q. And when did these discussions take place; do
5  you remember?
6    A. Probably very late 2013 or early 2014.
7    Q. Now, were you aware that Midwest Dock
8  Solutions had signed to one job site – strike that.
9    At that time were you aware that Midwest Dock
10  Solutions had signed two one-job site agreements with
11  the Carpenters Union?
12    A. No.
13    Q. Are you aware of that now?
14    A. Yes.
15    Q. Okay. And when did you become aware of that?
16    A. During the depositions.
17    Q. And were you aware that Midwest Dock Solutions
18  had performed new construction overhead door and dock
19  leveler installation?
20    A. Repeat that. I'm sorry.
21    Q. Yes. In 2014 were you aware that Midwest Dock
22  Solutions had performed new construction overhead door
23  and a dock leveler installation?
24    A. No.
25    Q. Okay. When did you become aware that it had

Page 24

1  done that work?
2    A. Not until I started Dock & Door.
3    Q. Okay.  You were here when Mr. Zarlengo
4  testified that Midwest Dock Solutions had signed a
5  one-job site agreement with the union to install 20
6  overhead doors and dock levelers at the Winpack Portions
7  facility in  Sauk Village; correct?
8    A. Correct.
9    Q. Okay. So you became aware that they did new
10  construction installation then; right?
11    A. Yes, at the deposition.
12    Q. I'm going to hand you what I have marked as
13  Exhibit 214.  These are the Articles of Incorporation
14  for Dock & Door Install; correct?
15    A. It appears to be.
16    Q. Okay. Are you familiar with them or no?
17    A. I haven't seen them in a long time, but yeah.
18    Q. Did you prepare these Articles of
19  Incorporation?
20    A. Yes.
21    Q. You did?
22    A. I did.
23    Q. Okay.  Did you use an attorney to assist you
24  to prepare them?
25    A. Yes.

Anthony Joseph Brutti
October 09, 2025                                               Pages 25..28

Page 25

1    Q.  And who did you use?
2    A.  Yes, my general attorney.  The name escapes
3    me.
4    Q.  Is it Lawrence Kamin?
5    A.  Lawrence Kamin, yes.
6    Q.  That's the name of the law firm; correct?
7    A.  Yes.
8    Q.  I hand you what I've marked as Exhibit 215. Is
9    that the law firm you're referring to?
10   A.  Yes, it is.
11   Q.  Okay. Now, if you go back to the Articles of
12   Incorporation, if you look at the second page, do you
13   see where it says Names and Addresses of Incorporators?
14   It's about midway down the page, and it's in bold in the
15   center of the page.
16   A.  Okay.  Yes.
17   Q.  Okay. And it says: "The undersigned
18   incorporator(s) hereby declare(s), under penalties of
19   perjury, that the statements made in the foregoing
20   Articles of Incorporation are true."
21       Do you see that?
22   A.  Yes.
23   Q.  And it's dated July 11, 2014, and signed by
24   Steffani Scanlan, Assistant Secretary for Illinois
25   Corporation Service Company; do you see that?

Page 26

1    A.  I do.
2    Q.  Do you know who that is?
3    A.  I do not.
4    Q.  Do you know what the Illinois Corporation
5    Service Company is?
6    A.  I do not.
7    Q.  Did you hire them to prepare these Articles of
8    Incorporation?
9    A.  I did not.
10   Q.  Okay. I'm just trying to get – they are
11   signed by that entity, but you said you prepared them,
12   so I'm just trying to understand –
13   A.  No, I would say that Lawrence Kamin prepared
14   them. I should correct that then.
15   Q.  Okay. And that's fine. As we go along, if
16   there's something that you need to correct, please feel
17   to do that, all right?
18       And if you look at the engagement letter here,
19   is this a letter that is directed to you?  It's
20   Exhibit 215.
21   A.  It is.
22   Q.  And was that your personal address back in
23   2014 on Catalpa?
24   A.  It is.
25   Q.  C A T A L P A.

Page 27

1        Now, this letter says in the first sentence:
2    "As you know, we have represented and continue to
3    represent Midwest Dock Solutions, Inc.(Midwest) and Tony
4    Zarlengo in various matters."
5        Do you see that?
6    A.  Yes.
7    Q.  "Mr. Brutti (AJ) has requested that we form
8    and organize a new corporation in Illinois named Dock &
9    Door Install, Ltd. (DDI)." Is that correct?
10   A.  Correct.
11   Q.  And it says: "We understand that Midwest and
12   DDI will have an ongoing business relationship
13   (Relationship)."  Right?
14   A.  Yes.
15   Q.  Okay. And it says:  "In order to avoid any
16   misunderstanding between our firm, Tony, Mike, Midwest,
17   AJ, and DDI, we wanted to disclose to you our
18   relationship to each of the parties."
19       Do you see that?
20   A.  I do.
21   Q.  And then you signed this letter, correct, at
22   the bottom?
23   A.  Yes.
24   Q.  And do you recognize that Mr. Richert and Mr.
25   Zarlengo also signed it?  Do you recognize their

Page 28

1    signatures?
2    A.  I do.
3    Q.  Do those appear to be their signatures?
4    A.  It does.
5    Q.  So you hired this law firm to form Dock &
6    Door; correct?
7    A.  Correct.
8    Q.  All right. And they were also the law firm for
9    Midwest and Mr. Zarlengo; correct?
10   A.  Correct.
11   Q.  And you describe – I'm going to refer, the
12   law firm is Lawrence, Kamin, Saunders & Uhlenhop,
13   U H L E N H O P; correct?
14   A.  Correct.
15   Q.  But you refer to them as Lawrence Kamin; is
16   that fair?
17   A.  Yeah.
18   Q.  And did you know Thomas Bennington, Jr.? He's
19   the attorney who signed this letter. Did you know him at
20   this time?
21   A.  No, that was when I met him.
22   Q.  Okay. How did you come to meet him?
23   A.  I knew that we needed a lawyer to do the
24   Articles.  And I asked Tony and Mike or I think I asked
25   probably Tony, "Who would you recommend I use?"  And he

Anthony Joseph Brutti
October 09, 2025

Pages 29..32

Page 29

1  said "Well, use Lawrence Kamin. They can do that for
2  you."
3    Q.  Okay. So you were aware at this time that he
4  represented them?
5    A.  Yes.
6    Q.  Okay. And he agreed to represent you too for
7  purposes of forming Dock & Door; correct?
8    A.  Yes.
9    Q.  Okay. And then you continued to use him as you
10  general attorney after that; is that correct?
11    A.  I did.
12    Q.  Okay. And you were aware that Midwest Dock
13  Solutions also used them; correct?
14    A.  Correct.
15    Q.  Okay. Let me hand you what I've marked as
16  Exhibit 216. And if you could just -- these appear to
17  be the annual reports for Dock & Door; correct?
18    A.  Correct.
19    Q.  Or documents sent to the Illinois Secretary of
20  State as part of the annual reports; correct?
21    A.  Correct.
22    Q.  Okay. And if you look, there is a note that's
23  attached to one of the annual reports that appears to
24  have been submitted and the pages are numbered, and the
25  page number is 453.

Page 30

1    A.  Correct.
2    Q.  And that's your handwriting?
3    A.  It is.
4    Q.  And is that a note that you sent in to the
5  Secretary of State along with your annual report for
6  2017?
7    A.  I don't know if I would have sent it to the
8  Secretary of State or if I would have sent it to
9  Lawrence Kamin.
10    Q.  Okay. So you may have sent it to Lawrence
11  Kamin?
12    A.  Yeah, correct.
13    Q.  And you'll note that the annual reports, they
14  appear to have your signature on them. Is that your
15  signature on the annual reports?
16    A.  Yes.
17    Q.  Okay. And I take it, you said you may have
18  sent this note to Lawrence Kamin and then he may have
19  sent it in. Would you sign these annual reports and
20  then send them back to him? Is that how it worked?
21    A.  Yeah.
22    Q.  And then he would file them?
23    A.  I remember, I think I would just get them from
24  CSC.
25    Q.  Okay.

Page 31

1    A.  And I would just send it back to them, just
2  send it back to CSC.
3    Q.  Do you know what CSC is?
4    A.  I don't know. It's an acronym for --
5    Q.  Corporation Service Company?
6    A.  It could be, yeah.
7    Q.  So you're not sure who would have actually
8  submitted these?
9    A.  Right.
10    Q.  Now, if you turn to the second page of this
11  exhibit, which is 446, do you see where it says on that
12  annual report in the second box down on the left, it
13  says Prepared by?
14    A.  Okay. Yes.
15    Q.  And it says Thomas F. Bennington, Jr.,
16  Lawrence Kamin Saunders & Uhlenhop?
17    A.  I see.
18    Q.  So do you have any reason to doubt that he
19  prepared this?
20    A.  No.
21    Q.  And if you turn to the page 449, do you see it
22  has the same entry that it shows that one was also
23  prepared by him?
24    A.  I see that.
25    Q.  Do you have any reason to doubt that?

Page 32

1    A.  No.
2    Q.  Okay. So is it possible that you sent them
3  back to him to send in?
4    MR. HUGHES:  Objection, time frame, vague.
5    MR. McJESSY:  Well, these are the annual reports for
6  2015, 2016, let's see, 2017. Let's take a look.
7    MR. HUGHES:  Which ones are you asking about?
8    BY MR. McJESSY:
9    Q.  And if you look at the next one, which is page
10  455, that's the 2018 annual report, and the second page
11  of that, which is page 456, it also says Prepared by;
12  correct?
13    A.  Right, correct.
14    Q.  And do you have any reason to doubt he
15  prepared it?
16    A.  No, I would say he prepared it.
17    Q.  Okay. And if you turn to page 471, that's the
18  annual report for 2019. That one has some handwriting
19  on it. Is that your handwriting?
20    A.  It does not appear to be.
21    Q.  Okay. And if you turn to the next page, there
22  is handwriting on that page also; do you see, page 472?
23    A.  It's got like some numbers written in and then some
24  scribbles on the bottom; do you see that?
25    A.  Yeah, I see that, right.

Anthony Joseph Brutti
October 09, 2025

Pages 33..36

Page 33

1    Q.  Is that your handwriting?
2    A.  No.
3    Q.  Do you know whose handwriting that would be?
4    A.  No, I don't.
5    Q.  Do you recall, have you ever been the person
6  to submit directly to the Illinois Secretary of State
7  the annual reports for Dock & Door?
8    A.  Not that I recall.
9    Q.  Somebody's taking care of that for the
10  company; correct?
11    A.  Correct.
12    Q.  And if you turn to page – well, and do you
13  think that that could be Lawrence Kamin?
14    A.  Yeah, that would be my –
15    Q.  Presumption?
16    A.  Yeah.
17    Q.  I hand you what's been marked as Exhibit 216
18  [sic]. And if you look at the first e-mail on the first
19  page in this matter, it's an e-mail – well, it's –
20  actually, look at the – oh, there is an e-mail at the
21  top of this page. It's from Thomas Bennington to you;
22  do you see that?
23    A.  I do.
24    Q.  It's dated July 31st, 2024; correct?
25    A.  Correct.

Page 34

1    Q.  And it says: "Anthony, please call me
2  regarding the attached." Do you see that?
3    A.  I do.
4    Q.  And if you look below, it's got two
5  attachments. One is Service Date Confirmation, and the
6  other is Mid-American Carpenters Regional Council
7  Pension Fund vs. Dock & Door Install, Inc., an Illinois
8  Corporation_SummonsComplaint.pdf. Do you see that?
9    A.  I do.
10    Q.  And is that an e-mail from Mr. Bennington
11  forwarding to you the complaint that was filed in this
12  lawsuit?
13    A.  It is.
14    Q.  Okay. And is that when you first became aware
15  of this lawsuit?
16    A.  Yes.
17    Q.  Okay. And was he the registered agent for
18  Dock & Door at that time?
19    A.  Yes.
20    Q.  So his firm was still providing registered
21  agent services for Dock & Door in 2024; correct?
22    A.  Yes.
23    Q.  Is it still?
24    A.  Yes.
25    Q.  And then on the next page, if you turn to the

Page 35

1  next page, there's an e-mail that's dated Friday, August
2  2nd, 2024, and it says: "Anthony: As we will not
3  represent you in this matter, you requested a referral
4  regarding this matter." Do you see that?
5    A.  Yes.
6    Q.  And then they make a referral for another
7  attorney; correct?
8    A.  Yes.
9    Q.  And I don't want to know what was discussed
10  between you and Mr. Bennington, but had you asked Mr.
11  Bennington to represent Dock & Door in this case?
12    A.  I did not.
13    Q.  Okay. You just asked him for a referral for
14  another attorney?
15    A.  Yes.
16    Q.  Okay. Was there a reason you didn't ask Mr.
17  Bennington to represent Dock & Door in this case?
18    A.  He was pretty up front about not willing to
19  represent me in this case.
20    Q.  Okay. And was that because he also represented
21  Midwest?
22    A.  That would be my assumption.
23    Q.  Okay. How did Dock & Door go about signing up
24  with the union?
25    A.  I had to – I don't remember who I contacted,

Page 36

1  but I remember filling out like a questionnaire. It was
2  pretty simple. We had to get a bond. And then – well,
3  I should say before I got the bond, I met with – I met
4  with the people somewhere in the Loop. I couldn't tell
5  you the building or anything like that, but I met with
6  them briefly and they signed off on it. And it wasn't
7  very – it wasn't too difficult. It took a little while
8  for them to get back to me and stuff like that, but...
9    Q.  Let me hand you what I've marked as
10  Exhibit 217.
11    MR. HUGHES: Is this 2018 now?
12    MR. McJESSY: I've got 14, 15 and 16 that I marked
13  this morning.
14    MR. HUGHES: 14, 15, 16, and 17. I've got 14, 15,
15  and 16. I don't know if you said a number for the
16  Gmail that you just used.
17    MR. McJESSY: That was 216. Well, I've got two 216s.
18  Uh-oh. All right. Let's change the Gmail, so the record
19  is clear, the exhibit that is the e-mail exchange
20  between Mr. Bennington and Mr. Brutti is now
21  Exhibit 217.
22    (Pause.)
23    MR. McJESSY: What do you have the Lawrence Kamin
24  letter as?
25    MR. HUGHES: I have that as 215.

Anthony Joseph Brutti
October 09, 2025

Pages 37..40

Page 37

1   MR. McJESSY: So 214 was –
2   MR. HUGHES: 214 was the Articles of Incorporation.
3   MR. McJESSY: Okay. And then 215 was the Lawrence
4   Kamin letter.
5   MR. HUGHES: Right. And 216 –
6   MR. McJESSY: 216 are the annual reports. Got it.
7   Well, this e-mail was 217.
8   MR. HUGHES: Right.
9   MR. McJESSY: And the current application is 218. I
10  need two minutes.
11          (A short break was had.)
12  MR. McJESSY: All right. So the record is clear,
13  the e-mail exchange between Mr. Brutti and Mr.
14  Bennington is actually going to be Exhibit 217, and the
15  questionnaire will be – I will hand you Exhibit 218.
16  BY MR. McJESSY:
17      Q.  So you have the questionnaire that's Exhibit
18  218 in front of you; correct?
19      A.  Correct.
20      Q.  And is this the questionnaire that you
21  referred to that you filled out when you went to meet
22  with somebody at the union?
23      A.  Yes.
24      Q.  All right. And how did you know where to go or
25  who to contact?

Page 38

1       A.  I don't remember. I was in contact with
2   somebody from the union.
3       Q.  Okay. Do you think Mr. Richert might have
4   told you who to reach out to?
5       A.  I'm sure they would have, yes.
6       Q.  Okay. And at the time you filled out the
7   questionnaire, you listed Dock & Door's office as 1249
8   East Burville Road, Unit 9; correct?
9       A.  Correct.
10      Q.  Okay. And that was also Midwest Dock
11  Solutions' office at the time; correct?
12      A.  I'm not sure. They might have had the other
13  unit. There was two units. I don't know if we shared
14  that unit or not.
15      Q.  You don't know if you shared which unit?
16      A.  I think we had 9 and maybe 10.
17      Q.  Okay.
18      A.  Or 9 and 8. I don't remember.
19      Q.  And what were Units 9 and 8?
20      A.  They were next to each other.
21      Q.  Okay. And I mean, were they office space?
22      A.  Oh, office and shop.
23      Q.  Both units had office and both units had shop?
24      A.  Correct.
25      Q.  Okay. And did Midwest Dock Solutions at some

Page 39

1   point operate out of both locations?
2       A.  Well, they would store some material in the
3   shop area. So that part of it, yeah, not in the office
4   space though.
5       Q.  Okay. I'm sorry, I just want to be clear. Does
6   Unit 9 have both office and shop and Unit 8 have both
7   office and shop?
8       A.  It does.
9       Q.  Okay. I see. And are the shops connected in
10  any way?
11      A.  Yes.
12      Q.  Okay. So it was like one shop area?
13      A.  No, the shop areas were on opposite sides of
14  each other.
15      Q.  Oh, okay. Could you walk from one to the
16  other?
17      A.  Yes, through the offices you could, yeah.
18      Q.  Oh, I see. So the offices were between the
19  two shops?
20      A.  Yeah, like shop, office, office, shop.
21      Q.  I see. But you were – Dock & Door was in
22  Unit 9?
23      A.  Probably correct, yeah.
24      Q.  Okay. And then you listed First Midwest Bank
25  as the bank for Dock & Door; correct?

Page 40

1       A.  Yes.
2       Q.  Were you aware that Midwest Dock Solutions
3   also used First Midwest Bank?
4       A.  Not until I started receiving checks from
5   them.
6       Q.  Okay. And you listed your Workmen's
7   Compensation Insurance Carrier as Esser Hayes Insurance
8   Company; correct?
9       A.  Yes.
10      Q.  And were you aware that Esser Hayes was the
11  insurance agency also for Midwest Dock Solutions?
12      A.  Yes.
13      Q.  And did Tony or Mike refer you to them?
14      A.  They did.
15      Q.  Okay. And then if you turn to the page that
16  has on the bottom 337 – let me take a step back. Did
17  you fill out this – is this handwriting on here your
18  handwriting?
19      A.  It is.
20      Q.  Okay. You filled out this questionnaire?
21      A.  Yes.
22      Q.  Okay. So then if you go to page 337, it says
23  "Type of Work: Commercial 100 percent;" correct?
24      A.  Correct.
25      Q.  And then it says: "Primary function of co.;"

Anthony Joseph Brutti
October 09, 2025
Pages 41..44

Page 41

1   do you see that?
2      A.   Yes.
3      Q.   And what does it say there?
4      A.   "Installation of loading dock equipment and
5   doors."
6      Q.   Okay. And was that similar work to what
7   Midwest Dock Solutions did?
8      A.   They did mainly service work.
9      Q.   Would they do installation of overhead doors?
10     A.   Probably rarely.
11     Q.   Would they do it though?
12     A.   I would say they would do it, yeah.
13     Q.   Okay. Would they do installation of loading
14  docks?
15     A.   Yes.
16     Q.   Okay. And if you turn to the next page, you'll
17  see that there are counties that are checked in
18  Illinois; do you see that?
19     A.   Yes.
20     Q.   So it's DuPage, Cook, Kane, Kankakee, and
21  Will; do you see that?
22     A.   I see that.
23     Q.   How did you come to select those boxes?
24     A.   I believe those are the – well, with the
25  exception of Lake, these are all the counties in the

Page 42

1   Chicagoland area.
2      Q.   Why did you pick the counties in the
3   Chicagoland area?
4      A.   I anticipated that that would be where most of
5   our work would be coming from.
6      Q.   Okay. And why did you anticipate that?
7      A.   Because we are based in the south suburbs of
8   Chicago, and I don't think we're going to go very, very
9   far to do work, but we have gone outside this area.
10     Q.   Well, you've gone into Wisconsin; correct?
11     A.   Yeah, yeah.
12     Q.   I mean, did you know that these were the areas
13  where Midwest Dock Solutions was bidding new
14  construction work?
15     A.   Yes.
16     Q.   Okay. And how did you come to know that?
17     A.   Well, no, I guess I did not know that, but I
18  think I just anticipated that that's where our work
19  would be. You know, I couldn't narrow down where we were
20  bidding at the time. I believe that we only had one or
21  two jobs that were, you know, really cooking at that
22  time.
23     Q.   Okay. So were there jobs that were being bid
24  on at that time?
25     A.   I believe there were.

Page 43

1      Q.   Okay. And you said there were one or two jobs
2   that were really cooking. What did you mean –
3      A.   Yeah, I'm pretty sure we were doing a job at a
4   college in – oh, Malcolm X College, I believe, is one
5   of my first jobs right off the bat and that, the one we
6   were talking about in the previous deposition in
7   Lockport. That was a while ago, so I can't remember
8   every job that we were...
9      Q.   You mentioned the job that we were talking
10  about in the prior deposition. Was that the –
11     A.   Heritage Crossing.
12     Q.   – Heritage Crossing?
13     A.   Yeah.
14     Q.   Okay. So that was also your recollection one
15  of the early jobs?
16     A.   Early, yeah.
17     Q.   Okay. And that was one of the jobs that was
18  being considered at the time that you were signing up
19  with the union?
20     A.   Yes.
21     Q.   Okay. And if you turn to the second to last
22  page, it's page 340, it shows – it shows "List Names of
23  Carpenter Employees;" do you see that?
24     A.   I do.
25     Q.   Okay. And who is listed there?

Page 44

1      A.   David Green.
2      Q.   And he worked for Midwest Dock Solutions at
3   that time; correct?
4      A.   I do not know that.
5      Q.   Well, how did you come to know Mr. Green?
6      A.   He was my first employee. And I was referred
7   to him by Mike and Tony.
8      Q.   Okay.
9      A.   I don't know, like I said, I don't know if he
10  worked at Midwest Dock, but they said "We need – you
11  need to have him to start off with for sure."
12     Q.   Okay. And did they tell you why?
13     A.   He's good.
14     Q.   Okay.
15     A.   He knows what he's doing.
16     Q.   Do you know how they knew that?
17     A.   I don't know.
18     Q.   Okay. So they told with you he's good and he
19  knows what he's doing, but they didn't tell you that he
20  was working for Midwest Dock Solutions at the time?
21     A.   They may have, but I don't recall.
22     Q.   Okay. So you might have known that; you just
23  don't recall?
24     A.   I don't recall.
25     Q.   Okay. I'm going to hand you what I've marked

Anthony Joseph Brutti
October 09, 2025
Pages 45..48

Page 45

1  as Exhibit 219. And this is several agreements. The
2  first one says Memorandum of Agreement; correct?
3  A. Correct.
4  Q. And that's the agreement that you signed with
5  the union; correct?
6  A. I don't remember it, but yes.
7  Q. Okay. Well, it's dated 18th day of September,
8  2014; correct?
9  A. Correct.
10 Q. Does that sound like about the time that you
11 signed up with the union?
12 A. It does.
13 Q. Okay. And is that your signature on the
14 bottom?
15 A. It is.
16 Q. And if you turn a couple of more pages in,
17 there is initials on that page. And it's also dated
18 September 18th. Are those your initials?
19 A. Yes.
20 Q. And if you turn to the next page, there is
21 another Memorandum of Agreement. This one is dated the
22 15th day of August 2019. Do you see that?
23 A. I do.
24 Q. And is that your signature?
25 A. It is.

Page 46

1  Q. Do you know how you came to sign this second
2  agreement here?
3  A. I believe we had to renew the bond.
4  Q. Okay.
5  A. Did we re-sign when we renewed the bond? I'm
6  not really sure.
7  Q. Okay. You don't recall?
8  A. No.
9  Q. All right. But you recognize that as a
10 document you signed?
11 A. Yes.
12 Q. And then if you turn three more pages to page
13 that has the number 329 on it, is that also your
14 signature?
15 A. Yes.
16 Q. All right. And then there is another document
17 attached to that, which is a Recognition Agreement; do
18 you see that?
19 A. What page are we on?
20 Q. 330.
21 A. Okay. Yes.
22 Q. And then on the next page of that document,
23 it's dated 15th of August 2019, that's your signature on
24 the bottom there?
25 A. Yes.

Page 47

1  Q. All right. And then there is another agreement
2  on the next page which is dated August 15th, 2019. It's
3  titled Southern Region of the Chicago Regional Council
4  of Carpenters Information Sheet; do you see that?
5  A. I see it.
6  Q. Is that your signature on that?
7  A. It is.
8  Q. And on the next page there is a page called
9  Chicago Regional Council of Carpenters Health, Welfare,
10 Pension, and Annuity Trust Funds Participation
11 Agreement, and it's also dated August 15th, 2019;
12 correct?
13 A. Correct.
14 Q. Is that your signature on that document?
15 A. It is.
16 Q. All right. And as far as you know, is your
17 agreement with the Carpenters Union still in force and
18 effect?
19 A. It is.
20 Q. You never terminated it?
21 A. No.
22 Q. Okay. I'm going to hand you what I've marked
23 as Exhibit 220. And Exhibit 220 appears to be Fringe
24 Benefit contribution reports that are sent to the
25 Chicago Regional Council of Carpenters Combined Fringe

Page 48

1  Benefit Funds for the period September 2014 to
2  July 2019; would you agree with that?
3  A. Yes.
4  Q. Okay. And the first one is the September 2014,
5  that's the month you signed with the union; correct?
6  A. Yeah, I believe it was.
7  Q. All right. And the person reported there is
8  David Green; correct?
9  A. Correct.
10 Q. Did you complete this report?
11 A. I did.
12 Q. Okay. And so would you presume he started
13 working for Dock & Door Install in September of 2014?
14 A. Yes.
15 Q. And do you know what work he was doing for
16 Dock & Door?
17 A. It was new construction. I couldn't tell you
18 the exact job.
19 Q. Well, aside from new construction, do you know
20 what kind of work he was doing?
21 A. He would do sectional doors, loading docks,
22 and coiling doors.
23 Q. And is that installation of overhead sectional
24 doors?
25 A. Correct.

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F - California Firm Registration #179

Anthony Joseph Brutti
October 09, 2025                                    Pages 49..52

Page 49

1   Q.   And installation of loading docks?
2   A.   Correct.
3   Q.   And installation of coiling doors?
4   A.   Correct.
5   Q.   And I note that he's the only one who appears
6   to be reported here for the first four months, for
7   September, October, November, December. Do you know, was
8   he working by himself?
9   A.   No, there was an ironworker.
10  Q.   Okay. And was Dock & Door signatory with the
11  ironworkers?
12  A.   We were.
13  Q.   Okay. And when did you sign up with the
14  ironworkers?
15  A.   At the same time.
16  Q.   And why did you sign up with the ironworkers?
17  A.   I believe – well, we had an ironworker that
18  we wanted to hire, and I believe we needed to be – I
19  believe his work would be the coiling doors also.
20  Q.   Okay. Do you know who that other person was?
21  A.   Yes, Brian Ward.
22  Q.   I hand you what's marked as Exhibit 221.  And
23  these are Dock & Door Install's Responses to Plaintiffs'
24  First Set of Interrogatories; correct?
25  A.   Correct.

Page 50

1   Q.   And you signed these; is that correct?
2   A.   I did.
3   Q.   And did you understand you were verifying that
4   they were true and accurate to the best of your
5   information and belief?
6   A.   Yes.
7   Q.   Okay. And if you look at the response to
8   Interrogatory No. 1, it asks Dock & Door to identify all
9   the persons who were paid by Dock & Door from
10  January 1st, 2016 to the present; correct?
11  A.   Correct.
12  Q.   And then it asks for anybody that was paid
13  during that period to state the approximate time periods
14  during which the person worked for Dock & Door; correct?
15  A.   Correct.
16  Q.   Okay. And if you turn to the next page, there
17  is a table that sort of answers that question.  And if
18  you look, if you go down to David Green; do you see
19  that?
20  A.   Yes.
21  Q.   He is somebody who was paid by Dock & Door
22  during that period; correct?
23  A.   Correct.
24  Q.   But it shows that he was employed from
25  1-1-2016 to the president, and I assume that's supposed

Page 51

1   to be "present," correct?
2   A.   Correct.
3   Q.   All right. But he actually wasn't employed
4   from 1-1-2016, he started back in September of 2014;
5   correct?
6   A.   Correct.
7   Q.   And if you go down to Brian Ward, it's
8   something similar to that where it says 1-1-2016, but
9   you're telling me he was also employed in September
10  of 2014; correct?
11  A.   Right, yes.
12  Q.   Okay. So the employment dates here aren't
13  quite accurate.  Some of these people started earlier
14  than 2016; correct?
15  A.   Yes.
16  Q.   Including you.  You're listed here as 1-1-2016
17  to the present.
18  A.   Right.
19  Q.   And you also would have been at least from the
20  date the company was formed to the present; correct?
21  A.   Yes.
22  Q.   And James Murray is listed here; do you see
23  him?
24  A.   Yes.
25  Q.   Is his name actually James Murray or is it

Page 52

1   Murray James?
2   A.   No, it's James Murray.
3   Q.   Okay.
4   A.   Yeah.
5   Q.   And was he employed in January of 2016 or is
6   he somebody who would have been employed earlier?
7   A.   I couldn't answer that.  Being that I put
8   1-14, I would say that was when he started.
9   Q.   Okay. How about Anthony Tattini? He's also
10  listed as 1-1-2016.
11  A.   Yeah.
12  Q.   May he have started earlier also just like
13  Brian Ward and the date is just not accurate?
14  A.   I believe so, yeah.
15  Q.   Okay. Do you know when Anthony Tattini would
16  have started?
17  A.   No, I couldn't tell you.  Early on, probably
18  2015 or so.
19  Q.   Okay. Now, when Dock & Door started out, all
20  of its revenue came from Midwest Dock Solutions;
21  correct?
22  A.   Correct.
23  Q.   Okay. And that was the plan when Dock & Door
24  started out; correct?
25  A.   Partially.  I can go after other work if I

Anthony Joseph Brutti
October 09, 2025                              Pages 53..56

Page 53

1   want to. But Midwest would be my 99 percent account,
2   sure.
3       Q. Okay. Well, at least through December 2024,
4   all of Dock & Door's revenue came from Midwest Dock
5   Solutions; correct?
6       A. Correct.
7       Q. Okay. And is that still true today?
8       A. Correct, yes.
9       Q. Okay. All right, so from the time Dock & Door
10  started on until today, all of its revenue comes from
11  Midwest Dock Solutions; correct?
12      A. It does.
13      Q. Now, did you hire Dave Green to work for Dock
14  & Door?
15      A. I did.
16      Q. Did you interview him?
17      A. I believe – I don't believe I did, no.
18      Q. Okay. You just put him on the payroll?
19      A. Yeah.
20      Q. Okay. And you did that solely at the
21  recommendation of Mr. Zarlengo and Mr. Richert?
22      A. Yes.
23      Q. If you take a look at Exhibit 220, and you
24  turn to page 346, MACRC 346, the number sort of got
25  obscured a little by the signature line, do you see it

Page 54

1   there?
2       A. I do.
3       Q. It looks like Dock & Door started reporting
4   Raymond Peters in January of 2015; do you see that?
5       A. I do.
6       Q. Who is Mr. Peters?
7       A. He was another carpenter that we picked up.
8       Q. And do you know where you picked him up from?
9       A. I'm not sure. I think we got him like calling
10  the hall.
11      Q. All right. And if you turn to page 352. Wait a
12  minute. If you turn to, I'm sorry, page 370, which is
13  June of 2016 Fringe Benefit Contribution Report, do you
14  see that it reports David Richert there?
15      A. Yes.
16      Q. Okay. And David Richert, is he also your
17  cousin?
18      A. He is.
19      Q. Okay. And he is Michael Richert's brother?
20      A. He is.
21      Q. All right. And how did Door & Door come to
22  hire him?
23      A. I don't recall.
24      Q. Okay. Were you aware that he had he worked for
25  Midwest Dock Solutions?

Page 55

1       A. No.
2       Q. And if you turn to October of 2017, let me
3   know when you're there. It's page 387.
4       A. I'm there.
5       Q. And do you see that Jose Aguirre Garcia is
6   reported there?
7       A. I do.
8       Q. Dock & Door came to employ him in October
9   of 2017; correct?
10      A. Correct.
11      Q. All right. And he was also working for Midwest
12  Dock Solutions at the time that Dock & Door hired him;
13  correct?
14      A. Correct.
15      Q. And what was he doing for Midwest Dock &
16  Door – or I'm sorry, what was he doing for Midwest Dock
17  Solutions?
18      A. He was doing some service work, and I believe
19  he was also doing some installation work.
20      Q. All right. And service work of what?
21      A. Overhead doors.
22      Q. Okay. And installation work, installation of
23  what?
24      A. Like also taking down and installing overhead
25  doors, yeah.

Page 56

1       Q. Okay. And what was the work that he did for
2   Dock & Door?
3       A. He would do new installations of overhead
4   doors.
5       Q. Okay. I hand you what I've marked as
6   Exhibit 222. And this appears to be on the bottom an
7   e-mail from you to Callie Stephens; correct,
8   S T E P H E N S?
9       A. Correct.
10      Q. All right. And it looks like an e-mail dated
11  October 17th, 2016; do you see that?
12      A. Correct.
13      Q. And it says: "Hi, Callie. I have a new
14  employee starting this pay period for me. Jose from
15  Midwest Dock is going to work for Dock & Door now. Can
16  you just transfer over all the paperwork or do you need
17  me to get all his info from him?" Do you see that?
18      A. Correct.
19      Q. And Callie responds to you, it looks like on
20  the same day, saying "What's his hourly rate?"
21          Do you see that?
22      A. Yes.
23      Q. All right. So is this e-mail on the bottom,
24  does that – well, strike that. Does this look like an
25  e-mail exchange between you and Callie Stephens?

Anthony Joseph Brutti
October 09, 2025                                             Pages 57..60

Page 57

1    A. It does.
2    Q. Okay. And does that look like the date you
3  would have hired Jose to work for Dock & Door?
4    A. Yes.
5    Q. Now, if you turn to Exhibit 220, page 399,
6  this shows that Nicolas Kelly was employed by Dock &
7  Door; correct?
8    A. Correct.
9    Q. All right. And he was also working for Midwest
10  Dock Solutions when he became employed by Dock & Door;
11  correct?
12   A. Yes.
13   MR. HUGHES: Objection, vague.
14  BY MR. McJESSY:
15   Q. And I'm going to show you what was previously
16  marked – Exhibit 211. And this is on the second page,
17  there is an e-mail at the bottom of the page from Sherri
18  Weber to Callie Stephens dated September 26, 2018; do
19  you see that?
20   A. Okay. The bottom half.
21   Q. Yeah.
22   A. Yeah.
23   Q. And can you read that e-mail and just tell me
24  when you've had a chance to do so.
25   MR. HUGHES: Objection, foundation, competency. I

Page 58

1  don't think this witness is a party to this e-mail.
2  BY MR. McJESSY:
3    Q. Have you had a chance to look at it?
4    A. No.
5    Q. Can you take a look at it and let me know when
6  you've had a chance to do so.
7    A. Okay.
8    Q. Now, you're not copied on this e-mail;
9  correct?
10   A. I am not.
11   Q. Do you know were you blind copied on this
12  e-mail?
13   A. No, I don't think so, no.
14   Q. Okay. You don't recall seeing this e-mail?
15   A. No.
16   Q. Okay. The e-mail from Sherri Weber to Callie
17  Stephens says: "Hi, Callie," and there is a paragraph
18  talking about James Kelly. And then she says: "Also,
19  Nico Kelly is on the union side now, so I won't be
20  paying him any longer through ADP. Should I change
21  anything in ADP so he doesn't show up on the payroll
22  list any longer?" Do you see that?
23   A. I see it.
24   Q. And Nico Kelly, is that Nicolas Kelly?
25   A. It is.

Page 59

1    Q. Does he go by Nico?
2    A. Yeah.
3    Q. Okay. And when she says "union side now," do
4  you know what she's referring to?
5    MR. HUGHES: Objection foundation, objection
6  competency.
7  BY THE WITNESS:
8    A. She would be referring to Dock & Door Install.
9  BY MR. McJESSY:
10   Q. Okay. And what kind of work was Nico Kelly
11  doing for Midwest Dock Solutions?
12   A. He was doing service work. I believe he was
13  more doing loading dock equipment, not as much with
14  doors.
15   Q. Is he a welder?
16   A. Yes, he is a very good welder.
17   Q. Okay. And loading dock – dock leveler work
18  requires welding; is that fair?
19   A. Fair.
20   Q. Okay. You have a number of people that work
21  for Dock & Door; correct?
22   A. Correct.
23   Q. Not all of them can do welding; correct?
24   A. No. Some are better than others, let's say
25  that.

Page 60

1    Q. Welding is its own unique skill set; is that
2  fair?
3    A. Yes.
4    Q. Okay. And to do loading dock dock leveler
5  installation you have to be able to weld; correct?
6    A. Yes.
7    Q. Okay. Can the guys that do the welding for
8  dock leveler installation, can they also do door
9  installation?
10   A. Yeah, yes. Yes, most everybody can.
11   Q. But the guys who do door, overhead door
12  installation, they can't necessarily do welding?
13   A. Not always, no.
14   Q. Okay. What kind of work did Mr. Kelly do,
15  well, Nico Kelly do for Dock & Door when you hired him?
16   A. He did mostly loading dock equipment,
17  levelers.
18   Q. Okay. That requires welding?
19   A. Correct.
20   Q. Okay. Dock & Door also employed Brandon
21  Bishop; correct?
22   A. Correct.
23   Q. And still does?
24   A. It does.
25   Q. Okay. He worked for Midwest Dock Solutions

Anthony Joseph Brutti
October 09, 2025

Pages 61..64

**Page 61**

1　also before going to work for Dock & Door; correct?
2　　A.　He might have for a very short time.
3　　Q.　And Zachary Corrigan, he worked for Midwest
4　Dock Solutions; correct?
5　　A.　He did.
6　　Q.　And he also worked for Dock & Door; correct?
7　　A.　He did.
8　　Q.　And Donald Cruikshank, he worked for Midwest
9　Dock Solutions; correct?
10　　A.　Correct.
11　　Q.　And does he still work for Dock & Door?
12　　A.　He does not.
13　　Q.　Okay. But he also did work for Dock & Door?
14　　A.　Yes, he did.
15　　Q.　Okay. Now, when Dock & Door started out, its
16　accountant was Gineris & Associates; correct?
17　　A.　Correct.
18　　Q.　Still Gineris & Associates?
19　　A.　It is.
20　　Q.　So it's always been -- strike that. Has
21　Gineris always been Dock & Door's accountant?
22　　A.　It has.
23　　Q.　Okay. And how did you come to hire Gineris to
24　act as Dock & Door's accountant?
25　　A.　I took the advice of Tony and Michael.

**Page 62**

1　　Q.　Okay. They recommended him?
2　　A.　Yeah. I did not know any accountants.
3　　Q.　And who is your primary contact at Gineris?
4　　A.　I'll usually talk to Callie Stephens.
5　　Q.　Okay. And do they also prepare your personal
6　taxes?
7　　A.　They do.
8　　Q.　And they prepare your business taxes?
9　　A.　They do.
10　　Q.　What other work do they handle for Dock &
11　Door?
12　　A.　The payroll, and I believe they just maintain
13　the general ledger, if you want to call it that.
14　　Q.　When you say they handle the payroll -- and
15　we'll get to this, but I take it you do the hourly entry
16　for the employees into the payroll system; correct?
17　　A.　Yeah.
18　　Q.　Okay. We'll get to that later. But when you
19　say they do the payroll, what specifically do you mean
20　by that?
21　　A.　Well, I wouldn't know like how to like figure
22　the taxes, the employer taxes and the employee taxes.
23　So I believe they do all that work and they submit it on
24　my behalf to ADP or whatever.
25　　Q.　Okay. Dock & Door does not employ any sales

**Page 63**

1　staff; correct?
2　　A.　Correct.
3　　Q.　And who are the salespersons that sell the
4　contracts that Dock & Door ultimately works on?
5　　A.　Ira Sugar.
6　　Q.　Okay. And anyone else?
7　　A.　Currently, no.
8　　Q.　How about in the past?
9　　A.　Tony Zarlengo.
10　　Q.　Anybody else in the past?
11　　A.　No, just those two.
12　　Q.　Were you here for --
13　　A.　Oh, no, Joe Sheridan, I'm sorry, Joe Sheridan.
14　　Q.　Who?
15　　A.　Joseph Sheridan, going back further.
16　　Q.　S H E R I D A N?
17　　A.　I believe so.
18　　Q.　All right. And he's no longer there?
19　　A.　He is not.
20　　Q.　Okay. So Ira Sugar, Tony Zarlengo, and Joseph
21　Sheridan, they're the three, they're the only three that
22　you're aware of as sales staff that have sold projects
23　that Dock & Door has worked on; correct?
24　　A.　I believe so, yeah.
25　　Q.　Has Dock & Door ever paid them any

**Page 64**

1　compensation for their work?
2　　A.　No.
3　　Q.　And Dock & Door has never employed any sales
4　staff; correct?
5　　A.　Correct.
6　　Q.　Has Dock & Door ever employed any office staff
7　like a receptionist, secretary, bookkeeper, anyone like
8　that?
9　　A.　No.
10　　Q.　Do you work on job sites installing overhead
11　doors and installing dock levelers?
12　　A.　I do not.
13　　Q.　Okay. So is it fair to say then that other
14　than yourself, since you don't do that work, Dock & Door
15　has only ever employed workers who actually perform
16　overhead door and dock leveler installation work?
17　　A.　Yes.
18　　Q.　That's the universe of the employees that it's
19　had since its existence?
20　　A.　That's true.
21　　Q.　Okay. Are you capable of doing overhead door
22　installation work?
23　　A.　I would say no. I can do small things, but I
24　would not install anything, no.
25　　Q.　Okay. If you showed up at a job site where an

Anthony Joseph Brutti
October 09, 2025                                          Pages 65..68

1   overhead door had to be installed –
2       A.   No.
3       Q.   – and you had an assistant, but you were in
4   charge, could you install it?
5       A.   I probably could, but I wouldn't try.
6       Q.   You may not be able to do it successfully?
7       A.   Yeah, it might be sketchy.
8       Q.   How about dock leveler installation? Are you
9   capable of installing a dock leveler?
10      A.   I have not. I think I could do that, though,
11  with no problem.
12      Q.   Okay. Why do you think that?
13      A.   Well, it's simpler.
14      Q.   Can you weld?
15      A.   I can weld fair enough, yes.
16      Q.   Okay. Where did you learn to weld?
17      A.   Working on race cars.
18      Q.   All right. What is service work?
19      A.   Service work they generally refer to as just
20  repair work. It's kind of all-encompassing on fixing and
21  swapping out panels and hinges and rollers and springs
22  and any other parts that might be needed.
23      Q.   Okay.  Is that work that Dock & Door does?
24      A.   Dock & Door will on a rare occasion do some
25  service work when it's he really slow.

1       Q.   Okay. I'm going to hand you what I have marked
2   as Exhibit 223. And this is just sort of a sampling of
3   invoice. You do know what these are; correct?
4       A.   Correct.
5       Q.   Do you prepare these?
6       A.   I do.
7       Q.   Okay. What are these?
8       A.   These are my bills and invoices to Midwest
9   Dock Solutions.
10      Q.   Okay. And these are prepared per worker per
11  day; correct?
12      A.   It is, yes.
13      Q.   Now, if you look at these, these are just
14  again, and I'll represent to you that there were
15  hundreds, I didn't count, but multiple invoices like
16  this that were produced that say service work. Do you
17  see that?
18      A.   I do.
19      Q.   And where it says Reference, it says Service
20  Work, and then where it has the employee description it
21  says Service Work; correct?
22      A.   Correct.
23      Q.   Okay. Now, are you aware that usually most
24  often these invoices will have where it says Reference,
25  they'll have a job location?

1       A.   Correct.
2       Q.   And maybe a contractor, like a general
3   contractor that's running that job like Pepper or
4   Principal or one of those big general contractors;
5   correct?
6       A.   Yes.
7       Q.   And then usually, the same information is on
8   the line where it says like Collin Zarlengo and the
9   date, it will say like something to the effect of
10  overhead door installation, Pepper Construction, and
11  some project name; correct?
12      A.   Correct.
13      Q.   Okay. These don't, though, they just say
14  Service Work and they have no reference for where the
15  work was done or who it was done for.  What does that
16  indicate to you?
17      A.   Some could be service work.  And others I
18  would just label Service Work as it was like a one-day
19  small job –
20      Q.   Okay.
21      A.   – and it wasn't something that was going to
22  be an ongoing...
23      Q.   Okay. But Service Work would mean to you what
24  you just described to me when I asked you what Service
25  Work meant?

1       A.   Yes.
2       Q.   Okay. Now, Dock & Door also performs new
3   installations; correct?
4       A.   Correct.
5       Q.   And installations in new structures; correct?
6       A.   Correct.
7       Q.   Describe for me the work that you would say
8   Dock & Door principally does.
9       A.   Principally, it definitely does new
10  construction where I believe that in the contract it
11  says union labor is required.
12      Q.   Okay.  And do you get copies of those
13  contracts or is it –
14      A.   I do not.
15      Q.   Okay. So those are contracts that Midwest Dock
16  Solutions has with its customers?
17      A.   Yes.
18      Q.   Would you refer to them as clients?
19  Customers?  How would you refer to them?
20      A.   Yeah, clients, yeah.
21      Q.   Okay. So those are contracts that Midwest Dock
22  Solutions has with its clients?
23      A.   Yes.
24      Q.   Okay.
25      MR. McJESSY: And so we've been going about an hour

Anthony Joseph Brutti
October 09, 2025                                            Pages 69..72

Page 69

1    and a half. I'm going to say this is probably a good
2    place to stop and take a five-minute break and then
3    we'll pick back up. Off the record.
4              (A short break was had.)
5         MR. McJESSY: Back on the record.
6    BY MR. McJESSY:
7         Q. Sir, I've handed you what's previously marked
8    in this case as Exhibit 65. And it's a contract or
9    subcontract, rather, between Midwest Dock Solutions and
10   Meridian Design Build; do you see that?
11        A. I do.
12        Q. All right. And if you turn in this document to
13   the page, it's page 3 of Exhibit B, which it says up
14   here (indicating).
15        A. I'm there.
16        Q. Okay. Page 3 of Exhibit B. It's got a
17   highlighted paragraph 12; do you see that? And
18   paragraph 12 says: "All dock equipment and overhead
19   doors shall be installed by union labor." Do you see
20   that?
21        MR. HUGHES: I'm going to object to the use of this
22   exhibit with this witness. He's not a party to this,
23   and no foundation, lack of competence.
24   BY MR. McJESSY:
25        Q. So if this is a contract between Midwest Dock

Page 70

1    and Meridian Design Build requiring union labor, would
2    Dock & Door provide the labor for that project?
3         MR. HUGHES: Objection, foundation.
4    BY THE WITNESS:
5         A. They would.
6    BY MR. McJESSY:
7         Q. Okay. And do you see there's an address on
8    here that's the 303 Jack Court Facility Upgrades? It's
9    303 Jack Court, Bartlett, Illinois?
10        MR. HUGHES: Objection, it misstates the document.
11   BY THE WITNESS:
12        A. 1303?
13   BY MR. McJESSY:
14        Q. Oh, I thought that's what it says. On the top
15   of the document, on Exhibit 65 it says – well, I'll
16   just read it, and if I get it wrong, Mr. Hughes can
17   correct me.
18            But it says: "The contractor has heretofore
19   entered into a construction contract dated 2024-02-22
20   ("construction contract") with 26 Denali, LLC ("owner")
21   to perform certain labor and furnish certain material at
22   1303 Jack Court Facility Upgrades, 1303 Jack Court,
23   Bartlett, Illinois 60103 ("project"). Do you see that?
24        A. I do.
25        Q. Okay. Are you familiar with that location and

Page 71

1    that work at that location?
2         A. I don't remember.
3         Q. Okay. But if Midwest Dock contracted to
4    perform the work in this contract with Meridian Design
5    Build and it required union labor, Dock & Door would
6    have been the company to provide that union labor;
7    correct?
8         A. Correct.
9         Q. Okay. To your knowledge, does Midwest Dock
10   Solutions use any other company to provide union labor
11   on its job sites?
12        A. Not that I'm aware.
13        Q. Okay. And so then if you turn to – I showed
14   you the page that had that paragraph 12 referring to
15   "all dock equipment and overhead doors shall be
16   installed by union labor," do you remember that page?
17        A. I do.
18        Q. If you could turn one page back or forward
19   from that to page 2 of that exhibit.
20        A. Back.
21        Q. Yeah, I'm not quite sure how to describe it,
22   but where it says: "Work shall specifically include, but
23   is not limited to the following," do you see that?
24        A. Yes.
25        Q. And it says overhead doors; do you see that?

Page 72

1         A. Oh, yeah, yeah.
2         Q. And it says in paragraph 1: "Subcontractor
3    shall remove 1 (one) existing 9 foot by 10 foot dock
4    door and 1 (one) 12 foot by 14 foot Drive-in door,
5    including associated tracks, springs, and operator," do
6    you see that?
7         A. I do.
8         Q. Okay. So that's a take-down two existing
9    doors; correct?
10        A. Yes.
11        Q. And the operators and the tracks and the
12   springs; correct?
13        A. Correct.
14        Q. All right. And then it says in paragraph 2:
15   "Subcontractor shall furnish and install 1 21 foot by 16
16   foot overhead door and drive-in ramp." Do you see that?
17        A. I do.
18        Q. "Door to be Clopay Model 3720," and then it
19   goes on from there and talks about a 3 inch vertical
20   track, weather seal and operator; correct?
21        A. Correct.
22        Q. Okay. And then paragraph 3 says:
23   "Subcontractor shall furnish and install Z-guards at
24   nine dock positions." Do you see that?
25        A. I do.

Anthony Joseph Brutti
October 09, 2025

Pages 73..76

---

Page 73

1    Q.  And it says in paragraph 4:  "Subcontractor
2  shall remove dock leveler and dock seal from existing
3  dock position and reinstall at new dock position."  Do
4  you see that?
5    A.  I do.
6    Q.  All right. And is that the kind of work that
7  Dock & Door employees would perform?
8    A.  Not the takedown part, not very often, but
9  they would, the install part all the time.
10    Q.  Okay. I hand you what's marked Exhibit 224,
11  and this appears to be an e-mail exchange between you
12  and Tom Downs; do you see that?
13    A.  I do.
14    Q.  And does this look like an e-mail exchange
15  that you had with Mr. Downs?
16    A.  Yes.
17    Q.  And if you look at the, there is a paragraph
18  there, it appears to be an e-mail from you dated
19  July 1st, 2025.  Do you see that? It's on the first
20  page.  It's like the first e-mail down.
21    A.  I do.
22    Q.  And that e-mail says:  "Hey, Tom, we install
23  commercial overhead doors and loading dock equipment.
24  The door work consists of sectional garage/dock doors,
25  rolling steel doors, and high-speed doors.  The loading

---

Page 74

1  dock equipment consists of dock levelers, dock seals,
2  and truck restraints.  We mostly do work at precast
3  concrete storage warehouses, but occasionally do work at
4  manufacturing facilities and small businesses."
5       Is that what you told him?
6    A.  Yes.
7    Q.  Okay. And it says: "We mostly do work at
8  precast concrete storage warehouses."  That's the new
9  construction work that you described; correct?
10    A.  Correct.
11    Q.  Those are the large logistics buildings where
12  they're going up and you guys go in –
13    A.  Yeah.
14    Q.  – your guys go in and install the overhead
15  doors and the dock levelers where there's none prior;
16  correct?
17    A.  Yes.
18    Q.  Okay. And then you also say you do work at
19  manufacturing facilities and small businesses; correct?
20    A.  Correct.
21    Q.  Okay. And those are existing businesses;
22  correct?
23    A.  Not always.
24    Q.  They're different from the new construction;
25  right?

---

Page 75

1    A.  Oftentimes it will be a new manufacturing
2  facility or a new small like a trucking outfit or –
3  generally usually new.
4    Q.  You say oftentimes.  What about other times?
5    A.  There will be if there is a – if there is a
6  general contractor that is heading up the small business
7  job and it requires union labor, we will do those.
8    Q.  Okay. And those are existing businesses;
9  correct?
10    A.  Yeah, they could be, yes.
11    MR. McJESSY: Oh, I'll get that out of your way.
12    THE WITNESS:  Oh, the book?
13    MR. McJESSY: The book, yeah.
14  BY MR. McJESSY:
15    Q.  Dock & Door uses Midwest Dock Solutions trucks
16  and equipment for its work; correct?
17    A.  It does.
18    Q.  Okay.  The employees use trucks owned by
19  Midwest Dock for its works?
20    A.  It does.
21    Q.  And Dock & Door doesn't have any trucks of its
22  own; correct?
23    A.  Correct.
24    Q.  It never has; correct?
25    A.  No.

---

Page 76

1    Q.  So since Dock & Door has been operating, it's
2  always used Midwest Dock's trucks; correct?
3    A.  It has.
4    Q.  Okay. And I previously showed you Exhibit 221.
5  Do you still have that in front of you?
6    A.  I do.
7    Q.  All right.  And if you turn to Interrogatory
8  No. 9, it references a number of vehicles that are used
9  by Dock & Door.  Do you see that?
10    A.  I do.
11    Q.  And there is a 2015 Chevy Silverado that's the
12  first item on that.  Was that your personal vehicle?
13    A.  Yes.
14    Q.  Okay. And you sold that to Midwest Dock
15  Solutions; correct?
16    A.  I did.
17    Q.  Okay. And that's the one you sold for like
18  70-some thousand dollars?
19    A.  Correct.
20    Q.  Okay. What kind of condition was that in when
21  you sold it?
22    A.  Fair, fair to poor, I suppose. It was good
23  enough for me.
24    Q.  All right.
25    A.  I mean, I could maintain it.

---

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

Anthony Joseph Brutti
October 09, 2025        Pages 77..80

Page 77

1   Q. Do you know how many miles were on it?
2   A. Oh, I believe 180,000-ish.
3   Q. Okay. And you heard me ask, you were here for
4 Mr. Zarlengo's testimony when I asked him why he paid
5 71,000, or whatever the number was, for a truck that was
6 a 2015 in the condition it was in. I don't think I knew
7 the mileage then, but 180,000 miles apparently. Do you
8 know why they paid you that amount of money for that
9 vehicle?
10   A. I do not know why.
11   Q. Do you know how much the vehicle cost new?
12   A. 2015?
13   Q. When you bought it. Did you buy it new?
14   A. No, no, I bought it used.
15   Q. Oh, you bought it used.
16   A. Yeah. How much did I pay for it?
17   Q. Yeah.
18   A. 29,000.
19   Q. Okay. All right. And to your knowledge, is
20 the Chevy Silverado now owned by Midwest Dock Solutions?
21   A. Yes.
22   Q. Okay. And how about the Honda Civic that's
23 there?
24   A. That's my personal vehicle.
25   Q. Okay. And the 2024 Chevy Silverado that's

Page 78

1 listed there?
2   A. That is also my personal vehicle.
3   Q. Okay. You use your personal vehicle for work
4 purposes; correct?
5   A. Correct.
6   Q. Okay. You visit job sites, deliver stuff to
7 job sites; is that correct?
8   A. Correct.
9   Q. Okay. How about the Honda Civic? Do you use
10 that for work?
11   A. I do sometimes.
12   Q. To travel to job sites, that kind of thing?
13   A. Yeah.
14   Q. Okay. Do Dock & Door employees use the Honda
15 Civic or either of the Chevy Silverados?
16   A. No.
17   Q. Okay. And then the rest of the items there are
18 Ford F450s or 350s; correct?
19   A. Correct.
20   Q. And those Midwest Dock Solutions vehicles;
21 correct?
22   A. Correct.
23   Q. Okay. And Dock & Door employees do use those
24 vehicles; correct?
25   A. They do.

Page 79

1   Q. Dock & Door employees use welders in their
2 work?
3   A. They do.
4   Q. And are those also owned by Midwest Dock
5 Solutions?
6   A. Yes.
7   Q. Okay. And that's always been the case;
8 correct?
9   A. Correct.
10   Q. I'm going to hand you Exhibit 225. And this
11 appears to be a text conversation between you and Dave
12 Green, who produced this e-mail. Do you see where it
13 says Tony B at the top?
14   A. Oh, okay.
15   MR. HUGHES: Objection, foundation.
16   THE WITNESS: No, I don't know this to be from Dave
17 Green.
18   BY MR. McJESSY:
19   Q. Okay. Do you recognize this text string?
20   A. I don't remember this.
21   Q. You don't remember this?
22   A. No.
23   Q. All right. Well, Dave Green produced these
24 e-mails to us in response to a subpoena. And do they
25 look like the type of e-mail exchange you would have

Page 80

1 with David Green concerning the use of equipment?
2   MR. HUGHES: Objection.
3   BY THE WITNESS:
4   A. Yeah, I don't even know – I don't know what's
5 me and what's him.
6   BY MR. McJESSY:
7   Q. Well, the right side would be the phone
8 holder, so that would be Mr. Green. The left side would
9 be you.
10   A. Okay.
11   Q. If you're Tony B.
12   MR. HUGHES: Objection, foundation, to even the
13 characterization of who's who here.
14   MR. McJESSY: Does – well, it's a text message.
15   MR. HUGHES: Do we know what service this is on? I
16 mean, I don't even know how texts appear, but you can, I
17 guess –
18   MR. McJESSY: All right. Well, I'll let you make
19 your objection, then I'll move on.
20   MR. HUGHES: Object as to foundation and to the
21 testimony of Mr. McJessy as to what this exhibit appears
22 to be.
23   BY MR. McJESSY:
24   Q. Does Midwest Dock Solutions have a forklift?
25   A. They do.

Page 81

1    Q. And is that a forklift that's used by Dock &
2  Door on its jobs?
3    A. Yes, occasionally, yes.
4    Q. Okay. And it's transported to job sites on a
5  trailer?
6    A. It is.
7    Q. And the trailer is also a Midwest Dock
8  Solutions trailer?
9    A. It is.
10   Q. And is that sometimes used by employees
11 of Dock & Door to transport the forklift to Dock & Door
12 job sites?
13   A. It is.
14   Q. I'm going to hand you what I've marked as
15 Exhibit 226. And do you recognize this as a text
16 exchange between you and Mr. Green?
17   MR. HUGHES: Objection, foundation.
18 BY THE WITNESS:
19   A. Yeah, I don't remember it.
20 BY MR. McJESSY:
21   Q. All right. Does – you don't remember it?
22   A. No, I don't remember the text message, no.
23   Q. Okay. You don't remember sending a text
24 message to Mr. Green that says "Can I use the forklift
25 for a little while at Bensenville tomorrow morning?

Page 82

1  Clopay doors coming"?
2    A. I don't remember.
3    Q. Okay. Do you know what Bensenville would be
4  referring to?
5    A. I would think a job site.
6    Q. Okay. And then it looks to be the end of an
7  image that is being forwarded above that; do you see
8  that?
9    A. Yes.
10   Q. And do you typically receive timesheets from
11 Dave Green and other employees by text message?
12   A. Correct.
13   Q. That's how they typically send them to you;
14 correct?
15   A. Yeah.
16   Q. I hand you what I have marked as Exhibit 227.
17 And there is a text message on here that says Tony B; do
18 you see that?
19   A. Yes.
20   Q. And it says: "Monday, Dave, Branden and Nico
21 at Expeditors. Nico to pick up trailer to bring lift
22 back. Finish drive in door, angles and track guards." Do
23 you see that?
24   A. I do.
25   MR. HUGHES: Objection again, foundation.

Page 83

1  BY MR. McJESSY:
2    Q.  Does that text message look like one that you
3  sent?
4    A. I don't remember.
5    Q. You don't remember that? Do you know what
6  Expeditors refers to?
7    A. It was a job site.
8    Q. It was?
9    A. It was, yes.
10   Q. So you're familiar with that job site?
11   A. Yeah.
12   Q. All right. Where was that job site?
13   A. I don't remember.
14   Q. Okay. Do you know what the work was that was
15 being done there?
16   A. I don't remember.
17   Q. I'm going to hand you what I have marked as
18 Exhibit 228 and ask you if you recognize this text
19 message exchange?
20   A. I don't remember.
21   Q. Okay. Do you know what cable crimpers are?
22   A. Yes.
23   Q. What are cable crimpers?
24   A. So when you build a door cable, you wind it on
25 the drum. And then you need to have a, like a weight on

Page 84

1  that drum that goes over the cable so you don't rip the
2  cable out of the drum. And you need to crimp that onto
3  the cable.
4    Q. Okay. And do you know what tire socks are?
5    A. Yeah.
6    Q. What are tire socks?
7    A. Yeah, tire socks are oftentimes on a newly
8  finished floor, the site superintendent will not want
9  any kind of black marks on his brand new floor. So we
10 put socks on our equipment so we don't mark up the
11 floor.
12   Q. Okay. And those socks go on the forklift?
13   A. Forklift, scissor lift, boom lift, yeah, any
14 kind of driving equipment.
15   Q. Okay. Are there tire socks for the forklifts
16 that you use?
17   A. Yes.
18   Q. Do you know what the break room that's
19 referred to here?
20   A. Yeah, there's a little common area, I suppose,
21 at the office. You could eat lunch on it, but it's
22 cluttered with various things.
23   Q. All right.
24   A. It's an easy spot for the guys to find stuff
25 so it's not scattered over the shop somewhere.

Anthony Joseph Brutti
October 09, 2025                                        Pages 85..88

Page 85

1    Q.  Got it.  I hand you what is marked as
2    Exhibit 229. Do you recognize this text message?
3    A.  I do not.
4    Q.  Does Midwest Dock Solutions have a bucket
5    truck?
6    A.  They do.
7    Q.  And is that bucket truck sometimes used by
8    Dock & Door for its work?
9    A.  Not that I remember.
10   Q.  Do you know has Dock & Door done work for
11   Clayco?
12   A.  Yes.
13   Q.  Do you know whether the bucket truck was used
14   on any Clayco job sites?
15   MR. HUGHES:  Objection, asked and answered.
16   BY THE WITNESS:
17   A.  No, I don't.
18   Q.  I hand you what's been marked as Exhibit 230
19   and you if you recognize this text exchange?
20   A.  I don't.
21   Q.  Okay.  You see there is a partial picture of a
22   trailer there?
23   A.  Yeah.
24   Q.  Does that look like the trailer that Midwest
25   Dock Solutions has?

Page 86

1    A.  It does.
2    Q.  Okay. And you will see that it looks like
3    there's a scissor lift on it too; do you see that?
4    A.  I do.
5    Q.  Does that look like the scissor lift that
6    Midwest Dock Solutions has?
7    A.  I couldn't tell you.
8    Q.  Okay. Because it's too small a portion of the
9    scissor lift?
10   A.  Yeah, I couldn't
11   Q.  Okay. Is the scissor lift sometimes used by
12   Dock & Door for its work?
13   MR. HUGHES:  Objection, foundation.
14   BY THE WITNESS:
15   A.  Rarely, but yeah.
16   BY MR. McJESSY:
17   Q.  Okay. And is it sometimes transported on the
18   trailer to Dock & Door job sites?
19   A.  It is.
20   Q.  I'm handing you what's been marked as
21   Exhibit 231, ask you if you recognize this text
22   exchange?
23   A.  I don't.
24   Q.  Okay. And there's a text exchange on the
25   second page, do you see that, second and third page?

Page 87

1    A.  Yes.
2    Q.  Do you recognize those text exchanges?
3    A.  I don't.
4    Q.  Would you sometimes leave items in the break
5    room at the office for employees to pick up if they
6    asked for them?
7    A.  Yes.
8    Q.  And that's the break room at the office at 27
9    East 36th Place in Steger?
10   A.  It is.
11   Q.  I hand you what I have marked as Exhibit 232.
12   And do you recognize this text exchange?
13   A.  I do not.
14   Q.  Does Midwest Dock Solutions, do you know, keep
15   spray paint in its shop?
16   A.  Usually.
17   Q.  Does it keep propane in the shop as well?
18   A.  It does.
19   Q.  Okay. And there's places for that to be kept?
20   A.  Yes.
21   Q.  And is that – are those items that Dock &
22   Door might put use on the projects that it works on?
23   A.  Not so often black spray paint, but a propane
24   tank on rare occasion on the forklift.
25   Q.  Forklift, that's what I was going to ask.

Page 88

1    Okay. Handing you what I have marked as Exhibit 233, ask
2    you if you recognize this text exchange?
3    A.  I do not.
4    Q.  Do employees typically leave their timesheets
5    for you on the break room table?
6    A.  Not typically, but they will.
7    Q.  Okay. That's one of the places they'll leave
8    them for you?
9    A.  Yeah.
10   Q.  Where would they typically leave them?
11   A.  Usually a text.
12   Q.  Okay.
13   A.  But sometimes if they're at the shop, they
14   just send the hard copy or drop it off.
15   Q.  Do you know what a retractable lanyard Al is?
16   A.  I know what a retractable lanyard is. I don't
17   know what – the AI might be – oh, that's at the shop.
18   That's a misprint.
19   Q.  Oh, I see.
20   A.  Yeah.
21   Q.  Oh, "Do we have a retractable lanyard at
22   shop?"
23   A.  Yeah.
24   Q.  I see. What's a retractable lanyard?
25   A.  It's mandated on some job sites that you need

Anthony Joseph Brutti
October 09, 2025                                                    Pages 89..92

Page 89

1   to – you wear a harness on your body and then you clip
2   into the harness with a lanyard, and then you also
3   attach the lanyard to the lift that you're in.  And if
4   you fall out of the lift, you'll fall for three feet and
5   then the lanyard will kind of have a little bit of a
6   shock absorption so you don't choke yourself basically.
7       Q.  So it's to protect against fall hazards?
8       A.  Yeah, yeah.
9       Q.  Okay.  And it's a safety device?
10      A.  It is, yeah.
11      Q.  Would the lift that you would be in be like a
12  scissor lift?
13      A.  Yeah, a scissor lift or a boom lift would
14  generally, at some of the stricter job sites, they would
15  demand that.
16      Q.  Showing you what we've marked as Exhibit 234,
17  do you recognize that text exchange?
18      A.  I do not.
19      Q.  Okay. Do you know did Dock & Door have a
20  project that it worked on for Midwest Dock Solutions at
21  ABT?
22      A.  Yes.
23      Q.  Do you know what that project involved?
24      A.  We did several stages of work at ABT.  We did
25  additions.  They built an entire wing, and we did the

Page 90

1   coiling doors, maybe the dock equipment.  And then they
2   built another addition after that.  We did that also.
3   And then they built an entire like truck maintenance
4   facility where they could service all their own trucks.
5   And we did everything on that building also.
6       Q.  Okay. And were dock seals part of that work?
7       A.  If we did the dock equipment, we most likely
8   did the dock seals, but I can't remember this job
9   particularly.
10      Q.  Okay. Do you know what angle brackets for dock
11  seals are?
12      A.  Oh, yes.
13      Q.  What are they?
14      A.  That is a bracket that lags into the wood of
15  the dock seal and then it's anchored into the wall of
16  the building –
17      Q.  Okay.
18      A.  – to attach the seal to the wall.
19      Q.  All right. If dock seals are part of the job
20  that you're doing and you need angle brackets, is that
21  something that might be kept at the warehouse?
22      A.  No.  Well, no, they usually come with the
23  seals.
24      Q.  Okay.
25      A.  There may have been a shortage or something on

Page 91

1   the truck, yeah, on the delivery.
2       Q.  So is that something that would exist at the
3   warehouse?
4       A.  Yeah.
5       Q.  Okay.
6       A.  Yes.
7       Q.  So if you needed them on a job site, you could
8   get them from the warehouse?
9       A.  Yeah, if they're there, we can get them.
10      Q.  Is that something that Dock & Door might do if
11  it needs them on the job site is pick them up at the
12  warehouse?
13      A.  Yeah.
14      Q.  Let me hand you what I've marked as
15  Exhibit 235.  Do you see that?
16      A.  Yeah.
17      Q.  Do you recognize that text exchange?
18      A.  I do not.
19      Q.  Okay. Well, this one says Ira at the top;
20  correct?
21      A.  It does.
22      Q.  Do you see those scissor lifts that are in the
23  picture?
24      A.  Yes.
25      MR. HUGHES:  Objection, foundation.

Page 92

1       BY MR. McJESSY:
2       Q.  Do those scissor lifts look like the ones that
3   Midwest Dock Solutions has or had?
4       A.  They do not look familiar to me.
5       Q.  Okay.  Do you know the make of the scissor
6   lifts that Midwest Dock Solutions owns?
7       A.  We actually have both of these brands, Genie,
8   and I forget the orange manufacturer.
9       Q.  Skyjack?
10      A.  It could be, yeah.
11      Q.  I hand you what I've marked as Exhibit 236.
12  And this is I'll represent to you an e-mail produced by
13  David Green, and again, it shows at the top Ira; do you
14  see that?
15      A.  Yes.
16      Q.  And the text says –
17      MR. HUGHES:  Excuse me, objection.  There is no
18  indication that this witness is on this at all.  You're
19  reading it into the record as basically your own
20  testimony, and so object to foundation and competency.
21      BY MR. McJESSY:
22      Q.  And the text message says at the top "Tony
23  bringing you lift." And there is a response "Ok." And it
24  says:  "Do you know if you guys were using the Genie
25  lift out in Lowell?" And the answer is "Yes, it's there.

Anthony Joseph Brutti
October 09, 2025        Pages 93..96

Page 93

1   We are done with it."  Do you see that?
2     A.  Yes.
3     Q.  Genie is one of the -- is the make of one of
4  the lifts, at least, that Midwest Dock Solutions owns;
5  correct?
6     A.  Yes.
7     Q.  Okay. And would you as part of your work for
8  Dock & Door deliver a forklift or a scissor lift to a
9  job site?
10     A.  I would.
11     Q.  Okay. I hand you what I have marked as
12  Exhibit 237.  And again, you're not on this text message
13  exchange, but there is a text message exchange that's
14  the first two pages, and then there's four pages
15  attached to that which are invoices from Dock & Door to
16  Midwest Dock Solutions.  Do you see those?
17     A.  Yes.
18   MR. HUGHES:  Kevin, were those invoices part or
19  attached to the text at all or is this something you put
20  together?
21   MR. McJESSY: No, I put together.
22   MR. HUGHES:  I just want to make sure exactly what
23  we're looking at here.
24   BY MR. McJESSY:
25     Q.  So if you look at the text messages, on the

Page 94

1  first page it has a date Thursday, March 26, 2020; do
2  you see that?
3     A.  I do.
4   MR. HUGHES: Objection, foundation.  It's improper
5  to use this document with this witness.  He is a
6  purported participant here and didn't use it. Lack of
7  foundation, lack of competency.
8     Q.  And these invoices under Reference it says Car
9  X; do you see that?
10     A.  Yeah.
11     Q.  And then including in the invoice themselves
12  it has the worker's name, the date, and then it says Car
13  X Des Plaines. Do you see that?
14     A.  Yes.
15     Q.  And the date that's there, the 3-27-20, that's
16  the date that the work was performed; correct?
17     A.  Correct.
18     Q.  Okay. And if you look at the next page or the
19  second page of this exhibit, there is a full text
20  message there to Dave and Jose.  Do you see that?
21     A.  Yes.
22     Q.  And it says:  "Dave and Jose, change of plan.
23  Tomorrow you are installing manual op. full vision doors
24  at Car X. Please pick up blue scissor lift on trailer at
25  shop, 1108 East Oakton Street, Des Plaines. Thanks." Do

Page 95

1  you see that?
2     A.  I do.
3     Q.  Do you remember that job?
4     A.  I do not.
5     Q.  Okay. But you, from the invoices it appears to
6  be a job that Dock & Door did; correct?
7     A.  Yes.
8     Q.  Okay. And it looks like it did that job on
9  March 27, 2020; correct?
10     A.  Correct.
11     Q.  Is the blue scissor lift a scissor lift that
12  Midwest Dock Solutions had?
13     A.  They -- yes.  Well --
14   MR. HUGHES:  Objection, foundation for the text.
15   THE WITNESS:  Yes, I would say yes.
16   BY MR. McJESSY:
17     Q.  Okay.  And is -- I understand you're not party
18  to the text that's here, but is what's described here
19  the kind of thing that would normally happen as part of
20  Dock & Door's business, that Dave and Jose would swing
21  by to pick up the scissor lift to take it out to a job
22  they're working on if they needed it?
23     A.  A smaller job like this, I could see them
24  taking one of Midwest's lifts.
25     Q.  Okay. And how do you know that the Car X job

Page 96

1  was a smaller job?
2     A.  Well, just by reading the text it just says
3  they're installing a vision door. So it's only one door.
4     Q.  Okay.
5     A.  I guess I shouldn't say that I know that it's
6  a small job.  Just reading the text, it appears to be a
7  one-door job.
8     Q.  Well, it says "full vision doors at Car X,"
9  correct?
10     A.  Correct.
11     Q.  What are full vision doors?
12     A.  They are like glass doors, so you can see in
13  and out of them.
14     Q.  Makes sense.
15     A.  Free sunlight.
16     Q.  All right. This says full vision doors,
17  plural.  I take it you don't know how many they're
18  installing?
19     A.  I don't remember.
20     Q.  What's a manual op mean?
21     A.  It's not -- it's not a motorized door.  You
22  have to lift it manually.
23     Q.  Okay.  Just like it says.
24     A.  Yes.
25     Q.  Let me hand you what I've marked as

Anthony Joseph Brutti
October 09, 2025                                   Pages 97..100

Page 97

1  Exhibit 238 and ask you if you recognize this as a text
2  exchange that you had with Dave Green.
3      MR. HUGHES: Objection, form.
4  BY THE WITNESS:
5      A.  I don't remember.
6  BY MR. McJESSY:
7      Q.  Okay. I hand you what I've marked as
8  Exhibit 239.  And again, this is an exhibit that I put
9  together.  It's got three pages of text messages and
10 then two pages of invoices.  Let me know when you have
11 had a chance to look at the text messages.
12     A.  Who is this, Ira and who else?
13     Q.  Dave Green.
14     A.  Okay.
15     MR. HUGHES: Objection to foundation,
16 characterization of the document, authentication.
17     THE WITNESS: Okay.
18 BY MR. McJESSY:
19     Q.  And you prepared the invoices that are
20 attached here; right?
21     A.  I did.
22     Q.  Are you familiar with the Peak IPT job in
23 Mount Prospect?
24     A.  I don't really remember it, no.
25     Q.  And if you look at the text message, the first

Page 98

1  page it's December 19th, 2018.  Do you see that?
2      A.  Yeah.
3      Q.  And if you look at the invoice descriptions,
4  they're for December 20th, 2018.  Do you see that?
5      A.  Correct, yeah.
6      Q.  Do you remember any of the work that would
7  have been performed at the Peak IPT job in Mount
8  Prospect?
9      MR. HUGHES: Objection, asked and answered.
10 BY THE WITNESS:
11     A.  I don't remember.
12 BY MR. McJESSY:
13     Q.  Okay. Sir, Dock & Door doesn't have a website;
14 correct?
15     A.  Correct.
16     Q.  It has never had a website; correct?
17     A.  No.
18     Q.  And Dock & Door has no Facebook page; correct?
19     A.  Correct.
20     Q.  And has never had a Facebook page; correct?
21     A.  Correct.
22     Q.  And Dock & Door doesn't advertise in trade
23 publications; is that correct?
24     A.  Correct.
25     Q.  All right. Has Dock & Door ever advertised in

Page 99

1  trade publications?
2      A.  Not to my knowledge, no.
3      Q.  Okay. I'd like to show you what was previously
4  marked as Exhibit 118.  And that's one of your race
5  cars?
6      A.  It is.
7      Q.  You had at least two, I think, correct?
8      A.  Yes.
9      MR. HUGHES: What number is this?  I'm sorry.
10     MR. McJESSY: 118.
11 BY MR. McJESSY:
12     Q.  It looks like it's got Midwest Dock Solutions'
13 logo on the hood of the car; correct?
14     A.  Correct.
15     Q.  Okay. Does it have Dock & Door Install on it
16 anywhere?
17     A.  It does not.
18     Q.  Okay. And why does it have Midwest Dock
19 Solutions' logo on it?
20     A.  The reason why is Midwest Dock wanted a
21 billboard for their building, and I told them "I know a
22 guy that can do that for you," and...
23     Q.  A vinyl guy?
24     A.  A guy that prints vinyl.
25     Q.  Oh, okay.

Page 100

1      A.  "And he can put it on a sheet of aluminum or
2  whatever you guys would want." And I think I set it up
3  for them, and he built the advertising sign.  And I said
4  to my vinyl guy, I said, "Why don't you make a small one
5  for me and I'll put it on the race car," more of a
6  gimmick to make Michael laugh.
7      Q.  Okay.
8      A.  I don't even think Tony ever saw it.
9      Q.  All right. And it's on two race cars; right?
10     A.  Yeah, I believe it is, yeah.
11     Q.  Okay. And the race car we're looking at there,
12 Exhibit 118, how long did you have that race car?
13     A.  I actually still have this car.
14     Q.  Oh. When did you get it?
15     A.  2000 – when did I get this car? I want to say
16 around 2013, I think.
17     Q.  Oh, a long time.
18     A.  A while.
19     Q.  Do you still race it?
20     A.  No. I want to race it next year, but I have
21 not raced it in a few years.
22     Q.  Okay. And how long has the Midwest Dock
23 Solutions logo been on the hood?
24     A.  I couldn't tell you.
25     Q.  Okay. And it's actually, it's not like glued

Anthony Joseph Brutti
October 09, 2025

Pages 101..104

**Page 101**

1 on vinyl, right, it's actually sprayed on the paint?
2   A.  No, it's a sticker.
3   Q.  Okay, a sticker.
4   A.  Yeah.
5   Q.  Okay.  Like a decal?
6   A.  Correct.
7   Q.  Do you see McDonald's there?
8   A.  Yes.
9   Q.  And the same kind of thing?
10  A.  Yes.
11  Q.  Okay. Oh, so when you said you have a vinyl
12 guy, I was envisioning sort of a, like a vinyl tarp.
13  A.  No, like decals.
14  Q.  Okay.
15  A.  They call it vinyl. That's the trade name, I
16 suppose.
17  Q.  Oh, okay. So it's a decal that sticks on the
18 building.  Okay. And in this case you had him do a decal
19 that is on your race car?
20  A.  Yeah, yeah.
21  Q.  Okay. And does McDonald's pay anything to put
22 its logo on your car?
23  A.  They do.
24  Q.  How much do they pay?
25  A.  $2,500.

**Page 102**

1   Q.  Okay. And let's see. When did you stop racing
2 the car that's Exhibit 118?
3   A.  Oh, maybe 2019 or '20, maybe '21.
4   Q.  And I'm showing you now what's been marked as
5 Exhibit 119, and that's a different race car, correct?
6   A.  That is.
7   Q.  Okay.  And it also, it's hard to see, but it
8 also has the Midwest Dock Solutions decal on the hood;
9 correct?
10  A.  Yes.
11  Q.  Okay. And when did you get that race car?
12  A.  2000 and maybe 19.
13  Q.  Okay. So is that sort of the race car that
14 took over from the other one you were using?
15  A.  Yeah.  Yeah, this is the car I primarily
16 drive.
17  Q.  Okay. And has that had the logo, the Midwest
18 Dock Solutions logo on it also since 2019?
19  A.  Yeah.
20  Q.  And you still drive that one?
21  A.  I do.
22  Q.  Okay. And does that race car have a Dock &
23 Door Install logo on it anywhere?
24  A.  It does not.
25  Q.  Okay. Is there any reason that you didn't put

**Page 103**

1 a Dock & Door Install sticker on it?
2   A.  No.  I never bothered.
3   Q.  How often do you race?
4   A.  Well –
5   Q.  Maybe I'll give a time frame because it will
6 help. From 2020 to the present, like how often do you
7 race?
8   A.  I try to race about 10 times a year.  That
9 would be my goal.  Sometimes if I'm doing well, I can
10 race a little bit more.  If I'm doing poorly and fixing
11 the junk, then I race less.
12  Q.  When you say "junk," I assume you mean
13 affectionately the race car?
14  A.  Yeah. If I'm repairing bent parts and
15 rebuilding whatever, then, yeah –
16  Q.  Okay.
17  A.  – I have to race less.
18  Q.  And when you have a race, can you describe for
19 me what that entails as far as time commitment.
20  A.  Like on the whole week or just the day of the
21 race?
22  Q.  No, leading up to and the race.
23  A.  I would have to say that from March through
24 October I probably put 20 to 25 hours a week work into
25 the program, not necessarily just my own car, but other

**Page 104**

1 cars that I work on and drive, and yeah.
2   Q.  People you help out?
3   A.  Yeah.  I could work infinite amount of time on
4 that car if I wanted to.
5   Q.  And then how about when you have a race?  Are
6 they always on the weekends or are they sometimes during
7 the week?
8   A.  Generally Fridays and Saturdays.
9   Q.  Okay. And then what's the time commitment for
10 a race? You have to get there, I assume.
11  A.  Depending on a local race, we usually leave
12 around 1:00, 2:00 in the afternoon on like a local race.
13  Q.  Okay.
14  A.  And we get back usually around midnight.
15     For a traveling race it's a whole other – you
16 leave at 3 in the morning and there is hotels involved
17 and people and a lot of logistics.  It's better to go up
18 there and spend the night and be fresh and be ready to
19 go in the morning.
20     Sometimes budgetary constraints say we're just
21 going to leave at 3:00 a.m. and do a 24-hour day and
22 hoof back at night.
23  Q.  All right. And you're driving, how fast do you
24 go?
25  MR. HUGHES: Objection, vague.

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

Anthony Joseph Brutti
October 09, 2025

Pages 105..108

Page 105

BY MR. McJESSY:
1
2    Q.  On the track.
3    MR. HUGHES: Fair enough. On the track.
4    BY THE WITNESS:
5    A.  On the track? Smaller tracks you get up to
6    make 85, 90, and bigger, faster tracks 130, 140.
7    BY MR. McJESSY:
8    Q.  So you want to be well-rested, I presume.
9    A.  Ideally.  It doesn't work out that way, but...
10   Q.  Now, Dock & Door I saw in the general ledgers
11   it pays sponsorship fees and entry fees for the race
12   car; is that correct?
13   A.  It has.
14   Q.  Okay. And Dock & Door also has paid expenses
15   related to things like parts, engine work, and
16   maintenance; is that fair?
17   A.  It is.
18   Q.  Okay. Is that part of your business?
19   A.  No, not really.
20   Q.  And I saw payments to Dyer Storage.  Is that
21   for the race car also?
22   A.  That's where I store the older car.
23   Q.  Okay.  If you could, I'm sorry, go back to
24   Exhibit 221 and go to Interrogatory Response 3.
25   A.  Okay.

Page 106

1    Q.  And Interrogatory 3 asks Dock & Door to
2    identify where it maintained an office or operated its
3    business from 2016 to the present; correct?
4    A.  Correct.
5    Q.  And are these three offices and the dates that
6    are listed there, do you believe accurate?
7    A.  As accurate as I can remember.
8    Q.  Okay. And you'll see there's an overlap
9    between the Holeman address, 3211 Holeman,
10   H O L E M A N, and 27 East 36th Place within Steger.  Do
11   you see that, where one has May 2016 to January 2018 for
12   Holeman, but then January 2016 to the present for
13   Steger?
14   A.  Yeah, that's a misprint. I'm sorry.
15   Q.  What should it say?
16   A.  January probably 2018.
17   Q.  January 2018. Okay.
18   A.  Yeah.
19   Q.  So when it moved, it moved from one location
20   to the other.  It didn't keep an office in two separate
21   locations at the same time; correct?
22   A.  No.
23   Q.  Okay. Well, that's correct; right?
24   A.  That's correct, yes.
25   Q.  Okay. Now, are you aware that Midwest Dock

Page 107

1    Solutions had offices at these locations at the same
2    time?
3    A.  Yes.
4    Q.  Okay. And so when Midwest Dock Solutions moved
5    its offices, Dock & Door moved its offices as well;
6    correct?
7    A.  Correct, with this few month exception of the
8    Burville shop.
9    Q.  Okay. Explain that to me.
10   A.  I stayed at Burville for maybe 2 or 3 months
11   while they went into Holeman.
12   Q.  Okay. But you believe you were at the
13   Burville location from January to May of 2016?
14   A.  That's probably accurate, yeah.
15   Q.  Okay.  And you believe that it would be
16   accurate to say that you were at the Holeman location
17   from May of 2016 to January 2018?
18   A.  That's probably accurate.
19   Q.  Okay. And then to correct this, you say it
20   would be that you were at the 27 East 36th Place Steger
21   address from January of 2018 to the present?
22   A.  Yes.
23   Q.  Okay.  Now, Midwest Dock Solutions rented each
24   of these office locations; correct?
25   A.  Correct.

Page 108

1    Q.  Okay. And Dock & Door has also used each of
2    these office locations; correct?
3    A.  Correct.
4    Q.  And Dock & Door doesn't pay rent to Midwest
5    Dock; correct?
6    A.  Correct.
7    Q.  And Dock & Door has never paid anyone rent;
8    correct?
9    A.  Correct.
10   Q.  Okay. And Dock & Door hasn't paid any electric
11   bill for any of these locations; correct?
12   A.  Correct.
13   Q.  And it hasn't paid a gas bill for any of these
14   locations; correct?
15   A.  Correct.
16   Q.  Okay. Now, Midwest Dock Solutions opened a
17   post office box at the Steger post office sometime in
18   2021; does that sound right to you?
19   A.  I don't know.
20   Q.  Okay.  Were you aware that mail was being gone
21   missing at the Steger post office address?
22   A.  I believe, yeah, Tony told me that.
23   Q.  Okay. Are you aware that Midwest Dock
24   Solutions opened a post office box at around that time?
25   A.  Well, no.  I've seen envelopes with that P.O.

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

Anthony Joseph Brutti
October 09, 2025                                              Pages 109..112

Page 109

1   box on it.
2       Q.  Okay.  Did you change Dock & Door's address to
3   that post office box?
4       A.  No.
5       Q.  I'm going to hand you what's been marked as
6   Exhibit 240.  This is a document that was produced to us
7   pursuant to a subpoena to Cincinnati Insurance
8   Companies.  And this is a Change of Endorsement form
9   that's dated March 24th, 2021.  Do you see that it says
10  Effective Change Date on it?
11      A.  Yeah.
12      Q.  And Cincinnati Insurance Companies was one of
13  Dock & Door's insurance companies; correct?
14      A.  Yes.
15      Q.  Okay.  And Dock & Door had insurance policies
16  with Cincinnati Insurance during 2019 to 2022 at least;
17  correct?
18      A.  Yes.
19      Q.  Okay.  And this is a general Change of
20  Endorsement form that changes the address for Dock &
21  Door to Post Office Box 363, Steger, Illinois; do you
22  see that?
23      A.  I do.
24      Q.  Did you make that change?
25      A.  I don't remember making that change.

Page 110

1       Q.  Okay. Do you know how that change would have
2   come to be made?
3       A.  I do not.
4       Q.  Let me show you what was previously marked as
5   Exhibit 48, and if you can just sort of flip through
6   those documents just to be familiar with what they are,
7   I'll represent to you that they appear to be monthly
8   invoices issued from Cincinnati Insurance to Dock &
9   Door.
10      A.  Yes.
11      Q.  Okay. Did you receive those invoices?
12      A.  I did.
13      Q.  And do you see that they're addressed, each
14  one is addressed to Post Office Box 363?
15      A.  I do.
16      Q.  But that's not a change you recall making; is
17  that correct?
18      A.  I don't recall, no.
19      Q.  Okay. Would you receive those invoices?
20      A.  Yes.
21      Q.  All right. And how would you receive them?
22      A.  Sherri would hand them to me.
23      Q.  Okay. Sherri would leave them on your desk –
24      A.  Yes.
25      Q.  – or give them to you at the office?

Page 111

1       A.  Correct.
2       Q.  Okay. And if you turn to Exhibit 47, and those
3   are Fringe Benefit Contribution Reports; do you see
4   that?
5       A.  Yes.
6       Q.  And do you see that they're preprinted at the
7   top with Dock & Door Installation on them?
8       A.  Yes.
9       Q.  And then they're also preprinted with a number
10  of the employees' names, though not all; correct?
11      A.  All of the employees at that time.
12      Q.  Well, there are some that are handwritten in?
13      A.  Oh, yeah, right.
14      Q.  Do you see where they're handwritten in?
15      A.  Yes.
16      Q.  So employees that were reported before, they
17  show up as preprinted on the form, and then if you need
18  to add employees, you can; correct?
19      A.  Correct.
20      Q.  Okay. And you completed those contribution
21  reports?
22      A.  I did.
23      Q.  And the form that you get to fill out, that
24  was mailed to Dock & Door; correct?
25      A.  Correct.

Page 112

1       Q.  All right. And it was mailed to the Post
2   Office Box 363; is that correct?
3       A.  Correct.
4       Q.  All right. So did you make the change to the
5   post office box for Dock & Door with the fringe benefit
6   funds that sent you those contribution reports?
7       A.  No.
8       Q.  Okay. Do you know who did make that change?
9       A.  I do not.
10      Q.  Okay. But you would get those Fringe Benefit
11  Contribution Reports; correct?
12      A.  Yes.
13      Q.  To fill out and send in?
14      A.  Yes.
15      Q.  Okay. And do you remember that they're like
16  multipage forms, like they've got a top page and then a
17  different color second sheet that like prints through as
18  a duplicate?
19      A.  No.
20      Q.  You just remember it as a single sheet?
21      A.  Right, yes.
22      Q.  And how would you get those forms?  Same
23  thing, would Sherri give them to you?
24      A.  She would.
25      Q.  Okay. Did you ever retrieve mail from the post

Anthony Joseph Brutti
October 09, 2025                                    Pages 113..116

Page 113

1  office box in Steger, the Post Office Box 363?
2     A.  No.
3     Q.  You don't have a key to that post office box;
4  correct?
5     A.  I don't.
6     Q.  Did you ever have any other post office box
7  for Dock & Door?
8     A.  I did not.
9     Q.  Okay. How about credit cards?  Does Dock &
10  Door supply its employees with credit cards?
11     A.  It does not.
12     MR. McJESSY: I'll take that back from you just so
13  you don't have to put up with it.
14  BY MR. McJESSY:
15     Q.  Some of Dock & Door's employees do carry
16  Midwest Dock Solutions credit cards; correct?
17     A.  Correct.
18     Q.  Okay. And that's Richard Mantone, Nicolas
19  Kelly, David Green, Donald Cruikshank, and Collin
20  Zarlengo, they've all had credit cards that were from
21  Midwest Dock Solutions; correct?
22     A.  I'm not a hundred percent sure who, but –
23     Q.  Okay. Do you know anybody who for a hundred
24  percent did have them?
25     A.  David.

Page 114

1     Q.  David Green?
2     A.  David Green, yeah.
3     Q.  Anybody else?
4     A.  I know Nico has one.
5     Q.  Okay.
6     A.  I'm not aware who else would.
7     Q.  Okay. You weren't responsible for coordinating
8  to provide them with the credit cards?
9     A.  No.
10     Q.  Okay. So if I told you that Richard Mantone
11  had a credit card, you don't know that?
12     A.  I don't know that.
13     Q.  Okay. And if I told you Donald Cruikshank had
14  a credit card, you don't know that?
15     A.  No.
16     Q.  And if I told you that Collin Zarlengo had a
17  credit card, you don't know that?
18     A.  I don't know that, no.
19     Q.  How do you know that Nicolas Kelly and
20  David Green did or do?
21     A.  I know David Green will give me gas receipts
22  if he is on the road. I guess I don't know that Nico
23  has one for sure.
24     Q.  Okay.
25     A.  Yeah.

Page 115

1     Q.  All right. So if they charge and have
2  receipts, they don't give them to you?
3     A.  No.  Correct.
4     Q.  Okay. Who would they give their receipts to?
5     A.  David does give his receipts to me.
6     Q.  Okay. Do you know why he does?
7     A.  He texts them to me and I give them to Sherri.
8     Q.  Okay. That's what I was going to ask you, who
9  they ultimately go to. Do you do anything with the
10  receipts other than give them to Sherri?
11     A.  I print them or yeah, or just give them to
12  Sherri.
13     Q.  Okay. How does he give them to you?  Like are
14  they paper or are they nowadays electronic?
15     A.  Some are text and some are just paper.
16     Q.  Okay. So if you get a physical copy, you hand
17  it to Sherri at the office; is that it?
18     A.  Yeah.
19     Q.  And if you it's texted to you, you forward it
20  to Sherri by text?
21     A.  No, I'll just print it.
22     Q.  Oh, okay, and then give it to her?
23     A.  Yeah, or give her a hard copy, yeah.
24     Q.  Okay. You can print from your phone?
25     A.  No, I just e-mail it to myself, e-mail the

Page 116

1  picture to myself –
2     Q.  Okay.
3     A.  – and then print it off my computer.
4     Q.  Okay. At work?
5     A.  I do.
6     Q.  At the office?
7     A.  Yes.
8     Q.  Okay. And your computer can print to the
9  office printer; correct?
10     A.  It can, yeah.
11     Q.  Okay. There's a shared office copier printer?
12     A.  Yes.
13     Q.  And you can print to that?
14     A.  I can.
15     Q.  Do you ever review David Green's receipts at
16  all for any purpose?
17     A.  No.
18     Q.  Strictly just to pass them through?
19     A.  Yeah.
20     Q.  Do you carry a Midwest Dock Solutions credit
21  card?
22     A.  I do not.
23     Q.  Okay. Why not?
24     A.  I have a credit – well, I have a debit card,
25  my own debit card for Dock & Door.

Anthony Joseph Brutti
October 09, 2025

Pages 117..120

Page 117

1    Q.  Okay. And you use that for Dock & Door
2  expenses?
3    A.  I do.
4    Q.  And does Midwest Dock Solutions reimburse you
5  for those expenses?
6    A.  No.
7    Q.  Okay.  And to your knowledge, does David Green
8  use his credit card for Dock & Door expenses?
9    A.  No.
10   Q.  What does he use it for?
11   A.  Generally material and fuel.
12   Q.  Okay. And what is the material for?
13   A.  Those would be for the jobs.
14   Q.  Okay.
15   A.  If they're short on anchors or caulk or
16  whatever, Dave would run to the hardware store and buy
17  that stuff.
18   Q.  Okay. And he'd put it on the Midwest Dock
19  Solutions credit card?
20   A.  Yeah.
21   Q.  Okay. And would Midwest Dock Solutions pay
22  those charges?
23   A.  Yeah.
24   Q.  Okay.  Does Dock & Door ever pay those
25  charges?

Page 118

1    A.  I have -- in an emergency I may have bought a
2  tool.
3    Q.  No, no, I'm sorry, maybe any question wasn't
4  clear.  Does Dock & Door pay the charges on the Midwest
5  Dock Solutions credit card?
6    A.  Oh, no, no.
7    Q.  Okay. That was my question.
8    A.  Sorry.
9    Q.  Does Dock & Door ever reimburse Midwest Dock
10  Solutions for expenses on the Midwest Dock Solutions
11  credit card?
12   A.  No.
13   Q.  Okay. I'm going to switch gears.  You put
14  charges on your debit card for expenses for projects
15  that Dock & Door is working on; correct?
16   A.  Not often.
17   Q.  No?
18   A.  Not much, yeah.
19   Q.  Okay. So if there's point-of-sale charges on
20  -- do you know what a point-of-sale charge is? Like a
21  debit card charge?
22   A.  Okay. Yeah.
23   Q.  Okay. If there's point-of-sale charges or
24  debit card charges on your debit card for Dock & Door,
25  those are personal expenses?

Page 119

1    A.  Some are for myself, and then some are for my
2  like own vehicles and my own office expenses.
3    Q.  Okay. And I saw charges on there to like NAPA
4  and some racing places.
5    A.  Yeah.
6    Q.  Those are for your race cars?
7    A.  Yeah.  I try to maintain my own vehicles as
8  well as possible too, so I do that also.
9    Q.  All right. Do you ever purchase parts or
10  supplies on your debit card that are used for job sites
11  for Dock & Door's performing work?
12   A.  No.  No.  I've bought maybe a grinder or a
13  hammer drill in an emergency situation, but I don't --
14  but Midwest Dock generally handles all that.
15     MR. McJESSY: We've been going a little over,
16  actually more than a little over an hour.  I'd like to
17  take another break.  And we can go off the record.
18     (A short break was had.)
19     MR. McJESSY: Back on the record.
20  BY MR. McJESSY:
21   Q.  Now, you had an e-mail address of
22  tonyb@midwestdocksolutions.com; correct?
23   A.  I did.
24   Q.  All right. Do you still have that?
25   A.  I do not.

Page 120

1    Q.  When did it change?
2    A.  I believe in August of 2024.
3    Q.  And do you know why?
4    A.  I do not.
5    Q.  Do you know when you got that e-mail account?
6    A.  I couldn't tell you the date or the...
7    Q.  Can you tell me the year?
8    A.  No.  2000.  It would be a guess.
9    Q.  What would be your best approximation, even if
10  it were a couple of year period?
11   A.  Maybe '18.
12   Q.  Okay. And do you know who gave you that
13  account?
14   A.  I believe -- I believe Tony's sister Mandy.
15   Q.  Okay. And who took the account away?
16   A.  I don't know that.
17   Q.  How do you know you don't have it anymore?
18   A.  It doesn't exist.  I can't even see it.
19   Q.  And when was the last time you tried to see
20  it?  In August of 2024?
21   A.  Yeah, probably, yeah.
22   Q.  Okay. Did you talk with anybody about the fact
23  that it was going to go away?
24   A.  No.
25   Q.  Did anybody -- did you have any discussions

Anthony Joseph Brutti
October 09, 2025                                                    Pages 121..124

Page 121

1  about it at all about the time that it went away?
2      A.  No.
3      Q.  All right.  So how would you access that
4  e-mail account?
5      A.  I could get it from my laptop and my phone.
6      Q.  Okay.  And so was there a time on your laptop
7  when you went to log into it and it just -- you couldn't
8  get in?
9      A.  Correct.
10     Q.  Okay.  And did you ask anybody about that?
11     A.  No.
12     Q.  Like "Hey, I can't get into my e-mail
13  account"?
14     A.  I knew why it was gone, so...
15     Q.  Okay.  And why was it gone?
16     A.  I assume because of this.
17     Q.  This lawsuit?
18     A.  Yeah.
19     Q.  And what is your assumption about because of
20  this lawsuit?
21     A.  Somebody that doesn't work for Midwest Dock
22  Solutions probably doesn't need to have a Midwest Dock
23  Solutions e-mail address.
24     Q.  Okay.  Now, you used that e-mail account to
25  communicate with some of the general contractors that

Page 122

1  Midwest Dock Solutions was hired to perform work for;
2  right?
3      A.  Yes.
4      Q.  I'm going to show you what I've marked as
5  Exhibit 241.  And this is e-mail from you using the
6  tonyb@midwestdocksolutions.com e-mail address on
7  November 4th, 2021; do you see that?
8      A.  I do.
9      Q.  And it's an e-mail to Zack Adkins.  Do you know
10  who Zack Adkins is?
11     A.  No, I don't.
12     Q.  Okay.  Do you remember him as a project manager
13  for Pepper Construction?
14     A.  I don't remember.
15     Q.  Okay.  And your e-mail says "Closeout documents
16  for Green Era from Midwest Dock Solutions."  Do you see
17  that?
18     A.  It does.
19         MR. HUGHES:  Objection, foundation.
20     BY MR. McJESSY:
21     Q.  And is preparation of closeout documents
22  something that you would assist in?
23     A.  I would.
24     Q.  Okay.  And would that include, for example,
25  warranty letters?

Page 123

1      A.  Yeah.
2      Q.  And if you look at this e-mail, on the third
3  page of the e-mail is the Subcontractor/Supplier
4  Guarantee/Warranty; do you see that?
5      A.  I do.
6      Q.  And do you recognize that as a warranty letter
7  from Midwest Dock?
8      A.  I do.
9      Q.  And would you prepare these warranty letters?
10     A.  Well, I had a template or the contractor would
11  send you their template.
12     Q.  Okay.  And had a template for Midwest Dock;
13  correct?
14     A.  I did.
15     Q.  Okay.  And then that's Tony Zarlengo's
16  signature on here; correct?
17     A.  Correct.
18     Q.  So how would you come to have a copy with his
19  signature on it?
20     A.  I would physically have him sign it.
21     Q.  Okay.  Like hand it to him as a piece of paper?
22     A.  Yeah.
23     Q.  At the office?
24     A.  Yeah.
25     Q.  And so it's not a -- that's not like an e-

Page 124

1  signature of some sort that's attached to it?
2      A.  No.
3      Q.  Okay.  That's actually a physical signature
4  that he would sign?
5      A.  Yeah.
6      Q.  And then this being e-mailed by you;
7  correct?
8      A.  Yes.
9      Q.  And so how would you get it to attach it to
10  the e-mail, like scan it in?
11     A.  Yeah.  Yes.
12     Q.  And is that something you could do at the
13  office?
14     A.  I could.
15     Q.  Okay.  And then the very last page of this is a
16  Clopay Commercial Product Limited Warranty; do you see
17  that?
18     A.  Yes.
19     Q.  Is any of the handwriting on that yours?
20     A.  That is mine.
21     Q.  That is your handwriting?
22     A.  Yes.
23     Q.  Okay.  So you would fill this out as well;
24  correct?
25     A.  I would.

**Page 125**

1    Q.  And then send it to the general contractor?

2    A.  Correct.

3    Q.  Is there – now, you also have an e-mail

4    address ajbrutti@gmail.com; is that right?

5    A.  Yes.

6    Q.  Okay. Is there a reason you use the

7    tonyb@midwestdocksolutions e-mail address instead of the

8    Gmail address?

9    A.  The only reason would be because in the chain,

10   I believe this came from Ira, and Ira sent it to me on

11   the Midwest Dock e-mail address.

12   Q.  Okay. And as a matter of fact, the e-mail

13   there directly below yours is from Ira; correct? Well,

14   it says "On Thursday, October 10th."

15   A.  Yeah.

16   Q.  All right. He's forwarding this list to you

17   and then you're sending it to Pepper; is that it?

18   A.  Yeah.

19   Q.  So he would have sent it to you at that e-mail

20   address; is that it?

21   A.  Right. Yes.

22   Q.  All right. I've handed you what's been marked

23   as Exhibit 242.  Now, this is another sort of similar

24   e-mail to the last one we saw; correct?

25   A.  Correct.

**Page 126**

1    Q.  This is an e-mail from you to Zack Adkins.

2    This one is dated December 21st, 2021; correct?

3    A.  Correct.

4    Q.  And if you look at the attachments to the

5    e-mail, again, it says Subcontractor/Supplier

6    Guarantee/Warranty; do you see that?

7    A.  Correct.

8    Q.  And is this again like a template form that

9    you would have prepared – strike that.

10       Is this again a template form that you would

11   have altered to fit this particular project?

12   A.  This template came from the contractor.

13   Q.  Oh, this came from Pepper?

14   A.  Correct.

15   Q.  Okay. So then you just fill in the information

16   or does it come already filled out?

17   A.  It depends.

18   Q.  Sometimes you fill it out?

19   A.  Sometimes I put dates in.

20   Q.  Okay. Same process, you'd have Tony Zarlengo

21   sign it and then you'd scan it in and e-mail it back to

22   them?

23   A.  Yes.

24   Q.  I hand you what's been marked as Exhibit 243.

25   This is an e-mail from you to Christi Adams dated

**Page 127**

1    August 4th, 2023; do you see that?

2    A.  I do.

3    Q.  And this refers to a Matteson Commerce Center

4    project; do you see that?

5    A.  Yep.

6    Q.  Do you remember that project?

7    A.  I do remember that.

8    Q.  What was that project?

9    A.  It was a new construction precast building we

10   did the doors on.

11   Q.  Okay. Just doors?

12   A.  I remember the doors.  I don't remember if

13   there was more.

14   Q.  Yeah, if you turn to the warranty letter,

15   which is again the last page, that might –

16   A.  Okay.

17   Q.  It only refers to doors.

18   A.  Yeah.  Okay.

19   Q.  So that's consistent with your recollection?

20   A.  Yeah.

21   Q.  Okay.  Again, same process, they would have –

22   now, this one says, if you look at it, it says

23   "Subcontractor: Company Name Here.  Scope of Work, Enter

24   Your Scope Here." Do you see that?

25   A.  Yeah.

**Page 128**

1    MR. HUGHES: Where are we looking, Kevin?

2    MR. McJESSY: On the warranty letter here.

3    MR. HUGHES:  Okay.

4    BY MR. McJESSY:

5    Q.  All right.  So it looks like it wasn't

6    completely filled out; is that correct?

7    A.  Yeah, yeah.

8    Q.  All right. Same process, though, you would

9    have filled it out apparently?

10   A.  Yeah, apparently.

11   Q.  And then scanned it in and e-mailed it back?

12   A.  Correct.

13   Q.  Okay. I hand you what I have marked as

14   Exhibit 244.  And this is an e-mail from Tony Zarlengo

15   to you dated June 9th, 2023; do you see that?

16   A.  I do.

17   Q.  And the attachment is

18   C555_1011_MidwestDockSolutions.pdf; do you see that?

19   A.  Okay. Yeah.

20   Q.  If you turn two pages in, there is a

21   subcontract agreement there.  Do you see where it says

22   Subcontract No. C55-1011?

23   A.  Yes, yes.

24   Q.  Okay. So those numbers are the same; do you

25   see that?

Anthony Joseph Brutti
October 09, 2025                              Pages 129..132

Page 129

1    A. Yes.
2    Q. I'll represent to you that this is a document
3 that was produced to us by Midwest Dock Solutions. Do
4 you see the Bates number on the bottom there, MDS?
5    A. Okay. Yes.
6    Q. And this appears to be the attachment to this
7 e-mail. Do you remember this project, the Crow Holdings
8 Joliet Truck Terminal project?
9    A. I can't say that I know exactly which job this
10 is.
11   Q. All right. Do you remember a truck terminal
12 project in Joliet?
13   A. Yeah, we've done a several Crow Holdings jobs.
14   Q. All right. So you're not sure which one this
15 might have been?
16   A. No.
17   Q. And there is an e-mail here – the e-mail on
18 the front page from Tony Zarlengo to you says: "We have
19 no closeouts for this job?" What is that asking?
20   A. I don't know.
21   Q. All right. You don't know what Tony Zarlengo
22 is asking you?
23   A. He is probably asking me do we have closeouts
24 for this job.
25   Q. All right. Well, that's what I mean. If

Page 130

1 that's what it means, what are closeouts?
2    A. The closeouts are whatever they ask for to do
3 their wrap-up, the warranty letters, any, maybe they
4 might ask for shop drawings. They might ask for
5 instruction manuals.
6    Q. Okay. So closeouts like, does that mean the
7 final materials that you give to the general contractor
8 when the job is completed?
9    A. Yeah.
10   Q. Okay. And it can mean any of those items that
11 you just described or all of them?
12   A. Yeah, or all of them, yeah.
13   Q. Would it also mean lien waivers? Or is that
14 not generally what you think?
15   A. I don't do anything with – I've never done
16 anything with that.
17   Q. Oh, sorry. So to you closeouts means shop
18 drawings, warranty letters, things like that –
19   A. Yeah.
20   Q. – manufacturers' warranty papers?
21   A. Exactly, yeah.
22   Q. Okay. Now, one of the document requests that
23 we had issued in this case was e-mail communications
24 between you and Mr. Zarlengo or you and Mr. Richert.
25 And this wasn't an e-mail that you produced. Is there a

Page 131

1 reason you wouldn't have produced this?
2    A. Generally, the closeouts, I don't keep them.
3 Once it's done, it's done.
4    Q. You don't keep the e-mails?
5    A. No.
6    Q. Do you have a policy of retaining e-mails or
7 deleting e-mails?
8    A. Usually, when I get the final, like "Okay,
9 received, all good," I just delete it and it's done.
10   Q. Let me hand you what I've marked as
11 Exhibit 245. And I'll represent to you that this is a
12 supplemental discovery production that we received on
13 October – maybe it was on October 7th, but it may have
14 been yesterday.
15   MR. MILLER: It was October 7th.
16   MR. McJESSY: Was it October 7th?
17   MR. MILLER: It was a few days ago.
18   MR. HUGHES: Did I get this?
19   MR. MILLER: No, I didn't send it to you, but I'll
20 give it to you.
21   MR. McJESSY: Oh, today's only the 9th. Okay. For
22 some reason I thought it was Friday.
23   BY MR. McJESSY:
24   Q. There are – in this supplemental production
25 it's responding to the production request to produce

Page 132

1 communications between Dock & Door on the one hand and
2 Midwest Dock Solutions on the other hand.
3    There are 19 communications between you and
4 Mr. Zarlengo produced here and no text messages. Is
5 this all of the communications between you and Mr.
6 Zarlengo and you and Mr. Richert, including text
7 messages, that would exist for communications between
8 2016 and the present?
9    A. It would probably be everything that I have,
10 yeah.
11   Q. You would have no other e-mails or text
12 messages exchanged between you and Mr. Zarlengo?
13   A. There's texts.
14   Q. Do you still have those texts?
15   A. I believe I gave them to my attorney.
16   MR. MILLER: Those were sent over to you in April.
17   MR. McJESSY: Okay. All of the text messages were
18 produced?
19   MR. MILLER: Yes.
20   BY MR. McJESSY:
21   Q. Okay. And all of the text messages between you
22 and Mr. Richert were produced?
23   A. Yeah.
24   Q. Do you typically delete your text messages?
25   A. I think they're in there for 30 or 60 or so

Anthony Joseph Brutti
October 09, 2025                                    Pages 133..136

Page 133

1    days.
2        Q.   Do you think after this lawsuit was filed that
3    there would have been e-mail communications between you
4    and Mr. Zarlengo that got deleted, e-mail or text
5    messages?
6        A.   Probably not.
7        Q.   So all of the text messages that you and Mr.
8    Zarlengo had would have still been preserved?
9        A.   Don't quote me 100 percent, but the vast
10   majority, yeah.
11       Q.   Okay. Vast majority, what does that mean?
12       A.   I can make a mistake if I deleted something.
13       Q.   Okay. How often would you say you text with
14   Mr. Zarlengo?
15       A.   A couple times a week maybe.
16       Q.   And how many times would you say you e-mail
17   him or copy him on an e-mail?
18       A.   Not very often anymore.
19       Q.   How about over the last five years?
20       A.   More so when he was actually selling jobs.
21       Q.   Okay. Well, that was up until like three or
22   four months ago; right?
23       A.   Oh, well, yeah, I mean, unfortunately, he
24   hasn't sold a lot of dock jobs in the last couple years,
25   so it would be not much.

Page 134

1        Q.   All right. Was it ordinarily part of your job
2    to produce the closeout documents for projects that Dock
3    & Door had done?
4        A.   I would, yes.
5        Q.   Yeah. And those closeout documents would be
6    like the ones we saw. If there's a warranty provided,
7    it would come from Midwest Dock Solutions; correct?
8        A.   Correct.
9        Q.   Dock & Door never provided a warranty;
10   correct?
11       A.   No, we never -- we never provided -- I would
12   send them from my e-mail address, but not provide an
13   actual warranty.
14       Q.   Okay. But in sending them, the ones you'd send
15   would be Midwest Dock Solutions warranties; correct?
16       A.   Yeah, they would be.
17       Q.   Let me show you what I have marked as
18   Exhibit 245.
19       MR. HUGHES: No, this is 246.
20       MR. McJESSY: Oh, you're right. Let's put a 246 on
21   that.
22   BY MR. McJESSY:
23       Q.   All right. And this is an e-mail from you to
24   Christi Adams dated July 25th, 2023; correct?
25       A.   Correct.

Page 135

1        Q.   And again, sent from your
2    midwestdocksolutions.com e-mail address; correct?
3        A.   Correct.
4        Q.   And it says: "Closeout documents attached for
5    Matteson Commerce from Midwest Dock Solutions. Standing
6    by for warranty letter information." Do you see that?
7        A.   I do.
8        Q.   And it looks like the shop drawings are
9    actually the attachments for this; correct?
10       A.   I didn't actually attach them because they're
11   huge, but it was a PDF that was attached.
12       Q.   Oh, I see, yeah, the attachments. Yes. Manuals
13   and -- no, I don't -- oh, yeah, and shop drawings,
14   you're right. Okay.
15            And the Clopay commercial installation manual,
16   that's the installation manual that comes from Clopay;
17   correct?
18       A.   Correct.
19       Q.   Describing how the either doors or operators
20   are installed; correct?
21       A.   Yes.
22       Q.   Okay. And what do you mean "Standing by for
23   Warranty Letter Information"?
24       A.   Oh, they most likely did not have the date of
25   completion, and so we don't have a warranty letter yet,

Page 136

1    so I'm waiting for them to send me that date and maybe
2    their template.
3        Q.   Okay. Because that's when the warranty starts
4    to run is based on the completion date?
5        A.   Right, right. Yeah, exactly, yeah.
6        Q.   Okay. So you're waiting to get information
7    from her as to when it was completed?
8        A.   Yes.
9        Q.   Now, going back to 244 for a minute, that's
10   the e-mail from Mr. Zarlengo to you for the closeout
11   documents for the ARCO/Murray project; correct?
12       A.   Correct.
13       Q.   And we've looked at a number of e-mails for
14   closeout documents for Pepper Construction; correct?
15       A.   Correct.
16       Q.   Is the issuance of the closeout documents sort
17   of a typical thing that these large general contractors
18   where you're doing work, is that part of the end of the
19   project?
20       A.   Generally, yeah.
21       Q.   Okay. Like that's a standard thing that like
22   you're working for large general contractors like
23   ARCO/Murray, Clayco, Krusinski, Meridian Design Build,
24   Morgan Harbour, Opus Design Build, Peak Construction,
25   Pepper Construction, Principle Construction; right?

Anthony Joseph Brutti
October 09, 2025

Pages 137..140

1    A.  Right.
2    Q.  Okay. And so these closeout documents, is that
3  like an ordinary part of the process?
4    A.  Yeah, usually, yeah.
5    Q.  Okay.  And was that -- even though we've
6  looked at ones for ARCO/Murray or one for ARCO/Murray
7  and some for Pepper, you would do the same thing for
8  those other companies; correct?
9    A.  I would.
10    Q.  And let me hand you what's been marked
11  as Exhibit 247. And if you look at the last -- this is
12  another one -- this is another's e-mail from you to
13  Cecil Kidenda at Pepper Construction forwarding another
14  warranty letter; correct -- actually, the warranty
15  letter and the other closeout documents; correct?
16    A.  Yes.
17    Q.  And I only attached the warranty letter, but
18  it looks like this one also had the owner's manuals and
19  the operation manuals and things like -- and the
20  installation manuals; correct?
21    A.  Yeah.
22    Q.  Okay. But the warranty letter that's
23  attached, this one's sort of different from the other
24  ones that we looked at. It looks more like a letter
25  format; do you see that?

1    A.  Yeah.
2    Q.  Would a letter like this be prepared by
3  Midwest Dock or again, would you get the form text from
4  Pepper and then put it on a Midwest Dock letterhead?
5    A.  This is Midwest Dock's template.
6    Q.  Okay. So you would have used Midwest Dock's
7  template to prepare this warranty letter?
8    A.  Yes.
9    Q.  And then again, you'd have given it to Anthony
10  Zarlengo to sign?
11    A.  Correct.
12    Q.  And this is going to almost sound like a silly
13  question, but would you recognize that as one of the
14  ways that he signs documents?
15    A.  He should have been a doctor.
16    Q.  All right.  I take it that's a yes, that's one
17  of the ways he signs?
18    A.  Yes.
19    Q.  Okay. And this is an e-mail from you
20  forwarding the document to Pepper Construction; correct?
21    A.  Yes.
22    Q.  I hand you what I've marked as Exhibit 248.
23  And this is an e-mail from Ira Sugar to Cecil Kidenda at
24  Pepper, and that's the top e-mail on this dated January
25  17th, 2024 forwarding a revised warranty letter.  Do you

1  see that?
2    A.  Yeah.
3    Q.  And the e-mail below that is from you to Ira,
4  and it looks like you're forwarding the revised warranty
5  letter to him.  Do you see that? It says "revised
6  warranty letter attached"?
7    A.  Okay. Yes.
8    Q.  And then it looks like he's forwarding that,
9  the actual revised warranty letter to Cecil Kidenda; do
10  you see that?
11    A.  I do, yeah.
12    Q.  Is there -- and if you look down below, it
13  looks like Cecil Kidenda sent an e-mail to Ira saying
14  she noticed a discrepancy in the warranty period, so
15  she's asking for a revised warranty letter.  Do you see
16  that?
17    A.  Yeah.
18    Q.  Any reason that you wouldn't have in this
19  instance just sent the revised warranty letter directly
20  to Cecil?
21    A.  Typically, I probably would have done that.  I
22  don't know why.  I may have accidently sent it to Ira.
23    Q.  Okay.
24    A.  He just forwarded it.
25    Q.  Yeah. All right.

1    I hand you what I'm marking as Exhibit 249.
2  And this is an e-mail from you to Christi Adams dated
3  March 28th, 2024. Do you see that?
4    A.  I do.
5    Q.  And it looks like you're forwarding an
6  attachment called an SSSP Pepper RR Donnelley Wallace
7  PDF; do you see that?
8    A.  I do.
9    Q.  And if you look below that, there is an e-mail
10  from Christi Adams to Ira asking for -- one of the items
11  there that she is asking for to be submitted within five
12  days is a site specific safety plan; do you see that?
13    A.  Correct.
14    Q.  Is that -- well, let's just make it easy.  And
15  if you turn to the next page, two pages back, there is
16  a -- one more -- site specific safety plan; do you see
17  that?
18    A.  I do.
19    Q.  Okay. And do you recognize that as the SSP
20  Pepper RR Donnelley Wallace PDF?
21    A.  I do.
22    Q.  Okay. And are you familiar with site specific
23  safety plans?
24    A.  I am.
25    Q.  What are they?

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

Anthony Joseph Brutti
October 09, 2025                    Pages 141..144

Page 141

1    A.  There is just your basic rules of the job site
2   and then also like where your nearest hospital would be
3   and then where, the scope of work that we're doing and
4   then like a disciplinary section at the bottom, I think.
5    Q.  So in general terms that's what that type of
6   document includes?
7    A.  Yeah.
8    Q.  Okay.  And did you prepare this -- you can
9   take a look at it, it's just three pages long.  Is this
10  a document that you would have prepared?
11   A.  I was given a template, and then I would fill
12  it in.
13   Q.  Okay. That's what I was going to ask. It's
14  sort of a form that you use and then you fill in
15  specific information?
16   A.  Yeah.
17   Q.  All right. So for example, you would have
18  filled in the name Pepper Construction RR Donnelley on
19  the first page?
20   A.  Yeah.
21   Q.  And the address and the subcontractor?
22   A.  Yeah.
23   Q.  And for the contacts would you have filled
24  that information in as well?
25   A.  Yes.

Page 142

1    Q.  And then if you turn to the next page, the
2   first item is Item 1.  Midwest Dock Solutions Contacts;
3   do you see that?
4    A.  Yes.
5    Q.  And it says Project Manager is Tony Zarlengo;
6   correct?
7    A.  Yes.
8    Q.  And the Field Operations Manager is Mike
9   Richert; correct?
10   A.  Correct.
11   Q.  And the Site Foreman/Competent Person is David
12  Green; correct?
13   A.  Yes.
14   Q.  Okay. And you would have filled that all
15  information in?
16   A.  I did.
17   Q.  Okay. And it says Item 4. Midwest Dock Scope
18  of Work, Installation of sectional doors.  Did you fill
19  that in?
20   A.  Yes.
21   Q.  Okay. And is that what this work was on this
22  project was just sectional doors?
23   A.  I don't remember.
24   Q.  You don't remember this project specifically?
25   A.  No.

Page 143

1    Q.  And then at the bottom of this document is
2   Tony Zarlengo's name; correct?
3    A.  Yes.
4    Q.  With the date.  And would you have filled that
5   in?
6    A.  Yeah, just the date, yeah.
7    Q.  Okay. Tony's name would already be on this as
8   part of the preprinted form?
9    A.  Yeah.
10   Q.  And then after you prepared it, you would have
11  e-mailed it -- well, you did e-mail it to Pepper
12  Construction; correct?
13   A.  Well, usually that's what I do, yeah.
14   Q.  All right. Well, the top e-mail here is from
15  you to Christi Adams, and it shows the attachment of the
16  SSP?
17   A.  Okay, yeah.
18   Q.  The items that are -- do you see where it
19  says, the e-mail from Christi Adams where it says:
20  "Please also note the following shall be submitted
21  within five business days"?
22   A.  Yeah.
23   Q.  And Item 1 was the Site, the Site Specific
24  Safety Plan we just discussed; correct?
25   A.  Yes.

Page 144

1    Q.  Would you have provided any of the other
2   information that's listed here, Items 2 through 5?
3    A.  I do have some MSDS sheets that I have
4   provided. I don't know if I did for this.
5    Q.  Okay.
6    A.  If the contractor asks for a COI from Dock &
7   Door, I provide that.
8    Q.  What if they ask for a COI from Midwest Dock
9   Solutions?
10   A.  I don't do that.
11   Q.  Okay.
12   A.  I don't do the submittals.
13   Q.  Okay.
14   A.  Well, I guess the submittals, part of the
15  submittals would be the shop drawings, so I maybe would
16  do some of that.
17   Q.  Okay.
18   A.  And then Draft Schedule of Values, yeah, I
19  don't do anything with number 5.
20   Q.  You don't do anything with that. Somebody else
21  from Midwest takes care of those things.
22   A.  Yeah, I guess so.
23   Q.  Okay.  I hand you what I have marked
24  Exhibit 250.  Now, this is an e-mail from you on August
25  2nd, 2024; correct?

Anthony Joseph Brutti
October 09, 2025                                           Pages 145..148

Page 145

1      A. Correct.
2      Q. And again, it's from your
3   tonyb@midwestdocksolutions.com e-mail address; correct?
4      A. Correct.
5      Q. And you're forwarding the closeout documents
6   for the McMaster-Carr project; correct?
7      A. Correct.
8      Q. And if you turn to the last page of this, this
9   is the warranty letter that Midwest Dock supplies the
10  template for; correct?
11     A. Yeah.
12     Q. Okay. So you prepared this warranty letter
13  using Midwest Dock Solutions template?
14     A. I did.
15     Q. I hand you what's been marked as Exhibit 251.
16  And this is an e-mail from Tony Zarlengo to you at your
17  Gmail account; correct?
18     A. Yeah.
19     Q. And he's asking for closeout documents for a
20  Project Sawgrass; do you see that?
21     A. Yes.
22     Q. And he says: "Thought these were done."  Is
23  that his way of asking you to do it if it's not done?
24     A. No. He legitimately thought these were done.
25     MR. HUGHES:  Objection calls for speculation.

Page 146

1   BY MR. McJESSY:
2      Q. All right. What did you understand him to be
3   communicating to you?
4      A. Like we did this a long time ago, why do we
5   have to do it again?
6      Q. Okay. And the e-mail he's forwarding from
7   Clayco is an e-mail asking for these documents; correct,
8   when it says Not Submitted?
9      A. Yeah.
10     Q. Was this a project that Dock & Door provided
11  the labor for?
12     A. Which job is this. Sawgrass. Yes.
13     Q. All right. Let me hand you what is marked as
14  Exhibit 252.  And this is an e-mail from you to Tony
15  Zarlengo dated January 13th, 2022; do you see that?
16     A. Yes.
17     Q. And it says:  "Do you want Travis to go to
18  Rockford? We have about three hours until the next truck
19  comes, but we need address for Rockford. Yours, Tony
20  Brutti." Do you see that?
21     A. I see that.
22     Q. Who is Travis?
23     A. Travis, if it's Travis Wolfe, it was an
24  employee of Midwest Dock Solutions.
25     Q. Okay.  Is there another Travis that you're

Page 147

1   aware of?
2      A. I am not.
3      Q. Has Midwest Dock ever employed a Travis – I'm
4   sorry, strike that.  Has Dock & Door ever employed
5   somebody named Travis?
6      A. I don't think so, no.
7      Q. Okay. Do you know why you'd be asking Tony
8   Zarlengo if he wants Travis to go to Rockford?
9      A. I don't know. Yeah, I could speculate, but I
10  don't know.
11     Q. Since 2016, who has Dock & Door used as its
12  insurance agent?  Well, actually, strike that.
13     Since Dock & Door was formed, who has it used
14  as its insurance agent?
15     A. We have used – I believe it was Assured.
16     Q. Is that Esser Hayes?
17     A. Esser Hayes, yeah.
18     Q. Okay. They're the same; right?
19     A. Yeah.
20     Q. So Esser Hayes started and then were they
21  bought out by Assured?
22     A. Something.
23     Q. They merger or whatever?
24     A. Yeah, yeah.
25     Q. Okay. And then who else?

Page 148

1      A. I used Assured all the way up until July of
2   this year.
3      Q. And how did you come to use Esser Hayes as
4   Dock & Door's insurance agent?
5      A. A recommendation by Tony.
6      Q. Okay. Tony Zarlengo?
7      A. Yes.
8      Q. All right. And what lines of insurance did
9   Esser Hayes place for Dock & Door?
10     A. General liability and workman's comp.
11     Q. Anything else?
12     A. I don't think so.
13     Q. How about umbrella coverage?
14     A. I only know of the two policies.  Maybe – I
15  don't know what would be blended together or anything
16  like that.
17     Q. Okay. And how about automobile insurance?
18     A. No.
19     Q. Does Dock & Door have an automobile insurance
20  policy?
21     A. You know, I've seen it on my policies.  I
22  don't know why I have it. I don't have any vehicles.
23     Q. How about Inland Marine coverage? Does Dock &
24  Door have Inland Marine coverage?
25     A. I do not, no.

Anthony Joseph Brutti
October 09, 2025                                                    Pages 149..152

Page 149

1      Q. Okay. How about property insurance? Does it
2   have any personal property insurance?
3      A. I don't know.
4      Q. And who would know that, the insurance agent?
5      A. The agency would know that, yeah.
6      Q. Okay. Who tells them what insurance to get?
7      A. I believe it would be their recommendation.
8      Q. They would tell you what insurance you need?
9      A. Yeah.
10     Q. Why did you switch to Holden Insurance?
11     A. My general liability rates were going to go up
12  86 percent. And I said well, I'm going to have to shop.
13  So I asked -- I asked Tony if he recommended a different
14  insurance agency, not necessarily to switch insurances,
15  but just to get to get a price and to say "This is where
16  I'd like you to be." So I contacted Holden and got
17  their quote, and it was about $12,000 or $15,000 cheaper
18  than Assured and I showed it to them, and they said
19  okay. So it didn't really work out like I planned. So
20  I switched to Holden.
21     Q. Okay. So you contacted Holden at Tony
22  Zarlengo's recommendation?
23     A. I did, yeah.
24     Q. Okay. And who is your workers' comp carrier?
25     A. Holden.

Page 150

1      Q. Holden Insurance is?
2      A. Oh, I'm sorry.
3      Q. Who actually are you insured by?
4      A. ICW.
5      Q. Okay. And were you insured by somebody else
6   before them for workers' comp?
7      A. Yeah.
8      Q. Do you remember who?
9      A. First Cincinnati, then BerkleyNet.
10     Q. And how about for general liability?
11     A. Cincinnati and -- oh, shoot, what is it called
12  now? It's not ICW, it's -- I can't remember the name of
13  the company now.
14     Q. Is it Liberty Insurance?
15     A. It is Liberty. I could see the little mascot
16  guy on the paper.
17     Q. And you don't know whether you have any
18  automobile insurance coverage?
19     A. I would have to look at the policies.
20     Q. Okay. Do you know whether you have any
21  umbrella coverage?
22     A. I don't know. I would have to look.
23     Q. Okay. All right. Dock & Door employees work
24  on job sites for large general contractors; correct?
25     A. Correct.

Page 151

1      Q. And that was for ARCO/Murray, Clayco,
2   Krusinski Construction, Meridian Design Build, Morgan
3   Harbour Construction, Opus Design Build, Peak
4   Construction, Pepper Construction, and Principle
5   Construction; correct?
6      A. Yes.
7      Q. Okay. Do you know what a certificate of
8   insurance is?
9      A. Yes.
10     Q. All right. And what's a certificate of
11  insurance?
12     A. I believe it's just proof that you have
13  insurance, if I'm not mistaken.
14     Q. And are you aware that the general contractors
15  require a certificate of insurance for subcontractors to
16  get on to their job sites?
17     A. Not always. I mean, I'm not aware, no.
18     Q. Okay.
19     A. Not always.
20     Q. Are you aware that that's sometimes the case?
21     A. I am.
22     Q. Okay. You never looked at the contracts, you
23  said, between Midwest Dock Solutions and the general
24  contractors; correct?
25     A. I did not.

Page 152

1      Q. Okay. So you also don't know the terms of
2   those contracts; is that correct?
3      A. I would not.
4      Q. Okay. From January of 2020 to the present, who
5   was responsible for obtaining certificates of insurance
6   on behalf of Dock & Door for the projects that its
7   employees worked on?
8      A. I believe -- like a person's name?
9      Q. Well, who at Dock & Door was responsible --
10     A. Oh, I'm sorry, me, yeah. I thought you meant
11  the agency.
12     Q. Oh, no, I meant like who at Dock & Door would
13  be responsible for getting the certificate of insurance?
14     A. Me.
15     Q. Okay. And how would you go about that?
16     A. I would contact -- my contact at Assured I
17  believe was Margaret.
18     Q. Okay.
19     A. She would get me a COI.
20     Q. Okay. And do you know who Margaret is, what
21  her last name is?
22     A. Streade, I believe, S T R E A D E, I think.
23     Q. Okay. And is there anybody else you would
24  contact during that period?
25     A. I don't think so. My agent was Rose Couch. I

Anthony Joseph Brutti
October 09, 2025        Pages 153..156

Page 153

1 don't think she ever actually got me COIs though.
2      Q. Okay.
3      A. Yeah. There had to have been somebody before,
4 but I don't know the name.
5      Q. Okay. Let me hand you what's been marked as
6 Exhibit 253. And I'll represent to you this is an
7 e-mail from counsel for Holden Insurance that was sent
8 to me on October 6th. And we had asked for any
9 Certificates of Insurance that had been issued for Dock
10 & Door through the Holden Insurance Agency.
11      And do you see that she says: "As of today
12 there have been none issued for Dock & Door"?
13      A. Yes.
14      Q. Does that sound right to you? Has the Holden
15 Insurance Agency to date not issued any Certificates of
16 Insurance or provided any Certificates of Insurance for
17 Dock & Door?
18      A. Not yet, no.
19      Q. Okay. So if any Certificates of Insurance were
20 issued on behalf of Dock & Door from January of 2020 to
21 the present, they would have been issued through
22 AssuredPartners?
23      A. Yeah.
24      A. Okay.
25      Q. Or Esser Hayes, depending on when it changed

Page 154

1 its name.
2      A. Yeah.
3      MR. McJESSY: Take a look at these before I hand
4 them to the witness. I don't have multiple copies. But
5 they're Certificates of Insurance. I've labeled them as
6 Exhibits 254, 255, 256, 257, 258. And they're the
7 Certificates of Insurance that were produced by
8 AssuredPartners related to Dock & Door.
9      MR. HUGHES: 254 through which?
10      MR. McJESSY: 258.
11 BY MR. McJESSY:
12      Q. Sir, I've handed you the Certificates of
13 Insurance that were issued or that were produced to us
14 by AssuredPartners in response to our subpoena. And
15 they're the Certificates of Insurance issued on behalf
16 of Dock & Door. Do you see those?
17      A. I do.
18      Q. Okay. And between Exhibit 254, 255, 256, 257,
19 and 258, there is, I believe, 26 Certificates of
20 Insurance.
21      So for example, I think Exhibit 254 is a
22 Certificate of Insurance issued on behalf of Dock & Door
23 to ARCO/Murray for a project, and I think the date on it
24 is what, is 2025 in the upper right corner?
25      A. Oh, yes.

Page 155

1      Q. What's the date?
2      3-20-25.
3      Q. So that one was actually issued after this
4 lawsuit was filed; correct?
5      A. Yes.
6      Q. But in any event, I'll ask you a couple of
7 questions about those. But does that look like the
8 complete universe of Certificates of Insurance that Dock
9 & Door would have requested since January of 2020?
10      A. Yeah. I mean, I don't look at these very
11 closely, but yeah, the general template looks like what
12 I would normally see, yeah.
13      Q. All right. Well, I guess my question is does
14 the volume, does the number of them --
15      A. Oh.
16      Q. -- look like the approximate number of
17 Certificates of Insurance that --
18      A. Yeah, yeah, I would say so.
19      Q. Okay. You think you probably over the last
20 five years maybe asked for 26 Certificates of Insurance
21 to be issued?
22      A. Yeah, that's -- I feel like there could be
23 some more, but I guess that might be true.
24      Q. Okay. You don't think that there were like
25 hundreds of them, for example?

Page 156

1      A. No, no.
2      Q. Okay. So 259, Certificates of Insurance issued
3 to Midwest Dock for ARCO/Murray.
4      All right. And I hand you what's been marked
5 as Exhibit 259, which are --
6      MR. HUGHES: Object to foundation.
7 BY MR. McJESSY:
8      Q. -- which are the Certificates of Insurance
9 that were produced to us by AssuredPartners for Midwest
10 Dock Solutions and ARCO/Murray projects. Do you see that
11 the name on the bottom is ARCO/Murray?
12      A. Correct, yes.
13      Q. And since 2020, Dock & Door has done quite a
14 number of projects for ARCO/Murray; correct?
15      A. Correct.
16      Q. Okay. And you have, for Dock & Door there is
17 one Certificate of Insurance that was issued in March
18 of 2025. And for Midwest Dock Solutions there is, I'll
19 represent to you, 94 Certificates of Insurance for
20 projects that are ARCO/Murray projects.
21      Would Dock & Door have provided the labor on
22 those projects?
23      A. I would have to read through this, but I'm
24 sure some of these.
25      Q. Okay. Has provided labor on a lot of

Anthony Joseph Brutti
October 09, 2025

Pages 157..160

Page 157

1 ARCO/Murray projects; correct?
2    A. Correct.
3    Q. Okay. Is there a reason that Dock & Door would
4 not have provided Certificates of Insurance for those
5 projects?
6    A. I only provided Certificates of Insurance when
7 I would be asked.
8    Q. When who would ask you?
9    A. Usually, it would be Midwest Dock asking me
10 for one.
11    Q. Okay. So if Midwest Dock asked you to provide
12 a Certificate of Insurance for a project, then you would
13 provide it?
14    A. I would.
15    Q. Okay. Did the general contractors ever ask you
16 to provide a Certificate of Insurance?
17    A. Only I think Clayco. I think that might be the
18 only one.
19    Q. All right. And if I represent to you that
20 there were no Certificates of Insurance for Pepper
21 Construction by Dock & Door, does that sound right to
22 you?
23    A. I don't know.
24    Q. Okay. If I represent to you that there were no
25 Certificates of Insurance for Dock & Door for Principle

Page 158

1 Construction, does that sound right to you?
2    A. I don't know.
3    Q. Okay. How about for Opus Design Build?
4    A. I don't know.
5    Q. Would you have that information available to
6 you?
7    A. I wouldn't say I have all of it. I have some
8 of it probably.
9    Q. Okay.
10    A. I don't know if I kept all of that.
11    Q. All right. Where would you have that
12 information if you had it?
13    A. On my computer.
14    Q. Okay. And is your computer a desktop or
15 laptop?
16    A. It's a laptop.
17    MR. MILLER: Are these for my review?
18    MR. McJESSY: Yes. Certificates of Insurance issued
19 to Pepper Construction for Midwest Dock Solutions.
20 BY MR. McJESSY:
21    Q. I've handed you what is marked as Exhibit 260,
22 and I'll represent to you that those are Certificates of
23 Insurance produced by AssuredPartners that were issued
24 on behalf of Midwest Dock Solutions to Pepper
25 Construction; do you see that?

Page 159

1    A. I do.
2    Q. And Dock & Door provided the labor for the
3 work that was performed on those projects that are
4 referred to there in the description of where it says
5 Description?
6    A. Yeah, probably.
7    Q. You did work for Pepper Construction?
8    A. I have, yeah.
9    Q. On a number of projects?
10    A. I have.
11    Q. Okay. And to your knowledge, did Dock & Door
12 provide Certificates of Insurance for those projects?
13    A. I don't recall.
14    Q. All right. Fair to say Dock & Door has done
15 work on a significant number of projects for Krusinski
16 Construction?
17    A. It is.
18    Q. And for Meridian Design Build same thing?
19    A. It is.
20    Q. And for Morgan Harbour Construction same
21 thing?
22    A. Yes.
23    Q. And for Opus Design Build same thing?
24    A. Yes.
25    Q. Okay. And for Peak Construction same thing?

Page 160

1    A. Yes.
2    Q. And for Pepper Construction same thing?
3    A. Yes.
4    Q. And for Principle Construction same thing?
5    A. Yes.
6    Q. Okay. Do you have a list of exactly how many
7 projects Dock & Door has done for each of those general
8 contractors?
9    A. I don't.
10    Q. Okay. You don't maintain any record that
11 would show that?
12    A. No.
13    Q. How many hours would you say you work on
14 average for Dock & Door?
15    A. Oh, 35, 32, something like that. I mean, it
16 varies.
17    Q. Okay.
18    A. Sometimes it could be more, you know,
19 depending on the workload.
20    Q. Okay. Could it be less or would that be sort
21 of the low?
22    A. That's probably the average. It could be
23 less, yeah.
24    Q. Okay. Do you typically work five days a week?
25    A. I do.

Anthony Joseph Brutti
October 09, 2025        Pages 161..164

**Page 161**

1   Q. And if you work for, it was NAPA and then it
2 became Lang's Auto Parts.
3   A. Yeah.
4   Q. If you work there and said you usually work
5 Saturdays, maybe an occasional day during the week, if
6 you work during week, do you work typically in the
7 evenings, and you'll have worked for Dock & Door during
8 the day, or is that a day you would take off from Dock &
9 Door and work there?
10   A. No, I would just, whenever I'm done at Dock &
11 Door, it's a three-minute drive over to Lang's.
12   Q. So it's convenient to get to?
13   A. Absolutely.
14   Q. All right. So you could work in both places
15 during a given day?
16   A. I could, yeah.
17   Q. Okay. Do you assist Dock & Door employees in
18 doing their work?
19   A. Not labor-wise, just gathering and
20 material-wise.
21   Q. Okay. Tell me what kind of work do you do for
22 Dock & Door as it relates to the job sites and the work
23 being done there.
24   A. I'll try to do a site visit beforehand.
25   Q. Okay.

**Page 162**

1   A. I might do a little bit of field measuring and
2 making sure the openings are the actual right size and
3 making the job site is actually safe. I've run into
4 some jobs where I didn't really feel that it was safe
5 for us to be working there. So I would maybe bring
6 things up to the superintendent what needs to be done.
7   And then I would do, I would generally go
8 there one more time to offload the trucks. And then if
9 just anything arised where I didn't want them leaving
10 the job site, I would just – I would say I'll just give
11 it to you, anchors, material, whatever, safety stuff,
12 you know.
13   Q. All right. And would you bring some of those
14 items from the shop?
15   A. Yeah, generally.
16   Q. Anchors and other materials or supplies?
17   A. Yeah.
18   Q. And when you say "offload the trucks," you
19 mean offload the overhead doors and dock levelers?
20   A. I would, yeah.
21   Q. And how would you do that?
22   A. Usually with a forklift.
23   Q. Okay. And would that be the forklift from
24 Midwest Dock Solutions?
25   A. Sometimes.

**Page 163**

1   Q. And would sometimes you use one that's at the
2 job site?
3   A. Or a rental, yeah.
4   Q. Rental. Now, if it's a rental, would the
5 rental be arranged by Midwest Dock Solutions?
6   A. Yes.
7   Q. And it would be paid for by Midwest Dock
8 Solutions?
9   A. Yes.
10   Q. So you know how to drive a forklift obviously?
11   A. I can.
12   Q. Does Dock & Door pay Midwest Dock Solutions
13 anything to use its vehicles, forklifts, scissor lifts,
14 welding equipment?
15   A. It does not.
16   Q. Tell me about the other kind of work that you
17 do for Dock & Door. What else do you do besides the work
18 on the job site that you just described for me? Well,
19 strike that. Let me take a step back.
20   Do you do any other work at the job sites that
21 you didn't describe for me?
22   A. No, I will sometimes stage some stuff so it's
23 not clumped in one area. If I can disperse the
24 material, make it a little bit easier on the guys so
25 they're not lugging stuff 500 yards across a building,

**Page 164**

1 you know.
2   Q. So put the doors where they're going to be
3 installed?
4   A. Yeah, yeah, just try to make it to where
5 they're not going back and forth, yeah, so staging them
6 in the right areas.
7   Q. Okay. Put the dock levelers where they're
8 supposed to go, all that kind of thing?
9   A. Yeah.
10   Q. Okay. So is that pretty much all the work that
11 you would do like on the job sites for Dock & Door?
12   A. Yes.
13   Q. Okay. What kind of work do you do – what kind
14 of other work do you do for Dock & Door that you haven't
15 told me about?
16   A. I would do any safety, like in office stuff I
17 would do any safety work.
18   Q. Okay.
19   A. I would do any like –
20   Q. What's that mean?
21   A. Oh, like the safety plans, of if Dock & Door
22 is requested for a safety plan, I would do that one. I
23 would do like certified payrolls. Yeah, basically, any
24 time a contractor would ask me for anything, I would do
25 that.

Anthony Joseph Brutti
October 09, 2025                           Pages 165..168

Page 165

1    I would – if it's material that's at the
2    shop, I try to get that all ready to go for the next day
3    for my guys.
4        Q.  Okay.
5        A.  Whether it's loading it onto a trailer or just
6    staging it somewhere in the shop for them to see it
7    easily.
8        Q.  Okay.
9        A.  Try to make their trip in the morning as quick
10   and painless as possible.
11       Q.  All right. How about payroll invoices?
12       A.  Oh, yeah, payroll and invoices.
13       Q.  What do you do to prepare payroll?
14       A.  The guys send me a timesheet, and I try to
15   best I can compare it against my text messages to them.
16   And then some of the trucks have a GPS in there that I
17   can look at just to kind of see if they're showing up on
18   time and staying at the job so that I can decipher
19   payroll.  And then once I have payroll submitted, I
20   usually do my invoicing.
21       Q.  How do you submit the payroll?
22       A.  I just upload it into the ADP program.
23       Q.  I mean, how do you actually enter it?  Like
24   you have a timesheet from a worker.
25       A.  Yeah.

Page 166

1        Q.  And it says eight hours – I mean, I've seen
2    your invoices and they mostly have a description of the
3    job location and the worker and the hours.
4        A.  Yeah.
5        Q.  So how do you input that?
6        A.  Well, for payroll I just input just the hours.
7        Q.  Okay.
8        A.  For the invoicing I make a record for myself
9    where they were, what they were doing.
10       Q.  Okay. So those are two different things,
11   invoicing –
12       A.  Yeah.
13       Q.  – and payroll?
14       A.  Yeah, for sure, yeah.
15       Q.  What software do you enter the hours in for
16   payroll?
17       A.  It's some sort of portal from ADP.
18       Q.  Okay. And what do you enter the information
19   into for the invoicing?
20       A.  Xero.
21       Q.  When did you start using Xero?
22       A.  I feel like quite a while ago.
23       Q.  Was that set up by Gineris?
24       A.  Yeah.
25       Q.  Okay. Are you aware that Midwest Dock also

Page 167

1    uses Xero?
2        A.  I've seen Sherri's Xero, so yeah.
3        Q.  Okay. And how do you enter the information for
4    the invoicing into Xero?
5        A.  There is a section for invoicing.  And I bill
6    it to Midwest Dock Solutions, and then I put the
7    information in the content area or whatever, I don't
8    know what you would call it.
9        Q.  All right. Well, we looked at a – you have an
10   exhibit there in front of you that had the service
11   invoices?
12       A.  Yeah.
13       Q.  Exhibit 223.
14       A.  Yeah, the Description area.
15       Q.  So when you go in to enter the
16   information, I take it you don't have to enter the name
17   of Midwest Dock Solutions or Dock & Door each time. Is
18   that part of the template?
19       A.  I do have to enter Midwest Dock.  It's like an
20   auto-type, so you start typing M I D, it shows up.
21       Q.  Okay. And then what else do you enter?
22       A.  I enter all this (indicating).  This is all I
23   do, yeah.
24       Q.  And you're pointing to where it says
25   Description, Quantity, Unit Price?

Page 168

1        A.  Yes, correct.
2        Q.  Does it calculate the dollar amount
3    automatically or do you have to enter that too?
4        A.  I only have to enter the unit price.
5        Q.  Okay. And then what about where it says
6    Reference Service Work; do you have to enter that
7    information?
8        A.  I do.
9        Q.  Okay. And the invoice number?
10       A.  Yes, I enter the number also.
11       Q.  That doesn't auto-populate?
12       A.  No, for some reason it doesn't.  It
13   auto-populates, but to a different – it's a different
14   chronology than I've always used, so I just stay with
15   the chronology I've always used.
16       Q.  Okay. And so you actually enter in the name,
17   the date, and the description of the work?
18       A.  Yeah.
19       Q.  Okay. And then when you're done entering in
20   the information for the invoices, and the invoices
21   generally include, each invoice is a separate employee
22   on a specific day; correct?
23       A.  Yes.
24       Q.  So you have a separate invoice for each
25   employee for each day?

Anthony Joseph Brutti
October 09, 2025           Pages 169..172

Page 169

1    A. Yes.
2    Q. Okay. And essentially it includes their name
3 and the hours they worked; correct?
4    A. Correct.
5    Q. That's like the quantity is the hour worked?
6    A. Hourly, yeah.
7    Q. Okay. So each invoice is like a separate
8 charge bases on each day they have on their timesheets?
9    A. It's a bill to Midwest Dock Solutions.
10    Q. But you're billing Midwest Dock like for each
11 day for each employee right off like their timesheets?
12    A. Correct.
13    Q. Okay. You also write checks?
14    A. I do.
15    Q. Okay. And you also sign checks, I presume?
16    A. I do.
17    Q. Do you balance the checking account?
18    A. No.
19    That's handled by Gineris?
20    A. Yeah.
21    Q. Other than that, is there any other work that
22 you do for Dock & Door or have you described all the
23 work that you do?
24    A. The majority of that would be, 99 percent of
25 it I'd say yeah.

Page 170

1    Q. Okay. Is there anything else you can think of
2 that would be that one percent?
3    A. No, I don't think so.
4    Q. How often would you say you're actually in the
5 office? And by "office" I mean the office area or the
6 warehouse.
7    A. It completely varies, but some days I'm in
8 there for, especially like on payroll days, I'm in there
9 for maybe three, four hours. Some days I'm out in the
10 field driving, doing whatever. Sometimes I'll be out in
11 the shop a little bit fiddling with something.
12    Yes, it's not overbearing most of the time.
13 It does have its moments, and then there is sometimes
14 where it's boredom.
15    Q. All right. And how is your salary set?
16    A. I set it.
17    Q. But I mean, how do you determine how much
18 you're going to get paid?
19    A. I just – I have given myself raises over time
20 just as cost of living adjustments or whatever, you
21 know.
22    Q. All right. I guess I'm wondering do you pay
23 yourself hourly or do you pay yourself a salary?
24    A. A salary.
25    Q. Salary.

Page 171

1    A. Yeah.
2    Q. And how do you set that salary?
3    A. I just – every couple of years I pay myself
4 more money.
5    Q. You're paid through ADP; correct?
6    A. Correct.
7    Q. So when you enter the payroll, you enter in
8 your payroll as well; correct?
9    A. I do, yeah.
10    Q. And are you paid every week? Every two weeks?
11 Twice monthly?
12    A. No, every week.
13    Q. Every week. Are the other employees of Dock &
14 Door paid the same way?
15    A. They are.
16    Q. They're paid weekly also?
17    A. They are, yes.
18    Q. All right. I've handed you quite a number of
19 exhibits. The first exhibit is a group exhibit that you
20 have there. It consists of your W-2s for 2017
21 through 2023. And it's Exhibits 173, 176, 179, 182,
22 185, 188, and 191; do you see that?
23    A. I do.
24    Q. Okay. And do those look like your W-2s?
25    A. They do.

Page 172

1    Q. Okay. And if you could go to in the W-2 packet
2 to Exhibit 182.
3    A. Okay.
4    Q. And also take a look at the tax return I
5 handed you that's marked as Exhibit 184.
6    A. Okay.
7    Q. And you'll see that the tax return on line 11
8 has – I'm sorry, line 7 has Compensation of Officers.
9 Do you see that?
10    A. Yes.
11    Q. And the number shown there is $63,098; do you
12 see that?
13    A. I do.
14    Q. Okay. And that's the number that shows up on
15 your W-2 form for that year; correct?
16    A. Correct.
17    Q. Okay. And then if you turn in the tax return
18 to page 5, the number is in the upper right corner,
19 there is also a line there for Distributions. That's
20 line No. 7; do you see that?
21    A. Okay. Yes.
22    Q. And that doesn't show any amount there for
23 that year; correct?
24    A. Well, which column.
25    Q. In the column, the first column?

Anthony Joseph Brutti
October 09, 2025      Pages 173..176

---

**Page 173**

1      A. Column A?

2      Q. Yeah. It shows $21,000 across for Other

3 Adjustments on that account; right?

4      A. Okay. Yeah.

5      Q. Do you know like for 2020, does it – does the

6 number $63,098, the number on your W-2, sound like the

7 compensation you received that year?

8      A. I don't know offhand.

9      Q. Okay. You're not sure about that?

10      A. No.

11      Q. Okay. If you wanted to know how much

12 compensation you received in 2020, would you ask Gineris

13 & Associates?

14      A. Yeah. I would probably just look at my W-2.

15      Q. Okay. That's the easiest way.

16      A. Yeah.

17      Q. So if we look at your – yeah, well, let's

18 take a, just go to the next, if you look at the W-2 for

19 2021, which is Exhibit 185. And you look at the tax

20 return, Exhibit 187, do you see that the compensation of

21 officers again line 7 and that matches the reported

22 wages on the W-2?

23      A. They do match.

24      Q. Okay.

25      A. Well, close, yeah. Within an hour.

---

**Page 174**

1      Q. Yeah, it looks like they round it up for your

2 tax returns to 369; correct?

3      A. Correct.

4      Q. And the W-2 has $368.56 as the ending digits;

5 right?

6      A. Yeah.

7      Q. The total number is $64,368.56. On your W-2

8 the tax return doesn't include cents, so it's $64,369

9 even; correct?

10      A. Yes.

11      Q. Okay. And then if you can just, since we're

12 doing this, turn to Exhibit 188 and the W-2s and the

13 next tax return, which is Exhibit 190, you'll note that

14 the W-2 matches again the Compensation to Officer line;

15 correct.

16      A. Yes.

17      Q. Now, if you go back to Exhibit 173, which is

18 your W-2.

19      (Discussion off the record re exhibit numbers.)

20 BY MR. McJESSY:

21      Q. I hand you what's been marked as Exhibit 261.

22 And now if we look at Exhibit 173, that's your W-2 for

23 2017; correct?

24      A. Yeah.

25      Q. And Exhibit 261 is the W-2s for Anthony

---

**Page 175**

1 Tattini and David Green; correct?

2      MR. HUGHES: Objection, foundation.

3      MR. McJESSY: Also for 2017.

4 BY THE WITNESS:

5      A. Oh, on 261. Okay. David Green and Anthony

6 Tattini, yes.

7 BY MR. McJESSY:

8      Q. All right. And these are actually Dock &

9 Door's W-2s; right?

10      A. Yes.

11      Q. And it shows that David Green in 2017 made

12 $73,000 that year and change and Anthony Tattini made

13 almost 79,000; do you see that?

14      A. I do.

15      Q. So they made more than you did during that

16 year; is that fair?

17      A. Fair.

18      Q. And how is their wage set?

19      A. They're on a union scale. So whatever the

20 rate is for the journeyman union members, that's what

21 they get.

22      Q. Okay. Do you know what the current journeyman

23 scale is?

24      A. Not to the penny, but it's in the 56 dollar

25 range for the wages.

---

**Page 176**

1      Q. Okay.

2      A. And I think it's like 1, like with the whole

3 package 104 or 5.

4      Q. I hand you what's been marked as Exhibit 262.

5 And if you look at your W-2 for 2018, which is

6 Exhibit 176, and that year you made $58,000 and change,

7 and if you compare it to the W-2s for Donald Cruikshank,

8 Anthony Tattini, and David Green, they made roughly

9 76,000, 65,086 – I'm sorry, that year you made $58,000 and change,

10 2018. So they all made more than you did that year too;

11 correct?

12      A. Correct.

13      MR. HUGHES: Objection, foundation.

14 BY MR. McJESSY:

15      Q. The W-2s that I'm showing you, those are

16 records of Dock & Door, correct?

17      A. They are.

18      Q. Okay. And do you have any reason to think –

19 and ADP is Dock & Door's payroll provider; correct?

20      A. Correct.

21      Q. And ADP issue the W-2s for Dock & Door?

22      A. They do.

23      Q. Do you have any reason to think those W-2s

24 aren't accurate?

25      A. No.

---

Anthony Joseph Brutti
October 09, 2025      Pages 177..180

**Page 177**

1   Q. I hand you what I have marked as Exhibit 263.
2 And if you could jump in your packet of W-2s to the last
3 page, which is the W-2 for 2023, it's Exhibit 191; do
4 you see that?
5   A. I do.
6   Q. And that year you made $71,000 and change;
7 correct?
8   A. Correct.
9   Q. All right. And if you look at the W-2s that
10 I've handed you that are marked as Exhibit 263, those
11 show wages to Jose Aguirre of $100,000 and change, to
12 David Green of $98,000 and change, to Eric Jansma of
13 $93,000 and change, to Nicolas Kelly of $96,000 and
14 change, and to Collin Zarlengo of $93,000 and change;
15 correct?
16   A. Correct.
17   Q. All right. So they all made more than you did
18 that year too; correct?
19   A. Correct.
20   Q. Okay. Is there any reason as the owner of the
21 company that you don't make more than your employees?
22   A. I never really thought about it. I mean, it's
23 never really been an issue with me.
24   Q. And I have W-2s here for the other years, but
25 would you agree that every year there are employees who

**Page 178**

1 work for Dock & Door that make considerably more than
2 you do?
3   A. It appears that way.
4   Q. Let me hand you what's been marked as
5 Exhibit 264. And if you compare, these are W-2s for
6 Jose Aguirre, Don Cruikshank, David Green, Eric Jansma,
7 Nicolas Kelly, and Collin Zarlengo. Those look like
8 their W-2s?
9   A. It does.
10   Q. Okay. And for 2022 your wages again were
11 $71,000 and change; correct? And that's Exhibit 188.
12   A. Correct.
13   Q. All right. And Jose Aguirre made $104,000, Don
14 Cruikshank made $116,000, David Green made $104,000,
15 Eric Jansma made $87,000, Nicolas Kelly made $93,000,
16 and Collin Zarlengo made $88,000; correct?
17   A. Correct.
18   Q. So again, they all made considerably more than
19 you did; correct?
20   A. Yep.
21   Q. In setting what your wages are, do you account
22 for what your employees make or no?
23   A. No.
24   Q. Would you say they work more hours than you
25 do?

**Page 179**

1   A. Yeah.
2   Q. In addition to paying the wages for the
3 employees, you also pay their fringe benefit
4 contributions; correct?
5   A. Correct.
6   Q. All right. And you said that's on average
7 what, maybe another $40 an hour?
8   A. Yeah, I think in that neighborhood, yeah.
9   Q. Do you have a pension plan, annuity,
10 retirement, 401k plan of any sort?
11   A. I do.
12   Q. Okay. And what's your retirement plan?
13   A. I have an ROA, a Roth ROA, and I have a – I
14 don't even know what they call it, just like a general
15 stock fund that my financial adviser manages for me.
16   Q. Okay.
17   A. And I have a money market.
18   Q. Do you participate in Midwest Dock Solutions'
19 401k plan at all?
20   A. No. Oh, I did have a 401k with NAPA. I cashed
21 it out, but I did have one.
22   Q. And the Roth IRA, does Dock & Door contribute
23 to that or do you personally pay into that?
24   A. Well, I personally pay into it.
25   Q. Sir, I've handed you what is marked as

**Page 180**

1 Exhibit 265. This is the answer that Midwest – I'm
2 sorry, this is the wrong one. Let's actually just
3 strike that because we already have this marked as an
4 exhibit. So cross out 265.
5      (Discussion off the record.)
6 BY MR. MCJESSY:
7   Q. Sir, I'm showing you what's been previously
8 marked as Exhibit 168. And the first page of this
9 exhibit is a check written from Midwest Dock Solutions
10 to Dock & Door; do you see that?
11   A. I do.
12   Q. On the second page is a receipt stapled to the
13 front of a deposit summary. Then the next page is the
14 deposit summary without the receipt obscuring it. Do you
15 see that?
16   A. Yes, yes.
17   Q. And then the rest of it are the invoices that
18 are referenced in the deposit summary; correct?
19   A. Yes.
20   Q. Okay. How does – now, the check that's
21 written from Midwest Dock Solutions to Dock & Door,
22 that's a check that Dock & Door somehow gets; right?
23 You actually receive the physical check?
24   A. Yeah.
25   Q. And who gives the check to you?

Anthony Joseph Brutti
October 09, 2025                                    Pages 181..184

Page 181

1   A. Generally Sherri.
2   Q. SHERRI; correct?
3   A. I believe so.
4   Q. Okay. And that's Sherri Weber?
5   A. It is.
6   Q. Does she generally just hand it to you in the
7   office?
8   A. Yes.
9   Q. Okay. And what do you do with the check when
10  you receive it?
11  A. Deposit it.
12  Q. Okay. And does anyone else deposit checks for
13  Dock & Door?
14  A. No.
15  Q. All right. Now, Dock & Door banks at the same
16  bank as Midwest; correct?
17  A. I think they do, yeah.
18  Q. Okay. And who prepares and deposits the
19  summary that's attached here?
20  A. I do.
21  Q. All right. And how do you prepare the deposit
22  summary?
23  A. I look at -- like how do I figure out the
24  numbers?
25  Q. Well, no, I mean, physically, how do you go

Page 182

1   about preparing the deposit summary? Do you prepare it
2   on your computer at work?
3   A. Yeah, yeah, I prepare it in Xero.
4   Q. Oh, it's prepared on Xero?
5   A. Yeah, yeah.
6   Q. All right. And so this deposit summary is a
7   document generated by the Xero software program?
8   A. It is.
9   Q. Okay. Now, these were produced to us in volume
10  in three boxes.
11  A. Yes.
12  Q. And so you must print them out, I'm assuming?
13  A. I do, yeah.
14  Q. Okay. And you can print them out from the Xero
15  software program?
16  A. I can.
17  Q. Okay. And again, you do that at the office, I
18  take it?
19  A. I do.
20  Q. Okay. On the copier printer that's there?
21  A. Yes.
22  Q. And what do you want with this deposit summary
23  when you create it?
24  A. I staple it to the invoices that I billed
25  Midwest along with the deposit slip, and then I put it

Page 183

1   away in a cabinet.
2   Q. Old school.
3   A. Yeah.
4   Q. Okay. And so the deposit summary doesn't go to
5   the bank?
6   A. No.
7   Q. As part of your deposit with the check.
8   That's just your record?
9   A. Yeah, that's just for me, yeah.
10  Q. Okay. The deposit slip that's attached here
11  that's stapled, that you get from the bank; right?
12  A. Yeah.
13  Q. Okay. And then the invoices, now, there is a
14  group of invoices here that are attached to the deposit
15  summary, which is then paid by the check; right?
16  A. Correct.
17  Q. All right. And that seems to be how it works
18  on a regular basis; is that fair?
19  A. Fair.
20  Q. All right. And do you prepare the deposit
21  summaries on any particular routine time frame or how do
22  you decide -- I've seen these deposit summaries with a
23  lot more invoice numbers than these, and this one's
24  probably one of the smaller ones in fact; is that fair?
25  A. Well, yeah, probably an average size, yeah.

Page 184

1   Q. Yeah. Okay. But I've seen much longer ones.
2   How do you decide when to generate a deposit invoice and
3   to -- well, strike that.
4        Here's what I'm trying to get at. You
5   prepared these invoices that are attached to this
6   deposit invoice; correct?
7   A. Correct.
8   Q. And you print these out, as I understand it
9   from Sherri Weber's testimony, you print them out at the
10  office and you give them to her and you also provide
11  them to her somehow through the Xero system; is that
12  right?
13  A. I believe like an e-mail is generated.
14  Q. Okay. And the e-mail goes to her?
15  A. It does.
16  Q. And then she can somehow click on the e-mail
17  and download the information; is that correct?
18  A. I don't know.
19  Q. Okay. But you do know an e-mail gets sent to
20  her.
21  A. Yeah.
22  Q. Okay. And you also print out those invoices;
23  correct?
24  A. I do.
25  Q. And you do that at the office?

Anthony Joseph Brutti
October 09, 2025          Pages 185..188

Page 185

1   A. I do.
2   Q. And then you give Sherri the invoices;
3 correct?
4   A. I do.
5   Q. Okay. Now, would you give her like just this
6 group of invoices so that they can write this check or
7 do you give her more invoices than this and she picks
8 out a group and then writes the check?
9   A. No, I decide how many invoices to give her.
10   Q. Okay. And then is the deposit summary attached
11 to that group of invoices when you give them to her?
12   A. No, because I have not deposited it yet.
13   Q. Okay. So this only gets generated after you do
14 the deposit?
15   A. Correct, yeah.
16   Q. I see. And so when you give her the stack of
17 invoices, does she have to add them up?
18   A. I add it up for her.
19   Q. Okay.
20   A. Yeah.
21   Q. Okay. I mean, is there like a note –
22   A. I'm sure she double checks me. But yeah, I'll
23 –
24   Q. All right. But you give her the stack of
25 invoices along with something that says how much they

Page 186

1 are?
2   A. Yeah.
3   Q. Okay. And again, you print the invoices out at
4 the office?
5   A. I do.
6   Q. Okay. And then you give them to Sherri with a
7 note that says how much is owed for this group of
8 invoices; correct?
9   A. Correct.
10   Q. And then she gives you a check?
11   A. Yeah.
12   Q. Does she give you back the invoices?
13   A. She does.
14   Q. Okay. That's what I thought. And then you
15 take the check to the bank and you generate the deposit
16 summary?
17   A. Yeah.
18   Q. And you generate that in Xero?
19   A. Yes.
20   Q. Do you enter the deposit into Xero too or is
21 that part of the deposit summary?
22   A. I think the deposit summary does that, yeah.
23   Q. Okay. And then Gineris has access to your Xero
24 account; correct?
25   A. Yes.

Page 187

1   Q. Okay. So then they can see that you've made
2 the deposit and generated the invoices?
3   A. Yes.
4   Q. Okay. Now, to create – you said when it's
5 payroll day – you said when it's payroll day, you're in
6 the office for three or four hours; correct?
7   A. It could be, yeah..
8   Q. And that's generating these invoices?
9   A. Yeah.
10   Q. And entering the information that's on them?
11   A. Yes.
12   Q. Okay. And you do that from the timesheets that
13 all the Dock & Door employees e-mail to you or leave in
14 the break room; correct?
15   A. Correct.
16   Q. Okay. So you gather all the timesheets?
17   A. Yeah.
18   Q. Okay. And the information that's in the
19 Reference section of the invoice, I notice it's
20 remarkably consistent, the words in the reference look
21 like to be the first words after the colon in the
22 description.
23   A. Yeah.
24   Q. Is that just because that's how you enter it
25 or does one auto-populate to the other?

Page 188

1   A. It used to – no, it does auto-populate, yeah.
2 I'm sorry. Yeah, it does.
3   Q. All right.
4   A. Yeah, I only have to enter it once per job.
5   Q. All right. And I've seen your employee
6 timesheets. And I can get one out as an exhibit if we
7 need to. But it looks like you go through the
8 timesheets and you either add up the hours or make
9 notices on them; is that fair?
10   A. Fair.
11   Q. Okay. Is there a reason that you include the
12 project name on the invoices?
13   A. I do that for two reasons, for myself, because
14 I get like e-mails that say you know, you need to
15 certify payroll or something like that for this job, and
16 it could have been a year ago.
17   Q. Okay.
18   A. So now I have to type in keywords and try to
19 drum up that job.
20   Q. All right.
21   A. And then I believe – well, Ira would like to
22 usually add up the hours worked per job.
23   Q. Okay.
24   A. As an easy way of just typing a keyword in, we
25 can get that information to him.

Anthony Joseph Brutti
October 09, 2025                                   Pages 189..192

Page 189

1    Q. All right. And that's sort of where I was
2  going on the second point, which is for keeping job
3  cost records so that Midwest knows how much a particular
4  job cost it, they need to know who was working on the
5  project and how many hours they spent; correct?
6    A. More likely the dollar amount if they underbid
7  it, overbid it or were right on it.
8    Q. Right. So Midwest Dock Solutions uses that
9  information so they can determine whether they made
10  money on a project and if so, how much.
11    MR. HUGHES: Objection foundation, objection
12  competency, objection calls for speculation.
13    MR. McJESSY: You can answer.
14  BY THE WITNESS:
15    A. Yeah. They would like to see the information
16  sometimes.
17  BY MR. McJESSY:
18    Q. All right. You do that in part at the request
19  of what Midwest Dock Solutions is asking for; correct?
20    A. Yeah. I do it this way for myself, and it just
21  so happened that it helped them also, yeah.
22    Q. Okay. Well, you said Ira likes to see that
23  information; correct?
24    A. Yes. Right.
25    (Discussion off the record.)

Page 190

1  BY MR. McJESSY:
2    Q. I'm handing you what's been marked as
3  Exhibit 265, which is Dock & Door's Answer to the
4  Complaint in this case. Do you recognize that document?
5    A. I've seen multiple answers. I don't know
6  which one this is.
7    Q. Did you review the final Answer before it was
8  filed?
9    A. Yeah.
10    Q. To the best of your knowledge, were the
11  answers to the allegations in the complaint on behalf of
12  Dock & Door accurate?
13    A. Yes.
14    MR. McJESSY: Okay. Now let's take our break.
15    (Recess from 3:11 p.m. to 3:52 p.m.)
16  BY MR. McJESSY:
17    Q. All right, Mr. Brutti, I want to ask you some
18  questions. You've got in front of you still
19  Exhibit 168, which is the checks and deposit summary and
20  the invoices.
21    So I want to ask you if you could turn to just
22  the first invoice is fine.
23    A. Sure.
24    Q. Do you see that Don Cruikshank has a quantity
25  and then a unit price of 210?

Page 191

1    A. Yes.
2    Q. That's $210 per hour; correct?
3    A. Correct.
4    Q. And if you turn to the next page, Don
5  Cruikshank has a quantity of 8 and a unit price of $105
6  an hour; correct?
7    A. Correct.
8    MR. HUGHES: Can you let me get to the page.
9    MR. McJESSY: Oh, I'm sorry.
10    MR. HUGHES: This is an invoice?
11    MR. McJESSY: Yeah, just the first two invoices, not
12  exhibits.
13    MR. HUGHES: Okay.
14  BY MR. McJESSY:
15    Q. And then if you go to further back, there's an
16  invoice, it's Collin Zarlengo, the work date is 7-29-22.
17  I think they're sort of in order, but...
18    A. (Inaudible).
19    Q. Yes. And he has a unit price of $96 an hour;
20  correct?
21    A. Correct.
22    Q. At least on that page. If you turn to the
23  next page, the unit price is $144 an hour.
24    A. Right.
25    Q. If you turn to the next page, it's $192 an

Page 192

1  hour. That one says DT in the entry though; do you see
2  that?
3    A. Yeah.
4    Q. Okay. And the one before that had OT in the
5  entry.
6    A. Correct.
7    Q. Okay. So I'm assuming that the OT and DT are
8  overtime and double time; is that right?
9    A. That's correct.
10    Q. Okay. And it's all based on the original unit
11  price of either $105 an hour or $96 an hour, depending
12  on which worker we're talking about; right?
13    A. That is correct.
14    Q. All right. And if you turn to Richard Mantone,
15  he's a couple pages back.
16    A. Yep.
17    Q. You see he's $83 hour as the unit price; do
18  you see that?
19    A. Yes.
20    Q. How is the unit price set?
21    A. At this time he was an apprentice, meaning RJ
22  was an apprentice.
23    Q. Okay.
24    A. So his price would be a little bit less than a
25  journeyman price.

Anthony Joseph Brutti
October 09, 2025            Pages 193..196

Page 193

1   Q.   Okay.
2    A.   And then same with Collin was maybe a third or
3   a fourth year at the time, so his would be less also.
4    Q.   Okay. So let's take Donald Cruikshank, who he
5   was a journeyman; correct?
6    A.   Correct.
7    Q.   And he is $105 an hour; correct?
8    A.   Correct.
9    Q.   How did you come up with $105 an hour for a
10   journeyman?
11    A.   We negotiated a price early on, and then
12   through, when the bargaining agreement would change, I
13   think it's like June 1st, I would often have to change
14   the price. We didn't always have to change the price,
15   but generally, that would be the time when I would
16   change the price.
17    Q.   Okay. And how did you negotiate a price for
18   Donald Cruikshank of $105 an hour?
19    A.   I would pretty much tell Tony that "This is
20   the price I'm going to have to charge you."
21    Q.   Okay. And why was that the price you'd have to
22   charge him?
23    A.   We have to cover costs and be a profitable
24   business.
25    Q.   Okay. So it's based essentially on covering

Page 194

1   the wages; correct?
2    A.   The wages and increases in anything, insurance
3   or...
4    Q.   As I say, you've got to cover wages, you've
5   got to cover fringe benefit contributions; correct?
6    A.   Yes.
7    Q.   And you have to cover, Dock & Door has to pay
8   for liability insurance; correct?
9    A.   Its own insurance policies, yeah.
10    Q.   Right?
11    A.   Yeah.
12    Q.   And it has to pay for –
13    A.   Accounting services.
14    Q.   – accounting services, has to pay for legal
15   fees?
16    A.   Yeah.
17    Q.   Is that yes?
18    A.   Yes. I'm sorry.
19    Q.   Just so the record's clear. Never want to
20   forget the legal fees. You needed to cover unemployment
21   insurance; right?
22    A.   Yeah.
23    Q.   State and federal unemployment?
24    A.   Yes.
25    Q.   And the employer's share of FICA; correct?

Page 195

1    A.   Yes.
2    Q.   And Medicare; correct?
3    A.   Yes.
4    Q.   Medicare and Social Security?
5    A.   Yes.
6    Q.   All right. Did you factor all those things in
7   in setting the unit price?
8    A.   I probably didn't factor all that in, no. I
9   basically would just see my end of quarter or end of
10   year reports, and as long as we were making money, I was
11   generally pretty happy.
12    Q.   Okay. Was the company making money?
13    A.   It made more money in some years than others,
14   and I believe that in some years it may have taken a
15   loss.
16    Q.   If you could get out Exhibits 184, 187, 190,
17   and 193, they're the tax returns.
18     And if you just look at line 21 on each one of
19   those where it says Ordinary Business Income or Loss; do
20   you see that?
21    A.   Which line?
22    Q.   Line 22. For example, for 2020 it shows
23   Ordinary Business Loss, Income Loss minus $101,000; do
24   you see that?
25    A.   Yeah.

Page 196

1    Q.   All right. And then if you look at the same
2   line for 2021 on Exhibit 187, it shows 33,000 to the
3   positive; do you see that?
4    A.   Correct, yeah.
5    Q.   And then if you look at 2022, it shows on that
6   line that's Exhibit 190 a loss of $40,000; do you see
7   that?
8    A.   Correct.
9    Q.   And then 2023 it shows $12,000 to the good,
10   that's Exhibit 193; correct?
11    A.   Correct.
12    Q.   All right. So what kind of profit were you
13   looking to make in setting the unit price?
14    A.   I wouldn't have any kind of number in my head,
15   but wanting to, like I said, cover costs and hopefully
16   grow the business slowly. That always hasn't been the
17   case.
18    Q.   So your hope was as long as you could cover
19   costs and pay yourself the salary you were taking, you
20   were good with that?
21    A.   Well, yeah, I would hope to take dividend
22   checks and be able to, yeah.
23    Q.   Do you have any idea how much you took in
24   dividends in the last five years?
25    A.   I don't know that number off the top of my

Anthony Joseph Brutti
October 09, 2025

Pages 197..200

---

Page 197

1　head.
2　　Q. Okay. Would it be $50,000, do you think?
3　　A. I don't know.
4　　Q. You have no idea?
5　　A. I don't.
6　　Q. Okay. What did your negotiations for the unit
7　price consist of?
8　　A. It wasn't much of a negotiation. I would
9　basically just tell him I'm going to have to raise this
10　price.
11　　Q. Okay. And that was because the number went up
12　for the fringe benefit contribution and the hourly rate?
13　　A. Among others. Among others. And also as, so
14　the more work we had, the more employees we had, the
15　more billable hours we had, which also helped make it
16　easier to make money, as business declined, less
17　billable hours, so the pricing had to go up also.
18　　Q. Well, your costs also went down; correct?
19　　A. Not – yes, the cost of employment did, but
20　things like insurance and accounting costs and things
21　like that don't go down.
22　　Q. They –
23　　A. They usually go up, yeah.
24　　Q. Okay. So other than – how about when you
25　first started out, how was the unit price negotiated?

---

Page 198

1　　A. Well, I mean, we were kind of flying at the
2　hip, but I think we started at about 100 or 90, 90 or a
3　100.
4　　Q. Okay.
5　　A. But we just agreed to that, said let's see how
6　this goes, I mean, we'll change it fast if we need to
7　change it, but let's try this and see how it goes.
8　　Q. Okay. And then since then it's changed based
9　upon the costs that the company has had to pay?
10　　MR. HUGHES: Objection, misstates testimony.
11　　MR. McJESSY: Well, I'm asking.
12　BY THE WITNESS:
13　　A. Say that we were –
14　BY MR. McJESSY:
15　　Q. Well, as I understand, you said, I asked you
16　how the rate was negotiated, and if I understand you
17　correctly, you said, well, I would just tell Tony this
18　is the amount that I had to charge now because of
19　whatever.
20　　A. Yeah.
21　　Q. And what I then asked you as well, let's go
22　back to the beginning when the rate was set and it was
23　negotiated, what did those negotiations entail. And if
24　I understood you correctly, you said, "Well, we just
25　sort of went by the seat of our pants. We picked a

---

Page 199

1　number of 90 or 100."
2　　A. We roughly estimated that this is what it
3　would cost to make this work.
4　　Q. Yeah. Okay. And then you said you'd see where
5　this goes.
6　　A. Yeah.
7　　Q. Is that right?
8　　A. Yeah, yeah. It worked like that for I think a
9　while, if I remember.
10　　Q. Okay. With the same number?
11　　A. I think it did, yeah.
12　　Q. Okay.
13　　A. I think we got a year or two.
14　　Q. And then the number eventually changed;
15　correct?
16　　A. It did.
17　　Q. Okay. And what I'm asking you is going back to
18　when you first started out and you described for me all
19　the negotiations as to how you arrived at the number.
20　　A. (Nodding).
21　　Q. Is that a yes?
22　　A. Yes, yes.
23　　Q. Okay. You nodded your head. I just want to
24　make sure the record is clear.
25　　A. I'm on fumes here.

---

Page 200

1　　Q. Okay. That's all right. And then as changes
2　occurred, I was asking you how those negotiations
3　occurred, and you pretty much said "Well, I just told
4　Tony what the number had to be," correct?
5　　A. That's correct, yeah.
6　　Q. Okay. And that was because of the costs or the
7　expenses that Dock & Door had to pay; correct?
8　　A. Correct.
9　　Q. Okay. And was there anything else that's part
10　of that calculus?
11　　A. I mean, I want to give myself a pay raise
12　also, so that would definitely – not that I'm, you
13　know, telling him what I want to make or anything like
14　that, but I know in the back of my head I want to make
15　more money also –
16　　Q. Okay.
17　　A. – so if I can. The price was at like 105 for
18　a long time because we had a lot of workers, and I
19　really didn't have to renegotiate the price. But as
20　business went down and the costs went up, I had, you
21　know, told him like we're going to have to renegotiate
22　this and the price is going to have to go up.
23　　Q. All right. And the costs that you have are,
24　the major costs, I take it, are the insurance and the
25　taxes.

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

Anthony Joseph Brutti
October 09, 2025                                   Pages 201..204

Page 201

1    A. Well, the payroll is definitely number one.
2    Q. Well, payroll, that's right, the payroll for
3  the workers, their fringes; correct?
4    A. Yeah.
5    Q. And the taxes that you have to pay on them;
6  correct?
7    A. Yes, correct.
8    Q. And then also the insurance you said?
9    A. Insurance, the accounting fees.
10   Q. The accounting fees, the professional fees;
11  correct?
12   A. Professional fees.
13   Q. Anything else?
14   A. Cost-wise, oh, boy – well, my own insurance
15  and cellphone and things like that, smaller stuff.
16   Q. Your insurance meaning your health insurance?
17   A. Correct, yes.
18   Q. All right. And that runs at about $4,600 a
19  year; does that sound about right?
20   A. It's 400 and something a month. I don't know
21  what the year is.
22   Q. I'm going to hand you what I've marked as
23  Exhibit 266, and it's actually an excerpt of what was
24  previously marked as Exhibit 192, but I didn't want to
25  print the whole thing out.

Page 202

1        So this is the general ledger for Dock & Door
2  for the year 2023; do you see that?
3    A. I do.
4    Q. And I didn't print out the whole thing, but I
5  printed out the first page. And then if you turn the
6  page, I printed out the Accounts Receivable section; do
7  you see that, which is Account 1200?
8    A. Okay.
9    Q. And this shows all of the invoices and
10  payments to Midwest Dock Solutions; do you see that?
11   A. Yes.
12   Q. Okay. And it lists the projects there that the
13  invoices and payments are attributable to; do you see
14  that?
15   A. Yes.
16   Q. And that's all information you enter, so it's
17  all correct; correct?
18   A. Yes.
19   Q. All right. And you've already testified to
20  this, but all the payments are, all the invoices are to
21  Midwest Dock and all the payments are from Midwest Dock;
22  correct?
23   A. Correct.
24   Q. Okay. And so if we get through that section,
25  you'll see it's in date order. So if you flip to the

Page 203

1  December.
2    A. Okay.
3    Q. All right. And then if you turn to the next
4  page, there is a Due To, Due From Officer section; do
5  you see that? On that side.
6    A. Yeah. Okay.
7    Q. And there is payments to Tech One Parts. Can
8  you tell me what that is?
9    A. Yeah, he is a racing chassis builder and a
10  parts dealer.
11   Q. Okay. So it's for your racing –
12   A. It is.
13   Q. – hobby. And then there is a dividends
14  payment to you of $5,000; correct?
15   A. Yes, I see it.
16   Q. All right. And so you took out $5,000 in
17  dividends that year; correct?
18   A. Correct.
19   Q. And then Plymouth Motor, is that also a racing
20  expense?
21   A. I don't know what that is. I race at a
22  racetrack called Plymouth Motor Speedway.
23   Q. Oh, okay.
24   A. But that doesn't look familiar to me. I don't
25  know what it is.

Page 204

1    Q. All right. Then there's an item there that
2  says Loan from J.D. Brutti; do you see that?
3    A. I do.
4    Q. All right. And that actually reflects the
5  start-up money for Dock & Door; correct?
6    A. It reflects –
7    Q. Well, strike that. The $15,000 was start-up
8  money for Dock & Door; correct?
9    A. Language, whatever you want to call it, but I
10  believe that it is the first billable – I didn't send
11  them a bill when we first started. I was still working.
12  So I don't have any kind of like accounting software. I
13  don't know at that time what QuickBooks is or what – so
14  I believe it was just the first check that Midwest Dock
15  wrote.
16   Q. All right. It actually shows up as a loan;
17  correct?
18   A. Yeah.
19   Q. On your books?
20   A. I don't know how that is, but I could be foggy
21  on this too.
22   Q. I'm going to show you what was previously
23  marked as Exhibit 107 – I'm sorry, 106. And it's a
24  text message exchange between you and Callie Stephens at
25  Gineris. Can you read to me the exchange that's

Anthony Joseph Brutti
October 09, 2025                                                     Pages 205..208

Page 205

1   circled.
2       A.  Yeah. So Callie is saying: "Hey, Tony, we have
3   a loan from J.D. Brutti on the books since the company's
4   inception. Do you know about this?"  And I said yeah, I
5   didn't know the details of it, but I had seen it in –
6       Q.  Just read your response into the record,
7   please.
8       A.  "Yeah, it's the original start-up money from
9   Mike and Tony back when I first started.  I think they
10  wanted to keep the two businesses as separate as
11  possible, so they just put my dad's name on it."
12      Q.  Were you lying to Callie when you said that?
13      A.  No.
14      Q.  Okay. That's what you believed at the time you
15  wrote that; right?
16      A.  I –
17      Q.  Is that what you believed when you wrote that?
18  MR. HUGHES:  Objection, let him finish his answer.
19  THE WITNESS:  Yeah, it was,  if you want to call it
20  start-up money, okay.  It would be the first couple of
21  weeks of pay that would be needed for the business.
22  BY MR. McJESSY:
23      Q.  Okay. You referred to it as start-up money;
24  right?
25      A.  I did. I was probably being vague at the time.

Page 206

1       Q.  What did you mean when said "I think they
2   wanted to keep the two businesses as separate as
3   possible, so they just put my dad's name on it"?
4       A.  I don't know if Midwest wanted to do that or
5   Gineris wanted to do that.
6       Q.  Okay.
7       A.  Meaning they, I don't know who it was.
8       Q.  All right. You said:  "It's the original
9   start-up money from Mike and Tony back when I first
10  started," correct?
11      A.  Correct.
12      Q.  All right. And this is a text message you sent
13  to Callie; correct?
14      A.  Correct.
15      Q.  But it wasn't a loan from your father;
16  correct?
17      A.  No, it was definitely not a loan from my
18  father.
19      Q.  Now, if you take a look at Exhibit 192 – or
20  I'm sorry, Exhibit 266, and you look at the Dividend
21  section – actually, that just records the manual
22  entries. Let's skip that.
23          If you go to Sales – let's skip that.
24          Go to Supplies, which is right after it's GL
25  Account 5030.

Page 207

1       A.  Is that in numerical order?
2       Q.  Yeah, the accounts are listed in numerical
3   order.
4       A.  Okay.
5       Q.  When you record or when you – strike that.
6   Do you know what the supplies that are listed there
7   would be for?
8       A.  I don't.
9       Q.  Okay. They could be for – and are they for
10  the business?
11      A.  I couldn't tell you.
12      Q.  You don't know. Okay.  If you go to
13  Advertising, which is on the next page.
14      A.  Okay.
15      Q.  It says Anthony Brutti Sponsorship.
16      A.  Correct.
17      Q.  What's that for?
18      A.  I would pay myself just for the racing.
19      Q.  So is that for the – that's for your racing
20  business?
21      A.  Yeah.
22      Q.  Okay.  If you go down further and to Dues and
23  Subscriptions; do you see that?
24      A.  I do.
25      Q.  And it says Championship Racing Association?

Page 208

1       A.  I see.
2       Q.  Is that relating to the racing as well?
3       A.  It is.
4       Q.  Okay. Do you know what that would be for?
5       A.  Yeah, that's an initial membership at the
6   beginning of the season.
7       Q.  Okay. And then if you turn to the next page,
8   there is a section called Office Supplies.
9       A.  Okay.
10      Q.  Do you see that section?
11      A.  I see.
12      Q.  And there is a number of entries there monthly
13  for Dyer Self Storage; do you see that?
14      A.  Yeah.
15      Q.  That's for the storage of the race car; right?
16      A.  It is.
17      Q.  Okay. And then there's a number of expenses
18  listed there for Jewel Osco; do you see that?
19      A.  I do.
20      Q.  And Bass Pro Shops, there's an entry there for
21  that.  Do you know what these expenses are related to?
22      A.  I don't know about Bass Pro. I'm sure most of
23  it's personal.
24      Q.  Okay. That's what I sort of thought too, but I
25  just wanted to – like grocery expenses?

Anthony Joseph Brutti
October 09, 2025                                    Pages 209..212

Page 209

1    A. Yeah, I buy myself stuff at Jewel.
2    Q. Okay.
3    A. Yeah.
4    Q. And then if you turn to the next page, there
5    is a section for Legal and Professional Fees; do you see
6    that?
7    A. I see.
8    Q. And do you see that there's a Lawrence Kamin
9    Saunders, that's for legal representation; correct?
10   A. Correct.
11   Q. All right. And Gineris & Associates is for
12   accounting; correct?
13   A. Correct.
14   Q. All right. And then below that there is a
15   section called Repairs and Maintenance; correct?
16   A. Correct.
17   Q. And then there's a number of entries there for
18   Left-hander Chassis?
19   A. Yeah, those are our racing parts.
20   Q. Okay. O'Reilly Auto Parts?
21   A. O'Reilly's is the closest auto parts store to
22   the shop.
23   Q. So those could be expenses for the shop?
24   A. Most likely not.
25   Q. Okay. You think they're most likely personal

Page 210

1    expenses?
2    A. Yeah.
3    Q. All right. And Tech One Auto, you said that's
4    for racing, the racing program?
5    A. Yeah.
6    Q. Okay. And there is an entry there for Big Tex
7    Trailer; do you see that?
8    A. Oh, yeah.
9    Q. That's the trailer that Midwest Dock Solutions
10   has, correct, it's a Big Tex trailer?
11   A. They do have a Big Tex trailer, yeah.
12   Q. Is this related to that or is this different?
13   A. Not necessarily. I could get something for my
14   own trailer too.
15   Q. Oh, okay. Do you have a trailer?
16   A. I do.
17   Q. Okay. Is it a Big Tex trailer?
18   A. It's not, but they're so universal that..
19   Q. Got it. That's like a store brand that you
20   could go to?
21   A. Yeah.
22   Q. Okay. So you think most of these expenses on
23   here would be either personal or for your racing
24   program?
25   A. Yeah, most likely.

Page 211

1    Q. Okay. And then if you turn to the next page,
2    there is a number of entries for supplies. And I see a
3    lot of Amazon and Ace Hardware and Crete Ace Hardware on
4    there. Again, you think personal expenses?
5    A. Most likely personal, yeah. There might be –
6    I might buy like work clothes and stuff like that, if
7    you want to call it work expenses, but most of it is
8    personal.
9    Q. Okay. And then if you turn to the next page
10   where it says Vehicle Expense, I don't know, but I'm
11   just guessing most of these expenses like they could be
12   for fuel?
13   A. Yeah, these would be gas station trips and
14   auto repair it looks like.
15   Q. Okay. Presumably for your personal vehicle or
16   for your truck that you're using for your job?
17   A. Yeah.
18   Q. So it would be a mix of personal expenses and
19   –
20   A. Yeah.
21   Q. Okay. McDonald's, do they sponsor your race
22   car?
23   A. Currently?
24   Q. Yeah.
25   A. No.

Page 212

1    Q. Who does?
2    A. Fortunately, nobody.
3    Q. Oh, sorry to hear that. I take it they did
4    sponsor your race car for a while?
5    A. Yeah.
6    Q. Is that what it's called, sponsorship?
7    A. It is.
8    Q. Okay. Joseph Pineda, P I N E D A?
9    A. Yeah.
10   Q. Or Jose Pineda, I'm sorry.
11   A. Jose Pineda, yeah.
12   Q. Is he an employee of Dock & Door?
13   A. He was.
14   Q. He was?
15   A. Yes.
16   Q. Did he get into an accident?
17   A. Yeah, I believe he hurt his shoulder.
18   Q. And what was the nature of the accident?
19   A. He was taking something off a truck. I
20   wasn't there, but he was taking something off a truck
21   and he tripped over a box, is what he claimed, and tore
22   his rotator cuff I think.
23   Q. All right. And did he file a claim at all?
24   A. Yeah.
25   Q. Against Dock & Door?

Anthony Joseph Brutti
October 09, 2025
Pages 213..216

**Page 213**

1  A. He did.
2  Q. And was it – has it been resolved?
3  A. As far as I know, it has been, yeah. I believe
4  they covered it, my insurance, workman's comp.
5  Q. They covered the accident?
6  A. Yeah.
7  Q. All right. And did one of Dock & Door's
8  employees get into an auto accident with somebody? Does
9  that sound familiar?
10  A. I don't recall that.
11  Q. I hand you what I've marked as Exhibit 267.
12  And these are the text messages that you produced in
13  this case; correct?
14  A. You're correct, yes.
15  Q. So between the e-mails that we looked at
16  earlier that were part of the supplemental discovery
17  response and these text messages, those are all the
18  communications that you had to produce between you and
19  Tony Zarlengo; is that correct?
20  A. Correct.
21  Q. And you apparently had none to produce between
22  you and Mike Richert; is that true?
23  A. No, there was a couple.
24  Q. Was there a couple here?
25  A. Yeah.

**Page 214**

1  Q. Which ones are – oh, at the end. I'll take
2  that back. So between you and Mr. Zarlengo and you and
3  Mr. Richert from 2016 to when you produced the records
4  to your counsel, this is the complete universe of
5  communications by e-mail or text that you had?
6  A. That I had, yes.
7  Q. If you turn to the entry for Thursday,
8  March 27th in here, there's a text message exchange I
9  wanted to ask you about.
10  A. That's it.
11  Q. Yeah. And do you see the text message exchange
12  that says: "You want me to call in forklift? Yes."
13  And then there's another entry: "Is Branden
14  working tomorrow?
15  "Ira said no. I may use him."
16  "Ok he was asking."
17  "Ira just told me." Do you see that?
18  A. I do.
19  Q. All right. Now, the text on the right are your
20  texts; correct?
21  A. Yes.
22  Q. And texts on the left are Tony Zarlengo's;
23  correct?
24  A. Correct.
25  Q. And when you asked Tony Zarlengo "Is Branden

**Page 215**

1  working tomorrow," who is Branden?
2  A. Branden Bishop, I would think.
3  Q. Okay. Do you know another Branden?
4  A. I do not.
5  Q. Okay. So between Dock & Door and Midwest Dock
6  Solutions, he's the only Branden; correct?
7  A. Yes.
8  Q. Okay. And Tony Zarlengo is responding: "Ira
9  said no, I may use him;" correct?
10  A. Correct.
11  Q. Okay. And when he says "I may use him," who is
12  he referring to? Himself?
13  A. Tony might have a job that he could go on,
14  yeah.
15  MR. McJESSY: Okay. I don't have any other
16  questions. Have you?
17  MR. MILLER: I don't think I do.
18  MR. HUGHES: I might have five minutes. I'll check
19  my notes just to be sure.
20  (A short break was had.)
21  MR. HUGHES: I have no questions.
22  MR. MILLER: We are done. We will waive signature.
23  THE COURT REPORTER: Is this to be held or
24  transcribed?
25  MR. McJESSY: Yeah, I'll order it.

**Page 216**

1  THE COURT REPORTER: Okay.
2  MR. McJESSY: There is a large volume of exhibits,
3  so we won't get those to you today, but we will get them
4  to you.
5  THE COURT REPORTER: Do you want them attached or
6  not?
7  MR. McJESSY: No.
8  THE COURT REPORTER: Okay.
9  MR. McJESSY: I'll take them. Can you initial them
10  so they've got your official –
11  THE COURT REPORTER: Yes.
12  MR. McJESSY: Usually the court reporters do that
13  when we're in person. If you can initial them, that
14  would be helpful.
15  (Witness excused.)
16
17
18
19
20
21
22
23
24
25

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F - California Firm Registration #179

Anthony Joseph Brutti
October 09, 2025

Pages 217..218

Page 217

1    UNITED STATES OF AMERICA        )
     NORTHERN DISTRICT OF ILLINOIS  )
2    EASTERN DIVISION              )  SS.
     STATE OF ILLINOIS             )
3    COUNTY OF COOK                )

4

5         I, Lois A. LaCorte, Certified Shorthand

6    Reporter, Registered Diplomate Reporter, and Notary

7    Public, do hereby certify that ANTHONY JOSEPH BRUTTI was

8    first duly sworn by me to testify to the whole truth and

9    that the above deposition was reported stenographically

10   by me and reduced to typewriting under my personal

11   direction.

12        I further certify that the said deposition was

13   taken at the time and place specified and that the

14   taking of said deposition commenced on the 9th day of

15   October, 2025, at 10:00 a.m.

16        I further certify that I am not a relative or

17   employee or attorney or counsel of any of the parties,

18   nor a relative or employee of such attorney or counsel,

19   nor financially interested directly or indirectly in

20   this action.

21

22

23

24

25

Page 218

1         In witness whereof, I have hereunto set my

2    hand and affixed my seal of office at Chicago, Illinois,

3    this 1st day of December, 2025.

4

5

6

7

8                        _____

                         LOIS A. LA CORTE, CSR, RDR

9                        180 North LaSalle Street

                         Suite 2800

10                       Chicago, Illinois 60601

11                       Phone: (312) 236-6936

     CSR No. 084-001061

12

13

14

15

16

17

18

19

20

21

22

23

24

25

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 4

1

```
          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
                   EASTERN DIVISION

MID-AMERICA CARPENTERS REGIONAL COUNCIL )
PENSION FUND, et al,                    )
                                        )
                  Plaintiffs,           )
                                        )
        -vs-                            ) 2024 CV 06428
                                        )
DOCK & DOOR INSTALL, INC., an Illinois  )
corporation and MIDWEST DOCK SOLUTIONS, )
INC., an Illinois corporation,          )
                                        )
                  Defendants.           )
_____ )


        The deposition of MICHAEL RICHERT called by
the Plaintiffs for examination, pursuant to notice and
pursuant to the Federal Rules of Civil Procedure for
the District Courts of the United States, taken before
Sheryl F. Rose, a Notary Public and Certified Shorthand
Reporter within and for the County of Cook and the
State of Illinois at 3759 North Ravenswood Avenue,
Chicago, Illinois, on the 25th day of September, 2025,
commencing at the hour of 9:30 o'clock a.m.
```

3

```
1              I N D E X
2 WITNESS:
3 Michael Richert
4     Examination by Mr. McJessy              4 - 208
5
6
7 EXHIBITS:
8 Exhibit No. 40                                   11
9 Exhibit No. 79                                   72
10 Exhibit No. 80                                  94
11 Exhibit No. 81                                 140
12 Exhibit No. 82                                 143
13 Exhibit No. 83                                 145
14 Exhibit No. 84                                 145
15 Exhibit No. 85                                 150
16 Exhibit No. 86                                 154
17 Exhibit Nos. 87 - 91                           156
18 Exhibit No. 53                                 185
19 Exhibit No. 92                                 193
20 Exhibit No. 93                                 207
21 Exhibit No. 94                                 208
22
23
24
```

2

```
1 A P P E A R A N C E S:
2         McJESSY CHING & THOMPSON LLC, by
          MR. KEVIN P. McJESSY
3         3759 North Ravenswood Avenue
          Suite 231
4         Chicago, Illinois   60613
5         mcjessy@MCandT.com
6              Appeared on behalf of the Plaintiffs;
7
8         ALLOCCO MILLER & CAHILL P.C., by
          MS. KATHLEEN CAHILL
9         20 North Wacker Drive
          Suite 3517
10        Chicago, Illinois   60606
11        kmc@alloccomiller.com
12             Appeared on behalf of Dock & Door
                 Install, Inc.;
13
14        AMUNDSEN DAVIS LLC, by
          MR. MICHAEL HUGHES
15        3815 East Main Street
          Suite A-1
16        St. Charles, Illinois   60174
17        mhughes@amundsendavislaw.com
18             Appeared on behalf of Midwest Dock
                 Solutions, Inc.
19
20
21        ALSO PRESENT:  Mr. Anthony Brutti
22
23
24
```

4

1  (Witness sworn)
2  WHEREUPON:
3       M I C H A E L   R I C H E R T
4  the deponent herein, called as a witness, having been
5  first duly sworn, was examined and testified as
6  follows:
7            E X A M I N A T I O N
8       by Mr. McJessy
9     **Q   Sir, could you state your name for the record,**
10 **first, middle and last, and spell each?**
11    A   Michael Lee Richert.
12    **Q   And can you spell each?**
13    A   M-i-c-h-a-e-l  L-e-e  R-i-c-h-e-r-t.
14    **Q   And have you ever been deposed before, sir?**
15    A   No.
16    **Q   Okay.  But you did sit through the deposition**
17 **on Tuesday of Mr. Sugar, correct?**
18    A   Yes.
19    **Q   So you're generally familiar with the process,**
20 **but just for the record we'll go through a few ground**
21 **rules.**
22         **You understand you're under oath?**
23    A   Yes.
24    **Q   And you understand that that oath has the**

5

1   same force and effect as if you were testifying in
2   a court of law?
3       A   Yes.
4       Q   Okay.  And you saw how it went on Tuesday, but
5   I'm going to ask you a series of questions.  You give
6   me the best answers you can.
7           We both can't talk at the same time just
8   because the court reporter would have a hard time
9   taking down what each of us say if we're talking at
10  the same time.
11          So when I ask a question, I'll wait for
12  you to answer and when I'm asking a question it would
13  be -- I'd appreciate it if you wait for me to finish
14  asking my question.
15          Is that fair?
16      A   Yes.
17      Q   All right.  All your answers need to be verbal
18  yeses and nos, and we're off to a good start on that,
19  but if you nod your head, shake your head, say uh-huh
20  or uh-uh, something like that, I will prompt you is
21  that a yes, is that a no, just so the record is clear.
22          Is that fair?
23      A   Fair.
24      Q   All right.  If I ask you a question and you

6

1   don't understand it, will you ask me to explain it?
2       A   Yes.
3       Q   Okay.  So then if you don't ask me to explain
4   it, is it fair that I can presume you understood my
5   question?
6       A   Yes.
7       Q   All right.  Any reason you cannot give
8   truthful answers today?
9           For example, are you under -- suffering
10  from any conditions or under -- taking any medications
11  that would either impair your ability to understand my
12  questions or give truthful answers?
13      A   No.
14      Q   Okay.  Sir, are you related to Anthony Brutti?
15      A   Yes.
16      Q   All right.  He's here in our conference room
17  today, correct?
18      A   Yes.
19      Q   And how are you related to Anthony Brutti?
20      A   Cousins.
21      Q   Okay.  And can you describe for me the
22  connection?
23          How is it that you're cousins?  Who's
24  the -- is it --

7

1       A   My mother's brother.
2       Q   Okay.  Your mother's brother is his father?
3       A   Correct.
4       Q   Okay.  And who is that?  Who's your mother
5   and --
6       A   Judy.
7       Q   (Continuing) -- who's his father?
8           Judy --
9       A   Richert.
10      Q   Okay.  And his father is?
11      A   Joe Brutti.
12      Q   And are you related to Anthony Zarlengo?
13      A   No.
14      Q   He's not your brother-in-law?
15      A   No, not anymore.
16      Q   Was he your brother-in-law?
17      A   Yes.
18      Q   For what period of time?
19      A   17 years.
20      Q   And from what time to what time?
21      A   2006.
22      Q   That's when he married your sister?
23      A   That's when I married his sister.
24      Q   I'm sorry.  Strike that.

8

1           That's when you married his sister?
2       A   Correct.
3       Q   And you got divorced, I take it?
4       A   We're not legally divorced just yet, but have
5   been separated for three years.
6       Q   So legally he's still your brother-in-law?
7       A   Yes.
8       Q   All right.  Sir, you're represented here today
9   by counsel, is that correct?
10      A   What was that again?
11      Q   You're represented today here by counsel,
12  correct?
13      A   Yes.
14      Q   And that's Mr. Hughes; he's your attorney?
15      A   Yes.
16      Q   Okay.  And did you do anything today to
17  prepare for your deposition?
18      A   No.
19      Q   Okay.  Have you reviewed any documents?
20      A   No.
21      Q   All right.  Did you have a chance to -- I
22  don't want to know what you said to him or what he said
23  to you, but did you have a chance to speak with your
24  attorney to prepare for the deposition?

9

1   A   Yes.
2   Q   And on how many occasions?
3   A   Once.
4   Q   And for how long?
5   A   52 minutes.
6   Q   That's pretty precise.
7   A   It is.
8   Q   How do you know it's 52 minutes?
9   A   Said it on my phone.
10      MR. HUGHES:  I'll have to adjust my bill for
11  that.
12      MR. McJESSY:  I was going to offer that
13  comment.  No rounding off to the top of the hour.
14  BY MR. McJESSY:
15  Q   Was anybody -- was anybody else present during
16  that meeting?
17  A   No.
18  Q   Okay.  Did you review any documents during the
19  course of that meeting?
20  A   No.
21  Q   All right.  Have you spoken with anybody else
22  about your deposition here today?
23  A   No.
24  Q   You know a number of people have already been

10

1   deposed in this case, correct?
2   A   Correct.
3   Q   And have you spoken to anybody about their
4   deposition that was given in this case?
5   A   No.
6   Q   Are you aware that other depositions other
7   than -- you were here for Mr. Sugar's, but are you
8   aware that depositions other than his took place?
9   A   Yes.
10  Q   Whose depositions are you aware took place?
11  A   Who was the first person?
12      I was here.
13      Quentin.
14  Q   Quentin Williams.
15  A   I was here for Zach.
16  Q   Corrigan?
17  A   Yes.
18  Q   All right.  So those are the ones that you're
19  -- the ones that you're aware of are the ones that you
20  were here for?
21  A   Yes.
22  Q   Okay.  Sir, are you aware that Midwest Dock
23  Solutions -- if I refer to it as Midwest or Midwest
24  Dock, you understand I'm talking about Midwest Dock

11

1   Solutions?
2   A   Yes.
3   Q   Are you aware that Midwest Dock Solutions
4   tendered discovery responses in this case, answers to
5   interrogatories, and produced documents?
6   A   Yes.
7   Q   All right.  Were you involved at all in
8   gathering information -- I've handed you Exhibit 40.
9       That's one of the discovery responses
10  that we received from Midwest.
11      Did you ever review these responses?
12  A   No.
13  Q   Okay.  Have you reviewed any discovery
14  responses by Midwest?
15  A   No.
16  Q   Were you involved at all in gathering
17  information or documents to respond to the
18  interrogatories that have been issued to Midwest
19  in this case?
20  A   No.
21  Q   Were you at all involved in gathering any
22  documents responsive to produce -- strike that.
23      Were you at all involved in gathering
24  documents to produce in response to the document

12

1   requests issued in this case?
2   A   No.
3   Q   Okay.  Were you ever asked to review your
4   emails in order to produce emails in this case?
5   A   Yes.
6   Q   All right.  And when were you asked to do
7   that?
8   A   I'm not sure.  At the beginning.
9   Q   And did you produce emails in this case?
10  A   Yes.
11  Q   And who did you give those to?
12  A   Mike.
13  Q   Mr. Hughes?
14  A   Yes.
15  Q   All right.  Do you know what volume of emails
16  you produced to him?
17  A   Between nine and maybe fifteen.
18  Q   And where are your emails kept?
19  A   On my laptop.
20  Q   And are they kept in any sort of program like
21  Outlook or something like that or do you just log onto
22  the Internet to view them?
23  A   I just get on my email.
24  Q   You get it on your email?

13

1   A  Yes.

2   **Q  Okay.  When you open up your laptop and turn**

3 **on your laptop, are they just there or do you have to**

4 **click on something to access them?**

5   A  They're probably just there.

6   **Q  Okay.**

7   A  I don't email much.  I don't email at all.

8   **Q  I've reviewed emails produced by third parties**

9 **in this case and have not seen any really from you.**

10   A  No.

11   **Q  So you say you don't really email at all?**

12   A  No.

13   **Q  Explain to me what you mean by that just so**

14 **the record is clear.**

15   A  I don't send out emails.

16   **Q  Ever?**

17   A  Not really.

18   **Q  Okay.  Do you get emails?**

19   A  Yes.

20   **Q  Okay.  And who do you -- for work.  I'm**

21 **talking about for your work for Midwest of course.**

22   A  Yes.

23   **Q  Okay.  And what kind of emails do you get?**

24   A  Service tickets.

14

1   **Q  What are those?**

2   A  Tickets for service work.

3   **Q  What's a service ticket?**

4   A  A ticket a service tech would fill out when

5 the job is completed or if they need something going

6 forward to complete the job.

7   **Q  So it's not something that initiates a job.**

8      **It's something at the completion of a**

9 **job or for the continuance of a job that's already in**

10 **progress?**

11   A  Correct.

12   **Q  What initiates a ticket?**

13   A  Them going out and servicing and then writing

14 that ticket out.

15   **Q  And do they do that on -- how do they do that?**

16      **Is it in an email on a --**

17   A  They hand write a service ticket out.  They

18 take a picture and then email it.

19   **Q  And if you -- you have Exhibit 40 in front**

20 **of you there.**

21      **If you turn to the second and third page**

22 **of that document, do you see that there's a list of**

23 **employees there where it says employee name, employment**

24 **period, email address, type of work?**

15

1      **Do you see that?**

2   A  Yes.

3   **Q  Okay.  And then a list of names and then it**

4 **says type of work and it says technician.**

5      **And if you look on the right, for example,**

6 **it says Branden Bishop, technician.**

7      **It says Vincent Conti, warehouse.**

8      **Do you see that?**

9   A  Correct.

10   **Q  So when you said a service tech, looking**

11 **at the names of the people here who are listed as**

12 **technicians, are the technicians that are listed here**

13 **the service techs you're referring to?**

14   A  Not all of them, no.

15   **Q  Okay.  There's others besides these?**

16   A  No.  Some of them are not service techs.

17   **Q  Okay.  Is there a difference between a**

18 **technician and a service technician?**

19   A  Well, there's a service tech and then there

20 would be what I would consider a helper or even

21 possibly someone that's helping in between school,

22 summer school.

23   **Q  Okay.  And what's the difference between a**

24 **technician and a helper or a summer helper?**

16

1   A  A summer helper would be somebody we hire for

2 the summer to help.

3   **Q  And what's a helper?**

4   A  Somebody that just delivers parts, may give

5 somebody a hand on a job or runs around in the shop

6 and does stuff.

7   **Q  All right.  Let's go through this list.**

8      **You see the list of folks there that are**

9 **listed as technicians, correct?**

10   A  Correct.

11   **Q  And why don't you tell me which ones you**

12 **think -- well, let's just go through the list starting**

13 **at the beginning and I'll ask you.**

14      **Is Branden Bishop a technician?**

15   A  No.

16   **Q  Okay.  What is a technician?**

17   A  A service technician that does service calls.

18   **Q  And what does that mean?**

19   A  He works on doors and docks.

20   **Q  Doing what kind of work?**

21   A  Fixing them.

22   **Q  And would he also -- are there any female**

23 **technicians or service techs that work for Midwest**

24 **Dock Solutions?**

17

```
 1    A   No.
 2    Q   So would he also remove and replace a door,
 3  for example?
 4    A   He could.  Yes.
 5        MR. HUGHES:  Objection.
 6            Are you talking about a specific person
 7  or are you talking about a service technician?
 8        MR. McJESSY:  A service technician.
 9  BY MR. McJESSY:
10    Q   Would a service technician also remove and
11  replace a dock?
12    A   Yes.
13    Q   A dock leveler?
14    A   Yes.
15    Q   Would a service technician also install a new
16  overhead door?
17    A   No.
18    Q   Okay.  Would a service technician also install
19  a new dock leveler?
20    A   No.
21    Q   So I asked you first Branden Bishop, is he a
22  technician and you said no, correct?
23    A   Correct.
24    Q   What kind of work does Branden Bishop do or
```

18

```
 1  did he do?
 2    A   Branden worked for Midwest Dock when he was
 3  in school as a helper or a shop hand.
 4    Q   Okay.
 5    A   I don't know the dates of what this would be
 6  and where he would be.
 7    Q   Okay.  That's your recollection of the work
 8  he did?
 9    A   Yes.
10    Q   Did you hire him?
11    A   When he was in school, yes.
12    Q   Okay.  Is there a period other than when he
13  was in school?
14    A   No.
15    Q   Why did you qualify it with when he was in
16  school, yes?
17    A   Because he worked for Midwest Dock.
18    Q   When he was in school?
19    A   Yes.  In high school.  He would work there in
20  the summertime.
21    Q   Okay.  And you hired him to do that?
22    A   Yes.
23    Q   Okay.  How about did he work -- strike that.
24        Did he work there after high school,
```

19

```
 1  after he completed high school?
 2    A   I don't remember.  I could not honestly answer
 3  that.
 4    Q   All right.  Adam Clay?
 5    A   I don't know who he is.
 6    Q   How about Vincent Conti?
 7    A   I don't know who he is.
 8    Q   Zachary Corrigan, you were here for his
 9  testimony you said, correct?
10    A   Correct.
11    Q   Was he a technician?
12    A   Yes.
13    Q   All right.
14    A   When he worked for Midwest Dock.
15    Q   Okay.  And do you know did he also work for
16  Dock & Door?
17    A   He worked for Dock & Door at a later date.
18    Q   And do you know did Branden Bishop also work
19  for Dock & Door?
20    A   Yes.  At a later date.  I don't know those
21  dates, but yes.
22    Q   And you see Branden Bishop here, it says
23  employment period 6/3/2029 to 8/12/2020.
24        Do you see that?
```

20

```
 1    A   Yes.
 2    Q   Do you know what -- obviously those dates
 3  don't work because 2029 comes before 2020 and 2029
 4  hasn't happened yet.
 5        Do you know what -- approximately what
 6  dates his employment period would have been?
 7    A   No.
 8    Q   And for Zachary Corrigan, the same thing.
 9  It says 1/11/2027 to 3/25/2019.
10        Do you see that?
11    A   Yes.
12    Q   Do you know what his actual employment period
13  would have been?
14    A   No.
15    Q   And Ronald Cronk, it says technician.
16        Is he a technician?
17    A   He was when he worked at Midwest Dock
18  Solutions.
19    Q   Did he also work at Dock & Door?
20    A   Correct.
21    Q   And who hired Ronald Cronk?
22    A   I would have hired him at Midwest Dock
23  Solutions.
24    Q   You would have made the decision to hire him?
```

21

```
 1    A   Possibly, yes.
 2    Q   Okay.  You said possibly.
 3    A   It was a long time ago.
 4    Q   So you're not sure, but that's what you think?
 5    A   Me and Tony could have hired him or I could
 6  have.
 7    Q   How about Zachary Corrigan, who hired him?
 8    A   When he worked for Midwest Dock?
 9    Q   Yes.
10    A   Me and/or Tony.
11    Q   And Donald Cruikshank, it says that he's a
12  technician.
13        Was he a technician?
14    A   When he worked at Midwest Dock.
15    Q   And do his employment dates that are shown
16  there look about right to you?
17    A   I couldn't answer that.
18    Q   You don't know?
19    A   I don't know.
20    Q   And who would have hired Donald Cruikshank?
21    A   Me and/or Tony.
22    Q   And Tyler Michael DeAngeles, it lists him as a
23  technician?
24    A   I don't know him.
```

22

```
 1    Q   Okay.  Jacob Deboer, D-e-b-o-e-r?
 2    A   I don't know him.
 3    Q   Thomas Donnelly, D-o-n-n-e-l-l-y?
 4    A   Yes.
 5    Q   He was a technician?
 6    A   Correct.
 7    Q   Do you know who hired him?
 8    A   Me and/or Tony.
 9    Q   You don't remember specifically?
10    A   No.
11    Q   If you give me a response that's me and/or
12  Tony, does that mean you don't recall specifically, but
13  it could have been one or the other of you?
14    A   Correct.  It was probably together.
15    Q   If you do remember specifically, will you tell
16  me that?
17    A   Yes.
18    Q   Otherwise tell me this is what I think just so
19  I don't have to keep asking you that same question over
20  and over.
21        Do his employment dates look about right
22  to you?
23    A   I cannot answer that question.
24    Q   Okay.  And Jeff Gibson, it lists him as a
```

23

```
 1  technician.
 2        Do you see that?
 3    A   Yes.
 4    Q   Was he a technician?
 5    A   Yes.
 6    Q   And who hired him?
 7    A   Me and Tony.
 8    Q   And when you say "and Tony," just so we're
 9  clear because there's a Tony Brutti in this case and
10  a Tony Zarlengo, --
11    A   Tony Zarlengo.
12    Q   (Continuing) -- can you use a last name just
13  going forward so we're clear?
14    A   Yes.
15    Q   Okay.  And the other times you've said me
16  and/or Tony, you meant Tony Zarlengo, correct?
17    A   Correct.
18    Q   Matthew Gongola, it lists him as a technician.
19        Is that correct?
20    A   No.
21    Q   Do the employment dates look about right to
22  you?
23    A   I don't know who he is.
24    Q   Okay.  Then how do you know that he's not a
```

24

```
 1  technician?
 2    A   Because I would know if he worked for Midwest
 3  Dock.  I would think I would know.
 4    Q   You're not sure though?
 5    A   No.
 6    Q   So he could have been a technician?
 7    A   I'm going to say no.
 8    Q   And what's the basis -- what's your knowledge
 9  that he wasn't a technician if you don't remember him?
10    A   I don't remember him.
11        I mean, it's that simple.
12    Q   So if you don't remember him, you think he
13  couldn't have been a technician, but you really don't
14  know?
15    A   I really don't know.
16        I think I would remember, but no, I do
17  not remember him.
18    Q   Richard Kardosh, it lists him as a technician.
19        Do you see that?
20    A   Yes.  I know him.
21    Q   And is he a technician?
22    A   Yes.
23    Q   And who hired him?
24    A   Me and Tony Zarlengo.
```

25

1    Q    And if you look at -- it says James Johnson
2    and George Kantzavelos, K-a-n-t-z-a-v-e-l-o-s.
3         It shows them as both sales, is that
4    correct?
5    A    This could have been a guy that was hired
6    many, many years ago --
7    Q    Okay.
8    A    (Continuing) -- for sales.  Yes.
9    Q    That's George?
10   A    Yes.
11   Q    And then what about James Johnson?
12   A    Sales.
13   Q    Do you know who would have -- strike that.
14        Do you know who hired James Johnson?
15   A    Me and Tony Zarlengo.
16   Q    Okay.  And do you know who hired George
17   Kantzavelos?
18   A    Me and Tony Zarlengo.
19   Q    Okay.  And then I didn't ask you about
20   Jane Graham.
21        Does she go by Janie?
22   A    Janie.
23   Q    And does see work in the warehouse?
24   A    Yes.

26

1    Q    What kind of things does she do working in the
2    warehouse?
3    A    She gets jobs ready, builds curb angle and
4    keeps the inventory.
5    Q    And what does it mean to get jobs ready?
6    A    Like if somebody orders a job, she will
7    prepare it and get it ready to be loaded.
8    Q    What does that mean?
9    A    She will put it on a pallet or stage it so
10   they know where that's at in the shop.
11   Q    What is she putting on a pallet or staging?
12   A    Whatever is needed for that service job.
13   Q    And can you give me some examples?
14   A    Could be electrical fittings, electrical
15   wire.  Could be a piece of flat steel.  It could be
16   one single panel.
17   Q    Door panel?
18   A    Door panel.
19   Q    Could it be a dock leveler?
20   A    It could be.
21   Q    Could it be an entire door?
22   A    It could be.
23   Q    Okay.  And she puts it so that the workers,
24   when they come in, they can find the things that they

27

1    need to take out to the jobsite?
2         Is that a --
3    A    Correct.
4    Q    And then you said she builds curb angle.
5         What's that?
6    A    That is for a loading dock.
7    Q    And what is a curb angle?
8    A    It is where the pit sits.  The dock sits in a
9    pit.
10   Q    And what's the curb angle?
11        The pit?
12   A    Yes.  Goes around the top of the pit.
13   Q    So there's a pit at the jobsite, correct?
14   A    Correct.
15   Q    And the curb angle goes into that pit that's
16   at the jobsite?
17   A    Correct.  If it's needed.
18        MR. HUGHES:  Kevin, I'm going to need two
19   minutes.  I'm just going to step out here and hopefully
20   it will be less than five minutes.
21        MR. McJESSY:  All right.  I guess we'll take a
22   break for a few minutes.
23        (Whereupon a short recess was had)
24        MR. McJESSY:  Can you read back to me the last

28

1    question and answer.
2         (Whereupon the record was read)
3    BY MR. McJESSY:
4    Q    And you said that Jane Graham also keeps
5    inventory, is that correct?
6    A    Correct.
7    Q    Is that Midwest Dock Solutions' inventory?
8    A    Correct.
9    Q    And that's in the warehouse at 27 36th Place?
10   A    Correct.
11   Q    And is she also responsible for ordering
12   inventory?
13   A    No.
14   Q    Okay.
15   A    Well, small inventory.
16   Q    What do you mean by that?
17   A    Rollers.  Hinges.
18   Q    Okay.
19   A    Like spring clamps.  Small inventory.
20   Q    Parts that are needed for the kind of work
21   that the service techs do.
22        Is that fair?
23   A    Correct.
24   Q    Okay.  She wouldn't order like dock levelers

29

1  or dock doors, things like that?
2  A  No.
3  Q  Would she order panels, door panels?
4  A  No.
5  Q  Okay.  So when you say small, you don't mean
6  necessarily physically small, but inexpensive parts,
7  that kind of thing?
8  A  Yes.  Inexpensive.  And, yes, smaller sized
9  parts.
10  Q  Okay.  Dylan Kelly, it lists him as a
11  technician.
12     Do you see that?
13  A  Yes.
14  Q  And is that correct?
15  A  No.
16  Q  Okay.  What did Dylan Kelly do?
17  A  He was a helper.
18  Q  And who hired him?
19  A  Me and Tony Zarlengo.
20  Q  And do the employment dates there look about
21  right to you?
22  A  I can't honestly answer that.
23  Q  How about James Kelly, it says he's sales.
24     Was he a salesperson?

30

1  A  If that is the right James Kelly, he would
2  have been a service tech.
3  Q  Was there more than one James Kelly?
4  A  I can't answer that.  I don't know why he
5  would have been put as sales.
6  Q  Okay.  You know a James Kelly, I take it?
7  A  Yes.
8  Q  Okay.
9  A  I know there were multiple James.
10     I would say he's a service tech.
11  Q  So you know a James Kelly and the James Kelly
12  you knew was a service tech?
13  A  Correct.
14  Q  Who hired the James Kelly that you knew?
15  A  Me and Tony Zarlengo.
16  Q  And how about -- and how would it come about
17  that you would both hire somebody?
18     Do they come in and interview or --
19  A  Yes.
20  Q  And they interview with both of you?
21  A  Yes.
22  Q  At the office?
23  A  Yes.
24  Q  And then you and Tony talk about -- you and

31

1  Tony Zarlengo talk about it after the fact?
2  A  Yes.
3  Q  And then decide whether to hire the person or
4  not?
5  A  Yes.
6  Q  Do you both collectively have to agree to hire
7  somebody for them to get hired?
8  A  Yes.
9  Q  Okay.  How about Nicholas Kelly?
10     It says he's a service technician.
11     Is that right?
12  A  When he worked at Midwest Dock Solutions.
13  Q  He also worked for Dock & Door?
14  A  Correct.
15  Q  And who hired Nicholas Kelly?
16  A  For Midwest Dock it would have been me and
17  Tony Zarlengo.
18  Q  And do the employment dates there look about
19  right to you?
20  A  I can't honestly answer that.
21  Q  Nicholas Kelly left Midwest Dock?
22  A  Correct.
23  Q  Was he fired or did he leave?
24  A  He left.

32

1  Q  And Sean Leer?
2  A  Service tech.
3  Q  So that one is correct.
4     Who hired him?
5  A  Me and Tony Zarlengo.
6  Q  And Daniel Lietz?
7     I'm sorry.  Strike that.
8     Sean Leer left Midwest Dock?
9  A  Correct.
10  Q  And why did he leave?
11  A  On to bigger and better things, I guess.
12  Q  It was his choice?
13  A  Yes.
14  Q  Daniel Lietz, L-i-e-t-z?
15  A  Yes.
16  Q  It says administrative.
17  A  Correct.
18  Q  Is that correct?
19  A  Correct.
20  Q  What did he do?
21  A  He does dispatch.
22  Q  And he's still there?
23  A  Yes.
24  Q  And what does dispatch mean?

33

1    A   He dispatches the service techs.
2    **Q   As a practical matter how does he go about**
3    **doing that?**
4    A   I can't honestly answer that.
5    **Q   You don't know?**
6    A   No.
7    **Q   When you say he dispatches the service techs,**
8    **what does that mean?**
9    A   He dispatches them.
10   **Q   All right.**
11   A   I mean, he dispatches them. Sends them to
12   jobs.
13   **Q   Okay. Does he give them the locations where**
14   **the jobs are?**
15   A   Yes.
16   **Q   And when does he do that or how does he do**
17   **that?**
18   A   Over text.
19   **Q   And do the employment dates there look about**
20   **right to you?**
21   A   I'm going to say yes.
22   **Q   And who hired him?**
23   A   Me and Tony Zarlengo.
24   **Q   And does he go by Danny?**

34

1    A   I call him Daniel.
2    **Q   Have you heard other people call him Danny**
3    **or no?**
4    A   I can't honestly answer that.
5    **Q   Does he have an office at the 27 36th Place**
6    **location?**
7    A   Yes.
8    **Q   An office or a desk?**
9    A   Office.
10   **Q   Is it his own office?**
11   A   Yes.
12   **Q   And John Mallon?**
13   A   Yes.
14   **Q   It says he's sales.**
15       **Is that correct?**
16   A   Correct.
17   **Q   And he was only there for a short time, it**
18   **looks like, is that correct?**
19   A   It looks that way.
20   **Q   Do you know why he left?**
21   A   Bigger and better things.
22   **Q   It was his choice to leave?**
23   A   Yes.
24   **Q   Do you know who hired him?**

35

1    A   Me and Tony Zarlengo.
2    **Q   How about John Mancha, M-a-n-c-h-a?**
3    A   Yes.
4    **Q   And he's a technician?**
5    A   Yes.
6    **Q   He's still there?**
7    A   No. He has also left.
8    **Q   When did he leave?**
9    A   I can't answer that. Three months ago maybe.
10   **Q   Okay.**
11   A   Maybe five.
12   **Q   And why did he leave?**
13   A   He moved.
14   **Q   Moved out of the area?**
15   A   Moved out of state.
16   **Q   I think I asked you.**
17       **He was a technician, correct?**
18   A   Correct.
19   **Q   And who hired him?**
20   A   Me and Tony Zarlengo.
21   **Q   How about Michael Mateja?**
22   A   Yes.
23   **Q   He was a technician?**
24   A   Yes.

36

1    **Q   And who hired him?**
2    A   Me and Tony Zarlengo.
3    **Q   Is he still there?**
4    A   Yes.
5    **Q   And Austin McCartney. It says he's a**
6    **technician.**
7        **Is that correct?**
8    A   I cannot answer that honestly.
9    **Q   You don't recall?**
10   A   No.
11   **Q   Do you recall who he is?**
12   A   No. I don't know who he is.
13   **Q   Okay. David Mortell. It says that he's**
14   **sales.**
15   A   Correct.
16   **Q   And that's correct?**
17   A   Correct.
18   **Q   What kind of sales does he do?**
19   A   End user.
20   **Q   What's that mean?**
21   A   People that are already in existing buildings.
22   **Q   Is it selling -- end user, people who are**
23   **already in existing buildings.**
24       **I don't quite understand what that means.**

37

```
 1    A   He goes out to people that are in buildings
 2  already and sells to them service agreements,
 3  maintenance agreements.
 4    Q   Okay.
 5    A   Sells equipment to them if they need it.
 6    Q   Would that be docks and doors?
 7    A   No.
 8    Q   What would it be?
 9    A   Would it be docks and doors as far as product?
10    Q   Would it be dock levelers and overhead doors?
11    A   Yes.
12    Q   And related equipment?
13    A   Yes.
14    Q   And I asked you earlier about George
15  Kantzavelos.
16    A   Where are we at on that one?
17    Q   Up above.  It begins with a K.
18        He's in sales?
19    A   Yes.
20    Q   What kind of sales did he do?
21    A   He didn't do much.  That's why he's no longer
22  with the company.
23    Q   Was he asked to leave?
24    A   Yes.
```

38

```
 1    Q   And who made the decision to terminate him?
 2    A   Me and Tony.
 3    Q   And do you see James Johnson above him?
 4    A   Yes.
 5    Q   What kind of sales did he do?
 6    A   End user work.
 7    Q   The same kind of thing you just described
 8  for me?
 9    A   Correct.
10    Q   And Steven French at the top there, do you see
11  that?
12    A   Yes.
13    Q   He was sales also?
14    A   Correct.
15    Q   What kind of sales does he do?
16    A   End user work.
17    Q   Same thing?
18    A   Correct.
19    Q   People that are already in existing buildings?
20    A   Correct.
21    Q   Could that be new doors and new dock levelers
22  to those parties?
23    A   It could be.
24    Q   And then getting back to where we left off on
```

39

```
 1  the list, there's a John Murphy that's listed there.
 2        Do you see that?
 3    A   Yes.
 4    Q   And he's listed as a technician?
 5    A   Correct.
 6    Q   Was he a technician?
 7    A   Yes.
 8    Q   And he was there for a fairly short time it
 9  looks like.
10        Was he hired by you and Tony?
11    A   Yes.
12    Q   And why did he leave?
13    A   I believe he moved to Wisconsin.
14    Q   Okay.  And Kacy Meirynck.
15    A   Yes.
16    Q   Is that a he?
17    A   Yes.
18    Q   Okay.  And he was also a technician?
19    A   No.
20    Q   What was he?
21    A   Summer help.
22    Q   So what kind of work would he do as summer
23  help?
24    A   Help around the shop, run parts out.
```

40

```
 1        That's about it.
 2    Q   Okay.
 3    A   Hands.  Extra hands.
 4    Q   All right.  Would he do door installation or
 5  dock installation?
 6    A   No.
 7    Q   Would he do repair work on docks or doors?
 8    A   No.
 9    Q   And, I take it, he would do things like maybe
10  hand tools to people who were working on a jobsite or
11  deliver tools or items to people on jobsites?
12    A   Yes.
13    Q   All right.  Who hired him?
14    A   I'm going to say me on that one.
15    Q   Just you?
16    A   Yes.
17    Q   Do you know him?
18    A   Yes.
19    Q   Describe the situation that you hired him.
20    A   He just needed a summer job.
21    Q   He was somebody you knew outside of --
22    A   Family friends.
23    Q   Okay.  That's what I'm getting at.
24        Eric Poole?
```

41

1    A   Yes.
2    Q   He was a technician?
3    A   Yes.
4    Q   And he's still working there?
5    A   You know what, I'm going to take that back.
6        He's not a technician.
7        I'm going to go as far as to say that
8   he is help.
9    Q   What made you change your mind?
10   A   Because he cannot go off and do a service job
11  by himself.
12   Q   Why not?
13   A   He's just not there yet.  He's not trained
14  there yet.
15   Q   Okay.  Is that the kind of thing he's training
16  to do?
17   A   I'm hoping.
18   Q   He's been there since May of '22?
19   A   Yes, but he was out sick for some time.
20   Q   Like a period of months or years?
21   A   I would say long months.
22   Q   Do you know approximately when the gap was?
23   A   No.
24   Q   So if he's training to become a service tech

42

1   and you would call him a helper right now, what kind
2   of work would he do on a jobsite to train to become
3   a service tech?
4    A   He would pay attention, help, help the actual
5   technician and learn.
6    Q   And then eventually, I take it, he would take
7   over at jobsites?
8    A   I can't answer that.  I mean, he doesn't have
9   the experience as of right now.
10   Q   All right.  How about Larry Richert?
11   A   Yes.
12   Q   It says he's administrative.
13   A   Yes.
14   Q   What kind of work -- who's Larry Richert?
15   A   That's my father.
16   Q   He's not there anymore?
17   A   No.
18   Q   What kind of work did he do?
19   A   Just helped out around the shop.
20   Q   So -- okay.
21   A   He was retired at that point.  So he was just
22  looking for something to do.
23   Q   Then there's you and we'll get to more about
24  what you do.

43

1        Mitton Rivers, was he a technician?
2    A   I can't answer that.
3    Q   All right.
4    A   So some of these I don't know their last
5   names.  I mean, it's been so long ago, I can't answer
6   that.
7    Q   Do you know a Mitton?
8    A   Not that I remember, no.
9    Q   So you just don't recall him?
10   A   No.
11   Q   How about Joseph Sheridan?
12   A   Sales.
13   Q   What kind of sales does Joseph Sheridan do?
14   A   I can't answer that.
15   Q   Why not?
16   A   Well, he wasn't doing much.  He's no longer
17  with the company.
18   Q   Okay.  He was there for, it looks like, a
19  little over two years?
20   A   Yes.
21   Q   Do you know who hired him?
22   A   It could have been me and Tony Zarlengo.
23   Q   And you don't recall what kind of sales he
24  did though?

44

1    A   No.
2    Q   And Joshua -- let me go back to Joseph
3   Sheridan.
4        Did he leave on his own volition or was
5   he terminated?
6    A   He was terminated.
7    Q   Who made the decision to terminate him?
8    A   Me and Tony Zarlengo.
9    Q   And if you were going to make that decision,
10  how would you make that decision?
11   A   Based on what you should have been doing,
12  your job, job tasks.
13   Q   Let me re-ask my question.
14       How would you and Tony go through the
15  process of making the decision to terminate somebody
16  if you were making the decision together?
17   A   We would look at -- for instance, he's in
18  sales.  He wasn't selling anything.
19       So we obviously would terminate him.
20   Q   And how about somebody who was a service
21  technician?
22   A   As far as releasing them from the company?
23   Q   Yes.
24   A   It just depends.  If you show up late or

11 (Pages 41 to 44)

45

1  you're sleeping or you don't go to the jobs.
2      I mean, there's all different reasons.
3  **Q   But how would you -- would you and Tony always**
4  **terminate people together or have you ever terminated**
5  **somebody on your own?**
6  A   Together.
7  **Q   You would never make a decision to terminate**
8  **somebody by yourself?**
9  A   No.
10 **Q   Joshua Sichterman.  It says he's a technician.**
11 A   Yes.
12 **Q   Is that accurate?**
13 A   Yes.
14 **Q   And he's still there?**
15 A   Yes.
16 **Q   And John Sparr, he's a technician?**
17 A   Yes.
18 **Q   He's still there?**
19 A   Yes.
20 **Q   Christopher -- and who made the decision to**
21 **hire Mr. Sichterman and Mr. Sparr?**
22 A   Me and Tony Zarlengo.
23 **Q   For both of them?**
24 A   Correct.

46

1  **Q   And Christopher Stanton, is he a technician?**
2  A   Not that I could recall, no.
3  **Q   Do you know who he is?**
4  A   No.
5  **Q   You don't know who that was?**
6  A   No.
7  **Q   Okay.  Ryan Stawychey S-t-a-w-y-c-h-e-y, do**
8  **you see that?**
9  A   Yes.
10 **Q   Do you know who Ryan was?**
11 A   I do not.
12 **Q   John Stoltenberg?**
13 A   Yes.
14 **Q   Do you know him?**
15 A   Yes.
16 **Q   He still works there?**
17 A   Yes.
18 **Q   Is he a technician?**
19 A   Yes.
20 **Q   Has he always been a technician?**
21 A   Not at first.
22 **Q   Okay.**
23 A   He was learning.
24 **Q   And when did that change?**

47

1  A   He's probably been on his own for a year now
2  or better.
3  **Q   Was he hired to be a technician?**
4  A   They all start as helpers.
5  **Q   And how long -- they all start as helpers.**
6      **None of them came with experience before**
7  **you hired them?**
8  A   Only the experienced ones.  They start as a
9  technician.
10 **Q   Okay.  So some people, if they show up with**
11 **experience, they're technicians right from the get-go?**
12 A   Correct.
13 **Q   So they don't all start as helpers?**
14 A   No, not if they have experience.  Depending on
15 how many years experience.
16 **Q   John Stoltenberg, he's still there.**
17     **Who made the decision to hire him?**
18 A   Me and Tony Zarlengo.
19 **Q   Is he still there?**
20 A   Yes.
21 **Q   Michael Strazzabosco?**
22 A   Yes.
23 **Q   He's still there?**
24 A   Yes.

48

1  **Q   And he's a technician?**
2  A   Correct.
3  **Q   Was he hired as a technician?**
4  A   No.
5  **Q   When did he become a technician?**
6  A   After about three to five years of experience.
7  **Q   Okay.**
8  A   He's more electrical.
9  **Q   What does that mean?**
10 A   He does more electrical work.
11 **Q   Hooking up door openers and dock levelers,**
12 **that kind of thing?**
13 A   Correct.
14 **Q   Connecting them to electricity?**
15 A   Correct.
16 **Q   Do you have any other technicians in the past**
17 **or currently who are capable of doing that?**
18 A   Johnny Mancha.
19 **Q   He can also do some electrical work?**
20 A   Correct.
21 **Q   Anybody else?**
22 A   Not that I can recall.
23 **Q   Who hired Michael Strazzabosco?**
24 A   I'm going to just say me and Tony Zarlengo.

49

```
 1    Q   Are you sure about that when you say I'm going
 2  to say?
 3    A   Yes.
 4    Q   I just wasn't sure if you were qualifying it
 5  in some way.
 6        Ira Sugar, is he sales?
 7    A   Inside sales.
 8    Q   What's inside sales?
 9    A   He bids off of a computer screen.
10    Q   And he bids new construction jobs?
11    A   Yes.
12    Q   Have you had any salespersons other than
13  Ira Sugar who did those kind of jobs?
14    A   Joe attempted.  Joe Sheridan attempted.
15    Q   He tried to do that kind of thing?
16    A   Yes.
17    Q   But he was unsuccessful?
18    A   Correct.
19    Q   And Ira Sugar was hired shortly after
20  Joe Sheridan left, correct?
21    A   Correct.
22    Q   Did Ira replace Joe Sheridan?  Was he hired
23  to replace him?
24    A   No.
```

50

```
 1    Q   Okay.  Has Ira always bid those kind of jobs?
 2    A   Yes.
 3    Q   Does Tony Zarlengo also bid those kind of
 4  jobs?
 5    A   Yes.
 6    Q   Other than Ira Sugar and Tony Zarlengo has
 7  Midwest Dock Solutions had anybody else that's bid
 8  new construction projects like that?
 9    A   No.
10    Q   They're the two that have always been
11  responsible for that?
12    A   Correct.
13    Q   Do you have any idea of Midwest Dock's
14  revenue, what percentage of its revenue is accounted
15  for by inside sales work?
16    A   I do not.
17    Q   Who would know that?
18    A   Tony Zarlengo.
19    Q   Ira Sugar is still there, correct?
20    A   Correct.
21    Q   And who hired Ira Sugar?
22    A   Me and Tony Zarlengo.
23    Q   And the next name is Amber Toigo?
24        How do you pronounce that?
```

51

```
 1    A   Your guess is as good as mine.
 2    Q   Do you know Amber?
 3    A   I'm going to think that's Josh's wife.
 4    Q   There's an Anthony Toigo directly below that.
 5        Do you see that?
 6    A   Yes.  She is administrative.
 7    Q   Does she work in the office?
 8    A   Yes.
 9    Q   Do you know who she is?
10    A   Yes.
11    Q   Who hired Amber?
12    A   Tony.
13    Q   Tony hired her?
14    A   Yes.
15    Q   All right.
16    A   Zarlengo.
17    Q   And what kind of work does she do?
18    A   I can't honestly answer that.
19    Q   You don't know?
20    A   I don't know.
21    Q   And Anthony Toigo?
22    A   Yes.
23    Q   He's a technician?
24    A   Helper.
```

52

```
 1    Q   He's a helper.  He was a helper.
 2        He's no longer there?
 3    A   No.  He is still there.
 4    Q   Oh, he is still there?
 5    A   Yes.  I believe he is.
 6    Q   All right.
 7    A   Yes.  He's still there.
 8    Q   All right.  And Zachary Torkelsen, it lists
 9  him as a technician.
10        Is that accurate?
11    A   No.
12    Q   What was Zachary Torkelsen?
13    A   Shop.  Shop help.  And then he would run
14  parts out.
15    Q   That's your recollection?
16    A   Yes.
17    Q   Would you directly supervise him?
18    A   No.
19    Q   Who would?
20    A   More Tony Zarlengo.
21    Q   So to the extent there was day-to-day
22  supervision of his work, it would be Tony Zarlengo?
23    A   Depending on if he was running parts, yes.
24    Q   Okay.  What do you mean?
```

53

1   A   If he was running parts to a jobsite, Zarlengo
2   would have told him where to go.
3        If he was in the shop, Janie would have
4   been watching over him.
5   Q   Okay.  The service techs that we've talked
6   about so far, who would oversee them day to day?
7   A   To do what?
8   Q   To do their work.  Tell them where to go, what
9   to do, supervise them to make sure they're doing their
10  job right.
11  A   Danny.
12  Q   Danny would do that?
13  A   Yes.  I don't know how to pronounce his last
14  name here.
15  Q   Danny Lietz?
16  A   Yes.
17  Q   Would he go out to worksites?
18  A   Who?
19  Q   Dan Lietz.
20  A   No.
21  Q   Would anybody go out to worksites where the
22  technicians are working to supervise their work?
23  A   No.
24  Q   Jerry Valentino, it lists him as a technician.

54

1   A   Yes.
2   Q   Was he?
3   A   Yes.
4   Q   Who hired him?
5   A   Me and Tony Zarlengo.
6   Q   And he left.
7        Do you know why he left?
8   A   Another job opportunity.
9   Q   He left on his own?  He wasn't asked to leave,
10  is that right?
11  A   Correct.
12  Q   Sherri Webber, she's administrative.  We know
13  what she did.
14  A   Correct.
15  Q   Travis Woff?  Is it Woff?
16  A   Yes.
17  Q   W-o-f-f.
18        And was he a technician?
19  A   He was a helper.
20  Q   And did you supervise his work?
21  A   No.
22  Q   Who would have supervised his work?
23  A   Nobody.
24  Q   Why not?

55

1   A   He just dropped off parts and was extra hands.
2   Q   And he's no longer there?
3   A   No.
4   Q   And why did he leave?
5   A   He passed away.
6   Q   I'm sorry to hear that.
7   A   Yes.
8   Q   Austin Wood?
9   A   Yes.
10  Q   Was he a technician?
11  A   No.
12  Q   What was he?
13  A   Helper.
14  Q   Who hired him?
15  A   Me and Tony Zarlengo.
16  Q   He left in September of 2017?
17  A   Correct.
18  Q   And why did he leave?
19  A   I believe he went to the railroad.
20  Q   So that he left on his own volition?
21  A   Yes.
22  Q   Edward Zarlengo, Jr.
23        It says he was administrative.
24  A   Correct.

56

1   Q   What kind of work did he do?
2   A   Same as my father.
3   Q   All right.  He was retired and looking for
4   something to do?
5   A   Yes.
6   Q   Now, you mentioned some of the technicians
7   started with experience and they started right up as
8   technicians and some of the technicians may have
9   started without any experience and were helpers in
10  the beginning, correct?
11  A   Correct.
12  Q   Who would know which helpers started with
13  experience and which were helpers for some period of
14  time?
15  A   Tony would know better.  Zarlengo.
16  Q   He would be the person most knowledgeable
17  about that?
18  A   Yes.
19  Q   And he would -- who would be the person most
20  knowledgeable for those persons who started as helpers
21  when they became full-fledged technicians?
22  A   Me.
23  Q   You would know that?
24  A   Yes.

57

1   Q   Okay.  Well, let me ask you.
2        Did Branden Bishop start as a technician
3   or start as a helper?
4   A   It was summer help.
5   Q   How about Adam Clay, he was just there for a
6   short time.
7   A   Yes.  I believe he would have been -- you know
8   what, I can't answer that.  I don't remember an Adam.
9   Q   And Zachary Corrigan, did he start out as a
10  service tech or was he a helper for a period of time?
11  A   He came from another company with experience.
12  Q   So he started right out as a service tech?
13  A   Yes.
14  Q   And Ronald Cronk?
15  A   I can't honestly answer that.
16  Q   Donald Cruikshank, did he start out as a
17  technician or was he a helper for a period of time?
18  A   I'm going to say he probably started out as
19  a helper.
20  Q   And how long was he a helper?
21  A   I can't answer that.
22  Q   Who would know?
23  A   Tony may know.
24  Q   Tyler DeAngeles, did he start out as a

58

1   technician?
2   A   No.
3   Q   He was a helper?
4   A   I'm trying to think who he even is.
5   Q   You don't recall him, is that correct?
6   A   Correct.
7   Q   Okay.  And Jacob Deboer, D-e-b-o-e-r?
8   A   I don't recall him.
9   Q   And Thomas Donnelly you said was a technician.
10       Did he start out as a technician?
11  A   I believe he did.
12  Q   Jeff Gibson, did he start out as a technician?
13  A   No, not the first time.
14  Q   The first time?
15       Oh, you said there was a gap?
16  A   Yes.
17  Q   And did he start out the second time as a
18  technician?
19  A   Yes.
20  Q   And Matthew Gongola, did he start out as a
21  technician?
22  A   Where are we at here?
23  Q   Matthew Gongola, third one down from the top.
24  A   I don't remember him.

59

1   Q   Okay.  Richard Kardosh, did he start out as
2   a technician?
3   A   No.
4   Q   How long was he a helper?
5   A   I would say two to three years.
6   Q   And Dylan Kelly, did he start out as a
7   technician?
8   A   No.
9   Q   How long was he a helper?
10  A   His whole career.
11  Q   He was a helper?  He's still a helper?
12  A   No.  He left.
13  Q   He left, but he was a helper the whole time
14  he was there?
15  A   Yes.
16  Q   James Kelly you told me was a service tech.
17  A   Yes.
18  Q   Was he a service tech during the whole time
19  he was there?
20  A   Yes.
21  Q   And Nicholas Kelly, you said he was a service
22  tech.
23  A   He came in to work the summers.
24  Q   Was he a helper?

60

1   A   Yes.  When he worked for Midwest Dock
2   Solutions.
3   Q   Okay.  Then he went to work for Dock & Door,
4   correct?
5   A   Correct.
6   Q   Sean Leer, was he a technician the whole time?
7   A   Yes.
8   Q   John Mancha who's still there, was he a
9   technician the whole time?
10  A   Johnny Mancha is not still there.
11  Q   Oh, he left?
12       Three months ago you said, three to five
13  months ago.
14  A   Yes.  He was a service tech.  Hired in as a
15  service tech.
16  Q   And Michael Mateja, was he hired in as a
17  service tech?
18  A   Yes.
19  Q   Austin McCartney?
20       I think you said you didn't remember
21  Austin.
22  A   Yeah.  I don't remember him.
23  Q   John Murphy, was he always a service tech?
24  A   Yes.

61

1    Q    Kacy was summer help you said?
2    A    Correct.
3    Q    Okay.  Eric Poole, was he always -- you said
4  Eric Poole was also a helper, right?
5    A    Yes.
6    Q    And Mitton Rivers you said you did not recall,
7  correct?
8    A    Correct.
9    Q    And Joshua Sichterman, was he always a
10  technician?
11    A    No.
12    Q    How long was he a helper?
13    A    I'd say two years.  He learned awfully quick.
14    Q    So maybe some time toward the middle of 2022
15  he became a technician?
16    A    Yes.
17    Q    John Sparr, was he hired in as a technician?
18    A    No.
19    Q    How long was he a helper?
20    A    Two years on average.  Two to three years.
21    Q    Is it fair to say you don't recall
22  specifically?
23         You just recall that he was hired in as
24  a helper and now he's a technician?

62

1    A    Yes.
2    Q    And it's your estimate based on your
3  experience that it would have taken two to three years?
4    A    Correct.
5    Q    Okay.  Would anybody have more specific
6  information as to when he became a technician or are
7  you the best person to --
8    A    Tony Zarlengo might.
9    Q    I think when I asked you, you said you were
10  the person who knew best when somebody went from being
11  a helper to a technician, but you think Tony might
12  also --
13    A    Oh, no.  I would know that.  I just don't know
14  the dates.
15    Q    Okay.  Michael Strazzabosco, was he hired in
16  as a technician?
17    A    No.
18    Q    How long did it take him to become a
19  technician?
20    A    Two to three years.
21    Q    Anthony Toigo, you said he's a helper?
22    A    Helper.
23    Q    Zachary Torkelsen you said was a helper.
24         Did he ever become a technician?

63

1    A    No.
2    Q    He went to work for Dock & Door, is that
3  correct?
4    A    No.
5    Q    Jerry Valentino, was he hired in as a
6  technician?
7    A    Yes.
8    Q    Travis Woff, was he hired in as a -- no.
9  You said he was a helper.
10         Austin Wood was a helper.
11         All right.  Are your emails on your
12  laptop, are they password protected?
13    A    No.
14    Q    Is your laptop password protected?
15    A    I don't think so.
16    Q    When you turn it on, you don't have to enter
17  a password to access things?
18    A    The last time I turned that on I couldn't
19  honestly tell you.
20    Q    I take it, you don't check your emails often?
21    A    No.
22    Q    All right.  I understood earlier when I asked
23  you about the emails you get, you said you get service
24  tickets?

64

1    A    Yes.
2    Q    You do not check the service tickets
3  regularly?
4    A    No.
5    Q    How often would you say you check the service
6  tickets?
7    A    Never.
8    Q    How do you know you get them if you don't
9  check them?
10    A    Because Tony set it up for me.  Zarlengo.
11    Q    It was set up on your computer, but it's not
12  something that you check?
13    A    Yes.  Correct.
14    Q    I understand.
15         So you receive them; you just don't look
16  at them?
17    A    Yes.
18    Q    Okay.
19    A    That's not what I'm there to do.
20    Q    And we'll get to that.  I'm just trying to
21  have a better understanding of how often you check
22  your emails.
23         And, I take it, you said you don't
24  remember the last time you checked your emails?

65

1  A  No.
2  Q  Do you get your emails on your -- do you have
3  a cell phone?
4  A  I don't look at them.
5  Q  Okay.
6  A  So perfect scenario.  He emails me.
7  Q  He, you're gesturing, just so the record is
8  clear, Mr. Hughes.
9  A  Mike, my lawyer.  Tony lets me know.
10  Q  You don't see the email?  You don't check your
11  emails?
12          (Simultaneously speaking.
13          Reporter clarification)
14      You really just count on people to talk
15  to you and tell you what you need to know?
16  A  Yes.
17  Q  All right.  Ballpark it for me.
18      When was the last time you checked your
19  emails on your laptop?
20  A  On my laptop?
21  Q  Yes.
22  A  Probably May.
23  Q  And that's your normal practice.  You just
24  don't look at emails on your laptop.

66

1      Is that fair?
2  A  Correct.
3  Q  Fair to say you're not a technology guy?
4  A  No.
5  Q  That is fair to say?
6  A  Yes.
7  Q  Do you text?
8  A  Yes.
9  Q  You check text messages?
10  A  Yes.
11  Q  Would you say you check those daily?
12  A  Yes.
13  Q  So if somebody needs to get in touch with you
14  or contact you, they have to send you a text?
15  A  Or call.
16  Q  Or call, but an email is not going to get your
17  attention?
18  A  No.
19  Q  Did you look over any of the documents that
20  Midwest Dock Solutions produced in this case --
21  A  No.
22  Q  (Continuing) -- other than the nine to fifteen
23  emails you gave to Mr. Hughes?
24  A  No.

67

1  Q  Were you ever asked to look at any files other
2  than your emails to produce documents in this case?
3  A  No.
4  Q  What's the highest level of education you've
5  received?
6  A  That's a great question.
7  Q  Did you graduate -- let's make it easy.
8  A  No.  I did not graduate high school.
9  Q  I was going to say did you graduate from
10  high school?
11  A  No.
12  Q  What was the highest grade you finished?
13  A  Sophomore possibly.
14  Q  And where did you go to high school?
15  A  Crete-Monee High School.
16  Q  And have you received any training or
17  education since then, like training in the trades,
18  that kind of thing?
19  A  Yes.
20  Q  Okay.  And what have you received?
21  A  Fire door training.
22  Q  And who was that with?
23  A  Cornell.
24  Q  Okay.

68

1  A  Coiling door training.  Raynor.
2  Q  Can you spell that?
3  A  I probably couldn't.
4  Q  Raynor?
5  A  R-a-y-n-o-r.
6  Q  Something like that?
7  A  Yes.
8  Q  Anything else?
9  A  That's it.
10  Q  And Cornell and Raynor are companies, correct?
11  A  Correct.
12  Q  So you received training in how to install
13  their products?
14  A  Correct.
15  Q  Did you ever receive -- have you ever been a
16  member of a union?
17  A  Yes.
18  Q  And what union have you been a member of?
19  A  Carpenters.  Riggers.
20      And that's it.
21  Q  Did you ever attend the carpenters apprentice
22  program?
23  A  No.
24  Q  Any sort of training with the carpenters, any

69

1  sort of formal training through like their apprentice
2  program or anything like that?
3      A   No.
4      Q   How about the riggers?
5      A   No.
6      Q   And do you remember what local you were a
7  member of for the Carpenters Union?
8      A   I can't honestly answer.
9      Q   When were you a member of the Carpenters
10 Union?
11     A   I probably left in 2001 maybe.
12     Q   And when did you join, do you think?
13     A   I can't honestly answer.
14     Q   Can you approximate?
15     A   I can take a guess.
16     Q   Sure.
17     A   I would have graduated in '97.  So probably
18 '98 I would have gotten in.
19     Q   And you said you would have graduated in '97.
20         I just want to make sure I didn't
21 misunderstand you earlier.
22         You didn't graduate?
23     A   Correct.
24     Q   Had you graduated, you would have graduated

70

1  in '97?
2      A   Correct.
3      Q   So you think it was about a year after that
4  that you joined the Carpenters Union?
5      A   Correct.
6      Q   So maybe approximately three years?  Does that
7  sound about right?
8      A   Correct.
9      Q   And when did you join the riggers?
10     A   I can't honestly answer that.
11     Q   Did you -- when you were -- was it after the
12 Carpenters Union?
13     A   Yes.
14     Q   And do you know how long you were a member
15 of the riggers union?
16     A   Six months.
17     Q   And when you were a union carpenter, did you
18 work on -- did you work for companies?
19         Strike that.
20         We'll get to that.
21         How did you become a member of the
22 Carpenters Union?
23     A   I bought my card.
24     Q   Did anybody have to sponsor you?

71

1      A   No.
2      Q   And how did you become a member of the riggers
3  union?
4      A   I think we just did a per job agreement.
5      Q   So you were a member just for one particular
6  job?
7      A   Correct.
8      Q   And do you remember who you were working for,
9  what the job was?
10     A   I do not.
11         I worked for a lot of companies doing
12 pile driving, bridge work.
13     Q   Did you do that when you were a member of the
14 Carpenters Union?
15     A   Yes.
16     Q   Are you a still a member of any union?
17     A   No.
18     Q   So the last union you would have been a member
19 of would be the riggers union?
20     A   Yes.
21     Q   And was that before you started Midwest Dock
22 Solutions?
23     A   I was in the Carpenters Union before I started
24 Midwest Dock Solutions.

72

1          I believe we did a per agreement for
2  one job with the riggers.
3      Q   Midwest Dock Solutions did that?
4      A   Yes.
5      Q   So they signed a One Jobsite Agreement with
6  the riggers and you joined the riggers union?
7      A   Correct.
8      Q   So it would have been some time after you
9  started Midwest Dock Solutions?
10     A   Yes.
11         MR. McJESSY:  I'm going to take a five-minute
12 break here and then we'll continue on.
13         THE WITNESS:  Okay.
14             (Whereupon a short recess was had.)
15 BY MR. McJESSY:
16     Q   Sir, I want to ask you about your experience
17 before -- your work experience before starting Midwest
18 Dock Solutions.
19         Sir, I'm going to hand you what's been
20 marked as Exhibit 79.
21         And these are the Articles of
22 Incorporation for Midwest Dock Solutions.
23         Do you see that?
24     A   Yes.

73

1    Q    And they show you as the original registered
2    agent, correct?
3    A    Correct.
4    Q    And was that your address back in 2006?
5    A    Yes.
6    Q    And is that your signature on the second page?
7    A    Yes.
8    Q    And it looks like -- is it fair to say you
9    started Midwest Dock Solutions in May -- on May 15th,
10   2006?
11   A    Yes.
12   Q    So between -- you said you left school in
13   maybe 1996, '95, somewhere in there.
14        Does that sound right?
15   A    Say '96.
16   Q    Okay.  Where was the first place you worked
17   after that?
18   A    Heating and cooling.
19   Q    What did you do?
20   A    Helper.
21   Q    Like HVAC systems?
22   A    Yes.
23   Q    And who was that with?
24   A    J&K Heating.

74

1    Q    Where are they located?
2    A    Crete.
3    Q    How long were you there?
4    A    Let me think.
5        Not long.  Two years maybe.
6    Q    Okay.  And you just helped out people doing
7    installation of air conditioners and furnaces, that
8    kind of thing?
9    A    Yes.
10   Q    And then what was the next job after that?
11   A    Well, I went into the loading dock and door
12   industry.
13   Q    Okay.
14   A    I don't know the name of the company.
15   Q    And where were they located?
16   A    Beecher.
17   Q    Why did you leave J&K and go to the loading
18   dock company?
19   A    More consistent work.
20   Q    And what kind of work did you do for them?
21   A    I did service work on loading docks, overhead
22   doors.
23   Q    And what kind of -- just like the service
24   techs do?

75

1    A    Correct.  As a helper obviously.
2    Q    So you were a helper?
3    A    Yes.
4    Q    And how long were you at the loading dock
5    company in Beecher?
6    A    Until I was 21.  So probably three years.
7    Q    Okay.  And how do you know that was until
8    you were 21?  Like why was that the marker?
9    A    Because I believe I got in the union right
10   at 19 or right at 20 or 21.
11       So I would have left him.
12   Q    To go into the union?
13   A    Yes.
14   Q    And that was the Carpenters Union?
15   A    Yes.
16   Q    And why did you do that?
17   A    Better opportunity.
18   Q    Better wages, benefits, that kind of thing?
19   A    I thought I would work more.
20   Q    And the work you did for the loading dock
21   company in Beecher -- well, strike that.
22       If, as we go along, you remember the name
23   of it, will you let me know what it was?
24   A    Yes.

76

1    Q    All right.  And the work you did for the
2    loading dock company, did it install dock levelers?
3    A    No.
4    Q    So it was just overhead doors?
5    A    No.  We did service, maintenance service.  We
6    just fixed loading docks, fixed overhead doors, fixed
7    like -- have you ever been to Best Buy, they got those
8    ladders that roll around to get high inventory off the
9    shelves?
10   Q    Okay.
11   A    We fixed those.  Any kind of material handling
12   equipment.
13   Q    You would not do work on dock levelers then?
14   A    Yes.
15   Q    You did do work on dock levelers?
16   A    We serviced them.
17   Q    Serviced dock levelers?
18   A    Yes.
19   Q    Serviced overhead doors?
20   A    Yes.
21   Q    Serviced material handling equipment of any
22   sort?
23   A    Yes.
24   Q    Would that include things like forklifts?

77

1   A   No.
2   Q   So non-motorized or non -- how would you
3   distinguish between -- the ladders were motorized,
4   right?
5   A   No.
6   Q   They had electric motors?
7   A   They were manual.
8   Q   And, I take it, that was just on-the-job
9   learning for you?
10  A   Correct.
11  Q   And how about installation of door operators?
12  A   No.
13  Q   Would you assist in repairing door operators?
14  A   Yes.
15  Q   Do you know where in Beecher the company was
16  located?
17  A   No.
18  Q   And then what was the next job you had after
19  that?
20  A   Then I went to J & B Ventures.
21  Q   What did they do?
22  A   Loading docks.  Installation of.
23  Q   Installation of what?
24  A   The loading docks.

78

1   Q   When you say installation of loading docks,
2   does that mean dock levelers?
3   A   Yes.
4   Q   Any other components?
5   A   Dock seals.
6   Q   Anything else?
7   A   No.
8   Q   Okay.
9   A   Well, dock restraints.
10  Q   Those are the things that hold the truck
11  in place when it backs up to a loading dock?
12  A   Correct.
13  Q   Anything else?
14  A   No.
15  Q   How about overhead doors?
16  A   No.
17  Q   So this was strictly dock leveler related
18  products?
19  A   Correct.
20  Q   Where is J & B Ventures located?
21  A   They were in Beecher, Illinois.
22  Q   How long were you there?
23  A   All the way up until I started my company
24  roughly.

79

1   Q   Until you started Midwest Dock Solutions?
2   A   Yes.
3   Q   So up until 2006?
4   A   Correct.
5   Q   Did you stay with them after you started
6   Midwest Dock Solutions?
7   A   No.  I left them.
8   Q   And you mentioned earlier you did pile
9   driving.
10  A   Yes.
11  Q   Where did that fit in here?
12  A   When I worked for J & B Ventures.  If they
13  were slow, I would go do that.
14  Q   And would you do that for J & B Ventures or
15  for somebody else?
16  A   Separate companies.
17  Q   And would it be just various different
18  companies?
19  A   Correct.
20  Q   Union companies?
21  A   Correct.
22  Q   Was J & B Ventures a union company?
23  A   Yes.
24  Q   And were fringe benefit contributions reported

80

1   on your behalf as far as you know?
2   A   Yes.
3   Q   Do you know if you vested with the Carpenters
4   Union?
5   A   I do not know.  I pulled whatever I had out
6   of there.
7   Q   What does that mean when you say you pulled
8   whatever you had out of there?
9   A   Whatever investment I had with the carpenters
10  I took over myself.
11  Q   If you were able to do so?
12  A   I did.
13  Q   You're sure you were able to do so?
14  A   Yes.  I took it out.
15  Q   And when did you do that?
16  A   I can't give you a solid answer on that.
17      Before 2006.
18  Q   What did the pile driving work entail?
19  A   Pile driving sheets of steel into the earth.
20  Q   And are those those huge like corrugated
21  pieces of -- I don't know if they're steel or what
22  they are.
23  A   The best I can explain is it is a 53-foot long
24  piece of steel that you pound into the earth with a

81

1  hammer.
2  **Q   Okay.**
3  A   Tongue and groove.  The next piece slides in.
4  **Q   All right.  And what was your role in that**
5  **process?**
6  A   Welder and grunt.
7  **Q   Where did you learn how to weld?**
8  A   On the job.
9  **Q   Doing pile driving work or did you know before**
10 **you started that work?**
11 A   No.  All on-site training.
12 **Q   Before you started doing pile driving work --**
13 A   Yes.
14 **Q   (Continuing) -- or was it part of the pile**
15 **driving work?**
16 A   It was part of their work, but I welded
17 with J & B.
18 **Q   Okay.  That's what I was trying to say.**
19 **Other than Midwest Dock Solutions do**
20 **you own any other business or enterprise?**
21 A   Yes.
22 **Q   What other business or enterprises do you own?**
23 A   I own a hunting club.
24 **Q   And how much of your time does that take?**

82

1  **Well, how long have you owned the hunting**
2  **club?**
3  A   Eighteen years.
4  **Q   Long time.**
5  **And how much of that time -- how much of**
6  **your time does that take up?**
7  A   Six days a week, I bet, on and off.
8  **Q   Okay.**
9  A   It's all year.
10 **Q   I just mention it because when you were here**
11 **on Tuesday, you made a comment that we need to get your**
12 **deposition in before October 11th, I think, because you**
13 **said you would be gone until January.**
14 A   February 1st.
15 **Q   Okay.**
16 A   It will be starting up then.
17 **Q   And my question is are you away from like**
18 **Midwest Dock Solutions during that time as well?**
19 A   I go in in between.
20 **Q   What do you mean you go in in between?**
21 A   So I take people out in the morning, then I
22 go to work after that.  And then when I get done at
23 that work, then I go back out there.
24 **Q   And where is it?**

83

1  A   Crete.
2  **Q   And what do you mean you take -- can you just**
3  **in general terms explain to me what it is you do that**
4  **takes up your time for the hunting club between like**
5  **October and February?**
6  A   I take them hunting every day, sometimes twice
7  a day.
8  **Q   So you get up in the morning; you meet them**
9  **out there?**
10 A   They stay with me.
11 **Q   These are people who want to hunt?**
12 A   Correct.
13 **Q   And you go out and you hunt for a while and**
14 **then you go to work?**
15 A   Correct.
16 **Q   And then you maybe go back out and hunt some**
17 **more?**
18 A   Correct.
19 **Q   And then back to work or then home?**
20 A   Home to cook.
21 **Q   So what does it mean to run the hunting club?**
22 **You're like a guide?**
23 A   No.  It's members only.
24 **Q   And is it on land that you own?**

84

1  A   Some of it.
2  **Q   Or you've arranged to use.**
3  **Is that fair?**
4  A   Correct.
5  **Q   And you said it's six days a week during the**
6  **year, I think you said, is that right?**
7  A   Correct.
8  **Q   And what is it you do during the year?**
9  A   Farm it.  Prep it.  Get it ready.
10 **Q   So during -- I'm going to call it the hunting**
11 **season from October to February.**
12 **How much time are you in the office?**
13 A   Every day.
14 **Q   You're at Midwest Dock Solutions every day?**
15 A   Not so much in the office.  Looking at jobs
16 or whatever.
17 **Q   How often would you say you're in the office?**
18 A   On a day to day, not often.
19 **Q   And then -- but when you say you're looking**
20 **at jobs, what does that mean?**
21 A   Service jobs that have gone bad or we can't
22 figure out why objects are breaking.
23 **Q   So you go out to jobsites?**
24 A   Yes.

85

```
 1   Q   And you do that how often during a typical
 2  week?
 3   A   Every day.
 4   Q   So you're sort of like a field guy?
 5   A   Yes.
 6   Q   Most of your work is in the field?
 7   A   Yes.
 8   Q   So I'm just trying to get an idea of your
 9  schedule.
10       During the hunting season what time would
11  you finish in the morning and start doing service work
12  or going out to the jobsites?
13   A   I would get up around 3:00 o'clock.  Get back
14  probably around 9:30 in the morning.  Then go do that.
15       And then try to get back by 4:00 and then
16  either take them out again and then bring them back and
17  cook them dinner.
18   Q   And then how about during the non-hunting
19  season, how much of your time is taken up -- do you
20  still maintain basically a 9:00 to 4:00 time working
21  for Midwest Dock Solutions during the week?
22   A   Yes.  I'm there more -- earlier, but I'm there
23  probably three days a week, if not four days a week,
24  doing something.
```

86

```
 1   Q   At Midwest Dock Solutions?
 2   A   No.  At my --
 3   Q   At your hunting club?
 4   A   Yes.
 5   Q   But you still maintain the same roughly
 6  9:00 to 4:00 or a full day of work for Midwest Dock
 7  Solutions?
 8   A   Yes.
 9   Q   But, again, it's mostly field work, is that
10  fair?
11   A   Correct.
12   Q   Okay.  Any other companies that you own?
13   A   I own an angle company.
14   Q   What is that?
15   A   We build angles.
16       We don't build angles.  We subcontract
17  to a gentleman that builds the angles for us.
18   Q   What are the angles?
19       Are those what you described earlier
20  that go around the pits for the docks?
21   A   Correct.
22   Q   Dock levelers?
23   A   Correct.
24   Q   Okay.  And does the company do anything
```

87

```
 1  besides that?
 2   A   No.
 3   Q   So it's strictly a company that builds the
 4  angles that go around the pits that the dock levelers
 5  go in?
 6   A   Correct.
 7   Q   Earlier I had asked you about what Janie did
 8  as far as staging goes and one of the things you said
 9  is she would put together things including angles, I
10  think.
11   A   Correct.
12   Q   Is that these items?
13   A   She does it on a small scale.
14   Q   No, I meant, does the angles that the angle
15  company builds through its subcontractor, are those
16  the angles that Janie is like assembling to go out
17  to jobsites?
18   A   No.  Janie will build those angles on a very
19  small scale.
20   Q   She builds them?
21   A   On a small scale.
22   Q   Okay.
23   A   I sub out to a guy that builds them on a big
24  scale.
```

88

```
 1   Q   Explain to me what's a small scale and what's
 2  a big scale.
 3   A   Ten or less Janie would build.  Eleven or more
 4  I would sub out.
 5   Q   So Janie is a welder?
 6   A   Yes.
 7   Q   Okay.  I thought she was just gathering these
 8  items.
 9       She actually makes them?
10   A   She makes them periodically.  She's not doing
11  that every day.
12   Q   But she actually builds them and then sets
13  them out for the guys to take to the jobsites?
14   A   Correct.
15   Q   They're not pre-fabricated and purchased in
16  advance?
17   A   No.
18   Q   Okay.  Is your angle company Midwest Angle &
19  Fabricating?
20   A   Yes.
21   Q   And Anthony Zarlengo, is he also an owner of
22  that business?
23   A   Correct.
24   Q   And does Midwest Dock Solutions purchase --
```

89

1  what do you call these again?
2  A  Curb angles.
3  Q  Curb angles.  Thank you.
4        Does Midwest Dock Solutions purchase the
5  curb angles from Midwest Angle & Fabricating?
6  A  Yes.
7  Q  And it uses those to install at jobsites
8  either where Midwest Dock Solutions is doing service
9  work or where Dock & Door is doing installations?
10  A  Correct.
11  Q  And how much of your time does that business
12  take up?
13  A  Not much.
14  Q  And you said you have a subcontractor that
15  does the -- builds the curb angles, is that right?
16  A  Correct.
17  Q  Is it like one person or is the subcontractor
18  another company?
19  A  One person.
20  Q  And where does that person work?
21  A  In Ava, Illinois.
22  Q  And then how do you get the curb angles, the
23  ones when Midwest Dock or Dock & Door needs them, how
24  do you get them from where they're being fabricated to

90

1  where you need them to be installed?
2  A  We would ship direct to job.
3  Q  And how would you ship?
4        Does the subcontractor do that?
5  A  Or the shipper.
6  Q  So you contract with like a third-party
7  shipper?
8  A  Yes.
9  Q  Would Midwest Dock or Dock & Door employees
10  go get them?
11  A  No.
12  Q  Where did you say the fabricator was located?
13  A  Ava.
14  Q  All right.  Now, you started Midwest Dock
15  Solutions with Tony Zarlengo, correct?
16  A  Correct.
17  Q  And who was involved in the decision to start
18  Midwest Dock Solutions?
19  A  I don't understand the question.
20  Q  Who all was involved in the decision to start
21  the business?  Like who did you talk to about it?
22  A  Me and Tony.
23  Q  Just the two of you?
24  A  Yes.

91

1  Q  And why did you start Midwest Dock Solutions?
2  A  It was a good opportunity.
3  Q  What was the opportunity?
4  A  To own your own company.
5  Q  And did you have any prospective business when
6  you started it?
7  A  No.
8  Q  And what was the business plan for Midwest
9  Dock Solutions?
10  A  There was none.
11  Q  You formed the company, correct?
12  A  Correct.
13  Q  And was 2828 East Spruce Drive, was that a
14  residential address or was that --
15  A  That's my parents' house.
16  Q  So it wasn't like a business facility?
17  A  No.
18  Q  And did Tony Zarlengo have any experience
19  working in the loading dock or overhead door industry?
20  A  No.
21  Q  So you brought all the hands-on experience
22  to the company?
23  A  Correct.  And what I knew in sales.
24  Q  And what was -- what did Tony Zarlengo bring

92

1  to -- why start the business with him?
2  A  Just felt good.
3  Q  Okay.  Had you spoken with him about it before
4  starting the business, like had you been planning this
5  out for some period of time?
6  A  Actually, no.
7  Q  Okay.
8  A  I met him through my wife.  He -- I don't know
9  what he was doing, if anything, at that time and we had
10  a couple beers and said let's go.
11  Q  And did you have an attorney who helped you
12  get the business started?
13  A  Gineris would have helped.
14  Q  That's the accounting firm, correct?
15  A  Yes.
16  Q  Why would Gineris have helped?
17  A  I don't know.  I wouldn't have been able to
18  do it on my own.
19  Q  Well, I mean, how do you know Gineris?
20  A  I'm just taking a guess.
21  Q  Okay.
22  A  Who else would -- Tony wouldn't have been
23  able to do that either.
24  Q  So you're not sure who may have helped, but

93

1  you think it might have been Gineris?
2      A   Correct.
3      Q   Just because they're the accounting firm that
4  you're familiar with.
5          Is that fair?
6      A   Correct.
7      Q   Did Tony Brutti ever work for Midwest Dock
8  Solutions?
9      A   When he was in college.
10     Q   And when was that?
11     A   What year?
12     Q   Yes.
13     A   I couldn't tell you.
14     Q   Was it when you started the -- first started
15  the company?
16     A   Yes.
17     Q   And what did he do?
18     A   Just a helper.
19     Q   Did he ever work for the company as a
20  technician?
21     A   No.
22     Q   How did it come about that Tony Brutti started
23  working for the company?
24     A   He was home from college and I needed hands

94

1  and he helped.
2      Q   Was it more than one summer, do you recall?
3      A   I don't recall.
4      Q   Do you remember where he went to college?
5      A   I don't recall.
6      Q   Was it far enough away that he couldn't work
7  for the company and go to college at the same time?
8      A   Yes.
9      Q   So when he started back to school in the fall,
10  he stopped working?
11     A   Correct.
12     Q   What is your title?
13     A   As of today or then?
14     Q   Well, both.  Then and as of today if it's
15  changed.
16     A   Owner.
17     Q   Okay.  Is that then or is that now?
18     A   It's then all the way through.
19     Q   How about a formal officer title with the
20  company?
21     A   Just owner.
22     Q   I'm going to hand you what I have marked as
23  Exhibit 80.
24         And these are the annual reports that

95

1  have been filed by Midwest Dock Solutions over the
2  years since 2013 and I think the most recent one is
3  2024.
4          Have you ever looked at these before?
5      A   No.
6      Q   All right.  And if you look at the first one,
7  it's from 2013 and it shows that you are the president.
8          Do you see that?
9      A   Yes.
10     Q   Were you aware you were the president?
11     A   No.
12     Q   And it shows that Anthony Zarlengo is the
13  secretary.
14         Do you see that?
15     A   Yes.
16     Q   And then Anthony Zarlengo is a director.
17         And if you turn to the next page, you're
18  also listed as a director.
19         Do you see that?
20     A   Yes.
21     Q   Were you aware that Anthony Zarlengo was the
22  secretary?
23     A   No.
24     Q   Were you aware that you and Anthony Zarlengo

96

1  were directors?
2      A   No.
3      Q   Do you know what a director is or does?
4      A   No.
5      Q   All right.  If you turn to the fourth page in
6  this, it's got an MACRC 533 number on the bottom right
7  corner, there's the annual report for 2014.
8          Do you see that there?
9      A   Yes.
10     Q   And it shows a signature at the bottom that
11  appears to be Mr. Zarlengo's.
12         Would you agree with that?
13     A   Agreed.
14     Q   And it says vice president there.
15         Do you see that?
16     A   Yes.
17     Q   Were you aware of whether the company ever
18  had vice presidents?
19     A   No.
20     Q   Okay.  And again you'll see it shows you as
21  president and Anthony Zarlengo as secretary.
22         Do you see that?
23     A   Yes.
24     Q   And since you were unaware of your title or

97

1  Mr. Zarlengo's formal title, is it fair to say that
2  those titles were assigned just as a matter of
3  convenience because the company needs to have a
4  president and a secretary?
5      A   I can't answer that.
6      Q   You don't know?
7      A   No.
8      Q   Do you have any idea why you're listed as the
9  president and Mr. Zarlengo is listed as the secretary?
10     A   No.
11     Q   Now, do you know that you're a shareholder
12 in -- well, strike that.
13         Do you know whether you're a shareholder
14 in Midwest Dock Solutions?
15     A   I would hope.
16     Q   Okay.
17     A   I own fifty percent of it.
18     Q   That's your understanding, you own fifty
19 percent?
20     A   Yes.  Of the shares.  Yes.
21     Q   Do you know how many shares there are?
22     A   No.
23     Q   Do you know how many shares are outstanding?
24     A   No.

98

1      Q   But whatever they are, you own half and
2  Tony Zarlengo owns the other half.
3          Is that fair?
4      A   Correct.
5      Q   That's your understanding?
6      A   Yes.
7      Q   Did you make any sort of capital contribution
8  when the company was formed to get it started?
9      A   I don't understand what you're asking.
10     Q   Is the reason you don't understand is because
11 you're not sure what a capital contribution is?
12     A   Correct.
13     Q   Did you invest any money in the business to
14 get it started?
15     A   Yes.
16     Q   And how much did you invest?
17     A   I bought a truck.
18     Q   How much did the truck cost you?
19     A   I couldn't tell you.
20     Q   But whatever --
21     A   Yeah.
22     Q   You bought a truck?
23     A   Correct.
24     Q   And you had to buy equipment, too, I'm

99

1  assuming, correct?
2      A   As we went.
3      Q   What do you mean by that?
4      A   I had a lot of hand tools already.
5      Q   Okay.
6      A   We did not have a welder or anything at first
7  and we got it as we went.
8      Q   And do you remember -- well, strike that.
9          I think you answered this, but I'm going
10 to ask it anyway in case I forgot.
11         Do you know how much you paid for the
12 truck to get started?
13     A   No.
14     Q   Did Anthony Zarlengo contribute any money to
15 the company to get it started?
16     A   No.
17     Q   And where were you located when you first
18 started?
19     A   At my father's address.
20     Q   On Spruce Drive?
21     A   Correct.
22     Q   As far as you being -- well, strike that.
23         Fair to say you have never been aware
24 of formal officer titles for your role in Midwest Dock

100

1  Solutions?
2      A   Correct.
3      Q   And fair to say that as far as you recall
4  there was never an active decision about what formal
5  title you would have and what formal title Mr. Zarlengo
6  would have?
7      A   Correct.
8      Q   Now, are you aware that you have an email
9  address with Midwest Dock Solutions that's Mike at
10 Midwest Dock Solutions dot com?
11     A   Yes.
12     Q   That's not an email that you check frequently
13 however, correct?
14     A   Correct.
15     Q   As a matter of fact, you check it very, very
16 infrequently, if ever, correct?
17     A   Correct.
18     Q   Does anybody else check it on your behalf?
19     A   No.
20     Q   Do you have a personal email address aside
21 from the Midwest Dock Solutions dot com email address?
22     A   I do.
23     Q   Do you check that one any more frequently?
24     A   Not really, no.

101

1    Q   Do you use that email for work?
2    A   Yes.
3    Q   Okay.  What's that email address?
4    A   MLR302 at Yahoo dot com.
5    Q   Does the 302 stand for anything?
6    A   Yes.
7    Q   What's it stand for?
8    A   My first car.
9    Q   You had a 302?
10   A   Mustang.
11   Q   And when you were looking for documents to
12   produce in discovery in this case, did you review your
13   emails at that email address?
14   A   Yes.
15   Q   And what kind of emails for work would you get
16   at that email address?
17   A   None.
18   Q   None?
19   A   The few I had I sent to Mike.
20   Q   How often do you check that email address?
21   A   About the same as the Midwest Dock Solutions.
22           I don't -- I do not email.  I do not
23   check emails.
24           If you want to get ahold of me, don't

102

1    email me.
2    Q   I'm sorry.  I thought when I asked you earlier
3    you said you checked that one more frequently.
4    A   I mean, if I order something online, it sends
5    me an email or it sends me you bought something stupid
6    online, but yeah.
7    Q   Any other email addresses that you use?
8    A   I can't answer that.  I don't think I have any
9    other ones.
10   Q   Do you have any role in finding suppliers for
11   Midwest Dock Solutions?
12   A   We have all our suppliers.
13   Q   You have suppliers?
14   A   Yes.  We're not looking for new.
15   Q   And can you turn to --
16       MR. HUGHES:  Are you on Exhibit 40?
17   BY MR. McJESSY:
18   Q   If you can go back to Exhibit 40 which is the
19   interrogatory responses.
20           And if you turn to Interrogatory No. 6,
21   this asks the company, Midwest Dock, to identify its
22   suppliers.
23           And if you look at pages -- if you look
24   at the very bottom of this page there's a heading that

103

1    says supplier.
2        MR. HUGHES:  It's Interrogatory 6.  It's
3    page 7.
4    BY MR. McJESSY:
5    Q   There's Interrogatory 6 (indicating).
6    A   Gotcha.
7    Q   It says identify the material suppliers for
8    Midwest Dock.
9    A   Okay.
10   Q   And then if you look below, it starts with
11   the answer at the very bottom of the page where it says
12   supplier.  That's like a heading for the table that's
13   on the next two pages -- three pages.
14           Do you see that?
15   A   Yes.
16   Q   And just looking down through those companies,
17   do those look like a list of Midwest's suppliers?
18   A   Yes.
19   Q   Okay.  I would just like to get an idea in
20   a word or two what the companies supply, which ones
21   you're familiar with, and if you're not, just say you
22   don't know, and what they supply.
23           So 4Front?
24   A   Dock equipment.

104

1    Q   Like dock levelers?
2    A   Like parts, pieces, all of the above.
3    Q   Triple A Supply Corporation?
4    A   Steel.
5    Q   ABT?
6    A   Can't answer.
7    Q   Ace Hardware.
8        General hardware supplies?
9    A   Small supplies.
10   Q   That's Ace Hardware like I'm familiar with,
11   correct?
12   A   Yes.
13   Q   Advance Auto Parts?
14   A   Yes.
15   Q   What do they supply?
16   A   I guess auto parts.
17   Q   Are you familiar with them as a supplier to
18   Midwest Dock Solutions?
19       I want to make sure you're not just
20   assuming that because of the name that's there.
21   A   Obviously we would get a battery for our work
22   truck or something there.  So yes.
23   Q   Affiliated Force?
24   A   Don't know them.

105

1 Q AGP?
2 A Don't know them.
3 Q Airgas?
4 A Yes.
5 Q What do they supply?
6 A Gas.
7 Q Like gasoline for the trucks?
8 A No. Cutting torches.
9 Q Welding gases?
10 A Welding gases. Yes. Cutting gases.
11 Q Alert Lighting?
12 A No.
13 Q Allied Electronics?
14 A No.
15 Q Amazon?
16 A I'm going to say yes.
17 Q Miscellaneous small items?
18 A I bought a vacuum by accident the other day.
19 Q For the office?
20 A For my house.
21 Q From Amazon?
22 A Uh-huh.
23 Q Okay.
24 A I didn't physically do it, but I had somebody

106

1 get it for me.
2 Q That's not for the company though?
3 A No.
4 Q The company --
5 A I don't know what we would get off Amazon.
6 Q Okay. That's where I was going.
7 American Garage Door Supply?
8 A Yes.
9 Q Door parts, I'm assuming?
10 A Yes.
11 Q Overhead garage door parts and pieces?
12 A Correct.
13 Q Aquatica?
14 A Don't know.
15 Q Auto Zone?
16 A Yes.
17 Q What would they supply?
18 A A battery also.
19 Q Parts for the trucks?
20 A Correct.
21 Q AZZ Galvanizing?
22 A Yes.
23 Q What do they supply?
24 A Galvanizing.

107

1 Q What's that?
2 A You galvanize steel.
3 Q Is that something you do for the door
4 installation or dock installation?
5 A No. That would be for the curb angle.
6 Q They galvanize the curb angles?
7 A Correct. If needed.
8 Q B & F Fabricating?
9 A Out of business.
10 Q What did they supply, do you know?
11 A They supplied the same stuff Triple A would
12 supply to us. They're just no longer in business.
13 Q Bea Inc?
14 A No.
15 Q You don't know them?
16 A No.
17 Q Beecher Hardware.
18 Is that the town of Beecher?
19 A That's what I'm thinking. Yes.
20 Q You're not familiar with what you get from
21 there?
22 A No.
23 Q Blue Creek Supply?
24 A No.

108

1 Q Blue Giant Equipment?
2 A Loading dock equipment we get from them.
3 Q Bolingbrook Glass?
4 A No.
5 Q Brett Supply Company?
6 A No.
7 Q Bristol Hose & Fitting?
8 A Hose.
9 Q Hose for --
10 A Hydraulic hose for hydraulic dock levelers.
11 Q Builders Chicago Corp?
12 A No.
13 Q City Electric Supply?
14 A Yes. Electric supplies.
15 Q Clopay?
16 A Yes. Overhead doors.
17 Q All right. And electric supplies, things like
18 wires, switches, conduit, that kind of thing, for
19 City Electric Supply?
20 A Yes.
21 Q And that's for hooking up overhead doors, door
22 operators and dock leveler equipment?
23 A Correct.
24 Q And Construction Gear?

109

1   A   No.
2   Q   Copperloy?
3   A   Yes.
4   Q   What do they supply?
5   A   Edge of docks or EOD.
6   Q   And what part is that?
7   A   It sits on the -- it's a loading dock that
8   sits on the edge of your dock instead of in a pit.
9   Q   Crane Dorray Corp?
10  A   Where are we at now?
11  Q   Right under Copperloy.  Crane Dorray Corp.
12  A   No.
13  Q   Crete Ace Hardware.
14          That's Ace Hardware?
15  A   That's Crete Lumber in Crete.  We get simple
16  supplies.
17      MR. HUGHES:  I want to make sure you guys are
18  on the same line.
19  BY MR. McJESSY:
20  Q   I was on the one before that.
21          Crete Ace Hardware.
22  A   Yes.  It's another Ace Hardware.
23  Q   Small hardware supplies?
24  A   Correct.

110

1   Q   Crete Lumber & Supply, what kind of things
2   would you get from the lumber company?
3   A   Same as Ace Hardware.
4   Q   Door Masters?
5   A   No.
6   Q   Drain Cables?
7   A   No.
8   Q   Durable Corporation?
9   A   Bumpers.
10  Q   Dock bumpers?
11  A   Yes.
12  Q   Eagle Manufacturing?
13  A   No.
14  Q   Ed's Welding & Fabricating?
15  A   No.
16  Q   Elmer & Smith?
17  A   Locksmith.
18  Q   What would they do?
19  A   They did the doors on the house.
20  Q   On your house?
21  A   Yes.
22  Q   You're personal house?
23  A   Yes.
24  Q   Farm and Fleet?

111

1   A   Yes.
2   Q   What do they provide?
3   A   Nothing that I would know of, but I probably
4   bought something down there.
5   Q   Fastenal?
6   A   They would supply anchors, nuts, bolts,
7   washers.
8   Q   Like anchors for -- concrete anchors?
9   A   Yes.
10  Q   For putting up doors and door tracks, that
11  kind of thing?
12  A   Yes.
13  Q   Fastener Superstore?
14  A   No.
15  Q   Galco?
16  A   No.
17  Q   Gatorsupply Corp?
18  A   No.
19  Q   GDS?
20  A   Yes.  Garage Door Supply.
21          I think that's the same as American
22  Garage Door Supply, GDS.
23  Q   What would they provide?
24  A   Parts.

112

1   Q   GEM Electric Supply?
2   A   Yes.
3   Q   What do they provide?
4   A   Electric supply.
5   Q   Again, for hooking up like door openers and
6   dock levelers?
7   A   Correct.
8   Q   And to an electrical supply so they can
9   operate?
10  A   Correct.
11  Q   Grainger?
12  A   Yes.
13  Q   What do they supply?
14  A   Safety products.
15  Q   Like what kind of safety products?
16  A   It could be a safety vest, safety hard hats,
17  safety glasses.
18  Q   Graybar Electric?
19          And that's for the -- that the employees
20  would wear and use?
21  A   Correct.
22  Q   Graybar Electric Supply?
23  A   I'm going to say yes and the same as the other
24  two electrical supply stores.

113

1    Q    HD Supply?
2    A    No.
3    Q    Helsel-Jepperson?
4    A    Electrical supply store.
5    Q    Same kind of electrical supplies that we've
6    talked about with the other electrical suppliers?
7    A    Correct.
8    Q    Illinois Engineered Products?
9    A    No.
10   Q    Integrated Warehouse Solutions?
11   A    No.
12   Q    J & L Fasteners?
13   A    Yes.  They would supply concrete fasteners,
14   nuts, bolts, washers.
15   Q    Have you heard of the phrase wedge anchors?
16   A    Yes.
17   Q    That kind of thing?
18   A    Yes.
19   Q    And that's again used for the installation of
20   the garage doors, correct?
21   A    Yes.
22   Q    The door tracks, is that correct?
23   A    Yes.
24   Q    Jamison Door Company?

114

1    A    No.
2    Q    John Rickhoff Sheet Metal Company?
3    A    I think they're out of business.
4    Q    Johnstone Supply?
5    A    No.
6    Q    Kamin Fluid Power?
7    A    No.
8    Q    Leeps Supply?
9    A    Yes.
10   Q    What do they provide?
11   A    Pipes for my farm.
12   Q    Liftmaster?
13   A    Yes.
14   Q    They supply door openers?
15   A    Yes.
16   Q    New openers?
17   A    Yes.
18   Q    Are those openers that Midwest Dock Solutions
19   would install?
20   A    Yes.
21   Q    Are they also openers that Dock & Door would
22   install?
23   A    Yes.
24   Q    Maven Industrial Supply?

115

1    A    Don't know.  No.
2    Q    McGuire?
3    A    Loading docks.
4    Q    The docks themselves?
5    A    Yes.  Manufactured.
6    Q    Midwest Dock Supply would install those?
7    A    Wait.  What now?
8    Q    I'm sorry.
9         Midwest Dock Solutions would install
10   those?
11   A    Possibly.
12   Q    Okay.  And Dock & Door would install those,
13   too?
14   A    Possibly.
15   Q    Menards?
16   A    Yes.
17   Q    That's the retail store I'm familiar with?
18   A    Correct.
19   Q    You buy hardware there, tools, that kind of
20   thing?
21   A    Yes.
22   Q    Midwest Angle.  We talked about that.
23        That's your company?
24   A    That's my company.

116

1    Q    Miller Industrial?
2    A    No.
3    Q    Milne Supply Inc?
4         M-i-l-n-e, it looks like.
5    A    No.
6    Q    MMTC?
7    A    No.
8    Q    Modern Fluid Technology?
9    A    No.
10   Q    Motion Industries?
11   A    No.
12   Q    MSC Industrial Supply?
13   A    No.
14   Q    Nelson Stud Welding?
15   A    Yes.
16   Q    What do they provide?
17   A    Studs.
18   Q    Metal studs?
19   A    Yes.
20   Q    And what are those used for?
21   A    Curb angle.
22   Q    And would Midwest Dock Solutions install
23   curb angles?
24   A    Well, not full, no.

117

1    Q    Would Dock & Door install curb angles?
2    A    No.
3    Q    Who installs the curb angles?
4    A    Concrete people.
5         Midwest Dock will do small jobs.
6    Q    So do you provide the curb angles to other
7    parties --
8    A    Yes.
9    Q    (Continuing) -- to install?
10   A    Yes.
11   Q    And would that be on Midwest Dock Solutions
12   jobsites?
13   A    That would be on multiple jobsites.
14   Q    But it could be on Midwest Dock Solutions
15   jobsites?
16   A    Yes.
17   Q    And it could also be on Dock & Door jobsites?
18   A    Yes.  We also sell in Missouri, Iowa.
19   Q    Nice Group Canada?
20   A    No.
21   Q    North Shore Commercial Door Company?
22   A    No.
23   Q    Northern Tool?
24   A    Yes.

118

1    Q    Okay.  And what do they provide?
2    A    Possibly small hand tools or something in an
3    emergency, I'm thinking.
4    Q    O'Leary's Contractor Equipment?
5    A    No.
6    Q    Omega Industrial Safety?
7    A    No.
8    Q    Overhead Door Corporation?
9    A    I know what they are, but I don't know why
10   we would have dealt with them.
11   Q    Paul Reilly Company?
12   A    Yes.
13   Q    What do they provide?
14   A    They are the same company as Midwest Dock
15   Solutions.
16   Q    What do you mean they're the same company?
17   A    They're a service company.
18   Q    They provide similar services?
19   A    Yes.  We may have bought parts off of them
20   or they bought parts off of us.
21   Q    I understand.  Okay.  I thought you meant it
22   was somehow literally the same company.
23        When you said it's the same company, you
24   mean they do the same kind of work?

119

1    A    Yes.
2    Q    Pierini Iron Works?
3    A    I want to say rolling steel doors.  Yes.
4    Q    Installed by Midwest Dock Solutions?
5    A    Well, it would be the slats replacement.
6    Q    Okay.
7    A    And yes.
8    Q    And would Dock & Door also install those, --
9    A    No.
10   Q    (Continuing) -- the rolling doors?
11   A    They just replace -- replacement parts only.
12   Q    They sell replacement parts only?
13   A    Yes.
14   Q    They sell rolling door slats?
15   A    Yes.  And barrels.
16   Q    Pirtek?
17   A    No.
18   Q    Preferred Doors?
19   A    Another service shop.  Yes.  Buying parts.
20   Q    Similar to Paul Reilly?
21   A    Correct.
22   Q    Protec Controls?
23   A    No.
24   Q    Protek Systems?

120

1    A    No.
2    Q    Reliable Parts?
3    A    No.
4    Q    Rittertech?
5    A    No.
6    Q    River Bend Hose Specialty?
7    A    I'm thinking hydraulic hoses.  Yes.
8    Q    Used to install dock levelers?
9    A    Replace and repair.
10   Q    Rytec?
11   A    Yes.
12   Q    And what do they provide?
13   A    High speed doors.
14   Q    New?
15   A    Yes.
16   Q    The actual doors themselves?
17   A    And parts.
18   Q    And would Midwest Dock Solutions install
19   those doors?
20   A    Yes.
21   Q    Would Dock & Door install those doors?
22   A    I can't honestly answer that.
23   Q    Dock & Door does install high speed doors,
24   correct?

121

1　A　Midwest Dock Solutions, yes.
2　**Q　And Dock & Door does, too, correct?**
3　A　Yes.
4　**Q　And Sargent's Equipment & Repairs?**
5　A　I'm thinking -- no.
6　**Q　Service Spring Corp?**
7　A　Yes.
8　**Q　What do they provide?**
9　A　Service parts for overhead doors.
10　**Q　Smith Control Systems?**
11　A　No.
12　**Q　South Eastern Dock Systems?**
13　A　I'm going to just go with no.
14　**Q　Standard Electric Supply?**
15　A　An electric company, yes, that we get supplies
16　from.
17　**Q　Same kind of general supplies we've talked**
18　**about earlier; wire switches, conduit, cable, that kind**
19　**of thing?**
20　A　Correct.
21　**Q　For hooking up garage doors and dock levelers**
22　**or garage door openers and dock levelers?**
23　A　Correct.
24　**Q　Swift Saw & Tool Supply Company?**

122

1　A　No.
2　**Q　Tractor Supply Company?**
3　A　Yes.
4　**Q　What do they provide?**
5　A　I bought my gas tanks there.
6　**Q　Gas tanks that are at --**
7　A　No.
8　**Q　(Continuing) -- 27 36th Place or on your farm?**
9　A　In the back of my truck.
10　**Q　Tri State Propane Exchange?**
11　A　Yes.
12　**Q　What do they provide?**
13　A　Propane.
14　**Q　What do you use propane for?**
15　A　Fork truck.
16　**Q　A forklift?**
17　A　Yes.
18　**Q　Is that at the warehouse --**
19　A　Yes.
20　**Q　(Continuing) -- at 27 East 36th Place?**
21　A　Correct.
22　**Q　Turek & Sons?**
23　A　I should know that, but I don't.
24　**Q　Vestil Manufacturing Corp?**

123

1　A　Vestil would -- yes.
2　**Q　What do they provide?**
3　A　Everything.  It's a book that's everything
4　from pens to safety gear to loading dock equipment to
5　caulk to everything.
6　**Q　Voss Equipment?**
7　A　Yes.
8　**Q　What do they provide?**
9　A　They fix our fork truck.
10　**Q　Waukegan Steel?**
11　A　No.
12　**Q　Weldstar?**
13　A　Yes.
14　**Q　What do they provide?**
15　A　Gas, welding rod.
16　**Q　Welding supplies?**
17　A　Welding supplies.
18　**Q　Wunderlich Doors?**
19　A　I think they're out of business.
20　**Q　Do you know what they did provide?**
21　A　Probably bought parts from us or we bought
22　parts from them.
23　**Q　There's something here that's X-c-l-u-d-e-r.**
24　**Do you know what that company is?**

124

1　A　No.
2　**Q　And Zoro Tools?**
3　A　No.
4　**Q　Describe for me what was Midwest Dock**
5　**Solutions business when it started out.**
6　**What kind of work did it do?**
7　A　Service shop.
8　**Q　Service of doors and dock levelers?**
9　A　Correct.
10　**Q　Would it install doors and dock levelers?**
11　A　Yes.
12　**Q　So it would remove old dock levelers and**
13　**install new ones?**
14　A　Yes.
15　**Q　Would it install new dock levelers in a**
16　**location that didn't have a dock leveler?**
17　A　No.
18　**Q　Did it repair dock levelers?**
19　A　Yes.
20　**Q　What kind of overhead door installation did**
21　**it do?**
22　A　Take down, retrofit install.
23　**Q　Would it install where there was no prior**
24　**door?**

125

```
1    A   No.
2    Q   Why not?
3    A   We didn't have any of those contacts.
4    Q   Just because it didn't have those kind of
5    customers?
6    A   Yes.
7    Q   Same thing for the reason that it didn't
8    install new dock levelers?
9    A   Correct.
10   Q   Were its customers typically one-off customers
11   or were they repeat customers --
12   A   Repeat.
13   Q   (Continuing) -- when it started out?
14   A   Well, one off obviously at first.
15   Q   But they became repeat customers?
16   A   Then they became repeat.  Yes.
17   Q   Did you have any contacts in the industry when
18   you started up?
19   A   No.
20   Q   How did you get business when you started up?
21   A   Went and knocked on doors.
22   Q   Just said, hey, I see you've got docks --
23   A   Correct.
24   Q   (Continuing) -- and here's our card?
```

126

```
1    A   Yes.
2    Q   Did the nature of Midwest Dock Solutions
3    business change over time?
4    A   No.
5    Q   Okay.  What was the -- what's the division of
6    labor between you and Tony Zarlengo at Midwest Dock
7    Solutions?
8    A   I don't understand the question.
9    Q   Are there things that you're primarily
10   responsible for and things that he's primarily
11   responsible for?
12   A   Yes.
13   Q   What are you primarily responsible for?
14   A   Everything outside the office.
15   Q   Okay.
16   A   At this point or when we started?
17   Q   When you started.
18   A   I knocked on doors, too.
19   Q   You both did?
20   A   Yes.
21   Q   Let's talk about now.
22       What's the division of labor between you
23   and Tony say over the last five years?
24   A   Tony Zarlengo handles the office and inside
```

127

```
1    and I handle anything outside.
2    Q   So what's considered -- like what does he do
3    inside the office that you're aware of?
4    A   I can't answer that.
5    Q   You know he quotes jobs, right?
6    A   Yes.
7    Q   He bids -- he does bid proposal work?
8    A   Correct.
9    Q   Do you do any of that?
10   A   No.
11   Q   Okay.
12   A   I will help with job hours.
13   Q   What does that mean?
14   A   If somebody asks what I think, how long it
15   will take to get done, I will give them my opinion.
16   Q   So if he's bidding a job, for example?
17   A   Yes.
18   Q   And you said if anyone asks.
19       Would that include like Ira Sugar?
20   A   No.
21   Q   So who would be asking like how long it would
22   take to do a job and ask you for that information?
23   A   Steve.  Dave.  Just until they get going.
24       They also conversate with Tony.
```

128

```
1    Q   And you're mostly -- you described earlier
2    you're outside going to jobsites and looking at
3    problems when you've got a problem and something is
4    not working?
5    A   Correct.
6    Q   Does Tony Zarlengo do that kind of work?
7    A   No.
8    Q   Any other kind of work that you do that you're
9    primarily responsible for just going to jobsites,
10   looking at problem jobs?
11   A   I fix things.
12   Q   What does that mean?
13   A   If it's broke, I fix it.
14   Q   At the --
15   A   Job.
16   Q   Things at the jobsite --
17   A   Correct.
18   Q   (Continuing) -- or things at the warehouse?
19   A   On the jobsite.
20   Q   So you're hands-on at the jobsite?
21   A   Yes.
22   Q   What kind of things would you fix?
23   A   I'll fix docks, doors.
24   Q   And you had experience before starting the
```

129

1    company doing that, correct?
2        A    I didn't have that experience.  I built that
3    as I ran the company.
4        Q    What do you mean you didn't have that
5    experience?
6        A    I didn't do much service when I was at the
7    other companies.
8            We didn't do any service.
9        Q    Well, when you were with JR Ventures you said
10   you were a helper.
11       A    Yes.
12       Q    Okay.
13       A    They did no service.
14       Q    What did they do?
15       A    They just installed.
16       Q    New installs?
17       A    That's it.
18           J & B.
19       Q    J & B Ventures -- I'm sorry -- in Beecher.
20       A    Correct.
21       Q    They did loading dock installations, dock
22   leveler -- they did dock leveler installations, dock
23   seals and dock restraints?
24       A    Correct.

130

1        Q    And that was all new installation?
2        A    Correct.
3        Q    Not retrofit?
4        A    None.
5        Q    So the repair work you learned on the job?
6        A    On my own.
7        Q    And you had no prior experience doing door
8    installation, correct?
9        A    Correct.
10       Q    Okay.  But now one of the things you do is you
11   will actually go out to jobsites and you will fix dock
12   levelers and fix overhead doors?
13       A    Correct.  Trouble shoot.
14       Q    Will you also do retrofit repair and replace
15   work?
16       A    Yes.
17       Q    For both docks and doors?
18       A    Yes.
19       Q    How big of a part of your job is that?
20       A    All of it.  That's what I do every day.
21       Q    Are you involved at all in getting insurance
22   for the business?
23       A    No.
24       Q    Liability insurance, automobile insurance?

131

1        A    No.
2        Q    That kind of thing.
3        A    No.
4        Q    Who handles that?
5            Tony?
6        A    Tony.
7        Q    That's Tony Zarlengo?
8        A    Correct.
9        Q    Do you sign contracts on behalf of Midwest
10   Dock Solutions for work?
11       A    No.
12       Q    Have you done that in the past?
13       A    Not that I remember.
14       Q    Do you interact at all with representatives of
15   any of the big general contractors that Midwest Dock
16   Solutions contracts with?
17       A    No.
18       Q    You're familiar with like Arco Murray, Clayco,
19   Krusinski, Meridian Design Build, Morgan Harbour
20   Construction, Opus Design Build, Peak Construction,
21   Pepper Construction, Power Construction, Principle
22   Construction?
23           Are you familiar with those companies?
24       A    Yes.

132

1        Q    And you're aware that Midwest Dock Solutions
2    contracts with those companies?
3        A    Yes.
4        Q    Do you have any interaction with any of those
5    companies?
6        A    No.
7        Q    To the best of your recollection have you ever
8    had any interaction with anyone from those companies
9    concerning any jobs that Midwest Dock Solutions had
10   contracted?
11       A    I've talked to Doug because he is my uncle's
12   friend from Principle.
13       Q    Okay.
14       A    And that's it.
15       Q    Who's Doug?
16       A    I don't know his last name, but he is a GC
17   at Principle.
18       Q    What's a GC?
19       A    General contractor.
20       Q    He's a general contractor at Principle?
21       A    I don't know what he actually does there.
22       Q    And who's your uncle?
23       A    My Uncle Bill.
24       Q    And what's Bill's last name?

133

1   A   Elliott.
2   Q   So Doug is a friend of your Uncle Bill?
3   A   Yes.
4   Q   So you've had conversations with him?
5   A   Correct.
6   Q   How long have you known Doug?
7   A   I can't answer that. Ten years.
8   Q   Long time?
9   A   Yes.
10  Q   Do you have any involvement in obtaining
11  Certificates of Insurance for projects?
12  A   No.
13  Q   Do you have any involvement in making
14  decisions concerning the employee health insurance
15  plan for Midwest Dock Solutions?
16  A   It's a -- as far as if it's a health plan?
17  Q   Making decisions about which plan to pick,
18  which company to place the benefits with.
19  A   No.
20  Q   Whether to change the terms of the plan.
21      Anything like that.
22  A   No.
23  Q   Do you have any involvement in Midwest Dock
24  Solutions retirement plan or its 401(k) plan?

134

1   A   Yes.
2   Q   And what is your involvement?
3   A   I just wanted it for everybody.
4   Q   Okay.
5   A   So we got it started.
6   Q   And other than wanting it and getting it
7   started, what was your role?
8   A   Just working with the accountant to get it
9   going.
10  Q   And do you have any like ongoing involvement
11  in managing that plan?
12  A   No. They do all that.
13  Q   And is that a plan available to all of the
14  employees of Midwest Dock Solutions?
15  A   After one year of service.
16  Q   And is the same true for the health insurance
17  plan?
18  A   90 days.
19  Q   How is your income from Midwest Dock Solutions
20  determined?
21  A   We pay -- we just pay ourselves a salary.
22  Q   Equal?
23  A   Yes.
24  Q   And then you also take distributions, correct?

135

1   A   Correct.
2   Q   Equal?
3   A   Yes.
4   Q   And how do you decide how much to set your
5   salary at and how do you decide -- well, strike that.
6       How do you decide what to set your salary
7   at?
8   A   The accountant does that.
9   Q   The accountant does?
10  A   Yes.
11  Q   The accountant tells you what your salary is?
12  A   He runs the whole company. He knows best what
13  we can take and what we cannot take.
14  Q   That is Gineris & Associates?
15  A   Correct.
16  Q   And who specifically at Gineris?
17  A   I don't know. I can't answer that.
18  Q   Do you have any -- do you interact at all with
19  the people from Gineris?
20  A   Margaret handles my taxes.
21  Q   Your personal taxes?
22  A   Yes.
23  Q   How about for the business?
24  A   Callie.

136

1   Q   Callie Stevens?
2   A   Yes, but we don't interact that often.
3   Q   You and her don't?
4   A   No.
5   Q   Do you think Tony Zarlengo has more
6   interaction with her?
7   A   Yes.
8   Q   Who determines the amount of distributions
9   you could take?
10  A   Somebody from Gineris.
11  Q   Okay. How are you paid when you receive
12  payment from Midwest Dock Solutions?
13      Is it by direct deposit, check, cash?
14  A   Direct deposit.
15  Q   Have you ever received cash?
16  A   No.
17  Q   Has the method by which you're paid ever
18  changed over time?
19  A   Not much.
20      You're talking the wage or you're talking
21  direct deposit versus check?
22  Q   The latter.
23  A   No. It hasn't changed. I couldn't even tell
24  you.

137

1    Q   Do you know who the payroll company is that
2  does your payroll?
3    A   Gineris.
4    Q   Okay.  If I said it was ADP, does that make
5  sense to you?
6    A   No.
7    Q   You think it's Gineris?
8    A   I guess I can't answer that one then.
9    Q   Is Gineris the only accounting firm that
10  Midwest Dock Solutions has ever used?
11   A   Yes.
12   Q   And how did it choose Gineris?
13   A   My Auntie Joyce chose them when I first
14  started the company.
15   Q   Who is Auntie Joyce?
16   A   She's passed now.  She was my aunt though.
17   Q   She was your father's sister or your mother's
18  sister?
19   A   Mother's -- not sister.  We're Italian so
20  everybody is aunt and uncle.
21       That's all I could tell you.
22       She helped me do everything.  Incorporate
23  it.
24   Q   So she may not be your actual aunt?

138

1    A   I think she is.  I just don't know how.
2    Q   Okay.
3    A   It's irrelevant.  It is what it is.
4    Q   Does Auntie Joyce have a last name?
5    A   I should know this.
6        Frazzini.  Don't ask me to spell it.
7    Q   And she recommended Gineris & Associates?
8    A   Correct.
9    Q   Do you know what -- why or what connection
10  she had with Gineris & Associates?
11   A   The car dealership at that time did their
12  books that she worked at.
13   Q   She worked at a car dealership?
14   A   Yes.
15   Q   The car dealership that she worked at used
16  Gineris?
17   A   Correct.
18   Q   And she said, in essence, hey, Mike, Gineris
19  is good.  Use them.
20   A   Correct.
21   Q   And you did?
22   A   Correct.
23   Q   And did you reach out to them originally
24  or did Tony Zarlengo or do you even recall?

139

1    A   Tony Zarlengo.
2    Q   Do you know has Callie Stevens always been
3  the person you dealt with there?
4    A   Can't answer that.
5    Q   All right.  A different person than Callie
6  prepares your taxes, correct?
7    A   Personal?
8    Q   Yes.
9    A   Margaret.
10   Q   And how about the company taxes, do you know
11  who prepares those?
12   A   Callie, I believe.
13       MR. McJESSY:  What time is it?
14       MR. HUGHES:  Noon on the dot.
15       MR. McJESSY:  Off the record.
16       (Whereupon a short recess was had)
17  BY MR. McJESSY:
18   Q   Sir, in 2014 Midwest Dock Solutions got
19  a contract with Principle Construction to perform
20  work at the Winpak Portion Packaging facility in
21  Sauk Village, correct?
22   A   Correct.
23   Q   Do you remember that?
24   A   I do not.

140

1    Q   Do you know whether that was somehow through
2  Doug that you mentioned at Principle Construction?
3    A   I can't answer that.
4    Q   Okay.  Are you aware that Midwest Dock
5  Solutions signed a One Jobsite Agreement with the
6  Carpenters Union?
7    A   I am aware of it.
8    Q   Okay.  And if you look at -- I've handed you
9  what's been marked as Exhibit 81.
10       Does that look like the One Jobsite
11  Agreement that Midwest Dock Solutions would have signed
12  for this project?
13   A   Yes.
14   Q   And do you recognize on the first page there
15  it says Midwest Dock Solutions and there's initials
16  after that?
17   A   Correct.
18   Q   Those look like Anthony Zarlengo's?
19   A   Yes.
20   Q   And if you turn to the next page, it looks
21  like it says estimated starting date November 14, 2011,
22  correct?
23   A   Correct.
24   Q   And does that sound like approximately when

141

1  this project could have been?
2      A  It could be.
3      Q  Okay.  And if you look at the next page,
4  this is something that was online by Dermody and it
5  talks about a groundbreaking for the Winpak Portion
6  Packaging manufacturing facility in Sauk Village.
7          Do you see that?
8      A  Yes.
9          MR. HUGHES:  I'm going to object to foundation
10 of this portion of the document.
11         MR. McJESSY:  That's fine.
12 BY MR. McJESSY:
13     Q  And if you look at the second paragraph there,
14 it refers to their new 267,000 square foot facility
15 that will be located on a 28-acre site at 1111 Winpak
16 Way.
17         Do you see that?
18     A  Yes.
19     Q  And it says Principle Construction has begun
20 work on the project.
21         Do you know was Midwest Dock Solutions,
22 was it hired by Principle Construction on this project?
23     A  I cannot answer that.
24     Q  Okay.  And if you turn to the last page of

142

1  this, I'll represent to you that that's a Google Street
2  View Map photo of the Winpak Portion Packaging Company
3  at 1111 Winpak Way, Sauk Village.
4          Do you see that?
5      A  Yes.
6      Q  Were you ever at the jobsite that was done by
7  Midwest Dock Solutions?
8          MR. HUGHES:  And before you answer, I'm going
9  to object to foundation on this as well.
10         MR. McJESSY:  Okay.
11 BY MR. McJESSY:
12     Q  For this project?
13     A  Yes.
14     Q  And does this look like the facility?
15     A  Yes.
16     Q  And it's a little hard to see, but down the
17 left-hand side of this it looks like it shows trucks
18 pulled up to loading docks.
19         Do you see that?
20     A  Yes.
21     Q  Is that where the work was done?
22     A  Yes.
23     Q  Do you remember was the work doors and docks
24 or was it just doors or just docks?

143

1      A  I couldn't answer that.
2      Q  You don't recall?
3      A  No.
4      Q  And if you look at this exhibit that's marked
5  as Exhibit 81, do you see at the top where it says --
6  there's a FAX line there, November 11th, 2011?
7      A  Yes.
8      Q  And it says Midwest Dock Solutions?
9      A  Correct.
10     Q  And there's a phone number there.
11         Do you see that?
12     A  Yes.
13     Q  Did Midwest -- is this Midwest Dock Solutions
14 FAX header?
15     A  Yes.
16     Q  And I'm going to hand you what I've marked
17 as Exhibit 82.
18         And you'll see this has the same FAX
19 header at the top, the same time?
20     A  Yes.
21     Q  Except this one says page 2 of 6 and page 5
22 of 6.
23         Do you see that?
24     A  Yes.

144

1      Q  And the other one had -- Exhibit 81 had 3 of 6
2  and 4 of 6, correct?
3          Exhibit 81.
4      A  Yes.
5      Q  So it looks like these pages were intermingled
6  when they were FAX'd, but Exhibit 82 I will represent
7  to you is an employer questionnaire from the Carpenters
8  Union.
9          And on the second page again do you
10 recognize the initials as being those of Anthony
11 Zarlengo?
12     A  Yes.
13     Q  Okay.  Were you involved at all in either
14 filling out this employer questionnaire that's marked
15 as Exhibit 82 or the One Jobsite Agreement that's
16 marked as Exhibit 81?
17     A  No.
18     Q  Okay.  Did you contact the Carpenters Union at
19 all to sign up on the One Jobsite Agreement in order to
20 do the Winpak Portion Packaging project?
21     A  I mean, we must have.  I don't remember
22 contacting them.
23     Q  But you don't remember being involved in that,
24 is that correct?

145

1    A   Correct.
2    Q   I'm going to hand you what's been marked as
3    Exhibit 83.
4         This appears to be page 1 of 6, the first
5    page of the FAX, and it looks like a FAX page from
6    Midwest Dock Solutions.
7         Would you agree with that?
8    A   Yes.
9    Q   All right.  And did Midwest Dock Solutions
10   use FAX cover sheets like this back in 2011?
11   A   Can't answer that.
12   Q   You don't recall?
13   A   No.
14   Q   I'm going to hand you what I've marked as
15   Exhibit 84.
16        And this is an email that appears to be
17   from Tony Zarlengo to Robert Lid.
18        Do you see that?
19   A   Correct.
20   Q   And it's dated the same date as the FAX that
21   we were just looking at.
22        Do you see that?
23   A   Yes.
24   Q   And it says I'm not -- it says in the email in

146

1    the second sentence, also I'm not sure who needs to
2    know, but we will be using David Richert from the
3    carpenters to work for us next week.
4         Do you see that?
5    A   Yes.
6    Q   Do you know who David Richert is?
7    MR. HUGHES:  First I'm going to object again
8    to foundation of this document.
9    BY MR. McJESSY:
10   Q   Do you know who David Richert is?
11   A   My brother.
12   Q   Is he a union carpenter?
13   A   Yes.
14   Q   Was he a union carpenter back in 2011?
15   A   I can't answer that.
16   Q   Do you have any recollection of whether
17   he performed the work on this job?
18   A   I can't answer that.
19        I would say I did the work.
20   Q   Your recollection is you did the work?
21   A   Yes.
22   Q   Do you remember being out at that jobsite?
23   A   No.
24   Q   Why do you think you did the work?

147

1    A   What else would I be doing?
2         You know what I mean?
3         Do you know how many buildings I've been
4    in in the last thirty years?
5    Q   So you could have been at the building; you
6    just don't remember it?
7    A   They all look identical.
8    Q   Is it possible you and he could have done the
9    work together?
10   A   There's a possibility.  Yes.
11   Q   Okay.
12   A   What year was this?
13   Q   2011.
14   A   I don't know.
15   Q   I'm going to hand you what's been marked as
16   Exhibit 85.
17        And before I ask you about this, it's my
18   understanding that the process for installing doors in
19   facilities, new construction facilities like the one
20   that was shown in that Google street image of the
21   Winpak Portion Packaging Company, is that the doors
22   get installed by a process initially that involves
23   stacking where the panels are put into place and then
24   they're fastened together after that, is that correct?

148

1    A   I would say you would probably fasten them
2    together as you're stacking.
3    Q   But there's a stacking process involved,
4    correct?
5    A   Correct.
6    Q   So you put a panel in place and then you stack
7    another panel on top of that and you connect them
8    together.
9         Is that it?
10   A   Correct.
11   Q   And then you stack the next panel on top of
12   that and you connect them together, is that correct?
13   A   Correct.
14   Q   And are the panels -- are they in the tracks
15   when you stack them?
16   A   It depends on the jobsite.
17   Q   Okay.  And explain that to me just so I
18   understand how it works.
19   A   Maybe they didn't have enough room on that
20   jobsite and they set one track in, stack all the panels
21   and then lower the other track to it.
22   Q   But there would have to be one track in place,
23   I presume?
24   A   Always.

149

1    **Q**   Otherwise the panels wouldn't stand, --
2    A   Correct.
3    **Q**   (Continuing) -- correct?
4    A   Correct.
5    **Q**   But you could have just one track in place
6    and stack them?
7    A   Yes.
8    **Q**   And my understanding is from the other workers
9    who testified that the stacking process is a two-person
10   job.
11       **Is that fair?**
12   A   No and -- no.
13   **Q**   One person can do it?
14   A   Yes.
15   **Q**   Is that -- have you ever stacked it by
16   yourself?
17   A   Yes.  Two weekends ago I did.
18   **Q**   And was that at a big project or was that
19   a small project?
20   A   A house.
21   **Q**   A residential garage door?
22   A   Yes.
23   **Q**   Have you ever stacked by yourself at a large
24   construction site?

150

1    A   You could.
2    **Q**   No, I understand you could, but --
3    A   Did I?
4    **Q**   Yes.
5    A   Yes.
6    **Q**   At like a logistics building kind of
7    situation?
8    A   Yes.
9    **Q**   I'm showing you what I've marked as
10   Exhibit 82 -- actually 85.
11       **Did I properly mark that?**
12   A   I was looking for the date on it.
13       MR. HUGHES:  It's 85.
14   BY MR. McJESSY:
15   **Q**   If you look, it says month of and you see it
16   says November 11th.
17       **Do you see that?**
18   A   Where are you looking at?
19       MR. HUGHES:  Right here (indicating).
20   BY THE WITNESS:
21   A   Okay.
22   BY MR. McJESSY:
23   **Q**   Do you see that?
24   A   Yes.

151

1    **Q**   And then if you look at the bottom, there's
2    a received stamp that says January 5th, 2012.
3       **Do you see that?**
4    A   Yes.
5    **Q**   And this appears to be a Fringe Benefit
6    Contribution Report by Midwest Dock Solutions, correct?
7    A   Correct.
8       MR. HUGHES:  Objection.  Foundation.
9    BY MR. McJESSY:
10   **Q**   All right.  And do you recognize the initials
11   at the bottom where it says authorized signature?
12   A   Yes.
13   **Q**   Okay.  And are those Tony Zarlengo's initials?
14   A   Yes.
15   **Q**   And if you turn in this document to the page
16   that has MACRC 609 on the bottom right corner, there's
17   a Rodney Platt there.
18       **Do you see that?**
19   A   Yes.
20   **Q**   Do you know -- do you recall Rodney Platt?
21   A   I do not.
22   **Q**   And if you turn to the next page, there's the
23   name Adam -- I'm going to take a shot -- Schwoebez,
24   S-c-h-w-o-e-b-e-z.

152

1       **Do you see that?**
2    A   Yes.
3    **Q**   Do you recognize that person?
4    A   I do not.
5    **Q**   And there's another name there, it looks like
6    it's John Leavitt, L-e-a-v-i-t-t.
7       **Do you see that?**
8    A   I do.
9    **Q**   Do you know who that is?
10   A   I do not.
11   **Q**   Okay.  And then if you turn two more pages
12   back, there's a person named David Green.
13       **Do you see that?**
14   A   Yes.
15   **Q**   And you do recognize who he is, correct?
16   A   Yes.
17   **Q**   Was he employed by Midwest Dock Solutions?
18   A   I would say so.  It says Midwest Dock
19   Solutions on there.
20   **Q**   Okay.  You're just assuming that because you
21   see the name there?
22   A   Correct.
23   **Q**   You don't have -- as you sit here today do you
24   recall that he was employed by Midwest Dock Solutions?

153

1    A   I can't answer that.
2    Q   Why is that?
3    A   I don't know when he left Midwest Dock
4    Solutions.
5    Q   So you know he was at Midwest Dock Solutions?
6    A   Yes.  He did work at Midwest Dock Solutions.
7    Q   And what kind of work did he do for Midwest
8    Dock Solutions?
9    A   Service work.
10   Q   Did he also do installation of overhead doors?
11   A   Yes.
12   Q   New construction?
13   A   No.
14   Q   Would Midwest Dock have been reporting hours
15   on his behalf for any purpose other than work at a
16   jobsite that it signed an agreement for?
17   A   That's what it looks like.
18   Q   It's reporting hours on his behalf, correct?
19   A   Yes.
20   Q   Okay.  And that would have been for an
21   agreement with the union, correct?
22   A   Yes.
23   Q   And do you believe that would have been for
24   the work at the Winpak Portion Packaging project?

154

1    A   Yes.
2    Q   I'm going to hand you what I've marked as
3    Exhibit 86.
4        And this is another One Jobsite
5    Agreement.
6        MR. HUGHES:  Objection.  Foundation.
7    Completeness.
8    BY MR. McJESSY:
9    Q   And it's a One Jobsite Agreement for -- it
10   says Kapstone, Aurora, Illinois.
11       Do you see that?
12   A   Yes.
13   Q   And on this document, unlike the one that we
14   looked at previously, it shows an address of 1249 East
15   Burrville, Unit 8, Crete, Illinois.
16       Do you see that?
17   A   Yes.
18   Q   Is that an address that Midwest Dock Solutions
19   was at?
20   A   Yes.
21   Q   And do you know when it moved into that
22   address?
23   A   I do not.
24   Q   Do you know what the Kapstone project was?

155

1    A   I do not.
2    Q   Are you familiar with it in any way?
3    A   No.
4    Q   Do you know whether Midwest Dock Solutions
5    did work on -- and I'm guessing since you don't
6    remember the project --
7    A   I'm going to say yes.
8    Q   Say yes what?
9    A   I was probably there.
10   Q   But you don't recall?
11   A   No.
12   Q   All right.  At the Winpak project, do you
13   know, would that have just been doors or doors and
14   docks?
15   A   It would have probably been just docks.
16   Q   Just docks?
17   A   Yes.
18   Q   And why do you think that at that time?
19   A   I don't know if we did doors at that point.
20   Q   But you're not sure?
21   A   Not sure.
22   Q   Okay.  Do you know why Midwest Dock signed the
23   agreement with the Carpenters Union, the One Jobsite
24   Agreement?

156

1    A   I don't recall.
2    Q   Have you ever performed work for Dock & Door?
3    A   No.
4    Q   Have you ever assisted Tony Brutti in his work
5    for Dock & Door?
6    A   No.
7        MR. McJESSY:  87, 88, 89, 90 and 91.
8    BY MR. McJESSY:
9    Q   Sir, if you could take a look at Exhibit 89,
10   this is the Depreciation Schedule from -- I'm sorry.
11       Actually take a look at 87.
12       This is the Depreciation Schedule from
13   Midwest Dock Solutions 2017 tax returns that were
14   produced by Gineris & Associates.
15       First I'd like you to take a look at the
16   items on the left-hand column and ask you if these look
17   like -- you'll see that there's numbered paragraphs 1
18   through 29 -- and ask if those look like assets that
19   belonged to Midwest Dock Solutions back in 2017?
20       MR. HUGHES:  Object to foundation.
21       You can answer.
22   BY MR. McJESSY:
23   Q   Well, let's do it this way then.
24       The first item there says -- let's go

157

1  through them individually.
2       The first item there says trash pump.
3       Do you see that?
4  A  Yes.
5  Q  Do you know what a trash pump is?
6  A  It's personal.
7  Q  It's a personal item?
8  A  Yes.
9  Q  It's not part of the company property?
10  A  No.
11  Q  It's not part of Midwest Dock Solutions
12  business?
13  A  No.
14  Q  Next item is plasma cutters.
15       Do you see that?
16  A  Yes.
17  Q  Is that part of Midwest Dock Solutions
18  business?
19  A  Yes.
20  Q  What is that?
21  A  It's to cut curb angle.
22  Q  And did Midwest Dock Solutions have plasma
23  cutters?
24  A  Yes.

158

1  Q  Does it still have plasma cutters?
2  A  Yes.
3  Q  All right.  Next item there says tractor.
4       Is that Midwest Dock Solutions?
5  A  I can't answer that.
6  Q  Because you don't know exactly what it is?
7  A  Correct.
8  Q  Does Midwest Dock Solutions have something
9  that could be considered a tractor?
10  A  Not to my knowledge.
11  Q  Did it in 2017?
12  A  Not to my knowledge.
13  Q  So you think that might be a personal item?
14  A  It could be, but not to my knowledge, no.
15  Q  Do you have a tractor or did you in 2017?
16  A  I did not in 2017.  Somebody cut my grass.
17  Q  The next item, item 4, is dock leveler.
18       Do you see that?
19  A  Yes.
20  Q  Did Midwest Dock Solutions have a dock
21  leveler?
22  A  Yes.
23  Q  And how about a 2005 Honda utility cart?
24  A  Yes.

159

1  Q  And did Midwest Dock Solutions have that?
2  A  Yes.
3  Q  And how about a 2005 Ford F450?
4  A  Yes.
5  Q  You mentioned that when you started up you
6  bought a vehicle to get the business going.
7       Do you know what it was?
8  A  It's probably that.  2005 F450.
9  Q  Okay.  That's what I was going to ask.
10       That's around the time you started the --
11  the model of it is around the time you started the
12  business.
13       All right.  Is that the kind of truck
14  you bought to start the business?
15  A  Yes.
16  Q  How about a 2004 Honda Accord, did the company
17  own that kind of vehicle?
18  A  Yes.
19  Q  And that was Midwest Dock Solutions?
20  A  Yes.
21  Q  And then let's skip to number 9.
22       Did Midwest Dock Solutions own a welder?
23  A  Yes.
24  Q  Does it still own a welder?

160

1  A  Yes.
2  Q  And then item 10, there's a Chevy Econovan.
3       Did Midwest Dock Solutions own a Chevy
4  Econovan?
5  A  Yes.
6  Q  What did it use that for?
7  A  Service work.
8  Q  And did Midwest Dock Solutions own a forklift?
9  A  I don't know.  At this time I couldn't tell
10  you.
11  Q  Does it now?
12  A  Yes.
13  Q  But you're not sure when it acquired the
14  forklift?
15  A  No.  I don't know at this date where we were
16  at.
17  Q  It references a laptop computer in item 12.
18       Did the company own laptop computers?
19  A  Yes.
20  Q  The next item is a 2012 Ford F450.
21       Do you see that?
22  A  Yes.
23  Q  Did Midwest Dock Solutions own a vehicle like
24  that?

161

1    A   Yes.
2    Q   And what did it use that vehicle for?
3    A   Service.
4    Q   Servicing its customers?
5    A   Correct.
6    Q   Performing its work.
7        Is that a fair description, that it
8   used the vehicle to service its customers and perform
9   work?
10   A   Yes.
11   Q   Salesforce sales software.
12       Do you see that?
13   A   Yes.
14   Q   And what is that software, do you know?
15   A   No, I do not.
16   Q   2012 Ford F550.
17       Do you see that?
18   A   Yes.
19   Q   Do you know what the SD stands for?
20   A   No.
21   Q   Did Midwest Dock Solutions have a vehicle
22  like that?
23   A   Yes.
24   Q   And what did it use that vehicle for?

162

1    A   To do service for their customers.
2    Q   And then the next item is a lift.
3        Do you know what that refers to?
4    A   Yes.
5    Q   What's that?
6    A   A scissors lift to perform service.
7    Q   And a 2013 F450.
8        Did Midwest Dock Solutions own that
9   vehicle?
10   A   Yes.
11   Q   And what was it used for?
12   A   Perform service.
13   Q   And the next item says welder.
14       Again, did Midwest Dock Solutions own
15  multiple welders?
16   A   Yes.
17   Q   Does it still?
18   A   Yes.
19   Q   The next item 20 is a 2014 Ford F450 SD.
20       Do you see that?
21   A   Yes.
22   Q   Did Midwest Dock Solutions own a vehicle like
23  that?
24   A   I can't answer that.

163

1    Q   Okay.  Next item is a 2015 Ford F450.
2        Do you see that?
3    A   Yes.
4    Q   Did Midwest Dock Solutions own a vehicle
5   like that?
6    A   I can't answer that.
7    Q   Why is that?
8    A   What is this sheet again?
9    Q   This is the Depreciation Schedule from Midwest
10  Dock Solutions 2017 tax return.
11   A   I don't know how many vehicles we had at that
12  point.
13   Q   Okay.  Did it have multiple vehicles?
14   A   In 2015?
15   Q   '17.
16   A   '17?
17   Q   Yes.
18   A   Yes.  It did have multiple vehicles.
19       THE WITNESS:  What is that date then?
20       MR. HUGHES:  I don't know.
21  BY MR. McJESSY:
22   Q   Now, the next item on there is a scissor lift.
23       You mentioned that the company had a
24  scissor lift, correct?

164

1    A   Yes.
2    Q   And does it still have a scissor lift?
3    A   Yes.
4    Q   And is a scissor lift different than just a
5   lift, do you think?
6    A   No.
7    Q   Has the company ever had multiple scissor
8   lifts at the same time?
9    A   Yes.
10   Q   Does it have multiple scissor lifts now?
11   A   Yes.
12   Q   And it uses those in its service work?
13   A   Yes.
14   Q   The 2015 Ford F450 SD, do you see that?
15       Number 23.
16   A   Yes.
17   Q   Do you know did Midwest Dock Solutions have
18  that vehicle?
19   A   Can't answer it.
20   Q   How about an Infiniti QX80?
21   A   Yes.
22   Q   Does Midwest still have that vehicle?
23   A   No.
24   Q   But it had it back then?

165

1    A   Yes.
2    Q   And what was that vehicle used for?
3    A   Tony's vehicle.
4    Q   Would he use it for work purposes?
5    A   Yes.
6    Q   And a 2015 Ford Cargo Van, is that a vehicle
7  that Midwest Dock Solutions had?
8    A   Yes.
9    Q   And what was it used for?
10   A   Service.
11   Q   2016 GMC Sierra 2500, do you see that?
12   A   Yes.
13   Q   Was that a vehicle that Midwest Dock Solutions
14 had?
15   A   Yes, we did.
16   Q   What was it used for?
17   A   It was my everyday truck.
18   Q   So you would use it to make service calls and
19 such, correct?
20   A   Drive to jobsites.
21   Q   There's a Runnion bucket truck?
22   A   Yes.
23   Q   Do you know what that is?
24   A   Yes.

166

1    Q   What is that?
2    A   It's a bucket truck.
3    Q   Is that like a truck that has -- like you see
4  the utility companies use to --
5    A   Yes.
6    Q   And is that a vehicle that Midwest Dock
7  Solutions had?
8    A   Yes.
9    Q   And does it still have it?
10   A   Yes.
11   Q   And what's it used for?
12   A   Nothing.  It's broken.  It sits in the shop.
13   Q   ProCore software, do you know what that's
14 referring to?
15   A   I do not.
16   Q   There's a significant number of vehicles that
17 are listed on here.
18       Did Midwest Dock Solutions take out loans
19 to buy these vehicles?
20   A   Some.
21   Q   Some of them it did?
22   A   Yes.
23   Q   Did it take out loans to buy some of the
24 trucks that are listed on here, the F450's and --

167

1    A   Some.
2    Q   Okay.  There's an F550 on here.
3        Do you know what the difference is
4  between an F550 and an F450?
5    A   Hundred points.
6    Q   Okay.
7    A   It's just how Ford letters them.
8    Q   Is that all it is?
9    A   Yes.
10   Q   It doesn't have anything to do with --
11   A   The 550 is probably a heavier truck.
12   Q   You're not sure?
13   A   No.
14   Q   Let's jump ahead to Exhibit 90.
15       And I'll represent to you that this is
16 a Bonus Depreciation Report that was part of Midwest
17 Dock Solutions tax returns for the year 2023 that was
18 produced to us by Gineris & Associates.
19       And you'll see that on here there's a
20 list of -- again a description of property.
21       Do you see that?
22   A   Yes.
23   Q   And are these -- if you look at the list of
24 properties, these all look like items that Midwest Dock

168

1  Solutions owned?
2    A   No.
3    Q   And what doesn't look like something that
4  Midwest Dock Solutions owned?
5    A   Probably the lifts were rented.
6        After that I can't answer that.
7    Q   Okay.
8    A   I mean, obviously we own the trucks.
9    Q   Okay.  Between roughly 2020 and 2024, during
10 that time period, how many trucks would you say Midwest
11 Dock Solutions owned?
12   A   I can't answer that.
13   Q   You have no idea?
14   A   No.  I don't pay the bills.
15   Q   Do you see the trucks at the office?
16   A   Yes, here and there, but --
17   Q   So you don't see them all together
18 necessarily?
19   A   No.  I don't sit there and count the trucks.
20   Q   And the workers are allowed to take the
21 vehicles home, too, correct?
22   A   Correct.
23   Q   Are the trucks that are owned by Midwest Dock
24 or that were owned by Midwest Dock during that time

169

```
 1   period, they're also used by Dock & Door, correct?
 2   A   Three specific trucks.
 3   Q   Three specific trucks that are owned by
 4   Midwest Dock Solutions are used by Dock & Door for
 5   its work, too, correct?
 6   A   Correct.
 7   Q   Which three specific trucks?
 8   A   One service body truck and two flatbed trucks.
 9       I couldn't tell you looking at this.
10   Q   And how do you know it's three specific
11   trucks?
12   A   Because they're not marked or lettered.
13   Q   So the three specific trucks that aren't
14   marked or lettered, those are the ones that are used
15   by Dock & Door?
16   A   Correct.
17   Q   Okay.  And why are the trucks that are used
18   by Dock & Door not marked or lettered?
19   A   We never marked or lettered them.
20   Q   No particular reason?
21   A   No.
22   Q   Are all of the other trucks other than the
23   ones used by Dock & Door, are those marked and
24   lettered?
```

170

```
 1   A   Yes.
 2   Q   And when you say marked and lettered, you mean
 3   they have Midwest Dock Solutions written on the side,
 4   correct?
 5   A   Correct.
 6   Q   Okay.  Who's responsible for purchasing new
 7   vehicles for Midwest Dock Solutions?
 8   A   Me.
 9   Q   You are?
10   A   Yes.
11   Q   All right.  Is that like one of your job
12   responsibilities?
13   A   Sure.  Yes.
14   Q   Okay.  Does Tony Zarlengo have any role in
15   that?
16   A   He pays the bill or pays for the truck.
17   Q   An important role.
18   A   Yes.
19   Q   But he's not the one who makes the decisions
20   to like buy a new truck?
21   A   Correct.
22   Q   Okay.  And when was the last time Midwest
23   Dock Solutions bought a new truck?
24   A   I'd say four months ago.
```

171

```
 1   Q   And who's that truck used by?
 2   A   Service truck.
 3   Q   Okay.
 4   A   It's a van.
 5   Q   Okay.  Like a white van?
 6   A   Uh-huh.
 7   Q   Is that a yes?
 8   A   Yes.
 9   Q   And how about before that, what was the last
10   truck?
11   A   Bought a service truck for Tom.  Service truck
12   for Tom.
13   Q   Tom?
14   A   Yes.
15   Q   Tom who?
16   A   Tom, our employee.  Beck.  Tom Beck.
17   Q   I don't see him listed on --
18   A   He just started.
19   Q   When did he start?
20   A   Four months ago when I bought him a truck.
21   Q   Okay.
22   A   Maybe five months ago.
23   Q   I didn't ask you earlier when we looked at
24   this list in Exhibit 40.
```

172

```
 1       If you go back, it's --
 2       MR. HUGHES:  It would be the first document,
 3   I think.
 4   BY MR. McJESSY:
 5   Q   Are there any -- is there anybody who was
 6   employed by Midwest Dock Solutions say from 2020 until
 7   the present, say from January of 2020 to the present,
 8   who is not listed on this list as an employee other
 9   than Tom Beck who you just mentioned who was recently
10   hired?
11   A   What are the dates now?
12   Q   From January of 2020 to the present.
13   A   I couldn't answer that.
14   Q   You don't know?
15   A   No.
16   Q   You don't --
17   A   I hired -- me and Tony hired two guys this
18   year.
19   Q   And one was Tom Beck.
20       Who was the other?
21   A   Brian.  I don't know his last name.
22   Q   So you don't know if there's anybody else
23   who was an employee during that time period who's not
24   listed?
```

173

1    A    Yes.
2    Q    If you buy a new truck -- the van and the
3    truck you mentioned that you bought recently, were
4    they financed?
5    A    No.
6    Q    You bought them outright?
7    A    Yes.
8    Q    Okay.  When was the last vehicle you bought
9    that was financed, do you recall?
10   A    Could not answer that.
11   Q    Because you don't recall?
12   A    I don't recall.
13   Q    All right.  Was the Burrville Road the first
14   office location that Midwest Dock had?
15   A    Yes.
16   Q    And who made the decision to rent the office
17   space there?
18   A    Me and Tony Zarlengo.
19   Q    Jointly?
20   A    Jointly.
21   Q    Do you know did Midwest Dock Solutions have
22   a written lease for that location?
23   A    I couldn't confirm that.
24   Q    Do you know does it have a written lease for

174

1    its current location?
2    A    I couldn't confirm that.
3    Q    Okay.  Did Midwest Dock Solutions pay rent for
4    the first location that it had?
5    A    Yes.
6    Q    And that was 1249 East Burrville Road, Crete,
7    Illinois?
8    A    Yes.
9    Q    Do you remember what the rent was?
10   A    No.
11   Q    Do you remember who the landlord was?
12   A    No.
13   Q    Do you remember what the office was like,
14   the layout?
15   A    There was -- I think it was a one-room office.
16   Q    One-room office?
17   A    Yes.
18   Q    And who had desks there?
19   A    Just Zarlengo.
20   Q    Just Tony Zarlengo?
21   A    Yes.
22   Q    You didn't have a desk there?
23   A    No.
24   Q    All right.  You were a pretty small operation

175

1    when you first started out, correct?
2    A    Just me and him.
3    Q    And you eventually moved to 3211 Holeman,
4    South Chicago Heights, correct?
5    A    Correct.
6    Q    And if my information is correct, you moved
7    there in May of 2016.
8        Does that sound about right to you?
9    A    Yes.
10   Q    And you were at -- do you remember when you
11   moved into the Burrville Road location?
12   A    No.
13   Q    If you look at what we marked as Exhibit 80
14   which is this document here (indicating) and you turn
15   to the fourth page, that's an Annual Report filed by
16   Midwest Dock Solutions and it has a file stamp date of
17   May 26, 2015.
18       Do you see that?
19   MR. HUGHES:  He's not at the page.
20       He's there now.
21   MS. CAHILL:  What's the page number?
22   MR. McJESSY:  533 on the bottom.
23   BY MR. McJESSY:
24   Q    Are you on that page?

176

1    A    Yes.
2    Q    And do you see that's the Annual Report for
3    Midwest Dock Solutions and it's file stamped May 26,
4    2015?
5    A    Okay.
6    Q    Do you see that?
7    A    Yes.
8    Q    And do you see that it lists the address as
9    1249 East Burrville Road, Unit 8?
10   A    Yes.
11   Q    So would you think that Midwest Dock Solutions
12   was at that location at least by May 26, 2015?
13   A    Yes.
14   Q    Did that location have a warehouse of any
15   sort?
16   A    Which location?
17   Q    The Burrville Road.
18   A    Yes.
19   Q    Okay.  And what was the -- how big was the
20   warehouse?
21   A    Not big.
22   Q    Okay.  Could you drive a vehicle into it?
23   A    Yes.  Two.
24   Q    And did it have a place to park both vehicles

177

```
 1    outside of it?
 2    A   Yes.
 3    Q   And did Midwest Dock Solutions have vehicles
 4    by that point?
 5    A   Not many.
 6    Q   Work trucks?
 7    A   Yes, but not many.
 8    Q   Do you remember how many?
 9    A   No.
10    Q   What's not many mean to you?
11    A   Two or three.
12    Q   Okay.  And did anybody else have a desk at
13    that location?
14    A   No.
15    Q   And when you moved to the Holeman location,
16    did Midwest Dock Solutions have a lease for that
17    location?
18    A   Yes.
19    Q   And why did you move from the Burrville Road
20    location to the Holeman Road location?
21    A   We needed a bigger shop area.
22    Q   And Holeman had that?
23    A   Yes.
24    Q   And how big was the shop area there?
```

179

```
 1    another big open space?
 2    A   Tony had an office.
 3    Q   He had an office?
 4    A   Yes.
 5    Q   Anybody else have an office there?
 6    A   I don't think so.
 7         Joe.  Not an office though.
 8    Q   Joe had a desk there?
 9    A   Yes.
10    Q   But no office?
11    A   No office.
12    Q   Anybody else?
13    A   I don't think there was any offices.  No.
14    Q   Anybody else have a desk there?
15    A   No.
16    Q   Did Mr. Brutti have a desk there?
17    A   Not that I recall.
18    Q   You don't recall specifically one way or the
19    other?
20    A   No.
21    Q   All right.  And how did the decision come
22    about to move from that office space?
23    A   From which office space?
24    Q   From the Holeman Road.
```

178

```
 1    A   Can't answer that.
 2    Q   Because you don't know or because you can't
 3    estimate?
 4    A   I don't know how big it was.
 5    Q   Could you drive a truck into it?
 6    A   Oh, yes.
 7    Q   Could you drive several trucks into it?
 8    A   Four or five.
 9    Q   And why did you need a bigger warehouse space?
10    A   Because we're growing.
11    Q   And what did you need the warehouse space for?
12    A   Parts, some scrap.  A lot of scrap went in
13    there.
14    Q   Do you remember who the landlord was at that
15    location?
16    A   I do not.
17    Q   Did Midwest Dock Solutions pay rent for that
18    location?
19    A   Yes.
20    Q   And can you describe what the offices were
21    like for me?
22    A   I don't remember.
23    Q   Okay.  Do you remember who had an office?
24         Well, did it have offices or was it
```

180

```
 1    A   To move out of it?
 2    Q   Yes.
 3    A   We needed more room.
 4    Q   So similar situation, business is growing?
 5    A   Yes.
 6    Q   And who was involved in that decision to move
 7    offices?
 8    A   Me and Tony.
 9    Q   Just you and Tony?
10    A   Uh-huh.
11    Q   Is that a yes?
12    A   Yes.
13    Q   And was it just you and Tony who made the
14    decision to move from Burrville Road to Holeman also?
15    A   Yes.
16    Q   Nobody else was involved in that decision?
17    A   No.
18    Q   And nobody else was involved but you and
19    Tony in the decision to move from Holeman Road to
20    36th Place, is that correct?
21    A   Correct.
22    Q   And did Midwest Dock Solutions have a lease
23    for the 36th Place location?
24    A   Yes.
```

181

1   Q   Did it pay rent for that location?
2   A   Yes.
3   Q   Does it still pay rent for that location?
4   A   Yes.
5   Q   Do you know does it have a written lease
6   currently for that location?
7   A   I do not know.
8   Q   Okay.  Who would know that?
9   A   Tony Zarlengo.
10  Q   All right.  And do you have an office at
11  that location?
12  A   I do not.
13  Q   You do not have an office?
14      Is that a no?
15  A   No.
16  Q   Do you have a desk at that location?
17  A   No.
18  Q   If Sherri Webber testified that you share an
19  office with Anthony Brutti at that location, is she
20  wrong?
21  A   Yes.
22  Q   Do you know why she would testify to that?
23  A   Maybe she thinks I have it.
24  Q   Okay.

182

1   A   Do I go into Tony's office?
2       Yes.
3   Q   Okay.  Are there two desks in Tony's office?
4   A   Yes.
5   Q   In Tony Brutti's office?
6   A   Yes.
7   Q   And will you sometimes sit at one of the desks
8   when you're in the office?
9   A   Yes.
10  Q   And Tony Zarlengo has an office at the
11  36th Place address?
12  A   Yes.
13  Q   Does Tony Brutti currently have a desk at
14  that office?
15  A   Yes.
16  Q   And he currently works out of that location,
17  correct?
18  A   Correct.
19  Q   How did you pick that location?
20  A   Size of the warehouse and it was in a better
21  area.
22  Q   And who picked it?  Like how did you find it?
23  A   Tony Zarlengo found it.
24  Q   Okay.  And then did you look at it before you

183

1   chose -- before the two of you chose to lease it?
2   A   Yes.
3   Q   Other than -- well, strike that.
4       Are you aware that Tony Brutti has an
5   email address or had an email address, Tony B at
6   Midwest Dock Solutions dot com?
7   A   Yes.
8   Q   And let me take a step back.
9       You had an email address or you have an
10  email address, Mike at Midwest Dock Solutions dot com,
11  correct?
12  A   Correct.
13  Q   And Tony Zarlengo has an email address, Tony
14  at Midwest Dock Solutions dot com, correct?
15  A   Correct.
16  Q   Do you know when you adopted the email
17  extension, at Midwest Dock Solutions dot com?
18  A   I do not.  Mine I do not.
19  Q   Were you involved in that decision at all?
20  A   No.
21  Q   Okay.  Do you know how that was set up?
22  A   As far as --
23  Q   Do you know how the arrangements were made
24  to actually set it up?

184

1   A   No.
2   Q   Do you know who was responsible for that?
3   A   Setting it up, yes.
4   Q   Who?
5   A   Mandy.
6   Q   Mandy who?
7   A   Zarlengo.
8   Q   Okay.
9   A   Setting up my email, correct?
10  Q   No.
11      Setting up the email account at Midwest
12  Dock Solutions dot com.
13  A   No.
14  Q   Okay.
15  A   No.
16  Q   Thank you for asking.
17      Mandy Zarlengo, when you say she --
18  strike that.
19      I take it, Mandy Zarlengo set up your
20  email account?
21  A   Put it on my -- yes.
22  Q   Well, I think you know where I'm going.
23      When I asked she set it up, you mean she
24  set it up on your laptop?

185

1    A   Yes.
2    Q   Whatever magic needed to be done so that you
3  could get emails on your laptop, she took care of that?
4    A   Correct.
5    Q   That's not something that's your forte?
6    A   No.
7    Q   But you don't know who actually made the
8  arrangements and reserved the domain at Midwest Dock
9  Solutions dot com?
10   A   No.
11   Q   Were you involved at all in that process?
12   A   No.
13   Q   Now, at some point Midwest Dock Solutions got
14  a website, correct?
15   A   Yes.
16   Q   All right.  And were you involved at all in
17  that process?
18   A   No.
19   Q   Okay.  Midwest Dock Solutions has a Facebook
20  page, correct?
21   A   Correct.
22   Q   I'm going to hand you what was previously
23  marked as Exhibit 53.
24   A   Can I set these aside?

186

1    Q   Yes.  You can set them over there.
2        And Exhibit 53 is Midwest Dock Solutions
3  Facebook page?
4    A   Yes.
5    Q   Do you recognize that?
6    A   Yes.
7    Q   And if you flip through there, does that look
8  familiar to you?
9    A   Yes.
10       MR. HUGHES:  What page are you on?
11       MR. McJESSY:  Nothing yet.  I'm just asking
12  in general if that's the Facebook page.
13  BY MR. McJESSY:
14   Q   And have you posted to this Facebook page?
15   A   Yes.
16   Q   Did you set this up?
17   A   As far as -- no.
18   Q   Did you create the Facebook -- did you create
19  -- strike that.
20       Did you create the Facebook account for
21  this page?
22   A   No.
23   Q   Do you know who did?
24   A   No.

187

1    Q   But you know how to post to it?
2    A   No.
3    Q   No?
4    A   No.
5    Q   I think there's some posts on here that may
6  have come from you, but --
7    A   Yes.  And I could explain that.
8    Q   Okay.  Tell me.
9    A   Mandy put it up for me.
10   Q   So she somehow got it so she could post in
11  your name?
12   A   Yes.  She does that.
13   Q   She does the Facebook page?
14   A   I took the picture.
15   Q   And then she would post them?
16   A   Yes.
17   Q   So the picture on the first page here, did
18  you take that?
19   A   Yes.
20   Q   Where is that taken at?
21   A   Crete, Illinois.
22   Q   Where at in Crete, Illinois?
23   A   In Crete.
24   Q   Where at?  I mean, it's a location, correct?

188

1    A   Like a street?
2    Q   It's a facility, isn't it?
3    A   Yes.  Route 1.
4    Q   And what's the facility?
5    A   Al-Amin.
6    Q   Is that the name of the company or the street
7  or what?
8    A   Company.
9    Q   And what is the company?
10   A   Cold storage.
11   Q   And this is a project that Midwest Dock
12  Solutions did?
13   A   Yes.
14   Q   And what did it do?
15   A   I put the enclosures up, the doors up and
16  the verticals in.
17   Q   And was this a new construction project?
18   A   Yes.
19   Q   And you did the work?
20   A   Yes.
21   Q   And you say you put the enclosures up.
22       Those are the black things there?
23   A   Correct.
24   Q   And what else did you put up?

189

1         The doors?
2    A   The doors.
3    Q   We can see those.
4         And what was the last thing?
5    A   The verticals in.
6    Q   What are verticals?
7    A   Vertical dock right there (indicating).
8         See it?
9    Q   No.
10   A   Right there inside the building.
11   Q   It's inside?
12   A   Yes.
13   Q   Okay.  And that's on the far right where the
14   door is like halfway up?
15   A   Correct.
16   Q   Okay.  And who was the -- do you know who the
17   general contractor was on that project?
18   A   I do not.
19   Q   And what was the address you said or the
20   street?
21   A   Just say Route 1.  I don't know the actual
22   address.
23   Q   In Crete, Illinois?
24   A   Yes.

190

1    Q   If I wanted to look up the location and find
2    it on a map, is there anything that would be a landmark
3    that would be near this?
4    A   How about the name of the company?
5    Q   But you're not sure how to spell it.
6         But is the full name like Al-Amin Cold
7    Storage?
8    A   No.  I think it's just Al-Amin.
9    Q   But it's a cold storage facility?
10   A   Correct.
11   Q   Is there anything special about the fact that
12   it's a cold storage facility for the installation of
13   the doors or the products you sold?
14   A   As far as --
15   Q   Like are the doors special cold storage doors
16   or are they insulated whereas other doors might not be
17   insulated?
18   A   Yes.
19   Q   Is there something that --
20   A   That was probably a thicker door.
21   Q   Okay.
22   A   Waterproof stuff.
23         The outside enclosures are different.
24   You will never see that on a precast or a warehouse

191

1    building ever.
2    Q   I won't see what?
3    A   The enclosures, you will never see that on any
4    standard warehouse or precast building.
5    Q   Why is that?
6    A   Because they blow up for air.
7    Q   But on a new construction cold storage
8    facility, that's the kind of thing that gets installed?
9    A   Yes.  On this particular building.
10   Q   Okay.  Would that be true for other cold
11   storage facilities?
12   A   I can't answer that.
13   Q   Okay.  And did you work with anybody for the
14   installation of all those items?
15   A   Jeff helped me.
16   Q   Jeff --
17   A   Gibson.
18   Q   Okay.  So the two of you did this job
19   together?
20   A   Yes.
21   Q   Okay.
22   A   Well, no.  I did the job.  He helped me.
23   Q   Anybody else?
24   A   No, not that I recall.

192

1    Q   And do you know when that was?
2    A   Not that I recall.
3    Q   All right.  Do you know who sold that job?
4    A   I would say Tony Zarlengo.
5    Q   All right.
6    A   Isn't there a date on the picture?
7    Q   I didn't see one on it.  Maybe somewhere in
8    here we'll find one.
9    A   I'm thinking '16.
10   Q   2016 approximately?
11   A   Ish.
12   Q   And then if you look on the next page of this
13   document, there's a Midwest Dock Solutions entry for
14   December 14th, 2016.
15         Do you see that?
16   A   Where would that be?
17   Q   Right at the top right here (indicating).
18   A   Yes.
19   Q   Do you see that?
20   A   Yes.
21   Q   Do you know who would have made that post?
22   A   Mandy.
23   Q   Would she also have like prepared the graphic
24   that's there?

193

1   A  Yes.
2   Q  And is that photograph that's there, is that
3  one of your photographs?
4   A  No.
5   Q  Do you know where it came from?
6   A  Took it off the Internet.
7   Q  So the next couple of pages is the same ad
8  and then you get to a page that's got a picture of
9  two individuals in it.
10      Let's do it this way.
11  MR. McJESSY:  What are we up to?
12  MR. HUGHES:  The last one was 91.
13  MR. McJESSY:  So I'll make this one 92.
14 BY MR. McJESSY:
15   Q  Sir, I've handed you what we marked as
16  Exhibit 92.
17      And this looks like a post that you
18  made, correct?
19   A  Correct.
20   Q  And would Mandy have actually posted this?
21   A  Yes.
22   Q  So you would have told her what to say and
23  she would have posted it using your name?
24   A  Correct.

194

1   Q  And this says December 7th, 2016, Franklin
2  Park.
3      Do you see that at the very top
4  right-hand corner?
5   A  Yes.
6   Q  And then it says two hardest workers I know.
7      Do you see that?
8   A  Yes.
9   Q  Who are the two hardest workers you know that
10  are pictured there?
11   A  Well, that is me (indicating).
12   Q  That's you?
13   A  Yes.
14   Q  With the glasses in the front, the first guy?
15   A  You tell me.
16   Q  I can't.
17      You're the first guy on the left with the
18  green shirt?
19   A  Correct.
20   Q  And who's the guy with you?
21   A  Dave Green.
22   Q  Where is this taken?
23   A  Franklin Park.
24   Q  And what project?

195

1   A  It was not a project.  I believe this was a
2  service coiling door that had to come down.
3   Q  And the stickers on your hat, can you tell me
4  what those are for?
5   A  Those are from when I used to work in the
6  field and they would make you put -- like you took a
7  safety evaluation.
8      Whatever you win they put on.
9   Q  So you're working for a contractor and they
10  require you to do some certification at a jobsite,
11  they give you a sticker and you put it on your hat?
12   A  Correct.
13   Q  Okay.  And then if you turn to the next page,
14  there's a picture.
15      I believe this is James Kelly, is that
16  right?
17   A  Correct.
18   Q  And do you know where this was taken?
19   A  Michelin.
20   Q  Where?
21   A  Michelin Tire, Monee, Illinois.
22   Q  And this looks like -- is this a new
23  construction facility?
24   A  No.

196

1   Q  What is this?
2   A  That was a facility where they were expanding
3  and I believe they cut in ten doors to their existing
4  building.
5   Q  So the doors going in are all new?
6   A  Yes.
7   Q  So somebody is doing like an expansion of
8  an existing facility?
9   A  No.  They literally cut the holes in the
10  building.  There was no expansion.
11   Q  There were no doors or anything there before?
12   A  Correct.
13   Q  So the doors all going in are new?
14   A  Correct.
15   Q  And it looks like dock levelers, too, is that
16  correct or can you tell from the photo?
17   A  I can't tell.
18   Q  Okay.  But at least the new doors are going
19  in, correct?
20   A  Correct.
21   Q  All right.
22   A  I don't believe we did the docks there.  I did
23  the doors.
24   Q  You and Mr. Kelly?

197

1   A  Yes.
2   **Q  And do you know who the general contractor was**
3 **on this project?**
4   A  There was no general contractor.
5   **Q  It was done directly through Michelin?**
6   A  Yes.
7   **Q  Okay.  Do you remember how many new doors were**
8 **installed?**
9   A  I want to say ten because this is the same
10 building.
11   **Q  So turning to -- you turned to the next page?**
12   A  Yes.
13   **Q  I've been wondering where this building was.**
14       **You think it was the same building?**
15   A  I know it's the same building.  I'm just
16 trying to see how many doors are there.
17   **Q  So we're looking at the next page of that**
18 **which is Midwest Dock Solutions, July 26, 2016,**
19 **correct?**
20   A  Correct.
21   **Q  So all those doors that are shown on the right**
22 **are the doors that you're putting in?**
23   A  Correct.
24   **Q  And they're all new doors going into an**

198

1 **existing facility?**
2   A  Correct.
3   **Q  So if you look at the second picture on that**
4 **page, the one on the bottom, is that Mr. Kelly that**
5 **we can see there?**
6   A  I can't answer that.
7   **Q  Now, this says Midwest Dock Solutions is in**
8 **Lockport, Illinois.**
9       **Do you see that?**
10       **It's part of the caption of the photo.**
11   A  Maybe that's why I sent it to her.
12   **Q  This photograph on the prior page with**
13 **Mr. Kelly you said is at Michelin in Monee, Illinois.**
14       **If you look at the top of that picture,**
15 **it says Mike Richert, December 9th, 2016, Bloomingdale.**
16       **Do you see that?**
17       **This photo here (indicating).**
18       **Do you see the caption on the top of that**
19 **says Mike Richert, Bloomingdale?**
20   A  Yes.
21   **Q  Do you still think that was Monee?**
22   A  Yes.
23   **Q  They're close enough together that you think**
24 **that's --**

199

1   A  No, not anywhere close.
2   **Q  Then why do you think that even though it says**
3 **Bloomingdale that that was --**
4   A  I think that's when I sent it to her.
5   **Q  What do you mean that's when you sent it to**
6 **her?**
7   A  Like the picture.
8       I don't know.  I don't know why that
9 would be on there.
10   **Q  Okay.**
11   A  I mean, the only reason I know this is because
12 I know the buildings in the area and I know I did that
13 job, too.
14   **Q  And if you turn to the second page, that's --**
15 **this photo is dated December 5th, 2016.**
16       **Do you see that?**
17   A  Yes.
18   **Q  And the photo on the next page is dated**
19 **July 26th, 2016 and it said Midwest Dock Solutions**
20 **is in Lockport, Illinois.**
21       **Do you see that?**
22   A  I was looking at this (indicating).
23   **Q  Do you see this here (indicating)?**
24   A  Yes.

200

1   **Q  Okay.  So was this job in Lockport, Illinois,**
2 **the one that's shown in these two photographs?**
3   A  I don't know if that's the same job.
4   **Q  It doesn't look like it to me.  That's what**
5 **I'm asking.**
6       **Do you think you took these photos?**
7   A  I can't answer that.
8   **Q  Okay.**
9   A  That Michelin building, yes.
10   **Q  That's the one with James Kelly in the prior**
11 **photograph?**
12   A  Correct.
13   **Q  All right.  The next photograph, although it**
14 **has your name on the post, I mean, this is like almost**
15 **seven months later, would it have taken you that long**
16 **to complete the Michelin job?**
17   A  Just depends how they did it, you know, what
18 phases.
19   **Q  Ten doors.**
20   A  Well, they cut these ten in in there.
21       Tony would know more how many exact doors
22 they did.
23   **Q  But you can't be sure this is the same --**
24   A  The bottom, no.

201

1    Q   Or even the top one.
2        They look like the same -- you see
3  they're the same -- look like the same project, right?
4    A   They could be.
5    Q   Do you know what project you would have had
6  in Lockport that would look like this?
7    A   No.  They all look like that.
8    Q   And the two photographs that are part of the
9  July 26, 2016 Midwest Dock Solutions as a Lockport
10 entry on here, these, that's new construction of
11 overhead -- new construction installation of overhead
12 doors, is that correct?
13   A   I can't answer that.
14   Q   Okay.  Why can't you answer that?
15   A   Because those are cut in.
16   Q   Okay.
17   A   So it would be an existing building that
18 they cut -- they opened into.
19   Q   But it would be installation of new overhead
20 doors, correct?
21   A   Yes.
22   Q   There were no existing overhead doors there,
23 correct?
24   A   No.

202

1    Q   That's correct, that there were no overhead
2  doors there before, correct?
3    A   Correct.
4        MR. McJESSY:  How are we on time?
5        MR. HUGHES:  We're at 1:21.
6        THE WITNESS:  If we're going to break now,
7  I might as well just head out.
8        MR. McJESSY:  My guess is we're not going
9  to -- I mean, if he needs to go, we're not going to --
10       THE WITNESS:  I mean, how much have you got?
11 What do you think?
12       An hour or so?
13       MR. McJESSY:  Probably at least.  Maybe a
14 little more.
15       I mean, I don't want to commit to -- I
16 don't want to say one thing and then have you say --
17       THE WITNESS:  No.  I get it.
18       MR. HUGHES:  Every time I think an hour,
19 it's more.
20       THE WITNESS:  Let's go to 1:30.
21       MR. McJESSY:  Another few minutes?
22       THE WITNESS:  Yes.  Might as well round it
23 off.
24       MR. McJESSY:  Well, let's finish up with the

203

1  photographs I've got, however long that takes.
2  BY MR. McJESSY:
3    Q   So going back to Exhibit 53 which is the
4  Facebook page, if you turn to -- I'm not sure what
5  page this is, but it's the one that has this on it
6  (indicating).
7        It's got an entry from October 15th,
8  2016.
9        Do you see where it says your complete
10 dock and door experts?
11   A   Yes.
12   Q   Did you put this post on here?
13   A   I would have had Mandy.
14   Q   You would have had Mandy do it?
15   A   Yes.
16   Q   Did you create this or would you have had
17 somebody create it for you?
18   A   I can't answer that.
19   Q   Okay.  But it's a post that you would have had
20 Mandy make on the website?
21   A   Correct.
22   Q   And then if you look at the next page, do you
23 recognize that project?
24   A   No.

204

1    Q   Okay.
2    A   I do on the lower.
3    Q   Okay.  We'll get to there.
4    A   Okay.
5    Q   The project that's shown as October 15th,
6  2016, it says another job well done.  Install of
7  64 dock levelers, dock seals, and 68 overhead doors.
8        Do you see that?
9    A   Yes.
10   Q   Is that a Midwest Dock Solutions project?
11   A   I can't answer that.
12   Q   Okay.  And why can't you answer that?
13   A   Because I used to drive by buildings and just
14 take pictures of them for our website that we did not
15 install, we didn't do anything at.
16   Q   So you might just take a picture of a random
17 warehouse and say another job well done, install of
18 64 dock levelers, dock seals, and 68 overhead doors?
19   A   Plenty of them.
20   Q   And that would be untrue?
21   A   Yes.  It's advertisement.
22       It's the same thing I do at my other
23 websites.
24   Q   Well, that would be a false statement though

205

1   if this wasn't a Midwest Dock Solutions job, correct?
2   A   Okay.  Yes.
3   Q   Who would have posted this?
4   A   Which one?
5   Q   The photograph of the logistics building we're
6   looking at.
7   A   Mandy would have helped me.
8   Q   Okay.
9   A   She created that.
10  Q   She created what?
11  A   This (indicating).  Midwest Dock Solutions.
12  Q   The little logo that's there?
13  A   Yes.  I mean, it's on my phone, but I don't
14  post to it.  She would post to it.
15  Q   But you would supply her with the photographs,
16  correct?
17  A   Correct.
18  Q   Okay.  So hypothetically if this was a Midwest
19  Dock Solutions job, say that it wasn't just one you
20  drove by randomly, but it was actually a Midwest Dock
21  Solutions job, would you have been the one who would
22  have taken the pictures of the jobsite for her to post?
23  A   Yes.
24  Q   Now, turning to the next page, you said you

206

1   know this project, the photos that are on the top,
2   correct?
3       That's the one that says BMW Schererville,
4   Indiana?
5   A   Yes.
6   Q   All right.  And is that the BMW in
7   Schererville, Indiana?
8   A   Yes.
9   Q   So that post accurately describes what it is,
10  correct?
11  A   Correct.
12  Q   And is this a project Midwest Dock did?
13  A   Yes.
14  Q   And if you turn to this page, it's got a big
15  rolling overhead door.
16      Is that a picture you took?
17  A   Yes.  I did that job also.
18  Q   And what was that?
19  A   It's a rolling steel door in Indiana.  What
20  town I don't know.
21  Q   Was that a new installation, a retrofit or
22  repair job?
23      What was it?
24  A   Retrofit.

207

1   Q   That's Exhibit 93.
2       And this is another photograph of a job
3   you took?
4   A   Correct.
5   Q   And it says Steger, Illinois, correct?
6   A   Correct.
7   Q   Is that where this was taken?
8   A   No.
9   Q   Where was this job at?
10  A   I believe this is Indiana and that was a
11  fertilizer barn.
12  Q   It says Mike is at Midwest Dock Solutions.
13  A   Correct.
14  Q   And Midwest Dock Solutions is in Steger,
15  Illinois, correct?
16  A   It is Steger, Illinois.
17  Q   And it was in 2016, is that right?
18  A   I need to go all the way back.
19      That might have been the Holeman address.
20  Q   You're not sure?
21  A   No.
22  Q   Was this a new installation or was this a --
23  A   Existing.
24  Q   (Continuing) -- retrofit?

208

1   A   Retrofit.
2   Q   Okay.  I'm going to hand you what I've marked
3   as Exhibit 94.
4       You're the guy in the front?
5   A   Front.
6   Q   Front lower left, right?
7   A   Yes.  Sitting down.
8   Q   And I should recognize who the other two are,
9   but tell me.
10  A   Jerry Valentino.
11  Q   Which one is he?
12  A   Middle.
13  Q   Okay.
14  A   And Tony Brutti.
15  Q   He's the one with the hammer?
16  A   It looks so.  He was --
17  Q   Goofing around?
18  A   Yes.
19  Q   I understand.
20      Where was this taken?
21  A   Holeman possibly.
22  Q   This isn't the 27 East 36th Place?
23  A   No.
24      MR. McJESSY:  All right.  I think this is

209

```
 1   probably as good a stopping place as any.
 2         MR. HUGHES:  Okay.
 3         MR. McJESSY:  We will coordinate.
 4         MR. HUGHES:  Yes.
 5         MR. McJESSY:  We'll continue -- I know
 6   Mr. Richert needs to go.  So we're going to continue
 7   to finish the deposition to another date and time.
 8         Is that fair?
 9         MR. HUGHES:  Yes.
10         MR. McJESSY:  And we'll coordinate that.
11         THE COURT REPORTER:  Are you ordering the
12   transcript?
13         MR. McJESSY:  Yes.
14         THE COURT REPORTER:  Do you want a copy?
15         MR. HUGHES:  Yes.
16         And we'll reserve.
17
18
19         (Whereupon said deposition was
20          continued sine die)
21
22
23
24
```

211

```
 1   STATE OF ILLINOIS  )
 2                      )  SS.
     COUNTY OF C O O K  )
 3
 4
 5
 6
 7      I, SHERYL F. ROSE, CSR, a Notary Public, do hereby
 8   certify that I am a court reporter doing business in
 9   the City of Chicago, County of Cook, State of Illinois;
10   that I reported in machine shorthand the testimony
11   given at the deposition of Michael Richert on the 25th
12   day of September, 2025, and that the foregoing is a
13   true and correct transcript of my shorthand notes so
14   taken as aforesaid to the best of my knowledge, skill
15   and ability.
16
17
18
19      Sheryl F. Rose
       SHERYL F. ROSE,
20     Certified Shorthand Reporter
       Notary Public, Cook County, IL
21     License No. 084-001478
22
23   My notary commission
24   expires July 18, 2027.
```

210

```
 1        IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                EASTERN DIVISION
 3
 4   MID-AMERICA CARPENTERS REGIONAL COUNCIL )
     PENSION FUND, et al,              )
 5                    Plaintiffs,      )
 6         -vs-                        ) 2024 CV 06428
 7   DOCK & DOOR INSTALL, INC., an Illinois  )
 8   corporation and MIDWEST DOCK SOLUTIONS, )
     INC., an Illinois corporation,         )
 9                    Defendants.      )
10   _____)
11
12      I, Michael Richert, being first duly sworn,
     on oath, say that I am the deponent in the aforesaid
13   deposition; that I have read the foregoing transcript
     of my deposition, consisting of pages 1 through 209
14   inclusive, taken at the aforesaid time and place and
     that the foregoing is a true and correct transcript of
15   my testimony so given.
16
17
18
19      _____
              Michael Richert, Deponent
20
     SUBSCRIBED AND SWORN TO
21   before me this _____ day
     of _____, 2025.
22
23
     _____
24     Notary Public
```

53 (Pages 209 to 211)

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 5

1(a) Midwest Dock Solutions Inc.   is
being organized as a close corporation.

FORM **BCA 2.10 (2A)** (rev. Dec. 2003)
**ARTICLES OF INCORPORATION**
Business Corporation Act (Close Corporation)

Jesse White, Secretary of State
Department of Business Services
Springfield, IL 62756
Telephone (217) 782-9522
www.cyberdriveillinois.com

**FILED**

**MAY 1 6 2006**

**JESSE WHITE**
**SECRETARY OF STATE**

Remit payment in the form of a
cashier's check, certified check,
money order or an Illinois attorney's
or CPA's check payable to the Secretary of State.
**SEE NOTE 1 CONCERNING FEES!**

Filing Fee: $150.00  Franchise Tax $ _25.00_   Total $ _175.00_  File # _____   **6482-3221**   Approved:

————Submit in duplicate————   ————Type or Print clearly in black ink————   ————Do not write above this line————

1.  CORPORATE NAME: **Midwest Dock Solutions, Inc.**
    * NOTE: Item 1(a) in the upper left hand corner must also be completed.

    (The corporate name must contain the word "corporation", "company", "incorporated", "limited"        CP0305162

2.  Initial Registered Agent: **Michael** _____ **Richert**
                                First Name        Middle Name           Last Name

    Initial Registered Office: **2828 E. Spruce Drive**
                                Number    Street      Suite No. (A P.O. Box alone is not acceptable)

    **Crete** _____ IL **60417** _____ **Will**  99
      City              ZIP Code            County

3.  Purpose or purposes for which the corporation is organized:
    (If not sufficient space to cover this point, add one or more sheets of this size.)

    The transaction of any or all lawful business for which corporations may be incorporated under
    the Illinois Business Corporation Act.

4.  Paragraph 1: Authorized Shares, Issued Shares and Consideration Received:

| Class | Number of Shares Authorized | Number of Shares Proposed to be Issued | Consideration to be Received Therefore |
|---|---|---|---|
| Common | 100,000 | 1,000 | $ 1,000 |
| | | | |
| | | | |
| | | TOTAL = $ | 1,000 |

Paragraph 2: The preferences, qualification, limitations, restrictions and special or relative rights in respect
of the shares of each class are:
(If no sufficient space to cover this point, add one or more sheets of this size.)

C-323

**PAID**

**MAY 1 6 2006**

**EXPEDITED**
**SECRETARY OF STATE**

PLAINTIFF'S
EXHIBIT
79

MACRC-00523

5. *OPTIONAL:* (a) Number of directors constituting the initial board of directors of the corporation: _____

(b) Names and addresses of the persons who are to serve as directors until the first annual meeting of shareholders or until their *successors are elected and qualify:*

| Name | Address | City, State, ZIP |
|------|---------|------------------|
|      |         |                  |
|      |         |                  |
|      |         |                  |

6. *OPTIONAL:* (a) It is estimated that the value of all property to be owned by the corporation for the following year wherever located will be:      $ _____

(b) It is estimated that the value of the property to be located within the State of Illinois during the following year will be:      $ _____

(c) It is estimated that the *gross amount of business that will be* transacted by the corporation during the following year will be:      $ _____

(d) It is estimated that the gross amount of business that will be transacted from places of business in the State of Illinois during the following year will be:      $ _____

7. *OPTIONAL:* **OTHER PROVISIONS**

Attach a separate sheet of this size for any other provision to be included in the Articles of Incorporation, e.g., authorizing preemptive rights, denying cumulative voting, *regulating internal affairs,* voting majority requirements, fixing a duration other than perpetual, etc.

8. **NAME(S) & ADDRESS(ES) OF INCORPORATOR(S)**

The undersigned incorporator(s) hereby declare(s), under penalties of perjury, that the statements made in the foregoing Articles of Incorporation are true.

Dated _____ **May 15** , **2006**
                    *(Month & Day)*      *Year*

**Signature and Name**                     **Address**

1.  *Mike Richert*                    1.  **2828 E. Spruce Drive**
    *Signature*                           *Street*
    **Michael Richert**                   **Crete, IL 60417**
    *(Type or Print Name)*                *City/Town*      *State*      *ZIP Code*

2.  _____                   2.  _____
    *Signature*                           *Street*

    _____                       _____
    *(Type or Print Name)*                *City/Town*      *State*      *ZIP Code*

3.  _____                   3.  _____
    *Signature*                           *Street*

    _____                       _____
    *(Type or Print Name)*                *City/Town*      *State*      *ZIP Code*

(Signatures must be in **BLACK INK** on original document. Carbon copy, photocopy or rubber stamp signatures may only be used on conformed copies.)
NOTE: If a corporation acts as incorporator, the name of the corporation and the state of incorporation shall be shown and the execution shall be by a duly authorized corporate officer.

Note 1: Fee Schedule
The initial franchise tax is assessed at the rate of 15/100 of 1 percent ($1.50 per $1,000) on the paid-in capital represented in this State. (Minimum initial franchise tax is $25)

The filing fee is $150

The **minimum total due** (franchise tax + filing fee) is $175.

Note 2: Return to:
**Midwest Dock Solutions, Inc.**
*(Firm name)*
**Michael Richert**
*(Attention)*
**2828 E. Spruce Drive**
*(Mailing Address)*
**Crete, IL 60417**
*(City, State, ZIP Code)*

MACRC-00524

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 6



























1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 7

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MID-AMERICA CARPENTERS )
REGIONAL COUNCIL PENSION )
FUND, et al., )
)
Plaintiffs, ) No. 1:24-cv-02428
)
vs. ) Judge Andrea R. Wood
)
DOCK & DOOR INSTALL, ) Magistrate Judge
INC., an Illinois ) Jeannice W. Appenteng
corporation and MIDWEST )
DOCK SOLUTIONS, INC., an )
Illinois corporation, )
)
Defendants. )

The deposition of ZACHARY RYAN
CORRIGAN, called by the Defendant for
examination, taken pursuant to the Federal
Rules of Civil Procedure of the United States
District Courts pertaining to the taking of
depositions, taken before DIANE M. NULICK, a
Notary Public within and for the County of
Cook, State of Illinois, and a Certified
Shorthand Reporter of said State, at Suite 231,
3759 North Ravenswood, Chicago, Illinois, on
the 14th day of March, A.D. 2025, at 9:02 a.m.

**2**

1  PRESENT:
2    McJESSY, CHING & THOMPSON, LLC,
     BY: MR. KEVIN P. McJESSY,
3    mcjessy@MCandT.com,
     (3759 North Ravenswood, Suite 231,
4    Chicago, Illinois 60613,
     (773) 880-1260),
5
       appeared on behalf of the plaintiffs;
6
     ALLOCCO MILLER & CAHILL, P.C.,
7    BY: MS. KATHLEEN M. CAHILL,
     kmc@alloccomiller.com,
8    (20 North Wacker Drive, Suite 3517,
     Chicago, Illinois 60606,
9    (312) 675-4325),
10     appeared on behalf of the defendant,
     Dock & Door Install, Inc.;
11
     AMUNDSEN DAVIS LLC,
12   BY: MR. MICHAEL F. HUGHES,
     mhughes@amundsendavislaw.com,
13   (3815 East Main Street, Suite A-1,
     St. Charles, Illinois 60174,
14   (630) 587-7925/(630) 217-1228 (direct),
15     appeared on behalf of the defendant,
     Midwest Dock Solutions, Inc.
16
17 Also Present:
18   Mr. Michael Richert,
19
20
21
22
23
24

**3**

1                    I N D E X
2
3  WITNESS:  ZACHARY RYAN CORRIGAN
4
5  EXAMINATION BY:                          PAGE
6  Mr. McJessy                                 4
   Mr. Hughes                                191
7  Mr. McJessy                               217
   Mr. Hughes                                220
8  Mr. McJessy                               221
9
10 PLAINTIFF'S EXHIBITS:
11 No. 16                                     12
   No. 17                                     13
12 No. 3                                      40
   No. 4                                      44
13 No. 17                                     74
   No. 10                                     79
14 No. 18                                     81
   No. 17                                     82
15 No. 18                                     86
   No. 15                                    108
16 No. 15                                    125
   No. 6                                     127
17 No. 7                                     131
   No. 9                                     136
18 No. 19, 20, 21, 22, and 23               139
   No. 19                                    140
19 No. 9                                     144
   No. 24                                    182
20 No. 24                                    191
   No. 17                                    193
21 No. 18                                    208
   No. 17                                    210
22 No. 23                                    214
23
24

**4**

(The witness was duly sworn.)

ZACHARY RYAN CORRIGAN,
called as a witness herein, having been first
duly sworn, was examined and testified as
follows:

EXAMINATION
BY MR. McJESSY:

Q. All right.
We can go on the record, and,
sir, could you state your name for the
record -- first, middle, and last -- and spell
each?
A. Zachary R. Corrigan, Z-a-c-h-a-r-y,
R., C-o-r-r-i-g-a-n.
Q. Okay.
And what's the "R" stand for?
A. Ryan.
Q. And that's spelled?

1 (Pages 1 to 4)

5

1    A.  R-y-a-n.
2    Q.  Excellent.
3         And, sir, have you ever been
4    deposed before?
5    A.  I'm sorry?
6    Q.  Have you ever -- I'm sorry.  I'll slow
7    down.
8         Have you ever been deposed
9    before?
10   A.  No.
11   Q.  Okay.
12        You understand you're under
13   oath?
14   A.  Yes.
15   Q.  Okay.
16        And this is an informal
17   setting, in a conference room, but do you
18   understand that that oath would have the same
19   force and effect as if you were in a court of
20   law?
21   A.  Yes.
22   Q.  Okay.
23        I'm going to set some ground
24   rules and describe what's going to happen here

6

1    today just to make the process, hopefully, go
2    faster and be a little more efficient.
3         So I'm going to ask you a
4    series of questions.  And, hopefully, you'll
5    give me the best most truthful answers that you
6    can.  There's other attorneys here representing
7    Midwest Dock Solutions and Dock & Door, and
8    they may have objections to my questions.  So I
9    may ask a question and then they'll make an
10   objection about foundation or something.  Let
11   them go ahead and do that.  And then after they
12   make their objection for the record, you can go
13   ahead and answer my question.
14        Is that fair?
15   A.  Okay.
16   Q.  All right.
17        So that's sort of how the
18   process will work.  If you need to take -- it
19   probably will take, I'm guessing, a couple
20   hours for your deposition today.  So if you
21   need to take a break at some time, just tell
22   me --
23   A.  Okay.
24   Q.  -- and we can take a break and then

7

1    come back and, you know, resume.
2         A couple of ground rules that
3    will make the court reporter's life a lot
4    easier.  We can't talk at the same time because
5    she can't take down what both of us are saying
6    if we're talking at the same time.  Sometimes
7    I'm going to ask a question, and you're going
8    to know what my question is before I finish,
9    and you're going to be inclined just to answer
10   it to move things along, but try to resist that
11   urge.  I will, in turn, try to resist the urge
12   of asking a new question before you've finished
13   answering the question that I previously asked.
14        Also, all of your responses
15   need to be verbal responses.  Yeses and nos are
16   fine.  But nods or shakes of the head or ah-huh
17   or uh-uh, those kind of responses she has a
18   hard time taking down.  So I might prompt you,
19   is that a yes, is that a no, that kind of
20   thing, if you --
21   A.  Okay.
22   Q.  Okay.
23        Is there any reason today
24   that you can't give truthful answers to my

8

1    questions?
2    A.  No.
3    Q.  For example, are you suffering from
4    any conditions or under any medications that
5    would prevent you from truthfully answering my
6    questions?
7    A.  No.
8    Q.  Okay.  Excellent.
9         And as we go along, if I ask
10   a question and I fumble and it's not clear and
11   you don't understand my question, please ask me
12   to explain it, and I'll be happy to do that.
13        Is that fine?
14   A.  Yes.
15   Q.  Okay.
16        And is it fair to say if you
17   answer a question, then, that I've asked, we
18   can assume you understood my question?
19   A.  Yes.
20   Q.  Okay.  Let's see.  All right.
21        Sir, are you represented by
22   an attorney here today?
23   A.  No.
24   Q.  Okay.

2 (Pages 5 to 8)

9

```
1            I just want the record to be
2    clear because there are other attorneys here in
3    the room.
4            Let's see.  Have you spoken
5    to anybody about your deposition today?
6        A.  No.
7        Q.  Okay.
8            Have you -- when was the last
9    time that you were in touch with Tony Brutti?
10       A.  It's been a while.
11       Q.  More than six months?
12       A.  Yes.
13       Q.  Okay.
14           When was the last time that
15   you were in touch with Tony Zarlengo?
16       A.  Probably, at least, a year.
17       Q.  Okay.
18           And when was the last time
19   that you were in touch with Mike Richert?
20       A.  Probably, at least, a year.
21       Q.  Okay.
22           How about the last time you
23   were in touch with anybody that you used to
24   work with when you worked for Dock & Door
```

10

```
1    Install or Midwest Dock Solutions?
2        A.  I think I've talked -- oh, there's one
3    other guy I've talked to, but he doesn't work
4    there anymore.
5        Q.  Okay.
6            Who's that?
7        A.  Sean Leer.
8        Q.  Okay.
9            When was the last time you
10   talked to him?
11       A.  I talk to him occasionally still.
12       Q.  Okay.
13           Did you talk to him --
14       A.  A couple weeks.
15       Q.  A couple weeks?
16       A.  Yeah.
17       Q.  Did you talk to him about getting a
18   subpoena in this case?
19       A.  No.
20       Q.  Okay.
21           Anything about a lawsuit
22   between the Mid-America Carpenters Council and
23   Dock & Door and Midwest Dock Solutions?
24       A.  No.
```

11

```
1        Q.  All right.  Excellent.
2            Now, you and I spoke --
3        A.  Yes.
4        Q.  -- correct?
5            And do you remember when that
6    was?
7        A.  Last week.
8        Q.  Okay.
9            And do you recall what we
10   talked about?
11       A.  Just about texts and information being
12   texted to you about conversations with anyone
13   at the company.
14       Q.  Okay.
15           And that was to get documents
16   responsive to the subpoena?
17       A.  Yes.
18       Q.  Okay.
19           And you sent me a -- a
20   handful of text messages, correct?
21       A.  Yes.
22       Q.  Okay.
23           And, in fact, let's just go
24   ahead and -- I'm going to mark -- they're
```

12

```
1    marked as Exhibit 16 and hand you that.
2
3            (WHEREUPON, the document was
4            marked Plaintiff's
5            Exhibit 16 for identification,
6            as of 3/14/25.)
7
8    BY MR. McJESSY:
9        Q.  And is this a copy of the subpoena
10   that you got?
11       A.  Yes.
12       Q.  And this is the document that forced
13   you to be here today, correct?
14       A.  Yes.
15       Q.  Okay.
16           And if you look at the last
17   two pages of this document, it's got a heading
18   that says documents that you must produce.
19           Do you see that?
20       A.  Yes.
21       Q.  All right.
22           And this is what we've talked
23   about, right?
24       A.  Yes.
```

13

1   Q.  All right.
2          And after -- we talked about
3   that, and I'm going to hand you what we've
4   marked as Exhibit 17.  I'm sure the -- let's
5   see.
6          Can I see that copy back
7   again?
8   A.  Ah-huh.
9   Q.  Neither of the two I handed you -- off
10  the record.
11
12          (There was a discussion off
13          the record.)
14
15          MR. McJESSY:  Back on the record.
16
17          (WHEREUPON, the document was
18          marked Plaintiff's
19          Exhibit 17 for identification,
20          as of 3/14/25.)
21
22  BY MR. McJESSY:
23  Q.  Okay.
24          And I've handed you what

14

1   we've marked as Exhibit 17.
2          Do you see that?
3   A.  Yes.
4   Q.  And is -- are these the text messages
5   that you produced to me?
6   A.  Yes.
7   Q.  Okay.
8          And did you produce any other
9   documents to me besides these text messages?
10  A.  No.
11  Q.  Okay.  Excellent.
12          And looking at the requests
13  and the subpoena asking for documents, are
14  these the only documents that you have that
15  were responsive to these requests and the
16  subpoena?
17  A.  Yes.
18  Q.  Okay.
19          You didn't have any emails or
20  anything like that or any other text messages
21  between you and anybody at either Dock &
22  Door --
23  A.  No.
24  Q.  -- or Midwest?

15

1   A.  No.
2   Q.  All right.  All right.
3          Sir, what's -- I'm going to
4   ask you a couple of background questions just
5   to get an idea of your educational and work
6   experience background.  Okay?
7   A.  Okay.
8   Q.  What's the highest level of education
9   you've received?
10  A.  High school.
11  Q.  Okay.
12          And where did you graduate
13  from?
14  A.  Lincoln-Way East.
15  Q.  And when did you graduate?
16  A.  2007.
17  Q.  Where is Lincoln-Way East?
18  A.  Frankfort, Illinois.
19  Q.  Okay.  Excellent.
20          And then what about training
21  in the trades?  Have you received any training
22  after high school?
23  A.  Yes.  I go to school for the
24  carpenters union.

16

1   Q.  Okay.
2          And did you go through the
3   apprentice program?
4   A.  Yes.
5   Q.  And when did you get -- when was the
6   first time you enrolled in that program?
7   A.  Two thousand -- 2020.
8   Q.  Okay.  Excellent.
9          And can you tell me about
10  what was the nature of your training through
11  the carpenters program?
12  A.  We go every -- once a week every three
13  months for about three and a half years.
14  Q.  Okay.
15          And are you still involved in
16  that program?
17  A.  Yes.
18  Q.  All right.
19          For three years, you say?
20  A.  About three and a half, four years.
21  Right around there.
22  Q.  Okay.
23          And what kind of skills do
24  you learn at the carpenters apprentice program?

4 (Pages 13 to 16)

17

1    A. Welding. Any power tools. Conveyor
2    work.
3    Q. What was the last thing?
4    A. Conveyor work.
5    Q. Conveyor work?
6    A. Lining motors. Turbine work. That's
7    about it.
8    Q. Whoa.
9    A. Hand tools.
10   Q. Do you learn things like -- I'm going
11   to be real basic, but framing and drywall and
12   things like that?
13   A. I don't. I'm a millwright, so it's
14   under -- it's underneath the carpenters
15   training program.
16   Q. Okay.
17       So explain that to me. What
18   does that mean, that you're a millwright?
19   A. So carpentry, I guess they do more
20   like drywall, framing work, flooring. And we
21   do turbines, lining motors, any -- any moving
22   parts.
23   Q. Okay.
24       A lot of it sounds like

18

1    mechanical work.
2    A. Mechanical work, yes.
3    Q. Okay.
4        And when you enrolled in the
5    apprentice program, is that like -- is that
6    like -- I'm not sure how to describe it, but
7    like a focus that you enroll in, like you can
8    pick which program you want to be in?
9    A. Depends what union you go in, yes.
10   Q. Yeah, but -- okay.
11       Different unions, you'd go
12   into different programs?
13   A. Correct.
14   Q. Okay.
15       And so you go into the -- you
16   went into the millwright program?
17   A. Yes.
18   Q. Excellent.
19       And we talked over each other
20   a little bit.
21   A. I'm sorry.
22   Q. That's all right.
23       The -- what -- were you a
24   member of the local before you enrolled in the

19

1    apprentice program, or is it the same time kind
2    of thing?
3    A. I was on a permit before the
4    millwrights with the ironworkers.
5    Q. Okay.
6        Explain that to me.
7    A. Midwest needed more guys to do --
8    union guys. So I was on a permit for 63,
9    ironworkers --
10   Q. Okay.
11   A. -- to do union work with them.
12   Q. Local 63?
13   A. Yes.
14   Q. Ironworkers?
15   A. Yes.
16   Q. What do you mean when you say -- when
17   you say Midwest, do you mean Midwest Dock
18   Solutions?
19   A. Well, Dock & Door Install --
20   Q. Okay.
21   A. -- needed more guys to do some work.
22   Q. All right.
23       Well, you said Midwest needed
24   some more guys was what you said at first. And

20

1    when you said "Midwest," did you mean Midwest
2    Dock Solutions?
3    A. Yes.
4    Q. Okay.
5        If you say -- can we refer to
6    Midwest Dock Solutions shorthand as Midwest?
7    A. Okay.
8    Q. Is that agreeable?
9    A. Yes.
10   Q. Okay.
11       Is that how you would refer
12   to it?
13   A. Yes.
14   Q. Okay.
15       And if we refer to Dock &
16   Door, that means Dock & Door Install.
17       Is that fair?
18   A. Yes.
19   Q. Is that how you would refer to that?
20   A. Yes.
21   Q. Okay.
22       And -- and, okay.
23       So what does it mean to be on
24   a permit with Local 63?

5 (Pages 17 to 20)

21

```
1    A.  As far as I know, you can sign up for
2  a permit, which would enable you to do union
3  work.
4    Q.  Okay.
5        And you did that?
6    A.  Yes.
7    Q.  And why did you do that?
8    A.  To go on the bigger install jobs.
9    Q.  Say that again?
10   A.  To go on the bigger install jobs.
11   Q.  Okay.
12       And what does that mean, to
13 go on the bigger install jobs?
14   A.  Instead of running service, I guess,
15 through Midwest, I would be doing the big
16 box -- bigger box buildings, longer jobs with
17 Dock & Door Install.
18   Q.  Okay.  All right.
19       And did you fill out -- how
20 did you get the permit?
21   A.  We had to go through the hall every
22 week and pay a small amount of money to receive
23 a permit to be able to work in the union for
24 that job.
```

22

```
1    Q.  Okay.
2        For the particular job you
3  were on?
4    A.  Yes.
5    Q.  All right.
6        And did you do that?
7    A.  I -- I believe I was there.  It's been
8  a -- it's been a while, a few years, but --
9    Q.  Okay.
10       Well, I guess, my question --
11 bigger question is, you had to do it on a
12 weekly basis.
13       Did you do that personally,
14 or did somebody do that on your behalf, or was
15 it sometimes one way, sometimes the other?
16   A.  I can't exactly say.  I know I was
17 there one time.  I can't remember if someone on
18 my behalf reached out to them and got me a
19 permit.
20   Q.  Somebody might have done it on your
21 behalf?
22   A.  Possibly.
23   Q.  Okay.
24       Do you know who that would
```

23

```
1  have been, possibly?
2    A.  It would have been Tony Brutti.
3    Q.  Okay.
4        So he might have taken care
5  of that during some of the times?
6    A.  Yes.
7    Q.  Okay.
8        And do you know when you
9  became a part of the ironworkers?
10   A.  Not exactly what year.  I would say --
11 that's hard to say, too.  It's been -- it's
12 been a while since I -- since I've been in
13 there.
14   Q.  All right.
15       And I know today is a little
16 bit of a memory test, but is there -- can you
17 give me a year that you --
18   A.  I would say around, maybe, 2018.
19   Q.  Okay.  All right.
20       And how long were you -- did
21 you get the weekly permit from Local 63?
22   A.  A few months.  A few months.
23   Q.  And then did you join the carpenters
24 union after that?
```

24

```
1    A.  Yes.  But I stopped working, got laid
2  off, and then -- and then I didn't work for a
3  little while -- and then I joined the
4  millwrights --
5    Q.  Okay.
6    A.  -- apprentice program.
7    Q.  All right.
8        So -- well, let's take --
9  let's -- let's take a big step back, and then
10 we'll catch up.
11       You graduated from high
12 school, you said, in?
13   A.  2007.
14   Q.  2007.  Thank you.
15       And what was the -- what was
16 the first job you got out of high school?
17   A.  I worked at a pharmacy.
18   Q.  Okay.
19       How long did you do that?
20   A.  About a year.
21   Q.  Okay.
22       What was the next job?
23   A.  Oh, boy.  Metal Management.
24   Q.  Metal Management?
```

6 (Pages 21 to 24)

25

```
1        A.  Ah-huh.
2        Q.  Okay.
3             And what did you do for them?
4        A.  Laborer.
5        Q.  Okay.
6             Were you a member of the
7   laborers union at all?
8        A.  No.
9        Q.  Okay.
10            And how long were you with
11  Metal Management?
12       A.  About a year and a half.
13       Q.  All right.
14            And do you remember what the
15  next job was you had after that?
16       A.  Sargents Equipment and Repair.
17       Q.  Say that again?
18       A.  Sargents Equipment and Repair.
19       Q.  Okay.
20            And what did you do for them?
21       A.  Mechanic.
22       Q.  All right.
23            And how long were you with
24  them?
```

26

```
1        A.  About two years.
2        Q.  All right.
3             And then what was the next
4   job after that?
5        A.  I believe, Trotta Construction in
6   Chicago.  Trotta, T-r-o-t-t-a.
7        Q.  Okay.
8             And what did you do for them?
9        A.  Carpentry work.
10       Q.  Okay.
11            Carpentry, like framing,
12  drywall, that kind of thing?
13       A.  Yes.
14       Q.  Okay.
15            And when you were with Metal
16  Management, you did labor.
17            What kind of labor did you
18  do?
19       A.  We were outside all day switching
20  railcars, cleaning up -- you know, kind of just
21  whatever -- whatever they needed cleaned or
22  moved around.
23       Q.  Okay.
24            And how long were you with
```

27

```
1   Trotta Construction?
2        A.  About two years.
3        Q.  All right.
4             Where did you go after that?
5        A.  Brookfield Iron and Metal.
6        Q.  What did you do at Brookfield Iron and
7   Metal?
8        A.  A scale operator.
9        Q.  All right.
10            Like weighing large things?
11       A.  Yeah.  They would come -- trucks would
12  come with a scale of scrap cars.  It was a
13  scrap yard.
14       Q.  Oh, okay.  All right.
15            How long were you with
16  Brookfield Iron and Metal?
17       A.  Maybe about a year and a half,
18  somewhere around there.
19       Q.  All right.
20            Do you remember what year
21  we'd be up to when you were working there?
22       A.  Maybe, 2015.  Somewhere around
23  there --
24       Q.  Okay.
```

28

```
1        A.  -- I think.
2        Q.  And then what was the next job you had
3   after that?
4        A.  Where did I go after that?  I'm trying
5   to think here.
6        Q.  That's all right.
7             I think we're getting close
8   to Midwest, so --
9        A.  Yeah.
10            I think after that I went to
11  Overdoors of Illinois.
12       Q.  Overdoors?
13       A.  Yes.
14       Q.  And what did you do at Overdoors?
15       A.  Garage door work.
16       Q.  Is that residential or commercial?
17       A.  They do both.
18       Q.  Both.
19            And what kind of work would
20  you do on garage doors?
21       A.  Install.  Repair work.
22       Q.  All right.
23            And would you -- did you do
24  both commercial and residential work?
```

7 (Pages 25 to 28)

29

1    A.  Yes.
2    Q.  Okay.
3         So you did -- and did you
4  install garage doors and openers?
5    A.  Yes.
6    Q.  And repair both?
7    A.  Yes.
8    Q.  All right.
9         And how long were you there?
10   A.  About four years.
11   Q.  Okay.
12        And why did you leave there?
13   A.  To go to Midwest Dock Solutions.
14   Q.  All right.
15        And, now, you were not a
16 member of any union up till this time, right?
17   A.  Correct.
18   Q.  All right.
19        And how did you come to work
20 for Midwest Dock Solutions?
21   A.  One of the guys I worked for at
22 Overdoors went there.  And they needed more
23 guys, and I called and got a job.
24   Q.  All right.

30

1         And who was the guy?
2    A.  Jimmy Kelly.
3    Q.  Okay.
4         Was he a friend of yours?
5    A.  Yes.
6    Q.  Okay.
7         And you worked with him at
8  Overdoors?
9    A.  Yes.
10   Q.  All right.
11        And does he go by James, or
12 does he go by Jimmy?
13   A.  James also.
14   Q.  Okay.
15        He goes both ways?
16   A.  Yes.
17   Q.  Okay.
18        And so when -- so he told you
19 they were looking for guys?
20   A.  Yes.
21   Q.  All right.
22        And who did you call?
23   A.  I believe, Tony.  Tony Zarlengo.
24   Q.  Okay.

31

1         And there's a couple Tonys,
2  right?  There's Tony Zarlengo and Tony Brutti?
3    A.  Yes.
4    Q.  So as we go along, if you mention
5  Tony -- I know it's a little hard to remember.
6  But if you can give me a last name with it,
7  too, that would just be helpful.  Otherwise,
8  I'll probably prompt you.  Okay?
9    A.  Okay.
10   Q.  All right.
11        So you called Tony Zarlengo
12 and -- did you call him, or he call you?
13   A.  I'm not sure.
14   Q.  Okay.
15        That's quite a while ago,
16 correct?
17   A.  Yes.
18   Q.  Do you remember what year,
19 approximately?
20   A.  Like, probably, 10 years ago.  2015,
21 maybe, give or take.
22   Q.  All right.
23        And do you recall where the
24 company was located at that time?

32

1    A.  It's Steger.
2    Q.  Does 27 East 36th Place, Steger, sound
3  right?
4    A.  Yes.
5    Q.  Okay.
6         And did you go there?
7    A.  Yes.
8    Q.  Did you meet with Mr. -- and, I'm
9  sorry.  I should focus on the time, again.  But
10 when you were -- when you reached out to him
11 about the job, did you go to that location?
12   A.  Yes.
13   Q.  Okay.
14        Did you have like an
15 interview with him or anything?
16   A.  I believe, a brief talk, it would have
17 been.
18   Q.  Okay.
19        Was it just with him?
20   A.  I'm not -- I can't remember.
21   Q.  Okay.
22        Do you recall whether anybody
23 else was present?
24   A.  No.

8 (Pages 29 to 32)

33

1    Q.   Was it at that location?
2    A.   If it's the location I'm thinking of,
3    yes.
4    Q.   Okay.
5         Can you describe the location
6    to me?
7    A.   A little off of I-394.  Maybe west a
8    half mile.
9    Q.   Does it have a railroad track by it?
10   A.   There were -- there were three
11   locations when I -- at the time I worked there.
12   Q.   Okay.
13   A.   They moved from the one we started at
14   to a different one and then to the one I
15   believe they're in now.
16   Q.   I'm going to give you a couple
17   different addresses.  Tell me if they sound at
18   all familiar.
19        3211 Holeman Avenue, South
20   Chicago Heights?
21   A.   Okay.
22        I believe that was the second
23   location I was at.
24   Q.   Okay.

34

1         How about 1249 -- 1249 East
2    Burville Road, B-u-r-v-i-l-l-e, Road, Suite 9,
3    Crete, Illinois?
4    A.   I believe that was the first address I
5    was at.
6    Q.   Okay.
7         And then 27 East 36th Place,
8    Steger, Illinois, S-t-e-g-e-r?
9    A.   Is there another after that?  Because
10   I was at three.  I think the current one is
11   South Chicago Heights, maybe, or --
12   Q.   All right.
13        I have another address.  7975
14   Catalpa Street, Dyer, Indiana?
15   A.   No.  I was not at that one.
16   Q.   Okay.
17        Those are the three addresses
18   I have.
19        So do you -- do you
20   remember -- was it the Crete address that you
21   met him with -- met him at?
22   A.   I believe it was the Crete one.
23   Q.   Okay.
24   A.   Yeah.

35

1    Q.   All right.
2         And how long -- when you met
3    with him the first time, how long did you meet
4    with him?
5    A.   I don't remember, really.
6    Q.   All right.
7         And did you fill out any job
8    application or anything like that?
9    A.   I don't think so.
10   Q.   Okay.
11        Do you have a resumé or
12   anything like that?
13   A.   No.
14   Q.   No.
15        Did you get the job?
16   A.   Yes.
17   Q.   Did he hire you?
18   A.   Yes.
19   Q.   Okay.
20        And as far as you know, was
21   he the decisionmaker of who hired you?
22   A.   Probably a mix between Tony Zarlengo
23   and Mike Richert.
24   Q.   Okay.

36

1         And why do you say that?
2    A.   They kind of work hand in hand,
3    together.
4    Q.   All right.
5         And this was in approximately
6    2015, you think?
7    A.   Approximately.
8    Q.   Okay.
9         And what did you do when you
10   started?
11   A.   Started doing service work, fixing and
12   repairing garage doors, and some installs.
13   Q.   Okay.
14        And was this residential and
15   commercial work?
16   A.   Mostly commercial.
17   Q.   Okay.
18        When you say "mostly
19   commercial," what -- if you had to give a
20   percentage to residential and commercial --
21   A.   Probably, 95 commercial, five
22   residential.
23   Q.   Okay.
24        Did that change over time?

9 (Pages 33 to 36)

37

1    A.  No.
2    Q.  Okay.
3         And you said you did service
4    work and some installs, correct?
5    A.  Yes.
6    Q.  All right.
7         What -- what do you mean when
8    you say service work?
9    A.  Going to a job that they have
10   something broken and fixing and repairing their
11   garage door or operators and motors.
12   Q.  Okay.
13        So what kind of things would
14   you repair that would be broken?
15   A.  Broken springs on garage doors, broken
16   cables, damaged door sections.
17   Q.  Okay.
18   A.  Damaged operators.
19   Q.  All right.
20        So if a door section is
21   damaged, what would be involved in fixing that?
22   A.  Usually, measure it up, get a
23   measurement to see what kind of door it is,
24   ordering sections or temporarily repairing it,

38

1    maybe straighten it out.  They'll get it
2    working until the new sections came in.
3    Q.  Okay.
4         And then would you -- when
5    the new sections came in, would you replace the
6    damaged section?
7    A.  Yes.
8    Q.  Okay.
9         How about door openers, if
10   the door opener no longer works?
11   A.  Most likely replace it.
12   Q.  Okay.
13        So remove and replace it with
14   a new one?
15   A.  Yes.
16   Q.  All right.
17        And you mentioned springs,
18   replacing springs that were broken.
19        That would be a replacement,
20   correct?
21   A.  Yes.
22   Q.  Okay.
23        You can't fix a broken
24   spring?

39

1    A.  Correct.
2    Q.  Okay.
3         And how about -- you
4    mentioned installs.  What's involved in an
5    install?
6    A.  Going to the job -- you would have new
7    doors, usually, on site, or bring it from the
8    shop, and taking down the old doors and
9    installing new doors.
10   Q.  Okay.
11        And how about openers?
12   A.  The same.  Just bring an opener from
13   the shop over there -- or they'd already, you
14   know, be there -- and take down old openers and
15   replace with new ones.
16   Q.  Okay.
17        And that would be on
18   commercial jobs?
19   A.  Yes.
20   Q.  Okay.  All right.
21        How about installation of
22   tracks?
23   A.  I've done that, yes.
24   Q.  Would that be work that you would have

40

1    done as part of the installation of new -- of
2    new doors?
3    A.  Yes.
4    Q.  All right.
5         And I'm trying to think of
6    the other components.
7         How about track guards?
8    Would that be something you'd also install?
9    A.  Sometimes, yes.
10   Q.  Okay.
11        And that would be part of the
12   installation of the doors?
13   A.  Yes.
14   Q.  If you could -- you have a binder
15   there in front of you.  If you could turn to
16   Exhibit 3.
17
18        (WHEREUPON, the document marked
19        Plaintiff's Exhibit 3 for
20        identification was tendered to
21        the deponent.)
22
23
24   BY MR. McJESSY:

10 (Pages 37 to 40)

41

1    Q.  All right.
2         And are you familiar with
3  Midwest Dock Solutions website?
4    A.  No, I'm not.
5    Q.  Okay.
6         If you could take a --
7  there's a paragraph there.
8         Do you see under where it
9  says products, and it has a description?
10   A.  Yes.
11   Q.  Can you -- can you read that paragraph
12 for me?
13   A.  Sure.
14         Midwest Dock Solutions
15 specializes in the service, supply, and
16 installation of loading dock equipment and
17 overhead doors.  We pride ourselves on giving
18 the customer not only excellent service but
19 doing it at an affordable price.  We also offer
20 a free quote or consultation on any new
21 product.  Our staff -- our sales staff and
22 service professionals are dedicated to giving
23 you an experience that you won't forget.  Come
24 and experience the difference of Midwest Dock

42

1  Solutions.
2    Q.  Okay.
3         And looking at the first
4  sentence there, the one that's in bold, does
5  that look like a fair description of the work
6  that Midwest Dock Solutions does?
7    A.  The picture?
8    Q.  No.  The first sentence that says
9  Midwest Dock Solutions specializes in the
10 service, supply, and installation of loading
11 dock equipment and overhead doors.
12   A.  Yes.
13   Q.  Okay.
14         Now, that says loading dock
15 equipment.
16         Do you see that?
17   A.  Yes.
18   Q.  What kind of loading dock equipment
19 does Midwest install?
20   A.  Dock levelers and the seals that go
21 around the opening.
22   Q.  Okay.
23         And would you do that kind of
24 work also?

43

1    A.  Yes.
2    Q.  All right.
3         And that was part of your
4  work for Midwest, correct?
5    A.  Correct.
6    Q.  You said dock seals.
7         What are dock seals?
8    A.  If you have the picture, it's the --
9  it's the -- it's the black seal that goes on
10 the outside of the opening that the trucks back
11 up into.  It seals between the building and the
12 truck --
13   Q.  Okay.
14   A.  -- so they don't get any, you know,
15 rain and snow and stuff inside the building.
16   Q.  I see.
17         So on Exhibit 3, in that
18 first page, the photo on the bottom, it's the
19 black square around the door?
20   A.  Yes.
21   Q.  Okay.
22         Would you also repair dock
23 levelers?
24   A.  Yes.

44

1    Q.  Okay.
2         And how did you learn the
3  skills to do the installation and repair of
4  dock levelers?
5    A.  It's all on site training.
6    Q.  On the job?
7    A.  Yes.
8    Q.  So when you got hired by Midwest, that
9  was part of the work you did for them, was
10 learning how to do these things?
11   A.  Yes.
12   Q.  All right.
13         And who -- do you remember
14 any of the folks who sort of trained you to do
15 that work?
16   A.  I've worked with a bunch of guys
17 there, but --
18
19         (WHEREUPON, the document marked
20         Plaintiff's Exhibit 4 for
21         identification was tendered to
22         the deponent.)
23
24 BY MR. McJESSY:

11 (Pages 41 to 44)

45

1    Q.  I'm going to -- and I don't want this
2  to be too much of a memory test.  If you turn
3  to the next exhibit, Exhibit 4 in that book,
4  there's a list of --
5    A.  Okay.
6    Q.  -- names, and you can take a look
7  through that list of names.  There's one name
8  I'll represent to you that's missing on that
9  list.  Somebody pointed it out yesterday.
10 Collin Zarlengo is missing.  But, otherwise,
11 it's an alphabetical list.  But, if that name -- if
12 that list helps refresh your memory as to who
13 may have trained you to do work with dock
14 levelers.
15   A.  I may have worked with -- did some
16 work with Jimmy Kelly. I'm not sure. Hold on
17 here.
18           Oh, okay.  Michael
19 Strazzabosco.  I'm not sure how to pronounce
20 the last name.  Seventy-two.
21   Q.  Excellent.
22   A.  John Sparr.
23   Q.  Sixty-eight.  Okay.
24   A.  Yes.  I think that might be about it

46

1  for, I think, dock equipment.
2    Q.  Okay.
3           So James Kelly, John Sparr,
4  and Michael -- I'm going to shot at it --
5  Strazzabosco, S-t-r-a-z-z-a-b-o-s-c-o?
6    A.  Yes.
7    Q.  You think you worked on dock equipment
8  with those folks?
9    A.  Yes.
10   Q.  Okay.
11          And that was when you were
12 with Midwest, correct?
13   A.  Correct.
14   Q.  Okay.
15          And they sort of taught you
16 how to do that work.
17          Is that fair?
18   A.  Yes.
19   Q.  Okay.
20          And looking at this list,
21 since we're on this list, can you go through
22 the list and tell me the names of people who --
23 who you met while working with either Midwest
24 or Dock & Door?

47

1    A.  Yes.  Let's see.
2    MR. HUGHES:  And if -- if I could
3  just interject, if you can use the number as
4  well --
5    THE WITNESS:  Okay.  Yes.
6    MR. HUGHES:  -- that would -- that
7  would just be helpful.
8    MR. McJESSY:  That's fine.  Yeah.
9  That's a good idea.
10   THE WITNESS:  Number one, Jose.
11 BY MR. McJESSY:
12   Q.  Okay.
13   A.  Number five, Anthony Brutti.  Sixteen,
14 Thomas Donnelly.  Twenty-four, David Green.
15 Thirty-one, Dylan R. Kelly.  Thirty-two, James
16 S. Kelly.  Thirty-three, Nicolas Kelly.
17 Thirty-five, Sean Leer.  Thirty-seven, Daniel
18 Lietz, L-i-e-t-z.  Forty-one, John Mancha.
19 I'll turn the page.  Fifty-two, John Murphy.
20 Fifty-eight, Michael Richert.  Sixty-eight,
21 John Sparr.  Seventy-two, Michael Strazzabosco.
22 Seventy-three, Ira Sugar.  Seventy-eight, Jerry
23 Valentino.  Eighty-five, Austin Wood.
24 Eighty-seven, Anthony Zarlengo.

48

1    Q.  All right.
2           And if there was an 88 on
3  there, Collin Zarlengo, did you work with or
4  know him?
5    A.  Yes.
6    Q.  Okay.  All right.
7           Anybody who is not on that
8  list other than Collin Zarlengo who you can
9  also recall?
10   A.  Not that I can recall.
11   Q.  Okay.  All right.
12          Now, you worked for Midwest
13 for a time, and then you left, correct?
14   A.  Yes.
15   Q.  All right.
16          And then how long did you
17 work for -- for Midwest?
18   A.  Maybe about -- about four years, I
19 think.
20   Q.  And during that four years, you did
21 the service work that you described for me and
22 the install work that you described for me,
23 correct?
24   A.  Correct.

12 (Pages 45 to 48)

49

1    Q.  Including installation of dock
2  levelers, correct?
3    A.  Correct.
4    Q.  And repair of dock levelers?
5    A.  Yes.
6    Q.  Okay.
7        And was -- did you that --
8  when you started working there, did you do --
9  well, strike that.
10        Did your work change over
11  that period of four years, or was it pretty
12  much the same work?
13    A.  I mostly did doors.
14    Q.  Okay.
15    A.  Sometimes docks, but not -- mostly --
16  I'd say 90/10 -- mostly doors and openers.
17    Q.  Okay.
18        And was that consistent from
19  the time you started until the time you left?
20    A.  Yes.
21    Q.  Okay.
22        So it was 90/10 the whole
23  time?
24    A.  Yes.

50

1    Q.  Okay.
2        And of the service work and
3  installation work for the doors, what
4  percentage, would you say?
5    A.  Maybe 70 service 30 install.
6    Q.  Okay.
7        And, again, was that roughly
8  the same the whole time you were there?
9    A.  Yes.
10    Q.  Okay.
11        So 30 percent of the time you
12  were doing new installation, and 70 percent of
13  the time for doors you're doing service work?
14    A.  Yes.  The new installation would be
15  take down old doors, install new doors.
16    Q.  Okay.
17        Or take down an old opener
18  and install a new one?
19    A.  Yes.
20    Q.  Okay.  All right.  All right.
21        And during this time -- this
22  period of time where you're working for them,
23  were you a member of the ironworkers union?
24    A.  For a couple months near the end.

51

1    Q.  Okay.
2        So it was during that period
3  of time that you became a member of the
4  ironworkers union?
5    A.  Yes.
6    Q.  Okay.
7        And tell me how did -- how
8  did that come about?
9    A.  Dock & Door needed guys to do some
10  more work, so I was able to get a permit and
11  then kind of switch -- switch companies to
12  Dock & Door and do install work.
13    Q.  Okay.
14        And you're under -- let's
15  talk about the relationship between Midwest and
16  Dock & Door.
17        You said you needed to be a
18  union member to work for Dock & Door; is that
19  correct?
20    A.  Yes.
21    Q.  Okay.
22        And what -- what is your
23  understanding of the relationship between those
24  two companies?

52

1    A.  Midwest does mostly all -- there's,
2  you know, a different group of guys.  There was
3  two different groups.  Midwest would go do the
4  service.  And then the guys in Dock & Door
5  would go to the -- like the bigger box
6  buildings and do the big installs on the union
7  side.
8    Q.  Okay.
9        And they're using the same
10  trucks, right?
11    A.  Yes.
12    Q.  Okay.
13        And they're -- the -- so
14  you'd have Dock & Door guys go into big box --
15  do you call them logistics buildings, if I use
16  that phrase?
17    A.  Yes.
18    Q.  Okay.
19        Is that -- you know what that
20  is?
21    A.  Yes.
22    Q.  Is that how you would refer to some of
23  those buildings?
24    A.  I can, yes.

13 (Pages 49 to 52)

53

1   Q.  Okay.
2          They're -- they're big new
3   construction, large buildings, with huge rows
4   of overhead doors, right?
5   A.  Yes.
6   Q.  Okay.
7          And if -- if Dock & Door is
8   going to install doors at those locations, they
9   would use Midwest trucks, correct?
10  A.  Correct.
11  Q.  Okay.
12         And when you were doing
13  service work or install work for Midwest, you
14  would use the same trucks, correct?
15  A.  Correct.
16  Q.  Okay.
17         And you said it's really two
18  different groups of guys.  One is nonunion, and
19  one is union, correct?
20  A.  Yes.
21  Q.  Okay.
22         They're both working out of
23  the same location?
24  A.  Yes.

54

1   Q.  Okay.
2          Same buildings?
3   A.  Yes.
4   Q.  All right.
5          And when the buildings change
6   from location to location, there was no
7   difference, correct?
8   A.  Correct.
9   Q.  Okay.
10         The companies continued to --
11  the guys continued to work out of the same
12  locations, correct?
13  A.  Correct.
14  Q.  Okay.
15         And -- but you understood, to
16  work on the big box jobs, you had to be a union
17  member, correct?
18  A.  Yes.
19  Q.  And then you'd get paid through Dock &
20  Door, correct?
21  A.  Yes.
22  Q.  Okay.
23         And they needed more guys to
24  work on the big box doors, correct?

55

1   A.  Correct.
2   Q.  Okay.
3          That was your understanding?
4   A.  Yes.
5   Q.  Who told you that?
6   A.  I believe, Mike Richert.
7   Q.  Okay.
8   A.  I probably talked to -- you know, with
9   Tony Zarlengo also and Tony Brutti.
10  Q.  Okay.
11  A.  But I'm not sure exactly what
12  individual person I talked to to get in there.
13  Q.  Okay.
14         But, collectively, it was
15  sort of agreed you'd switch from Midwest to
16  Dock & Door, correct?
17  A.  Yes.
18  Q.  Okay.
19         And it was collective amongst
20  those three individuals, correct?
21  A.  Yes.
22  Q.  Okay.
23         And so in order to do that,
24  though, you had to be a union member.

56

1          Is that fair?
2   A.  Yes.
3   Q.  Okay.
4          Was there a reason that
5   you -- to your knowledge, was there a reason
6   that you became a member of the ironworkers
7   local instead of the carpenters local, at
8   first?
9   A.  From what I remember, I believe they
10  needed an ironworker on jobs to do dock
11  levelers.
12  Q.  Okay.
13         And that -- your
14  understanding is that was ironworkers' work?
15  A.  Yes.
16  Q.  Okay.
17         You -- you learned to weld at
18  some point, I'm assuming?
19  A.  Yes.
20  Q.  Okay.
21         And when did you learn to
22  weld?
23  A.  I learned to weld through Overdoors of
24  Illinois and the Sargents Equipment Repair.

14  (Pages 53 to 56)

57

1    Q.  Okay.
2          And I don't know a lot about
3  welding, I confess.
4          Can you -- are there
5  different kinds of welding?
6    A.  Yes.
7    Q.  Okay.
8          That you would use in your
9  job with overhead door installation or dock
10  leveler work.  I'm going to narrow it to that.
11    A.  Yeah.  I mean, there's different --
12  different kind of rods, but it's pretty much
13  all -- all standard -- you know, seventy,
14  eleven.  Those are different rod types.  All of
15  the welding was pretty much the same.
16    Q.  Okay.
17          And I'm going to take a big
18  step back and ask you to do me a favor.
19    A.  Yeah.
20    Q.  Can you teach me a little bit about
21  what -- what a -- I don't know what
22  seven-eleven means.
23    A.  It's just --
24    Q.  Explain to me like what you would do

58

1  as a welder installing dock levelers or dock
2  doors.
3    A.  Yeah.  So you usually get a fork
4  truck, a forklift --
5    Q.  Okay.
6    A.  -- and place the dock leveler in the
7  pit.
8    Q.  Okay.
9    A.  In the open pit.  You'd get a -- and
10  the pit is square, and, I guess, raise -- you
11  know, raise the back up to weld the back of it
12  and then go to the front and shim the front,
13  so, you know, it sits flush with the -- with
14  the ground and weld the shims in.
15    Q.  And what -- what kind of welding
16  equipment do you use?  What kind of gas?  What
17  kind of rods?
18    A.  I guess -- I'm not sure, exactly sure
19  what kind of rods, but you've got your -- you
20  know, your -- I guess your welder.  You've got
21  your leads.
22    Q.  Your --
23    A.  Your leads.  Your leads to -- for
24  your -- for your ground wire and your stick.

59

1    Q.  Is it arc welding, or is it gas?  Is
2  it electric or gas?
3    A.  Arc.
4    Q.  Oh, it's gas -- it's electric welding?
5    A.  Yes.
6    Q.  Okay.
7          And was that the kind of
8  welding equipment you used when you worked
9  for -- did you use welding equipment when you
10  were being paid from Dock & Door?
11    A.  I didn't really install too much.  I
12  don't really remember installing docks for
13  Dock & Door.  I mostly did doors.
14    Q.  Okay.
15          So did you use welding
16  equipment when you worked for -- when you were
17  paid by Midwest?
18    A.  Occasionally, yes.
19    Q.  And was it -- was it arc welding or
20  gas?
21    A.  It would have been arc welding.
22    Q.  Okay.
23          Arc welding is electric,
24  right?

60

1    A.  Yes.
2    Q.  Okay.  All right.  All right.
3          Take a big step back.  So you
4  joined the -- you joined the ironworkers local
5  toward the end of your tenure with Midwest Dock
6  so that you could work on dock levelers,
7  correct?
8    A.  Yes.
9    Q.  Is that -- do I have that right, or
10  did I get it wrong?
11    A.  Yes.  Near the end, yes.
12    Q.  Okay.
13          And where were you installing
14  the dock levelers?
15    A.  For -- for Midwest?
16    Q.  Yeah.
17    A.  Oh, that would have been -- if -- if
18  you go to a job, there's not exactly one place.
19  If someone needed a leveler, we would go work
20  on them.  But I didn't do too much installation
21  of those.  I can't remember exactly.
22    Q.  Okay.
23          I'm going to take a big step
24  back, so, maybe, that was a confusing question.

15 (Pages 57 to 60)

61

1    And some point you had a
2 conversation with Tony Brute, Tony Zarlengo,
3 and Mike Richert. You think the three of them.
4 And they said they needed more guys to do work
5 for Dock & Door, correct?
6    A.  Ah-huh.  Yes.
7    Q.  Okay.
8    And so you went -- you
9 started going to work for Dock & Door, correct?
10    A.  Yes.
11    Q.  Okay.
12    And so you started getting
13 paid through Dock & Door; is that right?
14    A.  Yes.
15    Q.  Okay.
16    And that was because you were
17 working on union projects, correct?
18    A.  Yes.
19    Q.  Okay.
20    And you joined the
21 ironworkers local so that you could be a member
22 of the union, correct?
23    A.  Yes.
24    Q.  Okay.

62

1    And what kind of work were
2 you working on after you joined the ironworkers
3 local?  Was it door installation, or was it
4 dock leveler installation?
5    A.  Mostly doors.
6    Q.  Okay.
7    You were doing door
8 installation?
9    A.  Yes.
10    Q.  Okay.
11    And, well, that was at
12 these -- these logistics buildings; is that
13 correct?
14    A.  Yes.
15    Q.  Okay.
16    What did that work entail?
17    A.  Going to the job site and installing
18 the track and overhead doors.
19    Q.  All right.
20    And that involved stacking
21 doors?
22    A.  Yes.
23    Q.  All right.
24    And putting up door tracks?

63

1    A.  Yes.
2    Q.  And would that -- would that work be
3 done before the floors were installed in the
4 buildings?
5    A.  Both.
6    Q.  Both.
7    Would you also seal up the
8 openings?
9    A.  No.
10    Q.  For the concrete floors to get poured
11 or no?
12    A.  I did not --
13    Q.  You did not.
14    A.  -- do that.
15    Q.  All right.
16    What about -- my
17 understanding is that that are -- there's
18 tracks for the doors, and then there's like
19 overhead tracks; is that right?
20    A.  Yes.
21    Q.  Okay.
22    Would you install the
23 overhead tracks?
24    A.  Yes.

64

1    Q.  Okay.
2    And would you install the
3 openers?
4    A.  Yes.
5    Q.  Okay.
6    And that was all after you
7 became a member of the ironworkers?
8    A.  Yes.
9    Q.  Okay.
10    And, now, if I understand
11 correctly, you worked there for a period of
12 time after you became a member of the
13 ironworkers, and then you left; is that
14 correct?
15    A.  Correct.
16    Q.  And why did you leave?
17    A.  I wasn't showing up to work.
18    Q.  Pardon?
19    A.  I kind of was calling off a bit and
20 not being a star employee.
21    Q.  All right.
22    Did -- did you leave, or did
23 they ask you to leave?
24    A.  I was asked to leave.

16 (Pages 61 to 64)

65

1    Q.  Okay.
2         And who -- who asked you to
3  leave?
4    A.  Mike.  Mike Richert.
5    Q.  Mike Richert.  Okay.
6         And I appreciate your
7  honesty.
8    A.  Yep.
9    Q.  And what did Mike say?  Can you just
10 tell me how it came about?
11   A.  Pretty much that was my last day
12 because I wasn't -- I wasn't working up to
13 their par, let's say.
14   Q.  Okay.
15        And did -- was it a
16 face-to-face conversation, or was it over the
17 phone?
18   A.  I think, over the phone.
19   Q.  All right.
20        And just as best you recall,
21 what did -- what did Mike say to you, and what
22 did you --
23   A.  Just that that was my last day.
24   Q.  Okay.

66

1         He just said, essentially,
2  you're done?
3    A.  Yes.
4    Q.  Okay.
5         And where did you go after
6  that?
7         Well, wait.  Before I ask you
8  that, when -- when -- after Mike let you go, as
9  of that date, had you received any other
10 training or certifications or anything from any
11 union programs -- you know, training in the
12 trade -- as of that time?
13   A.  Since then?
14   Q.  No, no.  As of that date.
15   A.  Okay.
16   Q.  Which -- do you remember when that
17 was, approximately?
18   A.  It was about six years ago, maybe
19 2019.
20   Q.  Okay.
21        So as of that date in 2019,
22 assuming that's the right year, had you
23 received -- had you been enrolled in any other
24 training programs or received any other

67

1  training other than on-the-job training that
2  led to any sort of certifications or anything
3  else as of that time?
4    A.  No.
5    Q.  Okay.
6         So you hadn't enrolled in any
7  apprenticeship programs with the ironworkers,
8  if they have one, or the carpenters or anything
9  as of that date, correct?
10   A.  No.  Correct.
11   Q.  Okay.  All right.
12        So then you -- well, Mike
13 asked you to leave, and what did you do next?
14   A.  I didn't work for a little bit.  I was
15 in a motorcycle accident and couldn't use my
16 arms, so I was out of work for a few months.
17 And then I had a kid.
18   Q.  Oh, congratulations.  Exciting.
19   A.  And then -- then I applied for the
20 millwrights union.
21   Q.  Uh, okay.
22        And you got accepted,
23 obviously?
24   A.  Yes.

68

1    Q.  Did you have to be sponsored for that,
2  or how -- how does that work?
3    A.  They have a -- like a helper program,
4  so you apply -- they send you to a job.  And on
5  that job, if a company wants to like sponsor
6  you into the -- into the apprenticeship
7  program, and then you'll get in.
8    Q.  Oh, okay.
9    A.  And then you start your schooling.
10   Q.  So, obviously, you did?
11   A.  Yes.
12   Q.  Okay.
13        And do you remember
14 approximately when that was that you applied to
15 the millwrights program and got accepted?
16   A.  It would have been in 2020.
17   Q.  Okay.
18        And who was the -- where did
19 they send you?  What was the company you went
20 to work for?
21   A.  Doral, D-o-r-a-l, Corporation.
22   Q.  And what were you doing for them?
23   A.  I was doing installation of conveyors.
24   Q.  Okay.

17 (Pages 65 to 68)

69

```
1              And is it logistics
2    buildings?
3        A.  Yes.
4        Q.  They do work for Amazon?
5        A.  That's where I was at, yes.
6        Q.  Okay.  All right.
7              And as a result of that, they
8    sponsored you into the millwrights program?
9        A.  Yes.
10       Q.  All right.
11             And so did you start that in
12   2020?
13       A.  Yes.
14       Q.  All right.
15             And then as a result of being
16   in that program, have you received any sort of
17   certifications or -- I'm not quite sure what
18   the right word would be, but any sort of -- I'm
19   not sure if you would use the word
20   certification, but any certifications, any
21   awards, any, you know, confirmations of a
22   graduate of a particular program, anything like
23   that?
24       A.  Yes.  You get your forklift training.
```

70

```
1        Q.  Okay.
2        A.  You get aerial lifts training.  Power
3    tools.  Precision measurements.  Conveyor.
4    OSHA.
5        Q.  What is conveyor, conveyor --
6        A.  Conveyor installation.
7        Q.  Okay.
8        A.  There might be a couple more I'm
9    missing, but that's --
10       Q.  All right.
11             And so you did receive
12   various certifications through that program?
13       A.  Yes.
14       Q.  And you're still involved in the
15   program, correct?
16       A.  Yes.
17       Q.  Okay.
18             Any welding certifications of
19   any sort?
20       A.  No certifications.
21       Q.  Okay.
22             Did -- but those were classes
23   you took?
24       A.  Yes.
```

71

```
1        Q.  Okay.
2              That was training you
3    received?
4        A.  Yes.
5        Q.  Any other training you received that
6    didn't result in a certification?
7        A.  There's rigging.
8        Q.  Rigging.  Okay.
9              How about scaffolding?
10       A.  No.
11       Q.  No?  All right.
12             And -- all right.  So that
13   was all after you left Midwest, correct?
14       A.  Yes.
15       Q.  Okay.
16             Now, do you know, did your --
17   did your membership in the ironworkers local,
18   did that terminate at some point?
19       A.  I think -- I believe it was a weekly
20   basis you had to go and get a permit, so
21   whenever -- I don't think we had to call
22   anybody or let them know.  It was kind of just
23   at the end of the week if that permit was over.
24       Q.  Okay.
```

72

```
1              And what -- what union are
2    you a member of -- what local are you a member
3    of for the carpenters?
4        A.  1693.  Millwrights.
5        Q.  And are you still a member?
6        A.  Yes.
7        Q.  And when did you become a member?
8        A.  I believe, in '21.  2021.
9        Q.  All right.
10             And you've been a member
11   consistently after that, correct?
12       A.  Yes.
13       Q.  Okay.
14             Ever been a member of any
15   other union?
16       A.  No.
17       Q.  All right.
18             Have you told me, as best you
19   can recall, all of the professional training
20   that -- the formal professional training you
21   have received?
22       A.  Yes.
23       Q.  Okay.
24             And then you've also
```

18 (Pages 69 to 72)

73

```
1   received, of course, just on-the-job training
2   experience.
3            Is that fair?
4   A.  Yes.
5   Q.  Okay.
6            Now, eventually, you went
7   back to work with Dock & Door, correct?
8   A.  Yes.
9   Q.  And how -- when -- when did that
10  happen, and how did that come about?
11  A.  I think I was in-between jobs, so I --
12  I'm not sure who I contacted.  It may have been
13  Tony Brutti.  I was in-between jobs and was
14  asking them if they had -- if they were busy,
15  if they needed more guys to come work and do
16  the logistic buildings.
17  Q.  Okay.
18           And what happened?
19  A.  They said yes.
20  Q.  Okay.
21           And you don't remember
22  exactly who you talked to?
23  A.  Correct.  I do not.
24  Q.  Okay.
```

74

```
1            And do you remember when that
2   was?
3   A.  I'm going to say, maybe, 20 -- 2022,
4   '23 somewhere.
5
6            (WHEREUPON, the document marked
7            Plaintiff's Exhibit 17 for
8            identification was tendered to
9            the deponent.)
10
11  BY MR. McJESSY:
12  Q.  You have an exhibit there in front of
13  you.
14  A.  Oh, I didn't know that.
15  Q.  Seventeen.  That might help.
16  A.  Okay.
17           Oh, yeah.
18  Q.  Does that help?
19  A.  Yes.
20  Q.  Okay.
21           And that's -- that's the text
22  messages you produced?
23  A.  Yes.
24  Q.  All right.
```

75

```
1            And the first one is January
2   18, 2022, correct?
3   A.  Yes.  That's it.
4   Q.  And the top of it, it says, Tony
5   Brutti Midwest.
6            Do you see that?
7   A.  Yes.
8   Q.  Is that how you have Tony Brutti in
9   your contact information?
10  A.  Yes.
11  Q.  Okay.
12           Is that on an iPhone?
13  A.  Yes.
14  Q.  Okay.
15           And so for Tony, you have
16  Tony Brutti Midwest, right?
17  A.  Yes.
18  Q.  Okay.
19           And Midwest, that's Midwest
20  Dock Solutions?
21  A.  Yes.
22  Q.  Okay.
23           And is this your onboarding
24  information that you're giving to him?
```

76

```
1   A.  Yes.
2   Q.  Okay.
3            And so does that help refresh
4   your memory as to when --
5   A.  Yes.  I've got my years right here.
6   Q.  All right.
7            And so you go back to work
8   for Dock & Door, and how long are you there?
9   A.  Let's see here.  I guess, to mid -- or
10  end of June.
11  Q.  Okay.
12           And you're looking at the
13  last text message in that string, correct?
14  A.  Yes.
15  Q.  Okay.
16           So you think that this string
17  covers the time that you were working there
18  again --
19  A.  Yeah.
20  Q.  -- is that right?
21  A.  I believe so, yes.
22  Q.  All right.
23           So, maybe, for about five,
24  six months?  Is that how long you think you
```

19 (Pages 73 to 76)

77

```
1    were there?
2        A.  Yeah.
3        Q.  Okay.
4        A.  It seemed shorter, but that might
5    be -- this might be it.
6        Q.  All right.
7            You recall it as being a
8    shorter period of time?
9        A.  I've been working a lot, so --
10       Q.  All right.
11       A.  -- I don't recall.
12       Q.  All right.
13           I would like to ask you a
14   number of questions, and I'd like to cover both
15   of your periods of employment.
16       A.  Okay.
17       Q.  So from -- I'm going to try to ask my
18   questions about let's talk about this and then
19   let's talk about that.  Okay?  So -- so the
20   first period was the period from 2015 to 2019,
21   and that would include all of the work that you
22   did whether you were being paid through Midwest
23   or paid through Dock & Door after you became a
24   member of the -- well, let me take a step back.
```

78

```
1            Were you paid through Dock &
2    Door when you -- after you joined the
3    ironworkers union?
4        A.  I don't have pay stubs for -- I'm not
5    sure.
6        Q.  Okay.
7            Is it possible you continued
8    to get paid through Midwest?
9        A.  I don't know.
10       Q.  You don't recall?
11       A.  Yeah, without my pay stub.  I never --
12       Q.  Do you recall whether fringe benefit
13   contributions were paid on your behalf to the
14   ironworkers local?
15       A.  They were, yes.
16       Q.  They were.  Okay.  All right.
17           So when I ask you about your
18   first period of employment, I'm talking about
19   2015 to 2019 regardless of which company you
20   are getting paid through.  The second period
21   would be the six-month period in 2022.
22           Fair enough?
23       A.  Yes.
24       Q.  Okay.
```

79

```
1            So how did you report your
2    hours during the first period of time?
3        A.  I believe -- I believe -- I think the
4    first period of time was only GPS.  I think we
5    had -- we had work vehicles, and they were GPS,
6    so they kind of knew our time in and time out.
7        Q.  Okay.
8            So you didn't have to fill
9    out any sort of time sheet or time record?
10       A.  I believe so, yes.
11       Q.  Okay.
12
13           (WHEREUPON, the document marked
14            Plaintiff's Exhibit 10 for
15            identification was tendered to
16            the deponent.)
17
18   BY MR. McJESSY:
19       Q.  And if you take a look at Exhibit
20   10 -- and, now, these are -- and, I guess, you
21   can sort of see.
22           Do you see that there's a --
23   like a preprinted -- ignore the handwriting,
24   but do you see that there's a typed form there?
```

80

```
1        A.  Yes.
2        Q.  And if you turn, I don't know, maybe
3    four pages in, to a page that's got a number
4    DDI 22 -- oh, yeah, you're there.
5            If you look at that page, do
6    you see that printed form?
7        A.  Yes.
8        Q.  Are you familiar with forms like that?
9        A.  I did not use any of these.
10       Q.  Okay.
11           That's what -- that was my --
12   what my question was going to be.
13           Did you ever fill out a form
14   that looked like that?
15       A.  No.
16       Q.  Are you familiar with those forms?
17       A.  No.
18       Q.  Okay.
19           You haven't seen that kind of
20   form before?
21       A.  No.
22       Q.  Okay.
23           So to the best -- the best
24   you recall, during the time that you were there
```

20 (Pages 77 to 80)

81

1  during this first period of time, you didn't
2  fill out any sort of time records?
3      A.  No.
4      Q.  Okay.
5
6          (WHEREUPON, the document marked
7          Plaintiff's Exhibit 18 for
8          identification was tendered to
9          the deponent.)
10
11  BY MR. McJESSY:
12      Q.  And then I'm going to hand you what's
13  been marked as Exhibit 18, and I'll represent
14  to you these are documents produced to us in
15  this case.
16          Is any of the handwriting on
17  these pages yours?
18      A.  No.
19      Q.  Okay.
20          When you were there the
21  second period of time, did you ever fill out
22  any time sheets, then?
23      A.  No.
24      Q.  Okay.

82

1          Did you keep track of your
2  hours in any way?
3      A.  Yes.
4      Q.  Okay.
5          How did you do that?
6      A.  Mostly, I wrote them down, my hours
7  down for the week.  And then would send them,
8  text them to Tony Brutti.
9      Q.  Okay.
10
11          (WHEREUPON, the document marked
12          Plaintiff's Exhibit 17 for
13          identification was tendered to
14          the deponent.)
15
16  BY MR. McJESSY:
17      Q.  And what we have as Exhibit 17 has
18  text messages -- and we'll get to that -- but
19  it's got, at least, some text messages in there
20  that seem to show hours, correct?
21      A.  Yes.
22      Q.  Okay.  All right.
23          Now, when you went back to
24  work during the second period of time, what

83

1  kind of work did you do?
2      A.  They've mostly been the logistic
3  buildings.
4      Q.  Okay.
5      A.  All logistic buildings.
6      Q.  And what kind of work were you doing
7  at the logistics buildings?
8      A.  From what I remember, pretty much all
9  overhead doors and motors.
10      Q.  And when you say "overhead doors and
11  motors," does that mean installing the tracks,
12  the track guards, the doors, the side tracks,
13  the tracks on top, all of that?
14      A.  Yes.
15      Q.  Okay.
16          And what kind of tools would
17  you use to do that work?
18      A.  Our impact guns, all hand tools,
19  hammer drills.  That's pretty much it.
20      Q.  Okay.
21          And who would provide those
22  tools?
23      A.  We had our own.
24      Q.  You had your own tools?

84

1      A.  Yes.
2      Q.  Okay.
3          And how would you get to the
4  job sites?
5      A.  I believe I drove my vehicle to almost
6  all of the job sites.
7      Q.  Okay.
8          Your personal -- you drove
9  your personal vehicle?
10      A.  Yes.
11      Q.  Okay.
12          Did you ever go to the shop
13  or the warehouse and load up and then drive out
14  to the job site even if it was separately in
15  your truck?
16      A.  I think when I was there the second
17  time with Dock & Door, I mostly drove my
18  vehicle.  I can't really remember driving a
19  company vehicle at that time.
20      Q.  Okay.  All right.
21          Now, if you -- if you look at
22  Exhibit 18 -- I think I asked you this, asked
23  you if any of the handwriting on this was
24  yours.  And I don't remember your answer.  Can

21 (Pages 81 to 84)

85

1  you tell me again?
2      A.  No.  It's not my handwriting.
3      Q.  Okay.
4          This looks like your hours
5  reported for various weeks.
6          Do you see that it's got a
7  week at the top?
8      A.  Yes.
9      Q.  Do you know who prepared these?
10     A.  I do not.
11     Q.  And let's -- let's -- if we can walk
12 through them there.  There aren't that many.
13 Do you see the first one?  It's got April 21 to
14 April 22?
15     A.  Yes.
16     Q.  Or, I'm sorry, through April 27?
17     A.  Yes.
18     Q.  And -- let's see.
19         MR. HUGHES:  Just objection.
20 Foundation.
21 BY MR. McJESSY:
22     Q.  All right.
23         I was looking through your
24 text messages to see if there was a

86

1  corresponding text message, and I don't -- oh,
2  well, let's see.
3          All right.  If you look at --
4  you might already be there -- page ZC 018 --
5  or, actually, ZC 019 of Exhibit 17.
6      A.  Okay.
7      Q.  And it looks like that's a text
8  message -- the blue text message is from you,
9  correct?
10     A.  Yes.
11     Q.  All right.
12         And it shows 40 hours.  Do
13 you see that?
14     A.  Yes.
15     Q.  And then it says 21 Dekalb eight; 22
16 off paid eight for Dekalb in 4/28; 25 Elk Grove
17 eight; 26 Dekalb eight; 27 Dekalb eight.
18         Do you see that?
19     A.  Yes.
20
21         (WHEREUPON, the document marked
22         Plaintiff's Exhibit 18 for
23         identification was tendered to
24         the deponent.)

87

1  BY MR. McJESSY:
2      Q.  All right.
3          And those -- those dates, 21
4  through 27, seem to match the dates that are on
5  Exhibit 18, correct?
6      A.  Yes.
7      Q.  Okay.
8          Now, Exhibit 18 references
9  Krusinski -- I can't read the next notation,
10 but GQ9 Dekalb for 4/21.
11         Do you see that?
12     A.  Yes.
13     Q.  And it says eight, and your entry on
14 your text message says Dekalb eight.
15         Do you see that?
16     A.  Yes.
17     Q.  Do you remember working on a project
18 out in Dekalb?
19     A.  I do not.
20     Q.  No?
21         Do you know what Krusinski
22 refers to?
23     A.  Construction company.
24     Q.  Okay.

88

1          And how do you know that?
2      A.  I've done work for them for multiple
3  companies.
4      Q.  Okay.
5          And is that these logistics
6  buildings?
7      A.  Yes.
8      Q.  Okay.
9          And if you go down to the
10 entry on Exhibit 18 for 4/25/22 -- down here.
11     A.  Oh, okay.  Okay.
12     Q.  Yeah.  It says -- and it looks like
13 Duke Elk Grove -- and I can't read the next
14 word -- eight.
15         Do you see that?
16     A.  Yes.
17     Q.  And then if you look at your time
18 entry or your -- your text message, it says,
19 for 25, it says Elk Grove eight.
20         Do you see that?
21     A.  Yes.
22     Q.  All right.
23         So do you remember a project
24 in Elk Grove?

22 (Pages 85 to 88)

89

1    A. I don't remember.
2    Q. Okay.
3        It looks to me like you're
4    reporting your hours in and your text message,
5    and somebody is transcribing them into a time
6    sheet, a handwritten time sheet.
7        Would you say that's fair?
8    A. Yes.
9    Q. Okay.
10       Do you know who would do
11   that?
12   A. No.
13   Q. Okay.
14       Do you recognize any of the
15   writing on Exhibit 18?
16   A. I do not.
17   Q. Now, if you turn to the next page --
18   and it's got --
19       MR. HUGHES: Next page of which
20   exhibit?
21       MR. McJESSY: Of Exhibit 18. It's
22   DDI 1098 in the bottom right corner. It looks
23   like it's hours for the week of April 14th to
24   the 20th.

90

1        Do you see that?
2        THE WITNESS: Yes.
3    BY MR. McJESSY:
4    Q. All right.
5        And if you look at Exhibit
6    17, which is your text messages, it looks like
7    there is a text message from you on page ZC 017
8    with corresponding dates.
9        Do you see 14, 15, 18, 19,
10   20?
11   A. Yes.
12   Q. And your -- it looks like the hours
13   match.
14       Do you see that? It's 5.5,
15   8, 6, and 7?
16   A. Yes.
17   Q. Okay.
18       For a total of 26.5. Do you
19   see that?
20   A. Yes.
21   Q. Which is also what's in your text
22   message, correct?
23   A. Yes.
24   Q. And the first item on there, on the --

91

1    I'm looking at the handwritten time sheet,
2    Exhibit 18. For Thursday 4/14/22, it says
3    service work.
4        Do you see that?
5    A. Yes.
6    Q. Do you know what "service work" would
7    be referring to?
8    A. That would be referring to a
9    customer's -- something's broke, their door
10   operator, going there and fixing them.
11   Q. All right.
12       And if -- do you remember
13   working at -- oh, well, we're back to the same
14   Krusinski IGQ9 Dekalb, and that was the same
15   project on the first page of Exhibit 18 that we
16   looked at?
17   A. Yes.
18   Q. And you don't remember that project;
19   is that right?
20       MR. HUGHES: And I'm going to just
21   object to the use of any specifics in 18 with
22   this witness. He's testified he's never seen
23   it, doesn't know, so foundation and competency
24   to testify about this exhibit.

92

1    BY MR. McJESSY:
2    Q. All right.
3        Do you -- do you remember
4    that project? Does looking at this document at
5    all refresh your memory about that project for
6    Krusinski?
7    A. No.
8    Q. Or Krusinski, I guess. Okay.
9        And then if you turn to page
10   DDI 1099 in Exhibit 18, that looks like it's
11   time entries for April 7, 2022, to April 13,
12   2022.
13       Do you see that?
14   A. Yes.
15   Q. And if you turn in Exhibit 17 to page
16   ZC 015, it looks like that's a text message
17   where you're reporting hours for Glendale
18   Heights, Elk Grove, and Bolingbrook.
19       Do you see that?
20   A. Yes.
21   Q. And it looks like the hours, again,
22   match, right? There's eight hours for Glendale
23   Heights, 16 hours for the two days, the 11th
24   and 12th, and then for the 12th, it says

23 (Pages 89 to 92)

93

1   Bolingbrook seven hours.
2              Do you see that?
3       A.  Yes.
4       Q.  All right.
5              And if you look at the time
6   sheet, it says seven hours.  It shows 4/13
7   instead of 4/12.
8              Do you see that?
9              Like the hours add up to the
10  same.  It's 31 hours.  But the time sheet that
11  is DDI 1099 shows eight, eight, eight, seven
12  for the 7th, 11th, 12th, and 13th.  Your text
13  message seems to show for the 12th -- it's a
14  little confusing.  See the 12th on there twice?
15  Do you see that?
16      A.  Yeah.  I think I wrote the wrong date
17  down in that text.
18      Q.  Okay.
19              So it should have been 4/13
20  at Bolingbrook?
21      A.  Most likely.
22      Q.  Okay.
23              And, again, the time sheet --
24  the handwritten time sheet, DDI 1099, shows

94

1   service work for the 13th, correct?
2       A.  Yes.
3       Q.  For the seven hours that you show for
4   Bolingbrook, correct?
5       A.  Correct.
6       Q.  Do you recall the work that you did in
7   Bolingbrook?
8       A.  I do not.
9       Q.  Okay.
10              And would you take service
11  work to mean the same thing that you described
12  for me previously?
13      A.  Yes.
14      Q.  Let's go through Exhibit 17, actually,
15  a little bit more.  Let's start at the
16  beginning of that exhibit, if you would for me.
17              And, actually, we've been
18  going a little over an hour.  Would you like to
19  take a break?
20      A.  We can keep going if you want.
21      Q.  All right.
22              We'll go about another half
23  hour, and then we'll take a break.  Okay?
24              So it looks like the first

95

1   set of texts here on page ZC 001 is sort of
2   onboarding information.  You know the phrase
3   onboarding?  Is that --
4       A.  Yes.
5       Q.  Okay.
6              It looks like onboarding
7   information where you're getting back into
8   their system, right, providing your basic
9   information so they can put you on payroll?
10      A.  Yes.
11      Q.  Okay.
12              And let's see.  There's a --
13  a text on -- there's a text on page ZC 0002.
14  Well, actually, let's go to page ZC 0003
15  because it's more complete.  There's a text at
16  the top of this that says, hey, it's Zach.
17  This is Tony B., right?
18              Can you explain that text to
19  me?
20      A.  I don't think I had his number saved.
21  Maybe -- or, no, I did.  I guess, I was making
22  sure it was -- it was him.  I'm not sure if I
23  didn't have his number saved or what.
24      Q.  Okay.

96

1       A.  It looks like previous.
2       Q.  So you're making sure you're texting
3   Tony B., correct?
4       A.  Correct.
5       Q.  Okay.
6              And further down in the
7   middle of that page, it says, hey, I've got to
8   call -- call the hall and let them know what
9   company I'm working for.  What's the union
10  company called?
11              What are you asking there?
12      A.  I guess, make sure that Dock & Door
13  Install was the right -- the right name for the
14  union company.
15      Q.  Okay.
16              Well, you didn't -- you
17  didn't know the name of the company at that
18  time, it looks like; is that correct?
19      A.  Well, I --
20          MR. HUGHES:  Objection.  Leading.
21          THE WITNESS:  I believe I knew.  I
22  just wanted to confirm.
23  BY MR. McJESSY:
24      Q.  Okay.

24 (Pages 93 to 96)

97

```
 1          You knew that -- what company
 2   did you know at that time?
 3       A.  Well, Dock & Door Install.  But I just
 4   wanted to make sure that -- I probably called
 5   the hall, that that was the correct name, then,
 6   I guess, that we were using.
 7       Q.  Okay.
 8          Were you -- you were familiar
 9   with Midwest Dock Solutions, correct?
10       A.  Yes.
11       Q.  Okay.
12          And you were also, then,
13   familiar with Dock & Door Install; is that
14   correct?
15       A.  Yes.
16       Q.  Okay.
17          And if you look at page
18   ZC 0005, there's a text at the middle of that
19   page that shows a bracket.
20          Do you see that?
21       A.  Yes.
22       Q.  And then there's a text below that.
23          That's your text, correct?
24       A.  Yes.
```

98

```
 1       Q.  And you're texting Tony Brutti,
 2   correct?
 3       A.  Yes.
 4       Q.  And can you read that text?
 5       A.  Tony wanted me to send you a picture
 6   of the flat brackets we need for the side
 7   seals.  They are about four inches long, and we
 8   need a lot.
 9       Q.  All right.
10          So who is Tony referring to
11   in that text?
12       A.  Most likely Tony Zarlengo.
13       Q.  Okay.
14          And can you explain to me
15   what you mean in that text?
16       A.  I probably -- I would assume that I
17   talked to Tony Zarlengo about missing brackets,
18   sending him the picture,, and then he most
19   likely wanted me to send it to Tony Brutti.
20       Q.  Okay.
21          And this is for a project you
22   were working on, correct?
23       A.  Correct.
24       Q.  Okay.
```

99

```
 1          And why would you have
 2   reached out to Tony Zarlengo?
 3       A.  They kind of -- I feel like they all
 4   kind of work hand in hand.
 5       Q.  Okay.
 6       A.  So it didn't really matter who I
 7   reached out to for information.
 8       Q.  All right.
 9          It was all part of the same
10   operation?
11       A.  Yes.
12       Q.  All right.
13          MS. CAHILL:  Objection.
14          MR. HUGHES:  Objection.  Leading.
15   BY MR. McJESSY:
16       Q.  All right.
17          And if you look at the next
18   page, it looks like there's a response.  This
19   is by Tony Brutti saying, okay, I will gather
20   up what we have at the shop, but it won't be
21   much.
22          Do you see that?
23       A.  Yes.
24       Q.  Do you know what shop he's referring
```

100

```
 1   to?
 2       A.  Yeah.  I believe there's one there now
 3   still, the shop that they're still in now.
 4       Q.  Okay.
 5          Is that in Steger?
 6       A.  Yes.  I would guess.
 7       Q.  And there's only one shop, correct?
 8       A.  Correct.
 9       Q.  Whether it's Midwest or Dock & Door,
10   there's one shop, right?
11       A.  Correct.
12       Q.  Were you ever at that location?
13       A.  Yes.
14       Q.  Okay.
15          And were you in the warehouse
16   at the -- strike that.
17          Can you describe the location
18   for me?
19       A.  Yeah.  There's a -- well, when I
20   worked there, there was a new gas station being
21   built on corner.  And then I go south, maybe, a
22   quarter mile, turn right onto a street.  And it
23   dead ends pretty much at their shop on the
24   right, and they're by some railroad tracks.
```

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

101

1  Q.  That's right, as far as I know.  But I
2  asked a bad question.  I'm sorry.
3         Can you describe for me like
4  what the facility is like, like the building,
5  the physical layout, that kind of thing?  I'm
6  sorry.
7  A.  Yeah.  So once you pretty much dead
8  end, the office is on the right.
9  Q.  Yep.
10  A.  There's a big gravel drive, a big area
11  to turn our trailers in.
12  Q.  Okay.
13  A.  The shop's also on the right.  There's
14  two like 14-foot overhead doors you pull in and
15  out of the shop.
16  Q.  Okay.
17         How big is the -- you
18  referred to it as a shop because they store
19  stuff in there?
20  A.  Yes.
21  Q.  Okay.
22         And can you -- how big is it,
23  would you say?
24  A.  I'd say, maybe, a hundred and twenty

102

1  feet by eighty.
2  Q.  All right.
3  A.  Give or take.
4  Q.  And what's -- what's in there?
5  A.  Just stored doors and track from when
6  I was there, maybe some docks.  They had a fork
7  truck.
8  Q.  Okay.
9  A.  And all of your parts.
10  Q.  All right.
11         And then is there in any sort
12  of office space?
13  A.  There is, yes.
14  Q.  And how -- can you describe what the
15  relationship is between the ware -- you refer
16  to it as a shop.  Is that how you refer to it?
17  A.  Yes.  Yes.
18  Q.  Okay.
19         Between the shop space and
20  the office space, are they -- are they
21  connected, the same building?
22  A.  Yes.
23  Q.  Okay.
24         How do you get from one to

103

1  the other?
2  A.  There's just a man door.
3  Q.  Okay.
4         Is there also a separate
5  entrance for the -- for the office?
6  A.  Yes.
7  Q.  Okay.
8         And describe the office space
9  to me.
10  A.  If you go in the front door, there's a
11  little receptionist area.
12  Q.  Okay.
13  A.  And then right in the middle, I guess,
14  a receptionist, and then there's -- if you go
15  left, there's a couple offices on the left, and
16  it kind of goes around this little office or
17  like this room right in the middle.  And then
18  it leads out to your eating area, like a
19  little -- a little nother room like this, your
20  little cafeteria, and then that leads out to
21  the shop.
22  Q.  Okay.
23         And the cafeteria is like a
24  lunchroom?

104

1  A.  Yeah.  It has a table and microwave.
2  Q.  Okay.
3         And who uses that room?
4  A.  I never used it.
5  Q.  Okay.
6  A.  Maybe if there are guys there that --
7  at the shop that needed to eat or something.
8  Q.  Okay.
9         How about -- who sat at the
10  receptionist area when you first walked in?
11  A.  Oh, I'm not sure.
12  Q.  Okay.  You don't know.
13         Do you know any of the people
14  that worked in the office?
15  A.  Mike Richert, Tony Brutti, Tony
16  Zarlengo.  Sugar is his last name.  I forgot
17  his first name.
18  Q.  Ira Sugar?
19  A.  Ira.
20  Q.  Okay.
21         Anybody else that you can
22  recall?
23  A.  No.
24  Q.  Okay.

26 (Pages 101 to 104)

105

```
1          In the warehouse area, were
2   there any -- any sort of designation or
3   separation of this is tools, equipment, or
4   parts or supplies for Midwest, and this is
5   tools, equipment, parts and supplies for Dock &
6   Door, anything like that?
7      A.  No.
8      Q.  Okay.
9          Just a warehouse with stuff?
10     A.  Yes.
11     Q.  Okay.
12         And was there any name on the
13  door or on the building or out front?
14     A.  I do not think so.
15     Q.  All right.
16         And then if you turn to the
17  next page, ZC 007, do you see that?
18     A.  Yes.
19     Q.  And it says -- there's a paragraph
20  that says ah, haha, definitely sent my hours
21  through the group chat, oops.
22         Do you see that?
23     A.  Yes.
24     Q.  What is the group chat referring to?
```

106

```
1      A.  There's probably a group chat with all
2   of the people that worked there.
3      Q.  Okay.
4          And how was that -- it says
5   you sent your hours through that.
6          How did the group chat work?
7      A.  Well, I would assume that someone made
8   a group chat with all of us, maybe if I asked a
9   question.  And I sent my hours through that
10  instead of directly to Tony Brutti.
11     Q.  Okay.
12         Was the group chat like text
13  messages, or is it through like, you know, one
14  of those other app services?
15     A.  It would have been through text.
16     Q.  So a text message like this but that
17  everybody is on?
18     A.  Correct.
19     Q.  Okay.
20         Do you know who else would
21  have been on that?
22     A.  No.
23     Q.  Okay.
24         Would you still have access
```

107

```
1   to that on your phone?
2      A.  I -- I looked for some work messages.
3   I didn't really go through it that -- I kind of
4   looked to see what I had.
5      Q.  Okay.
6          Can I ask you, after the --
7   either on a break today, when we take a
8   break -- can you see if you still have access
9   to the group chat?
10     A.  Sure.
11     Q.  Okay.
12         And then if you go further
13  down, it says, hey, Tony, do you guys have any
14  extra large shirts available?
15         Do you see that?
16     A.  Yes.
17     Q.  What shirts is that referring to?
18     A.  Either the yellow or orange shirts.
19     Q.  Okay.
20         Are those the ones that have
21  like the company logo on them?
22         Let me turn to -- let's see.
23  Turn to Exhibit 15 in the binder there.
24
```

108

```
1          (WHEREUPON, the document marked
2          Plaintiff's Exhibit 15 for
3          identification was tendered to
4          the deponent.)
5
6      THE WITNESS:  There's Jimmy.
7   BY MR. McJESSY:
8      Q.  Is that the shirt you're -- the kind
9   of shirts you're referring to?
10     A.  Yes.
11     Q.  Okay.
12         And were there similar shirts
13  to that for Dock & Door?
14     A.  I did not see any.
15     Q.  Okay.
16         The only shirts that they had
17  with the logos were the Midwest Dock Solution
18  shirts, correct?
19     A.  Yes.
20     Q.  Okay.
21         Do you know why you're asking
22  for shirts?
23     A.  Because I don't want to dirty my own
24  shirts.
```

27 (Pages 105 to 108)

109

1  Q. When you're working on the job?
2  A. Ah-huh. Yes.
3  Q. Okay.
4      So you would wear shirts like
5  that when you were working on the job?
6  A. Yes.
7  Q. Okay.
8      And you would wear those
9  shirts when you were working for Dock & Door,
10 correct?
11 A. Yes.
12 Q. Okay.
13     And would the other guys wear
14 shirts like that when they were working for
15 Dock & Door?
16 A. Yes.
17 Q. Okay.
18     Did -- and you're an extra
19 large, I take it?
20 A. Yes.
21 Q. Okay.
22     So this is shirts for you --
23 for you personally?
24 A. Yes.

110

1  Q. Okay.
2      And who would provide those
3  shirts?
4  A. Any of the guys in the office.
5  Q. Okay.
6      And this is a response by
7  Tony Brutti saying, yes, I should, correct?
8  A. Yes.
9  Q. Do you recall, did he get you more
10 shirts?
11 A. Yes.
12 Q. All right.
13     And you already have some
14 shirts, correct?
15 A. Correct.
16 Q. Okay.
17     And if you look at the next
18 page, there's a text message that says, hey,
19 I'm stopping by shop for some LDT anchors.
20     Do you see that?
21 A. Yes.
22 Q. What are LDT anchors?
23 A. Just an anchor to go into concrete.
24 Q. Okay.

111

1      So this is for putting up
2  like tracks or something?
3  A. Yes. Most likely tracks guards or
4  possibly tracks for the door, yes.
5  Q. Okay.
6      And those would be kept at
7  the shop?
8  A. Yes.
9  Q. And that was -- so you're working on a
10 job for Midwest -- or, I'm sorry, strike that.
11     You were working on the job
12 for Dock & Door, and you're going to swing by
13 the warehouse to pick up these supplies for
14 that job; is that right?
15 A. Yes.
16 Q. Okay.
17     If you turn to the next page,
18 if -- well, actually, let's -- I'm sorry. Stay
19 on ZC 0008. No, I guess it does start on
20 ZC 0009. I'm sorry.
21     If you can turn to the next
22 page and if you can just read the texts on that
23 page and through the next page -- you don't
24 need to read them out loud -- but can you read

112

1  them and tell me when you've had a chance to do
2  that?
3  A. Okay. I'm done.
4  Q. Okay.
5      And it looks to me like this
6  is a series of texts about your trying to
7  access information about your pay; is that
8  correct?
9  A. Yes.
10 Q. All right.
11     Do you recall what this was
12 about?
13 A. I know there was like an app you would
14 download, and you had to log into the app to
15 get access to your pay stubs.
16 Q. Okay.
17 A. And I was trying to access that.
18 Q. Okay.
19     Through the app that you had
20 on your phone?
21 A. Yes.
22 Q. And somehow the login system isn't
23 working.
24     Is that fair?

28 (Pages 109 to 112)

113

1    A.  Correct.
2    Q.  All right.
3         And there's a -- on ZC 0009,
4  there's a reference to Gineris.
5         Do you see that?
6    A.  Yes.
7    Q.  Do you know who Gineris is?
8    A.  I do not.
9    Q.  Okay.
10        Do you recall -- and this
11  says that you're going to get an email, do you
12  see that, from Gineris?
13   A.  Yes.
14   Q.  Do you know whether you did get an
15  email from them?
16   A.  Most likely, yes.
17   Q.  All right.
18        And it looks like your email
19  address is zcorrigan9@gmail.com.
20        Do you still have that
21  e-mail?
22   A.  Yes.
23   Q.  Do you -- do you delete your emails,
24  or do you generally just leave them accumulate?

114

1    A.  They should be saved.
2    Q.  Okay.
3         Can you check and see -- you
4  didn't produce an email from Gineris about your
5  pay stub.
6    A.  Okay.
7    Q.  But if you can check and see if you
8  can -- that you may not be able to do today,
9  but even after the deposition, if you can check
10  and see if you have that.
11   A.  Yes.
12   Q.  And if so, can you send me whatever
13  the communications were that you had from
14  Gineris?
15   A.  Yes.
16   Q.  Thanks.
17        MR. HUGHES:  Just for the record,
18  we'll request a copy of everything.
19        MR. McJESSY:  Oh, yeah.
20        MR. HUGHES:  I just want to --
21        MR. McJESSY:  Yeah.  If I get
22  anything, I'd produce it, of course.
23  BY MR. McJESSY:
24   Q.  All right.

115

1         And it looks like somehow,
2  whatever the communications were, that your
3  account had been suspended or something and
4  that you couldn't get into it.
5         Is that fair?
6    A.  Yes.
7    Q.  All right.
8         Do you remember, were you
9  eventually able to get into the account?
10   A.  I do not remember.
11   Q.  Okay.
12        Now, if you turn to -- it
13  looks like, actually, the string sort of
14  continues, and I see you're looking through it,
15  ZC 011 and ZC 012.  Do you see that, that the
16  conversation is going back and forth about
17  still trying to get the information?
18   A.  Yes.
19   Q.  Okay.
20        And on ZC 012, it says, she's
21  still working on it.
22        Do you see that?
23   A.  Yes.
24   Q.  Do you know who "she" is that's

116

1  referred to there?
2    A.  Most likely Gineris.
3    Q.  Okay.
4         You're not sure?
5    A.  Not sure.
6    Q.  Okay.
7         And at the top of it, it says
8  it's not giving me an option for Dock & Door
9  Install.
10        Do you see that?
11   A.  Yes.
12   Q.  Do you know what that's referring to?
13   A.  I most likely had pay stubs on that
14  app through Midwest also.
15   Q.  Okay.
16        So it was giving you an
17  option for one, but not the other?
18   A.  I believe that would be it.
19   Q.  All right.  Let's see.
20        Now, if you can turn to
21  ZC 016.
22   A.  Okay.
23   Q.  At the top, it says -- there's a text
24  message from you that says, hey, I've got to

29 (Pages 113 to 116)

117

1  throw something at you, comma, but it's
2  important. And then there's a response from
3  Tony that says -- that's Tony Brutti, I'm
4  assuming. It says, okay. And then you say, so
5  I have a class the week of May 2 I've got to go
6  to.
7          Is that the class at the
8  apprentice training program?
9      A.  Yes.
10     Q.  Okay.
11         It says, but I need a
12 temporary layoff for four weeks after that. I
13 have a millwright job I have to be at for those
14 weeks.
15         Do you see that?
16     A.  Yes.
17     Q.  It says it's temporary but very high
18 paying, can't pass up while our work is getting
19 kinda spotty.
20         Do you see that?
21     A.  Yes.
22     Q.  All right.
23         And the response is, okay,
24 I'll let Tony know.

118

1          Do you see that?
2      A.  Yes.
3      Q.  Now, Tony Brutti is responding, okay,
4  I'll let Tony know, correct?
5      A.  Yes.
6      Q.  Okay.
7          So do you understand that
8  that refers to Tony Zarlengo?
9      A.  Yes.
10     Q.  All right.
11         And then you -- you send a
12 text message that says talk to Tony yet today?
13         That's -- that's a question,
14 correct?
15     A.  Yes.
16     Q.  Okay.
17         And Tony in that text message
18 refers to Tony Zarlengo, correct?
19     A.  Correct.
20     Q.  All right.
21         Can you explain to me why
22 you're letting Tony -- why it's letting Tony
23 Zarlengo know, and you're a follow-up about
24 whether he's talked to Tony Zarlengo yet?

119

1      A.  Like I said, they kind of work hand in
2  hand from what I -- what I've seen.
3      Q.  Okay.
4          So you wanted Tony Zarlengo
5  to know that you were going to take time off,
6  correct?
7      A.  Well, I think, Tony Brutti was letting
8  him know, and I was making sure that --
9      Q.  That he --
10     A.  -- he had talked to him.
11     Q.  Okay.
12         That Tony Brutti had talked
13 to Tony Zarlengo?
14     A.  Yes.
15     Q.  Okay.
16         About your leave of absence?
17     A.  Correct.
18     Q.  Okay.
19         And then if you turn to the
20 next page -- actually, if you turn to the next
21 page, ZC 017, you're following up about that
22 conversation in your text of April 26 at 10:16
23 a.m., correct?
24     A.  Yes.

120

1      Q.  Okay. All right.
2          And can you tell me -- or can
3  you read your text message to Tony Brutti about
4  that?
5      A.  At 10:16 a.m.?
6      Q.  Yeah.
7      A.  Did he talk to Tony about my four-week
8  temporary layoff for school and that three-week
9  job I have to go to, correct. Just making sure
10 because this Friday is my last day for that.
11     Q.  And what does Tony Brutti respond to
12 you?
13     A.  Yeah. I told him as soon as you told
14 me.
15     Q.  Okay.
16         And then there's a -- if you
17 look at the next page, ZC 018, it refers --
18 your top text message refers to a drug test and
19 background check.
20         Do you see that?
21     A.  Yes.
22     Q.  Is that for the millwright job that
23 you're going to be taking?
24     A.  Yes.

121

```
1     Q.  Okay.
2          And then there's a text
3   message from Tony Brutti that responds to that.
4          Can you read that?
5     A.  Ask -- asked Tony Z. about that.  I'm
6   not sure who he has scheduled.
7     Q.  And do you know what that's responding
8   to?
9     A.  From the text I sent before that, I
10  asked if he had someone else that can come to
11  Dekalb tomorrow.
12    Q.  Okay.
13         Were you working in Dekalb at
14  the time?
15    A.  Most likely, yes.
16    Q.  Okay.
17         And you weren't going to be
18  able to be there the next day?
19    A.  Correct.
20    Q.  Okay.
21         And do you -- Tony Brutti
22  seems to be telling you to ask Tony Zarlengo
23  about that, correct?
24    A.  Correct.
```

122

```
1     Q.  Okay.
2          And do you know why that
3   would be?
4     A.  They work hand in hand.
5     Q.  Okay.
6          So he would be the person to
7   know whether they had scheduled somebody for
8   Dekalb the next day.
9          Is that your understanding?
10    A.  Yes.
11         MR. HUGHES:  Objection.  Leading.
12         THE WITNESS:  Yes.
13  BY MR. McJESSY:
14    Q.  All right.  All right.
15         And then if -- if you look at
16  the last page of that, ZC 019, it's a text
17  message from you dated June 26, which would be
18  about almost seven or eight weeks after the one
19  before that where you're reporting your hours
20  for May 2nd?
21    A.  Yes.
22    Q.  And it looks like your text message
23  from April 28 says -- strike that.
24         Your text message above that
```

123

```
1   from April 28 essentially seems to say you're
2   not going to be at the job the next day on
3   April 29, correct?
4     A.  Correct.
5     Q.  All right.
6          And then your text message on
7   May 2 is reporting hours for April 21 to April
8   27, correct?
9     A.  Yes.
10    Q.  Okay.
11         And then the next text
12  message we have in the string is for June 26,
13  correct?
14    A.  Yes.
15    Q.  Which would have been after that
16  four-week millwright job --
17    A.  Yes.
18    Q.  -- correct?  Okay.
19         And it looks like you're
20  reaching out to them to find out what kind of
21  work they have; is that right?
22    A.  Yes.
23    Q.  All right.
24         And -- and what's the
```

124

```
1   response that you get?
2     A.  We are kind of struggling to keep
3   everyone busy right now, but I will let you
4   know if we pick up.
5     Q.  Okay.
6          And you say, seems that way.
7   Slow on installs, correct?
8     A.  Yes.
9     Q.  What's that referring to?
10    A.  It kind of seems like kind of the door
11  company is getting a little slow at that time.
12    Q.  Okay.
13    A.  Usually, in the summer.
14    Q.  And then it says, we haven't seen --
15  you say, the last one -- we haven't seen big
16  install jobs in months.  Service strong,
17  though, correct?
18    A.  Yes.
19    Q.  And that was spelled t-h-o-u.
20         What -- what is that
21  referring to?
22    A.  I'm not sure where -- I'm actually not
23  sure where I was at at that time.
24    Q.  Okay.  All right.
```

31 (Pages 121 to 124)

125

```
1            Why don't we take a -- just
2  take a break.  Five minutes.  Off the record.
3
4            (After a break from 10:44 a.m.
5             to 10:57 a.m., the deposition
6             was resumed as follows:)
7
8            (WHEREUPON, the document marked
9             Plaintiff's Exhibit 15 for
10            identification was tendered to
11            the deponent.)
12
13  BY MR. McJESSY:
14    Q.  Sir, Exhibit 15 in front of you there,
15  do you know who that is in the photo?
16    A.  Jimmy Kelly.
17    Q.  Okay.
18            And you worked with him?
19    A.  Yes.
20    Q.  Did you work with him when you were
21  there the first time and the second time?
22    A.  Just the first time.
23    Q.  Just the first time.  All right.
24            And what did he do?
```

126

```
1    A.  He did the same as me, service and
2  install work.
3    Q.  Okay.
4            And the -- he's there with a
5  white van.
6            Do you see that?
7    A.  Yes.
8    Q.  Was that a van -- or were you familiar
9  with that van or ones like it?
10    A.  Yes.
11    Q.  All right.
12            And were those vans -- how
13  many were there?
14    A.  I believe, just one.
15    Q.  Just one.
16            Did you ever use it?
17    A.  I've been in it, yes.
18    Q.  What was it -- what was it used for?
19    A.  Transporting tools or some parts.
20    Q.  All right.
21            And did you use it the first
22  time you were there and the second time you
23  were there?
24    A.  I didn't drive it, but I've been in
```

127

```
1  it, so the first time.
2    Q.  Okay.
3    A.  Then the second.
4    Q.  All right.
5            Did it have any logos or
6  anything on it?
7    A.  I do not believe so.
8    Q.  Okay.
9            And if you could turn to
10  Exhibit 6.
11
12            (WHEREUPON, the document marked
13             Plaintiff's Exhibit 6 for
14             identification was tendered to
15             the deponent.)
16
17  BY MR. McJESSY:
18    Q.  All right.
19            Do you recognize that truck?
20    A.  Yes.
21    Q.  Okay.
22            And you used trucks like that
23  when you were there the first time and the
24  second time?
```

128

```
1            MR. HUGHES:  Objection.  Compound.
2            MR. McJESSY:  Pardon?
3            MR. HUGHES:  Compound.
4            MR. McJESSY:  Oh.
5            MR. HUGHES:  I just wanted it for
6  clarification purposes.
7            MR. McJESSY:  I was thinking about
8  it.
9  BY MR. McJESSY:
10    Q.  Did you use trucks like that when you
11  were there the first time?
12    A.  Yes.
13    Q.  And did you use trucks like that when
14  you were there the second time?
15    A.  Yes.
16    Q.  Okay.
17            And so the trucks are used
18  by -- for both service work and for new install
19  work, correct?
20    A.  Yes.
21    Q.  Including at the logistics buildings?
22    A.  Yes.
23    Q.  Okay.
24            And can you tell me what's on
```

32 (Pages 125 to 128)

129

1      that truck?
2          A.   It says Midwest Dock Solutions.
3          Q.   No, I mean -- well, that's good.  But
4      I meant physically, like what -- what is on the
5      back of the truck?  What does it carry?
6          A.   Some tool containers.
7          Q.   Okay.
8          A.   And it looks like --
9          Q.   And that's the big black square thing?
10         A.   Yes.
11         Q.   Okay.
12         A.   And it looks like a torch setup in the
13     back.
14         Q.   Okay.
15              That sticks up over the top
16     of the back of the truck?
17         A.   Yes.
18         Q.   Okay.
19              And those look like cables or
20     hoses or something like that; is that right?
21         A.   Yes.
22         Q.   And does it carry tanks?  Is that
23     what's on the back of it?
24         A.   Yes.

130

1          Q.   Okay.
2               And that would be for gas
3      welding?
4          A.   Torching.
5          Q.   Torching.  Okay.
6          A.   Cutting metal.
7          Q.   Okay.
8               That's where I was getting
9      confused.  That's not used for welding.  It's
10     used for cutting?
11         A.   Correct, yeah.
12         Q.   All right.
13              And you use an arc welder, an
14     electric welder for welding.
15         A.   Yes, with like a generator, say a big
16     generator, a big blue generator.
17         Q.   Got it.
18              And so would the -- for
19     cutting or for the torches that were used on
20     the back here, would you use those in your
21     service work?
22         A.   Yes.
23         Q.   All right.
24              And would you use it also for

131

1      your install work?
2          A.   Not really for the installs.
3          Q.   Okay.  Less so for that?
4          A.   Yes.
5          Q.   Okay.
6               And if you turn -- do you --
7      do you recognize the location where this photo
8      is taken, by any change?
9          A.   I do not.
10
11              (WHEREUPON, the document marked
12               Plaintiff's Exhibit 7 for
13               identification was tendered to
14               the deponent.)
15
16     BY MR. McJESSY:
17         Q.   Okay.
18              Turn to the next page.  And,
19     again, another photo of a Midwest Dock truck,
20     correct?
21              MR. HUGHES:  This is Exhibit --
22              MR. McJESSY:  Exhibit 7.
23              MR. HUGHES:  Seven?
24              MR. McJESSY:  Yeah.

132

1               MR. HUGHES:  Okay.
2               MR. McJESSY:  Thank you.
3               MR. HUGHES:  I just wanted the
4      record to --
5               MR. McJESSY:  No.  I appreciate
6      that.
7               THE WITNESS:  Okay.
8      BY MR. McJESSY:
9          Q.   And do you recognize the location
10     where this was taken?
11         A.   I do not.
12         Q.   Okay.
13              And it's in another truck
14     that says Midwest Dock Solutions on it?
15         A.   Yes.
16         Q.   Similar kind of stiff on the back of
17     it?
18         A.   Yes.
19         Q.   All right.
20              But, also, it looks like some
21     ladders in this picture, correct?
22         A.   Correct.
23         Q.   All right.
24              And my understanding is that

33 (Pages 129 to 132)

133

1 that basket to the upper left above the cab of
2 the truck is not part of the truck, correct?
3    A.  Correct.
4    Q.  Again, you use trucks like this for
5 your work for Midwest Dock Solutions?
6    A.  Yes.
7    Q.  And also for Dock & Door?
8    A.  Yes.
9    Q.  And if you turn to the next page,
10 which is Exhibit 8, as Mr. Hughes keeps me
11 focused on exhibits as opposed to tabs, do you
12 see that Exhibit 8 there?
13    A.  Yes.
14    Q.  All right.
15       And, now, that looks like
16 it's work being done in one of these logistics
17 buildings that you've described, correct?
18    A.  Yes.
19    Q.  All right.
20       And that's new install work?
21    A.  It would be, yes.
22    Q.  All right.
23       And that's a Midwest Dock
24 Solutions truck there, correct?

134

1    A.  Yes.
2    Q.  All right.
3       And do you recognize this
4 location?
5    A.  I do not.
6    Q.  Okay.
7       Does it -- I understand you
8 don't recognize this specific job location.
9 But is this picture -- does it fairly represent
10 sort of the installation, the new doors in one
11 of these logistics buildings?
12    A.  Yes.
13    Q.  Okay.
14       Where you have a -- just door
15 after door after door lined up and you just go
16 through and install the doors?
17    A.  Yes.
18    Q.  Okay.
19       And these are new
20 installations, correct?
21    A.  Correct.
22    Q.  All right.
23       Can you tell me what the
24 items are that are on the ground to the right

135

1 of the truck?
2    A.  Those would be a stack of lower track
3 and upper track along with some door sections
4 next to them.
5    Q.  Okay.
6       And that's part of -- how
7 would -- how would these materials get to the
8 job site?
9    A.  Most likely -- well, either -- they've
10 most likely been delivered from the door
11 company.
12    Q.  Okay.
13
14       (There was a discussion off
15        the record.)
16
17    THE WITNESS:  Most likely would be
18 delivered from the door company on a big truck
19 and trailer.
20 BY MR. McJESSY:
21    Q.  Okay.
22    A.  Or somebody brought them there -- you
23 know, from our -- from the company on a work
24 vehicle.

136

1    Q.  Like this vehicle that's shown here?
2    A.  Could be, yes.
3    Q.  Okay.
4
5       (WHEREUPON, the document marked
6        Plaintiff's Exhibit 9 for
7        identification was tendered to
8        the deponent.)
9
10 BY MR. McJESSY:
11    Q.  And if you turn to the next page,
12 which is Exhibit 9, this is a -- I want to
13 focus on the two pictures on the right, and it
14 looks like a -- have you ever been to Midwest
15 Dock Solutions' Facebook page?
16    A.  I have not.
17    Q.  Okay.
18       It's a -- looks to be a
19 Facebook entry.  You see, at the top, it says
20 Mike Richert?
21    A.  Yes.
22    Q.  And it says Midwest Dock Solutions.
23       Do you see that?
24    A.  Yes.

137

1      Q.  And it says July 26, 2016.
2            Do you see that?
3      A.  Yes.
4      Q.  And you were working for Midwest Dock
5   Solutions around that time, correct?
6      A.  Around.  Around that time, yeah.
7      Q.  Yeah.  I think you said you started
8   there, you thought, in 2015, right?
9      A.  Maybe, yeah.  Yeah.  About 10 years
10  ago, I think.
11     Q.  All right.
12           Do you recognize this job
13  location at all?
14     A.  I do not.
15     Q.  Okay.
16           And it looks like the top
17  picture is the same as the one we just looked
18  at; is that right?
19     A.  Yes.
20     Q.  As Exhibit 8?  Okay.
21           And this says Midwest Dock
22  Solutions is in Lockport, Illinois.
23           Do you see that?
24     A.  Yes.

138

1      Q.  And it says it at the bottom of the
2   picture?
3      A.  Yes.
4      Q.  All right.
5            Do you know, did you ever
6   work on any projects in Lockport, Illinois?
7      A.  Near there.  I'm not sure if it was
8   actually in Lockport.  I've been there.
9   Probably about 355.  In that -- in that area.
10     Q.  Okay.
11           And do you remember what the
12  project was?
13     A.  No.
14     Q.  And, again, the bottom picture, does
15  that look familiar to you at all?  Do you
16  recognize that project?
17     A.  No.
18     Q.  Okay.
19           But, again, just in general
20  terms, does that bottom picture look like one
21  of these logistics new install projects that
22  you've been on?
23     A.  It does.
24     Q.  Okay.

139

1            And you were on those kind of
2   projects for Dock & Door, correct?
3      A.  Yes.
4      Q.  All right.
5            Can you mark this as Exhibit
6   19?  And mark this as Exhibit 20.  Mark this as
7   Exhibit 21.  Mark this as Exhibit 22.  Mark
8   this as Exhibit 23.
9
10           (WHEREUPON, the documents were
11           marked Plaintiff's
12           Exhibits 19, 20, 21, 22, and 23
13           for identification, as of
14           3/14/25.)
15
16  BY MR. McJESSY:
17     Q.  All right.
18           I'd like just to ask you a
19  couple of quick questions about Exhibits 19
20  through 23 that I've just handed you.
21     A.  What?
22     Q.  If we can first look at Exhibit 19.
23
24

140

1            (WHEREUPON, the document marked
2            Plaintiff's Exhibit 19 for
3            identification was tendered to
4            the deponent.)
5
6   BY MR. McJESSY:
7      Q.  Do you recognize the building that's
8   shown in the three photos on the right there?
9      A.  I do not.
10     Q.  Okay.
11           And do you see at the top
12  where it says Midwest Dock Solutions, another
13  job well done, install of 64 dock levelers,
14  dock seals, and 68 overhead doors?  Do you see
15  that?
16     A.  Yes.
17     Q.  All right.
18           And that was the kind of work
19  that Dock & Door did?
20     A.  Yes.
21     Q.  Okay.
22           And does this look like a --
23  I understand you don't recognize this
24  particular project, but does this look like an

35 (Pages 137 to 140)

141

1  exterior picture of the kind of logistics door
2  installations that Dock & Door did?
3      A.  Yes.
4      Q.  Okay.
5          And if you turn to Exhibit
6  20, there's a photograph of a door there.
7          Do you see that?
8      A.  Yes.
9      Q.  Do you recognize that?
10     A.  No.
11     Q.  Okay.
12         Do you know where that photo
13 was taken?
14     A.  No.
15     Q.  All right.
16         And if you turn to Exhibit
17 21, do you recognize the two individuals shown
18 in that picture?
19     A.  One is Dave Green.
20     Q.  Which one is that?
21     A.  The one in the orange.
22     Q.  Okay.
23     A.  The other one, not necessarily.
24     Q.  The other one you don't recognize?

142

1      A.  I'm not sure.
2      Q.  All right.
3          Do you recognize where that
4  photo was taken?
5      A.  No.
6      Q.  Okay.
7          And if you turn to the next
8  page, do you recognize that person?
9      A.  No, but it says the name up there.
10     Q.  Well, aside from that.
11     A.  No.  No.
12     Q.  Okay.
13     A.  Never met him.
14     Q.  All right.
15         And then if you can look at
16 Exhibit 23, do you recognize where that picture
17 was taken?
18     A.  No.  It might be our -- the shop, but
19 not too sure.
20     Q.  You're not sure?
21     A.  No.
22     Q.  All right.
23         That's what I wanted -- I was
24 going to ask you if that was a picture of the

143

1  shop, but if you can't say for sure.
2          Do you recognize who that's a
3  picture of?
4      A.  That's James Kelly.
5      Q.  All right.
6          And the -- the shirt that he
7  has on, do you recognize that shirt?  I can't
8  quite see the logo, but I guess my question to
9  you is:  Do you recognize the shirt such that
10 you can tell me what the logo was?
11     A.  It most likely says Midwest Dock.
12     Q.  Did they have shirts like that?
13     A.  Yes.
14     Q.  Okay.
15         And they had the logo on the
16 chest like that?
17     A.  Yes.
18     Q.  Okay.
19         Did Dock & Door have any
20 similar shirts?
21     A.  No.
22     Q.  Okay.  Let's see.
23
24

144

1          (WHEREUPON, the document marked
2          Plaintiff's Exhibit 4 for
3          identification was tendered to
4          the deponent.)
5
6  BY MR. McJESSY:
7      Q.  Let's go back to Exhibit 4, which is
8  the list of names.  And I'd like to run through
9  with you the persons who you were able to
10 recall from your work.
11         So the first person you
12 mentioned was Jose Aguirre, A-g-u-i-r-r-e,
13 Garcia.
14         Do you see that there?
15     A.  Yes.  Yes.
16     Q.  How did you know Jose?
17     A.  He just worked for us.
18     Q.  All right.
19         And did you work with him
20 both times you were there?
21     A.  Yes.
22     Q.  Okay.
23         And what kind of work did he
24 do?

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

145

1    A. Well, the first time, he was also
2  nonunion. Then the second time, by that time,
3  he -- he was in the carpenters.
4    Q. Carpenters union?
5    A. Yes.
6    Q. Okay.
7         So the first time you were
8  there with him, what kind of work did you do?
9  Did you work with him?
10   A. I've worked with him, yes.
11   Q. Like on jobs together?
12   A. Yes.
13   Q. Okay.
14        And what kind of work would
15 you and he do when you were there the first
16 time?
17   A. Service work.
18   Q. All right.
19        And that's the kind of work
20 you described for me previously?
21   A. Yes.
22   Q. Okay.
23        And that could include -- did
24 that also include like install work?

146

1    A. Yes.
2    Q. All right.
3         So installing new doors and
4  openers and things like that as part of
5  replacing an old door and opener, correct?
6    A. Yes.
7    Q. All right.
8         And the installation of a new
9  door where you're replacing an old door, that
10 could include installation of new tracks, too,
11 correct?
12   A. Yes.
13   Q. Okay.
14        So aside from like removing
15 the old door and opener, the installation
16 process for the new door and opener is
17 essentially the same as if you're installing a
18 new door without an old door having been there,
19 correct?
20   A. Yes.
21        MR. HUGHES: Objection. Leading.
22        MR. McJESSY: Okay.
23        Well, I'm asking is that
24 correct.

147

1         MR. HUGHES: You're asking a leading
2  question, but, yeah, it's --
3         MR. McJESSY: Okay.
4         MR. HUGHES: I know what you're
5  asking.
6  BY MR. McJESSY:
7    Q. All right. All right.
8         The second time you were
9  there, you worked with Jose on installing doors
10 in the logistics buildings?
11   A. Yes.
12   Q. All right.
13        Side by side?
14   A. Yes.
15   Q. All right.
16        Do you know how he made the
17 transition from the nonunion to the union?
18   A. I'm not sure on that.
19   Q. All right.
20        You never discussed that with
21 him?
22   A. He never left the company, so probably
23 transferred from Midwest Dock to Dock & Door.
24   Q. All right.

148

1         Well, not in these words
2  exactly, but did you ever have a discussion
3  with him like, oh, hey you're working for, you
4  know, the -- you're union now?
5    A. Yeah, I have.
6    Q. Okay.
7    A. I don't really recall it, but I'm sure
8  I've talked about it.
9    Q. Okay.
10        You don't recall any of those
11 conversations?
12   A. No.
13   Q. Okay.
14        Anthony Brutti. He's the
15 next person on the list?
16   A. Yes.
17   Q. You worked with him the first time you
18 were there?
19   A. Brutti, yes. Well, he was in the
20 office, yes.
21   Q. Okay.
22        And so what would have been
23 your interaction with him the first time you
24 were there?

37 (Pages 145 to 148)

149

1    A.  I don't really deal too much with him,
2  because like I said, he -- I pretty much went
3  through Tony or Mike the first time.
4    Q.  Okay.
5         And "Tony," meaning Tony
6  Zarlengo?
7    A.  Tony Zarlengo.  Yes, Zarlengo.
8    Q.  And then how about the second time you
9  were there?
10   A.  I had to send him my weekly hours,
11 so --
12   Q.  Okay.
13        Other than that, did you do
14 anything else with Anthony Brutti the second
15 time you were there?
16   A.  Pretty much report to him, mostly.
17 But I never -- not any work or anything like
18 that.
19   Q.  Okay.
20        So the first time you were
21 there, how would -- how would you get your job
22 assignments on a day-to-day basis?
23   A.  Tony or Mike.  Tony Zarlengo or Mike
24 Richert.

150

1    Q.  Okay.
2         And they would -- how would
3  you get -- how would you -- like that's who
4  gave them to you.  How would you get them?
5    A.  Text.  Text either one like the day
6  before, you know, where to go or what time to
7  come in.  And then once you get to the office
8  in the morning, then you'll figure out where
9  you're going and what you're doing.
10   Q.  Okay.
11        And when -- so would you come
12 into the office in the morning?
13   A.  Well, the shop or office.  You park
14 your car, you get out, go in the shop, kind of
15 talk to somebody and figure out what you're
16 doing for the day.
17   Q.  Okay.
18        And who would you talk to?
19   A.  Anyone that was there.  Any three, you
20 know.
21   Q.  Any of the three?
22   A.  Yeah.
23   Q.  Okay.
24        And the three being Anthony

151

1  Zarlengo, Michael Richert, or Anthony Brutti,
2  correct?
3    A.  Yes.  I mean, most of it came from
4  Tony Zarlengo.
5    Q.  Okay.
6         And then the second time you
7  were there, how would you get your job
8  assignments?
9    A.  If -- if they were bigger jobs, you
10 kind of knew at the beginning of the week, like
11 you're going to be here every day at 7:00.  But
12 kind of the same, whoever gave you -- told you
13 where to go, you're going.
14   Q.  Okay.
15        And that could be -- I take
16 it, that could be Tony Zarlengo?
17   A.  Could be.
18   Q.  And it could be Mike Richert?
19   A.  Could be.
20   Q.  Okay.
21        It could be Tony Brutti?
22   A.  Correct.
23   Q.  Okay.
24        So it was essentially the

152

1  same thing the second time you were there?
2    A.  Correct.
3    Q.  Okay.
4         But you weren't in the
5  office -- well, strike that.
6         Were you in -- did you go to
7  the location the same way the second time you
8  were there?
9    A.  Most of the time, I went directly to
10 the job.  If I had to get something, parts
11 or -- I can't remember if I took any work
12 vehicles to the job location the second time.
13 If we had to get any parts or a vehicle, we
14 would go to the shop first.
15   Q.  Okay.
16        So I just want to make sure,
17 again.
18        Basically, the same thing
19 both times?
20   MR. HUGHES:  Objection.  Leading.
21 Misstates his testimony.
22 BY MR. McJESSY:
23   Q.  Is that -- you can correct me if I'm
24 wrong.

38 (Pages 149 to 152)

153

1    Am I -- am I wrong?
2    A.  Give or take.  It was pretty much the
3  same.  You know, someone's going to tell you
4  where to go, or you talk to someone, and
5  they're going to tell you where to go.
6    Q.  Okay.
7         And the someone that you
8  talked to would be, again, one of those three
9  people?
10   A.  Yes.
11   Q.  All right.
12        And then how about -- did
13 Tony Brutti ever work on job sites with you?
14   A.  No.
15   Q.  Okay.
16        Did he ever bring materials
17 to the job sites, as far as you know?
18   A.  I can't -- I don't remember.
19   Q.  Okay.
20        How about Zachary Corrigan?
21   A.  That's me.
22   Q.  Oh, that's you.
23   A.  I don't --
24   Q.  I've got a checkmark next to your

154

1  name, but it's not blue.  I should have known.
2        Thomas -- Thomas Donnelly?
3    A.  He -- I worked with him the first
4  time.
5    Q.  Okay.
6         And how do you -- how do you
7  know him?  Did you work with him?  What did you
8  do?
9    A.  Same thing.  Service and some
10 installs.
11   Q.  Okay.
12        And did you work side by side
13 with him?
14   A.  Yes.
15   Q.  All right.
16        And do you know a Janie
17 Graham?
18   A.  Janie?  I don't think so, no.
19   Q.  Okay.
20        How about Dave -- David Green
21 was the next name that you told me about.
22   A.  Yes.
23   Q.  Did you call him Dave or David?
24   A.  Dave.

155

1    Q.  Dave.
2         How do you know Dave?  Like
3  did you work with him?
4    A.  I worked with him.
5    Q.  Okay.
6         The first time and second
7  time?
8    A.  Second time.  He was around in the
9  shop -- you know, the shop.  But I mostly
10 worked with him the second time.
11   Q.  Okay.
12        So the first time you worked
13 there, you would see him around the shop?
14   A.  Yes.
15   Q.  Okay.
16        So you knew him?
17   A.  Yes.
18   Q.  Okay.
19        Did you know him personally,
20 like would you hang out together outside of
21 work, or only knew him from work?
22   A.  Just from work.
23   Q.  Okay.
24        And would you see him like in

156

1  the lunchroom and in the office or pretty much
2  just around the shop the first time?
3    A.  I seen him in the -- I seen him in the
4  shop, and then I worked with him when I was on
5  the permit for the ironworkers.
6    Q.  Okay.
7         And then -- all right.  And
8  then how about the second time?
9    A.  Yes.  I worked with him the second
10 time.
11   Q.  Okay.
12        And what kind of work did he
13 do?
14   A.  Mostly, installs with me.
15   Q.  Okay.
16        Dylan Kelly?
17   A.  Yes.
18   Q.  Did you work with him the first time?
19   A.  The first time, yes.
20   Q.  Did you work with him the second time?
21   A.  No.
22   Q.  Okay.
23        And what kind of work did he
24 do?

39 (Pages 153 to 156)

157

1    A.  Service.
2    Q.  Okay.
3         Sir, and when you say
4    service, that could include, again, install
5    of -- strike that.
6         When you say "service," did
7    that also include installation of new doors and
8    openers as part of replacement of old --
9    A.  Yes.
10   Q.  Okay.
11        And that would be commercial
12   work, too, correct?
13   A.  Yes.
14   Q.  All right.
15        And James Kelly, he's the one
16   in the picture, correct?
17   A.  Yes.
18   Q.  All right.
19        Did you work with him the
20   first time?
21   A.  Yes.
22   Q.  All right.
23        And what kind of work did he
24   do?

158

1    A.  Service and installation of doors and
2    openers.
3    Q.  Okay.  All right.
4         And did you work with him the
5    second time?
6    A.  No.
7    Q.  Okay.
8         And then how about Nicolas
9    Kelly?
10   A.  Yes.
11   Q.  Okay.
12        Did you work with him the
13   first time?
14   A.  Yes.
15   Q.  All right.
16        And what kind of work did he
17   do?
18   A.  The same thing.  Installation and
19   service.
20   Q.  Okay.
21        And how about -- and that
22   included commercial work, too?
23   A.  Yes.
24   Q.  All right.

159

1         And how about the second
2    time?
3    A.  Yes.  He eventually made a transfer to
4    the union.
5    Q.  Okay.
6         And do you know what union
7    he's a member of?
8    A.  Carpenters.
9    Q.  Okay.
10        Do you know how he made the
11   transfer that the carpenters union?
12   A.  I do not.
13   Q.  Okay.
14        Now, when you worked with him
15   the second time, what kind of work did he do?
16   A.  Installs.
17   Q.  All right.
18        And those are commercial
19   installs in the logistics buildings we looked
20   at?
21   A.  Yes.
22   Q.  All right.
23        Did you ever discuss with him
24   how he came to transition from one company to

160

1    the other?
2    A.  No.
3    Q.  Okay.
4         Sean Leer.  What kind of --
5    did you work with him both the first time and
6    the second time?
7    A.  He might have been there at the end of
8    my first time.  I think he was there after I
9    left.
10   Q.  Okay.
11        Did you work with him the
12   second time you were there?
13   A.  No.
14   Q.  All right.
15        So you just knew him from --
16   A.  I knew him from Overdoors.  I worked
17   with him at Overdoors.
18   Q.  Oh, okay.
19        Are you friends with him
20   personally, like outside of work or --
21   A.  Yes.
22   Q.  Okay.
23        You hang out with him or --
24   A.  Yes.

40 (Pages 157 to 160)

161

1    Q. All right.
2         When was the last time you
3    saw him?
4    A. A couple weeks ago.
5    Q. Okay.
6         And discuss anything about
7    your work for Dock & Door or Midwest Dock?
8    A. No.
9    Q. Okay.
10   A. No.
11   Q. Talk to him about the Bears latest
12   decisions?
13        All right. And did you --
14   you think he started when you were leaving the
15   first time; is that right?
16   A. Yes.
17   Q. Okay.
18        Did -- was he union or
19   nonunion?
20   A. Nonunion.
21   Q. Okay.
22        So what kind of work did he
23   do, as far as you know?
24   A. Service, as far as I know.

162

1    Q. All right.
2         Did you work with him?
3    A. Unless it was right when I was -- I
4    think he was there right after, but I didn't --
5    I don't think I worked with him.
6    Q. Okay.
7         Do you know how he came to be
8    hired there?
9    A. No.
10   Q. Do you -- I can't remember if I asked
11   you this. Is he a union member?
12   A. No, he's not.
13   Q. He's not a union member. Okay.
14        Do you know which company he
15   was working for?
16   A. It would have been Midwest Dock
17   Solutions.
18   Q. All right.
19        And how about Daniel Lietz?
20   A. Yes.
21   Q. How do you know him?
22   A. I worked with him a little bit the
23   first time I was there.
24   Q. Okay.

163

1         And what kind of work did he
2    do?
3    A. I think, service.
4    Q. All right.
5         And when you say "service,"
6    again, would that mean installation, too, of
7    replacing doors?
8    A. It would have been, yes.
9    Q. Okay.
10        So he would have -- he would
11   install doors and openers as part of replacing
12   old ones?
13   A. Yeah. I think he just started, so he
14   was kind of just learning how to --
15   Q. Okay.
16   A. I didn't work with him too much.
17   Q. People were training him to do that
18   work?
19   A. Correct.
20   Q. How about John Mancha, number 41?
21   A. Yes.
22   Q. How do you know him?
23   A. I worked with him at Overdoors.
24   Q. Oh, all right.

164

1         Are you friends with him?
2    A. Not -- we don't hang out.
3    Q. Okay.
4         That's -- yeah, that's a fair
5    description.
6         All right. So did you work
7    with him the first time you were at Midwest
8    Dock?
9    A. Again, I -- I think he was there
10   briefly while I was there.
11   Q. Okay.
12        Toward the end, I take it?
13   A. Yeah. It would have been.
14   Q. All right.
15        And did you work with him the
16   second time you were there?
17   A. No. No.
18   Q. All right.
19        And what kind of -- did he do
20   service and installation of existing doors?
21   A. Yes.
22   Q. All right.
23        And John Murphy.
24   A. Yes.

41 (Pages 161 to 164)

165

1   Q.  How do you know him?
2   A.  I just worked with him at Midwest.
3   Q.  All right.
4           And what kind of work did he
5   do?
6   A.  He mostly did dock work.
7   Q.  Okay.
8   A.  Service.
9   Q.  All right.
10          For dock levelers?
11  A.  Yes.
12  Q.  Okay.
13          Not -- not the doors so much,
14  I take it?
15  A.  He did both, but -- he did both.
16  Q.  Okay.
17          Did he do service of existing
18  doors and installation of new doors to replace
19  old ones?
20  A.  Yes.
21  Q.  All right.
22          And then he also did dock
23  leveler work?
24  A.  Yes.

166

1   Q.  All right.
2           And that was -- did you work
3   with him the second time you were there?
4   A.  No.
5   Q.  All right.
6           And did you work side by side
7   with him on jobs?
8   A.  I have, yes.
9   Q.  Okay.
10          For the kind of work that you
11  described?
12  A.  Yes.
13  Q.  All right.
14          And then how about Michael
15  Richert?
16  A.  Yes.  I know him.
17  Q.  Okay.
18          And you knew him from the
19  first time you worked there, as you described
20  previously.
21          Is that fair?
22  A.  Yes.
23  Q.  And the second time you were there
24  also; is that correct?

167

1   A.  Yes.
2   Q.  All right.
3           And did he work on job sites?
4   A.  I was not on a job site with him.
5   Q.  Okay.
6           Do you know if he worked on
7   job sites?
8   A.  I believe, in the -- in the past, yes,
9   before I got there.
10  Q.  Okay.
11          Why do you think that?
12  A.  I just know he did.
13  Q.  Okay.
14          From conversations --
15  A.  Yeah.
16  Q.  -- with him and other people or --
17  A.  I'm sure there's pictures.  I don't
18  think in here, but, yeah.  I mean, I know,
19  before I got there, he was a worker and then --
20  but he was never on any job sites with me.
21  Q.  Okay.
22          Do you know whether he worked
23  on any job sites while you were there even if
24  you weren't working on the job sites with him?

168

1   A.  That I do not know.
2   Q.  Okay.
3           Other -- do you know -- you
4   described for me -- well, strike that.
5           He on occasion -- strike
6   that.
7           Other than the work that
8   you've already described for me that he did,
9   can you recall any other work that he did for
10  the -- as part of either company?
11  A.  No.  Like I say, I was never in the
12  field with him.
13  Q.  All right.
14  A.  I know he would show up -- he'll stop
15  at places, make sure, you know, everything --
16  everyone had everything they need or make sure
17  the job's going good.
18  Q.  Okay.
19          So he would show up on job
20  sites?
21  A.  Yeah.
22  Q.  Okay.
23          And just to make sure that
24  things are running properly?

42 (Pages 165 to 168)

169

```
1    A.  Correct.
2    Q.  Okay.
3            Would he bring out like
4   materials to a job site if you needed it,
5   like --
6    A.  I'm sure if we needed something he
7   would.
8    Q.  That would be the kind of thing he'd
9   do?
10   A.  Yes.
11   Q.  Okay.
12           And did he do that the first
13  time you were there?
14   A.  Most likely, yes.
15   Q.  Okay.
16           And the second time you were
17  there?
18   A.  Most likely, yes.
19   Q.  Okay.
20           Same kind of thing?
21   A.  Yes.
22   Q.  Okay.
23           Make sure the job's running
24  right, that kind of thing?
```

170

```
1    A.  Yes.
2    Q.  Okay.
3            And he did that when you were
4   doing the logistics buildings, too, correct?
5    A.  Correct.
6    Q.  Okay.
7            How about Andre Senter?
8    A.  That I do not -- I do not know him.
9    Q.  Oh, I'm sorry.  That's the one with
10  the checkmark.
11           John Sparr, you mentioned?
12   A.  Yes.
13   Q.  All right.
14           And how do you know him?
15   A.  I worked with him the first time.
16   Q.  Okay.
17           And doing the service and
18  installation -- I'm going to call it retrofit
19  installation.  How's that?  Is that okay?
20   A.  Yes.
21   Q.  Okay.
22           And can we agree that
23  retrofit installation means that it's taking
24  down existing equipment and putting in new
```

171

```
1   equipment?
2    A.  Yes.
3    Q.  Okay.
4            So did you do service and
5   retrofit installation with him?
6    A.  I've been on jobs with him.  He did
7   mostly replacing dock levelers, so he did a lot
8   of dock work.
9    Q.  Okay.
10   A.  I didn't do too much dock work.
11   Q.  All right.
12           Similar to John Murphy?
13   A.  Yes.
14   Q.  Okay.
15           I mean, you said he did dock
16  leveler installation?
17   A.  Yes.
18   Q.  Okay.
19           Dock leveler installation and
20  service, is that like a little bit different
21  kind of work than the installation of the
22  doors?
23   A.  It just has more welding, grinding,
24  cutting.  You would need torches.
```

172

```
1    Q.  Okay.
2            So a little -- slightly
3   different skills?
4    A.  Yes.
5    Q.  Okay.
6            Did you work with John Sparr
7   the second time you were there?
8    A.  No.
9    Q.  Okay.
10           And the first time you were
11  there, Michael Strazzabosco, did you work with
12  him the first time you were there?
13   A.  The first time, yes.
14   Q.  Okay.
15           How about the second time?
16   A.  The second time, no.
17   Q.  Okay.
18           Do you know, was he even
19  still there?
20   A.  I'm not sure.
21   Q.  Okay.
22           And what did you do with him
23  the first time you were there, or what was your
24  work with him like?
```

43 (Pages 169 to 172)

173

1    A.  He usually would get jobs where they
2  would need docks -- docks or door, and I would
3  most likely be doing the door while he's docks
4  or something.
5        Q.  Okay.
6             Was he a dock guy?
7    A.  Yes.
8        Q.  Principally, dock levelers?
9    A.  Yes.
10       Q.  Okay.
11            Did he -- did he do work on
12 doors -- I don't -- I mean, did he do
13 installation of the doors and openers, too, or
14 was he -- I mean, I know he might have done
15 some incidental work, so that's maybe not an
16 ideal question, but I'm just trying to get a
17 sense.
18            Was he like principally a
19 dock guy?
20   A.  Yes.
21       Q.  Okay.
22            He might do a little work on
23 doors, but that wasn't really his job?
24   A.  Correct.

174

1        Q.  Okay.
2             How about Ira Sugar?
3    A.  He did sales.
4        Q.  Okay.
5             And did you work with him at
6  all?
7    A.  If he sold a job, you would kind of
8  talk to him about material or what needs to be
9  done.
10       Q.  Okay.
11            So he would -- he would ask
12 you about that?
13   A.  Yes.
14       Q.  Okay.
15            Or would you ask him about
16 it?  I'm trying to understand the dynamics.
17   A.  If he sold a job and if we were sent
18 to that job, we might report to him or call him
19 and see exactly what needs to be done or what
20 exactly he sold them so we can install it.
21       Q.  I get it.  All right.
22            And did you work with him in
23 that capacity the first time you were there?
24   A.  Yes.

175

1        Q.  And did you work with him in that
2  capacity the second time you were there?
3    A.  I don't believe so.  I'm not a hundred
4  percent sure.
5        Q.  Okay.  You don't recall?
6    A.  I don't recall.
7        Q.  All right.
8             Did he do sales, do you know,
9  for both Midwest and for Dock & Door?
10   A.  I'm not sure.
11       Q.  Okay.
12            Did he have an office or a
13 desk in the -- in the office area?
14   A.  Yes, an office.
15       Q.  Okay.
16            He had an office?
17   A.  Yes.
18       Q.  All right.
19            Can you describe him for me?
20   A.  Maybe, six foot, 260-ish, glasses,
21 kind of a bigger guy.
22       Q.  Okay.
23            How old is he?
24   A.  I'd say, maybe, around -- around 50.

176

1        Q.  Was he there the -- he was there
2  the -- strike that.
3             Was he there the entire time
4  you were there the first time?
5    A.  Not the entire time.
6        Q.  Okay.
7             Did he start after you?
8    A.  Yes.
9        Q.  Okay.
10            Was he there when you left?
11   A.  Yes.
12       Q.  Was he there the second time?
13   A.  Yes.
14       Q.  Okay.
15            Was he still there when you
16 left the second time.
17   A.  Yes.
18       Q.  Okay.
19            Did he ever come to job
20 sites?
21   A.  I haven't seen him at job sites.
22       Q.  Okay.
23            And Jerry Valentino?
24   A.  Yes.

44 (Pages 173 to 176)

177

1    Q.  How do you know him?
2    A.  I worked with him the first time.
3    Q.  All right.
4            And what did he do?
5    A.  Again, service work on doors and
6    openers.
7    Q.  Okay.
8            And retrofit installations?
9    A.  Yes.
10   Q.  All right.
11           And are you personal friends
12   with him or strictly work related?
13   A.  We talk here and there, but mostly
14   work related.
15   Q.  All right.
16           When was the last time you
17   spoke with him?
18   A.  About a month ago.
19   Q.  All right.
20           About personal matters?
21   A.  Yeah.  Yes.
22   Q.  Anything about door installation or
23   the companies we've been talking about?
24   A.  No.

178

1    Q.  Okay.
2            How about Austin Wood?
3    A.  Yes.  I worked with him the first
4    time.
5    Q.  Okay.
6            And what kind of work did he
7    do?
8    A.  Service.  Again, on doors and docks.
9    Q.  Okay.
10           And retrofit installations?
11   A.  Yes.
12   Q.  All right.
13           And did you work on job sites
14   with him?
15   A.  Yes.
16   Q.  Are you personal friends with him?
17   A.  No.
18   Q.  All right.
19           And was he there the
20   second -- when you were there the second time?
21   A.  No, he was not.
22   Q.  Okay.
23           And Anthony Zarlengo?
24   A.  Yes.

179

1    Q.  You sort of described your
2    interactions with him.
3            Any other work that he did
4    that you're aware of?
5    A.  No.  He was usually in the office all
6    of the time.  He kind of just did all of the
7    office stuff and told you what was going on for
8    the -- for the day.
9    Q.  Okay.
10           And that was true when you
11   were there the first time?
12   A.  Yes.
13   Q.  And true when you were there the
14   second time?
15   A.  Yes.
16   Q.  All right.
17           And Collin Zarlengo?
18   A.  Collin, yes.
19   Q.  And did you work with him?
20   A.  Yes.  I'm going to say for sure the
21   second time.  He was in the carpenters.
22   Q.  All right.
23           How about the first time you
24   were there?

180

1    A.  I'm not a hundred percent sure.
2    Q.  Okay.
3            And what kind of work did
4    you -- did he do when you were with him?
5    A.  Door.  Door installation.
6    Q.  All right.
7            And that was in the logistics
8    buildings that we have talked about?
9    A.  Yes.
10   Q.  All right.
11           Were all of your checks
12   direct deposited?
13   A.  Yes.
14   Q.  And that was true regardless of which
15   company you were being paid from?
16   A.  Yes.
17   Q.  All right.
18           Did you ever receive payments
19   for anything other than hours worked?
20   A.  No.
21   Q.  Okay.
22           Did you ever receive tool
23   reimbursement?
24   A.  No.

45 (Pages 177 to 180)

181

1  Q. Did you ever receive any sort of
2  expense reimbursement?
3  A. No.
4  Q. Did you ever travel out of -- out of
5  town for any period of time where you did a
6  job, like overnight somewhere?
7  A. No.
8  Q. Okay.
9      Did you ever have a company
10  credit card?
11  A. No.
12  Q. Do you know, did anybody else have a
13  company credit card?
14  A. I do not know.
15  Q. Okay. Let's see.
16      Did you -- are you familiar
17  with the email extension like
18  @midwestdocksolutions.com?
19  A. No, I'm not.
20  Q. Okay.
21      Did you ever communicate, to
22  your knowledge, with anybody at that email
23  address?
24  A. No.

182

1  Q. Oh, just so that we -- since you
2  produced these to me, I want to make sure I
3  produce them to the other parties.
4      Can you mark this as
5  Exhibit -- I don't remember what we're up to.
6  MR. HUGHES: Twenty-four, it should
7  be.
8  MR. McJESSY: Twenty-four?
9  MR. HUGHES: Yeah.
10  MR. McJESSY: Could you mark this as
11  Exhibit 24.
12
13      (WHEREUPON, the document was
14       marked Plaintiff's
15       Exhibit 24 for identification,
16       as of 3/14/25.)
17
18  BY MR. McJESSY:
19  Q. I've handed you what's been marked as
20  Exhibit 24, although -- I think I might have
21  given it away. Can I have one of those back?
22  There we go. It's marked as Exhibit 24. This
23  is -- you forwarded these documents to me
24  during a break, correct?

183

1  A. Yes.
2  Q. All right.
3      And these were the -- the --
4  it looks like pay stubs that you had; is that
5  correct?
6  A. Correct.
7  Q. Okay.
8      And they're from Dock & Door
9  Install for the second time you were there in
10  2022, correct?
11  A. Yes.
12  Q. All right.
13      The first time you were there
14  and you were working for -- you were being paid
15  by Midwest Dock Solutions, how was your pay
16  set?
17  A. As far as how much?
18  Q. Yeah.
19  A. It was around -- I'm not sure --
20  maybe, $30, $31 an hour.
21  Q. Okay.
22      And who set the rate?
23  A. Tony Zarlengo.
24  Q. Okay.

184

1      And did you get a raise at
2  all while you were there?
3  A. Slightly, yes.
4  Q. All right.
5  A. I have.
6  Q. And did he make the decision to do
7  that?
8  A. I believe so.
9  Q. Okay.
10      And did you have any benefits
11  while you were there the first time, health
12  benefits, pension benefits, 401(k), anything
13  like that?
14  A. No.
15  Q. Okay.
16      Do you know, did any of the
17  persons who were being paid by Midwest Dock
18  Solutions have those kind of benefits?
19  A. As far as I know, no.
20  Q. Okay.
21      Was there ever any discussion
22  while you were working there the first time
23  about, you know, hey, these guys are union,
24  they get benefits, hey, we're nonunion, we

46 (Pages 181 to 184)

185

1  don't get any benefits?
2      A.  Between me and someone else?
3      Q.  Yeah, or among the workers that worked
4  there.
5      A.  Yeah.  Yeah.  I'm sure.
6      Q.  All right.
7          Well --
8      A.  I mean, yeah.
9      Q.  Do you recall specifically those
10  conversations?
11      A.  Not specifically.  But, I mean, we've
12  all talked about, you know, we want benefits so
13  we can retire one day, you know.
14      Q.  Ah-huh.
15      A.  So --
16      Q.  And so was there any discussion among
17  the parties about the relationship between
18  Midwest and Dock & Door?
19      A.  Yes.
20      Q.  And what was the nature of those
21  discussions?
22          MR. HUGHES:  Objection.  Foundation.
23          THE WITNESS:  You know, without --
24  people always talked like, you know, we need to

186

1  get in the union so you, you know, can start
2  making some good money with benefits and stuff.
3  That's -- that's pretty much as far as that
4  goes.
5  BY MR. McJESSY:
6      Q.  Okay.
7          That was like -- that was the
8  nature of the discussions?
9      A.  Yes.
10      Q.  Because if you were a member of the
11  union, then you'd get paid through Dock & Door,
12  correct?
13          MS. CAHILL:  Objection.  Leading.
14          MR. HUGHES:  Objection.  Leading.
15          THE WITNESS:  Yes.
16  BY MR. McJESSY:
17      Q.  Were you ever paid in cash?
18      A.  No.
19      Q.  Did you ever get vacation pay?
20      A.  No.
21      Q.  Your current address?
22      A.  Yes.  You want it?
23      Q.  Yeah.
24      A.  208 MacGregor, M-a-c-G-r-e-g-o-r,

187

1  Road, Lockport, Illinois, 60441.
2      Q.  All right.
3          And your -- what was the cell
4  phone number you used when you worked at --
5  when you worked at Midwest Dock?
6      A.  I believe --
7      Q.  The first -- the first time.
8      A.  Oh, I'm not sure.
9      Q.  Did you change it since then, do you
10  think?
11      A.  I think I may -- I think I may have,
12  yes.
13      Q.  Okay.
14          What's your cell phone number
15  now?
16      A.  It's (708) 677-5747.
17      Q.  And when -- and I take it, these days,
18  you don't have a home phone number, correct?
19      A.  Correct.
20      Q.  The only phone number you have is your
21  cell phone?
22      A.  Yes.
23      Q.  And that's probably been true for you
24  for most of your life?

188

1      A.  Yes.
2      Q.  Okay.
3          The --
4          MR. HUGHES:  You didn't have a
5  rotary?
6          THE WITNESS:  No rotary phone, no.
7          MR. McJESSY:  Off the record.
8
9          (There was a discussion off
10          the record.)
11
12          MR. McJESSY:  Back on the record.
13  BY MR. McJESSY:
14      Q.  Do you know how long you had that
15  phone number?
16      A.  This one?  Let's say four years, five
17  years.
18      Q.  All right.
19          You don't remember the one
20  you had before that?
21      A.  No.
22      Q.  All right.
23          And who's your current
24  carrier?

47 (Pages 185 to 188)

189

1    A.  It is Xfinity Mobile.
2    Q.  Okay.
3         And has it been that for the
4    last four years, since you got this new number?
5    A.  Yes.
6    Q.  Okay.
7         Would you have record of what
8    your old number was?
9    A.  I could try to find it, yes.
10   Q.  I'll ask if you -- you were going to
11   check, I think, for some emails that may have
12   been sent to you based on the text message
13   exchange we saw, so you were going to check
14   your Gmail account for text messages or for
15   emails, and you were going to check your phone
16   for other text messages that might have been
17   part of that group chat.  If you can find your
18   old phone number, if you can let me know that,
19   that would be great, too, and I'll pass that
20   information on.
21   A.  Okay.  I will.
22   Q.  Any present intention to move from
23   your current residence?
24   A.  No.

190

1    Q.  Okay.
2         I think I'm done with my
3    questions.  These folks may have some follow-up
4    questions.  And if they do, then I may have
5    some follow-ups to their follow-ups.  But,
6    otherwise, I appreciate your time.
7    A.  Awesome.  Thank you.
8    MR. HUGHES:  Okay.
9         Let's take a few minutes,
10   like ten minutes.
11   MR. McJESSY:  That's fine.
12   MR. HUGHES:  If that works.
13
14        (After a break from 11:46 a.m.
15        to 12:04 p.m., the deposition
16        was resumed as follows:)
17
18   MR. HUGHES:  Okay.
19        As I mentioned -- or we can
20   go on the record.
21
22
23
24

191

1              EXAMINATION
2    BY MR. HUGHES:
3
4    Q.  As I mentioned before, my name is Mike
5    Hughes.  I represent Midwest Dock Solutions.  I
6    want to ask you a few follow-up questions.
7    Okay?
8    A.  Okay.
9
10        (WHEREUPON, the document marked
11        Plaintiff's Exhibit 24 for
12        identification was tendered to
13        the deponent.)
14
15   BY MR. HUGHES:
16   Q.  All right.
17        You are -- we have some pay
18   stubs here that you had -- you had produced,
19   Exhibit 24.  And these are only for -- these
20   are only for what we'll call your second time,
21   correct?
22   A.  Yes.
23   Q.  And this is when you worked for Dock &
24   Door?

192

1    A.  Yes.
2    Q.  Okay.
3         These list, as the -- on the
4    top of the paycheck, Dock & Door Install, Inc.
5         Do you see that?
6    A.  Yes.
7    Q.  Do you -- do you recall, when you
8    worked for Midwest Dock Solutions during your
9    first time, did your pay stubs say something
10   different?
11   A.  I'm not sure.  I don't think I ever
12   needed to print those out.  So I think
13   everything was in an app, so --
14   Q.  Okay.
15        Are you aware that Midwest
16   Dock Solutions and Dock & Door Install are two
17   separate companies?
18   A.  Yes.
19   Q.  And when did you become aware of that?
20   A.  I've known.
21   Q.  Okay.
22        From the time that you
23   started working with Midwest Dock?
24   A.  Yes.

48  (Pages 189 to 192)

193

1    Q.  Okay.
2         Are you -- do you know if any
3    other employees are -- to your knowledge, do
4    other employees understand that as well?
5    A.  Yes.
6
7         (WHEREUPON, the document marked
8         Plaintiff's Exhibit 17 for
9         identification was tendered to
10        the deponent.)
11
12   BY MR. HUGHES:
13   Q.  In Exhibit 17, which is your text
14   messages with Tony Brutti --
15   A.  Yes.
16   Q.  -- there was a couple of -- there's an
17   instance there where you needed to -- you
18   needed to print -- you were looking for a pay
19   stub, correct?
20   A.  Yes.
21   Q.  And why did you go to Tony Brutti
22   about that?
23   A.  He would lead me to the direction
24   where I would need to go to acquire the pay

194

1    stubs.
2    Q.  And that was while you were working
3    with Dock & Door, correct?
4    A.  Yes.
5    Q.  Prior to that, when you were working
6    for Midwest Docks the first time, if you needed
7    something payroll related, who would you have
8    gone to?
9    A.  Most likely, Tony Zarlengo.
10   Q.  Okay.
11        And why is that?
12   A.  The first time I never really needed
13   to go through Tony Brutti for much unless he
14   was -- he was giving some direction for
15   something or if we needed to talk, because like
16   I said, they all kind of intermingled as to
17   what we were doing.
18   Q.  Do you recall -- and I think you
19   testified that during your first time working
20   there, when you were working for Midwest Dock,
21   Tony Brutti wasn't involved in giving you any
22   job direction, correct?
23   A.  For the most part, yes.
24   Q.  Okay.

195

1         Was there a time when he was
2    giving you direction when you worked for
3    Midwest Dock?
4    A.  No.  I mean, he was -- and, you know,
5    if you go to the -- if you go to the shop, he
6    was at the shop.  So, I mean, if it was a small
7    question you had, you would just ask him while
8    he was passing about it.
9    Q.  What type of question?
10   A.  Well, where parts are or something of
11   that nature.
12   Q.  Okay.
13        But as far as, you know,
14   where to go, what work to do, did Tony Brutti
15   give you any direction when you worked for
16   Midwest Dock?
17   A.  No, not much, if at all -- if any.
18   Q.  Okay.
19        You talked about this service
20   work that's done for Midwest Dock, correct?
21   A.  Yes.
22   Q.  And I believe you are -- you testified
23   that it includes retrofit installation of some
24   sort?

196

1    A.  Yes.
2    Q.  And that would be for removal of an
3    old door and installation of a new door?
4    A.  Yes.
5    Q.  And also included service work where,
6    let's say, a door or a dock or some other
7    component had been damaged --
8    A.  Yes.
9    Q.  -- or was old and needed updating?
10   A.  Correct.
11   Q.  Okay.
12        That type of work is
13   different than installation of doors and docks
14   and new construction, correct?
15   A.  Yes.  I mean, after you get the old --
16   after you get the old door or dock out, they're
17   installed the exact same.  But starting off --
18   as far as the new construction, you know --
19   obviously, you don't have to take anything
20   down.
21   Q.  And then you don't have to rebuild any
22   of the frame or structure or anything either,
23   correct?
24   A.  Correct.  On the new installs, you

49 (Pages 193 to 196)

197

1    would not.
2        Q.   So for the new installs, all of that
3    frame and structure to install the door into is
4    done by some other contractor, right?
5        A.   Yes.  Yes.  For the most part, yes.
6        Q.   Okay.
7             And for a retrofit, kind of
8    replace and install, does that work entail
9    rebuilding, perhaps, part of the frame, shoring
10   up any of the -- any of the framework or
11   anything that the door goes into?
12       A.   Yes.
13       Q.   And how much of the service work is --
14   is involved in that?
15       A.   You could possibly have to replace the
16   wood jams or cut stuff out of the ceilings to
17   make, you know, spring lines fit or -- so
18   there's retrofitting in the -- where you take
19   the old doors out and put new ones in.
20       Q.   Okay.
21             And so you testified about
22   torch work, correct?
23       A.   Yes.
24       Q.   And that was only for -- and so you

198

1    only did that work for Midwest Dock, correct?
2        A.   Yes.
3        Q.   Okay.
4             And what would you need the
5    torch for?
6        A.   Cutting out old docks.  Cutting off
7    old tracks off the walls.  That's about it.
8        Q.   Would any of that type of work have to
9    be done for Dock & Door?
10       A.   No.
11       Q.   Are the -- is the skill set needed to
12   do the service work or retro work any different
13   than the skills you need to do -- to do
14   installs at a logistics building for Dock &
15   Door?
16       A.   A little bit, yes.
17       Q.   Okay.
18             And what -- what difference
19   would there be?
20       A.   Knowing how to, I guess, use a torch,
21   grind a -- you know, cut stuff out of the way.
22   You might have to bring spring lines down or up
23   to get around obstacles.  That's about it.
24       Q.   So someone who had only worked for

199

1    Dock & Door and didn't have any prior -- like
2    you worked for Overdoors and another -- and a
3    door company elsewhere, correct?
4        A.   Yes.
5        Q.   And you did service work there?
6        A.   Yes.
7        Q.   Okay.
8             So someone who didn't have
9    that prior service work experience anywhere
10   else, if they got on-the-job training at Dock &
11   Door to do install at new construction logistic
12   buildings, would they be able to take that
13   skills and work for Midwest Dock and know how
14   to do everything day one?
15       A.   No.
16       Q.   And what -- what additional skills
17   would they need on that side?
18       A.   Well, when we put up the new
19   construction stuff, all of your cables,
20   everything is already made, so it's kind of
21   just you're a robot, putting the same thing up
22   all day.  But when you do the service work, you
23   might have to, you know, make different -- make
24   the cables on your own.  You've got to know how

200

1    to take the tension off -- you know, properly
2    take the tension off the door to, you know, fix
3    cables or replace the springs, so --
4        Q.   Is the -- you said work for Dock &
5    Door could be kind of like kind of a robot,
6    right?
7        A.   Yes.
8        Q.   You're doing a lot of the same thing
9    over and over again?
10       A.   Yes.
11       Q.   On the service side, even if it's a,
12   you know, replacement and installation, is
13   it -- would you say that every job is kind of
14   different and its own -- its own thing?
15       A.   Yes.
16       Q.   Okay.
17             Would you say the installs
18   done on -- for Midwest Dock are different,
19   then, in that regard from the installs for Dock
20   & Door?
21       A.   For the most part.  You, obviously,
22   need to take the -- you know, cut the old stuff
23   out.  As far as putting the new stuff in, as
24   long as you don't have any obstacles,

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

201

1    everything is the same, so --
2        Q.  Okay.
3            And that would be once you
4    shored up any of the frame or anything else
5    that needed to be done?
6        A.  Yes.
7        Q.  Okay.
8            You talked about Ira Sugar.
9            Do you know if you had any
10   interactions with -- I think you said he's in
11   sales?
12       A.  Yes.
13       Q.  Do you know if he -- what types of
14   jobs that he would sell or get?
15       A.  Not exactly.  I mean, he's had quite a
16   few sales that we have done doors for, but I'm
17   not sure on which side of the fence.
18       Q.  Okay.
19           Do you recall him being the
20   salesperson for your time at Dock & Door for
21   jobs there?
22       A.  I'm not sure on Dock & Door.
23       Q.  Okay.
24           What about for Midwest Dock?

202

1        A.  Yes.
2        Q.  Okay.
3            And do you -- what -- what
4    jobs, do you recall?
5        A.  They're numerous.  I can't say one job
6    exactly, which one.
7        Q.  Okay.
8            But those are service jobs?
9        A.  For Midwest Dock, they would have
10   been, yes.
11       Q.  Okay.  Okay.
12           There was some testimony
13   about shirts, correct?
14       A.  Yes.  Yes.
15       Q.  And the shirts all in the pictures are
16   high-visibility shirts, correct?
17       A.  Yes.
18       Q.  And those were required, to wear
19   high-visibility shirts?
20       A.  Yes.
21       Q.  All right.
22           Was it a requirement -- does
23   everybody who works for Midwest Dock wear
24   high-visibility shirts?

203

1        A.  No.
2        Q.  Okay.
3            Do guys who are working in
4    the field wear high-visibility shirts?
5        A.  Most of the time.
6        Q.  Okay.
7            And what about for Dock &
8    Door, the guys working in the field?  Are they
9    wearing high-visibility shirts?
10       A.  Most of the time, yes.
11       Q.  Okay.
12           Is there a requirement for
13   Midwest Dock that the high-visibility shirts be
14   company issued and have a Midwest Dock logo?
15       A.  No.
16       Q.  Is there a requirement for Dock & Door
17   that the high-visibility shirts worn in the
18   field bear a Midwest Dock logo?
19       A.  No.
20       Q.  Okay.
21           Do guys, in fact, wear any
22   number of kinds of high-visibility shirts?
23       A.  Yes.
24       Q.  Okay.

204

1            It doesn't have to be company
2    issued, correct?
3        A.  Correct.
4        Q.  Okay.
5            It doesn't have to be branded
6    in any kind of way?
7        A.  It does not.
8        Q.  Okay.
9            And that's true for both when
10   you worked at Midwest Dock and Dock & Door?
11       A.  Yes.
12       Q.  When you were -- at your first stint
13   working, when you were -- before you had got
14   your permit to work with the ironworkers and
15   you were working for Midwest Dock, did you ever
16   do any work for Dock & Door?
17       A.  I don't believe so.
18       Q.  When you got your permit through the
19   Ironworkers Local 63 and you -- is that when
20   you began working for Dock & Door?
21       A.  Yes.
22       Q.  And at that time, did you do any work
23   after that for Midwest Dock?
24       A.  I'm not a hundred percent sure.  I

51 (Pages 201 to 204)

205

1  don't believe so.
2  **Q.** And then when you came back and worked
3  **for Dock & Door, when you became a member of**
4  **the carpenters, did you do any -- any work**
5  **thereafter for Midwest Dock?**
6  A. No.
7  **Q.** Other than persons like yourself who
8  may have started with one company and moved to
9  another company, are you aware of anybody that
10 would work for both companies at the same time?
11 A. No.
12 **Q.** When you worked for Midwest Dock, did
13 you do any work at the logistics big box
14 install jobs?
15 A. I mean, I think I've gone there like
16 months after we were done to look over some
17 stuff.
18 **Q.** What I'm talking about -- I just want
19 to make sure I'm clear.
20       When you worked for Midwest
21 Dock during the first time, did you go -- are
22 you saying that you went to logistic big box
23 new construction install jobs and worked?
24 A. I believe so.

206

1  **Q.** And what did you do?
2  A. Maybe some small adjustments on doors.
3  **Q.** Okay.
4       So a repair to the -- to the
5  job needed to be done after the install had
6  been done?
7  A. Yes.
8  **Q.** Completed?
9  A. Yes.
10 **Q.** Okay. Okay.
11      But you didn't work at that
12 time -- when you worked for Midwest Dock, you
13 didn't -- you weren't assigned to work any
14 installation jobs at any of the logistics big
15 box locations, correct?
16 A. Correct.
17 **Q.** Okay.
18      The training or the
19 apprenticeship training that you've done
20 through the carpenters, does any of the welding
21 training you did there carry over into your
22 work for what you did for Midwest Dock?
23      MR. McJESSY: Objection.
24 Foundation.

207

1       THE WITNESS: No.
2  BY MR. HUGHES:
3  **Q.** Did you, in your -- in your
4  apprenticeship training with the carpenters,
5  did you learn any torch work?
6  A. Yes.
7  **Q.** You did? Okay.
8       And do you use any of that
9  torch work in your work for Dock & Door?
10 A. No.
11 **Q.** Does the apprenticeship -- does the
12 carpenters apprenticeship program deal at all
13 with installation or repair of overhead doors?
14 A. No.
15 **Q.** Does it deal at all with installation
16 or repair of docks or docks levelers?
17 A. No.
18 **Q.** Mr. McJessy asked you questions about
19 the relationship between Midwest Dock and Dock
20 & Door.
21      Do you recall that?
22 A. Yes.
23 **Q.** Is it your understanding that Dock &
24 Door is a subcontractor of Midwest Dock?

208

1  A. No.
2  **Q.** No?
3       Do you -- do you -- are you
4  privy to any of the relationship of how -- what
5  the -- either legal relationship is between the
6  companies?
7  A. No.
8  **Q.** Is it -- are you involved in any of
9  the invoicing or subcontracting done by either
10 company?
11 A. No.
12 **Q.** Were you ever during the time, working
13 for either company?
14 A. No.
15
16       (WHEREUPON, the document marked
17       Plaintiff's Exhibit 18 for
18       identification was tendered to
19       the deponent.)
20
21 BY MR. HUGHES:
22 **Q.** Okay.
23      You were asked some questions
24 about Exhibit -- I think it's 18. If you can

52 (Pages 205 to 208)

209

1  flip to that.  And these are what appear to be
2  handwritten --
3      A.  Oh, okay.
4      Q.  -- somebody's handwritten records of
5  your time when you worked -- your time when you
6  work for Dock & Door, correct?
7      A.  Yes.
8      Q.  Okay.
9          And you didn't write these,
10  right?
11      A.  I did not.
12      Q.  You've never seen these before today?
13      A.  No.
14      Q.  And you didn't make any of the
15  notations there, did you?
16      A.  No.
17      Q.  Okay.
18          And Mr. McJessy asked you
19  about a couple of times where the notation,
20  "service work," appeared in your time sheets,
21  correct?
22      A.  Yes.
23
24

210

1          (WHEREUPON, the document marked
2          Plaintiff's Exhibit 17 for
3          identification was tendered to
4          the deponent.)
5
6  BY MR. HUGHES:
7      Q.  And, again, in reference to Exhibit
8  17, the cross-reference there, you don't have
9  any reference in Exhibit 17 of having performed
10  service work, do you?
11      A.  Correct.  I do not.
12      Q.  Well, if you -- with respect to
13  Exhibit 17 -- and these are the text messages
14  between you and Tony Brutti -- there's a series
15  of text messages towards the end where you're
16  informing Tony Brutti about a leave of absence
17  for a class and then for another millwright
18  activity, correct?
19      A.  Yes.
20      Q.  And then -- let me go to the page --
21  sixteen.
22          So on ZC 016, this part of
23  the conversation starts, correct?
24      A.  Yes.

211

1      Q.  Okay.
2          And you informed Tony Brutti
3  of your need to go to class, and then you
4  needed a temporary layoff for four weeks for a
5  millwright job, correct?
6      A.  Yes.
7      Q.  Okay.
8          You didn't -- you didn't ask
9  him at that point to inform Tony Zarlengo in
10  your -- in your text message, did you?
11      A.  I did not, no.
12      Q.  Okay.
13          He said, okay, I'll let Tony
14  know, correct?
15      A.  Yes.
16      Q.  Okay.
17          And on April 26, if you go to
18  ZC 017, towards the end of the -- towards the
19  end of the bottom third of the page, or bottom
20  half of the page, you ask Tony Brutti if you
21  talked to Tony about his four-week temp
22  layoff -- or about your four-week temp layoff
23  at school, correct?
24      A.  Yes.

212

1      Q.  Okay.
2          And he said, yes, I told him
3  as soon as you told me, right?
4      A.  Yes.
5      Q.  Okay.
6          Did he -- is there anywhere
7  in here where he's indicating to you that Tony
8  Zarlengo had approved any leave of any kind?
9      A.  No.
10      Q.  Okay.
11          And you didn't ask Tony
12  Brutti to have Tony Zarlengo approve any such
13  leave, correct?
14      A.  Correct.  I did not.
15      Q.  Okay.
16          And you don't -- there's
17  nothing in these text messages that indicates
18  that any such approval was sought or given,
19  correct?
20      A.  Correct.
21      Q.  After that, did you take that leave
22  of -- that four-week leave?
23      A.  Yeah.  I didn't go back.  The job ran
24  longer than it should have.

213

1  Q. Okay.
2      Did you ever go back to
3  Dock & Door after that leave?
4  A. No.
5  Q. Okay.
6      And so the -- the series of
7  texts at the end of the page of ZC 019 -- or at
8  the bottom half of that page of June 26, 2022,
9  this is after you had stopped working for Dock
10 & Door, correct?
11 A. Yes.
12 Q. Okay.
13     And that last -- the last
14 entry in the exhibit in blue -- so that's from
15 you, correct?
16 A. Yes.
17 Q. Where it says we haven't had big
18 install jobs in months, do you -- do you know
19 who "we" is?
20 A. I do not.
21 Q. But that's not Midwest Dock or Dock &
22 Door, correct?
23 A. Correct. It is not.
24

214

1      (WHEREUPON, the document marked
2      Plaintiff's Exhibit 23 for
3      identification was tendered to
4      the deponent.)
5
6  BY MR. HUGHES:
7  Q. Okay. There's an Exhibit 23.
8      Do you recall this Exhibit
9  23?
10 A. Yes.
11 Q. And I believe you identified that
12 individual as James Kelly?
13 A. Yes.
14 Q. Okay.
15     And did he -- was he an
16 employee of Midwest Dock?
17 A. Yes.
18 Q. Okay.
19     Was he an employee of Dock &
20 Door, to your knowledge?
21 A. Not to my knowledge, no.
22 Q. You testified about benefits offered
23 through Midwest Dock, correct?
24 A. Yes.

215

1  Q. Are you aware that Midwest Dock
2  offered health care insurance?
3  A. I don't think so, no.
4  Q. You're not aware, or you're --
5  A. I'm not aware.
6  Q. Okay. All right.
7      Is your position that they
8  didn't or that you're not aware of whether or
9  not they did?
10 A. I'm not aware of whether or not they
11 did.
12 Q. Okay.
13     Do you know if -- are you
14 aware if Midwest Dock offered a 401(k) plan?
15 A. No. I'm not aware.
16 Q. Okay.
17     Are you aware if they offered
18 a dental plan?
19 A. No.
20 Q. Okay.
21     Did you ever enroll in any
22 health benefit -- health, dental, or other
23 benefit plans when you worked for Midwest Dock?
24 A. I don't remember. I don't think so.

216

1  Q. To your understanding -- well, strike
2  that.
3  A. There might have been a COBRA thing,
4  but I can't -- I can't remember if I was
5  enrolled in that. I don't remember.
6  Q. Do you recall ever seeing some sort of
7  a COBRA notice from Midwest Dock?
8  A. I'm not sure.
9  Q. Okay.
10     What -- what prompted you to
11 say COBRA?
12 A. I remember something possibly about
13 some health insurance thing, but I'm not a
14 hundred percent sure.
15 Q. Okay.
16     When you were working for
17 Midwest Dock, if you needed time off, who would
18 you talk to?
19 A. Tony.
20 Q. Tony?
21 A. Tony Zarlengo.
22 Q. If you needed parts or brackets or
23 things like that when you worked for Midwest
24 Dock, who would you talk to?

54 (Pages 213 to 216)

217

1    A.  Tony -- Tony Zarlengo or Mike.
2        MR. HUGHES:  That's all I have.
3        MR. McJESSY:  I have a couple of --
4   oh, do you have anything?
5        MS. CAHILL:  I don't have any
6   questions.
7        MR. McJESSY:  I have a couple of
8   follow-up questions.
9
10       FURTHER EXAMINATION
11       BY MR. McJESSY:
12
13
14   Q.  How do you know if a project you're
15  working on is Dock & Door or Midwest Dock
16  Solutions during either of your times with
17  either company?
18   A.  I never really knew or never asked.
19   Q.  Okay.
20       So you didn't know?
21   A.  Correct.
22   Q.  Okay.
23       And you liked Mr. Zarlengo,
24  right?

218

1    A.  Yes.
2    Q.  You think highly of him.
3        Is that fair?
4    A.  Yes.
5    Q.  Okay.
6        And you don't want to -- is
7   it fair to say you don't want your testimony
8   today to cause him problems?
9    A.  Correct.
10   Q.  Okay.
11       But you understand you're
12  under oath and you have to tell the truth,
13  correct?
14   A.  Yes.
15   Q.  Okay.
16       And you're not here
17  voluntarily, correct?
18   A.  No.
19   Q.  You were compelled here by a subpoena,
20  correct?
21   A.  I was, yes.
22   Q.  Okay.
23       Mr. Moore asked you -- or Mr.
24  Hughes asked you a question about service work

219

1   for work on logistics buildings, and you said
2   you did some service work on those buildings,
3   correct?
4    A.  Yes.
5    Q.  Okay.
6        And that was service work to
7   fix or repair something that had been done, as
8   you understand it, by Dock & Door, correct?
9    A.  Yes.
10   Q.  Okay.
11       And is it fair to say, then,
12  that -- that the Midwest service work, Midwest
13  would do service work for doors installed by
14  Dock & Door?
15   A.  Yes.
16   Q.  Okay.
17       At the same locations?
18   A.  Yes.
19   Q.  Using the same trucks?
20   A.  Yes.
21   Q.  All right.
22       Do you have any photos of any
23  job sites you worked on?
24   A.  Not from that time, no.

220

1    Q.  No?  Okay.
2        MR. McJESSY:  Those are the only
3   questions I had.  Are we done?
4        MR. HUGHES:  Just real quick.
5        MR. McJESSY:  Oh.
6
7
8        FURTHER EXAMINATION
9        BY MR. HUGHES:
10
11   Q.  When you worked for Midwest Dock doing
12  service work, you worked on doors that were
13  installed by other companies, correct?
14   A.  When I worked at Midwest?
15   Q.  Correct.
16   A.  Yes.
17   Q.  Not just -- not just doors that had
18  been installed by Dock & Door, correct?
19   A.  Correct.
20   Q.  What percentage of your service work
21  done for Midwest Dock was repairing or fixing a
22  job that had been installed, to your knowledge,
23  by Dock & Door?
24   A.  I'd say, maybe, 80 percent not Dock --

55 (Pages 217 to 220)

221

1    not Dock & Door.
2        Q.  Okay.
3            How would you know if a -- if
4    a job that you were going to do repair work at
5    when you worked at Midwest Dock was -- was an
6    install job done by Dock & Door?
7        A.  We all kind of knew where the install
8    was at.  And if we go back there, we have
9    stickers on doors.
10       Q.  Okay.  Okay.
11           And -- but, at least, 80
12   percent of the work that you did for Midwest
13   Dock was for repairing, replacing doors that
14   were not installed by Dock & Door?
15       A.  Correct.
16       Q.  Okay.  Okay.
17
18
19           FURTHER EXAMINATION
20           BY MR. McJESSY:
21
22       Q.  To ask it the other way, 20 percent
23   was service work for doors installed by Dock &
24   Door, correct?

222

1        A.  Yeah, give or take.  Just a ballpark,
2    yeah.
3        MR. McJESSY:  Okay.  All right.
4            Are we done?
5        MR. HUGHES:  I am.
6        MR. McJESSY:  Okay.
7        MS. CAHILL:  Yes.
8        MR. McJESSY:  I'm going to just
9    reserve the right to -- I don't think this is
10   going to happen -- but reserve the right to ask
11   you to either come back here or over Zoom if we
12   have some questions about additional documents
13   that get produced after today.  I don't think
14   that's going to happen, but I just want to
15   technically for the record reserve that right
16   to do so.
17       THE WITNESS:  Okay.
18       MR. McJESSY:  Hopefully, if you
19   produce some additional records and we have
20   questions, we can do this by Zoom or something
21   like that so you don't have to come back.
22       THE WITNESS:  Okay.
23       MR. McJESSY:  Because it would, I'm
24   sure, be very few questions, but -- and also,

223

1    just to put it on the record, you agree to look
2    for the group text messages and for the other
3    email -- for the email communications you may
4    have.  So I'll follow-up with you one on that.
5    If you can provide that information to me, I'll
6    make sure it gets to the other attorneys as
7    well.
8        THE WITNESS:  Okay.
9        MR. McJESSY:  Because I subpoenaed
10   you, I get the privilege of telling you that
11   I'm going to order a copy of the transcript,
12   which means that it would get typed up into a
13   final form.  You have the right to reserve
14   signature on the transcript or -- or you can
15   waive signature on the transcript.  And what
16   that means is, you get -- if you reserve
17   signature, you can read the transcript and note
18   any errors that you believe occurred in
19   transcription.  So if I asked you what color
20   was the light and you said the light was red
21   and the transcript says green, you can note
22   that and say, hey, I said that the light was
23   red not green.  Okay?
24       THE WITNESS:  Okay.

224

1        MR. McJESSY:  And make those
2    corrections.
3            If the transcript accurately
4    reflects your -- your testimony, you can't
5    change it.  So if I said what color was the
6    light, you said the light was red, she wrote
7    the light was red, you can't go back and say,
8    well, I meant to say the light was green.
9    Okay?  Do you understand the difference?
10           If you want to reserve the
11   right to do that, the court reporter needs to
12   know that you're reserving your right.  You can
13   also waive that right, in which case the court
14   reporter will just prepare the transcript and
15   give it to us, and you'll just assume that she
16   got it right.  I don't care which you do, but
17   the court reporter needs to know from you
18   whether you're reserving that right or whether
19   you waive that right.
20       THE WITNESS:  I'll waive it.
21       MR. McJESSY:  Okay.
22           And off the record.
23
24           FURTHER DEPONENT SAITH NOT.

56 (Pages 221 to 224)

225

```
 1   STATE OF ILLINOIS   )
 2                       ) SS:
 3   COUNTY OF C O O K   )
 4
 5        I, DIANE M. NULICK, a Notary Public
 6   within and for the County of Cook, State of
 7   Illinois, and a Certified Shorthand Reporter of
 8   said state, do hereby certify:
 9        That previous to the commencement of the
10   examination of the witness, the witness was
11   duly sworn to testify the whole truth
12   concerning the matters herein;
13        That the foregoing deposition transcript
14   was reported stenographically by me, was
15   thereafter reduced to typewriting under my
16   personal direction and constitutes a true
17   record of the testimony given and the
18   proceedings had;
19        That the said deposition was taken
20   before me at the time and place specified;
21        That the said deposition was adjourned
22   as stated herein;
23        That I am not a relative or employee or
24   attorney or counsel, nor a relative or employee
```

226

```
 1   of such attorney or counsel for any of the
 2   parties hereto, nor interested directly or
 3   indirectly in the outcome of this action.
 4        IN WITNESS WHEREOF, I do hereunto set
 5   my hand and affix my seal of office at Chicago,
 6   Illinois, this 21st day of March, 2025.
 7
 8
 9
10
11
12        Notary Public, Cook County, Illinois.
13
14   C.S.R. Certificate No. 084-002029.
15
16
17
18
19
20
21
22
23
24
```

57 (Pages 225 to 226)

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 8

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MID-AMERICA CARPENTERS       )
REGIONAL COUNCIL PENSION      )
FUND, et al.,                 )
                              )
            Plaintiffs,       )   No. 1:24-cv-02428
                              )
        vs.                   )  Judge Andrea R. Wood
                              )
DOCK & DOOR INSTALL,          )    Magistrate Judge
INC., an Illinois             )  Jeannice W. Appenteng
corporation and MIDWEST       )
DOCK SOLUTIONS, INC., an      )
Illinois corporation,         )
                              )
            Defendants.       )

        The deposition of DONALD ALAN
CRUIKSHANK, called by the Defendant for
examination, taken pursuant to the Federal
Rules of Civil Procedure of the United States
District Courts pertaining to the taking of
depositions, taken before DIANE M. NULICK, a
Notary Public within and for the County of
Cook, State of Illinois, and a Certified
Shorthand Reporter of said State, at Suite 231,
3759 North Ravenswood, Chicago, Illinois, on
the 14th day of March, A.D. 2025, at 12:58 p.m.

**Page 2**

PRESENT:
    McJESSY, CHING & THOMPSON, LLC,
    BY:  MR. KEVIN P. McJESSY,
    mcjessy@MCandT.com,
    (3759 North Ravenswood, Suite 231,
     Chicago, Illinois  60613,
    (773) 880-1260),

        appeared on behalf of the plaintiffs;

    ALLOCCO MILLER & CAHILL, P.C.,
    BY:  MS. KATHLEEN M. CAHILL,
    kmc@alloccomiller.com,
    (20 North Wacker Drive, Suite 3517,
     Chicago, Illinois 60606,
    (312) 675-4325),
        appeared on behalf of the defendant,
        Dock & Door Install, Inc.;

    AMUNDSEN DAVIS LLC,
    BY:  MR. MICHAEL F. HUGHES,
    mhughes@amundsendavislaw.com,
    (3815 East Main Street, Suite A-1,
     St. Charles, Illinois  60174,
    (630) 587-7925/(630) 217-1228 (direct),
        appeared on behalf of the defendant,
        Midwest Dock Solutions, Inc.

Also Present:
    Mr. Anthony Zarlengo,

**Page 3**

                I N D E X

WITNESS:  DONALD ALAN CRUIKSHANK

EXAMINATION BY:                      PAGE
    Mr. McJessy                         4
    Mr. Hughes                        124


PLAINTIFF'S EXHIBITS:

    No. 25                             11
    No. 19                             24
    No. 5                              43
    No. 15                             44
    No. 4                              56
    No. 26                             66
    No. 3                              76
    No. 26                             78
    No. 4                              97
    No. 20                            117
    No. 21                            117
    No. 23                            118
    No. 5                             119
    No. 6                             120
    No. 7                             121
    No. 8                             121
    No. 15                            122

**Page 4**

(The witness was duly sworn.)




        DONALD ALAN CRUIKSHANK,
called as a witness herein, having been first
duly sworn, was examined and testified as
follows:


            EXAMINATION
        BY MR. McJESSY:

    Q.  All right.
            Sir, can you state your name
for the record -- first, middle, and last --
and spell each, if you would?
    A.  Donald Alan Cruikshank.
    Q.  And if you could spell each of your
names?
    A.  D-o-n-a-l-d, A-l-a-n,
C-r-u-i-k-s-h-a-n-k.
    Q.  Excellent.
            And, sir, I asked you before

1 (Pages 1 to 4)

5

1    we started if you have -- you've never been
2    deposed before; is that correct?
3       A. No.
4       Q. Okay.
5           A couple of ground rules and,
6    maybe, some information to help the afternoon
7    go a little faster.
8           I'm going to ask you a series
9    of questions. And, hopefully, you'll give me
10   the best, truthful answers that you can.
11          You understand you're under
12   oath?
13      A. Yes.
14      Q. Okay.
15          And even though this is an
16   informal setting, you understand that oath is
17   the same as if you were in a court?
18      A. Yes.
19      Q. Okay.
20          I'm going to ask you a series
21   of questions and ground rules to make life
22   easier for the court reporter. It will help if
23   you don't start answering a question until
24   after I've finished asking it even if you know

6

1    what I'm going to ask.
2       A. Okay.
3       Q. I will try to return the courtesy and
4    not talk over your answer by asking a new
5    question until you're done. We'll try our
6    best.
7           All of your responses need to
8    be yeses and nos or verbal responses. The
9    court reporter can't take down nods or shakes
10   of the head --
11      A. Yeah. Right.
12      Q. -- or ah-huh, uh-uh, that kind of
13   thing. So I may prompt you, if you nod or if
14   you say ah-huh, I may say is that a yes, is
15   that a no, just so the record's clear.
16         Also, if I ask a question and
17   you don't understand it because I fumbled the
18   question or for any reason, just ask me to
19   explain it, and I'll be happy to do so.
20         Is that fair?
21      A. Ah-huh.
22      Q. Is that a yes?
23      A. Yes. It won't happen again.
24      Q. It's good practice.

7

1      MR. HUGHES: I'll take that bet.
2    BY MR. McJESSY:
3      Q. And is it fair, then, that if you
4    answer a question, I can assume you understood
5    my question.
6         Is that fair?
7      A. Yes.
8      Q. Okay.
9          Any reason you can't give
10   truthful answers here today? So, for example,
11   are you on any medications or suffering any --
12   from any conditions that would prevent you from
13   understanding my questions or giving truthful
14   answers?
15      A. No.
16      Q. Excellent. All right.
17         Oh, last thing. If you need
18   to take a break as we go -- this will probably
19   go a couple hours, maybe a little more. It
20   might -- just based on the depositions we've
21   already taken in this case, it could go a
22   little over two hours. Usually, we take a
23   break at about the hour mark, so the court
24   reporter can rest her hands for a few

8

1    minutes --
2       A. Okay.
3       Q. -- and we can all take a break. If
4    you need to take a break, though, at any other
5    time, just say so, and we can take a break.
6    All right?
7      A. Ah-huh.
8      Q. Sir, you used to work for Midwest Dock
9    Solutions and Dock & Door Install, correct?
10      A. Yes.
11      Q. Okay.
12         And we'll get into the -- the
13   details of that as we go.
14         But you know Tony Brutti,
15   Tony Zarlengo, and Mike Richert?
16      A. Yes.
17      Q. Okay.
18         When was the last time that
19   you spoke with any of them?
20      A. Two years ago.
21      Q. Okay.
22         And so you haven't spoken to
23   them about this matter, your subpoena here
24   today?

2 (Pages 5 to 8)

9

1    A.  No.
2    Q.  Okay.
3         Who have you spoken to about
4    the subpoena that you received other than me?
5    A.  Nobody.
6    Q.  Okay.
7         And upon getting the
8    subpoena, you did at some point call me,
9    correct?
10   A.  Yes.
11   Q.  Okay.
12        And we spoke for about how
13   long?
14   A.  Thirty -- thirty, forty minutes.
15   Q.  Okay.
16        What did we talk about, as
17   best you recall?
18   A.  The basic steps that it takes to
19   install.
20   Q.  Install doors?
21   A.  Garage doors.
22   Q.  Okay.
23        At -- at large logistical
24   type buildings, correct?

10

1    A.  Commercial buildings.
2    Q.  Okay.
3         And you told me all about
4    that process, correct?
5    A.  Yes.
6    Q.  Okay.
7         And we talked about some
8    personal matters, correct?
9    A.  Yes.
10   Q.  You had a brother who had shops in
11   town or something, right?
12   A.  Yes.
13   Q.  Okay.
14        Anything else that you can
15   recall we talked about?
16   A.  No, not really.
17   Q.  Okay.
18        Did we talk -- I can't
19   remember.
20        You -- you have not produced
21   any documents to us, correct?
22   A.  No.
23   Q.  Okay.
24        You said you didn't have any;

11

1    is that right?
2    A.  No.  No, I didn't.
3    Q.  Okay.  I couldn't remember.
4         Let's take a look at Exhibit
5    25.
6
7         (WHEREUPON, the document was
8          marked Plaintiff's
9          Exhibit 25 for identification,
10         as of 3/14/25.)
11
12   BY MR. McJESSY:
13   Q.  This -- you are not here today
14   voluntarily, correct?
15   A.  No.
16   Q.  You were subpoenaed to be here,
17   correct?
18   A.  Yes.
19   Q.  Okay.
20        And this is the subpoena that
21   you received, correct?
22   A.  Yes.
23   Q.  All right.
24        And it asks -- on pages three

12

1    and four, there's a series of requests for
2    documents under the heading that says,
3    documents that you must produce, correct?
4    A.  Yes.
5    Q.  All right.
6         And among those requests
7    are -- are communications you had with anybody
8    at Dock & Door and Midwest Dock, time records,
9    pay stubs, that kind of thing.
10        Is that fair?
11   A.  Yes.
12   Q.  All right.
13        And you don't have -- well,
14   you told me, I think, just now that you don't
15   have any documents responsive to these
16   requests?
17   A.  No.
18   Q.  Is that correct?
19   A.  That's correct.
20   Q.  Okay.
21        You never filled out a job
22   application or anything for either company that
23   you would still have?
24   A.  No.

3 (Pages 9 to 12)

13

1    Q.  Okay.
2         And we'll get into the
3    details on that but all right, very good.
4         Let's see.  And if I
5    understood you correctly, you haven't discussed
6    the subpoena that you received with anybody
7    except me; is that right?
8    A.  That's correct.
9    Q.  Okay.
10        And then you aren't being
11   represented here today by a lawyer at this
12   deposition, are you?
13   A.  No.
14   Q.  All right.
15        You're just here on your own,
16   fair?
17   A.  Yes.
18   Q.  All right.
19        Let's see.  Just moving right
20   along.
21        Sir, how old are you?
22   A.  Sixty.
23   Q.  Sixty.
24        And when did you go -- I'm

14

1    going to jump right in.
2         When did you go to work for
3    Midwest Dock Solutions or Dock & Door?
4    A.  In what -- what year?
5    Q.  Yeah.  When did you start?
6    MR. HUGHES:  Objection.  That's
7    compound.
8    MR. McJESSY:  That's fine.
9    THE WITNESS:  Let's see.  Probably
10   like '97.  Something like that.
11   BY MR. McJESSY:
12   Q.  Okay.
13        Quite early on?
14   A.  Yeah.
15   Q.  Okay.
16   A.  I think -- is that right?
17   MR. ZARLENGO:  No, it's not.
18   MR. McJESSY:  Off the record.
19
20        (There was a discussion off
21         the record.)
22
23   MR. McJESSY:  Let's go back on the
24   record.

15

1    BY MR. McJESSY:
2    Q.  There was -- just for the record,
3    there was a --
4    A.  I think I started about two years
5    after you guys started -- opened the company,
6    so, yeah.
7    Q.  Okay.
8    A.  '09, '10.
9    Q.  Go ahead.
10   A.  '09 or '10.  Something like this.
11   Q.  Okay.
12        Off the record, there was a
13   colloquy, and Mr. Zarlengo offered that the
14   company had only been around since 2006.  So
15   does that help refresh your memory?
16   A.  Yes.  Yes.  Yes.
17   Q.  And so you started a couple years
18   after that, maybe around 2009?
19        I should have cautioned you
20   that a little bit of today's activity is going
21   to be a memory test.  If you -- if I ask you a
22   question and you -- you remember or you're
23   estimating, just say that on the record so it's
24   clear.  I know it's difficult because some of

16

1    these things happened a long time ago.  Believe
2    me.  So, you know, you can tell me this is what
3    I recall, this is, you know, what I believe or
4    I don't know or whatever -- whatever the truth
5    shall be.
6         So approximately sometime,
7    you said, in 2009.  And how did you come to get
8    your job?
9    A.  One of the salesmen that worked there
10   at the time I -- I knew.
11   Q.  Who -- excuse me while I choke.
12        Who was that?
13   A.  Joe Sheridan.
14   MS. CAHILL:  I'm sorry.  I didn't
15   hear that?
16   BY MR. McJESSY:
17   Q.  Joe -- what was the last name?
18   A.  Sheridan.
19   Q.  Oh, okay.  Joseph Sheridan.  All
20   right.
21        And how did you know him?
22   A.  Well, I knew his brother.  I knew his
23   brother, and he had -- I got introduced to him
24   from his brother.

4 (Pages 13 to 16)

17

1  Q. Okay.
2      And what were you doing
3  before you went to work -- what company did you
4  go to work for at that time?
5  A. Well, that was Midwest Dock.
6  Q. Okay.
7      Midwest Dock Solutions?
8  A. Yes.
9  Q. If we refer to it as Midwest Dock,
10  you'll understand that's the company we're
11  talking about?
12  A. Yes.
13  Q. Okay.
14      And who were you working with
15  prior to that?
16  A. For myself.
17  Q. Okay.
18      And what were you doing?
19  A. Installing garage doors.
20  Q. Oh, okay.
21  A. Residential.
22  Q. You had your own company?
23  A. Yeah.
24  Q. And you were doing residential door

18

1  installs?
2  A. Ah-huh. I was a subcontractor for
3  Sears.
4  Q. Oh, excellent.
5  A. At the time.
6  Q. And were you installing doors and door
7  openers?
8  A. Ah-huh. Yes.
9  Q. Okay.
10      And -- good catch. And would
11  that be on -- were you doing retrofit work,
12  like installing new -- replacing existing doors
13  with new doors?
14  A. Yes. Yes.
15  Q. Did you do new door installation,
16  also?
17  A. Occasionally.
18  Q. Okay.
19      And installing openers and
20  things like that?
21  A. Yes.
22  Q. And how long were you in that
23  business?
24  A. Well, I started, you know, like

19

1  probably 20 years ago with a friend that was --
2  was a residential installer.
3  Q. Ah-huh.
4  A. And he just started taking me on jobs,
5  and I learned from him. And then I started my
6  own business.
7  Q. Got it.
8      So you've been doing this a
9  long -- you were doing that work a long time?
10  A. Yeah. A very long time.
11  Q. Okay.
12      And how -- and you said you
13  knew -- you knew Joe Sheridan's brother,
14  S-h-e-r-i-d-a-n. And he -- he introduced you,
15  presumably, to Joe.
16      And how did that result in
17  your getting a job with Midwest Dock?
18  A. Well, I suppose the way it happened is
19  this company wasn't super savvy about sectional
20  doors when I first started, and the Sheridan
21  lad had picked up a job for IDOT or whatever
22  does the salt distribution. I can't remember
23  the name of that. I should know it.
24      But, anyway, they were big

20

1  sectional doors. And he needed somebody that
2  knew what they were doing, and he told me to
3  call him.
4  Q. Okay.
5      To call?
6  A. Tony Zarlengo.
7  Q. Oh, okay. You pointed. Okay.
8      So literally you mean Mr.
9  Zarlengo who's here?
10  A. Yes. There he is.
11  Q. All right.
12      And so did you reach out to
13  Mr. Zarlengo?
14  A. Yes.
15  Q. Okay.
16      And tell me what happened as
17  a result of that, like --
18  A. Hired me on the spot.
19  Q. Oh.
20      And did you meet with him in
21  person?
22  A. Yes.
23  Q. Excellent.
24      And was this door

5 (Pages 17 to 20)

21

1    installation commercial door installation?
2       A.  Yes.
3       Q.  And had you done commercial door
4    installation?
5       A.  Yes.
6       Q.  Okay.
7            You did that as part of your
8    own business?
9       A.  Well, actually, I had worked for a
10   commercial company for a short period of time
11   called Hobbs.
12      Q.  Okay.
13           Was that prior to your having
14   your own business?
15      A.  Yes.
16      Q.  Okay.
17      A.  Yes.
18      Q.  So you had some experience doing that?
19      A.  Yeah, a little bit.
20      Q.  Okay.
21           And Mr. Zarlengo hired you to
22   do the work for these -- were they actually at
23   the places where they store the salt?
24      A.  Yes.

22

1       Q.  Okay.
2            So these are sectional doors
3    that would open, and the trucks would go in and
4    load up the salt?
5       A.  No.  No.  It's where they store the
6    vehicles, in garages.
7       Q.  Oh, I see.  Okay.
8       A.  The actual salt doesn't even have a
9    door.
10      Q.  I got it.  Okay.
11           So this is where the trucks,
12   the salt trucks are kept?
13      A.  The snowplows and their trucks.
14      Q.  Okay.
15           And for who?  Any particular
16   municipality?
17      A.  IDOT.
18      Q.  Oh, for the State of Illinois?
19      A.  For the State of Illinois.
20      Q.  Got it.  All right.
21           So he had -- and is that the
22   first project you worked on?
23      A.  Yes.
24      Q.  Okay.

23

1            And that was approximately in
2    2009?
3       A.  Yes.
4       Q.  Okay.
5            And just describe for me, in
6    general terms, what that work involved?
7       A.  Taking down the old door and replacing
8    it.
9       Q.  Okay.
10           Would you replace the tracks?
11      A.  Yes.
12      Q.  Okay.
13           So you'd have to take the
14   tracks out, too?
15      A.  Everything gets replaced.
16      Q.  Okay.
17           Just take everything out and
18   put in new?
19      A.  Yes.
20      Q.  Okay.
21           And including openers?
22      A.  Yes.
23      Q.  Okay.
24           And how big are these doors?

24

1       A.  Twenty by eighteen.
2       Q.  Okay.
3            You're familiar with
4    commercial doors and logistics buildings?
5       A.  Yes.
6       Q.  Okay.
7            We're going to get into that,
8    but is -- are the doors similar to those?
9       A.  Now, I'm -- you're kind of losing me a
10   little.
11           Now, logistics buildings,
12   like what exactly is that?
13      Q.  Yeah, let me -- let me show you -- I'm
14   going to show you what we've previously marked
15   as Exhibit 19.
16
17           (WHEREUPON, the document marked
18            Plaintiff's Exhibit 19 for
19            identification was tendered to
20            the deponent.)
21
22   BY MR. McJESSY:
23      Q.  All right.
24           And I'm showing you a picture

25

1     that's on --
2         A.   Those are -- yeah.  They're just dock
3     doors.
4         Q.   Yeah, dock doors.
5              Are you familiar with
6     buildings like --
7         A.   Yeah.  Absolutely.
8         Q.   -- the ones that are shown in that
9     exhibit?
10        A.   Yes.
11        Q.   Okay.
12             And if I -- I was referring
13    to that as a logistics building.
14             What would you refer to it
15    as?
16        A.   A commercial building, you know.
17        Q.   So you're familiar with dock doors on
18    commercial buildings like the ones shown in
19    Exhibit 19?
20        A.   Yes.
21        Q.   Okay.
22             And how would the doors that
23    you just described for me that you were
24    installing for IDOT compare to those?

26

1         A.   Much bigger.
2         Q.   Oh, much bigger than those?
3         A.   Yeah.  Those are only nine by ten.
4         Q.   Okay.
5              And the doors for IDOT were
6     substantially larger?
7         A.   Yeah.  They're huge.
8         Q.   Okay.  All right.
9              And is it fair to say that
10    all of your training to do door installation
11    was on-the-job training?
12        A.   Yes.
13        Q.   Did you have any formal like training
14    through any sort of program?
15        A.   No.
16        Q.   Okay.
17        A.   There isn't one.
18        Q.   All right.
19             And were you ever a union
20    member prior to --
21        A.   No.
22        Q.   -- 2009?
23        A.   No.
24        Q.   Okay.

27

1         A.   Well, you know, I wasn't a union
2     member in 2009.
3         Q.   No, I know.  But, I mean, prior to
4     that.
5         A.   Okay.  No, no.
6         Q.   Any time prior to that.  We'll get
7     into when you did join the union, but I just
8     wanted to know if you were ever a union member
9     prior to that.
10        A.   No.
11        Q.   Okay.  All right.
12             And tell me about your job
13    with Midwest.  Did it change over time?
14        A.   No.
15        Q.   No?
16             Who did you -- who did you
17    report to?  Do you have a boss?
18        A.   Tony Zarlengo.
19        Q.   Okay.
20             And do you know Mike Richert?
21        A.   Yes.
22        Q.   Was he your boss?
23        A.   Yes.
24        Q.   Okay.

28

1              And do you know Anthony
2     Brutti?
3         A.   Yes.
4         Q.   If I -- does he go by Tony?
5         A.   Yeah.
6         Q.   Okay.
7              I'm going to refer to -- I'm
8     going to try to remember to say last names if
9     I refer to Tonys because I understand Tony
10    Zarlengo and Tony Brutti both go by Tony,
11    right?
12        A.   Yes.
13        Q.   Okay.
14             So if you refer to one of
15    them, try to please use the last name --
16        A.   Okay.
17        Q.   If you can remember.
18             Was Tony Brutti your boss?
19        A.   No.
20        Q.   Okay.
21             At any time?
22        A.   No.
23        Q.   Okay.
24             And so you started out with

7 (Pages 25 to 28)

29

1  Midwest doing the installation of these very
2  large doors for the -- where the snow plows and
3  stuff are kept.
4         Is that the kind of work you
5  kept doing for them, or did it change?
6     A.  Service, you know, in -- you know,
7  when you weren't installing a door, you were
8  going and fixing doors.
9     Q.  Okay.
10    A.  Servicing them.
11    Q.  All right.
12        And tell me what kind of work
13  would you do -- what's that entail?
14    A.  A lot -- you know, a lot of times
15  doors, they break in the open position, and
16  they'll be hanging out of the tracks on one
17  side and it's super dangerous, and you've got
18  to get it down.
19    Q.  Okay.
20        And so, I take it, you'd
21  repair broken doors, broken springs?
22    A.  Yep.  Yes.
23    Q.  Defective openers?
24    A.  Yes.

30

1     Q.  Replace tracks?
2     A.  Yes.
3     Q.  Remove entire doors and put on new?
4     A.  Yes.
5     Q.  Would you -- would you refer to that
6  as service work, or would you refer to that as
7  something else?
8     A.  It's service, you know.  I mean,
9  you're installing, and service is kind of the
10  same thing.  You're doing the same job, you
11  know.
12    Q.  Okay.  Right.
13        The same kind of work is
14  involved?
15    A.  Yes.
16    Q.  Except for new door installation, you
17  don't have take down the old?
18    A.  A lot of times, you do take down the
19  old --
20    Q.  Oh.
21    A.  -- you know.  When I was in the union,
22  it was all new construction.
23    Q.  Okay.
24    A.  But Midwest Dock does takedown and

31

1  replace in a lot of old buildings, you know.
2     Q.  Okay.
3         And for when you were in the
4  union and being paid through Dock & Door --
5  that's the other company, right?
6     A.  Yes.
7     Q.  Okay.
8         If I refer -- it's Dock &
9  Door Installs.
10        Do you know that?
11    A.  Yes.
12    Q.  Okay.
13        If I refer to it as Dock &
14  Door, though, you'll understand that's the
15  company I mean?
16    A.  Yes.
17    Q.  Yeah.
18        The Dock & Door didn't do any
19  door replacement, correct?
20    A.  No.
21    Q.  Okay.
22        That was all new construction
23  buildings?
24    A.  Yeah.  For -- for the most part, yes.

32

1     Q.  Okay.
2         And is the installation of a
3  new garage door, tracks, opener, for -- for a
4  new construction building essentially the same
5  work as the installation of a new door, tracks,
6  and opener in an old building once you've taken
7  out the old door?
8     A.  Yes.
9     Q.  Okay.
10        Basically, you're using the
11  same skills?
12    A.  Yes.
13    Q.  All right.
14    A.  Same tools.  Same skill.
15    Q.  Okay.
16        Did you do any dock leveler
17  work?
18    A.  Not much.
19    Q.  Okay.
20        At any time, did you do dock
21  leveler --
22    A.  A little bit of service, but never
23  really is installed.
24    Q.  And what -- it doesn't sound -- if you

8 (Pages 29 to 32)

33

1 had to give a percentage of time that you spent
2 doing dock leveler work, what would it be, one
3 percent, two percent, less than that?
4     A. Less than that, really.
5     Q. Okay.
6         And so you were principally
7 doing doors?
8     A. I was the sectional door guy, for the
9 most part.
10     Q. Okay. All right.
11         And when you first -- how
12 long -- you went from working -- being hired by
13 Midwest -- Midwest --
14     A. Yes.
15     Q. -- Dock. And then you worked there.
16 And then, eventually, you transitioned to the
17 union and were, then, working for Dock & Door,
18 correct?
19     A. Yes.
20     Q. And then eventually you left, correct?
21     A. Eventually, I left?
22     Q. Yeah.
23     A. No. I wore out my shoulder.
24     Q. Okay.

34

1     A. And I'm still due for another
2 operation.
3     Q. Okay.
4         But, I mean, you're no longer
5 working there?
6     A. No.
7     Q. Actively?
8     A. No.
9     Q. Okay.
10         When did you leave?
11     A. Oh, boy. A little over two years ago,
12 now.
13     Q. Two years ago?
14     A. I'm not exactly sure of the date, you
15 know. It's not something I --
16     Q. Yeah. So approximately -- this is
17 2025, so maybe 2023?
18     A. Yes. Yes.
19     Q. Okay.
20         So from the time you -- what
21 I'm trying to do is just set up the time period
22 I'm going to ask you about.
23         So you worked there from
24 pretty much 2009 to 2023, either Midwest or

35

1 then Dock & -- Dock & Door straight through,
2 correct?
3     A. Yes.
4     Q. Okay.
5         And -- and you didn't go back
6 and forth between the companies -- between
7 those companies?
8     A. No.
9     Q. Okay.
10         You just switched, at some
11 point, and went from Midwest to Dock & Door,
12 correct?
13     A. Yes.
14     Q. Okay.
15         And during that -- during
16 those -- almost 14 years; is that right?
17     A. Yes.
18     Q. Okay.
19         During that 14 years, was --
20 was Mr. Zarlengo, Tony Zarlengo, your boss?
21     A. Yes.
22     Q. Okay.
23         And Mike Richert was your
24 boss during those 14 years?

36

1     A. Yes.
2     Q. And Tony Brutti, was he your boss at
3 any point during those 14 years?
4     A. No. No.
5     Q. Okay.
6         And when you first started
7 there, how would you get your job assignments,
8 like how would you know where to go on a
9 day-to-day basis?
10     A. Probably text or phone calls.
11     Q. Somebody would call you and tell you
12 where to go or --
13     A. Texting most of the time, but, yes,
14 phone.
15     Q. Okay.
16         And who would send you those
17 texts, or who would make those calls?
18     A. Tony Zarlengo.
19     Q. Okay.
20         And was that true pretty much
21 for the full 14 years?
22     A. Yes.
23     Q. All right.
24         And sometimes -- and I've got

9 (Pages 33 to 36)

37

1   your time records here.  I was just seeing --
2   it looks like sometimes you're working on jobs
3   for several days in a row?
4       A.  Yes.
5       Q.  Okay.
6               And if a job is a multiday
7   job, I take it, you didn't get necessarily a
8   call every day?
9       A.  No.
10      Q.  Okay.
11              Sometimes you just know where
12  you're going because you were there the day
13  before, and you know you're not done?
14      A.  Yes.
15      Q.  Okay.
16              After you started working
17  there and you're doing -- you're doing the work
18  that you did for IDOT when you -- when you
19  first started out, were those -- was that new
20  installation, or was that -- was that a
21  replacement?
22      A.  Replacing.
23      Q.  Replacing.  Okay.  I think you told me
24  that.  I'm sorry.  I forgot.

38

1               Did you do any new
2   installation for Midwest when you were
3   working --
4       A.  Yes.
5       Q.  -- getting paid through them?
6       A.  Yes.
7       Q.  Okay.
8               And what kind of projects
9   would that be on?
10      A.  Commercial buildings, you know.  I
11  mean -- or actually, sometimes firehouses, you
12  know.  I mean, it was -- sometimes -- we did a
13  police station one time.  You know, commercial
14  buildings.
15      Q.  Okay.
16              New -- new construction?
17      A.  Yeah.
18      Q.  All right.
19              And you were there before
20  Dock & Door was formed, correct?  I mean,
21  you --
22      A.  Yes.
23      Q.  Okay.
24              And you're aware eventually

39

1   Dock & Door came into existence, correct?
2       A.  Yes.
3       Q.  Did you have an understanding of why
4   it came into existence?
5       A.  No, not really.
6       Q.  Okay.
7       A.  I wasn't part of -- it wasn't anything
8   I had anything to do with.
9       Q.  All right.
10              Nobody discussed that with
11  you, or it wasn't a general topic --
12      A.  No.
13      Q.  -- of discussion?
14      A.  No.
15      Q.  And what was your understanding of
16  what Dock & Door was?
17      A.  Well, I knew what they did.  They
18  installed new construction all of the time.
19      Q.  Okay.
20              And did they -- when you say
21  "it," how do you know what projects were Dock &
22  Door and what projects were Midwest Dock?
23      A.  Well, I don't understand the question,
24  really.

40

1       Q.  Okay.
2       A.  I mean, when I was Dock & Door, it was
3   union commercial work, you know.
4       Q.  Okay.
5               So that --
6       A.  And Midwest Dock was service.
7       Q.  Okay.
8       A.  So --
9       Q.  Well, you said Midwest Dock also did
10  installation of new doors, correct?
11      A.  Yes.
12      Q.  And new construction; is that right?
13      A.  Yes.
14      Q.  Okay.
15              And -- and I understand you
16  were paid through Midwest, and then you were
17  eventually paid through Dock & Door, correct?
18      A.  Yes.
19      Q.  Okay.
20              And Dock & Door was -- if you
21  were being paid through there, it was only --
22  you had to be union, right?
23      A.  Yes.
24      Q.  Okay.

10 (Pages 37 to 40)

41

1     And then you were paid union
2  scale and would get union benefits, correct?
3     A.  Yes.
4     Q.  Okay.
5         And I guess what I'm trying
6  to figure out is, say you're working on a
7  project while you're being paid by Dock & Door.
8  How do you know it's a Dock & Door project and
9  not a Midwest project?  Is it just because
10 that's the company that's paying you at that
11 time?
12        Maybe my question still isn't
13 good.  Let me try again.
14        Once you started being paid
15 by Dock & Door and you went out to a project,
16 how do you know it's a Dock & Door project and
17 not a project that Midwest Dock Solutions sold
18 and contracted for?
19    A.  I wouldn't have a way of knowing that.
20    Q.  Okay.
21    A.  It's -- I mean, it's just -- I mean,
22 when you were working for Dock & Door, you were
23 going to companies that -- like Krusinski
24 and -- you know, if it was a big Krusinski job,

42

1  you knew it was a union job.  There was no --
2  no debating that.
3     Q.  It required union labor to be on the
4  job?
5     A.  Yes.
6     Q.  Okay.
7         So if it required --
8  basically, if it required union labor, then it
9  had to be a Dock & Door job?
10    A.  Yes.
11    Q.  Okay.
12        MS. CAHILL:  Objection.  I mean,
13 it's leading and also -- yeah.
14        MR. HUGHES:  And I just want to,
15 just for the record -- because it wasn't in
16 your instructions --
17        MR. McJESSY:  Oh, yeah.
18        MR. HUGHES:  -- we may object to the
19 way he asks the question from time to time.  So
20 give us time to do that, and then you can
21 answer after those objections.
22 BY MR. McJESSY:
23    Q.  Yeah.  And you can answer after they
24 make their objections.

43

1     A.  Okay.
2     Q.  I forgot about that instruction.
3     A.  Yep.
4
5         (WHEREUPON, the document marked
6         Plaintiff's Exhibit 5 for
7         identification was tendered to
8         the deponent.)
9
10 BY MR. McJESSY:
11    Q.  Let me show you what we've marked
12 previously as Plaintiff's Exhibit 5, and that's
13 a picture of a Midwest Dock truck.
14        Do you recognize that?
15    A.  Yes.
16    Q.  And that was a truck -- I don't know
17 if it was that particular truck, but you would,
18 I take it, use trucks like that when you worked
19 for -- when you were being paid by Midwest
20 Dock, correct?
21    A.  Yes.
22    Q.  Okay.
23        And you would use those same
24 trucks when you were being paid by Dock & Door

44

1  on the job, correct?
2     A.  Yeah.  Yes.
3     Q.  And all -- there weren't any trucks
4  that said Dock & Door Install on them, correct?
5     A.  No.
6     Q.  Okay.
7         There were only trucks that
8  said Midwest Dock Solutions, correct?
9     A.  Yes.  Yes.
10    Q.  Okay.
11        And then there were also, I
12 think, a couple of vans that might have been
13 cargo vans that were just plain; is that right?
14    A.  Yes.
15
16        (WHEREUPON, the document marked
17        Plaintiff's Exhibit 15 for
18        identification was tendered to
19        the deponent.)
20
21 BY MR. McJESSY:
22    Q.  All right.  Let's see.  Yeah.
23        Showing you what's been
24 previously been marked as Exhibit 15 -- and

11 (Pages 41 to 44)

45

1    that's -- do you recognize the person in that
2    picture?
3        A.   Yeah, yeah, yeah.  Yes.
4        Q.   Who is that?
5        A.   Jimmy.
6        Q.   Okay.
7             Jim Kelly?
8        A.   Jim Kelly, yeah.
9        Q.   Yeah.
10            And you see he's outside of a
11   white van there?
12       A.   Yes.
13       Q.   Did the company have a couple of white
14   vans like that, also?
15       A.   Yes.
16       Q.   Did those have names on them?
17       A.   No.
18       Q.   Okay.
19            Would those trucks be used
20   in -- for Midwest -- Midwest Dock --
21       A.   Yes.
22       Q.   -- projects?
23       A.   Yes.
24       Q.   All right.

46

1             Would they also be used on
2    Dock & Door projects?
3        A.   Yes.
4        Q.   All right.
5             And --
6        A.   Well, I mean, not the same van.  I
7    mean, I used to drive one of those, and it
8    was -- I used it probably just for the union.
9        Q.   Okay.
10            Sometimes you used it just
11   for union work?
12       A.   Yeah.
13       Q.   Okay.
14       A.   Yes.
15       Q.   And would other people drive the same
16   van you did, like at different times, if you
17   weren't using it?
18       A.   Yes.
19       Q.   Okay.
20            And --
21       A.   Very rarely, but, yes.
22       Q.   Okay.
23            That was -- I take it -- did
24   you take it home?

47

1        A.   Yes.
2        Q.   All right.
3             So you had a work van that
4    you typically used in your work?
5        A.   Yes.
6        Q.   All right.
7             And did -- was that also true
8    when you were working through Midwest Dock?
9    Did you have a vehicle that you used?
10       A.   Yes.
11       Q.   All right.
12            And would you take it home?
13       A.   Yes.
14       Q.   And was it a van also?
15       A.   At the time, when I was in service, I
16   had a utility truck.
17       Q.   Okay.
18            Was that more like the other
19   exhibit we looked at?
20       A.   That was a flatbed.  Mine had
21   toolboxes all the way around.
22       Q.   Okay.
23            A similar kind of truck?
24       A.   Yes.

48

1        Q.   All right.
2             And -- all right.
3             And what kind of things would
4    you carry around in the van?
5        A.   Tools and supplies.  Parts.
6        Q.   Okay.
7             And where would you get the
8    tools and the supplies and the parts?
9        A.   They were my tools.  The supplies came
10   from Midwest Dock.  I mean, from the shop.
11       Q.   Okay.
12            And --
13       A.   Or we picked them up from supply
14   houses.
15       Q.   Okay.
16            Either place?
17       A.   Yes.
18       Q.   All right.
19            And my understanding --
20   you've been there long enough.  I'm going to
21   ask you about -- I understand that there
22   were -- well, strike that.
23            Where was -- when you first
24   started there, was -- where was Midwest

12 (Pages 45 to 48)

49

1   located?
2       A.  On -- on Burr --
3       Q.  Burville Road?
4       A.  Burville, yes.
5       Q.  Hold on.
6           1249 East Burville Road?
7       A.  That sound right.
8       Q.  Suite 9 in Crete?
9       A.  Yes.
10      Q.  And was there a warehouse there?
11      A.  Yes.
12      Q.  Okay.
13      A.  Small.
14      Q.  A small warehouse.
15          And what would be kept there,
16  supplies for jobs?
17      A.  Yes.  There was a limited amount of
18  room, so, you know, basically the vehicles.
19      Q.  Okay.  And the vehicles.
20          Were they kept inside, or was
21  that outside?
22      A.  Some of them were kept -- some of them
23  were kept inside.
24      Q.  Okay.

50

1       A.  The ones that didn't get taken home by
2   employees.
3       Q.  All right.
4           And what kind of vehicles?
5       A.  Ford F-450 Super Duties, most of them.
6       Q.  Was that like the --
7       A.  Yes.
8       Q.  Similar to the exhibit we looked like?
9       A.  That's exactly what that was.
10      Q.  Okay.
11          And then did the company
12  move, at some point, from there?
13      A.  Yes.
14      Q.  And where did it move to?
15      A.  Crete.
16      Q.  Okay.
17          Well, I've got two other
18  locations.
19          3211 Holeman Avenue, South
20  Chicago Heights?
21      A.  Yes.  Yeah, okay.  That was the first
22  one.
23      Q.  Oh, that was the first location?
24      A.  Well, no.  I mean, after they moved

51

1   from Burville.
2       Q.  Oh, I see.
3       A.  The first move since I was there.
4       Q.  They went to Holeman Avenue?
5       A.  Yes.
6       Q.  Okay.
7           And what was that facility
8   like?
9       A.  It was -- it was a small -- a small
10  warehouse --
11      Q.  Okay.
12      A.  -- with an office.
13      Q.  And did they close the Burville Road
14  location and move to the Holeman Avenue?
15      A.  Yes.
16      Q.  Okay.
17          So everything that was at the
18  one location went to the other?
19      A.  Yes.
20      Q.  All right.
21      A.  They needed more room.
22      Q.  All right.
23          And then did they move from
24  there to the 27 East 36th Place, Steger,

52

1   Illinois?
2       A.  Yes.
3       Q.  Okay.
4           And is that where they were
5   when you left?
6       A.  Yes.
7       Q.  So were those the three locations they
8   went to?  It was Burville, Holeman, 36th Place?
9       A.  Yes.
10      Q.  Okay.
11          And do you know, when they
12  were -- when the company was at 3211 Holeman,
13  did Dock & Door exist at that time, or was it
14  just Midwest Dock Solutions?
15      A.  It was Midwest Dock Solutions at that
16  time.
17      Q.  Okay.
18          And how about at the 1249
19  East Burville Road?
20      A.  That was also just Midwest Dock
21  Solutions.
22      Q.  Okay.
23          And then how about 27 East
24  36th Place?

13 (Pages 49 to 52)

53

1    A.   That's the Steger address?
2    Q.   Yeah.
3    A.   That's when the union had started, in
4  that building.
5    Q.   Okay.  Okay.
6         And both companies operated
7  effectively out of that building?
8    A.   Well, wait a minute, now.  You know
9  what?  I think I might be wrong about that.
10   Q.   Okay.  Please.
11   A.   The union actually started at that
12 Burville address, the first one.
13   Q.   Okay.
14   A.   Yeah.  Yeah, it did.
15   Q.   The union company --
16   A.   But I wasn't in it.
17   Q.   Okay.
18   A.   Not yet.
19   Q.   But the company was started at that
20 time?
21   A.   Yeah.
22   Q.   Okay.
23        Was there a sign -- was there
24 any sort of sign at the Burville Road location

54

1  that said like, you know, Midwest Dock
2  Solutions or -- that had the company name on
3  the door or out front?
4    A.   On the door, there was, yeah.
5    Q.   There was on the door?
6    A.   Yeah.
7    Q.   Did it -- what was the sign that was
8  on the door?
9    A.   Midwest Dock.
10   Q.   Okay.
11        Did it, at any point, say
12 Dock & Door?
13   A.   No.
14   Q.   Okay.
15        Dock & Door Install?
16   A.   No.
17   Q.   No.
18        And how about at 27 East 36th
19 Place in Steger?  Did that have a name on the
20 door?
21   A.   Yes.
22   Q.   And what was the name on the door
23 there?
24   A.   Midwest Dock.

55

1    Q.   Okay.
2         And did it say Dock & Door on
3  the --
4    A.   No.
5    Q.   Okay.  All right.
6         And let's see.  So if you --
7  if you were picking up supplies, you would --
8  these are the locations you would have gone to,
9  correct?
10   A.   Yes.
11   Q.   Okay.
12        Can you describe for me the
13 office space and the warehouse space at Steger?
14   A.   I really don't understand what you're
15 looking for.
16   Q.   Just describe for me the general
17 layout.  How big was the warehouse?  What was
18 kept there?  How big were the offices?  Who had
19 offices there?
20   A.   They were small offices, you know.  A
21 little smaller than this room here.
22   Q.   Okay.
23        And who had offices there?
24   A.   Tony Zarlengo and Tony Brutti and two

56

1  salesmen.
2    Q.   Okay.
3         Who were the salesmen?
4    A.   Steve -- I can't remember his last
5  name right now for some reason.
6    Q.   All right.
7         And do you remember the other
8  one?
9    A.   Ira.
10   Q.   Okay.
11        Ira Sugar?
12   A.   Yeah.  Ira Sugar.
13
14        (WHEREUPON, the document marked
15        Plaintiff's Exhibit 4 for
16        identification was tendered to
17        the deponent.)
18
19 BY MR. McJESSY:
20   Q.   All right.
21        I'm going to show you what's
22 been marked as Exhibit 4, which is just a list
23 of alphabetical names.  And I'll represent to
24 you that Collin Zarlengo is missing from the

14  (Pages 53 to 56)

57

1   end of the list, but if you can take a look at
2   that list of names.
3          You said the first
4   salesperson's name was Steve?
5     A.  I can't believe I can't remember his
6   name.
7     Q.  Well, it's a -- it's a lot to
8   remember.  Let's see if there's a --
9     A.  I forgot.  Can you just tell me?
10     Q.  No.  I'm sorry.  People can't help you
11   out.  That's all right if you don't remember,
12   but you remember there was a salesperson named
13   Steve?
14     A.  Yeah.
15     Q.  Was that early on?
16     A.  Yes.
17     Q.  Okay.
18     A.  He was -- he came from -- he was
19   trying to be an installer, and it didn't
20   exactly work out well for him.
21     Q.  Okay.
22          And do you remember when he
23   left?
24     A.  Well, he didn't -- he went into sales.

58

1     Q.  Oh, okay.
2          He was still there when you
3   left?
4     A.  Yes.
5     Q.  Okay.
6          And then Ira was the other
7   person in sales, correct?
8     A.  Yes.
9     Q.  Okay.
10          And do you know, does Ira
11   work for Midwest Dock Solutions?
12     A.  Yeah, no.  He was a salesman for Dock
13   & Door.
14     Q.  He's a salesman for Dock & Door?
15     A.  Yes.
16     Q.  Okay.
17          That's your understanding?
18     A.  Yes.
19     Q.  Okay.
20          And so does he do sales for
21   these new construction buildings?
22     A.  Yes.
23     Q.  Okay.
24          And how do you know that?

59

1   Like what's -- what's your basis for that, from
2   talking to him or talking to other people or
3   being on job sites and talking to him?
4     A.  He would show up occasionally on a job
5   site, but not very often.  But he was our
6   salesman.  He was the salesman for the union
7   side.
8     Q.  Okay.
9          And you knew that?
10     A.  Yes.
11     Q.  Okay.
12          And he would -- I take it,
13   the job sites he would show up on -- well,
14   you're talking about ones after you started
15   getting paid through Dock & Door?
16     A.  Yes.
17     Q.  Okay.  All right.
18          When did you -- when did you
19   become a member of the union?
20     A.  I'm -- I'm not sure of the year.  I'm
21   really not sure right now what the year was.
22     Q.  Okay.
23          And when did you make the --
24   do you remember approximately when you made the

60

1   switch from Midwest Dock to Dock & Door?
2     A.  Well, that's the date we're talking
3   about.  I'm not sure.
4     Q.  Okay.  You're not sure.
5          And what local did you join?
6     A.  2 -- 272.
7     Q.  Okay.  Local 272.  All right.
8          And how did it come about
9   that you made the switch from Midwest Dock
10   to -- to Dock & Door?
11     A.  They got overwhelmed with -- with
12   work, and they needed another head, another
13   hand.
14     Q.  Okay.
15          They were just -- they were
16   just busy?
17     A.  Yep.  Yes.
18     Q.  And did -- who approached you about
19   that, or who did you approach or how did it
20   happen?
21     A.  It was Mike Richert.
22     Q.  Okay.
23          And what did he say or do?
24     A.  He asked me if I wanted to be in the

15 (Pages 57 to 60)

61

1  union.
2    Q.  And what did you say?
3    A.  Yes.
4    Q.  Okay.
5            And is that -- that's when
6  you joined Local 272?
7    A.  Yes.
8    Q.  All right.
9            And is that when you started
10  getting paid through Dock & Door?
11    A.  Yes.
12    Q.  And is that when you started working
13  on the new construction buildings?
14    A.  Yes.
15    Q.  Prior -- prior to that, had the work
16  that you were doing since you got hired in
17  2009 -- until whatever the date was that you
18  started working for Dock & Door -- had the
19  nature of your work changed at all?
20    A.  No.
21    Q.  You were pretty much doing the same
22  thing?
23    A.  Same thing.
24    Q.  All right.

62

1            And when you started going to
2  work for Dock & Door, I presume that, at least,
3  to some extent, your work changed because you
4  were doing only new installations at that
5  point; is that correct?
6    A.  Yes.
7    Q.  Okay.
8            But the work you were doing
9  for the new installations was still the basic
10  same skill set you had been using for Midwest?
11    A.  Yes.
12    MR. HUGHES:  Objection.  Leading.
13  BY MR. McJESSY:
14    Q.  Okay.
15            Well, did the skill set
16  change at all from the work you were doing for
17  Midwest when you started doing work for Dock &
18  Door?
19    A.  No.
20    Q.  Okay.
21    A.  And I'm still trying to remember this
22  guy's name.  And what's bothering me is I don't
23  see a Steve on the first name section anywhere.
24    Q.  Well, I will represent to you that

63

1  these are only names that we received, I think,
2  based on our discovery request, on the request
3  we made from 2016 after.  So if it was -- do
4  you think he was there after 2016?
5    A.  No.  He was there -- he was there
6  before I was.
7    Q.  And he was still there after 2016?
8    A.  Yes.
9    Q.  He would have been there.  Okay.
10  Well, that's something we can -- after the
11  deposition -- I don't want to -- I'm sure Mr.
12  Zarlengo's counsel doesn't want him to talk to
13  you and influence your testimony at the
14  deposition.  But after the deposition --
15    A.  With a name?
16    MR. HUGHES:  What's that?
17    MR. McJESSY:  Do you want him to --
18  we can go off the record, and he can say the
19  name if he --
20    THE WITNESS:  Well, I don't really
21  care.  It's just bothering me.
22    MR. McJESSY:  I don't want it -- I
23  don't want it to bother you.
24    MR. HUGHES:  We can go off the

64

1  record.
2
3            (There was a discussion off
4             the record.)
5
6    MR. McJESSY:  Well, let's go back on
7  the record.
8  BY MR. McJESSY:
9    Q.  All right.
10            Did Mr. Zarlengo refresh your
11  recollection?
12    A.  Yeah, yeah.  Thank you.  Appreciate
13  that.
14    Q.  What's the name?
15    A.  Steve French.
16    Q.  Okay.
17            That's the sales personal you
18  recall?
19    A.  Yes.
20    Q.  Okay.
21            Did he do -- as far as you
22  know, did he do sales for Dock & Door?
23    A.  No.
24    Q.  He was -- was he --

16 (Pages 61 to 64)

65

1    A.  He was Midwest Dock Solutions.
2    Q.  Okay.  Let's see.
3          Now, I'm all thrown off.
4          When you were -- when you
5  were -- Midwest Dock Solutions, do you know,
6  did it do service work on doors and projects
7  that had been installed by Dock & Door?
8    A.  Yes.
9    Q.  Okay.
10         And how did -- explain that
11  to me.
12    A.  Repairs.  Stuff that didn't -- wasn't
13  working correctly after being installed.
14    Q.  Okay.
15         Then Midwest --
16    A.  Service work, yeah.
17    Q.  -- they would come out and do that
18  work?
19    A.  Yes.
20    Q.  On the same projects?
21    A.  Yes.
22    Q.  Okay.
23    A.  After the project was finished.
24    Q.  All right.  Okay.

66

1        (WHEREUPON, the document was
2        marked Plaintiff's
3        Exhibit 26 for identification,
4        as of 3/14/25.)
5
6  BY MR. McJESSY:
7    Q.  I'm going to hand you what's marked as
8  Exhibit 26.
9         Let's see.  I'm going to go
10  through and ask you some questions about these
11  documents.  These documents were produced to us
12  by Dock & Door Install, and they appear to
13  be -- and you can flip through them, and I'm
14  going to ask you some general questions about
15  them.  But do these look like time sheets that
16  you prepared?
17    A.  Yep.  Those are mine.
18    Q.  Okay.
19         And if you go further back in
20  this exhibit, it looks like there's some
21  notebook entries that are also your time
22  sheets.
23    A.  Before we had time sheets, yeah.
24    Q.  Okay.

67

1         And -- and then there's also
2  some -- I'm going to show you, for the record,
3  DDI 1222, which is a page that I'm guessing
4  that's not your handwriting?
5    A.  That's not me.
6    Q.  Okay.
7         So there's some documents in
8  here that you did not write.  And I'll ask you
9  about that, too, as we go along.  But if you
10  look at the -- well, if you look at the first
11  page of this document, which is dated -- it's
12  got dates on it at the top, August 27 of '20 to
13  9/2 of '20.
14         Is that writing at the top
15  yours or somebody else's?
16    A.  That's -- yeah, at the top's not mine.
17    Q.  Okay.
18         But the writing on the rest
19  of the document, I take it, is yours?
20    A.  Yes.
21    Q.  All right.
22         And you prepared this sheet
23  in this way with the dates on the left and the
24  lines after that?

68

1    A.  Yeah.
2    Q.  Okay.
3         And you're basically just
4  recording your -- your daily hours.
5         Is that fair?
6    A.  Yes.
7    Q.  Okay.
8         And it looks like you put the
9  hours down, like 8 or 6.5, and then a job
10  description.
11         Do you see that?
12    A.  Yes.
13    Q.  And how did you decide what
14  information to put in the job description?
15  Like who told you what to put there?
16    A.  Well, nobody told me what to put
17  there.  I put down what I was doing.
18    Q.  Right.  But how did you know -- like
19  this says Veterans.  And it says Dr. Pepper,
20  and it's got an address.  And then it describes
21  the work you did.
22         How did you know to put down
23  like the name of the project, the address, and
24  a description of work?  Did somebody say this

17 (Pages 65 to 68)

69

1  is how we want you to prepare your time sheets,
2  this is the information we want, or did you
3  just decide that's what you were going to put
4  down?
5      A.  No.  It was -- I decided.  I mean, you
6  wrote down what you did, and it comes with the
7  address.
8      Q.  Okay.  All right.
9          And -- very good.
10         And you'll see that these
11  pages are consecutively numbered.  Let's see.
12  I just have some specific questions, unless I
13  gave somebody -- oh, no.
14         Now, if you turn to page
15  number DDI 1122 --
16     A.  Some of them, the black is covering --
17     Q.  Yeah, I know.
18     A.  You said 1122?
19     Q.  Yeah.
20     A.  1132.
21     Q.  That's pretty close.
22     A.  Okay.
23     Q.  There we go.
24         You see how this is a printed

70

1  out form, like it's got -- you know, it's
2  printed with job info sheet, time in, time out,
3  name and date, job location, contractor.
4          Do you see that?
5      A.  Yeah.
6      Q.  Where did -- who prepared these blank
7  forms?  Not the one that is filled out with
8  your information.  I know you filled that out.
9  But where did you get this like form?
10     A.  From Dock & Door.
11     Q.  Okay.
12     A.  Midwest Dock & Door.
13     Q.  Okay.
14         Who -- did somebody in
15  particular give it to you or --
16     A.  Tony Brutti.
17     Q.  Tony gave it to you?
18     A.  Yes.
19     Q.  He gave you these forms?
20     A.  Yes.
21     Q.  Were they kept in the lunchroom?
22     A.  Yeah.  Yes.
23     Q.  That's your recollection?
24     A.  Yes.

71

1      Q.  Okay.
2          And who would you turn in
3  your time to?  Who would you turn these time
4  records into?
5      A.  We'd also leave them in the lunchroom.
6      Q.  Okay.
7          When they were completed --
8      A.  Yes.
9      Q.  -- you'd leave them in the lunch room?
10     A.  Yeah.
11     Q.  All right.
12         And where some of these are
13  like photographs of the time sheets, do you
14  know how -- like would you take a picture of
15  the time sheet and then send it to somebody
16  or --
17     A.  No.
18     Q.  That's not your recollection?
19     A.  No.  I don't remember doing that.
20     Q.  Okay.
21         You'd just leave the time
22  sheet in the lunchroom?
23     A.  Yes.
24     Q.  At the end of the week, that kind of

72

1  thing?
2      A.  It's what they wanted us to do.
3      Q.  Okay.
4          And then if you go to a
5  couple more pages back, time sheet 1125 or page
6  1125, and this is not your handwriting,
7  correct?
8      A.  No.
9      Q.  Okay.
10         Now, there's an entry there
11  that says ACG Addison.
12         Do you see that?
13     A.  Yes.
14     Q.  Do you remember what that project was?
15     A.  No.
16     Q.  Okay.
17         And then there's an entry
18  down below that that says service work.
19         Do you see that?
20     A.  Yes.
21     Q.  Do you know what that would be
22  referring to?
23     A.  I'm not sure.  This isn't me.
24     Q.  Okay.

18 (Pages 69 to 72)

73

```
 1          What do you mean, it's not
 2  you?
 3      A.  I mean, it's not my handwriting.  I
 4  don't remember -- service work.  It was
 5  repairing something.
 6      Q.  Okay.
 7              And if you go -- if you could
 8  turn to page DDI 1128.
 9              All right.  And is that your
10  handwriting on the date 4/27, where it says
11  service?
12      A.  Yes.
13      Q.  Okay.
14              And what would that work have
15  been?  Again, repairing work?
16      A.  Repairing something.
17      Q.  Okay.
18              And is that the kind of work
19  that you would do for Dock & Door?
20      A.  Occasionally.
21      Q.  Okay.
22              On occasion, you would do
23  service work?
24      A.  Occasionally.
```

74

```
 1      Q.  All right.
 2              And that would entail
 3  repairing something that wasn't working
 4  properly?
 5      A.  Yes.
 6      Q.  Okay.
 7              And then if you look at
 8  the --
 9      A.  But, you know, hang on now.
10      Q.  Yeah.
11      A.  I don't know if I ever did any service
12  when I was in Dock & Door.  I don't think
13  that -- you know, not that I can recall,
14  actually.  Dock & Door was always new
15  construction.
16      Q.  Okay.
17      A.  So I'm not sure -- I'm not sure what
18  that is.
19      Q.  All right.
20              If you could -- if you could
21  turn to page 11 -- DDI 1138.
22              All right.  And there's an
23  entry there for 2/12.
24              Do you see that?
```

75

```
 1      A.  Yes.
 2      Q.  And that also says service, correct?
 3      A.  Yes.
 4      Q.  And that's your handwriting, is it?
 5      A.  Yeah.  Yes.
 6      Q.  Okay.
 7              And is it possible that you
 8  could have been doing this service work for
 9  Midwest Dock Solutions, and you just recorded
10  it on this time sheet?
11      A.  A chance, yes.
12      Q.  Okay.  All right.
13              And if you could just briefly
14  go back to page 1128.  That was the page we
15  were just on.
16          MR. HUGHES:  What page is that?
17          MR. McJESSY:  1128.
18  BY MR. McJESSY:
19      Q.  All right.
20              And is it possible that the
21  service work on this page could have been done
22  for Midwest Dock?
23      A.  Possibly, yes.
24      Q.  You have no reason to doubt, though,
```

76

```
 1  that you were doing service work since that's
 2  what you wrote, correct?
 3      A.  Yes.
 4      Q.  Okay.
 5              And below that, there's two
 6  entries that say bug screens.
 7              Do you see that?
 8      A.  Yes.
 9      Q.  And what -- what are bug screens?
10      A.  They -- it's a -- kind of a complex
11  system.  It's got a set of -- extra set of
12  tracks that go on in front of the door.  And
13  the bug screen goes up into the tracks, and
14  then the door can go up and down.  And then
15  when the door goes up, you can bring the screen
16  door down, and it takes the place of the door.
17      Q.  Is that like a bug barrier?  Is that
18  the same thing?
19      A.  Yes.
20
21              (WHEREUPON, the document marked
22              Plaintiff's Exhibit 3 for
23              identification was tendered to
24              the deponent.)
```

19 (Pages 73 to 76)

77

BY MR. McJESSY:
   Q.  All right.
         I'd like you to take a
look -- I'm going to show you what we've
previously marked as Exhibit 3.
         Have you ever seen the
Midwest Dock Solutions website before?
   A.  No.
   Q.  Okay.
         Well, I'm going to show you
page three of Exhibit 3, and do you see where
it says bug barrier?
   A.  Yes.
   Q.  Is that the -- is that the kind of
thing you'd be installing as part of bug
screens?
   A.  Yes.
   Q.  Okay.  All right.  Let's see.
         And if you could turn in
Exhibit -- what's the number on that?  I'm
sorry.  Twenty-six?

78

         (WHEREUPON, the document marked
         Plaintiff's Exhibit 26 for
         identification was tendered to
         the deponent.)

BY MR. McJESSY:
   Q.  If you could turn in Exhibit 26 to
page DDI 1134, and at the top of it, on March
5, is that your handwriting?
   A.  Yes.  Part of it.
   Q.  Okay.
         What part is -- oh, I see.
What part is your handwriting?
   A.  Mokena.
   Q.  Okay.
         And is it also your
handwriting where it says replacing damaged
panels?
   A.  Yes.  I suppose, it is.  Yeah.
   Q.  Okay.
         The handwriting there where
it says industrial opus, that's not your
handwriting, is it?
   A.  No.

79

   Q.  Okay.
         Do you know who wrote that
in?
   A.  No.  I'm not sure.
   Q.  Okay.
         Replacing damaged panels,
would that be service work?
   A.  Yes.
   Q.  Okay.
         And if you could turn to
page --
   A.  You know what?  I'm not entirely
positive about that because there were times
that we would replace panels on the union side
that were -- that had damage previously to it
being installed.
   Q.  Okay.
   A.  And we'd put it up, anyway, with the
intent of coming back to replace them.
   Q.  Okay.
         And so it could have been
part of that?
   A.  It could have been part of the union
stuff, yes.

80

   Q.  Okay.
         And if a panel was -- say
that a panel -- you put up a door.  And all of
the panels were good, but the panels got
damaged after you completed all of your work.
         Is that something that
Midwest Dock Solutions would come out and
repair?
   A.  Yes.
   Q.  Okay.
         And if you could turn to page
1137, is any of the handwriting on that page
yours?
   A.  No.
   Q.  Okay.
         So there's an entry at the
top that looks like it's for February 13, 2020.
         You don't note who wrote
service work in there; is that right?
   A.  No.
   Q.  All right.
         And if you go to page 1147,
there's an entry at the top of that page that
says December 5, and then it says service.

20  (Pages 77 to 80)

81

1        Do you see that?
2    A.  Yes.
3    Q.  And that's your handwriting?
4    A.  Yes.
5    Q.  All right.
6        So you would have been doing
7  service work.
8        Is that what that indicates?
9    A.  Yes.
10   Q.  All right.
11       And if you turn to the next
12  page -- I'm sorry, yeah, the next page --
13  there's an entry there that says stack four
14  almost complete.
15       Do you see that?
16   A.  Stack -- yeah.
17   Q.  That's your handwriting, I take it?
18   A.  The stack four is, but I -- I don't
19  think -- it looks like my handwriting, but I
20  don't know why I would have put almost complete
21  there.
22   Q.  Okay.
23       Do you know what stack four
24  means or stack --

82

1    A.  Yeah.  Stack them in the door opening
2  where they're -- they're not functioning yet.
3    Q.  Okay.
4        It's putting up the tracks?
5    A.  Yes.
6    Q.  And putting up the panels?
7    A.  Yes.
8    Q.  But there's --
9    A.  Just to cover the door opening.
10   Q.  Okay.
11       And where it says -- down
12  below, there's an entry that says -- on 12/4 --
13  that says roll.
14       Do you see that?
15   A.  Yeah.
16   Q.  And it looks like Crete is in somebody
17  else's handwriting?
18   A.  Yes.
19   Q.  But do you know, what would roll mean?
20   A.  That's completing the door and making
21  them work.
22   Q.  Oh, the same -- the same door, like --
23   A.  Yes.
24   Q.  So you'd stack them?

83

1    A.  You'd stack them.  And then rolling
2  them is finishing the rest of it.
3    Q.  Okay.  All right.
4        So whenever you use in your
5  time sheet "stack" or "roll," that's what it
6  means?
7    A.  Yes.
8    Q.  Okay.
9        And then if you could turn to
10  page 1151, and here you've got something that
11  says bumpers.
12       Is that installing the
13  bumpers outside the docks that the trucks --
14   A.  Yes.
15   Q.  -- back up into?
16   A.  Yes.
17   Q.  Okay.
18       And -- and then you have head
19  curtains down below that, it looks like.
20       Do you see that?
21   A.  Yes.
22   Q.  What -- what are head curtains?  What
23  is that?
24   A.  That's what goes around the door

84

1  opening on the outside that the trucks back
2  into so they're sealed.
3    Q.  Okay.
4        I was going to say, is it
5  also called seals or dock seals?
6    A.  Yes.
7    Q.  Okay.
8        So where you have above that
9  seals, it would be similar kind of work?
10   A.  Similar thing.
11   Q.  Okay.
12       And then if you could turn to
13  page 1153, there's an entry there that says,
14  Rockford Airport.
15       Do you see that?
16   A.  Yes.
17   Q.  And it just says doors underneath it.
18       What does doors mean when you
19  use that phrase?
20       MR. HUGHES:  Objection.  Foundation
21  on this exhibit.
22  BY MR. McJESSY:
23   Q.  Oh, actually, this isn't your
24  handwriting, is it?

21 (Pages 81 to 84)

85

1    A.  No, it's not.
2    Q.  Thank you.
3        All right.  Let's skip that
4  one, then.  The next page, though, toward the
5  bottom, the second entry up from the bottom,
6  for 10/22, it looks like it says hardware and
7  hang 30 side shelters; is that right?
8    A.  Yes.
9    Q.  What -- what is that work?
10   A.  It's outside as well, on the outside
11 of the dock, the outside of the door opening.
12   Q.  Is it --
13   A.  The same thing as -- as seals,
14 basically, but a different type.  They're like
15 different construction.
16   Q.  Got it.
17       And what about finish punch
18 list?  Would that just be finishing anything
19 that wasn't finished on the job before?
20   A.  Yes.  Yes.
21   Q.  All right.
22       And what are track guards?
23   A.  They go on the inside and cover the
24 tracks on both sides so the forklift trucks

86

1  don't run into them.
2    Q.  Okay.
3        And if you could turn to page
4  1162 -- and I think that's your handwriting,
5  the top entry, 8/22.
6        Do you see that?
7    A.  Yes.
8    Q.  Can you tell me what that is?
9    A.  Install 12 by 14 with operator.
10   Q.  Yeah.
11   A.  Well, it's a door, a sectional door
12 with a -- with an operator.
13   Q.  Okay.
14       So just a standard sectional
15 door?
16   A.  Yes.
17   Q.  Okay.
18       And do you know what that
19 location was?  Do you remember that job, by any
20 chance?
21   A.  No.
22   Q.  Okay.  All right.
23       So wherever it has WOP,
24 that's with operator?

87

1    A.  Yes.
2    Q.  Okay.
3        And would that be an operator
4  like the one I'm showing you, Exhibit 3, the
5  last page, where it says door operator is
6  LiftMaster, operators like that?
7    A.  It could be that.  That's called a
8  jackshaft operator.  Or it could be a trolly
9  operator that runs over the -- overhead.
10   Q.  Okay.
11       Is a trolly operator similar
12 to what I think of when I think of my garage
13 door at my house?
14   A.  Yes.  Your residential one.
15   Q.  Okay.  Let's see.
16       If you could turn to page
17 1164, there's something there, an entry that
18 says thermoflex.
19       Do you see that?
20   A.  Yes.
21   Q.  What is that?
22   A.  I don't know.
23   Q.  Okay.
24   A.  I'm not sure what I was referring to.

88

1    Q.  Okay.
2        And if you could turn to page
3  1168, you'll see there's two entries there that
4  refer to bug screen -- or one says two bug
5  screen doors.  The other one says two bug
6  screens?
7    A.  Yes.
8    Q.  All right.
9        Is that the same thing that
10 we talked about earlier, like the bug barriers?
11   A.  Yes.
12   Q.  All right.
13       Wherever it says that kind of
14 entry, that's the kind of work you were doing?
15   A.  Yes.
16   Q.  All right.
17       And if you could turn to page
18 1184, on page 11 -- now, this switches to a
19 different kind of time document.  This is in
20 September of 2022, it looks like.  But there's
21 this, and a few after that are sort of time
22 records in a notebook.
23       Do you see that?
24   A.  Yes.

22 (Pages 85 to 88)

89

1    Q.  And most of this writing in the
2    notebook looks like it's yours except for where
3    it says Peak Scannell or PBS or Peak Scannell
4    or Clopay?
5        A.  Yes.
6        Q.  Or OT.
7            That's not -- those aren't
8    your writing?
9        A.  No.
10       Q.  Yeah, okay.
11           But the rest of it's your
12   writing, right?
13       A.  Yes.
14       Q.  And did you just start keeping track
15   of your time in this fashion because you didn't
16   have time sheets?  Is that what it was?
17       A.  There's a possibility I ran out, and I
18   just did that for --
19       Q.  Okay.
20           And -- well, go ahead.
21       A.  It's more than likely I just ran out
22   of time sheets, yes.
23       Q.  Okay.
24           And do you know how you

90

1    forwarded these time sheets to the company?
2        A.  I think, at this point, we were, you
3    know, maybe taking pictures of them and sending
4    them.
5        Q.  Okay.
6            And do you know who you would
7    have sent them to?
8        A.  It would have gone to Tony Brutti.
9        Q.  Okay.
10           And I hate to do this, but I
11   need to take a five-minute break.
12       A.  Okay.
13
14           (After a break from 2:02 p.m.
15            to 2:10 p.m., the deposition
16            was resumed as follows:)
17
18       MR. McJESSY:  We'll go back on the
19   record, keep it moving along.
20   BY MR. McJESSY:
21       Q.  Page 1235, if you could.  And if you
22   look at this page, there's a couple entries at
23   the top for September 23 and September 24, it
24   looks like, of 2021.  And it says, Rockford

91

1    Service and Empire Service.
2            Do you see that?
3        A.  Yes.
4        Q.  Again, would you have -- would you
5    assume that you were doing service work on
6    those dates?
7        A.  Yes.
8        Q.  Okay.
9            Do you know what Empire
10   refers to?
11       A.  Not anymore.
12       Q.  Is that -- and Rockford, I'm assuming,
13   would be a city?
14       A.  Yes.
15       Q.  Would you agree with that?
16       A.  Yes.
17       Q.  Is Empire -- is there an Empire,
18   Illinois, do you know?
19       A.  I don't know.
20       Q.  Okay.
21       A.  I'm not sure.  No, I've never heard of
22   Empire, Illinois.  I'm not sure.
23       Q.  I haven't either.  All right.
24           Not a bad name for a town,

92

1    but --
2        MR. HUGHES:  There's probably
3    Empire, New York.
4        MR. McJESSY:  Is there?
5    BY MR. McJESSY:
6        Q.  All right.
7            If you could turn to page
8    1242.
9        A.  Okay.
10       Q.  This page, it says Chicago Pepper.
11           Do you see that?
12       A.  Yes.
13       Q.  And it looks like somebody wrote --
14   somebody else wrote in Green EM.
15           Do you see that?
16       A.  Yes.
17       Q.  And that's not your handwriting,
18   right?
19       A.  No.
20       Q.  But the rest of it is your
21   handwriting?
22       A.  Yes.
23       Q.  Do you recall what this project was?
24       A.  No.

23 (Pages 89 to 92)

93

1      Q.  Do you recall any projects you worked
2  on for Pepper Construction?
3      A.  Oh, okay.  Yeah.  Well, I do remember
4  Pepper Construction, yes.
5      Q.  And what was that project?
6      A.  The same as the other ones, you know.
7  They were doors.
8      Q.  Installation of new overhead doors?
9      A.  Yes.  Yes.
10     Q.  All right.
11          And do you remember like
12 where was the project, what was it, what was
13 the building?
14     A.  No.
15     Q.  No, nothing like that?  Okay.
16          But you do remember doing a
17 project for Pepper Construction?
18     A.  Yes.  Yes.
19     Q.  All right.
20          What are the big contractors
21 that you can remember working for when you were
22 getting paid by Dock & Door?
23     A.  Well, Clayco, Krusinski, this Pepper
24 Construction.  I really can't recall any other

94

1  ones right now.
2      Q.  All right.
3      A.  It's been a while.
4      Q.  Do you remember doing work for
5  projects for Principal?
6      A.  Yes.
7      Q.  If you could turn to page 1268.
8          Actually, let's do 1267 --
9  no, 1268.  I'm sorry.
10     A.  Gees.  It's hard to read some of the
11 numbers.  Okay.
12     Q.  There we go.
13          Is that a page that's for
14 12/17 to 12/23?
15     A.  Yes.
16     Q.  All right.
17          And that's your handwriting
18 on that page?
19     A.  Yes.
20     Q.  And it says service?
21     A.  Yes.
22     Q.  And then it's got an arrow down.
23          Would you assume that that
24 means service work?

95

1      A.  We must not be on the same page.
2  Sixty-eight?
3      Q.  Yes, 1268.
4      A.  Oh, okay.  Sorry.
5      Q.  Okay.
6          Now, you're on 1268?
7      A.  Yeah.
8      Q.  From December 17 through December 23?
9      A.  Yes.
10     Q.  All right.
11          And the top says service,
12 correct?
13     A.  Yeah.
14     Q.  And then it's got a down arrow?
15     A.  Yes.
16     Q.  Does that indicate to you that it's
17 the same entry for each day?
18     A.  Yes.
19     Q.  All right.
20          And then if you turn to the
21 next page -- which would be the week, really,
22 date wise prior to that -- it says service for
23 10 -- for 12/10, right?
24     A.  Yes.

96

1      Q.  And service for 12/15 and 12/16.
2          Do you see that?
3      A.  Yes.
4      Q.  And then it's got Clayco, and it looks
5  like Bristol in the middle there, 12/11 and
6  12/14, correct?
7      A.  Yes.
8      Q.  Okay.
9          Again, you would assume you
10 were doing service work on the 10th, the 15th
11 and 16th?
12     A.  Yes.
13     Q.  All right.
14          And would that have been
15 working for Dock & Door, or you don't know?
16     A.  I'm not sure.
17     Q.  Okay.
18          It could have been Dock &
19 Door.  It could have been Midwest Dock
20 Solutions?
21     A.  Yes.
22
23
24

24  (Pages 93 to 96)

97

```
1              (WHEREUPON, the document marked
2          Plaintiff's Exhibit 4 for
3          identification was tendered to
4          the deponent.)
5
6   BY MR. McJESSY:
7      Q.  All right.
8              Let's go back to be Exhibit
9   4, which is the list of employees.  And
10  probably the fastest way to do this is we could
11  go through the list, and you can tell me the
12  names that you recognize here.  And you can
13  give the line -- it would be helpful if you
14  gave a line number as you went along.  And just
15  tell me generally what they did, if you can
16  tell me if you worked with them and what they
17  did.
18     A.  Okay.  Jose, number one.
19     Q.  Yep.
20     A.  He was my -- he was my partner.  I
21  worked with him.
22     Q.  Oh.
23     A.  Off and on, you know.
24     Q.  Yeah.
```

98

```
1              My understanding is that the
2   installation doors you generally worked two
3   people to a team.
4              Is that fair?
5      A.  Yes.
6      Q.  Okay.
7      A.  Yeah.
8              Zach, number 10.
9      Q.  Okay.  Oh, all right.
10             What did he do?
11     A.  He was a -- he was an installer.
12     Q.  Okay.
13             During the entire time you
14  were there?
15     A.  No.
16     Q.  What was the change?
17     A.  Well, he started after I did.
18     Q.  Okay.
19     A.  And -- and quit or got fire before I
20  left.  I can't remember which one it was.
21     Q.  All right.
22             But he was an installer when
23  you knew him?
24     A.  Yes.
```

99

```
1              Oh, there's -- there's Jeff
2   French.
3      Q.  But that's Steve French?
4      A.  Yes.  And, you know, I worked with him
5   for a short period of time.
6      Q.  Okay.
7              He was in sales?
8      A.  Yes, after he wasn't an installer
9   anymore.
10     Q.  And did he do -- did he try to be an
11  installer when you were with Midwest?
12     A.  Yeah.
13     Q.  Okay.
14     A.  The Kellys.  I know all of the
15  Dylan -- 31, 32, and 33.
16     Q.  What did they do?
17     A.  But I'm not sure who Nicolas Kelly is.
18     Q.  Oh, okay.
19             You don't know Nicolas, but
20  you --
21     A.  Oh, oh.  That's Nico.  Yeah.  Yeah.
22  Never mind.
23     Q.  So you know all of the Kellys?
24     A.  Yeah.
```

100

```
1      Q.  And what did they do?
2      A.  They were installers.
3      Q.  They were all installers?
4      A.  Yes.
5      Q.  Okay.
6              And you worked with them from
7   time to time?
8      A.  Yes.
9      Q.  Okay.
10             Anybody else on that page?
11     A.  No.
12     Q.  Okay.
13             How about the next page?
14     A.  Well, I know this 51 --
15     Q.  Yeah.
16     A.  -- wasn't my favorite person, and he
17  was a -- he was a service guy.
18     Q.  Okay.
19             John Moton?
20     A.  Johnny, I think.  I don't -- I never
21  knew his last name.  I'm just assuming Johnny.
22  He was the only Johnny I remember.
23     Q.  Okay.
24     A.  Quinten.  I think he's gone.
```

101

1    Q.  Ah-huh.
2    A.  He was -- he worked with me a couple
3  times.
4    Q.  Quinten Williams?
5    A.  Williams, yeah.
6    Q.  Well, what did he do?
7    A.  He was an installer.
8    Q.  Installer?
9    A.  And, yeah, that's it, you know.
10    Q.  Okay.
11        How about --
12    A.  Except, of course, the bottom one.
13    Q.  Okay.
14    A.  Number 87.
15    Q.  Anthony Zarlengo?
16    A.  Yeah.  I remember him.
17    Q.  Okay.
18        How about Collin Zarlengo
19  who's not on here?
20    A.  Yeah.  I worked with him.
21    Q.  You worked with him, too?
22        What did he do?
23    A.  He was an installer.
24    Q.  An installer, also.  All right.

102

1        And you know Anthony Zarlengo
2  who's here today, correct?
3    A.  Ah-huh.
4    Q.  Is that a yes?
5    A.  Yes.
6    Q.  Okay.
7        And what was his job with the
8  company?
9    A.  He's the owner.
10    Q.  Okay.
11        And how about Mike Richert?
12  You didn't mention him, but he's on the list.
13  And you know him, right?
14    A.  Yes.  They're --
15    Q.  What did he do?
16    A.  He's also an owner.
17    Q.  Okay.
18        And then Anthony Brutti was
19  on the list.
20        You know him as well,
21  correct?
22    A.  Yes.
23    Q.  What kind of work did he do?
24    A.  He was in charge of hours for the

103

1  union side and paying -- you know, payroll.
2    Q.  For the union side?
3    A.  Yeah.  Yeah.
4    Q.  Okay.  Okay.
5        Anything else that he did
6  that you're aware of?
7    A.  No.
8    Q.  Okay.
9        Would Anthony Brutti work on
10  the job sites?
11    A.  No.
12    Q.  Okay.
13        How about Anthony Zarlengo?
14  Would he work on the job sites?
15    A.  Definitely not.
16    Q.  How about Mike Richert?  Would he work
17  on the job sites?
18    A.  Not really on the door side.  But
19  early on, he was involved with dock levelers.
20    Q.  Installing dock levelers?
21    A.  Yes.
22    Q.  Okay.  Early on.
23        Did that change over time?
24    A.  Yeah.  He's -- I don't know exactly

104

1  why he quit installing.  I think, his eyes.  He
2  had an eye issue, and he just kind of -- I'm
3  not sure.  I'm not sure why he quit doing it,
4  but --
5    Q.  All right.
6        As far as you know, what --
7  what work does he -- what work does -- strike
8  that.
9        As far as you know, what work
10  did he do after he stopped doing the dock
11  leveler installation work?
12    A.  I wasn't -- I'm not sure.
13    Q.  You don't know.
14        All right.  Let's see.
15        Did you ever -- were you ever
16  given a credit card for purchasing, making any
17  company expense purchases?
18    A.  Yes.  Yes.
19    Q.  All right.
20        And when did you get a credit
21  card?
22    A.  Oh, I don't know.
23    Q.  When you worked for Midwest Dock
24  Solutions?

26 (Pages 101 to 104)

105

1    A.  Yes.
2    Q.  Okay.
3    A.  Yes.
4    Q.  And can you tell me, was the company
5    name on the credit card?
6    A.  Yes.
7    Q.  Okay.
8         And did you use that card
9    when you worked for Dock & Door Install?
10   A.  Yes.
11   Q.  Okay.
12        And do you remember who it
13   was issued through, like Visa, MasterCard?
14   A.  I think it was a MasterCard.
15   Q.  MasterCard?
16   A.  I think so.
17   Q.  All right.
18        And do you remember the bank,
19   Chase, or no?
20   A.  No.
21   Q.  All right.
22        And would you get the bills
23   for that credit card?  Would they come to your
24   house, or would they go to the company?

106

1    A.  The company.
2    Q.  Okay.
3         And what kind of purchases
4    would you make using the company credit card?
5    A.  Fuel.  Fuel and anchors and, you know,
6    hardware stuff.
7    Q.  Okay.
8         Whatever supplies you needed
9    for the job and fuel for the company vehicle?
10   A.  Yes.
11   Q.  Okay.
12        And you said you were using a
13   company van when you worked with Midwest Dock,
14   correct?
15   A.  Yes.  It was Dock & Door when I got
16   the van.
17   Q.  Okay.
18        Oh, what -- what vehicle did
19   you use when you worked for Midwest Dock?
20   A.  A 450 Super Duty.
21   Q.  Okay.  That's right.
22        And then you had the van when
23   you were working for Dock & Door?
24   A.  After the truck failed.

107

1    Q.  Oh.
2         What happened to the truck?
3    A.  The engine failed.
4    Q.  Okay.
5         So did you use the -- the
6    Super Duty 450 for a period of time when you
7    were working for Dock & Door?
8    A.  Yes.
9    Q.  And then, at some point, it broke
10   down?
11   A.  Yes.
12   Q.  Okay.
13        And then you switched over to
14   the van?
15   A.  Yes.
16   Q.  I get it.
17        And so you would use the
18   credit card to put gas in either of those
19   vehicles?
20   A.  Yes.
21   Q.  All right.
22        Did the company -- did either
23   company ever supply you with any tools?
24   A.  Yes.

108

1    Q.  What tools did they supply?
2    A.  The hammer drills.
3    Q.  Okay.
4    A.  And the grinding -- grinding wheels
5    and, you know, hardware stuff.
6    Q.  Okay.
7         And tools that you used when
8    you did work for Midwest Dock Solutions?
9    A.  Yes.
10   Q.  And tools you used when you worked for
11   Dock & Door?
12   A.  Yes.
13   Q.  Same tools?
14   A.  Yes.
15   Q.  Unless they broke, and you had to buy
16   a new one, correct?
17   A.  Yeah, right.
18   Q.  If you -- did you receive all of your
19   pay from Midwest Dock and Dock & Door through
20   a -- through a pay check, either as a direct
21   deposit or as a check?
22   A.  They were checks at first, and then it
23   went to direct deposit.
24   Q.  Okay.

27 (Pages 105 to 108)

109

```
 1              And they were all like
 2    paychecks, like ADP or some sort of pay --
 3         A.  Yeah.
 4         Q.  Okay.
 5              You didn't receive checks,
 6    like handwritten checks, company checks?
 7         A.  No.
 8         Q.  Okay.
 9              And if you received a check,
10    was it always for hours worked?  Like did you
11    receive vacation pay?
12         A.  No.
13         Q.  Okay.
14              If you were getting paid, it
15    was because you had worked hours?
16         A.  Yes.
17         Q.  And you were getting credit for your
18    hours?
19         A.  Yes.
20         Q.  Okay.
21              They didn't -- how about
22    tool -- would any of the pay have been for like
23    tool reimbursement?
24         A.  No.
```

110

```
 1         Q.  Parking reimbursement?  Mileage?
 2    Anything like that?
 3         A.  No.
 4         Q.  Okay.
 5              If you got pay, it was for
 6    hours worked?
 7         A.  Yes.
 8         Q.  Nothing else?
 9         A.  No.
10         Q.  Okay.
11              Never paid in cash?
12         A.  No.
13         Q.  All right.
14              Do you know, did anyone else
15    have a company credit card besides you?
16         A.  Yes.
17         Q.  Who else?
18         A.  I'm not sure how many of the employees
19    had them.
20         Q.  Okay.
21              Do you know anybody
22    specifically who did besides you?
23         A.  I can't think offhand.  I mean, maybe,
24    I guess, Dave, Dave Green.  I'm pretty sure he
```

111

```
 1    had one.
 2         Q.  All right.
 3              And you think there were
 4    others.  You're just not --
 5         A.  I think so.
 6         Q.  You're just not sure who?
 7         A.  No.
 8         Q.  Are you aware that some people had
 9    email addresses that -- with the email
10    extension @midwestdocksolutions.com?
11         A.  No.
12         Q.  Okay.
13              Did you ever communicate with
14    anybody, as far as, you know, at that email
15    extension?
16         A.  No.
17         Q.  Some of the time entries we saw on
18    that -- in Exhibit 26 were email -- time
19    entries you made like in a notebook kind of
20    like this?
21         A.  Yeah.
22         Q.  Okay.
23              You don't still have that
24    notebook?
```

112

```
 1         A.  No.
 2         Q.  Okay.
 3              MR. HUGHES:  Off the record, please.
 4
 5              (There was a discussion off
 6              the record.)
 7
 8    BY MR. McJESSY:
 9         Q.  You received W-2 forms?
10         A.  Yes.
11         Q.  How would you get those?
12         A.  In the mail.
13         Q.  In the mail?
14              Do you know who they came
15    from?
16         A.  Not really, no.  No.
17         Q.  Okay.
18              How was your wage rate set
19    when you worked with Midwest Dock, when you
20    were being paid by them?
21         A.  What was my wages?
22         Q.  How was it set?  Who set your wage
23    rate?
24         A.  I don't understand the question.  Who
```

28 (Pages 109 to 112)

113

```
1   set my --
2       Q.  Yeah.  Who made the decision as to how
3   much you would be paid per hour?
4       A.  Tony Zarlengo.
5       Q.  Okay.
6           And if you got raises, did he
7   make that decision?
8       A.  Yes.
9       Q.  Okay.
10          To your knowledge, are Tony
11  Brutti, Tony Zarlengo, and Mike Richert related
12  in any way?
13      A.  Yes.
14      Q.  How are they related?
15      A.  Well, Mike is Tony's brother-in-law
16  and --
17      Q.  Tony Zarlengo is?
18      A.  Yes.  Right?  And I'm not sure how
19  Brutti is related.  I'm not sure.  I don't
20  remember anymore.
21      Q.  Okay.
22          But you think he's related?
23      A.  In some way, yeah.
24      Q.  Okay.
```

114

```
1           Have you ever spoken to
2   anybody from an accounting firm called Gineris
3   & Associates?
4       A.  No.
5       Q.  Do you know -- do you know the name,
6   Gineris?
7       A.  Never heard of it.
8       Q.  Okay.
9           Do you know, did -- as far
10  as -- well, strike that.
11          Do you know, did Dock & Door
12  have any office personnel, secretaries,
13  receptionists?
14      A.  No.
15      Q.  Okay.
16          Your current address, is
17  it -- is it the address that's on the subpoena?
18      A.  Yes.
19      Q.  Okay.  All right.
20          Any -- any current plans to
21  move from there?
22      A.  How is that relevant?  I mean, no, but
23  I don't understand why you want to know.
24      Q.  Off the record.
```

115

```
1           (There was a discussion off
2           the record.)
3
4       MR. McJESSY:  Back on the record.
5   BY MR. McJESSY:
6       Q.  A phone -- your cell phone number?
7       A.  (708) 932-3048.
8       Q.  And how long have you had that?
9       A.  That number?
10      Q.  Yeah.
11      A.  About 25 years.
12      Q.  Oh, a long time.  All right.
13          Is that -- do you have any
14  other phone number, like a home phone or
15  anything like that?
16      A.  No.
17      Q.  All right.
18          And so if you communicated
19  with somebody at Midwest or at Dock & Door,
20  that's the number you would be texting from or
21  communicating from?
22      A.  Yes.
23      Q.  All right.
24          Who's your cell phone
```

116

```
1   carrier?
2       A.  AT&T.
3       Q.  All right.
4           Have you been with them a
5   long time?
6       A.  No.  Only about two months.
7       Q.  Oh.
8           Who were you with before
9   that?
10      A.  Verizon.
11      Q.  And were you with them for a long
12  time?
13      A.  Yeah.  I'm not even sure how many
14  years.
15      Q.  All right.
16          It's nice that you can take
17  your number with you now.
18      A.  Ah-huh.
19      Q.  Let me take one minute to look through
20  my papers.  I may be just about done.  I just
21  want to see if there's -- oh.  Actually, yes.
22  If you could -- if you could turn in the binder
23  that you have there to tab 19.
24      A.  That one?
```

29 (Pages 113 to 116)

117

1    Q.  Yeah.  And just the building that's on
2  the -- the left -- or on the right there, do
3  you see that?  And it's got like three
4  pictures?
5    A.  Yes.
6    Q.  Do you recognize what that project is?
7    A.  No.
8
9         (WHEREUPON, the document marked
10        Plaintiff's Exhibit 20 for
11        identification was tendered to
12        the deponent.)
13
14  BY MR. McJESSY:
15    Q.  Okay.
16        And if you could turn to
17  Exhibit 20, do you recognize what that project
18  is?
19    A.  No.
20
21        (WHEREUPON, the document marked
22        Plaintiff's Exhibit 21 for
23        identification was tendered to
24        the deponent.)

118

1  BY MR. McJESSY:
2    Q.  All right.
3        If you could turn to Exhibit
4  21, who's the person on the left there in the
5  green vest?
6    A.  I can't remember his name.  He didn't
7  work with us for long.
8    Q.  And the person on the right, is that
9  Dave Green?
10    A.  Dave Green, yeah.
11    Q.  Okay.
12        And do you know what project
13  they're working on there?
14    A.  No idea.
15
16        (WHEREUPON, the document marked
17        Plaintiff's Exhibit 23 for
18        identification was tendered to
19        the deponent.)
20
21  BY MR. McJESSY:
22    Q.  Okay.
23        And if you turn to Exhibit
24  23 --

119

1    A.  Okay.
2    Q.  One more.  One more.  There you go.
3        Is that a picture of Jim --
4  James Kelly?
5    A.  Yes, it is.
6    Q.  Okay.
7        Can you tell me where that's
8  taken?
9    A.  It looks like it's in our shop.  In
10  the shop.
11    Q.  Okay.
12        That's what I was --
13    A.  I'm not even sure which one.
14    Q.  Not sure which shop it was taken in?
15    A.  I'm not sure.
16    Q.  Okay.
17        But that's where you think it
18  was taken?
19    A.  It looks like it.
20
21        (WHEREUPON, the document marked
22        Plaintiff's Exhibit 5 for
23        identification was tendered to
24        the deponent.)

120

1  BY MR. McJESSY:
2    Q.  Okay.
3        Oh, and I earlier showed you
4  Exhibit -- well, let's go back to Exhibit 5.
5  Sorry to make you go all the way back to the
6  beginning.
7        Do you know where that
8  picture was taken?
9    A.  No.
10
11        (WHEREUPON, the document marked
12        Plaintiff's Exhibit 6 for
13        identification was tendered to
14        the deponent.)
15
16  BY MR. McJESSY:
17    Q.  Okay.
18        And Exhibit 6, if you flip to
19  the next tab, it's the same -- it looks like
20  it's the same picture, but you don't recognize
21  the --
22    A.  No.
23
24

30 (Pages 117 to 120)

121

1      (WHEREUPON, the document marked
2      Plaintiff's Exhibit 7 for
3      identification was tendered to
4      the deponent.)
5
6   BY MR. McJESSY:
7      Q.  All right.
8          And if you turn to the next
9   exhibit, Exhibit 7, do you know where that
10  picture was taken?
11     A.  No.  No, I don't.
12     Q.  What project that is?
13     A.  No.
14
15         (WHEREUPON, the document marked
16     Plaintiff's Exhibit 8 for
17     identification was tendered to
18     the deponent.)
19
20  BY MR. McJESSY:
21     Q.  Okay.
22         And if you turn to the next
23  exhibit, Exhibit 8, do you recognize that
24  project?

122

1      A.  No.
2      Q.  Okay.
3      A.  They all look the same on the inside.
4      Q.  Yeah.
5      A.  And the outside.
6
7          (WHEREUPON, the document marked
8      Plaintiff's Exhibit 15 for
9      identification was tendered to
10     the deponent.)
11
12  BY MR. McJESSY:
13     Q.  And if you -- and if you turn -- if
14  you turn to Exhibit 15, do you see the shirt
15  that Mr. Kelly has on there?
16     A.  Yes.
17     Q.  Did you have shirts like that?
18     A.  Yes.
19     Q.  All right.
20         And would you wear those
21  shirts on job sites?
22     A.  Yes.
23     Q.  And would you wear those same shirts,
24  including when you were on Dock & Door job

123

1   sites?
2      A.  Yes.
3      Q.  All right.
4          And the shirts, are they
5   worn, in part, because of the bright color for
6   safety reasons?
7      A.  Yes.
8      Q.  Okay.
9          Is that a job site
10  requirement --
11     A.  Yes.
12     Q.  -- do you know?
13         It is.  Okay.
14         And there were no shirts like
15  that for Dock & Door, correct?
16     A.  No.
17     Q.  Okay.  All right.  Getting faster.
18         I don't have any other
19  questions, though Mr. Hughes and Ms. Cahill may
20  have questions.  And if they do, then I may
21  have some follow-up questions based on your
22  answers to their questions.
23     A.  Okay.
24     Q.  But at the moment, thank you for your

124

1   time.
2      A.  Sure.  Sure.
3          MR. HUGHES:  Okay.
4          We'll probably have a
5   handful, so let me take a few --
6          MR. McJESSY:  Do you want to take a
7   couple minutes?
8          MR. HUGHES:  Yes, please.
9
10         (After a break from 2:36 p.m.
11         to 2:46 p.m., the deposition
12         was resumed as follows:)
13
14
15         EXAMINATION
16         BY MR. HUGHES:
17
18     Q.  So I'm just going to ask you a few
19  questions and follow-up to what Mr. McJessy has
20  asked you.  And as I think you know, I'm
21  Midwest Dock's attorney.
22     A.  Okay.
23     Q.  There's been a lot of discussion here
24  about the company, and I want to -- I want to

31 (Pages 121 to 124)

125

1  get your understanding of -- is it your
2  understanding that Midwest Dock Solutions, on
3  the one hand, and Dock & Door Install are
4  separate companies?
5      A.  Yes.
6      Q.  And when you began working for -- or
7  when you first began working at either of
8  those, it was Midwest Dock, correct?
9      A.  Yes.
10     Q.  Okay.
11             And at the time you were
12 working for Midwest Dock, did you ever do any
13 work for Dock & Door Install?
14     A.  No.
15     Q.  And after you transitioned to becoming
16 an employee of Dock & Door Install, did you
17 ever do work for Midwest Dock after that?
18     A.  From time to time.
19     Q.  Okay.  All right.
20             How frequently would that
21 happen?
22     A.  Oh, no, I don't know a timeframe.
23 Maybe once a month or something, you know.  I
24 don't -- I don't know.  I'm not sure of the

126

1  answer to that one.
2      Q.  Okay.
3              And some of your time
4  entries -- all of the time entries we looked at
5  here today were from when you were working with
6  Dock & Door, correct?
7      A.  Yes.
8      Q.  Okay.
9              And so from time to time,
10 there's entries that say service, right?
11     A.  Yes.
12     Q.  Okay.
13             And there's no description of
14 what service was done on any of those days,
15 right?
16     A.  No.
17     Q.  Is your indication of service -- I
18 mean, would you be able to look at any one of
19 those time entries and say what service work
20 you were doing at any given time?
21     A.  No.
22     Q.  When you were working for Dock & Door,
23 were there -- were there times after the
24 install was done, or even before the project

127

1  was closed out, where you were doing
2  adjustments or fittings or servicing anything
3  that you had installed on that job?
4      A.  Yes.
5      Q.  Would you consider that as service?
6      A.  Yes.
7      Q.  And if you were doing that type of
8  work, would you list it that way on your time
9  sheet?
10     A.  Yes.
11     Q.  I think you testified that -- Mr.
12 McJessy asked you if there was office personnel
13 for Dock & Door, right?
14     A.  Yes.
15     Q.  And you said no?
16     A.  No.
17     Q.  What's your understanding of Tony
18 Brutti's role?  Was he in the office?
19     A.  Well, yeah, but besides him, you know.
20 He asked if me if there were any receptionist,
21 I believe, and there wasn't.
22     Q.  Okay.
23             So Tony Brutti -- to your
24 knowledge, Tony Brutti worked in the office?

128

1      A.  Yes.
2      Q.  And he worked for Dock & Door?
3      A.  Yes.
4      Q.  Okay.
5              Do you have any understanding
6  of Dock & Door being a subcontractor of Midwest
7  Dock?
8      A.  No.
9      Q.  Okay.
10             You've had, at least, one
11 entry on your time entries that was listed as
12 punch list items?
13     A.  Yes.
14     Q.  Would you -- would you consider those
15 service work?
16     A.  Not necessarily.  It's -- the punch
17 list was things that needed to be finished on a
18 job site, so it could have easily have been
19 union.  You know --
20     Q.  Right.
21     A.  -- for Dock & Door.
22     Q.  Okay.
23             And so could some of those
24 punch list items be what you would otherwise

32 (Pages 125 to 128)

129

1  consider service?
2    A.  At that point, no.  You're still
3  completing the job.
4    Q.  Okay.
5    A.  You're finishing what you started.
6    Q.  Okay.
7         The install work -- the, you
8  know, repair, replace, and install work done
9  when you were at Midwest Dock, when you were
10 doing kind of a service install, how does that
11 differ from a new construction install?
12   A.  How -- I'm not sure what you're asking
13 me.
14   Q.  All right.
15        Let me ask you this.
16        If you -- when you were
17 working for Midwest Dock and the job was to
18 replace some old door with a new door --
19   A.  Okay.
20   Q.  -- that job necessarily entails you
21 taking out the old door, correct?
22   A.  Yes.
23   Q.  And then is there any other work you
24 would do before you could plop the new door in?

131

1  to replace it.
2    Q.  Okay.
3         Is there -- is there anything
4  on the Dock & Door projects that is -- that is
5  already set up for you when you're doing an
6  install that you -- that you would have to do
7  otherwise for Midwest Dock?
8    A.  No.
9    Q.  Okay.
10        MR. McJESSY:  Can you read that last
11 question and answer back for me?
12
13        (The record was read as follows:
14        "Q. Okay.
15             Is there -- is there
16        anything on the Dock & Door
17        projects that is -- that is
18        already set up for you when
19        you're doing an install that
20        you -- that you would have to do
21        otherwise for Midwest Dock?
22        "A.  No.")
23
24

130

1    A.  No.
2    Q.  I mean, did you need to retrofit the
3  framing?
4    A.  Well, sometimes, you know.  There was
5  some framing that had to be done at times if it
6  was -- depending on the application.
7    Q.  And would you use like a torch or
8  something like that on those jobs?
9    A.  Not usually.
10   Q.  Okay.
11   A.  Usually, it is all prefab concrete.
12   Q.  On -- for Midwest Dock?
13   A.  Yes.
14   Q.  Okay.
15        And what other work would you
16 do before you could actually put the door in on
17 a -- on a replacement job?  Let's say -- let's
18 say an old door, and you're -- you know, you
19 had to put in a brand new door.
20   A.  I'm not sure, you know.  I mean, some
21 framing, like I said.  Sometimes there was wood
22 that needed to be replaced if it was old rotten
23 stuff, you know.  And sometimes cosmetically,
24 just because something looked so bad, we wanted

132

1  BY MR. HUGHES:
2    Q.  You talked about the skills and kind
3  of competencies needed to do work for both
4  Midwest Dock and Dock & Door, correct?
5    A.  Yes.
6    Q.  If someone is -- has only worked for
7  Dock & Door, doing installs for Dock & Door,
8  would they have all -- and they had no other
9  training elsewhere -- would they have all of
10 the skills and competencies that they needed to
11 work doing service jobs for Midwest Dock?
12   A.  You're saying that the employees for
13 Dock & Door, would they have the knowledge to
14 do service work?
15   Q.  Yes.
16   A.  Yes.
17   Q.  Okay.
18        Off the bat, with -- and the
19 skills to do any -- anything that was needed on
20 the service job?
21   A.  Yes.
22   Q.  Okay.
23        So they could -- if the frame
24 needed to be repaired, torn out --

33 (Pages 129 to 132)

133

```
 1    A.  Yes.
 2    Q.  -- no extra training would be needed?
 3    A.  I wouldn't think so.
 4    Q.  Okay.  Okay.
 5             I think that's all I have.
 6    A.  Okay.
 7         MR. McJESSY:  All right.
 8             Did you have --
 9         MS. CAHILL:  No.  I don't have any
10   questions.
11         MR. McJESSY:  Okay.
12             Sir, I appreciate your time
13   coming here this afternoon.  I have to explain
14   one thing to you before you go just because the
15   court reporter needs to know.
16             I'm going to ask her to
17   prepare a copy of the transcript for today, for
18   your deposition.  So she'll type it up so we
19   can read it.  You have the right to review that
20   transcript and note any errors that you believe
21   occurred as she transcribed it, or you can
22   waive that right.  You can't change your
23   testimony.  So if I ask you what color is the
24   light and you said the light was green and she
```

134

```
 1   wrote down the light is green, you can't change
 2   that.  But if she wrote down red, you could
 3   say, I think she got this wrong.  I said green,
 4   and she wrote red.
 5             Do you want to reserve the
 6   right to do that, or do you want to waive the
 7   right to do that?  I don't care what you do,
 8   but she needs to know.
 9         THE WITNESS:  I'd like to read it.
10        MR. McJESSY:  Okay.  All right.
11             Then what she'll do is reach
12   out to you.  She has your phone number.  So
13   she'll probably reach out to you, or somebody
14   will, and coordinate with you to make sure that
15   you have the opportunity to read it.
16        THE WITNESS:  Okay.
17        MR. McJESSY:  All right.
18        THE WITNESS:  So is there a
19   chance -- a big chance that I'm going to end
20   up -- we're going to end up going to court?
21        MR. McJESSY:  Let's go off the
22   record.
23
24
```

135

```
 1        (There was a discussion off
 2         the record.)
 3
 4        FURTHER DEPONENT SAITH NOT.
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

136

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                 EASTERN DIVISION
 3
    MID-AMERICA CARPENTERS   )
 4  REGIONAL COUNCIL PENSION )
    FUND, et al.,            )
 5                           )
         Plaintiffs,  )  No. 1:24-cv-02428
 6                           )
         vs.          )  Judge Andrea R. Wood
 7                           )
    DOCK & DOOR INSTALL,     )  Magistrate Judge
 8  INC., an Illinois        )  Jeannice W. Appenteng
    corporation and MIDWEST  )
 9  DOCK SOLUTIONS, INC., an  )
    Illinois corporation,    )
10                           )
         Defendants.  )
11
12        This is to certify that I, DONALD ALAN
    CRUIKSHANK, have read the transcript of my
13  Deposition taken on March 14, 2025, in the
    above-entitled cause, consisting of Pages 1
14  through 135 inclusive, and I do again subscribe
    and make oath that the same is a true, correct,
15  and complete transcript of my Deposition as
    aforesaid, with corrections, if any, appearing
16  on the attached Correction Page(s).
17  _____ Correction Pages Attached.
18
19  _____
         DONALD ALAN CRUIKSHANK
20
    SUBSCRIBED AND SWORN to
21  before me this _____ day
    of _____, A.D. 20 ____.
22
23  _____
         Notary Public
24
```

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

137

```
 1   STATE OF ILLINOIS   )
 2                       ) SS:
 3   COUNTY OF C O O K   )
 4
 5       I, DIANE M. NULICK, a Notary Public
 6   within and for the County of Cook, State of
 7   Illinois, and a Certified Shorthand Reporter of
 8   said state, do hereby certify:
 9       That previous to the commencement of the
10   examination of the witness, the witness was
11   duly sworn to testify the whole truth
12   concerning the matters herein;
13       That the foregoing deposition transcript
14   was reported stenographically by me, was
15   thereafter reduced to typewriting under my
16   personal direction and constitutes a true
17   record of the testimony given and the
18   proceedings had;
19       That the said deposition was taken
20   before me at the time and place specified;
21       That the said deposition was adjourned
22   as stated herein;
23       That I am not a relative or employee or
24   attorney or counsel, nor a relative or employee
```

138

```
 1   of such attorney or counsel for any of the
 2   parties hereto, nor interested directly or
 3   indirectly in the outcome of this action.
 4       IN WITNESS WHEREOF, I do hereunto set
 5   my hand and affix my seal of office at Chicago,
 6   Illinois, this 21st day of March, 2025.
 7
 8
 9
10
11
         _____
12            Notary Public, Cook County, Illinois.
13
14   C.S.R. Certificate No. 084-002029.
15
16
17
18
19
20
21
22
23
24
```

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 9

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MID-AMERICA CARPENTERS REGIONAL   )
COUNCIL PENSION FUND; MID-AMERICA   )
CARPENTERS REGIONAL COUNCIL HEALTH )
FUND; MID-AMERICA CARPENTERS   )
REGIONAL COUNCIL APPRENTICE AND   )
TRAINEE PROGRAM; and MID-AMERICA   )
CARPENTERS REGIONAL COUNCIL   )
SUPPLEMENTAL RETIREMENT FUND,   )
  )
       Plaintiffs,   )    Case No.: 1:24-cv-06428
  )
     v.   )    Hon. Judge: Andrea R. Wood
  )    Mag. Judge: Jeannice W. Appenteng
DOCK & DOOR INSTALL, INC. an Illinois   )
Corporation and MIDWEST DOCK SOLUTIONS, )
INC., an Illinois Corporation,   )
  )
       Defendants.   )

### DEFENDANT MIDWEST DOCK SOLUTIONS, INC.'S ANSWER AND DEFENSES TO PLAINTIFFS' COMPLAINT

NOW COMES the Defendant, MIDWEST DOCK SOLUTIONS, INC. ("Midwest Dock"),

by and through its attorneys, Amundsen Davis, LLC, and for its Answer and Affirmative Defenses

to Plaintiffs' Complaint, Defendant states as follows:

### SUMMARY OF ACTION

1.     During the course of an audit of DOCK & DOOR, Legacy Professionals, LLP

("Legacy") identified MIDWEST DOCK as a related employer to DOCK & DOOR based upon

information gathered by Legacy. Although DOCK & DOOR produced records to Legacy during

the audit, DOCK & DOOR and MIDWEST DOCK did not produce all records requested by

Legacy related to MIDWEST DOCK and, therefore, Legacy was unable to complete the audit.



**ANSWER:** Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the allegations in the above paragraph, and therefore denies the same.

2. As more fully described herein, TRUST FUNDS bring this action against the DEFENDANTS under ERISA because DEFENDANTS breached the provisions of the Memorandum of Agreements, the Area Agreements, the Trust Agreements and the rules adopted by the TRUST FUNDS by failing to produce records required by Legacy to determine whether DEFENDANTS have complied with their obligations to contribute to the TRUST FUNDS and/or by failing to pay amounts owed to the TRUST FUNDS based upon the hours worked by employees and/or subcontractors performing work within the jurisdiction of the Union.

**ANSWER:** Defendant Midwest Dock admits that the Trust Funds bring this action purportedly under ERISA. Defendant Midwest Dock denies it is party to, or bound by, any of the alleged Memorandum of Agreements, Area Agreements, and/or Trust Agreements and denies any rules purportedly adopted by the Trust Funds apply to Defendant Midwest Dock. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

3. TRUST FUNDS seek to obtain the records necessary to determine the amount of any unpaid fringe benefit contributions owed by DEFENDANTS and to collect all unpaid fringe benefit contributions, interest, liquidated damages, auditors' fees and attorneys' fees and costs.

**ANSWER:** Defendant Midwest Dock admits the Trust Funds seek to obtain records and alleged unpaid contributions, damages, fees and costs. Defendant Midwest Dock denies it has any obligation to make contributions to the Trust Funds, or any obligation to the Trust Funds of any kind or nature. Defendant Midwest Dock denies the remaining allegations in the above paragraph.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this matter based on questions arising under Section 502 of the Employee Retirement Income Security Act (hereinafter referred to as "ERISA") and Section 301 of the Taft-Hartley Act. (29 U.S.C. §§1132 and 185).

**ANSWER:** Defendant Midwest Dock admits the allegations in the above paragraph.

5.     Venue is proper in the Northern District of Illinois, Eastern Division because the TRUST FUNDS are multi-employer employee benefit plans, which are located in and administered in Chicago, Illinois.

**ANSWER:**  Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the allegations in the above paragraph, and therefore denies the same.

## PLAINTIFFS

6.     The TRUST FUNDS receive contributions from numerous employers pursuant to collective bargaining agreements or "Area Agreements" between the employers and the Mid-America Carpenters Regional Council f/k/a Chicago Regional Council of Carpenters (hereinafter referred to as the "UNION"), and therefore, are multiemployer plans. See 29 U.S.C. §1002.

**ANSWER:** Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the allegations in the above paragraph, and therefore denies the same.

7.     The TRUST FUNDS collect contributions on their own behalf and on behalf of other Union-related trust funds which have charged the TRUST FUNDS with the obligation to collect contributions on their behalf.

**ANSWER:** Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the allegations in the above paragraph, and therefore denies the same.

8.     The TRUST FUNDS provide medical, pension and other benefits to UNION carpenters and other persons pursuant to certain terms and conditions.

**ANSWER:** Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the allegations in the above paragraph, and therefore denies the same.

9.     An employer bound by the Area Agreements is obligated to pay to the TRUST FUNDS fringe benefit contributions for the hours (i) worked by its employees falling within the scope of the Area Agreement and (ii) by the employees of its non-union subcontractors performing work within the scope of the Area Agreement if the employer has not required the subcontractor to become bound by the terms of the Area Agreement.

**ANSWER:** Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the allegations in the above paragraph, and therefore denies the same.

10.     The TRUST FUNDS routinely hire certified public accounting firms to review the books and records of an employer bound by the Area Agreement to determine if the employer has paid the fringe benefit contributions required by the Area Agreement for the hours worked by its employees falling within the scope of the Area Agreement and the hours worked by the employees of its non-union subcontractors.

**ANSWER:** Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the allegations in the above paragraph, and therefore denies the same.

**DEFENDANTS**

11.     DOCK & DOOR was incorporated in Illinois on July 11, 2014. DOCK & DOOR is an employer engaged in an industry affecting commerce. DOCK & DOOR entered into a Memorandum of Agreement with the UNION on September 18, 2014, a copy of which is attached as Exhibit A. DOCK & DOOR entered in to a Second Memorandum of Agreement with the

4

UNION on August 15, 2019 reaffirming its obligations, a copy of which is attached as Exhibit B. Exhibits A and B are collectively referred to herein as the "Memoranda."

**ANSWER:** Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the allegations in the above paragraph, and therefore denies the same.

12.     In the Memoranda, DOCK & DOOR agreed, among other things to be bound (i) by the provisions of the Area Agreements, (ii) by the Trust Agreements establishing the TRUST FUNDS to which DOCK & DOOR is obligated to make payments under the Area Agreement ("Trust Agreements"), and (iii) by the rules and regulations adopted by the TRUST FUNDS.

**ANSWER:** Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the allegations in the above paragraph, and therefore denies the same.

13.     The Memoranda, the Area Agreements, the Trust Agreements, and the rules and regulations adopted by the Trust Funds are hereinafter collectively referred to as the "Agreements."

**ANSWER:** Defendant Midwest Dock admits the Trust Funds refer to the listed documents as the "Agreements," but denies that it is, or at any time was, bound to any such Agreements.

14.     MIDWEST DOCK was incorporated in Illinois on May 16, 2006. MIDWEST DOCK is an employer engaged in an industry affecting commerce.

**ANSWER:** Defendant Midwest Dock admits the allegations in the above paragraph.

15.     MIDWEST DOCK is bound by the Area Agreements under the single-employer and/or alter-ego doctrines as set forth for example in *Lippert Tile Co. v. Int'l Union of Bricklayers & Allied Craftsmen*, 724 F.3d 939, 946 (7th Cir. 2013), *Trustees of Pension Funds of Local 701 v. Favia Elec.*, 995 F.2d 785, 789 (7th Cir. 1993), *Chicago Regional Council of Carpenters Pension Fund v. TMG Corporation*, 206 F.Supp.3d 1351, 1356-60 (N.D. Ill. 2016).

**ANSWER:** Defendant Midwest Dock denies the allegations contained in the above paragraph.

## GENERAL ALLEGATIONS

16.     DOCK & DOOR was formed to provide a means for MIDWEST DOCK to perform jobs that require UNION labor while at the same time avoiding the obligations imposed by the Agreements with the Union.

**ANSWER:** Defendant Midwest Dock denies the allegations contained in the above paragraph.

17.     DOCK & DOOR and MIDWEST DOCK are in the same business.

**ANSWER:** Defendant Midwest Dock denies the allegations contained in the above paragraph.

18.     DOCK & DOOR is in the business of installing and/or repairing loading dock equipment including dock levelers and doors.

**ANSWER:** Defendant Midwest Dock admits that Dock & Door is in the business of installing loading dock equipment, but is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

19.     MIDWEST DOCK is in the business of installing and/or repairing loading dock equipment including dock levelers and doors.

**ANSWER:** Defendant Midwest Dock admits the allegations contained in the above paragraph.

20.     The relationship between DOCK & DOOR and MIDWEST DOCK provides a means for the companies to obtain union work and to avoid paying fringe benefit contributions to the TRUST FUNDS for bargaining unit work performed by employees and subcontractors.

**ANSWER:** Defendant Midwest Dock denies the allegations contained in the above paragraph.

21.     The business transactions, management and operations of DOCK & DOOR and MIDWEST DOCK are and have been so interrelated and intermingled that MIDWEST DOCK is bound by the terms of the Agreements.

**ANSWER:** Defendant Midwest Dock denies the allegations contained in the above paragraph.

22.     DOCK & DOOR and MIDWEST DOCK do not maintain an arms-length relationship. DOCK & DOOR is operated and controlled by the owners and management of MIDWEST DOCK as evidenced by the following and therefore the companies have de facto common ownership.

**ANSWER:** Defendant Midwest Dock denies the allegations contained in the above paragraph.

23.     DOCK & DOOR only performs work for and at the direction of MIDWEST DOCK. DOCK & DOOR and MIDWEST DOCK have the same customers; the companies for which DOCK & DOOR performs its work are MIDWEST DOCK's customers.

**ANSWER:** Defendant Midwest Dock admits it subcontracts work to Dock & Door, but denies the remaining allegations contained in the above paragraph.

24.     During the period October 1, 2020 to December 31, 2022, DOCK & DOOR received approximately $473,514.50 from MIDWEST DOCK. It did not receive payments from other companies for work.

**ANSWER:** Defendant Midwest Dock denies the allegations in the first sentence of the above paragraph. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

25.     During the period July 1, 2017 to December 31, 2018, DOCK & DOOR received approximately $1,149,080.75 from MIDWEST DOCK. Again, it did not receive payments from other companies for work.

**ANSWER:** Defendant Midwest Dock denies the allegations in first sentence of the above paragraph. Defendant Midwest Dock is without knowledge or information sufficient to form a

belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

26.     DOCK & DOOR's records produced to Legacy reveal a lack of normal operating expenses associated with the operation of a company involved in the installation and repair of dock equipment such as dock levelers and overhead doors, such as rent, office staff, and equipment. Accordingly, DOCK & DOOR uses MIDWEST DOCK's office, office staff, and equipment.

**ANSWER:** Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of the above paragraph, and therefore denies the same. Defendant Midwest Dock denies the remaining allegations contained in the above paragraph.

27.     The businesses of DOCK & DOOR and MIDWEST DOCK require the use of heavy duty equipment including metal working equipment and welding equipment, and the use of trucks to haul materials and supplies to the jobsites. MIDWEST DOCK has numerous trucks registered to it that are used for this purpose, including trucks like these:



 

DOCK & DOOR has no expenses for trucks and equipment like that shown here. Accordingly, DOCK & DOOR uses the trucks and/or equipment belonging to MIDWEST DOCK to perform work.

**ANSWER:** Defendant Midwest Dock admits that its business requires the use of heavy duty equipment and trucks. On information and belief, Midwest Dock admits that Dock & Door's business at times may require use of heavy duty equipment and trucks. Midwest Dock admits that it has trucks registered to it. Midwest Dock admits that Dock & Door has used Midwest Dock's trucks and equipment, but denies that such usage is not part of an arm's-length business transaction, and further denies that such usage is not reflected in the pricing between the two companies. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the allegations in the above paragraph, and therefore denies the same.

28. DOCK & DOOR and MIDWEST DOCK share common professional service providers.

**ANSWER:** Defendant Midwest Dock admits that it and Defendant Dock & Door may both utilize certain common professional service providers. Defendant Midwest Dock denies such professional service providers are "shared" by it and Defendant Dock & Door.

29. DOCK & DOOR and MIDWEST DOCK both use Gineris & Associates, Ltd. to perform accounting, bookkeeping, and/or tax preparation services.

**ANSWER:** Defendant Midwest Dock admits that it utilizes Gineris & Associates for certain accounting, bookkeeping, and tax preparation services. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

30. DOCK & DOOR and MIDWEST DOCK both use First Midwest Bank for banking services.

**ANSWER:** Defendant Midwest Dock admits that it utilizes First Midwest bank for banking services. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

31. DOCK & DOOR and MIDWEST DOCK both use the services of a common law firm, namely Lawrence Kamin Saunders & Uhlenhop, LLC.

**ANSWER:** Defendant Midwest Dock admits that it utilizes Lawrence Kamin Saunders & Uhlenhop, LLC from time to time for certain legal services. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

32. DOCK & DOOR and MIDWEST DOCK both use Cincinnati Insurance Company for insurance purposes.

**ANSWER:** Defendant Midwest Dock denies the allegations contained in the above paragraph as to itself. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

33.    DOCK & DOOR does not maintain a separate office from MIDWEST DOCK. DOCK & DOOR operates from MIDWEST DOCK's location and, as a result, both companies move from one location to another at the same time.

**ANSWER:** Defendant Midwest Dock admits that Dock & Door operates from the same street address as Midwest Dock, but denies that Dock & Door does not maintain a separate office. Defendant Midwest Dock denies the remaining allegations in the above paragraph.

34.    DOCK & DOOR and MIDWEST DOCK both had a common address of 1249 E. Burville Road, Crete, Illinois as a common business location at the same time.

**ANSWER:** Defendant Midwest Dock admits that both it and Defendant Dock & Door utilized the street address listed in the above paragraph at the same time, but denies the remaining allegations in the above paragraph.

35.    Then, both DOCK & DOOR and MIDWEST DOCK used 3211 Holeman Avenue, South Chicago Heights, IL as a common business location at the same time.

**ANSWER:** Defendant Midwest Dock admits that both it and Defendant Dock & Door utilized the street address listed in the above paragraph at the same time, but denies the remaining allegations in the above paragraph.

36.    Then both DOCK & DOOR and MIDWEST DOCK used 27 E. 36th Street, Steger, Illinois as a common business location at the same time and both currently work from that location.

**ANSWER:** Defendant Midwest Dock denies that it ever has utilized the address listed above, but admits that both it and Defendant Dock & Door currently utilize the street address 27 E. 36th Place, Steger, Illinois. Defendant Midwest Dock denies the remaining allegations in the above paragraph.

37.     Invoices issued by DOCK &DOOR to MIDWEST DOCK include the same address for both companies.

**ANSWER:** Defendant Midwest Dock admits the allegations in the above paragraph.

38.     For example, this excerpt of invoice 2387 from DOCK & DOOR to MIDWEST DOCK shows the same address of 1249 E. Burville Rd., Crete, IL for both companies:



And, this excerpt of an another invoice 6186 from DOCK & DOOR to MIDWEST DOCK showing the same address of 27 E. 36th Place, Steger, IL for both companies:



**ANSWER:** Defendant Midwest Dock admits the allegations in the above paragraph.

39.     During the course of its audit, Legacy demanded documents necessary to determine the amount of fringe benefit contributions owed by DOCK & DOOR. The records requested by Legacy included the payroll records and cash disbursement records of MIDWEST DOCK.

**ANSWER:** Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the allegations in the above paragraph, and therefore denies the same.

40.     DOCK & DOOR and MIDWEST DOCK have common employees, so there is reason to believe that employees of DOCK & DOOR are being paid through MIDWEST DOCK and/or that MIDWEST DOCK employees are being paid to work on DOCK & DOOR projects without fringe benefit contributions being paid on the employees' behalf.

**ANSWER:** Defendant Midwest Dock denies the allegations contained in the above paragraph.

41.     MIDWEST DOCK is bound to the terms of the Agreements under the single-employer or alter ego doctrine.

**ANSWER:** Defendant Midwest Dock denies the allegations contained in the above paragraph.

42.     The Agreements require DEFENDANTS to pay fringe benefits to the TRUST FUNDS.

**ANSWER:** Defendant Midwest Dock denies it is party to, or otherwise bound by, the Agreements and therefore denies the Agreements place any requirements on it of any kind. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

43.     The Agreements require DEFENDANTS to contribute to the TRUST FUNDS for each hour worked by DEFENDANTS' employees performing work within the scope of the Area Agreements at the rate and in the manner specified in the Agreements.

**ANSWER:** Defendant Midwest Dock denies it is party to, or otherwise bound by, the Agreements and therefore denies the Agreements place any requirements on it of any kind. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

44.     The Agreements require DEFENDANTS to contribute to the TRUST FUNDS according to the hours worked by the employees of non-union subcontractors performing work within the scope of the Area Agreement which have not signed an agreement to be bound by the Area Agreement with the UNION.

**ANSWER:** Defendant Midwest Dock denies it is party to, or otherwise bound by, the Agreements and therefore denies the Agreements place any requirements on it of any kind. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

45.     The Agreements require DEFENDANTS to provide all records necessary for the TRUST FUNDS to determine whether DEFENDANTS have complied with their obligation to contribute to the TRUST FUNDS.

**ANSWER:** Defendant Midwest Dock denies it is party to, or otherwise bound by, the Agreements and therefore denies the Agreements place any requirements on it of any kind. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

## COUNT I

37.[*sic*]     The PENSION FUND hereby incorporates paragraphs 1 to 44 above as though fully set forth herein.

14

**ANSWER:** Defendant Midwest Dock hereby incorporates its answers to paragraphs 1 to 44 above as though fully set forth herein.

38.[*sic*]    DOCK & DOOR and MIDWEST DOCK breached the provisions of the Agreements by failing to produce records sufficient to allow auditors engaged by the PENSION FUND to determine whether DEFENDANTS have complied with their obligations to contribute to the PENSION FUND and/or by failing to pay amounts owed to the PENSION FUND based upon the hours worked by employees and/or subcontractors.

**ANSWER:** Defendant Midwest Dock denies it is party to, or otherwise bound by, the Agreements and therefore denies the Agreements place any requirements on it of any kind, including those listed in the above paragraph, and therefore further denies that it breached any aspect of the Agreements. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

39.[*sic*]    The Agreements require DOCK & DOOR and MIDWEST DOCK to pay liquidated damages, auditor fees, and all attorneys' fees and court costs that the PENSION FUND incurs in the collection process.

**ANSWER:** Defendant Midwest Dock denies it is party to, or otherwise bound by, the Agreements and therefore denies the Agreements place any requirements on it of any kind, including those listed in the above paragraph.  Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

40.[*sic*]    The PENSION FUND has complied with all conditions precedent in bringing this suit.

15

**ANSWER:** Defendant Midwest Dock denies it is party to, or otherwise bound by, the Agreements and therefore denies that any conditions precedent would allow the Pension Fund to bring suit against it. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

41.[*sic*]     The PENSION FUND has been required to employ the undersigned attorneys to collect the amounts that DOCK & DOOR and MIDWEST DOCK owe the PENSION FUND.

**ANSWER:** Defendant Midwest Dock denies it owes any amounts to the Pension Fund and therefore denies the allegations in the above paragraph as they purport to relate to Midwest Dock. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

42.[*sic*]     DOCK & DOOR and MIDWEST DOCK must pay attorneys' fees and court costs that the PENSION FUND incurs in this matter pursuant to 29 U.S.C. §1132 (g)(2)(D).

**ANSWER:** Defendant Midwest Dock denies the allegations contained in the above paragraph as purport to relate to it. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

43.[*sic*]     This Court should award the PENSION FUND, pursuant to 29 U.S.C. §1132(g)(2)(B), interest on the amount that is due.

**ANSWER:** Defendant Midwest Dock denies any amount is "due" to the Pension Fund from Midwest Dock and denies the remaining allegations in the above paragraph.

44.[*sic*]     This Court should award the PENSION FUND, pursuant to 29 U.S.C.

16

§1132(g)(2)(C), an amount equal to the greater of:

    (a) interest on the unpaid contributions; or

    (b) liquidated damages provided for under the Trust Agreements not in excess of 20% of the amount that is due.

**ANSWER:** Defendant Midwest Dock denies the Pension Fund is entitled to any amounts whatsoever and therefore denies the allegations contained in the above paragraph.

## COUNT II

45.[*sic*]    The HEALTH FUND hereby incorporates paragraphs 1 to 44 above as though fully set forth herein.

**ANSWER:** Defendant Midwest Dock hereby incorporates its answers to paragraphs 1 to 44 above as though fully set forth herein.

46.[*sic*]    DOCK & DOOR and MIDWEST DOCK breached the provisions of the Agreements by failing to produce records sufficient to allow auditors engaged by the HEALTH FUND to determine whether DEFENDANTS have complied with their obligations to contribute to the HEALTH FUND and/or by failing to pay amounts owed to the HEALTH FUND based upon the hours worked by employees and/or subcontractors.

**ANSWER:** Defendant Midwest Dock denies it is party to, or otherwise bound by, the Agreements and therefore denies the Agreements place any requirements on it of any kind, including those listed in the above paragraph, and therefore further denies that it breached any aspect of the Agreements. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

47. [*sic*]     The Agreements require DOCK & DOOR and MIDWEST DOCK to pay liquidated damages, auditor fees, and all attorneys' fees and court costs that the HEALTH FUND incurs in the collection process.

**ANSWER:** Defendant Midwest Dock denies it is party to, or otherwise bound by, the Agreements and therefore denies the Agreements place any requirements on it of any kind, including those listed in the above paragraph. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

48. [*sic*]     The HEALTH FUND has complied with all conditions precedent in bringing this suit.

**ANSWER:** Defendant Midwest Dock denies it is party to, or otherwise bound by, the Agreements and therefore denies that any conditions precedent would allow the Health Fund to bring suit against it. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

49. [*sic*]     The HEALTH FUND has been required to employ the undersigned attorneys to collect the amounts that DOCK & DOOR and MIDWEST DOCK owe the HEALTH FUND.

**ANSWER:** Defendant Midwest Dock denies it owes any amounts to the Health Fund and therefore denies the allegations in the above paragraph as they purport to relate to Midwest Dock. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

50.[*sic*]          DOCK & DOOR and MIDWEST DOCK must pay attorneys' fees and court costs that the HEALTH FUND incurs in this matter pursuant to 29 U.S.C. §1132 (g)(2)(D).

**ANSWER:** Defendant Midwest Dock denies the allegations contained in the above paragraph as purports to relate to it. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

51.[*sic*]          This Court should award the HEALTH FUND, pursuant to 29 U.S.C. §1132(g)(2)(B), interest on the amount that is due.

**ANSWER:** Defendant Midwest Dock denies any amount is "due" to the Health Fund from Midwest Dock and denies the remaining allegations in the above paragraph.

52.[*sic*]          This Court should award the HEALTH FUND, pursuant to 29 U.S.C. §1132(g)(2)(C), an amount equal to the greater of:

(a) interest on the unpaid contributions; or

(b) liquidated damages provided for under the Trust Agreements not in excess of 20% of the amount that is due.

**ANSWER:** Defendant Midwest Dock denies the Health Fund is entitled to any amounts whatsoever and therefore denies the allegations contained in the above paragraph.

## COUNT III

53.[*sic*]          The TRAINEE FUND hereby incorporates paragraphs 1 to 44 above as though fully set forth herein.

**ANSWER:** Defendant Midwest Dock hereby incorporates its answers to paragraphs 1 to 44 above as though fully set forth herein.

54.[*sic*]          DOCK & DOOR and MIDWEST DOCK breached the provisions of the Agreements by failing to produce records sufficient to allow auditors engaged by the TRAINEE

FUND to determine whether DEFENDANTS have complied with their obligations to contribute to the TRAINEE FUND and/or by failing to pay amounts owed to the TRAINEE FUND based upon the hours worked by employees and/or subcontractors.

**ANSWER:** Defendant Midwest Dock denies it is party to, or otherwise bound by, the Agreements and therefore denies the Agreements place any requirements on it of any kind, including those listed in the above paragraph, and therefore further denies that it breached any aspect of the Agreements. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

55. [*sic*] The Agreements require DOCK & DOOR and MIDWEST DOCK to pay liquidated damages, auditor fees, and all attorneys' fees and court costs that the TRAINEE FUND incurs in the collection process.

**ANSWER:** Defendant Midwest Dock denies it is party to, or otherwise bound by, the Agreements and therefore denies the Agreements place any requirements on it of any kind, including those listed in the above paragraph. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

56. [*sic*] The TRAINEE FUND has complied with all conditions precedent in bringing this suit.

**ANSWER:** Defendant Midwest Dock denies it is party to, or otherwise bound by, the Agreements and therefore denies that any conditions precedent would allow the Trainee Fund to bring suit against it. Defendant Midwest Dock is without knowledge or information sufficient to form a

20

belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

57.[*sic*]	The TRAINEE FUND has been required to employ the undersigned attorneys to collect the amounts that DOCK & DOOR and MIDWEST DOCK owe the TRAINEE FUND.

**ANSWER:** Defendant Midwest Dock denies it owes any amounts to the Trainee Fund and therefore denies the allegations in the above paragraph as they purport to relate to Midwest Dock. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

58.[*sic*]	DOCK & DOOR and MIDWEST DOCK must pay attorneys' fees and court costs that the TRAINEE FUND incurs in this matter pursuant to 29 U.S.C. §1132 (g)(2)(D).

**ANSWER:** Defendant Midwest Dock denies the allegations contained in the above paragraph as purports to relate to it. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

59.[*sic*]	This Court should award the TRAINEE FUND, pursuant to 29 U.S.C. §1132(g)(2)(B), interest on the amount that is due.

**ANSWER:** Defendant Midwest Dock denies any amount is "due" to the Trainee Fund from Midwest Dock and denies the remaining allegations in the above paragraph.

60.[*sic*]	This Court should award the TRAINEE FUND, pursuant to 29 U.S.C. §1132(g)(2)(C), an amount equal to the greater of:

(a) on the unpaid contributions; or

(b) liquidated damages provided for under the Trust Agreements not in excess of 20% of the amount that is due.

21

**ANSWER:** Defendant Midwest Dock denies the Trainee Fund is entitled to any amounts whatsoever and therefore denies the allegations contained in the above paragraph.

**COUNT IV**

61.[*sic*]    The SUPPLEMENTAL RETIREMENT FUND hereby incorporates paragraphs 1 to 44 above as though fully set forth herein.

**ANSWER:** Defendant Midwest Dock hereby incorporates its answers to paragraphs 1 to 44 above as though fully set forth herein.

62.[*sic*]    DOCK & DOOR and MIDWEST DOCK breached the provisions of the Agreements by failing to produce records sufficient to allow auditors engaged by the SUPPLEMENTAL RETIREMENT FUND to determine whether DEFENDANTS have complied with their obligations to contribute to the SUPPLEMENTAL RETIREMENT FUND and/or by failing to pay amounts owed to the SUPPLEMENTAL RETIREMENT FUND based upon the hours worked by employees and/or subcontractors.

**ANSWER:** Defendant Midwest Dock denies it is party to, or otherwise bound by, the Agreements and therefore denies the Agreements place any requirements on it of any kind, including those listed in the above paragraph, and therefore further denies that it breached any aspect of the Agreements. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

63.[*sic*]    The Agreements require DOCK & DOOR and MIDWEST DOCK to pay liquidated damages, auditor fees, and all attorneys' fees and court costs that the SUPPLEMENTAL RETIREMENT FUND incurs in the collection process.

**ANSWER:** Defendant Midwest Dock denies it is party to, or otherwise bound by, the Agreements and therefore denies the Agreements place any requirements on it of any kind, including those listed in the above paragraph. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

64.[*sic*]      The SUPPLEMENTAL RETIREMENT FUND has complied with all conditions precedent in bringing this suit.

**ANSWER:** Defendant Midwest Dock denies it is party to, or otherwise bound by, the Agreements and therefore denies that any conditions precedent would allow the Supplemental Retirement Fund to bring suit against it. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

65.[*sic*]      The SUPPLEMENTAL RETIREMENT FUND has been required to employ the undersigned attorneys to collect the amounts that DOCK & DOOR and MIDWEST DOCK owe the SUPPLEMENTAL RETIREMENT FUND.

**ANSWER:** Defendant Midwest Dock denies it owes any amounts to the Supplemental Retirement Fund and therefore denies the allegations in the above paragraph as they purport to relate to Midwest Dock. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

66.[*sic*]      DOCK & DOOR and MIDWEST DOCK must pay attorneys' fees and court costs that the SUPPLEMENTAL RETIREMENT FUND incurs in this matter pursuant to 29 U.S.C. §1132 (g)(2)(D).

23

**ANSWER:** Defendant Midwest Dock denies the allegations contained in the above paragraph as purport to relate to it. Defendant Midwest Dock is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the above paragraph, and therefore denies the same.

67.[*sic*]   This Court should award the SUPPLEMENTAL RETIREMENT FUND, pursuant to 29 U.S.C. §1132(g)(2)(B), interest on the amount that is due.

**ANSWER:** Defendant Midwest Dock denies any amount is "due" to the Supplemental Retirement Fund from Midwest Dock and denies the remaining allegations in the above paragraph.

68.[*sic*]   This Court should award the SUPPLEMENTAL RETIREMENT FUND, pursuant to 29 U.S.C. §1132(g)(2)(C), an amount equal to the greater of:

(a)   interest on the unpaid contributions; or

(b)   liquidated damages provided for under the Trust Agreements not in excess of 20% of the amount that is due.

**ANSWER:** Defendant Midwest Dock denies the Supplemental Retirement Fund is entitled to any amounts whatsoever and therefore denies the allegations contained in the above paragraph.

**WHEREFORE**, Defendant, Midwest Dock, denies that the Trust Funds are entitled to any relief, and respectfully requests that this Court dismiss the Complaint and award Defendant Midwest Dock its costs and reasonable attorneys' fees and any other relief that is just and equitable, as the Court deems appropriate.

## AFFIRMATIVE DEFENSES

NOW COMES the Defendant, Midwest Dock Solutions, Inc., by and through its attorneys, and for its Affirmative Defenses to the Plaintiffs' Complaint, states as follows:

1.   Plaintiffs Complaint is barred because it fails in whole or in part to state a claim upon which relief can be granted.

24

2.      Defendant Midwest Dock states that to the extent Plaintiffs are asserting claims which occurred outside the applicable statute of limitations period, such claims are time-barred.

3.      Plaintiffs' Complaint, and all claims and requests for damages contained therein, fails with respect to Defendant Midwest Dock because Defendant Midwest Dock was not a signatory to any collective bargaining agreement, Memorandum of Agreement, Trust Agreement and/or any other agreement with any of the individual Plaintiffs.

4.      The Plaintiffs' claims are barred by the operation of the doctrine of laches.

5.      The Plaintiffs' claims are barred by estoppel.

6.      The Plaintiffs' claims are barred by its unclean hands.

7.      The Plaintiffs' claims a barred by waiver.

8.      Defendant Midwest Dock is entitled to a set-off to the extent that any funds paid to Plaintiffs by any party extinguish any underlying claim for damages by Plaintiffs.

9.      Defendant reserves the right to assert such additional affirmative defenses that may become available or apparent, and hereby reserves its right to amend its' Answer to assert such additional affirmative defenses or claims.

WHEREFORE, Defendant, Midwest Dock Solutions, Inc., denies that Plaintiffs are entitled to any relief, and respectfully requests that this Court dismiss Plaintiffs' Complaint and award Defendant its costs and reasonable attorneys' fees and any other relief that is just and equitable, as this Court deems appropriate.


Dated: September 9, 2024                     Respectfully Submitted,
                                             **MIDWEST DOCK SOLUTIONS, INC.,**

                                             By: /s/ Jeffrey A. Risch
                                                     One of its Attorneys

25

Jeffrey A. Risch, Esq. (ARDC No.: 6271407)
Michael F. Hughes, Esq. (ARDC No.: 6279175)
AMUNDSEN DAVIS, LLC
3815 E. Main Street, Suite A-1
St. Charles, IL 60174
(630) 587-7922 – Telephone
(630) 587-7960 – Facsimile
JRisch@amundsendavislaw.com
MHughes@amundsendavislaw.com
***Attorneys for Defendant Midwest Dock Solutions, Inc.***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 9, 2024, he caused the foregoing **DEFENDANT MIDWEST DOCK SOLUTIONS, INC.'S ANSWER AND DEFENSES TO PLAINTIFFS' COMPLAINT** to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification to all parties of record.

By: /s/ Jeffrey A. Risch
One of its Attorneys

Jeffrey A. Risch, Esq. (ARDC No.: 6271407)
Michael F. Hughes, Esq. (ARDC No.: 6279175)
AMUNDSEN DAVIS, LLC
3815 E. Main Street, Suite A-1
St. Charles, IL 60174
(630) 587-7922 – Telephone
(630) 587-7960 – Facsimile
JRisch@amundsendavislaw.com
MHughes@amundsendavislaw.com
**Attorneys for Defendant Midwest Dock Solutions, Inc.**

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 10

# ONE JOBSITE AGREEMENT

Firm: MIDWEST DOCK SOLUTIONS Address: 2878 E. SPRUCE DR.

City: CRETE State: IL Zip: 60417 Phone: (708) 921-8950

THIS AGREEMENT is entered into between the CHICAGO REGIONAL COUNCIL OF CARPENTERS, COOK, DU PAGE, GRUNDY, IROQUOIS, KANE, KANKAKEE, KENDALL, LAKE, MC HENRY and WILL COUNTIES, ILLINOIS, hereinafter referred to as the "UNION" and MIDWEST DOCK SOLUTIONS

Its successors and assigns, hereinafter referred to as the "EMPLOYER".

This One Jobsite Agreement is made in consideration of the instant promises of the UNION and the EMPLOYER and the parties do hereby agree as follows:

1. This Agreement is intended to cover all carpentry work performed by the EMPLOYER at the jobsite known as WHIRAK PONTIUM PACKAGING which is located at SAUK VILLAGE, IL (Hereinafter referred to as the "Site".)

2. The EMPLOYER recognizes the UNION as the sole and exclusive bargaining agent for and on behalf of the Employees of the EMPLOYER within the territorial and occupational jurisdiction of the UNION.

3. The EMPLOYER and the UNION, hereby incorporate by reference and agree to be bound by the Area Agreements in effect on the date this document is executed through their respective expiration dates. Those Agreements include, but are not limited to, the following:

the Area Agreement negotiated between the UNION and the Mid-America Regional Bargaining Association (M.A.R.B.A), the Addendum negotiated between the UNION and the Residential Construction Employers Council (R.C.E.C.) covering Cook, Lake and Du Page Counties, the Agreement negotiated between the Union and the Contractors Association of Will and Grundy Counties covering Grundy County, the Agreement negotiated between the Union and the Contractors Association of Will and Grundy Counties covering Will County, the Agreement negotiated between the Union and the Residential Construction Employers Council (R.C.E.C.) covering Will County, the contract negotiated between the UNION and the Kankakee and Iroquois County Contractors Association, the Agreement negotiated between the UNION and the Fox Valley Contractors Association, and the Residential Construction Employers Council (R.C.E.C.) covering Kane, Kendall and McHenry County, as well as any contracts negotiated between the UNION and other employer associations involved in various subtrades within the Union's occupational jurisdiction.

C:/One Jobsite Agreement.doc


PLAINTIFF'S EXHIBIT
81

MACRC-00550

Case: 1:14-cv-06428 Document #: 53 Filed: 01/16/26 Page 778 of 953 PageID #:1080

4.     The EMPLOYER agrees to be bound by the terms of the Trust Agreements of the Fringe Benefit Trust Funds to which contributions are required to be made under the Agreements referred to in numbered paragraph 3 hereof and all rules and regulations adopted by the Trustees thereof. The EMPLOYER further agrees to make prompt payments of the per hour contributions with respect to each such Trust Fund for all Employees performing bargaining unit work and/or covered by the Agreement including nonbonded and nonsignatory subcontractors as required by the applicable provisions of each agreement.

5.     This Agreement and the adoption of the Area Agreement and Declarations of Trust referred to in paragraphs two and three above, shall be effective upon the date that construction begins on the Site and ends when the jobsite construction is complete.

6.     The EMPLOYER acknowledges receipt of copies of the above mentioned Area Agreements incorporated by reference or those that cover the above referenced jobsite.

7.     The EMPLOYER agrees to notify the Union, in writing, of the dates on which construction at the Site is expected to begin and end as well as notifying the Union of the actual beginning and ending dates of Site construction.

ESTIMATED STARTING DATE: 11/14/2011

ESTIMATED COMPLETION DATE: 11/17/2011

IN WITNESS WHEREOF the parties have executed this Agreement the 11th day of November 20 11

EMPLOYER: _____     CHICAGO REGIONAL COUNCIL OF CARPENTERS

_____

BY: Anthony Zanlewo - Owner
(Print or Type Name)          (Title)

_____     _____
(Signature)          (Regional Council Officer)

2

C:/One Jobsite Agreement.doc

MACRC-00551



September 8, 2011 | Uncategorized

# Groundbreaking Held For Winpak Manufacturing Facility In Sauk Village

CHICAGO, Ill. – A groundbreaking was held today for the Winpak Portion Packaging manufacturing facility in Dermody Properties'/ DP Partners' LogistiCenter at Sauk Village, Ill. Participants included Mayor Lewis Towers of Sauk Village, Illinois State Representative Anthony DeLuca, and representatives from Winpak Portion Packaging, Dermody Properties/DP Partners and Principle Construction.

Winpak is a leading multi-national packaging company and currently operates a manufacturing facility in nearby South Chicago Heights, producing plastic cups and trays for food and beverages. Their new 267,000 square foot facility will be located on a 28-acre site at 1111 Winpak Way. Principle Construction has begun work on the project and will complete the building envelope by November 2011, and the facility will be complete by March 2012. The expansion will create 40 jobs once the facility is complete, with more jobs in the future based on Winpak's plans to expand the facility to a full 600,000 square feet.

Winpak chose Dermody Properties'/ DP Partners' LogistiCenter because of its proximity to Winpak's South Chicago Heights facility and its strategic location. LogistiCenter at Sauk Village is a 325-acre Class A business park, bounded by Illinois state highway 394 on the east, Cottage Grove Avenue on the west, Sauk Trail on the south and the CN on the north. Located within the heavy industrial Calument Expressway Corridor, the park has immediate access to IL 394 and is within six miles

of I-80/I-94, making it an ideal location for serving the tri-state area of Illinois, Indiana and Michigan.

The State of Illinois provided a $1.6 million business investment package to Winpak Portion Packaging to help fund the new state-of-the-art manufacturing facility, which complements the company's $30 million investment for land, building and equipment. The office of Governor Pat Quinn, the Illinois Department of Commerce and Economic Opportunity (DCEO), and Mayor Lewis Towers' office were all instrumental in facilitating this successful transaction.

John Atwell, COO of Dermody Properties/ DP Partners, worked closely with Winpak throughout the process. Justin Fierz and Brian Vanosky of Lee & Associates represented Winpak, and George Cibula of Darwin Realty represented DP. Principle Construction is the general contractor for the build-to-suit facility.

About Dermody Properties
Dermody Properties is a privately held national industrial real estate development company. It is the parent company of DP Partners. Founded and headquartered in Reno, Nev., it has regional offices in Portland, Ore., Philadelphia, Pa., and Chicago, Ill., as well as property holdings in Las Vegas, Nev., Harrisburg, Pa., Savannah, Ga., and southern New Jersey. Over the last three years, Dermody Properties/DP Partners has developed and purchased more than 4.5 million square feet and leased approximately 1 million square feet annually. Dermody Properties currently has more than 3.5 million square feet of industrial space that is 90 percent occupied, and is actively doing build to suits and joint ventures throughout the nation. To learn more about Dermody Properties visit www.Dermody.com.

About Winpak Portion Packaging, Inc.
Winpak Portion Packaging, Inc. is a leading multi-national packaging manufacturing company. Winpak has nine production facilities in Canada and the United States, offering customers global coverage and expertise. The North American business units assist customers throughout the United States, Canada, Latin America and the

MACRC-00553

Pacific Rim countries primarily for the protection of perishable foods, beverages, and in health care applications.

About LogistiCenter at Sauk Village

Dermody Properties/DP Partners began developing LogistiCenter at Sauk Village in March of 2005. Since then, Dermody Properties/DP Partners has developed three facilities totaling 1,531,630 square feet. When completed, the 325-acre business park will accommodate approximately 5,000,000 square feet of high-cube distribution and manufacturing space and attract between 500 and 1,500 jobs to the region. LogistiCenter at Sauk Village offers the maximum in facility flexibility. Build-to-suit buildings are custom designed to meet the most demanding specifications of users. Dermody Properties/DP Partners is also developing single- or multi-tenant speculative buildings for immediate occupancy. All facilities in the park are built to Class A quality specifications, designed to protect the investment of tenants, the owner/developer, and the Village of Sauk Village.

## RECENT NEWS

MARCH 12, 2025

Dermody Announces Acquisition and New Development in Chicago Submarket

READ MORE ↗

FEBRUARY 19, 2025

Dermody Announces Lease of Building 3 at The Logistics Campus

READ MORE ↗

FEBRUARY 19, 2025

MACRC-00554



Dermody Properties Announces Streamlined Brand Identity: Dermody

READ MORE ↗

↖ VIEW ALL NEWS

MACRC-00555



Subscribe to our email updates for the latest information on all of our projects.

Email Address ↗



MACRC-00556



1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 11

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Telephone (Fringe Benefits) 312/787-9455 and (Regional Council) 312/787-3076

| PAGE NO. | ACCOUNT NO. 25198 |
|---|---|
| H & W | 12.34 |
| Con Pen | 11.25 |
| Appren. | 0.53 |
| Int Fnd | 0.10 |
| Lab Mgmt | 0.02 |
| Miaf | 0.06 |
| * Safety | 0.01 |
| * Cisco | 0.01 |

**SEE INSTRUCTIONS ON REVERSE**

☒ No Employees This Month   ☒ Change Of Address
☒ Change Of Name   ☒ Send More Forms

Firm Name and Address
MIDWEST DOCK SOLUTIONS
2828 E. SPRUCE DR.
CRETE, IL 60417

*NOT APPLICABLE FOR WORK PERFORMED UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY 3 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of NOV 11   (per Tony @ Co.)

| Social Security Number | Carpenter's Name | Local & Class | Total Actual Hours Worked | X | Benefit Hours (1) | Gross Wages | Dues Withhold (2) |
|---|---|---|---|---|---|---|---|
| | DAVE NICHENT | 1693 JOURNEYMAN | 24 | | 24 | $978.48 | 29.35 |



Pd which credit O/A

PLAINTIFF'S EXHIBIT 85

| | | | 24 | | 24 | $978.48 | $29.35 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

Total this month   24   24   $978.48   $29.35

(1) Amount due at $ 24.32 per hour   $ 583.68
+ (2) Total dues withheld $ 29.35
= Subtotal $ 613.03
Prior Balance Due or (Cr. Available) $ (778.74)
Grand Total $ (165.71)

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

JAN 05 2012

REPORT MUST BE SIGNED!   ▶
AUTHORIZED SIGNATURE
TITLE   OWNER

MACRC-00606

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Telephone (Fringe Benefits) 312/787-9455 and (Regional Council) 312/787-3076

| PAGE NO. | ACCOUNT NO. 25198 |
|---|---|
| H & W | 12.34 |
| Con Pen | 11.25 |
| Appren. | 0.53 |
| Intl Fnd | 0.10 |
| Lab Mgmt | 0.02 |
| Mlaf | 0.06 |
| * Safetv | 0.01 |
| * Cisco | 0.01 |

**SEE INSTRUCTIONS ON REVERSE**

☒ No Employees This Month  ☒ Change Of Address
☒ Change Of Name  ☒ Send More Forms

*NOT APPLICABLE FOR WORK PERFORMED UNDER THE
RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY 3 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Irm ame nd ddress

MIDWEST DOCK SOLUTIONS
2828 E. SPRUCE DR.
CRETE, IL 60417 — NOVEMBER
DECEMBER, 2011

#41

Month of **Dec 2011**

| Social Security Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked | Benefit Hours (1) | Gross Wages | Dues Withheld (2) |
|---|---|---|---|---|---|---|---|
| | DAVID RICHERT | 1693 | | 24 | 24 | $978.48 | 29.35 |

*Expired agreement Diceson 41*



| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒EPORT DUE ON OR BEFORE THE 15TH OF HE MONTH. LATE PAYMENTS WILL BE HARGED 1.5% PER MONTH, COMPOUNDED, S LIQUIDATED DAMAGES | Total this month | | | 24 | 24 | $ 978.48 | $ 29.35 |
| | (1) Amount due at $ 24.32 per hour | | | $ 583.68 | | | |
| | + (2) Total dues withheld | | $ 29.35 | | | | |
| | = Subtotal | | $ 613.03 | | | | |

N "X" INDICATES THE REGIONAL COUNCIL HAS A DUES
HECKOFF AUTHORIZATION FORM ON FILE

Prior Balance Due or (Cr. Available)  $ 165.2+

Grand Total  $ 44782

rtify the above is a true and complete report of actual hours worked by foremen, journeymen, apprentice carpenters, and does NOT include hours worked by any self-employed persons, ...ers or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are aintained. We agree to keep and maintain contemporaneous time records reporting the hours ting reported herein.

JAN 30 2012  BY: _____

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE _____

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

MACRC-00607

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Telephone (Fringe Benefits) 312/787-9455 and (Regional Council) 312/787-3076

| | |
|---|---|
| PAGE NO. | ACCOUNT NO. 25198 |

| | |
|---|---|
| H & W | 12.34 |
| Con Pen | 11.25 |
| Appren. | 0.63 |
| Intl Fnd | 0.10 |
| Lab Mgmt | 0.02 |
| Mlef | 0.06 |
| * Safety | 0.01 |
| * Cisco | 0.01 |

**SEE INSTRUCTIONS ON REVERSE**

☒ No Employees This Month   ☒ Change Of Address
☒ Change Of Name   ☒ Send More Forms

Firm Name and Address: MIDWEST DOCK SOLUTIONS
2828 E. SPRUCE DR.
CRETE, IL 60417 — INVOICE
DECEMBER, 2011

Month of _____

*NOT APPLICABLE FOR WORK PERFORMED UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY 3 % OF EACH EMPLOYEES MONTHLY GROSS WAGES

| | MUST BE SHOWN! | WATCH SPELLING! | PLEASE PRINT! | | | | |
|---|---|---|---|---|---|---|---|
| Social Security Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked | Benefit Hours (1) | Gross Wages | Dues Withheld (2) |
| ▮▮▮▮ | DAVID RICHERT | 1693 | | 24 | 24 | $978.48 | 29.35 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |



Dues + Wages on a Hi Report —

| | | | | Total this month | 24 | 24 | $ 978.48 | $ 29.35 |
|---|---|---|---|---|---|---|---|---|

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

(1) Amount due at $ 24.32 per hour   $ 583.68
+ (2) Total dues withheld   29.35
= Subtotal   $ 613.03
Prior Balance Due or (Cr. Available)   $ 165.21
Grand Total   $ 447.82
418.47

An "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

's certify the above is a true and complete report of actual hours worked by foreman, journeyman and apprentice carpenters, and does NOT include hours worked by any self-employed persons, ...rs or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all ... provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations ... Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours ...ing reported herein.

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

JAN ▮▮ 2012
BY: ▮▮▮

REPORT MUST BE SIGNED!   AUTHORIZED SIGNATURE

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Telephone (Fringe Benefits) 312/787-9455 and (Regional Council) 312/787-3076

PAGE NO. H & W

ACCOUNT NO. 51464
13.19

GENEVA

**SEE INSTRUCTIONS ON REVERSE**

☒ No Employees This Month   ☐ Change Of Address
☒ Change Of Name   ☒ Send More Forms

Firm Name and Address: Midwest Dock Solution

DUES CHECKOFF IS CURRENTLY **4** % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of December 2012

| !MUST BE SHOWN! WATCH SPELLING! PLEASE PRINT! Participant I.O. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | Rodney Platt | 916 | | 10 | 19.93 | 498.24 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

Total this month: 10   19.93   $ 498.24

(1) Amount due at $ 13.19 per hour $ 131.90

+ (2) Total dues withheld $ 19.93

= Subtotal $ 151.83

N "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

Prior Balance Due or (Cr. Available) $

Grand Total $ 151.83

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

JUN 13 2013

REPORT MUST BE SIGNED ▶   AUTHORIZED SIGNATURE

TITLE

MACRC-00609

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Telephone (Fringe Benefits) 312/787-9455 and (Regional Council) 312/787-3076

| PAGE NO. | ACCOUNT NO. 25198 | |
|---|---|---|
| H & W | 13.19 | |
| Con Pen | 11.75 | |
| Appren. | 0.53 | |
| Intl Fnd | 0.10 | |
| Lab Mgmt | 0.02 | |
| Mlaf | 0.06 | |
| Safety | 0.01 | |
| Cisco | 0.01 | |

SEE INSTRUCTIONS ON REVERSE

☒ No Employees This Month   ☒ Change Of Address
☒ Change Of Name   ☒ Send More Forms

Firm Name and Address: MIDWEST DOCK SOLUTIONS
282B E. SPRUCE DR.
CRETE, IL 60417

*NOT APPLICABLE FOR WORK PERFORMED UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY _____ % OF EACH EMPLOYEES MONTHLY GROSS WAGES

MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!   Month of December 2012

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | RODNEY PLATT | 916 | | 10 | 19.93 | 498.24 |
| | ADAM SCHWOEBEL | 1693 | X | 10 | 19.93 | 498.24 |
| | JOHN BEAVITT | 272 | | 35 | 56.13 | 1,453.20 |
| | | | | | | |
| | Geneva member - is | | | | | |
| | | | | | | |
| | * Spoke to Tony @ co regarding worth of Deposit on 12/4/13 | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

"X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

| | | |
|---|---|---|
| Total this month | 55 | $97.99 | $2,449.68 |
| (1) Amount due at $ 25.67 per hour | $1,411.85 | |
| + (2) Total dues withheld | $ 97.99 | |
| = Subtotal | $1,509.84 | $2,449.68 |
| Prior Balance Due or (Cr. Available) | $ | |
| Grand Total | $1,509.84 | |

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

I certify the above is a true and complete report of actual hours worked by foreman, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, owners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain such comprehensive and records reporting the hours being reported herein.

JAN 18 2013

REPORT MUST BE SIGNED   AUTHORIZED SIGNATURE   TITLE

MACRC-00610

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Telephone (Fringe Benefits) 312/787-9455 and (Regional Council) 312/787-3076

SEE INSTRUCTIONS ON REVERSE

| PAGE NO. | ACCOUNT NO. 25198 |
|---|---|
| H & W | 13.19 |
| Con Pen | 11.75 |
| Appren. | 0.53 |
| Intl Fnd | 0.10 |
| Lab Mgmt | 0.02 |
| Miaf | 0.06 |
| * Safety | 0.01 |
| * Cisco | 0.01 |

☑ No Employees This Month    ② Change Of Address
④ Change Of Name    ⑤ Send More Forms

Firm Name and Address: MIDWESS DOOR SOLUTIONS

1173326

NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY ___% OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of JAN 2012

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | Por Compam | | | | | |
| | No | | | | | |
| | | | | | | |
| | Uorn | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED AS LIQUIDATED DAMAGES!

| | | |
|---|---|---|
| Total this month | $ . | $ | $ |
| (1) Amount due at $ 25.67 per hour | $ | |
| + (2) Total dues withheld | $ | |
| = Subtotal | $ | |
| Prior Balance Due or (Cr. Available) | $ | |
| Grand Total | $ | |

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or propietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

NOV 0 [illegible] 2012

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT MUST BE SIGNED

AUTHORIZED SIGNATURE _____

TITLE _____
OWNER-PARTNER-OFFICER

CC-202-R 2/

MACRC-00011

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Telephone (Fringe Benefits) 312/787-9455 and (Regional Council) 312/787-3076

| | |
|---|---|
| H & W | 13.19 |
| Con Pen | 11.75 |
| Aperen. | 0.53 |
| Intl Fnd | 0.10 |
| Lab Mgmt | 0.02 |
| Misf | 0.06 |
| • Safety | 0.01 |
| • Cisco | 0.01 |

25198

**SEE INSTRUCTIONS ON REVERSE**

☒ No Employees This Month  ☒ Change Of Address
☒ Change Of Name  ☒ Send More Forms

Firm Name and Address: MIDWEST DECK SOLUTIONS
2828 E. SPRUCE DR.
CRETE, IL 60417

**\*NOT APPLICABLE FOR WORK PERFORMED UNDER THE RESIDENTIAL AGREEMENT**
DUES CHECKOFF IS CURRENTLY 4 % OF EACH EMPLOYEES MONTHLY GROSS WAGES

Month of FEBRUARY 2012

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | DAVID GREEN | 272 | | 14 | ~~22.83~~ | 570.78 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Co. has ($18.90) credit due to paying @ wrong rate Co. pd @ $25.67 s/o @ $24.32

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

| | | | | |
|---|---|---|---|---|
| Total this month | $346.55 | 1/3 24.32 25.67 | 14 | $22.83 | $570.78 |
| (1) Amount due at $ | | per hour | $ 359.38 | |
| + (2) Total dues withheld | | | $ 22.83 | |
| = Subtotal | | | ~~$ 336.32~~ 382.21 | |
| Prior Balance Due or (Cr. Available) | | | $ | |
| Grand Total | | | $ 382.21 | |

363.31

AN 'X' INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

**SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:**
**CHICAGO CARPENTERS TRUST FUNDS**
P.O. BOX 94432
CHICAGO, IL 60690

RECEIVED JUN 26 2012 BY D.C.

REPORT MUST BE SIGNED

AUTHORIZED SIGNATURE _____

TITLE ___ OWNER
OWNER-PARTNER-OFFICER

CC-202-R 1A

MACRC-00612

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Telephone (Fringe Benefits) 312/787-9456 and (Regional Council) 312/787-3075

## SEE INSTRUCTIONS ON REVERSE

| | |
|---|---|
| ☒ No Employees This Month | ☒ Change Of Address |
| ☐ Change Of Name | ☒ Send More Forms |

| | |
|---|---|
| H & W | 13.19 |
| Con Pen | 11.75 |
| Appren. | 0.53 |
| Intl Fnd | 0.10 |
| Lab Mamt | 0.02 |
| Misf | 0.68 |
| * Safety | 0.01 |
| * Cisco | 0.01 |

25198

Firm Name and Address  MIDWEST Deck Solutions
2828 E. SPRucc DR.
CRETE, IL 60417

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of  MARCH 2012

| Participant I.D. Number | Carpenter's Name | Local & Class | x | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| ▓▓▓▓▓ | DAVE GREEN | 272 | | 5 | 8.15 | 203.85 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| Co. has ($6.75) credit due to paying @ wrong | | | | | | |
| rate. Co. pd @ $35.67 s/b @ $34.32 | | | | | | |
| | | | | | | |
| | | Total this month | | 5 | $ 8.15 | $ 203.85 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1½% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE.

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of this Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

27.32
121.60
$ 129.75

| | | |
|---|---|---|
| (1) Amount due at $ | per hour | $ 28.15 |
| + (2) Total dues withheld | | $ 8.15 |
| = Subtotal | | $ 136.30 |
| Prior Balance Due or (Cr. Available) | | $ |
| Grand Total | | $ 136.50 |

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

 RECEIVED JUN 2 8 2012 BY

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE _____

TITLE _____
OWNER-PARTNER-OFFICER

CC-202-R 1A

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Telephone (Fringe Benefits) 312/787-9455 and (Regional Council) 312/787-3076

| | |
|---|---|
| H & W | 13.19 |
| Con Pen | 11.75 |
| Appren. | 0.53 |
| Int'l Fnd | 0.10 |
| Lab Mgmt | 0.02 |
| Misf | 0.06 |
| Safety | 0.01 |
| Cisco | 0.01 |

2 5198

SEE INSTRUCTIONS ON REVERSE

☐ No Employees This Month   ☐ Change Of Address
☐ Change Of Name   ☐ Send More Forms

Firm Name and Address: MIDWEST Dock Solutions
2828 E. SPRUCE DR.
CRETE IL 60417

*NOT APPLICABLE FOR WORK PERFORMED UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY 4 % OF EACH EMPLOYEES MONTHLY GROSS WAGES

Month of: ~~APRIL 2012~~ MAY 2012

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | DAVID GREEN | 272 | | 8 | 13.05 | 326.16 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Co. has ($10.80) credit due to paying @ wrong rate. Co. pd. @ $25.67 s/o @ $24.82.

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES.

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeyman and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

Total this month ~~25.87~~ to 24.32
(1) Amount due at $ ~~$194.56~~ to $195.36  per hour
+ (2) Total dues withheld
= Subtotal
$ 207.61
Prior Balance Due or (Cr. Available)
Grand Total

| | 8 | $ 13.05 | $ 326.16 |
|---|---|---|---|
| $205.36 | | | |
| $ 13.05 | | | |
| $ 218.41 | | | |
| $ | | | |
| $ 218.41 | | | |

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT MUST BE SIGNED! ▶ AUTHORIZED SIGNATURE

RECEIVED JUN 2 6 2012 By: N.6.

TITLE: OWNER-PARTNER-OFFICER

CC-202-R 1/

MACRC-00614

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Telephone (Fringe Benefits) 312/787-9455 and (Regional Council) 312/787-3076

## SEE INSTRUCTIONS ON REVERSE

| | |
|---|---|
| ☒ No Employees This Month | ☒ Change Of Address |
| ☒ Change Of Name | ☒ Send More Forms |

| PAGE NO. | ACCOUNT NO. 25198 |
|---|---|
| H & W | 12.34 |
| Con Pen | 11.25 |
| Appren. | 0.53 |
| Intl Fnd | 0.10 |
| Lab Mgmt | 0.02 |
| Mef | 0.06 |
| * Safety | 0.01 |
| * Cisco | 0.01 |

Firm Name and Address: MIDWEST DOCK SOLUTIONS
2828 E. SPRUCE DR.
CRETE, IL 60417

*NOT APPLICABLE FOR WORK PERFORMED UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY 3 % OF EACH EMPLOYEES MONTHLY GROSS WAGES

Month of JUNE 2012

| Social Security Number | Carpenter's Name | Local & Class | Total Actual Hours Worked | Benefit Hours | Gross Wages | Dues Withheld (2) |
|---|---|---|---|---|---|---|
| | DAVE GREEN | #272 | 9 | 8 | 257.06 | 7.71 |
| O 15 2012 | #released from Edison | | | | | |
| | Co Short 10.80 Paying @ The Wrong Rate. | | | | | |
| PAID IN FULL CK# 4405 11/23/12 | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1½% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foreman, journeymen, apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

| | | |
|---|---|---|
| Total this month | 8 | 8 |
| (1) Amount due at $ 24.32 per hour | $194.56 | $257.06 |
| | 205.36 | $7.71 |
| + (2) Total dues withheld | $7.71 | |
| = Subtotal | $202.27 | |
| Prior Balance Due or (Cr. Available) | $ | |
| Grand Total | $202.27 | |
| | 199.56 | |

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE _____ OWNER

TITLE _____ OWNER/PARTNER-OFFICER

RECEIVED JUL 2 0 2012

CC-300-N 7/6

MACRC-00615

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 12

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MID-AMERICA CARPENTERS )
REGIONAL COUNCIL PENSION )
FUND, et al., )
                         )
            Plaintiffs,  )  No. 1:24-cv-02428
                         )
      vs.                ) Judge Andrea R. Wood
                         )
DOCK & DOOR INSTALL,     )   Magistrate Judge
INC., an Illinois        ) Jeannice W. Appenteng
corporation and MIDWEST  )
DOCK SOLUTIONS, INC., an )
Illinois corporation,    )
                         )
            Defendants.  )

        The deposition of DAVID GREEN,
called by the Defendant for examination, taken
pursuant to the Federal Rules of Civil
Procedure of the United States District Courts
pertaining to the taking of depositions, taken
before DIANE M. NULICK, a Notary Public within
and for the County of Cook, State of Illinois,
and a Certified Shorthand Reporter of said
State, at Suite 231, 3759 North Ravenswood,
Chicago, Illinois, on the 11th day of April,
A.D. 2025, at 9:10 a.m.

**2**

1   PRESENT:
2     McJESSY, CHING & THOMPSON, LLC,
      BY:  MR. KEVIN P. McJESSY,
3     mcjessy@MCandT.com,
      (3759 North Ravenswood, Suite 231,
4      Chicago, Illinois  60613,
      (773) 880-1260),
5
        appeared on behalf of the plaintiffs;
6
      ALLOCCO MILLER & CAHILL, P.C.,
7     BY:  MR. TODD A. MILLER,
      tam@alloccomiller.com,
8     (20 North Wacker Drive, Suite 3517,
       Chicago, Illinois  60606,
9     (312) 675-4325),
10      appeared on behalf of the defendant,
        Dock & Door Install, Inc.;
11
      AMUNDSEN DAVIS LLC,
12    BY:  MR. MICHAEL F. HUGHES,
      mhughes@amundsendavislaw.com,
13    (3815 East Main Street, Suite A-1,
       St. Charles, Illinois  60174,
14    (630) 587-7925/(630) 217-1228 (direct),
15      appeared on behalf of the defendant,
        Midwest Dock Solutions, Inc.
16
17
18
19
20
21
22
23
24

**3**

1                 I N D E X
2
3   WITNESS:  DAVID GREEN
4
5   EXAMINATION BY:                      PAGE
6   Mr. McJessy                            4
7
8   PLAINTIFF'S EXHIBITS:
9   No. 27                                11
    No. 28                                18
10  No. 29                                25
    No. 3                                 40
11  No. 6                                 53
    No. 7                                 55
12  No. 8                                 56
    No. 8                                 92
13  No. 7                                 93
    No. 15                                93
14  No. 23                                96
    No. 21                                97
15  No. 19                               104
    No. 20                               105
16  No. 29                               106
    No. 28                               113
17  No. 30                               115
    No. 30                               159
18  No. 20                               178
    No. 31                               201
19
20
21
22
23
24

**4**

1            (The witness was duly sworn.)
2
3
4
5            DAVID GREEN,
6   called as a witness herein, having been first
7   duly sworn, was examined and testified as
8   follows:
9
10
11            EXAMINATION
12          BY MR. McJESSY:
13
14      Q.  All right.
15           Sir, can you state your name
16   for the record -- first, middle, and last --
17   and spell each one?
18      A.  David Jonathon Green, D-a-v --
19   D-a-v-i-d, J-o-n-a-t-h-o-n, G-r-e-e-n.
20      Q.  All right.
21           And, sir, have you ever been
22   deposed before?
23      A.  No.
24      Q.  Like this.

1 (Pages 1 to 4)

5

1     A.   No.
2     Q.   Okay.
3          Let me explain a few things
4 to you.
5          Have you had -- are you
6 represented by an attorney here today?
7     A.   No.
8     Q.   Okay.
9          So let me -- let me explain a
10 few things to you just to hopefully make the
11 process go faster and so you know what's going
12 on.
13          You understand you're under
14 oath?
15     A.   Yes.
16     Q.   Okay.
17          And even though we're in an
18 informal setting here in a conference room, do
19 you understand that that oath has the same
20 force and effect as if you were testifying in a
21 court?
22     A.   Yes.
23     Q.   Okay.
24          I'm going to ask you a series

6

1 of questions today, and hopefully you'll give
2 me the best, most truthful answers that you
3 can.
4          When I ask a question,
5 sometimes one of the attorneys in the room here
6 may -- may object to the question. If they do,
7 let them go ahead and make their objection on
8 the record so the court reporter can take it
9 down, and then you can go ahead and answer my
10 question, but give them a chance to make their
11 objections. Okay?
12          And if I ask a question and
13 you don't understand it, ask me -- tell me
14 that, and I will try to clarify my question.
15 I'll rephrase it or try to figure out how to
16 ask it in a way that's more understandable.
17          Is that fair?
18     A.   Okay.
19     Q.   Okay.
20          And if -- if I ask a question
21 and you do understand it, you can just answer.
22          Is that fair?
23     A.   Sure. Yeah.
24     Q.   Okay.

7

1          And all of your -- as I ask
2 you questions, a lot of them may be yeses and
3 no kind of questions. Your answers need to be
4 verbal responses. Yes and no is fine. But if
5 you nod or shake your head or if you say ah-huh
6 or uh-uh, I'll prompt you. I'll say is that a
7 yes, is that a no, just because the court
8 reporter is taking down my questions and your
9 responses, and the record needs to be clear.
10          Is that fair?
11     A.   Yes.
12     Q.   Okay.
13          And -- let's see. Another
14 important rule. Sometimes you're just going to
15 know what my question is before I finish asking
16 it. And to move things along, you're going to
17 want to start answering my question before I
18 finish asking it. Because the court reporter
19 can only take down what one of us is saying at
20 a time, please let me finish my question before
21 you start answering. I will try to return the
22 courtesy and not start asking a new question
23 while you're answering an old question.
24 Sometimes you're going to find we both make

8

1 mistakes on that, and the court reporter might
2 say whoa, whoa, whoa, I need -- you know, let
3 him finish or -- you know, let him finish
4 asking his question -- just so that the record
5 is clear.
6          Is that fair?
7     A.   Yes.
8     Q.   Okay.
9          Any reason that you cannot
10 give truthful answers to my questions today?
11 For example, is there any reason you can't
12 understand my questions or give truthful
13 answers, like you're, you know, on some
14 medication or suffering from some condition
15 that would prevent you from understanding my
16 questions or giving truthful answers?
17     A.   No.
18     Q.   Okay.
19          Also, I may ask you questions
20 about things that -- certainly will ask you
21 questions about things that have happened in
22 the past. This is a little bit of a memory
23 test. If you're giving me an answer based on
24 an estimate -- like, well, I think that was

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

9

1    about 2017, I think that was about 2018 -- if
2    you're estimating a date, just go ahead and say
3    it was approximately or about -- you know, to
4    be clear that you're not sure of a particular
5    answer, and you're giving me an estimate.
6    That's fair that you give an estimate, but just
7    try to let me know that's what you're doing.
8              Is that fair?
9        A.  Yeah.  Yes.
10       Q.  Okay.
11             Also, as we go along, I
12   suspect your deposition today will take
13   probably two hours, maybe a little bit more
14   than that.  If you need to take a break at any
15   time, just let me know, and we'll stop.  We'll
16   do that.  Generally, we take a break about
17   every hour just so the court reporter can rest
18   her fingers, and we can take a break.  But if
19   you need a break for any other reason, just let
20   me know, and we can stop.  Okay?
21       A.  Okay.
22       Q.  All right.
23             Have you spoken to anybody
24   about your deposition today?

10

1        A.  Spoken to them today?
2        Q.  No.
3              Have you spoken to -- well,
4    let me rephrase it.
5              Have you spoken to anybody
6    about the fact that you were subpoenaed to give
7    a deposition in this case?
8        A.  Yes.
9        Q.  Okay.
10             And who have you spoken to?
11       A.  Tony.
12       Q.  Tony?
13       A.  Tony Brutti, my boss.
14       Q.  Okay.
15             And when did you let him
16   know?
17       A.  Not long after I got the letter.
18       Q.  Okay.
19             And when you say "the
20   letter," do you mean the subpoena?
21       A.  Yes.
22       Q.  Okay.
23             And I'll take a brief pause.
24

11

1              (There was a discussion off
2               the record.)
3
4              (WHEREUPON, the document was
5               marked Plaintiff's
6               Exhibit 27 for identification,
7               as of 4/11/25.)
8
9    BY MR. McJESSY:
10       Q.  All right.
11             Sir, I'm handing you what
12   I've marked as Exhibit 27.
13             And when you said you spoke
14   to him when you got the letter in this matter,
15   is this what you're referring to?
16       A.  Yes.
17       Q.  Okay.
18             And this is the subpoena that
19   you received in this case, right?
20       A.  Yes.
21       Q.  All right.
22             And do you remember
23   approximately how long ago you were served with
24   this?

12

1        A.  It was mid February.
2        Q.  All right.
3              So was it sometime around
4    then that you spoke to him about this?
5        A.  Yes.
6
7              (There was a discussion off
8               the record.)
9
10   BY MR. McJESSY:
11       Q.  And what did you discuss with him?
12       A.  Just asked what was going on, and he
13   told me just to tell the truth.
14       Q.  All right.
15             Anything else?
16       A.  No.
17       Q.  What did he tell you was going on?
18       A.  An issue between Dock & Door and
19   Midwest Dock, about using equipment and trucks.
20       Q.  All right.
21             Did he say anything more than
22   that?
23       A.  No.
24       Q.  All right.

                                3 (Pages 9 to 12)

13

1    Have you pretty much told me
2  everything you can remember from that
3  conversation?
4    A.  Yes.
5    Q.  And did you speak with anybody else
6  besides him about the subpoena that you
7  received in this case?
8    A.  Tony T.  Tony Tattini.
9    Q.  Okay.
10    And when did you speak with
11  him?
12    A.  It had to be the end of February.
13    Q.  All right.
14    Sometime around -- similar --
15  close to the same timeframe?
16    A.  Similar, yes.
17    Q.  And do you know Tony Tattini?
18    A.  No, from previous, working with him.
19    Q.  Okay.
20    And he left Dock & Door back
21  in about 2019, correct?  Does that sound right
22  to you?
23    A.  Probably somewhere in there.
24    Q.  Okay.

14

1    And have you stayed in touch
2  with him since then?
3    A.  No.
4    Q.  Okay.
5    So how is it you reached out
6  to Tony Tattini?
7    A.  I didn't reach out to him.  He reached
8  out to me.
9    Q.  Oh, okay.
10    And what was the nature of
11  your conversation with him?
12    A.  Just asking what -- what was going on,
13  basically.
14    Q.  All right.
15    Was this after you had had
16  your conversation with Mr. Brutti?
17    A.  Yes.
18    Q.  And what did you tell him?
19    A.  Basically the same thing, about using
20  trucks and equipment?
21    Q.  Okay.
22    And anything else?
23    A.  No.
24    Q.  Any details about what using trucks

15

1  and equipment meant or why that was important?
2    A.  No.  From what I heard, it was just
3  using Midwest Dock's equipment.
4    Q.  Okay.
5    And did Mr. Tattini call you
6  on the phone, or how did you --
7    A.  Yeah.
8    Q.  -- talk to him?
9    All right.  And do you have
10  any other conversations with Mr. Tattini?
11    A.  He called me after he called you --
12    Q.  Okay.
13    A.  -- and told me the information he got
14  from you.
15    Q.  Okay.
16    And what did he tell you --
17  what was the information he said he got from
18  me?
19    A.  He just said he asked -- you asked him
20  some questions about time at the shop.  I think
21  that's really all I remember.
22    Q.  Okay.
23    Do you remember how long each
24  of your conversations with Mr. Tattini lasted?

16

1    A.  A couple minutes.
2    Q.  Okay.
3    Do you remember how long your
4  conversation with Mr. Brutti lasted when you
5  talked to him about this subpoena?
6    A.  Maybe a couple minutes.
7    Q.  Okay.
8    And any other conversations
9  with anybody else about the -- this lawsuit or
10  the matters raised in this lawsuit?
11    A.  No.
12    Q.  And did you and I speak?
13    A.  I did call you, yes.
14    Q.  Okay.
15    How many times have we
16  spoken?
17    A.  I think once.
18    Q.  Okay.
19    A.  That's -- and we texted a couple
20  times.
21    Q.  Okay.
22    And that was to -- there was
23  an issue about scheduling your deposition,
24

4 (Pages 13 to 16)

17

```
1    correct?
2        A.  Yes.
3        Q.  Okay.
4            And when we spoke, what --
5    what's your recollection of what our
6    conversation was about?
7        A.  Well, I called you just to find out
8    what was going on, too, basically, and --
9    because I didn't know exactly what I was
10   supposed to do.
11       Q.  Right.
12       A.  So -- and then I kept hearing that
13   the -- my date kept getting canceled, so I was
14   just trying to touch base and figure out what
15   was going on.
16       Q.  Okay.
17           And so we were working to
18   schedule your deposition and I think to get any
19   documents that you had that were responsive to
20   the subpoena, correct?
21       A.  Yes.
22       Q.  Okay.
23           And you eventually did
24   produce some documents responsive to the
```

18

```
1    subpoena, correct?
2        A.  Yes.
3        Q.  Which was -- let's see -- a number of
4    time sheets, correct?
5        A.  Yes, and W-2s.
6        Q.  It's your understanding that W-2s were
7    produced?
8        A.  I believe my wife sent them over --
9        Q.  All right.
10       A.  -- with the time sheets.
11       Q.  Okay.
12           I don't think I received --
13   let's go ahead and hand you what I've marked as
14   Exhibit 28.
15
16           (WHEREUPON, the document was
17            marked Plaintiff's
18            Exhibit 28 for identification,
19            as of 4/11/25.)
20
21   BY MR. McJESSY:
22       Q.  Do these look like the time sheets
23   that you produced?
24       A.  Yes.
```

19

```
1        Q.  Okay.
2            Oh, there were W-2s, and the
3    W-2s are at the very end, correct?
4        A.  Yes.
5        Q.  Yeah.  All right.  All right.  All
6    right.
7            Other than your conversation
8    with Mr. Brutti, your conversations with Tony
9    Tattini, and your conversation with myself,
10   have you had any other discussions with anybody
11   else about this lawsuit or your deposition?
12       A.  No.
13       Q.  Okay.
14           And you currently work for
15   Dock & Door, correct?
16       A.  Yes.
17       Q.  Okay.
18           And are you aware of anybody
19   else that's been deposed in this case?
20       A.  No.
21       Q.  Okay.
22           You're not aware that Mr.
23   Cruikshank has been deposed?
24       A.  I don't know who that is.
```

20

```
1        Q.  Okay.
2            Did you ever work with Mr.
3    Cruikshank?
4        A.  Have you got a first name?  I don't
5    know many last names of people.
6        Q.  Oh, okay.
7            Don Cruikshank?
8        A.  Yes.  I've worked with Don.
9        Q.  Okay.
10           Were you aware he was
11   deposed?
12       A.  No.
13       Q.  Or how about do you know Quinten
14   Williams?
15       A.  I do remember Quinten.
16       Q.  All right.
17           Were you aware he was
18   deposed?
19       A.  No.
20       Q.  All right.
21           If you could take a look at
22   the subpoena that you have in front of you
23   there, and it asks you to produce documents
24   that you have responsive to the subpoena.  And
```

5 (Pages 17 to 20)

21

```
 1    one of the requests, request number one, which
 2    is on page three, asks you to produce all
 3    documents showing any communications between
 4    you and either Dock & Door or anyone employed
 5    there or Midwest Dock or anyone employed there.
 6    And it says that some examples of documents you
 7    may have, which are responsive to this request,
 8    include things like emails or text messages.
 9              Do you have any emails or
10    text messages with anybody at Dock & Door or
11    Midwest Dock?
12       A.  Yes.
13       Q.  Okay.
14              And what -- what do you have,
15    emails, text messages?
16       A.  I have a couple emails.
17       Q.  Okay.
18       A.  And text messages.
19       Q.  All right.
20              And what are the emails that
21    you would have?
22       A.  As far as what they're regarding?
23    Work.
24       Q.  All right.
```

22

```
 1              And who are they with?
 2       A.  I probably have some from Tony
 3    Zarlengo.
 4       Q.  Okay.
 5       A.  And Ira Sugar.
 6       Q.  Okay.
 7       A.  That's probably it.
 8       Q.  All right.
 9              And I'm going to ask that you
10    not destroy those and that you produce those
11    to -- to me after the deposition.
12              All right?
13       A.  Okay.  Just send them to you?
14       Q.  Yeah.
15              Is there a reason you didn't
16    provide those previously?
17       A.  I'm not very text savvy.  I've got to
18    have my wife help me with that stuff, so --
19       Q.  Okay.
20              If you could have -- if you
21    just forward them to me, that's fine.
22       A.  Okay.
23       Q.  And I will forward them to counsel
24    here for each of the parties as well when I get
```

23

```
 1    them.
 2       A.  Okay.
 3       Q.  But if you can do that, that would be
 4    great.
 5              And then what text messages
 6    do you have?
 7       A.  Mostly, group texts.
 8       Q.  Okay.
 9       A.  As far as what we're doing.
10       Q.  All right.
11              And who are those with?
12       A.  Ira.  It would be different --
13    different co-workers, R. J., Collin, Nico, Tony
14    B., Tony Z., Brandon -- did I say Brandon?
15       Q.  No.  Uh-uh.
16       A.  R. J., Collin, Nico -- did I say Nico?
17       Q.  You did say Nico.
18       A.  That's about it.  Jose.
19       Q.  All right.
20              I will ask that you not
21    destroy those text messages.
22              And do you know how to take
23    screenshots of text messages?
24       A.  I do, yeah.
```

24

```
 1       Q.  If you would take screenshots of
 2    those, and I'll give you my cell number, and
 3    you can text me --
 4       A.  Just take screenshots of all of the
 5    conversations?
 6              MR. HUGHES:  Just scroll through
 7    them.
 8    BY MR. McJESSY:
 9       Q.  Yeah, if you would.
10       A.  Okay.
11       Q.  All right.
12              That's the only way that I
13    know how to get text messages produced, so
14    that's --
15       A.  Yeah.
16       Q.  -- what I would ask you to do.
17       A.  That's what I told you before, and
18    that's going to take a week to do.
19       Q.  I appreciate that.  I know it's
20    inconvenient, but I do need you to produce
21    those things pursuant to the subpoena.  Okay?
22       A.  Okay.
```

6 (Pages 21 to 24)

25

```
 1              (WHEREUPON, the document was
 2        marked Plaintiff's
 3        Exhibit 29 for identification,
 4        as of 4/11/25.)
 5
 6  BY MR. McJESSY:
 7      Q.  I've handed you what I've marked as
 8  Exhibit 29.
 9              And you mentioned Ira Sugar.
10      A.  Ah-huh.
11      Q.  And I think you mentioned R. J.,
12  correct?
13      A.  R. J., yes.
14      Q.  And is that -- I just want to make
15  sure I know who these individuals are that
16  you're referring to.
17              Is -- does R. J. have a last
18  name?
19      A.  I don't know his last name.
20      Q.  Is it Mantoan?  Is it Richard Mantoan?
21      A.  I couldn't tell ya.
22      Q.  Okay.
23              You're not sure?
24      A.  No.
```

26

```
 1      Q.  How about Collin?  Is that Collin
 2  Zarlengo?
 3      A.  Yes.
 4      Q.  Okay.
 5              And then you mentioned Nico.
 6  Is that Nicolas Kelly?
 7      A.  Kelly, yes.
 8      Q.  Okay.
 9              And you mentioned Tony B.
10  That's -- is that how you refer to Tony Brutti?
11      A.  Yes.
12      Q.  And then you mentioned Tony Z.
13              Is that how you refer to
14  Anthony -- Tony Zarlengo?
15      A.  Yes.
16      Q.  Okay.
17              And then you mentioned
18  Brandon.  Is that Brandon Bishop?
19      A.  Yeah.  Actually, I think it is.
20      Q.  Okay.
21      A.  I didn't know his last name.  But when
22  I heard it --
23      Q.  And then you mentioned Jose.
24              Do you know Jose's last name?
```

27

```
 1      A.  Aguirre.
 2      Q.  Okay.  All right.
 3              And does -- Exhibit 29, if
 4  you -- if we need to refer to or refresh your
 5  memory about names of people, we can use
 6  Exhibit 29.
 7      A.  Okay.
 8      Q.  All right.
 9              So other than the emails you
10  have and the group texts that you have, do you
11  have any other communications or documents
12  showing communications between you and anyone
13  at Dock & Door or anyone at Midwest Dock?
14      A.  No.
15      Q.  Okay.
16              And can I -- just so we can
17  set a date by which the documents get produced,
18  can you produce those to me within, say, 10
19  days?  Can we agree to that?
20      A.  I can try, yes.
21      Q.  Okay.  All right.
22              And then just so I don't
23  forget at the end of the deposition, I'm just
24  going to put on the record now that -- that
```

28

```
 1  we're continuing this deposition.  I don't -- I
 2  don't anticipate I will need you to come back.
 3  But I just for the record want to put on the
 4  record that we're continuing the deposition so
 5  that I can get those documents produced from
 6  you.
 7              Is that okay, or is that --
 8  I'm just letting you know I'm continuing the
 9  deposition, reserving the right to resume the
10  deposition because I need to get those
11  documents.
12      A.  Okay.
13      Q.  Okay?
14              If you get those to me, I
15  doubt we'll have to continue the deposition or
16  resume it, but I do need to get those
17  documents.
18      A.  Okay.
19      Q.  Okay.
20              The next one is produce all
21  documents showing or describing the work you
22  performed for either Dock & Door or Midwest
23  Dock.
24              You did produce approximately
```

7 (Pages 25 to 28)

29

1  40 pages of time sheets that refer to work that
2  you did.
3      A.  Ah-huh.
4      Q.  Did you have any other documents
5  besides those?
6      A.  No.  That's all I had.
7      Q.  Okay.
8          Did you keep any sort of work
9  log or hour log or journal or anything like
10  that?
11      A.  No.
12      Q.  Okay.
13          And then the next one is
14  produce all documents showing the hours you
15  worked for either Dock & Door or Midwest Dock.
16          Again, it would be, I'm
17  assuming, the same documents that we marked as
18  Exhibit 28?
19      A.  Yes.
20      Q.  Okay.
21          And then produce all
22  documents showing the amounts you were paid by
23  either Dock & Door or Midwest Dock.
24          You did tender the W-2s, as

30

1  you pointed out.  That's at the end of Exhibit
2  28.
3          Did you have any other
4  documents responsive to that request?
5      A.  No.
6      Q.  Okay.
7          My understanding is that the
8  company has some sort of online portal that you
9  can check for your pay stubs and pay records;
10  is that right?
11      A.  Yes.
12      Q.  Okay.
13          So you don't get paper copies
14  of your paychecks.  It's all done through that
15  portal?
16      A.  Yes.
17      Q.  Okay.
18          Item five is produce any
19  resumé or job applications you've completed
20  that includes any reference to either
21  Dock & Door or Midwest Dock.
22          Do you have any documents
23  responsive to that request?
24      A.  No.

31

1      Q.  Okay.
2          And then number six is
3  produce any job or career posting to any social
4  media platform or career platform -- and it
5  refers there to like Facebook, Instagram,
6  Indeed.com, ZipRecruiter, LinkedIn -- where
7  you've posted a reference to your work for
8  Dock & Door or Midwest Dock.
9          Do you have anything like
10  that?
11      A.  No.
12      Q.  Okay.
13          Sir, what's the highest level
14  of education you've received?
15      A.  High school.
16      Q.  High school.
17          And did you graduate from
18  high school?
19      A.  Yes.
20      Q.  And where did you graduate from high
21  school?
22      A.  Bloom Trail.
23      Q.  And where is that located?
24      A.  Chicago Heights.

32

1      Q.  All right.
2          And when -- when did you
3  graduate?
4      A.  1998.
5      Q.  Okay.  All right.
6          And have you -- after high
7  school, did you receive any training in any
8  trades?
9      A.  Yes, carpenters.
10      Q.  Okay.
11          And did you go to the
12  apprentice program?
13      A.  Yes.
14      Q.  Excellent.
15          And what was the training you
16  received?  When did you go?
17      A.  I think it was about six months after
18  I graduated.
19      Q.  Okay.
20      A.  So it would have been the middle of
21  summer of '98.
22      Q.  All right.
23          And you enrolled in the
24  training -- apprentice program?

8 (Pages 29 to 32)

33

1    A.  Yes.
2    Q.  And how long were you involved in that
3 program?
4    A.  I had a -- I believe it was a
5 nine-week pre-apprenticeship and then a
6 four-year apprenticeship.
7    Q.  All right.
8        And did you complete the
9 four-year apprenticeship program?
10   A.  Yes.
11   Q.  Excellent.  All right.
12       And did you have any special
13 concentration going through the apprentice
14 program?
15   A.  What do you mean?
16   Q.  Well, I don't know how it works.
17       Is there any sort of -- can
18 you focus on any particular area, or do you
19 just take all of the same sort of training
20 classes?
21   A.  It's all the same.
22   Q.  All the same.
23       Did you receive any
24 certifications or -- well, strike that.

34

1        Did you receive any sort of
2 certifications going through the program?
3    A.  Yes.
4    Q.  What certifications did you receive?
5    A.  Scaffolding, power-actuated tools,
6 OSHA, 10-hour.  That's all I can remember.
7    Q.  Did you take any welding classes as
8 part of the program?
9    A.  There was a welding class, yes.
10   Q.  And did you take that?
11   A.  Yes.
12   Q.  All right.
13       And when you -- well, strike
14 that.
15       What was the first job that
16 you got out of high school?
17   A.  In the carpenters or just my first
18 job?
19   Q.  First job, period.
20   A.  Grocery store.
21   Q.  And how long did you work there?
22   A.  I worked there a few years.  I was in
23 high school.
24   Q.  Oh.

35

1    A.  And I worked there when I was in the
2 pre-apprenticeship with the carpenters.
3    Q.  Okay.
4    A.  Maybe I didn't.  I'm not sure.
5    Q.  All right.
6        You're not sure about that.
7    A.  Yeah.
8    Q.  All right.  You were there a few
9 years.
10       And what was the -- the first
11 job that you got that was related to your
12 carpentry training?
13   A.  Trident Custom Builders.
14   Q.  Okay.
15       And when did you start
16 working for them?
17   A.  The school set me up with them right
18 after I graduated the pre-apprenticeship.  So
19 it was about six months when I started the
20 pre-apprenticeship, mid summer.  So nine weeks
21 after that is when I started with them.
22   Q.  Okay.
23       So August, September sometime
24 of '98?

36

1    A.  Yeah.  I think it was August,
2 September-ish.
3    Q.  All right.
4    A.  '98, yeah.
5    Q.  And what did you do for Trident Custom
6 Builders?
7    A.  Frame houses.
8    Q.  Residential homes?
9    A.  Yes.
10   Q.  And how long did you work for Trident
11 Custom Builders?
12   A.  Thirteen years.
13   Q.  Oh, a long time.
14   A.  Yes.
15   Q.  So you completed -- did you complete
16 the four-year apprentice program?
17   A.  Yes.
18   Q.  So if my math is right, sometime
19 approximately 2011 you worked for them?
20   A.  2011?  Yeah.  It was around 2011.
21   Q.  Okay.
22   A.  We got slow with the recession, and
23 they ran out of work.
24   Q.  Okay.

9 (Pages 33 to 36)

37

```
 1              And then what was the next
 2   job you got after that?
 3       A.  Midwest Dock Solutions.
 4       Q.  And did your -- did your job with
 5   Trident Custom Builders -- you said that you
 6   did -- you framed houses for them?
 7       A.  Ah-huh.
 8       Q.  Did it change at any time, or did you
 9   do house framing pretty much the whole time you
10   worked for them?
11       A.  The whole time.
12       Q.  Okay.
13              And then how did you come to
14   get your job with Midwest Dock?
15       A.  Through a friend that knew Mike,
16   Richard.
17       Q.  Okay.
18              R. J.?  Oh, I'm sorry.
19   Strike that.
20              Who is the friend that knew
21   Mike?
22       A.  Ira.
23       Q.  Ira Sugar?
24       A.  Yes.
```

38

```
 1       Q.  Okay.
 2              Oh, so you knew Ira Sugar
 3   before you went to work for Midwest?
 4       A.  Yes.
 5       Q.  All right.
 6       A.  They were neighbors.
 7       Q.  Ira Sugar and Mike Richert?
 8       A.  Yeah.
 9       Q.  Okay.  All right.
10              So explain to me how it came
11   about that you went to work for Midwest Dock.
12       A.  I was out of work and talked to Ira
13   one day, just about anything, and mentioned to
14   him that I was out of work and trying to find a
15   job.  The union didn't have anything going on.
16   And he mentioned his neighbor, Mike, had a
17   business and basically asked me if he could
18   give him my number, and he did.  And Mike
19   called me, and I went to work for him.
20       Q.  All right.
21              And Ira Sugar, was he working
22   for Midwest at the time?
23       A.  No.
24       Q.  Okay.
```

39

```
 1              And was it Mike Richert who
 2   hired you?
 3       A.  Yes.
 4       Q.  All right.
 5              Did you meet with Tony
 6   Zarlengo before you were hired?
 7       A.  No.
 8       Q.  Okay.
 9              Just Mike?
10       A.  Yes.
11       Q.  All right.
12              And what were you hired to
13   do?
14       A.  It was service work, fixing doors and
15   dock equipment that goes along with it.
16       Q.  All right.
17              And when you were hired by
18   Midwest, did you also do installation of doors?
19       A.  Yes.
20       Q.  Okay.
21              Did you do installation of
22   door openers?
23       A.  Yes.
24
```

40

```
 1              (WHEREUPON, the document marked
 2              Plaintiff's Exhibit 3 for
 3              identification was tendered to
 4              the deponent.)
 5
 6   BY MR. McJESSY:
 7       Q.  I'm going to show you Exhibit 3.
 8              This -- I'm going to show you
 9   what we've previously marked as Exhibit 3, and
10   have you ever seen the website for Midwest Dock
11   Solutions?
12       A.  No.
13       Q.  Okay.
14       A.  No.
15       Q.  All right.
16              I will represent to you that
17   this is a printout of the -- a part of the
18   website of Midwest Dock Solutions.  And it
19   says, at the middle of that page, Midwest Dock
20   Solutions specializes in the service, supply,
21   and installation of loading dock equipment and
22   overhead doors.  We pride ourselves on giving
23   the customer not only excellent service but
24   doing it at an affordable price.  We also offer
```

10 (Pages 37 to 40)

41

1 a free quote or consultation on any new
2 product. And then it goes on from there.
3         The first sentence of that
4 says, Midwest Dock Solutions specializes in the
5 service, supply, and installation of loading
6 dock equipment and overhead doors.
7         Does that seem like an
8 accurate description to you of the work that
9 Midwest Dock Solutions did when you went to
10 work for them?
11     A. Yes.
12     Q. Okay.
13         And did they do installation
14 of -- of new overhead doors?
15     A. You mean new construction or new --
16 just a new door?
17     Q. Just a new door.
18     A. Yeah.
19     Q. Okay.
20         Did it matter whether it was
21 new construction or existing construction?
22     A. No.
23     Q. Okay. All right.
24         And did you do installation

42

1 of overhead doors?
2     A. Yes.
3     Q. Did you do installation of loading
4 docks?
5     A. Yes.
6     Q. Okay.
7         And had you -- had you had
8 any prior experience doing that work?
9     A. No.
10     Q. All right.
11         So it was -- this was pretty
12 much like on-the-job --
13     A. Training.
14     Q. I'm trying to think of the word I'm
15 looking for. You know, learn by doing? Was it
16 that kind of thing?
17     A. Yes.
18     Q. Okay.
19         And do you remember who
20 trained you to do the installation of the
21 overhead doors and loading dock equipment?
22     A. Mike Strazzabosco.
23     Q. Okay.
24         And he was somebody who was

43

1 already working there?
2     A. Yes.
3     Q. And -- all right.
4         And when you were working for
5 Midwest Dock -- well, strike that.
6         You started with Midwest Dock
7 in approximately 2011.
8         Does that sound right?
9     A. Yes.
10     Q. Okay.
11         And when you started working
12 for Midwest Dock, who did you report to?
13     A. Tony Zarlengo and Mike Richert.
14     Q. Okay.
15         And did you work with anybody
16 primarily, in particular, or did the people you
17 worked with change from day to day?
18     A. Mike Strazzabosco, mostly.
19     Q. Okay.
20     A. And then there was another guy, Brian.
21 I don't recall his last name. I haven't seen
22 him in -- he wasn't there long after I started.
23     Q. All right.
24         Is Michael Strazzabosco still

44

1 there?
2     A. Yes.
3     Q. Okay.
4         Do you still work with him?
5     A. No.
6     Q. And how -- how long -- now, were you a
7 member -- let's take a step back.
8         Are you a member of a union?
9     A. Yes.
10     Q. What local are you a member of?
11     A. 272.
12     Q. Okay.
13         And how long have you been a
14 member of that local?
15     A. Sixteen years -- or 26 years. Since
16 1998, basically.
17     Q. Oh, okay.
18         Since 1998.
19     A. Yeah.
20     Q. Time flies. That's 26 -- I guess that
21 is 26 years.
22         And have you maintained your
23 union membership throughout that entire time?
24     A. Yes.

11 (Pages 41 to 44)

45

1    Q.  And how did you become a member of
2  that local?  Did anyone have to sponsor you or
3  anything like that?
4    A.  No.  I just -- when I wanted to go
5  into the union, I just called the local and
6  were asking them questions.  And I don't
7  remember exactly how I got affiliated with that
8  local.
9    Q.  Okay.
10        And you're still -- you're
11  still a member of that local?
12    A.  Yes.
13    Q.  Okay.
14        Did your membership lapse at
15  any time?
16    A.  What do you mean, like --
17    Q.  My understanding is that your union
18  membership can lapse, and then you have to pay
19  your dues and get caught up again, that kind of
20  thing.  I represent the trust funds.  I don't
21  represent the union.  So I'm not quite sure I
22  understand exactly how it works, but that's my
23  understanding.
24    A.  I just pay my dues every quarter.

46

1    Q.  Okay.
2        And you've done that every
3  quarter and stayed in good standing, as far as
4  you know, throughout the 26 years?
5    A.  I was probably late a couple of -- I
6  was probably late a couple times.
7    Q.  Okay.
8    A.  But as far as I know, it should be all
9  up to date and in good standing.
10    Q.  All right.
11        And whenever you were late,
12  you did pay your dues and get caught up, that
13  kind of thing?
14    A.  Yes.
15    Q.  Okay.
16        Now, eventually your
17  employment changed, and you weren't paid by
18  Midwest Dock.  You were paid by Dock & Door,
19  correct?
20    A.  Yes.
21    Q.  Okay.
22        Tell me when that happened
23  and how that came about.
24    A.  It had to be -- I think it was about

47

1  2014 --
2    Q.  Okay.
3    A.  -- ish.
4        I was wanting to get back
5  into the union because I was working for
6  Midwest Dock basically temporarily to keep
7  money coming in because the carpenters didn't
8  have work.
9    Q.  Sure.
10    A.  And I didn't know that Dock & Doors
11  were -- that there was union companies that did
12  that.  I didn't know what a dock was when I
13  started at Midwest Dock, but there's a training
14  in that.  I started with Dock & Door Install.
15    Q.  Okay.
16        So you were working for
17  Midwest Dock, and you were doing door
18  installation, loading dock installation.
19        How -- how did you come to be
20  working for Dock & Door?
21    A.  Mike knew Tony and gave him my name,
22  and he hired me and --
23    Q.  Tony who?
24    A.  Brutti.

48

1    Q.  Okay.  All right.
2        And how did that come about?
3    A.  What do you mean?
4    Q.  Well, my understanding is that Midwest
5  Dock and Dock & Door operate out of the same
6  location, right?
7    A.  Ah-huh.
8    Q.  Is that yes?
9    A.  Yes.  Sorry.
10    Q.  Okay.
11        And -- that's all right.
12        And what -- do you remember
13  what the location was you were working at when
14  you made the transition from Midwest Dock to
15  Dock & Door?
16    A.  I think it was where -- where we're at
17  now.
18    Q.  Do you -- do you -- were you
19  working -- do you remember a location, 3211
20  Holeman Avenue in South Chicago Heights?
21    A.  Yes.
22    Q.  Okay.
23        And was that an office that
24  Midwest Dock operated out of?

49

1    A.  Yes.
2    Q.  And did that -- can you describe that
3  facility for me?  Did it have an office,
4  warehouse, parking lot?
5    A.  It had a warehouse, office, parking
6  lot.
7    Q.  Okay.
8        A place to park vehicles,
9  company vehicles, that kind of thing?
10   A.  Yes.
11   Q.  Okay.
12       And did Dock & Door operate
13  out of that location?
14   A.  What year was it?
15   Q.  Well, that was what I was going to ask
16  you.
17       Do you remember what --
18   A.  I don't remember when we switched
19  locations and what year it was.  I don't
20  remember.
21   Q.  Okay.
22       But you do remember that
23  location?
24   A.  Yes.

50

1    Q.  And you worked from that location,
2  correct?
3    A.  Yes.
4    Q.  All right.
5        And -- but you don't
6  remember -- did you work for Midwest from that
7  location?
8    A.  I might have.  I don't remember --
9  because we've had a couple of shops -- so I
10  don't remember when the transition period was.
11   Q.  You mean from one location to the
12  other or when you transitioned from Midwest
13  Dock to Dock & Door?
14   A.  Both.
15   Q.  Okay.
16       And do you remember a
17  location at 1249 East Burville Road in Crete,
18  Illinois?
19   A.  Yes.
20   Q.  All right.
21       And can you describe that
22  facility for me?
23   A.  The same.  Parking lot, office,
24  warehouse.

51

1    Q.  Okay.
2        And then you're currently --
3  you're currently at 27 East 36th Place, Steger,
4  Illinois, correct?
5    A.  Steger, yes.
6    Q.  Steger.
7        And can you describe that
8  facility for me?
9    A.  The same thing.  Parking lot,
10  warehouse, office.
11   Q.  Okay.
12       And do you remember, was the
13  transition from the Holeman Avenue location to
14  the Burville Road location to the 36th Place
15  location?  Is that the order they went in?
16   A.  Can you say that again?
17   Q.  Yeah.
18       Did the business transition
19  from Holeman to Burville to 36th Place?  Is
20  that -- was it from Chicago Heights to Crete to
21  Steger?
22   A.  That could have been it.  I don't
23  remember.
24   Q.  Okay.

52

1        Do you remember where the
2  business was located prior to going to Steger,
3  Illinois?
4    A.  Steger was -- is where we're at now,
5  and we were in Chicago Heights before that.
6    Q.  Okay.
7        So you started out at
8  Burville Road and then went to Holeman, then to
9  36th Place?
10   A.  Burville is Crete -- yeah, was Crete.
11  Crete, Chicago -- Crete, Chicago Heights,
12  Steger.
13   Q.  Okay.
14   A.  Yeah.
15   Q.  All right.
16       And you don't remember -- do
17  you -- strike that.
18       Do you recall which location
19  you were working out of when you switched from
20  Midwest Dock to Dock & Door?
21   A.  Let me think about it for a second.
22   Q.  Sure.
23   A.  I think it was the Crete location now
24  that I think about it.

13 (Pages 49 to 52)

53

1    Q.  Okay.
2         The first location.
3    A.  Yeah.
4    Q.  All right.
5
6         (WHEREUPON, the document marked
7         Plaintiff's Exhibit 6 for
8         identification was tendered to
9         the deponent.)
10
11   BY MR. McJESSY:
12   Q.  And if you can take a look at -- I'm
13   showing you what's been previously marked as
14   Exhibit 6.
15        Do you see that?
16   A.  Yeah.
17   Q.  And do you recognize it -- recognize
18   that as a Midwest Dock Solutions truck?
19   A.  Yes.
20   Q.  All right.
21        And do you drive trucks or
22   use trucks like -- like that in your work for
23   Midwest Dock?
24   A.  When I worked for Midwest Dock?

54

1    Q.  Yeah.
2    A.  Yes.
3    Q.  Okay.
4         And you use trucks like that
5    when you work for Dock & Door, correct?
6    A.  Similar.
7    Q.  Okay.
8         Well, they -- when you say
9    "similar," they're a truck that says Midwest
10   Dock on it, correct?
11   A.  My truck doesn't have Midwest Dock on
12   it.
13   Q.  Okay.
14        It doesn't?
15   A.  The truck I drive, no.
16   Q.  What does it -- does it have a
17   Dock & Door sign on it?
18   A.  No.  It has no sign on it.
19   Q.  Okay.
20        Do you drive a panel van?
21   A.  No.  It's a flatbed, similar to that.
22   Q.  Okay.
23        And your testimony is that
24   there's a flatbed -- does it have the equipment

55

1    on it like -- that's shown in this picture?
2    A.  I have toolboxes on mine.
3
4         (WHEREUPON, the document marked
5         Plaintiff's Exhibit 7 for
6         identification was tendered to
7         the deponent.)
8
9    BY MR. McJESSY:
10   Q.  Okay.
11        How about turning to the next
12   page, Exhibit 7.
13        Do you see that?
14   A.  Yes.
15   Q.  All right.
16        And does your truck look like
17   that?
18   A.  Similar, yes.
19   Q.  Okay.
20        And -- but, again, your
21   testimony is that it doesn't have anything on
22   the door?
23   A.  Correct, no.  No, nothing on the door.
24

56

1         (WHEREUPON, the document marked
2         Plaintiff's Exhibit 8 for
3         identification was tendered to
4         the deponent.)
5
6    BY MR. McJESSY:
7    Q.  Okay.
8         And if you turn to the next
9    exhibit, Exhibit 8 -- and, again, that's a --
10   does your truck look similar to that?
11   A.  Similar, yes.
12   Q.  Okay.
13        But, again, your testimony is
14   that your -- is your truck the only one that
15   doesn't have Midwest Dock Solutions name on the
16   side, the only flatbed truck that doesn't have
17   Midwest Dock Solutions truck on the side --
18   strike that.
19        Is yours the only flatbed
20   truck like this that doesn't have a name on the
21   side of it?
22   A.  No.  No, there's other --
23   Q.  There are other ones?
24   A.  -- trucks without the name on it,

14 (Pages 53 to 56)

57

1  yeah.
2  **Q. Okay.**
3  **Who else uses the truck**
4  **besides you?**
5  A. The truck that I drive?
6  **Q. Yeah.**
7  A. No one.
8  **Q. You're the only one who uses it?**
9  A. Yes.
10  **Q. Okay.**
11  **And how long have you been**
12  **using that truck?**
13  A. Maybe around eight years. Well, it's
14  an '18.
15  **Q. Okay.**
16  A. So it must have been since '18, so ten
17  years.
18  **Q. What kind -- what kind of truck is it?**
19  A. An F-350.
20  **Q. Is it white?**
21  A. Yes.
22  **Q. All right.**
23  **And do you take it home?**
24  A. Yes.

58

1  **Q. You didn't drive it here today, did**
2  **you?**
3  A. I did.
4  **Q. Oh, you did?**
5  A. Ah-huh.
6  **Q. Oh, okay.**
7  **So we can take a look at it?**
8  A. Sure.
9  **Q. Excellent.**
10  MR. HUGHES: A little site visit.
11  BY MR. McJESSY:
12  **Q. All right.**
13  **On break, give us a field**
14  **trip.**
15  A. Sure.
16  **Q. All right. Let's see.**
17  **Prior to using this truck in**
18  **2018, did the truck -- did you drive another**
19  **similar truck? And by "similar," I mean a**
20  **flatbed.**
21  A. A service body.
22  **Q. What's that?**
23  A. A service body truck. Instead of a
24  flatbed, it's got doors built in to the whole

59

1  side of the truck, so it's kind of like a -- I
2  guess, kind of like a pickup truck, but it has
3  doors down the whole side of it.
4  **Q. Oh, all right.**
5  **Did it have like welding**
6  **equipment on it?**
7  A. Yes.
8  **Q. Okay.**
9  **Who is it made by?**
10  A. Ford.
11  **Q. Oh, it's a Ford?**
12  A. Yeah.
13  **Q. Do you know what model it is?**
14  A. That one was an F-450, I believe.
15  **Q. Okay.**
16  **And is it all enclosed?**
17  A. No.
18  **Q. Okay.**
19  **So it's got part of it that's**
20  **open?**
21  A. Some of it that's open in the back,
22  yes.
23  **Q. Okay.**
24  A. Part of it, there's toolboxes.

60

1  **Q. Okay.**
2  **Does it have a bed?**
3  A. Yes.
4  **Q. I see.**
5  **And down each side, it's got**
6  **like places where tools are stored inside?**
7  A. Yes.
8  **Q. Okay.**
9  **And did that one have Midwest**
10  **Dock Solutions on the side?**
11  A. Yes.
12  **Q. Okay.**
13  **And have you seen any trucks**
14  **or vehicles that have the name Dock & Door on**
15  **the side of them?**
16  A. I have not.
17  **Q. All right.**
18  **And did the nature of your**
19  **work change when you transitioned from Midwest**
20  **Dock to Dock & Door?**
21  A. Yes.
22  **Q. And how did it change?**
23  A. For one, staying on the same job all
24  day versus driving from job to job, basically

15 (Pages 57 to 60)

61

```
1    installing doors all day long and, you know,
2    doing the same thing, more or less, all day
3    long versus Midwest Dock, you know, you're
4    always doing something different from job to
5    job throughout the day.
6        Q.   Okay.
7             And so you were working on
8    larger projects?
9        A.   Yes.
10       Q.   Okay.
11            Where you were installing
12   many doors in a day; is that correct?
13       A.   Correct.
14       Q.   Okay.
15            Did you install things
16   besides doors?
17       A.   Docks, dock seals, bumpers, dock
18   locks, track guards, dock lights.
19       Q.   Did you say dock lights?
20       A.   Yes.
21       Q.   All right.
22            And would you do that same
23   kind of work when you were working for Midwest
24   Dock?  For example, would you install --
```

62

```
1    install dock seals?
2        A.   Yeah.  But it would be, more or less,
3    taking something old down and putting new up.
4        Q.   Okay.
5             And would you install bumper
6    seals or dock bumpers?
7        A.   Yeah, the same thing.  It was usually
8    taking something old down and putting something
9    new up.
10       Q.   Okay.
11            And would you install dock
12   locks?
13       A.   Yes.
14       Q.   Would you install track guards?
15       A.   Yes.
16       Q.   Would you install dock lights?
17       A.   Yes.
18       Q.   Okay.
19            Would you install door
20   operators?
21       A.   Yes.  But like I said, most of that
22   was taking something old down and putting in
23   new, like more or less replacing not just
24   installing.
```

63

```
1        Q.   Okay.
2             Is the -- the skill set
3    required to install the dock seals, the
4    bumpers, the dock locks, the track guards, the
5    dock lights, the overhead doors, is the skill
6    set to install that on an existing building the
7    same as to install it on a new building aside
8    from taking out the old first?
9        A.   No.
10       Q.   No?  It's a different skill set?
11       A.   Yeah.
12       Q.   How does it differ?
13       A.   Well, you have electric involved and
14   different tools.
15       Q.   What's the difference -- oh, I'm
16   sorry.  Are you done with your answer?  I don't
17   mean to cut you off.
18       A.   Yeah.  I probably can come up with
19   more if I thought about it.
20       Q.   All right.
21       A.   Basically, anything you need to cut
22   something out.  You'd be using torches to cut
23   out docks, old dock.  And so there's a quite
24   bit of differences.
```

64

```
1        Q.   Okay.
2             Anything else?
3        A.   Not offhand.
4        Q.   Okay.
5             When you say there's
6    electric, what does that mean?
7        A.   The stuff that's powered, operators,
8    some docks.  You've got to have the skills to
9    be able to remove that stuff safely.
10       Q.   Okay.
11            And you mean to remove what,
12   the --
13       A.   The wires.
14       Q.   Okay.
15            And so you're talking about
16   removing the electrical wires from the existing
17   overhead door or the existing dock?
18       A.   Correct, yes.
19       Q.   Okay.
20            And once that's removed, you
21   still need those wires to hook up to the new
22   door and the new dock?
23       A.   Correct.
24       Q.   Okay.
```

16 (Pages 61 to 64)

65

1      And is that basically the
2  same process as when you install a new door or
3  new dock, hooking up the electric, and if not,
4  how does it differ?
5      A.  No.
6      Q.  How does it differ?
7      A.  As far as we don't do any of that in
8  the new installations.
9      Q.  You don't hook up the openers?
10     A.  No.
11     Q.  You don't hook up the docks
12  themselves?
13     A.  No.
14     Q.  All right.
15         Do you install the openers?
16     A.  Yes.
17     Q.  And you install the docks?
18     A.  Yes.
19     Q.  But you don't hook them up?
20     A.  No.
21     Q.  So when you leave, the door's not
22  operational?
23     A.  Correct.
24     Q.  And the dock is not operational?

66

1      A.  Correct.
2      Q.  Okay.
3          So when you're doing new
4  installation, you actually do less work than
5  when you're installing work for a replacement;
6  is that right?
7      A.  Yes.
8      Q.  Okay.
9          And how about tools?  What
10  are the different tools that you use for
11  replacing an existing door or dock leveler
12  versus installing a new dock and door
13  leveler -- or a new door and dock leveler?
14     A.  Torches would be something different,
15  electrical tools, cable grabber come along.
16  That's all I can think of.
17     Q.  All right.
18         And you used the torches, you
19  said, to cut out the old dock leveler.
20         Is that it?
21     A.  Yes.
22     Q.  Okay.
23         Would the tools to install
24  the new dock leveler be the same whether it's a

67

1  new installation or a retrofit?
2      A.  To install it, they're basically the
3  same, yes.
4      Q.  Okay.
5          And the electrical tools
6  to -- what's the electrical tools you use on a
7  retrofit versus a new installation?
8      A.  Meter.  Like a voltage meter.  They
9  have special stuff for the pipes to connect to
10  the units.  Yeah, that's about it.
11     Q.  Okay.
12         And what -- what do you use
13  the voltage meter for?
14     A.  You would want to check your voltage
15  and that before you touch anything.
16     Q.  Okay.
17         Just to see if it's on?
18     A.  Yeah.
19     Q.  You don't want to get electrocuted?
20     A.  Correct.
21     Q.  Okay.  All right.
22         And you mentioned a volt
23  meter, and you said that there's pipes that you
24  connect.

68

1      A.  Ah-huh.
2      Q.  What -- what did you mean by that?
3      A.  Electrical pipes, like conduit.
4      Q.  Okay.
5          If you're doing the retrofit,
6  connecting the electrical, you would need to be
7  able to connect the conduit pipes?
8      A.  Yes.
9      Q.  All right.
10         And if you're doing new
11  installation, you're not connecting the
12  electrical; is that right?
13     A.  Correct.
14     Q.  All right.
15         And you mentioned the cable
16  grabber come along?
17     A.  Ah-huh.
18     Q.  Is that to remove the old dock from
19  the space that it's in?
20     A.  Door.
21     Q.  Oh, to remove a door?
22     A.  Yeah.
23     Q.  Explain that to me.
24     A.  For holding tension on a spring, on

17 (Pages 65 to 68)

69

1  the torsion springs, for removing panels, door
2  panels.
3      Q.  Okay.
4          And you don't need that tool
5  for a new installation because you're --
6  because you're not taking something down.
7          Is that it?
8      A.  Correct.
9      Q.  Okay.
10         So the things that you
11 mentioned to me, the torches, the electrical
12 tools, the cable grabber, that's all necessary
13 as part of the deinstallation of the existing
14 door or dock leveler.
15         Is that it?
16     A.  Correct.
17     Q.  Is the installation process for a new
18 dock leveler and door pretty much the same as
19 the installation process for an existing --
20 strike that.
21         Is the installation process
22 for a retrofit door and dock leveler pretty
23 much the same as the installation process for a
24 new door and dock leveler aside from the fact

70

1  that you don't hook up the electrical in the
2  new installation?
3      A.  Yeah.  After that's done, it's pretty
4  much the same.
5      Q.  Okay.
6          Did you have to receive any
7  new training when you started working for
8  Dock & Door?
9      A.  No.
10     Q.  Did you have a title when you worked
11 for Midwest Dock Solutions?
12     A.  Not that I know of.  Oh, service.  I
13 guess, a service worker would be a title.
14     Q.  All right.
15         I mean, was that a formal
16 title, or is that just sort of what you would
17 be called?
18     A.  I guess what I would be called.
19     Q.  Okay.
20         Do you have a formal title of
21 any sort with Dock & Door?
22     A.  Just carpenter.
23     Q.  Okay.
24         And did you -- have you

71

1  pretty much described to me all of the kinds of
2  work that you did for Midwest Dock?
3      A.  Yes.
4      Q.  Okay.
5          And just so I'm clear, the
6  work that you did for Midwest Dock included
7  installation of dock seals, bumpers, dock
8  locks, track guards, dock lights, overhead
9  doors, dock levelers, but it often involved
10 removal of old before you put in the new?
11     A.  Correct.
12     Q.  Okay.
13         And just so I'm clear, with
14 Dock & Door, do you install dock seals, dock
15 bumpers, dock locks, track guards, dock lights,
16 overhead doors, and dock levelers?
17     A.  Yes.
18     Q.  Okay.
19         Any other work that you did
20 for Midwest Dock that I didn't ask you about or
21 that you didn't tell me about?
22     A.  I mean, just problem solving.  Trying
23 to fix things that aren't working was a lot of
24 it.  Diagnosing.

72

1      Q.  Okay.
2          Any other work that you do
3  for Dock & Door that I didn't ask you about or
4  that you didn't tell me about?
5      A.  No, not that I can think of.
6      Q.  All right.
7          When you worked for Midwest
8  Dock day to day, how would you know where
9  you're going and what you're doing?
10     A.  Usually, phone call or text message
11 or --
12     Q.  Okay.
13         And who would call you or
14 give you a text message?
15     A.  Midwest Dock are you talking?
16     Q.  Yeah.
17     A.  Usually, Tony or a sales guy.
18 Zarlengo.
19     Q.  When you said "Tony," you meant Tony
20 Zarlengo?
21     A.  Yes.
22     Q.  And I know there's Tony Brutti and
23 Tony Zarlengo and Tony Tattini.
24     A.  Ah-huh.

18 (Pages 69 to 72)

73

1    Q.  If you could just give me a last name
2  when you use -- when you use --
3    A.  Yeah, I'll try.
4    Q.  There's a lot of Tonys.  Okay.
5    A.  Ah-huh.
6    Q.  All right.
7        And I'll prompt you if you
8  don't, but just so the record's clear.
9    A.  Ah-huh.
10   Q.  So they would text you -- one of
11 those -- who -- you said -- strike that.
12       You said that somebody from
13 the sales staff or Tony Zarlengo.  Who from the
14 sales staff would tell you?
15   A.  Well, I think Tony was also -- Tony
16 Zarlengo was also part of sales.
17   Q.  Okay.
18   A.  So whosever's job it was is usually
19 who you heard from.
20   Q.  All right.
21       And when you say "whoever's
22 job it was," you mean whoever sold that job?
23   A.  As far as I know, yes.
24   Q.  Okay.

74

1        So if a particular
2  salesperson was responsible for having sold a
3  particular job, they might be the one to call
4  you and say, hey, go here?
5    A.  Yes.
6    Q.  Okay.
7        And do you -- now, you
8  mentioned when Ira Sugar was -- you knew Ira
9  Sugar.
10   A.  Ah-huh.
11   Q.  Is that a yes?
12   A.  Yes.
13   Q.  And you knew him before you went to
14 work for Midwest Dock, correct?
15   A.  Yes.
16   Q.  Okay.
17       But he eventually went to
18 work for Midwest Dock himself, correct?
19   A.  Yes.
20   Q.  Do you know when that happened?
21   A.  Roughly, 2016, '17.
22   Q.  All right.
23       So you were, at that time,
24 being paid and working through Dock & Door,

75

1  correct?
2    A.  Yes.
3    Q.  All right.
4        And do you know how he came
5  to be hired?
6    A.  I do not.
7    Q.  Okay.
8        And do you know what position
9  he was hired for?
10   A.  Sales, I believe, the title would be.
11   Q.  Okay.
12       Is he somebody who you would
13 get direction from, where to go on particular
14 jobs?
15   A.  Yes.
16   Q.  Okay.
17       And is that still the case?
18   A.  Yes.
19   Q.  All right.
20       He will call you and say,
21 hey, go to this job location?
22   A.  Ah-huh.  Yes.
23   Q.  Okay.
24       And when he tells you where

76

1  to go for a particular job, even now, how do
2  you know -- how do you know what tools and
3  equipment to take and what you're going to be
4  doing?
5        Does that make sense?  Does
6  my question make sense to you?
7    A.  The tools are always on the truck --
8    Q.  Okay.
9    A.  -- for everything that I do.
10   Q.  Okay.
11   A.  As far as equipment, usually a rental.
12 He'll tell me that there will be a rental
13 scissor lift or boom lift or forklift on the
14 job, and it will be there at this such and such
15 time.
16   Q.  Okay.
17       What about the materials that
18 you need to do whatever it is you're doing?
19   A.  Usually, that's already on the job.
20 The truck will be there and offloaded, and the
21 material is usually there.
22   Q.  Okay.
23       Do you have to pick up any
24 materials from the warehouse for the projects

19 (Pages 73 to 76)

77

1    you work on?
2        A.   Yes, occasionally.
3        Q.   And what kind of materials would you
4    need to pick up at the warehouse?
5        A.   The same stuff, doors, dock, track
6    guards, seals kinds of things.
7        Q.   Sometimes those things are at the job
8    site.  Sometimes you have to take them to the
9    job site?
10       A.   Yeah.  If it's something small, I'll
11   have to sometimes pick it up from the shop.
12       Q.   What do you mean by that, if it's
13   small?
14       A.   Fit on the truck.  Because, usually,
15   bulk things come on a semi-truck and gets
16   delivered to the job site, and they'll have
17   somebody unload it.
18       Q.   So if you're installing 16 overhead
19   doors at a job site, those will be delivered to
20   the job site.  If you're installing three dock
21   seals, you might have to go pick those up at
22   the warehouse, something like that.  Is that --
23       A.   Yes.
24       Q.   -- fair?

78

1        A.   Yes.
2        Q.   Okay.
3            And the warehouse was, at any
4    given time, at those three locations we
5    previously discussed?
6        A.   Yes.
7        Q.   Has there ever been any other
8    warehouse that you're aware of?
9        A.   No.
10       Q.   Other than Ira Sugar, are you familiar
11   with any other salespeople, either at your time
12   with Midwest or your time with Dock & Door, who
13   would give you -- you know, who would give you
14   the kind of direction you just described for
15   me?
16       A.   Joe Sheridan.  That's all I can think
17   of right now.
18       Q.   Okay.
19       A.   Yeah.
20       Q.   Is Joe Sheridan still there?
21       A.   No.
22       Q.   And how long ago did he leave?
23       A.   Not long before Ira started.
24       Q.   Oh, he worked there before Ira?

79

1        A.   Yes.
2        Q.   Okay.
3            Did Ira replace him?
4        A.   That would be my guess, yes.
5        Q.   All right.
6            I mean, essentially, he left
7    and Ira came on board?
8        A.   Yes.
9        Q.   And did he work -- Joe Sheridan work
10   when you worked -- were with Midwest?
11       A.   I don't think so.
12       Q.   So he might have been there a short
13   time?
14       A.   He was there a few years.
15       Q.   All right.
16            And you said Ira Sugar
17   started, maybe, 2016 or '17?
18       A.   Yes.
19       Q.   And it sounds like you started, you
20   think, with -- you made the transition from
21   Midwest to Dock & Door in, maybe, 2014, 2015;
22   is that right?
23       A.   Yes.
24       Q.   Okay.

80

1            Anybody else who you can
2    think of that would give you directions, where
3    to go sort of day to day, like your job
4    assignment?
5        A.   Sometimes Tony Zarlengo.
6        Q.   Okay.
7            Does he still do that?
8        A.   On occasion.
9        Q.   Okay.
10            Anybody else?
11       A.   No.
12       Q.   Okay.
13            When you're on a job site --
14   when you're on a job site -- and let's talk
15   about the time you're working, first, for
16   Midwest Dock -- do you have somebody on the job
17   site who's supervising your work?
18       A.   From my company?  From Dock & Door,
19   you mean?
20       Q.   Oh, yeah.  I'm sorry.  Good question.
21   Yeah, no, from -- yeah, strike that.
22            Is there any supervisor from
23   your company who you're working under who
24   supervises your work at the job site when you

20  (Pages 77 to 80)

81

1    were working for Midwest?
2        A.  No.
3        Q.  Okay.
4            There's no like foreman who's
5    supervising your work, a foreman on behalf of
6    Midwest Dock?
7        A.  No.
8        Q.  Okay.
9            And I do understand that Mr.
10   Strazz -- Strazzabosco --
11       A.  Ah-huh.
12       Q.  -- sort of trained you on how to do
13   some of the work.
14           Is that fair?
15       A.  Yes.
16       Q.  Okay.
17           But once you were -- once you
18   were trained, you'd pretty much go to the job
19   site and just do your job; is that correct?
20       A.  Yes.
21       Q.  All right.
22           And I take it, there might be
23   somebody from the company there that you're
24   working for who's giving you sort of directions

82

1    on what to do.
2            Is that fair?
3        A.  Yes.
4        Q.  All right.
5            But that's not somebody from
6    Midwest?
7        A.  No.
8        Q.  Okay.
9            And, now, when you made the
10   transition to Dock & Door -- same question --
11   is there anybody from your company that's there
12   supervising, you know, what you're doing at the
13   job site?
14       A.  No.
15       Q.  Okay.
16           The same thing.  You pretty
17   much go to the job site, and you -- you know
18   what to do, and you do it?
19       A.  Yes.
20       Q.  Okay.
21           And there might be, I take
22   it, somebody from the -- you know, project
23   owner or the general contractor or whoever has
24   hired your company to do the work, telling you

83

1    what to do, but they're not from your company
2    supervising your work.
3            Is that accurate?
4        A.  Yes.
5        Q.  Okay.
6            And I take it, you usually
7    have a good idea -- focusing on the time you're
8    working for Dock & Door -- you have a pretty
9    good idea when you go to the job site of what
10   your assignment is going to be before you get
11   there; is that correct?
12       A.  Yes.
13       Q.  Okay.
14           And is that because the
15   salesman sort of tells you, okay, this is a --
16   you're doing a, you know, new door and dock
17   installation for 25 docks and doors.
18           Is that --
19       A.  Yes.
20       Q.  Okay.
21           And -- and because you've
22   been doing this for 10 years or more, 12 years,
23   something like that, you know what to do when
24   you get there.

84

1            Is that fair?
2        A.  Yes.
3        Q.  All right.
4            Do the salespersons ever
5    visit the job site when you're working there?
6    So, for example, would Ira Sugar show up and
7    take a look at a job site while you're working
8    there?
9        A.  No.
10       Q.  Okay.
11           Would anybody -- other than,
12   say, a worker who you're doing installs with --
13   show up at the job site to see what's going on?
14       A.  No.
15       Q.  How about would anybody show up to
16   deliver tools or supplies, anybody from either
17   Midwest Dock or Dock & Door?
18       A.  Yes.
19       Q.  And tell me about that.
20       A.  If you need a -- need some type of
21   supply, screws, anchors, anything of that sort,
22   I would call Ira, and he would have somebody
23   deliver something.
24       Q.  Okay.

21 (Pages 81 to 84)

85

1    If the shipment's missing
2  something that you didn't get and you need it
3  to install whatever it is you're doing, you'd
4  call the office, and they would send somebody
5  out with it?
6    A.  Yes.
7    Q.  Okay.
8        And does it still work that
9  way?
10   A.  Yes.
11   Q.  Okay.
12       And you'd still call Ira and
13 say, hey, I need whatever fasteners, and he'd
14 send somebody out with them?
15   A.  Yes.
16   Q.  All right.
17       But nobody came out to like
18 inspect the job or anything like that?
19   A.  No.
20   Q.  All right.
21       Is there anybody whose job it
22 is in particular to do things like that, to
23 deliver supplies to the job sites?
24   A.  Nobody in particular, just whoever's

86

1  in the area or -- a little bit of everybody.
2    Q.  Okay.
3        Can you -- can you give me
4  some examples of people who have brought stuff
5  to you at job sites in the last five years?
6    A.  Janie.  Tony -- Tony Brutti.  I think,
7  Josh.  I've seen Josh drop something off.  I
8  don't know his last name.  Alphabetical order
9  would be --
10   Q.  The last names are alphabetical.
11   A.  Oh, all right.
12   Q.  Oh, there's a Joshua Sichterman,
13 number 67.
14   A.  Yeah.  I think that's it.
15   Q.  Okay.
16   A.  Yeah.  I think it mostly would be
17 Janie or Tony Brutti.
18   Q.  All right.
19       Did you say Janie with an N
20 or a Jamie with an M?
21   A.  Janie with an N.
22   Q.  Is that a -- is that -- that's a man?
23   A.  No.
24   Q.  That's a woman?  It's a woman.  Yes?

87

1    A.  Yes.
2    Q.  And do you know her last name?
3    A.  I do not.
4    Q.  There's a Jane Graham on the list.
5        Could it be --
6    A.  It's possible.
7    Q.  Okay.
8    A.  I wouldn't -- I don't know.
9    Q.  You're not sure.
10       But you know her as Janie?
11   A.  Yes.
12   Q.  And can you describe her for me, age,
13 white -- age, race, height?
14   A.  I'm guessing she's in her 30s, white,
15 brown hair, on the shorter side.
16   Q.  All right.
17       She had been there a while?
18   A.  Quite a few years.
19   Q.  All right.
20       Do you know, does she work
21 for Midwest or Dock & Door?
22   A.  I would guess Midwest.
23   Q.  Okay.
24       And I don't remember if I

88

1  asked you this.  I apologize if I'm asking you
2  a question over again.  But are there any other
3  salespeople who you can think of that work at
4  the office currently besides Ira Sugar?  You
5  did say Tony Zarlengo, you thought, did sales,
6  too.
7    A.  Yes.
8    Q.  So other than the two of them.
9    A.  Steve French.
10   Q.  Okay.
11   A.  And that's all that I know of.  Yeah,
12 Steve French.
13   Q.  All right.
14       Would Steve French be
15 somebody who also might let you know where to
16 go and what kind of job you've got?
17   A.  No.
18   Q.  Is there a reason that he wouldn't be
19 somebody who would do that?
20   A.  I don't know.
21   Q.  Okay.
22       He just doesn't?
23   A.  Yeah.  Yes.
24   Q.  All right.

22 (Pages 85 to 88)

89

```
 1            Anybody who worked as a
 2  salesman in the past who you can recall that no
 3  longer works as a salesman?
 4      A.  Not that I can recall.
 5      Q.  Okay.
 6      A.  I don't really know them.
 7      Q.  All right.
 8            And then just so I'm -- I'm
 9  clear, it's your understanding that Tony
10  Zarlengo does sales currently, correct?
11      A.  As far as I know.
12      Q.  Okay.
13            And it was -- well, you
14  mentioned other people that do sales, so I'm
15  just sort of -- I want to understand what you
16  meant by that.
17            He also did sales in the
18  past, correct?
19      A.  Yes.
20      Q.  Okay.
21            And he does sales for jobs
22  that you work on?
23      A.  Yes.
24      Q.  Okay.
```

90

```
 1            And do you understand that
 2  he's one of the owners of Midwest Dock?
 3      A.  Yes.
 4      Q.  All right.
 5            And do you understand that
 6  Mike Richert is one of the owners of Midwest
 7  Dock?
 8      A.  Yes.
 9      Q.  Okay.
10            And what is your
11  understanding of the relationship between
12  Midwest Dock and Dock & Door?
13      A.  My understanding is Midwest Dock gets
14  work somehow, and we do it for them.
15      Q.  Okay.
16            And when you say "we," you
17  mean Dock & Door?
18      A.  Dock & Door.
19      Q.  Okay.
20            And is that pretty much the
21  extent of your knowledge of the relationship?
22      A.  Yes.
23      MR. McJESSY:  Okay.
24            Off the record.
```

91

```
 1            (There was a discussion off
 2            the record.)
 3
 4      MR. McJESSY:  Why don't we take a --
 5  why don't we take a five-minute break or
 6  10-minute break.  I'd like to see the truck
 7  you've got.  I'd like to take a picture of it.
 8  I assume nobody has an objection to that.  I'll
 9  produce the picture in the case.  And I assume
10  that defendant's counsel might want to see
11  it -- want to see it, too, and have a picture.
12            All right.  So we'll do that,
13  and then we'll pick back up.
14
15            (After a break from 10:30 a.m.
16            to 10:39 a.m., the deposition
17            was resumed as follows:)
18
19      MR. McJESSY:  We can go back on the
20  record.
21
22
23
24
```

92

```
 1            (WHEREUPON, the document marked
 2            Plaintiff's Exhibit 8 for
 3            identification was tendered to
 4            the deponent.)
 5
 6  BY MR. McJESSY:
 7      Q.  Sir, looking at Exhibit 8 in front of
 8  you there, do you recognize where that was
 9  taken?
10      A.  No.
11      Q.  All right.
12            Does that look like one of --
13  even if you don't recognize where it was taken,
14  does that look like sort of one of the normal
15  job sites that you would work on for
16  Dock & Door?
17      A.  Yes.
18      Q.  All right.
19            Doing sort of multiple --
20  installation of multiple overhead doors?
21      A.  Yes.
22      Q.  And just so I'm clear, you also do
23  installation of dock levelers for Dock & Door?
24      A.  Yes.
```

23 (Pages 89 to 92)

93

```
1            (WHEREUPON, the document marked
2         Plaintiff's Exhibit 7 for
3         identification was tendered to
4         the deponent.)
5
6   BY MR. McJESSY:
7       Q.  And if you could turn to Exhibit 7,
8   which is just back one, do you happen to
9   recognize where that photo was taken?
10      A.  No.
11
12           (WHEREUPON, the document marked
13        Plaintiff's Exhibit 15 for
14        identification was tendered to
15        the deponent.)
16
17  BY MR. McJESSY:
18      Q.  Okay.
19           And if you could turn to
20  Exhibit 15, do you recognize who that is?
21      A.  Jimmy Kelly.
22      Q.  Okay.
23           And do you -- do you see the
24  shirt that he's got on?
```

94

```
1       A.  Yes.
2       Q.  All right.
3            Do you have shirts like that?
4       A.  I do.
5       Q.  All right.
6            And do you work on job sites
7   that require you to wear bright-colored shirts
8   like the one that you have on today?
9       A.  Yes.
10      Q.  All right.
11           And is that -- is that
12  sometimes a requirement for job sites that
13  you're working on by the general contractor?
14      A.  Yes.
15      Q.  All right.
16           And do you sometimes wear the
17  Midwest Dock shirts like that that are brightly
18  colored?
19      A.  Yes.
20      Q.  All right.
21           And are there -- does
22  Dock & Door supply you with shirts like that at
23  all that are bright colored with Dock & Door's
24  name on them?
```

95

```
1       A.  No.
2       Q.  Okay.
3            And my understanding is there
4   are no shirts like that with Dock & Door's name
5   on them.
6            Is that accurate, as far as
7   you know?
8       A.  Right.  Yes.
9       Q.  Okay.
10           And who supplies you with the
11  shirts that have the Midwest Dock name on them?
12      A.  I have my shirts from when I worked
13  for Midwest Dock.
14      Q.  Okay.
15           You just kept them --
16      A.  Yeah.
17      Q.  -- and sometimes wear them on job
18  sites?
19      A.  Sometimes, yes.
20      Q.  Okay.
21           And do you wear them on the
22  job sites because they're brightly colored and
23  they satisfy that requirement, to wear
24  bright-colored clothes?
```

96

```
1       A.  Yes.
2
3            (WHEREUPON, the document marked
4         Plaintiff's Exhibit 23 for
5         identification was tendered to
6         the deponent.)
7
8   BY MR. McJESSY:
9       Q.  Oh, if you could turn to Exhibit 23.
10           Do you see that -- that's
11  also Mr. Kelly; is that right?
12      A.  It looks like him.
13      Q.  Yeah.  That sweatshirt you see that
14  he's got on --
15      A.  Yes.
16      Q.  -- are you familiar with shirts like
17  that that say Midwest Dock on them?
18      A.  Yes.
19      Q.  All right.
20           And do you have sweatshirts
21  like that, also?
22      A.  I do have a couple.
23      Q.  Okay.
24           And do you wear those on the
```

24 (Pages 93 to 96)

97

1    job site in colder temperatures?
2        A.  Yes.
3        Q.  Okay.
4            And you do that with your
5    work for Dock & Door, correct?
6        A.  Yes.
7        Q.  All right.
8            And, again, that's to satisfy
9    the requirement to wear brightly-colored
10   clothing on the job site?
11       A.  Correct.
12       Q.  All right.
13           And if you could -- do you
14   recognize where that photo was taken?
15       A.  No.
16
17           (WHEREUPON, the document marked
18           Plaintiff's Exhibit 21 for
19           identification was tendered to
20           the deponent.)
21
22   BY MR. McJESSY:
23       Q.  All right.
24           If you could go back a

98

1    page -- I'm sorry.  If you could go back two --
2    two exhibits to Exhibit 21, do you recognize
3    those individuals?
4        A.  That's me.
5        Q.  Oh, on the right?
6        A.  Yes.
7        Q.  All right.
8            I didn't put that together,
9    but, okay.  Thank you.
10       A.  And that looks like Mike Richert.
11       Q.  Oh, okay.
12           And do you know where this
13   photo was taken?
14       A.  I do not.
15       Q.  Okay.
16           And do you know what the
17   stickers are that are on Mr. Richert's helmet?
18       A.  Job site stickers.
19       Q.  And what are -- what are job site
20   stickers?
21       A.  Just stickers they give you when you
22   work on job sites.
23       Q.  Okay.
24           Why do they give you the

99

1    stickers?
2        A.  Basically to say that you're signed
3    in.
4        Q.  Okay.
5            So there's some job sites
6    that you go to where you have to sign in?
7        A.  Yes.
8        Q.  All right.
9            And is there a particular
10   reason for that, do you know?
11       A.  Just for safety, I guess.
12       Q.  Okay.
13           And I take it that sometimes
14   you get a sticker from the general -- who --
15   strike that.
16           Who gives you the sticker?
17       A.  The general contractor.
18       Q.  Okay.
19           And you put it on your hat
20   for what purpose?
21       A.  Just so they know that you've checked
22   in.
23       Q.  Okay.
24           Does it give you access to

100

1    the job site?
2        A.  No.
3        Q.  Oh, okay.  So if somebody is walking
4    around the job site, they know that you've
5    checked in there.
6            Is that it?
7        A.  Yes.
8        Q.  Okay.
9            So are there people that walk
10   around the job sites to make sure that only
11   people who are supposed to be on the job site
12   are on the job site?  Is that how it works?
13       A.  Could be.  I'm not sure --
14       Q.  Okay.
15       A.  -- no.
16       Q.  You've got similar stickers on your
17   hat, right?
18       A.  Ah-huh.
19       Q.  Is that yes?
20       A.  Yes.
21       Q.  All right.
22           And -- and are all of the
23   stickers on your hat job site stickers?
24       A.  No.

25 (Pages 97 to 100)

101

1    Q.  Okay.
2         What are -- what stickers on
3    your hat aren't job site stickers?
4    A.  The one in the front there, I think,
5    is just a carpenters' sticker.
6    Q.  Like the carpenters' union?
7    A.  Yes.
8    Q.  Okay.
9         Is that the green one?
10   A.  Yes.
11   Q.  Okay.
12   A.  And it's hard to tell, the other ones.
13   Q.  The other ones you're not sure about?
14   A.  Yeah.
15   Q.  All right.
16        And looking at Mr. Richert's
17   helmet or the hat that he has on and the
18   stickers, do you recognize what any of the --
19   what job sites any of those stickers are from?
20   A.  Malcolm X.  I remember Malcolm X
21   College, I believe it was.
22   Q.  Oh, I see.
23        That's the sticker on the
24   bottom left?

102

1    A.  The, yeah, 0797.
2    Q.  Yeah.  I see that.  Okay.
3         And what was that project?
4    A.  It was Malcolm X College, I believe,
5    is what it was.  We did some doors there.
6    Q.  Installation of doors?
7    A.  Yes.
8    Q.  Do you know who the general contractor
9    was on that job?
10   A.  I don't.  I would think it would say
11   it on that sticker somewhere.
12   Q.  Is that usually how it works?
13   A.  Yeah.  I can't make it out.
14   Q.  Okay.
15        And do you remember when,
16   approximately, that project was?
17   A.  Many years ago.  I don't recall when
18   it was.
19   Q.  Do you remember, was that a project
20   you worked on when you were with Dock & Door?
21   A.  Yes.  It would have been.
22   Q.  Okay.  All right.
23        And do the -- do the stickers
24   typically identify the job that the project is

103

1    for?
2    A.  Typically, yes.
3    Q.  Do you recognize any of the other
4    stickers on there and what jobs they were for?
5    A.  The blue one above the Malcolm X one
6    is Opus.
7    Q.  Okay.
8         And do you remember what
9    project that was for?
10   A.  No.  We've done a lot of work for
11   Opus.
12   Q.  Okay.
13        Oh, I sort of see Opus on it.
14        All right.  Any others that
15   you recognize?
16   A.  CORE on the right.  That's CORE
17   Construction.
18   Q.  All right.
19        And do you recall what
20   project that sticker would have been for?
21   A.  That was Van Drunen Farms.  I remember
22   that one.  V-a-n D-r-u-n-a-n, possibly.  Crown
23   Point.
24   Q.  Okay.

104

1         And you said in Crown Point?
2    A.  Indiana, yes.
3    Q.  Indiana.  All right.
4         And how about the one right
5    in the front in the middle?  It looks like it
6    says zero on it, but I'm not sure.
7    A.  I think that's just a -- I don't know
8    what that is.
9    Q.  Okay.
10   A.  Just a sticker.
11   Q.  All right.
12        And you said you're not sure
13   where this photo was taken?
14   A.  No.
15   Q.  Okay.  Okay.
16
17        (WHEREUPON, the document marked
18        Plaintiff's Exhibit 19 for
19        identification was tendered to
20        the deponent.)
21
22   BY MR. McJESSY:
23   Q.  If you could take a look at Exhibit
24   19.  There you go, yeah.  And there's a

26 (Pages 101 to 104)

105

1 photograph on the right there.  It actually
2 looks like three photographs that are sort of
3 blended as one.  It's under the entry that says
4 Midwest Dock Solutions, October 15, 2016.
5        Do you see that?
6     A.  Yes.
7     Q.  Do you recognize what that building
8 is, what project that was?
9     A.  No.
10    Q.  Okay.
11        And I'll ask you, is that --
12 this building with -- I don't know how many
13 docks it has there, maybe 20 docks -- is that
14 the kind of installation that you would do for
15 Dock & Door where you'd go through and install,
16 you know, 20 dock doors and levelers in a
17 session?
18    A.  Yes.
19
20        (WHEREUPON, the document was
21         marked Plaintiff's
22         Exhibit 20 for identification,
23         as of 4/11/25.)
24

106

1 BY MR. McJESSY:
2     Q.  And if you turn to the next exhibit,
3 Exhibit 20, do you recognize what that project
4 was?
5     A.  No.
6     Q.  Okay.
7
8        (WHEREUPON, the document marked
9         Plaintiff's Exhibit 29 for
10        identification was tendered to
11        the deponent.)
12
13 BY MR. McJESSY:
14    Q.  If we could take a look at Exhibit 29,
15 again, and just -- it sounds like you know most
16 people by their first names, not their last
17 names.
18    A.  Mostly.
19    Q.  Yeah.  If you could just go through
20 this list and give me the line numbers of
21 any -- anybody whose names you recognize that
22 you think you might have worked with.  I'd just
23 like to ask you what you know about the work
24 that they did with you or the work that they

107

1 did.
2        So I just have the list here.
3 Rather than ask you the names, I thought it
4 would be easier.  I can read the names off, or
5 you can just look at the list and tell me who
6 you think you might know.
7        THE WITNESS:  Just who I've worked
8 with?
9        MR. HUGHES:  Just real quick, for
10 clarification, are you asking him for his work?
11       MR. McJESSY:  For either Midwest or
12 Dock & Door.
13       MR. HUGHES:  I just want to make
14 sure everybody is on the same page.
15       MR. McJESSY:  Yeah, no.  Fair
16 question.
17 BY MR. McJESSY:
18    Q.  And counsel raises a good point.
19        Anybody whose name on here
20 you recognize that you worked with at any time,
21 at either Midwest or Dock & Door.
22    A.  Okay.
23        Jose, number one.
24    Q.  Okay.

108

1     A.  Number three.
2     Q.  Number three?
3     A.  Yes.
4     Q.  Okay.
5     A.  Now, as far as worked with on the job
6 site, right?
7     Q.  Just who you know.  No, not --
8     A.  Who I know?
9     Q.  Yeah.  Who you know.
10    A.  Number five.
11    Q.  Okay.
12    A.  I'm assuming Zachary.  Number 10 is
13 the Zach.
14    Q.  Zach Corrigan?
15    A.  That I don't know his last name,
16 though.
17    Q.  But you know a Zach?
18    A.  I know a Zach.
19    Q.  Okay.
20    A.  Don, number 13.
21    Q.  Yep.
22    A.  Eighteen.
23    Q.  You mentioned Steve French.  Okay.
24    A.  Twenty.

27 (Pages 105 to 108)

109

1    Q.  **Jeff Gibson.  Okay.**
2    A.  Twenty-three.  Twenty-four is me.
3    Q.  **Yep.**
4    A.  Could be 27.
5    Q.  **Okay.**
6    A.  Dylan, 31.
7    Q.  **Okay.**
8    A.  Thirty-two.  Thirty-three.
9    Q.  **Okay.**
10   A.  Forty-one.  Forty-three.  I'm assuming
11   45, Elliot.
12   Q.  **Okay.**
13   A.  Fifty-two.
14   Q.  **Okay.**
15   A.  I don't know if this 56 is the --
16   which Eric.
17   Q.  **Oh, I see.  Okay.**
18   A.  So the two Erics, I don't know which
19   one it was.
20   Q.  **Got it.**
21   A.  Or, no, I do know of two Erics.
22   Sorry.  There was an Eric that is no longer
23   with us, so it might --
24   Q.  **You might know both of them?**

110

1    A.  Yeah.
2    Q.  **Okay.**
3    A.  Fifty-eight.  Fifty-nine.
4    Sixty-seven.  I know him as Josh.  Sixty-eight,
5    seventy-one, seventy-two, seventy-three,
6    seventy-four, seventy-seven.  I know a Zach.
7    Don't know a last name.
8    Q.  **Okay.**
9    A.  Seventy-eight.  Seventy-nine.  Eighty.
10   Eighty-two.  Eighty-three.  I know 84 as Sam.
11   I don't know his last name.  I do remember an
12   Austin, 85.  Eighty-seven.  Eighty-eight.
13   Q.  **Okay.**
14       **And you mentioned number one,**
15   **Jose Aguirre?**
16   A.  Yes.
17   Q.  **Did you work with him at Midwest Dock?**
18   A.  No.
19   Q.  **Okay.**
20       **Do you work with him as -- as**
21   **Dock & Door?**
22   A.  Yes.
23   Q.  **And do you work on the job with him?**
24   A.  Yes.

111

1    Q.  **Does he still work there?**
2    A.  Yes.
3    Q.  **Okay.**
4        **And what kind of work does he**
5    **do?**
6    A.  He's a carpenter.
7    Q.  **And when you say he's a carpenter,**
8    **does that mean he does door installation and**
9    **dock leveler installation, all of the same work**
10   **you described for me that you do?**
11   A.  Yes.  Yes.
12   Q.  **All right.**
13       **And Brandon Bishop, did you**
14   **work with him at Midwest Dock?**
15   A.  No.
16   Q.  **Do you work with him at Dock & Door?**
17   A.  Yes.
18   Q.  **All right.**
19       **And does he do the same kind**
20   **of work that you do?**
21   A.  Yes.
22   Q.  **All right.**
23       **And Anthony Brutti, do you do**
24   **work with him?**

112

1    A.  No.
2    Q.  **Okay.**
3        **And did you -- you never**
4    **worked with him?**
5    A.  Not on a job site, no.
6    Q.  **Okay.**
7        **And what -- who is Anthony**
8    **Brutti?**
9    A.  He's my boss, as far as the owner of
10   Dock & Door Install as far as I know.
11   Q.  **Okay.**
12       **And when you say he's your**
13   **boss, what did -- what interaction do you have**
14   **with him on a day-to-day basis?**
15   A.  He keeps track of time, payroll.  And
16   that's about it, as far as I know.
17   Q.  **All right.**
18       **And you said he's -- he's**
19   **delivered stuff to the job site before that**
20   **you've been on, correct?**
21   A.  Yes.
22   Q.  **All right.**
23       **And when you say "time," you**
24   **mean you send him your time sheets?**

28 (Pages 109 to 112)

113

1    A. Yes.
2    **Q. All right.**
3    **And you do that -- how does**
4 **that work?**
5    A. Well, for a while, I was just giving
6 it -- dropping it off at the office and
7 probably -- actually, since all of these.
8 That's why I have these that I sent to you.
9
10    (WHEREUPON, the document marked
11    Plaintiff's Exhibit 28 for
12    identification was tendered to
13    the deponent.)
14
15 BY MR. McJESSY:
16    **Q. And you're pointing to Exhibit 28?**
17    A. Yes, 28.
18    **Q. Okay.**
19    A. Basically, we've been taking a picture
20 of it and sending it to him since these
21 started.
22    **Q. Okay.**
23    **And when did -- when you say**
24 **"these started," this is like a form time sheet**

114

1 **you fill out, correct?**
2    A. Well, not since these started. I'm
3 sorry. But since the date of here, whenever --
4 what I have here.
5    **Q. Okay.**
6    A. Because I always turned them into the
7 office, and I wouldn't have them anymore. So
8 since I've been taking pictures and sending it
9 over -- sending it over the phone, this is why
10 I still have these.
11    **Q. I see. Okay.**
12    **And we can -- let's mark --**
13 **I'm going to mark this as Exhibit 30.**
14 **Do you want to see this**
15 **before I hand it to -- I only made one copy,**
16 **but I did make -- I'm going to ask some**
17 **questions about some specific pages in there,**
18 **so I'll give you -- those are pages excerpted**
19 **from Exhibit 30 that I'm going to ask questions**
20 **about. I just didn't want to print out four**
21 **copies of this.**
22    MR. HUGHES: Yeah.
23    So this is -- this is
24 excerpts of 30.

115

1    MR. McJESSY: If you look at the
2 bottom right-hand corner, it has the numbers
3 they correspond with.
4
5    (WHEREUPON, the document was
6    marked Plaintiff's
7    Exhibit 30 for identification,
8    as of 4/11/25.)
9
10 BY MR. McJESSY:
11    **Q. Sir, I'm going to hand you what I've**
12 **marked as Exhibit 30, which are exhibits that**
13 **were produced to us by Dock & Door.**
14    A. Okay.
15    **Q. And I'd just ask you to look through**
16 **it sort of generally and ask -- I want to ask**
17 **you a couple of questions about that generally.**
18 **You'll notice that it's got dates on the top of**
19 **the pages.**
20    A. Okay. Okay.
21    **Q. Does Exhibit 30 look like your time**
22 **sheets?**
23    A. Yes.
24    **Q. Okay.**

116

1    **And Exhibit 30 is -- it's**
2 **got -- it's like a form time sheet that, then,**
3 **somebody fills out, correct?**
4    A. Yes.
5    **Q. All right.**
6    **And do you remember when you**
7 **started filling out this like form time sheet?**
8    A. I think that was when I started
9 Dock & Door.
10    **Q. Okay.**
11    **Do you think it was since**
12 **2014 or '15?**
13    A. Would be my guess, yes.
14    **Q. Okay.**
15    **And those look like they**
16 **begin sometime in 2019, if you look at --**
17    A. Oh, that's the beginning?
18    **Q. Well, I was going to say, if you look**
19 **at page 259, the last one, I think they're in**
20 **reverse date order is how they were produced to**
21 **us. It shows like June 2019.**
22    **Could it have been that these**
23 **forms started sometime around then?**
24    A. It's possible. I thought it

29 (Pages 113 to 116)

117

1  started -- I thought it started sooner than
2  that.
3      Q.  Okay.
4      A.  It had to be sooner than 2019.
5      Q.  You think -- you think you were
6  filling these out for some period prior that?
7      A.  Yeah.
8      Q.  Okay.
9          In any event, where would you
10 get -- well, let me ask you.  Is the writing on
11 these time sheets mostly yours?  I'm guessing
12 that there's some writing on the time sheets
13 that's not yours and some writing that is.
14         Is that fair?
15         And we don't need to go
16 through each time sheet and the writing that's
17 yours and not yours.
18     A.  It looks like it would be mostly mine.
19     Q.  Including the -- I see that there's
20 like hours that are circled, and there's
21 handwriting at the very top with dates.
22         Is all of that your
23 handwriting?
24     A.  I would have just put my first name,

118

1  not my last.
2      Q.  Okay.
3      A.  And then the dates there, I didn't put
4  that.
5      Q.  Okay.
6          So some of the writing on
7  these sheets is not yours, correct?
8      A.  Yes.
9      Q.  Okay.
10         But generally looking through
11 them, does it look like the description, job
12 description and contractor, is that your
13 handwriting, for the most part?
14     A.  Yes.
15     Q.  All right.
16         Now, the blank form that you
17 would get before it was filled out, where would
18 you get the blank forms?
19     A.  From the shop.
20     Q.  Okay.
21         And is that true regardless
22 of where the shop was located?
23     A.  Yes.
24     Q.  Which address it was located at.

119

1      A.  Yes.
2      Q.  And where in the -- when it was at the
3  Steger Road location, where would you get the
4  time sheets there?
5      A.  I guess it would have been the office.
6      Q.  Okay.
7          Would somebody in particular
8  give them to you, or were they just --
9      A.  No.  There would just be a stack of
10 them somewhere.
11     Q.  Okay.
12         And were they sometimes in
13 the lunchroom?
14     A.  They're in the lunchroom now is where
15 we get them.
16     Q.  Okay.
17     A.  Break room.
18     Q.  All right.
19         Did you fill out time sheets
20 like this when you were working with Midwest?
21     A.  No.
22     Q.  Okay.
23         So it's only something you've
24 done when you were getting paid through

120

1  Dock & Door?
2      A.  Yes.
3      Q.  Okay.
4          And you would pick up the
5  blank sheets at the office or now at the
6  lunchroom; is that right?
7      A.  Yes.
8      Q.  All right.
9          And then where would you
10 return the completed time sheets to?
11     A.  I'd put them back on the lunchroom
12 table.
13     Q.  Okay.
14         And somebody would pick them
15 up there?
16     A.  Yes.
17     Q.  All right.
18         And do you know who picked
19 them up?
20     A.  No.
21     Q.  All right.
22         And where do you return them
23 to now?
24     A.  Now, I just send pictures to Tony

30 (Pages 117 to 120)

121

1   Brutti.
2       **Q.  Okay.**
3       A.  I don't return them.
4       **Q.  Ahh, that's -- and that's why you**
5   **still have the ones that are marked as Exhibit**
6   **28?**
7       A.  Yes.
8       **Q.  Okay.**
9           **So did you -- did you start**
10  **the process of sending the pictures by text**
11  **message, roughly, with whatever the date is of**
12  **Exhibit 28, the first time sheet in here?  And**
13  **it looks like it might be June of 2024.**
14      A.  No.  I feel like we were doing it
15  longer than that.  I just might not have them
16  anymore.
17      **Q.  Okay.**
18          **But at some part -- some**
19  **point you switch from leaving them on the break**
20  **room table to texting them to Tony?**
21      A.  Yes.
22      **Q.  Tony Brutti?**
23      A.  Yes.
24      **Q.  All right.**

122

1           **And you said Tony -- so Tony**
2   **gets the time -- time sheets, and you said he**
3   **also handles payroll for Dock & Door; is that**
4   **correct?**
5       A.  I'm assuming.
6       **Q.  Okay.**
7       A.  Yeah.
8       **Q.  You're not sure about that?**
9       A.  I send it to him.
10      **Q.  Okay.**
11      A.  So I'm assuming he does the payroll.
12      **Q.  All right.**
13          **So other than sending your**
14  **time sheets to Tony Brutti, and you mentioned**
15  **that occasionally he would bring supplies out**
16  **to you at job sites, do you have any other**
17  **action -- interaction with Tony Brutti?**
18      A.  No.
19      **Q.  Okay.**
20          **Is there anything else that**
21  **you're aware of that he does?**
22      A.  He offloads material on job sites.
23      **Q.  Okay.**
24          **What does that mean?**

123

1       A.  The truck shows up with doors or
2   docks, and he'll come to the job site and
3   unload the truck.
4       **Q.  All right.**
5           **So whoever's supplying the**
6   **doors or the dock levelers to a job site on**
7   **like a semi-truck, I assume?**
8       A.  Yes.
9       **Q.  Okay.**
10          **He'll help unload those**
11  **materials at the job site?**
12      A.  Yes.
13      **Q.  Is that always or just sometimes?**
14      A.  I think, always.
15      **Q.  Okay.**
16          **And is that done using like a**
17  **forklift, I'm assuming?**
18      A.  Yes.
19      **Q.  Okay.**
20          **You're not physically lifting**
21  **and carrying those things off the truck?**
22      A.  No.
23      **Q.  Okay.**
24          **I'm assuming they're too**

124

1   heavy to do that?
2       A.  Yeah.  Usually, they're in big
3   bundles.
4       **Q.  Okay.**
5           **Is there some other way that**
6   **they get unloaded besides the forklift?**
7       A.  Not that I know of.
8       **Q.  Okay.**
9           **And how long has he been**
10  **doing that?**
11      A.  As long as I can remember Dock & Door.
12      **Q.  All right.**
13          **And to your knowledge, is**
14  **there anybody else that you've seen do that**
15  **kind of work?**
16      A.  I have seen Midwest Dock service guys
17  helping.
18      **Q.  Okay.**
19          **And who's that?**
20      A.  Janie.  Who I've seen?  I'm not -- I
21  haven't -- I don't really see them, but I've
22  heard of names like Janie.  Who else would have
23  been there?  I don't know.  It could have been,
24  I think -- what's his name?  Eric.  One of the

31 (Pages 121 to 124)

125

1  Erics.
2  **Q.  Okay.**
3  A.  I think he's helped, I've heard
4  through the grapevine.  It's hard to say.  I
5  mean, I don't see him.
6  **Q.  Okay.**
7  **So when you get there, the**
8  **stuff is already offloaded?**
9  A.  Yeah.
10 **Q.  Okay.**
11 **So is it fair -- I'm going to**
12 **paraphrase, and you tell me if I've got the**
13 **gist of it right.**
14 **You haven't seen others who**
15 **are service guys for Midwest do it, but you**
16 **believe that that's what's happened, is it,**
17 **because you've heard people say like, yeah, I**
18 **was at this job site, and we unloaded this**
19 **stuff?**
20 A.  Yes.
21 **Q.  And those would be Midwest service**
22 **guys who would say that they had been to a job**
23 **site to unload the stuff that you're going to**
24 **end up installing.**

126

1  **Is that it?**
2  A.  Yeah.  Yes.
3  **Q.  Okay.**
4  **And you think, maybe, Janie**
5  **and, maybe, Eric, one of the Erics, are the**
6  **people who you can recall may have said that or**
7  **may have -- they may have been the ones who**
8  **we're referring to as having been there?**
9  A.  Yeah.  Probably Janie would be the one
10 I heard it from.
11 **Q.  Okay.**
12 **And Janie is somebody,**
13 **though, who you've seen bring stuff to you at**
14 **job sites; is that correct?**
15 A.  Yes.
16 **Q.  Okay.**
17 **You mentioned a Zach, and**
18 **there's two Zachs.  There's Zachary Corrigan**
19 **and Zachary Torkelsen, number 77, and number --**
20 **Zachary Corrigan is number 10.**
21 **I take it, you've worked with**
22 **a Zach?**
23 A.  Yes.
24 **Q.  Can you describe him for me?**

127

1  A.  Normal height, white.  I think, tan
2  hair.
3  **Q.  How old?**
4  A.  Maybe late 20s, early 30s.
5  **Q.  Okay.**
6  **And when you say average**
7  **height, you mean like five-eleven, five-ten,**
8  **six feet, something like that?**
9  A.  Yes.
10 **Q.  Okay.**
11 **And does he still work there?**
12 A.  No.
13 **Q.  All right.**
14 **And what was the nature of**
15 **your interaction with him?**
16 A.  Coworker.
17 **Q.  Did you work with him at Midwest Dock?**
18 A.  I don't think he was at Midwest.
19 **Q.  You think he was with Dock & Door?**
20 A.  Yes.
21 **Q.  All right.**
22 **And what kind of work did he**
23 **do?**
24 A.  Same as me.

128

1  **Q.  All right.**
2  A.  Doors and docks and installs.
3  **Q.  All right.**
4  **And you mentioned you knew**
5  **Don.**
6  **You think it might be Don**
7  **Cruikshank; is that right?**
8  A.  Yeah.
9  **Q.  All right.**
10 **And does Don still work**
11 **there?**
12 A.  No.
13 **Q.  Okay.**
14 **Did Don leave within the last**
15 **couple of years?**
16 A.  Yes.
17 **Q.  Do you know, did he leave because he**
18 got injured?**
19 A.  Yes.
20 **Q.  Okay.**
21 **And what kind of work did Don**
22 do?**
23 A.  The same work.  Installing doors --
24 **Q.  All right.**

32 (Pages 125 to 128)

129

1    A.  -- docks, seals.
2    Q.  And did you work with him at Midwest
3  Dock?
4    A.  Yes.
5    Q.  And did you also work with him at
6  Dock & Door?
7    A.  Yes.
8    Q.  And did you both make the transition
9  from Midwest Dock to Dock & Door about the same
10 time?
11   A.  No.
12   Q.  Okay.
13       Did you make the transition,
14 first?
15   A.  Yes.
16   Q.  And then he joined Dock & Door later;
17 is that right?
18   A.  Yes.
19   Q.  Okay.
20       Do you know, did he basically
21 do all of the same kind of work you did?
22   A.  Yes.
23   Q.  Did you work with him?
24   A.  Yes.

130

1    Q.  Okay.
2        You worked with him on job
3  sites?
4    A.  Yes.
5    Q.  All right.
6        My understanding is sort of
7  the way it works on a job site is you work --
8  like pairs of guys work together to do the
9  work -- you know, lift the things, install the
10 things.
11       Is that sort of how it works?
12   A.  Yes.
13   Q.  All right.
14       And sometimes you'd be paired
15 up with him?
16   A.  Not much, but sometimes.
17   Q.  Okay.
18       Sometimes --
19   A.  There's been a few times.
20   Q.  Okay.
21       Sometimes you'd both be at
22 the same job site working, but you wouldn't
23 be -- he wouldn't be your partner on the job?
24   A.  That, too, yeah.  Yes.

131

1    Q.  Okay.
2        And sometimes he would be
3  your partner on the job?
4    A.  Yes.
5    Q.  All right.
6        Typically, if you're doing --
7  well, strike that.
8        All right.  How about Steve
9  French?  You described -- I think you said he
10 was a sales guy; is that right?
11   A.  Yes.
12   Q.  All right.
13       Did you work -- you didn't
14 really work with him, but was he working at the
15 same -- well, strike that.
16       I take it, you didn't work
17 with him?
18   A.  I did.
19   Q.  Oh, you did work with him?
20   A.  Yes.
21   Q.  Oh.  Tell me about that.
22   A.  When he first started Midwest Dock --
23   Q.  Okay.
24   A.  -- he started as a service guy.

132

1    Q.  Okay.
2    A.  It wasn't long, maybe a year.  And
3  then he was a salesman after that, so
4  transitioned into a salesman.
5    Q.  All right.
6        Did he struggle with doing
7  the work as a service guy?
8    A.  No.  I think he just wanted to be a
9  salesman, so they went ahead and let him do it.
10   Q.  All right.
11       So you only worked with him
12 at Midwest; is that right?
13   A.  Yes.
14   Q.  And have you worked with him at all as
15 Dock & Door?
16   A.  No.
17   Q.  All right.
18       I think you said he really
19 isn't somebody who -- who has told you where to
20 go or what to do?
21   A.  No.
22   Q.  Okay.
23       How about Jeff Gibson?
24   A.  He is a Midwest Dock service guy.

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

133

1  Q.  Okay.
2      Did you work with him when
3  you worked at Midwest Dock?
4  A.  No.  I don't think so.
5  Q.  All right.
6      Have you worked with him as
7  Dock & Door?
8  A.  No.
9  Q.  All right.
10     You just sort of know him?
11 A.  Yes.
12 Q.  Have you ever seen him on a job site
13 where you were working as Dock & Door?
14 A.  No.  Not that I can recall.
15 Q.  All right.
16     And what kind of work does he
17 do, do you know?
18 A.  Service type of work.  Fixing.  Fixing
19 stuff.
20 Q.  All right.
21     And how about Kevin Graham?
22 A.  Yes.  I have worked with him.
23 Q.  Okay.
24     Does he work for Dock & Door?

134

1  A.  When he worked with us, yeah, he was
2  at Dock & Door.
3  Q.  Okay.
4      Did you ever work with him as
5  Midwest?
6  A.  No.
7  Q.  All right.
8      What kind of work did he do?
9  A.  Same as me.  He was a carpenter
10 installing doors and docks and equipment.
11 Q.  Okay.
12     And would you work like
13 literally with him on a job site?  Would you be
14 partnered up with him to do the work?
15 A.  Yes.
16 Q.  Okay.
17     And that was when you were
18 working as -- being paid through Dock & Door?
19 A.  Yes.
20 Q.  All right.
21     And how about -- there's an
22 Eric here.  And there are two Erics.  There's
23 Eric Jansma, number 27, and Eric Pool, number
24 56.

135

1      Do you remember -- you said
2  you think you worked with an Eric.  Is that --
3  or that's what you remembered.  You remembered
4  an Eric, correct?
5  A.  Yes.
6  Q.  All right.
7      Do you know which Eric it is?
8  A.  I don't.
9  Q.  Can you describe the Eric for me?
10 A.  The Eric I worked with at Dock & Door
11 is tall, six-two, white, mid 30s, maybe late
12 30s, early 40s.
13 Q.  Okay.
14 A.  He's a carpenter.
15 Q.  Carpenter.  All right.
16     And did you work with him?
17 A.  Yes, I have.
18 Q.  All right.
19     And would you be partnered up
20 with him on job sites, like literally working
21 side by side with him?
22 A.  Yes.
23 Q.  All right.
24     And would you also work on

136

1  job sites where he was there, but you weren't
2  working with him directly?
3  A.  Yes.
4  Q.  All right.
5      And he did the same kind of
6  work you did, I assume?
7  A.  Yes.
8  Q.  You said he was a carpenter, so I was
9  assuming that's what you meant.
10 A.  Yes.
11 Q.  All right.
12     Does he still work there?
13 A.  No.
14 Q.  How long ago did he leave?
15 A.  He -- within the last couple of years.
16 Q.  Okay.
17     And there's a Dylan Kelly who
18 you mentioned you knew?
19 A.  Ah-huh.
20 Q.  Is that a yes?
21 A.  I do know him, yes.
22 Q.  Okay.
23     And how do you know him?
24 A.  He was a Midwest Dock service guy.

34 (Pages 133 to 136)

137

```
 1    Q.  Okay.
 2        Still work there?
 3    A.  No.
 4    Q.  And did you ever work with him when
 5  you were working as Dock & Door on a job site?
 6    A.  No.
 7    Q.  What kind of work did he do?
 8    A.  He was a service guy for Midwest Dock.
 9    Q.  Okay.
10        And James Kelly, he's the one
11  we saw in the picture, correct?
12    A.  I think it was Jimmy.  I know him as
13  Jimmy.
14    Q.  You know Jimmy Kelly?
15    A.  Yes.
16    Q.  Okay.
17        And how do you know him?
18    A.  He worked at Midwest Dock.
19    Q.  Does he still work there?
20    A.  No.
21    Q.  All right.
22        How long ago did he leave, do
23  you recall?
24    A.  Quite a few years ago.  Like I don't
```

138

```
 1  know.  Eight years ago, possibly.
 2    Q.  Oh, a long time ago.  All right.
 3        Did you ever work with him as
 4  Dock & Door?
 5    A.  No.
 6    Q.  And what kind of work did he do?
 7    A.  Service work for Midwest Dock.
 8    Q.  All right.
 9        And how about Nico?  You
10  mentioned you knew Nico?
11    A.  I know Nico, yes.
12    Q.  And do you work with him?
13    A.  Yes.
14    Q.  Still?
15    A.  Yes.
16    Q.  All right.
17        And did you work with him at
18  Midwest Dock?
19    A.  I don't think so.  I don't think he
20  was there at Midwest Dock.
21    Q.  And what kind of work does he do?
22    A.  Same as me.  Carpenter.  Same work as
23  I do.
24    Q.  Okay.
```

139

```
 1        How about number 41, John
 2  Mancha?
 3    A.  John Mancha?  I believe that's his
 4  last name.  Service guy at Midwest Dock.
 5    Q.  Okay.
 6        Does he still work there?
 7    A.  If that's the John I'm thinking of,
 8  no, he just left, moved to Tennessee.
 9    Q.  And did you ever work with him when
10  you were working on a Dock & Door project?
11    A.  No.
12    Q.  And Michael Mateja?  You mentioned a
13  Michael.  There's a --
14    A.  And I think that's a Michael, too,
15  that is a service guy.  I'm not positive.
16    Q.  A service guy for Midwest Dock?
17    A.  Yes.
18    Q.  Okay.
19        Does he still work there?
20    A.  Yes.
21    Q.  If it's the John you're thinking of?
22    A.  The Michael I'm thinking of.
23    Q.  Or the Michael that you're thinking
24  of, rather?  I'm sorry.
```

140

```
 1    A.  Yes.
 2    Q.  All right.
 3        And have you ever worked with
 4  him on a Dock & Door project?
 5    A.  No.
 6    Q.  The next one you mentioned was Elliot,
 7  number 45?
 8    A.  Yes.
 9    Q.  And who's Elliot?
10    A.  Elliot is a carpenter, same as me.
11    Q.  And he works for -- works with you on
12  Dock & Door projects?
13    A.  Yes.  And I think he was just somebody
14  that they got out of the hall when we were
15  slow.
16    Q.  Does he still work there?
17    A.  No.
18    Q.  All right.
19        And they do the same kind of
20  work you did?
21    A.  Yes.
22    Q.  Or the same kind of work you do?
23    A.  Yes.
24    Q.  And did you work with him on job
```

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

141

```
1    sites?
2       A.  Yes.
3       Q.  And would you work with him both as a
4    partner doing work and just separately with him
5    on a job site, not working directly with him?
6       A.  Yes.
7       Q.  Do you remember approximately what --
8    how -- how long he was there and when?
9       A.  On and off over the last, maybe, five
10   years, if that.
11      Q.  All right.
12          And the next name that I have
13   checked that you mentioned is John Murphy?
14      A.  Yes.
15      Q.  How do you know John?
16      A.  I remember him from Midwest Dock.
17      Q.  All right.
18          Did you ever work with him as
19   Dock & Door?
20      A.  No.
21      Q.  And what kind of work did he do?
22      A.  He was a service guy for Midwest Dock.
23      Q.  Okay.  All right.
24          And then the next name I have
```

142

```
1    checked is Eric Pool, but you only knew one
2    Eric, right?
3       A.  Yes.
4       Q.  Okay.
5       A.  Well, no, I know two Erics.
6       Q.  Oh, you know two Erics.
7       A.  I do.
8       Q.  Okay.
9       A.  So I don't know which one's which,
10   though.
11      Q.  Okay.
12      A.  So the other one I described to you is
13   a carpenter, tall, mid 30s, 40s.
14      Q.  Right.
15      A.  This Eric that I know is -- or
16   possibly, this one.  I don't know which one is
17   which.
18      Q.  Right.  What's the other Eric?
19      A.  He is black, mid 30s.
20      Q.  Okay.
21          How tall?
22      A.  Five foot eight.
23      Q.  Okay.
24          And what kind of work did he
```

143

```
1    do, and who did he work for?
2       A.  He worked for Midwest Dock, service.
3       Q.  Still work there?
4       A.  Yes.
5       Q.  All right.
6          Ever work with him on a job
7    where you were working as Dock & Door?
8       A.  No.
9       Q.  Michael Richert, what does he -- he's,
10   you mentioned, the owner of Midwest Dock, one
11   of the owners, correct?
12      A.  Yes.
13      Q.  What does he do?
14      A.  Hunts.  Goes hunting.
15      Q.  Anything else that you're aware of
16   that he does?
17      A.  No.
18      Q.  All right.
19          Do you have any day-to-day
20   interaction with him?
21      A.  No.
22      Q.  Well, is he somebody who will ever
23   like give you directions, what job site to go
24   to, that kind of thing?
```

144

```
1       A.  No.
2       Q.  Okay.
3          How about David Richert?
4       A.  Yes.  I know him.
5       Q.  And who's David Richert?
6       A.  A carpenter, or he might be
7    millwrights.
8       Q.  Millwrights?
9       A.  Yes.
10      Q.  All right.
11          Do you work with him at
12   Dock & Door?
13      A.  I have.
14      Q.  All right.
15          And what kind of work does he
16   do?
17      A.  Same thing.  Doors, docks.
18      Q.  Okay.
19          Does he still work there?
20      A.  No.
21      Q.  How long ago did he leave?
22      A.  He's kind of been the same, on and off
23   over the last years.
24      Q.  Okay.
```

36 (Pages 141 to 144)

145

1     And did he ever work at
2 Midwest with you?
3     A.  No.
4     Q.  Okay.
5     It was after you switched to
6 Dock & Door that you worked with him?
7     A.  Yeah.  Yes.
8     Q.  Okay.
9     And how about the Josh that
10 you mentioned earlier?
11     A.  Josh?
12     Q.  He's listed as number 67, if that's
13 the Josh you're thinking of.
14     A.  Josh, yes.
15     Q.  And what does -- did you work with him
16 at Midwest?
17     A.  No.
18     Q.  Do you work with him at Dock & Door?
19     A.  No.
20     Q.  Okay.
21     Who does he --
22     A.  He's a service guy at Midwest Dock.
23     Q.  Okay.
24     But you've never worked with

146

1 him?
2     A.  No.
3     Q.  Does he still work there, do you know?
4     A.  Yes.
5     Q.  All right.
6     Have you ever worked with him
7 on a Midwest -- I'm sorry.
8     Have you ever worked with him
9 on a Dock & Door job site?
10     A.  No.
11     Q.  All right.
12     And how about John Sparr?
13 You have -- I have a checkmark by him.
14     A.  Ah-huh.
15     Q.  Do you know --
16     A.  Service guy.  Midwest Dock.
17     Q.  Okay.
18     Still work there?
19     A.  No.
20     Q.  Did you work with him when you worked
21 at Midwest Dock?
22     A.  No.
23     Q.  All right.
24     So he's somebody you got to

147

1 know just being around the warehouse?
2     A.  Yes.
3     Q.  All right.
4     And John Stoltenberg?
5     A.  Yeah.  Midwest Dock.
6     Q.  Okay.
7     Service guy?
8     A.  Service guy, yes.
9     Q.  Did you work with him?
10     A.  No.
11     Q.  He's somebody who started there after
12 you were working for Dock & Door?
13     A.  Yes.
14     Q.  Did you ever work with him on a
15 Dock & Door job site?
16     A.  No.
17     Q.  Michael Strazzabosco?
18     A.  Yes.
19     Q.  He trained you?
20     A.  Yes.
21     Q.  And did he ever work with you when you
22 were working at -- as Dock & Door?
23     A.  No.
24     Q.  All right.

148

1     Does he still work there?
2     A.  Yes.
3     Q.  He still works at Midwest?
4     A.  Yes.
5     Q.  Ira Sugar.
6     You've told me he's a
7 salesman --
8     A.  Ah-huh.  Yes.
9     Q.  -- at Midwest, and he does -- your
10 interaction with him still continues.  He'll
11 give you directions, what job sites to go to,
12 and what you're going to do is there; is that
13 right?
14     A.  Yes.
15     Q.  All right.
16     And does he also -- if he's
17 giving you directions on what job site to go to
18 and tells you what you're going to do there,
19 will he also tell you whether you need to pick
20 up supplies at the warehouse before you go
21 there?
22     A.  Yes.
23     Q.  All right.
24     So he -- he may also know

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

149

1  like what's going to be delivered to the job
2  site?
3      A.  Yes.
4      Q.  Does he do anything else, as far as
5  you know?
6      A.  Not that I know of.
7      Q.  Okay.
8          Anthony Tattini.  You
9  mentioned him earlier.
10     A.  Ah-huh.
11     Q.  Do you work with him at Dock & Door?
12     A.  Yes.
13     Q.  Do you ever work with him at Midwest
14 Dock?
15     A.  No.
16     Q.  And what kind of work did he do?
17     A.  Same as me.  He's a carpenter,
18 installing docks and doors and equipment.
19     Q.  All right.
20          And would you work with him
21 as a partner on a job site?
22     A.  Yes.
23     Q.  And would you also work at -- on job
24 sites with him where he was partnered with

150

1  somebody else?
2      A.  Yes.
3      Q.  And there's another Zach here.
4          Do you know more than one
5  Zach or just one Zach?
6      A.  Did I mark two Zachs?
7      Q.  Well, there's another Zach above, and
8  you told me --
9      A.  Oh, no.  I only knew of one.
10     Q.  You knew one Zach?
11     A.  Yeah.  I just don't know which one it
12 is.
13     Q.  All right.
14          And then Jerry Valentino?
15     A.  I'm assuming that was a service guy.
16     Q.  Okay.
17          You knew Jerry?
18     A.  I don't know his last name, yes.
19     Q.  Okay.
20          He worked for Midwest?
21     A.  Midwest Dock, yes.  Service guy.
22     Q.  Okay.
23          Did you ever work with him
24 as -- on a Dock & Door project?

151

1      A.  No.
2      Q.  How about Brian Ward?
3      A.  Brian Ward?  Yeah.  He was one of the
4  first guys for Dock & Door.
5      Q.  Okay.
6          So you worked with him?
7      A.  He was an ironworker.
8      Q.  Ironworker.
9          And you worked with him on
10 Dock & Door projects?
11     A.  Yes.
12     Q.  And would you work like side by side
13 with him on projects?
14     A.  Yes.
15     Q.  And can you describe him to me?
16     A.  I would say around 50, white, blond
17 hair, five foot eight.
18     Q.  All right.
19          And what kind of work would
20 he do?
21     A.  Same as me.
22     Q.  All right.
23     A.  Installing docks and doors and
24 equipment.

152

1      Q.  Did you ever work with him at Midwest?
2      A.  No.
3      Q.  Okay.
4          Sherri Webber.  She works in
5  the office?
6      A.  Yes.
7      Q.  Okay.  All right.
8          And she still works in the
9  office?
10     A.  As far as I know.
11     Q.  All right.
12          And what interaction would
13 you have with her?
14     A.  Just more or less heard of her.  I
15 don't interact with her.
16     Q.  Okay.
17          Have you ever met her?
18     A.  Not formally.  I've seen her, you
19 know.  And I've introduced myself.  But I've
20 seen her.  I just know who she is.
21     Q.  Okay.
22          When you've been, I take it,
23 at the warehouse or -- the warehouse and the
24 office are part of the same building, right?

38 (Pages 149 to 152)

153

1     A.  Yes.
2     Q.  All right.
3         So when you've been at the
4  building, you've seen her?
5     A.  Yes.
6     Q.  Okay.
7         Do you know what she does?
8     A.  No.
9     Q.  All right.
10        Have you ever -- you said
11 you -- I'm sorry.  You said you haven't
12 interacted with her personally?
13    A.  No.
14    Q.  Okay.
15        Quinten Williams?
16    A.  Yes.  Carpenter.
17    Q.  Okay.
18    A.  Dock & Door.
19    Q.  All right.
20        Never worked with him at
21 Midwest?
22    A.  No.
23    Q.  Okay.
24        Does the same work you've

154

1  done?
2     A.  Yes.
3     Q.  Worked with him on job sites?
4     A.  A couple times.
5     Q.  Okay.
6         You mentioned Travis, Travis
7  Woff?
8     A.  Yes.
9     Q.  Woff, W-o-f-f.
10        Who's Travis?
11    A.  Midwest Dock.  Service guy.
12    Q.  All right.
13        Did you work with him when
14 you were at Midwest?
15    A.  No.
16    Q.  All right.
17        Does he ever work on any
18 projects where you were working as Dock & Door?
19    A.  No.
20    Q.  All right.
21        Is he still there?
22    A.  No.
23    Q.  Sam -- you said you knew a Sam, so
24 there's a -- I have to check, but 84, Sam

155

1  Wolters, W-o-l-t-e-r-s?
2     A.  I know a Sam.
3     Q.  Okay.
4         Who's Sam?
5     A.  I think he is a guy they got out of
6  the Indiana hall.
7     Q.  Okay.
8         You've worked with him on
9  projects with Dock & Door?
10    A.  Yes.
11    Q.  And what kind of work did he do?
12    A.  Same as me.
13    Q.  All right.
14        And would you work side by
15 side with him?
16    A.  Yes.
17    Q.  Okay.
18        And did he also work on job
19 sites where you weren't working with him as
20 your partner, but he was working with somebody
21 else?
22    A.  Yes.
23    Q.  All right.
24        And they were Dock & Door

156

1  projects?
2     A.  Yes.
3     Q.  All right.
4         Is he still there?
5     A.  He was another one on and off over the
6  last few years that they got out of the hall.
7  I believe he's there now.
8     Q.  Okay.
9     A.  Because they're getting kind of busy.
10 I believe they got him back.
11    Q.  Okay.
12        And then how about Austin
13 Wood?
14    A.  Austin, if I'm remembering right, it's
15 an Austin from Dock & -- sorry, Midwest Dock.
16    Q.  All right.
17    A.  Service guy.
18    Q.  All right.
19        Did you ever work with him on
20 a Dock & Door site?
21    A.  No.
22    Q.  And did you ever work with him when
23 you were at Midwest?
24    A.  No.

39 (Pages 153 to 156)

157

1     Q.  Okay.
2           And Anthony Zarlengo, we
3  talked about that he's the owner of Midwest
4  Dock, correct?
5     A.  Yes.
6     Q.  All right.
7           And he gives you directions
8  on what job sites to go to?
9     A.  Yes.
10     Q.  All right.
11           And he still does that,
12  right?
13     A.  Yes.
14     Q.  And does he -- like with Ira Sugar,
15  would he also tell you like what the project is
16  and whether you need to pick up any materials
17  before you go there?
18     A.  Yes.
19     Q.  All right.
20           And --
21     A.  And Collin, did I not mark Collin?
22     Q.  You did mention Collin.
23     A.  Okay.
24     Q.  Yeah.  And I was going to -- anything

158

1  else, though, that you're aware of that Anthony
2  Zarlengo does?
3     A.  No.  As far as being part of the owner
4  of Midwest Dock, that's all I know.
5     Q.  Okay.
6           And Collin Zarlengo, you work
7  with him?
8     A.  Yeah.
9     Q.  He's a carpenter?
10     A.  Carpenter.
11     Q.  All right.
12           And does the same kind of
13  work you do?
14     A.  Yes.
15     Q.  All right.
16           Did you ever work with him at
17  Midwest?
18     A.  No.
19     Q.  Okay.
20           And I take it, you work with
21  him on Dock -- he still works there, right?
22     A.  Yes.
23     Q.  And you work with him as Dock & Door
24  on job sites?

159

1     A.  Yes.
2
3           (WHEREUPON, the document marked
4           Plaintiff's Exhibit 30 for
5           identification was tendered to
6           the deponent.)
7
8  BY MR. McJESSY:
9     Q.  All right.
10           And if you could take a look
11  back at Exhibit 30, which is your time sheets.
12     A.  Okay.
13     Q.  And I want to -- if you'd look at the
14  bottom right-hand corner of those time sheets,
15  you'll notice there's a number there that's got
16  Green and then a hyphen and a number.
17           Could you turn to page 19?  I
18  want to ask you about certain pages in there.
19     A.  Okay.  Okay.
20     Q.  And if you look at the top, there's a
21  note there that says Tony didn't tell me what I
22  was doing till 6:00 a.m.
23           Do you see that?
24     A.  Ah-huh.  Yes.

160

1     Q.  Is that referring to Tony Zarlengo?
2     A.  Yes, possibly.
3     Q.  Okay.
4           And is -- you're noting that
5  because you didn't know where to go until that
6  time.
7           Is that it?
8     A.  I was probably noting that because I
9  was late, and that was my excuse for being
10  late.
11     Q.  Okay.
12           So you didn't know where to
13  go until he called and told you or texted you.
14           Is that it?
15     A.  Yeah.  Yes.
16     Q.  Okay.
17           And do you see that there's a
18  job location there, Keeley Joliet Whimsy?  Do
19  you see that?
20     A.  Yes.
21     Q.  Do you remember that project?
22     A.  I did not write Whimsy.
23     Q.  Okay.
24     A.  And I don't -- so, no, I would have

161

1    just wrote Keeley Joliet, and, no, I have no
2    idea which one it would have been.
3        Q.  Okay.
4                And then there's a
5    description there, dock seals.
6                Do you see that?
7        A.  Yes.
8        Q.  Is that your handwriting?
9        A.  Yes.
10       Q.  And what -- what does that mean?
11       A.  I installed dock seals.  Actually, the
12   way that looks, I probably installed docks and
13   seals.
14       Q.  Okay.
15               So you would have installed
16   dock levelers.
17               Is that it?
18       A.  Ah-huh.  Yes.
19       Q.  Okay.
20               And why do you think it means
21   docks and seals as opposed to dock seals?
22       A.  Because I put a dash in-between.  If
23   it was dock seals that I installed, I would
24   have put the dash in there.

162

1        Q.  Got it.
2                So further down, there's an
3    entry that's like dock lights, and there's no
4    dash.  It's just dock lights.
5        A.  So I would have installed dock lights.
6    Correct.
7        Q.  Okay.
8                And then if you turn to page
9    20, the next page, there's a notation at the
10   top of that one that says had to meet Janie in
11   morning.
12               Do you see that?
13       A.  Yes.
14       Q.  Is that your handwriting?
15       A.  Yes.
16       Q.  And is that the Janie that you
17   described for me earlier?
18       A.  Yes.
19       Q.  All right.
20               And what does that mean, had
21   to meet Janie in the morning?
22       A.  Another one where I would have been
23   late because I had to meet Janie in the morning
24   to pick up a supply from her or something.

163

1        Q.  Okay.
2                And she's the one -- she
3    works for Midwest, correct?
4        A.  Yes.
5        Q.  All right.
6        A.  As far as I know, she does.
7        Q.  Okay.
8                And then it says -- there's a
9    description there that says South Bend, and
10   then a hyphen, and then it says TW Chicago?
11       A.  Yes.
12       Q.  Is the TW Chicago -- that's not your
13   writing; is that right?
14       A.  No.  I think that's my handwriting.
15       Q.  Is that your writing?
16       A.  Yeah.
17       Q.  All right.
18               And do you remember that
19   project?
20       A.  I think so, yes.
21       Q.  What do you think that project was?
22       A.  It was a warehouse.
23       Q.  Do you remember where it was or what
24   it was?

164

1        A.  Just an old warehouse in South Bend.
2        Q.  Okay.
3                And were you installing docks
4    there?
5        A.  Yes.
6        Q.  Is that what it looks like to you?  Is
7    that what you would take from docks?
8        A.  Yes.
9        Q.  All right.
10               And when you write docks, I
11   take it that means you're installing dock
12   levelers?
13       A.  Yes.
14       Q.  Okay.
15               And there's a note further
16   down on the page?
17       A.  Ah-huh.
18       Q.  It looks like you're working at this
19   location for several days?
20       A.  Ah-huh.
21       Q.  Well, actually, I have reentry on this
22   page.
23               It's that same job, right?
24       A.  Yes.

41 (Pages 161 to 164)

165

```
1      Q.  All right.
2           And it says for the entry
3   that is February -- I can't tell if it's -- it
4   looks like it's the February 28 entry the way
5   this is set up.
6      A.  Yeah, it is.
7      Q.  Okay.
8           Where it says finish job,
9   went to shop, drop off -- and can you see --
10     A.  Lift.
11     Q.  Lift.
12          What is -- what's that mean?
13     A.  Scissor lift.  I had to -- I must have
14  had the trailer with the scissor lift, or I had
15  the scissor lift on the back of the flatbed
16  truck, and I had to bring it back to the shop.
17     Q.  Okay.
18          So, I take it, the company
19  owns a scissor lift?
20     A.  Yes.
21     Q.  All right.
22          Is that Midwest or is that
23  Dock & Door or do you know?
24     A.  I don't know.
```

166

```
1      Q.  Okay.
2           But it's a scissor lift
3   that's kept at the shop?
4      A.  Yes.
5      Q.  Okay.
6           And does the -- and that
7   would have been the Steger address, right?
8      A.  Ah-huh.  Yeah.  Yes.
9      Q.  Okay.
10          And it says -- this is
11  February 2024, so the business is operating out
12  of Steger, right?
13     A.  Yes.
14     Q.  All right.
15          And does the Steger address
16  have a name on it anywhere, like out front or
17  on the front door?
18     A.  I don't think so, no.
19     Q.  All right.
20          It doesn't say Midwest Dock
21  or Dock & Door or anything like that?
22     A.  I don't think so, no.
23     Q.  Okay.
24          Do you know whose warehouse
```

167

```
1   it is?
2      A.  No.
3      Q.  You don't know if it's Dock & Door or
4   Midwest Dock?
5      A.  I don't know whose name it's under,
6   no.
7      Q.  Okay.
8           And if you turn to the next
9   page, there's an entry about three-quarters of
10  the way down the page for January 16, I
11  believe.  It says shop in morning, finish job.
12     MR. HUGHES:  What's your Bates?
13  BY MR. McJESSY:
14     Q.  Oh, I'm sorry.  Page 23.  Not your
15  next page, my next page.
16     A.  Okay.
17     Q.  About three-quarters of the way down
18  the page for January 16, 2024.
19     A.  Ah-huh.
20     Q.  Can you tell me what is -- what that
21  says?
22     A.  Shop in morning, finish job, Ira said
23  eight hours.
24     Q.  Okay.
```

168

```
1           What's that mean?
2      A.  So basically, if I don't get a full
3   eight hour day in, they will give us the eight
4   hours.
5      Q.  Okay.
6      A.  So say I worked -- I still wrote 7:00,
7   3:30.
8      Q.  Right.
9      A.  Because I expect to get my eight hours
10  because that's what they --
11     Q.  Standard.
12     A.  Yeah.
13     Q.  Okay.
14          And Ira, is that referring to
15  Ira Sugar?
16     A.  Yes.
17     Q.  All right.
18          And what does it mean, Ira
19  said eight hours?
20     A.  Because they -- he said that he'd give
21  me -- you know, he'd allow me to be there -- no
22  matter how long it took me --
23     Q.  Okay.
24     A.  -- he'd give me eight hours.
```

42 (Pages 165 to 168)

169

1    Q.  So even if it --
2    A.  Make sure I got eight hours pay.
3    Q.  I get it.
4          Even if you worked less than
5  eight hours, Ira's saying it's okay to put down
6  eight hours for this day?
7    A.  Yes.
8    Q.  Okay.
9          He's giving you that
10  authorization?
11    A.  Yes.
12    Q.  All right.
13          And you just want to make
14  sure that that's clear, that --
15    A.  Make sure it's clear, it's written
16  down, yes.
17    Q.  Okay.
18          And he had the authority to
19  do that?
20    A.  It's his job, so I guess he's just
21  doing me a favor.
22    Q.  All right.
23          The next page I'd like you to
24  look at is Green 27, and you'll see there's an

170

1  entry on this one about halfway down?
2    A.  Ah-huh.
3    Q.  Can you tell me what that says?
4    A.  Finish job.  Tony said full day.
5    Q.  Okay.
6          And who's that referring to?
7    A.  Tony Zarlengo.
8    Q.  Okay.
9          And is that something similar
10  to what you just described for me, which is you
11  were told you could -- even if you finished
12  less than a full eight hours, it was still a
13  full day of time?
14    A.  Correct.  Yes.
15    Q.  Okay.
16          And is this one -- it looks
17  like it says the project description is
18  Chicago -- and can you tell me what it says
19  after that?
20    A.  Bodega.
21    Q.  Do you know what that's referring to?
22    A.  I don't -- I don't remember.
23    Q.  All right.
24          It looks like it's for that

171

1  whole -- almost that whole week except for the
2  bottom entry.
3          Do you see that?
4    A.  Yeah.
5    Q.  And it says door.
6          Do you know what that means?
7    A.  I installed doors.
8    Q.  Okay.
9          You assume overhead doors,
10  correct?
11    A.  Yes.
12    Q.  All right.
13          And then the last entry on
14  this page is NHC 5301 Roosevelt, Cicero.
15          Do you see that?
16    A.  Yes.
17    Q.  Is the 5301 Roosevelt, Cicero, your
18  writing?
19    A.  I don't think so.
20    Q.  All right.
21          Do you know what project that
22  would have been for?
23    A.  No clue.
24    Q.  All right.

172

1          And if you turn to Green 29,
2  there's an entry at the top of this.
3          Can you tell me what it says?
4    A.  Shop in morning.  Pick up Jose and
5  material and drop off Jose after.
6    Q.  What does that mean?
7    A.  That is letting Tony Brutti know that
8  I had to go to the shop in the morning to pick
9  up Jose and material and drop off Jose
10  afterwards.
11    Q.  Okay.
12    A.  So that's letting him know that's why
13  I could have been late to the job and maybe why
14  I left a little bit early because I had to go
15  to the shop and drop Jose off.
16    Q.  Okay.  All right.
17          And so you picked him up and
18  dropped him off at the -- at the shop?
19    A.  Yes.
20    Q.  Okay.
21          And then if you turn to Green
22  30 -- oh, probably these entries are basically
23  the same thing, correct?
24          The ones that are at the

43 (Pages 169 to 172)

173

1 bottom of the page where it says material,
2 shop, and Jose?
3    A. Yes.
4    Q. Shop in morning, supplies, and Jose,
5 bring Jose back. The same thing, basically?
6    A. Yes. So that's so they can let him
7 know that that's why I was late and get back
8 early, and I expect a full day of pay.
9    Q. Got it.
10       If you could turn to Green
11 36, and there's a reference -- the two top time
12 entries on this page are Schaumburg, Pepper,
13 and the first one says AIT. The other one
14 below it sort of has hashmarks.
15       Do you see that?
16    A. Yes.
17    Q. Do you know what project that was?
18    A. No.
19    Q. Do you remember working on a project
20 for Pepper Construction in Schaumburg?
21    A. No.
22    Q. I know it's a bit of a memory test.
23    A. Yeah. They just all blend together.
24 I couldn't tell you, no.

174

1    Q. Okay.
2       And if you turn to Green 61
3 and there's an entry about three quarters of
4 the way down, it says high-speed doors.
5       Do you see that?
6    A. Yes.
7    Q. And it looks like it says Wood Dale
8 ARCO?
9    A. Yes.
10    Q. Do you remember that project?
11    A. No.
12    Q. Do you know -- what does high-speed
13 doors mean?
14    A. I installed a high-speed door.
15    Q. What is a high-speed door?
16    A. It's a fast-moving, roll-up door.
17    Q. Okay.
18       Which is different from a
19 panel door. Is that it?
20    A. Yes.
21    Q. Okay.
22       And then the next entry below
23 that is Bensenville Krusinski Prologis II?
24       Do you see that?

175

1    A. Yes.
2    Q. Do you know what project that was?
3    A. No.
4    Q. No.
5       Do you know what -- what are
6 vertical docks?
7    A. It's just a different style dock that
8 stands up instead of being flush with the door.
9 In its stored position, it's up like this,
10 where a normal dock plate is flush with the
11 floor.
12    Q. I see. Okay.
13       And then the bottom entry
14 says docks, locks, seals, and shelters?
15    A. Ah-huh.
16    Q. I take it, that's --
17    A. I did a little bit of everything that
18 day.
19    Q. What is a dock lock?
20    A. So I did docks.
21    Q. Yes.
22    A. I did locks, which is a -- it's a unit
23 that sits outside the building below the dock,
24 and it will have an arm to hook the trailer

176

1 bumper for safety and tells the forklift driver
2 it's okay to go into the back of the trailer.
3    Q. I see.
4       So it locks the truck into
5 place?
6    A. Correct.
7    Q. So that it can't move when you drive
8 onto it?
9    A. Correct.
10    Q. I see.
11       And -- okay. And then if you
12 turn to Green 64, at the bottom on this one, it
13 says Lion Electric, Joliet, Meridian, and it
14 looks like it says fixing doors; is that right?
15    A. Yes.
16    Q. What would that be?
17    A. I do remember that job. They had
18 problems with the doors that we installed
19 there, and I was going back to do some fixes.
20    Q. Okay.
21       And what were -- what were
22 the problems with the doors?
23    A. I believe the top of the tracks were
24 wobbling too much, so I had to go back and

44 (Pages 173 to 176)

177

1  reinforce them.
2      Q.  Okay.
3              And would you call that
4  service work?
5      A.  It could be.
6      Q.  Okay.
7              And if you turn to Green 65,
8  there's a description there at the bottom --
9  sort of midway down that says remove coil door.
10             Do you see that?
11     A.  Yes.
12     Q.  And that's on there twice.
13             What -- what is that work?
14     A.  I remember that job, too.  University
15 Park.  Clayco.  I don't know why I would have
16 removed a coil over there.  That was a pretty
17 big job.
18     Q.  Do you remember -- do you know what
19 that would mean, remove coil door?
20     A.  I must have removed the coil door.
21     Q.  What's a coil door?
22     A.  A rolling steel door.  It's another
23 type of door.
24     Q.  Is that different from a high-speed

178

1  door?
2      A.  Yes.
3      Q.  And how does it differ?
4      A.  It's all made of steel versus -- this
5  is a -- this is what I would refer to as a coil
6  door.
7
8              (WHEREUPON, the document marked
9              Plaintiff's Exhibit 20 for
10             identification was tendered to
11             the deponent.)
12
13 BY MR. McJESSY:
14     Q.  Okay.
15             And you're pointing at --
16 just so the record's clear, by chance -- you're
17 pointing at Exhibit 20?
18     A.  Yes.
19     Q.  Okay.
20     A.  And they roll up the same, but I just
21 word it as coil door.  This is all steel, a
22 high-speed door.  This is all vinyl.
23     Q.  Okay.
24             Exhibit 20 is all vinyl?  Is

179

1  that --
2      A.  No.  This is steel.
3      Q.  Oh, that's steel.
4      A.  A high-speed door is all vinyl.
5      Q.  Oh, I see.  Okay.
6              So where it says coil door,
7  it's like Exhibit 20?
8      A.  Yes.
9      Q.  Okay.
10             So Exhibit 20 is a picture of
11 a steel coil door?
12     A.  Yes.
13     Q.  And that's similar to the description
14 of work that is on Green page 65?
15     A.  Yes.
16     Q.  Okay.
17             But you don't remember why
18 you were removing the coil door?
19     A.  No.
20     Q.  All right.
21             You said you remember that
22 job.
23             Were you also installing coil
24 doors at that job?

180

1      A.  Yes.
2      Q.  All right.
3              So you think, based on the
4  time sheet description, you removed the old
5  ones and installed some new ones?
6      A.  No.  It was a new job.
7      Q.  It was a new job?
8      A.  So it would have been a coil door that
9  I installed.
10     Q.  Okay.
11     A.  And, maybe, they were moving it to a
12 different location or something.  It happens.
13     Q.  Okay.
14             You think this is an accurate
15 description of the work you did on these two
16 days, the removing coil door?
17     A.  Yes.
18     Q.  Okay.
19             And then if you turn to Green
20 66, it says counter shutter about halfway down.
21             Do you see that?
22     A.  Yes.
23     Q.  Do you know -- what's that mean?
24     A.  So in a doctor's office, some kind of

45 (Pages 177 to 180)

181

1 office, you walk up to a window, and there's a
2 counter. Somebody is sitting on the other
3 side. They'll have a -- similar to this style
4 door, just miniature, to close off that window.
5     Q. Okay.
6         When you said "this style
7 door," you were pointing, again, at Exhibit 20?
8     A. Exhibit 20. Like a coil door coils
9 up.
10     Q. Okay.
11         Much, much smaller?
12     A. Yes.
13     Q. Okay.
14         And so you were installing a
15 counter shutter like that?
16     A. Yes.
17     Q. As you've just described it. Okay.
18         And it looks like you did
19 that on a couple of days there; is that right?
20     A. Yes.
21     Q. Do you remember that?
22     A. I do remember, yeah. General RV.
23     Q. All right.
24         And is that an unusual kind

182

1 of thing for you to do, a small door like that?
2     A. It's not that common. But here and
3 there, I do do them.
4     Q. Okay.
5         And that's part of the work
6 that Dock & Door does?
7     A. Yes.
8     Q. All right.
9         And then further down on that
10 page, it refers to EODs.
11         Do you see that?
12     A. Yes.
13     Q. What -- what are EODs?
14     A. Edge of dock, so it's another style
15 dock.
16     Q. Okay.
17         Is there anything unusual
18 about it or special about it?
19     A. No. It's just -- it's on the outside
20 of the building all of the time. It welds to
21 the edge of the concrete.
22     Q. All right.
23         And then if you turn to Green
24 138, there is an entry there about

183

1 three-quarters of the way down that says,
2 Rochelle, service.
3         Do you see that?
4     A. Yes.
5     Q. What's that referring to?
6     A. They must have sent me to do service
7 on a coil door.
8     Q. Okay.
9         To fix something that was
10 broken?
11     A. Yes.
12     Q. And if you turn to the next page,
13 which is -- or, I'm sorry, to Green 142, and
14 there's an entry on 10/1, can you tell me what
15 it says?
16     A. You know, I don't recall. It must
17 have been a company, construction company,
18 Cosgrove Construction, maybe.
19         Is that what you're referring
20 to?
21     Q. Yeah. What -- yeah. Can you read it?
22     A. I'm guessing Cosgrove, but I don't
23 remember that name.
24     Q. Okay.

184

1         And it looks like it might
2 say Hammond?
3     A. Yeah, Hammond. It says Hammond, so
4 that would have been Hammond, Indiana.
5     Q. And then what's it say after that?
6     A. I don't think I wrote that in there.
7     Q. Okay.
8         It looks like it might say
9 service end user. Can you --
10     A. That could be it.
11     Q. But you're not sure?
12     A. Yeah. I did not -- I don't think I
13 wrote that.
14     Q. All right.
15         And then it says two coil
16 doors.
17         Do you know what that's
18 referring to?
19     A. I must have installed two coil doors
20 or worked on them or something to that effect.
21     Q. Okay.
22         You're not sure?
23     A. Correct.
24     Q. And then an entry down from that, it

46 (Pages 181 to 184)

185

1    looks like it says eight by ten with trolley?
2        A.   Yes.
3        Q.   Do you know what that is?
4        A.   That would have been an eight by ten
5    door with a trolley operator.
6        Q.   What's a trolley operator?
7        A.   It's like what -- an operator for an
8    overhead door like you would have on your own
9    garage door that has a trolley that runs back
10   and forth to open the door.
11       Q.   Okay.
12            And it looks like that's at
13   Earle Elementary?
14       A.   Yes.
15       Q.   Do you remember that project, by any
16   chance?
17       A.   No.
18       Q.   Okay.
19            And then it looks like the
20   last entry on that is two counter doors.
21            Are those like the steel
22   roll-up small doors you described earlier?
23       A.   Yes.
24       Q.   And would that be installation of

186

1    those kind of doors?
2        A.   Yes.
3        Q.   All right.
4             And then if you could turn to
5    Green 155. Here, let's -- you can -- I'm
6    sorry. Go to Green 223, and there's -- whoops.
7    Yeah, we're getting toward the end so sorry.
8        A.   Ah-huh.
9        Q.   The top entry on that, it says -- it
10   looks like Channahon hyphen Principle.
11            Do you see that?
12       A.   Yes.
13       Q.   And then it looks like it says Tracey
14   after that or Trace hyphen --
15       A.   Yes.
16       Q.   Slash mark. I can't tell if that's a
17   "Y" or -- do you know what that's referring to?
18       A.   I do not.
19       Q.   Okay.
20            Do you remember what
21   Channahon Principle is?
22       A.   Channahon would have been the town.
23   The contractor, Principal.
24       Q.   Okay.

187

1             Do you remember that project?
2        A.   No.
3        Q.   All right.
4             There's an entry at the
5    bottom of that page for February 25, '20. It
6    says pulling dock for Tony.
7             Do you see that?
8        A.   Yes.
9        Q.   Do you know what that's referring to?
10       A.   I must have pulled a dock out, removed
11   the dock for Tony.
12       Q.   Okay.
13            Do you know which Tony that's
14   referring to?
15       A.   Probably, Zarlengo.
16       Q.   Okay.
17            What does it mean to pull a
18   dock out?
19       A.   I removed a dock from the dock pit.
20       Q.   Okay.
21            An existing dock?
22       A.   I would assume, yes.
23       Q.   Okay.
24            Is that something you would

188

1    normally do?
2        A.   Not with Dock & Door, no.
3        Q.   Okay.
4             That was sort of the process
5    you described for me earlier where you'd pull
6    out a dock using a come along or something like
7    that?
8        A.   Torches.
9        Q.   Or torches?
10       A.   Yeah.
11       Q.   Cut it loose, kind of pull it out.
12       A.   But this might not even have been --
13   it might not have been installed. It might
14   have just been sitting in the pit. It's hard
15   to say.
16       Q.   And then if you go to page 236 --
17       A.   Okay.
18       Q.   -- there's an entry toward the bottom,
19   and it looks like it says 15 door locks.
20            Do you see that?
21       A.   Yes.
22       Q.   Can you read that full entry to me?
23       A.   Fifteen door locks, thirty bumpers
24   anchored at three docks, end pit, backs welded.

47 (Pages 185 to 188)

189

1  Q. What -- what does that last thing
2  there mean, three docks and pit back welded?
3  A. I must put the docks in the pits where
4  they go, and I welded the backs and didn't weld
5  the fronts yet.
6  Q. Oh, I see.
7  So when you put in a dock
8  leveler, it's in like a pit, like a cutout
9  area; is that right?
10  A. Yes.
11  Q. Okay.
12  Which is a concrete --
13  A. Yes.
14  Q. -- section that it goes into?
15  A. Yes.
16  Q. And you weld both the back and the
17  front, I take it?
18  A. Yes. But I only welded the backs in
19  here, and that's why I noted it.
20  Q. Okay.
21  And if you could go to Green
22  238, there's an entry in the middle of it that
23  says installed dock ramp?
24  A. Installed dock ramp? Yes.

190

1  Q. What -- what is -- what is that?
2  A. Dock ramp. I remember installing like
3  a ramp that went up to the building. I don't
4  know if that's what I'm referring to with that.
5  That's the only thing I can think of.
6  Q. All right.
7  You're not sure?
8  A. Yeah.
9  Q. All right.
10  And the very bottom says --
11  oh, there's an entry for Rockford.
12  Do you see that?
13  A. Yes.
14  Q. It says fixing dock?
15  A. Ah-huh.
16  Q. Do you know what that's referring to?
17  A. I must have fixed a dock plate, a
18  lock, and a operator.
19  Q. All right.
20  So it would be like repair
21  work?
22  A. Yes.
23  Q. Okay.
24  And if you could turn to page

191

1  259, which is the last page -- oh, wait a
2  minute. Actually, what we'll -- yeah.
3  Let's -- for the witness's sake, I'll just skip
4  to the last one and then come back.
5  The last -- can you read that
6  entry that's up there at the top? It looks
7  like it's for June 17, and it begins -- it
8  looks like got --
9  A. Got to the job 7:45. Had to drop off
10  lift to Tony in Bolingbrook. Moved slide locks
11  and handles up over track guards. Tony called,
12  said he just noticed locks should be on left
13  side. Moved slide locks and handles to left
14  side. Twenty-seven doors. Spent an hour with
15  Tony Z. and Kevin to go through where
16  guardrails go. Mocked up all guardrail where
17  it goes. Meeting tomorrow to find out if it's
18  okay to anchor.
19  Q. Okay.
20  Do you remember this project?
21  A. Tinley Park? Let me see. Yeah, I do.
22  Q. Okay.
23  And can you tell me what this
24  is describing here, what it's referring to?

192

1  A. So I must have had to drop a lift off
2  to Tony T.
3  Q. Who's Tony T.?
4  A. Tony Tattini.
5  Q. Oh, Tattini. Okay.
6  A. In Bolingbrook.
7  Q. Okay.
8  A. So I must have had to drop a lift off
9  to him in the morning.
10  Q. What's a lift?
11  A. Scissor lift.
12  Q. Okay.
13  A. Bolingbrook. I had to move slide
14  locks on overhead doors and the handles.
15  Q. Okay.
16  They were on the wrong side?
17  A. Over the top. Yeah, it sounds like
18  they were on the wrong side, and I had to move
19  them up because the track -- they were going to
20  be in the way of the track guards.
21  Q. Okay.
22  A. On the left side. I did it on 27
23  doors, spent an hour with Tony Z. and Kevin.
24  Tony Z., Tony Zarlengo. And Kevin was the

48 (Pages 189 to 192)

193

1 superintendent of Morgan Harbor.
2 **Q. Oh, he's with Morgan Harbor. Okay.**
3 A. Yeah.
4 **Q. So --**
5 A. Back and forth between Kevin and Tony
6 trying to figure out where the -- where this
7 guardrail was going and how Tony must have
8 ordered it and mocked it up, and there's going
9 to be a meeting the next day to find out if
10 it's okay to anchor down where we mocked it up.
11 **Q. Okay.**
12 **So you were on the job site**
13 **with Tony Zarlengo and Kevin from --**
14 A. No.
15 **Q. Oh, no?**
16 A. Tony wouldn't have been on the job
17 site. He probably would have been on the phone
18 or something.
19 **Q. Oh, I see.**
20 A. Kevin would have been on the job site.
21 Just basically letting my boss know that I
22 spent an hour basically doing nothing. You
23 know, I wasn't installing anything because I'm
24 waiting for Tony and Kevin to figure out where

194

1 the stuff is going.
2 **Q. Okay.**
3 **Tony Zarlengo?**
4 A. Yes.
5 **Q. Okay.**
6 **So it says -- so one -- one**
7 **hour with Tony Z. and Kevin means you were on**
8 **the phone for an hour with Tony Zarlengo and**
9 **meeting with Kevin from -- from the general**
10 **contractor to figure out how this project would**
11 **come together?**
12 A. Yes.
13 **Q. Okay.**
14 **And who was the general**
15 **contractor?**
16 A. MHC is Morgan Harbor.
17 **Q. Okay.**
18 **And if you could go back to**
19 **page 171 and the very last entry on this page,**
20 **it looks like it says six something dock**
21 **plates.**
22 **Do you see that?**
23 A. 171?
24 **Q. Yeah. The very bottom entry.**

195

1 A. Oh, six wheel chock plates.
2 **Q. Oh. What is that? What work was**
3 **that?**
4 A. Wheel chocks for the semitrailers.
5 There'll be another part of the job sometimes.
6 It will mount next to the dock plate on the
7 outside of the building.
8 **Q. And what's it do?**
9 A. Chock the wheels on the trailer.
10 **Q. Okay.**
11 A. Just put it -- the driver puts it in
12 front of the wheel.
13 **Q. Okay.**
14 **And you install those**
15 **somehow?**
16 A. Yes.
17 **Q. How are those installed?**
18 A. Usually, anchors into the concrete.
19 **Q. Oh, I see. And they're permanent?**
20 A. Oh, no. Hang on a second. No. This
21 is -- I remember this job. These are a
22 different, new style of wheel chocks where they
23 had a big grid that went down onto the concrete
24 and a big arm that mounted to the wall.

196

1 Same -- same theory. A big wheel chock for the
2 trailers.
3 **Q. Okay.**
4 **But they're mounted**
5 **permanently into the concrete?**
6 A. Yes.
7 **Q. Okay.**
8 **And then -- so the trailer**
9 **drives over them?**
10 A. Yes.
11 **Q. And then somehow something goes on the**
12 **plate to secure the wheels?**
13 A. Yes.
14 **Q. Okay.**
15 **And if you could turn to page**
16 **173, there's an entry there. I think it's like**
17 **the second or third one down. It says fix**
18 **door.**
19 **Do you see that?**
20 A. Yes.
21 **Q. What -- what kind of work would that**
22 **be?**
23 A. I must have fixed the door.
24 **Q. All right.**

49 (Pages 193 to 196)

197

1    Some sort of repair work?
2        A.  Some sort of repair on the door, yeah.
3        Q.  All right.
4            And then it looks like a
5    little further down -- well, the next entry --
6    it says -- can you read the next entry to me?
7        A.  Yes.  It would have been at ABT, eight
8    operators, set limits, all coil doors.
9        Q.  Doors.
10       A.  Fixed photo eyes.
11       Q.  Okay.
12           And what work would that have
13   been?  Can you describe for me what you were
14   doing?
15       A.  I must have installed an operator on
16   eight doors -- eight operators I installed.
17       Q.  Okay.
18       A.  The electricians must have had them
19   wired up, so I set limits on the doors and the
20   operators.  And then photo eyes, whoever
21   installed -- I remember this job.  Whoever
22   installed the photo eyes put them on backwards,
23   so I had to flip them around.
24       Q.  Oh, okay.

198

1            That's what you mean when you
2    say fixed photo eyes?
3        A.  Yes.
4        Q.  All right.
5            And then if you could turn to
6    Green 174, and there's an entry at the top
7    there, unload two truck, it looks like?
8        A.  Yes.
9        Q.  Install -- can you read what the rest
10   of that says?
11       A.  Install 20 dock sensors.
12       Q.  All right.
13           So what -- what work was
14   that?  Can you describe for me what that work
15   was?
16       A.  So I must have unloaded two trucks.
17   Sensors.  Must have installed dock sensors.
18   There's usually a sensor that goes along with
19   the dock locks.
20       Q.  So that it somehow tells somebody that
21   the lock is in place?
22       A.  Yes.
23       Q.  Okay.
24           And when it says unload two

199

1    truck, would you have been doing that with like
2    a forklift?
3        A.  Yes.
4        Q.  And if you could turn to page 181 --
5    I'm sorry, 180, and can you just tell me --
6    read each of these and tell me what the work
7    was that was involved in it where it says
8    worked performed?
9        A.  Yeah.  12/17/20 would have been a
10   Clayco job in Channahon.  Six power chocks.
11   Twenty-four docks and pits.
12       Q.  What would that have been?
13       A.  So the power chocks were the wheel
14   chocks I just explained to you.
15       Q.  Okay.
16           The same kind that you
17   described?
18       A.  Yes.
19       Q.  Okay.
20       A.  And then 24 docks and pits must have
21   kind of coincided with unloading the truck on
22   the previous page we talked about.
23       Q.  Okay.
24       A.  So unloaded a truck.  And then this

200

1    day, I was also able to get 24 docks put in the
2    pits with the forklift.
3        Q.  Got it.  All right.  You don't need to
4    read the rest, then.  That sort of describes
5    what the rest of them are.
6            All right.  And does that --
7    when you put them in the pits, does that mean
8    they're welded in place --
9        A.  No.
10       Q.  -- or not yet?
11       A.  Not yet.
12       Q.  Okay.  All right.
13           Actually, we're done with
14   that exhibit.  And I was on Exhibit, I think,
15   30?
16       MR. HUGHES:  That was 30, yes.
17       MR. McJESSY:  I mean, that last
18   exhibit we marked.
19       MR. HUGHES:  I believe so.
20       MR. McJESSY:  All right.
21           Then we'll mark this one 31.
22
23
24

201

```
 1              (WHEREUPON, the document was
 2          marked Plaintiff's
 3          Exhibit 31 for identification,
 4          as of 4/11/25.)
 5
 6   BY MR. McJESSY:
 7      Q.  I'm going to hand you what we've
 8   marked as Exhibit 31, and I just want to --
 9          MR. HUGHES:  That was fast.
10          MR. McJESSY:  Well, you know.
11   BY MR. McJESSY:
12      Q.  -- authenticate these for the record.
13          Exhibit 31 is a series of
14   photos -- oh, wait a minute.  Nope.  They
15   aren't collated.  All right.  If you can hand
16   them back to me, we will redo this.
17
18              (There was a discussion off
19          the record.)
20
21   BY MR. McJESSY:
22      Q.  I've handed you what I've marked as
23   Exhibit 31, which is a packet of four photos
24   that we took during our break earlier today,
```

202

```
 1   and those are the -- those are pictures of the
 2   truck that you drove today, correct?
 3      A.  Yes.
 4      Q.  All right.
 5              And, in fact, you're in one
 6   of the -- the third picture, correct?
 7      A.  Yes.
 8      Q.  Okay.
 9              And this is a truck that you
10   use with Dock & Door?
11      A.  Yes.
12      Q.  And it doesn't have any designation on
13   the door, correct?
14      A.  Any designation of what?
15      Q.  It has no company name on the door,
16   right?
17      A.  No.
18      Q.  And you've used this truck for --
19   since 2019; is that right?
20      A.  I think, '18, because I think the year
21   of the truck is a 2018.
22      Q.  All right.
23              And I'll just say, for the
24   amount of miles this thing has on it, it looks
```

203

```
 1   really good.  For six years old, it looks
 2   really good.  You must take good care of it.
 3      A.  I try.
 4      Q.  Do you -- you get to take this truck
 5   home, I take it?
 6      A.  Yes.
 7      Q.  All right.
 8              And you get to use it for
 9   work?
10      A.  Yes.
11      Q.  Okay.
12              And are those -- the tools
13   that are on the truck -- strike that.
14              What's -- what's in the --
15   the containers that are on the back of the
16   truck?
17      A.  Tools and supplies.
18      Q.  All right.
19              And are the tools yours, or
20   do they belong to the company?
21      A.  The company.
22      Q.  All right.
23              And what kind of tools are on
24   the back of it?
```

204

```
 1      A.  There's a welder, sawhorses, hammer
 2   drills, impact, miscellaneous -- the hand tools
 3   are my own personal tools -- vacuum.
 4      Q.  It looks like a ladder, maybe?
 5      A.  Ladders.
 6      Q.  Is that the company's ladders?
 7      A.  Yes.
 8      Q.  All right.
 9              Do you know which company
10   paid for the welder and the ladders and the
11   other tools that are on the back of it?
12      A.  I do not.
13      Q.  Okay.
14              Aside from your personal
15   tools?  You paid for those, I assume?
16      A.  Right.  Yes.
17      Q.  All right.  All right.
18              And do you know who bought
19   the truck?
20      A.  No.
21      Q.  Okay.
22          MR. HUGHES:  Kevin, can I grab a
23   paperclip?  Yeah, thanks.
24          MR. McJESSY:  Sure.
```

51 (Pages 201 to 204)

205

1  BY MR. McJESSY:
2      Q.  On job sites you've worked at for
3  Dock & Door, have there been trucks on the job
4  site that say Midwest Dock Solutions on them,
5  like the ones that -- like the truck we looked
6  at earlier in the exhibit?
7      A.  Probably a good possibility.
8      Q.  Okay.
9          Just because if somebody else
10 were driving the truck to the job site --
11     A.  Yes.
12     Q.  -- they might drive a truck like that?
13     A.  Yes.
14     Q.  Okay.
15         Are you familiar with the
16 phrase "carded," being carded on a job site?
17     A.  Yes.
18     Q.  Okay.
19         And what does that phrase
20 mean to you?
21     A.  Usually, it's a -- a business agent
22 that comes to make sure you have your union
23 card and you're paid up on your dues.
24     Q.  Okay.

206

1          Have you ever been carded on
2  a job site working for Dock & Door?
3      A.  Yes.
4      Q.  All right.
5          And have you had your union
6  ID with you when they do that?
7      A.  Yes.
8      Q.  All right.
9          So there's job sites where
10 the union cards the people who are working
11 there?
12     A.  Yes.
13     Q.  Okay.
14         So it's important that they
15 be union members; is that right?
16     A.  Yes.
17     Q.  All right.
18         And are you familiar with job
19 sites that have limited access, where you have
20 to go through a gate to get into the job site?
21     A.  What kind of gate do you mean?
22     Q.  Well, where you have to either show
23 your union ID or show the company that you're
24 working with?

207

1      A.  No.
2      Q.  No?  Nothing like that?
3          Can you recall any specific
4  job sites that you were working at where you
5  did get carded?
6      A.  Melrose Park.
7      Q.  Do you remember who the GC was on it?
8      A.  I don't remember who the GC was.
9      Q.  Okay.
10         Do you remember where it was?
11     A.  No.  It's probably in -- in here
12 somewhere.
13     Q.  You're tapping at the large --
14     A.  Melrose Park.
15     Q.  -- the large exhibit that we marked
16 with all of your time sheets, Exhibit 30?
17     A.  Yeah.
18     Q.  There was a job site in Melrose Park
19 where you were carded?
20     A.  Yeah.  Melrose Park I got carded
21 multiple times there.  I remember getting
22 carded at McCormick Place.  That's all I can
23 think of right now.
24     Q.  All right.

208

1          You think there were others
2  that you just can't remember?
3      A.  Yes.
4      Q.  Okay.
5          Have you ever communicated
6  with Tony Brutti by email?
7      A.  Don't think so.
8      Q.  Okay.
9          Only by text?
10     A.  Yes.
11     Q.  Have you ever been paid in a manner
12 other than by check or direct deposit?  For
13 example, have you ever received cash?
14     A.  No.
15     Q.  Any sort of wire transfers, anything
16 like that?
17     A.  No.
18     Q.  Okay.
19         And how was -- how was your
20 wage rate set when you worked at Midwest Dock?
21     A.  Honestly, I took whatever they could
22 give me.  I was in a hard time.
23     Q.  No.  I understand that.  But like who
24 set your wage rate?

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

209

1    A.  I don't know.  Tony or Mike.  Tony
2  Zarlengo or Mike.  When I was at Midwest Dock?
3    Q.  Yeah.
4    A.  Yeah, I don't know.
5    Q.  Okay.
6         And your wage now is set by
7  the union scale, right?
8    A.  Yes.
9    Q.  Okay.
10        What is your cell phone
11  number.
12    A.  (708) 334-9164.
13    Q.  All right.
14        And is your address the
15  address that was on the subpoena that we looked
16  at?
17    A.  Yes.  It should be.
18    Q.  All right.
19        I just wanted to confirm.
20    A.  Yeah.  The zip code is wrong.
21    Q.  Oh, what's your zip?
22    A.  46303.
23    Q.  Oh, all right.
24        And the last four digits of

210

1  your Social Security number?
2    A.  3690.
3    Q.  And your date of birth?
4    A.  2/20/80.
5    Q.  And who's your cell phone carrier?
6    A.  Xfinity.
7    Q.  And has -- have you had this number
8  for a long time?
9    A.  Yes.
10    Q.  All right.
11        You think more than 10 years?
12    A.  Yes.
13    Q.  All right.
14        And the same carrier, or has
15  your carrier changed?
16    A.  No.  The carrier changed.
17    Q.  When -- who was --
18    A.  Verizon.
19    Q.  And when did you change from Verizon
20  to Xfinity?
21    A.  I think, last year.
22    Q.  And was it Verizon for a long time?
23    A.  Yes.
24    Q.  Okay.

211

1        Like more than five years?
2    A.  Yes.
3    Q.  Okay.
4        MR. McJESSY:  I don't have any other
5  questions.  These gentlemen may.  And if they
6  do, I might have some follow-up questions
7  depending on what they ask you.  So I'm -- I'm
8  done for the time being other than to reserve
9  the right to continue the deposition so I can
10  get the remaining -- you know, the text
11  messages and the emails that you have.
12        THE WITNESS:  Okay.
13        MR. McJESSY:  All right.
14        Oh, what's an email address
15  where you can be reached?
16        THE WITNESS:  I don't do that very
17  often, so I've got to look.
18        MR. McJESSY:  Is that not a good way
19  to contact you, really?
20        THE WITNESS:  Not really.
21        MR. McJESSY:  Well, still, what's
22  a -- what's an email address that you have?
23        THE WITNESS:  Dgren74@gmail.com.
24        MR. McJESSY:  Just one E?

212

1        THE WITNESS:  D-g-r-e-n, yes.
2        MR. McJESSY:  Okay.
3        And I take it, your -- I
4  think your wife forwarded the time sheets to
5  me --
6        THE WITNESS:  Yes.
7        MR. McJESSY:  -- in an email.  So, I
8  take it, she communicates by e-mail, but you
9  not so much?
10        THE WITNESS:  Texts stuff for me,
11  yes.
12        MR. McJESSY:  All right.
13        That's fine.  Thank for your
14  time.
15        THE WITNESS:  Oh, yeah.  Sure.
16        MR. HUGHES:  Okay.
17        Give me a few minutes.  I'm
18  not sure I'll have any, but let me kind of go
19  back through my notes.
20        MR. McJESSY:  Sure.
21        Do you want to take a break
22  or --
23        MR. HUGHES:  Yeah, we can.  I mean,
24  I'll sit here probably.

53 (Pages 209 to 212)

213

```
 1          MR. McJESSY:  Yeah, no.  That's
 2   fine.  I'm just going to -- if I step out for a
 3   moment, you're good with that?
 4          MR. HUGHES:  Yeah.
 5
 6          (After a break from 12:21 p.m.
 7           to 12:27 p.m., the deposition
 8           was resumed as follows:)
 9
10          MR. HUGHES:  Okay.
11          I don't have anything.
12          MR. MILLER:  I don't either.
13          MR. McJESSY:  All right.
14          Sir, then subject to our
15   reservations to recall you just so we can get
16   those additional documents and ask you
17   questions about them if we need to -- again, if
18   I get the documents, I think I'm probably good.
19   But other than that, we're done for now.
20          Because I subpoenaed you
21   here -- you're here at my subpoena.  And
22   because you're not represented by an attorney,
23   I need to explain something to you.  I'm going
24   to ask the court reporter to prepare a copy of
```

214

```
 1   the transcript of today's deposition.  So
 2   she'll type it up, you know, so it can be read
 3   in a final format.  You have a right to review
 4   that transcript before it's put in final form.
 5   You can note any errors you believe that
 6   happened as part of the transcription.  In
 7   other words, if I asked you a question and I
 8   said is the light red or is the light green and
 9   you said the light is red and she wrote green,
10   you can say that's a mistake.  I said -- I said
11   that the light was red, and she wrote green.
12   You can't change your testimony.  So if I asked
13   you what color is the light, and you said green
14   and she wrote green, you can go back and say,
15   well, I meant to say red.  But if she made a
16   mistake in what you said, you can note those
17   kind of errors.  You can either reserve that
18   right, and she'll send you a copy or coordinate
19   with you to review the transcript when it's
20   typed up, or you can waive that right and just
21   trust that she took down your testimony
22   correctly.  I don't care which you do, if you
23   reserve your right or waive your right, but the
24   court reporter needs to know which you want to
```

215

```
 1   do.  And because I subpoenaed your deposition,
 2   it's my job to explain that to you.  So if you
 3   can let her know, that would be good.
 4          THE WITNESS:  I'll waive it.
 5          MR. McJESSY:  Okay.  All right.
 6          Then we're concluded for
 7   today.  Off the record.
 8
 9          FURTHER DEPONENT SAITH NOT.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

216

```
 1   STATE OF ILLINOIS   )
 2                       )  SS:
 3   COUNTY OF C O O K   )
 4
 5          I, DIANE M. NULICK, a Notary Public
 6   within and for the County of Cook, State of
 7   Illinois, and a Certified Shorthand Reporter of
 8   said state, do hereby certify:
 9          That previous to the commencement of the
10   examination of the witness, the witness was
11   duly sworn to testify the whole truth
12   concerning the matters herein;
13          That the foregoing deposition transcript
14   was reported stenographically by me, was
15   thereafter reduced to typewriting under my
16   personal direction and constitutes a true
17   record of the testimony given and the
18   proceedings had;
19          That the said deposition was taken
20   before me at the time and place specified;
21          That the said deposition was adjourned
22   as stated herein;
23          That I am not a relative or employee or
24   attorney or counsel, nor a relative or employee
```

54 (Pages 213 to 216)

```
 1    of such attorney or counsel for any of the
 2    parties hereto, nor interested directly or
 3    indirectly in the outcome of this action.
 4         IN WITNESS WHEREOF, I do hereunto set
 5    my hand and affix my seal of office at Chicago,
 6    Illinois, this 22nd day of April, 2025.
 7
 8
 9
10
11
12         Notary Public, Cook County, Illinois.
13
14    C.S.R. Certificate No. 084-002029.
15
16
17
18
19
20
21
22
23
24
```

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 13



**KRUSINSKI**
CONSTRUCTION
COMPANY

*General Contractors*

2107 Swift Drive
Oak Brook, Illinois 60523-1581
www.krusinski.com

TEL   630-573-7700
FAX   630-573-7780

Citadel group

June 11, 2014

Mr. Tony Zarlengo
**MIDWEST DOCK SOLUTIONS, INC.**
2828 E. Spruce Drive
Crete, IL  60417

Re:   **ML Realty, Heritage Crossing #8**
      **Heritage Crossing Commerce Center**
      **Lockport, IL**
      **Project Number: 14-543**

We are pleased that your firm is the successful Subcontractor, subject to your agreement with the terms and conditions contained in the enclosed subcontractor agreement, and we are looking forward to working with you on the referenced project. Enclosed is a copy our **Subcontractor Agreement,** which should be initialed on each page and executed by an officer of your company.  **Please email a copy to Candis Jackson** (candisj@krusinski.com) at our office. A fully executed copy will be returned to you.

**The following procedures and/or documents must be completed within fifteen (15) calendar days to expedite and finalize this agreement.**

- A Certificate of Insurance that indicates compliance with Krusinski Construction Company minimum insurance requirements **must** be submitted to our office specifically naming Krusinski Construction Company "General Contractor", ML Realty Partners, LLC "Owner", Harris Architects "Architect", MLRP Lockport 8, LLC, and MLRP Lockport Land, LLC, Wells Fargo Bank, and each of their respective members, managers, partners, agents, representatives, trustees, directors, officers, shareholders and employees. as additional insureds on all liability policies.  **No subcontractor is allowed on the jobsite until a proper certificate has been received.**

- We require the *Schedule of Values* to be completed and returned with the contract for it to be processed in our office as executed.

- Safety is of primary importance on all Krusinski Construction Company jobsites. Please review the Krusinski Construction Company *Subcontractor Site Safety Requirements Manual.* We require that your staff comply with these procedures at all times.

- All Invoices are due the 25th of the month. Invoices received after the 25th are subject to exclusion from the current month's billing cycle. A $100.00 administrative fee shall be charged to subcontractor each time contractor's personnel has to contact subcontractor for invoices to be submitted or corrected.

  - Every Invoice submitted **must** have our project number listed and a completed Schedule of Values (Exhibit "A") and Progress Payment Application (Exhibit "B") enclosed.

  - Invoices that do not comply with these requirements will be rejected.

  - Only Extra Work for which Subcontractor has received a signed Change Order from Contractor may be invoiced. Change Order Work may only be invoiced as part of the monthly Pay Application.

Sincerely,



Michael J. Metz
Vice President

Enclosures



PLAINTIFF'S
EXHIBIT

104

To All Krusinski Subcontractors,

This letter serves to clarify Krusinski's policy regarding the Schedule of Values and Waivers of Lien forms that we require.

The Schedule of Values is an important part of your monthly Pay Application submittal. It is important that sufficient care and attention be given to the preparation of this document. Please provide a breakdown of your total subcontract value in detail that itemizes your scope of work so that our Project Managers can determine whether they agree that the value of work being billed is equal to the work that was performed.

We also need it to be clear regarding the breakdown of line items between materials (in-stock materials separated from project-specific materials), labor, and work that you have subcontracted.

It is important that sufficient care and attention be given to the preparations of this document at the onset and remains consistent throughout the project completion. Providing this breakdown will not only help us to understand your scope of work in a way that allows the Krusinski Project Manager to more easily review and approve your pay request, but it will also let us know what we should expect to receive regarding your waivers of lien. Of course we expect the waivers submitted to match the value of work completed.

Thank you in advance for your compliance with this policy.

-1-



Contractor ✓
Subcontractor ℎ.ℤ.
Contract Template Revised 5/23/1?



## SUBCONTRACT AGREEMENT

This Agreement made this **Eleventh Day of June 2014,**

and effective the **Eleventh Day of June 2014,**

by and between **Krusinski Construction Company,** hereinafter called the Contractor and

**Midwest Dock Solutions, Inc.,** hereinafter called the Subcontractor,

to perform part of the Work on the following Project:

|  |  |
|---|---|
| **Project:** | **ML Realty, Heritage Crossing #8**<br>**Heritage Crossing Commerce Center**<br>**Lockport, IL**<br>**Project Number: 14-543** |

| | |
|---|---|
| **Owner:** | **ML Realty Partners, LLC**<br>One Pierce Place<br>Itasca, IL 60143 |
| **Architect:** | **Harris Architects**<br>4801 Emerson Avenue<br>Suite 210<br>Palatine, IL 60067 |
| **Contractor:** | **Krusinski Construction Company**<br>2107 Swift Drive<br>Oak Brook, IL 60523 |
| **Subcontractor:** | **Midwest Dock Solutions, Inc.**<br>2828 E. Spruce Drive<br>Crete, IL 60417<br>Phone: 219-365-1487<br>Fax:    219-365-1496 |

Notice to the parties shall be given at the above addresses.

-2-

Contractor ⌐
Subcontractor  A.Z

Contract Template Revised 5/23/11



**ARTICLE 2    SCOPE OF WORK**

2.1    **SUBCONTRACTOR'S WORK.** The Contractor employs the Subcontractor as an independent Contractor, to perform the work described in Article 15. The Subcontractor shall perform such work (hereinafter called the "Subcontractor's Work") under the general direction of the Contractor and in accordance with this Agreement and the Contract Documents.

2.2    **ASSIGNMENT.** Subcontractor shall not assign this subcontract, or the rights and obligations of this subcontract, to any other entity without the express written consent of Contractor. Contractor reserves the right to assign this subcontract to Owner or Owner's lender at any time.

2.3    **CONTRACT DOCUMENTS.** The Contract Documents which are binding on the Subcontractor are as set forth in Article 16.1. Upon the Subcontractor's request the Contractor shall furnish a copy of any part of these documents.

2.4    **CONFLICTS.** In the event of a conflict between this Agreement and the Contract Documents, this Agreement shall govern. In the event of any conflict between this document and the subcontractors' proposal, this document shall govern. In the event of any conflict between this document or drawings/ and/or the specifications, the more stringent, costly, strict, or difficult shall govern.

**ARTICLE 3    CONTRACT PRICE**

3.1    The Contractor agrees to pay the Subcontractor as full compensation for the satisfactory performance of the Subcontractor's work the sum of

**Two Hundred Fifty Two Thousand Dollars and no/100** ................................................. **($252,000.00)**
in accordance with Article 4, subject to additions or deductions per Article 5.

**ARTICLE 4    PAYMENT**

4.1    *GENERAL PROVISIONS.*

4.1.1    **SCHEDULE OF VALUES.** The attached Exhibit A – Schedule of Values must be completed by Subcontractor itemizing the components of the work and associated dollar values of the entire subcontract amount in sufficient detail satisfactory to the Contractor. Such Schedule shall be provided by Subcontractor upon execution of Subcontract, and to be completed and returned to Contractor with each monthly Progress Payment Application.

4.1.2    **PAYMENT USE RESTRICTION.** No payment from the Contractor to the Subcontractor shall be used to satisfy or secure any indebtedness other than one owed by the Subcontractor to a person furnishing labor or materials for use in performing the Subcontractor's obligations indicated in this Agreement.

4.1.3    **PAYMENT USE VERIFICATION.** The Contractor shall have the right to demand proof of payment by the Subcontractor to all persons, sub-Subcontractors and material suppliers who are entitled to compensation for labor and/or materials supplied to this project, the Contractor shall also have the right to make direct contact with any and all persons, sub-Subcontractors and material suppliers to ensure the same are being paid for services and materials rendered to this project. Nothing in this Agreement shall be construed to obligate the Contractor to make payment to any such person or materialmen, and the Contractor is not obligated to demand such proof or if so demanded the Contractor may thereafter waive the same from time to time.

4.1.4    **LIEN WAIVERS AND AFFIDAVITS.** As a prerequisite for payment the Subcontractor shall, in a form satisfactory to the Contractor, execute and/or provide to the Contractor:

    (a)    Full and complete unconditional waivers and releases of liens and affidavits from the Subcontractor per attached *Sample Waiver Forms* and from all persons furnishing labor, materials, equipment and services toward the performance of the work, and delivered to contractor in advance so as to be made a

-3-

Contractor ⌄
Subcontractor ⏗⏉.
Contract Template Revised 5/23/11



part of Contractors Application for Payment to the Owner.

    **(b)** Such formal guarantees pertaining to the work as may be required by the contract documents and such other affidavits, releases, receipts, waivers of lien and other documents to the extent and in such form as may be designated by the Contractor or Owner.

**4.1.5** **SUBCONTRACTOR PAYMENT FAILURE.** In the event the Contractor has reason to believe that labor, material or other obligations incurred in the performance of the Subcontractor's Work are not being paid for by the Subcontractor, the Contractor shall give written notice thereof to the Subcontractor and the Contractor may take any steps deemed necessary to insure that any progress payment shall be utilized to pay such obligations. All costs incurred by Contractor for such purposes shall be the sole responsibility of Subcontractor.

If upon receipt of said notice, the Subcontractor does not:

    **(a)** Supply evidence to the satisfaction of the Contractor that the monies owing to the claimant have been paid; or at Contractor's election,

    **(b)** Post a bond indemnifying the Owner, the Contractor, the Contractor's surety, if any, and the premises from such claim or lien,

then the Contractor shall have the right to retain out of any payments due or to become due to the Subcontractor a reasonable amount to protect the Contractor from any and all loss, damage or expense including attorney's fees arising out of or relating to any such non-payment until the Contractor has been satisfied that all required payments have been made by the Subcontractor.

**4.1.6** **PAYMENT NOT ACCEPTANCE.** Payment to the Subcontractor is specifically agreed not to constitute or imply acceptance by the Contractor or the Owner of any portion of the Subcontractor's Work. If Subcontractor has been paid for Work that is subsequently found not to be in compliance with the Contract Documents, Contractor may withhold from future payments to subcontractor a sum reasonably sufficient to cover the cost of correcting such non-conforming work until such time as the non-conforming work is corrected to the satisfaction of the Contractor.

**4.2** **PROGRESS PAYMENTS.**

**4.2.1** **APPLICATION.** Unless otherwise indicated herein, each month on the date selected by the Contractor the Subcontractor shall submit to the Contractor for approval and processing a Progress Payment Application in the amount equal to all labor and materials incorporated into the project to date, including extra work performed for which Subcontractor has received a signed Change Order, less retention of _ten_ percent (10%), less the aggregate of previous payments. Attached to this Contract is Exhibit B - Progress Payment Application, to be completed by the Subcontractor and submitted with their invoice and Exhibit "A" Schedule of Values to the Contractor. A $100.00 administrative fee shall be charged to subcontractor each time contractor's personnel has to contact subcontractor for invoices to be submitted or corrected.

**4.2.2** **STORED MATERIALS.** Unless otherwise provided in the Contract Documents, and if approved in advance by the Owner, applications for payment may include materials and equipment not incorporated in the Subcontractor's Work, but delivered and suitably stored at the site or at some other location agreed upon in writing. Approval of payment application for such stored items on the site shall be conditioned upon submission by the Subcontractor of bills of sale, photographs and applicable insurance or such other procedures satisfactory to the Owner and Contractor to establish the Owner's title to such materials and equipment or otherwise protect the Owner's and Contractor's interests therein, including transportation to the site. Subcontractor is only allowed to bill for stored materials that have been ordered specifically for this Project, not for any materials that are from Subcontractor's stock. A Certificate of Insurance shall be provided by the Subcontractor to the Contractor for any materials stored off-site.

**4.2.3** **TIME OF PAYMENT.** Progress payments to the Subcontractor for satisfactory performance of the Subcontractor's Work shall be made no later than ten (10) days after receipt by the Contractor of payment from the Owner for such Subcontractor's Work, subject to satisfactory fulfillment of Article 4.1.4. Payment by the Owner shall be a condition precedent to the Contractor's (or its surety's) obligation to pay the Subcontractor. Subcontractor is required to pay all

-4-

Contractor ✓
Subcontractor A.7
Contract Template Revised 5/23/11



advance deposits and permit fees that may be required that are included in the Contract Price listed in Article 3.1 of this Subcontract.

**4.3**      **FINAL PAYMENT.**

**4.3.1**      **APPLICATION.** Upon acceptance of the Subcontractor's Work by the Owner, the Contractor, and if necessary, the Architect, and upon the Subcontractor furnishing evidence of fulfillment of the Subcontractor's obligations in accordance with the Contract Documents and Article 4.3.2, the Contractor shall forward the Subcontractor's application for final payment without delay.

**4.3.2**      **REQUIREMENTS.** Before the Contractor shall be required to forward the Subcontractor's application for final payment to the Owner, the Subcontractor shall submit to the Contractor:

       (a)      an affidavit that all payrolls, bills for materials and equipment, and other indebtedness connected with the Subcontractor's Work for which the Owner or his property or the Contractor or the Contractor's surety might in any way be liable, have been paid or otherwise satisfied,

       (b)      consent of surety to final payment, if required,

       (c)      satisfaction of required closeout procedures,

       (d)      certified payroll affidavits, if required by the Contractor.

Final payment shall constitute a waiver of all claims by the Subcontractor relating to the Subcontractor's Work, but shall in no way relieve the Subcontractor of liability for the obligations assumed under Article 9.9 hereof, or for faulty or defective work appearing after final payment.

**4.3.3**      **TIME OF PAYMENT.** Final payment of the balance due of the contract price shall be made to the Subcontractor within ten (10) days after receipt by the Contractor of final payment from the Owner for such Subcontractor's Work upon satisfactory fulfillment of Article 4.1.4. Payment by the Owner shall be a condition precedent to the Contractor's obligation to pay the Subcontractor.

**4.4**      **WAIVER OF RIGHTS UNDER ILLINOIS PROMPT PAYMENT ACT.** The Subcontractor agrees that the terms of this agreement shall govern and control the rights and obligations of the parties with respect to all payments and, therefore, the Subcontractor hereby waives any and all rights and protections afforded by the provisions of any statute to the extent inconsistent with the requirements for payment hereunder, including but not limited to the Illinois Prompt Payment Act. *However, Subcontractor shall not be required to relinquish its lien right, except to the extent paid.*

Contractor ⊷
Subcontractor ⟋⟍
Contract Template Revised 5/23/11



**S O L U T I O N S**
*"Your Complete Dock & Door Experts"*

OFFICE 708.367.0801
FAX 708.367.0802
EMERGENCY SERVICE 708.921.8950

## Schedule Of Values

## Loading Dock Equipment

## Building 8

**Contract-$252,000**

**Dock Levelers & Bumpers-$144,000**

**Dock Seals-$36,000**

**Labor-$72,000**



## EXHIBIT A - SCHEDULE OF VALUES

| To: | **Krusinski Construction Company**<br>2107 Swift Drive<br>Oak Brook, IL 60523 | Subcontractor:_____ |
|---|---|---|
| Application and Certificate for Payment, containing Subcontractor's signed<br>Certificate (attached). In tabulation below, amount as are stated to the nearest dollar.<br>Use Column I on contracts where variable retainage for line items may apply. | | Application Number:_____<br>Application Date:_____<br>Period to:_____<br>Architect's Project No.:_____ |

### WORK COMPLETED

| Item No.<br><br>A | Description of<br>Work<br><br>B | Scheduled<br>Value<br><br>C | Previous<br>Applications<br><br>D | This<br>Application<br><br>E | Materials<br>Stored<br>Off-Site<br>F | Total Completed<br>and Stored to<br>Date<br>G (D+E+F) | % | Balance to<br>Finish<br><br>H(C-G) | Retainage<br><br>I |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| **Totals:** | | | | | | | | | |

*Schedule of Values must be completed when submitting contract back for final execution*

-6-

Contractor
Subcontractor



### EXHIBIT B - PROGRESS PAYMENT APPLICATION

| To: | Krusinski Construction Company Project:<br>2107 Swift Drive<br>Oak Brook, IL 60523  Contract for: |
|---|---|

From: _____  Application Number: _____

_____  Period from: ___/___/___  Period to: ___/___/___

_____  Architect Project Number: _____

Contact: _____  Specification Division: _____

| Change orders approved in previous months by General Contractor - Total: | | | | Original Contract Sum | $ _____ |
|---|---|---|---|---|---|
| | | | | Approved Change Orders<br> Total Additions | $ _____ |
| Subsequent Number | Change Orders Approved Date | Additions | Deletions | Total Deductions: | $ _____ |
| | | | | Contract Sum to Date | $ _____ |
| | | | | Balance to Finish | $ _____ |
| | | | | Total Completed to Date | $ _____ |
| | | | | Materials Stored Off-Site,<br> if applicable | $ _____ |
| | | | | Total Completed and Stored | $ _____ |
| | | | | Retainage_____ % | $ _____ |
| | | | | Total Earned Less Retainage | $ _____ |
| | | | | Less Previous Application | $ _____ |
| Totals: | | | | This Application | $ _____ |

-7-

Contractor _____
Subcontractor _____



## ARTICLE 5    CHANGES, CLAIMS AND DELAYS

5.1     **CHANGES.** When the Contractor's Project Manager so orders in writing, the Subcontractor, without nullifying this Agreement, shall make any and all changes in the Work, which are within the general scope of this Agreement. The Contractor shall not be obligated to employ the Subcontractor for any such additional work.

5.2     **ADJUSTMENT IN CONTRACT.** The Contractor shall select at his option, prior to the commencement of any revision work, any of the following methods of compensation for additions and deletions:

(a)     the Subcontractor's cost, plus overhead and profit not to exceed ten percent (10%) of the cost,

(b)     all premium time ordered by the Contractor shall be based on actual cost without overhead and profit,

(c)     All work authorized to be done on time and material basis shall be documented with material and labor tickets, verified by the Contractor's Superintendent.

(d)     lump sum basis or time and material with a guaranteed maximum, the Subcontractor shall submit to the Contractor for approval prior to commencement of work a complete and detailed breakdown indicating all labor, material, overhead and profit.

Upon receipt of a written Change Order request from Subcontractor, Contractor shall issue a Change Order to Subcontractor for the amount approved by Contractor. **No such adjustment shall be made for any changes performed by the Subcontractor that have not been so ordered by the Contractor and approved by Contractor in advance by the issuance of a Change Order to Subcontractor.** Only Change Order Work for which Contractor has issued a Change Order to Subcontractor may be invoiced, and only as an inclusion with the Monthly Pay Request.

5.3     **CLAIMS RELATING TO CONTRACTOR.** The Subcontractor shall give the Contractor's Project Manager written notice of all claims within two (2) days after the beginning of the event for which claim is made; otherwise, such claims shall be deemed waived.

## ARTICLE 6    SCHEDULE OF WORK

6.1     **TIME IS OF ESSENCE.** Time is of the essence of this Agreement. The work to be performed under this Agreement shall commence and be completed as directed and scheduled by the Contractor's Job Superintendent. Such work shall be carried on promptly and with dispatch and coordinated with all other work on the project, all to the satisfaction of the Contractor and Owner. The Subcontractor shall provide sufficient manpower, materials and equipment in the performance of his work to keep pace with the Contractor's schedule.

6.2     **PRIORITY OF WORK.** If necessary, on orders from the Contractor, certain parts of the work shall be prosecuted in preference to others. The Subcontractor shall move his personnel and equipment on the jobsite or provide additional personnel and equipment as necessary to perform and complete his work in various areas of the project in preference to or simultaneously with other areas, all as determined by the Contractor. The Contractor shall have the right, at any time, to delay or suspend the whole or any part of the work herein agreed to be done for a reasonable time without additional compensation to the Subcontractor, and no delay, suspension or obstruction by the Contractor, or his agents, shall serve to terminate this Agreement or increase the compensation to be paid to the Subcontractor. If directed by the Contractor, the Subcontractor shall delay the performance or completion of its work in those areas adjacent to any temporary construction appurtenance, such as a temporary construction hoist, a temporary construction rubbish chute, or any other such temporary appurtenance. The Subcontractor shall perform and complete his work in such areas when directed by the Contractor without increase to the compensation to be paid to the Subcontractor.

6.3     **MATERIAL AND SHOP DRAWINGS.** The Subcontractor shall fully and consistently expedite his material and equipment deliveries, and shall provide the Contractor, no more than fifteen (15) days from the date of execution of this Agreement, a schedule in a form acceptable to the Contractor, indicating complete breakdown

-8-

Contractor
Subcontractor




of materials and shop drawings with anticipated submission and delivery dates along with suppliers' names and contacts. The Subcontractor shall immediately advise the Contractor in writing of any variance to the dates indicated in this schedule so that appropriate actions may be taken to maintain the Contractor's construction schedule.

6.4     **EXPEDITING.** Any and all cost incurred by the Contractor as a direct result of expediting the Subcontractor's material shall be paid to the Contractor by the Subcontractor.

6.5     **DELAYS IN PROGRESS OF WORK.** The Subcontractor agrees that if the Subcontractor shall delay the progress of the work so as to cause damage to the Owner or Contractor, or any damage for which Owner or Contractor shall become liable or otherwise interfere or inhibit the flow of work, as determined by the Contractor, the Subcontractor shall be liable to the Owner and/or Contractor, and shall indemnify the Owner and Contractor against, any such loss, damage, claim, suit or judgment arising out of such delay, except that the Subcontractor shall not be held responsible for delay caused by strikes or lockouts, where such are beyond the Subcontractor's control, or acts of God.

## ARTICLE 7     CONTRACTOR'S OBLIGATIONS

7.1     **AUTHORIZED REPRESENTATIVE.** The Contractor shall designate one or more persons who shall be the Contractor's authorized representative(s) on-site and off-site. Such authorized representative(s) shall be the only person(s) the Subcontractor shall look to for instructions, orders and/or directions, except in an emergency. If the actions, acts, errors or failure to perform result in an unreasonable amount of time and effort of Contractor's authorized personnel being assigned to manage the issues created by the subcontractor, the Contractor shall have the right to recover direct damages from the Subcontractor, for the additionally required resources.

7.2     **STORAGE ALLOCATION.** The Contractor shall allocate adequate storage areas, if available, for the Subcontractor's materials and equipment during the course of the Subcontractor's Work.

7.3     **TIMELY COMMUNICATIONS.** The Contractor shall transmit, with reasonable promptness, all submittals, transmittals, and written approvals relating to the Subcontractor's Work.

7.4     **NONCONTRACTED SERVICES.** The Contractor agrees, except as otherwise provided in this Agreement, that no claim for noncontracted construction services rendered or materials furnished shall be valid except in an emergency affecting the safety of persons or property.

## ARTICLE 8     SUBCONTRACTOR'S OBLIGATIONS

8.1     **OBLIGATIONS DERIVATIVE.** The Subcontractor binds itself to the Contractor under this Agreement in the same manner as the Contractor is bound to the Owner under the Contract Documents.

8.2     **RESPONSIBILITIES.** The Subcontractor shall furnish all labor, materials, equipment, and services, including, but not limited to, competent supervision, shop drawings, samples, tools, scaffolding, and all cribbing and damage necessary for the completion of the work as are necessary for the proper performance of the Subcontractor's Work.

The performance of any work performed by the Contractor in an attempt to verify Subcontractors conformance to/with the Contract Documents, shall not be interpreted as relieving the Subcontractor of it's duty to comply with the Contract Documents.

The Subcontractor shall provide a list of proposed sub-Subcontractors and suppliers and be responsible for taking field dimensions before work is performed. He shall also arrange and pay for all tests, inspections, reports, order materials and all other actions as required to meet the schedule of work.

8.3     **TEMPORARY SERVICES.** The Subcontractor shall furnish all temporary services and/or facilities necessary

Contractor
Subcontractor _b.7._



to perform its work, except as provided in Article 15. Said article also identifies those common temporary services, if any, which are to be furnished by this Subcontractor.

**8.4**      **COORDINATION.** The Subcontractor shall:

    **(a)**      cooperate with the Contractor and all others whose work may interfere with the Subcontractor's Work;

    **(b)**      specifically note and immediately advise the Contractor of any such interference with the Subcontractor's Work; and

    **(c)**      participate in the preparation of coordination drawings and work schedules in areas of congestion.

**8.5**      **AUTHORIZED REPRESENTATIVE.** The Subcontractor shall designate one or more persons who shall be the authorized Subcontractor's representative(s) on-site and off-site. Such authorized representative(s) shall be the only person(s) to whom the Contractor shall issue instructions, orders or directions, except in an emergency.

**8.6**      **PROVISION FOR INSPECTION.** The Subcontractor shall notify the Contractor when portions of the Subcontractor's Work are substantially complete. The Contractor shall have the right to inspect the Subcontractor's Work at any time. The Subcontractor shall at all times furnish the Contractor and its representatives adequate, safe and proper facilities for inspecting the Subcontractor's work or materials at the site or any place where materials under this Agreement may be in the course of preparation, process, manufacture or treatment.

The Subcontractor shall furnish to the Contractor in such detail and as often as required, full reports of the progress of the Subcontractor's Work irrespective of the location of such work.

All work shall be subject to the inspection and approval of the Contractor, Architect and Owner, but such approval shall not relieve the Subcontractor of his obligations under this Agreement.

**8.7**      **SAFETY AND CLEANUP.** The Subcontractor shall follow the Contractor's cleanup and safety directions, and shall:

    **(a)**      at all times keep the building and premises free from debris and unsafe conditions resulting from the Subcontractor's Work,

    **(b)**      broom clean each work area prior to discontinuing work in the same, and

    **(c)**      remove from the building, haul away from jobsite and legally dispose of all rubbish, debris and surplus materials.

If the Subcontractor fails to immediately commence compliance with such safety duties or commence cleanup duties within 24 hours after receipt from the Contractor of notice of noncompliance, the Contractor may implement such safety or cleanup measures without further notice and deduct the cost plus a markup of ten and ten percent (10% + 10%) thereof from any amounts due or to become due the Subcontractor. Subcontractor shall also be responsible to indemnify Contractor for any additional costs incurred as a result of Subcontractor's failure to properly perform its cleanup responsibility.

**8.8**      **SAFETY RULES.** The Subcontractor shall take all necessary steps to insure that all persons employed by him or his sub-Subcontractors complies with and are subject to all applicable safety rules and regulations established during the term of this Agreement by the Contractor, Owner, United States Occupational Safety and Health Administration (OSHA), or any other governmental authority having jurisdiction.

-10-

Contractor
Subcontractor



The Subcontractor shall immediately replace or repair any OSHA safety requirements which he removes or damages.

8.9　　**PROTECTION OF THE WORK.** The Contractor assumes no liability for any loss or damage to the Subcontractor's materials, tools, equipment or labor, whether incorporated or not incorporated into the work.

The Subcontractor shall take necessary precautions to properly protect the Subcontractor's Work and the work of others from damage caused by the Subcontractor's operations. Should the Subcontractor cause damage to the Work or property of the Owner or fail to properly protect its Work, that of the Contractor or others, the Subcontractor shall promptly remedy such damage to the satisfaction of the Contractor, or the Contractor may so remedy and deduct the cost plus a markup of ten and ten percent (10% + 10%) thereof from any amounts due or to become due the Subcontractor.

If subcontractor causes damage to the work, owner's property, or that of others which results in a Builder's Risk Insurance Claim, subcontractor shall be responsible to pay for any deductibles on such claim up to a maximum of Ten Thousand Dollars ($10,000.00).

8.10　　**PERMITS, FEES AND LICENSES.** The Subcontractor shall give adequate notices to authorities pertaining to the Subcontractor's Work and shall secure and pay for all permits, fees, licenses, assessments, inspections and taxes necessary to complete the Subcontractor's Work in accordance with the Contract Documents regardless of whether excluded in Subcontractor's proposal or not.

8.11　　**MOVING OF MATERIALS.** If in the opinion of the Contractor, job conditions require accessibility to any area occupied by the Subcontractor's material, equipment or facilities, these shall then be moved at once by the Subcontractor at his own expense to an approved area by the Contractor.

8.12　　**PAYMENT OF TAXES AND CONTRIBUTIONS.** The Subcontractor assumes full and exclusive liability for the payment of all sales, retailers' occupational, service or use, or excise taxes, including but not limited to City of Chicago Sales Tax (if applicable), Social Security and Unemployment Compensation taxes and contributions, and any other taxes or duties upon the material and labor furnished under this agreement as required by the federal, state, county or local governments, under laws now in effect or which come into effect during this contract, together with all contributions required under any union contracts to which the Subcontractor is a party. All such taxes, contributions and levies are included in the compensation to be paid the Subcontractor herein.

8.13　　**NONCONTRACTED SERVICES.** The Subcontractor agrees (and shall require sub-subcontractors to agree) that, except as otherwise provided in this Agreement, that no claim for noncontracted construction services rendered or materials furnished shall be valid unless the Subcontractor provides the Contractor notice prior to furnishing of the services or materials, except in an emergency affecting the safety of persons or property.

**ARTICLE 9　　SUBCONTRACT PROVISIONS**

9.1　　**LAYOUT RESPONSIBILITY AND LEVELS.** The Contractor shall make available benchmarks and/or establish principal axis lines of the building and site whereupon the Subcontractor shall layout and be strictly responsible for the accuracy of the Subcontractor's Work and for any loss or damage to the Contractor or others by reason of the Subcontractor's failure to set out or perform its work correctly. The Subcontractor shall exercise prudence so that actual final conditions and details shall result in perfect alignment of finish surfaces.

9.2　　**WORKMANSHIP.** Every part of the Subcontractor's Work shall be executed in strict accordance with the Contract Documents in the most sound, workmanlike, and substantial manner. All workmanship shall be of the best of its quality, and all materials used in the Subcontractor's Work shall be furnished in ample quantities to facilitate the proper and expeditious execution of the work, and shall be new except such materials as may be expressly provided in the Contract Documents to be otherwise.

-11-

Contractor ␣␣␣␣
Subcontractor ␣␣␣␣



**9.3**      **MATERIALS FURNISHED BY OTHERS.** In the event the scope of the Subcontractor's Work includes installation of materials or equipment furnished by others, it shall be the responsibility of the Subcontractor to examine the items so provided and thereupon handle, store and install the items with such skill and care as to ensure a satisfactory and proper installation. Loss or damage due to acts of the Subcontractor shall be deducted from any amounts due or to become due the Subcontractor.

**9.4**      **SUBSTITUTIONS.** No substitutions shall be made in the Subcontractor's Work unless permitted in the Contract Documents and only then upon the Subcontractor first receiving written approval of the Contractor and all approvals required under the Contract Documents for substitutions. The Subcontractor shall indemnify the Contractor for any increased costs incurred by the Contractor as a result of such substitutions whether or not the Subcontractor has obtained approval thereof.

**9.5**      **USE OF CONTRACTOR'S EQUIPMENT.** The Subcontractor, its agents, employees, sub-Subcontractors or suppliers shall not use the Contractor's equipment without the express written permission of the Contractor's designated representative. If the Subcontractor or any of its agents, employees, suppliers or lower tier Subcontractors utilize any machinery, equipment, tools, scaffolding, hoists, lifts or similar items owned, leased, or under the control of the Contractor, the Subcontractor shall indemnify, defend and hold harmless the Contractor, as provided in Article 12, for any loss or damage (including personal injury or death) which may arise from such use, except where such loss or damage shall be found to have been due solely to the negligence of the Contractor's employees operating such equipment.

**9.6**      **PRIVITY.** Until final completion of the Project, the Subcontractor agrees not to perform any work directly for the Owner or any tenants thereof, or deal directly with the Owner's representatives in connection with the Project, unless otherwise directed in writing by the Contractor. All work for this Project performed by the Subcontractor shall be processed and handled exclusively by the Contractor.

**9.7**      **SUBCONTRACT BOND.** If a Performance and Payment Bond is required of the Subcontractor, under Article 15, then within the duration of this Agreement, the Contractor may require such bonds and the Subcontractor shall provide same.

Said bonds shall be in the full amount of this Agreement in a form and by a surety satisfactory to the Contractor. If the Subcontractor fails to procure a required bond in the full amount of this agreement, the Contractor can choose to either procure a bond for this work and deduct the cost from the Contract Price or terminate this subcontract.

The Subcontractor shall be reimbursed for cost of same. The reimbursement amount for the bonds shall not exceed the standard rate for such Subcontractor work.

In the event the Subcontractor shall fail to provide such requested bonds, within ten (10) working days after written notice requesting same, the Contractor may terminate this Agreement and re-let the work to another Subcontractor and all Contractor costs and expenses incurred thereby shall be paid by the Subcontractor.

**9.8**      **WARRANTY.** The Subcontractor warrants its work against all deficiencies and defects in materials and/or workmanship and as called for in the Contract Documents. The Subcontractor agrees to perform its work in a manner sufficient to comply with the requirements of any manufacturer's warranty. The Subcontractor agrees to satisfy, at the convenience of the Owner, such warranty obligations which appear within the guarantee or warranty period established in the Contract Documents without cost to the Owner or the Contractor. Subcontractor also agrees to pay for all damage to other work and correction thereof made necessary by Subcontractor's correction of its own work.

If no guarantee or warranty is required of the Contractor in the Contract Documents, then the Subcontractor shall guarantee or warranty its work as described above for the period of one year from the date(s) of substantial completion of all or a designated portion of the Subcontractor's Work or acceptance or use by the Contractor or Owner of designated equipment, whichever is sooner.

-12-

Contractor ~
Subcontractor ~.~



The Subcontractor further agrees to execute any special guarantees or warranties that shall be required for the Subcontractor's Work prior to final payment.

The decision of the Architect as to imperfect or defective work or materials and as to causes thereof, shall be binding on the Subcontractor.

**9.9**    **SHOP DRAWINGS.** The approval of the Contractor or the Architect of any shop drawings shall not relieve the Subcontractor from responsibility for any deviations from the drawings or specifications, unless the Subcontractor has at the time of submission called such deviations to the attention of the Contractor and the Architect in writing, by separate letter, and has secured a specific written approval of the Architect or the Contractor to any shop drawings, relieving the Subcontractor from responsibility for errors in the shop drawings. The Subcontractor hereby indemnifies the Contractor against any claims which may be asserted by anyone against the Contractor resulting from any errors in the Subcontractor's shop drawings. The approval by the Architect or the Contractor of any shop drawings or samples shall not relieve the Subcontractor of any responsibility in connection with the performance of his work. After the approval of final corrected shop drawings has been granted the Subcontractor shall provide copies of the final shop drawings in quantities as directed by the Contractor.

## ARTICLE 10    RECOURSE BY CONTRACTOR

**10.1**    **FAILURE OF PERFORMANCE**

**10.1.1**    **NOTICE TO CURE.** If the Subcontractor refuses or fails to supply enough properly skilled workers, proper materials, or to adhere to the Schedule of Work, or it fails to make prompt payment for its workers, sub-Subcontractors or suppliers, disregards laws, ordinances, rules, regulations or orders of any public authority having jurisdiction, or otherwise is guilty of a material breach of a provision of this Agreement, and fails within 24 hours after receipt of written notice by the Subcontractor to commence and diligently continue cure of such default with diligence and promptness, then the Contractor, without prejudice to any rights or remedies, shall have the right to any or all the following remedies:

(a)    supply such number of workers and quantity of materials, equipment and other facilities as the Contractor deems necessary for the completion of the Subcontractor's Work, or any part thereof which the Subcontractor has failed to complete or perform after the aforesaid notice, and charge all costs associated therewith to the Subcontractor, who shall be liable for the payment of same plus a markup of ten and ten percent (10% +10%) and attorney's fees,

(b)    contract with one or more additional Subcontractors to perform such part of the Subcontractor's Work as the Contractor shall determine will provide the most expeditious completion of the total Work and charge all costs associated therewith to plus a markup of five and five percent (5% + 5%) thereof to the Subcontractor, require Subcontractor to *immediately take steps necessary to catch up with the schedule*. To the extent overtime becomes necessary, Subcontractor shall reimburse Contractor for its cost of supervision.

(c)    withhold payment of any monies due the Subcontractor on this project or any other Krusinski project pending corrective action to the extent required by and to the satisfaction of the Contractor, and

(d)    in the event of an emergency affecting the safety of persons or property, the Contractor may proceed as above without notice.

**10.1.2**    **TERMINATION BY CONTRACTOR.** If the Subcontractor fails or refuses to commence and diligently continue cure of a default within one (1) working day after receipt by the Subcontractor of the notice issued under Article 10.1.1 , then the Contractor may, in lieu of or in addition to its remedies under Article 10.1.1.

-13-

Contractor M̄
Subcontractor A2



terminate this Agreement and use any materials, implements, equipment, appliances or tools furnished by or belonging to the Subcontractor to complete the Subcontractor's Work.

Contractor may also terminate this Agreement upon determining that subcontractor's financial condition is inadequate to provide the sufficient working capital necessary to complete the Work without considerable risk of disruption.

**10.1.3** **USE OF SUBCONTRACTOR'S EQUIPMENT.** If the Contractor performs work under this Article or sublets such work to be so performed, the Contractor and/or the persons to whom work has been sublet shall have the right to take and use any materials, implements, equipment, appliances or tools furnished by, belonging or delivered to the Subcontractor and located at the Project.

**10.2** **BANKRUPTCY**

**10.2.1** **TERMINATION ABSENT CURE.** Upon the appointment of a receiver for the Subcontractor or upon the Subcontractor making an assignment for the benefit of creditors, the Contractor may terminate this Agreement upon giving three (3) working days written notice, by certified mail, to the Subcontractor and its surety, if any. If an order for relief is entered under the bankruptcy code with respect to the Subcontractor, the Contractor may terminate this Agreement by giving three (3) working days written notice, by certified mail, to the Subcontractor, its trustee, and its surety, if any, unless the Subcontractor, the surety, or the trustee:

    **(a)**     promptly cures all defaults,

    **(b)**     provides adequate assurances of future performance,

    **(c)**     compensates the Contractor for actual pecuniary loss resulting from such defaults, and

    **(d)**     assumes the obligations of the Subcontractor within the statutory time limits.

**10.2.2** **INTERIM REMEDIES.** If the Subcontractor is not performing in accordance with the Schedule of Work at the time of entering an order for relief, or at any subsequent time, the Contractor, while awaiting the decision of the Subcontractor or its trustee to reject or to accept this Agreement and provide adequate assurance of its ability to perform hereunder, may avail itself of such remedies under this Article as are reasonably necessary to maintain the Schedule of Work.

The Contractor may offset against any sums due or to become due the Subcontractor on this project or any other Krusinski project all costs incurred in pursuing any of the remedies provided hereunder, which offset shall include, but not limited to, a markup of ten and ten percent (10% + 10%) and reasonable attorney's fees. The Subcontractor shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the contract price.

**10.3** **SUSPENSION BY OWNER.** Should the Owner suspend the Prime Contract or any part of the Prime Contract which includes the Subcontractor's Work, the Contractor shall so notify the Subcontractor in writing and upon receipt of said notice the Subcontractor shall immediately suspend the Subcontractor's Work.

In the event of such Owner suspension, the Contractor's liability to the Subcontractor is limited to the extent of the Contractor's recovery on the Subcontractor's behalf under the Contract Documents. The Contractor agrees to cooperate with the Subcontractor, at the Subcontractor's expense, in the prosecution of any Subcontractor claim arising out of an Owner suspension and to permit the Subcontractor to prosecute said claim, in the name of the Contractor, for the use and benefit of the Subcontractor.

**10.4** **TERMINATION BY OWNER.** Should the Owner terminate the Prime Contract or any part of the Prime Contract which includes the Subcontractor's Work, the Contractor shall so notify the Subcontractor in writing and upon receipt of said notice, this Agreement shall also be terminated, and the Subcontractor shall

-14-

Contractor _____

Subcontractor _____



immediately stop the Subcontractor's Work, and do its best to minimize all costs thereafter.

In the event of such Owner termination, the Contractor's liability to the Subcontractor is limited to the extent of the Contractor's recovery on the Subcontractor's behalf under the Contract Documents.

## ARTICLE 11    LABOR RELATIONS

**11.1**    **UNION ACCORD.** Subcontractor shall not cause labor disharmony on the Project, including failure to remit all Union dues and benefit payments when due and any action that may result in union picketing. If such action does occur, Contractor may treat such action as Subcontractor's default, and exercise all remedies available under Article 10, including termination of this Agreement.

**11.2**    **ACCEPTABILITY OF LABOR.** All work performed by the Subcontractor under this Agreement shall be by appropriate union labor acceptable to the Contractor. In the event that a jurisdictional dispute should arise concerning some phase of the Subcontractor's Work, the Subcontractor shall abide by the decision of the joint conference board, and even if said decision places the work with mechanics other than those regularly employed by the Subcontractor, the responsibility for completing this work shall remain with the Subcontractor.

## ARTICLE 12    INDEMNIFICATION

**12.1**    **SUBCONTRACTOR'S PERFORMANCE.** To the fullest extent permitted by law, the Subcontractor shall indemnify, defend and hold harmless the Owner, the Architect, the Contractor (including its affiliates, parents and subsidiaries), and other Contractors and Subcontractors and all of their agents and employees from and against all claims, damages, loss and expenses, including but not limited to reasonable attorney's fees, arising out of or resulting from the performance of the Subcontractor's Work.

**12.2**    **NO LIMITATION UPON LIABILITY.** In any and all claims against the Owner, the Architect, the Contractor (including its affiliates, parents and subsidiaries), and other Contractors or Subcontractors, or any of their agents or employees, by any employee of the Subcontractor, anyone directly or indirectly employed by the Subcontractor or anyone for whose acts the Subcontractor may be liable, the indemnification obligation under this Article 12 shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Subcontractor under worker's or workmen's compensation acts, disability benefit acts or other employee benefit acts.

**12.3**    **ARCHITECT EXCLUSION.** The obligations of the Subcontractor under this Article 12 shall not extend to the liability of the Architect, its agents or employers, arising out of:

    **(a)**    the preparation or approval of maps, drawings, opinions, reports, surveys, Change Orders, designs or specifications, or

    **(b)**    the giving of or the failure to give directions or instructions by the Architect, its agents or employees provided such giving or failure to give is the primary cause of the injury or damage.

**12.4**    **COMPLIANCE WITH LAWS.** The Subcontractor agrees to be bound by, and at its own cost, comply with all federal, state and local laws, ordinances and regulations (hereinafter collectively referred to as "laws"), applicable to the Subcontractor's Work including, but not limited to, equal employment opportunity, minority business enterprise, women's business enterprise, disadvantaged business enterprise, safety and all other laws to which the Contractor is subject.

The Subcontractor shall be liable to the Contractor and the Owner for all loss, cost and expense attributable to any acts of commission or omission by the Subcontractor, its employees and agents resulting from the failure to comply therewith, including, but not limited to, any fines, penalties or corrective measures.

-15-

Contractor ✓
Subcontractor 



**12.5** **PATENTS.** Except as otherwise provided by the Contract Documents, the Subcontractor shall pay all royalties and license fees which may be due on the inclusion of any patented materials in the Subcontractor's Work. The Subcontractor shall indemnify, defend and save harmless the Contractor, Owner and Architect, and defend all suits for claims for infringement of any patent rights arising out of the Subcontractor's Work, which may be brought against the Contractor or Owner, and shall be liable to the Contractor and Owner for all loss, including all costs, expenses, and reasonable attorney's fees.

## ARTICLE 13    INSURANCE

**13.1** **INTENT AND GENERAL REQUIREMENTS OF SUBCONTRACTOR'S INSURANCE.**

**13.1.1** **INSURANCE BY SUBCONTRACTOR.** It is the intent of these specifications that the Subcontractor effects, maintains and pays for insurance as specified herein, as well as other insurance as he may require, including coverage for the Subcontractor's own or rented tools and equipment.

**13.1.2** **PARTICULAR HAZARDS.** If other insurance is desired by the Subcontractor or sub-Subcontractors to insure against particular hazards not specified for coverage in this section, they shall effect and pay for such special coverage as they may individually require or wish to carry.

**13.1.3** **GOVERNMENTAL REQUIREMENTS.** If any governmental agency requires special coverage for Work on or adjacent to public streets or property, and which is not otherwise covered under the specified insurance, the Subcontractor or sub-contractors shall comply with and provide such insurance, endorsements or extensions as may be required by the governmental agency.

**13.2** **SUBCONTRACTOR'S LIABILITY INSURANCE.**

**13.2.1** **GENERAL.** The Subcontractor shall purchase and maintain such insurance (and shall require same from its subcontractors or any sub-subcontractors) with insurance companies that carry an A.M. best rating no lower than A-, Class 12, in order to protect the Contractor from claims set forth below which may arise out of or result from the Subcontractor's operations under the Contract, whether such operations are by the Subcontractor or by any Sub-Subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable:

   **(a)**    Claims under Worker's Compensation, Disability Benefit and other similar Employee Benefit Acts;

   **(b)**    Claims for damages because of bodily injury, sickness or disease, or death of employees;

   **(c)**    Claims for damages because of bodily injury, sickness or disease, or death of any person other that employees;

   **(d)**    Claims for damages insured by usual and customary personal injury liability coverage which are sustained (1) by any person as a result of any event directly or indirectly related to the employment of such person by the Contractor, or (2) by any other person;

   **(e)**    Claims for damages, other than to the Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom; and

   **(f)**    Claims for damages because of bodily injury or death of any person or property damage arising out of the ownership, maintenance or use of any owned or non-owned motor vehicle.

   **(g)**    Where the subcontractor's scope of work includes design responsibility, claims resulting from faulty design.

-16-



Contractor
Subcontractor



**13.2.2**      **CERTIFICATES.** Prior to starting the Work and within ten (10) days after execution of the Subcontract Agreement or notice or award, the Subcontractor shall furnish to the Contractor, certificates of insurance from itself and all its subcontractors with additional insured endorsement attached, indicating all required coverages, and also indicating the deductibles on all policies. The Work at the site shall not be started and no payment on the Subcontract Agreement shall be made until all insurance certificates have been delivered to and accepted by the Contractor. Failure of Subcontractor to provide aforementioned certificates of insurance in no manner avoids Subcontractor obligations as set forth herein.

**13.2.3**      **CANCELLATION, RENEWAL OR MODIFICATION.** The Subcontractor and its subcontractors shall maintain in effect all insurance coverage required under this Agreement at the Subcontractor's sole expense and with insurance companies acceptable to the Contractor, as defined in Article 13.2.1. Subcontractor agrees to provide written notice to Contractor promptly upon discovery that coverage will be cancelled.

     All insurance policies shall contain a provision that the coverage afforded thereunder shall not be canceled or not renewed, nor restrictive modifications added, until at least thirty (30) days prior written notice has been given to the Contractor, unless otherwise specifically required in the Contract Documents.

     Certificates of Insurance, or certified copies of policies acceptable to the Contractor shall be filed with the Contractor prior to the commencement of the Subcontractor's Work.

     In the event the Subcontractor fails to obtain or maintain any insurance coverage required under this Agreement, the Contractor may purchase such coverage and charge the expense thereof to the Subcontractor, or forthwith terminate this Agreement.

**13.2.4**      **POLICIES OR ENDORSEMENTS.** The Subcontractor shall deliver to Contractor, if requested by the Contractor, a copy of any or all policies or endorsements, or both, as set forth in Article 13. Whether or not Contractor requests delivery of copies of the policies or endorsements set forth in Article 13, requirements to purchase insurance and endorse the policies, pursuant to the provisions of A through F of this Section 13.2, are not modified or waived in any request.

**13.3**      **INSURANCE LIMITS AND REQUIREMENTS.**

**13.3.1**      **WORKERS COMPENSATION (WC) EMPLOYERS LIABILITY (EL)** The required workers compensation and employers liability insurance shall be as follows with the limits and other indicated requirements deemed as the minimum acceptable coverage's unless greater limits are required by laws: For both Worker's Compensation Insurance and General Liability Insurance, a waiver of subrogation in favor of Krusinski Construction Company shall be included:

     **(a)**      Worker's Compensation:      Statutory limits. If any individuals are excluded, such names shall appear on the certificate and such individuals shall not appear on the job site.

     **(b)**      Employer's Liability:      Bodily Injury by Accident.
     $500,000.00 each accident

     Bodily Injury By Disease
     $500,000.00 policy limit

     Bodily Injury by Disease
     $500,000.00 each employee

**13.3.2**      **DESIGN LIABILTY INSURANCE**
To the extent that Subcontractor's Scope of Work includes design responsibility, Subcontractor agrees to provide evidence of Professional Liability Insurance coverage in an amount not less than $2,000,000.00.

Contractor 
Subcontractor



**13.3.3** **COMMERCIAL GENERAL LIABILITY (OCCURRENCE FORM).**
Shall include coverage for Premises and Operations, Contractor's Protective Liability, Contractual Liability [exclusion for work within fifty (50) feet of railroad track deleted], Broad Form Property Damage including Products/Completed Operations, and Personal Injury. If the Contractor's operation includes any exposure to Explosion, Collapse or Underground damage ("X, C and U"), he will insure against such hazard with deductibles acceptable to the Owner.

| Limits: | $1,000,000.00 | Per Occurrence |
| --- | --- | --- |
| | $2,000,000.00 | General Aggregate including "Per Project" Endorsement |
| | $1,000,000.00 | Products-Completed Operations Aggregate |
| | $1,000,000.00 | Personal and Advertising Injury Limit |

**13.3.4** **COMPREHENSIVE AUTOMOBILE LIABILITY:**

| Limits: | $1,000,000.00 | Per Accident Including Bodily Injury and Property Damage Liability All Owned, Non-Owned and Hired Vehicles to be Insured. |
| --- | --- | --- |

**13.4** **AIRCRAFT/WATERCRAFT.** If the Subcontractor uses owned or non-owned aircraft or watercraft in his operations, he will insure to a limit of not less than $1,000,000.00 Combined Single Limit for bodily injury and property damage any one occurrence.

**13.5** **UMBRELLA OR EXCESS LIABILITY.** In addition to the above primary limits, Umbrella or Excess Liability insurance of not less than $5,000,000.00 for any one occurrence and subject to the same aggregate limit over the Comprehensive General Liability, Employer's Liability and Comprehensive Automobile Liability. Umbrella Coverage is subject to Contractor's approval as to form and self-insured retention shall not exceed $25,000.00.

**13.6** **THE SUBCONTRACTOR WILL NAME THE CONTRACTOR, OWNER, ARCHITECT AND ENGINEER, AS WELL AS ANY OTHERS LISTED IN RIDER 1, ATTACHED TO THIS CONTRACT, AS ADDITIONAL INSUREDS TO THE COMPREHENSIVE COMMERCIAL GENERAL LIABILITY AND UMBRELLA POLICIES, INCLUDING COMPLETED OPERATIONS COVERAGE.**

    (a)    Such coverage shall use ISO Additional Insured Endorsement CG 2010 (10/01) and CG2037(10/01) or an endorsement providing equivalent coverage to the additional insureds. This insurance for the additional insureds shall be as broad as the coverage provided for the named insured subcontractor. It shall apply as Primary and non-contributing Insurance before any other insurance or self-insurance, including any deductible, maintained by, or provided to, the additional insured.

    (b)    Certificate of Insurance must be provided by subcontractor evidencing such coverage, with Additional Insured Endorsement attached.

**13.7** **ANY FORM OF SELF-INSURANCE AS REGARDS WORKERS' COMPENSATION, COMPREHENSIVE GENERAL OR AUTOMOBILE LIABILITY MUST BE APPROVED BY THE CONTRACTOR.**

    (a)    The Subcontractor agrees that to the extent it engages any sub-Subcontractor to perform any work at the project, it shall require said sub-Subcontractor **by written contract** to arrange the kinds and amounts of insurance as required in 13.3 through 13.5 above, and that with respect to 13.6 above, it shall require that the sub-Subcontractor's policies be endorsed to show the Contractor, the

-18-

Contractor ~
Subcontractor ~ Z



Owner and the Subcontractor as Additional Insureds, and endorsed so that the policies provide primary noncontributory coverage to the Additional Insureds in relation to any and all other liability insurance policies carried by or for the benefit of either Contractor or Owner, or both even though such sub-subcontractor has no direct contract with contractor. Certificate of insurance shall indicate such coverage. The Subcontractor shall deliver to the Contractor, if requested by the Contractor, a copy of some or all policies or endorsements, or both, that are required of any Subcontractor under this clause.

(b) In addition to the agreement of the Subcontractor contained in 13.7 to require any sub-Subcontractor to arrange insurance as set forth therein, the insurance requirements of 13.3 through 13.8 of this Article 13 are incorporated into and made part of all contracts between Subcontractor and sub-Subcontractors, such that each sub-Subcontractor is bound to arrange the kinds and amounts of insurance as set forth in 13.3 through 13.5 above, and to endorse its policies as set forth in 13.6 above.

13.8 **COMPLETED OPERATIONS INSURANCE.** The Subcontractor agrees and guarantees to maintain completed operations insurance on the work for three (3) years after completion and acceptance of the work by the Owner and will evidence said coverage to the Contractor from time to time, as required by the Contractor.

13.9 **THIRD-PARTY BENEFICIARY.** Subcontractor agrees to designate General Contractor as an intended third-party beneficiary of all subcontracts that Subcontractor enters into relating to its work under this subcontract.

## ARTICLE 14   CONTRACT INTERPRETATION

14.1 **INCONSISTENCIES AND OMISSIONS.** Should inconsistencies or omissions appear in the Contract Documents, it shall be the duty of the Subcontractor to so notify the Contractor in writing within one (1) working day of the Subcontractor's discovery thereof. Subcontractor accepts responsibility for all errors or omissions in the Contract Documents that should be reasonably inferable from the Documents or the Scope of Work. Upon receipt of said notice, the Contractor shall instruct the Subcontractor as to the measures to be taken and the Subcontractor shall comply with the Contractor's instructions.

14.2 **SEVERABILITY AND WAIVER.** The partial or complete invalidity of any one or more provisions of this Agreement shall not affect the validity or continuing force and effect of any other provision. The failure of either party hereto to insist, in any one or more instances, upon the performance of any of the terms, covenants or conditions of this Agreement, or to exercise any right herein, shall not be construed as a waiver or relinquishment of such term, covenant, condition or right as respects further performance.

14.3 **COST TO ENFORCE AGREEMENT.** The Subcontractor shall pay to the Contractor any and all costs, expenses and reasonable attorney's fees which the Contractor may suffer, incur or become liable for by reason of the Contractor's enforcing, or attempting to enforce the terms and provisions of this Agreement, whether or not such costs, expenses and fees are related to direct action against the Subcontractor.

14.4 **TITLES.** The titles given to the Articles of this Agreement are for ease of reference only and shall not be relied upon or cited for any other purpose.

14.5 **ENTIRE AGREEMENT.** This Agreement is solely for the benefit of the signatories hereto and represents the entire and integrated agreement between the parties hereto and supersedes all prior negotiations, representations, or agreements, either written or oral.

14.6 **NOTICES.** All notices to or demands upon the Contractor or the Subcontractor desired or required to be given under any of the provisions hereof shall be in writing. Any notices or demands from the Contractor to the Subcontractor shall be deemed to have been duly and sufficiently given when received or refused, if sent by

-19-

Contractor
Subcontractor 



United States registered or certified mail in an envelope properly stamped and addressed or if sent by courier service, with receipt, to the Subcontractor at Subcontractor's address specified in Article 1 or at such other address as the Subcontractor may theretofore have designated by written notice to the Contractor, and any notices or demands from the Subcontractor to the Contractor shall be deemed to have been duly and sufficiently given when received or refused is sent by United States registered or certified mail in an envelope properly stamped and addressed or if sent by courier service, with receipt, to the Contractor at Contractor's address specified in Article 1 or at such other address as the Contractor may theretofore have designated by written notice to the Subcontractor.

14.7    It is agreed upon by Subcontractor and General Contractor that signed documents faxed or emailed shall be treated the same as if they were originals.

## ARTICLE 15    SPECIAL PROVISIONS

Provide all union labor, material, equipment, insurance, taxes, and supervision as required to complete all Dock Equipment work in accordance with the contract documents including, but not limited to the following: (Phase Code: 11160)

- All work to be done in conformance with OSHA regulations, as well as all municipal codes and regulations.
- Construction sequence to be coordinated with and approved by Krusinski Construction Company.
- Commencement of work constitutes acceptance of site conditions. Krusinski Construction Company must be notified immediately, in writing, of any variance in existing site conditions before work begins.
- "Subcontractor is responsible to provide all cribbing and dunnage required by its subcontractors for the completion of the Work".
- Coordination with other related trades.
- Coordination of all necessary inspections and testing agencies.
- Maintain an accurate set of as-built drawings for record purposes and provide to Contractor in hard copy form and on CD.
- Provide samples and catalog cut sheets for approval as required.
- Provide all necessary shop drawings for Architect's and Engineer's review.
- Provide all required warranties as specified.
- All dock equipment work per plans and specifications, to include:
  - Blue Giant dock levelers to match specifications
    - Include operating toe guard, side weatherseal
  - Laminated bumpers as specified
  - Dock seals as specified
    - Include head curtain
    - Vinyl as specified
  - Paint touchup of dock leveler as required
  - Spring waded safety legs
  - Automatic night locks
  - Weatherseal
  - Hold down release
  - Structural steel safety legs
  - Grease fittings
  - Yellow guide stripes on seals

15.A    The Subcontractor shall be responsible for all layout (line and grade) for its scope of work including

-20-

Contractor ⟨signature⟩
Subcontractor ⟨signature⟩ 

coordination with all other Subcontractors.

**15.B** The Subcontractor shall provide sufficient union manpower to maintain the Contractor's construction schedule. The Subcontractor may be required to submit completed weekly manpower projection forms prior to commencing work. Subcontractor shall complete its punch list work and provide required as-built drawings and O&M Manuals no later than 30 days following substantial completion of its work.

**15.C** All equipment, material, deliveries and Subcontractor's trailers will be scheduled, coordinated and located only in areas indicated by the Contractor's authorized representative.

**15.D** Subcontractor shall be responsible for his own cleanup with the proper union labor. All excess material, rubbish, etc., will be removed and the work area will be broom swept at the end of each work day. The Contractor, after written notice, will cleanup and remove material if not completed, and will backcharge the Subcontractor.

**15.E** If applicable, sufficient cleaning of streets, sidewalks, etc., is the responsibility of the Subcontractor, and if acceptable cleanup is not completed in a timely manner from the Subcontractor's operation the Contractor has the right to backcharge the Subcontractor for the cleanup.

**15.F** Construction trades working outside will not be permitted to enter existing finished building or tenant area. These trades will have to be separate from the tradesmen working tenant on build-outs.

**15.G** It is the Subcontractor's responsibility to educate and furnish the necessary safety procedures and equipment to their employees, suppliers and respective Sub-Subcontractors, as required by all governing agencies including but not limited to OSHA, EPA, state and local Fire Marshall. It is the Subcontractor's responsibility to produce and maintain the necessary safety records and provide the Contractor with the required documents including but not limited to the Material Safety Data Sheet (M.S.D.S.) for any and all material the Subcontractor would bring to the project site.

In the event the Subcontractor does not meet these requirements, the Contractor has the authority to furnish any necessary equipment, labor and materials required to rectify the violations. The Subcontractor will then be backcharged accordingly for this service.

**15.H** The Subcontractor agrees to report any and all accidents to the Contractor immediately, reporting any injury or other loss.

The Subcontractor agrees to report in writing to the Contractor all accidents, injuries, damage to property or other losses occurring on the construction site, within 24 hours after said accident, injury, damage or loss. Said report to include the following: date of accident, injury, damage or loss, name and address of the person sustaining injury, and the name and address of his employer, or a description of the property damaged (or loss sustained), and the name and address of the Owner of said property or person sustaining said loss, and a brief description of the injury, damage or loss sustained and how it occurred.

**15.I** This Subcontractor is responsible for labor and material cost increases occurring through this project.

**15.J** The Contract sum shall include, and the Subcontractor shall pay at its own expense, taxes, use taxes, occupation taxes, excise taxes and other applicable state and local taxes including the Chicago Sales (Use) Tax and other taxes, and all inspection fees and other expenses in connection with its performance under this contract, all of which are included in the agreed price and none of which shall be otherwise recoverable from the Contractor. The Subcontractor's invoice shall separately itemize and show Illinois Retailers Occupation Tax, City/County Occupation Tax, Chicago Sales Tax where applicable, RTA Tax where applicable, and the total of all the above.

**15.K** Each Progress Payment Application (Exhibit "B" attached herewith) shall be based on the Schedule of Values (Exhibit "A" attached herewith) submitted by each Subcontractor in accordance with the contract document.

-21-

Contractor W
Subcontractor NZ



Each Application for Payment shall indicate the percentage of completion of each portion of the work as of the end of each period. The Subcontractor shall provide an invoice for payment each month on the date selected by the Contractor. Contractor must receive final invoices within 30 days following Subcontractor's completion of the Work. All invoices received by Contractor more than 45 days following Subcontractor's completion of Work shall be rejected. Failure of Subcontractor to notify Contractor of any claims for unpaid amounts prior to the expiration of this 45-day period shall constitute a waiver of all claims. **This Application for Payment shall be accompanied by all signed, certified, correct, material supplier and Subcontractor waivers.**

15.L    Notwithstanding anything in the Drawings, Specifications or this document, it shall be the Subcontractor's responsibility to meet or exceed any and all applicable federal, state, and local codes at no additional cost to the Contractor.

15.M    No changes to the Contract Documents shall be binding upon the Contractor unless approved in writing by the Contractor's Project Manager.

15.N    Subcontractor will provide Contractor with evidence of MBE/WBE certification upon request, if applicable.

15.O    Subcontractor will provide Contractor with weekly-certified payrolls if requested, including addresses of employees in order to verify compliance with any applicable residency requirements.

15.P    Subcontractor agrees not to use any photographs or videos of the Project or representing the Project, except for use on the Project, or to use Owner's, Tenant's or Contractor's name, or to refer to Owner, Contractor, or any tenant directly or indirectly in any promotion or advertisement, in any news release or release to any general or trade publication or other media without receiving Contractor's prior written approval for the specific photograph, video, use or release, which approval may be withheld at the sole discretion of the Contractor. Contractor shall use reasonable efforts to respond to subcontractor's requests for approval within fifteen (15) days, but in no event shall Contractor's failure to respond to a request within fifteen (15) days be deemed to be an approval by Contractor.

15.Q    Subcontractor agrees to provide financial statements to Contractor evidencing financial condition, upon Contractor's request.

15.R    Subcontractor agrees to respond promptly and completely to Contractor's requests for information pertaining to Subcontractor's work or potential Extra Work on the project, including itemization of costs for the Work and the pricing and itemization of proposed Extra Work or Change Order Work.

## ARTICLE 16    CONTRACT DOCUMENT

16.1    **SCHEDULES.** The Drawings and Specifications as listed herein have been examined by the Subcontractor, and the Subcontractor shall comply with the same as if contained herein, as follows:

**DRAWINGS:** In accordance with Drawing Schedule below hereto and made part of this Agreement.

**SPECIFICATIONS:** In accordance with Specification Schedule, attached hereto and made part of this Agreement.

16.1.1    **Drawing List**

**ML Realty, Heritage Crossing #8**
**Lockport, IL**

{includes Revision #1 drawings dated 06/04/2014}

Jacob & Hefner
Civil

-22-

Contractor 
Subcontractor 



| Sheet 01 | Cover Sheet | 04/11/2014 |
| Sheet 02 | General Notes & Specifications | 04/11/2014 |
| Sheet 03 | Existing Conditions & Demolition Plan | 04/11/2014 |
| Sheet 04 | Dimensional Control & Paving Plan | 04/11/2014 |
| Sheet 05 | Grading & Erosion Control Plan | 04/11/2014 |
| Sheet 06 | Utility Plan | 04/11/2014 |
| Sheet 07 | SWPPP | 04/11/2014 |
| Sheet 08 | SWPPP Details | 04/11/2014 |
| Sheet 09 | Details | 04/11/2014 |
| Sheet 10 | Details | 04/11/2014 |
| Sheet 11 | Details | 04/11/2014 |
| Sheet 12 | Details | 04/11/2014 |

**Harris Architects**
**Architectural**

| A1.0 | Architectural Site Plan & Code & Project Info | 06/02/2014 |
| A2.0 | North & Enlarged Exterior Elevations | 06/04/2014 |
| A2.1 | South, East & West Exterior Elevations | 06/04/2014 |
| A3.0 | Overall Architectural Floor Plan | 06/02/2014 |
| A3.1 | Partial Northwest Floor Plan | 06/02/2014 |
| A3.2 | Partial Northeast Floor Plan | 06/02/2014 |
| A3.3 | Partial Southwest Floor Plan | 06/02/2014 |
| A3.4 | Partial Southeast Floor Plan | 06/02/2014 |
| A3.5 | Roof Plan | 06/04/2014 |
| A3.6 | Architectural Plumbing Plan | 06/02/2014 |
| A4.0 | Wall Sections & Details | 06/02/2014 |
| A4.1 | Wall Sections & Details | 06/02/2014 |
| A4.2 | Wall Sections & Details | 06/02/2014 |
| A5.0 | Door Schedule, Elevations & Details, Misc. Details | 06/02/2014 |
| SP1 | Specifications | 06/02/2014 |
| SP2 | Specifications | 06/02/2014 |

**Structural**

| S1.0 | Overall Foundation Plan | 06/02/2014 |
| S1.1 | Partial Northwest Floor Plan | 06/02/2014 |
| S1.2 | Partial Northeast Floor Plan | 06/02/2014 |
| S1.3 | Partial Southwest Floor Plan | 06/02/2014 |
| S1.4 | Partial Southeast Floor Plan | 06/02/2014 |
| S2.0 | Foundation Sections & Details | 06/02/2014 |
| S3.0 | Overall Framing Plan | 06/02/2014 |
| S3.1 | Partial Northwest Floor Plan | 06/02/2014 |
| S3.2 | Partial Northeast Floor Plan | 06/04/2014 |
| S3.3 | Partial Southwest Floor Plan | 06/02/2014 |
| S3.4 | Partial Southeast Floor Plan | 06/04/2014 |
| S4.0 | Framing Sections & Details | 06/04/2014 |

**Specifications**

| Outline Specifications | | 04/11/2014 |

16.2     **INTERPRETATION.** The decision of the Architect, or his successor duly appointed by the Owner, in interpreting the true intent and meaning of the Drawings, and any explanations appearing thereon, or of the Specifications, and any addenda thereto, or in determining compliance with the Drawings, Specifications, General Conditions, Special Conditions or Schedules, and any such interpretation thereof, shall be final and conclusive upon the parties hereto.

Contractor
Subcontractor



**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement under seal the day, month and year first above written.

**Midwest Dock Solutions, Inc.**

By_____
      Authorized Signatory

Print Name _____

Title _____

**Krusinski Construction Company**

By_____

Michael J. Metz
Vice President

MJM/cmj

-24-

Contractor ____
Subcontractor ____



# **RIDER 1**

## **INSURANCE REQUIREMENTS**

## **ADDITIONAL INSUREDS**

**PROJECT:** **ML Realty, Heritage Crossing #8**
Heritage Crossing Commerce Center
Lockport, IL

**PROJECT NUMBER:** **14-543**

**ADDITIONAL INSUREDS:**

Krusinski Construction Company "General Contractor"
ML Realty Partners, LLC "Owner"
Harris Architects "Architect"
MLRP Lockport 8, LLC
MLRP Lockport Land, LLC
Wells Fargo Bank, and each of their respective members, managers, partners, agents,
representatives, trustees, directors, officers, shareholders and employees.

**CERTIFICATE HOLDER:**

Krusinski Construction Company
2107 Swift Drive
Oak Brook, IL 60523

Additional insured endorsement is required with all certificates.

-25-

Contractor
Subcontractor



**WAIVER OF LIEN TO DATE**



STATE OF ILLINOIS

COUNTY OF

Qty #

Escrow #

TO WHOM IT MAY CONCERN:
WHEREAS the undersigned has been employed by
to furnish
for the premises known as
of which          is the owner.
        THE undersigned, for and in consideration of
($          ) Dollars, and other good and valuable considerations, the receipt whereof is hereby acknowledged, do(es)
hereby waive and release any and all lien or claim of, or right to, lien, under the statutes of the State of Illinois, relating to mechanics'
liens, with respect to and on said above-described premises, and the improvements thereon, and on the material, fixtures, apparatus or
machinery furnished, and on the moneys, funds or other considerations due or to become due from the owner, on account of all labor,
services, material, fixtures, apparatus or machinery, furnished to this date by the undersigned for the above-described premises,
INCLUDING EXTRAS.*

DATE          COMPANY NAME
        ADDRESS
SIGNATURE AND TITLE _____

*EXTRAS INCLUDE BUT ARE NOT LIMITED TO CHANGE ORDERS, BOTH ORAL AND WRITTEN, TO THE CONTRACT

**CONTRACTOR'S AFFIDAVIT**

STATE OF ILLINOIS

COUNTY OF

TO WHOM IT MAY CONCERN:
        THE UNDERSIGNED, (NAME)          BEING DULY SWORN, DEPOSES
AND SAYS THAT HE OR SHE IS (POSITION)          OF
(COMPANY NAME)          WHO IS THE
CONTRACTOR FURNISHING          WORK ON THE BUILDING
LOCATED AT
OWNED BY
That the total amount of the contract including extras* is $          on which he or she has received payment of
$          prior to this payment.  That all waivers are true, correct and genuine and delivered unconditionally and that
there is no claim either legal or equitable to defeat the validity of said waivers.  That the following are the names and addresses of all
parties who have furnished material or labor, or both, for said work and all parties having contracts or sub contracts for specific
portions of said work or for material entering into the construction thereof and the amount due or to become due to each, and that the
items mentioned include all labor and material required to complete said work according to plans and specifications:

| NAMES AND ADDRESSES | WHAT FOR | CONTRACT PRICE INCLDG EXTRAS* | AMOUNT PAID | THIS PAYMENT | BALANCE DUE |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| TOTAL LABOR AND MATERIAL INCLUDING EXTRAS* TO COMPLETE |  |  |  |  |  |

That there are no other contracts for said work outstanding, and that there is nothing due or to become due to any person for material,
labor or other work of any kind done or to be done upon or in connection with said work other than above stated.

DATE_____          SIGNATURE:_____

SUBSCRIBED AND SWORN TO BEFORE ME THIS_____ DAY OF_____

*EXTRAS INCLUDE BUT ARE NOT LIMITED TO CHANGE
ORDERS, BOTH ORAL AND WRITTEN, TO THE CONTRACT.          NOTARY PUBLIC

f.1722 R5/96          Provided by Chicago Title Insurance Company

-26-

Contractor
Subcontractor



**FINAL WAIVER OF LIEN**



**STATE OF ILLINOIS**

**COUNTY OF**

Qty #

Escrow #

TO WHOM IT MAY CONCERN:
WHEREAS the undersigned has been employed by
to furnish
for the premises known as
of which             is the owner.

THE undersigned, for and in consideration of
($        ) Dollars, and other good and valuable considerations, the receipt whereof is hereby acknowledged, do(es)
hereby waive and release any and all lien or claim of, or right to, lien, under the statutes of the State of Illinois, relating to mechanics'
liens, with respect to and on said above-described premises, and the improvements thereon, and on the material, fixtures, apparatus or
machinery furnished, and on the moneys, funds or other considerations due or to become due from the owner, on account of all labor,
services, material, fixtures, apparatus or machinery, heretofore furnished, or which may be furnished at any time hereafter, by the
undersigned for the above-described premises, INCLUDING EXTRAS.*

DATE          COMPANY NAME
ADDRESS
SIGNATURE AND TITLE _____

*EXTRAS INCLUDE BUT ARE NOT LIMITED TO CHANGE ORDERS, BOTH ORAL AND WRITTEN, TO THE CONTRACT

## CONTRACTOR'S AFFIDAVIT

**STATE OF ILLINOIS**

**COUNTY OF**

TO WHOM IT MAY CONCERN:
THE UNDERSIGNED, (NAME)        BEING DULY SWORN, DEPOSES
AND SAYS THAT HE OR SHE IS (POSITION)        OF
(COMPANY NAME)        WHO IS THE
CONTRACTOR FURNISHING        WORK ON THE BUILDING
LOCATED AT
OWNED BY
That the total amount of the contract including extras* is $        on which he or she has received payment of
$        prior to this payment. That all waivers are true, correct and genuine and delivered unconditionally and that
there is no claim either legal or equitable to defeat the validity of said waivers. That the following are the names and addresses of all
parties who have furnished material or labor, or both, for said work and all parties having contracts or sub contracts for specific
portions of said work or for material entering into the construction thereof and the amount due or to become due to each, and that the
items mentioned include all labor and material required to complete said work according to plans and specifications:

| NAMES AND ADDRESSES | WHAT FOR | CONTRACT PRICE INCLDG EXTRAS* | AMOUNT PAID | THIS PAYMENT | BALANCE DUE |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| TOTAL LABOR AND MATERIAL INCLUDING EXTRAS* TO COMPLETE. |  |  |  |  |  |

That there are no other contracts for said work outstanding, and that there is nothing due or to become due to any person for material,
labor or other work of any kind done or to be done upon or in connection with said work other than above stated.

DATE _____        SIGNATURE: _____

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____

*EXTRAS INCLUDE BUT ARE NOT LIMITED TO CHANGE
ORDERS, BOTH ORAL AND WRITTEN, TO THE CONTRACT.

_____
NOTARY PUBLIC

F.3870 R5/96          Provided by Chicago Title Insurance Company

-27-

Contractor
Subcontractor



ACORD®

# CERTIFICATE OF LIABILITY INSURANCE

MIDWE11  OP ID: CD

DATE (MM/DD/YYYY)
06/19/2014

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group 1811 High Grove, Suite 139 Naperville, IL 60540-9100 Richard W. Kerley, CIC | Phone: 630-355-2077 Fax: | PHONE (A/C, No, Ext): E-MAIL ADDRESS: | FAX (A/C, No): |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Owners Insurance Company | | 32700 |
| INSURED **Midwest Dock Solutions** 1249 E. Burville Rd. #8 Crete, IL 60417-3601 | INSURER B : Auto Owners Insurance | | 18988 |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES  CERTIFICATE NUMBER:  REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY** X COMMERCIAL GENERAL LIABILITY CLAIMS-MADE X OCCUR | X | X | 07015506 | 03/13/2014 | 03/13/2015 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: POLICY X PRO-JECT LOC | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | | $ |
| B | **AUTOMOBILE LIABILITY** ANY AUTO ALL OWNED AUTOS SCHEDULED AUTOS X HIRED AUTOS X NON-OWNED AUTOS | | | 4627388301 | 03/13/2014 | 03/13/2015 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR EXCESS LIAB CLAIMS-MADE DED X RETENTION $ 10000 | | | 4627388300 | 03/13/2014 | 03/13/2015 | EACH OCCURRENCE | $ 6,000,000 |
| | | | | | | | AGGREGATE | $ 6,000,000 |
| | | | | | | | | FOLLOWS FORM |
| B | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y/N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | Y | N/A | 07245352 | 03/16/2014 | 03/16/2015 | X WC STATU-TORY LIMITS OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | LEASED EQUIPMENT | | | 0715506 | 03/13/2014 | 03/13/2015 | 10,000 | LIMIT |
| | | | | | | | 500 | DED |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)
JOB: #14-543 ML REALTY, HERITAGE CROSSING #8, HERITAGE CROSSING COMMERCE CENTER, LOCKPORT, IL. ADDITIONAL INSUREDS FOR GENERAL LIABILITY PER FORM #55373 ATTACHED: KRUSINSKI CONSTRUCTION COMPANY; ML REALTY PARTNERS, LLC; HARRIS ARCHITECTS; MLRP LOCKPORT 8, LLC; MLRP LOCKPORT LAND, LLC; WELLS FARGO BANK, N.A., AND EACH OF THEIR RESPECTIVE MEMBERS, MANAGERS, PARTNERS,

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| KRUSINS KRUSINSKI CONSTRUCTION COMPANY 2107 SWIFT DRIVE OAK BROOK, IL 60523 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE *Richard W. Kerley* |

© 1988-2010 ACORD CORPORATION. All rights reserved.

ACORD 25 (2010/05)  The ACORD name and logo are registered marks of ACORD

| **NOTEPAD:** | HOLDER CODE **KRUSINS** | **MIDWE11** | PAGE **2** |
|---|---|---|---|
| | INSURED'S NAME **Midwest Dock Solutions** | **OP ID: CD** | DATE **06/19/14** |

AGENTS, REPRESENTATIVES, TRUSTEES, DIRECTORS, OFFICERS, SHAREHOLDERS AND
EMPLOYEES.

Agency Code 04-0229-00                    Policy Number 054604-07015506

COMMERCIAL GENERAL LIABILITY
55373 (1-07)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# BLANKET ADDITIONAL INSURED

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM.

A. Under SECTION II - WHO IS AN INSURED, the following is added:

A person or organization is an Additional Insured, only with respect to liability arising out of "your work" for that Additional Insured by or for you:

1. If required in a written contract or agreement; or

2. If required by an oral contract or agreement only if a Certificate of Insurance was issued prior to the loss indicating that the person or organization was an Additional Insured.

B. Under SECTION III - LIMITS OF INSURANCE, the following is added:

The limits of liability for the Additional Insured are those specified in the written contract or agreement between the insured and the owner, lessee or contractor or those specified in the Certificate of Insurance, if an oral contract or agreement, not to exceed the limits provided in this policy. These limits are inclusive of and not in addition to the limits of insurance shown in the Declarations.

C. SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS, is amended as follows:

1. The following provision is added to 4. Other Insurance:

This insurance is primary for the Additional Insured, but only with respect to liability arising out of "your work" for that Additional Insured by or for you. Other insurance available to the Additional Insured will apply as excess insurance and not contribute as primary insurance to the insurance provided by this endorsement.

2. The following provision is added:

Other Additional Insured Coverage Issued By Us

If this policy provides coverage for the same loss to any Additional Insured specifically shown as an Additional Insured in another endorsement to this policy, our maximum limit of insurance under this endorsement and any other endorsement shall not exceed the limit of insurance in the written contract or agreement between the insured and the owner, lessee or contractor, or the limits provided in this policy, whichever is less. Our maximum limit of insurance arising out of an "occurrence", shall not exceed the limit of insurance shown in the Declarations, regardless of the number of insureds or Additional Insureds.

All other policy terms and conditions apply.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright Insurance Services Office, Inc., 1984, 2003.                    Page 1 of 1



# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 3/18/2015 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-355-7996 |
| 1811 High Grove, Suite 139 | E-MAIL ADDRESS: | | |
| Naperville IL 60540-9100 | | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                     MIDWE11 | INSURER B : Cincinnati Casualty Company | | 28665 |
| Midwest Dock Solutions | INSURER C : | | |
| 1249 E. Burville Rd. #8 | INSURER D : | | |
| Crete IL 60417-3601 | INSURER E : | | |
| | INSURER F : | | |

**COVERAGES**   **CERTIFICATE NUMBER: 69288576**   **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|---|
| A | X | COMMERCIAL GENERAL LIABILITY | Y | | ENP0314304 | 3/13/2015 | 3/13/2016 | EACH OCCURRENCE | $1,000,000 |
| | | CLAIMS-MADE  X  OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $300,000 |
| | | | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | | POLICY  X  PRO-JECT    LOC | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | | OTHER: | | | | | | | $ |
| A | | AUTOMOBILE LIABILITY | | | ENP0314304 | 3/13/2015 | 3/13/2016 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | | ALL OWNED  X  SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X | HIRED AUTOS  X  NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | | $ |
| A | X | UMBRELLA LIAB  X  OCCUR | | | ENP0314304 | 3/13/2015 | 3/13/2016 | EACH OCCURRENCE | $6,000,000 |
| | | EXCESS LIAB    CLAIMS-MADE | | | | | | AGGREGATE | $6,000,000 |
| | | DED  X  RETENTION $10,000 | | | | | | | $ |
| B | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY      Y/N | | | EWC0314305 | 3/13/2015 | 3/13/2016 | X PER STATUTE    OTH-ER | |
| | | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | Y | N/A | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $1,000,000 |
| | | | | | | | | E.L. DISEASE - POLICY LIMIT | $1,000,000 |
| A | | Leased/Rented Equipment Spec Form, ACV | | | ENP0314304 | 3/13/2015 | 3/13/2016 | Limit: 10,000 | Deductible: 500 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #14-543 ML REALTY, HERITAGE CROSSING #8, HERITAGE CROSSING COMMERCE CENTER, LOCKPORT, IL. ADDITIONAL INSUREDS FOR GENERAL LIABILITY PER FORM GA233 IL 0207 ATTACHED: KRUSINSKI CONSTRUCTION COMPANY; ML REALTY PARTNERS, LLC; HARRIS ARCHITECTS; MLRP LOCKPORT 8, LLC; MLRP LOCKPORT LAND, LLC; WELLS FARGO BANK, N.A., AND EACH OF THEIR RESPECTIVE MEMBERS, MANAGERS, PARTNERS, AGENTS, REPRESENTATIVES, TRUSTEES, DIRECTORS, OFFICERS, SHAREHOLDERS AND EMPLOYEES.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| KRUSINSKI CONSTRUCTION COMPANY 2107 SWIFT DRIVE OAK BROOK IL 60523 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| ENTERED | AUTHORIZED REPRESENTATIVE  Richard W. Kirby |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)    The ACORD name and logo are registered marks of ACORD

001106



https://property.compstak.com/14908-South-Gougar-Road-Lockport/p/119809







1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 14



PLAINTIFF'S EXHIBIT
tabbies

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 15

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MID-AMERICA CARPENTERS          )
REGIONAL COUNCIL PENSION        )
FUND, et al.,                   )
                                )
          Plaintiffs,           )   No. 1:24-cv-02428
                                )
     vs.                        )   Judge Andrea R. Wood
                                )
DOCK & DOOR INSTALL,            )   Magistrate Judge
INC., an Illinois              )   Jeannice W. Appenteng
corporation and MIDWEST         )
DOCK SOLUTIONS, INC., an        )
Illinois corporation,           )
                                )
          Defendants.           )

          The deposition of ANTHONY ROBERT
TATTINI, called by the Defendant for
examination, taken pursuant to the Federal
Rules of Civil Procedure of the United States
District Courts pertaining to the taking of
depositions, taken before DIANE M. NULICK, a
Notary Public within and for the County of
Cook, State of Illinois, and a Certified
Shorthand Reporter of said State, at Suite 231,
3759 North Ravenswood, Chicago, Illinois, on
the 11th day of April, A.D. 2025, at 2:04 p.m.

**2**

PRESENT:

McJESSY, CHING & THOMPSON, LLC,
   BY:  MR. KEVIN P. McJESSY,
   mcjessy@MCandT.com,
   (3759 North Ravenswood, Suite 231,
    Chicago, Illinois  60613,
   (773) 880-1260),

        appeared on behalf of the plaintiffs;

ALLOCCO MILLER & CAHILL, P.C.,
   BY:  MS. KATHLEEN M. CAHILL,
   kcahill@alloccomiller.com,
   (20 North Wacker Drive, Suite 3517,
    Chicago, Illinois  60606,
   (312) 675-4325),
        appeared on behalf of the defendant,
        Dock & Door Install, Inc.;

AMUNDSEN DAVIS LLC,
   BY:  MR. MICHAEL F. HUGHES,
   mhughes@amundsendavislaw.com,
   (3815 East Main Street, Suite A-1,
    St. Charles, Illinois  60174,
   (630) 587-7925/(630) 217-1228 (direct),
        appeared on behalf of the defendant,
        Midwest Dock Solutions, Inc.

**3**

                  I N D E X

WITNESS:  ANTHONY ROBERT TATTINI

EXAMINATION BY:                          PAGE
Mr. McJessy                                 4
Mr. Hughes                                143
Mr. McJessy                               151
Mr. Hughes                                157


PLAINTIFF'S EXHIBITS:

No. 32                                     10
No. 33                                     13
No. 34                                     19
No. 35                                     24
No. 3                                      52
No. 6                                      62
No. 15                                     65
No. 33                                     74
No. 19                                     85
No. 15                                    100
No. 23                                    101
No. 6                                     106
No. 7                                     108
No. 8                                     109
No. 19                                    111
No. 29                                    119

**4**

(The witness was duly sworn.)


     ANTHONY ROBERT TATTINI,
called as a witness herein, having been first
duly sworn, was examined and testified as
follows:


          EXAMINATION
          BY MR. McJESSY:

     Q.  Okay.
          Sir, have you ever been
deposed before?
     A.  A very long time ago.
     Q.  Okay.
          What was the nature of that
action, do you remember?
     A.  I was a teenager.  We were at like a
party, and one of the parents came home, got
irate and like -- yeah, like threatened us and
like found us and like rammed somebody through

**1 (Pages 1 to 4)**

5

1  a stop sign and -- yeah, a two-lane highway.
2      Q.  Too -- too much information.  I just
3  wanted to know if you were familiar with the
4  deposition process.
5      A.  Kind of sort of, but it was a long
6  time ago.
7      Q.  Kind of sort of.  All right.
8          I'll -- I'll give you --
9  we'll go over some Rules of the Road just to
10  make, hopefully, the process go faster.
11          But, first, let's start out
12  with, can you say your name for the record?
13      A.  Anthony Robert Tattini.
14      Q.  Excellent.
15          Can you spell each name just
16  in case there's some unusual spellings?
17      A.  A-n-t-h-o-n-y, R-o-b-e-r-t,
18  T-a-t-t-i-n-i.
19      Q.  Excellent.
20          And, sir, do you understand
21  that you're under oath?
22      A.  Yes.
23      Q.  Okay.
24          And even though we're here in

6

1  quite an informal setting, in a conference
2  room, do you understand that that oath is the
3  same as if you were in a court of law?
4      A.  Yes.
5      Q.  Okay.
6      A.  Yes, I do.
7      Q.  All right.
8          And you've been deposed once
9  a long time ago?
10      A.  Yes, sir.
11      Q.  I'm going to give you some ground
12  rules that will hopefully make it more familiar
13  to you.
14      A.  Okay.
15      Q.  I'm going to ask you a series of
16  questions.
17      A.  Ah-huh.
18      Q.  You'll give me a series of answers.
19      A.  Ah-huh.
20      Q.  She'll type them down.
21      A.  Okay.
22      Q.  All of your responses to my questions
23  need to be verbal responses.  You can't nod or
24  shake your head or say --

7

1      A.  Okay.
2      Q.  -- ah-huh, uh-uh, just because she
3  can't take down those kind of responses.
4      A.  Okay.
5      Q.  So if you do that, it's just sort of a
6  natural response.  I'll probably prompt you, is
7  that a yes, is that a no.
8      A.  Okay.
9      Q.  And then you can answer.
10      A.  Yes, sir.
11      Q.  The second thing is -- and I can tell
12  we're going to have trouble on this one, and
13  then we always do, anyway.
14      A.  Ah-huh.
15      Q.  When I'm asking a question, it's
16  helpful if you don't start speaking until I'm
17  done.
18      A.  Okay.
19      Q.  I will try to return the courtesy.
20      A.  Ah-huh.
21      Q.  When you're giving an answer --
22      A.  Okay.
23      Q.  -- I will try not to interrupt your
24  answer.

8

1      A.  Okay.
2      Q.  Just because she's taking down what
3  each of us are saying.
4      A.  I understand.
5      Q.  And she has a hard time doing that if
6  we both talk at the same time.
7      A.  I understand.
8      Q.  Okay.  Let's see.
9          If I ask a question and you
10  don't understand it --
11      A.  Ah-huh.
12      Q.  -- will you ask me to explain it?
13      A.  Sure.
14      Q.  Okay.
15          And then if that's our ground
16  rule, can we assume that if I ask a question
17  and you answer it, you must have understood it?
18  Is that fair?
19      A.  Yes.
20      Q.  Okay.
21          And is there any reason today
22  that you cannot give truthful answers to my
23  questions?
24      A.  No.

2 (Pages 5 to 8)

9

1 Q. For example, are you on any
2 medications or suffering from any conditions
3 that would prevent you from either
4 understanding my questions or giving truthful
5 answers?
6 A. No.
7 Q. Okay. Excellent.
8  So we can go ahead and get
9 started and -- oh, if you need to take a break
10 at some point --
11 A. Ah-huh.
12 Q. -- tell me.
13 A. Okay.
14 Q. We'll stop. We'll take a break.
15 A. All right.
16 Q. Usually, we do it about every hour.
17 A. Okay.
18 Q. I think we might go, roughly, two
19 hours today --
20 A. Okay.
21 Q. -- or do a little more.
22 A. Sure.
23 Q. So if you need to take a break, just
24 let me know, and we'll stop.

10

1 A. All right.
2 Q. The questions I'm going to ask you
3 about today have to do with your work for
4 Midwest Dock Solutions, Dock & Door, and your
5 history as an overhead door and dock leveler
6 installer. That's the gist of this.
7
8  (WHEREUPON, the document was
9  marked Plaintiff's
10  Exhibit 32 for identification,
11  as of 4/11/25.)
12
13 BY MR. McJESSY:
14 Q. So let me show you first what I've
15 marked as Exhibit 32, and does this look
16 familiar to you?
17 A. Yes.
18 Q. All right.
19  And you're not here today
20 voluntarily, correct?
21 A. Correct.
22 Q. You're here because you received a
23 subpoena, correct?
24 A. Correct.

11

1 Q. Okay.
2  And are you represented by an
3 attorney here today?
4 A. No.
5 Q. Okay.
6  And this subpoena asked you
7 to produce some documents on the last two pages
8 of it.
9 A. Ah-huh.
10 Q. Were you familiar with the requests
11 that were in here?
12 A. Yes.
13 Q. All right.
14  Did you have any documents
15 that were responsive to this subpoena?
16 A. No, not at this moment, just because
17 of the fact that I'm separated --
18 Q. Okay.
19 A. -- and my wife has all of the
20 documents, like pay stubs. She said she had --
21 well, I communicate with my daughter, not with
22 my wife.
23 Q. Okay.
24 A. So like I was told that she had some

12

1 like pay stubs. I know she has W-2s --
2 Q. Okay.
3 A. -- proving that I worked there. But
4 it's been really difficult for me to get ahold
5 of them.
6 Q. Okay.
7  Are the only documents that
8 you would have responsive to the subpoena W-2s
9 and pay stubs?
10 A. Yes.
11 Q. Okay.
12  Would you have any email
13 communications with anybody?
14 A. No.
15 Q. Would you have any -- well, any text
16 messages, you would have those if you had any,
17 right? I'm guessing you don't have any?
18 A. No. I switched phones like many
19 times. And when I was working there, I didn't
20 have -- I didn't even have a smartphone.
21
22
23
24

3 (Pages 9 to 12)

13

```
 1          (WHEREUPON, the document was
 2          marked Plaintiff's
 3          Exhibit 33 for identification,
 4          as of 4/11/25.)
 5
 6  BY MR. McJESSY:
 7      Q.  Okay.
 8          And I'm going to show you
 9  what I've already marked as Exhibit 33 --
10      A.  Ah-huh.
11      Q.  -- and ask you if you're familiar
12  with -- with these documents.  And you can just
13  sort of look at it generally for the moment.
14      A.  Oh, yeah.  I forgot we even did these,
15  you know.
16      Q.  Would you have any documents like
17  these that we have marked as Exhibit 33?
18      A.  You mean like -- you mean like
19  personal?
20      Q.  Yeah.  Time sheets.
21      A.  No.  No.
22      Q.  Okay.
23      A.  Well, that's -- I mean, that's my
24  writing right there.
```

14

```
 1      Q.  Yeah.
 2          So the only documents that
 3  you would have would be W-2s and pay stubs?
 4      A.  Ah-huh.  And maybe like my bank
 5  statements showing I received the payments --
 6      Q.  All right.
 7      A.  -- electronically, I'm assuming, if
 8  you want to go back and get those.
 9      Q.  Okay.
10          For the time being, let's --
11  I will tell you that it's -- maybe we'll make
12  this decision after the deposition.
13      A.  Okay.
14      Q.  But we just won't need you to produce
15  that information.
16      A.  Okay.
17      Q.  If that's the only information you
18  have that's responsive.
19          When was the last time that
20  you spoke to anybody -- well, strike that.
21          When was the last time you
22  spoke with Tony Brutti?
23      A.  The last time I spoke to Tony Brutti
24  would be probably within the last week that I
```

15

```
 1  worked there, somewhere 2019 or 2020.  It's
 2  hard to say.  I forget.  Mike fired me on --
 3  somewhere between 2019, 2020.
 4      Q.  Okay.
 5          And when was the last time
 6  you spoke with Tony Zarlengo?
 7      A.  The same day Mike fired me.  The day I
 8  was terminated, yeah.
 9      Q.  Okay.
10          And when you say "Mike," is
11  that Mike Richert?
12      A.  Yes.
13      Q.  Okay.
14          When was the last time you
15  spoke to Mike Richert?
16      A.  The same time.
17      Q.  Okay.
18          And you said he fired you?
19      A.  Yes, sir.
20      Q.  Okay.
21          And how did that come about?
22      A.  It came about because I was like
23  refusing to pick up an employee that had a
24  so-called DUI.  I'm not sure if the guy had a
```

16

```
 1  license or had a DUI.  I'm not sure what the
 2  situation was, but I was -- I had to pick up a
 3  certain individual -- not every day.  But like
 4  me and my coworker, Dave, we were like --
 5  mostly, like the foreman, had trucks.  So
 6  either if it was -- if it was Dave or me, we
 7  would have to pick up this certain individual
 8  at the shop, which we would be going out of
 9  everybody's way.  And it was inconvenient, you
10  know.  And one day I like spited him and
11  refused to pick him up, and I left this
12  individual at the shop.  I said, Mike, like why
13  am I doing this?  Like I don't even -- I said,
14  I'm getting -- this stuff is getting really old
15  because we were in Wisconsin the day before.
16  We got home late.  I loaded up my truck -- I
17  went back to the shop at like 6:00, 6:30
18  because I loaded up everything I needed for the
19  next day because it was a close job in Monee.
20      Q.  Ah-huh.
21      A.  And I was like, I'm going to sleep
22  late.  You know what I'm saying?  I have all of
23  the stuff I need.  I'm not picking this guy up.
24  It's -- this is getting ridiculous.  And it was
```

4 (Pages 13 to 16)

17

1  like a spiteful move on my part. And when I
2  didn't pick him up, he called me. He's like
3  what are you doing? You can't just do that and
4  leave him here. I said, well, this is getting
5  old. I'm like, you know, I don't even -- I'm
6  like how about this? How about I just drive my
7  own self to work, and I give you back the truck
8  because this is getting really old. He's like,
9  well, you don't understand. You don't have a
10  truck now because I won't pick up that
11  individual. And he's like come -- and I was
12  like, so I'm fired or -- like he said, you
13  don't understand. You don't have a truck.
14  Pretty much you're fired. I don't know if he
15  said it or I asked him. Either way.
16     Q.  Ah-huh.
17     A.  And I was like, okay, I'll be back at
18  the shop, get my check, and I'm gone. He tried
19  calling me back on the individual's phone
20  because they brought that individual to the job
21  site, another employee did. I'm like that's
22  it, I'm fired, get in the truck. And then he's
23  trying to call me and communicate through the
24  individual that I had to drive every day. I'm

18

1  like I have nothing to say. You fired me. I
2  had enough of this. This is fine. You fire
3  me. I go back to the shop. Mike -- Mike's
4  there. I walk in. And Tony's there. Tony's
5  like what's up.
6     Q.  Tony?
7     A.  Zarlengo. And Mike said, yeah, we
8  need to give him -- Tony -- his check. And
9  he's like what's going on? He's like -- he's
10  like I fired him. And --
11     Q.  That's Mike who said that?
12     A.  Yeah. And Tony's like, well, we can't
13  give him a check right now. We don't have no
14  money. And Mike said, yeah, you can, and like
15  hold on. So I get all of my tools. I had my
16  wife at the time -- ex-wife -- pick me up. I
17  put my tools in. They gave me a check. I go
18  to the bank. I try cashing it. It bounces.
19  Then I go back -- I call Mike. I was like,
20  hey, Mike, the check just bounced. He said,
21  oh, come back to the shop. I go back to the
22  shop. He -- he meets me in the lobby, won't
23  let me in like. And he's like -- he's like
24  here's another check. He goes, but you just

19

1  can't go to my bank and cash that. I go,
2  excuse me? I go, yeah, I can. And -- I know,
3  like -- like I'm like that ignorant? You know
4  what I'm saying? Like -- so whatever. So they
5  gave me a good check, I cash it, and that was
6  it.
7
8         (WHEREUPON, the document was
9         marked Plaintiff's
10         Exhibit 34 for identification,
11         as of 4/11/25.)
12
13  BY MR. McJESSY:
14     Q.  Okay.
15         And I'm going to show you
16  what I've marked as Exhibit 34 and ask you
17  could those be the checks?
18     A.  That bounced?
19     Q.  That you got.
20     A.  That day?
21     Q.  Yes.  They're dated, it looks like,
22  September 24, 2019.
23     A.  September 24, 2019.  Yeah, let me see.
24  How much was it for?  Yeah.  These are like

20

1  handwritten checks. What are the dates? Are
2  the days in sequence here? I'm having a hard
3  time seeing this.
4     Q.  I can -- I can probably print out
5  larger copies if you want me to do that.
6     A.  I can probably take a picture.
7     Q.  I'll have them -- I'll have them blown
8  up.
9     A.  Well, there's different -- just -- oh,
10  just the ones highlighted, I'm assuming. Okay.
11  Right?
12     Q.  Oh, I was just looking at the two
13  highlighted checks, yeah.
14     A.  Oh, here we go. Here we go.
15     Q.  Did you take a picture of them on your
16  phone --
17     A.  Yes, I did.
18     Q.  -- so you can blow them up?
19     A.  Okay.
20         Yes. Yes. It's probably the
21  ones because we did get electronic deposits,
22  but we did receive pay stubs in the mail. So,
23  yes, this would be probably the last day I
24  worked because it shows -- it shows the week

5 (Pages 17 to 20)

21

1  before's payment of thirteen twenty-four, or
2  whatever it was. And then I'm assuming the
3  eight twenty-seven was for like the day or two
4  that I worked the week, because if you get
5  terminated, it's in our contract where, you
6  know, they have to pay you in full. They can't
7  wait -- make you wait until the next pay
8  period.
9      Q.  Oh, they have to pay you in full that
10  day?
11     A.  Yes, for everything. So that's what
12  that $824 probably is as well.
13     Q.  Okay.
14     A.  Like it was probably -- the $824 -- it
15  was probably a Monday or a Tuesday, I'm
16  assuming. I'm assuming it's going to be a
17  Tuesday.
18     Q.  Well, if you look at -- if you look at
19  this, Exhibit 33 --
20     A.  Ah-huh.
21     Q.  -- these appear to be time sheets, and
22  they're in sort of --
23     A.  Oh, okay.
24     Q.  -- reverse date order starting in June

22

1  and then going towards September. The last
2  time sheet that's in there --
3      A.  Ah-huh.
4      Q.  -- it looks like it's from, I'm
5  guessing, September 18 --
6      A.  Ah-huh.
7      Q.  -- or the week of September 18.
8      A.  Right. And that was written -- yeah,
9  and that was probably -- yeah, so that was a
10  Friday.
11     MR. HUGHES:  Where are we looking,
12  Kevin?
13     MR. McJESSY:  Exhibit 33, the first
14  page.
15     MR. HUGHES:  The first page. Okay.
16     THE WITNESS:  Ah-huh.
17     MR. McJESSY:  Because they're in
18  reverse date order.
19     THE WITNESS:  No, that's -- that's
20  totally like --
21  BY MR. McJESSY:
22     Q.  Okay.
23     A.  Yeah. That's totally right because --
24     Q.  Actually, you said you were working in

23

1  Monee, right?
2      A.  Yes. Ah-huh.
3      Q.  And the last entry on here for
4  September 18 is Monee.
5      A.  And we were in Wisconsin the night
6  before. Premier. Oh, no. Monee, Premier.
7  Monee, Premier. Joliet Park. Joliet Park.
8  Oh, we went back. I think we went back to
9  Monee.
10     Q.  Do you think there's another week
11  that's missing in the time sheet here because
12  this ends up --
13     A.  Yes. Yes, I do. Yeah. Let me see.
14  So -- yes, because -- yes. I think there's one
15  more. I think -- because this check was on the
16  24th -- there is another week missing because
17  we were in Monee for this week, or partial
18  week. We were in Monee. And I think Monday we
19  went to Wisconsin for a day, and then we were
20  supposed to go back to Monee and just put
21  bumpers on because it says install 20 docks --
22  here it is -- install 20 docks without bumpers.
23  That was on the Thursday prior to the 24th.
24     Q.  Okay.

24

1          And you're pointing at
2  Exhibit 33 for that day? You're pointing at --
3      A.  Yes.
4      Q.  -- the entry on 9/17, install 11 docks
5  without bumpers?
6      A.  Yes, sir.
7      Q.  All right.
8          You went back the next week
9  to install those bumpers?
10     A.  Tuesday. Yep. I'm gonna almost --
11  yeah, it's Tuesday. I guarantee it was
12  Tuesday.
13     Q.  Okay.
14     A.  Because everything makes sense. I
15  mean, $824 is pretty much -- you know, 80
16  times -- yeah. So, yeah, that's about right,
17  or maybe it could have been a Wednesday. It
18  could have been a Wednesday.
19
20          (WHEREUPON, the document was
21          marked Plaintiff's
22          Exhibit 35 for identification,
23          as of 4/11/25.)
24

6 (Pages 21 to 24)

25

```
 1   BY MR. McJESSY:
 2       Q.  All right.
 3               I'm handing you what's marked
 4   as Exhibit 35 just because it's a little easier
 5   to see.  It's the same two checks that we were
 6   looking at --
 7       A.  Yeah.  Makes total sense.
 8       Q.  -- but blown up.
 9               So you think that the
10   check -- that these checks were related to your
11   last pay?
12       A.  Yes, sir.  Most definitely.
13       Q.  Okay.
14       A.  A hundred percent positive.
15       Q.  And would the check -- the top check
16   be for the week of September 12 and the bottom
17   check be for the next week?
18       A.  Yes, sir.  Yep.
19       Q.  Okay.
20       A.  And the $827 would probably be for two
21   days.
22       Q.  Okay.
23       A.  Or three days.
24       Q.  All right.
```

26

```
 1               For the partial week?
 2       A.  Yes, sir.
 3       Q.  All right.
 4               So you were probably -- does
 5   that sound like the date you were terminated,
 6   would have been 9/24/19?
 7       A.  Yes.  I'm a hundred percent positive
 8   it is with these -- with the evidence you
 9   showed me, yes.  I mean --
10       Q.  Okay.
11       A.  -- yeah, it's totally accurate.
12       Q.  And who gave you these checks, then,
13   that we've marked as Exhibits 34 and 35?
14       A.  Mike gave me those in the lobby, in
15   the foyer.
16       Q.  Okay.
17               And those are -- that's his
18   signature on the checks?
19       A.  Yeah.
20       Q.  All right.
21               And this was for your --
22   basically, your last two weeks of work for
23   Dock & Door?
24       A.  Yes, sir.
```

27

```
 1       Q.  All right.
 2       A.  And these are the ones I cashed, I'm
 3   assuming.
 4       Q.  Okay.
 5               Well, if you look at -- you
 6   signed these, certainly.
 7       A.  Okay.
 8       Q.  And if you go back to Exhibit 34, is
 9   that -- well, let me ask you.  Is that your
10   signature on the back of those checks?
11       A.  Yes, sir.
12       Q.  Okay.
13               And it looks like this is a
14   bank statement showing the checks cleared,
15   so --
16       A.  Okay.
17               So, yes.  Yeah, that was it.
18   Ah-huh.
19       Q.  All right.
20               Did you go back and get
21   the -- when the checks bounced, did you go back
22   the same day --
23       A.  Yes, sir.
24       Q.  -- and get the replacement checks?
```

28

```
 1       A.  Yes, sir.
 2       Q.  Okay.  All right.
 3               So that tells me that was the
 4   last -- that was the last time you spoke to
 5   Mike Richert.
 6               When was the last time you
 7   spoke with anybody that you worked with at the
 8   company -- well, actually, strike that.
 9               You mentioned about the
10   frustration with going to pick up Jose?
11       A.  Yes.  That's exactly --
12       Q.  Is that Jose Aguirre?
13       A.  Ah-huh.
14       Q.  Is that a yes?
15       A.  Yes.
16       Q.  Okay.
17       A.  Yes, sir.
18               MR. HUGHES:  I'm going to object.  I
19   don't think he said a name, but --
20               MR. McJESSY:  Well, he said Jose.
21               MR. HUGHES:  I thought he said an
22   individual.
23               THE WITNESS:  I did say individual
24   because I was trying to be like --
```

7 (Pages 25 to 28)

29

```
1    BY MR. McJESSY:
2        Q.  Oh, okay.
3        A.  -- like kind of -- I don't know.  Like
4    I guess, professional.  I don't know.  But
5    that's who -- that's exactly who it was.  It
6    was Jose.
7        Q.  Okay.
8            And you said David was the
9    other person?  I think you said David.
10       A.  Yeah.  David Green.
11       Q.  Okay.
12           Well, that's what I was going
13   to ask.  Was it David Green?
14       A.  Yes, sir.
15       Q.  Okay.
16           He was the other person who
17   was picking up Jose, correct?
18       A.  Yes.
19       Q.  Okay.
20       A.  Along with other people, too.  Yes,
21   along with other people as well.
22       Q.  Okay.
23           And -- all right.  Then back
24   to my other -- other question.
```

30

```
1            Have you spoken to David
2    Green recently about this case?
3        A.  Yes, I have.
4        Q.  Okay.
5            And when did you speak with
6    him?
7        A.  Probably about when I received the
8    subpoena.
9        Q.  All right.
10           And what was the nature of
11   your conversation with Mr. Green?
12       A.  It was just pretty much like what he
13   was told, I think, from your office.
14       Q.  Sure.
15       A.  The same thing.  I had that
16   conversation with you, just -- just regarding
17   that, the conversations that we both had.  And
18   that was about it.  But nobody -- I mean, we
19   still didn't really understand like -- you
20   know, like what was really going on.
21       Q.  Okay.
22           And you and I had a
23   conversation --
24       A.  Ah-huh.
```

31

```
1        Q.  -- when you got the subpoena, correct?
2        A.  Yes.
3        Q.  Okay.
4            And what did we talk about?
5    What can you recall of that conversation?
6        A.  I can recall that you asked me
7    about -- we were speaking about how they were a
8    double-breasted shop -- I mean,
9    nonunion/union -- sending guys on -- sending
10   nonunion guys on union jobs, going to the shop
11   early in the morning, picking up stuff, picking
12   up employees, not getting reimbursed.  The same
13   thing on the way home.  Going to the shop,
14   dropping off equipment, loading up for the next
15   day, and not getting reimbursed.  And then you
16   also mentioned that somebody was trying to do
17   an audit, and they couldn't -- they couldn't
18   produce the paperwork or documents, and that's
19   like what led to this -- I guess, it's a civil
20   lawsuit.  Well, you didn't tell me that.  But
21   from what I looked into -- what I tried to look
22   into from the federal district court when I
23   tried to, it's a civil matter.
24       Q.  Okay.
```

32

```
1        A.  Right.
2        Q.  You did a little investigation?
3        A.  Yeah, I did.
4        Q.  Okay.  All right.
5            Anything else that you can
6    recall?
7        A.  No.  That was about it.
8        Q.  Okay.
9            You told -- you did tell me
10   about picking up workers in the morning and
11   dropping off workers and loading trucks, I
12   think --
13       A.  Yes, sir.
14       Q.  -- and not getting paid for it,
15   correct?
16       A.  Yes, sir.
17       Q.  Okay.
18           Or that -- you didn't get
19   paid for that time, right?
20       A.  No, sir.
21       Q.  Okay.
22       A.  For the record, though, it wasn't just
23   Jose.  It was other employees as well, mostly
24   like relatives, the younger guys, like Mike
```

8 (Pages 29 to 32)

33

1  Richert's like stepson.
2      Q.  Okay.
3      A.  You know, like I'd have to go pick
4  him -- I mean, he lived like a half a mile from
5  me, so that wasn't really that bad.  But like
6  sometimes we'd have to go to the shop and pick
7  up a relative named Nico, which lived in
8  Chicago Heights.
9      Q.  Nico Kelly?
10     A.  Yes.  He didn't have a personal -- he
11  didn't have a work truck at the time, so the
12  same thing.  We would have to go to the shop
13  just to meet Nico, but not too much Collin, the
14  stepson, because me and Dave, as we drove to
15  work -- or like I said, Collin lived in the
16  next subdivision next to me, so that wasn't a
17  big deal.  And the same thing for Dave.  Dave
18  pretty much passed his house as he was going to
19  work, so it wasn't a big deal.  But we would
20  have to stop and get Jose and Nico.
21     Q.  Okay.
22     A.  Yes, sir.
23     Q.  You said -- to your knowledge, is Nico
24  related to somebody?

34

1      A.  Oh, yes.
2      Q.  Who is he related to?
3      A.  Nico is -- all right.  So Nico is the
4  son of Tony Zarlengo's stepfather.
5      Q.  Okay.
6          So there's a family
7  relationship there somewhere?
8      A.  Ah-huh.
9      Q.  All right.
10         And do you know, is
11  Anthony -- you know who Anthony Brutti is?
12     A.  Yes, sir.
13     Q.  And is he related to Michael Richert
14  or Tony Zarlengo?
15     A.  Allegedly, Mike Richert's cousin, but
16  I don't -- I can't say a hundred percent.
17  That's what Mike would say, my cousin, my
18  cousin, my cousin.  But I know Nico.  I know
19  Nico's dad.  I know Nico's grandpa, which is
20  Tony Zarlengo's stepdad.  So the Nico thing I
21  know is a hundred percent.  I'm assuming Tony
22  Brutti is, too.  I mean, he called him his
23  cousin all of the time.
24     Q.  Mike Richert referred to --

35

1      A.  Yes.
2      Q.  -- Tony Brutti as his cousin?
3      A.  Yes, sir.
4      Q.  Okay.  All right.
5          As far as you can recall,
6  have you told me everything you can remember
7  about our conversations?
8      A.  You did say like there might be like
9  some kind of reimbursement.
10     Q.  You should have received a check for
11  that, right?
12     A.  Right.  But I kind of took it like --
13  as like -- you said, well -- or not
14  reimbursement, more like compensation for the
15  time that we were picking up people and stuff
16  like that and picking up equipment and stuff
17  like that.
18     Q.  Okay.
19         That was your
20  understanding --
21     A.  Yeah.  That was my understanding.
22     Q.  -- of our conversation?
23     A.  Yeah.
24     Q.  Okay.

36

1          Anything else you can recall?
2      A.  You did ask me for the documents,
3  which I tried to get.
4      Q.  Right.
5      A.  You asked me -- you asked -- well, I
6  think we talked about like who was like the
7  brains behind the business and like -- and
8  stuff like that.  I recall talking about
9  like -- I think I told you how I thought like
10  Tony Zarlengo -- Tony Zarlengo, I think, kind
11  of got bamboozled by Mike -- Mike Richert,
12  like, oh, don't worry about it, don't worry
13  about it.  But, I mean, this is all assumption.
14  But like, Tony Zarlengo is the brains behind
15  the operation.  He is.
16     Q.  Okay.
17         And when you say "the
18  operation," what are you referring to?
19     A.  The company.
20     Q.  Okay.
21         Meaning both Dock & Door and
22  Midwest Dock?
23     A.  Yes, sir.
24     Q.  Okay.

9 (Pages 33 to 36)

37

1        **Which you take as one**
2  **company, in essence?**
3     A.  Yes, sir.
4         MS. CAHILL:  Objection.
5         MR. HUGHES:  Objection.
6  BY MR. McJESSY:
7     **Q.  I did forget to say at the beginning**
8  **there may be questions I ask that they make**
9  **objections to.**
10    A.  I understand.  Yeah, okay.
11    **Q.  But you can go ahead and answer after**
12  **they make their objections.**
13    A.  Okay.
14    **Q.  All right.**
15        **And we'll get into more of**
16  **that as we go, but anybody else that you've**
17  **spoken to about -- anything else -- well,**
18  **strike that.**
19        **Anything else you can recall**
20  **that we talked about, or does that pretty much**
21  **exhaust your --**
22    A.  We talked about sending -- sending
23  nonunion jobs -- nonunion guys on union jobs,
24  yeah, and --

38

1    **Q.  And it was your recollection that**
2  **there were instances where nonunion guys were**
3  **working on union jobs?**
4    A.  Oh, yes.  For sure.  I'm 99.9 percent.
5  I -- actually, I'm a hundred percent because
6  I've actually had like -- like confirmation.
7  When I asked Tony Brutti before, he -- he
8  confirmed it.
9    **Q.  And what did he tell you?**
10    A.  We were at a job in -- I think it was
11  Romeoville.  It was a box building, a big
12  warehouse.  But it was only like, maybe, 20
13  docks and dock doors.  It was right by Martin
14  Concrete.  Martin Concrete Company is like
15  another like big union concrete company that we
16  see on job sites all of the time, so it was --
17  it was a big box building right next to Martin
18  Cement Company.  So -- and this is one I know
19  because we went back to do the doors.  And all
20  of the docks were in, and we had the docks.
21  And I'm like who did this?  I'm like this --
22  these aren't my welds.  These aren't Dave's
23  welds.  I'm like who did this?  And so I go
24  back to the shop that night.  And I was like,

39

1  Tony Brutti, I'm like who put those docks in?
2  He goes John Sparr did.  I said, well, what?
3  He goes, yeah, it was only a couple, though.  I
4  was like, oh, okay.
5    **Q.  Okay.**
6    A.  Yep.
7    **Q.  And John Sparr you knew was paid**
8  **through Midwest Dock Solutions?**
9    A.  Ah-huh.  Yes.  Nonunion all of the
10  way.
11    **Q.  Okay.**
12        **And how could you -- I'm just**
13  **curious.  How could you tell the welds weren't**
14  **yours or weren't John -- Dave Green's, rather?**
15    A.  Because Dave Green has an excellent
16  weld.  Excellent weld.  And mine is pretty
17  good, too.  And this was like -- you know, it
18  was past subpar, but --
19    **Q.  So you could tell by looking at a weld**
20  **whether it's done --**
21    A.  Oh, yeah.  Oh, yeah.  With only a
22  couple -- like the guys we have, yeah.  I
23  mean -- and some of the dudes were younger
24  guys, too, so, you know, yeah.

40

1    **Q.  All right.**
2        **So you can just tell by how**
3  **the welding --**
4    A.  Yes, sir.
5    **Q.  -- was done?**
6        **Interesting.**
7        **All right.  Anybody else**
8  **besides me or Dave Green that you spoke with**
9  **about this case or about the subpoena that you**
10  **got?**
11    A.  Yes.
12    **Q.  Who?**
13    A.  One coworker named Jake Rodgers.
14    **Q.  Okay.**
15    A.  He worked at Midwest Dock for a couple
16  times.  I called him and asked if he was
17  subpoenaed.  That's all I talked to him about.
18  He said he wasn't.
19    **Q.  Okay.**
20        **Oh, that was -- that was the**
21  **end of the conversation?**
22    A.  Yes.
23    **Q.  Okay.**
24        **Anybody else?**

10 (Pages 37 to 40)

41

1     A.  One of the workers that still works
2 there. It's a young kid. He's been there --
3 he's one of their apprentices there.
4     **Q.  Okay.**
5     A.  And I seen him -- previously, last
6 year, I was still doing door installs for
7 another company, and I seen him -- seen him on
8 site. And this kid was doing -- helping me on
9 the weekends and stuff, like cut grass and
10 like -- you know, at my property.
11     **Q.  Ah-huh.**
12     A.  And he's like -- I'm like did you hear
13 anything? He's like no. But then last time I
14 worked with him, he said, yeah, Tony called me,
15 and he's like, you know, man -- he goes if
16 we -- if we've got to settle, we're going
17 bankrupt. And I don't -- I'm not sure if
18 that's exactly what he -- it sounded like if he
19 had to pay, they're going bankrupt, and if not
20 or something, they're like --
21     **Q.  That's what this guy said to you that**
22 **Tony had told him?**
23     A.  The apprentice, yeah. I mean, if
24 you -- I mean, I don't want to get this kid --

42

1     **Q.  And Tony Zarlengo or Tony Brutti, do**
2 **you know?**
3     A.  Tony -- I think, Tony Zarlengo.
4     **Q.  Okay.**
5     A.  But like, yeah -- I mean, I really
6 don't want to -- I'd really rather not say his
7 name because the dude's really a good kid.
8 He's really young. You know what I'm saying?
9 So --
10     **Q.  This is a list of names that we've**
11 **gotten --**
12     A.  Okay. Let's see.
13     **Q.  -- and I just wondered if it was --**
14     A.  I can probably point to a name. I'm
15 not going to say anything. But, I mean,
16 like --
17     **Q.  Can you give me a number?**
18     A.  Yeah. I can point to a number. That
19 would be even better. Let's see his name.
20 It's got to be over here. Right there. Three.
21     **Q.  All right.**
22     A.  Number three.
23     **Q.  All right.**
24     MR. HUGHES: And just for the

43

1 record, this is Exhibit 29.
2     MR. McJESSY: Yeah.
3 BY MR. McJESSY:
4     **Q.  All right.**
5         **Anybody else that you've**
6 **spoken to?**
7     A.  No.
8     **Q.  Okay.**
9     A.  Nope.
10     MR. HUGHES: Kevin, before you move
11 on, I'm sorry, did he say number three?
12     MR. McJESSY: Three.
13     MR. HUGHES: Okay.
14 BY MR. McJESSY:
15     **Q.  All right.**
16         **We talked about your**
17 **subpoena.**
18         **Sir, what's the highest level**
19 **of education -- I'm going to take a step way**
20 **back.**
21     A.  Ah-huh.
22     **Q.  What's the highest level of education**
23 **you've received?**
24     A.  Junior college and trade school.

44

1     **Q.  Where did you go to junior college?**
2     A.  Joliet Junior College.
3     **Q.  And did you graduate from there?**
4     A.  No, sir.
5     **Q.  And where did you go to trade school?**
6     A.  Through the carpenters' apprentice
7 program.
8     **Q.  Excellent.**
9         **When did you go there?**
10     A.  2016 to 2020.
11     **Q.  All right.**
12         **Oh, you completed the**
13 **program?**
14     A.  Yes.
15     **Q.  All right.**
16         **Are you a member of a**
17 **union --**
18     A.  Yes.
19     **Q.  -- local?**
20     A.  Ah-huh.
21     **Q.  What local are you a member of?**
22     A.  272.
23     **Q.  Okay.**
24         **How long have you been a**

11 (Pages 41 to 44)

45

1    member of Local 272?
2        A.  Oh, since 1996.
3        Q.  Did you take welding -- oh, since
4    1996?
5        A.  Yes, sir.
6        Q.  But you went to the apprentice program
7    in '16?
8        A.  Oh, I'm sorry.  I'm sorry.  I
9    misspoke.  So I went to their apprenticeship
10   program 1996 to 2000.  Yes, sir.
11       Q.  Oh, okay.
12       A.  Yeah, my fault.
13       Q.  Oh, no worries.  That makes more
14   sense.
15       A.  Yeah, a lot more.
16       Q.  1996 to 2000?
17       A.  Yes.
18       Q.  And then -- so you've been a member of
19   Local 272 since 1996?
20       A.  Yes, sir.
21       Q.  All right.
22           Did you take welding classes
23   when you went to the carpenters' --
24       A.  No.

46

1        Q.  -- apprentice program?
2        A.  No, sir.
3        Q.  Okay.
4            Did you receive any
5    certifications as a result of going through the
6    program?
7        A.  Yes.
8        Q.  What certifications did you receive?
9        A.  I think, back then, it was like an
10   OSHA ten-hour.  I think we did scaffolding,
11   fall -- fall arrest or fall hazard.  I think
12   that was about it.
13       Q.  All right.
14           Still a member of Local 272?
15       A.  Yes, sir.
16       Q.  Have you been in good standing since
17   1996?
18       A.  Ah-huh.  Well, during the recession, I
19   stopped paying on my card for -- for a couple
20   years, but I reactivated it --
21       Q.  Okay.
22       A.  Yeah, so --
23       Q.  When you say "the recession," which --
24   which years?

47

1        A.  2009 through '13.
2        Q.  Okay.
3            Those years you might not
4    have been in good standing?
5        A.  Yeah, not -- maybe for like two of
6    those years, I would say, because I kept my
7    card for a while, and then I was finally
8    like -- yeah, so I would say like from -- I
9    would say probably 2011 to, maybe, 2013 I might
10   not have been in good standing.
11       Q.  Okay.
12           Other than that, the entire
13   time you were?
14       A.  Yes, sir.
15       Q.  And when did -- did you go -- did
16   you -- strike that.
17           Did you work for Midwest Dock
18   Solutions directly, like -- well, strike that.
19           When did you first go to work
20   for -- strike that.
21           What do you know the company
22   as?  You know it as Midwest Dock Solutions,
23   Dock & Door?
24       A.  We know it as both, but like the --

48

1    the face and branding of it is Midwest Dock.
2    We would show up in Midwest Dock, you know,
3    labeled trucks, but we all knew we were getting
4    paid from Dock & Door Install or whatever it
5    was.
6        Q.  Okay.
7        A.  Yeah.  So we all knew that.
8        Q.  Okay.
9            So when you were hired, the
10   first company you were paid through, was it
11   Dock & Door?
12       A.  Yes.
13       Q.  Okay.
14           So you were hired right in as
15   a union carpenter --
16       A.  Yes.
17       Q.  -- to work for Dock & Door?
18       A.  Yes.
19       Q.  Okay.
20           Are you aware that there's
21   some individuals who worked for Midwest Dock
22   Solutions, and then they started getting paid
23   by Dock & Door?
24       A.  Yes.

12 (Pages 45 to 48)

49

1     Q.  Okay.
2         Do you know who any of those
3 people are?
4     A.  Yes.
5     Q.  Who?
6     A.  The only person -- oh, yeah.  Well,
7 actually two.  I know Dave Green was working
8 with them during the recession and at the end
9 of the recession because he was -- like he
10 couldn't find a union job either, so he took --
11 he took whatever he could.  And then once the
12 economy started picking up, you know, and they
13 decided to go into union work -- you know, they
14 asked Dave, do you want to go back into it?
15 And then another guy was Don Cruikshank or
16 however you --
17     Q.  Cruikshank?
18     A.  Yeah.  However you say his name.  He
19 was a service guy, getting paid like $22 an
20 hour, you know.  And he worked with me and this
21 other kid one day because we were slow, and I
22 was like -- I told Mike.  I was like Don's
23 pretty good, like he's pretty good.  And then
24 he put Don into the union as well.

50

1     Q.  Okay.
2     A.  That's the only people I know.
3     Q.  And then Don started working with you
4 on -- more often on the --
5     A.  Yeah.  He did get in the union,
6 though.  He did.
7     Q.  Right.
8     A.  Ah-huh.  Yes.
9     Q.  Okay.
10         And -- all right.  Who hired
11 you?
12     A.  Mike Richert.  Mike Richert.
13     Q.  And how did that come about?
14     A.  My neighbor at the time was good
15 friends with him, and they were starting the
16 union side of the -- of the company.  And my
17 neighbor knew I was a good worker and
18 recommended me.
19     Q.  Okay.
20         And did you meet with Mike?
21 Did you talk to him on the phone?  How did
22 it -- do you remember exactly how you got
23 hired?
24     A.  Talked to him on the phone.  Yeah,

51

1 talked to him on the phone.
2     Q.  Okay.
3     A.  And then I -- and then I worked with
4 him for like the first couple weeks.  Well,
5 not -- yeah, I'd say the first two, three
6 weeks.
7     Q.  Alongside of him?
8     A.  Yes.
9     Q.  Okay.
10         So he did -- he actually did
11 door installation work?
12     A.  We were doing docks.
13     Q.  Okay.
14         Oh, that was my next
15 question.
16     A.  Yeah.
17     Q.  So you and he did dock work together?
18     A.  In the beginning, yes.
19     Q.  Installation of dock levelers?
20     A.  Yes.
21     Q.  All right.
22         Tell me, what kind -- what
23 kind of work did you do when you were working?
24     A.  For Midwest Dock?

52

1     Q.  Yeah.
2     A.  Strictly -- 90 percent of the time --
3 strictly installs.
4     Q.  Of what?
5     A.  Installs of overhead doors, rolling
6 steel doors, high-speed doors, loading docks.
7 That's pretty much it.
8     Q.  Okay.
9         What about -- let's see.
10
11         (WHEREUPON, the document marked
12         Plaintiff's Exhibit 3 for
13         identification was tendered to
14         the deponent.)
15
16 BY MR. McJESSY:
17     Q.  I'm going to show you what we've
18 marked as Exhibit -- I think, three.
19         Would you do -- install bug
20 barriers?
21     A.  Oh, yeah.
22     Q.  Would you install --
23     A.  Yeah.  Yes, sir.
24     Q.  I'm pointing at -- I'm looking --

13 (Pages 49 to 52)

53

1  we're looking at Exhibit 3, and there's a page
2  there that shows --
3      A.  Guardrail.
4      Q.  Guardrails?
5      A.  Yes, sir.
6      Q.  You installed those?
7      A.  Yes, sir.
8      Q.  There's a page there that shows door
9  operators.
10          Would you install those?
11      A.  Yes, sir.
12      Q.  There's a picture there that shows
13  Hormann high-speed doors.
14          Would you install -- is that
15  what you --
16      A.  Yes, sir.
17      Q.  Okay.
18          That's what you were
19  referring to?
20      A.  Yes, sir.  And that's -- that's a
21  steel rolling door.
22      Q.  Okay.
23          And we're looking at the
24  second page of Exhibit 3, and it says Cornell,

54

1  it looks like?
2      A.  Ah-huh.
3      Q.  Okay.
4          And that's a steel rolling
5  door?
6      A.  Ah-huh.
7      Q.  Is that a yes?
8      A.  Yes.  Yes.
9      Q.  Okay.
10          You'd install those?
11      A.  Yes.  That's an overhead door.
12      Q.  Okay.
13          That's Clopay?
14      A.  Yes.  Most of the time, it was Clopay.
15      Q.  Okay.
16          You installed those?
17      A.  Yes.
18      Q.  All right.
19          And install --
20      A.  Fire doors, too.  Traffic doors we
21  did.  Pedestrian doors as well.
22      Q.  Okay.
23          And how about -- oh, shoot --
24      A.  We had --

55

1      Q.  -- dock locks?
2      A.  Oh, yeah.  Dock lights.  Dock locks.
3      Q.  Dock lights.  That's the other one I
4  was trying to think of.
5          And then there's chock --
6      A.  Yeah.
7      Q.  -- chock blocks?  Is that what they're
8  called?
9      A.  Ah-huh.  Chock blocks, yeah.
10      Q.  Would you install those as well?
11      A.  Yes.
12      Q.  Okay.
13          That was all work that you
14  did?
15      A.  Yes.  We also did -- also, we did like
16  scissor lift -- scissor lift installs, which is
17  like a -- say, it's like a 10 by 10 steel
18  plate, and you had to raise something up six
19  feet or eight feet or like sometimes a computer
20  floor, raise them up three feet, so -- or even
21  a truck could back up to them.  But it's just
22  a -- a steel plate that raises elevation just
23  by -- you know, like scissoring up.
24      Q.  Right.  I understand.

56

1      A.  Like a regular scissor man lift, yeah.
2      Q.  Is that installed at a dock, or is
3  that installed inside the building?
4      A.  Sometimes they're installed outside.
5  A lot of times they're installed inside.
6      Q.  Okay.
7          Any other kind of work you
8  can think that you did?
9      A.  We did vertical docks, which, I mean,
10  basically is a dock.
11      Q.  Same thing?  Similar, right?
12      A.  Yeah.  Food warehouses.  Yeah.  We did
13  like inflatable dock seals like for -- on the
14  side of railroads.
15      Q.  Okay.
16      A.  Ah-huh.  So --
17      Q.  How about dock canopies?
18      A.  Yeah.  Ah-huh.
19      Q.  Okay.  All right.
20          Anything else you can think
21  of?  That's quite a lot.
22      A.  Yeah.  We did a lot.  What else?  Oh,
23  shelters.  I mean, dock seals, dock shelters,
24  soft shelters.  Yeah, dock, all kinds of that stuff,

14  (Pages 53 to 56)

57

1  too.
2      Q.  Okay.
3          And when you worked with Mike
4  Richert -- you said, when you started out, you
5  were hired by him.  And you worked with him for
6  about two weeks, correct?
7      A.  Yes, sir.
8      Q.  Okay.
9          And what -- was the only work
10 that you did with him dock levelers?
11     A.  We did some -- we -- no.  We did some
12 service calls on docks.
13     Q.  Okay.
14     A.  We did one or two high-speed doors.
15 We did, probably, 10 dock doors.  I'm not sure
16 on the number, but we did some dock doors.  It
17 was just like he was just training me, like
18 showing me the ropes.
19     Q.  Okay.
20          Had you done that kind of
21 work before starting there?
22     A.  No.
23     Q.  All right.
24          What -- what was your

58

1  experience prior to that?
2      A.  Framer.  Rough framer.  House -- new
3  construction, house framing, yes.
4      Q.  Okay.
5          Had you done welding before?
6      A.  Before that?  No.
7      Q.  Okay.
8          So how did you learn welding?
9      A.  Pretty much from Mike.
10     Q.  Oh, he taught you?
11     A.  Yes, sir.
12     Q.  Okay.
13          Was he a pretty good welder?
14     A.  Yeah.
15     Q.  All right.
16          And did he -- when you
17 worked -- when you worked there, did he also
18 do -- did he work on job sites with you?  Other
19 than the ones --
20     A.  Only in the beginning.  Maybe for like
21 the first six months.  After that, he was a
22 ghost.  He was always a ghost after that.
23     Q.  You didn't see him around.
24     A.  Never.

59

1      Q.  Okay.
2      A.  Unless -- after hunting season,
3  whatever -- whatever season or fishing season
4  it was, when it was over, he would show up at
5  the shop and like bust everybody's -- you know,
6  like -- you know.  And then it would be like
7  for a month, and then you'd just put up with
8  it.  And then you wouldn't see him for like
9  another six months or that, yeah, so --
10     Q.  He's a big hunter, I'm guessing?
11     A.  Yeah, he is.  Yeah.
12     Q.  I'm starting to get the feel.
13     A.  He's an all right dude.  He's an all
14 right dude.  I mean --
15     Q.  Yeah.
16     A.  -- he's just got an ego.
17     Q.  All right.
18          And then did you have any
19 sort of formal title at -- at the company or
20 no?
21     A.  I mean, I consider myself to be a
22 foreman.
23     Q.  Okay.
24          You -- and what does that

60

1  mean?
2      A.  That just means somebody calling the
3  shots, bringing the tools, driving the trucks,
4  the one in charge, the one that has to be
5  responsible at the end of the day.
6      Q.  Okay.
7          And who -- who are the people
8  that had trucks?
9      A.  Me, Dave Green -- at the time I was --
10 when I was working there, it was me, Dave
11 Green, Don, and then the service guys pretty
12 much, so that would be like John Sparr, Mike
13 Strazz, Rick.
14     Q.  Is it Rick Mantoan?
15     A.  No.
16     Q.  Oh.
17     A.  Rick Mantoan?
18     Q.  Yeah.
19     A.  No.  That's just a guy that lives
20 behind Mike from what I know.
21     Q.  Is there a guy named R. J.?
22     A.  Yeah.  That's Rick -- yeah, that's
23 Rick Mantoan's son.
24     Q.  Oh, okay.

15 (Pages 57 to 60)

61

1    **And how about R. J.?**
2    A.   I don't -- I've seen him on the job
3    site.  And that kid number three, he's been
4    like, oh, R. J. wants to come and like chop
5    down trees, too, and stuff.  So I never -- but
6    I've done work on the side, you know, on a
7    Saturday or something, like helping him build
8    his deck and stuff like that.  So I know Rick.
9    I know Rick, yeah.
10   **Q.   All right.**
11   A.   But, no, Rick -- there's another
12   employee named Rick that works there, and he
13   still works there.
14   **Q.   Okay.**
15       **And he had a truck?**
16   A.   Yeah, his -- yeah, but it's not Rick
17   Mantoan.
18   **Q.   Okay.**
19       **Anybody else you can think of**
20   **that had a truck?**
21   A.   At the time I worked there?
22   **Q.   Yeah.**
23   A.   Tom Donnelly, he had a truck.  I mean,
24   the guy, Jake Rodgers, had a truck.  Jake.

62

1    Yeah, it was Jake, me, Dave, Don.  And then the
2    other guys on the service side was Mike Strazz,
3    Rick, Tom Donnelly, John Sparr, when I worked
4    there, when I was fired, yeah.
5
6        (WHEREUPON, the document marked
7         Plaintiff's Exhibit 6 for
8         identification was tendered to
9         the deponent.)
10
11   BY MR. McJESSY:
12   **Q.   All right.**
13       **And if you take a look at**
14   **what's been previously marked as Exhibit 6, is**
15   **that -- I'm going to show you -- actually, I'm**
16   **going to show you -- the truck that's shown**
17   **there, is that a truck like the one you drove?**
18   A.   No.  Uh-uh.
19   **Q.   What was your truck like?**
20   A.   The truck I was driving -- let me
21   think.  Well, wait a second.  I'm going to have
22   to go back for that.  I drove many trucks, but
23   I'm trying to think about the first truck I had
24   when I worked there.  Okay.  At first -- I'm

63

1    trying to think which trucks they had me in.
2        Okay.  At first, I was
3    swapping trucks, whatever truck they told me to
4    go in.  So it could have been this truck.  It
5    could have been the crane truck, which kind of
6    looks like this.
7    **Q.   Ah-huh.**
8    A.   And that was about it.  So I was
9    driving the crane truck or one of these like
10   flatbed trucks in the beginning.
11   **Q.   Did it say Midwest Dock Solutions --**
12   A.   Yes.
13   **Q.   -- on the side?**
14   A.   Yes.
15   **Q.   Okay.**
16       **And then -- and then, I take**
17   **it, it changed over time?**
18   A.   Yes.  Then I drove a bucket truck with
19   like a service body.  It was just like --
20   **Q.   What's a bucket truck?**
21   A.   It has a -- a bucket that telescopes,
22   so --
23   **Q.   Oh, okay.**
24   A.   -- it kind of goes up like 20 feet.

64

1    So if you want to change springs -- or you can
2    install doors off of it, too -- instead of
3    using a ladder or instead of having to go to
4    into the rental place or bringing your own
5    scissors lift or renting one, you already
6    pretty much have your lift on the back of the
7    truck.
8    **Q.   Okay.**
9    A.   Like you see, like, the electrician
10   guys.
11   **Q.   I was going to say similar to what you**
12   **see the utility people use?**
13   A.   Yes.  Exactly.
14   **Q.   Okay.**
15   A.   So I drove one of those for a while.
16   I drove a Ford Sprinter for a long time.
17   **Q.   Is that a -- what kind of truck is**
18   **that?**
19   A.   A Ford van.
20   **Q.   Okay.**
21   A.   It looks like -- you know, like a
22   European van.
23   **Q.   Did that say Midwest -- Midwest Dock**
24   **Solutions on it?**

16 (Pages 61 to 64)

65

1    A.  No.  That one didn't.
2    Q.  Okay.
3            The van was just a plain van?
4    A.  Yes.
5    Q.  Was there a white van?
6    A.  Yes.
7
8            (WHEREUPON, the document marked
9            Plaintiff's Exhibit 15 for
10           identification was tendered to
11           the deponent.)
12
13   BY MR. McJESSY:
14   Q.  Okay.
15           Was it -- was the van -- did
16   it look something like the one that's shown in
17   Exhibit 15?
18   A.  Yeah.  That's it, yeah.
19   Q.  Okay.
20           And then I'm going to show
21   you what we've previously marked today as
22   Exhibit 31.
23   A.  Okay.
24   Q.  Which is four pictures and -- which is

66

1    another truck that looks like the one I showed
2    you a few minutes ago, but this one you'll see
3    doesn't have a name on the door.
4    A.  Ah-huh.
5    Q.  It's just a truck.
6    A.  Ah-huh.
7    Q.  And I'll represent to you that that
8    truck was driven here by Mr. Green.
9    A.  Okay.
10   Q.  That's out front.
11   A.  Yeah, it is.  Yeah.
12   Q.  So does that look like a truck that --
13   do you remember trucks without the name on the
14   door?
15   A.  Ah-huh.
16   Q.  Okay.
17           So they had trucks like that,
18   too?
19   A.  Ah-huh.
20   Q.  Is that a yes?
21   A.  Yes.  I'm sorry.  Yeah.  Yes.  Yes,
22   sir.
23   Q.  Okay.
24           And would you sometimes drive

67

1    a truck like that that didn't have a name on
2    the door?
3    A.  Yes.
4    Q.  Okay.
5    A.  For -- I would say -- I would say for
6    like -- I don't think like the bucket truck was
7    lettered.  I know -- I know the van wasn't
8    lettered.  The service body truck I was driving
9    at the end, it was, though, lettered up --
10   Q.  Okay.
11   A.  -- which was Dave Green's old truck
12   before -- when he -- he quit for a while, and
13   I -- and I received his truck.
14   Q.  Okay.
15   A.  But that was lettered up.
16   Q.  And when you say "lettered up," it
17   was -- it had the name, Midwest Dock Solutions,
18   on it?
19   A.  Yes, sir.
20   Q.  There were no trucks -- strike that.
21           Were there any trucks that
22   had Dock & Door Installs on the side?
23   A.  No, sir.
24   Q.  Okay.  All right.  All right.

68

1            Once you were hired -- and
2    what do you -- I'm sorry.  What do you refer to
3    the company as?  Do you refer to it as Midwest?
4    A.  Yeah.
5    Q.  Okay.
6            So when -- when you were
7    hired by Midwest, how would you get your job
8    assignments day to day?  How did you know where
9    you were going?
10   A.  Tony Zarlengo.
11   Q.  Okay.
12           And he would give you your
13   job assignments?
14   A.  Yes, sir.
15   Q.  And what would he tell you?
16   A.  He would say -- he would say, in the
17   beginning, take -- come to the shop, take this
18   truck, pick up Jose or Nico, and -- and load
19   up -- load up.
20   Q.  Would he tell you what to load?
21   A.  Oh, yeah.
22   Q.  Okay.
23   A.  Oh, yeah.  I mean, he -- he even
24   had -- he had -- I'm sure he still does.  He

17 (Pages 65 to 68)

69

1 has cameras in the shop. So he would be
2 texting us, like what's going on? It's taking
3 too long to load. You guys should be out of
4 there. So, yeah, I mean, he knew what was
5 going on. Yeah, I mean -- and I received all
6 of my work assignments from Tony Zarlengo. I
7 mean, yeah, yeah. All of the time.
8    Q. So he would tell you what -- so would
9 he tell you what you were going to be
10 installing?
11    A. Oh, yeah.
12    Q. Like you're installing a lot of
13 different stuff?
14    A. Oh, yeah.
15    Q. So you need to know what you're going
16 to be installing every day, I take it?
17    A. Yes.
18    Q. Okay.
19        And so he would tell you
20 where you were going and what you were going to
21 be installing?
22    A. Yes, sir.
23    Q. Okay.
24        And I take it -- my

70

1 understanding is, with really large jobs, the
2 materials are delivered to the job site?
3    A. Yes.
4    Q. Is that --
5    A. Yes, sir.
6    Q. -- accurate?
7    A. Yes.
8    Q. And smaller jobs you might have to
9 pick stuff up from the warehouse and take it
10 there?
11    A. Yes. Most definitely, yes.
12    Q. Okay.
13        And anybody come to the job
14 sites to check on you? Anybody from Midwest, I
15 mean? Not from like the general contractor.
16    A. To come check on us? Yes.
17    Q. Who would come to the job sites?
18    A. Occasionally, Mike. Occasionally,
19 Tony.
20    Q. When you say "Tony," Tony Zarlengo?
21    A. Tony Zarlengo and probably -- Tony
22 Brutti, probably, like the most, would because
23 he might be delivering something or something
24 like that.

71

1    Q. Okay.
2    A. Ah-huh.
3    Q. So he would be at the job site, too?
4    A. Tony Brutti?
5    Q. Yeah.
6    A. Yes. He would even -- I mean, he
7 would -- he would unload. His job was
8 supposedly to unload the semis with the dock
9 levelers, so he would always be doing that. So
10 when we showed up on a job, most of the time
11 the dock levelers would be in the pits because
12 he was out there putting them in there.
13    Q. Okay.
14        And then it was your job to
15 weld them into place?
16    A. Ah-huh.
17    Q. Is that a yes?
18    A. Yes. Yes. Yes, yes, yes.
19    Q. All right.
20        So would he -- I take it
21 that -- well, strike that.
22        How are the dock levelers
23 unloaded?
24    A. They are unloaded off a semi-truck

72

1 with either a fork truck -- a fork lift or like
2 some kind of bigger articulating, telescoping
3 forklift, what they call a Pettibone or a Wall.
4 Those are just like brand names.
5    Q. Ah-huh.
6    A. But it's like a big -- big forklift
7 that pretty much telescopes.
8    Q. Got it.
9    A. Ah-huh.
10    Q. And so he would be out there doing
11 that?
12    A. Yes.
13    Q. Okay.
14        How about unloading trucks
15 with overhead doors?
16    A. Yes. He would be doing that, too.
17 That was kind of like his job, was like to
18 unload.
19    Q. Okay.
20    A. Yes.
21    Q. Did you consider him your boss?
22    A. No. No. Not at all.
23    Q. Okay.
24        Who -- who did you consider

18 (Pages 69 to 72)

73

1  your boss?
2    A. Mike and Tony.
3    Q. Okay.
4        And Tony, you mean Zarlengo?
5    A. Zarlengo.
6    Q. Okay.
7        There's two Tonys, so I just
8  want to be clear.
9    A. Yeah.
10   Q. Or there's three Tonys?
11   A. Yeah, yeah.
12   Q. All right.
13       And, let's see. How about
14 Ira Sugar?
15   A. Yeah.
16   Q. Would he come out to the job site?
17   A. No.
18   Q. No?
19       Do you know somebody named
20 Janie?
21   A. I think that was a secretary.
22   Q. Okay.
23       You don't remember -- do you
24 remember somebody named Janie delivering things

74

1  to the job site?
2    A. No. Not at all.
3    Q. Not while you were there?
4    A. No. That might have been like -- I
5  think they still have a female employee. That
6  might have been her. But I think I was
7  terminated by that time.
8    Q. All right.
9        Do you remember Sherri
10 Webber?
11   A. That was the secretary.
12   Q. All right.
13       I was going to ask if you
14 knew what she did.
15   A. No.
16   Q. No?
17   A. No.
18
19       (WHEREUPON, the document marked
20       Plaintiff's Exhibit 33 for
21       identification was tendered to
22       the deponent.)
23
24

75

1  BY MR. McJESSY:
2    Q. Let's go back to the Exhibit 33, which
3  was -- Exhibit 33.
4        When you started there,
5  how -- when you first started working for
6  Midwest, how did you report your time, your
7  hours?
8    A. I recall texts.
9    Q. All right.
10       You'd text your hours in?
11   A. Yes, sir.
12   Q. And who would you send them to?
13   A. I can't really recall that, to be
14 honest. I think -- I'm not a hundred percent
15 sure. But from what I can remember, Tony
16 Brutti. And I thought we were supposed to give
17 those time sheets you showed me to Tony Brutti
18 as well. I think we did text Tony Brutti.
19   Q. All right.
20       So -- and at some point, you
21 started filling out time sheets, correct?
22   A. Yes.
23   Q. All right.
24       And what we've marked as

76

1  Exhibit 33, I'll represent to you that these
2  are documents that were produced to us in this
3  case by Dock & Door.
4    A. Ah-huh.
5    Q. And do these look like the time sheets
6  you filled out?
7    A. I mean, like this -- like this looks
8  like my handwriting right here, but this
9  doesn't.
10   Q. Okay.
11       So which date are you on?
12   A. Well, I seen it here, too. This --
13 that looks like my handwriting.
14       Okay. That may be -- that
15 might be like Tony Brutti or somebody writing
16 it. I mean, that's my handwriting there.
17   Q. Okay.
18       So we're looking at a page
19 dated 8/15/2019?
20   A. Yeah.
21   Q. And -- and you're saying the first
22 entry -- 8/15 -- it looks like your handwriting
23 where it says Tony T., and then it's got
24 8/21/19?

19 (Pages 73 to 76)

77

1    A.  Yes, sir.  That looks look my
2  handwriting.  Ah-huh.
3       **Q.  How about underneath that where it**
4  **says loaded and unloaded shelters?**
5    A.  Yes.  That's my handwriting.
6       **Q.  But the name that's handwriting there**
7  **and the -- and the date above, that looks like**
8  **it's somebody else's handwriting; is that**
9  **right?**
10   A.  Yes.
11      **Q.  Okay.**
12   A.  And like right here, this whole page
13 really doesn't look like --
14      **Q.  What's the date on that page, the top**
15 **of that page?**
16   A.  8/22/19.
17      **Q.  Okay.**
18   A.  To 8/28/19.
19      **Q.  Okay.**
20          **None of that looks like your**
21 **handwriting?**
22   A.  No.
23      **Q.  Okay.**
24   A.  Uh-uh.

78

1          And then like right here --
2       **Q.  What date?**
3    A.  8/8/19 to 8/14/19.
4       **Q.  Okay.**
5    A.  That's definitely not my handwriting
6  right there.  Definitely not.  I know that for
7  a fact.
8       **Q.  Okay.**
9    A.  This might be.  My name right there
10 might be.  And, no, that doesn't -- that's not
11 even -- I don't even think that's my
12 handwriting either right there, to be honest,
13 because --
14      **Q.  Okay.**
15          **So it looks like somebody**
16 **filled out a page with your hours on it?**
17   A.  Yeah.  Most definitely.
18      **Q.  All right.**
19   A.  And, I mean, what else is on here?
20      **Q.  All right.**
21   A.  Like all of these -- all of these ones
22 that like don't have any lines on them --
23      **Q.  Ah-huh.**
24   A.  -- that don't look like --

79

1       **Q.  That don't look like a form?**
2    A.  Right.  Those all look bogus.
3       **Q.  All right.**
4          **Well, somebody else -- or**
5  **somebody took your information and wrote it**
6  **down?**
7    A.  Maybe.
8       **Q.  Yeah.**
9    A.  Possibly.
10      **Q.  All right.**
11          **But the ones that are --**
12 **let's -- let's focus on the ones that are**
13 **filled out that are like a form sheet.**
14   A.  All right.
15      **Q.  Okay.**
16          **Do you recall there started**
17 **to be a time where they had these forms**
18 **available for you to fill out?**
19   A.  Yes.
20      **Q.  And does that -- I think the first one**
21 **here is June 2019.**
22          **Does that sound about right**
23 **as to when they might have started with these**
24 **time sheets?**

80

1    A.  Yeah.
2       **Q.  Was it fairly close to the time you**
3  **left?**
4    A.  Yes, sir.
5       **Q.  Okay.**
6          **And where would you get the**
7  **time sheets?**
8    A.  From the office.
9       **Q.  Okay.**
10          **And --**
11   A.  The shop.  The office shop.
12      **Q.  Okay.**
13          **Were they just there for you**
14 **to pick up?**
15   A.  Ah-huh.  Yes.
16      **Q.  Okay.**
17          **And where did you return them**
18 **to?**
19   A.  Back to the slop.
20      **Q.  Okay.**
21          **Was there like a basket or**
22 **something?**
23   A.  Yes.  Yes.
24      **Q.  Okay.**

20  (Pages 77 to 80)

81

1 And it looks like, at least,
2 maybe on one occasion -- there's a page in
3 here. It's blue. It looks like it might have
4 been a screenshot of -- of a time sheet.
5 Would you ever like take
6 pictures of them and send them to somebody --
7 A. No.
8 Q. -- or you don't recall that?
9 A. I do not recall that at all.
10 Q. Okay.
11 A. I just -- yeah. I just learned how to
12 do a screenshot like, maybe, three years ago.
13 Q. Oh.
14 A. For real, right? Well, maybe longer
15 than that. But, seriously, I was not doing
16 screenshots on this -- like, no.
17 Q. Okay.
18 So -- all right.
19 And if you could turn to the
20 third page of this document, there's a time
21 sheet there that's dated September 5, 2019?
22 A. Yes.
23 Q. And it says installed remaining docks
24 and welded bumpers.

82

1 Do you see that?
2 A. Yes, sir.
3 Q. And the one below that says welded 27
4 sets of bumpers and over --
5 A. Anchored them.
6 Q. Anchored them. Thank you.
7 A. Yes, sir.
8 Q. I take it -- the welding equipment, I
9 take it, was on the truck that you had?
10 A. Yes.
11 Q. What kind of welding equipment was it?
12 A. It was a -- most of the time, it was
13 like a Trailblazer or a Bobcat welder with --
14 with the leads, you know.
15 Q. Is that gas or electric?
16 A. It's electric. It's -- or, no. I'm
17 sorry, no. It's gas powered, but it
18 produces -- it's a generator and a welder, but
19 it is gas powered.
20 Q. Oh, I see. But it is an electric
21 weld?
22 A. It's a stick weld. So, yeah, it's
23 using electric, yes. Yes, it is.
24 Q. It's not like -- I'm thinking it's

83

1 probably not right, but like --
2 A. The gas one?
3 Q. Yeah, where you've got the -- you
4 know, the torch with the rods.
5 A. No. No. Uh-uh.
6 Q. It's not like that?
7 A. You do have a stick, which melts the
8 two pieces that you're trying to join.
9 Q. Okay.
10 A. But it's not the -- like argon gas
11 one.
12 Q. Yeah. That's what I was thinking.
13 A. Ah-huh. No.
14 Q. It's an electric --
15 A. Yes.
16 Q. -- process?
17 A. Yes, sir.
18 Q. And the company provided you with that
19 welder?
20 A. Yes.
21 Q. Okay.
22 How much of the work you did
23 involved welding?
24 A. Fifty percent.

84

1 Q. Fifty percent?
2 A. We would also attach like steel
3 rolling doors by welding a lot of the times.
4 Q. Okay.
5 Would the -- could those be
6 attached other ways?
7 A. Yes.
8 Q. How else would they be attached?
9 A. You could attach them with like a --
10 you could thread -- you could like go with a
11 threaded rod and bolt, like if it's an old
12 building or something. You can use concrete
13 anchors. You can use bolt -- thread holes and
14 put bolts -- you know, tap bolts. If you're
15 attaching to steel, you can either weld or use
16 tap bolts, which is pretty much drilling a
17 hole, threading it, and then just screwing in a
18 bolt.
19 Q. Okay.
20 Would you do that -- those
21 kind of installations?
22 A. Yes.
23 Q. Okay.
24 And let me -- you did a lot

21 (Pages 81 to 84)

85

```
1    of installations on new construction buildings?
2        A.  Yes, sir.
3        Q.  All right.
4               Did you also do installations
5    on older buildings?
6        A.  Yes, sir.
7        Q.  All right.
8               And would the installations
9    involve taking out old stuff and putting in new
10   stuff?
11       A.  Yes, sir.
12       Q.  All right.
13              And that was part of the work
14   you did --
15       A.  Yes, sir.
16       Q.  -- for Dock & Door?
17       A.  Yes, sir.
18
19              (WHEREUPON, the document marked
20              Plaintiff's Exhibit 19 for
21              identification was tendered to
22              the deponent.)
23
24
```

86

```
1    BY MR. McJESSY:
2        Q.  All right.
3               And I'm looking at Exhibit 19
4    in front of you there.  It looks to be a --
5    some sort of -- what would you -- how would you
6    describe the building that's shown in that
7    picture?
8        A.  Oh, a big box.
9        Q.  Okay.
10              You used that term earlier.
11       A.  Yes, sir.
12       Q.  So would you do a lot of installations
13   in big box stores, locations like that?
14       A.  Yes.  Most of -- most of -- most of
15   the installs, a lot of them was in big boxes.
16       Q.  Okay.
17              That would be most of the
18   work you were doing?
19       A.  Yes.  Yes.  Pretty much all of it.  We
20   wouldn't even -- like we wouldn't like say this
21   big box had -- all of these doors had like, you
22   know, electric operators, door opener/closers.
23   Like we wouldn't even do that because he would
24   send in the other guys later.  We might hang
```

87

```
1    the operators.  But we would not wire them,
2    like the low voltage, because all of the time
3    it's a thing with the electricians.  Like some
4    of the electricians are like, oh, it's not in
5    the scope.  And other guys are like it is.
6    It's a gray area.  But the low voltage -- the
7    low voltage, a lot of times the carpenters do
8    it for door companies, so like -- but we would
9    never do the low voltage.  I didn't even know
10   how to wire an operator.  I worked there four
11   years.  I was never like really showed how to
12   wire an operator because the other -- the other
13   side, the nonunion guys would come in and do
14   it.  You know what I'm saying?  But like --
15       Q.  Okay.
16              How do you know that?
17       A.  Huh?
18       Q.  The other nonunion guys from Midwest?
19       A.  Yes.
20       Q.  How do you know that?
21       A.  Because we never did.
22       Q.  Well, how do you know they were the
23   ones who did it instead of like somebody else?
24       A.  Because, I mean, everybody knew
```

88

```
1    because they would be like, oh, we were at --
2    we were at that big box, and you -- you don't
3    know how to put on -- you don't know how to put
4    on operators?
5        Q.  Oh, they were just saying they were --
6        A.  Oh, yeah, yeah.  And that's the only
7    time you would ever even hear.  Like if you
8    made some kind of mistake, like Tony or Mike,
9    they would never even call you and be like,
10   hey, maybe next time do this.  You would just
11   hear it through the grapevine, from like the
12   service guys.  Oh, you went over there and, you
13   know -- you know, like --
14       Q.  And they had to come in and finish it
15   for you?
16       A.  Oh, yeah, yeah, yeah.  So -- but
17   like -- but the second company I worked for as
18   a door installer, I learned like all kind of
19   stuff because he let -- you know, he didn't
20   have a half-breasted company, so like all of
21   the carpenters were doing was setting limits,
22   adjusting docks, doing the finals, you know.
23   So it's like how can -- how can -- how can this
24   guy compete when this guy is sending dudes for
```

22 (Pages 85 to 88)

89

1  one-third of the price?
2  **Q. The nonunion guys.**
3  A. Yeah, like what? It's -- like we get
4  paid -- like our package is like $82, $85 an
5  hour, so how can you -- how can you compete?
6  How can another company compete? I mean, I get
7  it. You've got to make money, but like, yeah,
8  when you're going to send -- send these guys in
9  for twenty-five --
10  **Q. Who's the company that you -- and by**
11  **twenty-five, you mean the guys working for**
12  **Midwest?**
13  A. Yes, the nonunion.
14  **Q. The nonunion guys?**
15  A. Yeah. So, I mean, you're paying them
16  one-third of the price.
17  **Q. Okay.**
18  **And you knew the guys working**
19  **for Midwest, the nonunion guys, were making**
20  **less than you?**
21  A. Oh, yeah.
22  **Q. Okay.**
23  **Do you know, did they have**
24  **fringe benefits?**

90

1  A. Oh, not at first.
2  **Q. Okay.**
3  **Did they before they left?**
4  A. From what -- from what I was told,
5  they had medical.
6  **Q. Okay.**
7  A. Yes.
8  **Q. And who told you that?**
9  A. That was just like word on the street,
10  in the shop. I'm not sure who I heard it from.
11  **Q. Okay.**
12  **And who did you go work for**
13  **after Midwest?**
14  A. House of Doors.
15  **Q. Okay.**
16  **And is that a union company?**
17  A. Yes, sir.
18  **Q. They do commercial installation?**
19  A. Yes, sir.
20  **Q. They do dock leveler work?**
21  A. Yes, sir.
22  **Q. You said you learned more.**
23  **You're doing the same work**
24  **plus, I take it?**

91

1  A. Right.
2  **Q. Okay.**
3  A. Ah-huh.
4  **Q. When you started working for Midwest,**
5  **where were they located, do you recall?**
6  A. Off of Sauk Trail.
7  **Q. Was it Steger?**
8  A. No. It was -- I think it was
9  considered -- no. I think it was considered
10  South Chicago Heights.
11  **Q. Okay.**
12  A. The shop they're -- the shop they're
13  in now is in Steger.
14  **Q. Okay.**
15  **So was it Holeman Avenue in**
16  **South Chicago Heights? Does that sound right?**
17  A. Yeah. Ah-huh.
18  **Q. That's where you started?**
19  A. Yes, sir.
20  **Q. Okay.**
21  **Can you describe what that**
22  **facility was like?**
23  A. It was probably -- probably, I'd say,
24  a thousand square feet warehouse with one

92

1  back-end loading dock for semis --
2  **Q. Okay.**
3  A. -- with a little fenced-in yard and a
4  side parking area.
5  **Q. All right.**
6  **And they would -- did it have**
7  **office space?**
8  A. It did in the front.
9  **Q. Do you know who worked in the office?**
10  A. Tony.
11  **Q. Tony? Which Tony?**
12  A. Tony Zarlengo, Tony Brutti -- Tony
13  Zarlengo -- Mike.
14  **Q. And Mike Richert?**
15  A. Ah-huh.
16  **Q. Okay.**
17  **Is that a yes?**
18  A. Yes.
19  **Q. Okay.**
20  A. Yes.
21  **Q. And anybody else that you can think**
22  **of?**
23  **Was Sherri Webber there,**
24  **then?**

23 (Pages 89 to 92)

93

1    A.  No.
2    Q.  Okay.
3        And then do you remember
4  when they moved to Steger?
5    A.  Yes, I remember.  I don't remember the
6  dates, but I totally remember --
7    Q.  Okay.
8    A.  -- because we were -- yeah.
9    Q.  Did you help with the move?
10   A.  Yes.
11   Q.  All right.
12       And can you describe the
13 Steger facility to me?
14   A.  I would say it's probably about, you
15 know, 2,000 square feet, two -- two drive-in
16 doors so you can kind of make like a U.  You
17 can drive in from one door, grab what you need,
18 and then drive out the other door.  It had a
19 break room, bathroom, shower, and then the
20 front office.
21   Q.  Okay.
22       And who worked in the office
23 there?
24   A.  It was -- when I left, it was Ira,

94

1  Tony Zarlengo, Tony Brutti, Sherri.  Jimmy
2  Kelly was there for a long time, but he kind of
3  got terminated, maybe, a couple months before I
4  did, maybe.  So he was working up there, too,
5  at a point.
6    Q.  He was working in the office?  That's
7  your recollection?
8    A.  Yeah.  Yeah, for a while.  Joe
9  Sheridan, too.  Oh, wait.  Joe -- oh, wait,
10 wait.  I'm sorry.  I'm sorry.  Man, the
11 first -- the first time -- when I first got
12 hired, we were in a shop in Crete off of
13 Burville Road.
14   Q.  Okay.
15   A.  Yes.
16   Q.  That was the first -- so you were at
17 the first location?
18   A.  Yeah, I'm sorry.  Yeah.  Yeah.
19   Q.  All right.
20       And did you help move to the
21 Holeman Avenue location?
22   A.  No.
23   Q.  Okay.
24       Were you there when they

95

1  moved to the Holeman Avenue location?
2    A.  Yes.
3    Q.  Okay.
4        But you just didn't help with
5  the move?
6    A.  No, sir.
7    Q.  All right.
8        And -- all right.
9        Anybody else you can recall
10 that worked in the office at the Steger
11 facility?
12   A.  I don't know if Joe -- I don't know if
13 Joe Sheridan was working at the -- at the
14 Steger facility, but --
15   Q.  Where do you think he was working?
16   A.  Well, I know he was working at the
17 first -- the first location.
18   Q.  In Burville?
19   A.  Ah-huh.  And I know he was working at
20 the second location.
21   Q.  Okay.
22   A.  Ah-huh.
23   Q.  What did he do?
24   A.  Joe?  He was -- he was a salesman on

96

1  the union side, so I think he just went on
2  Dodge reports and like construction -- bid
3  construction or whatever.  Just threw out bids.
4    Q.  Okay.
5    A.  Ah-huh.  Salesman.
6    Q.  All right.
7        And what -- what was your
8  understanding of what Ira did?
9    A.  After Joe Sheridan was terminated, he
10 took -- he took job -- salesmen on the union
11 side.
12   Q.  Okay.
13       And what is your
14 understanding of what Tony Zarlengo did?
15   A.  Ran everything.
16   Q.  Okay.
17       And what is your
18 understanding of what Mike Richert did?
19   A.  Muscle.
20   Q.  What's that mean?
21   A.  It means he dealt with the guys in the
22 field.
23   Q.  Okay.
24   A.  Yes.  Or if Tony didn't know how

24 (Pages 93 to 96)

97

1  something was going to be installed or like how
2  are we going to do this, because Mike worked in
3  the field for a long time, so everybody --
4  yeah, when there was some kind of problem or
5  something, Tony was like -- you know, like --
6  yeah, Tony would call Mike, and it was totally
7  obvious, you know, like --
8  **Q. That Mike knew more of the technical**
9  **stuff?**
10  A. More of the technical stuff, but more
11  like disciplining people or like with
12  employees, conflict with employees, or
13  production. So like if -- like one time I
14  drove the truck because it had GPS. I drove
15  the truck somewhere on a Saturday to use it.
16  And, you know, Tony Zarlengo is the one
17  watching it, but it's my -- but Tony calls Mike
18  to get on me because he's like the muscle.
19  **Q. I see what you're saying.**
20  A. Because -- yeah, because Tony's like
21  nimble and like -- you know, like business --
22  like, you know, what I'm saying? And like
23  Mike -- yeah, he'll tell you. Yeah, he's not
24  afraid to like, you know, get in your face or

98

1  tell you how it is. Do you want to work here
2  or get fired? You've got to do this, you know.
3  So he was the muscle.
4  **Q. I understand what you mean. Okay.**
5  A. Ah-huh.
6  **Q. He was the disciplinarian, shall we**
7  **say?**
8  A. Yeah.
9  **Q. Okay.**
10  A. Yes, sir. Ah-huh.
11  **Q. And then how about Tony Brutti?**
12  A. He sat in the office and shot flies
13  with that little salt gun.
14  **Q. With a little what?**
15  A. Like you ever see that -- like it
16  looks like a little gun? It shoots like a
17  blast of salt, and you're supposed to like kill
18  the flies.
19  **Q. Oh, no.**
20  A. Yeah. Like everybody knew he didn't
21  do nothing. Everybody knew -- everybody knew
22  he was the -- the face or the -- or straw man
23  or whatever you want to call it.
24  **Q. Okay.**

99

1  A. Ah-huh. Everybody knew that.
2  **Q. All right.**
3  Salt -- salt, s-a-l-t, gun?
4  A. Yeah. Ah-huh.
5  **Q. All right.**
6  Oh, Sherri Webber. What did
7  she do?
8  A. Worked in the office.
9  **Q. Okay.**
10  Just general administrative
11  stuff?
12  A. From -- from what I know, yes.
13  **Q. Okay.**
14  You weren't familiar with
15  what she did specifically?
16  A. No, sir.
17  **Q. Okay.**
18  You don't happen to recognize
19  that project, do you? Exhibit 19.
20  A. If I was to say, it kind of looks like
21  the building off of 355, I would say, on the
22  east side of 355 approximately -- I would say
23  approximately four to five miles north of I-80.
24  Maybe Lemont. I would say Lemont.

100

1  **Q. Okay.**
2  You don't recall what the
3  name of the project might have been if it's the
4  one you're thinking of?
5  A. No, sir.
6
7  (WHEREUPON, the document marked
8  Plaintiff's Exhibit 15 for
9  identification was tendered to
10  the deponent.)
11
12  BY MR. McJESSY:
13  **Q. Okay.**
14  I'd like you to take a look
15  at Exhibit 15 again.
16  A. Okay.
17  **Q. Yeah.**
18  Do you see the shirt that Mr.
19  Kelly's wearing?
20  A. Yes, sir.
21  **Q. Did you have shirts like that?**
22  A. Yes, sir.
23  **Q. Okay.**
24  Who gave you those shirts?

25 (Pages 97 to 100)

101

1     A.  The couple times I received them, Tony
2  Brutti gave them to me.
3     Q.  Okay.
4          And my understanding is that
5  some job sites you work at, the general
6  contractor requires the parties working there
7  to wear bright-colored clothing?
8     A.  Yes.  High vis, yes.
9     Q.  High vis?
10    A.  Yes.
11    Q.  Is that -- it's like a thing in the
12  industry; is that right?
13    A.  Yes.
14    Q.  Okay.
15         And were these shirts that
16  you would wear on the job sites when you were
17  working to comply with that requirement?
18    A.  Yes.
19
20         (WHEREUPON, the document marked
21          Plaintiff's Exhibit 23 for
22          identification was tendered to
23          the deponent.)
24

102

1  BY MR. McJESSY:
2     Q.  Okay.
3          And if you look at Exhibit --
4     A.  I still have shirts like that, I
5  think.
6     Q.  -- 23 -- do you still have the shirts?
7     A.  I think.  I mean, I could probably
8  come up with one or two.
9     Q.  That's all right.
10    A.  Twenty-three?
11    Q.  Yeah.
12         If you look at Exhibit 23, do
13  you see that -- that's another picture, I
14  think, of Mr. Kelly.  Yeah, you're there.
15    A.  Yes, it is.
16    Q.  Do you see that?
17    A.  Ah-huh.
18    Q.  And do you see he's wearing a
19  sweatshirt?
20    A.  Yes.
21    Q.  And you can't quite read the label on
22  it, but does it say Midwest Dock on it?
23    A.  Yeah.  That's it.
24    Q.  Are you familiar with sweatshirts like

103

1  that?
2     A.  Oh, yeah.  Yes, sir.
3     Q.  Okay.
4          Did you have sweatshirts like
5  that?
6     A.  Yeah.  Yes, sir.
7     Q.  Okay.
8          And I take it, these are to
9  comply with that high vis requirement when the
10  weather's cold?
11    A.  All year long.
12    Q.  Okay.
13    A.  Well, a sweatshirt.  I'm sorry, yes.
14    Q.  Yeah.  That's what I meant.
15         For a sweatshirt, you'd wear
16  it when it's chillier?
17    A.  Yes, sir.
18    Q.  Okay.
19         And did you -- you said you
20  had sweatshirts like that?
21    A.  Yes, sir.
22    Q.  And would you wear those, again, when
23  you were on jobs for Midwest?
24    A.  Yes, sir.

104

1     Q.  And who gave you those sweatshirts?
2     A.  Tony Brutti.
3     Q.  Okay.
4          Are you familiar with the
5  concept of being carded on a job site?
6     A.  Yes, sir.
7     Q.  Were you ever carded when you were
8  working on any of the job sites --
9     A.  Yes, sir.
10    Q.  -- for Midwest?
11    A.  Yes, sir.
12    Q.  All right.
13         But you had a union card,
14  right?
15    A.  Yes, sir.
16    Q.  All right.
17         Was there ever a time when
18  somebody carded you on a job site when there
19  were people working there who were not union
20  members from Mid -- from Midwest, meaning
21  Midwest nonunion members?
22    A.  Once or twice.
23    Q.  Did that happen?
24    A.  Yes.

26  (Pages 101 to 104)

105

1    Q. Did they get caught?
2    A. It was, more or less, the --
3 whoever -- it was more or less, most of the
4 time, Tony Brutti. They would give him a hard
5 time because he would be unloading that stuff.
6 But that's a gray area, too, in our field,
7 like --
8    Q. Like nonunion people might be able to
9 unload trucks?
10    A. Yeah. They let the kids from the
11 supply houses come or the guy from Sherwin
12 Williams come and drop off paint. But like
13 when he's out there for a day with the fork
14 truck -- you know, sometimes it's -- more or
15 less, it's more or less the operators get --
16 get after him, would get after Tony Brutti,
17 because most of the time we didn't have any
18 nonunion guys with us from what I can recall.
19    Q. Okay.
20        Anything else -- can you
21 recall any specific job sites where you were
22 carded?
23    A. No.
24    Q. Let's see.

106

1        If you could turn to
2 Exhibit 6 again.
3
4        (WHEREUPON, the document marked
5        Plaintiff's Exhibit 6 for
6        identification was tendered to
7        the deponent.)
8
9    THE WITNESS: Okay.
10 BY MR. McJESSY:
11    Q. Do you happen to recognize that job
12 site?
13    A. It looks like a freezer building. I
14 can tell you that much. But I --
15    Q. Why do you think that?
16    A. I can tell from the out -- the
17 exterior wall.
18    Q. Okay.
19    A. Those are freezer panels.
20        See how they're like
21 three-feet wide?
22    Q. Right.
23    A. Yeah. That's a freezer panel job. It
24 almost -- this might be in Rochelle or way out

107

1 west off of 88 or 90. I think it was off of
2 90. I think it was in Rochelle. I think it
3 was a freezer building.
4    Q. Okay.
5    A. Well, nah, to be honest -- it could
6 be. It really could be because you can tell
7 it's a freezer building, and you can tell it
8 kind of looks they're gonna -- it's hard to
9 tell. But I think it's -- it looks like it's
10 vertical docks, so it would be some kind of,
11 probably, food place -- like, well -- I mean,
12 if it's refrigeration, a freezer building, most
13 likely it's food. But if it's a real big
14 building, I think it's right off of 90 in
15 Rochelle. It was like one of the state of the
16 art things because the whole thing was like --
17 it was like -- I don't know. It had to be like
18 18, 20 stories. And it was all automated. The
19 whole thing was automated. But I'm not -- I'm
20 not a hundred percent, but I know that's a
21 freezer building.
22    Q. Okay.
23        And you remember what the
24 project was, the business or the general

108

1 contractor?
2    A. No. Wow, no.
3
4        (WHEREUPON, the document marked
5        Plaintiff's Exhibit 7 for
6        identification was tendered to
7        the deponent.)
8
9 BY MR. McJESSY:
10    Q. How about Exhibit 7? Does that
11 project look -- does that photo look familiar
12 to you?
13    A. No. That -- and that looks like one
14 of the -- that actually looks like one of the
15 service guy's side truck. That doesn't look
16 like one of the installer's truck.
17    Q. Why is that?
18    A. Because of that double -- that double
19 truck box on the driver's side and like that
20 little -- that little ladder rack behind it --
21    Q. Ah-huh.
22    A. Yeah. Nobody in the -- I mean, at the
23 time I was working there, none of the guys on
24 like the -- on the union side, that's not one

27 (Pages 105 to 108)

109

1    of their trucks.
2
3            (WHEREUPON, the document marked
4            Plaintiff's Exhibit 8 for
5            identification was tendered to
6            the deponent.)
7
8    BY MR. McJESSY:
9        Q.  Okay.
10            And then Exhibit 8, does that
11   look like -- do you recognize that project, by
12   any chance?
13       A.  Oh, wow.  It's so hard.  They all look
14   the same, but, let's see.  This looks like --
15       Q.  If you turn to the next page --
16       A.  Ah-huh.
17       Q.  -- you can see that it comes from a
18   Facebook post?
19       A.  Okay.
20       Q.  That's dated July 26, 2016, and it
21   says Midwest Dock Solutions is in Lockport,
22   Illinois.
23       A.  Yeah.  Well, that's -- well, that's
24   probably -- that's probably more of the job I

110

1    was talking about off of 355, but not Lockport.
2    I think it was Lemont.  July --
3        Q.  So this could be an interior photo of
4    the space that we looked at earlier that was
5    the exterior photo, which was -- I can't find
6    it now.
7        A.  Six?
8        Q.  Yeah.
9            I think you said it was off
10   355?
11       A.  Oh, no.  That was a different picture.
12   Yeah, yeah.  Most likely, yes.  Especially at
13   that time because that's exactly when I
14   started.  Wow, yeah.  I think I started -- I
15   think I started on like July 6 of 2016, so that
16   makes total sense that we were over there at
17   that time.
18       Q.  And -- and oh, as a matter of fact,
19   it's here.  I know you -- let's see.
20            Were you at that facility,
21   going off of --
22       A.  Yes.
23       Q.  All right.
24       A.  I think there was two of them -- two

111

1    of them at that time right there.
2        MS. CAHILL:  Just to clarify, are
3    you still talking about Exhibit 8?
4        MR. McJESSY:  We are talking about
5    Exhibit 8 and 9.
6        MS. CAHILL:  Okay.
7        THE WITNESS:  You said 10?
8        MR. McJESSY:  Which Exhibit 8 is a
9    big picture of what is shown on Exhibit 9.  And
10   then -- oh, Exhibit 19.
11
12            (WHEREUPON, the document marked
13            Plaintiff's Exhibit 19 for
14            identification was tendered to
15            the deponent.)
16
17   BY MR. McJESSY:
18       Q.  If you look at Exhibit 19, is that
19   the -- what would possibly be the exterior?
20       A.  Yes.
21       Q.  Okay.
22       A.  Yes.
23       Q.  You think those might be the same
24   project?

112

1        A.  Yes, sir.
2        Q.  All right.
3            And Exhibit 19 is dated
4    October 15, 2016, so a couple of months later?
5        A.  Ah-huh.
6        Q.  So that could be the finished job?
7        A.  Ah-huh.  Most likely, yes.
8        Q.  Okay.
9            And I had a note that said
10   east side of 355, four miles -- four to five
11   miles north of I-80 in Lemont?
12       A.  Yes, sir.
13       Q.  All right.
14       A.  I think it was Lockport.
15       Q.  Lockport?
16       A.  Ah-huh.
17            Maybe -- I think -- I think
18   there's an exit -- Archer, maybe, right there.
19   Getting close to that.  Oh, I forget what's --
20   there's a -- there's a big box on the west side
21   of it, on the west side of 355, and it's like a
22   sports place.  If you go on Google Earth, I'm
23   sure you'll be able to find it.
24       Q.  That's what -- that's what I'll try.

28 (Pages 109 to 112)

113

1    **All right.**
2        A.  It might be a collagen place as well,
3    like a beauty supply, collagen slash like --
4    the other side of that building is a sports --
5    some kind of sports clothing, I think.  So,
6    yeah, right -- right east of it would be those
7    buildings.
8        Q.  **All right.**
9            **Is it visible from the**
10   **highway?**
11       A.  Yes.
12       Q.  **All right.  All right.**
13       A.  And then we did one like right on the
14   west side of that as well, right by the
15   building I'm talking about.  But that was --
16   that was almost about the same time.
17       Q.  **All right.**
18           **And that was one of the --**
19   **was that one of the first projects you worked**
20   **on when you were hired?**
21       A.  Yes.  Ah-huh.
22       Q.  **Are you doing okay?  Do you need to**
23   **take a break, or are we good?**
24       A.  I'm good.

114

1        Q.  **All right.**
2            **I'm actually -- we're moving**
3    **pretty quick, so is everybody fine to keep**
4    **going?**
5
6            (There was a discussion off
7             the record.)
8
9    BY MR. McJESSY:
10       Q.  **Did you -- all of the pay you**
11   **received, was it by check or direct deposit?**
12       A.  Yes, sir.
13       Q.  **Okay.**
14           **Except for -- well, that was**
15   **a check, too, the one we looked at?**
16       A.  Yes.
17       Q.  **All right.**
18           **You never received any**
19   **check -- any payment in cash?**
20       A.  No, sir.
21       Q.  **All right.**
22           **To your knowledge, did**
23   **anybody else at the company ever receive a cash**
24   **payment?**

115

1        A.  Yes.
2        Q.  **Who did?**
3        A.  A lot of people.  And, actually, I did
4    receive cash, now that you mention it.
5        Q.  **Okay.**
6            **How did you -- what did you**
7    **receive cash for?**
8        A.  I received cash for going on a service
9    call one night for the service side.
10       Q.  **Okay.**
11       A.  From a salesman.  It was from another
12   guy.  What's his name?  Steve.
13       Q.  **Steve French?**
14       A.  Yeah.  So I came back to the shop one
15   night, and he's like I've got a service call.
16   I'll pay you in cash to do it.  And that's --
17   that's the only -- that was strictly -- yeah,
18   that was from a salesman like.  Ah-huh.
19       Q.  **Okay.**
20       A.  But I think there was stuff going on
21   where I heard, you know, Tony was paying people
22   cash and stuff -- you know, like -- I think it
23   was more on the service side, to be honest.
24       Q.  **Okay.**

116

1            **You're not aware of any of**
2    **the union members being paid cash?**
3        A.  No.  No.
4        Q.  **Okay.**
5        A.  He would always say he didn't have any
6    cash, like.
7        Q.  **All right.**
8            **And that was just the one**
9    **instance where you received cash for this**
10   **one-time --**
11       A.  Yes.
12       Q.  **-- service call?**
13       A.  Yes, sir.
14       Q.  **Okay.**
15           **And other than that, was all**
16   **of the -- other than -- leaving that aside, did**
17   **you ever receive payment for tool**
18   **reimbursement, parking, gas, anything other**
19   **than hours worked?**
20       A.  Repeat that?
21       Q.  **Did you ever receive -- did you ever**
22   **receive payment for anything other than hours**
23   **worked, like payment for tool reimbursement,**
24   **parking, gas, anything like that?**

29 (Pages 113 to 116)

117

1    A. Gas? No. I mean, not -- no. But
2  they supplied some stuff. Like parking, we
3  would get reimbursed. Gas, we'd usually fill
4  up at the shop, or I had a credit card.
5    Q. Okay.
6    A. But tools, no. Like we were forced to
7  buy our own drills, like cordless drill,
8  cordless impact gun, which we're not supposed
9  to, but it's another gray area. Like you want
10  to work here? You know -- like you know how it
11  is. There's a lot of gray areas, so -- but we
12  didn't get reimbursed for that, no.
13    Q. Okay.
14         So the only thing you
15  mentioned was, maybe, parking?
16    A. No. We got reimbursed if we had to.
17    Q. That's what I mean.
18    A. Yes.
19    Q. If parking was one thing, you could
20  get reimbursed for it?
21    A. Yes.
22    Q. Would you get reimbursed by check, or
23  would they just give you the money, cash money
24  to reimburse you for parking?

118

1    A. To be honest, I don't even know if I
2  ever myself ever had got reimbursed.
3    Q. Okay.
4         I was going to say. The only
5  checks I think that I've so far seen to you
6  were just these two.
7    A. Yeah.
8    Q. So that's what I was going to ask,
9  like if you were reimbursed for parking, how
10  were you reimbursed. But you may not have been
11  reimbursed.
12    A. No. No.
13    Q. Okay.
14    A. Just to -- most of the time, we were
15  able to park on the job site because we're
16  usually only there for a couple days -- or, at
17  least, like where -- somewhere downtown
18  where -- where you need to pay to park, we
19  would always be able to like, you know, put up
20  cones or like --
21    Q. Because it was a service truck?
22    A. Yes, sir.
23    Q. Okay. All right.
24         Let's take a quick look --

119

1  let's walk through the list of carpenters
2  that's Exhibit 29 that you have there -- or
3  carpenters and others, I guess, because I don't
4  think it's limited to carpenters.
5         I don't think it's actually
6  in the book.
7    A. Over here. Okay.
8    Q. I think, because it was just marked
9  today. So let me see if we have -- do we
10  have -- oh, you need a garbage can? Around the
11  corner there. You can bring it over closer to
12  you if you want.
13         Oh, here it is. I'm looking
14  at it.
15    A. Okay.
16
17         (WHEREUPON, the document marked
18         Plaintiff's Exhibit 29 for
19         identification was tendered to
20         the deponent.)
21
22  BY MR. McJESSY:
23    Q. All right.
24         I've handed you Exhibit --

120

1    A. Twenty-four?
2    Q. Yeah. You can take a look. You don't
3  need those. I'll just set them over by you.
4  Exhibit 29.
5    A. Okay.
6    Q. And if you can just go down -- I'd
7  like to go down the list with you and just if
8  you can tell me if -- just tell me if there are
9  people that you've worked with on job sites,
10  either worked with -- my understanding is, the
11  way the job sites worked, you generally worked
12  with a partner when you were doing your work;
13  is that right?
14    A. Yes, sir. Yes, sir.
15    Q. And so if you and I are working on a
16  job site, there might be two other people who
17  are also working on the job site. But they're
18  sort of a team, and we're a team.
19         Is that the way it worked?
20    A. Yes, sir. Yes, sir.
21    Q. Okay.
22         And so if you were working on
23  a job site as part of a team or alongside of
24  two other people, can you just tell me people

30 (Pages 117 to 120)

121

1  you've worked with at job sites?
2      A.  Sure.
3      Q.  Okay.
4          And just go down and give me
5  the numbers of the people that you've worked
6  with at job sites.
7      A.  Okay.  One.  Number two, I'm not sure.
8  I think it's the person I'm thinking about.
9  Dan.  He's an older guy.  He's probably like
10 55.  He's been a carpenter for a long time.
11     Q.  Okay.
12     A.  I think, him.  If it's the Dan I'm
13 thinking about, yes.
14     Q.  Okay.
15         There was a Dan that you
16 worked with?
17     A.  Yes.
18     Q.  All right.
19     A.  Five.
20     Q.  Okay.
21     A.  Ten.
22     Q.  Okay.
23     A.  Thirteen.
24     Q.  Okay.

122

1      A.  Sixteen.
2          Brian Georges worked there.
3  I didn't work with him, but that's my buddy.
4  Maybe it's a different guy.
5          Okay.  Let's see.
6  Twenty-three.  Twenty-four.  James, yeah.  He
7  don't work there no more either.  Thirty-one.
8  Thirty-two.  Thirty-three.  Thirty-five.
9  Thirty-nine.  Oh.  Forty-four.  Forty-six.
10 Fifty-two.  Fifty-eight.  Fifty-nine.
11 Sixty-three.  Sixty-eight.  Seventy-two.
12 Seventy-eight.  Eighty-eight.
13     Q.  And I've probably got -- would you do
14 service work as well as new installation work?
15     A.  Yes.
16     Q.  Okay.
17         You did -- you've referred
18 to -- several times during your deposition --
19 to sort of either the service side or the
20 service guys.  I'm not quite sure what phrase
21 you've used, but something like that.
22     A.  Ah-huh.  Yes, sir.
23     Q.  And is that how you sort of refer to
24 the nonunion guys?

123

1      A.  Yes.
2      Q.  Okay.
3          Was there a difference in the
4  kind of work that you did versus the nonunion
5  guys?
6      A.  Yes, sir.
7      Q.  And what was the difference?
8      A.  First off, like physical labor.  A lot
9  of the jobs we went on were like you see, like
10 a hundred doors, 60 doors, 60 dock levelers,
11 60 -- like we might have 60 doors, 60 dock
12 seals, 60 dock locks, 60 dock levelers.  We
13 might have the whole job.  So it's run and gun,
14 like you have to produce.  It's like all day,
15 like crack-the-whip type of stuff.
16     Q.  Ah-huh.
17     A.  And where the service guys, it was
18 like la-di-da.  They pull up, drink their
19 coffee.  They find a reason they can't do it,
20 and then, you know -- but that's like the first
21 difference.
22     Q.  Ah-huh.
23     A.  The second difference is, though, we
24 were just like mostly installing, just putting

124

1  the doors on the wall, getting them to go up
2  and down, and then the other guys would come
3  in.  Then the service guys would come in and do
4  the easy stuff, set the limits.  So if there's
5  a hundred doors in the building, the operators,
6  you have to set them to where it opens, where
7  it stops and closes -- I mean, opens and stops
8  where you want, you know, which is just like
9  turning like a thread rod.  It's -- you know,
10 it's just fine tuning things.  And photo eyes,
11 like the safety eyes and stuff like that, they
12 would hook those up and stuff like that.  So it
13 was like a lot easier work for them.  But, I
14 mean, they would have to -- like their work,
15 too, is like sometimes more dirty.  They'd end
16 up in like some factory or -- you know, a
17 factory working on a door that's like 30 years
18 old, you know, and --
19     Q.  And they're fixing it?
20     A.  Yes.
21     Q.  And if you were doing it, you'd be
22 replacing it?
23     A.  Most of the time, yes.  Ninety
24 percent.

31 (Pages 121 to 124)

---

125

1    Q. Okay.
2        But you would do retro --
3  well, strike that. Let me ask the question
4  more directly.
5        Would you do -- I'm going to
6  call it retrofit work. Does that make sense to
7  you?
8    A. Yes.
9    Q. Okay.
10       What's retrofit work to you?
11   A. Fabrication. Like something
12 doesn't -- something that's not working
13 perfectly, you have to troubleshoot and make
14 decisions and fix it.
15   Q. Okay.
16       Would you do retrofit work?
17   A. Yes.
18   Q. Okay.
19       Would you also do
20 remove-and-replace work?
21   A. Yes.
22   Q. Okay.
23       Where you remove an opener or
24 a door or a dock leveler and put in a new one?

---

126

1    A. Yes, sir.
2    Q. Okay.
3        And that was all part of your
4  work for Midwest?
5    A. Yes, sir.
6    Q. Okay.
7        You mentioned -- I'm going to
8  run through the names, just to ask you a couple
9  of questions about each one.
10       Jose Aguirre. Did you work
11 with him on job sites?
12   A. Oh, yes.
13   Q. Doing the same kind of work you did?
14   A. Yes, sir.
15   Q. And Daniel Bara -- if he's the Dan
16 you're thinking of.
17   A. It has to be, yeah.
18   Q. Okay.
19       Did he do the same kind of
20 work you did?
21   A. Yes, sir.
22   Q. And you worked on job sites with him?
23   A. Yes, sir.
24   Q. Anthony Brutti you mentioned, but I

---

127

1  think he didn't do installation work from what
2  I understand; is that correct?
3    A. No.
4    Q. He just did the unloading stuff at the
5  job site?
6    A. Ah-huh.
7    Q. Is that a yes?
8    A. Yes. Yes.
9    Q. And he would also bring stuff to the
10 job site if you needed something?
11   A. Yes, sir.
12   Q. Okay.
13       So he was sort of a parts
14 runner? Is that fair?
15   A. Yes, sir.
16   Q. Okay.
17       And Zach Corrigan, did you
18 work with him?
19   A. Yes, sir.
20   Q. Doing the same kind of work you did?
21   A. Yes, sir.
22   Q. And Don Cruikshank, you worked with
23 him, you said, right?
24   A. Yes, sir.

---

128

1    Q. Doing the same kind of work?
2    A. Yes, sir.
3    Q. Tom Donnelly. You worked with him?
4    A. Yes, but not very -- not too
5  frequently. He was on the so-called service
6  side. So there was some times where Tony would
7  send me and him to go do a job.
8    Q. Okay.
9    A. And nobody would really think of
10 anything, even if it was a union job, because
11 we'd would roll up in a lettered truck, and
12 they'd -- you know, they'd -- a lot of times
13 nobody asked questions if you looked like you
14 know what you're doing. You know what I'm
15 saying? I mean, so, yeah, I worked with Tom
16 sometimes.
17   Q. Okay.
18       And would he do overhead door
19 work and dock leveler work?
20   A. Yes. More service. Mostly service,
21 though.
22   Q. What's that mean?
23   A. He would go -- if -- if somebody's
24 dock wasn't opening and closing or it broke, he

---

32 (Pages 125 to 128)

129

```
1   would fix it, or if some -- the springs broke
2   on a door or a coil lure got jammed or
3   something, he would go out there and just
4   service it.
5       Q.  Okay.
6           And would you do that with
7   him?
8       A.  Most of the time, he would be doing
9   install with me.
10      Q.  Okay.
11          When -- okay.  Well, that's
12  what I wanted -- I'm glad we clarified.
13          When he's working with you,
14  what would he do?
15      A.  Installs.
16      Q.  Okay.
17          Installs of doors and docks?
18      A.  Yes.
19      Q.  Okay.
20          How about Kevin Graham?
21      A.  Install.
22      Q.  Okay.
23          And the same kind of work you
24  did?
```

130

```
1       A.  Yes, sir.
2       Q.  All right.
3           And David Green?
4       A.  Yes.
5       Q.  Okay.  You worked with him.
6           He did the same kind of work
7   you did?
8       A.  Yes, sir.
9       Q.  Okay.
10          And he's still there?
11      A.  Yes, sir.
12      Q.  Doing the same work.
13          Dylan Kelly?
14      A.  Yes.
15      Q.  Did you work with him?
16      A.  Occasionally.
17      Q.  Okay.
18          And what kind of work -- when
19  he was working with you, what kind of work
20  would you do?
21      A.  More labor.
22      Q.  What do you --
23      A.  More labor.
24      Q.  What do you mean by that?
```

131

```
1       A.  Carrying stuff.  Moving stuff.
2   Unloading.
3       Q.  Okay.
4           So he didn't do installs?
5       A.  No.  I would say no.
6       Q.  Okay.
7           And James Kelly?
8       A.  Ah-huh.
9       Q.  Did you work with him?
10      A.  Yes.
11      Q.  And did you do installs with him?
12      A.  Yes.
13      Q.  Okay.
14          And installs of doors and
15  dock levelers?
16      A.  Yes.
17      Q.  All right.
18          And Nick Kelly?
19      A.  Yes.
20      Q.  He's Nico, right?
21      A.  Yes, sir.
22      Q.  Okay.
23          And you worked with him?
24      A.  Yes, sir.
```

132

```
1       Q.  And he did installation of doors and
2   dock levelers?
3       A.  Yes, sir.
4       Q.  That kind of thing?
5           And how about Sean Leer?
6       A.  Not too much.  I've worked with him on
7   one or two jobs.  That was about it.
8       Q.  Okay.
9           And what kind of work did he
10  work -- when you worked on the jobs with him,
11  what kind of work did he do?
12      A.  I think he was -- I think that might
13  have been once or twice when they did send me
14  out with him to do service, I think it was.
15      Q.  Okay.
16          Service work?
17      A.  Ah-huh.  But I know he didn't work
18  there very long, and I think I got terminated
19  right about the same time he left, yeah.  So I
20  didn't really know him that good, yeah.
21      Q.  Okay.
22          How about Reynaldo Maldonado?
23      A.  Oh.  Yeah.
24      Q.  What kind of work did you do with him?
```

33 (Pages 129 to 132)

133

1    A.  Install.
2    Q.  Dock levelers?  Doors?
3    A.  Yes.
4    Q.  All right.
5    A.  I mean, everything.  All of the dock
6  locks.  When I say "install," yeah, we -- I'm
7  referring to everything for everybody, yeah.
8  We were all doing it.
9    Q.  Okay.
10        And when I ask -- so when I
11  said dock levelers and doors and you said yes,
12  you mean also like --
13    A.  Dock locks, dock seals, dock shelters,
14  rolling coil doors, high-speed doors.
15    Q.  All of the same kind of stuff?
16    A.  Yes.
17    Q.  Okay.
18        How about Austin McCartney?
19    A.  Yes.  I worked with him.
20    Q.  And what kind of work did you do with
21  him?
22    A.  To be honest, I don't know if I ever
23  worked on a job with him, to be honest.
24    Q.  All right.

134

1    A.  But I know him.
2    Q.  But you know him?
3    A.  Yes.
4    Q.  Okay.
5    A.  He was a service -- he was on the
6  service side.
7    Q.  All right.
8        And how about Ryan Mead?
9    A.  Yes.
10    Q.  Did you work with him?
11    A.  Yes.
12    Q.  And what kind of work did you do?
13    A.  The install part.
14    Q.  Okay.
15        All of the things you
16  described earlier?
17    A.  Yes, sir.
18    Q.  All right.
19        And how often did you work
20  with Ryan Mead?
21    A.  I probably worked with him, maybe, for
22  two months, and then he -- he wasn't there
23  anymore.  I don't know what happened.
24    Q.  Okay.

135

1        How about John Murphy?  What
2  did you -- what was --
3    A.  I never worked on a job with him,
4  though.  But he was on the service side.
5    Q.  Okay.
6        You knew him?
7    A.  Yes, sir.
8    Q.  All right.
9        And Michael Richert, you've
10  already -- we've talked about him?
11    A.  Yes.
12    Q.  David Richert?
13    A.  Yes.
14    Q.  You worked with him?
15    A.  Yes.
16    Q.  And what kind of work did you do with
17  him?
18    A.  Dock work.  He refused to do door
19  work.
20    Q.  Why is that?
21    A.  Because it's harder.  Because like,
22  you know, some dock work's way easier because
23  you already have the dock leveler in the pit.
24  So all you have to do is like, you know, go on

136

1  top on the inside the building, like do five
2  welds across the top, pop it open, crawl in,
3  shim it, weld it some more.  You're not running
4  up the ladder.  Like a lot of times these
5  buildings don't have concrete, so it would be
6  dirt, and the pits will be there.  So you're
7  like already four feet down in the dirt.  It
8  could be muddy.  It could be in the winter.
9  It's just -- it's just a lot harder work.  He
10  wanted the easy way out.
11    Q.  Got it.
12    A.  Ah-huh.
13    Q.  So he did dock leveler work?
14    A.  Yes, sir.
15    Q.  Okay.
16        And Jacob Rodgers, he goes by
17  Jake, I take it?
18    A.  Yes, sir.
19    Q.  And what kind of work did you do with
20  him?
21    A.  Install.  Doors.  Doors.  Installs.
22    Q.  Okay.
23        Would he do like dock
24  canopies and --

34 (Pages 133 to 136)

137

1    A.  Seals?
2    Q.  -- seals and things like that?
3    A.  Yes.  He didn't weld, though.  So,
4  yes, he would do -- so he didn't do too many`
5  docks.
6    Q.  Okay.
7    A.  He didn't do any docks.
8    Q.  And you worked on installation with
9  him?
10   A.  Yes, sir.
11   Q.  All right.
12           And how long did you work
13  with him?
14   A.  Six months.
15   Q.  All right.
16           John Sparr?
17   A.  Yes.
18   Q.  Did you work with him?
19   A.  Yes.
20   Q.  What kind of work did he do?
21   A.  Not much, maybe like -- not -- not too
22  much work with him -- too much, though.  I
23  think we -- I think he might have showed up on
24  like a job or two that we were working on.

138

1    Q.  Okay.
2           And doing what kind of work?
3    A.  Whatever we were -- install.  Whatever
4  we were doing.
5    Q.  Okay.
6           Was it a new big box kind of
7  store?
8    A.  No.  Most of the time it was some
9  like -- like one off, like -- you know, like a
10  little -- a small factory that had three or
11  four or five doors, and, you know, we were
12  doing a teardown or something like that.
13   Q.  What's a teardown?
14   A.  Or just take down --
15   Q.  Oh.
16   A.  Tear one down and put one up.  But I
17  really didn't work with him too much at all.
18   Q.  Okay.
19           Just a couple jobs?
20   A.  Yes.
21   Q.  All right.
22           The jobs that you did work on
23  with him, did he do the teardown and install?
24   A.  Yeah.

139

1    Q.  Okay.
2           How about Michael
3  Strazzabosco?  Did you work with him, or do you
4  just know him?
5    A.  No.  I didn't really work with him.
6    Q.  You just knew him?
7    A.  Yes.
8    Q.  Okay.
9           How about Jerry Valentino?
10   A.  Yeah.  I worked with him.
11   Q.  And what kind of work did you do with
12  him?
13   A.  We've done service.  We did install.
14   Q.  And when you say "install," you mean
15  like dock doors --
16   A.  Yes.
17   Q.  -- and canopies and seals, that kind
18  thing?
19   A.  Everything we were kind of doing.
20   Q.  Okay.
21   A.  Yeah.
22   Q.  And how long did you work with him?
23   A.  Jerry?  I mean, Jerry worked there for
24  a year or two, not -- not frequent.

140

1    Q.  Not frequent?
2    A.  No, sir.
3    Q.  All right.
4           And then Collin Zarlengo?
5    A.  Yes.  I worked with him.
6    Q.  And what kind of work did you do with
7  him?
8    A.  The -- all of the installs.
9    Q.  Docks and doors?
10   A.  Yes, sir.
11   Q.  Okay.
12           I'm sorry.  Where did you go
13  after you left Midwest?
14   A.  I went to House of Doors.
15   Q.  Are you still there?
16   A.  No, sir.
17   Q.  Oh.  Where are you now?
18   A.  I'm currently unemployed right now.
19   Q.  Oh, okay.
20   A.  But I did go to -- after two years
21  with House of Doors, I worked at United Dock &
22  Door.
23   Q.  Okay.
24   A.  For about four years.

35 (Pages 137 to 140)

141

```
1    Q.  Okay.
2        Doing the same kind of work?
3    A.  Yes, sir.
4    Q.  All right.
5        Your cell phone number?
6    A.  Yeah.  (219) 356-1381.
7    Q.  And your carrier?
8    A.  Carrier?  Hmm.
9    Q.  AT&T?  Verizon?
10   A.  Oh, gees.  I think it's Verizon.
11   Q.  You're not sure?
12   A.  No.
13   Q.  Have you had that number long?
14   A.  Probably three years.
15   Q.  What was the number that you had when
16   you worked for --
17   A.  Midwest Dock?
18   Q.  Midwest Dock.
19   A.  I'm going to -- I'm going to say
20   (708) 436-0660.
21   Q.  And do you remember who your carrier
22   was back then?
23   A.  Probably AT&T, I think.
24   Q.  Okay.
```

142

```
1        Is the address on your
2    subpoena -- is this yours or somebody else's?
3    No, that's it.  Is that address correct?
4    A.  Yes, sir.
5    MR. McJESSY:  Okay.
6        I don't have any other
7    questions.  I don't know if the other attorneys
8    here do.  If they do, I might have some
9    follow-up questions.
10   THE WITNESS:  Okay.
11   MR. McJESSY:  But, otherwise, I
12   think I'm done.
13   THE WITNESS:  All righty.
14   MR. HUGHES:  All righty.
15       I might have one or two.  I'm
16   not sure.
17   THE WITNESS:  Okay.
18   MR. HUGHES:  Give me a few minutes
19   to --
20   MR. McJESSY:  He wants to take a
21   look at his notes to see what he's got.
22
23
24
```

143

```
1        (After a break from 3:54 p.m.
2        to 3:58 p.m., the deposition
3        was resumed as follows:)
4
5        MR. HUGHES:  I think I just have a
6    couple.
7
8
9        EXAMINATION
10       BY MR. HUGHES:
11
12   Q.  Okay.
13       Mr. McJessy asked you a
14   number of questions about certain shirts or
15   sweatshirts that you may have worn on a job,
16   correct?
17   A.  Ah-huh.  Yes.
18   Q.  And those are high -- high vis shirts?
19   A.  Yes.
20   Q.  And that's because it's required in
21   the -- in the construction industry --
22   A.  Yes.
23   Q.  -- that you wear that?
24       Okay.  And just let me finish
```

144

```
1    before you answer.
2    A.  Oh, okay.
3    Q.  You looked at some pictures of -- of
4    high vis shirts with Midwest Dock lettering on
5    them, correct?
6    A.  Yes.
7    Q.  Were you required to wear Midwest Dock
8    branded shirts on your jobs?
9    A.  Yes.
10   Q.  You couldn't wear just some like high
11   vis shirt?
12   A.  You could.
13   Q.  You could wear kind of -- you could
14   wear any high vis shirt --
15   A.  Yes.
16   Q.  -- if you wanted to?
17   A.  According to meet the compliance of
18   the contractor, yes.
19   Q.  Right.
20   A.  But to be compliant with my boss, I'd
21   have to wear the Midwest attire.
22   Q.  Okay.
23       And when you say your boss,
24   who are you talking about?
```

36 (Pages 141 to 144)

145

1    A.  Mike and Tony.
2    Q.  Tony who?
3    A.  Zarlengo.
4    Q.  Okay.
5         So --
6    A.  Other guys would wear like high vis
7  stuff from other companies.
8    Q.  Ah-huh.
9    A.  And, you know, that's like a jab.  So
10  like, you know, then they -- you know, they --
11  they didn't like that.  I'll tell you that
12  much.
13   Q.  But a high vis -- like a non-branded
14  blank high vis shirt was okay?
15   A.  Compliant with the contractor.
16   Q.  Okay.
17   A.  Ah-huh.
18   Q.  And were you ever reprimanded for not
19  wearing a Midwest branded shirt?
20   A.  No.
21   Q.  You were shown a series of pictures of
22  different trucks, correct?
23   A.  Yes, sir.
24   Q.  And we saw the one, which is -- which

146

1  is depicted in the pictures in Exhibit 31, and
2  can you identify -- you can identify that
3  truck?
4    A.  Yes.
5    Q.  Whose truck is that truck?
6    A.  Dave Green's.
7    Q.  Okay.
8         And there's no Midwest Dock
9  branding on that truck, correct?
10   A.  No.
11   Q.  And you were shown a series of other
12  pictures of trucks that had Midwest Dock
13  branding on it, correct?
14   A.  Yes.
15   Q.  And I believe, in one, you were able
16  to identify that it was a service side truck,
17  correct?
18   A.  Yes.
19   Q.  And the service side trucks were not
20  used by the Dock & Door side people, correct?
21   A.  In the beginning, when I worked there,
22  it was.  They didn't have as many trucks.  But
23  after -- I'd say after about eight months
24  working there, yes, we never switched trucks --

147

1    Q.  Okay.
2    A.  -- with the service side.
3    Q.  Okay.
4         You didn't work in the
5  office, correct?
6    A.  No.
7    Q.  And so any testimony that you would
8  have given related to what Tony Brutti did in
9  the office, that's just based on your
10  speculation, correct?
11   A.  Yes.
12   Q.  Okay.
13        And as far as what phone
14  calls Tony Zarlengo may have made to like
15  Richert, that's based on your speculation,
16  correct?
17   A.  No.  Because whenever I got a phone
18  call like that from Mike, it would be like Tony
19  said.
20   Q.  Okay.
21        And -- but you weren't -- you
22  weren't on those calls between Tony and Mike,
23  correct?
24   A.  No, sir.

148

1    Q.  Okay.
2         So unless Mike said Tony said
3  this, you wouldn't be privy to know -- you
4  wouldn't know whether or not what Mike was
5  telling you was based on some conversation with
6  Tony?
7    A.  Correct.
8    Q.  Okay.
9         You talked about, you know,
10  the union side and the nonunion side, correct?
11   A.  Yes.
12   Q.  And, specifically, for like the big
13  box installs, those were union side jobs,
14  right?
15   A.  Yes.
16   Q.  They were -- were the other
17  contractors working on those jobs union
18  represented as well?
19   A.  Yes.
20   Q.  And so would there be like a union
21  electrician contractor?
22   A.  Yes, sir.
23   Q.  Okay.
24        And you don't know what the

37 (Pages 145 to 148)

149

1  scope -- do you know if the scope of the union
2  electrician contractor was to hook up the
3  electricity to the dock -- to the door
4  operators or anything?
5      A.  We would only find out being told by,
6  most of the time, the contractor.  It would
7  come down to the contractor.
8      Q.  When you said "the contractor," who
9  would --
10     A.  The general contractor.
11     Q.  Okay.
12     A.  Yeah.  It would come down to the
13  general contractor.  That's -- that's who would
14  like pretty much have the final say --
15     Q.  Okay.
16     A.  -- of who was doing what because they
17  would go and look back at the contracts, or
18  they would negotiate a price with either us or
19  the electricians.  Sometimes it got skipped,
20  looked over, the low voltage, so --
21     Q.  Other than low voltage -- or let me
22  ask you this.  Were you ever involved in any of
23  the negotiations between the general contractor
24  and any contractors about what work was going

150

1  to be done by whom?
2      A.  Yes.
3      Q.  And what -- who -- who were you
4  representing in those negotiations?
5      A.  Midwest Dock.
6      Q.  And -- and you would negotiate with
7  the general contractor about what electric work
8  you were --
9      A.  I guess I wouldn't call it negotiate,
10  no.  It wouldn't be negotiate, but it would be
11  discuss.
12     Q.  And what would you discuss -- can you
13  recall any specific discussion you had with the
14  general contractor about what electrical work
15  either you or some other contractor was going
16  to do?
17     A.  Well, yeah.  A lot of times the
18  contractor would be like you guys aren't doing
19  low voltage?  We're like I don't know.  Call
20  Tony or Mike, you know.  And then that was
21  about it.
22     Q.  Okay.
23         That's the extent of your
24  involvement?

151

1      A.  Yes.  Yes.
2      Q.  Okay.
3          The two checks that you were
4  shown that were the -- kind of the handwritten
5  checks --
6      A.  Ah-huh.
7      Q.  -- are those the only handwritten
8  checks that you received in your -- in the
9  course of your work?
10     A.  Yes, sir.
11         MR. HUGHES:  Okay.
12             That's all I have.
13         MS. CAHILL:  I don't have any
14  questions.
15
16
17         FURTHER EXAMINATION
18         BY MR. McJESSY:
19
20     Q.  Just a follow-up to -- to Mr. Hughes'
21  question.
22         In instances where you would
23  be on a job site and the general contractor
24  is -- is discussing with you like who's going

152

1  to do this work --
2      A.  Ah-huh.
3      Q.  -- hookup the electric, for example --
4  that was the discussion -- you would discuss
5  with the general contractor whether you were
6  going to do that, and then you would reach out
7  to Mike or Tony Zarlengo to coordinate with
8  them whether that was part of your work or
9  whether you weren't doing that work.
10         Is that -- did I understand
11  that correctly?
12     A.  Ah-huh.  I would say about 60 percent
13  of the time, yes.
14     Q.  Okay.
15         About -- what do you mean, 60
16  percent of the time?
17     A.  Not -- not all of the times it would
18  happen like that.  Like sometimes the
19  contractor would be like, okay, I'll talk to
20  him.
21     Q.  Okay.
22     A.  Or they'll be like, well, call -- you
23  know, can you call Tony?  Most -- most of the
24  time it was Tony.

38 (Pages 149 to 152)

153

1    Q.  Tony Zarlengo?
2    A.  Can you call Tony and tell us what's
3    up?
4    Q.  Tony Zarlengo?
5    A.  Yes.
6    Q.  Okay.
7    A.  Yes.
8    Q.  And so then you would reach out to
9    him --
10    A.  Ah-huh.
11    Q.  -- and say are we supposed to do this
12    or somebody else?
13    A.  Yes, sir.
14    Q.  Is that the nature of the
15    conversation?
16    A.  Yes, sir.  And actually, most of the
17    time, it would be -- it wouldn't be so much a
18    contractor would come up, the general
19    contractor.  Most of the time it would be the
20    electrician supervisor or foreman would come
21    up, and that's who we would most of the time
22    discuss it with.
23    Q.  Okay.
24        And if you were supposed to

154

1    do that work, meaning Midwest, that that was
2    part of their contract, would -- I mean, was it
3    sometimes part of Midwest's contract to do that
4    work?
5    A.  Yes.
6    Q.  Okay.
7        And that's what Tony would
8    tell you?
9    A.  Yes.
10    Q.  All right.
11        And then -- but you didn't do
12    that work, then?
13    A.  No.  Uh-uh.
14    Q.  Somebody else from, as you described
15    it, the service side would do that?
16    A.  We would install.  We would just screw
17    the photo eyes to the wall and the pushbutton
18    to the wall, and then we'd get out of there.
19    And then, yes, most likely, the service guy
20    would come back, and they would do the low
21    voltage.
22    Q.  Okay.
23        Were there -- and just to
24    confirm, to make sure I understood you

155

1    correctly, there were times when you understood
2    Midwest was supposed to do the final electrical
3    hookup?
4    A.  Low voltage.
5    Q.  Low voltage.  I'm sorry.
6        Low voltage is different
7    than --
8    A.  Yes.  That's just like communication
9    wire, like for the safety eyes and stuff and
10    any accessories.
11    Q.  Oh, I see.  That's -- so you're not
12    hooking -- you're -- I get it.  It's the little
13    thin wires.
14    A.  Yes.  Yes.
15    Q.  Okay.
16        That's why -- I'm trying to
17    understand why there's an issue with the
18    electricians and whether you can do that work
19    or whether that's their work.
20    A.  Ah-huh.
21        But we would do -- like if it
22    was a nonunion job -- say Tony sent us to like
23    a factory that it's -- or a company that, you
24    know, you don't have to use union work, we

156

1    would sometimes do electric -- you know
2    disconnect it.  The high voltage as well.
3    Q.  Okay.
4        And then you would also
5    reconnect it?
6    A.  Yes, sir.
7    Q.  And you would also do the low voltage
8    connections?
9    A.  Yes, sir.
10    Q.  And sometimes -- and I just want to
11    make sure I'm clear, then.
12        These little thin wires that
13    are the eyes or the push buttons for the
14    door --
15    A.  Yes.
16    Q.  -- sometimes it was Midwest's job to
17    install that, to finish that work; is that
18    right?
19    A.  Yes, sir.
20    Q.  Okay.
21    A.  Yes, sir.
22    Q.  And then you would coordinate on the
23    job site with the electrician and say, no,
24    we're going to do that?  Is that how it worked?

39 (Pages 153 to 156)

157

1   A. Yes.
2   Q. Okay.
3       And then -- and would you do
4   that work, then, or would somebody else come in
5   from Midwest and do that?
6   A. We wouldn't do that.
7   Q. You wouldn't do that?
8   A. No.
9   Q. But it would get done?
10  A. Yes.
11      MR. McJESSY: Okay.
12          Those were the only questions
13  I had.
14      MR. HUGHES: Just a quick follow-up.
15
16
17      FURTHER EXAMINATION
18      BY MR. HUGHES:
19
20  Q. So for the high voltage stuff that's
21  like conduit --
22  A. Yeah.
23  Q. -- that was typically done by like
24  electrical contractors, correct?

158

1   A. On union sites.
2   Q. Yeah.
3   A. Yes.
4   Q. Okay.
5       So not by any Midwest
6   affiliated company?
7   A. Uh-uh.
8   Q. Okay.
9   A. No, sir.
10      MR. HUGHES: Okay.
11          That's all.
12      MR. McJESSY: Okay. Good.
13          All right. Sir, I appreciate
14  your time today.
15      THE WITNESS: Oh, thanks.
16      MR. McJESSY: Because I subpoenaed
17  your deposition, I have more one more job to
18  do.
19      THE WITNESS: Yeah.
20      MR. McJESSY: And that's to explain
21  to you that I'm going to order a copy of this
22  transcript, which means that she's going to
23  type it up.
24      THE WITNESS: Yeah.

159

1       MR. McJESSY: So that we can read
2   it.
3       THE WITNESS: Okay.
4       MR. McJESSY: You have a right to
5   review that transcript before it's put in final
6   form.
7       THE WITNESS: Okay.
8       MR. McJESSY: Meaning you can review
9   the transcript. And if there's any errors that
10  occurred in transcription, you can note them on
11  the record.
12      THE WITNESS: All right.
13      MR. McJESSY: So, for example, if I
14  asked you was the light red or was the light
15  green and you said the light was red and she
16  wrote down green, you can say, hey, I said --
17      THE WITNESS: Okay.
18      MR. McJESSY: -- I said red not
19  green.
20      THE WITNESS: Okay.
21      MR. McJESSY: You can't change your
22  testimony. So if I said was the light red or
23  the light green and you said the light was red
24  and she wrote the light was red, you can't go

160

1   back now and change it and say I meant to say
2   green.
3       THE WITNESS: Okay.
4       MR. McJESSY: You can either reserve
5   that right and review the transcript, or you
6   can waive that right and trust that she took it
7   down accurately, and she can just prepare the
8   transcript.
9       THE WITNESS: Yeah. I waive it. I
10  waive it.
11      MR. McJESSY: Okay.
12          I was going to say I don't
13  care what you do, but she needs to know.
14      THE WITNESS: No. That's fine. I
15  trust you guys.
16      MR. McJESSY: All right.
17          We can go off the record.
18
19      (There was a discussion off
20       the record.)
21
22      FURTHER DEPONENT SAITH NOT.
23
24

40 (Pages 157 to 160)

161

```
 1    STATE OF ILLINOIS   )
 2                        )  SS:
 3    COUNTY OF C O O K   )
 4
 5         I, DIANE M. NULICK, a Notary Public
 6    within and for the County of Cook, State of
 7    Illinois, and a Certified Shorthand Reporter of
 8    said state, do hereby certify:
 9         That previous to the commencement of the
10    examination of the witness, the witness was
11    duly sworn to testify the whole truth
12    concerning the matters herein;
13         That the foregoing deposition transcript
14    was reported stenographically by me, was
15    thereafter reduced to typewriting under my
16    personal direction and constitutes a true
17    record of the testimony given and the
18    proceedings had;
19         That the said deposition was taken
20    before me at the time and place specified;
21         That the said deposition was adjourned
22    as stated herein;
23         That I am not a relative or employee or
24    attorney or counsel, nor a relative or employee
```

162

```
 1    of such attorney or counsel for any of the
 2    parties hereto, nor interested directly or
 3    indirectly in the outcome of this action.
 4         IN WITNESS WHEREOF, I do hereunto set
 5    my hand and affix my seal of office at Chicago,
 6    Illinois, this 22nd day of April, 2025.
 7
 8
 9
10
11
      _____
12         Notary Public, Cook County, Illinois.
13
14    C.S.R. Certificate No. 084-002029.
15
16
17
18
19
20
21
22
23
24
```

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 16



# All of your loading dock and overhead door needs, in one place

We specialize in the service, supply & installation of loading dock equipment and overhead doors.

We pride ourselves on giving the customer not only excellent service but doing it at an affordable price. We also offer a free quote or consultation on any new project. Our sales staff and service professionals are dedicated to giving you an experience that you won't forget. Come experience the difference of Midwest Dock Solutions.



PLAINTIFF'S
EXHIBIT
57









# Clients & Testimonials

★ ★ ★ ★

*"Midwest Dock Solutions has the best customer service."*
**SARINA W.**



**ABOUT US**

Midwest Dock Solutions specializes in the service, supply & installation of loading dock equipment and overhead doors. We pride ourselves on giving the customer not only excellent service but doing it at an affordable price.

**CONTACT INFO**

OFFICE: 708-367-0801
EMERGENCY SERVICE: 708-921-8950

info@midwestdocksolutions.com

27 E. 36th place
Steger, IL 60475



Midwest Dock Solutions specializes in the service, supply & installation of loading dock equipment and overhead doors. We pride ourselves on giving the customer not only excellent service but doing it at an affordable price. We also offer a free quote or consultation on any new project. Our sales staff and service professionals are dedicated to giving you an experience that you won't forget. Come experience the difference of Midwest Dock Solutions.

**Request a Free Quote**



## Loading Dock Equipment



Dock equipment allows for safe and efficient loading and



OFFICE - 708-367-0801    SERVICE TEXT - 708-578-8278    24 HOUR EMERGENCY SERVICE - 708-921-8950

HOME    PRODUCTS ⌄    SERVICES ⌄    CONTACT

**New Inquiry**

**Service Call**



## Loading Dock Equipment



Dock equipment allows for safe and efficient loading and unloading of goods and must accommodate heavy loads, uneven bed heights, and unevenly distributed loads.

Midwest Dock Solutions offers a wide range of capacities, deck sizes, deck constructions and both hydraulic and mechanical operation to suit virtually any application.

Regardless of your application, Midwest Dock Solutions provides the most economical and durable solution.

DOCK LEVELERS
E.O.D.'s
DOCK SEALS
DOCK SHELTERS
DOCK LIGHTS
DOCK RESTRAINTS
STEEL CANOPIES
NEW INSTALLATIONS
RETRO FIT
CUSTOM APPLICATIONS



| | | |
|---|---|---|
| OFFICE - 708-367-0801 | SERVICE TEXT - 708-578-8278 | 24 HOUR EMERGENCY SERVICE - 708-921-8950 |

HOME | PRODUCTS ⌄ | SERVICES ⌄ | CONTACT

New Inquiry
Service Call

https://www.midwestdocksolutions.com/products

## Overhead Doors



America's Favorite Doors™

**Clopay® is a preferred supplier of commercial overhead sectional garage doors and coiling steel doors.**

**Midwest Dock Solutions offers the industry's premier heavy-duty commercial insulated or hollow, steel, aluminum, and special application sectional doors. And because commercial applications vary, a variety of customization options to fit your specific needs are available.**

**RIBBED STEEL**
**ALUMINUM FULL-VIEW**
**INSULATED OR UNINSULATED**
**VARIETY OF GLASS OPTIONS**
**EXHAUST PORT OPTIONS**
**10-YEAR LIMITED WARRANTY**
**FULLY CUSTOMIZABLE**





## Rolling Steel Doors





## Rolling Steel Doors

CornellCookson is a leading door manufacturer. We manufacture a complete line of overhead door and closure products, designed for commercial, industrial, institutional and retail use.

When you select a Cornell IronWorks door, you're not just getting a superior product, you're getting professional door installation and service expertise. Our trained experts can help you select the right door for your home. And, when it comes to installation, because it's done right the first time, your door will deliver performance and reliability from the day it's installed. Your technician will check your door for everything from safety to performance to appearance.

**ROLLING DOORS**
**FIRE DOORS**
**TRAFFIC DOORS**

## High Speed Doors



Hörmann is one of the world's leading high speed roll up doors





Chicago Overhead Doors Installa... ✕ +

https://www.midwestdocksolutions.com/products

Guest

📞 OFFICE - 708-367-0801    📞 SERVICE TEXT - 708-578-8278    📞 24 HOUR EMERGENCY SERVICE - 708-921-8950

HOME    PRODUCTS ⌄    SERVICES ⌄    CONTACT

**New Inquiry**

**Service Call**

## High Speed Doors



Hörmann is one of the world's leading high speed roll up door manufacturers and a global leader in today's building components industry. The family's name has become synonymous with brand quality products covering a wide range of doors for industrial, commercial door and residential applications. Hörmann currently serves customers in more than 30 countries with a multitude of quality products.

The Hörmann range of commercial roll up doors along with the openers are specially designed and developed to meet the requirements of the North American market. And we do it without compromising the Hörmann standard for quality and design offering superior protection and safety.

**AUTOMOTIVE RETAIL**
**CLEAN ROOMS**
**COLD STORAGE**
**FOOD & BEVERAGE**
**TRANSPORTATION**
**WASTE MANAGEMENT**





### Bug Barrier





## Bug Barrier

Several different model styles are available to choose from for your particular application. Bug Barrier doors are custom manufactured to accommodate virtually any size opening. Specialty screens and strip screens, manual/automatic roll-up, wind-curtains, single & bi-parting.

Keep out insects and birds while improving sanitation areas by having a controlled environment
Helps meet FDA/AIB requirements
Helps keep the plant facility cooler - offers 65% shade
Improves ventilation- aids in employee comfort which will lead to increased productivity
Allow daylight and outside air in while providing a safe and secure barrier that will deter unwelcome visitors.
Readily installed on dock doors, dumpster areas, and warehouse openings
Bug Barriers are ideal for food processing, packaging and manufacturing facilities.

## Door Operators







Chicago Overhead Doors Install...

https://www.midwestdocksolutions.com/products

OFFICE - 708-367-0801    SERVICE TEXT - 708-578-8278    24 HOUR EMERGENCY SERVICE - 708-921-8950

HOME   PRODUCTS ⌄   SERVICES ⌄   CONTACT   **New Inquiry**   **Service Call**

## Door Operators





Commercial customers want strength, durability and a long life with low maintenance. Midwest Dock Solutions offers a comprehensive line of electric door operators to meet a wide range of sectional and rolling door requirements, including mounting options, electrical specifications, safety devices and special controls.

Whether it be safety equipment, harsh environments or large doors, Midwest Dock Solutions sells and installs openers in a variety of modifications, horsepowers, voltages and phases to meet your specific needs. We also stock accessories and safety systems for any application.

**TROLLEY OPERATORS**
**HOIST OPERATORS**
**HIGH CYCLE TROLLEY OPERATORS**
**JACKSHAFT OPERATORS**
**SLIDE OPERATORS**
**AND MORE**



## Safety Products

 **Yellow Products**



Chicago Overhead Doors Install... ✕  +

https://www.midwestdocksolutions.com/products

Guest

OFFICE - 708-367-0801      SERVICE TEXT - 708-578-8278      24 HOUR EMERGENCY SERVICE - 708-921-8950

HOME    PRODUCTS ⌄    SERVICES ⌄    CONTACT

**New Inquiry**

**Service Call**



## Safety Products

 **Yellow Products**

"Save"ty has been recognized as the innovative leader when it comes to the fabrication and design of high quality dock and warehouse equipment. All products are built to the most rigid industry standards, providing customers with the greatest possible value.

Steel and aluminum dock boards and plates
Portable Yard Ramps
Rail Boards
Dock Levelers
Safety Products
Mezzanines
Stairways
Ladders
Slab Handling Products



### ABOUT US

Midwest Dock Solutions specializes in the service, supply & installation of loading dock equipment and overhead doors. We pride ourselves on giving the customer not only excellent service but doing it at an affordable price.

### CONTACT INFO

OFFICE: 708-367-0801
EMERGENCY SERVICE: 708-921-8950

info@midwestdocksolutions.com

27 E. 36th place
Steger, IL 60475

 



**Midwest Dock Solutions' Technicians are committed to the highest level of safety standards when performing dock leveler, vehicle restraint, and industrial door inspection, service or repair.**

**Combining Exceptional Service With Affordable Prices**
**Service & Installation of loading dock equipment & overhead doors**
**Preventative maintenance programs for dock & door equipment**
**24 hour emergency service**

## Repairs

___

When your equipment is down, time is of the essence.
Our commitment to making your operation safer and more productive doesn't end with your equipment purchase.
We don't sub-contract out for repair work. When your equipment is down, time is money. Our certified technicians are dedicated to getting you back up and running. You can depend on Midwest Dock Solutions' prompt and reliable



Chicago Overhead Doors Install × +

← C https://www.midwestdocksolutions.com/services

OFFICE - 708-367-0801  SERVICE TEXT - 708-578-8278  24 HOUR EMERGENCY SERVICE - 708-921-8950

**MIDWEST DOCK SOLUTIONS**

HOME  PRODUCTS ⌄  SERVICES ⌄  CONTACT

**New Inquiry**

**Service Call**

## Repairs

When your equipment is down, time is of the essence.
Our commitment to making your operation safer and more productive doesn't end with your equipment purchase. We don't sub-contract out for repair work. When your equipment is down, time is money. Our certified technicians are dedicated to getting you back up and running. You can depend on Midwest Dock Solutions' prompt and reliable service.

## Preventative Maintenance

Dock equipment faces rain, snow and dirt and takes a constant pounding from trucks and forklifts. Without maintenance, levelers will break down. Reduce costly repair service calls with a preventive maintenance plan.
To assist you in keeping your operation running smoothly, we offer unequaled loading dock and industrial door experience as well as maintenance service programs at affordable rates. Our maintenance program will keep the repair bills down, and extend the life of your equipment.

## Welding & Fabrication

Midwest Dock goes beyond installer and distributor... Our expert welding combined with custom metal fabrication creates a quality loading dock or industrial door installation that is durable, safe, and professional looking. Midwest Dock Solutions can also provide custom welding and metal fabrication for industrial and commercial applications, both on and off-site. Whether dock plates, steel door jams or door wraps, loading dock pit framework, industrial door accessories, railings, stairways, or a range of other loading dock applications, Midwest Dock Solutions' welders can provide custom welding services to meet your needs. Our expert welding combined with custom metal



Chicago Overhead Doors Installa ✕ +

https://www.midwestdocksolutions.com/services

OFFICE - 708-367-0801     SERVICE TEXT - 708-578-8278     24 HOUR EMERGENCY SERVICE - 708-921-8950

**MIDWEST DOCK SOLUTIONS** "Your Complete Dock & Door Experts"

HOME    PRODUCTS ⌄    SERVICES ⌄    CONTACT

New Inquiry

Service Call

## Welding & Fabrication

Midwest Dock goes beyond installer and distributor... Our expert welding combined with custom metal fabrication creates a quality loading dock or industrial door installation that is durable, safe, and professional looking. Midwest Dock Solutions can also provide custom welding and metal fabrication for industrial and commercial applications, both on and off-site. Whether dock plates, steel door jams or door wraps, loading dock pit framework, industrial door accessories, railings, stairways, or a range of other loading dock applications, Midwest Dock Solutions' welders can provide custom welding services to meet your needs. Our expert welding combined with custom metal fabrication creates a quality loading dock installation that is durable, safe, and professional looking.

## Fire Door Drop Test

National Fire Protection Association (NFPA) standards require building owners and managers to have their rolling and sliding fire doors inspected and tested annually, and to maintain written documentation of such inspections. Midwest Dock Solutions' Fire Door Drop Test program helps building owners and managers stay in compliance with the most recent NFPA 80 standards, while maintaining the proper operation and full closure of your facility's rolling and sliding fire doors.



**MIDWEST DOCK SOLUTIONS** "Your Complete Dock & Door Experts"

**ABOUT US**

Midwest Dock Solutions specializes in the service, supply & installation of loading dock equipment and overhead doors. We pride ourselves on giving the customer not only excellent service but doing it at an affordable price.

**CONTACT INFO**

OFFICE: 708-367-0801
EMERGENCY SERVICE: 708-921-8950

info@midwestdocksolutions.com

27 E. 36th place
Steger, IL 60475



**OFFICE - 708-367-0801**    **SERVICE TEXT - 708-578-8278**    **24 HOUR EMERGENCY SERVICE - 708-921-8950**

HOME   PRODUCTS ∨   SERVICES ∨   CONTACT   **New Inquiry**   **Service Call**

# Get in Touch

27 E. 36th place
Steger, IL 60475

info@midwestdocksolutions.com

OFFICE: 708-367-0801
EMERGENCY SERVICE: 708-921-8950

**Contact Us**

First Name

Last Name

Email

Company

Title

Phone

Message

**Send Message**

**Midwest Dock Solutions is conveniently located 20 miles south of Chicago on the Illinois/Indiana border.**







