UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

MID-AMERICA CARPENTERS REGIONAL
COUNCIL PENSION FUND; *et al.,*

         Plaintiffs,

  v.

DOCK & DOOR INSTALL, INC., *et al.*,

         Defendants.

24-cv-06428

Judge Andrea R. Wood

Magistrate Judge Jeannice W. Appenteng

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACT IN
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT
<u>PURSUANT TO LOCAL RULE 56.1</u>**


**EXHIBITS 17-29**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOI
EASTERN DIVISION

MID-AMERICA CARPENTERS REGIONAL
COUNCIL PENSION FUND; *et al.,*

                    Plaintiffs,

     v.

DOCK & DOOR INSTALL, INC., an Illinois
corporation and MIDWEST DOCK SOLUTIONS,
INC., an Illinois corporation,

                    Defendants.

Case No 1:24-cv-06428

Judge Andrea R. Wood

Magistrate Judge Jeannice
W. Appenteng

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACT
IN SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT PURSUANT TO LOCAL RULE 56.1**

**LIST OF EXHIBITS**

| | |
|---|---|
| 1 | Declaration of John Conklin |
| 2 | Deposition Transcript of Anthony Zarlengo |
| 3 | Deposition Transcript of Anthony Brutti |
| 4 | Deposition Transcript of Michael Richert |
| 5 | Midwest Dock Solutions Inc. Articles of Incorporation, May 16, 2006, (Exhibit 79) |
| 6 | Midwest Dock Solutions Inc. Facebook Page, (Exhibit 53) |
| 7 | Deposition Transcript of Zachary Corrigan |
| 8 | Deposition Transcript of Donald Cruikshank |
| 9 | Defendant Midwest Dock Solutions, Inc.'s Answer, [ECF#18], (Exhibit 120) |
| 10 | One Jobsite Agreement Between Midwest Dock Solutions, Inc. and Chicago Regional Council of Carpenters n/k/a Mid-America Carpenters Regional Council, Nov. 11, 2011 and GoogleMaps Screenshot of Winpak Portion Packaging Facility, Sauk Village, IL, (Exhibit 81) |
| 11 | Midwest Dock Solutions, Inc.'s Fringe Benefit Contribution Reports (Exhibit 85) |
| 12 | Deposition Transcript of David Green |
| 13 | Krusinski Construction Company Cover Letter, Jun. 11, 2014, Subcontract Agreement, Midwest Dock Solutions, Inc. Certificates of Insurance, Compstak Website, Midwest Dock Solutions, Inc. Facebook Page, and GoogleMaps Images of 14907 Gougar Road, (Exhibit 104) |
| 14 | Midwest Dock Solutions, Inc.'s Facebook Page, (Exhibit 19) |

| 15 | Deposition Transcript of Anthony Tattini |
|----|------|
| 16 | Midwest Dock Solutions, Inc.'s Website, (Exhibit 57) |
| 17 | Intentionally Omitted |
| 18 | Deposition Transcript of Quinten Williams |
| 19 | Subcontract Agreement Between Pepper Construction Company and Midwest Dock Solutions Inc. for North American Warehouse Expansion, Glenview, Illinois, May 15, 2020, (Exhibit 61) |
| 20 | Declaration of S. Oertley, Senior Contract Specialist, Pepper Construction Company, Nov. 4, 2025 |
| 21 | Meridian Design Build: Subcontract between Meridian Design Build and Midwest Dock Solutions, Inc. for 1303 Jack Court Facility Upgrades, Bartlett, IL, May 28, 2024, (Exhibit 65) |
| 22 | Opus Design Build LLC Subcontract Agreement between Midwest Dock Solutions, Inc. and Opus Design Build LLC for Mokena Industrial Supply Spec Building A, Dec. 9, 2019 |
| 23 | Deposition Transcript of Ira Sugar |
| 24 | Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, (Exhibit 40) |
| 25 | Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, (Exhibit 221) |
| 26 | Deposition Transcript of Zachary Torkelson |
| 27 | Articles of Incorporation of Dock & Door Install, Inc., Jul. 11, 2014, (Exhibit 214) |
| 28 | Photograph of Anthony Brutti Race Car, (Exhibit 118) |
| 29 | Dock & Door Install, Inc. Answer, [ECF#17], (Exhibit 265) |
| 30 | Memorandum of Agreement between Dock & Door Install, Inc. and the Chicago Regional Council of Carpenters, Sep. 18, 2014, (Exhibit 219) |
| 31 | Memorandum of Agreement between Dock & Door Install, Inc. and the Chicago Regional Council of Carpenters, Aug. 15, 2019 |
| 32 | Defendant Dock & Door Install, Inc.'s Responses to Plaintiffs' Document Requests, Dec. 2, 2024 |
| 33 | Text Message Exchange between Callie Stephens (Gineris & Associates) and Tony Brutti, (Exhibit 106) |
| 34 | Dock & Door Install Inc. Invoices to Midwest Dock Solutions, Inc., (Exhibit 223) |
| 35 | Email from Tony Brutti, Dock & Door Install, to Tom Downs, Holden Insurance, Jul. 1, 2025, (Exhibit 151) |
| 36 | Letter from Thomas Bennington, Jr. (Lawrence Kamin Saunders & Uhlenhop, LLC) to Anthony Zarlengo, Michael Richert, and Anthony Brutti, Jul. 9, 2014, (Exhibit 215) |
| 37 | Dock & Door Install Inc. Employer Questionnaire / Application to Chicago Regional Council of Carpenters, Aug. 5, 2014, (Exhibit 218) |

| 38 | ADP Client Account Agreement and Authorization to Debit/Credit for Midwest Dock Solutions Inc., Oct. 6, 2016 |
|---|---|
| 39 | ADP Client Account Agreement and Authorization to Debit/Credit for Dock &Door Install, Inc., Oct. 6, 2016 |
| 40 | Subcontract Agreement Midwest Dock Solutions Inc. and Clayco Inc., (Exhibit 99) |
| 41 | Subcontract Agreement between Midwest Dock Solutions, Inc. and Opus Design Build LLC for Euclid Beverage Expansion Product, Mar. 26, 2024 |
| 42 | ARCO/Murray Construction Company: Subcontract Agreement between Midwest Dock Solutions, Inc. and ARCO/Murray National Construction Company, Inc., Feb. 27, 2023  SUBJECT TO PROTECTIVE ORDER - TO BE FILED SEPARATELY |
| 43 | Intentionally Omitted |
| 44 | Dock & Door Install Inc. Certificate of Insurance for Krusinski Construction Company, Aug 6, 2020, (Exhibit 256) |
| 45 | Dock & Door Install Inc. Certificate of Insurance for Meridian Design Build, Inc., Apr 14, 2025, (Exhibit 257) |
| 46 | Intentionally Omitted |
| 47 | Midwest Dock Solutions, Inc. Certificates of Insurance to Krusinski Construction Company, (Exhibit 280) |
| 48 | Midwest Dock Solutions, Inc. Certificates of Insurance to Opus Design Build LLC, (Exhibit 282) |
| 49 | Midwest Dock Solutions, Inc. Certificates of Insurance to Meridian Design Build LLC, (Exhibit 279) |
| 50 | Midwest Dock Solutions, Inc. Certificate of Insurance for ARCO/Murray, LLC, (Exhibit 259) |
| 51 | Dock & Door Install Inc. Certificate of Insurance for ARCO/Murray National Holdings, Inc., Mar. 20, 2020, (Exhibit 254) |
| 52 | Midwest Dock Solutions, Inc. Certificates of Insurance to Principle Construction Company, Inc., (Exhibit 284) |
| 53 | Standard Form of Subcontract Agreement Between Principle Construction Corp. and Midwest Dock Solutions, Inc. for General RV Showroom Huntley, IL, Jan. 26, 2022, (Exhibit 64) |
| 54 | Dock & Door Install, Inc. 2016 IRS Form 1120-S (First page only), (Exhibit 172) |
| 55 | Dock & Door Install, Inc. 2017 IRS Form 1120-S (First page only), (Exhibit 175) |
| 56 | Dock & Door Install, Inc. 2018 IRS Form 1120-S (First page only), (Exhibit 178) |
| 57 | Dock & Door Install, Inc. 2019 IRS Form 1120-S (First page only), (Exhibit 181) |
| 58 | Dock & Door Install, Inc. 2020 IRS Form 1120-S (First page only), (Exhibit 184) |
| 59 | Dock & Door Install, Inc. 2021 IRS Form 1120-S (First page only), (Exhibit 187) |
| 60 | Dock & Door Install, Inc. 2022 IRS Form 1120-S (First page only), (Exhibit 190) |
| 61 | Dock & Door Install, Inc. 2023 IRS Form 1120-S (First page only), (Exhibit 193) |

| 62 | Deposition Transcript of Callie Stephens |
|----|------------------------------------------|
| 63 | Deposition Transcript of Sherri Webber |
| 64 | Steger, IL Application for Post Office Box Service, Jan. 11, 2021, (Exhibit 49) |
| 65 | Steger, IL P.O. Box Service Fee Notice of Midwest Dock Solutions and Credit Card Payment Receipts, (Exhibit 50) |
| 66 | Cincinnati Insurance Company Endorsement for Change of Address, Mar. 24, 2021, (Exhibit 240) |
| 67 | Cincinnati Insurance Company Billing Statements to P.O. Box 363 from Feb. 28, 2022 to Aug. 29, 2024, (Exhibit 48) |
| 68 | Dock & Door Install, Inc. Fringe Benefit Contribution Reports March 2021 to October 2023, (Exhibit 47) |
| 69 | Deposition Transcript of Richard Mantoan |
| 70 | Deposition Transcript of Nicolas Kelly |
| 71 | Deposition Transcript of Branden Bishop |
| 72 | Dock & Door Install Inc.'s Fringe Benefit Contribution Reports September 2014 to July 2019, (Exhibit 220) |
| 73 | Email from Callie Stephens (Gineris & Associates) to Tony Brutti, Oct. 17, 2016, (Exhibit 222) |
| 74 | Email from Sherri Webber to Callie Stephens (Gineris & Associates), Sep. 26, 2018, (Exhibit 211) |
| 75 | Quinten Williams LinkedIn Page (Exhibit 2) |
| 76 | Tony Tattini Checks from Midwest Dock Solutions, (Exhibit 35) |
| 77 | Intentionally Omitted |
| 78 | Intentionally Omitted |
| 79 | Intentionally Omitted |
| 80 | Intentionally Omitted |
| 81 | David Green and Anthony Tattini W-2s for 2017, (Exhibit 261) |
| 82 | Anthony Brutti W-2 for 2017, (Exhibit 173) |
| 83 | Anthony Brutti W-2 for 2018, (Exhibit 176) |
| 84 | Don Cruikshank, David Green, and Anthony Tattini W-2s for 2018, (Exhibit 262) |
| 85 | Anthony Brutti W-2 for 2019, (Exhibit 179) |
| 86 | Anthony Brutti W-2 for 2020, (Exhibit 182) |
| 87 | Anthony Brutti W-2 for 2021, (Exhibit 185) |
| 88 | Anthony Brutti W-2 for 2022, (Exhibit 188) |
| 89 | Jose Aguirre, Don Cruikshank, David Green, Eric Jansma, Nicolas Kelly and Collin Zarlengo W-2s for 2022, (Exhibit 264) |
| 90 | Anthony Brutti W-2 for 2023 (Exhibit 191) |

| 91 | Jose Aguirre, David Green, Eric Jansma, Nicolas Kelly and Collin Zarlengo W-2s for 2023, (Exhibit 263) |
| 92 | David Green W-2s for 2020-2024, (Exhibit 28) |
| 93 | Blue Book Building & Construction Network ProView Worksheet and Contract |
| 94 | The Blue Book Building & Construction Network Contract for the Period August 2021 through July 2023, Apr. 14, 2021, (Exhibit 105) |
| 95 | The Blue Book Building & Construction Network Contract for the Period August 2021 through July 2023, Apr. 14, 2021 |
| 96 | Email from Ira Sugar, Midwest Dock Solutions Inc., to Zach Adkins, Pepper Construction Company, Nov. 4, 2019, (Exhibit 60) |
| 97 | Bid Proposal by Midwest Dock Solutions, Inc. to Opus Design Build LLC, Jan. 21, 2022 for MTC Kenosha 2021, (Exhibit 100) |
| 98 | Photograph of Midwest Dock Solutions Truck, (Exhibit 8) |
| 99 | Photograph of Midwest Dock Solutions Truck, (Exhibit 5) |
| 100 | Photograph of Midwest Dock Solutions Truck, (Exhibit 6) |
| 101 | Photograph of Midwest Dock Solutions Shirt (Exhibit 15) |
| 102 | Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' Second Set Of Interrogatories And Document Production Requests |
| 103 | Dock & Door, Inc. Deposit Summary, Sep. 1, 2022, Midwest Dock Solutions Inc. Payment of $10,972, Dock & Door Install Inc. Invoices to Midwest Dock Solutions Inc., (Exhibit 168) |
| 104 | Email from Tony Brutti to Margaret Stredde (Esser Hayes), Apr. 20, 2021, (Exhibit 52) |
| 105 | Email Exchange Between Tony Brutti, Zack Adkins (Pepper Construction) and Ira Sugar, (Exhibit 241) |
| 106 | Email Exchange Between Tony Brutti and Zack Adkins (Pepper Construction), (Exhibit 242) |
| 107 | Email Exchange Between Tony Brutti and Christi Adams (Pepper Construction), (Exhibit 243) |
| 108 | Email Communications from Sherri Webber to Tony Brutti and Tony Zarlengo, (Exhibit 244) |
| 109 | Email Exchange Between Tony Brutti and Christi Adams (Pepper Construction), (Exhibit 246) |
| 110 | Email Exchange Between Tony Brutti and Thomas Braun (Pepper Construction), (Exhibit 250) |
| 111 | Email from Tony Brutti (Midwest Dock Solutions Inc.) to Christi Adams (Pepper Construction), Mar. 28, 2024, (Exhibit 249) |
| 112 | Email from Tony Brutti, Midwest Dock Solutions Inc., to Christi Adams, Pepper Construction, Mar. 28, 2024, (Exhibit 98) |

| 113 | Deposition Transcript of Veronica O'Connor |
|---|---|
| 114 | Email from Tony Brutti (Midwest Dock Solutions Inc.) to Margaret Stredde (Esser Hayes), Oct. 22, 2020, (Exhibit 287) |
| 115 | Email from Margaret Stredde (Esser Hayes) to Tony Brutti (Midwest Dock Solutions Inc.), Oct. 22, 2020, (Exhibit 288) |
| 116 | Midwest Dock Solutions, Inc. Certificate of Insurance for Principle Construction Corp., Oct. 16, 2020 |
| 117 | Email from Tony Brutti (Midwest Dock Solutions Inc.) to Margaret Stredde (Esser Hayes), Oct. 23, 2020, (Exhibit 290) |
| 118 | Village of Hazel Crest Department of Building & Inspectional Services, Application for Contractor's Registration Certificate, Company Name: Midwest Dock Solutions |
| 119 | Email from Margaret Stredde, Esser Hayes, to Margaret Stredde, Oct. 23, 2020, (Exhibit 291) |
| 120 | Midwest Dock Solutions, Inc. Certificate of Insurance for Village of Hazel Crest, Oct. 23, 2020 |
| 121 | Email from Tony Brutti, Midwest Dock Solutions, to Cathie Demitropoulos, Assured Partners, Jan. 11, 2021, (Exhibit 293) |
| 122 | Text Message Between Callie Stephens, Gineris & Associates, Ltd. and Tony Zarlengo, Midwest Dock Solutions, Jun. 13, 2023, (Exhibit 107), EX. 122 |
| 123 | Text Message from Richard Mantoan to Tony Brutti (Exhibit 273) |
| 124 | Email from Mara Spring, Counsel for Holden Insurance, to Kevin McJessy, Plaintiffs' Counsel, Oct. 6, 2025, (Exhibit 253) |
| 125 | Deposition Transcript of Jacie Olson |

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 17

Intentionally Omitted

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 18

1

```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
                     EASTERN DIVISION

MID-AMERICA CARPENTERS      )
REGIONAL COUNCIL PENSION    )
FUND, et al.,               )
                            )
            Plaintiffs,     )   No. 1:24-cv-02428
                            )
        vs.                 ) Judge Andrea R. Wood
                            )
DOCK & DOOR INSTALL,        )   Magistrate Judge
INC., an Illinois           ) Jeannice W. Appenteng
corporation and MIDWEST     )
DOCK SOLUTIONS, INC., an    )
Illinois corporation,       )
                            )
            Defendants.     )
```

          The deposition of QUINTEN MARCELLUS
WILLIAMS, called by the Defendant for
examination, taken pursuant to the Federal
Rules of Civil Procedure of the United States
District Courts pertaining to the taking of
depositions, taken before DIANE M. NULICK, a
Notary Public within and for the County of
Cook, State of Illinois, and a Certified
Shorthand Reporter of said State, at Suite 231,
3759 North Ravenswood, Chicago, Illinois, on
the 13th day of March, A.D. 2025, at 9:21 a.m.

2

```
1   PRESENT:
2     McJESSY, CHING & THOMPSON, LLC,
      BY:  MR. KEVIN P. McJESSY,
3       mcjessy@MCandT.com,
        (3759 North Ravenswood, Suite 231,
4       Chicago, Illinois  60613,
        (773) 880-1260),
5
        appeared on behalf of the plaintiffs;
6
     ALLOCCO MILLER & CAHILL, P.C.,
7     BY:  MR. TODD A. MILLER,
        tam@alloccomiller.com,
8       (20 North Wacker Drive, Suite 3517,
        Chicago, Illinois  60606,
9       (312) 675-4325),
10        appeared on behalf of the defendant,
          Dock & Door Install, Inc.;
11
     AMUNDSEN DAVIS LLC,
12    BY:  MR. MICHAEL F. HUGHES,
       mhughes@amundsendavislaw.com,
13     (3815 East Main Street, Suite A-1,
        St. Charles, Illinois  60174,
14     (630) 587-7925/(630) 217-1228 (direct),
15        appeared on behalf of the defendant,
          Midwest Dock Solutions, Inc.
16
17  Also Present:
18    Mr. Anthony Zarlengo,
      Mr. Michael Richert,
19
20
21
22
23
24
```

3

```
1                   I N D E X
2
3   WITNESS:  QUINTEN MARCELLUS WILLIAMS
4
5   EXAMINATION BY:                         PAGE
6   Mr. McJessy                                4
    Mr. Hughes                               183
7   Mr. McJessy                              228
    Mr. Hughes                               239
8
9   PLAINTIFF'S EXHIBITS:
10
    No. 1                                     13
11  No. 2                                     19
    No. 3                                     47
12  No. 4                                     49
    No. 5, 6, 7, 8, and 9                     78
13  No. 6                                     79
    No. 7                                     83
14  No. 3                                     93
    No. 10                                   101
15  No. 8                                    107
    No. 3                                    117
16  No. 11                                   141
    No. 12                                   148
17  No. 13                                   149
    No. 11                                   153
18  No. 14                                   176
    No. 5                                    189
19  No. 3                                    211
    No. 11                                   214
20  No. 14                                   219
    No. 15                                   229
21  No. 3                                    230
22
23
24
```

4

1          (The witness was duly sworn.)

2

3

4

5          QUINTEN MARCELLUS WILLIAMS,

6   called as a witness herein, having been first

7   duly sworn, was examined and testified as

8   follows:

9

10

11              EXAMINATION

12          BY MR. McJESSY:

13

14          Q.  Sir, can you state your name for the

15   record -- first, middle, and last -- and spell

16   each for the court reporter, if you would?

17          A.  My name is Quinten Marcellus Williams.

18   That's Q-u-i-n-t-e-n, M-a-r-c-e-l-l-u-s, last

19   name Williams, W-i-l-l-i-a-m-s.

20          Q.  All right.

21              Have you ever been deposed

22   before, sir?

23          A.  No, ma'am -- sir.

24          Q.  That's all right.

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

5

1 All right. Well, then, I'm
2 the lucky guy who gets to introduce you to the
3 process.
4 So today is going to be a bit
5 of a memory test.
6 A. Okay.
7 Q. I'm going to ask you questions about
8 things that happened in the past, probably.
9 And, hopefully, you will give me the best
10 answers that you can.
11 A. Yes.
12 Q. I understand that it's a memory test.
13 If you -- if you know something, you can answer
14 the question. If you -- if you're guessing or
15 estimating or whatever or it's just the best
16 you can recall, just say that on the record.
17 That's fine. Okay?
18 A. Okay.
19 Q. You understand you're under oath?
20 A. Yes, sir.
21 Q. Okay.
22 And you understand that even
23 though we're in a conference room in an
24 informal setting, that oath has the same force

6

1 and effect as if this were a court?
2 A. Yes, sir.
3 Q. Okay.
4 If I ask you a question today
5 as we go along and you don't understand it --
6 and sometimes I can fumble a question -- just
7 tell me you don't understand it, and I'll
8 rephrase or explain and make sure that we're
9 both on the same page.
10 Is that fair?
11 A. Okay. That's fine.
12 Q. Okay.
13 Is there any reason you
14 can't -- you can't give -- bless you.
15 Is there any reason you can't
16 give truthful answers today? For example, are
17 you on any medications that would influence
18 your ability to understand my questions or give
19 truthful answers or anything like that?
20 A. No, sir.
21 Q. Okay.
22 A couple of ground rules,
23 just that will help make life easier. These
24 folks may make objections to my questions. So

7

1 if they do -- you know, they may say things
2 like objection, foundation, objection,
3 something else --
4 A. Right.
5 Q. -- let them go ahead and make their
6 objection for the record so that the court
7 reporter can take that down. Then you can go
8 ahead and answer the question. Okay?
9 A. Okay. Yeah, that's fine.
10 Q. Also, the court reporter has got two
11 hands, but she can only take down what one of
12 us is saying at a time. So sometimes you're
13 going to know what my question is before I
14 finish asking it, and your inclination is going
15 to be to start answering it. But let me finish
16 my question before you start answering just so
17 she doesn't -- so she can take down an accurate
18 record.
19 Is that fair?
20 A. Yeah. That's fine.
21 Q. Okay.
22 I will do my best. But
23 sometimes I will fail, too. I will try to make
24 sure you're done with your answer before I

8

1 start asking my question so I don't talk over
2 you, but I'm not always good at that.
3 Also, all of your answers
4 need to be verbal responses. Yeses and nos are
5 good, but the court reporter can't take down
6 nods or shakes of the head or ah-huh or uh-uh,
7 those kind of responses.
8 A. Right.
9 Q. Okay?
10 A. Yeah. That's fine.
11 Q. Okay.
12 So sometimes I'll ask you a
13 question. You might nod or say ah-huh. And
14 I'll say, is that a yes? Is that a no? Just
15 so the record is clear.
16 All right. I represent the
17 Mid=America Carpenters Regional Council Fringe
18 Benefit Fund. There's also attorneys here from
19 Dock & Door Install and Midwest Dock Solutions.
20 So are you represented by an
21 attorney here today?
22 A. No, sir.
23 Q. Okay.
24 And that's just so that the

2 (Pages 5 to 8)

9

1  record is clear.
2      **Have you spoken with anybody**
3  **about your deposition today?**
4      A.  No, sir.
5      **Q.  Okay.**
6          **You and I did have a**
7  **conversation, correct?**
8      A.  Yes, sir.  I called you.
9      **Q.  Yeah.**
10         **And you called me after you**
11 **got the subpoena, correct?**
12     A.  Yes, sir.
13     **Q.  And do you remember approximately how**
14 **long ago that was?**
15     A.  I got subpoenaed and received the
16 documents approximately three days ago.
17     **Q.  Okay.**
18         **So it was right around that**
19 **time, right?**
20     A.  Yes, sir.
21     **Q.  Okay.**
22         **And how long did we talk?**
23     A.  For probably about 20 minutes.
24     **Q.  Okay.**

10

1      A.  I guess.
2      **Q.  And what did we talk about, generally?**
3      A.  You asked me did I have any documents
4  that I can prepare for you and have them
5  emailed over.  We discussed what the case,
6  possibly -- like was about a little bit and
7  about the deposition today.
8      **Q.  Okay.**
9          **And -- and you confirmed you**
10 **were available today, right?**
11     A.  Yes, sir.
12     **Q.  And -- oh, and you said you had some**
13 **documents responsive.  But just so the record's**
14 **clear, I did send you an email, and you said**
15 **you didn't get it; is that right?**
16     A.  Yeah, you sent me an email.
17     **Q.  Okay.**
18         **So you sent them to me today;**
19 **is that right?**
20     A.  Yes, sir.
21     **Q.  Okay.**
22         **So we'll print those out, and**
23 **I'll mark them so that you can confirm that's**
24 **what you had.**

11

1          **When was the last time -- do**
2  **you know who Tony Brutti is?**
3      A.  Tony Brutti?  I believe that's Payroll
4  Tony.
5      **Q.  Okay.**
6          **When you say "Payroll Tony,"**
7  **what's that mean?**
8      A.  That's the person we would send our
9  time sheets, too, I believe.
10     **Q.  Okay.**
11         **And you believe -- you called**
12 **him Payroll Tony?**
13     A.  Yes.
14     **Q.  Okay.**
15         **Do you know his last name?**
16     A.  Not off the record.
17     **Q.  Okay.**
18         **So you're just guessing that**
19 **that's who you -- who that is?**
20     A.  Yes.
21     **Q.  Okay.**
22         **Do you know Tony Zarlengo?**
23     A.  Yes.
24     **Q.  Okay.**

12

1          **He's here today, right?**
2      A.  Yeah, he's here.  Right.
3      **Q.  Okay.**
4          **And when was the last time**
5  **you spoke with Mr. Zarlengo?**
6      A.  The last time I worked for Midwest
7  Docks was back in October of 2023.
8      **Q.  Okay.**
9          **And do you know Mike Richert?**
10     A.  Not so much.
11     **Q.  Okay.**
12         **He's here today, too,**
13 **correct?**
14         **Do you recognize him?**
15     A.  Not really, honestly.
16     **Q.  Okay.  That's fine.**
17         **And do you recall when the**
18 **last time was that you spoke with him?**
19     A.  I believe Ira put us in a group chat
20 back in October of 2023.
21     **Q.  Okay.**
22         **And -- all right.  Let's see.**
23 **I am going to go ahead and mark this as**
24 **Exhibit 1.**

3 (Pages 9 to 12)

13

```
 1              (WHEREUPON, the document was
 2         marked Plaintiff's
 3         Exhibit 1 for identification,
 4         as of 3/13/25.)
 5
 6    BY MR. McJESSY:
 7       Q.  All right, sir.
 8              And the court reporter has
 9    handed you what we've marked as Exhibit 1.
10         Do you see that there?
11       A.  Oh, yes, sir.
12       Q.  Okay.
13              At the end of the day, we'll
14    probably have a number of exhibits that are
15    marked.  Don't take any of them with you.
16    Okay?
17       A.  Okay.
18       Q.  Please leave them here so that they
19    can be a part of the record.
20              Fair enough?
21       A.  That's fine.
22       Q.  Is that a copy of the subpoena you
23    received?
24       A.  Yes, sir.
```

14

```
 1       Q.  All right.
 2              And that's what caused you to
 3    be here today; is that right?
 4       A.  Correct.
 5       Q.  Okay.
 6              And if you could turn to the
 7    third page of that subpoena, it asks you to
 8    produce documents responsive to the six
 9    categories that are listed there on that page
10    and on the next page, correct?
11       A.  Yes, sir.
12       Q.  Okay.
13              And the first one is
14    documents showing communications between you
15    and Dock & Door or Midwest Dock Solutions.
16         Do you see that?
17       A.  Correct.
18       Q.  And the documents that you sent me by
19    text message today, are those the documents
20    that you have that's responsive to that
21    request?
22       A.  Yes, sir.
23       Q.  Okay.
24              You don't have anything else?
```

15

```
 1       A.  In communications?  No.
 2       Q.  Okay.
 3              And the next one is documents
 4    describing the work you performed for either
 5    Dock & Door or Midwest Dock.
 6              Do you have any documents
 7    responsive to that?
 8       A.  Those kind of relate because I sent
 9    you time sheets that states my location and
10    what I did that day.
11       Q.  Okay.
12              And so all of those documents
13    have been produced; is that right?
14       A.  Yes, sir.
15       Q.  Okay.
16              And then documents showing
17    the hours you worked, you'd say the same thing
18    for that, I assume?
19       A.  Yes, sir.
20       Q.  Okay.
21              And then documents showing
22    amounts you were paid by either Dock & Door or
23    Midwest Dock, how about documents responsive to
24    that request?
```

16

```
 1       A.  I believe I only sent the -- the time
 2    sheets.  But I do have the W-2s, if that will
 3    work.
 4       Q.  Okay.
 5              And you can provide those
 6    after today?
 7       A.  Yes, sir.
 8       Q.  All right.  That's fine.
 9              And are they W-2s from Dock &
10    Door or Midwest Dock, both?
11       A.  I believe it said Midwest Dock & Door
12    Solutions.
13       Q.  Okay.
14              You think Midwest Dock & Door
15    Solutions?
16       A.  Yes.  I believe so.  Actually, I'm
17    looking for them now, a screenshot.
18       Q.  Oh, okay.
19              So you have those on your
20    screenshot, so you can take a look at the --
21    oh, can you take a look at your phone and see
22    what it says?
23       A.  Dock & Door Install, Inc.
24       Q.  Dock & Door Install, Inc.  Okay.
```

4 (Pages 13 to 16)

17

1   Good.
2           And then documents related to
3   job or career postings or any social media
4   platform where you've posted a reference for
5   either Dock & Door or Midwest Dock, do you have
6   any documents responsive to that?
7       A.  No, not from any social media.
8       Q.  Okay.
9           Now, I do have a copy of your
10  LinkedIn page.
11          You have a LinkedIn page?
12      A.  I actually do, yes.  It's pretty old.
13      Q.  Okay.
14          You remember that now?
15      A.  I do now, yeah.
16      Q.  So I have a copy of that that I'll
17  show you as we go along today.
18          Other than that, do you have
19  anything else that you can think of?
20      A.  I possibly have an Indeed page, too.
21      Q.  Oh, a what?
22      A.  Indeed.
23      Q.  Oh, Indeed.
24      A.  I'm flipping to that.

18

1       Q.  Okay.
2           If you do, can you send me
3   that?
4       A.  Yes, sir.
5       Q.  Okay.  All right.
6           All right.  A couple of
7   background questions for you, sir.
8       A.  All right.
9       Q.  What's the highest level of education
10  you've received?
11      A.  I did two years of college.
12      Q.  Okay.
13          Where at?
14      A.  Mississippi Valley State University.
15      Q.  All right.
16          And when was that?
17      A.  From 2017 to 2019.
18      Q.  Okay.  Excellent.
19          And where did you grow up?
20      A.  The inner city of Chicago, south side.
21      Q.  Okay.
22          And let's -- actually, maybe
23  this will just be easier, if we do this.
24          Can you mark this as

19

1   Exhibit 2?
2
3           (WHEREUPON, the document was
4           marked Plaintiff's
5           Exhibit 2 for identification,
6           as of 3/13/25.)
7
8   BY MR. McJESSY:
9       Q.  All right.
10          Does that look like your --
11  I've handed you what we've marked as Exhibit 2.
12          Does that look like a copy of
13  your LinkedIn page?
14      A.  Yes, sir.
15      Q.  All right.
16          So if we go to the second
17  page of that where it talks about -- well,
18  education, I guess.  Actually, I'm going to ask
19  you.  Where did you graduate from high school?
20      A.  John Marshall Harlan Community
21  Academy.
22      Q.  Okay.
23          When did you graduate?
24      A.  2017.

20

1       Q.  And what was -- in college, did you
2   have a major or anything like that?
3       A.  I was a biology major.
4       Q.  Was it a two-year or a four-year
5   program?
6       A.  It was a four-year program.
7       Q.  Okay.
8           So you didn't finish it?
9       A.  I didn't finish that, no.
10      Q.  Okay.
11          And I'd like to ask you about
12  training you've received in the trade.
13      A.  Okay.
14      Q.  The first thing there under education
15  says United Brotherhood of Carpenters and
16  Joiners of America.
17          Is that the apprentice
18  training program?
19      A.  Yes, sir.
20      Q.  All right.
21          And when did you enroll in
22  that?
23      A.  I enrolled and got accepted and
24  started class in September of 2019.

5 (Pages 17 to 20)

21

1    Q.   Okay.
2         And how did --
3    A.   2020.  I'm sorry.
4    Q.   You think it was 2020?
5    A.   Yeah, because I didn't become a union
6  carpenter until November of 2020.  And it's a
7  nine-week program, so I believe that date on
8  there is wrong.
9    Q.   Okay.
10        So it should be September of
11 20 --
12   A.   Twenty.
13   Q.   Okay.
14        When did you get accepted in
15 the union?
16   A.   My last day was actually November 24,
17 2020, my pre-apprenticeship.
18   Q.   Okay.
19        So both of those dates should
20 be 2020, you think?
21   A.   Yes, sir.
22   Q.   Okay.
23        And how did you come to get
24 enrolled in the Carpenters Training Program?

22

1    A.   Well, I did a program at South
2  Suburban, the Highway Construction Career
3  Training Program.  And they guided us to get
4  into multiple different trades, and the
5  carpenters is the first one that called.
6    Q.   Oh, okay.
7         And what -- tell me what
8  training you received as part of that program.
9    A.   We did heavy equipment operations with
10 mini-escalators, Bobcats.  We also did basic
11 framing classes, math classes, slight
12 electrical.
13   Q.   Okay.
14        And then what was your
15 training with the United Carpenters -- United
16 Brotherhood of Carpenters?
17   A.   I'm a heavy-gauge concrete -- what do
18 they call it?  I'm a concrete form builder.
19 There we go.
20   Q.   Okay.
21        That was the training that
22 you received through them?
23   A.   Correct.
24   Q.   Okay.

23

1         And then it mentioned
2  scaffolding, hand tools, plus four skills.
3    Q.   Do you see that?
4    A.   Yes.
5    Q.   What's that a reference to?
6    A.   Some of the skills that we learned
7  through our training center.
8    Q.   Okay.
9         And what was -- what's the
10 four -- plus four skills?
11   A.   Probably like OSHA 30.  OSHA 30 -- I
12 can't recall the rest of them.  I'm sorry.
13   Q.   Okay.
14        And then -- and then after
15 that, you joined the union?
16   A.   Yes.
17   Q.   The carpenters union?
18   A.   Yes.
19   Q.   And what local were you a member of?
20   A.   Local 272.
21   Q.   Okay.
22        Did anybody have to sponsor
23 you or anything like that to become a member?
24   A.   No, sir.

24

1    Q.   Okay.
2         And did you graduate from the
3  program at the United Brotherhood of
4  Carpenters?
5    A.   Yes, sir.
6    Q.   Okay.
7         And you think that was in
8  November of 2020?
9    A.   I could guarantee you it was November
10 of 2020.
11   Q.   Okay.  All right.
12        All right.  And then under
13 licenses and certifications --
14   A.   Ah-huh.
15   Q.   -- it mentions first aid CPR, and
16 what's AED?
17   A.   The AED machine that you'll see.
18   Q.   Oh.
19   A.   You put the patches on the heart.
20   Q.   Defibrillator?
21   A.   Yes, basically.
22   Q.   Okay.
23        Any other certifications that
24 you -- any certifications or licenses that you

6 (Pages 21 to 24)

25

1    hold?
2        A.   I've got my MEWP, which is basically
3    forklift and heavy equipment operations.
4        Q.   Okay.
5        A.   Aerial lift.
6        Q.   Aerial.
7        A.   OSHA 30.  What else?  You said the
8    first aid, CPR, AED.  I can't recall the other
9    licenses off the top of my head right now.
10       Q.   Okay.
11            And then below that, it says
12   intro to welding, 75 hours.
13            Do you see that?
14       A.   Yes, sir.
15       Q.   And then there's a series of initials
16   after that?
17       A.   Yes, sir.
18       Q.   What are those?
19       A.   The different types of welding.  So
20   you've got MIG, TIG, and I can't recall the
21   last two.
22       Q.   Okay.
23            And what -- what does intro
24   to welding, 75 hours, mean?

26

1        A.   The program I was at at South Suburban
2    College, the HCCTP program, they gave us an
3    intro class to welding to get us like hands on
4    with the welding tools and everything and the
5    process of welding.
6        Q.   Okay.
7            And you had approximately 75
8    hours in that program?
9        A.   Correct.
10       Q.   Okay.  All right.
11            Any other skills training
12   that you have related to the trade that I
13   haven't asked you about or that you haven't
14   told me about?
15       A.   Skills training?  We went over all of
16   them.
17       Q.   Okay.
18            Any other licenses or
19   certifications that you have?
20            You mentioned there were a
21   couple that you couldn't remember.
22       A.   Yeah.  I can't recall all of them.  I
23   actually have -- I think I can receive a
24   document from the training center that has my

27

1    list of certifications.
2        Q.   And when you say "training center,"
3    which training center?
4        A.   The Mid-America Carpenters Regional
5    Council.
6        Q.   Okay.
7            So they would have record of
8    that?
9        A.   Yes, sir.
10       Q.   Okay.  All right.
11            So you graduated there.  You
12   became a -- from there, you became a member of
13   Local 272.  And when did you join the union?
14       A.   November 24 of 2020.
15       Q.   Okay.
16            And are you still a member of
17   that local?
18       A.   Yes, sir.
19       Q.   Okay.
20            And what was the first job
21   you got after coming out of -- after joining
22   the union?
23       A.   I worked for Power & Sons.  We was
24   building the Amazon out of Matteson.

28

1        Q.   Okay.
2            Amazon warehouse?
3        A.   Yes.
4        Q.   Okay.
5            And what were you doing on
6    that job?
7        A.   We were weather control.
8        Q.   What's that mean?
9        A.   So by being in the middle of winter,
10   we put up like tarp walls to prevent the cool
11   air from coming in to keep the heat in for the
12   concrete to get poured.
13       Q.   And can you just explain to me a
14   little bit about the process that takes place
15   for building a warehouse and what your role in
16   it was?
17       A.   So -- so in order to pour the concrete
18   in cold conditions, we need to make sure the
19   environment is right so the concrete can cure
20   properly, so my company was put in a position
21   to make sure those conditions were met.  So
22   like I said, we put up tarp walls to prevent
23   the cool air from coming in.  We'll keep
24   heaters properly located and turned on.  We

7 (Pages 25 to 28)

29

```
 1   have weather tarps that we will put down over
 2   the dirt to make sure that the dirt was at a
 3   proper temperature for concrete to get poured.
 4       Q.  Okay.
 5               When you say put up tarp
 6   walls, are you scovering the openings where
 7   the -- the overhead doors are going to be
 8   installed?
 9       A.  No.  So literally this is a brand new
10   building.  There's not even a wall here yet.
11       Q.  Oh, I see.
12       A.  There's no concrete wall yet.  That
13   hasn't been put in yet.  It's just the steel,
14   the -- the columns.
15       Q.  Okay.
16               What about the roof?
17       A.  The roof?  Well, there was five
18   floors, so the roof was going up per floor.  So
19   I believe, once we -- once I came in, the roof
20   was just now getting put in.
21       Q.  I see.
22               So you're putting up
23   essentially temporary walls to keep the heat
24   in?
```

30

```
 1       A.  Exactly.  Exactly.
 2       Q.  Okay.
 3               And how long were you with
 4   Power & Sons?
 5       A.  Approximately like three months.
 6       Q.  Okay.
 7               And then what was your next
 8   position?
 9       A.  Next, I went to -- I want to believe
10   it was Doral.
11       Q.  Okay.
12               And that's on your LinkedIn
13   page here?
14       A.  Right.
15       Q.  All right.
16               And what -- what did you do
17   at Doral?
18       A.  I was a millwright, so I was putting
19   in the conveyor systems, the spiral conveyor
20   system that they have at the same Amazon in
21   Matteson.
22       Q.  So this was another Amazon warehouse?
23       A.  This is the same Amazon warehouse.
24       Q.  Oh, the same Amazon warehouse.
```

31

```
 1       A.  A different company now.
 2       Q.  Okay.
 3               But you're at the same
 4   location?
 5       A.  Right.
 6       Q.  And you're doing different work?
 7       A.  Right.
 8       Q.  I see.
 9               And what is -- just so I can
10   understand generally, what is a spiral
11   elevator?
12       A.  The spiral conveyor?  So in this
13   facility, they have five floors.  So in order
14   for packages to go up and down, each floor
15   without, you know, the man house (sic), so they
16   built a spiral conveyor system that reaches all
17   the way up all five floors.
18       Q.  I see.
19               So people -- they can throw
20   packages on it --
21       A.  Right.
22       Q.  -- and it takes packages up and down?
23       A.  Exactly.
24       Q.  Okay.
```

32

```
 1               Were you welding as part of
 2   that job?
 3       A.  No, sir.
 4       Q.  No.
 5               Is it -- can you describe for
 6   me generally what your job was in putting in
 7   the conveyor?
 8       A.  Staging materials, so placing
 9   conveyors in certain locations where they go,
10   reading the blueprint to align, making sure
11   that it was on center of the blueprint.  And
12   then I would actually install the conveyor
13   system, whether that's the framework that it
14   sits on, or if it was hanging from the ceiling,
15   I would put all of that in, too.
16       Q.  Okay.
17               And I take it that your work
18   with Power & Sons essentially ended when they
19   poured the concrete floors?
20       A.  Yes.
21       Q.  So that's why you went to work for
22   Doral?
23       A.  Right.
24       Q.  All right.
```

8 (Pages 29 to 32)

33

1  　　　　And how long were you with
2  Doral?
3  　　A.  For approximately five to six months.
4  　　Q.  All right.
5  　　　　And then what was the next
6  job you had after that?
7  　　A.  Adjustable Forms.
8  　　Q.  Okay.
9  　　A.  No, Milhouse.  I worked for Milhouse
10 after that.
11 　　Q.  Okay.
12 　　　　And what did you do for
13 Milhouse?
14 　　A.  Milhouse, we built the Walmart Academy
15 on 83rd and Stewart.  I built two elementary
16 schools with them and -- yeah, that's about it.
17 　　Q.  All right.
18 　　　　And what was your -- what was
19 your job for them?  What did you do on those
20 projects?
21 　　A.  So we did general carpentry.  So I did
22 like heavy and light-gauge framing, hanging of
23 like the dense glass, drywall, hardware
24 install, so like the doors.  What else?

34

1  Cabinetry.  We did cabinets.  That sounds about
2  it.
3  　　Q.  All right.
4  　　　　And how long were you with
5  Milhouse Engineering?  Are the dates on here
6  correct?  It says August 2021 to April of 2022.
7  Nine months?
8  　　A.  Yes.
9  　　Q.  Okay.
10 　　　　And then what was your next
11 job after that?
12 　　A.  I was with Adjustable Forms, built
13 high-rises.
14 　　Q.  Okay.
15 　　　　And what did you do for them?
16 　　A.  Concrete.  It was strictly concrete
17 pouring.  So that would be framing, Symons
18 forms.  S-y-m-o-n-s, forms.
19 　　Q.  All right.
20 　　　　And then it looks like the
21 next job that's listed here is Midwest Dock &
22 Door?
23 　　A.  Correct.
24 　　Q.  Is that the next job you had after

35

1  Adjustable Concrete Construction?
2  　　A.  Yes, sir.
3  　　Q.  Okay.
4  　　　　And are you familiar with the
5  companies, Dock & Door Install and Midwest Dock
6  Solutions?
7  　　A.  I know it as Midwest Dock & Door
8  Solutions.
9  　　Q.  Okay.
10 　　　　That's how you -- that's what
11 you know the company as?
12 　　A.  Right.
13 　　Q.  Okay.
14 　　　　Say that name again?
15 　　A.  Midwest Dock & Doors.
16 　　Q.  Midwest Dock & Doors Solutions?
17 　　A.  Right.
18 　　Q.  Okay.  All right.
19 　　　　Are you aware that there's
20 two separate companies?
21 　　A.  No, not formally.
22 　　Q.  Not formally?
23 　　A.  Yeah.
24 　　Q.  Okay.

36

1  　　　　You sort of know it as one
2  company?
3  　　A.  Yes.
4  　　Q.  Okay.
5  　　　　And how did you come to be
6  employed at -- since you call it Midwest Dock &
7  Door Solutions, I'm going to call it the same
8  thing.
9  　　A.  Okay.
10 　　Q.  How did you come to be employed at
11 Midwest Dock & Door Solutions?
12 　　A.  I was referred by my BA, my business
13 rep.
14 　　Q.  All right.
15 　　　　And who is your BA?
16 　　A.  Joe.  Joe Willis.
17 　　Q.  And after he referred you to them,
18 what did you do?
19 　　A.  I believe the next step was calling --
20 I believe I talked to Tony Zarlengo over the
21 phone about my start date.
22 　　Q.  Okay.
23 　　　　Did you have to introduce
24 yourself to him or anything like that, or did

9 (Pages 33 to 36)

37

1    he just know who you were when you called or --
2        A.  I believe that they sent over my
3    information already, so he -- he knew my name.
4    I'm not going to say he knew who I was right
5    off the bat.
6        Q.  Okay.
7            And when you say they sent
8    over my information, who's "they"?
9        A.  My local.  Local 272.
10       Q.  Okay.
11           And would that have been Joe
12   Willis?
13       A.  Possibly.  Possibly, Joe Willis, or it
14   might be an office worker that he refers my
15   information over to to get sent.
16       Q.  Okay.
17           So did you call Mr. Zarlengo
18   or did he call you or do you recall?
19       A.  I don't recall.
20       Q.  Okay.
21           But somehow you got in touch
22   with him over the phone, either you called him
23   or he called you?
24       A.  Yes, sir.

38

1        Q.  Okay.
2            And do you recall anything of
3    the first conversation?
4        A.  It was just an introduction with a
5    date to come in and start paperwork, and that's
6    about it.
7        Q.  Okay.
8            And tell me about that
9    process.  I'm going to call it the onboarding
10   process.  Tell me about the onboarding process.
11   How did you --
12       A.  So I had an introduction at their home
13   facility in Steger.
14       Q.  Okay.
15       A.  Came in.  Did my paperwork the first
16   day.  I believe I started the following week
17   after, if I'm not mistaken.
18       Q.  Okay.
19       A.  So, yeah, after that --
20       Q.  All right.
21           Let me stop you there.
22           So when you came in to do
23   your paperwork, what paperwork do you recall
24   you had to fill out?

39

1        A.  Just the normal onboarding, so your
2    W-4s and -- really, that's about all I can
3    think of right now.
4        Q.  Okay.
5        A.  It was the normal onboarding
6    paperwork.
7        Q.  All right.
8            Did you have to give him a
9    resumé, fill out a job application, anything
10   like that?
11       A.  I believe I did have to fill out the
12   application for the job.  A resumé, no, because
13   I was referred.
14       Q.  Did they give you a copy of the job
15   application?
16       A.  No, not after I completed it.
17       Q.  Okay.
18           Was it handwritten?
19       A.  I believe so.
20       Q.  Okay.
21           And who -- who gave that to
22   you, and who did you give it back to when you
23   finished?
24       A.  I believe I gave it back to Tony

40

1    Zarlengo.
2        Q.  Okay.
3            And did he give it to you to
4    complete?
5        A.  Yeah.  I completed it in the office.
6        Q.  Okay.
7            But I mean, was he the one
8    who gave it -- when you showed up at the
9    office, did you meet with Tony?
10       A.  Yeah.  That's the only person I met
11   with.
12       Q.  Okay.
13           Tony Zarlengo was the only
14   one you met with?
15       A.  Yes.
16       Q.  Okay.  Okay.
17           So he had to have given you
18   the papers to fill out?
19       A.  Right.
20       Q.  And you gave them back to him?
21       A.  Right.
22       Q.  Okay.
23           Did you get anything like an
24   employee handbook or anything like that?

10 (Pages 37 to 40)

41

1      A.  No.
2      Q.  Okay.
3          And then you said you -- it
4  was about a week later that you started?
5      A.  Approximately.
6      Q.  Okay.
7          And how did you get your --
8  well, how long did you work there?
9      A.  I believe I was there from July of '22
10 to October of '23.
11     Q.  Okay.
12         And how did you get your job
13 assignment?  Like how did you know where to go
14 that first week?
15     A.  Ira.  They have a guide, a
16 superintendent, Ira -- I believe his last name
17 is Sugar, I believe.
18     Q.  Okay.
19     A.  He -- he would text our locations
20 every day for where we were going.
21     Q.  Okay.
22         He would send you a text
23 message?
24     A.  Yes, sir.

42

1      Q.  And was that pretty consistent during
2  the entire time you were there?
3      A.  Yes.
4      Q.  All right.
5          So from the time that you got
6  the call from the union until the time that you
7  started working and Ira sent you the text, was
8  the only person that you had spoken with Tony
9  Zarlengo?
10     A.  Yeah.  Higher up, yes.
11     Q.  Okay.
12         Is it fair to say he hired
13 you?
14     A.  Yeah.  You can say that.
15     Q.  Okay.
16         Him in conjunction with the
17 union, I take it?
18     A.  Yeah.
19     Q.  Okay.
20         When you say -- when I asked
21 you a question, you said, "higher up."
22         Was there be somebody else
23 you had spoken to?
24     A.  I believe I had a slight communication

43

1  with Mike.
2      Q.  Okay.
3      A.  But it wasn't as consistent as Tony
4  Zarlengo.
5      Q.  Mike Richert?
6      A.  I believe that's the last name.  I
7  don't know.
8      Q.  Okay.
9          And was that when -- at the
10 time that you were hired, or was that after
11 that?
12     A.  At the time I was hired.
13     Q.  Okay.
14         So you also, at some point,
15 met Mike Rick?
16     A.  I never met him in person, no.
17     Q.  Oh, you spoke to him?
18     A.  Yeah.  Really, just text messages, I
19 believe.
20     Q.  Okay.
21         And what was the nature of
22 the text messages with Mr. Richert?
23     A.  Sending over like my basic
24 information, my name, address, my level of

44

1  apprenticeship.
2      Q.  Oh, is there a level of
3  apprenticeship?
4      A.  So I'm a third-year carpenter, now.
5      Q.  I see.
6      A.  At the time, I was a first-year,
7  turning second-year when I was hired by Midwest
8  Docks.
9      Q.  Okay.
10         So they needed to know that?
11     A.  Right, because of the pay wage.
12     Q.  Okay.
13         Because of like the union
14 scale that they have to pay?
15     A.  Right.
16     Q.  Okay.
17         So that was the nature of
18 your exchange with Mr. Richert?
19     A.  Yeah.  That's -- that's all.
20     Q.  Okay.
21         Prior to starting work on
22 your first job, had you met with Tony Brutti at
23 all?
24     A.  No, not formally.

11 (Pages 41 to 44)

45

1    Q.  Okay.
2        Had you exchanged text
3    messages with Tony Brutti?
4    A.  No, because originally we were
5    dropping time sheets off on a desk location.
6    Q.  All right.
7        And we'll get to that.  I'll
8    ask you more about that as we go.
9        Oh, one thing I didn't say
10   when we started out.  I suspect the deposition
11   today will take, probably, several hours.  If
12   you need to take a break at some point, just
13   ask, and we can stop and take a break.
14   Usually, we do it about every hour --
15   A.  Okay.
16   Q.  -- just because the court reporter
17   needs a break, too.
18   A.  Okay.  That's fine.
19   Q.  Okay.
20       It's just I forgot to mention
21   that.
22       All right.  What -- what was
23   your -- what was your position with Dock &
24   Door?

46

1    A.  Technically, I was a Dock & Door
2    installer.
3    Q.  Okay.
4    A.  First and second-year apprentice.
5    Q.  All right.
6        And what kind of work did you
7    do for -- for the company?
8    A.  Install dock doors and positioned the
9    actual docks.  I wasn't certified to weld yet,
10   so I technically wasn't a welder for them.
11   Q.  Okay.
12       And did your position change
13   at any time?
14   A.  No, sir.
15   Q.  And I'm going to show you -- now, you
16   mentioned from your perspective, as far as you
17   understood, there was just one company,
18   correct?
19   A.  Yes, sir.
20       MR. McJESSY:  Okay.
21       Can you mark this as Exhibit
22   3?
23
24

47

1        (WHEREUPON, the document was
2         marked Plaintiff's
3         Exhibit 3 for identification,
4         as of 3/13/25.)
5
6    BY MR. McJESSY:
7    Q.  Now, what I've handed you is -- what
8    I've marked as Exhibit 3 is the web page for
9    Midwest Dock Solutions.
10       Do you see that?
11   A.  Yes.  Correct.
12   Q.  Have you ever seen this website
13   before?
14   A.  No, sir.
15   Q.  Okay.  All right.  Well, then, let's
16   set that aside for the moment.
17       The company you were working
18   for, can you tell me what kind of work it did?
19   A.  Midwest Dock & Doors?
20   Q.  Yeah.
21   A.  We would install dock doors, which are
22   dock doors and operation doors, so the bigger
23   dock doors, basically.
24   Q.  Is that the same thing, a dock door

48

1    and an operations door?
2    A.  An operators door has an operator on
3    it that can electrically be operated.  A
4    regular dock door you can roll up manually.
5    Q.  I see.  Okay.
6        And go on.  I'm sorry.
7    A.  Install the actual docks, the dock
8    levelers.
9    Q.  Okay.
10   A.  And, really, that was it.
11   Q.  Okay.
12       How about service work?
13   A.  By us being union, technically service
14   work is out of our jurisdiction.
15   Q.  You didn't do service work?
16   A.  No.
17   Q.  So you did all new installation?
18   A.  Yes.
19   Q.  Okay.
20       And did that include both
21   dock doors and dock levelers?
22   A.  Yes.
23   Q.  Okay.
24       Did the company do service

12 (Pages 45 to 48)

49

1    work?
2        A.  Yes.
3        Q.  And what kind of service work did it
4    do?
5        A.  I didn't really talk to too many of
6    the service guys, especially about their work.
7    But I believe it was just if a door is not
8    going up, they're going to make it go up.
9        Q.  Okay.
10           And the workers that did that
11   work, were they nonunion guys?
12       A.  Yes.
13           MR. McJESSY:  Okay.
14           I'm going to -- let's mark
15   this as an exhibit.  Mark this as Exhibit 4.
16
17           (WHEREUPON, the document was
18           marked Plaintiff's
19           Exhibit 4 for identification,
20           as of 3/13/25.)
21
22   BY MR. McJESSY:
23       Q.  All right.
24           Sir, I've handed you Exhibit

50

1    4, which is a document I prepared that's a list
2    of names numbered one to 87.
3        A.  Ah-huh.
4        Q.  And I'll represent to you that this is
5    a list of names that have been identified in
6    discovery responses in this case as the people
7    that are associated with Dock & Door Install
8    and Midwest Dock Solutions.
9            Can you tell me the names on
10   here that you recognize of people that you have
11   met or interacted with?
12       A.  Zach.  So number 10 is Zachary.
13       Q.  Okay.
14       A.  Zach I talked to.  I've worked with
15   Don.
16       Q.  Don Cruikshank?
17       A.  Yeah, Cruikshank.  Thirteen.
18       Q.  There's a number there.  So, yeah, if
19   you can give me the numbers and the names,
20   that's great.
21       A.  I believe, Janie.  I know Janie, but
22   her name is Jane.  Number 22.  I believe that's
23   her.
24       Q.  Okay.

51

1        A.  She's a nonunion.
2            Who else do I know?  Eric.  I
3    believe, that's the Eric I know.  Twenty-seven.
4        Q.  Okay.
5        A.  I know him by R. J.  I don't know
6    which Richard it is.  I don't know if it's
7    Richard, number 30, or Richard, number 42.
8        Q.  Okay.
9            You know an R. J. that's
10   first name is Richard?
11       A.  Richard, yeah.  He's a junior.
12       Q.  Okay.
13       A.  Nicolas.  I believe that's Nico,
14   number 33.  I believe I know the Ryan Mead,
15   number 46.
16       Q.  Okay.
17       A.  Number 56 might be the Eric I know.
18       Q.  Okay.
19       A.  I know 65, Andre Senter.
20       Q.  Okay.
21       A.  Seventy-three, Ira Sugar.
22       Q.  Okay.
23       A.  Number 77 might be the Zach, Zachary I
24   know.  Eighty-three, Travis.

52

1        Q.  Okay.
2        A.  These are all of the names?
3        Q.  That's what I've got.
4            Is there anybody else who is
5    not on this list here who you can recall having
6    worked with or met or know?
7        A.  So I worked mostly with Collin
8    Zarlengo, but he's not on here.
9        Q.  You're right.  He's not.
10           Okay.  Anybody else whose
11   name you can recall who is not on here?
12       A.  It was so long ago.  Yeah.  I mostly
13   worked with R. J., Nico, and Collin was the
14   three I worked closely with.
15       Q.  Okay.  All right.
16           How about people in the
17   office that you interacted with?
18       A.  The office people were really the
19   service people that I seen the most.  I really
20   didn't go too far into the office area.
21       Q.  Okay.
22       A.  So I really know or spoke with a lot
23   of the union guys and a couple of the service
24   people.

13 (Pages 49 to 52)

53

```
1    Q.  Okay.
2        And the service people, did
3  you mention -- did you identify them to me
4  or --
5    A.  Really, there was only one that I
6  remember.  And that was because she was the
7  only female service worker, and that's Janie --
8    Q.  Okay.
9    A.  -- or Jane.
10   Q.  Did she work on any jobs with you?
11   A.  She would do like delivery.  So she
12 had to drop off material, but that was about
13 it.
14   Q.  Okay.
15   A.  Travis, I want to say.  Travis is a --
16 a service guy.  He has worked on jobs with me.
17   Q.  Okay.
18       And what kind of work would
19 he do on jobs with you?
20   A.  If they would send him out, it was
21 probably welding, I believe.
22   Q.  Okay.
23       He was a welder?
24   A.  Yes.
```

54

```
1    Q.  All right.
2    A.  I believe that was Travis.
3    Q.  All right.
4        So you mentioned you knew an
5  Eric, so that could be either Eric Pool, which
6  is number 56, or Eric Jansma, which is 27, but
7  you knew him as Eric, correct?
8    A.  Yeah.  Yeah.
9    Q.  Can you describe him for me?
10   A.  He's a tall white guy.  Roughly,
11 maybe, 50.
12   Q.  Okay.
13       How -- how heavy?
14   A.  Probably like 240.
15   Q.  And how tall?
16   A.  Probably like six-two, six-three.
17   Q.  Oh, tall.
18       And what did you -- what's
19 your familiarity with him?  Did you work
20 together, what did he do, that kind of thing?
21   A.  He was a union guy.  So we were never
22 part of this together, but he has been on job
23 sites with us.
24   Q.  Okay.
```

55

```
1        And what kind of work did he
2  do?
3    A.  The same as me, so Dock & Door
4  installs.
5    Q.  Okay.
6        MR. MILLER:  Which guy was that,
7  Kevin?  Sorry.
8        MR. McJESSY:  That was Eric.
9        MR. MILLER:  Eric.  Okay.
10 BY MR. McJESSY:
11   Q.  And then you also mentioned that there
12 was a Zach that you knew, and that could be
13 either number 77, Zach Torkelsen, or number
14 ten, Zach Corrigan, correct?
15   A.  Correct.
16   Q.  And you just knew him as Zach,
17 correct?
18   A.  Zach.
19   Q.  Can you describe him for me?
20   A.  You know what?  I can't really recall
21 what Zach looked like because there's another
22 face that's probably -- but I don't think that
23 was Zach -- a shorter guy, glasses.  He was
24 kind of balding, probably like two -- maybe
```

56

```
1  like 230, if I'm not -- if I'm not mistaken.
2    Q.  Do you recall how old?
3    A.  Probably like 40 something.
4    Q.  Okay.
5        The Zach that you knew, what
6  kind of work did he do?
7    A.  Now, that I think about it, I believe
8  he was a service guy.
9    Q.  Okay.
10   A.  But he would bring materials.  I knew
11 him to bring materials mostly.
12   Q.  Okay.
13       What kind of materials did he
14 and Jane bring to the work site?
15   A.  So they would bring the actual dock
16 doors, springs and shafts.
17   Q.  Anything else?
18   A.  Maybe like welding, welding material.
19   Q.  Including the welders themselves,
20 tanks, that kind of thing?
21   A.  Normally, the welders are installed
22 into the actual trucks, company trucks we was
23 using, so they would be already pre-installed.
24 But sometimes they have to bring in more --
```

14 (Pages 53 to 56)

57

1   like welding sticks.
2       Q.  Oh, I see.
3           Oh, the welding equipment is
4   part of truck?
5       A.  Right.
6       Q.  Like it's attached to it?
7       A.  Right.
8       Q.  Oh, I see.
9           So you would already have the
10  truck on the work site?
11      A.  Yes.
12      Q.  Okay.  All right.
13          And you mentioned Don
14  Cruikshank, number 13.  Don.
15      A.  Don.
16      Q.  Did you work with him?
17      A.  Yes.
18      Q.  And what kind of work did he do?
19      A.  Similarly, we did the install of the
20  docks and the dock doors.
21      Q.  Okay.
22          And you mentioned Nico Kelly,
23  number 33?
24      A.  Yes.

58

1       Q.  And what kind of work did he do?
2       A.  The same.  The install of the dock
3   doors and actual docks, and he was a welder.
4   He was a certified welder.
5       Q.  Okay.
6           And then you mentioned that
7   there was a Richard, and you weren't sure if it
8   was number 30, Richard Kardosh, or number 42,
9   Richard Mantoan, but you knew him as R. J.,
10  Junior, correct?
11      A.  Right.
12      Q.  All right.
13          And did you work with him?
14      A.  Yes, closely.
15      Q.  Closely?
16      A.  Ah-huh.
17      Q.  And what kind of work did he do?
18      A.  Similarly.  Installed the dock doors
19  and docks.
20      Q.  Okay.  All right.
21          And then you mentioned Ryan
22  Mead, number 46, correct?
23      A.  Yes.  I believe he was a service guy.
24      Q.  All right.

59

1       Q.  Did you work with him?
2       A.  No.  Just when we're passing.
3       Q.  Okay.
4           Did he work at any of the job
5   locations where you worked, as far as you
6   recall?
7       A.  He may have been in one, possibly.
8   But I mostly knew Travis to be the one who come
9   out.
10      Q.  To do the service work?
11      A.  Right, or to weld.
12      Q.  To do the welding?
13      A.  Yeah.  He should have been doing the
14  service work.  But they would send him out to
15  weld, too.
16      Q.  All right.
17          And then you mentioned -- and
18  that was Travis Woff?
19      A.  I believe so.  I believe that was his
20  last name.
21      Q.  Okay.
22          You mentioned Andre Senter?
23      A.  Yes.
24      Q.  Number 65.

60

1           What did he do?
2       A.  So I knew him.  He was coming out as I
3   was coming in.  And we are part of the same
4   local.
5       Q.  Okay.
6           And did you work together
7   with him --
8       A.  No.
9       Q.  -- or he was just leaving the company
10  when you were coming in?
11      A.  He was just leaving as I was coming
12  in.
13      Q.  Okay.
14          Did you sort of replace him?
15      A.  No.  Well, yeah, because he found a
16  new -- a new job closer to home.
17      Q.  Okay.
18      A.  So, technically, yes, I would say I
19  replaced him.
20      Q.  Okay.
21          That was your understanding?
22      A.  Right.
23      Q.  Okay.
24          And then how about Ira Sugar?

15 (Pages 57 to 60)

61

```
1      A.  Ira was the super who would give me my
2   destinations.
3      Q.  And would you say he was your
4   supervisor?
5      A.  Right.
6      Q.  And was that true the entire time you
7   were there?
8      A.  Yes.
9      Q.  He'd give you your instructions, where
10  to go for work?
11     A.  Right.
12     Q.  And did he do anything else?
13     A.  No.
14     Q.  All right.  All right.
15         Now, you looked at your W-2
16  when we started out, and the W-2 form showed a
17  Dock & Door Install on it, correct?
18     A.  Yes.  I believe so.
19     Q.  Okay.
20         And as far as you know, was
21  that the name on your paychecks?
22     A.  So we used the ADP app, and I wasn't
23  really checking them because the money was
24  direct deposited into my account.
```

62

```
1      Q.  Okay.
2          So you didn't get a -- a
3   paycheck?
4      A.  No.
5      Q.  Okay.
6          Like a handwritten or a
7   hand -- strike that.
8          You didn't get -- you didn't
9   get a check like in an envelope, or they didn't
10  hand you a check or even a pay stub directly, I
11  take it?
12     A.  No.
13     Q.  Okay.
14         Nothing in paper?
15     A.  No.
16     Q.  Okay.
17         It was all electronic through
18  the ADP app?
19     A.  Exactly.
20     Q.  And then it would be direct deposited
21  into your bank account?
22     A.  Yes, sir.
23     Q.  Okay.
24         Did you use the ADP app or
```

63

```
1   no?
2      A.  I would check during like the tax
3   season to see if I can get my W-2s early, but
4   they will mail them in.
5      Q.  Okay.
6          Oh, the W-2s will get mailed
7   to you?
8      A.  Right.
9      Q.  So you'd get those in the mail?
10     A.  Right.
11     Q.  Do you know who would mail them to
12  you?
13     A.  Not exactly.
14     Q.  Okay.
15         Would they come in an ADP
16  envelope or --
17     A.  Oh, no.  It comes in a regular clear
18  envelope.  And when you open it, it says the
19  Dock & Doors Solution, Inc.
20     Q.  Okay.  All right.
21         And did you ever have a
22  situation where you needed to address -- for
23  example, you didn't get enough pay in your
24  paycheck or your hours were underreported or
```

64

```
1   there is -- you had some dispute over whether
2   all of your fringe benefit contributions had
3   been paid, anything like that?
4      A.  Not that I can recall.  I was still
5   kind of new to understanding all of that.  So
6   as long as the money was in my account, I was
7   okay.
8      Q.  All right.  Very pragmatic of you.
9          All right.  So you never had
10  occasion to like go to somebody and say, hey,
11  there's been a mistake, as far as you recall?
12     A.  Oh, not that I can recall, no.
13     Q.  All right.
14         If something like that had
15  happened, who would you have gone to?
16     A.  I would have went to Ira, first.
17     Q.  Okay.
18     A.  Ira.  Then I would have went to Tony,
19  Payroll Tony.  Benton, I believe his last name
20  is.
21     Q.  Okay.
22     A.  I believe that's his last name.
23     Q.  Benton?  You have a list there.
24     A.  Brutti.
```

16 (Pages 61 to 64)

65

1    Q. Brutti?
2    A. Brutti, yeah.
3    Q. Okay.
4         You think that's Payroll
5    Tony?
6    A. Right.
7    Q. Okay.
8         Did you have access to a
9    credit card for making purchases on behalf of
10   the company --
11   A. No.
12   Q. -- like, you know, tools, equipment,
13   and supplies, that kind of thing?
14   A. No, sir.
15   Q. Okay.
16        Did you ever have occasion to
17   need reimbursement for like tools or parking
18   expenses or anything like that?
19   A. So I was informed that there was no
20   reimbursement for my tools. I later found out
21   that that was wrong, that I'm not supposed to
22   purchase my own power tools for any union
23   company.
24   Q. Okay.

66

1    A. So I was never reimbursed for my power
2    tools.
3    Q. Okay.
4         How about any sort of
5    reimbursements? Did you ever get any sort of
6    reimbursements, parking, gas?
7    A. No, because -- nah, because we would
8    normally drive the work truck up there. And
9    whoever I was working with was a higher
10   individual in the union already with the
11   company, so they would have their credit
12   cards --
13   Q. Okay.
14   A. -- through the company.
15   Q. Okay.
16        So they did have credit cards
17   through the company?
18   A. Right.
19   Q. Okay.
20        And -- all right. And do you
21   know who -- who had those cards, if you recall?
22   A. Collin had one. That's who I used to
23   work with the most going out of town with. So
24   that's how we would get our per diems, so like

67

1    our eating and everything, our hotel rooms.
2    Q. Okay.
3         He would put it on the
4    company credit card?
5    A. Either him or Ira.
6    Q. Oh, Ira would sometimes pay for it?
7    A. Pay for like the room in advance.
8    Q. Okay. He would take care of that.
9         Any other expenses that he
10   would take care of when you were working out of
11   town?
12   A. Him, himself, the hotel was the most
13   one, commonly. Me and Collin or me and Nico
14   would order food while we were out with the
15   credit card, company credit card.
16   Q. Okay.
17        And how do you know Ira took
18   care of the hotel?
19   A. Because Collin would call Ira to make
20   sure he had the room available.
21   Q. So you'd be there with him, and Collin
22   would call Ira and say, hi, Ira, have you got
23   the room taken care of, that kind of thing?
24   A. We were going to stay in Wisconsin for

68

1    a time, so, yeah.
2    Q. Okay.
3         And you would -- I take it,
4    you would see the company credit card used to
5    make purchases for food and sometimes --
6    A. Correct.
7    Q. -- pay for hotels if Ira hadn't taken
8    care of it and that kind of thing?
9    A. Correct.
10   Q. Okay. Let's see.
11        Are you -- you're familiar, I
12   take it -- because you mentioned Steger
13   earlier.
14        Are you familiar with the
15   facility at 27 East 36th Place in Steger,
16   Illinois?
17   A. Steger, yes. That's the home
18   facility.
19   Q. Okay.
20        Is that the only office
21   you're familiar with?
22   A. Yes, sir.
23   Q. Okay.
24        I'm going to ask you about

17 (Pages 65 to 68)

69

1  three others and just tell me if it rings a
2  bell. 7975 Catalpa, C-a-t-a-l-p-a, Street,
3  Dyer, Indiana, D-y-e-r?
4      A. No.
5      Q. Okay.
6          How about 3211 Holeman,
7  H-o-l-e-m-a-n, Avenue, South Chicago Heights,
8  Illinois?
9      A. No.
10     Q. How about 1249 East Burville Road,
11  B-u-r-v-i-l-l-e, Road, Suite 9, Crete,
12  Illinois?
13     A. No.
14     Q. Okay.
15         Can you describe the
16  location -- the facilities at 27 East 36th
17  Place for me?
18     A. So it's off the main road. When we
19  pull in, we always pull in through the back,
20  which is a gravel road. Right behind that,
21  there's a train yard, I want to say. They have
22  two rolling doors for the work trucks to drive
23  in. They have a gas tank to fill the trucks up
24  with back there. Besides our facilities,

70

1  there's a big old facility where they store a
2  lot of the Dock & Door materials. Adjoining,
3  like connected to that, they have their office
4  area, and the office space is connected to it.
5      Q. Okay.
6          And -- so it's one building
7  that is divided into the warehouse,
8  essentially, or the storage area, and then the
9  other half is the office space?
10     A. Correct.
11     Q. Okay.
12         Is there a sign at the
13  location?
14     A. No, not that I can recall.
15     Q. Okay.
16     A. Maybe on like the main office door,
17  possibly. But, no, not that I can recall.
18     Q. Okay.
19         And there's no big sign out
20  front?
21     A. Midwest Docks? No.
22     Q. Yeah, okay.
23         And on the -- do you recall
24  whether there's a sign on the front door or not

71

1  really?
2      A. Not really.
3      Q. Okay.
4          And can you -- how big is
5  the -- what would you call the big area with
6  the two roll-up doors? Would you call it a
7  warehouse? Would you call it a storage
8  facility?
9      A. Well, I would call it a warehouse
10  because the service guys would do some work in
11  there sometimes, so technically it's not just
12  storage.
13     Q. Okay.
14         So it's also got like a
15  workshop area?
16     A. Right.
17     Q. Okay.
18         Can you describe for me how
19  big it is, what's in there, what it was used
20  for, that kind of thing?
21     A. I'd say we could approximately fit,
22  maybe, four work trucks in there.
23     Q. Oh, you can drive into it?
24     A. Yes.

72

1      Q. Oh, okay.
2          So the roll-up doors are
3  ground level so you can pull in?
4      A. Right, so we can pull in. There's two
5  of them.
6      Q. Okay. All right.
7          I'm sorry. Can you continue?
8  I didn't mean to cut you off.
9      A. That's fine.
10         I would say, if the material
11  wasn't in there, you'd probably be able to fit,
12  maybe, like six more cars in there. Footage?
13  I can't give you the exact footage of how big
14  the facility is.
15     Q. Okay.
16         Did they have racks for
17  storing stuff?
18     A. Yes, they did along the -- the back
19  wall, yeah.
20     Q. Okay.
21         And what kind of stuff would
22  be stored there?
23     A. You would have your basic materials,
24  like welding equipment, any type of screws,

18 (Pages 69 to 72)

73

1    boxes of -- of dock door materials, gloves.
2    That's all -- straps.
3        Q.  And then there was -- you said there
4    was a shop area?
5        A.  Yeah.  There was a little -- a small
6    little area where they would weld iron
7    together, materials.
8        Q.  All right.
9            And then what was -- could
10   you get into the office from the warehouse
11   area?
12       A.  Yes.
13       Q.  Okay.
14           And there was also a front
15   door to the office, too, I take it?
16       A.  Yes.  I rarely used that door, though.
17       Q.  Okay.
18           And can you describe the
19   office space for me?
20       A.  So coming right off the warehouse,
21   there was like a lunchroom area.  And then to
22   the right, it was the actual office door.  I
23   probably only went in there like once or two
24   times.  There's approximately one, two,

74

1    three -- maybe, three to four office areas.  I
2    believe one of them was mainly used for storing
3    like extra boxes that couldn't fit in the
4    warehouse side.  Yeah, that's about it.
5        Q.  Okay.
6            Do you know any of the people
7    that worked in the office?
8        A.  Besides Tony and Ira, not really.  I
9    knew there was a lady that worked in there, but
10   I never really met her formally.
11       Q.  Okay.
12           And when you say "Tony," you
13   mean Tony Zarlengo?
14       A.  Right.
15       Q.  Okay.
16           And because there's -- there
17   is Tony Brutti -- does -- do you know, does Mr.
18   Brutti go by Tony or Anthony?
19       A.  I know him by Tony.
20       Q.  Okay.
21           So there's two Tonys?
22       A.  I don't know if he is an Anthony that
23   goes by Tony, but I know him as Tony.
24       Q.  Okay.

75

1            So there's Tony Zarlengo and
2    Tony Brutti, correct?
3        A.  Right.
4        Q.  Okay.
5            So I just want to be sure,
6    when you mentioned Tony -- and we're talking
7    about the office space -- that was Tony
8    Zarlengo?
9        A.  Right.  Tony Zarlengo had one.  I
10   believe, Tony Brutti had an office space, too.
11   But I'm not formally sure about that.
12       Q.  Okay.
13           And did Mike Richert have an
14   office?
15       A.  Not that I recall.  Like I said, I
16   never really met with him too much or even seen
17   him at the facility a lot.
18       Q.  Okay.  All right.
19           Let's see.  It is 10:19.
20   We've been going probably a little bit over an
21   hour.  We were started late because you were
22   sending me the documents.
23           Do you want to take a break,
24   or are you okay for a little bit?

76

1        A.  No, I'm fine.  Are you okay?  Yeah,
2    I'm fine.
3        Q.  Anybody else need a break, or are we
4    good?
5            MR. HUGHES:  I'm good.
6            Are you guys okay?
7            MR. McJESSY:  All right.
8            We'll keep marshalling on
9    for, maybe, another half hour and then take a
10   break.
11           THE WITNESS:  Okay.  That's fine.
12   BY MR. McJESSY:
13       Q.  Were there any conference rooms in the
14   office space?
15       A.  Office space?  No.  There was a big
16   round table in our lunchroom, but I wouldn't
17   say that's necessarily a conference room.
18       Q.  Okay.
19           And other than the offices in
20   the office area, was there any open areas with
21   desks, like common areas?
22       A.  Like I say, I've only really been in
23   the office area, maybe, once or twice.
24       Q.  Okay.

19 (Pages 73 to 76)

77

1    A.  So I can't completely recall the whole
2 office area.
3    Q.  Fair enough.  All right.
4          The woman who you mentioned
5 who you didn't know her name, can you describe
6 her for me?
7    A.  I believe I only seen her once, but I
8 remember she was an older white lady with black
9 hair.  I believe she wore glasses, if I'm not
10 mistaken.
11    Q.  Black hair?
12    A.  Ah-huh.
13    Q.  And when you say older, like 65?
14    A.  Close in that range.  Maybe like late
15 50s.
16    Q.  Okay.
17    A.  Early 60s.
18    Q.  Was there a parking area at the
19 facility where trucks would be kept?
20    A.  Technically, yes.  But a lot people
21 would take their work trucks home with them.
22    Q.  Okay.
23          Do you know how many trucks
24 the company had?

78

1    A.  I could roughly say, maybe, like four
2 or five.
3    Q.  Okay.
4    A.  I believe they had like -- like four
5 actual work trucks.  No.  You know what?
6 Because some of the service guys got work
7 trucks.  Like I said, they would take them
8 home.  So I would say probably like five to six
9 work trucks, and then, maybe, like two vans
10 they would use.
11    Q.  Oh, okay.  Let me grab -- okay.
12          What are we on, five?  If you
13 can mark that five, six, seven, eight, nine.
14
15          (WHEREUPON, the documents were
16          marked Plaintiff's
17          Exhibits 5, 6, 7, 8, and 9 for
18          identification, as of 3/13/25.)
19
20 BY MR. McJESSY:
21    Q.  All right.
22          I've handed you Exhibits 5 to
23 9.  Let's start with Exhibit 5.  And if you
24 look at Exhibit 5 and actually Exhibit 6, they

79

1 look like they have the same basic picture on
2 them.
3          Do you see that?
4    A.  Yeah.  Correct.
5    Q.  Okay.
6          Had you ever seen the
7 Facebook page for Midwest Dock Solutions?
8    A.  No, sir.
9
10          (WHEREUPON, the document marked
11          Plaintiff's Exhibit 6 for
12          identification was tendered to
13          the deponent.)
14
15 BY MR. McJESSY:
16    Q.  Okay.
17          And if you look at Exhibit 6,
18 do you recognize that as one of the trucks that
19 Midwest had?
20    A.  Yeah.  They roughly look the same,
21 yeah.
22    Q.  Okay.
23          Is that one of the trucks
24 that you would use in your work, something

80

1 similar to that?
2    A.  Similar, yeah.
3    Q.  Okay.
4          And do you know where this
5 picture was taken?
6    A.  No, sir.
7    Q.  Okay.
8          And can you describe for
9 me -- can you tell by looking at this
10 picture -- I know you can't completely see the
11 bed of the truck -- but can you tell me what
12 kind of things are on the truck?
13    A.  So there's a storage box for tools.
14    Q.  Okay.
15    A.  I see a welding -- that green spec is
16 a welding jacket, I believe.
17    Q.  Okay.
18    A.  It looks like there's a box of dock
19 door materials, and that's about it.  Maybe a
20 tool bag.  That's about all I can see.
21    Q.  Okay.
22          And you would use a truck
23 like this in your work?
24    A.  Yes.

20 (Pages 77 to 80)

81

1    Q.  Okay.
2         And it would have the Midwest
3  Dock Solutions on the side of it like this?
4    A.  Yes.
5    Q.  All right.
6         Would you take this truck
7  home?  You said some people took trucks home.
8    A.  Right.
9    Q.  Would you take the truck home?
10   A.  No.  I wasn't a driver.
11   Q.  Okay.
12        So if -- if you were going
13 to -- when you went to your job sites, who
14 would bring the truck to the job site,
15 typically?
16   A.  Depending on who I'm working with.
17 But I normally worked closely with Collin.  So
18 I was always with Collin a lot, so he -- he
19 would be the one driving.
20   Q.  Okay.
21        And when -- when you went
22 places, would he be the one who drove the
23 truck?
24   A.  Yes.

82

1    Q.  Okay.
2         And would you ever drive the
3  truck?
4    A.  I've driven a truck before, but it
5  wasn't common.
6    Q.  Okay.
7         Was there a reason that you
8  weren't the person who drove or that it wasn't
9  common?
10   A.  No.  Because mostly it's a partner
11 thing, so they would partner up people with
12 trucks with a new hire.
13   Q.  I get it.
14        Do you know, did you have to
15 be on the insurance to drive the truck?
16   A.  I would -- I would think so.  I
17 wasn't.
18   Q.  Okay.
19        As far as you know, was there
20 any effort made to put you on an insurance
21 policy for the company you were working with,
22 Midwest --
23   A.  No.
24   Q.  -- Dock & Door Solutions?

83

1    A.  No.
2    Q.  Okay.
3         When your work went out of
4  town, would you take a truck like this with
5  you?
6    A.  Yes.
7    Q.  Okay.  Let's see.
8
9         (WHEREUPON, the document marked
10        Plaintiff's Exhibit 7 for
11        identification was tendered to
12        the deponent.)
13
14 BY MR. McJESSY:
15   Q.  And if you'll look at what's marked as
16 Exhibit 7, do you recognize this truck?
17   A.  Yes.  They roughly all look the same.
18   Q.  Okay.
19        All of the trucks had -- had
20 different equipment on them, I'm assuming?
21   A.  Correct.
22   Q.  Okay.
23        But this also has, it looks
24 like, a work box on it?

84

1    A.  Yeah, the tool -- the storage box?
2    Q.  Yeah.
3         And then what else is on this
4  truck?
5    A.  It has two ladders, which is not
6  uncommon, but uncommon for it to be up top like
7  that.  I've never really seen that.
8    Q.  Okay.
9    A.  The aerial lift in the back, that big
10 cage in the back -- to the left, the orange
11 cage -- that's not a part of the truck.
12   Q.  Okay.
13        That's separate?
14   A.  Right.
15   Q.  Okay.
16        And, again, maybe you said
17 this, but how many trucks do you think the
18 company had when you were working there?
19   A.  Approximately five to six work trucks
20 and then like two vans, one or two vans.
21   Q.  Okay.
22        Like just white vans?
23   A.  Regular cargo vans, yeah.
24   Q.  Okay.

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

85

1      **And how would the materials**
2  **get to the job site where you -- the job sites**
3  **where you were working?**
4      A.   So we would come and load them up at
5  the job site the majority of the time.  If it
6  was an off-site or out-of-town place, they
7  would already have them staged there, mostly.
8      Q.  **Okay.**
9          **And where would you load them**
10 **up at?**
11     A.  We would put the majority of them on
12 top of the rack.  Some will go in the actual
13 back of bed of the truck.
14     Q.  **Okay.**
15         **And where -- where would you**
16 **go to load the trucks?**
17     A.  To the Steger location.
18     Q.  **Okay.**
19         **And so there would be**
20 **supplies and materials there that you would**
21 **load up onto the trucks?**
22     A.  Correct.
23     Q.  **Okay.**
24         **And how did that work?  Would**

86

1  **you show up there in the morning to load the**
2  **truck and then go out to the work site, or how**
3  **would it work?**
4      A.  So there was a point in time where
5  Collin -- because we lived close in nature --
6  he would come pick me up, and he would go load
7  up the truck.  Sometimes I'd actually drive my
8  own personal car there and meet him there, and
9  then we would load everything up.
10     Q.  **Okay.**
11         **And if it's a job site -- a**
12 **big job site where the materials are delivered**
13 **to the job site, would you just drive directly**
14 **to the job site?**
15     A.  Correct, if there was no material that
16 needed to be picked up.
17     Q.  **Okay.**
18         **You'd just go right to the**
19 **job site?**
20     A.  Correct.
21     Q.  **Okay.**
22         **Can you describe for me --**
23 **describe for me generally what kind of tools**
24 **you used in your job?**

87

1      A.  A hammer drill, impact, socket sets.
2      Q.  **Impact wrench?**
3      A.  Impact drill.
4      Q.  **Impact drill.**
5          **Hammer drill, impact drill,**
6  **is that the same thing?**
7      A.  No.
8      Q.  **Different.**
9          **Socket wrenches, you said?**
10     A.  Yeah, socket wrenches.  A bar, rolling
11 bar, was just a long metal -- and this is just
12 me, what I just use.
13     Q.  **Yeah.**
14     A.  Yeah.  That's about it.
15     Q.  **Hammers?**
16     A.  Yes, hammers to sink the anchors.
17            Kleins.
18     Q.  **What are Kleins?**
19     A.  It's a -- it's an electrical -- like a
20 pair of pliers almost.  Yeah, that's about it.
21     Q.  **I take it, you'd also use assorted**
22 **hand tools, like screwdrivers and --**
23     A.  That was the impact drill.
24     Q.  **Oh, okay.**

88

1      **How about -- you mentioned**
2  **pliers.  Would you use regular pliers?**
3      A.  Sometimes.  We use the Kleins mostly,
4  though.
5      Q.  **Okay.**
6          **So relatively, it sounds**
7  **like, simple tools for what you were doing?**
8      A.  Correct.
9      Q.  **Okay.**
10         **What other kinds of tools**
11 **would others be using with you on the job?**
12     A.  The welding equipment.  So that would
13 be your stringers, your welding machines.
14 That's really the only other thing.
15     Q.  **Stringers, you said?**
16     A.  That's what we called the metal -- the
17 actual rods.
18     Q.  **The welding rods?**
19     A.  Yes.
20     Q.  **All right.**
21         **And who supplied the tools**
22 **that you described for me, the hammer drill,**
23 **impact drill, socket wrenches, rolling bars,**
24 **hammers, Kleins?**

22  (Pages 85 to 88)

89

1     A.  Besides the rolling bars, everything
2 else was self-supplied.
3     Q.  Okay.
4         You supplied that yourself?
5     A.  Correct.
6     Q.  And the welding equipment, that was, I
7 take it, company provided?
8     A.  Yeah.
9     Q.  And then the trucks, obviously, were
10 company provided?
11    A.  Correct.
12    Q.  And so what you mentioned to me -- and
13 the rolling bars were company provided, I take
14 it?
15    A.  Yeah, correct.  That was just basic
16 metal bars.
17    Q.  Metal bars.  All right.
18         Is that for cranking the
19 springs on the doors?
20    A.  Right.
21    Q.  Putting the tension on the springs?
22    A.  Yeah, correct.
23    Q.  And then what materials did the
24 company provide that you installed?

90

1     A.  So the actual dock door panels.
2     Q.  Okay.
3     A.  The tracks.  So that's lower and upper
4 tracks.  The actual springs, shafts, and
5 operators.
6     Q.  The -- like the electric openers?
7     A.  Right.  And then the hardware, which
8 is where all of the screws and the hinges come
9 in.
10    Q.  Okay.
11         Anything else?
12    A.  All of the docks, the actual docks.
13 You have tread guards.  We put tread guards in,
14 the -- what do we call them?  The -- I can't
15 remember what we called them.  The actual black
16 like pillows that's on the outside of the door.
17    Q.  Oh, I know what you're talking about.
18 Like the bumper guards?
19    A.  Yeah.  There you go.  Those and then
20 the actual bumper blocks so that those were
21 welded onto the actual building.  We supply
22 those, too.
23         That sounds about it.
24    Q.  All right.

91

1         If as we -- as we go along
2 today like you remember something additional
3 to -- like you remember some other tools you
4 used or something like that, if you could just
5 say, oh, yeah, by the way, and add that to your
6 answer if you can.
7     A.  Okay.  Yes.
8     Q.  All right.
9         And, again, the company would
10 provide all of the materials that you just
11 described for the installation?
12    A.  Yeah.  For installs, yes.
13    Q.  Okay.
14         Are you familiar with the
15 e-mail extension @midwestdocksolutions.com?
16    A.  We -- I never emailed them anything.
17 That was not something I ever did.
18    Q.  Okay.
19         So you never -- you never
20 sent anything to anybody at that email address
21 or received anything from anybody at that email
22 address?
23    A.  No.
24    Q.  Okay.

92

1         You never had an email
2 address, I'm assuming, like, you know,
3 quintenwilliams@?
4     A.  Oh, no.  Not me personally.
5     Q.  Do you know, were any of the employees
6 ever provided with company cell phones?
7     A.  Cell phones?  No.
8     Q.  Anything else that the company
9 provided to any of the employees?
10    A.  Besides certain people got company
11 credit cards and trucks.
12    Q.  Okay.
13         We already talked about how
14 you were given your job assignments.
15         You know what?  This is --
16 I'm going to stop here and take like a
17 five-minute break just because I'm about to
18 jump into a new area that will take a little
19 longer period of time.
20    THE WITNESS:  Okay.
21    MR. McJESSY:  So why don't we take a
22 break, and then we'll pick back up.
23    THE WITNESS:  That's fine.
24    MR. McJESSY:  Five minutes.

23 (Pages 89 to 92)

93

1    (After a break from 10:36 a.m.
2    to 10:51 a.m., the deposition
3    was resumed as follows:)
4
5    MR. McJESSY: I'm going to go back
6    to Exhibit 3 for a moment just so you know.
7
8    (WHEREUPON, the document marked
9    Plaintiff's Exhibit 3 for
10   identification was tendered to
11   the deponent.)
12
13   BY MR. McJESSY:
14   **Q. Sir, looking in Exhibit 3, do you see**
15   **there's a little paragraph there that discusses**
16   **Midwest Dock Solutions?**
17   A. Specializes in the service, supply,
18   and installation of loading dock equipment.
19   **Q. Yeah. That paragraph.**
20   MR. HUGHES: Objection. Foundation.
21   BY MR. McJESSY:
22   **Q. Okay.**
23   **It says, specializes in the**
24   **service -- and you said you didn't do service**

94

1    **work, correct?**
2    A. No.
3    **Q. Okay.**
4    **And it also says supply and**
5    **installation of loading dock equipment.**
6    **You did do that work,**
7    **correct?**
8    A. Correct.
9    **Q. Okay.**
10   **And overhead -- supply and**
11   **installation of loading dock equipment and**
12   **overhead doors, right?**
13   A. Correct.
14   **Q. And you did that work, too?**
15   A. Correct.
16   **Q. You installed loading dock equipment**
17   **and overhead doors, correct?**
18   A. Correct.
19   **Q. All right.**
20   **And it says, we also offer a**
21   **free quote or consultation on any new project.**
22   **Do you see that?**
23   A. Yes.
24   **Q. All right.**

95

1    **And the projects you did were**
2    **new projects, correct?**
3    A. Correct.
4    **Q. Okay.**
5    **And do you know who would do**
6    **the quotes or consultations for new projects?**
7    A. Through discussion of the coworkers.
8    I believe, Ira was one of the ones that did the
9    quotes.
10   **Q. Okay.**
11   **And that was discussion among**
12   **the people you worked with?**
13   A. Right.
14   **Q. Okay.**
15   **And then it says, our sales**
16   **staff and service professionals are dedicated**
17   **to giving you an experience that you won't**
18   **forget.**
19   **Do you see that?**
20   A. Yes.
21   **Q. Do you know who the sales staff was?**
22   A. Not off the top my head, no.
23   **Q. Okay.**
24   **And was -- it says -- if you**

96

1    look further down there, it says, loading dock
2    equipment, Blue Giant.
3    **Do you see that?**
4    A. Yes.
5    **Q. Was that one of the companies that**
6    **supplied equipment for you to install?**
7    A. I don't necessarily remember this
8    logo.
9    **Q. Okay.**
10   A. Yeah. I don't really know that logo.
11   **Q. How about the next page? It refers to**
12   **overhead doors, Clopay?**
13   A. Yes.
14   **Q. Do you know, was that one of the**
15   **suppliers for doors that you installed?**
16   A. The actual doors? Yes.
17   **Q. Okay.**
18   **And then further down there,**
19   it says, Cornell, Safe and Secure.
20   **Do you see that?**
21   A. Yes.
22   **Q. And below that, it says,**
23   CornellCookson is a leading door manufacturer.
24   **Do you see that?**

24 (Pages 93 to 96)

97

1    A. Correct.
2    Q. Do you know that? Was that one of the
3  suppliers of doors that you installed?
4    A. No, not that I can recall.
5    Q. Okay.
6       You don't recall that?
7    A. No.
8    Q. And the next one on the next page is,
9  I think, Hormann, H-o-r-m-a-n-n.
10      Do you see that?
11   A. Yes.
12   Q. And it says, Hormann is one of the
13 world's leading high speed roll-up door
14 manufacturers.
15      Do you see that?
16   A. Yes.
17   Q. Do you know, was that one of the
18 companies that supplied materials that you
19 installed?
20   A. I don't want to say that's the actual
21 name that I seen, but I do know the high speed
22 doors that we installed.
23   Q. Okay.
24      You don't know whether they

98

1  were Hormann or not?
2    A. Right.
3    Q. Okay.
4       But you know you installed
5  high speed roll-up doors?
6    A. Correct.
7    Q. Okay.
8       And then the last one -- the
9  second to last one there says bug barrier,
10 Gateway Industrial Products.
11      Do you see that?
12   A. Yes.
13   Q. And do you know, did you install
14 products by -- from Gateway Industrial
15 Products?
16   A. No.
17   Q. Okay.
18      Did you install bug barriers?
19   A. No.
20   Q. Okay.
21      And then on the last page, it
22 refers to LiftMaster.
23      Do you see that?
24   A. Correct?

99

1    Q. Did you install products from
2  LiftMaster?
3    A. Yes. Those were the operators that we
4  had put up.
5    Q. Okay.
6       And do you see it lists -- on
7  the left side there, it says, trolly operators,
8  hoist operators, high cycle trolly operators,
9  jackshift operators -- jackshaft operators, I'm
10 sorry -- slide operators and more.
11      Do you see that?
12   A. Correct.
13   Q. Do you know what each of those items
14 are?
15   A. I can roughly say that we put in the
16 jackshaft operators, I do believe.
17   Q. What are -- what's a jackshaft
18 operator?
19   A. So the operator will actually connect
20 to the actual shaft of the -- the springs.
21   Q. I get it.
22   A. I believe those are the ones we put
23 in.
24   Q. All right.

100

1       Do you know what the others
2  are?
3    A. By me knowing what a trolly is -- I
4  can comprehend what it is, but I had never
5  personally seen one.
6    Q. Okay.
7       Based on your experience of
8  what a trolly is and what a trolly operator
9  might be, what would that be?
10   A. It will -- it will connect to like a
11 pulley system almost, I believe.
12   Q. So another kind of door opener?
13   A. Right.
14   Q. Okay. All right.
15      Any other suppliers of
16 products that aren't -- that we didn't talk
17 about here that you can remember being
18 delivered to job sites where you installed the
19 products?
20   A. The only other thing -- I can't recall
21 the company name for it, but the track guards.
22 That would be the only other thing.
23   Q. Okay.
24      So there was a company that

25 (Pages 97 to 100)

101

```
 1    supplied track guards?
 2         A.   Right.
 3
 4              (WHEREUPON, the document was
 5              marked Plaintiff's
 6              Exhibit 10 for identification,
 7              as of 3/13/25.)
 8
 9    BY MR. McJESSY:
10         Q.   Okay.
11              I'd like you to take a look
12    at Exhibit 10 for me.
13         A.   Yes.
14         Q.   And these look to be time sheets that
15    you would have completed on a weekly basis.
16              Does that look right to you?
17         A.   Yeah.  Correct.
18         Q.   Okay.
19              And did you fill out these
20    time sheets?
21         A.   Yes.
22         Q.   All right.
23              And where did -- you see --
24    you see on the first one it looks like a
```

102

```
 1    photograph of the time sheet, correct?
 2         A.   Correct.
 3         Q.   All right.
 4              And if you look at the bottom
 5    of these pages, they have Bates labeling on
 6    them.  DDI 2277 is the first one.
 7              Do you see that?
 8         A.   Correct.
 9         Q.   All right.
10              If you go in a few pages --
11    oh, gosh, more than a few, I guess.  If you go
12    in to DDI 2280, which is just a couple pages
13    in, it's a slightly more legible version of the
14    time sheet form.
15              Do you see that?
16         A.   Correct.
17         Q.   Where did you get this form, the blank
18    form to fill out?
19         A.   Those would be in the office building.
20         Q.   Okay.
21              And where would they be at in
22    the office building?
23         A.   In the lunchroom right off the -- the
24    warehouse part.  So, technically, not the
```

103

```
 1    office.  It was the lunchroom.
 2         Q.   Okay.
 3              And did you ever have to ask
 4    anybody for them, or were they always there?
 5         A.   They was always there.
 6         Q.   Okay.
 7              So you would just go in and
 8    grab them?
 9         A.   Correct.
10         Q.   Okay.
11              And I'm going to ask you
12    about the handwriting on them, but let's take
13    the first page because it's got -- maybe it
14    looks like different handwriting on it.
15              The time sheet itself that's
16    in the picture --
17         A.   Correct.
18         Q.   -- is that handwriting on there yours?
19         A.   Correct.
20         Q.   Okay.
21              Including -- do you see where
22    it says ARCO Bridge on the first time entry?
23         A.   Correct.
24         Q.   Is that also your handwriting?
```

104

```
 1         A.   No.
 2         Q.   Okay.
 3              Do you know whose handwriting
 4    that would be?
 5         A.   No.
 6         Q.   Okay.
 7              And there's writing at the
 8    top of this page also --
 9         A.   Ah-huh.
10         Q.   -- that's above the photograph.
11              Do you see that?
12         A.   Yes.
13         Q.   Is that your handwriting?
14         A.   No.
15         Q.   Do you know whose handwriting that is?
16         A.   No.
17         Q.   Okay.
18              What handwriting on this
19    first page is yours?
20         A.   My name, Quinten Williams, the date
21    next to it, the circled hours I worked, the
22    McCook, and then stack.
23         Q.   Okay.
24              And -- and that's the same
```

26 (Pages 101 to 104)

105

1 pretty much for all of these entries, correct?
2     A.  And then the word "off" on the second.
3     Q.  Okay.
4             And when it says, "stack,"
5 what does that mean?
6     A.  That means we did stacking of dock
7 doors.
8     Q.  Okay.
9             And can you describe for me
10 what that work means?
11     A.  So we would put up the -- the lower
12 tracks and stack each individual door panel.
13     Q.  Okay.
14             So it's not like delivering
15 them to the job site and just stacking them up.
16 It's actually putting them sort of in the
17 tracks?
18     A.  Right, in the tracks and against the
19 wall to the door opening.
20     Q.  All right.
21             And what was the work you
22 would do?
23     A.  We would detail the actual doors,
24 detail them, put the hinges on the actual door

106

1 panels, then install the lower tracks and then
2 install the actual individual panels on top of
3 each other.
4     Q.  Okay.
5             And where would -- so you
6 would have the tracks.  You'd have the hinges.
7 You'd have the --
8     A.  Screws.
9     Q.  The screws and the fasteners to attach
10 everything?
11     A.  Yes.
12     Q.  Where would you get all of those
13 materials?
14     A.  Out of -- the tracks come as a group
15 delivered to the job site, or we would pick
16 those up.  It's a box -- it's a box that
17 normally holds all of the hardware materials,
18 which is your screws, your hinges, your
19 rollers, your cables.
20     Q.  Okay.
21             And when you said they would
22 either be delivered to the job site or we'd
23 pick those up, if you picked them up, you'd
24 pick them up from the warehouse?

107

1     A.  Yeah.  The Steger location.
2     Q.  Okay.  All right.
3             And you'd load them up on the
4 company trucks that we looked at and drive them
5 to the job site?
6     A.  Correct.
7     Q.  Okay.
8             Do you remember this project,
9 the McCook ARCO Bridge project?
10     A.  Roughly.  Roughly because of where
11 McCook is.  It was kind of far.
12     Q.  And what was this project?
13     A.  Just the standard logistics building
14 that we normally work on.
15     Q.  Okay.
16             Lots of doors?  You say
17 standard logistics building that we work on.
18     A.  Like these.
19
20             (WHEREUPON, the document marked
21             Plaintiff's Exhibit 8 for
22             identification was tendered to
23             the deponent.)
24

108

1 BY MR. McJESSY:
2     Q.  Okay.
3             That's -- you're pointing to
4 Exhibit 8, correct?
5     A.  Yes.
6     Q.  Okay.
7             And it shows just a row of
8 dock doors, correct?
9     A.  Correct.
10     Q.  Okay.
11             Is that what you call those
12 kind of buildings, logistics buildings?
13     A.  Yes, because mostly they will be
14 storing materials for shipment.  Some of them
15 turn into Amazons, but we don't know exactly
16 what they are prior to building them.
17     Q.  Okay.
18             And then if you turn to the
19 second page, DDI 2278 --
20     A.  Ah-huh.
21     Q.  -- again, I take it, where it says
22 missing or Missner -- I think it's Missner,
23 M-i-s-s-n-e-r, 2100 Melrose -- that's not your
24 writing, correct?

27 (Pages 105 to 108)

109

1    A. No.
2    Q. And the writing at the top of this
3  page is not your writing, correct?
4    A. No.
5    Q. All right.
6        And do you know what the --
7  there's a reference on this page that wasn't on
8  the last one that says mail.google.com.
9        Do you see that?
10   A. No.
11   Q. At the very bottom of the page, and
12 it's printed HTTPS?
13   A. Yeah. I see it.
14   Q. Do you know how that got to be there?
15   A. No.
16   Q. Okay.
17       And this time sheet refers --
18 on the second entry down -- refers to drive
19 i-n-s.
20       Do you see that?
21   A. Yeah, drive-in doors.
22   Q. Okay.
23       What does that mean?
24   A. So those are the bigger doors that we

110

1  will put most of the operators on.
2    Q. Okay.
3    A. Those are the ones you can drive in
4  and out of.
5    Q. All right.
6        So you put the door openers
7  on those, the automatic openers?
8    A. We will stack a row of them, and I'll
9  put the operators on them.
10   Q. Okay.
11       And would you put openers on
12 the stack doors, too, or no?
13   A. Rarely. Rarely. I think I probably
14 did once. But, normally, all operators go on
15 the drive-in doors so they can electrically be
16 operated.
17   Q. Okay.
18       And what were -- did your
19 work for installing the drive-in doors differ
20 from the work for installing stacking doors
21 where it says stacking?
22   A. So stacking is part of the process of
23 putting in the rolling doors because we have to
24 stack the panels on top of each other, put up

111

1  the same side guards. They're just bigger.
2  The only difference will be the operator you
3  have to put on the shaft.
4    Q. Okay.
5        The installation of the door
6  opener?
7    A. Right.
8    Q. Okay. All right.
9        And if you could turn to the
10 next page --
11   A. Ah-huh.
12   Q. -- you have an entry there for
13 September 1?
14       Do you see that?
15   A. Correct.
16   Q. And you wrote in Merrillville.
17       Do you see that?
18   A. Correct.
19   Q. And it looks like somebody crossed
20 that out and wrote in a different writing
21 something else.
22       Can you see what it says
23 after that?
24   A. Yeah. It says ARCO sander forms,

112

1  Crown Point.
2    Q. Okay.
3        And what was that, do you
4  know?
5    A. It was the same logistics building.
6  The location that they sent me said
7  Merrillville, but it was in Crown Point.
8    Q. So it's the same project. It's just a
9  different description of the project?
10   A. Right.
11   Q. Okay.
12       And -- all right. And
13 directly below that, it says, holiday.
14       Do you see that?
15   A. Yes.
16   Q. What does that mean?
17   A. It must have been some holiday on
18 September 4. I don't know.
19   Q. It could have been Labor Day that
20 year. I don't know.
21   A. Yeah, maybe.
22   Q. All right.
23       So you're just marking -- do
24 you get paid for holiday time?

28 (Pages 109 to 112)

113

1    A.  If I worked, yes.  But we didn't work
2  that day.
3    Q.  Okay.
4        And so in the top entry for
5  8/31, you're just noting that you had off that
6  day; is that right?
7    A.  Right.
8    Q.  Okay.
9        After you would complete
10  these time sheets, who did you send them to?
11    A.  Payroll Tony, so Tony Brutti.
12    Q.  Tony Brutti?  Okay.
13        And how would you send them
14  to him?
15    A.  Text message.
16    Q.  Okay.
17        And for the time sheet -- the
18  next time sheet I wanted to ask you to take a
19  look at was DDI 2280.
20        Do you see that?
21    A.  Yes, sir.
22    Q.  So that's not a photograph.  That's
23  actually the time sheet itself.
24        Do you see that?

114

1    A.  Correct.
2    Q.  How would you give this time sheet to
3  the company?
4    A.  So this means we came back to the
5  Steger location after work -- and this was the
6  only day, I guess -- and we would turn them in
7  by putting them on the desk, like the table we
8  was talking about in the lunchroom.
9    Q.  Okay.
10        So that's where you would
11  leave them?
12    A.  Correct.
13    Q.  Okay.
14        Do you know who would pick
15  them up from there?
16    A.  I would want to say Tony Brutti, but I
17  wouldn't confirm that.
18    Q.  You don't know?
19    A.  Right.
20    Q.  Okay.
21        Do you know, did the service
22  employees fill out time sheets that looked like
23  this?
24    A.  I'm not sure, honestly.

115

1    Q.  Okay.
2        And if you turn to the next
3  page, DDI 2281 --
4    A.  Ah-huh.
5    Q.  -- do you see that the time entry says
6  at school?
7    A.  Correct.
8    Q.  What does that mean?
9    A.  Everything that I'm working compared
10  to my hours.  I have to go back to the training
11  center, the carpenters training center.
12    Q.  Okay.
13    A.  So I was at school for those two days
14  out of this week.
15    Q.  Okay.
16        And did you get paid for that
17  work or for being at school or no?
18    A.  Not from the company.
19    Q.  Okay.
20        So you get paid through the
21  union?
22    A.  Through the actual carpenters training
23  center.  They send us a stipend.
24    Q.  Okay.

116

1        And then if you look at the
2  middle entry on that page, it says, track
3  guards.
4    A.  Correct.
5    Q.  Do you see that?
6    A.  Yeah.
7    Q.  And do you know -- what does that
8  mean?
9    A.  We would install the left and right
10  track guards for each individual dock door.
11    Q.  Okay.
12        Is that different than
13  stacking?
14    A.  Yes.  So these are the yellow track
15  guards that go over the -- the actual tracks
16  that we install, so it's like a safety measure
17  so the tracks don't get bent up from like force
18  and stuff.
19    Q.  I see.
20        I'm just curious as to --
21  yes.  All right.  Okay.
22    A.  So this is not the exact ones that we
23  install, but it's roughly kind of like these.
24

117

1       (WHEREUPON, the document marked
2      Plaintiff's Exhibit 3 for
3      identification was tendered to
4      the deponent.)
5
6  BY MR. McJESSY:
7    Q. Oh, okay. So we're looking -- for the
8  record, we're looking at Plaintiff's Exhibit 3.
9  And the last page, there's a photograph at the
10  bottom, correct?
11    A. Yeah. So those aren't the exact way
12  they look, but that's the same -- the same
13  operation that those are doing. It's guarding
14  something.
15    Q. I see. Okay.
16       Do you -- do you know what
17  ARCO Bridge means?
18    A. ARCO is a general contractor company,
19  I believe.
20    Q. Okay.
21       And so it's your
22  understanding that's a company that these were
23  being installed for?
24    A. Correct.

118

1    Q. Okay.
2       And it says Melrose on here.
3       Do you know where that
4  location is?
5    A. Melrose Park, I believe, Illinois.
6    Q. Okay.
7       And then -- let's see. If
8  you turn to the next page, which is DDI 2282 --
9    A. Correct.
10    Q. -- it says -- there's an entry there
11  that says rolled.
12       Do you see -- do you see
13  that?
14    A. Correct.
15    Q. What does rolled mean?
16    A. So we actually rolled doors that day.
17  So instead of stacking them, we did the second
18  operation to installing the doors, which is
19  putting up the upper tracks and the springs and
20  shafts in.
21    Q. I see. Okay.
22       And wherever it says rolled,
23  that's what that would mean?
24    A. Correct.

119

1    Q. Okay.
2       And are there different
3  supplies that you need to do that?
4    A. Yeah. So that's when we would have
5  the springs and the shafts -- they would be
6  delivered, or we will pick those up, too, from
7  the Steger warehouse -- and the tension
8  spring -- bars.
9    Q. And -- all right.
10       And if you turn to the next
11  page, DDI 2283, it says -- you've got an entry
12  at the top there that says, Chicago, and then
13  it looks like it says Missner, M-i-s-s-n-e-r,
14  Normal Street, ST period.
15       Do you see that?
16    A. Correct.
17    Q. Does that look like what it says there
18  to you?
19    A. Missner, yeah.
20    Q. Do you know what that project was?
21    A. Not off the top of my head, no.
22    Q. No. Okay.
23       And if you turn to the next
24  page, DDI 2284, there's an entry at the top

120

1  there that just says doors.
2       Do you see that?
3    A. Correct.
4    Q. What does that mean?
5    A. Just install -- I don't think that's
6  my handwriting.
7    Q. Okay.
8       Is this sheet your
9  handwriting?
10    A. All right.
11       You know what? Yeah, that is
12  my writing. My D's the same.
13       We probably just stacked
14  doors that day.
15    Q. Okay.
16       So doors would mean stack,
17  the same thing as stack?
18    A. Right.
19    Q. Okay.
20       And if you turn to the next
21  page, DDI 2285, do you see that?
22    A. 2285? Yeah.
23    Q. Yeah.
24       Do you know what the Ellis

30 (Pages 117 to 120)

121

1  **ARCO 2700 Ellis Joliet project was?**
2      A.  Roughly, probably the same logistics
3  building as we always do.
4      **Q.  Okay.**
5              **Something similar to that?**
6      A.  Correct.
7      **Q.  You don't remember that project**
8  **specifically?**
9      A.  No.
10     **Q.  All right.**
11             **Further down on this page,**
12 **there's an entry that says seals.**
13             **Do you see that?**
14     A.  Correct.
15     **Q.  What does "seals" mean?**
16     A.  Those are the cushions for outside,
17 for the trailers.  These.  So this is
18 Exhibit 6.
19     **Q.  Okay.**
20     A.  Those are the seals.
21     **Q.  Okay.**
22             **So it's the whole thing that**
23 **goes -- it's the -- for the record, it's the**
24 **black pieces on the side and on the top of the**

122

1  dock that go around the dock entranceway?
2      A.  Correct.
3      **Q.  Okay.**
4              **And that was Exhibit 6 you**
5  **were pointing to, correct?**
6      A.  Correct.
7      **Q.  And how do you install the seals?**
8      A.  From outside, we would be in an aerial
9  lift.  We attach brackets to the seals and
10 hammer drill into the concrete, put in anchors.
11 And that's for all three seals.
12     **Q.  Okay.**
13             **And you said an aerial lift.**
14 **Where would you get the aerial left?**
15     A.  It would be delivered for our company.
16     **Q.  Okay.**
17             **And would that be rented by**
18 **the company for the installation of these dock**
19 **seals?**
20     A.  Correct.
21     **Q.  Okay.**
22             **And -- so the company didn't**
23 **have one that it would deliver itself to the**
24 **job site?**

123

1      A.  No.
2      **Q.  Okay.**
3      A.  I believe the only they had was like
4  one scissor lift, if I'm not mistaken.
5      **Q.  Would that go to the job sites?**
6      A.  Rarely.  Somebody would sometimes take
7  it depending on if they needed it or not.
8      **Q.  Okay.**
9              **Otherwise, the aerial lift**
10 **would be rented just for that purpose?**
11     A.  Correct.
12     **Q.  Okay.**
13             **And as far as you know, the**
14 **company you were working for rented the -- that**
15 **equipment?**
16     A.  Correct.
17     **Q.  Okay.**
18             **And why do you think that?**
19     A.  Think what?
20     **Q.  Why do you think the company you**
21 **worked for rented that equipment instead of**
22 **like somebody else?**
23     A.  Having too many jobs going on at once,
24 found out it might not have been proper to own

124

1  because they are expensive.
2      **Q.  Okay.**
3              **I mean, like would you know**
4  **like would somebody from the office say, hey,**
5  **we'll make sure we'll have that out there for**
6  **you?**
7      A.  Correct.
8      **Q.  Okay.**
9              **So it was an internal company**
10 **thing to coordinate?**
11     A.  Yeah.  Ira would normally have them
12 delivered to us.
13     **Q.  Okay.**
14             **That's what I was -- that's**
15 **what I was -- what I was trying to get at.**
16             **So you would make sure -- Ira**
17 **would make sure that you had that piece of**
18 **equipment on site?**
19     A.  Correct.
20     **Q.  Okay.**
21             **Is that something you would**
22 **talk to him about if you needed it?**
23     A.  Me personally?  No.  Collin, yes.
24     **Q.  Okay.**

31 (Pages 121 to 124)

125

1     A.  My partner.
2     Q.  He would call Ira and say, hey, make
3  sure you've got this there?
4     A.  Right.
5     Q.  Okay.
6         Do you know who the -- who
7  the aerial lifts would be leased from?  Like
8  did it have a name on it or anything?
9     A.  The company is, I believe, Sunbelt.
10 We normally would get the green one, so that's
11 Sunbelt.
12    Q.  Oh, okay.
13        They're a big tool rental --
14 equipment rental company, correct?
15    A.  Yeah.
16    Q.  Okay.
17        If you turn to page DDI
18 2286 -- do you see that?
19    A.  Correct.
20    Q.  On this one, I notice there's no
21 description of work on this page.
22        Any particular reason that
23 would be?
24    A.  Probably sent this one in late and

126

1  just put -- put just the location.
2     Q.  Where you were?
3     A.  Yeah.
4     Q.  All right.
5         That doesn't mean anything to
6  you, the fact that it doesn't have a
7  description there?
8     A.  Oh, no.
9     Q.  Okay.
10        And if you go to DDI 2290 --
11 let me know when you're there.
12    A.  2290?  Here.
13    Q.  Yeah.
14        And do you see where it says
15 build out seals on the top of that?
16    A.  Correct.
17    Q.  All right.
18        Is that the same thing as
19 installation of the dock seals that you've
20 already described for me?
21    A.  Yes, but maybe that day I just
22 detailed the seals, so that means just putting
23 the brackets and everything on there.  I didn't
24 really install them.  I just detailed them.

127

1     Q.  I got it.
2         And then where it says seals,
3  that would be where you're actually installing
4  the seals?
5     A.  Right.
6     Q.  And if you turn to DDI 2291, do you
7  see where it says -- well, you can tell me what
8  says.  The first entry, it says dock something
9  and signs.
10        Do you see that?
11    A.  Yeah, dock chokes -- chocks.
12    Q.  Chocks, c-h-o-c-k-e-s?
13    A.  Right.
14    Q.  What does that mean?
15    A.  So when trailers pull up, they have to
16 chock their tires sometimes, so it's basically
17 a tire block so that it won't roll.
18    Q.  I see.
19    A.  And they get hammer drilled into the
20 outer side of the door.
21    Q.  Okay.
22        So you were installing those?
23    A.  Right.
24    Q.  Where would you get those pieces of

128

1  equipment?
2     A.  I believe those were already at the
3  job site.
4     Q.  Okay.
5         And what does signs mean?
6     A.  There were signs that we would put up.
7  What they say, I don't remember.  But they were
8  just yellow signs we would anchor onto the
9  walls.
10    Q.  Okay.
11        And then if you go to the
12 next page, DDI 2292, do you see where it says
13 dock lights?
14    A.  Yes.
15    Q.  And what does that mean?
16    A.  It's dock lights that we would install
17 that has a fan like connected to it sometimes.
18 We would have to install and anchor the arm to
19 the wall, and it's basically just a light that
20 can get rotated into the trailer.
21    Q.  Okay.  Oh, I see.
22        So that if you're working,
23 unloading the trailer, people can see what
24 they're doing?

32 (Pages 125 to 128)

129

1    A.  Correct.
2    Q.  Okay.
3        And above that, it says,
4  drive, and those are the drive-in doors you
5  described for me earlier?
6    A.  Correct.
7    Q.  The same -- and the process is just
8  what you described for me earlier?
9    A.  Same thing.
10   Q.  Okay.
11       If you go to page DDI 2298 --
12   A.  Correct.
13   Q.  -- there's a project there that says,
14 Pepper Matteson, and I think -- well, can you
15 tell me what the second word is?
16   A.  It's Matteson.
17   Q.  Matteson?
18       How do you spell that?
19   A.  M-a-t-t-e-s-o-n.  Matteson.
20   Q.  And then it says 57.
21       Do you see that?
22   A.  Correct.
23   Q.  Pepper Matteson 57.  And it says,
24 sectional doors.

130

1        Do you see that?
2    A.  Correct.
3    Q.  What -- what are sectional doors?
4    A.  I honestly don't recall.  I don't want
5  to say it's those fast rolling doors.  So,
6  yeah, I really don't recall the sectional
7  doors.
8    Q.  All right.
9        Do you remember this project
10 at all?
11   A.  Not really.  I believe I had only been
12 there once, maybe.
13   Q.  Okay.
14       And the next page refers to a
15 project at Bristol Park.
16       Do you see that?
17   A.  Yes.
18   Q.  And do you know what that project was?
19   A.  Out in Wisconsin.
20   Q.  Okay.
21   A.  I didn't write this, though.
22   Q.  All right.
23       That's not your handwriting?
24   A.  No.

131

1    Q.  Okay.
2        And I notice this isn't on a
3  standard -- one of the standard --
4    A.  Right.
5    Q.  -- time forms.
6        All right.  Do you have any
7  reason to think that it's wrong?
8    A.  Maybe not wrong.  Maybe they corrected
9  where I was at or something.  I don't know,
10 honestly.
11   Q.  Okay.  Let's see.
12   A.  And this is a Tuesday.
13   Q.  Well, this is -- you'll notice these
14 are all dated weekly at the top?
15   A.  Correct.
16   Q.  Do you see that?
17   A.  Ah-huh.
18   Q.  Is that your recollection, as to how
19 did you this?
20   A.  Dated it weekly?  No.  It will have
21 all data like this with the weeks on there
22 already for each individual day.
23   Q.  I see.
24       Oh, the entry at the top

132

1  isn't your handwriting?
2    A.  No.
3    Q.  Okay.
4        Somebody else wrote the week
5  at the top; is that right?
6    A.  Correct.
7    Q.  Okay.
8        And -- all right.
9        Do you know, were you at a
10 park?  Did you do work in Bristol Park?
11   A.  Yes.  That -- that was out in
12 Wisconsin.  Me and Collin would normally go all
13 the way out there.
14   Q.  Okay.
15       Is that one of the places
16 where you might stay overnight?
17   A.  Correct.
18   Q.  Okay.
19       And then the next page, if
20 you look at this one, DDI 2300 --
21   A.  Ah-huh.
22   Q.  -- this one's got block type.
23       Do you see that?
24   A.  Yeah.

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

133

1  Q. Did you fill this out, or did somebody
2  else fill this out?
3      A. I filled it out on my phone.
4  Q. Oh, I see. So you typed it on your
5  phone?
6      A. Right.
7  Q. Okay.
8          So where it says, Principle
9  Midwest Star, do you see that?
10     A. Right.
11 Q. Was that your handwriting?
12     A. No.
13 Q. Okay.
14         So you filled it out and then
15 sent it in, and somebody circled the hours and
16 wrote that in there; is that right?
17     A. Correct.
18 Q. Do you remember the project, Principle
19 Midwest Star?
20     A. Alsip? Not -- not offhand, no. I
21 remember the Woodfield Mall, though.
22 Q. Okay.
23         What was the Woodfield Mall?
24     A. We went there to install like four new

134

1  dock doors that were old.
2  Q. That were --
3      A. Old. So we would take down the old
4  ones and put up new ones at the Woodfield Mall.
5  Q. Oh, I see.
6          So this wasn't a new
7  construction project?
8      A. No.
9  Q. Okay.
10         You were replacing old doors
11 with new ones?
12     A. Correct.
13 Q. Okay.
14         Was that work that you also
15 did?
16     A. Yes.
17 Q. Okay.
18         From time to time, some of
19 these projects would be replacing old doors
20 with new ones?
21     A. No. This was literally the only one.
22 Q. Oh, that was the only one?
23     A. Yeah.
24 Q. Okay.

135

1      A. Every other one was normally new
2  construction.
3  Q. Okay.
4          That's what I wondered.
5  That's what I thought we were talking about.
6          All right. The next page is
7  the same thing, I take it. You typed in the
8  bold?
9      A. Correct.
10 Q. And the one at the top that says
11 Bristol, that's Bristol, Wisconsin?
12     A. Yes.
13 Q. All right.
14         The same project as the other
15 one we talked about, or is this a different
16 one?
17     A. It was actually a few projects, but
18 I'm pretty sure this is probably the same one.
19 I think we did like two, maybe three buildings
20 out there in Bristol.
21 Q. Okay. All right.
22         And if you turn to page
23 DDI 2305, do you see that there's a notation
24 for -- in the middle of the page -- for eight

136

1  hours overtime?
2      A. Correct.
3  Q. Okay.
4          Why -- oh, is that because
5  it's a Saturday?
6      A. Correct.
7  Q. All right.
8          And if you go further down,
9  it says, stack and roll -- roll -- strike that.
10         At the bottom, it says stack
11 and rolled --
12     A. Drive-in.
13 Q. -- drive-in.
14         Do you see that?
15     A. Correct.
16 Q. So on this day, were you doing all
17 three types of work?
18     A. So -- so previously, those were newer
19 times where I just got used to driving in --
20 putting in drive in. But, now, this is
21 probably like first time or a couple of times
22 doing stacks. So, yes, it's the same exact
23 work.
24 Q. Okay.

34 (Pages 133 to 136)

137

1     **If you go to page DDI 2307,**
2     **there's an entry at the top of this that says**
3     **work performed.**
4          **Do you see that?**
5     A. Yes.
6     **Q. Do you know -- can you -- or it**
7     **says -- and it says -- can you read what it**
8     **says to me there?**
9     A. Temporary lift on door. I believe
10    this was the job location where they was trying
11    to pour the concrete for the actual docks, and
12    we have to lift a bunch of them. And that took
13    like, maybe, half the day.
14    **Q. What do you mean, you had to lift a**
15    **bunch of them?**
16    A. So we already had stacked the doors.
17    But we didn't roll them, so they weren't
18    operable. So instead of trying to hurry and
19    roll them, they had us just lift it up
20    temporarily so they can pour the concrete. And
21    then later, we will come out and take out the
22    temporary lifts and then roll the door.
23    **Q. I see.**
24          **And how would you lift them?**

138

1     A. We would lift them about four inches
2     off the forms that they had already installed
3     and put screws in to hold the door in place.
4     **Q. Okay.**
5          **And then it says -- and then**
6     **it says, I think, then stack?**
7     A. Yeah.
8     **Q. Okay.**
9          **And that's the stack process**
10    **you already described for me?**
11    A. Correct.
12    **Q. All right.**
13          **And do you know what project**
14    **this was on? It says MHC Brandon Road, it**
15    **looks like.**
16    A. Yeah. It was Joliet. That's the only
17    thing I can recall. Most of the buildings that
18    we worked on were universal logistics
19    buildings.
20    **Q. Okay.**
21          **And Bensenville, do you see**
22    **the entry directly below that?**
23    A. Correct.
24    **Q. And it says --**

139

1     A. Move materials.
2     **Q. Yeah. But above, next to Bensenville,**
3     **it says, Krusinski, K-r-u-s-i-n-s-k-i, Pro**
4     **Logic or Pro something there. Can you tell**
5     **what it is?**
6     A. Not -- not off my eyes, no.
7     **Q. Okay.**
8          **Roman numeral two. That's --**
9     **that is not your handwriting, right?**
10    A. No.
11    **Q. Okay.**
12          **Do you know what that project**
13    **refers to?**
14    A. So, normally, those are the -- the
15    general contractors, so those are the guys
16    above everybody else.
17    **Q. Okay.**
18          **And do you have any**
19    **interaction with them?**
20    A. No.
21    **Q. Okay.**
22          **And do -- do you know who the**
23    **general contractors are on the projects?**
24    A. Oh, yes, because when you pull into

140

1     new constructions, they have to actually show
2     who the general contractors are.
3     **Q. I see.**
4          **So there are signs or**
5     **something there?**
6     A. Yeah. Correct.
7     **Q. Okay.**
8     **Q. So like the ARCO, the MHC, and the**
9     Krusinski.
10    **Q. Got it.**
11          **All right. And if you go to**
12    **DDI 2317 --**
13    A. Correct.
14    **Q. -- do you see that this starts like a**
15    **whole group of time sheets that don't have --**
16    **that they're not on the preprinted form?**
17    A. Right. Yeah. I didn't write none of
18    this.
19    **Q. And if you flip from this toward the**
20    **back, is that true for all of these? You**
21    **didn't write any of this?**
22    A. Yeah. Correct.
23    **Q. Okay.**
24          **So somebody else is filling**

35 (Pages 137 to 140)

141

1  this out for you?
2       A.  So actually now I can recall what's
3  going on.  I would text -- because this is
4  before I had the time sheets, so we was
5  probably out of town somewhere.  I would text
6  Tony Brutti like what I did that day, what I
7  worked, and he must be writing them out for me.
8       Q.  Okay.
9            And then -- all right.
10  That's what I was going to ask, how these came
11  to be prepared.  Okay.
12      A.  Yeah.  I believe I sent you actually
13  these dates and messages from Tony.
14      Q.  Yeah.  Let me see if we've got the --
15  what are we up to 11?
16
17           (WHEREUPON, the document was
18            marked Plaintiff's
19            Exhibit 11 for identification,
20            as of 3/13/25.)
21
22  BY MR. McJESSY:
23      Q.  Sir, the court reporter has handed you
24  what we've marked as Exhibit 11.

142

1            Are these the text messages
2  you're referring to?
3       A.  Yes.
4       Q.  Okay.
5            And at the top of it, it
6  says, Tony Payroll.
7            Do you see that?
8       A.  Yes.
9       Q.  Okay.
10           And can you check on your
11  phone what the actual phone number is that's
12  associated with Tony Payroll because it didn't
13  print out there?
14      A.  Yes.  815.
15      Q.  815.
16      A.  922.
17      Q.  922.
18      A.  5258.
19      Q.  5258.
20           All right.  And -- and you
21  just have that contact listed in your phone as
22  Tony Payroll?
23      A.  Correct.
24      Q.  Okay.

143

1            Do you have any other
2  contacts listed in your phone for folks at --
3       A.  I believe I have --
4       Q.  -- the company?
5       A.  -- Tony -- Tony Zarlengo, which is --
6  do you want it now?
7       Q.  Yeah.  Do you have his -- what's the
8  number you have associated with that?
9       A.  (708) 921-8950.
10      Q.  All right.
11           And you have his full name as
12  part of the contact?
13      A.  No.  I have it as Tony Midwest Dock
14  Boss.
15      Q.  Tony Midwest Dock Boss?
16      A.  Right.
17      Q.  Okay.
18           Anybody else?
19      A.  I have Ira.
20      Q.  All right.
21      A.  I have it saved as Ira Midwest Docks.
22      Q.  Ira Midwest Docks.  Okay.
23           What's his number?
24      A.  (708) 280-2642.  2642.

144

1       Q.  Thank you.
2       A.  I believe I have Mike's number.
3       Q.  Anybody else?
4       A.  I believe this is Mike, the boss right
5  here.  (708) 825-4303.
6       Q.  4303?
7       A.  Ah-huh.
8       Q.  And what do you have that contact
9  listed as?
10      A.  Mike Midwest Docks Boss.
11      Q.  And then boss, right?  B-o-s-s?
12      A.  I only have that on Tony's.
13      Q.  Oh, Tony --
14      A.  Tony Midwest Dock Boss.
15      Q.  Okay.
16           And that's Tony Zarlengo?
17      A.  Right.
18      Q.  And then what is -- what do you have
19  for contact information for Mike, just Mike
20  Midwest?
21      A.  Docks, yeah.
22      Q.  Oh, Mike Midwest Docks.
23           And Ira was Ira Midwest
24  Docks?

36 (Pages 141 to 144)

145

1   A. Correct.
2   Q. Okay.
3         Any others?
4   A. You want employees? I believe I have
5   Collin's.
6   Q. Yeah.
7         MR. HUGHES: I'm sorry. I didn't
8   catch what you said there.
9         THE WITNESS: Employees. Collin.
10  I've got him as Collin Midwest Docks. His
11  number is (219) 314-7040.
12  BY MR. McJESSY:
13  Q. And he's listed as Collin Midwest
14  Docks?
15  A. Correct.
16         I have R. J. Midwest Dock.
17  Q. Okay.
18  A. His number is (219) 779-6239. I have
19  Nico.
20  Q. What's he listed as?
21  A. Nico Midwest Dock.
22  Q. Okay.
23  A. (708) -- (708) 310-2020.
24  Q. All right.

146

1   A. I've got Don Midwest Dock.
2   (708) 932-3048.
3   Q. All right.
4   A. I have a Dave, so I believe that's
5   David Midwest Dock.
6   Q. All right.
7   A. (708) 334-9164.
8         And I have a Chris Midwest
9   Dock.
10  Q. Okay.
11         C Chris or K Chris?
12  A. I honestly don't remember.
13  Q. No. I meant does it say C-h-r-i-s
14  or --
15  A. Oh, C Chris, yeah.
16  Q. Okay.
17         C Chris Midwest Dock?
18  A. Yes.
19  Q. And what's that number?
20  A. (708) 244-2218.
21  Q. Okay.
22  A. That's everybody at Midwest Docks that
23  I have.
24  Q. Thank you.

147

1         Do you know, is the Dave
2   Midwest Dock, is that David Green?
3   A. Maybe. Maybe. I don't --
4   Q. You're not sure?
5   A. Yeah, I'm not -- I can't recall. I
6   can't even picture a face right now.
7   Q. Okay.
8   A. And Chris, I believe Chris was -- he
9   was like Mexican/Asian. You know, like
10  Mexican/Asian.
11  Q. Chris Loqui, L-o-q-u-i?
12  A. Possibly, yeah.
13  Q. Okay.
14         You're not sure?
15  A. No.
16  Q. All right.
17         He was -- you describe him as
18  Mexican/Asian?
19  A. Yeah.
20  Q. Okay.
21         There's also a Christopher
22  Stanton.
23         Does that sound familiar?
24  A. No. Stanton, that don't sound

148

1   familiar. No, it doesn't sound familiar.
2   Q. No. Okay.
3         All right. And just so the
4   record's complete, I'm going to ask that the
5   court reporter mark this as Exhibit 12.
6
7         (WHEREUPON, the document was
8         marked Plaintiff's
9         Exhibit 12 for identification,
10        as of 3/13/25.)
11
12  BY MR. McJESSY:
13  Q. And this is -- this is another
14  document you forwarded to me, correct?
15  A. Correct.
16  Q. Okay.
17         And that's the W-2 form you
18  were referring to, correct?
19  A. Correct.
20  Q. All right.
21         And it shows Dock & Door
22  Install on it, correct?
23  A. Correct.
24  Q. Okay.

37 (Pages 145 to 148)

149

1      **Can you mark this as Exhibit**
2  **13?**
3
4          (WHEREUPON, the document was
5          marked Plaintiff's
6          Exhibit 13 for identification,
7          as of 3/13/25.)
8
9  BY MR. McJESSY:
10     **Q.  So I'm going to ask you to turn to**
11 **page DDI 2323 in Exhibit 10.**
12     A.  Yes.
13     **Q.  And I've handed you what's been marked**
14 **as DDI 1723 --**
15     A.  Ah-huh.
16     **Q.  -- as Exhibit 13.  And you'll see at**
17 **the top it looks like it's the same week, but**
18 **one is -- it says Quinten Williams.  The other**
19 **one says Nico Kelly.**
20          **Do you see that?**
21     A.  Correct.
22     **Q.  And do you see where it says ARCO**
23 **Bridge Mundelein?**
24     A.  Correct.

150

1      **Q.  Do you recall that project, ARCO**
2  **Bridge Mundelein?**
3      A.  No, not -- not off the top of my head.
4      **Q.  I'm assuming all of these projects are**
5  **sort of the same.**
6      A.  Yeah.
7      **Q.  Is that fairly accurate?**
8      A.  Correct.
9      **Q.  Okay.**
10          **New construction.  And what**
11 **did you call them, logistics buildings?**
12     A.  Logistics buildings.
13     **Q.  Yeah.**
14          **And it shows -- if you look**
15 **at Nico Kelly's, his shows, for example, on**
16 **8/13/2022, ARCO Bridge Mundelein.**
17          **Do you see that?**
18     A.  Correct.
19     **Q.  And it looks like whoever filled these**
20 **out, it's the same handwriting?**
21     A.  Correct.
22     **Q.  Does that look the same to you?**
23     A.  Yes.
24     **Q.  Okay.**

151

1      **But neither of these are your**
2  **handwriting, correct?**
3      A.  No.
4      **Q.  Okay.**
5          **Would this suggest to you, if**
6  **these are company records -- these are company**
7  **time sheets that were produced -- you were**
8  **working with Nico Kelly, at least, on the 13th**
9  **and the 15th?**
10     A.  Yes.
11     **Q.  Okay.**
12          **And then he might have worked**
13 **somewhere else on the 14th.**
14          **Do you see that that's a**
15 **different project?**
16     A.  Yes.
17     **Q.  Okay.**
18          **Would that be a normal thing?**
19 **Some days you'd be working with some different**
20 **people?**
21     A.  Yes.
22     **Q.  Okay.**
23          **Would you typically be**
24 **working with somebody?**

152

1      A.  Yes.  All of the time.
2      **Q.  Oh, all of the time?**
3      A.  Yes.
4      **Q.  Usually, two people on a job?**
5      A.  Correct.
6      **Q.  Okay.**
7          **Two people working together?**
8      A.  Still got the partners, yeah.
9      **Q.  Okay.**
10     A.  It might be two groups there.  So like
11 even this one, I might not have necessarily
12 worked with Nico, but Nico was in the facility.
13     **Q.  I got it.**
14          **But you would have been**
15 **working with somebody?**
16     A.  Right.
17     **Q.  And Nico would, then, be working with**
18 **somebody else?**
19     A.  Somebody else, correct.
20     **Q.  I get it.**
21          **And is that just because of**
22 **the nature of the work?  It requires two people**
23 **to do it?**
24     A.  Yes.

38 (Pages 149 to 152)

153

1    Q. All right.
2        Did you -- other than the
3 time sheets that we looked at as Exhibit 10,
4 did you keep track of your time in any other
5 fashion?
6    A. No. Just the time sheets.
7    Q. Okay.
8        And the text messages that
9 you sent, correct?
10    A. Yeah. Everything was between me and
11 Tony.
12
13        (WHEREUPON, the document marked
14        Plaintiff's Exhibit 11 for
15        identification was tendered to
16        the deponent.)
17
18 BY MR. McJESSY:
19    Q. Okay.
20        And if we're looking -- I
21 want to look at Exhibit 11 with you. I'm going
22 to sort of go through this, I guess, in real
23 time with you since I'm just looking at it now.
24        The first entries on the --

154

1 on the first page of Exhibit 11 say bens eight
2 hours.
3        Do you see that?
4    A. Correct.
5    Q. What does that mean?
6    A. Bensenville.
7    Q. I see. Okay.
8        So that's telling him where
9 you were working?
10    A. Correct.
11    Q. And then it looks like there's a -- on
12 the October 11, 2022, text -- it's sort of cut
13 off at the bottom there -- it looks like that's
14 the time sheet you're forwarding by text
15 message, correct?
16    A. Correct.
17    Q. And it looks like text message is on
18 the next page, correct?
19    A. Correct.
20    Q. Or a photograph is; is that correct?
21    A. Yes.
22    Q. All right.
23        And then on this time
24 sheet -- is that your handwriting at the top

155

1 where it says September 29 to October 5?
2    A. Yes.
3    Q. All right.
4        And I'm just guessing that
5 this is September 9 through October 5, 2022,
6 correct?
7    A. Yes.
8    Q. Because that's the year of your text
9 message, correct?
10    A. Correct.
11    Q. All right.
12        And that's -- if you could
13 turn to the text message -- these are Bates
14 labeled, so it's hard to -- if you go to
15 December -- I think these are generally in date
16 order. If you turn to -- there's a text
17 message dated December 9, 2022. I think you're
18 there. Okay. You've been following along.
19    A. Yeah, yeah.
20    Q. I'm impressed.
21    A. I was watching you.
22    Q. There's an entry that says, I have the
23 letter here from the union saying you are a
24 second-year apprentice.

156

1        Do you see that?
2    A. Correct.
3    Q. All right.
4        And that's a text message
5 from Tony Payroll, correct?
6    A. Correct.
7    Q. Okay.
8        What is the letter?
9    A. So the letters are sent out when
10 you're a new hire. Also closer to the
11 changeover date -- from when I go from one year
12 to the next -- they will re-send the letter out
13 saying when I change from first-year to
14 second-year, third-year, fourth-year
15 apprentice.
16    Q. Okay.
17        And -- and it looks like, at
18 the bottom of the page, it says, yes, can't
19 wait for that, exclamation point.
20        That's your text, right?
21    A. Correct.
22    Q. And if you turn to the next page, that
23 full balloon is at the top, right?
24    A. Correct.

39 (Pages 153 to 156)

157

1 Q. And then the next text is from Tony
2 Payroll, correct?
3 A. Correct.
4 Q. And it says -- can you read it?
5 A. We've been paying you as third year.
6 Michael said that's what you said in your
7 interview. Second-year pay is $26 per hour.
8 We're paying $33.81.
9 Q. Okay.
10 And when he says that's what
11 Michael said that's what you said in your
12 interview --
13 A. Correct.
14 Q. -- he's referring to your interview
15 when you were hired, correct?
16 A. Correct. Which was with Tony
17 Zarlengo.
18 Q. Okay.
19 And do you remember, was
20 Michael there also?
21 A. No. It was just me and him.
22 Q. It was just you and Tony Zarlengo?
23 A. Correct.
24 Q. Okay.

158

1 Do you understand that he's
2 referring to Michael Richert in this text, or
3 you don't know?
4 A. Not necessarily Michael Richert, but I
5 did know there was another boss named Mike.
6 Q. Okay.
7 And do you know who that was?
8 A. No.
9 Q. Okay.
10 But the only person you
11 interviewed with was Tony Zarlengo?
12 A. Correct.
13 Q. Okay. All right. All right.
14 And if you go -- there's a
15 text message, it looks like, January 16, 2023?
16 A. 16th? Yeah.
17 Q. And if you turn to the next page, do
18 you see where it says this is good?
19 A. To the next page?
20 Q. Yeah.
21 A. Yeah.
22 Q. Okay.
23 It says, there are sheets on
24 the break room table if you want to go back to

159

1 writing them.
2 A. Okay. Yeah.
3 Q. Do you see that?
4 A. Correct.
5 Q. Okay.
6 So is there -- that's where
7 you're saying you would normally get the time
8 sheets to fill out the blank forms?
9 A. Correct.
10 Q. Okay.
11 And this suggests there
12 weren't any there for some period of time, but
13 there are now.
14 Is that what your
15 recollection was?
16 A. Correct.
17 Q. Okay.
18 And then that was the break
19 room at the Steger facility?
20 A. Correct.
21 Q. And if you go to -- there's a series
22 of photographs and then -- well, actually,
23 there's one photograph. There's an entry for
24 May 11, 2023?

160

1 A. Correct.
2 Q. And it's your text message. And it
3 says, I have school next week and need two pair
4 of welding gloves?
5 A. Ah-huh.
6 Q. Do you see that?
7 A. Correct.
8 Q. Do you have any, question mark.
9 Did you do welding?
10 A. So as a carpenter, that's one of the
11 classes we have to take in our requisites. So
12 that week, I had a welding class.
13 Q. Okay.
14 And is that something the
15 company provided, was the welding gloves?
16 A. No. That was me asking just to see if
17 they had some.
18 Q. Okay.
19 And the message back to you
20 is I ordered glove. They should be here by
21 tomorrow. I'll leave them in the break room
22 table.
23 Do you see that?
24 A. Correct.

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

161

1    Q.  Did they provide you with the welding
2  gloves?
3    A.  From my knowledge, I believe so.
4    Q.  Do you recall this or --
5    A.  Actually, yes, because I didn't get
6  kicked out of the class, so they had to.
7  Because if I didn't have the gloves, they would
8  have -- I wouldn't be able to take the class.
9    Q.  Okay.
10         You didn't have your own set?
11   A.  No.
12   Q.  Okay.  All right.
13         It says -- do you see the
14  exchange below that?  It says, hey, do you know
15  if the gloves came in yet?
16         That's you, correct?
17   A.  Correct.
18   Q.  And there's a response.  It says, they
19  did come in.  You'll have to ask the secretary
20  where they're at.
21         Do you see that?
22   A.  Correct.
23   Q.  Do you know who the secretary was?
24   A.  I believe he was referring to the

162

1  lady, but I never spoke with her.
2    Q.  Okay.
3         Was there a secretary that
4  worked at the company?
5    A.  I don't know.  She would be in the
6  main office area because I hear a lady voice
7  through the walls.  But other than that, I
8  don't recall.
9    Q.  You don't know who it was?  Okay.
10         There's an entry on July 27,
11  2023, at 6:30 p.m.
12   A.  Ah-huh.
13   Q.  It says, hey, what's up?  I've got 39
14  hours on my check.
15         That was your response,
16  correct?
17   A.  Correct.
18   Q.  And it looks like it's supposed to be
19  40 hours, correct?
20   A.  Correct.
21   Q.  Is that what you're asking about?
22   A.  Yeah.
23   Q.  Okay.
24         And you're asking that of

163

1  Tony in payroll, correct?
2    A.  Correct.
3    Q.  Okay.  All right.
4         And that was -- the time was
5  actually correct, right?
6    A.  Ah-huh.
7    Q.  Because you said in the next one, my
8  bad.  And he responds, all good.
9         Okay.  The second to last
10  page --
11   A.  Correct.
12   Q.  -- there's a text that says I no
13  longer work for this company.
14         What are you referring to?
15   A.  I resigned at that time.
16   Q.  Okay.
17         And why did you leave?
18   A.  Me and Ira had an exchange of words.
19  I didn't appreciate what the company was doing
20  at that time, sending nonunion guys to work on
21  union because I found out that's really against
22  union laws.  So I told Ira that I reported it
23  to my BA, and I resigned at that moment.
24   Q.  Okay.

164

1         And who did you report it to?
2    A.  My BA, Rich Ginnis and Joe Willis.
3    Q.  Okay.
4         And what did you tell them?
5    A.  That I was finding out that nonunion
6  guys was coming to do union work on these union
7  job sites.
8    Q.  Okay.
9    A.  Like the welding.  It's a really hard
10  welding course that we go through.  So the same
11  guys that don't have that course that do union
12  work is putting a lot of work in jeopardy.
13   Q.  Okay.
14         And so you raised that with
15  Ira?
16   A.  Ira, yeah.
17   Q.  And what did he say?
18   A.  First, it started off with the
19  overtime thing, and he kind of got smart at the
20  mouth.  And it led to a heated discussion, I
21  should say.
22   Q.  Okay.
23         And what -- what were -- what
24  did you tell him about the nonworker -- the

41 (Pages 161 to 164)

165

1   nonunion workers working on the union jobs?
2       A.   I asked him about why he never asked
3   me to work overtime after he mistakenly asked
4   everybody around me.  And I told him I was
5   available, but he said I couldn't come.  And I
6   was like, how are you going to have nonunion
7   guys going to do overtime work that I'm
8   supposed to be doing, basically.
9       Q.   Okay.
10              And how did you know that's
11  what was happening?
12      A.   Because the guys were around.
13      Q.   On the job sites?
14      A.   No.  We was in the Steger facility at
15  the time.
16      Q.   Okay.
17              And I -- I'm still not
18  quite sure I understand.
19              How did you know -- well, let
20  me take big step back.  Were there nonunion
21  guys working on the job sites where you were
22  working?
23      A.   Sometimes, yes.
24      Q.   Okay.

166

1               And you understood those were
2   supposed to be union workers working on those
3   job sites?
4       A.   As I started learning more about being
5   in the union, I started to learn that, oh,
6   that's not right, and that's actually going
7   against a lot of union laws.
8       Q.   Okay.
9               And -- and so what did you
10  tell Ira?
11      A.   So Ira mistakenly asked for overtime
12  as I was walking into the break room.
13      Q.   Like he asked if people wanted to work
14  overtime?
15      A.   Right.
16      Q.   Okay.
17      A.   And some of the nonunion guys were in
18  the room also with the union guys.
19      Q.   Okay.
20      A.   And when I walked in, he kind of like
21  stopped the conversation, if that makes sense.
22      Q.   Yeah.  Okay.
23              And then what did you say to
24  him, like I'll be happy to do that work?

167

1       A.   Yeah.  I was like I could work
2   overtime, too, as I was coming in.
3       Q.   Okay.
4               And what did he say?
5       A.   He left it at that.  Then, I believe,
6   we had text messages.  I'm going to have to
7   check.  But that was in my other phone.  I have
8   to check that one.
9       Q.   Okay.
10              So you may have additional
11  text messages?
12      A.   Will I be able to email -- email them
13  to you after?
14      Q.   Yeah.  If you could, that would be
15  great.
16      A.   Okay.  That's fine.
17      Q.   All right.
18              And you had an email exchange
19  with him about this situation?
20      A.   No, not an email.
21      Q.   Or a text message?  I'm sorry.
22      A.   Correct.
23      Q.   A text message exchange with him about
24  this situation?

168

1       A.   Correct.  Because once I left, I was
2   really confused as to why I was never asked to
3   work the overtime shifts.
4       Q.   Okay.
5               And -- and then was it after
6   that that you reported this to your BA?
7       A.   Correct.
8       Q.   Okay.
9               And I take it, it had to be
10  sometime around September of 2023?
11      A.   Correct.
12      Q.   Okay.
13              And what did you do next?
14      A.   I found a new job.
15      Q.   Okay.
16      A.   I want to say that's when I went to --
17  I can't recall what company I went to after
18  this.
19      Q.   Okay.
20              And then -- and then who did
21  you tell I'm not working here anymore?
22      A.   I will have to call -- well, you're
23  talking about within the company?
24      Q.   Yeah.

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

169

1    A.  Oh, Ira.  And I believe that's when
2  Ira put me and Mike in a group chat and said I
3  no longer work here and don't show up next weak
4  or something like that.
5    Q.  Okay.
6       So that was Ira and Mike
7  Richert?
8    A.  I believe so.
9    Q.  Okay.
10      Somebody named Mike?
11   A.  Right.  That's the Mike I have saved
12  in my phone.
13   Q.  Okay.
14      That's the -- yeah, okay, the
15  (708) 825-4303 number?
16   A.  Correct.
17   Q.  Okay.
18      And you had a group chat.
19  What was discussed during that group chat?
20   A.  That was it for that.  Literally,
21  that's the one message that was saved.
22   Q.  Okay.
23      Was just that you were
24  leaving?

170

1    A.  Right.
2    Q.  Okay.
3       And did they ever respond --
4  did you ever get a response about the nonunion
5  workers working on the union job sites?
6    A.  So I informed my BA.  He said he was
7  going to look into it, and if I had any
8  evidence, to send it in.  And from there, I
9  left it alone.
10   Q.  Okay.
11      And other than your
12  communication with Ira, did you have any other
13  communications with anybody else at Midwest
14  Dock & Door Solutions about nonunion guys
15  working on union job sites?
16   A.  Verbal conversations?  I talked to
17  Collin, and I asked him like are they supposed
18  to be doing the welding?  And he kind of like
19  brushed it off because he was a welder, and he
20  was like he will take the help.  But I later
21  found out that that's not what's supposed to be
22  going on, basically.
23   Q.  Okay.
24      So you had a conversation

171

1  with Collin Zarlengo about that?
2    A.  Right.
3    Q.  And I take it Collin Zarlengo is a
4  welder?
5    A.  Yes.
6    Q.  Okay.  All right.
7       He's a union guy, too, right?
8    A.  Correct.
9    Q.  Okay.  All right.
10      Is there anything else about
11  that situation I didn't ask you about that you
12  can recall?  Any other conversations, text
13  message exchanges, that kind of thing?
14   A.  The conversation between me and Collin
15  is about the only thing.
16   Q.  Okay.
17      Do you know, did any other
18  employees keep track of their hours other than
19  on these time sheets?
20   A.  I would want to say I remember Chris
21  because Chris was the first one ever to inform
22  me like it's good to have your own book of what
23  you did and where you did it just in case
24  something like this come up, you know.

172

1    Q.  Right.  All right.
2    A.  And he was the first one to ever tell
3  me, and that's what I can remember.
4    Q.  So he might have?
5    A.  Right.
6    Q.  Okay.
7       Do you know whether he did?
8    A.  Yes.  I seen the little -- he had a
9  little black book.
10   Q.  Okay.
11   A.  And he would just write every day what
12  he did down.
13   Q.  Okay.
14      So Chris did have a -- that
15  information?
16   A.  Correct.
17   Q.  Okay.
18      And anybody else that you're
19  aware of?
20   A.  No.  Everybody else, you know, we just
21  keep the time sheet somewhere.
22   Q.  Okay.
23      And when you say "Chris," is
24  this the gentleman who is like --

43 (Pages 169 to 172)

173

```
1       A.  Mexican/Asian.
2       Q.  -- Mexican/Asian?  Yeah, okay.
3            As far as you know, did you
4   always receive the proper wage rate for your
5   position with the union?
6       A.  Apparently, except that one time when
7   they was paying me over wage.  But then they
8   said they would switch --
9       Q.  Okay.
10      A.  -- me back to the proper wage.
11      Q.  Okay.
12      A.  But the thing is, they can't do
13  anything about paying me less than my wage.
14      Q.  Okay.
15           They can't do anything about
16  paying --
17      A.  So like my wage is at $26, or whatever
18  it was.  They can't pay me $25 if they wanted
19  to because it's union wage.
20      Q.  I see what you're saying.
21           But if they over -- they
22  overpaid you for some period of time is your
23  understanding?
24      A.  Right.
```

174

```
1       Q.  Okay.
2            And what about payment of
3   fringe benefit contributions?  Are you aware of
4   whether all fringe benefit contributions were
5   paid in on your behalf?
6       A.  I'm not aware.  I later on started to
7   learn that we could check everything online.
8       Q.  You didn't do that while you were
9   working for --
10      A.  No, because I was still kind of new
11  into the whole union thing.
12      Q.  Okay.
13           So you don't know one way or
14  the other on that?
15      A.  No.
16      Q.  Okay.  Let's see.
17           Did you ever receive any
18  bonuses?
19      A.  No.
20      Q.  Did you ever receive any payment that
21  was compensation for tool reimbursement?
22      A.  No.
23      Q.  Did you ever receive any compensation
24  that was for something other than hours worked?
```

175

```
1       A.  No.
2       Q.  Okay.
3            So if you worked hours, you
4   were paid.  You didn't get any money besides
5   that?
6       A.  No.
7       Q.  Okay.
8       A.  I would say the closest thing would be
9   the per diem.  But that was paid off the credit
10  card, so it wasn't directly sent to me.
11      Q.  Okay.
12           That was a good point.  I
13  forgot about that.
14           So the per diem, you weren't
15  paid that?
16      A.  No.
17      Q.  It was -- those expenses were put on
18  the company credit card, and somebody else paid
19  the credit card?
20      A.  Right.
21      Q.  And you didn't use the credit card
22  personally, correct?
23      A.  No.
24      Q.  Okay.
```

176

```
1            I'm almost done, I think.
2
3            (WHEREUPON, the document was
4            marked Plaintiff's
5            Exhibit 14 for identification,
6            as of 3/13/25.)
7
8   BY MR. McJESSY:
9       Q.  I've handed you what I've marked as
10  Exhibit 14.
11      A.  Correct.
12      Q.  And if you look at these, they appear
13  to be invoices from Dock & Door Install, Inc.,
14  to Midwest Dock Solutions for hours that you
15  worked on projects.
16           Do you see that?
17      A.  Correct.
18      Q.  Have you ever seen these documents or
19  documents like these?
20      A.  No.
21      Q.  Okay.
22           Were you aware that there
23  were -- you're only really aware of one
24  company, correct?
```

44 (Pages 173 to 176)

177

1    A.  Correct.
2    Q.  Okay.
3         So if I asked you if there
4    was a company called Dock & Door Install, Inc.,
5    that was in the building and another company,
6    Midwest Dock Solutions, for your time, would
7    you have any knowledge of that?
8    A.  No.
9    Q.  Okay.
10        I think I have asked you
11   this, but I'm just going to double check since
12   we're toward the end here.
13   A.  Ah-huh.
14   Q.  Have you ever heard of a company
15   called Gineris & Associates?
16   A.  No.
17   Q.  To your knowledge, did Dock -- did
18   the -- well, strike that.
19        To your knowledge, did the
20   company that you worked for have salespersons?
21   A.  Yes.
22   Q.  Okay.
23        Do you know who they were?
24   A.  Not off name.  I know Ira did a lot of

178

1    the biddings for the new construction.
2    Q.  Okay.
3         And you're aware it had
4    salespeople.  You just don't know who they
5    were?
6    A.  Correct.
7    Q.  Okay.
8         Did the company you worked
9    for have estimators?
10   A.  Correct.
11   Q.  That's the same thing to your --
12   A.  Yeah, yeah, yeah.
13   Q.  Okay.
14        To your knowledge, did the
15   company you worked for have a personnel
16   department or a bookkeeper?
17   A.  Yes.  I would say that was Tony
18   Brutti.
19   Q.  Okay.
20        He was --
21   A.  For the payroll.
22   Q.  The personnel department?
23   A.  Well, technically, he would come on
24   job sites, too.  So I can't necessarily he was

179

1    just personnel.
2    Q.  Okay.
3         But he would do personnel
4    stuff?
5    A.  Like keep track --
6    Q.  Kept your time sheets?
7    A.  Right.
8    Q.  Okay.
9         Anything else besides that?
10   A.  Personnel wise, not that I recall.  He
11   would bring materials to job sites.
12   Q.  Okay.
13        Would he do any work on the
14   job sites?
15   A.  No.  He would just come and stage the
16   material.
17   Q.  Okay.
18        So he would bring materials.
19        He'd unload the materials?
20   A.  Correct.
21   Q.  He would stage the materials?
22   A.  Correct.
23   Q.  You never saw him do any installation
24   work?

180

1    A.  No.
2    Q.  Okay.
3         Is there anybody else who we
4    haven't talked about who you were aware worked
5    with the company?
6    A.  No.  I'm pretty sure we went over
7    everybody I can recall.
8    Q.  Okay.
9         What was your understanding
10   of Tony Zarlengo's role with the company?
11   A.  That was Collin's uncle, and he was
12   one of the owners of the company.
13   Q.  Okay.
14        So overall operation of the
15   company?
16   A.  Right.
17   Q.  Okay.
18        Anything else?
19   A.  That was about it.
20   Q.  Okay.
21        And how about Michael
22   Richert?  What was your understanding of what
23   he did?
24   A.  What he did?  I just knew that he was

45 (Pages 177 to 180)

181

1    one of the owners through Collin.
2        **Q.  All right.**
3            **Who -- what is your**
4    **understanding of who the owners were of the**
5    **company you worked for?**
6        A.  Mike and Tony.
7        **Q.  Okay.**
8            **Tony Zarlengo?**
9        A.  Right.
10       **Q.  Okay.**
11           **Where did you go to work**
12   **after Dock and -- Midwest Dock & Door**
13   **Solutions?**
14       A.  I honestly can't recall.  I know I was
15   just working with F. H. Paschen, P-a-s-c-h-e-n.
16   I was doing some side work on my own for a
17   while.  Pro Star Flooring.
18       **Q.  Okay.**
19       A.  And that's what I did.
20           MR. McJESSY:  All right.
21           I don't think I have any
22   other questions.  These gentlemen may.
23           THE WITNESS:  Okay.
24           MR. McJESSY:  I suspect they will.

182

1    And I might have some follow-up questions when
2    they're done.
3            Do you want to take a break
4    before you start or --
5            MR. HUGHES:  Yeah, definitely.
6    We'll need --
7            MR. McJESSY:  All right.
8            Let's take a five-minute
9    break.  And it's about 12:00.  We've been
10   going --
11           MR. HUGHES:  I'm going to need more
12   than five minutes to go through my notes here,
13   so --
14           MR. McJESSY:  Okay.
15           MR. HUGHES:  It's 12:03 right now.
16   If you guys are okay, let's reconvene at 12:15.
17           MR. McJESSY:  Yeah.  That's fine.
18
19           (After a break from 12:03 p.m.
20            to 12:24 p.m., the deposition
21            was resumed as follows:)
22
23           MR. HUGHES:  Todd, do you have
24   anything?

183

1            MR. MILLER:  No.  Go for it.
2            MR. HUGHES:  All right.
3
4
5            EXAMINATION
6            BY MR. HUGHES:
7
8        **Q.  My name is Mike Hughes.**
9        A.  How you doing?
10       **Q.  I'm the attorney for Midwest Dock**
11   **Solutions.**
12       A.  Gotcha.
13       **Q.  Nice to meet you.**
14       A.  You, too.
15       **Q.  Doing a great job so far.**
16       A.  Thank you.  Thank you.
17       **Q.  I'm going to ask you a couple of**
18   **questions.  It won't be as long as your direct**
19   **examination but just to get some clarification**
20   **on things and, maybe, cover some other areas as**
21   **well.**
22           **At the beginning of the**
23   **deposition, Mr. McJessy and you discussed the**
24   **phone conversation that you -- that you guys**

184

1    had?
2        A.  Correct.
3        **Q.  And you said it lasted about 20**
4    **minutes?**
5        A.  Correct.
6        **Q.  And can you take me through -- take me**
7    **through -- I think one of the things you said**
8    **that you had discussed was Mr. McJessy gave you**
9    **a breakdown of what the case was about?**
10       A.  Yeah.
11       **Q.  Okay.**
12           **What -- what was your -- who**
13   **said what to whom during that conversation**
14   **about what the case was about?**
15       A.  So I informed him that I read over the
16   subpoena that I got said.  It was saying that
17   it was Mid-America versus Midwest Dock or
18   whatever it was titled.  It was basically me
19   asking was I on the good side or the bad side,
20   you know, because I informed him that I'm in
21   the process of changing careers, so that was my
22   reason on asking it.
23       **Q.  Okay.**
24           **And did Mr. McJessy answer**

46 (Pages 181 to 184)

185

1  your question of whether you're on the good
2  side or the bad side?
3      A. He said that it was the pension fund
4  versus you all, so technically I was on the
5  good side.
6      Q. So what did you take that to mean, to
7  be on the good side?
8      A. That I won't get in trouble with my
9  career change.
10     Q. Okay. All right.
11         And what did -- what did he
12 explain the issues in the case were?
13     A. He just really ran down that I got
14 subpoenaed to come in as a witness and that
15 he -- he went over the documents that he
16 requested to see if people were getting their
17 pension funds paid for.
18     Q. Okay.
19         It's your understanding --
20 are you aware of, at any time when you worked
21 for -- well, for Dock & Door Install -- that
22 any contributions to the pension fund or any of
23 the other funds were not being made?
24     A. I want to say I have knowledge, no.

186

1  The closest thing I could remember that should
2  be benefit paid is my vacation fund hitting on
3  time. So if my vacation fund hit on time, then
4  I was okay.
5      Q. Okay.
6         And it did hit on time, to
7  your knowledge?
8      A. Yes, from the actual carpenters union.
9      Q. Okay.
10         But that was -- that was
11 being funded through contributions made by the
12 company?
13     A. I believe so. I believe that's how it
14 worked, yeah.
15     Q. Okay.
16         Prior to your deposition,
17 after getting the subpoena, did you have any
18 communication with anyone from the union?
19     A. No.
20     Q. I think you mentioned a BA named -- is
21 it --
22     A. Joe Willis? Yeah, I tried to call
23 him, but he didn't answer.
24     Q. Okay.

187

1         Did you have any -- did you
2  send him any emails, text messages, anything
3  like that?
4      A. No.
5      Q. Okay.
6         Anyone else from the union
7  did you have any communications with?
8      A. No. That's the only, really, person I
9  talked to.
10     Q. Okay.
11         What about anybody who was a
12 former coworker of yours?
13     A. No. We haven't talked since I
14 resigned.
15     Q. Okay. Okay.
16         You -- you supplied a copy of
17 your W-2, correct?
18     A. Correct.
19     Q. And I think that's --
20     A. Number --
21     Q. That's exhibit, I want to say, 3?
22     A. Twelve.
23     Q. Oh, yeah. That came late. Twelve.
24         And during your testimony, I

188

1  believe you said that your W-2 was from Midwest
2  Dock & Door Install?
3      A. No. That was the company I said that
4  I worked for. I did see on here that it said
5  Dock & Door Install.
6      Q. Okay.
7         And is it your understanding
8  that you worked for Dock & Door Install, Inc.?
9      A. Midwest Dock & Door Solutions was the
10 company I was working for.
11     Q. Okay.
12         And where -- where did you
13 get that name, Midwest Dock & Door Solutions?
14     A. Solutions?
15     Q. Yeah.
16     A. That was the way they referred to the
17 company we worked. And then it says it on the
18 side of the company trucks, Midwest Dock & Door
19 Solutions.
20     Q. Okay.
21         Doesn't it say Midwest Dock
22 Solutions on the side of the trucks if you look
23 at Exhibit -- Exhibit 5, for example?
24

47 (Pages 185 to 188)

189

1    (WHEREUPON, the document marked
2    Plaintiff's Exhibit 5 for
3    identification was tendered to
4    the deponent.)
5
6    THE WITNESS: Exhibit 5? Yeah. So
7 it doesn't say doors.
8 BY MR. HUGHES:
9    Q. Okay.
10    And it doesn't say install,
11 correct?
12    A. Yeah. I never said install.
13    Q. Okay.
14    I just want to make -- it
15 just says Midwest Dock Solutions, correct?
16    A. Correct.
17    Q. Okay.
18    And there's trucks that have
19 no markings on them, correct?
20    A. Those would be like the one or two
21 vans they have.
22    Q. Okay.
23    And, in fact, the truck
24 that -- that Collin Zarlengo would drive you in

191

1 said now there was a second company that did
2 service?
3    A. Well, from what I'm understanding,
4 there is.
5    Q. Okay.
6    When did you learn that?
7    A. Today.
8    Q. Okay.
9    A. Because the service guy would drive
10 the Midwest trucks like that. They were older,
11 but they still had the Midwest Dock Solutions
12 on them.
13    Q. Okay.
14    And you didn't do any service
15 work, correct?
16    A. No. New installs only.
17    Q. Okay.
18    And to your knowledge, is
19 that true for -- anybody who did new installs,
20 they did new installs?
21    A. Yeah, only.
22    Q. Okay.
23    And the guys who did service
24 did service only?

190

1 was not marked with any Midwest Dock Solutions
2 markings, was it?
3    A. From what I recall, it was because we
4 had one of the ones with the welders on it.
5    Q. Okay.
6    And you're not aware of one
7 with the welder -- any with the welders on them
8 that did not have the markings?
9    A. Not that I can recall, no.
10    Q. There could be?
11    A. Not that I recall.
12    Q. But there could be?
13    A. They had a second company, I guess.
14 They had the service side. So the service side
15 worked for Midwest Docks. I would think theirs
16 has a logo on it, too.
17    Q. Okay. Okay.
18    So you're -- you're aware
19 that there was a separate company that did
20 service?
21    A. Well, I thought they was all the same
22 company.
23    Q. Okay.
24    I take it -- but you just

192

1    A. They were supposed to. But some of
2 them started -- weren't union guys, and they
3 was coming to do union work, like welding.
4    Q. And where did you learn that from?
5    A. Talking to Collin and learning the
6 relationships of others and what they did for
7 work.
8    Q. What did Collin say, as far as
9 nonunion guys doing union work?
10    A. So -- so seeing certain guys come onto
11 a job site -- well, I mean, I didn't know he
12 was union. And then he was like, no, he was on
13 the service side. But then I talked to the
14 dude, and he was like, you know, I'm here to
15 weld and get up out of here.
16    Q. Okay.
17    And you don't know if he was
18 welding in relation to the installation part of
19 the project or --
20    A. Yes. It was -- it was the dock
21 levelers that were being installed. That's the
22 only welding we do.
23    Q. And you -- you don't know of any
24 welding that's done on the service side at all?

48 (Pages 189 to 192)

193

1    A.  There shouldn't be no welding done on
2  the service side.
3    Q.  And what's your -- I think you said
4  you didn't do any service work, correct?
5    A.  No.
6    Q.  Okay.
7         So how do you know if welding
8  is done on the service side?
9    A.  Talking to Janie, Janie in the office.
10 I was like asking her like how do their
11 benefits work, how do they time off work?
12 They'd be on call because of the service, so
13 having discussions with certain of the people
14 in the service work.
15   Q.  Okay.
16        You said Janie in the office?
17   A.  Yeah.  In the warehouse.
18   Q.  Okay.
19   A.  She's a service worker.
20   Q.  Okay.
21        Did she work in the shop?
22   A.  Right.  The workshop.
23   Q.  Okay.
24   A.  She would do a lot of welding for the

194

1  in beds and stuff like that.
2    Q.  Okay.
3         So she did welding for the
4  service side?
5    A.  Right.
6    Q.  Okay.
7         So there is welding done for
8  the service side?
9    A.  In the workshop.
10   Q.  Okay.
11        Have you ever been at a
12 service job?
13   A.  No.
14   Q.  Okay.
15        So you've never observed what
16 happens on a service job?
17   A.  No.
18   Q.  Okay.
19        So any -- any statement about
20 there's no welding done on a service job is --
21   A.  On a service job is pre-install doors
22 that's already up, and they need to be
23 serviced.  So welding is not a part of a
24 service door because welding is the dock

195

1  levelers.
2    Q.  Okay.
3         And you're not aware of
4  any -- but you've never been on a service job
5  to know if any other welding in conjunction
6  with the service job was done?
7    A.  From understanding how the doors
8  worked and my profession, there shouldn't have
9  been no other welding done.
10   Q.  Okay.
11        And, again, that's -- that's
12 not with any -- you don't have any personal
13 knowledge --
14   A.  No.
15   Q.  -- of what happens on a service job?
16   A.  No.
17   Q.  Okay.
18        You testified about going
19 through training through the union, correct?
20   A.  The Mid-America Carpenters.
21   Q.  Yeah.
22   A.  Ah-huh.
23   Q.  And none of that training was related
24 to any dock or door installation, correct?

196

1    A.  No.
2    Q.  Okay.
3         To your knowledge, does the
4  union offer any -- any training that relates to
5  dock and door installation?
6    A.  We have a hardware class.  I haven't
7  taken it, so I can't say if it does deal with
8  docks and doors.
9    Q.  Okay.
10        But none of the training you
11 did at the union related to --
12   A.  No.
13   Q.  -- your work for -- your work doing
14 installs with Docks & Doors, correct?
15   A.  No.
16   Q.  Okay.  Okay.
17        With respect to your
18 hiring --
19   A.  Ah-huh.
20   Q.  -- by the company, you stated that you
21 believed you spoke to Tony Zarlengo on the
22 phone, right?
23   A.  Right.
24   Q.  And you're not sure about that?

49 (Pages 193 to 196)

197

1    A.  No.  I can't recall the words,
2  honestly.
3        Q.  Okay.
4            You're not -- you're not --
5  you're not sure who you spoke to on the phone?
6    A.  Correct.
7        Q.  Okay.
8            You said that you believed
9  you filled out an application.
10            Do you know if you did?
11    A.  I know I had to fill out the W-4s so I
12  can get paid properly, so I believe that's part
13  of the application process, so, yes.
14        Q.  Okay.
15            But there wasn't something
16  that's a separate job application that you
17  recall filling out?
18    A.  Not that I can recall.
19        Q.  Okay.
20            You said you believed that
21  you gave the job application to Tony Zarlengo?
22    A.  Tony was the only one that was in
23  my -- it wasn't really an interview.  It was
24  just a proper introduction.

198

1        Q.  Okay.
2            And you're -- you're certain
3  that was Tony Zarlengo?
4    A.  Yes.
5        Q.  Okay.
6            Was Mike Richert involved in
7  any of that hiring process?
8    A.  No, not in the in-person part.
9        Q.  Okay.
10            Was Tony Brutti involved?
11    A.  Tony Brutti?  No.
12        Q.  No?
13            Okay.  You're sure about
14  that?
15    A.  Positive.
16        Q.  You testified -- I was a little
17  confused.
18            You testified about being
19  overpaid at some point?
20    A.  Ah-huh.
21        Q.  And how did that come about?
22    A.  Tony Brutti sent me my forms that you
23  get when you -- because the company is supposed
24  to call the apprenticeship program to receive

199

1  my pay wages and everything, and they must have
2  finally called and received that.  That's
3  what's in the document, that letter you got
4  about my wages.  And it showed that I didn't
5  get my pay wage for being a third-year until a
6  certain date.
7        Q.  But you were already being paid as a
8  third-year?
9    A.  Yeah.  I believe so, yes.
10        Q.  And that's because when you were hired
11  you reported that you had advanced to a
12  certain --
13    A.  Second-year.
14        Q.  But you hadn't, correct?
15    A.  Right.
16        Q.  Okay.
17    A.  Literally, my first week -- after my
18  first week working there, I was advanced into
19  my second-year apprenticeship.
20        Q.  Okay.
21            But the year of
22  apprenticeship that you gave the company was
23  actually a year ahead of where you actually
24  were, correct?

200

1    A.  No.  I gave them that I was a
2  second -- a first-year turning second-year.
3        Q.  Okay.
4            And that coincides with the
5  dates you have for the training classes on your
6  LinkedIn page, right, were a year off, correct?
7    A.  Correct.  The date that I finished my
8  apprenticeship was in 2020, yeah.
9        Q.  Okay.
10            But you stated on your
11  LinkedIn that you finished in '19?
12    A.  Right.
13        Q.  Okay.
14            And that was your -- that was
15  your entry in the LinkedIn, right?
16    A.  Yes.
17        Q.  Okay.
18            You stated that you had some
19  slight communications with Mike Richert at the
20  time of your hiring?
21    A.  Correct.
22        Q.  And you stated that it was giving him
23  your name, address, and level of
24  apprenticeship?

50 (Pages 197 to 200)

201

1  A. Right.
2  Q. Okay.
3      And that was needed for pay
4  rate, correct?
5  A. Correct.
6  Q. Okay.
7      And that's where you gave him
8  the incorrect apprenticeship level, correct?
9  A. No.
10     MR. McJESSY: Objection. Misstates
11 what he said previously.
12     THE WITNESS: No.
13 BY MR. HUGHES:
14 Q. You had stated you didn't recall ever
15 having an issue with your pay or hours. But if
16 you had that, you would go to Ira first,
17 correct?
18 A. Correct.
19 Q. But then we saw on the documents that
20 you did have an issue. You were questioning 39
21 hours in a certain week, correct?
22 A. Right.
23 Q. And you went to Tony Brutti, correct?
24 A. I believe so, yes.

202

1  Q. Okay.
2      You didn't go to Ira?
3  A. No.
4  Q. Okay.
5      You testified you considered
6  Ira your supervisor?
7  A. Correct.
8  Q. Okay.
9      And -- but you also
10 testified, I believe -- I just want to make
11 sure this is correct -- that the only direction
12 you received from Ira was what job to go to,
13 correct?
14 A. Correct.
15 Q. He didn't -- he didn't give you
16 day-to-day, you know, instruction on how to
17 perform a certain piece of your job?
18 A. Technically, yes, because he would
19 tell me day to day what we were doing and what
20 he wanted done.
21 Q. Okay.
22     And where to go?
23 A. And where to go.
24 Q. Okay.

203

1      He didn't ever -- did he
2  critique your work? Did he give you
3  evaluations?
4  A. I believe he came to a job site once.
5  That was about it.
6  Q. Okay.
7      But when he was there, he
8  wasn't acting in a supervisory role, overseeing
9  your work, correct?
10 A. Not necessarily, no.
11 Q. Okay.
12     And you never saw him acting
13 in that manner with any other installers,
14 correct?
15 A. Yes, because we had to send pictures
16 sometimes when stuff gets damaged, or if
17 something is not properly installed right and
18 we need something -- some type of ticket put in
19 to get something changed, like concrete get
20 jacked out, they'll contact Ira.
21 Q. Okay.
22     And do you have any
23 understanding why that -- why that would go to
24 Ira?

204

1  A. Well, maybe because he was the one
2  that sent us to our locations and what we was
3  doing every day.
4  Q. Okay.
5      But you don't know what Ira's
6  job function was, do you?
7  A. No.
8  Q. Okay.
9  A. I couldn't put a title next to it.
10 Q. And not only a title, but you couldn't
11 put any -- you couldn't write a job description
12 for what Ira's job duties are, right?
13 A. Maybe.
14 Q. His complete job duties?
15 A. Not complete, but from what I know.
16 Q. And what did you understand, from him
17 telling you where to go, what his job duties
18 were?
19 A. He was my supervisor because that's
20 where we reported everything to.
21 Q. What did you -- you say you reported
22 everything to him?
23 A. So like if we needed a new lift, if we
24 needed materials dropped off, if we needed

51 (Pages 201 to 204)

205

1  anything missing that we don't have, Ira.
2  Ira's the guy.
3      Q.  Okay.
4          And how did you communicate
5  that to Ira?
6      A.  Collin.
7      Q.  So you didn't communicate that to Ira?
8      A.  Not all of the time.  Sometimes I
9  have.
10     Q.  Okay.
11     A.  Damaged -- damaged parts and stuff
12 like that.
13     Q.  Okay.  Okay.
14         You testified about a guy
15 named Travis?
16     A.  Correct.
17     Q.  And what was his role?
18     A.  If I remember correctly, he was a
19 service guy.
20     Q.  Okay.
21         And how do you know that?
22     A.  Communication and seeing him on job
23 sites.
24     Q.  Doing what?

206

1      A.  I believe that was one of the guys
2  that they were sending to do welding that I
3  remember.  I couldn't remember his face.  I do
4  believe that was Travis I was seeing.
5      Q.  Okay.
6          You believe that, or you're
7  sure of that.
8      A.  Name wise, I remember Travis being the
9  guy.  The face I have in my brain, I can't
10 really say that was Travis all of the way.
11     Q.  Okay.
12         And Travis would sometimes
13 deliver materials to a job site?
14     A.  No.
15     Q.  No?  You never saw him do that?
16     A.  No.  That was either Tony or Janie.
17     Q.  Tony --
18     A.  Tony Brutti.
19     Q.  Okay.
20         And who's -- or Janie?
21     A.  Janie.
22     Q.  Okay.
23         And she's the one we talked
24 about who works in the shop?

207

1      A.  Right.
2      Q.  Okay.
3          So you're not sure if Travis
4  was -- you ever saw Travis on a job site?
5      A.  I do know it was Travis on the job
6  site for sure.
7      Q.  Okay.
8      A.  The face, now, I'm trying to recall
9  might not be exactly Travis, though.
10     Q.  Okay.
11         So you remember -- I guess,
12 I'm confused.
13         You don't remember ever
14 seeing Travis on a job site?
15     A.  Yes, Travis.  But the person I'm
16 picturing right now in my brain is not -- it
17 might or might not be Travis, that name Travis
18 that you see.  It's just like Collin Zarlengo
19 wasn't listed on there.  You might not have
20 listed the Travis I know on the paper.
21     Q.  Okay.
22         But you don't recall seeing
23 the person that you --
24     A.  Travis?

208

1      Q.  Yeah.
2      A.  I don't know if this Travis is
3  whatever his last name is on the paper.
4      Q.  Okay.
5      A.  Just like --
6      Q.  So you don't -- you don't know what
7  his face looks like, though?
8      A.  Yes.  But the Travis that I'm thinking
9  of might not be the same Travis you're talking
10 about.
11     Q.  I'm talking about the Travis that
12 you've testified to.  That's the Travis I'm
13 talking about.
14     A.  Correct.
15     Q.  All right.
16         And you don't know what he
17 looks like?
18     A.  Yes.  He was a tall white guy, roughly
19 like 30s, 30-ish.
20     Q.  And how many times did you see him at
21 a job site?
22     A.  Probably like a little less than 10
23 times.
24     Q.  Okay.

52 (Pages 205 to 208)

209

1    And were you ever working in
2  tandem with him?
3    A.  Not in tandem.  I would know that --
4  because welding is done by one person, and I'm
5  normally doing the installing of the doors and
6  actually using a lift to put in the docks.
7    Q.  Ah-huh.
8    A.  So while I put the docks in, he might
9  be a couple of docks down welding.
10    Q.  You said he might be?
11    A.  He might be a couple.  He might be a
12  lot more than that.
13    Q.  There's only one welder at a job site?
14    A.  Normally, there would be like two
15  depending on how many they want done in a day.
16    Q.  Okay.
17    A.  There's one welder per truck.
18    Q.  Okay.  Okay.
19    MR. McJESSY:  One what per truck?
20    THE WITNESS:  Welder.
21    MR. McJESSY:  Oh, welder.
22  BY MR. HUGHES:
23    Q.  We went through all of your time
24  sheets.  We leafed through them.  Mr. McJessy

210

1  asked you questions about various things?
2    A.  Correct.
3    Q.  All of the entries that you listed on
4  your time sheet, as far as the type of work you
5  performed, that was all install work, correct?
6    A.  Correct.
7    Q.  All right.
8    None of that was service
9  work?
10    A.  No.
11    Q.  Okay.
12    For your entire tenure with
13  the company?
14    A.  Correct.
15    Q.  Okay.
16    Did you ever do any work in
17  the shop?
18    A.  No.
19    Q.  Okay.
20    Did any of the sellers, to
21  your knowledge, do work in the shop?
22    A.  No.
23    Q.  Okay.
24    A.  Service people.

211

1    Q.  Mr. McJessy asked you some questions
2  about language on the Midwest Dock Solutions
3  website, correct?
4    A.  Correct.
5    Q.  And you've never seen that website
6  before today, correct?
7    A.  No.
8    Q.  And so you don't have any
9  understanding of what -- of who put what onto
10  that website?
11    A.  No.
12    Q.  Okay.
13    Or what any of the text on
14  the website is meant to mean?
15    A.  Correct.
16    Q.  Okay.
17    You testified on -- about
18  track guards, installing track guards?
19    A.  Correct.
20
21    (WHEREUPON, the document marked
22    Plaintiff's Exhibit 3 for
23    identification was tendered to
24    the deponent.)

212

1  BY MR. McJESSY:
2    Q.  And if we go to Exhibit --
3    A.  The last page of Exhibit 3.
4    Q.  Yeah, the last page of three.
5  That's -- or that's, yeah, Exhibit -- I lost
6  it.  Yeah, the last page of Exhibit 3.  You
7  pointed that out.
8    That's not a track guard,
9  correct?
10    A.  Not a guard for the tracks, but it's a
11  guard for something.  But, no, that's not a
12  track guard.
13    Q.  Okay.
14    And have you ever -- did you
15  ever install any -- this track looks like it's
16  a -- it's kinds of like guardrails that are --
17  that are mounted to the floor, correct?
18    A.  Correct.
19    Q.  Okay.
20    Did you ever install any of
21  these?
22    A.  These specifically, no.
23    Q.  Okay.
24    And that's -- but that's not

53 (Pages 209 to 212)

213

1  a track guard, correct?
2  A.  No.
3  Q.  Okay.
4          Where did the track guards
5  go?
6  A.  Along the tracks of the -- so if you
7  look, you can kind of see it.  This is Exhibit
8  8.  These are actually tracks right here.
9  Q.  Okay.
10         For the record, it's
11  referencing the materials that's kind of laying
12  along the ground?
13  A.  These are considered tracks.
14  Q.  Okay.
15  A.  Track guards would go against the
16  guards on the door -- you can barely see
17  them -- to prevent forklifts or machinery from
18  bumping into the tracks and bending the tracks
19  and damaging the door.
20  Q.  Okay.
21         And that's part of the door
22  installation?
23  A.  Correct.
24  Q.  Okay.

214

1          As opposed to those like wall
2  guards that we saw in the other picture,
3  correct?
4  A.  Correct.
5  Q.  Okay.
6
7          (WHEREUPON, the document marked
8          Plaintiff's Exhibit 11 for
9          identification was tendered to
10         the deponent.)
11
12  BY MR. HUGHES:
13  Q.  If you'd go to Exhibit 11, which is
14  your text messages, the entries for 12/9/21 --
15  A.  That's all the way in the back.
16  Twenty-one?
17  Q.  Or excuse me.  '22.  12/9/22.  So
18  about, maybe, a third of the way in.
19          It's this.  It's with the
20  letter.  About here.  Your movement from the
21  third-year.
22  A.  Oh, here you go.  Yeah.
23  Q.  Okay.
24  A.  10/9.

215

1  Q.  Okay.
2          And so this is -- this dealt
3  with how you would be paid, correct?
4  A.  Right.
5  Q.  And, again, you're having that
6  conversation with Tony Brutti, correct?
7  A.  Yeah, Tony.
8  Q.  And not with Ira?
9  A.  Correct.
10  Q.  Okay.
11          When you requested the
12  welding gloves to go to -- for your --
13  A.  Training.
14  Q.  -- training, correct, you requested
15  that of Tony Brutti, correct?
16  A.  Correct.
17  Q.  Okay.
18          You didn't go to Ira for
19  that?
20  A.  No.  Ira told me to ask Tony over the
21  phone, and I called him.
22  Q.  Okay.
23          And what did Ira say?
24  A.  Ask Tony.

216

1  Q.  Okay.
2          You testified about your --
3  some sort of walking in where -- I think it was
4  the lunchroom, and correct me if I'm
5  mistaken -- where Ira was talking to other
6  individuals about overtime work?
7  A.  Yeah, because that's where the -- the
8  scheduling board was.
9  Q.  Okay.
10          And --
11  MR. McJESSY:  I'm sorry.  Can you
12  say that again?  That's where the what?
13  THE WITNESS:  The scheduling board
14  was.
15  BY MR. HUGHES:
16  Q.  Okay.
17          What's the scheduling board?
18  A.  For the union people to have a
19  schedule for like where we're going, where
20  we're stationed for the week.
21  Q.  Ah-huh.
22          And what about -- is the
23  service schedule there as well?
24  A.  I believe they had a board.  I believe

54 (Pages 213 to 216)

217

1    they had a board on the adjacent wall.
2        **Q. And what project was overtime being**
3    **sought for?**
4        A. I can't recall.
5        **Q. You don't know if it was service or if**
6    **it was install?**
7        A. Oh, no. It was -- he was talking to
8    the union guys.
9        **Q. Okay.**
10           **So he was talking to the**
11    **union guys about them working overtime?**
12        A. Right. And there were service guys in
13    there, too.
14        **Q. Okay.**
15           **And -- but he was asking --**
16    **your understanding was he was asking the union**
17    **guys about working overtime?**
18        A. He was asking about a union project,
19    yes.
20        **Q. Okay.**
21           **So he wasn't asking nonunion**
22    **guys to work overtime on a -- on an install**
23    **project?**
24        A. Not that I can recall.

218

1        **Q. Okay. Okay.**
2           **And so you became upset**
3    **because he wasn't asking to you do that work?**
4        A. Correct.
5        **Q. Okay.**
6           **But he was asking other union**
7    **guys and stuff?**
8        A. Correct.
9        **Q. Okay.**
10           **And those other union guys**
11    **had more skills and training than you, correct?**
12        A. They was at the company longer.
13        **Q. Okay.**
14           **And they could do other**
15    **things like weld and work quicker?**
16        A. Not necessarily, but, okay.
17        **Q. Okay.**
18           **So that conversation wasn't**
19    **anything about Ira or anyone else asking**
20    **nonunion guys to work overtime on a -- on an**
21    **install job, correct?**
22        A. Not necessarily.
23        **Q. I mean, was it or wasn't it?**
24        A. No.

219

1        **Q. No. Okay.**
2
3           (WHEREUPON, the document marked
4           Plaintiff's Exhibit 14 for
5           identification was tendered to
6           the deponent.)
7
8    BY MR. HUGHES:
9        **Q. Mr. McJessy showed you -- and this is**
10    **Exhibit -- I think it's the last one, invoices.**
11        A. Correct.
12        **Q. Exhibit 14.**
13           **You've never seen these**
14    **before, correct?**
15        A. No.
16        **Q. Okay.**
17           **And what was your -- what was**
18    **your pay rate as of -- if you look at the first**
19    **invoice, August 5, 2022, what was your pay**
20    **rate?**
21        A. August 5? I should have been a
22    second-year apprentice then. No, I was
23    third-year.
24        **Q. Okay.**

220

1           **And what was your pay rate?**
2        A. I can't recall.
3           Wait, 2022? I was a
4    second-year, then, so like $27, maybe even
5    less.
6        **Q. Okay.**
7           **And this is for $89 an hour,**
8    **correct?**
9        MR. McJESSY: Objection.
10    Foundation.
11           You can answer.
12        THE WITNESS: That's what a union
13    person is? That's what they was paying me?
14    BY MR. HUGHES:
15        **Q. No. This invoice lists quantity of**
16    **eight.**
17        A. Eight? Eight what?
18        **Q. Okay.**
19           **So we can -- did you ever**
20    **work at the ARCO Bridge Mundelein project?**
21        A. Correct.
22        **Q. And installing sectional doors and**
23    **loading dock equipment?**
24        A. Correct.

55 (Pages 217 to 220)

221

1  Q.  Okay.
2          And do you know if you worked
3  there, at that project, on August 5 of 2022?
4      A.  If I recall my time schedule, yes.
5      Q.  Okay.
6          And did you work eight hours
7  there that day?
8      A.  Correct.
9      Q.  Okay.
10         And were you paid $89 an
11 hour?
12     A.  No.
13     Q.  Okay.
14         What were you paid?
15     A.  It should have been my union wage.
16 And, honestly, it should have been more than
17 that because my package costs more than that.
18     Q.  What did your -- what did your package
19 cost?
20     A.  I would say, roughly, after pension,
21 the vacation funds -- everything coming out of
22 my union package is bidded for a journeyman
23 scale no matter what, so roughly a hundred and
24 like fifty, sixty dollars an hour.

222

1      Q.  A hundred and fifty or a hundred and
2  sixty dollars an hour?
3      A.  Roughly.
4      Q.  That was your understanding of what
5  the full --
6      A.  Journeyman, yeah.
7      Q.  Okay.
8          Just let me -- I know you
9  know what I'm asking.  Let me finish.
10     A.  All right.
11     Q.  Your understanding, as of August 5,
12 2022, was that the full package, meaning the
13 wage rate for a second-year apprentice --
14     A.  Right.
15     Q.  -- plus all of the fringe benefit
16 contributions that would need to be made for a
17 pension, health and welfare, anything else --
18     A.  Right.
19     Q.  -- amounted to a hundred and fifty or
20 a hundred and sixty dollars per hour?
21     A.  So by contract, they can't bid for an
22 apprentice because they don't know if they're
23 hiring apprentices, so they bid as a journeyman
24 no matter what.

223

1      Q.  Okay.
2          And I'm not asking what
3  anybody is bidding a job at.
4      A.  Oh, okay.
5      Q.  I'm asking you what you -- what you
6  understood the full hourly package for a second
7  year apprentice --
8      A.  Correct.
9      Q.  -- was that was inclusive of their pay
10 rate and all of the fringes?
11     A.  I wouldn't have said I know the number
12 off the top my head for a second-year
13 apprentice.
14     Q.  Okay.
15         But how about for a
16 journeyman?
17     A.  Roughly.
18     Q.  Roughly what?
19     A.  I know the wage.
20     Q.  Yeah, what?
21     A.  Roughly, a hundred and fifty to a
22 hundred and sixty dollars an hour.
23     Q.  Okay.  Okay.
24     A.  We just got a raise, so it might be

224

1  more now.
2      Q.  Okay.
3          And you're basing that off of
4  what?
5      A.  Me going over my union -- like a
6  breakdown of how everything is paid out of it.
7      Q.  Okay.
8          And so you've -- you've gone
9  through that?
10     A.  Yes.
11     Q.  Okay.
12         And your calculation, it says
13 a hundred and fifty, a hundred and sixty
14 dollars per hour?
15     A.  Roughly.
16     Q.  Okay.
17         You testified that after your
18 employment with the company ended --
19     A.  Ah-huh.
20     Q.  -- that you worked for a time for
21 F. H. Paschen?
22     A.  Correct.
23     Q.  And what did you do for them?
24     A.  We was doing the blue line.

56 (Pages 221 to 224)

225

1    Q.  Okay.
2         And were you -- were you --
3    was that union work?
4    A.  Correct.
5    Q.  Okay.
6         Are you still a union member?
7    A.  Correct.
8    Q.  And then you said you did side work?
9    A.  Correct.
10   Q.  Okay.
11        And what type of work was
12   that?
13   A.  Redoing like my sister's floors,
14   painting.
15   Q.  Okay.
16   A.  Stuff like that.
17   Q.  And did -- other than your sister, who
18   else did you do side work for?
19   A.  That's about it.  My sister had bad
20   water damage that year, so I had to redo her
21   house.
22   Q.  Okay.
23        And that's it?
24   A.  Yeah.

226

1    Q.  Who else -- who do you work for now?
2    A.  I just got laid off in January from
3    F. H. Paschen for the weather.
4    Q.  How long did you work for
5    F. H. Paschen?
6    A.  Since June of 2024.
7    Q.  Okay.
8         And so from -- I think it was
9    roughly October, November of '23, when you were
10   no longer employed with the company, correct?
11   A.  Right.
12   Q.  Okay.
13        And what did you do between
14   then and beginning work with Paschen?
15   A.  Collect unemployment.
16   Q.  Okay.  Okay.
17        Did you say that you had
18   other -- I can't recall -- that you had other
19   documents you were going to be producing?
20   A.  Yeah.
21   Q.  And what are those?
22   A.  I believe I had messages between me
23   and Ira.
24   Q.  Okay.

227

1         Anything else?
2    A.  No.
3    Q.  Okay.
4         When you were on the job --
5    and you said most of the time you were working
6    with Collin?
7    A.  Correct.
8    Q.  And Collin was more experienced than
9    you, correct?
10   A.  Correct.
11   Q.  And so would you take direction from
12   Collin as to kind of what to do or how to do
13   something?
14   A.  Yeah.
15   Q.  Okay.
16        Was there any -- did the
17   company have any kind of other superintendent
18   that would be on site giving direction to
19   employees?
20   A.  No.
21        MR. HUGHES:  Okay.
22        That's all I have.
23        MR. McJESSY:  I just have -- do you
24   have -- I have a couple of follow-up questions.

228

1         FURTHER EXAMINATION
2         BY MR. McJESSY:
3
4    Q.  Would you describe Collin as a
5    superintendent or as a coworker?
6    A.  More like a foreman, a coworker.  He
7    just turned journeyman.  So, technically, he
8    couldn't even be a super because he was still
9    an apprentice with me for like a week or two.
10   Then he turned journeyman.
11   Q.  Okay.
12        So when you started out, you
13   were both apprentices as far as you understood?
14   A.  Yeah.  I believe Collin was still an
15   apprentice.
16   Q.  Okay.
17        Mr. Hughes asked you about
18   the trucks without markings on them.
19   A.  Correct.
20        MR. McJESSY:  Can you mark that as
21   Exhibit 15?
22
23
24

57 (Pages 225 to 228)

229

1       (WHEREUPON, the document was
2       marked Plaintiff's
3       Exhibit 15 for identification,
4       as of 3/13/25.)
5
6  BY MR. McJESSY:
7       Q.  And you mentioned that there were a
8  couple of cargo vans that didn't have markings
9  on them, correct?
10      A.  Correct.
11      Q.  And does that look like -- that's only
12  a partial picture.
13          Does that look like one of
14  the cargo vans?
15      A.  Yeah.  That looks like one.
16      Q.  Okay.
17          And do you recognize the
18  person in that picture?
19      A.  No.
20      Q.  Okay.
21          You see they have a Midwest
22  Dock shirt on?
23      A.  Correct.
24      Q.  Okay.

230

1           Were the vans used by Midwest
2  Dock?
3       A.  Correct.  Me and Don actually used it
4  a lot.  Don, he used to take his home.
5       Q.  Okay.
6           And what was -- what was
7  hauled around in those vans?
8       A.  We would put materials, like boxes and
9  stuff in there.  We couldn't fit doors in
10 there.  They had like a table to keep materials
11 on.
12      Q.  Okay.
13
14          (WHEREUPON, the document marked
15          Plaintiff's Exhibit 3 for
16          identification was tendered to
17          the deponent.)
18
19 BY MR. McJESSY:
20      Q.  I'd like you to take a quick look at
21 Exhibit 3.  I'm just going to take a shot on
22 this one.  I don't know if I'm right.
23          But there was some talk about
24 guards?

231

1       A.  Correct.
2       Q.  Door guards.  If you could take a look
3  at the second to last page where it's got
4  Hormann on it.
5           Do you see there's a door in
6  the upper right corner there?
7       A.  Correct.
8       Q.  Is -- is -- the thing on the left side
9  of the door, is that a door guard?
10      A.  The steel?
11      Q.  Yeah.
12      A.  The steel?  Technically, yes.
13      Q.  But that's not the kind that you were
14 installing?
15      A.  No.
16      Q.  Okay.  It was worth a shot.
17          Do you know the company that
18 provided the door guards that you installed?
19      A.  Not off the top of my head.  Yeah.
20 Not off the top my head.
21      Q.  Okay.
22          Mr. Hughes asked you a
23 question, and he talked about -- I can't
24 remember what your response was.  But you said

232

1  you had spoken with Janie, something about how
2  their benefits worked --
3       A.  Right.
4       Q.  -- with the service people, correct?
5       A.  Yeah, that that's how they're paid.
6  They're on call with the holiday pay and stuff
7  like that.
8       Q.  Okay.
9           Do you know what kind of
10 medical or pension benefits they received?
11      A.  Not off the top of my head, no.
12      Q.  Okay.
13          Was that part of your
14 discussion with her or no?
15      A.  No.  She -- that was part of a
16 conversation because she told me they would be
17 on call.  So I asked her like how do you all
18 get your days off and stuff, then.
19      Q.  I see.
20          So it was those -- it was
21 those kind of benefits?
22      A.  Right.
23      Q.  Okay.
24          Did you have any

58 (Pages 229 to 232)

233

1  understanding of the benefits that the service
2  workers received?
3      A.  Not completely, no.
4      Q.  Okay.
5          Any understanding?  You said
6  "not completely," so I've got to ask.
7      A.  Besides -- besides just the holiday
8  pay and the time off, no.
9      Q.  Okay.
10         Also, there were some
11 questions about -- I can't remember what the
12 question was, but your pay for time?
13     A.  Correct.
14     Q.  Were you paid for the time loading the
15 trucks?
16     A.  No.
17     Q.  Okay.
18         How did that work?
19     A.  Really, we were supposed to get paid
20 for the time on the job site, but I never
21 really asked.
22     Q.  Okay.
23         So when you were loading
24 trucks at the warehouse, you weren't paid for

234

1  that?
2      A.  No.  Not to my knowledge no.
3      Q.  Okay.
4          That was time that you were
5  told not to include in your time?
6      A.  Well, technically --
7      MR. HUGHES:  Objection as to
8  leading.
9  BY MR. McJESSY:
10     Q.  Okay.
11         Explain to me.  Well, strike
12 that, and I'll restate the question.
13     A.  I will now say yes.
14     Q.  Explain to me what the situation was
15 with regard to loading time for trucks.
16     A.  So by us getting to the job site
17 pretty late and then leaving at the appropriate
18 time still, I will -- I will include that that
19 overtime was paid into it because we would
20 never stay overtime.
21     Q.  What do you mean?
22     A.  So if we was getting off at 2:45, me
23 and Collin was getting off at 2:45 regardless
24 if we completed everything we needed to do that

235

1  day or not.
2      Q.  Okay.
3          So what -- and what time
4  would you start working?  What time would you
5  start loading trucks, for example?
6      A.  7:00.
7      Q.  You'd start loading the trucks at
8  7:00?
9      A.  Right.
10     Q.  Okay.
11         And then you'd get to, maybe,
12 a job site at what time?
13     A.  Roughly, like -- depending where it
14 was at -- maybe 8:00, 8:30.
15     Q.  Tony Zarlengo is here today, correct?
16     A.  Correct.
17     Q.  Okay.
18         He's the guy you met with
19 when you came to the company to fill out the
20 paperwork, correct?
21     A.  Correct.
22     Q.  Okay.
23         And you -- you believe it was
24 he that you spoke to on the phone when you

236

1  first made the contact with the company,
2  correct?
3      A.  Correct.
4      Q.  Okay.
5          Mr. Hughes asked you some
6  questions about whether you could have talked
7  to somebody else, and I'm assuming he means
8  Anthony Brutti or Tony Brutti.
9      MR. HUGHES:  Objection.
10 BY MR. McJESSY:
11     Q.  Why do you think it was Tony Zarlengo
12 that you spoke to on the phone when you first
13 reached out?
14     A.  His voice kind of sounded familiar.
15 That's about it.
16     Q.  What was your -- what was your cell
17 phone number at the time that you got hired?
18     A.  My one -- I believe it was the same,
19 (773) 251-9459.
20     Q.  9459?
21     A.  Yep.
22     Q.  All right.
23         And you know -- who is your
24 cell phone provider?

59 (Pages 233 to 236)

237

1      A.  AT&T.
2      Q.  Oh, okay.
3             Are you aware that AT&T you
4   can look up your statements online and see all
5   of your phone calls and that kind of thing?
6      A.  Correct.
7      Q.  Okay.
8             So you would have access to
9   the statement back when you first reached out
10  to Midwest Dock Solutions?
11     A.  Possibly, yes.
12     Q.  Okay.
13            Could you see if you have
14  that?
15     A.  Send it over to you?
16     Q.  Yeah, if you could, so we can see what
17  the phone number was that you called --
18     A.  Okay.
19     Q.  -- at that time for that month?  I
20  would appreciate that.
21            And did Tony Brutti ever
22  critique your work on the job?
23     A.  No.  The most I talked to Tony Brutti
24  was for payroll.

238

1      Q.  Okay.
2             That's all I have as well.
3   The only thing I would ask is that we don't
4   have yet the text messages for -- from Ira,
5   between you and Ira?
6      A.  Correct.
7      Q.  I would like to reserve the right to
8   resume the deposition once we see those text
9   messages just so if we have questions about
10  them we can ask you on the record as opposed to
11  just my asking you informally over the phone
12  when Mr. Hughes or Mr. Miller wouldn't be
13  there.
14     A.  Correct.
15     Q.  If we do that, I suspect that -- I
16  don't know.  I don't want to speak for Mr.
17  Hughes or Mr. Miller, but we could probably do
18  it by Zoom over the phone --
19     A.  That would be fine.
20     Q.  -- and the court reporter could appear
21  by Zoom.  Something like that.  It would
22  probably be just a few questions.  So I would
23  like to reserve the right to finish the
24  deposition once we get those text messages if

239

1   we need to.  I'm not even saying that we do
2   need to.  But I'd like to, at least, reserve
3   that right.
4      A.  Okay.
5      Q.  Other than that, I'm done.
6             Do you have any other
7   questions, Mr. Hughes?  Can I explain the --
8      MR. HUGHES:  One sec here.  Let me
9   just -- just a couple real quick.
10
11
12            FURTHER EXAMINATION
13            BY MR. HUGHES:
14
15     Q.  I guess, I'm not clear on -- you were
16  saying whether or not you were to be paid for
17  loading trucks?
18     A.  Correct.
19     Q.  Were you paid for the loading time?
20     A.  It wasn't specified on my time sheet
21  as loading time.
22     Q.  Okay.
23            But your -- but the time you
24  put on your time sheets was meant to cover

240

1   loading time as well?
2      A.  Maybe.  Sometimes we'd unload.
3      Q.  And how frequently would you -- would
4   you go to the -- the Steger facility and load a
5   truck?
6      A.  At first, it was kind of frequent.
7   But then we started working in Wisconsin and
8   far out, so we wouldn't load all of the time.
9      Q.  Okay.
10            You could go a month without
11  loading a truck, correct?
12     A.  Possibly, yeah.
13     Q.  Okay.
14            Typically, would it be like
15  maybe once a week if you're working smaller
16  jobs in town?
17     A.  Yeah, maybe.
18     Q.  Okay.
19            You said you recognized Tony
20  Zarlengo's voice on that call you had with him?
21     A.  Correct.
22     Q.  And that was the first call you ever
23  had with him, correct?
24     A.  Yes.

60  (Pages 237 to 240)

241

1    Q.  Okay.
2        I was just wondering how you
3  could recognize the voice of someone you had
4  never spoken to before?
5    A.  Hey.  When you get hired for a new job
6  and the person you're talking to is the person
7  that's going to pay you, you're going to
8  remember.  At least, I do.
9        MR. HUGHES:  Okay.
10       I don't have anything
11  further.
12       MR. McJESSY:  Okay.
13       You have a -- if one of the
14  attorneys orders the transcript, that means
15  she'll type it up into a final form, and you
16  have a right to review that transcript and note
17  any errors that you believe occurred in
18  transcription.  So, for example, if I asked you
19  what color was the light and you said the light
20  was red and she wrote the light was green, you
21  could note that on an error form saying I
22  believe I said the light was red.  She wrote
23  the light was green.  That's wrong.  Okay?
24       THE WITNESS:  Correct.

242

1       MR. McJESSY:  You can't change your
2  testimony.  So if I asked you what was -- what
3  color was the light and you said the light was
4  red and she wrote down red, you can't go back
5  and say, well, I meant to say it was green and
6  change your testimony.
7       THE WITNESS:  Right.
8       MR. McJESSY:  You can waive that
9  right and trust that she'll prepare the
10  transcript and it will be accurate and, you
11  know -- and, you know, you don't need to do
12  anything, or you can reserve that right, in
13  which case she'll allow you to read the
14  transcript and note any errors you believe that
15  occurred in transcription.
16       THE WITNESS:  Okay.
17       MR. McJESSY:  I don't care what you
18  do, but she needs to know from you whether you
19  reserve the right to review the transcript or
20  whether you waive the right to review the
21  transcript.
22       THE WITNESS:  I will reserve.
23       MR. McJESSY:  Okay.
24       And I will order a copy of

243

1  the transcript.  So she'll reach out to you.
2  And I don't know how they do that, but Diane
3  will reach out to you and make some
4  arrangements to have you review the transcript.
5  You have a limited period of time to do that.
6       THE WITNESS:  Yes, sir.
7       MR. McJESSY:  I think you have 30
8  days.  And then if you don't sign it, then
9  they'll just finalize it without your
10  signature.
11       All right.  Other than the
12  reservation to finish based upon those final --
13  the phone bill and the final text messages,
14  we're done.
15       THE WITNESS:  Okay.  Thank you.
16       MR. McJESSY:  Thank you for being
17  here today.  I appreciate it.  And we can go
18  off the record.
19
20       FURTHER DEPONENT SAITH NOT.
21
22
23
24

244

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
2           EASTERN DIVISION
3
  MID-AMERICA CARPENTERS  )
4  REGIONAL COUNCIL PENSION  )
  FUND, et al.,         )
5             )
      Plaintiffs,  )  No. 1:24-cv-02428
6             )
     vs.      )  Judge Andrea R. Wood
7            )
  DOCK & DOOR INSTALL,  )  Magistrate Judge
8  INC., an Illinois  )  Jeannice W. Appenteng
  corporation and MIDWEST  )
9  DOCK SOLUTIONS, INC., an  )
  Illinois corporation,  )
10            )
      Defendants.  )
11
12     This is to certify that I, QUINTEN
  MARCELLUS WILLIAMS, have read the transcript of
13  my Deposition taken on March 13, 2025, in the
  above-entitled cause, consisting of Pages 1
14  through 243 inclusive, and I do again subscribe
  and make oath that the same is a true, correct,
15  and complete transcript of my Deposition as
  aforesaid, with corrections, if any, appearing
16  on the attached Correction Page(s).
17      _____ Correction Pages Attached.
18
19     _____
      QUINTEN MARCELLUS WILLIAMS
20
  SUBSCRIBED AND SWORN to
21  before me this _____ day
  of _____, A.D. 20 ____.
22
23  _____
     Notary Public
24

61 (Pages 241 to 244)

245

```
 1    STATE OF ILLINOIS  )
 2                       ) SS:
 3    COUNTY OF C O O K  )
 4
 5         I, DIANE M. NULICK, a Notary Public
 6    within and for the County of Cook, State of
 7    Illinois, and a Certified Shorthand Reporter of
 8    said state, do hereby certify:
 9         That previous to the commencement of the
10    examination of the witness, the witness was
11    duly sworn to testify the whole truth
12    concerning the matters herein;
13         That the foregoing deposition transcript
14    was reported stenographically by me, was
15    thereafter reduced to typewriting under my
16    personal direction and constitutes a true
17    record of the testimony given and the
18    proceedings had;
19         That the said deposition was taken
20    before me at the time and place specified;
21         That the said deposition was adjourned
22    as stated herein;
23         That I am not a relative or employee or
24    attorney or counsel, nor a relative or employee
```

246

```
 1    of such attorney or counsel for any of the
 2    parties hereto, nor interested directly or
 3    indirectly in the outcome of this action.
 4         IN WITNESS WHEREOF, I do hereunto set
 5    my hand and affix my seal of office at Chicago,
 6    Illinois, this 21st day of March, 2025.
 7
 8
 9
10
11
12         Notary Public, Cook County, Illinois.
13
14    C.S.R. Certificate No. 084-002029.
15
16
17
18
19
20
21
22
23
24
```

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 19



**Pepper Construction**
Tomorrow Transformed

# SUBCONTRACT AGREEMENT
**DATE: May 15, 2020**
NO: 1600633MID13901

411 Lake Zurich Road, Barrington, IL 60010-3141
847 381-2760 Fax: 847 304-6510
General Contractor License #TGC04179

To: Midwest Dock Solutions, Inc.
27 E 36th Place
Steeger, IL 60475

Perform Work at: North American Warehouse Expansion
Or Ship to: ("Project")
2101 Claire Court
Glenview, IL 60025

Attn: Ira Sugar
Phone: 708.367.0801     Fax: 708-367-0802

Attn:
Phone: Fax:

Contract Dollar Value  24,547 00     Job No. - 1600633     Vendor # - MID139     Minimum Insurance (See Article 10)
Subject to retainage of: 10%     SubJob - 1600633AAA     Phase - 0899.000     $2,000,000

Furnish all labor, material, equipment, supervision and insurance as required to provide and fully complete all Overhead Doors work ("Work") for the above-referenced Project in strict accordance with the Contract Documents as further described herein. This Work is to be performed for the Lump Sum price, including all applicable taxes, Twenty Four Thousand Five Hundred Forty Seven Dollars And 0/100 ($24,547.00) ("Subcontract Price").

This Subcontract Agreement must be signed and received in addition to submitting an acceptable Certificate of Insurance, prior to working on site. This information must be submitted before any payouts or accounting functions may proceed.

The exchange of copies of this Subcontract Agreement and signature pages by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether conveyed electronically by the worldwide web), by electronic mail in "portable document format" ("pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by combination of such means, shall constitute effective execution and delivery of this Subcontract Agreement as to the Parties and may be used in lieu of the original Subcontract Agreement for all purposes. To that end, signatures of the Parties transmitted by facsimile and/or electronic format shall be deemed to be their original signatures for all purposes.

The Owner for this Project is  North American Corporation ("Owner") and the Architect for this Project is  Heitman Architects, Inc ("Architect")
A COPY OF SUBCONTRACTOR'S UP-TO-DATE INSURANCE CERTIFICATE MUST BE ON FILE WITH PEPPER's SUPERINTENDENT AT THE JOB SITE BEFORE WORK CAN BE STARTED.  PLEASE SEE ARTICLE 10 AND EXHIBIT C FOR FURTHER INSTRUCTIONS.

**SUBMIT BILLS BY THE 15th OF EACH MONTH. (SEE ARTICLE 47, BILLING PROCEDURES.)**

Contract Documents applicable to this Subcontract Agreement (Articles 1 through 47 inclusive) are as follows:
- EXHIBIT A - Contract Documents Listing
- EXHIBIT B - Scope of Work
- EXHIBIT C - Insurance Requirements (Non-CCIP or CCIP, as applicable)
- EXHIBIT D - 01/01/17 Jobsite Safety Handbook (See Article 11 for on-line access)
- EXHIBIT E - Project Schedule as prepared by Pepper Construction Company
- EXHIBIT G - 6B Tax Incentive Requirements

*Subcontractor agrees that the subject matter of this Subcontract is confidential in nature and that Subcontractor will not provide any third-party with any information contained herein without the prior written consent of PEPPER CONSTRUCTION COMPANY.*

**TERMS AND CONDITIONS ACCEPTED:**
**Midwest Dock Solutions, Inc.**

By:
Printed:     ANTHONY ZANCENE
Title:     OWNE
Date:     6-25-P_D

**Pepper Construction Company**

Zack Adkins
Title:     Project Manager
Date:     06.29.2020

PLAINTIFF'S EXHIBIT 61

## SUBCONTRACTOR OBLIGATIONS

By executing and returning the attached acceptance copy of this Subcontract, or if the acceptance copy is not executed and returned, by partial or complete performance under this Subcontract Agreement ("Subcontract" or "Agreement"), you, as Subcontractor, agree with Pepper Construction Company ("PEPPER"), as follows:

1.  **Contract Documents**

    This Subcontract Agreement as defined on page 1 includes, but is not limited to, the Agreement between PEPPER and Owner ("Owner Agreement"), all addenda, modifications, revisions, Drawings, Specifications, details, all general, technical and supplementary conditions, and any Project Labor Agreement for the Project. A listing of the Contract Documents is found at **Exhibit A**, and Subcontractor's Scope of Work is found at **Exhibit B**. For the purposes of this Subcontract Agreement, the Subcontractor is obligated to PEPPER as PEPPER is obligated to the Owner under the Contract Documents. The Owner is a third-party beneficiary to this Subcontract. Subcontractor also agrees to similarly bind its sub-subcontractors. Subcontractor shall have the same rights against PEPPER that PEPPER has against the Owner. In case of conflict between the Contract Documents and this Subcontract Agreement, the more stringent term or the highest quality materials shall be required.

2.  **Incomplete Details**

    The work to be performed by the Subcontractor ("Work") includes that work specifically set forth in this Subcontract Agreement, as well as any and all other work reasonably inferable from the Contract Documents to include work which is necessary to have a properly working and totally acceptable Scope of Work for this Subcontract Agreement. The Subcontractor shall take all field measurements necessary to perform its work. PEPPER makes no warranty, either expressed or implied, as to the sufficiency of the Construction Documents furnished by the Owner. The Subcontractor shall furnish all required samples and shop drawings in order to ensure that the Subcontractor's Scope of Work is complete in every detail and free from any gaps, duplications, or omissions.

3.  **Examination of Site**

    Subcontractor warrants that it has visited and examined the Project site and further that it shall make no claim for extra work on account of existing exposed site conditions.

4.  **Permits and Licenses**

    In performing the Work, Subcontractor shall comply with all laws and ordinances, give authorities timely and proper notices, secure and pay for all necessary permits, licenses, inspections, tests and bonds required for the Work performed under the Subcontract. The general building permit will be obtained and paid for by others.

5.  **Payment and Performance Bonds**

    Subcontractor warrants to PEPPER that it currently has, and will maintain for the life of the Project, sufficient bonding capacity from a surety company acceptable to PEPPER. If included as part of the Bid Instructions, or upon reasonable written notice prior to the start of the Work, or thereafter if required by amendment to this Subcontract Agreement, Subcontractor shall furnish to PEPPER a One Hundred Percent (100%) payment and performance bond with an A.M. Best rating of A/X or better. The premium costs for such bonds are included in the Subcontract Price or within a Change Order.

6.  **Taxes**

    Subcontractor shall pay all sales taxes, use taxes, occupation taxes, excise taxes, FICA taxes, unemployment taxes and any other tax or levy applicable to this Subcontract Agreement.

7.  **Liens/Bonds**

    In the event that PEPPER receives a notice or claim of lien from a sub-subcontractor or a material supplier of Subcontractor, PEPPER shall have the right to require the Subcontractor to bond over the lien in an amount of One Hundred Seventy-Five Percent (175%) of the claim. Should PEPPER determine, in its sole discretion, that Subcontractor is not justified in refusing to pay the claim, after three (3) business days' written notice to Subcontractor, PEPPER shall have the right to pay a sum sufficient to discharge such lien or obligation and charge the same against any amount owed Subcontractor. PEPPER shall also have the right to require the Subcontractor to furnish and pay for a lien release bond in an amount not less than One Hundred Seventy-Five Percent (175%) of (a) the sum of any final lien waivers the Subcontractor fails to provide or (b) the amount of any lien claims. Provided payment is made for Work properly performed, Subcontractor agrees to defend, hold harmless and indemnify PEPPER and Owner against all loss, damages, judgments and expenses (including reasonable attorneys' fees) which PEPPER or Owner may sustain in connection with any lien or claim.

**8.**     **Payments**

PEPPER does not financially guarantee the Owner's ability to fund the Project cost. In the event of Owner's insolvency or willful refusal to pay PEPPER, and notwithstanding anything to the contrary in the Owner Agreement, it is an express condition of this Subcontract Agreement that PEPPER's obligation to pay Subcontractor is contingent upon receipt of payment from Owner for Subcontractor's Work. Owner's withholding of a PEPPER payment, due to an alleged failure by PEPPER to perform any of its obligations unrelated to this Subcontract Agreement, will not excuse payment to Subcontractor according to the terms of this Subcontract Agreement. To the extent permitted by law, retainage shall be held by PEPPER as provided in the Owner Agreement, or as deemed necessary by PEPPER until any failure of performance is corrected and Subcontractor is in compliance with this Subcontract Agreement.

In the event of Owner's nonpayment, nothing contained in this Agreement shall be construed as a waiver or impairment of Subcontractor's mechanic lien rights.

Unless expressly made a part of the Scope of Work for this Agreement, the cost of construction work completed does not include materials or equipment stored off the site.

All billings to the General Contractor for materials delivered or Work completed will be done per the PEPPER billing procedures ("Accounting Package"), which are further described within Article 45. All amounts to be billed must be approved before billings are submitted. Payments received from Owner shall be held for Subcontractor's account and promptly disbursed according to the terms of this Subcontract Agreement.

In accordance with the terms of the Agreement between the Owner and PEPPER, PEPPER or the Owner shall have the right to audit Subcontractor's performance and billing of the Work.

**9.**     **Indemnification**

To the fullest extent permitted by law, the Subcontractor shall defend, indemnify and hold harmless PEPPER, the Owner, Architect and others required in the Contract Documents and their agents, invitees and other employees, from and against first- and third-party claims, damages (direct and consequential), losses and expenses, including but not limited to attorneys' fees ("Claims"), arising out of or resulting from: 1) Subcontractor's performance of or failure to perform its obligations under this Subcontract Agreement; 2) defective workmanship or materials; 3) bodily injury, sickness, disease or death, or to injury to or destruction of tangible property, including loss of use resulting there from, but only to the extent caused by acts or omissions of the Subcontractor, or anyone directly or indirectly employed by them or anyone for whose acts they may be liable; 4) fines, penalties and other charges levied against PEPPER by any governmental entity or authority having jurisdiction as the result of Subcontractor's acts or omissions; 5) mechanics lien and bond claims asserted by Subcontractor or its suppliers or lower tier subcontractors or suppliers; and 6) patent, trademark, copyright or trade dress infringement Claims arising out of Subcontractor's Work. This indemnification shall not be limited in any way by any limitations on the amount or type of damages, compensation or benefits payable by or for the Subcontractor under Workers' Compensation Acts, disability benefit acts or other employee benefit acts and shall survive Completion and final payment of this Subcontract.

Subcontractor further agrees to obtain, maintain, and pay for such insurance as will insure the provisions of this Article 9.

**10.**     **Insurance**

Subcontractor shall maintain, at its own expense, during the progress of the Work and throughout the warranty period, all insurance coverages as required in the attached Insurance **Exhibit C - Non-CCIP** [or in the event of a CCIP, **Exhibit C – CCIP**]. PEPPER reserves the right to implement a Contractor Controlled Insurance Program ("CCIP") in PEPPER's sole discretion, for the provision of Commercial General Liability and Umbrella (follow form) Liability coverages for the Project. In the event a CCIP is implemented, Subcontractor shall credit against the Subcontract Price the actual cost of insurance not required from the Subcontractor for the Project, and shall comply with and maintain all other insurance as set forth in **Exhibit C – CCIP**.

**11.**     **Safety Regulations**

A PEPPER representative is required to be on site any time Work is being performed by Subcontractor. The Subcontractor, its agents, employees, materialmen and sub-subcontractors will comply with all laws and ordinances and will perform all work on the Project in a safe and responsible manner. In particular, Subcontractor shall, at its own expense, conform to the safety policies and regulations established by PEPPER as listed within this Subcontract Agreement and the "Jobsite Safety Handbook", **Exhibit D**, and shall comply with all specific safety requirements promulgated by any government authority, including, without limitation, the requirements of the Occupational Safety and Health Act of 1970 and the Construction Safety Act of 1969 and all standards and regulations which have been or shall be promulgated by the parties or agencies which administer the Acts.

**The Jobsite Safety Handbook, Exhibit D, may be accessed at**
-     **www.pccsafety.com**
**as well as the following within https://pepper.plansandspecs.com:**

-     **Project Name > Documents > Bid Packages (during the bidding stage) and**
-     **Project Name > Documents > General & Photos > Safety Documents (once construction starts).**

**If for any reason Subcontractor is unable to access the Jobsite Safety Handbook from either of these sources, contact the PEPPER Project Manager.**

Subcontractor shall comply with said requirements, standards and regulations and require and be directly responsible for compliance therewith on the part of its agents, employees, materialmen and subcontractors, and shall directly receive, respond to, defend and be responsible for all citations, assessments, fines or penalties which may be incurred by reason of its failure on the part of its agents, employees, materialmen or subcontractors to so comply.

A.    The Subcontractor must develop a pre-job safety plan outlining any hazards and the procedures it will use to eliminate those hazards  Subcontractor will review its plan with PEPPER's field supervisory personnel and crews. This plan is to be submitted to the PEPPER Superintendent at least two (2) weeks prior to commencing the Work.

B.    The Subcontractor's field personnel assigned to this Project, including subs of the Subcontractor, will abide by the PEPPER Drug & Alcohol Policy as further detailed in the Jobsite Safety Handbook. In addition, Subcontractor will commit to no drug or alcohol use by its employees over the lunch period or any other break time. Subcontractor agrees to remove from the jobsite any of its employees or sub-subcontractor employees who violate this policy

C.    Subcontractor shall report immediately to PEPPER any injuries suffered by its employees or any injuries to other persons or property damage arising out of its operation. PEPPER shall be furnished one (1) copy of the accident report within twenty-four (24) hours of the injury or damage.

D.    Subcontractor will equip its personnel with all necessary personal protective equipment required by law or PEPPER. This includes, but is not limited to, hard hats, eye protection, foot and hand protection, ear protection, fall protection and respiratory protection.

E.    Subcontractor will protect all of its employees when using electric power equipment by utilizing Ground Fault Circuit Interrupters at all times. As supplemental protection, the Assured Equipment Grounding Program may be implemented. As stated in the Jobsite Safety Handbook, all branch circuit conductors shall be permitted only within cable assemblies or be multi-conductor cord or cable of a type indentified for hard usage or extra hard usage. NEC Table 400-4 lists "hard" and "extra hard" usage wire types.

F.    All of the Subcontractor's scaffolds and ladders shall be in compliance with all required safety regulations and manufacturers' requirements.

G.    Subcontractor will comply with all applicable standards contained within OSHA's Construction Industry Regulations, Subpart M. With regard to steel erection and decking, Subcontractor and its employees shall comply **with specific fall protection guidelines** as contained within the PEPPER Project Safety Plan For Steel Erection and within the Instructions to Bidders. In addition, those Subcontractors engaged in the steel erection process will comply with all requirements of the revised Subpart R Standard, except where the requirements of PEPPER's Steel Erection Plan are more stringent. In such cases, the Subcontractor will abide by the stricter standard.

H.    Subcontractor agrees to require all of its employees and sub-subcontractor's employees to abide by OSHA regulations and PEPPER's Jobsite Safety Handbook on all PEPPER Projects. Subcontractor shall provide training to all of its employees with regard to the possible hazards associated with the tasks each employee performs and each employee must know and understand all of these safety regulations. Prior to entering the PEPPER jobsite, ALL PERSONS performing Work must attend the PEPPER jobsite safety orientation training

I.    Subcontractor's employees are required to attend PEPPER's Jobsite Orientation prior to beginning Work on the site. Subcontractor shall coordinate and schedule the orientation with PEPPER's Superintendent in a timely manner for all personnel for this Project. This mandatory orientation consists of a general safety orientation and a Project-specific orientation for each person entering a PEPPER jobsite.

J.    Subcontractor shall ensure that its jobsite supervisor has completed the 30-hour OSHA Construction Safety Course and Subcontractor shall provide PEPPER with certification of such training prior to the start of its Work

K.    Subcontractor will hold weekly Tool Box Safety Meetings, led by its jobsite supervisor. Minutes of the Tool Box Safety Meetings, as well as a signature sheet of all attendees, are to be turned in to the PEPPER jobsite Superintendent weekly.

L.    Subcontractor must provide first aid equipment to be made accessible to its employees.

M.    Subcontractor agrees to submit all necessary Safety Data Sheets, SDS-OSHA Form 20, or equivalent for all hazardous substances introduced on the job site and shall inform PEPPER's office prior to its introduction to the jobsite. Subcontractor must be in compliance with the OSHA Hazard Communication Standard 1926.59 It is imperative that the Material Safety Data Sheets be on file in PEPPER's office prior to Subcontractor's starting work on the site.

## 12.    Price Escalation

This Subcontract includes any and all price escalation throughout the duration of the Project.

## 13.    Time

**TIME IS OF THE ESSENCE OF THIS SUBCONTRACT!** Subcontractor shall supply a sufficient number of competent workers and shall cooperate with PEPPER and other Subcontractors in the scheduling and performance of its Work. Subcontractor shall commence its Work upon notification from PEPPER and will proceed towards completion in accordance with the Project Schedule as described in **Exhibit E** established by PEPPER, which may be adjusted from time to time to allow for proper coordination of all trades' work. Should Subcontractor fail to pursue or complete its Work in accordance with the Schedule established by PEPPER, it hereby agrees to indemnify PEPPER for any loss or damages caused by such delay, including all consequential damages suffered by PEPPER as the result of such delay.

Extensions of time for delays not caused by the Subcontractor or not within the Subcontractor's control shall be strictly governed by the terms of the Contract Documents. Subcontractor must give PEPPER notice of any potential delay within three (3) business days, or as otherwise stipulated within the Contract Documents, after such occurrence with an estimate of the additional time needed to overcome the delay. In no event will Subcontractor be entitled to any consideration for delays if it fails to give PEPPER written notice of the delay and such potential claims shall be deemed waived. Anything in the Contract Documents or this Subcontract Agreement to the contrary notwithstanding, an extension of time hereunder shall be Subcontractor's exclusive remedy in the event of a delay, no matter how or by whom caused and Subcontractor specifically waives any right it may otherwise have to an increase in Subcontract Price or damages because of any delays. However, should Owner pay PEPPER for any excusable delays to Subcontractor's Work, PEPPER will adjust this Subcontract Price accordingly.

## 14.    Schedule / Coordination / Labor Harmony

Subcontractor is obligated to perform Work in accordance with the schedule as follows.

A.    Subcontractor is required to prepare its detailed schedule within the scope of the preliminary Project Schedule so as not to impede the stated Project completion time.

B.    Subcontractor's assistance and input, with detailed breakdown of work items and duration for each, is required to develop an agreeable and accurate final Project Schedule. Subcontractor shall submit a statement outlining start date(s), completion date and estimated times for delivery of the major components of its Work. Schedules shall be in the form of a bar chart and indicate durations in weeks. The schedule shall indicate, in detail, the status and progress of shop drawings and submittals, fabrications, delivery and installation start/complete dates for various stages of Work. Subcontractor shall provide a detailed schedule five (5) business days after Subcontract is awarded.

C.    Subcontractor shall cooperate and coordinate its Work with all other contractors and furnish them all details and information required for proper coordination of Work.

D.    Subcontractor shall designate a single representative assigned to the Project who will be responsible for attending meetings, monitoring schedules and coordinating all activities. Subcontractor's representative shall have the authority to commit the Subcontractor to solutions and/or actions as agreed in these meetings.

E.    Regularly scheduled progress meetings shall be held weekly, unless otherwise scheduled. It will be the responsibility of each Subcontractor to attend these meetings to determine the status of the Project and to report on the status of its Work.

F.    It is expressly understood that scheduling requirements may require temporary omissions and out of sequence work as designated by PEPPER's Superintendent. All "come back" work required for this or other out of sequence work, including remobilization, shall be completed on a timely basis at no additional cost to PEPPER.

G.    The Subcontractor shall (and shall expressly require in writing any of its sub-subcontractors to) employ only field labor and tradesmen to perform work on the site whose presence on the job will not result in strikes, work stoppages, picketing, or other labor disputes with any other field labor and tradesmen present on the Project site. The Subcontractor shall manage its work force so as to avoid labor disputes with its own and other trades on the job, and shall keep current in the payment of all wages and benefits required to be paid

to or on behalf of its employees working on the job under any collective bargaining agreements or trust agreements to which it is signatory. The diligent progress of the Work is of the essence and Subcontractor's violation of this clause shall be a material breach of this Agreement.

**15.** **Overtime**

When ordered in writing by PEPPER, Subcontractor shall perform base Subcontract Work during overtime hours. In the event overtime work is required because of Subcontractor's own delays to the Project Schedule, i.e. insufficient manpower, submitting shop drawings and other submittals too late for approval per the Project Schedule, no additional compensation will be granted. In the event overtime is required because of delays of others, Subcontractor shall be compensated for the net increased labor costs only.

**16.** **Shop Drawings and Submittals**

Subcontractor shall promptly submit Shop Drawings, Product Data, Samples and similar submittals required by the Contract Documents with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of PEPPER or other subcontractors.

**17.** **Performance/Assignment/Amendments**

PEPPER's failure to require strict performance of any provision of this Subcontract shall not constitute a waiver of its right to require strict performance in the future. Subcontractor shall not assign this Subcontract without the prior written permission of PEPPER. Any assignment for the benefit of Creditors, of Accounts, of Receivables or of any monies due under this Subcontract to a Creditor, Lender or Trustee shall be a material default of this Subcontract   A sale of a majority interest in Subcontractor shall be considered a default under this Subcontract. Once executed, this Agreement may only be amended in writing by PEPPER and the Subcontractor.

**18.** **Default by Subcontractor**

Should the Subcontractor fail in any manner to perform its Work properly or default in the performance of any provision of this Subcontract or suffer any delay not accepted by PEPPER and Owner as authorized under the Contract Documents, or should the Subcontractor suffer any form of financial distress so that it could not give reasonable assurance to PEPPER that it can continue to perform its obligations under this Subcontract, PEPPER may give written notice to the Subcontractor to begin with all necessary diligence to cure such defaults within a twenty-four (24) hour period or failing to do so, PEPPER may, without prejudice to any other remedies it may have under the law or in equity, terminate this Agreement and look to the Subcontractor for payment of all damages which it incurs ("Termination for Default"). PEPPER's remedies shall include, but not be limited to, its right to proceed with the Work with its own forces or with other contractors on a time and material or other appropriate basis, the cost of which will be charged against the balance of any sums due Subcontractor. In the event of such a breach, in addition to any other remedy PEPPER may have, the Subcontractor agrees to indemnify, defend, and hold PEPPER harmless from all losses, damages, expenses, (including reasonable attorneys' fees) as well as any judgments suffered by PEPPER as a result of Subcontractor's acts or omissions in the performance of its Work. PEPPER shall have the right of set off and to deduct from any balance due under this Subcontract Agreement or any other accounts of subcontracts under which PEPPER is holding funds due the Subcontractor, the amount of any losses, damages, or expenses as described above.

**19.** **Legal Fees**

In the event that PEPPER is deemed to be the prevailing party in any legal proceeding, arbitration or other form of dispute resolution procedure that may be commenced between the parties to this Agreement, whether in contract or in tort, PEPPER shall be entitled, in addition to such other relief as may be granted, to a reasonable sum for attorneys' fees and costs, which sum shall be determined by the court or forum in such proceeding.

**20.** **Termination for Convenience**

PEPPER shall have the absolute right to terminate all or part of the Work under this Subcontract for its own convenience with or without reason and in its sole discretion by giving notice of termination effective upon receipt thereof by Subcontractor ("Termination for Convenience"). Termination for Default, if wrongly made, shall be treated as Termination for Convenience. If PEPPER terminates all or part of this Agreement for convenience, the Subcontractor shall be paid the actual cost of the Work, which includes materials and labor in place, plus the actual cost of any materials properly delivered and stored on or off site at the direction of PEPPER (if PEPPER elects to retain such stored materials), plus a pro rata percentage of the Subcontractor's fee or stated profit equal to the percentage of completion (whichever is less), and which amounts are actually paid to PEPPER by Owner. If PEPPER terminates this Subcontract for convenience, Subcontractor shall not be entitled to anticipated profits on unperformed portions of the Work or to punitive or consequential damages. All of Subcontractor's warranty, guaranty, indemnity and dispute obligations for Work performed shall survive such Termination for Convenience.

**21.** **Key Personnel**

Subcontractor hereby agrees that key personnel assigned to the Project will remain for the duration of this Work. Reassignment or removal of said key personnel will require PEPPER's approval.

22.   **Sub-Subcontractors**

Subcontractor agrees not to sub-subcontract more than Five Percent (5%) of this Subcontract Agreement without the written consent of PEPPER.   For all proposed sub-subcontractors in excess of Five Percent (5%), Subcontractor shall furnish PEPPER an AIA Document A-305 or equal Subcontractor's Qualification Statement, not less than five (5) business days prior to final execution of any sub-subcontractor agreement.  In accordance with Project Contract Documents as defined in Article 1, Subcontractor agrees it shall not contract with any such proposed person or entity to whom the Owner or the Architect has a reasonable objection.

Subcontractor agrees that any part of Work performed for the Subcontractor by an approved sub-subcontractor shall be pursuant to a written subcontract between the Subcontractor and each sub-subcontractor.  Said written subcontract shall contain provisions that:

A.     Require the work be performed in accordance with the requirements of the Contract Documents.

B      Require the sub-subcontractor to carry and maintain liability insurance coverage in accordance with the Contract Documents.

C.     Require the sub-subcontractor to agree to the construction schedule as outlined and/or detailed in Article 14, above

D.     Require the sub-subcontractor to acknowledge that PEPPER is an explicit third-party beneficiary of the subcontract between the Subcontractor and sub-subcontractor.

E.     Require that the sub-subcontractor provide waivers and other required billing materials as set forth in Article 47, below.

F.     Unless PEPPER requires current waivers of lien, upon receipt of payment from PEPPER, Subcontractor shall promptly disburse from such payment, in exchange for waivers, the sums due and owing to any sub-subcontractor and/or material supplier for its work included in PEPPER's payment to Subcontractor. Waivers must be supplied for sub-subcontractors and/or material suppliers at the time they are listed in the "This Payment" section of the Contractor's Affidavit provided within the waiver, and for further lower tiers upon request.

G.     Require the sub-subcontractor to indemnify and hold harmless the Owner, Architect, PEPPER and the Subcontractor from any and all claims for bodily injury by an employee of the sub-subcontractor or anyone directly or indirectly employed by it or for anyone whose acts  it may be liable without limiting or restricting such indemnity by an limitation on the amount or type of damages, compensation or benefits payable by or for the sub-subcontractor under Workers' or Workmens' Compensation Acts, disability benefit or other employee benefit acts.

23.   **Access / Parking**

The use of and access to the site shall be restricted to those areas and  limited to those temporary roads authorized and designated by PEPPER's on-site Superintendent.

Parking on the job site is restricted to company vehicles and equipment only if allowed by PEPPER's Superintendent. Subcontractor's employees shall park in the designated areas

24.   **Jobsite Offices / Storage**

The Project site may have limited space available for storage; therefore, any on-site storage will require prior approval of PEPPER and the Project Superintendent   Subcontractors' jobsite trailers, materials, tools and equipment may be stored on the jobsite at locations approved by PEPPER and must be removed or relocated when directed Subcontractor shall use, for this purpose only, the minimum space that is absolutely required for proper performance of the Work.  Any damage or losses resulting from storage of material, tools and equipment shall be remedied at the cost of the Subcontractor.  Each Subcontractor shall be responsible for erection, dismantling, maintenance, utilities, security, etc., that it may deem necessary in setting up its trailers, sheds and storage area.

Subcontractor may establish a temporary office at the job site except that the exact size and location of said facilities shall be subject to the approval of PEPPER's Superintendent.  The temporary office, along with any electrical, telephone or similar service for this field office, shall be the responsibility of the Subcontractor.  As the Work progresses, Subcontractor agrees to relocate and/or remove said facilities upon seventy-two (72) hours written notice from PEPPER's Superintendent.

25.   **Temporary Facilities**

Temporary facilities furnished by PEPPER for this Subcontractor's use on the site shall be limited to the following:

A.      Temporary sanitary services for Subcontractor's personnel.

B       Temporary non-potable water service only after the permanent tap is made at water main.  Water will be available at a minimum of one location, adjacent to the construction area.  It shall be the Subcontractor's responsibility to provide hook-ups and extensions as required and to coordinate with PEPPER's on-site Superintendent.

C.      Temporary power and lighting for the building shall be specific to OSHA standards and provided by the electrical contractor for all contractors' use  If special or additional services are required, arrangements through the PEPPER on-site Superintendent will be necessary.  However, the contractual relationship shall be directly between the on-site electrical contractor and Subcontractor.

D.      Temporary power will be limited to 120-volt, single-phase temporary electric service in the construction area only after temporary or permanent power is established on the job site.  If temporary power is not available or is insufficient for the Subcontractor, the Subcontractor shall furnish generators at its expense.  The Subcontractor shall be required to provide extension cords for all power tools.

26.     **Hoisting and Scaffolding**

Subcontractor agrees to be solely responsible for all hoisting of materials and all scaffolding necessary for the performance of its own Work unless otherwise stated  Unless expressly provided for in this Scope of Work, no provisions for hoisting or scaffolding will be provided by PEPPER  Any scaffolding or hoisting equipment used by Subcontractor must conform to all local code requirements including, but not necessarily limited to, those of state and federal OSHA.  Subcontractor shall keep and maintain current maintenance logs for all cranes utilized by Subcontractor as of the date such cranes are delivered to the job site.  All logs shall be readily available for review by PEPPER upon request.

27.     **Daily Reports**

Subcontractor will submit a daily report to PEPPER's Superintendent for each day Subcontractor is working on the Project.  The daily report should state:

A.      The number of tradesmen that worked;
B.      The positions of those tradesmen;
C.      The number of hours each tradesman worked;
D.      The specific hours each tradesman worked;
E.      The shift worked by each tradesman: 1st, 2nd, or 3rd;
F.      A brief description of the day's activities;
G.      A two-day look ahead for scheduling purposes;
H.      Any inspections, problems or otherwise pertinent information; and
I.      Accidents that occurred during the day, if any.

28.     **Material Delivery**

Material delivery to the job site shall be handled in accordance with the following:

A.      Cost of all shipping of materials, freight to the jobsite and insurance of same is the responsibility of the Subcontractor.
B.      Subcontractor must notify PEPPER's on-site Superintendent forty-eight (48) hours prior to delivering any materials  Copies of the delivery ticket will be stamped, showing the actual time and date shipment was received.
C.      Each shipment of material shall contain a packing slip with the correct nomenclature of contents and the box or carton containing this information must be so marked.  At the time of shipment, one (1) copy of said packing slip shall be forwarded to the destination of shipment to alert PEPPER's Superintendent as to what material is in transit so that arrangements can be made at least forty-eight (48) hours in advance to receive, allocate and store said material.

If Subcontractor fails to adhere to the foregoing notification and other requirements, PEPPER reserves the right to refuse, warehouse, or return to the carrier the shipment in question.  All related costs incurred by PEPPER, e g , handling, storage, protection, etc., will be borne by Subcontractor.

29.     **Owner's Work Forces**

Subcontractor is advised that the Owner may, at its discretion, employ other contractors or employees of the Owner to perform work on this Project.  In such event, Subcontractor shall cooperate in scheduling activities in order that the work of all parties can be completed on a timely basis

Subcontractor hereby agrees not to perform any work directly for the Owner, or its agents, on the Project while under contract with PEPPER without PEPPER's prior approval, which shall not be unreasonably withheld. Failure to abide by this provision will be considered a material breach of this Subcontract Agreement.

**30.**   **Layout and Engineering**

All Subcontractors will perform layout and engineering as required to complete the Work within the scope of their respective Subcontracts from vertical and horizontal principal control lines and grades established by PEPPER.

**31.**   **Protection of Work**

Subcontractor shall take reasonable precautions for safety of and shall provide reasonable protection to prevent damage, injury, or loss to:

A.      Employees on the jobsite and other persons who may be affected;

B.      The work and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody, or control of the Subcontractor or sub-subcontractors; and

C.      Other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

Subcontractor shall promptly remedy damage and loss (other than damage or loss insured under property insurance required by the Contract Documents) to property as described above caused in whole or in part by the Subcontractor or its sub-subcontractor, or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable and for whom the Subcontractor is responsible, except damage or loss attributable to acts or omissions of the Owner, Architect, PEPPER or anyone directly or indirectly employed by them, or by anyone for whose acts they may be liable and not attributable to the fault or negligence of the Subcontractor.

**32.**   **Dewatering**

Subcontractors who are performing excavation, trenching, utility and/or concrete work are responsible for keeping their excavations free of water during construction.

**33.**   **Subcontractor's Tools and Equipment**

Subcontractor shall assume all risks and liability for damage or loss to all materials, tools or equipment not incorporated into the Work and which belong to it or are under its care, custody or control.

**34.**   **Clean-up**

Subcontractor must provide cleanup and disposal of debris resulting from its Work on a daily basis in order to keep the Project clean, orderly and hazard free. Material will be placed in dumpsters provided by PEPPER. Location of dumpsters will be at PEPPER's discretion.

Upon completion of its Work and prior to leaving the site, Subcontractor must receive approval and acceptance by PEPPER that all final cleanup requirements have been met and that the area is ready for final inspection. When directed in writing in the field by PEPPER's Superintendent, Subcontractor agrees to clean up all debris attributable to its Work within twenty-four (24) hours notice for any given work area, or accept the appropriate back charges for clean-up performed by PEPPER or other contractors, which will be billed to Subcontractor on a monthly basis no later than the following month in which the charges are incurred.

**35.**   **Environmental Compliance**

Subcontractor agrees to comply with pollution and environmental protection regulations for the use of water and other services. Subcontractor further agrees to discharge wastes and storm water drainage from the Project site and to comply with any "Environmental Impact" commitments may have been made by the Owner in securing approval to proceed with construction of this Project. All waste materials and substances (e.g., solvents, cleaners, waste oils, etc.) shall be handled and/or disposed of by this Subcontractor in full compliance with all applicable federal, state and local statutes, regulations, ordinances and rules.

**36.**   **Cutting and Patching**

Subcontractor shall perform cutting, patching, fire safing and caulking, as required to complete the Work within the Scope of its Subcontract.

**37.**   **Revisions / Changes**

When PEPPER so orders in writing, the Subcontractor shall make any and all changes in the Work which are in the general Scope of this Agreement. Adjustments in the Subcontract Price or Subcontract time resulting from such changes, if any, shall be set forth in a Subcontract Change Order pursuant to the Contract Documents. No adjustment shall be made for any changes performed by the Subcontractor that have not been ordered in writing by PEPPER.

As additional information or revisions are provided by PEPPER, Owner or Architect, the Subcontractor shall review the same for its Work and notify PEPPER within ten (10) business days of any cost or schedule changes to the Subcontract Agreement. If no response is received within this time frame, it will be assumed that no additional costs or time extensions will apply. Any changes which are made without prior written authorization of PEPPER's Project Manager will be done at Subcontractor's own risk and payment for such changes is not guaranteed. All revisions causing potential cost increases to the Subcontractor must be approved prior to commencement of said Work. Compensation for extra work shall be by one or more of the following methods at the option of PEPPER:

A. Unit prices contained in the Scope of Work;
B. Alternate prices contained in the Scope of Work;
C. Negotiated lump sums;
D. Negotiated unit prices, or
E. Cost plus compensation.

In the case of cost plus compensation, costs shall be defined as and specifically include the following: Cost of materials, including sales tax and cost of delivery; cost of labor in the field, including social security, old age and unemployment insurance; Workers' Compensation and general liability costs; bond premiums and rental value of the power tools and equipment at rates not to exceed those contained in the current edition of the Associated Equipment Distributors Construction Equipment Rental Rates.

Overhead and profit shall include the following: Costs to prepare estimates or shop drawings, wages of superintendents, project managers, non-working foremen (unless specifically included in the Scope of Work), timekeepers, watchmen and clerks; hand tools; incidentals; general office expenses; interest expense; warranty expenses and all other expenses not included in "costs" as defined above.

Unless otherwise stipulated in the Owner-PEPPER Agreement, the following percentages for overhead and profit are to be added to Subcontractor's approved costs:

      1)      For any work performed by Subcontractor's own forces, 10% for overhead and 5% for profit.

      2)      For work performed by sub-subcontractor, 0% for overhead and 5% for profits of the amount due the sub-subcontractor.

To facilitate checking of quotations for extras or credits, all proposals must be accompanied by complete itemization of cost including labor, materials, equipment and sub-subcontractors.

For Field Changes, time and material tickets signed by the PEPPER Superintendent at the jobsite are to verify actual hours worked, materials and equipment used and must be signed within 24 hours of completing the Work. The verification that the Work is additional work outside of the contractual Scope is subject to approval by PEPPER's Project Manager. No changes will be approved without such itemization. For Field Changes, Extra Work Orders or any other type of Change Directive where the performance of the additional work comes before the approval of the cost, the Subcontractor shall promptly submit its Change Request within the time directed by PEPPER but if a specific amount of time is not set for submission of such costs, then not later than twenty-one (21) business days after the completion of the additional work.

**A Pending Change Request Log shall be submitted electronically by the Subcontractor to the PEPPER Project Manager at the time of each monthly Application for Payment submission. Such Log shall identify any outstanding change requests ("CRs") as well as correlating CR date, description, dollar value and the status of the Change Request. Receipt of such Log does not imply acknowledgement or approval of identified CRs, but rather that such CRs have been submitted for review. CRs are finalized when incorporated into Subcontractor's Subcontract via Change Order. Change Order pricing must be in accordance with the Contract. Monthly progress payments may be delayed or withheld by PEPPER if such Pending CR Log is not timely provided by Subcontractor to PEPPER.**

38.    **Testing**

Subcontractor will be responsible for costs of retesting and correcting or replacing Work that fails the Owner's testing or that of local authorities. This Subcontractor is also responsible for all costs incurred by other trades due to testing failure of its Work.

39.    **Punch List**

All punch list work will be completed within ten (10) business days. Subcontractor will give written notification upon completion of punch list.

**40.** **Record Documents**

Subcontractor is required to maintain an up-to-date set of "As-Built" drawings at all times. At the completion of Subcontractor's Work, Subcontractor will provide to PEPPER the number of copies of "As-Built" drawings that are required per the Contract Documents and one (1) additional copy for PEPPER's use. Subcontractor is also to provide copies of Owner's Operational/Instructional/Maintenance Manuals and training as required by the Project Specifications.

**41.** **Warranties**

Subcontractor shall provide a separate written warranty in triplicate at the time of final billing, guaranteeing its Work against defects in materials and/or workmanship for the period required in the Specifications. If required by the Contract Documents, Subcontractor shall also provide a manufacturer's warranty for installed materials and equipment. All warranties shall meet the express terms and conditions required under the provisions of the Contract Documents for the period called for in the Specifications or, if not specified, for twelve (12) months from acceptance of Project by Owner. Subcontractor shall promptly repair or replace any such defects occurring within the warranty period without cost or liability to PEPPER or Owner.

**42.** **UAS Usage**

Subcontractor shall not be permitted to use an unmanned aircraft system ("UAS") on the Project site without the prior written approval of PEPPER. Should the use of any UAS be permitted, Subcontractor shall enter into a separate agreement ("UAS Agreement") with PEPPER with regard to such usage, submit proof of compliance with all Federal Aviation Administration, state, county, local, and any other applicable laws and regulations in effect, and provide proof of insurance as set forth within such UAS Agreement.

**43.** **Equal Employment Opportunity**

A. **Nondiscrimination, Affirmative Action and Federal Contract Compliance:**

During the performance of this Subcontract, the Subcontractor agrees as follows:

1) The Subcontractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Subcontractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. Such action shall include, but not be limited to, the following: employment, upgrading, demotion, or transfer, recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Subcontractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

2) To supplement Paragraph 1 above (to the extent applicable and that additional requirements are proscribed in the following), pursuant to 41 C.F.R. Sections 60-1.4(d), 60-250.5(d), and 60-741.5(d), PEPPER incorporates by reference the provisions found at **41 C.F.R. Sections 60-1.4(a)(b)**, 41 C.F.R. Section 60-4.3(a), **41 C.F.R. Section 60-250.5 and/or Section 60-300.5**, and **41 C.F.R. Section 60-741.5, Executive Order 13496 and 29 C.F.R. Part 471, Appendix A to Subpart A, if applicable**, into this Subcontract. Subcontractor is hereby notified that it has an obligation to determine whether the Work it is performing, or the goods and services it is providing to PEPPER are provided pursuant to a federal government contract or a federally assisted construction contract. If so, Subcontractor shall determine the extent to which the provisions of Executive Order 11246, the Vietnam Era Veterans' Readjustment Assistance Act of 1974, and Section 503 of the Rehabilitation Act of 1973, as amended, along with their respective implementing regulations found at 41 C.F.R. Part 60, apply to the terms of this specific Subcontract and shall comply with all such provisions. Note: federal construction subcontractors or federally-assisted construction subcontractors are advised to review the Department of Labor's, Office of Federal Contract Compliance Programs (OFCCP) Technical Assistance Guide for Federal Construction Contractors to understand the requirements for both federal contractors and subcontractors.

3) The Subcontractor shall comply with all federal, state, and local equal employment and affirmative action statutes, rules and regulations including, to the extent applicable given the geographical location of the Project (and not in limitation of any other particular law that would pertain to the Subcontractor's Scope of Work), the City of Chicago Human Rights Ordinance and the Illinois Human Rights Act, 775 ILCS 5/1-101 et seq. (1993), the Illinois Prevailing Wage Act, 820 ILCS 130/1 et seq., if applicable, and any subsequent amendments to or regulations thereof.

**B.**     **Default**

Violation of any anti-discrimination or affirmative action requirements, whether or not expressly described herein, that are lawfully imposed on the operation of the Subcontractor's business in the performance of the Scope of Work described herein, shall be a material breach of this Subcontract and a basis for default under Article 18, above.

**44.**     **Scope of Work**

Scope of Subcontractor's Work shall include, but not necessarily be limited to the following:
See Scope of Work, attached hereto at **Exhibit B**.

**45.**     **Dispute Resolution**

**A.**     If arbitration of disputes is provided for in the Contract Documents, and if PEPPER, in its sole discretion, elects to demand arbitration with Subcontractor individually, or as part of joint proceedings with Owner or others, any dispute between PEPPER and Subcontractor involving or arising out of this Subcontract Agreement, including the breach thereof, shall be decided by arbitration as provided for in the Contract Documents. If PEPPER elects to demand arbitration with Subcontractor individually and subject to applicable law, such arbitration proceedings shall be held in Chicago, IL or such other place as PEPPER may designate. The award rendered by the arbitrator(s) shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

**B.**     If the Contract Documents do not provide for arbitration, and if PEPPER, in its sole discretion, elects to demand arbitration with Subcontractor individually, or as part of proceedings with Owner or other parties, any dispute arising between PEPPER and Subcontractor under the Subcontract Agreement, including the breach thereof, shall be decided by arbitration in accordance with the then current Construction Industry Arbitration Rules of the American Arbitration Association. The venue of such arbitration shall be Chicago, IL or such other place as PEPPER may designate. The award rendered by the arbitrator(s) shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

**C.**     Subcontractor further agrees that, upon request by PEPPER, resolution of any dispute between PEPPER and Subcontractor may be consolidated with resolution of any dispute between Owner and PEPPER, whether in litigation or arbitration, at PEPPER's sole discretion, and that Subcontractor will join in and be bound by the result of any such dispute resolution process, even if such consolidation and/or joinder requires resolution of Subcontractor disputes in a forum not provided for in this Subcontract and/or otherwise not selected by Subcontractor and even if Subcontractor is not permitted to become a named party to such proceeding or process. Subcontractor agrees not to institute (and to stay) legal remedies against PEPPER until all legal proceedings against Owner with respect to such claim are final and complete. Subcontractor shall not be entitled to and hereby agrees to make no claim for further payment beyond the Subcontract Price for costs arising out of the site conditions, acts, errors, or omissions of Owner, Architect, or other agents or representatives of Owner, other than to the extent that PEPPER may receive funds from the Owner on behalf of Subcontractor, which funds shall be paid by PEPPER to Subcontractor less costs and expenses incurred by PEPPER in prosecuting such claims.

**D.**     Notwithstanding any provision to the contrary, any dispute involving Owner, PEPPER and Subcontractor shall be resolved in accordance with the law specified in the Owner Agreement.

**46.**     **Strict Compliance**

Subcontractor is bound to strict compliance with this Subcontract Agreement. PEPPER's failure to insist upon strict compliance with any of the provisions of this Agreement, or failure to exercise any options provided, shall not be construed as a waiver or an estoppel of PEPPER's right to thereafter require such strict compliance or to exercise such option.

## 47. BILLING PROCEDURES

### PEPPER CONSTRUCTION COMPANY ACCOUNTING PACKAGE
### SUBCONTRACTOR APPLICATION FOR PAYMENT AND PAYMENT CONDITIONS

The following terms and conditions are an integral part of Subcontract Agreement 1600633MID13901. Please direct any billing procedure questions to PEPPER's Accountant for this Project, Susan Bauer at 847 381-2760 and sbauer@pepperconstruction.com.

<u>APPLICATION FOR PAYMENT</u>

PEPPER CONSTRUCTION COMPANY IS ONLY ABLE TO PROCESS INVOICES THROUGH OUR ACCOUNTING SYSTEM AFTER OUR SUBCONTRACT AGREEMENT HAS BEEN SIGNED WITHOUT ALTERATION AND RETURNED TO US, INCLUDING APPROPRIATE INSURANCE AND SAFETY DOCUMENTATION.

CHANGES TO SUBCONTRACTOR'S SUBCONTRACT CANNOT BE BILLED UNTIL A FORMAL CHANGE ORDER HAS BEEN RECEIVED BY SUBCONTRACTOR FROM AN AUTHORIZED REPRESENTATIVE OF PEPPER CONSTRUCTION COMPANY AND EXECUTED BY BOTH SUBCONTRACTOR AND PEPPER. ONCE APPROVED, CHANGES SHOULD NOT BE SEPARATELY BILLED, BUT SHOULD BE INCLUDED IN SUBCONTRACTOR'S MONTHLY BILLING AT THE REVISED SUBCONTRACT AMOUNT.

1. Given the requirements of the Owner Agreement, Applications for Payment for Work performed and accepted by Owner, shall include the following:

    One (1) of each of the following documents:
    a) Affidavit, which must include values for the sub-subcontractors in the "Amount of this Request" column at the time the sub-subcontractors are listed in the "Completed This Period" column of the Schedule of Values;

    b) Application and Certificate for Payment signed and notarized (AIA G702);

    c) Schedule of Values (AIA G703) in format approved by PEPPER;

    d) Stored materials documentation, as required by Owner;

    e) Pending Change Request Log, submitted electronically, identifying outstanding Change Requests ("CRs"), as well as correlating CR date, description, dollar value and status of the Change Request, as further described at Article 37, and

    Three (3) of each of the following documents:
    f) Partial or Final Waivers of Lien as required, including waivers from all sub-subcontractors and Materials Suppliers listed in the "This Payment" section of the Contractor's Affidavit provided within the Waiver, and for further lower tiers upon request.

2. All invoice packages must be received no later than the 15th of the month for Work performed from the 1st projected up to the last day of the month. Invoice Packages not received by this deadline WILL NOT be processed until the following month.

3. Unless PEPPER requires current Waivers of Lien, upon PEPPER's receipt of payment from the Owner, Subcontractor will be contacted with the correct information to be included in the Waiver. The Waiver and Affidavit format to be used shall be that attached hereto, unless otherwise specified by Owner.

4. Subcontractor shall, as often as requested by PEPPER, furnish such information, evidence, and substantiation as PEPPER may require with respect to the extent and value of the current progress of Subcontractor's Work. Subcontractor shall also furnish, upon request, similar detail regarding the nature and extent of all obligations incurred by Subcontractor in connection with the Work and all payments made by Subcontractor on account thereof.

5. Subcontractor shall also furnish, as required by PEPPER in its sole discretion, such partial or final lien waivers or releases as PEPPER deems necessary to ensure that Subcontractor has paid all parties furnishing any labor, material, or services in furtherance of any Work furnished hereunder. If required by PEPPER, the furnishing of such lien waivers and releases shall be a condition precedent to any payment hereunder. Moreover, no prior failure of PEPPER to require such releases and waivers shall limit PEPPER's right to subsequently require them.

6. Accordingly, Subcontractor is intended to assume the risk of Owner's non-payment under the circumstances set forth herein. Owner's payment to PEPPER is a condition precedent to PEPPER's obligation to pay Subcontractor unless the Owner's refusal to pay is due to a material breach by PEPPER of its Agreement with the Owner unrelated to the Work of the Subcontractor. If payment to PEPPER is received from Owner,

and provided the billing and insurance requirements have been met as required under this Subcontract Agreement, all payments by PEPPER on Subcontractor's Work accepted by Owner shall be made in the net amount of its request within two (2) business days of receipt of Owner's payment.

7. At the time the Final Waiver is required, it shall be in the full amount of the adjusted Subcontract Price

8. Retainage shall be held in accordance with the Contract Documents between Owner and PEPPER and paid to Subcontractor after approval and acceptance by Owner and upon payment by Owner to PEPPER.

9. In the event Subcontractor suffers financial distress as described in Article 18, above, PEPPER shall, in its sole and absolute discretion, have the right but not the obligation to pay sub-subcontractors or suppliers directly or tender payment jointly to Subcontractor and lower tiers.

10. Subcontractor and its lower tier subcontractors shall be solely responsible for and make all contributions or payments required to be made to any health and welfare, pension, vacation, apprenticeship, training or other fringe benefit or employee benefit program or trust with whom Subcontractor or its lower tier subcontractors are affiliated (collectively, a "Trust") within thirty (30) days from receipt of payment from PEPPER. As a condition precedent to any progress payment, PEPPER shall have the right to:
   (a) require lien waivers and other certification of payment and confirmation (such as a letter of good standing), for the benefit of PEPPER, that Subcontractor and its lower tier subcontractors are current (within thirty (30) days) in making all contributions or payments to a Trust;
   (b) require Subcontractor to submit payroll reports on a weekly basis, in form and substance as required by PEPPER, signed and attested to by a duly authorized officer of the Subcontractor (a "Certified Payroll Report"), and/or
   (c) pay a Trust directly as part of a progress payment.

## WAIVER OF LIEN TO DATE

STATE of _____ ) SS
County of _____ ) SS

TO WHOM IT MAY CONCERN:
WHEREAS the undersigned has been employed by _____ to furnish _____ for the premises known as _____ of which _____ is the owner

     THE undersigned, for and in consideration of _____ ($ _____ ) Dollars, and other good and valuable considerations, the receipt whereof is hereby acknowledged, do(es) hereby waive and release any and all lien or claim of, or right to, lien, under the statutes of the State of _____ , relating to mechanics' liens, with respect to and on said above described premises, and the improvements thereon, and on the material, fixtures, apparatus or machinery furnished, and on the moneys, funds or other considerations due or to become due from the owner, on account of labor, services, material, fixtures, apparatus or machinery, furnished to this date by the undersigned for the above-described premises, including extras*.

     Given under my hand and sealed this _____ day of _____ , 20__

     Signature and Seal: _____

*Extras include but are not limited to change orders, both oral and written, to the contract.

## CONTRACTOR'S AFFIDAVIT

STATE of _____ ) SS
County of _____ ) SS

TO WHOM IT MAY CONCERN:
THE undersigned, being duly sworn, deposes and says that he/she is _____ of the _____ who is contractor for the _____ work on the building located at _____ owned by _____ .
That the total amount of the contract, including additional work and Change Orders, is $ _____ on which he/she has received payment of $ _____ prior to this payment. That all waivers are true, correct and is genuine and delivered unconditionally and that there is no claim, either legal or equitable, to defeat the validity of said waivers. That the following are the names of all parties who have furnished material or labor, or both, for said work and all parties having contracts or subcontracts for specific portions of said work or for material entering into the construction thereof and the amount due or to become due to each, and that the items mentioned include all labor and material required to complete said work according to plans and specifications

| NAMES | WHAT FOR | CONTRACT PRICE INCLUDING EXTRAS* | AMOUNT PAID | THIS PAYMENT | BALANCE DUE |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| TOTAL LABOR AND MATERIAL INCLUDING EXTRAS* TO COMPLETE | | | | | |

That there are no other contracts for said work outstanding, and that there is nothing due or to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work other than above stated

     Signed this _____ day of _____ , 20__

     Signature: _____

     Subscribed and sworn to before me this _____ day of _____ , 20__

     Signature: _____

*Extras include but are not limited to change orders, both oral and written, to the contract

## FINAL WAIVER OF LIEN

STATE of _____ ) SS
County of _____ ) SS

TO WHOM IT MAY CONCERN:
WHEREAS the undersigned has been employed by _____ to furnish _____ for the premises known as _____ of which _____ is the owner.

       THE undersigned, for and in consideration of _____ ($ _____ ) Dollars, and other good and valuable considerations, the receipt whereof is hereby acknowledged, do(es) hereby waive and release any and all lien or claim of, or right to, lien, under the statutes of the State of _____ , relating to mechanics' liens, with respect to and on said above-described premises, and the improvements thereon, and on the material, fixtures, apparatus or machinery furnished, and on the moneys, funds or other considerations due or to become due from the owner, on account of labor, services, material, fixtures, apparatus or machinery, heretofore furnished, or which may be furnished at any time hereafter, by the undersigned for the above-described premises, including extras*.

       Given under my hand and sealed this _____ day of _____ , 20__

       Signature and Seal: _____

*Extras include but are not limited to change orders, both oral and written, to the contract.

## CONTRACTOR'S AFFIDAVIT

STATE of _____ ) SS
County of _____ ) SS

TO WHOM IT MAY CONCERN:
THE undersigned, being duly sworn, deposes and says that he/she is _____ of the _____ who is contractor for the _____ work on the building located at _____ owned by _____ .
That the total amount of the contract, including additional work and Change Orders, is $ _____ on which he/she has received payment of $ _____ prior to this payment. That all waivers are true, correct and is genuine and delivered unconditionally and that there is no claim, either legal or equitable, to defeat the validity of said waivers. That the following are the names of all parties who have furnished material or labor, or both, for said work and all parties having contracts or subcontracts for specific portions of said work or for material entering into the construction thereof and the amount due or to become due to each, and that the items mentioned include all labor and material required to complete said work according to plans and specifications.

| NAMES | WHAT FOR | CONTRACT PRICE INCLUDING EXTRAS* | AMOUNT PAID | THIS PAYMENT | BALANCE DUE |
|-------|----------|----------------------------------|-------------|--------------|-------------|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| TOTAL LABOR AND MATERIAL INCLUDING EXTRAS* TO COMPLETE |  |  |  |  |  |

That there are no other contracts for said work outstanding, and that there is nothing due or to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work other than above stated.

       Signed this _____ day of _____ , 20__

       Signature: _____

       Subscribed and sworn to before me this _____ day of _____ , 20__

       Signature: _____

*Extras include but are not limited to change orders, both oral and written, to the contract

# Exhibit 'A'
# Contract Documents List

**Exhibit – 'A'**
**Contract Documents**

**Architectural**
Plans Prepared by Heitman Architects, Inc. Dated 10.18.2019

# Exhibit 'B'
# Scope of Work

## North American Corporation

**2101 Claire Ct**
**Glenview, IL**
Job#: 1600633

| 0899.000<br>**Overhead Doors** | **Midwest Dock Solution**<br>**Ira Sugar** |
|---|---|

| **Base Bid** | |
|---|---|

| **Safety Requirements** | Comments /<br>Quantities | Cost | Notes |
|---|---|---|---|
| Pepper's Safety procedures have been reviewed and all necessary provisions have been included in Base Bid. | Included | | |
| To promote safety awareness on our jobsites, Subcontractor may be asked to participate in a site-wide Safety event. | Included | | |
| Subcontractor understands that 100% fall protection, hard hats, protective eye wear, and high visibility clothes are required. | Included | | |
| Include costs for all on site tradespersons to attend an on site safety and code of conduct orientation. Allow a one time orientation of approximately one (1) hour for each tradesperson. | Included | | |
| Subcontractor to submit daily field reports for each prime trade, including any 2nd/3rd tier subcontractors. | Included | | |
| Required Safety Deliverables:<br>a) Weekly Toolbox Talks (TBT)<br>b) Daily Task Hazard Analysis (THA)<br>c) Time and material tickets signed daily by Pepper Superintendent for any extras<br>d) MSDS and Hazard Communication Program on record in Pepper trailer<br>e) Job Specific Safety Plan Prior to Mobilization<br>f) Up to date Certificate of Insurance<br>g) Competent person, name in writing, on safety plan with 30 hour OSHA training card<br>h) Report all injuries and submit an accident report the day of the incident<br>i) Crane inspection report daily, if applicable | Included | | |

| **Insurance Requirements** | Comments /<br>Quantities | Cost | Notes |
|---|---|---|---|
| Insurance requirements necessary to complete installations are included in base bid. Pepper standard insurance requirements will be required as set forth in Article 10 of subcontract agreement (Exhibit F). | Included | | |
| A Certificate of Insurance must be issued to Pepper prior to commencement of work at the site. Identify additional insured as required within Pepper Subcontractor Insurance Requirements (Exhibit C). | Included | | |

| **Prequalification** | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

| **Bid / Contract Documents** | Comments /<br>Quantities | Cost | Notes |
|---|---|---|---|
| EXHIBIT A - Bid documents - plans outlined on Exhibit A. Exhibit A has been reviewed and taken into account when generating the contracted scope of work bid submission. | Included | | |
| EXHIBIT B - Scope of Work (this document). | Included | | |

Pepper Construction          Exhibit - B          Scope of Work

| 0899.000<br>Overhead Doors | Midwest Dock Solution<br>Ira Sugar | | |
|---|---|---|---|
| EXHIBIT C - Pepper Insurance Requirements have been reviewed and taken into account when generating the contracted scope of work bid submission. | Included | | |
| EXHIBIT D - Jobsite Safety Handbook. Pepper's temporary power and grounding requirements have been reviewed. No changes or modifications to jobsite safety handbook are allowed. | Included | | |
| EXHIBIT E - Schedule dated 5/5/2020 for Reference | Included | | |
| EXHIBIT F - Design Build Agreement | Excluded | | |
| Exhibit G - 6B Tax Incentive Requirements | Included | | |
| **General Requirements** | Comments / Quantities | Cost | Notes |
| Subcontractor attended the pre-bid walk through and/or visited the site prior to submitting bid. | N/A | | |
| Subcontractor is responsible to complete all the necessary drawings, permit application forms as required by the City or Village. | N/A | | |
| All plan review and inspection fees for your work will be included with your bid. | N/A | | |
| Licenses, business or bond fees as required by the City or Village. | Included | | Business License |
| Subcontractor pricing is to include all work that is reasonably inferable from the drawings, specifications and this scope of work sheet. | Included | | |
| Each subcontractor has the responsibility to immediately examine the contract documents for errors, inconsistencies or omissions. Any such errors, inconsistencies or omissions shall immediately be brought to the attention of Pepper. | Included | | |
| All sales and use taxes are included. | Included | | |
| Union installations are utilized for all work performed on the jobsite. | Included | | |
| Labor rate escalation is included with your bid for the duration of the job. | Included | | |
| Full time supervision is included for this scope of work. Subcontractor also includes full time supervision while any of their 2nd/3rd Tier Subcontractors are onsite performing their scope of work. | Included | | |
| This trades' company representative will attend all coordination meetings and prepare fully coordinated shop drawings. All cost for engineering, CAD drafting and plan reproduction will be included. | N/A | | |
| All layout associated with this scope of work has been considered and is included in the base bid. | Included | | |
| Project correspondence is electronic based. Subcontractor and onsite foreman to have electronic access for current contract documents. | Included | | |
| Subcontractor PM & Superintendent will be required to attend weekly coordination meetings. | Included | | |
| Street sweeping for site track-out created by this sub and sub tier(s). | N/A | | |
| Flagging of trucks in/out of project site to ensure of project and public safety. | N/A | | |
| Any "loud" or "noisy" work must be completed per area of jurisdiction (i.e. City, Village, building rules & regs) noise ordinances. | N/A | | |
| **Submittal / Procurement Requirements** | Comments / Quantities | Cost | Notes |
| Subcontractor agrees to provide all submittals, certifications, manufacturer's documentation, etc. as required by all applicable specifications. | Included | | |
| Subcontractor shall generate & maintain a submittal schedule for their items. | Included | | |
| Subcontractor shall generate & maintain a material expediting log indicating submittal status, order date & delivery date for all items. | Included | | |

| 0899.000<br>**Overhead Doors** | **Midwest Dock Solution<br>Ira Sugar** | | |
|---|---|---|---|
| Indicate number of weeks subcontractor requires to prepare major shops/submittal/sample for review submission. Complete submittals shall be provided no greater than TWO (2) BUSINESS WEEKS from contract award unless stated below. All submittals must include a high level of detail, appropriate spec section # and be submitted electronically in PDF format (unless requested otherwise). | Included | | |
| a) shop drawings - submitted | 1WK | | |
| b) shop drawings - returned | 1WK | | |
| List the approximate lead time for procurement / fabrication in number of weeks, after submittal approval, for the major material / equipment items applicable to subcontractor's trade. Material lead time shall be no greater than two (2) weeks after approval unless noted below. | Included | | |
| a) dock levelers | | | confirm |
| b) dock shelters | | | confirm |
| Subcontractor agrees to provide all progress and record as-built documents as require by applicable specifications. | N/A | | |

| **Schedule Requirements** | Comments /<br>Quantities | Cost | Notes |
|---|---|---|---|
| Exhibit E - Schedule dated 5/5/2020 has been reviewed. All labor and material considerations have been included as part of the base bid noted above. | Included | | |
| Phasing constraints and multiple requirements are included. | Included | | |
| Overall construction schedule is June 2020 through February 2021. All labor, material, equipment, and escalation considerations have been included. | Included | | |
| This trade acknowledges that adverse weather conditions shall NOT be the basis for a Claim for additional time or money unless such adverse weather conditions cause significant damage to the work in place as determined by the architect or delays beyond the control of the contractor attributable to unanticipated extremely adverse weather conditions as defined by the Army Corp of Engineers of the five year weather averages of standard climatologically data collected by NOAA for project location. | N/A | | |
| All work within this scope of work may not specifically be shown in the schedule provided, but workflow timing can be determined based upon the activities provided. | Included | | |
| All costs required to maintain the construction schedule have been considered and have been included. Subcontractor will guarantee the man power to complete the job per the Exhibit E Schedule, or work overtime if you fall behind the schedule at your own cost. | Included | | |
| Indicate total man-hours (for onsite labor) included in your Bid (including all of the Bidders' second tier subcontractors). | ___ MH's | | |
| Mobilization as required will be included in subcontractor bid. Indicate number of mobilizations included based on Exhibit E schedule. | Included | | |
| Premium costs necessary to complete the schedule have been considered and are included in the base bid if needed. | Included | | |

| **Clean up Requirements** | Comments /<br>Quantities | Cost | Notes |
|---|---|---|---|
| All clean up (labor, material & equipment) associated with this scope of work to a dumpster provided by Pepper on a daily basis is included in base bid. This also includes daily clean up of lunch and break areas. All clean up shall be performed by union labor as required by the union having jurisdiction. Subcontractor is responsible for maintaining labor harmony on the project. For bid comparison purposes, identify $$$$ amount included in base bid within the NOTES column. | Included | | |

| 0899.000<br>Overhead Doors | Midwest Dock Solution<br>Ira Sugar | | |
|---|---|---|---|
| Pepper implements a "NOTHING HITS THE FLOOR" (NHTF) program, which includes the following:<br>1. Minimize staging of any materials/equipment onsite. Staging of materials shall be limited to a maximum of one week.<br>2. Any materials staged onsite must be on an OSHA approved mobile platform or pallet with an accompanying pallet jack. Any material staged onsite without a mobile platform will be removed at the subcontractor's expense.<br>3. All trades are required to put scrap and debris directly into portable trash containers on respective floors supplied by Subcontractor. Subcontractor laborers will empty the portable trash containers at the end of each day to the jobsite dumpster.<br>4. Any debris found on the floor in the subcontractors work area, at the end of the day, will be photographed and picked up at the subcontractor's expense.<br>5. Subcontractor will use dedicated cut areas an protect areas from dust and residue.<br>6. Subcontractor will provide equipment such as vacuum attachments and floor covers. Subcontractor to keep cords off floors. | Included | | |
| Subcontractor includes dust control for your work as a result of your work. This includes, but is not limited to the trades of demolition, site utilities, earthwork, earth retention, masonry, drywall, carpentry, millwork, flooring, finishes, and sitework. | Included | | |
| Subcontractor to complete NHTF Subcontractor plan that demonstrates how they will be in compliance with the NHTF program. | Included | | |
| Each subcontractor to build, maintain and remove any temporary chop/cut area to isolate all dust when cutting material. | Included | | |
| **Deliveries** | **Comments / Quantities** | **Cost** | **Notes** |
| Freight for materials and equipment required for the contracted scope of work has been included. This includes coordinated delivery with Pepper superintendent, this trade being on-site to accept delivery, unload, and distribute to final locations. | Included | | |
| If any material is stored on-site, subcontractor has included coordination with Pepper Superintendent and includes storing material on carts for relocation purposes and has included on-going protection of stored materials and work installed. All deliveries must be labeled with the Job Name and Job Number along with any other pertinent information. | Included | | |
| Subcontractor includes all labor and equipment required for the project vertical or other transportation. Pepper will not be responsible for any of subcontractors labor, material and equipment. | Included | | |
| This trade includes all cleaning of streets and of adjacent areas due to this trades work and associated delivery trucks. Cleaning to be performed on a daily basis at minimum. Subcontractor to provide cleaning multiple times a day as required. | N/A | | |
| Subcontractor to provide flagman for all trade events that require entering and/or exiting the site including deliveries, hauling, etc. Identify $$$$ amount and duration (in days) included. | N/A | | |
| **Quality Requirements** | **Comments / Quantities** | **Cost** | **Notes** |
| Subcontractor has included all coordination hours as required to complete scope of work that is fully coordinated. | Included | | |

**Pepper Construction**     **Exhibit - B**     **Scope of Work**

| 0899.000<br>Overhead Doors | Midwest Dock Solution<br>Ira Sugar | | |
|---|---|---|---|
| Subcontractor will review and sign a contractor agreement of electronic documents from the architect and engineer and will agree to all terms. The owner, architect and engineer are NOT responsible for any issues related to the subcontractor's use of the electronic information provided for bidding or coordination purposes. | N/A | | |
| Coordination to include egress considerations for future equipment replacement and/or maintenance. (i.e. getting equipment in and out of building / roof.) | N/A | | |
| Subcontractor is to participate in a quality pre-installation meeting prior to mobilization. This meeting will include subcontractor foreman, subcontractor project manager, and Director of Quality/Pepper Project Manager. Any action items generated during the pre-installation meeting will be completed before start of work. Subcontractor to strictly adhere to the Pepper Quality Program. | N/A | | |
| Complete the Pepper standard trade item checklist for your scope of work in preparation for the pre-installation meeting. | N/A | | |
| Participate as required in all Pepper Quality Reviews and construction progress reviews. | N/A | | |
| Review and take action on Quality issues brought up by Pepper, Owner, Architect, and Engineer to comply with the contract documents and proper installation. | Included | | |
| Provide mock ups as specified | N/A | | |
| Provide constructability mock ups for quality and field coordination purposes. (First in place mock up OR mock up for removal by this trade) Trade/s specific mock ups for this project include, but are not limited to: | N/A | | |

| **Financial Requirements** | Comments /<br>Quantities | Cost | Notes |
|---|---|---|---|
| Identify all second tier subcontractors. Lien waivers to be provided for each payment request. | Included | | |
| A pending change request (CR) log shall be submitted electronically by the subcontractor to the Pepper Project Manager at the time of each monthly payment application submission. Receipt of such log does not imply acknowledgement or approval of identified CR's but rather that such CR's have been submitted for review. Monthly progress payments may be delayed or withheld by Pepper if such pending CR log is not timely provided by Subcontractor to Pepper. For any costs that are not finalized, Subcontractor must submit a rough order of magnitude for each change order item on the log. | Included | | |
| Subcontractor to complete the Pepper labor rate sheet for the current year prior to a contract being awarded to your company. | Included | | |
| Change Order Analysis must be submitted with each PCI (potential cost item), utilizing labor rates as indicated within labor force rate sheet submitted to Pepper, and utilizing the allowable mark ups per Owner contract or Subcontract Agreement (if they differ; the more stringent supersedes) as summarized below: | Included | | |
| A. 10% for OH and 5% for profit ---- for any work performed by Subcontractor's own forces | Included | | |
| B. 0% for OH and 5% for profit ---- for any work performed by Sub-Subcontractor | Included | | |

| **Hoisting** | Comments /<br>Quantities | Cost | Notes |
|---|---|---|---|
| Landing platforms must be utilized to stock material on multiple story buildings. Materials may not be "pulled" onto floors. | N/A | | |
| Material & equipment hoisting will be included with your base bid. PCC will not be responsible for hoisting any of your equipment. | Included | | |

| 0899.000<br>Overhead Doors | Midwest Dock Solution<br>Ira Sugar | | |
|---|---|---|---|
| For any crane lifts, schedule in advance with Pepper superintendent and Owner as required. Crane lift plan and safety meeting to be scheduled and held in advance of lift. | N/A | | |

| Closeout | Comments / Quantities | Cost | Notes |
|---|---|---|---|
| Closeout documents (certifications, as-builts, O&M manuals) and owner training shall be provided no later that the date of Substantial Completion. Retainage will be withheld and not be released until closeout documents are received and accepted. | Included | | |
| Provide As-builts in latest version of AutoCAD and/or PDF as specified, as required. | N/A | | |
| Provide labor and material warranty letters as specified, as required. One (1) year warranty period from substantial completion date per Subcontractor Agreement or Owner Contract (if they differ, the more stringent supersedes). | Included | | |
| Provide special warranty documentation, in writing, applicable to this trade as specified, as required. | Included | | |
| Supply O&M manuals and owner training session/s as specified, as required. | Included | | |
| Any testing required by local authorities or testing agencies is included in your bid. | N/A | | |
| Provide all factory authorized start-up as specified, as required. | Included | | |
| Provide all spare parts and attic stock as specified, as required. | N/A | | |

## TRADE SPECIFIC SCOPE OF WORK

| Bidder shall include a complete FURNISHED AND INSTALLED system / assembly relevant to its scope of work as indicated in the contract documents and as per this scope of work document. Each scope of work section includes, but is not limited to, the following: | | | |
|---|---|---|---|
| **Project Specific Scope of Work** | Comments / Quantities | Cost | Notes |
| (14) 9x10 Dock Doors - Installed | Add ▶ | $17,150 | Clopay 3715 |
| Manually Operated | Included | | |
| R-13 - Insulated | Included | | |
| 2" Tracks | Included | | |
| (01) 24x12 Vision Lite | Included | | |
| Standard Finish | Included | | |
| (01) 12x14 Drive-In Door - Installed | Add ▶ | $3,950 | Clopay 3715 |
| Motorized 1/2 HP Jackshaft w/3-Button Controller and Photo Eyes | Included | | |
| R-13 - Insulated | Included | | |
| 3" Tracks | Included | | |
| (01) 24x12 Vision Lite | Included | | |
| Standard Finish | Included | | |
| (14) Pair of Prefinished Track Guards at the Dock Doors - Installed | Add ▶ | $2,800 | |
| Sales Tax | Add ▶ | $647 | |
| **Total Bid** | | **$24,547** | |

# Exhibit 'C'
# Insurance
# Requirements

## Exhibit C
## Pepper Construction Company
### Subcontractor Insurance Requirements

PLEASE ISSUE A CERTIFICATE OF INSURANCE FOR THE PROJECT REFERENCED BELOW IN ACCORDANCE WITH THE FOLLOWING REQUIREMENTS. SUBMIT TO THE SAME ADDRESS AS SHOWN AS CERTIFICATE HOLDER. THANK YOU.

**JOB DESCRIPTION**

| | |
|---|---|
| Job Number | 1600633 |
| Job Name: | North American Warehouse Expansion |
| Job Address: | 2101 Claire Court |

Glenview, IL 60025

ADDITIONAL INSUREDS TO BE LISTED: (Must be listed exactly as shown)

North American Corporation (Owner)
Pepper Construction Company (General Contractor)
Heitman Architects, Inc. (Architect)

CERTIFICATE HOLDER:

PEPPER CONSTRUCTION COMPANY
Attention: Zack Adkins

EXPERIENCE MODIFICATION RATING (EMR):

**PEPPER CONSTRUCTION COMPANY** ("PEPPER") has a strong commitment to safety on our construction projects and it is important that our subcontractors display that same commitment  Therefore, PEPPER requests that each Subcontractor instruct its insurance company to send PEPPER a letter indicating its Experience Modification Rating (EMR) for the last three (3) years

Contractually, the Subcontractor is required to keep a valid Certificate of Insurance on file for a period of three (3) years from the date of Substantial Completion.

Any questions, please call 847 381-2760

1

## Exhibit C
## Pepper Construction Company
### Subcontractor Insurance Requirements

Subcontractor shall maintain, at its own expense, during the progress of the Work and throughout the warranty period, insurance written by insurance companies acceptable to PEPPER (as further described below) with the minimum limits and coverage as shown below or, if higher, the requirements set forth in the Contract Documents. For purposes of this insurance section, major trades include: Concrete/Pre-cast Concrete; Curtainwall; Electrical; Elevator; Excavation/Earthwork; Fire Protection; Hoisting/Tower Crane; HVAC, Plumbing/Piping; Shoring/Underpinning, Soil Stabilization, Special Foundations/Caissons; and Steel (collectively, "Major Trades").

A       Unless otherwise required by the Contract Documents, at a minimum, Subcontractor's insurance shall be provided by
        1) Insurer(s) authorized to transact business in the state where the Work or operations will be performed by
           Subcontractor, and
        2) Admitted insurers that maintain an A.M. Best's rating of not less than A-/VIII.

B       WORKERS' COMPENSATION including Employers' Liability insurance in an amount of at least:
        1) $1,000,000, bodily injury by accident – each accident;
        2) $1,000,000, bodily injury by disease – policy limit; and
        3) $1,000,000, bodily injury by disease each employee.

        Where applicable, evidence of coverage shall be required for Longshore and Harbor Workers' Compensation, Maritime
        coverage, Federal Employers' Liability Act and other unique exposures requiring endorsement of coverage.

        Workers' Compensation coverage must extend to every employee, including owners/officers of a closely held
        corporation and/or individuals operating as a sole proprietorship or partnership.

C.      COMMERCIAL GENERAL LIABILITY ("CGL") insurance for Major Trades with a limit of not less than $2,000,000 per
        occurrence for both Premises/Ongoing Operations, $2,000,000 Products-Completed Operations aggregate; and
        $2,000,000 general aggregate applicable to claims other than Products-Completed Operations. For all other trades,
        with a limit of not less than $1,000,000 per occurrence for both Premises/Ongoing Operations, $1,000,000 Products-
        Completed Operations aggregate; and $1,000,000 general aggregate applicable to claims other than Products-
        Completed Operations. To the extent that Subcontractor's CGL insurance is subject to aggregate limits, the policy shall
        be endorsed so as to apply such aggregate limits separately to each Project.

        Coverage afforded under Subcontractor's CGL and any Commercial Umbrella insurance shall be provided on an
        occurrence basis and shall be subject to the terms of the Insurance Services Office ("ISO") Commercial General
        Liability Coverage Form CG 0001, or an equivalent form providing coverage at least as broad as the ISO form
        specified. There shall be no limitations or exclusions of coverage beyond those contained in the standard coverage
        form and coverage shall include liability arising from Premises/Operations, Elevators, Broad-Form Property Damage,
        Independent Contractors, Contractual Liability, Products-Completed Operations including Construction Defect,
        Contractual Liability or Personal Injury and Advertising Injury

        All coverages shall be maintained in force for a period of three (3) years after Substantial Completion of the Project or
        for such period of time as is described in the Contract Documents ("Products-Completed Operations Period") All terms
        and conditions of such coverage shall be maintained during this Products-Completed Operations Period, including the
        required coverage limits and the requirement to provide PEPPER and Owner with coverage as an **Additional Insured**
        for Products-Completed Operations. XCU Exclusions must be deleted when applicable to operations performed by the
        Subcontractor

D.      COMMERCIAL UMBRELLA LIABILITY ("Umbrella Liability") shall be maintained by Subcontractor, providing the same
        coverage and with the same **Additional Insureds** as the primary policy in the amount of $5,000,000 for Major Trades
        and $1,000,000 for all other trades. All terms and conditions of such coverage shall be maintained during the three (3)
        year Project-Completed Operations Period, including the required coverage limits and the requirement to provide
        PEPPER and Owner with coverage as an **Additional Insured** for Products- Completed Operations. Umbrella Liability
        insurance required under this Subcontract shall follow the form of the Commercial General Liability insurance, Business
        Automobile insurance, and Employers' Liability insurance as required in the Subcontract. To the extent that
        Subcontractor's Umbrella Liability insurance is subject to aggregate limits, policies shall be endorsed so as to apply
        such aggregate limits separately to each Project.

        When providing a Blanket Certificate of Insurance, the following wording must be included: *"All work performed by
        [Subcontractor Company Name] for all Pepper Construction Company jobsites. Additional Insureds: Pepper
        Construction Company and all others identified at Exhibit C of the Subcontractor Agreement."*

E       BUSINESS AUTOMOBILE LIABILITY on an accident basis covering all Owned, Leased, Non-Owned and Hired
        Vehicles providing limits of liability for Bodily Injury and Property Damage of $1,000,000 each occurrence, including its
        own employees

## Exhibit C
## Pepper Construction Company

### Subcontractor Insurance Requirements

F.  CONTRACTOR'S POLLUTION LIABILITY insurance shall be provided by Subcontractor with minimum limits of $1,000,000 per occurrence and $1,000,000 per aggregate for at least the following types of Subcontractors: building enclosure systems, drywall/insulation, MEP (including but not limited to HVAC, plumbing, sprinkler), and excavating. Policy shall include affirmative mold coverage. The policy must include the parties listed in this **Exhibit C** Insurance Requirements as **Additional Insureds** on a primary and non-contributory basis. Occurrence or claims-made coverage is acceptable. Occurrence-based coverage is to be maintained for five (5) years after completion. Claims-made coverage is to have a retroactive date prior to the date the Subcontractor commences contracting services on the Project and shall include an Extended Reporting Period of three (3) years. **Additional Insured** coverage under the Contractor's Pollution Liability shall apply to both ongoing and completed operations.

G.  ADDITIONAL INSURED: The Subcontractor's CGL and Umbrella Liability policies must include the parties listed in **Exhibit C** as **Additional Insureds**, on an ISO **Additional Insured** Endorsement (CG 2010 and CG 2037, Edition #07 04 or older, or equivalent) covering Ongoing and Completed Operations. Subcontractor's insurance will be Primary and Non-Contributory to any insurance carried by any of the **Additional Insured**. Subcontractor's required insurance shall apply separately to each **Additional Insured**. Any other insurance or self-insurance maintained by PEPPER or Owner shall be excess of, and non-contributory with, the coverage afforded by Subcontractor's CGL and Umbrella Liability insurance.

H.  A Certificate of Insurance on an ACORD form, and the **Additional Insured** Endorsement (including a waiver of subrogation), must be delivered to the PEPPER Project Manager of record and FAXED TO THE PEPPER JOBSITE FIELD SUPERINTENDENT *PRIOR TO THE COMMENCEMENT OF ANY WORK*. The Subcontractor shall notify PEPPER by email within thirty (30) days if such Certificate is to be altered, cancelled or allowed to expire.

I.  Subcontractor's required insurance shall apply separately to each **Additional Insured**.

J.  Equivalent insurance coverage must be obtained from each sub-subcontractor or supplier, if any, before permitting them on the Project site. In the event Subcontractor fails to obtain such coverage from its lower tiers, protection of such parties shall be included within Subcontractor's insurance policies.

K.  PEPPER may furnish, erect or provide equipment, appurtenances and devices, motorized or otherwise, for its use to complete its Contract with the Owner. Subcontractor may use such items upon PEPPER's prior written authorization. In the event of any such Subcontractor use, the Subcontractor agrees to insure against claims of injury or damage caused by such items while in Subcontractor's care, custody or control by naming PEPPER as an insured party. Liability limits shall be the same as in Section C, above. Physical Damage insurance against damage to the items themselves shall be on a "Replacement Cost" basis

L.  Subcontractor will be responsible for any deductible or self-insured retention under its insurance policies.

M.  It is understood and agreed that PEPPER shall withhold payments to the Subcontractor until a properly executed Certificate of Insurance and endorsement providing insurance as required herein, accompanied by a signed Subcontract Agreement, are received by PEPPER. The failure of PEPPER to withhold such payments or obtain the required Certificate or endorsement shall not be deemed to be a waiver of Subcontractor's obligation to provide the insurance required under the Subcontract Agreement

N   Subcontractor hereby waives any rights of subrogation against PEPPER, the Owner, the Architect, and any other **Additional Insureds** as required by this Subcontract, the Owner Agreement or the Invitation to Bid. If insurance policies specified within this **Exhibit C** require an endorsement to provide for continued coverage where there is a waiver of subrogation, the Subcontractor will cause them to be so endorsed. This waiver shall apply to all first party Property, Equipment, Vehicle and Workers' Compensation claims (unless prohibited under applicable state statutes), and all third party liability claims.

O.  Limits under the Commercial General Liability, Business Auto Liability, and Employer's Liability policies can be obtained by any combination of primary and excess coverage.

**Pepper Construction Company Indemnification Requirements**
To the fullest extent permitted by law, the Subcontractor shall defend, indemnify and hold harmless PEPPER, the Owner, Architect and others required in the Contract Documents and their agents, invitees and other employees, from and against all claims, damages, losses and expenses, including but not limited to attorneys' fees ("Claims"), arising out of or resulting from Subcontractor's performance of or failure to perform its obligations under this Subcontract Agreement and extend to consequential Claims for defective workmanship or materials, provided that such Claim is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property, including loss of use resulting there from, but only to the extent caused by negligent acts or omissions of the Subcontractor, or anyone directly or indirectly employed by them or anyone for whose acts they

### Subcontractor Insurance Requirements

Rev. 020116

## Exhibit C
## Pepper Construction Company

may be liable  This indemnification shall not be limited in any way by any limitations on the amount or type of damages, compensation or benefits payable by or for the Subcontractor under Workers' Compensation Acts, disability benefit acts or other employee benefit acts and shall survive Completion and final payment of this Subcontract.

Subcontractor further agrees to obtain, maintain, and pay for such insurance as will insure the provisions of this **Exhibit C.**

4

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 20

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MID-AMERICA CARPENTERS REGIONAL
COUNCIL PENSION FUND; *et al.*,

                  Plaintiffs,

v.

DOCK & DOOR INSTALL, INC. and MIDWEST
DOCK SOLUTIONS, INC.,

                  Defendants.

Case No 1:24-cv-06428

Judge Andrea R. Wood

Magistrate Judge Jeannice
W. Appenteng

## DECLARATION OF SHAWNA L. OERTLEY

I, Shawna L. Oertley, hereby declare as follows:

1.      I am a Senior Contract Specialist for Pepper Construction Company ("Pepper"), and I have worked for Pepper for approximately twenty-four (24) years. I was responsible for gathering Pepper's Subcontract Agreements, certificates of insurance, emails, Subcontractor Prequalification information, and other documents requested by the third-party subpoena issued to Pepper in the above-captioned lawsuit seeking documents related to Midwest Dock Solutions, Inc. ("Midwest Dock") and Dock & Door Install, Inc. ("Dock & Door"). True and accurate copies of these documents which are maintained by Pepper in its regular course of business were produced by Pepper in this lawsuit. I am familiar with the matters stated herein based upon my experience and the documents gathered and produced by Pepper.

2.      Pepper is signatory to the collective bargaining agreement with various unions, one of which is the Mid-America Carpenters Regional Council of Carpenters.

3.      Generally subcontractors who bid on projects for Pepper complete an online "Subcontractor Prequalification" form. A true and accurate copy of Midwest Dock's Prequalification Form with Pepper is attached as Exhibit 1. One of the items that the Subcontractor Prequalification form includes is whether the company completing the form is a union company. Midwest Dock's Prequalification Form includes a checked box that it is union as follows: "Union ☑" and specifically identifies their affiliation with the Carpenters.

4.      Attached here as Exhibit 2 is a May 1, 2020 email exchange maintained by Pepper in its email records between Ira Sugar from Midwest Dock and Zack Adkins, who was employed as a Senior Project Manager for Pepper, where Mr. Adkins asks Mr. Sugar whether Midwest Dock would use union labor on a prospective project and Mr. Sugar responded, "Yes thats correct, we are union."

5.     The records referenced above indicate that Midwest Dock was a union company when Pepper awarded Midwest Dock subcontracts.  Pepper and Midwest Dock entered into the following Subcontract Agreements for Midwest Dock to perform work described at the stated locations.

a.   Subcontract Agreement for the North American Warehouse Expansion project at 2101 Claire Court, Glenview, IL 60025 dated May 15, 2020 for "Overhead Doors work".

b.   Subcontract Agreement for the Green Era Digester Facility and Urban Campus project at 650 West 83rd St., Chicago, IL 60620 dated October 27, 2020 for "Overhead Doors Work" (this Subcontract Agreement, unlike the other Subcontract Agreements, is a Pepper/Ujamaa Construction, LLC subcontract agreement).

c.   Subcontract Agreement for the LPC - Palatine Spec 350k sf Distribution project, 623 E. Algonquin Rd., Palatine, IL 60173 dated March 2, 2022 for "Overhead Doors work".

d.   Subcontract Agreement for the Matteson 57 Commerce Center project at 21500 Gateway Dr., Matteson, IL 60443 dated October 5, 2022 for "Overhead Doors work".

e.   Subcontract Agreement for the LPC - Palatine I LP project called the "LPC Palatine – AIT Build Out" at 975 W. Algonquin Rd., Palatine, IL 60067 dated April 24, 2023 for "Overhead Doors at Bay 46 & 47 Work".

f.   Subcontract Agreement for the McMaster - Carr West WH Day 2 project at 600 County Line Rd., Elmhurst, IL 60126 dated February 1, 2024 for "Coiling Fire Doors Work".

g.   Subcontract Agreement for the RR Donnelley - Wallace Ave Expansion project at 1750 Wallace Ave., St. Charles, IL 60147 dated March 20, 2024 for the "Award Midwest Dock Solutions - EWA Subcontract work".

Each of the forgoing Subcontract Agreements are referred to collectively as the "Subcontract Agreements."

6.     A copy of the Subcontract Agreement for the "RR Donnelley - Wallace Ave Expansion" project including its Exhibit B Scope of Work and Exhibit C regarding insurance terms is attached here as Exhibit 3, which is fairly representative of the other Subcontract Agreements as described below.

7.     Each of the Subcontract Agreements state:

Subcontractor agrees not to sub-subcontract more than Five Percent (5%) of this Subcontract Agreement without the written consent of PEPPER. For all proposed sub-subcontractors in excess of Five Percent (5%), Subcontractor shall furnish PEPPER an AJA Document A-305 or equal Subcontractor's Qualification Statement, not less than five (5) business days prior to final execution of any sub-

subcontractor agreement. In accordance with Project Contract Documents as defined in Article 1, Subcontractor agrees it shall not contract with any such proposed person or entity to whom the Owner or the Architect has a reasonable objection.

Pepper did not locate any records showing that Midwest Dock asked Pepper for permission to subcontract the work under the Subcontract Agreements to another entity, and Pepper did not locate any records indicating that it consented to Midwest Dock's subcontracting the work under the Subcontract Agreements to another entity.

8.      The Subcontract Agreements state that Midwest Dock shall "[f]urnish all labor, material, equipment, supervision, and insurance as required to fully complete" the work specified for the above projects and the Scope of Work for each of the Subcontract Agreements requires that "Union installations are utilized for all work performed on the jobsite."

9.      The Subcontract Agreements require a subcontractor have an up-to-date certificate of insurance on file with Pepper before the subcontractor is allowed to commence work on the jobsite.  The Subcontract Agreements state:

> A COPY OF SUBCONTRACTOR'S UP-TO-DATE INSURANCE CERTIFICATE MUST BE ON FILE WITH PEPPER'S SUPERINTENDENT AT THE JOBSITE PRIOR TO BEGINNING WORK ON THIS PROJECT.
> * * *
> A Certificate of Insurance on an ACORD form, and the Additional Insured Endorsement (including a waiver of subrogation), must be delivered to the PEPPER Project Manager of Record and FAXED TO THE PEPPER JOBSITE FIELD SUPERINTENDENT PRIOR TO THE COMMENCEMENT OF ANY WORK. The Subcontractor shall notify PEPPER by email within thirty (30) days if such Certificate is to be altered, cancelled or allowed to expire.

10.      According to Pepper's records, Pepper received the required Certificates of Insurance from Midwest Dock for the Subcontract Agreements above.  Copies of the Certificates of Insurance listing Pepper as a certificate holder are attached as group Exhibit 4.  Under the Subcontract Agreements, Midwest Dock's employees were permitted to work on the jobsites. Pepper did not locate any Certificate of Insurance from Dock & Door and, therefore, under the Subcontract Agreements, Dock & Door's employees were not permitted to work on the jobsites.

11.      According to emails gathered by Pepper, Pepper communicated with Tony Brutti regarding jobs subcontracted to Midwest Dock.  Copies of emails exchanged between Mr. Brutti on behalf of Midwest Dock and Pepper are attached to this Declaration as group Exhibit 5.  Mr. Brutti held himself out to Pepper as a representative of Midwest Dock by using the email address tonyb@midwestdocksolutions.com, by using a signature block identifying him with "Midwest Dock Solutions", and by forwarding closeout warranty documents to Pepper on behalf of Midwest Dock.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United

States of America that the forgoing is true and correct.

FURTHER AFFIANT SAYETH NOT.

_Signature_

Shawna L. Oertley
Print Name

11-04-25
Dated

# EXHIBIT 1



## SUBCONTRACTOR PREQUALIFICATION

| Field | Value |
|---|---|
| Code* | MID139 |
| Company* | Midwest Dock Solutions, Inc. |
| Also Known As | |
| Legal Name | Midwest Dock Solutions, Inc. |
| Parent Corp. | |
| Ctrl Business Partner | |
| Street | 27 E 36th Place |
| Suite | |
| City | Steeger |
| State* | Illinois |
| Country | |
| Contact | Tony Zarlengo |

Tax ID* ▮▮▮▮▮

Zip 60475

| Field | Value |
|---|---|
| Prequalification Status | Update Prequal |
| Safety Status | Y |
| Aggregate Project Limit: | 581,651.50 |
| CAP Required | ☐ |
| Host Region | |
| Last Approval Date | 04242023 |
| Workflow Status | Unsubmitted |

Master Subcontract ☐
Financial Statement ☐
OSHA 300A Form ☐
Bonding Reference Letter ☐

| Field | Value |
|---|---|
| Insurance Rating | |
| Approval Status | Expired |
| Single Project Limit: | 581,651.50 |
| CAP Approved | |
| Urgent | ☐ |
| Renewal Date | 04242024 |
| Prequal Required | Prequal Required |

Union ☑
Open Shop ☐
Sample Insurance Cert. ☐
Additional Comments ☑



| Certifying Agency* | | Action |
|---|---|---|
| N/A | | |

EXHIBIT 2

**From:** ira@midwestdocksolutions.com
**Sent:** Friday, May 1, 2020 4:42 PM
**To:** Zack Adkins
**Subject:** Re: [EXTERNAL] North American Paper, OH Doors.

Hi Zack,
Yes thats correct, we are union.
Thanks,

Ira Sugar

Midwest Dock Solutions

708.367.0801 – Office

708.280.2642 – Cell

www.midwestdocksolutions.com

-------- Original message --------
From: Zack Adkins <ZAdkins@pepperconstruction.com>
Date: 5/1/20 4:33 PM (GMT-06:00)
To: Ira Sugar <ira@midwestdocksolutions.com>
Subject: Re: [EXTERNAL] North American Paper, OH Doors.

Ira - union install correct?

Zack Adkins
Senior Project Manager
Pepper Construction Company
411 Lake Zurich Road, Barrington, IL 60010
T 847.620.4191
M 630.699.6179

**From:** Ira Sugar <ira@midwestdocksolutions.com>
**Sent:** Friday, May 1, 2020 3:40:22 PM
**To:** Zack Adkins <ZAdkins@pepperconstruction.com>
**Subject:** RE: [EXTERNAL] North American Paper, OH Doors.

Hi Zack,
Please find attached the sell sheet for the doors proposed. Let me know if you have any questions.
Thank you,

Ira Sugar
Midwest Dock Solutions
708.367.0801 – Office
708.280.2642 – Cell

---

**From:** Zack Adkins <ZAdkins@pepperconstruction.com>
**Sent:** Friday, May 1, 2020 3:04 PM
**To:** ira@midwestdocksolutions.com
**Subject:** Re: [EXTERNAL] North American Paper, OH Doors.

Ira - sounds good. Can you please send me the brochure info on the doors you're proposing?

Zack Adkins
Senior Project Manager
Pepper Construction Company
411 Lake Zurich Road, Barrington, IL 60010
T 847.620.4191
M 630.699.6179

---

**From:** ira@midwestdocksolutions.com <ira@midwestdocksolutions.com>
**Sent:** Friday, May 1, 2020 12:39:15 PM
**To:** Zack Adkins <ZAdkins@pepperconstruction.com>
**Subject:** RE: [EXTERNAL] North American Paper, OH Doors.

Hi Zack,
Yes, quote is still good as long as doors are installing this year.

Please contact me at your convenience if I may be of assistance.
Thank you,

Ira Sugar

Midwest Dock Solutions

708.367.0801 – Office

708.280.2642 – Cell

www.midwestdocksolutions.com

-------- Original message --------
From: Zack Adkins <ZAdkins@pepperconstruction.com>
Date: 5/1/20 12:27 PM (GMT-06:00)
To: Ira Sugar <ira@midwestdocksolutions.com>
Subject: RE: [EXTERNAL] North American Paper, OH Doors.

Ira

This proposal still good?  Pepper is reviewing and awarding trades (finally released).

Zack Adkins

Senior Project Manager

**Pepper Construction Company**

411 Lake Zurich Road, Barrington, IL 60010

**T**  847.620.4191

**M**  630.699.6179

*Click here to read Pepper's 2019 Annual Review*

---

**From:** Ira Sugar <ira@midwestdocksolutions.com>
**Sent:** Monday, November 4, 2019 2:53 PM
**To:** Zack Adkins <ZAdkins@pepperconstruction.com>
**Subject:** [EXTERNAL] North American Paper, OH Doors.

Hi Zack,

Please find attached my proposal for the OH doors.

Please contact me at your convenience if I may be of assistance.

Thank you,

Ira Sugar

Midwest Dock Solutions

708.367.0801 – Office

708.280.2642 – Cell

EXHIBIT 3

# Pepper
## Tomorrow Transformed

# SUBCONTRACT AGREEMENT

**Date:** March 20, 2024
**No.:** 2301962MID13901

411 Lake Zurich Road  Barrington, IL 60010-3141
847 381-2760 Fax  847 304-8510
General Contractor License #TGC04179

| To: | Midwest Dock Solutions, Inc.<br>27 E 36th Place<br>Steeger, IL 60475<br><br>Attn: Ira Sugar<br>Phone: 708.367.0801   Fax: 708-367-0802 | Perform Work at:<br>Or Ship to: | RR Donnelley - Wallace Ave Expansion<br>("Project")<br>1750 Wallace Ave.<br>St. Charles, IL 60174<br>Attn:<br>Phone:   Fax: |
|---|---|---|---|

| Contract Dollar Value: 56,838.00 | Job No. - 2301962 | Vendor # - MID139 | Minimum Insurance (See Article 10 |
|---|---|---|---|
| Subject to retainage of: 10% | SubJob - 2301962EWA | Phase- 0833.000 | and **Exhibit C**) $2,000,000 |

Furnish all labor, material, equipment, supervision and insurance as required to provide and fully complete all Award Midwest Dock Solutions - EWA Subcontract work ("Work") for the above-referenced Project in strict accordance with the Contract Documents as further described herein.  This Work is to be performed for the Lump Sum price, including all applicable taxes, of Fifty Six Thousand Eight Hundred Thirty Eight Dollars And 00/100 ($56,838.00) ("Subcontract Price").

This Subcontract Agreement must be signed and received in addition to submitting an acceptable Certificate of Insurance prior to working on site.  This information must be submitted before any payouts or accounting functions may proceed.

The Owner for this Project is RR Donnelly & Sons Comp ("Owner") and the Architect for this Project is NWS Architects, Inc. ("Architect").

A COPY OF SUBCONTRACTOR'S UP-TO-DATE INSURANCE CERTIFICATE MUST BE ON FILE WITH PEPPER'S SUPERINTENDENT AT THE JOBSITE PRIOR TO BEGINNING WORK ON THIS PROJECT.  PLEASE SEE ARTICLE 10 AND **EXHIBIT C** FOR FURTHER INSTRUCTIONS.

**SUBCONTRACTOR SHALL SUBMIT INVOICES BY THE 15th OF EACH MONTH.  SEE ARTICLE 47, BILLING PROCEDURES.**

Contract Documents applicable to this Subcontract Agreement (Articles 1 through 47 inclusive) are as follows:

- EXHIBIT A - Contract Documents Listing
- EXHIBIT B - Scope of Work
- EXHIBIT C - Insurance Requirements (Non-CCIP or CCIP, as applicable)
- EXHIBIT D - 01/01/2022 Trade Partner Safety Handbook (See Article 11 for on-line access)
- EXHIBIT E - Project Schedule as prepared by Pepper Construction Company
- Any additional Exhibits are identified within Exhibit B, Scope of Work, and/or shown on the following page 2.

*Subcontractor agrees that the subject matter of this Subcontract is confidential in nature and that Subcontractor will not provide any third party with any information contained herein without the prior written consent of PEPPER CONSTRUCTION COMPANY.*

**TERMS AND CONDITIONS ACCEPTED:**

**Midwest Dock Solutions, Inc.**
DocuSigned by:

By: *Ira Sugar*
0E70066DC6A9486

Printed: Ira Sugar

Title: Sales

Dated: 3/22/2024

**Pepper Construction Company**
DocuSigned by:

By: *Timothy Lumpp*
816C10456064465

Printed: Timothy Lumpp

Title: Project Executive

Dated: 3/22/2024

Additional Exhibits:

- Exhibit I - Pepper's Quality Coordination Guidelines (for all Trades).
- Exhibit J - Logistics/ Phasing & Site Use Plan.
-

# SUBCONTRACTOR OBLIGATIONS

By executing and returning the attached acceptance copy of this Subcontract, or if the acceptance copy is not executed and returned, by partial or complete performance under this Subcontract Agreement ("Subcontract" or "Agreement"), you, as Subcontractor, agree with Pepper Construction Company ("PEPPER"), as follows:

1. **Contract Documents**

   This Subcontract Agreement as defined on page 1 includes, but is not limited to, the Agreement between PEPPER and Owner ("Owner Agreement"), all addenda, modifications, revisions, Drawings, Specifications, details, all general, technical and supplementary conditions, and any Project Labor Agreement for the Project. A listing of the Contract Documents is found at **Exhibit A**, and Subcontractor's Scope of Work is found at **Exhibit B**. For purposes of this Subcontract Agreement, the Subcontractor is obligated to PEPPER as PEPPER is obligated to the Owner under the Contract Documents. The Owner is a third-party beneficiary to this Subcontract. Subcontractor also agrees to similarly bind its sub-subcontractors. Subcontractor shall have the same rights against PEPPER that PEPPER has against the Owner. In case of conflict between the Contract Documents and this Subcontract Agreement, the more stringent term or the highest quality materials shall be required.

   The exchange of copies of this Subcontract Agreement and of signature pages by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether conveyed electronically by the worldwide web), by electronic mail in "portable document format" ("pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by combination of such means, shall constitute effective execution and delivery of this Subcontract Agreement as to the Parties and may be used in lieu of the original Subcontract Agreement for all purposes. To that end, signatures of the Parties transmitted by facsimile and/or electronic format shall be deemed to be their original signatures for all purposes.

2. **Incomplete Details**

   The work to be performed by the Subcontractor ("Work") includes that work specifically set forth in this Subcontract Agreement, as well as any and all other work reasonably inferable from the Contract Documents to include work which is necessary to have a properly working and totally acceptable Scope of Work for this Subcontract Agreement. The Subcontractor shall take all field measurements necessary to perform its work. PEPPER makes no warranty, either expressed or implied, as to the sufficiency of the Construction Documents furnished by the Owner. The Subcontractor shall furnish all required samples and shop drawings in order to ensure that the Subcontractor's Scope of Work is complete in every detail and free from any gaps, duplications, or omissions.

3. **Examination of Site**

   Subcontractor warrants that it has visited and examined the Project site and further that it shall make no claim for extra work on account of existing exposed site conditions.

4. **Permits and Licenses**

   In performing the Work, Subcontractor shall comply with all laws and ordinances, give authorities timely and proper notices, and secure and pay for all necessary permits, licenses, inspections, tests and bonds required for the Work performed under the Subcontract. The general building permit will be obtained and paid for by others.

5. **Payment and Performance Bonds**

   Subcontractor warrants to PEPPER that it currently has, and will maintain for the life of the Project, sufficient bonding capacity from a surety company acceptable to PEPPER. If included as part of the Bid Instructions, or upon reasonable written notice prior to the start of the Work, or thereafter if required by amendment to this Subcontract Agreement, Subcontractor shall furnish to PEPPER a One Hundred Percent (100%) payment and performance bond with an A.M. Best rating of A/X or better. The premium costs for such bonds are included in the Subcontract Price or within a Change Order.

6. **Taxes**

   Subcontractor shall pay all sales taxes, use taxes, occupation taxes, excise taxes, FICA taxes, unemployment taxes, and any other tax or levy applicable to this Subcontract Agreement.

7. **Liens/Bonds**

   In the event that PEPPER receives a notice or claim of lien from a sub-subcontractor or material supplier of Subcontractor, PEPPER shall have the right to require the Subcontractor to bond over the lien in an amount of One Hundred Seventy-Five Percent (175%) of the claim. Should PEPPER determine, in its sole discretion, that Subcontractor is not justified in refusing to pay the claim, after three (3) business days' written notice to Subcontractor, PEPPER shall have the right to pay a sum sufficient to discharge such lien or obligation and charge the same against any amount owed Subcontractor. PEPPER shall also have the right to require the Subcontractor to furnish and pay for a lien release bond in an amount not less than One Hundred Seventy-Five Percent (175%) of (a) the sum of any final lien waivers the Subcontractor fails to provide or (b) the amount of any lien claims. Provided payment is made for Work properly performed, Subcontractor agrees to defend, hold harmless and indemnify PEPPER and Owner against any loss, damages, judgments and expenses (including reasonable attorneys' fees) which PEPPER or Owner may sustain in connection with any lien or claim.

8. **Payments**

   PEPPER does not financially guarantee the Owner's ability to fund the Project cost. In the event of Owner's insolvency or willful refusal to pay PEPPER, and notwithstanding anything to the contrary in the Owner Agreement, it is an express condition of this Subcontract Agreement that PEPPER's obligation to pay Subcontractor is contingent upon receipt of payment from Owner for Subcontractor's Work. Owner's withholding of a PEPPER payment, due to an alleged failure by PEPPER to perform any of its obligations unrelated to this Subcontract Agreement, will not excuse payment to Subcontractor according to the terms of this Subcontract Agreement. To the extent permitted by law, retainage shall be held by

PEPPER as provided in the Owner Agreement, or as deemed necessary by PEPPER until any failure of performance is corrected and Subcontractor is in compliance with this Subcontract Agreement.

In the event of Owner's nonpayment, nothing contained in this Agreement shall be construed as a waiver or impairment of Subcontractor's mechanic lien rights.

Unless expressly made a part of the Scope of Work for this Agreement, the cost of construction work completed does not include materials or equipment stored off the site.

All billings to the General Contractor for materials delivered or Work completed will be done per the PEPPER billing procedures ("Accounting Package"), which are further described within Article 47. All amounts to be billed must be approved before billings are submitted. Payments received from Owner shall be held for Subcontractor's account and promptly disbursed according to the terms of this Subcontract Agreement.

In accordance with the terms of the Agreement between the Owner and PEPPER, PEPPER or the Owner shall have the right to audit Subcontractor's performance and billing of the Work.

## 9. Indemnification

To the fullest extent permitted by law, the Subcontractor shall defend, indemnify and hold harmless PEPPER, the Owner, Architect and others required in the Contract Documents and their agents, invitees and other employees, from and against first- and third-party claims, damages (direct and consequential), losses and expenses, including but not limited to attorneys' fees ("Claims"), arising out of or resulting from: 1) Subcontractor's performance of or failure to perform its obligations under this Subcontract Agreement; 2) defective workmanship or materials; 3) bodily injury, sickness, disease or death, or to injury to or destruction of tangible property, including loss of use resulting therefrom, but only to the extent caused by acts or omissions of the Subcontractor, or anyone directly or indirectly employed by them or anyone for whose acts they may be liable; 4) fines, penalties and other charges levied against PEPPER by any governmental entity or authority having jurisdiction as the result of Subcontractor's acts or omissions; 5) mechanics lien and bond claims asserted by Subcontractor or its suppliers or lower tier subcontractors or suppliers; 6) patent, trademark, copyright or trade dress infringement Claims arising out of Subcontractor's Work; and 7) claims for wages or benefits by employees of Subcontractor or Sub-subcontractors. This indemnification shall not be limited in any way by any limitations on the amount or type of damages, compensation or benefits payable by or for the Subcontractor under Workers' Compensation Acts, disability benefit acts or other employee benefit acts and shall survive Completion and final payment of this Subcontract.

Subcontractor further agrees to obtain, maintain, and pay for such insurance as will insure the provisions of this Article 9.

## 10. Insurance

Subcontractor shall maintain, at its own expense, during the progress of the Work and throughout the warranty period, all insurance coverages as required in the attached Insurance **Exhibit C - Non-CCIP** [or in the event of a CCIP, **Exhibit C – CCIP**]. PEPPER reserves the right to implement a Contractor Controlled Insurance Program ("CCIP") in PEPPER's sole discretion, for the provision of Commercial General Liability and Umbrella (follow form) Liability coverages for the Project. In the event a CCIP is implemented, Subcontractor shall credit against the Subcontract Price the actual cost of insurance not required from the Subcontractor for the Project and shall comply with and maintain all other insurance as set forth in **Exhibit C – CCIP.**

## 11. Safety Regulations

A PEPPER representative is required to be on site any time Work is being performed by Subcontractor. The Subcontractor, its agents, employees, materialmen and sub-subcontractors will comply with all laws and ordinances and will perform all work on the Project in a safe and responsible manner. In particular, Subcontractor shall, at its own expense, conform to the safety policies and regulations established by PEPPER as listed within this Subcontract Agreement and the "Trade Partner Safety Handbook", **Exhibit D**, and shall comply with all specific safety requirements promulgated by any government authority, including, without limitation, the requirements of the Occupational Safety and Health Act of 1970 and the Construction Safety Act of 1969 and all standards and regulations which have been or shall be promulgated by the parties or agencies which administer the Acts.

**The Trade Partner Safety Handbook, Exhibit D, may be accessed at www.pccsafety.com.**

**If for any reason Subcontractor is unable to access the Trade Partner Safety Handbook, contact the PEPPER Project Manager.**

Subcontractor shall comply with said requirements, standards and regulations and require and be directly responsible for compliance therewith on the part of its agents, employees, materialmen and subcontractors, and shall directly receive, respond to, defend and be responsible for all citations, assessments, fines or penalties which may be incurred by reason of its failure on the part of its agents, employees, materialmen or subcontractors to so comply.

A. The Subcontractor must develop a pre-job safety plan outlining any hazards and the procedures it will use to eliminate those hazards. Subcontractor will review its plan with PEPPER's field supervisory personnel and crews. This plan is to be submitted to the PEPPER Superintendent at least two (2) weeks prior to commencing the Work.

B. The Subcontractor's field personnel assigned to this Project, including subs of the Subcontractor, will abide by the PEPPER **Drug & Alcohol Policy** as further detailed in the Trade Partner Safety Handbook. In addition, Subcontractor will commit to no drug or alcohol use by its employees over the lunch period or any other break time. Subcontractor agrees to remove from the jobsite any of its employees or sub-subcontractor employees who violate this policy.

C. Subcontractor shall report immediately to PEPPER any injuries suffered by its employees or any injuries to other persons or property damage arising out of its operation. PEPPER shall be furnished one (1) copy of the accident report within twenty-four (24) hours of the injury or damage.

D. Subcontractor will equip its personnel with all necessary personal protective equipment required by law or PEPPER. This includes, but is not limited to, hard hats, eye protection, foot and hand protection, ear protection, fall protection and respiratory protection.

E.   Subcontractor will protect all its employees when using electric power equipment by utilizing Ground Fault Circuit Interrupters **at all times**. As supplemental protection, the Assured Equipment Grounding Program may be implemented. All branch circuit conductors shall be permitted only within cable assemblies or be multi-conductor cord or cable of a type identified for *hard usage* or *extra hard usage*. NEC Table 400-4 lists "hard" and "extra hard" usage wire types.

F.   All of the Subcontractor's scaffolds and ladders shall be in compliance with all required safety regulations and manufacturers' requirements.

G.   Subcontractor will comply with all applicable standards contained within OSHA's Construction Industry Regulations, Subpart M. With regard to steel erection and decking, Subcontractor and its employees shall comply with **specific fall protection guidelines** as contained within the PEPPER Trade Partner Safety Handbook and within the Instructions to Bidders. In addition, those Subcontractors engaged in the steel erection process will comply with all requirements of the revised Subpart R Standard, except where the requirements of PEPPER's Trade Partner Safety Handbook are more stringent. In such cases, the Subcontractor will abide by the stricter standard.

H.   Subcontractor agrees to require all of its employees and sub-subcontractor's employees to abide by OSHA regulations and PEPPER's Trade Partner Safety Handbook on all PEPPER Projects. Subcontractor shall provide training to all of its employees with regard to the possible hazards associated with the tasks each employee performs and each employee must know and understand all of these safety regulations. Prior to entering the PEPPER jobsite, <u>ALL PERSONS</u> performing Work must attend the PEPPER jobsite safety orientation training.

I.   Subcontractor's employees are required to attend PEPPER's Jobsite Orientation, prior to beginning Work on the site. Subcontractor shall coordinate and schedule the orientation with PEPPER's Superintendent in a timely manner for all personnel for this Project. This mandatory orientation consists of a general safety orientation and a Project-specific orientation for each person entering a PEPPER jobsite.

J.   Subcontractor shall ensure that its jobsite supervisor has completed the 30-hour OSHA Construction Safety Course and Subcontractor shall provide PEPPER with certification of such training prior to the start of its Work.

K.   Subcontractor shall perform a daily task hazard analysis and provide documentation of the same to the PEPPER Superintendent.

L.   Subcontractor will hold weekly Tool Box Safety Meetings, led by its jobsite supervisor. Minutes of the Tool Box Safety Meetings, as well as a signature sheet of all attendees, are to be turned in to the PEPPER jobsite Superintendent weekly.

M.   Subcontractor must provide first aid equipment to be made accessible to its employees.

N.   Subcontractor agrees to submit all necessary Safety Data Sheets, SDS-OSHA Form 20 or equivalent, for all hazardous substances introduced on the jobsite and shall inform PEPPER's office prior to its introduction to the jobsite. Subcontractor must be in compliance with the OSHA Hazard Communication Standard 1926.59. It is imperative that the Safety Data Sheets be on file in PEPPER's office prior to Subcontractor's starting work on the site.

## 12.  <u>Price Escalation</u>

This Subcontract includes any and all price escalation throughout the duration of the Project.

## 13.  <u>Time</u>

**TIME IS OF THE ESSENCE OF THIS SUBCONTRACT!** Subcontractor shall supply a sufficient number of competent workers and shall cooperate with PEPPER and other Subcontractors in the scheduling and performance of its Work. Subcontractor shall commence its Work upon notification from PEPPER and will proceed towards completion in accordance with the Project Schedule as described in **Exhibit E** established by PEPPER, which may be adjusted from time to time to allow for proper coordination of all trades' work. Should Subcontractor fail to pursue or complete its Work in accordance with the Schedule established by PEPPER, it hereby agrees to indemnify PEPPER for any loss or damages caused by such delay, including all consequential damages suffered by PEPPER as the result of such delay.

Extensions of time for delays not caused by the Subcontractor or not within the Subcontractor's control shall be strictly governed by the terms of the Contract Documents. Subcontract must give PEPPER notice of any potential delay within three (3) business days, or as otherwise stipulated within the Contract Documents, after such occurrence with an estimate of the additional time needed to overcome the delay. In no event will Subcontractor be entitled to any consideration for delays if it fails to give PEPPER written notice of the delay and such potential claims shall be deemed waived. Anything in the Contract Documents or this Subcontract Agreement to the contrary notwithstanding, an extension of time hereunder shall be Subcontractor's exclusive remedy in the event of a delay, no matter how or by whom caused and Subcontractor specifically waives any right it may otherwise have to increase in Subcontract Price or damages because of any delays. However, should Owner pay PEPPER for any excusable delays to Subcontractor's Work, PEPPER will adjust this Subcontract Price accordingly.

## 14.  <u>Schedule/Coordination/Labor Harmony</u>

Subcontractor is obligated to perform work in accordance with the schedule as follows:

A.   Subcontractor is required to prepare its detailed schedule within the scope of the preliminary Project Schedule so as not to impede the stated Project completion time.

B.   Subcontractor's assistance and input, with detailed breakdown of work items and duration for each, is required to develop an agreeable and accurate final Project Schedule. Subcontractor shall submit a statement outlining start date(s), completion date and estimated times for delivery of the major components of its Work. Schedules shall be in the form of a bar chart and indicate durations in weeks. The schedule shall indicate, in detail, the status and progress of shop drawings and submittals, fabrications, delivery, and installation start/complete dates for various stages of Work. Subcontractor shall provide a detailed schedule five (5) business days after Subcontract is awarded.

C.   Subcontractor shall cooperate and coordinate its Work with all other contractors and furnish them all details and information required for proper coordination of Work.

D.   Subcontractor shall designate a single representative assigned to the Project who will be responsible for attending meetings, monitoring schedules and coordinating all activities. Subcontractor's representative shall have the authority to commit the Subcontractor to solutions and/or actions as agreed in these meetings.

E.  Regularly scheduled progress meetings shall be held weekly, unless otherwise scheduled.  It will be the responsibility of each Subcontractor to attend these meetings to determine the status of the Project and to report on the status of its Work.

F.  It is expressly understood that scheduling requirements may require temporary omissions and out of sequence work as designated by PEPPER's Superintendent.  All "come back" work required for this or other out of sequence work, including remobilization, shall be completed on a timely basis at no additional cost to PEPPER.

G.  The Subcontractor shall (and shall expressly require in writing any of its sub-subcontractors to) employ only field labor and tradesmen to perform work on the site whose presence of the job will not result in strikes, work stoppages, picketing, or other labor disputes with any other field labor and tradesmen present on the Project site.  The Subcontractor shall manage its work force so as to avoid labor disputes with its own or other trades on the job, and shall keep current in the payment of all wages and benefits required to be paid to or on behalf of its employees working on the job under any collective bargaining agreements or trust agreements to which it is signatory.  The diligent progress of the Work is of the essence and Subcontractor's violation of this clause shall be a material breach of this Agreement.

## 15.  Overtime

When ordered in writing by PEPPER, Subcontractor shall perform base Subcontract Work during overtime hours.  In the event overtime work is required because of Subcontractor's own delays to the Project Schedule, *i.e.* insufficient manpower, submitting shop drawings and other submittals too late for approval per the Project Schedule, no additional compensation will be granted.  In the event overtime is required because of delays of others, Subcontractor shall be compensated for the <u>net</u> increased labor costs only.

## 16.  Shop Drawings and Submittals

Subcontractor shall promptly submit Shop Drawings, Product Data, Samples and similar submittals required by the Contract Documents with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of PEPPER or other subcontractors.

## 17.  Performance/Assignment/Amendments

PEPPER's failure to require strict performance of any provision of this Subcontract shall not constitute a waiver of its right to require strict performance in the future.  Subcontractor shall not assign this Subcontract without the prior written permission of PEPPER.  Any assignment for the benefit of Creditors, of Accounts, of Receivables or of any monies due under this Subcontract to a Creditor, Lender or Trustee shall be a material default of this Subcontract.  A sale of a majority interest in Subcontractor shall be considered a default under this Subcontract.  Once executed, this Agreement may only be amended in writing by PEPPER and the Subcontractor.

## 18.  Default by Subcontractor

Should the Subcontractor fail in any manner to perform its Work properly or default in the performance of any provision of this Subcontract or suffer any delay not accepted by PEPPER and Owner as authorized under the Contract Documents, or should the Subcontractor suffer any form of financial distress so that it could not give reasonable assurance to PEPPER that it can continue to perform its obligations under this Subcontract, PEPPER may give written notice to the Subcontractor to begin with all necessary diligence to cure such defaults within a twenty-four (24) hour period or failing to do so, PEPPER may, without prejudice to any other remedies it may have under the law or in equity, terminate this Agreement and look to the Subcontractor for payment of all damages which it incurs ("Termination for Default").  PEPPER's remedies shall include, but not be limited to, its right to proceed with the Work with its own forces or with other contractors on a time and material or other appropriate basis, the cost of which will be charged against the balance of any sums due Subcontractor.  In the event of such a breach, in addition to any other remedy PEPPER may have, the Subcontractor agrees to indemnify, defend, and hold PEPPER harmless from all losses, damages, expenses (including reasonable attorneys' fees), as well as any judgments suffered by PEPPER as a result of Subcontractor's acts or omissions in the performance of its Work.  PEPPER shall have the right of set-off and to deduct from any balance due under this Subcontract Agreement or any other accounts of subcontracts under which PEPPER is holding funds due the Subcontractor, the amount of any losses, damages, or expenses as described above.

## 19.  Legal Fees

In the event that PEPPER is deemed to be the prevailing party in any legal proceeding, arbitration or other form of dispute resolution procedure that may be commenced between the parties to this Agreement, whether in contract or in tort, PEPPER shall be entitled, in addition to such other relief as may be granted, to a reasonable sum for attorneys' fees and costs, which sum shall be determined by the court or forum in such proceeding.

## 20.  Termination for Convenience

PEPPER shall have the absolute right to terminate all or part of the Work under this Subcontract for its own convenience with or without reason and in its sole discretion by giving notice of termination effective upon receipt thereof by Subcontractor ("Termination for Convenience"). Termination for Default, if wrongly made, shall be treated as Termination for Convenience. If PEPPER terminates all or part of this Agreement for convenience, the Subcontractor shall be paid the actual cost of the Work, which includes materials and labor in place, plus the actual cost of any materials properly delivered and stored on or off site at the direction of PEPPER (if PEPPER elects to retain such stored materials), plus a pro rata percentage of the Subcontractor's fee or stated profit equal to the percentage of completion (whichever is less), and which amounts are actually paid to PEPPER by Owner. If PEPPER terminates this Subcontract for convenience, Subcontractor shall not be entitled to anticipated profits on unperformed portions of the Work or to punitive or consequential damages. All of Subcontractor's warranty, guaranty, indemnity and dispute obligations for Work performed shall survive such Termination for Convenience.

## 21.  Key Personnel

Subcontractor hereby agrees that key personnel assigned to the Project will remain for the duration of this Work.  Reassignment or removal of said key personnel will require PEPPER's approval.

---

**22.  Sub-Subcontractors**

Subcontractor agrees not to sub-subcontract more than Five Percent (5%) of this Subcontract Agreement without the written consent of PEPPER. For all proposed sub-subcontractors in excess of Five Percent (5%), Subcontractor shall furnish PEPPER an AIA Document A-305 or equal Subcontractor's Qualification Statement, not less than five (5) business days prior to final execution of any sub-subcontractor agreement. In accordance with Project Contract Documents as defined in Article 1, Subcontractor agrees it shall not contract with any such proposed person or entity to whom the Owner or the Architect has a reasonable objection.

Subcontractor agrees that any part of Work performed for the Subcontractor by an approved sub-subcontractor shall be pursuant to a written subcontract between the Subcontractor and each sub-subcontractor. Said written subcontract shall contain provisions that:

A.  Require the work be performed in accordance with the requirements of the Contract Documents.

B.  Require the sub-subcontractor to carry and maintain liability insurance coverage in accordance with the Contract Documents.

C.  Require the sub-subcontractor to agree to the construction schedule as outlined and/or detailed in Article 14, above.

D.  Require the sub-subcontractor to acknowledge that PEPPER is an explicit third-party beneficiary of the subcontract between the Subcontractor and sub-subcontractor.

E.  Require that the sub-subcontractor provide waivers and other required billing materials as set forth in Article 47, below.

F.  Unless PEPPER requires current waivers of lien, upon receipt of payment from PEPPER, Subcontractor shall promptly disburse from such payment, in exchange for waivers, the sums due and owing to any sub-subcontractor and/or material supplier for its work included in PEPPER's payment to Subcontractor. Waivers must be supplied for sub-subcontractors and/or material suppliers at the time they are listed in the "This Payment" section of the Contractor's Affidavit provided within the waiver, and further lower tiers upon request.

G.  Require the sub-subcontractor to indemnify and hold harmless the Owner, Architect, PEPPER and the Subcontractor from any and all claims for bodily injury by an employee of the sub-subcontractor or anyone directly or indirectly employed by it or for anyone whose acts it may be liable without limiting or restricting such indemnity by a limitation on the amount or type of damages, compensation or benefits payable by or for the sub-subcontractor under Workers' or Workmens' Compensation Acts, disability benefit or other employee benefit acts.

**23.  Access/Parking**

The use of and access to the site shall be restricted to those areas and limited to those temporary roads authorized and designated by PEPPER's on-site Superintendent.

Parking on the jobsite is restricted to company vehicles and equipment only if allowed by PEPPER's Superintendent. Subcontractor's employees shall park in the designated areas.

**24.  Jobsite Offices/Storage**

The Project site may have limited space available for storage; therefore, any on-site storage will require prior approval of PEPPER and the Project Superintendent. Subcontractors' jobsite trailers, materials, tools and equipment may be stored on the jobsite at locations approved by PEPPER and must be removed or relocated when directed. Subcontractor shall use, for this purpose only, the minimum space that is absolutely required for proper performance of the Work. Any damage or losses resulting from storage of material, tools and equipment shall be remedied at the cost of the Subcontractor. Each Subcontractor shall be responsible for erection, dismantling, maintenance, utilities, security, etc., that it may deem necessary in setting up its trailers, sheds and storage area.

Subcontractor may establish a temporary office at the jobsite except that the exact size and location of said facilities shall be subject to the approval of PEPPER's Superintendent. The temporary office, along with any electrical, telephone or similar service for this field office, shall be the responsibility of the Subcontractor. As the Work progresses, Subcontractor agrees to relocate and/or remove said facilities upon seventy-two (72) hours written notice form PEPPER's Superintendent.

**25.  Temporary Facilities**

Temporary facilities furnished by PEPPER for this Subcontractor's use on the site shall be limited to the following:

A.  Temporary sanitary services for Subcontractor's personnel.

B.  Temporary non-potable water service only after the permanent tap is made at water main. Water will be available at a minimum of one location, adjacent to the construction area. It shall be the Subcontractor's responsibility to provide hook-ups and extensions as required and to coordinate with PEPPER's on-site Superintendent.

C.  Temporary power and lighting for the building shall be specific to OSHA standards and provided by the electrical contractor for all contractors' use. If special or additional services are required, arrangements through the PEPPER on-site Superintendent will be necessary. However, the contractual relationship shall be directly between the on-site electrical contractor and Subcontractor.

D.  Temporary power will be limited to 120-volt, single-phase temporary electric service in the construction area only after temporary or permanent power is established on the jobsite. If temporary power is not available or is insufficient for the Subcontractor, the Subcontractor shall furnish generators at its expense. The Subcontractor shall be required to provide extension cords for all power tools.

**26.  Hoisting and Scaffolding**

Subcontractor agrees to be solely responsible for all hoisting of materials and all scaffolding necessary for the performance of its own Work unless otherwise stated. Unless expressly provided for in this Scope of Work, no provisions for hoisting or scaffolding will be provided by PEPPER. Any

---

scaffolding or hoisting equipment used by Subcontractor must conform to all local code requirements including, but not necessarily limited to, those of state and federal OSHA. Subcontractor shall keep and maintain current maintenance logs for all cranes utilized by Subcontractor as of the date such cranes are delivered to the jobsite. All logs shall be readily available for review by PEPPER upon request.

### 27. Daily Reports

Subcontractor will submit a daily report to PEPPER's Superintendent for each day Subcontractor is working on the Project. The daily report should state:

A.  The number of tradesmen that worked;
B.  The positions of those tradesmen;
C.  The number of hours each tradesman worked;
D.  The specific hours each tradesman worked;
E.  The shift worked by each tradesman: 1st, 2nd, or 3rd;
F.  A brief description of the day's activities;
G.  A two-day look ahead for scheduling purposes;
H.  Any inspections, problems or otherwise pertinent information; and
I.  Accidents that occurred during the day, if any.

### 28. Material Delivery

Material delivery to the jobsite shall be handled in accordance with the following:

A.  Cost of all shipping of materials, freight to the jobsite and insurance of same is the responsibility of the Subcontractor.

B.  Subcontractor must notify PEPPER's on-site Superintendent forty-eight (48) hours prior to delivering any materials. Copies of the delivery ticket will be stamped, showing the actual time and date shipment was received.

C.  Each shipment of material shall contain a packing slip with the correct nomenclature of contents and the box or carton containing this information must be so marked. At the time of shipment, one (1) copy of said packing slip shall be forwarded to the destination of shipment to alert PEPPER's Superintendent as to what material is in transit so that arrangements can be made at least forty-eight (48) hours in advance to receive, allocate and store said material.

If Subcontractor fails to adhere to the foregoing notification and other requirements, PEPPER reserves the right to refuse, warehouse, or return to the carrier the shipment in question. All related costs incurred by PEPPER, *e.g.*, handling, storage, protection, etc., will be borne by Subcontractor.

### 29. Owner's Work Forces

Subcontractor is advised that the Owner may, at its discretion, employ other contractors or employees of the Owner to perform work on this Project. In such event, Subcontractor shall cooperate in scheduling activities in order that the work of all parties can be completed on a timely basis.

Subcontractor hereby agrees not to perform any work directly for the Owner, or its agents, on the Project while under contract with PEPPER without PEPPER's prior approval, which shall not be unreasonably withheld. Failure to abide by this provision will be considered a material breach of this Subcontract Agreement.

### 30. Layout and Engineering

All Subcontractors will perform layout and engineering as required to complete the Work within the scope of their respective Subcontracts from vertical and horizontal principal control lines and grades established by PEPPER.

### 31. Protection of Work

Subcontractor shall take reasonable precautions for safety of and shall provide reasonable protection to prevent damage, injury, or loss to:

A.  Employees on the jobsite and other persons who may be affected;

B.  The work and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody, or control of the Subcontractor or sub-subcontractors; and

C.  Other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

Subcontractor shall promptly remedy damage and loss (other than damage or loss insured under property insurance required by the Contract Documents) to property as described above caused in whole or in part by the Subcontractor or its sub-subcontractor, or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable and for whom the Subcontractor is responsible, except damage or loss attributable to acts or omissions of the Owner, Architect, PEPPER or anyone directly or indirectly employed by them, or by anyone for whose acts they may be liable and not attributable to the fault or negligence of the Subcontractor.

### 32. Dewatering

Subcontractors who are performing excavation, trenching, utility and/or concrete work are responsible for keeping their excavations free of water during construction.

### 33. Subcontractor's Tools and Equipment

Subcontractor shall assume all risks and liability for damage or loss to all materials, tools or equipment not incorporated into the Work and which belong to it or are under its care, custody or control.

**34. Cleanup**

Subcontractor must provide cleanup and disposal of debris resulting from its Work on a daily basis in order to keep the Project clean, orderly and hazard free. Material will be placed in dumpsters provided by PEPPER. Location of dumpsters will be at PEPPER's discretion.

Upon completion of its Work and prior to leaving the site, Subcontractor must receive approval and acceptance by PEPPER that all final cleanup requirements have been met and that the area is ready for final inspection. When directed in writing in the field by PEPPER's Superintendent, Subcontractor agrees to clean up all debris attributable to its Work within twenty-four (24) hours' notice for any given work area, or accept the appropriate back charges for clean-up performed by PEPPER or other contractors, which will be billed to Subcontractor on a monthly basis no later than the following month in which the charges are incurred.

**35. Environmental Compliance**

Subcontractor agrees to comply with pollution and environmental protection regulations for the use of water and other services. Subcontractor further agrees to discharge wastes and storm water drainage from the Project site and to comply with any "Environmental Impact" commitments that may have been made by the Owner in securing approval to proceed with construction of this Project. All waste materials and substances (e.g., solvents, cleaners, waste oils, etc.) shall be handled and /or disposed of by this Subcontractor in full compliance with all applicable federal, state and local statutes, regulations, ordinances and rules.

**36. Cutting and Patching**

Subcontractor shall perform cutting, patching, fire safing and caulking, as required to complete the Work within the Scope of its Subcontract.

**37. Revisions/Changes**

When PEPPER so orders in writing, the Subcontractor shall make any and all changes in the Work which are in the general Scope of this Agreement. Adjustments in the Subcontract Price or Subcontract time resulting from such changes, if any, shall be set forth in a Subcontract Change Order pursuant to the Contract Documents. No adjustment shall be made for any changes performed by the Subcontractor that have not been ordered in writing by PEPPER.

As additional information or revisions are provided by PEPPER, Owner or Architect, the Subcontractor shall review the same for its Work and notify PEPPER within ten (10) business days of any cost or schedule changes to the Subcontract Agreement. If no response is received within this time frame, it will be assumed that no additional costs or time extensions will apply. Any changes which are made without prior written authorization of PEPPER's Project Manager will be done at Subcontractor's own risk and payment for such changes is not guaranteed. All revisions causing potential cost increases to the Subcontractor must be approved prior to commencement of said Work. Compensation for extra work shall be by one or more of the following methods at the option of PEPPER:

A. Unit prices contained in the Scope of Work;
B. Alternate prices contained in the Scope of Work;
C. Negotiated lump sums;
D. Negotiated unit prices; or
E. Cost plus compensation.

In the case of cost plus compensation, costs shall be defined as and specifically include the following: Cost of materials, including sales tax and cost of delivery; cost of labor in the field, including social security, old age and unemployment insurance; Worker's Compensation and general liability costs; bond premiums and rental value of the power tools and equipment at rates not to exceed those contained in the current edition of the Associated Equipment Distributors Construction Equipment Rental Rates.

Overhead and profit shall include the following: Costs to prepare estimates or shop drawings, wages of superintendents, project managers, non-working foremen (unless specifically included in the Scope of Work), timekeepers, watchmen and clerks; hand tools; incidentals; general office expenses; interest expense; warranty expenses and all other expenses not included in "costs" as defined above.

Unless otherwise stipulated in the Owner Agreement, the following percentages for overhead and profit are to be added to Subcontractor's approved costs:

1) For any work performed by Subcontractor's own forces, 10% for overhead and 5% for profit.

2) For work performed by sub-subcontractor, 0% for overhead and 5% for profits of the amount due the sub-subcontractor.

To facilitate checking of quotations for extras or credits, all proposals must be accompanied by complete itemization of cost including labor, materials, equipment and sub-subcontractors.

For Field Changes, time and material tickets signed by the PEPPER Superintendent at the jobsite are to verify actual hours worked, materials and equipment used and must be signed within twenty-four (24) hours of completing the Work. The verification that the Work is additional work outside of the contractual Scope is subject to approval by PEPPER's Project Manager. No changes will be approved without such itemization. For Field Changes, Extra Work Orders or any other type of Change Directive where the performance of the additional work comes before the approval of the cost, the Subcontractor shall promptly submit its Change Request within the time directed by PEPPER but if a specific amount of time is not set for submission of such costs, then not later than twenty-one (21) business days after the completion of the additional work.

**A Pending Change Request Log shall be submitted electronically by the Subcontractor to the PEPPER Project Manager at the time of each monthly Application for Payment submission. Such Log shall identify any outstanding change requests ("CRs") as well as correlating CR date, description, dollar value and the status of the Change Request. Receipt of such Log does not imply acknowledgement or approval of identified CRs, but rather that such CRs have been submitted for review. CRs are finalized when incorporated into Subcontractor's Subcontract via Change Order. Change Order pricing must be in accordance with the Contract. Monthly progress payments may be delayed or withheld by PEPPER if such Pending CR Log is not timely provided by Subcontractor to PEPPER.**

**38.** **Testing**

Subcontractor will be responsible for costs of retesting and correcting or replacing Work that fails the Owner's testing or that of local authorities. This Subcontractor is also responsible for all costs incurred by other trades due to testing failure of its Work.

**39.** **Punch List**

All punch list work will be completed within ten (10) business days. Subcontractor will give written notification upon completion of punch list.

**40.** **Record Documents**

Subcontractor is required to maintain an up-to-date set of "As-Built" drawings at all times. At the completion of Subcontractor's Work, Subcontractor will provide to PEPPER the number of copies of "As-Built" drawings that are required per the Contract Documents and one (1) additional copy of PEPPER's use. Subcontractor is also to provide copies of Owner's Operational/Instructional/Maintenance Manuals and training as required by the Project Specifications.

**41.** **Warranties**

Subcontractor shall provide a separate written warranty in triplicate at the time of final billing, guaranteeing its Work against defects in materials and/or workmanship for the period required in the Specifications. If required by the Contract Documents, Subcontractor shall also provide a manufacturer's warranty for installed materials and equipment. All warranties shall meet the express terms and conditions required under the provisions of the Contract Documents for the period called for in the Specifications or, if not specified, for twelve (12) months from acceptance of Project by Owner. Subcontractor shall promptly repair or replace any such defects occurring within the warranty period without cost or liability to PEPPER or Owner.

**42.** **UAS Usage**

Subcontractor shall not be permitted to use an unmanned aircraft system ("UAS") on the Project site without the prior written approval of PEPPER. Should the use of any UAS be permitted, Subcontractor shall enter into a separate agreement ("UAS Agreement") with PEPPER with regard to such usage, submit proof of compliance with all Federal Aviation Administration, state, county, local, and any other applicable laws and regulations in effect, and provide proof of insurance as set forth within such UAS Agreement.

**43.** **Equal Employment Opportunity**

  **A.** **Nondiscrimination, Affirmative Action and Federal Contract Compliance:**

  During the performance of this Subcontract, the Subcontractor agrees as follows:

  1) The Subcontractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Subcontractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to, the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Subcontractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

  2) To supplement Paragraph 1 above (to the extent applicable and that additional requirements are proscribed in the following), pursuant to 41 C.F.R. Sections 60-1.4(d), 60-250.5(d), and 60-741.5(d), PEPPER incorporates by reference the provisions found at **41 C.F.R. Sections 60-1.4(a)(b),** 41 C.F.R. Section 60-4.3(a), **41 C.F.R. Section 60-250.5 and/or Section 60-300.5,** and **41 C.F.R. Section 60-741.5, Executive Order 13496 and 29 C.F.R. Part 471, Appendix A to Subpart A, if applicable,** into this Subcontract. Subcontractor is hereby notified that it has an obligation to determine whether the Work it is performing, or the goods and services it is providing to PEPPER, are provided pursuant to a federal government contract or a federally assisted construction contract. If so, Subcontractor shall determine the extent to which the provisions of Executive Order 11246, the Vietnam Era Veterans' Readjustment Assistance Act of 1974, and Section 503 of the Rehabilitation Act of 1973, as amended, along with their respective implementing regulations found at 41 C.F.R. Part 60, apply to the terms of this specific Subcontract and shall comply with such provisions. Note: federal construction subcontractors or federally-assisted construction subcontractors are advised to review the Department of Labor's, Office of Federal Contract Compliance Programs (OFCCP) Technical Assistance Guide for Federal Construction Contractors to understand the requirements for both federal contractors and subcontractors.

  3) The Subcontractor shall comply with all federal, state, and local equal employment and affirmative action statutes, rules and regulations including, to the extent applicable given the geographical location of the Project (and not in limitation of any other particular law that would pertain to the Subcontractor's Scope of Work), the City of Chicago Human Rights Ordinance and the Illinois Human Rights Act, 775 ILCS 5/1-101 et seq. (1993), the Illinois Prevailing Wage Act, 820 ILCS 130/1 et seq., if applicable, and any subsequent amendments to or regulations thereof.

  **B.** **Default**

  Violation of any anti-discrimination or affirmative action requirements, whether or not expressly described herein, that are lawfully imposed on the operation of the Subcontractor's business in the performance of the Scope of Work described herein, shall be a material breach of this Subcontract and a basis for default under Article 18, above.

**44.** **Scope of Work**

Scope of Subcontractor's Work shall include, but not necessarily be limited to, the following:
See Scope of Work, attached hereto at **Exhibit B**.

**45. Dispute Resolution**

A.  If arbitration of disputes is provided for in the Contract Documents, and if PEPPER, in its sole discretion, elects to demand arbitration with Subcontractor individually, or as part of joint proceedings with Owner or others, any dispute between PEPPER and Subcontractor involving or arising out of this Subcontract Agreement, including the breach thereof, shall be decided by arbitration as provided for in the Contract Documents. If PEPPER elects to demand arbitration with Subcontractor individually and subject to applicable law, such arbitration proceedings shall be held in Chicago, IL or such other place as PEPPER may designate. The award rendered by the arbitrator(s) shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

B.  If the Contract Documents do not provide for arbitration, and if PEPPER, in its sole discretion, elects to demand arbitration with Subcontractor individually, or as part of proceedings with Owner or other parties, any dispute arising between PEPPER and Subcontractor under the Subcontract Agreement, including the breach thereof, shall be decided by arbitration in accordance with the then current Construction Industry Arbitration Rules of the American Arbitration Association. The venue of such arbitration shall be Chicago, IL or such other place as PEPPER may designate. The award rendered by the arbitrator(s) shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

C.  Subcontractor further agrees that, upon request by PEPPER, resolution of any dispute between PEPPER and Subcontractor may be consolidated with resolution of any dispute between Owner and PEPPER, whether in litigation or arbitration, at PEPPER's sole discretion, and that Subcontractor will join in and be bound by the result of any such dispute resolution process, even if such consolidation and/or joinder requires resolution of Subcontractor disputes in a forum not provided for in this Subcontract and/or otherwise not selected by Subcontractor and even if Subcontractor is not permitted to become a named party to such proceeding or process. Subcontractor agrees not to institute (and to stay) legal remedies against PEPPER until all legal proceedings against Owner with respect to such claim are final and complete. Subcontractor shall not be entitled to and hereby agrees to make no claim for further payment beyond the Subcontract Price for costs arising out of the site conditions, acts, errors, or omissions of Owner, Architect, or other agents or representatives of Owner, other than to the extent that PEPPER may receive funds from the Owner on behalf of Subcontractor, which funds shall be paid by PEPPER to Subcontractor less costs and expenses incurred by PEPPER in prosecuting such claims.

D.  Notwithstanding any provision to the contrary, any dispute involving Owner, PEPPER and Subcontractor shall be resolved in accordance with the law specified in the Owner Agreement.

**46. Strict Compliance**

Subcontractor is bound to strict compliance with this Subcontract Agreement. PEPPER's failure to insist upon strict compliance with any of the provisions of this Agreement, or failure to exercise any options provided, shall not be construed as a waiver or an estoppel of PEPPER's right to thereafter require such strict compliance or to exercise such option.

## 47. BILLING PROCEDURES
**PEPPER CONSTRUCTION COMPANY ACCOUNTING PACKAGE**
**SUBCONTRACTOR APPLICATION FOR PAYMENT AND PAYMENT CONDITIONS**

The following terms and conditions are an integral part of Subcontract Agreement 2301962MID13901.
Please direct any billing questions to PEPPER's Accountant for this Project, Lisa Lewellyn at 847 381-2760 and
llewellyn@pepperconstruction.com.

### APPLICATION FOR PAYMENT

PEPPER CONSTRUCTION COMPANY IS ONLY ABLE TO PROCESS INVOICES THROUGH OUR ACCOUNTING SYSTEM AFTER
OUR SUBCONTRACT AGREEMENT HAS BEEN SIGNED WITHOUT ALTERATION AND RETURNED TO US, INCLUDING
APPROPRIATE INSURANCE AND SAFETY DOCUMENTATION.

CHANGES TO SUBCONTRACTOR'S SUBCONTRACT CANNOT BE BILLED UNTIL A FORMAL CHANGE ORDER HAS BEEN
RECEIVED BY SUBCONTRACTOR FROM AN AUTHORIZED REPRESENTATIVE OF PEPPER CONSTRUCTION COMPANY AND
EXECUTED BY BOTH SUBCONTRACTOR AND PEPPER.  ONCE APPROVED, CHANGES SHOULD NOT BE SEPARATELY
BILLED, BUT SHOULD BE INCLUDED IN SUBCONTRACTOR'S MONTHLY BILLING AT THE REVISED SUBCONTRACT AMOUNT.

1.  Given the requirements of the Owner Agreement, Applications for Payment for Work performed and accepted by Owner, shall
    including the following:

    One (1) of each of the following documents:
    a)  Affidavit, which must include values for sub-subcontractors in the "Amount of This Request" column at the time the sub-
        subcontractors are listed in the "Completed This Period" column of the Schedule of Values;
    b)  Application and Certificate for Payment signed and notarized (AIA G702);
    c)  Schedule of Values (AIA G703) in format approved by PEPPER;
    d)  Stored materials documentation, as required by Owner;
    e)  Pending Change Request Log, submitted electronically, identifying outstanding Change Requests ("CRs"), as well as
        correlating CR date, description, dollar value and status of the Change Request, as further described at Article 37; and

    Three (3) of each of the following documents:
    f)  Partial or Final Waivers of Lien as required, including waivers from all sub-subcontractors and Material Suppliers listed in the
        "This Payment" section of the Contractor's Affidavit provided within the Waiver, and for further lower tiers upon request.

2.  All invoice packages must be received no later than the 15th of the month for Work performed, as projected, from the first to the last
    day of the month.  Invoice packages not received by this deadline WILL NOT be processed until the following month.

3.  Unless PEPPER requires current Waivers of Lien, upon PEPPER's receipt of payment from the Owner, Subcontractor will be
    contacted with the correct information to be included in the Waiver.  The Waiver and Affidavit form to be used shall be that attached
    hereto, unless otherwise specified by Owner.

4.  Subcontractor shall, as often as requested by PEPPER, furnish such information, evidence, and substantiation as PEPPER may
    require with respect to the extent and value of the current progress of Subcontractor's Work.  Subcontractor shall also furnish, upon
    request, similar detail regarding the nature and extent of all obligations incurred by Subcontractor in connection with the Work and
    all payments made by Subcontractor on account thereof.

5.  Subcontractor shall also furnish, as required by PEPPER in its sole discretion, such partial or final lien waivers or releases as
    PEPPER deems necessary to ensure that Subcontractor has paid all parties furnishing any labor, material, or services in
    furtherance of any Work furnished hereunder.  If required by PEPPER, the furnishing of such lien waivers and releases shall be a
    condition precedent to any payment hereunder.  Moreover, no prior failure of PEPPER to require such releases and waivers shall
    limit PEPPER's right to subsequently require them.

6.  Accordingly, Subcontractor is intended to assume the risk of Owner's non-payment under the circumstances set forth herein.
    Owner's payment to PEPPER is a condition precedent to PEPPER's obligation to pay Subcontractor unless the Owner's refusal to
    pay is due to a material breach by PEPPER of its Agreement with the Owner unrelated to the Work of the Subcontractor.  If
    payment to PEPPER is received from Owner and provided the billing and insurance requirements have been met as required
    under this Subcontract Agreement, all payments by PEPPER on Subcontractor's Work accepted by Owner shall be made in the
    net amount of its request within two (2) business days of receipt of Owner's payment.

7.  At the time the Final Waiver is required, it shall be in the full amount of the adjusted Subcontract Price.

8.  Retainage shall be held in accordance with the Contract Documents between Owner and PEPPER and paid to Subcontractor after
    approval and acceptance by Owner and upon payment by Owner to PEPPER.

9.  In the event Subcontractor suffers financial distress as described in Article 18, above, PEPPER shall, in its sole and absolute
    discretion, have the right but not the obligation to pay sub-subcontractors or suppliers directly or tender payment jointly to
    Subcontractor and lower tiers.

10. Subcontractor and its lower tier subcontractors shall be solely responsible for and make all contributions or payments required to be made to any health and welfare, pension, vacation, apprenticeship, training or other fringe benefit or employee benefit program or trust with whom Subcontractor or its lower tier subcontractors are affiliated (collectively, a "Trust") within thirty (30) days from receipt of payment from PEPPER. As a condition precedent to any progress payment, PEPPER shall have the right to:

(a)   require lien waivers and other certification of payment and confirmation (such as a letter of good standing), for the benefit of PEPPER, that Subcontractor and its lower tier subcontractors are current (within thirty (30) days) in making all contributions or payments to a Trust;

(b)   require Subcontractor to submit payroll reports on a weekly basis, in form and substance as required by PEPPER, signed and attested to by a duly authorized officer of the Subcontractor (a "Certified Payroll Report"); and/or

(c)   pay a Trust directly as part of a progress payment.

## WAIVER OF LIEN TO DATE

STATE of      _____ ) SS
County of    _____ ) SS

TO WHOM IT MAY CONCERN:
WHEREAS the undersigned has been employed by _____ to furnish _____ for the premises known as _____ of which _____ is the owner.

       THE undersigned, for and in consideration of _____ ($_____) Dollars, and other good and valuable considerations, the receipt whereof is hereby acknowledged, do(es) hereby waive and release any and all lien or claim of, or right to, lien, under the statutes of the State of _____, relating to mechanics' liens, with respect to and on said above-described premises, and the improvements thereon, and on the material, fixtures, apparatus or machinery furnished, and on the moneys, funds or other considerations due or to become due from the owner, on account of labor, services, material, fixtures, apparatus or machinery, furnished to this date by the undersigned for the above-described premises, including extras*.

       Given under my hand and sealed this _____ day of _____, 20_____

       Signature and Seal: _____

*Extras include but are not limited to change orders, both oral and written, to the contract.

## CONTRACTOR'S AFFIDAVIT

STATE of      _____ ) SS
County of    _____ ) SS

TO WHOM IT MAY CONCERN:
THE undersigned, being duly sworn, deposes and says that he/she is _____ of the _____ who is contractor for the _____ work on the building located at _____ owned by _____.
That the total amount of the contract, including additional work and Change Orders, is $_____ on which he/she has received payment of $_____ prior to this payment. That all waivers are true, correct and is genuine and delivered unconditionally and that there is no claim, either legal or equitable, to defeat the validity of said waivers. That the following are the names of all parties who have furnished material or labor, or both, for said work and all parties having contracts or subcontracts for specific portions of said work or for material entering into the construction thereof and the amount due or to become due to each, and that the items mentioned include all labor and material required to complete said work according to plans and specifications:

| NAMES | WHAT FOR | CONTRACT PRICE INCLUDING EXTRAS* | AMOUNT PAID | THIS PAYMENT | BALANCE DUE |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| TOTAL LABOR AND MATERIAL INCLUDING EXTRAS* TO COMPLETE |  |  |  |  |  |

That there are no other contracts for said work outstanding, and that there is nothing due or to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work other than above stated.

       Signed this _____ day of _____, 20_____

       Signature: _____

       Subscribed and sworn to before me this _____ day of _____, 20_____

       Signature: _____

*Extras include but are not limited to change orders, both oral and written, to the contract.

## FINAL WAIVER OF LIEN

STATE of _____ ) SS
County of _____ ) SS

TO WHOM IT MAY CONCERN:
WHEREAS the undersigned has been employed by _____ to furnish _____ for the premises known as _____ of which _____ is the owner.

THE undersigned, for and in consideration of _____ ($_____) Dollars, and other good and valuable considerations, the receipt whereof is hereby acknowledged, do(es) hereby waive and release any and all lien or claim of, or right to, lien under the statutes of the State of _____ , relating to mechanics' liens, with respect to and on said above-described premises, and the improvements thereon, and on the material, fixtures, apparatus or machinery furnished, and on the moneys, funds or other considerations due or to become due from the owner, on account of labor, services, material, fixtures, apparatus or machinery, heretofore furnished, or which may be furnished at any time hereafter, by the undersigned for the above-described premises, including extras*.

Given under my hand and sealed this _____ day of _____, 20_____

Signature and Seal: _____

*Extras include but are not limited to change orders, both oral and written, to the contract.

## CONTRACTOR'S AFFIDAVIT

STATE of _____ ) SS
County of _____ ) SS

TO WHOM IT MAY CONCERN:
THE undersigned, being duly sworn, deposes and says that he/she is _____ of the _____ who is contractor for the _____ work on the building located at _____ owned by _____ .
That the total amount of the contract, including additional work and Change Orders, is $_____ on which he/she has received payment of $_____ prior to this payment. That all waivers are true, correct and is genuine and delivered unconditionally and that there is no claim, either legal or equitable, to defeat the validity of said waivers. That the following are the names of all parties who have furnished material or labor, or both, for said work and all parties having contracts or subcontracts for specific portions of said work or for material entering into the construction thereof and the amount due or to become due to each, and that the items mentioned include all labor and material required to complete said work according to plans and specifications:

| NAMES | WHAT FOR | CONTRACT PRICE INCLUDING EXTRAS* | AMOUNT PAID | THIS PAYMENT | BALANCE DUE |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| TOTAL LABOR AND MATERIAL INCLUDING EXTRAS* TO COMPLETE |  |  |  |  |  |

That there are no other contracts for said work outstanding, and that there is nothing due or to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work other than above stated.

Signed this _____ day of _____, 20_____

Signature: _____

Subscribed and sworn to before me this _____ day of _____, 20_____

Signature: _____

*Extras include but are not limited to change orders, both oral and written, to the contract.

# Subcontractor's Affidavit Completion Requirements

*All Affidavits produced by Subcontractor to Pepper Construction Company for the purpose of requesting construction payments shall include the following:*

A.  Identification of the State in which the Project is located;
B.  Identification of the County in which the Project is located;
C.  Identification of the Affiant as an authorized representative of the
D.  Subcontractor entity;
E.  Identification of the Owner with whom Pepper Construction Company has contracted;
F.  Identification of the Project for which services or materials are provided by Subcontractor;
G.  Description of the improvements or type of labor, service or materials furnished under the Subcontract (i.e., type of trade work);
H.  Identification of the real estate legal description, if available, or commonly known address of the Project;
I.  Identification of the type of payment being requested: Partial or Final;

For Subcontractor and each sub-subcontractor, vendor or material supplier engaged by Subcontractor, provide:

J1.  Names and addresses;
J2.  Identification of the type of labor, service or materials furnished;
J3.  Base Contract amounts;
J4.  Approved Change Order amounts;
J5.  Base Contract amount (J3) plus/minus Change Order amounts (J4);
J6.  Cumulative previously requested amounts;
J7   Current payment amounts requested;
J8.  Balance of payments to become due (including retainage, if any);
J9.  Total base Contract amounts for Subcontractor and all sub-tier entities;
J10.  Total approved Change Order amounts for Subcontractor and all sub-tier entities;
J11.  Total Revised Contract amounts for Subcontractor and all sub-tier entities;
J12.  Total previously requested amounts for Subcontractor and all sub-tier entities;
J13.  Total current payment amounts requested for Subcontractor and all sub-tier entities;
J14.  Total balance of payments to become due (including retainage, if any) for Subcontractor and all sub-tier entities;

K1.  Base Subcontract amount;
K2.  Approved extras to the Subcontract;
K3.  Total of base Subcontract amount plus amount of approved extras;
K4.  Approved credits to the Subcontract;
K5.  Total adjusted Subcontract amount;
K6.  Total amount requested to date;
K7.  Percentage retained;
K8   Total dollar amount of retained funds to date;
K9.  Net amount earned;
K10.  Total of payments previously requested;
K11.  Amount of current requested payment;
K12.  Balance due to completion of the Work (including retainage);
L.  Percentage of Work completed to date;
M.  Signature and title of Affiant, as shown at A., above;
N.  Subcontractor Company name, as shown at D., above;
O.  Current date of Affidavit notarization; and
P.  Signature and stamp of Notary to whom the Affidavit is subscribed and sworn.

# AFFIDAVIT

State of **A** )
            ) ss
County of **B** )

The Affiant, _____C_____, being first duly sworn, on oath deposes and says that he/she is an Authorized Representative of _____D_____, who has a Contract with Pepper Construction Company, under its Owner Agreement with _____E_____ for the Project known as _____F_____, to provide _____G_____ on the following described premises in said County, to wit: _____H_____

That, for the purpose of said Contract, the following persons have been contracted with and have furnished, or are furnishing and preparing materials for, and have performed or are performing labor on said improvement; that there is due and to become due them, respectively, the amounts set forth opposite their names for materials or labor as stated; that this statement is made to said Owner for the purpose of procuring from said Owner _____I_____ on said Contract; and this is a full, true and complete statement of all such persons, and of the amounts paid, due, and to become due them.

| NAME AND ADDRESS | CONTRACT FOR | BASE CONTRACT AMOUNT | EXTRAS TO CONTRACT | REVISED CONTRACT AMOUNT | TOTAL PREVIOUS REQUEST | AMOUNT OF THIS REQUEST | BALANCE TO COMPLETE |
|---|---|---|---|---|---|---|---|
| J1 | J2 | J3 | J4 | J5 | J6 | J7 | $ J8 |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | **Totals:** | $ J3 | $ J4 | $ J5 | $ J6 | $ J7 | $ J8 |

| AMOUNT OF ORIGINAL CONTRACT | $ K1 | TOTAL AMOUNT REQUESTED | $ K6 |
|---|---|---|---|
| EXTRAS TO CONTRACT | $ K2 | LESS K7% RETAINED | $ K8 |
| TOTAL CONTRACT & EXTRAS | $ K3 | NET AMOUNT EARNED | $ K9 |
| CREDIT TO CONTRACT | $ K3 | AMOUNT OF PREVIOUS PAYMENTS | $ K9 |
| NET AMOUNT OF CONTRACT | $ K5 | AMOUNT DUE THIS PAYMENT | $ K11 |
| | | BALANCE TO COMPLETE | $ K12 |

It is understood that the total amount paid to date plus the amount requested in this Application shall not exceed __L___% of the Cost of the Work completed to date. I agree to furnish Waivers of Lien for all materials under my Contract when demanded.

SIGNED: _____
                      Signatory name and Title

FOR: _____
                 Subcontractor Name

NOTARY PUBLIC: _____

Subscribed and sworn to before me this

_____O_____ day of _____, 20___.

The above sworn statement should be obtained by the Owner before each and every payment.

Rev. 030121

**EXHIBIT A - Contract Documents**
RR Donnelley St Charles Distribution Space Reno
**Pepper #2301962**

Drawing issued by NWS Architects, Inc. dated 2/13/24 as summarized.

## The Drawings:

| ARCHITECTURAL DRAWINGS | | |
|---|---|---|
| A001 | COVER SHEET & CODE REVIEW | 2/13/24 |
| D100 | BUILDING DEMO PLAN | 2/13/24 |
| A100 | BUILDING PLAN-NEW WORK | 2/13/24 |
| A101 | EGRESS PLAN | 2/13/24 |
| A502 | WALL TYPES | 2/13/24 |
| A503 | SCHEDULES & DETAILS | 2/13/24 |
| **STRUCTURAL DRAWINGS** | None | |
| **MECHANICAL DRAWINGS** | | |
| M000 | MECHANICAL SCHEDULES AND NOTES | 2/13/24 |
| M101 | FIRST FLOOR MECHANICAL PLAN | 2/13/24 |
| M102 | MECHANICAL ROOF PLAN | 2/13/24 |
| **ELECTRICAL DRAWINGS** | | |
| E000 | NOTES & KEY PLAN | 2/13/24 |
| E100 | LIGHTING PLAN - EAST STL CC | 2/13/24 |
| E101 | LIGHTING PLAN - WEST STL CC | 2/13/24 |
| E102 | LIGHTING PLAN - WEST STC WH | 2/13/24 |
| E103 | LIGHTING PLAN - WEST STC WH | 2/13/24 |
| E200 | POWER PLAN - EAST STL CC | 2/13/24 |
| E201 | POWER PLAN - WEST STL CC | 2/13/24 |
| E202 | POWER PLAN - EAST STC WH | 2/13/24 |
| E203 | POWER PLAN - WEST STC WH | 2/13/24 |
| E302 | HVAC PLAN - EAST STC WH | 2/13/24 |
| E303 | HVAC PLAN - WEST STC WH | 2/13/24 |
| E400 | FIRE ALRAM - EAST STL CC | 2/13/24 |
| E401 | FIRE ALRAM - WEST STL CC | 2/13/24 |
| E402 | FIRE ALRAM - EAST STC WH | 2/13/24 |
| E403 | FIRE ALRAM - WEST STC WH | 2/13/24 |
| E500 | RISER DIAGRAM | 2/13/24 |
| E501 | EQUIPMENT SCHEDULES | 2/13/24 |
| E502 | PANEL SCHEDULES | 2/13/24 |
| E503 | PANEL SCHEDULES (CONT.) | 2/13/24 |
| E504 | PANEL SCHEDULES (CONT.) | 2/13/24 |
| **PLUMBING DRAWINGS** | | |
| P1.0 | PARTIAL PLUMBING FLOOR PLAN | 2/13/24 |

| | A | B | C | D |
|---|---|---|---|---|
| 1 | **RRD WH Expansion** | | | |
| 2 | 1750 Wallace Ave. | | | |
| 3 | St. Charles, IL 60174 | | | |
| 4 | Job#: 2301962 | | | |
| 5 | | | Midwest Dock Solutions | |
| 6 | **0830** | | Ira Sugar | |
| 7 | Overhead & Specialty Doors | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | **Safety Requirements** | Comments / Quantities | Cost | Notes |
| 13 | Pepper Safety procedures have been reviewed and all necessary provisions have been included in Base Bid. | Included | | |
| 14 | To promote safety awareness on our jobsites, Subcontractor may be asked to participate in a site-wide Safety event. | Included | | |
| 15 | Subcontractor understands that 100% fall protection, hard hats, protective eye wear, and high visibility clothes are required. | Included | | |
| 16 | Include costs for all on site tradespersons to attend an on site safety and code of conduct orientation.  Allow a one time orientation of approximately one (1) hour for each tradesperson. | Included | | |
| 17 | Subcontractor to submit daily field reports for each prime trade, including any 2nd/3rd tier subcontractors. | Included | | |
| 18 | Required Safety Deliverables:<br>a) Weekly Toolbox Talks (TBT)<br>b) Daily Task Hazard Analysis (THA)<br>c) Time and material tickets signed daily by Pepper Superintendent for any extras<br>d) MSDS and Hazard Communication Program on record in Pepper trailer<br>e) Job Specific Safety Plan Prior to Mobilization<br>f) Up to date Certificate of Insurance<br>g) Competent person, name in writing, on safety plan with 30 hour OSHA training card<br>h) Report all injuries and submit an accident report the day of the incident<br>i) Crane inspection report daily, if applicable | Included | | |
| 19 | If the Subcontractor needs to remove safety related measures (i.e. railings, hole covers, roofing rails, etc.) to perform their Work, the Subcontractor shall remove and replace the safety related measures at no additional expense to Pepper Construction. After the Work is complete, the Subcontractor shall immediately reinstall all safety measures to meet OSHA and/or jobsite standards. | Included | | |
| 20 | | | | |
| 21 | **Insurance Requirements** | Comments / Quantities | Cost | Notes |
| 22 | Insurance requirements necessary to complete installations are included in base bid.  Pepper standard insurance requirements will be required as set forth in Article 10 of subcontract agreement **(Exhibit F)**. | Included | | |
| 23 | A Certificate of Insurance must be issued to Pepper prior to commencement of work at the site. Identify additional insured as required within Pepper Subcontractor Insurance Requirements **(Exhibit C)**. | Included | | |
| 24 | | | | |
| 25 | **Bid / Contract Documents** | Comments / Quantities | Cost | Notes |
| 26 | EXHIBIT A - **Bid documents** entitled RRD Wallace Ave dated 2/13/24 as prepared by NWS Architects, Inc.  Exhibit A has been reviewed and taken into account when generating the contracted scope of work bid submission. | Included | | |
| 27 | **EXHIBIT B - Scope of Work** (this document). | Included | | |
| 28 | EXHIBIT C - **Pepper Insurance Requirements** have been reviewed and taken into account when generating the contracted scope of work bid submission. | Included | | |

Pepper Construction Company

Exhibit B

| | A | B | C | D |
|---|---|---|---|---|
| 5 | | Midwest Dock Solutions | | |
| 6 | **0830** | Ira Sugar | | |
| 7 | **Overhead & Specialty Doors** | | | |
| 8 | | | | |
| 29 | **EXHIBIT D - Trade Partner Safety Handbook.** Pepper's temporary power and grounding requirements have been reviewed. No changes or modifications to Trade Partner Safety Handbook are allowed. | Included | | |
| 30 | **EXHIBIT E - Project Schedule** dated 3/14/2024. | Included | | |
| 31 | **EXHIBIT F - Pepper's standard subcontract agreement** has been reviewed. It will be accepted in its entirety without any changes. | Included | | |
| 32 | **EXHIBIT G - Prequalification Form** (complete on-line) including financial statements and safety documents from the last 2 years have been submitted. Any annual prequalification paperwork has been renewed. | Included | | Completed. |
| 33 | **EXHIBIT H - Pepper's Instruction to Bidders (ITB)** has been reviewed and included within bid. | Excluded | | |
| 34 | **EXHIBIT I - Pepper's Quality Coordination Guidelines** (for all Trades). NO EXCEPTIONS, accept as is, as applicable. | Included | | |
| 35 | **EXHIBIT J - Logistics Plan.** | Included | | |
| 36 | | | | |
| 37 | **General Requirements** | Comments / Quantities | Cost | Notes |
| 38 | Pepper to provide the building permit. | N/A | | |
| 39 | This Trade's licenses, business or bond fees are included within their proposal as required by the City. | Included | | |
| 40 | Subcontractor pricing is to include all work that is reasonably inferable from the drawings, specifications and this scope of work sheet. | Included | | |
| 41 | Each subcontractor has the responsibility to immediately examine the contract documents for errors, inconsistencies or omissions. Any such errors, inconsistencies or omissions shall immediately be brought to the attention of Pepper formally in writing (such as RFI). | Included | | |
| 42 | All sales and use taxes are included. | Included | | |
| 43 | Union installations are utilized for all work performed on the jobsite. | Included | | |
| 44 | Full time supervision is included for this scope of work. Subcontractor also includes full time supervision while any of their 2nd/3rd Tier Subcontractors are onsite performing their scope of work. | Included | | |
| 45 | This trades' company representative will attend all coordination meetings, as required. | Included | | |
| 46 | All layout associated with this scope of work has been considered and is included in the base bid. Control points or bench marks to be established by Pepper. | Included | | |
| 47 | Project correspondence is electronic based. Subcontractor and onsite foreperson to have electronic access for current contract documents. | Included | | |
| 48 | Subcontractor has reviewed the project schedule, logistics/ phasing plane, etc. and has included all equipment required to complete this scope of work. This includes but it not limited to ladders, lift (all types), work platforms, catch decks, etc. | Included | | |
| 49 | Subcontractors shall be responsible for reviewing all substrates and existing conditions where their work is to be installed, prior to starting their work, and advising Pepper of any deficiencies immediately. Start of work by subcontractors on top of or against any adjacent surface means this contractor has accepted the quality and completeness of that surface. | Included | | |
| 50 | | | | |
| 51 | **Submittal / Procurement Requirements** | Comments / Quantities | Cost | Notes |
| 52 | Indicate number of weeks subcontractor requires to prepare major shops/submittal/sample for review submission. Complete submittals shall be provided no greater than ONE (1) BUSINESS WEEK from contract award unless stated below. All submittals must include a high level of detail, appropriate spec section # and be submitted electronically in PDF format (unless requested otherwise). | | | |
| 53 | a) Rapid Roll-Up Doors Product Data/ Installation Instructions/ Color Samples | 1 WK | | |

Exhibit B

| | A | B | C | D |
|---|---|---|---|---|
| 5 | | Midwest Dock Solutions | | |
| 6 | **0830** | Ira Sugar | | |
| 7 | Overhead & Specialty Doors | | | |
| 8 | | | | |
| 54 | b) Fire Shutter Product Data/ Installation Instructions/ Color Samples | 1 WK | | |
| 55 | c) | ___ WK | | |
| 56 | List the approximate lead time for procurement / fabrication in number of weeks, after submittal approval, for the major material / equipment items applicable to subcontractor's trade. Material lead time shall be no greater than two (2) weeks after approval unless noted below. | | | |
| 57 | a) Rapid Roll-Up Doors | 6 WK | | |
| 58 | b) Coiling Fire Door | 4 WK | | |
| 59 | c) | ___ WK | | |
| 60 | Subcontractor shall be responsible for monitoring and weekly (minimum) updating Pepper on the progress of all material procurement, fabrication, and delivery statuses of their materials and equipment for the project. Failure to advise Pepper on the change in status of their materials or equipment which directly impacts the project schedule shall not be a basis for cost or schedule adjustment, and subcontractor shall be directly responsible for any / all costs incurred as a result. | Included | | |
| 61 | | | | |
| 62 | **Schedule Requirements** | Comments / Quantities | Cost | Notes |
| 63 | **Exhibit E** - Project Schedule dated 03/14/2024 has been reviewed. All labor and material considerations have been included as part of the base bid noted above. | Included | | |
| 64 | Phasing constraints and multiple requirements are included. | Included | | |
| 65 | Overall construction schedule is 04/2024 to 10/2024. All labor, material, equipment, and escalation considerations have been included. | Included | | |
| 66 | Labor rate escalation is included for the scope of work within the contract schedule. | | | |
| 67 | All work within this scope of work may not specifically be shown in the schedule provided, but workflow timing can be determined based upon the activities provided. | Included | | |
| 68 | All costs required to maintain the construction schedule have been considered and have been included. Subcontractor will guarantee the labor resources to complete the job per the Exhibit E Schedule, or work overtime if you fall behind the schedule at your own cost. | Included | | |
| 69 | Mobilization as required will be included in subcontractor bid. Indicate number of mobilizations included based on Exhibit E schedule. | Included | | |
| 70 | | | | |
| 71 | **Clean up Requirements** | Comments / Quantities | Cost | Notes |
| 72 | All clean up (labor, material & equipment) associated with this scope of work to a dumpster provided by Pepper on a daily basis is included in base bid. This also includes daily clean up of lunch and break areas. All clean up shall be performed by union labor as required by the union having jurisdiction. Subcontractor is responsible for maintaining labor harmony on the project. | Included | | |

| | A | B | C | D |
|---|---|---|---|---|
| 5 | | Midwest Dock Solutions | | |
| 6 | **0830** | Ira Sugar | | |
| 7 | **Overhead & Specialty Doors** | | | |
| 8 | | | | |
| 73 | Pepper implements a "NOTHING HITS THE FLOOR" (NHTF) program, which includes the following:<br>1. Minimize staging of any materials/equipment onsite. Staging of materials shall be limited to a maximum of one week.<br>2. Any materials staged onsite must be on an OSHA approved mobile platform or pallet with an accompanying pallet jack. Any material staged onsite without a mobile platform will be removed at the subcontractor's expense.<br>3. All trades are required to put scrap and debris directly into portable trash containers on respective floors supplied by Subcontractor. Subcontractor laborers will empty the portable trash containers at the end of each day to the jobsite dumpster.<br>4. Any debris found on the floor in the subcontractors work area, at the end of the day, will be photographed and picked up at the subcontractor's expense.<br>5. Subcontractor will use dedicated cut areas an protect areas from dust and residue.<br>6. Subcontractor will provide equipment such as vacuum attachments and floor covers. Subcontractor to keep cords off floors. | Included | | |
| 74 | Subcontractor includes dust control for your work as a result of your work. | Included | | |
| 75 | Subcontractor to complete NHTF Subcontractor plan that demonstrates how they will be in compliance with the NHTF program. | Included | | |
| 76 | | | | |
| 77 | **Deliveries** | Comments / Quantities | Cost | Notes |
| 78 | Freight for materials and equipment required for the contracted scope of work has been included. This includes coordinated delivery with Pepper superintendent, this trade being on-site to accept delivery, unload, and distribute to final locations. | Included | | |
| 79 | If any material is stored on-site, subcontractor has included coordination with Pepper Superintendent and includes storing material on pallets/ carts for relocation purposes and has included on-going protection of stored material and work installed. All deliveries must be labeled with the Job Name and Job Number along with any other pertinent information. | Included | | |
| 80 | Subcontractor includes all labor and equipment required for the project vertical or other transportation. Pepper will not be responsible for any of subcontractors labor, material and equipment. | Included | | |
| 81 | | | | |
| 82 | **Quality Requirements** | Comments / Quantities | Cost | Notes |
| 83 | Subcontractor has included all coordination hours as required to complete scope of work that is fully coordinated. | Included | | |
| 84 | Subcontractor will review and sign a contractor agreement of electronic documents from the architect and engineer and will agree to all terms. The owner, architect and engineer are NOT responsible for any issues related to the subcontractor's use of the electronic information provided for bidding or coordination purposes. | Included | | |
| 85 | Subcontractor is to participate in a quality pre-installation meeting prior to mobilization. This meeting will include subcontractor foreperson, subcontractor project manager, and Director of Quality/Pepper Project Manager. Any action items generated during the pre-installation meeting will be completed before start of work. Subcontractor to strictly adhere to the Pepper Quality Program. | Included | | |
| 86 | REFERENCE - EXHIBIT I - Pepper Quality Coordination Guidelines (for all Trades). NO EXCEPTIONS accept as is, as applicable. | Included | | |
| 87 | Complete the Pepper standard trade item checklist for your scope of work in preparation for the pre-installation meeting. | Included | | |
| 88 | Participate as required in all Pepper Quality Reviews and construction progress reviews. | Included | | |

| | A | B | C | D |
|---|---|---|---|---|
| 5 | | Midwest Dock Solutions | | |
| 6 | **0830** | Ira Sugar | | |
| 7 | **Overhead & Specialty Doors** | | | |
| 8 | | | | |
| 89 | Review and take action on Quality issues brought up by Pepper, Owner, Architect, and Engineer to comply with the contract documents and proper installation. Corrective action must be completed to maintain Project Schedule. | Included | | |
| 90 | Participate and complete Pepper's architectural pre-punch list. | Included | | |
| 91 | | | | |
| 92 | **Financial Requirements** | Comments / Quantities | Cost | Notes |
| 93 | Identify all second tier subcontractors.  Lien waivers to be provided for each payment request. | Included | | |
| 94 | A pending change request (CR) log shall be submitted electronically by the subcontractor to the Pepper Project Manager at the time of each monthly payment application submission.  Receipt of such log does not imply acknowledgement or approval of identified CR's but rather that such CR's have been submitted for review.  Monthly progress payments may be delayed or withheld by Pepper if such pending CR log is not timely provided by Subcontractor to Pepper.  For any costs that are not finalized, Subcontractor must submit a rough order of magnitude for each change order item on the log. | Included | | |
| 95 | Subcontractor to complete the Pepper labor rate sheet for the current year prior to a contract being awarded to your company. | Included | | |
| 96 | **Change Order Analysis** must be submitted with each PCI (potential cost item), utilizing labor rates as indicated within labor force rate sheet submitted to Pepper, and utilizing the allowable mark ups per Owner contract or Subcontract Agreement (if they differ; the more stringent supersedes) as summarized below: | Included | | |
| 97 | A. For work performed by sub's own forces: 10% for OH and 5% for profit | Included | | |
| 98 | B. For work performed by sub's subs (2nd tiers):  0% for OH and 5% for profit | Included | | |
| 99 | C. For material and equipment, mark ups can be no greater than 10% mark up | Included | | |
| 100 | | | | |
| 101 | **Closeout** | Comments / Quantities | Cost | Notes |
| 102 | Provide PDF as-builts, as required.  This Trade to utilize most current drawing issuances for as-builts. | Included | | |
| 103 | Provide labor and material warranty letters as specified, as required.  One (1) year warranty period from substantial completion date per Subcontractor Agreement or Owner Contract (if they differ, the more stringent supersedes). | Included | | |
| 104 | Provide special warranty documentation, in writing, applicable to this trade as specified, as required. | Included | | |
| 105 | Provide all factory authorized start-up as specified, as required. | Included | | |
| 106 | Closeout documents (certifications, as-builts, O&M manuals) and owner training shall be provided no later that the date of Substantial Completion. Retention will not be released until closeout documentation has been received by Pepper. | Included | | |
| 107 | | | | |
| 108 | | | | |
| 109 | **TRADE SPECIFIC SCOPE OF WORK** | | | |
| 110 | | | | |
| 111 | Bidder shall include a complete FURNISHED AND INSTALLED ("Provide" means to "furnish & install") system / assembly relevant to its scope of work as indicated in the contract documents and as per this scope of work document. Each scope of work section includes, but is not limited to, the following: | | | |
| 112 | **General Scope of Work** | Comments / Quantities | Cost | Notes |

| | A | B | C | D |
|---|---|---|---|---|
| 5 | | Midwest Dock Solutions | | |
| 6 | **0830** | Ira Sugar | | |
| 7 | **Overhead & Specialty Doors** | | | |
| 8 | | | | |
| 113 | Furnish and install pre-finished doors/ panels, track, motors, sensors, limit switches, motor housing, controls, vision lites, wiring, weather proofing gasketing flashing, etc. and all related hardware as indicated, as required. | Included | | |
| 114 | Provide for all wiring and safety features (photoeyes, pressure thresholds, etc.) as indicated, as required. | Included | | |
| 115 | Provide for all wiring and connections for a fully function door system. Electrical Subcontractor to only provide final connection/ power at the motor. | Included | | |
| 116 | Provide for all powder coating, finishes, colors, etc. as specified. | Included | | |
| 117 | Provide for door color as specified. In the event a color is not specified, include standard color options for specified manufacturers. (see alternates below for custom/ optional colors.) | Included | | |
| 118 | Provide for all required fasteners, hangers, etc. | Included | | |
| 119 | Provide additional enclosure trim, angle, returns, etc. to ensure a complete, finished system. | Included | | |
| 120 | Field verify and coordinate opening dimensions and install conditions prior to final procurement. | Included | | |
| 121 | 2x/ wood blocking to be provide by the rough carpenter. Provide for coordination of blocking requirements, as applicable. | Included | | |
| 122 | Provide for specified warranty and owner training. | Included | | |
| 123 | | Included | | |
| 124 | | | | |
| 125 | **Project Specific Scope of Work** | Comments / Quantities | Cost | Notes |
| 126 | Furnish and install Clopay/ Cookson 2-hour rated overhead coiling fire door. Interior mount face of wall above header, 8" CMU. Non-insulated slats. 22gu. Hood to match door slats. Door to be operated via fire links (both sides of door) & chain hoist. | Included | | Qty. 2 |
| 127 | Furnish and install Hormann "rapid roll-up" overhead door. Direct-drive motor. 1/16" thick reinforced PVC panels w/ vision panels. Includes required control panels, buttons, sensors, emergency opening controls, etc. Full perimeter draft seals. One door to be installed face mount to 8" CMU. One door to be faced mounted to CFMF drywall partition. | Included | | Qty. 2 |
| 128 | Furnish and install 6"dia. 42" high bolt down pre-finished bollards. (4) at each of three openings. | Included | | Qty. 12 |
| 129 | | Included | | |
| 130 | | | | |
| 131 | **Unit Costs** | Unit Cost | UM | |
| 132 | Subcontractor shall provide hourly unit rates for all trades. Include ST & OT rates. Must be provided before first pay application. | | HR | |
| 133 | | | | |
| 134 | **Allowances** | Comments / Quantities | Cost | Notes |
| 135 | | N/A | | |
| 136 | | | | |
| 137 | **Alternates** | Comments / Quantities | Cost | Notes |
| 138 | | N/A | | |
| 139 | | | | |
| 140 | **Exclusions** | Comments / Quantities | Cost | Notes |
| 141 | | Excluded | | |
| 142 | | Excluded | | |
| 143 | | | | |
| 144 | | | | |
| 145 | | | | |

## EXHIBIT C – Non-CCIP

### Pepper Construction Company
### Subcontractor Insurance Requirements

Subcontractor: Midwest Dock Solutions, Inc.
Vendor #:MID139

PLEASE ISSUE A CERTIFICATE OF INSURANCE FOR THE PROJECT REFERENCED BELOW IN ACCORDANCE WITH THE FOLLOWING REQUIREMENTS.  SUBMIT TO THE SAME ADDRESS AS SHOWN AS CERTIFICATE HOLDER.  THANK YOU.

<u>JOB DESCRIPTION:</u>

      Job Number:     2301962
      Job Name:      RR Donnelley - Wallace Ave Expansion
      Job Address:    1750 Wallace Ave.

                      St. Charles, IL 60174

<u>ADDITIONAL INSUREDS TO BE LISTED:</u> (Must be listed exactly as shown)

PEPPER CONSTRUCTION COMPANY (General Contractor)
RR Donnelly & Sons Comp ( Owner)
NWS Architects, Inc. ( Architect)
Sound Structures, Inc. (Structural Engineer)


<u>CERTIFICATE HOLDER:</u>

PEPPER CONSTRUCTION COMPANY
Attention: Timothy Lumpp
411 Lake Zurich Road,
Barrington, IL 60010-3141

<u>EXPERIENCE MODIFICATION RATING (EMR):</u>

**PEPPER CONSTRUCTION COMPANY** ("PEPPER") has a strong commitment to safety on our construction projects and it is important that our subcontractors display that same commitment.  Therefore, PEPPER requests that each Subcontractor instruct its insurance company to send PEPPER a letter indicating its Experience Modification Rating (EMR) for the last three (3) years.

**<u>Contractually, the Subcontractor is required to keep a valid Certificate of Insurance on file for a period of three (3) years from the date of Substantial Completion.</u>**

               Any questions, please call  847 381-2760

Rev. 111523

## EXHIBIT C – Non-CCIP

Subcontractor shall maintain, at its own expense, during the progress of the Work and throughout the warranty period, insurance written by insurance companies acceptable to PEPPER (as further described below) with the minimum limits and coverage as shown below or, if higher, the requirements set forth in the Contract Documents. For purposes of this **Exhibit C – Non-CCIP**, subcontractors performing, in whole or in part, the following major trade classifications shall be referred to as "Major Trade Subcontractors": Concrete/Pre-cast Concrete; Curtainwall; Electrical; Elevator; Excavation/Earthwork; Fire Protection; Hoisting/Tower Crane; HVAC; Plumbing/Piping; Shoring/Underpinning; Soil Stabilization; Special Foundations/Caissons; and Steel.

A. Unless otherwise required by the Contract Documents, at a minimum, Subcontractor's insurance shall be provided by:
   1) Insurer(s) authorized to transact business in the state where the Work or operations will be performed by Subcontractor; and
   2) Admitted insurers that maintain an A.M. Best's rating of not less than A-/VIII.

B. WORKERS' COMPENSATION including Employers' Liability insurance in an amount of at least:
   1) **$1,000,000**, bodily injury by accident – each accident;
   2) **$1,000,000**, bodily injury by disease – policy limit; and
   3) **$1,000,000**, bodily injury by disease each employee.

   Where applicable, evidence of coverage shall be required for Longshore and Harbor Workers' Compensation, Maritime coverage, Federal Employers' Liability Act and other unique exposures requiring endorsement of coverage.

   Workers' Compensation coverage must extend to every employee, including owners/officers of a closely held corporation and/or individuals operating as a sole proprietorship or partnership.

C. COMMERCIAL GENERAL LIABILITY ("CGL"). Major Trade Subcontractors shall provide and maintain **a minimum CGL primary insurance limit** of not less than **$2,000,000** per occurrence for both Premises/Ongoing Operations, **$2,000,000** Products-Completed Operations aggregate; and **$2,000,000** general aggregate applicable to claims other than Products-Completed Operations. All other subcontractors shall provide and maintain CGL insurance with a limit of not less than **$1,000,000** per occurrence for both Premises/Ongoing Operations, **$1,000,000** Products-Completed Operations aggregate; and **$1,000,000** general aggregate applicable to claims other than Products-Completed Operations. To the extent that Subcontractor's CGL insurance is subject to aggregate limits, the policy shall be endorsed so as to apply such aggregate limits separately to each Project.

   Coverage afforded under Subcontractor's CGL and any Commercial Umbrella insurance shall be provided on an occurrence basis and shall be subject to the terms of the Insurance Services Office ("ISO") Commercial General Liability Coverage Form CG 0001, or an equivalent form providing coverage at least as broad as the ISO form specified. There shall be no limitations or exclusions of coverage beyond those contained in the standard coverage form and coverage shall include liability arising from Premises/Operations, Elevators, Broad Form Property Damage, Independent Contractors, Contractual Liability, Products-Completed Operations including Construction Defect, Contractual Liability or Personal Injury and Advertising Injury.

   All coverages shall be maintained in force for a period of three (3) years after Substantial Completion of the Project or for such period of time as is described in the Contract Documents ("Products-Completed Operations Period"). All terms and conditions of such coverage shall be maintained during this Products-Completed Operations Period, including the required coverage limits and the requirement to provide PEPPER and Owner with coverage as an **Additional Insured** for Products-Completed Operations. XCU Exclusions must be deleted when applicable to operations performed by the Subcontractor.

D. COMMERCIAL UMBRELLA LIABILITY ("Umbrella Liability") shall be maintained by Subcontractor, providing the same coverage and with the same **Additional Insureds** as the primary policy in the amount of **$5,000,000** for Major Trade Subcontractors and **$1,000,000** for all other Subcontractors. All terms and conditions of such coverage shall be maintained during the three (3) year Project-Completed Operations Period, including the required coverage limits and the requirement to provide PEPPER and Owner with coverage as an **Additional Insured** for Products- Completed Operations. Umbrella Liability insurance required under this Subcontract shall follow the form of the Commercial General Liability insurance, Business Automobile insurance, and Employers' Liability insurance as required in the Subcontract. To the extent that Subcontractor's Umbrella Liability insurance is subject to aggregate limits, policies shall be endorsed so as to apply such aggregate limits separately to each Project.

   When providing a Blanket Certificate of Insurance, the following wording must be included: "*All work performed for [Subcontractor Company Name] for all Pepper Construction Company jobsites. Additional Insureds: Pepper Construction Company and all others identified at **Exhibit C – Non-CCIP** of the Subcontract Agreement.*"

E. BUSINESS AUTOMOBILE LIABILITY on an accident basis covering all Owned, Leased, Non-Owned and Hired Vehicles providing limits of liability for Bodily Injury and Property Damage of **$1,000,000** each occurrence, including its own employees.

F. **CONTRACTOR'S POLLUTION LIABILITY insurance shall be provided by Subcontractor with minimum limits of $1,000,000** per occurrence and **$1,000,000** per aggregate for at least the following types of Subcontractors: building enclosure systems, drywall/insulation, MEP (including but not limited to HVAC, plumbing, sprinkler), and excavating. Policy shall include affirmative mold coverage. The policy must include the parties listed in this **Exhibit C – Non-CCIP** Insurance Requirements as **Additional Insureds** on a primary and non-contributory basis. Occurrence or claims-made coverage is acceptable. Occurrence-based coverage is to be maintained for three (3) years after completion. Claims-made coverage is to have a retroactive date prior to the date the Subcontractor commences contracting services on the Project and shall include an Extended Reporting Period of three (3) years. **Additional Insured** coverage under the Contractor's Pollution Liability shall apply to both ongoing and completed operations.

G. CONTRACTOR'S PROFESSIONAL LIABILTY INSURANCE ("Design Liability"). If Subcontractor provides any architectural or professional engineering service, by its employees or through others, (regardless whether such service does not result in stamped or sealed submissions) including any surveying, soils analysis, approval of materials, equipment or design, connections, or sizing of members for any earth retention, shoring, dewatering, mechanical, electrical, plumbing, fire protection, windows, wall systems, structural walls, precast, elevators, roofing,

2

## EXHIBIT C – Non-CCIP

drainage or communications systems, the Subcontractor shall furnish PEPPER with an appropriate certificate, including any endorsements, directly relating to the Project which shall remain in effect for a period of three (3) years after the date of final completion identifying the Subcontractor's professional liability insurance coverage and stipulating amounts of coverage at not less than **$2,000,000** with Subcontractor's deductible not to exceed **$100,000** insuring Subcontractor's proper performance of its Design Services. The Professional Liability policy shall be maintained without interruption for no less than three (3) years after the date of final payment to Subcontractor. If the insurance policy is written on a "claims-made" form, the policy must include a three (3) year "Extended Reporting Period" endorsement (coverage option). The "Extended Report Period" coverage shall commence to the degree that continuous Professional Liability coverage has not been kept in force from the inception of the contracted project and three (3) years thereafter. Subcontractor agrees that coverage thereunder will not be cancelled or not renewed until at least thirty (30) days' prior written notice has been given to PEPPER.

H.  AVIATION INSURANCE.

1.  If either of the following aviation options (H2 or H3, below) are applicable to this Project, Subcontractor shall request in writing and obtain PEPPER's written approval for proposed aviation events. With such request, Subcontractor shall include a detailed description of the proposed event, identifying specific dates, times, and proof of pilot licensing, as described below. If approved, Subcontractor shall provide evidence of the required liability coverage, as identified below in H2 or H3, as applicable.

    To the extent that **Subcontractor** shall provide aviation services, it is required to:
    a.  provide prior written notice to PEPPER that Subcontractor shall provide such aviation services ("Sub Notice");
    b.  provide such Sub Notice to PEPPER at least ten (10) days prior to the scheduled flight;
    c.  obtain approval for aviation events and provide written evidence of the Subcontractor's required insurance coverage, as identified below at H2 or H3, as applicable, including Owner, PEPPER, and others per the Owner Agreement as an **Additional Insured** on a primary and non-contributory basis for bodily injury or property damage with respect to the ownership, maintenance, or use of the aircraft and provide a Waiver of Subrogation in favor of the parties as set forth in Article J, below;
    d.  provide to PEPPER proof of Subcontractor's FAA pilot license, with Commercial Helicopter Rating, or FAA 107 Commercial UAS License, as applicable;
    e.  provide written evidence of Non-Owned Aviation liability coverage to the same extent as required by H2 or H3; and
    f.  advise PEPPER's Project Manager and Director of Corporate Risk Management of the financial risk exposures involved at least ten (10) days prior to the scheduled flight.

    To the extent that **Subcontractor's lower-tier subcontractor** shall provide aviation services, **Subcontractor** is required to:
    g.  provide prior written notice to PEPPER that a Sub-Subcontractor shall provide such aviation services ("Sub-Sub Notice");
    h.  provide such Sub-Sub Notice to PEPPER at least ten (10) days prior to the scheduled flight;
    i.  notify Sub-Subcontractor, in writing, that all terms of this Article H are applicable to Sub-Subcontractor;
    j.  obtain approval for aviation events and provide written evidence of the Sub-Subcontractor's required insurance coverage, as identified below at H2 or H3, as applicable, including Owner, PEPPER, and others per the Owner Agreement as **Additional Insureds** on a primary and non-contributory basis for bodily injury or property damage with respect to the ownership, maintenance, or use of the aircraft and provide a Waiver of Subrogation in favor of the parties as set forth in Article J, below;
    k.  provide to PEPPER proof of Sub-Subcontractor's FAA pilot license, with Commercial Helicopter Rating, or FAA 107 Commercial UAS License, as applicable;
    l.  provide written evidence of its own **and** Sub-Subcontractor's Non-Owned Aviation liability coverage to the same extent as required by H2 or H3; and
    m.  advise PEPPER's Project Manager and Director of Corporate Risk Management of the financial risk exposures involved at least ten (10) days prior to the scheduled flight.

2.  Commercial Aviation (Manned Fixed and Rotor Wing Aircraft) Liability Insurance Coverage: Should Subcontractor's or Sub-Subcontractor's Work include the approved use of any owned, leased, chartered, or hired aircraft of any type on the Project, minimum limits in an amount not less than **$10,000,000** per occurrence, including Passenger Liability, shall apply. Cargo/Sling coverage with limits of **$250,000** per load shall apply. PEPPER reserves the right to determine and require higher limits of liability based on jobsite exposure.

3.  Commercial Aviation Liability (Unmanned Aircraft System or Aerial Drones ("UAS")) Insurance Coverage: Should Subcontractor's or Sub-Subcontractor's Work include the approved use of any owned, leased, borrowed, or hired UAS on the Project, minimum limits of liability of **$2,000,000** each occurrence shall apply.

4.  Coverage in Sections H2 and H3, above, shall include:
    a.  Bodily Injury, Property Damage, Contractual Liability, and Hired and Non-Owned Aircraft Liability. Coverage under this policy shall also be extended to the authorized pilot in command of the aircraft when performing on behalf of the Named Insureds. NOTE: Approved usage of all drones (not to exceed 40 pounds in total unit weight) shall be strictly limited to aerial photography and survey work; and
    b.  any aircraft, equipment, or property used in the aviation event shall:
        i.   be specifically scheduled on the aircraft liability insurance policy; and
        ii.  carry hull and physical damage coverage for the replacement cost value of the aircraft.

5.  With regard to both H2 and H3, above, the Subcontractor and any Sub-Subcontractor shall agree that:
    a.  if the pilot for such aviation event has not previously flown on a PEPPER project, and has neither been interviewed nor approved by PEPPER to fly, PEPPER and the Subcontractor (and Sub-Subcontractor, if involved) shall timely arrange for the pilot to participate in an interview with a PEPPER drone pilot prior to the first scheduled flight, and the Subcontractor, Sub-Subcontractor and pilot shall all fully cooperate; and
    b.  PEPPER reserves the right to decline the drone flight request based on the results of the interview conducted by PEPPER; such decision to decline the flight request shall be in PEPPER's sole discretion and may be based on factors including, but not limited to, the pilot's demonstrated incompetence, lack of experience, or failure to meet PEPPER's standards and requirements.

Rev. 111523

## EXHIBIT C – Non-CCIP

I.   NETWORK SECURITY AND PRIVACY PROTECTION LIABILITY coverage ("Cyber Liability") is required of all Subcontractors and sub-subcontractors as determined by PEPPER, in circumstances where physical or wireless connection will be made to any PEPPER network (including a Guest internet connection) or Owner's Network at the site of the Project. Such networks include, without limitation, Building Automation, Computer Maintenance Management, HVAC, MEP, Building Security/Access Controls, Fire Protections/Alarm, and Telecommunication/Data Management systems. The Subcontractor shall provide evidence of Cyber Liability with limits of not less than **$2,000,000** per occurrence and **$2,000,000** annual aggregate. Coverage shall be sufficiently broad to respond to the cyber and network liability exposure resulting from or arising out of Subcontractor's performance of its duties and obligations under this Subcontract Agreement, and shall provide coverage for loss occurrences which include, but are not limited to, claims involving invasion of privacy violations, information theft, damage to or destruction of electronic information, release of private information, alteration of electronic information, extortion, network security, installation of malware/ransomware, loss of network use, and infringement of intellectual property (including infringement of copyright, trademark, and trade dress). The policy shall provide coverage sufficient to defend and indemnify the **Additional Insureds** and shall also provide coverage for breach response costs, regulatory fines and penalties, and credit monitoring expenses.

J.   ADDITIONAL INSURED: The Subcontractor's CGL and Umbrella Liability policies must include the parties listed in **Exhibit C – Non-CCIP** as **Additional Insureds**, on an ISO **Additional Insured** Endorsement (CG 2010 and CG 2037, Edition #07 04 or older, or equivalent) covering Ongoing and Completed Operations. Subcontractor's insurance will be Primary and Non-Contributory to any insurance carried by any of the **Additional Insured**. Subcontractor's required insurance shall apply separately to each **Additional Insured**. Any other insurance or self-insurance maintained by PEPPER or Owner shall be excess of, and non-contributory with, the coverage afforded by Subcontractor's CGL and Umbrella Liability insurance.

K.   A Certificate of Insurance on an ACORD form, and the **Additional Insured** Endorsement (including a waiver of subrogation), must be delivered to the PEPPER Project Manager of record and PROVIDED TO THE PEPPER JOBSITE FIELD SUPERINTENDENT *PRIOR TO THE COMMENCEMENT OF ANY WORK*. The Subcontractor shall notify PEPPER by email within thirty (30) days if such Certificate is to be altered, cancelled or allowed to expire.

L.   Equivalent insurance coverage must be obtained from each sub-subcontractor or supplier, if any, before permitting them on the Project site. In the event Subcontractor fails to obtain such coverage from its lower tiers, protection of such parties shall be included within Subcontractor's insurance policies.

M.   PEPPER may furnish, erect or provide equipment, appurtenances and devices, motorized or otherwise, for its use to complete its Contract with the Owner. Subcontractor may use such items upon PEPPER's prior written authorization. In the event of any such Subcontractor use, the Subcontractor agrees to insure against claims of injury or damage caused by such items while in Subcontractor's care, custody or control by naming PEPPER as an insured party. Liability limits shall be the same as in Section C, above. Physical Damage insurance against damage to the items themselves shall be on a "Replacement Cost" basis.

N.   Subcontractor will be responsible for any deductible or self-insured retention under its insurance policies.

O.   It is understood and agreed that PEPPER shall withhold payments to the Subcontractor until a properly executed Certificate of Insurance and endorsement providing insurance as required herein, accompanied by a signed Subcontract Agreement, are received by PEPPER. The failure of PEPPER to withhold such payments or obtain the required Certificate or endorsement shall not be deemed to be a waiver of Subcontractor's obligation to provide the insurance required under the Subcontract Agreement.

P.   Subcontractor hereby waives any rights of subrogation against PEPPER, the Owner, the Architect, and any other **Additional Insureds** as required by this Subcontract, the Owner Agreement or the Invitation to Bid. If insurance policies specified within this **Exhibit C – Non-CCIP** require an endorsement to provide for continued coverage where there is a waiver of subrogation, the Subcontractor will cause them to be so endorsed. This waiver shall apply to all first party Property, Equipment, Vehicle and Workers' Compensation claims (unless prohibited under applicable state statutes), and all third-party liability claims.

Q.   Provided the <u>minimum required primary</u> limits under the Commercial General Liability are provided as stated in Section C., above, CGL, Business Auto Liability, and Employer's Liability policies can be obtained by any combination of primary and excess coverage.

Rev. 111523

# EXHIBIT 4

ACORD®

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
05/26/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER **State Farm** | CONTACT NAME: ADAM HAGE | |
|---|---|---|
| ADAM HAGE | PHONE (A/C, No, Ext): 708-279-7600 | FAX (A/C, No): 708-716-4095 |
| 1362 W EXCHANGE ST | E-MAIL ADDRESS: Adam@AdamIsMyAgent.com | |
| CRETE IL 60417 | INSURER(S) AFFORDING COVERAGE | NAIC # |
| | INSURER A : State Farm Mutual Automobile Insurance Company | 25178 |
| INSURED | INSURER B : | |
| | INSURER C : | |
| MIDWEST DOCK SOLUTIONS | INSURER D : | |
| 3211 HOLEMAN AVE | INSURER E : | |
| S CHICAGO HTS IL 60411 | INSURER F : | |

## COVERAGES          CERTIFICATE NUMBER:          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **COMMERCIAL GENERAL LIABILITY** | | | | | | EACH OCCURRENCE | $ |
| | ☐ CLAIMS-MADE  ☐ OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | ☐ OTHER: | | | | | | | $ |
| A | **AUTOMOBILE LIABILITY** | Y | Y | E676095-E01-13 | 05/01/2020 | 11/01/2020 | COMBINED SINGLE LIMIT (Ea accident) | $ 2,000,000 |
| | ☒ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY  ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ONLY  ☐ NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | ☐ **UMBRELLA LIAB**  ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | ☐ **EXCESS LIAB**  ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | DED ☐  RETENTION $ | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N | | | | | | ☐ PER STATUTE  ☐ OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? ☐ **(Mandatory in NH)** | N/A | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)**
Re: Job #1600633, Subcontract #1600633MID13901, North American Warehouse Expansion, 2101 Claire Court, Glenview, IL 60025.
Primary/Non-Contributory Additional Insureds for General Liability and Additional Insureds on Umbrella Liability: Pepper Construction Company; North American Corporation (Owner) and Heitman Architects, Inc. (Architect). Waiver of Subrogation on Auto Liability

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PEPPER CONSTRUCTION COMPANY ATTN: Zack Adkins 411 LAKE ZURICH RD BARRINGTON, IL 60010 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | **AUTHORIZED REPRESENTATIVE** *Adam Hage* |

© 1988-2015 ACORD CORPORATION. All rights reserved.

**ACORD 25 (2016/03)**          The ACORD name and logo are registered marks of ACORD

1001486  132849.12  03-16-2016

ACORD®

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
7/9/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Certificate Team | | |
|---|---|---|---|
| AssuredPartners of Illinois, LLC<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-355-7996 |
| | E-MAIL ADDRESS: COI@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED MIDWDOC-01 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES  CERTIFICATE NUMBER: 306439850  REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X **COMMERCIAL GENERAL LIABILITY**<br>☐ CLAIMS-MADE ☒ OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | ☒ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | **AUTOMOBILE LIABILITY** | | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☒ HIRED AUTOS ONLY ☒ NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| A | X **UMBRELLA LIAB** X OCCUR<br>☐ **EXCESS LIAB** ☐ CLAIMS-MADE | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | ☐ DED ☒ RETENTION $ N/A | | | | | | AGGREGATE | $ 6,000,000 |
| B | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y/N<br>ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? ☐ (Mandatory in NH) | N/A | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE ☐ OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Re: Subcontract Agreement #1600633MID13901, Job #1600633, North American Warehouse Expansion Project at 2101 Claire Court, Glenview, IL 60025. Primary/Non-Contributory Additional Insureds for General Liability and Additional Insureds for Umbrella Liability: Pepper Construction Company (General Contractor); North American Corporation (Owner), Heitman Architects, Inc. (Architect), Claireview Partners, LLC (Owner), Northwest Synergy Holdings, LLC, Rellim Capital Management LLC, Relim PTC LLC and their parent companies, corporations, partnerships, limited liability companies, trusts and/or their owned, controlled,
affiliated, associated, and subsidiary companies, corporations, partnerships, limited liability companies, trusts and their respective agents, consultants, principles, partners, servants, officers, stockholders, directors, employees, and trustees. Waiver of Subrogation on General Liability, Auto Liability, Umbrella Liability and Workers Compensation applies in favor of the Additional Insureds.
See Attached...

## CERTIFICATE HOLDER

Pepper Construction Company - Attn: Zack Adkins
411 Lake Zurich Road
Barrington, IL 60010-3141

## CANCELLATION

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.

AUTHORIZED REPRESENTATIVE

© 1988-2015 ACORD CORPORATION. All rights reserved.

**ACORD 25 (2016/03)**  The ACORD name and logo are registered marks of ACORD
THIS CERTIFICATE SUPERSEDES PREVIOUSLY ISSUED CERTIFICATE

**AGENCY CUSTOMER ID:** MIDWDOC-01

LOC #: _____

# ACORD®    ADDITIONAL REMARKS SCHEDULE

Page __1__ of __1__

| | |
|---|---|
| **AGENCY**<br>AssuredPartners of Illinois, LLC | **NAMED INSURED**<br>Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 |
| **POLICY NUMBER** | |
| **CARRIER** | **NAIC CODE** | **EFFECTIVE DATE:** |

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

**FORM NUMBER:** __25__ **FORM TITLE:** CERTIFICATE OF LIABILITY INSURANCE

Endorsement forms attached.
Excluded from Workers Compensation:  Mike Richert, Anthony Zarlengo

© 2008 ACORD CORPORATION.  All rights reserved.

The ACORD name and logo are registered marks of ACORD

# CERTIFICATE OF LIABILITY INSURANCE

**ACORD**®

**DATE (MM/DD/YYYY)**
11/19/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | ADAM HAGE | | |
|---|---|---|---|---|
| **State Farm** ADAM HAGE 1362 W EXCHANGE ST CRETE IL 60417 | PHONE (A/C, No, Ext): 708-279-7600 | | FAX (A/C, No): 708-716-4095 | |
| | E-MAIL ADDRESS: Adam@AdamIsMyAgent.com | | | |
| | **INSURER(S) AFFORDING COVERAGE** | | | NAIC # |
| | INSURER A : State Farm Mutual Automobile Insurance Company | | | 25178 |
| INSURED MIDWEST DOCK SOLUTIONS 3211 HOLEMAN AVE S CHICAGO HTS IL 60411 | INSURER B : | | | |
| | INSURER C : | | | |
| | INSURER D : | | | |
| | INSURER E : | | | |
| | INSURER F : | | | |

## COVERAGES    CERTIFICATE NUMBER:    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **COMMERCIAL GENERAL LIABILITY** ☐ CLAIMS-MADE ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: ☐ POLICY ☐ PRO-JECT ☐ LOC ☐ OTHER: | | | | | | GENERAL AGGREGATE | $ |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | | | | | | | | $ |
| A | **AUTOMOBILE LIABILITY** ☒ ANY AUTO ☐ OWNED AUTOS ONLY ☐ HIRED AUTOS ONLY ☐ SCHEDULED AUTOS ☐ NON-OWNED AUTOS ONLY | Y | Y | E676095-E01-13 | 11/01/2020 | 05/01/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 2,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | **UMBRELLA LIAB** ☐ OCCUR **EXCESS LIAB** ☐ CLAIMS-MADE ☐ DED ☐ RETENTION $ | | | | | | EACH OCCURRENCE | $ |
| | | | | | | | AGGREGATE | $ |
| | | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | | | | ☐ PER STATUTE ☐ OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Re: Subcontract Agreement # 1600633MID13901, Job #1600633, North American Warehouse Expansion, 2101 Claire Court, Glenview, IL 60025. Primary/Non-Contributory Additional Insureds for General Liability and Additional Insureds on Umbrella Liability: Pepper Construction Company (General Contractor); North American Corporation (Owner); Heitman Architects, Inc. (Architect); Claireview Partners LLC (Owner); Northwest Synergy Holdings LLC; Rellim Capital Management LLC; Rellim PTC LLC and their parent companies, corporations, partnerships, limited liability companies, trusts and/or their owned, controlled, affiliated, associated, and subsidiary companies, corporations, partnerships, limited liability companies, trusts and their respective agents, consultant, principles, partners, servants, officers, stockholders, directors, employees and trustees. Waiver of Subrogation on Auto Liability.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PEPPER CONSTRUCTION COMPANY ATTN: Zack Adkins 411 LAKE ZURICH RD BARRINGTON, IL 60010 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE *Gaby Perez* |

© 1988-2015 ACORD CORPORATION. All rights reserved.

**ACORD 25 (2016/03)**    The ACORD name and logo are registered marks of ACORD

1001486  132849.12  03-16-2016

**ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
11/19/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: ADAM HAGE | |
|---|---|---|
| **State Farm** | **PHONE (A/C, No, Ext):** 708-279-7600 | **FAX (A/C, No):** 708-716-4095 |
| ADAM HAGE | **E-MAIL ADDRESS:** Adam@AdamIsMyAgent.com | |
| 1362 W EXCHANGE ST | **INSURER(S) AFFORDING COVERAGE** | **NAIC #** |
| CRETE                    IL  60417 | **INSURER A:** State Farm Mutual Automobile Insurance Company | 25178 |
| **INSURED** | **INSURER B:** | |
| | **INSURER C:** | |
| MIDWEST DOCK SOLUTIONS | **INSURER D:** | |
| 3211 HOLEMAN AVE | **INSURER E:** | |
| S CHICAGO HTS            IL  60411 | **INSURER F:** | |

| COVERAGES | CERTIFICATE NUMBER: | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **COMMERCIAL GENERAL LIABILITY** | | | | | | EACH OCCURRENCE | $ |
| | ☐ CLAIMS-MADE  ☐ OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | ☐ POLICY  ☐ PRO-JECT  ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | ☐ OTHER: | | | | | | | $ |
| A | **AUTOMOBILE LIABILITY** | Y | Y | | | | COMBINED SINGLE LIMIT (Ea accident) | $ 2,000,000 |
| | ☒ ANY AUTO | | | E676095-E01-13 | 11/01/2020 | 05/01/2021 | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY  ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ONLY  ☐ NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | ☐ **UMBRELLA LIAB**  ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | ☐ **EXCESS LIAB**  ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | ☐ DED  ☐ RETENTION $ | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N | | | | | | ☐ PER STATUTE  ☐ OTHER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Re: Subcontract Agreement # 1600633MID13901, Job #1600633, North American Warehouse Expansion, 2101 Claire Court, Glenview, IL 60025. Primary/Non-Contributory Additional Insureds for General Liability and Additional Insureds on Umbrella Liability: Pepper Construction Company (General Contractor); North American Corporation (Owner); Heitman Architects, Inc. (Architect); Claireview Partners LLC (Owner); Northwest Synergy Holdings LLC; Rellim Capital Management LLC; Rellim PTC LLC and their parent companies, corporations, partnerships, limited liability companies, trusts and/or their owned, controlled, affiliated, associated, and subsidiary companies, corporations, partnerships, limited liability companies, trusts and their respective agents, consultant, principles, partners, servants, officers, stockholders, directors, employees and trustees. Waiver of Subrogation on Auto Liability.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| PEPPER CONSTRUCTION COMPANY ATTN: Zack Adkins 411 LAKE ZURICH RD BARRINGTON, IL 60010 | **AUTHORIZED REPRESENTATIVE**  *Gaby Perez* |

© 1988-2015 ACORD CORPORATION. All rights reserved.

**ACORD 25 (2016/03)**          The ACORD name and logo are registered marks of ACORD

1001486  132849.12  03-16-2016

**ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
5/6/2025

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Holden Insurance Agency, Inc. 823 Belknap St., Suite 121 PO Box 459 Superior WI 54880 | PHONE (A/C, No, Ext): 715-394-7741 | | FAX (A/C, No): 715-394-7502 |
| | E-MAIL ADDRESS: holden@holdeninsurance.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| INSURED                                    MIDWDOC-01 | INSURER A : Liberty Mutual | | 23043 |
| Midwest Dock Solutions PO Box 363 Steger IL 60475 | INSURER B : ICW Group Insurance Companies | | 27847 |
| | INSURER C : Westchester Surplus Lines | | 10172 |
| | INSURER D : CSU Producer Resources, Inc, | | 13037 |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES          CERTIFICATE NUMBER: 473354295          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | BKS67256221 | 3/13/2025 | 3/13/2026 | EACH OCCURRENCE | $ 1,000,000 |
| | ☐ CLAIMS-MADE  X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X  PRO-JECT ☐  LOC ☐ | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY  ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ONLY  ☐ NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB  X OCCUR | Y | Y | USO67256221 | 3/13/2025 | 3/13/2026 | EACH OCCURRENCE | $ 5,000,000 |
| | EXCESS LIAB  ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ 5,000,000 |
| | DED  X RETENTION $ 10,000 | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY          Y/N | | Y | WWI 5076518 01 | 3/13/2025 | 3/13/2026 | X PER STATUTE  ☐ OTH-ER | |
| | ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?  Y (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| C D A | Pollution Liability Excess Liability Installation Floater | | | G71658144 004 CSU 0226944 BKS67256221 | 3/13/2025 3/13/2025 3/13/2025 | 3/13/2026 3/13/2026 3/13/2026 | Aggregate Limit Aggregate Limit Limit | 2,000,000 1,000,000 250,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
RE: Subcontract Agreement #1600633MID13901, Job #1600633, North American Warehouse Expansion Project at 2101 Claire Court, Glenview, IL 60025. When required by a written contract, Pepper Construction Company (General Contractor); North American Corporation (Owner), Heitman Architects, Inc. (Architect), Claireview Partners, LLC (Owner), Northwest Synergy Holdings, LLC, Relim Capital Management LLC, Relim PTC LLC and their parent companies, corporations, partnerships, limited liability companies, trusts and/or their owned, controlled, affiliated, associated, and subsidiary companies, corporations, partnerships, limited liability companies, trusts and their respective agents, consultants, principles, partners, servants, officers, stockholders, directors, employees, and trustees are included as Additional Insureds on a primary and non-contributory basis for ongoing and completed operations under form CG8979 04/2013 and CG8980 04/2013 (01/2010) on the General Liability. A Waiver of Subrogation applies in favor of Pepper Construction Company (General Contractor); North American Corporation (Owner), Heitman Architects, Inc. (Architect), Claireview Partners, LLC (Owner), Northwest Synergy See Attached...

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Pepper Construction Company Attn: Zack Adkins 411 Lake Zurich Road Barrington IL 60010 USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE  *Thomas Dms* |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)          The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID: MIDWDOC-01

LOC #: _____

**ACORD®**

# ADDITIONAL REMARKS SCHEDULE

Page __1__ of __1__

| AGENCY | NAMED INSURED |
|---|---|
| Holden Insurance Agency, Inc. | Midwest Dock Solutions<br>PO Box 363<br>Steger IL 60475 |
| **POLICY NUMBER** | |

| CARRIER | NAIC CODE | |
|---|---|---|
| | | **EFFECTIVE DATE:** |

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

**FORM NUMBER:** __25__ **FORM TITLE:** CERTIFICATE OF LIABILITY INSURANCE

Holdings, LLC, Rellim Capital Management LLC, Relim PTC LLC and their parent companies, corporations, partnerships, limited liability companies, trusts and/or their owned, controlled, affiliated, associated, and subsidiary companies, corporations, partnerships, limited liability companies, trusts and their respective agents, consultants, principles, partners, servants, officers, stockholders, directors, employees, and trustees on the General Liability and Workers Comp. Umbrella follows form of the underlying policies. Anthony Zarcengo and Michael Richert are excluded on the Workers Comp. XCU Coverage is included. Umbrella follows form of the underlying policies. 30 Day Notice of Cancellation, 10 Day Notice of Non-Payment in favor of Pepper Construction Company.

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

# CERTIFICATE OF LIABILITY INSURANCE

**ACORD®**

DATE (MM/DD/YYYY)
11/03/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: ADAM HAGE |
|---|---|
| State Farm ADAM HAGE 1362 W EXCHANGE ST CRETE IL 60417 | PHONE (A/C, No, Ext): 708-279-7600   FAX (A/C, No): 708-716-4095 |
| | E-MAIL ADDRESS: Adam@AdamIsMyAgent.com |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| | INSURER A : State Farm Mutual Automobile Insurance Company | 25178 |
| INSURED MIDWEST DOCK SOLUTIONS 3211 HOLEMAN AVE S CHICAGO HTS IL 60411 | INSURER B : | |
| | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

## COVERAGES          CERTIFICATE NUMBER:          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **COMMERCIAL GENERAL LIABILITY** ☐ CLAIMS-MADE ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: ☐ POLICY ☐ PRO-JECT ☐ LOC ☐ OTHER: | | | | | | GENERAL AGGREGATE | $ |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | | | | | | | | $ |
| A | **AUTOMOBILE LIABILITY** ☒ ANY AUTO ☐ OWNED AUTOS ONLY ☒ SCHEDULED AUTOS ☐ HIRED AUTOS ONLY ☐ NON-OWNED AUTOS ONLY | Y | Y | E788236B0613 | 08/06/2020 | 02/06/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | MEDICAL | $ |
| | **UMBRELLA LIAB** ☐ OCCUR **EXCESS LIAB** ☐ CLAIMS-MADE ☐ DED ☐ RETENTION $ | | | | | | EACH OCCURRENCE | $ |
| | | | | | | | AGGREGATE | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | | | | ☐ PER STATUTE ☐ OTHER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Re: Subcontract Agreement #2001015MID13901, Job #2001015, SubJob #2001015AAA, Vendor #MID139, Green Era Digester Facility and Urban Campus, 650 West 83rd St., Chicago, IL 60620.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Pepper/Ujamaa Construction Company Attn: Zack Adkins 411 Lake Zurich Road Barrington, IL 60010-3141 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE *Amy Shugan* |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)          The ACORD name and logo are registered marks of ACORD

1001486  132849.12  03-16-2016

# CERTIFICATE OF LIABILITY INSURANCE

**ACORD®**

**DATE (MM/DD/YYYY)** 11/5/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Kathy Wasielewski | |
|---|---|---|
| AssuredPartners of Illinois, LLC<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-908-5058 | FAX (A/C, No): 630-908-4710 |
| | E-MAIL ADDRESS: kwas@mctrinka.com | |

| | | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|---|
| | | INSURER A : Cincinnati Insurance Company | 10677 |
| INSURED | MIDWDOC-01 | INSURER B : The Cincinnati Indemnity Company | 23280 |
| Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | | INSURER C : | |
| | | INSURER D : | |
| | | INSURER E : | |
| | | INSURER F : | |

## COVERAGES  CERTIFICATE NUMBER: 1803716969  REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY<br>CLAIMS-MADE  X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $500,000 |
| | | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER:<br>POLICY X PRO-JECT LOC<br>OTHER: | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | | | | | | | | $ |
| A | AUTOMOBILE LIABILITY<br>ANY AUTO<br>OWNED AUTOS ONLY  SCHEDULED AUTOS<br>X HIRED AUTOS ONLY  X NON-OWNED AUTOS ONLY | | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| A | X UMBRELLA LIAB  X OCCUR<br>EXCESS LIAB  CLAIMS-MADE | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $6,000,000 |
| | DED  X RETENTION $ N/A | | | | | | AGGREGATE | $6,000,000 |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY  Y / N<br>ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE  OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Re: Subcontract Agreement #2001015MID13901, Job #2001015, Sub Job #2001015AAA, Vendor #MID139, Green Era Digester Facility and Urban Campus, 650 West 83rd St., Chicago, IL 60620.
Primary/Non-Contributory Additional Insureds for General Liability and Additional Insureds for Umbrella Liability: Pepper/Ujamaa Construction Company (General Contractor); Green Era 83rd Street, LLC (Owner); Mcbride Kelley Bauer Architects/Planners (Architect); Adams & Christensen Engineers, Inc. (Engineer); DV Community Investment, LLC; DVCI CDE L111, LLC (USB Lender); Green Arrow Engineering, LLC (Engineer); Green Era 83rd Street, LLC and Green Era Educational NFP, and their respective officers, agents & employees (Owner); IFF (Lender (Nonprofits)); IL SNMTC Holdco Fund 5, LLC (USB Lender); MBS Urban Initiatives CDE, LLC; MBS-UI Sub-CDE 47, LLC (USB Lender); SCORE Sub-CDE 19, LLC (USB Lender); Southside Community Optimal Redevelopment Enterprises, LLC; TRF (Reinvestment Fund Leverage Lender); The QALICB (USB Lender); Trillium Consulting, LLC (Owner's Representative); See Attached...

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Pepper/Ujamaa Construction Company<br>Attn: Zack Adkins<br>411 Lake Zurich Road<br>Barrington, IL 60010-3141 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION. All rights reserved.

**ACORD 25 (2016/03)**  The ACORD name and logo are registered marks of ACORD
THIS CERTIFICATE SUPERSEDES PREVIOUSLY ISSUED CERTIFICATE

AGENCY CUSTOMER ID: MIDWDOC-01

LOC #: _____

# ADDITIONAL REMARKS SCHEDULE

Page __1__ of __1__

| AGENCY | NAMED INSURED |
|---|---|
| AssuredPartners of Illinois, LLC | Midwest Dock Solutions |
| | 27 East 36th Place |
| **POLICY NUMBER** | Steger IL 60475 |

| CARRIER | NAIC CODE |
|---|---|
| | |

EFFECTIVE DATE:

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

FORM NUMBER: ___25___   FORM TITLE: CERTIFICATE OF LIABILITY INSURANCE

US Bancorp Community Development Corporation (USB Lender); USBCDC Investment Fund 292, LLC (USB Lender); USBCDE Sub-CDE 202, LLC (USB Lender) and Ujamaa Construction, Inc.
Waiver of Subrogation on General Liability, Auto Liability, Umbrella Liability and Workers Compensation applies in favor of the Additional Insureds.
Mike Richert and Anthony Zarlengo are excluded from Workers Compensation.
Endorsement forms attached.

---

**ACORD 101 (2008/01)**

© 2008 ACORD CORPORATION.  All rights reserved.

The ACORD name and logo are registered marks of ACORD

**MIDWDOC-01**

**JOLSON**

# CERTIFICATE OF LIABILITY INSURANCE

**ACORD®**

**DATE (MM/DD/YYYY)**
**4/18/2022**

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Holden Insurance Agency, Inc. | PHONE (A/C, No, Ext): (715) 394-7741 | | FAX (A/C, No): (715) 394-7502 |
| 823 Belknap St., Suite 121 | | | |
| PO Box 459 | E-MAIL ADDRESS: holden@holdeninsurance.com | | |
| Superior, WI 54880 | | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Midwest Family Mutual Insurance Company | | |
| INSURED | INSURER B : Westchester Surplus Lines | | |
| Midwest Dock Solutions | INSURER C : | | |
| 27 E 36th Pl | INSURER D : | | |
| Steger, IL 60475 | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **X** COMMERCIAL GENERAL LIABILITY | X | X | CPIL0560128080 | 3/13/2022 | 3/13/2023 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE **X** OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY **X** PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS ONLY NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | **X** UMBRELLA LIAB **X** OCCUR | X | X | CPIL0560128080 | 3/13/2022 | 3/13/2023 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED **X** RETENTION $ 10,000 | | | | | | | $ |
| A | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y / N | | X | CPIL1060128495 | 3/13/2022 | 3/13/2023 | **X** PER STATUTE OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) Y | N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Installation Floater | | | CPIL0560128080 | 3/13/2022 | 3/13/2023 | Limit | 100,000 |
| B | Pollution Liability | | | G71658144 001 | 3/13/2022 | 3/13/2023 | Aggregate Limit | 2,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
RE: Subcontract Agreement #2001015MID13901, Job #2001015, Sub Job #2001015AAA, Vendor #MID139, Green Era Digester Facility and Urban Campus, 650 West 83rd St., Chicago, IL 60620. When required by a written contract, Pepper/Ujamaa Construction Company, Green Era 83rd Street, LLC, Mcbride Kelley Baurer Architects/Planners ( Architect), Adams & Christensen Engineers, Inc. (Engineer), DV Community Investment, LLC, DVCI CDE L111, LLC (USB Lender), Green Arrow Engineering, LLC (Engineer), Green Era 83rd Street, LLC and Green Era Educational NFP, and their respective officers, agents & employees (Owner), IFF (Lender Nonprofits), IL SNMTC Holdco Fund 5, LLC (USB Lender), MBS Urban Initiatives CDE, LLC, MBS-UI Sub-CDE 47, LLC (USB Lender), SCORE Sub-CDE 19, LLC (USB Lender), Southside Community Optimal Redevelopment Enterprises, LLC, TRF (Reinvestment Fund Leverage Lender), The QALICB (USB Lender), Trillium Consulting, LLC (Owner's Representative), US Bancorp Community Development Corporation (USB Lender), USBCDC
SEE ATTACHED ACORD 101

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Pepper Construction Company Pepper/Ujamaa Construction Company 411 Lake Zurich Road Barrington, IL 60010 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE *Thomas St Davis* |

**ACORD 25 (2016/03)**

© 1988-2015 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID: MIDWDOC-01    JOLSON

LOC #: 1

**ACORD®**

# ADDITIONAL REMARKS SCHEDULE

Page 1 of 1

| AGENCY | NAMED INSURED |
|---|---|
| **Holden Insurance Agency, Inc.** | **Midwest Dock Solutions**<br>**27 E 36th Pl**<br>**Steger, IL 60475** |

| POLICY NUMBER | | |
|---|---|---|
| **SEE PAGE 1** | | |

| CARRIER | NAIC CODE | |
|---|---|---|
| **SEE PAGE 1** | **SEE P 1** | |

EFFECTIVE DATE: **SEE PAGE 1**

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER: ACORD 25    FORM TITLE: Certificate of Liability Insurance

**Description of Operations/Locations/Vehicles:**
**Investment Fund 292, LLC (USB Lender), USBCDE Sub-CDE 202, LLC (USB Lender), Ujamaa Construction Inc., and any others are included as Additional Insureds on a primary and non-contributory basis for ongoing and completed operations under form BP0003 (01/2010) on the General Liability. A Waiver of Subrogation applies in favor of the Additional Insureds on the General Liability and Workers Comp. Umbrella follows form of the underlying policies. Anthony Zarcengo and Michael Richert are excluded on the Workers Comp. XCU Coverage is included. Umbrella follows form of the underlying policies. 30 Day Notice of Cancellation, 10 Day Notice of Non-Payment in favor of Pepper Construction Company.**

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

MIDWDOC-01             **JOLSON**

**ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
**4/18/2022**

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | |
|---|---|---|
| Holden Insurance Agency, Inc.<br>823 Belknap St., Suite 121<br>PO Box 459<br>Superior, WI 54880 | PHONE (A/C, No, Ext): (715) 394-7741 | FAX (A/C, No): (715) 394-7502 |
| | E-MAIL ADDRESS: holden@holdeninsurance.com | |
| | **INSURER(S) AFFORDING COVERAGE** | NAIC # |
| | INSURER A : Midwest Family Mutual Insurance Company | |
| INSURED | INSURER B : Westchester Surplus Lines | |
| Midwest Dock Solutions<br>27 E 36th Pl<br>Steger, IL 60475 | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

**COVERAGES**      **CERTIFICATE NUMBER:**      **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY<br>CLAIMS-MADE X OCCUR | X | X | CPIL0560128080 | 3/13/2022 | 3/13/2023 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT LOC<br>OTHER: | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | | $ |
| | AUTOMOBILE LIABILITY<br>ANY AUTO<br>OWNED AUTOS ONLY SCHEDULED AUTOS<br>HIRED AUTOS ONLY NON-OWNED AUTOS ONLY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR<br>EXCESS LIAB CLAIMS-MADE | X | X | CPIL0560128080 | 3/13/2022 | 3/13/2023 | EACH OCCURRENCE | $ 6,000,000 |
| | | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ 10,000 | | | | | | | $ |
| A | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y / N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? Y<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | N / A | X | CPIL1060128495 | 3/13/2022 | 3/13/2023 | X PER STATUTE OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Installation Floater | | | CPIL0560128080 | 3/13/2022 | 3/13/2023 | Limit | 100,000 |
| B | Pollution Liability | | | G71658144 001 | 3/13/2022 | 3/13/2023 | Aggregate Limit | 2,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
RE: Subcontract Agreement #2001015MID13901, Job #2001015, Sub Job #2001015AAA, Vendor #MID139, Green Era Digester Facility and Urban Campus, 650 West 83rd St., Chicago, IL 60620. When required by a written contract, Pepper/Ujamaa Construction Company, Green Era 83rd Street, LLC, Mcbride Kelley Baurer Architects/Planners ( Architect), Adams & Christensen Engineers, Inc. (Engineer), DV Community Investment, LLC, DVCI CDE L111, LLC (USB Lender), Green Arrow Engineering, LLC (Engineer), Green Era 83rd Street, LLC and Green Era Educational NFP, and their respective officers, agents & employees (Owner), IFF (Lender Nonprofits), IL SNMTC Holdco Fund 5, LLC (USB Lender), MBS Urban Initiatives CDE, LLC, MBS-UI Sub-CDE 47, LLC (USB Lender), SCORE Sub-CDE 19, LLC (USB Lender), Southside Community Optimal Redevelopment Enterprises, LLC, TRF (Reinvestment Fund Leverage Lender), The QALICB (USB Lender), Trillium Consulting, LLC (Owner's Representative), US Bancorp Community Development Corporation (USB Lender), USBCDC
SEE ATTACHED ACORD 101

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Pepper Construction Company<br>Pepper/Ujamaa Construction Company<br>411 Lake Zurich Road<br>Barrington, IL 60010 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*Thomas St Davis* |

**ACORD 25 (2016/03)**        © 1988-2015 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID: MIDWDOC-01  JOLSON

LOC #: 1

# ACORD®

## ADDITIONAL REMARKS SCHEDULE

Page 1 of 1

| AGENCY | NAMED INSURED |
|---|---|
| Holden Insurance Agency, Inc. | Midwest Dock Solutions<br>27 E 36th Pl<br>Steger, IL 60475 |

| POLICY NUMBER | | |
|---|---|---|
| SEE PAGE 1 | | |

| CARRIER | NAIC CODE | |
|---|---|---|
| SEE PAGE 1 | SEE P 1 | EFFECTIVE DATE: SEE PAGE 1 |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER: ACORD 25  FORM TITLE: Certificate of Liability Insurance

**Description of Operations/Locations/Vehicles:**
Investment Fund 292, LLC (USB Lender), USBCDE Sub-CDE 202, LLC (USB Lender), Ujamaa Construction Inc., and any others are included as Additional Insureds on a primary and non-contributory basis for ongoing and completed operations under form BP0003 (01/2010) on the General Liability. A Waiver of Subrogation applies in favor of the Additional Insureds on the General Liability and Workers Comp. Umbrella follows form of the underlying policies. Anthony Zarcengo and Michael Richert are excluded on the Workers Comp. XCU Coverage is included. Umbrella follows form of the underlying policies. 30 Day Notice of Cancellation, 10 Day Notice of Non-Payment in favor of Pepper Construction Company.

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

# CERTIFICATE OF LIABILITY INSURANCE

**ACORD**®

**DATE (MM/DD/YYYY)** 5/6/2025

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Holden Insurance Agency, Inc. 823 Belknap St., Suite 121 PO Box 459 Superior WI 54880 | PHONE (A/C, No, Ext): 715-394-7741 | | FAX (A/C, No): 715-394-7502 |
| | E-MAIL ADDRESS: holden@holdeninsurance.com | | |
| | **INSURER(S) AFFORDING COVERAGE** | | **NAIC #** |
| | INSURER A : Liberty Mutual | | 23043 |
| INSURED                          MIDWDOC-01 | INSURER B : ICW Group Insurance Companies | | 27847 |
| Midwest Dock Solutions PO Box 363 Steger IL 60475 | INSURER C : Westchester Surplus Lines | | 10172 |
| | INSURER D : CSU Producer Resources, Inc, | | 13037 |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES        CERTIFICATE NUMBER: 349011742        REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X **COMMERCIAL GENERAL LIABILITY** <br> CLAIMS-MADE  X OCCUR | Y | Y | BKS67256221 | 3/13/2025 | 3/13/2026 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY  X PRO- JECT  LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| | **AUTOMOBILE LIABILITY** | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY  SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS ONLY  NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X **UMBRELLA LIAB**  X OCCUR <br> **EXCESS LIAB**  CLAIMS-MADE | Y | Y | USO67256221 | 3/13/2025 | 3/13/2026 | EACH OCCURRENCE | $ 5,000,000 |
| | | | | | | | AGGREGATE | $ 5,000,000 |
| | DED  X RETENTION $ 10,000 | | | | | | | $ |
| B | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**  Y / N <br> ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?  Y <br> (Mandatory in NH) <br> If yes, describe under DESCRIPTION OF OPERATIONS below | N / A | Y | WWI 5076518 01 | 3/13/2025 | 3/13/2026 | X PER STATUTE  OTH- ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| C D A | Pollution Liability <br> Excess Liability <br> Installation Floater | | | G71658144 004 <br> CSU 0226944 <br> BKS67256221 | 3/13/2025 <br> 3/13/2025 <br> 3/13/2025 | 3/13/2026 <br> 3/13/2026 <br> 3/13/2026 | Aggregate Limit <br> Aggregate Limit <br> Limit | 2,000,000 <br> 1,000,000 <br> 250,000 |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)**
RE: Subcontract Agreement #2001015MID13901, Job #2001015, Sub Job #2001015AAA, Vendor #MID139, Green Era Digester Facility and Urban Campus, 650 West 83rd St., Chicago, IL 60620. When required by a written contract, Pepper/Ujamaa Construction Company, Green Era 83rd Street, LLC, Mcbride Kelley Baurer Architects/Planners ( Architect), Adams & Christensen Engineers, Inc. (Engineer), DV Community Investment, LLC, DVCI CDE L111, LLC (USB Lender), Green Arrow Engineering, LLC (Engineer), Green Era 83rd Street, LLC and Green Era Educational NFP, and their respective officers, agents & employees (Owner), IFF (Lender Nonprofits), IL SNMTC Holdco Fund 5, LLC (USB Lender), MBS Urban Initiatives CDE, LLC, MBS-UI Sub-CDE 47, LLC (USB Lender), SCORE Sub-CDE 19, LLC (USB Lender), Southside Community Optimal Redevelopment Enterprises, LLC, TRF (Reinvestment Fund Leverage Lender), The QALICB (USB Lender), Trillium Consulting, LLC (Owner's Representative), US Bancorp Community Development Corporation (USB Lender), USBCDC Investment Fund 292, LLC (USB Lender), USBCDE Sub-CDE 202, LLC (USB Lender), Ujamaa Construction Inc., and any others are included as See Attached...

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Pepper Construction Company Pepper/Ujamaa Construction Company 411 Lake Zurich Road Barrington IL 60010 USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | **AUTHORIZED REPRESENTATIVE** <br> *Thomas Dus* |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)        The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID: MIDWDOC-01

LOC #: _____

# ADDITIONAL REMARKS SCHEDULE

Page __1__ of __1__

| AGENCY | NAMED INSURED |
|---|---|
| Holden Insurance Agency, Inc. | Midwest Dock Solutions<br>PO Box 363<br>Steger IL 60475 |

| POLICY NUMBER | |
|---|---|

| CARRIER | NAIC CODE |
|---|---|
| | |

EFFECTIVE DATE:

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

FORM NUMBER: ___25___   FORM TITLE: CERTIFICATE OF LIABILITY INSURANCE

Additional Insureds on a primary and non-contributory basis for ongoing and completed operations under form CG8979 04/2013 and CG8980 04/2013 (01/2010) on the General Liability.  A Waiver of Subrogation applies in favor of the Additional Insureds on the General Liability and Workers Comp.  Umbrella follows form of the underlying policies.  Anthony Zarcengo and Michael Richert are excluded on the Workers Comp.  XCU Coverage is included.  Umbrella follows form of the underlying policies.  30 Day Notice of Cancellation, 10 Day Notice of Non-Payment in favor of Pepper Construction Company.

© 2008 ACORD CORPORATION.  All rights reserved.

The ACORD name and logo are registered marks of ACORD

# CERTIFICATE OF LIABILITY INSURANCE

**ACORD®**

DATE (MM/DD/YYYY)

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: ADAM HAGE | | |
|---|---|---|---|
| **State Farm** ADAM HAGE 1362 W EXCHANGE ST CRETE, IL 60417 | PHONE (A/C, No, Ext): 708-279-7600 | | FAX (A/C, No): 708-716-4095 |
| | E-MAIL ADDRESS: Adam@AdamIsMyAgent.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : State Farm Mutual Automobile Insurance Company | | 25178 |
| INSURED MIDWEST DOCK SOLUTIONS INC 27 E 36TH PLACE STEGER IL 60475 | INSURER B : | | |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES       CERTIFICATE NUMBER:       REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **COMMERCIAL GENERAL LIABILITY** | | | | | | EACH OCCURRENCE | $ |
| | ☐ CLAIMS-MADE  ☐ OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | ☐ OTHER: | | | | | | | $ |
| A | **AUTOMOBILE LIABILITY** | Y | Y | E649942-C27-13 | 03/27/2024 | 09/27/2024 | COMBINED SINGLE LIMIT (Ea accident) | $ 2,000,000 |
| | ☒ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY  ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ONLY  ☐ NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | MEDICAL | $ 10,000 |
| | ☐ UMBRELLA LIAB  ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | ☐ EXCESS LIAB  ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | ☐ DED  ☐ RETENTION $ | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y/N | N/A | | | | | ☐ PER STATUTE  ☐ OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

Job Number: 2101974, Job Name: LPC - Palatine Spec 350k sf Distribution, Job Address 623 E Algonquin Rd, Palatine, IL 60173 When required by written contract, Pepper Construction Company (General Contractor), Logistics Property Company, LLC (Owner), Architects Plus Design Studio, PLLC (Architect), Swift Structural and Jacob & Hefner are included as Additional Insured on a primary and non-contributory basis for ongoing and completed operations under form CG8979 04/2013 and CG8980 04/2013. Waver of subrogation applies. 30 Day Notice 10 day notice non-payment in favor of Pepper Construction Company

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Pepper Construction Conpany Attn: Zach Atkins 411 Lake Zurich Road Barrington IL 60010 USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)       The ACORD name and logo are registered marks of ACORD

1001486 132849,12 03-16-2016

MIDWDOC-01 JLIETHA

**ACORD**

# CERTIFICATE OF LIABILITY INSURANCE

| DATE (MM/DD/YYYY) |
|---|
| 6/14/2022 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Holden Insurance Agency, Inc.<br>823 Belknap St., Suite 121<br>PO Box 459<br>Superior, WI 54880 | PHONE (A/C, No, Ext): (715) 394-7741 | | FAX (A/C, No): (715) 394-7502 |
| | E-MAIL ADDRESS: holden@holdeninsurance.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Midwest Family Mutual Insurance Company | | |
| INSURED | INSURER B : Westchester Surplus Lines | | |
| Midwest Dock Solutions<br>PO Box 363<br>Steger, IL 60475 | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X **COMMERCIAL GENERAL LIABILITY**<br>☐ CLAIMS-MADE X OCCUR | X | X | CPIL0560128080 | 3/13/2022 | 3/13/2023 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT ☐ LOC<br>OTHER: | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | **AUTOMOBILE LIABILITY** | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ONLY ☐ NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X **UMBRELLA LIAB** X OCCUR<br>☐ EXCESS LIAB ☐ CLAIMS-MADE | X | X | CPIL0560128080 | 3/13/2022 | 3/13/2023 | EACH OCCURRENCE | $ 6,000,000 |
| | | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ 10,000 | | | | | | | $ |
| A | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? Y<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | X | CPIL1060128495 | 3/13/2022 | 3/13/2023 | X PER STATUTE ☐ OTHER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Installation Floater | | | CPIL0560128080 | 3/13/2022 | 3/13/2023 | Limit | 100,000 |
| B | Pollution Liability | | | G71658144 001 | 3/13/2022 | 3/13/2023 | Aggregate Limit | 2,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Job Number: 2101974. Job Name: LPC - Palatine Spec 350k sf Distribution. Job Address: 623 E. Algonquin Rd., Palatine, IL 60173. When required by a written contract, Pepper Construction Company (General Contractor), Logistics Property Company, LLC (Owner), Architects Plus Design Studio, PLLC (Architect) and LPC Palatine, LP are included as Additional Insured on a primary and non-contributory basis for ongoing and completed operations under form BP0003 (01/2010) on the General Liability. A Waiver of Subrogation applies in favor of Pepper Construction Company (General Contractor), Logistics Property Company, LLC (Owner), Architects Plus Design Studio, PLLC (Architect) and LPC Palatine, LP on the General Liability and Workers Comp. Anthony Zarcengo and Michael Richert are excluded on the Workers Comp. XCU Coverage is included. Umbrella follows form of the underlying policies. 30 Day Notice of Cancellation, 10 Day Notice of Non-Payment in favor of Pepper Construction Company.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Pepper Construction Company<br>Attn: Zach Adkins<br>411 Lake Zurich Road<br>Barrington, IL 60010 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*Thomas St Davis* |

ACORD 25 (2016/03)

© 1988-2015 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

# ACORD® CERTIFICATE OF LIABILITY INSURANCE

| DATE (MM/DD/YYYY) |
| --- |
| 09/19/2022 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: ADAM HAGE | | |
| --- | --- | --- | --- |
| **State Farm** ADAM HAGE 1362 W EXCHANGE ST CRETE, IL 60417 | PHONE (A/C, No, Ext): 708-279-7600 | | FAX (A/C, No): 708-716-4095 |
| | E-MAIL ADDRESS: Adam@AdamIsMyAgent.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : State Farm Mutual Automobile Insurance Company | | 25178 |
| INSURED MIDWEST DOCK SOLUTIONS 27 E 36TH PLACE STEGER IL 60475 | INSURER B : | | |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES  CERTIFICATE NUMBER:  REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | COMMERCIAL GENERAL LIABILITY | | | | | | EACH OCCURRENCE | $ |
| | CLAIMS-MADE  OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | POLICY  PRO-JECT  LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | E649942-C27-13 | 09/27/2022 | 03/27/2023 | COMBINED SINGLE LIMIT (Ea accident) | $ 2,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY  SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS ONLY  NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | MEDICAL | $ 10,000 |
| | UMBRELLA LIAB  OCCUR | | | | | | EACH OCCURRENCE | $ |
| | EXCESS LIAB  CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | DED  RETENTION $ | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | Y/N N/A | | | | | PER STATUTE  OTH-ER. | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

RE: Job 2101974 Job name LPC - Palatine Spec 350k Distribution Job Address 623 E Algonquin Rd Palatine IL 60173 When required by a written contract, Pepper Construction Company, Logistics Property Company LLC, Architects Plus Design Studio, PLLC and LPC Palatine, LP are included as additional insured on a primary and non-contributory basis. Waiver of subrogation applies in favor of the above listed additional insureds.

| CERTIFICATE HOLDER | CANCELLATION |
| --- | --- |
| Pepper Construction Company Attn: Zach Adkins 411 Lake Zurich Road Barrington, IL 60020 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)  The ACORD name and logo are registered marks of ACORD

1001486 132849.12 03-16-2016

**ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
09/19/2022

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: ADAM HAGE | | |
|---|---|---|---|
| **State Farm** ADAM HAGE 1362 W EXCHANGE ST CRETE, IL 60417 | PHONE (A/C, No, Ext): 708-279-7600 | | FAX (A/C, No): 708-716-4095 |
| | E-MAIL ADDRESS: Adam@AdamIsMyAgent.com | | |
| | **INSURER(S) AFFORDING COVERAGE** | | **NAIC #** |
| | INSURER A : State Farm Mutual Automobile Insurance Company | | 25178 |
| **INSURED** MIDWEST DOCK SOLUTIONS 27 E 36TH PLACE STEGER IL 60475 | INSURER B : | | |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **COMMERCIAL GENERAL LIABILITY** | | | | | | EACH OCCURRENCE | $ |
| | CLAIMS-MADE ☐ OCCUR ☐ | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | POLICY ☐ PRO-JECT ☐ LOC ☐ | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | OTHER: | | | | | | | $ |
| A | **AUTOMOBILE LIABILITY** | Y | Y | E649942-C27-13 | 03/27/2023 | 09/27/2023 | COMBINED SINGLE LIMIT (Ea accident) | $ 2,000,000 |
| | ☒ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY ☐ SCHEDULED AUTOS ☐ | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS ONLY ☐ NON-OWNED AUTOS ONLY ☐ | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | MEDICAL | $ 10,000 |
| | **UMBRELLA LIAB** ☐ OCCUR ☐ | | | | | | EACH OCCURRENCE | $ |
| | **EXCESS LIAB** ☐ CLAIMS-MADE ☐ | | | | | | AGGREGATE | $ |
| | DED ☐ RETENTION $ | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? ☐ (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N / A | | | | | PER STATUTE ☐ OTH-ER ☐ | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Job 2101974 Jop Name LPC - Palatine Spec 350k Distribution. Job Address 623 E Algonquin Rd Palatine IL 60173
Pepper Construction Company, Logistics Property Company, LLC, Architects Plus Design Studio PLLC and LPC palatine LP are named as additional insured on a primary and non-contributory basis with respect to all policies noted above. A waiver of subrogation applies in favor of the above additional insureds

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Pepper Construction Company Attn Zach Adkins 411 Lake Zurich Road Barrington IL 60020 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)     The ACORD name and logo are registered marks of ACORD

1001486 132849.12 03-16-2016

MIDWDOC-01       **JOLSON**

# ACORD®

## CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
4/3/2023

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | |
|---|---|---|
| Holden Insurance Agency, Inc.<br>823 Belknap St., Suite 121<br>PO Box 459<br>Superior, WI 54880 | PHONE (A/C, No, Ext): (715) 394-7741 | FAX (A/C, No): (715) 394-7502 |
| | E-MAIL ADDRESS: holden@holdeninsurance.com | |
| | **INSURER(S) AFFORDING COVERAGE** | NAIC # |
| | INSURER A : Midwest Family Mutual Insurance Company | |
| INSURED | INSURER B : Westchester Surplus Lines | |
| Midwest Dock Solutions<br>PO Box 363<br>Steger, IL 60475 | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

| COVERAGES | CERTIFICATE NUMBER: | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|---|
| A | X | COMMERCIAL GENERAL LIABILITY | X | X | CPIL0560128080 | 3/13/2023 | 3/13/2024 | EACH OCCURRENCE | $ 1,000,000 |
| | | CLAIMS-MADE [X] OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | POLICY [X] PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | OTHER: | | | | | | | $ |
| | | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | | OWNED AUTOS ONLY / SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | | HIRED AUTOS ONLY / NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | | $ |
| A | X | UMBRELLA LIAB [X] OCCUR | X | X | CPIL0560128080 | 3/13/2023 | 3/13/2024 | EACH OCCURRENCE | $ 6,000,000 |
| | | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | | DED [X] RETENTION $ 10,000 | | | | | | | $ |
| A | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY | | X | CPIL1060128495 | 3/13/2023 | 3/13/2024 | [X] PER STATUTE / OTH-ER | |
| | | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) Y/N [Y] | N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | | Installation Floater | | | CPIL0560128080 | 3/13/2023 | 3/13/2024 | Limit | 100,000 |
| B | | Pollution Liability | | | G71658144 002 | 3/13/2023 | 3/13/2024 | Aggregate Limit | 2,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Job Number: 2101974. Job Name: LPC - Palatine Spec 350k sf Distribution. Job Address: 623 E. Algonquin Rd., Palatine, IL 60173. When required by a written contract, Pepper Construction Company (General Contractor), Logistics Property Company, LLC (Owner), Architects Plus Design Studio, PLLC (Architect) and LPC Palatine, LP are included as Additional Insured on a primary and non-contributory basis for ongoing and completed operations under form BP0003 (01/2010) on the General Liability. A Waiver of Subrogation applies in favor of Pepper Construction Company (General Contractor), Logistics Property Company, LLC (Owner), Architects Plus Design Studio, PLLC (Architect) and LPC Palatine, LP on the General Liability and Workers Comp. Anthony Zarcengo and Michael Richert are excluded on the Workers Comp. XCU Coverage is included. Umbrella follows form of the underlying policies. 30 Day Notice of Cancellation, 10 Day Notice of Non-Payment in favor of Pepper Construction Company.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| Pepper Construction Company<br>Attn: Zach Adkins<br>411 Lake Zurich Road<br>Barrington, IL 60010 | AUTHORIZED REPRESENTATIVE<br>*Thomas St Davis* |

**ACORD 25 (2016/03)**       © 1988-2015 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

**ACORD®** CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
4/11/2024

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Holden Insurance Agency, Inc. 823 Belknap St., Suite 121 PO Box 459 Superior WI 54880 | PHONE (A/C, No, Ext): 715-394-7741 | | FAX (A/C, No): 715-394-7502 |
| | E-MAIL ADDRESS: holden@holdeninsurance.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| INSURED MIDWDOC-01 Midwest Dock Solutions, Inc PO Box 363 Steger IL 60475 | INSURER A : Liberty Mutual | | |
| | INSURER B : Westchester Surplus Lines | | |
| | INSURER C : ICW Group Insurance Companies | | |
| | INSURER D : CSU Producer Resources, Inc, | | 13037 |
| | INSURER E : | | |
| | INSURER F : | | |

**COVERAGES** CERTIFICATE NUMBER: 187292211 REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | BKS67256221 | 3/13/2024 | 3/13/2025 | EACH OCCURRENCE | $ 1,000,000 |
| | ☐ CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ONLY ☐ NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | USO67256221 | 3/13/2024 | 3/13/2025 | EACH OCCURRENCE | $ 5,000,000 |
| | EXCESS LIAB ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ 5,000,000 |
| | DED X RETENTION $ 10,000 | | | | | | | $ |
| C | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N | | Y | WWI 5076518 00 | 3/13/2024 | 3/13/2025 | X PER STATUTE ☐ OTH-ER | |
| | ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBEREXCLUDED? (Mandatory in NH) | Y N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| B D A | Pollution Liability Excess Liability Installation Floater | | | G71658144 003 CSU0226944 BKS67256221 | 3/13/2025 3/13/2025 3/13/2025 | 3/13/2025 3/13/2025 3/13/2025 | Aggregate Limit Aggregate Limit Limit | 2,000,000 1,000,000 300,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Job Number: 2101974. Job Name: LPC - Palatine Spec 350k sf Distribution. Job Address: 623 E. Algonquin Rd., Palatine, IL 60173. When required by a written contract, Pepper Construction Company (General Contractor), Logistics Property Company, LLC (Owner), Architects Plus Design Studio, PLLC (Architect), Swift Structural and Jacob & Hefner are included as Additional Insured on a primary and non-contributory basis for ongoing and completed operations under form CG8979 04/2013 and CG8980 04/2013 on the General Liability. A Waiver of Subrogation applies in favor of Pepper Construction Company (General Contractor), Logistics Property Company, LLC (Owner), Architects Plus Design Studio, PLLC (Architect), Swift Structural and Jacob & Hefner on the General Liability and Workers Comp. Anthony Zarlengo and Michael Richert are excluded on the Workers Comp. XCU Coverage is included. Umbrella follows form of the underlying policies. 30 Day Notice of Cancellation, 10 Day Notice of Non-Payment in favor of Pepper Construction Company.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Pepper Construction Company Attn: Zach Adkins 411 Lake Zurich Road Barrington IL 60010 USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE *Thomas Dus* |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03) The ACORD name and logo are registered marks of ACORD

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)** 5/6/2025

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER Holden Insurance Agency, Inc. 823 Belknap St., Suite 121 PO Box 459 Superior WI 54880 | CONTACT NAME: | | |
|---|---|---|---|
| | PHONE (A/C, No, Ext): 715-394-7741 | | FAX (A/C, No): 715-394-7502 |
| | E-MAIL ADDRESS: holden@holdeninsurance.com | | |
| | **INSURER(S) AFFORDING COVERAGE** | | NAIC # |
| INSURED                                  MIDWDOC-01 Midwest Dock Solutions PO Box 363 Steger IL 60475 | INSURER A : Liberty Mutual | | 23043 |
| | INSURER B : ICW Group Insurance Companies | | 27847 |
| | INSURER C : Westchester Surplus Lines | | 10172 |
| | INSURER D : CSU Producer Resources, Inc, | | 13037 |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES

**CERTIFICATE NUMBER:** 1237099450 **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X **COMMERCIAL GENERAL LIABILITY** | Y | Y | BKS67256221 | 3/13/2025 | 3/13/2026 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE  X  OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY  X  PRO- JECT  LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| | **AUTOMOBILE LIABILITY** | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY  SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS ONLY  NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X **UMBRELLA LIAB** X OCCUR | Y | Y | USO67256221 | 3/13/2025 | 3/13/2026 | EACH OCCURRENCE | $ 5,000,000 |
| | **EXCESS LIAB**  CLAIMS-MADE | | | | | | AGGREGATE | $ 5,000,000 |
| | DED  X  RETENTION $ 10,000 | | | | | | | $ |
| B | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N | | Y | WWI 5076518 01 | 3/13/2025 | 3/13/2026 | X PER STATUTE  OTH- ER | |
| | ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? Y (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| C D A | Pollution Liability Excess Liability Installation Floater | | | G71658144 004 CSU 0226944 BKS67256221 | 3/13/2025 3/13/2025 3/13/2025 | 3/13/2026 3/13/2026 3/13/2026 | Aggregate Limit Aggregate Limit Limit | 2,000,000 1,000,000 250,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Job Number: 2101974. Job Name: LPC - Palatine Spec 350k sf Distribution. Job Address: 623 E. Algonquin Rd., Palatine, IL 60173. When required by a written contract, Pepper Construction Company (General Contractor), Logistics Property Company, LLC (Owner), Architects Plus Design Studio, PLLC (Architect), Swift Structural and Jacob & Hefner are included as Additional Insured on a primary and non-contributory basis for ongoing and completed operations under form CG8979 04/2013 and CG8980 04/2013 on the General Liability. A Waiver of Subrogation applies in favor of Pepper Construction Company (General Contractor), Logistics Property Company, LLC (Owner), Architects Plus Design Studio, PLLC (Architect), Swift Structural and Jacob & Hefner on the General Liability and Workers Comp. Anthony Zarlengo and Michael Richert are excluded on the Workers Comp. XCU Coverage is included. Umbrella follows form of the underlying policies. 30 Day Notice of Cancellation, 10 Day Notice of Non-Payment in favor of Pepper Construction Company.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Pepper Construction Company Attn: Zach Adkins 411 Lake Zurich Road Barrington IL 60010 USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE _Thomas Dus_ |

© 1988-2015 ACORD CORPORATION. All rights reserved.

**ACORD 25 (2016/03)** The ACORD name and logo are registered marks of ACORD

# CERTIFICATE OF LIABILITY INSURANCE

**ACORD®**

| | DATE (MM/DD/YYYY) |
|---|---|
| | 10/20/2021 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | | CONTACT NAME: ADAM HAGE | |
|---|---|---|---|
| **State Farm** ADAM HAGE 1362 W EXCHANGE ST CRETE, IL 60417 | | PHONE (A/C, No, Ext): 708-279-7600 | FAX (A/C, No): 708-716-4095 |
| | | E-MAIL ADDRESS: Adam@AdamIsMyAgent.com | |
| | | INSURER(S) AFFORDING COVERAGE | NAIC # |
| | | INSURER A : State Farm Mutual Automobile Insurance Company | 25178 |
| INSURED MIDWEST DOCK SOLUTIONS 27 E 36TH PLACE STEGER IL 60475 | | INSURER B : | |
| | | INSURER C : | |
| | | INSURER D : | |
| | | INSURER E : | |
| | | INSURER F : | |

## COVERAGES          CERTIFICATE NUMBER:          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **COMMERCIAL GENERAL LIABILITY** | | | | | | EACH OCCURRENCE | $ |
| | ☐ CLAIMS-MADE ☐ OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | ☐ OTHER: | | | | | | | $ |
| A | **AUTOMOBILE LIABILITY** | Y | Y | E649942-C27-13 | 09/27/2022 | 03/27/2023 | COMBINED SINGLE LIMIT (Ea accident) | $ 2,000,000 |
| | ☒ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ONLY ☐ NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | MEDICAL | $ 10,000 |
| | **UMBRELLA LIAB** ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | **EXCESS LIAB** ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | ☐ DED ☐ RETENTION $ | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? **(Mandatory in NH)** If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | | | | ☐ PER STATUTE ☐ OTHER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
RE: 2200210 Matteson 57 Commerce Center 21500 Gateway Dr Matteson IL 60443
Additional Insureds: PEPPER CONSTRUCTION COMPANY (General Contractor), Matteson CC, L.L.C. ( Owner), Harris Architects Inc. ( Architect), CHI Cal Developer Investor, L.L.C (Owner), CHI Cal Venture, LLC, (Owner), CHI LTH GP, L.L.C (Owner), Jacob & Hefner Assoc, Inc (Civil Engineer), LJB Inc. (Tilt Wall Engineer), SMBH, Inc. (Structural Engineer)
The coverage afforded to the additional insured is on a primary and non-contributory basis. A waiver of subrogation applies

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PEPPER CONSTRUCTION COMPANY Attention: Angela Wisker | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION. All rights reserved.

**ACORD 25 (2016/03)**          The ACORD name and logo are registered marks of ACORD

1001486  132849.12  03-16-2016

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)** 09/19/2022

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: ADAM HAGE | | |
|---|---|---|---|
| State Farm ADAM HAGE 1362 W EXCHANGE ST CRETE, IL 60417 | PHONE (A/C, No, Ext): 708-279-7600 | FAX (A/C, No): 708-716-4095 | |
| | E-MAIL ADDRESS: Adam@AdamIsMyAgent.com | | |
| | **INSURER(S) AFFORDING COVERAGE** | | **NAIC #** |
| | INSURER A : State Farm Mutual Automobile Insurance Company | | 25178 |
| **INSURED** MIDWEST DOCK SOLUTIONS 27 E 36TH PLACE STEGER IL 60475 | INSURER B : | | |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES    CERTIFICATE NUMBER:    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **COMMERCIAL GENERAL LIABILITY** ☐ CLAIMS-MADE ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: ☐ POLICY ☐ PRO-JECT ☐ LOC ☐ OTHER: | | | | | | GENERAL AGGREGATE | $ |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | | | | | | | | $ |
| A | **AUTOMOBILE LIABILITY** ☒ ANY AUTO ☐ OWNED AUTOS ONLY ☐ SCHEDULED AUTOS ☐ HIRED AUTOS ONLY ☐ NON-OWNED AUTOS ONLY | Y | Y | E649942-C27-13 | 03/27/2023 | 09/27/2023 | COMBINED SINGLE LIMIT (Ea accident) | $ 2,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | MEDICAL | $ 10,000 |
| | ☐ **UMBRELLA LIAB** ☐ OCCUR ☐ **EXCESS LIAB** ☐ CLAIMS-MADE | | | | | | EACH OCCURRENCE | $ |
| | | | | | | | AGGREGATE | $ |
| | ☐ DED ☐ RETENTION $ | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | | | | ☐ PER STATUTE ☐ OTHER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
RE: 2200210 Matteson 57 Commerce Center 21500 Gateway Dr Matteson IL 60443
Additional Insureds: PEPPER CONSTRUCTION COMPANY (General Contractor), Matteson CC, L.L.C. ( Owner), Harris Architects Inc. ( Architect), CHI Cal Developer Investor, L.L.C (Owner), CHI Cal Venture, LLC, (Owner), CHI LTH GP, L.L.C (Owner), Jacob & Hefner Assoc, Inc (Civil Engineer), LJB Inc. (Tilt Wall Engineer), SMBH, Inc. (Structural Engineer)
The coverage afforded to the additional insured is on a primary and non-contributory basis. A waiver of subrogation applies

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PEPPER CONSTRUCTION COMPANY Attention: Angela Wisker | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. **AUTHORIZED REPRESENTATIVE** |

© 1988-2015 ACORD CORPORATION. All rights reserved.

**ACORD 25 (2016/03)**    The ACORD name and logo are registered marks of ACORD

1001486  132849.12  03-16-2016

# ACORD® CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
10/24/2023

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | ADAM HAGE | | |
|---|---|---|---|---|
| **State Farm** ADAM HAGE 1362 W EXCHANGE ST CRETE, IL 60417 | PHONE (A/C, No, Ext): 708-279-7600 | | FAX (A/C, No): 708-716-4095 | |
| | E-MAIL ADDRESS: Adam@AdamIsMyAgent.com | | | |
| | INSURER(S) AFFORDING COVERAGE | | | NAIC # |
| | INSURER A : State Farm Mutual Automobile Insurance Company | | | 25178 |
| INSURED MIDWEST DOCK SOLUTIONS INC 27 E 36TH PLACE STEGER IL 60475 Ira Sugar <ira@midwestdocksolutions.com>708.367.0801 ~ | INSURER B : | | | |
| | INSURER C : | | | |
| | INSURER D : | | | |
| | INSURER E : | | | |
| | INSURER F : | | | |

## COVERAGES  CERTIFICATE NUMBER:  REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **COMMERCIAL GENERAL LIABILITY** | | | | | | EACH OCCURRENCE | $ |
| | ☐ CLAIMS-MADE ☐ OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | OTHER: | | | | | | | $ |
| A | **AUTOMOBILE LIABILITY** | Y | Y | E649942-C27-13 | 09/27/2023 | 03/27/2024 | COMBINED SINGLE LIMIT (Ea accident) | $ 2,000,000 |
| | ☒ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ONLY ☐ NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | MEDICAL | $ 10,000 |
| | **UMBRELLA LIAB** ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | **EXCESS LIAB** ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | ☐ DED ☐ RETENTION $ | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | | | | ☐ PER STATUTE ☐ OTHER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
RE: 2200210 Matteson 57 Commerce Center 21500 Gateway Dr Matteson IL 60443
Additional Insureds: PEPPER CONSTRUCTION COMPANY (General Contractor), Matteson CC, L.L.C. ( Owner), Harris Architects Inc. ( Architect), CHI Cal Developer Investor, L.L.C ( Owner), CHI Cal Venture, LLC, (Owner), CHI LTH GP, L.L.C (Owner), Jacob & Hefner Assoc, Inc (Civil Engineer), LJB Inc. (Tilt Wall Engineer), SMBH, Inc. (Structural Engineer)
The coverage afforded to the additional insured is on a primary and non-contributory basis. A waiver of subrogation applies

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PEPPER CONSTRUCTION COMPANY Attention: Angela Wisker | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)  The ACORD name and logo are registered marks of ACORD

1001486  132849.12  03-16-2016

**ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

| DATE (MM/DD/YYYY) |
|---|
| 5/6/2025 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed.  If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Holden Insurance Agency, Inc.<br>823 Belknap St., Suite 121<br>PO Box 459<br>Superior WI 54880 | PHONE (A/C, No, Ext): 715-394-7741 | | FAX (A/C, No): 715-394-7502 |
| | E-MAIL ADDRESS:  holden@holdeninsurance.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| INSURED                                          MIDWDOC-01 | INSURER A : Liberty Mutual | | 23043 |
| Midwest Dock Solutions<br>PO Box 363<br>Steger IL 60475 | INSURER B : ICW Group Insurance Companies | | 27847 |
| | INSURER C : Westchester Surplus Lines | | 10172 |
| | INSURER D : CSU Producer Resources, Inc, | | 13037 |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES     CERTIFICATE NUMBER: 909251098     REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X **COMMERCIAL GENERAL LIABILITY**<br>☐ CLAIMS-MADE  X OCCUR | Y | Y | BKS67256221 | 3/13/2025 | 3/13/2026 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | ☐ POLICY  X PRO-JECT  ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| | **AUTOMOBILE LIABILITY** | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY  ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ONLY  ☐ NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X **UMBRELLA LIAB**  X OCCUR<br>**EXCESS LIAB**  ☐ CLAIMS-MADE | Y | Y | USO67256221 | 3/13/2025 | 3/13/2026 | EACH OCCURRENCE | $ 5,000,000 |
| | | | | | | | AGGREGATE | $ 5,000,000 |
| | DED  X RETENTION $ 10,000 | | | | | | | $ |
| B | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**  Y/N<br>ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?  Y N/A<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | Y | WWI 5076518 01 | 3/13/2025 | 3/13/2026 | X PER STATUTE  ☐ OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| C<br>D<br>A | Pollution Liability<br>Excess Liability<br>Installation Floater | | | G71658144 004<br>CSU 0226944<br>BKS67256221 | 3/13/2025<br>3/13/2025<br>3/13/2025 | 3/13/2026<br>3/13/2026<br>3/13/2026 | Aggregate Limit<br>Aggregate Limit<br>Limit | 2,000,000<br>1,000,000<br>250,000 |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES  (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)**
Job Number: 2200210.  Job Name: Matteson 57 Commerce Center.  Job Address: 21500 Gateway Dr. Matteson, IL 60443.  When required by a written contract, PEPPER CONSTRUCTION COMPANY (General Contractor), Matteson CC, L.L.C. (Owner), Harris Architects Inc. (Architect), CHI Cal Developer Investor, L.L.C (Owner), CHI Cal Venture, LLC, (Owner), CHI LTH GP, L.L.C (Owner), Jacob & Hefner Assoc, Inc (Civil Engineer), LJB Inc. (Tilt Wall Engineer) and SMBH, Inc. (Structural Engineer) are included as Additional Insureds on a primary and non-contributory basis for ongoing and completed operations under form CG8979 04/2013 and CG8980 04/2013 (01/2010) on the General Liability. A Waiver of Subrogation applies in favor of PEPPER CONSTRUCTION COMPANY (General Contractor), Matteson CC, L.L.C. (Owner), Harris Architects Inc. (Architect), CHI Cal Developer Investor, L.L.C (Owner), CHI Cal Venture, LLC, (Owner), CHI LTH GP, L.L.C (Owner), Jacob & Hefner Assoc, Inc (Civil Engineer), LJB Inc. (Tilt Wall Engineer) and SMBH, Inc. (Structural Engineer) on the General Liability and Workers Comp.  Umbrella follows form of the underlying policies.  Anthony Zarcengo and Michael Richert are excluded on the Workers See Attached...

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Pepper Construction Company Attn: Angela Wisker<br>411 Lake Zurich Road<br>Barrington IL 60010<br>USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*Thomas Dus* |

© 1988-2015 ACORD CORPORATION.  All rights reserved.

ACORD 25 (2016/03)          The ACORD name and logo are registered marks of ACORD

**AGENCY CUSTOMER ID:** MIDWDOC-01

**LOC #:** _____

# ADDITIONAL REMARKS SCHEDULE

ACORD®

Page __1__ of __1__

| | |
|---|---|
| **AGENCY** Holden Insurance Agency, Inc. | **NAMED INSURED** Midwest Dock Solutions PO Box 363 Steger IL 60475 |
| **POLICY NUMBER** | |
| **CARRIER** | **NAIC CODE** |
| | **EFFECTIVE DATE:** |

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

**FORM NUMBER:** ___25___ **FORM TITLE:** CERTIFICATE OF LIABILITY INSURANCE

Comp. XCU Coverage is included. Umbrella follows form of the underlying policies. 30 Day Notice of Cancellation, 10 Day Notice of Non-Payment in favor of Pepper Construction Company. Mold Aggregate Limit of $1,000,000.

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

MIDWDOC-01       **JOLSON**

**ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
5/11/2023

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | |
|---|---|---|
| Holden Insurance Agency, Inc.<br>823 Belknap St., Suite 121<br>PO Box 459<br>Superior, WI 54880 | PHONE (A/C, No, Ext): (715) 394-7741 | FAX (A/C, No): (715) 394-7502 |
| | E-MAIL ADDRESS: holden@holdeninsurance.com | |

*Please see Exh C for 2101974 LPC Palatine "AIT" Phase starting on pg 3 (addl insureds are slightly diff than main job)*

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURED<br><br>Midwest Dock Solutions<br>PO Box 363<br>Steger, IL 60475 | INSURER A : Midwest Family Mutual Insurance Company | |
| | INSURER B : Westchester Surplus Lines | |
| | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

**COVERAGES**     **CERTIFICATE NUMBER:**     **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X **COMMERCIAL GENERAL LIABILITY**<br>   CLAIMS-MADE   X   OCCUR | X | X | CPIL0560128080 | 3/13/2023 | 3/13/2024 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY   X   PRO-JECT    LOC<br>OTHER: | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | **AUTOMOBILE LIABILITY** | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY   SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS ONLY   NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X **UMBRELLA LIAB**   X   OCCUR | X | X | CPIL0560128080 | 3/13/2023 | 3/13/2024 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB    CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED   X   RETENTION $ 10,000 | | | | | | | $ |
| A | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**   Y / N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?   Y<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | X | CPIL1060128495 | 3/13/2023 | 3/13/2024 | X PER STATUTE    OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Installation Floater | | | CPIL0560128080 | 3/13/2023 | 3/13/2024 | Limit | 100,000 |
| B | Pollution Liability | | | G71658144 002 | 3/13/2023 | 3/13/2024 | Aggregate Limit | 2,000,000 |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)**
Job Number: 2101974 - ODF. Job Name: LPC Palatine - AIT Build Out. Job Address: 975 W. Algonquin Rd., Palatine, IL 60067. When required by a written contract, Pepper Construction Company, Logistics Property Co., Architects Plus Studio, PLCC, Swift Structural and Jacob & Hefner are included as Additional Insureds on a primary and non-contributory basis for ongoing and completed operations under form BP0003 (01/2010) on the General Liability. A Waiver of Subrogation applies in favor of Pepper Construction Company, Logistics Property Co., Architects Plus Studio, PLCC, Swift Structural and Jacob & Hefner on the General Liability and Workers Comp. Anthony Zarcengo and Michael Richert are excluded on the Workers Comp. XCU Coverage is included. Umbrella follows form of the underlying policies. 30 Day Notice of Cancellation, 10 Day Notice of Non-Payment in favor of Pepper Construction Company.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| <br>**Pepper Construction Company Attn: Kevin Maguire**<br>643 North Orleans Street<br>Chicago, IL 60654 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*Thomas St Davis* |

**ACORD 25 (2016/03)**      © 1988-2015 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

# ACORD®

## CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
05/03/2023

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | | CONTACT NAME: | ADAM HAGE | |
|---|---|---|---|---|
| State Farm ADAM HAGE 1362 W EXCHANGE ST CRETE, IL 60417 | | PHONE (A/C, No, Ext): 708-279-7600 | | FAX (A/C, No): 708-716-4095 |
| | | E-MAIL ADDRESS: Adam@AdamIsMyAgent.com | | |
| | | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | | INSURER A : State Farm Mutual Automobile Insurance Company | | 25178 |
| INSURED MIDWEST DOCK SOLUTIONS 27 E 36TH PLACE STEGER IL 60475 | | INSURER B : | | |
| | | INSURER C : | | |
| | | INSURER D : | | |
| | | INSURER E : | | |
| | | INSURER F : | | |

## COVERAGES        CERTIFICATE NUMBER:        REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **COMMERCIAL GENERAL LIABILITY** | | | | | | EACH OCCURRENCE | $ |
| | ☐ CLAIMS-MADE ☐ OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | ☐ OTHER: | | | | | | | $ |
| A | **AUTOMOBILE LIABILITY** | Y | Y | E649942-C27-13 | 03/27/2023 | 09/27/2023 | COMBINED SINGLE LIMIT (Ea accident) | $ 2,000,000 |
| | ☒ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ONLY ☐ NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | MEDICAL | $ 10,000 |
| | **UMBRELLA LIAB** ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | **EXCESS LIAB** ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | ☐ DED ☐ RETENTION $ | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | Y / N N/A | | | | | ☐ PER STATUTE ☐ OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

2101974 - ODF Job Name: LPC Palatine - AIT Build Out 975 W Algonquin Rd Palatine Il 60067. Pepper Construction Company, Logistics Property Co, Architects Plus Studio PLCC, Swift Structural, & Jacob & Hefner are included as Additional Insureds on a primary and non-contributory basis. A Waiver of Subrogation applies. 30 days notice of cancellation applies.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PEPPER CONSTRUCTION COMPANY Attention: Kevin Mcguire | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)        The ACORD name and logo are registered marks of ACORD

1001486  132849.12  03-16-2016

**ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
5/6/2025

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Holden Insurance Agency, Inc. 823 Belknap St., Suite 121 PO Box 459 Superior WI 54880 | PHONE (A/C, No, Ext): 715-394-7741 | | FAX (A/C, No): 715-394-7502 |
| | E-MAIL ADDRESS: holden@holdeninsurance.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Liberty Mutual | | 23043 |
| INSURED                                    MIDWDOC-01 | INSURER B : ICW Group Insurance Companies | | 27847 |
| Midwest Dock Solutions PO Box 363 Steger IL 60475 | INSURER C : Westchester Surplus Lines | | 10172 |
| | INSURER D : CSU Producer Resources, Inc, | | 13037 |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES          CERTIFICATE NUMBER: 1820349444          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | BKS67256221 | 3/13/2025 | 3/13/2026 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO- JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS ONLY NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | USO67256221 | 3/13/2025 | 3/13/2026 | EACH OCCURRENCE | $ 5,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 5,000,000 |
| | DED X RETENTION $ 10,000 | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y / N | | Y | WWI 5076518 01 | 3/13/2025 | 3/13/2026 | X PER STATUTE OTH- ER | |
| | ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | Y | N/A | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| C D A | Pollution Liability Excess Liability Installation Floater | | | G71658144 004 CSU 0226944 BKS67256221 | 3/13/2025 3/13/2025 3/13/2025 | 3/13/2026 3/13/2026 3/13/2026 | Aggregate Limit Aggregate Limit Limit | 2,000,000 1,000,000 250,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Job Number: 2101974 - ODF. Job Name: LPC Palatine - AIT Build Out. Job Address: 975 W. Algonquin Rd., Palatine, IL 60067. When required by a written contract, Pepper Construction Company, Logistics Property Co., Architects Plus Studio, PLCC, Swift Structural and Jacob & Hefner are included as Additional Insureds on a primary and non-contributory basis for ongoing and completed operations under form CG8979 04/2013 and CG8980 04/2013 (01/2010) on the General Liability. A Waiver of Subrogation applies in favor of Pepper Construction Company, Logistics Property Co., Architects Plus Studio, PLCC, Swift Structural and Jacob & Hefner on the General Liability and Workers Comp. Anthony Zarcengo and Michael Richert are excluded on the Workers Comp. XCU Coverage is included. Umbrella follows form of the underlying policies. 30 Day Notice of Cancellation, 10 Day Notice of Non-Payment in favor of Pepper Construction Company.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Pepper Construction Company Attn: Kevin Maguire 643 North Orleans Street Chicago IL 60654 USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE *Thomas Dns* |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)          The ACORD name and logo are registered marks of ACORD

**ACORD®** CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY): 4/11/2024

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Holden Insurance Agency, Inc.<br>823 Belknap St., Suite 121<br>PO Box 459<br>Superior WI 54880 | PHONE (A/C, No, Ext): 715-394-7741 | | FAX (A/C, No): 715-394-7502 |
| | E-MAIL ADDRESS: holden@holdeninsurance.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Liberty Mutual | | |
| INSURED MIDWDOC-01<br>Midwest Dock Solutions, Inc<br>PO Box 363<br>Steger IL 60475 | INSURER B : Westchester Surplus Lines | | |
| | INSURER C : ICW Group Insurance Companies | | |
| | INSURER D : CSU Producer Resources, Inc, | | 13037 |
| | INSURER E : | | |
| | INSURER F : | | |

**COVERAGES** CERTIFICATE NUMBER: 1590556708 REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY<br>　CLAIMS-MADE X OCCUR | Y | Y | BKS67256221 | 3/13/2024 | 3/13/2025 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $300,000 |
| | | | | | | | MED EXP (Any one person) | $5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER:<br>POLICY X PRO-JECT LOC<br>OTHER: | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | | | | | | | | $ |
| | AUTOMOBILE LIABILITY<br>　ANY AUTO<br>　OWNED AUTOS ONLY　SCHEDULED AUTOS<br>　HIRED AUTOS ONLY　NON-OWNED AUTOS ONLY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR<br>　EXCESS LIAB　CLAIMS-MADE | Y | Y | USO67256221 | 3/13/2024 | 3/13/2025 | EACH OCCURRENCE | $5,000,000 |
| | | | | | | | AGGREGATE | $5,000,000 |
| | DED X RETENTION $10,000 | | | | | | | $ |
| C | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N<br>ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? Y N/A<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | Y | WWI 5076518 00 | 3/13/2024 | 3/13/2025 | X PER STATUTE OTHER | |
| | | | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $1,000,000 |
| B<br>D<br>A | Pollution Liability<br>Excess Liability<br>Installation Floater | | | G71658144 003<br>CSU0226944<br>BKS67256221 | 3/13/2024<br>3/13/2024<br>3/13/2024 | 3/13/2025<br>3/13/2025<br>3/13/2025 | Aggregate Limit 2,000,000<br>Aggregate Limit 1,000,000<br>Limit 300,000 | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Job Number: 2100167. Job Name: McMaster - Carr West WH Day 2 Project. Job Address: 600 County Line Rd., Elmhurst, IL 60126. When required by a written contract, PEPPER CONSTRUCTION COMPANY (General Contractor), McMaster - Carr Supply Co (Owner), Valerio Dewalt Train Associates, Inc. (Architect), Aria Group Architects, Inc. (Café Architect), Syska Hennesy Group, Inc. (MEPFFP Engineer) and Uzan + Case, LCC (Structural Engineer) are included as Additional Insureds on a primary and non-contributory basis for ongoing and completed operations under form CG8979 (04/2013) and CG8980 (04/2013) on the General Liability. A Waiver of Subrogation applies in favor of PEPPER CONSTRUCTION COMPANY (General Contractor), McMaster - Carr Supply Co (Owner), Valerio Dewalt Train Associates, Inc. (Architect), Aria Group Architects, Inc. (Café Architect), Syska Hennesy Group, Inc. (MEPFFP Engineer) and Uzan + Case, LCC (Structural Engineer) on the General Liability and Workers Comp. Umbrella follows form of the underlying policies. XCU Coverage is included. 30 Day Notice of Cancellation, 10 Day Notice of Non-Payment in favor of Pepper Construction Company. Pollution Liability Coverage See Attached...

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| Pepper Construction Company<br>Attention: Colin Thomson<br>411 Lake Zurich Road<br>Barrington IL 60010-3141 | AUTHORIZED REPRESENTATIVE<br>_Thomas Das_ |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03) The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID: MIDWDOC-01

LOC #: _____

**ACORD®**

## ADDITIONAL REMARKS SCHEDULE

Page __1__ of __1__

| AGENCY | NAMED INSURED |
|---|---|
| Holden Insurance Agency, Inc. | Midwest Dock Solutions, Inc<br>PO Box 363<br>Steger IL 60475 |
| **POLICY NUMBER** | |
| **CARRIER** | **NAIC CODE** | |
| | | **EFFECTIVE DATE:** |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER: ___25___  FORM TITLE: CERTIFICATE OF LIABILITY INSURANCE

Includes Mold Coverage, $1,000,000 Each Pollution Condition, $2,000,000 Mold Aggregate Limit. Michael Richert and Anthony Zarlengo are Excluded on the Workers Comp.

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION. All rights reserved.<br>The ACORD name and logo are registered marks of ACORD

**ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
5/6/2025

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Holden Insurance Agency, Inc. 823 Belknap St., Suite 121 PO Box 459 Superior WI 54880 | PHONE (A/C, No, Ext): 715-394-7741 | | FAX (A/C, No): 715-394-7502 |
| | E-MAIL ADDRESS: holden@holdeninsurance.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Liberty Mutual | | 23043 |
| INSURED MIDWDOC-01 | INSURER B : ICW Group Insurance Companies | | 27847 |
| Midwest Dock Solutions PO Box 363 Steger IL 60475 | INSURER C : Westchester Surplus Lines | | 10172 |
| | INSURER D : CSU Producer Resources, Inc, | | 13037 |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES    CERTIFICATE NUMBER: 2026098941    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | BKS67256221 | 3/13/2025 | 3/13/2026 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS ONLY NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | USO67256221 | 3/13/2025 | 3/13/2026 | EACH OCCURRENCE | $ 5,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 5,000,000 |
| | DED X RETENTION $ 10,000 | | | | | | | |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y / N | | Y | WWI 5076518 01 | 3/13/2025 | 3/13/2026 | X PER STATUTE OTHER | |
| | ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | Y N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| C D A | Pollution Liability Excess Liability Installation Floater | | | G71658144 004 CSU 0226944 BKS67256221 | 3/13/2025 3/13/2025 3/13/2025 | 3/13/2026 3/13/2026 3/13/2026 | Aggregate Limit Aggregate Limit Limit | 2,000,000 1,000,000 250,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Job Number: 2100167. Job Name: McMaster - Carr West WH Day 2 Project. Job Address: 600 County Line Rd., Elmhurst, IL 60126. When required by a written contract, PEPPER CONSTRUCTION COMPANY (General Contractor), McMaster - Carr Supply Co (Owner), Valerio Dewalt Train Associates, Inc. (Architect), Aria Group Architects, Inc. (Café Architect), Syska Hennesy Group, Inc. (MEPFFP Engineer) and Uzan + Case, LCC (Structural Engineer) are included as Additional Insureds on a primary and non-contributory basis for ongoing and completed operations under form CG8979 (04/2013) and CG8980 (04/2013) on the General Liability. A Waiver of Subrogation applies in favor of PEPPER CONSTRUCTION COMPANY (General Contractor), McMaster - Carr Supply Co (Owner), Valerio Dewalt Train Associates, Inc. (Architect), Aria Group Architects, Inc. (Café Architect), Syska Hennesy Group, Inc. (MEPFFP Engineer) and Uzan + Case, LCC (Structural Engineer) on the General Liability and Workers Comp. Umbrella follows form of the underlying policies. XCU Coverage is included. 30 Day Notice of Cancellation, 10 Day Notice of Non-Payment in favor of Pepper Construction Company. Pollution Liability Coverage See Attached...

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Pepper Construction Company Attention: Colin Thomson 411 Lake Zurich Road Barrington IL 60010-3141 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE _Thomas Dus_ |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)    The ACORD name and logo are registered marks of ACORD

**AGENCY CUSTOMER ID:** MIDWDOC-01

**LOC #:** _____

**ACORD®**

# ADDITIONAL REMARKS SCHEDULE

Page __1__ of __1__

| | |
|---|---|
| **AGENCY**<br>Holden Insurance Agency, Inc. | **NAMED INSURED**<br>Midwest Dock Solutions<br>PO Box 363<br>Steger IL 60475 |
| **POLICY NUMBER** | |
| **CARRIER**　　　　　　　　　　　　　**NAIC CODE** | **EFFECTIVE DATE:** |

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

**FORM NUMBER:** ___25___ **FORM TITLE:** CERTIFICATE OF LIABILITY INSURANCE

Includes Mold Coverage, $1,000,000 Each Pollution Condition, $2,000,000 Mold Aggregate Limit.  Michael Richert and Anthony Zarlengo are Excluded on the Workers Comp.

**ACORD 101 (2008/01)**

© 2008 ACORD CORPORATION.  All rights reserved.

The ACORD name and logo are registered marks of ACORD

**ACORD®** CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY): 5/6/2025

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Holden Insurance Agency, Inc. 823 Belknap St., Suite 121 PO Box 459 Superior WI 54880 | PHONE (A/C, No, Ext): 715-394-7741 | | FAX (A/C, No): 715-394-7502 |
| | E-MAIL ADDRESS: holden@holdeninsurance.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Liberty Mutual | | 23043 |
| INSURED                    MIDWDOC-01 | INSURER B : ICW Group Insurance Companies | | 27847 |
| Midwest Dock Solutions PO Box 363 Steger IL 60475 | INSURER C : Westchester Surplus Lines | | 10172 |
| | INSURER D : CSU Producer Resources, Inc, | | 13037 |
| | INSURER E : | | |
| | INSURER F : | | |

COVERAGES    CERTIFICATE NUMBER: 1082951844    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | BKS67256221 | 3/13/2025 | 3/13/2026 | EACH OCCURRENCE | $ 1,000,000 |
| | ☐ CLAIMS-MADE  X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | ☐ POLICY  X PRO-JECT  ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY  ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ONLY  ☐ NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB  X OCCUR | Y | Y | USO67256221 | 3/13/2025 | 3/13/2026 | EACH OCCURRENCE | $ 5,000,000 |
| | EXCESS LIAB  ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ 5,000,000 |
| | DED  X RETENTION $ 10,000 | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY          Y / N | | Y | WWI 5076518 01 | 3/13/2025 | 3/13/2026 | X PER STATUTE  ☐ OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH)  Y | N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| C D A | Pollution Liability Excess Liability Installation Floater | | Y | G71658144 004 CSU 0226944 BKS67256221 | 3/13/2025 3/13/2025 3/13/2025 | 3/13/2026 3/13/2026 3/13/2026 | Aggregate Limit Aggregate Limit Limit | 2,000,000 1,000,000 250,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Job Number: 2301962. Job Name: RR Donnelley - Wallace Ave Expansion. When required by a written contract, PEPPER CONSTRUCTION COMPANY (General Contractor), RR Donnelly & Sons Comp (Owner), NWS Architects, Inc. (Architect), Sound Structures, Inc. (Structural Engineer) are included as Additional Insureds on a primary and non-contributory basis for ongoing and completed operations under form CG8979 (04/2013) and CG8980 (04/213) on the General Liability. A Waiver of Subrogation applies in favor of PEPPER CONSTRUCTION COMPANY (General Contractor), RR Donnelly & Sons Comp (Owner), NWS Architects, Inc. (Architect), Sound Structures, Inc. (Structural Engineer) on the General Liability and Workers Comp. Anthony Zarlengo and Michael Richert are excluded on the Workers Comp. XCU Coverage is included. Umbrella follows form of the underlying policies. 30 Day Notice of Cancellation, 10 Day Notice of Non-Payment in favor of Pepper Construction Company. Pollution Liability Coverage Includes Mold Coverage, $1,000,000 Each Pollution Condition, $2,000,000 Mold Aggregate Limit.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Pepper Construction Company Attn: Timothy Lumpp 411 Lake Zurich Road Barrington IL 60010 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE  _Thomas Dms_ |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)    The ACORD name and logo are registered marks of ACORD

EXHIBIT 5

| | |
|---|---|
| **From:** | Tony Brutti <tonyb@midwestdocksolutions.com> |
| **Sent:** | Thursday, November 4, 2021 9:11 AM |
| **To:** | Zack Adkins |
| **Subject:** | [EXTERNAL] Re: FW: Green Era - Closeout Documents by 11/5 |
| **Attachments:** | Clopay Warranty.pdf; Warranty Letter.pdf; Clopay Manual.pdf |

Closeout documents for Green Era from Midwest Dock Solutions.

On Thu, Oct 28, 2021 at 10:37 AM Ira Sugar <ira@midwestdocksolutions.com> wrote:

---

**From:** Zack Adkins <ZAdkins@pepperconstruction.com>
**Sent:** Thursday, October 28, 2021 9:02 AM
**To:** Rodney Walker <rodney@a-hmechanical.com>; Harold Harvey <harold@a-hmechanical.com>; Chris Collis <ccollis@ahorninc.com>; Paul Krauze <pkrauze@atmiprecast.com>; Don Ziegler <dziegler@actionfence.com>; Kelsi Kubo <kubo@actionfence.com>; Willie Hedrick <whedrick@aaexs.com>; Gordon Itami <GordonI@andersonlock.com>; Bill Downey <BDowney@arlingtonsteel.com>; Rick Sojka <rsojka@artlow.com>; Eduardo Salgado <eduardo@cswoodwork.com>; Eric Cox <ecox@dlz.com>; William Gallagher <will@gallagherasphalt.com>; Michael Mannion <mmannion@garcesplumbing.com>; Jeffrey White <jwhite@garcesplumbing.com>; Edward Cezar <edward@ibuilderscorp.com>; Jakelski, Jacob <jacob.jakelski@mjelectric.com>; Dino Conte <dinomconte@sbcglobal.net>; Chris Slowinski MARIO CONTE EXCAVATING <chrisdooleymce@aol.com>; Denver Doherty <ddoherty@michels.us>; Jeremy Olivotti <j.olivotti@msprecast.com>; Evan Saunders <e.saunders@msprecast.com>; Ira Sugar <ira@midwestdocksolutions.com>; Mike Vickers <mvickers@paulreilly.com>; Stephanie Biles <sbiles@paulreilly.com>; Patrick Kowalewski <PKowalewski@pepperconstruction.com>; Larry Kotke <larry@ramfp.com>; keith@sullivanroofing.com; Rick Romeo <rick.romeo@veisolutions.com>; uptowndecoratingcorp@yahoo.com; Estimating Dept. <estimating@uptownpaintingconst.com>
**Cc:** Christi Adams <CAdams@pepperconstruction.com>
**Subject:** Green Era - Closeout Documents by 11/5

Morning

See attached closeout checklist.

As it applies to you, please send me Manufacturer's Warranty, O&Ms, As-Builts and Test Reports.

1

I have attached the Warranty Letter template, however the Substantial Completion/Warranty Start has not yet been approved by the Owner yet.

So, send me what you owe, then we'll follow up with the Warranty Letters once the date is established.

Owner Training for MEP/FP trades to be scheduled later.

Please email me the documents by Friday, 11/5.

Zack Adkins
Project Executive

**Pepper Construction Company**

411 Lake Zurich Road, Barrington, IL 60010

T    847.620.4191

M    630.699.6179

--
Yours,

Tony Brutti
Midwest Dock Solutions
Phone: 815-922-5258
Email: tonyb@midwestdocksolutions.com

**MIDWEST DOCK**
S O L U T I O N S
*"Your Complete Dock & Door Experts"*

OFFICE 708.367.0801
FAX 708.367.0802
EMERGENCY SERVICE 708.921.8950

GREEN ERA DIGESTER FACILITY AND URBAN CAMPUS
650 W. 83RD STREET
CHICAGO, ILLINOIS

PEPPER/UJAMAA CONSTRUCTION JOB #: 2001015

## SUBCONTRACTOR/SUPPLIER GUARANTEE/WARRANTY

SUBCONTRACTOR/SUPPLIER:

SCOPE OF WORK:

DATE OF SUBSTANTIAL COMPLETION: PENDING OWNER

We, the undersigned, herewith guarantee/warranty the overhead doors against defects in material or workmanship or any nonconformity with the requirements of the contract documents for a period of one (1) year from the date of Substantial Completion.

If, during the guarantee/warranty period, any faulty materials or defects in materials or workmanship are found, we agree to promptly replace and repair them, together with any damage to finish, fixtures, equipment or furnishings due to our defective work upon notification by the Architect or Owner at no additional expense to the Owner.

By:          Anthony Zarlengo

Title:        President

Signature:

# Clopay® Commercial Product Limited Warranty

## Models 3715, 3717, 3718, 3720, 3724, 3722, 3730

For a period of ten (10) years from the date of the purchase of your door, if a door section rusts through due to the paint finish cracking, checking or peeling (losing adhesion), as verified upon inspection by persons authorized by Clopay, we will replace or otherwise restore (at our option) any such defective door sections.

In addition, for a period of one (1) year from the date of your purchase of your door, we will repair or replace (at our option) any door section, parts or hardware that is defective in material or workmanship.

Further, for a period of ten (10) years from the date of your purchase of your door, we will repair or replace (at our option) any door section that delaminates.

We will pay all labor and materials costs associated with any repair work described above, however, labor costs associated with the removal and reinstallation of any repaired sections and the installation of replacement sections will be your responsibility.

This warranty extends to and benefits only the original purchaser of the door and to normal usage when the door has been installed and maintained in accordance with the manufacturer's instructions.

Our warranty does not cover these items:
WE WILL NOT PAY FOR ANY DAMAGES, INCLUDING INCIDENTAL OR CONSEQUENTIAL DAMAGES, CAUSED BY OR RESULTING FROM A DEFECTIVE DOOR SECTION, PARTS OR HARDWARE. Some states do not allow the exclusion of incidental or consequential damages, so the above limitation may not apply to you.

Our warranty shall not extend to or cover deterioration due to rust resulting from damage to the door section finish caused by fire, other accident or casualty, vandalism, radiation, harmful fumes or foreign substances in the atmosphere, or occurring as a result of any physical damage after the door left our factory, or failure to provide reasonable, necessary and proper maintenance. Nor shall our warranty extend to or cover any damages or claims with respect to any products that in any way or degree have been altered, processed, misused or improperly handled or installed.

If your door does not conform to this warranty, notify us in writing at the following address promptly after discovery of the defect: Clopay Building Products Company, 8585 Duke Blvd, Mason OH 45040.

WE MAKE NO OTHER WARRANTIES, REPRESENTATIONS, OR COVENANTS, EXPRESS OR IMPLIED, WITH RESPECT TO THIS PRODUCT, AS TO ANY MATTER WHATSOEVER, EXCEPT FOR ANY "IMPLIED WARRANTY" AS THAT TERM IS DEFINED IN THE MAGNUSON-MOSS WARRANTY-FEDERAL TRADE COMMISSION IMPROVEMENT ACT, SUCH IMPLIED WARRANTIES TO BE LIMITED IN DURATION TO A PERIOD OF ONE YEAR FROM THE DATE OF PURCHASE.

This warranty gives you specific legal rights, and you may also have other rights which vary from state to state.

To: CT MLH Bluff Road Venture LLC.
4343 Von Karman Ave. Ste. 200
Newport Beach, CA 92660



© 2010 Clopay Building Products Company, Inc.,
A Griffon Company

| KEEP THIS DOCUMENT FOR YOUR RECORDS – DO NOT REMIT |
|---|
| Door Model _3200_ |
| Installation Company ~~Bick~~ Midwest Dock Solutions |
| Address _27. E. 36th Pl._ |
| City _Steger_ State _IL_ Zip _60475_ |
| Date of Purchase _____ |

**From:**        Tony Brutti <tonyb@midwestdocksolutions.com>
**Sent:**        Tuesday, December 21, 2021 10:57 AM
**To:**          Zack Adkins
**Subject:**     Re: [EXTERNAL] Re: FW: Green Era - Closeout Documents by 11/5
**Attachments:** Warranty Letter revised.pdf

Revised warranty letter attached.

On Thu, Dec 16, 2021 at 1:50 PM Zack Adkins <ZAdkins@pepperconstruction.com> wrote:

Please change the warranty letter to a 11/18/2021 start – see attached

Zack Adkins
Project Executive

**Pepper Construction Company**

411 Lake Zurich Road, Barrington, IL 60010

T   847.620.4191

M   630.699.6179

**From:** Tony Brutti <tonyb@midwestdocksolutions.com>
**Sent:** Thursday, November 4, 2021 9:11 AM
**To:** Zack Adkins <ZAdkins@pepperconstruction.com>
**Subject:** [EXTERNAL] Re: FW: Green Era - Closeout Documents by 11/5

Closeout documents for Green Era from Midwest Dock Solutions.

On Thu, Oct 28, 2021 at 10:37 AM Ira Sugar <ira@midwestdocksolutions.com> wrote:

1

**From:** Zack Adkins <ZAdkins@pepperconstruction.com>
**Sent:** Thursday, October 28, 2021 9:02 AM
**To:** Rodney Walker <rodney@a-hmechanical.com>; Harold Harvey <harold@a-hmechanical.com>; Chris Collis <ccollis@ahorninc.com>; Paul Krauze <pkrauze@atmiprecast.com>; Don Ziegler <dziegler@actionfence.com>; Kelsi Kubo <kubo@actionfence.com>; Willie Hedrick <whedrick@aaexs.com>; Gordon Itami <GordonI@andersonlock.com>; Bill Downey <BDowney@arlingtonsteel.com>; Rick Sojka <rsojka@artlow.com>; Eduardo Salgado <eduardo@cswoodwork.com>; Eric Cox <ecox@dlz.com>; William Gallagher <will@gallagherasphalt.com>; Michael Mannion <mmannion@garcesplumbing.com>; Jeffrey White <jwhite@garcesplumbing.com>; Edward Cezar <edward@ibuilderscorp.com>; Jakelski, Jacob <jacob.jakelski@mjelectric.com>; Dino Conte <dinomconte@sbcglobal.net>; Chris Slowinski MARIO CONTE EXCAVATING <chrisdooleymce@aol.com>; Denver Doherty <ddoherty@michels.us>; Jeremy Olivotti <j.olivotti@msprecast.com>; Evan Saunders <e.saunders@msprecast.com>; Ira Sugar <ira@midwestdocksolutions.com>; Mike Vickers <mvickers@paulreilly.com>; Stephanie Biles <sbiles@paulreilly.com>; Patrick Kowalewski <PKowalewski@pepperconstruction.com>; Larry Kotke <larry@ramfp.com>; keith@sullivanroofing.com; Rick Romeo <rick.romeo@veisolutions.com>; uptowndecoratingcorp@yahoo.com; Estimating Dept. <estimating@uptownpaintingconst.com>
**Cc:** Christi Adams <CAdams@pepperconstruction.com>
**Subject:** Green Era - Closeout Documents by 11/5

Morning

See attached closeout checklist.

As it applies to you, please send me Manufacturer's Warranty, O&Ms, As-Builts and Test Reports.

I have attached the Warranty Letter template, however the Substantial Completion/Warranty Start has not yet been approved by the Owner yet.

So, send me what you owe, then we'll follow up with the Warranty Letters once the date is established.

Owner Training for MEP/FP trades to be scheduled later.

Please email me the documents by Friday, 11/5.

Zack Adkins
Project Executive

**Pepper Construction Company**

2



411 Lake Zurich Road, Barrington, IL 60010

T   847.620.4191

M   630.699.6179

--

Yours,


Tony Brutti

Midwest Dock Solutions

Phone: 815-922-5258

Email: tonyb@midwestdocksolutions.com

--
Yours,

Tony Brutti
Midwest Dock Solutions
Phone: 815-922-5258
Email: tonyb@midwestdocksolutions.com



OFFICE 708.367.0801
FAX 708.367.0802
EMERGENCY SERVICE 708.921.8950

**S O L U T I O N S**
*"Your Complete Dock & Door Experts"*

GREEN ERA DIGESTER FACILITY AND URBAN CAMPUS
650 W. 83RD STREET
CHICAGO, ILLINOIS

PEPPER/UJAMAA CONSTRUCTION JOB #: 2001015

# SUBCONTRACTOR/SUPPLIER GUARANTEE/WARRANTY

SUBCONTRACTOR/SUPPLIER:

SCOPE OF WORK:

DATE OF SUBSTANTIAL COMPLETION: <u>November 18, 2021</u>

We, the undersigned, herewith guarantee/warranty the <u>overhead doors</u> (trade) against defects in material or workmanship or any nonconformity with the requirements of the contract documents for a period of one (1) year from the date of Substantial Completion.

If, during the guarantee/warranty period, any faulty materials or defects in materials or workmanship are found, we agree to promptly replace and repair them, together with any damage to finish, fixtures, equipment or furnishings due to our defective work upon notification by the Architect or Owner at no additional expense to the Owner.

By: ___Tony Zarlengo_____

Title: ___President_____

Signature: _____

| | |
|---|---|
| **From:** | Tony Brutti <tonyb@midwestdocksolutions.com> |
| **Sent:** | Tuesday, July 25, 2023 12:55 PM |
| **To:** | Christi Adams |
| **Subject:** | [EXTERNAL] Re: FW: Matteson Commerce Center - Closeout Time! |
| **Attachments:** | Shop Drawings.pdf; Liftmaster J operators manual.pdf; Clopay Commercial Installation Manual - 2015.pdf |

Closeout documents attached for Matteson Commerce from Midwest Dock Solutions. Standing by for Warranty Letter information.

On Tue, Jul 18, 2023 at 11:07 AM Ira Sugar <ira@midwestdocksolutions.com> wrote:

**From:** Christi Adams <CAdams@pepperconstruction.com>
**Sent:** Tuesday, July 18, 2023 10:15 AM
**To:** ptrainor@activeglassco.com; timreif@adlerplbg.com; Jason Tenpas <jtenpas@aaexs.com>; Matt Skole <mskole@allsealants.com>; Brian Bartasius <bbartasius@alliancecousa.com>; Shahara Byford <sbyford@byfordconstruction.com>; G. Maldonado <gmaldonado@cecchin-inc.com>; JJ Hund <jhundjr@classiclandscapeltd.com>; William Sweatt <wsweatt@connellyelectric.com>; Ryan Andreas <randreas@continentalpainting.com>; ellisonb@fairbornequipment.com; Ernesto Esparza <eesparza@glenrockcompany.com>; bhochstatter@houseofdoorsinc.com; Dan Maras <dmaras@portaking.com>; Ken Bridgmon <ken@kingerysteel.com>; Ira Sugar <ira@midwestdocksolutions.com>; Don Anderson <danderson@plote.com>; eringstad@primescaffold.com; Will McCoy <wmccoy@rankingroup.com>; Joe Ryan <joe.ryan@ryancentral.com>; Mike O'Connell <MikeO@scurtocement.com>; Jennifer Niemiec <jniemiec@sunmechsys.com>; apmosqueda@truseal-inc.com; Paul Suvanich <Paul.Suvanich@usafp.us>; Melissa Murphy <mmurphy@parvinclauss.com>
**Cc:** Chance Van Dyck <CVanDyck@pepperconstruction.com>; Angela Wisker <AWisker@pepperconstruction.com>
**Subject:** Matteson Commerce Center - Closeout Time!

Good morning, Matteson Team, please start pulling together your closeout information for Matteson 57 Commerce!  We thank you for all your efforts out there and the part you played.  For those still working out there please forward when you can – thank you everyone!

For now, please get your As-Builts and Operation & Maintenance Manuals together, you can start forwarding your information <u>electronically to my attention</u>. It will be determined later if we need hard copies. Please name your pdfs clearly.

At this time, we are not sure of our Warranty Date, so do not send your warranties over quite yet. I will forward a form letter over once the client gives us the date to use! Thank you.

**I. AS-BUILT DRAWINGS** (you know who you are for this)

**II. OPERATIONS & MAINTENANCE MANUALS**

1. Operating instructions.
2. Maintenance instructions for equipment and systems.
3. Maintenance instructions for special finishes, including recommended cleaning methods and materials, and special precautions identifying detrimental agents.
4. Shop Drawings and product data.
5. Test Reports

**III. WARRANTIES -** HOLD OFF ON THIS RIGHT NOW

1. Warranty letter – **Substantial completion date** *********
2. Provide copies/certificates of manufacturer and all extended warranties that apply to your work or material provided.

Please let me know who will be pulling this data together from your team. Please let me know if you have any questions. Thank you!

Christi S Adams
Project Coordinator

**Pepper Construction Company**

411 Lake Zurich Road, Barrington, IL 60010

**T**  847-620-4037

**Be kind to each other**

*Click here to read Pepper's 2022 Annual Review | Join our team*

--
Yours,

Tony Brutti
Midwest Dock Solutions
Phone: 815-922-5258
Email: tonyb@midwestdocksolutions.com

| | |
|---|---|
| **From:** | Tony Brutti <tonyb@midwestdocksolutions.com> |
| **Sent:** | Friday, August 4, 2023 1:38 PM |
| **To:** | Christi Adams |
| **Subject:** | [EXTERNAL] Re: FW: Matteson Commerce Center - Closeout Time! |
| **Attachments:** | Warranty Letter.pdf |

Warranty Letter attached for Matteson Commerce from Midwest Dock Solutions.

On Tue, Aug 1, 2023 at 11:00 AM Ira Sugar <ira@midwestdocksolutions.com> wrote:

**From:** Christi Adams <CAdams@pepperconstruction.com>
**Sent:** Tuesday, August 1, 2023 10:42 AM
**To:** ptrainor@activeglassco.com; timreif@adlerplbg.com; Jason Tenpas <jtenpas@aaexs.com>; Matt Skole <mskole@allsealants.com>; Brian Bartasius <bbartasius@alliancecousa.com>; Shahara Byford <sbyford@byfordconstruction.com>; G. Maldonado <gmaldonado@cecchin-inc.com>; JJ Hund <jhundjr@classiclandscapeltd.com>; William Sweatt <wsweatt@connellyelectric.com>; Ryan Andreas <randreas@continentalpainting.com>; ellisonb@fairbornequipment.com; Ernesto Esparza <eesparza@glenrockcompany.com>; bhochstatter@houseofdoorsinc.com; Dan Maras <dmaras@portaking.com>; Ken Bridgmon <ken@kingerysteel.com>; Ira Sugar <ira@midwestdocksolutions.com>; Don Anderson <danderson@plote.com>; eringstad@primescaffold.com; Will McCoy <wmccoy@rankingroup.com>; Joe Ryan <joe.ryan@ryancentral.com>; Mike O'Connell <MikeO@scurtocement.com>; Jennifer Niemiec <jniemiec@sunmechsys.com>; apmosqueda@truseal-inc.com; Paul Suvanich <Paul.Suvanich@usafp.us>; Melissa Murphy <mmurphy@parvinclauss.com>
**Cc:** Chance Van Dyck <CVanDyck@pepperconstruction.com>; Angela Wisker <AWisker@pepperconstruction.com>
**Subject:** RE: Matteson Commerce Center - Closeout Time!

Good morning, Matteson Team! Please see attached warranty letter to be placed on your letterhead. Our date of Substantial Completion date has been set and is August 1, 2023, the date to be used for warranties.

Please see below email dated 7/18/23 below for the closeout information that was requested. Hopefully you have most pulled together already.

**We are requesting this information to be submitted by August 15th**. If you have any questions, please let me know. Please do your best to get your closeout submitted as soon as possible! Thank you.

The building looks great and was fun to watch from the office with all the of pictures! I am going to mention and remind everyone to keep your COI renewals coming as they renew in the coming months.

Christi S Adams
Project Coordinator

**Pepper Construction Company**

411 Lake Zurich Road, Barrington, IL 60010

**T** 847-620-4037

**Be kind to each other**

*Click here to read Pepper's 2022 Annual Review | Join our team*

---

**From:** Christi Adams
**Sent:** Tuesday, July 18, 2023 10:15 AM
**To:** ptrainor@activeglassco.com; timreif@adlerplbg.com; Jason Tenpas <jtenpas@aaexs.com>; Matt Skole <mskole@allsealants.com>; Brian Bartasius <bbartasius@alliancecousa.com>; Shahara Byford <sbyford@byfordconstruction.com>; G. Maldonado <gmaldonado@cecchin-inc.com>; JJ Hund <jhundjr@classiclandscapeltd.com>; William Sweatt <wsweatt@connellyelectric.com>; Ryan Andreas <randreas@continentalpainting.com>; ellisonb@fairbornequipment.com; Ernesto Esparza <eesparza@glenrockcompany.com>; bhochstatter@houseofdoorsinc.com; Dan Maras <dmaras@portaking.com>; Ken Bridgmon <ken@kingerysteel.com>; Ira Sugar <ira@midwestdocksolutions.com>; Don Anderson <danderson@plote.com>; eringstad@primescaffold.com; Will McCoy <wmccoy@rankingroup.com>; Joe Ryan <joe.ryan@ryancentral.com>; Mike O'Connell <MikeO@scurtocement.com>; Jennifer Niemiec <jniemiec@sunmechsys.com>; apmosqueda@truseal-inc.com; Paul Suvanich <Paul.Suvanich@usafp.us>; Melissa Murphy <mmurphy@parvinclauss.com>
**Cc:** Chance Van Dyck <CVandyck@pepperconstruction.com>; Angela Wisker <AWisker@pepperconstruction.com>
**Subject:** Matteson Commerce Center - Closeout Time!

Good morning, Matteson Team, please start pulling together your closeout information for Matteson 57 Commerce! We thank you for all your efforts out there and the part you played. For those still working out there please forward when you can – thank you everyone!

For now, please get your As-Builts and Operation & Maintenance Manuals together, you can start forwarding your information <u>electronically to my attention</u>. It will be determined later if we need hard copies. Please name your pdfs clearly.

At this time, we are not sure of our Warranty Date, so do not send your warranties over quite yet. I will forward a form letter over once the client gives us the date to use! Thank you.

**I. AS-BUILT DRAWINGS** (you know who you are for this)

**II. OPERATIONS & MAINTENANCE MANUALS**

1. Operating instructions.
2. Maintenance instructions for equipment and systems.
3. Maintenance instructions for special finishes, including recommended cleaning methods and materials, and special precautions identifying detrimental agents.
4. Shop Drawings and product data.
5. Test Reports

**III. WARRANTIES**

1. Warranty letter – **August 1, 2023** *********
2. Provide copies/certificates of manufacturer and all extended warranties that apply to your work or material provided.

Please let me know who will be pulling this data together from your team. Please let me know if you have any questions. Thank you!

Christi S Adams
Project Coordinator

**Pepper Construction Company**

3

411 Lake Zurich Road, Barrington, IL 60010

**T** 847-620-4037

**Be kind to each other**

*Click here to read Pepper's 2022 Annual Review | Join our team*

--
Yours,

Tony Brutti
Midwest Dock Solutions
Phone: 815-922-5258
Email: tonyb@midwestdocksolutions.com

**MIDWEST DOCK**

S O L U T I O N S

*"Your Complete Dock & Door Experts"*

OFFICE 708.367.0801
FAX 708.367.0802
EMERGENCY SERVICE 708.921.8950

## Matteson 57 Commerce Center

### PEPPER CONSTRUCTION COMPANY JOB #: 2200210

SUBCONTRACTOR:                    Company Name Here

SCOPE OF WORK:                    Enter Your Scope Here

DATE OF SUBSTANTIAL COMPLETION:    August 1, 2023

---

We, the undersigned, herewith guarantee/warranty the <u>overhead doors</u> (trade) against defects in material or workmanship or any nonconformity with the requirements of the contract documents for a period of one year from the date of Substantial Completion. (unless noted otherwise or for the extended warranties)

If, during the guarantee/warranty period, any faulty materials or defects in materials or workmanship are found, we agree to promptly replace and repair them, together with any damage to finish, fixtures, equipment or furnishings due to our defective work upon notification by the Architect or Owner at no additional expense to the Owner.

By:         _Tony Zarlengo_____

Title:      _President_____

Signature:  _____

| | |
|---|---|
| **From:** | Tony Brutti <tonyb@midwestdocksolutions.com> |
| **Sent:** | Tuesday, December 5, 2023 12:17 PM |
| **To:** | Cecil Kidenda |
| **Subject:** | [EXTERNAL] Re: FW: LPC/AIT Palatine - Outstanding Closeout Documents - Midwest Dock Solutions |
| **Attachments:** | Warranty Letter.pdf; Approved 0836-001 - Overhead Doors_Reviewed_AP JMW_ 040822s.pdf; Clopay Commercial Installation Manual - 2015.pdf; Liftmaster J operators manual.pdf; ML10_OwnersManual_V3.pdf |

Closeout documents attached for LPC/AIT Palatine from Midwest Dock Solutions.

On Tue, Dec 5, 2023 at 11:06 AM Ira Sugar <ira@midwestdocksolutions.com> wrote:

**From:** Cecil Kidenda <CKidenda@pepperconstruction.com>
**Sent:** Tuesday, December 5, 2023 9:30 AM
**To:** ira@midwestdocksolutions.com
**Cc:** Kevin Maguire <KMaguire@pepperconstruction.com>
**Subject:** LPC/AIT Palatine - Outstanding Closeout Documents - Midwest Dock Solutions

Hey Ira,

We're still awaiting **As-Builts, O&Ms, and Warranties** for the LPC AIT Palatine Project. Your prompt attention to this matter is crucial. Please compile these items and send them my way.

**Cecil Kidenda**
Project Engineer

**Pepper Construction Group**

411 Lake Zurich Road, Barrington, IL 60010

**T**:  847-620-4062

**Be kind to each other**

*Click here to read Pepper's 2022 Annual Review* | *Join our team*

1

--
Yours,

Tony Brutti
Midwest Dock Solutions
Phone: 815-922-5258
Email: tonyb@midwestdocksolutions.com

**MIDWEST DOCK**

S O L U T I O N S
*"Your Complete Dock & Door Experts"*

OFFICE 708.367.0801
FAX 708.367.0802
EMERGENCY SERVICE 708.921.8950

November 17, 2023

Pepper Construction Company
643 North Orleans Street
Chicago, IL 60654

Re: **LPC AIT Palatine**

To Whom It May Concern:

We, **Midwest Dock Solutions** warrant to **LPC AIT Palatine**, that all materials and equipment furnished under our Subcontract are new, unless otherwise specified, and that all Work is of good quality, free from improper workmanship and defective materials and in conformance with Drawings and Specifications. We agree to correct all Work performed under this Agreement which proves to be defective in material and workmanship within a period of one (1) year from the date of Substantial Completion November 17, 2023, or for such longer periods of time as may be set forth with respect to specific warranties contained in the Specifications.

The warranty provided herein shall not be construed to establish a period of limitation with respect to other obligations the Subcontractor has under the Subcontract Documents. Establishment of the one-year period for correction of Work as described herein relates only to the specific obligation of the Subcontractor to correct the Work, and has no relationship to the time within which the obligation to comply with the Subcontract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Subcontractor's liability with respect to the Subcontractor's obligations other than specifically to correct the Work.

We have secured the required inspections and approvals and will deliver copies of these reports to Pepper Construction Company.

Sincerely,

Anthony Zarlengo, President
**Midwest Dock Solutions**

| | |
|---|---|
| **From:** | Tony Brutti <tonyb@midwestdocksolutions.com> |
| **Sent:** | Friday, August 2, 2024 12:41 PM |
| **To:** | Thomas Braun |
| **Subject:** | [EXTERNAL] Re: FW: McMaster-Carr Closeouts |
| **Attachments:** | Warranty Letter.pdf; Approved 083233-001 Coiling Fire Door Shop Drawings REV3_VDT Final.pdf; Cornell Fire Door Installation Instructions.pdf |

---

**This Message Is From an External Sender**
This message came from outside your organization.

Report Suspicious

Closeout documents attached for McMaster-Carr from Midwest Dock Solutions.

On Fri, Aug 2, 2024 at 12:14 PM <ira@midwestdocksolutions.com> wrote:

---

**From:** Thomas Braun <Thomas.Braun@pepperconstruction.com>
**Sent:** Thursday, August 1, 2024 1:28 PM
**To:** Ira Sugar <ira@midwestdocksolutions.com>
**Cc:** Colin Thomson <CThomson@pepperconstruction.com>; Kelly Brockway <KBrockway@pepperconstruction.com>
**Subject:** McMaster-Carr Closeouts

Ira,

We now have our substantial completion date set as **7/26/24.**

With that date set could you please provide us with the following closeout documents.

- Warranties
- O&M Manuals
- Owner Trainings – Please contact us with times that trainings can be done so we can get them scheduled

Closeout documents are required to release final payments.

Please reach out if you have any questions.


Thanks,



**Thomas Braun**

Intern

**Pepper Construction**

411 Lake Zurich Road, Barrington, IL, 60010

Main Office: 847-381-2760

Work: 312-266-6915

**Pepper Construction**
**Tomorrow Transformed**

Click here to read Pepper's 2023 Annual Review | Join our team



--
Yours,

Tony Brutti
Midwest Dock Solutions
Phone: 815-922-5258
Email: tonyb@midwestdocksolutions.com

# SITE SPECIFIC SAFETY PLAN

## **Pepper Construction**
## **RR Donnelley Wallace**

1750 Wallace Avenue
St. Charles, IL 60174

### **SUBCONTRACTOR**

Midwest Dock Solutions
27 E. 36th Pl.
Steger, IL 60475

Contacts:
Tony Zarlengo, 708-367-0801
Mike Richert, 708-825-4303

Pepper Project Manager: Tim Lumpp

1. Midwest Dock Solutions Contacts
   a. Project Manager- Tony Zarlengo
   b. Field Operations Manager- Mike Richert
   c. Site Foreman/Competent Person- David Green

2. Pepper Construction Contacts
   a. Project Manager – Tim Lumpp 847-381-2760
   b. Site Superintendent – Jay Munoz

3. Local Medical Facility
   a. Northwestern Medicine Delnor Hospital 300 S. Randall Rd, Geneva, IL 60134
   b. Call 911 for Emergencies
   c. ALL accidents reported immediately to Midwest Dock Solutions and Pepper Construction Site Superintendent. Accident Report to Midwest Dock Solutions Office and Pepper Construction per onsite policy.

4. Midwest Dock Scope of Work
   a. Detailed scope of work:

      Installation of Sectional doors

   b. Phases of Work:

      Tracking, Panels, and weatherseal

   c. Equipment to be used:

      Work trucks, man lifts

   d. Typical Work Hours:

      Typically 7:00AM – 3:30 PM

5. Site Specific Safety
   a. Perform Pre-Task Safety Analysis prior to starting any new task
   b. Weekly Toolbox talks
   c. SDS in Gang Box
   d. SDS on file with Controlling Contractor
   e. Proper PPE
      i. Hard Hats
      ii. Safety Glasses
      iii. High Visibility Vest
      iv. Ear Plugs
      v. Harness & Lanyards
   f. Documentation provided to Pepper per on-site policy.

6. <u>On-Site Rules</u>
    a. Proper Safety Practices
    b. Proper PPE
    c. Proper Housekeeping
        i. Cleanup of area to commence Waste to on-site dumpster.
        ii. Gang Box kept in good order

    e. Smoking only allowed in designated areas per on-site policy

7. <u>Disciplinary Policy</u>
    a. Violation – violation of any Company rule or regulation without premeditation and without cause of injury, property damage or loss of work.
        i. $1_{st}$ – Verbal warning with discussion on proper methods to be used.
        ii. $2_{nd}$ – Written notice issued to employee
        iii. $3_{rd}$ – Up to one day off without pay
    b. Serious Violation – violation of Company rule or regulation without   premeditation, but results in an injury, sickness, property damage or loss of work.
        i. $1_{st}$ - Up to one day off without pay
        ii. $2_{nd}$ – Up to three days off without pay
        iii. $3_{rd}$ – Termination of employment
    c. Willful Violation – violation of Company rule or regulation with premeditation   or forethought. The discipline indicated below is the minimum. However, the degree of discipline may be extended or increased to termination of employment on the first or second violation, depending on the seriousness of the violation.
        i. $1_{st}$ – Minimum of one day off without pay
        ii. $2_{nd}$ – Minimum of three days off without pay
        iii. $3_{rd}$ – Termination of employment

_____

Tony Zarlengo,
President
Midwest Dock Solutions

March 27, 2024

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 21



SUBCONTRACT # SC2401.010

This SUBCONTRACT AGREEMENT is made this **May 28, 2024** ("Contract Date"), by and between **Meridian Design Build, Inc., 9550 W Higgins Road, Ste 400 , Rosemont IL, 60018** ("Contractor") and **Midwest Dock Solutions Inc., PO Box 363 , Steger, IL 60475 ("Subcontractor").**

The Contractor has heretofore entered into a construction contract dated **2024-02-22** ("Construction Contract") with **26 Denali LLC** ("Owner"), to perform certain labor and furnish certain material at **1303 Jack Court Facility Upgrades, 1303 Jack Court , Bartlett, IL 60103** ("Project").

The Construction Contract, the Drawings, the Specifications, the general conditions and/or special conditions made a part of the Construction Contract, if any, all addenda and amendments attached to the Construction Contract, this Subcontract Agreement, the general conditions and/or special conditions made a part of this Subcontract Agreement (the "General Conditions"), and any rider, addenda or amendments made apart of or attached hereto, the bond, if any, and all amendments, modifications and change orders issued after execution of the Construction Contract or this Subcontract Agreement are hereinafter collectively referred to as the "Contract Documents." The Contractor has made all existing Contract Documents available to the Subcontractor. The Subcontractor has carefully examined all Contract Documents. The Subcontractor shall be responsible for obtaining copies of any documents pertinent to its work.  All capitalized terms used but which are not defined in this Subcontract Agreement, shall have the meaning given to such terms in the General Conditions.

**GENERAL INFORMATION**

|  |  |
|---|---|
| **Project #:** | 2401 |
| **Project:** | 1303 Jack Court Facility Upgrades |
| | 1303 Jack Court , |
| | Bartlett, IL 60103 |
| **Owner:** | 26 Denali LLC |

**Subcontract Scope:** Drive in door and dock equipment
**Subcontract Total:** Twenty Six Thousand Two Hundred Fifty Five Dollars 00/100 ($26,255.00)

PLAINTIFF'S EXHIBIT

65

**PART A**

**THE SUBCONTRACTOR AGREES AS FOLLOWS:**

1) Subcontractor shall perform the work, render the services and perform the obligations described herein and in the Contract Documents all in accordance with the terms of this Subcontract Agreement and the other Contract Documents ("Work") for the Contract Sum (as defined below). The following documents, addenda and/or riders are expressly made a part of this Subcontract Agreement, whether or not physically attached to this Subcontract Agreement, and expressly made a part of the Contract Documents, and Subcontractor acknowledges that it has received and reviewed copies of, and agrees to comply with, all of the terms and conditions of the following described documents and agreements:

   – Minimum Insurance Requirements (Exhibit A)

   – Scope of Work (Exhibit B)

   – Safety Regulations (Exhibit C)

2) Subcontractor shall pay for all materials, skills, labor and equipment used in or in connection with the Work, when and as bills or claims therefore become due, and shall furnish satisfactory evidence to the Contractor when and if required, that Subcontractor has complied with the above requirements.

3) Subcontractor shall begin the Work as soon as the Project is ready for such work or, within two (2) calendar days after being notified in writing by the Contractor and shall complete the Work within the following time limits:

   **ALL WORK REQUIRED HEREUNDER SHALL BE COMPLETED WITHIN THE TIME PERIODS SPECIFIED IN THE ATTACHED SCOPE OF WORK (SEE EXHIBIT B). IN THE EVENT NO COMPLETION DATE FOR THE WORK IS SPECIFIED, THE WORK, IN ALL EVENTS, SHALL BE COMPLETED AS NECESSARY TO ALLOW SUBSTANTIAL COMPLETION OF THE ENTIRE PROJECT ON OR BEFORE: August 02, 2024.**

4) Subcontractor shall proceed with the Work in any orderly and reasonable sequence as directed by the Contractor and shall abide by the Contractor's decision as to the allotment of all storage and working space on the Project. Subject to the terms of the Contract Documents, Subcontractor shall be responsible for the means and methods of the Work.

5) Any extension of time for performance of the Work shall require the prior written consent of the Contractor. If, however, Subcontractor is delayed in the performance or completion of the Work for reasons reasonably beyond Subcontractor's control, then the time of the performance or completion of the Work shall be extended accordingly, provided the cause of the delay is of a type set forth in the Contract Documents constituting an "excused delay" and entitling Contractor an extension of time for completion of the Project.

6) Subcontractor shall obtain, maintain and pay for such insurance as may be required by law, the Contract Documents, or any exhibit or rider attached hereto, and shall furnish the Contractor satisfactory evidence that it has complied with this paragraph prior to commencing any portion of the Work; and shall obtain and furnish to the Contractor an undertaking by the insurance company issuing each such policy that such policy will not be canceled except after at least thirty (30) days written notice to the Contractor of its intention to so do. All insurance shall be issued on a primary, non-contributory basis. If the Subcontractor fails to purchase and maintain, or require to be purchased and maintained, any insurance required hereunder, the Contractor may, but shall not be obligated to, upon five (5) days' written notice to the Subcontractor, purchase such

insurance on behalf of the Subcontractor and shall be entitled to be reimbursed for the cost thereof by the Subcontractor upon demand. The Contractor is under no obligation to purchase any particular type or amount of coverage and nothing herein shall be deemed to require Contractor to obtain such coverage on Subcontractor's behalf.

7) Subcontractor shall be liable to Contractor for all losses, damages and costs Contractor incurs as a result of Subcontractor's failure to perform in accordance with the terms of the Contract Documents. Subcontractor's failure to perform shall include, but not be limited to, the failure of its sub-subcontractors to perform. Subcontractor's liability shall include but not be limited to (1) damages and other delay costs payable by Contractor to the Owner (including, but not limited to, liquidated damages set forth in the Contract Documents); (2) Contractor's increased costs of performance, such as extended overhead and increased performance costs resulting from Subcontractor caused delays or improper Subcontractor work (including, but not limited to, the costs incurred in accelerating other work); (3) warranty and rework costs; (4) liability to third parties; (5) excess re-procurement costs; (6) consultants' fees; and (7) attorneys' fees and related costs relating to the enforcement of the terms of the Contract Documents.

8) To the fullest extent permitted by law, Subcontractor shall indemnify and hold harmless the Owner, Contractor, Contractor's consultants, and the agents and employees of any of them (the "Indemnified Parties") from and against claims, damages, losses fines, penalties, expenses, including but not limited to attorney's fees, and punitive damages arising out of, resulting from or caused by (i) performance of the Subcontractor's Work under this Subcontract, provided that any such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the acts or omissions of the Subcontractor, the Subcontractor's sub-subcontractors, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder; (ii) any violation of or failure to comply with any law, statute, ordinance, rule, regulation, code, or requirement of a public authority that bears upon the performance of the Work by Subcontractor, or any person or entity for whom Subcontractor is responsible, (iii) the means, methods, procedures, techniques, or sequences of execution or performance of the Work, (iv) the failure to secure and pay for permits, fees, approvals, licenses, and inspections as required under the Contract Documents, or any violation of any permit or other approval of a public authority applicable to the Work, by Subcontractor, or any person or entity for whom Subcontractor is responsible, (v) any and all liens, stop notices and charges of every type which may be at any time filed or claimed against the Project, the Contractor or Owner as a consequence of acts or omissions of Subcontractor or its agents, servants, employees, sub-subcontractors or material suppliers, or (vi) any claim by or any act or omission of any employee of Subcontractor or its agents, servants, employees, sub-subcontractors, material suppliers, or anyone employed by any of them or for whose acts they may be liable, including without limitation, any workers' compensation claims, equal employment claims, unemployment claims, withholding claims or social security claims. Such obligation shall not be construed as to negate, abridge or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Section. Subcontractor's assumption of liability herein includes but is not limited to assumption of liabilities on account of or in any way related to Subcontractor's work that the Contractor has assumed under the Contract Documents or under agreements with third parties who may be affected by construction of the Project. The indemnification obligation under this Section shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefit payable by or for Subcontractor under worker's compensation acts, disability benefit acts or other employee benefit acts or other insurance provided for by the Contract Documents. The obligations set forth herein shall survive termination of this Agreement. Subcontractor's indemnity obligations hereunder shall include indemnification of the Indemnified Parties against any and all costs and expenses (including reasonable attorneys' fees) incurred by any of the Indemnified Parties in enforcing any of Subcontractor's defense, indemnity, and hold-harmless obligations under this Contract.

9) Subcontractor shall be responsible for all damage caused by Subcontractor, and shall protect the Work, it being understood that the standards of protection shall not be less than those specified in the Construction Contract or required by law. If any dispute arises between the Subcontractor and another subcontractor as to who is responsible for any item of damage, the dispute shall be submitted to the Contractor for Contractor's determination as to responsibility.

10) Subcontractor shall take all safety precautions with respect to the Work, and shall comply with all safety measures required by Contractor, the Contract Documents and all applicable laws, ordinances, rules, regulations and lawful orders of any public authority for the safety of persons or property.

11) Subcontractor may not assign or sublet this Subcontract Agreement or any part thereof or assign any money due or to become due hereunder without first obtaining the written consent of the Contractor hereto, which consent may be withheld by Contractor in its sole and absolute discretion.

12) Subcontractor shall conform to and comply with the provisions of the Construction Contract, and shall assume toward the Contractor all the obligations and responsibilities that the Contractor assumes in and by the Construction Contract toward the Owner, insofar as they are applicable to this Subcontract Agreement. Where any provision of the Contract Documents between the Owner and the Contractor or the Contractor and the Subcontractor is inconsistent with any provision of this Subcontract Agreement, the provision or agreement which imposes the greater degree of responsibility and liability upon the Subcontractor shall govern, and in all other instances, the provisions of this Subcontract Agreement shall govern.

13) Subcontractor shall furnish such shop drawings or samples as may be required by the Contractor in the performance of the Work.

14) Subcontractor shall not employ any person whose employment in connection with the Work may be objectionable to the Contractor and shall remove any such person from the Project when objected to by the Contractor.

15) The Contractor shall have the right to order, in writing, the deletion or addition of any parts of the Work; that fair adjustments shall be made in the Contract Sum (defined below) for such deleted or added Work; and that no extra work shall be allowed or changes made by the Subcontractor, or paid for by the Contractor UNLESS AND UNTIL AUTHORIZED BY THE CONTRACTOR IN WRITING BEFORE THE WORK AND/OR CHANGES ARE BEGUN.

16) Subcontractor shall give notice to the Contractor of all claims for extras, extensions of time and damage for delays or otherwise, promptly and in accordance with the Contract Documents.

17) Subcontractor shall obtain and furnish to the Contractor, and maintain in effect during the term of this Subcontract Agreement, if requested by Contractor, a surety bond in form and with sureties acceptable to the Contractor and in an amount equal to the Contract Sum, conditioned upon and covering the faithful performance of and compliance with all the terms, provisions and conditions of this Subcontract Agreement, the premium therefore to be paid by Subcontractor.

BOND REQUESTED? No

Unless the Contract Documents require it, nothing herein shall give the Contractor the right to designate that the Bond be executed by a specific surety or procured from a specific agent.

18) Subcontractor hereby guarantees the Work to the same extent that the Contractor is obligated to guarantee its work under the Construction Contract, but in any event Subcontractor hereby guarantees its Work against all defects in material or workmanship for no less than a period of **ONE (1) YEARS plus SIXTY (60) DAYS** from the date of substantial completion and acceptance of the Project by the Owner. As a condition of final payment of the Contract Sum Subcontractor shall execute and deliver to Contractor a Subcontractor Guarantee in the form attached to the General Conditions.

19) In the event that Subcontractor fails to correct, replace and/or re-execute faulty or defective work done and/or materials furnished under this Subcontract Agreement when and if required by the Contractor, or Subcontractor fails to complete or diligently proceed with the Work within the time herein provided for, the Contractor, upon three (3) days written notice to the Subcontractor, shall have the right to correct, replace and/or re-execute such faulty or defective work, or to take over this Subcontract Agreement and complete same either through its own employees or through a contractor or subcontractor of its choice, and to charge the cost thereof to the Subcontractor, together with any liquidated damages charged against the Contractor by the Owner as a result of such failure or delay in the performance of the Work. In the event of a default on the part of the Subcontractor under the terms of this Subcontract Agreement, the material and equipment of the Subcontractor shall be left on the job for the use by the Contractor in completing the Work, at no cost to the Contractor.

20) Subcontractor shall comply with all applicable Federal and State laws, codes, regulations and municipal ordinances; pay all costs, expenses, fees and taxes related to such compliance; and pay all taxes imposed by any State or Federal law for any employment insurance, pensions, old age retirement funds or any similar purpose and shall furnish all necessary reports and information to the appropriate federal, state and municipal agencies, with respect to all of the foregoing the same as though the Subcontractor was in fact the Contractor.

21) Subcontractor shall pay all sales, consumer, use and similar taxes relating to or imposed or assessed in connection with the Work provided by Subcontractor that are legally enacted when bids are received or negotiations concluded, whether or not yet effective or merely scheduled to go into effect.

22) Subcontractor shall pay all royalties and license fees; shall defend all suits or claims for infringement of any patent rights involved in the Work; and shall save the Contractor and other subcontractors harmless from loss, cost or expense on account of such use or infringement by the Subcontractor.

23) If any part of the Work depends for proper execution or results upon the work of the Contractor, any other subcontractor or any other separate contractor on the Project, the Subcontractor shall inspect and promptly report to the Contractor any apparent discrepancies or defects in such work that renders it unsuitable for such proper execution and results. Failure of the Subcontractor to so inspect and report shall constitute an acceptance of the work of the Contractor, other subcontractors or other separate contractors as fit and proper to receive his work.

24) Subcontractor shall submit its payment request and all applicable invoices by the 25TH day of the month for Work completed during that month.

**PART B**

### THE CONTRACTOR AGREES AS FOLLOWS:

1) Contractor hereby employs the Subcontractor to perform the Work, subject to the provisions of this Subcontract Agreement.

2) **Contractor shall pay the Subcontractor for the full, faithful and prompt performance of this Subcontract Agreement, subject to additions and deductions by change order and all the terms and conditions hereof, the total sum of Twenty Six Thousand Two Hundred Fifty Five Dollars 00/100 ($26,255.00) (the "Contract Sum"). Notwithstanding the above, ten percent (10%) of the amount certified as being due Subcontractor at the time of each draw request shall be withheld from payment and retained by either Owner or Contractor until fifty percent (50%) of the Project has been completed in accordance with the Construction Contract. At all times thereafter, Contractor or Owner may retain five percent (5%) of the total amount due Subcontractor until the project has been completed in accordance with the Construction Contract and final payment has been made by Owner to Contractor.**

3) Contractor shall include in Contractor's monthly estimate to the Owner, the value of all work, labor and materials of the Subcontractor properly incorporated into the Project, in accordance with the provisions of this Subcontract Agreement based upon those estimates furnished by the Subcontractor and approved by the Contractor. If the amount certified by Owner or Project architect as being due the Subcontractor is different from the amount requested by the Contractor and the Subcontractor, Contractor shall immediately advise Subcontractor and Contractor shall furnish such information to Subcontractor as the Contractor may have relating to the discrepancy. So long as the Subcontractor is not in default hereunder, Contractor shall pay the Subcontractor, within seven (7) days of receipt of such funds from the Owner, the amount received by the Contractor on account of the Subcontractor's work to the extent of the Subcontractor's interest therein. If allowed by the Construction Contract, payment shall be made on account of inventory, materials, or equipment not incorporated in the Project but delivered and suitably stored at the site or at some other location agreed upon in writing; such payments to be made in accordance with the terms and conditions of the Contract Documents.

4) So long as Subcontractor has complied with the terms of this Subcontract Agreement and is not in default hereunder, final payment, including but not limited to all amounts retained, shall become due and payable within thirty (30) days after Owner or the Project architects' certification of final payment to the extent that the Contractor has received payment from the Owner on the Subcontractor's account.

5) Any dispute arising between the Contractor and the Subcontractor under this Subcontract Agreement, including the breach thereof, shall, at the sole option of the Contractor, be settled in the manner provided for in the General Conditions.

6) If notification of any claims have been made against the Subcontractor or the Contractor arising out of the Work, or the acts or omissions of the Subcontractor, the Contractor may, at its discretion, withhold from such amount otherwise due, or to become due hereunder, a sum, in Contractor's reasonable discretion, adequate to cover said claims and any costs or expenses arising or to arise in connection therewith pending legal settlement thereof. This right of the Contractor shall not be exclusive of any other rights of the Contractor provided for in this Subcontract Agreement, the Contract Documents, or at law.

## PART C

1) This Subcontract Agreement, together with Exhibits **A, B,** and **C**, the General Conditions and the other Contract Documents, constitutes the entire understanding of the parties and supersedes any prior proposals or agreements.

2) This Subcontract Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Counterparts may be executed in either original or electronically transmitted form (e.g., faxed or emailed portable document format (PDF) form), and the parties hereby adopt as original any signatures received via electronically transmitted form.

3) **BY EXECUTING THIS AGREEMENT, SUBCONTRACTOR ACKNOWLEDGES THAT IT HAS READ THIS AGREEMENT (INCLUDING EXHIBITS A, B AND C) IN ITS ENTIRETY, THAT THE AGREEMENT FULLY AND COMPLETELY EXPRESSES THE TERMS OF SUBCONTRACTOR'S AGREEMENT WITH CONTRACTOR WITH RESPECT TO THE WORK AND THAT SUBCONTRACTOR FULLY UNDERSTANDS THE TERMS OF THIS AGREEMENT.**

**IN WITNESS WHEREOF**, the Contractor and Subcontractor have hereunto set their hands and seals in duplicate the day and year first written above.

**Meridian Design Build, Inc.**                                    **Midwest Dock Solutions Inc.**

DocuSigned by:                                                      DocuSigned by:

*Peter Schmidt*                                                     *Ira Sugar*

SIGNATURE  9B200725E5F453...                                       SIGNATURE  245A97280AEB4D4...

Peter Schmidt                                                       Ira Sugar
NAME                                                               NAME

Senior Vice President                                              Sales
TITLE                                                             TITLE

6/4/2024                                                           6/4/2024
DATE                                                              DATE

## EXHIBIT A: SAMPLE INSURANCE CERTIFICATE

Before entering job site, please provide Meridian Design Build, Inc. an Insurance Certificate in compliance with the following specifications.

| CERTIFICATE OF LIABILITY INSURANCE | | | | | | ISSUE DATE (MM/DD/YY) | |
|---|---|---|---|---|---|---|---|
| **PRODUCER**<br>Name<br>Address<br>City, State, Zip<br>Phone | | | | | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. | | | |
| | | | | | **INSURERS AFFORDING COVERAGE**<br>(All insurers must have an AM Best Rating of A-/VII or better.) | | **NAIC #** |
| **INSURED**<br>Name<br>Address<br>City, State, Zip<br>Phone | | | | INSURER A: | *Fill In As Applicable* | | |
| | | | | INSURER B: | | | |
| | | | | INSURER C: | | | |
| | | | | INSURER D: | | | |
| | | | | INSURER E: | | | |

**COVERAGES**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YY) | POLICY EXP (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|---|
| | **GENERAL LIABILITY** | | | | | | | EACH OCCURRENCE | $1,000,000 |
| | X | COMMERCIAL GENERAL LIABILITY | X | X | Policy # | Date | Date | DAMAGE TO RENTED PREMISES | $300,000 |
| | | CLAIMS MADE  X  OCCUR | | | | | | MED. EXPENSE (Any one person) | $10,000 |
| | | | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | GENERAL AGGREGATE APPLIES PER:<br>POLICY  X  PROJECT   LOCATION | | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | **AUTOMOBILE LIABILITY** | | | | | | | COMBINED SINGLE LIMIT (Each Accident) | $1,000,000 |
| | X | ANY AUTO | X | X | Policy # | Date | Date | | |
| | | ALL OWNED AUTOS | | | | | | BODILY INJURY (Per Person) | |
| | | SCHEDULED AUTOS | | | | | | | |
| | X | HIRED AUTOS | | | | | | BODILY INJURY (Per Accident) | |
| | X | NON-OWNED AUTOS | | | | | | | |
| | | GARAGE LIABILITY | | | | | | PROPERTY DAMAGE (Per Accident) | |
| | **EXCESS/UMBRELLA LIABILITY** | | | | | | | EACH OCCURRENCE | $10,000,000 |
| | X | OCCUR   CLAIMS MADE | X | X | Policy # | Date | Date | AGGREGATE | $10,000,000 |
| | | DEDUCTIBLE   RETENTION $ | | | | | | | |
| | **WORKERS COMPENSATION / EMPLOYERS' LIABILITY**<br>ANY PROPRIETOR/PARTNER/EXECUTIVE/OFFICER/<br>MEMBER EXCLUDED? Y/N<br>If yes, describe under DESCRIPTION OF OPERATIONS below. | | N/A | X | Policy # | Date | Date | X   WC STATUTORY LIMITS | |
| | | | | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | | | | | | | | E.L. DISEASE – EACH EMPOYEE | $1,000,000 |
| | | | | | | | | E.L. DISEASE – POLICY LIMIT | $1,000,000 |
| | PROFESSIONAL LIABILITY | | | | Policy # | Date | Date | EACH OCCURRENCE | $2,000,000 |
| | | | | | | | | AGGREGATE | $4,000,000 |
| | POLLUTION LIABILITY | | | | Policy # | Date | Date | EACH OCCURRENCE | $2,000,000 |
| | | | | | | | | AGGREGATE | $2,000,000 |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/SPECIAL ITEMS

1305 Jack Court, Bartlett, IL 60103

"Certificate Holder is named as Additional Insured on a primary and non-contributory basis as respects all policies noted above, except Workers Compensation/Employers' Liability." (General Liability Additional Insured endorsement must be on ISO Forms CG 20 10 (10/01) & CG 20 37 (10/01) or equivalent.) Waiver of Subrogation applies to General Liability, Auto & Workers Compensation policies in favor of the additional insured. Umbrella follows form of the underlying policies.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| **MERIDIAN DESIGN BUILD, INC.**<br>9550 West Higgins Road, Suite 400<br>Rosemont, IL 60018 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL MAIL 30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT. |
| | AUTHORIZED REPRESENTATIVE |

**REQUIRED ADDITIONAL INSURED(S) TO BE ENDORSED ONTO POLICY:**
1.  Meridian Design Build, Inc. (Design-Builder)
2.  26 Denali LLC (Owner)
3.  CBRE (Consultant)



**DESIGN BUILD**

9550 W. Higgins Road, Suite 400 / Rosemont, IL 60018 / 847-374-9200 / FAX 847-374-9222 / www.meridiandb.com

---

## EXHIBIT B: SCOPE OF WORK

**Project:** **IPC Improvements TI**          **Job #:**   **2401**
            **1313 Jack Court**
            **Bartlett, IL 60103**               **Code #:**   **8.360**

**Subcontractor: Midwest Dock Solutions**

**Date: May 23, 2024**

Subcontractor shall furnish all labor, material, skill, and equipment necessary to design, coordinate, furnish and install all **Overhead Door and Dock Equipment** work in accordance with local codes and the following (the "Contract Documents"):

### CONTRACT DOCUMENTS

Architectural Drawings, A0.0, A0.1, A0.2, A0.3, A0.4, A0.5, A1.0, A2.0, A2.1, A2.2, A2.3, A2.4, A3.0, A3.1, A5.1, A6.1, A9.0, A10.0, and A11.1, dated 04/10/2024, prepared by Heitman Architects Incorporated.

Structural Drawings, S0.01, S1.01, S2.01, S3.01, S3.02, S3.03, and S3.04, dated 04/05/2024, prepared by Carsello Engineering, Inc.

Civil Drawings, C0.0, C1.0, C2.0, C3.0, C4.0, and C5.0, dated 04/04/2024 prepared by V3 Companies, LTD.

Fire Protection Drawings, FP1 dated 04/05/2024 prepared by Fire Control, Inc.

Plumbing Drawings, P100, P101, P200 dated 04/09/2024, prepared by MVP Plumbing Corp.

HVAC Drawings, M1-M4, dated 04/04/2024, prepared by Sun Mechanical Systems.

Electrical and Fire Alarm Drawings, E1-E4, dated 04/16/2024, prepared by Complete Electrical Service.

Meridian Design Build Standard General Conditions July 15, 2016, 25 pages, as prepared by Meridian Design Build LLC.

### *BASE BUILDING DRAWINGS FOR REFERENCE ONLY*

*Architectural Drawings, Title Sheet, A0.1, A1.1, A3.1 - A3.6, A4.1, A4.2, A5.1 - A5.3, A6.1, A9.1, and A9.2, dated 10/10/2022, prepared by Partners in Design Architects.*

*Structural Drawings, S0.1, S0.2, S1.1 – S1.8, S2.1, S2.2, and S3.1 - S3.3 dated 8/02/2022, prepared by Carsello Engineering, Inc.*

**Exhibit B – Midwest Dock Solutions**
**IPC Improvements TI**
**1313 Jack Court**
**Bartlett, IL 60103**

**May 23, 2024**
**Page 2**

Civil Drawings, C1.0 - C1.2, C2.0, C2.1, C3.0 - C3.4, C4.0 - C4.6, C5.7, and C6.0 - C6.2 dated 11/30/2022 and C0.0, and C5.0 - C5.6, dated 9/25/2023, prepared by V3 Companies, LTD.

Landscape Drawings, L-1 - L-5, dated 10/12/2022, prepared by Ives/Ryan Group, Inc.

Precast Drawings, E-1 - E-12, D-1, and D-2, dated 11/03/2022, prepared by Dukane Precast Incorporated.

Fire Protection Drawings, FP4, FP8, and FP9, dated 9/22/2022 and FP1, FP2, FP3, FP5, FP6, and FP7, prepared by Cybor Fire Protection Company.

Plumbing Drawings, P-100 and P-101, dated 9/28/2022, prepared by MVP Plumbing Corp.

HVAC Drawings, M-1 and M-2, dated 9/1/2023, prepared by Sun Mechanical Systems.

Electrical Drawings, E000, E100, E101, E200, E300, E400, and E401, dated 9/22/2023, prepared by Connelly Electric.

Fire Alarm Drawings, FA1, and FA2, dated 9/20/2023, prepared by Connelly Electric.

All above Contract Documents and Base Building Drawings have been posted, and can be found in Meridian's Plan Room https://www.meridiandesignbuild.com/subs/login.asp
Username:          Password:

## Work shall specifically include but is not limited to the following:

**Overhead Doors**

1. Subcontractor shall remove one (1) existing 9'x10' dock door and one (1) 12'x14' drive in door, including associated tracks, springs, and operator.

2. Subcontractor shall furnish and install one (1) 21'x16' overhead door at drive in ramp. Door to be Clopay model 3720, R-18.4 isulated sectional door with 27 gauge steel and six (6) 24"x8" vision lites. Subcontractor shall include 3" vertical lift track, weather seal, and ¾ HP JDC operator with 3 button wall controller and photo eyes.

3. Subcontractor shall furnish and install z-guards at nine (9) dock positions.

4. Subcontractor shall remove dock leveler and dock seal from existing dock position and reinstall at new dock position.

5. Subcontractor shall furnish nine (9) LED swing-arm dock lights.

6. Subcontractor is responsible for all layout required for their work.

**Exhibit B – Midwest Dock Solutions**
**IPC Improvements TI**
**1313 Jack Court**
**Bartlett, IL 60103**

**May 23, 2024**
**Page 3**

7. Subcontractor shall install caulk between the door track and precast wall panels if necessary to eliminate visible gaps at the locations.

8. Subcontractor shall furnish and install all materials, labor and equipment as required, to provide a complete system that meets or exceeds all governing code requirement.

9. Subcontractor shall furnish and install all final connections and shall provide start-up for the drive-in door.

10. Subcontractor shall include all applicable local and state taxes.

11. Subcontractor shall adequately caulk joint between head curtain and precast with high quality silicone sealant to prevent water infiltration behind dock seal.

12. All dock equipment and overhead doors shall be installed by union labor.

13. Subcontractor shall include all applicable local and state taxes.


**GENERAL**

14. Subcontractor guarantees all pricing including materials, labor, equipment rentals, subcontracted work, etc. Material, labor, or any other cost increase will be the sole responsibility of the Subcontractor and will not become the basis for a change order or adjustment to the Contract Sum.

15. Subcontractor shall be responsible for obtaining and paying for all licenses, bonds, etc. required to do work in the municipality in which this project is being constructed.

16. All work shall comply with the requirements of the governing codes of the State, County, local municipality, and any other governmental or regulatory agencies having jurisdiction.

17. All 2024 labor and material increases have been included.

18. Subcontractor shall be available for any required meetings with municipality and/or governing agencies, as necessary to obtain the necessary approvals required for a complete installation.

19. Subcontractor acknowledges that Contractor or Owner has hired a testing agency to verify that work is being done in conformance with the Contractor Documents. Subcontractor shall be responsible for verifying that proper inspections have been made by this testing agency prior to proceeding with work which will make previously completed work inaccessible to the testing agency for inspection. Subcontractor shall work with the testing agency as necessary to provide access to inspect and test their work.

20. Subcontractor shall be responsible for strict adherence to details shown on the Contract Documents unless otherwise directed or approved in writing by Contractor's project management. Subcontractor shall be responsible for reviewing all documents and contacting Contractor's project management to

**Exhibit B – Midwest Dock Solutions**
**IPC Improvements TI**
**1313 Jack Court**
**Bartlett, IL 60103**

**May 23, 2024**
**Page 4**

request clarification on any discrepancies or inconsistencies prior to start of work in the field. Where there is a discrepancy between the documents the more stringent requirement shall apply.

21. Subcontractor shall be solely responsible for and include all Hoisting and Scaffolding required for this Subcontractor's Work including all related OSHA required protection. No rooftop safety rails will be provided for this project, therefore, this Subcontractor will be solely responsible for providing the appropriate OSHA approved protection as necessary to accommodate their work.

22. This Subcontractor will provide flagmen and/or traffic coordinators for work as required when trucks and/or equipment must obstruct traffic flow on adjacent streets.

23. Subcontractor shall be responsible for cutting openings in walls, floors, and roofs relating to their scope of work and immediately installing OSHA approved protection to protect these openings until such time as they are closed with permanent construction. Subcontractor shall immediately replace any temporary safety cabling, temporary construction, or other work removed by its forces to accommodate their Work in a manner that complies with all OSHA requirements. Removal of any such work shall be discussed with Contractor's superintendent prior to start of work.

24. Subcontractor shall be solely responsible for ensuring that all means and methods are in accordance with OSHA regulations and meet the safety standards of all governmental or regulatory agencies having jurisdiction.

25. This Subcontractor shall be solely responsible for reviewing the contract drawings to ensure that the design satisfactorily meets all OSHA and other safety requirements relating to this scope of work.

26. Subcontractor shall be responsible for removal of all debris generated by their work on a daily basis or more regularly if necessary to maintain a safe and orderly work environment. Contractor reserves the right to hire a 3rd party to complete cleanup and charge Subcontractor for costs associated with this work in the event Subcontractor fails to complete cleanup work relating to their work within 24 hours of receiving written notice from Contractor to do so. It is understood that these costs will be deducted from the amounts otherwise due the Subcontractor.

27. Subcontractor shall be responsible for all layout associated with this scope of work from control points and a common benchmark established by Contractor.

28. Subcontractor shall attend weekly job meetings with Contractor's Superintendent to discuss and coordinate scheduling of work, safety, etc. Subcontractor's project manager shall be required to review schedule and any outstanding issues.

29. This Subcontractor shall coordinate all staging and access requirements with Contractor's superintendent in advance of their work.

30. This Subcontractor shall provide all required conveying systems necessary to hoist and place materials without adversely affecting other trades. This Subcontractor shall provide all cribbing and mats as required to provide a safe and level platform for their cranes/equipment.

**Exhibit B – Midwest Dock Solutions**
**IPC Improvements TI**
**1313 Jack Court**
**Bartlett, IL 60103**

May 23, 2024
Page 5

31. Subcontractor shall be responsible for ensuring that any materials stored at the job site are properly protected from theft and/or damage. Subcontractor shall provide and maintain protection to keep materials dry at all times including protection against exposure to weather and contact with wet or damp surfaces.

32. Subcontractor shall replace and repair, at no additional cost, any construction damaged by this Subcontractor's field operations, equipment and/or personnel.

33. Subcontractor shall off-load, and inventory all materials which are to be supplied by others and installed by this Subcontractor. Any and all damaged materials and/or missing materials shall be reported in writing to the Contractor's Superintendent prior to departure of the shipper.

34. This Subcontractor shall be responsible for notifying underground utility companies and other entities as necessary to ensure existing underground lines are properly located prior to start of work.

35. Subcontractor shall be responsible for all street cleaning associated with this scope of work.

36. Subcontractor shall take precautions as necessary to ensure that any excavation work is completed in a manner that protects the stone pad from contamination.

37. Warranty Letters, Material Test Certificates, current insurance certificates, as may be applicable, shall be submitted to Contractor within Ten (10) working days following Substantial Completion of the project.

38. Subcontractor shall complete punchlist items relating to their work within seven (7) working days of issuance of the punchlist.

39. No additional work beyond the scope of this Subcontract shall be authorized or paid for unless agreed to in writing by Contractor's Project Manager prior to performing the work. Claims for compensation for work not authorized in advance by Contractor's Project Manager shall be denied.

40. Subcontractor shall furnish a one (1) year (or longer if called for in the above referenced documents) guarantee on all labor and materials furnished for this project on Contractor's standard guarantee form. Copies of any extended manufacturer's guarantees/warranties shall also be provided at project completion.


**PROJECT SCHEDULE**

41. The below durations will be used to schedule and track the following tasks. These tasks are to be completed by the dates noted below and within the noted durations:

| Task | Duration / Date |
|---|---|
| Shop Drawings | 5 Working Days |
| Remove Existing Overhead Doors | 1 Working Day |
| Remove Existing Dock Equipment | 1 Working Day |

**Exhibit B – Midwest Dock Solutions**
**IPC Improvements TI**
**1313 Jack Court**
**Bartlett, IL 60103**

May 23, 2024
Page 6

| | |
|---|---|
| Installation of Overhead Door | 1 Working Day |
| Re-Installation of Dock Equipment | 1 Working Day |

42. Subcontractor agrees to mobilize to begin work at the site on the dates outlined in this Subcontract or within three (3) days verbal notice from Contractor after a signed contract is in place.

43. Subcontractor shall man the project appropriately and consistently during normal working hours as required to maintain the aggressive schedule. Subcontractor is to begin work at 7:00 a.m. unless advised otherwise by Contractor's superintendent. If the Subcontractor falls behind schedule, the Subcontractor shall be responsible for providing additional man power and working overtime at no additional cost to Contractor.

44. Contractor reserves the right to amend the project schedule in order to maintain the progress of the job due to weather, progress of other Subcontractors, etc.

45. These dates are subject to Standard Force Majeure Provisions.

46. It is understood and consistent with the nature of this project that this Subcontractor's work is not scheduled for one continuous operation, but shall be phased to suit job progress. Subcontractor shall:

a. Assign to the project on a full time basis a competent foreman, having full authority to act and make decisions on the Subcontractor's behalf.

b. Be required to work in different areas concurrently if necessary, in order to maintain the project schedule.

47. All work included in this Subcontract shall be completed, as necessary, to allow a total project completion on or before August 2, 2024.

**ALTERNATES**

The following items may be incorporated into the scope of work at a later date at the option and direction of Contractor as a Change Order to this subcontract for the amounts identified below:

1) Furnish and install track guards at dock doors. **ADD/DEDUCT:** $275/Pair

2) Furnish LED swing arm dock lights. **ADD/DEDUCT:** $295/EA



**Meridian**
_____ **DESIGN BUILD**
9550 W. Higgins Road, Suite 400 / Rosemont, IL 60018 / 847-374-9200 / FAX 847-374-9222 / www.meridiandb.com

## EXHIBIT C: SAFETY REGULATIONS

THE FOLLOWING REGULATIONS MUST BE ADHERED TO BY ALL JOB SITE PERSONNEL. Each subcontractor shall be responsible for advising their employees, vendors, and sub-subcontractors of these regulations and for monitoring and enforcing these regulations. In addition to all other rights and remedies Meridian Design Build, Inc. may have under the terms of the Contract Documents, Meridian reserves the right to remove any subcontractor from the job site for any known failure to comply with the following safety regulations and requirements:

1.  Report all injuries immediately to Meridian Design Build's superintendent.

2.  All subcontractors and their employees, vendors, and sub-subcontractors shall conform to all applicable OSHA standards and other federal, local, and state statutes.

3.  All subcontractors must hold meetings with all of subcontractor's employees on a weekly basis. Safety "Tool Box" Meeting Outlines must be given to the Meridian's Superintendent each week. The delivery of any safety manual or outlines by the subcontractor to Meridian shall not create any duty or liability on the part of Meridian to enforce the subcontractor's safety procedures or to attend any Tool Box Meetings. Each subcontractor shall be solely responsible for compliance with its safety procedures.

4.  Report all unsafe conditions or unsafe acts to your immediate supervisor and to Meridian's superintendent.

5.  Any unsafe act by any personnel will be grounds for removal from the job site.

6.  Hard hats must be worn by all personnel on the jobsite at all times.

7.  Appropriate personal protective equipment shall be used as required by OSHA including, but not limited to, ear, foot, eye, and hand protection, etc. No tennis shoes are allowed on the jobsite (even with steel toes).

8.  Appropriate clothing shall be worn.

9.  OSHA approved respirators are to be used when conditions warrant.

10.  OSHA compliant fall protection harnesses are to be used when conditions warrant.

11.  Good housekeeping by all personnel is mandatory.

12.  Scaffolds and ladders shall be installed and inspected in accordance with all required OSHA safety regulations.

13.  Electric power tools and extension cords must be grounded and tested per OSHA's Assured Ground Program, or GFCI's must be utilized.

14.  Powder actuated tools, power tools, grinders, etc. will not be used by non-licensed operators and without proper personal protective gear.

15.  Hand tools (hammers, chisels, screwdrivers, axes, shovels, etc.) shall be kept well dressed, handles replaced to prevent injury from flying particles.

16.  Fire protection equipment is not to be tampered with or removed from assigned location.

17.  No employee, other than the operator, shall ride on any trucks, loaders, forklifts, or other moving equipment.

18.  Only authorized and properly trained employees shall operate machinery, equipment, tools, or vehicles.

19.  All engines shall be shut off when refueling.

20.  All trucks and mobile equipment shall have backup warning devices as required by OSHA.

21.  A Hot Work Permit is required and must be provided to Meridian's superintendent prior to the start of Hot Work in the following cases (Hot Work Permit forms can be obtained from Meridians' superintendent):

    -when hot work is completed within 35' of combustible material
    -in areas where hazardous materials are stored and cannot be removed
    -in areas where flammable atmospheres could exist

22.  The possession or use of, or being under the influence of, alcohol, drugs, or other related substances by any personnel on the job site will be reason for removal from the job site.

23.  No firearms shall be allowed on the jobsite.

24.  SDS sheets shall be required on job site prior to start of work.

**THE ABOVE LIST IS NOT INTENDED TO BE AN ALL INCLUSIVE LIST AND THE SUBCONTRACTOR MUST ADHERE TO ALL OTHER CUSTOMARY AND PRUDENT SAFETY MEASURES AND ALL PROVISIONS CONTAINED IN THE CONTRACT DOCUMENTS.**

Above Safety Regulations Acknowledged:

**By:** Ira Sugar                                    **Date:** 6/4/2024

DocuSign Envelope ID: 43F7C914-5988-4523-9C8F-67EE401D325?

January 6, 2023
2 pages

# MERIDIAN DESIGN BUILD
# COVID-19 MINIMUM CONSTRUCTION SITE PROTOCOLS

All companies, subcontractors, vendors, suppliers, consultants, individuals and any other entities with personnel working on or visiting the project site (a "Participant" or collectively "Participants"), shall be responsible for reviewing, enforcing, and complying with the following protocols related to Coronavirus and COVID-19 in addition to any other policies they may be implementing specific to their operations at the site. Each Participant shall be responsible for conveying this information directly to their onsite personnel including 3rd party vendors/guests/suppliers/delivery personnel, consultants, etc. and advising those individuals that they are personally responsible for complying with these protocols. Failure to follow these protocols may be considered grounds for any Participant to be required to immediately leave the site.

This document is intended to outline minimum protocols only and is not to be relied upon as legal or official guidance. Each Participant is encouraged to consult with legal, safety, insurance, labor, and HR professionals to determine the appropriate practices for their respective operations.

Participants working on the site are strongly encouraged to take any additional measures they feel might be appropriate specific to their work with respect to hygiene, limitation of personal contact, etc.

As a minimum precaution, and in the interest of protecting everyone's safety and well-being, all Participants shall adhere to the following minimum basic protocols:

- Review and continue to closely monitor and implement all applicable governmental, regulatory, and CDC recommendations and follow all applicable guidelines/requirements with a heightened sensitivity to hygiene and limiting personal contact (social distancing) ("CDC Guidance"). The CDC website and other online sources should be consulted for additional information and recommendations regularly as the information there is being updated on an ongoing basis: https://www.cdc.gov/coronavirus/2019-ncov/index.html.

- It is mandatory that anyone who feels unwell stay at home (or go home if on site) for their own well-being and the well-being of others (regardless of whether or not they believe it is COVID-19 related). It will be up to each Participant to monitor and enforce this requirement and any associated isolation/quarantine measures per CDC Guidance. We ask that you err on the side of caution in this regard.

- In the event an individual, or someone they've come in contact with, tests positive for COVID-19 they should follow CDC Guidance.

  In the event a Participant becomes aware that one of their employees, suppliers, guests, etc. who has recently been at the jobsite tests positive for COVID-19, the Participant should follow CDC Guidance with respect to notifying other Participants.

- Any in-person interactions at the jobsite should be handled in a manner consistent with CDC Guidance, including limiting density, close contacts, handshakes and other personal contact.

All Participants should follow CDC Guidance regarding appropriate PPE and spread mitigation measures.

- Communications between onsite personnel including communications with Meridian's onsite personnel should be handled by cell phone or radio rather than in person to the extent possible.

- Access to the jobsite trailer will be limited to Meridian personnel and those specifically invited there by Meridian personnel for essential meetings.

- Personal items (cell phones, tablets, tools, vests, hardhats, etc.) should not be shared.

- When required by CDC Guidance, Weekly Job Meetings will be handled via teleconference to the extent possible. In such cases, Meridian will distribute dial-in information with the meeting invitation and advise those participating that the meeting will be handled by teleconference. In the event individuals show up in person for such a meeting they will be directed to dial in for the meeting from their vehicle or from a suitable remote location on or off the jobsite.

- Participants should keep Meridian apprised as to any delays that they may be experiencing as a result of lack manpower, issues with material delivery or availability, etc.

- Meridian will provide temporary toilet facilities but recommends efforts be made to minimize their use.

- Participants with personnel onsite are required to maintain dedicated hand wash stations and/or hand sanitizer stations for use by their onsite personnel.

- Participants with personnel onsite are encouraged to provide other dedicated temporary site facilities (i.e. temporary toilet facilities) for use by their crews.

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 22

DocuSign Envelope ID: 4B16336A-8CEB-48A2-B5BA-FDFB6ED7A3E8



# Procedures for Completing Your Subcontract Agreement

1. **Electronically sign and Return the Subcontract Agreement and Safety Letter:**
   Follow the instructions within DocuSign to sign the Subcontract Agreement and Safety Letter. Once signed by all parties, you will receive a link to save and/or print a copy for your records. Please electronically sign no later than ten days after receipt.

2. **Provide completed Certificate of Liability Insurance within 10 days:**
   You must provide evidence of the insurance type and in the limits as set forth in Rider C of the Opus Subcontract Agreement. An example of the required Accord certificate form with the required additional insured endorsement provisions and a memo to forward to your insurance provider are enclosed for your reference. If Certificate of Liability Insurance is incomplete, subcontractors will not be allowed on site and payments will be delayed. Send the completed Certificate of Liability Insurance to COI@opus-group.com.

DocuSign Envelope ID: 4B16336A-8CEB-48A2-B5BA-FDFB6ED7A3E8

# SAMPLE

 **ACORD®**  **CERTIFICATE OF LIABILITY INSURANCE**  DATE (MM/DD/YYYY)  XX/XX/XXXX

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER |  | CONTACT NAME: | Broker Contact Information |  |
|---|---|---|---|---|
| Broker Name |  | PHONE (A/C, No, Ext): |  | FAX (A/C, No): |
| Street Address |  | E-MAIL ADDRESS: |  |  |
| City, State          Zip |  | INSURER(S) AFFORDING COVERAGE |  | NAIC # |
| INSURED |  | INSURER A: | Insurance Company |  |
| Subcontractor (Name on Contract) |  | INSURER B: | Insurance Company |  |
| Street Address |  | INSURER C: | Insurance Company |  |
| City, State          Zip |  | INSURER D: |  |  |
|  |  | INSURER E: |  |  |
|  |  | INSURER F: |  |  |

**COVERAGES          CERTIFICATE NUMBER:          REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY** X COMMERCIAL GENERAL LIABILITY  CLAIMS-MADE X OCCUR | | Y | ABCXYZ | Start Date | End Date | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 50,000 |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: POLICY X PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| A | **AUTOMOBILE LIABILITY** X ANY AUTO  ALL OWNED AUTOS  SCHEDULED AUTOS  HIRED AUTOS  NON-OWNED AUTOS | | X | ABCXYZ | Start Date | End Date | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| B | X **UMBRELLA LIAB** X OCCUR  **EXCESS LIAB** CLAIMS-MADE X | | X | ABCXYZ | Start Date | End Date | EACH OCCURRENCE | $ 1,000,000** |
| | | | | | | | AGGREGATE | $ 1,000,000** |
| | DED RETENTION $ | | | | | | | $ |
| C | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y/N  ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N | N/A | ABCXYZ | Start Date | End Date | X WC STATU-TORY LIMITS | OTH-ER |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Professional Liability  Contractors Pollution Liability | | | ABCXYZ | Start Date | End Date | Prof - $1,000,000 if required by Contract  CPL - Per Contract | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

Opus Design Build, L.L.C. and Owner (if applicable) are named as additional insureds under the General Liability policy per ISO forms CG 20 10 04 13 and CG 20 37 04 13. (Subject to subcontractor. All All forms need to be attached whether they are the ISO forms or an equivalent.)

**$1,000,000 Umbrella/Excess - Required if Subcontractor is performing or supplying any of the following as part of the Work: Structural Concrete or Wood Framing, Masonry, Electrical, HVAC, Plumbing, Fire Protection Sprinkler, Steel Erection, Elevator, Excavating, Roof, Formwork, and Curtain Wall Glazing. If Subcontractor's work does not include any of the Work items listed directly above then the $1,000,000 Umbrella/Excess limit is satisfactory.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| Opus Design Build, L.L.C. Address City, State          Zip | AUTHORIZED REPRESENTATIVE (Signed by Broker) |

ACORD 25 (2010/05)          © 1988-2010 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

DocuSign Envelope ID: 4B16336A-8CEB-48A2-B5BA-FDFB6ED7A3E8

# PLEASE FORWARD TO YOUR INSURANCE PROVIDER

## CERTIFICATES OF INSURANCE FOR PROJECTS AT:

### Mokena Industrial Spec
### Building A - 8965 187th Street; Building B - 8905 187th Street
### Mokena, IL 60448

## MUST INCLUDE AS ADDITIONAL INSUREDS:

- **OPUS DESIGN BUILD, L.L.C. (CONTRACTOR)**
- **OWNER**
- 

## ADDITIONAL INSURED FORMS
ISO CG 20 10 04 13 AND CG 20 37 04 13 OR EQUIVALENT MUST BE ATTACHED TO CERTIFICATE OF INSURANCE.

## IF THE CERTIFICATES OF INSURANCE ARE INCOMPLETE, SUBCONTRACTOR WILL NOT BE ALLOWED ON SITE AND PAYMENTS WILL BE DELAYED.

DocuSign Envelope ID: 4B16336A-8CEB-48A2-B5BA-FDFB6ED7A3E8



**THE OPUS GROUP**

## Procedures for Submitting Your Application for Payment

As described in Article 6 of the General Conditions of Subcontract, use of the **Opus** Application for Payment Form, the Conditional Release and Waiver Form, and a Schedule of Values **is required** when applying for payment.

To submit your Application for Payment, please navigate to https://subs.opus-group.com and follow the necessary prompts.

Support documentation can be found here: https://subs.opus-group.com/help

Application for payment must be submitted by the Subcontractor ***no later than the 25th of the month***. Reference: Article 6 in the General Conditions of Subcontract.

DocuSign Envelope ID: 4B16336A-8CEB-48A2-B5BA-FDFB6ED7A3E8

**CONDITIONAL RELEASE AND WAIVER**
(Progress Payments)

_____ ("Subcontractor") and Opus Design Build, L.L.C. ("Opus") entered into a Subcontract Agreement dated _____, 20____, as amended by written change orders through Change Order No. _____ dated _____, 20____ (collectively, the "Subcontract"). The Subcontract constitutes the entire agreement between Subcontractor and Opus.

1. Under the Subcontract, Subcontractor is furnishing certain work, including all labor and related payroll taxes, skills, services, equipment, materials, machinery, and other items (collectively, the "Subcontract Work") as part of Opus' construction of improvements on property located at _____ and commonly known as _____ ("Property"), which is owned by _____ ("Owner").

2. Subcontractor submits this Conditional Release and Waiver ("Waiver") to Opus in connection with the attached application for payment ("Application") in the net amount of $_____ for Subcontract Work performed or provided through _____, 20_____. Upon receipt of the net amount due under the Application, Subcontractor releases and waives all statutory, contract, and equitable rights, including the right to file construction or mechanic's liens against the Property (collectively, "Claims"), it may have against Opus, Owner, and any surety or other party to whom Opus is liable (collectively, the "Released Parties") for payment of the net amount due under the Application.

3. Subcontractor represents and certifies to Opus and Owner that the monies to be received from Opus under the Application will be used for Subcontract Work as shown in the Application. Subcontractor will indemnify and defend the Released Parties from and against any Claims, loss, or damage that the Released Parties may sustain in connection with Claims for payment filed or asserted against the Property or the Released Parties by any party engaged by or on behalf of Subcontractor to provide all or any portion of the Subcontract Work, and for which Opus has made payment, including any Claims for amounts validly retained by Opus under the Subcontract.

This Waiver is executed and delivered by a duly authorized representative of Subcontractor.

**SUBCONTRACTOR:**

_____

DocuSign Envelope ID: 4B16336A-8CEB-48A2-B5BA-FDFB6ED7A3E8

Opus Design Build, L.L.C. believes that the safety of its employees, its subcontractors and their employees, and the general public is of the highest priority on all our projects. Our goal is for our projects to have the safest working conditions possible for all involved resulting in an injury and accident-free workplace. To accomplish this goal, a strong and stringent safety program must be followed for the benefit of all.

Our subcontract agreement requires you to comply with the safety policies and requirements of Opus Design Build, L.L.C., and those of all local, state and federal agencies. Specific requirements are referenced in the Safety Article of the General Conditions of Subcontract. Please note the following:

1. You are required to provide safety documentation as listed <u>prior</u> to the start of your work at the jobsite. This documentation must be submitted to the Opus Project Manager and include the following information:

   a. Subcontractor safety manual.

      Latest version date of Subcontractor safety manual: _____

   b. Subcontractor site-specific safety plan.
   c. Subcontractor site-specific fall protection plan.
   d. Subcontractor site-specific hazard communication program and safety data sheets for all materials brought on site.
   e. Identification of Subcontractor's designated site safety representative and representative contact information.
   f. List of Subcontractor's employees who have current first aid certifications and who will be at the jobsite.
   g. Subcontractor's emergency phone numbers list.

2. You are required to actively participate in the project safety program. Please note the following points:

   a. We require 100% hardhat and 100% safety eye wear policy on all Opus construction sites.
   b. We require proper work clothing to include high visibility clothing for earthmoving operations.
   c. We require mandatory fall protection at 6'or greater.

Opus Design Build, L.L.C. places the highest priority on safety and it has the right to take appropriate action to enforce applicable safety policies and requirements. We trust that you are in agreement with this emphasis of safety and will cooperate fully.

Thank you for your cooperation.

Please enter the required information above and acknowledge your understanding of the requirements outlined in this letter by signing below and returning one copy with your signed subcontracts:

SUBCONTRACTOR NAME:  **Midwest Dock Solutions, Inc.**

By:  *tony zarlengo*
— AC32B5A9571B49D
tony zarlengo
(Print name)

owner
(Title)

12/11/2019
(Date)

DocuSign Envelope ID: 4B16336A-8CEB-48A2-B5BA-FDFB6ED7A3E8



**Mokena - Building A/31648.30**
**Overhead Doors and Dock Equipment - Building A**
**Tony Zarlengo/Midwest Dock Solutions, Inc.**
PH: 708.367.0801 / M: 708.921.8950
Email: tony@midwestdocksolutions.com
**(Payment Terms: <u>Per General Conditions</u>)**
**(Retainage: <u>10%</u>)**

**SUBCONTRACT AGREEMENT (Labor and Materials)**

This Subcontract Agreement ("Subcontract") is made as of 12/9/2019 by and between Opus Design Build, L.L.C., a Delaware limited liability company ("Contractor"), with its office located at 9700 W. Higgins Rd, Suite 900 , Rosemont, IL 60018 and **Midwest Dock Solutions, Inc.** ("Subcontractor") with its office located at 27 E. 36th Place , Steger IL 60475.

Contractor and Subcontractor agree as follows:

1. <u>Subcontract Documents</u>. The term "Subcontract Documents" is defined in Paragraph 1 of the attached RIDER "A."

2. <u>Project</u>. Contractor is providing design and construction-related services to Owner (defined below) in connection with the project generally described as Mokena Industrial Spec ("Project"), located at Building A - 8965 187th Street; Building B - 8905 187th Street , Mokena, IL 60448 ("Project Site").

3. <u>Owner</u>. The Owner of the Project is USRLP Mokena, L.L.C. ("Owner").

4. <u>Architect/Engineer</u>. The architect and engineers ("Architect/Engineer") of record for the Project are:

    | | |
    |---|---|
    | Structural Engineer of Record: | Opus AE Group, L.L.C. |
    | Civil Engineer: | SPACECO, Inc. |
    | Architect of Record: | Opus AE Group, L.L.C. |

5. <u>Scope of Subcontract Work</u>. Subcontractor's scope of work for the Project is described in Paragraph 1 of the attached RIDER A and is defined therein as the Subcontract Work.

6. <u>Schedule</u>. Time is of the essence. Accordingly, all time limits and requirements for completion set forth in the Subcontract Documents, including any intermediate milestones (collectively referred to in the Subcontract Documents as the "Schedule"), are of the essence of this Subcontract. Subcontractor shall begin its Subcontract Work as soon as the Project is ready for the Subcontract Work or within three (3) calendar days after being notified orally or in writing to proceed by Contractor. The Substantial Completion of the Subcontract Work (defined in the General Conditions of Subcontract) shall be achieved as required by job progress, so as to allow the entire Project to be substantially completed on or before **6/1/2020**. Subcontractor shall conform to all progress and schedule requirements of the Subcontract Documents and as directed by Contractor's project manager or superintendent, and must achieve the milestones (if any) as described in the attached RIDER A.

7. <u>Subcontract Sum</u>. Contractor shall pay Subcontractor the sum of **$105,930.00** ("Subcontract Sum"). The Subcontract Sum includes freight and delivery charges and all applicable state and local taxes including sales and use tax, and if required by law, these taxes must be separately stated on any payment applications, invoices or similar documents delivered by Subcontractor to Contractor for completion of the Subcontract Work in accordance with the terms and conditions of the Subcontract Documents. A breakdown of the components of the Subcontract Sum including any allowances is set forth in the attached RIDER A.

8. <u>Independent Examination</u>. By executing the Subcontract, Subcontractor represents that it has: (a) carefully read and understands the Subcontract Documents; (b) investigated the nature, locality and site of the Subcontract Work; (c) visited the Project Site, familiarizing itself with the local conditions and difficulties under which the Subcontract Work is to be performed; (d) investigated the Laws; and (e) correlated its observations with the requirements of the Subcontract Documents. Subcontractor acknowledges that it enters into this Subcontract on the basis of its own examination, investigation and evaluation of all such matters and not in reliance upon any opinions or representations of Contractor or Owner, or any of their respective officers, agents or employees. Subcontractor will immediately report to Contractor any error, inconsistency or omission Subcontractor discovers in the Subcontract Documents. Contractor will not be liable to Subcontractor for any damages to Subcontractor due to errors, inconsistencies or omissions that a careful review of the Subcontract Documents would have disclosed.

9. <u>Interpretation of Subcontract Documents</u>.

    9.1 Contractor will be the interpreter of the Subcontract Documents and upon the request of Subcontractor will issue written interpretations necessary for the proper execution of the Subcontract Work in the form of drawings or otherwise, with reasonable promptness. All interpretations of Contractor will be consistent with the intent of and reasonably inferable from the Subcontract Documents and will be in writing or in the form of drawings. All requests for interpretations will be directed to Contractor's project manager. Contractor's decisions in matters relating to artistic effect will be final if consistent with the intent of the Subcontract Documents. Contractor will not be liable to Subcontractor for the result of any interpretation or decision rendered in good faith in such capacity. The organization of the Project Specifications into divisions, sections and articles, and the arrangements of Project Drawings will not control Contractor in dividing the Subcontract Work among Subcontractors or in establishing the extent of Subcontract Work to be performed by any trade.

    9.2 The intent of the Subcontract Documents is to include all items necessary for the proper execution and completion of the Subcontract Work. The Subcontract Documents are complementary, and what is required by any one will be as binding as if required by all unless expressly stated otherwise. In case of any conflict, Subcontractor will comply with the highest or most stringent standard. In the event of a conflict between Project Drawings and Project Specifications affecting quantity or quality requirements, the greater amount will be required in questions of quantity and the higher quality will be required in questions of quality. Words and abbreviations in the Subcontract Documents which have well-known technical or trade meanings are used in accordance with such recognized meanings. References to published or association standards will mean the latest edition of such standards at the time of execution of the Subcontract, unless specifically referred to by edition date or revision number.

9.3 To the greatest extent possible, the Subcontract Documents will be construed consistently, so as to complement each other. Any inconsistencies in the provisions of the Subcontract Documents will be resolved, except as otherwise provided therein, by giving priority to the Subcontract Documents in the following order:

   (a) The Subcontract with modifications and Change Orders thereto of later date having priority over those with earlier dates;
   (b) The General Conditions of Subcontract;
   (c) The Project Specifications and Project Drawings; and
   (d) Instructions to Bidders.

10. <u>Administration of the Subcontract.</u>

   10.1 <u>General Obligations of Contractor.</u>  Contractor will: (a) provide the general administration of the Project as herein described; (b) control the Schedule; and (c) determine the dates of Substantial Completion of the Subcontract Work, Final Completion of the Subcontract Work and Substantial Completion of the Project.

   10.2 <u>General Obligations of Subcontractor.</u>  Subcontractor will: (a) obtain and deliver to Contractor written warranties and related documents required by the Subcontract Documents; and (b) forward all communications to Contractor through Contractor's project manager.

11. <u>Integration.</u>  The Subcontract Documents constitute the final and complete understanding of Contractor and Subcontractor with respect to the Subcontract Work.  The Subcontract Documents supersede all prior or contemporaneous communications, whether oral or written, concerning the Subcontract Work.  The Subcontract Documents will take precedence over any conflicting terms, conditions or provisions contained in any invoice, or other communication between the parties except for a Change Order as provided in Section 7 of the General Conditions of Subcontract.

12. <u>Project Drawings and Project Specifications.</u>  Unless otherwise provided in the Subcontract Documents, Subcontractor will be furnished free of charge an electronic copy of applicable Project Drawings and Project Specifications reasonably necessary for execution of the Subcontract Work.

13. <u>Performance is Acceptance.</u>  If Subcontractor commences performance of all or any portion of the Subcontract Work before Subcontractor executes and delivers the Subcontract to Contractor, Subcontractor will be deemed to have agreed to and accepted all terms and provisions of the Subcontract Documents.

14. <u>Authority.</u>  The signatories of Contractor and Subcontractor have the power and authority to execute the Subcontract and to bind Contractor and Subcontractor, as applicable, to this Subcontract.

15. <u>Riders.</u>  The following Riders are attached to and made a part of this Subcontract:

   15.1 RIDER A (Scope of Subcontract Work)

   15.2 RIDER B (Indemnification)

   15.3 RIDER C (Insurance)

Approved by Contractor's project manager ___Scott Staros_____
DocuSigned by:
*Scott Staros*
Scott Staros 05DB439...

Contractor and Subcontractor sign as follows:

| **CONTRACTOR:** | **SUBCONTRACTOR:** |
|---|---|
| Opus Design Build, L.L.C., | Midwest Dock Solutions, Inc. |
| a Delaware limited liability company | a ___ |
| | (a "State" "business entity type") |
| By: _DocuSigned by:_ [signature] | By: _DocuSigned by:_ [signature] |
| Name: James R. Caesar | Name: tony garlengo / tony garlengo |
| Its: Regional Vice President | Its: owner |
| (Print Name) | (Print Name) |
| (Title) | (Title) |
| Date: 12/12/2019 | Date: 12/11/2019 |

DocuSign Envelope ID: 4B16336A-8CEB-48A2-B5BA-FDFB6ED7A3E8

Mokena - Building A/31648.30
Overhead Doors and Dock Equipment - Building A

## RIDER A
(Scope of Subcontract Work)

This RIDER A is attached to and made a part of the Subcontract between Contractor and Subcontractor dated **12/9/2019**. All capitalized terms used but not defined in this RIDER A have the meaning ascribed to them in the Subcontract.

### 1. **Subcontract Work/Subcontract Documents.**

Subcontractor shall furnish all necessary labor, materials, equipment, skills, services (including design and engineering, if applicable), supervision and appurtenances necessary to complete all **Overhead Doors and Dock Equipment - Building A** work ("Subcontract Work") for the Project, including but not limited to strict compliance with the following documents (the "Subcontract Documents"):

| Description | | Date |
|---|---|---|
| Subcontract | | December 9 2019 |
| General Conditions of Subcontract | | June 2019 Edition |
| Opus Safety Manual | | June 2017 Edition |
| Outline Specification | 006 Rev 4 | September 6 2019 |
| Mokena Light Industrial - Project Schedule | 007 Rev 2 | September 3 2019 |
| Mokena Light Industrial - Detailed Specification Index | 008 | August 7 2019 |
| Mokena Light Industrial - Division 01 General Provisions Specifications | 009 | August 7 2019 |
| Mokena Light Industrial - Building A - Architectural Drawings - Building Permit Set | 011 REV 4 | October 7 2019 |
| Mokena Industrial Building A - Structural Drawings - Building Permit Set | 012 Rev 2 | October 7 2019 |
| Civil - Site Improvement Plans for 187th Street Mokena Industrial | 016 | September 18 2019 |
| Mokena Light Industrial - Division 08 Door and Glazing Openings Detailed Specification | 0800 | September 10 2019 |
| Mokena Light Industrial - Division 11 - Equipment Specification | 1100 | September 17 2019 |

Subcontractor acknowledges that Contractor has made available to Subcontractor all of the Subcontract Documents, and Subcontractor shall be responsible for obtaining copies pertinent to its Subcontract Work. Subcontractor represents that it has carefully examined the Subcontract Documents.

The Subcontract Work of this Subcontract specifically includes but is not limited to the following items:
1. Includes all sales tax, freight, labor, equipment, materials, tools and testing to complete the Dock Equipment scope of work and Overhead Doors scope of work in accordance with the bid and subcontract documents, all federal, state, county, and municipal codes.
2. Subcontractor to furnish and install (16) 24 gauge, 9'x10' Clopay insulated sectional overhead doors with manual operations for the dock positions. Dock doors are to have 2" full vertical lift tracks, 10,000 cycle springs, (1) 24" x 8" vision light on the right side looking in, and all necessary weather seals/stripping.
3. Subcontractor to furnish and install at drive-in door locations two (2) 24 gauge, 12' wide x 14' high, ¾ HP motor-operated, insulated, steel sectional vertical lift overhead doors with 3" track and standard 10,000 cycle springs and push button control. Each door to have two (2) 24" x 8" vision lights in the third panel from the bottom and be weather-stripped. Push button controls to be located on adjacent man door side of the opening.
4. Overhead doors include internal support struts to provide a smooth, non-ribbed interior side of door.
5. Furnish and install (16) 40,000 pound capacity 7' x 8' mechanical type levelers with 4" dock bumpers at truck dock locations as noted on the subcontract documents. Levelers to have brush type weather stripping, tapered lips, and full range toe guards.
6. Dock bumpers to be mounted at the proper height to accommodate the pavement at truck court being sloped at least 1% away from the building foundations.
7. Furnish and install compressible, foam-type dock seals with 40 oz. vinyl wear pleats at the 9'x10' exterior overhead doors at (16) dock locations.
8. Furnish and install (16) LED lights with 40" double-swing arms.
9. Furnish-only (16) Six-piece dock pit angle sets for dock levelers. Angles to have pre-drilled holes for installation. Angles to be set by others.
10. Interior 'Z' track guards are to be furnished and installed at each 9'x10' overhead door opening per the subcontract documents. Track guards are to be 36" high, painted safety yellow, and bolted to the floor and wall. Door lock to be located above the track guards for easy lockability.
11. Subcontractor to complete the low voltage and control wiring required for the motor-operated drive-in doors. Conduit to be provided by others.
12. Subcontractor to include the necessary hardware required to attach directly to precast without the use of wood bucks.
13. All corresponding tax, delivery, and off-loading is included.
14. Subcontractor understands that all overhead doors will be installed prior to interior slab on grade and dock pits being poured. Subcontractor has included costs for their own lifts and equipment necessary to install off a stone sub-base.
15. Opus shall not be charged with multiple mobilizations unless otherwise agreed to in writing by Opus Project Manager.
16. Subcontractor is responsible for dust control in their work area and worksite debris generated by this Subcontractor shall be cleaned daily by this Subcontractor's personnel and as directed by the Opus onsite staff.
17. Subcontractor is responsible for getting their equipment, vehicles and personnel safely on and off the site.
18. Provide all necessary protection of in-place materials during installation. Subcontractor shall be responsible for the protection of adjacent finished surfaces. Subcontractor is responsible for the repair of any damage caused in the field by this subcontractor during installation.
19. Toolbox talks will be held and documented each week Subcontractor is on site. Documentation to be provided to Opus superintendent.
20. All work shall meet Village of Mokena requirements and comply with all local, state and federal laws/codes.
21. Includes warranty per specifications.
22. Includes all union labor.
23. Subcontractor shall cooperate with and assist the testing and inspection agencies in the performance of their work.
24. Subcontractor shall coordinate all work and schedules with the other subcontractors.
25. Subcontractor will designate, subject to Opus approval, an individual as representative of the Subcontractor. Said representative will be present at the jobsite as deemed necessary by Opus to coordinate the work, attend weekly job meetings, and review the work of the other trades associated with the work of this Subcontractor. The Subcontractor's representative will have the authority to make binding commitments associated with the work of Subcontractor.
26. Subcontractor has included multiple crews as needed to meet the milestone schedule.

DocuSign Envelope ID: 4B16336A-8CEB-48A2-B5BA-FDFB6ED7A3E8

2.    **Schedule.** Subcontractor will achieve the following milestones (referred to as the "Schedule")

| Description | Date |
|---|---|
| Submit Shop Drawings - Overhead Doors | Planned End: 10/31/2019 Submit on or before |
| Submit Shop Drawings - Dock Equipment | Planned End: 12/9/2019 Submit on or before |
| Time required to start delivering doors after approved shop drawings | Planned Start: 11/25/2019 Planned End: 12/16/2019 3 Weeks |
| Material Leadtime for Dock Equipment after Approved Shop Drawings | Planned Start: 12/23/2019 Planned End: 1/27/2020 5 Weeks |
| Complete with installation of dock doors and drive-on doors - Building A | Planned Start: 12/16/2019 Planned End: 12/20/2019 5 days; Coordinate start date with Opus Superintendent |
| Complete installation of dock equipment - Building A | Planned Start: 4/15/2020 Planned End: 4/17/2020 3 days; Coordinate start date with Opus Superintendent |

3.    **Subcontract Break Down.** The breakdown of the Subcontract Sum is as follows:

**Subcontract Recap**

| Description | Amount |
|---|---|
| Overhead Doors - Building A | $30,330.00 |
| Dock Levelers - Building A | $52,800.00 |
| Dock Seals - Building A | $14,400.00 |
| LED Lights 40" Long Double Swing Arm - Building A | $4,800.00 |
| Six-Piece Dock Pit Angle Sets - Building A | $3,600.00 |
| **Total Subcontract Sum** | **$105,930.00** |

4.    **Unit Pricing.**

If requested by Contractor, Subcontractor will provide additional units of work, as directed, at the unit prices set forth below. Unit prices will apply to all building construction and will include, without limitation, all material, labor, equipment, compensation, general conditions, benefits, overhead, clean-up, supervision, profit, parking, shop drawings, small tools and all sales, use and other applicable taxes. Unit prices include design and engineering, if applicable. Unit prices will also apply to net quantity changes in the Subcontract Work made pursuant to the Subcontract Documents.

The following unit prices shall be in effect for the duration of the project:

| Description | UOM | Rate |
|---|---|---|
| Dock Levelers - Building A | EA | $3,300.00 |
| Dock Seals - Building A | EA | $900.00 |
| LED Lights 40" Long Double Swing Arm - Building A | EA | $300.00 |
| Six-Piece Dock Pit Angle Sets - Building A | EA | $225.00 |
| 9'x10' Clopay Model 3200 Overhead Door | EA | $1,175.00 |
| 12'x14' Clopay Model 3200 Drive-in Door | EA | $3,850.00 |
| Set of Z-Guards for Interior Track Protection at Dock Doors | EA | $195.00 |

**END RIDER A**

DocuSign Envelope ID: 4B16336A-8CEB-48A2-B5BA-FDFB6ED7A3E8

## RIDER B

This RIDER B is attached to and made a part of the Subcontract between Contractor and Subcontractor dated **12/9/2019**. All capitalized terms used but not defined in this RIDER B have the meaning ascribed to them in the Subcontract or General Conditions of Subcontract, as applicable.

1.      **Indemnification.** To the extent permitted by law, Subcontractor shall indemnify, defend and hold harmless Contractor, Owner and Architect/Engineer, and their respective officers, directors, agents, and employees (collectively, "Indemnities"), from and against all claims, damages, losses and expenses, including legal fees and disbursements paid or incurred to defend any such claims or to enforce provisions of this paragraph (collectively, "Claims"), arising out of the performance or non-performance of the Subcontract Work, to the extent such Claims are caused by the negligence or willful misconduct of Subcontractor, its Sub-subcontractors, anyone directly or indirectly employed by them, or anyone for whose acts any of them may be liable. The foregoing indemnification obligation is not limited by any limitation on the amount or type of damages, compensation or benefits payable by or for Subcontractor or its Sub-subcontractors under (a) worker's compensation acts, (b) disability benefit acts, (c) other employees benefit acts or (d) insurance required to be carried by Subcontractor under the Subcontract Documents, and Subcontractor expressly waives the benefits of any liability cap recognized by the Laws of the State of Illinois. Subcontractor's failure to procure specific contractual liability and other types of insurance for the benefit of Contractor and Owner, as required under the Subcontract Documents, will not render the foregoing indemnification provisions unenforceable under any applicable law.

    If Subcontractor does not have design responsibility under the Subcontract Documents, Subcontractor has no obligation to indemnify the Architect/Engineer, its agents or employees from and against any liability arising out of (x) the preparation by the Architect/Engineer or approval by the Architect/Engineer of maps, drawings, opinions, reports, surveys, designs or specifications, or (y) the giving of or the failure to give direction or instruction required herein to be given, if any, by the Architect/Engineer, its agents or employees, provided such giving or failure to give is required herein and is the primary cause of the injury or damage.

2.      **Labor Relations.** Section 10.1(b) of the General Conditions of Subcontract is supplemented by adding the following to the end of the existing text of Section 10.1(b):

    "Subcontractor acknowledges that Contractor is a signator to certain collective bargaining agreements entered into between the Associated General Contractors – Mid-America Regional Bargaining Association and local trade unions."

3.      **Dispute Resolution.** Article 13 of the General Conditions of Subcontract is modified by adding the following new Sections 13.8 and 13.9 following the existing text of Article 13:

    "13.8 If Contractor becomes involved in any dispute, including litigation or arbitration proceedings, with Subcontractor over the provisions of the Subcontract Documents or the Subcontract Work, the prevailing party in such litigation or proceedings shall be entitled to recover from the other party all costs and expenses incurred in such litigation, including but not limited to court costs, attorneys' fees and expert witness fees arising before, during or after trial, including any costs, attorneys' fees or expenses incurred in any appeal therefrom.

    13.9 Subcontractor hereby waives its right to a jury trial in any and all disputes or claims arising out of or relating to the Subcontract Documents or the Subcontract Work. If Subcontractor enters into a contract with a Sub-subcontractor in connection with the Subcontract Work, Subcontractor will include a similar provision requiring the Sub-subcontractor to waive its right to a jury trial."

## END RIDER B

DocuSign Envelope ID: 4B16336A-8CEB-48A2-B5BA-FDFB6ED7A3E8

**Mokena - Building A/31648.30**
**Overhead Doors and Dock Equipment - Building A**

# RIDER C
### (Insurance)

This RIDER C is attached to and made a part of the Subcontract between Contractor and Subcontractor dated 12/9/2019. All capitalized terms used but not defined in this RIDER C have the meaning ascribed to them in the Subcontract or General Conditions of Subcontract, as applicable.

1. <u>SUBCONTRACTOR'S INSURANCE</u>. Subcontractor will purchase and maintain the insurance described in this Paragraph 1.

   1.1 <u>Subcontractor's Liability and Workers' Compensation Insurance</u>. Prior to commencing the Subcontract Work, Subcontractor shall purchase and maintain during the progress of the Subcontract Work and any periods of warranty and additional work performed by Subcontractor, all in accordance with Paragraph 1.2 below, insurance that will protect against claims for bodily injury, death, damage to property or other damages arising out of or in connection with the performance of the Subcontract Work (including warranty and additional work) by Subcontractor, Sub-subcontractors or by anyone employed by any of them, or by anyone for whose acts any of them may be liable. Subcontractor's liability insurance may be maintained in a combination of primary and umbrella policies, and the cost of such insurance shall be included in the Subcontract Sum. Subcontractor's policies of insurance shall have the following coverages, requirements and minimum limits:

| INSURANCE COVERAGE | MINIMUM LIMITS |
|---|---|
| **WORKERS' COMPENSATION**<br>(must include coverage for all employees including owners) | Statutory Limits |
| **EMPLOYER'S LIABILITY**<br>(including "Stop Gap" coverage and USL&H if applicable) | $1,000,000 each accident<br>$1,000,000 disease-policy limit<br>$1,000,000 disease-each employee |
| **COMMERCIAL GENERAL LIABILITY**<br>(applies if Subcontractor is performing or supplying any of the following as part of the Subcontract Work: structural concrete or wood framing; masonry; electrical; HVAC; plumbing; fire protection sprinkler; steel erection; elevator; excavating; roofing; exterior utilities; foundation and curtain wall/glazing Subcontractors) | $5,000,000 each occurrence<br>$5,000,000 products/completed operations aggregate<br>$5,000,000 general aggregate (minimum $2,000,000 per project) |
| (applies if the Subcontract Work does not include any of the work items listed immediately above.) | $2,000,000 each occurrence<br>$2,000,000 products/completed operations aggregate<br>$2,000,000 general aggregate (per project) |
| **COMMERCIAL AUTOMOBILE LIABILITY**<br>(including owned, hired and non-owned) | $1,000,000 any one accident or loss |
| (include MCS 90 if Subcontractor or its Sub-subcontractors haul or transport hazardous substances) | $1,000,000 any one accident or loss |
| **PROFESSIONAL LIABILITY/ERRORS & OMISSIONS**<br>(applies if Subcontractor is providing engineering or design services) | $1,000,000 each claim<br>$1,000,000 annual aggregate |
| **CONTRACTOR'S POLLUTION LIABILITY**<br>(applies if Subcontractor is providing any of the following as part of the Subcontract Work: asbestos, lead or mold abatement; demolition; fuel providers; building envelope trades; roofing; concrete, asphalt or hot tar contractors; sand blasting; excavation and subterranean work; transporting of regulated or hazardous substances) | $5,000,000 each occurrence<br>$5,000,000 aggregate |

**Mokena - Building A/31648.30**
**Overhead Doors and Dock Equipment - Building A**

1.2     Subcontractor's Insurance Requirements.  Subcontractor's policies of insurance set forth in Paragraph 1.1 must meet the following requirements:

(a)     Workers' Compensation insurance must (i) provide coverage in the state where the Project is located, and (ii) extend to every employee, including owners, even if not statutorily required.

(b)     Where applicable, evidence of Employer's Liability coverage shall be required for U.S. Longshore and Harborworkers' Compensation, Maritime coverage, Federal Employer's Liability Act, and other unique exposures requiring endorsement of coverage.

(c)     Employer's Liability, Commercial General Liability and Automobile Liability insurance may be arranged under separate policies for the full minimum limits required, or by a combination of underlying policies with the balance provided by an Excess or Umbrella Liability policy.

(d)     The Commercial General Liability insurance must: (i) be on ISO Form CG 00 01 or its equivalent; (ii) include coverage for products/completed operations; (iii) not have an exclusion for residential work; (iv) not have an exclusion for subsidence or earth movement; (v) be maintained after completion of the Subcontract Work for a minimum of the period of the applicable statute of repose for the state in which the Project is located; (vi) specifically cover as "insured contracts" the Subcontractor's indemnity obligations as set forth in this Subcontract and other contractual indemnities assumed by the Subcontractor under the Subcontract Documents; (vii) provide a $2,000,000 minimum general aggregate limit of liability on a per project basis; (viii) include Contractor, Contractor's affiliates and Owner (and others as specifically required by the Subcontract Documents) as "additional insureds;" and (ix) delete or amend any "insured vs. insured" exclusion to provide that the exclusion shall not apply to Contractor's, Owner's and any other required parties' status as "additional insureds."  The "additional insured" endorsements to Subcontractor's Commercial General Liability policy will be on ISO Forms CG 20 10 04 13 and CG 20 37 04 13 or equivalent and will include coverage for ongoing and completed operations.  The additional insured endorsement form numbers must be listed on the insurance certificate and the endorsement(s) must be attached to the certificate of insurance.  Subcontractor's Commercial General Liability and Umbrella/Excess insurance policies will be primary insurance and not excess over, or contributing with, any insurance purchased or maintained by Contractor or Owner.

(e)     The Commercial Automobile Liability insurance must: (i) include coverage for all owned, hired and non-owned automobiles; and (ii) be written on the current ISO CA 00 01 form or its equivalent.

(f)     Professional Liability/Errors & Omissions, if applicable to the Subcontract Work, must be maintained after completion of the Subcontract Work for a minimum of the period of the applicable statute of repose for the state in which the Project is located. Any retroactive date on such Professional Liability policy shall be prior to the commencement of any Subcontract Work under this Subcontract.

(g)     Contractor's Pollution Liability insurance, if applicable to the Subcontract Work, must: (i) be occurrence based and be maintained after completion of the Subcontract Work for a minimum of the period of the applicable statute of repose for the state in which the Project is located; (ii) specifically cover as "insured contracts" Subcontractor's indemnity obligations as set forth in this Subcontract and other contractual indemnities assumed by Subcontractor under the Subcontract Documents; (iii) include transportation coverage for loading, unloading, and transporting of regulated or hazardous substances from the Project Site to the final disposal location with an endorsement scheduling the non-owned disposal facility if transportation of regulated or hazardous substances is included in the Subcontract Work; (iv) specifically include pollution coverage for all Subcontract Work performed, such as asbestos, lead-based paint, and mold abatement; (v) cover replacement or restoration costs as a result of pollution conditions; (vi) include Contractor, Contractor's affiliates and Owner (and others as specifically required by the Subcontract Documents) as "additional insureds;" and (vii) delete or amend any "insured vs. insured" exclusion to provide that the exclusion shall not apply to Contractor's, Owner's and any other required parties' status as "additional insureds."  Coverage will be primary insurance and not excess over, or contributing with, any insurance purchased or maintained by Contractor or Owner.

(h)     All insurance policies required of Subcontractor under this Paragraph 1: (i) must be issued by insurance companies that have an A.M. Best rating of A- VII or better, (ii) must contain a provision that coverage afforded thereunder shall not be cancelled without thirty (30) days prior written notice to the Contractor; and (iii) may consist of both primary and excess insurance and may carry commercially reasonable deductibles, but may not have self-insured retentions exceeding (1) $25,000 for Commercial General Liability, (2) $100,000 for Professional Liability/Errors & Omissions, and (3) $100,000 for Contractor's Pollution Liability. If Subcontractor fails to purchase and maintain the insurance coverage required under this Paragraph 1, Contractor may, but shall not be obligated to, obtain such insurance and either charge all costs for such insurance to the Subcontractor or offset the costs of such insurance against amounts due Subcontractor under the Subcontract.  Subcontractor shall provide a copy of the policies to Contractor upon request.

(i)     Certificates of Insurance must be filed with the Contractor prior to Subcontractor starting the Subcontract Work on the Project Site.  Such Certificates of Insurance must be in a form and substance acceptable to the Contractor and will provide satisfactory evidence that the Subcontractor has complied with all insurance requirements, including Contractor's, Owner's and any other required parties' status as "additional insureds."

(j)     Contractor may exclude Subcontractor from the Project Site and withhold payments to Subcontractor until a properly executed certificate of insurance evidencing the insurance required under this Paragraph 1 is received by Contractor.

(k)     To the extent permitted by law, Subcontractor waives all claims against Contractor, Owner and others as required in the Subcontract Documents for recovery of damages to the extent these damages are covered or coverable by the Workers' Compensation insurance, Commercial General Liability insurance, and Contractor's Pollution Liability insurance policies required of Subcontractor under this RIDER C.  In addition, to the extent permitted by law, Subcontractor shall cause the insurers issuing the required Workers' Compensation insurance, Commercial General Liability insurance, and Contractor's Pollution Liability insurance policies applicable to the Subcontract Work to be endorsed to waive the rights of recovery or subrogation.

(l)     The insurance coverages and limits required by this Subcontract do not limit or modify Subcontractor's responsibilities and liabilities specified within the Subcontract Documents or under law.

DocuSign Envelope ID: 4B16336A-8CEB-48A2-B5BA-FDFB6ED7A3E8

2. <u>PERSONAL PROPERTY</u>. Subcontractor hereby releases Contractor and Owner from all claims for loss or damage to or loss of use of Subcontractor's Personal Property (defined below) in or about the Project Site. Subcontractor shall purchase such insurance in respect to Subcontractor's Personal Property as Subcontractor deems appropriate and Subcontractor's insurance shall waive subrogation against Contractor and Owner. Subcontractor shall require a similar release by Sub-subcontractors. In addition, if Contractor permits Subcontractor to use Contractor's Personal Property, Subcontractor's use will be at its sole risk and Subcontractor will indemnify Contractor against any and all claims, damages, losses, costs, and expenses including but not limited to claims for loss or damage to or loss of use of Contractor's Personal Property, attorneys' fees, and court costs arising out of Subcontractor's use of Contractor's Personal Property. For purposes of this RIDER C, "Subcontractor's Personal Property" means and includes tools, equipment, or other personal property that is owned, leased, or otherwise in Subcontractor's possession; and "Contractor's Personal Property" means and includes tools, equipment, or other personal property that is owned, leased, or otherwise in Contractor's possession.

3. <u>CONTRACTOR'S BUILDER'S RISK INSURANCE</u>.

   3.1 <u>Builder's Risk Insurance Coverage</u>. Unless otherwise provided in the Subcontract Documents, Contractor will cause to be purchased and maintained, until Substantial Completion of the Project, builder's risk insurance with a "causes of loss" or equivalent policy form covering work to be performed by Contractor (including those working for or under Contractor) at the Project Site to the full insurable value thereof, on a replacement cost basis and subject to reasonable deductibles. Covered "causes of loss" means risks of direct physical loss or damage to covered property unless specifically excluded or limited under the policy. This insurance will include the interests of Owner, Contractor, Subcontractor and Sub-subcontractors in respect to the work to be performed by Contractor at the Project, and shall insure against perils of fire (with extended coverage), theft, vandalism, malicious mischief, collapse, temporary falsework, shoring and forms and debris removal, and such other matters as are insured against in the form of the policy maintained by Contractor including, as Contractor deems appropriate, earthquake, flood, or coastal windstorm. Unless specifically provided in writing, such insurance will not include coverage for any property, structure(s) and contents (whether real or personal) owned by the Owner or third parties existing as of commencement of Contractor's work or otherwise.

   3.2 <u>Builder's Risk Insurance - Waiver of Subrogation</u>. To the extent of coverage afforded by builder's risk applicable to the Subcontract Work or the Project (excluding deductible and self-insured retention amounts), regardless of whether such insurance is owned by Contractor or Owner, Contractor and Subcontractor agree to waive all rights against (a) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (b) the Owner and any of its contractors, subcontractors, agents and employees, whether under subrogation or otherwise, for loss or damage to the extent covered by such insurance, except such rights as they may have to the proceeds of such insurance. If the insurance coverage referred to in this paragraph requires an endorsement to provide for continued coverage where there is a waiver of subrogation, then the owners of such policy will cause the policy to be so endorsed. A waiver of subrogation shall be effective as to a party even though that party would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the party had an insurable interest in the property damaged.

4. <u>APPORTIONMENT OF DEDUCTIBLE</u>. If (a) the Project suffers a loss, (b) the loss is due in part to the negligence of Subcontractor, and (c) the loss is an insurable loss under builder's risk or other property insurance, then Subcontractor will be liable to Contractor for either (i) the deductible amount (not to exceed $25,000.00 or $50,000 for water damage) if a claim is submitted to the insurance carrier for the loss; or (ii) the actual amount of the loss (not to exceed $25,000.00 or $50,000 for water damage) if (Y) the policy holder determines in its sole discretion not to submit a claim to the insurance carrier for the loss, or (Z) the actual amount of the loss is less than the deductible amount. Contractor may, in its discretion, apportion the deductible amount among other parties responsible for the loss. Subcontractor will promptly pay Contractor, upon demand, for any such amount, and Contractor may offset the amount against any amounts due Subcontractor under the Subcontract.

5. <u>LOSS PAYABLE</u>. Any insured loss is to be adjusted by Owner and Contractor and made payable to Contractor, as trustee, or to Owner and Contractor, as joint trustees for the insureds, as their interests may appear, subject to the requirements of any applicable mortgage or loss payable clause.

6. <u>INSURANCE REQUIREMENTS</u>. Neither Contractor nor Owner represents that the insurance required under this RIDER C is adequate to protect the interests of Subcontractor. It is Subcontractor's obligation to determine the types or amounts of insurance that may be needed beyond the insurance required under this RIDER C.

**END RIDER C**

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 23

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
MID-AMERICA CARPENTERS      )
REGIONAL COUNCIL PENSION     )
FUND, et al.,                )
                             )
              Plaintiffs,    )  No. 1:24-cv-02428
                             )
         vs.                 )  Judge Andrea R. Wood
                             )
DOCK & DOOR INSTALL,         )    Magistrate Judge
INC., an Illinois            )  Jeannice W. Appenteng
corporation and MIDWEST      )
DOCK SOLUTIONS, INC., an     )
Illinois corporation,        )
                             )
              Defendants.    )
```

The deposition of IRA KEITH SUGAR,
called by the Defendant for examination, taken
pursuant to the Federal Rules of Civil
Procedure of the United States District Courts
pertaining to the taking of depositions, taken
before DIANE M. NULICK, a Notary Public within
and for the County of Cook, State of Illinois,
and a Certified Shorthand Reporter of said
State, at Suite 231, 3759 North Ravenswood,
Chicago, Illinois, on the 23rd day of
September, A.D. 2025, at 10:48 a.m.

**2**

```
PRESENT:
   McJESSY, CHING & THOMPSON, LLC,
   BY:  MR. KEVIN P. McJESSY,
        mcjessy@MCandT.com,
        (3759 North Ravenswood, Suite 231,
        Chicago, Illinois  60613,
        (773) 880-1260),

           appeared on behalf of the plaintiffs;

   ALLOCCO MILLER & CAHILL, P.C.,
   BY:  MR. TODD A. MILLER,
        tam@alloccomiller.com,
        (20 North Wacker Drive, Suite 3517,
        Chicago, Illinois  60606,
        (312) 675-4325),
           appeared on behalf of the defendant,
           Dock & Door Install, Inc.;

   AMUNDSEN DAVIS LLC,
   BY:  MR. MICHAEL F. HUGHES,
        mhughes@amundsendavislaw.com,
        (3815 East Main Street, Suite A-1,
        St. Charles, Illinois  60174,
        (630) 587-7925/(630) 217-1228 (direct),
           appeared on behalf of the defendant,
           Midwest Dock Solutions, Inc.

Also Present:

   Mr. Michael Richert,
```

**3**

```
                I N D E X

WITNESS:  IRA KEITH SUGAR

EXAMINATION BY:                        PAGE
Mr. McJessy                               4
Mr. Hughes                              194


PLAINTIFF'S EXHIBITS:

No. 57                                   80
No. 58                                   89
No. 59                                   94
No. 60                                   99
No. 61                                  101
No. 62                                  121
No. 63                                  132
No. 64                                  133
No. 65                                  134
No. 66                                  137
No. 67                                  142
No. 68                                  144
No. 69                                  149
No. 70                                  150
No. 71                                  153
No. 72                                  162
No. 73                                  166
No. 74                                  169
No. 75                                  171
No. 76                                  172
No. 77                                  176
No. 78                                  183
No. 53                                  186
```

**4**

(The witness was duly sworn.)

IRA KEITH SUGAR,
called as a witness herein, having been first
duly sworn, was examined and testified as
follows:

EXAMINATION
BY MR. McJESSY:

Q.  Now, sir, can you state your name for
the record -- first, middle, and last -- and
spell each?

A.  Full middle or just --

Q.  Full middle.

A.  Ira Keith Sugar.

Q.  And can you spell each?

A.  I-r-a, K-e-i-t-h, S-u-g-a-r.

Q.  Excellent.

And, sir, have you ever been
deposed before?

1 (Pages 1 to 4)

5

1    A.  No.
2    Q.  Okay.
3           Well, you're here today
4    pursuant to a subpoena, correct?
5    A.  Yeah.
6    Q.  Okay.
7    A.  I understand that.
8    Q.  And you understand you're under oath?
9    A.  Yes.
10   Q.  Okay.
11          And even though we're here in
12   an informal setting in a conference room, do
13   you understand that that oath has the same
14   force and effect as if you were testifying in a
15   court of law?
16   A.  Sure.
17   Q.  Okay.
18          And a couple of rules to make
19   things go easier today.
20          I'm going to ask you a series
21   of questions.  And, hopefully, you'll give me
22   the best, most truthful answers that you can,
23   but we both can't talk at the same time.  So
24   even if you know what my question is going to

6

1    be, I'm going to ask that you let me finish my
2    question before you start answering just so we
3    don't talk over each other.
4           Is that fine?
5    A.  Yes.
6    Q.  Okay.
7           And that's just so the court
8    reporter can take down an accurate record of
9    what both of us are saying.  Okay?
10   A.  Ah-huh.
11   Q.  And then, also, all of your answers
12   need to be yeses and nos, verbal responses.
13   Nods and shakes of the head or ah-huh, uh-uh,
14   the court reporter has a hard time taking down
15   those kind of affirmations or -- or responses.
16          All right?
17   A.  Okay.
18   Q.  Okay.
19          So if -- if I ask you a
20   question and you respond with an ah-huh or
21   uh-uh or nod or shake your head, I'll prompt
22   you, is that a yes, is that a no, just so the
23   record's clear.
24          Is that fair?

7

1    A.  Yes.
2    Q.  Okay.
3           And then, also, if I ask you
4    a question and you don't understand it because
5    it's vague or confusing or for whatever reason,
6    please ask me to explain it or re-ask my
7    question in a different way, and I'll be happy
8    to do so.
9           Okay?
10   A.  Ah-huh.
11   Q.  Is that a yes?
12   A.  Yes.
13   Q.  Okay.
14          And if I ask a question and
15   you answer it, is it fair to assume, then, that
16   you believe you understood my question?
17   A.  Yes.
18   Q.  Okay.
19          And is there any reason that
20   you cannot give truthful answers to my
21   questions today?  For example, are you under
22   any medications or under -- suffering from any
23   conditions that would prevent you from either
24   understanding my questions or giving truthful

8

1    answers?
2    A.  No.
3    Q.  Okay.
4           And you're represented today
5    by counsel?
6    A.  Yes.
7    Q.  Okay.
8           And Mr. Hughes is your
9    attorney, correct?
10   A.  Yes.
11   Q.  Okay.
12          And did you do anything to
13   prepare for your deposition today?
14   A.  Not really.  I mean, we had a
15   conversation yesterday and this morning.
16   Q.  Okay.  All right.
17          And without telling me what
18   was said by you to Mr. Hughes or what Mr.
19   Hughes said to you, tell me how long was your
20   conversation with him yesterday and how long
21   was it this morning?
22   A.  Probably, about 25 minutes yesterday
23   and 10 minutes today.
24   Q.  Okay.

2 (Pages 5 to 8)

9

1  And that's the sum and
2  substance of conversations you had with Mr.
3  Hughes?
4  A. Yes.
5  Q. Okay.
6  Was anybody present during
7  those conversations other than you and Mr.
8  Hughes?
9  A. No.
10  Q. All right.
11  And other than speaking with
12  Mr. Hughes, have you spoken with anybody else
13  about your deposition here today?
14  A. No.
15  Q. Did you speak with Mr. Zarlengo about
16  it?
17  A. No.
18  Q. And by that, I mean -- I think there's
19  a number of Zarlengos but Tony Zarlengo.
20  Is that who you understood I
21  was asking about?
22  A. Yes.
23  Q. Okay.
24  And did you speak with Mike

10

1  Richert about your deposition today?
2  A. Just where we are, as far as the
3  drive.
4  Q. Okay.
5  A. Yeah.
6  Q. And Mr. Richert, Mike Richert, is here
7  with us today in the conference room; is that
8  correct?
9  A. Yes.
10  Q. Okay.
11  And he is -- is he one of
12  your bosses?
13  A. Yes.
14  Q. Okay.
15  Do you have more than one
16  boss?
17  A. Yes.
18  Q. Who is your other boss?
19  A. Tony.
20  Q. Okay. All right.
21  MR. HUGHES: And I would just say,
22  for clarification purposes, Tony -- I mean,
23  there's a couple of Tonys in the case. Which
24  Tony? I just want to be clear.

11

1  THE WITNESS: Yeah.
2  BY MR. McJESSY:
3  Q. Yeah.
4  How do you -- you know Tony
5  Brutti, too, right?
6  A. Yes.
7  Q. Okay.
8  And how do you refer to Tony
9  Brutti?
10  A. Dock & Door.
11  Q. You refer -- when you see him, you
12  say, hi, Dock & Door?
13  A. No. I usually call him Brutti.
14  Q. Okay. Brutti. Okay.
15  And how do you refer to Tony
16  Zarlengo?
17  A. Tony.
18  Q. Okay.
19  So one is Brutti, and the
20  other is Tony?
21  A. Yeah.
22  Q. All right.
23  Well, maybe just so -- just
24  so our record's clear today, we'll try to -- if

12

1  you -- if you refer to one of them, let's try
2  to say Tony Zarlengo or Tony Brutti so that
3  we're clear. And, hopefully, if I don't catch
4  that, Mr. Hughes, feel free to jump in and make
5  the same thing, just so our record's clear.
6  Fair enough?
7  A. Yes.
8  Q. All right.
9  Are you aware that other
10  people have been deposed in this case?
11  A. Yes.
12  Q. Okay.
13  And who are you aware has
14  been deposed?
15  A. Several of the Dock & Door employees.
16  Q. Okay.
17  And do you know who?
18  A. I heard that Nico and Dave and
19  Branden.
20  Q. Can you give me the last names with
21  those?
22  A. Dave Green. I can't think of
23  Branden's last name. And Nico Kelly.
24  Q. All right.

3 (Pages 9 to 12)

13

1   And how did you hear that
2   they were deposed?
3       A. Chatter.
4       Q. Okay.
5   Chatter with who?
6       A. The staff. They themselves have
7   mentioned it.
8       Q. Okay.
9   You spoke to them?
10      A. Yeah.
11      Q. Okay.
12  Did you speak to all three of
13  them?
14      A. At different points, yes.
15      Q. Okay.
16  And, I'm sorry. Nico Kelly.
17  Is that one?
18      A. Yeah.
19      Q. Dave Green and Branden?
20      A. Yeah.
21      Q. And you don't remember Branden's last
22  name?
23      A. I can't think of it.
24      Q. If I told you Bishop, would that sound

14

1   familiar?
2       A. Yes. Yes.
3       Q. All right.
4   And where did you speak to
5   them?
6       A. Probably at the shop.
7       Q. Okay.
8   And can you recall what Nico
9   Kelly told you?
10      A. There was really no conversation about
11  the specific deposition, just that they were
12  going. I do remember a comment that I think
13  Nico had to sit around a while before things
14  got started. That's the extent of what I've
15  heard.
16      Q. Okay.
17  And what about Dave Green?
18  What was --
19      A. Just that he -- that he went, and it
20  was far.
21      Q. Okay.
22  And what did Branden Bishop
23  tell you?
24      A. That he was scheduled to go.

15

1       Q. Okay.
2   You didn't talk to him after
3   the deposition?
4       A. No. No.
5       Q. Okay.
6   And are these people, Mr.
7   Kelly, Mr. Green, and Mr. Bishop, people who
8   you would occasionally see around the shop?
9       A. Correct.
10      Q. Okay.
11  So you know who they are?
12      A. Yes.
13      Q. All right.
14  And how often, on average,
15  might you run into them?
16      A. Once or twice a week, at most.
17      Q. Okay.
18  And how is it that you would
19  run into them?
20      A. Usually, when they're coming back to
21  the shop to drop off equipment or material,
22  that sort of thing. Fueling up.
23      Q. Okay.
24  Fueling up the trucks?

16

1       A. Yeah.
2       Q. There's a -- some system on the
3   property to fuel trucks?
4       A. There is gas tanks on the property,
5   yes.
6       Q. Oh.
7   So the company gets gas
8   delivered in bulk?
9       A. Yes.
10      Q. Oh.
11  That's Midwest Dock
12  Solutions, I take it?
13      A. Probably, yes.
14      Q. Okay.
15  You're not sure?
16      A. No. I'm not sure.
17      Q. All right.
18  Have you talked to anybody
19  else about any depositions that have occurred
20  in this case?
21      A. No.
22      Q. Okay.
23  Were you aware that Sherri
24  Webber was deposed?

4 (Pages 13 to 16)

17

```
 1    A.  Yes.
 2    Q.  Okay.
 3        And how were you aware of
 4  that?
 5    A.  We're scheduled this week.  We were
 6  notified together.
 7    Q.  Okay.
 8    A.  She actually shared your address with
 9  me.
10    Q.  Got it.  All right.
11        Are you aware that Midwest
12  Dock Solutions answered interrogatories and
13  produced documents in this case?
14    A.  Yes.  I was asked to provide quotes
15  for certain contractors for a certain time
16  frame.
17    Q.  Okay.
18        And quotes meaning proposals
19  for work?
20    A.  Correct.
21    Q.  Okay.
22        That Midwest Dock made?
23    A.  Correct.
24    Q.  All right.
```

18

```
 1        To which contractors?
 2    A.  I remember Krusinski and, I believe,
 3  Pepper.  I'm not sure.  I think there were four
 4  companies, and I can't remember the others.
 5    Q.  Okay.
 6        Were -- were those companies
 7  specifically identified to you to gather
 8  records for?
 9    A.  Correct.
10    Q.  Okay.
11        And you think there were --
12  there were four of them, you said?
13    A.  I think so, yes.
14    Q.  Okay.
15        And so what did you do to
16  gather the documents?
17    A.  I went through all of my files and
18  printed every quote within that time frame for
19  that contractor.
20    Q.  Okay.
21        Were you ever asked to
22  provide emails in this case?
23    A.  No.
24    Q.  Were you ever asked to review your
```

19

```
 1  emails for this case?
 2    A.  No.
 3    Q.  Do you have an email account that's
 4  ira@midwestdocksolutions.com?
 5    A.  Correct.
 6    Q.  And how do you get those emails?
 7    A.  I have a -- a laptop with Outlook.
 8    Q.  Oh, with Outlook?  Is that the program
 9  you use?
10    A.  Yeah.  Is that what you're asking?
11    Q.  Yeah.  That is what I'm asking.
12        Like how is it you physically
13  get to review your emails.
14    A.  Right.
15    Q.  Okay.
16        So you have a laptop?
17    A.  Yes.
18    Q.  Okay.
19        Is that at the office?
20    A.  Yes.
21    Q.  Is that on your -- do you have a
22  desk -- you have an office that -- strike that.
23        When I said "at the office,"
24  I'm referring to 36 --
```

20

```
 1    A.  Twenty -- yes, 27 East 36th Place.
 2    Q.  Thank you.  That's the one I'm
 3  referring to.
 4        You have an office there?
 5    A.  Correct.
 6    Q.  Okay.
 7        And is it a dedicated office?
 8  It's your personal office?
 9    A.  Yeah.  I have an office in the
10  building, yes.
11    Q.  Okay.
12        And you don't share it with
13  anybody?
14    A.  No.
15    Q.  All right.
16        And is your -- when you log
17  on to your laptop to check your emails, is it
18  password protected?
19    A.  Yes.
20    Q.  And does anybody have that password
21  but you?
22    A.  No.
23    Q.  And once you set up Outlook, it
24  automatically downloads your emails when you
```

5 (Pages 17 to 20)

21

```
 1    open Outlook.
 2              Is that fair?
 3         A.  Yes.
 4         Q.  You needed a password, though, to --
 5    to set up that account on Outlook so it could
 6    download your emails; is that correct?
 7         A.  Yes.
 8         Q.  Okay.
 9              And you know that password?
10         A.  I do.
11         Q.  Okay.
12              Does anybody else know that
13    password?
14         A.  No.
15         Q.  Okay.
16              Do you keep your emails on
17    your laptop or delete them regularly, or how do
18    you handle their emails?
19         A.  No.  I hardly ever delete email unless
20    it's --
21         Q.  All right.
22         A.  -- junk.
23         Q.  I'll just ask that -- oh, okay.  I'll
24    ask that, at least, for the time being, you
```

22

```
 1    don't go in and delete any emails in your
 2    account.  Okay?
 3         A.  Yep.
 4         Q.  And you didn't produce any of those
 5    emails in this case, correct?
 6         A.  No.
 7         Q.  Okay.
 8              And you didn't review them to
 9    produce them in this case, correct?
10         A.  No.
11         Q.  All right.
12              Well, I said correct, and you
13    said no.  I think -- let me ask -- I think
14    we're on the same page, but let me ask my
15    question differently.
16              It is correct that you did
17    not review and produce your emails for this
18    case?
19         A.  That is correct.
20         Q.  Thank you.  Sorry.  It was a bad
21    question, but we were on the same page.
22              All right.  Other than the
23    quotes that you mentioned for the four general
24    contractors, did you review any other files to
```

23

```
 1    produce in this case?
 2         A.  Not to my knowledge, no.
 3         Q.  Okay.
 4              And if I -- if you think of
 5    the other general contractors that you reviewed
 6    records for, will you let me know as we go
 7    along?
 8         A.  Okay.
 9         Q.  Sir, the highest level of education
10    you've received?
11         A.  I have an associates in electronics
12    engineering.
13         Q.  Okay.  Excellent.
14              And where is that from?
15         A.  ITT Tech.
16         Q.  And when did you get that?
17         A.  '99.
18         Q.  All right.
19              And an associate's degree?
20         A.  Yeah.
21         Q.  All right.
22              And do you have any education
23    beyond that, any formal education with, you
24    know, an educational institution of some sort?
```

24

```
 1         A.  No.
 2         Q.  Okay.
 3              How about training in the
 4    trades?  Have you received any training in any
 5    sort of trades?
 6         A.  No.
 7         Q.  And do you hold any certifications of
 8    any sort?
 9         A.  No.
10         Q.  And other than a drivers license or a
11    concealed carry permit -- you know, a firearm
12    license or something like that or a hunting
13    license -- do you hold any other licenses?
14         A.  No.
15         Q.  Are you a member of a union?
16         A.  No.
17         Q.  Have you ever been a member of a
18    union?
19         A.  No.
20         Q.  All right.
21              When you graduated in
22    approximately 1999, what was the first job that
23    you had out of college?
24         A.  I worked for an event technology
```

6 (Pages 21 to 24)

25

1 company, formerly called PSAV.
2 **Q. PSAD?**
3 A. AV. V as in Victor.
4 **Q. All right.**
5 **And what did you do for them?**
6 A. I sold event technology in hotels and
7 convention centers in Chicago.
8 **Q. Okay.**
9 **And what's event technology?**
10 A. Audiovisual screens, sound systems,
11 computer systems.
12 **Q. All right.**
13 **So if I went to a conference**
14 **at a hotel --**
15 A. Correct.
16 **Q. -- they might have a big projection**
17 **screen with --**
18 A. Correct.
19 **Q. Okay.**
20 **And how long were you there?**
21 A. Almost 20 years.
22 **Q. Oh.**
23 **When did you start with**
24 **Midwest Dock Solutions?**

26

1 A. 2017.
2 **Q. Okay.**
3 **So did your employment**
4 **overlap?**
5 A. A little bit, yes.
6 **Q. Okay.**
7 **You were working for PSAV?**
8 A. Oh. No, no. You mean between
9 employers or between school and employment?
10 **Q. No. Between employers.**
11 A. No.
12 **Q. You said you -- when did you graduate?**
13 A. The ITT Tech was a night class.
14 **Q. Okay.**
15 A. So I was working days.
16 **Q. All right.**
17 **So when did you start at**
18 **PSAV?**
19 A. That was '98.
20 **Q. And you worked until -- were there**
21 **until approximately 2018?**
22 A. 2017.
23 **Q. 2017?**
24 A. Yeah.

27

1 **Q. All right.**
2 **So did you leave there to go**
3 **to work at Midwest Dock Solutions?**
4 A. Correct.
5 **Q. All right.**
6 **And did you actually leave**
7 **there and start at Midwest Dock Solutions, or**
8 **did you work at both companies for any period**
9 **of time together?**
10 A. No. I -- I had no -- I haven't had a
11 day off in -- since I've been in school.
12 **Q. Brutal.**
13 A. Yeah.
14 **Q. All right.**
15 **How did you come to -- to**
16 **work for Midwest Dock Solutions?**
17 A. I met Mike, and we were friends for a
18 while, fishing buddies. And I always
19 complained about working for a giant
20 corporation and how I've hit a glass ceiling.
21 And he said, why don't you come sell doors for
22 me.
23 **Q. All right.**
24 **And that's -- Mike is Mike**

28

1 **Richert?**
2 A. Correct.
3 **Q. The gentleman who's here today?**
4 A. Yes.
5 **Q. And so you didn't have to fill out a**
6 **job application or submit a resumé or anything**
7 **like that?**
8 A. No. There were interviews conducted
9 between Mike and Tony Zarlengo.
10 **Q. Oh, okay.**
11 **Did you interview with both**
12 **of them?**
13 A. Yes.
14 **Q. Okay.**
15 **So you met with Tony Zarlengo**
16 **before you were hired?**
17 A. Correct.
18 **Q. Okay.**
19 **And do you know who hired**
20 **you?**
21 A. I would say they both did.
22 **Q. Okay.**
23 **As far as you understood, it**
24 **was a collective decision?**

7 (Pages 25 to 28)

29

1    A.  Correct.
2    Q.  All right.
3         And you said there were
4  interviews.
5         Did you fill out a job
6  application or tender a resumé or anything like
7  that?
8    A.  I might have shared a resumé.  I don't
9  remember.
10    Q.  Okay.
11         But you know you had an
12  interview, one or more, with Tony Zarlengo?
13    A.  Correct, yes.
14    Q.  Okay.
15         How many do you think?
16    A.  It was either one or two.  It wasn't
17  many.
18    Q.  Okay.
19    A.  Yeah.
20    Q.  And then they -- who told you you were
21  hired?
22    A.  I believe Mike told me I was hired.
23    Q.  Okay.
24         And that was in two

30

1  thousand --
2    A.  '17.
3    Q.  '17.
4         Do you remember when in 2017?
5    A.  I want to say it was late July.
6    Q.  That's an estimate on your part,
7  correct?
8    A.  Yes.
9    Q.  All right.
10         And I think I asked you
11  earlier when we started out that you'd consider
12  both Mike Richert and Tony Zarlengo to be your
13  bosses, correct?
14    A.  Correct.
15    Q.  All right.
16         Anybody else that you'd
17  consider to be -- that you report to?
18    A.  No.
19    Q.  Okay.
20         Now, how did you get your
21  email address ira@midwestdocksolutions.com?
22    A.  I believe Tony issued it to me.
23    Q.  Okay.
24         And do you know how it was

31

1  set up?
2    A.  No.
3    Q.  Do you know who the email hosting
4  company is?
5    A.  It's a Gmail address.
6    Q.  A Gmail address.  All right.
7         All right.  Do you have any
8  role in setting up the email accounts for the
9  folks at Midwest Dock Solutions?
10    A.  No.
11    Q.  And what position were you hired for?
12    A.  Sales for new construction.
13    Q.  All right.
14         And you said sales for new
15  construction.  What is new construction?
16    A.  The spec buildings that are being
17  built, and contractors are bidding those jobs
18  out to subcontractors.
19    Q.  Okay.
20         And how is it specifically
21  that you were assigned sales for new
22  construction as opposed to other kinds of
23  sales?
24    A.  I believe, whoever was handling it

32

1  before was no longer employed, and there was
2  a -- an opening in the company for that role.
3    Q.  All right.
4         Do you know who that was?
5    A.  Joe something.  Joe.
6    Q.  All right.
7         So the person you were
8  replacing, it's your understanding they did
9  sales for new construction, so that's why you
10  were hired for that position?
11    A.  Yes.
12    Q.  Okay.
13         And do you have a title?
14    A.  I believe, it's inside sales.
15    Q.  Okay.
16         And has your title changed at
17  any time?
18    A.  No.
19    Q.  And tell me about what your
20  responsibilities are as inside sales?
21    A.  I receive invitations to bid.
22    Q.  Okay.
23    A.  I review drawing sets and door
24  schedules and specifications for these

8 (Pages 29 to 32)

33

1  buildings that are being constructed, and I
2  chase pricing from the manufacturers and
3  compile a proposal for the contractor of my --
4  what material I am proposing and its price.
5     **Q. Okay. All right.**
6         **What else do you do?**
7     A. Once a job is awarded, I field measure
8  and verify construction sites. I order
9  material. I schedule labor with Dock & Door
10  and deal with the superintendents on site until
11  the job is done.
12     **Q. What was the last thing you said?**
13     A. I deal with the superintendents on
14  site.
15     **Q. Okay.**
16         **Anything else?**
17     A. No. I mean --
18     **Q. Okay.**
19     A. -- start to end, I'm their point of
20  contact.
21     **Q. I also -- and we'll get into this, but**
22  **I've seen emails from you, like providing**
23  **Certificates of Insurance to general**
24  **contractors.**

34

1     A. Ah-huh.
2     **Q. What would you describe that work as?**
3     A. Just part of the execution of the
4  award.
5     **Q. Okay.**
6     A. When -- when I'm awarded, they ask for
7  COIs. They ask for submittal drawings and --
8  that need to be approved by the architect.
9  There's -- there's a bunch of paperwork that
10  happens initially before anything is ordered or
11  executed.
12     **Q. Okay.**
13         **And you're responsible for**
14  **following up on all of that as well?**
15     A. Yeah.
16     **Q. All right.**
17         **So how -- let me ask you,**
18  **first -- well, do you also make -- I'm not sure**
19  **if I've got the terminology right, but do you**
20  **make cold calls on companies?**
21     A. A little, but I get so much emailed
22  invitations --
23     **Q. Okay.**
24     A. -- that it keeps me busy enough. If

35

1  there was ever a time where I felt slow, then I
2  could go and start cold calling or driving
3  around looking for construction sites that
4  might not have purchased anything yet.
5     **Q. All right.**
6     A. Yeah.
7     **Q. Your comment earlier that you haven't**
8  **had a day off in 20 years, I'm guessing you**
9  **don't feel like you're slow.**
10         **The -- the emails that you**
11  **get for the invitations, are those from**
12  **companies that you've worked for in the past?**
13  **Is that how it is? Or do you -- are you signed**
14  **up on some systems or listed somewhere where**
15  **you get invitations from all sorts of**
16  **companies?**
17     A. Both. So the relationships that I've
18  built, sometimes they're emailing me
19  directly --
20     **Q. Okay.**
21     A. -- as part of their team. And I do
22  get more than enough invitations through these
23  other organizations that just have a directory
24  of -- of subcontractors.

36

1     **Q. Okay.**
2         **And what directories of**
3  **subcontractors might you be on that would cause**
4  **you to get invitations?**
5     A. The main one is called Building
6  Connected.
7     **Q. Okay.**
8         **Is it a website?**
9     A. Yeah.
10     **Q. Building Connected.**
11         **And Midwest Dock Solutions is**
12  **listed on that?**
13     A. Correct.
14     **Q. Okay.**
15         **Did it have -- how did it get**
16  **listed on that?**
17     A. Before my time.
18     **Q. Okay.**
19         **And are you familiar with**
20  **a -- a publication called Blue Book**
21  **Construction Network?**
22     A. I've heard of it. I don't know
23  anything about it.
24     **Q. Okay.**

9 (Pages 33 to 36)

37

1       What -- describe for me, as
2  best you can, what Building Connected is?
3       A.  It's essentially a membership site.  I
4  know the contractors pay a much bigger fee to
5  post their drawing sets and the information
6  that they need to provide to their
7  subcontractors, and I used to pay a smaller fee
8  to find those contractors.  But since I have
9  more than enough work, I don't pay the
10 membership and I just work with the invitations
11 that I receive under their membership, if that
12 makes sense.
13      Q.  I'm not quite sure I understand that
14 last part, where you said you pay -- you get --
15      A.  So if I wanted to find a contractor, I
16 would have to be a member to see, like, the
17 jobs that they have and that sort of thing.
18      Q.  Right.
19      A.  But if they're paying their fee and
20 they're sending me an invitation, I can log
21 into that specific job, review what I need to
22 review, and get the proposal out.
23      Q.  I get it.
24          So, now, most of the

38

1  invitations -- anybody lists -- strike that.
2          So as I understand it
3  currently, you get the invitations from general
4  contractors who are listed on that site?
5       A.  Correct.
6       Q.  So you don't need to pay a higher
7  membership fee to basically search the site?
8       A.  Correct.
9       Q.  Okay.
10         And do you know who was
11 paying that fee -- who was making the
12 arrangements to pay that fee for the site?
13      A.  I believe, Tony Zarlengo was paying
14 it.
15      Q.  So you weren't going on and -- and
16 like signing up for it yourself?
17      A.  No.
18      Q.  Okay.
19         Or for -- on behalf of the
20 company, you weren't handling sign-up?
21      A.  Correct.
22      Q.  Tony was -- Tony Zarlengo was handling
23 that?
24      A.  Yeah.  He got me started.

39

1       Q.  Okay.
2          Does -- in signing up for the
3  site, did Midwest Dock Solutions, do you know,
4  have to provide any information about its
5  operations, what it does?
6       A.  Other than you choose what fields you
7  handle, like we handle dock levelers or
8  sectional doors, coiling doors, and they all
9  have their own code, you choose those.  And
10 that's what they will float to you, as far as
11 information.
12      Q.  Okay.
13         That's exactly what I was
14 asking.
15         So you do have to indicate
16 some information about the company to kind of
17 work it?
18      A.  Yes.
19      Q.  Okay.
20         Do you also -- does the
21 company also have to identify whether it does
22 union or nonunion work?
23      A.  No.  Not to my knowledge.
24      Q.  Okay.  All right.

40

1          So any other -- besides
2  Building Connected, any other organizations or
3  websites that Midwest Dock is a member of or
4  connected with in order to get job information?
5       A.  No.  Not that I'm aware of.
6       Q.  So the first thing you mentioned when
7  I asked you what your job roles were, you said
8  you receive invitations.
9          Tell me about that.  What
10 does that mean?
11      A.  So I would get emails with these
12 invites from the contractors through Building
13 Connected or directly from a contractor.
14      Q.  Okay.
15      A.  And they would provide me with
16 drawings or door schedules and specifications
17 and ask me to quote the doors as specified in
18 the architectural documents.
19      Q.  Okay.
20         And I'm going to go through a
21 list of companies and ask you if these are
22 companies that send you invitations for
23 proposals or if these are companies that you
24 get invitations for proposals through Building

10 (Pages 37 to 40)

41

```
 1   Connected.
 2              ARCO Murray?
 3       A.  ARCO Murray doesn't use Building
 4   Connected --
 5       Q.  Okay.
 6       A.  -- I believe.
 7       Q.  Do they send you have invitations for
 8   proposals?
 9       A.  Yes.  I think they have their own
10   system.
11       Q.  Okay.
12              Tell me about that.  What do
13   you mean?
14       A.  I don't know what it's called, but
15   they -- they provide you a link and password
16   and -- and you log into their site to get
17   information.
18       Q.  I get it.
19              But they send you an email?
20       A.  Yes.
21       Q.  Okay.
22              And how about Clayco?
23       A.  Clayco would be one that uses Building
24   Connected, yes.
```

42

```
 1       Q.  Okay.
 2              And Krusinski Construction?
 3       A.  Yeah, also them.
 4       Q.  Okay.
 5              They use Building Connected?
 6       A.  Yes.
 7       Q.  All right.
 8              And Meridian Design Build?
 9       A.  Yes.
10       Q.  They use Building Connected?
11       A.  Correct.
12       Q.  A popular system.
13              Morgan/Harbour Construction?
14       A.  Yes.
15       Q.  Same -- same thing?
16       A.  Same thing.
17       Q.  Opus Design Build?
18       A.  Yes.
19       Q.  Also Building Connected?
20       A.  Yes.
21       Q.  Peak Construction?
22       A.  Yes.
23       Q.  Also Building Connected?
24       A.  Right.
```

43

```
 1       Q.  Pepper Construction?
 2       A.  Yep.  Yes.
 3       Q.  Also Building Connected?
 4       A.  Yes.
 5       Q.  Power Construction?
 6       A.  Yes.
 7       Q.  Principal Construction?
 8       A.  Yes.
 9       Q.  And McShane Construction?
10       A.  I don't know that I've bid -- I've
11   seen invites come through from them, but I'm
12   not sure I've bid anything to them.
13       Q.  Are there any other GCs that I
14   mentioned that use Building Connected --
15       A.  Lots.
16       Q.  -- that send proposals to you that
17   you've done work for?
18              And by "you," I mean Midwest
19   Dock Solutions.
20       A.  Yeah.  I feel like you've called out
21   pretty much anybody that I've worked with.
22   There are plenty of other contractors that I
23   may dump -- you know, I might have received
24   something from them.  But, you know, it might
```

44

```
 1   be one door and a tiny little thing.  And I've
 2   never worked with them before, so I would just
 3   dump it.
 4       Q.  Okay.
 5              What do you mean when you
 6   say, "dump it"?
 7       A.  I would delete it and not spend any
 8   time on it.
 9       Q.  I understand.
10              So all of the -- the general
11   contractors I just mentioned, are those all
12   general contractors that Midwest Dock Solutions
13   does work for?
14       A.  Yeah.
15       Q.  Okay.
16              And -- but -- and you --
17   strike that.
18              You can't recall -- there may
19   be others, and you just can't recall if there
20   are others, or you said you think I got them
21   all?
22       A.  Basically, I've worked with --
23       Q.  Hold on.
24              I'm just trying to find out
```

11 (Pages 41 to 44)

45

1  whether there might be others that you just
2  can't recall right now or whether you think,
3  indeed, I've named all of the contractors that
4  Midwest Dock Solutions works for.
5      A.  Okay.
6          So I originally took it as
7  through Building Connected.
8      Q.  Okay.
9      A.  So there are other contractors that we
10 have -- that I have worked with.
11     Q.  Okay.
12     A.  There's PSI in Kankakee, Chicago
13 Heights Construction.  And those are the only
14 two that I can think of that you didn't -- that
15 you didn't name already.
16     Q.  All right.
17         And, yeah, I did not -- I'm
18 glad we worked that out because I wasn't -- I
19 did want to know which ones use Building
20 Connected, but I wasn't limiting my question
21 for general contractors that Midwest Dock
22 Solutions works for to just those.  I wanted to
23 know if there were any others.  And there's two
24 others apparently, PSI and Chicago Heights,

46

1  that I didn't ask about.
2          Is that fair?
3      A.  Yes.
4      Q.  Is PSI -- is that a general
5  contractor?
6      A.  Yes.
7      Q.  Okay.
8          What kind of -- does it
9  specialize in a particular type of
10 construction?
11     A.  No.
12     Q.  Okay.
13         And Chicago Heights
14 Construction, is that also a general
15 contractor?
16     A.  Correct.
17     Q.  Does it specialize in any particular
18 type of construction?
19     A.  No.
20     Q.  Okay.
21         Can you describe for me, just
22 in general terms, what are the kind of projects
23 that Midwest Dock has done for PSI?
24     A.  Typically, it's sectional doors on a

47

1  smaller scale.
2      Q.  Okay.
3      A.  Much smaller scale.
4      Q.  Much smaller than what, than the other
5  general contractors?
6      A.  Yeah.  Most of those general
7  contractors do big buildings.
8      Q.  Okay.
9      A.  And in those cases, it might be a
10 handful of doors or less.
11     Q.  Okay.
12         So in those cases, you mean
13 PSI?
14     A.  Yep.
15     Q.  And is that also Chicago Heights?
16     A.  Yep.
17     Q.  Okay.
18         And did you get that as a
19 yes?
20         THE COURT REPORTER:  I got that as a
21 yep.
22         MR. McJESSY:  Just making sure the
23 record's clear.
24

48

1  BY MR. McJESSY:
2      Q.  So when you said -- I want to be a
3  little more specific about your answer.
4          PSI and Chicago Heights do
5  smaller projects; is that correct?
6      A.  Yes.
7      Q.  And how many doors in a typical
8  project for those companies?
9      A.  Two to four.
10     Q.  Okay.
11         And when you said the others,
12 I think, or something to that effect, you were
13 referring to the ARCO Murray, Clayco,
14 Krusinski, Meridian, Morgan/Harbour, Opus,
15 Peak, Pepper, Power, Principal, McShane, those
16 companies were the other, correct?
17     A.  Correct.
18     Q.  And those companies do larger
19 projects; is that correct?
20     A.  Correct.
21     Q.  Okay.
22         And how many doors would be a
23 typical project for those companies?
24     A.  It could be 10 to a hundred.

12  (Pages 45 to 48)

49

```
 1      Q.  Okay.
 2      A.  Or even more.
 3      Q.  All right.
 4          And would -- for the larger
 5   contractors that I just listed, would you do
 6   dock leveler installation for those companies,
 7   too?
 8      A.  We do.  That was sold by Tony.
 9      Q.  Tony?
10      A.  Zarlengo.
11      Q.  Thank you.
12      A.  I sold doors, and Tony Zarlengo sold
13   docks up until very recently where I've taken
14   over both.
15      Q.  Oh, okay.
16      A.  I haven't actually executed anything
17   dock wise yet.
18      Q.  All right.
19          So -- and PSI and Chicago
20   Heights, would you do doors and dock levelers
21   for those companies?
22      A.  I believe it's just doors.
23      Q.  Okay.
24          And so for the -- I want to
```

50

```
 1   ask you about the distinction between doors and
 2   dock sales -- or door sales and dock sales.
 3          You said Tony Zarlengo did --
 4   sold the docks; is that correct?
 5      A.  Yeah.
 6      Q.  And you sold the doors, correct?
 7      A.  Correct.
 8      Q.  But for a project, if one of these
 9   large general contractors needs both doors and
10   docks installed on a -- on a construction
11   project, how did that work?
12      A.  So often, it would be a combination
13   award for both doors and docks.  But, also,
14   often the specification of the dock leveler may
15   not meet what the customer is looking for, and
16   I would just get doors.
17      Q.  I see.
18          And so would -- when -- and
19   I'm just trying to understand like how the bid
20   works.
21          If you're -- some of the
22   projects you would bid docks and doors,
23   correct?
24      A.  Yes.
```

51

```
 1      Q.  And would you prepare two separate
 2   proposals, one prepared by you for doors and
 3   one prepared by Tony Zarlengo for docks?
 4      A.  Correct.
 5      Q.  Oh, I see.
 6          And then you would submit
 7   those either together or separately, but they
 8   would be two separate proposals?
 9      A.  Right.
10      Q.  I see.
11          And why were you just doing
12   doors and Tony Zarlengo handling docks?
13      A.  That's how it started, and it stayed
14   that way for a very long time.
15      Q.  All right.
16          And when you started, you
17   were -- you had previously been selling
18   technology equipment for event spaces.
19          How did you learn about the
20   door -- commercial overhead door industry?
21      A.  I was pretty much thrown in the fire.
22   So they showed me where on the architectural
23   drawings to find the door schedule, where to
24   find the specification, and gave me the -- the
```

52

```
 1   companies to reach out to for pricing, where we
 2   get our material, and I -- I ran away with it.
 3      Q.  All right.
 4          So you just had to learn from
 5   the ground up?
 6      A.  Yeah.
 7      Q.  And who -- who taught you?
 8      A.  Tony Zarlengo showed me the document
 9   aspects.  And if I had installation questions,
10   I asked Mike Richert.
11      Q.  Okay.
12          And what do you mean,
13   "installation aspects"?
14      A.  Like how long would it take to install
15   this size of door on this type of building.
16      Q.  Okay.
17          And -- and then he -- what --
18   why would you ask Mr. Richert about that?
19      A.  He was the most experienced, to my
20   knowledge.
21      Q.  Okay.
22          He had that kind of
23   knowledge?
24      A.  Yeah.
```

13 (Pages 49 to 52)

53

1    Q.   Do you know had he done that kind of
2  installation work himself in the past?
3    A.   Yeah.  Well, before my time, I
4  believe, he was working installing -- doing
5  installs for Midwest Dock.
6    Q.   Okay.
7         And that's what you learned
8  just in talking with him?
9    A.   Yeah.
10    Q.   All right.
11         So tell me -- you said you
12  received invitations.  I presume that involves
13  opening emails and looking at the plans,
14  drawings, and specifications that you're
15  receiving either through Building Connected or
16  through the GC's own system.
17         Is that fair?
18    A.   Yes.
19    Q.   All right.
20         And then what's the -- what's
21  the next thing you do in that process?
22    A.   Once I review the information, I ask
23  for pricing from the manufacturers.  And then I
24  calculate a profit margin, I calculate labor, I

54

1  put together a proposal, and I submit it to the
2  contractor.
3    Q.   Okay.
4         And when you say you
5  calculate profit margins, what do you mean?
6    A.   I have to mark up the doors, and I
7  have to calculate how many hours of labor it's
8  going to take.
9    Q.   Okay.
10    A.   And freight and cost of anchors and
11  all of the hardware and drill bits that go with
12  it.
13    Q.   Anything else?
14    A.   That sums it up, I think.
15    Q.   Okay.
16         And how do you calculate the
17  hours of labor that it's going to take?
18    A.   Now, it's based on experience, you
19  know, and how long I think it's going to take
20  to install each door.
21    Q.   Okay.
22         And when you first started
23  out, how did you -- was that Mr. Richert who
24  gave you that information?

55

1    A.   Yes.  I would ask for feedback on what
2  he thought it would take.
3    Q.   Okay.
4         So you would discuss a
5  project with him; for example, say these are
6  the doors that the general contractor wants to
7  install, this is the number of them, and how
8  much time do you think this will take?
9    A.   Yeah.
10    Q.   And then you and him would have a back
11  and forth, and you'd come to figure out an
12  estimate.
13         Is that fair?
14    A.   Yes.
15    Q.   Okay.
16         And -- well, you said the
17  anchors and hardware.
18         What are you referring to by
19  that?
20    A.   All of the materials that you need to
21  install the doors.
22    Q.   Okay.
23         And are -- what are -- what
24  are anchors?

56

1    A.   Screws.
2    Q.   Okay.
3         Like screws that go into
4  concrete?
5    A.   Yes.
6    Q.   Okay.
7         Are they special type of
8  screws or something?
9    A.   Yeah.  I think they -- I think they're
10  called wedge anchors.
11    Q.   Okay.
12         And then you also mentioned
13  hardware.
14         Is that different than the
15  screws?  Is there other hardware?
16    A.   No.  I just call everything
17  hardware -- you know, the screws, the drill
18  bits -- you know, that sort of thing -- that
19  you need to work with to get the doors
20  installed.
21    Q.   Okay.
22         And then -- well, ultimately,
23  I guess, that's what I'm trying to figure out.
24         And then there's also the

14  (Pages 53 to 56)

57

1  doors themselves, correct?
2      A.  Correct.
3      Q.  And then there's tracks, I'm assuming,
4  or is that part of the door?
5      A.  That's part of the door.
6      Q.  Okay.
7          So if you order a door from
8  one of your suppliers, you're getting the
9  tracks with it?
10     A.  Yes.
11     Q.  Okay.
12         Anything else besides the
13 doors, tracks, screws, wedge anchors, drill
14 bits?
15     A.  No.
16     Q.  I'm curious.  You mentioned drill bits
17 specifically.
18         Are the drill bits
19 particularly costly, or do they go through a
20 lot of them or --
21     A.  Yes.  They go through a lot of them.
22     Q.  Oh, really?
23         I assume, they're concrete
24 drill bits, correct?

58

1      A.  Yes.
2      Q.  And are they particularly -- like are
3  they a noteworthy expense for the company?
4      A.  Define "noteworthy."
5      Q.  Well, important enough to include it
6  in a -- as part of your estimate.
7      A.  I think you need to factor the cost of
8  installation, yeah.
9      Q.  And that's part of the cost?
10     A.  Yeah.
11     Q.  Any other tools or equipment or parts,
12 pieces, that you can think of that you take
13 into account when you're doing the estimate?
14     A.  No.
15     Q.  Okay.
16         And then you mentioned the
17 labor, which now you do based on experience?
18     A.  Yes.
19     Q.  And what do you mean by that?
20     A.  I've been doing this long enough to
21 know how long it will take based on previous
22 sales and the types of doors.
23     Q.  Okay.
24     A.  Yeah.

59

1      Q.  Does the distance of the job factor
2  in?
3      A.  Unless it's in Wisconsin.
4      Q.  Why is that?
5      A.  Just the -- a lot of times they might
6  be staying overnight or the amount of miles
7  they're driving every day.
8      Q.  Okay.  All right.
9          You mean if the workers are
10 going to Wisconsin, they may be staying in a
11 hotel every night overnight, and that's a
12 factor you factor in?
13     A.  Yes.
14     Q.  Okay.
15         How about is there any sort
16 of per diem cost of somebody staying overnight
17 besides just the hotel, like meals and things
18 like that?
19     A.  I believe so.  I don't know what that
20 is.
21     Q.  All right.
22         How do you take the cost
23 of -- how do you account for that cost, the
24 hotels and the per diem, when you make your

60

1  estimates?  You, obviously, know what that is,
2  so --
3      A.  Well, I would say --
4          MR. HUGHES:  Objection.  Misstates
5  his testimony with respect to per diem.
6  BY MR. McJESSY:
7      Q.  Okay.
8          If I have -- did I make a
9  mistake in my question or --
10     A.  I was told to add $25 a door.
11     Q.  Okay.
12         And who told you that?
13     A.  Tony Zarlengo.
14     Q.  Okay.  All right.
15         The anchor -- the anchors and
16 the drill bits, are those the kind of materials
17 that Midwest Dock Solutions has in its shop?
18     A.  Yes.
19     Q.  And my understanding is, from the --
20 for the larger projects, like the ones for
21 these large general contractors that we talked
22 about, the doors are usually delivered directly
23 to the job site; is that correct?
24     A.  Correct.

15 (Pages 57 to 60)

61

1    Q.  Are the jobs -- are the doors for
2    those ever delivered directly to Midwest Dock
3    Solutions?
4        A.  Not on any large scale.
5        Q.  Okay.
6            I take it, it's happened on
7    occasion?
8        A.  If it's a few doors that are farther
9    out -- if it's a few doors that is farther out,
10   the job is farther out, we would receive that
11   at the shop.
12       Q.  Okay.
13           And those are doors that,
14   then, ultimately may be installed by employees
15   who are paid through Dock & Door?
16       A.  Occasionally.
17       Q.  And for the -- you said the PSI and --
18       A.  Sorry.  You said Dock & Door?
19       Q.  Yes.
20       A.  Sorry.  Mostly.
21       Q.  What do you mean by, "mostly."
22       A.  There is a very small case where I
23   would have an actual door installed by Midwest
24   Dock.

62

1        Q.  Okay.
2            And what would those
3    occasions be?
4        A.  Like a service-related call.
5        Q.  Okay.
6            Explain that, what you mean
7    by that.
8        A.  Somebody needs an operator replaced or
9    some sections replaced, something like that.
10       Q.  Okay.
11           Is that -- is that on one of
12   the projects for these general contractors?
13       A.  No, never for a contractor.  Well, no.
14   Midwest Dock would not work for a contractor.
15   It would be Dock & Door guys do all of the
16   contractor work.
17       Q.  Okay.
18       A.  But if somebody takes over a building
19   and they want to replace some sections and they
20   know me and they contact me to have these
21   sections replaced, I would order them, they
22   would come to the shop, and they would be
23   installed by Midwest Dock.
24       Q.  Okay.

63

1            And -- now, let me get back
2    to my -- my original question was:  Would there
3    be projects for some of these larger general
4    contractors, and just so the record's clear --
5    I think we're on the same page -- but when I
6    say one of the large general contractors, I'm
7    referring to ARCO, Clayco, Krusinski, Meridian,
8    Morgan, Opus, Peak, Pepper, Power, Principal,
9    McShane.
10           Is that what you understand
11   when I say, "one of the large general
12   contractors"?
13       A.  Yes.
14       Q.  Okay.
15           And then you've got a couple
16   of small general contractors, PSI in Chicago
17   Heights.
18           Fair?
19       A.  Yes.
20       Q.  Okay.
21           So would you ever get doors
22   delivered to the twenty -- what is it, 36th
23   Place?  Is that --
24       A.  Yeah.

64

1        Q.  -- the address?
2        A.  Not -- not likely.
3        Q.  Okay.
4            Has that ever happened?
5        A.  If it was a small scale, maybe.  And
6    then we would have the Dock & Door guys pick
7    them up and take them out when they actually
8    conduct the install.
9        Q.  All right.
10           And then PSI and Chicago
11   Heights, those are smaller jobs, you said --
12       A.  Yeah.
13       Q.  -- typically?
14           Are those jobs also worked on
15   by employees of -- who are paid through Dock &
16   Door?
17       A.  Correct.
18       Q.  Okay.
19           And would those doors be
20   delivered to the 36th Place, the Steger office?
21       A.  If it's a small quantity, yes.
22       Q.  Okay.
23           And then they would be picked
24   up there and taken out to the job site?

16  (Pages 61 to 64)

65

1      A.  Correct.
2      Q.  Okay.
3              And I take it that the
4   supplies for the -- the, like, drill bits and
5   the anchors and things like that, even on
6   the -- for the projects for the larger general
7   contractors, the Dock & Door guys would pick
8   the -- pick those up at the 36th Place, Steger
9   office.
10              Is that fair?
11      A.  Yes.
12      Q.  Okay.
13              And then they would take them
14   out to the job site, correct?
15      A.  Yes.
16      Q.  And I take it, those same kind of
17   anchors and hardware and drill bits would also
18   be used even on the smaller jobs for PSI and
19   Chicago Heights, correct?
20      A.  Yes.
21      Q.  So those -- those materials that are
22   also used by the Dock & Door guys would be
23   picked up from the Midwest Dock Solutions
24   office at 36th Place, correct?

66

1      A.  Yes.
2      Q.  All right.
3              And when I say "36th Place,"
4   that's 27 East 36th Place, Steger, correct?
5      A.  Correct.
6      Q.  Once you figure out the cost of the
7   materials, hours of labor, the cost of the
8   supplies, the anchors, hardware, drill bits for
9   a door -- for a door installation project,
10   what's the next step in preparing the bid, the
11   proposal?
12              What do you call it?  Do you
13   call it a bid or a proposal?
14      A.  Both.
15      Q.  Okay.
16              What's the next step in
17   preparing the proposal?
18      A.  I create an actual proposal that
19   outlines the quantity, the -- the specification
20   of the manufacturer that I'm proposing and the
21   pricing and estimated tax, and -- and then I
22   send it through Building Connected or directly
23   to the contractor as the invite dictates.
24      Q.  Okay.

67

1              Oh, so that will tell you how
2   to send it in?
3      A.  Correct.
4      Q.  Okay.
5              And if the job also includes
6   dock levelers, how do you coordinate that with
7   in Mr. Tony Zarlengo, if at all?
8      A.  There's really no coordination.
9      Q.  Okay.
10      A.  You know.
11      Q.  When he was doing that and you
12   weren't, he would just prepare that and submit
13   it on his own?
14      A.  Yes.
15      Q.  Okay.
16              So, conceivably, the
17   proposals could go in at separate times?
18      A.  Yes.
19      Q.  Okay.
20              What's the next step that
21   happens in the bid process?
22      A.  After some time, I might follow-up
23   with the contractor to see if they had been
24   awarded the job and try to understand time

68

1   frames.
2      Q.  Okay.
3      A.  And I basically wait for them to say
4   we've got the award, and we're going to be
5   awarding our subcontractors.  And it's all a
6   numbers game.  You know, the lowest bidder
7   wins.
8      Q.  Right.  All right.
9              And then if the general
10   contractor gets the job and your proposal's
11   been selected by the general contractor, you'll
12   get a notice of some sort that you've been
13   selected.
14              Is that fair?
15      A.  Yes.
16      Q.  All right.
17              And is that -- is that just
18   an email that you might get, or how does that
19   work?
20      A.  Email or phone call.
21      Q.  Okay.
22              You said that you also
23   reviewed drawings and specs as part of
24   preparing the proposals.

17 (Pages 65 to 68)

69

1          What does that involve?
2      A.  Each type of door will have a
3  specification where they ask for certain
4  elements, like standard springs or 10,000
5  cycle.  They may want to upgrade to 25,000
6  cycle or 50,000 cycle, whether they want
7  two-inch track or three-inch track or what the
8  R value is, what type of steel do they want.
9  You know, it's very detailed, and every job has
10  a different specification.
11      Q.  Okay.
12          And so you review all of that
13  information and then compare it against your
14  suppliers and what they have and what the cost
15  is.
16          Is that fair?
17      A.  Yes.
18      Q.  Okay.
19          And you come up with the
20  equipment that you're going to propose to be
21  used?
22      A.  Yes.
23      Q.  Okay.
24          So when you said you chase

70

1  pricing from manufacturers -- that was the next
2  thing I think you said you did -- what does
3  that mean?
4      A.  So once I reviewed the spec and
5  determined what model from the manufacturer
6  best fits that, I ask for a quote from the
7  manufacturer based on the quantity and the type
8  of door and the -- and the size.
9      Q.  Okay.
10          Are there ever issues when
11  you look at a proposal that proposes something
12  unique that you're not sure whether you have
13  the capacity to install?
14      A.  No.  I -- I don't get -- there's
15  certain types of doors that I don't want to get
16  involved in, like sliding doors or folding
17  doors.  I -- I just stick to actual overhead
18  doors.
19      Q.  So you stick to proposals that -- for
20  the kind of doors that you know you can
21  install?
22      A.  Correct.
23      Q.  Okay.
24          Now, you said once a bid is

71

1  awarded, you field measure -- you said field
2  measure and verify construction sites.
3          Were those two different
4  things, or is that one thing?
5      A.  It's one thing.
6      Q.  And what does that mean?
7      A.  So once the building is erected, I
8  would go out and measure the actual opening --
9      Q.  Oh.
10      A.  -- and make sure it's what they said
11  it was.
12      Q.  Okay.
13      A.  Sometimes they can vary and -- which
14  would present a problem if I just ordered the
15  doors without actually seeing them, verifying
16  the clear height to the roof, because you can't
17  have a door that goes straight vertical if you
18  don't have enough roof -- you know, those sorts
19  of things.
20      Q.  I get it.
21          So you actually physically go
22  out to the construction site?
23      A.  Yeah.
24      Q.  Okay.

72

1          If it -- if a proposal
2  includes dock leveler installation, would you
3  also look at -- you know, measure for that as
4  well, or is that --
5      A.  I haven't yet.
6      Q.  Okay.
7      A.  But now that I've taken over, I do
8  expect to have to go verify that as well, but
9  those would be two different time frames.
10      Q.  Okay.
11          So in the past when this
12  happened, would Tony Zarlengo go out to the job
13  site and measure for the dock leveler work?
14      A.  I believe so, or maybe he sends
15  someone.
16      Q.  Okay.
17      A.  I'm not sure.
18      Q.  You're not sure.
19          Are there any other occasions
20  when you would go out to job sites?
21      A.  Not really.  There's been, maybe, a
22  handful of times in my years where I might have
23  brought material out to a site that they needed
24  the same day.

18 (Pages 69 to 72)

73

1    Q.  Okay.
2        And that would be like one of
3  these general contractor sites?
4    A.  Yeah.
5    Q.  Large general contractors we're
6  talking about?
7    A.  Yes.
8    Q.  Okay.
9        And other than those
10  occasions, would there be -- would you ever go
11  out while the construction is being performed
12  to look at the -- what's happening?
13    A.  No.  No.  Not at all.
14    Q.  Okay.
15        And there's never been a
16  situation where there was a problem with an
17  installation that something didn't fit, or
18  something like that, and you went out to
19  inspect what was happening?
20    A.  No.
21    Q.  Okay.
22        Do you inspect any job sites
23  when the work is complete?
24    A.  I think there might have been a

74

1  handful of times in all of the years where I've
2  been asked to go and walk the doors as a --
3  like a punch list type of thing, but usually
4  not, no.
5    Q.  Okay.
6        And, again, would that be for
7  these general contractor -- for these large
8  general contractors?
9    A.  Yes.
10    Q.  Okay.
11        And that would have been work
12  done by Dock & Door, correct?
13    A.  Yes.
14    Q.  Okay.
15        Now, you said the next thing
16  you do is you order the materials after you do
17  the field measure and verify the construction
18  site, correct?
19    A.  Yes.
20    Q.  And what does that entail?
21    A.  Ordering -- I basically send the
22  manufacturers a purchase order for the quantity
23  and types of doors that I'm contracted for.
24    Q.  Okay.

75

1        And the other hardware that
2  you mentioned -- the wedge anchors and the
3  drill bits -- are those particular to a
4  particular door, or are they sort of general
5  hardware that are used with all of the doors?
6    A.  It's pretty much general, yeah.
7    Q.  Okay.
8        And are those ordered from
9  some place other than like the specific door
10  manufacturers?
11    A.  Yeah.  There's a separate supplier for
12  that.  I'm not sure who it is.
13    Q.  Okay.
14        And those are just supplies
15  that are kept in-house?
16    A.  Correct.
17    Q.  Okay.
18        They aren't delivered to the
19  job site with the doors?
20    A.  No.
21    Q.  Okay.
22        And then you said you
23  scheduled the labor with Dock & Door, correct?
24    A.  Yes.

76

1    Q.  And what does that entail?
2    A.  Assigning crews to specific jobs and
3  providing any useful information.  That's about
4  it.
5    Q.  Okay.
6        And is that something you
7  would do also?
8    A.  Yeah, I did.
9    Q.  Okay.
10        And does that involve like
11  picking out who you want to do the
12  installations?
13    A.  Yeah.
14    Q.  All right.
15    A.  Yeah.
16    Q.  And you need to make sure that the
17  people you're sending out are qualified,
18  correct?
19    A.  Correct.
20    Q.  Okay.
21        And would you actually talk
22  to them about what the installation involves?
23    A.  If I felt it was needed, yes.
24    Q.  Okay.

19 (Pages 73 to 76)

77

1        Like, hey, you're going out
2 and you're going to do this many doors and it's
3 this manufacturer and it's this kind of door,
4 that kind of thing?
5     A.  To an extent.
6     Q.  All right.
7        Well, tell me about that.  To
8 what extent?
9     A.  Well, like if it's a big building with
10 docks, you don't really have to tell them
11 anything.  They know what the expectations are.
12 It's like if you have a high-speed door or a
13 coiling door, something that requires more
14 experience, and just letting them know, hey, is
15 it being mounted to a steel column or is it
16 being mounted to precast or that sort of thing.
17     Q.  Oh.  So you would sell those kind of
18 doors, too, in that kind of -- those kind of
19 installations?
20     A.  Yeah.  Anything that's overhead.
21     Q.  Okay.
22     A.  There's several types.
23     Q.  What are the more unique type of items
24 to install?

78

1     A.  The high speed, mostly.
2     Q.  The high speed.
3     A.  Yeah.
4     Q.  And why is that?
5     A.  They have a lot of electronic
6 components.  They're a little trickier, as far
7 as tolerances.
8     Q.  Okay.
9        And are there some people
10 that are better than others at installing that
11 kind of thing?
12     A.  In my opinion, yes.
13     Q.  Who are the better people installing
14 those kind of things?
15     A.  Dave Green and Jose.
16     Q.  Jose Aguirre Garcia?
17     A.  Yeah.  That sounds right.
18     Q.  Okay.
19        So would you talk to them
20 when you've got something like that to be done?
21     A.  Yeah.
22     Q.  Dave Green has been around a long
23 time, correct?
24     A.  Yes.

79

1     Q.  And so has Jose?
2     A.  Yes.
3     Q.  Anybody else who you feel is
4 particularly talented?
5     A.  Nico Kelly is not bad.  He's -- he's
6 coming up.  He's learning, yeah.
7     Q.  All right.
8        Any other kind of
9 installations that you tend to prefer
10 somebody -- a particular person do or
11 particular persons?
12     A.  No.  Like outside of what we just
13 discussed, I think that covers it.
14     Q.  Okay.
15        Are high-speed doors and
16 coiling doors the same thing?
17     A.  Not really.  Coiling doors are made of
18 metal.  They move slowly.  High-speed doors are
19 typically made of fabric, but there are a few
20 metal, and they move very fast.
21
22
23
24

80

1        (WHEREUPON, the document was
2        marked Plaintiff's
3        Exhibit 57 for identification,
4        as of 9/23/25.)
5
6 BY MR. McJESSY:
7     Q.  I'm going to hand you what I've marked
8 as Exhibit 57 and ask you if you recognize --
9 if you could take a look at Exhibit 57 and ask
10 you if you recognize what it is.
11     A.  I assume it's our website based on the
12 address at the top of the page.
13     Q.  Have you looked at the website before?
14     A.  It's been a long time.
15     Q.  All right.
16        Does it look like your
17 website?
18     A.  Yeah.
19     Q.  If you flip four pages in, you'll see
20 there's a page that says products.
21        Do you see that?
22     A.  Yes.
23     Q.  And then if you flip one -- two
24 more -- three more pages in -- oh, three --

20  (Pages 77 to 80)

81

1    yeah, three more pages in, there's a reference
2    there to rolling steel doors.
3         Do you see that?
4    A.  Yes.
5    Q.  All right.
6         And that's a rolling door
7    like you described; is that correct?
8    A.  This is what I would call a coiling
9    door.
10   Q.  A coiled door.  Okay.
11        And -- a coiling door?
12   A.  Yeah.
13   Q.  Okay.
14        And if you look at the next
15   page, it says high-speed doors.
16        Do you see that?
17   A.  Yes.
18   Q.  All right.
19        And does that show a picture
20   of a high-speed door?
21   A.  Yes.
22   Q.  What is a high -- what is a high-speed
23   door?
24   A.  It's made of fabric.  It moves four to

82

1    seven feet per second.
2    Q.  Oh, wow.
3    A.  It's super fast.  It's made so a
4    forklift could drive through it without
5    stopping.
6    Q.  Oh, like it automatically starts
7    opening and goes up real quick?
8    A.  Yep.
9    Q.  So this door that's in this picture
10   here is fabric on the --
11   A.  Yes.
12   Q.  Oh.  All right.
13        When I asked you about
14   scheduling labor with Dock & Door, do you
15   actually decide who's going to go out on the
16   job site to do the work other than the
17   high-speed door situation?
18   A.  Pretty much, yeah.
19   Q.  And then I asked you about the part of
20   the execution of the award -- or you said part
21   of the execution of the award is doing COIs and
22   submittal drawings.
23        What -- what does that mean?
24   A.  As soon as the contract is signed,

83

1    they ask for Certificates of Insurance.  They
2    ask for submittal drawings.  So each type of
3    door would have a drawing based on the size
4    that shows the track is this many inches --
5    outside of the opening -- the track goes this
6    many feet above the opening.  It shows the
7    complete installation of a door.  And then you
8    would provide like the product data, which is
9    the specification of the product that I have
10   sold them, which I submit, and then they take
11   it to an architect who reviews it and approves
12   it or makes changes.
13   Q.  Okay.
14   A.  And then it comes back to me approved,
15   and then I am cleared to order the material
16   that I have proposed and contracted with them.
17   Q.  Okay.
18        And -- and then do you order
19   that material?
20   A.  Yes.
21   Q.  Okay.
22        And then the invoices for
23   that material, do they come to you, or do
24   they --

84

1    A.  No.  They go to Sherri.
2    Q.  Okay.
3         And then she pays for all of
4    the materials or arranges for that?
5    A.  Yes.
6    Q.  And the Certificates of Insurance,
7    what's your role handling the Certificates of
8    Insurance?
9    A.  I take the contract, which has a
10   section about insurance, and send that to our
11   insurance agencies.
12   Q.  Okay.
13   A.  And then they produce the COI, which I
14   send to my contact.
15   Q.  Okay.
16        And the Certificates of
17   Insurance are important.
18        Is that fair to say?
19   A.  Yeah.  Very important to a contractor.
20   Q.  Yeah.
21   A.  They drive you crazy about it.
22   Q.  Oh, is that right?
23   A.  Yeah.
24   Q.  The -- and the contracts typically

21 (Pages 81 to 84)

85

1    provide that the Certificate of Insurance has
2    to be provided before you can go on the job
3    site, correct?
4        A. Yes.
5        Q. And do you know, have you ever been
6    kept of off of a job site because the
7    Certificate of Insurance hadn't been provided?
8        A. Yeah. I do recall an instance where
9    we had to wait a few days until the Certificate
10   of Insurance was approved by their people.
11       Q. Do you know who -- who the contractor
12   was on that project?
13       A. No.
14       Q. Do you remember what the project was?
15       A. No.
16       Q. Okay.
17              But -- and when I say
18   "contractors," I'm referring to the large
19   general contractor.
20              That's important to them,
21   correct?
22       A. Yes. Yes.
23       Q. Okay.
24              And would you communicate

86

1    directly with -- well, when you said you would
2    reach out to the insurance companies, which --
3    which companies do you have contact with?
4        A. I think it's called Holden and State
5    Farm.
6        Q. And what does State Farm have?
7        A. Auto.
8        Q. Okay.
9              And do you recall whether you
10   ever dealt with Assurance -- Assured Partners?
11       A. It doesn't ring a bell.
12       Q. That doesn't ring a bell?
13              How about Esser Hayes.
14       A. I believe that we used to have them,
15   years ago.
16       Q. Okay.
17              But now you use Holden
18   Insurance?
19       A. Yeah. That's who I currently email.
20       Q. Okay.
21       A. Yeah.
22       Q. And has it been Holden for a while?
23       A. Yes.
24       Q. How long, do you think?

87

1        A. I couldn't honestly tell you.
2        Q. Do you have a particular contact at
3    Holden that you deal with?
4        A. I email Jacie Olsen, I think her name
5    is.
6        Q. Now, the -- the labor on these
7    projects is for the -- is provided by the guys
8    who are paid through Dock & Door, correct?
9        A. Yeah. Dock & Door provides the labor
10   for those jobs, yes.
11       Q. Okay.
12              So -- and you're providing a
13   Certificate of Insurance for Midwest Dock
14   Solutions, correct?
15       A. Correct.
16       Q. Do you have any role in obtaining a
17   Certificate of Insurance for Dock & Door?
18       A. No. He would do that himself.
19       Q. Who would do that?
20       A. Tony Brutti.
21       Q. Okay. All right.
22              And is it your understanding
23   that since Dock & Door -- since it's
24   Dock & Door employees who are providing the

88

1    labor on these job sites that it needs to have
2    a Certificate of Insurance as well?
3        A. Yes.
4        Q. Would you make the arrangements with
5    Tony Brutti to get -- you know, you said he
6    would make those arrangements.
7              How does he know to make
8    those arrangements?
9        A. If the contractor is asking for
10   subcontracted labor information, we would
11   provide it.
12       Q. Okay.
13              So if the contractor asks,
14   then you would provide it?
15       A. Yeah.
16       Q. Okay.
17              If the contractor doesn't
18   ask, then you might not provide it?
19       A. Correct.
20       MR. McJESSY: How long have we been
21   going?
22       THE COURT REPORTER: About an hour
23   and a half.
24       MR. McJESSY: All right.

22 (Pages 85 to 88)

89

```
 1          Let's take a few minute
 2   break.  We'll go off the record.
 3
 4          (After a break from 12:07 p.m.
 5           to 12:22 p.m., the deposition
 6           was resumed as follows:)
 7
 8          (WHEREUPON, the document was
 9           marked Plaintiff's
10           Exhibit 58 for identification,
11           as of 9/23/25.)
12
13       MR. McJESSY:  Back on the record.
14   BY MR. McJESSY:
15       Q.  I'm going to hand you what I've marked
16   as Exhibit 58.  And if you could turn to the
17   second page of this exhibit, this is a -- it
18   appears to be an email from Tony Zarlengo sent
19   to George Leah.  Do you know George Leah -- or,
20   I'm sorry, Leah, George?
21       A.  Yeah.  I've worked with her.
22       Q.  Okay.
23          At ARCO Murray?
24       A.  Yes.
```

90

```
 1       Q.  Okay.
 2          L-e-a-h.  Last name George,
 3   G-e-o-r-g-e.
 4          And this is an email from Mr.
 5   Zarlengo to Ms. George, and do you see there
 6   that it says, a few notes on docks.  I added
 7   pit steel onto the bid.  Hope that's okay.  And
 8   I won't do wiring for this project.  Unions are
 9   very strict in this area, as we have found out,
10   and it could run into an issue there.
11          Do you see that?
12       A.  Yes.
13          MR. HUGHES:  Kevin, I just want
14   to -- there's stuff that's highlighted on here.
15          Is that -- is that highlights
16   that you've --
17          MR. McJESSY:  Those are highlights
18   I've added.
19          MR. HUGHES:  I just wanted to make
20   sure.
21          MR. McJESSY:  Yeah.  For the record,
22   unless I state otherwise, any highlighting on
23   any documents is highlighting I added just to
24   sort of help move things along and focus on
```

91

```
 1   what I want to ask about.
 2          Is that fair?  Or that's
 3   noted for the record.
 4   BY MR. McJESSY:
 5       Q.  What -- do you know what Mr.
 6   Zarlengo's referring to where he says unions
 7   are very strict in this area?
 8       A.  Well, wiring would be electricians'
 9   work.
10       Q.  Okay.
11       A.  And we don't contract any -- we don't
12   have any electricians that we deal with.
13       Q.  Okay.
14          And it says that we have
15   found out that this could run into an issue
16   there.
17          Do you see that?
18       A.  Yeah.
19       Q.  Is that -- and I take it, the dock
20   levelers have to be hooked up to electronics or
21   electricity?
22       A.  If they are electric or hydraulic,
23   yes.
24       Q.  Okay.
```

92

```
 1          And is that work that -- that
 2   you can do?
 3       A.  Not for construction, no.
 4       Q.  No.  I mean, is it -- maybe I didn't
 5   phrase it properly.
 6          Is it work that -- that your
 7   guys are capable of doing?
 8       A.  No.
 9       Q.  No.
10          They can't do that?
11       A.  Any -- our guys should not be touching
12   high voltage.
13       Q.  No.  I understand that.  I mean --
14   okay.  And why not?
15       A.  They're not trained to do so.
16       Q.  I see.  Okay.
17          Well, it says, I won't do
18   wiring for this project.  Unions are very
19   strict in the area.
20          Are there any projects, to
21   your knowledge, where Midwest has done the
22   wiring on dock levelers?
23       A.  No, not to my knowledge.
24       Q.  Okay.
```

23 (Pages 89 to 92)

93

1         Do you know what it means by,
2  "unions are very strict in this area"?
3     A.  I am assuming he means it has to be an
4  electrician.
5     Q.  Okay.
6         And why is that?
7     A.  Just from my experience.  Electricians
8  claim wiring work.
9     Q.  What does that mean, they claim wiring
10 work?
11    A.  It's their work.
12    Q.  Okay.
13    A.  I don't know how to --
14    Q.  And what would happen if somebody who
15 was not -- you mean the electricians union?
16    A.  Yes.
17    Q.  And what would happen if somebody who
18 is not in the electricians union tried to do
19 the work?
20        MR. HUGHES:  I'm going to object to
21 competency.
22 BY MR. McJESSY:
23    Q.  You can go ahead and answer.
24    A.  I'm not sure what the ramification is.

94

1     Q.  Okay.
2
3         (WHEREUPON, the document was
4          marked Plaintiff's
5          Exhibit 59 for identification,
6          as of 9/23/25.)
7
8  BY MR. McJESSY:
9     Q.  I'm going to hand you what I've marked
10 as Exhibit 59.  And, again, this is another
11 series of emails, but the one I'd like you to
12 take a look at begins on the third to last
13 page, and there's an email that's highlighted
14 that says from -- actually, on yours, I don't
15 think I did highlight it, but you see the red
16 where it says external?
17    A.  Ah-huh.
18    Q.  That's not my highlighting, but -- and
19 do you see the highlighting above that that
20 says from Tony Zarlengo sent Tuesday, October
21 1, 2024?  Do you see that heading at 8:28 a.m.?
22    A.  Yes.
23    Q.  And you're copied on that email; is
24 that correct?

95

1     A.  Yes.
2     Q.  All right.
3         And it's an email that says,
4  Re, Nexus Elwood Notice to Proceed.
5         Do you see that?
6     A.  Yes.
7     Q.  All right.
8         Do you know what -- who this
9  project was for?
10    A.  ARCO Murray.
11    Q.  ARCO Murray.  Okay.
12        And -- let's see.  And it
13 looks like Midwest Dock Solutions was awarded
14 this contract; is that correct?
15    A.  Yes.
16    Q.  Okay.
17        And if you look down further
18 at the bottom on the email string at the very
19 bottom, it says on -- on Monday September 30,
20 2024, Carter Hamlin wrote.
21        Do you see that?
22    A.  Yes.
23    Q.  And it says, Ira and Tony -- Ira is
24 you, correct?

96

1     A.  Yes.
2     Q.  Huge congratulations on winning
3  Project Nexus Elwood in Elwood, Illinois.
4  Thank you for your cooperation through a long
5  bidding process.
6         Do you see that?
7     A.  Yes.
8     Q.  And then if you continue down, it
9  looks like the information that's there is
10 information for the project you were bidding
11 on, correct?
12    A.  Yes.
13    Q.  Okay.
14        And if you go to the last
15 page, it says -- at the very top of it --
16 paragraph A says, all labor is to be performed
17 by union laborers, correct?
18    A.  Yes.
19    Q.  Right.
20        So this is a project that
21 Midwest Dock was bidding on, correct?
22    A.  Yes.
23    Q.  All right.
24        So the union laborers that

24  (Pages 93 to 96)

97

```
1   it's going to use on this project are the
2   employees who are paid through Dock & Door,
3   correct?
4       A.  Correct.
5       Q.  Okay.
6               Is it unusual to get
7   contracts where the company is requiring labor
8   to be performed by union laborers?
9       A.  I wouldn't say unusual.
10      Q.  Okay.
11              That's sometimes a
12  requirement of the contracts?
13      A.  Yes.
14      Q.  And is that particularly true of the
15  large general contractors that we were talking
16  about?
17      A.  Yes.
18      Q.  Okay.
19              And Midwest Dock regularly
20  bids work that requires union labor?
21      A.  Yes.
22      Q.  Okay.
23              And although this says union
24  laborers -- and I know that the laborers union
```

98

```
1   is a particular union -- you understand that
2   this means like union carpenters doing
3   carpentry work, union electricians doing
4   electrical work, that sort of thing, correct?
5       A.  Correct.
6       Q.  Okay.
7               Now, you mentioned that
8   Midwest Dock Solutions contracts with Pepper
9   Construction, correct?
10      A.  Yes.
11      Q.  Okay.
12              And when did it start
13  contracting with Pepper Construction, do you
14  know?
15      A.  No.
16      Q.  Okay.
17              Do you know who Zach Atkins
18  is?
19      A.  Yes.
20      Q.  Who's Zach Atkins?
21      A.  He, I believe, is a project manager.
22      Q.  All right.
23              For Pepper Construction?
24      A.  Yes.
```

99

```
1           (WHEREUPON, the document was
2           marked Plaintiff's
3           Exhibit 60 for identification,
4           as of 9/23/25.)
5
6   BY MR. McJESSY:
7       Q.  All right.
8               I'm going to hand you what
9   I've marked as Exhibit 60.  And if you could
10  turn to the third to the last -- third page,
11  there's an email from you to Zach Atkins dated
12  November 4, 2019.
13              Do you see that?
14          MR. HUGHES:  What page, again?  I'm
15  sorry.
16          MR. McJESSY:  The third page back.
17          MR. HUGHES:  Okay.
18  BY MR. McJESSY:
19      Q.  Do you see that?
20      A.  Yes.
21      Q.  And that's an email from you to Mr.
22  Atkins, it looks like, forwarding a proposal
23  for the OH doors.
24              Do you see that?
```

100

```
1       A.  Yes.
2       Q.  OH stands for overhead?
3       A.  Correct.
4       Q.  Okay.
5               And then there's an email
6   above that from Zach Atkins to you dated May 1,
7   2020.
8               Do you see that?  It starts
9   on the prior page and continues over.
10      A.  Yes.
11      Q.  And he's asking if the proposal that
12  you sent is still good.
13              Do you see that?
14      A.  Yes.
15      Q.  And then on the second page just above
16  that is an email from you to Zach saying that
17  the quote is still good, correct?
18      A.  Yes.
19      Q.  All right.
20              And then on the first page of
21  this, there's a -- an email from Zach Atkins to
22  you dated May 1, 2020, and he asks, Ira, union
23  install, correct?  Do you see that?
24      A.  Yes.
```

25 (Pages 97 to 100)

101

1      Q.  And what do you understand him to be
2  asking?
3      A.  If I'm going to be using union labor
4  on this job.
5      Q.  Okay.
6          And then you respond to him
7  in the email -- that's the first email on this
8  page, May 1, 2020 -- saying, hi, Zach.  Yes,
9  that's correct.  We are union, correct?
10     A.  Yes.  That's what it says.
11     Q.  Okay.
12         That was your email to him?
13     A.  Yes.
14
15         (WHEREUPON, the document was
16         marked Plaintiff's
17         Exhibit 61 for identification,
18         as of 9/23/25.)
19
20  BY MR. McJESSY:
21     Q.  All right.
22         I'm going to hand you what
23  I've marked as Exhibit 61, and this is a
24  subcontract agreement between Midwest Dock

102

1  Solutions and Pepper Construction, correct?
2      A.  Yes.
3      Q.  All right.
4          And this one's dated May 15,
5  2020, correct?
6      A.  Yes.
7      Q.  All right.
8          And what project is this for?
9      A.  It says it's the North American
10  Warehouse Expansion.
11     Q.  Okay.
12         And if you look at the prior
13  exhibit, Exhibit 60, do you see that at the top
14  of that it says -- and the re line is North
15  American Paper, OH doors.
16         Do you see that?
17     A.  Yeah.
18     Q.  And is -- and that's dated like two
19  weeks before the subcontract agreement,
20  correct?
21     A.  Yes.
22     Q.  Okay.
23         And was that the contract
24  that you had made the proposal for?

103

1      A.  It looks like it.
2      Q.  Okay.
3          And, now, this subcontract is
4  signed by -- or appears to be signed by Anthony
5  Zarlengo.
6          Do you see that?
7      A.  Yes.
8      Q.  But at the -- at the top, do you see
9  where it says, attention, Ira Sugar?
10     A.  Ah-huh.
11     Q.  Is that a yes?
12     A.  Yes.
13     Q.  Okay.  Just so the record's clear.
14         Do you know why you were
15  listed as the a-t-t-n, colon, name?
16     A.  Because I submitted the proposal?
17     Q.  Okay.
18         It was sort of your project,
19  right?
20     A.  Yeah.
21     Q.  Okay.
22         Is Mr. Zarlengo signing this
23  because he's the owner of Midwest Dock
24  Solutions?

104

1      A.  Correct.
2      Q.  All right.
3          But you did the proposal for
4  this, right?
5      A.  Yes.
6      Q.  Okay.
7          And this was a project in
8  Glenview, Illinois; is that correct?
9      A.  Yes.
10     Q.  All right.
11         And do you see where it
12  says -- the first highlighted section of the
13  contract there where it says this subcontract
14  agreement must be signed and received in
15  addition to submitting an acceptable
16  Certificate of Insurance prior to working on
17  site.
18         Do you see that?
19     A.  I do.
20     Q.  And then it goes on to say, this
21  information must be submitted before any
22  payouts or accounting functions may proceed.
23         Do you see that?
24     A.  Yes.

26 (Pages 101 to 104)

105

1     Q.  Is that a fairly standard provision
2   with these large general contractors?
3     A.  Yes.
4     Q.  Okay.
5         And, in fact, below that,
6   there's another highlighted section that says a
7   copy of subcontractor's up-to-date insurance
8   certificate must be on file with Pepper's
9   superintendent at the job site before work can
10  be started.  Please see article ten in Exhibit
11  C for further instructions.
12        Do you see that?
13    A.  Yes.
14    Q.  Okay.
15        Do you know, is that also a
16  fairly common provision, that the -- the work
17  can't proceed at the job site before the
18  certificate of service -- strike that.
19        Do you know, is that a fairly
20  common provision, that work cannot proceed at
21  the job site unless the Certificate of
22  Insurance is submitted?
23    A.  Yes.
24    Q.  Okay.

106

1         And then if I remember
2   earlier, you described that was one of your
3   functions, was to get that Certificate of
4   Insurance on file, correct?
5     A.  Yes.
6     Q.  All right.
7         And you would have done
8   that -- or somebody at Midwest Dock would have
9   provided the Certificates of Insurance for
10  Midwest Dock on this job, correct?
11    A.  Yes.
12    Q.  Okay.
13        Would you have provided a
14  Certificate of Insurance for Dock & Door?
15    A.  No.  I wouldn't have done that.
16    Q.  Okay.
17        And if you can turn in this
18  contract a few pages back to page four, and the
19  pages are numbered in small type on the bottom.
20        Do you see that?
21    A.  Yes.
22    Q.  Okay.
23        I'd like to you take a look
24  at paragraph I.  And it says, subcontractor's

107

1   employees are required to attend Pepper's job
2   site orientation prior to beginning work on the
3   site.  Subcontractor shall coordinate and
4   schedule the orientation with Pepper's
5   superintendent in a timely manner for all
6   personnel for this project.
7         Do you see that?
8     A.  Yes.
9     Q.  This mandatory orientation consists of
10  a general safety orientation and project
11  specific orientation for each person entering a
12  Pepper job site.
13        Do you see that?
14    A.  Yes.
15    Q.  Is that something that you know was
16  done?
17    A.  No, not for a fact on this job.
18    Q.  Okay.
19        Do you know, is that
20  something that's typically done?
21    A.  It's done often.  There's -- they
22  might conduct an orientation on the first day
23  of the job.
24    Q.  Okay.

108

1         That is something that
2   happens as a matter of routine among the big
3   general contractors?
4     A.  Yes.
5     Q.  Okay.
6         And -- so the employees
7   actually have to show up on the job site and
8   attend this orientation?
9     A.  Yes.
10    Q.  Okay.
11        Is that something that you
12  would coordinate, to make sure that the people
13  get there?
14    A.  Yeah.  I mean, if they're scheduled to
15  go there, they would -- on their first day,
16  they would know to report and attend
17  orientation if -- if I was asked to do that.
18    Q.  Okay.
19        And, I guess, that's sort of
20  what I'm getting at.  Like you would get some
21  sort of notice from Pepper that says, hey,
22  here's the general orientation meeting?
23    A.  The superintendent would say, on your
24  first day, I need to meet with your guys.

27 (Pages 105 to 108)

109

1    Q.  Okay.
2         And they would reach out to
3  you for that?
4    A.  Yes.
5    Q.  Okay.
6         And then how do you make sure
7  the guys get there to be there for the
8  orientation?
9    A.  When they're scheduled for work,
10 they -- I just notify them that they report to
11 the job trailer and meet with so-and-so at a
12 specific time.
13   Q.  Okay.
14        And that's a regular part of
15 your job?
16   A.  Yes.
17   Q.  If you could turn to paragraph 22 for
18 me.
19   A.  Page?
20   Q.  Which is on page seven.  I'm sorry.
21        And can you -- can you read
22 paragraph 22, the first two sentences?
23   A.  Subcontractor agrees not to
24 sub-subcontract more than five percent of this

110

1  subcontract agreement without the written
2  consent of Pepper.
3    Q.  And the next sentence?
4    A.  Oh.
5         For all proposed
6  sub-subcontractors in excess of five percent,
7  subcontractor shall furnish Pepper an AIA
8  document A-305 or equal subcontractor's
9  qualifications statement not less than -- not
10 less than five business days prior to final
11 execution of any sub-subcontract agreement.
12   Q.  And -- now, the work in this case, the
13 labor, would have been provided by Dock & Door,
14 employees paid through Dock & Door, correct?
15   A.  Correct.
16   Q.  Okay.
17        Did Midwest, do you know,
18 sign a document with Pepper advising it that it
19 was subcontracting more than five percent of
20 this subcontract to any other company?
21   A.  I don't know.
22   Q.  Okay.
23        Are you aware of whether that
24 ever happened, whether any of the general

111

1  contractors were notified about the
2  subcontract -- about any subcontracting to
3  Dock & Door?
4    A.  No.
5    Q.  Okay.
6         And I'm going ask you to turn
7  back through that document.  You're going to
8  come across to a page called Exhibit E, scope
9  of work.  And if you look at that -- are you on
10 the first -- yes.  Excellent.  Thank you.
11        Do you see where it says
12 Midwest Dock Solutions/Ira Sugar at the upper
13 right-hand corner?
14   A.  Yes.
15   Q.  Okay.
16        Are you the person designated
17 there because you're sort of the main contact
18 on behalf of Dock & Door for this project?  Is
19 that what your understanding would be?
20   A.  I'm the main point of contact for
21 Pepper, as far as material and installation,
22 yes.
23   Q.  Okay.
24        And that's well said,

112

1  probably better than my question was your
2  answer.
3         You're -- you're the point of
4  contact person --
5    A.  Yes.
6    Q.  -- for Midwest Dock for anybody at
7  Pepper that wants to contact Midwest Dock,
8  correct?
9    A.  Yes.
10   Q.  Okay.
11        So if there's a problem on
12 the project, you're the guy they contact,
13 correct?
14   A.  Yes.
15   Q.  Okay.  Okay.
16        And then if you turn to the
17 next page, under the general requirements,
18 these are the general contract requirements,
19 correct?
20   A.  Yes.
21   Q.  And is this a document that -- that
22 you fill out, this Exhibit B?
23   A.  This is part of a pre-award preview,
24 so they -- they do this with all of the

113

1    companies that are bidding, that they're
2    looking at potentially awarding --
3        Q.   Okay.
4        A.   -- and they have these forms that are
5    filled out by both parties and reviewed over a
6    conference call before they decide who to
7    award.  And then, apparently, they've attached
8    this to the contract in this case.
9        Q.   Okay.
10           So is -- is this document
11   something that you would get through Building
12   Connections?
13       A.   No.  Usually, the contractor will have
14   narrowed it down to a few contractors that
15   they're looking to award to, and -- and then
16   they would contact you directly to review your
17   proposal and your -- your material specs,
18   whatever pertinent information.  And, quite
19   often, it's in a document like this.
20       Q.   Okay.
21           And then -- and is this
22   document -- this document something discussed
23   on the conference call?
24       A.   Yes.

114

1        Q.   Okay.
2            And the conference call, is
3    that with like Pepper Construction and those
4    subcontractors who are going to do overhead
5    door work that it's considering?
6        A.   Yeah.  But it would be one-on-one.
7        Q.   Oh, I see.
8            So when you said "a
9    conference call," you just mean a one-on-one
10   conference call?
11       A.   Yes.  Yes.
12       Q.   Okay.  I'm sorry.  I misunderstood.
13           Not a conference call with
14   multiple parties?
15       A.   No.
16       Q.   So they'd call you up on the phone and
17   go over this?
18       A.   Yes.
19       Q.   And is this document -- like where it
20   says included, do you see where -- and do you
21   see where it says union installations are
22   utilized for all work performed on the job
23   site?
24       A.   Yes.

115

1        Q.   And it says included.
2            Do you see that?
3        A.   Right.
4        Q.   Is that something you filled in, or is
5    that something they filled in based on the
6    conversation with you?
7        A.   They filled in based on our
8    conversation.
9        Q.   Okay.
10           So they go through this with
11   you on the phone?
12       A.   Yeah.  It's essentially like their
13   checklist.
14       Q.   I get it.
15           So they call you up with this
16   checklist and they ask you the questions and
17   they fill it out?
18       A.   Correct.
19       Q.   Okay.
20           So you would have had a call
21   with somebody at Pepper.  And they would have
22   said, is union installation utilized for all
23   work performed on the job site, and you would
24   have said yes?

116

1        A.   Yes.
2        Q.   And they would have said included?
3        A.   Right.
4        Q.   Okay.
5            And then if you turn to the
6    next page -- well, let's see.  Let me pick
7    one -- pick one at random that says N/A.
8            There's one -- I don't have
9    it highlighted, but do you see where it says,
10   Schedule Requirements?
11       A.   Yes.
12       Q.   And there's an entry above that that
13   says, subcontractor agrees to provide all
14   progress of record as bill documents required
15   by applicable specifications.  And then it
16   says, N/A.
17           Do you see that?
18       A.   Yeah.
19       Q.   So during your call with them, they
20   would have either not asked you that, because
21   it's not applicable, or you would have told
22   them this doesn't apply to us?
23       A.   I would believe that -- the first.
24       Q.   Okay.

29 (Pages 113 to 116)

117

1    They wouldn't have even asked
2  you if it's not applicable?
3    A.  Right.
4    Q.  Okay.
5        And then at the bottom, it
6  says, Clean-Up Requirements, all clean-up shall
7  be performed by union laborers required by the
8  union having jurisdiction.  And that says,
9  included, also, correct?
10   A.  Yes.
11   Q.  All right.
12       And does your -- does Midwest
13 provide clean-up as part of the work that it's
14 doing?
15   A.  No.  The Dock & Door guys should be
16 cleaning up as they go.
17   Q.  Okay.
18       Does Midwest Dock have any
19 sales persons other than you that sell new
20 construction?
21   A.  Only Tony Zarlengo and the dock
22 equipment.
23   Q.  Okay.
24       And you mentioned that was

118

1  changed -- going to change, and you haven't
2  sold any dock equipment yet, have you?
3    A.  I am bidding.
4    Q.  Okay.
5    A.  But I have not actually executed
6  anything yet.
7    Q.  All right.
8        So when did you start
9  bidding -- when did you start bidding the dock
10 equipment, the dock levelers?
11   A.  Two, three months.
12   Q.  Oh, just recently.
13   A.  Yeah, yeah, yeah.
14   Q.  And if you could turn to the fourth
15 page from the end -- that's Exhibit C -- and
16 that provides the insurance, the requirement
17 for you to provide the Certificate of
18 Insurance, correct?  At the top.
19   A.  Yeah.
20   Q.  Where it says, please issue a
21 Certificate of Insurance for the project
22 referenced below, and in accordance with the
23 following requirements, submit to the same
24 address as shown as certificate holder, thank

119

1  you; is that correct?
2    A.  Yes.
3    Q.  And then it tells you where to provide
4  the certificate.  And in this case, it says,
5  certificate holder, Pepper Construction
6  Company, attention Zach Atkins; is that
7  correct?
8    A.  Yes.
9    Q.  So you would provide him with the
10 Certificate of Insurance?
11   A.  Yes.  I would get it from the
12 insurance and send it to him.
13   Q.  Okay.
14       And then if you look at the
15 next page and look at paragraph H and it says,
16 a Certificate of Insurance on an ACORD Form and
17 the additional insured endorsement, including a
18 waiver of subrogation, must be delivered to the
19 Pepper project manager of record and faxed to
20 the Pepper job site field superintendent prior
21 to the commencement of any work, is that
22 something that you typically would do?
23   A.  I'm unsure if this is any different
24 from what you just asked me.

120

1    Q.  Is that -- well, what I asked you
2  previously was whether these were the
3  requirements.
4        Is Zach -- is Zach Atkins the
5  superintendent?
6    A.  He would be the project manager.
7    Q.  He would be -- so he would be the
8  person you provide it to?
9    A.  Yes.
10   Q.  Okay.
11       So it is the same thing.
12 It's providing him with the Certificate of
13 Insurance?
14   A.  Okay.
15   Q.  Is that correct?  Is that how you read
16 that?
17       MR. HUGHES:  Asked and answered.
18 BY MR. McJESSY:
19   Q.  You can answer still.
20   A.  Yeah.  It's just the way this is
21 worded is confusing to me.
22   Q.  Okay.
23       And -- but you understood you
24 had to provide the Certificate of Insurance

30 (Pages 117 to 120)

121

1  before -- before Midwest would start any work?
2      A. Yes.
3      Q. Okay.
4
5          (WHEREUPON, the document was
6          marked Plaintiff's
7          Exhibit 62 for identification,
8          as of 9/23/25.)
9
10 BY MR. McJESSY:
11     Q. I'll hand you what I've marked as
12 Exhibit 62, and if you could take a look at
13 the -- well, if you could take a look at the
14 last page of this exhibit, it appears to be a
15 change order for the same contract we were just
16 looking at, correct?
17     A. Yeah.
18     Q. All right.
19          And then if you look at the
20 prior page, which is the last email in this
21 string, it's an email dated, Friday, August 28,
22 2020, and it's an email from Zach Atkins to you
23 and somebody named Bob Ellison.
24          Do you know who Bob Ellison

122

1  is?
2      A. No. But based on the email, he's
3  doing the dock levelers.
4      Q. All right.
5          How do you know that?
6      A. He's with Fairborn.
7      Q. Oh, he's with -- okay.
8          So you can tell from his
9  email address?
10     A. Yes.
11     Q. Okay.
12          So this is an instance where
13 you're doing -- Midwest is doing the doors, and
14 another company is doing the dock levelers,
15 correct?
16     A. Yes.
17     Q. Okay.
18          So Mr. Zarlengo's bid wasn't
19 as good as yours?
20     A. Sometimes it just comes down to
21 manufacturer.
22     Q. Okay.
23          So it says, slab is slated
24 for 9/21 hyphen 9/29. Paint has been underway

123

1  for a week and will be done by mid September.
2  Mid S-e-p-t period. Please send me your
3  delivery schedule for levelers, comma, doors
4  and shelters.
5          So would Midwest being doing
6  the doors and shelters?
7      A. No. Well, doors, yes.
8      Q. Okay.
9          And what about the shelters?
10     A. That, I assume, would be part of
11 levelers.
12     Q. Okay.
13          So you're getting this email
14 because here he's giving you sort of an update
15 on where the project is, is that it?
16     A. Yes.
17     Q. Okay.
18          And he wants to let you know
19 so -- because you're going to be doing the
20 doors?
21     A. Yes.
22     Q. Okay.
23          And then if you look at the
24 prior page, that's an email from you to Mr.

124

1  Atkins responding, correct?
2      A. My page isn't highlighted.
3      Q. No, I know, but it's at the -- it's at
4  the bottom. It says, Friday, August 28, 2020,
5  at 2:54 p.m.
6          Do you see that email?
7      A. 28th, 2:54?
8      Q. Yeah.
9      A. Yeah.
10     Q. And it's an email from you to Zach
11 Atkins, and you copy John Carpenter, correct?
12     A. Yes.
13     Q. All right.
14          And it's for the North
15 American in Glenview.
16          That's the project that we
17 looked at the contract for, correct?
18     A. Yes.
19     Q. All right.
20          And can you read the first
21 sentence of your -- your email to Mr. Atkins?
22     A. My lead time is roughly four weeks for
23 doors.
24     Q. All right.

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

125

1    And the next sentence, too,
2 please?
3    A.  It would be nice to have the levelers
4 in, if possible, so we don't have to work over
5 open pits.
6    Q.  Okay.
7    And who does the "we" refer
8 to?
9    A.  To the installers.
10    Q.  Okay.
11    To the installers who are
12 going to be out there, correct?
13    A.  Yeah.
14    Q.  Okay.
15    On behalf of Midwest?
16    A.  Yes.
17    Q.  Okay.
18    And then there's an email
19 above that from Zach Atkins to you dated August
20 28, 2020, at 3:12, so just shortly after you
21 send your email.
22    Do you see that?
23    A.  Yes.
24    Q.  It says -- and the email says, we put

126

1 l-i-l pep in our step.  We put a little pep in
2 our step I think is what it's supposed to say?
3    A.  Yeah.
4    Q.  Please order them based on the
5 approvals.  If for some reason we end up
6 stacking without levelers, I will compensate
7 you for the additional time, effort, and a boom
8 lift charge.
9    What does that mean?  What is
10 he telling you?
11    A.  If the leveler is not in the pit.
12 There's a pit that the leveler sits in.
13    Q.  Yes.
14    A.  You can't drive a scissor lift up to
15 where you're going to install the door.
16    Q.  Okay.
17    A.  So, therefore, you have to get a boom
18 lift that reaches over the pit and work -- you
19 work off of a boom lift.
20    Q.  I get it.
21    And that -- and that's an
22 additional cost?
23    A.  Yes.  The boom lift costs more than a
24 scissor lift.  It takes a little more time and

127

1 effort to install without -- from a boom lift.
2    Q.  Okay.
3    So it's an additional cost to
4 Midwest.  And they're saying, we'll compensate
5 you for that?
6    A.  Yes.
7    Q.  Okay.
8    Now, Midwest has a -- has a
9 scissor lift, correct?
10    A.  Yes.
11    Q.  Does it usually take that lift out to
12 job sites?
13    A.  Not long-term job sites, no.
14    Q.  Okay.
15    Oh, just short-term job
16 sites?
17    A.  Right.
18    Q.  What would be a short-term job site
19 versus a long-term job site?
20    A.  Like one, two days versus longer,
21 three -- three days to months.
22    Q.  Okay.
23    Would -- would the scissor
24 lift be taken out to job sites for these --

128

1 some of these larger contractors?
2    A.  Not likely.
3    Q.  Not likely.
4    And if you could turn to the
5 prior page, there's an email I want to ask you
6 about in the middle.  It's dated September 28,
7 2020, at 11:20 a.m.
8    Do you see that?
9    A.  Yes.
10    Q.  And that's an email from you to Zach
11 Atkins, correct?
12    A.  Yes.
13    Q.  And it says, hi, Zach, the doors are
14 coming on Wednesday afternoon.  We have a
15 finished floor and no levelers, correct?
16 Please let me know.  Thank you.
17    Did I read that right?
18    A.  Yes.
19    Q.  And this has to do with the issue that
20 the levelers aren't in, so you're going to have
21 to use a boom lift, correct?
22    A.  That's the question, yes.
23    Q.  Okay.
24    How do you know what the

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

129

1   status is of the job at this point?
2       A.   I'm trying to find that out by asking.
3       Q.   I see.   You don't -- well, it says, we
4   have a finished floor and no levelers, correct?
5   So it sounds like you -- that that's what you
6   believe, or is it just because of his prior
7   emails?
8       A.   Right.   I'm essentially asking.
9       Q.   Okay.
10      A.   Yeah.
11      Q.   You don't know one way or the other?
12      A.   Right.
13      Q.   And then if you could turn to the
14  prior page, the middle of that page, there's an
15  email from you to Zach Atkins dated October 1,
16  2020.
17              Do you see that?
18      A.   Yes.
19      Q.   And it says, hi, Zach, please find
20  attached the change order request.   I realized
21  I didn't get a CO for the size change on the
22  drive-in doors.   I added the boom lift to that.
23  Please send a CO at your earliest convenience.
24  Thank you, Ira Sugar.

130

1              Did I read that right?
2       A.   Yes.
3       Q.   And is that the change order that's
4   attached to this string of communications?
5       A.   Yes.
6       Q.   Okay.
7              And that's basically saying
8   we received an increased cost for a couple of
9   things that were not what was in the contract,
10  so you're going to pay us a little bit more?
11      A.   Correct.
12      Q.   All right.
13             And then it looks like -- if
14  you look at the emails directly above that, it
15  looks like that change order goes back and
16  forth between the two parties for a signature.
17             Is that fair?
18      A.   Yes.
19      Q.   All right.
20             And then they send you the
21  final signed version from Pepper, correct?
22      A.   Yes.
23      Q.   All right.
24             Is this -- this email

131

1   exchange and the work -- you know, your
2   communications with Pepper Construction -- is
3   this the kind of thing that you do day in and
4   day out for these kind of projects?
5       A.   Yeah.
6       Q.   All right.
7              Coordinating work to be done,
8   when it's going to be done, changes in the
9   contract and change orders, that kind of thing?
10      A.   Correct.
11      Q.   All right.
12             And that's pretty much true
13  for all of the general contractors that we were
14  talking about earlier?
15      A.   Yes.   Anything I'm awarded.
16      Q.   Right.
17             On projects, right, where
18  you're the contact person?
19      A.   Yes.
20      Q.   Yeah.
21
22
23
24

132

1              (WHEREUPON, the document was
2              marked Plaintiff's
3              Exhibit 63 for identification,
4              as of 9/23/25.)
5
6   BY MR. McJESSY:
7       Q.   There's 63.
8              All right.   So this is
9   another subcontract agreement between Midwest
10  Dock Solutions and Pepper Construction,
11  correct?
12      A.   Yes.
13      Q.   All right.
14             And -- except this one is
15  actually signed by you, correct?
16      A.   It appears that way.
17      Q.   Okay.
18             Was there a -- is there a
19  reason that the other contract we looked at was
20  signed by Mr. Zarlengo and this one is signed
21  by you?
22      A.   I'm unsure.   I don't typically sign
23  contracts or read them.   I find that odd.
24

33 (Pages 129 to 132)

133

```
 1              (WHEREUPON, the document was
 2          marked Plaintiff's
 3          Exhibit 64 for identification,
 4          as of 9/23/25.)
 5
 6   BY MR. McJESSY:
 7      Q.  I'm going to hand you what I've marked
 8   as Exhibit 64, and that's a standard form of
 9   subcontract agreement between contractor and
10   subcontractor, between Principal Construction
11   and Midwest Dock Solutions, correct?
12      A.  Yes.
13      Q.  All right.
14              And if you look at the last
15   page of -- well, let's -- I'm sorry.  It's got
16   a number on the bottom, Principal 0234.
17              All right.  And that appears
18   to be also your electronic signature, correct?
19      A.  It does.
20      Q.  All right.
21              Do you sometimes sign
22   contracts with an electronic signature?
23      A.  I don't think so.
24      Q.  Is it -- is it possible somebody else
```

134

```
 1   could have signed your name to the contract?
 2      A.  I wonder if it's emailed to me and
 3   somehow it populates that way.
 4      Q.  Okay.
 5              Even though you don't sign
 6   it, it automatically populates the signature
 7   that way?
 8      A.  I wonder, yes.
 9      Q.  Okay.
10              Because you don't sign
11   contracts very often, so you think that you --
12      A.  Well, I try not to sign contracts.  I
13   will sign a change order because it's just a
14   product and it -- and a number.  There's no
15   real verbiage there.
16
17              (WHEREUPON, the document was
18          marked Plaintiff's
19          Exhibit 65 for identification,
20          as of 9/23/25.)
21
22   BY MR. McJESSY:
23      Q.  All right.
24              I'm going to hand you what
```

135

```
 1   I've marked as Exhibit 65, and this is a
 2   contract between Meridian Design Build and --
 3   and Midwest Dock Solutions.  And if you look
 4   at -- oh, the fourth page in, that appears to
 5   be your electronic signature also.
 6              Do you see that?
 7      A.  Yes.
 8      Q.  Okay.
 9              So -- and I'll represent to
10   you that, you know, the general contractors
11   have produced a lot of contracts.  I haven't
12   printed them all out in this case, but your
13   signature is on a lot of them.
14              Do you think that -- that you
15   didn't sign them or you -- you know, you didn't
16   click the box to electronically sign it?
17      A.  I don't recall, no.
18      Q.  Okay.
19              You're not sure, but it's
20   your recollection you didn't sign many
21   contracts?
22      A.  Correct.
23      Q.  Okay.  The -- okay.
24              Are contracts, final
```

136

```
 1   contracts typically emailed to you?
 2      A.  They usually come in a DocuSign type
 3   of --
 4      Q.  They do?
 5      A.  Yeah.
 6      Q.  And then do you sign -- do you click
 7   on the DocuSign links, or do you forward the
 8   email to -- to somebody else?
 9      A.  I will open it and review that the
10   dollar amounts and the scope of work is
11   correct, and then I forward it to Tony.
12      Q.  I see.  Okay.
13              So if the -- the DocuSign box
14   gets clicked, it could be that Tony's clicking
15   it, Tony Zarlengo, and it's auto populating
16   your name because the email came to you?
17      MR. HUGHES:  Objection.  Calls for
18   speculation.
19   BY MR. McJESSY:
20      Q.  Yeah.  Well, I'm trying to figure
21   out --
22      A.  Potentially.  Speculation.  That's
23   just speculation.
24      Q.  But you think you didn't sign -- you
```

34 (Pages 133 to 136)

137

1  don't recall signing many contracts at all?
2     A.  No.  I try not to sign contracts.
3     Q.  Okay.
4          I'm going to hand you what
5  I've marked as Exhibit 64.
6          MR. HUGHES:  I think we're on 66.
7          MR. McJESSY:  Oh, are we on -- oh,
8  okay.  Let me relabel that.
9
10         (WHEREUPON, the document was
11          marked Plaintiff's
12          Exhibit 66 for identification,
13          as of 9/23/25.)
14
15  BY MR. McJESSY:
16     Q.  I'm going to hand you what I've
17  marked, I'm sorry, as Exhibit 66.
18          All right.  And this appears
19  to be an email from Christi Adams to a lot of
20  people but one of which is you, correct?
21     A.  Yes.
22     Q.  All right.
23          And it looks like it's
24  forwarding a document called a foreman's

138

1  meeting TS.
2          Do you see that?
3     A.  Yes.
4     Q.  And it's -- Christi Adams is a project
5  coordinator for Pepper Construction; is that
6  right?
7     A.  Yes.
8     Q.  All right.
9          Somebody who you deal with?
10    A.  Sometimes, yes.
11    Q.  Okay.
12         And it says, please see
13  attached form and meeting record slash agenda
14  from today's meeting.  Any questions, please
15  let us know, thank you; is that correct?
16    A.  Yes.
17    Q.  All right.
18         And attached it looks like
19  it's foreman meeting notes, correct?
20    A.  Yes.
21    Q.  All right.
22         And is this a -- the kind of
23  document -- well, strike that.
24         What is the foreman's

139

1  meeting?
2     A.  Some contractors conduct weekly
3  meetings with the foremen on site to discuss
4  schedule, safety, anything they should be aware
5  of.
6     Q.  Okay.
7          And how is that done, in
8  person, Zoom, conference call?
9     A.  All of the above.
10    Q.  Oh, all of the above?
11    A.  Yeah.
12    Q.  Okay.
13         And are those meetings that
14  you would attend?
15    A.  Yeah.  There are conference calls that
16  I would attend to discuss the schedule.  There
17  are on site meetings where the -- one of the
18  installers would go and -- and attend this.
19  It's usually pretty short.
20    Q.  Okay.
21         And one of the installers
22  would be who, somebody from --
23    A.  Dock & Door.
24    Q.  Dock & Door?

140

1     A.  Yeah.
2     Q.  All right.
3          So you're being forwarded the
4  agenda.
5          Is this for a meeting that's
6  already occurred and they're sending the notes
7  of what happened?
8     A.  Yeah.
9     Q.  Okay.
10         And is this the kind of
11  meeting you would have attended in some
12  capacity?
13    A.  Usually not on site, no.
14    Q.  Okay.
15         But if it's a Zoom or a
16  conference call, then you would?
17    A.  Yes.
18    Q.  Okay.
19         So it's either you at the
20  office or somebody from Dock & Door on the
21  site?
22    A.  Right.
23    Q.  Okay.
24         And if you look at this,

35 (Pages 137 to 140)

141

1  there's a -- on the last page -- second to last
2  page has a heading that says schedule.
3      Do you see that?
4  A. Yes.
5  Q. And then it's got lettered paragraphs,
6  and in paragraph G is Midwest Dock Equipment on
7  site, working on four large OH doors.
8      That's overhead doors?
9  A. Yes.
10 Q. Start stacking 25 doors, 13 hyphen 25.
11 Then make them operable. Two large doors on
12 south side were installed yesterday, doing two
13 north side today.
14     Do you see that?
15 A. Yes.
16 Q. Did I read that right?
17 A. Yes.
18 Q. Okay.
19     And that's describing the
20 work that Midwest Dock Solutions is doing,
21 correct?
22 A. What the installers are doing, yes.
23 Q. Okay.
24     Well, it says Midwest Dock

142

1  Equipment.
2      Is that -- do you understand
3  that to mean Midwest Dock, the company you're
4  working for?
5  A. Yes.
6  Q. Okay.
7
8      (WHEREUPON, the document was
9      marked Plaintiff's
10     Exhibit 67 for identification,
11     as of 9/23/25.)
12
13 BY MR. McJESSY:
14 Q. Let me hand you what I've marked as
15 Exhibit 67.
16     And just going back to
17 Exhibit 66, again, this is the kind of activity
18 that you would participate in your work for
19 Midwest Dock Solutions?
20 A. Yeah.
21 Q. Okay.
22     And it would be with other --
23 although the meetings might take place in
24 different ways, it would be the same for any of

143

1  the general contractors, correct?
2  A. Yes.
3  Q. And if we turn to Exhibit 67, it looks
4  like Chance Van Dyck sent you an email about
5  the Matteson 57 project.
6      Do you see that?
7  A. Yes.
8  Q. And it looks like it's a punch list
9  report, correct?
10 A. Yes.
11 Q. Again, is this the kind of email that
12 you would typically receive in -- in your work,
13 like here's the punch list for things that need
14 to be finished?
15 A. Yes.
16 Q. Okay.
17     And then what would you with
18 an email like this that has this kind of punch
19 list information?
20 A. Order materials and schedule labor.
21 Q. Okay.
22     And how would you -- and
23 how -- so you'd schedule the materials from
24 whoever your supplier is?

144

1  A. Correct.
2  Q. And how would you schedule the labor?
3  A. The same way, do the installation.
4  Q. Okay.
5      Just reach out to whoever the
6  installers you want on the job are and tell
7  them?
8  A. Right.
9
10     (WHEREUPON, the document was
11     marked Plaintiff's
12     Exhibit 68 for identification,
13     as of 9/23/25.)
14
15 BY MR. McJESSY:
16 Q. All right.
17     Let me hand you what I've
18 marked as Exhibit 68.
19     All right. And this is
20 another email from somebody at Pepper
21 Construction concerning another foreman's
22 meeting, correct?
23 A. Yes.
24 Q. Okay.

36 (Pages 141 to 144)

145

```
1              And, again, you're -- you're
2   one of the voluminous people on the email
3   addressee list, correct?
4       A.  Yes.
5       Q.  Okay.
6              And this one says, good
7   morning, team.  Please find the attached
8   meeting summary from Tuesday's 2/14 meeting at
9   the site.
10             Do you see that?
11      A.  Yes.
12      Q.  So this -- this one actually must have
13  been a meeting on the job site, correct?  Is
14  that how you would take that?
15      A.  It reads that way, yes.
16      Q.  Okay.
17             And then if you look, there's
18  an attached summary of the meeting minutes,
19  correct?
20      A.  Yes.
21      Q.  All right.
22             And because this is an
23  on-site meeting, do you think that you would
24  not have attended this?
```

146

```
1       A.  No.
2       Q.  Okay.
3              You would -- somebody from
4   Dock & Door, one of the employees paid through
5   Dock & Door, would have attended this?
6       A.  Potentially.
7       Q.  Okay.
8              Do you know how -- like
9   how -- how would they know about when the
10  meeting is and where it is?
11      A.  Usually, the superintendent would tell
12  either me or them.
13      Q.  Okay.
14             So the superintendent on the
15  job sites will communicate with you?
16      A.  Yes.
17      Q.  And then what would --
18      MR. HUGHES:  Objection.  That isn't
19  his testimony.
20  BY MR. McJESSY:
21      Q.  You or -- communicate with you or
22  sometimes them, I'm sorry, directly, correct?
23      MR. HUGHES:  Objection.  Misstates
24  his testimony.
```

147

```
1       THE WITNESS:  That's what I said,
2   yeah.
3   BY MR. McJESSY:
4       Q.  Okay.  That's what I thought.
5              And -- and if they
6   communicate to you, how do you communicate with
7   somebody at Dock & Door to make sure they're
8   out there?
9       A.  By text, usually.
10      Q.  Okay.
11             And do you have the text
12  numbers for -- or the phone numbers for the
13  workers from Dock & Door?
14      A.  Yes.
15      Q.  Okay.
16             How -- how would you know who
17  to send the text to?  You'd know who was on the
18  job?
19      A.  Right.
20      Q.  Okay.
21             Because you assigned them to
22  the job?
23      A.  Right.
24      Q.  Okay.
```

148

```
1              And if you look at the -- the
2   foreman meeting minutes in this case, if you
3   look at -- it's another schedule.  It looks
4   like it's scheduling, another schedule item F
5   on the last page, Midwest Dock Equipment
6   working on doors on southwest side CL 13-25.
7   They did not show up on Monday and are not on
8   site today.
9              Do you see that?
10      A.  I do.
11      Q.  And that's -- they did not show up on
12  Monday and are not on site today is in red
13  text.
14             Do you -- do you see that?
15      A.  Yes.
16      Q.  Okay.
17             What would you do in response
18  to something like this?
19      A.  Nothing.
20      Q.  Okay.
21      A.  Because --
22      Q.  Why not.
23      A.  -- I feel like they're just
24  documenting.
```

37 (Pages 145 to 148)

149

1    Q. Oh, I see. Not that they were
2  supposed to be there. They just weren't there?
3    A. They could have been supposed to be
4  there. I -- I don't recall.
5    Q. Okay.
6         And, again, you understand
7  the Midwest Dock Equipment is referring to
8  Midwest, the company you work for, correct?
9    A. Say that again?
10   Q. You understand that the phrase,
11 "Midwest Dock Equipment," is referring to the
12 company that you're working for, correct,
13 Midwest Dock Solutions?
14   A. Yes.
15
16         (WHEREUPON, the document was
17          marked Plaintiff's
18          Exhibit 69 for identification,
19          as of 9/23/25.)
20
21 BY MR. McJESSY:
22   Q. I'm going to hand you what I've marked
23 as Exhibit 69. And, actually, let's -- I'll
24 hand you Exhibit 70 at the same time.

150

1         (WHEREUPON, the document was
2          marked Plaintiff's
3          Exhibit 70 for identification,
4          as of 9/23/25.)
5
6  BY MR. McJESSY:
7    Q. I'd like you to go back to Exhibit 64
8  for a minute, if you would. And that was the
9  subcontract from Principal Construction. It
10 also had subcontract change orders attached to
11 it. If you could turn to just one of the last
12 three pages. Any of them are fine.
13   A. Yeah.
14   Q. Those are all subcontract change
15 orders that also appear to have your electronic
16 signature.
17         Do you see that?
18   A. Yes.
19   Q. If you got -- and I think you answered
20 this, but I just want to be sure.
21         If you received the change
22 order, say, separate from the contract -- it
23 was just a separate change order like this, and
24 it had a DocuSign link for you to sign -- is

151

1  that something you'd click on and sign?
2    A. Yes. There's no verbiage here. It's
3  just a dollar amount and -- and the change, and
4  I'm okay with that.
5    Q. Okay.
6         You're comfortable signing
7  that?
8    A. Yes.
9    Q. Okay.
10        Because you know what changes
11 are made on the project because you're sort of
12 running it, correct?
13   A. Correct.
14   Q. Okay.
15        Both Exhibit 69 and Exhibit
16 70 are also subcontracts with -- with Pepper
17 Construction.
18        Do you see that?
19   A. Yes.
20   Q. And, again, these have your electronic
21 signature on them.
22        Do you see that?
23   A. I do see that.
24   Q. Okay.

152

1         But -- do you think these
2  would be contracts that you would have like
3  received by email and then forwarded to Mr.
4  Zarlengo --
5    A. Yes.
6    Q. -- to sign?
7         It's your -- your best
8  recollection that you wouldn't have signed
9  these because they're the actual contract,
10 correct?
11   A. Yes.
12   Q. Okay.
13        Now, Exhibit 69 is for an LPC
14 Palatine I, LP project, correct?
15   A. Yes.
16   Q. And, again, it says, attention Ira
17 Sugar on it.
18        Do you see that?
19   A. Yes.
20   Q. So do you think that's a project that
21 you would have prepared the bid for?
22   A. Yes.
23   Q. You mentioned that Mr. Zarlengo, up
24 until -- Tony Zarlengo, up until maybe a few

38 (Pages 149 to 152)

153

1 months ago, would bid the -- the dock leveler
2 work?
3 A. Yes.
4 Q. And you just did doors?
5 A. Right.
6 Q. Exhibit 70 is for R. R. Donnelley
7 Wallace Avenue Expansion.
8 Do you see that?
9 A. Yes.
10 Q. It's a contract dated March of last
11 year, correct?
12 A. Yes.
13 Q. Do you recall, is that a contract you
14 would have prepared the bid for?
15 A. Yes.
16 Q. And would you have prepared the bid
17 for the LPC Palatine I project as well?
18 A. Yes.
19
20 (WHEREUPON, the document was
21 marked Plaintiff's
22 Exhibit 71 for identification,
23 as of 9/23/25.)
24

154

1 BY MR. McJESSY:
2 Q. Let me hand you what I've marked as
3 Exhibit 71.
4 Now, this is an email -- I
5 want to talk to you about the email on the --
6 the first email on the page. It's an email
7 from you to Christi Adams, correct?
8 A. Yes.
9 Q. And she's with Pepper Construction?
10 A. Yes.
11 Q. All right.
12 And this concerns the
13 R. R. Donnelley Wallace project that we just
14 looked at the contract for?
15 A. Yes.
16 Q. All right.
17 And it says, hi, Christi
18 please find attached are COIs and submittals.
19 Hormann Doors need to know which side the
20 operator and controls go on, what color panel,
21 and what voltage slash phase, question mark,
22 what color for Cornell fire doors, question
23 mark.
24 Is that -- did I read that

155

1 accurately?
2 A. Yes.
3 Q. Okay.
4 And then you signed it Ira
5 Sugar, correct?
6 A. Yes.
7 Q. All right.
8 And then attached -- the
9 attachments it shows are the COI auto and COI.
10 Do you see that?
11 A. Yes.
12 Q. And if you turn back in this -- to the
13 documents that are the attachments after the
14 email, there's a Certificate of Insurance for
15 Midwest Dock Solutions for State Farm, it looks
16 like, which is the auto policy that you said,
17 correct?
18 A. Yes.
19 Q. And then the Certificate of Insurance
20 from Holden Agency for the liability, correct?
21 A. Correct.
22 Q. And then the Certificates of Insurance
23 down below in the description of operations
24 identify the R. R. Donnelley Wallace project,

156

1 correct?
2 A. Yes.
3 Q. All right.
4 So this is an example of you
5 obtaining the Certificates of Insurance and
6 providing them, correct?
7 A. Correct.
8 Q. Okay.
9 And do you know if any
10 arrangements were made to provide certificates
11 of liability insurance for Dock & Door?
12 A. I don't know.
13 Q. Okay.
14 But you wouldn't have done
15 that?
16 A. No.
17 Q. Okay.
18 And also attached to this as
19 one of the attachments is something that says
20 Cornell Innovative Door Solutions.
21 Do you see that?
22 A. Yes.
23 Q. Okay.
24 And could you go back to the

39 (Pages 153 to 156)

157

1  Exhibit 57, which is the website?  And if you
2  go to the product section, back to the rolling
3  steel doors --
4      A.  Yep.
5      Q.  -- is that -- this is Midwest Dock
6  Solutions' website, right, Exhibit 57, where it
7  says rolling steel doors?
8      A.  Yes.
9      Q.  All right.
10         And it has Cornell Safe and
11 Secure.
12         Do you see that?
13     A.  Yes.
14     Q.  Is that the same Cornell Company that
15 is referenced in the attachment to Exhibit 71?
16     A.  Yes.
17     Q.  All right.
18         And is that sort of an
19 example of a rolling steel door?
20     A.  Correct.
21     Q.  Okay.
22         So it's a door -- not, maybe,
23 this door, but a similar door to that that's
24 being discussed with Pepper Construction,

158

1  correct?
2      A.  Yes.
3      Q.  All right.
4          And then if you continue
5  back, you come to -- another attachment to the
6  email is an example of a Hormann door,
7  H-o-r-m-a-n-n.
8          Do you see that?
9      A.  Yes.
10     Q.  All right.
11         And if you look at the next
12 page in Exhibit 57, where it says high-speed
13 doors, Hormann -- do you see that?
14     A.  Yes.
15     Q.  Okay.
16         Is that also a product that
17 Midwest Dock promotes on its website?
18     A.  Yes.
19     Q.  All right.
20         And it's basically a similar
21 door that's being promoted to Pepper
22 Construction, correct?
23     A.  Correct.
24     Q.  All right.

159

1          And your proposal says, a
2  fast opening speed of 80 inches per second.
3          Like six feet a second?
4      A.  More than six feet, yeah.
5      Q.  All right.
6          So the kind of items that
7  you're going to install for Pepper Construction
8  on this job are the kind of items that are
9  shown on Midwest Dock Solutions' website,
10 correct?
11     A.  Yes.
12     Q.  And if you look at the email below --
13 below -- if you go back to Exhibit 71 and look
14 at the second email on this page, it's from
15 Christi Adams dated March 28, 2024, at 12:50
16 p.m.
17         Do you see that?
18     A.  Yep.
19     Q.  And it's addressed to Tony Brutti, and
20 his email address is
21 tonyb@midwestdocksolutions.com.
22         Do you see that?
23     A.  I do.
24     Q.  All right.

160

1          Is that an email address
2  you're aware that Mr. Brutti uses?
3      A.  Yes.
4      Q.  Okay.
5          And has he used that email
6  for a long time?
7      A.  He did.
8      Q.  Okay.
9          Did it change?
10     A.  Yes.
11     Q.  When did it change?
12     A.  Several months ago.  I'm not sure.
13     Q.  Okay.
14         Do you know why it changed?
15     A.  I think, because of this.
16     Q.  Because of this lawsuit?
17     A.  Yeah.
18     Q.  All right.
19         What do you know about that?
20     A.  Not much.  Just trying to do better.
21     Q.  What's that mean?
22     A.  Separating himself from us situation.
23     Q.  Okay.
24         Because of the -- because of

161

1    the lawsuit?  Because of this lawsuit?
2       A.  Yes.
3       Q.  Okay.
4            And if you look at the last
5    page of these emails, which is page four of
6    this exhibit, because of the way that the
7    email's forwarded, it puts the signature line
8    for certain emails that were sent by Mr. Brutti
9    at the end.
10           Do you see that?
11      A.  I do.
12      Q.  And it says Tony Brutti, Midwest Dock
13   Solutions.
14          Do you see that?
15      A.  I do.
16      Q.  Okay.
17          Now, is that a closing block
18    that you've seen on other emails from Tony
19   Brutti?
20      A.  I don't receive that many emails from
21   him.
22      Q.  Okay.
23          Is it an email block, though,
24    that you've seen on emails from Tony Brutti?

162

1      A.  Yes.  I think so.
2      MR. McJESSY:  Why don't we take five
3   minutes.
4
5        (After a break from 1:34 p.m.
6        to 1:38 p.m., the deposition
7        was resumed as follows:)
8
9      MR. HUGHES:  Seventy-one is the last
10   one I have.
11      MR. McJESSY:  That's Exhibit 72.
12
13      (WHEREUPON, the document was
14       marked Plaintiff's
15       Exhibit 72 for identification,
16       as of 9/23/25.)
17
18   BY MR. McJESSY:
19      Q.  All right.
20          Handing you what's been
21   marked as Exhibit 72, I feel like this is still
22   the -- an email exchange concerning the same
23   project we've been talking about, the Donnelley
24   Wallace -- R. R. Donnelley Wallace project,

163

1    correct?
2      A.  Yes.
3      Q.  Okay.
4          And it looks like -- if you
5    look at the second page, there's an email at
6    the top dated April 16, 2024, from Tim Lumpp.
7         Do you see that?
8      A.  Yes.
9      Q.  And it says, Ira, can you please
10   confirm you received the return submittals
11   yesterday and are moving forward with
12   procurement?  We've also reviewed the rapid
13   roll-up door product data, shop drawings, and
14   installation instructions and cannot find
15   backing requirement slash details to mount the
16   door on the drywall partition.  Can you
17   provide?  Do you know where the backing is
18   needed?
19         Do you see that?
20      A.  Yes.
21      Q.  And then it looks like you respond to
22   him.
23         That's the email on the
24   bottom of the first page, correct?

164

1      A.  Yes.
2      Q.  All right.
3         And then it looks like the
4    top email on the first page is forwarding to
5    you drawings to show how the product is to be
6    installed, is that it, or can you tell me what
7    the -- what the -- what the second transmittal
8    is supposed to show?
9      A.  Where he says, see attached?
10      Q.  Yeah.  I'm not sure.  The way it's
11   printed out, it looks like it only printed out
12   a portion of the --
13      A.  So he's returning to me the approved
14   submittals.
15      Q.  Okay.
16      A.  It's marked reviewed.
17      Q.  And then instructions on how to
18   install it?
19      A.  This would, you know, show the plan of
20   opening, so they know where structurally there
21   needs to be something inside the wall for them
22   to attach the door.  They made changes or
23   confirmed that it is a right-handed 480-volt
24   operator and that they want their panel color

41 (Pages 161 to 164)

165

1  to be blue.
2  **Q. Now, if you're installing a door like**
3  **this, who would install the controls for it?**
4  A. Dock & Door would install, and it's
5  like a plug and play. And then the
6  electricians would run power and wiring to
7  that.
8  **Q. Over to the device?**
9  A. Yes.
10 **Q. I see.**
11     **And when you say plug and**
12 **play, you mean the control plugs into the**
13 **door --**
14 A. To the operator, yeah, and the sensor.
15 **Q. Got it.**
16     **And so they would mount the**
17 **controls but not hook up the electricity?**
18 A. Correct.
19 **Q. All right.**
20     **And, again, this is a normal**
21 **part of your job, is to get these kind of --**
22 **this kind of information and coordinate this**
23 **activity?**
24 A. Yes.

166

1  **Q. And then would you coordinate directly**
2  **with the installers on how to go out and do**
3  **this?**
4  A. Yeah. I -- I would give them the
5  address, the contact, what product they're
6  installing, something specific.
7  **Q. And tell them like what side -- give**
8  **them the plans, so they knew what side of the**
9  **door the controls went on, that kind of thing?**
10 A. Yeah.
11 **Q. All right.**
12     **And because this is**
13 **actually -- this actually is a high speed door?**
14 A. Yes.
15 **Q. So you would pick who's going to**
16 **install it as well, correct?**
17 A. Yeah.
18
19     (WHEREUPON, the document was
20     marked Plaintiff's
21     Exhibit 73 for identification,
22     as of 9/23/25.)
23
24

167

1  BY MR. McJESSY:
2  **Q. I'm going to hand you what I've marked**
3  **as Exhibit 73.**
4      **I've handed you an email**
5  **marked Exhibit 73. And this looks like an**
6  **email communication for the Matteson 57**
7  **project.**
8      **Do you see that?**
9  A. Yes.
10 **Q. And that was -- and I'll just show you**
11 **the first page because it's faster, but it's**
12 **Exhibit 63 that we've previously marked; is**
13 **that correct?**
14 A. Yes.
15 **Q. Okay.**
16     **And what is this email**
17 **address about?**
18 A. The way I read it is they wanted a
19 Teamster, or whatever Local 150 is, to unload
20 the doors at this job site.
21 **Q. Okay.**
22     **And you say, this is an**
23 **unusual request and an unexpected cost as we**
24 **have to hire a third-party to provide, correct?**

168

1  A. Yes.
2  **Q. All right.**
3      **And that means because you**
4  **don't have anybody that's a Local 150 operator,**
5  **correct?**
6  A. Correct.
7  **Q. Okay.**
8      **Do you know why they**
9  **requested that?**
10 A. Not specifically, no.
11 **Q. Even generally, do you know?**
12 A. I suppose they -- they have some sort
13 of agreement with the Teamsters or whoever
14 Local 150 is.
15 **Q. So you're aware that general**
16 **contractors sometimes have agreements with**
17 **specific unions?**
18 A. They can.
19 **Q. And then that may require them to use**
20 **people from that particular union on a job**
21 **site?**
22 A. Yeah. That would be called a PLA
23 agreement between the contractor and
24 whatever -- a PLA agreement.

42 (Pages 165 to 168)

169

1    Q.  Between the contractor and whatever
2  union, correct?
3    A.  Yes.
4
5         (WHEREUPON, the document was
6         marked Plaintiff's
7         Exhibit 74 for identification,
8         as of 9/23/25.)
9
10 BY MR. McJESSY:
11   Q.  I'm going to hand you what I've marked
12 as Exhibit 74, and this -- the email, the
13 second email on the first page, is dated April
14 25, 2023.
15         Do you see that?
16   A.  Yes.
17   Q.  And it says, Ira, the OH door --
18 that's overhead door -- on the northeast side
19 has been hit again; is that right?
20   A.  Yes.
21   Q.  The lower track on the left side has
22 been bent.  The new switch has been bent.
23         Do you see that?
24   A.  Yes.

170

1    Q.  Do you -- do you remember this issue?
2    A.  No.
3    Q.  Okay.
4         And you -- your email up
5  above responds, got it, Tony.  I will get you a
6  price on Monday.  I'm out of town this week.
7  I'm confident we have this material in stock
8  and can replace next week?
9    A.  I do.
10   Q.  And then it says, track guards are
11 scheduled for Monday as well.
12         Do you see that?
13   A.  Yes.
14   Q.  The track guards, I take it, are
15 something that Midwest Dock sells?
16   A.  Yes.
17   Q.  And when you say, we have it in stock,
18 does that mean at the warehouse?
19   A.  Yes.
20   Q.  Okay.
21         36th Place, correct?
22   A.  Correct.
23
24

171

1         (WHEREUPON, the document was
2         marked Plaintiff's
3         Exhibit 75 for identification,
4         as of 9/23/25.)
5
6  BY MR. McJESSY:
7    Q.  Okay.
8         I'm handing you what's been
9  marked as Exhibit 75, and if you look -- if you
10 can look at -- and, I guess, it's only three
11 pages -- if you can look at all three pages and
12 then let me know when you've had a chance to do
13 so.
14   A.  Okay.
15   Q.  All right.
16         And this is an email exchange
17 by Pepper Construction asking for a new
18 Certificate of Insurance because the one they
19 have on file is about to expire, correct?
20   A.  Yes.
21   Q.  And you're forwarding them to the new
22 Certificate of Insurance, correct?
23   A.  Yes.
24   Q.  All right.

172

1         And this sort of demonstrates
2  that it's important for them to have that
3  Certificate of Insurance, correct?
4    A.  Correct.
5
6         (WHEREUPON, the document was
7         marked Plaintiff's
8         Exhibit 76 for identification,
9         as of 9/23/25.)
10
11 BY MR. McJESSY:
12   Q.  I hand you what I've marked as Exhibit
13 76.  And if you take a look, it looks like this
14 is forwarding a change order, correct?  The
15 first email on the first page.
16   A.  Ask your question again.
17   Q.  I said, this email, the first email on
18 the first page, looks like you're forwarding a
19 signed change order, correct?
20   A.  Yes.
21   Q.  And if you turn to the second page,
22 that looks like it's the change order?
23   A.  Yes.
24   Q.  And this one is signed by you,

173

```
1   correct?
2       A.  Yes.
3       Q.  Okay.
4           And, again, that's a change
5   order, not a contract, which you said you do
6   sign?
7       A.  Correct.
8       Q.  Okay.
9           And that's actually a pen and
10  ink?  That's what your signature look like?
11      A.  Yes.
12      Q.  All right.
13          And then would you -- you
14  would have prepared the proposals that are
15  attached as the third and fourth pages of this
16  exhibit, correct?
17      A.  These are what the email is referring
18  to but not what the change order is.
19      Q.  Right.
20          But, I mean, you would have
21  prepared these proposals, correct?
22      A.  Yes.
23      Q.  Okay.
24          What's on the second
```

174

```
1   proposal, the last page, refers to a one-third
2   jackshaft operator.
3           What is that?
4       A.  A third horsepower is a smaller
5   operator that's wall mounted for a smaller-type
6   door.
7       Q.  Is jackshaft a brand name?
8       A.  Jackshaft is the type.
9       Q.  Okay.
10          What would be the actual
11  operator?
12      A.  It's -- it is a jackshaft operator
13  that mounts on a wall.
14      Q.  I'm sorry.
15          What would be the brand?
16      A.  Oh.  Usually, LiftMaster.
17      Q.  Okay.
18      A.  But things are -- we're buying from
19  different manufacturers sometimes.
20      Q.  Okay.
21          But if you look at -- if you
22  go back to Exhibit 57, and in the products,
23  it's got door openers.
24          Do you see that?
```

175

```
1       A.  I see your picture.  That does look
2   like the product.
3       Q.  Okay.
4       A.  Yeah.
5       Q.  Okay.
6           And you're looking at the
7   page that says door operator's LiftMaster?
8       A.  Yeah.
9       Q.  Okay.
10          And that's the kind of
11  product that would be referred to in --
12      A.  Correct.
13      Q.  -- that proposal?
14          Okay.  So that's a product
15  that Midwest Dock sells?
16      A.  Yes.
17      Q.  And that's the kind of product that
18  would be referred to in that proposal?
19      A.  Correct.
20      Q.  All right.
21          And if you could look at the
22  proposal just before that in Exhibit 76,
23  it's -- it refers to a Hormann Coolmaster High
24  Speed Cooler Door.
```

176

```
1           Do you see that?
2       A.  Yes.
3       Q.  And a Hormann Chillfast High Speed
4   Freezer Door.
5           Do you see that?
6       A.  Yes.
7       Q.  And if you look at the website again
8   and go to the Hormann page, it refers to cold
9   storage and food and beverage down below.
10          Do you see that?
11      A.  Yes.
12      Q.  All right.
13          Are those the kind of doors
14  that this is referring to?
15      A.  Yes.
16      Q.  All right.
17          So, again, those products are
18  promoted on Midwest Dock's web page?
19      A.  Sure.
20
21          (WHEREUPON, the document was
22          marked Plaintiff's
23          Exhibit 77 for identification,
24          as of 9/23/25.)
```

44 (Pages 173 to 176)

177

1    BY MR. McJESSY:
2        Q.  I'm going to hand you what I've marked
3    as Exhibit 77, and this looks like an email
4    exchange related to that LPC Palatine project
5    that we looked at the contract for earlier.
6            Do you see that --
7        A.  Yes.
8        Q.  -- on the re line?
9            And -- and this looks like
10   they're asking for a Certificate of Insurance
11   for the auto policy, correct?
12       A.  Yes.
13       Q.  And, again, you're -- you're
14   forwarding them the -- the Certificate of
15   Insurance for Midwest Dock Solutions' auto
16   policy, correct?
17       A.  Correct.
18       Q.  All right.
19           And, again, this is another
20   example of the kind of email you get because
21   the Certificates of Insurance are important,
22   correct?
23       A.  Yes.
24       Q.  All right.

178

1            Are you aware of any instance
2    where workers were kicked off of a job site for
3    a project that you were managing because they
4    were nonunion?
5        A.  No.
6        Q.  Okay.
7            Have you ever performed any
8    work for Dock & Door?
9        A.  No.
10       Q.  Have you ever assisted Tony Brutti in
11   any way?
12       A.  No.
13       Q.  Can you turn to the -- back to the
14   website page?  If you look at the -- the front
15   page of the website, it says, at the bottom --
16   do you see where it says, we specialize in the
17   service, supply, and installation of loading
18   dock equipment and overhead doors?
19       A.  Yes.
20       Q.  All right.
21           And then below that, it says,
22   we pride ourselves on giving the customer not
23   only excellent service but doing it at an
24   affordable price.  We also offer a free quote

179

1    or consultation on any new project.
2            Do you see that?
3        A.  I do.
4        Q.  And would you characterize the
5    projects that you're -- that you're bidding as
6    new projects?
7        A.  Yes.
8        Q.  And if you could turn to the first
9    page that has products on it -- and do you see
10   the picture that's behind the word "products"
11   there?
12       A.  Yes.
13       Q.  Does that look like sort of a generic
14   picture of the kind of projects that you're
15   bidding on with the large contractors that
16   we've been talking about?
17       A.  Yes.
18       Q.  All right.
19           Sort of a logistics building
20   with rows of overhead doors, correct?
21       A.  Correct.
22       Q.  Do you participate in a health
23   insurance plan at Midwest?
24       A.  No.

180

1        Q.  Is it offered to you?
2        A.  Yes.
3        Q.  Okay.
4            But you chose not to
5    participate in it?
6        A.  Correct.
7        Q.  Any particular reason?
8        A.  My wife has good insurance.
9        Q.  Okay.
10           Does it have a -- any type of
11   retirement, 401(k), pension, annuity plan,
12   something like that?
13       A.  Yes.
14       Q.  And do you participate in that?
15       A.  Yes.
16       Q.  Okay.
17           And do you know, do the
18   technicians at Midwest Dock Solutions
19   participate in that?
20       A.  I don't know.
21       Q.  Okay.
22           Do you know if it's offered
23   to them?
24       A.  I believe it is.

45 (Pages 177 to 180)

181

1    Q.  Okay.
2        Do you keep track of your
3   hours?
4    A.  No.
5    Q.  How are you paid?
6    A.  Salary.
7    Q.  Okay.
8        Do you receive any
9   commission?
10   A.  Yes.
11   Q.  And how does that work?
12   A.  It's based on the profit.
13   Q.  What's that mean?
14   A.  The contract minus material minus
15  labor costs, and I get a percentage of the
16  profit, the bottom line profit.
17   Q.  Okay.
18       And -- so do you keep track
19  of what all of the costs are on every job so
20  that you know --
21   A.  Yes.
22   Q.  -- what your commission is going to
23  be?
24   A.  Yes.

182

1    Q.  All right.
2        How are the labor rates on
3   the jobs that you bid calculated?
4    A.  Well, Tony Brutti shows me what the
5   labor rate is.  If it goes up, he let's me know
6   what that is, and I calculate the hours based
7   on the payrolls and -- and I have all of the
8   invoices from the material purchased, copies of
9   them, so that I can track everything.
10   Q.  What does Tony -- you said Tony Brutti
11  gives you -- what does Tony Brutti give you?
12   A.  So he creates like a document that
13  shows how many hours and what job every person
14  worked at.
15   Q.  Okay.
16   A.  And I refer to that to calculate how
17  many hours were spent at a specific job.
18   Q.  Okay.
19       How do you know, when you're
20  bidding a job, what the labor cost is going to
21  be?
22   A.  That's just experience and what I --
23  what I think it's going to take.
24   Q.  Okay.

183

1        Well, let's --
2
3        (WHEREUPON, the document was
4        marked Plaintiff's
5        Exhibit 78 for identification,
6        as of 9/23/25.)
7
8   BY MR. McJESSY:
9    Q.  I'm going to hand you what I've marked
10  as Exhibit 78.
11       Handing you what I've marked
12  as Exhibit 78, have you seen documents like
13  these before?
14   A.  No.  I don't see these.
15   Q.  Okay.
16       Do you know what they are?
17   A.  Yeah.  I see that this is a
18  Dock & Door invoice.
19   Q.  Have you ever seen a document like
20  this before?
21   A.  No.
22   Q.  Okay.
23       If you look at this, it
24  shows -- on the first invoice, it shows Nico

184

1   Kelly, Principal, General RV Huntley.
2        Do you see that?
3    A.  Yeah, I do.
4    Q.  And it's got a date there.  And it
5   says, eight hours, and the unit price is $105.
6        Do you see that?
7    A.  Yes.
8    Q.  And if you turn three pages or four
9   pages in, there's an invoice for R. J. Mantoan.
10  And it says, quantity eight, unit price $83.
11       Do you see that?
12   A.  I do.
13   Q.  All right.
14       So it appears that there's a
15  different price point for these two workers.
16       Do you see that?
17   A.  I do see that.
18   Q.  Are you aware that some workers have a
19  different price point than others?
20   A.  There was a time where they were
21  journeymen or -- not journeymen -- apprentices,
22  and they had to work up to the full rate.  I
23  know that much.
24   Q.  All right.

46 (Pages 181 to 184)

185

1     Well, I understand that. But
2  when you're bidding a job, you need to know
3  what the labor is going to cost, right?
4     A.  Yeah.  I just assume it's the full
5  rate.
6     Q.  What's the full rate?
7     A.  $105.
8     Q.  Okay.
9        Well, if you -- if you -- all
10 right.
11       So $105 you understood to be
12 the full rate?
13    A.  Yeah.
14    Q.  Where did you get that number?
15    A.  It's just what I was told.
16    Q.  Okay.
17       By whom?
18    A.  By Tony Brutti.
19    Q.  Okay.
20       So in bidding any job, that's
21 the number that you assume is going to be
22 applied to the labor?
23    A.  Correct.
24    Q.  Have you ever been -- received any

186

1  payment from Dock & Door?
2     A.  No.
3     Q.  Have you ever performed any work at
4  the office, like setting up office computers or
5  configuring them?
6     A.  No.
7     Q.  All right.
8        Are the computers at the
9  office on a network?
10    A.  They're on the same Internet, yeah.
11    Q.  Same Internet?
12       Do you know, is there like a
13 server or anything for the office?
14    A.  I don't believe there is.
15    Q.  Okay.
16       Is your laptop a
17 company-provided laptop?
18    A.  Yeah.
19
20       (WHEREUPON, the document marked
21        Plaintiff's Exhibit 53 for
22        identification was tendered to
23        the deponent.)
24

187

1  BY MR. McJESSY:
2     Q.  I'm going to hand you this exhibit,
3  what we've previously marked as Exhibit 53, and
4  ask you, have you ever seen Midwest Dock
5  Solutions' Facebook page?
6     A.  It's been a while, but, yes.
7     Q.  Okay.
8        And does Exhibit 53 look like
9  Midwest Dock Solutions' Facebook page?
10    A.  Based on the Facebook logo in the
11 corner, I'd have to assume so.
12    Q.  All right.
13       And the dock doors that are
14 shown in the -- in the picture on the first
15 page there, are those the kind of dock doors
16 that -- that Midwest Dock Solutions installs?
17    A.  Yes.
18    Q.  Okay.
19       And do you know where that
20 picture was taken?
21    A.  No.
22    Q.  And those are the kind of dock doors
23 that Midwest Dock Solutions installs for the
24 general contractors that we've been talking

188

1  about, correct?
2     A.  Correct.
3     Q.  All right.
4        And if you could turn to
5  page -- it's the one that looks like this.
6  It's the one that's got the --
7     A.  I've gone too far.  I've got it.
8     Q.  Got it?
9        All right.  Do you
10 recognize -- oh, I'm sorry.
11    A.  How many pages -- the picture I'm
12 looking at says --
13       MR. HUGHES:  Keep going.  Keep
14 going.
15       MR. McJESSY:  Keep going.
16       MR. HUGHES:  Keep going back to like
17 late 2016.  I think they're all from 2016.
18 BY MR. McJESSY:
19    Q.  One more.  There you go.
20    A.  Okay.
21    Q.  It looks like it's a picture of -- it
22 says, another job well done, installed dock
23 levelers, dock seals, and 68 overhead doors.
24       Do you see that?

47 (Pages 185 to 188)

189

1    A.  I do.
2    Q.  Do you recognize what project that is?
3    A.  No.  That's before my time.
4    Q.  Okay.
5         But that's the kind of work
6  that -- this is an example, again, of the kind
7  of project that you're bidding as new
8  construction for Midwest Dock Solutions?
9    A.  Yes.
10   Q.  Do you have a credit card with Midwest
11 Dock Solutions -- from Midwest Dock Solutions?
12   A.  I do.
13   Q.  Okay.
14        And what do you use that for?
15   A.  To purchase materials.
16   Q.  Okay.
17        For the projects that -- the
18 new construction projects that we've been
19 talking about?
20   A.  Yep.
21   Q.  Okay.
22        And do you know who pays that
23 credit card bill?
24   A.  I believe, Sherri.  Sherri pays the

190

1  invoices.
2    Q.  Okay.
3         So you think she takes care
4  of that?
5    A.  Yeah.
6    Q.  All right.
7         What kind of things do you
8  purchase on it for the project?
9    A.  Any material that we don't have
10 billing terms with.
11   Q.  Okay.
12        Can you give me some
13 examples?
14   A.  Key switches for operators, slide
15 gates from a specific manufacturer.  I don't
16 use it all that much, to be honest.
17   Q.  All right.
18        What are slide gates?
19   A.  So if a building has a mezzanine, it's
20 a gate that they can open to move material in
21 and out without having somebody walk off the
22 edge.
23   Q.  I see.  All right.
24        I take it, there's other

191

1  things, too, that you just probably can't think
2  of right now?
3    A.  Yeah.  I'm sure there is.
4    Q.  Prior to today's deposition, did
5  anyone suggest to you what your testimony
6  should be or shouldn't be on any of the
7  subjects that we've discussed?
8    A.  No.
9    Q.  Was the testimony you gave today
10 truthful?
11   A.  Yes.
12   Q.  Is there anything you said today that
13 you would like to correct before we end the
14 deposition?
15   A.  No.
16   Q.  What's your current residential
17 address?
18   A.  9442 Henry Street, Dyer, Indiana,
19 46311.
20   Q.  All right.
21        And the last four digits of
22 your social security number?
23   A.  4659.
24   Q.  Date of birth?

192

1    A.  11/22/75.
2    Q.  A phone number where you can be
3  reached.
4    A.  (708) 280-2642.
5    Q.  Is that a cell phone number?
6    A.  Yes.
7    Q.  All right.
8         And who is your cell service
9  provider?
10   A.  AT&T.
11   Q.  And how long has it been AT&T, a long
12 time?
13   A.  Decades.
14   Q.  Do you have any present intention to
15 move from your current address?
16   A.  No.
17   Q.  Okay.
18        The -- your cell phone, is
19 that a personal cell phone or is that company
20 provided?
21   A.  Personal.
22   Q.  Okay.
23        But you use it for work?
24   A.  I do.

48 (Pages 189 to 192)

193

1    Q.  You don't have a separate work phone?
2    A.  Correct.
3           MR. McJESSY:  I don't have any other
4    questions.  I may have some questions -- if Mr.
5    Hughes or Mr. Miller asks you questions, I may
6    have some follow-up questions.
7           THE WITNESS:  Okay.
8           MR. McJESSY:  And, again, just for
9    the record, I'll reserve my right to recall the
10   witness.  I have some concern about the emails
11   that were not reviewed or may not have been --
12   that may be responsive that weren't produced.
13   So for the record, I'll reserve that right.
14   But, otherwise, I appreciate your time.  Thank
15   you.
16          MR. HUGHES:  Okay.
17             Todd, I'm assuming you don't
18   have anything, or do you?
19          MR. MILLER:  No, I don't.
20          MR. HUGHES:  I'm going to go through
21   my notes.  I'm not sure I'll have anything or
22   not, but, yeah, we'll go ahead and do that.
23
24

194

1            (After a break from 2:17 p.m.
2             to 2:25 p.m., the deposition
3             was resumed as follows:)
4
5        MR. HUGHES:  All right.
6           I just have -- really, I
7    think, just a couple of questions.
8
9
10          EXAMINATION
11         BY MR. HUGHES:
12
13   Q.  Do you recall -- it's the last exhibit
14   you were given -- 78?
15   A.  Yes.
16   Q.  And that's invoices from Dock & Door
17   to Midwest Dock, correct?
18   A.  It looks that way, yes.
19   Q.  Yes.
20          And have you ever seen these
21   before?
22   A.  No.
23   Q.  Do you -- are you involved in any
24   processing of these invoices in any way?

195

1    A.  No.
2    Q.  Do you know who is?
3    A.  Sherri pays the invoices, I believe.
4    Q.  Okay.
5           And Mr. McJessy asked you
6    questions about the unit price for certain
7    individuals on the invoices, correct?
8    A.  Yes.
9    Q.  For example, on the first page, the
10   invoice listed a unit price related to Nico
11   Kelly at $105, correct?
12   A.  Yes.
13   Q.  Is -- and you said -- I believe you
14   testified that Tony Brutti tells you a number
15   of what that unit price is, right?
16   A.  Yes.
17   Q.  And when Tony Brutti gives you that
18   number, is that the number that you are quoting
19   to the general contractors in your bid?
20   A.  No.
21   Q.  What -- what number do you quote to
22   the general contractors in the bid?
23   A.  Today's rate is $160.
24   Q.  Okay.

196

1            And is it -- and I just want
2    to be clear.  The number that Tony Brutti gives
3    to you, that's not the number that you're
4    quoting to the contractors, correct?
5    A.  Correct.
6    Q.  Okay.
7           Do you know, out of this
8    $105, what -- what exact amount Tony Brutti is
9    paying to the Dock & Door employees?
10   A.  No.
11          MR. HUGHES:  That's all I have.
12          MR. McJESSY:  Okay.
13             I don't -- just subject to
14   the reservation I made earlier, I don't have
15   any questions.
16          MR. HUGHES:  We'll reserve.
17          MR. McJESSY:  All right.
18             And I'll order.
19          MR. HUGHES:  I'll order, too.
20
21          FURTHER DEPONENT SAITH NOT.
22
23
24

49 (Pages 193 to 196)

197

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                EASTERN DIVISION
 3
   MID-AMERICA CARPENTERS    )
 4 REGIONAL COUNCIL PENSION  )
   FUND, et al.,             )
 5                           )
          Plaintiffs,  )  No. 1:24-cv-02428
 6                           )
          vs.                )  Judge Andrea R. Wood
 7                           )
   DOCK & DOOR INSTALL,      )  Magistrate Judge
 8 INC., an Illinois         )  Jeannice W. Appenteng
   corporation and MIDWEST   )
 9 DOCK SOLUTIONS, INC., an  )
   Illinois corporation,     )
10                           )
          Defendants.  )
11
          This is to certify that I, IRA KEITH
12 SUGAR, have read the transcript of my
   Deposition taken on September 23, 2025, in the
13 above-entitled cause, consisting of Pages 1
   through 196 inclusive, and I do again subscribe
14 and make oath that the same is a true, correct,
   and complete transcript of my Deposition as
15 aforesaid, with corrections, if any, appearing
   on the attached Correction Page(s).
16
17 _____ Correction Pages Attached.
18
19 _____
          IRA KEITH SUGAR
20
   SUBSCRIBED AND SWORN to
21 before me this _____ day
   of _____, A.D. 20 ____.
22
23
   _____
24    Notary Public
```

198

```
 1 STATE OF ILLINOIS   )
 2                     )  SS:
 3 COUNTY OF C O O K   )
 4
 5      I, DIANE M. NULICK, a Notary Public
 6 within and for the County of Cook, State of
 7 Illinois, and a Certified Shorthand Reporter of
 8 said state, do hereby certify:
 9      That previous to the commencement of the
10 examination of the witness, the witness was
11 duly sworn to testify the whole truth
12 concerning the matters herein;
13      That the foregoing deposition transcript
14 was reported stenographically by me, was
15 thereafter reduced to typewriting under my
16 personal direction and constitutes a true
17 record of the testimony given and the
18 proceedings had;
19      That the said deposition was taken
20 before me at the time and place specified;
21      That the said deposition was adjourned
22 as stated herein;
23      That I am not a relative or employee or
24 attorney or counsel, nor a relative or employee
```

199

```
 1 of such attorney or counsel for any of the
 2 parties hereto, nor interested directly or
 3 indirectly in the outcome of this action.
 4      IN WITNESS WHEREOF, I do hereunto set
 5 my hand and affix my seal of office at Chicago,
 6 Illinois, this 29th day of September, 2025.
 7
 8
 9
10
11
   _____
12    Notary Public, Cook County, Illinois.
13
14 C.S.R. Certificate No. 084-002029.
15
16
17
18
19
20
21
22
23
24
```

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 24

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MID-AMERICA CARPENTERS REGIONAL )
COUNCIL PENSION FUND; MID-AMERICA )
CARPENTERS REGIONAL COUNCIL HEALTH )
FUND; MID-AMERICA CARPENTERS )
REGIONAL COUNCIL APPRENTICE AND )
TRAINEE PROGRAM; and MID-AMERICA )
CARPENTERS REGIONAL COUNCIL )
SUPPLEMENTAL RETIREMENT FUND, )
           )
          Plaintiffs, )    Case No.: 1:24-cv-06428
          )
       v. )    Hon. Judge: Andrea R. Wood
          )    Mag. Judge: Jeannice W. Appenteng
DOCK & DOOR INSTALL, INC. an Illinois )
Corporation and MIDWEST DOCK SOLUTIONS, )
INC., an Illinois Corporation, )
          )
          Defendants. )

## DEFENDANT MIDWEST DOCK SOLUTIONS, INC.'S
## OBJECTIONS AND ANSWERS TO PLAINTIFFS' FIRST SET OF
## INTERROGATORIES AND DOCUMENT PRODUCTION REQUESTS

Defendant MIDWEST DOCK SOLUTIONS, INC. ("Midwest Dock" or "Defendant"), by

and through its attorneys, Amundsen Davis, LLC, and for its Objections and Answers to Plaintiffs'

First Set of Interrogatories and Document Production Requests, states as follows:

## OBJECTIONS & ANSWERS TO INTERROGATORIES

**Interrogatory No. 1:** Identify every Person who performed work for Midwest Dock or who was
paid by Midwest Dock at any time during the period from January 1, 2016 to the present and for
each such Person, provide the following information:
(a) state the approximate time period during which each Person worked for or was paid by
     Midwest Dock;

(b) describe each type of work the Person performed (for example, Bargaining Unit Work,
     payroll, personnel, secretarial, accounting, etc.);

(c) identify the methods by which the Person was paid (for example, by cash payment, by cash
     disbursement check, by payroll check, by direct deposit, or by any other method); and,



(d) identify every Company who paid each Person for his or her work (for example, Dock & Door or Midwest Dock).

**ANSWER:** **Midwest Dock objects to this interrogatory on the grounds it is seeks information not relevant to the claims or defenses in this this case, is overly broad in scope and time frame, and is vague and ambiguous with respect to the term "performed work for," which is not limited in any way, and is disproportional to the needs of the case. Moreover, the term "Bargaining Unit Work" is overly broad, vague and ambiguous as defined, as it purports to include nearly every conceivable task, including for example "assembling, erection, fastening or dismantling of all material of wood, plastic, metal, fiber, cork, and composition, and all other substitute materials,"--which covers, for example anytime someone uses a stapler or erects a cardboard box; and also includes any "handling ... of machinery and equipment" where "skill, knowledge and training of the Employees are required, either through the operation of machine or hand tools," which would cover, for example, anytime a third-party auto mechanic services one of Midwest Dock's vehicles, and even anytime an induvial used a computer to perform accounting or legal services, and countless other irrelevant situations. Subject to and without waiving its objections, *see* below list of Midwest Dock employees, since January 1, 2016, with approximate dates of employment, type of work performed, company email. All employees were paid by Midwest Dock via direct deposit.**

| Employee Name | Employment Period | Email address | Type of Work |
|---|---|---|---|
| Bishop, Branden P | 6/3/2029-8/12/2020 | | Technician |
| Clay, Adam R | 1/3/2019 - 5/17/2019 | | Technician |
| Conti, Vincent A | 8/3/2023 - present | | Warehouse |
| Corrigan, Zachary R | 1/11/2027 - 3/25/2019 | | Technician |
| Cronk, Ronald | 3/27/2019 - present | ronc@midwestdocksolutions.com | Technician |
| Cruikshank, Don | 10/18/2013 - 10/19/2017 | | Technician |
| DeAngeles, Tyler Michael | 10/10/2022 - 12/14/2022 | | Technician |
| Deboer, Jacob M | 3/2/2020 - 6/1/2020 | | Technician |
| Donnelly, Thomas | 12/30/2019 - 10/26/2020 | | Technician |

2

| | | | |
|---|---|---|---|
| French, Steven M | 11/19/2012 - present | steve@midwestdocksolutions.com | Sales |
| Gibson, Jeff | 9/17/2021 - present | jeffg@midwestdocksolutions.com | Technician |
| Gongola, Matthew M | 6/12/2014 - 11/1/2016 | | Technician |
| Graham, Jane F | 10/7/2019 - present | janey@midwestdocksolutions.com | Warehouse |
| Johnson, James M | 1/15/2024 - present | james@midwestdocksolutions.com | Sales |
| Kantzavelos, George | 2/18/2016 - 4/4/2017 | | Sales |
| Kardosh, Richard S | 10/27/2017 - present | rickk@midwestdocksolutions.com | Technician |
| Kelly, Dylan R | 9/10/2018 - 4/8/2022 | | Technician |
| Kelly, James S | 4/16/2015 - 8/21/2019 | | Sales |
| Kelly, Nicolas | 8/22/2017 - 9/27/2018 | | Technician |
| Leer, Sean V | 10/17/2018 - 3/1/2021 | | Technician |
| Lietz, Daniel J | 12/4/2018 - present | dannyl@midwestdocksolutions.com | Administrative |
| Mallon, John C | 1/1/2016 - 9/30/2016 | | Sales |
| Mancha, John A | 9/18/2020 - present | johnnym@midwestdocksolutions.com | Technician |
| Mateja Jr., Michael J | 5/31/2024 - present | mikem@midwestdocksolutions.com | Technician |
| McCartney, Austin M | 12/20/2021 - 3/4/2022 | | Technician |
| Mortell, David E | 5/19/2017 - present | david@midwestdocksolutions.com | Sales |
| Murphy, John | 6/21/2018 - 11/21/2018 | | Technician |
| Meirynck, Kacy R | 5/9/2017 - 10/25/2017 | | Technician |
| Poole, Eric | 5/23/2022 - present | ericp@midwestdocksolutions.com | Technician |
| Richert, Larry L | 5/21/2020 - 6/17/2020 | | Administrative |
| Richert, Michael | 1/1/2026 - present | mike@midwestdocksolutions.com | Owner |
| Rivers, Mitton G | 6/13/2019 - 3/26/2020 | | Technician |
| Sheridan, Joseph | 1/29/2015 - 4/5/2017 | | Sales |
| Sichterman, Joshua P | 7/24/2020 - present | joshs@midwestdocksolutions.com | Technician |
| Sparr, John | 12/19/2019 - present | johns@midwestdocksolutions.com | Technician |
| Stanton, Christopher | 4/19/2021 - 9/17/2021 | | Technician |
| Stawychey, Ryan N | 3/5/2021 - 7/14/2021 | | Technician |
| Stoltenberg, John R | 4/24/2023 - present | johnst@midwestdocksolutions.com | Technician |
| Strazzabosco, Michael | 1/1/2016 - present | mikes@midwestdocksolutions.com | Technician |
| Sugar, Ira | 6/28/2017 - present | ira@midwestdocksolutions.com | Sales |
| Toigo-Sichterman, Amber | 10/27/2022 - present | amber@midwestdocksolutions.com | Administrative |
| Toigo, Anthony A | 6/5/2023 - 8/16/2023 | | Technician |
| Torkelsen, Zachary R | 7/16/2021 - 7/19/2023 | | Technician |
| Valentino, Jerry A | 10/22/2015 - 1/1/2020 | | Technician |
| Webber, Sherri | 1/11/2017 - present | sherri@midwestdocksolutions.com | Administrative |
| Woff, Travis | 11/12/2020 - 5/13/2024 | | Technician |
| Wood, Austin | 10/22/2015 - 9/29/2017 | | Technician |
| Zarlengo Jr., Edward M | 4/23/2020 - 6/17/2020 | | Administrative |
| Zarlengo, Anthony | 1/1/2016 - present | tony@midwestdocksolutions.com | Owner |

**Interrogatory No. 2:** Identify every Company that performed work for Midwest Dock at any time during the period from January 1, 2016 to the present or was paid by Midwest Dock for work at any time during the period from January 1, 2016 to the present. For each such Company identified provide the following information:

(a) describe in detail every type of work the Company performed (for example, Bargaining Unit Work, payroll, personnel, secretarial, accounting, etc.);

(b) if the Company performed any Bargaining Unit Work, during the period from October 1, 2020 through the present, then state when (either by day, week or month) the Company performed the work, how much the Company was paid for the work, identify the Persons employed by the Company who performed the work, and for each Person state how many hours the Person worked on a daily basis.

**ANSWER: Midwest Dock objects to this interrogatory on the grounds it is seeks information not relevant to the claims or defenses in this this case, is overly broad in scope and time frame (covering nearly 9 years), and is vague and ambiguous with respect to the term "performed work for," which is not limited in any way, and is disproportional to the needs of the case. Moreover, the term "Bargaining Unit Work" is overly broad, vague and ambiguous as defined, as it purports to include nearly every conceivable task, including for example "assembling, erection, fastening or dismantling of all material of wood, plastic, metal, fiber, cork, and composition, and all other substitute materials,"--which covers, for example anytime someone uses a stapler or erects a cardboard box; and also includes any "handling … of machinery and equipment" where "skill, knowledge and training of the Employees are required, either through the operation of machine or hand tools," which would cover, for example, anytime an auto mechanic services one of Midwest Dock's vehicles, and even anytime an induvial used a computer to perform accounting or legal services, and countless other irrelevant situations. Midwest Dock further objects that this interrogatory is overly broad in scope for the same reasons, and because it is disproportional to the needs of the case, rendering it unduly burdensome. Subject to and without waiving these objections, *see* the below list of Midwest Dock subcontractors and service providers; *see also* bank statements,**

4

including canceled checks, already produced pursuant to subpoena by Old National Bank and Midwest Bank related to Midwest Docks's accounts therewith, ending in ▮ and ▮ answering further, responsive documents are available for inspection and copying at Midwest Dock's offices and at Gineris & Associates, Ltd. ("Gineris").

| Company Name | Type of work |
|---|---|
| A-Bec Electic | Sub-contractor work |
| All Tech Decoration | Sub-contractor work |
| Associated Electric | Sub-contractor work |
| Bear Metal Welding & Fabrication | Sub-contractor work |
| C & J Industries | Sub-contractor work |
| Dock & Door Install | Sub-contractor work |
| Ed's Welding & Fabrication | Sub-contractor work |
| Fabcon Precast | Sub-contractor work |
| Flying Locksmiths | Sub-contractor work |
| Four Seasons Home Services | Sub-contractor work |
| Gunderson Construction | Sub-contractor work |
| Hinsdale Electric | Sub-contractor work |
| Industrial Commercial Services | Sub-contractor work |
| Jennings Electric | Sub-contractor work |
| Joseph Craig House | Sub-contractor work |
| KLY Development | Sub-contractor work |
| L & S Electric | Sub-contractor work |
| Neutral Zone Electrical Mainteance & Construction | Sub-contractor work |
| Overhead Door of Indianapolis | Sub-contractor work |
| Premier Installers | Sub-contractor work |
| Raymond Storage Concepts | Sub-contractor work |
| S & S Construction | Sub-contractor work |
| Scott Overhead Door | Sub-contractor work |
| Solid Restoration Services | Sub-contractor work |
| The Woodshop | Sub-contractor work |
| Emmzie Marketing | Professional office services |
| Gineris & Associates | Accounting, tax, services |
| Koru HR Consulting | Consulting services |
| Lawrence Kamin, LLC | Legal services |
| ADP | Payroll Services |
| Media Monkey | Consulting services |
| Schooley Mitchell | Professional office services |
| Amundsen Davis, LLC | Legal Services |
| Liberty Mutual Insurance Co. | Insurance Services |
| State Farm | Insurance Services |

| ICW Group | Insurance Services |
| Cincinnati Insurance | Insurance Services |
| Holden Insurance Agency | Insurance Broker |

**Interrogatory No. 3:** Identify each address where Midwest Dock either maintained an office or operated its business at any time during the period from January 1, 2016 to the present and, for each identified address, state the months during which Midwest Dock either maintained an office or operated its business from that location.

ANSWER:    **1249 E. Burville Rd., Crete, IL; from before January 2016 to approximately May 2016.**

**3211 Holeman, South Chicago Heights, IL; from approximately May 2016 to approximately January 2018.**

**27 E. 36th Place, Steger, IL; from approximately January 2018 to present.**

**Interrogatory No. 4:** Identify every Account held by Midwest Dock, in its own name or jointly with another Person or Company; and, for each Account, (i) identify every Person who issued payments from the Account by either signing checks for the Account, issuing checks or payments from the Account using an online banking system, or signing checks using a signature stamp or other automated method for signing checks, (ii) identify every person who was an authorized signor on the Account at any time, and (iii) identify every person who accessed any such Account using the financial institution's online banking access.

ANSWER:    **Midwest Dock objects to this interrogatory on the grounds it is seeks information not relevant to the claims or defenses in this this case, is overly broad in scope and time frame, and with respect to the purported definition of "Account" which is also vague and ambiguous and circular, and further is disproportional to the needs of the case. Subject to and without waiving these objections, *see* bank statements including canceled checks, signature cards and resolutions already produced pursuant to subpoena by Old National Bank and Midwest Bank related to Midwest Docks's accounts therewith (account numbers ending in ▮▮ and ▮▮. Answering further, the following are authorized signers, or are authorized to initiate ACH transactions, for accounts ending in ▮▮ and ▮▮ Michael Richert and Anthony Zarlengo. Gineris has access to the accounts, but is neither a signer nor authorized to initiate ACH transactions.**

**Interrogatory No. 5:** Identify each service provider for Midwest Dock (including for example, each accountant, attorney, bookkeeper, insurance agent, insurance carrier, payroll service provider, tax preparer, registered agent, website and email hosting service, and website design service), and for each identified service provider, identify the dates during which the service provider provided services to Midwest Dock.

**ANSWER:** **Midwest Dock objects to this interrogatory on the grounds it is redundant of Interrogatory No. 2, and because the term "service provider" is vague and ambiguous and overly broad, and would include countless entities and individuals, such as restaurants, service stations, parcel delivery services, utilities, and limitless others. Answering further,** *see* **objections and answer to Interrogatory No. 2, above, including the documents referenced therein.**

**Interrogatory No. 6:** Identify each material supplier for Midwest Dock (including for example, every supplier of welding equipment and supplies, dock plates, dock levelers, overhead doors, dock canopies, dock shelters, dock seals, overhead door openers, jackshaft operators, trolley operators, slide operators, and parts for any of the forgoing, etc.).

**ANSWER:** **Midwest Dock objects to this interrogatory on the grounds it is seeks information not relevant to the claims or defenses in this this case, is overly broad in scope and time frame, and is disproportional to the needs of the case. Midwest Dock further objects on the ground that "material supplier" is vague and ambiguous in that it could deal with any a limitless number of "materials" having no relevance in any way to the claims or defenses in this lawsuit. Subject to and without waiving these objections,** *see* **the below list of Midwest Dock suppliers for the period of 2016 to present;** *see also* **bank statements, including canceled checks, already produced pursuant to subpoena by Old National Bank and Midwest Bank related to Midwest Docks's accounts therewith, ending in ▇▇ and ▇▇; answering further, responsive documents are available for inspection and copying at Midwest Dock's offices and at Gineris.**

| Supplier |
|---|

| |
|---|
| 4Front |
| AAA Supply Corporation |
| ABT |
| ACE Hardware |
| Advance Auto Parts |
| Affiliated Force |
| AGP |
| Airgas |
| Alert Lighting |
| Allied Electronics |
| Amazon |
| American Garage Door Supply |
| Aquatica |
| AutoZone |
| AZZ Galvanizing |
| B & F Fabricating |
| Bea Inc |
| Beecher Hardware |
| Blue Creek Supply |
| Blue Giant Equipment |
| Bolingbrook Glass |
| Brett Supply Company |
| Bristol Hose & Fitting |
| Builders Chicago Corp |
| City Electric Supply |
| Clopay |
| Construction Gear |
| Copperloy |
| Crane Dorray Corp |
| Crete Ace Hardware |
| Crete Lumber & Supply |
| Door Masters |
| DrainCables |
| Durable Corporation |
| Eagle Mfg |
| Ed's Welding & Fabricating |
| Elmer & Smith |
| Farm and Fleet |
| Fastenal |
| Fastener Superstore |
| Galco |
| Gatorsupply Corp. |
| GDS |
| GEM Electric Supply |
| Grainger |
| Graybar Electric Supply |

| |
|---|
| H D Supply |
| Helsel-Jepperson |
| HOME DEPOT |
| Illinois Engineered Products |
| Integrated Warehouse Solutions |
| J & L Fasteners |
| Jamison Door Company |
| John J Rickhoff Sheet Metal Co |
| Johnstone Supply |
| Kamin Fluid Power |
| Leeps Supply |
| Liftmaster |
| Marvel Equipment |
| Maven Industrial Supply |
| McGuire |
| Menards |
| Midwest Angle |
| Miller Industrial |
| Milne Supply Inc |
| MMTC |
| Modern Fluid Technology |
| Motion Industries |
| MSC Industrial Supply |
| Nelson Stud Welding |
| Nice Group Canada |
| North Shore Commercial Door Company |
| Northern Tool |
| O'Leary's Contractor Equipment |
| Omega Industrial Safety |
| Overhead Door Corporation |
| Paul Reilly Company |
| Pierini Iron Works |
| Pirtek |
| Preferred Doors |
| Protec Controls |
| Protek Systems |
| Reliable Parts |
| Rittertech |
| River Bend Hose Specialty Inc |
| Rytec |
| Sargent's Equipment & Repairs |
| Service Spring Corp |
| Smith Control Systems |
| South Eastern Dock Systems |
| Standard Electric Supply |

| |
|---|
| Swift Saw & Tool Supply Co |
| Tractor Supply Co |
| Tri State Propane Exchange |
| Turek & Sons |
| Vestil Manufacturing Corp |
| Voss Equipment |
| Waukegan Steel |
| Weldstar |
| Wunderlich Doors, Inc |
| Xcluder |
| Zoro Tools |

**Interrogatory No. 7:** Identify each officer, director, and shareholder for Midwest Dock. For each identified officer and director identify the positions held, the dates during which the officer or director held each position; and, in the case of a shareholder, identify the percentage of ownership the shareholder held and the period of time she/he/it held such interest.

**ANSWER:** At all relevant times, Michael Richert and Anthony Zarlengo have each been 50% shareholders for Midwest Dock. Currently, Michael Richert serves as President and Anthony Zarlengo is Vice President; however Richert and Zarlengo have alternated at various times between serving as President and Vice President. There are no other shareholders, officers or directors.

**Interrogatory No. 8:** Regardless of date, identify all internet URL's and all email addresses owned, controlled, or used by Midwest Dock, all Persons who used an email address extension belonging to Midwest Dock or who had access to email accounts used by Midwest Dock, including any email extension ending in @midwestdocksolutions.com, and identify all email addresses used by officers, directors, or employees of Midwest Dock for any Midwest Dock related business.

**ANSWER:** Midwest Dock objects to this interrogatory on the grounds it is seeks information not relevant to the claims or defenses in this this case, is overly broad in scope and in its unlimited time frame, and is disproportional to the needs of the case. Subject to and without waiving these objections, at all relevant times Midwest Dock has utilized the URL www.midwestdocksolutions.com, and its email accounts have had the extension @midwestdocksolutions.com. Answering further, see the list of employees provided in

response to Interrogatory No. 1, which contains Midwest Dock email addresses for any individuals who have been issued, used, or had access to the Midwest Dock email accounts corresponding to their names.

**Interrogatory No. 9:** Identify by year, make, and model all cars, trucks, or other motorized vehicles owned, leased, or used by Midwest Dock.

**ANSWER:** Midwest Dock objects to this interrogatory on the grounds it is overly broad in scope and time frame. Subject to and without waiving the foregoing objections, Midwest Dock currently owns or uses the following motorized vehicles:

- **2009 Ford Econoline Van**
- **2012 Ford F-550**
- **2014 Ford F-450**
- **2015 Ford F-450 (2)**
- **2015 Ford T-150**
- **2017 Ford F-450**
- **2018 Ford F-350**
- **2018 Ford F-450**
- **2018 GMC Sierra 3500**
- **2019 Ford F-450**
- **2020 Ford F-350**
- **2022 Ford F-350**
- **2022 Ford F-450**

**Interrogatory No. 10:** State all facts that support any of your affirmative defenses of laches, estoppel, unclean hands, or waiver and identify the person most knowledgeable about those facts.

**ANSWER:** Midwest Dock objects to this interrogatory on the grounds it is overly broad in scope and time frame, and because it is a premature contention interrogatory.

**Interrogatory No. 11:** Identify all Persons who assisted in answering these document requests and interrogatories and for each Person, identify which document requests and interrogatories he or she assisted in answering.

**ANSWER:** Other than counsel, who prepared the legal objections, the following individuals assisted in answering Interrogatories 1 through 10: Michael Richert and Anthony Zarlengo.

**Interrogatory No. 12**: Identify (a) each non-expert witness and (b) each expert witness who you intend to call to testify at any hearing or trial. For each witness describe the subjects on which he/she will testify. For each expert witness, also provide the following additional information: (a) his/her opinions and conclusions; (b) the bases of those opinions and conclusions; (c) his/her qualifications; (d) identify any report, memos, notes he/she prepared; and (e) identify all documents he/she relied on to form his/her conclusions and opinions including, but not limited to, textbooks and other publications.

**ANSWER: Midwest Dock objects to this interrogatory on the grounds it seeks premature information. Midwest Dock has not yet determined who it intends to call as witnesses for any hearing or trial in this matter, and it has not yet determined whether or not it will utilize expert witnesses. Subject to and without waiving these objections, Midwest Dock responds,** *see* **Midwest Dock's Rule 26(a)(1) Initial Disclosures, previously tendered.**

## OBJECTIONS & RESPONSES TO DOCUMENT REQUESTS

1.      For each Person identified in response to Interrogatory No. 1, produce all documents showing the type(s) of work the Person performed (for example, union contribution reports, employee lists, company flow charts, and the like).

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. The Request would require the production of every single piece of paper, and every electronic document, that every employee of Midwest Dock ever reviewed, authored, touched, filed, etc. Midwest Dock further incorporates its objections and answer**

to Interrogatory No. 1. **Subject to and without waiving the foregoing, responsive documents are available for inspection and copying at Midwest Dock's offices and at Gineris & Associates, Ltd. ("Gineris").**

2.        For each Person identified in response to Interrogatory No. 1, produce all documents showing the time period during which each Person worked (for example, payroll records, time records, and the like).

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. The Request would require the production of every single piece of paper, and every electronic document, that every employee of Midwest Dock ever reviewed, authored, touched, filed, etc. Midwest Dock further incorporates its objections and answer to Interrogatory No. 1. Subject to and without waiving the foregoing, payroll reports and time records are available for inspection and copying at Gineris.**

3.        For each Person identified in response to Interrogatory No. 1, produce all documents showing who paid the Person for his/her work (for example payroll records, cash disbursement records, IRS Form 1099, IRS Form W-2, and the like).

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff**

has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Midwest Dock further incorporates its objections to Interrogatory No. 1. Subject to and without waiving the foregoing, W-2s are available for inspection and copying at Gineris.

4.     For each Person identified in response to Interrogatory No. 1, produce all documents showing the actual payments made to the Person (for example payroll records, cash disbursement records, IRS Form 1099, IRS Form W-2, and the like).

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Midwest Dock further incorporates its objections to Interrogatory No. 1. Subject to and without waiving the foregoing, payroll reports and W-2s are available for inspection and copying at Gineris.**

5.     For each Person identified in response to Interrogatory No. 1, produce all documents showing how the Person's pay was calculated—(for example, hourly, salary, commission, piece rate, some combination of the foregoing, etc.).

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Midwest Dock further incorporates its objections to Interrogatory No. 1. Subject to and without waiving the foregoing, payroll reports are available for inspection and copying at Gineris.**

6.      For each Person identified in response to Interrogatory No. 1, produce all documents showing the method of each payment made to the Person (for example, payroll check, cash disbursement check, cash, direct deposit, money order, etc.).

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Midwest Dock further incorporates its objections to Interrogatory No. 1.**

**Subject to and without waiving the foregoing, payroll reports are available for inspection and copying at Gineris.**

      7.      For each Person identified in response to Interrogatory No. 1 who performed Bargaining Unit Work, produce all documents showing the wage rate paid to the Person for hours worked by the Person from October 1, 2020 to the present, and, if the wage rate changed, then also produce documents sufficient to show the date of such change and the amount of such change.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Midwest Dock further incorporates its objections to Interrogatory No. 1. Subject to and without waiving the foregoing, payroll reports are available for inspection and copying at Gineris.**

      8.      For each Person identified in response to Interrogatory No. 1 who performed Bargaining Unit Work, produce all documents showing the amount paid to the Person during the period from October 1, 2020 to the present.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and**

"relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Midwest Dock further incorporates its objections to Interrogatory No. 1. Subject to and without waiving the foregoing, payroll reports and W-2s are available for inspection and copying at Gineris.

9.     For each Person identified in response to Interrogatory No. 1 who performed Bargaining Unit Work, produce all documents showing the purpose of each payment made to the Person (for example, wages, expense reimbursement, vacation pay, etc.) during the period from October 1, 2020 to the present.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Midwest Dock further incorporates its objections to Interrogatory No. 1. Subject to and without waiving the foregoing, payroll reports are available for inspection and copying at Gineris.**

10.     For each Person identified in response to Interrogatory No. 1 who performed Bargaining Unit Work, produce all documents showing the number of hours the Person worked (for example, timecards, time records, etc.) at any time during the period from October 1, 2020 to the present.

17

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Midwest Dock further incorporates its objections to Interrogatory No. 1. Subject to and without waiving the foregoing, payroll reports and time records are available for inspection and copying at Gineris.**

11.     For each Person identified in response to Interrogatory No. 1 who performed Bargaining Unit Work, produce all documents showing payments made to any union or union-affiliated fringe benefit fund on the Person's behalf (for example, all monthly contribution reports to union-affiliated fringe benefit funds).

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Subject to and without waiving these objections, none.**

12.     For each Company identified in response to Interrogatory No. 2, produce all documents showing the type of work the Company performed (for example, contracts, invoices, work orders, and lien waivers).

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. The Request would require the production of every single piece of paper, and every electronic document, that every employee of a "Company" ever reviewed, authored, touched, filed, etc., related to "work" done for Midwest Dock. Midwest Dock further incorporates its objections to Interrogatory No. 2. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Gineris.**

13.     For each Company identified in response to Interrogatory No. 2, produce all documents showing the time period(s) during which the Company performed its work.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to,**

contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. The Request would require the production of every single piece of paper, and every electronic document, that every employee of a "Company" ever reviewed, authored, touched, filed, etc., related to "work" done for Midwest Dock. Midwest Dock further incorporates its objections to Interrogatory No. 2. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's offices and at Gineris.

14.     For each Company identified in response to Interrogatory No. 2, produce all documents sufficient to show the number of hours the Company's employees worked on Midwest Dock's project(s) on a daily basis.

RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, lacking in reasonable particularity, and disproportional to the needs of the case. Midwest Dock further incorporates its objections to Interrogatory No. 2. Subject to and without waiving these objections, responsive invoices are available for inspection and copying at Midwest Dock's offices and at Gineris.

15.     For each Company identified in response to Interrogatory No. 2, produce all contracts, estimates, proposals, or other agreements with the Company for the work.

RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, unduly burdensome, vague and ambiguous with respect to the terms "proposals" and "agreements," lacking in reasonable particularity, and disproportional to the needs of the case. Midwest Dock further incorporates its objections to Interrogatory No. 2. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's offices and at Gineris.

20

16.     For each Company identified in response to Interrogatory No. 2, produce all invoices from the Company for the work.

**RESPONSE:** *See* **objections and answers to Document Request Nos. 12-15.**

17.     For each Company identified in response to Interrogatory No. 2, produce all documents showing payments to the Company for the work.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Midwest Dock further incorporates its objections to Interrogatory No. 2. Subject to and without waiving the foregoing, payment information is available for inspection and copying at Gineris.**

18.     Produce documents sufficient to identify the officers of Midwest Dock during the period from January 1, 2016 to the present.

**RESPONSE: Documents responsive to this request are corporate records, which are available for inspection and copying at Midwest Dock's offices and at Gineris.**

19.     Produce documents sufficient to identify the directors of Midwest Dock for the period from January 1, 2016 to the present.

**RESPONSE: Documents responsive to this request are corporate records, which are available for inspection and copying at Midwest Dock's offices and at Gineris.**

21

20.     Produce documents sufficient to identify the shareholders of Midwest Dock for the period from January 1, 2016 to the present.

**RESPONSE: Documents responsive to this request are corporate records, which are available for inspection and copying at Midwest Dock's offices and at Gineris.**

21.     Produce all shareholder resolutions of Midwest Dock for the period January 1, 2016 to the present.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad and disproportional to the needs of the case. Subject to and without waiving these objections, documents responsive to this request are corporate records, which are available for inspection and copying at Midwest Dock's offices and at Gineris.**

22.     Produce all board of director resolutions of Midwest Dock for the period January 1, 2016 to the present.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad and disproportional to the needs of the case. Subject to and without waiving these objections, documents responsive to this request are corporate records, which are available for inspection and copying at Midwest Dock's offices and at Gineris.**

23.     Produce Midwest Dock's bylaws or other corporate governance documents in effect at any time during the period from January 1, 2016 to the present.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad and disproportional to the needs of the case. Subject to and without waiving these objections, documents responsive to this request are corporate records, which are available for inspection and copying at Midwest Dock's offices and at Gineris.**

24.     Produce documents sufficient to show each Person who was an authorized signer at any time during the period from January 1, 2016 to the present on each Account maintained by Midwest Dock.

**RESPONSE: Midwest Dock objects to this interrogatory on the grounds it is seeks documents not relevant to the claims or defenses in this this case, is overly broad in scope and time frame, and with respect to the purported definition of "Account" which is also vague and ambiguous and circular, and further is disproportional to the needs of the case. Subject to and without waiving these objections, *see* bank statements including canceled checks, signature cards and resolutions already produced pursuant to subpoena by Old National Bank and Midwest Bank related to Midwest Docks's accounts therewith (account numbers ending in ▮▮ and ▮▮. Answering further, responsive documents are available for inspection and copying at Gineris.**

      25.     Produce documents sufficient to show each Person who signed checks or authorized payments from Midwest Dock's Accounts during the period from January 1, 2016 to the present.

**RESPONSE: Midwest Dock objects to this interrogatory on the grounds it is seeks documents not relevant to the claims or defenses in this this case, is overly broad in scope and time frame, and with respect to the purported definition of "Account" which is also vague and ambiguous and circular, and further is disproportional to the needs of the case. Subject to and without waiving these objections, *see* bank statements including canceled checks already produced pursuant to subpoena by Old National Bank and Midwest Bank related to Midwest Docks's accounts therewith (account numbers ending in ▮▮ and ▮▮. Answering further, responsive documents are available for inspection and copying at Gineris.**

      26.     Produce documents sufficient to show each Person who accessed any Midwest Dock Account using the financial institution's online banking access.

**RESPONSE: Midwest Dock objects to this interrogatory on the grounds it is seeks documents not relevant to the claims or defenses in this this case, is overly broad in scope and time frame,**

and with respect to the purported definition of "Account" which is also vague and ambiguous and circular, and further is disproportional to the needs of the case. Subject to and without waiving these objections, investigation continues.

27.     Produce all documents showing amounts paid by Midwest Dock for rent at any time during the period from January 1, 2016 to the present.

RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Gineris.

28.     Produce any lease for any space where Midwest Dock either maintained an office or operated its business at any time during the period from January 1, 2016 to the present.

RESPONSE: Midwest Dock objects to this interrogatory on the grounds it is seeks documents not relevant to the claims or defenses in this this case, and is overly broad in scope and time frame. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's offices.

29.     Produce all documents showing who was Midwest Dock's accountant at any time during the period from January 1, 2016 to the present, including all engagement letters or other agreements pursuant to which any accountant provided services to Midwest Dock.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. The Request would require the production of every single piece of paper, and every electronic document, that every employee of any such accountant firm ever reviewed, authored, touched, filed, etc., related to Midwest Dock. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Gineris.**

30.     Produce all documents showing who was Midwest Dock's attorney at any time during the period from January 1, 2016 to the present, including all engagement letters or other agreements pursuant to which any attorney provided services to Midwest Dock.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are**

**facially overbroad. The Request would require the production of every single piece of paper, and every electronic document, that every employee of any such law firm ever reviewed, authored, touched, filed, etc., related to Midwest Dock. Moreover, such broad request necessarily calls for documents covered by the attorney-client privilege and work-product doctrines.**

31.　Produce all documents showing who was Midwest Dock's bookkeeper at any time during the period from January 1, 2016 to the present, including all engagement letters or other agreements pursuant to which any bookkeeper provided services to Midwest Dock.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. The Request would require the production of every single piece of paper, and every electronic document, that any such "bookkeeper," and every employee thereof, ever reviewed, authored, touched, filed, etc., related to Midwest Dock. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's office and at Gineris.**

32.　Produce all documents showing who was Midwest Dock's insurance broker or insurance agent at any time during the period from January 1, 2016 to the present, including all engagement letters or other agreements pursuant to which any insurance broker or insurance agent provided services to Midwest Dock.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. The Request would require the production of every single piece of paper, and every electronic document, that every employee of any such insurance broker or insurance agency authored, touched, filed, etc., related to Midwest Dock. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's office and at Gineris.**

33. Produce all documents showing who was Midwest Dock's payroll service provider at any time during the period from January 1, 2016 to the present, including all engagement letters or other agreements pursuant to which any payroll service provider provided services to Midwest Dock.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are**

**facially overbroad. The Request would require the production of every single piece of paper, and every electronic document, that every employee of any such payroll service provider ever reviewed, authored, touched, filed, etc., related to Midwest Dock. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's office and at Gineris.**

34.     Produce all documents showing who was Midwest Dock's registered agent at any time during the period from January 1, 2016 to the present, including all engagement letters or other agreements pursuant to which any registered agent provided services to Midwest Dock.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's office.**

35.     Produce all documents showing who was Midwest Dock's tax preparer at any time during the period from January 1, 2016 to the present, including all engagement letters or other agreements pursuant to which any tax preparer provided services to Midwest Dock.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related**

to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. The Request would require the production of every single piece of paper, and every electronic document, that every employee of any such tax preparer ever reviewed, authored, touched, filed, etc., related to Midwest Dock. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Gineris.

36.     Produce all documents showing who was Midwest Dock's website designer at any time during the period from January 1, 2016 to the present, including all engagement letters or other agreements pursuant to which any website design services were provided to Midwest Dock.

RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. The Request would require the production of every single piece of paper, and every electronic document, that every employee of any such website designer ever reviewed, authored, touched, filed, etc., related to Midwest Dock. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's office and at Gineris.

29

37.     Produce documents related to Midwest Dock's workers compensation audits and employee classifications for its workers compensation insurance for the period January 1, 2016 to the present.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents related to" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. The Request would require the production of every single piece of paper, and every electronic document, that every employee of Midwest Dock ever reviewed, authored, touched, filed, etc.  Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's office.**

38.     Produce documents related to Midwest Dock's workers compensation insurance policies for the period January 1, 2016 to the present, including the policies, documents showing the Companies covered by the policies, invoices for the policies and documents showing who paid for the policies.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents related to" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to,**

contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. The Request would require the production of every single piece of paper, and every electronic document, that every employee of any such insurance firm ever reviewed, authored, touched, filed, etc., related to Midwest Dock, as well as by any Midwest Dock employee. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's office and at Gineris.

39.     Produce documents related to Midwest Dock's automobile insurance policies for the period January 1, 2016 to the present, including the policies, documents showing the drivers and vehicles covered by the policies, invoices for the policies, and documents showing who paid for the policies.

RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents related to" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. The Request would require the production of every single piece of paper, and every electronic document, that every employee of any such insurance firm ever reviewed, authored, touched, filed, etc., related to Midwest Dock, as well as by any Midwest Dock employee.  Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's office and at Gineris.

40.     Produce documents related to Midwest Dock's general liability policies for the period January 1, 2016 to the present, including the policies, documents showing the Companies

covered by the policies, invoices for the policies and documents showing who paid for the policies.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents related to" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. The Request would require the production of every single piece of paper, and every electronic document, that every employee of any such insurance firm ever reviewed, authored, touched, filed, etc., related to Midwest Dock, as well as by any Midwest Dock employee. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's office and at Gineris.**

41. Produce documents related to Midwest Dock's property insurance policies for the period January 1, 2016 to the present, including the policies, documents showing the property covered by the policies, invoices for the policies and documents showing who paid for the policies.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents related to" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection**

**whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Subject to and without waiving these objections, none.**

42.    Produce all documents showing tools and equipment (including for example welding equipment and hand tools) owned or leased by Midwest Dock, including for example, any depreciation schedules, insurance schedules, or loan application schedule of assets.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Midwest Dock further objects that the term "tools and equipment" is vague, ambiguous and all-encompassing of any physical item owned by Midwest Dock. The Request would require the production of every single piece of paper, and every electronic document, that every Midwest Dock employee ever reviewed, authored, touched, filed, etc., related to or made, reviewed, received by any such Midwest Dock "tool and equipment." Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's office and at Gineris.**

43.    Produce all documents showing office equipment (including for example desktop and laptop computers, computer tablets, computer servers, desks) owned or leased by Midwest Dock, including for example, any depreciation schedules, insurance schedules, or loan application schedule of assets.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Midwest Dock further objects that the term "office equipment" is vague, ambiguous and all-encompassing of any physical item owned by Midwest Dock that may appear or be located in an office. The Request would require the production of every single piece of paper, and every electronic document, that every Midwest Dock ever reviewed, authored, touched, filed, etc., related to, or made, reviewed, received by or using any such Midwest Dock "office equipment." Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's office and at Gineris.**

44.     Produce all documents showing vehicles owned or leased by Midwest Dock, including for example, any depreciation schedules, insurance schedules, or loan application schedule of assets.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and**

34

"relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. The Request would require the production of every single piece of paper, and every electronic document, that every Midwest Dock employee ever reviewed, authored, touched, filed, etc., related to a company vehicle. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's office and at Gineris.

45.     Produce all documents showing lists of tools and equipment (including for example welding equipment and hand tools), office equipment (including office equipment such as computers, desks, furniture and ), and vehicles owned or leased by Midwest Dock.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is duplicative of Requests 42 & 43. Midwest Dock further incorporates its objections and responses to Requests 42 & 43.**

46.     Produce documents showing Midwest Dock's inventory.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. The Request would require the production of every single piece of**

paper, and every electronic document, that every Midwest Dock employee ever reviewed, authored, touched, filed, etc., related to "inventory," which itself is vague and ambiguous. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's office and at Gineris.

47. Produce all documents related to any social media pages maintained by Midwest Dock, including but not limited to Facebook, Instagram, or LinkedIn.

RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, vague and ambiguous, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents related to" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. The Request would require the production of every single piece of paper, and every electronic document, that every Midwest Dock employee ever reviewed, authored, touched, filed, etc., related to a company social media account. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's office.

48. Produce all documents related to the creation, design, maintenance, updating and hosting of any website owned or controlled by Midwest Dock, including but not limited to agreements, invoices, payment records, and the like.

RESPONSE: Midwest Dock objects to this Request on the grounds it is redundant of prior requests, including Request 36, and because it is overbroad, vague and ambiguous, lacking

in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents related to" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. The Request would require the production of every single piece of paper, and every electronic document, that every employee of any such website designer ever reviewed, authored, touched, filed, etc., related to Midwest Dock. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's office and at Gineris.

49.     Produce documents sufficient to show all Persons who have or have had an email address owned, controlled, or used by Midwest Dock to conduct business, including any email address ending in @midwestdocksolutions.com.

**RESPONSE: Midwest Dock objects to this Request on the grounds it seeks information not relevant to the claims or defenses at issue in this case and is disproportional to the needs of the case. Answering further, *see* objections and answers to Interrogatory Nos. 1 & 8. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's offices.**

50.     Produce documents sufficient to show all Persons who have access to the email address to any email address owned, controlled, or used by Midwest Dock to conduct business.

**RESPONSE: Midwest Dock objects to this Request on the grounds it seeks information not relevant to the claims or defenses at issue in this case and is disproportional to the needs of**

the case, and because it is redundant of Request 49. Answering further, *see* objections and answers to Interrogatory Nos. 1 & 8 and to Request 49. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's offices.

51.     Produce documents sufficient to show any website maintained by Midwest Dock at any time during the period from January 1, 2016 to the present.

RESPONSE: Midwest Dock objects to this Request on the grounds it is redundant of prior requests, including Requests 36 & 48. *See* objections and responses to Requests 36 & 48.

52.     Produce all contracts or agreements between Midwest Dock on the one hand and Dock & Door on the other hand.

RESPONSE:   Midwest Dock objects to this Request on the grounds it is vague and ambiguous regarding the terms "contracts or agreements." Subject to and without waiving this objection, none.

53.     Produce all documents showing any money transferred by Midwest Dock to Dock & Door.

RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad.

**Subject to and without waiving these objections, responsive documents are available for inspection and copying at Gineris.**

54.    Produce all documents related to any transfer of money by Midwest Dock to Dock & Door.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is redundant of Request 53, overbroad, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents related to" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Gineris.**

55.    Produce all documents showing any money transferred by Dock & Door to Midwest Dock.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises**

the subject matter of the interrogatory or document request") are facially overbroad. Subject to and without waiving these objections, none.

56.    Produce all documents related to any transfer of money by Dock & Door to Midwest Dock.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is redundant of Request 55, overbroad, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents related to" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Subject to and without waiving these objections, none.**

57.    Produce all documents related to any Midwest Dock "due to" or "due from" accounting entries related to Dock & Door.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is redundant of Requests 53, 54, 55 &56, overbroad, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents related to" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or**

document request") are facially overbroad. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Gineris.

58.  Produce Midwest Dock's QuickBooks records.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad in time and scope and unduly burdensome, seeks information not relevant to the claims and defenses of this case, and disproportional to the needs of the case. Subject to and without waiving these objections, none, as Midwest Dock does not utilize Quickbooks. Answering further, documents similar to Quickbooks are available for inspection and copying at Gineris.**

59.  Produce Midwest Dock's invoices for services for the period from October 1, 2020 to the present.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad in time and scope and unduly burdensome, seeks information not relevant to the claims and defenses of this case, and disproportional to the needs of the case. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's offices and Gineris.**

60.  Produce all estimates, proposals, and contracts for Midwest Dock's customers and potential customers for the period from October 1, 2020 to the present.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad in time and scope and unduly burdensome, seeks information not relevant to the claims and defenses of this case, and disproportional to the needs of the case. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's offices and Gineris.**

61.     Produce all registrations for Midwest Dock with any municipal or governmental entity, including for example any business licenses or permits.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad in time and scope and unduly burdensome, vague and ambiguous with respect to the term "registrations," seeks information not relevant to the claims and defenses of this case, and is disproportional to the needs of the case. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's offices.**

62.     Produce all contractor registrations for Midwest Dock.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad in time and scope and unduly burdensome, vague and ambiguous with respect to the term "contractor registrations," is redundant of Request 61, seeks information not relevant to the claims and defenses of this case, and is disproportional to the needs of the case. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's offices.**

63.     Produce any project lists showing the projects Midwest Dock worked on at any time during the period from January 1, 2016 to the present.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad in time and scope and unduly burdensome, vague and ambiguous with respect to the term "project lists", seeks information not relevant to the claims and defenses of this case, and is disproportional to the needs of the case. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's offices and Gineris.**

64.     Produce Midwest Dock's vendor listing for the period January 1, 2016 to the present.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad in time and scope and unduly burdensome, vague and ambiguous with respect to the term "vendor listing", seeks information not relevant to the claims and defenses of this case, and is disproportional to the needs of the case. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Midwest Dock's offices and Gineris.**

65. Produce all loan applications by Midwest Dock during the period January 1, 2016 to the present.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad in time and scope and unduly burdensome, seeks information not relevant to the claims and defenses of this case, and is disproportional to the needs of the case. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Gineris**

66. Produce Midwest Dock's financial statements for the period January 1, 2016 to the present, including balance sheet and income statement.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad in time and scope and unduly burdensome, vague and ambiguous with respect to the term "financial statements", seeks information not relevant to the claims and defenses of this case, and is disproportional to the needs of the case. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Gineris.**

67. Produce all communications between Michael Richert or Anthony Zarlengo on the one hand and Anthony Brutti on the other hand.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad in time and scope and unduly burdensome, seeks information not relevant to the claims and defenses**

43

of this case, and is disproportional to the needs of the case. Subject to and without waiving these objections, investigation continues.

68.    Produce all contribution reports submitted by Midwest Dock to any union or union-affiliated trust funds.

**RESPONSE: None.**

69.    Produce Midwest Dock's Account statements for the period from January 1, 2016 to the present.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overly broad in time and scope and vague and ambiguous with respect to the term "Account", seeks irrelevant documents and information, and is disproportional to the needs of the case. The request covers any banking activity or transaction of Midwest Dock for almost 9 years, regardless of relevance to any claim or defense in this case. Subject to and without waiving these objections, *see* bank statements produced by Old National Bank and Midwest Bank related to Midwest Docks's accounts therewith, ending in ▮▮▮ and ▮▮▮; answering further, responsive documents are available for inspection and copying at Gineris.**

70.    Produce Midwest Dock's cash disbursements journals for the period from January 1, 2016 to the present.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overly broad in time and scope, seeks irrelevant documents and information, and is disproportional to the needs of the case. The request covers any disbursement made by Midwest Dock for almost 9 years, regardless of relevance to any claim or defense in this case. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Gineris.**

71.    Produce Midwest Dock's cash receipts journal for the period from January 1, 2016 to the present.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overly broad in time and scope, seeks irrelevant documents and information, and is disproportional to the needs of the case. The request covers any cash receipts of Midwest Dock for almost 9 years, regardless of relevance to any claim or defense in this case. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Gineris.**

72.     Produce Midwest Dock's check register or general ledger for the period from January 1, 2016 to the present.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overly broad in time and scope, seeks irrelevant documents and information, and is disproportional to the needs of the case. The request covers any check cut by Midwest Dock for almost 9 years, regardless of relevance to any claim or defense in this case. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Gineris.**

73.     Produce Midwest Dock's payroll journal for the period from January 1, 2016 to the present.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overly broad in time and scope, seeks irrelevant documents and information, and is disproportional to the needs of the case. The request covers any and all payroll of Midwest Dock for almost 9 years, regardless of relevance to any claim or defense in this case. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Gineris.**

74.     Produce Midwest Dock's quarterly federal tax returns (Form 941) for the period from January 1, 2016 to the present.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overly broad in time and scope, seeks irrelevant documents and information, and is disproportional to the needs of the case. The request covers any quarterly tax filings by Midwest Dock for almost 9 years,**

regardless of relevance to any claim or defense in this case. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Gineris.

75.     Produce Midwest Dock's wage and tax statements (Form W-2) for the period from January 1, 2016 to the present.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overly broad in time and scope, seeks irrelevant documents and information, and is disproportional to the needs of the case. The request covers any W-2s issued by Midwest Dock for almost 9 years, regardless of relevance to any claim or defense in this case. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Gineris.**

76.     Produce Midwest Dock's miscellaneous income statements (Form 1099) for the period from January 1, 2016 to the present.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overly broad in time and scope, seeks irrelevant documents and information, and is disproportional to the needs of the case. The request covers any Form 1099s issued by Midwest Dock for almost 9 years, regardless of relevance to any claim or defense in this case. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Gineris.**

77.     Produce Midwest Dock's quarterly Illinois unemployment wage reports (Form UI 3/40) for the period from January 1, 2016 to the present.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overly broad in time and scope, seeks irrelevant documents and information, and is disproportional to the needs of the case. The request covers any unemployment wage reports of Midwest Dock for almost 9 years, regardless of relevance to any claim or defense in this case. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Gineris.**

78.     Produce Midwest Dock's Federal Unemployment Report (Form 940) for the period from January 1, 2016 to the present.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overly broad in time and scope, seeks irrelevant documents and information, and is disproportional to the needs of the case. The request covers any Form 940 completed by Midwest Dock for almost 9 years, regardless of relevance to any claim or defense in this case. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Gineris.**

79.     Produce Midwest Dock's Transmittal of Income and Tax Statements (Form W-3) for the period from January 1, 2016 to the present.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overly broad in time and scope, seeks irrelevant documents and information, and is disproportional to the needs of the case. The request covers any W-3s prepared by Midwest Dock for almost 9 years, regardless of relevance to any claim or defense in this case. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Gineris.**

80.     Produce Midwest Dock's complete federal tax returns together with all schedules, statements, and work papers for the period from January 1, 2016 to the present.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overly broad in time and scope, seeks irrelevant documents and information, and is disproportional to the needs of the case. The request covers any tax returns prepared by Midwest Dock for almost 9 years, regardless of relevance to any claim or defense in this case. Subject to and without waiving these objections, responsive documents are available for inspection and copying at Gineris.**

81.     Produce all documents showing any communication between Midwest Dock and the Union regardless of date.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Subject to and without waiving these objections, investigation continues.**

82.    Produce all documents showing any communications between Midwest Dock and Plaintiffs regardless of date.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents showing" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Subject to and without waiving these objections, none.**

83.    Produce all documents used to gather information to respond to any of the above interrogatories.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, lacking in reasonable particularity, and disproportional to the needs of the case. Subject to and**

without waiving these objections, none other than the documents being made available for inspection and copying in conjunction herewith.

84. Produce all documents obtained by you in response to any subpoena in this matter.

**RESPONSE: None.**

85. Produce all statements or summaries of statements obtained by you from any witness in this case.

**RESPONSE: None.**

86. Produce all documents which you believe support any defense, in whole or in part, that you have to the Plaintiffs' claims in this lawsuit.

**RESPONSE: Midwest Dock objects to this Request on the grounds it is overbroad, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents" that "support" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad.**

87. Produce all documents identified in your Rule 26(a) initial disclosures.

**RESPONSE: Documents identified in Midwest Dock's Rule 26(a) initial disclosures are available for inspection and copying at Midwest Dock's office and at Gineris.**

88. Produce documents showing any opinions and conclusions reached by any expert retained by you in this lawsuit.

**RESPONSE: None.**

89.     Produce all reports, memos, notes or work papers prepared by any expert retained by you in this matter.

**RESPONSE: None.**

90.     Produce documents any expert retained by you relied on to form his/her conclusions and opinions, including but not limited to textbooks and other publications.

**RESPONSE: None.**

91.     Produce all documents that support your affirmative defense that "Plaintiffs Complaint is barred because it fails in whole or in part to state a claim upon which relief can be granted."

**RESPONSE: Midwest Dock objects to this Request on the grounds it is redundant of Request 86, is overbroad, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents that support" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad.  Answering further, investigation continues.**

92.     Produce all documents that support your affirmative defense that "Plaintiffs are asserting claims which occurred outside the applicable statute of limitations period."

**RESPONSE: Midwest Dock objects to this Request on the grounds it is redundant of Request 86, is overbroad, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents that support" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to,"**

"related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Answering further, investigation continues.

93.    Produce all documents that support your affirmative defense that "Plaintiffs' claims are barred by the operation of the doctrine of laches."

RESPONSE: Midwest Dock objects to this Request on the grounds it is redundant of Request 86, is overbroad, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents that support" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Answering further, investigation continues.

94.    Produce all documents that support your affirmative defense that "Plaintiffs' claims are barred by estoppel."

RESPONSE: Midwest Dock objects to this Request on the grounds it is redundant of Request 86, is overbroad, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents that support" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection

whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Answering further, investigation continues.

95.    Produce all documents that support your affirmative defense that "Plaintiffs' claims are barred by its unclean hands."

**RESPONSE: Midwest Dock objects to this Request on the grounds it is redundant of Request 86, is overbroad, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents that support" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Answering further, investigation continues.**

96.    Produce all documents that support your affirmative defense that "Plaintiffs' claims a barred by waiver."

**RESPONSE: Midwest Dock objects to this Request on the grounds it is redundant of Request 86, is overbroad, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents that support" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to,**

contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Answering further, investigation continues.

      97.    Produce all documents that support your affirmative defense that "Midwest Dock is entitled to a set-off to the extent that any funds paid to Plaintiffs by any party extinguish any underlying claim for damages by Plaintiffs."

**RESPONSE: Midwest Dock objects to this Request on the grounds it is redundant of Request 86, is overbroad, lacking in reasonable particularity, and disproportional to the needs of the case. Requests, such as this one, seeking "all documents that support" (where, as here, Plaintiff has defined the following words and phrases to be "interchangeable": "relates to," "related to," "relating to," "concerning," "showing," "support," "supported," "supporting," and "relied upon"; and where each such word or phrase is defined to mean "any connection whatsoever, direct or indirect, which supports, evidences, describes, mentions, refers to, contradicts or comprises the subject matter of the interrogatory or document request") are facially overbroad. Answering further, investigation continues.**

Dated: December 6, 2024

         Respectfully Submitted,
         **MIDWEST DOCK SOLUTIONS, INC.,**

         By: /s/ Michael F. Hughes
                 One of its Attorneys

Jeffrey A. Risch, Esq. (ARDC No.: 6271407)
Michael F. Hughes, Esq. (ARDC No.: 6279175)
AMUNDSEN DAVIS, LLC
3815 E. Main Street, Suite A-1
St. Charles, IL 60174
(630) 587-7922 – Telephone
(630) 587-7960 – Facsimile
JRisch@amundsendavislaw.com
MHughes@amundsendavislaw.com
***Attorneys for Defendant Midwest Dock Solutions, Inc.***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 6, 2024, he served a true and correct copy of **DEFENDANT MIDWEST DOCK SOLUTIONS, INC.'S OBJECTIONS AND ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES AND DOCUMENT PRODUCTION REQUESTS** upon the following individual(s) via Electronic Mail and addressed as follows:

Kevin McJessy
MCJESSY, CHING & THOMPSON, LLC
3759 N. Ravenswood, Suite 231
Chicago, Illinois 60613
McJessy@mcandt.com
*Attorney for Plaintiffs*

Todd A. Miller
Kathleen M. Cahill
ALLOCCO, MILLER & CAHILL, P.C.
20 N. Wacker Dr., Suite 3517
Chicago, Illinois 60606
tam@ alloccomiller.com
kmc@alloccomiller.com
*Attorneys for Co-Defendant, Dock & Door Install, Inc.*

By: /s/ Michael F. Hughes
One of Plaintiff's Attorneys

Jeffrey A. Risch, Esq. (ARDC No.: 6271407)
Michael F. Hughes, Esq. (ARDC No.: 6279175)
AMUNDSEN DAVIS, LLC
3815 E. Main Street, Suite A-1
St. Charles, IL 60174
(630) 587-7922 – Telephone
(630) 587-7960 – Facsimile
JRisch@amundsendavislaw.com
MHughes@amundsendavislaw.com
*Attorneys for Defendant Midwest Dock Solutions, Inc.*

## VERIFICATION

I, Anthony Zarlengo, have reviewed the foregoing Objections and Answers to Interrogatories (Nos. I through 12), and state, under penalty of perjury, that said answers are true and correct to the best of my knowledge, information and belief.

Dated: December 6, 2024

_____

Anthony Zarlengo

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MID-AMERICA CARPENTERS REGIONAL
COUNCIL PENSION FUND; MID-AMERICA
CARPENTERS REGIONAL COUNCIL HEALTH
FUND; MID-AMERICA CARPENTERS
REGIONAL COUNCIL APPRENTICE AND
TRAINEE PROGRAM; and MID-AMERICA
CARPENTERS REGIONAL COUNCIL
SUPPLEMENTAL RETIREMENT FUND,

                Plaintiffs,

v.

DOCK & DOOR INSTALL, INC., an Illinois
corporation and MIDWEST DOCK SOLUTIONS,
INC., an Illinois corporation,

                Defendants.

Case No 1:24-cv-06428

Judge Andrea R. Wood

Magistrate Judge Jeannice
W. Appenteng

**DEFENDANT DOCK & DOOR INSTALL, INC.'S
RESPONSES TO PLAINTIFFS'
FIRST SET OF INTERROGATORIES**

Defendant DOCK & DOOR INSTALL, INC. answers Plaintiffs' interrogatories as
follows:

**INTERROGATORIES**

**Interrogatory No. 1**: Identify every Person who performed work for Dock & Door or who was
paid by Dock & Door at any time during the period from January 1, 2016 to the present and for
each such Person, provide the following information:

(a) state the approximate time period during which each Person worked for or was paid by Dock
& Door;

(b) describe each type of work the Person performed (for example, Bargaining Unit Work,
payroll, personnel, secretarial, accounting, etc.);

(c) identify the methods by which the Person was paid (for example, by cash payment, by cash
disbursement check, by payroll check, by direct deposit, or by any other method); and,

(d) identify every Company who paid each Person for his or her work (for example, Dock &
Door or Midwest Dock).

1

PLAINTIFF'S
EXHIBIT
221

**ANSWER:**

| Employee | Dates Employed | Type of Work | Method Paid | Company |
|----------|----------------|--------------|-------------|---------|
| Aguirre, Jose | 10-21-2016 – Present | Carpenter | Direct Deposit | Dock & Door |
| Bara, Daniel | 9-21-2018 – 7-24-2020 | Carpenter | Direct Deposit | Dock & Door |
| Bishop, Branden | 1-20-2023 – Present | Carpenter | Direct Deposit | Dock & Door |
| Borkstrom, Edward | 3-12-2021 – 1-28-2022 | Carpenter | Direct Deposit | Dock & Door |
| Brutti, Anthony | 1-1-2016 – Present | President | Direct Deposit | Dock & Door |
| Casey, William | 11-27-2020 – 12-11-2020 | Carpenter | Direct Deposit | Dock & Door |
| Cherven, Matthew | 9-8-2023 – 9-15-2023 | Carpenter | Direct Deposit | Dock & Door |
| Corrigan, Zachery | 7-15-2016 – 1-13-2017<br>2-18-2022 – 5-6-2022 | Iron Worker<br>Carpenter | Direct Deposit | Dock & Door |
| Crouch, Robin | 5-3-2019 – 5-17-2019 | Carpenter | Direct Deposit | Dock & Door |
| Cruikshank, Donald | 10-27-2017 – 1-20-2023 | Carpenter | Direct Deposit | Dock & Door |
| Foy, James | 5-12-2017 – 5-17-2017 | Carpenter | Direct Deposit | Dock & Door |
| Georges, Brian | 12-21-2018 – 12-21-2018 | Carpenter | Direct Deposit | Dock & Door |
| Graham, Kevin | 12-23-2016 – 8-18-2017 | Carpenter | Direct Deposit | Dock & Door |
| Green, David | 1-1-2016 – President | Carpenter | Direct Deposit | Dock & Door |
| Grishaber, Joseph | 2-14-2020 – 2-14-2020 | Carpenter | Direct Deposit | Dock & Door |
| Jansma, Eric | 2-11-2022 – 12-22-2023 | Carpenter | Direct Deposit | Dock & Door |
| Kelly, Nicolas | 6-8-2018 - Present | Carpenter | Direct Deposit | Dock & Door |
| Lazaro, Jonathan | 12-2-2022 – 2-10-2023 | Carpenter | Direct Deposit | Dock & Door |
| Lester, Jason | 11-25-2016 – 1-13-2017 | Carpenter | Direct Deposit | Dock & Door |
| Loqui, Christopher | 8-12-2022 – 2-10-2023 | Carpenter | Direct Deposit | Dock & Door |
| Maldonado, Reynaldo | 10-20-2017 – 11-20-2020 | Carpenter | Direct Deposit | Dock & Door |
| Mantoan, Richard | 7- 9-2021 – Present | Carpenter | Direct Deposit | Dock & Door |
| McManamy, Elliot | 9-29-2023 – Present | Carpenter | Direct Deposit | Dock & Door |
| Mead, Ryan | 11-21-2017 – 12-22-2017 | Carpenter | Direct Deposit | Dock & Door |
| Montello, Rodney | 7-31-2020 – 7-31-2020 | Carpenter | Direct Deposit | Dock & Door |
| Morales, Fabian | 7-30-2021 – 7-30-2021 | Carpenter | Direct Deposit | Dock & Door |
| Moton, John | 9-22-2023 – 9-22-2023 | Carpenter | Direct Deposit | Dock & Door |
| James, Murray | 1-14-2016 – 3-25-2016 | Carpenter | Direct Deposit | Dock & Door |
| Peneda, Jose' | 3-5-2021 – 1-28-2022 | Carpenter | Direct Deposit | Dock & Door |
| Richert, David | 12-2-2022 – 12-22-2023 | Carpenter | Direct Deposit | Dock & Door |
| Rickert, Jonathan | 9-29-2017 – 11-17-2017 | Carpenter | Direct Deposit | Dock & Door |
| Rodgers, Hugh | 11-27-2020 – 1-22-2021 | Carpenter | Direct Deposit | Dock & Door |
| Rodgers, Jacob | 8-3-2018 – 4-1-2022 | Carpenter | Direct Deposit | Dock & Door |
| Rodriguez, Ricardo | 1-7-2022 – 1-7-2022 | Carpenter | Direct Deposit | Dock & Door |
| Senter, Andre | 12-31-2021 – 1-7-2022 | Carpenter | Direct Deposit | Dock & Door |
| Tattini, Anthony | 1-1-2016 – 9-26-2019 | Carpenter | Direct Deposit | Dock & Door |
| Ward, Brian | 1-1-2016 - 1-14-2016 | Iron Worker | Direct Deposit | Dock & Door |
| Whittle, Michael | 2-7-2020 – 4-3-2020 | Carpenter | Direct Deposit | Dock & Door |
| Williams, Quinten | 8-12-2022 – 9-29-2023 | Carpenter | Direct Deposit | Dock & Door |
| Wolters, Samuel | 9-15-2023 – 12-15-2023 | Carpenter | Direct Deposit | Dock & Door |
| Zarlengo, Collin | 6-15-2018 – Present | Carpenter | Direct Deposit | Dock & Door |

**Interrogatory No. 2:** Identify every Company that performed work for Dock & Door at any time during the period from January 1, 2016 to the present or was paid by Dock & Door for work at any time during the period from January 1, 2016 to the present. For each such Company identified provide the following information:

2

(a) describe in detail every type of work the Company performed (for example, Bargaining Unit Work, payroll, personnel, secretarial, accounting, etc.);

(b) if the Company performed any Bargaining Unit Work during the period from October 1, 2020 through the present, then state when (either by day, week or month) the Company performed the work, how much the Company was paid for the work, identify the Persons employed by the Company who performed the work, and for each Person state how many hours the Person worked on a daily basis.

**ANSWER:** Dock & Door did not engage any other company to perform work for it during the period January 2016 to the present.

**Interrogatory No. 3:** Identify each address where Dock & Door either maintained an office or operated its business at any time during the period from January 1, 2016 to the present and, for each identified address, state the months during which Dock & Door either maintained an office or operated its business from that location.

**ANSWER:**

| Address | Dates |
|---|---|
| 1249 E. Burville Rd<br>Crete, IL 60417 | January – May 2016 |
| 3211 Holeman Ave.<br>South Chicago Heights, IL 60411 | May 2016 – January 2018 |
| 27 E. 36th Pl.<br>Steger, IL 60475 | January 2016 – Present |

**Interrogatory No. 4:** Identify every Account held by Dock & Door, in its own name or jointly with another Person or Company, during the period January 1, 2016 to the present; and, for each Account, (i) identify every Person who issued payments from the Account by either signing checks for the Account, issuing checks or payments from the Account using an online banking system, or signing checks using a signature stamp or other automated method for signing checks, (ii) identify every person who was an authorized signor on the Account at any time, and (iii) identify every person who accessed any such Account using the financial institution's online banking access.

**ANSWER:**

| Banking Accounts | Dates |
|---|---|
| First Midwest Bank Checking | January 2016 – June 2022 |
| First Midwest PPP Account | May 2020 – April 2021 |
| Old National Bank Checking | July 2022 – Present |

3

(i)       Anthony Brutti President Dock & Door Install Inc.
(ii)      Anthony Brutti President Dock & Door Install Inc.
(iii)     Anthony Brutti President Dock & Door Install Inc.
          Gineris & Associates Accounting Service

**Interrogatory No. 5:**  Identify each service provider for Dock & Door from January 1, 2016 to the present (including for example, each accountant, attorney, bookkeeper, insurance agent, insurance carrier, payroll service provider, tax preparer, registered agent, website and email hosting service, and website design service), and for each identified service provider, identify the dates during which the service provider provided services to Dock & Door.

**ANSWER:**

**Service Providers**

Accountant, Bookkeeper, Tax Preparer
Gineris & Associates   January 1, 2016 – Present

Attorney
Lawrence Kamin, LLC    January 1, 2016 – Present
Allocco, Miller & Cahill, P.C. August 7, 2023 – Present

Insurance Provider
Cincinnati Insurance Companies General Liability January 1, 2016 – Present
Cincinnati Insurance Companies Workers Compensation January 1, 2016 – July 2023
BerkleyNet Workers Compensation July 2023 – Present

Insurance Agent
Rose Couch Assured Partners January 1, 2016 – Present

Payroll Service Provider
ADP January 1, 2016 – Present

**Interrogatory No. 6:**  Identify each material supplier for Dock & Door from January 1, 2016 to the present (including for example, every supplier of welding equipment and supplies, dock plates, dock levelers, overhead doors, dock canopies, dock shelters, dock seals, overhead door openers, jackshaft operators, trolley operators, slide operators, and parts for any of the forgoing, etc.).

**ANSWER:**

Dock & Door has not purchased materials from any material suppliers between January 1, 2016 and the present so there are no suppliers to identify for this Interrogatory No. 6.

4

**Interrogatory No. 7:**  Identify each officer, director, and shareholder for Dock & Door from January 1, 2016 to the present.  For each identified officer and director identify the positions held, the dates during which the officer or director held each position; and, in the case of a shareholder, identify the percentage of ownership the shareholder held and the period of time she/he/it held such interest.

**ANSWER:**

Anthony Brutti President    January 1, 2016 – Present    100% Ownership

**Interrogatory No. 8:**  Regardless of date, identify all internet URL's and all email addresses owned, controlled, or used by Dock & Door and all email addresses used by the officers, directors, or employees of Dock & Door for any Dock & Door related business.

**ANSWER:**

Email address: ajbrutti@gmail.com

**Interrogatory No. 9:**  Identify by year, make, and model all cars, trucks, or other motorized vehicles owned, leased, or used by Dock & Door during the period from January 1, 2016 to the present.

**ANSWER:**

Vehicles Owned by Dock and Door: None

Vehicles Leased by Dock and Door: None

Vehicles used by Dock and Door:

    2015 Chevy Silverado 2500
    2012 Honda Civic
    2024 Chevy Silverado 2500
    2014 Ford F450
    2018 Ford F450
    2020 Ford F450
    2021 Ford F350

**Interrogatory No. 10:**  Identify all Persons who assisted in answering these document requests and interrogatories and for each Person, identify which document requests and interrogatories he or she assisted in answering.

**ANSWER:**

Anthony Brutti and Todd Miller assisted in answering all the interrogatories.

**Interrogatory No. 11**: Identify (a) each non-expert witness and (b) each expert witness who you intend to call to testify at any hearing or trial. For <u>each</u> <u>witness</u> describe the subjects on which he/she will testify. For <u>each</u> <u>expert</u> <u>witness</u>, also provide the following additional information: (a) his/her opinions and conclusions; (b) the bases of those opinions and conclusions; (c) his/her qualifications; (d) identify any report, memos, notes he/she prepared; and (e) identify all documents he/she relied on to form his/her conclusions and opinions including, but not limited to, textbooks and other publications.

**ANSWER:**

Dock & Door does not intend to call any expert witness and refers Plaintiffs to its Initial Disclosures for the response to this Interrogatory No. 11.

Dated: December 2, 2024

Respectfully submitted,

DOCK & DOOR INSTALL, INC.,

By: /s/ Todd A. Miller_____
    Todd A. Miller
    One of Its Attorneys

Todd A. Miller (tam@alloccomiller.com)
Kathleen M. Cahill (kmc@alloccomiller.com)
ALLOCCO, MILLER & CAHILL, P.C.
20 N. Wacker Drive, Suite 3517
Chicago, Illinois 60606
(312) 675-4325 TEL
(312) 675-4326 FAX

## VERIFICATION BY CERTIFICATION

Under penalties of perjury as provided by law pursuant to 735 ILCS 5/1-109, the undersigned certifies that the statements set forth in Defendant, Dock & Door Install, Inc.'s Answers to Plaintiffs' Interrogatories are true and correct, except as to such matters therein stated to be on information and belief and as such matters, the undersigned certifies as aforesaid that the undersigned verifies and believes the same to be true.

Anthony Brutti, President
Dock & Door Install, Inc.

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney of record, hereby certifies that he electronically served the attached,

*Defendant, Dock & Door Install, Inc.'s Answers to Plaintiffs' First Set of Interrogatories*, this 2nd day of

December 2024 at the e-mail address below:

> Kevin Patrick McJessy
> McJessy, Ching & Thompson, LLC
> 3759 N. Ravenswood, Suite 231
> Chicago, IL 60613
> (773)880-1260
> mcjessy@mcandt.com

>   /s/ *Todd A. Miller*     

Todd A. Miller (#6216561)
Kathleen M. Cahill (#6269486)
ALLOCCO, MILLER & CAHILL, P.C.
*Counsel for Defendant, Dock & Door*
20 N. Wacker Drive, Suite 3517
Chicago, Illinois 60606
(312) 675-4325 TEL
(312) 675-4326 FAX
tam@alloccomiller.com

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 26

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MID-AMERICA CARPENTERS REGIONAL COUNCIL )
PENSION FUND, et al,                     )
                                         )
                    Plaintiffs,          )
                                         )
          -vs-                           ) 2024 CV 06428
                                         )
DOCK & DOOR INSTALL, INC., an Illinois   )
corporation and MIDWEST DOCK SOLUTIONS,  )
INC., an Illinois corporation,           )
                                         )
                    Defendants.          )
_____)

         The deposition of ZACHARY TORKELSEN called
by the Plaintiffs for examination, pursuant to notice
and pursuant to the Federal Rules of Civil Procedure
for the District Courts of the United States, taken
before Sheryl F. Rose, a Notary Public and Certified
Shorthand Reporter within and for the County of Cook
and the State of Illinois at 3759 North Ravenswood
Avenue, Chicago, Illinois, on the 3rd day of October,
2025, commencing at the hour of 10:30 o'clock a.m.

---

2

1 A P P E A R A N C E S :
2         McJESSY CHING & THOMPSON LLC, by
          MR. KEVIN P. McJESSY
3         3759 North Ravenswood Avenue
          Suite 231
4         Chicago, Illinois   60613
5         mcjessy@MCandT.com
6              Appeared on behalf of the Plaintiffs;
7
8         ALLOCCO MILLER & CAHILL P.C., by
          MS. KATHLEEN CAHILL
9         20 North Wacker Drive
          Suite 3517
10        Chicago, Illinois   60606
11        kmc@alloccomiller.com
12             Appeared on behalf of Dock & Door
               Install, Inc.;
13
14        AMUNDSEN DAVIS LLC, by
          MR. MICHAEL HUGHES
15        3815 East Main Street
          Suite A-1
16        St. Charles, Illinois   60174
17        mhughes@amundsendavislaw.com
18             Appeared on behalf of Midwest Dock
               Solutions, Inc.
19
20
21        ALSO PRESENT:  Ms. Jillian Torkelsen
22
23
24

---

3

1               I N D E X
2 WITNESS:
3 Zachary Torkelsen
4     Examination by Mr. McJessy          4 - 81
      Examination by Mr. Hughes          81 - 91
5     Further Examination by Mr. McJessy  91 - 93
6
7
8
9 EXHIBITS:
10 Exhibit No. 121                              7
11 Exhibit No. 57                             27
12 Exhibit No. 29                             44
13 Exhibit No. 19                             52
14 Exhibit No. 6                              57
15 Exhibit No. 7                              60
16 Exhibit No. 8                              60
17 Exhibit No. 31                             62
18 Exhibit No. 15                             72
19 Exhibit No. 122                            73
20 Exhibit No. 123                            79
21 Exhibit No. 124                            79
22 Exhibit No. 5                              82
23
24

---

4

1 (Witness sworn)
2 WHEREUPON:
3      Z A C H A R Y   T O R K E L S E N
4 the deponent herein, called as a witness, having been
5 first duly sworn, was examined and testified as
6 follows:
7           E X A M I N A T I O N
8           by Mr. McJessy
9     Q   Sir, can you state your name for the record,
10 first name, middle name and last name, and spell each
11 one?
12    A   Zachary, Z-a-c-h-a-r-y, Ryan, R-y-a-n,
13 Torkelsen, T, as in Tom, o-r-k-e-l-s-e-n.
14    Q   And, sir, have you ever been deposed before?
15    A   No.
16    Q   All right.  And let me lay some ground rules
17 just to make things go a little smoother and faster.
18        Do you understand you're under oath?
19    A   Yes.
20    Q   And do you understand that even though we're
21 here in an informal setting in a conference room that
22 oath has the same force and effect as if you were
23 testifying in a court of law?
24    A   Yes.

5

1    Q   And I'm going to ask you a series of questions
2  today and you'll give me hopefully the best most
3  truthful answers that you can.
4         It's important that all of your answers
5  be verbal responses.  Yeses and nos are fine, but if
6  you nod your head or shake your head or say uh-huh,
7  uh-uh, that kind of thing, I'll prompt you is that
8  a yes, is that a no, just so that the court reporter
9  can take down an accurate transcript of what's
10  happening.
11        Is that fair?
12   A   Understood.  Yes.
13   Q   Okay.  And then also if I ask a question and
14  you don't understand it because it's vague or confusing
15  or something like that, will you ask me to explain my
16  question?
17   A   Yes.
18   Q   Okay.  And then if you answer a question
19  then, is it fair that I can presume you think you
20  understood my question?
21   A   Yes.
22   Q   Okay.  And also we can't both talk at the same
23  time.  The court reporter has two hands, but she can
24  only take down what one of us is saying at a time.

6

1         Sometimes I'm going to ask a question
2  and you're going to know what my question is before
3  I finish asking it and your inclination is to start
4  answering it.
5         Please wait until I finish my question
6  and then you can answer just so she can take down an
7  accurate transcript of what we're saying.
8         Is that fair?
9    A   Yes.
10   Q   Okay.  I'll try to return the courtesy and not
11  ask a question while you're still giving an answer.
12        Some of the attorneys here might make
13  objections during your testimony.  If they do, let
14  them make their objection for the record and then
15  you can go ahead and answer.
16        Okay?
17   A   Okay.
18       MR. HUGHES:  Kevin, before we begin, can
19  we have the record reflect Mr. Torkelsen's wife's
20  presence?
21       MR. McJESSY:  Oh, yes.
22  BY MR. McJESSY:
23   Q   The court reporter, I think, notes who's here
24  in the conference room, but for the record, your wife

7

1  Jillian Torkelsen is here in the conference room, too.
2         Is that fair?
3    A   Yes.
4    Q   Okay.  She just asked to sit in.
5    A   Okay.
6    Q   And none of the counsel had an objection to
7  your wife sitting in.
8        MR. McJESSY:  Is that correct?
9        MR. HUGHES:  That's correct.
10       MS. CAHILL:  Yes.
11  BY MR. McJESSY:
12   Q   Last thing, any reason you cannot give
13  truthful answers to my questions today?
14        For example, are you taking any
15  medication or suffering from any conditions that would
16  prevent you from either understanding my questions or
17  giving truthful responses?
18   A   No.
19   Q   All right.  Sir, you are here today pursuant
20  to a subpoena, correct?
21   A   Yes.
22   Q   And I've handed you what's been marked as
23  Exhibit 121.
24        And if you can take a look at that, does

8

1  that look like the subpoena that you received?
2    A   Yes.
3    Q   And if you turn to the last page, the subpoena
4  asks you to produce certain documents.
5         Do you see that?
6    A   Yes.
7    Q   And prior to today have you produced any
8  documents to me?
9    A   No.
10   Q   All right.  And do you have any documents
11  that are responsive to these requests?
12   A   No.
13   Q   Okay.  The first one asks you to produce
14  emails or text messages that you exchanged with anyone
15  at Dock & Door or Midwest Dock Solutions.
16        You don't have any text messages or
17  emails?
18   A   No.
19   Q   Okay.  The next one asks you to produce
20  documents related to any work you performed for those
21  companies like time sheets, job notes, that kind of
22  thing.
23        Do you have any documents like that?
24   A   No.

**9**

1    Q   All right.  How about documents showing the
2  hours that you worked?
3    A   No.
4    Q   What about pay stubs, W-2's, 1099's, things
5  like that?
6    A   No.  I did not bring those.
7    Q   You have those?
8    A   I do not have them.  I might be able to find
9  them through whatever paycheck app they had.
10       I don't have any connection with any of
11  them anymore.  So it's been over two years.
12   Q   And you didn't retain any of those documents?
13   A   No.
14   Q   And then the next item is item 5.  It asks you
15  to produce any resume or job application you completed
16  that references those companies.
17       Do you have anything like that?
18   A   I do not.  No.
19   Q   What about photographs of any jobsites you
20  worked on?
21   A   No.
22   Q   Okay.  And have you spoken -- have you spoken
23  with anybody about your deposition here today?
24   A   No.

**10**

1    Q   Okay.  You spoke with your wife, correct?
2    A   Yes.
3    Q   Okay.  Anybody other than that?
4    A   No.
5    Q   All right.  Has anybody from -- that you knew
6  while you were at Dock & Door or Midwest Dock Solutions
7  contacted you?
8    A   Repeat the question, please.
9    Q   Has anybody that you worked with while you
10  were at Midwest Dock Solutions been in contact with
11  you about your deposition?
12   A   No.
13   Q   Okay.  And are you familiar with Midwest Dock
14  Solutions?
15   A   Yes.
16   Q   You worked for that company for a period of
17  time, correct?
18   A   Yes.
19   Q   Okay.
20   A   Can I say that I did send a message to Tony
21  asking him what it was about on Facebook, but I am not
22  friends with him on there.  Never have been.
23       When this happened it was just a quick,
24  hey, what is this?  Why am I getting this for you?

**11**

1        And there was no response, no nothing.
2        So I'm not even sure if that's a current
3  Facebook of his.
4    Q   When you say Tony, which Tony?
5    A   Anthony Zarlengo.
6    Q   And do you know an Anthony Brutti?
7    A   I do.
8    Q   Just because both of them are involved in this
9  matter, as we go along, if you refer to Tony, can you
10  specify whether it's Tony Zarlengo or Tony Brutti?
11   A   Yes.
12   Q   And if you don't, either I or Mr. Hughes or
13  Miss Cahill will probably prompt you just for the
14  record.
15   A   Usually -- I'm sorry.
16   Q   Go ahead.
17   A   (Continuing) -- we referred to him as Brutti
18  in the job -- at the job.  So if that's how I speak it
19  when I'm differentiating --
20   Q   That's fine.
21       Usually when you say Tony, you mean
22  Tony Zarlengo?
23   A   Yes.
24   Q   And when you mean Tony Brutti, you refer to

**12**

1  him as Brutti?
2    A   Yes.
3    Q   Fair enough.
4        And you said you sent out a Facebook
5  thing of some sort to Mr. Zarlengo, but you didn't
6  get a response.
7        Is that fair?
8    A   Yes.  Correct.
9    Q   Okay.  And anybody else that you reached out
10  to?
11   A   Uh-uh.
12   Q   Is that a no?
13   A   Yes.  No.
14   Q   And when was the last time that you spoke with
15  Tony Zarlengo?
16   A   The day he fired me.
17   Q   When was that?  Do you remember approximately?
18   A   A couple months before I started my new job in
19  October of 2023.  So June or July-ish of 2023.
20   Q   Okay.  And when was the last time you spoke
21  with Tony Brutti?
22   A   Around the same time.
23   Q   And do you know who Mike Richert is?
24   A   Mike, yes.  He's the other -- the co-owner

13

1 they called each other or we referred to them as.
2 **Q   Co-owner of --**
3 A   Midwest Dock.
4 **Q   Okay.  And when was the last time you spoke**
5 **with Mike Richert?**
6 A   The day they fired me.
7 **Q   And you and I have spoken, correct?**
8 A   Yes.
9 **Q   We spoke this morning when you got here,**
10 **correct?**
11 A   Yes.
12 **Q   Was that the first time we had spoken?**
13 A   I believe so.
14 **Q   Okay.**
15 A   Yes.
16 **Q   That's my recollection, too.**
17     I think I spoke to your wife to schedule
18 the deposition, correct?
19 A   Yes.
20 **Q   Okay.  And you are not represented by an**
21 **attorney here today, correct?**
22 A   Correct.
23 **Q   And when was the last -- other than Mr. Brutti**
24 **and Mr. Zarlengo and Mike Richert when was the last**

14

1 **time you talked to anybody who you used to work with**
2 **at Midwest Dock Solutions?**
3 A   There was a Mike Mateja.  We were friends,
4 quote/unquote.  We ended up having a falling out
5 shortly after that.
6 **Q   All right.  So you talked to him some time**
7 **after you left?**
8 A   A little bit, yes.
9 **Q   Okay.  Was the falling out in any way related**
10 **to your work --**
11 A   No.
12 **Q   (Continuing) -- or Midwest Dock Solutions or**
13 **Dock & Door?**
14 A   It was not.  No.
15 **Q   It was just personal?**
16 A   Yes.
17 **Q   Okay.  Sir, what's the highest level of**
18 **education you've received?**
19 A   High school.
20 **Q   And where did you graduate and when?**
21 A   Murray High School in Kentucky, in Murray,
22 Kentucky.
23     501 Doran Road, I believe is the address,
24 D-o-r-a-n.

15

1 **Q   That's pretty good.**
2     **What year was that?**
3 A   2007 is when I graduated.
4 **Q   All right.  And have you had any training**
5 **in any trades like carpentry, electrical, plumbing,**
6 **anything like that?**
7 A   No, sir.
8 **Q   Okay.  Was high school the last formal**
9 **education you received?**
10 A   Yes.
11 **Q   Okay.  You didn't attend even part time and**
12 **temporarily any other educational institutions after**
13 **high school?**
14 A   No.
15 **Q   And are you a member of any union?**
16 A   No.
17 **Q   Other than a driver's license and -- I don't**
18 **want to know about a driver's license or a firearms**
19 **permit, but do you hold any other certifications or**
20 **licenses of any sort?**
21 A   Forklift certification.
22 **Q   Where did you get that?**
23 A   At my job.
24 **Q   And when did you get that?**

16

1 A   When I started and then another training class
2 I did a few months ago.
3 **Q   So the forklift certification you got after**
4 **you started your job after you left Midwest Dock?**
5 A   Correct.
6 **Q   Okay.  And who did you get that through?**
7 A   Through my job.
8 **Q   Who's that?**
9 A   NFI.
10 **Q   And does that stand for anything or is that**
11 **the name of the company?**
12 A   It stands for something.  I'm not a hundred
13 percent sure.
14 **Q   Where are they located?**
15 A   I am at Manteno warehouse.
16     I know that they do different things
17 at different NFI's, but we move product for Lowe's;
18 ranges, refrigerators, microwaves, dishwashers, washers
19 and dryers, that sort of stuff.
20 **Q   And Manteno, is that a location?  Is that a**
21 **city?**
22 A   That's a city.
23 **Q   Is that Manteno, Illinois or Manteno, Indiana?**
24 A   Manteno, Illinois.

17

1   **Q  So you work at the NFI warehouse in Manteno?**
2   A  Yes.
3   **Q  And you're a forklift operator, I take it?**
4   A  Yes.
5   **Q  Do you do anything else for them or is that**
6  **principally your job?**
7   A  That's basically it.  Yes.
8   **Q  Okay.  And you said you've never been a member**
9  **of a union, correct?**
10   A  I was in a union at a job I had years ago at a
11  glass factory in Chicago Heights, Illinois.
12   **Q  What was the union, do you recall?**
13   A  It was my only union job.  I think they said
14  it was GMP, something like that.
15      I'm not even sure.
16   **Q  So you were a member of that union while you**
17  **worked at the glass factory?**
18   A  Yes.
19   **Q  What did you do at the glass factory?**
20   A  I watched at the end of the line.  It was
21  medicinal glass for Moderna, Pfizer, those kind of
22  companies.
23      It would come down the assembly line
24  after they're molded and I would be at the end of the

18

1  line just inspecting them over a light to make sure
2  that there was no cracks, chips, any kind of -- you
3  know, things that could contaminate the medicine.
4      And I would stack it and ship them out.
5   **Q  And were the bottles used then to -- they put**
6  **some sort of medicine in the bottles?**
7   A  I don't know what happened to the bottles
8  after they left.  They were packaged in plastic wrap.
9   **Q  And how long were you a member of that union?**
10   A  A year to two years.  Somewhere around there.
11      I'm not sure exactly how long I had that
12  job.  I want to say it was close to two years.
13   **Q  Do you remember the name of the company?**
14   A  Gerresheimer Glass, G-e-r-r-e-s-h-e-i-m-e-r.
15   **Q  And as we go along if you can spell -- just**
16  **like you did -- the court reporter would greatly**
17  **appreciate that.**
18      **First job out of high school was what?**
19   A  Honestly, I don't remember.
20   **Q  What's the first job you do recall after**
21  **high school?**
22   A  First job after high school was when I moved
23  back up here and was doing roofing.
24   **Q  You were a roofer?**

19

1   A  I was a laborer for a roofer.
2   **Q  And what did you do?**
3   A  I would clean up the tear-off.
4      When they were doing the roof, they would
5  tear it off and I would clean it up off of the ground.
6  It was on tarps.
7      And I would put it into a dumpster and
8  bring shingles up a ladder for them and do the labor
9  work to make the shingler's life easier.
10   **Q  And do you remember the company you were**
11  **working for?**
12   A  I don't remember what it was called.
13   **Q  Do you remember where they were located?**
14   A  Park Forest.
15   **Q  Okay.**
16   A  It may have been Lambert Roofing.  I do know
17  the name of the owner of it.
18   **Q  What was the name of the owner?**
19   A  Bruce Lambert.
20   **Q  How long were you there and from when until**
21  **when?**
22   A  It was -- I'm not sure of the exact dates.
23   **Q  Can you ballpark it?**
24   A  Summer of 2008-ish.

20

1   **Q  How long were you there do you think?**
2   A  Probably just --
3   **Q  The summer?**
4   A  (Continuing) -- that summer.  Yes.
5   **Q  And then do you remember where you went after**
6  **that?**
7      **Well, let me take a step -- a giant leap**
8  **forward.**
9      **When did you start with Midwest Dock**
10  **Solutions?**
11   A  2021, I believe it was.
12   **Q  And how did you come to be employed there?**
13   A  Mike Mateja.  He had put in a recommendation
14  for me.
15   **Q  And do you know who he had recommended you to?**
16   A  To Anthony Brutti.
17      Or, no, I'm sorry, not Anthony Brutti.
18      Anthony Zarlengo.
19   **Q  Okay.**
20   A  I think having to differentiate is throwing
21  me off a little bit.
22   **Q  Okay.  And what job were you hired for --**
23  **well, Mike Mateja recommended you to Anthony Zarlengo.**
24      **What happened?  How did you get your job?**

21

1    A   He talked to him and said that I was looking
2  for work and that I did not have experience, but that
3  I was a good worker and willing to learn.
4         And he said okay.
5    Q   All right.  And were you there when he talked
6  to Mr. Zarlengo or he just told you what he had relayed
7  to Mr. Zarlengo?
8    A   He told me what he had relayed to Mr. Zarlengo
9  and his response.
10   Q   Okay.  And prior -- and this was when?
11        In 2021?
12   A   2021.
13   Q   And prior to going there were you working?
14   A   Yes.
15   Q   Where were you working?
16   A   Well, when he -- before Midwest Dock I believe
17  was a place in Chicago.
18        I can't remember the name.
19   Q   Okay.
20   A   They worked with Ford.  It was over by --
21  Flex-N-Gate.
22        F-l-e-x, the letter N, Gate, G-a-t-e.
23        And they made bumpers for Ford.
24        They were over there located about where

22

1  the Ford plant is off of 394 or 94.
2    Q   And what was your job?
3    A   I was a forklift operator there and at the end
4  of the assembly line where the bumpers were finished
5  and crated in their crates, I would move the crates
6  over to the staging lanes where they were shipped out.
7    Q   And how long had you been at Flex-N-Gate?
8    A   About a year, year and a half.
9    Q   And why did you -- why were you looking for
10  work?
11   A   They were shutting down a lot because of the
12  computer chip shortage and it was just an unreliable
13  job at the time.
14        I couldn't -- you know, it was shut down
15  for three months, come back to work for possibly two
16  months and then shut down again for two to three
17  months.
18   Q   And prior to working for Flex-N-Gate do you
19  remember who you were working for before then?
20   A   No.
21   Q   Okay.  And did you -- after -- how do you
22  spell Mike Mateja's name, do you know?
23   A   M-i-k-e  M-a-t-e-j-a.
24   Q   Okay.  What did Mike do for Midwest Dock?

23

1    A   He was just an installer, a door installer.
2    Q   Overhead doors?
3    A   Yes.
4    Q   And how did you know Mr. Mateja?
5        Am I pronouncing that right?
6    A   Mateja.
7    Q   How do you know Mr. Mateja?
8    A   He was friends with -- he was dating, fiancee,
9  a mutual friend of me and my wife's.
10   Q   And after he recommended you to Tony Zarlengo,
11  what was the next thing that happened?
12   A   I mean, I started working.
13   Q   Did you have an interview with Mr. Zarlengo?
14   A   Yes.
15   Q   Did you meet with him?
16   A   I met with him.
17   Q   And where did you meet with him?
18   A   At the office.
19   Q   Was that the office at 27, I think it's East,
20  36th Place in Steger?
21   A   I believe so.  Yes.  I believe that is the
22  address.
23   Q   All right.  And did you meet with anybody else
24  or just him?

24

1    A   Just him.
2    Q   Okay.  Did you meet with Mr. Michael Richert
3  at all?
4    A   I may have met with him at a separate time,
5  but I do not believe he was in the initial interview.
6        No.
7    Q   Are you sure you met with him or you just
8  think you might have met with him?
9    A   It's possible.  I'm not a hundred percent
10  sure of when I met Mike.
11   Q   You may have already been hired?
12   A   Yes.  I may have already started working
13  before I met Mike.
14   Q   And what position were you hired for?
15   A   An installer.
16   Q   Overhead door installer?
17   A   Uh-huh.
18   Q   Is that a yes?
19   A   Yes.
20   Q   Okay.  And you're aware that Midwest installs
21  dock levelers, too?
22   A   Yes.
23   Q   And dock canopies, dock bumpers?
24   A   Yes.

25

```
1    Q    Those kind of items?
2    A    Dock bumpers, dock shelters.
3    Q    Did you install those kind of things?
4    A    Occasionally, yes.
5    Q    Including dock levelers?
6    A    Rarely just because that included a lot of
7  welding and I have no experience with welding.
8         And they wanted people who knew how to
9  weld to do that.
10   Q    And what other items did Midwest install?
11   A    The yellow bollards.  Like the poles
12 throughout the warehouses that have the reflective
13 yellow paint that they put along walls and certain
14 electrical equipment just as a preventative barrier.
15   Q    Track guards?
16   A    Yes.
17   Q    Overhead door openers?
18   A    The electric --
19   Q    The openers or the operators?
20   A    Yes.  The electric lifters of the door,
21 whatever it is that lifts the door when you push
22 the button.
23   Q    And when you started did anybody train you
24 to do the -- well, strike that.
```

26

```
1         After you were working for Midwest Dock,
2  what kind of work did you do while you were there?
3    A    While I was there initially I was just a
4  helper.  I watched for the first day or two to see what
5  was going on.
6         And then I had been out on a job doing
7  an install and it was basically just hold this while
8  I install it into place.
9         You know, grab this.  Now let's put this
10 here.
11        I'm going to do this.  Now hold this
12 while I do this.
13   Q    And did that change at any time or was it --
14   A    Yes, as it progressed.
15   Q    Describe for me while you were there all the
16 kinds of work that you would do.
17   A    I mean, once I started knowing a little bit
18 about what I would do, they would send me with separate
19 people, you know, different people to do different
20 jobs.
21        It was never set who I was working with.
22        So it was just different.  Sometimes it
23 would be me just sitting there while dock installers
24 were installing the docks and being their helpers.
```

27

```
1    Q    Okay.
2    A    And there was other times where I was doing
3  door installs with people which I had more knowledge of
4  at the time.  So I would, you know, be using the tools.
5         And you be on one side, I'll be on the
6  other, and we do equal work.
7    Q    Okay.  So would you install overhead doors?
8    A    Yes.
9    Q    And would you install overhead door operators?
10   A    Yes.
11   Q    Would you install track guards?
12   A    Yes.
13   Q    Did installing overhead doors include the
14 tracks themselves?
15   A    Yes.
16   Q    Would you -- I'm going to hand you what we've
17 previously marked in this case as Exhibit 57 for you to
18 take a look at.
19        Do you see that?
20   A    Yes.
21   Q    And do you recognize that?
22   A    It's the logo.
23   Q    Do you recognize that as the website for
24 Midwest Dock Solutions?
```

28

```
1    A    Honestly, I don't go to the website.  So I
2  can't give you a definitive answer on that.
3    Q    All right.  Well, if you turn in that exhibit
4  to a place that has loading dock equipment, it's got
5  Blue Giant on it.
6         There you go.
7         So I just want to -- I'm going to go
8  through -- just because I think this might be an easier
9  way to ask you about the work you did.
10        Did you install -- did you install or
11 help install dock shelters?
12   A    Yes.
13   Q    How about dock lights?
14   A    Yes.
15   Q    And dock restraints?
16   A    Yes.  The locks, yes.
17   Q    Dock locks, is that what they call them?
18   A    Yes.
19   Q    And did you do -- let's see.
20        You said you did -- you installed dock
21 canopies?
22   A    Yes.
23   Q    And you installed overhead doors?
24   A    Yes.
```

29

```
 1    Q    And if you could turn two more pages past
 2  that.
 3         Actually, let me go back.
 4         Do you know did you install Clopay
 5  overhead doors?
 6    A    Yes.
 7    Q    And if you turn to the next page, it mentions
 8  rolling doors, fire doors and traffic doors.
 9         Do you see that?
10    A    Yes.
11    Q    Did you install those items?
12    A    Yes.
13    Q    And if you turn to the next page, it refers
14  to high speed doors.
15         Do you see that?
16    A    Yes.
17    Q    Did you install high speed doors?
18    A    I don't think I've ever installed any.
19         Me, personally, I did not get enough
20  experience to be able to install anything myself.
21         I was a helper for the people who had
22  experience.
23    Q    So all the things we've been talking about
24  that I asked you if you installed, you were a helper
```

30

```
 1  for those things?
 2    A    Yes.  Like with -- if you go to the Cornell
 3  doors, I was there while they were installed.
 4         I would help do it, yes, but as far as
 5  like knowing how to do it, I did not work on those a
 6  lot.
 7         So my knowledge was basically just do
 8  what I'm told to do, you know, as they were installing
 9  it.
10    Q    Okay.  And give me an idea like how would --
11  what would you do as a helper?
12    A    I mean, I guess they wouldn't consider it as
13  a helper, my position, but it would basically be just
14  listening to the people who had the most experience
15  and, you know, doing what they were -- you know, if I
16  was installing this (indicating), it would be like help
17  me lift this up here (indicating).
18         You know, if I needed to go -- if they
19  forgot something, I would be the one to run and get it.
20    Q    Would you, for example, secure concrete
21  anchors into the wall?
22    A    Uh-huh.
23    Q    That's a yes?
24    A    Yes.
```

31

```
 1    Q    And would you -- how were door tracks secured
 2  into the wall?
 3    A    The tracks with the anchors.
 4    Q    And then how would you fasten them?
 5         What tools would you use?
 6    A    With an impact gun.
 7    Q    Okay.  Would you use an impact gun?
 8    A    Yes.
 9    Q    So you would secure the tracks to the wall
10  using an impact gun --
11    A    Yes.
12    Q    (Continuing) -- and concrete anchors?
13    A    Yes.
14    Q    And is that true for the dock shelters, too,
15  were they secured in a similar fashion?
16    A    Yes.
17    Q    And would you do that work with the impact gun
18  and the concrete anchors?
19    A    Yes.
20    Q    Okay.  And how were the doors attached to the
21  tracks?
22    A    The doors are attached to the tracks through
23  rollers that are attached to the door.
24    Q    Okay.  And how are the rollers attached to the
```

32

```
 1  door?
 2         Are they screwed in in some fashion?
 3    A    Yes.  They're bolted in.  Yes.
 4    Q    All right.  And would you attach the rollers
 5  to the doors and bolt them in place?
 6    A    Yes.
 7    Q    Okay.  So you would actually do the
 8  installation work, but you would be doing it at the
 9  direction of somebody who's telling you what to do?
10    Q    Okay.  I'm just trying to understand.
11         When you say helper and getting things
12  versus doing installations, I'm trying to understand
13  what you actually did on the job on a day-to-day basis,
14  like what tools you used and what your job was.
15    A    Like I was never sent out on my own to do
16  anything.
17    Q    I understand that.
18         You were always working with somebody?
19    A    Yes.
20    Q    But were you doing work similar to what they
21  were doing?
22    A    Yes.
23    Q    Okay.  And you were doing it at their
```

33

1 direction?
2 A Yes.
3 Q Okay.
4 A For the most part once we were doing the
5 regular overhead doors like these (indicating) --
6 Q You're pointing to the Clopay page.
7 A The Clopay, yes.
8 I was able to eventually just work with
9 the person without getting much direction from them.
10 Q Because you knew what to do by that time?
11 A Yes.
12 Q All right. How long would you say it took you
13 to get that kind of experience working?
14 A Honestly, for the first year, every day was a
15 different day. It was a different experience going to
16 a different location, a different door, a different
17 issue.
18 So to get to where I was able to work
19 alongside an experienced person to install these took
20 probably nine months to a year.
21 Q And were some of the installs that you were --
22 was some of the installation work that you were doing,
23 was it installing a new door?
24 A No.

34

1 Q What was it?
2 A A lot of it was fixing issues that arised.
3 Q Okay. You call that service work?
4 A Yes.
5 Q So you were fixing doors?
6 A Yes.
7 Q All right. Did you ever do installation of
8 a new door?
9 A Yes.
10 Q And you would do that alongside the people
11 from Midwest Dock?
12 A Yes.
13 Q And would you ever do like installation of a
14 new dock canopy, that kind of thing?
15 A Yes.
16 Q And did sometimes the work of installing a new
17 door involve taking out an old door to put in the new
18 door?
19 A Yes.
20 Q And the same is true for a dock canopy, for
21 example?
22 Sometimes you have to take out an old
23 dock canopy to put in a new one?
24 A When you say canopy, you're referring to like

35

1 an angled roof, not like the dock shelters, correct?
2 Q Well, tell me what's the difference between
3 those.
4 And is there a difference between the
5 angled shelter or the angled roof, the shelter, and
6 a dock seal?
7 A I think that the --
8 Q And you could turn to the Blue Giant page,
9 if that helps.
10 A The steel canopies, there was maybe one or
11 two times where I did that alongside with somebody.
12 Q All right.
13 A Those is what I would call the angled pieces,
14 like the canopies over a house, but they were for
15 these (indicating).
16 They were not these (indicating).
17 These would be just the dock pads.
18 Q Okay.
19 A The dock shelters are wooden and need more
20 assembling and come out farther to give the trailer
21 more coverage room, I guess.
22 Protection from the elements.
23 Q So if I understand correctly, there's sort of
24 three different dock items you've described; the steel

36

1 canopies, the dock shelters and then the item that's
2 shown in the black here?
3 A The dock pads.
4 Q Which you call a dock pad, correct?
5 A Yes.
6 Q And you think you only installed dock steel
7 canopies once, once or twice?
8 A Once or twice.
9 Q And were those -- do you recall were they new
10 installations like there was nothing there and you were
11 just installing them?
12 A Yes.
13 Q And how about did you install dock shelters?
14 A Yes.
15 Q All right.
16 A Occasionally.
17 Q Okay. And on some occasions when those were
18 installed, would they be a new installation where there
19 was nothing there and you installing them new?
20 A Once in a while. Sometimes it would be
21 replacing old ones with new ones.
22 Q So it went both ways?
23 A Yes.
24 Q And how about the dock pads as you've

37

1  described them?
2       Would it sometimes be taking out an
3  old one and putting in a new one and sometimes just
4  installing a new one?
5       MR. HUGHES:  Objection.  Compound.
6       MR. McJESSY:  Well, let me ask it.
7       Let me strike the question and ask it
8  a different way.
9  BY MR. McJESSY:
10      Q   Sometimes would you install the dock pads new
11  where there were no prior existing dock pads?
12      A   When we installed them new?
13      Q   Well, let me strike that question.
14          Sometimes you would take out an old dock
15  pad and put in a new one, correct?
16      A   Correct.  Yes.
17      Q   Okay.  Would sometimes you just -- there would
18  be no dock pad and you just put in a new one?
19      A   Yes.
20      Q   And is the same true for installation of -- I
21  think you said you did installation of overhead doors
22  in addition to the service work, is that correct?
23      A   Yes.
24      Q   And would sometimes it involve taking out an

38

1  old door and putting in a new one?
2       A   Yes.
3       Q   And would sometimes it just be putting in
4  a new one?
5       A   Yes.  Like if the business decided to put a
6  new door in a pre-existing doorway that was there,
7  we have done that occasionally.
8           Or if a business was expanding, you know.
9  that would be a new install.
10      Q   There's no door there and you're going to put
11  one in?
12      A   Yes.
13      Q   All right.
14      A   Something that another construction company
15  came and they made the -- they made the building and
16  then we make the door.  We put the doorway there.
17      Q   Okay.  Another company did the construction of
18  the space and they left an opening, correct?
19      A   Yes.
20      Q   And then you come in and you would put in the
21  door, correct?
22      A   Yes.
23      Q   There's no door there previously.
24          You're putting in the first door?

39

1       A   In that situation, yes.
2       Q   Okay.  And that was work you would do for
3  Midwest Dock?
4       A   Correct.
5       Q   And then if you can turn a couple more pages
6  back, there's a page that looks like this (indicating)
7  and it says bug barrier.
8           Would you install bug barriers?
9       A   Occasionally.  I think if those are -- are
10  those the secondary screen that comes up?
11      Q   I don't know.  You would have to tell me.
12      A   I don't know.
13      Q   Is there something that's like a secondary
14  screen that covers a door?
15      A   Yes.
16      Q   And whatever that's called, you installed
17  those?
18      A   I have been part of an installation of those.
19  Yes.
20      Q   Okay.  Fair enough.
21          When I say have you installed, I mean,
22  have you worked with somebody --
23      A   Yes.
24      Q   (Continuing) -- and done that installation for

40

1  Midwest Dock.
2       A   Okay.
3       Q   How about door openers, have you installed --
4  if you turn to the next page, have you installed door
5  openers?
6       A   Yes.
7       Q   And that was work you did for Midwest Dock?
8       A   Yes.
9       Q   And when I say you did it, you assisted others
10  who did it, correct?
11      A   Yes.
12      Q   But would you use tools, wrenches and pliers
13  to actually do the work?
14      A   Yes.
15      Q   And would sometimes your work involve
16  servicing overhead door operators, like fixing broken
17  ones?
18      A   Yes.
19      Q   Would sometimes it involve taking out a broken
20  door opener and putting in a new one?
21      A   Yes.
22      Q   And would sometimes it involve just putting in
23  a new door opener where none had previously existed?
24      A   Yes.

41

1   Q   Okay.  And then if you turn to the next page,
2   do you see it says Safety Products?
3   A   Yes.
4   Q   And this one seems to show a, like, yellow
5   guard rail.
6       Do you see that?
7   A   Yes.  That is what I was describing earlier
8   when I was trying to explain what a bollard was.
9       I was explaining it as the post at the
10  conjunction points.
11  Q   The posts that are shown in this picture?
12  A   Yes.
13  Q   And would you install those?
14  A   Yes.
15  Q   And would you install those new where there
16  weren't previously bollards like this installed?
17  A   Yes.
18  Q   And, I take it, this is all work that you
19  learned to do on the job while you were there after
20  you started working and over the course of the year
21  and a half you were there.
22      Is that fair?
23  A   Yes.  Correct.
24  Q   And the more you worked, the better you got at

42

1   doing the things you were taught to do.
2       Is that fair?
3   A   Yes.
4   Q   Now, you were hired by Midwest Dock, correct?
5   A   Correct.
6   Q   And are you familiar with a company called
7   Dock & Door Install?
8   A   Yes.
9   Q   Okay.  And how are you familiar with that
10  company?
11  A   That was the union side of Midwest Dock.
12  Q   And what do you mean by that?
13  A   There was a side that was union and a side
14  that was non-union.
15      The non-union would do repairs and new
16  installs on pre-existing buildings.
17      And the union side would do the installs
18  of new construction of warehouses.
19      MR. HUGHES:  Which one are you looking for,
20  Kevin?
21      MR. McJESSY:  Exhibit 29.
22  BY MR. McJESSY:
23  Q   And how did you have an understanding of what
24  the two different companies were?

43

1   A   The union -- I'm sorry.
2       Can you repeat that?
3   Q   How did you have an understanding of what the
4   relationship between the two different companies was?
5   A   I didn't -- I don't know anything about
6   business.  So I didn't know how that worked.
7       I had no opinion on it.  I had no
8   questioning of it.
9   Q   Let me ask my question a little differently.
10      You described Dock & Door as the union
11  side of Midwest Dock, correct?
12  A   Yes.
13  Q   All right.  How did you have an understanding
14  that that was the relationship between the two
15  companies?
16      MR. HUGHES:  Objection.  Misstates testimony.
17  BY MR. McJESSY:
18  Q   You can go ahead and answer.
19  A   Just as time went on, that's just word of
20  mouth.
21  Q   Among the people that you worked with?
22  A   Yes.
23  Q   Were some of the people also people who you
24  understood were working for or being paid through

44

1   Dock & Door?
2   A   Yes.
3   Q   Okay.  I've got a list of names there in front
4   of you which is a part of an exhibit we've previously
5   marked as Exhibit 29.
6       And can you walk through that list and --
7   first just look at the list, if you would for me, and
8   tell me the names of the people there that you
9   recognize.
10      And by recognize I mean people who you
11  can recall interacting with.
12  A   Anthony Brutti.
13  Q   Okay.
14  A   I believe Ronald Cronk, if that was the Ron
15  that was on the non-union side.
16  Q   Okay.
17  A   Last names I am completely unaware of for a
18  majority of these people.
19  Q   Okay.  Well, you can go by the first names and
20  clarify whether you remember them.
21  A   Jose possibly.  I know the name.
22      He would have been on the union side.
23      MR. HUGHES:  Can you please refer to the line
24  number, too, just so we're all kind of on the same page

11 (Pages 41 to 44)

45

```
 1   if he's only using first names?
 2        MR. McJESSY:  Oh, sure.
 3        THE WITNESS:  The number?
 4        MR. McJESSY:  Yes.
 5        MR. HUGHES:  So, for example, Jose Aguirre
 6   Garcia is number 1 on the list.
 7           Is that who you were referring to?
 8        THE WITNESS:  Yes.
 9   BY MR. McJESSY:
10        Q    And number 5 was Anthony Brutti, correct?
11        A    Correct.
12        Q    And you said you knew a Ron.
13             So that was number 11?
14        A    Number 11, I think, yes.
15             I haven't gone down the list to see if
16   anything else stood out.
17        Q    That's fair.
18        A    Janie, number 22.  Jane F. Graham.
19        Q    Okay.
20        A    John Mancha, number 41.
21        Q    Okay.
22        A    Michael Mateja, number 43.
23             That's all that I recognize from this
24   list.
```

46

```
 1        Q    Actually there's a second page.
 2        A    Michael Richert, number 58.
 3             John Sparr, number 68.
 4             Michael Strazzabosco, number 72.
 5             Ira Sugar, number 73.
 6             Number 77 is me, Zachary Torkelsen.
 7             I don't know if I should say that one or
 8   not.
 9        Q    That's good.
10        A    I believe number 80, Sherri.  She was a lady
11   up front at the desk.
12             Anthony Zarlengo, number 87.
13             Colin Zarlengo, number 88.
14        Q    And the Jose you knew, as best you recall
15   who was he?
16        A    A union worker.
17        Q    Okay.
18        A    We usually didn't see them much.  They usually
19   started before us.
20             They, I guess, knew what they were
21   supposed to do because they were doing new construction
22   buildings.
23        Q    Okay.  And Ronald Cronk, you said you knew a
24   Ron.
```

47

```
 1        Q    The Ron you knew, what was his role?
 2        A    He was an installer, I guess you would say.
 3        Q    Okay.
 4        A    I believe he was experienced from prior work.
 5   So I would say an installer.
 6        Q    Do you know which company he was working for?
 7        A    I do not.
 8        Q    And how about Janie?
 9        A    I do not know.
10        Q    Was she the warehouse person?
11        A    She was in the warehouse.  Yes.  She was
12   located in the shop.
13             She would do a lot of the prep work for
14   the workers.
15        Q    Do you know was she part of the union company
16   or the non-union company?
17        A    I believe she was non-union.
18        Q    Okay.
19        A    She was with us on our side.  You know, she
20   was at the shop all day.  So I would assume.
21             I never asked her.
22        Q    How about John Mancha?
23        A    John Mancha was on our side.
24        Q    Did you work with him?
```

48

```
 1        A    Occasionally, yes.
 2        Q    How about Michael Mateja?
 3        A    Yes.
 4        Q    You described him earlier.
 5             He was your friend, correct?
 6        A    Yes.
 7        Q    You worked with him, correct?
 8        A    I did a lot of my, I guess you would call it,
 9   training.
10             My first few months I spent riding with
11   him for the most part.
12        Q    He was somebody you worked with principally?
13        A    Yes.
14        Q    And then John Sparr, who was that?
15        A    He was a worker, an installer.
16        Q    Doing overhead door installation?
17        A    Yes.  He knew how to do docks as well.
18             There were certain people who knew
19   certain things that would get sent on the job that best
20   fits their strengths.
21        Q    Okay.  And do you know which company he worked
22   for?
23        A    No.
24        Q    And Michael Strazzabosco?
```

49

1   A  Yes.
2  **Q  How do you know him?**
3   A  As a worker at Midwest Dock.
4  **Q  And what kind of work did he do?**
5   A  He did a lot of dock installation.
6      I didn't do much work with him because I
7 was mainly needed for door repair and installation and
8 not so much dock work.
9  **Q  And how about -- did you say Ira Sugar?**
10   A  Yes.
11  **Q  And who was Ira Sugar?**
12   A  Ira Sugar was an office worker.
13  **Q  Do you know which company he worked for?**
14   A  When you were asking me these questions, all
15 the people that I'm naming are people that I worked
16 with at Midwest Dock.
17      So when you're asking which company they
18 worked for, I'm assuming you mean previously.
19      So I may be wrong about that.
20  **Q  No.  I understand.  I just want to know what**
21 **your understanding was.**
22   A  Yes, but I am saying that I do not know their
23 employer that would be previous to Midwest Dock
24 Solutions.

50

1  **Q  OKay.  I'm not sure I understand what you**
2 **mean.**
3   A  You're asking me about people's employers.
4      Michael Strazzabosco.
5      I'm assuming -- I was under the impression
6 that you were talking previous employers from Midwest
7 Dock.
8  **Q  No, no.**
9  **I mean was he working for Midwest Dock**
10 **as far as you know --**
11   A  Yes.
12  **Q  (Continuing) -- or was he working for Dock &**
13 **Door?**
14   A  Midwest Dock.
15  **Q  Okay.  And the same for like Janie?**
16   A  Janie, yes.  Midwest Dock.
17  **Q  And Ira Sugar?**
18   A  Ira Sugar was an office worker who I believe
19 was in charge of union work.
20      I may be wrong.
21  **Q  But that was your impression?**
22   A  Yes.
23  **Q  And why do you think that?**
24      **I mean, why do you have that impression?**

51

1   A  I just feel like we didn't do much work with
2 his stuff.
3  **Q  So whatever he was doing, you had the**
4 **impression that was the other side?**
5   A  Yes.
6  **Q  Okay.  And Sherri Webber?**
7   A  Yes.
8  **Q  Who was she as far as you know?**
9   A  Up front.  Possibly HR.  I'm not sure.
10      She had a desk in the offices.
11  **Q  And how about Colin Zarlengo?**
12   A  I believe he's related to Anthony in some
13 way.  Son, stepson.
14      I wasn't -- I was -- to my understanding
15 he was on the union side of things.
16  **Q  Would you work with him?**
17   A  No.
18  **Q  Now, what is your understanding of the nature**
19 **of the work that the union side did?**
20   A  The union side, to the best of my knowledge,
21 would do installations of newly built warehouses.
22  **Q  Like --**
23   A  Like that was on the picture of the Blue Giant
24 that you had showed me in the previous thing.

52

1  **Q  Okay.  Let me show you what was previously**
2 **marked as Exhibit 19.**
3      **Do you see the picture on the right**
4 **there?**
5   A  Yes.
6  **Q  Is that the kind of building you're talking**
7 **about?**
8   A  Yes.  Newly constructed buildings like this.
9  **Q  And have you ever been on jobsites where**
10 **workers were doing this kind of installation work?**
11   A  Have I physically been there?
12  **Q  Yes.**
13   A  Yes.
14  **Q  And what kind of work did you do?**
15      **And you were on jobsites like this when**
16 **you were working for Midwest Dock, is that right?**
17   A  Correct.  Yes.
18  **Q  Okay.  And what kind of work did you do?**
19   A  It would be just to drop off material or
20 anything that the union guys would need.
21      I would do no kind of work as far as
22 any -- you know, any work with tools on union jobs,
23 I didn't do anything with that.
24      It would just be delivery of products.

53

1   You know, something happened, a couple pieces got
2   damaged.  I would go to -- I can't remember what it
3   was called, but it was the store for door parts.
4       Q    And would you do -- would you also unload
5   items at the jobsite?
6       A    Yes.
7            At these kind of buildings?
8       Q    Yes.
9       A    Yes.
10      Q    Okay.  And would it be like unloading like
11  overhead doors and things like that that are going to
12  be installed there?
13      A    Correct.  Yes.
14      Q    All right.  Any other kind of products that
15  you would unload at these kind of jobsites?
16      A    Docks.  I mean, doors, docks, the pads.
17           Anything that you would see in the
18  picture could be in the truck.
19      Q    And those would be the kind of things you
20  would unload at the jobsite?
21      A    Yes.  For the new builds it would be sometimes
22  where it would be just the shell of the building that's
23  put up and it would be dirt floor.
24           So just a completely brand new building.

54

1       Q    And where would you put things then?
2       A    We would just stage them in the general area
3   of where they would -- like if there was twenty-five
4   doors on the northwest side of the building, we would
5   put twenty-five doors on one side.
6            You know, we would spread them out to set
7   the guys up at the union to do the work.
8       Q    Okay.  And would other Midwest Dock employees
9   do the same kind of work?
10      A    Yes.
11      Q    Do you recall when you were hired, did you
12  have to fill out any paperwork or anything like that?
13      A    I'm sure I had to fill out the normal for my
14  paycheck, whatever deposit slips.
15      Q    Did you ever fill out like a job application?
16      A    I cannot recall.
17      Q    When you were sent to the new construction
18  jobsites like you see on Exhibit 19 there to do the
19  offloading and staging of the material as you
20  described, who would send you to the location to
21  do that?
22      A    Generally we would get the -- order would
23  come from Tony.
24      Q    Zarlengo?

55

1       A    Zarlengo, yes.
2       Q    Okay.  He would tell you where to go and what
3   to do?
4       A    Yes.
5       Q    Okay.
6       A    And that would be told to, I believe, Anthony
7   Brutti who would be -- when we did the offloads,
8   Anthony Brutti is who, I guess, the lead would be
9   in our group.
10           It would generally be me, Anthony Brutti.
11  Janie Graham would go.
12           And they may have one other person there,
13  depending on who's in the area, if they needed extra
14  help.
15      Q    So it would be like four people?
16      A    Yes.
17      Q    And Tony Brutti would be one of the people who
18  would be there?
19      A    Correct.  Yes.
20      Q    But you mentioned Tony Zarlengo would be the
21  one to tell you where you were going to be going,
22  correct?
23      A    Maybe not me physically.
24           The order would come from Tony Zarlengo,

56

1   I believe, to Tony Brutti who would then drive us to
2   the job location to do the thing.
3            So I guess in that sense we listened to
4   Anthony Brutti, but he listened to Tony Zarlengo.
5       Q    And why is that your understanding?
6            Like why is your understanding that
7   Tony Zarlengo was telling Tony Brutti?
8       A    Because Tony was the business owner, Tony
9   Zarlengo.
10      Q    Okay.
11      A    So that's what I assume it would be.
12      Q    Did you have an understanding of who the owner
13  of Dock & Door was?
14      A    No.
15           I'm sorry.  Can you rephrase that?
16      Q    Yes.
17      A    I didn't know if there was separate ownership
18  of Midwest Dock Solutions and Dock & Door.
19      Q    You didn't have an understanding about whether
20  there's separate ownership?
21      A    Correct.
22      Q    What was your understanding of who owned
23  Midwest Dock Solutions?
24      A    A co-ownership between Anthony Zarlengo and

14 (Pages 53 to 56)

57

1   Michael Richert.
2       Q   All right.  Did the -- did you ever have any
3   discussions among your co-workers at Midwest Dock about
4   the relationship between Dock & Door and Midwest Dock?
5       A   In terms of what?
6       Q   Any discussion about the relationship of the
7   companies.
8       A   No.  Just other than that it was -- it was
9   the union side of -- Dock & Door was the union side of
10  Midwest Dock.
11      Q   Okay.  Would you drive a truck as part of your
12  work with Midwest Dock?
13      A   Yes.
14      Q   If I could ask you to turn to Exhibit 6 in the
15  binder.
16          Does that look like one of the trucks
17  that you drove or does that look like -- strike that.
18          Does that look like a truck that you
19  drove?
20      A   No, not on a regular basis.
21      Q   And why is that?
22      A   Well, this looks like a union truck, a truck
23  that was used by somebody on the union side.
24          The only time I would ever drive it would

58

1   be if I was -- let's just say they were set to get to
2   a site at 6:00 a.m., but two people rode together and
3   they had needed this truck at a later time that day,
4   I would bring that truck to the location.
5          That would be a situation where I would
6   have driven this truck, but there are several trucks
7   that look like that and the boxes -- the toolboxes can
8   be put -- adjusted to either side.
9          So that could be a truck that, you know,
10  previously had the toolbox on the passenger's side.
11      Q   You said this looks like a truck that would
12  have been used on the union side.
13          Why do you have that impression?
14          What is it about this truck that makes
15  you say that?
16      A   Just with it being a newer model and having
17  the black racking between the truck cab and the propane
18  -- not propane tanks -- the welding tanks, the oxygen
19  and acetylene.
20      Q   And why is it your understanding that that's
21  the kind of truck that would be on a union jobsite?
22      A   Those are just -- it just looks like a newer
23  model and the newer models were usually driven by the
24  union side.

59

1       Q   And you said you may have driven it to --
2   correct me if I'm wrong, but I think you said that you
3   would have driven a truck like this if they needed it
4   later in the day?
5       A   Yes.
6       Q   Do you remember saying something like that?
7       A   Yes.
8       Q   What did you mean by that?
9       A   If there was a union job that was not
10  completed and let's just say two people were closer
11  to the job than to the shop where the truck might be,
12  it would be more money friendly to the company maybe
13  to have them ride together and then I would bring them
14  the truck later instead of wasting time to come get the
15  truck and then return to the jobsite.
16      Q   I see.
17          So you drove trucks like this to union
18  jobsites to deliver it to the workers that were working
19  there, is that correct?
20      A   I cannot -- maybe.  Maybe this one right there
21  (indicating).
22          It's possible.
23      Q   I meant like this.  I didn't mean this
24  particular truck.

60

1       A   Occasionally, yes.
2       Q   Okay.  And then if you could turn to the next
3   page, there's another truck.
4          Is this a truck like the one you would
5   have used?
6       A   No.
7       Q   Okay.  And --
8          MR. HUGHES:  Hold on.
9          7?
10         MR. McJESSY:  That was Exhibit 7.
11  BY MR. McJESSY:
12      Q   And I'll ask you to turn to Exhibit 8.
13         There's another truck there.
14         Do you see that?
15      A   Yes.  I believe this is the one I would
16  have drove.
17      Q   Okay.  And why do you think that?
18      A   I can't really see.
19         It looks like that's -- no.  No.  I can't
20  tell because I think the rack was bolted to the front
21  of the truck to where I couldn't see, but I know that
22  I had a rack on my truck.
23         And this picture -- no.  Actually it
24  looks like a newer truck.

61

1   Q  So you don't think that's a truck like --
2   A  No.
3   Q  (Continuing) -- the one you would have driven?
4   A  I don't think that's the one I drove.  No.
5   Q  Okay.  When you say your truck had a rack on
6 it, what do you mean?
7   A  A rack similar to the one on 8.
8   Q  On Exhibit 8?
9   A  Yes.
10   Q  Okay.
11   A  If there's more pictures of trucks to look
12 through, I would be able to -- first thing I noticed
13 was a rack in that picture.
14       So that's why I thought that it was the
15 one I drove, but after looking at it more I don't think
16 this is the one.
17   Q  But your truck looked -- did your truck look
18 something like that?
19   A  It was a white pickup truck with the rack that
20 was able to hold product, but I believe that it was a
21 different truck because the rack does not look like
22 it's set up the same way as the one that I drove --
23   Q  Okay.
24   A  (Continuing) -- when I would drive on my own.

62

1   Q  Understood.
2       My understanding is some guys took trucks
3 home with them, correct?
4   A  Correct.
5   Q  Did you?
6   A  No.
7   Q  All right.
8   A  There was a time or two where Anthony Zarlengo
9 had instructed me that I was able to take the truck
10 home because of being closer to the worksite for the
11 next day, if that makes sense.
12   Q  Did your truck have Midwest Dock Solutions
13 name on the side, do you recall?
14   A  I believe that it did.  Yes.
15   Q  The truck that you used most often?
16   A  Yes.  I believe so.
17   Q  If you could turn to Exhibit 31.
18       Is that not in your binder?
19   A  I just see up to number 29.
20   Q  That's all right.
21       What kind of tools did you use in your
22 job?
23   A  I would use an impact driver, screwdrivers,
24 wrenches.

63

1      That's about it.
2   Q  Socket wrenches, I'm assuming?
3   A  Yes.  Socket wrenches, open end wrenches,
4 Allen wrenches.
5   Q  Pliers?  Things like that?
6   A  Pliers.  Occasionally wire cutters.
7   Q  And who supplied the tools?
8   A  Me.
9   Q  They were your personal tools?
10   A  In the beginning, yes, I supplied my own
11 tools.
12       There was a time where my impact driver
13 broke and it stopped working in the middle of a job and
14 I was instructed to go get another one on a company
15 card.
16   Q  On a company card?
17   A  Card, yes.
18   Q  Did you have a credit card?
19   A  I did not.  No.
20   Q  Did some people have credit cards?
21   A  Some people had company credit cards.  Yes.
22       I believe it was mainly union side, but
23 I do know that occasionally they would give a card to
24 the non-union side people.

64

1   Q  And do you remember on the occasion when you
2 had to replace your tool where you got the credit card
3 to replace the cool?
4   A  Where I got the credit card?
5   Q  Yes.  You said you put it on a company credit
6 card.
7   A  It would be from somebody who I would be with.
8   Q  You don't recall who it was?
9   A  That day, the day my gun broke, I was with
10 Mike Mateja.
11   Q  So you think he may have had a credit card?
12   A  He may have had the card on him.
13       If he did, it wasn't his at all times.
14 It would just be his for the day and then after the job
15 when we got back to the shop and dropped off the truck
16 and entered our personal vehicles, he would return the
17 card.
18   Q  Okay.
19   A  As is, I believe, the situation with everybody
20 else who would have a card.
21   Q  What kind of supplies did you use in your
22 work?
23   A  Supplies as in?
24   Q  Items at the jobsite.

65

1    A   I mean, the materials for the door, screws,
2   bolts, cables for the door.
3    Q   And where would you get those items; the
4   screws, the bolts?
5    A   A lot of the stuff would come -- like for the
6   doors, the doors would come with the screws to get them
7   together, to get the doors screwed to each other, and
8   to get the tracks put together, but to get the tracks
9   secured to the wall they would use the anchors, the
10  metal anchors.
11        Those would be purchased at Menard's,
12  Lowe's, Home Depot, whatever was closest to the
13  jobsite.
14   Q   Were some of those -- did you ever pick those
15  items up from the warehouse?
16   A   Occasionally, yes.  If we had screws left
17  over, we would put them in a box and if we needed
18  screws, we would take a handful of screws and throw
19  them in the truck for when we needed them.
20   Q   Okay.  What kind of things were kept in the
21  warehouse?
22   A   The materials for the doors.
23        It was -- usually it was a lot of
24  leftover stuff.

66

1        Some of it was for small jobs to where
2   it would only take up a little bit of space.
3    Q   You mean like doors and door openers?
4    A   Yes.
5    Q   Those kind of things?
6    A   The doors, door openers.
7        The other warehouse had docks in it.
8    Q   What other warehouse?
9    A   Just right on the other side of the alley.
10   Q   It's the same basic location?
11   A   Yes.
12   Q   The 36th Place?
13   A   The same location, but just it was a different
14  building.
15   Q   There's two buildings there?
16   A   I don't believe that that building is Midwest
17  Dock.  He may have rented out the storage.
18        It was just an overhead door that opened
19  up and there was an overhead door on the other side and
20  just storage in between.
21        I'm not sure if he owned it or if it
22  belonged to whoever owned that building, but they did
23  store some stuff there.
24   Q   All right.  My understanding is there's an

67

1   office with a warehouse attached.
2    A   Yes.
3    Q   And that's Midwest Dock's office, correct?
4    A   Yes.
5    Q   Is there a separate building next door to
6   that?
7    A   There's a separate building that's not -- it's
8   across the street.  It's not Midwest Dock.
9    Q   It's not attached, but Midwest Dock may have
10  kept some things there, is that it?
11   A   Yes.
12   Q   All right.
13   A   Docks mainly.  It's where we keep like the
14  surplus of docks for jobs that are coming up.  Some
15  dock pads.
16        That's basically it for that part.
17   Q   All right.  On any of the jobsites, the new
18  construction jobsites that we had talked about earlier
19  that were the union jobsites, when you were unloading
20  items there, were you ever asked by anyone to produce
21  a union card?
22   A   No, I was not.
23   Q   Are you familiar with the phrase carded?
24   A   No, I am not, outside of like being asked to

68

1   present your ID for buying alcohol.
2    Q   Not that.
3        I just made the connection when you
4   started to give your follow-up answer.
5    A   I could assume, given the information that you
6   presented to me, it would be being asked to show a
7   union card.
8    Q   Okay.  From whom would you get your daily job
9   assignments, where to go, what to do?
10   A   It might come from Anthony Zarlengo.  It might
11  come from Ira.
12        There was another guy.  Steve.  He was in
13  the office.  I'm not sure if I seen his name on there.
14        Can't remember his last name off the top
15  of my head, but if I seen it again, I would be able to
16  point it out.
17   Q   French?
18   A   Yes.
19   Q   Steve French?
20   A   Yes.
21   Q   Anybody else?
22   A   In the office area?
23   Q   Anybody else that would have given you daily
24  job assignments, told you where to go and what to do?

69

```
 1    A   Tony Brutti.  Ira.
 2    Q   Okay.  Tony Brutti also?
 3    A   Anthony Brutti.  Anthony Zarlengo.  Ira Sugar.
 4  Steve French.
 5    Q   How did you keep track of your hours?
 6    A   Anthony Zarlengo kept track of the hours.
 7    Q   Would you just report your hours to him or how
 8  did that work?
 9    A   I would usually get a text the day before,
10  be at the shop at 6:00, be at the shop at 7:00, and
11  then he would, I guess, calculate it from that time
12  until -- he would watch us on the GPS on the trucks
13  and then when we got back to the shop, I guess that's
14  when the time would end.
15    Q   Okay.  Were you always paid by -- well, strike
16  that.
17        How were you paid?
18    A   I was paid by direct deposit.
19    Q   Always the same way?
20    A   Yes.
21    Q   What was your wage rate?
22    A   $19 an hour to start off.
23    Q   And how was that set?
24    A   That was just his offer for me having zero
```

70

```
 1  experience.
 2    Q   Tony Zarlengo set your salary or your hourly
 3  rate?
 4    A   Yes.
 5    Q   Okay.  And did that increase at all while you
 6  were there?
 7    A   Yes.  It did go up a little bit.  I think he
 8  gave me a dollar raise after a year of being there.
 9    Q   And, again, he made -- Tony Zarlengo gave you
10  the raise?
11    A   Yes.
12    Q   All right.
13    A   I would assume that is who it would come from.
14  Tony or Mike, one of the two.
15    Q   Okay.  He didn't say, hey, I'm giving you a
16  raise?
17        You just noticed your pay went up?
18    A   Well, he would have a yearly meeting with his
19  people, his employees, and for my yearly meeting he
20  told me that I was doing okay and that he was giving
21  me a dollar raise.
22    Q   And that was Tony Zarlengo that you had that
23  meeting with?
24    A   Yes.
```

71

```
 1    Q   All right.  Were you ever paid by Dock & Door
 2  for any of the work you did?
 3    A   No.
 4    Q   Did you ever receive a payment other than by
 5  direct deposit?
 6        Like cash or anything like that?
 7    A   I would receive a check every once in a while
 8  if we would do an emergency call or would work on a
 9  holiday.
10        There were times where he would say --
11  you know, we would be on our way back to the shop and
12  we would be ten minutes from the base location in
13  Steger and he would call and say, hey, I had a business
14  call me with an emergency that's forty-five minutes
15  away.
16        I'll give you $200 to go and fix it real
17  quick.
18        And we would usually do it, --
19    Q   Okay.
20    A   (Continuing) -- but I did not get those calls
21  very often.
22        I did not get those calls at all.  If the
23  call came through, it was to somebody who I was working
24  with such as Mike Mateja and we would just both get a
```

72

```
 1  check.
 2    Q   And that was a check separate from your direct
 3  deposit?
 4    A   Yes.
 5        MR. McJESSY:  I'm going to take a five-minute
 6  break and I will probably have just a couple of
 7  follow-up questions and then I will be done.
 8        We can go off the record.
 9        (Whereupon a short recess was had)
10        MR. McJESSY:  Back on the record.
11  BY MR. McJESSY:
12    Q   Sir, I've shown you what's been marked as
13  Exhibit 15.
14        Do you see the photograph there that --
15  this one (indicating).
16        Do you see that photograph?
17    A   Yes.
18    Q   Do you see the shirt that that gentleman is
19  wearing in the photograph?
20    A   Yes.
21    Q   Do you see how it says Midwest Dock on it?
22    A   Yes.
23    Q   Were you ever given clothing items like that
24  that had the company branding on them?
```

73

1   A  Yes.
2   Q  And how did you get those?
3   A  They were at the shop.
4   Q  And you just could pick up shirts to wear?
5   A  They would have to order them.  They wouldn't
6 keep an enormous surplus, but they would give us short
7 sleeves, about five, six short sleeves for the summer,
8 and then in the winter we would get long sleeves.
9   Q  And they had the Midwest Dock company branding
10 on them?
11   A  Yes.
12   Q  And do you know were those provided to people
13 on both the Midwest side and the Dock & Door Install
14 side?
15   A  I believe so.  Yes.
16   Q  And if you could turn to Exhibit 122 that I
17 gave you.
18       These are, I'll represent to you, W-2
19 statements that were provided to us by ADP.
20       And it looks like it's three W-2
21 statements for you for 2021, for 2022 and for 2023.
22       Do you see that?
23   A  Yes.
24   Q  Does that -- are these three W-2's consistent

74

1 with your understanding of the rough time period that
2 you worked for Midwest Dock?
3   A  Yes.
4   Q  All right.  It looks like the one in '21 and
5 '23 are fairly small --
6   A  Yes.
7   Q  (Continuing) -- and then most of the wages
8 look like they were earned in 2022, correct?
9   A  Yes.  Correct.
10   Q  So you would have started in late 2021 and
11 left in early 2023, is that correct?
12   A  Yes.
13   Q  And were you -- did you leave voluntarily or
14 were you terminated?
15   A  I was terminated.
16   Q  And when were you terminated?
17   A  I cannot remember the exact date.
18   Q  Approximately.
19   A  June of 2023.
20   Q  And who terminated you?
21   A  I think the final phone call came from Mike.
22   Q  Mike --
23   A  Mike Richert.  Yes.
24   Q  Okay.  And when you say the final phone call,

75

1 had something happened before you got the final phone
2 call that led you to --
3   A  I was sent home shortly into my shift on the
4 day that I was terminated.  So I had assumed that I was
5 being terminated.
6   Q  Who sent you home?
7   A  Anthony.
8   Q  Zarlengo?
9   A  Zarlengo, yes.
10   Q  All right.  And were you given a reason for
11 your termination?
12   A  Wasting company money.
13   Q  Do you know what was meant by that?
14   A  Yes.  I was -- the day I was terminated I was
15 sent to bring a generator to a union worker that was
16 north of our location.  I believe it was somewhere in
17 the city.
18       It was approximately an hour to an hour
19 and twenty minutes away from the shop.
20       I was driving the generator and I had the
21 idea that it may not have gas to power it.
22       So I pulled off to the side of the road.
23 I checked the generator and it did not have gas in it.
24       So I called Janie at the shop to ask for

76

1 advice on what to do because I was not sure if the
2 union worker had a company card and was able to fill it
3 with gas himself when I got there or if she needed me
4 to turn around and fill it up with gas at the shop.
5   Q  Okay.
6   A  She told me to turn around because there was
7 no company credit card at the jobsite for them to be
8 able to get gas.
9       So I turned around and as I was driving
10 back south towards the shop I received a phone call
11 from Anthony Zarlengo asking me why I was heading
12 south.
13       So I had to explain to him the situation
14 and he told me to park the truck and go home.
15   Q  Park the truck?
16   A  Park the truck at the shop.  Yes.
17   Q  I thought you meant on the side of the road.
18   A  No.
19   Q  So bring the truck back to the jobsite and
20 then go home?
21   A  Bring the truck back to the shop.
22   Q  Or to the shop.  I'm sorry.  Yes.
23   A  Yes.
24   Q  Okay.  And do you know what the jobsite was

77

1 that you were going to?
2 A  No.
3 Q  How do you know it was a union jobsite?
4 A  Because the person I was bringing it to was a
5 person that I was under the impression was on the union
6 side of the shop.
7          So I just assumed it was a union job.
8 Q  Union jobsite?
9 A  Yes.
10 Q  Do you recall who the person was?
11 A  No.
12 Q  But you remember they were on the -- what you
13 understood to be the union side?
14 A  Yes.
15 Q  Then later you parked the truck back at the
16 shop and then went home, I take it?
17 A  Yes.
18 Q  And later that day you got a call from
19 Mike Richert?
20 A  Yes.  To tell me that I was being terminated.
21 Q  Okay.  And did he give you a further
22 explanation or no?
23 A  Basically wasting company money.
24          Anthony had instructed me to be at the

78

1 shop at, I believe, 6:00 o'clock that morning and I was
2 instructed not to leave until a certain time.
3          And when I was told to leave, I left.
4          And then when I got sent back to the shop
5 or when I got the call from Tony, it had been probably
6 about an hour and a half from the start of my shift.
7          And he was upset that the union guy had
8 to sit because I was told it is a hundred dollars an
9 hour that union paid for their job.
10          And then it was $200 that I had wasted
11 that morning.
12          And that's why.
13 Q  And the generator that you're describing, is
14 it like a tow-behind generator or is it on the truck?
15          Do you know what I mean?
16          I'm trying to understand like how big the
17 generator was.
18 A  I mean, it can be moved if it's on wheels.
19          Approximately four hundred pounds maybe.
20 Q  Okay.
21 A  So, I mean, it's maybe three feet tall by
22 two to three feet wide and deep.
23          So it's a small gasoline powered
24 generator.

79

1 Q  And it was on the back of the truck?
2 A  Yes.  It was put on the back of the truck that
3 day.  Yes.
4 Q  And if you look at Exhibit 123, I'll represent
5 to you that this is an extract of the general ledger
6 accounts of Midwest Dock Solutions.
7          And it shows -- do you see where it
8 says payment, payroll and then direct deposit EMP,
9 Torkelsen, Zachary?
10 A  Yes.
11 Q  And this is an extract from 2022.
12          Does that look like roughly the amount
13 you were paid on a weekly basis when you were working?
14 A  Yes.
15 Q  Okay.  And then if you turn to Exhibit 124,
16 there were a couple of payments, it looks like, to
17 Jillian Torkelsen.
18          She's your wife, correct?
19 A  Correct.
20 Q  And do you know what those would have been
21 for?
22 A  Those would have been for the emergency jobs.
23 Q  They would have written the check and made it
24 payable to your wife?

80

1 A  Yes.
2 Q  Any particular reason?
3 A  I didn't ask.
4 Q  All right.  But those would be -- instead of
5 direct deposit they were checks you received for that
6 work?
7 A  Yes.
8          MR. McJESSY:  All right.  I don't have any
9 other questions.
10          The other attorneys here may.
11          And if they do, I may have some follow-up
12 questions, but I appreciate your time.
13          MR. HUGHES:  I think I may have a couple.
14          MR. McJESSY:  Oh, actually, I just -- if you
15 don't mind I'd like to --
16          MR. HUGHES:  Go ahead.
17          MR. McJESSY:  Thanks.
18 BY MR. McJESSY:
19 Q  Sir, can you state your address for the
20 record?
21 A  My current address is 517 North Entrance
22 Avenue in Kankakee, Illinois.
23 Q  And the last four digits of your Social
24 Security number?

81

```
 1    A   3091.
 2    Q   Your date of birth?
 3    A   December 7th, 1988.
 4    Q   Your phone number?
 5    A   Area code 815-278-4430.
 6    Q   Is that a cell phone?
 7    A   Yes.
 8    Q   Have you had that phone number a long time?
 9    A   Yes.
10    Q   All right.  Who's your carrier?
11    A   T-Mobile.
12    Q   And do you have any present intention to move
13 from where you live now?
14    A   No.
15        MR. McJESSY:  All right.  Thanks.
16        I just wanted to get that on the record.
17        MR. HUGHES:  Let's go off the record.
18            (Whereupon a discussion was held
19             off the record)
20        MR. HUGHES:  Okay.  We can go back on.
21
22         E X A M I N A T I O N
23            by Mr. Hughes
24    Q   Mr. Torkelsen, as Mr. McJessy said, I'm the
```

82

```
 1 lawyer that represents Midwest Dock Solutions.
 2    A   Okay.
 3    Q   You were shown some exhibits, Exhibits 5, 6,
 4 7 and 8, correct?
 5    A   I believe so.  Yes.
 6    Q   If you can flip to those.
 7        We'll start with 5.
 8        And this is a picture of a truck with the
 9 Midwest Dock logo on it, correct?
10    A   Correct.
11    Q   And what year model is that truck?
12    A   I'm not sure.
13    Q   I believe you testified that this was a newer
14 truck?
15    A   Yes.
16    Q   Okay.  Do you know when this picture was
17 taken?
18    A   I do not.
19    Q   So how do you know it's a newer model truck?
20    A   Newer compared to the model that I drove.
21    Q   Okay.  And what year was the model you drove?
22    A   I'm not a hundred percent sure.
23    Q   Do you know if it was before or after a
24 2016 model truck?
```

83

```
 1    A   Not sure.
 2    Q   Okay.
 3    A   The reason I would describe it as an older
 4 truck is just because the headlights were shaped
 5 different and the body was -- looked like it was
 6 modeled after an older truck and it had a lot of
 7 rust, a lot more dings.
 8    Q   Okay.
 9    A   Sign of wear and tear over the year than this
10 truck has.
11    Q   Okay.  And if this picture was taken in 2016,
12 would that change your opinion as to whether this is a
13 newer truck?
14    A   No.  Because it's newer than the model that
15 I drove is what I was implying.
16        I don't mean this is new as in the last
17 five years, you know, but I just mean new as in newer
18 than the truck that I drove.
19    Q   Okay.  And if you turn to -- I want to draw
20 your attention to -- just turn to 6.
21        I think it's the same picture, correct?
22    A   Looks to be.  Yes.
23    Q   And I think you testified that there was --
24 there's a toolbox on the back, correct?
```

84

```
 1    A   I believe that's what I see.  Yes.
 2    Q   And then is there also a torch of some sort?
 3    A   I see the top of an acetylene and oxygen tank
 4 with the lines for the torch.  Correct.
 5    Q   Okay.  And for your work at Midwest Dock on
 6 jobs that you worked on for Midwest Dock, they would
 7 use the acetylene torch?
 8    A   Occasionally for -- they would use it for
 9 docks more so than doors.
10    Q   And would that be for taking out old docks?
11    A   Yes.
12    Q   Okay.  And you never performed any work on a
13 Dock & Door job, correct?
14    A   Correct.
15    Q   Okay.  And you're not aware of any use of a
16 torch at a Dock & Door job, correct?
17    A   Correct.
18    Q   Okay.  I think you testified that the work
19 that you did for Midwest Dock could be different every
20 day, is that right?
21    A   Correct.
22    Q   And what do you mean by that?
23    A   Meaning I could have a door that has broke
24 its springs on it one day and it's just completely
```

85

1  shut.  No tension to pull it up.
2          And the next day it could be a door that
3  a forklift driver hit and knocked a panel out of the
4  track and bent it to a point where they couldn't close
5  the door.
6          So we would go and get it rolling, get it
7  how it -- get it running to where they would be able to
8  use it or get it closed enough for elemental purposes,
9  you know, winter.
10         And then they would shut the door down
11 until they were able to completely fix it.
12     Q   Okay.  Is that the typical type of job that
13 you had as a service technician for Midwest Dock?
14     A   Typical as in -- it's different every day.
15         Sometimes, like I explained to him, we
16 would take out doors and put in a new one.
17         You know, if it was too -- let's just say
18 forklift went all the way through it and completely
19 ruined the door and had to do a complete new one, we
20 would do that.
21         Or, you know, it could be a spot where we
22 had to go and do inspections on all the doors, where we
23 could look at them and make sure that all the wheels
24 were there, all the hinges were correctly bolted into

86

1  place, all the doors opened and closed properly and
2  we would mark down the ones that wouldn't.
3          You know, general maintenance type stuff.
4      Q   So would there be -- to your understanding
5  were there customers of Midwest Dock that like were
6  on an annual or some other periodic inspection?
7      A   There's been times.  Yes.  I'm not sure if
8  they were scheduled inspections or if they just needed
9  one and called.
10         I don't know how any of that works.
11     Q   Okay.  In these jobs where, you know, there's
12 been damage or something like that, how much of the job
13 is kind of figuring out how to fix it or how to deal
14 with the situation?
15     A   Basically just getting there and seeing it.
16         Basically the hardest part is to try and
17 figure out how to safely do it because the springs are
18 under a lot of tension.
19         So safety was a big priority of the job.
20         So, I mean, just to get it figured out
21 might take five to ten minutes and then getting it done
22 might take an additional hour to half a day, depending
23 on the damage, depending on the workload for the day.
24         You know, they might just need us to be

87

1  like, hey, this is what you're going to need, here's
2  the paper for it.
3          Sign here that says you came and wrote an
4  estimate.  Not an estimate.  Just like a work order
5  type sheet.
6          And we would go to a different job.
7          It just, like I said, varied day by day.
8      Q   Were there days where you were at different
9  jobsites in the day?
10     A   Yes.
11     Q   How frequently was that?
12     A   Weekly at least I would be -- I don't want to
13 say every day because some days I would be, you know,
14 at a bigger job where, let's just say, it might take
15 two days for us to do.
16         So I would be at that same job for those
17 two days, but at least once a day every week we would
18 be at multiple jobs a day.
19     Q   And in the course of a week how many
20 different jobsites typically would you be at?
21     A   Anywhere from five to twenty or more depending
22 on what it was, you know, if it was just a quick look
23 at this.
24         Sometimes I would go to five or six

88

1  different spots a day just writing up work orders of
2  what needed to be done.
3      Q   Did any of the work that Midwest Dock
4  performed at any of the service jobs involve actually
5  doing any electrical wiring?
6      A   Yes.
7      Q   How many?
8          What percentage of the jobs would include
9  electrical wiring?
10     A   Depending on if they included electric
11 operators, those were wiring.
12         So, I mean, ten percent of the doors were
13 probably -- had those that we had to -- had wiring that
14 we did, but it wasn't any kind of high voltage type
15 things where we had to cut electricity off.
16         It was just, you know, a wire from the
17 box down to the switch.
18     Q   You were asked certain questions about who
19 owned Midwest Dock or who owned Dock & Door, correct?
20     A   Correct.
21     Q   Okay.  Do you have any personal knowledge of,
22 in fact, who owns either of the companies?
23     A   No.
24     Q   Okay.

89

1    A   I was just always told that Mike Richert and
2  Anthony Zarlengo were co-owners.
3        So I didn't know that -- I didn't know
4  if Midwest Dock Solutions and Dock & Door Company were
5  separate entities or how any of that worked.
6    **Q   You talked about, at least one time, where**
7  **I think you needed to purchase a new impact wrench?**
8    A   Yes.
9    **Q   And a Midwest Dock credit card was used that**
10 **Michael Mateja had?**
11   A   Yes.  I believe the credit card was issued to
12 Midwest Dock Solutions.
13   **Q   Okay.  And both you and Mr. Mateja worked for**
14 **Midwest Dock Solutions, correct?**
15   A   Correct.
16   **Q   Okay.  And I think you testified about turning**
17 **it in every day and other things.**
18       Do you have any personal knowledge of
19 **whether, in fact, that was the policy of how that**
20 **worked?**
21   A   No.
22   **Q   And what about for anybody at Dock & Door,**
23 **are you aware of any policy of how that works with**
24 **them?**

90

1    A   No.
2    **Q   Okay.**
3    A   This is all just assumptions based on what I
4  have seen because I could see one person have a credit
5  card one day and the other person have a credit card
6  another day and the person who had the credit card on
7  Monday doesn't have it on Thursday.
8        So that's just assumptions.
9    **Q   I want to draw your attention to Exhibit 124**
10 **which is the last exhibit that was given to you.**
11       Those are the check payments that you
12 **testified were for like emergency work, correct?**
13   A   Yes.
14   **Q   When you got those, was that in addition to**
15 **the hourly pay that you would receive through direct**
16 **deposit?**
17   A   Yes.
18   **Q   With respect to your termination, was there**
19 **any -- there was an issue with materials that were not**
20 **safely or that weren't -- or load shifting during you**
21 **driving causing a very serious situation, correct?**
22   A   There was a situation on the highway.  Yes.
23   **Q   And when was that in relation to when you were**
24 **terminated?**

91

1    A   Months.  At least a month or so.
2        I can't remember exactly.  I couldn't
3  give you specifically, but when I was terminated, I
4  didn't think it had anything to do with that because
5  when that situation happened and I had talked to Tony,
6  asked him, you know, what was going on, he asked if I
7  was okay and he asked if anybody was injured, if I hit
8  anybody, and he said it was -- I had went home for the
9  day because I was shaken up.
10       And that was the last I had heard about
11 that.
12   **Q   And when you say Tony, that's Tony Zarlengo?**
13   A   Yes.
14   MR. HUGHES:  Okay.  That's all I have.
15   MS. CAHILL:  I have no questions.
16   MR. McJESSY:  I have maybe three or four.
17
18       FURTHER EXAMINATION
19       by Mr. McJessy
20   **Q   Mr. Hughes asked you about -- asked you if you**
21 **did any work at Dock & Door jobsites and I think you**
22 **said no.**
23       **Correct?**
24   A   Correct.

92

1    **Q   But you did do --**
2    MR. HUGHES:  Objection.  I don't think I asked
3  that question.
4    MR. McJESSY:  Okay.  Well, strike that.
5    MR. HUGHES:  Beyond the scope.
6  BY MR. McJESSY:
7    **Q   I think he asked you a question.  You said**
8  **you didn't do work at Dock & Door jobsites.**
9        I think that might have been your answer.
10       I don't remember what his question was.
11   MS. CAHILL:  I'm going to object because I
12 think that misstates what he testified to.
13   MR. McJESSY:  Okay.  Well, strike all that
14 then and let me just ask you this.
15 BY MR. McJESSY:
16   **Q   You did do offloading and staging at**
17 **Dock & Door jobsites, correct, at union jobsites?**
18   A   Yes.
19   **Q   Okay.  I just wanted to be clear about that.**
20       The other question is Mr. Hughes asked
21 **you a question about a load shifting incident?**
22   A   Yes.
23   **Q   Were you taking something somewhere?**
24   A   Yes.

93

1    Q   And what were you taking and where were you
2  taking it?
3    A   A pallet of dock bumpers and I'm not exactly
4  sure where I was taking it, but it happened on 294.
5        Somebody cut me off.  I had to slam on
6  the brakes and it shifted from the pallet and came
7  through the back window.
8    Q   You were okay?
9    A   Luckily on 294 I did not hit anybody.
10       And I had 40-pound steel and rubber dock
11 bumpers.  About four of them come crashing through the
12 window directly to my right.
13   Q   Do you know were you taking those to a union
14 jobsite?
15       MR. HUGHES:  Objection.  Asked and answered.
16 BY MR. McJESSY:
17   Q   You can answer.
18   A   I am unsure of where I was taking them, if
19 it was union or non-union.
20   Q   Okay.  Is that the kind of delivery that you
21 might make to a union jobsite?
22   A   Yes.
23       MR. McJESSY:  All right.  I don't have any
24 other questions.

94

1        Follow up?
2        MR. HUGHES:  No.
3        MR. McJESSY:  Sir, we're done.
4        I appreciate your time.
5        Because I'm the one who asked you to be
6  here for your deposition by the subpoena I have to
7  explain something to you.
8        You need to give some direction to the
9  court reporter.
10       I'm going to order a copy of your
11 transcript be prepared.  So it will be typed up.
12       And you have a right to review that
13 transcript and note any errors you believe occurred
14 in transcription, you know, that she took down.
15       You can't change your testimony.
16       So if I asked you was the light red or
17 was the light green and you said the light was red, you
18 can't go back and change your testimony and say I meant
19 to say the light was green, but if you believe there's
20 an error that occurred in the transcription, for
21 example, I asked you is the number 1 or the number 2
22 and you said 1 and she wrote down 2, you could note on
23 a sheet that you believe that an error occurred in the
24 transcription of your testimony.

95

1        You can either reserve that right and
2  review the transcript and note any errors you believe
3  occurred or you can waive that right and just trust
4  that she got it right and she can type it up without
5  you reviewing it.
6        I don't care which you do.  I don't care
7  if you reserve that right or waive that right, but the
8  court reporter needs to know from you if you want to
9  reserve your right to review the transcript or whether
10 you waive that right.
11       THE WITNESS:  I will reserve that right.
12       MR. McJESSY:  I didn't ask you this, but I
13 will ask you this because it will make everybody's life
14 easier.
15       Can you give me an email address where
16 the transcript could be sent for you to review?
17       THE WITNESS:  ZacharyTorkelsen1 --
18       MR. McJESSY:  All one word?
19       THE WITNESS:  Yes.  The number 1, not the word
20 spelled out.
21       At gmail dot com.
22       MR. McJESSY:  Okay.  ZacharyTorkelsen1 at
23 gmail dot com.
24       THE WITNESS:  Correct.

96

1        MR. McJESSY:  All right.  And I think when it
2  gets sent to you, you have like thirty days to review
3  it and send it back to them.
4        THE WITNESS:  Okay.
5        MR. McJESSY:  So just be aware.
6        All right.  We're done.
7        I appreciate your time today.
8        MR. HUGHES:  Thank you.
9        MS. CAHILL:  Thank you.
10       THE COURT REPORTER:  Do you want a copy of
11 this?
12       MR. HUGHES:  Not at this time.
13
14
15
16
17
18       (Witness excused)
19       AND FURTHER THE DEPONENT SAITH NOT
20       ---
21
22
23
24

97

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                EASTERN DIVISION

 3

 4  MID-AMERICA CARPENTERS REGIONAL COUNCIL )
    PENSION FUND, et al,              )
 5                                    )
                  Plaintiffs,    )
 6                                    )
          -vs-            ) 2024 CV 06428
 7                                    )
    DOCK & DOOR INSTALL, INC., an Illinois )
 8  corporation and MIDWEST DOCK SOLUTIONS, )
    INC., an Illinois corporation,       )
 9                                    )
                  Defendants.    )
10  _____)

11

12        I, Zachary Torkelsen, being first duly sworn,
    on oath, say that I am the deponent in the aforesaid
13  deposition; that I have read the foregoing transcript
    of my deposition, consisting of pages 1 through 96
14  inclusive, taken at the aforesaid time and place and
    that the foregoing is a true and correct transcript of
15  my testimony so given.

16

17

18

             _____
19           Zachary Torkelsen, Deponent

20

    SUBSCRIBED AND SWORN TO
21  before me this _____ day
    of _____, 2025.

22

23

    _____
24    Notary Public
```

98

```
 1  STATE OF ILLINOIS )
                      ) SS.
 2  COUNTY OF C O O K )

 3

 4

 5

 6

 7        I, SHERYL F. ROSE, CSR, a Notary Public, do hereby
 8  certify that I am a court reporter doing business in
 9  the City of Chicago, County of Cook, State of Illinois;
10  that I reported in machine shorthand the testimony
11  given at the deposition of Zachary Torkelsen on the 3rd
12  day of October, 2025, and that the foregoing is a true
13  and correct transcript of my shorthand notes so taken
14  as aforesaid to the best of my knowledge, skill and
15  ability.

16

17

18

19      Sheryl F. Rose    _____
        SHERYL F. ROSE,
20      Certified Shorthand Reporter
        Notary Public, Cook County, IL
21      License No. 084-001478

22

23  My notary commission
24  expires July 18, 2027.
```

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 27

FORM **BCA 2.10** (rev. Dec. 2003)
**ARTICLES OF INCORPORATION**
Business Corporation Act

Jesse White, Secretary of State
Department of Business Services
Springfield, IL 62756
217-782-9522
217-782-6961
www.cyberdriveillinois.com

Remit payment in the form of a cashier's
check, certified check, money order
or an Illinois attorney's or CPA's check
payable to Secretary of State.

# FILED

### JUL 11 2014

### JESSE WHITE
### SECRETARY OF STATE

# PAID

### JUL 15 2014

### EXPEDITED
### SECRETARY OF STATE

See Note 1 on back to determine fees.

6964-3086

Filing Fee: $150   Franchise Tax $ 25.00   Total $ 175.00   File #_____   Approved: _____

—————  Submit in duplicate  ————  Type or Print clearly in black ink  ————  Do not write above this line —————

1. Corporate Name: __DOCK & DOOR INSTALL, INC.__

CD0021162

The corporate name must contain the word "corporation," "company," "incorporated," "limited" or an abbreviation thereof.

2. Initial Registered Agent: __ILLINOIS CORPORATION SERVICE COMPANY__

|  | First Name | Middle Initial | Last Name |
|---|---|---|---|

Initial Registered Office: __801 ADLAI STEVENSON DRIVE__

| Number | Street | | Suite No. (P.O. Box alone is unacceptable) |
|---|---|---|---|
| SPRINGFIELD | | IL 62703 | SANGAMON |
| City | | ZIP Code | County |

3. Purposes(s) for which the corporation is organized:
   (If more space is needed, attach additional 8 1/2" x 11" sheets.)

   The transaction of any or all lawful businesses for which corporations may be incorporated under the Illinois Business Corporation Act.

4. Paragraph 1 — Authorized Shares, Issued Shares and Consideration Received:

| Class | Number of Shares Authorized | Number of Shares Proposed to be Issued | Consideration to be Received Thereof |
|---|---|---|---|
| COMMON | 10000 | 1000 | 1,000.00 |
|  |  | $ |  |

TOTAL = $ 1,000.00

Paragraph 2 — The preferences, qualifications, limitations, restrictions and special or relative rights in respect of the shares of each class are:
(If more space is needed, attach additional 8 1/2" x 11" sheets.)

(cont. on back)

Printed by authority of the State of Illinois. June 2006 — 25M — C 162.25

**PLAINTIFF'S EXHIBIT**
**214**

MACRC-00442

## ITEMS 5, 6 AND 7 ARE OPTIONAL

5. a. Number of Directors constituting the initial board of directors of the corporation: _____
   b. Names and Addresses of persons serving as directors until the first annual meeting of shareholders or until their successors are elected and qualify:

| Name | Address | City, State, ZIP |
|------|---------|------------------|
| | | |
| | | |
| | | |

6. a. It is estimated that the value of the property to be owned by the corporation for the following year wherever located will be:      $ _____
   b. It is estimated that the value of the property to be located within the State of Illinois during the following year will be:      $ _____
   c. It is estimated that the gross amount of business that will be transacted by the corporation during the following year will be:      $ _____
   d. It is estimated that the gross amount of business that will be transacted from places of business in the State of Illinois during the following year will be:      $ _____

7. Other Provisions: Attach a separate 8 1/2" x 11" sheet for any other provision to be included in the Articles of Incorporation (e.g., authorizing preemptive rights, denying cumulative voting, regulating internal affairs, voting majority requirements, fixing a duration other than perpetual, etc.).

## NAME(S) & ADDRESS(ES) OF INCORPORATOR(S)

8. The undersigned incorporator(s) hereby declare(s), under penalties of perjury, that the statements made in the foregoing Articles of Incorporation are true.

Dated   __JULY 11__ , __2014__
       Month & Day       Year

**Address**

1. _Steffani Scanlan_ (signature)
   Steffani Scanlan, Assistant Secretary for Illinois Corporation
   Service Company, a Delaware Corporation
   Name (type or print)

1. 801 Adlai Stevenson Dr
          Street
   Springfield    IL    62703
   City/Town    State    ZIP Code

2. _____
   Signature
   _____
   Name (type or print)

2. _____
   Street
   _____
   City/Town    State    ZIP Code

3. _____
   Signature
   _____
   Name (type or print)

3. _____
   Street
   _____
   City/Town    State    ZIP Code

Signatures must be in **BLACK INK** on an original document. Carbon copy, photocopy or rubber stamp signatures may only be used on conformed copies.

**NOTE:** If a corporation acts as incorporator, the name of the corporation and the state of incorporation shall be shown and the execution shall be by a duly authorized corporate officer. Type or print officer's name and title beneath signature.

**Note 1 — Fee Schedule:**
- The initial franchise tax is assessed at the rate of 15/100 of 1 percent ($1.50 per $1,000) on the paid-in capital represented in this state. (The minimum initial franchise tax is $25.)
- The filing fee is $150.
- The **minimum total due** (franchise tax + filing fee) is $175.

**Note 2 — Return to:**

_____
Firm name

_____
Attention

_____
Mailing Address

_____
City, State, ZIP Code

Printed by authority of the State of Illinois. June 2006 — 25M — C 162.25

MACRC-00443

*File Number*     6964-308-6



## To all to whom these Presents Shall Come, Greeting:

*I, Jesse White, Secretary of State of the State of Illinois, do hereby certify that I am the keeper of the records of the Department of Business Services. I certify that*

THE FOREGOING AND HERETO ATTACHED IS A TRUE
AND CORRECT COPY, CONSISTING OF 2 PAGES, AS TAKEN FROM THE ORIGINAL
ON FILE IN THIS OFFICE FOR DOCK & DOOR INSTALL, INC..**************



## In Testimony Whereof, *I hereto set my hand and cause to be affixed the Great Seal of the State of Illinois, this*   2ND *day of*   JULY    A.D.   2019

Authentication #: 1918300493 verifiable until 07/02/2020.
Authenticate at: http://www.cyberdriveillinois.com

*Jesse White*

**SECRETARY OF STATE**

MACRC-00444

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 28



1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 29

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| MID-AMERICA CARPENTERS REGIONAL COUNCIL PENSION FUND; MID-AMERICA CARPENTERS REGIONAL COUNCIL HEALTH FUND; MID-AMERICA CARPENTERS REGIONAL COUNCIL APPRENTICE AND TRAINEE PROGRAM; and MID-AMERICA CARPENTERS REGIONAL COUNCIL SUPPLEMENTAL RETIREMENT FUND, ) ) ) ) ) ) ) ) | CIVIL ACTION<br><br>Case No. 24-CV-06428<br><br>Honorable Judge Wood<br><br>Magistrate Judge Appenteng |
| *Plaintiffs,* ) ) | |
| v. ) ) | |
| DOCK & DOOR INSTALL, INC., an Illinois corporation and MIDWEST DOCK SOLUTIONS, INC., an Illinois corporation, ) ) ) ) | |
| *Defendants.* ) | |

## DEFENDANT, DOCK & DOOR INSTALL, INC.'S
## ANSWER TO PLAINTIFFS' COMPLAINT

NOW COMES Defendant, DOCK & DOOR INSTALL, INC., an Illinois corporation (hereinafter, "Dock & Door"), by and through its attorneys, ALLOCCO, MILLER & CAHILL, P.C., and for its Answer to the Complaint of Plaintiffs, MID-AMERICA CARPENTERS REGIONAL COUNCIL PENSION FUND ("PENSION FUND"); MID-AMERICA CARPENTERS REGIONAL COUNCIL HEALTH FUND ("HEALTH FUND"); MID-AMERICA CARPENTERS REGIONAL COUNCIL APPRENTICE AND TRAINEE PROGRAM ("TRAINEE FUND"); and, MID-AMERICA CARPENTERS REGIONAL COUNCIL SUPPLEMENTAL RETIREMENT FUND ("SUPPLEMENTAL RETIREMENT FUND") (hereinafter collectively referred to as the "TRUST FUNDS"), Defendant Dock & Door states as follows:

1

PLAINTIFF'S EXHIBIT
265

## SUMMARY OF ACTION

1.      During the course of an audit of DOCK & DOOR, Legacy Professionals, LLP ("Legacy") identified MIDWEST DOCK as a related employer to DOCK & DOOR based upon information gathered by Legacy. Although DOCK & DOOR produced records to Legacy during the audit, DOCK & DOOR and MIDWEST DOCK did not produce all records requested by Legacy related to MIDWEST DOCK and, therefore, Legacy was unable to complete the audit.

        **ANSWER:**      Defendant Dock & Door is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1.

2.      As more fully described herein, TRUST FUNDS bring this action against the DEFENDANTS under ERISA because DEFENDANTS breached the provisions of the Memorandum of Agreements, the Area Agreements, the Trust Agreements and the rules adopted by the TRUST FUNDS by failing to produce records required by Legacy to determine whether DEFENDANTS have complied with their obligations to contribute to the TRUST FUNDS and/or by failing to pay amounts owed to the TRUST FUNDS based upon the hours worked by employees and/or subcontractors performing work within the jurisdiction of the Union.

        **ANSWER:**      Defendant Dock & Door denies the allegations in Paragraph 2.

3.      TRUST FUNDS seek to obtain the records necessary to determine the amount of any unpaid fringe benefit contributions owed by DEFENDANTS and to collect all unpaid fringe benefit contributions, interest, liquidated damages, auditors' fees and attorneys' fees and costs.

        **ANSWER:**      Defendant Dock & Door is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this matter based on questions arising under Section 502 of the Employee Retirement Income Security Act (hereinafter referred to as "ERISA") and Section 301 of the Taft-Hartley Act. (29 U.S.C. §§1132 and 185).

**ANSWER:**    Defendant Dock & Door admits the allegations in Paragraph 4.

5.    Venue is proper in the Northern District of Illinois, Eastern Division because the TRUST FUNDS are multi-employer employee benefit plans, which are located in and administered in Chicago, Illinois.

**ANSWER:**    Defendant Dock & Door admits the allegations in Paragraph 5.

### PLAINTIFFS

6.    The TRUST FUNDS receive contributions from numerous employers pursuant to collective bargaining agreements or "Area Agreements" between the employers and the Mid- America Carpenters Regional Council f/k/a Chicago Regional Council of Carpenters (hereinafter referred to as the "UNION"), and therefore, are multiemployer plans. *See* 29 U.S.C. §1002.

**ANSWER:**    Defendant Dock & Door admits the allegations in Paragraph 6.

7.    The TRUST FUNDS collect contributions on their own behalf and on behalf of other Union-related trust funds which have charged the TRUST FUNDS with the obligation to collect contributions on their behalf.

**ANSWER:**    Defendant Dock & Door admits the allegations in Paragraph 7.

8.    The TRUST FUNDS provide medical, pension and other benefits to UNION carpenters and other persons pursuant to certain terms and conditions.

**ANSWER:**    Defendant Dock & Door admits the allegations in Paragraph 8.

9.    An employer bound by the Area Agreements is obligated to pay to the TRUST FUNDS fringe benefit contributions for the hours (i) worked by its employees falling within the scope of the Area Agreement and (ii) by the employees of its non-union subcontractors performing work within the scope of the Area Agreement if the employer has not required the subcontractor to become bound by the terms of the Area Agreement.

**ANSWER:**    Defendant Dock & Door admits the allegations in Paragraph 9.

10.    The TRUST FUNDS routinely hire certified public accounting firms to review the books

and records of an employer bound by the Area Agreement to determine if the employer has paid the fringe benefit contributions required by the Area Agreement for the hours worked by its employees falling within the scope of the Area Agreement and the hours worked by the employees of its non-union subcontractors.

**ANSWER:**     Defendant Dock & Door admits the allegations in Paragraph 10.

## DEFENDANTS

11.     DOCK & DOOR was incorporated in Illinois on July 11, 2014. DOCK & DOOR is an employer engaged in an industry affecting commerce. DOCK & DOOR entered into a Memorandum of Agreement with the UNION on September 18, 2014, a copy of which is attached as Exhibit A. DOCK & DOOR entered in to a Second Memorandum of Agreement with the UNION on August 15, 2019 reaffirming its obligations, a copy of which is attached as Exhibit B. Exhibits A and B are collectively referred to herein as the "Memoranda."

**ANSWER:**     Defendant Dock & Door admits the allegations in Paragraph 11.

12.     In the Memoranda, DOCK & DOOR agreed, among other things to be bound (i) by the provisions of the Area Agreements, (ii) by the Trust Agreements establishing the TRUST FUNDS to which DOCK & DOOR is obligated to make payments under the Area Agreement ("Trust Agreements"), and (iii) by the rules and regulations adopted by the TRUST FUNDS.

**ANSWER:**     Defendant Dock & Door admits the allegations in Paragraph 12.

13.     The Memoranda, the Area Agreements, the Trust Agreements, and the rules and regulations adopted by the Trust Funds are hereinafter collectively referred to as the "Agreements."

**ANSWER:**     Defendant Dock & Door admits the allegations in Paragraph 13.

14.     MIDWEST DOCK was incorporated in Illinois on May 16, 2006. MIDWEST DOCK is an employer engaged in an industry affecting commerce.

**ANSWER:**     Defendant Dock & Door is without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 14.

15.      MIDWEST DOCK is bound by the Area Agreements under the single-employer and/or alter-ego doctrines as set forth for example in *Lippert Tile Co. v. Int'l Union of Bricklayers & Allied Craftsmen*, 724 F.3d 939, 946 (7th Cir. 2013), *Trustees of Pension Funds of Local 701 v. Favia Elec.*, 995 F.2d 785, 789 (7th Cir. 1993), *Chicago Regional Council of Carpenters Pension Fund v. TMG Corporation*, 206 F.Supp.3d 1351, 1356-60 (N.D. Ill. 2016).

**ANSWER:**      Defendant Dock & Door denies the allegations in Paragraph 15.

## GENERAL ALLEGATIONS

16.      DOCK & DOOR was formed to provide a means for MIDWEST DOCK to perform jobs that require UNION labor while at the same time avoiding the obligations imposed by the Agreements with the Union.

**ANSWER:**      Defendant Dock & Door denies the allegations in Paragraph 16.

17.      DOCK & DOOR and MIDWEST DOCK are in the same business.

**ANSWER:**      Defendant Dock & Door denies the allegations in Paragraph 17.

18.      DOCK & DOOR is in the business of installing and/or repairing loading dock equipment including dock levelers and doors.

**ANSWER:**      Defendant Dock & Door denies it is in the business of repairing loading dock equipment and admits the remaining allegations in Paragraph 18.

19.      MIDWEST DOCK is in the business of installing and/or repairing loading dock equipment including dock levelers and doors.

**ANSWER:**      Defendant Dock & Door is without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 19.

20.      The relationship between DOCK & DOOR and MIDWEST DOCK provides a means for the companies to obtain union work and to avoid paying fringe benefit contributions to the TRUST FUNDS for bargaining unit work performed by employees and subcontractors.

**ANSWER:**      Defendant Dock & Door denies the allegations in Paragraph 20.

21. The business transactions, management and operations of DOCK & DOOR and MIDWEST DOCK are and have been so interrelated and intermingled that MIDWEST DOCK is bound by the terms of the Agreements.

**ANSWER:** Defendant Dock & Door denies the allegations in Paragraph 21.

22. DOCK & DOOR and MIDWEST DOCK do not maintain an arms-length relationship. DOCK & DOOR is operated and controlled by the owners and management of MIDWEST DOCK as evidenced by the following and therefore the companies have *de facto* common ownership.

**ANSWER:** Defendant Dock & Door denies the allegations in Paragraph 22.

23. DOCK & DOOR only performs work for and at the direction of MIDWEST DOCK. DOCK & DOOR and MIDWEST DOCK have the same customers; the companies for which DOCK & DOOR performs its work are MIDWEST DOCK's customers.

**ANSWER:** Defendant Dock & Door admits it performs work for MIDWEST DOCK and denies the remaining allegations in Paragraph 23.

24. During the period October 1, 2020 to December 31, 2022, DOCK & DOOR received approximately $473,514.50 from MIDWEST DOCK. It did not receive payments from other companies for work.

**ANSWER:** Defendant Dock & Door admits the allegations in Paragraph 24.

25. During the period July 1, 2017 to December 31, 2018, DOCK & DOOR received approximately $1,149,080.75 from MIDWEST DOCK. Again, it did not receive payments from other companies for work.

**ANSWER:** Defendant Dock & Door admits the allegations in Paragraph 25.

26. DOCK & DOOR's records produced to Legacy reveal a lack of normal operating expenses associated with the operation of a company involved in the installation and repair of dock equipment such as dock levelers and overhead doors, such as rent, office staff, and equipment. Accordingly, DOCK & DOOR uses MIDWEST DOCK's office, office staff, and equipment.

**ANSWER:** Defendant Dock & Door denies the allegations in Paragraph 26.

27.    The businesses of DOCK & DOOR and MIDWEST DOCK require the use of heavy duty equipment including metal working equipment and welding equipment, and the use of trucks to haul materials and supplies to the jobsites. MIDWEST DOCK has numerous trucks registered to it that are used for this purpose, including trucks like these:







DOCK & DOOR has no expenses for trucks and equipment like that shown here. Accordingly, DOCK & DOOR uses the trucks and/or equipment belonging to MIDWEST DOCK to perform work.

> **ANSWER:**    Defendant Dock & Door denies its business requires the use of heavy duty equipment including metal working equipment and welding equipment, and the use of trucks to haul material and supplies to the jobsites.  Defendant Dock & Door admits it has no expenses for trucks like that shown above.  Defendant Dock & Door admits it has used trucks and equipment belonging to MIDWEST DOCK to perform work.  Defendant Dock & Door is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 27.

28.    DOCK & DOOR and MIDWEST DOCK share common professional service providers.

> **ANSWER:**    Defendant Dock & Door is without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 28.

29.    DOCK & DOOR and MIDWEST DOCK both use Gineris & Associates, Ltd. to perform accounting, bookkeeping, and/or tax preparation services.

> **ANSWER:**    Defendant Dock & Door is without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 29.

30.    DOCK & DOOR and MIDWEST DOCK both use First Midwest Bank for banking services.

> **ANSWER:**    Defendant Dock & Door is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 30.

31.    DOCK & DOOR and MIDWEST DOCK both use the services of a common law

firm, namely Lawrence Kamin Saunders & Uhlenhop, LLC.

**ANSWER:** Defendant Dock & Door is without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 31.

32.     DOCK & DOOR and MIDWEST DOCK both use Cincinnati Insurance Company for insurance purposes.

**ANSWER:** Defendant Dock & Door denies the allegations in Paragraph 32.

33.     DOCK & DOOR does not maintain a separate office from MIDWEST DOCK. DOCK & DOOR operates from MIDWEST DOCK's location and, as a result, both companies move from one location to another at the same time.

**ANSWER:** Defendant Dock & Door denies the allegations in Paragraph 33.

34.     DOCK & DOOR and MIDWEST DOCK both had a common address of 1249 E. Burville Road, Crete, Illinois as a common business location at the same time.

**ANSWER:** Defendant Dock & Door admits it and MIDWEST DOCK used the same street address listed above in Paragraph 34 at the same time and denies the remaining allegations in Paragraph 34.

35.     Then, both DOCK & DOOR and MIDWEST DOCK used 3211 Holeman Avenue, South Chicago Heights, IL as a common business location at the same time.

**ANSWER:** Defendant Dock & Door admits it and MIDWEST DOCK used the same street address listed above in Paragraph 35 at the same time and denies the remaining allegations in Paragraph 35.

36.     Then both DOCK & DOOR and MIDWEST DOCK used 27 E. 36th Street, Steger, Illinois as a common business location at the same time and both currently work from that location.

**ANSWER:** Defendant Dock & Door admits it and MIDWEST DOCK used the same

street address listed above in Paragraph 36 at the same time and denies the remaining allegations in Paragraph 36.

37.     Invoices issued by DOCK &DOOR to MIDWEST DOCK include the same address for both companies.

**ANSWER:**     Defendant Dock & Door admits the allegations in Paragraph 37.

38.     For example, this excerpt of invoice 2387 from DOCK & DOOR to MIDWEST DOCK shows the same address of 1249 E. Burville Rd., Crete, IL for both companies:

Dock & Door Install Inc.
1249 E. Burville Rd.
Crete, IL  60417-3600
(815)922-5258
ajbrutti@gmail.com

INVOICE

BILL TO                                           INVOICE # 2387
Midwest Dock Solutions                                  DATE 12/22/2016
1249 E. Burville Rd.                                DUE DATE 01/21/2017
Unit 8                                               TERMS Net 30
Crete, IL  60417

And, this excerpt of an another invoice 6186 from DOCK & DOOR to MIDWEST DOCK showing the same address of 27 E. 36th Place, Steger, IL for both companies:

INVOICE

                          Invoice Date                         Dock & Door Install Inc
                          Jun 15, 2020                         27 E. 36th Place
Midwest Dock Solutions                                         STEGER IL 60475
27 E. 36th Place          Invoice Number
STEGER IL 60475           6186

                          Reference
                          Clune Stream Data

**ANSWER:**     Defendant Dock & Door admits the allegations in Paragraph 38.

39.     During the course of its audit, Legacy demanded documents necessary to determine the amount of fringe benefit contributions owed by DOCK & DOOR. The records requested by

Legacy included the payroll records and cash disbursement records of MIDWEST DOCK.

    **ANSWER:**    Defendant Dock & Door admits the allegations in Paragraph 39.

    40.    DOCK & DOOR and MIDWEST DOCK have common employees, so there is reason to believe that employees of DOCK & DOOR are being paid through MIDWEST DOCK and/or that MIDWEST DOCK employees are being paid to work on DOCK & DOOR projects without fringe benefit contributions being paid on the employees' behalf.

    **ANSWER:**    Defendant Dock & Door denies the allegations in Paragraph 40.

    41.    MIDWEST DOCK is bound to the terms of the Agreements under the single employer or alter ego doctrine.

    **ANSWER:**    Defendant Dock & Door denies the allegations in Paragraph 41.

    42.    The Agreements require DEFENDANTS to pay fringe benefits to the TRUST FUNDS.

    **ANSWER:**    Defendant Dock & Door denies the allegations in Paragraph 42.

    43.    The Agreements require DEFENDANTS to contribute to the TRUST FUNDS for each hour worked by DEFENDANTS' employees performing work within the scope of the Area Agreements at the rate and in the manner specified in the Agreements.

    **ANSWER:**    Defendant Dock & Door denies the allegations in Paragraph 43.

    44.    The Agreements require DEFENDANTS to contribute to the TRUST FUNDS according to the hours worked by the employees of non-union subcontractors performing work within the scope of the Area Agreement which have not signed an agreement to be bound by the Area Agreement with the UNION.

    **ANSWER:**    Defendant Dock & Door denies the allegations in Paragraph 44.

    45.    The Agreements require DEFENDANTS to provide all records necessary for the

TRUST FUNDS to determine whether DEFENDANTS have complied with their obligation to contribute to the TRUST FUNDS.

**ANSWER:** Defendant Dock & Door denies the allegations in Paragraph 45.

## COUNT I

37.[*sic*] The PENSION FUND hereby incorporates paragraphs 1 to 44 above as though fully set forth herein.

**ANSWER:** Defendant restates its answers to Paragraphs 1 through 44.

38.[*sic*] DOCK & DOOR and MIDWEST DOCK breached the provisions of the Agreements by failing to produce records sufficient to allow auditors engaged by the PENSION FUND to determine whether DEFENDANTS have complied with their obligations to contribute to the PENSION FUND and/or by failing to pay amounts owed to the PENSION FUND based upon the hours worked by employees and/or subcontractors.

**ANSWER:** Defendant Dock & Door denies the allegations in Paragraph 38.

39.[*sic*] The Agreements require DOCK & DOOR and MIDWEST DOCK to pay liquidated damages, auditor fees, and all attorneys' fees and court costs that the PENSION FUND incurs in the collection process.

**ANSWER:** Defendant Dock & Door denies the allegations in Paragraph 39.

40.[*sic*] The PENSION FUND has complied with all conditions precedent in bringing this suit.

**ANSWER:** Defendant Dock & Door denies the allegations in Paragraph 40.

41.[*sic*] The PENSION FUND has been required to employ the undersigned attorneys to collect the amounts that DOCK & DOOR and MIDWEST DOCK owe the PENSION FUND.

**ANSWER:** Defendant Dock & Door denies the allegations in Paragraph 41.

42. [*sic*] DOCK & DOOR and MIDWEST DOCK must pay attorneys' fees and court costs that the PENSION FUND incurs in this matter pursuant to 29 U.S.C. §1132 (g)(2)(D).

**ANSWER:**    Defendant Dock & Door denies the allegations in Paragraph 42.

43. [*sic*] This Court should award the PENSION FUND, pursuant to 29 U.S.C. §1132(g)(2)(B), interest on the amount that is due.

**ANSWER:**    Defendant Dock & Door denies the allegations in Paragraph 43.

44. [*sic*] This Court should award the PENSION FUND, pursuant to 29 U.S.C. §1132(g)(2)(C), an amount equal to the greater of:

(a)     interest on the unpaid contributions; or

(b)     liquidated damages provided for under the Trust Agreements not in excess of 20% of the amount that is due.

**ANSWER:**    Defendant Dock & Door denies the allegations in Paragraph 44.

### COUNT II

45. [*sic*] The HEALTH FUND hereby incorporates paragraphs 1 to 44 above as though fully set forth herein.

**ANSWER:**    Defendant restates its answers to Paragraphs 1 through 44.

46. [*sic*] DOCK & DOOR and MIDWEST DOCK breached the provisions of the Agreements by failing to produce records sufficient to allow auditors engaged by the HEALTH FUND to determine whether DEFENDANTS have complied with their obligations to contribute to the HEALTH FUND and/or by failing to pay amounts owed to the HEALTH FUND based upon the hours worked by employees and/or subcontractors.

**ANSWER:**    Defendant Dock & Door denies the allegations in Paragraph 46.

47. [*sic*] The Agreements require DOCK & DOOR and MIDWEST DOCK to pay

liquidated damages, auditor fees, and all attorneys' fees and court costs that the HEALTH FUND incurs in the collection process.

**ANSWER:** Defendant Dock & Door denies the allegations in Paragraph 47.

48.[*sic*] The HEALTH FUND has complied with all conditions precedent in bringing this suit.

**ANSWER:** Defendant Dock & Door denies the allegations in Paragraph 48.

49.[*sic*] The HEALTH FUND has been required to employ the undersigned attorneys to collect the amounts that DOCK & DOOR and MIDWEST DOCK owe the HEALTH FUND.

**ANSWER:** Defendant Dock & Door denies the allegations in Paragraph 49.

50.[*sic*] DOCK & DOOR and MIDWEST DOCK must pay attorneys' fees and court costs that the HEALTH FUND incurs in this matter pursuant to 29 U.S.C. §1132 (g)(2)(D).

**ANSWER:** Defendant Dock & Door denies the allegations in Paragraph 50.

51.[*sic*] This Court should award the HEALTH FUND, pursuant to 29 U.S.C. §1132(g)(2)(B), interest on the amount that is due.

**ANSWER:** Defendant Dock & Door denies the allegations in Paragraph 51.

52.[*sic*] This Court should award the HEALTH FUND, pursuant to 29 U.S.C. §1132(g)(2)(C), an amount equal to the greater of:

(a) interest on the unpaid contributions; or

(b) liquidated damages provided for under the Trust Agreements not in excess of 20% of the amount that is due.

**ANSWER:** Defendant Dock & Door denies the allegations in Paragraph 52.

## <u>COUNT III</u>

53.[*sic*] The TRAINEE FUND hereby incorporates paragraphs 1 to 44 above as though fully set forth herein.

14

**ANSWER:**     Defendant restates its answers to Paragraphs 1 through 44.

54.[*sic*] DOCK & DOOR and MIDWEST DOCK breached the provisions of the Agreements by failing to produce records sufficient to allow auditors engaged by the TRAINEE FUND to determine whether DEFENDANTS have complied with their obligations to contribute to the TRAINEE FUND and/or by failing to pay amounts owed to the TRAINEE FUND based upon the hours worked by employees and/or subcontractors.

**ANSWER:**     Defendant Dock & Door denies the allegations in Paragraph 54.

55.[*sic*] The Agreements require DOCK & DOOR and MIDWEST DOCK to pay liquidated damages, auditor fees, and all attorneys' fees and court costs that the TRAINEE FUND incurs in the collection process.

**ANSWER:**     Defendant Dock & Door denies the allegations in Paragraph 55.

56.[*sic*] The TRAINEE FUND has complied with all conditions precedent in bringing this suit.

**ANSWER:**     Defendant Dock & Door denies the allegations in Paragraph 56.

57.[*sic*] The TRAINEE FUND has been required to employ the undersigned attorneys to collect the amounts that DOCK & DOOR and MIDWEST DOCK owe the TRAINEE FUND.

**ANSWER:**     Defendant Dock & Door denies the allegations in Paragraph 57.

58.[*sic*] DOCK & DOOR and MIDWEST DOCK must pay attorneys' fees and court costs that the TRAINEE FUND incurs in this matter pursuant to 29 U.S.C. §1132 (g)(2)(D).

**ANSWER:**     Defendant Dock & Door denies the allegations in Paragraph 58.

59.[*sic*] This Court should award the TRAINEE FUND, pursuant to 29 U.S.C. §1132(g)(2)(B), interest on the amount that is due.

**ANSWER:**     Defendant Dock & Door denies the allegations in Paragraph 59.

60.[*sic*] This Court should award the TRAINEE FUND, pursuant to 29 U.S.C. §1132(g)(2)(C), an amount equal to the greater of:

(a)     interest on the unpaid contributions; or

(b)     liquidated damages provided for under the Trust Agreements not in excess of 20% of the amount that is due.

**ANSWER:**     Defendant Dock & Door denies the allegations in Paragraph 60.

## COUNT IV

61.[*sic*] The SUPPLEMENTAL RETIREMENT FUND hereby incorporates paragraphs 1 to 44 above as though fully set forth herein.

**ANSWER:**     Defendant restates its answers to Paragraphs 1 through 44.

62.[*sic*] DOCK & DOOR and MIDWEST DOCK breached the provisions of the Agreements by failing to produce records sufficient to allow auditors engaged by the SUPPLEMENTAL RETIREMENT FUND to determine whether DEFENDANTS have complied with their obligations to contribute to the SUPPLEMENTAL RETIREMENT FUND and/or by failing to pay amounts owed to the SUPPLEMENTAL RETIREMENT FUND based upon the hours worked by employees and/or subcontractors.

**ANSWER:**     Defendant Dock & Door denies the allegations in Paragraph 62.

63.[*sic*] The Agreements require DOCK & DOOR and MIDWEST DOCK to pay liquidated damages, auditor fees, and all attorneys' fees and court costs that the SUPPLEMENTAL RETIREMENT FUND incurs in the collection process.

**ANSWER:**     Defendant Dock & Door denies the allegations in Paragraph 63.

64.[*sic*] The SUPPLEMENTAL RETIREMENT FUND has complied with all conditions precedent in bringing this suit.

**ANSWER:**     Defendant Dock & Door denies the allegations in Paragraph 64.

65.[*sic*] The SUPPLEMENTAL RETIREMENT FUND has been required to employ the

undersigned attorneys to collect the amounts that DOCK & DOOR and MIDWEST DOCK owe the SUPPLEMENTAL RETIREMENT FUND.

      **ANSWER:**    Defendant Dock & Door denies the allegations in Paragraph 65.

      66.[*sic*] DOCK & DOOR and MIDWEST DOCK must pay attorneys' fees and court costs that the SUPPLEMENTAL RETIREMENT FUND incurs in this matter pursuant to 29 U.S.C. §1132 (g)(2)(D).

      **ANSWER:**    Defendant Dock & Door denies the allegations in Paragraph 66.

      67.[*sic*] This Court should award the SUPPLEMENTAL RETIREMENT FUND, pursuant to 29 U.S.C. §1132(g)(2)(B), interest on the amount that is due.

      **ANSWER:**    Defendant Dock & Door denies the allegations in Paragraph 67.

      68.[*sic*] This Court should award the SUPPLEMENTAL RETIREMENT FUND, pursuant to 29 U.S.C. §1132(g)(2)(C), an amount equal to the greater of:

    (a)    interest on the unpaid contributions; or

    (b)    liquidated damages provided for under the Trust Agreements not in excess of 20% of the amount that is due.

      **ANSWER:**    Defendant Dock & Door denies the allegations in Paragraph 68.

Dated: September 9, 2024              Respectfully submitted,

                                    **DOCK & DOOR INSTALL, INC.**

                                    By:  /s/ *Todd A. Miller*
                                        One of its Attorneys

Todd A. Miller (#6216561)
Kathleen M. Cahill (#6269486)
ALLOCCO, MILLER & CAHILL, P.C.
*Counsel for Defendant, Dock & Door*
20 N. Wacker Drive, Suite 3517
Chicago, Illinois 60606
(312) 675-4325 TEL
(312) 675-4326 FAX
tam@alloccomiller.com

## CERTIFICATE OF SERVICE

The undersigned, an attorney of record, hereby certifies that he electronically filed the

attached, *Defendant, Dock & Door Install, Inc.'s Answer to Plaintiffs' Complaint*, with the Clerk

of the Court using the CM/ECF system this 9 day of September 2024, which will send notice of

such filings to the following:

> Kevin Patrick McJessy
> McJessy, Ching & Thompson, LLC
> 3759 N. Ravenswood, Suite 231
> Chicago, IL 60613
> (773)880-1260
> mcjessy@mcandt.com

>   /s/  *Todd A. Miller*

Todd A. Miller (#6216561)
Kathleen M. Cahill (#6269486)
ALLOCCO, MILLER & CAHILL, P.C.
*Counsel for Defendant, Dock & Door*
20 N. Wacker Drive, Suite 3517
Chicago, Illinois 60606
(312) 675-4325 TEL
(312) 675-4326 FAX
tam@alloccomiller.com