UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

|  |  |
|---|---|
| MID-AMERICA CARPENTERS REGIONAL COUNCIL PENSION FUND; *et al.,* | 24-cv-06428 |
| Plaintiffs, | Judge Andrea R. Wood |
| v. | Magistrate Judge Jeannice W. Appenteng |
| DOCK & DOOR INSTALL, INC., *et al.*, | |
| Defendants. | |

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACT IN
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT
<u>PURSUANT TO LOCAL RULE 56.1</u>**

**EXHIBITS 51-80**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOI
EASTERN DIVISION

MID-AMERICA CARPENTERS REGIONAL
COUNCIL PENSION FUND; *et al.*,

               Plaintiffs,

    v.

DOCK & DOOR INSTALL, INC., an Illinois
corporation and MIDWEST DOCK SOLUTIONS,
INC., an Illinois corporation,

               Defendants.

Case No 1:24-cv-06428

Judge Andrea R. Wood

Magistrate Judge Jeannice
W. Appenteng

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACT
IN SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT PURSUANT TO LOCAL RULE 56.1**

**LIST OF EXHIBITS**

| | |
|---|---|
| 1 | Declaration of John Conklin |
| 2 | Deposition Transcript of Anthony Zarlengo |
| 3 | Deposition Transcript of Anthony Brutti |
| 4 | Deposition Transcript of Michael Richert |
| 5 | Midwest Dock Solutions Inc. Articles of Incorporation, May 16, 2006, (Exhibit 79) |
| 6 | Midwest Dock Solutions Inc. Facebook Page, (Exhibit 53) |
| 7 | Deposition Transcript of Zachary Corrigan |
| 8 | Deposition Transcript of Donald Cruikshank |
| 9 | Defendant Midwest Dock Solutions, Inc.'s Answer, [ECF#18], (Exhibit 120) |
| 10 | One Jobsite Agreement Between Midwest Dock Solutions, Inc. and Chicago Regional Council of Carpenters n/k/a Mid-America Carpenters Regional Council, Nov. 11, 2011 and GoogleMaps Screenshot of Winpak Portion Packaging Facility, Sauk Village, IL, (Exhibit 81) |
| 11 | Midwest Dock Solutions, Inc.'s Fringe Benefit Contribution Reports (Exhibit 85) |
| 12 | Deposition Transcript of David Green |
| 13 | Krusinski Construction Company Cover Letter, Jun. 11, 2014, Subcontract Agreement, Midwest Dock Solutions, Inc. Certificates of Insurance, Compstak Website, Midwest Dock Solutions, Inc. Facebook Page, and GoogleMaps Images of 14907 Gougar Road, (Exhibit 104) |
| 14 | Midwest Dock Solutions, Inc.'s Facebook Page, (Exhibit 19) |

| 15 | Deposition Transcript of Anthony Tattini |
|---|---|
| 16 | Midwest Dock Solutions, Inc.'s Website, (Exhibit 57) |
| 17 | Intentionally Omitted |
| 18 | Deposition Transcript of Quinten Williams |
| 19 | Subcontract Agreement Between Pepper Construction Company and Midwest Dock Solutions Inc. for North American Warehouse Expansion, Glenview, Illinois, May 15, 2020, (Exhibit 61) |
| 20 | Declaration of S. Oertley, Senior Contract Specialist, Pepper Construction Company, Nov. 4, 2025 |
| 21 | Meridian Design Build: Subcontract between Meridian Design Build and Midwest Dock Solutions, Inc. for 1303 Jack Court Facility Upgrades, Bartlett, IL, May 28, 2024, (Exhibit 65) |
| 22 | Opus Design Build LLC Subcontract Agreement between Midwest Dock Solutions, Inc. and Opus Design Build LLC for Mokena Industrial Supply Spec Building A, Dec. 9, 2019 |
| 23 | Deposition Transcript of Ira Sugar |
| 24 | Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, (Exhibit 40) |
| 25 | Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, (Exhibit 221) |
| 26 | Deposition Transcript of Zachary Torkelson |
| 27 | Articles of Incorporation of Dock & Door Install, Inc., Jul. 11, 2014, (Exhibit 214) |
| 28 | Photograph of Anthony Brutti Race Car, (Exhibit 118) |
| 29 | Dock & Door Install, Inc. Answer, [ECF#17], (Exhibit 265) |
| 30 | Memorandum of Agreement between Dock & Door Install, Inc. and the Chicago Regional Council of Carpenters, Sep. 18, 2014, (Exhibit 219) |
| 31 | Memorandum of Agreement between Dock & Door Install, Inc. and the Chicago Regional Council of Carpenters, Aug. 15, 2019 |
| 32 | Defendant Dock & Door Install, Inc.'s Responses to Plaintiffs' Document Requests, Dec. 2, 2024 |
| 33 | Text Message Exchange between Callie Stephens (Gineris & Associates) and Tony Brutti, (Exhibit 106) |
| 34 | Dock & Door Install Inc. Invoices to Midwest Dock Solutions, Inc., (Exhibit 223) |
| 35 | Email from Tony Brutti, Dock & Door Install, to Tom Downs, Holden Insurance, Jul. 1, 2025, (Exhibit 151) |
| 36 | Letter from Thomas Bennington, Jr. (Lawrence Kamin Saunders & Uhlenhop, LLC) to Anthony Zarlengo, Michael Richert, and Anthony Brutti, Jul. 9, 2014, (Exhibit 215) |
| 37 | Dock & Door Install Inc. Employer Questionnaire / Application to Chicago Regional Council of Carpenters, Aug. 5, 2014, (Exhibit 218) |

| 38 | ADP Client Account Agreement and Authorization to Debit/Credit for Midwest Dock Solutions Inc., Oct. 6, 2016 |
| 39 | ADP Client Account Agreement and Authorization to Debit/Credit for Dock &Door Install, Inc., Oct. 6, 2016 |
| 40 | Subcontract Agreement Midwest Dock Solutions Inc. and Clayco Inc., (Exhibit 99) |
| 41 | Subcontract Agreement between Midwest Dock Solutions, Inc. and Opus Design Build LLC for Euclid Beverage Expansion Product, Mar. 26, 2024 |
| 42 | ARCO/Murray Construction Company: Subcontract Agreement between Midwest Dock Solutions, Inc. and ARCO/Murray National Construction Company, Inc., Feb. 27, 2023  SUBJECT TO PROTECTIVE ORDER - TO BE FILED SEPARATELY |
| 43 | Intentionally Omitted |
| 44 | Dock & Door Install Inc. Certificate of Insurance for Krusinski Construction Company, Aug 6, 2020, (Exhibit 256) |
| 45 | Dock & Door Install Inc. Certificate of Insurance for Meridian Design Build, Inc., Apr 14, 2025, (Exhibit 257) |
| 46 | Intentionally Omitted |
| 47 | Midwest Dock Solutions, Inc. Certificates of Insurance to Krusinski Construction Company, (Exhibit 280) |
| 48 | Midwest Dock Solutions, Inc. Certificates of Insurance to Opus Design Build LLC, (Exhibit 282) |
| 49 | Midwest Dock Solutions, Inc. Certificates of Insurance to Meridian Design Build LLC, (Exhibit 279) |
| 50 | Midwest Dock Solutions, Inc. Certificate of Insurance for ARCO/Murray, LLC, (Exhibit 259) |
| 51 | Dock & Door Install Inc. Certificate of Insurance for ARCO/Murray National Holdings, Inc., Mar. 20, 2020, (Exhibit 254) |
| 52 | Midwest Dock Solutions, Inc. Certificates of Insurance to Principle Construction Company, Inc., (Exhibit 284) |
| 53 | Standard Form of Subcontract Agreement Between Principle Construction Corp. and Midwest Dock Solutions, Inc. for General RV Showroom Huntley, IL, Jan. 26, 2022, (Exhibit 64) |
| 54 | Dock & Door Install, Inc. 2016 IRS Form 1120-S (First page only), (Exhibit 172) |
| 55 | Dock & Door Install, Inc. 2017 IRS Form 1120-S (First page only), (Exhibit 175) |
| 56 | Dock & Door Install, Inc. 2018 IRS Form 1120-S (First page only), (Exhibit 178) |
| 57 | Dock & Door Install, Inc. 2019 IRS Form 1120-S (First page only), (Exhibit 181) |
| 58 | Dock & Door Install, Inc. 2020 IRS Form 1120-S (First page only), (Exhibit 184) |
| 59 | Dock & Door Install, Inc. 2021 IRS Form 1120-S (First page only), (Exhibit 187) |
| 60 | Dock & Door Install, Inc. 2022 IRS Form 1120-S (First page only), (Exhibit 190) |
| 61 | Dock & Door Install, Inc. 2023 IRS Form 1120-S (First page only), (Exhibit 193) |

| 62 | Deposition Transcript of Callie Stephens |
|---|---|
| 63 | Deposition Transcript of Sherri Webber |
| 64 | Steger, IL Application for Post Office Box Service, Jan. 11, 2021, (Exhibit 49) |
| 65 | Steger, IL P.O. Box Service Fee Notice of Midwest Dock Solutions and Credit Card Payment Receipts, (Exhibit 50) |
| 66 | Cincinnati Insurance Company Endorsement for Change of Address, Mar. 24, 2021, (Exhibit 240) |
| 67 | Cincinnati Insurance Company Billing Statements to P.O. Box 363 from Feb. 28, 2022 to Aug. 29, 2024, (Exhibit 48) |
| 68 | Dock & Door Install, Inc. Fringe Benefit Contribution Reports March 2021 to October 2023, (Exhibit 47) |
| 69 | Deposition Transcript of Richard Mantoan |
| 70 | Deposition Transcript of Nicolas Kelly |
| 71 | Deposition Transcript of Branden Bishop |
| 72 | Dock & Door Install Inc.'s Fringe Benefit Contribution Reports September 2014 to July 2019, (Exhibit 220) |
| 73 | Email from Callie Stephens (Gineris & Associates) to Tony Brutti, Oct. 17, 2016, (Exhibit 222) |
| 74 | Email from Sherri Webber to Callie Stephens (Gineris & Associates), Sep. 26, 2018, (Exhibit 211) |
| 75 | Quinten Williams LinkedIn Page (Exhibit 2) |
| 76 | Tony Tattini Checks from Midwest Dock Solutions, (Exhibit 35) |
| 77 | Intentionally Omitted |
| 78 | Intentionally Omitted |
| 79 | Intentionally Omitted |
| 80 | Intentionally Omitted |
| 81 | David Green and Anthony Tattini W-2s for 2017, (Exhibit 261) |
| 82 | Anthony Brutti W-2 for 2017, (Exhibit 173) |
| 83 | Anthony Brutti W-2 for 2018, (Exhibit 176) |
| 84 | Don Cruikshank, David Green, and Anthony Tattini W-2s for 2018, (Exhibit 262) |
| 85 | Anthony Brutti W-2 for 2019, (Exhibit 179) |
| 86 | Anthony Brutti W-2 for 2020, (Exhibit 182) |
| 87 | Anthony Brutti W-2 for 2021, (Exhibit 185) |
| 88 | Anthony Brutti W-2 for 2022, (Exhibit 188) |
| 89 | Jose Aguirre, Don Cruikshank, David Green, Eric Jansma, Nicolas Kelly and Collin Zarlengo W-2s for 2022, (Exhibit 264) |
| 90 | Anthony Brutti W-2 for 2023 (Exhibit 191) |

| 91  | Jose Aguirre, David Green, Eric Jansma, Nicolas Kelly and Collin Zarlengo W-2s for 2023, (Exhibit 263) |
|-----|-------|
| 92  | David Green W-2s for 2020-2024, (Exhibit 28) |
| 93  | Blue Book Building & Construction Network ProView Worksheet and Contract |
| 94  | The Blue Book Building & Construction Network Contract for the Period August 2021 through July 2023, Apr. 14, 2021, (Exhibit 105) |
| 95  | The Blue Book Building & Construction Network Contract for the Period August 2021 through July 2023, Apr. 14, 2021 |
| 96  | Email from Ira Sugar, Midwest Dock Solutions Inc., to Zach Adkins, Pepper Construction Company, Nov. 4, 2019, (Exhibit 60) |
| 97  | Bid Proposal by Midwest Dock Solutions, Inc. to Opus Design Build LLC, Jan. 21, 2022 for MTC Kenosha 2021, (Exhibit 100) |
| 98  | Photograph of Midwest Dock Solutions Truck, (Exhibit 8) |
| 99  | Photograph of Midwest Dock Solutions Truck, (Exhibit 5) |
| 100 | Photograph of Midwest Dock Solutions Truck, (Exhibit 6) |
| 101 | Photograph of Midwest Dock Solutions Shirt (Exhibit 15) |
| 102 | Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' Second Set Of Interrogatories And Document Production Requests |
| 103 | Dock & Door, Inc. Deposit Summary, Sep. 1, 2022, Midwest Dock Solutions Inc. Payment of $10,972, Dock & Door Install Inc. Invoices to Midwest Dock Solutions Inc., (Exhibit 168) |
| 104 | Email from Tony Brutti to Margaret Stredde (Esser Hayes), Apr. 20, 2021, (Exhibit 52) |
| 105 | Email Exchange Between Tony Brutti, Zack Adkins (Pepper Construction) and Ira Sugar, (Exhibit 241) |
| 106 | Email Exchange Between Tony Brutti and Zack Adkins (Pepper Construction), (Exhibit 242) |
| 107 | Email Exchange Between Tony Brutti and Christi Adams (Pepper Construction), (Exhibit 243) |
| 108 | Email Communications from Sherri Webber to Tony Brutti and Tony Zarlengo, (Exhibit 244) |
| 109 | Email Exchange Between Tony Brutti and Christi Adams (Pepper Construction), (Exhibit 246) |
| 110 | Email Exchange Between Tony Brutti and Thomas Braun (Pepper Construction), (Exhibit 250) |
| 111 | Email from Tony Brutti (Midwest Dock Solutions Inc.) to Christi Adams (Pepper Construction), Mar. 28, 2024, (Exhibit 249) |
| 112 | Email from Tony Brutti, Midwest Dock Solutions Inc., to Christi Adams, Pepper Construction, Mar. 28, 2024, (Exhibit 98) |

| 113 | Deposition Transcript of Veronica O'Connor |
|---|---|
| 114 | Email from Tony Brutti (Midwest Dock Solutions Inc.) to Margaret Stredde (Esser Hayes), Oct. 22, 2020, (Exhibit 287) |
| 115 | Email from Margaret Stredde (Esser Hayes) to Tony Brutti (Midwest Dock Solutions Inc.), Oct. 22, 2020, (Exhibit 288) |
| 116 | Midwest Dock Solutions, Inc. Certificate of Insurance for Principle Construction Corp., Oct. 16, 2020 |
| 117 | Email from Tony Brutti (Midwest Dock Solutions Inc.) to Margaret Stredde (Esser Hayes), Oct. 23, 2020, (Exhibit 290) |
| 118 | Village of Hazel Crest Department of Building & Inspectional Services, Application for Contractor's Registration Certificate, Company Name: Midwest Dock Solutions |
| 119 | Email from Margaret Stredde, Esser Hayes, to Margaret Stredde, Oct. 23, 2020, (Exhibit 291) |
| 120 | Midwest Dock Solutions, Inc. Certificate of Insurance for Village of Hazel Crest, Oct. 23, 2020 |
| 121 | Email from Tony Brutti, Midwest Dock Solutions, to Cathie Demitropoulos, Assured Partners, Jan. 11, 2021, (Exhibit 293) |
| 122 | Text Message Between Callie Stephens, Gineris & Associates, Ltd. and Tony Zarlengo, Midwest Dock Solutions, Jun. 13, 2023, (Exhibit 107), EX. 122 |
| 123 | Text Message from Richard Mantoan to Tony Brutti (Exhibit 273) |
| 124 | Email from Mara Spring, Counsel for Holden Insurance, to Kevin McJessy, Plaintiffs' Counsel, Oct. 6, 2025, (Exhibit 253) |
| 125 | Deposition Transcript of Jacie Olson |

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 51

# ACORD® CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 3/20/2025 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Certificate Team | | |
|---|---|---|---|
| AssuredPartners of Illinois, LLC<br>4350 Weaver Pkwy<br>Warrenville IL 60555 | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-355-7996 |
| | E-MAIL ADDRESS: certs.apil@assuredpartners.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED DOCK&DO-02 | INSURER B : Berkley Casualty Company/Berkely Industrial Comp | | 15911 |
| Dock & Door Install Inc<br>PO Box 363<br>Steger IL 60475 | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES  CERTIFICATE NUMBER: 908862931  REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0265614 | 7/22/2024 | 7/22/2025 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT X LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | | | EBA 0265614 | 7/22/2024 | 7/22/2025 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY / SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS ONLY X NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | ENP 0265614 | 7/22/2024 | 7/22/2025 | EACH OCCURRENCE | $ 1,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 1,000,000 |
| | DED X RETENTION $ /A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N | | Y | BNET508640479 | 7/22/2024 | 7/22/2025 | X PER STATUTE OTH-ER | |
| | ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) Y | N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
RE: Job #C938 - Project Nexus Elwood at Mississippi Street & Diagonal Rd, Elwood IL 60421.

Primary/Non-Contributory Additional Insured(s) for General Liability and Umbrella Liability: ARCO/Murray National Holdings, Inc. c/o ARCO/Murray National Construction Company.; CJ Logistics America, LLC; KORUS Logistics Infra EW LLC (Owner) and Village of Elwood, Baxter & Woodman, Inc. and their respective parents, subsidiaries, affiliates, successors, and assigns, Owner's lender, and anyone else required in the General Contract. Waiver of Subrogation on General Liability, Umbrella Liability and Workers Compensation applies in favor of the Additional Insureds. Endorsement form(s) attached.

## CERTIFICATE HOLDER  CANCELLATION

| | |
|---|---|
| ARCO/Murray National Holdings, Inc.<br>c/o ARCO/Murray National Construction Company<br>3110 Woodcreek Drive<br>Downers Grove IL 60515 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)  The ACORD name and logo are registered marks of ACORD

PLAINTIFF'S EXHIBIT 254 LAL

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 52


**ACORD®** | **CERTIFICATE OF LIABILITY INSURANCE** | DATE (MM/DD/YYYY)
10/16/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Certificate Team | | |
|---|---|---|---|
| AssuredPartners of Illinois, LLC 1811 High Grove, Suite 139 Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-355-7996 |
| | E-MAIL ADDRESS: COI@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                                    MIDWDOC-01 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| Midwest Dock Solutions 27 East 36th Place Steger IL 60475 | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

**COVERAGES** CERTIFICATE NUMBER: 1707263560 REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X **COMMERCIAL GENERAL LIABILITY** | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | ☐ CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | ☐ POLICY X PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | **AUTOMOBILE LIABILITY** | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS ONLY X NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X **UMBRELLA LIAB** X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | ☐ EXCESS LIAB ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | ☐ DED X RETENTION $ N/A | | | | | | | $ |
| B | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y/N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE ☐ OTH-ER | |
| | ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | Y | N/A | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Re: Job #2020-05, Code #08360, Contract #3717 - Bridgepoint 355 Lombard.
Primary/Non-Contributory Additional Insured(s) for General Liability, Auto Liability and additional insured's for Umbrella Liability: Principle Construction Corp.;
Bridge Development Partners, LLC; BDP Development Services of Illinois, LLC; Harris Architects and Spaceco Inc.
Waiver of Subrogation on General Liability, Auto Liability, Umbrella Liability and Workers Compensation applies in favor of the Additional Insured's.
Endorsement forms attached.

**PLAINTIFF'S EXHIBIT 284** tabbies

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Principle Construction Corp. 9450 W. Bryn Mawr Ave. Suite 765 Rosemont, IL 60018 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03) The ACORD name and logo are registered marks of ACORD



# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
10/16/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Certificate Team |
|---|---|
| AssuredPartners of Illinois, LLC<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077    FAX (A/C, No): 630-355-7996 |
| | E-MAIL ADDRESS: COI@esserhayes.com |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| | INSURER A : Cincinnati Insurance Company | 10677 |
| INSURED        MIDWDOC-01 | INSURER B : The Cincinnati Indemnity Company | 23280 |
| Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

## COVERAGES      CERTIFICATE NUMBER: 1707263560      REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X **COMMERCIAL GENERAL LIABILITY**<br>   CLAIMS-MADE X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT LOC<br>OTHER: | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | | $ |
| A | **AUTOMOBILE LIABILITY**<br>ANY AUTO<br>OWNED AUTOS ONLY   SCHEDULED AUTOS<br>X HIRED AUTOS ONLY   X NON-OWNED AUTOS ONLY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X **UMBRELLA LIAB**   X OCCUR<br>EXCESS LIAB    CLAIMS-MADE<br>DED X RETENTION $ N/A | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | | | | | | | AGGREGATE | $ 6,000,000 |
| | | | | | | | | $ |
| B | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**   Y / N<br>ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? Y<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE   OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment<br>Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Re: Job #2020-05, Code #08360, Contract #3717 - Bridgepoint 355 Lombard.
Primary/Non-Contributory Additional Insured(s) for General Liability, Auto Liability and additional insured's for Umbrella Liability: Principle Construction Corp.; Bridge Development Partners, LLC; BDP Development Services of Illinois, LLC; Harris Architects and Spaceco Inc.
Waiver of Subrogation on General Liability, Auto Liability, Umbrella Liability and Workers Compensation applies in favor of the Additional Insured's. Endorsement forms attached.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| Principle Construction Corp.<br>9450 W. Bryn Mawr Ave.<br>Suite 765<br>Rosemont, IL 60018 | AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)      The ACORD name and logo are registered marks of ACORD

 **ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 10/16/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | | CONTACT NAME: | Certificate Team | | |
|---|---|---|---|---|---|
| AssuredPartners of Illinois, LLC | | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-355-7996 | |
| 1811 High Grove, Suite 139 | | E-MAIL ADDRESS: COI@esserhayes.com | | | |
| Naperville IL 60540-9100 | | | | | |
| | | INSURER(S) AFFORDING COVERAGE | | | NAIC # |
| | MIDWDOC-01 | INSURER A : Cincinnati Insurance Company | | | 10677 |
| INSURED | | INSURER B : The Cincinnati Indemnity Company | | | 23280 |
| Midwest Dock Solutions | | INSURER C : | | | |
| 27 East 36th Place | | INSURER D : | | | |
| Steger IL 60475 | | INSURER E : | | | |
| | | INSURER F : | | | |

## COVERAGES CERTIFICATE NUMBER: 1707263560 REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | ☐ CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS ONLY X NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y / N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE ☐ OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? Y (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Re: Job #2020-05, Code #08360, Contract #3717 - Bridgepoint 355 Lombard.
Primary/Non-Contributory Additional Insured's for General Liability, Auto Liability and additional insured's for Umbrella Liability: Principle Construction Corp.; Bridge Development Partners, LLC; BDP Development Services of Illinois, LLC; Harris Architects and Spaceco Inc.
Waiver of Subrogation on General Liability, Auto Liability, Umbrella Liability and Workers Compensation applies in favor of the Additional Insured's. Endorsement forms attached.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| Principle Construction Corp. 9450 W. Bryn Mawr Ave. Suite 765 Rosemont, IL 60018 | AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION.  All rights reserved.

ACORD 25 (2016/03)  The ACORD name and logo are registered marks of ACORD

 **ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 3/19/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | |
|---|---|---|
| Esser Hayes Insurance Group | PHONE (A/C, No, Ext): 630-355-2077 | FAX (A/C, No): 630-579-0001 |
| 1811 High Grove, Suite 139 | E-MAIL ADDRESS: coi@esserhayes.com | |
| Naperville IL 60540-9100 | | |

| | | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|---|
| | | INSURER A : Cincinnati Insurance Company | 10677 |
| INSURED | MIDWE11 | INSURER B : The Cincinnati Indemnity Company | 23280 |
| Midwest Dock Solutions | | INSURER C : | |
| 27 East 36th Place | | INSURER D : | |
| Steger IL 60475 | | INSURER E : | |
| | | INSURER F : | |

## COVERAGES    CERTIFICATE NUMBER: 2078793991    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT LOC OTHER: | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS  SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y / N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) Y N/A | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2019-12 SEEFRIED INDUSTRIAL PROPERTIES 1, 8500 116TH ST, PLEASANT PRAIRIE, WI 53158. PRINCIPLE CONSTRUCTION CORP; TGA PLEASANT PRAIRIE CENTER LLC C/O NUVEEN REAL ESTATE; PARTNERS IN DESIGN ARCHITECTS; PINNACLE ENGINEERING; SEEFRIED INDUSTRIAL PROPERTIES ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY, AUTOMOBILE LIABILITY AND UMBRELLA LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORMS ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP, C/O DSP CERTIFICATE TRACKING 1900 E GOLF RD, SUITE 650 SCHAUMBURG IL 60173 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

**ACORD 25 (2014/01)**    The ACORD name and logo are registered marks of ACORD
THIS CERTIFICATE SUPERSEDES PREVIOUSLY ISSUED CERTIFICATE



# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 3/19/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group 1811 High Grove, Suite 139 Naperville IL 60540-9100 | PHONE (A/C, No. Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: coi@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                                MIDWE11 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| Midwest Dock Solutions 27 East 36th Place Steger IL 60475 | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES    CERTIFICATE NUMBER: 476069235    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS    SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y / N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) Y N/A | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2019-26 IDI PROJECT TRACEY, 23700 W BLUFF ROAD, CHANNAHON, IL.
PRINCIPLE CONSTRUCTION CORP (GENERAL CONTRACTOR); IDIG CHANNAHON A, LLC (OWNER); IDI LOGISTICS (OWNER); SPARKS (ARCHITECT) ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY, AUTOMOBILE LIABILITY AND UMBRELLA LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORMS ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP, C/O DSP CERTIFICATE TRACKING 1900 E GOLF RD, SUITE 650 SCHAUMBURG IL 60173 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

**ACORD 25 (2014/01)**    The ACORD name and logo are registered marks of ACORD
THIS CERTIFICATE SUPERSEDES PREVIOUSLY ISSUED CERTIFICATE

 **ACORD®** | **CERTIFICATE OF LIABILITY INSURANCE** | DATE (MM/DD/YYYY)<br>3/19/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | | CONTACT<br>NAME: | | |
|---|---|---|---|---|
| Esser Hayes Insurance Group<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | | PHONE<br>(A/C, No, Ext): 630-355-2077 | | FAX<br>(A/C, No): 630-579-0001 |
| | | E-MAIL<br>ADDRESS: col@esserhayes.com | | |
| | | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED | MIDWE11 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | | INSURER C : | | |
| | | INSURER D : | | |
| | | INSURER E : | | |
| | | INSURER F : | | |

**COVERAGES** CERTIFICATE NUMBER: 476069235 REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | Y | N/A | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2019-26 IDI PROJECT TRACEY, 23700 W BLUFF ROAD, CHANNAHON, IL.
PRINCIPLE CONSTRUCTION CORP (GENERAL CONTRACTOR); IDIG CHANNAHON A, LLC (OWNER); IDI LOGISTICS (OWNER); SPARKS (ARCHITECT) ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY, AUTOMOBILE LIABILITY AND UMBRELLA LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORMS ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP, C/O DSP<br>CERTIFICATE TRACKING<br>1900 E GOLF RD, SUITE 650<br>SCHAUMBURG IL 60173 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)  The ACORD name and logo are registered marks of ACORD
THIS CERTIFICATE SUPERSEDES PREVIOUSLY ISSUED CERTIFICATE



# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 3/19/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No. Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: coi@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                                    MIDWE11<br>Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES          CERTIFICATE NUMBER: 1169457735          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | ☐ CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | ☐ POLICY X PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | ☐ EXCESS LIAB ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY            Y / N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? ☐ Y N/A<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE ☐ OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
RE: JOB #2018-15, PHARMA LOGISTICS - 1795 N BUTTERFIELD ROAD, SUITE 203, LIBERTYVILLE, IL 60048.
PRIMARY/NON-CONTRIBUTORY ADDITIONAL INSURED ON GENERAL LIABILITY, AUTO LIABILITY AND UMBRELLA LIABILITY: PRINCIPLE
CONSTRUCTION CORP., FOREVER LAND COMPANY, PHARMA LOGISTICS AND HARRIS ARCHITECTS. WAIVER OF SUBROGATION AS IT PERTAINS
TO GENERAL LIABILITY, AUTO LIABILITY, UMBRELLA AND WORKERS COMPENSATION IN FAVOR OF THE ADDITIONAL INSURED.
COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES).  ENDORSEMENT
FORM(S) ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP.<br>9450 W. BRYN MAWR AVE.<br>SUITE 765<br>ROSEMONT IL 60018 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD
THIS CERTIFICATE SUPERSEDES PREVIOUSLY ISSUED CERTIFICATE



# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 3/19/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed.  If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group  1811 High Grove, Suite 139  Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: col@esserhayes.com | | |
| | **INSURER(S) AFFORDING COVERAGE** | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                          MIDWE11  Midwest Dock Solutions  27 East 36th Place  Steger IL 60475 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES          CERTIFICATE NUMBER: 1169457735          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY  X PRO-JECT  LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS  SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS  X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB  X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB  CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED  X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY        Y / N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE  OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH)     Y N/A | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
RE: JOB #2018-15, PHARMA LOGISTICS - 1795 N BUTTERFIELD ROAD, SUITE 203, LIBERTYVILLE, IL 60048.
PRIMARY/NON-CONTRIBUTORY ADDITIONAL INSURED ON GENERAL LIABILITY, AUTO LIABILITY AND UMBRELLA LIABILITY: PRINCIPLE CONSTRUCTION CORP., FOREVER LAND COMPANY, PHARMA LOGISTICS AND HARRIS ARCHITECTS. WAIVER OF SUBROGATION AS IT PERTAINS TO GENERAL LIABILITY, AUTO LIABILITY, UMBRELLA AND WORKERS COMPENSATION IN FAVOR OF THE ADDITIONAL INSURED.
COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES).  ENDORSEMENT FORM(S) ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP.  9450 W. BRYN MAWR AVE.  SUITE 765  ROSEMONT IL 60018 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.  AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION.  All rights reserved.

ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD
THIS CERTIFICATE SUPERSEDES PREVIOUSLY ISSUED CERTIFICATE



# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 3/19/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: coi@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                                    MIDWE11 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES  CERTIFICATE NUMBER: 903726874  REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE  X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY  X PRO-JECT  LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS   SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS  X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB  X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB  CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED  X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY          Y/N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE   OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?  Y (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2019-02 STAG INDUSTRIAL HOLDINGS BUILDING ADDITION, 10441 80TH AVE, PLEASANT PRAIRIE, WI. PRINCIPLE CONSTRUCTION CORP; STAG INDUSTRIAL HOLDINGS, A DELAWARE LIMITED LIABILITY COMPANY; PARTNERS IN DESIGN; PINNACLE ENGINEERING ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY, AUTOMOBILE LIABILITY AND UMBRELLA LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORMS ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP, C/O DSP<br>CERTIFICATE TRACKING<br>1900 E GOLF RD, SUITE 650<br>SCHAUMBURG IL 60173 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)    The ACORD name and logo are registered marks of ACORD

THIS CERTIFICATE SUPERSEDES PREVIOUSLY ISSUED CERTIFICATE

 **ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 3/19/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | | CONTACT NAME: | | |
|---|---|---|---|---|
| Esser Hayes Insurance Group<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| | | E-MAIL ADDRESS: coi@esserhayes.com | | |
| | | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED | MIDWE11 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | | INSURER C : | | |
| | | INSURER D : | | |
| | | INSURER E : | | |
| | | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: 2078793991 | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY<br>☐ CLAIMS-MADE X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $500,000 |
| | | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER:<br>POLICY X PRO-JECT ☐ LOC<br>OTHER: | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| A | AUTOMOBILE LIABILITY<br>☐ ANY AUTO<br>☐ ALL OWNED AUTOS X HIRED AUTOS<br>☐ SCHEDULED AUTOS X NON-OWNED AUTOS | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR<br>☐ EXCESS LIAB ☐ CLAIMS-MADE<br>DED X RETENTION $ N/A | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $6,000,000 |
| | | | | | | | AGGREGATE | $6,000,000 |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? Y N/A<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE ☐ OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2019-12 SEEFRIED INDUSTRIAL PROPERTIES 1, 8500 116TH ST, PLEASANT PRAIRIE, WI 53158. PRINCIPLE CONSTRUCTION CORP; TGA PLEASANT PRAIRIE CENTER LLC C/O NUVEEN REAL ESTATE; PARTNERS IN DESIGN ARCHITECTS; PINNACLE ENGINEERING; SEEFRIED INDUSTRIAL PROPERTIES ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY, AUTOMOBILE LIABILITY AND UMBRELLA LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORMS ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP, C/O DSP<br>CERTIFICATE TRACKING<br>1900 E GOLF RD, SUITE 650<br>SCHAUMBURG IL 60173 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)    The ACORD name and logo are registered marks of ACORD
THIS CERTIFICATE SUPERSEDES PREVIOUSLY ISSUED CERTIFICATE



# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 2/4/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-355-7996 |
| 1811 High Grove, Suite 139 | E-MAIL ADDRESS: coi@esserhayes.com | | |
| Naperville IL 60540-9100 | | | |

| | | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|---|
| | | INSURER A : Cincinnati Insurance Company | 10677 |
| INSURED | MIDWE11 | INSURER B : The Cincinnati Indemnity Company | 23280 |
| Midwest Dock Solutions | | INSURER C : | |
| 27 East 36th Place | | INSURER D : | |
| Steger IL 60475 | | INSURER E : | |
| | | INSURER F : | |

## COVERAGES CERTIFICATE NUMBER: 407937432 REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2019 | 3/13/2020 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2019 | 3/13/2020 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | ENP 0314304 | 3/13/2019 | 3/13/2020 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N | | Y | EWC 0314305 | 3/13/2019 | 3/13/2020 | X PER STATUTE OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) Y | N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2019 | 3/13/2020 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2019-26 IDI PROJECT TRACEY, 23700 W BLUFF ROAD, CHANNAHON, IL.
PRINCIPLE CONSTRUCTION CORP (GENERAL CONTRACTOR); IDIG CHANNAHON A, LLC (OWNER); IDI LOGISTICS (OWNER); SPARKS (ARCHITECT) ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY AND AUTOMOBILE LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AND UMBRELLA LIABILITY AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORMS ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP, C/O DSP CERTIFICATE TRACKING 1900 E GOLF RD, SUITE 650 SCHAUMBURG IL 60173 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01) The ACORD name and logo are registered marks of ACORD

 **ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
2/13/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-355-7996 |
| | E-MAIL ADDRESS: coi@esserhayes.com | | |

| | | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|---|
| | | INSURER A : Cincinnati Insurance Company | 10677 |
| INSURED MIDWE11 | | INSURER B : The Cincinnati Indemnity Company | 23280 |
| Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | | INSURER C : | |
| | | INSURER D : | |
| | | INSURER E : | |
| | | INSURER F : | |

| COVERAGES | CERTIFICATE NUMBER: 1208283729 | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2019 | 3/13/2020 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2019 | 3/13/2020 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | ENP 0314304 | 3/13/2019 | 3/13/2020 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N | | Y | EWC 0314305 | 3/13/2019 | 3/13/2020 | X PER STATUTE OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) Y | N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2019 | 3/13/2020 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2019-26 IDI PROJECT TRACEY, 23700 W BLUFF ROAD, CHANNAHON, IL.
PRINCIPLE CONSTRUCTION CORP (GENERAL CONTRACTOR); IDIG CHANNAHON A, LLC (OWNER); IDI LOGISTICS (OWNER); SPARKS (ARCHITECT) ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY, AUTOMOBILE LIABILITY AND UMBRELLA LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORMS ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| PRINCIPLE CONSTRUCTION CORP, C/O DSP CERTIFICATE TRACKING 1900 E GOLF RD, SUITE 650 SCHAUMBURG IL 60173 | AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)     The ACORD name and logo are registered marks of ACORD

 **ACORD**

## CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 3/19/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group 1811 High Grove, Suite 139 Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: coi@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                    MIDWE11 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| Midwest Dock Solutions 27 East 36th Place Steger IL 60475 | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES          CERTIFICATE NUMBER: 903726874          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS        SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS  X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB  X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB       CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED  X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY      Y/N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE   OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?  Y  N/A (Mandatory in NH) | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2019-02 STAG INDUSTRIAL HOLDINGS BUILDING ADDITION, 10441 80TH AVE, PLEASANT PRAIRIE, WI. PRINCIPLE CONSTRUCTION CORP; STAG INDUSTRIAL HOLDINGS, A DELAWARE LIMITED LIABILITY COMPANY; PARTNERS IN DESIGN; PINNACLE ENGINEERING ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY, AUTOMOBILE LIABILITY AND UMBRELLA LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORMS ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP, C/O DSP CERTIFICATE TRACKING 1900 E GOLF RD, SUITE 650 SCHAUMBURG IL 60173 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

**ACORD 25 (2014/01)**     The ACORD name and logo are registered marks of ACORD
THIS CERTIFICATE SUPERSEDES PREVIOUSLY ISSUED CERTIFICATE

 **ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 11/1/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Certificate Team | |
|---|---|---|
| AssuredPartners of Illinois, LLC<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | FAX (A/C, No): 630-355-7996 |
| | E-MAIL ADDRESS: COI@esserhayes.com | |
| | INSURER(S) AFFORDING COVERAGE | NAIC # |
| | INSURER A : Cincinnati Insurance Company | 10677 |
| INSURED                           MIDWDOC-01 | INSURER B : The Cincinnati Indemnity Company | 23280 |
| Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

## COVERAGES          CERTIFICATE NUMBER: 517623282          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X **COMMERCIAL GENERAL LIABILITY** | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | ☐ CLAIMS-MADE  X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | **AUTOMOBILE LIABILITY** | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY  ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS ONLY  X NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X **UMBRELLA LIAB**  X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | ☐ EXCESS LIAB  ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**                      Y / N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE ☐ OTH-ER | |
| | ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? Y (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment<br>Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Re: Job #2020-05, Code #08360, Contract #3717 - Bridgepoint 355 Lombard.
Primary/Non-Contributory Additional Insured(s) for General Liability, Auto Liability and Umbrella Liability: Principle Construction Corp.; Bridge Development Partners; BDP Development Services of Illinois, LLC; Harris Architects and Spaceco Inc. Waiver of Subrogation on General Liability, Auto Liability, Umbrella Liability and Workers Compensation applies in favor of the Additional Insured's. Umbrella limit extends over the General Liability, Auto Liability and Workers Comp primary limits. Coverage is excluded under the Workers Compensation for Tony Zarlengo (VP) and Mike Richert (Pres.). Endorsement forms attached.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| Principle Construction Corp., c/o DSP Certificate Tracking<br>1900 E Golf Rd, Suite 650<br>Schaumburg IL 60173 | AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)          The ACORD name and logo are registered marks of ACORD


ACORD®

# CERTIFICATE OF LIABILITY INSURANCE

| DATE (MM/DD/YYYY) |
|---|
| 3/16/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: coi@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                                    MIDWE11 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: 1898922 | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO- JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y / N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE OTH- ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | Y | N/A | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2018-04 BITS 850 ASBURY DRIVE, BUFFALO GROVE, IL 60089. PRINCIPLE CONSTRUCTION CORP, USRLP ASBURY DRIVE, LLC; RIDGELINE PROPERTY GROUP; BUSINESS IT SOURCE ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY AND AUTOMOBILE LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AND UMBRELLA LIABILITY AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP.<br>C/O DSP CERTIFICATE TRACKING<br>1900 E GOLF ROAD, SUITE 650<br>SCHAUMBURG IL 60174 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)         The ACORD name and logo are registered marks of ACORD

 **ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
3/16/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | |
|---|---|---|
| Esser Hayes Insurance Group<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: coi@esserhayes.com | |
| | INSURER(S) AFFORDING COVERAGE | NAIC # |
| | INSURER A : Cincinnati Insurance Company | 10677 |
| INSURED                      MIDWE11 | INSURER B : The Cincinnati Indemnity Company | 23280 |
| Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

| COVERAGES | CERTIFICATE NUMBER: 113800251 | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $500,000 |
| | | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | POLICY X PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS      SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS  X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB  X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $6,000,000 |
| | EXCESS LIAB  CLAIMS-MADE | | | | | | AGGREGATE | $6,000,000 |
| | DED  X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY  Y/N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE    OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?  Y N/A (Mandatory in NH) | Y | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
RE: JOB #2017-23, COST #11160 - BUILDING ADDITION/CONNECTION, 1855 WALLACE AVENUE, ST. CHARLES, IL.
PRIMARY/NON-CONTRIBUTORY ADDITIONAL INSUREDS ON GENERAL LIABILITY AND ADDITIONAL INSUREDS ON AUTO LIABILITY AND UMBRELLA LIABILITY: PRINCIPLE CONSTRUCTION CORP., EXACT REPLACEMENT PARTS, INC. AND CORNERSTONE ARCHITECTS LTD.
WAIVER OF SUBROGATION AS IT PERTAINS TO GENERAL LIABILITY, AUTO LIABILITY, UMBRELLA LIABILITY AND WORKERS COMPENSATION IN FAVOR OF THE ADDITIONAL INSUREDS.
ENDORSEMENT FORM(S) ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP.<br>9450 W. BRYN MAWR AVE.<br>SUITE #765<br>ROSEMONT, IL 60018 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

**ACORD 25 (2014/01)**      The ACORD name and logo are registered marks of ACORD

 ACORD®

# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 3/16/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group 1811 High Grove, Suite 139 Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: coi@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                                      MIDWEN11 Midwest Dock Solutions 27 East 36th Place Steger IL 60475 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: 439788659 | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY           Y / N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | Y N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2017-19 LINN STAR TENANT BUILD-OUT, 850 ASHBURY DR, BUFFALO GROVE, IL 60089. PRINCIPLE CONSTRUCTION CORP, USRLP ASBURY DRIVE LLC, A TEXAS LIMITED PARTNERSHIP; HARRIS ARCHITECTS; KIMLEY HORN; RIDGELINE PROPERTY GROUP; LINN STAR TRANSFER, INC ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY AND AUTOMOBILE LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AND UMBRELLA LIABILITY AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORM(S) ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP. C/O DSP CERTIFICATE TRACKING 1900 E GOLF RD, SUITE 650 SCHAUMBURG IL 60173 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)     The ACORD name and logo are registered marks of ACORD

 **ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 3/16/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| 1811 High Grove, Suite 139 | E-MAIL ADDRESS: coi@esserhayes.com | | |
| Naperville IL 60540-9100 | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                           MIDWE11 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| Midwest Dock Solutions | INSURER C : | | |
| 27 East 36th Place | INSURER D : | | |
| Steger IL 60475 | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES        CERTIFICATE NUMBER: 802964485        REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | ☐ CLAIMS-MADE  X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | ☐ POLICY  X PRO-JECT  ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS  ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS  X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB  X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | ☐ EXCESS LIAB  ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED  X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY           Y / N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE  ☐ OTHER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH)  Y  N/A | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2018-10 STREAM DATA, 2080 LUNT AVENUE, ELK GROVE VILLAGE, IL.
PRINCIPLE CONSTRUCTION CORP, JE DUN CONSTRUCTION COMPANY, STREAM DATA AND HARRIS ARCHITECTS ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY AND AUTOMOBILE LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AND UMBRELLA LIABILITY AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORM(S) ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP. C/O DSP CERTIFICATE TRACKING 1900 E GOLF ROAD, SUITE 650 SCHAUMBURG IL 60174 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)        The ACORD name and logo are registered marks of ACORD

 **ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
3/16/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group 1811 High Grove, Suite 139 Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: coi@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                                   MIDWE11 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| Midwest Dock Solutions 27 East 36th Place Steger IL 60475 | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES          CERTIFICATE NUMBER: 957242763          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|---|
| A | X | COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | | CLAIMS-MADE [X] OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | POLICY [X] PRO-JECT [ ] LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | OTHER: | | | | | | | $ |
| A | | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | | ALL OWNED AUTOS [ ] SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X | HIRED AUTOS [X] NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | | $ |
| A | X | UMBRELLA LIAB [X] OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | | EXCESS LIAB [ ] CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | | DED [X] RETENTION $ N/A | | | | | | | $ |
| B | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY           Y/N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | [X] PER STATUTE [ ] OTH-ER | |
| | | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? [Y] (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2016-09 DOHENEY ENTERPRISES, LOT 40-LAKEVIEW CORPORATE PARK, 10411 80TH AVE, PLEASANT PRAIRIE, WI 53158. PRINCIPLE CONSTRUCTION CORP, DOHENEY FAMILY INVESTMENTS LLC, PARTNERS IN DESIGN ARCHITECTS, WINTRUST FINANCIAL CORP C/O LAKE FOREST BANK AND TRUST, ISAOA, ATIMA, 1100 WAUKEGAN RD, NORTHBROOK, IL 60062, DOHENY ENTERPRISES, INC, DOHENY'S LLC AND PINNACLE ENGINEERING GROUP ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY, AUTOMOBILE LIABILITY AND UMBRELLA LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORM(S) ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP. C/O DSP CERTIFICATE TRACKING 1900 E GOLF ROAD, SUITE 650 SCHAUMBURG IL 60174 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

**ACORD 25 (2014/01)**          The ACORD name and logo are registered marks of ACORD

 **ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
3/16/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: coi@esserhayes.com | | |
| | **INSURER(S) AFFORDING COVERAGE** | | **NAIC #** |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                                    MIDWE11<br>Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: 1276029040 | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS       SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS   X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY              Y / N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE    OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | Y N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
RE: JOB #2018-15, PHARMA LOGISTICS - 1795 N BUTTERFIELD ROAD, SUITE 203, LIBERTYVILLE, IL 60048.
PRIMARY/NON-CONTRIBUTORY ADDITIONAL INSURED ON GENERAL LIABILITY, AUTO LIABILITY AND ADDITIONAL INSURED ON UMBRELLA
LIABILITY: PRINCIPLE CONSTRUCTION CORP., FOREVER LAND COMPANY, PHARMA LOGISTICS AND HARRIS ARCHITECTS. WAIVER OF
SUBROGATION AS IT PERTAINS TO GENERAL LIABILITY, AUTO LIABILITY, UMBRELLA AND WORKERS COMPENSATION IN FAVOR OF THE
ADDITIONAL INSURED
COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT
FORM(S) ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP.<br>9450 W. BRYN MAWR AVE.<br>SUITE 765<br>ROSEMONT IL 60018 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

**ACORD 25 (2014/01)**          The ACORD name and logo are registered marks of ACORD



# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 3/16/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group | PHONE (A/C, No. Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| 1811 High Grove, Suite 139 | E-MAIL ADDRESS: coi@esserhayes.com | | |
| Naperville IL 60540-9100 | | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                          MIDWE11 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| Midwest Dock Solutions | INSURER C : | | |
| 27 East 36th Place | INSURER D : | | |
| Steger IL 60475 | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES          CERTIFICATE NUMBER: 1546181014          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|---|
| A | X | COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $1,000,000 |
| | | CLAIMS-MADE [X] OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $500,000 |
| | | | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | | POLICY [X] PRO-JECT [ ] LOC | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | | OTHER: | | | | | | | $ |
| A | | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | | ALL OWNED AUTOS [ ] SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X | HIRED AUTOS [X] NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | | $ |
| A | X | UMBRELLA LIAB [X] OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $6,000,000 |
| | | EXCESS LIAB [ ] CLAIMS-MADE | | | | | | AGGREGATE | $6,000,000 |
| | | DED [X] RETENTION $ N/A | | | | | | | $ |
| B | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY          Y/N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | [X] PER STATUTE [ ] OTH-ER | |
| | | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? [Y] (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | | | | | | | | E.L. DISEASE - EA EMPLOYEE | $1,000,000 |
| | | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $1,000,000 |
| A | | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2017-08 BOERMAN MOVING & STORAGE ADDITION. PRINCIPLE CONSTRUCTION CORP, BOERMAN MOVING & STORAGE AND TIMOTHY MORGAN & ASSOCIATES LLC ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY AND AUTOMOBILE LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AND UMBRELLA LIABILITY AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORM(S) ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| PRINCIPLE CONSTRUCTION CORP. C/O DSP CERTIFICATE TRACKING 1900 E GOLF ROAD, SUITE 650 SCHAUMBURG IL 60174 | AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD

 ACORD®

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
3/16/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group 1811 High Grove, Suite 139 Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: coi@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                                    MIDWE11 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| Midwest Dock Solutions 27 East 36th Place Steger IL 60475 | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: 1557305967 | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO- JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY            Y / N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE OTH- ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | Y N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
RE: JOB #2017-14, BR-4 MONEE, MONEE II, 60449.
PRIMARY/NON-CONTRIBUTORY ADDITIONAL INSURED ON GENERAL LIABILITY, AUTO LIABILITY AND ADDITIONAL INSURED ON UMBRELLA LIABILITY: PRINCIPLE CONSTRUCTION CORP., BAILLY RIDGE OWNER, LLC, BAILLY RIDGE JV, LLC, CANYON PARTNERS REAL ESTATE LLC, CANYON LAUREL MASTER FUND LP., CANYON LAUREL INVESTMENT FUND (A) L.P., CANYON LAUREL LP., AND THEIR AFFILIATES, SUCCESSORS AND ASSIGNS, BAILLY RIDGE FOUR, LLC, DEBARTOLO DEVELOPMENT, LLC, DEBARTOLO CONSTRUCTION SERVICES, LLC, LFI LOCATION FINDERS INTERNATIONAL, ORCHARD 2251, MONEE FOUR, LLC, CLF-PE BAILLY RIDGE 4 MEMBER LLC, AND THEIR MEMBERS, MANAGERS, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, AFFILIATES, SUCCESSORS, ASSIGNS, ANY LENDER AND ANY OTHER PARTIES AS STIPULATED BY OWNER, VALLEY NATIONAL BANK, ITS SUCCESSORS AND/OR ASSIGNS AND VILLAGE OF MONEE.
See Attached...

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP. 9450 W. BRYN MAWR AVE. SUITE 765 ROSEMONT, IL 60018 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)           The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID: MIDWE11

LOC #: _____

# ACORD®

## ADDITIONAL REMARKS SCHEDULE

Page __1__ of __1__

| AGENCY | NAMED INSURED |
|---|---|
| Esser Hayes Insurance Group | Midwest Dock Solutions |
| **POLICY NUMBER** | 27 East 36th Place |
| | Steger IL 60475 |
| **CARRIER**          **NAIC CODE** | **EFFECTIVE DATE:** |

### ADDITIONAL REMARKS

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

**FORM NUMBER:** ___25___  **FORM TITLE:** CERTIFICATE OF LIABILITY INSURANCE

WAIVER OF SUBROGATION AS IT PERTAINS TO GENERAL LIABILITY, AUTO LIABILITY, UMBRELLA AND WORKERS COMPENSATION IN FAVOR OF THE ADDITIONAL INSURED.
COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR ANTHONY ZARLENGO (SECY) AND MIKE RICHERT (PRES).
ENDORSEMENT FORM(S) ATTACHED.

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION.  All rights reserved.

The ACORD name and logo are registered marks of ACORD

 **ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
3/16/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: coi@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                      MIDWE11 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: 1786628313 | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS          SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY         Y / N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE   OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? Y (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2018-14 2001 ARTHUR AVE, ELK GROVE VILLAGE, IL. PRINCIPLE CONSTRUCTION CORP, CH REALTY VIII/I CHICAGO L.L.C. C/O CROW HOLDINGS CAPITOL REAL ESTATE, HARRIS ARCHITECTS, KIMLEY HORN ARCHITECTS AND SEEFRIED PROPERTIES ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY AND AUTOMOBILE LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AND UMBRELLA LIABILITY AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORM(S) ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP.<br>C/O DSP CERTIFICATE TRACKING<br>1900 E GOLF ROAD, SUITE 650<br>SCHAUMBURG IL 60174 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)     The ACORD name and logo are registered marks of ACORD

**ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

| DATE (MM/DD/YYYY) |
|---|
| 3/16/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: coi@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                                      MIDWE11<br>Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES CERTIFICATE NUMBER: 1930419038 REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS        SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS   X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB   X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB      CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE   OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? Y (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2017-11 MLE-ELMHURST, 540 W LAMONT ROAD. PRINCIPLE CONSTRUCTION CORP, MLE AND CORNERSTONE ARCHITECTS ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY AND AUTOMOBILE LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AND UMBRELLA LIABILITY AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORM(S) ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP.<br>C/O DSP CERTIFICATE TRACKING<br>1900 E GOLF ROAD, SUITE 650<br>SCHAUMBURG IL 60174 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD

 **ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
3/16/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: coi@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                     MIDWE11<br>Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: 2014208685 | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | ☐ CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS  ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS  X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB  X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | ☐ EXCESS LIAB  ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY       Y / N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE  ☐ OTHER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?  Y  N/A<br>(Mandatory in NH) | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2019-11 NATIVE FLORAL ADDITIONAL DOCKS AND SITE IMPROVEMENTS, 1301 N LOMBARD ROAD, LOMBARD, IL 60148. PRINCIPLE CONSTRUCTION CORP; NATIVE FLORAL GROUP; HARRIS ARCHITECTS ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY AND AUTOMOBILE LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AND UMBRELLA LIABILITY AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORM ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP.<br>9450 W BRYN MAWR AVE, SUITE 765<br>ROSEMONT IL 60018 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)         The ACORD name and logo are registered marks of ACORD



# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 3/19/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No. Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: coi@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED          MIDWE11<br>Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES          CERTIFICATE NUMBER: 1169457735          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY<br>◻ CLAIMS-MADE  X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER:<br>◻ POLICY  X PRO-JECT  ◻ LOC<br>OTHER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | | $ |
| A | AUTOMOBILE LIABILITY<br>◻ ANY AUTO<br>◻ ALL OWNED AUTOS  ◻ SCHEDULED AUTOS<br>X HIRED AUTOS  X NON-OWNED AUTOS | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB  X OCCUR<br>◻ EXCESS LIAB  ◻ CLAIMS-MADE | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY  Y / N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?  Y N/A<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE  ◻ OTHER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment<br>Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
RE: JOB #2018-15, PHARMA LOGISTICS - 1795 N BUTTERFIELD ROAD, SUITE 203, LIBERTYVILLE, IL 60048. PRIMARY/NON-CONTRIBUTORY ADDITIONAL INSURED ON GENERAL LIABILITY, AUTO LIABILITY AND UMBRELLA LIABILITY: PRINCIPLE CONSTRUCTION CORP., FOREVER LAND COMPANY, PHARMA LOGISTICS AND HARRIS ARCHITECTS. WAIVER OF SUBROGATION AS IT PERTAINS TO GENERAL LIABILITY, AUTO LIABILITY, UMBRELLA AND WORKERS COMPENSATION IN FAVOR OF THE ADDITIONAL INSURED. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORM(S) ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP.<br>9450 W. BRYN MAWR AVE.<br>SUITE 765<br>ROSEMONT IL 60018 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD

THIS CERTIFICATE SUPERSEDES PREVIOUSLY ISSUED CERTIFICATE


**ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 10/16/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Certificate Team | | |
|---|---|---|---|
| AssuredPartners of Illinois, LLC<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-355-7996 |
| | E-MAIL ADDRESS: COI@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                    MIDWDOC-01 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: 1707263560 | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $500,000 |
| | | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | POLICY X PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS ONLY X NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $6,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE OTH-ER | |
| | ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? Y (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Re: Job #2020-05, Code #08360, Contract #3717 - Bridgepoint 355 Lombard.
Primary/Non-Contributory Additional Insured(s) for General Liability, Auto Liability and additional insured's for Umbrella Liability: Principle Construction Corp.; Bridge Development Partners, LLC; BDP Development Services of Illinois, LLC; Harris Architects and Spaceco Inc.
Waiver of Subrogation on General Liability, Auto Liability, Umbrella Liability and Workers Compensation applies in favor of the Additional Insured's.
Endorsement forms attached.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| Principle Construction Corp.<br>9450 W. Bryn Mawr Ave.<br>Suite 765<br>Rosemont, IL 60018 | AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)      The ACORD name and logo are registered marks of ACORD



# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 1/8/2021 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Kathy Wasliewski | |
|---|---|---|
| AssuredPartners of Illinois, LLC<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-908-5058 | FAX (A/C, No): 630-908-4710 |
| | E-MAIL ADDRESS: kwas@mctrinka.com | |

| | | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|---|
| INSURED | MIDWDOC-01 | INSURER A : Cincinnati Insurance Company | 10677 |
| Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | | INSURER B : The Cincinnati Indemnity Company | 23280 |
| | | INSURER C : | |
| | | INSURER D : | |
| | | INSURER E : | |
| | | INSURER F : | |

## COVERAGES        CERTIFICATE NUMBER: 381747787        REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $1,000,000 |
| | ☐ CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $500,000 |
| | | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | POLICY X PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY   ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS ONLY   X NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB  X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $6,000,000 |
| | ☐ EXCESS LIAB  ☐ CLAIMS-MADE | | | | | | AGGREGATE | $6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY        Y/N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE   ☐ OTHER | |
| | ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? Y (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Re: Job #2020-09, Code #08360, tenant improvements for JEC Ventures, LLC, 456 S. Dartmoor Dr., Crystal Lake, IL.
Primary/Non-Contributory Additional Insureds for General Liability, Auto Liability and Umbrella Liability: Principle Construction Corp. (General Contractor), JEC Ventures, LLC (Owner) MLCV Investments, LLC (Owners) and Harris Architects (Architect)
Waiver of Subrogation on General Liability, Auto Liability, Umbrella Liability and Workers Compensation applies in favor of the Additional Insureds.
Endorsement form(s) attached.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| Principle Construction Corp.<br>9450 W. Bryn Mawr Ave.<br>Suite 765<br>Rosemont, IL 60018 | AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)        The ACORD name and logo are registered marks of ACORD

 **ACORD**

# CERTIFICATE OF LIABILITY INSURANCE

| DATE (MM/DD/YYYY) |
|---|
| 3/16/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: col@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                                    MIDWE11<br>Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: 649632909 | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **X** COMMERCIAL GENERAL LIABILITY<br>☐ CLAIMS-MADE **X** OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY **X** PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY<br>☐ ANY AUTO<br>☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS<br>**X** HIRED AUTOS **X** NON-OWNED AUTOS | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | **X** UMBRELLA LIAB **X** OCCUR<br>☐ EXCESS LIAB ☐ CLAIMS-MADE | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | DED **X** RETENTION $ N/A | | | | | | AGGREGATE | $ 6,000,000 |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY                Y / N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? **Y**<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | N/A | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | **X** PER STATUTE ☐ OTHER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment<br>Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2017-23 1855 WALLACE AVENUE, ST CHARLES, IL-BUILDING ADDITION/CONNECTION. PRINCIPLE CONSTRUCTION CORP, EXACT REPLACEMENT PARTS, INC, CORNERSTONE ARCHITECTS, LTD ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY AND AUTOMOBILE LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AND UMBRELLA LIABILITY AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORM(S) ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP<br>C/O DSP CERTIFICATE TRACKING<br>1900 E GOLF RD, SUITE 650<br>SCHAUMBURG IL 60173 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD

**ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
3/16/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | |
|---|---|---|
| Esser Hayes Insurance Group<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: col@esserhayes.com | |
| | **INSURER(S) AFFORDING COVERAGE** | **NAIC #** |
| | INSURER A : Cincinnati Insurance Company | 10677 |
| INSURED                                          MIDWE11<br>Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | INSURER B : The Cincinnati Indemnity Company | 23280 |
| | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

| COVERAGES | CERTIFICATE NUMBER: 1234844143 | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | ___ CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT ___ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ___ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ___ ALL OWNED AUTOS   ___ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS  X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB  X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | ___ EXCESS LIAB  ___ CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY        Y / N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE ___ OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | Y | N/A | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2017-06 2080 LUNT. PRINCIPLE CONSTRUCTION CORP, SEEFRIED PROPERTIES, CH REALTY VII/I CHICAGO LUNT LLC AND HARRIS ARCHITECTS, INC. ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY, AUTOMOBILE LIABILITY AND UMBRELLA LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORM(S) ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP<br>C/O DSP CERTIFICATE TRACKING<br>1900 E GOLF ROAD, SUITE 650<br>SCHAUMBURG IL 60174 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

**ACORD 25 (2014/01)** The ACORD name and logo are registered marks of ACORD

**ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

| DATE (MM/DD/YYYY) |
|---|
| 3/16/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed.  If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: coi@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                              MIDWE11 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES          CERTIFICATE NUMBER: 1780120035          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE  X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY  X PRO-JECT   LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS   SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS  X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB  X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB   CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED  X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY          Y / N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE    OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH)  Y | N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2019-09 CAVALIER LOGISTICS TI, 2001 ARTHUR AVE, SUITE A, ELK GROVE VILLAGE, IL 60007.  PRINCIPLE CONSTRUCTION CORP; CH REALTY VIII/I CHICAGO ARTHUR, LLC, C/O CROW HOLDINGS CAPITAL REAL ESTATE; HARRIS ARCHITECTS; SEEFRIED INDUSTRIAL PROPERTIES, INC ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY AND AUTOMOBILE LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AND UMBRELLA LIABILITY AS REQUIRED BY WRITTEN CONTRACT.  WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT.  COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES).   ENDORSEMENT FORM ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| PRINCIPLE CONSTRUCTION CORP<br>9450 WEST BRYN MAWR, SUITE 765<br>ROSEMONT IL 60018 | AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION.  All rights reserved.

ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD

 **ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 2/4/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | | CONTACT NAME: | |
|---|---|---|---|
| Esser Hayes Insurance Group<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | | PHONE (A/C, No, Ext): 630-355-2077 | FAX (A/C, No): 630-355-7996 |
| | | E-MAIL ADDRESS: coi@esserhayes.com | |
| | | INSURER(S) AFFORDING COVERAGE | NAIC # |
| | | INSURER A : Cincinnati Insurance Company | 10677 |
| INSURED | MIDWE11 | INSURER B : The Cincinnati Indemnity Company | 23280 |
| Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | | INSURER C : | |
| | | INSURER D : | |
| | | INSURER E : | |
| | | INSURER F : | |

## COVERAGES   CERTIFICATE NUMBER: 407937432   REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|---|
| A | X | COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2019 | 3/13/2020 | EACH OCCURRENCE | $ 1,000,000 |
| | | CLAIMS-MADE [X] OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | POLICY [X] PRO-JECT [ ] LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | OTHER: | | | | | | | $ |
| A | | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2019 | 3/13/2020 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | X | ALL OWNED AUTOS / SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X | HIRED AUTOS / X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | | $ |
| A | X | UMBRELLA LIAB  X OCCUR | Y | Y | ENP 0314304 | 3/13/2019 | 3/13/2020 | EACH OCCURRENCE | $ 6,000,000 |
| | | EXCESS LIAB   CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | | DED [X] RETENTION $ N/A | | | | | | | $ |
| B | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY   Y / N | | Y | EWC 0314305 | 3/13/2019 | 3/13/2020 | [X] PER STATUTE / OTHER | |
| | | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? [Y] (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2019 | 3/13/2020 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2019-26 IDI PROJECT TRACEY, 23700 W BLUFF ROAD, CHANNAHON, IL.
PRINCIPLE CONSTRUCTION CORP (GENERAL CONTRACTOR); IDIG CHANNAHON A, LLC (OWNER); IDI LOGISTICS (OWNER); SPARKS (ARCHITECT) ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY AND AUTOMOBILE LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AND UMBRELLA LIABILITY AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORMS ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP, C/O DSP<br>CERTIFICATE TRACKING<br>1900 E GOLF RD, SUITE 650<br>SCHAUMBURG IL 60173 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD



# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 2/13/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed.  If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER<br>Esser Hayes Insurance Group<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | CONTACT NAME: | | | |
|---|---|---|---|---|
| | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-355-7996 | |
| | E-MAIL ADDRESS: coi@esserhayes.com | | | |
| | INSURER(S) AFFORDING COVERAGE | | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | | 10677 |
| INSURED                              MIDWE11<br>Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | INSURER B : The Cincinnati Indemnity Company | | | 23280 |
| | INSURER C : | | | |
| | INSURER D : | | | |
| | INSURER E : | | | |
| | INSURER F : | | | |

## COVERAGES     CERTIFICATE NUMBER: 1208283729     REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2019 | 3/13/2020 | EACH OCCURRENCE | $1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $500,000 |
| | | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | POLICY X PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2019 | 3/13/2020 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS   SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS  X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB  X OCCUR | Y | Y | ENP 0314304 | 3/13/2019 | 3/13/2020 | EACH OCCURRENCE | $6,000,000 |
| | EXCESS LIAB   CLAIMS-MADE | | | | | | AGGREGATE | $6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY       Y / N | | Y | EWC 0314305 | 3/13/2019 | 3/13/2020 | X PER STATUTE  OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH)   Y N/A | | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2019 | 3/13/2020 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2019-26 IDI PROJECT TRACEY, 23700 W BLUFF ROAD, CHANNAHON, IL.
PRINCIPLE CONSTRUCTION CORP (GENERAL CONTRACTOR); IDIG CHANNAHON A, LLC (OWNER); IDI LOGISTICS (OWNER); SPARKS (ARCHITECT) ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY, AUTOMOBILE LIABILITY AND UMBRELLA LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AS REQUIRED BY WRITTEN CONTRACT.  WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT.  COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES).  ENDORSEMENT FORMS ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP, C/O DSP<br>CERTIFICATE TRACKING<br>1900 E GOLF RD, SUITE 650<br>SCHAUMBURG IL 60173 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION.  All rights reserved.

ACORD 25 (2014/01)     The ACORD name and logo are registered marks of ACORD



**ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

| DATE (MM/DD/YYYY) |
|---|
| 3/16/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: col@esserhayes.com | | |

| | | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|---|
| | | INSURER A : Cincinnati Insurance Company | 10677 |
| INSURED | MIDWE11 | INSURER B : The Cincinnati Indemnity Company | 23280 |
| Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | | INSURER C : | |
| | | INSURER D : | |
| | | INSURER E : | |
| | | INSURER F : | |

## COVERAGES    CERTIFICATE NUMBER: 77424386    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS  SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS  X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB  CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY      Y / N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE  OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?  Y N/A | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | (Mandatory in NH) | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2019-12 SEEFRIED INDUSTRIAL PROPERTIES 1, 8500 116TH ST, PLEASANT PRAIRIE, WI 53158. PRINCIPLE CONSTRUCTION CORP; TGA PLEASANT PRAIRIE CENTER LLC C/O NUVEEN REAL ESTATE; PARTNERS IN DESIGN ARCHITECTS; PINNACLE ENGINEERING; SEEFRIED INDUSTRIAL PROPERTIES ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY AND AUTOMOBILE LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AND UMBRELLA LIABILITY AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORMS ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP, C/O DSP<br>CERTIFICATE TRACKING<br>1900 E GOLF RD, SUITE 650<br>SCHAUMBURG IL 60173 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)    The ACORD name and logo are registered marks of ACORD

ACORD®

# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 3/16/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group 1811 High Grove, Suite 139 Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: coi@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                                    MIDWE11 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| Midwest Dock Solutions 27 East 36th Place Steger IL 60475 | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES          CERTIFICATE NUMBER: 726070720          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE  X  OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY  X  PRO-JECT   LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS     SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS  X  NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB  X  OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB   CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED  X  RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY        Y/N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE   OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH)  Y  N/A | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2019-04 PITNEY BOWES TI, 2001 ARTHUR AVE, SUITE B, ELK GROVE VILLAGE, IL 60007. PRINCIPLE CONSTRUCTION CORP; CH REALTY VIII/I CHICAGO ARTHUR, LLC, C/O CROW HOLDINGS CAPITAL REAL ESTATE; HARRIS ARCHITECTS; SEEFRIED INDUSTRIAL PROPERTIES, INC ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY AND AUTOMOBILE LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AND UMBRELLA LIABILITY AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORM ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP, C/O DSP CERTIFICATE TRACKING 1900 E GOLF RD, SUITE 650 SCHAUMBURG IL 60173 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD


**ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 3/16/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | | CONTACT NAME: | |
|---|---|---|---|
| Esser Hayes Insurance Group | | PHONE (A/C, No, Ext): 630-355-2077 | FAX (A/C, No): 630-579-0001 |
| 1811 High Grove, Suite 139 | | E-MAIL ADDRESS: coi@esserhayes.com | |
| Naperville IL 60540-9100 | | | |

| | | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|---|
| | | INSURER A : Cincinnati Insurance Company | 10677 |
| INSURED | MIDWE11 | INSURER B : The Cincinnati Indemnity Company | 23280 |
| Midwest Dock Solutions | | INSURER C : | |
| 27 East 36th Place | | INSURER D : | |
| Steger IL 60475 | | INSURER E : | |
| | | INSURER F : | |

## COVERAGES    CERTIFICATE NUMBER: 1387101390    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS    SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS    X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB    X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB    CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY        Y / N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE    OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH)    Y | N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2019-02 STAG INDUSTRIAL HOLDINGS BUILDING ADDITION, 10441 80TH AVE, PLEASANT PRAIRIE, WI. PRINCIPLE CONSTRUCTION CORP; STAG INDUSTRIAL HOLDINGS, A DELAWARE LIMITED LIABILITY COMPANY; PARTNERS IN DESIGN; PINNACLE ENGINEERING ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY AND AUTOMOBILE LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AND UMBRELLA LIABILITY AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORMS ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP, C/O DSP CERTIFICATE TRACKING 1900 E GOLF RD, SUITE 650 SCHAUMBURG IL 60173 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)        The ACORD name and logo are registered marks of ACORD



| | | CERTIFICATE OF LIABILITY INSURANCE | | DATE (MM/DD/YYYY) 3/16/2020 |
|---|---|---|---|---|

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER Esser Hayes Insurance Group 1811 High Grove, Suite 139 Naperville IL 60540-9100 | CONTACT NAME: | | |
|---|---|---|---|
| | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: coi@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| INSURED MIDWE11 Midwest Dock Solutions 27 East 36th Place Steger IL 60475 | INSURER A : Cincinnati Insurance Company | | 10677 |
| | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: 2030946233 | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO- JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y / N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE OTH- ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) Y N/A | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2019-26 IDI PROJECT TRACEY, 23700 W BLUFF ROAD, CHANNAHON, IL.
PRINCIPLE CONSTRUCTION CORP (GENERAL CONTRACTOR); IDIG CHANNAHON A, LLC (OWNER); IDI LOGISTICS (OWNER); SPARKS (ARCHITECT) ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY, AUTOMOBILE LIABILITY AND UMBRELLA LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORMS ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP, C/O DSP CERTIFICATE TRACKING 1900 E GOLF RD, SUITE 650 SCHAUMBURG IL 60173 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD



# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
3/19/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: coi@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                    MIDWE11<br>Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: 476069235 | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO- JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS      SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS  X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB  X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB  CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY       Y / N<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | Y N/A | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE    OTH- ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000      Deductible: $250 | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2019-26 IDI PROJECT TRACEY, 23700 W BLUFF ROAD, CHANNAHON, IL.
PRINCIPLE CONSTRUCTION CORP (GENERAL CONTRACTOR); IDIG CHANNAHON A, LLC (OWNER); IDI LOGISTICS (OWNER); SPARKS (ARCHITECT) ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY, AUTOMOBILE LIABILITY AND UMBRELLA LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORMS ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| PRINCIPLE CONSTRUCTION CORP, C/O DSP<br>CERTIFICATE TRACKING<br>1900 E GOLF RD, SUITE 650<br>SCHAUMBURG IL 60173 | AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD
THIS CERTIFICATE SUPERSEDES PREVIOUSLY ISSUED CERTIFICATE

 **ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 3/19/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | |
|---|---|---|
| Esser Hayes Insurance Group 1811 High Grove, Suite 139 Naperville IL 60540-9100 | PHONE (A/C, No. Ext): 630-355-2077 | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: coi@esserhayes.com | |
| | INSURER(S) AFFORDING COVERAGE | NAIC # |
| | INSURER A : Cincinnati Insurance Company | 10677 |
| INSURED                    MIDWE11 | INSURER B : The Cincinnati Indemnity Company | 23280 |
| Midwest Dock Solutions 27 East 36th Place Steger IL 60475 | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

| COVERAGES | CERTIFICATE NUMBER: 903726874 | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $500,000 |
| | | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | POLICY X PRO-JECT LOC OTHER: | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $6,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | Y | N/A | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2019-02 STAG INDUSTRIAL HOLDINGS BUILDING ADDITION, 10441 80TH AVE, PLEASANT PRAIRIE, WI. PRINCIPLE CONSTRUCTION CORP; STAG INDUSTRIAL HOLDINGS, A DELAWARE LIMITED LIABILITY COMPANY; PARTNERS IN DESIGN; PINNACLE ENGINEERING ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY, AUTOMOBILE LIABILITY AND UMBRELLA LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORMS ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP, C/O DSP CERTIFICATE TRACKING 1900 E GOLF RD, SUITE 650 SCHAUMBURG IL 60173 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

**ACORD 25 (2014/01)** The ACORD name and logo are registered marks of ACORD

THIS CERTIFICATE SUPERSEDES PREVIOUSLY ISSUED CERTIFICATE



# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 3/19/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No. Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: col@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                          MIDWE11 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: 2078793991 | REVISION NUMBER: |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $500,000 |
| | | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | POLICY X PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS          SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS   X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $6,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY          Y/N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE     OTHER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?    Y   N/A | | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2019-12 SEEFRIED INDUSTRIAL PROPERTIES 1, 8500 116TH ST, PLEASANT PRAIRIE, WI 53158. PRINCIPLE CONSTRUCTION CORP; TGA PLEASANT PRAIRIE CENTER LLC C/O NUVEEN REAL ESTATE; PARTNERS IN DESIGN ARCHITECTS; PINNACLE ENGINEERING; SEEFRIED INDUSTRIAL PROPERTIES ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY, AUTOMOBILE LIABILITY AND UMBRELLA LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORMS ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP, C/O DSP<br>CERTIFICATE TRACKING<br>1900 E GOLF RD, SUITE 650<br>SCHAUMBURG IL 60173 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD
THIS CERTIFICATE SUPERSEDES PREVIOUSLY ISSUED CERTIFICATE


**ACORD®** | # CERTIFICATE OF LIABILITY INSURANCE | DATE (MM/DD/YYYY) 3/16/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER Esser Hayes Insurance Group 1811 High Grove, Suite 139 Naperville IL 60540-9100 | CONTACT NAME: | | |
|---|---|---|---|
| | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-579-0001 |
| | E-MAIL ADDRESS: coi@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| INSURED Midwest Dock Solutions 27 East 36th Place Steger IL 60475 MIDWE11 | INSURER A : Cincinnati Insurance Company | | 10677 |
| | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

**COVERAGES** CERTIFICATE NUMBER: 18159750 REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y / N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? Y (Mandatory in NH) | N / A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2018-23 INTERLAND, 1315 LAKESIDE DR, ROMEOVILLE, IL 60446. PRINCIPLE CONSTRUCTION CORP, INTERLAND TRANSPORTATION, PARTNERS IN DESIGN ARCHITECTS ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY AND AUTOMOBILE LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AND UMBRELLA LIABILITY AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORM(S) ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP, C/O DSP INSURANCE SERVICES 1900 E GOLF RD, SUITE 650 SCHAUMBURG IL 60173 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01) The ACORD name and logo are registered marks of ACORD



# CERTIFICATE OF LIABILITY INSURANCE

| DATE (MM/DD/YYYY) |
| --- |
| 12/13/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Kathy Wasliewski | | |
| --- | --- | --- | --- |
| AssuredPartners of Illinois, LLC<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No. Ext): 630-908-5058 | | FAX (A/C, No): 630-908-4710 |
| | E-MAIL ADDRESS: kwas@mctrinka.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                              MIDWDOC-01 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

| COVERAGES | CERTIFICATE NUMBER: 1031951141 | REVISION NUMBER: |
| --- | --- | --- |

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| A | **X** COMMERCIAL GENERAL LIABILITY<br> CLAIMS-MADE **X** OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $500,000 |
| | | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER:<br>POLICY **X** PRO-JECT LOC<br>OTHER: | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | | | | | | | | $ |
| A | AUTOMOBILE LIABILITY<br>ANY AUTO<br>OWNED AUTOS ONLY   SCHEDULED AUTOS<br>**X** HIRED AUTOS ONLY   **X** NON-OWNED AUTOS ONLY | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | **X** UMBRELLA LIAB **X** OCCUR<br> EXCESS LIAB   CLAIMS-MADE | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $6,000,000 |
| | | | | | | | AGGREGATE | $6,000,000 |
| | DED **X** RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N<br>ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? **Y**<br>(Mandatory in NH)<br>If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | **X** PER STATUTE   OTHER | |
| | | | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $1,000,000 |
| A | Leased/Rented Equipment<br>Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Re: 2020-09
Primary/Non-Contributory Additional Insureds for General Liability and Umbrella Liability: Principle Construction Corp., JEC Ventures, LLC, MLCV Investments, LLC and Harris Architects. Waiver of Subrogation on General Liability Umbrella Liability and Workers Compensation applies in favor of the Additional Insureds. Endorsement form(s) attached.

| CERTIFICATE HOLDER | CANCELLATION |
| --- | --- |
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| Principle Construction Corp. c/o DSP Certificate Tracking<br>1900 E. Golf Rd, Suite 650<br>Schaumburg IL 60173 | AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)         The ACORD name and logo are registered marks of ACORD

 **ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
11/1/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER AssuredPartners of Illinois, LLC 1811 High Grove, Suite 139 Naperville IL 60540-9100 | CONTACT NAME: Certificate Team | | |
|---|---|---|---|
| | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-355-7996 |
| | E-MAIL ADDRESS: COI@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED MIDWDOC-01 Midwest Dock Solutions 27 East 36th Place Steger IL 60475 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES     CERTIFICATE NUMBER: 517623282     REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY CLAIMS-MADE X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $500,000 |
| | | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: POLICY X PRO-JECT LOC OTHER: | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | | | | | | | | $ |
| A | AUTOMOBILE LIABILITY ANY AUTO OWNED AUTOS ONLY SCHEDULED AUTOS X HIRED AUTOS ONLY X NON-OWNED AUTOS ONLY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR EXCESS LIAB CLAIMS-MADE DED X RETENTION $ N/A | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $6,000,000 |
| | | | | | | | AGGREGATE | $6,000,000 |
| | | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY ANY PROPRIETOR/PARTNER/EXECUTIVE Y/N OFFICER/MEMBER EXCLUDED? Y (Mandatory in NH) N/A If yes, describe under DESCRIPTION OF OPERATIONS below | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Re: Job #2020-05, Code #08360, Contract #3717 - Bridgepoint 355 Lombard.
Primary/Non-Contributory Additional Insured(s) for General Liability, Auto Liability and Umbrella Liability: Principle Construction Corp.; Bridge Development Partners, LLC; BDP Development Services of Illinois, LLC; Harris Architects and Spaceco Inc. Waiver of Subrogation on General Liability, Auto Liability, Umbrella Liability and Workers Compensation applies in favor of the Additional Insured's. Umbrella limit extends over the General Liability, Auto Liability and Workers Comp primary limits. Coverage is excluded under the Workers Compensation for Tony Zarlengo (VP) and Mike Richert (Pres.). Endorsement forms attached.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Principle Construction Corp., c/o DSP Certificate Tracking 1900 E Golf Rd, Suite 650 Schaumburg IL 60173 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION. All rights reserved.

**ACORD 25 (2016/03)**     The ACORD name and logo are registered marks of ACORD

 **ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 10/16/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Certificate Team | | |
|---|---|---|---|
| AssuredPartners of Illinois, LLC<br>1811 High Grove, Suite 139<br>Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-355-7996 |
| | E-MAIL ADDRESS: COI@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                    MIDWDOC-01 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| Midwest Dock Solutions<br>27 East 36th Place<br>Steger IL 60475 | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES          CERTIFICATE NUMBER: 1707263560          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $1,000,000 |
| | ☐ CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $500,000 |
| | | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | ☐ POLICY X PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS ONLY X NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $6,000,000 |
| | ☐ EXCESS LIAB ☐ CLAIMS-MADE | | | | | | AGGREGATE | $6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY      Y/N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE ☐ OTHER | |
| | ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH)  Y  N/A | | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Re: Job #2020-05, Code #08360, Contract #3717 - Bridgepoint 355 Lombard.
Primary/Non-Contributory Additional Insured's for General Liability, Auto Liability and additional insured's for Umbrella Liability: Principle Construction Corp.;
Bridge Development Partners, LLC; BDP Development Services of Illinois, LLC; Harris Architects and Spaceco Inc.
Waiver of Subrogation on General Liability, Auto Liability, Umbrella Liability and Workers Compensation applies in favor of the Additional Insured's.
Endorsement forms attached.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| Principle Construction Corp.<br>9450 W. Bryn Mawr Ave.<br>Suite 765<br>Rosemont, IL 60018 | AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)          The ACORD name and logo are registered marks of ACORD

**ACORD**

# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 1/8/2021 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Kathy Wasliewski | | |
|---|---|---|---|
| AssuredPartners of Illinois, LLC 1811 High Grove, Suite 139 Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-908-5058 | | FAX (A/C, No): 630-908-4710 |
| | E-MAIL ADDRESS: kwas@mctrinka.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                                MIDWDOC-01 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| Midwest Dock Solutions 27 East 36th Place Steger IL 60475 | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES          CERTIFICATE NUMBER: 381747787          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE  X  OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY  X PRO- JECT   LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY   SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS ONLY  X NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB  X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB   CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED  X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY          Y / N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE   OTH- ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | Y | N / A | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Re: Job #2020-09, Code #08360, tenant improvements for JEC Ventures, LLC, 456 S. Dartmoor Dr., Crystal Lake, IL.
Primary/Non-Contributory Additional Insureds for General Liability, Auto Liability and Umbrella Liability: Principle Construction Corp. (General Contractor), JEC Ventures, LLC (Owner) MLCV Investments, LLC (Owners) and Harris Architects (Architect)
Waiver of Subrogation on General Liability, Auto Liability, Umbrella Liability and Workers Compensation applies in favor of the Additional Insureds.
Endorsement form(s) attached.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Principle Construction Corp. 9450 W. Bryn Mawr Ave. Suite 765 Rosemont, IL 60018 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)          The ACORD name and logo are registered marks of ACORD

**ACORD®** | **CERTIFICATE OF LIABILITY INSURANCE** | DATE (MM/DD/YYYY)
12/13/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Kathy Wasliewski | | |
|---|---|---|---|
| AssuredPartners of Illinois, LLC | PHONE (A/C, No, Ext): 630-908-5058 | | FAX (A/C, No): 630-908-4710 |
| 1811 High Grove, Suite 139 | E-MAIL ADDRESS: kwas@mctrinka.com | | |
| Naperville IL 60540-9100 | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED MIDWDOC-01 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| Midwest Dock Solutions | INSURER C : | | |
| 27 East 36th Place | INSURER D : | | |
| Steger IL 60475 | INSURER E : | | |
| | INSURER F : | | |

**COVERAGES**     CERTIFICATE NUMBER: 1031951141     **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS ONLY X NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y / N | | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE OTH-ER | |
| | ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBEREXCLUDED? Y (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Re: 2020-09
Primary/Non-Contributory Additional Insureds for General Liability and Umbrella Liability: Principle Construction Corp., JEC Ventures, LLC, MLCV Investments, LLC and Harris Architects. Waiver of Subrogation on General Liability Umbrella Liability and Workers Compensation applies in favor of the Additional Insureds. Endorsement form(s) attached.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| Principle Construction Corp. c/o DSP Certificate Tracking 1900 E. Golf Rd, Suite 650 Schaumburg IL 60173 | AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)     The ACORD name and logo are registered marks of ACORD

 **ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 2/4/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | |
|---|---|---|
| Esser Hayes Insurance Group | PHONE (A/C, No, Ext): 630-355-2077 | FAX (A/C, No): 630-355-7996 |
| 1811 High Grove, Suite 139 | E-MAIL ADDRESS: coi@esserhayes.com | |
| Naperville IL 60540-9100 | | |
| | INSURER(S) AFFORDING COVERAGE | NAIC # |
| | INSURER A : Cincinnati Insurance Company | 10677 |
| INSURED                        MIDWE11 | INSURER B : The Cincinnati Indemnity Company | 23280 |
| Midwest Dock Solutions | INSURER C : | |
| 27 East 36th Place | INSURER D : | |
| Steger IL 60475 | INSURER E : | |
| | INSURER F : | |

## COVERAGES          CERTIFICATE NUMBER: 407937432          REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **X** COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2019 | 3/13/2020 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE **X** OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY **X** PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2019 | 3/13/2020 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS   SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | **X** HIRED AUTOS **X** NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | **X** UMBRELLA LIAB **X** OCCUR | Y | Y | ENP 0314304 | 3/13/2019 | 3/13/2020 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB   CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED **X** RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY   Y/N | | Y | EWC 0314305 | 3/13/2019 | 3/13/2020 | **X** PER STATUTE     OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? **Y** (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2019 | 3/13/2020 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2019-26 IDI PROJECT TRACEY, 23700 W BLUFF ROAD, CHANNAHON, IL.
PRINCIPLE CONSTRUCTION CORP (GENERAL CONTRACTOR); IDIG CHANNAHON A, LLC (OWNER); IDI LOGISTICS (OWNER); SPARKS (ARCHITECT) ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY AND AUTOMOBILE LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AND UMBRELLA LIABILITY AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORMS ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| PRINCIPLE CONSTRUCTION CORP, C/O DSP CERTIFICATE TRACKING 1900 E GOLF RD, SUITE 650 SCHAUMBURG IL 60173 | AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)          The ACORD name and logo are registered marks of ACORD


**ACORD®**

# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 2/13/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Esser Hayes Insurance Group 1811 High Grove, Suite 139 Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | | FAX (A/C, No): 630-355-7996 |
| | E-MAIL ADDRESS: coi@esserhayes.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Cincinnati Insurance Company | | 10677 |
| INSURED                                    MIDWE11 | INSURER B : The Cincinnati Indemnity Company | | 23280 |
| Midwest Dock Solutions 27 East 36th Place Steger IL 60475 | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES            CERTIFICATE NUMBER: 1208283729            REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2019 | 3/13/2020 | EACH OCCURRENCE | $ 1,000,000 |
| | ☐ CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | ☐ POLICY  X PRO-JECT  ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2019 | 3/13/2020 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS  ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS  X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB  X OCCUR | Y | Y | ENP 0314304 | 3/13/2019 | 3/13/2020 | EACH OCCURRENCE | $ 6,000,000 |
| | ☐ EXCESS LIAB  ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY        Y / N | | Y | EWC 0314305 | 3/13/2019 | 3/13/2020 | X PER STATUTE  ☐ OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?  Y N/A | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | (Mandatory in NH) | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2019 | 3/13/2020 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2019-26 IDI PROJECT TRACEY, 23700 W BLUFF ROAD, CHANNAHON, IL.
PRINCIPLE CONSTRUCTION CORP (GENERAL CONTRACTOR); IDIG CHANNAHON A, LLC (OWNER); IDI LOGISTICS (OWNER); SPARKS (ARCHITECT) ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY, AUTOMOBILE LIABILITY AND UMBRELLA LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORMS ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP, C/O DSP CERTIFICATE TRACKING 1900 E GOLF RD, SUITE 650 SCHAUMBURG IL 60173 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)            The ACORD name and logo are registered marks of ACORD



# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 2/13/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | |
|---|---|---|
| Esser Hayes Insurance Group 1811 High Grove, Suite 139 Naperville IL 60540-9100 | PHONE (A/C, No, Ext): 630-355-2077 | FAX (A/C, No): 630-355-7996 |
| | E-MAIL ADDRESS: coi@esserhayes.com | |

| | | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|---|
| | | INSURER A : Cincinnati Insurance Company | 10677 |
| INSURED | MIDWE11 | INSURER B : The Cincinnati Indemnity Company | 23280 |
| Midwest Dock Solutions 27 East 36th Place Steger IL 60475 | | INSURER C : | |
| | | INSURER D : | |
| | | INSURER E : | |
| | | INSURER F : | |

## COVERAGES  CERTIFICATE NUMBER: 1208283729  REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | ENP 0314304 | 3/13/2019 | 3/13/2020 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | Y | Y | EBA 0314304 | 3/13/2019 | 3/13/2020 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB X OCCUR | Y | Y | ENP 0314304 | 3/13/2019 | 3/13/2020 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N | | Y | EWC 0314305 | 3/13/2019 | 3/13/2020 | X PER STATUTE OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? Y (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2019 | 3/13/2020 | Limit: $25,000 | Deductible: $250 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
JOB: #2019-26 IDI PROJECT TRACEY, 23700 W BLUFF ROAD, CHANNAHON, IL.
PRINCIPLE CONSTRUCTION CORP (GENERAL CONTRACTOR); IDIG CHANNAHON A, LLC (OWNER); IDI LOGISTICS (OWNER); SPARKS (ARCHITECT) ARE LISTED AS AN ADDITIONAL INSURED WITH RESPECTS TO THE GENERAL LIABILITY, AUTOMOBILE LIABILITY AND UMBRELLA LIABILITY ON A PRIMARY & NON-CONTRIBUTORY BASIS AS REQUIRED BY WRITTEN CONTRACT. WAIVER OF SUBROGATION IS INCLUDED FOR GENERAL LIABILITY, AUTOMOBILE LIABILITY, WORKERS COMPENSATION AND UMBRELLA LIABILITY IN FAVOR OF THE ABOVE REFERENCED ADDITIONAL INSUREDS AS REQUIRED BY CONTRACT. COVERAGE IS EXCLUDED UNDER THE WORKERS COMPENSATION FOR TONY ZARLENGO (VP) AND MIKE RICHERT (PRES). ENDORSEMENT FORMS ATTACHED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PRINCIPLE CONSTRUCTION CORP, C/O DSP CERTIFICATE TRACKING 1900 E GOLF RD, SUITE 650 SCHAUMBURG IL 60173 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)  The ACORD name and logo are registered marks of ACORD

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 53

DocuSign Envelope ID: 39F6BC3F-DA15-4CF6-B83C-F60101208E6A

| Attention: | Ira Sugar | | Job #: 2021-26 |
|---|---|---|---|
| Phone: | 708-367-0801 | | Code #: 08630 |
| EMAIL: | ira@midwestdocksolutions.com | | |

**STANDARD FORM OF SUBCONTRACT AGREEMENT BETWEEN CONTRACTOR AND SUBCONTRACTOR**

**Principle Construction Corp.**
**9450 W. Bryn Mawr Ave.**
Suite 120
Rosemont, IL 60018
847-615-1515 (phone); 847-615-1598 (FAX)

This Subcontract agreement made as of this day **25th of January, 2021,** by and between **Principle Construction Corp.,** hereinafter called "Contractor" and **Midwest Dock Solutions, 27 E. 36th Place, Steger, IL, 60475,** hereinafter called "Subcontractor". Whereas the Contractor has entered into a contract dated 11/30/2021, with, General RV Sales, LLC **25000 Assembly Park Dr. Wixom, MI 48393,** hereinafter called "Owner", which provides for the furnishing of labor, materials, equipment and services in connection with the construction of **General RV – Showroom TI, 14000 Automall Dr. Huntley, IL 60142** hereinafter called "Project". The Project is pursuant to plans, drawings and specifications prepared by **Cornerstone Architects,** which consist of the invitation to bidders, the instruction to bidders, the proposal, the contract, the plans, drawings and specifications, the general conditions, the bond, if any, and any addenda or amendments are hereinafter collectively referred to as the "General Contract". Of which, copies are available to and have been carefully examined by the Subcontractor pertinent to his work.

**A. SERVICES & ACKNOWLEDGEMENTS PROVIDED BY THE SUBCONTRACTOR**

1.  To furnish and install all design, labor, material, skill, equipment and appurtenances necessary or required to complete all **Overhead Doors** work on a design/build basis. The contract includes but is not limited to the following additional items as listed in Riders "A", "B" and "C".

2.  To pay for all materials, skills, labor and equipment used in or in connection with the performance of this Subcontract, when bills or claims become due. To save and protect the Project, the Owner and the Contractor from all claims and mechanic's liens on account thereof and to furnish satisfactory evidence to the Contractor, when and if required, that he has complied with the above requirements. This provision shall not be construed as a waiver of the right of the Subcontractor to file and enforce a lien claim against the Owner in the event of the Contractor's failure to pay the Subcontractor.

3.  To begin work of this Subcontract as soon as the Project is ready for such work or within five (5) calendar days after being notified in writing by the Contractor. **All work herein is to be complete by 7/1/2022 or as per project requirements. Project completion is 7/31/2022 and timing is of the essence. Contact the project manager, Matt Cotherman at 224-880-5532 for specific scheduling requirements.**

4.  To proceed with the work in an orderly and reasonable sequence directed by the Contractor and to abide by the Contractor's decision as to the allotment of all storage and working space on the Project.

5.  The Contractor without the Contractor's written consent shall recognize no extension of time for performance of this Subcontract. If however, Subcontractor is delayed in the performance or completion of the Subcontract work for reasons beyond his control, time for the performance or completion of said work shall be extended accordingly. Provided however, the cause of the delay is of a type set forth in the Contract, which justifies an extension of time for completion of the General Contract.

6.  To hold harmless the Contractor and all other Subcontractors from any and all losses or damage (including without limiting the generality of the foregoing, legal fees and disbursements paid or incurred by the Contractor to enforce the provisions of this paragraph) occasioned by the failure of the Subcontractor to carry out the provisions of this Subcontract unless such failure results from causes beyond the control of the Subcontractor.

7.  To obtain, maintain and pay for such insurance as may be required by the General Contract; Rider A attached hereto or by law. To furnish the Contractor satisfactory evidence that Subcontractor has complied with this paragraph.

8.  To accept responsibility for all damage caused by the Subcontractor. To clean all surfaces soiled by the Subcontractor and to protect the work by the Subcontractor. It being understood that the standards of protection shall not be less than those specified in the General Contract or required by law and to be responsible for any defective or improper work or material caused by its failure to do so. If any dispute arises between the Subcontractor and another subcontractor as to which is responsible for any item of damage, the dispute shall be submitted to the Contractor for decision and determination as to responsibility.

9.  The Subcontractor, its agents, employees, materialmen and subcontractors will perform all work on the project in a safe and responsible manner. In particular, Subcontractor shall, at its own expense, conform to the safety policies and regulations established by the Contractor. Subcontractor shall comply with all specific safety requirements promulgated by any government authority, including without limitation, the requirements of the Occupational Safety and Health Act of 1970 and the Construction Safety Act of 1969 and all standards and regulations which have been or shall be promulgated by the parties or agencies, which administer the Acts. Subcontractor shall comply with said requirements, standards and regulations, require, and be directly responsible for compliance therewith on the part of its said agents, employees, materialmen and subcontractors. Subcontractor shall directly receive, respond to, defend

1



PLAINTIFF'S EXHIBIT

64

PRINCIPLE_0229

DocuSign Envelope ID: 39F6BC3F-DA15-4CF6-B83C-F60101208E6A

and be responsible for all citations, assessments, fines or penalties which may be incurred by reason of its failure on the part of its agents, employees, materialmen or subcontractors to so comply. The Subcontractor shall report to the Contractor within 24 hours any injury to an employee or agent of which occurred at the job site. A written copy of the first notice of injury form shall be delivered to the Contractor within three (3) days of the event.

10. If hazardous substances of a type of which an employer is required by law to notify its employees are being used on the job site by the Subcontractor, its agents, employees or materialmen, the Subcontractor shall, prior to harmful exposure of any employees on the site to such substance, give written notice of the chemical composition thereof to the Contractor in sufficient detail and time to permit compliance with such laws by the Contractor, other subcontractors and other employers on the site.

11. Not to assign or sub-let this Subcontract or any part thereof and not to assign any money due or to become due hereunder without first obtaining the written consent of the Contractor.

12. To be bound to the Contractor by the terms of the General Contract. To conform to and to comply with the provisions of the General Contract. To furnish such shop drawings or samples as may be required. To assume toward the Contractor all the obligations and responsibilities that the Contractor assumes in and by the General Contract toward the Owner, insofar, as they are applicable to this Subcontract. Where any provision of the General Contract Documents between the Owner and Contractor is inconsistent with any provisions of this Agreement, this Subcontract shall govern.

13. To employ no person whose employment on or in connection with this Subcontract that may be objectionable to the Contractor and to remove any such person when objected to by the Contractor, all upon reasonable grounds.

14. The Contractor or his authorized agent shall have the right to order, in writing, the omission or addition of any parts of the work or materials as omitted from or added to the General Contract by the Architect and/or Owner. That fair adjustment shall be made in the Contract price for such omitted or added work or materials. That no extra work shall be allowed or changes made by the Subcontractor or paid for by the Contractor unless and until authorized by the Contractor or his agent in writing before the work and/or changes are begun.

15. To obtain and furnish to the Contractor and maintain in effect during the life of this Subcontract, if requested to do so, in the space provided below a surety bond. The Surety bond shall be in form and with sureties acceptable to the Contractor and in an amount equal to the Subcontract price, conditioned upon and covering the faithful performance of and compliance with all terms, provisions and conditions of this Subcontract. The premium therefore, to be paid is included in this Subcontract amount; Bond requested [ ] Bond not requested [×] (Check one). Unless the General Conditions require it, nothing herein shall give the contractor the right to designate that the Bond be executed by a specific surety or procured from a specific agent.

16. To guarantee the Subcontractor to the same extent that the Contractor is obligated to guarantee its work under the General Contract. But in any event to guarantee its work against all defects in material or workmanship for a period of one (1) year from the date of acceptance of the Project or a portion thereof by the Owner.

17. That in case the Subcontractor shall fail to perform, repeatedly fail or neglect to carry out the work, correct, replace and/or re-execute faulty or defective work done and/or materials furnished under this Subcontract, when and if required by the Contractor or shall fail to complete or diligently proceed with this Subcontract within the time herein provided for, the Contractor upon three (3) days' notice, in writing to the Subcontractor, shall have the right to cancel this Subcontract and correct, replace and/or re-execute such faulty or defective work or to take over this Subcontract and complete same either through its own employees or through a contractor or subcontractor of its choice and to charge the cost thereof to the Subcontractor, together with any liquidated damages caused by a delay in the performance of this Subcontract.

18. That in case of default on the part of the Subcontractor under the terms of this Subcontract, the material and equipment of the Subcontractor shall be left on the job for the use of the Contractor in completing the work covered under this Subcontract.

19. To comply with all Federal and State laws, codes and regulations and all municipal ordinances and regulations effective where the work under this Subcontract is to be performed and to pay all costs and expenses connected with such compliance. To pay all fees and taxes, including sales and use taxes and also pay all taxes imposed by any State or Federal law for any employment insurance, pensions, old age retirement funds or any similar purpose and to furnish all necessary reports and information to the appropriate federal, state and municipal agencies with respect to all of the foregoing the same as though the Subcontractor was in fact the Contractor. To hold the Contractor, each other Subcontractor and the Owner harmless from any and all losses or damage occasioned by the failure of the Subcontractor to comply with the terms of this paragraph.

20. To pay all royalties and license fees; to defend all suits or claims for infringement of any patent rights involved in the work of the Subcontractor under this Subcontract. To save the Contractor and other subcontractors harmless from loss, cost or expense on account of such use or infringement by the Subcontractor.

21. If any part of the Subcontractor's work depends for proper execution or results upon the work of the Contractor, any other subcontractor or any other separate Contractor on the Project, the Subcontractor shall inspect and promptly report to the Contractor any apparent discrepancies or defects in such work that renders it unsuitable for such proper execution and results. Failure of the Subcontractor to so inspect and report shall constitute an acceptance of the work of the Contractor, other subcontractors or other separate contractors as fit and proper to receive his work.

2

DocuSign Envelope ID: 39F6BC3F-DA15-4CF6-B83C-F60101208E6A

22. Upon seven days' written notice to Subcontractor, Contractor, without cause and without prejudice to any other right or remedy of contractor, may terminate this Subcontract. In such case, Contractor shall pay Subcontractor for (a) completed and acceptable work, (b) other expenses sustained prior the effective date of termination, (c) performing services and furnishing labor, materials and equipment as required by the Contract Documents for uncompleted work and (d) reasonable expenses directly attributable to termination. Subcontractor shall be paid overhead and profit only on completed and acceptable work and expenses sustained for uncompleted work required by the Contract Documents in the amount not to exceed 10% of the subcontract amount. Contractor shall not be paid on account of loss of anticipated profits or revenue or other economic loss arising out of or resulting from such termination.

## B. SERVICES & ACKNOWLEDGEMENTS PROVIDED BY THE CONTRACTOR

1. To employ and does hereby employ the Subcontractor to do work described in paragraph A.1 hereof, subject to the provisions of this Subcontract.

2. To pay the Subcontractor for the full, prompt and faithful performance of this Subcontract, subject to all the terms and conditions hereof, the sum of **one hundred five thousand nine hundred nineteen dollars and 00/100 ($105,919.00).**

3. To include in Contractor's monthly estimate to Owner, the value of all work, labor and materials of the Subcontractor properly incorporated into the Project. All in accordance with the provisions of this Subcontract for which estimates have been furnished by the Subcontractor and approved by the contractor. Upon learning that the amount certified due for the Subcontractor is different from the amount requested by the Subcontractor, Contractor shall immediately advise the Subcontractor and furnish such information as the Contractor may have for the difference. So long as the Subcontractor is not in default hereunder, Contractor shall pay the Subcontractor within seven (7) days upon receipt thereof from the Owner, the amount received by the Contractor on account of the Subcontractor's work to the extent of the Subcontractor's interest therein. That if allowed by the General Contract, payment shall be made on account of inventory, materials or equipment not incorporated in the Project but delivered and suitably stored at the site or at some other location agreed upon in writing. Such payments shall be made in accordance with the terms and conditions of the Contract Documents.

4. Final payment including all retention becomes due and payable within thirty (30) days after Architect's certification of final payment. At all times the Subcontractor shall be paid to the extent that the Contractor has been paid on the Subcontractor's account.

5. If arbitration of disputes is provided for in the General Contract, any dispute arising between the Contractor and the Subcontractor under this Subcontract, including the breach thereof, shall be settled by arbitration in the manner provided for in the General Contract.

6. If notification of any claims have been made against the Subcontractor or the Contractor arising out of labor or materials furnished for the project or otherwise on account of any actions or failures to act by the Subcontractor in the performance of this Subcontract, the Contractor may, at his discretion, withhold from such amount otherwise due or to become due hereunder a sum adequate to cover said claims and any costs or expenses arising or to arise in connection therewith pending legal settlement thereof. This right of the Contractor shall not be exclusive of any other rights of the Contractor herein or by law provided.

7. The failure of the Contractor to make payments as and when herein provided shall, in addition to all other rights, entitle the Subcontractor to suspend all work and shipments during the continuance of such default on the part of the Contractor and shall further entitle the Subcontractor to an extension of time for the performance of the work covered by this Subcontract.

8. Except in an emergency or to enforce safety requirements, contractor shall not to issue or give instructions, orders or directions to any employee or workman of the Subcontractor other than persons Subcontractor has designated as the persons at the work site having supervisory responsibility for the Subcontracted work.

9. This Subcontract, together with Rider's A, B and C, attached hereto and made a part hereof, constitutes the entire understanding of the parties and supersedes any prior proposals or agreements.

## C. PAYMENT TERMS AND INSURANCE CERTIFICATES

1. Ten percent (10%) retainage until the Owner contract items are completed.
2. Payment request and invoice by the 25th of each month utilizing AIA form G702 & G703.
3. Lien waivers by the 10th of the following month corresponding to approved invoice amounts. Waiver requests will be sent.
4. Payment will be made within 5 days of Contractor receipt of payment from Owner.

PRINCIPLE_0231

DocuSign Envelope ID: 39F6BC3F-DA15-4CF6-B83C-F60101208E6A

This Subcontract entered into and agreed as of the day and year written above

**SUBCONTRACTOR**
**Midwest Dock Solutions**

DocuSigned by:

By _Ira Sugar_
Name: 5CBC659CFF3F435...
Title:

Date: 1/25/2022

**CONTRACTOR**
**Principle Construction Corp.**

DocuSigned by:

By _Matt Cotherman._
589C3FC... Matthew Cotherman
Sr. Project Manager

Darrin's Review: _Darrin Delumlow_
Darrin Delumlow B44E

Date: 1/26/2022

4

DocuSign Envelope ID: 39F6BC3F-DA15-4CF6-B83C-F60101208E6A

| | |
|---|---|
| **Attention:** Ira Sugar | **Job #:** 2021-26 |
| **Phone:** 708-367-0801 | **Code #:** 08630 |
| **Fax:** ira@midwestdocksolutions.com | |

### *RIDER "A"*
### *SUBCONTRACTOR'S SAFETY, INDEMNITY, AND INSURANCE REQUIREMENTS* to:
### STANDARD FORM OF SUBCONTRACT AGREEMENT BETWEEN CONTRACTOR AND SUBCONTRACTOR

**Principle Construction Corp.**
**9450 W. Bryn Mawr Ave., Suite 120**
**Rosemont, IL 60018**
**847-615-1515 (phone); 847-615-1598 (FAX)**

1.  INDEMNIFICATION – To the fullest extent permitted by law, the subcontractor shall indemnify, defend and hold harmless Principle Construction Corp., the Owner, Architect and others required in the contract documents, and their agents, invitees and other employees, from and against all claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from Subcontractor's performance of its work under the Contract Documents. This indemnification agreement shall not be limited in any way by any limitations on the amount or type of damages, compensation or benefits payable by or for the Subcontractor under Worker's Compensation Acts, disability benefit acts or other employee benefit acts, however, the Subcontractor shall not be required to indemnify Principle Construction Corp. against the consequences of Principle Construction Corp.'s own negligence.

2.  INSURANCE – The Subcontractor shall maintain during the progress of the Work, and if required to return during the warranty period, insurance with the minimum limits and coverages as shown below or, if higher, the requirements set forth in the contract documents:

    (A)  WORKER'S COMPENSATION including Occupational Disease insurance meeting the statutory requirements of the State in which work is to be performed together with a Broad Form All States Endorsement and containing Employer's Liability insurance in an amount of at least $500,000. All proprietors, partners, executive officers and members must be included for coverage. Waiver of Subrogation required in favor of Principle Construction Corp. and others if required in the Contract Documents.

    (B)  COMMERCIAL GENERAL LIABILITY insurance providing limits of $1,000,000 each occurrence, and $2,000,000 aggregate. The policy must include Principle Construction Corp., the Owner, the Architect and others if required in the Contract Documents as ADDITIONAL INSUREDS using Form CG2010 10/01 and CG2037 10/1 or an equivalent through statue of repose on a primary and non-contributory basis and must provide Premise-Operations, Elevators, Independent Contractors, Broad Form Property Damage, Contractual Liability, Products & Completed Operations coverage (which shall be maintained in force through statue of repose after substantial completion of the project or for such longer period of time as is described in the Contract Documents), XCU Exclusions must be deleted when applicable to operations performed by the subcontractor. Per Project Aggregate must apply. Waiver of Subrogation required in favor of Principle Construction Corp. and others if required in the Contract Documents. The policy must not include modifications or endorsements to ISO CG0001 that exclude or limit the extent of contractual coverage, coverage for injuries to subcontractors' employees or the scope of the coverage for liability arising from damage to the named insured's work or for any other type of operations or work being performed under the subcontract.

    (C)  COMPREHENSIVE AUTOMOTIVE LIABILITY on an occurrence basis covering all Owned, Non-Owned and Hired Vehicles providing a limit of liability of $1,000,000 per occurrence. The policy must include Principle Construction Corp., the Owner, the Architect and others if required in the Contract Documents as ADDITIONAL INSUREDS on a primary and non-contributory basis. Waiver of Subrogation required in favor of Principle Construction Corp. and others if required in the Contract Documents.

    (D)  A certificate of insurance on an approved form must be delivered to Principle Construction Corp. If coverage outlined in the certificate is altered, cancelled or allowed to expire the subcontractor must give thirty (30) days written notice by registered mail to Principle Construction Corp.

    (E)  PROPERTY INSURANCE. It is agreed that the Subcontractor shall purchase and maintain property insurance for material and equipment used and left at the jobsite. Waiver of Subrogation: Subcontractor waives all rights of subrogation against Contractor and Owner for loss of, or damage to, Subcontractor's work, tools, machinery, equipment, materials or supplies.

    (F)  Equivalent insurance coverage must be obtained from each of your subcontractors or suppliers, if any, before permitting them on the site of the project. Otherwise, their protection must be included within your insurance policies.

5

DocuSign Envelope ID: 39F6BC3F-DA15-4CF6-B83C-F60101208E6A

(G)    UMBRELLA LIABILITY on an "Occurrence" basis with the same Additional Insureds as General Liability policy. Policy should provide limits of $1,000,000 per Occurrence and $1,000,000 Aggregate. The policy must include Principle Construction Corp., the Owner, the Architect and others if required in the Contract Documents as ADDITIONAL INSUREDS on a primary and non-contributory basis. Waiver of Subrogation required in favor of Principle Construction Corp. and others if required in the Contract Documents.

(H)    PROFESSIONAL LIABILITY insurance providing limits of $1,000,000 per Occurrence and $1,000,000 Aggregate. Insurance is to be provided if Subcontractor has any design responsibility as part of its work to cover liability for errors and omissions that may arise as a result of acts or omissions, negligent or otherwise, of Subcontractor's employees or Subcontractors who perform such design work. No greater than a $50,000 deductible shall be permitted. Professional liability insurance shall be maintained for a period of two years after the completion of the project.

(I)    POLLUTION LIABILITY insurance providing limits of $1,000,000 per Occurrence and $1,000,000 Aggregate. Insurance is to be provided if Subcontractor handles any hazardous waste as part of its work.

(J)    Insurance Company. The required insurance policies shall be issued by an insurance company with an A.M. Best's rating of "A VI" or better.

(K)    It is understood and agreed that the insurance coverages and limits, required above, shall not limit the extent of the Subcontractor's responsibilities and liabilities specified within the Contract Documents or by law.

(L)    It is understood and agreed authorization is hereby granted to Principle Construction Corp. to withhold payments to the Subcontractor until a properly executed Certificate of Insurance providing insurance as required herein accompanied by a signed subcontract or purchase order are received by Principle Construction Corp.

3.    ADDITIONAL INSUREDS – The following parties are to be listed as additional insureds on the certificate:

| | | |
|---|---|---|
| 1. | Principle Construction Corp. | General Contractor |
| 2. | General RV Sales, LLC | Owner |
| 3. | Cornerstone Architects | Architect |

*Matt Cotherman*

PRINCIPLE CONSTRUCTION CORP.    DATE 1/26/2022

*Ira Sugar*

Midwest Dock Solutions    DATE 1/25/2022

6

DocuSign Envelope ID: 39F6BC3F-DA15-4CF6-B83C-F60101208E6A

Job #:  2021-26
Code #:  08630

**RIDER "B"**

**Principle Construction Corp.**
**9450 W. Bryn Mawr Ave., Suite 120**
**Rosemont, IL  60018**

**Midwest Dock Solutions**, shall furnish and install all labor, material, skill, equipment and appurtenances necessary to complete the **Overhead Doors** work on a design/build basis in accordance with national, state and local codes and the following:

Furnish and Install
Fourteen (14) – 14x14 clopay Model 3200 R-9 insulated sectional door
Standard Finish
1 vision panel per door
½ hp jackshaft operator with 3 button wall controller and photo eye
Each door will have an exhaust port to match existing.

Installation will be Mid to Late June

It is understood that the drawings and specifications are documents which indicate the general scope of the project and as such, the drawings and specifications do not necessarily indicate or describe all work required for the full performance and completion of the work.  Subcontractor is to furnish and install items required for the proper completion of his work without adjustment to the contract/subcontract price.

7

DocuSign Envelope ID: 39F6BC3F-DA15-4CF6-B83C-F60101208E6A

**Job Name: General RV Showroom TI**

**Rider C**
**Drawing List Exhibit**

1. Interior Renovation plan dated October 6, 2021, Cornerstone Architects
1. Interior Sketch, October 6, 2021, Cornerstone Architects
2. Outline spec email dated October 6, 2021

8

PRINCIPLE_0236

DocuSign Envelope ID: 63555DCC-1D17-4FE9-B7F2-66F171EA0A6F



**Principle Construction Corp.**
**9450 West Bryn Mawr**
**Suite #120**
**Rosemont IL 60018**

# SUBCONTRACT CHANGE ORDER

| | |
|---|---|
| CONTRACT# | 202126-10 |
| ORDER DATE | 05/26/2022 |
| CHANGE# | 1 |

| TO | | PROJECT | 202126 | Code: 8360.000 |
|---|---|---|---|---|

**Midwest Dock Solutions**
**P.O. Box 363**
**Steger IL 60475**

**General RV Addition & Showroom Remo**
**14000 Automall Drive**
**Huntley IL 60142**

You are hereby directed to make the following changes to the subcontract(s) listed below

PLANS ATTACHED
SPECIFICATIONS ATTACHED

In accordance with Article A.14 of the original Subcontract between Principle Construction Corp. and subcontractor, the following changes shall be incorporated into the Subcontract:

| Description of work | Amount |
|---|---|
| Increase in contract amount. | 6,000.00 |
| Added cost to expedite the new doors.  Lead time was going to be late with initial door spec. | |

**Notes**

| *Amount of Change* | **6,000.00** |
|---|---|
| The original Contract Sum was-------------------------------------------------- | 105,919.00 |
| Net change by previous Change Orders-------------------------------------------- | 0.00 |
| The Contract Sum prior to this Change Order-------------------------------------- | 105,919.00 |
| The Contract Sum will be changed by this Change Order--------------------------- | 6,000.00 |
| The new Contract Sum (including this Change Order)------------------------------ | 111,919.00 |

Approved   Date   5/26/2022

Contractor  *Victoria Dollenmaier*
DE23B46C1354F68  **Principle Construction Corp.**

Date   5/26/2022

Subcontractor  *Ira Sugar*
5C8C659CFF3F435...

DocuSign Envelope ID: FFF4782F-38BA-4B82-ACF2-5DAAC8C6606E



**Principle Construction Corp.**
9450 West Bryn Mawr
Suite #120
Rosemont IL 60018

# SUBCONTRACT
# CHANGE ORDER

CONTRACT# 202126-10
ORDER DATE 10/03/2022
CHANGE# 2

TO **Midwest Dock Solutions**
P.O. Box 363
Steger IL 60475

PROJECT **202126** Code: 8360.000

**General RV Addition & Showroom Remo⌐**
**14000 Automall Drive**
**Huntley IL 60142**

You are hereby directed to make the following changes to
the subcontract(s) listed below  PLANS ATTACHED
                SPECIFICATIONS ATTACHED

In accordance with Article A.14 of the original Subcontract between Principle Construction Corp.
and subcontractor, the following changes shall be incorporated into the Subcontract:

| Description of work | Amount |
|---|---|
| Increase in contract amount. | 20,507.00 |
| To remove the existing sectional door and replace with a coiling door for the paint booth. | |
| ADD $20,507.00 | |

**Notes**

| *Amount of Change* | **20,507.00** |
|---|---|

| | |
|---|---|
| The original Contract Sum was---------------------------------------------------- | 105,919.00 |
| Net change by previous Change Orders----------------------------------------- | 6,000.00 |
| The Contract Sum prior to this Change Order------------------------------------- | 111,919.00 |
| The Contract Sum will be changed by this Change Order---------------------------------- | 20,507.00 |
| The new Contract Sum (including this Change Order)---------------------------------- | 132,426.00 |

10/4/2022          10/4/2022
Approved Date       Date
Contractor *Victoria Dollenmaier*  Subcontractor *Ira Sugar*
— DE23D66C1354453 **Principle Construction Corp.** 5CBC859CFF3F435...

DocuSign Envelope ID: 39CEA395-108A-44F0-9772-EEA159DEB0F3



**Principle Construction Corp.**
**9450 West Bryn Mawr**
**Suite #120**
**Rosemont IL 60018**

# SUBCONTRACT
# CHANGE ORDER

| | |
|---|---|
| CONTRACT# | 202126-10 |
| ORDER DATE | 12/15/2022 |
| CHANGE# | 3 |

**TO**
**Midwest Dock Solutions**
**P.O. Box 363**
**Steger IL 60475**

**PROJECT**   **202126**       Code: 8360.000

**General RV Addition & Showroom Remo**
**14000 Automall Drive**
**Huntley IL 60142**

You are hereby directed to make the following changes to
the subcontract(s) listed below

PLANS ATTACHED
SPECIFICATIONS ATTACHED

In accordance with Article A.14 of the original Subcontract between Principle Construction Corp.
and subcontractor, the following changes shall be incorporated into the Subcontract:

| Description of work | Amount |
|---|---|
| Increase in contract amount. | 8,760.00 |

**Notes**

To furnish and install a security coil door for the new part department approximately 8' wide by 5'-6" in height.
Sale taxes are included.
ADD $8,760.00

| *Amount of Change* | **8,760.00** |
|---|---|

| | |
|---|---|
| The original Contract Sum was-------------------------------------------------------- | 105,919.00 |
| Net change by previous Change Orders-------------------------------------------- | 26,507.00 |
| The Contract Sum prior to this Change Order---------------------------------------- | 132,426.00 |
| The Contract Sum will be changed by this Change Order----------------------------- | 8,760.00 |
| The new Contract Sum (including this Change Order)-------------------------------- | 141,186.00 |

Approved  Date    12/15/2022

Contractor *Victoria Dollenmaier*
DE239B66C1354428
**Principle Construction Corp.**

Date      12/15/2022

Subcontractor *Ira Sugar*
5CBC656CFF3F435...

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 54

DOCK 03/06/2017 10:44 AM

Form **1120S**

Department of the Treasury
Internal Revenue Service

## U.S. Income Tax Return for an S Corporation
► Do not file this form unless the corporation has filed or is attaching Form 2553 to elect to be an S corporation.
► Information about Form 1120S and its separate instructions is at *www.irs.gov/form1120s.*

OMB No. 1545-0123

**2016**

For calendar year 2016 or tax year beginning _____ , ending _____

| | | | |
|---|---|---|---|
| **A** S election effective date **07/11/14** | **TYPE OR PRINT** | Name **Dock & Door Install, Inc.** | **D** Employer identification number |
| **B** Business activity code number (see instructions) **238900** | | Number, street, and room or suite no. If a P.O. box, see instructions. **3211 Holeman Ave** | **E** Date incorporated **07/11/2014** |
| **C** Check if Sch. M-3 attached ☐ | | City or town, state or province, country, and ZIP or foreign postal code **South Chicago Hts. IL 60411** | **F** Total assets (see instructions) $ |

**G** Is the corporation electing to be an S corporation beginning with this tax year? ☐ Yes ☒ No If "Yes," attach Form 2553 if not already filed

**H** Check if: **(1)** ☐ Final return **(2)** ☐ Name change **(3)** ☐ Address change **(4)** ☐ Amended return **(5)** ☐ S election termination or revocation

**I** Enter the number of shareholders who were shareholders during any part of the tax year ► **1**

**Caution.** Include **only** trade or business income and expenses on lines 1a through 21. See the instructions for more information.

### Income

| | | | |
|---|---|---|---|
| **1a** | Gross receipts or sales | **1a** 443,905 | |
| **b** | Returns and allowances | **1b** | |
| **c** | Balance. Subtract line 1b from line 1a | **1c** | 443,905 |
| **2** | Cost of goods sold (attach Form 1125-A) | **2** | 199,991 |
| **3** | Gross profit. Subtract line 2 from line 1c | **3** | 243,914 |
| **4** | Net gain (loss) from Form 4797, line 17 (attach Form 4797) | **4** | |
| **5** | Other income (loss) (see instructions—attach statement) **See Stmt 1** | **5** | 71 |
| **6** | Total income (loss). Add lines 3 through 5 ► | **6** | 243,985 |

### Deductions (see instructions for limitations)

| | | | |
|---|---|---|---|
| **7** | Compensation of officers (see instructions–attach Form 1125-E) | **7** | 50,577 |
| **8** | Salaries and wages (less employment credits) | **8** | |
| **9** | Repairs and maintenance | **9** | 620 |
| **10** | Bad debts | **10** | |
| **11** | Rents | **11** | |
| **12** | Taxes and licenses | **12** | 23,662 |
| **13** | Interest | **13** | |
| **14** | Depreciation not claimed on Form 1125-A or elsewhere on return (attach Form 4562) | **14** | |
| **15** | Depletion **(Do not deduct oil and gas depletion.)** | **15** | |
| **16** | Advertising | **16** | |
| **17** | Pension, profit-sharing, etc., plans | **17** | |
| **18** | Employee benefit programs | **18** | |
| **19** | Other deductions (attach statement) **See Stmt 2** | **19** | 174,300 |
| **20** | Total deductions. Add lines 7 through 19 ► | **20** | 249,159 |
| **21** | Ordinary business income (loss). Subtract line 20 from line 6 | **21** | −5,174 |

### Tax and Payments

| | | | |
|---|---|---|---|
| **22a** | Excess net passive income or LIFO recapture tax (see instructions) | **22a** | |
| **b** | Tax from Schedule D (Form 1120S) | **22b** | |
| **c** | Add lines 22a and 22b (see instructions for additional taxes) | **22c** | |
| **23a** | 2016 estimated tax payments and 2015 overpayment credited to 2016 | **23a** | |
| **b** | Tax deposited with Form 7004 | **23b** | |
| **c** | Credit for federal tax paid on fuels (attach Form 4136) | **23c** | |
| **d** | Add lines 23a through 23c | **23d** | |
| **24** | Estimated tax penalty (see instructions). Check if Form 2220 is attached ► ☐ | **24** | |
| **25** | Amount owed. If line 23d is smaller than the total of lines 22c and 24, enter amount owed | **25** | |
| **26** | Overpayment. If line 23d is larger than the total of lines 22c and 24, enter amount overpaid | **26** | |
| **27** | Enter amount from line 26 Credited to 2017 estimated tax ► _____ Refunded ► | **27** | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer **Anthony Brutti** Date _____ Title **President**

May the IRS discuss this return with the preparer shown below (see instructions)? ☒ Yes ☐ No

**Paid Preparer Use Only**

| | | | | |
|---|---|---|---|---|
| Print/Type preparer's name **Patrick W Gineris** | Preparer's signature **Patrick W Gineris** | Date **03/06/17** | Check ☐ if self-employed | PTIN |
| Firm's name ► **Gineris & Associates, LTD.** | | | Firm's EIN ► | |
| Firm's address ► **2005 Hart St Dyer, IN** | **46311** | | Phone no. **219-864-4800** | |

For Paperwork Reduction Act Notice, see separate instructions.

Form **1120S** (2016)

DAA

PLAINTIFF'S EXHIBIT 172

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 55

| Form **1120S** | **U.S. Income Tax Return for an S Corporation** | OMB No. 1545-0123 |
|---|---|---|

▶ Do not file this form unless the corporation has filed or is attaching Form 2553 to elect to be an S corporation.
▶ Go to www.irs.gov/Form1120S for instructions and the latest information.

**2017**

Department of the Treasury
Internal Revenue Service

For calendar year 2017 or tax year beginning _____ , and ending _____

**A** S election effective date
07/11/2014

**B** Business activity code number (see instructions)
238900

**C** Check if Sch. M-3 attached ☐

Name
**Dock & Door Install, Inc.**

Number, street, and room or suite no. If a P.O. box, see instructions.
**27 E. 36th Place**

City or town, state or province, country, and ZIP or foreign postal code
**Steger, IL 60475**

**D** Employer identification number

**E** Date incorporated
07/11/2014

**F** Total assets (see instructions)

**G** Is the corporation electing to be an S corporation beginning with this tax year? ☐ Yes ☒ No If "Yes," attach Form 2553 if not already filed

**H** Check if: **(1)** ☐ Final return **(2)** ☐ Name change **(3)** ☐ Address change **(4)** ☐ Amended return **(5)** ☐ S election termination or revocation

**I** Enter the number of shareholders who were shareholders during any part of the tax year ▶ 1

Caution: *Include only trade or business income and expenses on lines 1a through 21. See the instructions for more information.*

**Income**

| | | | |
|---|---|---|---|
| 1a | Gross receipts or sales | 652,445. | |
| b | Return and allowances | | |
| c | Bal. Subtract line 1b from line 1a ▶ | **1c** | 652,445. |
| 2 | Cost of goods sold (attach Form 1125-A) | **2** | 505,041. |
| 3 | Gross profit. Subtract line 2 from line 1c | **3** | 147,404. |
| 4 | Net gain (loss) from Form 4797, line 17 *(attach Form 4797)* | **4** | |
| 5 | Other income (loss) *(attach statement)* | **5** | |
| 6 | **Total income (loss).** Add lines 3 through 5 ▶ | **6** | 147,404. |

**Deductions (See instructions for limitations)**

| | | | |
|---|---|---|---|
| 7 | Compensation of officers (see instrs. - attach Form 1125-E) | **7** | 51,950. |
| 8 | Salaries and wages (less employment credits) | **8** | |
| 9 | Repairs and maintenance | **9** | 802. |
| 10 | Bad debts | **10** | |
| 11 | Rents | **11** | 34. |
| 12 | Taxes and licenses               Statement 1 | **12** | 33,256. |
| 13 | Interest | **13** | |
| 14 | Depreciation not claimed on Form 1125-A or elsewhere on return *(attach Form 4562)* | **14** | |
| 15 | Depletion **(Do not deduct oil and gas depletion.)** | **15** | |
| 16 | Advertising | **16** | 1,132. |
| 17 | Pension, profit-sharing, etc., plans | **17** | |
| 18 | Employee benefit programs | **18** | |
| 19 | Other deductions *(attach statement)*        Statement 2 | **19** | 62,021. |
| 20 | **Total deductions.** Add lines 7 through 19 ▶ | **20** | 149,195. |
| 21 | Ordinary business income (loss). Subtract line 20 from line 6 | **21** | -1,791. |

**Tax and Payments**

| | | | | |
|---|---|---|---|---|
| 22a | Excess net passive income or LIFO recapture tax *(see instructions)* | 22a | | |
| b | Tax from Schedule D (Form 1120S) | 22b | | |
| c | Add lines 22a and 22b | | **22c** | |
| 23a | 2017 estimated tax payments and 2016 overpayment credited to 2017 | 23a | | |
| b | Tax deposited with Form 7004 | 23b | | |
| c | Credit for federal tax paid on fuels *(attach Form 4136)* | 23c | | |
| d | Add lines 23a through 23c | | **23d** | |
| 24 | Estimated tax penalty (see instructions). Check if Form 2220 is attached ▶ ☐ | | **24** | |
| 25 | **Amount owed.** If line 23d is smaller than the total of lines 22c and 24, enter amount owed | | **25** | |
| 26 | **Overpayment.** If line 23d is larger than the total of lines 22c and 24, enter amount overpaid | | **26** | |
| 27 | Enter amount from line 26 Credited to 2018 estimated tax ▶            Refunded ▶ | | **27** | |

**PLAINTIFF'S EXHIBIT 175**

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer _____ Date _____ Title ▶ **President**

May the IRS discuss this return with the preparer shown below (see instr.)? ☒ Yes ☐ No

**Paid Preparer Use Only**

| | | | | |
|---|---|---|---|---|
| Print/Type preparer's name | Preparer's signature | Date | Check if self-employed ☐ | PTIN |
| Patrick Gineris | Patrick Gineris | 02/12/18 | | |
| Firm's name ▶ Gineris & Associates, Ltd. | | | Firm's EIN ▶ | |
| Firm's address ▶ 2005 Hart Street Dyer, IN 46311 | | | Phone no. 219-864-4800 | |

JWA
711701
12-20-17

For Paperwork Reduction Act Notice, see separate instructions.

Form **1120S** (2017)

1

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 56

| Form **1120S** | **U.S. Income Tax Return for an S Corporation** | | OMB No. 1545-0123 |
|---|---|---|---|

Department of the Treasury
Internal Revenue Service

▶ Do not file this form unless the corporation has filed or is attaching Form 2553 to elect to be an S corporation.
▶ Go to www.irs.gov/Form1120S for instructions and the latest information.

**2018**

For calendar year 2018 or tax year beginning _____ , and ending _____

**A** S election effective date
07/11/2014

**B** Business activity code number (see instructions)
238900

**C** Check if Sch. M-3 attached ☐

**Name**
Dock & Door Install, Inc.

**Number, street, and room or suite no.** If a P.O. box, see instructions.
27 E. 36th Place

**City or town, state or province, country, and ZIP or foreign postal code**
Steger, IL 60475

**D** Employer identification number
[redacted]

**E** Date incorporated
07/11/2014

**F** Total assets (see instructions)
$ [redacted]

**G** Is the corporation electing to be an S corporation beginning with this tax year? ☐ Yes ☒ No   If "Yes," attach Form 2553 if not already filed

**H** Check if: **(1)** ☐ Final return **(2)** ☐ Name change **(3)** ☐ Address change **(4)** ☐ Amended return **(5)** ☐ S election termination or revocation

**I** Enter the number of shareholders who were shareholders during any part of the tax year ▶ 1

**Caution:** *Include only trade or business income and expenses on lines 1a through 21. See the instructions for more information.*

**Income**

| | | | |
|---|---|---|---|
| **1 a** Gross receipts or sales 813,572. | **b** Returns and allowances | **c** Bal. Subtract line 1b from line 1a | **1c** 813,572. |
| **2** Cost of goods sold (attach Form 1125-A) | | | **2** 651,337. |
| **3** Gross profit. Subtract line 2 from line 1c | | | **3** 162,235. |
| **4** Net gain (loss) from Form 4797, line 17 (attach Form 4797) | | | **4** |
| **5** Other income (loss) (attach statement) | | Statement 1 | **5** 6. |
| **6** **Total income (loss).** Add lines 3 through 5 | | ▶ | **6** 162,241. |

**Deductions (See instructions for limitations)**

| | | |
|---|---|---|
| **7** Compensation of officers (see instrs. - attach Form 1125-E) | **7** 58,353. |
| **8** Salaries and wages (less employment credits) | **8** |
| **9** Repairs and maintenance | **9** 3,767. |
| **10** Bad debts | **10** |
| **11** Rents | **11** |
| **12** Taxes and licenses       Statement 2 | **12** 36,216. |
| **13** Interest (see instructions) | **13** |
| **14** Depreciation not claimed on Form 1125-A or elsewhere on return (attach Form 4562) | **14** |
| **15** Depletion (**Do not** deduct oil and gas depletion.) | **15** |
| **16** Advertising | **16** 1,084. |
| **17** Pension, profit-sharing, etc., plans | **17** |
| **18** Employee benefit programs | **18** |
| **19** Other deductions (attach statement)       Statement 3 | **19** 56,810. |
| **20** **Total deductions.** Add lines 7 through 19 ▶ | **20** 156,230. |
| **21** **Ordinary business income (loss).** Subtract line 20 from line 6 | **21** 6,011. |

**Tax and Payments**

| | | | |
|---|---|---|---|
| **22 a** Excess net passive income or LIFO recapture tax (see instructions) | **22a** | | |
| **b** Tax from Schedule D (Form 1120S) | **22b** | | |
| **c** Add lines 22a and 22b | | | **22c** |
| **23 a** 2018 estimated tax payments and 2017 overpayment credited to 2018 | **23a** | | |
| **b** Tax deposited with Form 7004 | **23b** | | |
| **c** Credit for federal tax paid on fuels (attach Form 4136) | **23c** | | |
| **d** Refundable credit from Form 8827, line 8c | **23d** | | |
| **e** Add lines 23a through 23d | | | **23e** |
| **24** Estimated tax penalty (see instructions). Check if Form 2220 is attached ▶ ☐ | | | **24** |
| **25** **Amount owed.** If line 23e is smaller than the total of lines 22c and 24, enter amount owed | | | **25** |
| **26** **Overpayment.** If line 23e is larger than the total of lines 22c and 24, enter amount overpaid | | | **26** |
| **27** Enter amount from line 26: Credited to 2019 estimated tax _____ Refunded ▶ | | | **27** |

PLAINTIFF'S EXHIBIT 178

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer _____ Date _____ Title President

May the IRS discuss this return with the preparer shown below (see instr.)? ☒ Yes ☐ No

**Paid Preparer Use Only**

| Print/Type preparer's name Patrick Gineris | Preparer's signature Patrick Gineris | Date 02/07/19 | Check if self-employed ☐ | PTIN [redacted] |
|---|---|---|---|---|
| Firm's name ▶ Gineris & Associates, Ltd. | | | | Firm's EIN ▶ [redacted] |
| Firm's address ▶ 2005 Hart Street   Dyer, IN 46311 | | | | Phone no. 219-864-4800 |

JWA   811701   12-12-18   **For Paperwork Reduction Act Notice, see separate instructions.**

Form **1120S** (2018)

1

06240207 151105 DOCK       2018.02040 DOCK & DOOR INSTALL, INC. DOCK____1

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 57

Form **1120-S**

Department of the Treasury
Internal Revenue Service

## U.S. Income Tax Return for an S Corporation

▶ Do not file this form unless the corporation has filed or is attaching Form 2553 to elect to be an S corporation.
▶ Go to www.irs.gov/Form1120S for instructions and the latest information.

OMB No. 1545-0123

**2019**

For calendar year 2019 or tax year beginning _____ , ending _____

| | | | |
|---|---|---|---|
| **A** S election effective date 07/11/2014 | Name **DOCK & DOOR INSTALL, INC.** | | **D** Employer identification number |
| **B** Business activity code number (see instructions) 238900 | Number, street, and room or suite no. If a P.O. box, see instructions. **27 E. 36TH PLACE** | | **E** Date incorporated 07/11/2014 |
| **C** Check if Sch. M-3 attached ☐ | City or town, state or province, country, and ZIP or foreign postal code **STEGER, IL 60475** | | **F** Total assets (see instructions) $ |

**G** Is the corporation electing to be an S corporation beginning with this tax year? ☐ Yes ☒ No If "Yes," attach Form 2553 if not already filed

**H** Check if: **(1)** ☐ Final return **(2)** ☐ Name change **(3)** ☐ Address change **(4)** ☐ Amended return **(5)** ☐ S election termination or revocation

**I** Enter the number of shareholders who were shareholders during any part of the tax year ▶ 1

**J** Check if corporation: **(1)** ☐ Aggregated activities for section 465 at-risk purposes **(2)** ☐ Grouped activities for section 469 passive activity purposes

**Caution:** Include **only** trade or business income and expenses on lines 1a through 21. See the instructions for more information.

| | | | | |
|---|---|---|---|---|
| **Income** | **1 a** Gross receipts or sales | 826,099. | **b** Return and allowances | **c** Bal. Subtract line 1b from line 1a | **1c** | 826,099. |
| | **2** Cost of goods sold (attach Form 1125-A) | | | **2** | 327,511. |
| | **3** Gross profit. Subtract line 2 from line 1c | | | **3** | 498,588. |
| | **4** Net gain (loss) from Form 4797, line 17 (attach Form 4797) | | | **4** | |
| | **5** Other income (loss) (attach statement) | | STATEMENT 1 | **5** | 1. |
| | **6** **Total income (loss).** Add lines 3 through 5 | | ▶ | **6** | 498,589. |
| **Deductions (See instructions for limitations)** | **7** Compensation of officers (see instrs. - attach Form 1125-E) | | | **7** | 61,172. |
| | **8** Salaries and wages (less employment credits) | | | **8** | |
| | **9** Repairs and maintenance | | | **9** | 3,319. |
| | **10** Bad debts | | | **10** | |
| | **11** Rents | | | **11** | |
| | **12** Taxes and licenses | | STATEMENT 2 | **12** | 35,004. |
| | **13** Interest (see instructions) | | | **13** | |
| | **14** Depreciation not claimed on Form 1125-A or elsewhere on return (attach Form 4562) | | | **14** | |
| | **15** Depletion **(Do not deduct oil and gas depletion.)** | | | **15** | |
| | **16** Advertising | | | **16** | 890. |
| | **17** Pension, profit-sharing, etc., plans | | | **17** | |
| | **18** Employee benefit programs | | | **18** | |
| | **19** Other deductions (attach statement) | | STATEMENT 3 | **19** | 370,785. |
| | **20** **Total deductions.** Add lines 7 through 19 | | ▶ | **20** | 471,170. |
| | **21** **Ordinary business income (loss).** Subtract line 20 from line 6 | | | **21** | 27,419. |

| | | | | |
|---|---|---|---|---|
| **Tax and Payments** | **22 a** Excess net passive income or LIFO recapture tax (see instructions) | **22a** | | |
| | **b** Tax from Schedule D (Form 1120-S) | **22b** | | |
| | **c** Add lines 22a and 22b | | **22c** | |
| | **23 a** 2019 estimated tax payments and 2018 overpayment credited to 2019 | **23a** | | |
| | **b** Tax deposited with Form 7004 | **23b** | | |
| | **c** Credit for federal tax paid on fuels (attach Form 4136) | **23c** | | |
| | **d** Reserved for future use | **23d** | | |
| | **e** Add lines 23a through 23d | | **23e** | |
| | **24** Estimated tax penalty (see instructions). Check if Form 2220 is attached ▶ ☐ | | **24** | |
| | **25** **Amount owed.** If line 23e is smaller than the total of lines 22c and 24, enter amount owed | | **25** | |
| | **26** **Overpayment.** If line 23e is larger than the total of lines 22c and 24, enter amount overpaid | | **26** | |
| | **27** Enter amount from line 26: Credited to 2020 estimated tax ▶ _____ Refunded ▶ | | **27** | |

**PLAINTIFF'S EXHIBIT 181**

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer _____ Date _____ Title **PRESIDENT**

May the IRS discuss this return with the preparer shown below? See instr. ☒ Yes ☐ No

| | | | | | |
|---|---|---|---|---|---|
| **Paid Preparer Use Only** | Print/Type preparer's name **PATRICK GINERIS** | Preparer's signature **PATRICK GINERIS** | Date **03/23/20** | Check if self-employed ☐ | PTIN |
| | Firm's name ▶ **GINERIS & ASSOCIATES, LTD.** | | | Firm's EIN ▶ | |
| | Firm's address ▶ **2005 HART STREET DYER, IN 46311** | | | Phone no. **219-864-4800** | |

LHA **For Paperwork Reduction Act Notice, see separate instructions.** 911701 12-30-19

Form **1120-S** (2019)

1

08150323 151105 DOCK                     2019.03020 DOCK & DOOR INSTALL, INC. DOCK___1

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 58

Form **1120-S**

Department of the Treasury
Internal Revenue Service

# U.S. Income Tax Return for an S Corporation

▶ Do not file this form unless the corporation has filed or is attaching Form 2553 to elect to be an S corporation.
▶ Go to www.irs.gov/Form1120S for instructions and the latest information.

OMB No. 1545-0123

**2020**

For calendar year 2020 or tax year beginning _____ , ending _____

| | |
|---|---|
| **A** S election effective date<br>07/11/2014 | **Name** DOCK & DOOR INSTALL, INC. |
| **B** Business activity code number (see instructions)<br>238900 | **Number, street, and room or suite no.** If a P.O. box, see instructions.<br>27 E. 36TH PLACE |
| **C** Check if Sch. M-3 attached ☐ | **City or town, state or province, country, and ZIP or foreign postal code**<br>STEGER, IL 60475 |

TYPE OR PRINT

**D** Employer identification number ▓▓▓▓▓▓

**E** Date incorporated 07/11/2014

**F** Total assets (see instructions)

**G** Is the corporation electing to be an S corporation beginning with this tax year? ☐ Yes ☒ No   If "Yes," attach Form 2553 if not already filed

**H** Check if: **(1)** ☐ Final return **(2)** ☐ Name change **(3)** ☐ Address change **(4)** ☐ Amended return **(5)** ☐ S election termination or revocation

**I** Enter the number of shareholders who were shareholders during any part of the tax year ............................ 1

**J** Check if corporation: **(1)** ☐ Aggregated activities for section 465 at-risk purposes **(2)** ☐ Grouped activities for section 469 passive activity purposes

**Caution:** Include **only** trade or business income and expenses on lines 1a through 21. See the instructions for more information.

### Income

| | | | |
|---|---|---|---|
| 1a | Gross receipts or sales | 966,443. | |
| b | Returns and allowances | | |
| c | Bal. Subtract line 1b from line 1a | **1c** | 966,443. |
| 2 | Cost of goods sold (attach Form 1125-A) | **2** | 475,483. |
| 3 | Gross profit. Subtract line 2 from line 1c | **3** | 490,960. |
| 4 | Net gain (loss) from Form 4797, line 17 (attach Form 4797) | **4** | |
| 5 | Other income (loss) (attach statement) | **5** | |
| 6 | **Total income (loss).** Add lines 3 through 5 ▶ | **6** | 490,960. |

### Deductions (See instructions for limitations)

| | | | |
|---|---|---|---|
| 7 | Compensation of officers (see instrs. – attach Form 1125-E) | **7** | 63,098. |
| 8 | Salaries and wages (less employment credits) | **8** | |
| 9 | Repairs and maintenance | **9** | 3,182. |
| 10 | Bad debts | **10** | |
| 11 | Rents | **11** | |
| 12 | Taxes and licenses          STATEMENT 1 | **12** | 50,733. |
| 13 | Interest (see instructions) | **13** | |
| 14 | Depreciation not claimed on Form 1125-A or elsewhere on return (attach Form 4562) | **14** | |
| 15 | Depletion **(Do not deduct oil and gas depletion.)** | **15** | |
| 16 | Advertising | **16** | 1,620. |
| 17 | Pension, profit-sharing, etc., plans | **17** | |
| 18 | Employee benefit programs | **18** | |
| 19 | Other deductions (attach statement)          STATEMENT 2 | **19** | 473,736. |
| 20 | **Total deductions.** Add lines 7 through 19 ▶ | **20** | 592,369. |
| 21 | **Ordinary business income (loss).** Subtract line 20 from line 6 | **21** | -101,409. |

### Tax and Payments

| | | | | |
|---|---|---|---|---|
| 22a | Excess net passive income or LIFO recapture tax (see instructions) | **22a** | | |
| b | Tax from Schedule D (Form 1120-S) | **22b** | | |
| c | Add lines 22a and 22b | | **22c** | |
| 23a | 2020 estimated tax payments and 2019 overpayment credited to 2020 | **23a** | | |
| b | Tax deposited with Form 7004 | **23b** | | |
| c | Credit for federal tax paid on fuels (attach Form 4136) | **23c** | | |
| d | Reserved for future use | **23d** | | |
| e | Add lines 23a through 23d | | **23e** | |
| 24 | Estimated tax penalty (see instructions). Check if Form 2220 is attached ▶ ☐ | | **24** | |
| 25 | **Amount owed.** If line 23e is smaller than the total of lines 22c and 24, enter amount owed | | **25** | |
| 26 | **Overpayment.** If line 23e is larger than the total of lines 22c and 24, enter amount overpaid | | **26** | |
| 27 | Enter amount from line 26: Credited to 2021 estimated tax ▶ _____ Refunded ▶ | | **27** | |

PLAINTIFF'S EXHIBIT

**184**

### Sign Here

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

▶ _____ Signature of officer / Date

▶ PRESIDENT Title

May the IRS discuss this return with the preparer shown below? See instr. ☒ Yes ☐ No

### Paid Preparer Use Only

| Print/Type preparer's name | Preparer's signature | Date | Check if self-employed | PTIN |
|---|---|---|---|---|
| KELLEN LEONE | KELLEN LEONE | 04/19/21 | ☐ | ▓▓▓ |

Firm's name ▶ GINERIS & ASSOCIATES, LTD.
Firm's EIN ▶

Firm's address ▶ 2005 HART STREET
DYER, IN 46311
Phone no. 219-864-4800

LHA   **For Paperwork Reduction Act Notice, see separate instructions.**   011701 12-16-20

Form **1120-S** (2020)

1

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 59

Form **1120-S**

## U.S. Income Tax Return for an S Corporation

▶ Do not file this form unless the corporation has filed or is attaching Form 2553 to elect to be an S corporation.
▶ Go to www.irs.gov/Form1120S for instructions and the latest information.

Department of the Treasury
Internal Revenue Service

OMB No. 1545-0123

**2021**

For calendar year 2021 or tax year beginning _____ , ending _____

| | | |
|---|---|---|
| **A** S election effective date 07/11/2014 | Name **DOCK & DOOR INSTALL, INC.** | **D** Employer identification number ▉ |
| **B** Business activity code number (see instructions) 238900 | Number, street, and room or suite no. If a P.O. box, see instructions. **27 E. 36TH PLACE** | **E** Date incorporated 07/11/2014 |
| **C** Check if Sch. M-3 attached ☐ | City or town, state or province, country, and ZIP or foreign postal code **STEGER, IL 60475** | **F** Total assets (see instructions) $ ▉ |

**G** Is the corporation electing to be an S corporation beginning with this tax year? ☐ Yes ☒ No

**H** Check if: **(1)** ☐ Final return **(2)** ☐ Name change **(3)** ☐ Address change **(4)** ☐ Amended return **(5)** ☐ S election termination

**I** Enter the number of shareholders who were shareholders during any part of the tax year .......... ▶ **1**

**J** Check if corporation: **(1)** ☐ Aggregated activities for section 465 at-risk purposes **(2)** ☐ Grouped activities for section 469 passive activity purposes

**Caution:** Include **only** trade or business income and expenses on lines 1a through 21. See the instructions for more information.

### Income

| | | | | |
|---|---|---|---|---|
| **1 a** Gross receipts or sales | 935,652. | **b** Returns and allowances | **c** Bal. Subtract line 1b from line 1a | **1c** 935,652. |
| **2** | Cost of goods sold (attach Form 1125-A) | | | **2** 387,252. |
| **3** | Gross profit. Subtract line 2 from line 1c | | | **3** 548,400. |
| **4** | Net gain (loss) from Form 4797, line 17 (attach Form 4797) | | | **4** |
| **5** | Other income (loss) (attach statement) | | | **5** |
| **6** | **Total income (loss).** Add lines 3 through 5 | | ▶ | **6** 548,400. |

### Deductions (See instructions for limitations)

| | | | |
|---|---|---|---|
| **7** | Compensation of officers (see instrs. - attach Form 1125-E) | | **7** 64,369. |
| **8** | Salaries and wages (less employment credits) | | **8** |
| **9** | Repairs and maintenance | | **9** 4,818. |
| **10** | Bad debts | | **10** |
| **11** | Rents | | **11** |
| **12** | Taxes and licenses | STATEMENT 1 | **12** 42,511. |
| **13** | Interest (see instructions) | | **13** |
| **14** | Depreciation not claimed on Form 1125-A or elsewhere on return (attach Form 4562) | | **14** |
| **15** | Depletion **(Do not deduct oil and gas depletion.)** | | **15** |
| **16** | Advertising | | **16** 1,110. |
| **17** | Pension, profit-sharing, etc., plans | | **17** |
| **18** | Employee benefit programs | | **18** |
| **19** | Other deductions (attach statement) | STATEMENT 2 | **19** 402,221. |
| **20** | **Total deductions.** Add lines 7 through 19 | ▶ | **20** 515,029. |
| **21** | **Ordinary business income (loss).** Subtract line 20 from line 6 | | **21** 33,371. |

### Tax and Payments

| | | | |
|---|---|---|---|
| **22 a** | Excess net passive income or LIFO recapture tax (see instructions) | **22a** | |
| **b** | Tax from Schedule D (Form 1120-S) | **22b** | |
| **c** | Add lines 22a and 22b | | **22c** |
| **23 a** | 2021 estimated tax payments and 2020 overpayment credited to 2021 | **23a** | |
| **b** | Tax deposited with Form 7004 | **23b** | |
| **c** | Credit for federal tax paid on fuels (attach Form 4136) | **23c** | |
| **d** | Add lines 23a through 23c | | **23d** |
| **24** | Estimated tax penalty (see instructions). Check if Form 2220 is attached | ▶ ☐ | **24** |
| **25** | **Amount owed.** If line 23d is smaller than the total of lines 22c and 24, enter amount owed | | **25** |
| **26** | **Overpayment.** If line 23d is larger than the total of lines 22c and 24, enter amount overpaid | | **26** |
| **27** | Enter amount from line 26: Credited to 2022 estimated tax ▶ _____ Refunded ▶ | | **27** |

**PLAINTIFF'S EXHIBIT 187**

### Sign Here

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

▶ _____ ▶ **PRESIDENT**
Signature of officer         Date         Title

May the IRS discuss this return with the preparer shown below? See instr.
☒ Yes ☐ No

### Paid Preparer Use Only

| | | | |
|---|---|---|---|
| Print/Type preparer's name **KELLEN LEONE** | Preparer's signature **KELLEN LEONE** | Date **02/17/22** | Check ☐ if self-employed | PTIN ▉ |
| Firm's name ▶ **GINERIS & ASSOCIATES, LTD.** | | | Firm's EIN ▶ |
| Firm's address ▶ **2005 HART STREET DYER, IN 46311** | | | Phone no. **219-864-4800** |

**LHA** For Paperwork Reduction Act Notice, see separate instructions. 111701 12-23-21

Form **1120-S** (2021)

1

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 60

# Form 1120-S

## U.S. Income Tax Return for an S Corporation

Do not file this form unless the corporation has filed or is attaching Form 2553 to elect to be an S corporation.
Go to www.irs.gov/Form1120S for instructions and the latest information.

Department of the Treasury
Internal Revenue Service

OMB No. 1545-0123

**2022**

For calendar year 2022 or tax year beginning _____, ending _____

| | |
|---|---|
| **A** S election effective date 07/11/2014 | **Name** DOCK & DOOR INSTALL, INC. |
| **B** Business activity code number (see instructions) 238900 | **Number, street, and room or suite no.** If a P.O. box, see instructions. 27 E. 36TH PLACE |
| **C** Check if Sch. M-3 attached ☐ | **City or town, state or province, country, and ZIP or foreign postal code** STEGER, IL 60475 |

**D** Employer identification number ▮▮▮▮▮▮▮▮▮

**E** Date incorporated 07/11/2014

**F** Total assets (see instructions) $ ▮▮▮▮▮▮

(TYPE OR PRINT)

**G** Is the corporation electing to be an S corporation beginning with this tax year? ☐ Yes ☒ No

**H** Check if: **(1)** ☐ Final return **(2)** ☐ Name change **(3)** ☐ Address change **(4)** ☐ Amended return **(5)** ☐ S election termination

**I** Enter the number of shareholders who were shareholders during any part of the tax year ........................... **1**

**J** Check if corporation: **(1)** ☐ Aggregated activities for section 465 at-risk purposes **(2)** ☐ Grouped activities for section 469 passive activity purposes

**Caution:** Include **only** trade or business income and expenses on lines 1 through 21. See the instructions for more information.

### Income

| | | | |
|---|---|---|---|
| 1 a | Gross receipts or sales | 1,595,662. | |
| b | Returns and allowances | | |
| c | Bal. Subtract line 1b from line 1a | **1c** | 1,595,662. |
| 2 | Cost of goods sold (attach Form 1125-A) | **2** | 759,416. |
| 3 | Gross profit. Subtract line 2 from line 1c | **3** | 836,246. |
| 4 | Net gain (loss) from Form 4797, line 17 (attach Form 4797) | **4** | |
| 5 | Other income (loss) (attach statement) | **5** | |
| 6 | **Total income (loss).** Add lines 3 through 5 | **6** | 836,246. |

### Deductions (See instructions for limitations)

| | | | |
|---|---|---|---|
| 7 | Compensation of officers (see instrs. - attach Form 1125-E) | **7** | 71,594. |
| 8 | Salaries and wages (less employment credits) | **8** | |
| 9 | Repairs and maintenance | **9** | 2,989. |
| 10 | Bad debts | **10** | |
| 11 | Rents | **11** | |
| 12 | Taxes and licenses     STATEMENT 1 | **12** | 77,448. |
| 13 | Interest (see instructions) | **13** | |
| 14 | Depreciation from Form 4562 not claimed on Form 1125-A or elsewhere on return (attach Form 4562) | **14** | |
| 15 | Depletion (**Do not deduct oil and gas depletion.**) | **15** | |
| 16 | Advertising | **16** | 2,000. |
| 17 | Pension, profit-sharing, etc., plans | **17** | |
| 18 | Employee benefit programs | **18** | |
| 19 | Other deductions (attach statement)     STATEMENT 2 | **19** | 722,719. |
| 20 | **Total deductions.** Add lines 7 through 19 | **20** | 876,750. |
| 21 | **Ordinary business income (loss).** Subtract line 20 from line 6 | **21** | -40,504. |

### Tax and Payments

| | | | | |
|---|---|---|---|---|
| 22 a | Excess net passive income or LIFO recapture tax (see instructions) | 22a | | |
| b | Tax from Schedule D (Form 1120-S) | 22b | | |
| c | Add lines 22a and 22b | | **22c** | |
| 23 a | 2022 estimated tax payments and 2021 overpayment credited to 2022 | 23a | | |
| b | Tax deposited with Form 7004 | 23b | | |
| c | Credit for federal tax paid on fuels (attach Form 4136) | 23c | | |
| d | Add lines 23a through 23c | | **23d** | |
| 24 | Estimated tax penalty (see instructions). Check if Form 2220 is attached ☐ | | **24** | |
| 25 | **Amount owed.** If line 23d is smaller than the total of lines 22c and 24, enter amount owed | | **25** | |
| 26 | **Overpayment.** If line 23d is larger than the total of lines 22c and 24, enter amount overpaid | | **26** | |
| 27 | Enter amount from line 26: Credited to 2023 estimated tax _____ Refunded | | **27** | |

**PLAINTIFF'S EXHIBIT 190**

### Sign Here

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer _____ Date _____ Title **PRESIDENT**

May the IRS discuss this return with the preparer shown below? See instr. ☒ Yes ☐ No

### Paid Preparer Use Only

| | | | |
|---|---|---|---|
| Print/Type preparer's name KELLEN LEONE | Preparer's signature KELLEN LEONE | Date 02/12/23 | Check if self-employed ☐ | PTIN ▮▮▮▮▮▮ |
| Firm's name ▶ GINERIS & ASSOCIATES, LTD. | | | Firm's EIN ▶ ▮▮▮▮▮▮ |
| Firm's address ▶ 2005 HART STREET DYER, IN 46311 | | | Phone no. 219-864-4800 |

LHA   For Paperwork Reduction Act Notice, see separate instructions.   211701 12-09-22

Form **1120-S** (2022)

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 61

# Form 1120-S

**U.S. Income Tax Return for an S Corporation**

Do not file this form unless the corporation has filed or is attaching Form 2553 to elect to be an S corporation.

Go to www.irs.gov/Form1120S for instructions and the latest information.

Department of the Treasury
Internal Revenue Service

OMB No. 1545-0123

**2023**

For calendar year 2023 or tax year beginning _____, ending _____

| | | |
|---|---|---|
| **A** S election effective date 07/11/2014 | Name DOCK & DOOR INSTALL, INC. | **D** Employer identification number ▮▮▮▮▮ |
| **B** Business activity code number (see instructions) 238900 | Number, street, and room or suite no. If a P.O. box, see instructions. 27 E. 36TH PLACE | **E** Date incorporated 07/11/2014 |
| **C** Check if Sch. M-3 attached ☐ | City or town, state or province, country, and ZIP or foreign postal code STEGER, IL 60475 | **F** Total assets (see instructions) $ ▮▮▮▮▮ |

**G** Is the corporation electing to be an S corporation beginning with this tax year? ☐ Yes ☒ No

**H** Check if: **(1)** ☐ Final return **(2)** ☐ Name change **(3)** ☐ Address change **(4)** ☐ Amended return **(5)** ☐ S election termination

**I** Enter the number of shareholders who were shareholders during any part of the tax year ........... 1

**J** Check if corporation: **(1)** ☐ Aggregated activities for section 465 at-risk purposes **(2)** ☐ Grouped activities for section 469 passive activity purposes

**Caution:** Include **only** trade or business income and expenses on lines 1 through 22. See the instructions for more information.

## Income

| | | | | |
|---|---|---|---|---|
| 1a | Gross receipts or sales | 1,633,467. | **b** Less return and allowances _____ | **c** Balance |
| | | | 1c | 1,633,467. |
| 2 | Cost of goods sold (attach Form 1125-A) | | 2 | 695,369. |
| 3 | Gross profit. Subtract line 2 from line 1c | | 3 | 938,098. |
| 4 | Net gain (loss) from Form 4797, line 17 (attach Form 4797) | | 4 | |
| 5 | Other income (loss) (attach statement) | | 5 | |
| 6 | **Total income (loss).** Add lines 3 through 5 | | 6 | 938,098. |

## Deductions (See instructions for limitations)

| | | | |
|---|---|---|---|
| 7 | Compensation of officers (see instrs. - attach Form 1125-E) | 7 | 71,032. |
| 8 | Salaries and wages (less employment credits) | 8 | |
| 9 | Repairs and maintenance | 9 | 7,194. |
| 10 | Bad debts | 10 | |
| 11 | Rents | 11 | |
| 12 | Taxes and licenses **STATEMENT 1** | 12 | 71,861. |
| 13 | Interest (see instructions) | 13 | |
| 14 | Depreciation from Form 4562 not claimed on Form 1125-A or elsewhere on return (attach Form 4562) | 14 | |
| 15 | Depletion **(Do not deduct oil and gas depletion.)** | 15 | |
| 16 | Advertising | 16 | 6,500. |
| 17 | Pension, profit-sharing, etc., plans | 17 | |
| 18 | Employee benefit programs | 18 | |
| 19 | Energy efficient commercial buildings deduction (attach Form 7205) | 19 | |
| 20 | Other deductions (attach statement) **STATEMENT 2** | 20 | 769,503. |
| 21 | **Total deductions.** Add lines 7 through 20 | 21 | 926,090. |
| 22 | **Ordinary business income (loss).** Subtract line 21 from line 6 | 22 | 12,008. |

## Tax and Payments

| | | | | |
|---|---|---|---|---|
| 23 a | Excess net passive income or LIFO recapture tax (see instructions) | 23a | | |
| b | Tax from Schedule D (Form 1120-S) | 23b | | |
| c | Add lines 23a and 23b | | 23c | |
| 24 a | Current year's estimated tax payments and preceding year's overpayment credited to the current year | 24a | | |
| b | Tax deposited with Form 7004 | 24b | | |
| c | Credit for federal tax paid on fuels (attach Form 4136) | 24c | | |
| d | Elective payment election amount from Form 3800 | 24d | | |
| z | Add lines 24a through 24d | | 24z | |
| 25 | Estimated tax penalty (see instructions). Check if Form 2220 is attached | ☐ | 25 | |
| 26 | **Amount owed.** If line 24z is smaller than the total of lines 23c and 25, enter amount owed | | 26 | |
| 27 | **Overpayment.** If line 24z is larger than the total of lines 23c and 25, enter amount overpaid | | 27 | |
| 28 | Enter amount from line 27: Credited to 2024 estimated tax _____ Refunded | | 28 | |

PLAINTIFF'S EXHIBIT
**193**

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer _____ Date _____ Title **PRESIDENT**

May the IRS discuss this return with the preparer shown below? See instr. ☒ Yes ☐ No

**Paid Preparer Use Only**

| | | | |
|---|---|---|---|
| Print/Type preparer's name KELLEN LEONE | Preparer's signature KELLEN LEONE | Date 02/05/24 | Check if self-employed ☐ | PTIN ▮▮▮▮▮ |
| Firm's name ▸ GINERIS & ASSOCIATES, LTD. | | | Firm's EIN ▸ |
| Firm's address ▸ 2005 HART STREET DYER, IN 46311 | | | Phone no. 219-864-4800 |

LHA For Paperwork Reduction Act Notice, see separate instructions.

311701 12-19-23

Form **1120-S** (2023)

1

15220205 151105 DOCK                                       2023.02040 DOCK & DOOR INSTALL, INC. DOCK____1

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 62

## Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

MID-AMERICA CARPENTERS REGIONAL )
COUNCIL PENSION FUND; et al., )
                   )
       Plaintiffs, )
                   )
    vs.           ) Case No.
                ) 1:24-cv-06428
DOCK & DOOR INSTALL, INC., an )
Illinois corporation and MIDWEST )
DOCK SOLUTIONS, INC., an Illinois )
corporation,          )
                 )
       Defendants.    )

      The deposition of CALLIE MARIE STEPHENS,
taken via Zoom before GINA M. CAUSLEY, C.S.R. of the
State of Illinois, pursuant to Notice, pursuant to the
Federal Rules of Civil Procedure for the United States
District Courts pertaining to the taking of
depositions on Tuesday, October 7th, 2025, commencing
at 9:30 a.m.

## Page 2

```
 1   APPEARANCES:
 2     MCJESSY, CHING & THOMPSON, LLC
       3759 North Ravenswood - Suite 231
 3     Chicago, Illinois  60613
       BY:  MR. KEVIN P. MCJESSY,
 4        Appeared on behalf of the Plaintiffs;
 5
       ALLOCCO, MILLER & CAHILL, PC
 6     20 North Wacker Drive - Suite 3517
       Chicago, Illinois  60606
 7     BY:  MR. TODD MILLER,
          Appeared on behalf of the Defendant
 8        Dock & Door Install, Inc.;
 9
       AMUNDSEN DAVIS, LLC
10     3815 East Main Street - Suite A-1
       St. Charles, Illinois  60174
11     BY:  MR. MICHAEL HUGHES,
          Appeared on behalf of the Defendant
12        Midwest Dock Solutions, Inc.
13
14
15
16
17
18          - - - o0o - - -
19     Reported for Certified Reporting Company
          11 East Adams Street - Suite 1608
20          Chicago, Illinois  60603
                (312) 922-1666
21
22     Reported by Gina M. Causley, C.S.R.
23          - - - o0o - - -
24
```

## Page 3

```
 1              I N D E X
 2
 3   WITNESS:  CALLIE MARIE STEPHENS
 4                    PAGE
 5   EXAMINATION BY MR. MCJESSY..................4
 6
 7
 8            E X H I B I T S
 9
10   PLAINTIFFS' EXHIBIT
11        No. 106...........................107
12        No. 107...........................103
13        No. 167.............................7
14        No. 170...........................123
15        No. 191............................85
16        No. 192............................76
17        No. 193............................84
18        No. 203...........................122
19        No. 205............................61
20        No. 206............................96
21        No. 211...........................133
22
23
24
```

## Page 4

```
 1          (WHEREUPON, the witness was first
 2          duly sworn remotely.)
 3
 4          CALLIE MARIE STEPHENS,
 5   called as a witness in behalf of the Plaintiffs
 6   herein, having been first duly sworn remotely, was
 7   examined and testified as follows:
 8
 9              EXAMINATION
10
11   BY MR. MCJESSY:
12      Q    Hi.  Can you please state your full name
13   for the record, first, middle and last and spell each?
14      A    Callie Marie Stephens, C-a-l-l-i-e
15   M-a-r-i-e S-t-e-p-h-e-n-s.
16      Q    All right.  And have you ever been
17   deposed before?
18      A    No.
19      Q    Have you -- well, strike that.  Let me go
20   through some ground rules to hopefully make things go
21   faster today and a little more smoothly.
22          First, you understand you're under
23   oath, correct?
24      A    Yes.
```

Page 5

1    Q    And do you understand that even though
2    this is a deposition taking place by Zoom that oath
3    has the same force and effect as if you were
4    testifying in a court of law?
5    A    Yes.
6    Q    All right.  And I'm going to ask you a
7    series of questions today and you'll give me hopefully
8    the best most truthful answers that you can.
9         If I ask a question and you don't
10   understand it, will you ask me to explain my question
11   or tell me that you don't understand it so I can
12   rephrase it?
13   A    Yes.
14   Q    All right.  And with that understanding
15   then is it fair that I can presume if you answer a
16   question that I've asked that you understood my
17   question?
18   A    Yes.
19   Q    And we have a court reporter here today
20   taking down what everybody says, so it's important
21   that we not talk over each other.  She'll just have a
22   hard time taking down what each of us is saying.
23        So sometimes even if you know what
24   my question's going to be and you want to start

Page 6

1    answering my question before I finish, please let me
2    finish asking my question before you start answering,
3    is that fair?
4    A    Yes.
5    Q    All right.  And I'll try to return the
6    courtesy and not ask a new question while you're still
7    giving an answer.
8         Also, all of your responses need to
9    be verbal responses.  Yeses and no's are fine, but if
10   you nod or shake your head or say, "Uh-huh" or
11   "Huh-uh," I'll prompt you is that a yes, is that a no
12   just so the record is clear, is that fair?
13   A    Yes.
14   Q    And, also, as we go along today, if you
15   need to take a break -- usually we take a break about
16   every hour, but if you need to take a break, let me
17   know and we can stop and we can do that.
18        Is there any reason today that you
19   cannot give truthful answers to my questions, for
20   example, are you taking any medications or suffering
21   from any conditions that would prevent you from being
22   able to understand my questions or give truthful
23   answers?
24   A    No.

Page 7

1    Q    Okay.  Now, you are appearing here today
2    as the representative of Gineris & Associates,
3    G-i-n-e-r-i-s, correct?
4    A    Yes.
5    Q    And are you represented by counsel here
6    today?
7    A    No.
8
9         (WHEREUPON, said document was
10        marked as Plaintiffs' Deposition
11        Exhibit No. 167, for
12        identification, as of 10/7/25, so
13        marked by Mr. McJessy.)
14
15   BY MR. MCJESSY:
16   Q    All right.  I'm going to show you what I
17   have marked as Exhibit 167.  Are you able to see that
18   document?
19   A    Yes.
20   Q    And that's the subpoena that was issued
21   to Gineris & Associates, correct?
22   A    Yes.
23   Q    And it asks Gineris & Associates to
24   produce the person most knowledgeable about certain

Page 8

1    topics, correct?
2    A    Yes.
3    Q    And those topics are set forth in the
4    rider attached here as -- to the subpoena and there's,
5    oh, 16 different topics that it asks Gineris to
6    produce a representative for, correct?
7    A    Yes.
8    Q    And have you had a chance to review the
9    subpoena in the past?
10   A    Yes, about a year ago.
11   Q    All right.  And it also asks
12   Gineris & Associates to produce documents responsive
13   to 24 different categories, correct?
14   A    Yes.
15   Q    All right.  And are you the person most
16   knowledgeable about the topics that are in this
17   subpoena?
18   A    Yes.
19   Q    And were you the person responsible for
20   gathering and producing the documents responsive to
21   the document production requests?
22   A    Yes.
23   Q    Could you tell me what, if anything, did
24   you do to prepare for today's deposition?

Page 9

1    A   Nothing.

2    Q   You haven't reviewed any documents or

3  anything like that?

4    A   No.

5    Q   Now, I'm going to go -- I would like to

6  go through the topics in the deposition subpoena and

7  ask if you're the person most knowledgeable about each

8  of these topics and then also ask some information

9  about these topics.

10       So Topic No. 1 is Subpoena

11  Respondent's effort to gather and produce documents

12  responsive to this subpoena.  You're the person most

13  knowledgeable about that?

14    A   Yes.

15    Q   Who all was involved in the effort to

16  gather documents responsive to the subpoena?

17    A   It was me.  I believe -- oh, for the

18  subpoena?  It was just me.

19    Q   Okay.

20    A   For the document representation, that's a

21  different story.

22    Q   What do you mean by that?  I'm sorry.

23    A   Well, you guys had sent something out

24  about a year ago asking for documents.

Page 10

1    Q   Correct.

2    A   And so the tax professionals on the --

3  for Dock & Door, Midwest Dock, they sent in their own

4  information about e-mails and such, and then I think

5  maybe our billing person sent in information, but as

6  far as the subpoena, nobody has sent anything to me or

7  gathered anything.

8    Q   Okay.  So you said the tax professionals.

9  Are those tax professionals with Gineris?

10    A   Yes.

11    Q   And who would those persons have been?

12    A   Kellen Leone is the tax professional for

13  Midwest Dock, Dock & Door and Anthony Zarlengo, and

14  then Margaret Jonas is the tax professional for Mike

15  Richert.  Oh, and I think Kellen is also Anthony

16  Brutti's tax professional.

17    Q   So Kellen Leone was the tax professional

18  for Midwest Dock Solutions and Dock & Door?

19    A   Yes.

20    Q   And also for Tony Zarlengo?

21    A   Yes.

22    Q   And then Kellen Jones was the tax

23  professional for Tony Brutti and Mike Richert?

24    A   Kellen Leone is Tony Brutti, also, and

Page 11

1  Margaret Jonas is for Mike Richert.

2    Q   Oh, I'm sorry.  Okay.  Kellen Jonas is

3  just for Mike Richert personally?

4    A   It's Margaret Jonas.

5    Q   Margaret Jonas.

6    A   But, yes, just for Mike Richert.

7    Q   All right.  And do you know why there's

8  that division?

9    A   I think Margaret worked on Mike Richert's

10  return because she had a relationship with his wife,

11  Holly, and so it was just divided up that way.

12    Q   And to your knowledge -- well, we'll get

13  to this a little bit later, but how long has Gineris

14  been preparing the taxes for Dock & Door, Midwest Dock

15  Solutions, Mike Richert, Tony Zarlengo and Tony

16  Brutti?

17    A   I would have to look that up because when

18  I started in 2010, they were all clients of ours at

19  that time, but if you want me to go back further than

20  that, I would have to look that up.

21    Q   Okay.  Since at least 2010 Gineris has

22  been preparing all of their taxes?

23    A   Yes.

24    Q   And has that division -- well, strike

Page 12

1  that.

2       Has Kellen Leone been there since

3  2010, also?

4    A   No, Kellen Leone started, I believe, in

5  2017, and I would like to make one correction to what

6  I said previously.

7    Q   Sure.

8    A   Anthony Brutti, I don't believe he was a

9  client in 2010.  I would have to look that up.

10    Q   Okay.  And how long -- Strike that.

11       Has Margaret Jonas been there since

12  2010?

13    A   Yes, since before.

14    Q   Okay.  So do you know who was doing the

15  tax returns for Midwest Dock Solutions, Anthony

16  Zarlengo and Dock & Door prior to 2017?

17    A   I believe it was Patrick Gineris.  I can

18  confirm that if you need me to.

19    Q   Okay.  Did the tax professionals provide

20  the documents responsive to the subpoena separate from

21  you?

22    A   No.

23    Q   Okay.  Did they provide the documents to

24  you to provide in response to the subpoena?

Page 13

1      A    No.  Well, they were in our document
2  folders, so I grabbed them myself.
3      Q    I see.
4           So they maintain -- the tax
5  professionals maintain documents and you went into
6  their folders to produce their documents?
7      A    Yep.
8      Q    So you produced the documents of the tax
9  professionals?
10     A    That's right.
11     Q    And then you mentioned the Billing
12 Department, correct?
13     A    Yes.
14     Q    And the Billing Department, did you
15 produce the Billing Department's records?
16     A    Yes.
17     Q    And same thing, you went into their
18 folders and grabbed their documents?
19     A    Yes.
20     Q    Including e-mails and things like that?
21     A    No.  For the e-mails they would have
22 needed to forward those themselves.
23     Q    To you to forward to me?
24     A    I don't think so.  I think they all

Page 14

1  just -- yeah, they just forwarded them.  I shared
2  the -- are we calling it a subpoena, is that what that
3  is?
4      Q    Yes.
5      A    Okay.  I just forwarded the subpoena to
6  them and they took care of providing their e-mails and
7  tax and whatever communications was requested.
8      Q    All right.  And who are the people in the
9  Billing Department that would have done that?
10     A    I believe it was just Dave Betz.
11     Q    Can you spell that last name?
12     A    B-e-t-z.
13     Q    And what does the Billing Department do?
14     A    It finalizes the invoices that we as the
15 tax preparers and accountants prepare.
16     Q    To the clients like Midwest Dock
17 Solutions and Dock & Door?
18     A    Yes.  So we prepare our own invoices, but
19 they review them, finalize them and then collect the
20 payments on them.
21     Q    And would that also be to the individuals
22 like Mr. Brutti, Mr. Zarlengo and Mr. Richert?
23     A    That's right, yes.
24     Q    Okay.  And how about the tax

Page 15

1  professionals of production of e-mails, would you have
2  produced those or would they have produced those?
3      A    They produced their own.
4      Q    And the only two tax professionals
5  involved would have been, again, Kellen Leone and
6  Margaret Jonas, right?
7      A    Yes.
8      Q    And then it sounds to me like there's an
9  Accounting Department that's separate from tax
10 professionals and the Billing Department, is that
11 correct?
12     A    Yes.
13     Q    And who's the Accounting Department?
14     A    That would be me.
15     Q    Okay.  And do you do the accounting for
16 both Midwest Dock Solutions and Dock & Door?
17     A    Yes.
18     Q    And how long have you been doing the
19 accounting for those two companies?
20     A    Roughly since 2013.
21     Q    And how did -- did you start doing --
22 well, strike that.
23           Dock & Door, if I represent to you
24 that it came into existence after 2013, does that

Page 16

1  sound right?
2      A    Yes.  I was actually going to look that
3  up to see when they started, so thank you.
4      Q    But you've done the accounting for
5  Dock & Door since it started, correct?
6      A    Yes.
7      Q    How did you come to do the accounting for
8  Midwest Dock Solutions?
9      A    The accountant that was handling Midwest
10 Dock left our firm and I inherited her workload.
11     Q    Who was that?
12     A    Jaclyn McKee.
13     Q    All right.  So you took over when she
14 left?
15     A    Yeah.
16     Q    Have you done any work on that account
17 prior to her leaving?
18     A    Yes, I believe I assisted her with the
19 payroll, data entry and sales tax, like use tax.  They
20 file use tax.
21     Q    What's that?
22     A    It's the tax that you have to -- that
23 companies pay when they are -- sorry.
24           Dock & Door has to pay it because

## Page 17

1  they're not the end user, so they don't pay sales tax
2  when they purchase products.  So anything they don't
3  pay sales tax on, if they use it, they have to pay a
4  use tax.  If they use it at a location, they have to
5  pay use tax.
6      Q   That's Dock & Door or Midwest Dock?
7      A   Midwest Dock.
8      Q   And then you started -- you were the
9  original accountant for Dock & Door, correct?
10     A   Yes.
11     Q   And how did you come to have that
12  account?
13     A   It was handed to me by Patrick Gineris
14  once it was started, once the company was started.
15     Q   Do you know, did Mr. Gineris form the
16  company?
17     A   I don't know.
18     Q   Are you the person most knowledgeable
19  about Gineris' work for both Dock & Door Install and
20  Midwest Dock Solutions?
21     A   Yes.
22     Q   And are there engagement agreements with
23  Midwest Dock Solutions or Dock & Door?
24     A   If they -- if there is, then they already

## Page 18

1  have been handed over, and that would have come from
2  the Billing Department.
3      Q   Is it possible that there are not
4  engagement letters?
5      A   Yes, that's possible.
6      Q   Is there something that determines
7  whether there is an engagement letter or not?
8      A   We started doing engagement letters
9  probably after 2016 for new clients.  It just wasn't
10  something that we did when these two companies came on
11  board.
12     Q   The facts and circumstances surrounding
13  Subpoena Respondent's engagement by Dock & Door and
14  Midwest Dock Solutions, are you the person most
15  knowledgeable about that?
16     A   Yes.
17     Q   Okay.  Are you the person most
18  knowledgeable about the billing records, including
19  invoices, billing statements and account statements
20  for Gineris' work for Dock & Door and Midwest Dock
21  Solutions?
22     A   Yes.
23     Q   All right.  Are you the person most
24  knowledgeable about who paid Subpoena Respondent's

## Page 19

1  invoices and billing statements for the work performed
2  for Dock & Door and Midwest Dock?
3      A   I could see who paid me.  Like I could
4  see their books, so if that's good enough.
5      Q   All right.  And it looks like -- and
6  we'll get to this, too, but it looks like Gineris is
7  paid by either ACH transfer or something like that out
8  of the accounts for both of these companies.  Does
9  that sound right to you?
10     A   Yes.
11     Q   Do you know who would have set that up?
12     A   Whoever is in charge of the bank account
13  or the credit card has to set that up themselves.
14     Q   No. 7 is the financial statements of
15  Dock & Door and Midwest Dock Solutions.  Are you the
16  person most knowledgeable about that?
17     A   Yes.
18     Q   Gineris' communications with any of the
19  following companies or persons, Dock & Door Install,
20  Midwest Dock Solutions, Mike Richert, Anthony Zarlengo
21  and Anthony Brutti, are you the person most
22  knowledgeable about that?
23     A   Yes.
24     Q   Okay.  Any loans, lines of credit or

## Page 20

1  guarantees of any loans or lines of credit for
2  Dock & Door, Midwest Dock Solutions, are you the
3  person most knowledgeable about that?
4      A   Yes.
5      Q   The persons who were authorized -- or
6  strike that.
7          The persons who were authorized to
8  sign checks on behalf of Dock & Door and Midwest Dock
9  Solutions, are you the person most knowledgeable about
10  that?
11     A   No.
12     Q   Who would be?
13     A   I would say for -- if I had that
14  question, I would ask Anthony Zarlengo who's in
15  charge -- who's the signer on the banks for Midwest
16  Dock, and for Dock & Door I would ask Anthony Brutti.
17     Q   I understand, but to the extent there's
18  somebody at Gineris who's familiar with them would you
19  be the person most knowledgeable?
20     A   Yes.
21     Q   And the persons who were authorized to
22  transfer funds from the bank accounts of Dock & Door
23  and Midwest Dock Solutions, would you be the person
24  most knowledgeable about that at Gineris?

Page 21

1    A    Yes.
2    Q    And the person most knowledgeable at
3  Gineris about authorization to access online banking
4  records of Dock & Door and Midwest Dock Solutions, are
5  you the person most knowledgeable about that?
6    A    Yes.
7    Q    Do you have -- do you, meaning, Gineris
8  have access to Dock & Door Install's and Midwest Dock
9  Solutions' online banking records?
10   A    Yes.
11   Q    How does that work?
12   A    We have an accountant's login, so we
13  don't have straight admin access, but we do have an
14  accountant's login so we can login, see check images,
15  see deposit images if we need to and pull the bank
16  statements.
17   Q    And do you personally do that?
18   A    No, not anymore.
19   Q    You used to do that I take it?
20   A    Yes.
21   Q    And did you do that for both companies?
22   A    Yes.
23   Q    And have you delegated that task now to
24  somebody else?

Page 22

1    A    Yes.
2    Q    And who's that person?
3    A    Julie Filippo. She's an administrative
4  assistant here.
5    Q    Can you spell her last name, please?
6    A    F-i-l-i-p-p-o.
7    Q    And is she responsible for doing that for
8  both companies?
9    A    Yes.
10   Q    To your knowledge, do both companies bank
11  at the same banking institution?
12   A    I believe they do.
13   Q    Okay. To your knowledge, have they
14  always banked at the same banking institution?
15   A    Yes, it's a local bank.
16   Q    And when you use the accountant's login
17  to log into the companies' bank accounts, are you able
18  to like import that information into your accounting
19  system?
20   A    Yes.
21   Q    Can you describe for me how that works?
22   A    Off the top of my head I don't know if
23  there's a bank feed set up or not for either of these,
24  but in general how it works is we log into Xero, our

Page 23

1  accounting software, add the bank account and then log
2  into the bank account from the accounting software,
3  and then the accounting software is able to retrieve
4  all of the banking details.
5         If they don't have a bank feed,
6  then we will just log into the bank, download an
7  import file, like a QBO file or something and then
8  import that into the Xero accounting software.
9    Q    All right. And how long have you been
10  using the Xero accounting software for Midwest Dock
11  and Dock & Door?
12   A    I believe 2017.
13   MR. HUGHES: I'm going to object to compound
14  when you're asking about the two companies at the same
15  time. The question is compound.
16   THE WITNESS: Okay.
17  BY MR. MCJESSY:
18   Q    Do you use the same accounting software
19  for both companies?
20   A    Yes.
21   Q    And how long have you been using that
22  accounting software for the companies?
23   A    So for Dock & Door I believe we switched
24  them over in 2016, and for Midwest Dock we switched

Page 24

1  them over in 2017.
2    Q    And switched over from what in each
3  instance?
4    A    Midwest Dock was using QuickBooks, and so
5  we moved him from QuickBooks to Xero. Dock & Door was
6  using -- we were just using our Thomson Reuters
7  software to compile his books.
8    Q    And is there a fee associated with the
9  use of the Xero software?
10   A    Yes.
11   Q    And is that fee billed to Dock & Door
12  through Gineris' invoices to Dock & Door?
13   A    No, it's rolled into their flat fee
14  agreement.
15   Q    Let me take a step back. What is the
16  billing arrangement with Dock & Door?
17   A    So for Dock & Door they pay a flat fee
18  that includes all of their accounting, their payroll
19  and software that they use. I can look up to see if
20  it includes their tax return.
21   Q    Okay.
22   A    Okay. Their flat fee does include their
23  business tax return.
24   Q    Do you know, does Gineris prepare

Page 25

1    Mr. Brutti's individual tax return?
2        A    Yes.
3        Q    Is there a separate fee for that?
4        A    I'm going to look.
5        Q    MR. HUGHES:  I will object to beyond the
6    scope of the 30(b)(6) subpoena topics.
7        THE WITNESS:  Okay.  So do I answer that or
8    not?
9    BY MR. MCJESSY:
10       Q    Yes, you can go ahead and answer.
11       A    All right.  Okay.  I do not see a
12   separate invoice for a personal tax return for Anthony
13   Brutti.
14       Q    Now, you mentioned a flat fee agreement.
15   Is that a written agreement?
16       A    Like we talked about earlier, I don't
17   think we have an engagement letter or a written
18   agreement.  It was -- it would have been in a meeting
19   and verbalized, and then once we produced the invoices
20   those are written, but, no, I don't think we have a
21   formal written agreement.
22       Q    All right.  And as a result of the -- you
23   mentioned that the flat fee agreement includes the
24   accounting work, payroll work, software, business tax

Page 26

1    returns and it sounds like it may also include
2    Mr. Brutti's personal tax return, correct?
3        A    Yes, that's what I'm seeing.
4        Q    And what is the software that's included?
5        A    It would be the ADP payroll software and
6    also the Xero software.
7        Q    And would Dock & Door have the Xero --
8    would they access the Xero software directly?
9        A    Yes.
10       Q    And is that software that's installed on
11   a computer or is it accessed in the Cloud?
12       A    It's Cloud based.
13       Q    And to your knowledge, does Dock & Door
14   use the Xero software in its business operations?
15       A    Yes, it does.
16       Q    And for what purpose?
17       A    Invoicing and deposit reconciliation.
18       Q    And when we say, "Dock & Door," does that
19   really mean Anthony Brutti?
20       A    Yes.
21       Q    To your knowledge, is there anyone else
22   at Dock & Door who does invoicing besides Mr. Brutti?
23       A    No.
24       Q    How about reconciliation?

Page 27

1        A    No.
2        Q    And you said that Midwest Dock Solutions
3    was using QuickBooks and it was switched over to Xero
4    in 2017, correct?
5        A    Yes.
6        Q    And what does Midwest Dock Solutions use
7    Xero for?
8        A    Invoicing, bill payment, deposit
9    reconciliation, credit card reconciliation and receipt
10   matching.
11       Q    I think I got five things there,
12   invoicing, bill payment, bank account reconciliation,
13   receipt matching and credit card reconciliation?
14       A    Yes.
15       Q    And when you say, "invoicing," is that
16   invoicing its customers?
17       A    Yes.
18       Q    And is that also true for Dock & Door, it
19   uses invoicing its customer, too, also?
20       A    Yes.
21       Q    And bill payment, what do you mean by
22   bill payment?
23       A    Bills that they receive from their
24   vendors are entered into the system and then they're

Page 28

1    paid out of the system when they're due.
2        Q    Does Dock & Door use the Xero account
3    for -- or the Xero software for bill payment?
4        A    I'm going to look to confirm.
5             No, most of theirs are set up on
6    like an ACH, so he doesn't write many checks.
7        Q    And if you're using the Xero software, do
8    you have to like pay an additional fee in order to use
9    like a bill payment component of it or is the
10   software -- you just buy the software and you can use
11   all the features?
12       A    There are different levels of
13   subscriptions, yes, and so if you're paying for the
14   invoicing, then you're also getting the bill payment.
15       Q    I see.
16             All right.  And -- oh, I see.  So
17   Dock & Door has the ability to use the software for
18   bill payment, it just doesn't do that?
19       A    Correct.
20       Q    I see.
21             And then you mentioned credit card
22   reconciliation.  How does the Xero software work for
23   credit card reconciliation?
24       A    They feed in like -- like the bank feeds

Page 29

1    do, like the banks do, and Sherry -- I said that
2    specifically because Midwest Dock has an in-house
3    bookkeeper that handles the reconciliation of the
4    deposits -- I'm sorry -- of the credit card and the
5    deposits.
6        Q    And Sherry does that?
7        A    Sherry does that.
8        Q    And then how about receipt matching,
9    what's that?
10       A    The receipt matching, so they use Dext
11   which is also a software that's provided in their flat
12   fee.  They -- everyone that has a credit card has to
13   send their receipts up.  If Sherry is missing a
14   receipt, then she holds out the reconciliation of that
15   transaction until she gets the receipt so that she can
16   ensure there's no personal use on the cards and that
17   everything's on the up and up.
18       Q    And so the credit card reconciliation and
19   the receipt matching are somewhat related?
20       A    Yes.
21       Q    And then bank reconciliation, that's
22   reconciling the checks written on the bank account and
23   the other ACH transfers out of the account, that kind
24   of thing?

Page 30

1        A    Yes, but my team mostly handles that.
2    She -- Sherry has to handle the deposits, the
3    reconciliation of the deposits because, otherwise, we
4    don't know what invoice to match them to.
5        Q    You mentioned that Dock & Door has a flat
6    fee agreement that includes both the ADP payroll and
7    the Xero software.  What is the ADP payroll software?
8        A    ADP, like what's the cost of it or what's
9    it for?
10       Q    No.  What's it for?
11       A    We use ADP's wholesale platform to run
12   all of our accounts so we can handle all of our
13   clients' payrolls in-house without having to file wage
14   reports manually and handle direct deposit on our own.
15   So we use that as our payroll platform.  So we pay a
16   flat fee to them per client.
17       Q    And what is the fee arrangement with
18   Midwest Dock Solutions?
19       A    The entire flat fee, monthly flat fee?
20       Q    Well, I guess that's my question.  Do
21   they also have a flat fee agreement?
22       A    Oh, Midwest Dock, yes.  Sorry.
23       Q    Yes.
24       A    Yes.

Page 31

1        Q    And does it also include accounting,
2    payroll software and business tax returns?
3        A    I don't think so.  Let me look.
4            Okay.  It does include the payroll,
5    the sales tax, the accounting.  It says here that it
6    also includes the business tax return, but I want to
7    confirm that.
8            MR. HUGHES:  I just want to object.  I'm not
9    sure it's appropriate for the witness to be testifying
10   from some sort of document or system or computer that
11   we're not aware of what's going on.
12           If it's a situation where the
13   witness needs to refresh her recollection, I think
14   Mr. McJessy can have her do that with something, but
15   to just be relaying information from somewhere that
16   the parties here don't know what's going on I think is
17   not appropriate for the purposes of a deposition.
18   BY MR. MCJESSY:
19       Q    You can still answer.  You're reviewing I
20   take it Gineris' records?
21       A    Yes.
22       Q    Its business records?
23       A    Yes.
24           Okay.  So their flat fee agreement

Page 32

1    is for accounting, use tax filing, payroll, all the
2    software.  It does not includes the tax return.
3        Q    Okay.  And the software, is that also
4    ADP and the Xero?
5        A    And the Dext, yes.
6        Q    I'm sorry.  What's the last one?
7        A    Dext, D-e-x-t.
8        Q    And what was that software used for?
9        A    That's for the -- that's for the receipt
10   collection.
11       Q    In order to reconcile the credit cards?
12       A    Correct.
13       Q    To your knowledge, does Dock & Door
14   maintain credit card accounts?
15       A    They do not.
16       Q    So there would be no reason for it to pay
17   for the Dext software, correct?
18       A    Correct.
19       Q    All right.  Getting back to the subpoena,
20   the list of topics, are you the person most
21   knowledgeable about the persons from Dock & Door and
22   from Midwest Dock Solutions who direct Gineris' work
23   on behalf of each company?
24       A    Yes.

Page 33

1    Q    Who's your main contact with Dock & Dock
2  Install?
3    A    Anthony Brutti.
4    Q    He's actually your only contact, correct?
5    A    Yes.
6    Q    All right.  And to your knowledge, other
7  than -- to your knowledge, does Dock & Door have any
8  administrative staff?
9    A    No.
10   Q    Does it have any sales staff?
11   A    I'm not aware.
12   Q    Okay.  It has workers, correct?
13   A    Yep.
14   Q    Okay.  Other than the workers does it
15  have any other employees that you're aware of that
16  perform any other functions?
17       MR. HUGHES:  Objection; beyond the scope of the
18  topics and competency.
19  BY MR. MCJESSY:
20   Q    You can answer.
21   A    Not that I'm aware of.
22   Q    Okay.  And who's your main contact for
23  Midwest Dock Solutions?
24   A    Tony Zarlengo.

Page 34

1    Q    And do you have other contacts with
2  Midwest Dock Solutions?
3    A    Yes.
4    Q    And who are your other contacts?
5    A    Sherry Webber.
6    Q    And is she like an administrative person
7  at Midwest Dock Solutions?
8    A    Yes.
9    Q    And what is your understanding of what
10  she does?
11   A    I believe she handles the books,
12  maintains the books in-house.
13   Q    And what's the nature of your
14  interactions with her?
15   A    Strictly about the transactions in Xero.
16   Q    Are you the person most knowledgeable
17  about the accounting records, including QuickBooks and
18  other accounting software records of Dock & Door and
19  Midwest Dock Solutions?
20   A    Yes.
21   Q    All right.  Are you the person most
22  knowledgeable about the relationship between
23  Dock & Door Install and Midwest Dock Solutions?
24   A    Yes.

Page 35

1    Q    Are you the person most knowledgeable
2  about any written or verbal agreements between
3  Dock & Door and Midwest Dock Solutions?
4    A    Yes.
5    Q    And are you the person -- are you aware
6  of any agreements between Dock & Door and Midwest Dock
7  Solutions?
8    A    No.
9    Q    Okay.  Are you the person most
10  knowledgeable about the ownership, management and
11  operation of Dock & Door and Midwest Dock Solutions?
12   A    Yes.
13   Q    And I'd like to go through a couple of
14  document production requests just to confirm I
15  understand the nature of the records that were
16  produced and the nature of the records that Gineris
17  maintains.
18       Item No. 2 asks for documents --
19  billing records related to Dock & Door Install and
20  Midwest Dock Solutions.  Do you see that?
21   A    Yes.
22   Q    And what kind of billing records does
23  Gineris maintain?
24   A    Invoices.

Page 36

1    Q    Just regular invoices to its customers?
2    A    Yes.
3    Q    And for Midwest Dock and Dock & Door how
4  are they invoiced?
5    A    Monthly.
6    Q    And who prepares the invoice and how is
7  it prepared?
8    A    I prepare the invoice for my clients.
9  And what do you mean by how is it prepared?
10   Q    You prepare the invoice, is that right?
11   A    Yeah.
12   Q    What about for like tax preparation work?
13   A    That would be the tax preparer prepares
14  that.
15   Q    So whoever is performing the work
16  prepares the invoice?
17   A    Yes.
18   Q    And if two parties perform work during a
19  given month, are the invoices consolidated or are they
20  issued separately?
21   A    It depends.  So a tax return is always
22  billed by the tax professional.  Everything else is
23  billed by me.
24   Q    And Item 5 asks Subpoena Respondent to

Page 37

1    produce Subpoena Respondent's communications with
2    Dock & Door, Midwest Dock, Michael Richert, Anthony
3    Zarlengo and Anthony Brutti.  I just want to make sure
4    I understand correctly.
5            You arranged for each party that
6    had communications with those parties to produce their
7    communications separately, is that correct?
8        A    Yes.
9        Q    Okay.  So you relied on each of the
10   parties who you believe may have had communications
11   with those entities or persons to gather and produce
12   those documents on their own, is that fair?
13       A    Yes.
14       Q    All right.  Does everyone at Gineris
15   maintain their e-mails in the same manner using the
16   same software?
17       A    Yes.
18       Q    And what software does Gineris use?
19       A    We use G Suite.
20       Q    And do you know, does Gineris have any
21   sort of document retention policy, like as e-mails
22   kept indefinitely or are they regularly deleted or
23   does it just depend on the person?
24       A    It really just depends on the person.

Page 38

1        Q    Now, you mentioned that you've been doing
2    the accounting work for Dock & Door and Midwest Dock
3    since -- well, strike that.
4            You mentioned you've been doing the
5    accounting work for Midwest Dock since 2013 and for
6    Dock & Door since it was formed, correct?
7        A    Yes.
8        Q    And I think you said you had somebody
9    else now who assists you, Julie Filippo, who gathers
10   information from the bank accounts, correct?
11       A    Yes.
12       Q    Other than Julie Filippo is there anybody
13   else who assists you in doing your accounting work for
14   the companies?
15       A    Yes, I have a bookkeeping staff.  I have
16   a payroll staff.
17       Q    I see.
18           What does the payroll staff do?
19       A    They submit the payroll.  So if there
20   are -- they handle payroll issues.  So --
21       Q    Well, strike that.  Let me ask my
22   question a little differently.
23       A    Okay.  Thank you.
24       Q    What does your payroll staff do for

Page 39

1    Midwest Dock Solutions?
2        A    We just submit it.  So we review it after
3    Sherry enters the payroll just to make sure that
4    overtime is accounted for, any advances are accounted
5    for, and then we handle the final submission.
6        Q    Okay.  So Sherry Webber actually enters
7    the payroll into the system and you just review to
8    make sure it's accurate?
9        A    Yes.
10       Q    What does your payroll staff do for
11   Dock & Door?
12       A    After Tony enters the -- Anthony enters
13   the payroll into ADP we do the same thing.  We review
14   it to make sure that overtime is accounted for and any
15   advances are taken care of and we processed it.
16       Q    And when you say, "Tony," you mean Tony
17   Brutti?
18       A    I do.
19       Q    There's Tony Zarlengo and Tony Brutti.
20   So just as we go along, if you can mention which one
21   it is just so the record is clear, that would be
22   helpful; if not, I'll prompt you or Mr. Hughes will
23   prompt you.
24       A    Thank you.

Page 40

1        Q    So the payroll staff does the same thing
2    for both companies, correct?
3        A    Yes.
4        Q    And then what does -- does the payroll
5    staff do anything else for either company?
6        A    No.
7        Q    And both companies use the same ADP
8    software?
9        A    Yes.
10       Q    And how about what does the bookkeeping
11   staff do for Midwest Dock Solutions?
12       A    For Midwest Dock our bookkeeping staff
13   reconciles transactions in the bank that Sherry hasn't
14   handled.  They reconcile the payroll as it comes in
15   from ADP, and then we review it to make sure that
16   everything is coded properly.
17       Q    And what does your bookkeeping staff do
18   for Dock & Door?
19       A    We reconcile transactions that Anthony
20   hasn't taken care of and, again, reconciling the
21   payroll with the transactions from the bank and then
22   review it for coding errors.
23       Q    So the same work?
24       A    Yep.

Page 41

1    Q    And how many people are on your payroll
2  staff?
3    A    Three.
4    Q    And does the same person handle Midwest
5  Dock Solutions on a regular basis or does it vary
6  between the different staff members?
7    A    The same person maintains it on a regular
8  basis.
9    Q    And who's that?
10    A    I would have to look that up.
11    Q    And for Dock & Door is it the same thing,
12  the same person handles it on a regular basis?
13    A    Yes.
14    Q    All right.  And is it the same person who
15  handles it for Dock & Door that handles it for Midwest
16  Dock Solutions?
17    A    I'd have to look that up.
18    Q    Is that information that's available to
19  you easily?
20    A    Yes.
21    Q    Okay.  Could you look that up for me?
22    A    Yes.
23         For both companies Kim Burbach
24  handles the payrolls.

Page 42

1    Q    And how about for the bookkeeping?
2    A    Oh, let me look that up for you.
3         For the bookkeeping it's Saurabh
4  Prajapati.
5    Q    Can you spell that for the court
6  reporter, please?
7    A    Yes, S-a-u-r-a-b-h, last name Prajapati,
8  P-r-a-j-a-p-a-t-i.
9    Q    Is that for both companies?
10    A    I'm looking.
11         Same for Dock & Door.
12    Q    Okay.  Now, a couple general background
13  questions for you, are you a CPA?
14    A    No.
15    Q    What's the highest level of education
16  you've received?
17    A    A Bachelor's Degree.
18    Q    And what was your major?
19    A    Accounting.
20    Q    And when did you graduate and from where
21  did you graduate?
22    A    I believe I graduated in 2014 and from
23  University of Phoenix.
24    Q    And do you hold any licenses or

Page 43

1  certifications?
2    A    Yes.
3    Q    What licenses and certifications do you
4  hold?
5    A    I'm an enrolled agent with the IRS.
6    Q    What does that mean?
7    A    It means I can represent a client before
8  the IRS as an attorney would.
9    Q    And did you have to take any training or
10  classes to get that certification?
11    A    Yes.
12    Q    And what did that entail, can you
13  describe for me generally?
14    A    Yes.  I had to take three separate exams,
15  one on business, one on individual -- I'm sorry -- one
16  on business tax, one on individual tax and one on
17  ethics, pass all three and then maintain Continuing
18  Education each year.
19    Q    And how long have you held that
20  certification or -- is it a license or a
21  certification, how would you describe it?
22    A    It's a certification.
23    Q    How long have you held that
24  certification?

Page 44

1    A    I believe since 2015.
2    Q    And any other licenses or certifications?
3    A    No.
4    Q    All right.  And you mentioned you take
5  Continuing Education to maintain that certification,
6  correct?
7    A    Yes.
8    Q    Have you had -- since graduating from
9  college have you had any other training or formal
10  education?
11    A    Yes.
12    Q    And can you describe that for me?
13    A    Sure.  I took a payroll certification
14  class by ADP and also a QuickBooks certification class
15  and a Xero certification class.
16    Q    Now, you mentioned you graduated in 2014.
17  How long have you been working for Gineris?
18    A    Since 2010.
19    Q    So you were working there while you were
20  in college?
21    A    Yes.
22    Q    And what position were you hired for at
23  Gineris?
24    A    Front desk staff.

Page 45

1  Q    All right. And how long were you in that
2  position?
3  A    Two years.
4  Q    And then what was your next position?
5  A    I handled the payrolls for the entire
6  company where we did in-house payrolls, the sales tax,
7  and I did light bookkeeping.
8  Q    And did you have a formal title in that
9  position?
10  A    No.
11  Q    And then did that position change over
12  time?
13  A    Yes. Then I became an account manager
14  like I am now.
15  Q    When did you become an account manager?
16  A    In 2016.
17  Q    And that's the position you're in now?
18  A    Yes.
19  Q    All right. What are your
20  responsibilities as an account manager?
21  A    Maintaining the client's books, financial
22  statements, payroll, sales tax, making sure it's all
23  done on time and properly, issuing 1099's at the end
24  of the year, issuing W-2's and generally maintaining

Page 46

1  client happiness.
2  Q    And now among the documents that Gineris
3  produced in this case were general ledgers for Midwest
4  Dock Solutions and Dock & Door, correct?
5  A    Yes.
6  Q    Are you responsible for maintaining the
7  general ledgers for those companies?
8  A    Yes.
9  Q    And is that actually work that you do or
10  is that work that others working under you do?
11  A    It's work that others working under me
12  do, but I do review it to help maintain it. So I
13  review their work.
14  Q    Okay.
15  A    If that makes sense.
16  Q    So you're ultimately responsible for
17  maintaining the general ledgers?
18  A    Yes.
19  Q    And how long for both of the companies
20  has that been the case?
21  A    For Midwest Dock I've been maintaining
22  their general ledger as my full responsibility since
23  2016 -- no, since 2017 and for Dock & Door since 2016.
24  Q    And can you describe for me how the

Page 47

1  general ledger is maintained?
2  A    Through the reconciliation of
3  transactions.
4  Q    And what does that mean as a practical
5  matter?
6  A    So as the transactions flow in and out of
7  the bank, we reconcile the transactions. They go to
8  the general ledger accounts. For depreciation like on
9  their fixed assets we maintain journal entries, enter
10  journal entries to maintain the general ledger.
11  Q    And who would enter those kind of
12  entries, the journal entries for depreciation of
13  assets?
14  A    The bookkeeper, my bookkeeper.
15  Q    And then you would review those entries?
16  A    Yes.
17  Q    All right. And then when it comes time
18  to prepare the taxes, the tax preparer would use those
19  entries to prepare the taxes, is that how it works?
20  A    Yes.
21  MR. MCJESSY: All right. We've been going a
22  little over an hour. I'd like to take a five-minute
23  break, and then we'll pick back up.
24  THE WITNESS: Okay.

Page 48

1  (WHEREUPON, a short break was had.)
2
3  MR. MCJESSY: Back on the record.
4  BY MR. MCJESSY:
5  Q    You mentioned you wanted to make a
6  correction. Please.
7  A    Yes. So I did not take Midwest Dock over
8  from Jaclyn McKee. Marco Garcia took it over from
9  Jaclyn McKee. I took it over from him when he left
10  in -- I believe he left in December 2016. So I would
11  have started working on the account in January of
12  2017.
13  Q    Okay. I think that may have been what
14  you said. I have down here that you started taking --
15  when you say, "take over" -- well, strike that.
16  When you say, "take over the
17  account," what do you mean by that?
18  A    Running the books for the account. So I
19  had originally said that I started running the books
20  for Midwest Dock around 2013. That was wrong. I did
21  not.
22  Q    I see.
23  All right. So describe for me what
24  you mean by running the books.

Page 49

1     A   Reconciling the account to the bank
2 statements, preparing the financial statement. What I
3 did at that time, like 2011, '12, '13 was just the
4 payroll, was just the payroll, yeah.
5     Q   All right. And, please, as we go along
6 if you want to make corrections to something you said,
7 feel free to do that or if you didn't remember
8 something when I asked you and you do remember it
9 afterwards, you can feel free to add that information.
10 All right?
11     A   Thank you.
12     Q   All right. I want to take a step back
13 just so I understand how Gineris works.
14            I understand it has basically a
15 payroll staff, correct?
16     A   Yes.
17     Q   And it has a bookkeeping staff, correct?
18     A   Yes.
19     Q   And it has tax professionals, is that
20 correct?
21     A   Yes.
22     Q   Does it have any other departments or
23 segments?
24     A   Administrative staff, billing staff.

Page 50

1     Q   All right. And from, say, 2020 to the
2 present how many people worked in the payroll staff at
3 any one time?
4     A   Oh, like right now we have three.
5     Q   Right.
6     So it's usually around three, two to
7 three, yeah.
8     Q   How about the bookkeeping staff?
9     A   Around five to seven.
10     Q   And how about tax professionals?
11     A   Around four.
12     Q   And how about administrative?
13     A   Two to three.
14     Q   And billing?
15     A   Two.
16     Q   So is it fair to say Gineris has about 15
17 to 20 employees over the course of the last five years
18 at any given time?
19     A   Yes, we missed a department, though, the
20 Account Manager Department.
21     Q   Oh, what's the Account Manager
22 Department?
23     A   There's about four of us. I'm in that
24 department.

Page 51

1     Q   I see.
2     So about 20 to 24 people?
3     A   Yeah, some are overlapping. So some
4 departments overlap.
5     Q   Okay. What would be an example of
6 departments that overlap?
7     A   Kellen Leone is a tax professional and
8 also an account manager.
9     Q   Now, do you know what the circumstances
10 were that Midwest Dock Solutions became a client of
11 Gineris?
12     A   No.
13     Q   Who would know that?
14     A   Margaret Jonas or Patrick Gineris.
15     Q   And how about the circumstances that led
16 to Dock & Door becoming a client of Gineris, do you
17 know those circumstances?
18     A   No.
19     Q   Who would know that?
20     A   Patrick Gineris or Margaret Jonas.
21     Q   And why do you think one of them would
22 know how those companies became clients of Gineris?
23     A   They've been here the longest, those two.
24     Q   All right. Now, we've touched on this,

Page 52

1 but I would like to go back through to make sure I
2 have a complete understanding of what services Gineris
3 provides to Midwest Solutions.
4     It provides bookkeeping services,
5 correct?
6     A   Yes.
7     Q   And you described for me that you have
8 somebody under you that does that work and you review
9 their work, correct?
10     A   Yes.
11     Q   And do bookkeeping services, does that
12 include maintaining the general ledger?
13     A   Yes.
14     Q   You described for me how the bank
15 information and the credit card information is added
16 to the general ledger for Midwest Dock Solutions
17 through the Xero system. Is there any information
18 that gets added into the general ledger manually?
19     A   Manual journal entries, yes.
20     Q   Oh, payroll also gets entered into the
21 general ledger automatically, too, is that correct?
22     A   Yes.
23     Q   And how does that happen?
24     A   ADP transfers a bill into Xero

Page 53

1    Accounting, and then we reconcile the bank transaction
2    to that bill.
3        Q    What about the amount -- well, strike
4    that.
5            You said ADP transfers a bill.
6    Does that mean a bill for their services?
7        A    No, it's a -- it's for the payroll.  So
8    if the payroll is 10,000, it breaks that down in the
9    form of a bill.
10       Q    By employee?
11       A    No, by gross pay, by department, by
12   department.  So you've got productive labor is one
13   payment.  You've got office staff; you've got officer
14   wages that come through.  All is a debit.  Then you've
15   got your payroll, your employer taxes that come
16   through as a debit and then your credits for the sales
17   tax payable and the net pay.  That all comes out as a
18   bill from ADP.
19           MR. MCJESSY:  Gina, can you just read back that
20   last response to me?  I didn't quite get it all.
21
22
23
24

Page 54

1            (WHEREUPON, the record was read as
2            follows:
3            "A   No, by gross pay, by
4            department, by department.  So
5            you've got productive labor is
6            one payment.  You've got office
7            staff; you've got officer wages
8            that come through.  All is a
9            debit.  Then you've got your
10           payroll, your employer taxes
11           that come through as a debit
12           and then your credits for the
13           sales tax payable and the net
14           pay.  That all comes out as a
15           bill from ADP.")
16
17           MR. MCJESSY:  Thank you.
18           THE WITNESS:  Sorry, the credit for the payroll
19   taxes payable.
20   BY MR. MCJESSY:
21       Q    All right.  And do you get the same
22   information for both Midwest Dock Solutions and
23   Dock & Door?
24       A    Yes.

Page 55

1        Q    And is it imported into their general
2    ledger accounts the same way?
3        A    Yes.
4        Q    And what is productive labor?
5        A    Labor that's actually attributed to the
6    job, so that goes up in the Cost of Goods section.
7        Q    And so is that like the workers who are
8    out on job sites working?
9        A    Yes.
10       Q    Okay.  So for both companies you get
11   something from ADP that is productive labor?
12       A    Yes.
13       Q    So would wages paid to Mr. Brutti or
14   Mr. Zarlengo or Mr. Richert, would those be part of
15   productive labor?
16       A    No.
17       Q    And then you mentioned office staff.
18   That's a separate category?
19       A    Yes.
20       Q    You actually said you get payments by
21   department.  Are these all the different departments
22   that you meant?
23       A    Yes.
24       Q    So when you said, "Department productive

Page 56

1    labor, office staff, officer wages," those kind of
2    things, those are all separate departments, is that
3    fair?
4        A    Yes.
5        Q    All right.  And then you said, "officer
6    wages."  What are officer wages?
7        A    The officers of the company.
8        Q    So for Midwest Dock do you know who that
9    is?
10       A    Yes.
11       Q    Who is that?
12       A    Tony Zarlengo and Mike Richert.
13       Q    Who is it for Dock & Door?
14       A    Tony Brutti.
15       Q    And anyone else for either company as far
16   as you know?
17       A    No.
18       Q    All right.  And then you said, "office
19   staff," is that right?
20       A    Yes.
21       Q    Does that include like sales staff?
22       A    Yes.
23       Q    To your knowledge, does Midwest Dock
24   Solutions have office staff?

Page 57

1    A    Yes.
2    Q    And do you know who the office staff is?
3    A    I know, yeah, roughly, yes.
4    Q    Can you give me some names?
5    A    Sherry Webber, Ira Sugar, Steve French
6    and maybe there's one more.
7    Q    To your knowledge, does Dock & Door have
8    office staff?
9    A    No.
10   Q    And another category you mentioned was
11   payroll, correct?
12   A    Productive labor.
13   Q    Okay.  Well, I have --
14   A    Oh, for the taxes?  The payroll taxes I
15   mentioned.
16   Q    Payroll taxes.
17        Okay.  And what are the payroll
18   taxes?
19   A    FICA and State unemployment and Federal
20   unemployment.  That's the employer portion.
21   Q    All right.  And the employer has to pay
22   those, correct, if they paid wages?
23   A    Correct.
24   Q    And then you mentioned -- I think you

Page 58

1    mentioned -- I don't know if it's a separate category,
2    but you said, "employer tax"?
3    A    That's what I just named off is the
4    employer taxes.
5    Q    Okay.
6    A    And then I mentioned the payroll taxes
7    payable.
8    Q    Those are two separate things?
9    A    Yes, so the employer taxes are included
10   in that but also the employee taxes, so the employee's
11   portion of the FICA, their State withholding and their
12   Federal withholding.
13   Q    That's collected by the employer and then
14   paid out, correct?
15   A    Yes.
16   Q    And so there's the employer tax and then
17   there's the payroll taxes that are collected by the
18   employer and paid on behalf of the employees, correct?
19   A    Yes.
20   Q    And then you also I think mentioned
21   something called sales tax payable?
22   A    That was a misspeak, sorry.
23   Q    And then you said, "net pay"?
24   A    Yep.

Page 59

1    Q    And that's the -- what is that?
2    A    That's the employee's final pay after
3    they've paid their taxes, advances, whatever comes out
4    of their check.
5    Q    And then I think you also said, "credit
6    for the payroll tax is payable," correct?
7    A    Yes.
8    Q    What is that?
9    A    That's the credit side of the transaction
10   for the employer portion that's owed and the employee
11   portion that's owed.
12   Q    All right.  And what manual journal
13   entries would you make in the general ledger?
14   MR. HUGHES:  Objection.  Is this in -- this is
15   way beyond the scope of the topic.  I'm not sure
16   anymore if we're talking about just general or things
17   that she does for any of these companies.
18   MR. MCJESSY:  Well, strike that then, and I'll
19   rephrase my question.
20   BY MR. MCJESSY:
21   Q    What manual journal entries would you
22   make for Midwest Dock Solutions to maintain its
23   general ledger?
24   A    Interest expense on loans, depreciation

Page 60

1    expense, amortization expense.
2    Q    And for Dock & Door what kind of general
3    journal entries would you make to maintain its general
4    ledger?  I'm sorry.  Strike that.
5        For Dock & Door what kind of manual
6    entries would you make in the general ledger?
7    A    The only one I can think of is the one to
8    move -- to adjust retained earnings at the beginning
9    of the year every year, and that also has to be done
10   on Midwest Dock.
11   Q    Dock & Door doesn't have any assets to
12   depreciate, correct?
13   A    Correct.
14   Q    And it doesn't have any loans, correct?
15   A    Correct.  It does have a loan that is on
16   the books but it's not currently being paid back.
17   Q    It doesn't have any like equipment loans
18   or vehicle loans, correct?
19   A    Correct.
20   Q    But Midwest Dock Solutions does, correct?
21   A    Correct.
22
23
24

Page 61

1          (WHEREUPON, said document was
2          marked as Plaintiffs' Exhibit
3          No. 205, for identification, as of
4          10/7/25, so marked by Mr. McJessy.)
5
6    BY MR. MCJESSY:
7          Q    I'd like to show you what I've marked as
8    Exhibit 205. Can you see that document?
9          A    Yes.
10         Q    All right. This is a pdf version, but
11   does this look like the -- it's 589 pages, but I'll
12   represent to you it's the General Ledger Detail for
13   Midwest Dock Solutions that was produced in an Excel
14   format to us.
15         A    Okay.
16         Q    Does that document look like the general
17   ledger for -- and I can flip through as much of it as
18   you'd like, but does this look like the general ledger
19   for Midwest Dock Solutions?
20         A    Yes.
21         Q    All right. And you produced general
22   ledgers for Midwest Dock Solutions for 2016 to 2024,
23   correct?
24         A    Yes.

Page 62

1          Q    And you also produced general ledgers for
2    Dock & Door for the same period, correct?
3          A    Yes.
4          Q    And those were produced in Excel format?
5          A    Yes.
6          Q    They aren't maintained in an Excel
7    format, though, correct?
8          A    Correct.
9          Q    They're maintained in the Xero software?
10         A    Yes.
11         Q    And so that you could produce them in a
12   format that they were viewable you produced them in an
13   Excel format, is that fair?
14         A    Yes.
15         Q    All right. I'd like to go to -- I'm
16   going to go to Page 222 of that exhibit, and this
17   is -- can you see that document all right, is it large
18   enough?
19         A    Yes.
20         Q    And do you see that there's -- I've added
21   the highlighting to this document to make it easier
22   for me to ask you questions about it, but do you see
23   where it says, "Chase Ink - C. Zarlengo"?
24         A    Yes.

Page 63

1          Q    Is the No. 2029 there, is that a GL
2    account?
3          A    Yes.
4          Q    And it looks like this is
5    Chase Ink - S. Josh and that's Account 2027. This is
6    on Page 220 of that exhibit. Do you see that?
7          A    Yes.
8          Q    So are there separate GL accounts for the
9    different credit cards that are issued to people at
10   Midwest Dock Solutions?
11         A    Yes.
12         Q    Okay. Is there a reason that they have
13   separate GL accounts?
14         A    Yes, that's how they feed in from the
15   bank.
16         Q    All right. And so one of the things I
17   wanted to ask you about is the detail that's included
18   here for the charges -- and we're back to Page 222 and
19   the credit card for C. Zarlengo.
20              The detail -- there's a fair amount
21   of detail here about, you know, Payment: Speedway;
22   Payment: Home Depot where it says, "Payable Payment,
23   Spend Money." Can you describe for me how this
24   information gets imported into your Xero system and

Page 64

1    what information you add at Gineris versus what just
2    comes in from wherever you're importing it?
3          A    So where you're seeing Payment, Payable
4    Payment, Payment: Speedway and then that RB number
5    there in the middle, RB stands for Receipt Bank.
6    That's what Dext was called when we first started
7    using it. They got bought out and then they became
8    Dext, but all of those RB that means that she sent the
9    receipt from Dext or Receipt Bank to Xero to match it
10   up with the transaction from the credit card. So
11   where there's a payment it means she had a receipt for
12   it.
13         Q    Okay.
14         A    Where there isn't a payment -- I'm sorry.
15   Like that Speedway one --
16         Q    The third one down?
17         A    Yeah, that's right. Where it's just the
18   Spend Money, she didn't have a receipt to match that
19   to.
20         Q    Okay. And when you say, "she," you mean
21   Sherry?
22         A    Yes.
23         Q    So when she goes in using the Dext system
24   or the Receipt Bank system and she has a copy of the

Page 65

1    receipt and matches it to a charge, it adds that
2    number onto it, is that it, the RB number?
3        A    Yes.
4        Q    Okay.  How does that number get imported
5    into the Xero system at your end so that it gets
6    included in this general ledger, is it the work that
7    Sherry is doing that causes that number to appear on
8    this -- on these line items?
9        A    No, so it's -- when she pushes it out
10   from Receipt Bank or Dext, when she pushes it out of
11   Dext, it has a reference number attached to it.  It's
12   that RB number, and so that RB number, that reference
13   number is recorded with the -- it basically records as
14   a bill that she has to pay.  That's why it comes in as
15   a payable payment.  So that's like the reference
16   number of the bill.
17       Q    Okay.  And so, for example, the third
18   line down where it says, "Spend Money:  Speedway" and
19   it looks like it's a charge for $17.68, there's no
20   receipt to attach to that charge?
21       A    Correct.
22       Q    All right.  And that's true for anywhere
23   that there's no RB number across from the charge, is
24   that correct?

Page 66

1        A    Yes.
2        Q    Now, there's a payment -- if you go down
3    to May 21st, 2023, it says, "Payment:  7-Eleven."  Do
4    you see that?
5        A    Uh-huh.
6        Q    And there's a number there, but it
7    doesn't have an RB in front of it.
8        A    I can't -- I don't know why that is.
9        Q    Okay.  You don't know what that number --
10   you don't know the significance of that number?
11       A    Correct.
12       Q    Okay.  And then there's also where it
13   says, "Bank Transfer," so the fourth line down, for
14   example, Bank Transfer from Chase Ink to Chase
15   Ink - C. Zarlengo - 4995," and then there's some other
16   numbers after that.  Do you see that?
17       A    Yes.
18       Q    Is that a payment of the credit card
19   amount?
20       A    Okay.  So you know how -- it is a
21   payment, but it's a payment from the main account,
22   from the main credit card on the account.  So that's a
23   manual entry that we're doing on the credit card to
24   move all of the balances from each of these subcards

Page 67

1    to the main card so that we can reconcile that main
2    card because we only get one balance on the bank
3    statement or on the credit card statement, right?  So
4    all of our balances on each of these individual cards
5    have to be moved to the main card.
6        Q    Okay.  Now, each of the separate
7    employees that are identified have their own credit
8    card, correct?
9        A    It's a subcard.  There's one main card.
10   It's the -- it's the -- it's a Chase Ink card.  It's
11   probably in Tony Zarlengo's name.  I'd have to look,
12   but he's got the main card and then these are all
13   subcards of that.
14       Q    Okay.
15       A    His would most likely be like a 2010
16   number.  He usually would be the first.
17       Q    So I've turned to Page 174 --
18       A    Yes.
19       Q    -- of the exhibit, of Exhibit 205, and
20   there is a GL account called 2000 - Chase Ink 9507.
21       A    Yeah, that look like it's the main card
22   for all those subcards.
23       Q    Okay.  As a practical matter, is it your
24   understanding that Tony would have a physical credit

Page 68

1    card, Tony Zarlengo?
2        A    Yes.
3        Q    And the persons that have the subcards,
4    they would also have physical charge cards, too,
5    correct?
6        A    Yes.
7        Q    And they would have different numbers,
8    correct?
9        A    Yes.
10       Q    Okay.  And when the parties make charges,
11   those charges are kept track of based upon the card
12   that they're charged against, correct?
13       A    Yes.
14       Q    But for accounting purposes they're all
15   consolidated under this 2000 GL account, is that
16   correct?
17       A    Yes.
18       Q    So we should see the same charges and
19   payments under the 2000 account that we would see
20   under the individual card accounts, correct?
21       A    No.  So if you're asking if I'll see --
22   if you'll see the Speedway for 17 bucks here, no, you
23   won't.
24       Q    What will I see here?

Page 69

1    A    You'll see just the balance.  So if you
2  go back to that Page 222 --
3    Q    Okay.
4    A    -- where it says, "Transfer to the Chase
5  Ink," that 89.64 --
6    Q    Correct.
7    A    -- let's go back to 174, and then if we
8  scroll down to like that January -- I think it was
9  January 29th, we should see that $89 somewhere in
10  here.  Let's see if we put it on the 31st, but we
11  shouldn't have, though.  Let me find that.  Chase Ink,
12  Chase Ink.  Can you do a --
13    Q    Yeah, let me do -- I know what you're
14  thinking.
15    A    Was it 89.64?
16    Q    I thought it was 74, but let's try 89.
17       Oh, 89.64.
18    A    Yes.  So see all of these bank transfers?
19    Q    I see.
20    A    Yeah.  I'm sorry.  I said the wrong date.
21  We do it at the end of the closing, the statement
22  closing date.  So those are all of the transfers from
23  those individual cards.
24    Q    And then does Midwest Dock Solutions pay

Page 70

1  the credit card bill for the Chase Ink account?
2    A    Yes.
3    Q    Okay.  Does Midwest -- I'm sorry.  Strike
4  that.
5       Does Dock & Door pay any of the
6  credit card accounts, either the subaccounts or any
7  amounts toward the main account for this Chase Ink
8  credit card?
9    A    No.
10    Q    The Chase Ink credit card is solely paid
11  by Midwest Dock Solutions, correct?
12    A    Yes.
13    Q    Are you aware, for example, that David
14  Green is an employee of Dock & Door?
15    A    No.
16    Q    Are you aware that Donald Cruikshank is
17  an employee of Dock & Door?
18    A    No.
19    Q    You don't know who the individual
20  employees are employed by, is that correct?
21    A    No, I could know, but I don't know.  I
22  don't -- it's not something I maintain or watch.
23    Q    You'd have to look -- you could look at
24  the payroll records and see?

Page 71

1    A    That's right.
2    Q    Okay.  And does it make any difference
3  for payment of the credit card invoices whether there
4  has been a receipt provided for the individual
5  expenses?
6    A    That's Sherry's call.
7    Q    What do you mean by that?
8    A    Whether or not she requires the receipt.
9  I think we saw one where -- like that Speedway one
10  where there wasn't a receipt she can reconcile it
11  anyway and ignore that there isn't one, but, no, there
12  is no difference.  It's just whether or not she could
13  get the receipt from the employee.
14    Q    The credit card bill has to be paid
15  either way, right?
16    A    Yes.  Okay.  So were you asking what she
17  does with the receipt?  Because sometimes there are
18  personal transactions on the cards.
19    Q    Okay.
20    A    And they would withhold that money from
21  the employee or they would pay it back.
22    Q    And how would that be handled?
23    A    Usually through payroll, but sometimes
24  through cash, you know, like they just pay the company

Page 72

1  back, but that's rare, very rare.
2    Q    And if they paid the company back by
3  cash, would Gineris be involved in that transaction?
4    A    Well, we would have to put it on the
5  general ledger because -- yeah.
6    Q    And how would it appear on the general
7  ledger?
8    A    So let's say C. Zarlengo gets $20 worth
9  of personal expenses, that would go on the balance
10  sheet as an AR - C. Zarlengo, and then Sherry would
11  tell me how the employee paid it back.  I would create
12  a journal entry to pay off the AR - C. Zarlengo, and
13  then I would -- since they don't maintain cash on hand
14  there -- let me double-check that before I say it.
15       It would usually go to cash on
16  hand, but if they don't maintain cash on hand, then I
17  would split it between the two owners as if they took
18  it as a draw or something.
19    Q    All right.  And if it was handled -- if
20  it was paid back by payroll, would there also be a
21  journal entry for that?
22    A    No, that would come through from ADP as
23  an entry like an advance.  It would come off of their
24  net pay and it would zero out that AR - C. Zarlengo

Page 73

1  account.
2      Q    So would you still have to create a
3  C. Zarlengo account?
4      A    Yeah, yes.
5      Q    And would that show up in the general
6  ledger?
7      A    Yes.
8      Q    Okay.  So if I wanted to see, for
9  example, in the general ledger whether either of these
10 types of -- I'm not sure what the proper terminology
11 is -- reconciliations occurred, is that a fair way to
12 describe it?
13     A    Yes.
14     Q    How would I -- where would I look?
15     A    That would be like in the 1100's
16 accounts.  You would look for like AR employees.
17     Q    I see a 1020 account, a 1200 account.  I
18 don't see any 1100 account.
19     A    Okay.  Go down.  Let's call it a 1200
20 account.  It's after the AR - Trade.
21     Q    I see a 1202 AR - Trade and a
22 1220 - Child Support.
23     A    Keep going.  There it is, AR - Employees,
24 did you see that?  Go up one page, AR - Employee.

Page 74

1      Q    I see.
2          So there's a payroll invoice, but
3  it says, "Child Support Accounts Payable."
4      A    That's actually the invoice that comes
5  in.  So that last column there is showing you all of
6  the related GL accounts, not specifically this one.
7          So you're looking in -- so you're
8  looking in the 1220 account, and that's the deduction
9  that was for that transaction right above it, John
10 Stoltenberg - New Employee.  So that was just an
11 advance in his pay.
12     Q    The 450 was?
13     A    Yeah, the 450.  The first one on
14 April 28th was an advance in pay because we probably
15 didn't have his information to pay him through payroll
16 yet.
17     Q    Oh, I see.
18     A    So we ran his paycheck through payroll.
19     Q    I see.
20          So there was no credit card -- none
21 of the amounts on the credit card for this year, which
22 I think this is 2023, none of the -- there were no
23 amounts reimbursed -- Strike that.
24          There were no amounts charged to

Page 75

1  the credit cards that had to be reimbursed by the
2  employees, correct?
3      A    Correct.
4      Q    Okay.  And if there were, they would have
5  been in this 1221 AR - Employees account, correct?
6      A    Correct.
7      Q    So regardless of whether the employees
8  provided a receipt or not, the company paid all the
9  credit card charges, correct?
10     A    Yes.
11     Q    And actually, since we're looking at this
12 exhibit I'd like to walk through the general ledger
13 with you generally.
14          So the general ledger for 2023 for
15 Midwest Dock Solutions has a Cash On Hand account.  Do
16 you see that?
17     A    Yes.
18     Q    What is cash on hand?
19     A    Cash that they've been paid, cash that's
20 in the -- like maybe in a safe that isn't in the bank.
21     Q    Got it.
22
23
24

Page 76

1          (WHEREUPON, said document was
2          marked as Plaintiffs' Exhibit
3          No. 192, for identification, as of
4          10/7/25, so marked by Mr. McJessy.)
5
6  BY MR. MCJESSY:
7      Q    Now, I'm showing you what's marked as
8  Exhibit 192, and this is the general ledger for
9  Dock & Door Install for the same year, 2023, correct?
10     A    Yep, yes.
11     Q    I could flip through the whole thing.
12 This one's considerably smaller, but it's still quite
13 long, but is that what this looks like to you?
14     A    Yes.
15     Q    Now, this doesn't have a Cash On Hand
16 account at the beginning, correct?
17     A    Yes.
18     Q    Is there a reason that Dock & Door
19 doesn't have a Cash On Hand account?
20     A    They don't have any cash on hand.
21     Q    Okay.  That would be a good reason.
22          Now, are we back to Exhibit 205 on
23 your screen there?
24     A    Yes.

Page 77

1    Q    And then the next account is the 1010
2    account which is Old National Checking and this looks
3    to be basically a reflection of every transaction that
4    would be reflected on the bank statements for Midwest
5    Dock Solutions, correct?
6    A    Yes.
7    Q    And do they just have the one account
8    with Old National Checking -- or strike that.
9         They only have one checking
10   account, correct?
11   A    Correct.
12   Q    Okay.  And this is important as you've
13   described it earlier from the bank using the account
14   login information?
15   A    Yes.
16   Q    Is there information that's included here
17   that Gineris adds to the information that gets
18   downloaded?
19   A    No.
20   Q    Is there information that's included here
21   that Midwest Dock adds to the bank statement
22   information?
23   A    No.
24   Q    Okay.  Like Sherry doesn't go through and

Page 78

1    review the bank statements and include information in
2    Xero that appears here, is that correct?
3    A    No.
4    Q    Did I ask the question well, do you
5    understand what I'm asking?
6    A    I'm going to answer what I think you're
7    asking.
8    Q    Okay.
9    A    So where it says, "Payment:  Opus Group"
10   on that February 1st, that doesn't come in from the
11   bank like that.  That's actually picked up from Xero.
12   Q    And that would be information that Sherry
13   enters into the Xero system?
14   A    Right.
15   Q    Okay.  But would the deposit be part of
16   what comes from the bank statement?
17   A    Yeah, all of the amounts and the dates
18   are exactly what comes in from the bank.
19   Q    Okay.
20   A    It could be the case that we call it
21   something different than the bank does.  So, for
22   example, if they pay PayPal, that always comes in from
23   the bank as PayPal.  We'll just call it what it is,
24   Amazon, for example.

Page 79

1    Q    Okay.
2    A    Okay.
3    Q    And the invoices that are listed here,
4    those wouldn't come in from the bank either, correct?
5    A    Correct.
6    Q    Those are loaded in from Xero, also,
7    correct?
8    A    Yes.
9    Q    And going back to Dock & Door, it also
10   has Account 1010 which is its checking account,
11   correct?
12   A    Yes.
13   Q    And it just has the one checking account,
14   also, correct?
15   A    Yes.
16   Q    And, again, the amounts that are shown
17   here -- and we're on Page 5 of Exhibit 192 -- these
18   would all be amounts -- the amounts would come in from
19   the bank statements, is that correct?
20   A    Yes.
21   Q    Now, there's a series of at the top of
22   this page invoices that say, "Receivable Payment,
23   Payment:  Midwest Dock Solutions."  Do you see that?
24   A    Yes.

Page 80

1    Q    And it shows a series of invoices,
2    invoice numbers, correct?
3    A    Yes.
4    Q    And then amounts, and those are invoices
5    issued by Dock & Door to Midwest Dock Solutions,
6    correct?
7    A    Yes.
8    Q    And so are those -- those are entered
9    into the Xero system, correct?
10   A    They are in Xero, yes.
11   Q    So those aren't a part of the bank
12   statement, correct?
13   A    Correct.
14   Q    And the amounts here that show Payable
15   Payment, Payroll, are those amounts from the bank
16   statement or from ADP?
17   A    Those are from ADP.
18   Q    Okay.  So this 1010 account includes bank
19   statements and ADP records and Xero records that are
20   entered by the company, correct?
21   A    Yes.
22   Q    Okay.  And that's true for both
23   Dock & Door and Midwest Dock Solutions?
24   A    Yeah.

Page 81

1    Q    All right.  You should have Exhibit 205
2  again, correct?
3    A    Yes.
4    Q    And then there's a 1200 account that's
5  Accounts Receivable, correct?
6    A    Yes.
7    Q    What is the Accounts Receivable GL?
8    A    That's for invoices they've sent out to
9  their customers that we're waiting for payment on or
10  that's where the payments get received on those
11  invoices.
12    Q    Okay.  So all of these entities that
13  are -- where it says, "Receivable Invoice," those are
14  companies that have received an invoice from Midwest
15  Dock Solutions?
16    A    Yes.
17    Q    And then if it says, "Receivable
18  Payment," I take it that reflects the payment of an
19  invoice or at least a payment from the party that's
20  listed there, is that correct?
21    A    Yes.
22    Q    So going back to Dock & Door, it also has
23  an Accounts Receivable account, correct?
24    A    Yes.

Page 82

1    Q    All right.  And we're on Page 45, and
2  then it's over -- it's got a column that says,
3  "Receivable Invoice, Midwest Dock Solutions," and then
4  it's got a column that shows different projects.  Do
5  you see that?
6    A    Yes.
7    Q    Is that information that would be entered
8  into the system by Dock & Door?
9    A    Yes.
10    Q    So Mr. Brutti would do that, correct?
11    A    Yes.
12    Q    And if you look through the Accounts
13  Receivable, it looks like all of the Accounts
14  Receivable are, I believe, Midwest Dock Solutions, is
15  that correct?
16    A    Yes.
17    Q    And the Accounts Receivable shows both
18  the invoices that are issued and the payments that are
19  received, correct?
20    A    Yes.
21    Q    All right.  And I've flipped through the
22  entire year and all of the Accounts Receivable
23  invoices and payments are just from Midwest Dock
24  Solutions, correct?

Page 83

1    A    Yes.
2    Q    And it shows at the bottom here in the
3  Accounts Receivable two numbers; one is $1,553,099.75,
4  and those are the amount of the invoices that have
5  been issued for that year, correct?
6    A    Yes.
7    Q    And those are all invoices just issued to
8  Midwest Dock Solutions, correct?
9    A    Yes.
10    Q    And then it shows $1,633,467.25 for that
11  year, and those are the payments received, correct?
12    A    Yes.
13    Q    And those are payments just received for
14  Midwest Dock Solutions, correct?
15    A    Yes.
16    Q    Aside from maybe interest income is all
17  of the income for Dock & Door listed in this GL
18  account?
19    A    Yes.
20    Q    And that's true for each year, that's how
21  the GL Account 1200 for Dock & Door is -- that's what
22  it reflects, right, who paid it and who it invoiced?
23    A    Yes.
24

Page 84

1         (WHEREUPON, said document was
2         marked as Plaintiffs' Exhibit
3         No. 193, for identification, as of
4         10/7/25, so marked by Mr. McJessy.)
5
6  BY MR. MCJESSY:
7    Q    All right.  I'd like to show you what's
8  been marked as Exhibit 193, and this appears to be
9  Dock & Door's Federal tax return for 2023.  I'm
10  flipping through it sort of quickly, but does that
11  look like what that document is?
12    A    Yes.
13    Q    And, again, it has some highlighting that
14  I've added, but this is a document that Gineris
15  produced, is that correct?
16    Q    And at the bottom it shows it was
17  prepared by Kellen Leone, is that correct?
18    A    Yes.
19    Q    K-e-l-l-e-n L-e-o-n-e.
20         And it shows gross sales of
21  $1,630,467, and that's the same amount that was shown
22  on that GL account total, correct?
23    A    Yes.
24

Page 85

1    Q    All right. So all of the income that
2  Dock & Door received in 2023 came from Midwest Dock
3  Solutions, correct?
4    A    Yes.
5    Q    And on the tax return there's a section
6  for Compensation of Officers. Do you see that?
7    A    Yes.
8    Q    And what does that reflect?
9    A    The salary of Anthony Brutti.
10   Q    And it would just be him, correct?
11   A    Yes.
12   Q    And does that include both the salary and
13 amounts paid for his medical benefits?
14   A    I'd have to look, but I believe so.
15   Q    Okay.
16   A    Yes, it does.
17   Q    And would those be reflected on his W-2
18 form?
19   A    Yes.
20
21            (WHEREUPON, said document was
22            marked as Plaintiffs' Exhibit 191,
23            for identification, as of 10/7/25,
24            so marked by Mr. McJessy.)

Page 86

1  BY MR. MCJESSY:
2    Q    So I'm showing you now what's been marked
3  as Exhibit 191, and that's Mr. Brutti's W-2 for 2023.
4  Do you see that?
5    A    Yes.
6    Q    And it shows wages of $71,031.76,
7  correct?
8    A    Yes.
9    Q    And that's the amount that we saw on the
10 tax form, correct?
11   A    Yes.
12   Q    I'm back to Exhibit 193 which is his tax
13 form.
14            Now, this tax return shows -- for
15 rents it shows zero amount paid, correct?
16   A    Yes.
17   Q    As far as you know, does Dock & Door --
18 it doesn't have a rent expense, does it?
19   A    Correct.
20   MR. MCJESSY: You know, we've been going about
21 another hour. I think I'd like to take another
22 five-minute break and then come back.
23            I probably am not going to finish
24 up in the next hour, so we may also want to talk about

Page 87

1  whether it makes sense to take a short lunch break at
2  some point, but do you think you can go another hour?
3  THE WITNESS: Yes.
4  MR. MCJESSY: Okay. Then we'll take five
5  minutes and then we'll resume.
6
7            (WHEREUPON, a short break was had.)
8
9  MR. MCJESSY: All right. Back on the record.
10 BY MR. MCJESSY:
11   Q    Continuing along with Exhibit 205, the
12 general ledger, the next account is 1202 AR - Trade.
13 What does that account deal with? Let me --
14   A    AR - Trade?
15   Q    Yes. Let me put it up on the screen and
16 share it again. I'm sorry.
17            There you go. Do you see that?
18   A    The 1202 account?
19   Q    Yes.
20   A    Okay. So that is to reclassify any
21 overpayments. This is Midwest Dock, right?
22   Q    Correct.
23   A    They file on the cash basis. So when we
24 convert the financial statement from accrual basis to

Page 88

1  cash basis, sometimes there are overpayments that
2  haven't been taken care of yet. So we have to move
3  those down to the Liability section, and we have to do
4  that by creating a separate account.
5    Q    Okay. And then going to Dock & Door it
6  doesn't have a similar account. Is there a reason for
7  that?
8    A    They don't have overpayments.
9    Q    Okay. Its only customer is Midwest Dock
10 Solutions, correct?
11   A    Yes.
12   Q    Did that go back to the Exhibit 205?
13   A    Yes.
14   Q    And this one has the AR - Employees
15 Account 1221, and that's what we talked about where
16 any credit card reconciliations where the employees
17 had to pay for amounts charged on the credit card
18 would appear, correct?
19   A    Yes.
20   Q    All right. And without going through all
21 of the general ledgers that you produced for Midwest
22 Dock Solutions is it fair to say that if there were
23 adjustments made where the employees had to reimburse
24 the company for credit card charges, they would always

Page 89

1    appear in this 1221 AR - Employees, account?

2        A    Yes.

3        Q    Now, you mentioned here for this account

4    the company may have paid Mr. Stoltenberg before he

5    appeared on -- before he was added to their payroll

6    account, is that right?

7        A    If we were missing a direct deposit, it

8    could have been that he -- we ran his check -- we paid

9    him the check and then ran his paycheck through ADP at

10   a later date or if he was just missing some piece of

11   information for the employment, yeah.

12       Q    Okay.  And there's an Account 1450 here

13   that's called Prepaid Payroll.  Do you see that?

14       A    Yes.

15       Q    Actually, this is Prepaid Payroll and

16   other Taxes, and if you look at the Midwest -- I'm

17   sorry.  If you look at the Dock & Door 2023 general

18   ledger, Exhibit 192, it's got an

19   Account 1401 - Prepaid Payroll.  Do you see that?

20       A    Yes.

21       Q    What is the Prepaid Payroll for

22   Dock & Door?

23       A    So ADP debits the funds for the payroll

24   one day before the paycheck date.  When that lands at

Page 90

1    the end of the month, it throws off the accounts and

2    shows it as overpaid.  It will show like the payroll

3    was overpaid.  So we create this account or we move

4    the payments to a prepaid account so that at

5    August 31st we aren't showing an overpaid payroll in

6    the Liability section.

7        Q    Okay.  And then what's the

8    Account 1402 - Prepaid Shareholder Medical, what's

9    that for?

10       A    He had paid the December payroll.

11   December of 2022 he paid January's shareholder medical

12   in December 2022.  We had already accounted for all of

13   the shareholder medical for 2022, so we moved this as

14   a prepaid, and then on January 1st, 2023, we created a

15   journal entry to move it to the P & L where it should

16   be.

17       Q    I see.

18            And then how about Prepaid Payroll

19   Taxes, 1403?

20       A    Okay.  Prepaid Payroll Taxes, that's,

21   again, a timing difference that August 31st debit

22   for the September 1st paycheck.  It goes back to the

23   Prepaid Payroll.

24       Q    Okay.  And Prepaid PTE Tax, what's that

Page 91

1    referring to?

2        A    That's Pass-through Entity Tax.  It's

3    like an income tax that the company pays.  We pay

4    estimates quarterly.

5        Q    Okay.  Now, I note that -- for example,

6    I'm going to show you the two GL statements.  First

7    what I'd like you to do is notice the

8    Account 1410 - Prepaid PTE Tax and the

9    Account 1450 - Savings Bonds.  Do you see those two

10   account numbers on the GL account?

11       A    Yes.

12       Q    Okay.  That's for Dock & Door, and then

13   if I show you the GL account -- or the general ledger

14   for Midwest Dock Solutions, it also has a 1450

15   account, but it's for Prepaid Payroll and other Taxes

16   and it's got also a Prepaid PTE account, but this one

17   is 1452 instead of 1410.

18       A    Uh-huh.

19       Q    So my question is I assume these account

20   numbers for the GL accounts while they're often

21   similar and sometimes the same, the number and the

22   description are different in some instances between

23   the two companies.  Do you see that?

24       A    Yes.

Page 92

1        Q    Are the account numbers set up in any

2    particular way?

3        A    Just in groups.  So like the AR accounts

4    are all 1200 accounts.  The bank accounts are always

5    1000 accounts.  These prepaid accounts are usually 13

6    and 1400 accounts.  Asset accounts like your capital

7    assets are 1500 to 1700 accounts.

8        Q    And that would be true for both of these

9    companies?

10       A    Yes.

11       Q    And it would be true for pretty much any

12   company that you're doing the accounting for, is that

13   correct?

14       A    Yes.

15       Q    Okay.  So looking at the general ledger

16   account for 2023, Exhibit 205, for Midwest Dock

17   Solutions it shows an Account 1510 for Vehicles.  Do

18   you see that?

19       A    Yes.

20       Q    Would acquisition of vehicles be in the

21   1500's?

22       A    Yes.

23       Q    Okay.  And it also shows an Account 1520,

24   and it looks like it's to record the sale of a 2013

Page 93

1    Skyjack, is that correct?
2        A    Yes.  The equipment account is to record
3    purchases or sale of assets.
4        Q    Okay.  So there's also a purchase of a
5    2023 Skyjack recorded there, correct?
6        A    Yes.
7        Q    And if we go back to Dock & Door
8    Install's 2023 general ledger, there's no accounts in
9    the 1500's, 1600's or 1700's, correct?
10       A    Yes.
11       Q    And what did you say those Accounts 15,
12   16 and 1700's account for?
13       A    The assets, like the capitalized assets.
14       Q    So this would indicate Dock & Door has no
15   capitalized assets, is that correct?
16       A    Yes.
17       Q    And it does have -- it refers to savings
18   bonds here.  Do you see that?
19       A    Yes.
20       Q    Do you know, were those savings bonds
21   payable to Dock & Door or to Mr. Brutti individually?
22       A    I don't know.
23       Q    Okay.  Does the fact that they're listed
24   here suggest that they're assets of Dock & Door?

Page 94

1        A    Yes.
2        Q    And the next account here is
3    Account 2200 - Accounts Payable.  Do you see that?
4        A    Yes.
5        Q    And what is Account 2200 - Accounts
6    Payable?
7        A    Bills that you would enter, so payments
8    made to vendors or in this case the payroll.
9        Q    Okay.  And looking through this account
10   it looks like the only -- all of the payments in the
11   Accounts Payable Department are -- Strike that.
12           It looks like all of the payments
13   in the Accounts Payable GL Account 2200 are for
14   payroll, correct?
15       A    Yes.
16       Q    And then the Account 2360 - Payroll Tax
17   Payable, that's the payroll taxes that the company
18   withheld from the employees and that the company owes
19   or is it one or the other?
20       A    It's both.
21       Q    All right.  And if we go back to
22   Exhibit 205, which is the Midwest Dock Solutions
23   general ledger, do you have that in front of you
24   again?

Page 95

1        A    Yes.
2        Q    It shows an account for Furniture and
3    Equipment.  Do you see that?
4        A    Yes.
5        Q    It shows an opening balance of $1,000.
6    What's that reflect?
7        A    Whatever they had bought in a prior year,
8    maybe a desk.  I don't know.
9        Q    And then GL Account 1650 - Accumulated
10   Depreciation, what's that reflect?
11       A    The depreciation that's been accumulated
12   on all of the assets.
13       Q    And is this a manual entry that Gineris
14   does?
15       A    Yes.
16       Q    Manual journal, is that what that means?
17       A    Yes.
18       Q    And can you just describe for me the
19   first line, what that's recording, January 21st, 2023?
20       A    It's recording that month's portion of
21   the depreciation.  So we get a year total, and then we
22   break it out by month.
23       Q    Okay.
24       A    And it's recording the accumulated

Page 96

1    depreciation and then the depreciation expense onto
2    the P & L.
3        Q    And what does the No. 131327 reflect?
4        A    That's just the manual journal number.
5    It's automatically generated from zero.
6        Q    And how do you calculate the $4,375.09?
7        A    We pull a Fixed Asset Report from our tax
8    software, and we divide that number by 12 so that we
9    can record it each month.
10       Q    So does the Fixed Asset Report have a
11   list of assets that are being depreciated?
12       A    Yes.
13       Q    And would that list also be part of the
14   tax return?
15       A    Yes.
16
17           (WHEREUPON, said document was
18           marked as Plaintiffs' Exhibit
19           No. 206, for identification, as of
20           10/7/25, so marked by Mr. McJessy.)
21
22   BY MR. MCJESSY:
23       Q    All right.  And you should have now in
24   front of you Exhibit 206.

Page 97

1    A   Yes.
2    Q   This is the tax return for Midwest Dock
3  Solutions for 2023, correct?
4    A   Yes.
5    Q   And if we go further back in here, it has
6  a Page 18.  It says, "Federal Statements."  Do you see
7  that?
8    A   Yes.
9    Q   And then it's got Regular Depreciation
10  and then it's got Property Type.  Do you see that?
11    A   Yes.
12    Q   Are these assets of Midwest Dock
13  Solutions that are being depreciated?
14    A   Yes.
15    Q   Okay.  And then we if go further back,
16  there's a page, a Page 26.  It's a Federal Asset
17  Report.  Do you see that?
18    A   Yes.
19    Q   And this also -- well, can you tell me
20  what this document is?
21    A   This breaks down the assets and how they
22  were depreciated.  So like that top one that says,
23  "Section 179 Expense," that was taken as a 179, not
24  just depreciated over five years.  We took all of the

Page 98

1  depreciation according to, I guess, IRS Code
2  Section 179 that you could take all of the
3  depreciation in the year for that -- for those assets.
4    Q   I see.
5         And then the five-year GDS
6  Property, what does that refer to?
7    A   I don't know that, but I do know MACRS is
8  just the depreciation.  It factors in bonus
9  depreciation and also spreads it out over the five
10  years.
11    Q   Okay.  And you said, "MACRS."  It's
12  M-A-C-R-S.  Is that what you were referring to?
13    A   Yes.
14    Q   And that's an acronym for something?
15    A   Yes.
16    Q   And what does Prior MACRS refer to?
17    A   All assets that are still on there that
18  are fully depreciated.
19    Q   Okay.
20    A   So in that last column it says, "Zero for
21  current."
22    Q   Oh, yes.
23    A   Yeah, there's no current depreciation on
24  those assets.

Page 99

1    Q   And are all those assets as far as
2  Gineris is concerned still assets of the company?
3    A   Yes.
4    Q   All right.  And then what about the
5  Listed Property at the bottom?
6    A   Listed Property had something to do with
7  vehicles.  I don't know -- for tax.
8    Q   And lastly, I'm showing you what's
9  been -- what's titled "Quality Property Report."  It's
10  Page 29 of this exhibit.  Do you see that?
11    A   Yeah, Qualified Property, yes.
12    Q   Yes, Qualified Property Report.  What
13  does this report reflect?
14    A   I don't know.
15    Q   And there's a column -- or a
16  GL account here 1790 - Accumulated Amortization.  What
17  does that account reflect?
18    A   The amortization of intangible assets.
19    Q   And then it looks like the next account
20  here is the GL account we looked at which is the Chase
21  Ink credit card account?
22    A   Yes.
23    Q   And then there's an AP Trade account
24  here, 2202.  Can you tell me what that refers to?

Page 100

1    A   Yes, that's also for overpayments.  When
2  we switch the financial statements to cash basis, if
3  there's an overpayment that hasn't been applied, then
4  we have to move it to the Asset section.
5    Q   All right.  What is the method of
6  accounting for Dock & Door, is it accrual or cash
7  basis?
8    A   The method of accounting is accrual for
9  the books; for tax it's cash.
10    Q   And the same is true for Midwest Dock
11  Solutions?
12    A   Yes.
13    Q   All right.  There's an account -- I
14  believe you're still looking at Exhibit 205, Midwest
15  Dock Solutions' general ledger, is that right?
16    A   Yes.
17    Q   And there's an account here 2550 - Due
18  to/from Officer - Tony Zarlengo.  Do you see that?
19    A   Yes.
20    Q   What does this reflect?
21    A   Personal transactions he's made on the
22  credit cards or out of the bank.
23    Q   Okay.  What does that mean?
24    A   So if he's -- let's say, for example, if

Page 101

1 he used his Chase Ink card at Whole Foods, that's a
2 personal charge. We're not going to expense that. He
3 basically has to pay it back or we give the same
4 amount to Mike Richert and they both take them as
5 dividends.
6 Q So there's a -- for example, I just --
7 there's an entry September 1st, 2023, Spend Money,
8 Tony Zarlengo, and it's $180,000. Do you see that?
9 A Yeah, that was a check written to him.
10 Q And so is that like a dividend
11 distribution or how --
12 A Yes. So we record everything, like all
13 personal transactions or distributions made out to the
14 shareholders as AR Officer or Due to/from Officer, and
15 then at the end of the quarter or the end of the year
16 we move all of those to distributions.
17 Q And so I'm showing you Exhibit 192, and
18 this is Dock & Door's general ledger, and there's an
19 account, same Account No. 2550, Due to/from Officer.
20 Do you see that?
21 A Yes.
22 Q And are these personal transactions for
23 Mr. Brutti?
24 A Yes.

Page 102

1 Q And it looks like -- do you know what --
2 like Tech One Parts, do you know what that's for?
3 A I believe it was for the race car.
4 Q I was going to ask you know he has a race
5 car that he engages in racing?
6 A Yes.
7 Q And there are expenses that are paid
8 through Dock & Door for the racing, correct?
9 A Yes.
10 Q All right. And are those -- are some of
11 those expenses included as business expenses?
12 A I tried to pick up the ones -- they could
13 slip through, but, yes, I tried to pick them up, and
14 if he's paying for advertising like for the race car,
15 if Dock & Door is paying for advertising, then we
16 issue him a 1099 at the end of the year, and you
17 wouldn't see those here in the Due to/from Officer.
18 Q And Gineris prepares the 1099's?
19 A Yes.
20 Q All right. Now, do you see that there's
21 a distribution there for May of 2023 of $5,000?
22 A Yes.
23 Q How would you become aware of that?
24 A I would see the check clear the bank.

Page 103

1 Q Okay. So part of the reconciliation of
2 the accounts?
3 A Yes.
4
5 (WHEREUPON, said document was
6 marked as Plaintiffs' Exhibit
7 No. 107, for identification, as of
8 10/7/25, so marked by Mr. McJessy.)
9
10 BY MR. MCJESSY:
11 Q Okay. I'd like to show you what's been
12 marked previously as Exhibit 107, and this is a text
13 message that you produced, a text message that you had
14 with Tony Zarlengo, correct?
15 A Yes.
16 Q And this is dated about a month after
17 that distribution. There's a text message here dated
18 June 13th, 2023. Do you see that?
19 A Yes.
20 Q And it says, "Hey, Tony, long time no
21 talk. I hope you're well. I'm reviewing Dock & Door
22 for May. I saw that Tony took a $5,000 distribution.
23 Were you aware of this? Do you want me to notify you
24 in the future?" Do you see that?

Page 104

1 A Yep.
2 Q All right. And Tony is Tony Brutti,
3 correct?
4 A Yes.
5 Q And you typically notified Tony Zarlengo
6 if there were distributions taken out of Dock & Door
7 by Mr. Brutti, correct?
8 A Can you ask that again?
9 Q Yes.
10 You would typically notify
11 Mr. Zarlengo if there were distributions taken out of
12 Dock & Door by Mr. Brutti, correct?
13 A No.
14 MR. HUGHES: Objection to form.
15 BY MR. MCJESSY:
16 Q Okay. Did you do that -- have you done
17 that on other occasions?
18 A No.
19 Q This is the only occasion that you recall
20 doing that?
21 A Yes.
22 Q And why did you do that?
23 A Maybe the amount.
24 Q Okay. What about the amount?

Page 105

1    A    It was just more than normal, I guess.
2    Yeah, I don't know why I did.
3    Q    Okay. So it was a particularly large
4    amount?
5    A    Yes.
6    Q    And so, obviously, you wanted Tony
7    Zarlengo to be aware of it, correct?
8    A    Yes.
9    Q    Okay. And then he responds "Yes, we told
10    him to, no issue. Thanks. We are working on this
11    mile thing also for sales guys." Do you see that?
12    A    Yes.
13    Q    And you're asking Mr. Brutti in your
14    e-mail do you want me to notify you in the future. Do
15    you see that?
16    A    Yes.
17    Q    To your knowledge, has Mr. Brutti taken
18    any distributions of a similar amount or larger since
19    then?
20    A    I'd have to look that up.
21    Q    All right. And going back to -- you
22    should have Exhibit 205 in front of you again, is that
23    correct?
24    A    Yes.

Page 106

1    Q    And then the next GL accounts here are
2    2756, 2757, 2758, and they look like they're for
3    vehicle expenses, is that correct?
4    A    Yes -- oh, let me see. Those are for
5    vehicle payments.
6    Q    Okay. Is that loan payments that the
7    company is making on vehicles it has purchased?
8    A    Yes.
9    Q    Looking at Account 2551 where it says,
10    "Due to/from Officer - Mike Richert" there's an entry
11    there that says, "To reclassify AR Officer to
12    Dividends - Mike Richert, $108,500." Do you see that?
13    A    Yes.
14    Q    What does that mean?
15    A    That's where we're reclassifying his AR
16    Officer Due to/from Officer dividends. You should see
17    a similar entry, the same entry on Tony.
18    Q    (Indicating.)
19    A    Yeah, it's right there.
20    Q    I see.
21         So that's reclassifying it to
22    dividends?
23    A    Yes.
24    Q    That's money they're taking out of the

Page 107

1    company, correct?
2    A    Yes.
3    Q    And going back to Exhibit 192, this has
4    the entry -- earlier I had asked you about loans to
5    Dock & Door, and you mentioned that it only had one
6    loan on the books that wasn't being serviced. Do you
7    recall that testimony?
8    A    Yes.
9    Q    And this is the loan you were referring
10    to, the loan from J.D. Brutti, correct?
11    A    Yes.
12    Q    And that's pretty much been on the books
13    for as long as you have been keeping the records for
14    the company?
15    A    Yes.
16
17         (WHEREUPON, said document was
18         marked as Plaintiffs' Exhibit
19         No. 106, for identification, as of
20         10/7/25, so marked by Mr. McJessy.)
21
22    BY MR. MCJESSY:
23    Q    Okay. I'm sharing with you now
24    Exhibit 106 which is a text message exchange between

Page 108

1    you and Mr. Brutti, correct?
2    A    Yes.
3    Q    And there's a text message there dated
4    January 14th, 2024, "Hey, Tony, we have a loan from
5    J.D. Brutti on the books since the company's
6    inception. Do you know about this," and his response
7    is, "Yeah, it's the original start-up money for Mike
8    and Tony back when I first started. I think they
9    wanted to keep the two businesses as separate as
10    possible so they just put my dad's name on it." Is
11    that what the exchange says?
12    A    Yes.
13    Q    And that's what Mr. Brutti told you about
14    this loan that's on GL Account 2600, correct?
15    A    Yes.
16    Q    All right. Do you have any reason to
17    doubt that?
18    A    No.
19    Q    All right. Now I'm showing you what's
20    marked as -- it's still Exhibit 205. It's the general
21    ledger account for Dividends Paid. Do you see that?
22    A    Yes.
23    Q    And that's Account 3600?
24    A    Yes.

Page 109

1     Q   And where it says, "To reclassify AR

2  Officer to dividends," those are -- well, explain to

3  me what those are again.

4     A   So those are coming from the Due to/from

5  Officer accounts, the one for Mike and the one for

6  Tony Zarlengo, and so we're reclassifying them as

7  dividends.

8     Q   Okay.  So originally when the transaction

9  occurs, it goes into the general ledger as a Due

10  to/Due from entry and then it's reclassified later as

11  a dividend, is that it?

12     A   Yes.

13     Q   Why does it go in as a Due to/Due from

14  entry?

15     A   So that we keep the dividends account

16  clean so it's easier to follow and make sure that,

17  especially when there's more than one shareholder, you

18  can see that the entries -- the dividends are

19  proportionate to their share ownership.

20     Q   Okay.  So I just want to see if -- can

21  you tell me what the number at the bottom here

22  (indicating) means, the $678,545.66 number?

23     A   That looks like it's the total of the

24  dividends for the year, plus the 111 from the prior

Page 110

1  year.

2     Q   I see.

3         The 111 is from the prior year?

4     A   Yeah.

5     Q   So the $567,482.10 number, that's from

6  this year, from 2023?

7     A   Yes.

8     Q   Okay.  And that's effectively how much

9  they took out in dividends?

10     A   Yes.

11     Q   So then looking at Exhibit 192, does the

12  same analysis apply to this Account 2550 -- oh, I'm

13  sorry.  Wait a minute.  It's at the bottom, 3600.

14  That's what I wanted to focus on.  It looks like it

15  starts on this page and continues onto the next page.

16         So is the $1,590.79 number the

17  dividends from this year?

18     A   Yes.

19     Q   What about the dividend above here

20  (indicating), the $5,000 dividend in the Due to/Due

21  from Officer?

22     A   Okay.  So we have debits and credits in

23  this account.  Yeah, so these debits would be the --

24  would be all going to Mr. Brutti, and then the credits

Page 111

1  that are coming off -- so you have this journal entry

2  to reclassify advances.  That reduced his AR Officer.

3  So the vehicle expense, he gets the mileage expense.

4  He records miles and turns it in.  So that would

5  essentially have been a check paid out to him, but we

6  used it to reduce the funds that he had already taken.

7  So it reduced his dividends for the year.  So the

8  right side reduces the left side.

9     Q   I see.

10         So he takes a mileage expense, and

11  as a result of that, he doesn't have to declare the

12  full $5,000 as income, for example?

13     A   Well, a dividend is an income.  He's

14  paying the tax on it anyway.

15     Q   I'm trying to understand the offset for

16  the mileage.

17     A   Go back.  The mileage would have been

18  money owed to him.

19     Q   Right.

20     A   So basically it cut into his dividend.

21  He didn't get the money.

22     Q   I see.

23     A   It reduced his dividend.

24     Q   All right.  And then if we look at

Page 112

1  Exhibit 205 again, the next account is Sales.  Do you

2  see that?

3     A   Yes.

4     Q   Or it's not the next account, but you see

5  GL Account 4000 for Sales?

6     A   Yes.

7     Q   And what does this record?

8     A   All the invoices that were sent to

9  customers.

10     Q   So all of these (indicating) where it

11  says, "Receivable Invoice" and then it has a name of a

12  company, those are all companies that Midwest Dock

13  Solutions is invoicing for its services --

14     A   Yes.

15     Q   -- or products that it sold, either way I

16  presume?

17     A   Okay.  Yes.

18     Q   And then if we go to Exhibit 192, that's

19  Dock & Door's general ledger, and these are all the

20  invoices it issued for the year, is that correct?

21     A   Yes.

22     Q   And all of its invoices have only gone to

23  Midwest Dock Solutions, correct?

24     A   Yes.

Page 113

1     Q    It doesn't have any other customers,
2    correct?
3     A    Yes.
4     Q    All right.  Going back to Exhibit 192,
5    this has an account for Supplies.  Do you see that?
6     A    Yes.
7     Q    And what's the Supplies account for?
8     A    Supplies used on the job.
9     Q    Okay.  And do you have a way to know what
10   specifically was purchased that shows up in the
11   Supplies account or how do these transactions get
12   recorded into the Supplies account?
13    A    The transaction flows through the bank
14   and it gets recorded.  I don't see the receipts.
15    Q    So, for example, if the charge for
16   Menards was a personal charge for an item used by
17   Mr. Brutti personally and not part of the business,
18   would you know that?
19    A    No.
20    Q    Okay.  And then the Productive Labor GL
21   Account 5040, what's that showing?
22    A    The payroll for the employees out on the
23   job.
24    Q    Okay.  So should this number up here

Page 114

1    (indicating), this $695,296 figure, should that equal
2    the payroll for the company for the year?
3     A    Yeah.
4     Q    All right.
5     A    It would equal the -- yes, plus all the
6    other stuff that's included in payroll, but, yes, that
7    would be for that department, yes.
8     Q    Okay.  And as I understand it, there's
9    really only two parts of Dock & Door's payroll,
10   there's the workers who would be in Productive Labor
11   and Mr. Brutti who would be Gross Wages Officer,
12   correct?
13    A    Yes.
14    Q    So all the workers would be up in
15   Productive Labor and Mr. Brutti would be I take it in
16   Account 6000 Gross Wages Officer?
17    A    Yes.
18    Q    And this number, the 66,100, that doesn't
19   include payments for medical, right?
20    A    No.
21    Q    Okay.  You'd have to add in the other --
22   the number, the one below that Shareholder Medical,
23   correct?
24    A    Yes.

Page 115

1     Q    And then, for example, the next GL column
2    is 6050 - Advertising.  Do you see that?
3     A    Yes.
4     Q    And that's Anthony Brutti's sponsorship,
5    that's for his racing, correct?
6     A    Yes.
7     Q    And is that included as a company
8    expense?
9     A    Yes.
10    Q    All right.  And then is Mr. Brutti the
11   one who makes the ultimate call that that's part of
12   his company expense?
13    A    I don't know.
14    Q    Well, who decides that it's a company
15   expense?
16    A    Like how it gets coded or who would
17   decide -- I guess Anthony is the one that decides how
18   much he's going to pay out towards the advertising,
19   yeah.
20    Q    And then Dues and Subscriptions, do you
21   see that?
22    A    Yes.
23    Q    And it's Champion Racing Association
24   Membership, is that correct?

Page 116

1     A    Yes.
2     Q    All right.  And that's also related to
3    his racing, correct?
4     A    Yes.
5     Q    And that's included as a company expense,
6    correct?
7     A    Yes.
8     Q    And then I'm showing you what's
9    Account 6850 - Office Expense.  Do you see that?
10    A    Yes.
11    Q    And there's a lot of charges on here it
12   looks like to Jewel Osco and Walgreens, Dyer Fitness.
13   Do you know what these specific charges are for?
14    A    No.
15    Q    They just get imported as part of the
16   bank statements?
17    A    Yes.
18    Q    And how do they get coded as office
19   expenses?
20    A    We code them.
21    Q    Somebody in the Bookkeeping Department
22   would do that?
23    A    Yes.
24    Q    And I don't remember her name, but you

Page 117

1     mentioned somebody earlier who was the bookkeeper for
2     Dock & Door.
3          A    Saurabh.
4          Q    Thank you.
5               And she would go through and code
6     these things like that, correct?
7          A    Yes.
8          Q    All right.  If these were personal
9     expenses, how would you know that?
10         A    We wouldn't.
11         Q    And some of these say, "Point of Sale
12    Debit Card Purchase."  Do you see that?
13         A    Yes.
14         Q    And is that information also imported as
15    part of the bank statement?
16         A    Yes.
17         Q    So basically somebody's using a debit
18    card to make these purchases, is that correct?
19         A    Yes.
20         Q    And I think you said this, but I want to
21    make sure.  You don't see the receipts for any of
22    these purchases, correct?
23         A    Correct.
24         Q    Next account is Legal and Professional

Page 118

1     Fees.  Do you see that?
2          A    Yes.
3          Q    And it shows Gineris & Associates and
4     Lawrence, Kamin, Saunders & Uhlenhop, LLC.  Do you see
5     that?
6          A    Yes.
7          Q    And these look like they're payments at
8     least the checks -- or the payments to
9     Gineris & Associates look like they're either debits
10    or ACH withdraws.  Do you know how that works?
11         A    Yes.
12         Q    How does that work?
13         A    He -- we just withdraw the funds from the
14    bank.  He would have set up that, an ACH form with us
15    to give us permission to withdraw the payment.
16         Q    So you issue an invoice and then do an
17    automatic transfer from the account?
18         A    Yes.
19         Q    And you mentioned that you had a flat fee
20    agreement?
21         A    Yes.
22         Q    There are some payments that are
23    different amounts, like, for example, there's 675 and
24    an 882 and then 1200.  Can you tell me like how the

Page 119

1     charges work?
2          A    Sure.  I could go through the invoices,
3     but those look like reimbursements.  So if we did his
4     annual report with Illinois, that fee is not included,
5     and then we'd also have to get a reimbursement for the
6     cost of it.
7          Q    I see.
8               So you advance fees and expenses on
9     behalf of Dock & Door as part of your services?
10         A    Yes.
11         Q    And then the next category I want to ask
12    you about is Repairs and Maintenance, Account 7500.
13    Do you see that?
14         A    Yes.
15         Q    And then it looks like there's quite a
16    number of charges to NAPA Auto Parts and O'Reilly Auto
17    Parts, left-handed chassis.  Do you know whether these
18    are expenses related to Mr. Brutti's racing
19    activities?
20         A    No, I don't.
21         Q    But they could be?
22         A    I suppose.
23         Q    Would it make any difference for your
24    accounting purposes whether they were or weren't, like

Page 120

1     if he says, "That's part of my business," then would
2     you include -- then those items would be properly part
3     of Dock & Door, right?
4          A    Yes, yeah.
5          Q    Do you have an understanding of whether
6     his racing activities are part of Dock & Door?
7          A    I don't have an understanding of that.
8          Q    Okay.  And then it says, "Shop Supplies"
9     here, Account 7594.  Do you see that?
10         A    Yes.
11         Q    And it looks like there's a lot of Amazon
12    charges, some Ace Hardware charges.  You don't know
13    what any of these specific charges are for, is that
14    correct?
15         A    Correct.
16         Q    So it could be for personal expenses and
17    you wouldn't know that, is that correct?
18         A    Correct.
19         MR. HUGHES:  Objection; calls for speculation,
20    asked and answered, beyond the scope.
21    BY MR. MCJESSY:
22         Q    All right.  Now I'm looking at the
23    category that's Vehicle Expense, which is
24    Account 7760, and again -- well, let me ask you some

Page 121

1  of these charges on here, especially the ones at the
2  top.  They don't have an entry that describes where it
3  came from.  Do you see that?
4     A   Yes.
5     Q   Do you know how these entries would have
6  been made, would they still come from the bank
7  statement?
8     A   Yes, they all came from the bank
9  statement.
10    Q   And how do we know that?
11    A   Because that's how we get the
12 transaction.
13    Q   All right.  So even if they don't have a
14 reference like a Point of Sale debit card, they still
15 came from the bank statement?
16    A   Yeah, sometimes that reference there gets
17 deleted during the reconciliation.
18    Q   All right.  Now, I want you to take a
19 look at -- this is Account 5010 that's called
20 Subcontracted Services for Midwest Dock Solutions.  Do
21 you see that in --
22    A   Yes.
23    Q   -- 205 again?
24       And at the bottom of it -- and

Page 122

1  you'll see that it lists -- it's got a lot of numbers
2  here that are listed in the middle, and I'm not sure
3  what those are.  I don't recall, but do you see how
4  the entries here in December 2023 have quite a bit of
5  detail included including like who was working and the
6  date they were working, do you see that?
7     A   Yeah.
8
9        (WHEREUPON, said document was
10           marked as Plaintiffs' Exhibit
11           No. 203, for identification, as of
12           10/7/25, so marked by Mr. McJessy.)
13
14 BY MR. MCJESSY:
15    Q   All right.  I'm going to show you what
16 I've marked as Exhibit 203 which is the general ledger
17 for Midwest Dock Solutions for 2022.  Do you see that?
18    A   Yes.
19    Q   And let's see.  I'm going to turn to
20 Page 537 of that exhibit.  Do you see this is again
21 Account 510 Subcontracted Services?
22    A   Yes.
23    Q   And that's on Page 536 but on 537, and
24 there's a number of entries here.  There are payable

Page 123

1  invoices and it has the invoice number there across.
2  Do you see 8252, 8251, 8250, they're highlighted?
3     A   Yes.
4     Q   All right.  What I'd like you to notice
5  here before I leave this exhibit is they go from 8240
6  to 8252.  Do you see that?
7     A   Yes.
8
9        (WHEREUPON, said document was
10           marked as Plaintiffs' Exhibit
11           No. 170, for identification, as of
12           10/7/25, so marked by Mr. McJessy.)
13
14 BY MR. MCJESSY:
15    Q   And you should have Exhibit 170 now in
16 front of you, is that correct?
17    A   Yes.
18    Q   So that's a deposit ticket, and then
19 attached to it are two deposit summaries from
20 Dock & Door Install, and the deposit summaries have
21 totals.  It has a list of invoice numbers, and then it
22 has a total at the bottom and there's two of them and
23 they're both dated -- February 18th, 2022, is the
24 payment date.  Do you see that?

Page 124

1     A   Yes.
2     Q   And the first one if you look at it, it
3  starts with Invoice No. 8240 and goes down to 8252 and
4  then it continues on, but the highlighted lines were
5  8240 to 8252 on the general ledger I showed you.
6        So this is a deposit summary from
7  Dock & Door, and then attached to it it has invoices,
8  and if you look at the first one, it's 8240, 8241,
9  8242, 8243.  Do you see that, they're in sequence?
10    A   Yes.
11    Q   And there's a description of work on each
12 of them.  So 8240 is Jake Rodgers.  It has a date.  It
13 has a project description, Principle Morgan Chicago.
14 Do you see that?
15    A   Yes.
16    Q   Okay.
17    MR. HUGHES:  I'm going to object to foundation
18 of these invoices, competency.
19 BY MR. MCJESSY:
20    Q   All right.  And if we turn back to
21 Exhibit 203 which is the general ledger that Gineris
22 produced, it's got 8240 and it's got Dock & Door
23 Install, Jake Rodgers, 12/31/21 Principle Morgan
24 Chicago then it goes on with the description of

Page 125

```
1    work.  Do you see that?
2        A    Yes.
3        Q    Do you know how this information, the
4    Dock & Door invoices, the invoice numbers and the
5    description of work are imported into the general
6    ledger?
7        A    Yes.
8        Q    How does that happen?
9        A    Sherry Webber receives the invoice from
10   Dock & Door and she manually enters it into Xero.
11       Q    When you say, "she manually enters it,"
12   does that mean she retypes all this?
13       A    Yes.
14       Q    That's your understanding?
15       A    Yes.
16       Q    Okay.  Do you know, are the invoices
17   generated in Xero?
18       A    Yes.
19       Q    And could the invoices be imported from
20   one party's Xero account into another party's Xero
21   account?
22       A    I don't know that.
23       Q    Okay.  Do you know whether Xero allows
24   Gineris to import records from other parties' Xero
```

Page 126

```
1    accounts into its files?
2        A    No, I don't know.
3        Q    So going back to Exhibit 203, all of the
4    payable invoices, the description that's next to that,
5    the invoice numbers and the amounts, that's all --
6    that general ledger information is all imported into
7    Xero in some fashion by Sherry Webber, and then when
8    you access Midwest Dock Solutions' Xero account, you
9    have access to all that information?
10       A    Yes.
11       MR. HUGHES:  Objection; misstates her prior
12   testimony about importing and competency.
13   BY MR. MCJESSY:
14       Q    Okay.  And the general ledger, is that
15   maintained just by Gineris or can Midwest Dock
16   Solutions alter the general ledger?
17       A    Midwest Dock Solutions can alter the
18   ledger.
19       Q    It can go in and make changes to the
20   general ledger by logging into the Xero account?
21       A    Yes.
22       Q    Okay.  So when you log into Midwest Dock
23   Solutions' Xero account or Dock & Door's Xero account,
24   one of the things that you can click on I take it to
```

Page 127

```
1    access is the general ledger account?
2        A    Yes.
3        Q    Are the tax returns also maintained in
4    the Xero account?
5        A    No.
6        Q    How are those prepared?
7        A    Using Thomson Reuters software UltraTax.
8        Q    And that's true for both Midwest and
9    Dock & Door?
10       A    Yes.
11       MR. MCJESSY:  All right.  We've been going a
12   little over an hour again.  I don't know how much I
13   have left, probably a little over an hour.  We can
14   either keep going or I'm fine taking like a
15   five-minute break or we can take a slightly longer
16   break.  I don't know if there's a consensus.
17       THE WITNESS:  I'm fine either way.
18       MR. MCJESSY:  Gina, do you have a preference?
19       THE REPORTER:  I mean, if we took like a
20   five-minute break, I'm good, too.
21       MR. MCJESSY:  Okay.  Everybody agree on that?
22       MR. HUGHES:  Yes.
23       MR. MCJESSY:  Let's make it about 10 minutes
24   and then come back.
```

Page 128

```
1        (WHEREUPON, a short break was had.)
2
3        MR. MCJESSY:  All right.  Back on the record.
4    BY MR. MCJESSY:
5        Q    All right.  Ms. Stephens, to your
6    knowledge, during the course of the last five years or
7    so has Mr. Brutti had any employment outside of
8    Dock & Door?
9        A    Not that I know of.
10       Q    Okay.
11       MR. HUGHES:  Objection; scope, beyond the scope
12   of the 30(b)(6) topics.
13   BY MR. MCJESSY:
14       Q    I want to go back very briefly and show
15   you Exhibit 170 again.  Are these invoices that were
16   attached as part of this exhibit, are those anything
17   that you receive as part of your work for Gineris?
18       A    No.
19       Q    How about the deposit summaries?
20       A    No.
21       Q    All right.  You should have in front of
22   you two documents.  One is Exhibit 193 and the other
23   is Exhibit 206, and they're the tax returns for 2023
24   for Dock & Door Install and Midwest Dock Solutions.
```

Page 129

1  Do you see that?

2  A   Yes.

3  Q   And the tax return for Midwest Dock

4  Solutions shows that it had rents in 2023 of $85,000.

5  Do you see that?

6  A   Yes.

7  Q   All right.  And what is the rents entry

8  on a tax return, is it for rents for like office

9  space?

10  A   Yes.

11  Q   Okay.  And Dock & Door didn't have any

12  rental expense, correct?

13  A   Correct.

14  Q   Do you have an understanding of whether

15  Dock & Door has an office?

16  A   I don't know.

17  Q   The tax return shows 27 East 36th Place,

18  correct?

19  A   Yeah.

20  Q   For both companies, correct?

21  A   Yes.

22  Q   And if Dock & Door had recorded the

23  dividends on its tax return, do you know where those

24  would be reported?

Page 130

1  A   I believe a few pages down.  Keep going.

2  Below this page.  Go one up.  I think it might be --

3  go down.  I think it might be in here in this M1 or M2

4  statement.

5  Q   It refers to distributions.  Is that

6  where it would be?

7  A   Yes.

8  Q   And it's Line 7 of M2.  That's the 2,124?

9  A   Yes.

10  Q   And do you know what the vehicle expense

11  is that's on the tax return for Dock & Door which is

12  on Page 9 of the tax return?

13  A   For Dock & Door it should be the total of

14  the mileage.

15  Q   So the vehicle expenses -- oh, that's the

16  expense for the mileage that Mr. Brutti records?

17  A   Yes.

18  Q   Okay.  To your understanding is there a

19  difference between distributions and dividends?

20  A   No.

21  Q   And the list that shows -- well, strike

22  that.

23      Do you know what -- I don't

24  remember if I asked you this before -- what the

Page 131

1  Federal Asset Report is supposed to show?

2  A   It shows the breakdown of the assets, how

3  they've been depreciated.

4  Q   Over time?

5  A   Yeah.

6  Q   Now, Gineris does the payroll work for

7  both Dock & Door and Midwest Dock Solutions, correct?

8  A   Yes.

9  Q   And do you have any involvement in that

10  process?

11  MR. HUGHES:  Objection; asked and answered.

12  THE WITNESS:  Only in setting up the initial

13  process and if there's a change to the process that I

14  set up.  Otherwise, everybody's just following my

15  order.

16  BY MR. MCJESSY:

17  Q   What do you mean by that?

18  A   So I set it -- I trained Sherry on how to

19  enter it.  I trained my staff on how to review it, and

20  then if there's ever going to be a change to that, it

21  has to go through me.

22  Q   I see.

23      And what if there's a change in the

24  payroll for Dock & Door, say, it hires a new employee?

Page 132

1  A   Oh, Anthony Brutti enters in new

2  employees.

3  Q   He would do that in the ADP system?

4  A   Yes.

5  Q   And what if an employee is terminated by

6  Dock & Door?

7  A   Anthony would handle that.

8  Q   He would enter that in the system, also?

9  A   Yes.

10  Q   And what if an employee is hired by

11  Midwest Dock Solutions?

12  A   Sherry would enter that.

13  Q   And the same goes if an employee were

14  terminated by Midwest Dock Solutions?

15  A   Yes.

16  Q   Do you have an understanding of the

17  relationship between Midwest Dock Solutions and

18  Dock & Door?

19  A   Yes.

20  Q   What is your understanding?

21  A   My understanding is that Dock & Door

22  handles only union jobs, and so if they're presented

23  with a union job, Dock & Door handles it.

24  Q   What do you mean if they're presented

1   with a union job?

2       A   If Midwest Dock is able to get a -- or if

3   they have a union job to do, then Midwest -- or I'm

4   sorry -- Dock & Door handles it.

5       Q   They provide the labor?

6       A   Yeah.

7

8           (WHEREUPON, said document was

9               marked as Plaintiffs' Exhibit

10              No. 211, for identification, as of

11              10/7/25, so marked by Mr. McJessy.)

12

13  BY MR. MCJESSY:

14      Q   All right. I'm showing you what's been

15  marked as Exhibit 211, and the e-mail on the top of

16  this is an e-mail from you to something called

17  Payroll. Do you see that?

18      A   Yes.

19      Q   And who's Payroll?

20      A   Payroll, it's -- it's a general inbox.

21  It's payroll@ginerisltd.com.

22      Q   But who would have been getting this

23  e-mail at Payroll?

24      A   Kim Burbach, but all of the payroll

1   clerks can see it, but Kim Burbach would have been the

2   one paying attention to it.

3       Q   Okay. On Page 2 it looks like you

4   write -- it looks like it's an e-mail from you

5   forwarding an e-mail from Sherry Webber and it says,

6   "Hema," H-e-m-a "please update Midwest Dock and

7   Dock & Door: See below." Do you see that?

8       A   I do.

9       Q   Who's Hema?

10      A   She was an outsourced company that we

11  used to use. She handled payrolls for us.

12      Q   So she would have access to the payroll

13  e-mail account back then?

14      A   I don't know that we had -- if it was

15  forwarded to there, then yes.

16      Q   Well, this is an e-mail dated

17  September 26th, 2018, correct?

18      A   Yes.

19      Q   Okay. And the first e-mail in the string

20  is an e-mail from Sherry Webber to you, correct?

21      A   Yes.

22      Q   And it copies Tony Zarlengo, and Sherry

23  Webber says, "Hi, Callie" and then it talks about

24  James Kelly, and then she says, "Also Nico Kelly is on

1   the union side now so I won't be paying him any longer

2   through ADP. Should I change anything in ADP so he

3   doesn't show up in the payroll list any longer?" Do

4   you see that?

5       A   Yes.

6       Q   What did you understand union side to

7   mean?

8       A   That he's not working for Dock & Door.

9       Q   And that's the union side of Midwest Dock

10  Solutions?

11      A   Well, no, it's a separate company. That

12  was her wording.

13      Q   Okay. Well, you respond -- you forward

14  this e-mail to Hema, correct?

15      A   Yes.

16      Q   And then Gineris Payroll responds to you

17  and asks a question "Nicholas Kelly, he is in both

18  companies. Can I put the termination date as 9/27/18

19  in both," question mark, correct?

20      A   Correct.

21      Q   And you respond to that by saying, "See

22  below," and then there's some red text after her

23  question. You added that red text, correct?

24      A   Yes.

1       Q   And you wrote "Only terminate him in

2   Midwest Dock. Dock & Door is the 'union side' so he

3   should remain active there," correct?

4       A   Yes.

5       Q   And so you used the same phrase Sherry

6   did, union side, correct?

7       A   Well, I was quoting her. I don't use

8   that side -- that language, no.

9       Q   Well, you did here, correct?

10      A   I quoted her, correct. I quoted her.

11      Q   And you used her language, right?

12      A   Yes.

13      MR. HUGHES: Objection; asked and answered.

14  BY MR. MCJESSY:

15      Q   And this was an e-mail exchange you had

16  with Payroll, correct?

17      A   Yes.

18      Q   Have both companies' 2024 tax returns

19  been filed?

20      A   Yes.

21      MR. MCJESSY: Can we go off the record for a

22  minute?

23

24

Page 137

1    (WHEREUPON, a discussion was had
2    off the record.)
3
4    MR. MCJESSY: All right. Gina, back on the
5 record.
6    All right. We had a conversation
7 off the record about stipulating to the authenticity
8 of the Federal tax returns and general ledgers that
9 were produced by Gineris & Associates in this case
10 which have been Bates labeled -- or exhibit labeled
11 between Exhibit 171 and Exhibit 213 and produced to
12 counsel today, and the parties have agreed to
13 stipulate that those -- just the tax returns and the
14 general ledgers for Dock & Door and Midwest Dock
15 Solutions are authenticated records for purposes of
16 this case. Is that fair?
17    MR. HUGHES: Yes, they're authenticated, and I
18 can stipulate on behalf of those documents as they
19 relate to Midwest Dock that are within that range,
20 that they are -- that they were -- that they are true
21 and accurate copies of the documents as they are
22 maintained in Gineris' records or produced by Gineris.
23    MR. MCJESSY: And, Todd, will you stipulate to
24 the same for the records that are Dock & Door's

Page 138

1 records?
2    MR. MILLER: I will.
3 BY MR. MCJESSY:
4    Q    And, Ms. Stephens, you did produce the
5 Federal tax returns and the general ledgers for both
6 companies Midwest Dock Solutions and Dock & Door for
7 2016 to 2023, correct?
8    A    Yes.
9    Q    All right. And the documents that were
10 produced by Gineris & Associates, those documents are
11 true and accurate copies of the documents that it
12 maintains in its files?
13    A    Yes.
14    MR. HUGHES: Kevin, what's the exhibit number
15 range for that just so I have it in my notes?
16    MR. MCJESSY: Yes, it's -- I'll just give you
17 the exhibit numbers, Exhibit 170, Exhibit 171,
18 Exhibit 172, Exhibit 174, Exhibit 175, Exhibit 177,
19 Exhibit 178, Exhibit 180, Exhibit 181, Exhibit 183,
20 Exhibit 184, Exhibit 186, Exhibit 187, Exhibit 189,
21 190, Exhibit 192, Exhibit 193, Exhibit 194,
22 Exhibit 195, Exhibit 196, Exhibit 197, Exhibit 198,
23 Exhibit 199, Exhibit 200, Exhibit 201, Exhibit 202,
24 Exhibit 203, Exhibit 204, Exhibit 205, Exhibit 206,

Page 139

1 Exhibit 212 and Exhibit 213.
2 BY MR. MCJESSY:
3    Q    Ms. Stephens, are you familiar with the
4 concept of banked hours?
5    A    No. Can you explain it?
6    MR. MCJESSY: No, that's what I was asking --
7 that's what I was going to ask you.
8    All right. In light of that I'm
9 going to take five minutes. I might be done, and the
10 only questions I may have would be follow-up questions
11 of Mr. Miller or Mr. Hughes, but I'm going to take
12 five minutes to look at my notes and see if I have any
13 other questions; otherwise, that may be it.
14    THE WITNESS: Okay.
15
16    (WHEREUPON, a short break was had.)
17
18    MR. MCJESSY: All right. I don't have any
19 other questions.
20    THE WITNESS: Okay. Great. So I can leave?
21    MR. MCJESSY: Well, not yet.
22    You're muted, Mike.
23    MR. HUGHES: I don't have any either.
24    MR. MCJESSY: Todd.

Page 140

1    MR. MILLER: Nothing for me either.
2    MR. MCJESSY: All right. Ms. Stephens, since I
3 called you for your deposition I have to explain one
4 thing to you. The court reporter needs to know
5 whether you reserve signature on the deposition or
6 waive it, and what that means is you have the right to
7 review the transcript and note any errors you believe
8 may have occurred in transcription or you can waive
9 that right.
10    You can't change your testimony.
11 You can only note errors that you believe occurred in
12 transcribing your testimony. I don't care what you
13 do, but the court reporter needs to know whether you
14 want to reserve that right or waive that right.
15    THE WITNESS: I'll waive it.
16    (DEPOSITION CONCLUDED.)
17
18
19
20
21
22
23
24

Page 141

1  STATE OF ILLINOIS )
                     ) SS:
2  COUNTY OF C O O K )
3       I, GINA M. CAUSLEY, a duly-commissioned,
4  qualified Certified Shorthand Reporter for the County
5  of Cook and State of Illinois, a Certified Shorthand
6  Reporter of said State, do hereby certify:
7       That prior to the commencement of the
8  examination of CALLIE MARIE STEPHENS, she was
9  previously duly sworn remotely to testify the truth,
10 the whole truth, and nothing but the truth concerning
11 the matters herein;
12      That the said deposition was taken via
13 Zoom before me at the time and place specified and
14 that counsel present were as hereinbefore set forth;
15      That the testimony so given by said
16 witness was by me recorded stenographically and later
17 transcribed into print by me, and that the foregoing
18 is a true and complete transcription of the testimony
19 given by the witness on said day and date, to the best
20 of my reportorial knowledge, skill and ability;
21      That the reading and signing of said
22 deposition transcript was waived by the witness;
23      I FURTHER CERTIFY that I am not related
24 to any of the parties herein, an employee of or

Page 142

1  counsel for any of the parties herein, and have no
2  interest in the outcome of the litigation.
3       IN WITNESS WHEREOF, I have hereunto set
4  my hand and affixed my seal of office at Chicago,
5  Illinois, this _____day of_____, A.D., .
6
7
8  _____
                     Certified Shorthand Reporter
9                    County of Cook, State of Illinois.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

36 (Pages 141 to 142)

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 63

**1**

```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
                     EASTERN DIVISION

MID-AMERICA CARPENTERS      )
REGIONAL COUNCIL PENSION    )
FUND, et al.,               )
                            )
              Plaintiffs,   )   No. 1:24-cv-02428
                            )
         vs.                )   Judge Andrea R. Wood
                            )
DOCK & DOOR INSTALL,        )     Magistrate Judge
INC., an Illinois           )   Jeannice W. Appenteng
corporation and MIDWEST     )
DOCK SOLUTIONS, INC., an    )
Illinois corporation,       )
                            )
              Defendants.   )
```

       The deposition of SHERRI LYNN
WEBBER, called by the Defendant for
examination, taken pursuant to the Federal
Rules of Civil Procedure of the United States
District Courts pertaining to the taking of
depositions, taken before DIANE M. NULICK, a
Notary Public within and for the County of
Cook, State of Illinois, and a Certified
Shorthand Reporter of said State, at Suite 231,
3759 North Ravenswood, Chicago, Illinois, on
the 22nd day of September, A.D. 2025, at 9:30
a.m.

**2**

```
 1    PRESENT:
 2       McJESSY, CHING & THOMPSON, LLC,
         BY:  MR. KEVIN P. McJESSY,
 3       mcjessy@MCandT.com,
         (3759 North Ravenswood, Suite 231,
 4        Chicago, Illinois  60613,
         (773) 880-1260),
 5
 6              and
 7       McJESSY, CHING & THOMPSON, LLC,
         BY:  MR. JOHN J. SOPATA,
 8       jsopata@lawyer.com,
         (3759 North Ravenswood, Suite 231,
 9        Chicago, Illinois  60613,
         (773) 880-1260),
10            appeared on behalf of the plaintiffs;
11       ALLOCCO MILLER & CAHILL, P.C.,
         BY:  MR. TODD A. MILLER,
12       tam@alloccomiller.com,
         (20 North Wacker Drive, Suite 3517,
13        Chicago, Illinois  60606,
         (312) 675-4325),
14
             appeared on behalf of the defendant,
15           Dock & Door Install, Inc.;
16       AMUNDSEN DAVIS LLC,
         BY:  MR. MICHAEL F. HUGHES,
17       mhughes@amundsendavislaw.com,
         (3815 East Main Street, Suite A-1,
18        St. Charles, Illinois  60174,
         (630) 587-7925/(630) 217-1228 (direct),
19
             appeared on behalf of the defendant,
20           Midwest Dock Solutions, Inc.
21    Also Present:
22       Mr. Anthony Zarlengo,
23
24
```

**3**

```
 1                     I N D E X
 2
 3    WITNESS:  SHERRI LYNN WEBBER
 4
 5    EXAMINATION BY:                        PAGE
 6    Mr. McJessy                              4
 7
 8    PLAINTIFF'S EXHIBITS:
 9    No. 39                                   6
      No. 40                                  56
10    No. 41                                  87
      Nos. 42, 43, 44, and 45                109
11    No. 46                                 125
      No. 47                                 129
12    No. 48                                 131
      No. 49                                 133
13    No. 50                                 140
      No. 51                                 149
14    No. 52                                 162
      No. 29                                 184
15    No. 53                                 207
      No. 3                                  213
16    No. 54                                 228
      Nos. 55 and 56                         239
17
18
19
20
21
22
23
24
```

**4**

```
 1        MR. McJESSY:  All right.
 2            You can go ahead and swear
 3    the witness, and we can get started.
 4
 5        (The witness was duly sworn.)
 6
 7
 8
 9        SHERRI LYNN WEBBER,
10    called as a witness herein, having been first
11    duly sworn, was examined and testified as
12    follows:
13
14
15            EXAMINATION
16            BY MR. McJESSY:
17
18    Q.  All right.
19            Hi.  Can you state your name
20    for the record, please?
21    A.  Sherri Webber.
22    Q.  Okay.
23            Do you have a middle name?
24    A.  Lynn.
```

1 (Pages 1 to 4)

5

1    Q. Lynn. All right.
2        And can you spell each of
3  your -- your first, middle, and last name for
4  the court reporter, please?
5    A. Yes. S-h-e-r-r-i, L-y-n-n,
6  W-e-b-b-e-r.
7    Q. All right.
8        And have you ever been
9  deposed before?
10    A. I have not.
11    Q. Okay.
12        You are here today pursuant
13  to a subpoena, correct?
14    A. Correct.
15    Q. Okay.
16        That's your understanding?
17    A. Yes.
18    Q. Okay.
19        I'm just going to go ahead
20  and mark this.
21
22
23
24

6

1        (WHEREUPON, the document was
2        marked Plaintiff's
3        Exhibit 39 for identification,
4        as of 9/22/25.)
5
6  BY MR. McJESSY:
7    Q. All right. And that's marked as
8  Exhibit 39.
9        And have you seen that
10  before?
11    A. Yes.
12    Q. Okay.
13        And that's the subpoena that
14  brought you here today, correct?
15    A. That's correct.
16    Q. All right.
17        And -- off the record.
18
19        (There was a discussion off
20        the record.)
21
22    MR. McJESSY: Back on the record.
23  BY MR. McJESSY:
24    Q. You understand that you are under oath

7

1  here today, correct?
2    A. I do.
3    Q. Okay.
4        And even though this is an
5  informal setting, in a conference room, do you
6  understand that that oath has the same force
7  and effect as if you were testifying in court?
8    A. Yes.
9    Q. Excellent. All right. And a couple
10  of ground rules to hopefully make things go
11  more efficiently today.
12        One ground rule is we can't
13  both talk at the same time. So even if you
14  know what my question is going to be and you
15  want to start answering it just to keep things
16  moving along, please let me finish my question
17  before you answer just so the court reporter
18  can take down a clear record of what each one
19  of is saying.
20        Is that fair?
21    A. Yes.
22    Q. And I, in turn, will try not to ask a
23  question while you're still giving an answer.
24        Also, all of your responses

8

1  need to be verbal yeses and nos. The court
2  reporter can't take down accurately nods or
3  shakes of the head or ah-huh or uh-uh, those
4  kind of things. So if as we go along you nod
5  your head or shake your head or say ah-huh or
6  uh-uh, I'll prompt you, is that a yes, is that
7  a no, just so the record's clear.
8        Is that fair?
9    A. Yes.
10    Q. And if I ask a question and you don't
11  understand it for some reason because it's
12  confusing or just because I didn't ask it well,
13  please ask me to explain, and I'll rephrase my
14  question so that we're both on the same page.
15        Is that fair?
16    A. Yes.
17    Q. Okay.
18        And is it fair, then, that I
19  can presume that if you do answer a question
20  that you believe you understood my question.
21        Is that fair?
22    A. Yes.
23    Q. Okay.
24        Is there any reason today

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

9

1　that you cannot give truthful answers to my
2　questions?
3　　　　For example, are you under
4　any medications or suffering from any
5　conditions that would either prevent you from
6　understanding my questions or giving truthful
7　answers?
8　　A.　No.
9　　Q.　Okay.
10　　　　You are represented here
11　today by counsel; is that correct?
12　　A.　I am.
13　　Q.　Okay.
14　　　　And your counsel is Mr.
15　Hughes?
16　　A.　Correct.
17　　Q.　Very good.
18　　　　And have you had a chance to
19　meet with -- I don't want to know what you
20　talked about, but have you had a chance to meet
21　with Mr. Hughes prior to showing up today for
22　your deposition?
23　　A.　Yes.
24　　Q.　Okay.

10

1　　　　And on how many occasions?
2　　A.　One.
3　　Q.　And for how long?
4　　A.　I believe, it was an hour.
5　　Q.　An hour.
6　　　　And was anybody else present
7　during that meeting?
8　　A.　No.
9　　Q.　Okay.
10　　　　And did you review any
11　documents during that meeting?
12　　A.　No.
13　　Q.　Okay.
14　　　　And have you met or spoken
15　with anybody else about your deposition here
16　today other than your attorney?
17　　A.　No.
18　　Q.　Okay.
19　　　　You haven't spoken with Tony
20　Zarlengo about it?
21　　A.　No.
22　　Q.　Or Mike Richert?
23　　A.　No.
24　　Q.　Okay.　All right.

11

1　　　　You are aware -- well, strike
2　that.
3　　　　Are you aware that -- well,
4　let me take a step back.
5　　　　You work for Midwest Dock
6　Solutions?
7　　A.　I do, yes.
8　　Q.　Okay.
9　　　　And are you aware that
10　Midwest Dock Solutions answered interrogatories
11　and produced documents in this case?
12　　A.　Can you repeat that?
13　　Q.　Yes.
14　　　　Are you aware of whether
15　Midwest Dock Solutions answered interrogatories
16　and produced documents in this case?
17　　A.　That we have given to you?
18　　Q.　Yes.
19　　A.　Yes.
20　　Q.　Okay.
21　　　　What -- what was your
22　involvement in that process?
23　　A.　I believe it was contracts for some of
24　the -- from the contractors, invoices from

12

1　Midwest Dock, Dock & Door Install, that we
2　subcontracted work through them.  I believe pay
3　apps, I believe, for new construction jobs.
4　I'm trying to think.  That was several months
5　ago, so I'm trying to think if --
6　　Q.　Sure.
7　　A.　That's all that I can recall.
8　　Q.　Okay.
9　　　　If as we go along you recall
10　something else that you put together to produce
11　in this case, will you let me know?
12　　A.　Yes.
13　　Q.　Okay.
14　　　　As best you can recall right
15　now, those are the documents that you put
16　together to produce in response to the
17　discovery request in this case; is that right?
18　　A.　Yes.
19　　Q.　Okay.
20　　　　Were you ever asked to review
21　your emails in order to produce e-mails in this
22　case?
23　　A.　No.
24　　Q.　Okay.

3 (Pages 9 to 12)

13

```
 1              Where are your emails kept,
 2   your work e-mails?
 3      A.  On my computer at work.
 4      Q.  Okay.
 5              On your desktop computer?
 6      A.  Yes.
 7      Q.  Okay.
 8              And are they password
 9   protected?  Do you need a password to log onto
10   your computer?
11      A.  I have to log onto my computer, yes.
12      Q.  Okay.
13              And who has the password for
14   your computer?
15      A.  I do.
16      Q.  Okay.
17              Anybody else?
18      A.  No.
19      Q.  And how are your emails kept?  Are
20   they like in Outlook, or are they online?  Do
21   you have to log into your account online?  How
22   do you access your emails?
23      A.  It's a Gmail account.
24      Q.  Okay.
```

14

```
 1              So do you log into Gmail?
 2      A.  Yes.
 3      Q.  Okay.
 4              And -- now, your email -- can
 5   you tell me what your email address is?
 6      A.  I can.
 7      Q.  Please.
 8      A.  It's sherri@midwestdocksolutions.com.
 9      Q.  Okay.
10              And that's a Gmail account?
11      A.  Yes.
12      Q.  Okay.
13              So when you log in, what
14   website do you go to to log in?
15      A.  I usually type in Gmail, and it comes
16   up.  I'm trying to think.  I don't know if it's
17   Google.  I'm not sure.  I just type in Gmail,
18   and then it pops up.
19      Q.  Okay.  All right.
20              And the -- and then do you
21   have to enter a password?
22      A.  I do.
23      Q.  Okay.
24              And who else has that
```

15

```
 1   password?
 2      A.  Only I do.
 3      Q.  Only you do.  Okay.  All right.
 4              And do you know if anyone
 5   else reviewed your emails in order to determine
 6   whether there were any documents in your emails
 7   responsive to the discovery in this case?
 8      A.  No.  No one has.
 9      Q.  Okay.
10              Do you keep paper files?
11      A.  For new construction jobs, we do.
12      Q.  Okay.
13              And what -- okay.  What does
14   new construction jobs mean?
15      A.  Those are contracted jobs to us
16   through contractors.
17      Q.  Okay.
18              What does -- what does new
19   construction mean?  Is that like a new building
20   that's going up kind of thing?
21      A.  Possibly at or if there's an addition
22   to a building.
23      Q.  Okay.
24              As opposed to work on a -- an
```

16

```
 1   existing building, like retrofit work, that
 2   kind of thing?
 3              I just want to -- let me take
 4   a step back.  You used the phrase, "new
 5   construction jobs."  I'm just trying to
 6   understand what you mean by that, so can you
 7   explain it to me as best you can?
 8      A.  Well, to me, that's just -- new
 9   construction jobs are more like the project,
10   contract-based, where -- versus service, where
11   someone calls us to provide service, like a
12   repair.  And those are -- those are not
13   contract-based.  We don't have contracts for
14   those.
15      Q.  I see.  Okay.
16              So a new construction job is
17   one that you would have a contract for?
18      A.  Yes.
19      Q.  Okay.
20              And somewhere in my notes --
21   I've got a list here -- but would new
22   construction jobs be for like contractors like
23   ARCO Murray, Pepper Construction, Meridian
24   Design Build, Opus Construction, those kind of
```

4 (Pages 13 to 16)

17

1    companies?
2        A.  Yes.
3        Q.  Okay.
4            Would they be for -- and
5    those are -- do you -- are you familiar with
6    the term like logistics buildings?
7        A.  You mean for like trucking?
8        Q.  Yeah.
9        A.  Yes.
10       Q.  Okay.
11           Are those the new -- new
12   construction jobs that you're referring to, or
13   could there be any other types of new
14   construction jobs also?
15       A.  No.  Those are them.
16       Q.  Okay.
17           That's what you're referring
18   to?
19       A.  Yes.
20       Q.  Okay.  All right.
21           So you keep paper files for
22   the new construction jobs?
23       A.  Correct.
24       Q.  All right.

18

1            And where are those files
2    kept?
3        A.  In the office.
4        Q.  Okay.
5            And we'll get into this in a
6    little greater detail, but can you describe for
7    me, like when you say "in the office," what do
8    you mean?  Like do you have a filing cabinet
9    area --
10       A.  Yes.
11       Q.  -- or something like that?
12       A.  Yeah.  We have a file cabinet.
13       Q.  Okay.
14           And do you know -- did you go
15   through those documents to produce documents in
16   this case?
17       A.  Yes.  I believe I had to pull the --
18   the contracts out and provide those.
19       Q.  Okay.
20           And as -- as part of those
21   projects, I'm assuming there's communications
22   back and forth with the general contractors
23   related to those projects?
24       A.  Can you repeat that?

19

1        Q.  I assume that as part of those
2    construction jobs, those new construction jobs,
3    you also have email communications with the
4    folks involved in those construction projects,
5    the general contractor?
6        A.  Yes.  You mean like ARCO Murray and --
7        Q.  Yeah.
8        A.  Yes.  Yes.
9        Q.  Okay.
10           And -- but those are all in
11   your emails, I take it?
12       A.  Yes.
13       Q.  Okay.
14           Do you know if anybody else
15   other than you reviewed the files in the filing
16   cabinet, the paper files, in order to produce
17   them in this case?
18       A.  Not -- not that I'm aware of.
19       Q.  Not that you're aware of.  Okay.  All
20   right.
21           What's the highest level of
22   education you've received?
23       A.  I have a college degree, a bachelor's.
24       Q.  Excellent.

20

1            And where do you have that
2    from?
3        A.  Purdue University.
4        Q.  Excellent.
5            What is it in?
6        A.  It's a bachelor of science degree, I
7    believe.
8        Q.  Oh, okay.
9            And do you know what your
10   major was?
11       A.  That was a long time ago.  You know
12   what?  I'm sorry.  I don't remember.
13       Q.  That's all right.
14           Do you know when you
15   graduated?
16       A.  Let's see.  I don't know exactly.  I
17   graduated high school in '86, and I think it
18   took me almost six years to graduate, so --
19       Q.  All right.
20           So approximately sometime,
21   maybe, in 1992?
22       A.  Somewhere around there, yes.
23       Q.  Approximate.  Okay.
24           And do you hold any

5 (Pages 17 to 20)

21

```
1   certificates or licenses, other than a drivers
2   license and, maybe, a firearms permit -- I
3   don't want to know about that -- but do you
4   hold any certificates or professional licenses
5   of any sort?
6       A.  I don't, no.
7       Q.  Have you had any other education,
8   formal education after graduating from college?
9       A.  No.
10      Q.  Have you attended any trade schools or
11  any sort of -- received any sort of training in
12  the trades, like carpentry, electrician, that
13  kind of thing?
14      A.  No.
15      Q.  Okay.  All right.
16              When did you start working
17  for Midwest Dock Solutions?
18      A.  January 2017.
19      Q.  Okay.
20      A.  Eight years, nine months.
21      Q.  Almost -- yeah.  Almost nine years; is
22  that right?
23      A.  Yes.
24      Q.  Okay.  All right.
```

22

```
1              And where were you working
2   before you were hired by Midwest Dock
3   Solutions?
4       A.  I was working at Omni Office
5   Equipment.
6       Q.  Okay.
7              And what were you doing for
8   them?
9       A.  I was working the front desk.
10      Q.  Okay.
11              And what kind of work did
12  that entail?
13      A.  They had service calls because they
14  repaired and copiers and fax machines and
15  things like that, printers.
16      Q.  Okay.
17              Did they also sell equipment?
18      A.  They did, yes.
19      Q.  Okay.
20              And so what was your job?
21  What were your tasks?
22      A.  Phone calls.  Let's see.  Processed
23  payments when people came in.  There were some
24  contract work with like maintenance contracts
```

23

```
1   for some of the companies we serviced.
2       Q.  You kept track of that?
3       A.  Yeah.  Had to update when they were
4   going to expire.
5       Q.  Okay.
6       A.  That's really all that I can recall.
7       Q.  All right.
8              Did you do like invoicing and
9   payments of accounts -- accounts
10  receivable/accounts payable, that kind of work?
11      A.  Possibly, a little bit.  But it wasn't
12  a major part of the job.
13      Q.  All right.
14              And how long were you at Omni
15  Office Equipment?
16      A.  I think, maybe, a year and a half, two
17  years.
18      Q.  Okay.
19              And why did you leave to go
20  to Midwest Dock Solutions?
21      A.  I didn't really like my job over
22  there.
23      Q.  Okay.  All right.
24              So it was your choice to
```

24

```
1   leave?
2       A.  Yes.
3       Q.  Okay.
4              And how did you get -- how
5   did you come to have a job at Midwest Dock
6   Solutions?
7       A.  A friend of mine, her husband is a
8   friend of Mike Richert.  And at the time, she
9   talked to them about possibly helping them out.
10  They were very busy doing some office work, and
11  so she had -- I believe she had met with Tony
12  Zarlengo about the job.  And then she went back
13  to her employer, and they offered her more
14  money.  And so she ended up staying there at
15  her job, and so she had called me and asked if
16  I was interested in talking to them, and she
17  had known that I wanted to leave my job at that
18  time.
19      Q.  I see.
20              And so did you reach out to
21  Midwest Dock, or did Midwest Dock reach out to
22  you?
23      A.  I believe, they reached out to me.
24  But I'm not certain.
```

6 (Pages 21 to 24)

25

```
1      Q.  Okay.
2          You're not -- fair enough.
3          And who did you meet with?
4   A.  Tony Zarlengo.
5      Q.  Okay.
6          And he's here today, correct?
7   A.  He is.
8      Q.  Okay.
9          Is he your boss?
10  A.  He is, yes.
11     Q.  Okay.
12         And did he interview you?
13  A.  Yes.
14     Q.  Did you have to fill out a job
15  application or provide a resumé or anything
16  like that?
17  A.  I don't think so.
18     Q.  Okay.
19         And where did he interview
20  you?
21  A.  In his office.
22     Q.  And where was that located at the
23  time?
24  A.  That was on Holeman Avenue.
```

27

```
1      Q.  And where is Omni Office Equipment
2   located?
3   A.  Highland, Indiana.
4      Q.  Okay.
5          And what did you do for
6   Realty Executives?
7   A.  I answered phones.  I also -- we dealt
8   with foreclosure, so we had to deal with banks
9   and making sure all of the paperwork is in
10  order, processing paperwork for like closings,
11  get them ready for the closing, things like
12  that.
13     Q.  All right.
14         And what -- did you have a
15  title with Realty Executives?
16  A.  Not really, no.
17     Q.  Not really.
18         How about with Omni Office
19  Equipment?  Did you have a title there?
20  A.  No.  It was a small little place.
21     Q.  How long were you with Realty
22  Executives?
23  A.  I believe about 15 years.
24     Q.  Oh, a long time.
```

26

```
1      Q.  Okay.
2          And you got hired, I'm going
3   to guess?
4   A.  I did.
5      Q.  Okay.
6          Did you have to interview
7   more than once?
8   A.  No.
9      Q.  Okay.
10         And did you interview with
11  Mike Richert before you were hired?
12  A.  I don't believe so.
13     Q.  Okay.
14         Just Tony?
15  A.  Yes.
16     Q.  Okay.
17         And I'm going to take a step
18  back, now.
19         Before you worked for Omni
20  Office Supply -- or Omni Office Equipment, I'm
21  sorry, who did you work with before that?
22  A.  I worked for Realty Executives.
23     Q.  Where are they located?
24  A.  In Lynwood.
```

28

```
1          And why did you switch from
2   Realty Executives to Omni Office Equipment?
3   A.  There was an incident at work, so I
4   left.
5      Q.  Okay.
6          And without going into too
7   much detail, what was the incident?
8   A.  There was just some drama going on in
9   the office and things happening and -- not my
10  boss, but another boss had said that you -- you
11  just have to do your job and be quiet.  And it
12  wasn't said as nicely as that.
13     Q.  Got it.
14  A.  So that was my point to exit.
15     Q.  All right.
16         And did you -- did you leave,
17  or were you terminated?
18  A.  I left.
19     Q.  Okay.
20         And where did you work before
21  Realty Executives?
22  A.  Before Realty Executives, I worked at
23  Bacon's Information.
24     Q.  Spelled just like it sounds?
```

7 (Pages 25 to 28)

29

1    A.  Yes.
2    Q.  And what did you do there?
3    A.  I worked in the subscription
4  department.  It's a company that would do like
5  clippings for people.  We had clients that
6  wanted to know like certain things, if their
7  company was ever mentioned, related topics that
8  they wanted, any buzz words.  And I was in the
9  department that would get all of the
10  subscriptions, so we got tons of magazines,
11  journals, and they all needed to be checked in.
12    Q.  All right.
13        And how long were you there?
14    A.  I believe, it was four years.
15    Q.  Was that your first job out of
16  college?
17    A.  No.  I had one prior to that.
18    Q.  What was that?
19    A.  That was at Fort Dearborn Life
20  Insurance.
21    Q.  And what was your job there?
22    A.  I did customer service for their
23  annuity department and then also just customer
24  service for their life insurance.

30

1    Q.  All right.
2        And what -- what did customer
3  service entail?
4    A.  Phone calls, for sure.
5    Q.  Answering them?
6    A.  Yes.  I don't know that we had that
7  many email back then, so --
8    Q.  The beginning of the --
9    A.  Just service.
10    Q.  -- at the cusp of the Internet era?
11    A.  Yes.  Right.  Right.
12    Q.  All right.
13        And have you ever been a
14  member of a union?
15    A.  No.
16        Well, actually, I have not
17  been a member of the union.  But when I had my
18  daughter, I got off of -- we had -- what is
19  that called -- HMO.  And in order to get onto
20  an HMO plan, you paid union dues and became
21  like -- like a -- you know, different people
22  from all different places on a union, so I
23  don't know if that counts.  I wasn't really
24  part of it, but it was like paperwork wise.  I

31

1  did have to pay union dues to get the
2  insurance.
3    Q.  I see.
4        And do you know what union
5  that was?
6    A.  That I don't know.
7    Q.  Okay.
8        Did you personally have to
9  pay the union dues?  Like were they out of your
10  paycheck or something like that?
11    A.  I did have to pay them.  I don't
12  remember.
13    Q.  You don't remember how they were paid?
14    A.  No.
15    Q.  Okay.
16    A.  That was -- my daughter is 27, so that
17  was a long time ago.
18    Q.  Well, that was my next question.
19        How long ago was that?
20    A.  So I didn't know -- I mean, I wasn't
21  really part of the union, but I don't know if
22  that --
23    Q.  Okay.
24        So you could have been a

32

1  member of the union and not --
2    A.  On paper.
3    Q.  -- be sure about it?
4    A.  Yes.
5    Q.  All right.
6        And how long did that last,
7  do you recall?
8    A.  Just until I had my daughter, so it
9  had to be under a year.
10    Q.  Okay.
11    A.  Because then I switched back to my
12  initial insurance.
13    Q.  All right.
14        And do you know who -- where
15  you were working when that happened?
16    A.  I was working at Fort Dearborn Life
17  Insurance.
18    Q.  Okay.  All right.
19        Do you remember, did anybody
20  have to sponsor you to be a member of the union
21  at that time --
22    A.  Not that I recall.
23    Q.  -- or to be part of this program?
24    A.  Not that I recall, no.

8 (Pages 29 to 32)

33

1    Q.  Okay.
2        Do you remember anything else
3    about that?
4    A.  No.  I mean, it was just -- like just
5    like on paper, you know.  Never had to meet
6    with anybody.
7    Q.  All right.  All right.
8        To your knowledge, when you
9    were hired by Midwest Dock, who made the
10   decision to hire you?
11   A.  I'm guessing it was Tony Zarlengo
12   since I had -- he's the one who contacted me
13   about the job.
14   Q.  Okay.
15       And he's the only one you
16   interviewed with?
17   A.  Yes.
18   Q.  Who contacted you to tell you you were
19   hired?
20   A.  I would say Tony Zarlengo.
21   Q.  Okay.
22       And I asked you earlier.
23   He's your boss, correct?
24   A.  Correct.

34

1    Q.  Is there anybody else you would
2    consider to be your boss?
3    A.  Well, Mike Richert is an owner, so
4    I -- I believe he was my boss also.
5    Q.  Okay.
6        Do you report to -- who do
7    you have the most interaction with?
8    A.  Tony Zarlengo.
9    Q.  Okay.
10       And what's -- what's the
11   nature of your interaction with Mr. Zarlengo on
12   a daily basis?
13       Well, strike that.  Let me
14   ask the question a different way.
15       Do you interact with Mr.
16   Zarlengo as part of your work on a daily basis?
17   A.  Yes.
18   Q.  Okay.
19       Do you interact with Mike
20   Richert as part of your work on a daily basis?
21   A.  No.
22   Q.  Okay.
23       How does -- how does your
24   relationship with Mr. Zarlengo differ from your

35

1    relationship with Mr. Richert?
2    A.  Really, I'm very little with Mike
3    Richert, so --
4    Q.  You deal with him very little?
5    A.  Yes.
6    Q.  You work in an office, right?
7    A.  Yes.
8    Q.  Okay.
9        And Mr. Zarlengo works in the
10   same office?
11   A.  He does.
12   Q.  Okay.
13       And does Mike Richert work in
14   the office?
15   A.  He does.
16   Q.  Okay.
17       Is he there on a regular
18   basis?
19   A.  No.
20   Q.  How often is he there?
21   A.  I mean, it varies week to week.
22   Definitely, not as much as Tony Zarlengo.
23   Q.  Okay.
24       Is Mr. Zarlengo in the office

36

1    most days?
2    A.  Yes.
3    Q.  Is Mike Richert in the office most
4    days?
5    A.  Not always, no.
6    Q.  Okay.
7        During hunting season --
8    A.  That's right.
9    Q.  -- is he frequently gone?
10   A.  Yes.
11   Q.  Okay.  All right.
12       And what's the -- when you do
13   interact with Mr. Richert at the office, can
14   you describe for me generally what your
15   interactions with him would be about?
16   A.  If I have any questions about -- he
17   usually handles like the vehicles.  If I have a
18   question about that, I would go to him.  If
19   there's any mail that comes addressed to him, I
20   would deliver that to him.  Not really much on
21   like my daily work.
22   Q.  Okay.
23       And when you say if you have
24   questions about the vehicles, what do you mean

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

37

1  by that?
2      A.  Like as far as ones that are still
3  being used because they're registered, and
4  that's really it.
5      Q.  And are there vehicles that are being
6  used and vehicles that are not being used?
7      A.  Sometimes, I suppose.
8      Q.  And I'm just trying to understand what
9  you mean when you said -- I asked you what you
10  would deal with him on the vehicles about, and
11  I think your answer was something to the
12  effect -- and please correct me if I've got it
13  wrong -- you would talk to him about -- or deal
14  with him about ones being used and about if
15  they're still registered, so I'm just trying to
16  figure out like what's --
17      A.  Well, not if they're still registered.
18  If we're still using those vehicles.
19      Q.  I see.
20          So there's vehicles you're
21  using and, maybe, vehicles you're not using?
22  Is that --
23      A.  Yes.
24      Q.  Okay.

38

1      A.  Sometimes.
2      Q.  What kind of vehicles are we talking
3  about?
4      A.  Trucks.
5      Q.  And vans?
6      A.  Yeah, some.  I think we have one or
7  two.
8      Q.  Okay.
9          Well, motor vehicles that you
10  drive on the road is what we're talking about,
11  right?
12      A.  Yes.
13      Q.  Okay.
14          Does the -- does the
15  company -- Midwest Dock Solutions, does it own
16  like scissor lifts and forklifts?
17      A.  Yes.
18      Q.  Okay.
19          Does it own both of those
20  kind of vehicles?
21      A.  That I'm not sure.
22      Q.  Okay.
23          Well, let me ask you this.
24  What vehicles are you aware of that the company

39

1  has?
2      A.  I know we have trucks.  I know we
3  have, at least, one van, maybe more.  I mean, I
4  have heard the term, "scissor lift."  But I'm
5  not really even sure, you know.
6      Q.  Oh, okay.
7          You're not sure what that is?
8      A.  Right.
9      Q.  All right.
10          How about a forklift?
11      A.  Yes.  Yes.
12      Q.  You have a forklift?
13      A.  I think we do, yes.
14      Q.  Okay.
15          Anything else that's a
16  motorized vehicle that you can think of that
17  the company has?
18      A.  No.
19      Q.  All right.
20          So when you said you dealt
21  with Mr. Richert about the vehicles, you meant
22  like the vans and the trucks?
23      A.  Yes.
24      Q.  Okay.

40

1          And what is it that you might
2  deal with him about concerning the vehicle, the
3  vans or the trucks?
4      A.  I would give him -- like if the
5  insurance cards came in, I'd give him those so
6  he can get them in the trucks.
7      Q.  I see.  Okay.
8      A.  Registrations, like the stickers for
9  them, the license plates, I would give those to
10  him --
11      Q.  Okay.
12      A.  -- so that he can get them on the
13  vehicles.
14      Q.  All right.
15          Anything else?
16      A.  No.  Uh-uh.
17      Q.  All right.
18          And then you said if you got
19  mail and it was addressed to him, you'd give
20  him that?
21      A.  Yes.
22      Q.  All right.
23          Other than dealing with the
24  vehicles as you've described and the mail,

10 (Pages 37 to 40)

41

1 anything else that you would work with Mr.
2 Richert on?
3     A. No. Not really.
4     Q. Okay.
5         So is it fair to say, then,
6 that your interaction with Mike Richert is
7 pretty minimal?
8     A. Yes.
9     Q. Okay.
10        How about Mr. Zarlengo? What
11 kind of things do you deal with with him?
12    A. If I have questions about an email, or
13 if I answer the phone and there's a question
14 about service or service calls that we're
15 getting in, I give those to him, also billing
16 with the -- the new construction, I'll call it,
17 to find out how much of the job has been done,
18 how much we can bill.
19    Q. Okay. All right.
20        Anything else?
21    A. I mean, we do interact a lot. I'm
22 trying to think. I mean, just all like
23 questions just that may come up.
24    Q. All right.

42

1         How about insurance matters?
2     A. As far as insurance for --
3     Q. Like Certificates of Insurance for new
4 construction projects?
5     A. Yes.
6     Q. You would work with him on that?
7     A. Yes.
8     Q. Okay.
9         Like he might say, hey, we
10 need a Certificate of Insurance for this
11 project, and you would get that?
12    A. Send the email, yes.
13    Q. Okay.
14    A. Yes.
15    Q. How about other kinds of insurance
16 issues, like insurance on the vehicles or
17 insurance on the -- you know, liability
18 insurance, that kind of thing? Would you deal
19 with him on that?
20    A. No, not really.
21    Q. No? All right.
22        Anything else you can think
23 of that you worked with him on a regular basis
24 about? How about employee benefits?

43

1     A. No. Payroll.
2     Q. Okay.
3     A. I do get payroll hours from him to
4 enter.
5     Q. How do you get those?
6     A. I get a text with those hours.
7     Q. Okay.
8         And do you have a work phone
9 or only a -- do you have more than one cell
10 phone?
11    A. No.
12    Q. You just have one cell phone?
13    A. Yes.
14    Q. And is that your -- do you pay the
15 bill for that cell phone?
16    A. Yes.
17    Q. Okay.
18        It's not a company-provided
19 cell phone?
20    A. No.
21    Q. Who's the carrier?
22    A. I have AT&T.
23    Q. All right.
24        And how long have you had

44

1 AT&T?
2     A. Forever.
3     Q. And what's your cell phone number?
4     A. It's (219) 670-4514.
5     Q. Okay.
6         And other than texting hours,
7 do you get the payroll hourlies -- the hours --
8 strike that.
9         Other than by text, do you
10 get payroll hours in any other way?
11    A. No.
12    Q. Okay.
13        And the employees' payroll
14 hours, are those kept by time sheet, do you
15 know?
16    A. That, I'm not -- I don't know.
17    Q. You don't know?
18    A. No.
19    Q. All right.
20        And you're aware that there's
21 employees who are paid through Midwest Dock
22 Solutions, and then Dock & Door has employees
23 that it pays, correct?
24    A. That they have their own employees?

11 (Pages 41 to 44)

45

```
1        Q.  Okay.
2        A.  Yeah.
3        Q.  Okay.
4             And -- and do you get hours
5    for Dock & Door employees?
6        A.  No.
7        Q.  Okay.
8             Only for the Midwest Dock
9    Solutions' employees?
10       A.  Right.  All Midwest Dock employees,
11   the weekly and the -- or the hourly and also
12   the salesmen.
13       Q.  Do the salesmen keep track of their
14   time?
15       A.  They do.
16       Q.  And how do you -- how is your pay
17   determined?  Is it hourly, or is it salary?
18       A.  It's hourly.
19       Q.  Hourly?
20       A.  Hourly, yes.
21       Q.  Do you keep track of your hours?
22       A.  I do.
23       Q.  Okay.
24             And how do you do that?
```

46

```
1        A.  I keep track, make a mental note of
2    those, yeah.
3        Q.  Do you write them down anywhere or no?
4        A.  I have before --
5        Q.  Okay.
6        A.  -- on occasion, yes.  If I know -- I
7    mean, if I'm not working a full day, then --
8    then I would note that, so, you know, I would
9    deduct that from --
10       Q.  I see.  Okay.
11            So you don't always --
12       A.  But most of the time, I'm working a
13   full day, yeah.
14       Q.  Got it.
15            So you don't always keep
16   track of your hours, just when it's on
17   shortened time?
18       A.  Yes.
19       Q.  Okay.
20            And the text messages that
21   you get from Mr. Zarlengo with the employees'
22   hours, what does -- can you tell me what that
23   looks like when he sends you those text
24   messages?
```

47

```
1        A.  It's the employee's name and how many
2    hours they worked.
3        Q.  That day or that week?
4        A.  That week.
5        Q.  Okay.
6             And would one text message
7    have like a list of the employees and the
8    hours, or would it be a separate text message
9    for each employee?
10       A.  One text message.
11       Q.  Okay.
12             Now, you work in the same
13   office as him, correct?
14       A.  As Tony Zarlengo?
15       Q.  Yeah.
16       A.  Yes.
17       Q.  Is there a reason that he doesn't just
18   like give you the hours, like here's the hours
19   and hand you a sheet of paper?
20            MR. HUGHES:  Objection.  Form.
21   BY MR. McJESSY:
22       Q.  That's fine.
23             You can go ahead and answer.
24       A.  I can answer?
```

48

```
1            MR. HUGHES:  Yeah.  You can answer.
2    Unless I tell you not to answer, you would
3    answer even over my objections.
4            THE WITNESS:  I believe he might
5    have used to do that, but now he just texts it
6    to me.  Sometimes he's in the office.
7    Sometimes he's not.
8    BY MR. McJESSY:
9        Q.  Okay.
10            And do you get the hours
11   texted to you on the same day of the week, or
12   does it -- is it random?
13       A.  It's the same day of the week, yes.
14       Q.  Okay.
15            And what day is that?
16       A.  On a Wednesday.
17       Q.  All right.
18            And then what do you do with
19   the hours once you get them?
20       A.  I enter them into ADP.
21       Q.  All right.
22            And how long has Midwest Dock
23   Solutions been using ADP for its payroll?
24       A.  I'm trying to think if we used
```

12 (Pages 45 to 48)

49

1  anything else.  I'm not sure if we used
2  anything else.  We may have used it the whole
3  time.
4      Q.  So do you think that would be since
5  you were hired?
6      A.  I believe so.
7      Q.  Okay.
8          And was that one of the
9  things that you did when you were hired was you
10  were in charge of like handling payroll?
11     A.  I'm not positive if it happened right
12  when I started working there or if it came
13  later.  I'm not really sure.
14     Q.  Okay.
15         When you started working
16  there, to the best that you recall, was your --
17  did you receive your pay through ADP, either a
18  check or direct deposit?
19     A.  I'm not sure.
20     Q.  Okay.  You don't recall.
21         But as far back as you can
22  recall, it was ADP?
23     A.  As far back as I can remember, yes.
24     Q.  Okay.

50

1          Now, you have the email
2  address sherri@midwestdocksolutions.com,
3  correct?
4      A.  Correct.
5      Q.  Okay.
6          And that's -- you said that
7  was password protected?
8      A.  Yes.
9      Q.  And only you know the password?
10     A.  Correct.
11     Q.  Okay.
12         And how did you get that
13  email address?
14     A.  That was created for me.
15     Q.  Okay.
16         And do you know who created
17  it?
18     A.  I believe it was Mandy Zarlengo.
19  Mandy Zarlengo.
20     Q.  Mandy Zarlengo?
21     A.  Yes.
22     Q.  And who is Mandy Zarlengo?
23     A.  That is Tony's sister.
24     Q.  Okay.

51

1          And does she work for the
2  company also?
3      A.  No, but she -- we -- I'm trying to
4  think.  We hired her to help us with
5  implementation of some of the, like, software
6  enhancements.
7      Q.  Okay.
8          And when did that happen?
9      A.  Not exact.  I would say, maybe, three
10  years ago.
11     Q.  All right.
12         How long have you had the --
13  you've had the email address
14  sherri@midwestdocksolutions.com longer than
15  three years, correct?
16     A.  Before that, I think I had -- I did
17  have a different email address before that.
18     Q.  You did?
19     A.  I did.
20     Q.  And what was that email address?
21     A.  I would have to go in and look.  It
22  was some -- it had my name in there part of the
23  way, but --
24     Q.  Okay.

52

1          Let's --
2      A.  It may have even just been my name
3  sherriwebber@gmail.
4      Q.  All right.
5          Well, maybe when we take a
6  break, I'll look.  I think I've seen emails
7  from sherriwebber@midwest -- or
8  sherri@midwestdocksolutions.com going back to,
9  at least, approximately 2021 or 2020.
10         Do you think you could have
11  had that email address that long?
12     A.  That could be.
13     Q.  That could be?
14     A.  Yes.
15     Q.  Okay.
16         And what I'm -- here's what
17  I'm trying to figure out, and you can explain
18  it to me as best you can.  You think that Mandy
19  Zarlengo gave you that -- provided you with the
20  email address sherri@midwestdocksolutions.com,
21  and you believe she was hired, maybe, three
22  years ago to provide some software-related
23  services.
24         If you had the email address

13 (Pages 49 to 52)

53

1  before three years -- before three years ago,
2  would you still think she provided you with
3  that email address?
4      A.  I believe so.
5      Q.  Okay.
6      A.  So she may have been hired by us
7  before that three years.
8      Q.  And that's what I -- to do some
9  software-related work or computer-related work?
10     A.  Yes.
11     Q.  Okay.
12          Is that -- to your knowledge,
13 is that what she does?  She works with
14 technology?
15     A.  She works for Salesforce.
16     Q.  Oh, okay.
17          That's a software firm,
18 correct?
19     A.  Yes.
20     Q.  All right.
21          And so the work that she does
22 for Midwest Dock Solutions, she does that while
23 she's working -- still working for Salesforce,
24 correct?

54

1      A.  Yes, because it is --
2      Q.  She's helping out her brother?
3      A.  Yeah, right.  We hired her to -- yes,
4  to bring Salesforce to us.
5      Q.  Oh, do you use Salesforce?
6      A.  We do.
7      Q.  Oh, okay.
8          What is -- what is
9  Salesforce?
10     A.  We use it for -- for service calls, to
11 kind of keep track of them in one location.
12     Q.  Okay.
13          So when people call in and
14 they want to hire Midwest Dock Solutions to do
15 service work, it's entered into Salesforce.
16          Is that how it works?
17     A.  Yes.
18     Q.  Okay.
19          And then what -- what does
20 that software do?
21     A.  It's just a place where we can put all
22 of the information all in one place -- you
23 know, why they're calling, who called -- just
24 instead of keeping it on paper.

55

1      Q.  I see.
2          And does it also say who did
3  the work when the work is done?
4      A.  Yes.  I believe so, yeah.
5      Q.  Is that information that gets entered
6  into the information?
7      A.  Yes.
8      Q.  Is that information that you enter
9  into the system?
10     A.  Not usually, no.
11     Q.  Who does that?
12     A.  That would be Danny, I believe.
13     Q.  Who's Danny?
14     A.  Danny Lietz.  He works in the office.
15     Q.  And what's his job?
16     A.  The service, like the service calls,
17 managing service calls.
18     Q.  Does he do anything else?
19     A.  I believe he orders parts sometimes.
20     Q.  Okay.
21          Anything else?
22     A.  Not that I'm aware of, no.
23     Q.  All right.
24          And -- all right.

56

1          And there are others with the
2  email address @midwestdocksolutions.com as
3  well, correct?
4      A.  Yes.
5      Q.  And do you know how the other
6  employees get that email address?
7      A.  How they got the address?
8      Q.  Yeah.
9      A.  I believe that was also created at
10 the -- from Mandy.
11     Q.  So if somebody new is hired, do you
12 know how it's determined whether they get an
13 email address -- you know,
14 @midwestdocksolutions.com?
15     A.  Only office people have that.  I don't
16 believe we've gotten any new employees since
17 those were created.
18
19          (WHEREUPON, the document was
20          marked Plaintiff's
21          Exhibit 40 for identification,
22          as of 9/22/25.)
23
24

14  (Pages 53 to 56)

57

```
1   BY MR. McJESSY:
2       Q.  Okay.  All right.
3           I'm going to hand you what's
4   been marked as Exhibit 40.  And if -- if you
5   could turn -- I'll represent to you that these
6   are what it says on the first page there.
7   They're Defendant Midwest Dock Solutions
8   Objections and Answers to Plaintiff's First Set
9   of Interrogatories and Document Production
10  Request.
11          Do you see that there?
12      A.  Ah-huh.
13      Q.  And if you turn to the last page of
14  that, you'll see that there's a verification
15  there attached by Mr. Zarlengo.
16          Do you see that?
17      A.  Yes.
18      Q.  Okay.
19          And if you turn to the
20  second, third, and fourth -- second and third
21  pages of this document, you'll see there's a
22  number of email -- there's a table, and it says
23  email address.
24          Do you see that?
```

58

```
1       A.  Yes.
2       Q.  And then if you look down the list by
3   certain person's names, it has their email.
4           Do you see that?
5       A.  Yes.
6       Q.  And if you look through those, do
7   those email addresses look familiar to you,
8   that those persons have those email addresses?
9       A.  A few of them that work in the office,
10  yes.
11      Q.  Okay.
12          How about somebody -- and
13  that's sort of where I was going with this.
14  Like on the first page, it's got Ronald Cronk.
15          Do you see that?
16      A.  Yes.
17      Q.  Did I say that right, C-r-o-n-k,
18  Cronk?  And it's got
19  ronc@midwestdocksolutions.com, and it shows
20  that he's a technician, right?
21      A.  Yes.
22      Q.  Were you aware that he had an email
23  address?
24      A.  I was not, no.
```

59

```
1       Q.  Okay.
2           And -- but on the top of the
3   next page where it says
4   steve@midwestdocksolutions.com, he's in sales,
5   correct?
6       A.  Yes.
7       Q.  Steve French?
8       A.  Yes.
9       Q.  Yeah.
10          And is he still there?
11      A.  Yes.
12      Q.  And he has an email address of
13  midwestdocksolutions.com, correct?
14      A.  Yes.
15      Q.  And he works in the office?
16      A.  He does.
17      Q.  So you were -- you knew he had an
18  email address?
19      A.  Yes.
20      Q.  Okay.
21          And the next one, Jeff
22  Gibson, where it's
23  jeffg@midwestdocksolutions.com, he's also a
24  technician.
```

60

```
1           Do you see that?
2       A.  I see that, yes.
3       Q.  Were you aware he had an email address
4   of midwestdocksolutions.com?
5       A.  No.
6       Q.  Okay.
7           How about
8   janie@midwestdocksolutions.com?  Were you aware
9   that Jane Graham had an email address?
10      A.  Yes.
11      Q.  How were you aware of that?
12      A.  Because she's a warehouse employee, so
13  I do have some interaction with her.
14      Q.  Okay.
15          And what's the nature of your
16  interaction with her?
17      A.  She will email me receipts for things
18  that she had purchased for the warehouse.
19      Q.  Like what kind of things would she
20  purchase for the warehouse?
21      A.  Any shop supplies that she may need.
22      Q.  Can you think of things that would be
23  examples?
24      A.  A ladder.  She also does welding, so
```

15 (Pages 57 to 60)

61

1    it could be welding supplies.
2        Q.  Okay.
3            As you -- as you look through
4    this list here, can you tell me the persons who
5    you knew had -- other than the ones you've
6    already talked about -- knew had
7    midwestdocksolutions.com e-mail addresses?
8        A.  I did know Danny.  I know David
9    because he's in sales.
10       Q.  David?
11       A.  Mortel.
12       Q.  M-o-r-t-e-l-l.
13       A.  I do know Ira Sugar and Amber.
14       Q.  What's Amber's last name?
15       A.  Toigo.
16       Q.  T-o-i-g-o?
17       A.  Yes.  And Tony Zarlengo.
18       Q.  And I take it, those are people who
19   you would communicate with by e-mail?
20       A.  Yes.
21       Q.  Okay.
22           How about James -- James
23   Johnson?
24       A.  He's no longer there.

62

1        Q.  When he -- oh, okay.  When did he
2    leave?
3        A.  I think it was in December.  I would
4    say, maybe, a year ago.
5        Q.  So sometime in the fall of 2024 or
6    winter?
7        A.  I'm not positive.
8        Q.  Did he leave, or was he fired?  I
9    mean, did he leave of his own volition, or was
10   he terminated?
11       A.  He left.
12       Q.  On his -- of his own volition?
13       A.  Yes.
14       Q.  All right.
15           And what did he do?
16       A.  He was in sales.
17       Q.  Okay.
18           And new construction sales?
19   Service sales?  Both?
20       A.  I believe, mostly service sales.
21       Q.  Mostly service.
22           What did he do, sell new
23   construction?
24       A.  No.  I don't think so.

63

1        Q.  Okay.
2            So he just did service?
3        A.  I believe so, yes.
4        Q.  Okay.
5            And how about Steven French?
6        A.  He does mostly service.
7        Q.  Okay.
8            When you say "mostly," then,
9    does he do also some new construction?
10       A.  He has just started doing a few, yes.
11       Q.  So he does both now?
12       A.  Yes.
13       Q.  Okay.
14           And what -- what does service
15   sales entail?
16       A.  He has certain clients that he
17   provides service for.  When they call, those
18   are his account.
19       Q.  I see.
20       A.  So he would take the call for that and
21   schedule the service for that.
22       Q.  Okay.
23           And -- oh, I'm sorry.  Did I
24   cut you off?  I didn't mean to.

64

1        A.  No.  No.
2        Q.  Okay.
3            And does he also find new
4    clients?
5        A.  Yes.
6        Q.  Okay.
7            Can you give me some examples
8    of -- of like who -- and they don't have to be
9    just his, but service clients that Midwest Dock
10   Solutions has?
11       A.  You're looking for names of some of
12   them?
13       Q.  Yeah.  Yeah.
14       A.  I should know those.  But, of course,
15   my brain is like -- let's see.  We do like XPO
16   Logistics.  We do -- let's see.  I'm trying to
17   think.
18       Q.  There's probably some major clients.
19       A.  Let's see.  Why can't I think of them?
20       Q.  Okay.
21           Well, you know what?  We can
22   come back to that.  If you think of them as we
23   go along, I'm just looking for, you know, some
24   examples of, maybe, the major clients that

16  (Pages 61 to 64)

65

1  would be illustrative of the service clients
2  that Midwest has.
3      A.  Yeah.  Let me think about that.
4      Q.  All right.
5          New construction versus
6  service work, how much of the business would
7  you say is -- is service work, and how much of
8  it is new construction?
9      A.  I'm really not sure.  I mean, I really
10  couldn't gauge.
11      Q.  All right.
12          How about on a daily basis?
13  How much of your time is spent doing work
14  related to service clients versus new
15  construction clients?
16      A.  I don't usually do the billing anymore
17  for service, so --
18      Q.  Did you used to?
19      A.  I did.
20      Q.  And when -- when did you do that?
21      A.  I did that just up until, maybe, just
22  a few years ago.
23      Q.  So can you give me just an
24  approximation?  Are we talking 2022, 2023?

66

1      A.  I'll say 2022.
2      Q.  Okay.
3          And then what changed so that
4  you stopped doing the billing for the service
5  work?
6      A.  We got very busy, and it was hard to
7  keep up with billing.
8      Q.  You got very busy with new
9  construction or with service work or just
10  overall?
11      A.  Just overall.
12      Q.  Okay.
13          So you had to give up on --
14      A.  Give it to someone else.
15      Q.  I see.
16      A.  Yes.
17      Q.  Okay.
18          Who did you hire to do the
19  billing for the service work?
20      A.  Amber Toigo.
21      Q.  Is that what she does primarily is the
22  billing for the service work?
23      A.  Yes.
24      Q.  Does she do anything else?

67

1      A.  She enters the bills that we receive.
2      Q.  And what do you mean by that?
3      A.  We use Zero.  She enters those in
4  Zero.
5      Q.  What is Zero?
6      A.  It's like an accounting system.
7      Q.  Okay.
8          So what kind of bills would
9  she enter into Zero, like for parts and
10  supplies?
11      A.  Bills for those, yes --
12      Q.  Okay.
13      A.  -- that we have to pay.
14      Q.  Bills from your -- your vendors?
15      A.  Yes.
16      Q.  Does Zero do anything else besides
17  keep track of -- of bills that need to be paid?
18      A.  Well, she enters the invoices there,
19  creates invoices for service.
20      Q.  Okay.
21          So customers that you've
22  worked for, to bill them for your services,
23  they're created in the Zero software?
24      A.  Okay.

68

1      Q.  Okay.  All right.
2          And does Zero software do
3  anything else?
4      A.  I do enter new construction in there.
5      Q.  Okay.
6      A.  It's not necessarily billed through
7  there because it's done a different way, but --
8  so we can keep track of what is owed to us.
9      Q.  Okay.
10          So all of the billing for the
11  new construction and for the service work is
12  entered into the Zero accounting software?
13      A.  Yes.
14      Q.  And so that's so that all of it can be
15  kept track of in one place?
16      A.  Yes.
17      Q.  Okay.
18          And you said -- does the Zero
19  accounting software, then, issue the billing
20  statements to the service clients?  Is that how
21  the invoices get issued?
22      A.  To people that owe us --
23      Q.  Yes.
24      A.  -- for work we've done?

69

1    Q.  Yes.
2    A.  Yes.
3    Q.  Okay.
4         And then how -- how is the
5    billing done for the new construction that's
6    different?
7    A.  Those are usually done on pay apps.
8    Q.  Okay.
9         Pay apps?
10   A.  Yes.
11   Q.  P-a-y a-p-p-s?
12   A.  Yes.
13   Q.  Okay.
14        And what is a pay app?
15   A.  It shows what the project total is,
16   how much of the project has been completed, and
17   how much we're billing for.
18   Q.  Okay.
19   A.  Because you're only -- you can only
20   bill for what you've completed, so it's -- it's
21   an ongoing process.
22   Q.  Okay.
23        And does -- are there
24   different pay apps?

70

1    A.  Some contractors have their own form,
2    which is basically the same information.  It
3    just may look slightly different.
4    Q.  By "apps," do you mean applications?
5    Was that a shorthand phrase or -- I'm trying to
6    figure out, is it a -- like when you say "app,"
7    what I'm thinking of is my phone, and it has
8    different apps?
9    A.  Oh, no, no.  Right.  It would be a pay
10   application, I guess.
11   Q.  Okay.
12        And is that something that's
13   typed up on the computer, like a Word document
14   or a PDF document, that kind of thing?
15   A.  Yes.  Yes.
16   Q.  Okay.
17        And then it's forwarded by
18   email to the contractors?
19   A.  Yes.
20   Q.  Okay.
21        But you said some of the
22   contractors have their own pay apps, correct?
23   A.  They may have a similar form, but --
24   Q.  Okay.

71

1         So that's what you meant when
2    you said they have their own?  They have a
3    different form?
4    A.  It's all basically the same
5    information, yes.
6    Q.  Okay.
7         And how do you prepare those
8    forms?  What software program do you use?
9    A.  I believe I use Excel.
10   Q.  Okay.
11        And then it's emailed to the
12   different contractors?
13   A.  Yes.
14   Q.  And then do you enter that information
15   into the Zero software as well?
16   A.  Yes.
17   Q.  All right.
18        And how do you know how much
19   work has been completed on a given project?
20   A.  I usually ask the person, the
21   salesperson, whose job it is.
22   Q.  Okay.
23        So you'd ask, for example,
24   Ira Sugar?

72

1    A.  Yes.
2    Q.  Or Steven French?
3    A.  Yes.
4    Q.  All right.
5         Or who else would be the
6    salespersons on the new construction jobs?
7    A.  Tony Zarlengo.
8    Q.  Okay.
9         He has -- Tony sells, too?
10   A.  Yes.
11   Q.  And who else?
12   A.  That's it, yeah.
13   Q.  So just to sort of recap that, just so
14   I don't make a mistake, the salespersons who
15   you -- for new construction jobs who you reach
16   out to to find out when to bill and how much to
17   bill a job are Steve French, Ira Sugar, and
18   Tony Zarlengo?
19   A.  Yes.
20   Q.  And nobody else?
21   A.  No.
22   Q.  How do you know which salesperson is
23   responsible -- and for right now, I'm going to
24   use -- when I say salesperson, I'm including

18 (Pages 69 to 72)

73

1    **Mr. Zarlengo, Tony Zarlengo, since you said**
2    **he's one of the people.**
3          **How do you know which one of**
4    **them to contact?**
5    A.  I usually get the contract from them.
6    So if it's Ira's project, he will get me the
7    contract for that.
8    **Q.  Okay.**
9          **And how do you get the**
10    **contract?  Is it emailed to you, or do they**
11    **print it out, hand you a copy?  How does that**
12    **work?**
13    A.  Sometimes both.  I mean, I've gotten
14    them through email or handed a copy.
15    **Q.  Okay.**
16          **Is one more common than the**
17    **other?**
18    A.  Well, he will give me that once it's
19    been signed, when he's sending it, so he will
20    physically give me the copy then because he's
21    scanning it to them.  If it's signed by the
22    construction company, the fully signed one,
23    it's usually an email.
24    **Q.  Okay.  All right.**

74

1          **So when you have -- when you**
2    **have a new construction job and the job starts,**
3    **how do you know when to start billing for the**
4    **work?**
5    A.  I usually go to the sales person and
6    ask if -- if we can bill it for that month.
7    **Q.  Oh, okay.  So sort of on a monthly**
8    **basis you say, hey, what projects can I bill**
9    **this month?**
10    A.  Right.
11    **Q.  And do you know how they know whether**
12    **a project is ready to be billed?**
13    A.  I believe it's how much work is
14    completed.
15    **Q.  How do they know that?**
16    A.  Because they're responsible for
17    scheduling the work to be on.
18    **Q.  Okay.**
19          **So that's part of -- their**
20    **job is to monitor what the progress is of the**
21    **job as it goes along?**
22    A.  Yes.
23    **Q.  Okay.**
24          **And you know that because you**

75

1    work with them in getting this information so
2    you can bill it?
3    A.  Right.  I don't know the progress, but
4    they do.
5    **Q.  Okay.**
6          **Prior to when Amber was**
7    **hired, were you doing the billing for the**
8    **service work?**
9    A.  Yes.
10    **Q.  Okay.**
11          **And were you using the same**
12    **software program for that?**
13    A.  Yes.
14    **Q.  Okay.**
15          **And you were also billing for**
16    **the new construction work?**
17    A.  Yes.
18    **Q.  And you were keeping track of that**
19    **work also with the Zero software program?**
20    A.  Yes.
21    **Q.  Do you know how long you've been using**
22    **that accounting software?**
23    A.  It's been a while.
24    **Q.  Do you think, at least, five years?**

76

1    A.  I was going to say five.
2    **Q.  Okay.**
3          **Do you know what you were**
4    **using before that?**
5    A.  QuickBooks.
6    **Q.  Okay.**
7          **And you were using QuickBooks**
8    **for both billing the service work and the new**
9    **construction work?**
10    A.  Yes.
11    **Q.  Okay.  All right.**
12          **Now, when Amber was hired --**
13    **you said, I think -- I think approximately**
14    **three years ago.  Does that sound right?**
15    A.  Yes.
16    **Q.  Okay.**
17          **So she was given an email**
18    **address @midwestdocksolutions.com, correct?**
19    A.  Yes.
20    **Q.  Okay.**
21          **And do you know how she was**
22    **provided with that?**
23    A.  I believe, through Mandy Zarlengo.
24    **Q.  Okay.**

19 (Pages 73 to 76)

77

```
1          And does -- well, let me take
2  a step back.
3          The office has a computer
4  system?
5      A.  I'm not -- what do you mean?
6      Q.  Well, who in -- who in the office has
7  a computer?
8      A.  You want all of the names?
9      Q.  Yeah.
10     A.  I do.  Tony does.  Tony Zarlengo,
11 Steve French, Ira Sugar, Mike Richert, Amber,
12 and Danny.
13     Q.  All right.
14          How about Tony Brutti?
15     A.  Well, he doesn't work for Midwest
16 Dock.
17     Q.  But does he have a computer?  He has
18 an office in the same facility, right?
19     A.  Yes.
20     Q.  And does he have a computer?
21     A.  He does.
22     Q.  Okay.
23          And Danny -- Danny was
24 Danny --
```

78

```
1      A.  Lietz, yeah.
2      Q.  And you gave me -- let's see -- you,
3  Mr. Zarlengo, Mr. French, Mr. Sugar, Mr.
4  Richert, Amber, Danny Lietz, and Tony Brutti.
5  That's one, two -- that's about eight
6  computers.
7          Does that sound about right?
8      A.  Yes.
9      Q.  Okay.
10          And are they all desktop
11 computers?
12     A.  Yes, except I'm not sure about Tony
13 Brutti.
14     Q.  Okay.
15          You know he has a computer.
16 You're just not sure if it's a desktop
17 computer?
18     A.  Right.
19     Q.  Okay.
20          Have you been in Mr. Brutti's
21 office before?
22     A.  I have.
23     Q.  Okay.
24          And have you seen the
```

79

```
1  computer?
2      A.  Well, he does have a laptop, so I'm
3  not sure if he has regular computer.
4      Q.  Okay.
5          And when -- when you save
6  something on your computer, can, for example,
7  Ira Sugar access that document that you've
8  saved?
9      A.  No.
10     Q.  Okay.
11          And do you have a printer in
12 the office?
13     A.  We do.
14     Q.  And can you print to that printer?
15     A.  I can.
16     Q.  How many printers do you have?
17     A.  Just one.
18     Q.  Just one.
19          And can other people print to
20 that same printer?
21     A.  Yes.
22     Q.  Okay.
23          Do you have a copier in the
24 office?
```

80

```
1      A.  It is one in the same, yeah.  It's a
2  big one.
3      Q.  Okay.
4          That's what I was going to
5  ask.  It's all of the rage.
6          So everybody can like print
7  to that same copier?
8      A.  Yes.
9      Q.  Okay.
10          Does that include Mr. Brutti?
11     A.  Yes.
12     Q.  Okay.
13          And -- but you don't have --
14 as far as you know, you don't have like a
15 common shared directory with any of the other
16 office staff where you can save a file to the
17 same directory and then access it?
18     A.  No, we don't.
19     Q.  Okay.
20          So if you want to give a
21 computer file to somebody, you have to put it
22 on a jump drive or something like that and hand
23 it to them?
24     A.  I would probably email it to them.
```

20 (Pages 77 to 80)

81

```
1      Q.  You would email it to them?
2      A.  Yeah.
3      Q.  I see.  Okay.
4          Do you know who set up the
5   computer system at the office?
6          MR. HUGHES:  Objection.  Misstates
7   her testimony.
8   BY MR. McJESSY:
9      Q.  Do you know who set up the -- strike
10  that.
11         Well, you can answer.  Strike
12  that.
13         Do you know who set up the
14  computer so that they could all print to the
15  same copier, for example?
16     A.  That was our -- the company we
17  purchased of the copier from.
18     Q.  Do you know who that was?
19     A.  I do.  Of course, I can't think of it
20  now.  Oh, my gosh.  Let me think on that.
21     Q.  Okay.
22         Do you know how long ago you
23  purchased the copier?
24     A.  Yes.  Recently.  Maybe six months ago.
```

82

```
1      Q.  All right.
2          And prior to that, did --
3      A.  Oh, it's Gateway.  I'm sorry.  Gateway
4   Business Solutions.  Solutions?  Gateway
5   Business.  And they're -- they're in Munster,
6   Indiana.
7      Q.  Okay.
8          And before that, before you
9   had the copier that everybody was printing to,
10  was there a printer or something else that you
11  could print to or another copier?
12     A.  Well, we had one prior to that.
13     Q.  Oh, I see.  Okay.
14     A.  Yes.  As a replacement, yeah.
15     Q.  And did it work in the same way?
16     A.  Yes.
17     Q.  Everybody with all of the printers
18  could print to that same copier?
19     A.  Yes.
20     Q.  Okay.
21         And how long did you have
22  that one?
23     A.  Since I started the job.  So, yeah, it
24  lasted a while.
```

83

```
1      Q.  The -- I'd ask what kind it was just
2   for --
3      A.  A Bizhub.  I know that.
4      Q.  It was what?
5      A.  A Bizhub.
6      Q.  A Bizhub?  Oh, I haven't heard of that
7   before.
8          Gateway Business Solutions,
9   were they like your copy party?
10     A.  Yes.
11     Q.  They did that one, too?
12     A.  Yes.
13     Q.  Okay.
14         All -- to your knowledge, do
15  all of the computers in the office have
16  Internet access?
17     A.  Yes.  I believe so.
18     Q.  All right.
19         And do you have any idea who
20  would have set up the system so that all of the
21  of the computers in the office have Internet
22  access?
23     A.  I would think Gateway did that.
24     Q.  Okay.
```

84

```
1          But you're not sure about
2   that?
3      A.  No.
4      Q.  Okay.
5          Does Midwest Dock Solutions
6   have like an IT person?
7      A.  No.
8      Q.  How about an IT company?
9      A.  No.
10     Q.  If you have a computer problem, how
11  does -- how does that get dealt with?
12     A.  Just try to figure it out.  Google
13  things.
14     Q.  Okay.
15         You don't have somebody that
16  you call in to fix --
17     A.  No.  I mean, not that I -- I really
18  haven't had any problems.
19     Q.  Okay.  All right.
20         When was the last time the
21  office got any new computers?  And I would
22  include Mr. Brutti in that.
23     A.  Well, I really don't know about him at
24  all.  Like new computers for everybody or --
```

21 (Pages 81 to 84)

85

1    Q.  Anybody.
2    A.  I got mine, maybe, like two years ago.
3    Q.  Okay.
4    A.  I believe, Ira had gotten one, maybe,
5  like a year and a half ago.  Other than that, I
6  don't really know.
7    Q.  Okay.
8        And how did you get the -- do
9  you know how you or Ira got the new computer?
10   A.  I went to the store and bought it.
11   Q.  All right.
12       And where did you get it at?
13   A.  I believe I got mine at Best Buy.
14   Q.  Okay.
15   A.  I'm not sure about him.
16   Q.  Okay.
17       Were you responsible for
18  getting the computer on your own?
19   A.  I just went to go do it.
20   Q.  That's what I meant, yeah.
21   A.  Yeah.
22   Q.  All right.
23       You went and you bought it?
24   A.  Right.

86

1    Q.  Okay.
2        You used a company credit
3  card or something?
4    A.  Yes.
5    Q.  And then you bring it back to the
6  office.
7        How does it get hooked up?
8  Did you hook it up yourself?
9    A.  As much as possible.  And then if I
10  needed help -- I don't remember, but I would
11  have called Gateway to do it.
12   Q.  Okay.  All right.
13       Can you tell me what time it
14  is?
15       MR. SOPATA:  Quarter to 11:00.
16       MR. McJESSY:  All right.
17       We've been going about an
18  hour and 15 minutes.  Can we like take a
19  five-minute break, and then we can pick it back
20  up.
21       Is that all right?
22
23
24

87

1        (After a break from 10:47 a.m.
2        to 10:58 a.m., the deposition
3        was resumed as follows:)
4
5        (WHEREUPON, the document was
6        marked Plaintiff's
7        Exhibit 41 for identification,
8        as of 9/22/25.)
9
10  BY MR. McJESSY:
11   Q.  Let me hand you what I've marked as
12  Exhibit 41.  And it's got an exhibit sticker on
13  the first and second pages, but ignore the
14  exhibit sticker on the second page.
15       This looks like an email
16  exchange between you and somebody at Esser
17  Hayes Insurance Group.
18       Do you see that?
19   A.  Ah-huh.
20   Q.  Is that a yes?
21   A.  Yes.  Sorry.
22   Q.  And it looks like it's dated -- the
23  one on the first page is dated April 9, 2020.
24       Do you see that?

88

1    A.  Yes.
2    Q.  And if you turn to the second page,
3  there's an email there that's addressed to
4  sherri@midwestdocksolutions.com, and it's dated
5  April 9, 2020.
6        Do you see that?
7    A.  Yes.
8    Q.  And it looks like they're forwarding
9  to you a Certificate of Insurance or something
10  like that.
11       Is that fair?
12   A.  Yes.
13   Q.  Does that -- the fact that this -- you
14  have a sherri@midwestdocksolutions.com email
15  address in 2020.
16       Does that sound right to you,
17  that you could have had it that long ago?
18   A.  Yes.
19   Q.  Okay.
20       Maybe longer than that?
21   A.  Possibly.
22   Q.  Okay.
23       But, at least, five -- at
24  least, back to that period of time, that sounds

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

89

1  right?
2      A.  Yes.
3      Q.  Okay.
4          And I think you said that
5  when we were talking, but I just wanted to
6  verify that that sounded right to you.
7          And do you see, at the bottom
8  of the first page, where there's -- it's --
9  it's from you.  It says from
10 sherriwebber@midwestdocksolutions --
11 sherri@midwestdocksolutions.com, and you're
12 emailing Margaret Stredde.
13         Do you know how to pronounce
14 that?
15     A.  I don't.
16     Q.  Okay.  S-t-r-e-d-d-e.
17         And you also copied Tony
18 Zarlengo on there.
19         Do you see that?
20     A.  Yes.
21     Q.  And his email address is
22 tony@midwestdocksolutions.com, correct?
23     A.  Yes.
24     Q.  Okay.

90

1          And was it -- when you -- you
2  think that, maybe, you had an email address
3  that was sherri@gmail.com, or something like
4  that, that you used for a period of time; is
5  that right?
6      A.  Yes.
7      Q.  Do you think that you got the email
8  address sherri@midwestdocksolutions.com around
9  the same time Tony got the
10 tony@midwestdocksolutions.com, or did you have
11 an email address that you were using that was
12 like a Gmail address -- you know,
13 sherri@gmail.com or something like that -- and
14 Tony had tony@midwestdocksolutions.com, and
15 then you got your email address later?  Does
16 that question make sense to you?  Do you
17 understand what I'm asking you?
18     A.  So you're asking if we got the
19 midwestdocksolutions.com email at the same
20 time?
21     Q.  Yeah.  That be would be a better way
22 to put it.  I wish I thought of it.
23     A.  Yes.  I believe that was at the same
24 time.

91

1      Q.  Okay.
2          That's how it worked?
3  Suddenly, they got this email address and
4  started using it?
5      A.  Yes.
6      Q.  Okay.
7          Do you know who was
8  responsible for getting that?  And I don't mean
9  who at the company.  I mean, how the
10 arrangement -- who at the company made the
11 arrangements to get that.
12     A.  That I don't know.
13     Q.  Okay.
14         And we'll get into this more
15 a little bit later, but the company has a
16 website, correct?
17     A.  Yes.
18     Q.  Okay.
19         And you're aware that that's,
20 you know, www.midwestdocksolutions.com?
21     A.  Yes.
22     Q.  Okay.
23         And do you know how long the
24 company has had that website?

92

1      A.  That I do not know.
2      Q.  Okay.
3          Do you know whether it had
4  the website before the email suffix changed
5  from Gmail to @midwestdocksolutions.com?
6      A.  That I don't know either.
7      Q.  Okay.
8          Do you have a title?
9      A.  I do.
10     Q.  What's your title?
11     A.  Office manager.
12     Q.  Okay.
13         Has that been your title
14 since you were hired?
15     A.  I really didn't have a title when I
16 was first hired.
17     Q.  Okay.
18         If you -- what position were
19 you hired for?
20     A.  I don't really think I was given one.
21     Q.  They didn't say we're looking to hire
22 a --
23     A.  Well, they didn't have somebody doing
24 my job.  It was like a created position, you

23 (Pages 89 to 92)

93

1  know.
2      Q.  Okay.
3      A.  It wasn't an existing one that I was
4  filling.
5      Q.  Okay.
6              And when were you given the
7  formal title, office manager?
8      A.  I don't know that there was a formal.
9  They just -- I have to sometimes put a title on
10  a document to say who I am, so --
11      Q.  Okay.
12              And so you use office
13  manager?
14      A.  Yes.
15      Q.  All right.
16              And as far as you know, is
17  Mr. Zarlengo good with that?
18      A.  I think so.
19      Q.  Okay.
20              How long have you been using
21  that title?
22      A.  I probably -- the first time that I
23  was asked for it, I suppose.  But I don't know.
24  I can't say an exact date.

94

1      Q.  Okay.
2              Do you think more than five
3  years ago?
4      A.  Yes.
5      Q.  Okay.
6              So you've been using the
7  title office manager for a fairly long time?
8      A.  Yes.
9      Q.  Okay.
10              And when you were hired, what
11  was the position that you understood you were
12  applying for?  Like did you know what you'd be
13  doing?
14              Strike that.
15              What was the position that
16  you thought you were applying for when you were
17  being interviewed?
18      A.  I knew it was to do like office
19  administrative work.  I did know it would be
20  some billing, things like that.
21      Q.  Okay.
22              When you were hired, did
23  anybody report to you?
24      A.  No.

95

1      Q.  Does anybody report to you now?
2      A.  No.
3      Q.  Have your job responsibilities changed
4  since you've been hired?
5      A.  Yes.
6      Q.  Well, let me -- let me ask you.
7              What -- what are your job
8  responsibilities now?
9      A.  Well, answer phones, check emails and
10  answer those.  I do order Certificates of
11  Insurance when they're requested.  I do the new
12  construction billing.  I -- I do process the
13  mail, pay bills that are due.  I process
14  payments that we receive for invoices.  I
15  process payroll into our ADP system.  That's
16  all I can think of right now.
17      Q.  All right.
18              You said you answer phones.
19              Is that the general phone
20  line for the company?
21      A.  Yes.
22      Q.  Okay.
23              And you said you check
24  emails.

96

1              Do you check emails other
2  than your own?
3      A.  No.
4      Q.  Okay.
5              So you only check the email
6  account sherri@midwestdocksolutions.com?
7      A.  Yes.
8      Q.  Okay.
9              And you said you do new
10  construction billing.
11              Is that like -- that's
12  preparing the payment applications?
13      A.  Yes.
14      Q.  Do you prepare any other sort of
15  invoices?
16      A.  Very rarely anymore.
17      Q.  Okay.
18              You used to --
19      A.  Yes.
20      Q.  -- when you did the service work?
21      A.  Right.
22      Q.  Okay.
23              And that was about three
24  years ago?

24 (Pages 93 to 96)

97

1    A. Yes.
2    Q. And -- and so you would prepare --
3 then you would prepare invoices for the service
4 clients?
5    A. Yes.
6    Q. Any other invoices that you would
7 prepare at that time?
8    A. No. I don't think so.
9    Q. All right.
10           And you said very rarely now.
11           I take it, you do it when
12 Amber is unavailable to do it?
13    A. Right.
14    Q. Okay.
15           And how did the invoices get
16 sent out, the payment applications and the
17 service invoices?
18    A. Through email.
19    Q. Okay.
20           And that's true for both
21 systems?
22    A. Yeah.
23    Q. Okay. You write checks?
24           You write checks?

98

1    A. Yes.
2    Q. Okay.
3           And -- and you don't -- do
4 you sign checks?
5    A. No.
6    Q. Mr. Zarlengo signs checks?
7    A. Correct.
8    Q. Anybody else?
9    A. Mike Richert can sign checks.
10    Q. He's an authorized signer?
11    A. Yes.
12    Q. Does he sign checks?
13    A. Occasionally. Not often.
14    Q. Okay.
15           Is it like if he's in the
16 office and -- and Mr. Zarlengo is not --
17    A. Right, yes.
18    Q. -- then he'll sign a check?
19    A. Yes.
20    Q. Okay.
21           And how do you prepare the
22 checks?
23    A. I just write them out.
24    Q. By hand?

99

1    A. Yes.
2    Q. Okay.
3           And do you have like a --
4 does your account record have like a carbon
5 copy system? When you write out a check, it
6 keeps a carbon copy of it?
7    A. Yes.
8    Q. And then do you enter the checks into
9 any sort of system?
10    A. Into Zero.
11    Q. Okay.
12           All checks?
13    A. Yes.
14    Q. You're familiar with Gineris &
15 Associates?
16    A. Yes.
17    Q. Okay.
18           G-i-n-e-r-i-s, I think.
19    A. Correct.
20    Q. Do they have access to the Zero
21 system?
22    A. They do.
23    Q. Okay.
24           So the Zero system has your

100

1 account -- if that's a fair description -- and
2 is maintained in the cloud; is that right?
3 Online somewhere?
4    A. No. I mean, we log into it. It's --
5    Q. Okay.
6           That's what I meant. You log
7 in through the Internet?
8    A. Yes.
9    Q. And then all of your information --
10 yours, meaning Midwest information's -- is
11 stored in the -- on the Zero system --
12    A. Program.
13    Q. -- wherever that is, correct?
14    A. Yes.
15    Q. Okay.
16           And so the folks at Gineris &
17 Associates, they can log into it, too?
18    A. Yes.
19    Q. Okay.
20           Are all deposits also entered
21 into the Zero system?
22    A. Yes.
23    Q. Okay.
24           Do you -- do you know whether

25 (Pages 97 to 100)

101

1   Dock & Door has an account with Zero or uses
2   Zero?
3       A.  They do.
4       Q.  They do.  Okay.
5               And have they been using it
6   about the same amount of time that Midwest Dock
7   Solutions has been using it?
8       A.  That I don't know.
9       Q.  Okay.
10              And how do you know that they
11  use it also?
12      A.  Because we do contract them to do some
13  work for us, and the invoices get emailed over
14  to me.
15      Q.  Okay.
16              And how can you tell that the
17  invoice was generated by the Zero system?
18      A.  Because it has like a -- a button
19  where you could like access the invoice or like
20  copy it over.
21      Q.  Oh.
22              The email has a -- something
23  imbedded in the email that you click on?
24      A.  Yes.

102

1       Q.  I see.
2               And -- and that somehow
3   identifies it as the Zero system?
4       A.  Yes.
5       Q.  I got it.
6               And then when you click on
7   the button, it opens the invoice or something
8   like that?
9       A.  Yes.
10      Q.  Okay.  I understand.
11              And -- so when you send
12  out -- when Midwest Dock Solutions sends out
13  its invoices for the service work, they go out
14  by Zero?
15      A.  They're created through Zero, but we
16  send them on just through email.
17      Q.  Oh, I see.
18              So you create -- I think I
19  want -- I just want to make sure I understand.
20              So you use Zero to create the
21  invoice, but the email would come from Amber
22  or, for example, you, and it would have a link
23  in it that somehow somebody would click on to
24  get their invoice from the Zero system?

103

1       A.  No.  We -- we don't send invoices out
2   like that.
3       Q.  Okay.
4       A.  We save them as a file and attach the
5   file to the email.
6       Q.  And the file somehow says Zero on it
7   or --
8       A.  No.
9       Q.  I'm sorry.  I don't -- I don't
10  understand.
11              You said that you knew
12  Dock -- Dock & Door uses the Zero system
13  because you get invoices from them.
14      A.  From them, yes.
15      Q.  And it has a link that you click on,
16  and somehow that identifies it as Zero?
17      A.  Yes.
18      Q.  What identifies it as Zero?
19      A.  There's --
20      Q.  Like does it say Zero or --
21      A.  Well, you can click on it.  And then
22  if -- if the other person receiving it has
23  Zero, that will like copy that invoice into
24  their system.

104

1       Q.  I see.
2               And you do, and it does?
3       A.  Yes.
4       Q.  I see.
5               You do have Zero.  And when
6   you click on it, it does copy the invoice in
7   your system?
8       A.  Because I log into our system, and it
9   will transfer over, yes.
10      Q.  I see.
11              So -- but who does the email
12  come from?
13      A.  The email?
14      Q.  With the link.
15      A.  That comes from Tony Brutti.
16      Q.  Okay.
17              And does it come from like
18  his email address?
19      A.  Yes.
20      Q.  I see.
21              And when -- then when Midwest
22  Dock sends out invoices, when it creates an
23  invoice in Zero, how does that invoice get sent
24  out?

26 (Pages 101 to 104)

105

1      A.   That invoice is saved as -- like in a
2   Word document or a -- well, a PDF.  I'm sorry.
3   Not a Word document.  And then that's attached
4   to an email that's outgoing.
5      Q.   I see.
6           So you just -- and it's like
7   you're sherri@midwestdocksolutions.com --
8      A.   Yes.
9      Q.   -- or amber@midwestdocksolutions.com,
10   that's her email address for your email that's
11   going out?
12      A.   Yes.  And we're attaching that file to
13   the email.
14      Q.   As a PDF?
15      A.   Yes.
16      Q.   I see.
17           And when the customer gets
18   that invoice, if they have Zero, can they click
19   on it and download it into their system?
20      A.   No.
21      Q.   Oh, because you're not sending it out
22   that way?
23      A.   Right.
24      Q.   I see.

106

1           But Tony Brutti, when he
2   sends the invoices, he does send them in a
3   manner that they can be added to your system if
4   you open them in Zero?
5      A.   Yes.
6      Q.   I see.  Okay.
7           And does he send out the
8   invoices for all of the work that he may do for
9   Midwest Dock Solutions or just some of the work
10   that he may do for Midwest Dock Solutions?
11   Does he always use Zero to invoice Midwest Dock
12   Solutions?
13      A.   Yes.  He always uses it.  I don't know
14   like when he -- you know, what work he's
15   sending it for other than what's on the
16   invoice.
17      Q.   Okay.
18           And do the invoices describe
19   the work that was done?
20      A.   Yes.
21      Q.   And does Midwest Dock Solutions
22   maintain those invoices in its system?
23      A.   Yes.
24      Q.   Do you balance or reconcile the bank

107

1   accounts for Midwest Dock Solutions?
2      A.   Yes.
3      Q.   Have you ever done that for
4   Dock & Door?
5      A.   No.
6      Q.   Have you ever written checks for
7   Dock & Door?
8      A.   No.
9      Q.   Have you ever issued invoices on
10   behalf of Dock & Door?
11      A.   No.
12      Q.   Let's see.
13           You paid -- you paid -- I'm
14   sorry.  Strike that.
15           You paid Midwest Dock
16   Solutions' bills, correct?
17      A.   Yes.
18      Q.   All right.
19           And that's part of preparing
20   the checks and things like that; is that right?
21      A.   Yes.
22      Q.   And you mentioned pay -- you handle
23   Midwest Dock Solutions' payroll.  We talked
24   about that, that you entered the hours in ADP's

108

1   system?
2      A.   Correct.
3      Q.   Do you do any other part of the
4   payroll for Midwest Dock Solutions, like
5   prepare quarterly payroll reports or anything
6   like that?
7      A.   No.
8      Q.   Do you -- is all of that handled by
9   Gineris?
10      A.   Yes.
11      Q.   What is the nature of your -- you
12   mentioned earlier that you interact with the
13   general contractors for the new construction
14   business that Midwest Dock Solutions does,
15   insofar as, you know, getting Certificates of
16   Insurance, correct?
17      A.   Yes.
18      Q.   Okay.
19           What other interaction would
20   you have with the general contractors?
21      A.   To submit the billing to them.
22      Q.   Okay.
23           Like, hey, can we bill this?
24      A.   There's usually certain dates in the

27 (Pages 105 to 108)

109

1  contract that you can bill by, and sometimes
2  they will send an email with a print date.  So
3  it's asking if we're billing, and it has to be
4  done by a certain date.
5      Q.  Okay.
6          And you can set those off the
7  to the side just so there's no clutter in front
8  of you.
9          Forty-two.  Forty-three.
10 Forty-four.  Forty-five.
11
12         (WHEREUPON, the documents were
13         marked Plaintiff's
14         Exhibits 42, 43, 44, and 45 for
15         identification, as of 9/22/25.)
16
17 BY MR. McJESSY:
18     Q.  All right.
19         And I've handed you a
20 sampling of emails there labeled Exhibits 42,
21 43, 44, and 45, and have you had a chance to
22 sort of look at those generally?
23     A.  Yes.
24     Q.  All right.

110

1          And do these look like emails
2  that you exchange with general contractors
3  concerning billing issues on -- on different
4  jobs?
5      A.  Yes.
6      Q.  All right.
7          And are these sort of
8  representative of the kind of emails that you
9  would exchange with general contractors
10 concerning billing matters?
11     A.  Yes.
12     Q.  Okay.
13         So in looking at this,
14 Exhibit 42, for example, this one says -- it's
15 an email to Jay Linsley; is that correct?
16     A.  Ah-huh.
17     Q.  Is that yes?
18     A.  Yes.
19     Q.  And that's a -- is that a Pepper
20 Construction job, do you recall?  Matteson 57?
21     A.  I think so.
22     Q.  If you look at the next exhibit,
23 Exhibit 43, that looks like it's an email there
24 on the bottom of the first page.  It's from

111

1  jlinsley@pepperconstruction.com?
2      A.  Yes.
3      Q.  And I'm assuming that's probably the
4  same Jay Linsley?
5      A.  Yes.
6      Q.  Okay.  L-i-n-s-l-e-y.  Linsley.
7          And how would you, for
8  example, know -- it says hi, Jay, just
9  wondering if a change order has been issued yet
10 for $1,850 for the replacement of the damaged
11 lower track and jam seal.
12         Do you see that?
13     A.  Ah-huh.
14     Q.  That's Exhibit 42.
15         Like how would you know about
16 that in order to be asking about it?
17     A.  Whoever's project this is, the
18 salesman would tell me that they're expecting a
19 change order, so then I would put a note in the
20 file to make sure that it was followed up if we
21 didn't get one.
22     Q.  Okay.
23         And you're familiar with what
24 change orders are?

112

1      A.  Yes.
2      Q.  All right.
3          And those are often issued as
4  part of the new construction jobs that you're
5  billing on?
6      A.  Yes.
7      Q.  It's not uncommon, anyway?
8      A.  No.  No.
9      Q.  And then on Exhibit 44, for example,
10 where you say hi, Jay, can we bill the final
11 five percent retention yet, what's that
12 referring to?
13     A.  Well, each contract has their own
14 retention.  So if we're billing a certain
15 amount, that retention gets deducted from that.
16     Q.  Okay.
17     A.  And that is not payable until the
18 project is completely done by everyone.
19     Q.  Okay.
20         And then you bill that
21 retention?  Bill for that retention?
22     A.  Right.  And because everything had
23 been billed up until that point, I was asking
24 if we can bill that yet because I wouldn't know

28 (Pages 109 to 112)

113

```
 1   when the project is completed with everyone
 2   else.
 3       Q.   Okay.
 4              And then if we look at
 5   Exhibit 45, that's an email -- I'm looking at
 6   the second email down on the first page.  It's
 7   one from Ira Sugar to you.  It looks like he's
 8   forwarding a message.
 9              Do you see that?
10       A.   Yes.
11       Q.   And he's forwarding you information
12   related to the billing on this project; is that
13   right?
14       A.   Yes.
15       Q.   All right.
16              And the prior emails look
17   like you were reaching out to Jay Linsley
18   directly.  But in this case, it looks like they
19   forwarded information to Ira Sugar.
20              He was the contact on this
21   project, right?
22       A.   Right.
23       Q.   All right.
24              And then you know to go ahead
```

114

```
 1   and bill for the final retention because Ira is
 2   forwarding this email to you, correct?
 3       A.   If that's what they're asking for,
 4   yes.
 5       Q.   Let's see.  Maybe not.
 6              Well, they're telling you to
 7   issue a bill, in any event, right?
 8       A.   Right, yes.
 9       Q.   And Ira is forwarding this to you so
10   you know to go and do that?
11       A.   Yes.
12       Q.   Okay.
13              And then, actually, it look
14   likes your top message is actually following up
15   on whether you're to bill for the retention,
16   correct?
17       A.   Correct.
18       Q.   All right.
19              And Lisa Lewellyn is somebody
20   else, I take it, at Pepper Construction?
21       A.   Yes.
22       Q.   All right.
23              And is this kind of thing
24   like a regular part of your job?
```

115

```
 1       A.   Yes.
 2       Q.   Okay.
 3              And you would do this -- that
 4   kind of work with ARCO Murray?
 5       A.   Yes.
 6       Q.   And Clayco?
 7       A.   Yes.
 8       Q.   And Krusinski Construction?
 9       A.   Yes.
10       Q.   Meridian Design Build?
11       A.   Yes.
12       Q.   Morgan/Harbour Construction?
13       A.   Yes.
14       Q.   Opus Design Build?
15       A.   Yes.
16       Q.   Peak Construction?
17       A.   Yes.
18       Q.   Pepper Construction?
19       A.   Yes.
20       Q.   Power Construction?
21       A.   What was that?
22       Q.   Power Construction?
23       A.   Oh, yes.
24       Q.   Principal Construction?
```

116

```
 1       A.   Yes.
 2       Q.   Any other big contractors or general
 3   contractors like these that you work with?
 4       A.   That covers most of the big ones,
 5   yeah.
 6       Q.   Okay.
 7              I had earlier asked you about
 8   service clients of Midwest Dock Solutions, and
 9   you had mentioned the XPO Logistics.
10       A.   Yes.
11       Q.   Have you -- can you remember any
12   others?
13       A.   Strack & Van Til, Kroger stores, 3-D
14   Baking, Dakkota.
15       Q.   The Dakkota?
16       A.   No.  It's Dakkota.
17       Q.   Okay.  Dakkota.
18       A.   Let's see.  Let's see.  Northern
19   Illinois Food Bank.  Let's see.
20       Q.   What was the second one you said?  You
21   said -- can you -- well, strike that.
22              Can you read those back to
23   me?  I missed one of them, and I'm hoping maybe
24   you can spell it for me.
```

29 (Pages 113 to 116)

117

1        (There was a discussion off
2           the record.)
3
4        THE WITNESS:  Strack & Van Til?
5  BY MR. McJESSY:
6     Q.  What did you say?
7     A.  Strack & Van Til.
8     Q.  Can you spell it for me?
9     A.  S-t-r-a-c-k & Van Til, V-a-n T-i-l.
10    Q.  Van Til.
11        Is it Strack & Van Til?
12    A.  Yes.
13    Q.  Okay.
14        And Dakkota is D-a --
15    A.  -- k-k-o-t-a.
16    Q.  Oh.
17        And Third Bake?
18    A.  3-D baking.
19    Q.  Oh, 3-D Baking.
20        Okay.  All right.  Thank you.
21        You said you process
22  payments.  What does that mean?
23    A.  When we get the checks in for our
24  invoices that we have sent out.

118

1     Q.  Okay.
2        What do you do with them?
3     A.  I apply the payment in Zero and then
4  prepare the deposit slip.
5     Q.  Okay.
6        And do you -- do you actually
7  receive physical checks?
8     A.  We do.  Some, yes.
9     Q.  Okay.
10        And then who takes those to
11  the bank, or how do you deposit them?
12    A.  Tony Zarlengo takes them to the bank.
13    Q.  Okay.
14        Do you also receive transfers
15  by like ACH or wire transfer?
16    A.  We do.
17    Q.  All right.
18        And then what do you do with
19  those, or how do you -- how do you get notice
20  that you've received an ACH or wire transfer?
21    A.  Well, I download the bank account into
22  Zero.
23    Q.  Okay.
24    A.  And then would clear that payment by

119

1  attaching it to that invoice to show that it
2  was paid.
3     Q.  So when you say you -- you have -- do
4  you have the password for the bank account?
5     A.  Yes.
6     Q.  Okay.
7        You have the login
8  information you need?
9     A.  Yes.
10    Q.  And how -- what do you download?  Is
11  it the bank statement, or is it some sort of
12  like Excel document or --
13    A.  It's the statement for the day.
14    Q.  Okay.
15    A.  The transactions for the day.
16    Q.  Oh, I see.  Okay.
17    A.  So it's done daily.  I'm importing
18  them into Zero.
19    Q.  All right.
20        If -- if -- you mentioned
21  that you would help obtain insurance
22  certificates for projects, correct?
23    A.  Yes.
24    Q.  Okay.

120

1        And is it fair to say that --
2  that the contractor can't work on a job site
3  without a Certificate of Insurance?
4     A.  Right.
5     Q.  Okay.
6        Have you ever been kept off
7  of a job site for failure to provide a
8  Certificate of Insurance in time?
9     A.  That I don't know.
10    Q.  You don't know.
11        Have you ever helped obtain a
12  Certificate of Insurance on behalf of
13  Dock & Door to get it to a general contractor?
14    A.  No.
15    Q.  So you've only obtained Certificates
16  of Insurance for Midwest Dock insurance --
17  Midwest Dock Solutions to get those to the
18  general contractor?
19    A.  Yes.
20    Q.  Okay.
21        Do you prepare and file -- do
22  you prepare or file any tax documents?
23    A.  I don't.
24    Q.  Okay.

30 (Pages 117 to 120)

121

1 **Does Midwest Dock Solutions**
2 **have any sort of employee health insurance**
3 **plan?**
4 A. Yes.
5 **Q. And who is that with?**
6 A. That is with Blue Cross/Blue Shield.
7 **Q. Okay.**
8 **And how long has it had that?**
9 A. Since I started my job.
10 **Q. Since you were there?**
11 A. Yes.
12 **Q. Is that -- or do you have that**
13 **coverage?**
14 A. I don't.
15 **Q. You don't?**
16 A. No.
17 **Q. Okay.**
18 **Did you decline it or --**
19 A. I have had it in the past. But, now,
20 I'm on my husband's plan.
21 **Q. I see. Okay.**
22 **And do you have any**
23 **involvement with the health insurance plan?**
24 A. No.

122

1 **Q. Do you pay the bills for the plan?**
2 A. I don't.
3 **Q. Do you -- you don't write the checks**
4 **for it? You don't know how to --**
5 A. No.
6 **Q. Okay.**
7 **Do you receive the bills for**
8 **the insurance plan?**
9 A. I think that's automatically
10 processed.
11 **Q. Okay.**
12 A. Like the payments.
13 **Q. All right.**
14 A. I don't pay them. They --
15 **Q. Is that a transaction --**
16 A. I have seen them come through the
17 statements, yes, so --
18 **Q. Okay. I'm sorry. I didn't mean to**
19 **cut you off.**
20 A. No. I've seen them come through the
21 statements, so I don't write checks for them,
22 but they are covered through the bank account.
23 **Q. Okay.**
24 **And is that a transaction**

123

1 **that you would, then, enter into Zero?**
2 A. It gets entered into Zero when I
3 download that day.
4 **Q. I see.**
5 **And it's automatic?**
6 A. Yes.
7 **Q. Okay.**
8 **Does Midwest Dock Solutions**
9 **have any sort of retirement plan, a 401(k),**
10 **pension, annuity, anything like that?**
11 A. Yes, 401(k).
12 **Q. It has a 401(k).**
13 **And do you have any**
14 **responsibilities with respect to the 401(k)**
15 **plan?**
16 A. No.
17 **Q. Okay.**
18 **And how long has it had a**
19 **401(k) plan?**
20 A. I think it's as long as I've been
21 there.
22 **Q. Okay.**
23 **Are you a participant in that**
24 **plan?**

124

1 A. I am.
2 **Q. Is that plan open to all of the**
3 **employees?**
4 A. On that, I'm not sure.
5 **Q. You don't have any responsibilities**
6 **for managing that plan or keeping track of**
7 **who's enrolled in it or not enrolled in it --**
8 A. No.
9 **Q. Or anything like that?**
10 A. No.
11 **Q. All right.**
12 **Do you know who's enrolled in**
13 **it?**
14 A. I do.
15 **Q. Okay.**
16 **And how do you know that?**
17 A. Because they have that set up in ADP.
18 **Q. Okay.**
19 **So if somebody's enrolled in**
20 **the plan and getting deductions, it would show**
21 **in their ADP --**
22 A. Yes.
23 **Q. -- paycheck -- pay stub?**
24 A. Yes.

31 (Pages 121 to 124)

125

```
 1              (WHEREUPON, the document was
 2          marked Plaintiff's
 3          Exhibit 46 for identification,
 4          as of 9/22/25.)
 5
 6   BY MR. McJESSY:
 7      Q.  I'm going to hand you what I've marked
 8   as Exhibit 46.
 9              You mentioned that you
10   process the hourly -- the pay hours for the
11   employees that are texted to you?
12      A.  Yes.
13      Q.  Have you ever seen a document like
14   this before?
15      A.  No.
16      Q.  Okay.
17              Are you aware of any
18   employees that keep track of their time on a
19   form like this?
20      A.  I'm not aware of any.
21      Q.  All right.
22              Have you ever seen forms like
23   this in the lunchroom at Midwest Dock
24   Solutions?
```

126

```
 1      A.  I don't think so.
 2      Q.  Okay.
 3              How are you paid, by check or
 4   direct deposit?
 5      A.  Direct deposit.
 6      Q.  All right.
 7              Have you ever been paid in
 8   cash?
 9      A.  No.
10      Q.  Have you ever been paid through a
11   system other than the ADP payroll system?
12      A.  No.
13      Q.  Have you ever -- have you ever been
14   paid anything by Dock & Door?
15      A.  No.
16      Q.  Only been paid by Midwest Dock
17   Solutions since you started working there?
18      A.  Correct.
19      Q.  You mentioned that you process mail.
20      A.  Ah-huh.
21      Q.  Now, Midwest Dock Solutions has a post
22   office box, correct?
23      A.  We do.
24      Q.  At the Steger Post Office?
```

127

```
 1      A.  Right.
 2      Q.  Okay.
 3              Are you responsible for
 4   getting the mail from that post office box?
 5      A.  Yes.
 6      Q.  Okay.
 7              Do you do that every day?
 8      A.  Usually, every other day.
 9      Q.  Every other day.
10              Does anybody else get the
11   mail there, or is it just you?
12      A.  It's just me unless I'm not working,
13   if I'm on vacation.
14      Q.  And then somebody else might get it?
15      A.  Yes.
16      Q.  Okay.
17              And if -- if you are on
18   vacation, who else would get it?
19      A.  Tony Zarlengo.
20      Q.  Okay.  All right.
21              And is the post office box
22   accessed with a key, or is it a combination?
23      A.  It's a key.
24      Q.  All right.
```

128

```
 1              And you have a key?
 2      A.  I do.
 3      Q.  And if you go on vacation and don't
 4   access it, do you have to give Mr. Zarlengo
 5   your key, or how does that work?
 6      A.  I give him the key, yes.
 7      Q.  Okay.
 8              So you've got like the one
 9   key?
10      A.  Yes.
11      Q.  And you give it to whoever to open the
12   box?
13      A.  Yes.
14      Q.  Okay.
15              And both Midwest Dock
16   Solutions and Dock & Door receive -- receive
17   mail at that post office box, correct?
18      A.  Yes.
19      Q.  Okay.
20              And so when you're there, do
21   you grab that mail, too.
22      A.  Yes.
23      Q.  Okay.
24              And then what do you do with
```

32 (Pages 125 to 128)

129

```
1    the mail that Dock & Door gets?
2       A.  I put it on Tony Brutti's desk.
3       Q.  All right.
4              And what kind of mail does
5    Dock & Door get at the mailbox?
6       A.  Usually, union papers from the union.
7
8              (WHEREUPON, the document was
9              marked Plaintiff's
10             Exhibit 47 for identification,
11             as of 9/22/25.)
12
13   BY MR. McJESSY:
14      Q.  All right.
15             Let me hand you what's been
16   marked as Exhibit 47.  This is a packet of what
17   are preprinted forms that are mailed out by
18   the -- by the Mid-America Carpenters Regional
19   Counsel Fringe Benefit Funds.  They mail out
20   these preprinted forms, and you see the address
21   on there, it says P.O. Box 363?
22      A.  Yes.
23      Q.  So are these the kind of union forms
24   that would show up in the mailbox that you
```

130

```
1    would give to Mr. Brutti?
2       A.  That I wouldn't know.  I don't open
3    the mail.
4       Q.  Okay.
5              But you notice that the
6    return envelope sometimes says Carpenters -- I
7    don't know --
8       A.  That's it's from, yes.  That it's from
9    the carpenters union, yes.
10      Q.  Okay.
11             And so that's how you know
12   some of the mail he gets at that post office
13   box is from the union?
14      A.  Yes.
15      MR. McJESSY:  Okay.
16             I only have one copy of this,
17   so I'm going to first hand it to Mr. Miller,
18   and then ask that Mr. Miller hand it to Mr.
19   Hughes, and let me know if you have any --
20   well, you can see it.  I mean, I don't have an
21   extra copy right now.  I'm just going to ask
22   general questions.
23
24
```

131

```
1              (There was a discussion off
2              the record.)
3
4              (WHEREUPON, the document was
5              marked Plaintiff's
6              Exhibit 48 for identification,
7              as of 9/22/25.)
8
9    BY MR. McJESSY:
10      Q.  All right.
11             I've handed you what's been
12   marked as Exhibit 48.  And you can flip through
13   there, if you'd like, just to see generally
14   what the documents are.  But they appear to be
15   like monthly billing statements with pay
16   stubs -- you know, pay attachments, a little
17   stub that you cut off and mail back in the
18   envelope from Cincinnati Insurance Company.
19             Do you see that?
20      A.  Ah-huh.
21      Q.  And those -- those -- that's a yes?
22      A.  Yes.
23      Q.  And those are all addressed to
24   Dock & Door at the P.O. Box 363.
```

132

```
1              Do you see that?
2       A.  Yes.
3       Q.  Yeah.
4              And you would receive also
5    those kind of things in the mail or mail from
6    Cincinnati Insurance Company even though you
7    didn't know what was in the envelope; is that
8    correct?
9       A.  Yes.
10      Q.  And you'd give those to Mr. Brutti as
11   well?
12      A.  Correct.
13      Q.  Okay.
14             Any other mail that you
15   can -- you know, any other names on envelopes
16   that you can recall that you would receive at
17   the P.O. Box and give to Mr. Brutti?
18      A.  Not that I can recall because all of
19   the mail addressed to Dock & Door Install goes
20   to --
21      Q.  Goes to him.
22      A.  Right.
23      Q.  And does Berkley Insurance Company
24   sound familiar?  Could you receive those bills
```

33 (Pages 129 to 132)

133

1    at the post office box also?
2          MR. HUGHES:  Objection.
3          THE WITNESS:  I'm not sure.
4    BY MR. McJESSY:
5      Q.  Okay.
6          But you know Dock & Door gets
7    mail at the post office box.  And whatever it
8    gets, you deliver to Mr. Brutti?
9      A.  Correct.
10      Q.  Okay.
11         And Midwest Dock Solutions
12    also gets mail at the mailbox?
13      A.  Yes.
14      Q.  Okay.
15         And you process that mail?
16      A.  Yes.
17
18        (WHEREUPON, the document was
19        marked Plaintiff's
20        Exhibit 49 for identification,
21        as of 9/22/25.)
22
23    BY MR. McJESSY:
24      Q.  Okay.

134

1         Now, I'm going to hand you
2    what I've marked as Exhibit 49 and ask you if
3    you've ever seen this document before.
4      A.  I'm not certain.
5      Q.  Okay.
6         I'll represent to you that
7    this is the application for post office box
8    service -- and I'm pretty much just reading the
9    top -- the top of the document, and it's for
10    Post Office Box 363.
11         Do you see that number at the
12    top?
13      A.  Yes.
14      Q.  And it looks like this application
15    is -- is dated January 11, 2021.
16         Do you see that on the
17    bottom?
18      A.  Yes.
19      Q.  And do you recognize that as Mr.
20    Zarlengo's signature?
21      A.  Yes, I do.
22      Q.  Okay.
23         And you're familiar with his
24    signature because you've seen him sign lots of

135

1    documents, correct?
2      A.  Yes.
3      Q.  Okay.
4         Now, this shows that the
5    application was made in January of 2021.
6         Do you see that?
7      A.  Yes.
8      Q.  And does that sound about right to
9    you, how long Midwest Dock Solutions has had
10    this post office box?
11      A.  Yes.
12      Q.  All right.
13         And if you turn to the next
14    page, you see that you're one of the authorized
15    representatives in paragraph 12 who's
16    authorized to pick up mail from that address.
17         Do you see that?
18      A.  Yes.
19      Q.  Okay.
20         And to your knowledge, has
21    Tony Brutti ever picked up mail from this
22    mailbox?
23      A.  No.
24      Q.  Okay.

136

1         And was there a reason that
2    this mailbox was opened?
3      A.  Yes.
4      Q.  What was it?
5      A.  We were having checks stolen out of
6    our mailbox.
7      Q.  Oh.
8         At the office?
9      A.  At the office, yes.
10      Q.  And which office, just for the record?
11      A.  I believe, the one we're at now.
12      Q.  In Steger?
13      A.  Right.  36th Place, yes.
14      Q.  Okay.
15         Where -- where was the
16    mailbox at that location, like the physical
17    mail?  Like when the mailman brought the -- or
18    the mail person -- strike that.  Strike that.
19         When the mail person brought
20    the mail, where would they deliver it at that
21    address?
22      A.  Next to the office entrance.
23      Q.  Is it --
24      A.  Outside.

34 (Pages 133 to 136)

137

1   Q.  -- like an actual mailbox?
2   A.  Yes, like a house mailbox.
3   Q.  Anybody can walk up --
4   A.  Yes.
5   Q.  -- and reach in?
6   A.  Right.
7   Q.  Is the office open on weekends?
8   A.  No.
9   Q.  So if mail gets delivered on a
10  Saturday, it would sit in the mailbox until
11  Monday?
12  A.  Yes.
13  Q.  How did you learn checks were being
14  stolen out of the mailbox?
15  A.  Because we -- I would check on
16  payments that were out owed to us, and then I
17  was told that the check had already been sent
18  out.  And so I asked them to see if it has been
19  cashed because we didn't receive it and then
20  found out that they were cashed by other
21  people.  And it was a big thing.  It was even
22  on the news, that it was happening to other
23  companies.
24  Q.  All right.

138

1          And so who made the decision
2   to open the P.O. Box?
3   A.  Tony Zarlengo.
4   Q.  Okay.
5          And then after that, I take
6   it you changed your billing address for parties
7   that were mailing checks to --
8   A.  Yes.
9   Q.  -- to Midwest Dock Solutions, to that
10  address?
11  A.  Yes.
12  Q.  All right.
13          And did you have -- do you
14  have -- do you have any mail delivered now to
15  the Steger address, to the Steger street
16  address?
17  A.  No.
18  Q.  Okay.
19          What -- what's the address
20  there, did you say, 36 --
21  A.  27 East 36th Place?
22  Q.  So if I call it 36th Place, you'll
23  know what I'm talking about?
24  A.  Yeah.

139

1   Q.  Okay.
2          You don't have any mail
3   delivered to 36th Place anymore?
4   A.  No mail, no.
5   Q.  Okay.
6          Everything was -- or the
7   email -- or the mailing addresses were changed,
8   like your insurance companies, to be that post
9   office box?
10  A.  Yes.  It was even included on e-mails,
11  at the bottom of an email.
12  Q.  Not to -- that your new address was --
13  A.  To mail payments to us.  To send them
14  to the P.O. Box.
15  Q.  All right.
16          So prior to this, there was
17  no post office box?
18  A.  No.
19  Q.  All of the mail just came to the
20  office?
21  A.  Yes.
22
23
24

140

1          (WHEREUPON, the document was
2           marked Plaintiff's
3           Exhibit 50 for identification,
4           as of 9/22/25.)
5
6   BY MR. McJESSY:
7   Q.  Okay.
8          I'm going to hand you what
9   I've marked as Exhibit 50.
10          And if you can just take a
11  look through that and let me know
12  when you've been able to do that.
13          All right.  You've had a
14  chance to look at that?
15  A.  Yes.
16  Q.  Okay.
17          And do you recognize these as
18  billing statements that Midwest Dock Solutions
19  gets for that post office box?
20  A.  Yes.
21  Q.  And then there's payment receipts
22  attached showing that it's paid those amounts,
23  too, correct?
24  A.  Yes.

35 (Pages 137 to 140)

141

1    Q.  And I take it, since the billing
2  statement -- billing statement is addressed to
3  P.O. Box 363, the billing statement comes in
4  the P.O. Box, too, correct?
5    A.  Correct.
6    Q.  Okay.
7        And you'll note that these
8  documents all have a Midwest Dock Solutions
9  Bates number on the bottom.
10       Do you see that?
11   A.  Yes.
12   Q.  Fair to say that Midwest Dock
13 Solutions pays and maintains that post office
14 box?
15   A.  Yes.
16   Q.  I'd like to ask you a little more
17 detail about the layout of the offices that
18 Midwest Dock Solutions has.  But I think you
19 said, when you were hired, the address was on
20 Burville Road; is that right?
21   A.  No, Holeman.
22   Q.  Holeman Road.  Okay.
23       Are you aware that the
24 company had an address on Burville Road?

142

1    A.  Yes.
2    Q.  Okay.
3        Were you ever at that
4  address?
5    A.  No.
6    Q.  Okay.
7        So the address -- the first
8  location we was on -- on Holeman Road,
9  H-o-l-e-m-a-n, in South Chicago Heights; is
10 that correct?
11   A.  Correct.
12   Q.  And do you remember -- I'm sorry.  I
13 apologize.
14       Do you remember when you were
15 hired?
16   A.  Yes.  January of 2017.
17   Q.  Oh, okay.  That's right.  Okay.
18       And the company moved from
19 the Holeman address to 36th Place, correct?
20   A.  Yes.
21   Q.  Okay.
22       First, I'd like to ask you
23 some questions about the Holeman Road address.
24   A.  Okay.

143

1    Q.  Do you know, did the company -- when
2  you were hired, were you paying bills at that
3  time for the company?
4    A.  That I don't remember.
5    Q.  You don't remember?  All right.
6        Do you remember whether you
7  were involved in paying rent for that location?
8    A.  I don't think so.
9    Q.  Okay.
10       And can you describe what
11 that office was like for me, what that space
12 was like?
13   A.  When you walked in the front door,
14 there was a medium-sized room with several
15 desks in it.
16   Q.  Okay.
17   A.  And a copy machine, a bathroom.  And
18 then there was Tony's office off to the right.
19   Q.  Okay.
20   A.  And then the shop was off to the left.
21   Q.  Tony Zarlengo?
22   A.  Yes.  His office.
23   Q.  And then the shop was off to the --
24 oh, Tony's office was off to the left, and the

144

1  shop was off to the right?
2    A.  No, reversed.
3    Q.  Oh, okay.
4        Tony's office was off to the
5  right?
6    A.  Was to the right, yes.
7    Q.  All right.
8        And what was -- what's the
9  shop?
10   A.  It's where we kept parts and equipment
11 and -- well, maybe not equipment because I
12 don't think it would fit in there, then, but
13 like parts and things like that.
14   Q.  Okay.
15       And how big was the shop,
16 would you say?
17   A.  That I really don't remember.  I
18 didn't go in there often.
19   Q.  Okay.
20       Could you drive into it?
21   A.  I don't think so.
22   Q.  Okay.
23       And the medium room that
24 had -- you said it had three desks or more?

36 (Pages 141 to 144)

145

1   A. I think it had three.
2   Q. Okay.
3       And do you know whose desks
4   they were, who used them?
5   A. Yes. I think so. Joe Sheridan. I
6   believe Ira Sugar was hired there. And Tony
7   Brutti.
8   Q. Then when you were hired, where --
9   where did you work?
10  A. I had a desk in Tony's office.
11  Q. Oh, I see. You shared office space
12  with him?
13  A. Yeah. Right.
14  Q. Okay. Okay.
15      Anybody else work in the
16  office at that location?
17  A. I don't believe so.
18  Q. Okay.
19      And you were there -- "you,"
20  meaning Midwest Dock Solutions -- was there
21  until approximately January of 2018.
22      Does that sound right?
23  A. I think so. We weren't there that
24  long --

146

1   Q. Okay.
2   A. -- after I started.
3   Q. All right.
4       And then who made the
5   decision to move to 36th Place?
6   A. I don't know for sure.
7   Q. Okay.
8       Do you know how that came
9   about or why?
10  A. I believe that it was space. We
11  needed a bigger space.
12  Q. That's what I was guessing. All
13  right.
14      And can you describe for me
15  the offices at 36th Place? Walk me through the
16  front door into the -- is there a front door?
17  A. There is.
18  Q. Okay.
19      Walk me through the front
20  door.
21  A. There's a foyer area through the front
22  door.
23  Q. Okay.
24  A. Once you go through that door, Amber

147

1   sits right there.
2   Q. Just past the foyer?
3   A. Yes.
4   Q. Okay.
5   A. Just inside the door. And then next,
6   if you walk a little further, then that's my
7   area.
8   Q. All right.
9   A. Off to the right is Danny's -- Danny's
10  office.
11  Q. Okay.
12  A. And going back to my spot, if you walk
13  straight through, you'll come to Tony
14  Zarlengo's office.
15  Q. Okay.
16  A. So it's kind of like a U-shape. So if
17  you keep going, you'll hit Mike Richert's
18  office.
19  Q. I'm sorry. I'm going to ask you --
20  actually, now, I'm confused. Could you --
21  could you draw it for me? I was trying to
22  follow along, but --
23  A. All right.
24  Q. So you walk through the foyer.

148

1   A. Let's see. This way.
2   Q. Oh.
3   A. This is the door. You come in.
4   Foyer. You know what? I drew that the wrong
5   way. It goes that way.
6   Q. Let's throw that away and start over.
7   A. Yeah. Actually, it goes the other
8   way.
9   Q. If counsel's all right with it.
10      Is that all right?
11
12      (There was a discussion off
13       the record.)
14
15      THE WITNESS: Okay. Here.
16  BY MR. McJESSY:
17  Q. And is there a lunchroom?
18  A. Yes.
19  Q. Oh, and you wrote that in there?
20  A. Yes.
21  Q. Are the walls really curved?
22  A. It kind of goes --
23  Q. It kind of goes like that?
24  A. I mean, they're not curved, but I

37 (Pages 145 to 148)

149

1    mean --
2        **Q.  I see what you're saying.  Okay.**
3        A.  And Amber and I do not have an office.
4    We're just out in the space.  The rest of them
5    are in offices.
6        **Q.  I see.  All right.**
7            **I'll mark that as an exhibit.**
8    **We'll make a copy.  So this will be Exhibit 51.**
9
10           (WHEREUPON, the document was
11           marked Plaintiff's
12           Exhibit 51 for identification,
13           as of 9/22/25.)
14
15   BY MR. McJESSY:
16       **Q.  So Tony Brutti --**
17       MR. HUGHES:  Kevin, before you ask
18   questions about it, can I take a look at it,
19   please?
20       MR. McJESSY:  Yeah.  I'm sorry.  Let
21   me make -- let me have Sheila make copies.
22
23
24

150

1            (After a brief interruption,
2            the deposition was resumed
3            as follows:)
4
5    BY MR. McJESSY:
6        **Q.  All right.**
7            **So looking at Exhibit 51,**
8    **when you walk through the foyer, Amber's desk**
9    **is there, like you said.**
10           **Is your desk to the left of**
11   **hers?**
12       A.  There's a short half wall, but it's on
13   the other side.
14       **Q.  Okay.**
15       A.  Yeah.
16       **Q.  And then it says Tony OFC.**
17           **That's Tony's office?**
18       A.  Yes.
19       **Q.  That's Mr. Zarlengo's office, correct?**
20       A.  Yes.
21       **Q.  Okay.**
22           **And then if you walk along**
23   **that wall, I take it the next office is Tony**
24   **Brutti's and Mike Richert's?**

151

1        A.  Correct.
2        **Q.  Do they share an office?**
3        A.  Yes.
4        **Q.  Are there -- is there more than one**
5    **desk in there?**
6        A.  Yes.
7        **Q.  Okay.**
8            **So they each have their own**
9    **desk?**
10       A.  Yes.
11       **Q.  And then Ira Sugar's office is next to**
12   **their office?**
13       A.  Correct.
14       **Q.  And then Steve is Steve French?**
15       A.  Yes.
16       **Q.  Okay.**
17           **And then the lunchroom, I**
18   **take it, is sort of to the right when you walk**
19   **in?  Is that -- how would you describe where**
20   **it is?**
21       A.  It's -- if you keep walking past
22   Steve's office, you'll go to the lunchroom.
23       **Q.  To the lunchroom?**
24       A.  Yeah.

152

1        **Q.  And how -- can you describe the**
2    **lunchroom for me?**
3        A.  It's got a really big table with a few
4    chairs.  The bathrooms are there, refrigerator.
5        **Q.  Microwave?**
6        A.  Yes.
7        **Q.  And then how about the -- the -- any**
8    **other appliances?**
9        A.  No, just a big refrigerator, a small
10   refrigerator, and then a microwave.
11       **Q.  Okay.**
12           **And then the shop area is --**
13   **do you go through the lunchroom to get to the**
14   **shop?**
15       A.  Yes.
16       **Q.  Okay.**
17           **And is the shop area big**
18   **enough to drive trucks into?**
19       A.  Yes.
20       **Q.  The location on Holeman -- on Holeman,**
21   **did it have an area to park vehicles, like the**
22   **work trucks?**
23       A.  I believe, in the back.
24       **Q.  Okay.**

38 (Pages 149 to 152)

153

1  **And is there a parking area**
2  **for the Steger address?**
3  A.  Yes.
4  **Q.  Okay.**
5  **So the work trucks get parked**
6  **there?**
7  A.  If they're not inside, yes.
8  **Q.  Okay.**
9  **How often is Tony Brutti in**
10 **the office?**
11 A.  Every day.
12 **Q.  Every day.**
13 **Is Tony Brutti -- does he**
14 **still have an office there?**
15 A.  Yes.
16 **Q.  Okay.**
17 **He still comes into the**
18 **office pretty much daily?**
19 A.  Pretty much.
20 **Q.  How often would you say Mr. Zarlengo's**
21 **in the office?**
22 A.  Every day.
23 **Q.  Every day also?**
24 A.  Yes.

154

1  **Q.  All right.**
2  **You're in the office pretty**
3  **much every day?**
4  A.  Yes.
5  **Q.  Okay.**
6  **How about Amber?**
7  A.  She's in the office three days a week.
8  **Q.  Okay.**
9  **And Ira?**
10 A.  Every day.
11 **Q.  And Steve?**
12 A.  Every day.
13 **Q.  Anybody else that works in the office**
14 **area that's there every day?**
15 A.  Danny.
16 **Q.  Oh, does Danny have an office or desk?**
17 A.  I'm sorry.  His office, yeah.  His
18 internal office.
19 **Q.  Okay.**
20 A.  So his is in-between like Amber's and
21 mine.  Sorry.  So Danny's is here.  I forgot
22 about him.
23 **Q.  Okay.**
24 **I'll make another copy of**

155

1  that one.
2  A.  There's no windows.  He's, you know --
3  **Q.  Oh, I see.**
4  **His office is literally --**
5  A.  You go through his office, and you'll
6  come through Ira's, so it's kind of like this
7  big room here.  It's a bigger space.
8  **Q.  You go -- I'm sorry.  Can you say that**
9  **again?**
10 A.  If you go through Danny's office, that
11 has another door, so you would come out by Ira.
12 So it's like -- it takes the space of.  So it's
13 a bigger -- it's big office.
14 **Q.  I get it.  Okay.**
15 **Can you walk literally**
16 **through his office?  Does he have a door on**
17 **both sides?**
18 A.  Yes.
19 **Q.  Okay.**
20 **Anybody else who is there**
21 **every day or who has an office -- well, strike**
22 **that.**
23 **Anybody else who has an**
24 **office there?**

156

1  A.  No.
2  **Q.  Okay.**
3  **And how about shop workers**
4  **that are there every day?**
5  A.  Yes.  We do have Janie.
6  **Q.  Okay.**
7  **And what's her -- is that**
8  **Graham?**
9  A.  Yes.
10 **Q.  Janie -- Janie Graham?**
11 A.  Yes.
12 **Q.  Anybody else?**
13 A.  We did have Vinny, but I believe he's
14 not in the warehouse full time.  He does other
15 things.
16 **Q.  Okay.**
17 **And what's Vinny's last name?**
18 A.  Conti.
19 **Q.  All right.**
20 **And what does he do besides**
21 **the warehouse work?**
22 A.  I believe he delivers material to job
23 sites, and he may possibly be starting service.
24 I'm not sure.  I just know he's not there.

157

1  Q.  Oh, starting to do service work?
2  A.  Right.  Right.
3  Q.  All right.
4        Anybody else that you can
5  think of?
6  A.  No.  Uh-uh.
7  Q.  All right.
8        Does the office have a fax
9  machine?
10  A.  No.
11  Q.  When was the last time you had a fax
12  machine?
13  A.  At the Holeman address.
14  Q.  The Holeman address?
15  A.  Yes.
16  Q.  You and Amber both have desks,
17  correct?
18  A.  I have a counter.
19  Q.  You have a counter.
20  A.  It's not really a desk, yes.
21  Q.  Okay.
22        You mentioned there's a half
23  wall there.  Is the counter built out from the
24  half wall?

158

1  A.  It actually goes around a big area.
2  It's like -- it goes the whole area from that
3  half wall all the way around.
4  Q.  Okay.
5        And do you remember when you
6  moved to that location where -- where the
7  company got that?
8  A.  Oh, it was there when we got there.
9  Q.  Oh, it was already there?
10  A.  Yes.
11  Q.  All right.
12        How about Amber?  She has a
13  desk?
14  A.  She does.
15  Q.  Was the desk -- her desk already there
16  or --
17  A.  Yes.
18  Q.  Okay.
19        And Tony's office -- was the
20  office rented furnished?
21  A.  I think so.
22  Q.  You think all of the office furniture
23  was there when you moved in?
24  A.  I think so, yes.

159

1  Q.  Okay.
2        Including Tony's desk, for
3  example?
4  A.  Yes, his for sure because it's a
5  built-in type of desk.
6        MR. HUGHES:  Objection as to -- not
7  objection, but clarification as to Tony, who --
8  which one you're talking about.
9        MR. McJESSY:  Oh, good point.
10  BY MR. McJESSY:
11  Q.  Tony Zarlengo.
12  A.  Tony Zarlengo's office, yes.  It has a
13  built-in desk.
14  Q.  Okay.
15        How about Tony Brutti's and
16  Mike Richert's?
17  A.  They have a desk.
18  Q.  And was that there when you moved in?
19  A.  That I'm not positive.
20  Q.  Okay.
21        And how about Ira Sugar and
22  Steve French?
23  A.  Yes.
24  Q.  Okay.

160

1        And how about the
2  lunchroom -- I'm sorry.  Strike that.
3        Just to make sure, their
4  desks were already there when you moved in?
5  A.  Who is that?
6  Q.  Ira and Steve French.
7  A.  As far as I know.
8  Q.  They both have desks.
9  A.  They do.
10  Q.  You don't -- okay.
11        You don't know where they
12  came from?
13  A.  I don't.
14  Q.  Okay.
15        The lunchroom table, was that
16  already there when you moved in?
17  A.  I think so.
18  Q.  Okay.  All right.
19        Since you've been there, has
20  Midwest Dock Solutions purchased any office
21  furniture?
22  A.  Not that I can think of.
23  Q.  Okay.
24        Now, you know who Tony Brutti

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

161

```
 1   is, obviously, correct?
 2       A.  Yes.
 3       Q.  How would you describe him?  Who is
 4   he?
 5       A.  He is the owner of Dock & Door
 6   Install.
 7       Q.  Okay.
 8           And he has an email address,
 9   tonyb@midwestdocksolutions.com, correct?
10       A.  He did.
11       Q.  Okay.
12           He did?
13       A.  Yes.
14       Q.  Does he anymore?
15       A.  No.
16       Q.  Did -- did that change?
17       A.  I'm not getting e-mails from him from
18   that email address.
19       Q.  Okay.
20           He could still have it and
21   just not use it; is that correct?
22       A.  I'm not sure.
23
24
```

162

```
 1           (WHEREUPON, the document was
 2           marked Plaintiff's
 3           Exhibit 52 for identification,
 4           as of 9/22/25.)
 5
 6   BY MR. McJESSY:
 7       Q.  Okay.
 8           Well, why do you say he did
 9   have one -- this is Exhibit 52 -- as opposed to
10   he does?  Why did you say he did have one as
11   opposed to he does have one?
12       A.  Because I had emailed him before at
13   that address.
14       Q.  Okay.
15           And this email -- or this
16   email exchange that's marked as Exhibit 52 is
17   an example of that, correct?
18       A.  Yes.
19       Q.  And that's an email -- I'm looking at
20   the email at the bottom of the first page that
21   says from Sherri Webber to Tony Brutti and Tony
22   Zarlengo, correct?
23       A.  Yes.
24       Q.  And the email address there is
```

163

```
 1   tonyb@midwestdocksolutions.com, correct?
 2       A.  Yes.
 3       Q.  Okay.
 4           And as far as you know, he
 5   could still have that email address; is that
 6   correct, or do you know that he -- and, I
 7   guess, let me make sure my question's clear.
 8           Do you know that he no longer
 9   has it, or it's just that you no longer use it?
10       A.  My email did not go through to it.
11       Q.  Oh, you received a bounce back?
12       A.  Yes.
13       Q.  Like something -- you received one of
14   those -- I can't think of how to describe it --
15   but one of those emails that says this was
16   undeliverable or something like that?
17       A.  I think so.  I mean, I don't know how
18   else I would know it wasn't going to go
19   through.
20       Q.  Okay.
21           Do you know when that
22   happened?
23       A.  I really don't.  I mean, time wise.
24       Q.  All right.
```

164

```
 1           Was it within the last year,
 2   do you think, or last couple months?
 3       A.  I'd say within several months.
 4       Q.  Okay.
 5           And when was the last time
 6   that you think you may have received an email
 7   from Tony Brutti at that email account?
 8       A.  Probably a couple months ago.
 9       Q.  Okay.
10           And, in fact, that sounds
11   like within the last several months you tried
12   to email him -- you tried to use that email
13   address, and it bounced back?
14       A.  Yes.
15       Q.  Okay.
16           And so you must have thought
17   it was good when you sent the email, correct?
18       A.  Yes.
19       Q.  Okay.
20           And did you ever ask him
21   about it, like, hey, Tony, that email bounced
22   back?
23       A.  I don't think so.
24       Q.  Okay.
```

41 (Pages 161 to 164)

165

```
1          Do you recall having any
2   conversations with Tony Brutti about that email
3   address?
4       A.  I don't, no.
5       Q.  Or trying to send him an email at that
6   email address?
7       A.  No.
8       Q.  Okay.
9           Did anybody tell you don't
10  send emails anymore to Tony Brutti at that
11  email address?
12      A.  No.
13      Q.  Okay.
14          Now, Tony Brutti also had an
15  email address that was like T. J. Brutti at
16  gmail.com, correct?  Does that sound familiar?
17      A.  He does -- I thought it was A. Brutti
18  or something like that.
19      Q.  Oh, maybe ajbrutti@gmail.com?
20      A.  Yes.
21      Q.  Something like that, right?
22      A.  Yes.
23      Q.  I'm sorry.  I think you're correct.
24          And you would sometimes email
```

167

```
1       Q.  Okay.
2           Now, if you look at the
3   second page of this email, it looks like it's
4   an email from Monica Lyons, project
5   administrator, McShane Construction Company.
6           Do you see that?
7       A.  Ah-huh.
8       Q.  Is that one of the general contractors
9   that Midwest Dock Solutions has new
10  construction agreements with?
11      A.  Yes.
12      Q.  Okay.
13          And I think I left that one
14  out earlier when I was asking about general
15  contractors, but that is -- that is one of --
16  McShane Construction is one of the GCs that
17  Midwest deals with?
18      A.  Not one of the bigger ones, no.
19      Q.  Okay.
20          But it does deal with McShane
21  Construction?
22      A.  Yes.
23      Q.  Okay.
24          And it was apparently dealing
```

166

```
1   him at that email address, too, correct?
2       A.  Yes.
3       Q.  Okay.
4           And was there a time where
5   you would use one email address versus times
6   you would use the other email address?  In
7   other words, times you would use
8   ajbrutti@gmail.com versus
9   tonyb@midwestdocksolutions.com?
10      A.  I think I used it when the Midwest
11  Dock didn't go through, and I started using
12  A. J. Brutti.
13      Q.  Okay.
14          Prior to that, you would use
15  the tonyb@midwestdocksolutions.com?
16      A.  Yes.
17      Q.  Okay.
18          And he would email you from
19  that email address, correct?
20      A.  Yes.
21      Q.  Okay.
22          Do you know how he got that
23  email address?
24      A.  I don't.
```

168

```
1   with McShane Construction back in 2021.
2           Is that fair?
3       A.  Yes.
4       Q.  All right.
5           And if you look at the --
6   well, first of all, if you look at the -- the
7   email on the first page where it says from Tony
8   Brutti -- do you see that?
9       A.  Yes.
10      Q.  And that's from his
11  tonyb@midwestdocksolutions.com email address,
12  correct?
13      A.  Yes.
14      Q.  And he's sending an email to Margaret
15  Stredde, S-t-r-e-d-d-e, correct?
16      A.  Yes.
17      Q.  And she's -- I think we saw an email
18  earlier where you were emailing with her for
19  insurance certificates, correct?
20      A.  Yes.
21      Q.  Okay.
22          And she was with Esser Hayes;
23  is that correct?
24      A.  Yes.
```

42 (Pages 165 to 168)

169

1    Q.  And that was an insurance agent that
2  Midwest Dock Solutions used?
3    A.  Yes.
4    Q.  Okay.
5          And Dock & Door also used
6  that insurance agent, correct?
7    A.  That I don't know.
8    Q.  Okay.
9          Well, Tony Brutti is sending
10  this email, correct, and it says, hi, Margaret,
11  there was some issues with the above
12  certificate.  Can we make appropriate changes
13  for the McShane project?  This is for
14  Dock & Door Install, Inc.
15          Do you see that?
16    A.  Yes.
17    Q.  Okay.
18          So does that look like to you
19  he's reaching out to get a Certificate of
20  Insurance for the McShane project for
21  Dock & Door?
22    A.  Yes.
23    Q.  Okay.
24          And if you -- if you look at

170

1  the last page of this, it appears to be that
2  he's forwarding these messages -- his signature
3  line appears on the bottom.
4          Do you see that?
5    A.  Yes.
6    Q.  And it says, Yours, Tony Brutti,
7  Midwest Dock Solutions, correct?
8    A.  It does.
9    Q.  Okay.
10          And was that a normal way for
11  Tony Brutti to sign emails that were sent from
12  his tonyb@midwestdocksolutions.com email
13  account?
14    A.  I didn't think so.
15    Q.  All right.
16          And just so I'm clear, you --
17  you would regularly use Tony's
18  tonyb@midwestdocksolutions.com email address up
19  until, maybe, a few months ago when you think
20  it's not working anymore.
21          Is that fair?
22    A.  Yes.
23    Q.  Okay.
24    MR. McJESSY:  Off the record for a

171

1  moment.
2
3          (There was a discussion off
4          the record.)
5
6    MR. McJESSY:  Back on the record.
7  BY MR. McJESSY:
8    Q.  I want to ask you about a few
9  companies and have you tell me if -- if you're
10  familiar with them.
11          Esser Hayes is one.  And I
12  take it, we just saw some email communications,
13  so you're familiar with Esser Hayes?
14    A.  Yes.
15    Q.  And what -- what -- what does Esser
16  Hayes do for Midwest Dock Solutions?
17    A.  They provide Certificates of
18  Insurance.
19    Q.  Okay.
20          So do you know if -- do they
21  carry liability insurance?
22    A.  I believe so.
23    Q.  Or provide liability insurance through
24  an insurance carrier?

172

1    A.  Yeah.
2    Q.  Okay.
3          Do you have -- are you aware
4  that they became Assured Partners?
5    A.  Yes.
6    Q.  Okay.
7          They changed their name or
8  got bought out or something?
9    A.  Yes.
10    Q.  And who's your primary person that you
11  deal with there?
12    A.  I deal with Jacie.  I believe her last
13  name is Olsen.
14    Q.  Can you spell Jacie, by any chance?
15    A.  J-a-c-i-e.
16    Q.  Oh.  All right.
17          And how long have you been
18  dealing with Ms. Olsen?
19    A.  I believe -- well, I don't think she's
20  the initial person because I think it was
21  Margaret.  But after that, so -- but for a long
22  time now.
23    Q.  Okay.
24          And you think the initial

43 (Pages 169 to 172)

173

1  person was Margaret?
2      A.  Yes.
3      Q.  And that's Margaret Stredde,
4  S-t-r-e-d-d-e?
5      A.  Right.
6      Q.  Okay.
7            So you dealt with Margaret
8  for a while?
9      A.  I believe so, yeah.
10     Q.  Okay.
11           And then after, for whatever
12  reason, you switched over, and now you deal
13  with Jacie Olsen?
14     A.  Yes.
15     Q.  Okay.
16           And other than contacting her
17  for Certificates of Insurance, is there any
18  other reason you would reach out to her?
19     A.  If we need a bond.
20     Q.  Okay.
21           And why would you need a
22  bond?
23     A.  To get registered with a particular
24  city.

174

1      Q.  Okay.
2      A.  To register our company.
3      Q.  And you would have handled that?
4      A.  Yes.
5      Q.  All right.
6            Any other reason?
7      A.  Not that I can think of, no.
8      Q.  Okay.
9            How about renewals of
10  insurance?  Do you -- do you handle that?
11     A.  No.
12     Q.  Okay.
13           Is that something that Mr.
14  Zarlengo handles?
15     A.  Yes.
16     Q.  Okay.
17           How about deciding what
18  insurance to get or what limits to get?  Is
19  that anything you're involved in?
20     A.  No.
21     Q.  Okay.
22           Again, that's Mr. Zarlengo?
23     A.  Correct.
24     Q.  Okay.

175

1            And how about Holden
2  Insurance?  Do you deal with Holden Insurance?
3      A.  I believe that's who Jacie -- yes,
4  Jacie works for Holden.
5      Q.  Oh, okay.
6      A.  And we go through her --
7      Q.  Okay.
8      A.  -- to get those things.
9      Q.  Okay.
10           Did -- do you deal with
11  anybody at Assured Partners anymore?
12     A.  I don't, no.
13     Q.  Okay.
14           Do you know when you
15  transitioned from Assured Partners to Holden
16  Insurance?
17     A.  I don't.
18     Q.  Okay.
19           Do you understand that
20  Assured Partners is like an insurance agency
21  that provides -- you know, obtains insurance
22  from insurance carriers?
23     A.  Yes.
24     Q.  Okay.

176

1            And Holden Insurance is sort
2  of the same thing, right?  They're an insurance
3  agency, and they help you get insurance?
4      A.  I believe so.
5      Q.  Okay.
6            Is that your understanding
7  or --
8      A.  Yes.
9      Q.  Okay.
10     A.  She's like the middle man -- or
11  they're the middleman.
12     Q.  Right.  Okay.
13           And so Jacie Olsen is with
14  Holden Insurance?
15     A.  Yes.
16     Q.  And just so I'm clear, when you were
17  dealing with Esser Hayes and then Assured
18  Partners, you would deal with Margaret Stredde,
19  and you would deal with her to get Certificates
20  of Insurance or bonds or whatever you needed.
21           Is that fair?
22     A.  Her name does sound familiar.
23     Q.  Okay.
24           Well, I think -- is she on

44 (Pages 173 to 176)

177

1  the -- all right. Okay. Let me rephrase my
2  question slightly different.
3          When you were dealing with
4  Esser Hayes and Assured Partners, whoever you
5  dealt with there, you would get Certificates of
6  Insurance and bonds from -- from that insurance
7  agency and then at some point switched to
8  Holden Insurance Agency.
9          Is that it?
10 A.  Yes. I believe so.
11 Q.  Okay.
12         There was a transition from
13 one to the other?
14 A.  I believe so.
15 Q.  Okay. All right.
16         And are you familiar with
17 Cincinnati Insurance?
18 A.  Yes.
19 Q.  Okay.
20         And is that an insurance
21 company that Midwest Dock Solutions purchased
22 insurance from?
23 A.  I think so.
24 Q.  Okay.

178

1          You don't -- you're not sure?
2  A.  I'm not sure.
3  Q.  Okay.
4          Who would handle the
5  insurance matters, like deciding which
6  insurance company to go with?
7  A.  Tony Zarlengo.
8  Q.  Okay.
9          And how about Liberty Mutual?
10 Is that an insurance company that Midwest Dock
11 Solutions uses?
12 A.  Yes.
13 Q.  Okay.
14         And that -- they currently
15 use Liberty Mutual?
16 A.  I think so.
17 Q.  Okay.
18         Again, Tony would be the
19 better person to know that?
20 A.  Tony Zarlengo, yes.
21 Q.  Okay.
22         And is there any other
23 insurance company that Midwest Dock Solutions
24 uses that you're aware of?

179

1  A.  Not that I could think of, no.
2  Q.  All right.
3          How about within the last
4  five years? Any other insurance companies you
5  can think of that Midwest Dock Solutions was
6  dealing with?
7  A.  No.
8  Q.  Have you ever heard of an insurance
9  company called Berkley?
10 A.  I don't believe we've dealt with them,
11 no.
12 Q.  Okay.
13         Have you heard of that
14 company?
15 A.  I have.
16 Q.  Okay.
17 A.  Yeah.
18 Q.  And do you think you've seen bills to
19 Dock & Door from -- from the post office box
20 from that company?
21 A.  Possibly.
22 Q.  Okay.
23         Other than, as you've
24 described it for me, getting the insurance

180

1  certificates and the bonds, did you have any
2  other interaction with any of Midwest Dock
3  Solutions insurance companies?
4  A.  No.
5  Q.  Are you responsible in any way for
6  handling the issuance of W-2 forms, getting
7  those out to employees, that kind of thing?
8  A.  Yes.
9  Q.  Okay.
10         What's -- what's your
11 responsibility for that, or what do you do?
12 A.  I usually put them in the lunchroom
13 for employees to pick up.
14 Q.  So they come to Midwest Dock from ADP;
15 is that correct?
16 A.  From Gineris.
17 Q.  From -- oh, from Gineris.
18 A.  I believe so.
19 Q.  And how do you get them?
20 A.  They mail them.
21 Q.  Okay.
22         And you get them in the mail?
23 A.  Individually, envelopes for each
24 person --

45 (Pages 177 to 180)

181

1    Q.   Okay.
2    A.   -- from Midwest Dock, yeah.
3    Q.   And then you'd distribute them by
4  putting them in the lunchroom?
5    A.   Yes.
6    Q.   Okay.
7         And those come to the post
8  office box?
9    A.   I believe they send them certified
10 mail.
11   Q.   Okay.
12        So they come --
13   A.   To the office.  FedEx or something
14 like that.
15   Q.   When something comes into the office
16 from UPS, FedEx, or via certified mail, how
17 does that work?  Who does the delivery person
18 come to?
19   A.   I usually get those.
20   Q.   Okay.
21        Because your desk is sort of
22 up front.
23        Is that --
24   A.   Because it's usually something for me

182

1  sometimes or for me to open.
2    Q.   Okay.
3         What if it's a package, a
4  delivery to Dock & Door or FedEx or UPS or
5  certified mail?
6    A.   No.  That wouldn't come to me.
7    Q.   Okay.
8         Well, they would come to the
9  front door, right?
10   A.   They usually go to the back.
11   Q.   Okay.
12   A.   Yeah.
13   Q.   And where is the back door?
14   A.   By the shop.
15   Q.   Okay.
16        And how do you -- how do
17 they -- is that a doorbell, a knock on the
18 door?  How does that work?
19   A.   As far as I know, the door's usually
20 open, so they'll bring the packages and put
21 them inside.
22   Q.   Okay.
23        And where do they put them?
24   A.   Just inside the door.

183

1    Q.   All right.
2         And if somebody has to sign
3  for something, how does that work?
4    A.   Usually, if there's somebody in the
5  warehouse, they'll sign.
6    Q.   Whoever it is?
7    A.   Right.
8    Q.   Okay.
9         So whoever's just present
10 will sign for a delivery?
11   A.   Right.  I only get like the envelopes
12 that are sent certified -- you know, that are
13 overnight mail or whatever.
14   Q.   All right.
15        And as far as you know, it
16 would work the same way for Dock & Door?  If a
17 delivery comes that has to be signed for,
18 whoever's standing there signs for it?
19   A.   I don't know for sure.
20   Q.   Okay.
21   A.   Because it's not usually me.
22   Q.   Okay.
23        Well, that's how you
24 described the process works for Midwest Dock,

184

1  right?
2    A.   I know they bring packages in.  I
3  don't know who signs for them.
4
5         (WHEREUPON, the document marked
6          Plaintiff's Exhibit 29 for
7          identification was tendered to
8          the deponent.)
9
10 BY MR. McJESSY:
11   Q.   Okay.
12        I'm going to hand you what's
13 been previously marked in this case as
14 Exhibit -- you can put that other exhibit
15 there -- what's been previously marked in this
16 case as Exhibit 29.  And you'll see it's a -- a
17 list of names in alphabetical order.  And I'd
18 like to walk through this with you and have you
19 tell me which names -- first of all, just tell
20 me which names you recognize and, you know,
21 people you're familiar with, who you've met and
22 who you know.  All right?
23   A.   Okay.
24   Q.   So can you just start at the beginning

46 (Pages 181 to 184)

185

1 and tell me who on here you recognize -- whose
2 name you recognize as somebody you've met?
3        MR. HUGHES:  And just before you
4 start on that, I'm going to object to
5 foundation.
6 BY MR. McJESSY:
7     Q.  All right.
8            You can answer.  Yeah.
9     A.  Jose.
10     Q.  Okay.
11     A.  Anthony Brutti, Vincent Conti, Don
12 Cruikshank, Thomas Donnelley, Steve French,
13 Jeff Gibson, Jane Graham, David Green, James
14 Johnson, Richard Kardosh, Dylan Kelly, James
15 Kelly, Nicolas Kelly, Sean Leer, Daniel Lietz,
16 John Mancha, Michael Mateja, or however you
17 pronounce it, David Mortel, John Murphy, Eric
18 Pool, Larry Richert, Michael Richert, Mitton
19 Rivers, Joseph Sheridan, Joshua Sichterman,
20 John Sparr, John Stoltenberg, Michael
21 Strazzabosco, Ira Sugar, Anthony Tattini,
22 Anthony Toigo, Amber Toigo, Zachary Torkelsen,
23 Jerry Valentino, Travis Woff, Edward Zarlengo,
24 Anthony Zarlengo, and Collin Zarlengo.

186

1     Q.  Okay.
2            And who is Jose Aguirre
3 Garcia?
4     A.  He works for Dock & Door Install.
5     Q.  Okay.
6            And how do you know him?
7     A.  I have seen him in the shop.
8     Q.  Have you spoken with him?
9     A.  Just to say hi.
10     Q.  Yeah, on occasion.
11     A.  Okay.
12     Q.  So on some occasion, you may have
13 greeted him and said hi?
14     A.  Yes.
15     Q.  All right.
16            Other than that, have you had
17 any other interactions with him from work?
18     A.  No.
19     Q.  No?
20            And Vincent Conti, how do you
21 know him?
22     A.  He was the one that works in the
23 warehouse, but now he's doing that and other
24 things.

187

1     Q.  Okay.
2            What kind of interactions
3 would you have with him?
4     A.  I would see him in the office.
5     Q.  Okay.
6            Would you ever have to help
7 him with anything or do anything or would he
8 have to help you with anything?
9     A.  He would bring me like receipts or
10 things like that.
11     Q.  I see.
12     A.  To me.
13     Q.  All right.
14            How about Donald Cruikshank?
15     A.  I would see him in the -- in the
16 office once in awhile.
17     Q.  Would he also bring you receipts?
18     A.  No, because we didn't start doing
19 that, like the physical receipts, until later.
20 So he doesn't work there anymore.
21     Q.  Okay.  All right.
22            So you would just see him
23 around the office, is that it?
24     A.  Yeah.

188

1     Q.  Okay.
2            And Thomas Donnelley?
3     A.  The same thing, just see him if he
4 came to the shop after he was done working.
5     Q.  Okay.
6            Steve French was a salesman,
7 correct?
8     A.  Yes.
9     Q.  He is?
10     A.  Yes.
11     Q.  So you -- you work with him regularly?
12     A.  Yes.
13     Q.  And, excuse me, Jeff Gibson?
14     A.  Just see him in the office, and he
15 would bring me receipts also.
16     Q.  Okay.
17            Any other interactions
18 that -- anything you would help him with or
19 that he would help you with?
20     A.  No.
21     Q.  All right.
22            How about Jane Graham?
23     A.  I would see her in the office.  She
24 would bring me receipts.  Also, she's in

47 (Pages 185 to 188)

189

```
 1   receiving.  So if she happened to get one of
 2   those FedEx envelopes, she would bring it to
 3   me.
 4        Q.  Okay.
 5              If -- if a package were
 6   delivered to her in receiving from Dock & Door,
 7   would she bring that to you, do you know, or
 8   would she take that to Tony Brutti, or do you
 9   even know?
10        A.  She did not bring them to me.
11        Q.  Okay.
12        A.  So I'm not sure otherwise.
13        Q.  All right.
14              Is she a Midwest Dock
15   employee?
16        A.  Yes.
17        Q.  And how about Jeff Gibson?  Is he a
18   Midwest Dock employee?
19        A.  Yes.
20        Q.  And Steve French is Midwest Dock,
21   correct?
22        A.  Yes.
23        Q.  And Thomas Donnelley, is he a Midwest
24   Dock -- was he a Midwest Dock employee?
```

190

```
 1        A.  Yes.
 2        Q.  And Donald Cruikshank?
 3        A.  Yes.
 4        Q.  Do you know, was he also for a period
 5   of time a Dock & Door employee?
 6        A.  That I don't remember.
 7        Q.  Okay.
 8              How about Vincent Conti?  Who
 9   did he work for?
10        A.  Midwest Dock.
11        Q.  And then Jose Aguirre Garcia?
12        A.  Dock & Door Install.
13        Q.  Oh, you said that.  That's right.
14              Okay.  How about David Green?
15   You mentioned him.
16        A.  I would see him in the shop once in
17   awhile.
18        Q.  All right.
19              And the same thing, that you
20   would speak to him casually?
21        A.  To say hi, yes.
22        Q.  And who did he work for and does he
23   work for?
24        A.  Dock & Door Install.
```

191

```
 1        Q.  Okay.
 2              And how about James Johnson?
 3        A.  He doesn't work there anymore, but he
 4   did sales.
 5        Q.  Okay.
 6        A.  So I would see him in the office.
 7        Q.  And he was a Midwest Dock employee,
 8   correct?
 9        A.  Correct.
10        Q.  How long ago did he leave?
11        A.  Maybe a year, year and a half.
12        Q.  Oh, he's the one we talked about, like
13   in December or last fall?
14        A.  Right.
15        Q.  Okay.
16              Richard Kardosh?
17        A.  He works for Midwest Dock Solutions.
18   I get receipts from Rick and see him once in a
19   while in the -- in the office.
20        Q.  Okay.
21              And why would you get
22   receipts from him, for credit card purchases?
23        A.  Yes.
24        Q.  Okay.
```

192

```
 1              Some of the employees carry
 2   credit cards, correct?
 3        A.  Yes.
 4        Q.  And that's company issued -- or
 5   they're issued by a bank, but they're company
 6   credit cards?
 7        A.  Yes.  Midwest Dock.
 8        Q.  Okay.
 9              And so those are the receipts
10   that they would bring you?
11        A.  Yes, for things they purchased for
12   jobs they were on.
13        Q.  Okay.
14              And how about Dylan Kelly?
15        A.  Well, Dylan doesn't work there
16   anymore.
17        Q.  Okay.
18              When did he leave?
19        A.  It's been a while.  It's been a while,
20   like four years.
21        Q.  Oh, quite a while?
22        A.  Maybe more.  Yes.
23        Q.  All right.
24              What did he do?
```

193

1    A. He worked for Midwest Dock Solutions.
2    Q. Okay.
3         And how would you -- how did
4  you know him, casually again?
5    A. Just in passing, yeah.
6    Q. Okay.
7         And James Kelly?
8    A. James Kelly doesn't work there
9  anymore. He worked for Midwest Dock Solutions.
10 Actually, he was in service, and then he came
11 to work in the office, so I would see him a
12 lot.
13   Q. Okay.
14        And when you say he was --
15 when did he leave?
16   A. That was probably like five years ago.
17   Q. Oh, okay. All right.
18   A. He's been gone a while now.
19   Q. And then Nicolas Kelly?
20   A. He works for Dock & Door Install.
21   Q. Okay.
22   A. And I would just see him casually in
23 the office.
24   Q. Okay.

194

1         So again, you'd have a casual
2  conversation with him, hi, how are you doing?
3    A. Right. I don't really know him,
4  but --
5    Q. You would know him to look at him,
6  though?
7    A. Yes.
8    Q. Okay.
9         Sean Leer?
10   A. He does not work there anymore. He
11 worked for Midwest Dock Solutions.
12   Q. All right.
13        And how long ago did he
14 leave, would you say?
15   A. I'm going to say six years ago. I
16 mean, it's been while.
17   Q. A long time ago?
18   A. Yes.
19   Q. All right.
20        And Daniel Lietz we've
21 already talked about, correct?
22   A. Yes.
23   Q. That's -- that's Danny, right?
24   A. Yes. Right.

195

1    Q. John Mancha?
2    A. He does not work there anymore. He
3  worked for Midwest Dock Solutions. I would get
4  receipts from him and also see him in the
5  office once in awhile.
6    Q. Okay.
7         And Michael Mateja,
8  M-a-t-e-j-a?
9    A. Yes. He works for Midwest Dock
10 Solutions and the same thing, receipts and
11 would see him at the end of the day, possibly.
12   Q. Okay.
13        And David Mortel?
14   A. David works for Midwest Dock Solutions
15 in sales. I see him once every three weeks
16 when he comes to the office.
17   Q. Oh. He's a salesman?
18   A. Yes.
19   Q. Okay.
20        But he doesn't have a desk in
21 the office?
22   A. He doesn't.
23   Q. Okay.
24        Does he -- does he sell new

196

1  construction as well as service work or --
2    A. His is mostly service.
3    Q. Okay.
4         And you said "mostly," so
5  does that mean he has sold new construction as
6  well or --
7    A. I don't know that it's new
8  construction. I believe he's had like very few
9  project things that he just started getting
10 into.
11   Q. I see.
12   A. But not many.
13   Q. Okay.
14        John Murphy?
15   A. Midwest Dock Solutions.
16   Q. And what does he do?
17   A. Actually, I don't know if this is --
18 if we actually had a person named John Murphy
19 that worked there that doesn't and we now have
20 a current one, which is a different person.
21   Q. Oh, you've had two John Murphys.
22   A. Which I don't think this is the new
23 one because this list was probably made up
24 before he worked there. So I do think that

49 (Pages 193 to 196)

197

```
1   this is one that used to work for us.
2       Q.  Okay.
3       A.  For Midwest Dock Solutions.
4       Q.  All right.
5           And would you have
6   interaction with him?
7       A.  Just in passing.
8       Q.  Okay.  All right.
9           And Eric Pool?
10      A.  Yes.  He works for Midwest Dock
11  Solutions, and I would see him in the office
12  once in a while.
13      Q.  He still works there?
14      A.  He does.
15      Q.  Okay.
16          And what was the nature of
17  your interaction with him, the same thing other
18  than casual conversation?
19      A.  No.  Not really.
20      Q.  Larry Richert?
21          Is he related to Michael
22  Richert, do you know?
23      A.  I believe that's his brother.
24      Q.  Okay.
```

198

```
1       A.  Or wait.  Hold on.  No, I'm sorry.  I
2   think that's his dad.
3       Q.  Okay.
4       A.  I think, his dad.
5       Q.  All right.
6           And he works --
7       A.  So, him, yes.  I don't -- I don't
8   really know his dad.
9       Q.  Okay.
10      A.  I did say his name, but I don't really
11  know him.
12      Q.  All right.
13          Would you know him to talk to
14  him or no?  Would you recognize him?
15      A.  No.  No.
16      Q.  Okay.
17          Michael Richert, obviously,
18  you know?
19      A.  Yes.
20      Q.  We talked about.
21          David Richert you didn't
22  mention.
23      A.  Oh, I thought I did.  I think I got
24  those names confused because -- yeah.
```

199

```
1           David, I believe, is
2   Michael's brother.
3       Q.  Okay.
4       A.  And he did work for Dock & Door
5   Install.  And I believe I met him, just being
6   introduced that it was Mike's brother.
7       Q.  Okay.
8           At the office somewhere?
9       A.  Yes.
10      Q.  Okay.
11          And so you think you don't
12  know Larry Richert --
13      A.  No, I do not.
14      Q.  -- but you do know David Richert?
15      A.  Right.  I got those names mixed up.
16      Q.  Got it.  All right.
17          Did you have any interactions
18  with David Richert?
19      A.  Just an introduction.
20      Q.  All right.
21          How about -- you didn't
22  mention Jonathan Richert either.
23      A.  Now, that I don't know who that is.
24      Q.  Okay.
```

200

```
1           That's why you didn't mention
2   him.
3           Milton Rivers?
4       A.  He --
5       Q.  Or Mitton Rivers.  I'm sorry.
6   M-i-t-t-o-n.
7       A.  He worked for Midwest Dock Solutions.
8       Q.  All right.
9       A.  He doesn't no longer work there.
10      Q.  He doesn't work there anymore?
11      A.  No.
12      Q.  All right.
13          What was the nature of your
14  interaction with him?
15      A.  I would just see him at the shop at
16  the end of the day, possibly.
17      Q.  Okay.
18          And Joseph Sheridan?
19      A.  He no longer works for Midwest Dock
20  Solutions.
21      Q.  He was a salesman?
22      A.  He was.
23      Q.  And did he sell new construction and
24  service work?
```

50 (Pages 197 to 200)

201

1    A.  That I don't know because he was at
2  the Holeman address when I started, and he
3  wasn't there very long after I started.
4      Q.  Got it.
5          Joshua Sichterman,
6  S-i-c-h-t-e-r-m-a-n?
7      A.  Yes.  He works for Midwest Dock
8  Solutions.
9      Q.  Still works there?
10     A.  He does.  I see him sometimes in the
11 shop, and I do get receipts from him.
12     Q.  And John Sparr?
13     A.  John Sparr currently works for Midwest
14 Dock Solutions.  The same thing for him.
15     Q.  Sometimes you get receipts from him,
16 and you see him around the shop?
17     A.  Yes.  Yes.
18     Q.  John Stoltenberg,
19 S-t-o-l-t-e-n-b-e-r-g?
20     A.  He works for Midwest Dock Solutions,
21 and I would see him once in a while in the
22 office.
23     Q.  Would you get receipts from him or no?
24     A.  I think he has a credit card.

202

1      Q.  You're not sure?
2      A.  No.  You know what?  No.  I don't
3  think so.
4      Q.  Michael Strazzabosco?
5      A.  Yes.  He works for Midwest Dock
6  Solutions.  I would see him in the -- in the
7  office and also get receipts from him.
8      Q.  He still works there?
9      A.  He does.
10     Q.  Ira Sugar we talked about.
11         Anthony Tattini?
12     A.  Anthony no longer works there.  I
13 believe he worked for Dock & Door Install.
14     Q.  Okay.
15     A.  But that -- he's been gone for a long
16 time, so --
17     Q.  Okay.
18         And how do you -- how did you
19 know him?
20     A.  Just had met him before.
21     Q.  Just see him around the office?
22     A.  Once in a while, yeah.
23     Q.  And casual conversation?
24     A.  Yes.

203

1      Q.  Okay.
2          Anthony Toigo?  I take it,
3  he's related to Amber Toigo?
4      A.  Yes.  That's her son, yes.
5      Q.  Okay.
6      A.  And I see him --
7      Q.  He works --
8      A.  -- in the office.  He still works for
9  Midwest Dock Solutions.
10     Q.  Okay.
11         So, again, you'd just have
12 casual conversation and see him around the
13 office?
14     A.  Yes.
15     Q.  Okay.
16         And Amber, you told me she
17 handles the billing for the service work?
18     A.  Yes.
19     Q.  And does she do anything else?
20     A.  She logs the incoming bills.
21     Q.  For new construction and service work
22 or just for the service work?
23     A.  Bills for like -- that we have to pay
24 or vendors.

204

1      Q.  Oh, I see.
2      A.  Yeah.
3      Q.  Parts.  Supplies.
4      A.  Yes.  Right.
5      Q.  That sort of thing?
6      A.  Yes.
7      Q.  Does she do anything else?
8      A.  Answers emails.
9      Q.  They come to her?
10     A.  So more administrative, yes.
11     Q.  Zachary Torkelsen?
12     A.  He does not work there anymore, and he
13 worked for Midwest Dock Solutions.
14     Q.  How long ago did he leave?
15     A.  He's been a long time, too.
16     Q.  Okay.
17     A.  Yeah.
18     Q.  All right.
19     A.  Same thing.
20     Q.  And how do you know him, just casual
21 conversation around the office?
22     A.  Just I met him.
23     Q.  Jerry Valentino?
24     A.  He no longer works for Midwest Dock

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

205

1 Solutions. Same thing. I just had met him.
2    Q. Okay.
3          Travis Woff, W-o-f-f. Is it
4 o-l-f or W-o-f-f?
5    A. I think it's just o-f-f.
6    Q. Okay. O-F-F.
7    A. He does not work for Midwest Dock
8 Solutions anymore.
9    Q. All right.
10          And how long ago do you think
11 he left?
12    A. About a year and a half.
13    Q. Okay.
14          And you just knew him
15 casually also?
16    A. Yes.
17    Q. Casual conversation around the office?
18    A. Yes.
19    Q. And then Edward Zarlengo?
20    A. That is Tony's -- Tony Zarlengo's
21 father, so I have met him.
22    Q. Okay.
23          And did he work for Midwest
24 Dock Solutions?

206

1    A. He did for short time.
2    Q. Do you know what he did?
3    A. I'm not really sure.
4    Q. All right.
5          Anthony Zarlengo is Tony, who
6 you've talked about, and Collin Zarlengo?
7    A. And Collin Zarlengo works for
8 Dock & Door Install.
9    Q. Okay.
10          And is he related to Anthony
11 Zarlengo?
12    A. Yes. It's his nephew.
13    Q. Nephew.
14          And what's the nature of your
15 interaction with him, just seeing him around
16 the office?
17    A. Yes. I can't remember if he worked
18 for Midwest Dock Solutions initially.
19    Q. Okay.
20          You'd have a casual
21 conversation with him if you see him?
22    A. I met him before, and I know him,
23 yeah.
24    Q. Hi, how are you doing?

207

1    A. Yes. Yes.
2    Q. Did he -- has he ever done any --
3 assisted you in any way in your job, or have
4 you ever asked him --
5    A. No.
6    Q. -- to assist you in any way?
7    A. No.
8
9        (WHEREUPON, the document was
10        marked Plaintiff's
11        Exhibit 53 for identification,
12        as of 9/22/25.)
13
14 BY MR. McJESSY:
15    Q. Okay.
16          I hand you what I've marked
17 as Exhibit 53.
18          I've handed you what I've
19 marked as Exhibit 53, and I'll represent to you
20 that this is the -- it appears to be the
21 Facebook page for Midwest Dock Solutions.
22          Do you see that?
23    A. Yes.
24    Q. Do you recognize this?

208

1    A. Yes.
2    Q. Have you been on the Facebook page for
3 Midwest Dock Solutions?
4    A. I have looked it up before, yes.
5    Q. All right.
6          And you've seen what it looks
7 like?
8    A. Yes.
9    Q. All right.
10          Does this look like it's the
11 web page --
12    A. Yes.
13    Q. -- over several pages?
14    A. Ah-huh. Yes.
15    Q. Okay.
16          Do you know who created this
17 web page?
18    A. I do not.
19    Q. Okay.
20          Do you have any role at all
21 in creating or maintaining or posting to this
22 Facebook page?
23    A. No.
24    Q. Okay.

52 (Pages 205 to 208)

209

1      And what -- how have you come
2  to look at it at some point?
3      A.  When I pulled up our address to see,
4  like if you Googled us, what our address -- you
5  know, what the thing would be.  And then I saw
6  the Facebook page, so I went on it.
7      Q.  And looked at it?
8      A.  Yes.
9      Q.  And did you ever talk to anybody about
10  it?
11      A.  No.
12      Q.  Like, hey -- you know, hey, Tony --
13  Tony Zarlengo I mean -- you know --
14      A.  No.
15      Q.  -- the Facebook page is out of date or
16  whatever.  Nothing like that?
17      A.  No.
18      Q.  Okay.
19          Do you know who made any of
20  these posts to the Facebook page?
21      A.  No.  I don't.
22      Q.  And do you know who has the -- the --
23  well, strike that.
24          Well, you know who -- do you

210

1  know who has the password for the Midwest Dock
2  Solutions Facebook account?
3      A.  I don't know that.
4      Q.  All right.
5          Do you know what e-mail is
6  attached to the Midwest Dock Solutions Facebook
7  account?
8          MR. HUGHES:  Objection.  Vague.
9          THE WITNESS:  Well, it says here
10  tony@midwestdocksolutions.com.
11  BY MR. McJESSY:
12      Q.  Okay.
13          So other than what it shows
14  here, that's what you -- you would just assume
15  because you're looking at the post, right?
16      A.  Right.  Other than that, I don't know.
17      Q.  Like if there's a username that's
18  needed to log into the account, do you know
19  what that is?
20      A.  No.
21      Q.  And as best you know, is -- is Mr.
22  Zarlengo the person who would be most
23  knowledgeable about that information?
24      A.  Yes.

211

1      Q.  Okay.
2          Do you think there's anybody
3  else who would have that information?
4      A.  I don't think so.
5      Q.  Okay.
6          If you look at the -- if you
7  go -- if you look at this page, it's going to
8  be the easiest way.  I think it's -- there you
9  go.  I'm not sure how many pages it's in.
10  There's an entry there that says your complete
11  Dock & Door experts.
12          Do you see that?
13      A.  Yes.
14      Q.  And do you see that it gives a list
15  of -- of types of work that -- types of work
16  there?
17      A.  Yes.
18      Q.  Dock levelers.  Dock seals.  That kind
19  of thing?
20      A.  Ah-huh.  Yes.
21      Q.  Does that look like a -- a fair
22  description of the kind of work Midwest Dock
23  Solutions does?
24      A.  Yes.

212

1      Q.  Okay.
2          And then if you turn to the
3  next page, there's a picture of a post there
4  that says another job well done.  Installed 64
5  dock levelers, dock seals, and 68 overhead
6  doors.  And then it's got a picture of a -- of
7  a logistics building there.
8          Do you see that?
9      A.  Yes.
10      Q.  And does that look like the kind of
11  work Midwest Dock Solutions does?
12      A.  Yes.
13      Q.  Do you know where that picture was
14  taken?  Are you familiar with that project?
15      A.  I don't know what project that is, no.
16      Q.  Okay.
17          And the next page -- the next
18  couple of pages have pictures on them.
19          Do you know where any of
20  those pictures were taken, what projects they
21  were?
22      A.  No.  I don't.
23          MR. McJESSY:  Give me one minute,
24  please.

53 (Pages 209 to 212)

213

```
 1              (After a brief interruption,
 2              the deposition was resumed
 3              as follows:)
 4
 5              (WHEREUPON, the document marked
 6              Plaintiff's Exhibit 3 for
 7              identification was tendered to
 8              the deponent.)
 9
10    BY MR. McJESSY:
11       Q.  I'm going to hand you what was
12    previously marked as Exhibit 3 and ask you if
13    you recognize that this is the website from
14    Midwest Dock Solutions -- or it's, at least,
15    part of the website.  It talks about products.
16              Actually, strike that.  Let
17    me take a step back.
18              Are you aware that Midwest
19    Dock Solutions has a website?
20       A.  Yes.
21       Q.  Have you ever been on the website?
22       A.  I had pulled it up before, yes.
23       Q.  Okay.
24              And why might you have looked
```

214

```
 1    at it, for any particular purpose or just --
 2       A.  To see what it looked like.
 3       Q.  Okay.
 4              Curiosity?
 5       A.  Right.
 6       Q.  Okay.
 7              Do you know who created the
 8    website?
 9       A.  I do not.
10       Q.  Have you had any involvement in
11    maintaining or changing or creating the
12    website?
13       A.  No.
14       Q.  Okay.
15              Mr. Zarlengo, is he the
16    person that would be most knowledgeable about
17    that?
18       A.  Yes.
19       Q.  Do you know who hosts the website?
20       A.  I do not.
21       Q.  Have you written any text for the
22    website?
23       A.  No.
24       Q.  Do you know who did?
```

215

```
 1       A.  I do not.
 2       Q.  Okay.
 3              Looking at this -- this
 4    extract, do you recognize this as the Midwest
 5    Dock Solutions website?
 6       A.  I don't recall seeing all of these
 7    pictures, so -- some of them, yes.
 8       Q.  All right.
 9              Do these look like the kind
10    of products that Midwest Dock Solutions sells?
11       A.  Yes.
12       Q.  And installs?
13       A.  Yes.
14       Q.  We talked a little bit about your
15    handling of -- or obtaining or reaching out to
16    the insurance companies to get Certificates of
17    Insurance for projects.
18              Do you remember that -- those
19    questions generally?
20       A.  Yeah.
21       Q.  Was that part of your work when you
22    started working for Midwest Dock Solutions?
23       A.  No.
24       Q.  When did that become part of your job?
```

216

```
 1    When did you start doing that?
 2       A.  It's been a while ago, but it wasn't
 3    initially.  I didn't do that at first.
 4       Q.  Okay.
 5              I think we looked at an email
 6    from 2021 that, maybe, dealt with that.
 7              Would it have been before
 8    that?
 9       A.  Probably like six years ago.
10       Q.  Okay.
11       A.  So started in '17.  So for the first
12    couple of years, I don't think I did it, but
13    then afterward.
14       Q.  You got involved in that?
15       A.  Just requesting them, yes.
16       Q.  Okay.
17              And how -- and do you recall
18    how that came about, who directed you to do
19    that, or is it just such a small office that,
20    you know --
21       A.  Well, Tony Zarlengo used to do it, and
22    so I think I had asked if he wanted me to
23    request them, and he said yes.
24       Q.  Oh, I see.  Okay.
```

54 (Pages 213 to 216)

217

1    And -- and you -- how did you
2 know how to go about doing that?
3    A. I think from seeing his emails
4 possibly requesting them, and I was copied on
5 them.
6    Q. Okay.
7    Are you involved in handling
8 any automobile insurance matters for Midwest
9 Dock Solutions?
10    A. I have to get auto COIs from the
11 insurance companies.
12    Q. And that's -- that's different from
13 COIs for liability insurance?
14    A. Yes. Yeah.
15    Q. Okay.
16    Those are the two kinds of
17 COIs you'd have to get?
18    A. Yes.
19    Q. And by "COIs," we mean Certificates of
20 Insurance?
21    A. Yes.
22    Q. Any other involvement with the
23 automobile insurance?
24    A. No.

218

1    Q. And I think I asked you this already,
2 but I'll ask you again just in case I didn't.
3    To your knowledge, have you
4 ever assisted Dock & Door in getting
5 insurance -- Certificates of Insurance for
6 projects?
7    A. No.
8    Q. To your knowledge, does Dock & Door
9 have any company-owned vehicles?
10    A. Not that I'm aware of, no.
11    Q. Okay.
12    Are you aware that
13 Dock & Door uses Midwest Dock Solutions'
14 vehicles?
15    A. Yes.
16    Q. Okay.
17    And what is your
18 understanding of the arrangement, if any,
19 between the businesses for that?
20    A. That I don't know.
21    Q. Okay.
22    You just know that their
23 employees use Midwest Dock Solutions' vehicles?
24    A. Yes, I -- yes.

219

1    Q. Okay.
2    And how about -- do you
3 know -- you mentioned that Midwest Dock
4 Solutions has a forklift.
5    Do you know, was that ever
6 taken to new construction jobs? Is it
7 transported off-site?
8    A. It is taken from the shop at times,
9 yes.
10    Q. It is.
11    And do you know where it
12 goes?
13    A. That I don't know.
14    Q. Okay.
15    Who would -- would Mr.
16 Zarlengo know that, do you think?
17    A. If it's his project. If not, it's
18 whoever the project belongs to.
19    Q. Okay.
20    And when you say "whoever the
21 project belongs to," does that mean like Ira
22 Sugar or Steve French?
23    A. Yes. Or David Mortel, yes.
24    Q. All right.

220

1    And those are the three that
2 sell new construction projects?
3    A. Including Mr. Zarlengo, yes.
4    Q. Yes, including Mr. Zarlengo.
5    Do you know what an aerial
6 lift is or a boom lift?
7    A. I have heard of a boom lift. I don't
8 know what it is, but I've heard of it.
9    Q. And you've heard of a scissor lift
10 before?
11    A. Yes.
12    Q. You're familiar with that? It
13 looks --
14    A. Yes. That I -- yes.
15    Q. Does Midwest Dock Solutions have a
16 scissor lift?
17    A. I believe so.
18    Q. Okay.
19    Is that sometimes taken off
20 site, too?
21    A. As far as I know. I mean, I don't
22 know for sure.
23    Q. Okay.
24    You don't -- you don't really

55 (Pages 217 to 220)

221

1   keep track of what's happening in the
2   warehouse, I take it?
3       A.  No.
4       Q.  Okay.
5           Are you responsible at all
6   for ordering materials and supplies?
7       A.  Just office supplies like paper and
8   pens and things like that.
9       Q.  Okay.
10          Other than copy paper and
11  tablets and pens, is there any other kinds of
12  office supplies you do order?
13      A.  No.
14      Q.  If Mr. Brutti wants to use the paper
15  and the pens and tablets, is he free to do
16  that?
17      A.  I'm not really sure where he gets his
18  from.  I mean --
19      Q.  Okay.
20          Where does Midwest Dock
21  Solutions bank?
22      A.  At Old National Bank.
23      Q.  Okay.
24          Is that First Midwest Bank,

222

1   now?
2       A.  Yes.
3       Q.  Okay.
4           Has it ever banked somewhere
5   else?
6       A.  No.
7       Q.  And do you know, does Dock & Door
8   bank -- bank there also?
9       A.  That I don't know.
10      Q.  Okay.
11          And the payroll service
12  provider is ADP, and I think you said -- we
13  talked about that earlier, right?
14      A.  Yes.
15      Q.  And you said you weren't sure if there
16  was ever anybody else; is that correct?
17      A.  Right.
18      Q.  And do you know, does Dock & Door use
19  that payroll service provider?
20      A.  That I don't know.
21      Q.  Okay.
22          And the account -- accountant
23  is Gineris & Associates, correct?
24      A.  Yes.

223

1       Q.  And how long -- do you know, was there
2   anybody before Gineris & Associates?
3       A.  No.  Not that I'm aware of.
4       Q.  Okay.
5           Since you've been there,
6   that's who the company's been using as their
7   accountant?
8       A.  Yes.
9       Q.  Okay.
10          And do you know, does
11  Dock & Door use that accountant also.
12      A.  That I don't know.
13      Q.  Do you know, has -- has Midwest Dock
14  solutions used a law firm called Lawrence Kamin
15  Sunders & Uhlenhop?
16      A.  Yes.
17      Q.  Okay.
18          And I don't want to know
19  conversations you've had with any -- have you
20  ever had a conversation with attorneys from
21  that office?
22      A.  No.
23      Q.  Oh, okay.
24          Well, then, there's -- strike

224

1   that.
2           Do you know what services
3   Midwest Dock Solutions has used that law firm
4   for?
5       A.  I don't.
6       Q.  Okay.
7           How do you know that that's a
8   law firm that it's used?
9       A.  We received a bill from them.
10      Q.  All right.
11          So you were involved in
12  paying a bill for them?
13      A.  Yes.
14      Q.  Okay.
15          On more than one occasion or
16  just one occasion?
17      A.  More than one.
18      Q.  All right.
19          When was the last time that
20  you can recall receiving a bill from them?
21      A.  That I really don't know.
22      Q.  Like more than five years ago or more
23  than --
24      A.  That we got a bill from them?

56 (Pages 221 to 224)

225

1    Q.  Yeah.
2    A.  No.  I don't know.
3    Q.  It was more recent than that?
4    A.  Yes.
5    Q.  Okay.
6              Last year?  Within the last
7    year?
8    A.  I'm not -- I'm not sure.
9    Q.  Mr. Zarlengo would be the best person
10   you think to ask about that?
11   A.  As far as the bill?  Yes.
12   Q.  And what services the law firm has
13   performed --
14   A.  Yes.
15   Q.  -- for the company?
16             Since you've been working for
17   Midwest Dock Solutions, has it provided any
18   company cell phones to anybody?
19   A.  Yes.  I believe some of the service
20   guys have those.
21   Q.  Okay.
22             That are paid for by the
23   company?
24   A.  Yes.

226

1    Q.  Okay.
2              Is that through Verizon?
3    A.  Yes.
4    Q.  And do you know who has a
5    company-provided cell phone?
6    A.  I do not.
7    Q.  If you wanted to know that
8    information, how would you find that out?
9    A.  I could look at the -- well, the bill
10   would have the numbers not the name, so that
11   I -- yeah, I wouldn't know.
12   Q.  So you think you get billing
13   statements from Verizon --
14   A.  Yes.
15   Q.  -- for the cell phone plan?
16   A.  Yes.
17   Q.  All right.
18             But you -- and just so I'm
19   clear, you don't know who specifically has
20   company-provided cell phones?
21   A.  I don't, no.
22   Q.  Has the company provided laptops to
23   anybody, as far as you know?
24   A.  No.

227

1    Q.  How about tablets?
2    A.  No.  We have some, but they haven't
3    been distributed.
4    Q.  Okay.
5              What do you mean by that?
6    A.  We purchased some.  We're just not
7    using them yet.
8    Q.  Oh, okay.
9              I take it, that was a recent
10   purchase?
11   A.  Within a year.
12   Q.  All right.
13             So they just laid there in
14   boxes or --
15   A.  Yes.
16   Q.  Unopened?
17   A.  Yes.
18             MR. HUGHES:  Are you looking for
19   one?
20   BY MR. McJESSY:
21   Q.  Are they Apple?
22   A.  I'm not --
23   Q.  You're not sure?
24   A.  No.

228

1    Q.  Okay.
2              Do you know what they were
3    purchased for?
4    A.  For the -- to give to the service
5    technicians.
6    Q.  Okay.
7              Does the company -- strike
8    that.
9              Do you maintain any
10   QuickBooks records for Midwest Dock Solutions?
11   A.  Not QuickBooks.  Zero.
12   Q.  Everything is done through Zero?
13   A.  Yes.
14   Q.  Okay.
15             How about Excel spreadsheets?
16   Do you maintain any Excel spreadsheets for
17   Midwest Dock Solutions?
18   A.  No.
19   Q.  Okay.  Let's see.
20
21             (WHEREUPON, the document was
22             marked Plaintiff's
23             Exhibit 54 for identification,
24             as of 9/22/25.)

57 (Pages 225 to 228)

229

1  BY MR. McJESSY:
2      Q.  All right.
3          I'm handing you what's been
4  marked as Exhibit 54.  And this is a document,
5  I'll represent to you, that was given to us by
6  Midwest Dock Solutions.  And it says credit
7  card holders at the top, and it appears to
8  continue -- you see the bottom line seems to
9  continue on?
10     A.  Yes.
11     Q.  This was the only page we got, so I
12 don't know if it's complete or not.  But can
13 you tell by looking at this -- oh, it does say
14 card holders 23 at the top, and it appears
15 there's 23 names on the page.
16         So does this look like all of
17 the credit card holders for Midwest Dock
18 Solutions' credit cards?
19     A.  Yes.
20     Q.  Okay.
21         And do you know, were there
22 cards issued to anybody else in the past who
23 aren't on this list?
24     A.  Well, previous employees, yes.

230

1      Q.  Okay.
2      A.  That don't work there anymore.
3      Q.  All right.
4          And do you recall who those
5  may have been?  And you can look at -- I mean,
6  I don't know if it helps to look at that
7  employee list that was marked as Exhibit 29.
8      A.  You'd think I remember.  Let's see.
9          I believe Don Cruikshank had
10 one.
11     Q.  Okay.
12         He's on here.
13     A.  James Johnson had one.
14     Q.  Okay.
15     A.  I don't recall if Dylan had one or
16 not.  Dylan Kelly.
17     Q.  Okay.
18     A.  I believe Sean Leer did.  Johnny
19 Mancha did.  Mitton Rivers.  I'm not sure about
20 Zach Torkelsen.  Travis Woff did.  Yeah.
21     Q.  Okay.
22         And are you aware that Collin
23 Zarlengo has a -- has a credit card?
24     A.  Yes.

231

1      Q.  Okay.
2          And is he somebody from whom
3  you would get receipts for purchases that he
4  made?
5      A.  Yes.
6      Q.  Okay.
7          And that's true currently,
8  correct?
9      A.  Yes.
10     Q.  Okay.
11         And then after -- do you get
12 the bills from the credit card company?
13     A.  The bills?
14     Q.  Well, how do you get the -- like how
15 do you -- do you pay the credit card bills?
16     A.  No, I do not.
17     Q.  Oh.  Who pays the credit card bills?
18     A.  Tony Zarlengo.
19     Q.  Oh, he handles the -- like he gets the
20 credit card statements, and then he writes out
21 the check for the credit cards?
22     A.  It's usually paid online.
23     Q.  Oh, I see.  Okay.
24         So he handles payment of all

232

1  of that?
2      A.  Yes.
3      Q.  Okay.
4          And were you aware that
5  Donald Cruikshank had a credit card -- has a
6  credit card?
7      A.  Actually, he doesn't work there
8  anymore.
9      Q.  Had a credit card?
10     A.  Yes.
11     Q.  Okay.
12         And David Green?
13     A.  Yes.
14     Q.  Okay.
15         He has a credit card?
16     A.  He does.
17     Q.  He still has one?
18     A.  Yes.
19     Q.  Okay.
20         Is he somebody who would also
21 give you receipts for charges?
22     A.  Yes.
23     Q.  Okay.
24         He still does that?

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

233

1     A.  Yes.
2     Q.  And Donald Cruikshank also would give
3  you receipts for charges when he worked there?
4     A.  Yes.
5     Q.  Okay.
6            And Nicolas Kelly, same
7  thing?  He would give you receipts for charges?
8     A.  Yes.
9     Q.  He still works there?
10    A.  He does.
11    Q.  He does.
12           And Richard Mantoan, he's
13  somebody who also would give you credit card
14  receipts for charges?
15    A.  Yes.
16    Q.  And he still works there?
17    A.  He does.
18    Q.  Okay.
19           And do you have a credit
20  card?
21    A.  I do.
22    Q.  Okay.
23           The credit card bills, do you
24  know if those come electronically, or do they

234

1  come in the mail?
2     A.  No.  There's an account online.
3     Q.  Okay.
4            Do you ever do any
5  reconciliation between the account statements
6  and the receipts that you've gotten?
7     A.  Yes.
8     Q.  Okay.
9            And do you handle that?
10    A.  Yes.
11    Q.  Okay.
12           And how does that process
13  work?  If Mr. Zarlengo is paying the credit
14  cards, does -- do you like go online and look
15  at the statement and reconcile and then say,
16  hey, Tony, this looks great, you can go ahead
17  and pay it, or, hey, Tony, there's a problem
18  or --
19    A.  Well, he views the statement itself.
20    Q.  Okay.
21    A.  I just process that part and Zero it.
22    Q.  Oh, I see.  Okay.
23           So you enter it into Zero so
24  that --

235

1     A.  It's automatically there.  And I
2  attach the receipt to it, for that charge.
3     Q.  Oh, explain to me how that works.
4     A.  Well, it shows up in Zero.
5     Q.  Okay.
6     A.  And then --
7     Q.  And does it have line-by-line charges?
8     A.  Yes.  Per person, yes.
9     Q.  Okay.
10           So it will have like Collin
11  Zarlengo, and it will have his individual
12  charges?
13    A.  Yes.
14    Q.  Okay.
15           And then you go through and
16  attach the -- like a PDF of the receipts to
17  each charge?
18    A.  There's a receipt program where I load
19  the receipts in and then match it up.
20    Q.  Oh.
21           And then after you do that,
22  is that when he pays the bill, or how does --
23  how does it work between you and him?
24    A.  Well, I mean, that's totally separate.

236

1  I'm getting receipts for them.  If I have any
2  that I'm not getting a receipt, I can tell him.
3  But as far as the payments, he just makes the
4  payments online.
5     Q.  I see.
6            So you'll say, Tony, I'm
7  missing this receipt, I'm missing that receipt?
8     A.  Right.  Yes.
9     Q.  Okay.
10           And then if you're missing a
11  receipt, what happens?
12    A.  I let him know.
13    Q.  And then --
14    A.  Well, yeah.
15    Q.  And then you're done?
16    A.  Right.  If I -- I either get the
17  receipt, or he says it's okay to clear it, that
18  he's looked into the situation.
19    Q.  Oh, do you actually have to like clear
20  the individual charges in the program?
21    A.  Yes.
22    Q.  Oh, I see.
23           So they're all approved by
24  Mr. Zarlengo, or you've got the receipt, and

59 (Pages 233 to 236)

237

1 you can approve it?
2 A. Yes.
3 Q. I understand.
4 How does it get into Zero?
5 Do you download the credit card statement to
6 put it in, or does Mr. Zarlengo do that?
7 A. I don't -- neither one of us. I
8 believe, Gineris set that up.
9 Q. Okay.
10 And has there ever been an
11 instance where there had been issues with
12 credit card charges that don't -- aren't
13 approved by Mr. Zarlengo and --
14 A. Yes.
15 Q. And you have to talk to the employee
16 about like, hey, there's a charge on this
17 credit card?
18 A. Or if they can't get a receipt to me,
19 then I let Tony know I don't have them.
20 Q. And then it's up to him to clear it or
21 not, tell you it's okay?
22 A. Yes.
23 Q. Okay.
24 Who authorized the employees

238

1 on this list to have credit cards? Who made
2 that decision?
3 A. I did not.
4 Q. Okay.
5 You don't know who made it?
6 A. No.
7 Q. All right.
8 That's a question for Mr.
9 Zarlengo?
10 A. Yes.
11 Q. Okay.
12 Are the credit card
13 statements from Chase? Is it Chase Bank that
14 is the credit card company?
15 A. Yes.
16 Q. And do you recognize that the last
17 four digits after -- or strike that.
18 Do you recognize that the
19 digits that are after each of the names on here
20 is the credit card number --
21 A. Yes.
22 Q. -- for these individuals? Is that
23 what that is?
24 A. Yes.

239

1 Q. It's like Mr. Zarlengo's credit card
2 would end in 3597. Mr. Cruikshank's would end
3 in 3645?
4 A. Yes.
5
6 (WHEREUPON, the documents were
7 marked Plaintiff's
8 Exhibits 55 and 56 for
9 identification, as of 9/22/25.)
10
11 BY MR. McJESSY:
12 Q. All right.
13 And I've handed you two
14 exhibits marked Exhibit 55 and 56, and they're
15 in many respects the same thing, but I just
16 have these as sort of examples. So on the
17 first page, let's take a look at Exhibit 55.
18 It's got a check from Midwest Dock Solutions to
19 Dock & Door Install for $49,911.50.
20 Do you see that?
21 A. Yes.
22 Q. Okay.
23 And if you turn to the next
24 page, there's a deposit receipt for Old

240

1 National Bank.
2 Do you see that?
3 A. Yes.
4 Q. And then there's a deposit summary
5 that lists payment from Midwest Dock Solutions
6 with an invoice number and an amount paid.
7 Do you see that?
8 A. Yes.
9 Q. And then -- and the deposit summary is
10 in the name of Dock & Door Install, Inc.
11 Do you see that?
12 A. Yes.
13 Q. And if you turn to the next page,
14 there's like a total for those -- that list of
15 invoices for $37,535.50.
16 Do you see that?
17 A. Yes.
18 Q. And then if you turn to the next page,
19 there's another deposit summary that, again,
20 lists invoice numbers for Midwest Dock
21 Solutions, and the amount is $12,376.
22 Do you see that?
23 A. Yes.
24 Q. And I'll represent to you, if you add

60 (Pages 237 to 240)

241

1  those two numbers together, you get the
2  $49,911.50. That's the check that's on the
3  first page.
4          And then if you look --
5  attached to that are the individual invoices
6  that are referenced on the deposit summaries.
7          Do you see that?
8  A.  Yes.
9  Q.  So the first one is an invoice to
10 Midwest Dock Solutions at 27 East 36th Place
11 dated February 15, 2023, from Dock & Door
12 Install at 27 East 36th Place.
13         Do you see that?
14 A.  Yes.
15 Q.  All right.
16         So I'd like to ask you
17 some -- some questions about this document.
18 And, actually -- well, let's look at Exhibit 56
19 also.
20         Do you see that there's a
21 check on this one that's for $22,741 from
22 Midwest Dock Solutions to Dock & Door Install?
23 A.  Yes.
24 Q.  All right.

242

1          And, again, if you turn to
2  the next page, there's a deposit receipt. And
3  then if you turn to the next page, there's the
4  same page without the deposit receipt and
5  security part of it, and it shows $22,741 as
6  the amount due, and then attached are similar
7  invoices.
8          Do you see those?
9  A.  Yes.
10 Q.  All right.
11         So, I guess, my first
12 question is: Did you write these checks --
13 A.  Yes.
14 Q.  -- to Dock & Door Install?
15 A.  Yes.
16 Q.  All right.
17         So that's your handwriting on
18 the checks; is that right?
19 A.  Yes.
20 Q.  And then you give the check to Mr.
21 Zarlengo to sign, is that it?
22 A.  Yes.
23 Q.  Excuse me. Sorry.
24         When you prepared this

243

1  check -- and let's take a look at Exhibit 56,
2  the first one -- or, I'm sorry, 55, the first
3  exhibit.
4          What -- what is it that you
5  have received in order to prepare that check?
6  A.  I get a copy of each of the invoices.
7  Q.  Okay.
8          Do you also get a copy of the
9  deposit summary?
10 A.  No.
11 Q.  Okay.
12         So you get -- in this
13 instance, you would have gotten the stack of
14 invoices that are attached to this?
15 A.  Yes.
16 Q.  And are they in printed form?
17 A.  I get an e-mail copy and a printed
18 form.
19 Q.  All right.
20         So it gets emailed to you,
21 and you get a printed copy?
22 A.  Yes.
23 Q.  And who does the email come from?
24 A.  From Tony Brutti.

244

1  Q.  Okay.
2          So you would have a cover
3  email that goes with each like group of
4  invoices that you pay, or do you get a separate
5  email with each invoice?
6  A.  One email with all of the invoices.
7  Q.  Okay.
8          And do you keep those emails?
9  Do you have them?
10 A.  I don't delete them, so, yeah.
11 Q.  All right.
12         And so -- so Mr. Brutti
13 forwards the invoices, a group of invoices to
14 you in like a single PDF or --
15 A.  He sends those through Zero. So
16 that's where I was saying before, I would have
17 the invoice, and then I can log into my account
18 since I do have Zero.
19 Q.  I see. Okay.
20         So you get an email from him,
21 and it has like a tab or something you click on
22 in order to go to Zero and download the
23 invoices into your system?
24 A.  Yes.

61 (Pages 241 to 244)

245

```
 1      Q.  Okay.
 2           And you also get a paper
 3  copy.
 4           Does he print it out and hand
 5  it to you?
 6      A.  Yes.
 7      Q.  Okay.
 8           And does he just print it out
 9  at the office there?
10      A.  Yes.
11      Q.  Okay.
12           And so he prints it out, and
13  does he leave it on your desk or does he hand
14  it to you or how does it work?
15      A.  If I'm there, he'll hand it to me.  If
16  not, he'll leave it on my desk.
17      Q.  And are they stapled in any way, or
18  how are they -- are they just left on a stack?
19      A.  Just left, yeah.
20      Q.  Okay.
21           And at the same -- at the
22  same time, you get an email from him with the
23  Zero link so that you can download them into
24  your system?
```

246

```
 1      A.  Yes.
 2      Q.  Okay.
 3           So tell me what happens next
 4  after the invoices are downloaded into your
 5  Zero system?
 6      A.  Once I download the invoices, then I
 7  will click on it to pay those, and I write the
 8  check.
 9      Q.  Do you verify any information on them
10  before you -- do you like total them up -- oh,
11  I'm guessing Zero totals them up for you?
12      A.  Yes.  Zero does that, yes.
13      Q.  Okay.
14           And so that tells you what
15  the amount of the check is to write?
16      A.  Yes.
17      Q.  And then you write the check, and you
18  leave that for Mr. Zarlengo to sign?
19      A.  Yes.
20      Q.  Okay.
21           And then after he signs the
22  check, what do you do with it?
23      A.  I take the check and the paper copy
24  and invoices he gave me, and I put them on his
```

247

```
 1  desk or give him them or give it to him if he's
 2  there.
 3      Q.  To who?
 4      A.  Anthony -- or Tony Brutti.
 5      Q.  Okay.
 6           So you take the check, and
 7  you take the paper stack of -- of invoices that
 8  he gave you?
 9      A.  Yes.
10      Q.  And you put it on his desk, or you
11  hand it to him?
12      A.  Yes.
13      Q.  Okay.
14           Do you ever deposit any of
15  the checks directly into the bank account for
16  Midwest Dock -- for Dock & Door?
17      A.  No.
18      Q.  Okay.
19           Do you know, does Mr.
20  Zarlengo ever take the checks with the deposit
21  ticket to the bank to deposit the checks into
22  Dock & Door's account?
23      A.  No.  I don't think so.
24      Q.  Okay.
```

248

```
 1           You don't know one -- one way
 2  or the other?
 3      A.  As far as I know, no.
 4      Q.  Okay.
 5      A.  No.
 6      Q.  Do you know how the invoices are
 7  prepared?
 8      A.  I mean, I know from doing ours how
 9  they're -- he has Zero, so he inputs the
10  information.
11      Q.  So they're prepared directly in the
12  Zero program?
13      A.  Yes.
14      Q.  I see.
15           How do you do it when you
16  fill out the invoice in Zero?  How does it
17  work?
18      A.  You click that you want to do an
19  invoice and then pick a person that it's
20  addressed to, the company that you wanted in
21  there.  You type in the information and then --
22      Q.  What information, for example, here
23  would you type in?  Like would you have to type
24  in the invoice date, the invoice number, the
```

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

249

1  reference, or would that auto populate?
2      A.  Well, for us, we type it -- well, the
3  invoice has an invoice number, yes.
4      Q.  Okay.
5          So that's auto generated?
6      A.  Yes.  And the invoice date.  And
7  the other things are inputted, the reference
8  number and anything you put in description.
9  You have to type what you want to put up there.
10     Q.  All right.
11         Do your invoices look very --
12 just appearance wise, do your invoices look the
13 same as these?  Like it will have invoice in
14 the upper left corner and then the company that
15 you're sending it to right below that and your
16 company name over on the far right?  Does it,
17 you know, look -- appearance wise, are your
18 invoices similar?
19     A.  Yes, because I don't -- I mean, that's
20 through the Zero program.
21     Q.  That's what I wondered.
22         So it's like a form?
23     A.  You can't really modify, you know,
24 right.

250

1      Q.  Does yours have a payment advice?
2      A.  Yes.
3      Q.  And with the little line across the
4  bottom with the -- that little dotted line,
5  that kind of thing?
6      A.  Yes.
7      Q.  Okay.
8          Do you verify any of the
9  information that's in the invoices?
10     A.  No.
11     Q.  Do you know, is -- well, you see the
12 deposit summary that's here on the like third
13 page?
14         Yeah.  That's it.  Thank you.
15         Does Zero generate a form
16 like this for deposits?
17     A.  Not that I'm aware of because I don't
18 use it that way for Midwest Dock Solutions.
19     Q.  Yeah.  That's what I was asking.
20         Like do you create anything
21 like this for your deposits for Midwest Dock
22 Solutions?
23     A.  No.
24     Q.  Any of your Midwest Dock Solutions

251

1  customers who are paying Midwest Dock, do any
2  of them use Zero so that you can transmit your
3  invoices to them the same way that Mr. Brutti
4  transmits his invoices to you?
5      A.  I'm not aware of anybody.
6      Q.  Okay.
7          When you started working at
8  Midwest Dock Solutions, did Dock & Door already
9  exist?
10     A.  Yes.
11         MR. McJESSY:  I need to take about a
12 five-minute break.  I may be getting close to
13 the end.
14         MR. HUGHES:  Okay.
15
16         (After a break from 1:52 p.m.
17          to 1:58 p.m., the deposition
18          was resumed as follows:)
19
20         MR. McJESSY:  All right.  Back on
21 the record.
22 BY MR. McJESSY:
23     Q.  Do you -- do you at all use any sort
24 of electronic signature stamp at work?

252

1      A.  No.
2      Q.  Okay.
3          How about any actual
4  signature stamps?  Does anybody have a
5  signature stamp that you can use to affix your
6  signature to things?
7      A.  No.
8      Q.  Other than like Word, DocuSign, or
9  something like that.  That used to work,
10 correct?
11     A.  Yes.
12     Q.  Yeah.
13     A.  Yes.
14     Q.  You -- I think you said one of jobs
15 that you do is you pay the bills, correct?
16     A.  Yes.
17     Q.  So you write up the checks.
18         I'm looking at Exhibit 55.
19 It's got other checks on there?
20     A.  Yes.
21     Q.  And Exhibit 56.
22         So if you get a check from
23 like -- I'm looking at Exhibit 56, and it's got
24 a check to something called Fastenal?

63 (Pages 249 to 252)

253

```
1    A.  Fastenal.
2    Q.  Fastenal?
3    A.  Yes.
4    Q.  Is that for materials or something?
5    A.  Yes.
6    Q.  Okay.
7            Do you verify -- like before
8    you write a check to them, if you get an
9    invoice, do you do anything to verify that the
10   amount owed is correct?
11   A.  Well, actually, Tony goes -- Tony
12   Zarlengo goes through the bills and let's me
13   know which ones to pay.
14   Q.  Okay.
15           And how much to pay?
16   A.  Well, we pay the full invoice amount,
17   but --
18   Q.  The full invoice?
19   A.  Right.
20   Q.  Okay.
21           So he gives you like a stack
22   of papers and says, here, pay this, that kind
23   of thing?
24   A.  Yes.
```

254

```
1    Q.  All right.
2            So Midwest Angle, he'll say
3    here's an invoice for Midwest Angle.  Here's a
4    couple of invoices.  Pay these?
5    A.  Yes.
6    Q.  And the same thing for Holden
7    Insurance?
8    A.  Yes.
9    Q.  Okay.  I'm looking at Exhibit 55.
10           The same thing would be true
11   for like Napa Auto Parts?  You must have gotten
12   a bill from them, I take it?
13   A.  Yes, or several.
14   Q.  Or multiple bills?
15   A.  Several, yeah.
16   Q.  All right.
17           Other than -- other than
18   Dock & Door, is there any other vendor or
19   supplier that you have that sends you invoices
20   through the Zero system?
21   A.  No.
22   Q.  That's the only one?
23   A.  Yes.
24   Q.  All right.
```

255

```
1            And I asked you earlier if
2    you had ever been paid in cash, and you said
3    no.
4            Are you aware of whether
5    workers have ever been paid in cash?
6    A.  I know that there has been cash in the
7    office they were picking up.
8    Q.  Okay.
9    A.  For either a reimbursement or -- I'm
10   not sure what else.
11   Q.  Okay.
12           And how would they pick that
13   up?
14   A.  They would just come in and get it off
15   the desk.
16   Q.  Okay.
17           It would be in an envelope?
18   A.  Yes.
19   Q.  Okay.
20           And would that be on Tony's
21   desk?
22   A.  Tony Zarlengo's, yes.
23   Q.  Yeah.
24           And would it have a name
```

256

```
1    written on it, like who -- who it was for?
2    A.  I don't -- I don't think so.  I don't
3    know.  I don't really see that.  They would
4    just tell me they have something to pick up.
5    Q.  Okay.
6            And I asked you earlier if
7    Dock & Door ever had any vehicles of its own,
8    and you said that it didn't, that it used
9    Midwest Dock Solutions' vehicles.  But I want
10   to ask the question in the past tense.
11           To your knowledge, has
12   Dock & Door ever had any of its own vehicles?
13   A.  Not that I'm aware of.
14   Q.  Okay.
15           And since you've been working
16   there, Dock & Door has always used Midwest Dock
17   Solutions' vehicles, correct?
18   A.  Yes.
19   Q.  Prior to coming here today, did anyone
20   suggest to you what your testimony should be on
21   any of the subjects that we covered today?
22   A.  No.
23   Q.  Okay.
24           And was all of your testimony
```

64 (Pages 253 to 256)

257

1  that you gave today truthful?
2  A.  Yes.
3  Q.  Is there anything you said today that
4  you would like to correct or change?
5  A.  No.
6  Q.  What's your current home address?
7  A.  It's 42 Timrick -- that's
8  T-i-m-r-i-c-k -- that's Drive -- in Munster,
9  Indiana.
10  Q.  And have you been there a long time?
11  A.  Yes.
12  Q.  Any present intention to move from
13  there?
14  A.  No.
15  Q.  Okay.
16       You had to think about that
17  one a little bit.
18  A.  Some day, yes.
19  Q.  All right.
20       The house isn't up for sale?
21  You're not moving somewhere now, at present?
22  A.  No.
23  Q.  All right.
24       The last four digits of your

258

1  Social Security number?
2  A.  2126.
3  Q.  And your date of birth?
4  A.  7/12/68.
5  Q.  All right.
6       And I've already asked you
7  your cell phone number, which you gave me
8  earlier.
9       Is that the best number to
10  reach you?
11  A.  Yes.
12  Q.  Okay.
13       Do you know who Richard
14  Papiese is, P-a-p-i-e-s-e?
15  A.  Yes.
16  Q.  Who is that?
17  A.  Well, he was the building owner.
18  Q.  Okay.
19  A.  He's deceased.  So, now, his daughter.
20  Q.  Okay.
21       So checks payable to him
22  would have been for rent checks?
23  A.  Yes.
24  Q.  Okay.

259

1       And are they now paid to his
2  daughter?
3  A.  Yes.
4  Q.  And who is Paul Riley?
5  A.  That is a company that we buy supplies
6  from.
7  Q.  Oh, okay.
8       What kind of supplies do you
9  buy from Paul Riley?
10  A.  I'm not sure.
11  Q.  Okay.
12       Are you familiar with the
13  Blue Book Construction Guide?
14  A.  Yes.
15  Q.  Okay.
16       How are you familiar with
17  that?
18  A.  I believe, we get charges from them.
19  Q.  Okay.
20  A.  Yeah.
21  Q.  And so you're familiar with paying
22  bills for them?
23  A.  Yes.
24  Q.  Okay.

260

1       Have you ever filled anything
2  out for them, like information sheets or
3  anything like that?
4  A.  No.
5  Q.  Okay.
6       Have you ever like logged
7  into an account or anything with Blue Book
8  Construction Guide?
9  A.  No.
10  Q.  Okay.
11       Is -- is your involvement
12  with that entity limited solely to just paying
13  bills -- you know, getting invoices and paying
14  bills?
15  A.  Yes.
16  Q.  Okay.
17       So you just recognize the
18  name from that?
19  A.  Right.
20  Q.  All right.
21       Do you know what it is?
22  A.  No.
23  Q.  Okay.  All right.
24       MR. McJESSY: I don't have any other

65 (Pages 257 to 260)

261

```
 1   questions at this time.  If your attorney asks
 2   some questions, I may have -- or if Mr. Miller
 3   does -- I may have some follow-up questions
 4   based upon what they ask.  And I am -- just for
 5   the record, I have some concerns about whether
 6   we received all of the documents that would
 7   have been responsive to our document request
 8   because some emails may have not been reviewed
 9   or produced.  So I just, for the record, will
10   reserve the right to recall the witness about
11   those documents if there are additional
12   documents to be produced, just for the record.
13   But that's what I have for now.
14            MR. HUGHES:  Okay.
15            Give me a few minutes to go
16   through my notes.  I'm not sure if I'll have
17   anything.  If I do, I'm sure it will brief.
18
19            (After a break from 2:06 p.m.
20            to 2:12 p.m., the deposition
21            was resumed as follows:)
22
23       MR. HUGHES:  We don't have anything.
24       MR. McJESSY:  No questions?  All
```

262

```
 1   right.
 2            Then, all right, aside from
 3   my reservation on the record --
 4       MR. HUGHES:  We'll reserve.
 5       MR. McJESSY:  Okay.
 6            And I will order a copy of
 7   the transcript.
 8       THE COURT REPORTER:  Do you need a
 9   copy?
10       MR. HUGHES:  Yes.
11
12            FURTHER DEPONENT SAITH NOT.
13
14
15
16
17
18
19
20
21
22
23
24
```

263

```
 1        IN THE UNITED STATES DISTRICT COURT
 2       FOR THE NORTHERN DISTRICT OF ILLINOIS
                EASTERN DIVISION
 3
   MID-AMERICA CARPENTERS    )
 4  REGIONAL COUNCIL PENSION  )
   FUND, et al.,             )
 5                           )
         Plaintiffs,  )  No. 1:24-cv-02428
 6                           )
         vs.          )  Judge Andrea R. Wood
 7                           )
   DOCK & DOOR INSTALL,      )  Magistrate Judge
 8  INC., an Illinois        )  Jeannice W. Appenteng
   corporation and MIDWEST   )
 9  DOCK SOLUTIONS, INC., an  )
   Illinois corporation,     )
10                           )
         Defendants.  )
11
12        This is to certify that I, SHERRI LYNN
   WEBBER, have read the transcript of my
13  Deposition taken on September 22, 2025, in the
   above-entitled cause, consisting of Pages 1
14  through 262 inclusive, and I do again subscribe
   and make oath that the same is a true, correct,
15  and complete transcript of my Deposition as
   aforesaid, with corrections, if any, appearing
16  on the attached Correction Page(s).
17        _____ Correction Pages Attached.
18
19        _____
              SHERRI LYNN WEBBER
20
   SUBSCRIBED AND SWORN to
21  before me this _____ day
   of _____, A.D. 20 ____.
22
23
   _____
24        Notary Public
```

264

```
 1   STATE OF ILLINOIS   )
 2                       ) SS:
 3   COUNTY OF C O O K    )
 4
 5        I, DIANE M. NULICK, a Notary Public
 6   within and for the County of Cook, State of
 7   Illinois, and a Certified Shorthand Reporter of
 8   said state, do hereby certify:
 9        That previous to the commencement of the
10   examination of the witness, the witness was
11   duly sworn to testify the whole truth
12   concerning the matters herein;
13        That the foregoing deposition transcript
14   was reported stenographically by me, was
15   thereafter reduced to typewriting under my
16   personal direction and constitutes a true
17   record of the testimony given and the
18   proceedings had;
19        That the said deposition was taken
20   before me at the time and place specified;
21        That the said deposition was adjourned
22   as stated herein;
23        That I am not a relative or employee or
24   attorney or counsel, nor a relative or employee
```

66 (Pages 261 to 264)

265

1  of such attorney or counsel for any of the
2  parties hereto, nor interested directly or
3  indirectly in the outcome of this action.
4      IN WITNESS WHEREOF, I do hereunto set
5  my hand and affix my seal of office at Chicago,
6  Illinois, this 25th day of September, 2025.
7
8
9
10
11
12      Notary Public, Cook County, Illinois.
13
14  C.S.R. Certificate No. 084-002029.
15
16
17
18
19
20
21
22
23
24

67 (Page 265)

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 64

Box Number(s) ___363___

# Application for Post Office Box™ Service

*Fill out all non-shaded fields, and take this application to the Post Office™.*

1. This service is for *(Required selection):* ☑ Business/Organization Use    ☐ Residential/Personal Use

2. Name of Business/Organization *(if applicable):* MIDWEST DOCK SOLUTIONS

3. Name of Person Applying *(Last, First, MI — include title if representing a business/organization):* ANTHONY ZAVERGO    owner

4. Address: Number, Street, Suite 27 E.36ᵗʰ PLACE    **Verify initials**

   HOME-13465 W.83ᵗʰ PL.    ST. JOHN, IN 46373

   City STEGEN    State IL ZIP+4® 60475

5. Telephone Number *(Include Area Code)*
   (708)367-0801

6. Email Address
   TONY@MIDWESTDOCKSOLUTIONS.COM

7. Box Size(s) (Required) *See page 1 for details*    ☑ Size 1    ☐ Size 2    ☐ Size 3    ☐ Size 4    ☐ Size 5

8. Applicant must select and enter the ID Number for two items of valid identification listed below. You must present the IDs at a Post Office. One item must contain a photograph and one must be traceable to the bearer (prove your physical address). Both must be current.

   **Select one photo ID:**

   ☑ Valid driver's license or state non-driver's ID card

   ☐ Armed forces, government, university, or recognized corporate ID

   ☑ Passport, passport card, alien registration card, or certificate of naturalization

   **Photo ID Number:** Indiana

   **Select one non-photo ID:**

   ☐ Current lease, mortgage, or deed of trust

   ☐ Voter or vehicle registration card

   ☐ Home or vehicle insurance policy    exp.

   **Non-Photo ID Number:** 12-21-21

   Verify initials (For Post Office Use Only)

9. On the *back of this form*, list the name(s) of all individuals, including members of a business, who will be receiving mail at this (these) PO Box number(s).

10. On the *back of this form*, list the names of the persons or representatives of the business/organization authorized to pick up mail addressed to this (these) PO Box number(s).

**Optional Automatic Renewal Payment — Terms and Agreement (Required for 3-month payment option)**
By initialing below and establishing automatic renewal payments at a Post Office, I hereby authorize the U.S. Postal Service® (USPS®) to charge my credit card for the amount of my designated box size per USPS pricing on the scheduled interval I have selected (i.e., 3, 6, or 12 months). This charge could appear on my credit card statement as early as the 15th of the month prior to the due date. If I provided my email address, I understand that I will receive email notification at least 10 days prior to the actual credit card charge. I will also receive a payment due notice in my PO Box before the payment due date. I understand that I may cancel the automatic payment option any time after the initial application/payment process is complete during the business hours at the Post Office where my box is located. If I do not cancel by the 14th of the month prior to the next payment due date, I understand that the payment will be charged to my credit card. I understand that if the payment cannot be transacted due to incorrect or obsolete payment information or the transaction would exceed the credit limit of the account, or the bank or credit card company rejects/returns the payment request, my PO Box may be closed and any mail received after closure would be returned to the sender. If my PO Box is closed for nonpayment, I understand that I could be charged a late payment fee to reactivate my PO Box service. If there are any changes to my credit card number, billing address, or expiration date, I agree to notify the Post Office where my box is located of these changes. I understand that this agreement will remain in effect until I or USPS terminates the PO Box service. The USPS may receive updated credit card account information from the institution that issued the card identified for payment. If I decide to close my PO Box, I must visit the Post Office where my box is located during business hours. (See the PO Box refund policy for information on refunds.) The USPS may terminate my participation under this automatic payment agreement in the event I provide incorrect, false, or fraudulent account information or if I have any returned payment items.

**Customer Initials** AZ    **Billing Address** *(if different from address in 4 above).*

Number, Street, Suite _____

City _____    State _____    ZIP+4® _____

| Application Date | Number of Keys Issued | Customer Eligible for No-Fee Service |
|---|---|---|
| 01 11 2021 | 2 | ☐ Yes  ☑ No |

**Signature of Applicant** *(Same as item 3)* I certify that all information furnished on this form is accurate, truthful, and complete. I understand that anyone who furnishes false or misleading information on this form or omits information requested on this form may be subject to criminal and/or civil penalties, including fines and imprisonment.

Post Office Date Stamp

PS Form **1093-T**, January 2012 (Page 3 of 4) PSN 7530-13-000-7111. See our Privacy Act Statement on page 4 of this form.

**PLAINTIFF'S EXHIBIT**
**49**

## Application for Post Office Box™ Service

The Postal Service™ may consider it valid evidence that a person is authorized to remove mail from the box if that person possesses a key or combination to the box.

| 11. Names of individuals (including members of a business) who will be receiving mail at this (these) PO Box number(s) are listed below. | 12. Persons or representatives of the business/organization who are authorized to pick up mail addressed to this (these) PO Box number(s) are listed below. All names listed must have verifiable ID and upon request, present this identification to the Postal Service. |
|---|---|
| a. **Residential/Personal** Use – Each adult listed must present two forms of valid identification to the Post Office. | |
| b. **Business/Organization** Use – Each person listed must, upon request, present two forms of valid identification to the Post Office. | |
| A parent or guardian may receive the mail of minors by listing their names (no ID is required). | |
| ANTHONY ZARCENGO | SHENNI WEBBER |
| MIKE DICHENT | |
| | |
| | |
| | |
| Verify initials (for Post Office Use Only)_____ | Verify initials (for Post Office Use Only)_____ |

**Privacy Act Statement:** Your information will be used to provide Post Office Box™ service and to ensure delivery to the box. Collection is authorized by 39 U.S.C 401, 403, and 404. Providing the information is voluntary, but, if not provided, we will be unable to provide this service to you. We do not disclose your information to third parties without your consent, except to facilitate the transaction, to act on your behalf or request, or as legally required. This includes the following limited circumstances: to a congressional office on your behalf; to financial entities regarding financial transaction issues; to a U.S. Postal Service® auditor; to entities, including law enforcement, as required by law or in legal proceedings; to contractors and other entities aiding us to fulfill the service (service providers); to process servers; to domestic government agencies if needed as part of their duties, and to a foreign government agency for violations and alleged violations of law. Information concerning an individual box holder who has filed a protective court order with the postmaster will not be disclosed except pursuant to court order. For more information regarding our privacy policies, visit *usps.com/privacypolicy.*

*2011 United States Postal Service®. All Rights Reserved. The Eagle Logo, PO Box and Your Other Address are some of the many trademarks of the U.S. Postal Service®.

PS Form **1093-T,** January 2012 (Page 4 of 4) PSN 7530-13-000-7111

# THIS COULD BE YOUR OTHER ADDRESS™.

GET A PO BOX™. ONLY FROM THE U.S. POSTAL SERVICE®. SEE INSIDE FOR DETAILS ON HOW TO APPLY.





1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 65



WEBBATS BAT710B1

# P.O. Box Service Fee Notice
# STEGER

### 23 W 34TH ST, STEGER, IL 60475

### (708) 754-2128

MIDWEST DOCK SOLUTIONS
PO BOX 363
STEGER, IL 60475

Date of Notice:  12/01/2021
Box#   363
6 Months:  $42.00
12 Months:  $84.00
Due Date:  12/31/2021

Dear MIDWEST DOCK SOLUTIONS:

This is a friendly reminder that your Post Office Box or Caller Service renewal fee is due. If you have already paid this fee, please disregard this notice and thank you for your continued business with the United States Postal Service. If you have not yet submitted your payment, please do so now.

For your convenience, you can sign up at www.usps.com/poboxes and renew or manage your PO Box online. You can use your credit card to make a one-time payment or sign up for automatic payments so you never miss a due date. You can also renew your PO Box at any one of our Self-Service Kiosks located at select Post Offices nationwide. Go to www.usps.com/locator/welcome.htm and look for Self-Service Kiosks to find a location near you.

As always, payments can be made at the Post Office or mailed to the attention of the Postmaster at the address indicated above. Please make checks or money orders payable to the US Postal Service and include your PO Box number and ZIP Code. If paying by mail, a receipt will be delivered to your PO Box.

**Note:** Caller Service may only be paid **in person** or **by mail** unless enrolled in Enterprise PO Box Online (EPOBOL). (Enroll at https://postalpro.usps.com/EPS under the "Quick Links" section). Please be sure to include this notice with your remittance. Caller Service receipts will be provided at the caller service pickup window.

If your payment is not received by the due date, access to your PO Box will be blocked and caller services will be limited. If we have not received your payment by the 10th day after the due date, your PO Box service will be terminated, incoming mail will be returned to the sender, and, in addition to any unpaid monthly PO Box fees, you will be charged a handling fee to reopen your box. To avoid this inconvenience, we encourage you to renew on time.

As a reminder, your account information must be current. If your physical address or other pertinent information has changed since you applied for your PO Box, please ask a Sales and Service Associate at your Post Office to update the filed copy of your PS Form 1093, *Application for Post Office Box Service*.

To update your information for Caller Service, you can ask a Sales and Service Associate to update the PS 1093-C, *Application for Caller Service* .

You are a valued customer and we appreciate your business. Thank you,

POSTMASTER, STEGER



PLAINTIFF'S
EXHIBIT
50

MDS - 006597



**UNITED STATES POSTAL SERVICE.**

STEGER
23 W 34TH ST
STEGER, IL 60475-9998
(800)275-8777

12/30/2021                                    09:01 AM

| Product | Qty | Unit Price | Price |
|---|---|---|---|

Box Renewal                                           $42.00
  ZIP Code : 60475
  Box #: 353
  Rental Start Date: 01/01/2022
  Next Renewal Date: 06/30/2022
  Customer Name: ZARLENGO ANTHONY

Grand Total:                                          $42.00

Personal/Bus Check                                    $42.00

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
USPS is experiencing unprecedented volume
increases and limited employee
availability due to the impacts of
COVID-19. We appreciate your patience.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Preview your Mail
Track your Packages
Sign up for FREE @
https://informeddelivery.usps.com

Earn rewards on your business account
purchases of Priority Mail labels
with the USPS Loyalty program by
using Click and Ship. Visit
www.usps.com/smallbizloyalty
for more info.

All sales final on stamps and postage.
Refunds for guaranteed services only.
Thank you for your business.

Tell us about your experience.
Go to: https://postalexperience.com/Pos
or scan this code with your mobile device.

MDS - 006598



**UNITED STATES POSTAL SERVICE.**

STEGER
28 W 34TH ST
STEGER, IL 60475-9998
(800)275-8777

06/21/2022                                09:26 AM

- - - - - - - - - - - - - - - - - - - -
Product              Qty    Unit      Price
                            Price
- - - - - - - - - - - - - - - - - - - -
Box Renewal                           $42.00
    ZIP Code : 60475
    Box #: 363
    Rental Start Date   07/01/2022
    Next Renewal Date   12/31/2022
    Customer Name  ZARLENGO ANTHONY

Grand Total:                          $42.00

Credit Card Remitted                  $42.00
    Card Name: VISA
    Account #: XXXXXXXXXXXX▮
    Approval #: 087786
    Transaction #: 931
    AID: A0000000▮            Chip
    AL: VISA CREDIT
    PIN: Not Required       CHASE VISA

Every household in the U.S. is now
eligible to receive a third set
of 8 free test kits.
Go to www.covidtests.gov

Preview your Mail
Track your Packages
Sign up for FREE @
https://informeddelivery.usps.com

All sales final on stamps and postage.
Refunds for guaranteed services only.
Thank you for your business.

Tell us about your experience.
Go to: https://postalexperience.com/Pos
or scan this code with your mobile device.



or call 1-800-410-7420.

MDS - 006596



# UNITED STATES POSTAL SERVICE.

STEGER
23 W 34TH ST
STEGER, IL 60475-9998
(800)275-8777

12/29/2022                                09:24 AM

---

| Product | Qty | Unit Price | Price |
|---------|-----|------------|-------|

---

Box Renewal                                      $46.00
    ZIP Code™: 60475
    Box #: 363
    Rental Start Date: 01/01/2023
    Next Renewal Date: 06/30/2023
    Customer Name: ZARLENGO ANTHONY

---

Grand Total:                                     $46.00

---

Credit Card Remit                                $46.00
    Card Name: VISA
    Account #: XXXXXXXXXXXX█████
    Approval #: 02696G
    Transaction #: 088
    AID: A0000000█████          Chip
    AL: VISA CREDIT
    PIN: Not Required       CHASE VISA

---

Preview your Mail
Track your Packages
Sign up for FREE @
https://informeddelivery.usps.com

All sales final on stamps and postage.
Refunds for guaranteed services only.
Thank you for your business.

Tell us about your experience.
Go to: https://postalexperience.com/Pos
or scan this code with your mobile device.



MDS - 006595



**UNITED STATES POSTAL SERVICE.**

STEGER
23 W 34TH ST
STEGER, IL 60475-9998
(800)275-8777

06/07/2023                          09:07 AM

| Product | Qty | Unit Price | Price |
|---------|-----|------------|-------|
| Box Renewal | | | $48.00 |

ZIP Code : 60475
Box #: 363
Rental Start Date: 07/01/2023
Next Renewal Date: 12/31/2023
Customer Name: ZARLENGO ANTHONY

Grand Total:                        $48.00

Credit Card Remit                  $48.00
   Card Name: VISA
   Account #: XXXXXXXXXXX
   Approval #: 01145G
   Transaction #: 859
   AID: A00000000              Chip
   AL: VISA CREDIT
   PIN: Not Required      CHASE VISA

Preview your Mail
Track your Packages
Sign up for FREE @
https://informeddelivery.usps.com

All sales final on stamps and postage.
Refunds for guaranteed services only.
Thank you for your business.

Tell us about your experience.
Go to: https://postalexperience.com/Pos
or scan this code with your mobile device.



or call 1-800-410-7420.

MDS - 006594



**UNITED STATES POSTAL SERVICE**

STEGER
23 W 34TH ST
STEGER, IL 60475-9998
(800)275-8777

12/15/2023                        09:03 AM

| Product | Qty | Unit Price | Price |
|---------|-----|-----------|-------|

Box Renewal                        $50.00
  ZIP Code™: 60475
  Box #: 363
  Rental Start Date: 01/01/2024
  Next Renewal Date: 06/30/2024
  Customer Name: ZARLENGO ANTHONY

Grand Total:                       $50.00

Credit Card Remit                  $50.00
  Card Name: VISA
  Account #: XXXXXXXXXXX
  Approval #: 09546G
  Transaction #: 838
  AID: A00000000          Contactless
  AL: VISA CREDIT
  CHASE VISA

Preview your Mail
Track your Packages
Sign up for FREE @
https://informeddelivery.usps.com

All sales final on stamps and postage.
Refunds for guaranteed services only.
Thank you for your business.

Tell us about your experience.
Go to: https://postalexperience.com/Pos
or scan this code with your mobile device.



MDS - 006593

MDS - 006592





WEBBATS BAT710B1

## P.O. Box Service Fee Notice
### STEGER
23 W 34TH ST STEGER, IL 60475
(708) 754-2128

MIDWEST DOCK SOLUTIONS
PO BOX 363
STEGER, IL 60475

| | |
|---|---|
| Date of Notice: | 05/31/2024 |
| Box#: | 363 |
| 6 Months: | $51.00 |
| 12 Months: | $102.00 |
| Due Date: | 06/30/2024 |

### Dear MIDWEST DOCK SOLUTIONS

This is a friendly reminder that your Post Office Box or Caller Service renewal fee is due. If you have already paid this fee, please disregard this notice and thank you for your continued business with the United States Postal Service. If you have not yet submitted your payment, please do so now.

For your convenience, you can sign up at www.usps.com/poboxes and renew or manage your PO Box online. You can use your credit card to make a one-time payment or sign up for automatic payments so you never miss a due date. You can also renew your PO Box at any one of our Self-Service Kiosks located at select Post Offices nationwide. Go to www.usps.com/locator/welcome.htm and look for Self-Service Kiosks to find a location near you.

As always, payments can be made at the Post Office or mailed to the attention of the Postmaster at the address indicated above. Please make checks or money orders payable to the US Postal Service and include your PO Box number and ZIP Code. If paying by mail, a receipt will be delivered to your PO Box.

**Note:** Caller Service may only be paid in Enterprise PO Box Online (EPOBOL) (Enroll at https://postalpro.usps.com/EPS under the "Quick Links" section) Please be sure to include this notice with your remittance. Caller Service receipts will be provided through the EPOBOL Application.

If your payment is not received by the due date, access to your PO Box will be blocked and caller services will be limited. If we have not received your payment by the 10th day after the due date, your PO Box service will be terminated, incoming mail will be returned to the sender, and, in addition to any unpaid monthly PO Box fees, you will be charged a handling fee to reopen your box. To avoid this inconvenience, we encourage you to renew on time.

**As a reminder, your account information must be current. If your physical address or other pertinent information has changed since you applied for your PO Box, please ask a Sales and Service Associate at your Post Office to update the filed copy of your PS Form 1093, *Application for Post Office Box Service*.**

To update your information for Caller Service, you can ask a Sales and Service Associate to update the PS 1093-C, *Application for Caller Service*.

You are a valued customer and we appreciate your business. Thank you.

POSTMASTER, STEGER



**P.O. Box Service Fee Notice**
**STEGER**

23 W 34TH ST, STEGER, IL 60475
(708) 754-2128

WEBBATS BAT710B1

MIDWEST DOCK SOLUTIONS
PO BOX 363
STEGER, IL 60475

| | |
|---|---|
| Date of Notice: | 11/30/2024 |
| Box# | 363 |
| 6 Months: | $51.00 |
| 12 Months: | $102.00 |
| Due Date: | 12/31/2024 |

Dear MIDWEST DOCK SOLUTIONS:

This is a friendly reminder that your Post Office Box or Caller Service renewal fee is due. If you have already paid this fee, please disregard this notice and thank you for your continued business with the United States Postal Service. If you have not yet submitted your payment, please do so now.

For your convenience, you can sign up at www.usps.com/poboxes and renew or manage your PO Box online. You can use your credit card to make a one-time payment or sign up for automatic payments so you never miss a due date. You can also renew your PO Box at any one of our Self-Service Kiosks located at select Post Offices nationwide. Go to www.usps.com/locator/welcome.htm and look for Self-Service Kiosks to find a location near you.

As always, payments can be made at the Post Office or mailed to the attention of the Postmaster at the address indicated above. Please make checks or money orders payable to the US Postal Service and include your PO Box number and ZIP Code. If paying by mail, a receipt will be delivered to your PO Box.

Note: Caller Service may only be paid in Enterprise PO Box Online (EPOBOL). (Enroll at https://postalpro.usps.com/EPS under the "Quick Links" section). Please be sure to include this notice with your remittance. Caller Service receipts will be provided through the EPOBOL Application.

If your payment is not received by the due date, access to your PO Box will be blocked and caller services will be limited. If we have not received your payment by the 10th day after the due date, your PO Box service will be terminated, incoming mail will be returned to the sender, and, in addition to any unpaid monthly PO Box fees, you will be charged a handling fee to reopen your box. To avoid this inconvenience, we encourage you to renew on time.

**As a reminder, your account information must be current. If your physical address or other pertinent information has changed since you applied for your PO Box, please ask a Sales and Service Associate at your Post Office to update the filed copy of your PS Form 1093,** *Application for Post Office Box Service.*

**To update your information for Caller Service, you can ask a Sales and Service Associate to update the PS 1093-C,** *Application for Caller Service .*

You are a valued customer and we appreciate your business. Thank you,

POSTMASTER, STEGER

MDS - 006591



**UNITED STATES POSTAL SERVICE.**

```
                STEGER
             23 W 34TH ST
          STEGER, IL 60475-9998
             (800)275-8777

12/17/2024                        08:46 AM

Product              Qty    Unit      Price
                            Price

Box Renewal                           $51.00
    ZIP Code™: 60475
    Box #: 363
    Rental Start Date: 01/01/2025
    Next Renewal Date: 06/30/2025
    Customer Name: ZARLENGO ANTHONY


Grand Total:                          $51.00
                        -------------------
Credit Card Remit                     $51.00
    Card Name: VISA
    Account #: XXXXXXXXXX
    Approval #: 08845G
    Transaction #: 566
    AID: A0000000            Chip
    AL: VISA CREDIT
    PIN: Not Required    CHASE VISA
                        -------------------

          Preview your Mail
          Track your Packages
          Sign up for FREE @
     https://informeddelivery.usps.com

     All sales final on stamps and postage.
     Refunds for guaranteed services only.
          Thank you for your business.

       Tell us about your experience.
     Go to: https://postalexperience.com/Pos
     or scan this code with your mobile device,
```



```
       or call 1-800-410-7420.

                                  ----

UFN: 167458-0475
Receipt #: 840-56040059-2-4784948-3
Clerk: 45
```

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 66

# THE
# CINCINNATI INSURANCE COMPANIES

☒ THE CINCINNATI INSURANCE COMPANY  ☐ THE CINCINNATI INDEMNITY COMPANY
☐ THE CINCINNATI CASUALTY COMPANY

**Named Insured:**  DOCK & DOOR INSTALL INC

**Policy Number:**  ENP 026 56 14 / EBA 026 56 14

**Policy Period:**  07-22-2019 to 07-22-2022

**Effective Date of Change:**  03-24-2021

**Endorsement Number:**  2

**Agency Name:**  ASSUREDPARTNERS OF ILLINOIS 12-103
NAPERVILLE, IL

### Explanation of Billing

A change was recently made to your policy with The Cincinnati Insurance Companies.  Attached to this summary is the endorsement that amends your policy.

**The additional premium for this endorsement is $** ▮
This premium  is for the time period of  03-24-2021  to  07-22-2021. You will receive a statement based on the payment option you have selected.

Please contact your agency if you have any questions concerning your policy or statement:
ASSUREDPARTNERS OF ILLINOIS
1811 HIGH GROVE LN STE 139
NAPERVILLE, IL 60540-9100

630-355-2077

**This is not a bill. No payment is necessary at this time.**


PLAINTIFF'S EXHIBIT
240

**IA 4319 08 07**    CIC 00281

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## GENERAL CHANGE ENDORSEMENT

Attached to and forming part of:

| | | |
|---|---|---|
| Auto / Garage Policy Number  EBA 026 56 14 | All Other Policy Number  ENP 026 56 14 | Effective Date of Endorsement  03-24-2021 |

Issued to   DOCK & DOOR INSTALL INC
Agent  ASSUREDPARTNERS OF ILLINOIS 12-103
    NAPERVILLE, IL                                  Endorsement #  2

---

### PREMIUM INFORMATION

Premium Due at Endorsement Effective Date <u>REFER TO IA4319</u>

Subsequent Monthly Installments Increased by          $ _____

Revised Monthly Installment Payment(s)             $ _____

**It is agreed that the policy is amended as indicated by   ☒**

☐ **Policy Installment Premium Amended to:**
  ☐ Annual    ☐ Semi-Annual    ☐ Quarterly
☐ **Named Insured**

☒ **Mailing Address**
  PO BOX 363
  STEGER, IL 60475-0363

☐ **Form(s) Added**

☐ **Form(s) Deleted**

**All Other Reason for Change**

**Auto / Garage Reason for Change**

03-25-2021 09:07

IA 4329 12 09                    CIC 00282                    Page  1 of  1

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 67





# THE CINCINNATI
## INSURANCE COMPANIES



**Statement – Premium Due**

**Statement Prepared On:** 02/28/2022

**Questions regarding your insurance coverage:**
AssuredPartners of Illinois
(630)355-2077

**Questions regarding your statement:**
Cincinnati Corporate Billing
877-942-2455, *CinciBill@cinfin.com*
Monday-Friday, 7:30 a.m.- 6 p.m. Eastern Time
Saturday, 8 a.m.– noon Eastern Time

000259   128   ███████   12103 03
DOCK & DOOR INSTALL INC
PO BOX 363
STEGER IL 60475-0363

| Pay Online or by Phone: | cinfin.com<br>800-364-3400<br><br>Payments may be made by checking, savings or credit card. We accept Visa®, MasterCard®, Discover®, and American Express® cards.<br><br>Payments confirmed prior to 3 p.m. Eastern Time are applied the same business day, Monday-Friday, excluding bank holidays. |
|---|---|
| Payment Address: | The Cincinnati Insurance Company<br>P.O. Box 145620<br>Cincinnati, OH 45250 - 5620 |
| Overnight Payment Address: | The Cincinnati Insurance Company<br>Attention: Corporate Accounts Receivable<br>6200 South Gilmore Road<br>Fairfield, OH 45014 - 5141 |

| **Amount Due:** | **$654.00** |
|---|---|
| **Due Date:** | **03/22/2022** |

**Account Number:** ███████
**Policy Number(s) with Premium Due:**
0265614

--

--

---

**Please detach and return the remittance stub below with your payment.**

Make check payable to: **THE CINCINNATI INSURANCE COMPANY.** *Please include your account number on the check. Do not send cash. If paying multiple accounts include the remittance stub for each.

| Account Number | Due Date | Amount Due |
|---|---|---|
| ███████ | 03/22/2022 | $654.00 |

☐ Please mark for change of address and complete the reverse side.

**Late Payments:** A fee of up to $25 and/or account cancellation may result if the total amount due is not received and posted by the due date.

DOCK & DOOR INSTALL INC
PO BOX 363
STEGER IL 60475-0363

THE CINCINNATI INSURANCE COMPANY
PO BOX 145620
CINCINNATI OH 45250 -5620



PLAINTIFF'S EXHIBIT
48

11  1  1000215088  03222022  000000065400  3

Page 2 of 5

**Payor Name:** DOCK & DOOR INSTALL INC     **Account Number:** ███████

---

**FUTURE ACCOUNT STATEMENTS AS OF  02/28/2022 :**

| Statement Date | Due Date | Premium Due |
|---|---|---|
| 03/31/2022 | 04/22/2022 | $649.00 |
| 04/28/2022 | 05/22/2022 | $649.00 |
| 05/31/2022 | 06/22/2022 | $649.00 |
| **Total** | | $1,947.00 |

| | |
|---|---|
| Current Amount Due | $654.00 |
| Scheduled Installment Premium Due | $1,947.00 |
| Amount to Pay Account Through 06/22/2022 Due Date | $2,601.00 |

*Account activity may result in changes to the following information provided above: Statement Date, Due Date, and Premium Due.*

*Future billing may be suspended if you receive a cancellation for non-payment of premium, which may result in multiple installments being combined on your next account statement.*

*Each policy installment not paid by electronic funds transfer (EFT) may include an installment fee of up to $5, not to exceed the amount filed with and approved in your state. Installment fees are assessed at invoicing and are not included in the premiums shown above. Worker's Compensation policies are not subject to installment fees.*

**Account Number:** ██████     **Policy Number(s):** 0265614

**Change of Address**
  *Please print clearly in blue or black ink.

☐ Billing Address (applies to all policies)
☐ Policy Mailing Address  ☐ All Policies  ☐ List Selected Policies ———————————

Street Address  ——————————————————————————

City, State  ——————————————————————————

Zip Code  ————————————   Area Code and Business Phone  ——————

Email Address  ————————————————




## THE CINCINNATI
### INSURANCE COMPANIES



**Statement – Premium Due**

**Statement Prepared On:** 10/31/2024

**Questions regarding your insurance coverage:**
AssuredPartners of Illinois
(630)355-2077

**Questions regarding your statement:**
Cincinnati Corporate Billing
877-942-2455, CinciBill@cinfin.com
Monday-Friday, 7:30 a.m.- 6 p.m. Eastern Time
Saturday, 8 a.m.- noon Eastern Time

000732  128  ███████  12103
DOCK & DOOR INSTALL INC
PO BOX 363
STEGER IL 60475-0363

| Pay Online or by Phone: | cinfin.com<br>800-364-3400 |
|---|---|
| | Payments may be made by checking, savings or credit card. We accept Visa®, MasterCard®, Discover® and American Express® cards for online and phone payments. |
| | PayPal™, PayPal Credit and Venmo™ are accepted for online payments. |
| | All payments confirmed prior to 3 p.m. Eastern Time are applied the same day. |
| Payment Address: | The Cincinnati Insurance Company<br>P.O. Box 145620<br>Cincinnati, OH 45250 - 5620 |
| Overnight Payment Address: | The Cincinnati Insurance Company<br>Attention: Corporate Accounts Receivable<br>6200 South Gilmore Road<br>Fairfield, OH 45014 - 5141 |

| **Amount Due:** | $1,235.00 |
|---|---|
| **Due Date:** | 11/22/2024 |

**Payment Method:** Direct Invoice

**Account Number:** ███████
**Policy Number(s) with Premium Due:**
0265614

Register your account at: cinfin.com/register/billing-account
Registration Code:   DcVPJwHn

---

**Please detach and return the remittance stub below with your payment.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Make check payable to: **THE CINCINNATI INSURANCE COMPANY.** *Please include your account number on the check. Do not send cash. If paying multiple accounts include the remittance stub for each.

| Account Number | Due Date<br>11/22/2024 | Amount Due<br>$1,235.00 |
|---|---|---|
| ███████ | | |

**Late Payments:** A fee of up to $25 and/or account cancelation may result if the total amount due is not received and posted by the due date.

DOCK & DOOR INSTALL INC
PO BOX 363
STEGER IL 60475-0363

☐ Please mark for change of address and complete the reverse side.

THE CINCINNATI INSURANCE COMPANY
PO BOX 145620
CINCINNATI OH 45250 -5620

11  1  1000215088  11222024  000000123500  7



Page 2 of 5

**Payor Name:** DOCK & DOOR INSTALL INC          **Account Number:** ████████

## FUTURE ACCOUNT STATEMENTS AS OF  10/31/2024:

| Statement Date | Due Date | Premium Due |
|---|---|---|
| 11/26/2024 | 12/22/2024 | $1,230.00 |
| 12/30/2024 | 01/22/2025 | $1,230.00 |
| 01/30/2025 | 02/22/2025 | $1,230.00 |
| 02/27/2025 | 03/22/2025 | $1,230.00 |
| 03/31/2025 | 04/22/2025 | $1,230.00 |
| 04/30/2025 | 05/22/2025 | $1,230.00 |
| 05/29/2025 | 06/22/2025 | $1,230.00 |
| **Total** | | $8,610.00 |

| | |
|---|---|
| Current Amount Due | $1,235.00 |
| Scheduled Installment Premium Due | $8,610.00 |
| Amount to Pay Account Through 06/22/2025 Due Date | $9,845.00 |

*Account activity may result in changes to the following information provided above: Statement Date, Due Date, and Premium Due.*

*Future billing may be suspended if you receive a cancelation for non-payment of premium, which may result in multiple installments being combined on your next account statement. An installment fee of up to $5.00, not to exceed the amount filed with and approved in your state, may apply to each installment on policies contained within your account. Installment fees are assessed at invoicing and are not included in the premiums shown above. Installment fees do not apply to policies paid by Electronic Funds Transfer (EFT) or Automatic Payment\* when paid by a checking or savings account or debit card. Automatic Payments paid via credit card, PayPal™, PayPal Credit and Venmo™ may include an installment fee. Workers Compensation policies are not subject to installment fees.*

*\*EFT and Automatic Payments are not available in TX.*

**Account Number:** ███████   **Policy Number(s):** 0265614

## Change of Address
\*Please print clearly in blue or black ink.

☐ Billing Address (applies to all policies)
☐ Policy Mailing Address  ☐ All Policies  ☐ List Selected Policies _____

Street Address  _____

City, State  _____

Zip Code  _____  Area Code and Business Phone  _____

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 68

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH  ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME  ☐ SEND MORE FORMS

25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 23.340 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

DUE BY 4/15/2021

DOCK & DOOR INSTALL, INC.
PO BOX 363
STEGER IL 60475-0363

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY **4** % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

MARCH 2021

Month of

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 157.5 | 317.52 | 7937.93 |
| | CRUIKSHANK DONALD | 272- | X | 159.5 | 317.52 | 7937.93 |
| | GREEN DAVID J | 272-JNY | X | 153 | 304.89 | 7622.35 |
| | KELLY NICOLAS J | 272-APP | X | 149 | 189.36 | 4734.00 |
| | RODGERS JACOB H | 174-JNY | X | 136 | 271.88 | 6797.00 |
| | ZARLENGO COLLIN M | 272-APP | X | 48.5 | 61.23 | 1530.66 |
| | Borkstrom, Edward | 272-APP | | 88 | 111.09 | 2777.28 |
| | Pineda, Jose O | 13-JNY | | 98 | 190.32 | 4757.70 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

| | | | |
|---|---|---|---|
| Total this month | 991.5 | $1763.81 | $ 44095.05 |
| (1) Amount due at $ 36.400 per hour | $ 36,090.60 | | |
| | + (2) Total dues withheld | $ 1763.81 | |
| | = Subtotal | $ 37,854.41 | |
| | Prior Balance Due or (Cr. Available) | $ | |
| | Grand Total | $ 37,854.41 | |

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

PLAINTIFF'S EXHIBIT 42

REPORT MUST BE SIGNED! ➤ AUTHORIZED SIGNATURE _Tony Brusca_

TITLE _President_

OWNER-PARTNER-OFFICER

CC-202-R 2/11

CHICAGO REGIONAL COUNCIL OF CARPENTERS
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1

25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 23.340 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

**SEE INSTRUCTIONS ON REVERSE**

☐ NO EMPLOYEES THIS MONTH  ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME  ☐ SEND MORE FORMS

DUE BY 5/15/2021

DOCK DOOR INSTALL, INC.
PO BOX 363
STEGER IL 60475-0363

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

APRIL 2021

Month of

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 95 | 184.49 | 4612.25 |
| | CRUIKSHANK DONALD | 272-JNY | X | 93.5 | 182.06 | 4551.56 |
| | GREEN DAVID J | 272-JNY | X | 104 | 201.97 | 5049.20 |
| | KELLY NICOLAS J | 272-APP | X | 106 | 134.45 | 3361.14 |
| | RODGERS JACOB H | 174-JNY | X | 0 | 0.00 | 0.00 |
| | ZARLENGO COLLIN M | 272-APP | X | 45.5 | 57.75 | 1443.87 |

MUST BE SHOWN!  WATCH SPELLING!  PLEASE PRINT!

AN 'X' INDICATES THE REGIONAL COUNCIL HAS A DUES
CHECKOFF AUTHORIZATION FORM ON FILE

REPORT DUE ON OR BEFORE THE 15TH OF
THE MONTH. LATE PAYMENTS WILL BE
CHARGED 1.5% PER MONTH, COMPOUNDED,
AS LIQUIDATED DAMAGES!

| | | | |
|---|---|---|---|
| Total this month | | 444 | $ 760.72 $ 19,018.02 |
| (1) Amount due at $ 36.400 per hour | $ | 16,161.60 | |
| + (2) Total dues withheld | $ | 760.72 | |
| = Subtotal | $ | 16,922.32 | |
| Prior Balance Due or (Cr. Available) | $ | | |
| Grand Total | $ | 16,922.32 | |

We certify the above is a true and complete report of actual hours worked by foremen, journeymen,
and apprentice carpenters, and does NOT include hours worked by any self-employed persons,
partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all
of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations
of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are
maintained. We agree to keep and maintain contemporaneous time records reporting the hours
being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT
MUST BE
SIGNED!

AUTHORIZED
SIGNATURE  *Tony Brown*

TITLE  *President*
OWNER-PARTNER-OFFICER

CC-302-B 2/1

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1          25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 23.340 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

**SEE INSTRUCTIONS ON REVERSE**

L⎽ NO EMPLOYEES THIS MONTH     L⎽ CHANGE OF ADDRESS

⎽ CHANGE OF NAME     L⎽ SEND MORE FORMS

DUE BY  6/15/2021

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY   4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

DOCK DOOR INSTALL, INC.
PO BOX 363
STEGER IL  60475-0363

Month of       MAY      2021

MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 40 | 77.68 | 1,942.00 |
| | BORKSTROM EDWARD J | 272-APP | X | 0 | 0.00 | 0.00 |
| | CRUIKSHANK DONALD | 272- | X | 35 | 67.97 | 1,699.25 |
| | GREEN DAVID J | 272-JNY | X | 44 | 85.45 | 2,136.20 |
| | KELLY NICOLAS J | 272-APP | X | 46 | 58.07 | 1,451.76 |
| | PINEDA JOSE O | 13-JNY | X | 0 | 0.00 | 0.00 |
| | RODGERS JACOB H | 174-JNY | X | 0 | 0.00 | 0.00 |
| | ZARLENGO COLLIN M | 272-APP | X | 15 | 18.94 | 473.40 |

Total this month          180       $ 308.11     $ 7,702.61

(1) Amount due at $            per hour $ 6,552.00

+ (2) Total dues withheld $ 308.11   36.400

= Subtotal $ 6,860.11

Prior Balance Due or (Cr. Available)

Grand Total $ 6,860.11

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours be reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE   Tony Brussi

TITLE   President
OWNER-PARTNER-OFFICER

CC-202-R 2/11

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1    25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 24.760 |
| Appren. | .680 |
| INTL FND | .110 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

## *SEE INSTRUCTIONS ON REVERSE*

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY   7/15/2021

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY  4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

DOCK DOOR INSTALL, INC.
PO BOX 363
STEGER IL  60475-0363

Month of   JUNE    2021

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 124 | 240.81 | 6020.20 |
| | CRUIKSHANK DONALD | 272- | X | 96 | 186.43 | 4660.80 |
| | GREEN DAVID J | 272-JNY | X | 114 | 221.39 | 5534.70 |
| | KELLY NICOLAS J | 272-APP | X | 105.5 | 147.89 | 3697.22 |
| | ZARLENGO COLLIN M | 272-APP | X | 118 | 148.96 | 37.24.08 |

MUST BE SHOWN!  WATCH SPELLING!  PLEASE PRINT!   2/291

| | | |
|---|---|---|
| Total this month | 557.5 | $ 945.48 | $ 23637.00 |

(1) Amount due at $ 37.880 per hour | $ 21,118.1
+ (2) Total dues withheld | $ 945.48
= Subtotal | $ 22,063.58
Prior Balance Due or (Cr. Available) | $
Grand Total | $ 22,063.58

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT MUST BE SIGNED! ►

AUTHORIZED SIGNATURE   *Tony Breves*

TITLE   *President*

OWNER-PARTNER-OFFICER

CC-202-R 2/11

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1    25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 24.760 |
| Appren. | .680 |
| INTL FND | .110 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH    ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME    ☐ SEND MORE FORMS

DUE BY  8/15/2021

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY  4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

DOCK & DOOR INSTALL, INC.
PO BOX 363
STEGER IL 60475-0363

Month of    JULY    2021

MUST BE SHOWN!  WATCH SPELLING!  PLEASE PRINT!

| Participant I.D. Number | Carpenter's Name | Local & Class | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X 145 | 303.13 | 7,578.14 |
| | CRUIKSHANK DONALD | 272- | X 155 | 315.33 | 7,883.30 |
| | GREEN DAVID J | 272-JNY | X 145 | 294.99 | 7,374.70 |
| | KELLY NICOLAS J | 272-APP | X 115 | 193.68 | 4,842.11 |
| | ZARLENGO COLLIN M | 272-APP | X 117 | 154.72 | 3,868.02 |
| | Mantoon Jr. Richard B | 272 APP | 80 | 65.09 | 1,627.20 |
| | Morales, Fabian | 272 APP | 16 | 26.04 | 651.04 |

| | | | |
|---|---|---|---|
| Total this month | | 773 | $1,352.98 | $33,824.51 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

(1) Amount due at $    per hour $ 29,281.24

37,880

+ (2) Total dues withheld $ 1,352.98

= Subtotal $ 30,634.22

Prior Balance Due or (Cr. Available) $

Grand Total $ 30,634.22

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE  Tony Bruzzi

TITLE  President

OWNER-PARTNER-OFFICER

CC-202-R 2/11

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1          25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 24.760 |
| Appren. | .680 |
| INT'L FND | .110 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### *SEE INSTRUCTIONS ON REVERSE*

☐ NO EMPLOYEES THIS MONTH     ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME     ☐ SEND MORE FORMS

DUE BY  9/15/2021

DOCK & DOOR INSTALL, INC.
PO BOX 363
STEGER IL 60475-0363

**\*NOT APPLICABLE FOR WORK PERFORMED UNDER THE RESIDENTIAL AGREEMENT**
DUES CHECKOFF IS CURRENTLY  4  % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of     AUGUST     2021

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 130 | 266.51 | 6,662.66 |
| | CRUIKSHANK DONALD | 272-JNY | X | 123 | 259.39 | 6,484.65 |
| | GREEN DAVID J | 272-JNY | X | 130 | 266.51 | 6,662.66 |
| | KELLY NICOLAS J | 272-APP | X | 117.5 | 191.24 | 4,781.08 |
| | ZARLENGO COLLIN M | 272-APP | X | 119.5 | 196.13 | 4,903.15 |
| | Mantoan Jr., Richard B | 272-APP | | 52 | 43.93 | 1,098.36 |
| | Rodgers, Jacob | 272-JNY | | 40 | 81.38 | 2,034.40 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**MUST BE SHOWN!     WATCH SPELLING!     PLEASE PRINT!**     2/396

**REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!**

Total this month: 712 | $1,305.08 | $32,626.96

(1) Amount due at $ ____ per hour: $26,970.56
37.880
+ (2) Total dues withheld: $1,305.08
= Subtotal: $28,275.64
Prior Balance Due or (Cr. Available): $
Grand Total: $28,275.64

AN 'X' INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

**SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:**
**CHICAGO CARPENTERS TRUST FUNDS**
P.O. BOX 94432
CHICAGO, IL 60690

REPORT MUST BE SIGNED! ▶

AUTHORIZED SIGNATURE  _Anthony Brussi_

TITLE  _President_

OWNER-PARTNER-OFFICER

CC-202-R 2/1

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
## Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

### SEE INSTRUCTIONS ON REVERSE

PAGE NO. **1**

ACCOUNT NO. **25435**

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 24.760 |
| Appren. | .680 |
| INTL FND | .110 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS
☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY 10/15/2021

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY **4** % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

DOCK & DOOR INSTALL, INC.
PO BOX 363
STEGER IL 60475-0363

Month of **SEPTEMBER 2021**

MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 96 | 203.44 | 5,086.00 |
| | CRUIKSHANK DONALD | 272- | X | 56 | 122.06 | 3,051.60 |
| | GREEN DAVID J | 272-JNY | X | 100 | 209.54 | 5,238.58 |
| | KELLY NICOLAS J | 272-APP | | 92.50 | 157.06 | 3,926.59 |
| | MANTOAN JR RICHARD B | 272-APP | | 70 | 59.39 | 1,484.82 |
| | MORALES FABIAN S | 272-APP | X | 0 | 0.00 | 0.00 |
| | ZARLENGO COLLIN M | 272-APP | X | 96 | 162.76 | 4,069.00 |
| | Rodgers, Jacob | 174,JNY | | 104 | 219.72 | 5,492.88 |

| | | |
|---|---|---|
| Total this month | 614.5 | $1,133.98 | $28,347.47 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

(1) Amount due at $ 37.880 per hour $ 23,277.26
+ (2) Total dues withheld $ 1,133.98
= Subtotal $ 24,411.24
Prior Balance Due or (Cr. Available) $
Grand Total $ 24,411.24

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE   _Tony Brunti_
TITLE   President
OWNER-PARTNER-OFFICER

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1          25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 24.760 |
| Appren. | .680 |
| INTL FND | .110 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

*SEE INSTRUCTIONS ON REVERSE*

☐ NO EMPLOYEES THIS MONTH    ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME    ☐ SEND MORE FORMS

DUE BY 11/15/2021

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY ⁴ % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

DOCK & DOOR INSTALL, INC.
PO BOX 363
STEGER IL 60475-0363

Month of     OCTOBER    2021

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 88 | 170.89 | 4,272.24 |
| | CRUIKSHANK DONALD | 272-JNY | X | 44 | 89.51 | 2,237.84 |
| | GREEN DAVID J | 272-JNY | X | 91 | 185.13 | 4,628.26 |
| | KELLY NICOLAS J | 272-APP | X | 112 | 183.92 | 4,597.97 |
| | MANTOAN JR RICHARD B | 272-APP | | 40 | 32.54 | 813.60 |
| | RODGERS JACOB H | 174-JNY | X | 40 | 81.38 | 2,034.40 |
| | ZARLENGO COLLIN M | 272-APP | X | 77 | 125.33 | 3,133.13 |

MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

AN 'X' INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

Total this month    488 (492) $ 868.70 | $ 21,717.44

(1) Amount due at $ _____ per hour $ 18,485.44 ̶1̶8̶,̶6̶3̶6̶.̶9̶6̶

+ (2) Total dues withheld    37.880 $ 868.70

= Subtotal $ 19,354.14

Prior Balance Due or (Cr. Available) $

Grand Total $ 19,354.14

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

( 151.52 )
owe

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE    *Tony Brusè*

TITLE    *President*

OWNER-PARTNER-OFFICER

CC-202-R 2/1

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1                    25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 24.760 |
| Appren. | .680 |
| INTL FND | .110 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

**SEE INSTRUCTIONS ON REVERSE**

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY 12/15/2021

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DOCK & DOOR INSTALL, INC.
PO BOX 363
STEGER IL 60475-0363

DUES CHECKOFF IS CURRENTLY  4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

NOVEMBER   2021

MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!   A/682   Month of

| Participant I.D. Number | Carpenter's Name | Local & Class | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X 127.5 | 259.39 | 6,484.65 |
| | CRUIKSHANK DONALD | 272- | X 168 | 349.92 | 8,747.92 |
| | GREEN DAVID J | 272-JNY | X 134.5 | 273.63 | 6,840.67 |
| | KELLY NICOLAS J | 272-APP | X 143 | 244.95 | 6,123.85 |
| | MANTOAN JR RICHARD B | 272-APP | 78 | 69.16 | 1,728.90 |
| | RODGERS JACOB H | 174-JNY | X 136 | 329.83 | 8,245.67 |
| | ZARLENGO COLLIN M | 272-APP | X 118 | 203.45 | 5,086.25 |

| | | | | | |
|---|---|---|---|---|---|
| Total this month | | | 905 | $1,730.32 | $43,257.91 |

REPORT DUE ON OR BEFORE THE 15TH OF
THE MONTH. LATE PAYMENTS WILL BE
CHARGED 1.5% PER MONTH, COMPOUNDED,
AS LIQUIDATED DAMAGES!

(1) Amount due at $ 37.880 per hour   $ 34,281.40
+ (2) Total dues withheld   $ 1,730.32
= Subtotal   $ 36,011.72
Prior Balance Due or (Cr. Available)   $
Grand Total   $ 36,011.72

AN 'X' INDICATES THE REGIONAL COUNCIL HAS A DUES
CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT
MUST BE
SIGNED!

AUTHORIZED
SIGNATURE   Tony Bruno

TITLE   President
OWNER-PARTNER-OFFICER

CC-202-R 2/1

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1   25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 24.760 |
| Appren. | .680 |
| INTL FND | .110 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

**SEE INSTRUCTIONS ON REVERSE**

☐ NO EMPLOYEES THIS MONTH    ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME    ☐ SEND MORE FORMS

DUE BY  1/15/2022

DOCK & DOOR INSTALL, INC.
PO BOX 363
STEGER IL 60475-0363

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY  4  % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of   DECEMBER  2021

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 200 | 423.16 | 10,578.88 |
| | CRUIKSHANK DONALD | 272- | X | 194 | 412.98 | 10,324.58 |
| | GREEN DAVID J | 272-JNY | X | 175.50 | 365.17 | 9,129.37 |
| | KELLY NICOLAS J | 272-APP | X | 202 | 345.05 | 8,626.28 |
| | MANTOAN JR RICHARD B | 272-APP | | 168 | 139.94 | 3,498.48 |
| | RODGERS JACOB H | 174-JNY | X | 204 | 434.36 | 10,884.04 |
| | ZARLENGO COLLIN M | 272-APP | X | 182 | 314.13 | 7,853.17 |
| | Borkstrom, Edward | 272-APP | | 135 | 226.24 | 5,655.91 |
| | Senter, Andre | 272-APP | | 24 | 31.74 | 793.44 |
| | | | | | 2,693.77 | |

| | | | |
|---|---|---|---|
| Total this month | | 1,484.50 | $ ~~2,693.77~~ | $ 67,344.15 |
| (1) Amount due at $  per hour | $ | 56,232.86 | |
| + (2) Total dues withheld | $ | 2,693.77 | |
| = Subtotal | $ | 56,926.63 | |
| Prior Balance Due or (Cr. Available) | $ | | |
| Grand Total | $ | 58,926.63 | |

**REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!**

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE   Tony Bruzzi

TITLE   President
OWNER-PARTNER-OFFICER

CC-202-R 2/

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1          25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 24.760 |
| Appren. | .680 |
| INTL FND | .110 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### *SEE INSTRUCTIONS ON REVERSE*

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY  2/15/2022

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY  4  % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

DOCK & DOOR INSTALL, INC.
PO BOX 363
STEGER IL 60475-0363

JANUARY   2022

Month of

MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 119 | ~~258.00~~ 238 | 6,255.78 |
| | CRUIKSHANK DONALD | 272- | X | 160 | 333.64 | 8,341.04 |
| | GREEN DAVID J | 272-JNY | X | 137 | 293.97 | 7,349.27 |
| | KELLY NICOLAS J | 272-APP | X | 145 | 246.58 | 6,164.54 |
| | MANTOAN JR RICHARD B | 272-APP | | 72.5 | 62.24 | 1,556.01 |
| | RODGERS JACOB H | 174-JNY | X | 136 | 284.82 | 7,120.90 |
| | ZARLENGO COLLIN M | 272-APP | X | ~~128~~ 149 | 252.28 | ~~6,330.86~~ |
| | Borkstrom, Edward | 272-APP | | 103 | 173.34 | 4,333.49 |
| | Rodriguez, Ricardo | 272-APP | | 8 | 8.14 | 203.44 |
| | Senter, Andre | 272-APP | | 31 | 45.62 | 1,140.57 |
| | Pineda, Jose' O | 13-JNY | | 128 | 268.54 | 6,713.52 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

Total this month  1,188.50  $ 2,219.40  $55,485.02

(1) Amount due at $ _____ per hour  $ 45,020.38
37,880
+ (2) Total dues withheld  $ 47,239.78

= Subtotal  $

AN 'X' INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

Prior Balance Due or (Cr. Available)  $

Grand Total  $ 47,239.78

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT MUST BE SIGNED! ▶

AUTHORIZED SIGNATURE   Tony Bruni

TITLE   President

OWNER-PARTNER-OFFICER

CC-202-R 2/11

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1                    25435

| | |
|---|---|
| Health | 11.790 |
| Pen/Supp | 24.760 |
| Appren. | .680 |
| INTL FND | .110 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

**SEE INSTRUCTIONS ON REVERSE**

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY   3/15/2022

DOCK DOOR INSTALL, INC.
PO BOX 363
STEGER IL 60475-0363

FEBRUARY 2022

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

| MUST BE SHOWN! WATCH SPELLING! PLEASE PRINT! | | | | | |
|---|---|---|---|---|---|
| **Participant I.D. Number** | **Carpenter's Name** | **Local & Class** | **X** | **Total Actual Hours Worked (1)** | **Dues Withheld (2)** | **Gross Wages** |
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 153.5 | 318.38 | 7,959.59 |
| | BORKSTROM EDWARD J | 272-APP | X | 0 | 0.00 | 0.00 |
| | CRUIKSHANK DONALD | 272-JNY | X | 145.5 | 302.11 | 7,552.71 |
| | GREEN DAVID J | 272-JNY | X | 145 | 294.99 | 7,374.70 |
| | KELLY NICOLAS J | 272-APP | X | 142 | 243.33 | 6,083.16 |
| | MANTOAN JR RICHARD B | 272-APP | | 76 | 78.11 | 1,952.64 |
| | RODGERS JACOB H | 174-JNY | X | 122 | 256.33 | 6,408.36 |
| | SENTER ANDRE W | 272-APP | | 0 | 0.00 | 0.00 |
| | ZARLENGO COLLIN M | 272-APP | X | 134 | 229.49 | 5,737.29 |
| | Corrigan, Zachery | 1693-APP | | 80 | 105.79 | 2,644.80 |
| | Jansma, Eric C | 174-JNY | | 104 | 219.72 | 5,492.88 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | Total this month | | | 1,122 | $ 2,048.24 | $ 51,206.13 |

REPORT DUE ON OR BEFORE THE 15TH OF
THE MONTH. LATE PAYMENTS WILL BE
CHARGED 1.5% PER MONTH, COMPOUNDED,
AS LIQUIDATED DAMAGES!

(1) Amount due at $ 37,880 per hour   $ 42,501.36
+ (2) Total dues withheld   $ 2,048.24
= Subtotal   $ 44,549.60
Prior Balance Due or (Cr. Available)   $
Grand Total   $ 44,549.60

AN 'X' INDICATES THE REGIONAL COUNCIL HAS A DUES
CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen,
and apprentice carpenters, and does NOT include hours worked by any self-employed persons,
partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all
of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations
of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are
maintained. We agree to keep and maintain contemporaneous time records reporting the hours
being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE   Tony Bruno

TITLE   President

OWNER-PARTNER-OFFICER

CC-202-R 2/1

## Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

**SEE INSTRUCTIONS ON REVERSE**
www.carpenterbenefits.org

| Health | 11.790 |
| Pen/Supp | 24.760 |
| Appren. | .680 |
| INTL FND | .110 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

☐ NO EMPLOYEES THIS MONTH  ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME  ☐ SEND MORE FORMS

DUE BY  4/15/2022

DOCK DOOR INSTALL, INC.
PO BOX 363
STEGER IL 60475-0363

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

MARCH  2022

**Month of**

MUST BE SHOWN!  WATCH SPELLING!  PLEASE PRINT!

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 128 | 260.40 | 6,510.08 |
| | BORKSTROM EDWARD J | 272-APP | X | 0 | 0.00 | 0.00 |
| | CRUIKSHANK DONALD | 272-JNY | | 162 | 331.61 | 8,290.18 |
| | GREEN DAVID J | 272-JNY | X | 136 | 276.68 | 6,916.96 |
| | KELLY NICOLAS J | 272-APP | X | 150 | 250.65 | 6,266.26 |
| | MANTOAN JR RICHARD B | 272-APP | | 136 | 110.65 | 2,766.24 |
| | PINEDA JOSE O | 13-JNY | X | 0 | 0.00 | 0.00 |
| | RODGERS JACOB H | 174-JNY | | 160 | 325.50 | 8,137.60 |
| | RODRIGUEZ RICARDO | 272-APP | | 0 | 0.00 | 0.00 |
| | SENTER ANDRE W | 272-APP | | 0 | 0.00 | 0.00 |
| | ZARLENGO COLLIN M | 272-APP | X | 146 | 249.02 | 6,225.57 |
| | Corrigan, Zachery | 1693-APP | | 122 | 161.33 | 4,033.32 |
| | Jansma, Eric C | 174-JNY | | 160 | 325.50 | 8,137.60 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

| | | |
|---|---|---|
| Total this month | 1300 | $2,291.34 | $57,283.81 |

(1) Amount due at $ 37.880 per hour $ 49,244.00

+ (2) Total dues withheld $ 2,291.34

= Subtotal $ 51,535.34

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

Prior Balance Due or (Cr. Available) $

Grand Total $ 51,535.34

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE  Tony Bruno

TITLE  President

OWNER-PARTNER-OFFICER

CC-202-R 2/1

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1    25435

| | |
|---|---|
| Health | 11.790 |
| Pen/Supp | 24.760 |
| Appren. | .680 |
| INTL FND | .110 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

**SEE INSTRUCTIONS ON REVERSE**
www.carpenterbenefits.org

☐ NO EMPLOYEES THIS MONTH    ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME    ☐ SEND MORE FORMS

DUE BY  5/15/2022

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY  4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

DOCK DOOR INSTALL, INC.
PO BOX 363
STEGER IL 60475-0363

APRIL    2022

MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!

Month of

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 168 | 341.78 | 8,544.48 |
| | CORRIGAN ZACHARY R | 1693-APP | | 116.5 | 154.06 | 3,851.49 |
| | CRUIKSHANK DONALD | 272-JNY | X | 204 | 431.29 | 10,782.32 |
| | GREEN DAVID J | 272-JNY | X | 192 | 390.60 | 9,765.12 |
| | JANSMA ERIC C | 174-JNY | X | 16 | 32.55 | 813.76 |
| | KELLY NICOLAS J | 272-APP | X | 167.5 | 273.44 | 6,835.93 |
| | MANTOAN JR RICHARD B | 272-APP | | 125 | 104.96 | 2,623.86 |
| | RODGERS JACOB H | 174-JNY | X | 16 | 32.55 | 813.76 |
| | ZARLENGO COLLIN M | 272-APP | X | 118 | 192.06 | 4,801.42 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

Total this month    1,123    $ 1,953.29    $ 48,832.14

(1) Amount due at $ _____ per hour    $ 42,539.24
37.880
+ (2) Total dues withheld    $ 1,953.29

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

= Subtotal    $ 44,492.53

Prior Balance Due or (Cr. Available)    $

Grand Total    $ 44,492.53

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT MUST BE SIGNED!    AUTHORIZED SIGNATURE    Tony Brucci

TITLE    President

OWNER-PARTNER-OFFICER

CC-202-R 2/11

# MID-AMERICA CARPENTERS REGIONAL COUNCIL
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

25435

| | |
|---|---|
| Health | 11.790 |
| Pen/Supp | 24.760 |
| Appren. | .680 -. 74 |
| INTL FND | .110 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |
| | .65 |

**SEE INSTRUCTIONS ON REVERSE**
www.carpenterbenefits.org

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY 6/15/2022

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

DOCK DOOR INSTALL, INC.
PO BOX 363
STEGER IL 60475-0363

Month of   MAY   2022

MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!   2/2\#

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 135 | 282.78 | 7069.54 |
| | CORRIGAN ZACHARY R | 1693-APP | | 40 | 52.90 | 1322.40 |
| | CRUIKSHANK DONALD | 272-JNY | X | 152 | 317.37 | 7934.16 |
| | GREEN DAVID J | 272-JNY | X | 141 | 286.85 | 7171.26 |
| | JANSMA ERIC C | 174-JNY | X | 120 | 244.13 | 6103.20 |
| | KELLY NICOLAS J | 272-APP | X | 100 | 162.76 | 4069.00 |
| | MANTOAN JR RICHARD B | 272-APP | | 92 | 74.85 | 1871.28 |
| | RODGERS JACOB H | 174-JNY | X | 0 | 0.00 | 0.00 |
| | ZARLENGO COLLIN M | 272-APP | X | 109 | 177.41 | 4435.21 |

Total this month   889   $ 1,599.04   $ 39,976.05

(1) Amount due at $ _____ per hour   $ 33,675.32
37.880
+ (2) Total dues withheld   $ 1,599.04
= Subtotal   $ 35,274.36
Prior Balance Due or (Cr. Available)   $
Grand Total   $ 35,274.36

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

AN 'X' INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT MUST BE SIGNED!   AUTHORIZED SIGNATURE   Tony Brutti

TITLE   President

OWNER-PARTNER-OFFICER

CC-202-R 2/1

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1                25435

| | |
|---|---|
| Health | 11.790 |
| Pen/Supp | 24.760 |
| Appren. | .680 |
| INTL FND | .120 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |
| Vacation | 1.500 |

**_SEE INSTRUCTIONS ON REVERSE_**
www.carpenterbenefits.org

☐ NO EMPLOYEES THIS MONTH    ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME    ☐ SEND MORE FORMS

DUE BY   7/15/2022

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY  1 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

DOCK DOOR INSTALL, INC.
PO BOX 363
STEGER IL 60475-0363

JUNE    2022

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 150 | 308.75 | 7,718.70 |
| | CORRIGAN ZACHARY R | 1693-APP | | 0 | 0.00 | 0.00 |
| | CRUIKSHANK DONALD | 272-JNY | X | 133 | 273.38 | 6,834.53 |
| | GREEN DAVID J | 272-JNY | X | 149.5 | 307.71 | 7,692.70 |
| | JANSMA ERIC C | 174-JNY | X | 136 | 279.81 | 6,995.16 |
| | KELLY NICOLAS J | 272-APP | X | 164 | 331.66 | 8,291.49 |
| | MANTOAN JR RICHARD B | 272-APP | | 142.5 | 120.86 | 3,021.44 |
| | ZARLENGO COLLIN M | 272-APP | X | 106.5 | 182.89 | 4,572.15 |

MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!   3/521

Month of

| | |
|---|---|
| Total this month | 981.5 | $1805.06 | $45,126.17 |
| (1) Amount due at $ 39.390 per hour | $ 38,661.29 |
| + (2) Total dues withheld | $ 1,805.06 |
| = Subtotal | $ 40,466.35 |
| Prior Balance Due or (Cr. Available) | $ |
| Grand Total | $ 40,466.35 |

REPORT DUE ON OR BEFORE THE 15TH OF
THE MONTH. LATE PAYMENTS WILL BE
CHARGED 1.5% PER MONTH, COMPOUNDED,
AS LIQUIDATED DAMAGES!

AN 'X' INDICATES THE REGIONAL COUNCIL HAS A DUES
CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen,
and apprentice carpenters, and does NOT include hours worked by any self-employed persons,
partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all
of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations
of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are
maintained. We agree to keep and maintain contemporaneous time records reporting the hours
being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT
MUST BE
SIGNED! ▶

AUTHORIZED
SIGNATURE    _Tony Brucci_

TITLE    _President_

OWNER-PARTNER-OFFICER

CC-202-R 2/1"

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1        25435

| | |
|---|---|
| Health | 11.790 |
| Pen/Supp | 24.760 |
| Appren. | .680 |
| INTL FND | .120 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |
| Vacation | 1.500 |

**SEE INSTRUCTIONS ON REVERSE**
www.carpenterbenefits.org

☐ NO EMPLOYEES THIS MONTH    ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME    ☐ SEND MORE FORMS

DUE BY   8/15/2022

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY  4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

DOCK  DOOR INSTALL, INC.
PO BOX 363
STEGER IL  60475-0363

Month of   JULY      2022

MUST BE SHOWN!    WATCH SPELLING!    PLEASE PRINT!    3/529

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 208 | 449.37 | 11,234.16 |
| | CORRIGAN ZACHARY R | 1693-APP | | 0 | 0.00 | 0.00 |
| | CRUIKSHANK DONALD | 272- | X | 214 | 478.49 | 11,962.30 |
| | GREEN DAVID J | 272-JNY | X | 217.50 | 479.01 | 11,975.30 |
| | JANSMA ERIC C | 174-JNY | X | 207 | 453.53 | 11,338.18 |
| | KELLY NICOLAS J | 272-APP | X | 162 | 357.83 | 8,945.72 |
| | MANTOAN JR RICHARD B | 272-APP | | 211 | 220.90 | 5,522.40 |
| | ZARLENGO COLLIN M | 272-APP | X | 197.5 | 340.37 | 8,509.25 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

| | | |
|---|---|---|
| Total this month | 1,417 | $2,779.49    $ 64,487.31 |
| (1) Amount due at $    per hour | $ 55,815.63 | |
| 39.390    + (2) Total dues withheld | $ 2,779.49 | |
| = Subtotal | $ 58,595.12 | |
| Prior Balance Due or (Cr. Available) | $ | |
| Grand Total | $ 58,595.12 | |

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT MUST BE SIGNED! ▶

AUTHORIZED SIGNATURE    Tony Brussi

TITLE    President

OWNER-PARTNER-OFFICER

CC-202-R 2/1

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1    25435

| | |
|---|---|
| Health | 11.790 |
| Pen/Supp | 24.760 |
| Appren. | .680 |
| INTL FND | .120 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |
| Vacation | 1.500 |

### SEE INSTRUCTIONS ON REVERSE
www.carpenterbenefits.org

☐ NO EMPLOYEES THIS MONTH ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME ☐ SEND MORE FORMS

DUE BY  9/15/2022

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DOCK  DOOR INSTALL, INC.
PO BOX 363
STEGER IL  60475-0363

DUES CHECKOFF IS CURRENTLY  4% OF EACH
EMPLOYEES MONTHLY GROSS WAGES

AUGUST    2022

| MUST BE SHOWN! WATCH SPELLING! PLEASE PRINT! 3/321 | | Month of | | | | |
|---|---|---|---|---|---|---|
| Participant I.D. Number | Carpenter's Name | Local & Class | X | Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 184 | 407.76 | 10,193.96 |
| | CRUIKSHANK DONALD | 272-JNY | X | 190 | 470.17 | 11,754.27 |
| | GREEN DAVID J | 272-JNY | X | 133 | 290.22 | 7,255.40 |
| | JANSMA ERIC C | 174-JNY | X | 141 | 327.66 | 8,191.58 |
| | KELLY NICOLAS J | 272-APP | X | 184 | 441.04 | 11,026.12 |
| | MANTOAN JR RICHARD B | 272-APP | | 156 | 177.84 | 4,446.00 |
| | ZARLENGO COLLIN M | 272-APP | X | 201 | 403.61 | 10,090.30 |
| | Williams, Quinten | 272-APP | | 128 | 205.56 | 5,139.12 |
| | Loqui, Christopher C | 272-JNY | | 96 | 199.72 | 4,992.96 |
| | | | | | | |

| | | | |
|---|---|---|---|
| Total this month | | 1413 | $ 2,923.59 | $ 73,089.71 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

(1) Amount due at $ 39.390 per hour $ 55,658.07
+ (2) Total dues withheld $ 2,923.59
= Subtotal $ 58,581.66

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

Prior Balance Due or (Cr. Available) $
Grand Total $ 58,581.66

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE  Tony Brutti
TITLE  President

OWNER-PARTNER-OFFICER

CC-202-R 2/11

# MID-AMERICA CARPENTERS REGIONAL COUNCIL
## Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

**PAGE NO.** 1

**ACCOUNT NO.** 25435

| | |
|---|---|
| Health | 11.790 |
| Pen/Supp | 24.760 |
| Appren. | .680 |
| INTL FND | .120 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |
| Vacation | 1.500 |

### SEE INSTRUCTIONS ON REVERSE
www.carpenterbenefits.org

☐ NO EMPLOYEES THIS MONTH    ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME    ☐ SEND MORE FORMS

**DUE BY 10/15/2022**

*NOT APPLICABLE FOR WORK PERFORMED UNDER THE RESIDENTIAL AGREEMENT

DOCK DOOR INSTALL, INC.
PO BOX 363
STEGER IL 60475-0363

DUES CHECKOFF IS CURRENTLY ____ % OF EACH EMPLOYEES MONTHLY GROSS WAGES

Month of **SEPTEMBER 2022**

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | x | 208 | 449.37 | 11,234.16 |
| | CRUIKSHANK DONALD | 272-JNY | x | 208 | 449.37 | 11,234.16 |
| | GREEN DAVID J | 272-JNY | x | 182 | 386.95 | 9,673.86 |
| | JANSMA ERIC C | 174-JNY | x | 191 | 412.96 | 10,323.79 |
| | KELLY NICOLAS J | 272-APP | x | 164 | 361.99 | 9,049.74 |
| | MANTOAN JR RICHARD B | 272-APP | | 193 | 210.08 | 5,252.00 |
| | ZARLENGO COLLIN M | 272-APP | x | 162 | 357.91 | 8,997.73 |
| | Williams, Quinten | 272-APP | | 156 | 210.97 | 5,274.36 |
| | Crqui, Christopher C | 272-JNY | | 165 | 351.59 | 8,789.69 |

| | | |
|---|---|---|
| Total this month | 1,634 | $3,193.19 | $79,829.69 |
| (1) Amount due at $ ____ per hour | $ 64,363.26 | |
| + (2) Total dues withheld | $ 3,193.19 | |
| = Subtotal | $ 67,556.45 | |
| Prior Balance Due or (Cr. Available) | $ | |
| Grand Total | $ 67,556.45 | |

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE _Anthony Brusec_

TITLE _President_
OWNER/PARTNER/OFFICER

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

**SEE INSTRUCTIONS ON REVERSE**
www.carpenterbenefits.org

1        25435

| | |
|---|---|
| Health | 11.790 |
| Pen/Supp | 24.760 |
| Appren. | .680 |
| INTL FND | .120 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |
| Vacation | 1.500 |

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS
☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY 11/15/2022

DOCK DOOR INSTALL, INC.
PO BOX 363
STEGER IL  60475-0363

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY **4%** OF EACH
EMPLOYEES MONTHLY GROSS WAGES

OCTOBER   2022

| Participant I.D. Number | Carpenter's Name | Local & Class | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X 160 | 341.19 | 8 529.64 |
| | CRUIKSHANK DONALD | 272-JNY | X 182 | 401.52 | 10 037.93 |
| | GREEN DAVID J | 272-JNY | X 163 | 344.31 | 8 607.66 |
| | JANSMA ERIC C | 174-JNY | X 164 | 355.75 | 8 893.71 |
| | KELLY NICOLAS J | 272-APP | X 160 | 344 31 | 8 607.66 |
| | LOQUI CHRISTOPHER | 272-JNY | X 142 | 297.50 | 7 437.43 |
| | MANTOAN JR RICHARD B | 272-APP | 165 | 174.20 | 4 355.00 |
| | WILLIAMS QUINTEN M | 272-APP | 149 | 204.89 | 5 122.22 |
| | ZARLENGO COLLIN M | 272-APP | X 158 | 344.31 | 8 607.66 |

MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!    Month of

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Mid-America Carpenters Regional Council Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

| | | |
|---|---|---|
| Total this month | 1,443 | $ 2,807.96 | $ 70 198.71 |
| (1) Amount due at $ **39.390** per hour | $ 56,839.77 | |
| + (2) Total dues withheld | $ 2,807.96 | |
| = Subtotal | $ 59,647.73 | |
| Prior Balance Due or (Cr. Available) | $ | |
| Grand Total | $ 59,647.73 | |

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
MID-AMERICA
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

212

REPORT MUST BE SIGNED! ➤

AUTHORIZED SIGNATURE  *Tony Brusi*

TITLE  *President*
OWNER-PARTNER-OFFICER

CC-202-R 2/11

**MID-AMERICA CARPENTERS REGIONAL COUNCIL**
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1          25435

| | |
|---|---|
| Health | 11.790 |
| Pen/Supp | 24.760 |
| Appren. | .680 |
| INTL FND | .120 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |
| Vacation | 1.500 |

**SEE INSTRUCTIONS ON REVERSE**
www.carpenterbenefits.org

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS
☐ CHANGE OF NAME                   ☐ SEND MORE FORMS

DUE BY 12/15/2022

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY    4% OF EACH
EMPLOYEES MONTHLY GROSS WAGES

DOCK  DOOR INSTALL, INC.
PO BOX 363
STEGER IL  60475-0363

NOVEMBER  2022

Month of

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 168 | 357.83 | 8,945.72 |
| | CRUIKSHANK DONALD | 272- | X | 176 | 399.44 | 9,985.92 |
| | GREEN DAVID J | 272-JNY | X | 160 | 341.19 | 8,529.64 |
| | JANSMA ERIC C | 174-JNY | X | 185 | 419.20 | 10,480.02 |
| | KELLY NICOLAS J | 272-APP | X | 144 | 312.06 | 7,801.50 |
| | LOQUI CHRISTOPHER | 272-JNY | X | 135 | 280.85 | 7,021.35 |
| | MANTOAN JR RICHARD B | 272-APP | | 153.5 | 178.36 | 4,459.00 |
| | WILLIAMS QUINTEN M | 272-APP | | 148 | 202.86 | 5,071.50 |
| | ZARLENGO COLLIN M | 272-APP | X | 181 | 378.40 | 9,959.92 |

MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

Total this month                                            $ 2,890.18   $ 72,254.57

(1) Amount due at $ _____ per hour   $ 57,135.20
                    39.390
+ (2) Total dues withheld   $ 2,890.18

= Subtotal   $ 60,025.38

Prior Balance Due or (Cr. Available)   $

Grand Total   $ 60,025.35

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
MID-AMERICA
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Mid-America Carpenters Regional Council Fringe Benefit Funds are maintained.  We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

REPORT MUST BE SIGNED!   ►   AUTHORIZED SIGNATURE   Tony Brucci

TITLE   President

OWNER-PARTNER-OFFICER

CC-202-R 2/11

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

| | |
|---|---|
| Health | 11.79 |
| Pen/Supp | 24.76 |
| Appren. | .68 |
| INTL FND | .12 |
| LAB MT/CAFS | .46 |
| MIAF | .06 |
| *Safety | .01 |
| *CISCO | .01 |
| Vacation | 1.50 |

### SEE INSTRUCTIONS ON REVERSE
www.carpenterbenefits.org

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY   1/15/2023

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY   4% OF EACH
EMPLOYEES MONTHLY GROSS WAGES

DOCK DOOR INSTALL, INC.
PO BOX 363
STEGER IL 60475-0363

DECEMBER   2022

| MUST BE SHOWN!  WATCH SPELLING!  PLEASE PRINT! | Month of | | | | |
|---|---|---|---|---|---|
| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 200 | 424.40 | 10,610.04 |
| | CRUIKSHANK DONALD | 272- | X | 206 | 460.81 | 11,520.22 |
| | GREEN DAVID J | 272-JNY | X | 216 | 474.33 | 11,858.28 |
| | JANSMA ERIC C | 174-JNY | X | 204 | 441.04 | 11,026.12 |
| | KELLY NICOLAS J | 272-APP | X | 176 | 399.44 | 9,985.93 |
| | LOQUI CHRISTOPHER | 272-JNY | X | 172 | 363.03 | 9,075.75 |
| | MANTOAN JR RICHARD B | 272-APP | | 131 | 139.88 | 3,497.06 |
| | WILLIAMS QUINTEN M | 272-APP | | 181 | 226.49 | 5,662.28 |
| | ZARLENGO COLLIN M | 272-APP | X | 181.5 | 402.56 | 10,063.94 |
| | Lazaro, Jonathan | 272-APP | | 133.5 | 180.55 | 4513.64 |
| | Richert, David | 1693 JNY | | 142 | 301.66 | 7,541.45 |
| | | | | | | 95,354.65 |

| | | | |
|---|---|---|---|
| Total this month | 1,743 | $ 3,814.19 | $ |
| (1) Amount due at $ 39.390 per hour | $ 76,534.77 | | |
| + (2) Total dues withheld | $ 3,814.19 | | |
| = Subtotal | $ 80,348.96 | | |
| Prior Balance Due or (Cr. Available) | $ | | |
| Grand Total | $ 80,348.96 | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Mid-America Carpenters Regional Council Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
MID-AMERICA
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT MUST BE SIGNED! ▶ AUTHORIZED SIGNATURE   _Tony Bruno_

TITLE   President
OWNER-PARTNER-OFFICER



CC-202-R 2/11

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1          25435

| | |
|---|---|
| Health | 11.79 |
| Pen/Supp | 24.76 |
| Appren. | .68 |
| INTL FND | .12 |
| LAB MT/CAFS | .46 |
| MIAF | .06 |
| *Safety | .01 |
| *CISCO | .01 |
| Vacation | 1.50 |

**SEE INSTRUCTIONS ON REVERSE**
www.carpenterbenefits.org

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY  2/15/2023

DOCK  DOOR INSTALL, INC.
PO BOX 363
STEGER IL  60475-0363

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY  4‰ OF EACH
EMPLOYEES MONTHLY GROSS WAGES

JANUARY   2023

**MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!**       Month of

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 136 | 282.93 | 7,073.36 |
| | CRUIKSHANK DONALD | 272-JNY | X | 48 | 99.86 | 2,496.48 |
| | GREEN DAVID J | 272-JNY | X | 136 | 282.93 | 7,073.36 |
| | JANSMA ERIC C | 174-JNY | X | 152 | 324.54 | 8,113.56 |
| | KELLY NICOLAS J | 272-APP | X | 110 | 229.84 | 5,721.10 |
| | LOQUI CHRISTOPHER | 272-JNY | X | 134 | 287.10 | 7,177.38 |
| | MANTOAN JR RICHARD B | 272-APP | | 128 | 135.20 | 3,380.00 |
| | WILLIAMS QUINTEN M | 272-APP | | 72 | 74.88 | 1,872.00 |
| | ZARLENGO COLLIN M | 272-APP | X | 141 | 300.62 | 7,515.45 |
| | Bishop, Branden P | 272-APP | | 64 | 53.25 | 1,331.20 |
| | Lazaro, Jonathon | 272-APP | | 131 | 177.16 | 4,429.11 |
| | Richert, David | 1693-JNY | | 84 | 174.75 | 4,368.84 |

REPORT DUE ON OR BEFORE THE 15TH OF
THE MONTH. LATE PAYMENTS WILL BE
CHARGED 1.5% PER MONTH, COMPOUNDED,
AS LIQUIDATED DAMAGES!

Total this month        1,336    $2,422.07   $60,551.84

(1) Amount due at $ ____ per hour  $ 52,625.04
39,390
+ (2) Total dues withheld  $ 2,422.07

= Subtotal  $ 55,047.11

Prior Balance Due or (Cr. Available)  $

Grand Total  $ 55,047.11

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES
CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen
and apprentice carpenters, and does NOT include hours worked by any self-employed persons,
partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all
of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations
of Trust under which the Mid-America Carpenters Regional Council Fringe Benefit Funds
are maintained. We agree to keep and maintain contemporaneous time records reporting
the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
MID-AMERICA
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT
MUST BE
SIGNED!

AUTHORIZED
SIGNATURE        Tony Brown

TITLE          President

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1                25435

| | |
|---|---|
| Health | 11.79 |
| Pen/Supp | 24.76 |
| Appren. | .68 |
| INTL FND | .12 |
| LAB MT/CAFS | .46 |
| MIAF | .06 |
| *Safety | .01 |
| *CISCO | .01 |
| Vacation | 1.50 |

### *SEE INSTRUCTIONS ON REVERSE*
www.carpenterbenefits.org

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY   3/15/2023

*NOT APPLICABLE FOR WORK PERFORMED UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY  4% OF EACH EMPLOYEES MONTHLY GROSS WAGES

ᵗᵖᵗᵗᵗᵖᵗᵗᵗᵖᵗᵗᵗᵗᵗᵖᵗᵗᵗᵗᵗᵗᵗᵖᵗᵗᵗ

DOCK  DOOR INSTALL, INC.
PO BOX 363
STEGER IL  60475-0363

FEBRUARY  2023

MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!   Month of

| Participant I.D. Number | Carpenter's Name | Local & Class | Total Actual Hours Worked (1) X | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X 149 | 309.98 | 7,749.49 |
| | CRUIKSHANK DONALD | 272- | X 0 | 0.00 | 0.00 |
| | GREEN DAVID J | 272-JNY | X 144 | 299.58 | 7,489.44 |
| | JANSMA ERIC C | 174-JNY | X 148 | 307.90 | 7,697.48 |
| | KELLY NICOLAS J | 272-APP | X 144 | 299.58 | 7,489.44 |
| | LAZARO HERNANDEZ JONATHAN J | 272-APP | X 30 | 40.57 | 1,014.30 |
| | LOQUI CHRISTOPHER | 272-JNY | X 30 | 62.41 | 1,560.30 |
| | MANTOAN JR RICHARD B | 272-APP | 140.5 | 146.12 | 3,653.00 |
| | RICHERT DAVID L | 1693-JNY | X 130 | 270.45 | 6,761.30 |
| | WILLIAMS QUINTEN M | 272-APP | 56 | 58.24 | 1,456.00 |
| | ZARLENGO COLLIN M | 272-APP | X 124 | 257.97 | 6,449.24 |
| | Bishop, Branden | 272-APP | 101.5 | 84.45 | 2,111.20 |
| | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

| | | |
|---|---|---|
| Total this month | 1,197 | $2,137.25 $53,431.19 |
| (1) Amount due at $ 39.390 per hour | $ 47,149.83 | |
| + (2) Total dues withheld | $ 2,137.25 | |
| = Subtotal | $ | |
| Prior Balance Due or (Cr. Available) | $ 0.00 | |
| Grand Total | $ 49,287.08 | |

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm.  We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Mid-America Carpenters Regional Council Fringe Benefit Funds are maintained.  We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
MID-AMERICA
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT MUST BE SIGNED! ▶   AUTHORIZED SIGNATURE   _Tony Brown_

TITLE   _President_
OWNER-PARTNER-OFFICER

CC-202-R 2/11

**Combined Fringe Benefit Funds and Dues Checkoff Report**

Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

**SEE INSTRUCTIONS ON REVERSE**

www.carpenterbenefits.org

25435

| | |
|---|---|
| Health | 11.79 |
| Pen/Supp | 24.76 |
| Appren. | .68 |
| INTL FND | .12 |
| LAB MT/CAFS | .46 |
| MIAF | .06 |
| *Safety | .01 |
| *CISCO | .01 |
| Vacation | 1.50 |

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY   4/15/2023

DOCK DOOR INSTALL, INC.
PO BOX 363
STEGER IL  60475-0363

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY  4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

MARCH    2023

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 175 | 364.07 | 9,101.75 |
| | BISHOP BRANDEN P | 272-APP | | 128 | 106.50 | 2,662.40 |
| | CRUIKSHANK DONALD | 272- | X | 0 | 0.00 | 0.00 |
| | GREEN DAVID J | 272-JNY | | 186.50 | 387.99 | 9,699.87 |
| | JANSMA ERIC C | 174-JNY | X | 163.50 | 340.15 | 8,503.64 |
| | KELLY NICOLAS J | 272-APP | X | 150 | 312.06 | 7,801.50 |
| | LAZARO HERNANDEZ JONATHAN J | 272-APP | X | 0 | 0.00 | 0.00 |
| | LOQUI CHRISTOPHER | 272-JNY | X | 0 | 0.00 | 0.00 |
| | MANTOAN JR RICHARD B | 272-APP | | 126.50 | 131.56 | 3,289.00 |
| | RICHERT DAVID L | 1693-JNY | X | 156 | 324.54 | 8,113.56 |
| | WILLIAMS QUINTEN M | 272-APP | | 0 | 0.00 | 0.00 |
| | ZARLENGO COLLIN M | 272-APP | X | 142 | 295.42 | 7,385.42 |

MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!

Month of

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

Total this month    1,227.5    $ 2,262.29    $ 56,557.14

(1) Amount due at $ 39.390 per hour   $ 48,351.23

+ (2) Total dues withheld   $ 2,262.29

= Subtotal   $ 50,613.52

Prior Balance Due or (Cr. Available)   $

Grand Total   $ 50,613.52

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Mid-America Carpenters Regional Council Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
MID-AMERICA
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

212

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE   Tony Bruttu

TITLE   President

OWNER-PARTNER-OFFICER

CC-202-R 2/11

**MID-AMERICA CARPENTERS REGIONAL COUNCIL**
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

**SEE INSTRUCTIONS ON REVERSE**
www.carpenterbenefits.org

| | |
|---|---|
| 1 | 25435 |

| | |
|---|---|
| Health | 11.79 |
| Pen/Supp | 24.76 |
| Appren. | .68 |
| INTL FND | .12 |
| LAB MT/CAFS | .46 |
| MIAF | .06 |
| *Safety | .01 |
| *CISCO | .01 |
| Vacation | 1.50 |

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY 5/15/2023

DOCK DOOR INSTALL, INC.
PO BOX 363
STEGER IL 60475-0363

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

APRIL    2023

Month of

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 123 | 255.89 | 6,397.23 |
| | BISHOP BRANDEN P | 272-APP | | 94.5 | 79.04 | 1,976.00 |
| | GREEN DAVID J | 272-JNY | X | 133 | 276.69 | 6,917.33 |
| | JANSMA ERIC C | 174-JNY | X | 59 | 123.79 | 3,094.66 |
| | KELLY NICOLAS J | 272-APP | X | 126.5 | 263.17 | 6,579.27 |
| | LAZARO HERNANDEZ JONATHAN J | 272-APP | X | 0 | 0.00 | 0.00 |
| | LOQUI CHRISTOPHER | 272-JNY | | 0 | 0.00 | 0.00 |
| | MANTOAN JR RICHARD B | 272-APP | | 67 | 70.20 | 1,755.00 |
| | RICHERT DAVID L | 1693-JNY | X | 0 | 0.00 | 0.00 |
| | WILLIAMS QUINTEN M | 272-APP | | 0 | 0.00 | 0.00 |
| | ZARLENGO COLLIN M | 272-APP | X | 122 | 254.85 | 6,371.23 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Mid-America Carpenters Regional Council Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

| | | | |
|---|---|---|---|
| Total this month | 725 | $1,323.63 | $33,040.66 |
| (1) Amount due at $ 39.390 per hour | $28,557.75 | | |
| + (2) Total dues withheld | $1,323.63 | | |
| = Subtotal | $29,881.31 | | |
| Prior Balance Due or (Cr. Available) | $ | | |
| Grand Total | $29,881.31 | | |

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
MID-AMERICA
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE   *Tony Bruce*

TITLE   *President*



**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1                    25435

| | |
|---|---|
| Health | 11.79 |
| Pen/Supp | 24.76 |
| Appren. | .68 |
| INTL FND | .12 |
| LAB MT/CAFS | .46 |
| MIAF | .06 |
| *Safety | .01 |
| *CISCO | .01 |
| Vacation | 1.50 |

**SEE INSTRUCTIONS ON REVERSE**
www.carpenterbenefits.org

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY   6/15/2023

DOCK  DOOR INSTALL, INC.
PO BOX 363
STEGER IL  60475-0363

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY  4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of   MAY   2023

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 149.50 | 312.06 | 7,801.51 |
| | BISHOP BRANDEN P | 272-APP | | 79.50 | 66.14 | 1,653.60 |
| | GREEN DAVID J | 272-JNY | X | 156.50 | 326.62 | 8,165.58 |
| | JANSMA ERIC C | 174-JNY | X | 144 | 300.62 | 7,515.45 |
| | KELLY NICOLAS J | 272-APP | X | 145 | 306.86 | 7,671.48 |
| | MANTOAN JR RICHARD B | 272-APP | | 160 | 166.40 | 4,160.00 |
| | RICHERT DAVID L | 1693-JNY | X | 83.50 | 172.35 | 4,433.86 |
| | ZARLENGO COLLIN M | 272-APP | X | 160 | 343.27 | 8,581.66 |
| | Williams, Quinten | 272-APP | | 107.5 | 111.8 | 2,795.00 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

Total this month   1,185.5   $ 2,111.13   $ 52,779.14

(1) Amount due at $ 39.390 per hour   $ 46,696.85

+ (2) Total dues withheld   $ 2,111.13

= Subtotal   $ 48,807.98

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

Prior Balance Due or (Cr. Available)   $ 0.00

Grand Total   $ 48,807.98

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Mid-America Carpenters Regional Council Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
MID-AMERICA
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE   Tony Bruse

TITLE   President

OWNER-PARTNER-OFFICER

CC-202-R 2/11

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1          25435

**SEE INSTRUCTIONS ON REVERSE**
www.carpenterbenefits.org

| | |
|---|---|
| Health | 12.29 |
| Pen/Supp | 25.26 |
| Appren. | .68 |
| INTL FND | .13 |
| LAB MT/CAFS | .46 |
| MIAF | .09 |
| *Safety | .01 |
| *CISCO | .01 |
| Vacation | 1.70 |

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS
☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY   7/15/2023

DOCK DOOR INSTALL, INC.
PO BOX 363
STEGER IL   60475-0363

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY   4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

JUNE        2023

| MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT! | Month of | | | | |
|---|---|---|---|---|---|
| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 178 | 376.79 | 9,419.78 |
| | BISHOP BRANDEN P | 272-APP | | 146 | 124.01 | 3,100.30 |
| | GREEN DAVID J | 272-JNY | X | 164 | 347.55 | 8,688.64 |
| | JANSMA ERIC C | 174-JNY | X | 143 | 303.20 | 7,579.93 |
| | KELLY NICOLAS J | 272-APP | X | 164 | 355.07 | 8,876.64 |
| | MANTOAN JR RICHARD B | 272-APP | | 128 | 135.43 | 3,385.76 |
| | ZARLENGO COLLIN M | 272-APP | X | 142 | 301.65 | 7,541.18 |
| | Williams, Quinten | 272-AM | | 126 | 151.33 | 3,784.40 |
| | Kichert, David | M93-JNY | | 99.5 | 210.09 | 5,252.25 |
| | | | | | 2,305.17 | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Mid-America Carpenters Regional Council Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

| | | |
|---|---|---|
| Total this month | 1,290.5 | $~~~2357.76~~ | $57,428.88 |
| (1) Amount due at $ 40.630 per hour | $ 52,433.01 | |
| + (2) Total dues withheld | $ 2,305.17 | |
| = Subtotal | $ 54,738.18 | |
| Prior Balance Due or (Cr. Available) | $ 0.00 | |
| Grand Total | $ 54,738.18 | |

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
MID-AMERICA
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690



REPORT
MUST BE
SIGNED!

AUTHORIZED
SIGNATURE        Anthony Brown

TITLE        President

OWNER-PARTNER-OFFICER        CC-202-R 2/1

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5, Regional Council: 312/787-3076

1                     25435

| | |
|---|---|
| Health | 12.29 |
| Pen/Supp | 25.26 |
| Appren. | .68 |
| INTL FND | .13 |
| LAB MT/CAFS | .46 |
| MIAF | .09 |
| *Safety | .01 |
| *CISCO | .01 |
| Vacation | 1.70 |

**SEE INSTRUCTIONS ON REVERSE**
www.carpenterbenefits.org

☐ NO EMPLOYEES THIS MONTH    ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME    ☐ SEND MORE FORMS

DUE BY   8/15/2023

DOCK DOOR INSTALL, INC.
PO BOX 363
STEGER IL  60475-0363

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY   **4** % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

JULY        2023

Month of

| MUST BE SHOWN! WATCH SPELLING! PLEASE PRINT! | | | | |
|---|---|---|---|---|
| Participant I.D. Number | Carpenter's Name | Local & Class | X / Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
| | AGUIRRE GARCIA JOSE L | 272-JNY | X 134 | 286.81 | 7,170.34 |
| | BISHOP BRANDEN P | 272-APP | 72 | 61.63 | 1,540.80 |
| | GREEN DAVID J | 272-JNY | X 139 | 297.52 | 7,437.89 |
| | JANSMA ERIC C | 174-JNY | X 136 | 291.09 | 7,277.36 |
| | KELLY NICOLAS J | 272-APP | X 117 | 251.50 | 6,287.43 |
| | MANTOAN JR RICHARD B | 272-APP | 128 | 178.07 | 4,451.84 |
| | RICHERT DAVID L | 1693-JNY | X 0 | 0.00 | 0.00 |
| | WILLIAMS QUINTEN M | 272-APP | 127 | 176.68 | 4,417.06 |
| | ZARLENGO COLLIN M | 272-APP | X 113 | 241.87 | 6,046.63 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

Total this month                    966    $ 1,785.17   $ 44,629.35

(1) Amount due at $ **40.630** per hour   $ 39,248.58

+ (2) Total dues withheld   $ 1,785.17

= Subtotal   $ 41,033.75

Prior Balance Due or (Cr. Available)   $

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

Grand Total   $ 41,033.75

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Mid-America Carpenters Regional Council Fringe Benefit Funds are maintained.  We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
MID-AMERICA
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT MUST BE SIGNED! ▶

AUTHORIZED SIGNATURE   *Anthony Brusk*

TITLE   *President*

OWNER-PARTNER-OFFICER

CC-202-R 2/11

**MID-AMERICA CARPENTERS REGIONAL COUNCIL**
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5, Regional Council: 312/787-3076

1        25435

| | |
|---|---|
| Health | 12.29 |
| Pen/Supp | 25.26 |
| Appren. | .68 |
| INTL FND | .13 |
| LAB MT/CAFS | .46 |
| MIAF | .09 |
| *Safety | .01 |
| *CISCO | .01 |
| Vacation | 1.70 |

**SEE INSTRUCTIONS ON REVERSE**
www.carpenterbenefits.org

☐ NO EMPLOYEES THIS MONTH    ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME    ☐ SEND MORE FORMS

DUE BY 9/15/2023

DOCK DOOR INSTALL, INC.
PO BOX 363
STEGER IL 60475-0363

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY 4% OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of AUGUST 2023

**MUST BE SHOWN!    WATCH SPELLING!    PLEASE PRINT!**

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE I. | 272-JNY | X | 169 | 371.36 | 9,283.99 |
| | BISHOP BRANDEN P | 272-APP | | 167 | 149.80 | 3,745.00 |
| | GREEN DAVID J | 272-JNY | X | 152 | 325.34 | 8,133.52 |
| | JANSMA ERIC C | 174-JNY | X | 168 | 368.15 | 9,203.72 |
| | KELLY NICOLAS J | 272-APP | X | 134 | 298.59 | 7,464.65 |
| | MANTOAN JR RICHARD B | 272-APP | | 162 | 236.50 | 5,912.60 |
| | RICHERT DAVID L | 1693-JNY | X | 72 | 154.11 | 3,852.72 |
| | WILLIAMS QUINTEN M | 272-APP | | 74 | 102.95 | 2,573.72 |
| | ZARLENGO COLLIN M | 272-APP | X | 161 | 357.45 | 8,936.17 |
| | | | | | | |
| Total this month | | | | 1259 | $2,364.24 | $59,106.09 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

(1) Amount due at $ 40.630 per hour $ 51,153.17
+ (2) Total dues withheld $ 2,364.24
= Subtotal $ 53,517.41
Prior Balance Due or (Cr. Available) $
Grand Total $ 53,517.41

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Mid-America Carpenters Regional Council Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
MID-AMERICA
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE Tony Brucci

TITLE President

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1                    25435

| | |
|---|---|
| Health | 12.29 |
| Pen/Supp | 25.26 |
| Appren. | .68 |
| INTL FND | .13 |
| LAB MT/CAFS | .46 |
| MIAF | .09 |
| *Safety | .01 |
| *CISCO | .01 |
| Vacation | 1.70 |

**SEE INSTRUCTIONS ON REVERSE**
www.carpenterbenefits.org

☐ NO EMPLOYEES THIS MONTH    ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME    ☐ SEND MORE FORMS

DUE BY 10/15/2023

DOCK DOOR INSTALL, INC.
PO BOX 363
STEGER IL 60475-0363

**\*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT**
DUES CHECKOFF IS CURRENTLY  4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

**SEPTEMBER 2023**

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 192 | 273.97 | 10,273.92 |
| | BISHOP BRANDEN P | 272-APP | | 163.50 | 148.30 | 3,707.55 |
| | GREEN DAVID J | 272-JNY | X | 160 | 342.46 | 8,561.60 |
| | JANSMA ERIC C | 174-JNY | X | 200 | 342.46 | 11,130.08 |
| | KELLY NICOLAS J | 272-JNY | X | 167 | 373.50 | 9,337.50 |
| | MANTOAN JR RICHARD B | 272-APP | | 177 | 254.94 | 6,373.44 |
| | WILLIAMS QUINTEN M | 272-APP | | 131.5 | 182.94 | 4,573.57 |
| | ZARLENGO COLLIN M | 272-JNY | X | 160 | 154.11 | 8,775.64 |
| | McManamy, Elliott R | 272-APP | | 25.5 | 36.52 | 912.98 |
| | Moton, John | 272-APP | | 26 | 36.17 | 904.28 |
| | Richert, David | 272-JNY | | 154 | 331.76 | 8,294.05 |
| | | | | | | |
| | | | | 1,556.50 | | |
| | Total this month | | | ~~1,556.50~~ | $2,477.13 | $72,844.61 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

(1) Amount due at $ 40.630 per hour $ 63,085.06
+ (2) Total dues withheld $ 2,477.13
= Subtotal $ 65,562.21
Prior Balance Due or (Cr. Available) $
Grand Total $ 65,562.21

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
MID-AMERICA CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Mid-America Carpenters Regional Council Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.



REPORT MUST BE SIGNED!    AUTHORIZED SIGNATURE    Tony Bruce

TITLE    President

OWNER-PARTNER-OFFICER

CC-202-R 2/11

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1    25435

| | |
|---|---|
| Health | 12.29 |
| Pen/Supp | 25.26 |
| Appren. | .68 |
| INTL FND | .13 |
| LAB MT/CAFS | .46 |
| MIAF | .09 |
| *Safety | .01 |
| *CISCO | .01 |
| Vacation | 1.70 |

**SEE INSTRUCTIONS ON REVERSE**
www.carpenterbenefits.org

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS
☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY 11/15/2023

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY  4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

DOCK DOOR INSTALL, INC.
PO BOX 363
STEGER IL  60475-0363

OCTOBER    2023

**MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!**   Month of

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-JNY | X | 8 | 17.12 | 424.08 |
| | BISHOP BRANDEN P | 272-APP | | 1745 | 156.43 | 3,910.85 |
| | GREEN DAVID J | 272-JNY | X | 147.75 | 317.58 | 7,934.56 |
| | JANSMA ERIC C | 174-JNY | X | 162 | 355.31 | 8,882.66 |
| | KELLY NICOLAS J | 272-JNY | X | 179.25 | 404.27 | 10,106.71 |
| | MANTOAN JR RICHARD B | 272-APP | | 134 | 197.20 | 4,930.07 |
| | RICHERT DAVID L | 1693-JNY | X | 115.75 | 247.75 | 6,193.79 |
| | WILLIAMS QUINTEN M | 372-APP | | 0 | 0.00 | 0.00 |
| | ZARLENGO COLLIN M | 272-JNY | X | 156 | 343.27 | 8,581.67 |
| | McManamy, Elliot R | 272-APP | | 152.25 | 223.11 | 5,577.84 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | 1229.5 | | 56,551.23 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

Total this month    $ 2,262.05   $

(1) Amount due at $ **40.630** per hour   $ 49,954.59
+ (2) Total dues withheld   $ 2,262.05
= Subtotal   $ 52,216.64

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

Prior Balance Due or (Cr. Available)   $

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Mid-America Carpenters Regional Council Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

Grand Total   $ 52,216.64

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
MID-AMERICA
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690



REPORT MUST BE SIGNED!   ➤   AUTHORIZED SIGNATURE   Tony Bruno

TITLE   President

OWNER-PARTNER-OFFICER   CC-202-R 2/11

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 69

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
MID-AMERICA CARPENTERS      )
REGIONAL COUNCIL PENSION    )
FUND, et al.,               )
                            )
            Plaintiffs,     )   No. 1:24-cv-02428
                            )
       vs.                  )  Judge Andrea R. Wood
                            )
DOCK & DOOR INSTALL,        )   Magistrate Judge
INC., an Illinois           )  Jeannice W. Appenteng
corporation and MIDWEST     )
DOCK SOLUTIONS, INC., an    )
Illinois corporation,       )
                            )
            Defendants.     )
```

         The deposition of RICHARD BRUNO
MANTOAN, called by the Defendant for
examination, taken pursuant to the Federal
Rules of Civil Procedure of the United States
District Courts pertaining to the taking of
depositions, taken before DIANE M. NULICK, a
Notary Public within and for the County of
Cook, State of Illinois, and a Certified
Shorthand Reporter of said State, at Suite 231,
3759 North Ravenswood, Chicago, Illinois, on
the 14th day of October, A.D. 2025, at 1:04
p.m.

**2**

```
1    PRESENT:
2       McJESSY, CHING & THOMPSON, LLC,
        BY:  MR. KEVIN P. McJESSY,
3       mcjessy@MCandT.com,
        (3759 North Ravenswood, Suite 231,
4        Chicago, Illinois  60613,
        (773) 880-1260),
5
            appeared on behalf of the plaintiffs;
6
        ALLOCCO MILLER & CAHILL, P.C.,
7       BY:  MS. KATHLEEN M. CAHILL,
        kmc@alloccomiller.com,
8       (20 North Wacker Drive, Suite 3517,
         Chicago, Illinois 60606,
9       (312) 675-4325),
10          appeared on behalf of the defendant,
            Dock & Door Install, Inc.;
11
        AMUNDSEN DAVIS LLC,
12      BY:  MR. MICHAEL F. HUGHES,
        mhughes@amundsendavislaw.com,
13      (3815 East Main Street, Suite A-1,
         St. Charles, Illinois  60174,
14      (630) 587-7925/(630) 217-1228 (direct),
15          appeared on behalf of the defendant,
            Midwest Dock Solutions, Inc.
16
17
18
19
20
21
22
23
24
```

**3**

```
 1              I N D E X
 2
 3   WITNESS:  RICHARD BRUNO MANTOAN
 4
 5   EXAMINATION BY:                      PAGE
 6   Mr. McJessy                            4
 7
 8   PLAINTIFF'S EXHIBITS:
 9   No. 272                                13
     No. 273                                19
10   No. 274 275 and 276                    33
     No. 277                                42
11   No. 273                                48
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**4**

```
 1            (The witness was duly sworn.)
 2
 3
 4
 5        RICHARD BRUNO MANTOAN,
 6   called as a witness herein, having been first
 7   duly sworn, was examined and testified as
 8   follows:
 9
10
11            EXAMINATION
12            BY MR. McJESSY:
13
14        Q.  Sir, can you state your name for the
15   record -- first, middle, and last -- and spell
16   each of them?
17        A.  Richard Bruno Mantoan, R-i-c-h-a-r-d,
18   B-r-u-n-o, M-a-n-t-o-a-n.
19        Q.  All right.
20            And have you ever been
21   deposed before, sir?
22        A.  Yes.
23        Q.  How many times?
24        A.  Once.
```

1 (Pages 1 to 4)

5

1    Q. Okay.
2        And what -- just briefly,
3 what did that entail?
4    A. Like what did they ask me or --
5    Q. What was the nature of the matter that
6 you were testifying in, an auto accident or --
7    A. Oh, auto accident.
8    Q. Auto accident?
9    A. Yeah.
10    Q. All right.
11        And how long ago was that?
12    A. January.
13    Q. Okay.
14        And was that related at all
15 to your work at Dock & Door or Midwest Dock,
16 anything like that?
17    A. No.
18    Q. Okay.
19        Just a completely separate
20 unrelated matter?
21    A. Yes.
22    Q. Okay.
23        So you're probably a little
24 bit familiar, then, with now the process works,

6

1 but I'll just go through a few quick ground
2 rules that may refresh your memory and be
3 similar to what you've heard before.
4        You know you're under oath,
5 correct?
6    A. Yes.
7    Q. Okay.
8        And do you understand that
9 even though we're here in an informal setting,
10 in a conference room, that that oath has the
11 same force and effect as if you were testifying
12 in court?
13    A. Yes.
14    Q. Okay.
15        And I'm going to go through
16 today and ask you a series questions. You'll
17 give me the best most truthful answers,
18 hopefully, that you can.
19        All of your responses need to
20 be verbal responses. Yeses and nos are fine.
21 But if you nod or shake your head or say ah-huh
22 or uh-uh, I'll probably prompt you, is that a
23 yes, is that a no, just so the record's clear.
24        Is that fair?

7

1    A. Yes.
2    Q. Okay.
3        And we have a court reporter
4 taking down what each of us is saying. She has
5 two hands, but she can only type what one of us
6 is saying at a time. So if I'm asking a
7 question, even if you know what my question's
8 going to be, try to let me finish before you
9 answer, and I will try to return the courtesy
10 and not ask a question while you're still
11 answering.
12        Is that fair?
13    A. Yes.
14    Q. Okay.
15        And also, as we go along, if
16 I ask a question and you don't understand it --
17 it's vague, confusing, something like that --
18 will you ask me to explain my question?
19    A. Yes.
20    Q. Okay.
21        And with that as a ground
22 rule, then, can we -- is it fair that I can
23 presume, if I ask a question and you answer it,
24 that you believe you understood my question?

8

1    A. Yes.
2    Q. Okay.
3        And last but not least, is
4 there any reason you cannot give truthful
5 answers to my questions today? For example,
6 are you suffering from any conditions or on any
7 medications that would prevent you from
8 understanding my questions or giving truthful
9 answers?
10    A. No.
11    Q. Excellent.
12        All right. Have you spoken
13 with anyone about your deposition here today?
14    A. Yes.
15    Q. Okay.
16        Who have you spoken with?
17    A. My family.
18    Q. Okay.
19        And what was the nature of
20 those conversations?
21    A. Just that I was supposed to have one.
22 And then they canceled it, and now I have to go
23 back and do it.
24    Q. Okay.

2 (Pages 5 to 8)

9

```
1            Have you spoken with anybody
2   from Midwest Dock Solutions or Dock & Door
3   about your deposition?
4       A.  Yes.
5       Q.  Who have you spoken to?
6       A.  Nico and Brandon.
7       Q.  All right.
8            And what did you discuss with
9   Nico?
10      A.  Just that I had a deposition on the
11  say same day, so --
12      Q.  Okay.
13           Anything else?
14      A.  No.
15      Q.  All right.
16           And what did you discuss with
17  Brandon?
18      A.  The same thing, just -- I just told
19  him that I had to go give one.
20      Q.  Okay.
21           And did you discuss his
22  deposition at all?
23      A.  No.
24      Q.  All right.
```

11

```
1   time it is.
2       A.  Okay.
3       Q.  Anything else?
4       A.  No.
5       Q.  How about Tony Zarlengo?  Did you talk
6   to him about your deposition?
7       A.  No.
8       Q.  How about Mike Richert?
9       A.  No.
10      Q.  Okay.
11           You and I haven't spoken
12  today -- before today, have we?
13      A.  No.
14      Q.  Okay.
15           You're represented by counsel
16  at the deposition here today, correct?
17      A.  Correct.
18      Q.  Okay.
19           And Ms. Cahill is your
20  attorney; is that right?
21      A.  Yes.
22      Q.  Okay.
23           And do you know Todd Miller?
24      A.  Yes.
```

10

```
1            Did you discuss anybody
2   else's -- anybody else who has given a
3   deposition in this case, have you discussed
4   their deposition?
5       A.  No.
6       Q.  All right.
7            Were you aware that other
8   people have given depositions in this case
9   besides Nico and Brandon?
10      A.  Yes.
11      Q.  All right.
12           How were you aware of that?
13      A.  Just talk at work.
14      Q.  Okay.
15           Do you recall anything
16  specific about those conversations?
17      A.  No.
18      Q.  Okay.
19           Have you spoken with Tony
20  Brutti about your deposition today?
21      A.  Yes.
22      Q.  And what was the nature of those
23  conversations?
24      A.  Just giving me the address and what
```

12

```
1       Q.  Okay.
2            And I don't want to know what
3   you've discussed with either Mr. Miller or Ms.
4   Cahill, but have you had a chance to speak with
5   them before your deposition here today?
6       A.  Yes.
7       Q.  Okay.
8            On how many occasions?
9       A.  Once.
10      Q.  And which -- with who?
11      A.  Todd.
12      Q.  Okay.
13           And for how long?
14      A.  Like ten, fifteen minutes.
15      Q.  Okay.
16           Did you do anything to
17  prepare for your deposition today?
18      A.  No.
19      Q.  Okay.
20           Now, you received a subpoena
21  to be here for your deposition today, correct?
22      A.  Well, the previous -- yeah.
23      Q.  It was rescheduled?
24      A.  Yes.  Yes.
```

3 (Pages 9 to 12)

13

1  Q.  Okay.
2          You received a subpoena in
3  this matter that has prompted your
4  deposition --
5  A.  Ah-huh.
6  Q.  -- here today.
7          Is that fair?
8  A.  Sorry.  Yes.
9  Q.  No.  That's fine.
10
11          (WHEREUPON, the document was
12          marked Plaintiff's
13          Exhibit 272 for identification,
14          as of 10/14/25.)
15
16  BY MR. McJESSY:
17  Q.  And Exhibit 272, does that look like
18  the subpoena you received?
19  A.  Yes.
20  Q.  All right.
21          And if you turn to the third
22  page of that subpoena, it asks you to produce
23  various documents.  And according to the first
24  page, the documents were supposed to be

14

1  provided by May 30, 2025.
2          Do you see that?
3  A.  Yes.
4  Q.  Okay.
5          And you've produced documents
6  through your attorney yesterday.
7          Is that fair?
8  A.  Yes.
9  Q.  Okay.
10          And those were text messages
11  with Tony Brutti?
12  A.  Yes.
13  Q.  All right.
14          The first item on here asks
15  you to produce all emails and text messages
16  between you and either Dock & Door or anyone
17  employed there or Midwest Dock or anyone
18  employed there.
19          Do you see that?
20  A.  Yes.
21  Q.  All right.
22          And do you have -- other than
23  the text message that you produced with Tony
24  Brutti, do you have text messages with anyone

15

1  else at either Midwest or Dock & Door?
2  A.  Yes.
3  Q.  All right.
4          What -- who else do you have
5  text messages with?
6  A.  Brandon.  Like, mostly, just guys from
7  the company.
8  Q.  Okay.
9  A.  They're just work texts, like picking
10  me up or that.
11  Q.  Okay.  All right.
12          I'll ask that you not destroy
13  those text messages.  Don't delete them off
14  your phone at this point.
15  A.  Okay.
16  Q.  And if you can provide them to Ms.
17  Cahill after the deposition, that would be -- I
18  would ask you to do that, too.
19  A.  Okay.
20  Q.  Okay?
21  A.  Just work-related texts, right?
22  Q.  What other texts would you have?
23  A.  Well, I'm good friends with Brandon,
24  so I just -- me and him talk a lot.

16

1  Q.  Okay.
2  A.  Personal stuff.
3  Q.  All right.
4          We'll limit it to
5  work-related texts or texts related to this
6  lawsuit.
7  A.  Okay.
8  Q.  All right.
9          How about texts with Ira
10  Sugar?
11  A.  I mean, I've texted him before, but
12  nothing as of recent.
13  Q.  Okay.
14          Do you have any texts with
15  him on your phone?
16  A.  No.
17  Q.  Okay.
18          But you did -- you have
19  texted with him?
20  A.  Yes.
21  Q.  Okay.
22          About work-related matters?
23  A.  Yeah.
24  Q.  Go here, be there, that kind of thing?

4 (Pages 13 to 16)

17

1    A.  More so like what -- like jobs, like
2  certain stuff, like special stipulations.
3    Q.  Like explain that to me.
4    A.  Like if there's like just a certain
5  like order, like thing you have to do on a job,
6  then like he'll tell us like, hey, this is what
7  you need to do there.
8    Q.  Okay.
9        So he'll give you job
10 specific instructions?
11   A.  Sometimes, yes.
12   Q.  Okay.
13       And he'll do that by text
14 message?
15   A.  That or call.
16   Q.  Okay.
17       And the text messages, I take
18 it, you've deleted those?
19   A.  They delete after a month.
20   Q.  Okay.
21   A.  All of my texts delete after a month.
22   Q.  Okay.
23       How about emails?  Do you
24 email with anybody?

18

1    A.  No.
2    Q.  Okay.
3        Have you in the past?
4    A.  No.
5    Q.  All right.
6        Item two on this list of
7  documents to be produced asks you to produce
8  all documents related to any work you've
9  performed for either Dock & Door or Midwest
10 Dock, including time sheets, job notes, and the
11 like.
12       Do you have any documents
13 responsive to that request?
14   A.  Just time sheets, but I believe that
15 you guys have those.
16   Q.  Okay.
17       Nothing else besides time
18 sheets?
19   A.  No.
20   Q.  All right.
21       And then item three asks you
22 to produce documents -- documents showing the
23 hours you've worked for either Dock & Door or
24 Midwest Dock.

19

1        Obviously, the time sheets
2  would be responsive to that, correct?
3    A.  Yes.
4    Q.  Okay.
5        Do you have any other
6  documents besides the time sheets?
7    A.  No.
8    Q.  All right.  Let's see.
9
10       (WHEREUPON, the document was
11       marked Plaintiff's
12       Exhibit 273 for identification,
13       as of 10/14/25.)
14
15 BY MR. McJESSY:
16   Q.  Let me hand you what I've marked as
17 Exhibit 273.  And if you just turn in this
18 document four pages back, you'll see there's a
19 photo at the bottom of the page.  It's a
20 picture of a time sheet.  The page you're on is
21 correct.
22       Are those the time sheets
23 that you would have?
24   A.  Yes.

20

1    Q.  Okay.
2        So it's the form that you
3  fill out and you turn in?
4    A.  Yes.
5    Q.  All right.
6        On the subpoena, which is
7  Exhibit 272, item four asks all -- asks you to
8  produce all documents showing amounts you were
9  paid by either Dock & Door or Midwest Dock,
10 such as paychecks, pay stubs, IRS W-2 forms,
11 IRS 1099 forms, and the like.
12       Do you see that?
13   A.  Yes.
14   Q.  All right.
15       Do you have any documents
16 responsive to that request?
17   A.  I probably could find some.
18   Q.  What documents would you have?
19   A.  Not on paper, but I assume I have like
20 W-2s.
21   Q.  Okay.
22       Anything else?
23   A.  No, not on paper.
24   Q.  All right.

5 (Pages 17 to 20)

21

```
1              Have you ever been paid by
2  Midwest Dock?
3       A.  No.
4       Q.  Okay.
5              You've only been paid by
6  Dock & Door?
7       A.  Yes.
8       Q.  All right.
9              Item five asks you to produce
10 any resumé or job application you've completed
11 that includes any reference to either
12 Dock & Door or Midwest Dock.
13             Do you have any documents
14 responsive to that request?
15      A.  No.
16      Q.  Okay.
17             And item six asks you to
18 produce all photographs that you have taken of
19 any job sites you've worked on for either
20 Dock & Door or Midwest Dock.
21             Do you see that?
22      A.  Yes.
23      Q.  Do you have photographs of job sites
24 that you've worked on?
```

22

```
1       A.  No.
2       Q.  Okay.
3              Sir, what's the highest level
4  of formal education you've completed?
5       A.  High school.
6       Q.  All right.
7              When did you graduate from
8  high school and where?
9       A.  2021.  Lake Central.
10      Q.  And where is that located?
11      A.  St. John, Indiana.
12      Q.  All right.
13             Did you get your diploma?
14      A.  Yes.
15      Q.  Okay.
16             And did you work when you
17 were in high school?
18      A.  Yes.
19      Q.  Where did you work?
20      A.  Calumet Collision.  Calumet Collision.
21      Q.  Calumet Collision.  Okay.
22             Auto body repair?
23      A.  Yes.
24      Q.  What did you do?
```

23

```
1       A.  I was more -- painted cars.
2       Q.  Oh.
3       A.  Kind of just whatever they needed.
4       Q.  All right.
5              And you graduated, you said,
6  when?  2021?
7       A.  Yes.
8       Q.  All right.
9              And how long did you work at
10 Calumet Collision?
11      A.  A couple years in the summers.
12      Q.  Okay.
13             And then your first job out
14 of high school was where?
15      A.  Dock & Door Install.
16      Q.  Okay.
17             Other than Calumet Collision
18 and Dock & Door Install, have you worked
19 anywhere else?
20      A.  No.
21      Q.  All right.
22             And how did you come to get a
23 job with Dock & Door Install?
24      A.  Collin is my neighbor, and I was told
```

24

```
1  to come outside one day.
2       Q.  Collin Zarlengo?
3       A.  Yes.
4       Q.  All right.
5              And tell me about that.  What
6  happened?
7       A.  I was just telling him I was looking
8  to get into the union.  And he said that where
9  he works is the union, so he could get me in
10 the union.
11      Q.  All right.
12             And was that any particular
13 union?
14      A.  I was looking at carpenters.
15      Q.  Okay.
16             Any particular reason?
17      A.  In high school, I did a construction
18 class, and carpentry interested me.
19      Q.  All right.
20             So you and Collin -- Collin
21 is your neighbor.
22             How close does he live?
23      A.  Behind me.
24      Q.  All right.
```

6 (Pages 21 to 24)

25

1      So you and he were talking.
2  **And you said, I would like to get a union job.**
3  **And then what happened?**
4      A.  He said that he would talk to his boss
5  and see if they could get me in there.
6      Q.  **All right.**
7          **And what happened next?**
8      A.  They called me.
9      Q.  **Okay.**
10     A.  Asked if I was interested.  And I
11  said, yeah.
12     Q.  **Okay.**
13         **And who is, "they"?**
14     A.  Tony Brutti.
15     Q.  **Okay.**
16         **And what happened next?**
17     A.  He just told me like whatever sheets I
18  needed to bring and that they would sponsor me
19  in.
20     Q.  **Okay.**
21         **And what happened after that?**
22     A.  I started working there.
23     Q.  **Started working at?**
24     A.  Dock & Door.

26

1      Q.  **Okay.**
2          **And you just showed up there**
3  **one day, or how did it work?**
4      A.  I went to the office and talked to
5  them.  They kind of gave me the rundown of what
6  I would be doing and see if I was interested,
7  and I told them, yeah.
8      Q.  **Okay.**
9          **So is that the office at 27**
10  **East 36th Place in Steger?**
11     A.  Yes.
12     Q.  **Okay.**
13         **So you went to the office**
14  **there?**
15     A.  Yes.
16     Q.  **And who did you meet with?**
17     A.  Tony Brutti.
18     Q.  **Anybody else?**
19     A.  No.
20     Q.  **All right.**
21         **And what did Tony tell you**
22  **you'd be doing?**
23     A.  Installing like garage doors and stuff
24  related to that.

27

1      Q.  **Okay.**
2          **Had you ever done that kind**
3  **of work before?**
4      A.  No.
5      Q.  **All right.**
6          **And how long did you and Tony**
7  **meet?**
8      A.  I don't remember, honestly.
9      Q.  **Did you meet at his office there?**
10     A.  Yes.
11     Q.  **All right.**
12         **He has an office at that**
13  **location?**
14     A.  Yes.
15     Q.  **All right.**
16         **And did you fill out a job**
17  **application or anything else?**
18     A.  No.
19     Q.  **Did you fill out any paperwork that**
20  **you can recall?**
21     A.  Yes.
22     Q.  **What did you fill out?**
23     A.  Like -- just like my bank information
24  for like payroll and that.

28

1      Q.  **Okay.**
2          **And then are you a union**
3  **member?**
4      A.  Yes.
5      Q.  **How did you become a union member?**
6      A.  They sponsored me in.  Then I had to
7  go to the school and then to the local hall and
8  then like all of the paperwork and stuff like
9  that.
10     Q.  **Okay.**
11         **And so you went to the**
12  **apprentice program?**
13     A.  Yes.
14     Q.  **All right.**
15         **And you enrolled there?**
16     A.  Yes.
17     Q.  **And that was in what year?**
18     A.  2021, I believe.  Late.
19     Q.  **Okay.**
20         **Are you still in the**
21  **apprentice program?**
22     A.  No.
23     Q.  **When did you complete the apprentice**
24  **program?**

7 (Pages 25 to 28)

29

1    A.  Like a month or two ago.
2    Q.  Congratulations.
3    A.  Thank you.
4    Q.  All right.
5        So, now, you're a
6   full-fledged journeyman?
7    A.  Yes.
8    Q.  All right.
9        And what union local are you
10  a member of?
11   A.  272.
12   Q.  All right.
13       And how did you become a
14  member of that local?  Walk me through it.
15   A.  They sponsored me in, and I went to
16  the local hall and filled out whatever
17  paperwork they gave me.
18   Q.  Okay.
19   A.  And then just from there just kind of
20  told me what to do.
21   Q.  All right.
22       And for training, as far as
23  install -- well, let me strike that.
24       Do you do dock leveler

30

1   installation?
2    A.  Not typically, no.  I've done it like
3   once.
4    Q.  Okay.
5        How long ago was the ones
6   that you installed a dock leveler?
7    A.  A couple months ago.
8    Q.  Okay.
9        Did you do it by yourself, or
10  were you assisting somebody?
11   A.  I was assisting.  I was just an extra
12  set of hands.
13   Q.  All right.
14       Other than that, all of your
15  work for Dock & Door has been overhead door
16  installation?
17   A.  Yes.
18   Q.  Okay.
19       And you received training
20  through the apprentice program, correct?
21   A.  Yes.
22   Q.  Did they train you to install overhead
23  doors?
24   A.  No.

31

1    Q.  Okay.
2        Well, how did you learn
3   overhead door installation?
4    A.  The guys I worked with taught me.
5    Q.  And who are those guys?
6    A.  Dave Green, Nico, Jose, all of the
7   older guys there.
8    Q.  All right.
9        And are you a member of any
10  other union?
11   A.  No.
12   Q.  Other than going through the
13  carpenters program, have you had any other
14  training in any other trades?
15   A.  No.
16   Q.  Okay.
17       How did you learn to paint
18  cars?
19   A.  My dad.
20   Q.  Oh, is that --
21   A.  Yeah.
22   Q.  He did that kind of work?
23   A.  Ah-huh.
24   Q.  Is that a yes?

32

1    A.  Yes.
2    Q.  All right.
3    A.  Sorry.
4    Q.  That's all right.
5    A.  Sorry.  I didn't think you meant
6   trades as in bodywork.
7    Q.  Oh, any trades, really.
8        But do you do bodywork also?
9    A.  No, not anymore.
10   Q.  Okay.
11       You did?
12   A.  Yes.
13   Q.  All right.
14       And you learned the same way,
15  from your dad?
16   A.  Yes.
17   Q.  What kind of work do you do for
18  Dock & Door?
19   A.  Install like dock doors in like
20  warehouse buildings and new construction, like
21  spec buildings they call them.
22   Q.  Okay.
23       Anything else?
24   A.  I do like the seals.

8 (Pages 29 to 32)

33

1    Q.  Okay.
2    A.  The dock seals.  Track guards.
3    Q.  Okay.
4    A.  Guard rail.
5    Q.  Anything else?  Door openers?
6    A.  I have a little experience with door
7    openers, but I've done them before.
8    Q.  Okay.
9         Oh, you said I have little
10   experience with door openers, or I have a
11   little experience?
12   A.  Have little.
13   Q.  Okay.
14        You've done them before, but
15   you don't do them often, I take it?
16   A.  Correct.
17        MR. McJESSY:  Okay.
18        274.  275.  276.
19
20        (WHEREUPON, the documents were
21        marked Plaintiff's
22        Exhibits 274, 275, and 276 for
23        identification, as of 10/14/25.)
24

34

1    BY MR. McJESSY:
2    Q.  All right.
3         Now, sir, I've handed you
4    three exhibits, 274, 275 and 276.  And I'll
5    represent to you that 275 and 276 are just
6    enlargements of the two checks that are part of
7    Exhibit 274 just so you can see them better.
8         Do you see those --
9    A.  Yes.
10   Q.  -- two checks?
11   A.  Yes.
12   Q.  All right.
13        And the check that is shown
14   in Exhibit 274 and Exhibit 275 looks to be a
15   check written to you by Midwest Dock Solutions,
16   correct?
17   A.  Yes.
18   Q.  Is that your signature on the back
19   of the check?
20        We're just on 275 at the
21   moment.
22   A.  I mean, it looks like it.
23   Q.  Okay.
24        And do you know what you

35

1    would have received this check for?
2    A.  No.
3    Q.  Okay.
4         Does this look like a check
5    that you received?
6    A.  No.  It could be my father.
7    Q.  Okay.
8         Is he also Richard Mantoan?
9    A.  Yes.
10   Q.  Okay.
11        But you said the signature on
12   the back looks like your signature?
13   A.  I mean, it's kind of hard to see.  We
14   have similar signatures.
15   Q.  Okay.
16        Do you know why your father
17   would receive a check from Midwest Dock
18   Solutions?
19   A.  Doing work on one of their trucks.
20   Q.  Okay.
21        Has he done work on one of
22   their trucks before?
23   A.  Yes.
24   Q.  Okay.

36

1         And the second check, then,
2    that's 276 -- that's also part of Exhibit
3    274 -- that's a check payable to Rick Mantoan.
4         Do you see that?
5    A.  Yes.
6    Q.  Do you -- do you recognize that as a
7    check that was written to you?
8    A.  No.  I don't go by Rick.
9    Q.  Okay.
10        How -- what do you go by?
11   A.  R. J.
12   Q.  Okay.
13        You also go by Richard?
14   A.  Occasionally.
15   Q.  Okay.
16        So you think that the check
17   that's 276 -- you think that was written to
18   your father, also?
19   A.  Yes.
20   Q.  Okay.
21        And you're not sure about
22   275?
23   A.  No.
24   Q.  Okay.

9 (Pages 33 to 36)

37

1     Sir, do you have a credit
2  card with -- a credit card from Midwest Dock
3  Solutions?
4     A.  Yes.
5     Q.  All right.
6        And when did you get the
7  credit card?
8     A.  A couple years ago.  I couldn't tell
9  you the exact date.
10    Q.  All right.  A couple years ago.
11       And if I said 2023, would
12 that sound right to you?
13    A.  Yeah.
14    Q.  Okay.
15       And who gave you the credit
16 card?
17    A.  Honestly, nobody gave it directly to
18 me.
19    Q.  Okay.
20       How did you get the credit
21 card?
22    A.  Brutti told me to pick it up in the
23 office.
24    Q.  Okay.

38

1        And, again, that's the office
2  at 26 -- or 27 East 36th Place in Steger?
3     A.  Yes.
4     Q.  Okay.
5        And is that what you did?
6  You went to the office and picked it up?
7     A.  Yeah.  It was just on the break room
8  table in there.
9     Q.  Okay.
10       And how did you come to get a
11 credit card from Tony Brutti?
12    A.  Just in case I needed materials.
13    Q.  Okay.
14       Is it just one day Tony
15 said -- Tony Brutti said that there's a credit
16 card for you on the break room table without
17 any prior discussions or anything like that?
18    A.  Yeah, just because sometimes like I'd
19 need stuff out on like job sites.  And I'm not
20 paying for it, so --
21    Q.  Okay.
22       And how -- do you know how
23 Mr. Brutti knew that you'd be out on a job site
24 and not have a credit card and need to purchase

39

1  something?
2     A.  Yeah.
3        MS. CAHILL:  Objection.  Form.
4  BY MR. McJESSY:
5     Q.  All right.  Let me rephrase my
6  question.
7        Did you have discussions with
8  Mr. Brutti about needing to purchase materials
9  when you're out in the field?
10    A.  Yeah.
11    Q.  Okay.
12       What was the nature of those
13 discussions?
14    A.  Probably needed anchors or drill bits,
15 something job specific.
16    Q.  Okay.
17       And you don't purchase those
18 things yourself?
19    A.  No.
20    Q.  Okay.
21       And did Mr. Brutti say, hey,
22 I'll get you a credit card or anything like
23 that?
24    A.  I don't remember to be honest with

40

1  you.
2     Q.  Okay.
3     A.  I don't remember exactly how the
4  conversation went.
5     Q.  Okay.
6        Do you remember any
7  conversation like that?
8     A.  No.
9     Q.  Okay.
10       But at some point, you
11 remember Mr. Brutti told you there was a credit
12 card for you on the break table?
13    A.  Yes.
14    Q.  Okay.
15       Anybody else other than Mr.
16 Brutti, to your knowledge, arrange for you to
17 have the credit card?
18    A.  Not to my knowledge.
19    Q.  Okay.
20       And then you, I take it, went
21 into the break room?  It's in the break room,
22 you said?
23    A.  Yeah.
24    Q.  On the table in the break room?

10 (Pages 37 to 40)

41

1   A.  Yeah.
2   Q.  Okay.
3           At Midwest Dock Solutions'
4   office?
5   A.  I don't know whose office it exactly
6   is, but, yes --
7   Q.  Okay.
8   A.  -- at 27 East --
9   Q.  36th Place?
10  A.  Yes.
11  Q.  All right.
12          You don't know whose office
13  that is?
14  A.  No, honestly.
15  Q.  All right.
16          As far as you know, it could
17  be either Dock & Door's or Midwest Dock
18  Solutions' or both?
19  A.  Yes.
20  Q.  Okay.
21          And you went in, and there
22  was a credit card for you; is that correct?
23  A.  Yes.
24  Q.  All right.

42

1           And you've used that credit
2   card since then for work purposes?
3   A.  Yes.
4
5           (WHEREUPON, the document was
6           marked Plaintiff's
7           Exhibit 277 for identification,
8           as of 10/14/25.)
9
10  BY MR. McJESSY:
11  Q.  All right.
12          I'm going to hand you what
13  I've marked as Exhibit 277.
14          And let me ask you this, when
15  you make purchases on the credit card, do you
16  have to account in any way for the purchases
17  you've made?
18  A.  I send receipts in.
19  Q.  Okay.
20          And who do you send the
21  receipts to?
22  A.  Sherri.
23  Q.  All right.
24          Is that Sherri Webber?

43

1   A.  I honestly don't know her last name.
2   Q.  Is she in the office?
3   A.  Yes.
4   Q.  And do you -- is that something you're
5   required to do, is send in the receipts?
6   A.  Yes.
7   Q.  And who told you you had to do that?
8   A.  Tony Brutti.
9   Q.  Okay.
10          And who told you that the
11  receipts had to go to Sherri?
12  A.  Tony Brutti.
13  Q.  Okay.
14          And how do you send Sherri
15  the receipts?
16  A.  Pictures.
17  Q.  All right.
18          Take a snapshot of the
19  receipt and e-text it to her?
20  A.  Yes.
21  Q.  All right.
22          So you have texts with Sherri
23  as well; is that correct?
24  A.  Not as of recently, but in the past,

44

1   yes.
2   Q.  Okay.
3           You don't have any of those
4   texts currently, I take it?
5   A.  No.
6   Q.  All right.
7           Excuse me.  And if you look
8   at what's marked as Exhibit 277, I'll represent
9   to you that this is a printout from 2022 and
10  2023 from the general ledger from Midwest Dock
11  Solutions for your credit card entries.  And if
12  you look through this, you'll see that it's
13  got -- it's got charges on here, payment BP,
14  payment Amoco, payment Grease Monkey, payment
15  Speedway, payment Home Depot, payment Culver's,
16  payment Texas Roadhouse, payment Buffalo Wild
17  Wings, payment Anytime Fitness, payment Anytime
18  Fitness, Anytime Fitness.
19          Do you see those charges on
20  there?
21  A.  Yes.
22  Q.  Are those your charges?
23  A.  Yes.
24  Q.  Okay.

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

45

1      And are any of those personal
2  charges?
3      A.  Not like -- I'm trying to think.  When
4  we stay out of town, that's when I use these,
5  to go out to eat or stuff like that.
6      Q.  All right.
7          What about the Anytime
8  Fitness charges?
9      A.  That's when I was out of town.
10     Q.  Okay.
11         You'd go to a fitness place?
12     A.  Yeah.  Go to the gym, yes.
13     Q.  Okay.
14         And does -- as far as you
15  know, are -- well, strike that.
16         Do you personally pay for any
17  of these charges?
18     A.  No.
19     Q.  Okay.
20         Have you ever had to
21  reimburse the company for any of these charges?
22     A.  No.
23     Q.  Okay.
24         Do you know who pays these

46

1  charges?
2      A.  No.
3      Q.  Okay.
4          You don't know whether it's
5  Dock & Door or Midwest Dock Solutions?
6      A.  No.
7      Q.  Okay.
8          But it's true that whoever
9  pays them it's not you, correct?
10     A.  Correct.
11     Q.  Okay.
12         And do you still have the
13  credit card?
14     A.  Yes.
15     Q.  Okay.
16         And do you still use it for
17  work purposes?
18     A.  Yes.
19     Q.  So when you're -- when you're out of
20  town, you mean out of town working, correct?
21     A.  Yes.
22     Q.  Okay.
23         And you would use it to pay
24  for meals and things like that?

47

1      A.  Yes.
2      Q.  All right.
3          And do you know other -- any
4  other persons who have a credit -- a company
5  credit card?
6      A.  I think most of the people we work
7  with do.
8      Q.  Okay.
9          And when you say "most," who
10  would be the names of those people?
11     A.  Nico, Dave Green, Collin.
12     Q.  Collin Zarlengo?
13     A.  Yes.
14     Q.  All right.
15         And have you gone out of town
16  on jobs with them as well?
17     A.  Yes.
18     Q.  All right.
19         And have they used their
20  credit cards, to your knowledge, for the same
21  basic purposes that you do?
22     A.  Yes.
23     Q.  Okay.
24         Meals, that kind of thing?

48

1      A.  Yes.
2      Q.  Do you know, are the credit card
3  receipts for the other employees handled the
4  same way, they send in their credit card
5  receipts to Sherri?
6      A.  Yes.
7      Q.  And since you've been working for
8  Dock & Door, have you worked for any other
9  employer?
10     A.  No.
11     Q.  All right.
12         Have you done work for
13  Midwest Dock Solutions?
14     A.  No.
15
16         (WHEREUPON, the document marked
17         Plaintiff's Exhibit 273 for
18         identification was tendered to
19         the deponent.)
20
21  BY MR. McJESSY:
22     Q.  Okay.
23         Let's take a look at the text
24  messages that you've produced that are marked

12  (Pages 45 to 48)

49

1  as Exhibit 273, and are these sort of
2  representative of the -- I know you only have
3  text messages going back to, it looks like, mid
4  September, but are these representative of the
5  kind of text messages that you ordinarily
6  exchange with Tony Brutti?
7      A.  Yes.
8      Q.  All right.
9          If you look at -- if you go
10 to the third page back -- well, actually, if
11 you go to the second page, there's a text
12 message on the bottom of that.  It says, okay,
13 we've got a couple of pallets out there.
14         Do you see that?
15     A.  The second page?
16     Q.  The second page in, yeah.  If you go
17 to the second page.
18     A.  Oh, one more page.  Sorry.
19     Q.  Okay.
20         And if you go to the second
21 page at the bottom, it looks like there's a
22 text.  It says, okay, we've got a couple of
23 pallets out there?
24     A.  Yes.

50

1      Q.  All right.
2          And this looks like part of a
3  text string from July 28, it looks like.
4          Do you see that?
5      A.  Yes.
6      Q.  All right.
7          And when did you send these
8  text messages to your attorney?
9      A.  Yesterday.
10     Q.  All right.
11         So you still had a text
12 message on your phone from July 28?
13     A.  I guess, yeah.
14     Q.  Would that suggest to you that they're
15 not deleted every 30 days?
16     A.  Yeah.  Some of them -- I have it set
17 on my phone to delete.  But sometimes when you
18 scroll up, they're still there.
19     Q.  Okay.
20     A.  It's not every text.  I don't know.
21     Q.  Okay.
22         How does it work that you
23 thought they were deleted every 30 days?
24     A.  Because if I like scroll up any more,

51

1  then there's nothing.  But then if I go into
2  other chats and I scroll up, there's just
3  nothing.
4      Q.  I don't quite understand that.
5      A.  I don't either.  I'm telling you like
6  they're set to delete after a month, but
7  sometimes like some of them save.
8      Q.  Okay.  All right.
9          In any event, this text
10 message at the bottom, it sort of cuts off.
11         Do you see that?
12     A.  Yes.
13     Q.  And then the next page doesn't seem to
14 pick right up with where that's at.
15         Do you see that?
16     A.  Yes.
17     Q.  Are there text messages that were
18 missing in this string?
19     A.  Not that I know of.
20     Q.  Okay.
21         When you send your text
22 messages -- when you send the other text
23 messages on your phone that we talked about to
24 your attorney, can you check and see if you

52

1  have -- like if there's sections missing from
2  this, can you produce the complete text string?
3      A.  Yes.
4      Q.  Okay.
5      A.  Sorry.  I kind of sent them in like
6  a -- I was just screenshotting and hurrying.
7      Q.  Okay.
8          And if you look at the next
9  page, there's a -- the first line at the top
10 says pretty sure Sam has one.
11         Do you see that?
12     A.  Yes.
13     Q.  Who's Sam?
14     A.  He was an employee for a little bit.
15     Q.  Okay.
16         Do you know his last name?
17     A.  Sorry.  I'm trying to think.
18         No.  I can't remember it.
19     Q.  When you say he was an employee for a
20 little bit, what do you mean by that?  Do you
21 know when he started?
22     A.  Last year.  He was here like on and
23 off.
24     Q.  Okay.

53

1    And was he working for
2 Dock & Door?
3    A.  Yes.
4    Q.  And do you know, was it -- do you know
5 if he had a more full name than Sam, like Sam
6 or Samuel or --
7    A.  I think it was Samuel.
8    Q.  Samuel.
9         And do you know his last
10 name?
11    A.  No.
12    Q.  Okay.
13    A.  I can't remember it.
14    Q.  All right.
15         But you think he started in
16 2024?
17    A.  Yes.
18    Q.  Okay.
19         And he was somebody who
20 worked on job sites with you?
21    A.  Occasionally, yes.
22    Q.  Okay.
23         And what kind of work did Sam
24 do?

54

1    A.  Just kind of whatever we needed extra
2 help with.
3    Q.  Okay.
4         Including like door
5 installation work?
6    A.  Yes.
7    Q.  Okay.  All right.
8         And then if you go to the top
9 of the next page, it talks about basically
10 buying, I think, a hammer drill, it looks like.
11         Is that the kind of thing you
12 would use your credit card for?
13    A.  Yes.
14    Q.  Okay.
15         And if you bought a tool
16 like -- do you remember, did you buy the
17 Milwaukee drill or the hammer drill or whatever
18 the -- what was it that you were buying?  Do
19 you know what it was you were buying?
20    A.  It was a hammer drill.
21    Q.  Okay.
22         For some reason, I thought
23 that.
24         Has that become a company

55

1 tool?
2    A.  Yes.
3    Q.  Okay.
4         It goes on the truck with the
5 other tools?
6    A.  Yes.
7    Q.  All right.
8         And if you turn to the page
9 that has August 5 on it at -- it's in the
10 middle of the page.  It says August.  Are you
11 there?  August 5 at 7:38 a.m.
12         Do you see that?
13    A.  Yes.
14    Q.  And the entry above that, those are
15 your texts in blue, correct?
16    A.  Yes.
17    Q.  All right.
18         And you say, I had Sam clean
19 up yesterday, not too much to do out here; is
20 that right?
21    A.  Yes.
22    Q.  All right.
23         That's the same Sam we were
24 talking about?

56

1    A.  Yes.
2    Q.  Okay.
3         And then the text below that,
4 the one that begins on August 5 at 7:38, it
5 says, you're going to send in your hours and
6 you ask is Collin coming.
7         Do you see that?
8    A.  Yes.
9    Q.  Does that mean out to the job site
10 where you're working?
11    A.  Yes.
12    Q.  All right.
13         And Tony's text is -- Tony
14 Brutti's text is directly below that.  It says,
15 I think he loaded some stuff at the shop,
16 correct?
17    A.  Yes.
18    Q.  Okay.
19         And that's the -- is the shop
20 he's referring to the 27 East 36th Place
21 location?
22    A.  Yes.
23    Q.  All right.
24         Is that where you would

14 (Pages 53 to 56)

57

1  typically load up with supplies for -- when
2  you're going out to the job site?
3       A.  Yes.
4       Q.  And then if you could turn in further
5  to -- let's see -- August 19, 10:47 a.m., I
6  want to ask you about the entries above that.
7  That's the one I'm seeing.
8            If you go to the page before
9  that, it says, at the top, so the electricians
10  are taking over everything on the lights,
11  question mark, like installing them, too.
12            That's your text, correct?
13       A.  Yes.
14       Q.  All right.
15            And Tony responds, yes,
16  lights and fans.  We will be doing the traffic
17  lights for the locks, and you -- and that's
18  what he says, correct?
19       A.  Yes.
20       Q.  And you said, that's stupid, correct?
21       A.  Yes.
22       Q.  All right.
23            What -- and if you go on from
24  here, it looks like there's -- you're talking

58

1  about carpenter work versus electrician work,
2  correct?
3       A.  Yes.
4       Q.  What's the issue that you're having?
5       A.  So there's dock lights and traffic
6  lights.  Traffic lights go on the outside of
7  the building and are like wired together where
8  dock lights are on the inside of the building.
9  And typically we install them, and it's just a
10  plug you plug into the wall.  So they were
11  trying to say that we shouldn't do the ones
12  inside but should be doing the ones outside,
13  which wouldn't make sense because then they
14  would have to wire them.
15       Q.  "They" meaning?
16       A.  The electricians.
17       Q.  Okay.
18            They were saying you should
19  be installing the traffic lights on the outside
20  of the building?
21       A.  Yes.
22       Q.  Okay.
23            But not wiring them?
24       A.  Correct.

59

1       Q.  And they were saying they should be
2  installing the dock lights on the inside of the
3  dock?
4       A.  Yes.
5       Q.  All right.
6            And if -- if you go to the
7  next page, just above your time sheet, it says,
8  yea, yea, y-e-a.  I -- well, obviously, I'm not
9  mad at Bill.  The electricians have tried to
10  pull this on another ARCO job.
11            Do you see that?
12       A.  Yes.
13       Q.  And it's a little cumbersome, but what
14  are you saying there?
15       A.  On a previous job -- it was another
16  ARCO -- the electricians had said that we
17  shouldn't be doing the dock lights on the
18  interior of the building.  And previously,
19  Bill, who's like the GC for ARCO, told them
20  like that's our thing.
21       Q.  Meaning?
22       A.  We should be installing them.
23       Q.  Meaning Dock & Door Install or Midwest
24  Dock or whoever?

60

1       A.  Dock & Door Install should be
2  installing them, yes.
3       Q.  Okay.
4            Do you know who ARCO's
5  contract was actually with for this job,
6  whether it was Dock & Door or Midwest Dock
7  Solutions?
8       A.  No.
9       Q.  Okay.
10            That isn't anything you would
11  have reason to know; is that right?
12       A.  Correct.
13       Q.  Okay.
14            And who's Connelly?
15       A.  The electricians company.
16       Q.  And if you turn to the next page,
17  there's a text message there asking if -- do we
18  have size large shirts, T-shirts.
19            Do you see that?
20       A.  Yes.
21       Q.  All right.
22            And is that referring to the
23  like neon color -- neon green shirts that you
24  sometimes wear?

15 (Pages 57 to 60)

61

```
1    A.  Yes.
2    Q.  Okay.
3        MS. CAHILL:  I have an objection.
4  He hasn't testified to that.
5  BY MR. McJESSY:
6    Q.  All right.
7        Are those the neon green
8  shirts that say Midwest Dock Solutions on them?
9    A.  Some of them.  Some of them are just
10 blank.
11   Q.  Okay.
12       And have you worn the ones
13 that say Midwest Dock Solutions on them?
14   A.  Yes.
15   Q.  Okay.
16       And -- all right.  And then
17 you say, below that, cool, I need to get rid of
18 some of my old ones.  They're destroyed, LOL,
19 correct?
20   A.  Yes.
21   Q.  All right.
22       Were the old ones the ones
23 that said Midwest Dock Solutions on them?
24   A.  Just, in general, I needed new shirts.
```

62

```
1    Q.  Okay.
2        But did the old ones say
3  Midwest Dock Solutions on them?
4    A.  I'm sure some of them did.
5    Q.  Okay.
6        And if you go to the fourth
7  to the last page, and on this page, it looks
8  like this is dated -- the entries here are
9  September 27 through October 1.
10       That's like a couple of weeks
11 ago, right?
12   A.  Yes.
13   Q.  All right.
14       And it looks like you're
15 forwarding -- for October 1, you're forwarding
16 your hours.
17       Is that what that is?
18   A.  Yes.
19   Q.  All right.
20       And then Tony's text says,
21 off tomorrow, correct?
22   A.  Yes.
23   Q.  And you say, off all week, question
24 mark; is that right?
```

63

```
1    A.  Yes.
2    Q.  All right.
3        And he responds, possibly,
4  I'm not a hundred percent sure about Friday
5  yet, correct?
6    A.  Yes.
7    Q.  Okay.
8        And then if you go further
9  down, it looks like then there's a text from
10 you that's dated October 6 where you're
11 providing hours, again, correct?
12   A.  Yes.
13   Q.  And is that for -- it says 25, 26, 29,
14 30.
15       That's September dates?
16   A.  Yeah, whichever date he asked for
17 hours for.
18   Q.  Okay.
19       But it wouldn't be -- it,
20 obviously, wouldn't be for October?
21   A.  No.
22   Q.  And I'm guessing it probably wouldn't
23 be for August.  So would that be September?
24   A.  Yes.
```

64

```
1    Q.  Okay.
2        And then you sent a text on
3  Thursday.
4        Is that Thursday of last
5  week?
6    A.  I'd assume so.
7    Q.  Okay.
8        It would be after October 6,
9  so I would assume so, too.
10       It says, so there's zero work
11 on union side, correct?
12   A.  Yes.
13   Q.  Okay.
14       And what does "union side"
15 mean?
16   A.  Like Dock & Door install.
17   Q.  Okay.
18       Is there a nonunion side?
19   A.  Not for us, but Midwest.
20   Q.  That's nonunion?
21   A.  Yes.
22   Q.  Okay.
23       So when you say there's zero
24 work on the union side, you mean for
```

16 (Pages 61 to 64)

65

```
 1   Dock & Door, correct?
 2       A.  Correct.
 3       Q.  The address that's on the subpoena
 4   that I showed you here, the 9458 Torrence
 5   Place, is that your current address?
 6       A.  Yes.
 7       Q.  Okay.
 8           And what's your current phone
 9   number?
10       A.  (219) -- do you need to write it down,
11   or are you just asking?
12       Q.  No.  I'm just asking.
13       A.  (219) 779-6239.
14       Q.  All right.
15           And is that your cell phone
16   number?
17       A.  Yes.
18       Q.  Who's your carrier?
19       A.  T-Mobile.
20       Q.  All right.
21           And how long have you had
22   that number?
23       A.  A couple years.
24       Q.  How long have you had T-Mobile as a
```

66

```
 1   carrier, same time?
 2       A.  Same time, yeah.
 3       Q.  The last four digits of your social
 4   security number?
 5       A.  9351.
 6       Q.  And date of birth?
 7       A.  01/27/03.
 8       MR. McJESSY:  Okay.
 9           I don't have any other
10   questions.  I'm going to reserve the right to
11   recall the witness just in case.  I'd like to
12   see the text messages that we didn't get.
13       MS. CAHILL:  I have no objection.
14       MR. McJESSY:  And other than that,
15   I'm done.  I have no other questions.
16       MS. CAHILL:  I have no questions.
17       MR. HUGHES:  I don't think I do.
18   Let me look.
19           No.  I don't have anything.
20       MR. McJESSY:  All right.
21           Sir, I appreciate your time.
22   Don't take any of those documents with you.
23       THE WITNESS:  Okay.
24       MS. CAHILL:  We'll waive.
```

67

```
 1       MR. McJESSY:  There you go.
 2           All right.  You're good.  I
 3   appreciate it.
 4
 5           FURTHER DEPONENT SAITH NOT.
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

68

```
 1   STATE OF ILLINOIS   )
 2                       ) SS:
 3   COUNTY OF C O O K   )
 4
 5       I, DIANE M. NULICK, a Notary Public
 6   within and for the County of Cook, State of
 7   Illinois, and a Certified Shorthand Reporter of
 8   said state, do hereby certify:
 9       That previous to the commencement of the
10   examination of the witness, the witness was
11   duly sworn to testify the whole truth
12   concerning the matters herein;
13       That the foregoing deposition transcript
14   was reported stenographically by me, was
15   thereafter reduced to typewriting under my
16   personal direction and constitutes a true
17   record of the testimony given and the
18   proceedings had;
19       That the said deposition was taken
20   before me at the time and place specified;
21       That the said deposition was adjourned
22   as stated herein;
23       That I am not a relative or employee or
24   attorney or counsel, nor a relative or employee
```

17 (Pages 65 to 68)

1 of such attorney or counsel for any of the
2 parties hereto, nor interested directly or
3 indirectly in the outcome of this action.
4   IN WITNESS WHEREOF, I do hereunto set
5 my hand and affix my seal of office at Chicago,
6 Illinois, this 17th day of October, 2025.
7
8
9
10
11

12  Notary Public, Cook County, Illinois.
13
14 C.S.R. Certificate No. 084-002029.
15
16
17
18
19
20
21
22
23
24

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 70

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MID-AMERICA CARPENTERS       )
REGIONAL COUNCIL PENSION      )
FUND, et al.,                            )
                                                )
                    Plaintiffs,      )   No. 1:24-cv-02428
                                                )
        vs.                              )  Judge Andrea R. Wood
                                                )
DOCK & DOOR INSTALL,       )       Magistrate Judge
INC., an Illinois                    )  Jeannice W. Appenteng
corporation and MIDWEST    )
DOCK SOLUTIONS, INC., an   )
Illinois corporation,             )
                                                )
                    Defendants.    )

               The deposition of NICOLAS JAMES
KELLY, called by the Defendant for examination,
taken pursuant to the Federal Rules of Civil
Procedure of the United States District Courts
pertaining to the taking of depositions, taken
before DIANE M. NULICK, a Notary Public within
and for the County of Cook, State of Illinois,
and a Certified Shorthand Reporter of said
State, at Suite 231, 3759 North Ravenswood,
Chicago, Illinois, on the 14th day of October,
A.D. 2025, at 9:16 a.m.

---

**2**

PRESENT:
     McJESSY, CHING & THOMPSON, LLC,
     BY:  MR. KEVIN P. McJESSY,
     mcjessy@MCandT.com,
     (3759 North Ravenswood, Suite 231,
     Chicago, Illinois  60613,
     (773) 880-1260),

          appeared on behalf of the plaintiffs;

     ALLOCCO MILLER & CAHILL, P.C.,
     BY:  MR. TODD A. MILLER,
     tam@alloccomiller.com,
     (20 North Wacker Drive, Suite 3517,
     Chicago, Illinois  60606,
     (312) 675-4325),
          appeared on behalf of the defendant,
          Dock & Door Install, Inc.;

     AMUNDSEN DAVIS LLC,
     BY:  MR. MICHAEL F. HUGHES,
     mhughes@amundsendavislaw.com,
     (3815 East Main Street, Suite A-1,
     St. Charles, Illinois  60174,
     (630) 587-7925/(630) 217-1228 (direct),
          appeared on behalf of the defendant,
          Midwest Dock Solutions, Inc.

---

**3**

                    I N D E X

WITNESS:  NICOLAS JAMES KELLY

EXAMINATION BY:                          PAGE
Mr. McJessy                                    4

PLAINTIFF'S EXHIBITS:
No. 268                                          11
Nos. 269 and 270                          12
No. 271                                          60
No. 269                                          77
No. 270                                          79

---

**4**

               (The witness was duly sworn.)

               NICOLAS JAMES KELLY,
called as a witness herein, having been first
duly sworn, was examined and testified as
follows:

               EXAMINATION
               BY MR. McJESSY:

     Q.  Sir, can you state your name for the
record -- your full name, first, middle, and
last -- and spell each one?
     A.  Nicolas, N-i-c-o-l-a-s, James,
J-a-m-e-s, Kelly, K-e-l-l-y.
     Q.  All right.
               And do you sometimes go by
Nico?
     A.  Yes.
     Q.  All right.
               Do you also go by Nick?

---

1 (Pages 1 to 4)

5

1      A.  Not really.  Nico pretty much a
2  hundred percent of the time.
3      Q.  Okay.
4           And, sir, have you ever been
5  deposed before?
6      A.  What?
7      Q.  Have you ever been deposed before?
8           I'm sorry.  I spoke too
9  quickly.  Sorry.
10     A.  I still didn't understand you.  Wait.
11     Q.  Oh, have you --
12     A.  Was I deposed?  No, I have not --
13     Q.  Have you ever been deposed before?
14     A.  No.
15     Q.  Okay.
16          A couple of ground rules,
17  then, just so you understand the process and
18  hopefully make things go smoother.
19          You understand you're under
20  oath, correct?
21     A.  Yes.
22     Q.  Okay.
23          And you understand that even
24  though we're here in a conference room, which

6

1  is an informal setting, that oath has the same
2  force and effect as if you were testifying in
3  court, correct?
4      A.  Yes.
5      Q.  Okay.
6           And I'm going to ask you a
7  series of questions.  You'll give me,
8  hopefully, the best most truthful answers that
9  you can.  We have a court reporter here, who's
10  going to take down what everybody says.  As we
11  go along, all of your responses to my questions
12  need to be verbal responses.  Yeses and nos are
13  fine.  But if you nod your head or shake your
14  head or say ah-huh or uh-uh, I will prompt you,
15  is that a yes, is that a no, just so the
16  record's clear.
17          Is that fair?
18     A.  Okay.  Yep.
19     Q.  All right.
20          And another thing.  Even
21  though the court reporter has two hands.  She
22  can only take down what one of us is saying at
23  a time.  So it's important when I'm asking a
24  question, even if you know what my question's

7

1  going to be, that you let me finish asking my
2  question before you start answering.
3           Is that fair?
4      A.  Yes.
5      Q.  Okay.
6           And I will try to return the
7  courtesy and not talk over you and ask a
8  question while you're still answering.
9           Fair enough?
10     A.  Yeah.
11     Q.  Okay.
12          If I ask you a question and
13  you don't understand it, like the beginning of
14  the deposition here --
15     A.  Yeah.
16     Q.  -- will you ask me to explain it?
17     A.  Okay.
18     Q.  Is that fair?
19     A.  Yes.
20     Q.  Okay.
21          And with that rule in place,
22  is it fair that if you answer a question that
23  you -- that I can presume you believe you
24  understood my question?

8

1      A.  Yes.
2      Q.  Okay.
3           Any reason today you cannot
4  give truthful answers to my questions?
5           For example, are you taking
6  any medications or suffering from any
7  conditions that would prevent you from either
8  understanding my questions or giving truthful
9  answers?
10     A.  No.
11     Q.  Okay.
12          You and I haven't spoken,
13  correct?
14     A.  We have not, I believe, no.
15     Q.  Okay.
16          Have you spoken with --
17  you're represented here by an attorney,
18  correct?
19     A.  Yes.
20     Q.  Okay.
21          That's Mr. Miller?
22     A.  Yes.
23     Q.  Okay.
24          I don't want to know what you

2 (Pages 5 to 8)

9

```
1    and Mr. Miller have talked about, but have you
2    had a chance to meet with Mr. Miller about your
3    deposition before today?
4        A.  Yes.
5        Q.  Okay.
6            And how long did you and him
7    speak?
8        A.  Ten, fifteen minutes.
9        Q.  Okay.
10           And have you spoken with
11   anybody else about your deposition?
12       A.  I have not.
13       Q.  Okay.
14           You haven't spoken with Mr.
15   Brutti or Mr. Zarlengo or Mr. Richert?
16       A.  I have not.
17       Q.  Okay.
18           Are they aware of your
19   deposition?
20       A.  No.  Tony Brutti is, told me about it,
21   yes.
22       Q.  Okay.
23           So you spoke with him just
24   about --
```

10

```
1        A.  Yeah, just to tell me -- because
2    originally I had one scheduled a few months
3    ago, but it got canceled.  And then he just
4    told me about this new one as well.
5        Q.  Okay.
6            And are you aware that other
7    employees at Midwest Dock Solutions or
8    Dock & Door have been deposed?
9        A.  Yes.
10       Q.  All right.
11           Whose depositions are you
12   aware of?
13       A.  Dave Green, I think.  We don't have a
14   lot of union guys, I guess.  Oh, Brandon.
15       Q.  Brandon Bishop?
16       A.  Yes, Branden Bishop.  I think, that's
17   it.
18       Q.  All right.
19           Did you speak with either of
20   them about their depositions?
21       A.  I have not.
22       Q.  Okay.
23           How are you aware that they
24   were deposed?
```

11

```
1        A.  Kind of just on a job site saying they
2    got the same letter we did or got served or
3    whatever, about coming to the first deposition.
4        Q.  Okay.
5            And how were you aware of
6    that?
7        A.  Just talking on the job site.
8        Q.  Oh, talking with them?
9        A.  Yeah, yeah.
10       Q.  Okay.
11           Did you talk to them about
12   their depositions after they were deposed?
13       A.  No.
14
15           (WHEREUPON, the document was
16            marked Plaintiff's
17            Exhibit 268 for identification,
18            as of 10/14/25.)
19
20   BY MR. McJESSY:
21       Q.  I'm going to hand you what's marked as
22   Exhibit 268, ask you if that looks like the
23   subpoena you received in this matter.
24       A.  Yes.  Yes.
```

12

```
1        Q.  All right.
2            And if you look at the last
3    page, it asks you to produce certain documents.
4            Do you see that?
5        A.  Yes.
6        Q.  All right.
7            So the first request asks you
8    to produce all emails and text messages between
9    you and either Dock & Door or anyone employed
10   there or Midwest Dock or anyone employed there.
11           Do you see that?
12       A.  Yes.
13       Q.  And I will represent to you that today
14   or last night we received a few text messages.
15
16           (WHEREUPON, the documents were
17            marked Plaintiff's
18            Exhibit 269 and 270 for
19            identification, as of 10/14/25.)
20
21   BY MR. McJESSY:
22       Q.  I hand you what's been marked as
23   Exhibit 269.
24           I'm going to hand you what's
```

3 (Pages 9 to 12)

13

```
1    marked as Exhibit 270.
2         All right.  I've handed you
3    what I've marked as Exhibit 269 and 270.  Are
4    those text messages that you produced?
5         A.  Yes.
6         Q.  All right.
7              Are those all of the text
8    messages that you have between you and anybody
9    at either Dock & Door or Midwest Dock
10   Solutions?
11        A.  Yes.  On my phone, yes.
12        Q.  Okay.
13             What do you mean, "on your
14   phone, yes"?
15        A.  I just -- I've always kind of been
16   like that.  I have my messages delete pretty
17   quickly, so that's it, whatever I got with
18   Brutti and Ira.  That's literally -- I've
19   always kind of had like a weird like OCD thing.
20   I have zero -- I delete messages as soon as
21   I -- the week's over, essentially.  So that's
22   kind of all I have.
23        Q.  Okay.
24        A.  That's why I sent it.
```

14

```
1         Q.  All right.
2              So during -- when you
3    received the subpoena, you would have had a
4    week's worth of text messages, then, correct?
5         A.  Yes.
6         Q.  All right.
7              And you've deleted -- you've
8    just been deleting them as --
9         A.  Well, my phone, there's a setting
10   where -- I should have probably turned it off,
11   but -- where they delete after 30 days or
12   whatever as well.
13        Q.  Okay.
14             And then these aren't 30 days
15   old.
16             I take, it you text --
17        A.  A couple weeks, yeah.
18        Q.  Okay.
19             I take it, you text with Mr.
20   Brutti and Mr. Sugar pretty regularly?
21        A.  Mainly, Brutti.  These are, obviously,
22   a few with Ira, Mr. Sugar.
23        Q.  Right.
24        A.  I don't really respond to him as often
```

15

```
1    as Brutti.
2         Q.  Okay.
3         A.  But, yeah, the majority of the time,
4    it's Tony Brutti.
5         Q.  Okay.
6              And you said you don't
7    respond to him as often as you do Brutti.
8              Do you receive texts from Mr.
9    Sugar fairly regularly?
10        A.  I wouldn't say fairly regularly, but
11   there are random times I will get like
12   questions about stuff or -- just like asking a
13   question about a job site or something.
14        Q.  Okay.
15             That's the kind of text
16   message he would send you?
17        A.  Yeah.
18        Q.  How often would you say Mr. Sugar
19   texts you?
20        A.  Once a week, maybe.
21        Q.  Okay.
22        A.  A couple times a week, maybe.
23        Q.  So this -- this is just one week that
24   you didn't delete from Mr. Sugar, correct?
```

16

```
1         A.  Correct.
2         Q.  And he texted you on this --
3         A.  Or a couple of -- a couple of weeks'
4    worth or a week.
5         Q.  Okay.
6              And he texted you on this, it
7    looks like, on the 17th --
8         A.  Yeah.
9         Q.  -- 18th, 24th, 26th?
10        A.  26th, yeah.
11        Q.  Okay.
12             Is that fairly representative
13   of the kind of texts that you would have with
14   Mr. Sugar?
15        A.  Yes.
16        Q.  And the frequency of texts you would
17   have with Mr. Sugar?
18        A.  Yeah.
19        Q.  Okay.
20             And then these are texts that
21   you had with Mr. Brutti; is that correct?
22        A.  Correct.
23        Q.  Okay.
24             And are these fairly
```

4 (Pages 13 to 16)

17

1 representative of the frequency and kind of
2 texts that you would have with Mr. Brutti over
3 a week?
4 A. Yes.
5 Q. Okay.
6 Do you text with anybody else
7 at either Midwest Dock Solutions or
8 Dock & Door?
9 A. No.
10 Q. All right.
11 Do you text with any of your
12 coworkers, even on a social basis?
13 A. Oh, yeah. A couple.
14 Q. Okay.
15 And who, for example?
16 A. Collin Zarlengo. He is my -- we're
17 actually related. He's my cousin, so --
18 Q. Okay.
19 A. And then Dan Lietz. Just grew up with
20 him.
21 Q. Okay.
22 A. Since we were children.
23 Q. All right.
24 What's Dan Lietz's position?

18

1 A. I'm not entirely sure, to be honest
2 with you.
3 Q. All right.
4 And Collin Zarlengo is a
5 coworker?
6 A. Yes.
7 Q. Anybody else you would text with that
8 would be a coworker?
9 A. Nope.
10 Q. Okay.
11 Do you still have text
12 messages on your phone with them?
13 A. Yeah. Just social stuff.
14 Q. Okay.
15 I'm going to ask that you, at
16 least, not delete those --
17 A. Okay.
18 Q. -- for the time being. All right?
19 And I'll ask also that you produce those to
20 your attorney, Mr. Miller. Okay?
21 Then item number two on the
22 subpoena is all documents related to any work
23 you've performed for either Dock & Door or
24 Midwest Dock, including time sheets, job notes,

19

1 and the like.
2 Do you see that?
3 A. Yep.
4 Q. Do you have any documents responsive
5 to that request?
6 A. I do. I do have more time sheets. I
7 can also send those.
8 Q. Okay.
9 A. I can take more pictures of those.
10 Q. Other than time sheets, do you have
11 any other documents?
12 A. No. For the most part, it's just I'll
13 send Tony Brutti time sheets.
14 Q. Okay.
15 And we'll look at some of
16 those today.
17 Item three is produce all
18 documents showing the hours you worked for
19 either Dock & Door or Midwest Dock.
20 Do you see that?
21 A. Yes.
22 Q. Do you have documents responsive to
23 that request?
24 A. Can you explain that?

20

1 Q. Yes.
2 A. Would that be like more time sheets?
3 Q. It would be time sheets, anything that
4 would reflect the hours that you worked for
5 either of those companies.
6 A. Yes. Yeah. I have like my time
7 sheets for --
8 Q. Okay.
9 So the same thing that we --
10 A. Yeah, yeah. Same thing, yeah.
11 Q. All right.
12 A. It basically would represent the same
13 thing as that stuff.
14 Q. Do you keep like a journal of any sort
15 of hours that you work?
16 A. No, not necessarily, kind of just use
17 the notes -- my notes app to kind of remember
18 what I did throughout the week.
19 Q. Okay.
20 So you keep --
21 A. Start it over every week.
22 Q. -- you keep a notes app?
23 A. Yeah, just for the week. Like Monday,
24 if I'm working Monday, write what I did,

5 (Pages 17 to 20)

21

```
 1   Tuesday what I did, send it off or write it on
 2   the paper, send it to Tony, and then start all
 3   over next week.
 4        Q.  Okay.
 5             And do you keep that notes
 6   app, or do you start -- when you say start
 7   it --
 8        A.  I would just start it over, yeah,
 9   every week.  I don't like keep --
10        Q.  Okay.
11             And I know sometimes you know
12   what I'm going to ask.
13        A.  Yeah, yeah.
14        Q.  But let me finish asking my
15   question --
16        A.  Oh, okay.
17        Q.  -- just so she can take down the
18   question.
19             All right.  So you don't keep
20   the old notes?
21        A.  No.
22        Q.  All right.
23             Item four is produce all
24   documents showing amounts you were paid by
```

22

```
 1   either Dock & Door or Midwest Dock, such as pay
 2   checks, pay stubs, IRS W-2 forms, IRS 1099
 3   forms, and the like.
 4             Do you have any documents
 5   responsive to that request?
 6        A.  Yeah.
 7        Q.  What would you have?
 8        A.  I would have pay stubs.  I probably
 9   have my W-2s somewhere laying around my house.
10        Q.  Okay.
11             Would they be just from
12   Dock & Door, or do you have the ones from
13   Midwest Dock, when you worked there as well?
14        A.  They would just be Dock & Door.
15        Q.  Okay.
16             It's been a while since
17   you've worked for Midwest Dock, correct?
18        A.  Yeah.  It was when I just got out of
19   college and started there for a year.
20        Q.  Okay.
21             Produce any -- item five is
22   produce any resumé or job application you've
23   completed that includes any reference to either
24   Dock & Door or Midwest Dock.
```

23

```
 1             Do you see that?
 2        A.  Yes.
 3        Q.  And do you have any documents
 4   responsive to that request?
 5        A.  I do not.
 6        Q.  Okay.
 7             And then six is produce any
 8   photographs that you've taken of any job sites
 9   you've worked on for either Dock & Door or
10   Midwest Dock.
11             Do you have any photographs
12   of job sites or taken of job sites?
13        A.  I would have to look.
14        Q.  Okay.
15        A.  I'm sure there is some in my phone,
16   but --
17        Q.  Okay.
18             If you have those, I would
19   ask you produce those to Mr. Miller as well.
20             Is that --
21        A.  Okay.
22        Q.  Okay.
23             Sir, what's the highest level
24   of education you've received?
```

24

```
 1        A.  Bachelor's.
 2        Q.  All right.
 3             And when did you get that and
 4   from where?
 5        A.  2017.  University of Jamestown in
 6   North Dakkota.
 7        Q.  And what was your field of major?
 8        A.  Criminal justice.
 9        Q.  Okay.  All right.
10             And after you graduated, what
11   was the first job that you had?
12        A.  Midwest Dock I did.
13        Q.  All right.
14             Did you work while you were
15   in college?
16        A.  No.
17        Q.  All right.
18             Did you work while you were
19   in high school?
20        A.  No.
21        Q.  Okay.
22             Have you received any
23   training in the trades, like electrician,
24   carpenter, that kind of thing?
```

6 (Pages 21 to 24)

25

1    A.  Yes, carpenter.  Union carpenter
2  school.
3       Q.  Okay.
4              You went to the apprentice
5  program?
6       A.  Yes.
7       Q.  When did you go to the apprentice
8  program?
9       A.  2018 to 2023.  I think, '23 because I
10 got -- there's a couple -- I got pushed back a
11 little bit.
12      Q.  What does that mean?
13      A.  If -- there was times where, maybe,
14 you couldn't attend class, and they'd just push
15 you back three months.
16      Q.  Oh, I see.
17      A.  So you have to wait three months, and
18 then it kind of pushes your apprenticeship
19 back.
20      Q.  Okay.
21      A.  So it extended it almost like five
22 years when it should have been four, I believe.
23      Q.  All right.
24              So you think it was from 2018

26

1  to 2023?
2       A.  Yeah.
3       Q.  Did somebody have to sponsor you to
4  get into the apprentice program?
5       A.  Yes.
6       Q.  Who sponsored you?
7       A.  Dock & Door Install.
8       Q.  Okay.
9              Anybody in particular?
10      A.  Tony Brutti.
11      Q.  All right.
12              And have you completed the
13 apprentice program?
14      A.  Yes.
15      Q.  And other than the carpenters'
16 apprentice program, have you received any other
17 training in any other trades?
18      A.  I have not.
19      Q.  All right.
20              And among the training that
21 you received at the carpenters' apprentice
22 program, was welding one of the things that you
23 learned?
24      A.  Yes.

27

1       Q.  Tell me about what training did you
2  receive for welding.
3       A.  MIG welding, TIG welding, stick
4  welding, torching.  That's -- yeah, throughout
5  the week, that's basically what that week was.
6       Q.  All right.
7              What's --
8       A.  All of those different things.
9       Q.  What's MIG welding?
10      A.  It's like a -- basically, a machine,
11 electrical machine, and a wire feeds through,
12 and then with the -- it's grounded with the
13 wire.
14      Q.  Okay.
15              And TIG welding, what's that?
16      A.  I can't really -- it's kind of -- kind
17 of similar, I think.  We didn't do much of
18 that.  We learned about it, but those -- that
19 was probably the least familiar I'm with.
20      Q.  Okay.
21              And what's torching?
22      A.  Acetylene oxygen, spark it up, and you
23 can cut through steel.
24      Q.  Okay.  All right.

28

1              And what -- what union are
2  you a member of?
3       A.  272.
4       Q.  All right.
5              And when did you first join
6  that union?
7       A.  2017 -- or 2018, when I got sponsored
8  in.
9       Q.  All right.
10              And who sponsored you?
11      A.  Dock & Door Install.
12      Q.  All right.
13              And are you still a member of
14 that union?
15      A.  Yes.
16      Q.  And you're still -- are you in good
17 standing?
18      A.  Yes.
19      Q.  Have you always been in good standing?
20      A.  Yes.
21      Q.  Have you ever been a member of any
22 other union?
23      A.  I have not.
24      Q.  Okay.

7 (Pages 25 to 28)

29

```
1            Prior to going to work for
2   Midwest Dock Solutions, did you work for
3   anybody else?
4        A. No.
5        Q. Okay.
6            That was the first job you
7   had?
8        A. Yeah.
9        Q. All right.
10           And how did you come to go to
11  work for Midwest Dock Solutions?
12       A. I knew Tony, and my dad worked for
13  them.
14       Q. Knew Tony?
15       A. Zarlengo.
16       Q. Okay.
17           And your father is James
18  Kelly?
19       A. Yes.
20       Q. Any other members of your family that
21  work there?
22       A. My brother, Dylan.
23       Q. Anybody else?
24       A. No.
```

30

```
1        Q. Okay. All right.
2            So you knew Tony Zarlengo,
3   and your dad worked there.
4            How did you come to get a job
5   there?
6        A. Graduated college, and it was like
7   time to start making some money. My dad was
8   like let's see if we can get you started. My
9   dad has always been doing like garage doors,
10  residential garage doors and stuff, so I kind
11  of already had like an idea, would go on side
12  jobs with him when I was a younger kid.
13       Q. Ah-huh.
14       A. So it was like -- I shouldn't say easy
15  but like something I knew about, going right
16  out of -- getting a job right out of college.
17       Q. Okay.
18       A. To start making some money.
19       Q. Okay.
20           And so your dad said he could
21  get you a job there?
22       A. Yeah.
23       Q. Okay.
24           And had your dad been working
```

31

```
1   there for a while?
2        A. I think when I started, five, six
3   years, maybe. But he was with other
4   companies --
5        Q. Okay.
6        A. -- beforehand.
7        Q. But he had been working for Midwest
8   Dock Solutions for four or five years, you
9   think, at that point?
10       A. At that point, I would say, yeah. I
11  can't tell you an exact number, but I would say
12  around there.
13       Q. Okay.
14           And what did your dad do for
15  Midwest Dock Solutions?
16       A. Just an installer or -- yeah.
17       Q. Installer of overhead doors?
18       A. Yes.
19       Q. Docks? Both?
20       A. I would say -- I would say just mainly
21  doors for him.
22       Q. Okay.
23           And how do you -- and how did
24  you know Tony Zarlengo?
```

32

```
1        A. He is my dad's stepbrother.
2        Q. Okay.
3            So did you know him growing
4   up?
5        A. Yes. Tony, yeah.
6        Q. Okay.
7            And who hired you?
8        A. I would guess Tony Zarlengo for
9   Midwest Dock, yeah.
10       Q. You said you would guess.
11           Is that because you sort of
12  just showed up and went to work there?
13       A. Yeah, kind of. That's kind of how it
14  went.
15       Q. Okay.
16           And when did you start at
17  Midwest Dock Solutions?
18       A. 2017. Right around when I got back
19  from school.
20       Q. And what did you do for Midwest Dock
21  Solutions?
22       A. When I started, I was kind of just
23  like the run around -- run around guy and would
24  bring material to other guys, then, yeah, kind
```

8 (Pages 29 to 32)

33

1  of learned more tricks of the trade -- you
2  know, like installing a door and stuff like
3  that.
4      Q.  All right.
5          And you said you were
6  somewhat familiar with the work because your
7  father did that for many years, right?
8      A.  Yes.
9      Q.  And you said you went to job sites
10 with him, right?
11     A.  Yeah.
12     Q.  All right.
13          So you had some experience
14 with the nature of overhead door installation,
15 working alongside your father or, at least,
16 going to job sites with him, correct?
17     A.  Correct.
18     Q.  Okay.
19          So did you do overhead door
20 installation for Midwest Dock Solutions?
21     A.  Yes.
22     Q.  Okay.
23          And did you do any dock
24 leveler installation work for Midwest Dock

34

1  Solutions?
2      A.  I did not.
3      Q.  Okay.
4          And I take it, this is
5  commercial overhead door installation?
6      A.  Yes.
7      Q.  Okay.
8          Did you also do service work
9  for Midwest Dock Solutions?
10     A.  Yes.
11     Q.  All right.
12          And that was service work on
13 overhead doors?
14     A.  Yeah.
15     Q.  And openers?
16     A.  Openers, yeah -- or doors, openers,
17 just the basic stuff, like fixing -- like if a
18 roller fell out or something like that, change
19 a panel.
20     Q.  Okay.
21     A.  Yeah.
22     Q.  And would you do service work on dock
23 levelers?
24     A.  No, not -- no.

35

1      Q.  Okay.
2          And who was your
3  supervisor -- or who was your boss at Midwest
4  Dock Solutions?
5      A.  Tony.  Tony Zarlengo.
6      Q.  Okay.
7          Since there's Tony Brutti and
8  Tony Zarlengo, let's try to use last names if
9  we talk about Tony.
10     A.  Yeah.
11     Q.  Okay.
12          And who did you work with at
13 Midwest Dock Solutions?
14     A.  My dad was one of them.  I didn't work
15 with my brother.  He wasn't there yet.  I'm
16 trying to think.  I'm not sure.  I'm trying to
17 think.  A lot of those guys are not there
18 anymore when I -- when I started, so like I'm
19 trying to think.  I can't think of their names.
20 I can picture their faces.  I can't think of
21 their names.  Guys like -- I think, Tom.  Tom.
22 There was a Tom.  There was a Sean.  I'm trying
23 to think.  John.  Josh.  Those type of guys.
24 Yeah.

36

1      Q.  That's what you can think of right
2  now?
3      A.  Yeah.
4      Q.  All right.
5          And, now, how long were you
6  at Midwest Dock Solutions?
7      A.  A year before they -- I was like
8  approached to join the union.
9      Q.  Okay.
10          And how did that come about?
11     A.  I was just honestly asked, would you
12 like to join the union?  And I sat with my
13 girlfriend at the time, and I thought about
14 pros and cons and decided to join.
15     Q.  All right.
16          And who approached you about
17 joining the union?
18     A.  Tony Brutti.
19     Q.  Okay.
20          And tell me what you mean by
21 that.
22     A.  Well, I was young.  They were looking
23 for younger guys, I guess, at the time, to
24 start as an apprentice, and he just approached

9 (Pages 33 to 36)

37

1    me. He was like, do you want to join the
2    union? And that's essentially how it went.
3    And so I went home, kind of did my research,
4    like what the money was going to look like in
5    the future, like yada, yada, yada, and I told
6    him yes one day.
7        Q. All right.
8            So he -- he approached you
9    while you were working for Midwest Dock
10   Solutions?
11       A. Yes.
12       Q. And said would you like to join the
13   union?
14       A. Yes.
15       Q. Okay.
16       A. Or I got a call from him.
17       Q. Okay.
18           So he called you and said
19   would you like to join the union?
20       A. Yes.
21       Q. All right.
22           This is back in like 2017,
23   2018?
24       A. Yes.

38

1        Q. Okay.
2            And did you understand that
3    you would -- if you joined the union, you'd be
4    being paid through Dock & Door?
5        A. Yes.
6        Q. Okay.
7            Did you have an understanding
8    of what Dock & Door was at the time?
9        A. I just knew it was the union -- a
10   union company, you know -- and it was a change.
11       Q. Okay.
12           Well, there were -- it was a
13   union company, you said. You knew what it did,
14   correct?
15       A. Yes.
16       Q. Okay.
17           And what was your
18   understanding of the work that it did?
19       A. Just new install construction, and I'd
20   honestly rather -- I did want to do that more.
21       Q. Okay.
22           Why is that?
23       A. Just a year of doing nonunion stuff
24   and like service stuff, just getting -- I

39

1    wasn't a fan of it, getting dirty, dirtier,
2    dealing with -- you deal with more.
3        Q. It's harder work --
4        A. Yeah, yeah.
5        Q. -- correct?
6        A. Yeah.
7        Q. Okay.
8        A. Everything's dirty. Like new
9    construction is clean. It's ready to go for
10   you, you know.
11       Q. You don't have to do any prep or
12   anything like that. You just show up and do
13   the installations, correct?
14       A. Yes.
15       Q. Okay.
16           So the new installation is a
17   lot easier than doing the service work and the
18   retrofit work, correct?
19       A. Yes.
20       Q. Okay.
21           The work, I take it, is
22   similar work?
23       A. Yeah, kind of. Kind of. I would say,
24   yeah, similar, but they have their differences.

40

1        Q. All right.
2            Well, when you're doing work
3    on -- doing service work, you may not be
4    replacing a whole door, correct? You may be
5    fixing a door?
6        A. Yes. Yes.
7        Q. All right.
8            And when you're doing --
9    replacing a door in an existing structure, you
10   have to take out the old one, correct?
11       A. Yes.
12       Q. You don't have to do that in new
13   construction, correct?
14       A. No.
15       Q. Okay.
16           And then you may have to do
17   other things to prep the space to put in the
18   new door, correct?
19       A. For -- on the union side, no.
20       Q. No. I'm talking about --
21       A. Yeah, yeah, yeah. There's more
22   fabrication.
23       Q. On the nonunion side?
24       A. Correct, yes. Puzzling things

10 (Pages 37 to 40)

41

1   together, making stuff work together correctly.
2     Q. Okay.
3          That's on the nonunion
4 side --
5     A. Yes.
6     Q. -- correct?
7          Okay. But on the union side,
8 it's all sort of set to go to install the new
9 door, correct?
10     A. Yes.
11     Q. Okay.
12          So that's easier work,
13 correct?
14     A. Yes.
15     Q. And cleaner, as you've described it,
16 correct?
17     A. Yes.
18     Q. All right.
19          And you knew that the -- when
20 Tony Brutti approached you about joining the
21 union, you would be doing new door
22 installation; is that correct?
23     A. Yes.
24     Q. How did you know that?

42

1     A. I just knew at the time, like
2 that's -- typically, that's what the union --
3 or what those guys did, you know.
4     Q. Okay.
5          And who are "those guys"?
6     A. Well, when I got approached, Dave
7 Green was in, so I talked to him. Tony -- Tony
8 Tattini. Tony T. Just those guys that were
9 already in kind of.
10     Q. Okay.
11          They were already doing the
12 union work, correct?
13     A. Yeah.
14     Q. All right.
15          And you would see them around
16 the -- where you worked, correct?
17     A. Yeah.
18     Q. Okay.
19          So you could talk to them
20 about what they were doing, correct?
21     A. Yeah, right. I asked my dad for --
22 like especially Tony T's number and gave him a
23 call.
24     Q. All right.

43

1          Well, they were also at the
2 shop where you worked, correct? From time to
3 time?
4     A. Sometimes, yeah.
5     Q. Okay.
6          And they drove Midwest Dock
7 Solutions' trucks, correct?
8     A. I'm not sure if their trucks had
9 logos, but they drove trucks, yeah.
10     Q. Okay.
11          And that they were sometimes
12 at the shop, correct?
13     A. Yes.
14     Q. Okay.
15          So you could run into them
16 there, correct?
17     A. Yeah. I could run into them, yeah,
18 from time to time.
19     Q. All right.
20          So after you decided that you
21 wanted to do the -- the union work, the new
22 door installation, you joined up with the
23 union, correct?
24     A. Yes.

44

1     Q. And then you went to work for
2 Dock & Door, correct?
3     A. Yes. I was sponsored in, and the
4 apprenticeship began.
5     Q. All right.
6          You stopped working for
7 Midwest Dock and went to work for Dock & Door,
8 correct?
9     A. Yes. Yes.
10     Q. Or strike that.
11          You stopped working for
12 Midwest Dock Solutions and went to work for
13 Dock & Door, correct?
14     A. Yes.
15     Q. Okay.
16          Did you have to submit a
17 resumé or job application or anything like
18 that?
19     A. No.
20     Q. All right.
21          It was simply Tony Brutti
22 coming to you and saying, hey, do you want to
23 work on the union side?
24     A. Yes.

11 (Pages 41 to 44)

45

1    Q.  You're still working for Dock & Door,
2  correct?
3    A.  Yes.
4    Q.  And when you started working for
5  Dock & Door, what did you do?
6    A.  New installs.  Overhead door installs.
7    Q.  Okay.
8         Installation of overhead
9  doors?
10   A.  Yes.
11   Q.  Installation of door openers?
12   A.  Yes.
13   Q.  What else would you install?
14   A.  Not right away, but eventually I did
15 learn -- after, I learned how to do the dock
16 levelers, so --
17   Q.  Okay.
18        When did you learn that?
19   A.  Probably around year two, three being
20 in the union.
21   Q.  Okay.
22        So that took a little while
23 to learn?
24   A.  Yeah.

46

1    Q.  All right.
2         And how did you learn that?
3    A.  Kind of with practice a little bit
4  with -- my dad has a welder at our house -- or
5  my old house.
6    Q.  Okay.
7    A.  So I kind of practiced, but practicing
8  on the easy parts of stuff on a -- on a new
9  install, like welding underneath the docks
10 that's not visible stuff, where you've still
11 got to shim like underneath the docks, just
12 practicing on that.  So if I was welding with
13 like Dave Green, he'd do all of the main
14 components, and I would just do -- weld the
15 shims underneath, so practiced on that.
16   Q.  All right.
17        So sort of on-the-job
18 training?
19   A.  Yeah.
20   Q.  All right.
21        And Dave Green was sort of
22 teaching you as well?
23   A.  Yeah.
24   Q.  All right.

47

1         And I take it, you also had
2  the classes at the apprentice program?
3    A.  Yes.
4    Q.  All right.
5         You have a credit card from
6  Midwest Dock Solutions, correct?
7    A.  Yes.
8    Q.  Okay.
9         And how long have you had
10 that credit card?
11   A.  About three, four years, maybe.
12   Q.  Okay.
13        Did you have it when you were
14 being paid through Midwest Dock Solutions?
15   A.  No.
16   Q.  Okay.
17        And how did you come to have
18 the credit card?
19   A.  One day I think it came about.  I was
20 on a -- I believe, a job, maybe, and we needed
21 material or something, and none of us could get
22 it like quickly because we weren't close enough
23 to anywhere where somebody could bring
24 something out to us, and I was told just --

48

1  they'd order me one, I guess.
2    Q.  Okay.
3         And so you were on a job
4  site, and you were unable to get material that
5  you needed --
6    A.  Yes.
7    Q.  -- because nobody had a credit card?
8    A.  No.
9    Q.  Okay.
10        And what happened as a result
11 of that?
12   A.  We just --
13   Q.  Like did you tell somebody, hey, I
14 can't get materials when I'm out on the job
15 site?
16   A.  Yeah.  We expressed it to Brutti.
17   Q.  Okay.
18        You told Tony Brutti that?
19   A.  Yes.
20   Q.  Okay.
21        And was that you?  You said
22 "we," so I just want to be sure.  Is it you or
23 somebody else?
24   A.  Yeah, yeah, yeah.  Yeah, I did.

12  (Pages 45 to 48)

49

1    Q.  Okay.
2         And -- and then what
3    happened?
4    A.  We just went about our day, just like
5    kind of -- there's other things to do on the
6    job site, so we worked on something else.
7    Q.  Okay.
8    A.  And then we eventually ended up
9    getting the material, but I also got a card out
10   of it.
11   Q.  Okay.
12   A.  Also, for gas as well, like I don't
13   always go to the shop or whatever to get gas,
14   so like I could just leave from my house, so --
15   Q.  Okay.
16        And who gave you the credit
17   card?
18   A.  Nobody specifically.  It was kind of
19   just go pick it up.
20   Q.  Okay.
21        And where did you go pick it
22   up?
23   A.  At the shop.
24   Q.  Okay.

50

1         Is that 27 East 36th Place in
2    Steger?
3    A.  I believe so, yes.
4    Q.  Okay.
5         When you say "the shop," is
6    that the place you're --
7    A.  Yeah, sorry.
8    Q.  Okay.
9    A.  I didn't know the address by heart,
10   until you say it out loud, you know.
11   Q.  Okay.
12        And who did you pick it up
13   from?
14   A.  Nobody specifically.  Like I say, it
15   was just kind of laying -- laying by the back
16   door.  And we looked a little bit by the back
17   door and grabbed it and left.
18   Q.  Okay.
19        I just want to have a better
20   understanding.
21        You were at a job site one
22   day, unable to get materials.  You told Tony
23   Brutti that?
24   A.  Yes.

51

1    Q.  Then you just show up at Steger and
2    find a credit card sitting somewhere, and you
3    just take it?
4    A.  Well, I was told that they set it
5    there.
6    Q.  Okay.
7         Who told you that?
8    A.  Brutti.
9    Q.  Okay.
10   A.  Tony Brutti.
11   Q.  Tony Brutti told you that who put it
12   there?
13   A.  Oh, I guess he gave it to me, then,
14   yes.  He left it there.
15   Q.  Okay.
16   A.  He left it by the back door.
17   Q.  And what did Tony Brutti say about the
18   credit card?
19   A.  He's like the card's by the back door.
20   Q.  Okay.
21        Did he tell you --
22   A.  That's how our interactions go.
23   Q.  Okay.
24        Did he tell you anything else

52

1    about it?
2    A.  No.
3    Q.  Okay.
4         Did you know what it was for?
5    A.  No.
6    Q.  Okay.
7    A.  I mean, I know what it -- I mean, like
8    I said, gas, or sometimes we're on the job and
9    the boom lift needs gas, go fill it up with a
10   tank real quick.
11   Q.  Okay.
12   A.  Stuff like that.
13   Q.  Did you ever have a conversation with
14   Tony Brutti that he said something to the
15   effect of, hey, here's a credit card.  This is
16   what you can use it for.  You know, you said
17   you didn't have material on a job site.  Now,
18   if you need job material, you can use this
19   credit card?
20        I'm trying to understand what
21   was the communication you had with who about
22   the credit card.
23   A.  Not really.
24   Q.  Oh, you didn't have really any --

13 (Pages 49 to 52)

53

1    A.  There was no like use it on this or
2  that, like -- I mean, we're all adults.  I know
3  there's some people that -- I'm not going to
4  swipe a company credit card for fun, you know.
5    Q.  Okay.  All right.
6        So was there any conversation
7  with Mr. Brutti about the credit card other
8  than here's where it's at?
9    A.  No.
10   Q.  You can pick it up at the shop?
11   A.  Nope.
12   Q.  Okay.
13       So there was this instance
14 where you couldn't get material on a job site.
15 And then after that, at some point, Mr. Brutti
16 told you there was a credit card that you could
17 pick up at the shop.
18       Is that pretty much it?
19   A.  Correct.
20   Q.  Okay.
21       Do you know how much time it
22 was between the time you had the -- the job
23 site experience where you couldn't get the
24 materials and Mr. Brutti provided you with a

54

1  credit card?
2    A.  I do not.
3    Q.  Okay.
4        Do you think it was like six
5  months, or do you think it was less than that?
6    A.  Maybe around six months.
7    Q.  Okay.
8        It could have been that long?
9    A.  Yeah.
10   Q.  Okay.
11       And it was Mr. Brutti who
12 told you you could pick up the card, correct?
13   A.  Correct.
14   Q.  Okay.
15       And it was Mr. Brutti who
16 told you you could pick up the card at the
17 shop, correct?
18   A.  Correct.
19   Q.  Okay.
20       And then you went to the
21 shop, and there it was?
22   A.  Yep.
23   Q.  Okay.
24       And --

55

1    A.  That's usually how the interactions
2  go, yes.
3    Q.  All right.
4        And the credit card is a
5  Midwest Dock Solutions' credit card, correct?
6    A.  Yes.
7    Q.  Okay.
8        And what kind of things do
9  you use the credit card for?
10   A.  Mainly, gas.  Like I said, a lot of
11 times I'll just leave from my house.  It's just
12 easier.  If we do need random things like --
13 I'm trying to think.  It's really -- honestly,
14 it's mainly gas, I would say.
15   Q.  Okay.
16   A.  I can't think of anything, really.
17 Well, I guess, one -- I mean, a ladder.  There
18 was one time we needed a ladder.  One of our --
19 we were on a Morgan/Harbour job, and they
20 deemed our ladder bad or whatever, so ran to
21 Home Depot and got a new one.
22   Q.  Okay.
23       There was something about the
24 ladder that didn't meet job site safety

56

1  requirements?
2    A.  Yes.
3    Q.  Is that what you mean when you say it
4  was bad?
5    A.  Yes.
6    Q.  Okay.  All right.
7        You only use it for gas and
8  work-related items, I take it?
9    A.  Yes.
10   Q.  Okay.
11       And what happens with the
12 receipts for the credit card?  Do you have to
13 report your usage to anybody?  Strike that.
14       Do you have to report any of
15 your usage of the credit card to anybody?
16   A.  We just send a receipt to Sherri.
17   Q.  Okay.
18   A.  I do not know her last name.  Sorry.
19 But the accountant on this or our in-house
20 accountant or something.  I don't know.
21   Q.  Sherri Webber?
22   A.  Yeah.  There you go.  I don't know her
23 last name.  I just know Sherri.
24   Q.  All right.

14  (Pages 53 to 56)

57

1    And how do you send her the
2 receipt?
3    A.  I just take a picture.
4    Q.  Okay.
5    A.  Send her a text message.
6    Q.  All right.
7    And do you have any of those
8 text messages on your phone?
9    A.  I might.
10    Q.  Okay.
11    If you do, would you provide
12 those to Mr. Miller?
13    A.  Yeah.
14    Q.  And other than sending Sherri the
15 receipts, do you have any other -- do you have
16 to do anything else when you make a purchase on
17 the credit card?
18    A.  Nope.
19    Q.  Okay.
20    Do you know who pays the
21 credit card bill?
22    A.  I do not.
23    Q.  Do you get any of the credit card
24 statements?

58

1    A.  I do not.
2    Q.  Is your name physically on the credit
3 card?
4    A.  Yes.
5    Q.  And if you were on a job site and
6 needed concrete anchors or something or drill
7 bits, concrete drill bits, things like that,
8 would you use the credit card to purchase those
9 kind of items?
10    A.  No.
11    Q.  Okay.
12    Where would you get those
13 kind of items?
14    A.  Tony Brutti.
15    Q.  Okay.
16    He'd bring them to the job
17 site?
18    A.  Yes.  Yeah.
19    Q.  All right.
20    Would you pick those kind of
21 things up sometimes at the shop?
22    A.  Yes.
23    Q.  Okay.
24    And that's the -- again, the

59

1 Midwest Dock Solutions' shop, correct?
2    A.  Yes.
3    Q.  Do you know of other persons who have
4 credit cards from Midwest Dock Solutions?
5    A.  I do not.
6    Q.  Okay.
7    Do you know whether any of
8 the other people you work with have credit
9 cards from Midwest Dock Solutions?
10    A.  I do not.
11    Q.  And I think you answered this, but I
12 just want to be clear.
13    Have you ever used the credit
14 card to make personal purchases?
15    A.  I have not.
16    Q.  Have you -- have you ever stayed
17 overnight on any jobs that you've worked on for
18 Dock & Door?
19    A.  I have.
20    Q.  Would you use the credit card to pay
21 for hotel rooms?
22    A.  Oh, yeah.  Well, sometimes, or Tony
23 Brutti will book them for us --
24    Q.  Okay.

60

1    A.  -- beforehand.
2    Q.  All right.
3    A.  If it's like a preplanned out thing.
4    Q.  Okay.
5    And then you said sometimes.
6 I just want to be -- you said sometimes or --
7    A.  Well, yeah, sometimes he'll book it,
8 or if we're working late, I've kind of got it
9 in my head just like I'm going to stay and use
10 the company card.
11    Q.  Okay.
12    A.  I'll get a one-night room.
13    Q.  Okay.
14    So that's another thing you
15 might use it for?
16    A.  Yes.
17
18    (WHEREUPON, the document was
19    marked Plaintiff's
20    Exhibit 271 for identification,
21    as of 10/14/25.)
22
23 BY MR. McJESSY:
24    Q.  All right.

15 (Pages 57 to 60)

61

1     I'm going to hand you what
2  I've marked as Exhibit 271, and this is a
3  partial production of time sheets that were
4  produced to us by Dock & Door.  And if you can
5  look through these, these look to be time
6  sheets that you've prepared for Dock & Door?
7     A.  Yes.
8     Q.  All right.
9         And they're sort of in
10  reverse date order.  But if you look at the
11  second page in on this, there's two
12  descriptions of work, one says drive-in, and
13  the other one says stacked -- actually,
14  three -- and then the one on the bottom says
15  rolled.
16         Do you see those?
17     A.  Yes.
18     Q.  Can you tell me what that work is?
19     A.  So drive-in is also -- it's an
20  overhead door.  It's the big -- the bigger
21  doors, the kind of the -- say a big -- say
22  a big Amazon building, the big 14-foot doors
23  that you could drive in, physically into.
24     Q.  Okay.

62

1     A.  Those would just be labeled as a
2  drive-in door.
3     Q.  Okay.
4     A.  Stacked is the dock doors.
5     Q.  All right.
6     A.  So we just -- you work a day of
7  stacking those.  And then the following day, we
8  just rolled, like where you make them operable.
9  You roll them.
10     Q.  Oh, I see.  Okay.
11         And so a drive-in door is
12  different than a dock door?
13     A.  Yes.
14     Q.  Okay.
15         A drive-in door is more --
16  somewhat at ground level where you actually
17  do --
18     A.  Yes, ground level or ground level to
19  the inside of the building with a ramp door or
20  a ramp up to it, and then the dock door is on a
21  dock leveler.
22     Q.  Okay.
23         And if you turn in two more
24  pages, there's an entry for R. R. Donnelley.

63

1     Do you see that?
2     A.  Yes.
3     Q.  ARCO R. R. Donnelley?
4         And it says two coiling
5  doors.  What kind of work is that?
6     A.  Essentially, also an overhead door,
7  but it's steel and it just rolls up.
8     Q.  Okay.
9     A.  It doesn't go vertically all the way
10  up to the ceiling.  It just would roll up
11  within itself.
12     Q.  Okay.
13         So that's installation work
14  that you did?
15     A.  Yes.
16     Q.  All right.
17         And then if you turn to the
18  next page, there's two days that are just
19  labeled service work that don't have a
20  location.
21         Do you see that?
22     A.  Yeah.
23     Q.  What is service work?
24     A.  For -- for us, essentially, when I

64

1  write that, it's like -- so a lot of jobs we
2  have like other crews, or even if I'm out
3  there, cleaning up the job site, like all of
4  the material everywhere, or the same thing,
5  like the brand new installs, there is work
6  where we do a whole building.  And then by the
7  time we finish it, somebody already hit a door
8  or something, so you're fixing like a roller, a
9  panel, a dented panel.
10     Q.  Is there a reason why it wouldn't have
11  the job location description there?
12     A.  I'm not sure.
13     Q.  Okay.
14         You can turn to the next
15  page, and it says cutting out grinding docks.
16         Do you see that?
17     A.  Yes.
18     Q.  What does "cutting out" mean?
19     A.  Just -- it's an angle grinder, just
20  cutting -- cutting welds and -- yeah, cutting
21  welds.
22     Q.  To remove something?
23     A.  I would assume, yes.
24     Q.  Okay.

16 (Pages 61 to 64)

65

```
 1          It would be taking out like
 2  an old dock?
 3      A.  Yeah.
 4      Q.  Okay.
 5          And what's grinding docks?
 6      A.  So when you cut out -- when you cut
 7  them out, the old weld would be like sticking
 8  up like a quarter inch or whatever, so you
 9  grind them down.
10      Q.  Okay.
11      A.  To get it flush with the steel.
12      Q.  Got it.
13          And if you turn to the next
14  page, it says dock maintenance.
15          Do you see that?
16      A.  Yes.
17      Q.  What is dock maintenance?
18      A.  Just spraying lube, essentially, on
19  the springs underneath and the hinges.
20      Q.  Okay.
21      A.  Just making sure they operate
22  correctly.
23      Q.  Okay.
24          Is that also service work, or
```

66

```
 1  is service work different?
 2      A.  I would say it's -- it's the same, I
 3  would say, because it's a new -- the docks we
 4  install, like I said, they -- they do need to
 5  get sprayed sometime, adjusted with spring
 6  tension and take a wrench and adjust them all.
 7      Q.  All right.
 8          Turn to the next page.  It
 9  says track guards.
10          Do you see that on the
11  bottom?
12      A.  Yes.
13      Q.  What are track guards?
14      A.  They're pieces of steel, essentially,
15  that just protect the track of a dock door.
16      Q.  Okay.
17          And you install those?
18      A.  Yes.
19      Q.  All right.
20          And if you turn to the next
21  list, the next page, it says punch list, the
22  two items there on the bottom, and it has
23  specific locations.
24          Do you see that?
```

67

```
 1      A.  Yes.
 2      Q.  What's punch list?
 3      A.  It's also, typically, when we finish a
 4  job.  You know, the contractor -- like I say,
 5  Morgan or Krusinski -- sends or gives us a
 6  punch list when we shut the job, like this door
 7  needs to be adjusted or there's a missing screw
 8  in this hinge on that door, stuff like that.
 9      Q.  All right.
10          So the stuff at the end of
11  the job that needs to be fixed?
12      A.  Yeah, tidied up or --
13      Q.  And if you turn to the next page, this
14  is all -- a whole week of service work,
15  correct?
16      A.  Yeah.
17      Q.  And there's --
18      A.  That's what it says.
19      Q.  -- no location specified, correct?
20      A.  Yeah.
21      Q.  Looking at this, could you tell what
22  the work is that you did and where you did it?
23      A.  No.
24      Q.  All right.
```

68

```
 1      A.  That's two years ago.  Sorry.
 2      Q.  Is there a -- if you turn to the next
 3  page, this is -- now, this looks -- you'll see
 4  the page before this one.  It's a photograph of
 5  your time sheet, correct?
 6      A.  Yeah.
 7      Q.  And then if you look at this, the next
 8  page, it's the actual time sheet itself.
 9      A.  Yeah.
10      Q.  Do you see that?
11      A.  Yep.
12      Q.  Do you sometimes hand in your physical
13  time sheets?
14      A.  Sometimes.
15      Q.  And how would you do that if you
16  physically hand it in?
17      A.  If I went to the shop, kicked ass or
18  something, and turned it in and left it.  We
19  have like a little area that we put all of the
20  time sheets in.
21      Q.  Okay.
22          And where is that area?
23      A.  I would say just outside like the
24  so-called like break room over there, maybe.
```

17 (Pages 65 to 68)

69

1    Q.  Okay.  All right.
2         And is it like a basket or
3    something or --
4    A.  Yeah.
5    Q.  Okay.
6         And if you look at this one,
7    look at this time sheet still, do you see how
8    the first entry has like Joliet MHC --
9    A.  Yes.
10   Q.  -- Brandon Road, and then the next
11   entry has Northbrook, I can't see what -- can
12   you read the next word after Northbrook?
13   A.  Austin.
14   Q.  Austin?
15   A.  Austin, yeah.
16   Q.  For the first one, Joliet MHC, what
17   does that mean?
18   A.  Just Joliet and Morgan/Harbour
19   Construction.
20   Q.  So that's who you're doing the work
21   for, correct?
22   A.  Yeah.
23   Q.  Okay.
24        And who is the next one?

70

1    A.  Austin Construction.  I'm not sure,
2    but they are --
3    Q.  One of the companies you work with?
4    A.  Yeah.
5    Q.  For.
6         And then the next entry is
7    Bensenville Krusinski Prologis, correct?
8    A.  Yeah.
9    Q.  And that's work that you did for
10   Krusinski Construction?
11   A.  Correct.
12   Q.  In Bensenville?
13   A.  Yes.
14   Q.  And is Prologis the job site?
15   A.  I guess.  I know I see the Prologis --
16   I think that's just what --
17   Q.  Is that your handwriting where it says
18   Prologis, or is that somebody else's?
19   A.  That's mine, but I don't --
20   essentially, I don't really know what Prologis
21   is.  I see it all over buildings, though.  Like
22   Prologis is all over the place.
23   Q.  All right.
24        And you're sure that's your

71

1    handwriting where it says Prologis?
2    A.  Yeah.
3    Q.  Okay.
4         Where it's got the numbers
5    written on here and the date at the top or it's
6    got the numbers that are like circled, the
7    eight, the thirty-two, is that your
8    handwriting?
9    A.  Those are always me.  I always do that
10   to my time sheets.
11   Q.  Okay.
12        How about the date at the
13   top?
14   A.  The dates at the top are not.
15   Q.  Okay.
16        And then the entry at the
17   bottom that says Bristol/Peak, P-e-a-k, do you
18   see that?
19   A.  Yep.
20   Q.  What's that?
21   A.  That's -- Bristol is Wisconsin, and
22   the Peak is Peak Construction.
23   Q.  Okay.
24        And why is it that you write

72

1    down the -- the project that you're working on
2    here for each of these entries?
3    A.  Sometimes -- in 2023, they were real
4    specific on our job locations and all of that.
5    Q.  What's that mean?
6    A.  Like exactly where we were or -- I
7    shouldn't say -- where we were or the -- who we
8    were working for.
9    Q.  Okay.
10   A.  And then --
11   Q.  They wanted you to be specific about
12   who you were working for and where you were
13   working?
14   A.  Yeah.  I mean, we're supposed to
15   always be, but guys technically always aren't.
16   Q.  Okay.
17   A.  Just kind of write --
18   Q.  Do you know why you were supposed to
19   be specific about who you were working for and
20   where you were working?
21   A.  I do not.
22   Q.  Okay.
23        And who told you, though,
24   that you should be specific about who you were

18 (Pages 69 to 72)

73

```
1    working for and where you were working?
2        A.  Tony Brutti.
3        Q.  Okay.
4               And was -- was that always
5    the case when you were preparing time sheets,
6    that you were supposed to be specific about
7    where you were working and who you were working
8    for?
9        A.  Yeah.  It was always the case.  I
10   wouldn't say everyone follows --
11       Q.  I understand.
12       A.  -- like they should.
13       Q.  I understand.
14              But that was what you were
15   supposed to be doing, correct?
16       A.  Correct.
17       Q.  All right.
18              And that was true the entire
19   time that you worked for Dock & Door?
20       A.  Yes.
21       Q.  Okay.
22              And then if you could turn to
23   the entries for September 29 to October 5,
24   2022 -- are you there?
```

74

```
1        A.  I don't know which one it is.  Did I
2    go too far?
3        Q.  No.  2022.  Keep going.
4        A.  Here we go.
5        Q.  There you go.
6               All right.  And do you see
7    where it says at the top unload dock under the
8    Bensenville Krusinski 9/29 entry?
9        A.  Oh, I'm sorry.  Am I wrong still?
10       Q.  9/29.
11       A.  Oh, here we go.  There we go.  I was
12   on 10.
13       Q.  Got it.
14       A.  Yes.
15       Q.  Okay.
16              What does "unload dock" mean?
17       A.  Unloading the dock levelers --
18       Q.  Okay.
19       A.  -- for a job site.  A flatbed would
20   come, essentially, and you have to unload
21   them --
22       Q.  All right.
23       A.  -- off the truck and throw them in the
24   dock pits.
```

75

```
1        Q.  All right.
2               And then further down in
3    there, it says -- you'll see there's an entry
4    for 10/3, and it says, docks cut off, back
5    angles of docks, and put in pits.
6               Do you see that?
7        A.  Okay.  Yes.
8        Q.  Is that all of your handwriting in
9    that entry?
10       A.  Yes.
11       Q.  And what does it mean, to cut off back
12   angles of docks?
13       A.  I assume it's 2022, or whatever
14   specific job this was.  So some docks come with
15   a -- like a two-inch back angle, essentially.
16   And I'm assuming that's what came in there.
17   And the pits were too -- were shorter, so
18   you've got to cut that two-inch angle off, and
19   then they ended up -- they fit.
20       Q.  Got it.
21              And then if you turn to the
22   next page, you'll see this is actually -- it's
23   not one of the time sheet forms.
24       A.  No.
```

76

```
1        Q.  This is just a -- it looks like a page
2    that you handwrote, correct?
3        A.  Yes.
4        Q.  All right.
5               And is all of the
6    handwriting on there yours?
7        A.  No.  This is probably one I -- I would
8    assume I wrote on a piece of paper or something
9    and sent to Tony.
10       Q.  Okay.
11              And what -- what handwriting
12   on here is -- I'm sorry.  I missed it if you
13   answered it.
14              Is all of the handwriting on
15   here yours?
16       A.  Just the jobs, not the hours or --
17       Q.  Okay.
18              So the eights that are
19   written there --
20       A.  Yeah.
21       Q.  -- that's not your handwriting?
22       A.  No.
23       Q.  And the name at the top with the date,
24   is that your handwriting?
```

19 (Pages 73 to 76)

77

1    A.  No.
2    Q.  All right.
3         But the dates and the
4  specific jobs and locations --
5    A.  Yeah.
6    Q.  -- that's your handwriting?
7    A.  Yes.
8    Q.  And, again, you'll note that this
9  isn't like a photograph of this page.  It's
10  a -- it's the actual page itself.
11         So is this the kind of thing
12  you dropped off at the -- at the --
13    A.  These?
14    Q.  Yeah, at the shop?
15    A.  Yes.
16
17         (WHEREUPON, the document marked
18         Plaintiff's Exhibit 269 for
19         identification was tendered to
20         the deponent.)
21
22  BY MR. McJESSY:
23    Q.  And if you could take a look at
24  Exhibit 269 -- that's the text message string

78

1  in front of you there.
2    A.  Ah-huh.
3    Q.  And this is -- I take it, the photo on
4  the first page is an example of you forwarding
5  your time sheet to Tony Brutti?
6    A.  Correct.
7    Q.  All right.
8         And then if you turn to the
9  second page, there's a text message there that
10  looks like it has locations and dates --
11    A.  Yes.
12    Q.  -- is that correct?
13    A.  That would be another example of --
14  say I run out of time sheets, I haven't made
15  copies or something, and I'll do it that way.
16    Q.  Okay.
17         Now, there's no hours for
18  each -- or is that -- is it the ten, the eight?
19    A.  That's the ten, eight, yeah.
20    Q.  Okay.
21         Those are the hours you
22  worked?
23    A.  Yes.
24    Q.  Okay.

79

1         And what are bollards where
2  it says Kenosha bollards?
3    A.  Basically, a track that's a cylinder,
4  and you just put it in front of like a beam
5  or -- a steel beam is all.  The same thing.
6  It's a track guard, essentially.
7    Q.  All right.
8         And do you bolt those into
9  the ground?
10    A.  Yes.
11    Q.  Or into the concrete floor?
12    A.  Yes.
13
14         (WHEREUPON, the document marked
15         Plaintiff's Exhibit 270 for
16         identification was tendered to
17         the deponent.)
18
19  BY MR. McJESSY:
20    Q.  All right.
21         And if we could turn to
22  Exhibit 270, and -- oh, I see.
23         It looks like the second page
24  should actually be the first page, but we'll

80

1  keep them in the order -- like the text message
2  at the top of the second page is September 17,
3  correct?
4    A.  Yep.
5    Q.  And that's the first text message in
6  these -- in this string, right?
7    A.  Yes.
8    Q.  All right.
9         And is Ira writing please
10  install the three dock lights as well?
11    A.  Yes.
12    Q.  All right.
13         And do you know what he's
14  referring to?
15    A.  Yes.
16    Q.  What's he referring to?
17    A.  Dock lights are mounted on the wall
18  next to the dock door and -- so like if a fork
19  lift is unloading a truck, it swivels over, and
20  there's a light so they can see into the
21  trailer.
22    Q.  I see.
23         And it says -- this is
24  saying, please install three dock lights as

20  (Pages 77 to 80)

81

1   well.  I take it, there's something -- there
2   was text before this that would tell you, as
3   well as what, correct?
4       A.  Probably.
5       Q.  Okay.
6           Do you know -- this job was
7   like -- I don't know, a little less than a
8   month ago, correct?
9       A.  Yeah.  Wisconsin?  Yeah.
10      Q.  Do you know what he's referring to
11  here?
12      A.  Yeah.  We were doing those bollards.
13      Q.  Okay.
14          And dock lights, correct?
15      A.  Yes.
16      Q.  And something else, too?
17      A.  We did do coil doors out there as
18  well.
19      Q.  Okay.
20      A.  But that was probably a few months
21  prior.
22      Q.  Okay.
23          Do you know what -- what job
24  he's referring to?  You said Wisconsin.

82

1       A.  I couldn't tell you the name.
2       Q.  Okay.
3           Do you know --
4       A.  I know the job, yes.
5       Q.  You do know the job?
6       A.  Yes.
7       Q.  Okay.
8           Do you know who you were
9   doing it for?
10      A.  It was Morgan/Harbour.
11      Q.  Okay.
12          And then you write, okay,
13  I'll have to look for them.  We're not going to
14  be able to finish all of this today, correct?
15      A.  Yes.
16      Q.  All right.
17          And Ira says, don't kill
18  yourself today.  You're going back tomorrow.
19  But we need to be done tomorrow, correct?
20      A.  Correct.
21      Q.  Okay.
22          Do you know, was this a job
23  that Ira Sugar had sold?
24      A.  I'm not sure.

83

1       Q.  Okay.
2           When Ira Sugar sells a job,
3   will he sometimes coordinate with you when a
4   job needs to be done?
5       A.  No.
6       Q.  Okay.
7           But he's telling you --
8       A.  Or yes.  But, yeah, not often.  I
9   mean, yeah, some jobs do have a quick time
10  limit, like if -- like those bollards, we
11  didn't have a lot, so I'm guessing that's why
12  he said that --
13      Q.  Okay.
14      A.  -- that I would be done in a couple
15  days.
16      Q.  Okay.
17          But it was the kind of thing
18  he might tell you to do?
19      A.  Yes.
20      Q.  Okay.
21          He'll keep you advised like
22  when something's --
23      A.  A deadline, yeah.
24      Q.  Okay.  That's what I'm getting at.

84

1           So that's the kind of thing
2   Ira will let you know, is what the deadline is
3   to have the job done, correct?
4       A.  Yes.
5       Q.  All right.
6           And he's also asking you what
7   kind of anchors you need for the skinny
8   bollards, correct?
9       A.  Correct.
10      Q.  Can you, just for the record, read the
11  next text entry there below the thumbs up?
12      A.  Out loud?
13      Q.  Yeah.
14      A.  For tomorrow, I am putting some door
15  drawings on the lunch table.  Please discuss
16  with the GC and carpenter about blocking for
17  our doors, and I need to put something on the
18  ceiling as well.  They're installing blocking
19  behind an insulated metal panel and ceiling.
20      Q.  All right.
21          What is Ira telling you
22  there?
23      A.  So we were going to install an
24  overhead door, but they're -- they're turning

21  (Pages 81 to 84)

85

1  it into a freezer building, so they were
2  putting blocking up behind a freezer wall that
3  we could eventually drill into and mount that
4  to a secure structure behind that wall.
5      **Q. I see.**
6          **And he's asking you to**
7  **discuss this with the GC.**
8          **That's general contractor,**
9  **right?**
10     A. Yes.
11     **Q. And carpenter, correct?**
12     A. Yes.
13     **Q. And is that the carpenters doing the**
14 **work on the job site?**
15     A. Yes.
16     **Q. Okay.**
17          **And is this the kind of**
18 **coordination that Ira would typically do with**
19 **you for a job site where work needs to be done?**
20     A. Yes.
21     **Q. Do you have an email address that's**
22 **@midwestdocksolutions.com?**
23     A. No.
24     **Q. Sir, what's your current address? Is**

86

1  **it the address that's on the subpoena, 258**
2  **South Mayfair?**
3      A. Yes.
4      **Q. Okay.**
5          **And what's the last four**
6  **digits of your social security number?**
7      A. 0684. I had to think about it.
8      **Q. And your date of birth?**
9      A. 8/1/93.
10     **Q. And a phone number where you can be**
11 **reached?**
12     A. (708) 310-2020.
13     **Q. And is that your cell phone?**
14     A. Yes.
15     **Q. Who's your carrier?**
16     A. T-Mobile.
17     **Q. And have you had that number long?**
18     A. Since high school.
19     MR. McJESSY: Okay.
20          I don't have any other
21 questions.
22          I'm going to, just for the
23 record, reserve the right to recall the witness
24 based on the production of emails and documents

87

1  that we have asked for, the photographs, the
2  text messages that -- that I had asked him to
3  produce to you, Mr. Miller, during the course
4  of the deposition. But other than that, I'm
5  done.
6      MR. MILLER: Great.
7          I have no questions for him.
8  Mike, do you have questions for him?
9      MR. McJESSY: I may have some
10 follow-up if Mr. Hughes asks questions.
11     MR. HUGHES: Yeah. I don't have any
12 questions.
13     MR. McJESSY: All right.
14          Then we're done subject to
15 the reservation.
16     MR. MILLER: We'll waive signature,
17 too. And off the record.
18
19          (There was a discussion off
20          the record.)
21
22          FURTHER DEPONENT SAITH NOT.
23
24

88

1  STATE OF ILLINOIS  )
2                     ) SS:
3  COUNTY OF C O O K  )
4
5      I, DIANE M. NULICK, a Notary Public
6  within and for the County of Cook, State of
7  Illinois, and a Certified Shorthand Reporter of
8  said state, do hereby certify:
9      That previous to the commencement of the
10 examination of the witness, the witness was
11 duly sworn to testify the whole truth
12 concerning the matters herein;
13     That the foregoing deposition transcript
14 was reported stenographically by me, was
15 thereafter reduced to typewriting under my
16 personal direction and constitutes a true
17 record of the testimony given and the
18 proceedings had;
19     That the said deposition was taken
20 before me at the time and place specified;
21     That the said deposition was adjourned
22 as stated herein;
23     That I am not a relative or employee or
24 attorney or counsel, nor a relative or employee

22 (Pages 85 to 88)

1   of such attorney or counsel for any of the
2   parties hereto, nor interested directly or
3   indirectly in the outcome of this action.
4       IN WITNESS WHEREOF, I do hereunto set
5   my hand and affix my seal of office at Chicago,
6   Illinois, this 17th day of October, 2025.
7
8
9
10
11   _____
12      Notary Public, Cook County, Illinois.
13
14   C.S.R. Certificate No. 084-002029.
15
16
17
18
19
20
21
22
23
24

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 71

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MID-AMERICA CARPENTERS       )
REGIONAL COUNCIL PENSION      )
FUND, et al.,                 )
                              )
            Plaintiffs,       )   No. 1:24-cv-02428
                              )
      vs.                     )  Judge Andrea R. Wood
                              )
DOCK & DOOR INSTALL,          )    Magistrate Judge
INC., an Illinois             )  Jeannice W. Appenteng
corporation and MIDWEST       )
DOCK SOLUTIONS, INC., an      )
Illinois corporation,         )
                              )
            Defendants.       )

        The deposition of BRANDEN PATRICK
BISHOP, called by the Defendant for
examination, taken pursuant to the Federal
Rules of Civil Procedure of the United States
District Courts pertaining to the taking of
depositions, taken before DIANE M. NULICK, a
Notary Public within and for the County of
Cook, State of Illinois, and a Certified
Shorthand Reporter of said State, at Suite 231,
3759 North Ravenswood, Chicago, Illinois, on
the 16th day of June, A.D. 2025, at 9:04 a.m.

**2**

```
 1   PRESENT:
 2      McJESSY, CHING & THOMPSON, LLC,
        BY:  MR. KEVIN P. McJESSY,
 3      mcjessy@MCandT.com,
        (3759 North Ravenswood, Suite 231,
 4       Chicago, Illinois  60613,
        (773) 880-1260),
 5
            appeared on behalf of the plaintiffs;
 6
        ALLOCCO MILLER & CAHILL, P.C.,
 7      BY:  MS. KATHLEEN M. CAHILL,
        kcahill@alloccomiller.com,
 8      (20 North Wacker Drive, Suite 3517,
         Chicago, Illinois  60606,
 9      (312) 675-4325),
10          appeared on behalf of the defendant,
            Dock & Door Install, Inc.;
11
        AMUNDSEN DAVIS LLC,
12      BY:  MR. MICHAEL F. HUGHES,
        mhughes@amundsendavislaw.com,
13      (3815 East Main Street, Suite A-1,
         St. Charles, Illinois  60174,
14      (630) 587-7925/(630) 217-1228 (direct),
15          appeared on behalf of the defendant,
            Midwest Dock Solutions, Inc.
16
17
18
19
20
21
22
23
24
```

**3**

                I N D E X

WITNESS:  BRANDEN PATRICK BISHOP

EXAMINATION BY:                        PAGE
Mr. McJessy                              4
Mr. Hughes                             126


PLAINTIFF'S EXHIBITS:

No. 36                                  11
No. 37                                  17
No. 3                                   50
No. 8                                   72
No. 7                                   74
No. 6                                   75
No. 38                                  83
No. 21                                  85
No. 22                                  88
No. 15                                  97
No. 37                                 101
No. 29                                 113

**4**

(The witness was duly sworn.)

        BRANDEN PATRICK BISHOP,
called as a witness herein, having been first
duly sworn, was examined and testified as
follows:


        EXAMINATION
        BY MR. McJESSY:

        Q.  Sir, can you state your name for the
record, please?  Well, state your name and
spell your first, middle, and last names.
        A.  Branden Bishop, B-r-a-n-d-e-n,
B-i-s-h-o-p.
        Q.  All right.
                No middle name?
        A.  Middle name Patrick.
        Q.  Okay.
                Can you spell that?
        A.  P-a-t-r-i-c-k.

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

5

 1    Q.  Okay.
 2          Just in case there's an
 3  unusual spelling or something.
 4    A.  Yep.
 5    Q.  All right.
 6          Sir, have you ever been
 7  deposed before?
 8    A.  No.
 9    Q.  So this is the first time?
10    A.  Yes.
11    Q.  Lucky you.
12          All right.  Let me go over a
13  few ground rules just to hopefully make things
14  move a little faster and go a little smoother.
15    A.  Yes, sir.
16    Q.  First of all, you understand you're
17  under oath, correct?
18    A.  Yes.
19    Q.  Okay.
20          And even though we're here in
21  an informal setting in a conference room, do
22  you understand that that oath has the same
23  force and effect as if you were testifying in a
24  court?

6

 1    A.  Yes.
 2    Q.  Okay.
 3          And I'm going to ask you a
 4  series of questions today.
 5    A.  Ah-huh.
 6    Q.  Hopefully, you'll give me the best,
 7  most truthful answers that you can.
 8    A.  Okay.
 9    Q.  I'm going to ask you questions, and
10  the other attorneys here who represent Dock &
11  Door, and Midwest Dock Solutions, they may make
12  objections after I ask a question.
13    A.  Okay.
14    Q.  Unless somebody instructs you not to
15  answer a question, after they're done making
16  their objection, you can go ahead and answer my
17  question.
18    A.  Okay.
19    Q.  Okay.
20          And I may prompt you, you can
21  go ahead and answer, that kind of thing.
22    A.  Sounds good.
23    Q.  If I ask you a question and you don't
24  understand it, please ask me to explain, and

7

 1  I'll try to rephrase my question or ask it in a
 2  way that's not confusing and that's
 3  understandable.
 4          Is that fair?
 5    A.  Yes.
 6    Q.  And since we have that agreement, if
 7  you answer a question, is it fair that I can
 8  assume you understood my question?
 9    A.  Yes.
10    Q.  Okay.
11          And all of your responses
12  need to be verbal responses.  Yeses and nos are
13  good.  Nods or shakes of the head or ah-huh,
14  uh-uh, those kind of responses, those aren't
15  helpful because the court reporter has a hard
16  time taking them down.
17    A.  Yes.
18    Q.  So if I ask you a question and you nod
19  your head or shake your head or say ah-huh,
20  I'll probably prompt you, is that a yes, is
21  that a no, just so the record's clear.
22          Fair enough?
23    A.  Okay.
24    Q.  All right.

8

 1          Also -- and I'm just guessing
 2  we're going to have an issue with this one --
 3  it's important that both of us not talk at the
 4  same time.
 5    A.  Yes.
 6    Q.  She has two hands, but she can only
 7  take down what one of us is saying at a time.
 8  So sometimes you're going to know what my
 9  question is before I finish asking it, and your
10  inclination is going to be to start answering
11  just to keep things moving along.
12          Please wait until I finish so
13  they can make their objections and so she can
14  take down an accurate record, and then I will
15  try my best to return the courtesy and not
16  start asking a new question until you're done
17  with your answer.
18          Fair enough?
19    A.  Yes, sir.
20    Q.  Okay.
21          Also we generally take a
22  break about every hour, but if you need to take
23  a break before then, let me know.  We can stop,
24  and we can do that.

2 (Pages 5 to 8)

9

1    Fair enough?
2    A. Yes, sir.
3    Q. And then -- what else? Oh, any reason
4 today that you cannot give truthful answers?
5 For example, are you under any medications or
6 suffering from any conditions that would
7 prevent you from either understanding my
8 questions or giving truthful answers?
9    A. No.
10   Q. Okay.
11        Also today I'm going to ask
12 you some questions about things that happened
13 in the past. If you don't recall exact dates
14 or when something happened, fair to answer.
15 Just tell me it's an approximation -- you know,
16 I think approximately sometime in 2022 or 2023,
17 that kind of thing.
18   A. Okay.
19   Q. And we might try to narrow it down a
20 little bit. I might ask you some follow-up
21 questions to try to, you know, figure out as
22 close as you can remember what the date was or
23 when something occurred. But if you're giving
24 me an estimation or approximation, that's fine.

10

1 But just so the record's clear, maybe say that
2 on the record. Okay?
3    A. Got it.
4    Q. All right.
5        Sir, you are currently
6 employed by Dock & Door Install, correct?
7    A. Yes.
8    Q. Okay.
9        And you were employed by
10 Midwest Dock Solutions, correct?
11   A. Yes, when I was in high school.
12   Q. Okay.
13        And how old are you?
14   A. Twenty-two.
15   Q. All right.
16        When did you graduate high
17 school?
18   A. The year of '21.
19   Q. It's like May or June of '21?
20   A. Yeah. I would say that.
21   Q. All right.
22        Now, have you talked with
23 anybody about your deposition here today?
24   A. No.

11

1    Q. Okay.
2        You haven't talked to Tony
3 Brutti about it?
4    A. I asked him a question. But, I mean,
5 I think it was -- it was about this stuff. I
6 didn't know how or where to send it in, and
7 then I never got anything back.
8    Q. Okay. Excellent. Well, let's go to
9 that.
10        You pulled out a subpoena,
11 correct?
12   A. Yes. I have the paper that was given
13 to my mom. I didn't receive this.
14   Q. Okay.
15   A. I was out of town.
16   Q. Oh, okay.
17        Well, let's -- I'm going to
18 stop for a moment and have the court reporter
19 mark this as Exhibit 36.
20
21        (WHEREUPON, the document was
22         marked Plaintiff's
23         Exhibit 36 for identification,
24         as of 6/16/25.)

12

1        MR. McJESSY: All right.
2        Back on the record.
3 BY MR. McJESSY:
4    Q. I've handed you what's been marked as
5 Exhibit 36.
6        Is that the same as the paper
7 you just pulled out?
8    A. Yes.
9    Q. Okay.
10        And that's the subpoena that
11 your mom received while you were out of town,
12 as you said, correct?
13   A. Correct.
14   Q. All right.
15        And was it served at your
16 house?
17   A. It was.
18   Q. Okay.
19        And that's what brought you
20 here today, correct?
21   A. Yes.
22   Q. All right.
23        You're not here voluntary.
24 You're here because of this subpoena, correct?

3 (Pages 9 to 12)

13

1    A.  Yes.
2    Q.  Okay.
3                Given your choice, you'd
4    rather be somewhere else, correct?
5    A.  Yeah.
6            MR. HUGHES:  That goes for all of
7    us.
8    BY MR. McJESSY:
9    Q.  All right.
10               And you said -- and what you
11   had pointed to initially was the request, one
12   through six.
13               It asks for the production of
14   documents, correct?
15   A.  Yes.
16   Q.  All right.
17               And do you have documents
18   responsive to these requests?
19   A.  So the text messages would probably be
20   a nightmare to collect because they do get --
21   occasionally, I try and keep my phone clean, so
22   I usually delete most of these texts.
23               Let's see.  Time sheets I do
24   have.

14

1    Q.  Okay.
2    A.  Sorry.  That would be the same thing
3    for three as two since they're time sheets.
4    W-2s and stuff like that, I do have.  Five, I
5    was reading, it says produce resumé or job
6    applications.  So is that applications that
7    I've submitted while working for a different
8    job?
9    Q.  Correct.
10   A.  Okay.
11               I probably do not have those.
12   Q.  Or have you submitted a job
13   application to Dock & Door or Midwest?
14   A.  To them?
15   Q.  Yes.
16   A.  I never sent a resumé, no.
17   Q.  Okay.
18               How about a job application?
19   Did you ever fill one out?
20   A.  No.
21   Q.  Okay.
22               For either company?
23   A.  Yes.  For either company, I did not.
24   Q.  Excellent.

15

1    A.  Okay.
2            And then photographs, no.
3    No.
4    Q.  No photographs of job sites?
5    A.  Nothing really there to take pictures
6    of.
7    Q.  Okay.
8            So I understand that the text
9    messages are probably a nightmare because you
10   have to screenshot them and then either forward
11   them by text or by email.
12   A.  Correct.
13   Q.  But I'm going to ask you to do that.
14   Okay?
15   A.  Okay.
16   Q.  After today's deposition.
17   A.  And that will be emailed to you or --
18   Q.  You can email it to me.  I'll give you
19   an email address that you can send it to.
20   A.  Sounds good.
21   Q.  Oh, it's actually on the front of the
22   subpoena, on the very bottom.
23   A.  Is that the mcjessy@MCandT.com --
24   Q.  Yep.

16

1    A.  -- or whatever that is?
2    Q.  That's it.  So if you can send those
3    there.
4            I'm going to ask the court
5    reporter to mark this as Exhibit 37.
6    A.  Just texts or time sheets as well?
7    Q.  Well, whatever documents that you
8    would have responsive to the subpoena.
9            All right.  And I'll just put
10   on the record now, I anticipate that once we're
11   done with the deposition today, I'm going to --
12   well, strike that.
13            Once we're done with the
14   deposition today, I'm going to continue the
15   deposition, not end it formally, just so I can
16   get those materials from you.  If I have
17   follow-up questions about those materials, we
18   may need to resume the deposition at some
19   future date.  I don't anticipate that that will
20   happen.  And if it does, we might even be able
21   to do it by Zoom.  But I do want to make sure I
22   get those materials, so we will just continue
23   the deposition when it concludes today.  And if
24   I have no questions when I receive the

4 (Pages 13 to 16)

17

1   materials, which seems most likely, then the
2   deposition will just be concluded. Okay?
3      A. And I'll be notified of that?
4      Q. Yeah. I'll notify you of that.
5
6          (WHEREUPON, the document was
7          marked Plaintiff's
8          Exhibit 37 for identification,
9          as of 6/16/25.)
10
11  BY MR. McJESSY:
12     Q. I'm going to hand you what I've marked
13  as Exhibit 37. And if you look at the back of
14  this document, there's some documents called
15  invoices that are with your time sheets. But I
16  believe that most of the documents in here are
17  just, generally, your time sheets, correct?
18      A. Yes.
19     Q. Okay.
20         Now, the invoices aren't your
21  time sheets, right? They reflect your hours
22  worked, but those aren't the time sheets you
23  prepared?
24      A. Yeah. I've never seen these before.

18

1     Q. Okay.
2         And you're looking at the
3  last couple pages of that exhibit, right?
4      A. Yes.
5     Q. Okay.
6         And we'll get into all of
7  this. But, for example, if you look at, maybe,
8  the fifth page to the end, that's -- it's got a
9  little number 24 and a circle in the upper
10  right corner. That's a photograph of your time
11  sheet, correct?
12      A. It is.
13     Q. All right.
14         And this is a time sheet you
15  filled out?
16      A. It is.
17     Q. Okay.
18         And then the handwriting at
19  the very top of this, where it says Branden
20  Bishop one hyphen five twenty-three hyphen one
21  hyphen eleven twenty-three and then the
22  twenty-four, that's not your writing, correct?
23      A. That is not my writing?
24         Oh, on the top of this?

19

1     Q. Yeah.
2      A. No. I don't -- no.
3     Q. Okay.
4         But the writing on the time
5  sheet is your writing, correct?
6      A. It is.
7     Q. Okay.
8         And then the next page is an
9  invoice. And if you look at it, it shows
10  Branden Bishop, 1/9/23, MHC, Brandon Road,
11  Joliet, installation of overhead sectional
12  doors, correct?
13      A. Yes.
14     Q. All right.
15         And that shows a quantity of
16  eight, correct?
17      A. Yes.
18     Q. And you assume that's eight hours?
19      A. Yes.
20     Q. All right.
21         And if you look at the page
22  just before that, that looks to be -- that's
23  your time sheet. And if you look at -- where
24  is it at?

20

1      A. I think I'm lost. I see a highlighter
2  on yours.
3     Q. There you go.
4      A. Oh, we're back here?
5     Q. If you look at that page, there's a
6  date, also 1/9 at the top, correct?
7      A. Yes.
8     Q. And then it's -- and then you have --
9  I can't tell what it says there, but can you
10  read what's underneath the line with the date?
11      A. For job location and contractor?
12     Q. Yeah.
13      A. It says the address, which looks like
14  I wrote 3351 Brandon Road, Joliet, Ira,
15  Morgan/Harbour, contractor, Joliet.
16     Q. Okay.
17         And that matches up, in some
18  respects, with the invoice page immediately
19  following, correct?
20      A. It does. The address could be
21  butchered.
22     Q. Okay.
23      A. But, yes.
24     Q. But it was Brandon Road?

5 (Pages 17 to 20)

21

```
1      A.  It was -- yeah.  That was my first
2   job.
3      Q.  Okay.
4          And why does it say Ira in
5   parentheses?
6      A.  I honestly don't entirely know because
7   Ira is our sales guy.  And from my
8   understanding, he -- Midwest Dock -- from my
9   understanding, I could be wrong, but my
10  understanding is he bids these jobs, and then
11  he hires Dock & Door --
12     Q.  Okay.
13     A.  -- to do these jobs.
14     Q.  That's Ira Sugar, correct?
15     A.  That is Ira Sugar.
16     Q.  Okay.
17          And why is it your
18  understanding he bids these jobs and then hires
19  Dock & Door to do the work?
20     A.  It's just what I've always assumed.
21     Q.  Okay.
22          Do you have any -- what's
23  your basis for that assumption?
24     A.  Nothing really.  It's just kind of
```

22

```
1   what I just kind of assumed --
2      Q.  Okay.
3      A.  -- goes on.
4      Q.  How do you know that he's the one
5   bidding -- that he's the salesperson bidding
6   that job?
7      A.  His names are -- his name is usually
8   on the material that we install.
9      Q.  Oh, okay.
10          Where is it on the materials?
11     A.  So think of a garage door panel.  On
12  the side of it, where your track is, there's a
13  white tape, and it's all of your specs for the
14  door, for the screens, for the track, rollers,
15  all of that kind of stuff, and then you usually
16  put a name and an address.  So for this job, it
17  would have said something Ira, and then it
18  would have also put in that address that I
19  stated earlier.
20     Q.  I see.
21          So when the product is being
22  shipped to the site, it has that description on
23  it that you just gave me?
24     A.  The majority of the time, yes.
```

23

```
1      Q.  Okay.
2          So some sort of shipping
3   label from the company that's supplying the
4   materials?
5      A.  Yeah, to keep everything in order
6   because there's a lot going on there.
7      Q.  I got it.
8          And so would it say like Ira
9   Sugar, Midwest Dock Solutions, and then a
10  description of the materials?
11     A.  Yeah, but it wouldn't say his last
12  name.
13     Q.  Okay.
14          It would just say Ira?
15     A.  Yeah.
16     Q.  Okay.
17     A.  And then sometimes it would be the
18  MWD, Midwest Dock, yeah.
19     Q.  Okay.
20          And is that pretty standard?
21     A.  Yeah.
22     Q.  Okay.
23          And is that still standard
24  like today?  I mean, it wasn't just back then.
```

24

```
1   It's been over time?
2      A.  From my memory, yes.
3      Q.  Okay.  All right.
4          So other than talking to Tony
5   Brutti about production of the documents in
6   response to the subpoena and not getting a
7   response from him about how to produce the
8   materials, did you have any other conversations
9   with Tony Brutti about your deposition today?
10     A.  No.
11     Q.  Okay.
12          How about Tony Zarlengo?
13     A.  No.
14     Q.  Well -- now, you probably speak, I'm
15  guessing, to Tony Brutti all of the time,
16  correct?
17     A.  Yes.  Well, actually, can I go back to
18  the other statement?
19     Q.  Of course.
20     A.  I did tell him to write on the board
21  that I needed this day off.
22     Q.  Okay.
23          Anything else you can think
24  of?
```

6 (Pages 21 to 24)

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

25

```
 1    A.  No.
 2    Q.  All right.
 3    A.  Other than that, yeah.
 4    Q.  And as we go along, if you've given
 5  some testimony or said you couldn't remember
 6  something and then you remember it --
 7    A.  Ah-huh.
 8    Q.  -- or you want to correct your
 9  testimony because you believe you said
10  something wrong, please feel free to let me
11  know.  Okay?  I want to make sure the record is
12  accurate.
13          Fair enough?
14    A.  Fair.
15    Q.  All right.
16          You probably speak to Tony
17  Brutti, though, all of the time, I'm guessing,
18  right?
19    A.  Yes.
20    Q.  Okay.
21          But about work, correct?
22    A.  Yes.
23    Q.  Okay.
24          How -- how about Tony
```

26

```
 1  Zarlengo?  When was the last time you spoke to
 2  Tony Zarlengo?
 3    A.  Roughly?
 4    Q.  Yeah.
 5    A.  Probably like, maybe, a month ago, two
 6  months ago.
 7    Q.  Okay.
 8    A.  Yeah.
 9    Q.  About work?
10    A.  It could have been.  We talk about the
11  gym sometimes as well.
12    Q.  What's "the gym"?
13    A.  Work out.
14    Q.  Oh, okay.
15    A.  Yeah.
16    Q.  Do you both work out?
17    A.  He does, yeah, and so do I.
18    Q.  At the same gym?
19    A.  Same gym, different location.
20    Q.  Got it.
21          So sometimes it's about work,
22  and sometimes it's about social matters?
23    A.  Ah-huh.
24    Q.  Is that a yes?
```

27

```
 1    A.  Sorry.  Yes.
 2    Q.  Okay.
 3          And when was the last time
 4  you spoke with Mike Richert?
 5    A.  Roughly, a year ago, maybe.
 6    Q.  Okay.
 7    A.  I don't talk to him often.
 8    Q.  Okay.
 9          And what would that have been
10  about?  Like what would you talk to him about?
11    A.  He's my neighbor, so I probably asked
12  him when his house is going to be fixed because
13  it burned down.
14    Q.  Oh.  I'm sorry to hear that.
15    A.  Yeah.
16    Q.  So how long have you known Mr.
17  Richert?
18    A.  Since I moved in.  He's my neighbor.
19  So that would be, roughly, 17 years.
20    Q.  Okay.
21          So you knew him before you
22  went to work for either Midwest Dock Solutions
23  or Dock & Door, correct?
24    A.  Yes.
```

28

```
 1    Q.  Let's see.
 2          I take it, you don't -- even
 3  though he's your neighbor, you don't see him
 4  very frequently?
 5    A.  Not anymore.  He doesn't live there
 6  anymore.
 7    Q.  Oh, okay.
 8          When did he move?
 9    A.  Their house burnt down in '22, so
10  about two, three years ago.
11    Q.  Okay.  All right.
12          Have you and I spoken prior
13  to today?
14    A.  You're -- no.
15    Q.  Okay.  I didn't think so.  I just
16  wanted to make sure.  All right.
17          All right.  I'm going to ask
18  you a couple of questions about your
19  educational background.
20          You said you graduated from
21  high school in '21?
22    A.  Yes.
23    Q.  And have you received any training or
24  education since graduating from high school?
```

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

29

1  A. Yes.
2  Q. What training or education have you
3  received?
4  A. The carpenters union.
5  Q. Okay.
6     Are you a member of the
7  carpenters union?
8  A. I am.
9  Q. And how long have you been a member of
10  the carpenters union?
11  A. Roughly, two and a half years.
12  Q. All right.
13     And what local are you a
14  member of?
15  A. Local 272.
16  Q. And how did you come to join the
17  carpenters union?
18  A. I asked Mike Richert for a union job.
19  Q. Okay.
20     And he said yes?
21  A. He did.
22  Q. Okay.
23     And then what happened next?
24  A. He got in touch, which I would assume

30

1  with Tony Brutti. And then I went in later and
2  took a test for the -- he sponsored me, and I
3  went and took a sponsor test at the Mid-America
4  Carpenters union hall.
5  Q. Okay.
6     And Mike -- so Mike Richert
7  sponsored you?
8  A. Yes. I think Dock & Door sponsored
9  me, so that would be, more or less, Tony
10  Brutti. But they probably communicated about
11  it.
12  Q. Okay.
13     And why did you -- you said
14  you went to Mike Richert because you wanted a
15  union job.
16     Why did you want a union job?
17  A. Benefits.
18  Q. Okay.
19     Better pay, too?
20  A. Yes.
21  Q. All right.
22     And to your knowledge, did
23  Dock & Door need workers at the time?
24  A. Yes, I think.

31

1  Q. You're not sure?
2  A. I'm not entirely sure, no.
3  Q. Okay.
4     And do you know -- did he --
5  the sponsorship with the union, was that with
6  somebody at the union in particular, or was it
7  just with Local 272?
8  A. It was through Local 272.
9  Q. Okay.
10     Was there -- did you have a
11  contact person there or anything like that?
12  A. No. I was -- Tony Brutti sent me an
13  email, where to go to take my test. And after
14  I took my test, the union sent me to go take a
15  field -- or a pee test. Drug test, sorry.
16  Q. Oh, okay.
17  A. And then after that, Tony Brutti sent
18  me my results of the test, and I passed. And I
19  was able to work on a permit until the union
20  had indentured me in, I think is the word.
21  Q. Okay.
22  A. And then that was that.
23  Q. Excellent.
24     And do you remember

32

1  approximately when that was?
2  A. I think my indenture date is February
3  '23. Probably, on the 22nd, maybe the 17th.
4  Q. Of February?
5  A. Yeah.
6  Q. All right.
7     And if you look at -- I
8  notice you're looking at the -- the Exhibit 37,
9  which is the time sheets that we've marked that
10  have a couple of invoices in them also.
11     If you notice the invoices,
12  I'll represent to you that these invoices -- or
13  not the invoices. Strike that.
14     I'll represent to you that
15  the time sheets were produced to us by
16  Dock & Door, like that's where we got these.
17  A. Yes. You'll --
18  Q. And I'll also -- hold on.
19  A. Sorry.
20  Q. I'll also represent to you that these
21  appear to be in reverse date order, so the most
22  recent ones on top and the oldest ones on back.
23  So the oldest time sheet that we would have
24  would be this January 5, 2023, that shows, you

CERTIFIED REPORTING COMPANY
11 E. Adams St., Chicago IL 60603

33

1  know, your time from January 9 through January
2  11 of 2023.
3      A.  Yes.
4      Q.  Does that sound about right to you,
5  when you started working for Dock & Door?
6      A.  It does.
7      Q.  Okay.
8      A.  And that January time was when I was
9  on a working permit.
10     Q.  Okay.
11     A.  Before I was indentured.
12     Q.  Okay.
13         So how far prior to this
14  would you have gone to Mike Richert and said,
15  hey, I'd like to see if I can get on the union?
16     A.  I don't understand what you meant,
17  sir.
18     Q.  Well, you said it started out by you
19  going to Mike Richert and saying you wanted to
20  do union work.
21     A.  Ah-huh.
22     Q.  Is that a yes?
23     A.  Yes.
24     Q.  Okay.

34

1          And then between him and Tony
2  Brutti, you believe they must have spoken, and
3  then you got a notice from Tony Brutti saying,
4  you know, here's -- here's a date for your
5  test, or something like that; is that right?
6      A.  Yes.
7      Q.  Okay.
8          And then, at some point, you
9  started working for -- getting paid through
10  Dock & Door, correct?
11     A.  Yes.
12     Q.  Okay.
13         And so -- and that was in
14  January, and you said you did that pursuant to
15  some sort of permit that you got from the
16  union, correct?
17     A.  Yes.
18     Q.  Okay.
19         So my question is, how far --
20  when -- like if you started getting paid and
21  working for Dock & Door in January of 2023,
22  when do you think those conversations with Mike
23  Richert and the email text exchange with
24  Anthony Brutti occurred?

35

1      A.  Oh, it would be December of '22.
2      Q.  Okay.
3          Just about a month prior?
4      A.  Yes.  I -- it was the beginning of
5  December I had contacted him, and then it -- it
6  took some time to set everything up.
7      Q.  Okay.
8          And when you say "him," you
9  mean --
10     A.  Mike Richert, yeah.
11     Q.  Okay.
12     A.  And then between him and Tony.
13     Q.  Okay.
14         So approximately a month, you
15  think?
16     A.  Yes.
17     Q.  Okay.
18         Just trying to get a time --
19     A.  Right.
20     Q.  -- reference here.
21         And then you said this was
22  the first job that you worked on, was the
23  Brandon Road job?
24     A.  Yes.

36

1      Q.  Okay.
2          And that was the first job
3  you worked on where you were getting paid
4  through Dock & Door?
5      A.  Yes.
6      Q.  Okay.
7          And does this date seem
8  right?  Do you think this actually is your
9  first time sheet?
10     A.  Yes.
11     Q.  Okay.
12         Now, did you take the test
13  before or after you got your work permit?
14         And if you don't recall,
15  that's fine.  I'm just --
16     A.  I don't recall.
17     Q.  Okay.
18         And after you passed the
19  test, did you start taking classes at the
20  carpenters apprentice school?
21     A.  Yes.
22     Q.  Okay.
23         And were you considered an
24  apprentice?

9 (Pages 33 to 36)

37

1    A.  Yes.
2    Q.  Okay.
3         And are you a journeyman now?
4    A.  Still apprentice.
5    Q.  Still apprentice.  Okay.
6         And when did you start taking
7    classes at the carpenters apprentice training
8    school?
9    A.  It would have been, let's see,
10   sometime -- sometime in January.
11   Q.  Okay.
12        Soon after?
13   A.  Yes.
14   Q.  All right.
15        And I'm looking -- there's
16   a -- since these are in reverse date order,
17   maybe the best way is to point it out by date.
18   But if you look at the one that says Branden
19   Bishop 1/26/23 at the top -- do you see that
20   one?
21   A.  Yes.
22   Q.  It does -- I see a --
23   A.  Oh, yeah.  That's it.
24   Q.  Okay.

38

1         I see --
2    A.  I was looking for that.
3    Q.  It says Branden Bishop has -- well,
4    can you -- can you read to me -- you know what
5    we're talking about, which is the entry that
6    suggests you had a class.
7         What does it say, Branden
8    Bishop --
9    A.  That was my OSHA class.  That was the
10   first class I took with the carpenters union.
11   Q.  Okay.
12   A.  That was my first class.  So that
13   first class you're asking about, the last
14   question, that is my first one.
15   Q.  Okay.
16        And it's January 30, correct?
17   A.  Yep.
18   Q.  Okay.
19        So you started classes pretty
20   much right away?
21   A.  Ah-huh.  Yes.  Yes.
22        Sorry.  I'll get better at
23   that.
24   Q.  No.  That's all right.

39

1         And the entry for January 30
2    says, Branden Bishop, something January 30.
3         Can you tell me what that
4    word is?
5    A.  That is -- oh, where the scribble is
6    at?
7    Q.  Oh, maybe it says Monday.
8    A.  It says -- yeah.  That is a Monday.
9    So Branden Bishop, Monday, January 30.  My mom
10   wrote this for me because I was out of -- I
11   was -- my aunt lives in Elgin, so I stay in
12   Elgin when I have to go to school because it's
13   only 20 minutes away, so I don't have such a
14   far drive.  So my mom has written this one, and
15   one of them in back as well.  So not all of
16   these are my handwriting.  This one, the 1/12
17   through 1/18, like two pages back --
18   Q.  Okay.
19   A.  -- it's also in my mom's handwriting.
20   Q.  All of this?
21   A.  Yeah, that entire -- that entire page.
22   I think we're on the same one.
23   Q.  It's got a 40 at the top?
24   A.  Yes.

40

1    Q.  Okay.
2         And it's January 12 through
3    January 18?
4    A.  Ah-huh.  Yep.
5    Q.  Okay.
6         And as far as you know, is
7    all of the information on here correct?
8    A.  Yes.  I was on the phone with her
9    telling her what to write.
10   Q.  I see.
11   A.  It was -- it was hard.  It was a
12   headache.
13   Q.  So you would have also told her to
14   write Ira on here where it says Ira?
15   A.  Yes.
16   Q.  All right.
17        And Ira, again, means Ira
18   Sugar, correct?
19   A.  It does.
20   Q.  All right.  All right.
21        So are you still taking
22   training classes at the apprentice program?
23   A.  I am.
24   Q.  Okay.

10 (Pages 37 to 40)

41

1    And have you received any
2  certifications or -- well, strike that.
3    Have you received any sort of
4  certifications since you've been in the
5  carpenters training program?
6    A.  I have.
7    Q.  All right.
8    What have you received?
9    A.  Scaffolding.  Certified apprentice
10 scaffolding.  There's -- what's the other one?
11 There's only a few.
12   Q.  You can keep answering while I turn up
13 the air-conditioning a little.
14   A.  Scaffolding.  Oh, OSHA certification.
15   Q.  Okay.
16    The first one we saw there?
17   A.  Yes.  Those two is what I can
18 remember.
19   Q.  Okay.
20    If you think of any others
21 that you've received as we go along, will you
22 let me know?
23   A.  Yes.
24   Q.  All right.  Okay.

42

1    Other than a drivers license,
2  do you hold any other licenses?
3    A.  Yes.
4    Q.  What other licenses?
5    A.  Conceal to carry.
6    Q.  Okay.
7    Other than that?
8    A.  No.
9    Q.  And other than the two -- can I call
10 those certifications?
11   A.  Yes.
12   Q.  Scaffolding and OSHA?
13   A.  Yes.
14   Q.  Other than those certifications, do
15 you hold any other certification?
16   A.  Not to my knowledge.
17   Q.  Okay.
18    And other than the carpenters
19 training program that you're involved in, have
20 you received any other training or education
21 since you graduated from high school?
22   A.  Actually, I got my motorcycles
23 license.
24   Q.  Oh, excellent.

43

1    Anything else?
2    A.  Nope.
3    Q.  All right.
4    And did you join Local 272 in
5  January of 2023, or would it have been December
6  or --
7    A.  It would have been January or
8  February.  One of the two.  It would be my
9  indenture date that I'm not even sure of.
10   Q.  Okay.
11    And are you still a good -- a
12 member in good standing?
13   A.  Yes, I am.
14   Q.  And have you been a member in good
15 standing since that time?
16   A.  I have.
17   Q.  And have you ever been a member of any
18 other union local?
19   A.  I have not.
20   Q.  All right.
21    And -- now, I'd like to talk
22 to you about your employment history.
23    Did you -- you said you
24 worked for Midwest Dock Solutions while you

44

1  were in high school?
2    A.  Yes.
3    Q.  How did that come about?
4    A.  Mike was in my front yard talking to
5  my dad.  I quit baseball.  My dad told me to
6  get a job.  And Mike said he could use a
7  helper.
8    Q.  Okay.
9    You say you quit baseball?
10   A.  I did.
11   Q.  Okay.
12    Did you play high school
13 baseball?
14   A.  I didn't make it to high school, no.
15 I gave it up about -- like my freshman year.
16   Q.  Oh, so how old were you when you
17 started working for Midwest Dock?
18   A.  That would have been my sophomore
19 summer so 16.  So I had just gotten my license.
20   Q.  Okay.
21   A.  And my parents weren't paying for gas
22 since I stopped playing sports.
23    MR. McJESSY:  Off the record.
24

11 (Pages 41 to 44)

45

1  (There was a discussion off
2  the record.)
3
4  MR. McJESSY: All right. Back on
5  the record.
6  BY MR. McJESSY:
7  Q. All right.
8  So what -- and what -- so was
9  this just a summer job, or did you work while
10 you were in school, too?
11 A. Mainly, a summer job. And then when I
12 was on like winter break, if he had anything, I
13 would ask him to work so I can have some more
14 extra cash for school.
15 Q. All right.
16 And what did you do for
17 Midwest Dock Solutions?
18 A. Really, just like cleaning, like just
19 cleaning out dock pits. That's about it. They
20 didn't -- more so like kind just watching and
21 being a third hand.
22 Q. Helper?
23 A. Yes, helper.
24 Q. Were you on job sites?

46

1  A. Union job sites or regular --
2  Q. Just any job site. Like were you
3  going out to job sites --
4  A. Yes.
5  Q. -- where the work was being done?
6  A. Yes. I was going to job sites.
7  Q. All right.
8  What I'm getting at is they
9  have a warehouse, correct?
10 A. Yeah. That's where we would go to
11 work and do stuff, too.
12 Q. Okay.
13 And the -- do you know what
14 the address of the warehouse is?
15 A. For Midwest Dock?
16 Q. Yeah.
17 A. I'm probably going to be wrong, but I
18 know it's on Union Avenue. It's like 37 East,
19 36 East. I don't know.
20 Q. All right.
21 36 East something?
22 A. Something Place, yeah.
23 Q. Okay.
24 And -- and what I was getting

47

1  at is, you weren't just working at that
2  location. You were actually going out on the
3  job sites?
4  A. Yes. I was going out with the Midwest
5  Dock guys and doing work.
6  Q. Okay.
7  A. Helping.
8  Q. Okay.
9  And when you say union job
10 sites -- when I asked that question originally
11 and you asked me back do I mean union job
12 sites, what's a union job site?
13 A. A union job site is an organized job
14 site that contractors that have contracts with
15 the union they do jobs, and if you -- to be on
16 those jobs, you must be a member of the union.
17 Q. Okay.
18 So when you say, "a union job
19 site," that's what you mean?
20 A. Yes.
21 Q. Okay.
22 A. But I wouldn't go there with Midwest
23 Dock. We would go to like old buildings,
24 rundown buildings.

48

1  Q. So who hired you to work for Midwest
2  Dock Solutions, Mike Richert?
3  A. Yes.
4  Q. Okay.
5  Did you have to talk to Tony
6  Zarlengo at all before you got hired?
7  A. For the job.
8  Q. Yeah, okay.
9  And did -- were you part time
10 or full time?
11 A. I don't know. I guess, I would call
12 it part time, yeah.
13 Q. Okay.
14 Were you working 40 hours a
15 week or less?
16 A. Yeah, 40 hours. But, I mean, that
17 was -- I mean, full time in the summer, but
18 part time, I guess, during the school year.
19 Q. Okay.
20 A. Since I would only work on breaks if I
21 wanted to.
22 Q. And you weren't a permanent employee.
23 Is that --
24 A. I wouldn't say so, no.

12 (Pages 45 to 48)

49

1  Q.  Okay.
2       Because you would stop
3  working during the school year except during
4  the holidays when they needed you.
5       Is that fair?
6  A.  Yes.
7  Q.  Okay.
8       And did your work -- just
9  focusing up until the time you were a sophomore
10 in high school until you graduated from high
11 school, did the nature of your work for Midwest
12 Dock Solutions change, or was it pretty much
13 cleaning out dock pits and acting as a helper?
14 A.  I just continued to act as a helper
15 that entire high school run.
16 Q.  Okay.
17      And what kind of work did
18 Midwest Dock do where you were acting as a
19 helper?  Like what would be -- the guys that
20 were doing the work that you were helping, what
21 were they doing?
22 A.  They would be repairing dock plates.
23 They would have me clean up the dock pits
24 because they collect garbage just from falling

50

1  in.  We would replace springs, door panels,
2  stuff of that nature.  That's about it.
3  Q.  All right.
4
5       (WHEREUPON, the document marked
6       Plaintiff's Exhibit 3 for
7       identification was tendered to
8       the deponent.)
9
10 BY MR. McJESSY:
11 Q.  I'm going to show you what we've
12 previously marked as Exhibit 3.
13 A.  Okay.
14 Q.  And I'm going to -- this is -- have
15 you ever seen the website for Midwest Dock
16 Solutions?
17 A.  No.
18 Q.  Okay.
19      Well, I'll represent to you
20 that this is one of the web pages for Midwest
21 Dock Solutions's website that has products.
22      Do you see at the top where
23 the word "products" is highlighted?
24 A.  Yes.

51

1  Q.  All right.
2       And it talks about loading
3  dock equipment.  Well, actually, above that, it
4  says -- where it says request a free quote --
5  A.  Ah-huh.  Yes.
6  Q.  -- it says, Midwest Dock Solutions
7  specializes in the service, supply, and
8  installation of loading dock equipment and
9  overhead doors.
10      Do you see that?
11 A.  I do.
12 Q.  All right.
13      Does that sound accurate to
14 you?
15 A.  Yes.
16 Q.  Okay.
17      And it says, we pride
18 ourselves in giving the customer not only
19 excellent service, but doing it at an
20 affordable price.
21      Do you see that?
22 A.  I do.
23 Q.  All right.
24      And would you agree with

52

1  that?
2  A.  I don't know what they price their
3  products at, so --
4  Q.  Okay.
5       So you can't comment on that?
6  A.  I can't.
7  Q.  Okay.
8       And then it talks about -- if
9  you look below that, it talks about loading
10 dock equipment.
11      Do you see that?
12 A.  Under Blue Giant?
13 Q.  Yeah.
14 A.  Yes, I do see that.
15 Q.  And it says, Midwest -- the second
16 paragraph down, under Blue Giant, it says,
17 Midwest Dock Solutions offers a wide range of
18 capability -- capacities, I'm sorry, deck
19 sizes, deck constructions in both hydraulic and
20 mechanical operations to suit virtually any
21 application.
22      Do you see that?
23 A.  I do.
24 Q.  And then it talks about, regardless of

13 (Pages 49 to 52)

53

1  your application, Midwest Dock Solutions
2  provides the most economical and durable
3  solution.
4          Do you see that?
5  A.  I do.
6  Q.  And then it lists a number of things
7  under there.  It says, dock levelers.
8          Do you see that?
9  A.  I do.
10  Q.  And was that some of the work you did,
11  was installation of dock levelers?
12  A.  I did.
13  Q.  All right.
14          You didn't do the
15  installation.  You helped, right?
16  A.  Yes.
17  Q.  Okay.
18          MR. HUGHES:  And I'm going to just
19  object.  What timeframe are we talking about
20  here?
21          MR. McJESSY:  When he was a
22  sophomore in high school until he graduated.
23          MR. HUGHES:  Okay.
24          I just wanted to make sure

54

1  that everybody's clear.
2  BY MR. McJESSY:
3  Q.  Were you on the same page, though?
4  A.  Yeah, I was.  I thought we were still
5  talking about high school.
6  Q.  Okay.  Good.
7          And then do you know what --
8  it says, EODs.
9          Do you know what that is?
10  A.  No.
11  Q.  Okay.
12          And then it says dock seals.
13          Do you know what that is?
14  A.  I do.
15  Q.  What's a dock seal?
16  A.  The black border around these
17  openings.
18  Q.  Okay.
19          Shown in the picture there?
20  A.  Yes.
21  Q.  Okay.
22          And would you help with the
23  installation of those?
24  A.  Yeah.  I don't really think I ever did

55

1  them, but I would have helped if we did.  I
2  don't remember if I did them, but I would have
3  helped do them if I did.
4  Q.  Was that the kind of work that Midwest
5  Dock Solutions was doing, installation of dock
6  seals?
7  A.  We would take old ones down and then
8  put up new ones, yes.
9  Q.  Okay.
10          And how about dock shelters?
11  A.  I never did a dock shelter when I was
12  in high school.
13  Q.  Okay.
14  A.  They're big.
15  Q.  How about dock lights?
16  A.  I've never done dock lights.
17  Q.  Dock restraints?
18  A.  I don't think I ever did a dock
19  restraint.
20  Q.  Steel canopies?
21  A.  No.  I don't know what that is.
22  Q.  Okay.
23          And then you see it says new
24  installations there?

56

1  A.  I see that.
2  Q.  Did -- to your knowledge, did Midwest
3  Dock do new installations?
4  A.  When I was with them when I was
5  younger?  I never did a new installation, no.
6  Q.  Okay.
7          Are you aware whether
8  Midwest -- even after -- are you aware if
9  Midwest Dock Solutions does new installations?
10  A.  I don't assume they do, no.
11  Q.  Okay.
12          You're not aware of that?
13  A.  No.
14  Q.  How about retrofit?
15  A.  Retrofit would be meaning like
16  creating something?
17  Q.  Well, to me, retrofit would be taking
18  down an old and putting in a new.
19  A.  Yes.  That's what I would --
20  Q.  Does that sound like a reasonable
21  definition to you?
22  A.  Yes.
23  Q.  All right.
24          And they did that kind of

14 (Pages 53 to 56)

57

1  work, right?
2      A.  Yes.
3      Q.  All right.
4          And then if you turn to the
5  next page, it says Clopay.  Clopay.  The word
6  underneath overhead doors.
7          Do you see that?
8      A.  Yes.
9      Q.  And then, also, it says rolling steel
10  doors, Cornell, safe and secure.
11          Do you see that?
12      A.  Yes.  Over here, yes.
13      Q.  And Cornell is C-o-r-n-e-l-l.  And
14  Clopay, C-l-o-p-a-y.
15          Are these the kind of doors
16  that you would assist with installation as part
17  of Midwest Dock Solutions?
18          While you were in high
19  school.  Still the same time.
20      A.  Yeah.
21      Q.  Okay.
22      A.  Well, I mean, I really didn't do much
23  with doors.  I really was just helping the dock
24  guys.

58

1      Q.  Okay.
2          Mostly, you were focused on
3  dock levelers?
4      A.  Yes.
5      Q.  Okay.  All right.
6          So let's get to after you
7  graduate from high school.
8          Did you go to work for
9  Midwest Dock Solutions full time?
10      A.  After?  No, I did not.
11      Q.  Okay.
12          What did you do after high
13  school?
14      A.  I was pursuing being an electrician.
15      Q.  Oh, okay.
16          And how were you doing that?
17      A.  I worked with an electrician from
18  Indiana, and we installed in residential.
19      Q.  Wiring houses?
20      A.  Yes, and bending pipe.
21      Q.  Excellent.
22          Out of conduit, that kind of
23  thing?
24      A.  Ah-huh.  Yep.

59

1      Q.  In my experience, that's a real talent
2  if you can do it.
3      A.  It is, and I loved it so much.  I got
4  really good at it, too.
5      Q.  That's almost like an art form.
6      A.  It was.  It was so fun.
7          That was -- that's what I
8  pictured, so --
9      Q.  Is that right?
10      A.  Yeah.
11      Q.  All right.
12          So how long did you do that
13  for?
14      A.  Roughly, a year and a half, so that
15  would put me from --
16      Q.  Mid to late 2022?
17      A.  Yes, late '22.
18      Q.  What did you say?
19      A.  Yeah, late '22.
20      Q.  Late '22.  2022.
21          And did that job have any
22  connection in any way with Midwest Dock
23  Solutions or Dock & Door?
24      A.  Nope.

60

1      Q.  Okay.
2          Just completely separate?
3      A.  Yes.
4      Q.  All right.
5          And then what happened next?
6      A.  After I stopped -- so the guy that I
7  was working with, he knew I was trying to get
8  into a union.  He knew that I was trying to get
9  into one for like the benefits or whatever.  So
10  like I was applying to other places, too.  And
11  then I told him that I was starting to get into
12  the carpenters.  So he just told me, whenever
13  your last day is, that's your last day.  And
14  then we went our separate ways.
15      Q.  Okay.
16          Oh, so you got into the
17  carpenters union by that point?
18      A.  Yes.
19      Q.  Were you working, then, for Midwest
20  Dock Solutions at that time?
21      A.  No.  I didn't work for Midwest Dock
22  after high school.
23      Q.  I see.  Okay.
24      A.  I went with -- after I graduated, I

15 (Pages 57 to 60)

61

1  was probably at home for a little bit until I
2  had my high school graduation party. And my
3  old Eagle Scout Master was there, and he
4  pointed me to a guy that does electric, and I
5  got -- that was my connection.
6       Q.  So when you -- you said earlier that
7  sometime in December you had approached Mike
8  Richert --
9       A.  Yes.
10      Q.  -- about getting into the -- into the
11 union side of the work.
12          You weren't working for
13 Midwest Dock Solutions at that time?
14      A.  No.
15      Q.  Okay.
16          You just brought it up to him
17 when you saw him again?
18      A.  Yes.
19      Q.  I get it.
20          And then he somehow put you
21 in touch with -- you got the notice, then, next
22 through Tony Brutti?
23      A.  Yes.
24      Q.  Okay.

62

1          That you were -- had this
2  test set up?
3       A.  Yes.
4       Q.  I see.  Okay.
5          I, for no particular reason,
6  thought you were working for Midwest Dock at
7  the time and approached Mike Richert.
8       A.  Right.
9       Q.  But that's not the case?
10      A.  No.  That is not.
11      Q.  Okay.
12          So between mid to late 2022
13 and the time that you approached Michael
14 Richert, were you still working for the
15 electrician?
16      A.  I was.  But we were slowing down,
17 so --
18      Q.  Because it's winter?
19      A.  Yes.
20      Q.  Okay.
21          And so you were slow.  And in
22 December, you left completely, I'm guessing?
23      A.  Yes.
24      Q.  Okay.

63

1          When you were working -- I'm
2  going to go back, now.
3          When you were working for
4  Midwest Dock Solutions while you were in high
5  school, who -- who was your boss?
6       A.  I asked Tony Z., Tony Zarlengo, what I
7  would be doing.  I would send him a text and
8  say, anything for tomorrow?  And he would tell
9  me what to do after that.
10      Q.  Okay.
11          So he was -- he sort of did
12 your scheduling, where you were supposed to go
13 and what you were supposed to do?
14      A.  Yes.
15      Q.  Okay.
16          So you'd consider him one of
17 your -- you'd consider him a boss?
18      A.  Yes.
19      Q.  Was Mike Richert a boss?
20      A.  Yes, but I was mainly going through
21 Tony.
22      Q.  Okay.
23          He wasn't involved in the
24 day -- your day-to-day work.  It was Tony?

64

1       A.  Yes.
2       Q.  Okay.
3          When you were working for
4  Midwest Dock Solutions, did you have any
5  interaction with Tony Brutti?
6       A.  No.  I didn't even know him.
7       Q.  That's what's what I was going to --
8  did you even know who he was?
9       A.  No.
10      Q.  Okay.
11          Did you have to fill out a
12 job application or anything like that with
13 Dock & Door Install?
14      A.  No.
15      Q.  All right.
16          It was just you reached out
17 to Mike Richert, and then you got the notice
18 from Tony Brutti that you were scheduled to
19 take the test?
20      A.  Yes.
21      Q.  Okay.
22          And understood that you were
23 hired?
24      A.  Yes.

16 (Pages 61 to 64)

65

```
 1      Q.  All right.
 2           Was passing the test a
 3  condition of going to work for Midwest Dock
 4  Solutions -- or, I'm sorry, for -- thank you.
 5           Was passing the test a
 6  condition of going to -- going to work for
 7  Dock & Door?
 8      A.  I would say kind of.  The test was
 9  more so to be placed in the union.
10      Q.  Okay.
11      A.  Because, I mean, they're not going to
12  let anybody in.  You've got to pass a test to
13  get into the union and -- but, I mean, there
14  was people that didn't past the test.  But you
15  just keep taking it.  If you don't pass it the
16  first time, you go through the union, and they
17  put you threw like a little school to learn
18  math, and they'll teach you.
19      Q.  All right.
20      A.  For people that couldn't pass it the
21  first time.  And then you take it again.
22      Q.  All right.
23           So you have to have
24  certain --
```

66

```
 1      A.  Knowledge to make it in there, yes.
 2      Q.  Okay.
 3           Do you have a Linked-In page?
 4      A.  I don't think so.
 5      Q.  Okay.
 6           Do you have a resumé?
 7      A.  Yes.
 8      Q.  Okay.
 9           When you produce your
10  documents, can you send me a copy of your
11  resumé, too?
12      A.  I can, yeah.  Sorry.
13      Q.  That's all right.
14           When you went to work with
15  Dock & Door, did you have to fill out any
16  paperwork?
17      A.  On the job site or just for them?
18      Q.  No.  Just for them.
19      A.  No.
20      Q.  Like a W-9 or any sort of -- I don't
21  know, any sort of tax -- federal tax
22  withholding paperwork or anything like that?
23      A.  I don't do my taxes.  My mom does.  So
24  I wouldn't know for sure.
```

67

```
 1      Q.  You don't recall that?
 2      A.  No.
 3      Q.  Okay.
 4           And do you know who Sherri
 5  Webber is?
 6      A.  Yes.  I've heard of her.
 7      Q.  Okay.
 8           Do you -- who is she?
 9      A.  She's a person that you would send a
10  receipt to if you had to buy a tool for
11  anything out of pocket.
12      Q.  Okay.
13           And was that true for when
14  you worked with Midwest Dock Solutions?
15      A.  I didn't know her when I was there.
16      Q.  Okay.
17           Is it true for when you
18  worked for Dock & Door?
19      A.  Yes.
20      Q.  Okay.
21           And when you say if you have
22  to buy a tool, she's the person you would send
23  the receipt to, that's buying tools for your
24  work on behalf of the company?
```

68

```
 1      A.  Yes.
 2      Q.  Okay.
 3           Do you supply your own tools,
 4  or does the company supply tools?
 5      A.  It's like 50/50.  So part of -- so
 6  like there's like rules in the carpenters
 7  union, so like you don't buy like power tools
 8  and what not.  So I would buy like my hammer,
 9  my pouches, wrenches, like stuff of that
10  nature, but like they would supply hammer
11  drills, generators, stuff of that --
12      Q.  Power tools?
13      A.  Yeah.
14      Q.  And if -- so if you have to buy a
15  power tool and you pay for it out of your
16  pocket, you would send Sherri Webber the
17  receipt to get reimbursed?
18      A.  Yes.
19      Q.  Okay.
20           Have you ever done that, do
21  you know?
22      A.  I had to buy a vacuum once.
23      Q.  Okay.
24           For working on a job site?
```

17 (Pages 65 to 68)

69

1    A. Yes.
2    Q. And you sent her the receipt to get
3  reimbursed?
4    A. Yep.
5    Q. All right.
6        And do you know, did your
7  reimbursement come from Dock & Door or Midwest
8  Dock Solutions?
9    A. Cash.
10   Q. It was cash. Okay.
11        How expensive was the shop
12  vac?
13   A. Around $150.
14   Q. All right.
15        And you gave her the receipt,
16  and then she reimbursed you in cash?
17   A. She did.
18   Q. And do you know, is that fairly
19  standard practice for the company?
20   A. I know after -- I mean, I'm not like
21  higher up. So other people have credit cards.
22  I don't. Yeah, so -- but I -- I rarely buy
23  anything. I think I only bought the vacuum,
24  and that was a long time ago.

70

1    Q. Okay.
2        Well, you say a long time
3  ago. You started in --
4    A. The beginning, yeah. It just gets
5  confusing because you do so much stuff every
6  day.
7    Q. Well, it may be --
8    A. It all mixes together.
9    Q. Well, it also may be a little
10  different whether you're in your 20s or whether
11  you're in your 50s.
12        MR. HUGHES: His long time ago is a
13  lot sooner than our long time ago.
14        MR. McJESSY: That's what I'm
15  thinking. All right.
16  BY MR. McJESSY:
17   Q. So it was sometime when you first
18  started out?
19   A. It was, yes.
20   Q. Okay.
21        And just so the record's
22  clear, when you first started out with
23  Dock & Door?
24   A. Yes.

71

1    Q. Okay.
2        And has your position with
3  Dock & Door changed at any time since you've
4  been there?
5    A. No, other than like in the union, I've
6  gone from like a first year apprentice to a
7  second year to a third year. That would be the
8  only change. But I don't see that.
9    Q. The work remained the same.
10        Is that fair?
11   A. Yep. Yes.
12   Q. Okay.
13        But your status has changed?
14   A. Yes.
15   Q. And do you get a pay increase with
16  each of the changes, from first to second to
17  third year?
18   A. I do.
19   Q. Okay.
20        As -- as -- as you understand
21  it, tell me what the relationship is between
22  Midwest Dock Solutions and Dock & Door Install.
23   A. I see that they're run out of the same
24  building, but there's like two different

72

1  versions of it. So like we only do like new
2  installs for the most part. And Midwest Dock,
3  they do like -- like the retrofitting --
4    Q. Okay.
5    A. -- so to say.
6    Q. All right.
7        Will they -- okay. Do
8  they -- let me show you what we've previously
9  marked as Exhibit 8.
10   A. Okay.
11
12        (WHEREUPON, the document marked
13         Plaintiff's Exhibit 8 for
14         identification was tendered to
15         the deponent.)
16
17  BY MR. McJESSY:
18   Q. All right.
19        Can you see the truck that's
20  in that picture?
21   A. I do.
22   Q. All right.
23        And does this look like a new
24  install building to you?

18 (Pages 69 to 72)

73

1  A. It does.
2  Q. Okay.
3      And does -- do employees of
4  Dock & Door use trucks like this that have the
5  Midwest Dock branding on the side?
6  A. We do.
7  Q. Okay.
8      And you use those on
9  Dock & Door job sites, correct?
10  A. We do.
11  Q. Okay.
12      And you said they share the
13  same building, and they -- to your -- well,
14  strike that.
15      To your knowledge, does
16  Midwest Dock Solutions also use these trucks to
17  do the retrofit work that you described?
18  A. Yes, but the -- so, I mean, as far as
19  the truck goes, yes, we -- they tend to have
20  like the same Ford trucks, but their -- like
21  their rig layout is different. So like I can't
22  tell whose truck this is, but a Midwest Dock
23  guy would have things such as like torches and
24  like more vigorous tools than we would have.

74

1  We really just have the welder and generator on
2  our -- on our Dock & Door trucks.
3  Q. Okay.
4  A. Because we don't retrofit.
5  Q. I see.
6      And when you say Dock & Door
7  trucks, though, it still has the Midwest Dock
8  Solutions brand on the side, correct?
9  A. Yeah. I don't -- I don't know why,
10  but, yeah.
11  Q. If you -- if you turn to Exhibit 7 --
12  yeah, the one prior.
13  A. Back one?
14  Q. Yeah, try back one.
15
16      (WHEREUPON, the document marked
17      Plaintiff's Exhibit 7 for
18      identification was tendered to
19      the deponent.)
20
21  BY MR. McJESSY:
22  Q. Can you tell from that what kind of
23  truck that is? Based on the rig.
24  A. No, I cannot. It looks like it might

75

1  be one of the Midwest Dock guys.
2  Q. How about if you turn to Exhibit 6?
3  A. Exhibit 6?
4  Q. Yeah.
5
6      (WHEREUPON, the document marked
7      Plaintiff's Exhibit 6 for
8      identification was tendered to
9      the deponent.)
10
11      THE WITNESS: That is -- that looks
12  like one of the Midwest Dock guys as well.
13  BY MR. McJESSY:
14  Q. All right.
15  A. I don't -- I don't know whose truck
16  that is. I haven't ever seen that one before.
17  But, yeah, that looks like --
18  Q. All right.
19      You can't tell?
20  A. No.
21  Q. All right.
22      Have you ever discussed with
23  either the other employees of Dock & Door or
24  Midwest Dock Solutions the relationship between

76

1  the two companies?
2  A. Not necessarily, no.
3  Q. Okay.
4  A. I've asked why we have the Midwest
5  Dock sticker on there. No one knows.
6  Q. Okay.
7      And when you say that -- I
8  think your words, when I asked you about the
9  relationship between the two companies, you
10  said Dock & Door does new installs, for the
11  most part.
12      Is there -- does it only do
13  new installs, or does it occasionally do other
14  work?
15  A. By "the most part," sometimes if we're
16  slow, I'll go back to that third hand as like a
17  helper, occasionally.
18  Q. Okay.
19  A. But, like, occasionally. It would be
20  like once in a blue moon.
21  Q. All right.
22      And then you would do the
23  retrofit work as a helper?
24  A. Yeah. I would really just be like

19 (Pages 73 to 76)

77

1  running around like passing tools back and
2  forth. I don't actually like do the work
3  because I don't know how to.
4      Q.  Okay.
5          And that's more of the
6  Midwest -- then you're doing it -- even though
7  it's once in a blue moon, that's on the Midwest
8  Dock side?
9      A.  Yeah.
10     Q.  Would you ever see guys that you
11 believe were working for Midwest Dock Solutions
12 on Dock & Door job sites?
13     A.  No. I've never seen them working --
14     Q.  Okay.
15     A.  -- on ours before.
16     Q.  How about delivering tools or
17 equipment to the job site?
18     A.  Sometimes the one lady in the shop,
19 she'll have to bring us like -- like hardware.
20     Q.  Okay.
21     A.  But that's about it.
22     Q.  Do you remember her name?
23     A.  Janie.
24     Q.  Janie?

78

1      A.  Yes.
2      Q.  Do you know her last name?
3      A.  No.
4      Q.  All right.
5          Sometimes she would bring
6  stuff out to the job sites?
7      A.  Yes.
8      Q.  Have you -- do you know what "carded"
9  means?
10     A.  Yes.
11     Q.  What does carded mean to you?
12     A.  When a BA comes onto a job site --
13 they do it to every trade -- they check you for
14 your card, like I have -- do you want me to
15 show you mine?
16     Q.  Yeah. When you say "your card," you
17 mean your union card?
18     A.  Yes.
19     Q.  And what does BA mean?
20     A.  Business agent. This is what they
21 would look for. That one might be out of date
22 because I know I have one on the kitchen table
23 right now, but they also check this. This is
24 what has my certifications on it.

79

1      Q.  Okay.
2      A.  And then this is also the OSHA card.
3  That's one of the other certifications.
4      Q.  I see.
5          I'd like to -- can I make a
6  copy of these for the -- for the record. And
7  we can make them an exhibit, and then you
8  can -- okay. Hold on just a minute. We'll go
9  off the record.
10
11         (There was a discussion off
12          the record.)
13
14 BY MR. McJESSY:
15     Q.  When you were working -- I want to
16 talk to you about -- a couple questions
17 about -- back to Midwest Dock Solutions during
18 high school.
19         How were you paid by Midwest
20 Dock Solutions? Like, literally, how did you
21 receive payment?
22     A.  Direct deposit.
23     Q.  Okay.
24     A.  And I got a W-2.

80

1      Q.  Okay. That was my next question.
2          Ever paid cash --
3      A.  No.
4      Q.  -- for non -- for something other than
5  like tool reimbursement?
6      A.  No.
7      Q.  Did you ever receive tool
8  reimbursement from when you worked with Midwest
9  Dock Solutions?
10     A.  No.
11     Q.  Okay.
12         And then, now, switching to
13 when you worked for -- get paid by Dock & Door,
14 how do you get paid for Dock & Door?
15     A.  Direct deposit.
16     Q.  Same thing?
17     A.  Yes.
18     Q.  And have you ever been paid in cash
19 for something other than a tool reimbursement?
20     A.  No.
21     Q.  Okay.
22         And you only received cash
23 for tool reimbursement the one time; is that
24 correct?

20 (Pages 77 to 80)

81

1    A.  Yes, the one time.
2    Q.  Did you have to fill in -- when you
3  handed in your receipt to get the reimbursement
4  for the vacuum that you -- shop vac that you
5  purchased, did you have to fill anything out,
6  or did you just give Sherri the receipt?
7    A.  I didn't fill anything out, no.  I can
8  hardly remember if I even gave her the receipt.
9  I think it was just good word.
10    Q.  And you said you don't have access to
11  a credit card for any purchases, right?
12    A.  I do not, no.
13    Q.  Are you aware that other employees do
14  have a credit card for making company work
15  purchases?
16    A.  Yes.
17    Q.  Do you drive -- do you drive the
18  trucks at all?
19    A.  Every once in awhile.
20    Q.  Okay.
21        Did you have to do anything
22  to get put on the insurance to drive the
23  trucks?
24    A.  No.

82

1    Q.  Do you take the trucks home?
2    A.  No.  I may have once or twice.  But, I
3  mean, I don't have my own, so, no.
4    Q.  Some of the guys do have their own
5  trucks, though, right?
6    A.  They do, yes.
7    Q.  And they take the trucks.  And they,
8  then, drive them to the job sites, correct?
9    A.  Yes.
10    Q.  All right.
11        But for the most part, you
12  just drive to the job site on your own in your
13  own vehicle?
14    A.  Yes.  But sometimes they'll pick me
15  up.  Like some guys are -- they're on the --
16  like I'm on the road out of the State of
17  Indiana, so they sometimes come and pick me up.
18    Q.  Okay.
19        Let me give you back the
20  cards -- oh, let me give you back the cards
21  that you showed me.
22    A.  Yes, sir.
23
24

83

1        (WHEREUPON, the document was
2         marked Plaintiff's
3         Exhibit 38 for identification,
4         as of 6/16/25.)
5
6  BY MR. McJESSY:
7    Q.  Sir, just so the record's clear, I've
8  handed you what we've marked as Exhibit 38.
9        Those are the three cards
10  that you showed me when I asked you about being
11  carded, correct?
12    A.  Yep.
13    Q.  And just so the record's clear, can
14  you tell me what the first page is, second page
15  is, and third page is?
16    A.  First page is your training card, so
17  when I complete classes.  If you scan that QR
18  code, it shows you what classes I've completed
19  and what certifications I have through those
20  said classes, but not every class do you get a
21  certification.
22    Q.  Okay.
23        So -- but it would show what
24  classes you completed even if you didn't get a

84

1  certification?
2    A.  Yes.  It just shows like what your
3  knowledge is.
4    Q.  Okay.
5    A.  And then the next one?
6    Q.  Yeah.
7    A.  That's just a 30-hour OSHA card.
8    Q.  Okay.
9    A.  Showing that you can safely perform
10  tasks on a union job site.
11        And the last card is my
12  quarterly membership card, which I pay every
13  three months to stay an active, good-standing
14  member of the union.
15    Q.  Okay.
16        And so when I was asking you
17  if you were familiar with being carded, you
18  described for me the BA coming on the job site
19  and asking for your union membership.
20        This is what you would show
21  him?
22    A.  This is what I would show them.
23    Q.  The third page?
24    A.  Yes, of the orange card.

21 (Pages 81 to 84)

85

```
 1      Q.  And have you ever been on a job site
 2  working for Dock & Door where you've been
 3  carded?
 4      A.  Yes.
 5              They give you T-shirts and
 6  stickers sometimes.  It's fun.
 7      Q.  They give you T-shirts and stickers?
 8      A.  Yeah, for your hard hat.
 9      Q.  Oh, who -- who gives you those?
10      A.  The BA guys.  They usually keep like
11  stickers, like the little weird cool thing we
12  do.  You get to decorate your hard hat in
13  stickers.
14      Q.  Okay.
15      A.  Yeah.
16
17              (WHEREUPON, the document marked
18              Plaintiff's Exhibit 21 for
19              identification was tendered to
20              the deponent.)
21
22  BY MR. McJESSY:
23      Q.  And so if you turn to Exhibit 21 in
24  the book in front of you there --
```

86

```
 1      A.  Yes.
 2      Q.  -- do you recognize those two people?
 3      A.  I think that's Mike on the left.  I
 4  don't know the other guy.
 5      Q.  Okay.
 6              Mike?
 7      A.  Richert.
 8      Q.  Richert?
 9      A.  Yeah.  It looks like him.
10      Q.  Okay.
11      A.  I think.
12      Q.  And are the stickers on their hard
13  hats the kind of stickers you were referring
14  to?
15      A.  No.  Those are just job site stickers.
16  So those ones, it looks like, are -- so when
17  you also go to a union job site, you have to go
18  to a meeting.  And they go through a safety
19  course just to make sure everything is all in
20  sync, and they'll tell you like certain hazards
21  that are on the job site and what to look out
22  for.  And then once you get that sticker, then
23  like you're qualified to be on said job site.
24      Q.  Okay.
```

87

```
 1              And then they give you a job
 2  site sticker?
 3      A.  Yes, which would be like -- so for the
 4  Morgan/Harbour job, it would -- the sticker
 5  would say MHC, and then there would be number
 6  under it.  It would be like a circle sticker,
 7  and it would be -- like your number would be
 8  what you are.  So just, for instance, say I was
 9  097.  Then it goes back to the paperwork of the
10  Morgan/Harbour guy.  So if he sees 097, he
11  knows it's me.
12      Q.  Oh, he knows it's specifically you?
13      A.  Yes.
14      Q.  Okay.
15              Not just that it's
16  Dock & Door or whatever.  It's specifically
17  you?
18      A.  Yes.  Everybody's specifically
19  labeled.
20      Q.  I see.  Okay.
21      A.  So like that 0979, that probably
22  indicates that if that is Mike, then the guys
23  know that that's Mike.
24      Q.  I see.
```

88

```
 1              And then on the one sticker
 2  to the right of that, it looks like it says
 3  138.
 4              Same thing?
 5      A.  Yeah, that looks -- I think that says
 6  CORE, which is another contractor.
 7      Q.  Okay.
 8              Is that a union contractor?
 9      A.  Could be.  I'm not sure.  I'm not
10  familiar with the names.
11
12              (WHEREUPON, the document marked
13              Plaintiff's Exhibit 22 for
14              identification was tendered to
15              the deponent.)
16
17  BY MR. McJESSY:
18      Q.  Okay.
19              And if you turn to the next
20  page, Exhibit 22 --
21      A.  Yes.
22              So, yeah, those are the
23  stickers I'm talking about.
24      Q.  Okay.
```

22 (Pages 85 to 88)

89

1    **Which one in particular?**
2    A.  It says millwright Chicago.  I think,
3  that one.
4    **Q.  Oh, right in the middle?**
5    A.  So it would be similar to that.  And,
6  let's see.  And then the local.  This sticker
7  right there, it says Local 578.  So that would
8  be a sticker that they would have.  So like say
9  we were in Chicago Heights.  Chicago Heights is
10  Local 272.  They would have a stack of
11  stickers, and they're just given to us.
12    **Q.  I see.**
13    **So -- and the two stickers**
14  **you pointed to -- the first one was the one**
15  **right in the middle that's red and white, and**
16  **the second one you pointed to is the one on the**
17  **left.**
18    A.  With the American flag?
19    **Q.  Yeah, that's like orange --**
20    A.  Kind of.
21    **Q.  -- orange and red and blue?**
22    A.  Yeah.
23    **Q.  Yeah.  All right.  All right.**
24    **And when I asked you about**

90

1  **the office address earlier, if I said 27 East**
2  **36th Place in Steger, does that sound right?**
3    A.  That's it, yeah.
4    **Q.  Okay.**
5    **And both companies work out**
6  **of that same location?**
7    A.  Yeah.
8    **Q.  And do you regularly go to that**
9  **location?**
10    A.  Often, yes.
11    **Q.  Okay.**
12    **And, I mean, just**
13  **approximately how often would you go there?**
14    A.  Maybe twice a week.
15    **Q.  All right.**
16    **And what for?**
17    A.  To get picked up.
18    **Q.  Oh, okay.**
19    **That's where you meet people**
20  **there?**
21    A.  Yeah, if they're not on the way to my
22  house.
23    **Q.  Okay.**
24    A.  If they're out of the way.

91

1    **Q.  All right.**
2    **Do you -- do you do any work**
3  **at that location?**
4    A.  No.
5    **Q.  All right.**
6    **Did you when you worked for**
7  **Midwest Dock Solutions?**
8    A.  Yes.
9    **Q.  And what did you do, then?**
10    A.  Sweep the floors.
11    **Q.  Okay.**
12    **Keep it clean and neat?**
13    A.  Ah-huh.  Yep.
14    **Q.  Okay.**
15    **What kind of supplies are**
16  **kept at the warehouse?**
17    A.  Anchors, LDTs, which is just a
18  different type of anchor, material such as like
19  springs, shafts, door panels, but I don't know
20  who they're for.  Yeah, and seals.
21    **Q.  Dock seals?**
22    A.  Yes, and docks.
23    **Q.  All right.**
24    A.  That's about it.

92

1    **Q.  And does -- well, strike that.**
2    **Your work for Midwest Dock**
3  **Solutions -- I don't think I asked.  What --**
4  **what principally do you do?  Or, I'm sorry, for**
5  **Dock & Door.  You're working for Dock & Door.**
6  **What kind of work do you do for Dock & Door?**
7    A.  New installs, such as like those dock
8  seals, putting in the dock doors, track guards,
9  sometimes help with docks, shelters.  That's
10  about it.
11    **Q.  Okay.**
12    **And when you say "help," do**
13  **you -- do you weld?**
14    A.  I can.  But they don't really let me,
15  no.
16    **Q.  Okay.**
17    **Welding, too, I think is a**
18  **bit of an art form.**
19    **Are you -- are you learning**
20  **to weld, or are you good at it?  How would you**
21  **describe your welding abilities?**
22    A.  Sometimes they let me do it.
23  Sometimes they let me do it.  But not on my
24  own, no.

23 (Pages 89 to 92)

93

1    Q.  Would you say you're being trained to
2    do it?
3       A.  In a way, yes.
4    Q.  I mean, you get some on-the-job
5    experience?
6       A.  Some, yes.
7    Q.  Okay.
8           But you do it under the
9    supervision of somebody else who's sort of
10   watching what you're doing?
11      A.  Yes.
12   Q.  Okay.
13          Are there -- are there
14   certain welds that are more complicated than
15   other welds?
16      A.  I don't -- I couldn't really get into
17   the specifics, but, yes.
18   Q.  Well, where I was going with it, what
19   I was going to ask you is, like, do they let
20   you do the easy welds but not the harder welds
21   or --
22      A.  Yes.
23   Q.  Does that -- does that make sense?
24      A.  Yes, it does.  Yeah, I would -- yeah,

94

1    I would say I do the easier welds.
2    Q.  Okay.  All right.
3           And the materials that are
4    kept at the warehouse, are some of those used
5    on jobs for Dock & Door?
6       A.  No, just the hardware, like the LDTs
7    and anchors.
8    Q.  Okay.
9           Well, that's what I was going
10   to ask.
11          So the LDTs and anchors would
12   be used on -- maybe on Dock & Door job sites?
13      A.  Yes.
14   Q.  Would they also be used on Midwest
15   Dock Solutions' job sites?
16      A.  If they do use them, probably.  I
17   don't know.
18   Q.  You're not sure?
19      A.  No.
20   Q.  All right.
21          Most of the products for the
22   job sites you work on for Dock & Door, are most
23   of the products delivered directly to the job
24   site from the manufacturer?

95

1       A.  All of it.
2    Q.  All of it is?
3       A.  Yes.
4    Q.  All right.
5           And those are the labels that
6    you were describing for me earlier?
7       A.  Yes, the shipping labels.
8    Q.  Okay.
9           And would anybody's name be
10   on those other than Ira's name?
11      A.  Not that I've seen, no.
12   Q.  Okay.
13          Are you aware -- you said you
14   thought Ira was the salesman for Midwest Dock
15   Solutions, correct?
16      A.  I mean, I just kind of assumed because
17   like I said it's -- it's confusing because
18   we're all in the same building, so I don't -- I
19   don't know like the specifics.  I just work,
20   really.  I don't know.
21   Q.  All right.
22      A.  I don't really get much into the shop.
23   Q.  Okay.
24          And do you know, are there

96

1    any other salespersons?
2       A.  I know there's Steve.  I've seen him
3    around.  But I don't do work for Steve.
4    Q.  Okay.
5           Do you know what Steve's last
6    name is?
7       A.  No.  No.
8    Q.  All right.
9           Anybody else?
10      A.  That's as far as I know, yes.
11   Q.  All right.  All right.
12          We've been going a little
13   over an hour.  You didn't say you want a break,
14   but I'd like a break.
15      A.  Okay.  Sounds good.
16   Q.  So let's take a five to ten-minute
17   break, and then we'll pick back up.
18
19
20
21
22
23
24

24 (Pages 93 to 96)

97

```
 1              (After a break from 10:19 a.m.
 2              to 10:29 a.m., the deposition
 3              was resumed as follows:)
 4
 5              (WHEREUPON, the document marked
 6              Plaintiff's Exhibit 15 for
 7              identification was tendered to
 8              the deponent.)
 9
10   BY MR. McJESSY:
11       Q.  All right.
12              If you could turn to Exhibit
13   15.  Yep.
14              Do you see the shirt that
15   that gentleman is wearing?
16       A.  Yes.
17       Q.  And it says -- I think, on the front,
18   it says Midwest Dock Solutions in small letters
19   on the upper left-hand side of the chest.
20              Is that fair?
21       A.  Yes.
22       Q.  And then it says Midwest Dock,
23   obviously, on the back of it, correct?
24       A.  Yes.
```

98

```
 1       Q.  Did you ever receive shirts like that?
 2       A.  Yes.  They have a little collection
 3   thing of them at the shop.
 4       Q.  Okay.
 5       A.  I just ask for them because they're
 6   shirts I can tear up.
 7       Q.  Okay.
 8              And -- oh, I was going to
 9   ask, have you ever worn shirts like that?
10       A.  Yeah.  I mean, I wear shirts like
11   that.  I wear shirts that -- I don't know if I
12   have a Morgan/Harbour one.  But if I do, I
13   would wear those -- like those, too.  I mean, I
14   just wear what I can get dirty.
15       Q.  All right.
16              And -- well, on union job
17   sites, you're required to wear shirts with
18   bright -- bright shirts, correct?
19       A.  Yes.
20       Q.  Okay.
21              And would these be considered
22   like bright shirts?
23       A.  Yes.
24       Q.  Okay.
```

99

```
 1              And so have you worn the
 2   Midwest Dock Solutions shirts when you've been
 3   working on Dock & Door jobs?
 4       A.  Yes.
 5       Q.  All right.
 6              And part of that is to comply
 7   with that requirement of wearing
 8   brightly-colored clothing, correct?
 9       A.  Yeah.  As long as you have like -- I
10   mean, it doesn't matter what's on the shirt on
11   those jobs.  It's just as long as it's a high
12   vis, so it can also be an orange.
13       Q.  Okay.
14              Does Midwest Dock Solutions
15   have orange shirts?
16       A.  They have had them before.  I don't
17   have any, though.
18       Q.  Okay.
19              You have the green ones?
20       A.  I do, yes.
21       Q.  All right.
22              Are there shirts that are
23   Dock & Door Install branded shirts?
24       A.  Not that I know of, no.
```

100

```
 1       Q.  All right.
 2              Oh, earlier I had asked you
 3   about being carded on a job site.
 4              Do you recall what the -- and
 5   you mentioned it happened, at least, once.
 6              Did it happen more than once
 7   that you can recall or just the once?
 8       A.  It's happened more than once.
 9       Q.  And do you recall what the job sites
10   were that you were working on when it's
11   happened?
12       A.  No.  I couldn't recall them.
13       Q.  Can you recall who the GC was on the
14   job site?
15       A.  Not his name, but the company, I
16   could -- possibly, one of the Morgan/Harbour
17   ones.  I think I got one at a Premier job and,
18   maybe, a Sanders Farm job.
19       Q.  Sanders Farm, is that -- was that
20   Pepper Construction?
21       A.  It could be, yes.
22       Q.  Okay.
23              Sanders Farm was the project
24   site, correct?
```

25 (Pages 97 to 100)

101

1   A.  Yes.
2   Q.  All right.
3          And you said Premier?
4   A.  Yes.
5   Q.  Was that also the project site, or was
6 that the GC?
7   A.  That was -- the project site would be
8 just the company hiring, if that's what you
9 mean by that.
10   Q.  Yeah.  It would be the GC.
11          Okay.  Let's see.
12   A.  And ARCO Murray.
13
14        (WHEREUPON, the document marked
15        Plaintiff's Exhibit 37 for
16        identification was tendered to
17        the deponent.)
18
19 BY MR. McJESSY:
20   Q.  All right.
21          If you look at the April 20,
22 2023, to April 26, 2023, time sheet in Exhibit
23 36 --
24        MR. HUGHES:  What dates, Kevin?  I'm

102

1 sorry.
2        MR. McJESSY:  April 30, 2023, to
3 April 26, 2023.
4        MR. HUGHES:  That's Exhibit 37.
5        MR. McJESSY:  Of Exhibit 36.  Oh,
6 37. I'm sorry.  You're right.  The time sheet
7 exhibit.
8        THE WITNESS:  April what?  I'm
9 sorry.
10 BY MR. McJESSY:
11   Q.  April 20, 2023.  Let me know when
12 you're there.
13   A.  What was the number of the day again,
14 22?
15   Q.  Actually --
16   A.  20? 20 to 26?
17   Q.  It's right in the middle of the page.
18 I'm trying to see what Bates it is.  Oh,
19 twenty --
20   A.  I've got it here, yeah.
21   Q.  24th, maybe?
22   A.  Yeah.  I think I have your page.
23   Q.  It's Merrillville, Sanders Farm?
24   A.  Yeah, Merrillville.

103

1   Q.  And it says ARCO?
2   A.  Yep.
3   Q.  All right.
4          So it was an ARCO Murray job?
5   A.  Yes.
6   Q.  All right.
7          Sanders Farm.
8   A.  From my knowledge.  Some -- some of
9 these can be incorrect.  Sometimes I -- like
10 filling out these time sheets, they couldn't
11 all be correct.
12   Q.  Okay.
13          As far as what -- what would
14 be wrong?
15   A.  The -- the name of the company, ARCO.
16 So, I mean, I don't -- I'm not saying like all
17 of them are wrong, but sometimes I just put
18 what I think to the best of my knowledge
19 because I don't really -- I don't know how they
20 do the time sheets.  So I feel like as long as
21 they have the town, and that's how I fill them
22 out.  Like you'll notice as I -- as you
23 progress through these dates, you'll lose like
24 that ARCO and that Ira.  It will just start

104

1 turning into just a town.
2   Q.  Okay.
3          And I did sort of notice
4 that, that Ira disappears off of them.
5   A.  Yeah.  I think it's more just like
6 laziness, and I don't think I even needed to
7 put that.
8   Q.  All right.
9          And -- all right.  But
10 Sanders Farm would have been -- Merrillville
11 would have been accurate, as far as you know,
12 correct?
13   A.  Yes.
14   Q.  All right.
15          And then Sanders Farm was the
16 name of a project, correct?
17   A.  Yes.  That is right.  I remember that.
18   Q.  All right.
19          And you think that may be one
20 of the locations where you got carded?
21   A.  Yes.
22   Q.  All right.
23          So you mentioned about three
24 them.  I think, Sanders Farm, Premier, and

26 (Pages 101 to 104)

105

1    there was one other one.  I don't recall.
2        A.  ARCO Murray was another one.
3        Q.  Okay.
4            Do you know which ARCO Murray
5    project?
6        A.  No.  I don't know exactly like where I
7    was like carded at, but those are like some
8    names that I remember.  I mean, they're just
9    random when they show up.
10       Q.  Okay.
11       A.  As far as I know.
12       Q.  And did you have your card with you on
13   each occasion when you were carded?
14       A.  Yes.
15       Q.  All right.
16           Are you familiar with the
17   e-mail extension, @midwestdocksolutions.com?
18       A.  No.
19       Q.  All right.
20           Do you communicate by e-mail
21   with anybody regarding your work for
22   Dock & Door?
23       A.  No.  The only time I've ever gotten
24   emails from them was from when we were going

106

1    through the hiring process of taking those
2    tests, and I don't even know what email that
3    was sent from.
4        Q.  Okay.
5            Do you think you would still
6    have those emails?
7        A.  Possibly.
8        Q.  All right.
9            If you --
10       A.  I can --
11       Q.  If you do, can you check for those
12   emails?
13       A.  Yeah, you decided you want that also.
14           And then you want me to put
15   those in that e-mail I'm going to send you
16   later.
17       Q.  Yeah, please.  And it seems like it
18   should be fairly easy to locate the month or so
19   when those would have been sent, I'm guessing.
20       A.  Yeah.  And I think I have some of it
21   starred.
22       Q.  Okay.
23           And I take it that you get
24   your job assignments by text message or by

107

1    phone?
2        A.  Yes.
3        Q.  All right.
4            You don't get them by email?
5        A.  No.
6        Q.  All right.
7            Other than the original
8    emails when you were getting set up, would you
9    have had any subsequent emails after that
10   regarding your work?
11       A.  No.  And I don't even think it was
12   Midwest.  Like I think they were just CC'ing me
13   on the union's behalf.
14       Q.  Okay.
15       A.  Because the union was the one sending
16   said emails.
17       Q.  All right.
18           Well, if you can provide me
19   with whatever communications you had, that
20   would be great.
21       A.  Yep.
22       Q.  And were you ever provided with a
23   company cell phone?
24       A.  No.

108

1        Q.  You have a -- you have a cell phone,
2    correct?
3        A.  I do.
4        Q.  And what's your cell phone number?
5        A.  (219) 902-7790.
6        Q.  All right.
7            And who's your cell service
8    provider?  Like AT&T, Verizon, T-Mobile?
9        A.  T-Mobile.
10       Q.  And how long have you had that number?
11       A.  Oh, boy.
12       Q.  A long time?
13       A.  Yeah.
14       Q.  Since high school?
15       A.  Since 5th grade.
16       Q.  Oh, gees.
17       A.  Maybe even 4th.  So that would be --
18       Q.  Nice.
19       A.  -- like 2012, 2011.
20       Q.  All right.
21           How do you get your job
22   assignments?
23       A.  Oh, who do -- like through text?
24       Q.  Is that -- do you get them like daily

27 (Pages 105 to 108)

109

1  by text or --
2      A.  Oh, yeah.  Yes, yes.  We don't have
3  like a schedule.  We just have a -- I mean, I
4  don't know if they have a schedule in the
5  office, but we just receive it the day -- or
6  the day before, around like 4:00 p.m.
7      Q.  Fairly consistent since you started
8  there?
9      A.  Yeah, for the most part.  Some days
10  are later.  Some days are earlier.
11     Q.  No, I get that.  But pretty much the
12  day before?
13     A.  Oh, yes.  Yes.
14     Q.  Late in the afternoon you get a text
15  message that tells you where to be the next
16  day?
17     A.  Yes.
18     Q.  And does it give you a job site, or
19  would it say come to the -- you know, come to
20  the warehouse and you'll get picked up and you
21  may not know where you're going, or do you
22  always know where you're going?
23     A.  I usually -- well, yeah.  I always
24  know where I'm going.  But then they'll send

110

1  the address, and they'll send the contact
2  information of like the GC or the head guy
3  there.  And they'll also include me on who I'm
4  working with and if they're -- and then it's up
5  to me to go ahead and contact like, say, Dave.
6  I would text him or call him and say, meet at
7  shop or pick me up?  And he would say, I'll
8  pick you up at 4:30 -- or not 4:30 -- 5:30,
9  6:00-ish, depending on the time, or meet at
10  shop at 6:00.
11     Q.  Got it.
12         And then -- I know this is a
13  bit of an approximation, but can you give me
14  some idea, like what's the longest period of
15  time you've worked at any given job that you
16  can recall?
17     A.  Two months.
18     Q.  Oh, quite a long time.
19     A.  Yeah, there was time where we were in
20  Wisconsin, and we were there for a little bit.
21     Q.  What was the job in Wisconsin?  Who
22  were you working for?
23     A.  Oh, man.  I want to say it was
24  Premier.  That's where I got the Premier shirt

111

1  from.
2      Q.  All right.
3          And you got like a
4  brightly-colored Premier shirt?
5      A.  Yeah.  The guy was super nice.
6      Q.  What color?
7      A.  Yellow.
8      Q.  All right.
9          And was it a -- two months is
10  quite a long time.  Was it docks and doors you
11  were installing there?
12     A.  Just doors.
13     Q.  Just doors?
14     A.  Yeah.  It was a big building.
15     Q.  I was going to -- I gather.  How big?
16     A.  I don't know like the square footage,
17  but, probably.  I think we had like over 200
18  doors.
19     Q.  All right.  All right.
20         Do you know where in
21  Wisconsin?  Was it Kenosha?
22     A.  Kenosha area.  I think it was --
23  what's that other one?  Prairie -- Prairie --
24         MR. HUGHES:  Pleasant Prairie?

112

1          THE WITNESS:  Pleasant Prairie,
2  yeah.  In-between that area.  I don't know the
3  exact address it was, but it was in-between
4  those two towns.
5  BY MR. McJESSY:
6      Q.  All right.
7          Do you -- were you working
8  with the same person up there?
9      A.  For the most part.  Some people were
10  coming in and out.  And then I had left for
11  vacation for a week during that time period.
12  So I was gone for a week, and they had some
13  other people out there.
14     Q.  Who were you principally working with?
15     A.  Richard.
16     Q.  Mahone?
17     A.  No.  Richard Mantoan, yes.  And then
18  Collin Zarlengo, and there was another guy.
19  What was his name?  What was his name?  I can't
20  think of his name.  I forget his name.  Eric.
21  That's his name.  I don't know his last name,
22  though.
23
24

28 (Pages 109 to 112)

113

```
 1              (WHEREUPON, the document marked
 2          Plaintiff's Exhibit 29 for
 3          identification was tendered to
 4          the deponent.)
 5
 6   BY MR. McJESSY:
 7       Q.  Let's see.
 8              If you go to Exhibit 29 --
 9       A.  Exhibit 29?
10       Q.  Eric Jansma?
11       A.  That might be him, yep.
12       Q.  Eric Pool?
13       A.  I think it was Jansma because he had
14   A. J. on his tools.
15       Q.  Who do you usually get the text
16   messages from, where to go for each day?
17       A.  Mainly, Tony Brutti and sometimes Ira.
18       Q.  Okay.
19       A.  But they're all like included.  It's
20   like a group chat.
21       Q.  I got it.
22              The time sheets we were
23   looking at --
24       A.  Yes, sir.
```

114

```
 1       Q.  -- the form of -- the basic form of
 2   the time sheet --
 3       A.  Yes.
 4       Q.  -- like not the handwritten part, but
 5   the printed part -- where did you get those
 6   time sheets?
 7       A.  There's a stack of them on the desk at
 8   the shop.
 9       Q.  All right.
10              And whose desk?
11       A.  I think it's just like a lunch desk.
12       Q.  Okay.
13              In like the lunchroom?
14       A.  Yes.
15       Q.  All right.
16              And so you pick them up from
17   there?
18       A.  Yes.
19       Q.  All right.
20              And is that still the
21   process?
22       A.  Yeah.  It's still -- it's a process.
23   But like I've said, I've gotten a little lazy
24   about it, so mine are all on the notes on the
```

115

```
 1   iPhone.
 2       Q.  Okay.
 3              Well, if you could turn to
 4   like 11/9/23.
 5       A.  Yes.
 6       Q.  All right.
 7       A.  Oh, yeah.
 8       Q.  And is that -- did you prepare this?
 9              The printed part, not the
10   handwritten part.
11       A.  Yes.  This is a screenshot from my
12   phone.
13       Q.  Okay.
14              And then how about the
15   handwriting on this page?
16       A.  That was probably Tony Brutti.
17       Q.  Okay.
18              It's not your handwriting?
19       A.  No.
20       Q.  Okay.
21              And so this is -- sometimes
22   when you don't have a time sheet, is this how
23   you send your time in?
24       A.  Yes.
```

116

```
 1       Q.  Okay.
 2              You just prepare it on your
 3   phone and then text it to him?
 4       A.  Yep.
 5       Q.  And who do you send your time to on a
 6   regular basis?
 7       A.  Tony Brutti.
 8       Q.  Other than the time sheets and the --
 9   the note, the iPhone note example there, do you
10   keep any other -- do you keep track of your
11   time in any other way?
12       A.  No.
13       Q.  All right.
14              And you said you receive a
15   W-2 form; is that right?
16       A.  I think so, yes.
17       Q.  Okay.
18              You're not sure?
19       A.  That's standard, right?
20       Q.  Yeah.  That would be like standard for
21   an employee.
22       A.  Yeah.
23       Q.  All right.
24              And does that come to you, or
```

29 (Pages 113 to 116)

117

1  does that go to your mom?  How do you -- do you
2  know what happens, how you get that?
3      A.  It comes to my parents' house where I
4  live.
5      Q.  Okay.
6          And you receive -- since
7  you've been working for Dock & Door, you
8  receive hourly union scale?
9      A.  Yes.
10     Q.  All right.
11         To your knowledge, have all
12 of your fringe benefits been paid?
13     A.  Yes, as far as I know.
14     Q.  Okay.
15         Do you still have in front of
16 you what's been marked as Exhibit 29?
17     A.  Yes.
18     Q.  Can you look through that list and
19 tell me who on this list you recall working
20 with since you've been working for Dock & Door?
21     A.  Okay.
22         So just -- do you want me to
23 tell you the number or just a name?
24     Q.  You can give me a number.

118

1      A.  All right.
2          One.
3      Q.  Okay.
4      A.  Three is, obviously, me.  Twenty-four.
5  Twenty-seven.  Thirty-four, I think.  I only
6  worked with him once.
7      Q.  Okay.
8          That's Jonathan --
9      A.  If that is his right -- yeah, if that
10 is him.  I only see one Jonathan, so I'm going
11 to assume it's him.  And forty-two.
12         Is there another page?
13     Q.  Yeah.
14     A.  Holy crap.  Forty-five.  I don't know
15 which Jose is who, but I think one is Jose, the
16 right Jose.  Yeah.  I'm going to go with this
17 one.
18     Q.  Okay.
19     A.  Oh, there's another Jonathan.
20     Q.  You worked with a Jonathan.  You're
21 just not sure if it's --
22     A.  Yeah.  I'm not sure what his last name
23 was.
24     Q.  Okay.

119

1          So you're not sure if it's,
2  for example, thirty-four or --
3      A.  Sixty.
4      Q.  Sixty.  Okay.
5      A.  And 88.
6      Q.  All right.
7          And, now, when you worked for
8  Midwest Dock Solutions while you were in high
9  school, can you remember working with anybody
10 on this list?
11     A.  Thirty-five.  That's it for the first
12 page.  Fifty-eight.  Well, I guess, he just had
13 me do stuff at the shop, so kind of worked with
14 him but not in the field.
15     Q.  Oh, okay.
16         That's your neighbor, Michael
17 Richert, correct?
18     A.  Yes.
19         Oh, back to the union side, I
20 worked with 59.
21     Q.  Oh, okay.
22     A.  For Dock & Door.
23     Q.  David Richert?
24     A.  Yeah.

120

1      Q.  Okay.
2      A.  Sixty-eight for Midwest.
3      Q.  All right.
4      A.  I don't know if he had a different
5  name, like a different government name, but
6  there was also a Rick that I worked with.
7      Q.  There's a Richard Kardosh at number
8  30.
9      A.  Could be him.
10     Q.  All right.
11         Somebody named Rick, though?
12     A.  Yeah.
13     Q.  And that was with Midwest Dock
14 Solutions?
15     A.  Yes.  That's when I was --
16     Q.  Anybody who's not on here that you
17 recall having worked with, either at Midwest
18 Dock Solutions or Dock & Door?
19     A.  No, not to my knowledge.
20         Did I say 31 for Midwest?
21     Q.  You did not.
22     A.  Yeah.
23     Q.  So 31, Dylan Kelly, you worked with
24 him at Midwest Dock Solutions?

30 (Pages 117 to 120)

121

```
 1      A.  Yeah, and 32.  I think James is his
 2   dad or -- yeah, James is his dad.  And then 33
 3   for Door Install, Dock & Door Install.  I
 4   worked with him as well.
 5      Q.  So Nick Kelly you worked with at
 6   Dock & Door?
 7      A.  Yes.
 8      Q.  Dylan and James Kelly you worked with
 9   at Midwest Dock Solutions?
10      A.  Yes.
11      Q.  Okay.
12          And to your knowledge, are
13   Dylan, James, and Nick Kelly related?
14      A.  Yeah.  Dylan and Nico are brothers,
15   and then I want to say James is their dad.
16      Q.  Okay.  All right.
17          And I think you answered the
18   question, but I want to make sure.  I may have
19   forgotten.
20          Are there -- is there anybody
21   else who you recall working with at either
22   Midwest Dock Solutions or Dock & Door who's not
23   on the list?
24      A.  No.  I don't recall --
```

122

```
 1      Q.  Okay.
 2      A.  -- seeing anybody that's not on there.
 3      Q.  To your knowledge, does Dock & Door
 4   have any estimators?
 5      A.  No.  I wouldn't even know.
 6      Q.  All right.
 7          And -- and that's fair.
 8          To your knowledge, does
 9   Dock & Door have any office staff, like
10   secretaries or anybody like that?
11      A.  No, not that I know of.
12      Q.  What does Tony Brutti do for
13   Dock & Door?
14      A.  As far as I know, he's the president,
15   and he just makes sure we work and make sure
16   like if we have anything, like school wise or
17   anything like that, he lets us know of it.
18      Q.  Anything else?
19      A.  No.
20      Q.  All right.
21          And that's the extent of your
22   interaction with Tony Brutti, is on those
23   items?
24      A.  Pretty much.  Just the time sheet
```

123

```
 1   stuff and what I said before.
 2      Q.  Okay.
 3          The time sheets tells you --
 4   he and Ira both give you directions on where to
 5   be.
 6          Does Anthony -- correct?
 7      A.  Huh?
 8      Q.  He and -- strike that.
 9          You also said Tony Brutti and
10   Ira also both give you directions sometimes on
11   where to be, correct?
12      A.  Correct.
13      Q.  Does Anthony Zarlengo have any
14   involvement in that?
15      A.  No.
16      Q.  Okay.
17          To your knowledge, what does
18   Tony Zarlengo do?
19      A.  I don't know.  I know he focuses more
20   on like stuff with like meetings and stuff with
21   the Midwest guys.  I don't think he really does
22   much for Door Install.
23      Q.  Okay.
24          Other than meetings with the
```

124

```
 1   Midwest guys, anything else you can think of he
 2   does?
 3      A.  No.
 4      Q.  Okay.
 5          How about Michael Richert?
 6   What does he do?
 7      A.  Nothing.
 8          MR. McJESSY:  Off the record.
 9
10          (There was a discussion off
11           the record.)
12
13          THE WITNESS:  He's more of the guy
14   that you call when you have a question.  He's
15   more of like a guy you'd call if you have a
16   question because he's more of like a field guy,
17   and I'd look at Tony as more of an office guy.
18   BY MR. McJESSY:
19      Q.  By "a field guy," you mean like on job
20   sites?
21      A.  Yeah.  Because from my understanding,
22   Mike was like the first employee slash owner of
23   the company.  So from my understanding, he like
24   started off doing all of the work, so like
```

31 (Pages 121 to 124)

125

1  he's -- if you ever have a question about
2  anything, he's the guy to ask, to an extent,
3  more of a -- he's more of a dock guy, so he
4  talks to the service guys way more, the Midwest
5  guys more.
6      Q.  Would he also, though, be somebody you
7  could ask questions about doing door
8  installation work?
9      A.  Nah.
10     Q.  Have you -- do you know who Gineris &
11 Associates is?
12     A.  I do not.
13     Q.  Is the address on the subpoena your
14 current address?
15     A.  Yes.
16     Q.  All right.
17         Do you have any -- oh, last
18 four digits of your social security number.
19     A.  Oh, crap.
20     Q.  All right.
21         Based on that response,
22 I'll -- I'll assume you're not sure.
23     A.  No, I'm not.
24     Q.  Okay.

126

1          Let's skip that, then,
2  because I don't want you to give me the wrong
3  numbers.
4          Your date of birth?
5      A.  September 8, 2002.
6      Q.  And do you have any present intention
7  to move from your current address?
8      A.  Not at the moment, no.
9      Q.  All right.
10     A.  Home cooked meals are good enough for
11 me.
12     Q.  All right.
13         Give me just a couple minutes
14 to look through my exhibits.  I may be done.
15     A.  Okay.
16
17         (After a break from 10:58 a.m.
18          to 10:59 a.m., the deposition
19          was resumed as follows:)
20
21     MR. McJESSY:  All right.
22         We can go back on the record.
23         All right.  I don't have any
24 other questions.  If -- if counsel has other

127

1  questions, I may have some follow-ups based on
2  whatever they ask.
3      THE WITNESS:  Okay.
4      MR. HUGHES:  Just give me a couple
5  minutes here.  I may have one or two.  I don't
6  think I'll have many.
7      THE WITNESS:  Okay.
8      MR. HUGHES:  You don't have any?
9      MS. CAHILL:  I don't have any, no.
10     MR. HUGHES:  Okay.
11         I just have a couple.
12
13
14         EXAMINATION
15         BY MR. HUGHES:
16
17     Q.  How are you doing?
18     A.  Good.  How are you doing?
19     Q.  Good.
20         Let me introduce myself
21 again.  I'm Mike Hughes.  I represent Midwest
22 Dock Solutions.
23     A.  Okay.
24     Q.  I just have a couple questions.  I'll

128

1  try to get you out of here.
2          You had talked about the --
3  the retrofit work that Midwest Dock Solutions
4  does?
5      A.  Yes.
6      Q.  And I think you said you wouldn't know
7  how to do that work?
8      A.  No.  I wouldn't know.
9      Q.  Why not?
10     A.  I -- because they like -- they
11 essentially like -- they're like -- I mean, I
12 guess I could, but -- if I learned it -- but
13 not really because, I mean, they do -- they
14 like -- the way they're doing the work is like
15 they're like cutting things, too.  Like say
16 you've got a square and you're coming with a
17 triangle.  They make the triangle fit in the
18 square, and I don't know how to do that.
19     Q.  Okay.
20         And I believe you said
21 there's different rigging that they have on
22 their truck?
23     A.  Yeah.  So -- I mean, they're like
24 taking apart old stuff.  So I mean, like

32 (Pages 125 to 128)

129

1 through time, stuff is rusty. I don't like
2 have tools. So like they use like torches a
3 lot to heat things up and turn it into liquid
4 and take it apart. They're constantly like
5 cutting stuff, like old metal and whatnot. And
6 then it's just more so like -- it's just more
7 tedious in a way, from my understanding.
8    Q. Okay.
9          And you were on those jobs
10 when you were a helper?
11    A. Yeah, pretty much.
12    Q. Okay.
13    A. But, I mean, I was more just like
14 standing watching and just going back and forth
15 handing tools and whatnot. I wasn't like --
16 they weren't teaching me.
17    Q. Yeah.
18    A. That was just like a helper.
19    Q. And is that different than the type of
20 work you're doing for Dock & Door?
21    A. Yes.
22    Q. How so?
23    A. So like what the Midwest guys are
24 doing, they're like taking down, taking apart

130

1 stuff, and then like either adding on to that,
2 or like say you back in your garage door, you
3 break it, they take it apart, but like it's on
4 like a different level in the warehouses. So
5 like when they're like taking stuff apart, like
6 you'll probably just get a whole new door. The
7 people at these warehouses, they just want the
8 bottom one fixed. So they're going to go in
9 there, fix all of the other panels to a certain
10 point to where they can put a brand new one in.
11 And so that's like where the retrofitting comes
12 in is because they've got to pry and pull. And
13 then like the springs, too, like instead of
14 like -- I know instead of like taking down the
15 springs and whatever to get to those doors,
16 because the doors are always holding tension,
17 so they have like different tools. It's called
18 a come-along, which they will crank on the
19 cable, and it will make it loose on the bottom
20 so they can go and like take that stuff out.
21 It's just more stuff.
22          And then like, also, I
23 remember when I was in high school, we did like
24 a dealership or something, and it was like

131

1 super low ceilings, so like just to get the
2 install in was like hard because like this is
3 your opening, and this is your -- the top of
4 the ceiling. So like it's very tight, and you
5 just have to make like certain cuts. And then
6 the new material and like -- I mean, when you
7 make a cut, it's permanent. So like I would be
8 second guessing myself a thousand times before
9 I made a second cut.
10    Q. And for Dock & Door, the work that
11 Dock & Door does, does it involve any of that
12 type of guesswork?
13    A. Yeah, no. It's just a flat wall on a
14 warehouse, and you just take a hammer drill and
15 just drill holes. You don't have to like make
16 any specific cuts, unless like you're doing
17 track guard. But, I mean, that's different
18 because like -- so the track guard is like this
19 big like metal beam that goes up about probably
20 up to here. And so like the fork truck
21 drivers, they won't like hit the track and
22 destroy the door and whatever. The most we'll
23 have to cut, there is like just a little notch
24 if there's like conduit in the way. But, I

132

1 mean, that's easy stuff there.
2    Q. You talked about the visibility
3 shirts?
4    A. Yes.
5    Q. And it's your understanding that's an
6 OSHA requirement, correct?
7    A. Yes, as long as you have high vis. So
8 you can wear a black hoodie, but you just have
9 to have a vest on that has reflective on it.
10    Q. Right.
11          And that's not necessarily a
12 union requirement. That's an OSHA requirement,
13 correct?
14    A. It's OSHA, yes.
15    Q. And so MD, Midwest Dock, has to wear
16 high vis as well, correct?
17    A. No. I don't think Midwest Dock would
18 need -- because, I mean, they're going on
19 like -- I mean, it just depends on the
20 building. Like when I was in high school, I
21 would go to these buildings and like you
22 wouldn't even need a hard hat. But like on my
23 jobs, you would need a hard hat, high vis.
24 Like what I wore in high school is I would

33 (Pages 129 to 132)

133

1  wear, jeans and like a black T.
2      Q.  Okay.
3          Is that --
4      A.  And that's fine.
5      Q.  Is that because it's your -- it's your
6  understanding it's not a construction site?
7      A.  Yes.  So like Midwest Dock guys,
8  they're not even -- they're not really on like
9  construction sites, so to say, or new
10  construction sites.  Like we're on new, and
11  they're big on the rules and stuff like that
12  because that's where all of the big money is
13  at, I guess.  Anyway, I don't know.
14      Q.  You were asked about is there anybody
15  who works in the office for Dock & Door.
16          Do you remember that?
17      A.  Yeah.
18      Q.  Does -- does Tony Brutti work in the
19  office?
20      A.  I think so.  I know he has a -- like a
21  little room that he goes out of and whatnot,
22  but I don't know what his day to day is.
23          MR. HUGHES:  Okay.
24              That's all I have.

134

1          THE WITNESS:  Yeah, but I know
2  they're in the same building.
3          MR. McJESSY:  All right.
4              I have no follow-ups based on
5  that.
6          MS. CAHILL:  Nothing for me.
7          MR. McJESSY:  All right.
8              You're done.  I'm going
9  reserve the right to recall you as a witness
10  just so -- to complete the deposition based
11  upon -- I want to make sure I get the documents
12  and then have a chance to look at those.  Like
13  I said, I don't think it will be necessary to
14  do that.  But just for the record, I'll reserve
15  that right.
16              I am going to order a copy of
17  the transcript from the court reporter, so
18  she'll type this up into a printed -- printed
19  form.  You have the right to review that
20  transcript when she prepares it.
21          THE WITNESS:  Okay.
22          MR. McJESSY:  And you can note any
23  errors you believe occurred in transcription.
24          THE WITNESS:  Okay.

135

1          MR. McJESSY:  You can't change your
2  testimony.  If you said red and she wrote red,
3  then --
4          THE WITNESS:  I can't say blue.
5          MR. McJESSY:  You can't say blue.
6          THE WITNESS:  Got it.
7          MR. McJESSY:  But if you said red
8  and she wrote green, you can say, no, I said
9  red.
10          THE WITNESS:  Okay.
11          MR. McJESSY:  Okay.
12              So do you understand the
13  difference?
14          THE WITNESS:  Yeah.
15          MR. McJESSY:  You can reserve that
16  right and review the transcript, or you can
17  waive that right.  I don't care what you do,
18  but the court reporter needs to know from you
19  which you want to do.
20          THE WITNESS:  Oh, okay.  So just --
21  she's going to email it to me, and then I just
22  like let her know.
23          MR. McJESSY:  Yeah.  Somehow it will
24  get transmitted to you.  I think we can email

136

1  it if you -- what's your email?  Let's stay on
2  the record.  What's your email address?
3          THE WITNESS:
4  Branbishop33@gmail.com.
5          MR. McJESSY:  Yes.  It can be
6  emailed to you, I'm sure.
7          THE WITNESS:  Okay.
8              And then I'll just respond
9  back if I do have a --
10          MR. McJESSY:  They attach a form
11  page that you fill out, and you put down like
12  the page and line number where you believe
13  the error occurred, and then you can make a -- you
14  know, what you think -- you can write down what
15  you think you said --
16          THE WITNESS:  Okay.
17          MR. McJESSY:  -- versus what the
18  transcription shows.
19          THE WITNESS:  And then if there's
20  nothing, do I just don't even email back?
21          MR. McJESSY:  You don't need to do
22  anything.  It will be final and official
23  without you doing anything further.
24          THE WITNESS:  Okay.

34 (Pages 133 to 136)

137

```
1            MR. McJESSY:  All right.
2            So do you want to reserve
3    your right to review the transcript?
4            THE WITNESS:  Sure.
5            MR. McJESSY:  She just needs to
6    know.
7            THE WITNESS:  Oh.  Yeah, I guess.
8    That's fine.  It will probably just stay the
9    same.
10           MR. McJESSY:  All right.
11           Then we're done for now.  And
12   how long do you think it will take before you
13   can get me those documents?
14           THE WITNESS:  Give me like a week.
15           Is that fine?
16           MR. McJESSY:  That's fine.
17           THE WITNESS:  Okay.
18           MR. McJESSY:  I'd just like to put
19   something on my calendar, so I don't forget.
20   Excellent.
21           THE WITNESS:  Perfect.
22           MR. McJESSY:  Thank you, sir.
23           You can go off the record.
24
```

138

```
1            (There was a discussion off
2             the record.)
3
4       FURTHER DEPONENT SAITH NOT.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

139

```
1            IN THE UNITED STATES DISTRICT COURT
2          FOR THE NORTHERN DISTRICT OF ILLINOIS
                    EASTERN DIVISION
3
   MID-AMERICA CARPENTERS    )
4  REGIONAL COUNCIL PENSION   )
   FUND, et al.,              )
5                             )
           Plaintiffs,  )  No. 1:24-cv-02428
6                             )
        vs.        )  Judge Andrea R. Wood
7                             )
   DOCK & DOOR INSTALL,      )  Magistrate Judge
8  INC., an Illinois         )  Jeannice W. Appenteng
   corporation and MIDWEST   )
9  DOCK SOLUTIONS, INC., an  )
   Illinois corporation,     )
10                            )
           Defendants.  )
11
12      This is to certify that I, BRANDEN
   PATRICK BISHOP, have read the transcript of my
13 Deposition taken on June 16, 2025, in the
   above-entitled cause, consisting of Pages 1
14 through 138 inclusive, and I do again subscribe
   and make oath that the same is a true, correct,
15 and complete transcript of my Deposition as
   aforesaid, with corrections, if any, appearing
16 on the attached Correction Page(s).
17          _____ Correction Pages Attached.
18
19      _____
            BRANDEN PATRICK BISHOP
20
   SUBSCRIBED AND SWORN to
21 before me this _____ day
   of _____, A.D. 20 _____.
22
23 _____
            Notary Public
24
```

140

```
1    STATE OF ILLINOIS   )
2                        )  SS:
3    COUNTY OF C O O K   )
4
5        I, DIANE M. NULICK, a Notary Public
6    within and for the County of Cook, State of
7    Illinois, and a Certified Shorthand Reporter of
8    said state, do hereby certify:
9        That previous to the commencement of the
10   examination of the witness, the witness was
11   duly sworn to testify the whole truth
12   concerning the matters herein;
13       That the foregoing deposition transcript
14   was reported stenographically by me, was
15   thereafter reduced to typewriting under my
16   personal direction and constitutes a true
17   record of the testimony given and the
18   proceedings had;
19       That the said deposition was taken
20   before me at the time and place specified;
21       That the said deposition was adjourned
22   as stated herein;
23       That I am not a relative or employee or
24   attorney or counsel, nor a relative or employee
```

                                    35  (Pages 137 to 140)

141

1   of such attorney or counsel for any of the
2   parties hereto, nor interested directly or
3   indirectly in the outcome of this action.
4       IN WITNESS WHEREOF, I do hereunto set
5   my hand and affix my seal of office at Chicago,
6   Illinois, this 23rd day of June, 2025.
7
8
9
10
11
12     Notary Public, Cook County, Illinois.
13
14   C.S.R. Certificate No. 084-002029.
15
16
17
18
19
20
21
22
23
24

36 (Page 141)

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 72

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Telephone (Fringe Benefits) 312/787-9455 and (Regional Council) 312/787-3076

PAGE NO.      ACCOUNT NO.   25435

| | |
|---|---|
| H & W | 13.29 |
| Pen/Sup | 13.75 |
| Appren. | 0.63 |
| Intl Fnd | 0.10 |
| Lab Mgmt | 0.27 |
| Misf | 0.06 |
| * Safety | 0.01 |
| * Cisco | 0.01 |

**SEE INSTRUCTIONS ON REVERSE**

- ⊡ No Employees This Month
- ⊡ Change Of Address
- ⊡ Change Of Name
- ⊡ Send More Forms

Firm Name and Address: Dock + Door Install
1249 E. Baruille Rd. Unit 9
Crete, IL 60417

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of September 2014

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| ▓▓▓▓ | David Green | | | 59.5 | 103.18 | 2579.33 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | Spoke to Tonya company is going to submit a check for the dues | | | | | |
| | | | | | | |
| | Short $103.17 | | | | | |
| | Applied 10/24/14 CK 5007 | | | | | |

PLAINTIFF'S
EXHIBIT
220

REPORT DUE ON OR BEFORE THE 15TH OF
THE MONTH. LATE PAYMENTS WILL BE
CHARGED 1.5% PER MONTH, COMPOUNDED,
AS LIQUIDATED DAMAGES!

| | | |
|---|---|---|
| Total this month | 59.5 | $103.18   $2579.33 |
| (1) Amount due at $ 28.12 per hour | $ | 1673.14 |
| + (2) Total dues withheld | $ | 103.18 |
| = Subtotal | $ | 1776.32 |
| Prior Balance Due or (Cr. Available) | $ | |
| Grand Total | $ | 1673.14 |

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES
CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen
and apprentice carpenters, and does NOT include hours worked by any self-employed persons,
partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all
of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations
of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are
maintained. We agree to keep and maintain contemporaneous time records reporting the hours
being reported herein.

OCT 17 2014

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE: Anthony Brown
TITLE: President

BY: _____

OWNER-PARTNER-OFFICER 0342    CC-202-R 2/1

# CHICAGO REGIONAL COUNCIL OF CARPENTERS

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

| | PAGE NO. | ACCOUNT NO. |
|---|---|---|
| | 1 | 25435 |

| | |
|---|---|
| H & W | 13.290 |
| Pen/Supp | 13.750 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

## *SEE INSTRUCTIONS ON REVERSE*

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

**DUE BY 11/15/2014**

DOCK & DOOR INSTALL, INC.
1249 E Burville Rd Ste 9
Crete IL 60417-3601

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY **4** % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

**Month of OCTOBER 2014**

| MUST BE SHOWN!  WATCH SPELLING!  PLEASE PRINT! | | | | | | |
|---|---|---|---|---|---|---|
| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
| | David Green | | | 176.5 | 306.05 | 7,651.28 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

| | | | | |
|---|---|---|---|---|
| Total this month | | 176.5 | $ 306.05 | $ 7,651.28 |
| (1) Amount due at $ **28.120** per hour | $ 4,963.18 | | | |
| + (2) Total dues withheld | $ 306.05 | | | |
| = Subtotal | $ 5,269.23 | | | |
| Prior Balance Due or (Cr. Available) | $ 0.00 | | | |
| Grand Total | $ 5,269.23 | | | |

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foreman, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

NOV 18 2014

President

BY:

AUTHORIZED SIGNATURE   Anthony Russi

TITLE   Owner   MACRC-00343
OWNER-PARTNER-OFFICER

REPORT MUST BE SIGNED!

CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

| PAGE NO. | ACCOUNT NO. |
|---|---|
| 1 | 25435 |

| | |
|---|---|
| H & W | 13.290 |
| Pen/Supp | 13.750 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

**SEE INSTRUCTIONS ON REVERSE**

☐ NO EMPLOYEES THIS MONTH  ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME  ☐ SEND MORE FORMS

DUE BY 12/15/2014

DOCK & DOOR INSTALL, INC.
1249 E Burville Rd Ste 9
Crete IL 60417-3601

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY __4__ % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of **NOVEMBER 2014**

(MUST BE SHOWN!)  (WATCH SPELLING!)  (PLEASE PRINT!)

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | GREEN DAVID J | 272-JNY | X | 114 | 197.68 | 4,741.90 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

| | | | | |
|---|---|---|---|---|
| Total this month | | 114 | $197.68 | $4,741.90 |
| (1) Amount due at $28.120 per hour | $ | 3,205.68 | | |
| + (2) Total dues withheld | $ | 197.68 | | |
| = Subtotal | $ | 3,403.36 | | |
| Prior Balance Due or (Cr. Available) | $ | .000 | | |
| Grand Total | $ | 3,403.36 | | |

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

Frank P. Lilly  President  DEC 19 2014

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE: Anthony Bauci

TITLE: Owner  MACRC-00344

OWNER-PARTNER-OFFICER

CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS

**·∵· Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

| PAGE NO. | ACCOUNT NO. |
|---|---|
| 1 | 25435 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME ☐ SEND MORE FORMS

DUE BY 1/15/2015

| | |
|---|---|
| H & W | 13.290 |
| Pen/Supp | 13.750 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

Կ||ս||ս··||ս|ս||ս|||սս||ս|սսս|||սս|||ս|ս|||ս·|

DOCK & DOOR INSTALL, INC.
1249 E Burville Rd Ste 9
Crete IL 60417-3601

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

(MUST BE SHOWN!) (WATCH SPELLING!) (PLEASE PRINT!) Month of DECEMBER 2014

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| ▮▮▮▮▮▮ | GREEN DAVID J | 272-JNY | x | 140.5 | 243.63 | 6,090.68 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

| | | |
|---|---|---|
| Total this month | 140.5 | $243.63 $ 6,090.68 |
| (1) Amount due at $ 28.120 per hour | $ 3,950.86 | |
| + (2) Total dues withheld | $ 243.63 | ⬅ |
| = Subtotal | $ 4,194.49 | |
| Prior Balance Due or (Cr. Available) | $ — | |
| Grand Total | $ 4,194.49 | |

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES
CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous payroll records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

RECEIVED JAN 20 2015

Frank *[signature]* President

AUTHORIZED
SIGNATURE *Anthony Brusca* [signature]

REPORT MUST BE SIGNED! ▷

TITLE President

OWNER-PARTNER-OFFICER

MACRC-00345

CC-202-R 2/11

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. 1·

ACCOUNT NO. 25435

| | |
|---|---|
| H & W | 13.290 |
| Pen/Supp | 13.750 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

**SEE INSTRUCTIONS ON REVERSE.**

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY 2/15/2015

DOCK & DOOR INSTALL, INC.
1249 E Burville Rd Ste 9
Crete IL 60417-3601

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of JANUARY 2015

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | GREEN DAVID J | 272-JNY | X | 155.5 | 269.64 | 6,740.93 |
| | Raymond J O Petas | | | 72.5 | 125.72 | 3,142.88 |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| | | |
|---|---|---|
| Total this month | 228 | $ 395.36 $9,883.81 |
| (1) Amount due at $28.120 per hour | $ 6,411.36 | |
| + (2) Total dues withheld | $ 395.36 | |
| = Subtotal | $ 6806.72 | |
| Prior Balance Due or (Cr. Available) | $ 0 | |
| Grand Total | $ 6806.72 | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 15% PER MONTH COMPOUNDED AS LIQUIDATED DAMAGES.

AN 'X' INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported here.

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

FEB 18 2015   President

REPORT MUST BE SIGNED

BY:

AUTHORIZED SIGNATURE   Anthony Bruno

TITLE President

OWNER-PARTNER-OFFICER

CC-202-R 2/11

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. 1

ACCOUNT NO. 25435

| | |
|---|---|
| H & W | 13.290 |
| Pen/Supp | 13.750 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY 3/15/2015

DOCK & DOOR INSTALL, INC.
1249 E Burville Rd Ste 9
Crete IL 60417-3601

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of FEBRUARY 2015

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | GREEN DAVID J | 272-JNY | X | 126 | 218.48 | 5,462.10 |
| | Raymond J. Peters | | | 67.5 | 117.05 | 2,926.13 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF
THE MONTH. LATE PAYMENTS WILL BE
CHARGED 1.5% PER MONTH, COMPOUNDED,
AS LIQUIDATED DAMAGES!

Total this month   193.5   $335.53   $8,388.23

(1) Amount due at $28.120 per hour   $5,441.22

+ (2) Total dues withheld   $335.53

= Subtotal   $5,776.75

Prior Balance Due or (Cr. Available)   $0

Grand Total   $5,776.75

* AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES
* CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

Frank J. Libby President

RECEIVED MAR 17 2015

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE   Anthony Brutti

TITLE   President   MACRC-00347

OWNER-PARTNER-OFFICER

CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. 1

ACCOUNT NO. 25435

| | |
|---|---|
| H & W | 13.290 |
| Pen/Supp | 13.750 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

*  **SEE INSTRUCTIONS ON REVERSE**

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS   DUE BY 4/15/2015

ⁱ¹ᵘⁱⁱ|ᵘ¹⁰ⁱᵘ¹ᵘ|ᵘ¹|¹ⁱᵘⁱᵘ|¹ⁱ·ⁱᵘⁱⁱ·ⁱ|ⁱᵘⁱ¹|ⁱⁱᵘ¹·|ⁱ|ⁱ

DOCK & DOOR INSTALL, INC.
1249 E Burville Rd Ste 9
Crete IL 60417-3601

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of MARCH 2015

| MUST BE SHOWN! WATCH SPELLING! PLEASE PRINT! | | | | | |
|---|---|---|---|---|---|
| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
| | GREEN DAVID J | 272-JNY | X | 170.5 | 295.65 | 7,391.18 |
| | PETERS RAYMOND J | 54-JNY | X | 112 | 194.21 | 4,855.20 |
| | | | | | | |
| | | | | | | |

| | |
|---|---|
| **REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!** | Total this month 282.5 ✓ $489.86 $12,246.38 |
| | (1) Amount due at $ 28.120 per hour $ 7,943.90 |
| | + (2) Total dues withheld $ 489.86 |
| | = Subtotal $ 8,433.76 |
| *AN 'X' INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE | Prior Balance Due or (Cr. Available) $ 0.00 |
| We certify the above is a true and complete report of actual hours worked by foremen, journeymen, partners or proprietors of the firm. We hereby agree to be bound by, and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein. | Grand Total $ 8,433.76 |

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

APR 16 2015

Frank T. Libby   President
REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE  Anthony Bruno

TITLE  President MACRC-00348
OWNER-PARTNER-OFFICER

CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

| | PAGE NO. | ACCOUNT NO. |
|---|---|---|
| | 1 | 25435 |

| | |
|---|---|
| H & W | 13.290 |
| Pen/Supp | 13.750 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

**SEE INSTRUCTIONS ON REVERSE**

☐ NO EMPLOYEES THIS MONTH  ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME  ☐ SEND MORE FORMS

DUE BY 5/15/2015

DOCK & DOOR INSTALL, INC.
1249 E Burville Rd Ste 9
Crete IL 60417-3601

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of APRIL 2015

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | GREEN DAVID J | 272-JNY | X | 168 | 291.31 | 7,282.90 |
| | PETERS RAYMOND J | 54-JNY | X | 120.5 | 208.95 | 5,223.68 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| | | |
|---|---|---|
| Total this month | 288.5 | $500.26 | $12,506.47 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

(1) Amount due at $28.120 per hour — $8,112.62

+ (2) Total dues withheld — $500.26

= Subtotal — $8,612.88

Prior Balance Due or (Cr. Available) — $00.00

An "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

Grand Total — $8,612.88

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

Frank F. Libby
President

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE _Anthony Brewer_

TITLE President MACRC 00349
OWNER-PARTNER-OFFICER

CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

| PAGE NO. | ACCOUNT NO. |
|---|---|
| 1 | 25435 |

| | |
|---|---|
| H & W | 13.290 |
| Pen/Supp | 13.750 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### *SEE INSTRUCTIONS ON REVERSE*

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY   6/15/2015

DOCK & DOOR INSTALL, INC.
1249 E Burville Rd Ste 9
Crete IL 60417-3601

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

**MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!**   Month of MAY   2015

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| ▓▓▓▓ | GREEN DAVID J | 272-JNY | X | 148 | ~~461.74~~ | $6,415.80 |
| ▓▓▓▓ | PETERS RAYMOND J | 54-JNY | X | 83.5 | ~~241.02~~ | $3619.73 |
| | | | | | 256.63 | |
| | | | | | 144.79 | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| | | | |
|---|---|---|---|
| **REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!** | Total this month | 231.5 | $ ~~6509.78~~ $10,035.53 |
| | (1) Amount due at $28.120 per hour | $ 6509.78 | 401.58 |
| | + (2) Total dues withheld | $ 401.58 | |
| | = Subtotal | $ 6,911.36 | |
| | Prior Balance Due or (Cr. Available) | $ | |
| | Grand Total | $ 6911.36 | |

AN 'X' INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE   over.16¢

We certify the above is a true and complete report of actual hours worked by foremen, journeyman, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain records corroborating the hours being reported herein.

_Frank J. ____   JUN 15 2015
President

BY:

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

AUTHORIZED SIGNATURE   _Anthony Bassi_
TITLE   President   MACRC 00350

CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. **1**

ACCOUNT NO. **25435**

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 16.390 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH  ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME  ☐ SEND MORE FORMS

DUE BY  7/15/2015

DOCK & DOOR INSTALL, INC.
1249 E Burville Rd Ste 9
Crete IL 60417-3601

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY **4** % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of  JUNE  2015

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | GREEN DAVID J | 272-JNY | X | 125 | 221.75 | 5,543.75 |
| | PETERS RAYMOND J | 54-JNY | X | 62.5 | 110.88 | 2,771.88 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

| | | | |
|---|---|---|---|
| Total this month | | 187.5 | $ 332.63 | $ 8,315.63 |

(1) Amount due at $ **29.260** per hour $ 5,486.25

+ (2) Total dues withheld $ 332.63

= Subtotal $ 5,818.88

Prior Balance Due or (Cr. Available) $ 000

Grand Total $ 5,818.88

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provision of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

JUL 20 201 REPORT MUST BE SIGNED!

President

BY

AUTHORIZED SIGNATURE  Anthony Brussi

TITLE  President MACRC 00351

OWNER-PARTNER-OFFICER

CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
## Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. **1**

ACCOUNT NO. **25435**

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 16.390 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAP | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME ☐ SEND MORE FORMS

DUE BY 8/15/2015

DOCK & DOOR INSTALL, INC.
1249 E Burville Rd Ste 9
Crete IL 60417-3601

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY **4** % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of **JULY 2015**

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | GREEN DAVID J | 272-JNY | X | 125 | 221.75 | 5,543.75 |
| | PETERS RAYMOND J | 54-JNY | X | 44 | 78.06 | 1,951.40 |
| | Anthony Tuttini | | | 70 | 124.18 | 3,104.50 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**MUST BE SHOWN!** **WATCH SPELLING!** **PLEASE PRINT!**

REPORT DUE ON OR BEFORE THE 15TH OF
THE MONTH. LATE PAYMENTS WILL BE
CHARGED 1.5% PER MONTH, COMPOUNDED,
AS LIQUIDATED DAMAGES!

| | | |
|---|---|---|
| Total this month | 239 | $ 423.99 | $10,599.65 |
| (1) Amount due at $ 29.260 per hour | $ 6,993.14 | |
| + (2) Total dues withheld | $ 423.99 | |
| = Subtotal | $ 7,417.13 | |
| Prior Balance Due or (Cr. Available) | $ | |
| Grand Total | $ 7,418.13 | |

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES
CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen,
and apprentice carpenters, and does NOT include hours worked by any self-employed persons,
partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all
of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations
of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are
maintained. We agree to keep and maintain contemporaneous time records reporting the hours
being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

AUG 18 2015

REPORT
MUST BE
SIGNED!

President

AUTHORIZED SIGNATURE _Anthony Brussi_

TITLE _President MACRC_ 00352

OWNER-PARTNER-OFFICER

CC-202-R 2/11

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

**SEE INSTRUCTIONS ON REVERSE**

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS
☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DOCK & DOOR INSTALL. INC.
1249 E Burville Rd Ste 9
Crete IL 60417-3601

Page No. 1     25435

| | |
|---|---|
| H & N | ~~13.290~~ 11.79 |
| Pen/Supp | ~~13.790~~ / 6.39 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

7-15-18
DUE BY ~~11/15/2014~~

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY  4  % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of  Aug. 2015  ~~OCTOBER   2014~~

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | Green, David J | 272-JNY | x | ~~145~~ 145.5 | 258.12 | 6,452.93 |
| | Peters, Raymond J | 54-JNY | x | 108.5 | 192.48 | 4811.98 |
| | Tattini, Anthony | 272 JNY | | 144 | 255.95 | 6,386.40 |
| | | | | | | |

| | | 399 | $ 706.05 | $ 17,651.31 |
|---|---|---|---|---|

Total this month  29.26
(1) Amount due at $ ~~28.120~~ per hour  $  11,645.48
+ (2) Total dues withheld  $  706.05
= Subtotal  $  12,351.53
Prior Balance Due or (Cr. Available)  $
Grand Total  $  12,351.53

REPORT DUE ON OR BEFORE THE 15TH OF
THE MONTH. LATE PAYMENTS WILL BE
CHARGED 1.5% PER MONTH, COMPOUNDED
AS LIQUIDATED DAMAGES

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES
CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters' Funds are maintained. We agree to keep and maintain system records reflecting the hours being reported herein.

SEP 17 2015
Frank T. ____   President

BY:

AUTHORIZED
SIGNATURE   Tony Bruno
TITLE   President
OWNER-PARTNER-OFFICER

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

CC-202-R 2/

MACRC-00353

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
## Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

| | |
|---|---|
| PAGE NO. | 1 |
| ACCOUNT NO. | 25435 |

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 16.390 |
| Appren. | .630 |
| INTL_FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME ☐ SEND MORE FORMS

DUE BY 10/15/2015

DOCK & DOOR INSTALL, INC.
1249 E Burville Rd Ste 9
Crete IL 60417-3601

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY  4  % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of ~~AUGUST~~ September 2015

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | GREEN DAVID J | 272-JNY | x | 114 | 202.24 | 5,055.90 |
| | PETERS RAYMOND J | 54-JNY | x | 69 | 122.41 | 3,060.16 |
| | Anthony Tattini | | | 119 | 211.11 | 5,277.65 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | Total this month | 302 | $535.76 | $ 13,393.71 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

(1) Amount due at $ 29.260 per hour $ 8,836.52

+ (2) Total dues withheld $ 535.76

= Subtotal $ 9,372.28

Prior Balance Due or (Cr. Available) $

Grand Total $ 9,372.28

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foreman, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

OCT 19 2015

Frank T. Libby President

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE Anthony Bruzzi

TITLE President

MACRC-00354

OWNER-PARTNER-OFFICER

CC-202-R 2/11

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

| | | 1 | | 25435 |
|---|---|---|---|---|

### SEE INSTRUCTIONS ON REVERSE

| | |
|---|---|
| ☐ NO EMPLOYEES THIS MONTH | ☐ CHANGE OF ADDRESS |
| ☐ CHANGE OF NAME | ☑ SEND MORE FORMS |

DUE BY 11/15/2014 5

| | |
|---|---|
| H & W | ~~13.290~~ 11.79 |
| Pen/Supp | ~~13.750~~ 6.39 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

DOCK & DOOR INSTALL, INC.
1249 E Burville Rd Ste 9
Crete IL 60417-3601

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

MUST BE SHOWN! WATCH SPELLING! PLEASE PRINT!   Month of OCTOBER 2014 5

| Participant I.D. Number | Carpenter's Name | Local & Class | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|
| | Green, David J | 272-JNY | 140 | 248.36 | 6,209.00 |
| | Peters, Raymond J | 54-JNY | 120.5 | 213.77 | 5,344.18 |
| | Tatini, Anthony | 272 | 91 | 161.43 | 4,035.45 |
| | Murray, James | 54 JNY | .16 | 28.38 | 709.60 |
| | per Tony Francis | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

| | | | | |
|---|---|---|---|---|
| Total this month 27.26 | | 367.5 | $ 651.94 ✓ | $ 16,298.63 ✓ |
| (1) Amount due at $ ~~28.120~~ per hour | $ | 10,753.05 ✓ | | |
| + (2) Total dues withheld | $ | 651.94 | | |
| = Subtotal | $ | 11,404.99 | | |
| Prior Balance Due or (Cr. Available) | $ | | | |
| Grand Total | $ | 11,404.99 | | |

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

We certify the above is a true and complete report of actual hours worked by foreman, journeyman, and apprentice carpenters, and does NOT include hours by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain complete and accurate time records reporting the hours being reported herein.

_Frank P. Libby_   NOV 18 2015   REPORT MUST BE SIGNED!   President

AUTHORIZED SIGNATURE _Anthony Brucci_

TITLE _President_

OWNER-PARTNER-OFFICER

MACRC-00355   CC-202-R 2/

CHICAGO REGIONAL COUNCIL OF CARPENTERS
**Combined Fringe Benefit Funds and Dues Checkoff Report**
— Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1   November 2015
25435

| | |
|---|---|
| H & W | ~~13.290~~ 11.79 |
| Pen/Supp | ~~12.750~~ 16.39 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

**SEE INSTRUCTIONS ON REVERSE**

☐ NO EMPLOYEES THIS MONTH    ☐ CHANGE OF ADDRESS
☐ CHANGE OF NAME    ☑ SEND MORE FORMS

12-15-2015
DUE BY ~~11/15/2015~~

DOCK & DOOR INSTALL, INC.
1249 E Burville Rd Ste 9
Crete IL 60417-3601

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY **4** % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

| ◀ MUST BE SHOWN! ◀ WATCH SPELLING! PLEASE PRINT! | Month of OCTOBER 2014 NOV 2015 | | | |
|---|---|---|---|---|
| Participant I.D. Number | Carpenter's Name | Local & Class [X] | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
| | Green, David J | 272-5NY | 152 | 274.97 | 6,874.26 |
| | Peters, Raymond J. | 54-5NY | 113 | 204.90 | 5,122.43 |
| | Tattini, Anthony | | 160 | 283.84 | 7,096.00 |
| | Murray, James | | 153 | 275.86 | 6,896.43 |
| | Richert, David | | 99 | 178.29 | 4,457.18 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

Total this month 29.26   677   $ 1,217.86 ✓   $ 30,446.30

(1) Amount due at $ ~~28.120~~ per hour $ 19,809.02
+ (2) Total dues withheld $ 1,217.86
= Subtotal $ 21,026.88
Prior Balance Due or (Cr. Available) $ 0.00
Grand Total $ 21,026.88

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

Frank P. Lilly   DEC 2 8 2015   president
REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE   Anthony Bruno
TITLE   President

OWNER-PARTNER OFFICER   MEM DE BE-00356   CC-202-R 2/11

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

| PAGE NO. | ACCOUNT NO. |
|---|---|
| 1 | 25435 |

**SEE INSTRUCTIONS ON REVERSE**

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 16.390 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

☐ NO EMPLOYEES THIS MONTH  ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME  ☐ SEND MORE FORMS

DUE BY  1/15/2016

DOCK & DOOR INSTALL, INC.
1249 E BURVILLE RD STE 9
CRETE IL 60417-3601

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of  DECEMBER  2015

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | GREEN DAVID J | 272-JNY | X | 110 | 195.14 | 4,878.50 |
| | MURRAY JR JAMES E | 54-JNY | X | 88 | 156.11 | 3,902.80 |
| | PETERS RAYMOND J | 54-JNY | X | 24 | 42.58 | 1,064.40 |
| | TATTINI ANTHONY R | 272-JNY | X | 122 | 216.43 | 5,410.70 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | ✓ | ✓ | ✓ |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

| | | | |
|---|---|---|---|
| Total this month | | 344 | $ 610.26 | $ 15,256.40 |
| 29.260 | | | |
| (1) Amount due at $ | per hour | $ | 10,065.44 |
| + (2) Total dues withheld | | $ | 610.26 |
| = Subtotal | | $ | 10,675.70 |
| Prior Balance Due or (Cr. Available) | | $ | |
| Grand Total | | $ | 10,675.70 |

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

I certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

JAN 22 2016

Frank T. Libby  President

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE  Anthony Brunti

TITLE  President
OWNER-PARTNER-OFFICER

ACRC 00357

CC-202-R 2/11

CHICAGO REGIONAL COUNCIL OF CARPENTERS

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1    25435

| | | |
|---|---|---|
| H & W | ~~13.270~~ | 11.79 |
| Pen/Supp | ~~13.950~~ | 16.39 |
| Appren. | .630 | |
| INTL FND | .100 | |
| LAB MT/CAF | .270 | |
| MIAF | .060 | |
| *Safety | .010 | |
| *CISCO | .010 | |

**SEE INSTRUCTIONS ON REVERSE**

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS        DUE BY 11/15/2014

DOCK & DOOR INSTALL, INC.
1249 E Burville Rd Ste 9
Crete IL 60417-3601

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of ~~OCTOBER  2014~~  January 2016

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | Green, David J | 272-JNY | X | 113.5 | 201.35 | 5,033.73 |
| | Murray Jr., James E. | 54-JNY | X | 68 | 120.63 | 3,015.80 |
| | Peters, Raymond J | 54-JNY | X | 8 | 14.19 | 354.80 |
| | Tattini, Anthony R | 272-JNY | X | 72 | 127.73 | 3,193.20 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

· MUST BE SHOWN!   · WATCH SPELLING!   · PLEASE PRINT!

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

Total this month ~~29.220~~ 261.5   $ 463.90  $ 1159.53

(1) Amount due at $ ~~28.120~~ per hour  $ 7,651.49

+ (2) Total dues withheld  $ 463.90

= Subtotal  $ 8115.39

Prior Balance Due or (Cr. Available)  $

**Grand Total** $ 8115.39

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

FEB 19 2016  REPORT MUST BE SIGNED!

Frank J. Libby  President

AUTHORIZED SIGNATURE  Anthony Bauer

TITLE  President  OWNER-PARTNER-OFFICER  00358

CC-202-R 2/11

CHICAGO REGIONAL COUNCIL OF CARPENTERS
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5, Regional Council: 312/787-3076

1                    25435

| | | | H & W | ~~13.290~~ | 11.79 |
|---|---|---|---|---|---|
| | | | Pen/Supp | ~~13.750~~ | 16.39 |
| | | | Appren. | .630 | |
| | | | INTL FND | .100 | |
| | | | LAB MT/CAF | .270 | |
| | | | MIAF | .060 | |
| | | | *Safety | .010 | |
| | | | *CISCO | .010 | |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH   ☑ CHANGE OF ADDRESS - on Back.

☐ CHANGE OF NAME   ☑ SEND MORE FORMS

3-15-16

DUE BY ~~11/15/2014~~

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

DOCK & DOOR INSTALL, INC.
1249 E Burville Rd Ste 9
Crete IL 60417-3601

Month of ~~OCTOBER 2014~~   Feb. 2016

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | Green, David J | 272-JNY | X | 123.5 | 219.10 | 5,477.24 |
| | Murray Jr., James E. | 54 JNY | X | 63 | 112.65 | 2,816.23 |
| | Tattini, Anthony R. | 272-JNY | X | 100 | 177.40 | 4,435.01 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | 12783.48 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

Total this month  29.26  286.5  $509.15  $12,683.48

(1) Amount due at $ ~~28.120~~ per hour  $ 8,372.99 ✓

+ (2) Total dues withheld  $ 509.15

= Subtotal  $ 8,892.14

Prior Balance Due or (Cr. Available)  $ ____

Grand Total  $ 8,892.14

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

MAR 2 1 2016

Frank P. Jeff  President

By ____

REPORT MUST BE SIGNED!

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

AUTHORIZED SIGNATURE  Anthony Bossari

TITLE  President

OWNER-PARTNER-OFFICER

MCBS-00359   CC-202-R 2/11

, New Address

7975 Catalpa St.
Dyer, IN 46311


RECEIVED
MAR 3 1 2016
By____

MACRC-00360

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Telephone (Fringe Benefits) 312/787-9455 and (Regional Council) 312/787-3076

PAGE NO. _____ ACCOUNT NO. _25435_

| | |
|---|---|
| H & W | 11.78 |
| Pen/Sup | 16.39 |
| Lab Mgmt/CAF | 0.27 |
| Appren. | 0.63 |
| Intl Fnd | 0.10 |
| Mjaf | 0.06 |
| * Safety | 0.01 |
| * Cisco | 0.01 |

**SEE INSTRUCTIONS ON REVERSE**

___ No Employees This Month    ___ Change Of Address
___ Change Of Name             ___ Send More Forms

Firm Name and Address

Dock & Door Install

② 1301142

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY 4% OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of March 16

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| ▇▇▇▇ | Anthony Tattini | Rm 8 | | 32 | — | — |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | Hours worked in March, originally reported as April | | | | | |
| | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED AS LIQUIDATED DAMAGES!

Total this month
(1) Amount due at $ 29.26 per hour $
+ (2) Total dues withheld $
= Subtotal $ 936.32
Prior Balance Due or (Cr. Available) $
Grand Total $

32   $ —   $ —

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

JUN 03 2016

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE _____

TITLE _____

OWNER-PARTNER-OFFICER

MACRC-00361

CC-202-R 2

CHICAGO REGIONAL COUNCIL OF CARPENTERS

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

1    25435

| | |
|---|---|
| H & W | ~~11.390~~ 11.79 |
| Pen/Supp | ~~13.750~~ 6.39 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH   ☑ CHANGE OF ADDRESS - *Reverse side*

☐ CHANGE OF NAME   ☑ SEND MORE FORMS

4-15-16

DUE BY ~~11/15/2014~~

DOCK & DOOR INSTALL, INC.
1249 E Burville Rd Ste 9
Crete IL 60417-3601

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of ~~OCTOBER~~ ~~2014~~  *March 2016*

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | Green, David J | 272-JNY | x | 74 | 133.05 | 3,326.25 |
| | Murray Jr. James E. | 54-JNY | x | 44 | 78.06 | 1,951.40 |
| | Tuttni, Anthony R. | 272-JNY | x | 46.5 | 82.49 | 2,062.28 |
| | | | | | | |
| | | | | | | |
| | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

Total this month 29.26       164.5   | $ 293.60 | $ 7,339.93

(1) Amount due at $ ~~287.120~~ per hour   $ 4,813.27

+ (2) Total dues withheld   $ 293.60

= Subtotal   $ 5,106.87

Prior Balance Due or (Cr. Available)   $

Grand Total   $ 5,106.87

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foreman, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by the Terms, conditions and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Carpenter Carpenters Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

APR 19 2018

*Frank J. Letz* By _____ President

REPORT MUST BE SIGNED!

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

AUTHORIZED
SIGNATURE   *Anthony Brussi*

TITLE   *President*

OWNER-PARTNER-OFFICER   CC-202-R 2/11

EAC008-B-00362

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Telephone (Fringe Benefits) 312/787-9455 and (Regional Council) 312/787-3076

| PAGE NO. | ACCOUNT NO. 25435 |
|---|---|
| H & W | 11.79 |
| Pen/Sup | 16.39 |
| Lab Mamt/CAF | 0.27 |
| Appren. | 0.63 |
| Intl Fnd | 0.10 |
| Mlaf | 0.06 |
| * Safety | 0.01 |
| * Cisco | 0.01 |

SEE INSTRUCTIONS ON REVERSE

☐ No Employees This Month   ☐ Change Of Address
☐ Change Of Name   ☐ Send More Forms

Firm Name and Address: Dock + Door Install  ②

1301143

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY  4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of April 2016

| MUST BE SHOWN! WATCH SPELLING! PLEASE PRINT! | | | | | | |
|---|---|---|---|---|---|---|
| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (*) | Dues Withheld (2) | Gross Wages |
| ▓▓▓▓ | Anthony Tattini | RY8 | | (32) | — | — |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| Hours worked in March, reported originally as April | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF
THE MONTH. LATE PAYMENTS WILL BE
CHARGED 1.5% PER MONTH, COMPOUNDED
AS LIQUIDATED DAMAGES!

Total this month

| | | (32) | $ — | $ — |
|---|---|---|---|---|

(1) Amount due at $ 29.26 per hour $
+ (2) Total dues withheld $
= Subtotal $ (936.32)
Prior Balance Due or (Cr. Available) $
Grand Total $

AN 'X' INDICATES THE REGIONAL COUNCIL HAS A DUES
CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen
and apprentice carpenters, and does NOT include hours worked by any self-employed persons,
partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all
of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations
of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are
maintained. We agree to keep and maintain contemporaneous time records reporting the hours
being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

JUN 03 2016

M

REPORT
MUST BE
SIGNED!

AUTHORIZED
SIGNATURE _____

TITLE _____  OWNER-PARTNER-OFFICER

© ▓▓▓▓ 212

CC-202-R 2

MACRC-00363

## CHICAGO REGIONAL COUNCIL OF CARPENTERS
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. 1

ACCOUNT NO. 25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 16.390 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY 5/15/2016

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

DOCK & DOOR INSTALL, INC.
7975 CATALPA ST
DYER IN 46311-2455

Month of APRIL 2016

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | GREEN DAVID J | 272-JNY | X | 4 | 7.10 | 177.40 |
| | MURRAY JR JAMES E | 54-JNY | X | 0 | 0.00 | 0.00 |
| | TATTINI ANTHONY R | 272-JNY | X | 51 | 90.47 | 2,261.85 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH COMPOUNDED AS LIQUIDATED DAMAGES!

| | | |
|---|---|---|
| Total this month | 55 | $ 97.57 | $2,439.25 |
| (1) Amount due at $ 29.260 per hour | $ 1,609.30 |
| + (2) Total dues withheld | $ 97.57 |
| = Subtotal | $ 1,706.87 |
| Prior Balance Due or (Cr. Available) | $ 0.00 |
| Grand Total | $ 1,706.87 |

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement, and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reflecting the hours being reported herein.

MAY 1 7 2016
President

AUTHORIZED SIGNATURE   Anthony Barata
TITLE   President

REPORT MUST BE SIGNED

OWNER-PARTNER-OFFICER   MACRC-00368   CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
## Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. 1

ACCOUNT NO. 25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 16.390 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH  ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME  ☐ SEND MORE FORMS

DUE BY  6/15/2016

DOCK & DOOR INSTALL, INC.
7975 CATALPA ST
DYER IN 46311-2455

*NOT APPLICABLE FOR WORK PERFORMED UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY 4 % OF EACH EMPLOYEES MONTHLY GROSS WAGES

Month of MAY  2016

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | GREEN DAVID J | 272-JNY | X | 93.5 | $165.87 | $4,146.73 |
| | MURRAY JR JAMES E | 54-JNY | X | 0 | 0 | 0 |
| | TATTINI ANTHONY R | 272-JNY | X | 59 | $104.67 | $2,616.65 |
| | Richert, David | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Total this month  152.5  $270.54  $6,763.38

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH COMPOUNDED, AS LIQUIDATED DAMAGES!

(1) Amount due at $29.260 per hour  $4,462.15

+ (2) Total dues withheld  $270.54

= Subtotal  $4,732.69

Prior Balance Due or (Cr. Available)  $0.00

Grand Total  $4,732.69

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time record reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

JUN 16 2016  President

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE  Anthony Bautter

TITLE  President

OWNER-PARTNER-OFFICER

MACRC 00369

CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
## Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. 1

ACCOUNT NO. 25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 17.600 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH  ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME  ☐ SEND MORE FORMS

DUE BY 7/15/2016

DOCK & DOOR INSTALL, INC.
7975 CATALPA ST
DYER IN 46311-2455

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

**MUST BE SHOWN!  WATCH SPELLING!  PLEASE PRINT!**  Month of JUNE 2016

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | GREEN DAVID J | 272-JNY | X | 152 | 275.73 | 6,893.20 |
| | TATTINI ANTHONY R | 272-JNY | X | 152 | 275.73 | 6,893.20 |
| | Richert, David | 1183 222-JNY | | 108.5 | 184.82 | 4,920.48 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

* AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters' Fringe Benefit Funds are maintained. We agree to keep and maintain those records and the records supporting the hours being reported herein.

| | | |
|---|---|---|
| Total this month | | 412.5 | $736.28 | $13,706.88 |
| (1) Amount due at $ 30.470 per hour | $ | 12,568.88 |
| + (2) Total dues withheld | $ | 736.28 |
| = Subtotal | $ | 13,305.16 |
| Prior Balance Due or (Cr. Available) | $ | 0.00 |
| Grand Total | $ | 13,305.16 |

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

JUL 1 9 2016

President

By

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE Anthony Bauri

TITLE President

OWNER-PARTNER-OFFICER

MACRC 00370

CC-202-R 2/11

**Tracy Nelson**

| | |
|---|---|
| **From:** | Tony Brutti <ajbrutti@gmail.com> |
| **Sent:** | Thursday, July 28, 2016 12:46 PM |
| **To:** | Tracy Nelson |
| **Subject:** | Re: letter of good standing |

David Richert's Soc. # is █████

On Thu, Jul 28, 2016 at 8:13 AM, Tracy Nelson <TNelson@crccbenefits.org> wrote:

Good morning,

I am working on your June report & I am missing the social for David Richert. Your report indicates that he is in local 272. I cannot find this member in our system. Can you please give me his social or union ID so that I can enter your report? I will sent your letter asap. Thank you!

Tracy K. Nelson, Assistant to the Contributions Manager
Chicago Regional Council of Carpenters Benefit Funds
12 E. Erie Street  Chicago, IL 60611
Telephone: (312) 988-1700
Facsimile: (312) 787-3212
Email: tnelson@crccbenefits.org



**Your Future — Our Focus**

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE. If the reader of this message is not the intended recipient or an employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to this e-mail indicating in the subject line "Received in error" and then delete the message you received. Thank you very much for your cooperation. Chicago Regional Council of Carpenters Funds.

**From:** Tony Brutti [mailto:ajbrutti@gmail.com]
**Sent:** Thursday, July 28, 2016 7:15 AM

MACRC-00371

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. 1

ACCOUNT NO. 25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 17.600 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY 8/15/2016

DOCK & DOOR INSTALL, INC.
7975 CATALPA ST
DYER IN 46311-2455

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of JULY 2016

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | GREEN DAVID J. | 272-JNY | X | 158 | 293.87 | 7,346.70 |
| | TATTINI ANTHONY R | 272-JNY | X | 155.5 | 283.89 | 7,097.28 |
| | Richert, David | | | 33 | 59.86 | 1,496.55 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| | | |
|---|---|---|
| **REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!** | Total this month | 346.5 $ 637.62 $15,940.53 |
| | (1) Amount due at $30.470 per hour | $ 10,557.85 |
| | + (2) Total dues withheld | $ 637.62 |
| AN 'X' INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE | = Subtotal | $ 11,195.47 |
| | Prior Balance Due or (Cr. Available) | $ 0.00 |

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

Grand Total $ 11,195.47

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

AUG 16 2016

President

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE   Anthony Bruce

TITLE   President

OWNER-PARTNER-OFFICER

CRC 00372

CC-202-R 2/11

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

| | |
|---|---|
| PAGE NO. | 1 |
| ACCOUNT NO. | 25435 |

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 17.600 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH      ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME      ☐ SEND MORE FORMS

DUE BY  9/15/2016

DOCK & DOOR INSTALL, INC.
3211 HOLEMAN AVE
SOUTH CHICAGO HEIGHTS IL 60411-5515

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of  AUGUST  2016

| Participant I.D. Number | Carpenter's Name | Local & Class. | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | GREEN DAVID J | 272-JNY | X | 155 | 261.17 | 7,029.25 |
| | RICHERT DAVID L | 1693-JNY | X | 0 | 0.00 | 0.00 |
| | TATTINI ANTHONY R | 272-JNY | X | 160 | 290.24 | 7,256.00 |
| | | | | | | |

MUST BE SHOWN!    WATCH SPELLING!    PLEASE PRINT!

| | | | |
|---|---|---|---|
| Total this month | 315 | $ 571.41 | $14,285.25 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

(1) Amount due at $30.470 per hour $ 9,598.05

+ (2) Total dues withheld $ 571.41

= Subtotal $ 10,169.46

Prior Balance Due or (Cr. Available) $ 0.00

Grand Total $ 10,169.46

A "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reflecting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

SEP 16 2016

President V.O.

AUTHORIZED SIGNATURE   Anthony Bruno

TITLE   President #C-00373

OWNER-PARTNER-OFFICER

REPORT MUST BE SIGNED!

CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS

**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. **1**

ACCOUNT NO. **25435**

### SEE INSTRUCTIONS ON REVERSE

| | |
|---|---|
| ☐ NO EMPLOYEES THIS MONTH | ☐ CHANGE OF ADDRESS |
| ☐ CHANGE OF NAME | ☐ SEND MORE FORMS |

DUE BY 10/15/2016

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 17.600 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

DOCK & DOOR INSTALL, INC.
3211 HOLEMAN AVE
SOUTH CHICAGO HEIGHTS IL 60411-5515

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of **SEPTEMBER 2016**

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | GREEN DAVID J | 272-JNY | X | 118 | 214.95 | 5,333.98 |
| | RICHERT DAVID L | 1693-JNY | X | 0 | 0 | 0.00 |
| | TATTINI ANTHONY R | 272-JNY | X | 137 | 311.78 | 6,235.63 |
| | | | | | | |

| | | | |
|---|---|---|---|
| Total this month | | 255 | $ 526.73 | $ 11,609.61 |
| (1) Amount due at $ 30.470 per hour | $ | 7,769.85 | |
| + (2) Total dues withheld | $ | 526.73 | |
| = Subtotal | $ | 8,296.58 | |
| Prior Balance Due or (Cr. Available) | $ | 0.00 | |
| Grand Total | $ | 8,296.58 | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

AN 'X' INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

OCT 19 2016

President By

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE

Tony Bauer

TITLE President

OWNER-PARTNER-OFFICER

EPC 00374

CC-202-R 2/11

## CHICAGO REGIONAL COUNCIL OF CARPENTERS
### Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

| | |
|---|---|
| PAGE NO. | 1 |

ACCOUNT NO. 25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 17.600 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY 11/15/2016

*NOT APPLICABLE FOR WORK PERFORMED UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY 4 % OF EACH EMPLOYEES MONTHLY GROSS WAGES

DOCK & DOOR INSTALL, INC.
3211 HOLEMAN AVE
SOUTH CHICAGO HEIGHTS IL 60411-5515

Month of OCTOBER 2016

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | GREEN DAVID J | 272-JNY | x | 139.5 | 253.05 | 6,326.33 |
| | TATTINI ANTHONY R | 272-JNY | x | 128 | 232.19 | 5,804.80 |
| permit | Jose' Aguirre | 272 | | 54 | 97.96 | 2,448.90 |
| | Verified w/ Tonya co. | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

| | | | |
|---|---|---|---|
| Total this month | | 321.5 | $ 583.20 | $ 14,580.03 |
| (1) Amount due at $ 30.470 per hour | $ 9,796.11 | | |
| + (2) Total dues withheld | $ 583.20 | | |
| = Subtotal | $ 10,379.31 | | |
| Prior Balance Due or (Cr. Available) | $ | | |
| Grand Total | $ 10,379.31 | | |

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters' Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

NOV 17 2016

By _Frank S. Lelli_ President

REPORT MUST BE SIGNED!

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

AUTHORIZED SIGNATURE _Anthony Brusa_
TITLE _President_

00375   CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. **1**

ACCOUNT NO. **25435**

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 17.600 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY 12/15/2016

DOCK & DOOR INSTALL, INC.
3211 HOLEMAN AVE
SOUTH CHICAGO HEIGHTS IL 60411-5515

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY **4** % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

**MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!**   Month of NOVEMBER 2016

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | GREEN DAVID J | 272-JNY | X | 152 | 275.73 | 6,893.21 |
| | TATTINI ANTHONY R | 272-JNY | X | 151 | 273.91 | 6,847.85 |
| | Jose' Aguirre | 272 | | 97.5 | 176.97 | 4,421.63 |
| | Jason Dee Lester | 250JNY | | 56 | 101.58 | 2,539.60 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| | |
|---|---|
| **REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!** | Total this month: 456.5  $828.09  $20,702.29 |
| | (1) Amount due at $30.470 per hour $ 13,909.56 |
| | + (2) Total dues withheld $ 828.09 |
| | = Subtotal $ 14,737.65 |
| AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE | Prior Balance Due or (Cr. Available) $ |
| We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We further agree to be bound by and ratify, confirm and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain complete and accurate time records reflecting the hours being reported herein. | Grand Total $ 14,737.65 |

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

DEC 16 2016   President   REPORT MUST BE SIGNED

AUTHORIZED SIGNATURE  Anthony Brussi

TITLE  President
OWNER-PARTNER-OFFICER   MACRC 00376   CC-202-R 2/1

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

| | |
|---|---|
| PAGE NO. | 1 |
| ACCOUNT NO. | 25435 |

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 17.600 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

**SEE INSTRUCTIONS ON REVERSE**

☐ NO EMPLOYEES THIS MONTH    ☐ CHANGE OF ADDRESS
☐ CHANGE OF NAME    ☐ SEND MORE FORMS

DUE BY  1/15/2017

DOCK & DOOR INSTALL, INC.
3211 HOLEMAN AVE
SOUTH CHICAGO HEIGHTS IL 60411-5515

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY  4  % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of  DECEMBER  2016

MUST BE SHOWN!    WATCH SPELLING!    PLEASE PRINT!

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE JOSE | -WAT | X | 121 | 206.80 | 5,167.91 |
| | GREEN DAVID J | 272-JNY | X | 140.5 | 377.86 | 9,446.44 |
| | TATTINI ANTHONY R  *per Local* | 272-JNY | X | 200 | 403.71 | 10,092.68 |
| | Kevin Graham | 272-JNY | | 84 | 152.38 | 3,809.40 |
| | Jason Dee Lester | 250 JNY | | 154 | 279.36 | 6,983.91 |
| | *Confirmed per Lisa per Dues* | | | | | |
| | | | | | | |

| | | |
|---|---|---|
| Total this month | 739.5 | $1420.11 | $ 35,502.34 |

REPORT DUE ON OR BEFORE THE 15TH OF
THE MONTH. LATE PAYMENTS WILL BE
CHARGED 1.5% PER MONTH, COMPOUNDED,
AS LIQUIDATED DAMAGES!

| | | |
|---|---|---|
| (1) Amount due at $ 30.470  per hour | $ | 22,532.57 |
| + (2) Total dues withheld | $ | 1,420.11 |
| = Subtotal | $ | 23,952.68 |
| Prior Balance Due or (Cr. Available) | $ | 0.00 |
| Grand Total | $ | 23,952.68 |

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES
CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen
and apprentice carpenters, and does NOT include hours worked by any self-employed persons,
partners or proprietors of the firm. We hereby agree to be bound by and verbally confirm and adopt all
of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations
of Trust under which this Chicago Regional Council of Carpenters Fringe Benefit Funds are
maintained. We agree to keep and maintain contemporaneous time records reporting the hours
being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

JAN 19 2017

REPORT
MUST BE
SIGNED!

*Frank J. Libby*
President

AUTHORIZED
SIGNATURE  *Anthony Bruno*

TITLE  President MACRC-00377

OWNER-PARTNER-OFFICER

CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
## Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

**PAGE NO.** 1

**ACCOUNT NO.** 25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 17.600 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH    ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME    ☐ SEND MORE FORMS

**DUE BY** 2/15/2017

*NOT APPLICABLE FOR WORK PERFORMED UNDER THE RESIDENTIAL AGREEMENT

DOCK & DOOR INSTALL, INC.
3211 HOLEMAN AVE
SOUTH CHICAGO HEIGHTS IL 60411-5515

DUES CHECKOFF IS CURRENTLY 4 % OF EACH EMPLOYEES MONTHLY GROSS WAGES

Month of JANUARY 2017

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE JOSE | -WAT | X | 101 | 186.84 | 4,671.06 |
| | GREEN DAVID J | 272-JNY | X | 104.5 | 189.56 | 4,739.03 |
| | LESTER JASON | 250-JNY | X | 79 | 150.56 | 3,764.05 |
| | TATTINI ANTHONY R | 272-JNY | X | 160 | 290.24 | 7,256.00 |
| | Kevin Graham | 272-JNY | | 86 | 156.00 | 3,900.10 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**MUST BE SHOWN!    WATCH SPELLING!    PLEASE PRINT!**

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records regarding the hours being reported herein.

| | | |
|---|---|---|
| Total this month | 530.5 | $ 973.20 | $ 24330.24 |
| (1) Amount due at $ 30.470 per hour | $ 16,164.34 | |
| + (2) Total dues withheld | $ 973.20 | |
| = Subtotal | $ 17,137.54 | |
| Prior Balance Due or (Cr. Available) | $ 0.00 | |
| Grand Total | $ 17,137.54 | |

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

RECEIVED FEB 17 2017

President

**REPORT MUST BE SIGNED!**

AUTHORIZED SIGNATURE  Anthony Bruozz

TITLE  President

OWNER-PARTNER-OFFICER

MACRC 00378

CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

| | |
|---|---|
| PAGE NO. | 1 |
| ACCOUNT NO. | 25435 |

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 17.600 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH ☐ CHANGE OF ADDRESS
☐ CHANGE OF NAME ☐ SEND MORE FORMS

DUE BY 3/15/2017

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY ___ % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

DOCK & DOOR INSTALL, INC.
3211 HOLEMAN AVE
SOUTH CHICAGO HEIGHTS IL 60411-5515

Month of FEBRUARY 2017

MUST BE SHOWN! WATCH SPELLING! PLEASE PRINT!

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | X | 126.5 | 115.67 | 2891.70 |
| | GRAHAM KEVIN | – | X | 74 | 134.24 | 3355.90 |
| | GREEN DAVID J | 272-JNY | X | 111.5 | 202.26 | 5056.53 |
| | LESTER JASON | 250-JNY | X | 0 | 0 | 0 |
| | TATTINI ANTHONY R | 272-JNY | X | 116.0 | 210.42 | 5260.60 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

| | | | |
|---|---|---|---|
| Total this month | | 428 | $ 662.59 $ 16,564.73 |
| (1) Amount due at $ 30.470 per hour | $ | 13,041.16 | |
| + (2) Total dues withheld | $ | 662.59 | |
| = Subtotal | $ | 13,703.75 | |
| Prior Balance Due or (Cr. Available) | $ | 0.00 | |
| Grand Total | $ | 13,703.75 | |

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain copies of and hereafter report the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

RECEIVED MAR 17 2017

Frank P. Liff President

AUTHORIZED SIGNATURE Anthony Bruce
TITLE President

OWNER-PARTNER-OFFICER

MACRO 00379 CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

**SEE INSTRUCTIONS ON REVERSE**

PAGE NO. 1

ACCOUNT NO. 25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 17.600 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY 4/15/2017

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY **4** % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

DOCK & DOOR INSTALL, INC.
3211 HOLEMAN AVE
SOUTH CHICAGO HEIGHTS IL 60411-5515

**MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!**   Month of MARCH 2017

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | X | 175.50 | 160.57 | 4014.36 |
| | GRAHAM KEVIN | 272-JNY | X | 99 | 181.40 | 4,535.60 |
| | GREEN DAVID J | 272-JNY | X | 115.00 | 210.42 | 5,260.60 |
| | LESTER JASON | 250-JNY | X | 0 | 0 | 0 |
| | TATTINI ANTHONY R | 272-JNY | X | 161.00 | 296.14 | 7,403.40 |
| | | | | | | |

| | | |
|---|---|---|
| **Total this month** | 550.5 | $ 848.53   $ 21,213.36 |
| (1) Amount due at $ 30.470 per hour | $ | 16,773.74 |
| + (2) Total dues withheld | $ | 848.53 |
| = Subtotal | $ | 17,622.27 |
| Prior Balance Due or (Cr. Available) | $ | 0.00 |
| **Grand Total** | $ | 17,622.27 |

**REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!**

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to recognize, acknowledge, assume and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

APR 18 2017

_Frank T. Libby_ By President

REPORT MUST BE SIGNED!

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

AUTHORIZED SIGNATURE _Tony Brusci_

TITLE _President_ MACRC 00380

OWNER-PARTNER-OFFICER

CC-202-R 2/11

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. 1

ACCOUNT NO. 25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 17.600 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

*SEE INSTRUCTIONS ON REVERSE*

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY 5/15/2017

DOCK & DOOR INSTALL, INC.
3211 HOLEMAN AVE
SOUTH CHICAGO HEIGHTS IL 60411-5515

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of APRIL 2017

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | X | 145.5 | 132.68 | 3,316.95 |
| | GRAHAM KEVIN | 272-JNY | X | 142 | 257.59 | 6,439.70 |
| | GREEN DAVID J | 272-JNY | X | 142 | 257.59 | 6,439.70 |
| | TATTINI ANTHONY R | 272-JNY | X | 144.5 | 262.57 | 6,564.41 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | Cohase credit of $2.00 due to error in total dues amount. | | | | | |
| | | | | | | |
| | | | | | ✓ | ✓ |
| | | | | ✓ | 910.43 | |

MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!

| | |
|---|---|
| REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES! | Total this month |

Total this month: 574 | $ 912.43 | $22,760.76

(1) Amount due at $ 30.470 per hour $ 17,489.78
58# 910.43 + (2) Total dues withheld $ 912.43
58# 18,400.21 = Subtotal $ 18,402.21
Prior Balance Due or (Cr. Available) $ 0.00
Grand Total $ 18,402.21

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

I certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters' Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

Frank T. Libby   President

MAY 1 8 2017

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE   Tony Bruso

TITLE   President CRC 00381

OWNER-PARTNER-OFFICER   CC-202-R 2/11

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. 1

ACCOUNT NO. 25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 17.600 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .270 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

**SEE INSTRUCTIONS ON REVERSE**

☐ NO EMPLOYEES THIS MONTH ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME ☐ SEND MORE FORMS

DUE BY 6/15/2017

*NOT APPLICABLE FOR WORK PERFORMED UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY 4 % OF EACH EMPLOYEES MONTHLY GROSS WAGES

DOCK & DOOR INSTALL, INC.
3211 HOLEMAN AVE
SOUTH CHICAGO HEIGHTS IL 60411-5515

Month of MAY 2017

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | X | 74.5 | 68.04 | 1,701.00 |
| | GRAHAM KEVIN | 272-JNY | X | 112.5 | 205.44 | 5,135.89 |
| | GREEN DAVID J | 272-JNY | X | 118.5 | 214.96 | 5,373.99 |
| | TATTINI ANTHONY R | 272-JNY | X | 93.5 | 169.61 | 4,240.23 |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Co shot #30.00 due to e error in adding dues total
Called and left VM regarding shortage

| | | | | | 658.05 | |
|---|---|---|---|---|---|---|
| | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

Total this month  399  $ 628.05  $ 14,451.10

(1) Amount due at $ 30.470 per hour  $ 12,157.53

+ (2) Total dues withheld  $ 628.05

SB #12815.58

= Subtotal  $ 12,785.58

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

Prior Balance Due or (Cr. Available)  $ 0.00

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Trust Funds are maintained. We agree to keep and maintain contemporaneous time records regarding the hours being reported herein.

Grand Total  $ 12,785.58

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

JUN 16 2017

REPORT MUST BE SIGNED!

_Frank T. ____  By ___  President

AUTHORIZED SIGNATURE  _Anthony Bruster_

TITLE  _President_

OWNER-PARTNER-OFFICER

MACBC 00382

CC-202-R 2/11

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. 1

ACCOUNT NO. 25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 18.870 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

**SEE INSTRUCTIONS ON REVERSE**

☐ NO EMPLOYEES THIS MONTH  ☐ CHANGE OF ADDRESS
☐ CHANGE OF NAME  ☐ SEND MORE FORMS

DUE BY  7/15/2017

DOCK & DOOR INSTALL, INC.
3211 HOLEMAN AVE
SOUTH CHICAGO HEIGHTS IL 60411-5515

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY  4  % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

MUST BE SHOWN!  WATCH SPELLING!  PLEASE PRINT!    Month of  JUNE   2017

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | X | 166 | 153.51 | 3,837.64 |
| | GRAHAM KEVIN | 272-JNY | X | 153 | 281.97 | 7,049.23 |
| | GREEN DAVID J | 272-JNY | X | 164 | 301.46 | 7,536.40 |
| | TATTINI ANTHONY R | 272-JNY | X | 173.5 | 319.90 | 7,997.56 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

Total this month    656.5 ✓  $ 1,056.84  $ 26,420.83

(1) Amount due at $ 31.930 per hour  $ 20,962.05

+ (2) Total dues withheld  $ 1,056.84

= Subtotal  $ 22,018.89

Prior Balance Due or (Cr. Available)  $ 30.00

Grand Total  $ 22,049.89

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

*AN 'X' INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

JUL 18 2017

Frank J. ___  President
BY:

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE  Anthony Bruce

TITLE  President  MACRC 00383
OWNER-PARTNER-OFFICER

CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
## Combined Fringe Benefit Funds and Dues Checkoff Report
.Ffinge Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. 1

ACCOUNT NO. 25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 18.870 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### *SEE INSTRUCTIONS ON REVERSE*

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY  8/15/2017

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY __4__ % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

DOCK & DOOR INSTALL, INC.
3211 HOLEMAN AVE
SOUTH CHICAGO HEIGHTS IL 60411-5515

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | X | 128 | 118.68 | 2,967.04 |
| | GRAHAM KEVIN | 272-JNY | X | 107 | 198.38 | 4,959.45 |
| | GREEN DAVID J | 272-JNY | X | 87 | 161.30 | 4032.45 |
| | TATTINI ANTHONY R | 272-JNY | X | 100 | 185.40 | 4,635.00 |

MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!

Month of JULY 2017

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

Total this month   422   $ 663.76   $ 16,593.94

(1) Amount due at $ **31.930** per hour $ 13,474.46

+ (2) Total dues withheld $ 663.76

= Subtotal $ 14,138.22

Prior Balance Due or (Cr. Available) $ 0.00

Grand Total $ 14,138.22

AN 'X' INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

AUG 17 2017

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO: CHICAGO CARPENTERS TRUST FUNDS P.O. BOX 94432 CHICAGO, IL 60690

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE  *Anthony Brucci*

TITLE  President   MACRC-00384

OWNER-PARTNER-OFFICER

CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. 1

ACCOUNT NO. 25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 18.870 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

**SEE INSTRUCTIONS ON REVERSE**

☐ NO EMPLOYEES THIS MONTH  ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME  ☐ SEND MORE FORMS

DUE BY 9/15/2017

*NOT APPLICABLE FOR WORK PERFORMED UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY __4__ % OF EACH EMPLOYEES MONTHLY GROSS WAGES

DOCK & DOOR INSTALL, INC.
3211 HOLEMAN AVE
SOUTH CHICAGO HEIGHTS IL 60411-5515

Month of AUGUST 2017

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | X | 97 | 89.94 | $2,248.46 |
| | GRAHAM KEVIN | 272-JNY | X | 51 | 94.55 | $2,363.85 |
| | GREEN DAVID J | 272-JNY | X | 120 | 222.48 | $5,562.00 |
| | TATTINI ANTHONY R | 272-JNY | X | 124 | 229.90 | $5,747.40 |
| | | | | | | |
| Total this month | | | | 392 | $636.87 | $15,921.71 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

(1) Amount due at $ 31.930 per hour $ 12,516.56

+ (2) Total dues withheld $ 636.87

= Subtotal $ 13,153.43

Prior Balance Due or (Cr. Available) $ 0.00

Grand Total $ 13,153.43

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

SEP 13 2017

REPORT MUST BE SIGNED!

By President

AUTHORIZED SIGNATURE

TITLE OWNER-PARTNER-OFFICER

CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
**Combined Fringe Benefit Funds and Dues Checkoff Report**
· Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

**SEE INSTRUCTIONS ON REVERSE**

| PAGE NO. | ACCOUNT NO. |
|---|---|
| 1 | 25435 |

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 18.870 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

☐ NO EMPLOYEES THIS MONTH  ☐ CHANGE OF ADDRESS
☐ CHANGE OF NAME  ☐ SEND MORE FORMS

DUE BY 10/15/2017

DOCK & DOOR INSTALL, INC.
3211 HOLEMAN AVE
SOUTH CHICAGO HEIGHTS IL 60411-5515

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY  4  % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of **SEPTEMBER 2017**

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | X | 178.5 | 165.97 | 4149.22 |
| | GRAHAM KEVIN | 272-JNY | X | 0 | | 0.00 |
| | GREEN DAVID J | 272-JNY | X | 155.5 | 288.30 | 7207.43 |
| | TATTINI ANTHONY R | 272-JNY | X | 121 | 224.33 | 5608.35 |
| | Richert, Jonathan | 272-APP | | 8 | 5.93 | 148.32 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF
THE MONTH. LATE PAYMENTS WILL BE
CHARGED 1.5% PER MONTH, COMPOUNDED,
AS LIQUIDATED DAMAGES!

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES
CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen
and apprentice carpenters, and does NOT include hours worked by any self-employed persons,
partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all
of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations
of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are
maintained. We agree to keep and maintain contemporaneous time records reporting the hours
being reported herein.

| | | |
|---|---|---|
| Total this month | 463 | $ 684.53  $ 17,113.32 |
| (1) Amount due at $ 31.930  per hour | $ 14,783.59 | |
| + (2) Total dues withheld | $ 684.53 | |
| = Subtotal | $ 15,468.12 | |
| Prior Balance Due or (Cr. Available) | $ 0.00 | |
| Grand Total | $ 15,468.12 | |

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

OCT 17 2017  REPORT MUST BE SIGNED!
President

AUTHORIZED SIGNATURE  Tony Bauer
TITLE  President  MACBC-00386
OWNER-PARTNER-OFFICER

CC-202-R 2/11

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. 1

ACCOUNT NO. 25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 18.870 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

*SEE INSTRUCTIONS ON REVERSE*

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY 11/15/2017

\|·||·|'||·||'||·|¹·||||||||·||||||·|||·||¹||·||
DOCK & DOOR INSTALL, INC.
3211 HOLEMAN AVE
SOUTH CHICAGO HEIGHTS IL 60411-5515

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY __4__ % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

| MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT! | | Month of OCTOBER 2017 | | | |
|---|---|---|---|---|---|
| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
| | AGUIRRE GARCIA JOSE L | 272-APP | X | 156 | 144.65 | 3616.08 |
| | GRAHAM KEVIN | 272-JNY | X | 0 | 0 | 0 |
| | GREEN DAVID J | 272-JNY | X | 155.00 | 301.28 | 7,531.88 |
| | TATTINI ANTHONY R | 272-JNY | X | 180.00 | 296.64 | 7416.00 |
| | Cruikshank, Don 345.68.1171 | 272-5NY | | 40 | 74.16 | 1854.00 |
| | Rickert, Jonathan | 272 APP | | 76.50 | 56.73 | 1418.31 |
| | Maldonado, Reynaldo | 272 JNY | | 40. | 74.16 | 1854.00 |

| | | |
|---|---|---|
| Total this month | 627.5 | $ 947.62 | $ 23,690.27 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

(1) Amount due at $ **31.930** per hour = $ 20,036.08

+ (2) Total dues withheld = $ 947.62

= Subtotal = $ 20,983.70

Prior Balance Due or (Cr. Available) = $

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

Grand Total = $ 20,983.70

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters' Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

NOV 2 0 2017

REPORT MUST BE SIGNED!

*Frank T. Libby* President
BY

AUTHORIZED SIGNATURE   *Tony Brewer*

TITLE   President CRC-00387
OWNER-PARTNER-OFFICER

CC-202-R 2/11

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. 1

ACCOUNT NO. 25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 18.870 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

*SEE INSTRUCTIONS ON REVERSE*

☐ NO EMPLOYEES THIS MONTH  ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME  ☐ SEND MORE FORMS

DUE BY 12/15/2017

DOCK & DOOR INSTALL, INC.
3211 HOLEMAN AVE
SOUTH CHICAGO HEIGHTS IL 60411-5515

3/572

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY  4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of NOVEMBER 2017

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | X | 112.5 | 108.25 | 2706.27 |
| | GREEN DAVID J | 272-JNY | X | 155 | 287.37 | 7184.25 |
| | RICKERT JONATHAN D | 272-APP | X | 109.5 | 84.17 | 2104.29 |
| | TATTINI ANTHONY R | 272-JNY | X | 160 | 296.64 | 7416.00 |
| | Donald Crutcshank | 272-JNY | | 168 | 326.30 | 8157.60 |
| | Reynaldo maldonado | 272-JNY | | 104 | 192.82 | 4820.40 |
| | Ryan Mead | 272-JNY | | 64 | 118.66 | 2966.40 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

MUST BE SHOWN!  WATCH SPELLING!  PLEASE PRINT!

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

| | | | |
|---|---|---|---|
| Total this month | | 873 | $ 1,414.21 | $ 35,354.61 |
| (1) Amount due at $ 31.930 per hour | | $ 27,874.89 | |
| + (2) Total dues withheld | | $ 1,414.21 | |
| = Subtotal | | $ 29,289.10 | |
| Prior Balance Due or (Cr. Available) | | $ | |
| Grand Total | | $ 29,289.10 | |

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

DEC 19 2017

REPORT MUST BE SIGNED!

Frank A. Fetty  President

AUTHORIZED SIGNATURE  Tony Brucci

TITLE  President MACRC-00389
OWNER-PARTNER-OFFICER

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
## Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5, Regional Council: 312/787-3076

**SEE INSTRUCTIONS ON REVERSE**

| | |
|---|---|
| PAGE NO. | 1 |
| ACCOUNT NO. | 25435 |

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 18.870 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY 1/15/2018

DOCK & DOOR INSTALL, INC.
3211 HOLEMAN AVE
SOUTH CHICAGO HEIGHTS IL 60411-5515

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of DECEMBER 2017

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | X | 144 | 133.52 | 8337.92 |
| | CRUIKSHANK DONALD | 272-JNY | X | 169 | 321.67 | 8041.73 |
| | GREEN DAVID J | 272-JNY | X | 154 | 285.52 | 7137.90 |
| | MALDONADO REYNALDO | 272-JNY | | 45 | 83.43 | 2085.75 |
| | RICKERT JONATHAN D | 272-APP | X | 0 | 0 | 0 |
| | TATTINI ANTHONY R | 272-JNY | X | 200 | 370.80 | 9,270.00 |
| | Ryan Mead | 272-JNY | | 103 | 190.96 | 4774.05 |
| | | | | | | |

| | | | |
|---|---|---|---|
| Total this month | 815 ✓ | $ 1385.90 ✓ | $ 34,647.35 |
| (1) Amount due at $ 31.930 per hour | $ 26,022.95 | | |
| + (2) Total dues withheld | $ 1,385.90 | | |
| = Subtotal | $ 27,408.85 | | |
| Prior Balance Due or (Cr. Available) | $ | | |
| Grand Total | $ 27,408.85 | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

RECEIVED
JAN 22 2018
President

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE

TITLE President

OWNER-PARTNER-OFFICER

MACRC-00390

CC-202-R 2/11

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Telephone (Fringe Benefits) 312/787-9455 and (Regional Council) 312/787-3076

SEE INSTRUCTIONS ON REVERSE

☐ No Employees This Month  ☑ Change Of Address
☐ Change Of Name  ☐ Send More Forms

PAGE NO. | ACCOUNT NO. 25435
--- | ---
H & W | 11.79
Pen/Sup | 18.87
Lab Mgmt/CAF | 0.46
Appren. | 0.63
Intl Fnd | 0.10
Misf | 0.06
* Safety | 0.01
* Cisco | 0.01

Firm Name: Dock & Door Install Inc.
and Address: 27 E. 36th Pl. Steger, IL 60475

DUES CHECKOFF IS CURRENTLY ___ % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of Jan 18   Per Tony

| Participant I.D. Number | Carpenter's Name | Local & Class | Total Actual Hours Worked | Benefit Hours (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | Aguirre Garcia, Jose | 272-APR | 64 | | 77.13 | 1,928.32 |
| | Cruikshank, Donald | 272-JNY | 56 | | 103.82 | 2,595.60 |
| | Green, David J | 272-JNY | 84 | | 155.74 | 3,893.40 |
| | Tattini, Anthony R | 272-JNY | 101 | | 187.25 | 4,681.35 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

Total this month: 305
(1) Amount due at $ 31.93 per hour $ 9,738.65
+ (2) Total dues withheld $ 523.94
= Subtotal $ 10,262.59
Prior Balance Due or (Cr. Available) $ 0.00
Grand Total $ 10,262.59

$ 523.94 | $ 13,098.67

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

FEB 21 2018 REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE Tony Brivai
TITLE President OWNER-PARTNER

MARC-00391 CC-202-MLMN

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. **1**

ACCOUNT NO. **25435**

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 18.870 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH  ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME  ☐ SEND MORE FORMS

DUE BY **3/15/2018**

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY **4** % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

DOCK & DOOR INSTALL, INC.
27 E 36TH PL
STEGER IL 60475-1762

Month of **FEBRUARY 2018**

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | X | 54 | 65.08 | 1627.02 |
| | CRUIKSHANK DONALD | 272- | X | 70 | 129.78 | 3244.50 |
| | GREEN DAVID J | 272-JNY | X | 78 | 144.61 | 3615.30 |
| | MALDONADO REYNALDO | 272-JNY | | 0 | 0 | 0 |
| | MEAD RYAN E | 272-JNY | X | 0 | 0 | 0 |
| | TATTINI ANTHONY R | 272-JNY | X | 100 | 185.40 | 4635.00 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| | | |
|---|---|---|
| Total this month | 302 | $ 524.87  $ 13,121.82 |

MUST BE SHOWN! WATCH SPELLING! PLEASE PRINT!

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

(1) Amount due at $ **31.930** per hour $ **9,642.86**

+ (2) Total dues withheld $ **524.87**

= Subtotal $ **10,167.73**

Prior Balance Due or (Cr. Available) $

Grand Total $ **10,167.73**

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records regarding the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

MAR 19 2018

REPORT MUST BE SIGNED!

Frank T. Libby President

AUTHORIZED SIGNATURE  *Anthony Brucci*

TITLE  President MACRC 00302

OWNER-PARTNER-OFFICER

CC-202-R 2/11

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. 1

ACCOUNT NO. 25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 18.870 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

**SEE INSTRUCTIONS ON REVERSE**

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY 4/15/2018

DOCK & DOOR INSTALL, INC.
27 E 36TH PL
STEGER IL 60475-1762

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!

Month of MARCH 2018

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | X | 100 | 120.52 | 3013.06 |
| | CRUIKSHANK DONALD | 272-JNY | X | 104 | 192.82 | 4820.40 |
| | GREEN DAVID J | 272-JNY | X | 92 | 170.57 | 4264.20 |
| | TATTINI ANTHONY R | 272-JNY | X | 88 | 163.15 | 4078.80 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

| | | |
|---|---|---|
| Total this month | 384 | $647.06 | $16,176.40 |
| (1) Amount due at $ 31.930 per hour | $ 12,261.12 | |
| + (2) Total dues withheld | $ 647.06 | |
| = Subtotal | $ 12,908.18 | |
| Prior Balance Due or (Cr. Available) | $ | |
| Grand Total | $ 12,908.18 | |

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

APR 1 8 2018

Frank A. Lefty President

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE Anthony Bruso

TITLE President MACRC 00393

OWNER-PARTNER-OFFICER

CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
## Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. 1

ACCOUNT NO. 25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 18.870 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH ☐ CHANGE OF ADDRESS

☒ CHANGE OF NAME ☐ SEND MORE FORMS

DUE BY 5/15/2018

DOCK & DOOR INSTALL, INC.
27 E 36TH PL
STEGER IL 60475-1762

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

MUST BE SHOWN! WATCH SPELLING! PLEASE PRINT!    Month of APRIL 2018

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE-GARCIA, JOSE L | 272-APP. | X | 72 | 76.77 | 2,169.36 |
| | CRUIKSHANK DONALD | 272- | X | 72 | 133.49 | 3,337.20 |
| | GREEN DAVID J | 272-JNY | X | 72 | 133.49 | 3,337.20 |
| | TATTINI ANTHONY R | 272-JNY | X | 72 | 133.49 | 3,337.20 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED AS LIQUIDATED DAMAGES!

AN 'X' INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

| | | | |
|---|---|---|---|
| Total this month | | 288 | $ 487.24 | $ 12,180.96 |
| (1) Amount due at $31.930 per hour | $ | 9,195.84 | |
| + (2) Total dues withheld | $ | 487.24 | |
| = Subtotal | $ | 9,683.08 | |
| Prior Balance Due or (Cr. Available) | $ | 0.00 | |
| Grand Total | $ | 9,683.08 | |

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of this firm. We hereby agree to be bound by and fully confirm and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters' Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

MAY 16 2018

▶ REPORT MUST BE SIGNED!

President

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

AUTHORIZED SIGNATURE Tony Brusca

TITLE President   MACRC-00394

OWNER-PARTNER-OFFICER

CC-202-R 2/11

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. 1

ACCOUNT NO. 25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 18.870 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

*SEE INSTRUCTIONS ON REVERSE*

☐ NO EMPLOYEES THIS MONTH ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME ☐ SEND MORE FORMS

DUE BY 6/15/2018

DOCK & DOOR INSTALL, INC.
27 E 36TH PL
STEGER IL 60475-1762

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of MAY 2018

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | X | 68 | 81.95 | 2049.84 |
| | CRUIKSHANK DONALD | 272- | X | 96 | 177.98 | 4449.60 |
| | GREEN DAVID J | 272-JNY | X | 83 | 153.88 | 3447.05 |
| | TATTINI ANTHONY R | 272-JNY | X | 136 | 252.14 | 6303.60 |
| | Maldonado, Reynaldo | 272-JNY | | 45 | 83.43 | 2035.75 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

Total this month: 428 | $749.38 | $18,734.84

(1) Amount due at $ 31.930 per hour $ 13,666.04

+ (2) Total dues withheld $ 749.38

= Subtotal $ 14,415.42

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

Prior Balance Due or (Cr. Available) $

Grand Total $ 14,415.42

We certify that the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of this firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records regarding the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

Frank F. [signature] President

JUN 18 2018

BY:

AUTHORIZED SIGNATURE: Tony Bruni

TITLE: President

OWNER-PARTNER-OFFICER

00395

CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
## Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

| | PAGE NO. | ACCOUNT NO. |
|---|---|---|
| | 1 | 25435 |

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 20.410 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH  ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME  ☐ SEND MORE FORMS

DUE BY  7/15/2018

DOCK & DOOR INSTALL, INC.
27 E 36TH PL
STEGER IL 60475-1762

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY  4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

3/621  Month of  JUNE  2018

| MUST BE SHOWN! WATCH SPELLING! PLEASE PRINT! | | | | | |
|---|---|---|---|---|---|
| Participant I.D. Number | Carpenter's Name | Local & Class | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
| | AGUIRRE GARCIA JOSE L | 272-APP. | X 147 | 179.13 | 4478.19 |
| | CRUIKSHANK DONALD | 272-JNY | X 161 | 302.33 | 7558.36 |
| | GREEN DAVID J | 272-JNY | X 181.5 | 340.94 | 8523.54 |
| | TATTINI ANTHONY R | 272-JNY | X 199 | 375.49 | 9387.00 |
| | Zorlengo Collin | 272-APP | 91.5 | 69.32 | 1733.01 |
| | Kelly, Nicolas | 272-APP | 152 | 115.15 | 2878.88 |
| | Maldonado, Reynaldo | 272 JNY | 44 | 89.57 | 2039.40 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | 976 | $ 1471.92 | $ 36,598.38 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

Total this month

(1) Amount due at $ 33.470 per hour $ 32,666.72

+ (2) Total dues withheld $ 1,471.92

= Subtotal $ 34,138.64

Prior Balance Due or (Cr. Available) $

Grand Total $ 34,138.64

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

I certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and fully confirm and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

JUL 17 2018

BY: _Frank J. ___  President

REPORT MUST BE SIGNED ▶

AUTHORIZED SIGNATURE  Tony Bruno

TITLE  President RC-00396

OWNER-PARTNER-OFFICER

CC-202-R 2/11

**CHICAGO REGIONAL COUNCIL OF CARPENTERS**
Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

| | PAGE NO. | ACCOUNT NO. |
|---|---|---|
| | 1 | 25435 |

*SEE INSTRUCTIONS ON REVERSE*

| | |
|---|---|
| ☐ NO EMPLOYEES THIS MONTH | ☐ CHANGE OF ADDRESS |
| ☐ CHANGE OF NAME | ☐ SEND MORE FORMS |

DUE BY 8/15/2018

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 20.410 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

DOCK & DOOR INSTALL, INC.
27 E 36TH PL
STEGER IL 60475-1762

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY  4  % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of   JULY   2018

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | x | 142.5 | 175.45 | 4386.15 |
| | CRUIKSHANK DONALD | 272- | x | 142.5 | 269.90 | 6747.39 |
| | GREEN DAVID J | 272-JNY | x | 110.5 | 210.23 | 5255.87 |
| | MALDONADO REYNALDO | 272-JNY | x | 0 | 0.00 | 0.00 |
| | TATTINI ANTHONY R | 272-JNY | x | 151.5 | 286.94 | 7173.53 |
| | Nicolas Kelly | 272 APP | | 118 | 90.91 | 2272.80 |
| | Collin Zarlengo | 272 APP | | 100.5 | 77.46 | 1936.62 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| | | | |
|---|---|---|---|
| Total this month | 765.5 ✓ | $1,110.89 ✓ | $27,772.35 |
| (1) Amount due at $ 33.470  per hour | $ 25,621.29 ✓ | | |
| + (2) Total dues withheld | $ 1,110.89 ✓ | | |
| = Subtotal | $ 26,732.18 ✓ | | |
| Prior Balance Due or (Cr. Available) | $ | | |
| Grand Total | $ 26,732.18 | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

AUG 17 2018

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE  Anthony Bruner

TITLE  President  MACRC-00397

OWNER-PARTNER-OFFICER   CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
## Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. 1

ACCOUNT NO. 25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 20.410 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

**SEE INSTRUCTIONS ON REVERSE**

☐ NO EMPLOYEES THIS MONTH  ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME  ☐ SEND MORE FORMS

DUE BY 9/15/2018

DOCK & DOOR INSTALL, INC.
27 E 36TH PL
STEGER IL 60475-1762

*NOT APPLICABLE FOR WORK PERFORMED UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY **4** % OF EACH EMPLOYEES MONTHLY GROSS WAGES

Month of AUGUST 2018

MUST BE SHOWN!  WATCH SPELLING!  PLEASE PRINT!

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | x | 158 | 195.15 | 4,878.63 |
| | CRUIKSHANK DONALD | 272- | x | 139 | 263.27 | 6,581.66 |
| | GREEN DAVID J | 272-JNY | x | 137.5 | 260.43 | 6,510.63 |
| | KELLY NICOLAS J | -WAT | x | 175 | 134.10 | 3,352.39 |
| | MALDONADO REYNALDO | 272-JNY | x | 0 | 0 | 0 |
| | TATTINI ANTHONY R | 272-JNY | x | 134 | 253.80 | 6,344.70 |
| | ZARLENGO COLLIN M | -WAT | x | 80.5 | 60.99 | 1524.67 |
| | Rodgers, Jacob | 174 JNY | | 189 | 360.81 | 9020.18 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

| | | | |
|---|---|---|---|
| Total this month | | 1013 | $ 1528.55 | $ 38,213.05 |
| (1) Amount due at $ **33.470** per hour | $ 33,905.11 | | |
| + (2) Total dues withheld | $ 1,528.55 | | |
| = Subtotal | $ 35,433.66 | | |
| Prior Balance Due or (Cr. Available) | $ | | |
| Grand Total | $ 35,433.66 | | |

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters' Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

Frank P. [signature]  President  SEP 18 2018  REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE Tony Baucci

TITLE President  MACRC-00398  OWNER-PARTNER-OFFICER

OO-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
## Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

**PAGE NO.** 1

**ACCOUNT NO.** 25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 20.410 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

**DUE BY 10/15/2018**

DOCK & DOOR INSTALL, INC.
27 E 36TH PL
STEGER IL 60475-1762

IA-16009

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY   4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

**Month of** SEPTEMBER 2018

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | x | 95.5 | 118.91 | 2970.27 |
| | CRUIKSHANK DONALD | 272-JNY | x | 1385.0 | 262.32 | 6557.98 |
| | GREEN DAVID J | 272-JNY | x | 108 | 204.55 | 5113.80 |
| | KELLY NICOLAS J | 272-APP | x | 131 | 100.00 | 2500.08 |
| | RODGERS JACOB | 174-JNY | x | 152 | 287.89 | 7197.20 |
| | TATTINI ANTHONY R | 272-JNY | x | 151 | 285.99 | 7149.85 |
| | ZARLENGO COLLIN M | -WAT | x | 96 | 72.73 | 1818.24 |
| | Bara, Daniel | 174-JNY | | 80 | 151.52 | 3788.00 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!

REPORT DUE ON OR BEFORE THE 15TH OF
THE MONTH. LATE PAYMENTS WILL BE
CHARGED 1.5% PER MONTH, COMPOUNDED,
AS LIQUIDATED DAMAGES!

**Total this month** 952   $1,483.81   $37,045.42

(1) Amount due at $ 33.470 per hour $ 31,863.44

+ (2) Total dues withheld $ 1,483.81

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES
CHECKOFF AUTHORIZATION FORM ON FILE

= Subtotal $ 33,347.25

Prior Balance Due or (Cr. Available) $

**Grand Total** $ 33,347.25

We certify the above is a true and complete report of actual hours worked by foremen, journeymen
and apprentice carpenters, and does NOT include hours worked by any self-employed persons,
partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all
of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations
of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are
maintained. We agree to keep and maintain contemporaneous time records reflecting the hours
being reported herein.

OCT 30 2018

By Frank F. Libby   President

**REPORT MUST BE SIGNED!**

**AUTHORIZED SIGNATURE** Anthony Bruno

**TITLE** President   MACRC-00399

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

OWNER-PARTNER-OFFICER   CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
## Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

**PAGE NO.** 1

**ACCOUNT NO.** 25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 20.410 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH  ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME  ☐ SEND MORE FORMS

**DUE BY 11/15/2018**

DOCK & DOOR INSTALL, INC.
27 E 36TH PL
STEGER IL 60475-1762

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY **4** % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

**Month of** OCTOBER 2018

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | x | 134.50 | 165.60 | 4,139.91 |
| | CRUIKSHANK DONALD | 272- | x | 125.5 | 239.59 | 5,989.78 |
| | GREEN DAVID J | 272-JNY | x | 153 | 298.78 | 7,469.47 |
| | KELLY NICOLAS J | 272-APP | x | 136.5 | 212.89 | 5,322.15 |
| | RODGERS JACOB | 174-JNY | x | 139 | 263.27 | 6,581.65 |
| | TATTINI ANTHONY R | 272-JNY | x | 152 | 287.88 | 7,197.20 |
| | ZARLENGO COLLIN M | 272-APP | x | 91 | 69.13 | 1728.28 |
| | Bura, Dan | 174-JNY | | 134 | 261.37 | 6,534.30 |
| | Junota, Robert E | JNY | | 8 | 15.15 | 378.80 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**MUST BE SHOWN!  WATCH SPELLING!  PLEASE PRINT!**

| | | |
|---|---|---|
| REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES! | Total this month | 1070.5 | $ 1,873.66 | $45,341.54 |

| | |
|---|---|
| (1) Amount due at $ 33.470 per hour | $ 35,829.64 |
| + (2) Total dues withheld | $ 1,813.66 |
| = Subtotal | $ |
| Prior Balance Due or (Cr. Available) | $ |
| Grand Total | $ 37,643.30 |

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreements and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain complete and accurate records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

NOV 19 2018

**REPORT MUST BE SIGNED**

BY:

**AUTHORIZED SIGNATURE** Tony Brunei

**TITLE** President HMACRC-00400
OWNER-PARTNER-OFFICER

CC-202-R 2/11

## CHICAGO REGIONAL COUNCIL OF CARPENTERS
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5, Regional Council: 312/787-3076

**SEE INSTRUCTIONS ON REVERSE**

| | |
|---|---|
| PAGE NO. | 1 |
| ACCOUNT NO. | 25435 |

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 20.410 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

☐ NO EMPLOYEES THIS MONTH  ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME  ☐ SEND MORE FORMS

DUE BY 12/15/2018

DOCK & DOOR INSTALL, INC.
27 E 36TH PL
STEGER IL 60475-1762

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY  4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

Month of **NOVEMBER 2018**

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | x | 137 | 168.67 | 4,216.86 |
| | BARA DANIEL | 174-JNY | x | 147.5 | 279.37 | 6,984.13 |
| | CRUIKSHANK DONALD | 272-JNY | x | 161 | 304.93 | 7,623.36 |
| | GREEN DAVID J | 272-JNY | x | 151 | 285.99 | 7,149.86 |
| | JANOTA ROBERT E | 272-JNY | x | 0 | 0 | 0 |
| | KELLY NICOLAS J | 272-APP | x | 139 | 152.47 | 3,811.68 |
| | RODGERS JACOB | 174-JNY | x | 182 | 344.71 | 8,617.70 |
| | TATTINI ANTHONY R | 272-JNY | x | 191 | 361.75 | 9,043.85 |
| | ZARLENGO COLLIN M | 272-APP | x | 114.5 | 86.75 | 2,168.63 |

| | | |
|---|---|---|
| Total this month | 1223 | $ 1,984.64  $ 49,616.07 |
| (1) Amount due at $ 33.470 per hour | $ 40,933.81 | |
| + (2) Total dues withheld | $ 1,984.64 | |
| = Subtotal | $ 42,918.45 | |
| Prior Balance Due or (Cr. Available) | $ | |
| Grand Total | $ 42,918.45 | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

DEC 18 2018

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE  Tony Brusa

TITLE  President CRC-00401

OWNER-PARTNER-OFFICER

BY:

CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

**SEE INSTRUCTIONS ON REVERSE**

☐ NO EMPLOYEES THIS MONTH ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME ☐ SEND MORE FORMS

| PAGE NO. | 1 |
| ACCOUNT NO. | 25435 |

| H & W | 11.790 |
| Pen/Supp | 20.410 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

DUE BY 1/15/2019

DOCK & DOOR INSTALL, INC.
27 E 36TH PL
STEGER IL 60475-1762

*NOT APPLICABLE FOR WORK PERFORMED UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY **4** % OF EACH EMPLOYEES MONTHLY GROSS WAGES

Month of DECEMBER 2018

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | X | 143.5 | 182.60 | 4564.88 |
| | BARA DANIEL | 174-JNY | X | 138 | 264.21 | 6605.33 |
| | CRUIKSHANK DONALD | 272- | X | 139.5 | 263.27 | 6581.66 |
| | GREEN DAVID J | 272-JNY | X | 144 | 272.74 | 6818.40 |
| | JANOTA ROBERT E | 272-JNY | X | 0 | 0 | 0 |
| | KELLY NICOLAS J | 272-APP | X | 146.5 | 153.60 | 3840.09 |
| | RODGERS JACOB H | 174-JNY | X | 135 | 264.21 | 6605.33 |
| | TATTINI ANTHONY R | 272-JNY | X | 156 | 295.46 | 7386.60 |
| | ZARLENGO COLLIN M | 272-APP | X | 142 | 110.23 | 2755.78 |
| | Georges, Brian | 272-JNY | | 8 | 15.15 | 378.80 |

| Total this month | 1,151.5 | $1,822.47 | $45,536.87 |
| (1) Amount due at $ 33.470 per hour | $ 38,540.71 |
| + (2) Total dues withheld | $ 1,822.47 |
| = Subtotal | $ 40,363.18 |
| Prior Balance Due or (Cr. Available) | $ |
| Grand Total | $ 40,363.18 |

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO: CHICAGO CARPENTERS TRUST FUNDS P.O. BOX 94432 CHICAGO, IL 60690

JAN 18 2019

AUTHORIZED SIGNATURE Tony Brunei
TITLE President MACRC-00402
CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

| | |
|---|---|
| PAGE NO. | 1 |
| ACCOUNT NO. | 25435 |

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 20.410 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY 2/15/2019

DOCK & DOOR INSTALL, INC.
27 E 36TH PL
STEGER IL 60475-1762

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY _____ % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!   Month of **JANUARY 2019**

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | x | 123.5 | 168.88 | 4222.10 |
| | BARA DANIEL G | 174-JNY | x | 0 | 0 | 0 |
| | CRUIKSHANK DONALD | 272- | | 119 | 226.33 | 5658.33 |
| | GREEN DAVID J | 272-JNY | x | 155.5 | 237.70 | 5942.43 |
| | KELLY NICOLAS J | 272-APP | x | 108.5 | 155.97 | 3899.27 |
| | RODGERS JACOB H | 174-JNY | x | 0 | 0 | 0 |
| | TATTINI ANTHONY R | 272-JNY | x | 150 | 284.10 | 7102.50 |
| | ZARLENGO COLLIN M | 272-APP | x | 45 | 34.09 | 852.30 |

| | | |
|---|---|---|
| Total this month | 671.5 | $ 1,107.07   $ 27,676.93 |
| (1) Amount due at $ 33.470 per hour | | $ 22,475.11 |
| + (2) Total dues withheld | | $ 1,107.07 |
| = Subtotal | | $ 23,582.18 |
| Prior Balance Due or (Cr. Available) | | $ |
| Grand Total | | $ 23,582.18 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

FEB 20 2019

BY: _____

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE   *Tony Brunei*

TITLE   *President*   MACBC-00403
OWNER-PARTNER-OFFICER

CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
## Combined Fringe Benefit Funds and Dues Checkoff Report
### Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

| | |
|---|---|
| PAGE NO. | 1 |
| ACCOUNT NO. | 25435 |

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 20.410 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

**SEE INSTRUCTIONS ON REVERSE**

☐ NO EMPLOYEES THIS MONTH   ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME   ☐ SEND MORE FORMS

DUE BY 4/15/2019

DOCK & DOOR INSTALL, INC.
27 E 36TH PL
STEGER IL 60475-1762

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY **4** % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!

Month of  MARCH  2019

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | X | 167 | 205.81 | 5140.26 |
| | CRUIKSHANK DONALD | 272-JNY | X | 144 | 272.74 | 6818.40 |
| | GREEN DAVID J | 272-JNY | X | 178 | 337.12 | 8428.30 |
| | KELLY NICOLAS J | 272-APP | X | 160.5 | 147.85 | 3696.36 |
| | TATTINI ANTHONY R | 272-JNY | X | 200 | 378.80 | 9470.00 |
| | ZARLENGO COLLIN M | 272-APP | X | 95 | 71.92 | 1799.30 |
| | | | | 944.5 ✓ | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

| | | | |
|---|---|---|---|
| Total this month | | $ 1414.04 | $ 35,352.62 ✓ |
| (1) Amount due at $ 33.470 per hour | $ | 31,612.42 | |
| + (2) Total dues withheld | $ | 1,414.04 | |
| = Subtotal | $ | 33,026.46 | |
| Prior Balance Due or (Cr. Available) | $ | | |
| Grand Total | $ | 33,026.46 | |

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

APR 16 2019

REPORT MUST BE SIGNED! ►

AUTHORIZED SIGNATURE _Andrew Bruno_

TITLE _President_ MACRC-00404
OWNER-PARTNER-OFFICER

CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
**Combined Fringe Benefit Funds and Dues Checkoff Report**
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

| | PAGE NO. | ACCOUNT NO. |
|---|---|---|
| | 1 | 25435 |

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 20.410 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH  ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME  ☐ SEND MORE FORMS

DUE BY 5/15/2019

DOCK & DOOR INSTALL, INC.
27 E 36TH PL
STEGER IL 60475-1762

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT
DUES CHECKOFF IS CURRENTLY  4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

3/620  Month of  APRIL  2019

MUST BE SHOWN!   WATCH SPELLING!   PLEASE PRINT!

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272–APP | x | 108 | 132.97 | 3,324.29 |
| | CRUIKSHANK DONALD | 272– | x | 105 | 198.87 | 4,971.75 |
| | GREEN DAVID J | 272–JNY | x | 118 | 223.49 | 5,587.31 |
| | KELLY NICOLAS J | 272–APP | x | 102 | 96.61 | 2,415.36 |
| | TATTINI ANTHONY R | 272–JNY | x | 107 | 202.66 | 5,066.45 |
| | ZARLENGO COLLIN M | 272–APP | x | 77.5 | 58.71 | 1,467.95 |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

| | | |
|---|---|---|
| Total this month | 617.5 | $ 913.31 | $22,832.96 |
| (1) Amount due at $ 33.470 per hour | $ 20,667.73 | |
| + (2) Total dues withheld | $ 913.31 | |
| = Subtotal | $ 21,581.04 | |
| Prior Balance Due or (Cr. Available) | $ | |
| Grand Total | $ 21,581.04 | |

AN 'X' INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

MAY 20 2019

BY: ___ O.G. ___

REPORT MUST BE SIGNED! ▶

AUTHORIZED SIGNATURE  _Tony Brucci_

TITLE  _President_ MACRC-00405
OWNER-PARTNER-OFFICER

CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
## Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

**PAGE NO.** 1

**ACCOUNT NO.** 25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 20.410 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH  ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME  ☐ SEND MORE FORMS

**DUE BY** 6/15/2019

DOCK & DOOR INSTALL, INC.
27 E 36TH PL
STEGER IL 60475-1762

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY ____ % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

**MUST BE SHOWN!  WATCH SPELLING!  PLEASE PRINT!**

**Month of** MAY 2019

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | X | 83 | 107.49 | 2,687.30 |
| | | | | 102 | 193.19 | 4,829.70 |
| | CRUIKSHANK DONALD | 272 | X | 158 | 299.25 | 7,481.30 |
| | GREEN DAVID J | 272-JNY | X | 111 | 112.71 | 2,817.84 |
| | KELLY NICOLAS J | 272-APP | X | 160.5 | 304.46 | 7,611.51 |
| | TATTINI ANTHONY R | 272-JNY | X | 151 | 141.67 | 3,541.78 |
| | ZARLENGO COLLIN M | 272-APP | X | | | |
| | | | | | | |

over Old

| | | |
|---|---|---|
| REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES! | **Total this month** | 765.5 | $1,158.77 | $28,969.43 |

(1) Amount due at $ 33.470 per hour $25,621.278
+ (2) Total dues withheld $1,158.77
= Subtotal $26,780.085
Prior Balance Due or (Cr. Available) $
**Grand Total** $26,780.06

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

I certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective Bargaining Agreement and the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

JUN 18 2019

**REPORT MUST BE SIGNED** ▶

**SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO:**
CHICAGO CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

**AUTHORIZED SIGNATURE** Tony Basuri

**TITLE** President

OWNER-PARTNER-OFFICER

MACRC 00406

CC-202-R 2/11

## CHICAGO REGIONAL COUNCIL OF CARPENTERS
### Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

| PAGE NO. | ACCOUNT NO. |
|---|---|
| 1 | 25435 |

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 21.840 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

**SEE INSTRUCTIONS ON REVERSE**

☐ NO EMPLOYEES THIS MONTH    ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME    ☐ SEND MORE FORMS

DUE BY 7/15/2019

DOCK & DOOR INSTALL, INC.
27 E 36TH PL
STEGER IL 60475-1762

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY 4 % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

MUST BE SHOWN!    WATCH SPELLING!    PLEASE PRINT!

Month of JUNE 2019

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | x | 61 | 77.01 | 1925.16 |
| | CRUIKSHANK DONALD | 272-JNY | x | 49.5 | 96.13 | 2403.23 |
| | GREEN DAVID J | 272-JNY | x | 96 | 186.43 | 4660.81 |
| | KELLY NICOLAS J | 272-APP | x | 62 | 74.78 | 1869.41 |
| | TATTINI ANTHONY R | 272-JNY | x | 62.5 | 122.83 | 3070.79 |
| | ZARLENGO COLLIN M | 272-APP | x | 61.5 | 48.16 | 1204.04 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH, LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

AN "X" INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

| | | | |
|---|---|---|---|
| Total this month | 392.5 | $ 605.34 | $15,133.44 |
| (1) Amount due at $ 34.900 per hour | $ 13,698.25 | | |
| + (2) Total dues withheld | $ 605.34 | | |
| = Subtotal | $ 14,303.59 | | |
| Prior Balance Due or (Cr. Available) | $ | | |
| Grand Total | $ 14,303.59 | | |

We certify the above is a true and complete report of actual hours worked by foremen, journeymen, and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Area Collective [Bargaining] Agreements and Declarations of Trust under which the Chicago Regional Council of [Carpenters] Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

RECEIVED
JUL 17 2019
BY:

REPORT MUST BE SIGNED!

SUBMIT ONE CHECK FOR THE
GRAND TOTAL & MAKE
PAYABLE TO:
CHICAGO
CARPENTERS TRUST FUNDS
P.O. BOX 94432
CHICAGO, IL 60690

AUTHORIZED SIGNATURE _Tony Brux_

TITLE President MACRC-00407

OWNER-PARTNER-OFFICER

CC-202-R 2/11

# CHICAGO REGIONAL COUNCIL OF CARPENTERS
## Combined Fringe Benefit Funds and Dues Checkoff Report
Fringe Benefits: 312/787-9455, Option #5. Regional Council: 312/787-3076

PAGE NO. 1

ACCOUNT NO. 25435

| | |
|---|---|
| H & W | 11.790 |
| Pen/Supp | 21.840 |
| Appren. | .630 |
| INTL FND | .100 |
| LAB MT/CAF | .460 |
| MIAF | .060 |
| *Safety | .010 |
| *CISCO | .010 |

### SEE INSTRUCTIONS ON REVERSE

☐ NO EMPLOYEES THIS MONTH  ☐ CHANGE OF ADDRESS

☐ CHANGE OF NAME  ☐ SEND MORE FORMS

DUE BY  8/15/2019

*NOT APPLICABLE FOR WORK PERFORMED
UNDER THE RESIDENTIAL AGREEMENT

DUES CHECKOFF IS CURRENTLY     % OF EACH
EMPLOYEES MONTHLY GROSS WAGES

DOCK & DOOR INSTALL, INC.
27 E 36TH PL
STEGER IL 60475-1762

MUST BE SHOWN!    WATCH SPELLING!    PLEASE PRINT!

Month of  JULY    2019

| Participant I.D. Number | Carpenter's Name | Local & Class | X | Total Actual Hours Worked (1) | Dues Withheld (2) | Gross Wages |
|---|---|---|---|---|---|---|
| | AGUIRRE GARCIA JOSE L | 272-APP | X | 78 | 98.47 | 2461.68 |
| | CRUIKSHANK DONALD | 272-JNY | X | 103 | 200.51 | 5012.79 |
| | GREEN DAVID J | 272-JNY | X | 91 | 176.72 | 4418.06 |
| | KELLY NICOLAS J | 272-APP | X | 110.5 | 108.05 | 2701.15 |
| | TATTINI ANTHONY R | 272-JNY | X | 136 | 266.05 | 6651.35 |
| | ZARLENGO COLLIN M | 272-APP | X | 96.5 | 76.13 | 1903.16 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | 925.93 | |

REPORT DUE ON OR BEFORE THE 15TH OF THE MONTH. LATE PAYMENTS WILL BE CHARGED 1.5% PER MONTH, COMPOUNDED, AS LIQUIDATED DAMAGES!

Total this month  615  $  $23,148.19

(1) Amount due at $ 34.900 per hour  $ 21,463.50
+ (2) Total dues withheld  $ 925.93
= Subtotal  $ 22,389.43
Prior Balance Due or (Cr. Available)  $
Grand Total  $ 22,389.43

AN 'X' INDICATES THE REGIONAL COUNCIL HAS A DUES CHECKOFF AUTHORIZATION FORM ON FILE

We certify the above is a true and complete report of actual hours worked by foremen, journeymen and apprentice carpenters, and does NOT include hours worked by any self-employed persons, partners or proprietors of the firm. We hereby agree to be bound by and ratify, confirm, and adopt all of the provisions of the Agreements and Declarations of Trust under which the Chicago Regional Council of Carpenters Fringe Benefit Funds are maintained. We agree to keep and maintain contemporaneous time records reporting the hours being reported herein.

AUG 19 2019

BY:

REPORT MUST BE SIGNED!

AUTHORIZED SIGNATURE  Tony Brown

SUBMIT ONE CHECK FOR THE GRAND TOTAL & MAKE PAYABLE TO: CHICAGO CARPENTERS TRUST FUNDS P.O. BOX 94432 CHICAGO, IL 60690

TITLE  President RC-00408

OWNER-PARTNER-OFFICER

CC-202-R 2/11

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 73

**From:** Callie Stephens <callie@ginerisltd.com>
**Sent:** Monday, October 17, 2016 2:51 PM
**To:** Tony Brutti
**Subject:** Re: New Employee

What's his hourly rate?

Sincerely,
Callie Stephens, EA

**Gineris & Associates, LTD**
2005 Hart St.
Dyer, IN 46311
(T) 219.864.4800 x117
(C) 219.746.3843
(F) 219.864.4297
www.ginerisltd.com

### Your Success is Our Business

On Mon, Oct 17, 2016 at 1:00 PM, Tony Brutti <ajbrutti@gmail.com> wrote:
Hi Callie, I have a new employee starting this pay period for me. Jose' from Midwest Dock is gonna work for Dock and Door now. Can you just transfer over all the paperwork or do you need me to get all his info from him?

--
Yours,

Tony Brutti
Dock & Door Install Inc.
815-922-5258
ajbrutti@gmail.com



1

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 74

**From:** Callie Stephens <callie@ginerisltd.com>
**Sent:** Thursday, September 27, 2018 12:12 PM
**To:** Payroll
**Subject:** Re: Payroll changes

See below -

 **Callie Stephens**
EA, Account Manager at Gineris & Associates, Ltd

**GINERIS**
& ASSOCIATES

**A** 2005 Hart St, Dyer IN 46311
**D** 219.359.4157  **P** 219.864.4800 Ext.117  **F** 219.864.4297  **E** callie@ginerisltd.com  **W** https://GinerisLtd.com

 

Relationships + Service = Success

📗 Schedule a meeting with me

👥 Watch our Webinar: Tax Strategies to Maximize Wealth for Small Businesses



---------- Forwarded message ---------
**From: Gineris Payroll** <payroll@ginerisltd.com>
Date: Thu, Sep 27, 2018 at 9:12 AM
Subject: Re: Payroll changes
To: Callie Stephens <callie@ginerisltd.com>

Callie

James Kelly - He has been paid all four weeks in September.  Keep his for weekly
The monthly payroll to be submitted on 10.4.18 is for Pay Period 9.1.18 to 9.30.18.
Should he start his monthly payroll after that?

Nicolas Kelly - He is in both companies. Can I put the termination date as 9.27.18 in both? Only
terminate him in Midwest Dock.  Dock & Door is the "union side" so he should remain active there.

*This email is for payroll and monitored only a few hours each day.  Please only send non-urgent payroll related emails to this address.*

Thank you.  Have a great day!

Gineris & Associates, Ltd
2005 Hart St.
Dyer, IN 46311
(T) 219-864-4800
(F) 219-864-4297

1



www.ginerisltd.com

On Wed, Sep 26, 2018 at 3:45 PM Callie Stephens <callie@ginerisltd.com> wrote:
Hema -

Please update Midwest Dock and Dock & Door; see below.



**Callie Stephens**
EA, Account Manager at Gineris & Associates, Ltd

**GINERIS**
& ASSOCIATES

A 2005 Hart St, Dyer IN 46311
D 219.359.4157  P 219.864.4800 Ext.117  F 219.864.4297  E callie@ginerisltd.com  W https://GinerisLtd.com

  

Relationships + Service = Success

Schedule a meeting with me

Watch our Webinar:Tax Strategies to Maximize Wealth for Small Businesses

---------- Forwarded message ---------
From: **Sherri Webber** <sherri@midwestdocksolutions.com>
Date: Wed, Sep 26, 2018 at 2:35 PM
Subject: Payroll changes
To: Callie Stephens <callie@ginerisltd.com>
Cc: Tony Zarlengo <tony@midwestdocksolutions.com>

Hi Callie,

I paid James Kelly on the weekly payroll this week, but Tony wants him added to the monthly payroll from now on.  His yearly salary is going to be $73,500.00.  Do you want to make that change in ADP or should I do it?

Also, Nico Kelly is on the union side now so I won't be paying him any longer thru ADP. Should I change anything in ADP so he doesn't show up on the payroll list any longer?

Sherri
Midwest Dock Solutions
27 E. 36th Pl.
Steger, IL  60475
708-367-0801

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 75

   My Network ·  Jobs ·  Messaging ·  Notifications ·  Me ▾ ·  For Business ▾ ·  Try for $0: Pre



## Quinten Williams · 3rd

Union Carpenter Local 272 Chicago, 60628

- Local 272

- United Brotherhood of Carpenters and Joiners of America

Chicago Heights, Illinois, United States · Contact info

9 connections

Connect  ( Message )  ( More )

## Activity

9 followers

Posts  ( Comments )  ( Images )

**Quinten Williams** posted this · 3w

 I started my Carpentry Journey at the age of 12 with my father and grandfather. Im 25 now and I'm still perfecting the craft👏🏾

 1

Show all posts →

## Experience

**Union Carpenter**
Local 272 · Full-time
Nov 2019 - Present · 4 yrs 9 mos

🏆 Carpentry, Framing and +2 skills

**Union Carpenter**
Midwest dock and door · Full-time
Jul 2022 - Oct 2023 · 1 yr 4 mos

 **Union Carpenter**
Adjustable Concrete Construction · Full-time
Jul 2022

🏆 Scaffolding, Hand Tools and +1 skill

 **Union Carpenter**
Milhouse Engineering and Construction, Inc. · Full-time
Aug 2021 - Apr 2022 · 9 mos



PLAINTIFF'S EXHIBIT 2

Chicago, Illinois, United States
- Heavy Gage Framing
- Light Gage Framing...          ...see more

⬦ Hand Tools, Power Tools and +1 skill

 **Union Carpenter**
Doral Corporation · Full-time
Mar 2021 - Jul 2021 · 5 mos
Matteson, Illinois, United States

- Assembled and Installed Tiffin Chutes
- Installed Conveyor Systems...          ...see more

⬦ Hand Tools and Power Tools

Show all 6 experiences →

## Education

**United Brotherhood of Carpenters and Joiners of America**
Carpentry, Carpentry/Carpenter
Sep 2019 - Nov 2019

⬦ Scaffolding, Hand Tools and +4 skills

## Licenses & certifications

 **First Aid, CPR and AED**
United Brotherhood of Carpenters & Joiners of America

**Intro to Welding 75 Hours ( GMAW, GTAW, OFC, & PAC)**
South Suburban College HCCTP

Show all 7 licenses & certifications →

## Skills

**Power Tools**

5 experiences across Local 272 and 4 other companies

United Brotherhood of Carpenters and Joiners of America

**Drywall**

 Union Carpenter at Milhouse Engineering and Construction, Inc.

United Brotherhood of Carpenters and Joiners of America

Show all 6 skills →

## Interests

**Companies**   Newsletters

**Trammell Crow Company**
55,152 followers
( + Follow )

**Turner Construction Company**
634,299 followers

+ Follow

Show all companies →



**Other similar profiles**

**Joe Iwanus** · 3rd
Carpenter local 272

View profile

**Talaun Valliant** · 3rd
Site Superintendent

View profile

**Eric Furlong** · 3rd
Project Manager, Mission Critical at Aldridge Electric

View profile

**Jacqueline Harris** · 3rd+
Teacher at CPS

🔒 Message

**John Mudro** · 3rd
President at Mudro Inc.

View profile

Show all

**Grow your network**
Premium peer suggestions

**Paul Henkelmann** 🔗 · 2nd
Partner and Patent Attorney at Fitch, Even, Tabin & Flannery LLP | Patent
Post-Issuance Proceedings, US and International Patent Procurement,...

👤 Connect

**Brian Hurst** 🔗 · 2nd
Partner at Hurst, Robin, Kay & Allen, LLC

👤 Connect

**People you may know**
From Quinten's industry



**Edmund Sexton**
Representative
Mid-America Carpenters Regional Council
🔗+ Connect

**Geraldine Barrett**
Mid-America Carpenters Regional Council
🔗+ Connect

**Frankie Guzman**
"Logic will get you from A to B. Imagination will take you everywhere"
🔗+ Connect

**Josh Jourdan**
Vice President at Professional Paving and Concrete Inc
🔗+ Connect

**Angela Dillon** 🔗
Owner and Chief Operating Officer
🔗+ Connect

Show all



Promoted •••

**Family business success**
Family Business Programs—In-Person and Virtual. Apply now.
Adrienne & 2 other connections also follow Harvar...

**Urgent Need for Attorneys**
We need attorneys to help our legal clients. Free trial to view cases.

About
Professional Community Policies
Privacy & Terms ▾
Sales Solutions
Safety Center

Accessibility
Careers
Ad Choices
Mobile

Talent Solutions
Marketing Solutions
Advertising
Small Business

❓ **Questions?**
Visit our Help Center.

⚙ **Manage your account and privacy**
Go to your Settings.

🛡 **Recommendation transparency**
Learn more about Recommended Content.

Select Language
English (English)

LinkedIn Corporation © 2024

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 76

SERIAL: 10839 PROCESSDATE: 9/24/2019 AMOUNT:
$1,324.68 SEQUENCE:  TRANCODE: 211

**MIDWEST DOCK SOLUTIONS** 03-07
27 E. 36TH PLACE
STEGER, IL 60476

10839

DATE 9/24/19

PAY TO THE ORDER OF  TONY TATTINI                    $ 1,324.68

One Thousand Three Hundred Twenty Four + 68/100 DOLLARS

**First Midwest Bank**
www.firstmidwest.com

FOR

Mike S. Richen

⑈010839⑈

SERIAL: 10838 PROCESSDATE: 9/24/2019 AMOUNT:
$827.88 SEQUENCE:  TRANCODE: 211

**MIDWEST DOCK SOLUTIONS** 03-07
27 E. 36TH PLACE
STEGER, IL 60476

10838

DATE 9/24/19

PAY TO THE ORDER OF  TONY TATTINI                    $ 827.88

Eight Hundred Twenty Seven + 88/100 DOLLARS

**First Midwest Bank**
www.firstmidwest.com

FOR

Mike S. Richen

⑈010838⑈



PLAINTIFF'S
EXHIBIT
35

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 77

Intentionally Omitted

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 78

Intentionally Omitted

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 79

Intentionally Omitted

1:24-cv-06428

Plaintiffs' Local Rule
56.1 Statement

EXHIBIT 80

Intentionally Omitted