UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| MID-AMERICA CARPENTERS REGIONAL COUNCIL PENSION FUND; *et al.,*<br><br>Plaintiffs,<br>v.<br><br>DOCK & DOOR INSTALL, INC., *et al*.,<br><br>Defendants. | 24-cv-06428<br><br>Judge Andrea R. Wood<br><br>Magistrate Judge Jeannice W. Appenteng |

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACT IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT PURSUANT TO LOCAL RULE 56.1**

**EXHIBITS 101-125**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOI
EASTERN DIVISION

MID-AMERICA CARPENTERS REGIONAL COUNCIL PENSION FUND; *et al.*,

Plaintiffs,

v.

DOCK & DOOR INSTALL, INC., an Illinois corporation and MIDWEST DOCK SOLUTIONS, INC., an Illinois corporation,

Defendants.

Case No 1:24-cv-06428

Judge Andrea R. Wood

Magistrate Judge Jeannice W. Appenteng

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACT IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT PURSUANT TO LOCAL RULE 56.1**

**LIST OF EXHIBITS**

| | |
|---|---|
| 1 | Declaration of John Conklin |
| 2 | Deposition Transcript of Anthony Zarlengo |
| 3 | Deposition Transcript of Anthony Brutti |
| 4 | Deposition Transcript of Michael Richert |
| 5 | Midwest Dock Solutions Inc. Articles of Incorporation, May 16, 2006, (Exhibit 79) |
| 6 | Midwest Dock Solutions Inc. Facebook Page, (Exhibit 53) |
| 7 | Deposition Transcript of Zachary Corrigan |
| 8 | Deposition Transcript of Donald Cruikshank |
| 9 | Defendant Midwest Dock Solutions, Inc.'s Answer, [ECF#18], (Exhibit 120) |
| 10 | One Jobsite Agreement Between Midwest Dock Solutions, Inc. and Chicago Regional Council of Carpenters n/k/a Mid-America Carpenters Regional Council, Nov. 11, 2011 and GoogleMaps Screenshot of Winpak Portion Packaging Facility, Sauk Village, IL, (Exhibit 81) |
| 11 | Midwest Dock Solutions, Inc.'s Fringe Benefit Contribution Reports (Exhibit 85) |
| 12 | Deposition Transcript of David Green |
| 13 | Krusinski Construction Company Cover Letter, Jun. 11, 2014, Subcontract Agreement, Midwest Dock Solutions, Inc. Certificates of Insurance, Compstak Website, Midwest Dock Solutions, Inc. Facebook Page, and GoogleMaps Images of 14907 Gougar Road, (Exhibit 104) |
| 14 | Midwest Dock Solutions, Inc.'s Facebook Page, (Exhibit 19) |

| | |
|---|---|
| 15 | Deposition Transcript of Anthony Tattini |
| 16 | Midwest Dock Solutions, Inc.'s Website, (Exhibit 57) |
| 17 | Intentionally Omitted |
| 18 | Deposition Transcript of Quinten Williams |
| 19 | Subcontract Agreement Between Pepper Construction Company and Midwest Dock Solutions Inc. for North American Warehouse Expansion, Glenview, Illinois, May 15, 2020, (Exhibit 61) |
| 20 | Declaration of S. Oertley, Senior Contract Specialist, Pepper Construction Company, Nov. 4, 2025 |
| 21 | Meridian Design Build: Subcontract between Meridian Design Build and Midwest Dock Solutions, Inc. for 1303 Jack Court Facility Upgrades, Bartlett, IL, May 28, 2024, (Exhibit 65) |
| 22 | Opus Design Build LLC Subcontract Agreement between Midwest Dock Solutions, Inc. and Opus Design Build LLC for Mokena Industrial Supply Spec Building A, Dec. 9, 2019 |
| 23 | Deposition Transcript of Ira Sugar |
| 24 | Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, (Exhibit 40) |
| 25 | Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, (Exhibit 221) |
| 26 | Deposition Transcript of Zachary Torkelson |
| 27 | Articles of Incorporation of Dock & Door Install, Inc., Jul. 11, 2014, (Exhibit 214) |
| 28 | Photograph of Anthony Brutti Race Car, (Exhibit 118) |
| 29 | Dock & Door Install, Inc. Answer, [ECF#17], (Exhibit 265) |
| 30 | Memorandum of Agreement between Dock & Door Install, Inc. and the Chicago Regional Council of Carpenters, Sep. 18, 2014, (Exhibit 219) |
| 31 | Memorandum of Agreement between Dock & Door Install, Inc. and the Chicago Regional Council of Carpenters, Aug. 15, 2019 |
| 32 | Defendant Dock & Door Install, Inc.'s Responses to Plaintiffs' Document Requests, Dec. 2, 2024 |
| 33 | Text Message Exchange between Callie Stephens (Gineris & Associates) and Tony Brutti, (Exhibit 106) |
| 34 | Dock & Door Install Inc. Invoices to Midwest Dock Solutions, Inc., (Exhibit 223) |
| 35 | Email from Tony Brutti, Dock & Door Install, to Tom Downs, Holden Insurance, Jul. 1, 2025, (Exhibit 151) |
| 36 | Letter from Thomas Bennington, Jr. (Lawrence Kamin Saunders & Uhlenhop, LLC) to Anthony Zarlengo, Michael Richert, and Anthony Brutti, Jul. 9, 2014, (Exhibit 215) |
| 37 | Dock & Door Install Inc. Employer Questionnaire / Application to Chicago Regional Council of Carpenters, Aug. 5, 2014, (Exhibit 218) |

| | |
|---|---|
| 38 | ADP Client Account Agreement and Authorization to Debit/Credit for Midwest Dock Solutions Inc., Oct. 6, 2016 |
| 39 | ADP Client Account Agreement and Authorization to Debit/Credit for Dock &Door Install, Inc., Oct. 6, 2016 |
| 40 | Subcontract Agreement Midwest Dock Solutions Inc. and Clayco Inc., (Exhibit 99) |
| 41 | Subcontract Agreement between Midwest Dock Solutions, Inc. and Opus Design Build LLC for Euclid Beverage Expansion Product, Mar. 26, 2024 |
| 42 | ARCO/Murray Construction Company: Subcontract Agreement between Midwest Dock Solutions, Inc. and ARCO/Murray National Construction Company, Inc., Feb. 27, 2023 SUBJECT TO PROTECTIVE ORDER - TO BE FILED SEPARATELY |
| 43 | Intentionally Omitted |
| 44 | Dock & Door Install Inc. Certificate of Insurance for Krusinski Construction Company, Aug 6, 2020, (Exhibit 256) |
| 45 | Dock & Door Install Inc. Certificate of Insurance for Meridian Design Build, Inc., Apr 14, 2025, (Exhibit 257) |
| 46 | Intentionally Omitted |
| 47 | Midwest Dock Solutions, Inc. Certificates of Insurance to Krusinski Construction Company, (Exhibit 280) |
| 48 | Midwest Dock Solutions, Inc. Certificates of Insurance to Opus Design Build LLC, (Exhibit 282) |
| 49 | Midwest Dock Solutions, Inc. Certificates of Insurance to Meridian Design Build LLC, (Exhibit 279) |
| 50 | Midwest Dock Solutions, Inc. Certificate of Insurance for ARCO/Murray, LLC, (Exhibit 259) |
| 51 | Dock & Door Install Inc. Certificate of Insurance for ARCO/Murray National Holdings, Inc., Mar. 20, 2020, (Exhibit 254) |
| 52 | Midwest Dock Solutions, Inc. Certificates of Insurance to Principle Construction Company, Inc., (Exhibit 284) |
| 53 | Standard Form of Subcontract Agreement Between Principle Construction Corp. and Midwest Dock Solutions, Inc. for General RV Showroom Huntley, IL, Jan. 26, 2022, (Exhibit 64) |
| 54 | Dock & Door Install, Inc. 2016 IRS Form 1120-S (First page only), (Exhibit 172) |
| 55 | Dock & Door Install, Inc. 2017 IRS Form 1120-S (First page only), (Exhibit 175) |
| 56 | Dock & Door Install, Inc. 2018 IRS Form 1120-S (First page only), (Exhibit 178) |
| 57 | Dock & Door Install, Inc. 2019 IRS Form 1120-S (First page only), (Exhibit 181) |
| 58 | Dock & Door Install, Inc. 2020 IRS Form 1120-S (First page only), (Exhibit 184) |
| 59 | Dock & Door Install, Inc. 2021 IRS Form 1120-S (First page only), (Exhibit 187) |
| 60 | Dock & Door Install, Inc. 2022 IRS Form 1120-S (First page only), (Exhibit 190) |
| 61 | Dock & Door Install, Inc. 2023 IRS Form 1120-S (First page only), (Exhibit 193) |

| | |
|---|---|
| 62 | Deposition Transcript of Callie Stephens |
| 63 | Deposition Transcript of Sherri Webber |
| 64 | Steger, IL Application for Post Office Box Service, Jan. 11, 2021, (Exhibit 49) |
| 65 | Steger, IL P.O. Box Service Fee Notice of Midwest Dock Solutions and Credit Card Payment Receipts, (Exhibit 50) |
| 66 | Cincinnati Insurance Company Endorsement for Change of Address, Mar. 24, 2021, (Exhibit 240) |
| 67 | Cincinnati Insurance Company Billing Statements to P.O. Box 363 from Feb. 28, 2022 to Aug. 29, 2024, (Exhibit 48) |
| 68 | Dock & Door Install, Inc. Fringe Benefit Contribution Reports March 2021 to October 2023, (Exhibit 47) |
| 69 | Deposition Transcript of Richard Mantoan |
| 70 | Deposition Transcript of Nicolas Kelly |
| 71 | Deposition Transcript of Branden Bishop |
| 72 | Dock & Door Install Inc.'s Fringe Benefit Contribution Reports September 2014 to July 2019, (Exhibit 220) |
| 73 | Email from Callie Stephens (Gineris & Associates) to Tony Brutti, Oct. 17, 2016, (Exhibit 222) |
| 74 | Email from Sherri Webber to Callie Stephens (Gineris & Associates), Sep. 26, 2018, (Exhibit 211) |
| 75 | Quinten Williams LinkedIn Page (Exhibit 2) |
| 76 | Tony Tattini Checks from Midwest Dock Solutions, (Exhibit 35) |
| 77 | Intentionally Omitted |
| 78 | Intentionally Omitted |
| 79 | Intentionally Omitted |
| 80 | Intentionally Omitted |
| 81 | David Green and Anthony Tattini W-2s for 2017, (Exhibit 261) |
| 82 | Anthony Brutti W-2 for 2017, (Exhibit 173) |
| 83 | Anthony Brutti W-2 for 2018, (Exhibit 176) |
| 84 | Don Cruikshank, David Green, and Anthony Tattini W-2s for 2018, (Exhibit 262) |
| 85 | Anthony Brutti W-2 for 2019, (Exhibit 179) |
| 86 | Anthony Brutti W-2 for 2020, (Exhibit 182) |
| 87 | Anthony Brutti W-2 for 2021, (Exhibit 185) |
| 88 | Anthony Brutti W-2 for 2022, (Exhibit 188) |
| 89 | Jose Aguirre, Don Cruikshank, David Green, Eric Jansma, Nicolas Kelly and Collin Zarlengo W-2s for 2022, (Exhibit 264) |
| 90 | Anthony Brutti W-2 for 2023 (Exhibit 191) |

| | |
|---|---|
| 91 | Jose Aguirre, David Green, Eric Jansma, Nicolas Kelly and Collin Zarlengo W-2s for 2023, (Exhibit 263) |
| 92 | David Green W-2s for 2020-2024, (Exhibit 28) |
| 93 | Blue Book Building & Construction Network ProView Worksheet and Contract |
| 94 | The Blue Book Building & Construction Network Contract for the Period August 2021 through July 2023, Apr. 14, 2021, (Exhibit 105) |
| 95 | The Blue Book Building & Construction Network Contract for the Period August 2021 through July 2023, Apr. 14, 2021 |
| 96 | Email from Ira Sugar, Midwest Dock Solutions Inc., to Zach Adkins, Pepper Construction Company, Nov. 4, 2019, (Exhibit 60) |
| 97 | Bid Proposal by Midwest Dock Solutions, Inc. to Opus Design Build LLC, Jan. 21, 2022 for MTC Kenosha 2021, (Exhibit 100) |
| 98 | Photograph of Midwest Dock Solutions Truck, (Exhibit 8) |
| 99 | Photograph of Midwest Dock Solutions Truck, (Exhibit 5) |
| 100 | Photograph of Midwest Dock Solutions Truck, (Exhibit 6) |
| 101 | Photograph of Midwest Dock Solutions Shirt (Exhibit 15) |
| 102 | Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' Second Set Of Interrogatories And Document Production Requests |
| 103 | Dock & Door, Inc. Deposit Summary, Sep. 1, 2022, Midwest Dock Solutions Inc. Payment of $10,972, Dock & Door Install Inc. Invoices to Midwest Dock Solutions Inc., (Exhibit 168) |
| 104 | Email from Tony Brutti to Margaret Stredde (Esser Hayes), Apr. 20, 2021, (Exhibit 52) |
| 105 | Email Exchange Between Tony Brutti, Zack Adkins (Pepper Construction) and Ira Sugar, (Exhibit 241) |
| 106 | Email Exchange Between Tony Brutti and Zack Adkins (Pepper Construction), (Exhibit 242) |
| 107 | Email Exchange Between Tony Brutti and Christi Adams (Pepper Construction), (Exhibit 243) |
| 108 | Email Communications from Sherri Webber to Tony Brutti and Tony Zarlengo, (Exhibit 244) |
| 109 | Email Exchange Between Tony Brutti and Christi Adams (Pepper Construction), (Exhibit 246) |
| 110 | Email Exchange Between Tony Brutti and Thomas Braun (Pepper Construction), (Exhibit 250) |
| 111 | Email from Tony Brutti (Midwest Dock Solutions Inc.) to Christi Adams (Pepper Construction), Mar. 28, 2024, (Exhibit 249) |
| 112 | Email from Tony Brutti, Midwest Dock Solutions Inc., to Christi Adams, Pepper Construction, Mar. 28, 2024, (Exhibit 98) |

| | |
|---|---|
| 113 | Deposition Transcript of Veronica O'Connor |
| 114 | Email from Tony Brutti (Midwest Dock Solutions Inc.) to Margaret Stredde (Esser Hayes), Oct. 22, 2020, (Exhibit 287) |
| 115 | Email from Margaret Stredde (Esser Hayes) to Tony Brutti (Midwest Dock Solutions Inc.), Oct. 22, 2020, (Exhibit 288) |
| 116 | Midwest Dock Solutions, Inc. Certificate of Insurance for Principle Construction Corp., Oct. 16, 2020 |
| 117 | Email from Tony Brutti (Midwest Dock Solutions Inc.) to Margaret Stredde (Esser Hayes), Oct. 23, 2020, (Exhibit 290) |
| 118 | Village of Hazel Crest Department of Building & Inspectional Services, Application for Contractor's Registration Certificate, Company Name: Midwest Dock Solutions |
| 119 | Email from Margaret Stredde, Esser Hayes, to Margaret Stredde, Oct. 23, 2020, (Exhibit 291) |
| 120 | Midwest Dock Solutions, Inc. Certificate of Insurance for Village of Hazel Crest, Oct. 23, 2020 |
| 121 | Email from Tony Brutti, Midwest Dock Solutions, to Cathie Demitropoulos, Assured Partners, Jan. 11, 2021, (Exhibit 293) |
| 122 | Text Message Between Callie Stephens, Gineris & Associates, Ltd. and Tony Zarlengo, Midwest Dock Solutions, Jun. 13, 2023, (Exhibit 107), EX. 122 |
| 123 | Text Message from Richard Mantoan to Tony Brutti (Exhibit 273) |
| 124 | Email from Mara Spring, Counsel for Holden Insurance, to Kevin McJessy, Plaintiffs' Counsel, Oct. 6, 2025, (Exhibit 253) |
| 125 | Deposition Transcript of Jacie Olson |

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 101

Search Facebook
Mike Richert
September 23, 2016 · Chicago ·
James Kelly hard at work once again!!!
MIDWEST DOCK
SPECIALIZING IN:
8
12 comments

PLAINTIFF'S
EXHIBIT
15
tabbies

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 102

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| MID-AMERICA CARPENTERS REGIONAL COUNCIL PENSION FUND; *et al.*<br><br>Plaintiffs,<br>v.<br><br>DOCK & DOOR INSTALL, INC., an Illinois corporation and MIDWEST DOCK SOLUTIONS, INC., an Illinois corporation,<br><br>Defendants. | Case No 1:24-cv-06428<br><br>Judge Andrea R. Wood<br><br>Magistrate Judge Jeannice W. Appenteng |
|---|---|

**DEFENDANT DOCK & DOOR INSTALL, INC.'S RESPONSES TO PLAINTIFFS' SECOND SET OF INTERROGATORIES AND DOCUMENT PRODUCTION REQUESTS**

Defendant DOCK & DOOR INSTALL, INC. answers Plaintiffs' second set of interrogatories and document production requests as follows:

**INTERROGATORIES**

**INTERROGATORY NO. 1**: Does Anthony Brutti, the owner of Dock & Door, have a familial relationship with either Michael Richert or Anthony Zarlengo, the owners of Midwest Dock; and, if so, what is the nature of their familial relationships?

**ANSWER:**

Anthony Brutti is the cousin of Michael Zarlengo
Anthony Brutti has not familial relationship with Tony Zarlengo

**INTERROGATORY NO. 2**: Did Anthony Brutti, the owner of Dock & Door, have health insurance at any time during the period January 1, 2020 to the present; if so, what companies provided Anthony Brutti with his health insurance and who paid the premiums for the insurance?

**ANSWER:**

Anthony Brutti has had health insurance with AmBetter during January 1, 2020 to present. Dock & Door paid the premiums.

**INTERROGATORY NO. 3**: Identify everyone on Exhibit A who was provided with a Midwest Dock company credit card.

**ANSWER:**

Defendant is without knowledge sufficient to respond to this interrogatory.

**INTERROGATORY NO. 4:** Identify everyone listed on Exhibit A who was provided with clothing with Midwest Dock's name on it, including everyone who was given a T-shirt or sweat shirt like the ones shown in in the following photographs:

**ANSWER:**

Defendant is without knowledge sufficient to respond to this interrogatory.

**INTERROGATORY NO. 5**: Identify every person who prepared invoices from Dock & Door to Midwest Dock like the one shown in Exhibit B.

**ANSWER:**

Only Anthony Brutti prepared invoices to Midwest Dock.

**RESPONSES TO DOCUMENT PRODUCTION REQUESTS**

1. Produce all communications between Dock & Door on the one hand and any of the following companies on the other hand during the period January 1, 2020 through the present:
    a. Arco/Murray Construction
    b. Krusinski Construction
    c. Meridian Design Build

    d.  Pepper Construction
    e.  Principle Construction
    f.  Opus Design Build
    g.  Peak Construction
    h.  Clayco
    i.  Morgan Harbour Construction
    j.  DH Pace

**RESPONSE:**

See Group Exhibit A.

2. Produce each certificate of insurance that Dock & Door or its insurance agent provided to any general contractor (including those listed above in document request number 1) for any projects during the period January 1, 2020 through the present along with documents such as emails or fax cover pages showing the transmittal of the insurance certificate to the general contractor.

**RESPONSE:**

See Group Exhibit A.

3. Produce all videos or photographs of any jobsite where either Dock & Door or Midwest Dock performed work for any of the general contractors identified in document request number 1.

**RESPONSE:**

Defendant does not possess any videos or photographs responsive to this request.

4. Produce all communications between Dock & Door on the one hand and Midwest Dock Solutions on the other hand.

**RESPONSE:**

Defendant does not possess any documents or other communications between Dock & Door and Midwest Dock.

5. Produce all communications between Dock & Door and the persons listed on Exhibit A.

**RESPONSE:**

Defendant does not possess any documents or other communications between Dock & Door and the persons listed on Exhibit A.

6.  Produce all job postings or job advertisements by Dock & Door regardless of date, including any postings in newspapers, on the internet, or on job listing services like LinkedIn, Indeed.com, Monster.com, and ZipRecruiter.com.

**RESPONSE:**

Defendant does not advertise or post jobs and therefore it does not possess any documents responsive to this request.

7.  Produce all job applications received by Dock & Door from the persons listed on Exhibit A.

**RESPONSE:**

Defendant did not receive job applications from the persons listed on Exhibit A and therefore does not possess any documents responsive to this request.

8.  Produce all documents related to Post Office Box 363, Steger, Illinois 60475 ("Box") regardless of date, including but not limited to any agreement related to the rental of the Box, fees paid for the Box, and documents showing who has access to the Box.

**RESPONSE:**

Defendant does not possess any documents related to Box..

9.  Produce the original excel spreadsheet(s) or other underlying electronic document (including all its metadata) used to create the invoices like the sample attached as Exhibit B.

**RESPONSE:**

Defendant does not possess the original excel spreadsheet used to create the invoices like the sample attached as Exhibit B.

10. Produce all documents showing all persons who prepared the invoices from Dock & Door to Midwest Dock like the one shown as Exhibit B.

**RESPONSE:**

Defendant does not possess any documents responsive to this request.

11. Produce all transmittal documents showing the transmittal of all invoices like the one shown as Exhibit B forwarding the invoices from Dock & Door to Midwest Dock.

**RESPONSE:**

Invoices like the one shown in Exhibit B are e-mailed through Xero.

12. Produce all documents related to the payment of health insurance for Anthony Brutti for the period January 1, 2020, including documents showing who paid the health insurance premium, who the health insurance carrier is and, if the policy is issued through an employer health plan, produce documents showing the name of the company provided health plan.

**RESPONSE:**

Attached. See Group Exhibit A.

13. Produce the premium invoices, payment records, and policy related to any health insurance benefit, program, plan, or policy providing health insurance coverage for Anthony Brutti.

**RESPONSE:**

Attached. See Group Exhibit A.

14. Produce all documents related to Dock & Door's purchase of any company branded clothing products, including T-shirts and sweatshirts.

**RESPONSE:**

Defendant does not purchase any company branded clothing therefore it does not possess any documents responsive to this request.

15. Produce all documents showing who received clothing with Midwest Dock's name on it like the T-shirt and sweatshirt shown in in the following photographs:

**RESPONSE:**

Defendant is without knowledge regarding who received clothing from Midwest Dock and does not possess any documents responsive to this request.

16. Produce all jobsite or project lists for projects worked on by Dock & Door during the period January 1, 2020 to December 31, 2024.

**RESPONSE:**

Defendant does not possess any project lists and therefore does not possess any documents responsive to this request.

DOCK & DOOR INSTALL, INC.

/s/ *Todd A. Miller*
One of Defendant's Attorneys

May 9, 2025

Todd A. Miller (#6216561)
Kathleen M. Cahill (#6269486)
ALLOCCO, MILLER & CAHILL, P.C.
*Counsel for Defendant, Dock & Door*
20 N. Wacker Drive, Suite 3517
Chicago, Illinois 60606
(312) 675-4325 TEL
(312) 675-4326 FAX
*tam@alloccomiller.com*

**VERIFICATION BY CERTIFICATION**

Under penalties of perjury as provided by law pursuant to 735 ILCS 5/1-109, the undersigned certifies that the statements set forth in Defendant, Dock & Door Install, Inc.'s Answers to Plaintiffs' Second Set of Interrogatories are true and correct, except as to such matters therein stated to be on information and belief and as such matters, the undersigned certifies as aforesaid that the undersigned verifies and believes the same to be true.

Anthony Brutti, President
Dock & Door Install, Inc.

**CERTIFICATE OF SERVICE**

I, Todd A. Miller, an attorney, certify that I caused the foregoing **Answers to Plaintiff's Second Set Of Interrogatories And Document Production Requests** to be served upon:

Todd A. Miller
Kathleen M. Cahill
Allocco & Cahill, P.C.
20 N. Wacker Dr., Ste. 3517
Chicago, IL 60606
tam@alloccomiller.com
kmc@alloccomiller.com

Jeffrey A. Risch
Michael A. Hughes
Amundsen Davis LLC
3815 E. Main St., Suite A-1
St. Charles, IL 60174
jrisch@amundsendavislaw.com
mhughes@amundsendavislaw.com

via Email on May 9, 2025.

/s/ *Todd A. Miller*

Todd A. Miller (#6216561)
Kathleen M. Cahill (#6269486)
ALLOCCO, MILLER & CAHILL, P.C.
*Counsel for Defendant, Dock & Door*
20 N. Wacker Drive, Suite 3517
Chicago, Illinois 60606
(312) 675-4325 TEL
(312) 675-4326 FAX
*tam@alloccomiller.com*

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 103



OLD NATIONAL BANK

08/31/2022 12590 $125.00

09/01/2022 12529 $300.00

08/31/2022 12587 $2,500.00

09/01/2022 12588 $19,710.00

08/31/2022 12589 $250.00

09/02/2022 12595 $20,972.00

PLAINTIFF'S EXHIBIT 168

OLD NATIONAL BANK
TlrDDDep Receipt DEPOSIT
Transaction Date: 9/2/2022 12:42
Posting Date: 9/2/2022
*****[redacted] $20,972.00
Cash Back: 0.00
346 0002 3877 67

**Account Name**
DDI Checking - First Midwest

**Bank Account Number**
[redacted]

**Payment Date**
Sep 2, 2022

| | Invoice Number | Reference | Amount Paid |
|---|---|---|---|
| | 9274 | | 1,680.00 |
| | 9275 | | 840.00 |
| Midwest Dock Solutions | 9276 | | 840.00 |
| Midwest Dock Solutions | 9277 | | 630.00 |
| Midwest Dock Solutions | 9278 | | 840.00 |
| Midwest Dock Solutions | 9279 | | 840.00 |
| Midwest Dock Solutions | 9280 | | 840.00 |
| Midwest Dock Solutions | 9281 | | 840.00 |
| Midwest Dock Solutions | 9282 | | 768.00 |
| Midwest Dock Solutions | 9283 | | 768.00 |
| Midwest Dock Solutions | 9284 | | 864.00 |
| Midwest Dock Solutions | 9285 | | 1,536.00 |
| Midwest Dock Solutions | 9286 | | 768.00 |
| Midwest Dock Solutions | 9287 | | 768.00 |
| Midwest Dock Solutions | 9288 | | 768.00 |
| Midwest Dock Solutions | 9289 | | 1,162.00 |
| Midwest Dock Solutions | 9290 | | 1,162.00 |
| Midwest Dock Solutions | 9291 | | 664.00 |
| Midwest Dock Solutions | 9292 | | 664.00 |
| Midwest Dock Solutions | 9293 | | 498.00 |
| Midwest Dock Solutions | 9294 | | 840.00 |
| Midwest Dock Solutions | 9295 | | 712.00 |
| Midwest Dock Solutions | 9298 | | 840.00 |
| Midwest Dock Solutions | 9299 | | 840.00 |
| | | Total 24 item(s) USD | 20,972.00 |

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# Deposit Summary

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

815-922-5258

**Account Name**
DDI Checking - First Midwest

**Bank Account Number**
[redacted]

**Payment Date**
Sep 2, 2022

| Payment from | Invoice Number | Reference | Amount Paid |
|---|---|---|---|
| Midwest Dock Solutions | 9274 | | 1,680.00 |
| Midwest Dock Solutions | 9275 | | 840.00 |
| Midwest Dock Solutions | 9276 | | 840.00 |
| Midwest Dock Solutions | 9277 | | 630.00 |
| Midwest Dock Solutions | 9278 | | 840.00 |
| Midwest Dock Solutions | 9279 | | 840.00 |
| Midwest Dock Solutions | 9280 | | 840.00 |
| Midwest Dock Solutions | 9281 | | 840.00 |
| Midwest Dock Solutions | 9282 | | 768.00 |
| Midwest Dock Solutions | 9283 | | 768.00 |
| Midwest Dock Solutions | 9284 | | 864.00 |
| Midwest Dock Solutions | 9285 | | 1,536.00 |
| Midwest Dock Solutions | 9286 | | 768.00 |
| Midwest Dock Solutions | 9287 | | 768.00 |
| Midwest Dock Solutions | 9288 | | 768.00 |
| Midwest Dock Solutions | 9289 | | 1,162.00 |
| Midwest Dock Solutions | 9290 | | 1,162.00 |
| Midwest Dock Solutions | 9291 | | 664.00 |
| Midwest Dock Solutions | 9292 | | 664.00 |
| Midwest Dock Solutions | 9293 | | 498.00 |
| Midwest Dock Solutions | 9294 | | 840.00 |
| Midwest Dock Solutions | 9295 | | 712.00 |
| Midwest Dock Solutions | 9298 | | 840.00 |
| Midwest Dock Solutions | 9299 | | 840.00 |
| | | Total 24 item(s) | USD 20,972.00 |

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9274

**Reference**
Krusinski MLRP

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| Don Cruikshank 7-31-22: Krusinski MLRP Bensenville, Installation of sectional doors DT | 8.00 | 210.00 | 1,680.00 |
| | | Subtotal | 1,680.00 |
| | | **TOTAL USD** | **1,680.00** |

**Due Date: Sep 12, 2022**

-✂- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
|---|---|
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9274 |
| **Amount Due** | **1,680.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9275

**Reference**
Clopay Belle Tire

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| Don Cruikshank 8-1-22: Clopay Belle Tire Yorkville, Installation of sectional overhead doors. | 8.00 | 105.00 | 840.00 |
| | | Subtotal | 840.00 |
| | | **TOTAL USD** | **840.00** |

**Due Date: Sep 12, 2022**

-✂-------------------------------------------------

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
|---|---|
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9275 |
| **Amount Due** | **840.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9276

**Reference**
Clopay Belle Tire

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| Don Cruikshank 8-2-22: Clopay Belle Tire Yorkville, Installation of sectional overhead doors. | 8.00 | 105.00 | 840.00 |
| | | Subtotal | 840.00 |
| | | **TOTAL USD** | **840.00** |

**Due Date: Sep 12, 2022**

-✂- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
|---|---|
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9276 |
| **Amount Due** | **840.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9277

**Reference**
Clopay Belle Tire

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| Don Cruikshank 8-3-22: Clopay Belle Tire Yorkville, Installation of sectional overhead doors. | 6.00 | 105.00 | 630.00 |
| | | Subtotal | 630.00 |
| | | **TOTAL USD** | **630.00** |

**Due Date: Sep 12, 2022**

-✂- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
|---|---|
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9277 |
| **Amount Due** | **630.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9278

**Reference**
Clayco Cubes

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| Nico Kelly 7-28-22: Clayco Cubes Country Club Hills, Installation of sectional doors and loading dock equipment. | 8.00 | 105.00 | 840.00 |
| | | Subtotal | 840.00 |
| | | **TOTAL USD** | **840.00** |

**Due Date: Sep 12, 2022**

-✂- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
|---|---|
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9278 |
| **Amount Due** | **840.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9279

**Reference**
Meridian Commerce Park

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| Nico Kelly 8-1-22: Meridian Commerce Park Chicago, Installation of loading dock equipment. | 8.00 | 105.00 | 840.00 |
| | | Subtotal | 840.00 |
| | | **TOTAL USD** | **840.00** |

**Due Date: Sep 12, 2022**

-✂- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
|---|---|
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9279 |
| **Amount Due** | **840.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9280

**Reference**
Meridian Army Trail

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| Nico Kelly 8-2-22: Meridian Army Trail Glendale Heights, Installation of overhead sectional doors. | 8.00 | 105.00 | 840.00 |
| | | Subtotal | 840.00 |
| | | **TOTAL USD** | **840.00** |

**Due Date: Sep 12, 2022**

-✂- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
|---|---|
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9280 |
| **Amount Due** | **840.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9281

**Reference**
Meridian Army Trail

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| Nico Kelly 8-3-22: Meridian Army Trail Glendale Heights, Installation of overhead sectional doors. | 8.00 | 105.00 | 840.00 |
| | | Subtotal | 840.00 |
| | | **TOTAL USD** | **840.00** |

**Due Date: Sep 12, 2022**

-✂- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
|---|---|
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9281 |
| **Amount Due** | **840.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9282

**Reference**
Clayco Cubes

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| Collin Zarlengo 7-28-22: Clayco Cubes Country Club Hills, Installation of sectional doors and loading dock equipment. | 8.00 | 96.00 | 768.00 |
| | | Subtotal | 768.00 |
| | | **TOTAL USD** | **768.00** |

**Due Date: Sep 12, 2022**

-✂- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
|---|---|
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9282 |
| **Amount Due** | **768.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9283

**Reference**
Arco Crow

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| Collin Zarlengo 7-29-22: Arco Crow Joliet, Installation of sectional doors and loading dock equipment. | 8.00 | 96.00 | 768.00 |
| | | Subtotal | 768.00 |
| | | **TOTAL USD** | **768.00** |

**Due Date: Sep 12, 2022**

-✂- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
|---|---|
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9283 |
| **Amount Due** | **768.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9284

**Reference**
Krusinski MLRP

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| Collin Zarlengo 7-30-22: Krusinski MLRP Bensenville, Installation of sectional doors OT | 6.00 | 144.00 | 864.00 |
| | | Subtotal | 864.00 |
| | | **TOTAL USD** | **864.00** |

**Due Date: Sep 12, 2022**

-✂- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
|---|---|
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9284 |
| **Amount Due** | **864.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9285

**Reference**
Krusinski MLRP

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| Collin Zarlengo 7-31-22: Krusinski MLRP Bensenville, Installation of sectional doors DT | 8.00 | 192.00 | 1,536.00 |
| | | Subtotal | 1,536.00 |
| | | **TOTAL USD** | **1,536.00** |

**Due Date: Sep 12, 2022**

-✂- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
|---|---|
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9285 |
| **Amount Due** | **1,536.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9286

**Reference**
Krusinski MLRP

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| Collin Zarlengo 8-1-22: Krusinski MLRP Bensenville, Installation of sectional doors | 8.00 | 96.00 | 768.00 |
| | | Subtotal | 768.00 |
| | | **TOTAL USD** | **768.00** |

**Due Date: Sep 12, 2022**

-✂- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
|---|---|
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9286 |
| **Amount Due** | **768.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9287

**Reference**
Krusinski MLRP

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
| --- | --- | --- | --- |
| Collin Zarlengo 8-2-22: Krusinski MLRP Bensenville, Installation of sectional doors | 8.00 | 96.00 | 768.00 |
| | | Subtotal | 768.00 |
| | | **TOTAL USD** | **768.00** |

**Due Date: Sep 12, 2022**

-✂- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
| --- | --- |
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9287 |
| **Amount Due** | **768.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9288

**Reference**
Krusinski MLRP

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| Collin Zarlengo 8-3-22: Krusinski MLRP Bensenville, Installation of sectional doors | 8.00 | 96.00 | 768.00 |
| | | Subtotal | 768.00 |
| | | **TOTAL USD** | **768.00** |

**Due Date: Sep 12, 2022**

-✂-------------------------------------------

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
|---|---|
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9288 |
| **Amount Due** | **768.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9289

**Reference**
Principle 3500 Wolf

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| RJ Mantoan 7-28-22: Principle 3500 Wolf Franklin Park, Installation of overhead sectional doors. | 8.00 | 83.00 | 664.00 |
| RJ Mantoan 7-28-22: Principle 3500 Wolf Franklin Park, Installation of overhead sectional doors. OT | 4.00 | 124.50 | 498.00 |
| | | Subtotal | 1,162.00 |
| | | **TOTAL USD** | **1,162.00** |

**Due Date: Sep 12, 2022**

-✂- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
|---|---|
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9289 |
| **Amount Due** | **1,162.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9290

**Reference**
Principle 3500 Wolf

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| RJ Mantoan 7-29-22: Principle 3500 Wolf Franklin Park, Installation of overhead sectional doors. | 8.00 | 83.00 | 664.00 |
| RJ Mantoan 7-29-22: Principle 3500 Wolf Franklin Park, Installation of overhead sectional doors. OT | 4.00 | 124.50 | 498.00 |
| | | Subtotal | 1,162.00 |
| | | **TOTAL USD** | **1,162.00** |

**Due Date: Sep 12, 2022**

-✂- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
|---|---|
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9290 |
| **Amount Due** | **1,162.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9291

**Reference**
Clopay Belle Tire

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| RJ Mantoan 8-1-22: Clopay Belle Tire Yorkville, Installation of sectional overhead doors. | 8.00 | 83.00 | 664.00 |
| | | Subtotal | 664.00 |
| | | **TOTAL USD** | **664.00** |

**Due Date: Sep 12, 2022**

-✂-------------------------------------------

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
|---|---|
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9291 |
| **Amount Due** | **664.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9292

**Reference**
Clopay Belle Tire

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| RJ Mantoan 8-2-22: Clopay Belle Tire Yorkville, Installation of sectional overhead doors. | 8.00 | 83.00 | 664.00 |
| | | Subtotal | 664.00 |
| | | **TOTAL USD** | **664.00** |

**Due Date: Sep 12, 2022**

-✂- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
|---|---|
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9292 |
| **Amount Due** | **664.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9293

**Reference**
Clopay Belle Tire

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| RJ Mantoan 8-3-22: Clopay Belle Tire Yorkville, Installation of sectional overhead doors. | 6.00 | 83.00 | 498.00 |
| | | Subtotal | 498.00 |
| | | **TOTAL USD** | **498.00** |

**Due Date: Sep 12, 2022**

-✂- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
|---|---|
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9293 |
| **Amount Due** | **498.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9294

**Reference**
Arco Crow

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| Eric Jansma 8-3-22: Arco Crow Joliet, Installation of sectional doors and loading dock equipment. | 8.00 | 105.00 | 840.00 |
| | | Subtotal | 840.00 |
| | | **TOTAL USD** | **840.00** |

**Due Date: Sep 12, 2022**

-✂- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
|---|---|
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9294 |
| **Amount Due** | **840.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9295

**Reference**
Krusinski MLRP

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| Quinten Williams 8-1-22: Krusinski MLRP Bensenville, Installation of sectional doors | 8.00 | 89.00 | 712.00 |
| | | Subtotal | 712.00 |
| | | **TOTAL USD** | **712.00** |

**Due Date: Sep 12, 2022**

-✂-------------------------------------------

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
|---|---|
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9295 |
| **Amount Due** | **712.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9298

**Reference**
Meridian Army Trail

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| Christopher Loqui 8-1-22: Meridian Army Trail Glendale Heights, Installation of overhead sectional doors. | 8.00 | 105.00 | 840.00 |
| | | Subtotal | 840.00 |
| | | **TOTAL USD** | **840.00** |

**Due Date: Sep 12, 2022**

-✂- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
|---|---|
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9298 |
| **Amount Due** | **840.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# INVOICE

Midwest Dock Solutions
27 E. 36th Place
STEGER IL 60475

**Invoice Date**
Aug 12, 2022

**Invoice Number**
9299

**Reference**
Arco Crow

Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| Christopher Loqui 8-2-22: Arco Crow Joliet, Installation of sectional doors and loading dock equipment. | 8.00 | 105.00 | 840.00 |
| | | Subtotal | 840.00 |
| | | **TOTAL USD** | **840.00** |

**Due Date: Sep 12, 2022**

-✂- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PAYMENT ADVICE

To: Dock & Door Install Inc
27 E. 36th Place
STEGER IL 60475

| | |
|---|---|
| **Customer** | Midwest Dock Solutions |
| **Invoice Number** | 9299 |
| **Amount Due** | **840.00** |
| **Due Date** | Sep 12, 2022 |
| **Amount Enclosed** | |

Enter the amount you are paying above

Registered Office: 27 E. 36th Place, Steger, IL, 60475.

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 104

**From:** ILCHI-Selectcerts.apil
**Sent on:** Wednesday, April 21, 2021 2:58:54 AM
**To:** Sharon Shannon
**Subject:** FW: #21019 - Abt Electronics: 2nd Tier Insurance Non-Compliant (11160 - DDI/MDS)
**Attachments:** Rider A - Sample Insurance Certificate.2021.03.01.pdf (397.87 KB), ABT.11160.2nd Tier Dock & Door Install COI.2021.07.22.pdf (1.76 MB)

Dock & Door Install Inc

Good Morning Sharon,

Please see below "Rejected" notice and provide a quote of below missing coverages to Tony.

Thank you,

**Select Business Team**
*Certificate Processing*

AssuredPartners, Inc.
1811 High Grove Lane, Suite 139
Naperville, IL 60540

P 630.355.2077 F 630.355.7996
www.esserhayes.com | www.assuredpartners.com
*Requesting a Certificate of Insurance? Submit request to selectcerts.apil@assuredpartners.com*

**From:** Tony Brutti <tonyb@midwestdocksolutions.com>
**Sent:** Tuesday, April 20, 2021 2:06 PM
**To:** Margaret R. Stredde <mrs@esserhayes.com>
**Subject:** Fwd: #21019 - Abt Electronics: 2nd Tier Insurance Non-Compliant (11160 - DDI/MDS)

Hi Margaret, there were some issues with the above Certificate. Can we make the appropriate changes for the McShane Project? This is for Dock and Door Install Inc.

---------- Forwarded message ---------
From: **Sherri Webber** <sherri@midwestdocksolutions.com>
Date: Fri, Apr 16, 2021 at 10:48 AM
Subject: Fwd: #21019 - Abt Electronics: 2nd Tier Insurance Non-Compliant (11160 - DDI/MDS)
To: Tony Brutti <tonyb@midwestdocksolutions.com>, Tony Zarlengo <tony@midwestdocksolutions.com>

---------- Forwarded message ---------
From: **Monica Lyons** <MLyons@mcshane.com>
Date: Fri, Apr 16, 2021 at 10:30 AM
Subject: #21019 - Abt Electronics: 2nd Tier Insurance Non-Compliant (11160 - DDI/MDS)
To: sherri@midwestdocksolutions.com <sherri@midwestdocksolutions.com>

PLAINTIFF'S
EXHIBIT
52
tabbies

Good Morning Sherri,

At this time, we have been notified by our Risk Transfer Advocate that your 2nd Tier subcontractor Door & Dock's insurance (copy attached) for this project has been reviewed and is currently non-compliant (see below). Please have them

correct all issues and resubmit the insurance certificates as soon as possible.

Thank you for your assistance.

**Rejected** Action Taken By Frey, Dedra

**Automobile Liability**
**All Owned Autos: - Coverage must include All Owned Autos.**

**Excess Liability**
**Limit - Each Occurence: - Coverage must include a minimum Each Occurrence limit of $5,000,000.**
**Limit - Aggregate: - Coverage must include a minimum aggregate limit of $5,000,000.**

**Workers Comp & Emp Liability**
**Limit - E.L. Each Accident: - Coverage must include a minimum E.L. Each Accident limit of $1,000,000.**
**Limit - E.L. Disease - EA Employee: - Coverage must include a minimum E. L. Disease - EA Employee limit of $1,000,000.**
**Limit - E.L. Disease - Policy Limit: - Coverage must include a minimum E.L. Disease - Policy limit of $1,000,000.**

**"Additional Insureds are added to the Auto Liability policy" needs to be stated on the certificate.**

**"The Auto Liability policy includes a Waiver of Subrogation in favor of all additional insureds" needs to be stated on the certificate.**

**"Excess/Umbrella Liability Policy Follows Form" needs to be stated on the certificate.**

**The certificate indicates excluded individuals and the names of all excluded individuals need to be stated on the certificate.**

**"The Workers Compensation policy includes a Waiver of Subrogation in favor of all additional insureds" needs to be stated on the certificate.**

Thursday, April 15, 2021 5:38:44 PM

**Monica Lyons** | Project Administrator
**McShane Construction Company**
*2020 Crain's Best Places to Work in Chicago*
*Seven-Time NAIOP Chicago Contractor of the Year*

**Direct:** 847.692.8823 | **Main:** 847.292.4300
9500 W. Bryn Mawr Avenue, Suite 200 | Rosemont, IL 60018
mlyons@mcshane.com | www.mcshane-construction.com

CHICAGO | AUBURN | IRVINE | MADISON | PHOENIX

--

Yours,

Tony Brutti
Midwest Dock Solutions
Phone: 815-922-5258
Email: tonyb@midwestdocksolutions.com

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 105

**From:** Tony Brutti <tonyb@midwestdocksolutions.com>
**Sent:** Thursday, November 4, 2021 9:11 AM
**To:** Zack Adkins
**Subject:** [EXTERNAL] Re: FW: Green Era - Closeout Documents by 11/5
**Attachments:** Clopay Warranty.pdf; Warranty Letter.pdf; Clopay Manual.pdf

Closeout documents for Green Era from Midwest Dock Solutions.

On Thu, Oct 28, 2021 at 10:37 AM Ira Sugar <ira@midwestdocksolutions.com> wrote:

**From:** Zack Adkins <ZAdkins@pepperconstruction.com>
**Sent:** Thursday, October 28, 2021 9:02 AM
**To:** Rodney Walker <rodney@a-hmechanical.com>; Harold Harvey <harold@a-hmechanical.com>; Chris Collis <ccollis@ahorninc.com>; Paul Krauze <pkrauze@atmiprecast.com>; Don Ziegler <dziegler@actionfence.com>; Kelsi Kubo <kubo@actionfence.com>; Willie Hedrick <whedrick@aaexs.com>; Gordon Itami <GordonI@andersonlock.com>; Bill Downey <BDowney@arlingtonsteel.com>; Rick Sojka <rsojka@artlow.com>; Eduardo Salgado <eduardo@cswoodwork.com>; Eric Cox <ecox@dlz.com>; William Gallagher <will@gallagherasphalt.com>; Michael Mannion <mmannion@garcesplumbing.com>; Jeffrey White <jwhite@garcesplumbing.com>; Edward Cezar <edward@ibuilderscorp.com>; Jakelski, Jacob <jacob.jakelski@mjelectric.com>; Dino Conte <dinomconte@sbcglobal.net>; Chris Slowinski MARIO CONTE EXCAVATING <chrisdooleymce@aol.com>; Denver Doherty <ddoherty@michels.us>; Jeremy Olivotti <j.olivotti@msprecast.com>; Evan Saunders <e.saunders@msprecast.com>; Ira Sugar <ira@midwestdocksolutions.com>; Mike Vickers <mvickers@paulreilly.com>; Stephanie Biles <sbiles@paulreilly.com>; Patrick Kowalewski <PKowalewski@pepperconstruction.com>; Larry Kotke <larry@ramfp.com>; keith@sullivanroofing.com; Rick Romeo <rick.romeo@veisolutions.com>; uptowndecoratingcorp@yahoo.com; Estimating Dept. <estimating@uptownpaintingconst.com>
**Cc:** Christi Adams <CAdams@pepperconstruction.com>
**Subject:** Green Era - Closeout Documents by 11/5

Morning

See attached closeout checklist.

As it applies to you, please send me Manufacturer's Warranty, O&Ms, As-Builts and Test Reports.

I have attached the Warranty Letter template, however the Substantial Completion/Warranty Start has not yet been approved by the Owner yet.

So, send me what you owe, then we'll follow up with the Warranty Letters once the date is established.

Owner Training for MEP/FP trades to be scheduled later.

Please email me the documents by Friday, 11/5.

Zack Adkins
Project Executive

**Pepper Construction Company**

411 Lake Zurich Road, Barrington, IL 60010

T   847.620.4191

M   630.699.6179

--
Yours,

Tony Brutti
Midwest Dock Solutions
Phone: 815-922-5258
Email: tonyb@midwestdocksolutions.com



OFFICE 708.367.0801
FAX 708.367.0802
EMERGENCY SERVICE 708.921.8950

GREEN ERA DIGESTER FACILITY AND URBAN CAMPUS
650 W. 83RD STREET
CHICAGO, ILLINOIS

PEPPER/UJAMAA CONSTRUCTION JOB #: 2001015

## SUBCONTRACTOR/SUPPLIER GUARANTEE/WARRANTY

SUBCONTRACTOR/SUPPLIER:

SCOPE OF WORK:

DATE OF SUBSTANTIAL COMPLETION: PENDING OWNER

---

We, the undersigned, herewith guarantee/warranty the overhead doors against defects in material or workmanship or any nonconformity with the requirements of the contract documents for a period of one (1) year from the date of Substantial Completion.

If, during the guarantee/warranty period, any faulty materials or defects in materials or workmanship are found, we agree to promptly replace and repair them, together with any damage to finish, fixtures, equipment or furnishings due to our defective work upon notification by the Architect or Owner at no additional expense to the Owner.

By: Anthony Zarlengo

Title: President

Signature: ____________

# Clopay® Commercial Product Limited Warranty

## Models 3715, 3717, 3718, 3720, 3724, 3722, 3730

For a period of ten (10) years from the date of the purchase of your door, if a door section rusts through due to the paint finish cracking, checking or peeling (losing adhesion), as verified upon inspection by persons authorized by Clopay, we will replace or otherwise restore (at our option) any such defective door sections.

In addition, for a period of one (1) year from the date of your purchase of your door, we will repair or replace (at our option) any door section, parts or hardware that is defective in material or workmanship.

Further, for a period of ten (10) years from the date of your purchase of your door, we will repair or replace (at our option) any door section that delaminates.

We will pay all labor and materials costs associated with any repair work described above, however, labor costs associated with the removal and reinstallation of any repaired sections and the installation of replacement sections will be your responsibility.

This warranty extends to and benefits only the original purchaser of the door and to normal usage when the door has been installed and maintained in accordance with the manufacturer's instructions.

Our warranty does not cover these items:
WE WILL NOT PAY FOR ANY DAMAGES, INCLUDING INCIDENTAL OR CONSEQUENTIAL DAMAGES, CAUSED BY OR RESULTING FROM A DEFECTIVE DOOR SECTION, PARTS OR HARDWARE. Some states do not allow the exclusion of incidental or consequential damages, so the above limitation may not apply to you.

Our warranty shall not extend to or cover deterioration due to rust resulting from damage to the door section finish caused by fire, other accident or casualty, vandalism, radiation, harmful fumes or foreign substances in the atmosphere, or occurring as a result of any physical damage after the door left our factory, or failure to provide reasonable, necessary and proper maintenance. Nor shall our warranty extend to or cover any damages or claims with respect to any products that in any way or degree have been altered, processed, misused or improperly handled or installed.

If your door does not conform to this warranty, notify us in writing at the following address promptly after discovery of the defect: Clopay Building Products Company, 8585 Duke Blvd, Mason OH 45040.

WE MAKE NO OTHER WARRANTIES, REPRESENTATIONS, OR COVENANTS, EXPRESS OR IMPLIED, WITH RESPECT TO THIS PRODUCT, AS TO ANY MATTER WHATSOEVER, EXCEPT FOR ANY "IMPLIED WARRANTY" AS THAT TERM IS DEFINED IN THE MAGNUSON-MOSS WARRANTY-FEDERAL TRADE COMMISSION IMPROVEMENT ACT, SUCH IMPLIED WARRANTIES TO BE LIMITED IN DURATION TO A PERIOD OF ONE YEAR FROM THE DATE OF PURCHASE.

This warranty gives you specific legal rights, and you may also have other rights which vary from state to state.

To: CTMLH Bluff Road Venture LLC.
4343 Von Karman Ave. Ste. 200
Newport Beach, CA 92660

**KEEP THIS DOCUMENT FOR YOUR RECORDS – DO NOT REMIT**

Door Model 3200

Installation Company ~~[illegible]~~ Midwest Dock Solutions

Address 27. E. 36th Pl.

City Steger State IL Zip 60475

Date of Purchase ____________________

© 2010 Clopay Building Products Company, Inc.,
*A Griffon Company*

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 106

**From:** Tony Brutti <tonyb@midwestdocksolutions.com>
**Sent:** Tuesday, December 21, 2021 10:57 AM
**To:** Zack Adkins
**Subject:** Re: [EXTERNAL] Re: FW: Green Era - Closeout Documents by 11/5
**Attachments:** Warranty Letter revised.pdf

Revised warranty letter attached.

On Thu, Dec 16, 2021 at 1:50 PM Zack Adkins <ZAdkins@pepperconstruction.com> wrote:

Please change the warranty letter to a 11/18/2021 start – see attached

Zack Adkins
Project Executive

Pepper Construction Company

411 Lake Zurich Road, Barrington, IL 60010

T 847.620.4191

M 630.699.6179

**From:** Tony Brutti <tonyb@midwestdocksolutions.com>
**Sent:** Thursday, November 4, 2021 9:11 AM
**To:** Zack Adkins <ZAdkins@pepperconstruction.com>
**Subject:** [EXTERNAL] Re: FW: Green Era - Closeout Documents by 11/5

Closeout documents for Green Era from Midwest Dock Solutions.

On Thu, Oct 28, 2021 at 10:37 AM Ira Sugar <ira@midwestdocksolutions.com> wrote:



**From:** Zack Adkins <ZAdkins@pepperconstruction.com>
**Sent:** Thursday, October 28, 2021 9:02 AM
**To:** Rodney Walker <rodney@a-hmechanical.com>; Harold Harvey <harold@a-hmechanical.com>; Chris Collis <ccollis@ahorninc.com>; Paul Krauze <pkrauze@atmiprecast.com>; Don Ziegler <dziegler@actionfence.com>; Kelsi Kubo <kubo@actionfence.com>; Willie Hedrick <whedrick@aaexs.com>; Gordon Itami <GordonI@andersonlock.com>; Bill Downey <BDowney@arlingtonsteel.com>; Rick Sojka <rsojka@artlow.com>; Eduardo Salgado <eduardo@cswoodwork.com>; Eric Cox <ecox@dlz.com>; William Gallagher <will@gallagherasphalt.com>; Michael Mannion <mmannion@garcesplumbing.com>; Jeffrey White <jwhite@garcesplumbing.com>; Edward Cezar <edward@ibuilderscorp.com>; Jakelski, Jacob <jacob.jakelski@mjelectric.com>; Dino Conte <dinomconte@sbcglobal.net>; Chris Slowinski MARIO CONTE EXCAVATING <chrisdooleymce@aol.com>; Denver Doherty <ddoherty@michels.us>; Jeremy Olivotti <j.olivotti@msprecast.com>; Evan Saunders <e.saunders@msprecast.com>; Ira Sugar <ira@midwestdocksolutions.com>; Mike Vickers <mvickers@paulreilly.com>; Stephanie Biles <sbiles@paulreilly.com>; Patrick Kowalewski <PKowalewski@pepperconstruction.com>; Larry Kotke <larry@ramfp.com>; keith@sullivanroofing.com; Rick Romeo <rick.romeo@veisolutions.com>; uptowndecoratingcorp@yahoo.com; Estimating Dept. <estimating@uptownpaintingconst.com>
**Cc:** Christi Adams <CAdams@pepperconstruction.com>
**Subject:** Green Era - Closeout Documents by 11/5

Morning

See attached closeout checklist.

As it applies to you, please send me Manufacturer's Warranty, O&Ms, As-Builts and Test Reports.

I have attached the Warranty Letter template, however the Substantial Completion/Warranty Start has not yet been approved by the Owner yet.

So, send me what you owe, then we'll follow up with the Warranty Letters once the date is established.

Owner Training for MEP/FP trades to be scheduled later.

Please email me the documents by Friday, 11/5.

Zack Adkins
Project Executive

**Pepper Construction Company**

411 Lake Zurich Road, Barrington, IL 60010

T 847.620.4191

M 630.699.6179

--

Yours,

Tony Brutti

Midwest Dock Solutions

Phone: 815-922-5258

Email: tonyb@midwestdocksolutions.com

--

Yours,

Tony Brutti
Midwest Dock Solutions
Phone: 815-922-5258
Email: tonyb@midwestdocksolutions.com



OFFICE 708.367.0801
FAX 708.367.0802
EMERGENCY SERVICE 708.921.8950

GREEN ERA DIGESTER FACILITY AND URBAN CAMPUS
650 W. 83RD STREET
CHICAGO, ILLINOIS

PEPPER/UJAMAA CONSTRUCTION JOB #: 2001015

# SUBCONTRACTOR/SUPPLIER GUARANTEE/WARRANTY

SUBCONTRACTOR/SUPPLIER:

SCOPE OF WORK:

DATE OF SUBSTANTIAL COMPLETION: November 18, 2021

---

We, the undersigned, herewith guarantee/warranty the overhead doors (trade) against defects in material or workmanship or any nonconformity with the requirements of the contract documents for a period of one (1) year from the date of Substantial Completion.

If, during the guarantee/warranty period, any faulty materials or defects in materials or workmanship are found, we agree to promptly replace and repair them, together with any damage to finish, fixtures, equipment or furnishings due to our defective work upon notification by the Architect or Owner at no additional expense to the Owner.

By: Tony Zarlengo

Title: President

Signature: ____________________

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 107

**From:** Tony Brutti <tonyb@midwestdocksolutions.com>
**Sent:** Friday, August 4, 2023 1:38 PM
**To:** Christi Adams
**Subject:** [EXTERNAL] Re: FW: Matteson Commerce Center - Closeout Time!
**Attachments:** Warranty Letter.pdf

Warranty Letter attached for Matteson Commerce from Midwest Dock Solutions.

On Tue, Aug 1, 2023 at 11:00 AM Ira Sugar <ira@midwestdocksolutions.com> wrote:

---

**From:** Christi Adams <CAdams@pepperconstruction.com>
**Sent:** Tuesday, August 1, 2023 10:42 AM
**To:** ptrainor@activeglassco.com; timreif@adlerplbg.com; Jason Tenpas <jtenpas@aaexs.com>; Matt Skole <mskole@allsealants.com>; Brian Bartasius <bbartasius@alliancecousa.com>; Shahara Byford <sbyford@byfordconstruction.com>; G. Maldonado <gmaldonado@cecchin-inc.com>; JJ Hund <jhundjr@classiclandscapeltd.com>; William Sweatt <wsweatt@connellyelectric.com>; Ryan Andreas <randreas@continentalpainting.com>; ellisonb@fairbornequipment.com; Ernesto Esparza <eesparza@glenrockcompany.com>; bhochstatter@houseofdoorsinc.com; Dan Maras <dmaras@portaking.com>; Ken Bridgmon <ken@kingerysteel.com>; Ira Sugar <ira@midwestdocksolutions.com>; Don Anderson <danderson@plote.com>; eringstad@primescaffold.com; Will McCoy <wmccoy@rankingroup.com>; Joe Ryan <joe.ryan@ryancentral.com>; Mike O'Connell <MikeO@scurtocement.com>; Jennifer Niemiec <jniemiec@sunmechsys.com>; apmosqueda@truseal-inc.com; Paul Suvanich <Paul.Suvanich@usafp.us>; Melissa Murphy <mmurphy@parvinclauss.com>
**Cc:** Chance Van Dyck <CVanDyck@pepperconstruction.com>; Angela Wisker <AWisker@pepperconstruction.com>
**Subject:** RE: Matteson Commerce Center - Closeout Time!

Good morning, Matteson Team! Please see attached warranty letter to be placed on your letterhead. Our date of Substantial Completion date has been set and is August 1, 2023, the date to be used for warranties.

Please see below email dated 7/18/23 below for the closeout information that was requested. Hopefully you have most pulled together already.



**We are requesting this information to be submitted by August 15th.** If you have any questions, please let me know. Please do your best to get your closeout submitted as soon as possible! Thank you.

The building looks great and was fun to watch from the office with all the of pictures! I am going to mention and remind everyone to keep your COI renewals coming as they renew in the coming months.

Christi S Adams
Project Coordinator

**Pepper Construction Company**

411 Lake Zurich Road, Barrington, IL 60010

**T** 847-620-4037

**Be kind to each other**

*Click here to read Pepper's 2022 Annual Review | Join our team*

---

**From:** Christi Adams
**Sent:** Tuesday, July 18, 2023 10:15 AM
**To:** ptrainor@activeglassco.com; timreif@adlerplbg.com; Jason Tenpas <jtenpas@aaexs.com>; Matt Skole <mskole@allsealants.com>; Brian Bartasius <bbartasius@alliancecousa.com>; Shahara Byford <sbyford@byfordconstruction.com>; G. Maldonado <gmaldonado@cecchin-inc.com>; JJ Hund <jhundjr@classiclandscapeltd.com>; William Sweatt <wsweatt@connellyelectric.com>; Ryan Andreas <randreas@continentalpainting.com>; ellisonb@fairbornequipment.com; Ernesto Esparza <eesparza@glenrockcompany.com>; bhochstatter@houseofdoorsinc.com; Dan Maras <dmaras@portaking.com>; Ken Bridgmon <ken@kingerysteel.com>; Ira Sugar <ira@midwestdocksolutions.com>; Don Anderson <danderson@plote.com>; eringstad@primescaffold.com; Will McCoy <wmccoy@rankingroup.com>; Joe Ryan <joe.ryan@ryancentral.com>; Mike O'Connell <MikeO@scurtocement.com>; Jennifer Niemiec <jniemiec@sunmechsys.com>; apmosqueda@truseal-inc.com; Paul Suvanich <Paul.Suvanich@usafp.us>; Melissa Murphy <mmurphy@parvinclauss.com>
**Cc:** Chance Van Dyck <CVandyck@pepperconstruction.com>; Angela Wisker <AWisker@pepperconstruction.com>
**Subject:** Matteson Commerce Center - Closeout Time!

Good morning, Matteson Team, please start pulling together your closeout information for Matteson 57 Commerce! We thank you for all your efforts out there and the part you played. For those still working out there please forward when you can – thank you everyone!

For now, please get your As-Builts and Operation & Maintenance Manuals together, you can start forwarding your information electronically to my attention. It will be determined later if we need hard copies. Please name your pdfs clearly.

At this time, we are not sure of our Warranty Date, so do not send your warranties over quite yet. I will forward a form letter over once the client gives us the date to use! Thank you.

**I. AS-BUILT DRAWINGS** (you know who you are for this)

**II. OPERATIONS & MAINTENANCE MANUALS**

1. Operating instructions.
2. Maintenance instructions for equipment and systems.
3. Maintenance instructions for special finishes, including recommended cleaning methods and materials, and special precautions identifying detrimental agents.
4. Shop Drawings and product data.
5. Test Reports

**III. WARRANTIES**

1. Warranty letter – **August 1, 2023** *********
2. Provide copies/certificates of manufacturer and all extended warranties that apply to your work or material provided.

Please let me know who will be pulling this data together from your team. Please let me know if you have any questions. Thank you!

Christi S Adams
Project Coordinator

**Pepper Construction Company**

411 Lake Zurich Road, Barrington, IL 60010

T 847-620-4037

**Be kind to each other**

*Click here to read Pepper's 2022 Annual Review | Join our team*

--
Yours,

Tony Brutti
Midwest Dock Solutions
Phone: 815-922-5258
Email: tonyb@midwestdocksolutions.com



OFFICE 708.367.0801
FAX 708.367.0802
EMERGENCY SERVICE 708.921.8950

Matteson 57 Commerce Center

PEPPER CONSTRUCTION COMPANY JOB #: 2200210

SUBCONTRACTOR: Company Name Here

SCOPE OF WORK: Enter Your Scope Here

DATE OF SUBSTANTIAL COMPLETION: August 1, 2023

---

We, the undersigned, herewith guarantee/warranty the overhead doors (trade) against defects in material or workmanship or any nonconformity with the requirements of the contract documents for a period of one year from the date of Substantial Completion. (unless noted otherwise or for the extended warranties)

If, during the guarantee/warranty period, any faulty materials or defects in materials or workmanship are found, we agree to promptly replace and repair them, together with any damage to finish, fixtures, equipment or furnishings due to our defective work upon notification by the Architect or Owner at no additional expense to the Owner.

By: Tony Zarlengo

Title: President

Signature: [signature]

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 108

**From:** Tony Zarlengo <tony@midwestdocksolutions.com>
**Sent:** Friday, June 9, 2023 9:39 AM
**To:** Tony Brutti <ajbrutti@gmail.com>
**Subject:** Fwd: Crow Holdings Joliet Truck Terminal
**Attach:** C555_1011_Midwest Dock Solutions.pdf

We have no closeouts for this job?

Thank you,

Tony Zarlengo
Midwest Dock Solutions
708-367-0801

---------- Forwarded message ---------
From: **Sherri Webber** <sherri@midwestdocksolutions.com>
Date: Fri, Sep 9, 2022 at 11:29 AM
Subject: Fwd: Crow Holdings Joliet Truck Terminal
To: Tony Brutti <tonyb@midwestdocksolutions.com>
Cc: Tony Zarlengo <tony@midwestdocksolutions.com>

They need a warranty letter please for the attached contract.

Please email it to: lgeorge@arcomurray.com

Thanks!

---------- Forwarded message ---------
From: **Esguerra, Liscel** <lesguerra@arcomurray.com>
Date: Tue, Dec 7, 2021 at 2:47 PM
Subject: RE: Crow Holdings Joliet Truck Terminal
To: Longino, Helene <hlongino@arcomurray.com>
Cc: Sherri Webber <sherri@midwestdocksolutions.com>

Hi Sherri,

See attached contract for reference.

Thank you,

**Liscel Esguerra**

**ARCO/Murray**

331-201-8836 | vCard

www.arcomurray.com

PLAINTIFF'S
EXHIBIT
244

DocuSign Envelope ID: 3EA025CD-21C7-4568-B5EF-7D231ABE4F52

# IMPORTANT NOTICE

Please execute the contract via DocuSign. Please DO NOT fax, email, or mail the document back to us.

The process is simple:

1. Click View Documents and Agree to Sign Electronically
2. Type in: Your name, Title, Date
3. For contracts $10,000 or more, complete ALL FIELDS in Exhibit A-Note if all fields are not complete, you cannot submit your signature for the document. For fields you will not be putting information or a dollar amount in, use "-", "N/A", or something of that nature.
4. For contracts under $10,000, Exhibit A requires only a signature and date.
5. Click Complete Signature

The Project Manager will then sign the contract and a fully executed copy will be emailed automatically to everyone. Our process is that ALL documents must be signed through DocuSign. Please submit PDF copies of your insurance, via email, to the Liscel Esguerra, (lesguerra@arcomurray.com) in order to be compliant for payment. If you are not compliant, payment will not be issued.

Contracts **will not** be considered executed if your Certificate of Insurance is not submitted at the time of signature!

All contracts must be executed and received by ARCO/Murray **prior** to starting any work.

Thank you.

TZ

Have an address change?

Email: lesguerra@arcomurray.com

DocuSign Envelope ID: 3EA025CD-21C7-4568-B5EF-7D231ABE4F52

Manager ☐
Subcontractor ☐
Superintendent ☐

**ARCO/Murray National Construction Company, Inc.**
3110 Woodcreek Drive
Downers Grove, IL 60515
Phone: 331-251-2726

# SUBCONTRACT AGREEMENT

E & O Req'd: ☐YES or ☒NO

| | | | |
|---|---|---|---|
| Job No: | C555- Crow Holdings Joliet Truck Terminal | Proj. Mgr.: | Jack York |
| Subcontract No: | C555-1011 | Job Sup't: | Jim Henchel |
| Job Phone: | 331-251-2726 | Sup't Cell: | 331-775-8285 |
| Job Fax: | 331-251-2727 | Sup't Email: | jhenchel@arcomurray.com |
| Contractor's Accountant: | Laura Brown lbrown@arcomurray.com | Job Location: | 2901 Channahon Rd. Joliet, IL 60436 |
| Contractor License #: | | Subcontractor License #: | |
| | | Sub License Holder: | |
| Subcontractor PM: | Ira Sugar ira@midwestdocksolutions.com 708.280.2642 | Sub Accountant: | Sherrie Weber sherri@midwestdocksolutions.com |
| Subcontractor: | Midwest Dock Solutions, Inc 3211 Holeman Ave Steger, IL 60475 | Vendor #: PM Firm: | 57639 57639 |
| Subcontractor Phone: | 708-367-0801 | | |
| Subcontractor Fax: | | Date: | 08/31/2021 |

| CSI No: | Description: |
|---|---|
| 08-0900- | Overhead Doors |

This agreement ("Subcontract") is made and entered into between ARCO/Murray National Construction Company, Inc. ("Contractor") and Midwest Dock Solutions, Inc ("Subcontractor") as of 08/31/2021 concerning the following project: C555- Crow Holdings Joliet Truck Terminal, Joliet, IL (the "Project"):

(a) Project Description: 117,024 SF Trucking Terminal

(b) Owner: CHI Development Operating, LLC

(c) Architect:

(d) Location of Project: 2901 Channahon Rd.
Joliet, IL 60436

(e) SUBCONTRACT SUM: $1,108,581.00

**TERMS & CONDITIONS**

**Article 1**
**SUBCONTRACTOR'S WORK & THE CONTRACT DOCUMENTS**

1.1 Subcontract Work: Subcontractor hereby agrees to perform and furnish all of the labor, services and materials required for the construction and completion of Subcontractor's portion of the Project, as defined in, and in accordance with, the terms and conditions of this Subcontract and the terms, specifications and conditions set forth in the Contract Documents identified in Paragraph 1.2 herein ("Subcontract Work"). Any work performed by Subcontractor with respect to the Project before the date of this Subcontract shall also be governed by the terms of this Subcontract, notwithstanding the terms of any prior agreement.

1.2 Contract Documents: The Contract Documents shall mean and consist of this Subcontract and all exhibits and addenda now or subsequently attached hereto; the **List of Subcontractors and Suppliers** for the Subcontract Work, prepared by Subcontractor and approved by Contractor as set forth in the attached **Exhibit A**; the **Insurance Requirements and Sample Form of Certificate of Insurance** attached hereto as **Exhibit B**; the **Additional Safety Requirements** attached hereto as **Exhibit C**; the **Application for Payment Form** attached hereto as **Exhibit D**; the **Scope of Work,** including plans, drawings and specifications as to particular elements of the Project, attached hereto as, or as referenced in, **Exhibit E**; the **Drawing Log,** attached hereto as **Exhibit F**; the **Lien Waiver Forms** attached hereto as **Exhibit G**; the state-specific Addendum, if any; all Change Orders and written modifications to this Subcontract executed after the date of this Subcontract by both Contractor and Subcontractor; and any bonds required to be furnished by Subcontractor pursuant hereto, all of which are incorporated herein by this reference. The Contract Documents are complementary and what is required by any one shall be as binding as if required by all. In the event of a conflict between Contract Documents or an internal conflict within a Contract Document, the better quality and greater quantity of work provided for shall govern in accordance with the Contractor's interpretation and no adjustment shall be made to the Subcontract Sum as a result of such conflicts or interpretations. The terms of this Subcontract (including all exhibits) shall be deemed to supersede all other oral or written communications between Contractor and Subcontractor. Subcontractor is solely responsible for notifying Contractor in writing of all such deviations, and such deviations will only be deemed accepted by Contractor to the extent a Change Order is executed by Contractor incorporating the identified deviation from the Contract Documents. Should added labor, materials, services or other elements not shown in the Contract Documents, but reasonably inferable from the Contract Documents, be necessary to complete Subcontract Work, Subcontractor will furnish the same without any change in the Subcontract Sum (as defined in Paragraph 2.1 herein).

1.3 Performance of Subcontract Work: Subcontractor shall perform and complete the Subcontract Work in accordance with the following standards and requirements: (a) Subcontractor shall furnish efficient business administration and supervision, shall furnish at all times an adequate supply of workers, equipment and materials and shall perform the Subcontract Work in an expeditious and economical manner consistent with the requirements of this Subcontract; (b) the Subcontract Work shall be performed in a good and workmanlike manner, free of any and all liens and claims of any nature, including claims or liens of laborers, labor unions, suppliers and Subcontractor's subcontractors, etc.; (c) all equipment, materials and labor to be furnished by Subcontractor shall conform strictly to the requirements of the Contract Documents, and all materials and equipment to be installed in the Project shall be new, unless otherwise specified, and of good quality; (d) Subcontractor shall be responsible for obtaining and shall pay for all necessary certificates, permits, inspections and tests necessary for completing Subcontract Work on a timely basis, provided that Subcontractor shall not be responsible for obtaining or paying for the Project building permit; (e) Subcontract Work shall be completed at Subcontractor's expense in strict accordance with all applicable state, federal and local laws, regulations, codes and ordinances, including but not limited to the Occupational Safety and Health Act of 1970, as amended from time-to-time, all requirements set forth on Exhibit C, and all applicable environmental laws and regulations, as well as with Contractor's standards and requirements, to the extent more stringent; (f) Subcontractor shall furnish all scaffolding, tools and equipment (including equipment for hoisting) that may be necessary to do Subcontract Work properly and expeditiously; (g) Subcontractor will inspect the conditions at the Project which may impact Subcontract Work in order to confirm that the Project is in proper condition to receive the Subcontract Work, and shall immediately verbally report to the Contractor and confirm in writing any non-conforming Project condition or any discrepancy or errors it discovers in the drawings, specifications, Project or Subcontract Work; (h) the installation and/or construction of the Subcontract Work shall be deemed as Subcontractor's acceptance that conditions at the Project and the plans, specifications and drawings are as they need to be for Subcontractor to perform the Subcontract Work; (i) Subcontractor assumes the risk of ascertaining proper dimensions for prefabrication, as well as the risk of installing any of Subcontract Work where there are on-site conditions or discrepancies or errors in the Contract Documents not caused by Subcontractor but which nevertheless are known or should be known by Subcontractor and which do or may adversely impact such installation; (j) Subcontractor shall remove from the Project site any employee or employees unsatisfactory to the Contractor; (k) Subcontractor shall provide, and shall cause its subcontractors to provide, at all times when the Subcontract Work is being performed, a competent and well trained on-site supervisor acceptable to Contractor who is fluent in spoken and written English; such on-site supervisor shall not be reassigned to a different project without Contractor's prior written consent; (l) Subcontractor shall pay when due for all supplies, fuel, equipment, machinery, repairs, transportation, material, labor, insurance premiums of any kind or description including workers' compensation insurance premiums, sales taxes, salaries, federal and state employment taxes, any similar payroll taxes relating to employees of Subcontractor, union costs and dues including but not limited to required pension, health and welfare fund contributions, and all other expenses whatsoever incurred in or as a result of, the performance of Subcontract Work; (m) Subcontractor shall be solely responsible to contact all appropriate sources in order to accurately determine the location of all underground wiring, plumbing, utilities, telecommunications systems and other similar items, and to have all such items clearly marked prior to commencement of any excavation (if applicable); (n) Subcontractor shall perform the Subcontract Work during normal working hours of normal working days unless otherwise specifically set forth in this Subcontract or directed by Contractor; (o) Subcontractor shall ensure the safety of all persons on the Project in course of and with respect to Subcontractor's operations; (p) Subcontractor shall keep the Project free from accumulation of water, material or rubbish caused by Subcontractor's operations; (q)

that Subcontractor and its employees and subcontractors shall be in compliance with all license and registration requirements imposed under applicable law; (r) Subcontractor and its employees and subcontractors shall not encroach upon property adjacent to the Project for storage of material, nor shall they be permitted on such adjacent properties without the permission of the Contractor and such adjacent property owners; (s) Subcontractor shall repair at its expense any and all damage to adjacent property caused by the Subcontract Work, and shall indemnify and hold harmless Contractor from any liability or responsibility for any claims due to such damage or injury and shall defend any action brought by reason thereof at its cost; (t) Subcontractor shall update and supplement as necessary, the list of sub-subcontractors and suppliers listed on Exhibit A in order to insure that Contractor always has complete and accurate information concerning the identity of who is supplying materials and/or labor for the Project; (u) Subcontractor shall observe when established separate gates for entry into the Project site; and (v) Subcontractor shall exercise that level of expertise and experience that enables it at all times to perform the Subcontract Work with the diligence and care reasonably exercised by experienced and fully competent contractors within Subcontractor's trade and profession (if applicable) on similarly situated projects, including but not limited to properly and timely designing (if applicable) and constructing the Subcontract Work.

1.4 Time for Performance of Subcontract Work: Time is of the essence of this Subcontract in all respects, including but not limited to delivery, installation, erection and otherwise. Subcontractor shall commence the Subcontract Work upon: ☒ full execution of this Subcontract, and/or ☒ Contractor's notice to proceed ("Commencement"), and shall proceed with sufficient labor and equipment continuously to complete the Subcontract Work within the Subcontract Completion Time, as updated from time-to-time by Contractor. Subcontractor hereby agrees to complete the Subcontract Work within the time period specified in the Scope of Subcontract Work ("Subcontract Completion Time"). Subcontractor shall adjust its scheduling from time-to-time as directed by Contractor, including performing certain parts of the Subcontract Work before other parts.

In the event the Subcontract Work is delayed due to the willful misconduct of Contractor, abnormal and unforeseeable weather or any other cause which Contractor agrees is beyond the control of Subcontractor, and Subcontractor demonstrates in writing that such condition(s) prevented Subcontractor from performing critical-path Subcontract Work ("Delays"), Subcontractor may request an extension of the Subcontract Completion Time. However, the Subcontract Completion Time shall not be extended for any reason, including Delays, unless the following absolute preconditions are fully and timely satisfied: (i) Subcontractor requests in writing from Contractor an extension of the Subcontract Completion Time, including a detailed explanation of the circumstances of the Delay and actions taken by the Subcontractor to mitigate or overcome the effects of such Delay, no later than three (3) business days after commencement of the Delay; and (ii) Contractor determines that such delay could not have been avoided, recovered or mitigated by reasonable actions taken by the Subcontractor; and (iii) Contractor receives, at a minimum, a corresponding extension of the Contract Time under the General Contract with the Owner (collectively, "Preconditions"). In no event will Contractor be obligated to extend the Subcontract Completion Time if any one or more of the preconditions are not satisfied. Timely, (no later than 5 days after commencement of any such claimed Delay) complete and accurate documentation shall be provided to Contractor to substantiate any equitable claims by Subcontractor for reimbursement of damages incurred by Subcontractor solely due a Delay. Subcontractor acknowledges its understanding that untimely, incomplete or inaccurate submissions of claims for damages due to Delays may preclude Contractor from seeking reimbursement for such damages from Owner, and that if Contractor is no longer able to seek reimbursement from Owner due to Subcontractor's failure to timely submit and substantiate its Claims, Subcontractor shall be deemed to have waived any such claims. Except as otherwise set forth herein and agreed in a Change Order executed by Subcontractor and Contractor, an extension of the Subcontract Completion Time shall be Subcontractor's sole and exclusive remedy for Delay.

1.5 Manufacturer's Warranties. Subcontractor hereby assigns to Contractor and Owner all manufacturer's warranties and guarantees for any and all equipment and fixtures to be installed at or attached to the Project site pursuant to this Subcontract. Upon final completion of the Subcontract Work, and before Contractor will be obligated to make final payment hereunder, Subcontractor shall deliver to Contractor: (i) originals or copies of all warranty and guarantee documents and all cut sheets and instructions and operating manuals of all equipment and fixtures; (ii) a final listing of serial numbers, if applicable, for all such equipment and fixtures along with the names and addresses of the manufacturers and suppliers of such equipment and fixtures; and (iii) final as-built drawings, if applicable, in hard-copy and electronic format.

1.6 Design-Build Elements: The parties acknowledge and agree that only if the Subcontract Work includes the furnishing of design elements (the "Design Elements"), will the terms of this Section 1.6 apply. Subcontractor shall provide Contractor with complete and detailed plans and specifications of the Design Elements (the "Design Plans and Specs") that are consistent with: (i) all applicable codes, laws and regulations; (ii) the Contract Documents; (iii) that professional level of care applicable to members of the design profession furnishing design services as required by the Contract Documents ("Standard of Care"); and (iv) the performance and other specifications included in the bid instructions attached to the Subcontract ("Specifications"). All design work shall be performed only by qualified architects, engineers and other design professionals duly licensed, as necessary, in the jurisdictions in which the Project is located. All Design Plans and Specs shall be stamped or sealed by a duly licensed or registered design professional, and, when approved by Contractor, shall become part of the Contract Documents. Modifications to the Design Plans and Specs shall become Contract Documents when incorporated by Change Order into this Subcontract. Subcontractor will disclose the identity of any engineers or consultants that Subcontractor wishes to retain, and will refrain from hiring anyone to whom Contractor has a reasonable objection. Subcontractor agrees that it shall correct any errors, omissions or other defects in the Design Plans and Specs (either through revised drawings or through written or field modifications or clarifications, as appropriate) with the level of promptness required in order to comply with the Project Schedule, and at no additional cost to Contractor or Owner. However, Contractor shall not have a duty to discover such errors; Subcontractor shall remain solely responsible for producing Design Plans & Specs that are in compliance with the applicable Standard of Care, Specifications and the Contract Documents. At no additional cost to Owner and Contractor, Subcontractor shall pay all royalties and license fees arising from the Design Plans and Specs, and shall defend any suits or claims for infringement of patent rights or other intellectual property rights, and shall save Contractor and Owner harmless from loss on account thereof. Contractor's approval of Design Plans and Specs that do not comply with the Contract Documents

shall not constitute approval of any changes from the Contract Documents unless such changes are specifically highlighted in the proposed Design Plans and Specs as changes.

**Article 2**
**SUBCONTRACT SUM & PROGRESS PAYMENTS**

2.1 Subcontract Sum: Subject to the terms and conditions contained herein, and to the full and complete performance by Subcontractor as and when required hereunder, of its obligations as specified herein, Contractor shall pay the sum of **One million, one hundred eight thousand, five hundred eighty-one 00/100 dollars $1,108,581.00.** It is understood and agreed that the Subcontract Sum is a lump sum amount and is not subject to increase under any circumstances unless both Contractor and Subcontractor execute a change order increasing the Subcontract Sum (a "Change Order").

2.2 Required Submittals for Payments: Subcontractor shall not be entitled to any payment for the Subcontract Work unless and until the following are submitted to Contractor on or before the 20th of the calendar month:

a) Application for Payment: Subcontractor shall utilize the Application for Payment, to be based upon the schedule of values (shown on Exhibit A), either in the format shown on Exhibit D, and attaching AIA Form G703, or as may be otherwise specified by Contractor; and
b) Lien Waivers: Subcontractor must furnish unconditional lien waivers from itself and all its subcontractors and suppliers, including suppliers for material, equipment and labor, before progress or final payments are due to Subcontractor. Lien waivers provided by Subcontractor and its subcontractors shall be in the form attached hereto as Exhibit G, or as Contractor, Owner, or any lender or title company may otherwise require. Upon Contractor's request or if required by the General Contract, Subcontractor shall furnish conditional lien waivers with and for the payment sought in the Application for Payment.
c) Other Documents: Contractor may require other documents, in which case Subcontractor shall furnish invoices, statements and other documentation in order to substantiate the amounts claimed due in any Application for Payment.
d) Final Payment: Prior to final payment hereunder, Subcontractor shall deliver all items specified in Section 1.5 herein in addition to all other requirements hereunder, including completion of all punch list items in accordance with all Subcontract requirements.

2.3 Joint Checks: Contractor reserves the right to issue joint checks to Subcontractor and its subcontractors and suppliers, or to pay such subcontractors and suppliers directly, but this shall not obligate Contractor to see to the proper disposition or application of any money advanced to or on behalf of Subcontractor. If Subcontractor fails to certify in writing all amounts due to any of its lower tier subcontractors or suppliers within 5 days after Contractor's request for such confirmation, Contractor shall have the right to rely on such lower tier's certification of the amount due it, and upon payment of such amount directly or via joint check, the Subcontract Sum shall be reduced accordingly, without further agreement of Subcontractor.

2.4 Processing of Payment: Following timely submittal of an Application for Payment, with all other documents as required hereunder or as requested by Contractor, Contractor will begin processing such Application for Payment on the 20th of the following month (). Processing and payment may be delayed to the following month to the extent that any Application for Payment from Subcontractor is received by Contractor in an incomplete form, without required documentation (including but not limited to required insurance) and/or later than the 20th of the prior month. To the extent enforceable under applicable law, Contractor's obligation to pay Subcontractor is expressly contingent upon, and subject to, receipt of payment for the Subcontract Work by Contractor from Owner.

2.5 Retention: Contractor shall retain 10.00% of each payment otherwise due Subcontractor until the later to occur of (i) Contractor's acceptance of the Subcontract Work; and (ii) Contractor is paid its retention withheld by Owner for Contractor's Work. The retention shall be due within 15 days thereafter, or as otherwise required under applicable state law, upon a separate billing by Subcontractor, after satisfaction of the foregoing conditions in (i) and (ii), and satisfaction of all obligations of Subcontractor in Section 2.2 herein.

2.6 Right to Withhold Payment & Other Remedies: Contractor shall be entitled, upon notice to Subcontractor, to terminate this Subcontract, reduce or eliminate all or any element of the Subcontract Work (with a corresponding reduction in the Subcontract Sum), withhold payment of all or any part of an Application for Payment or nullify all or any part of a previous Application for Payment and withhold that amount Contractor reasonably deems necessary to protect the interests of Contractor and/or Owner, on account of defective work or default by Subcontractor under this Subcontract or, to the fullest extent permitted by law, any other agreement between Subcontractor and Contractor or Contractor's affiliates. Grounds for exercising Contractor's remedies hereunder include liens and claims arising out of the Subcontract Work, or reasonable evidence indicating the probable filing thereof, reasonable evidence that the Subcontract Work will not be completed within the Subcontract Completion Time, Owner's objection to the payment of the Subcontractor, bankruptcy or insolvency of Subcontractor, defective work, third-party claims arising out of the performance of the Subcontract Work; delays or damage to other contractors' work, Subcontractor's failure to provide sufficient manpower to maintain the required progress of the Subcontract Work; or any other reasonable cause. In addition to withholding payment, Contractor shall have the right to exercise any other remedy available hereunder, at law or equity, including but not limited to (i) requiring Subcontractor to remove and/or replace any defective materials or work upon notice from Contractor, at Subcontractor's sole cost and expense, (ii) removing Subcontractor from the Project, (iii) taking possession of all materials at the job site for purposes of completing the Subcontract Work, (iv) offsetting direct and indirect costs incurred by Contractor to complete, correct or accelerate the Subcontract Work, to the extent arising out of Subcontractor's breach of this Subcontract or, to the fullest extent permitted by law, any other agreement between Subcontractor and Contractor or its affiliates, against any amounts otherwise due from Contractor to Subcontractor, (v) require Subcontractor, Subcontractor's sole costs, to add extra manpower or furnish overtime labor in order to comply with the requirements of the Project Schedule, and (vi) supplement Subcontractor's crew with additional

manpower at Subcontractor's sole cost; all without any increase in the Subcontract Sum. While Contractor has the right to execute the foregoing remedies, Contractor does not have the obligation to do so, and Contractor's failure to exercise one of more of its remedies shall not be construed as a waiver by Contractor of its right to do so.

2.7 Taxes and assessments: Subcontractor hereby certifies that the Subcontract Sum includes all sales, use, consumer, franchise, excise and other taxes, and is not subject to any addition or increase on account of such taxes or assessments now or hereafter levied. Subcontractor agrees that it shall be exclusively responsible for the payment of any such additional taxes or assessments.

2.8 Changes: No change in the Subcontract Work, whether by way of alteration or addition to the Subcontract Work, shall be the basis for any increase to the Subcontract Sum or change in the Subcontract Completion Time, unless and until such alteration or addition has been authorized in writing by Contractor or by Change Order executed by Contractor and Subcontractor. Notwithstanding anything contained in the Contract Documents to the contrary, Contractor may reduce or adjust the scope of the Subcontract Work (with corresponding adjustment in Subcontract Sum) by written directive, or terminate the Subcontract, at any time for any reason, without liability for any lost profits or other damages, except that Contractor shall pay Subcontractor for all authorized, accepted and completed Subcontract Work through and including the date of such termination. For any change directed or proposed by Contractor, the Subcontractor's acceptance shall be deemed given, unless Subcontractor delivers to Contractor an itemization of any of the terms with which Subcontractor is not in agreement, the reasons for such disagreement, and Subcontractor's proposed modifications to the Change Order or change directive issued by Contractor, NO LATER THAN SEVEN (7 ) CALENDAR DAYS after issuance of the Change Order or change directive by Contractor. Accordingly, no course of conduct or dealings between the parties, nor express or implied acceptance of alteration of the Subcontract Work, or claim that the Owner or Contractor has been unjustly enriched by the alteration of the Subcontract Work, whether or not there is in fact any such unjust enrichment, shall be the basis for any claim to increase the Subcontract Sum or change the Subcontract Completion Time. A Change Order signed by Subcontractor indicates Subcontractor's agreement therewith, including the adjustment in the Subcontract Sum or Subcontract Completion Time, as the complete and final compensation for all costs or claims incurred as a consequence of the Change Order.

Subcontractor acknowledges and agrees that Contractor and Owner have relied upon Subcontractor's agreements in this Subcontract in finalizing budgets and schedule, and that Subcontractor shall not be entitled to any increase in the Subcontract Sum or Subcontract Time except to the extent expressly provided in this Section 2.8, and: (i) Owner also agrees to increase the Contract Sum and/or Contract Time under the General Contract in connection with such change; and (ii) Subcontractor submits a timely request for change in strict accordance with the requirements of this Section 2.8. If for any reason Subcontractor believes that it is entitled to a change in the Subcontract Sum or Subcontract Time, Subcontractor shall submit any such request for Change Order NO LATER THAN THREE (3) BUSINESS DAYS after the cause for such proposed change first arises and prior to any additional work being performed. A timely request for a Change must be accompanied by a detailed statement of the conditions giving rise to such a claim, and back-up that fully substantiates such claim. Field or work tickets, or any other documents claimed to be signed by Contractor's Superintendent shall not be construed as acceptance of any proposed change or as evidence of quantities or quality of materials or work performed. Compliance with the requirements set forth in this Section 2.8 shall not entitle Subcontractor to a Change Order if the substance of Subcontractor's claim would not otherwise entitle Subcontractor to the Change. In no event will Subcontractor be entitled to any changes in the Subcontract Sum or Subcontract Time if Subcontractor is otherwise in breach of the all or any part of its obligations under this Subcontract. TIME IS OF THE ESSENCE with respect to all matters relating to claims for changes, Change Orders and change directives. Except as otherwise directed by Contractor in writing, Subcontractor shall continue performance of the Subcontract Work notwithstanding any disagreement concerning proposed changes.

**If timely notices are not given by Subcontractor as and when required under this Section 2.8, or are not backed-up with verifiable documentary evidence supporting such claim, such failures shall be deemed fatal to any such claims, and Subcontractor shall be deemed to have waived any such claims.**

## Article 3
## INSURANCE & BONDS

Subcontractor shall furnish the insurance and evidence of such insurance as may be required by Contractor or Owner, the minimum of which shall be as set forth on Exhibit B. Subcontractor agrees to obligate its subcontractors, if any, to maintain the same types, levels and terms of insurance coverage as required of Subcontractor, including but not limited to the waiver of subrogation in favor of Contractor and Owner, and Subcontractor shall indemnify and hold harmless Contractor and Owner for all damages and losses, should it fail to do so. Subcontractor shall furnish a certificate of insurance acceptable in form and substance to Contractor that establishes Subcontractor's compliance with the requirements of Exhibit B. **Acceptance of such certificate shall not serve as a waiver of any requirement in Exhibit B.** Subcontractor shall submit the certificate together with copies of the required Additional Insured endorsements to Contractor, or if applicable, on-line to a third-party administrator designated in writing by Contractor, before Subcontractor starts the Subcontract Work. Notwithstanding any other provision, Contractor shall have no obligation to make any payment to Subcontractor until Contractor has received such certificates, including any required updates. If required by Contractor, Subcontractor shall furnish a performance and/or payment bond at Subcontractor's expense. In the event of a conflict between the requirements of Exhibit B and any other exhibit, the requirements of Exhibit B shall control. Subcontractor shall furnish full and complete copies of all insurance policies and endorsements required by this Subcontract upon request from Contractor.

## Article 4
## MISCELLANEOUS

4.1 The parties acknowledge and agree that the Subcontractor is an independent contractor within the purview of the Internal Revenue Code, the Federal Social Security Act and any and all equivalent state or local laws, as well as any and all unemployment insurance and worker's compensation laws, both state and federal, and is solely responsible to the state and federal governments for all payroll taxes, deductions, withholdings and contributions under such laws. The parties further acknowledge and agree that Subcontractor is solely responsible for assessments for unemployment insurance, retirement benefits, union pension and health and welfare funds, annuities, disability benefits or other purposes which are in whole or in part measured by and/or based upon the wages, salaries, or other remuneration paid to persons employed by Subcontractor and its subcontractors on the Subcontract Work under this Subcontract.

4.2 Contractor has a general contract ("General Contract") with Owner concerning the Project, which may include plans, drawings, specifications and other details and documents incorporated into such General Contract. Subcontractor agrees that Subcontractor is fully bound by and is familiar with those terms and provisions of the General Contract that pertain to the Subcontract Work. The Subcontractor hereby expressly assumes and promises to perform for the benefit of the Contractor, Owner and Owner's lenders (as their interests may appear) all of the obligations undertaken by the Contractor towards the Owner in the General Contract, to the extent relevant to the Subcontract Work.

4.3 Subcontractor may not assign this Subcontract or any amounts due under this Subcontract without the prior written consent of Contractor. Contractor may assign this Subcontract in the event it is required to do so under its General Contract. Any such assignment without Contractor's prior written consent shall be null and void and the Subcontract shall be unenforceable by such assignee against Contractor.

4.4 Subcontractor shall not install, use, generate, store, dispose of or treat on or about the Project any Hazardous Substance (as defined below) other than those Hazardous Substances commonly required in the industry for the performance of the Subcontract Work and required under the Contract Documents. Any Hazardous Substances associated with the Subcontract Work must be stored, used and disposed of in accordance with all applicable environmental laws and regulations and Subcontractor must provide the appropriate Material Safety Data Sheets to Contractor prior to commencement of the Subcontract Work. As used in this Subcontract, "Hazardous Substance" means any hazardous, toxic, or radioactive substance, material, waste, pollutant or contaminant as defined, listed or regulated by any federal, state or local law, regulation or order, or as specified in the General Contract. If any portion of the Subcontract Work requires the removal and disposal of any preexisting Hazardous Substance, including without limitation creosote treated wood, Subcontractor shall comply with all federal, state and local laws, ordinances and regulations relating to the disposal of such Hazardous Substance, and shall exercise extra care in site clean-up each day during the removal and disposal of such Hazardous Substance.

4.5 Subcontractor guarantees (the "Warranty") that the Subcontract Work, when completed, will be completed in accordance with the Contract Documents and that the Subcontract Work will be free from any defects or deficiencies, including but not limited to defects or deficiencies resulting from materials, construction or workmanship or improper design by Subcontractor ("Defect"). In the event a Defect is found to exist in violation of this Warranty within one year following the date of final acceptance of the Subcontract Work of the General Contract by the Owner, or other longer period of time as may be required by law or equity, the Contract Documents or General Contract (the "Callback Period"), then Subcontractor shall, at its sole expense, promptly repair and/or replace non-conforming work or materials ("Corrective Action") and any other part of the Project damaged in connection therewith, and shall pay all costs and expenses incurred by Owner or Contractor in connection with such Defect and Corrective Action. Following any Corrective Action, Subcontractor shall, for an additional one-year period thereafter, have a duty to repair or replace such corrective Subcontract Work. If Subcontractor fails to commence and complete Corrective Action within a reasonable time (not to exceed ten (10) days) after notice from Contractor, then Contractor shall have the right to correct such Defect and Subcontractor shall be liable to Contractor for all direct, indirect, special, consequential and other damages, including lost profits and revenue, incurred due to or in connection with such Defect and the curing of such Defect. Any special, extended or other warranties given by the Contractor to the Owner in the General Contract that pertain to the Subcontract Work are hereby expressly assumed and undertaken by the Subcontractor. Nothing in this Section is intended to limit any manufacturer's warranty which provides Owner or Contractor with greater warranty rights than set forth in this Section or the Contract Documents. Establishment of the Callback Period for correction of Subcontract Work relates only to the specific obligation of the Subcontractor to correct the Subcontract Work, and has no relationship to the time within which the obligation to comply with the Contract Documents may sought to be enforced, nor to the time within which proceedings may be commenced to establish the Subcontractor's liability with respect to the Subcontractor's obligations other than specifically to take Corrective Action.

4.6 During a period in which any dispute is outstanding between Contractor and Subcontractor, Subcontractor shall continue to perform the Subcontract Work and otherwise comply with the Subcontract, and Contractor shall pay undisputed amounts otherwise due Subcontractor hereunder.

4.7 To the fullest extent permitted by law, Subcontractor hereby agrees to indemnify, defend and hold Contractor, Owner, any lender with a security interest in the Project, and each of their respective affiliates, subsidiaries, members, managers, partners, agents, representative, trustees, directors, officers, shareholders and employees, and each of them (collectively, "Indemnified Parties") harmless from and against any and all demands, claims, suits and causes of action, liability, costs, and direct, incidental and consequential damages, and costs to satisfy any settlements and judgments arising out of or in connection with the Subcontract Work (collectively or individually, "Claims"), including without limitation court costs, arbitration fees and costs, arbitrator fees and attorney's fees whether arising at law or equity, in connection with or arising out of the performance of the Subcontract Work by Subcontractor or any of its employees, subcontractors, suppliers or anyone else for whom Subcontractor

is responsible ("Subcontractor Parties"), including but not limited to: (i) any breach by Subcontractor of this Subcontract; (ii) any liens or other encumbrances Contractor's or Owner's property or the Project, arising out of the Subcontract Work and any failure by Subcontractor or the Subcontractor Parties to pay any of its agents, employees, subcontractors or suppliers; or (iii) property damage or destruction (including loss of use resulting therefrom), bodily injury, sickness, disease, or death arising out of or in connection with the Subcontract Work or any action or inaction by the Subcontractor or the Subcontractor Parties. Notwithstanding anything contained herein to the contrary: (a) Subcontractor shall be liable for Claims in connection with consequential damages only to the extent arising out of or in connection with the Subcontract Work and to the extent Contractor is held liable for such damages by Owner or a third party; (b) Subcontractor's duty to defend shall not apply with respect to Claims that arise exclusively from the performance of professional services that are insured only through the Subcontractor's professional liability insurance policy; and (c) whenever a duty to defend applies as to any Claim, such duty shall be triggered when any one or more of the Indemnified Parties tenders their defense to Subcontractor or its insurer.

In claims against any person or entity indemnified under this Section 4.7 by an employee of the Subcontractor or Subcontractor Party, anyone directly or indirectly employed by them, or anyone for whose acts they may be liable, the indemnification obligations under Section 4.7 and Subcontractor's exposure to contribution damages, if any, shall not be capped, limited or reduced in any way, by case-law or by any limitation on the amount or type of damages, compensation, or benefits paid or payable by or for the Subcontractor under workers' or workmen's compensation acts, disability benefits acts, or other employee benefit acts.

4.8 MEDIATION & ARBITRATION OF DISPUTES IS REQUIRED

a) Except as set forth in Section 4.8(e) below, any controversy or claim arising out of or relating to this Subcontract, or the breach thereof, shall be finally resolved by non-binding mediation or by arbitration in accordance with the requirements of this Section 4.8. Notwithstanding any provision in this Subcontract regarding applicable substantive law, any arbitration shall be governed by the Federal Arbitration Act (9 U.S.C., Secs. 1-16). Nothing in this Section 4.8 shall prohibit Subcontractor from taking the necessary actions to perfect its mechanic's lien rights or payment bond rights, but the parties agree that any judicial action on the lien or bond shall be promptly stayed pending a determination on the underlying facts by the arbitrator. Following arbitration, the successful lien claimant can, as applicable, proceed with its judicial foreclosure using all the factual findings and award from the arbitration in its favor. Except as required for any party to preserve statutory lien rights, mediation and if necessary, arbitration, shall be a precondition to any litigation.

b) Upon written application of Contractor or Subcontractor, the parties shall mediate claims and disputes prior to arbitration. Any mediation or arbitration shall be administered by JAMS ("Administrator") pursuant to its Engineering and Construction Arbitration Rules & Procedures currently in effect at the time of the proceeding, adjusted as set forth below ("Rules"). If JAMS is not available or is unable to accommodate the agreed upon conditions for mediation and arbitration as set forth in this Section 4.8, the Administrator shall be the American Arbitration Association and the Rules will be its Construction Industry Arbitration Rules and Mediation Procedures. The Rules shall be adjusted as follows: (i) the claiming party shall file a written demand for mediation or arbitration of the dispute with the Administrator, with a copy sent concurrently to the other party, (ii) any mediation or arbitration shall be held in St. Louis, MO, (iii) the arbitrator shall decide the dispute in accordance with the laws of the state where the Project is located (iv) the mediator or, except as set forth in Section 4.8(c) below, the arbitrator shall be chosen pursuant to the Rules from a list of experienced construction lawyers located in Missouri within a 100 mile radius of St. Louis; and (v) the mediation shall be completed within 60 days, arbitration within 120 days, after written demand for mediation or arbitration is made.

c) To provide for expedited dispute resolution through mediation, by no later than 14 days prior to the mediation, the parties shall serve upon the mediator and each other a written position statement, with exhibits, outlining and supporting their respective claims and defenses. By no later than 3 days prior to the mediation, the parties shall serve upon the mediator and each other a response to each other's written position statement. After eight hours of actual mediation time to be conducted in a single day, if the matter is not resolved, each party shall promptly submit one last, best, and final offer and demand in writing to the mediator before adjourning the mediation. The arbitrator shall disclose to the parties the amounts and details of said last offers and demands ("Last Offers"). If the amount remaining in dispute as disclosed in the Last Offers is less than Two Hundred Thousand Dollars ($200,000.00), the mediator shall immediately assume the role of an arbitrator. The arbitrator shall not consider any item of evidence which was not produced by the parties in their respective statements of position nor disclosed to the other in the course of the mediation, all as determined by the arbitrator. Within fifteen (15) days of having received the Last Offers, the arbitrator shall issue an award which shall adopt one and only one of said Last Offers, without modification or amendment. By execution of this Subcontract, Contractor and Subcontractor specifically consents to the conversion of the mediator to an arbitrator as contemplated herein.

d) If the amount remaining in dispute as disclosed in the Last Offers is greater than Two Hundred Thousand Dollars ($200,000.00), the mediator shall not become the arbitrator, and instead either party may submit the dispute to arbitration, which shall be administered by the Administrator pursuant to the Rules. The award of the arbitrator shall be final and binding, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof. In any proceeding other than mediation, the prevailing party shall be entitled to recover all of its reasonable attorneys' fees and other costs in addition to any other relief to which it may be entitled. The "prevailing party" shall be determined by reviewing the claims resolved at arbitration, considering the quantum of the claims being prosecuted and defended, and then determining which party achieved the greater success by quantifying the amounts awarded the party recovering damages and comparing same with the amounts that the party paying damages saved (i.e., the damages actually awarded versus those that were claimed).

e) Notwithstanding anything to the contrary in this Section 4.8, if Subcontractor is joined or named by Contractor or any other party in any judicial proceeding, arbitration or mediation initiated under the terms of the General Contract or in connection with the Project otherwise ("Other Proceeding"), then Contractor and Subcontractor agree that such Other Proceeding shall preclude any proceeding under Sections 4.8(a) thru (d) concerning all claims and/or counterclaims related to the Other Proceeding. To the extent the dispute resolution provisions of the General Contract are different than the foregoing provisions, then at Contractor's option (whether or not there is a current Other Proceeding), which may be exercised at any time, such differing dispute resolution provisions shall be deemed incorporated herein, and Subcontractor agrees to comply with such provisions (if invoked by Contractor) and to participate in and be fully bound by such differing dispute resolution provisions. IF ANY CLAIM

HEREUNDER IS LITIGATED FOR ANY REASON, CONTRACTOR AND SUBCONTRACTOR HEREBY AGREE TO WAIVE ANY RIGHTS THEY MAY HAVE TO A JURY TRIAL AND INSTEAD HAVE SUCH CLAIM HEARD BY A JUDGE.

4.9 Models are not Contract Documents. To the extent that any models or electronic files are provided to Subcontractor, they are, except as otherwise provided in the Contract Documents, provided for reference purposes only, with the understanding that Subcontractor shall have an affirmative duty to verify that such models and electronic files have not been corrupted and are accurate and up-to-date. Subcontractor acknowledges that it is possible that models and electronic files may be inaccurate, and therefore may not be relied upon. All persons consulting or reviewing models and electronic files should direct any questions about same to the Contractor, in writing, for review and resolution.

4.10 If any provision of this Subcontract is found to be unenforceable or invalid in its entirety, such provision will be severed from this contract, but will not affect the enforceability or validity of any other term or condition.

4.11 This Subcontract may be executed in any number of counterparts, each of which will, for all purposes, be deemed an original, and all of which are identical. The electronic transmission of any signed original document, and retransmission of any signed electronic transmission, shall be the same as the delivery of an original if sent to the correct email address. At the request of either party, the parties will confirm electronic transmitted signatures by signing an original document. All of Subcontractor's obligations hereunder shall apply to all or any part of the Subcontract Work performed before and after full execution of the Subcontract.

4.12 CONFIDENTIALITY: Confidential Information shall be deemed to include: (a) any information concerning the Contractor or the Owner (whether prepared by the Owner, Contractor, their advisors or otherwise), including, without limitation, information regarding assets, tangible and intangible, owned, leased or licensed, which is furnished to Subcontractor by or on behalf of the Contractor or Owner (b) this Agreement; (c) the fact that the parties have had, are having or may have discussions concerning the Project; (d) any negotiations that may occur between ARCO and Subcontractor; (e) the content of all plans, specifications, design concepts, design criteria mock-ups, site-specific geotechnical and/or other information related to the Project and/or the Project site; (f) the content of any resulting Bid from Subcontractor, including the individual elements of such Bid; and (g) any notes, copies, reports, analyses, forecasts, compilations, studies, presentations, interpretations or other documents prepared by or for Subcontractor that contain or reflect, in whole or in part, the information or materials furnished to Subcontractor pursuant to this Agreement. The term "Confidential Information" does not include any information that is in the public domain. The burden of proving that information falls within (a) through (g) shall rest with Subcontractor. Subcontractor shall use the Confidential Information solely for the purpose of furnishing the Subcontract Work in connection with the Project, and shall not use the Confidential Information for any other purpose. Subcontractor shall treat and safeguard all Confidential Information as strictly private and confidential, and Subcontractor shall take all steps reasonably necessary to preserve such confidentiality. Except as specifically provided in this Agreement, Subcontractor shall not disclose any Confidential Information to any person.

4.13 NON-DISPARAGEMENT: Neither Subcontractor nor any of its employees, officers, directors and agents will at any time during or subsequent to performance of Subcontract Work on the Project, make any statements or take any actions which could reasonably be expected to damage the reputation or business of Contractor, including, but not limited to: any action or statement which may induce any customer, prospective customer, vendor, subcontractor or supplier to cease doing business with Contractor; any action or statement which may induce any independent contractor or employee to cease employment or engagement of services with Contractor; or any other disparaging statement or action regarding the business operations of Contractor. Nothing contained in this Section 4.13 shall be deemed to preclude Subcontractor from participating in good faith in any dispute resolution proceeding or from responding to lawful court orders. Contractor shall have all legal and equitable remedies available to enforce Subcontractor's obligations under this Section 4.13, including but not limited to seeking injunctive relief.

4.14. This Subcontract is a full and complete expression of the parties' agreement and there are no other terms and conditions except as expressly set forth herein. The agreement of the parties hereto may not be modified or amended except by a written agreement signed by a duly authorized agent of both parties hereto.

**THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES. IN WITNESS WHEREOF,** the parties hereto have executed this Subcontract as of the date stated above.

| Midwest Dock Solutions, Inc | | ARCO/Murray National Construction Company, Inc. | |
|---|---|---|---|
| by: Tony Zarlengo | 9/3/2021 \| 8:01 AM CDT | by: Jack York | 9/3/2021 \| 10:49 AM CD |
| **Subcontractor** | Date | **Contractor** | Date |
| Owner | | Project Manager | |
| Title | | Title | |

## Illinois Subcontract Addendum

To the extent that the terms of this Addendum conflict with the terms of the Subcontract, the terms of this Addendum shall govern. Except as modified herein, the terms of the Subcontract shall remain in full force and effect. Notwithstanding anything contained in the Subcontract to the contrary, Contractor will retain ten percent (10%) from Subcontractor's Applications for Payment, provided however, that Contractor shall withhold no more retention than allowed under applicable Illinois law. If any portion of retention is required by law to be released before Subcontractor's work is completed and/or before Contractor's work is completed, then notwithstanding anything to the contrary herein, OWNER'S PAYMENT OF SUCH RETENTION TO CONTRACTOR IS A CONDITION PRECEDENT TO SUBCONTRACTOR'S RIGHT TO PAYMENT BY CONTRACTOR and Subcontractor expressly waives all rights under the Illinois Contractor Prompt Payment Act (815 ILCS 603) to the extent necessary to effectuate this sentence. Nothing in this paragraph shall be deemed to limit Contractor's right to withhold funds as otherwise provided under this Subcontract to the extent permitted by law.

DocuSign Envelope ID: 3EA025CD-21C7-4568-B5EF-7D231ABE4F52

## EXHIBIT A
## SUB-SUBCONTRACTORS/SUPPLIERS

ARCO/Murray National Construction Company, Inc.

Job Number: C555- Crow Holdings Joliet Truck Terminal

Date: 08/31/2021

Subcontractor: Midwest Dock Solutions, Inc

Address: 3211 Holeman Ave

City, State, and Zip: Steger, IL 60475

Please list all material suppliers and sub-subcontractors.

| ITEM | MATERIAL SUPPLIER / Equipment Rental | SUBCONTRACTOR | COST |
|---|---|---|---|
| Overhead doors | Clopay | NA | $ $150,000 |
| Dock equipment | Blue Giant | NA | $ 1,000000 |
| NA | NA | NA | $ NA |
| NA | NA | NA | $ NA |
| NA | NA | NA | $ NA |
| NA | NA | NA | $ NA |
| NA | NA | NA | $ NA |
| NA | NA | NA | $ NA |
| NA | NA | NA | $ NA |
| NA | NA | NA | $ NA |
| Subcontractor Stock Material | NA | NA | $ NA |
| Subcontractor In-House Labor | NA | NA | $ NA |
| **TOTAL CONTRACT AMOUNT** | | | $ 1150000 |

Under penalty of perjury, Midwest Dock Solutions, Inc certifies that the above information is correct and any changes in the above information will be submitted to ARCO/Murray National Construction Company, Inc. in writing. Subcontractor will supply ARCO/Murray National Construction Company, Inc. with all proper material and/or sub-subcontractor affidavits or lien waivers before progress or final payments are due to subcontractor.

Tony Zarlengo
Subcontractor

9/3/2021 | 8:01 AM CDT
Date

**NOTE: ALL Subcontractors are required to sign this form with the signing of the Subcontract and to update with any additional or different suppliers or subcontractors, with each Application for Payment.**

**EXHIBIT B**
**INSURANCE REQUIREMENTS**

Subcontractor's and its subcontractors' insurance shall be purchased from companies lawfully authorized to do business in the jurisdiction in which the Project is located with a current A.M. Best's rating of not less than "A-", and that is acceptable to Contractor, and shall be written for the minimum types and limits and shall be maintained, at their expense, for the life of this Subcontract, except as otherwise provided herein.

Worker's Compensation: Worker's Compensation in accordance with the statutory requirements for the state in which the Project is located

Employers' Liability: Employers' Liability, whether required by statute or not, for a limit of not less than $500,000 bodily injury by accident, each accident; $500,000 bodily injury by disease, policy limit; $500,000 bodily injury by disease, each employee, or if greater, in the amounts required by statute.

Commercial General Liability (occurrence format), (including Premises-Operations; Products/Completed Operations which remains in force for three (3) years after Final Completion of the Project; Independent Contractors; Broad Form Property Damage. If the Project involves any type of residential work, Subcontractor's Commercial General Liability policy shall not contain any exclusions or restrictions for residential work; and If Subcontractor's work includes the application, maintenance or repair of Exterior Insulation Finish Systems (EIFS) or similar product, Subcontractor's Commercial General Liability policy shall not exclude such work or Subcontractor shall provide separate insurance covering such operations):

$1,000,000................................Per Occurrence
$1,000,000................................Personal and Advertising Injury
$1,000,000................................Products/Completed Operations Aggregate
$1,000,000................................General Aggregate (Per Project)

Automobile Liability: $1,000,000 per accident; All Owned Automobiles; Liability for Non-owned Automobiles; Liability for Hired Cars/Trucks; Uninsured Motorists

Excess/Umbrella Policy: $2,000,000 each occurrence and in the aggregate

Pollution Liability: $1,000,000 each occurrence and in the aggregate (Per Project); (required if Subcontractor or its subcontractor/consultant is providing earthwork, demolition, concrete, plumbing, pile driving, dynamic compaction, drilling services (drillers, geopiers, etc.) and/or electrical services)

Professional Liability: (required if Subcontractor or its subcontractor is providing design services or surveying and layout services):
$1,000,000 each claim
$2,000,000 annual aggregate

The above policies shall not include self-insured retentions in excess of $10,000, and if the Professional Liability is provided on a claims-made basis shall include a three-year reporting period commencing from Final Completion of the Project.

Other Coverage: Subcontractor shall be responsible for any desired coverage against damage or loss to its own materials, facilities, tools, equipment, scaffolds, bracing and similar items. In all cases, Subcontractor is responsible for all deductibles on insurance claims submitted to Owner or Contractor.

Additional Insureds and Required Endorsements: Subcontractor shall endorse Commercial General Liability, Auto Liability, Pollution Liability, and Umbrella Excess Liability policies to name **CHI DEVELOPMENT OPERATING, L.L.C., a Texas limited liability company, Joliet Route 6 Logistics I, LLC, Delaware limited liability company, NFI Real Estate, LLC,** Contractor **ARCO/Murray National Construction Company, Inc.)** and Owner **(CHI Development Operating, LLC)** as additional insureds on a primary and non-contributory basis for current, ongoing and completed operations for three (3) years after Final Completion of the Project. Because Subcontractor does not have a direct contract with the Owner, additional insured status must be provided using forms **CG 2010 04/13, CG 2037 04/13, CG 2033 04/13, CG 2001 04/13, CG 2404 05/09, & WC 00 03/13,** or equivalent. The coverage procured pursuant to this Subcontract, shall stipulate that the insurance afforded to Subcontractor and any additional insureds under Subcontractor's insurance (designated pursuant to this Subcontract) shall apply as primary insurance and that any other insurance carried by the Contractor or other additional insureds will be excess only and not contribute with Subcontractor's insurance.

Subrogation: Subcontractor waives against Owner and Contractor all damages covered by insurance provided by Subcontractor and/or sub-subcontractors of any tier, and Subcontractor and its insurance carrier(s) waive all rights of subrogation against the Owner, Contractor and their officers, directors, shareholders, employees, agents, or appointed representatives unless restricted by state statutes.

Form of Policies: All policies shall be written on the ISO form CG0001, or equivalent, **and shall be endorsed to include a 30-day prior written notice of cancellation, via EMAIL, to lesguerra@arcomurray.com.**

Certificates: **INSURANCE CERTIFICATE MUST CONFORM TO THE SAMPLE COI ATTACHED HERETO, AND SHALL SPECIFY JOB NAME AND NUMBER, AND MUST BE ACCOMPANIED BY ENDORSEMENTS IDENTIFYING ADDITIONAL INSUREDS AND THE WAIVER OF SUBROGATION (OR A COPY OF THE POLICY LANGUAGE REGARDING SAME).**

**Job Number: C555-**

**Job Name: Crow Holdings Joliet Truck Terminal**

DocuSign Envelope ID: 3EA025CD-21C7-4568-B5EF-7D231ABE4F52

# SAMPLE

## CERTIFICATE OF LIABILITY INSURANCE

DATE(MM/DD/YYYY) 2/4/2019

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | |
|---|---|---|
| | PHONE (A/C, No, Ext): | FAX (A/C, No): |
| | E-MAIL ADDRESS: | |
| | INSURER(S) AFFORDING COVERAGE | NAIC # |
| | INSURER A: | |
| INSURED<br>Subcontractor | INSURER B: | |
| | INSURER C: | |
| | INSURER D: | |
| | INSURER E: | |
| | INSURER F: | |

COVERAGES CERTIFICATE NUMBER: **COI for SUBS** REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | X COMMERCIAL GENERAL LIABILITY; CLAIMS-MADE X OCCUR; GEN'L AGGREGATE LIMIT APPLIES PER: POLICY X PRO-JECT LOC; OTHER: | X | Y | <enter policy number> | <eff date> | <exp date> | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | | $ |
| | AUTOMOBILE LIABILITY; X ANY AUTO; ALL OWNED AUTOS; SCHEDULED AUTOS; X HIRED AUTOS; X NON-OWNED AUTOS | X | Y | <enter policy number> | <eff date> | <exp date> | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | X UMBRELLA LIAB X OCCUR; EXCESS LIAB CLAIMS-MADE; DED RETENTION $ | X | Y | <enter policy number> | <eff date> | <exp date> | EACH OCCURRENCE | $ 2,000,000 |
| | | | | | | | AGGREGATE | $ 2,000,000 |
| | | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N; ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) Y; If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | Y | <enter policy number> | <eff date> | <exp date> | X PER STATUTE OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |
| | Pollution Liability | X | Y | <enter policy number> | <eff date> | <exp date> | Occurrence | 1,000,000 |
| | Professional Liability | | | <enter policy number> | <eff date> | <exp date> | Occurrence / Aggregate | 1M / 2M |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

<Project Name> <ARCO entity> and <Owner name> are included as Additional Insureds on the General Liability (per form CG 2010 04/13, CG 2037 04/13, CG 2038 04/13, CG 2032 04/13, CG 2404 05/09, CG 2001 04/13, WC 00 03/13), Business Auto Liability, Umbrella, and Pollution Liability. Additional insured coverage is Primary & Non-Contributory

Waiver of Subrogation in favor of <ARCO entity> and <Owner> on the General Liability (CG 2404 05/09), Business Auto, Umbrella, Pollution Liability, and Workers Compensation.

30 Day Notice of Cancellation will be provided for the General Liability, Commercial Auto, Workers Compensation, and Umbrella policies except for nonpayment of premium in which 10 days written notice will be provided if required by written contract.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| <ARCO entity><br>(Insert the name of the ARCO entity company with whom you are contracting) | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. SEE ABOVE.<br>AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)
INS025 (201401)

The ACORD name and logo are registered marks of ACORD

**EXHIBIT C**
**ADDITIONAL SAFETY REQUIREMENTS**

1. **Contractor's Safety & Health Manual:** Subcontractor shall comply with the most stringent safety and health requirements among the federal Occupational Safety and Health Administration (OSHA) regulations (including but not limited to Title 29 of the Code of Federal Regulations), Subcontractor's safety and health plan, and Contractor's Safety & Health Manual, which is available for reviewing at www.arcosafe.com (password: letmein). If Subcontractor is unable at any time, for any reason to access Contractor's Safety & Health Manual, Subcontractor shall notify Contractor in writing, and Contractor will provide Subcontractor with other access to the Manual.

2. **Crystalline Silica Standards:** All Subcontract Work performed shall be in compliance with the Respirable Crystalline Silica Standard under 29 CFR 1926.1153, as amended from time to time. If Subcontractor is engaged in a task identified on Table 1 of 29 CFR 1926.1153(c), Subcontractor shall fully and properly implement the engineering controls, work practices, and respiratory protection specified for that task on Table 1. If (i) Subcontractor does not implement those specified exposure control methods in the manner prescribed or if (ii) any applicable task is not identified on Table 1, Subcontractor shall assess and limit exposure to respirable crystalline silica by using alternative control methods in accordance with 29 CFR 1926.1153(d), in which case Subcontractor shall provide copies of exposure assessments to ARCO before implementing those methods. Prior to commencing any Subcontract Work, Subcontractor shall provide a copy of its written exposure control plan, as required by 29 CFR 1926.1153(g), to ARCO. As used in this paragraph, "employee" has the meaning ascribed to it in 29 CFR 1926.32.

3. **OSHA Citation Costs:** Any OSHA citations received by the Contractor due to a Subcontractor violation of safety and health requirements will be paid by the Subcontractor.

4. **Minimum Reporting Requirements:** All employee accidents, near misses, or hazardous incidents must be reported to the Contractor as soon as possible, but no later than the end of that work shift. If a Contractor associate is not present, the Subcontractor shall call 314-963-0715, and ask to speak to the Contractor's Safety Department or someone in charge of that project. Subcontractor shall submit a formal written report to Contractor within 24 hours of the incident.

5. **HAZCOM & Safety Data Sheets:** Subcontractor shall submit a written safety program and HAZCOM program to Contractor, including all site-specific Safety Data Sheets, prior to beginning the Subcontract Work.

6. **Weekly Safety Talks:** Subcontractor shall perform at least one documented weekly safety talk and submit a copy to the Contractor's superintendent on a weekly basis.

7. **PPE:** All Personal Protective Equipment (PPE) must comply with OSHA and American National Standards Institute (ANSI) standards. PPE shall include, at a minimum: Hard hat, safety glasses, high-visibility shirts or vests, minimum 4" sleeves, long pants, and hard-soled boots or shoes.

8. **English-speaking Competent Person:** Subcontractor shall have at least one English speaking 'competent person' available on site at all times during the performance of Subcontractor's work activities to facilitate communication and help identify and discuss safety and health related issues, as necessary.

9. **Daily Housekeeping:** Subcontractor shall be responsible, on a DAILY basis, to keep the work site free and clear of all debris, dirt and trash, and for generally maintaining its work area in an organized, clean and hazard-free condition. If Subcontractor fails to fulfill its obligations in this regard, Contractor may, in additional to all other remedies under the Subcontract, at law or equity, perform all required cleanup tasks and back-charge the Subcontractor for all time and costs incurred by Contractor in such cleanup activities.

10. **First Aid:** Subcontractor shall provide adequate first-aid and medical supplies for Subcontractor's employees.

11. **GFCI's:** All temporary power utilized by Subcontractor shall be equipped with Ground Fault Circuit Interrupters (GFCI). All generators shall be equipped with GFCIs.

12. **Conditions to Crane Mobilization:** Prior to mobilizing a crane, Subcontractor shall submit annual inspection records, load charts, lifting plan, operator certifications, and any additional documentation related to crane operations.

13. **Rigging/Signaling Qualifications:** Subcontractors engaged in rigging and/or signaling operations shall submit rigger/signalperson qualifications to Contractor prior to beginning Subcontract Work.

14. **Fall Protection:** Subcontractor shall provide adequate fall protection to personnel who are working or present at heights in excess of 6 feet and such personnel shall use such Subcontractor-provided fall protection.

15. **Falling Object Protection:** Subcontractor shall provide falling object protection for all scaffold systems by means of toeboards, and screens or netting when required. Establishing a Limited (or Controlled) Access Zone around the base of a scaffolding system as a means of falling object protection is not permitted.

16. **Safety Monitor System Prohibited:** ARCO prohibits the use of a Safety Monitor System as a means of fall protection for all trades. Subcontractor may use a Warning Line System in accordance with OSHA standards. Anyone outside of the Warning Line System must utilize traditional fall protection methods.

17. **Flammable Liquid Storage**: Subcontractor shall store all flammable liquids in approved metal safety cans.

18. **Temporary Lighting**: Subcontractor is responsible for provided adequate temporary lighting for Subcontractor's scope of work. Lighting levels must be in accordance OSHA 1926.56 Table D-3

19. **Qualified Equipment Operators**: Subcontractor's personnel who operate equipment must be trained and qualified. Documentation of qualifications must be submitted to Contractor before Subcontractor's personnel operate equipment.

20. **Drugs & Alcohol:** Possessing drugs or alcohol while on-site is strictly prohibited. Working under the influence of drugs or alcohol is strictly prohibited.

21. **Notifications:** Subcontractor shall give prompt written notice to the Contractor of any accident involving bodily injury, any property damage exceeding, or any failure that could have resulted in serious bodily injury, regardless of whether such injury was sustained.

**Subcontractor, its employees, subcontractors, suppliers and anyone else for whom Subcontractor is responsible shall comply with federal, state, and local safety standards, the ARCO/Murray National Construction Company, Inc. safety and health program, as well as with Subcontractor's individual safety and health program. Establishment of a safety program by the Contractor shall not relieve the Subcontractor of its safety responsibilities.**

DocuSign Envelope ID: 3EA025CD-21C7-4568-B5EF-7D231ABE4F52

**EXHIBIT D**
**REQUEST FOR PAYMENT**

To: ARCO/Murray National Construction Company, Inc.
3110 Woodcreek Drive
Downers Grove, IL 60515
lbrown@arcomurray.com

Date: ______________

Invoice No: ______________

From: Midwest Dock Solutions, Inc
3211 Holeman Ave
Steger, IL 60475
Sherrie Weber sherri@midwestdocksolutions.com

Contractor Job: C555- Crow Holdings Joliet Truck Terminal

| | |
|---|---|
| 1 Amount of Subcontract | $______________ |
| 2 Approved Change Orders | $______________ |
| 3 Total Subcontract Amount (Line 1 + Line 2) | $______________ |
| 4 Total Work Completed to Date | $______________ |
| 5 Less 10.00% Retention (Line 4 x 10.00%) | $______________ |
| 6 Total Billable Amount (Line 4 - Line 5) | $______________ |
| 7 Billable Amount ( = Line 6) | $______________ |
| 8 Less Previous Payment Request | $______________ |
| 9 Net Amount Due This Invoice (Line 7 - Line 8) | $______________ |

I have received and incorporated in this project this month, materials and/or services from the following material suppliers and/or subcontractors for the respective amounts:

| Subcontractor/Material Supplier | Item | Contract Schedule of Value | Paid to Date | To Be Paid This Period |
|---|---|---|---|---|
| | | $ | $ | $ |
| | | $ | $ | $ |
| | | $ | $ | $ |
| | | $ | $ | $ |
| | | $ | $ | $ |
| | | $ | $ | $ |
| | | $ | $ | $ |

Please indicate here if joint checks are requested: YES \ NO

______________________
(Subcontractor signature)

______________________
(Title)

______________________
(Date)

Vendor# 57639

Job/W.O. C555-

CSI # ______________

SL# C555-1011

G/L # 5060

Approved ______________

NOTE TO THE SUBCONTRACTOR

1. All Subcontracts over $10,000.00 shall submit a breakdown for invoices per Paragraph 1, Section 3 of the Bid Instructions in a format similar to AIA-G703
2. Please DO NOT revise this form.
3. Failure to use this form will result in delay of payment.
4. ALL PAYMENT REQUESTS MUST BE RECEIVED BY THE 20TH OF THE MONTH

(A

DocuSign Envelope ID: 3EA025CD-21C7-4568-B5EF-7D231ABE4F52

**EXHIBIT E**
**SUBCONTRACTOR'S SCOPE OF WORK**

**JOB NAME: Crow Joliet Truck Terminal**

**JOB NO.: C555**

**DATE: 8/31/21**

**SUBCONTRACTOR: Midwest Dock Solutions**

**Scope of Work:**

| | |
|---|---|
| (140) Blue Giant Dock Levelers | $539,000 |
| (140) Dock Lights | $33,600 |
| (140) Dock Shelters | $173,600 |
| Dock Tax | $32,500 |
| (140) Clopay OH Sectional Doors | $280,000 |
| (1) Clopay Drive-in-Door with motor | $5,250 |
| (140) sets of Z-guards | $31,500 |
| Door Tax | $13,131 |
| **Total Base Contract** | **$1,108,581** |
| Pending Alt: Airbag levelers | $91,000 |
| Pending Alt: Dock restraints | $525,000 |
| Pending Alt: Dock Fan combos | $18,900 |

**Dock Levelers & Equipment**

A. Provide all labor, material, equipment, supervision, layout, expertise, etc., required to provide a turnkey installation of the dock levelers.

B. Special care must be taken with the floor slab. Delivery trucks will not be permitted on the slab and only lifts with wrapped or non-marking tires and diapered under-carriages will be permitted on the slab. Lifts that are leaking any type of fluids will not be permitted on the slab.

C. Furnish and install 20" tall heavy duty laminated steel bumpers with 4" projection for (140) dock positions.

D. Furnish and install (140) dock levelers.
   1. Dock levelers should be mechanical
      a. There is a **PENDING ALTERNATE** to provide airbag levelers
   2. 6' W x 8' L
   3. 40,000 lbs capacity, with 16" hinged lip projection and necessary brackets at each position.
   4. All levelers shall be grey colored
   5. Blue Giant brand
   6. **Pending Alternate:** Provide electric dock restraints at (140) dock positions with red/green backup light and combination control panel.

E. Furnish and install dock shelters at (140) dock positions.

F. Furnish and install LED flex arm dock lights at (140) dock positions.

DocuSign Envelope ID: 3EA025CD-21C7-4568-B5EF-7D231ABE4F52

1. There is a **PENDING ALTERNATE** to install combination dock lights/fans in lieu of just dock lights.

G. Provide a one (1) year labor and material warranty.

H. This subcontractor shall be responsible to complete layout for this work and clean up. ARCO will provide dumpster.

**Overhead Doors**

A. Furnish and install the following overhead doors:
   1. One hundred and forty (140) EA – 9'-0" W x 10'-0" H overhead sectional doors
   2. One (1) 12'-0" W x 14'-0" H overhead section door, with electrical operator

B. Provide and install a "heavy duty" operator with push button control for the door above that an operator is required for (drive in door). Operator to be 480/277V.

C. Control wiring to be included for the push button.

D. All overhead doors shall be counter balanced overhead.

E. All overhead doors shall be internally strutted.

F. Overhead doors shall contain a minimum of R-14 insulation.

G. All doors shall be furnished with a baked on white enamel primer finish on galvanized steel faces. The interior face shall be colored vinyl (white).

H. All doors shall have 3" tracks and wheels and 25,000 cycle springs.

I. All doors shall be high or vertical lift type.

J. Provide two (2) 12" x 24" vision panels on all doors.

K. Provide rubber astragals for all overhead doors.

L. Provide heavy-duty weather-stripping at heads, jambs, and sills.

M. The subcontractor shall be responsible to complete layout for this work and clean up. ARCO will provide dumpster.

N. The floor slab may or may not be poured prior to overhead doors installation.

O. All overhead doors shall be supported from the precast concrete walls. Tracks and tension springs shall be fastened to precast with concrete anchors.

P. Provide a separate lifting handle mounted 18" above finished floor elevation for manually operated sectional overhead doors.

Q. Provide side mounted locks for all overhead doors. Mount these sidelocks greater than the height of the Z-guards as to not interfere. Additionally – provide a slot to allow all overhead doors to be locked at a height of 12" AFF for ARCO to use during construction to "air out" the buildings.

R. Provide Z-guards at each overhead dock door (141 total dock positions including drive in door)

**Submittals**

A. All shop drawings are to be submitted within five (5) days of contract award.

B. All product data and samples are to be submitted within five (5) days of contract award.

**Tentative Schedule**

A. Work to start: December 2021

B. Lead times:

Doors: 16 weeks
Dock Levelers: 22 weeks

C. Durations:

Doors: 30 days
Dock Levelers: 12 days
Dock Shelters: 15 days

**T&M Rates**

**Straight time: $135/hr**
**Overtime: $165/hr**
**Double time: $200/hr**

**General Requirements:**

A. Claim any extras within 10 calendar days from date of occurrence. No extras can be approved later. Extras must be approved in writing by ARCO/Murray National Construction Company, Inc. representative before work begins.

B. Conform to all OSHA, hazardous communications, and other applicable safety requirements, including but not necessarily limited to the following:

1. GFI and Assured Grounding of Electrical Outlets

   All extension cords shall have either a GFI receptacle or be routinely checked as part of a written and recorded assured grounding program.

2. Hazardous Communications Program:

   Each subcontractor on ARCO/Murray National Construction Company, Inc.'s job sites must maintain a hazardous materials file for his own employees. Each file shall contain Material Safety Data Sheets (MSDS) on all material used in that specific project's construction.

   It is the subcontractor's responsibility to notify other Contractor's on the job site of any hazardous materials to which their employees may be exposed.

3. Any fines or penalties imposed by OSHA for work relating to subcontractor's scope shall be deducted from the subcontractor's compensation.

4. All workers shall dress in accordance with OSHA regulations and professional standards. Hard hats, long pants and safety shoes will be required of everyone on the project.

5. Excavations that are four feet or more in depth shall be either slopped or shored according to the specifications set aside in subpart P of the occupational safety and health standards for construction.

6. Provide backup alarms on all equipment.

7. It is the subcontractor's responsibility to insure that all equipment utilized to complete its scope of work is inspected and properly maintained per the equipment manufacturers and OSHA's standard. In addition, this subcontractor is responsible for properly training all employees who are operating said equipment including but not limited to lifts, excavation equipment, cranes, fork lifts, welders, etc.

C. If subcontractor's employee(s) arrives at the job site without a hard hat, the employee(s) will be issued a hard hat by ARCO/Murray National Construction Company, Inc. The hard hat will become property of the subcontractor and the subcontractor will be charged $50.00 for each hard hat issued to their employee(s). At no time will a subcontractor's employee be allowed to work at the site without a hard hat.

D. Subcontractor will perform all cleanup associated with subcontractor's work. ARCO/Murray National Construction Company, Inc. will provide dumpsters.

E. Procore:
   1. All subcontractors will be invited to collaborate on Procore, our online construction management tool:
      a. Procore comes at **NO COST** to subcontractors

DocuSign Envelope ID: 3EA025CD-21C7-4568-B5EF-7D231ABE4F52

b. We suggest taking the Certification course through Procore to familiarize your Project Manager and Project Superintendent with the Procore tools needed. The course is at No COST and can be found on the link below https://learn.procore.com/series/procore-certification-subcontractor-client

c. Procore use for Subcontractor/GC coordination will include, but is not limited to:
   i. Drawing/Document Distribution
      1) All drawing revisions, sketches, etc. will be added to Procore in order to ensure a most-current set is always accurate and accessible to everyone on the project.
   ii. Drawing Markups
      1) Each subcontractor's jobsite foreman is required to maintain a Procore account for necessary project coordination.
      2) Procore is accessible via tablet/iPad or computer; therefore, jobsite foreman shall be able to have daily access to a tablet/iPad or computer.
   iii. RFI's
      1) Subcontractors are required to formally submit all RFI's through Procore to ensure that it will be answered by the appropriate party in a timely fashion.
   iv. Submittals
      1) Subcontractors are required to upload all submittals (and revised submittals) to Procore.

E. No exclusions or changes from the drawings, specifications or bid instructions will be permitted without written approval from ARCO/Murray National Construction Company, Inc. project manager or superintendent.

F. ARCO/Murray National Construction Company, Inc. will allow the Subcontractor progress payments at monthly intervals, in the ratio and to the extent of this Subcontractor's completed work. Ten percent (10%) retention will be withheld from each progress payment. Retention withheld may be invoiced thirty (30) days after the completion of the subcontract work. The retention will be released upon completion of the project and after ARCO/Murray National Construction Company, Inc. receives the retention payment from the Owner. All requests by the Subcontractor for progress payments and retention must be originals (faxed copies are unacceptable) delivered to ARCO/Murray National Construction Company, Inc. at its principal office on or before the 25th day of the month in order to be processed for payment on or after the 20th day of the succeeding month. All payment requests should be made on the Contractor payment request form.

G. Insurance Requirements – See Exhibit B.

H. It is the Subcontractor's responsibility to visit the job site prior to bidding to familiarize himself with actual job site conditions.

I. All materials used shall be new and first quality, and shall be installed in accordance with manufacturer's recommendations.

J. On contracts over $10,000, the successful Subcontractor will be required to submit a schedule of values to be approved. Monthly invoices shall be prepared according to the schedule of values. Breakdowns shall include columns showing (1) item (2) value (3) percent completed to date (4) the amount previously invoiced and (5) the amount being invoiced. Breakdowns must be submitted to ARCO/Murray National Construction Company, Inc. for approval within ten (10) days of the date of award.

K. Subcontractor shall include all applicable taxes, fees, permits, freight, hoisting.

DocuSign Envelope ID: 3EA025CD-21C7-4568-B5EF-7D231ABE4F52

ARCO/Murray National Construction, Inc.

# EXHIBIT F- DRAWING LOG

Printed on Fri Aug 13, 2021 at 11:31 am CDT

Job #: C555 Crow Holdings Joliet Truck Terminal
2901 Channahon Rd.
Joliet, Illinois 60436
331-251-2726

**Current Drawings**

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| Architectural | | | | | |
| A2.1.1 | OVERALL FLOOR PLAN | 1 | 07/08/2021 | | Revision 2- 7/8/21 (07/08/21) |
| A2.1.2 | ENLARGED FLOOR PLAN - AREA A | 2 | 07/08/2021 | | Revision 2- 7/8/21 (07/08/21) |
| A2.1.3 | ENLARGED FLOOR PLAN - AREA B | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| A2.1.4 | ENLARGED FLOOR PLAN - AREA C | 1 | 06/02/2021 | | Revision 1- 6/2/21 (06/02/21) |
| A2.2.1 | PLAN DETAILS | 1 | 06/02/2021 | | Revision 1- 6/2/21 (06/02/21) |
| A2.3.1 | ROOF PLAN | 1 | 07/08/2021 | | Revision 2- 7/8/21 (07/08/21) |
| A2.4.1 | ROOF DETAILS | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| A4.1.1 | DOOR SCHEDULE | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| A4.2.1 | DOOR DETAILS | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| A4.3.1 | PARTITION TYPES AND DETAILS | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| A4.4.1 | WINDOW TYPES AND DETAILS | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| A5.1 | EXTERIOR ELEVATIONS | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| A5.2 | EXTERIOR ELEVATIONS | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| A5.3 | EXTERIOR ELEVATIONS | 1 | 06/02/2021 | | Revision 1- 6/2/21 (06/02/21) |
| A6.1 | WALL SECTIONS | 1 | 06/02/2021 | | Revision 1- 6/2/21 (06/02/21) |
| A6.2 | WALL SECTIONS | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| A6.3 | WALL SECTIONS | 1 | 06/02/2021 | | Revision 1- 6/2/21 (06/02/21) |
| A7.1 | SECTION DETAILS | 1 | 07/08/2021 | | Revision 2- 7/8/21 (07/08/21) |
| A7.2 | SECTION DETAILS | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| A8.1 | STAIR DETAILS | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| LS1.1 | LIFE SAFETY PLAN | 1 | 07/08/2021 | | Revision 2- 7/8/21 (07/08/21) |
| T1.1 | TITLE SHEET | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| T1.2 | ENVELOPE COMCHECK | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| T1.3 | PROPOSED GUARDSHACK | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| Civil | | | | | |
| C0.0 | CIVIL LEGEND & SITE LOCATION MAP | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C0.1 | GENERAL NOTES & SPECIFICATIONS | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C1.0 | OVERALL EXISTING CONDITIONS & DEMO PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C1.1 | DETAILED EXISTING CONDITIONS & DEMO PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C1.2 | DETAILED EXISTING CONDITIONS & DEMO PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |

DocuSign Envelope ID: 3EA025CD-21C7-4568-B5EF-7D231ABE4F52

ARCO/Murray National Construction, Inc.

Printed on Fri Aug 13, 2021 at 11:31 am CDT

Job #: C555 Crow Holdings Joliet Truck Terminal
2901 Channahon Rd.
Joliet, Illinois 60436
331-251-2726

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| C1.3 | DETAILED EXISTING CONDITIONS & DEMO PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C1.4 | DETAILED EXISTING CONDITIONS & DEMO PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C2.0 | OVERALL SITE PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C2.1 | DETAILED SITE PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C2.2 | DETAILED SITE PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C2.3 | DETAILED SITE PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C3.0 | OVERALL GRADING & STORMWATER MANAGEMENT PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C3.1 | DETAILED GRADING & STORMWATER MANGEMENT PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C3.2 | DETAILED GRADING & STORMWATER MANGEMENT PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C3.3 | DETAILED GRADING & STORMWATER MANGEMENT PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C3.4 | DETAILED GRADING & STORMWATER MANGEMENT PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C4.0 | OVERALL UTILITY PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C4.1 | DETAILED UTILITY PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C4.2 | DETAILED UTILITY PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C4.3 | DETAILED UTILITY PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C5.0 | CONSTRUCTION DETAILS | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C5.1 | CONSTRUCTION DETAILS | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C5.2 | CONSTRUCTION DETAILS | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C5.3 | CONSTRUCTION DETAILS | 1 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C6.0 | SOIL EROSION & SEDIMENT CONTROL PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C6.1 | SOIL EROSION & SEDIMENT CONTROL PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C6.2 | SOIL EROSION & SEDIMENT CONTROL DETAILS | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| Electrical | | | | | |

DocuSign Envelope ID: 3EA025CD-21C7-4568-B5EF-7D231ABE4F52

ARCO/Murray National Construction, Inc.

Printed on Fri Aug 13, 2021 at 11:31 am CDT

Job #: C555 Crow Holdings Joliet Truck Terminal
2901 Channahon Rd.
Joliet, Illinois 60436
331-251-2726

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| E1 | SCHDULES, NOTES, AND DIAGRAMS | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| E1A | Panel Schedules | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| E2 | Warehouse Lighting | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| E3 | Warehouse Power | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| E4 | Site Work | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| Landscape | | | | | |
| L1.1 | TREE REMOVAL & PROTECTION PLAN - SW | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L1.2 | TREE REMOVAL & PROTECTION PLAN - NW | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L1.3 | TREE REMOVAL & PROTECTION PLAN - SOUTH CENTER | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L1.4 | TREE REMOVAL & PROTECTION PLAN - NORTH CENTER | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L1.5 | TREE REMOVAL & PROTECTION PLAN - CENTER EAST | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L1.6 | TREE REMOVAL & PROTECTION PLAN - EAST | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L2.0 | LANDSCAPE PLAN SHEET REFERENCE | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L2.1 | LANDSCAPE PLAN SOUTHWEST | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L2.2 | LANDSCAPE PLAN NORTHWEST | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L2.3 | LANDSCAPE PLAN SOUTH CENTER | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L2.4 | LANDSCAPE PLAN NORTH CENTER | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L2.5 | LANDSCAPE PLAN CENTER EAST | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L2.6 | LANDSCAPE PLAN EAST | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L3.1 | PLANTING DETAILS | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| Mechanical | | | | | |
| M0.0 | EQUIPMENT SCHEDULES | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| M1.0 | OVERALL MECHANICAL FLOOR PLAN | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| Plumbing | | | | | |
| P100 | OVERALL PLUMBING PLAN | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| P200 | PLUMBING DETAILS AND NOTES | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| Structural | | | | | |
| S1.1 | PARTIAL FOUNDATION PLAN | 2 | 08/03/2021 | | Structural Rev 2 - 8/3/21 (08/03/21) |
| S1.2 | PARTIAL FOUNDATION PLAN | 2 | 08/03/2021 | | Structural Rev 2 - 8/3/21 (08/03/21) |
| S2.1 | PARTIAL ROOF FRAMING PLAN | 2 | 08/03/2021 | | Structural Rev 2 - 8/3/21 (08/03/21) |
| S2.2 | PARTIAL ROOF FRAMING PLAN | 2 | 08/03/2021 | | Structural Rev 2 - 8/3/21 (08/03/21) |
| S3.1 | FOUNDATION DETAILS | 2 | 08/03/2021 | | Structural Rev 2 - 8/3/21 (08/03/21) |
| S3.2 | FOUNDATION DETAILS | 2 | 08/03/2021 | | Structural Rev 2 - 8/3/21 (08/03/21) |
| S4.1 | FRAMING DETAILS | 2 | 08/03/2021 | | Structural Rev 2 - 8/3/21 (08/03/21) |
| S4.2 | FRAMING DETAILS | 2 | 08/03/2021 | | Structural Rev 2 - 8/3/21 (08/03/21) |
| S4.3 | JOIST LOADING DIAGRAMS | 2 | 08/03/2021 | | Structural Rev 2 - 8/3/21 (08/03/21) |
| S5.1 | GENERAL NOTES & SCHEDULES | 2 | 08/03/2021 | | Structural Rev 2 - 8/3/21 (08/03/21) |
| S5.2 | SPECIAL INSPECTIONS | 2 | 08/03/2021 | | Structural Rev 2 - 8/3/21 (08/03/21) |

DocuSign Envelope ID: 3EA025CD-21C7-4568-B5EF-7D231ABE4F52

**EXHIBIT G**
**LIEN WAIVER FORMS**

22

5/24/19

MDS - 002576

**PARTIAL WAIVER AND RELEASE OF LIEN**

STATE OF ____________ )

COUNTY OF ____________ )

TO WHOM IT MAY CONCERN:

The undersigned has been engaged by ARCO/Murray National Construction Company, Inc. ("Contractor") to furnish labor and materials for the premises known as, C555- Crow Holdings Joliet Truck Terminal, 2901 Channahon Rd. Joliet, IL 60436 (the "Premises"), of which CHI Development Operating, LLC is the Owner. The undersigned hereby acknowledges receipt of payment in the amount of ______________________________ Dollars ($______) for all work performed and materials purchased for the Premises.

The undersigned does hereby waive and release all claims against Contractor and Owner, and releases any and all liens, and claims or rights to lien on the above described building and premises under the Statutes of the State of IL relating to Mechanic's Liens, on account of labor, materials, and extras, including all direct and indirect costs for such Work, furnished by the undersigned for said building and premises.

Claimant represents and warrants that Claimant has authority to enter into, execute and deliver this Lien Waiver, and this Lien Waiver constitutes the valid and binding obligations of Claimant and that Claimant has no claims against Contractor or Owner other than for the payment amount referenced above. The undersigned representative acknowledges he or she is the appropriate officer and is authorized to execute this Lien Waiver.

Given under my hand and seal this ________ day of __________________, 20__.

Company:

Midwest Dock Solutions, Inc

By: ______________________

Print Name: ________________

Title: ______________________

Office phone: ______________

**Reference Check Number:**______

**Job Number:**_ C555-

**Job Name:** Crow Holdings Joliet Truck Terminal

DocuSign Envelope ID: 3EA025CD-21C7-4568-B5EF-7D231ABE4F52

**FINAL WAIVER AND RELEASE OF LIEN**

STATE OF ________ )

)

COUNTY OF ________ )

The undersigned has been engaged by ARCO/Murray National Construction Company, Inc. ("Contractor") to furnish labor and materials for the premises known as, C555- Crow Holdings Joliet Truck Terminal, 2901 Channahon Rd. Joliet, IL 60436 (the "Premises"), of which CHI Development Operating, LLC is the Owner.

The undersigned do(es) hereby release Contractor and Owner from claims in connection with the Project, and quit claims to the Owner, their successors and assigns, all liens, lien rights, claims or demands of any kind whatsoever, which the undersigned now has or might have against the building located on the Premises on account of labor performed and/or materials furnished for the construction of any improvements thereon (including all direct and indirect costs for such Work).

Claimant represents and warrants that: (i) Claimant has authority to enter into, execute and deliver this Lien Waiver, (ii) Claimant has paid all claims, invoices and bills for labor and materials (including union pension fund contributions, if applicable) for the Project, and there are no outstanding unpaid claims that could give rise to a lien or claim against Contractor, Owner, or the Project; (iii) Claimant has no other claims against Contractor or Owner in connection with the Project; and (iv) this Lien Waiver constitutes the valid and binding obligations of Claimant. The undersigned representative acknowledges he or she is the appropriate officer and is authorized to execute this Lien Waiver.

Given under my hand and seal this ________ day of ________________, 20__.

Company Name:

Midwest Dock Solutions, Inc

By: ________________________

Print Name: ________________

Title: ______________________

Telephone Number: __________

Reference Check Number: __________

**Job Number:** C555-

**Job Name:** Crow Holdings Joliet Truck Terminal

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 109

**From:** Tony Brutti <tonyb@midwestdocksolutions.com>
**Sent:** Tuesday, July 25, 2023 12:55 PM
**To:** Christi Adams
**Subject:** [EXTERNAL] Re: FW: Matteson Commerce Center - Closeout Time!
**Attachments:** Shop Drawings.pdf; Liftmaster J operators manual.pdf; Clopay Commercial Installation Manual - 2015.pdf

Closeout documents attached for Matteson Commerce from Midwest Dock Solutions. Standing by for Warranty Letter information.

On Tue, Jul 18, 2023 at 11:07 AM Ira Sugar <ira@midwestdocksolutions.com> wrote:

**From:** Christi Adams <CAdams@pepperconstruction.com>
**Sent:** Tuesday, July 18, 2023 10:15 AM
**To:** ptrainor@activeglassco.com; timreif@adlerplbg.com; Jason Tenpas <jtenpas@aaexs.com>; Matt Skole <mskole@allsealants.com>; Brian Bartasius <bbartasius@alliancecousa.com>; Shahara Byford <sbyford@byfordconstruction.com>; G. Maldonado <gmaldonado@cecchin-inc.com>; JJ Hund <jhundjr@classiclandscapeltd.com>; William Sweatt <wsweatt@connellyelectric.com>; Ryan Andreas <randreas@continentalpainting.com>; ellisonb@fairbornequipment.com; Ernesto Esparza <eesparza@glenrockcompany.com>; bhochstatter@houseofdoorsinc.com; Dan Maras <dmaras@portaking.com>; Ken Bridgmon <ken@kingerysteel.com>; Ira Sugar <ira@midwestdocksolutions.com>; Don Anderson <danderson@plote.com>; eringstad@primescaffold.com; Will McCoy <wmccoy@rankingroup.com>; Joe Ryan <joe.ryan@ryancentral.com>; Mike O'Connell <MikeO@scurtocement.com>; Jennifer Niemiec <jniemiec@sunmechsys.com>; apmosqueda@truseal-inc.com; Paul Suvanich <Paul.Suvanich@usafp.us>; Melissa Murphy <mmurphy@parvinclauss.com>
**Cc:** Chance Van Dyck <CVanDyck@pepperconstruction.com>; Angela Wisker <AWisker@pepperconstruction.com>
**Subject:** Matteson Commerce Center - Closeout Time!

Good morning, Matteson Team, please start pulling together your closeout information for Matteson 57 Commerce! We thank you for all your efforts out there and the part you played. For those still working out there please forward when you can – thank you everyone!

For now, please get your As-Builts and Operation & Maintenance Manuals together, you can start forwarding your information electronically to my attention. It will be determined later if we need hard copies. Please name your pdfs clearly.

PLAINTIFF'S EXHIBIT 246 LAL

At this time, we are not sure of our Warranty Date, so do not send your warranties over quite yet. I will forward a form letter over once the client gives us the date to use! Thank you.

**I. AS-BUILT DRAWINGS** (you know who you are for this)

**II. OPERATIONS & MAINTENANCE MANUALS**

1. Operating instructions.
2. Maintenance instructions for equipment and systems.
3. Maintenance instructions for special finishes, including recommended cleaning methods and materials, and special precautions identifying detrimental agents.
4. Shop Drawings and product data.
5. Test Reports

**III. WARRANTIES -** HOLD OFF ON THIS RIGHT NOW

1. Warranty letter – **Substantial completion date** *********
2. Provide copies/certificates of manufacturer and all extended warranties that apply to your work or material provided.

Please let me know who will be pulling this data together from your team. Please let me know if you have any questions. Thank you!

Christi S Adams
Project Coordinator

**Pepper Construction Company**

411 Lake Zurich Road, Barrington, IL 60010

T 847-620-4037

**Be kind to each other**

*Click here to read Pepper's 2022 Annual Review* | *Join our team*

--
Yours,

Tony Brutti
Midwest Dock Solutions
Phone: 815-922-5258
Email: tonyb@midwestdocksolutions.com

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 110

**From:** Tony Brutti <tonyb@midwestdocksolutions.com>
**Sent:** Friday, August 2, 2024 12:41 PM
**To:** Thomas Braun
**Subject:** [EXTERNAL] Re: FW: McMaster-Carr Closeouts
**Attachments:** Warranty Letter.pdf; Approved 083233-001 Coiling Fire Door Shop Drawings REV3_VDT Final.pdf; Cornell Fire Door Installation Instructions.pdf

**This Message Is From an External Sender**
This message came from outside your organization.

Report Suspicious

Closeout documents attached for McMaster-Carr from Midwest Dock Solutions.

On Fri, Aug 2, 2024 at 12:14 PM <ira@midwestdocksolutions.com> wrote:

**From:** Thomas Braun <Thomas.Braun@pepperconstruction.com>
**Sent:** Thursday, August 1, 2024 1:28 PM
**To:** Ira Sugar <ira@midwestdocksolutions.com>
**Cc:** Colin Thomson <CThomson@pepperconstruction.com>; Kelly Brockway <KBrockway@pepperconstruction.com>
**Subject:** McMaster-Carr Closeouts

Ira,

We now have our substantial completion date set as **7/26/24.**

With that date set could you please provide us with the following closeout documents.

- Warranties
- O&M Manuals
- Owner Trainings – Please contact us with times that trainings can be done so we can get them scheduled

Closeout documents are required to release final payments.



Please reach out if you have any questions.

Thanks,

Thomas Braun

Intern

Pepper Construction

411 Lake Zurich Road, Barrington, IL, 60010

Main Office: 847-381-2760

Work: 312-266-6915

**Pepper Construction**
Tomorrow Transformed

Click here to read Pepper's 2023 Annual Review | Join our team

--
Yours,

Tony Brutti
Midwest Dock Solutions
Phone: 815-922-5258
Email: tonyb@midwestdocksolutions.com



OFFICE 708.367.0801
FAX 708.367.0802
EMERGENCY SERVICE 708.921.8950

July 26, 2024

Pepper Construction Company
643 North Orleans Street
Chicago, IL 60654

Re: **McMaster-Carr**

To Whom It May Concern:

We, **Midwest Dock Solutions** warrant to **McMaster-Carr**, that all materials and equipment furnished under our Subcontract are new, unless otherwise specified, and that all Work is of good quality, free from improper workmanship and defective materials and in conformance with Drawings and Specifications. We agree to correct all Work performed under this Agreement which proves to be defective in material and workmanship within a period of one (1) year from the date of Substantial Completion July 26, 2024, or for such longer periods of time as may be set forth with respect to specific warranties contained in the Specifications.

The warranty provided herein shall not be construed to establish a period of limitation with respect to other obligations the Subcontractor has under the Subcontract Documents. Establishment of the one-year period for correction of Work as described herein relates only to the specific obligation of the Subcontractor to correct the Work, and has no relationship to the time within which the obligation to comply with the Subcontract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Subcontractor's liability with respect to the Subcontractor's obligations other than specifically to correct the Work.

We have secured the required inspections and approvals and will deliver copies of these reports to Pepper Construction Company.

Sincerely,

Anthony Zarlengo, President
**Midwest Dock Solutions**

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 111

**From:** Tony Brutti <tonyb@midwestdocksolutions.com>
**Sent:** Thursday, March 28, 2024 10:29 AM
**To:** Christi Adams
**Subject:** [EXTERNAL] Re: FW: RR Donnelley Wallace / Midwest Dock Agreement - Issued thru DocuSign
**Attachments:** SSSP Pepper RR Donnelley Wallace.pdf

**This Message Is From an External Sender**
This message came from outside your organization.

Report Suspicious

SSSP for RR Donnelley Wallace attached from Midwest Dock Solutions.

On Fri, Mar 22, 2024 at 10:31 AM Ira Sugar <ira@midwestdocksolutions.com> wrote:

Will share contact once I get it.

Ira

---

**From:** Christi Adams <CAdams@pepperconstruction.com>
**Sent:** Thursday, March 21, 2024 2:40 PM
**To:** Ira Sugar <ira@midwestdocksolutions.com>
**Cc:** Tim Lumpp <TLumpp@pepperconstruction.com>
**Subject:** RR Donnelley Wallace / Midwest Dock Agreement - Issued thru DocuSign

Hi Ira, just a quick email to let you know that your contract for RR Donnelley Wallace has been issued thru DocuSign. Please sign as soon as possible & order up your COI per attached Exhibit C.

Please also note, the following shall be submitted within 5 business days:

1. Site Specific Safety Plan
2. MSDS/HazCom
3. Certificate of Insurance (per exhibit C requirements.)
4. All Submittals, as applicable (submittals must be submitted in their entirety as specified in the project specifications)
5. DRAFT Schedule of Values with the following line items
    a. Labor for all phases of work
    b. Material for all phases of work
    c. Submittals
    d. Mobilization
    e. Closeout Documents

No work can begin onsite until all items are received and approved.

Thank you, we look forward to working with you.

Congratulations on your recent award!

Christi S Adams
Project Coordinator

**Pepper Construction Company**

411 Lake Zurich Road, Barrington, IL 60010

**T** 847-620-4037

**Pepper Construction**
**Tomorrow Transformed**

Click here to read Pepper's 2023 Annual Review | Join our team

***Please note: Our Chicago location will be temporarily closed for renovations from 1/12/2024 through Fall of 2024.***
While our phone numbers will not change, any deliveries should be addressed to: Pepper Construction, 125 E. Oakton Des Plaines, IL 60018

--
Yours,

Tony Brutti
Midwest Dock Solutions
Phone: 815-922-5258
Email: tonyb@midwestdocksolutions.com

# SITE SPECIFIC SAFETY PLAN

**Pepper Construction**
**RR Donnelley Wallace**

1750 Wallace Avenue
St. Charles, IL 60174

**SUBCONTRACTOR**

Midwest Dock Solutions
27 E. 36th Pl.
Steger, IL 60475

Contacts:
Tony Zarlengo, 708-367-0801
Mike Richert, 708-825-4303

Pepper Project Manager: Tim Lumpp

1. Midwest Dock Solutions Contacts
   a. Project Manager- Tony Zarlengo
   b. Field Operations Manager- Mike Richert
   c. Site Foreman/Competent Person- David Green

2. Pepper Construction Contacts
   a. Project Manager – Tim Lumpp 847-381-2760
   b. Site Superintendent – Jay Munoz

3. Local Medical Facility
   a. Northwestern Medicine Delnor Hospital 300 S. Randall Rd, Geneva, IL 60134
   b. Call 911 for Emergencies
   c. ALL accidents reported immediately to Midwest Dock Solutions and Pepper Construction Site Superintendent. Accident Report to Midwest Dock Solutions Office and Pepper Construction per onsite policy.

4. Midwest Dock Scope of Work
   a. Detailed scope of work:

      Installation of Sectional doors

   b. Phases of Work:

      Tracking, Panels, and weatherseal

   c. Equipment to be used:

      Work trucks, man lifts

   d. Typical Work Hours:

      Typically 7:00AM – 3:30 PM

5. Site Specific Safety
   a. Perform Pre-Task Safety Analysis prior to starting any new task
   b. Weekly Toolbox talks
   c. SDS in Gang Box
   d. SDS on file with Controlling Contractor
   e. Proper PPE
      i. Hard Hats
      ii. Safety Glasses
      iii. High Visibility Vest
      iv. Ear Plugs
      v. Harness & Lanyards

f. Documentation provided to Pepper per on-site policy.

6. On-Site Rules
   a. Proper Safety Practices
   b. Proper PPE
   c. Proper Housekeeping
      i. Cleanup of area to commence Waste to on-site dumpster.
      ii. Gang Box kept in good order

   e. Smoking only allowed in designated areas per on-site policy

7. Disciplinary Policy
   a. Violation – violation of any Company rule or regulation without premeditation and without cause of injury, property damage or loss of work.
      i. 1st – Verbal warning with discussion on proper methods to be used.
      ii. 2nd – Written notice issued to employee
      iii. 3rd – Up to one day off without pay
   b. Serious Violation – violation of Company rule or regulation without premeditation, but results in an injury, sickness, property damage or loss of work.
      i. 1st - Up to one day off without pay
      ii. 2nd – Up to three days off without pay
      iii. 3rd – Termination of employment
   c. Willful Violation – violation of Company rule or regulation with premeditation or forethought. The discipline indicated below is the minimum. However, the degree of discipline may be extended or increased to termination of employment on the first or second violation, depending on the seriousness of the violation.
      i. 1st – Minimum of one day off without pay
      ii. 2nd – Minimum of three days off without pay
      iii. 3rd – Termination of employment

__________________________

Tony Zarlengo,
President
Midwest Dock Solutions

March 27, 2024

Google Maps 1750 Wallace Ave, St. Charles, IL 60174 to Northwestern Medicine Delnor Hospital

Drive 4.4 miles, 12 min

1750 Wallace Ave
St. Charles, IL 60174

**Take Madison Ave to S 7th Ave**

3 min (0.9 mi)

1. Head west

220 ft

2. Turn right toward Wallace Ave

52 ft

3. Turn left toward Wallace Ave

279 ft

4. Turn right onto Wallace Ave

0.2 mi

5. Continue onto Madison Ave

0.6 mi

6. Turn right onto S 7th Ave

8 sec (203 ft)

**Continue on Madison Ave to IL-25 N**

59 sec (0.3 mi)

7. Turn left onto Madison Ave

0.2 mi

8. Turn left onto S 6th Ave

0.1 mi

**Follow Prairie St and S Randall Rd to Williamsburg Ave in Geneva**

7 min (2.8 mi)

9. Turn right onto IL-25 N

0.1 mi

10. Keep left to continue on Riverside Ave

0.1 mi

11. Turn left onto Prairie St

1.7 mi

12. Turn left onto S Randall Rd

0.9 mi

**Continue on Williamsburg Ave to your destination**

2 min (0.4 mi)

13. Turn right onto Williamsburg Ave

0.1 mi

14. Turn left onto Delnor Dr

0.1 mi

15. Turn right

236 ft

16. Turn left

289 ft

Northwestern Medicine Delnor Hospital

300 S Randall Rd, Geneva, IL 60134

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 112

**From:** Tony Brutti <tonyb@midwestdocksolutions.com>
**Sent:** Thursday, March 28, 2024 10:29 AM
**To:** Christi Adams <CAdams@pepperconstruction.com>
**Subject:** [EXTERNAL] Re: FW: RR Donnelley Wallace / Midwest Dock Agreement - Issued thru DocuSign

SSSP for RR Donnelley Wallace attached from Midwest Dock Solutions.

On Fri, Mar 22, 2024 at 10:31 AM Ira Sugar <ira@midwestdocksolutions.com> wrote:

> Will share contact once I get it.
> Ira
>
> ---
>
> **From:** Christi Adams <CAdams@pepperconstruction.com>
> **Sent:** Thursday, March 21, 2024 2:40 PM
> **To:** Ira Sugar <ira@midwestdocksolutions.com>
> **Cc:** Tim Lumpp <TLumpp@pepperconstruction.com>
> **Subject:** RR Donnelley Wallace / Midwest Dock Agreement - Issued thru DocuSign
>
> Hi Ira, just a quick email to let you know that your contract for RR Donnelley Wallace has been issued thru DocuSign. Please sign as soon as possible & order up your COI per attached Exhibit C.
>
> Please also note, the following shall be submitted within 5 business days:
>
> 1. Site Specific Safety Plan
> 2. MSDS/HazCom
> 3. Certificate of Insurance (per exhibit C requirements.)
> 4. All Submittals, as applicable (submittals must be submitted in their entirety as specified in the project specifications)
> 5. DRAFT Schedule of Values with the following line items
>
>    a. Labor for all phases of work
>    b. Material for all phases of work
>    c. Submittals
>    d. Mobilization
>    e. Closeout Documents
>
> No work can begin onsite until all items are received and approved.
>
> Thank you, we look forward to working with you.

PLAINTIFF'S
EXHIBIT
98
tabbies

Congratulations on your recent award!

Christi S Adams
Project Coordinator

Pepper Construction Company
411 Lake Zurich Road, Barrington, IL 60010
T 847-620-4037

**Tomorrow Transformed**

Click here to read Pepper's 2023 Annual Review | Join our team

***Please note: Our Chicago location will be temporarily closed for renovations from 1/12/2024 through Fall of 2024.***

While our phone numbers will not change, any deliveries should be addressed to: Pepper Construction, 125 E. Oakton Des Plaines, IL 60018

--
Yours,

Tony Brutti
Midwest Dock Solutions
Phone: 815-922-5258
Email: tonyb@midwestdocksolutions.com

--
Yours,

Tony Brutti
Midwest Dock Solutions
Phone: 815-922-5258
Email: tonyb@midwestdocksolutions.com

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 113

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MID-AMERICA CARPENTERS REGIONAL COUNCIL PENSION FUND, et al.,

Plaintiffs,

vs.

DOCK & DOOR INSTALL, INC., an Illinois corporation and MIDWEST DOCK SOLUTIONS, INC., an Illinois corporation,

Defendants.

No. 1:24-cv-02428

Judge Andrea R. Wood

Magistrate Judge Jeannice W. Appenteng

The deposition of VERONICA ELLYN O'CONNOR, called by the Defendant for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before DIANE M. NULICK, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said State, taken by way of Zoom videoconferencing on the 16th day of October, A.D. 2025, at 12:02 p.m.

PRESENT:

McJESSY, CHING & THOMPSON, LLC,
BY: MR. KEVIN P. McJESSY,
mcjessy@MCandT.com,
(3759 North Ravenswood, Suite 231,
Chicago, Illinois 60613,
(773) 880-1260),

appeared on behalf of the plaintiffs;

ALLOCCO MILLER & CAHILL, P.C.,
BY: MS. KATHLEEN M. CAHILL,
kmc@alloccomiller.com,
(20 North Wacker Drive, Suite 3517,
Chicago, Illinois 60606,
(312) 675-4325),

appeared on behalf of the defendant, Dock & Door Install, Inc.;

AMUNDSEN DAVIS LLC,
BY: MR. MICHAEL F. HUGHES,
mhughes@amundsendavislaw.com,
(3815 East Main Street, Suite A-1,
St. Charles, Illinois 60174,
(630) 587-7925/(630) 217-1228 (direct),

appeared on behalf of the defendant, Midwest Dock Solutions, Inc.

OGLETREE DEAKINS,
BY: MS. CARISSA A. TOWNSEND,
carissa.townsend@ogletree.com,
(155 North Wacker Drive, Suite 4300,
Chicago, Illinois 60606,
(312) 558-1423),

appeared on behalf of the deponent.

I N D E X

WITNESS: VERONICA ELLYN O'CONNOR

| EXAMINATION BY: | PAGE |
|---|---|
| Mr. McJessy | 5 |
| Mr. Hughes | 98 |
| Mr. McJessy | 114 |

| PLAINTIFF'S EXHIBITS: | |
|---|---|
| No. 278 | 26 |
| No. 254 | 36 |
| No. 255 | 38 |
| No. 256 | 40 |
| No. 257 | 41 |
| No. 258 | 41 |
| No. 286 | 48 |
| No. 259 | 53 |
| No. 260 | 57 |
| No. 279 | 58 |
| No. 280 | 59 |
| No. 281 | 61 |
| No. 282 | 62 |
| No. 283 | 63 |
| No. 284 | 64 |
| No. 285 | 64 |
| No. 286 | 66 |
| No. 287 | 75 |
| No. 288 | 77 |
| No. 290 | 81 |
| No. 291 | 83 |
| No. 293 | 86 |
| No. 296 | 90 |

THE COURT REPORTER: Good afternoon. My name is Diane Nulick with Certified Reporting Company, telephone number (312) 922-1666. Their email is certifiedreportingco@gmail.com.

At this time, I will ask counsel to identify yourselves, state who you represent, and agree on the record that there is no objection to this deposition officer administering a binding oath to the witness by Zoom.

Let's start with the noticing attorney.

MR. McJESSY: Kevin McJessy. I represent the Mid-America Carpenters Regional Council Fringe Benefit Funds. I have no objection.

MR. HUGHES: Michael Hughes. I represent Midwest Dock Solutions, one of the defendants. There's no objection.

MS. TOWNSEND: Carissa Townsend on behalf of Assured Partners. No objection.

MS. CAHILL: Kathleen Cahill on behalf of Dock & Door. No objection.

(The witness was duly sworn.)

VERONICA ELLYN O'CONNOR, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MR. McJESSY:

**Q. All right.**
**Ms. O'Connor, can you please state your full name for the record -- first, middle, and last -- and spell each of them for me?**
A. Sure. It's Veronica Ellyn O'Connor. Veronica is spelled V-e-r-o-n-i-c-a. Ellyn is E-l-l-y-n. O'Connor is O-'-C-o-n-n-o-r.
**Q. Excellent.**
**And, Ms. O'Connor, have you been deposed before?**

A. I have not.
**Q. Okay.**
**Have you had a chance to meet with your attorney before your deposition today?**
A. I did have the time, yes.
**Q. Okay.**
**And she probably may have gone over some of these rules with you, but I'm going to offer a few rules to hopefully make things go a little bit faster and smoother today.**
**First, you understand you're under oath, correct?**
A. Correct.
**Q. Okay.**
**And even though this is a proceeding by Zoom, you understand that that oath has the same force and effect as if you were testifying in court?**
A. Yes.
**Q. Okay.**
**And I'm going to ask you a series of questions today. Hopefully, you'll**

**give me the best, most truthful answers that you can.**
**If I ask a question and you don't understand it, will you ask me to explain my question?**
A. Yes.
**Q. Okay.**
**Then is it fair that if I ask a question and you answer it, I can presume that you believe you understood my question?**
A. Yes.
**Q. Okay.**
**And all of your answers today need to be verbal responses. Yeses and nos are fine. But if you nod or shake your head or say ah-huh or uh-uh, I'll probably prompt you, is that a yes, is that a no, just so we have a clear record.**
**Is that fair?**
A. Yes, it is.
**Q. All right.**
**Also, wait -- I'm going to ask you a series of questions. The attorneys may make objections as we go along. If they**

**do, just wait for them to make their objections, and then unless your own attorney instructs you not to answer question, you can go ahead and answer the question after the parties make their objections. Okay?**
A. Yes.
**Q. All right.**
**Also, is there any reason today that you cannot give truthful answers to my questions? For example, are you under any medications or suffering from any conditions that would prevent you from either understanding my questions or answering them truthfully?**
A. There is not.
**Q. Okay. All right.**
**And then last but not least, there may be a few times today where you know what my question is going to be before I finish asking it. Sometimes your inclination might be to be start answering my question because you know what I'm going to ask. But we have a court reporter taking down what -- what everybody is saying, so it's hard for her to do**

**that if two people talk at the same time. So if I ask -- if I'm asking a question, I'll ask that you wait until I'm done asking it before you start to answer, and I will try to return that courtesy and not ask you a new question while you're still answering a question that I have asked.**

**Is that fair?**

A. Yep.

**Q. All right.**

**What's the highest level of education you've received?**

A. High school.

**Q. Okay.**

**And when did you graduate from high school?**

A. 2006.

**Q. And where was that?**

A. West Chicago Community High School.

**Q. And what was the first job that you had out of high school?**

A. Boston Market.

**Q. Okay.**

**And -- well, where do you**

**work now? Let's --**

A. Assured Partners.

**Q. Okay.**

**How long have you worked at Assured Partners?**

A. Since 2011.

**Q. And have you received -- outside of high school, have you received any education or training or any sort of further education beyond high school even if it's specific to your industry?**

A. Yes.

**Q. What -- what training and education have you received?**

A. Well, I have my property and casualty license.

**Q. Okay.**

A. So that included testing and classes.

**Q. Anything else?**

A. I did do a -- about two and a half years of college. I did not graduate.

**Q. Where did you go to college?**

A. The Art Institute of Pittsburgh.

**Q. And during what period of time?**

A. In my early 20's.

**Q. I guess I meant approximately during what years. I'm sorry.**

A. Give me a minute to think about that. So probably about 2007 through 2009.

**Q. Okay. All right.**

**And what was your field of study there?**

A. Interior design.

**Q. Excellent.**

**And then you left there in approximately 2009.**

**What did you do between 2009 and 2011 when you started with Assured Partners?**

A. I was working full time at Boston Market as a -- yeah.

**Q. Okay.**

**And you started to work for Assured Partners in 2011.**

**What position were you hired for?**

A. I was hired for a mail position, as in incoming mailing that was delivered to our

office.

**Q. All right.**

**And how long were you in that position?**

A. A short time. I would estimate about six months.

**Q. Okay.**

**What was your next position?**

A. Certificates of insurance and surety.

**Q. And what did you do as a part of your -- strike that.**

**What were your responsibilities in certificates of insurance and surety?**

A. I would review requests coming in from our clients and issue the certificates per the request. And then in regards to the surety, it was issuing surety bonds of different types.

**Q. Okay.**

**Did you do anything else?**

A. No, not during that time.

**Q. All right.**

**Was -- and how long were you in that position?**

A. Approximately a year.
**Q. Okay.**
**Was one of your clients while you were in that position Midwest Dock Solutions?**
A. I cannot recall if they were my client -- well, the agency clients. I believe so.
**Q. Do you know whether during that period of time you would have been issuing certificates of insurance and surety bonds for Midwest Dock Solutions?**
A. I personally could have, yes.
**Q. You just don't recall because it's too long ago? Is that it?**
A. Correct.
**Q. Okay.**
**And so you were in that position for about a year, so that would take us sometime to 2012, maybe '13?**
A. Yes.
**Q. All right.**
**And then what was your next position?**

A. To a small business commercial lines account manager.
**Q. All right.**
**And what -- what was -- what did that entail?**
A. That entailed issuing new policies for clients, reviewing policies for the clients, servicing their insurance needs all around, ultimately.
**Q. Okay.**
**Now, you mentioned you took a -- you have your property and casualty license, and that involved some testing and taking of classes, correct?**
A. Yes.
**Q. When did you do that? When did you get your property and casualty license?**
A. Approximately, 2011.
**Q. So right around this period of time?**
A. When I started working with Assured Partners, yes.
**Q. Okay.**
**And -- and around the same time, you became a -- a small commercial account manager?**

A. I don't have the exact date. I was -- I want to believe that I was licensed prior to the account manager position. It was prior to the certificate and surety position as well.
**Q. Oh, I see. Okay.**
**And what did -- have you taken any continuing classes or education since you obtained your property and casualty license?**
A. Yes.
**Q. Okay.**
**And what does that -- what has that entailed?**
A. Every two years, we have to take, at least, 24 credits, CE credits. So I have taken those credits in addition to ethics classes.
**Q. All right.**
**And what did the -- you have to do -- every two years you have to take the continuing education classes that you have described?**
A. Correct.
**Q. And what do the -- not the ethics classes, but the other classes, what do those generally entail?**

A. Different topics of commercial insurance is what I would take the classes for, so general liability, umbrella liability, property coverage.
**Q. All right.**
**And then what do the ethics classes focus on?**
A. A lot of them focus on claims situations within the industry.
**Q. So other than the continuing legal education -- or, I'm sorry, strike that.**
**Other than the continuing education classes and the ethics classes and other than the time that you spent at college, have you had any other post high school education or training?**
A. Yes.
**Q. What else?**
A. While working at Boston Market, I took training on classes for management and sanitation.
**Q. Was that through Boston Market?**

A. It was through the McDonald's Corporation, yes.
**Q. Okay.**
**Oh, I didn't know they were part of McDonald's.**
**All right. And any -- any other training or education that you've had?**
A. I do take regular training, and I'm -- a lot of training in education, I would say, throughout the year, courses provided by our carriers that I do attend from time to time.
**Q. Okay.**
**Now, after you were a -- you worked in the mailroom, then you worked for -- issuing certificates of insurance and surety bonds. And then you became -- I think I have the title right -- a commercial small account manager?**
A. Small business commercial account manager, yes.
**Q. And how long were you in that position?**
A. Approximately a year and a half.
**Q. All right.**

**And then what was your next position?**
A. Middle market customer service representative.
**Q. Middle market -- I'm sorry. What did you say after that?**
A. A CSR, so customer service rep.
**Q. Customer service?**
A. Ah-huh.
**Q. Now, just so I'm clear, are you familiar with Esser Hayes?**
A. Yes.
**Q. Okay.**
**And what's -- you were working -- I'm trying to understand. I just want to make sure I've got it clear.**
**You were working for Assured Partners during this time, correct?**
A. No. Esser Hayes.
**Q. Oh, okay. I think you said you were hired by Assured Partners in 2011, but you meant you were hired by Esser Hayes in 2011?**
A. Correct.
**Q. Okay.**

**And Esser Hayes eventually became Assured Partners, correct?**
A. Correct.
**Q. Okay.**
**But you were working with Esser Hayes when you were hired, correct?**
A. Yes.
**Q. How long -- when did Esser Hayes become Assured Partners?**
A. 2019.
**Q. When did you -- when do you recall first being aware of Midwest Dock Solutions?**
A. Some time ago. I'm sorry. It's hard to put these years into -- I want say around, probably, 2012, my time as a small business account manager.
**Q. Okay.**
**I was just trying to figure out, during your different positions, when you would have first had interaction with Midwest Dock Solutions.**
A. Yes. That would be then.
**Q. All right.**
**And were they one of your**

**accounts?**
A. Not mine personally, no.
**Q. Okay.**
**And do you know whose account they were at that time?**
A. I do not know.
**Q. Okay.**
**But you did work on their account, I take it?**
A. Correct.
**Q. Okay. All right.**
**And we'll come back to that, but what were -- what were your responsibilities as a middle market customer service rep? How did that change from your responsibilities as a small business commercial account manager?**
A. In the middle market CSR role, I was assisting other account managers in the middle market space.
**Q. And what were you doing as a small business commercial account manager?**
A. In the small business commercial account manager? I was handling the primary

contact for our clients on that size of accounts.

**Q. And was Midwest Dock Solutions a small business commercial account?**

A. At that time, I believe so.

**Q. Okay.**

**And what did you do in handling the small business commercial accounts? What kind of things would you do?**

A. I would answer client questions regarding their insurance policies, billing questions, process the renewals, issue certificates.

**Q. Okay.**

A. The day-to-day insurance. It doesn't sound like a lot.

**Q. Well, actually, it does.**

**And what would you do as a middle market customer service rep? You said you assisted other account managers. What -- what were your duties?**

A. Creating proposals of insurance, requesting endorsements to carriers, processing those endorsements from the carriers. In that

position, I was more of a second point of contact, not the primary.

**Q. Okay.**

**So the customer would reach out to their account manager, and then the account manager would reach out to you?**

A. Correct.

**Q. All right.**

**And what was -- what was a small account versus a middle market account?**

MR. HUGHES: Kevin, I'm going to object. This -- you know, this large line of questioning is just not related to the topics on the 30(b)(6) subpoena that you issued. It's not -- it's not an individual deposition, so the -- this is the beyond subject of the subpoena.

MS. TOWNSEND: I'll be joining that objection.

BY MR. McJESSY:

**Q. You can go ahead and answer.**

A. Can you please repeat the question?

**Q. What is the -- what is considered a small business account versus a middle market**

**account?**

A. During that time period, I believe it was based on the revenue that we received from the insurance carriers of 2500 and below.

**Q. Okay.**

**And then what was your next position after middle market customer service rep?**

A. Middle market account manager.

**Q. Okay.**

**And how long were you in that position?**

A. Two years.

**Q. And did you -- were you responsible for Midwest Dock Solutions' account during that period of time?**

A. Our agency was, yes.

**Q. Okay.**

**But it wasn't your personal account?**

A. Correct.

**Q. Okay.**

**And what was your next position after middle market account**

**representative?**

A. Client service manager.

**Q. And what -- what time period are we up to with client service manager?**

A. I would say about 2017.

**Q. Okay.**

**And you're familiar with a company called Dock & Door Install, correct?**

A. Yes.

**Q. Okay.**

**Were they your account at this time?**

A. They were the agency -- at 2017? I believe part of that year, yes.

**Q. Okay.**

**And do you know when you first became familiar with Dock & Door Install?**

A. I do not know.

**Q. Okay.**

**And then what was your next position after middle market account manager?**

A. After the middle market account manager, I was the client service manager.

**Q. Okay. Oh, okay.**

**And how long were you in that position?**
A. Four years.
**Q. Okay.**
**And then what was your next position after that?**
A. Director of commercial lines.
**Q. Okay.**
**Is that your current position?**
A. That is, yes.
**Q. And when did you become director of commercial lines?**
A. 20 -- end of 2022.
**Q. All right.**
**And what are your responsibilities as director of commercial lines?**
A. I manage and oversee our commercial lines department.
**Q. Okay.**
**And what does that -- what does mean? What are your duties?**
A. I manage about 30 employees, service employees.
**Q. Okay. All right.**

(WHEREUPON, the document marked Plaintiff's Exhibit 278 for identification was tendered to the deponent.)

BY MR. McJESSY:
**Q. All right.**
**I'm going to do a share screen here, and I'm showing you what's been marked as Exhibit 278.**
**Do you see that?**
A. Yes.
**Q. And this is the subpoena that caused you to be here today, correct?**
A. Yes.
**Q. All right.**
**And you're the person most knowledgeable about the matters that are described in the subpoena rider; is that correct?**
A. Yes.

**Q. All right.**
**And you'll see that -- I'm going to go through the topics that are in the subpoena.**
**Have you seen the subpoena -- you've seen the subpoena before, correct?**
A. Yes.
**Q. Okay.**
**And item one says -- asks -- asks Assured Partners to produce the person most knowledgeable about its efforts to gather and produce documents responsive to the subpoena.**
**Do you see that?**
A. Yes.
**Q. Okay.**
**And is that you?**
A. Yes, it is.
**Q. All right.**
**And we received two PDFs of documents from Assured Partners. One was email communications and the other was insurance documents, including certificates of insurance and parts of or -- or complete insurance policies.**
**Does that sound right to you?**
A. Yes.
**Q. All right.**
**And are you the one who assembled those documents for production?**
A. I am.
**Q. Okay.**
**And did anybody else assist you in that endeavor?**
A. No.
**Q. Okay.**
**And how did you go about gathering the documents to respond to the subpoena?**
A. I extracted them from our agency management system and saved them into a shared drive.
**Q. Okay.**
**And then were you the one who combined them into a PDF?**
A. Some of the documents extract from our system into a PDF.
**Q. Oh, I see.**

A. So, yes.
**Q. Okay.**
**So that's how they extracted, one as a group of email communications and the other as a group of policy-related documents?**
A. Correct.
**Q. Okay.**
**The next item is the work services and products that Assured Partners performed for or provided to Dock & Door and Midwest Dock.**
**Are you the person most knowledgeable about that?**
A. Yes.
**Q. Okay.**
**Number three is the information provided by either Dock & Door or Midwest Dock to subpoena respondent.**
**Are you the person most knowledgeable about that?**
A. Yes.
**Q. All right.**
**The persons from Dock & Door and Midwest Dock who were in contact with the**

**subpoena respondent, Assured Partners, regarding the work performed for or products provided to Dock & Door and Midwest Dock.**
**Are you the person most knowledgeable about that?**
A. Yes.
**Q. Okay.**
**The communications between the subpoena respondent, Assured Partners, on the one hand and either Dock & Door or Midwest Dock on the other hand, that would -- you're the most the person most knowledgeable about that?**
A. Yes.
**Q. Okay.**
**To the extent Assured Partners has knowledge -- knowledge about the relationship between Dock & Door and Midwest Dock, would you be the person most knowledgeable about that?**
A. Yes.
**Q. Okay.**
**The ownership, management, and operation of Dock & Door and Midwest Dock,**

**to the extent that Assured Partners has knowledge about that, are you the person most knowledgeable?**
A. Yes.
**Q. All right.**
**The coverage -- the insurance coverage obtained by Assured Partners for Dock & Door and Midwest Dock, are you the -- are you the person most knowledgeable about that?**
A. Yes.
**Q. Okay.**
**And then the next one, all certificate of insurance documents that were provided to any general contractor or other third-party for insurance carried by either Dock & Door or Midwest Dock and the documents such as emails or fax cover pages showing the transmittal of the certificate of insurance docs -- documents, are you the person most knowledgeable about that?**
A. Yes.
**Q. Okay.**
**Any additional insurance on**

**any policy issued to Dock & Door or Midwest Dock, are you the person most knowledgeable about that?**
A. Yes.
**Q. Okay.**
**And all communications between Assured Partners and any third-party, including any general contractor on behalf of Dock & Door or Midwest Dock, are you the person most knowledgeable about that?**
A. Yes.
**Q. Okay.**
**And then the documents that were requested, item one is communications between Assured Partners and Dock & Door or Midwest Dock or -- or their employees or agents, you -- how did you gather those emails responsive to that document request?**
A. I extracted them from our agency management system.
**Q. And -- and how did you do that? Like did you search by email address or by account or -- or how was that done?**
A. Yeah. I searched by account, and I go

to the attachments within the account, and I can just right click and export.

**Q. Okay.**

**And to the best of your knowledge, that would capture communications with anyone from Dock & Door or Midwest Dock regarding its insurance matters with Assured Partners?**

A. Yes.

**Q. Okay.**

**And -- and you'll see above here, it says, the document requests herein apply to the period from January 1, 2020, to the present.**

**Was that the time period that you limited your request to?**

A. Yes.

**Q. Okay.**

**Or your search or however you did it?**

A. Yes.

**Q. Okay.**

**Item two asks for all certificate of insurance documents that were**

**provided to any general contractor or third-party for that period.**

**As best you know, have you produced all of those insurance certificates?**

A. Yes.

**Q. Okay.**

**For Dock & Door and Midwest Dock?**

A. Correct.

**Q. Okay.**

**All documents -- item three is all documents showing any party added as an additional assured on any policy issued to either Dock & Door or Midwest Dock.**

**Do you see that?**

A. Yes.

**Q. And have those documents been provided, as far as you know?**

A. Yes.

**Q. Okay.**

**And then item four is all declaration pages for policies providing insurance coverage to either Dock & Door or Midwest Dock.**

**Have all of those been provided?**

A. Yes.

**Q. Okay.**

**All invoices, billing statements, or account statements for any policy issued to either Dock & Door or Midwest Dock, have those documents been provided?**

A. Yes, all that we have had in our system.

**Q. Okay.**

**All documents showing any refund made on any insurance or bond, any insurance policy or bond providing coverage to Dock & Door or Midwest Dock, to the extent that those documents exist, have they been produced?**

A. All of the documents from our system, yes.

**Q. Okay.**

**And -- now, do you know offhand approximately how many certificates of insurance you've provided for -- provided in response to the subpoena for Dock & Door?**

A. Offhand, I do not know.

**Q. Okay.**

**If I told you the number was 26, does that sound about right?**

A. Yes.

(WHEREUPON, the document marked Plaintiff's Exhibit 254 for identification was tendered to the deponent.)

BY MR. McJESSY:

**Q. Okay.**

**I'm going to show you what we've previously marked as Exhibit 254.**

**Let's see. All right.**

**And do you see Exhibit 254 there?**

A. Yes.

**Q. All right.**

**And that's an insurance certificate.**

**This was issued on behalf of Dock & Door Install, correct?**

A. Yes.

**Q. And it was issued to ARCO Murray, and there's a -- is that correct?**
A. Yes.
**Q. And there's a date in the upper right-hand corner that's -- can you see that? It says 3/20/25. I can make it larger if its hard to see.**
A. Yes. Please make it larger.
Yes. I see 3/20/2025.
**Q. Okay.**
**So is that when the certificate would have been issued?**
A. Yes.
**Q. All right.**
**And that was the only certificate that I saw in the production for ARCO Murray on behalf of Dock & Door Install. This one was issued in March of 2025.**
**Do you know how this certificate of liability insurance came to be issued?**
A. I do not know the exact steps of how this was issued, no.
**Q. Okay.**

**So that was Exhibit 254.**

(WHEREUPON, the document marked Plaintiff's Exhibit 255 for identification was tendered to the deponent.)

BY MR. McJESSY:
**Q. And then I'm going to show you Exhibit 255.**
**All right. Well, this is a little different.**
**All right. And do you see Exhibit 255 there?**
A. Yes.
**Q. All right.**
**And this is a six-page exhibit. And these are certificates of -- of insurance issued to Clayco, and I'm going to flip through all six, again, real quick for you.**
**Can -- can you see that, or do you need me to make it larger?**
A. I can see some of it. It depends on

what I need to see.
**Q. Can you see where it says, the insured and the certificate holder?**
A. Yes.
**Q. Okay.**
**I'll try to make it a little bit bigger. I don't know how big the screen you're on is -- that you're looking at is.**
**Can you see the date is 3/3/20?**
A. Yes.
**Q. Okay.**
**And then this is the second page.**
**You can see the date is 3/1/2020?**
A. Yes.
**Q. And, again, it's for Clayco.**
**Do you see that?**
A. Yes.
**Q. And then the next one is 8/6/2020, again, for Dock & Door for Clayco, correct?**
A. Yes.
**Q. All right.**

**The next one's also 8/6/2020 for Dock & Door for Clayco, correct?**
A. Yes.
**Q. All right.**
**And then the next one is the same date, 8/6/2020, for Dock & Door, also for Clayco, correct?**
A. Yes.
**Q. And the last one is for 6/28/22 for Dock & Door for Clayco, correct?**
A. Yes.
**Q. All right.**

(WHEREUPON, the document marked Plaintiff's Exhibit 256 for identification was tendered to the deponent.)

BY MR. McJESSY:
**Q. I'm now showing you what's been marked as Exhibit 256. This is one insurance certificate issued on 8/6/2020 for Krusinski Construction.**
**Do you see that?**

A. Yes.

(WHEREUPON, the document marked Plaintiff's Exhibit 257 for identification was tendered to the deponent.)

BY MR. McJESSY:

**Q. All right.**

**Showing you what's been marked as Exhibit 257, which is a single insurance certificate for Meridian Design Build.**

**Do you see that?**

A. Yes.

**Q. And the issue date on this one is 4/14/25, correct?**

A. Yes.

(WHEREUPON, the document marked Plaintiff's Exhibit 258 for identification was tendered to the deponent.)

BY MR. McJESSY:

**Q. All right.**

**Now, I'm showing you Exhibit 258, and this is a 17-page exhibit, and these -- you'll see where it says insured is still Dock & Door, and this says certificate holder is 550 West Jackson, owner.**

**Do you see that?**

A. Yes.

**Q. And I'm just going to -- I'm going to scroll through these. And if you can tell me when you've had a chance to look at the insured and the certificate holder on the certificate and the date, let me know, and then I'll flip to the next one. Okay?**

A. Okay. Okay, next. Next. Next. Next. Next. Next. Next. Next. Next. Next. Next. Next. Next. Next. Next. Next. Next.

**Q. That's the last one.**

A. Oh.

**Q. All right.**

**So all of those certificates of insurance I just showed you, do you believe that's the universe of certificates of**

**liability insurance that were issued on behalf of Dock & Door that you have that were responsive to the subpoena?**

A. Yes.

**Q. Okay.**

**And how long has Dock & Door been a client of Assured Partners?**

A. As far as I know, I believe it was since -- 2013 is as far as my system goes back.

**Q. All right.**

**Do you know how they became a client of Assured Partners?**

A. A producer of Esser Hayes, at the time, brought them in as a client.

**Q. All right.**

**Do you know who that was?**

A. Which company are you referring to?

**Q. Dock & Door.**

A. I do not know the exact person at that time, no.

**Q. Okay.**

**And when -- is Dock & Door still a client of Assured Partners?**

A. Dock & Door is not.

**Q. Okay.**

**And when did it cease to be a client of Assured Partners?**

A. I believe -- I am not 100 percent positive of that answer.

**Q. Okay.**

**What would be your best guesstimate?**

A. My best guesstimate was -- I believe, Dock & Door was 2024, in January.

**Q. Now, you saw a couple of certificates of insurance that were issued in March of 2025, correct?**

A. Correct, so you're right.

**Q. Does that help?**

A. That does help.

So we were the agent of record on -- in March of 2025.

**Q. Okay.**

**But your -- your recollection is, I take it, that it was sometime early in 2025 that they stopped being a client?**

A. I am going to correct myself.

**Q. That's fine.**

A. I believe that I've mistaken the two. So Dock & Door, we did not renew their policy in 2025.

**Q. Okay.**

A. Which I believe was July.

**Q. Okay.**

**And for Midwest Dock Solutions, do you know how they became a client of -- if I say Assured Partners, do you understand that includes Esser Hayes?**

A. Yes.

**Q. Okay.**

**And if I say Esser Hayes, of course, I mean Esser Hayes. But when did -- or strike that.**

**How did Midwest Dock Solutions become a client of Esser Hayes?**

A. Midwest Dock Solutions was also brought in by a producer.

**Q. Okay.**

**Do you know, was it the same producer?**

A. I do not know.

**Q. Okay.**

**Do you know who that was?**

A. I do not.

**Q. Okay.**

**And Midwest Dock Solutions, it's no longer a client of Assured Partners, correct?**

A. Correct.

**Q. Do you know when Midwest Dock left -- left Assured Partners?**

A. 2023.

**Q. All right.**

**Do you know, did they transition some of their insurance policies away from Assured Partners prior to that?**

A. Prior to 2023?

**Q. Correct.**

A. Yes, I believe so.

**Q. And the reason I ask is, I don't see certificates of insurance for Midwest Dock in your document production, and I don't see any -- any significant communications -- I'm not sure I saw any from 2023 -- between Assured Partners and Midwest Dock Solutions. So could you be off on that date?**

A. I could be off, yes.

**Q. Okay.**

A. I do believe we had one policy left with us that ended in 2024, which probably did not require a lot of correspondence.

**Q. Okay.**

**Do you know what policy that was?**

A. It was an ERISA bond.

**Q. Okay.**

**An ERISA bond?**

A. Correct.

**Q. And that was with Midwest Dock Solutions?**

A. Yes.

**Q. What's an ERISA bond?**

A. An ERISA bond is a surety bond that covers the 401(k) employee assets.

**Q. Oh, okay.**

**Covers the 401(k) assets of Midwest Dock Solutions for its employees?**

A. Correct.

**Q. Okay. All right.**

**Now, you would also provide**

**certificates -- "you," meaning Assured Partners -- also provided insurance certificates for Midwest Dock Solutions, correct?**

A. Yes.

**Q. Okay.**

**And do you know approximately how many certificates of insurance you provided for Midwest Dock Solutions to its different contractors?**

A. I do not know the number.

**Q. Okay.**

**Do you know approximately?**

A. Not that many. I believe, 15 to 20.

**Q. Okay.**

A. That number could be off.

(WHEREUPON, the document marked Plaintiff's Exhibit 286 for identification was tendered to the deponent.)

BY MR. McJESSY:

**Q. Okay.**

**Let me start out by showing you -- I'm going to start out by showing you Exhibit 286, and I'll point out to you that the PDF is 688 pages long.**

**So I don't know how practical it is to go through all of these, but these are certificates of insurance for Midwest Dock Solutions, correct?**

A. Yes.

**Q. All right.**

**And I can certainly -- if you keep your eye on the Midwest Dock Solutions and the Keeley -- you know, the contractor and the date, you'll see that these are all separate insurance certificates for Midwest Dock Solutions, all dated 2020 or 2021. And I'm not sure I want to go and take the time to go through 688 pages, but you'll see that we're on page 17, and now the date is 2021.**

**Do you see that?**

A. Yes.

**Q. And it's still Keeley Construction. These are all -- the first group here is Keeley Construction. Now, we're at 550 West Jackson,**

**Owner, LLC.**

**Do you see it's Midwest Dock Solutions still?**

A. Yes.

**Q. And the date's still 2021.**

**And then we're into Air Products, and they're all different general contractors or company names down here.**

**You said 15 to 20, and I'll represent to you that this exhibit -- and if you want to go through it all, I'm happy to flip through it, but this is 688 certificates of insurance, and I'll also represent to you that I believe all of these are in 2020 and 2021. There's -- I don't think there's any after that date that I saw, so could you be way off on that number?**

A. I could definitely be way off.

**Q. Okay.**

**Prior to giving your deposition here today, did you review any documents to prepare for your deposition?**

A. The only documents that I reviewed were those that I pulled out of the system. I

did not review page by page, no.

**Q. Okay.**

**So you just reviewed the two large documents that you sent as a production?**

A. I did not send them as two large documents. They were all large individual documents dropped into a share point.

**Q. Oh.**

**Do you know -- I think we received two files from -- as a production to our subpoena.**

**Do you know who would have combined those?**

A. I would not know that. I would have to defer that to Carissa.

**Q. Okay.**

**Were you responsible for producing the certificates of insurance on behalf of Midwest Dock Solutions?**

A. Yes.

**Q. Okay.**

**So you would have been the person who would have been -- when they needed one, you would have sent it out or arranged to**

**have it sent out?**

A. I am personally not the person, no.

**Q. Okay.**

A. Our agency did send out.

**Q. Okay.**

**Who at your agency would have done that?**

A. We had many different people. At the time, I would not -- I cannot give you that answer.

**Q. Okay.**

**Do you know who Margaret Stredde is, S-t-r-e-d-d-e?**

A. I do.

**Q. Would she have been one of those persons?**

A. She could have been one of those people, correct.

**Q. Okay.**

**Is she still there?**

A. She is not.

**Q. Okay.**

**When did she leave?**

A. Well, I don't know the exact date, but

it's been over six years.
**Q. Okay.**
**Do you have any reason to doubt that -- that Esser Hayes or Assured Partners would have produced all of these certificates of insurance on behalf of Midwest Dock Solutions?**
A. I do not have any reason to doubt, no.
**Q. Okay. All right.**
**So in addition to that 600-plus page exhibit of certificates of insurance, we also received these certificates -- these certificates of the insurance issued on behalf of -- do you see where it says Midwest Dock Solutions?**
A. Yes.

(WHEREUPON, the document marked Plaintiff's Exhibit 259 for identification was tendered to the deponent.)

BY MR. McJESSY:
**Q. And these -- these are -- this 95-page**

**exhibit, which is Exhibit 259, these are all certificates of insurance that are just to ARCO Murray. They're not included in that exhibit I just showed you. These were -- these are separate as a group for just ARCO Murray, and do you have any reason to doubt that these certificates of insurance were issued on behalf of Midwest Dock Solutions for ARCO Murray?**
A. I do not.
**Q. Okay.**
**And, now, I note that it does say -- in the upper corner here -- producer, Esser Hayes Insurance Group. And this is a certificate of insurance for 2020. Let's see if I can find one from 2021. Here's one. Page 50 is a certificate of insurance, and this one is from 2021, February 18.**
**Do you see that?**
A. Yes.
**Q. And I don't think there's any issued after 2021. Here's one in March of 2021.**
**Now, this one says Assured Partners up here.**
**Do you see that?**

A. Yes.
**Q. And the other one I showed you was in February, and I believe it still said Esser Hayes. Let's go back. Well, this is -- this one is 10/14/20, and it says Assured Partners as well. Do you see that? It's page 57 of that exhibit.**
A. Yes.
**Q. So the name looks like it goes back and forth between Esser Hayes and Assured Partners.**
**Do you see that?**
A. Yes.
**Q. Is there an explanation for that?**
A. Could you go back to the certificate you referenced in February of 2021? Right there.
**Q. I think that might be a different one. I think the other one I referenced had Esser Hayes on it. I think it was back here. Here it is. No. That still says Assured Partners. Oh, here it is. It was page 44 of that exhibit. It says Esser Hayes, and it's a certificate dated February of 2020.**

A. 2020, correct. Esser Hayes did not re-brand until June of 2020 to Assured Partners.
**Q. I see. Okay.**
**So it was just a re-branding, a name change?**
A. Correct.
**Q. All right.**
**There was some sort of acquisition that took place, correct?**
A. Yes.
**Q. Okay.**
**But for purposes of issuing the certificate of liability insurance, where it says producer, that's more of an internal thing at your -- at the -- at the firm as it was making its transition?**
A. Correct.
**Q. Okay.**
**And, again, I think all of these certificates of insurance are either 2020 or 2021.**
**Would you agree with that?**
A. Yes.

(WHEREUPON, the document marked Plaintiff's Exhibit 260 for identification was tendered to the deponent.)

BY MR. McJESSY:

**Q. All right.**
**And now I'm showing you what's been marked as Exhibit 260. This is, mercifully, a short -- a small exhibit. It's twenty -- it's 23 pages, and these are all certificates of insurance for Pepper Construction as the certificate holder.**
**Do you see that?**

A. Yes.

**Q. Okay.**
**And some of these look like two -- two-page documents.**
**Is this like a second page of the certificate of insurance? I'm looking at page seven of Exhibit 260.**

A. Yes. It is a remarks that runs on --

**Q. Okay.**

A. -- from the first page.

**Q. All right.**
**So there's less than 23 certificates of insurance here because some of these are second pages, but -- all right.**
**And, again, these all look to be certificates of insurance from 2020. I'm not sure I see any from 2021.**
**Would you agree with that?**

A. Yes.

(WHEREUPON, the document marked Plaintiff's Exhibit 279 for identification was tendered to the deponent.)

BY MR. McJESSY:

**Q. All right.**
**And then Exhibit 279 -- I'll flip through these. Again, if you can notice the -- the date and the insured and the -- the certificate holder, I'll flip through them every couple of seconds. If you need me to go back and look at one, let me know.**

A. Okay.

**Q. All right. That's all of them.**
**Do you agree these are all Midwest Dock Solutions' certificates for Meridian Design Build from 2020 and 2021?**

A. Yes.

(WHEREUPON, the document marked Plaintiff's Exhibit 280 for identification was tendered to the deponent.)

BY MR. McJESSY:

**Q. All right.**
**And, now, I'm showing you Exhibit 280.**
**And these are all certificates of liability insurance for Midwest Dock Solutions, and the certificate holder is Krusinski Construction Company.**
**Do you see that?**

A. Yes.

**Q. And, again, they're all -- they're all from 2020 and 2021.**
**Do you see that?**

A. Yes.

**Q. I'm going to go through them again.**
**All right. Do you agree that those are all Krusinski Construction from 2020 and 2021 for Midwest Dock Solutions?**

A. Yes.

**Q. All right.**
**And, now, all of these seem to be for 2020 and 2021. We haven't seen one yet that's after that date.**
**Is there a reason that Assured Partners would have stopped issuing certificates of insurance for Midwest Dock Solutions after -- or sometime in 2021?**

A. Yes.

**Q. What would that be?**

A. We would not be providing the insurance policies for them after that.

**Q. Okay.**
**Do you think that that's the case, that whatever -- well, what's the insurance policies that would cause you to issue these certificates of liability insurance?**

A. The general liability, auto liability workers' comp, and umbrella liability.

**Q. Okay.**

**Do you think you may have stopped carrying those lines for Midwest Dock Solutions after -- sometime in 2021?**

A. Yes.

**Q. Okay. All right.**

**Yeah. And I'm going to try to run through these as quickly as I can, but I just want you to confirm that these are certificates of insurance provided by Assured Partners for Midwest Dock for the different contractors that are listed on the certificates. All right? And I've just got a couple more exhibits to go through.**

(WHEREUPON, the document marked Plaintiff's Exhibit 281 for identification was tendered to the deponent.)

BY MR. McJESSY:

**Q. So this is Exhibit 281, and these are**

**all certificates of insurance that were not included in that large group, again, but they're for Clayco Insurance.**

**Do you see that?**

A. Yes.

**Q. All right.**

**And I'm just going to flip through them again quickly because I'm looking for you to confirm that that's what these are.**

**All right. So those are all certificates of insurance for Clayco from 2020, correct?**

A. Yes.

(WHEREUPON, the document marked Plaintiff's Exhibit 282 for identification was tendered to the deponent.)

BY MR. McJESSY:

**Q. All right.**

**This is Exhibit 282. Now, these are all for Opus Design Build.**

**Do you see that?**

A. Yes.

**Q. All right.**

**And they're all certificates of insurance, again, that you can observe the date. I think they're all 2020 and 2021.**

**All right. Those are all Opus Design Build certificates of insurance for Midwest Dock Solutions from 2020, correct?**

A. Yes.

**Q. All right.**

(WHEREUPON, the document marked Plaintiff's Exhibit 283 for identification was tendered to the deponent.)

BY MR. McJESSY:

**Q. All right.**

**And these are certificates of insurance for Peak Construction issued on behalf of Midwest Dock Solutions during 2020 and 2021, correct?**

A. Yes.

**Q. All right.**

**(WHEREUPON, the document marked Plaintiff's Exhibit 284 for identification was tendered to the deponent.)**

BY MR. McJESSY:

**Q. Okay.**

**And these are certificates of insurance -- I am showing you Exhibit 284. The last Exhibit was 283, and this one's 284. And these are all certificates of insurance issued to Principal Construction on behalf of Midwest Dock Solutions for -- again, for 2020 and 2021, correct? The last one.**

A. Yep. Yes.

(WHEREUPON, the document marked Plaintiff's Exhibit 285 for identification was tendered to the deponent.)

BY MR. McJESSY:

**Q. And then the last one. These are certificates of insurance issued to**

**Morgan/Harbour on behalf of Midwest Dock Solutions, again, for 2020 and 2021. This is Exhibit 285. I'll flip through those.**
**Do you agree with that?**
A. Yes.
**Q. Okay.**
**So fair to say that for the period of 2020 through sometime in 2021, Assured Partners issued seven -- eight hundred certificates of insurance for Midwest Dock Solutions to different general contractors?**
A. Yes. However, I believe that some of those that were grouped separately were included in the larger bunch. I saw some duplicates in there.
**Q. Okay.**
**In this group here you think they were included? This is the 688 group of exhibits. You think some of those general contractors were also included in this 688 pages?**
A. I believe I saw some ARCO Murray and Clayco in there, in that mix, yes.
**Q. Okay.**

**Just doing a search for the word "Clayco" to see if it comes up. Perhaps, I missed one. I don't see Clayco.**
MR. HUGHES: Kevin, can you search for a known word? Okay, yeah. So I see --
MR. McJESSY: I'm just looking for -- there is a certificate of insurance to WMI Chicago, LLC, that's page 191 that references ARCO Murray in the description of operations. I see that.
THE WITNESS: Could you please go to --
BY MR. McJESSY:
**Q. That's not a certificate of insurance for ARCO Murray, correct?**
A. Correct.
**Q. Okay.**

(WHEREUPON, the document marked Plaintiff's Exhibit 286 for identification was tendered to the deponent.)

BY MR. McJESSY:
**Q. All right.**
**And page 488 of Exhibit 286 also references ARCO Murray in the description of operations, but that's actually a certificate of insurance for a Sante Fe Industrial Investors, correct?**
A. Correct.
**Q. Okay.**
**And -- oh, and I guess the next one is also for Sante Fe Industrial, and its -- but it's not a -- it's not a certificate for ARCO Murray, correct?**
A. Correct.
**Q. Though it references ARCO Murray in the description of operations, correct?**
A. Yes.
**Q. Oh, this is interesting. This is page 620 of Exhibit 286, and it actually says the assured -- the insured is ARCO Murray National Tenant Solutions, correct?**
A. That's what it looks like. It's a little small for me to read it all.
**Q. Let me make it bigger. I hadn't**

**noticed this one.**
**This actually isn't a certificate of insurance for -- for Midwest Dock Solutions, correct?**
A. That's what it appears, correct.
**Q. Okay.**
**Can -- can you see it now?**
A. Yes.
**Q. Okay.**
**And also --**
A. However, the producer -- I will point out the producer is not Assured Partners of Illinois either.
**Q. So do you know how this got produced, this page?**
A. I don't know off the top of my head. It could have been in our system because it was sent to us, and that's how it was produced. But I could not tell you.
**Q. Okay. It looks like that's all.**
**All right. All right. Well, you would agree with me, at the very least, that there are hundreds of certificates of insurance produced for Midwest Dock**

**Solutions -- if not 800, certainly getting close to that number -- during 2020 and part of 2021, correct?**
A. Yes.
**Q. Okay.**
**Does Assured Partners have a way to print out like a list of the certificates of insurance that were issued on behalf of one its clients?**
A. Yes.
**Q. You could print that out as a list?**
A. Yes.
**Q. Okay.**
**So could you print out like a list of all of the certificates of insurance that were issued on behalf of Dock & Door and all of the certificates of insurance that were printed out on behalf of Midwest Dock Solutions? Not the certificates themselves, but a list of those?**
A. Yes.
MS. TOWNSEND: I'm just going to object as Assured Partners has already complied with the subpoena and provided all of the

documents in response to the subpoena.
MR. McJESSY: Well, that was a -- those were documents I had asked about and was told they couldn't -- they couldn't be produced.
MS. TOWNSEND: Carissa Townsend. Again, on behalf of Assured Partners.
The subpoena respondent is not required to create documents to respond to the subpoena and has produced documents already in its possession.
MR. HUGHES: And this is Mike Hughes on behalf of Midwest Dock. The subpoena, the 30(b)(6) topics and even the rider, doesn't include even a request to create lists, which would be improper, anyways.
MS. CAHILL: And Kathleen Cahill on behalf of Dock & Door joining in on the objections.
BY MR. McJESSY:
**Q. All right.**
**Can you tell me what services Assured Partners performed for Dock & Door?**
A. Insurance services.

**Q. All right.**
**Well, let's try to unpack that a little bit.**
**What are insurance services?**
A. General liability, workers' comp, auto liability, and umbrella liability.
**Q. All right.**
**So it obtained those coverages for Dock & Door?**
A. Yes.
**Q. And do you know who the insurance carriers were for each of those lines of insurance?**
A. No. I do not know that answer. They could be different every year.
**Q. Okay.**
**And as you sit here today, do you know any of the years and any of the lines of coverage?**
A. I don't know off the top of my head, no.
**Q. Okay.**
**How about -- so it provided these lines of coverage to Dock & Door.**

**Did it perform any other services for Dock & Door?**
A. Not outside of the insurance or surety services, no.
**Q. Okay.**
**Well, I guess, I'm not sure what that means.**
**Outside of the insurance -- it procured these lines of insurance for Dock & Door, correct?**
A. Yes.
**Q. Did it do anything else?**
**It provided certificates of insurance. At least, we saw 26 of them, correct?**
A. Right.
**Q. Okay.**
A. Yes.
**Q. So it did that, correct?**
A. Yes. We provided certificates of insurance.
**Q. All right.**
**And did it do anything else other than procure those lines of insurance and**

**provide those 26 certificates of insurance?**
A. We did provide the services that go along with any insurance policy in regards to claims handling, billing.
**Q. Well, you -- you handled the billing, then, for their insurance policies, correct?**
A. We -- the carriers provide the billing directly.
**Q. Okay.**
A. We assist the carriers.
**Q. All right.**
**And you said claims handling.**
**Did -- were there any claims by Dock & Door that you recall?**
A. I don't have that information off the top of my head.
**Q. Okay.**
**There could have been. You just don't know that?**
A. Correct.
**Q. Okay.**
**And what insurance services did Assured Partners provide for Midwest Dock Solutions?**

A. The general liability, auto liability, workers compensation, and I believe the umbrella liability as well.
**Q. Okay.**
**And then you would have also provided any claims handling or billing assistance also, correct?**
A. Correct, in addition to surety services.
**Q. Okay.**
**So --**
A. When I say -- I'm sorry. Go ahead.
**Q. Go ahead. Go ahead.**
A. In my terms, surety services rolls into insurance services.
**Q. Okay.**
**So all of the same work that it provided to Dock & Door was also provided to Midwest Dock Solutions, correct?**
A. Yes.
**Q. Do you know who Assured Partners contact was for Dock & Door?**
A. Tony Brutti, I believe, is how you say his last name.

**Q. Anybody else?**
A. No.
**Q. And who was Assured Partners' contact for Midwest Dock?**
A. Tony Brutti as well.
**Q. Tony Brutti as well?**
A. Yes.

(WHEREUPON, the document marked Plaintiff's Exhibit 287 for identification was tendered to the deponent.)

BY MR. McJESSY:
**Q. All right.**
**And I'm showing you what's been marked as Exhibit 287. I'm trying to make it a little larger for you. And it has some highlighting on it that I've added.**
**Can you see that?**
A. Yes.
**Q. Okay.**
**And that's an email that was -- that you -- you meaning Assured**

**Partners -- produced to us, correct?**
A. Yes.
**Q. All right.**
**And this is an email from Tony Brutti dated October 22, 2020, to Margaret -- and how do you pronounce her last name?**
A. Stredde.
**Q. Stredde. Okay. Margaret Stredde.**
**And Tony Brutti is writing on behalf of Midwest Dock Solutions, correct?**
A. Yes.
**Q. And he's asking for a COI for this Principal job.**
**Do you see that?**
A. Yes.
**Q. And then there's an attachment attached to this email that says Midwest Dock sub-agreement PDF.**
**Do you see that?**
A. Yes.
**Q. Now, when this email was produced to us, that attachment wasn't part of the email, like you couldn't click on it and open it, and**

**it wasn't produced as an attachment. If this is an email that's still in your system, would you have the attachment for this email?**
A. If, indeed, Tony did provide an attachment to this one, yes, we would still have this.
**Q. Okay.**
**And I'll just ask your counsel, after the deposition's over, if she could produce that attachment to us just so we can see -- so we can have that attachment.**
**But this is -- this is an example of Tony Brutti reaching out on behalf of Midwest Dock Solutions; is that correct?**
A. Yes.
MR. HUGHES: Objection to foundation.

(WHEREUPON, the document marked Plaintiff's Exhibit 288 for identification was tendered to the deponent.)

BY MR. McJESSY:
**Q. All right.**
**Now, I'm showing you what's been marked as Exhibit 288, and this is an email from Margaret Stredde to Tony Brutti.**
**Do you see that?**
A. Yes.
**Q. And it looks like she's replying to the one we just looked at. This is -- the one we just looked at was what's on the -- essentially, what's on the bottom here.**
**Do you see that?**
A. Yes.
**Q. The COI for the Principal job.**
**And then -- and his email was on October 22, 2020, at 3:22, and it looks like she replies on October 22, 2020, at 4:47 p.m.**
**Do you see that?**
A. Yes.
**Q. And, again, there's an attachment to this email, but, again, that wasn't attached. So for this one, too, I'll ask that if you have the email, you'd still have the attachment if there was one, right?**

A. Yes.
**Q. Okay.**
**So I'll just ask if you can produce that attachment to us as well.**
**And do you see what Margaret Stredde writes there?**
A. Yes.
MR. HUGHES: Object to -- objection to foundation of this exhibit.
BY MR. McJESSY:
**Q. Okay.**
**And this is an email that -- that Assured Partners produced in response to the subpoena, correct?**
A. Yes.
**Q. Okay.**
**And it says -- it's an email that's in Assured Partners files?**
A. Yes.
**Q. Okay.**
**Electronic, such as they are.**
**Can you read what -- what she writes back?**
A. Can you make it a little bit larger?

**Q. Oh, sure. I'm sorry.**
A. Thank you.
It says, Tony, here is the COI that Ira ordered on 10/15 of '20.
**Q. All right.**
**And do you know what Ira is?**
A. I do not.
**Q. All right.**
**If I told you the name Ira Sugar, does that sound familiar to you at all?**
A. It does not.
**Q. Okay.**
**I'm going to show you two exhibits, Exhibits 290 and 291. And I'm hoping you can explain to me how they fit together, and it's going to be a little hard for me to show them to you at the same time. So I'm first going to show you Exhibit 290, and then I'll show you Exhibit 291. I think if I put them both on the screen at the same time, you wouldn't be able to see them, I'm guessing.**

(WHEREUPON, the document marked Plaintiff's Exhibit 290 for identification was tendered to the deponent.)

BY MR. McJESSY:

**Q. So here's Exhibit 290, and it's an email from Tony Brutti.**
**Do you see that?**
A. Yes.
**Q. All right.**
**And you'll note the date is it October 23, 2020, at 10:12 a.m.**
**Do you see that?**
A. Yes.
**Q. And it says -- it's an email that's signed, yours, comma, Tony Brutti, Midwest Dock Solutions.**
**Do you see that?**
A. Yes.
**Q. And it has the email below that, which is tonyb@midwestdocksolutions.com.**
**Do you see that?**
A. Yes.

**Q. And, again, this is an email produced by Assured Partners, correct?**
A. Yes.
**Q. Okay.**
A. Or, no. I'm sorry. This email was produced by Tony. Oh, we provided it to you.
**Q. Yeah. I'm sorry. Maybe I didn't say that well.**
**Tony sent the email, correct?**
A. Yes.
**Q. Tony Brutti.**
**But -- but it was produced to us, our firm, in response to the subpoena by Assured Partners, correct?**
A. Yes.
**Q. Okay.**
**It's an email you have in your file somewhere, correct?**
A. Yes.
**Q. All right.**
**And this one, too, seems to have a certificate of -- I'm sorry, seems to have a permit attached. It says, COI needed, Hazel Crest permit PDF.**

**Do you see that?**
A. Yes.
**Q. All right.**
**And, again -- and I'll follow-up with your counsel after the fact. But, again, you would have this PDF if it's, indeed, an attachment, correct?**
A. Yes.

(WHEREUPON, the document marked Plaintiff's Exhibit 291 for identification was tendered to the deponent.)

BY MR. McJESSY:

**Q. Okay.**
**And then -- now, I'm going to show you a different exhibit. I'm going to show you Exhibit 291. Now, let me to try and make it bigger.**
**Can you see that?**
A. Yes.
**Q. All right.**
**So this is an email that's**

**dated October 23, 2020, at 10:20 a.m., so about eight minutes after the last one, and it's from Margaret Stredde to Margaret Stredde.**
**Do you see that?**
A. Yes.
**Q. And it says, certificate of insurance was issued for Midwest Dock Solutions, and then it has an attachment, a certificate PDF.**
**Do you see that?**
A. Yes.
**Q. And it says, insured, Midwest Dock Solutions, and it looks like it has their address, 27 East 36th Place in Steger.**
**Do you see that?**
A. Yes.
**Q. And then it has holder, Village of Hazel Crest.**
**Do you see that?**
A. Yes.
**Q. Okay.**
**And then it's got delivery methods issued by Margaret Stredde, emailed to Tony Brutti, tonyb@midwestdocksolutions.com, confirmation email to Midwest Dock Solutions,**

**Inc., tony -- without the B -- @midwestdocksolutions.com.**

**Do you see that?**

A. Yes.

**Q. And then it says, contact Midwest Dock Solutions, Inc.**

**What is this exhibit?**

A. This is a document that is produced by our system automatically. It's an automated document when we issue a certificate through a program.

**Q. Okay.**

**And does the delivery method down here mean that this was -- that the certificate of insurance that was requested was emailed to Tony Brutti?**

A. Yes.

**Q. And when it says confirmation email to Midwest Dock Solutions, Inc., tony@midwestdocksolutions.com, does that mean that that was like a cc or a separate email?**

A. That would be a separate email, meaning he most likely got it twice.

**Q. Okay. All right.**

**Well, one email address you'll note is Tony Brutti at -- tonyb@midwestdocksolutions.com. The other one is tony -- without a B -- @midwestdocksolutions.com.**

**Do you see that?**

A. Yes.

**Q. Okay. All right.**

**Do you know who Tony Zarlengo is?**

A. No.

**Q. Okay.**

(WHEREUPON, the document marked Plaintiff's Exhibit 293 for identification was tendered to the deponent.)

BY MR. McJESSY:

**Q. All right.**

**Now, I'm showing you what's been marked as Exhibit 293, and the email at the bottom of this is, again, an email from Tony Brutti.**

**Do you see that?**

A. Yes.

**Q. To Cathie Demitropoulos?**

A. Demitropoulos, yes.

**Q. Demitropoulos, D-e-m-i-t-r-o-p-o-u-l-o-s. And Cathie is C-a-t-h-i-e for the court reporter.**

**And this is another request for a certificate of insurance to be issued, correct.**

A. A certificate and a bond, yes.

**Q. Okay.**

**And that's what I was getting at. What's the bond? When he says COI and bond needed, what does that mean to you?**

A. A bond is a -- this is a surety bond for, most likely, a license and permit bond.

**Q. Okay.**

**And what's that mean?**

A. A license and permit bond is a bond that a contractor would apply for for the city or village or town in this case. The town would require them to produce a certificate of insurance and a license and permit bond to do

the work.

**Q. Okay.**

**And if you look at above, there's a -- it says from, and the email address where it says from is i-l-c-h-i hyphen certs dot a-p-i-l, I think.**

**Do you see that?**

A. Yes.

**Q. I can make bigger if it's hard to see.**

**Who is this email from?**

A. We have a certificate department that has a separate inbox. That is who the email is from.

**Q. Okay.**

**Oh, I see. Down here where Mr. Brutti is sending the email, he sends it to Cathie Demitropoulos and also to that other email address?**

A. Yes.

**Q. Okay.**

**So that's the department that's responsible for getting COIs and bonds issued?**

A. Correct. For the COIs. Cathie

handled the bonds at that time.
**Q. Oh, I see. Okay. All right.**
**And it says -- the body of the email says, Midwest Dock Solutions.**
**Do you see that?**
A. Yes.
**Q. And it says, bond, please, COIs attached for you to send along with the bond.**
**What does that mean?**
A. The client needs to provide the COI and bond to the town at the same time.
**Q. Okay.**
A. So in this case, our certificate team produced the certificate, sent it along to Cathie to issue the bond so Cathie could send both together to our client.
**Q. I got it.**
**And, again, there's attachments here, and you should still have those attachments in your file?**
A. Yes.
**Q. Okay.**
**We've been going over an hour and a half. I'd like to take about a five-minute break. I don't have too much more to go, but I'd like to take a five-minute break. All right?**

(After a break from 1:38 p.m. to 1:47 p.m., the deposition was resumed as follows:)

(WHEREUPON, the document marked Plaintiff's Exhibit 296 for identification was tendered to the deponent.)

BY MR. McJESSY:
**Q. All right.**
**I'm showing you page two of four. Actually, let me turn to the next page. Three of four. There's an email at the bottom here.**
MR. HUGHES: Kevin, what -- what exhibit is this?
BY MR. McJESSY:
**Q. It's Exhibit 296. It's an email that's dated Monday April 14, 2025, from Tony Brutti.**

**Do you see that?**
A. Yes.
**Q. And here his signature is Tony Brutti, Dock & Door Install, Inc.**
**Do you see that?**
A. Yes.
**Q. All right.**
**And he says, hello, I'm in need of a COI for a Meridian project for Dock & Door Install, Inc. See attachment for requirements.**
**Do you see that?**
A. Yes.
**Q. And this -- this email -- and I don't see the attachment, because it's probably down in the string. But if you have this original email and there was an attachment, you'd still have that, correct?**
A. Yes.
**Q. Okay.**
**And then this email is to the -- it looks like it's to the certs dot apil email address, so that's the department responsible for issuing certificates of insurance, correct?**

A. Yes.
**Q. All right.**
**And there's an email response that begins on the prior page that's dated April 17 -- let's see. Oh, here it is. It's dated April 14. I'm sorry. It says, on Monday, April 14 -- if I call it the certs department, does that sound appropriate?**
A. Yes.
**Q. Okay.**
**The certs department wrote, hello, Tony, please find attached certificate of insurance which reflects your current insurance coverage. After review of the requirements, we want to bring the following to your attention. And then it says, missing auto liability primary slash noncontributory additional insured and missing auto liability waiver of subrogation. Please let us know if you would like us to check on availability and obtain a quote for any of the coverages. If not, please discuss with the certificate holder**

**to have these requirements removed. We will wait to hear from you before making any changes.**
**Can you tell me what that email is conveying from the certs department?**
A. Yes. So the certs department reviewed the requirements they provided, and it -- they're stating that the client does not have these endorsements to their auto liability policy. The primary not contributory additional insured and the waiver subrogation are endorsements added to the policy.
**Q. Okay.**
**And their policy doesn't have them?**
A. At that time, that's what they're saying, yes.
**Q. Okay.**
**And that means Dock & Door's policy does not have these -- these endorsements?**
A. Correct.
**Q. Okay.**
**So they're saying they can't**

**issue the certificate of insurance as the general contractor required?**
A. Correct.
**Q. Okay.**
**And then above that, there's an email from Tony Brutti dated April 17 to the certs department. And it says, hi, they would like me to revise the COI. They would like to have -- they would like the certificate holder to be Midwest Dock Solutions since they are under contract with me. I'm actually not under contract with Meridian. Sorry for the confusion.**
**Do you see that?**
A. Yes.
**Q. Okay.**
**So do you understand that to be asking for the COI to be issued by Midwest -- on behalf of the Midwest Dock Solutions now?**
MS. CAHILL: Objection. Foundation.
BY MR. McJESSY:
**Q. Well, strike that.**
**What do you understand this**

**communication to be asking?**
A. This communication? So what is asked is asking me to change certificate holder to Midwest Dock Solutions.
**Q. Okay.**
**And do you have an understanding why that would be?**
A. I do not.
MS. TOWNSEND: I'm going to object. Calls for speculation.
BY MR. McJESSY:
**Q. And then if you look at this email above, above that one -- it's in the -- in the line, so it's on page one of four. It's from the certs department dated April 17, 2025, and the re line is, re, Certificate of Insurance request for, parentheses, Midwest Dock Solutions, close parentheses, missing information. And it says, hi, Tony, please see the below Certificate of Insurance request and provide the missing information, address of certificate holders, Midwest Dock Solutions.**
**Do you see that?**
A. Yes.

**Q. And then it just says, thank you, certificate team, processing team.**
**So what are they asking for here?**
A. For the address of Midwest Dock Solutions.
**Q. Okay.**
**Do you have an understanding of what the relationship between Dock & Door and Midwest Dock is?**
A. From my understanding, Tony Brutti is the contact that we have on file for both companies.
**Q. Okay.**
**I think I asked you this already. But just out of an abundance of caution, are you aware of any claims that were made on any policy, either by Dock & Door or -- strike that.**
**Are you aware of any claims that were made on either Dock & Door's policy or Midwest Dock Solutions' policies?**
A. If there were claims made, then the documents would have been provided with our

subpoena. They would be in there.

**Q. All right.**

**But I just -- to the extent -- I didn't see anything in there, but I just wanted to know, is Assured Partners aware of any claims that were made against any of either company's policies? Do you have any knowledge --**

A. I don't have that off the top of my head.

MR. McJESSY: Okay. All right.

I don't have any other questions. I will just reserve my right to continue the deposition just so that I can get some sort of authentication of the attachments that I've asked for to the email communications, but I suspect we can do that without needing to resume the deposition. I just may need some statement that says these are the attachments to these emails, that kind of thing. But other than that, I don't have any other questions. I may have some follow-up questions if Ms. Cahill or Mr. Hughes have questions. But, otherwise, thank you for your time.

THE WITNESS: Thank you.

MR. HUGHES: I'm going to need about five minutes to go through my notes to see if I -- if I have questions to ask you.

MR. McJESSY: All right.

(After a break from 1:56 p.m. to 2:03 p.m., the deposition was resumed as follows:)

EXAMINATION
BY MR. HUGHES:

**Q. Okay. Hi, Ms. O'Connor.**

A. Hello.

**Q. My name is Mike Hughes. I am the attorney for Midwest Dock Solutions. I'll have a couple questions for you, not many.**

**What -- as a 30(b)(6) witness to the -- responding to the subpoena and presenting as the witness to testify on behalf of Assured Partners, what did you do to prepare to answer the questions that were listed in the topic -- in the topic list for the subpoena?**

A. What did -- I reviewed the account to brief myself on the most recent correspondence with the client.

**Q. Okay.**

**And when you say "with the client," do you understand that Midwest Dock Solutions and Dock & Door are two separate companies?**

A. Yes. They are two separate companies.

**Q. Okay.**

**And do you understand that they are -- they're two separate clients, or they were two separate clients of Assured Partners?**

A. Yes. They were two separate clients.

**Q. Okay.**

**Are you familiar -- if you look at the correspondence, did you see -- was there correspondence between an individual named Sherri Webber for Midwest Dock Solutions and Assured Partners?**

A. I did not see any that jumped out at me, no.

**Q. Okay.**

**How long did you spend going through the correspondence?**

A. Not very long. This was however long it took me to export the documents for the subpoena.

**Q. Okay.**

**And since you exported the documents for the subpoena, have you -- did you review them between when you did that and today?**

A. No.

**Q. Okay.**

**And do you know when you exported the documents to -- to produce them with the subpoena response?**

A. I don't know the exact day. I want to say it was in May of 2025.

**Q. Okay.**

**Approximately five months ago?**

A. Yes.

**Q. Okay.**

**And is that the same time that you did any review with respect to reviewing the accounts?**
A. Yes.
**Q. Okay.**
**And so nothing in the last five months to -- to review the accounts for preparing for today?**
A. No.
**Q. Okay.**
**When you -- I believe you testified that Mr. Brutti was who Assured Partners had as the contact for both Midwest Dock Solutions and Dock & Door, correct?**
A. Yes.
**Q. And is that something that is based on your review of any type of document in preparation for your deposition today?**
A. That is based on -- when I locate the accounts, the two separate accounts in my agency management system -- the front screen shows me the primary contact. That is where I got that information.
**Q. Okay.**

**And you got that back in May?**
A. Yes.
**Q. Okay.**
**And is -- is that something that you produced, kind of the front page of the -- you know, that account? What did you call it, the account --**
A. Yeah. In our management system?
**Q. Ah-huh.**
A. No, I did not produce that.
**Q. Okay.**
**Is that something that you could produce?**
A. I could take a screenshot of it, yes.
**Q. Okay.**
**I'm going to ask you to -- if you can produce those for both of the -- for Midwest Dock Solutions and Dock & Door.**
A. Okay.
**Q. Okay.**
**Were you the account manager or did you have direct oversight over Dock & Door Install, that account?**
A. Dock & Door Install? During my time

as a small business account manager -- so this goes back to -- I believe it was 2012 and 2013 -- I may have.
**Q. Do you know if Dock & Door was -- I'm sorry.**
**Do you know if Dock & Door was --**
MR. McJESSY: Well, I'm going to ask that we let her finish answering the question.
MR. HUGHES: I thought she had.
THE WITNESS: Sorry.
At that --
BY MR. HUGHES:
**Q. If you have something else to add, please do.**
A. I do.
At that time, I handled hundreds of accounts, so I cannot recall them all.
**Q. Okay.**
**Do you know if Dock & Door was an entity in existence in 2011 or 2012?**
A. I do not know.
**Q. Do you know if Midwest Dock was an**

**entity in existence at that time frame?**
A. I do not know.
**Q. Do you know when Dock & Door became formed as an entity?**
A. We do not have that information, no.
**Q. Okay.**
**Do you know when Dock & Door became a client of -- of Assured Partners or its predecessor, Esser Hayes?**
A. Our system let's me go back to 2013. That's as far as I can access. I don't know exactly when they became a client of ours, no.
**Q. Okay.**
**Do you know when Midwest Dock Solutions became a client of Assured Partners or its predecessor, Esser Hayes?**
A. I do not know. My answer would be the same.
**Q. Do you know if -- do you know what kind of work Midwest Dock Solutions does?**
A. I do not.
**Q. Do you know what kind of work Dock & Door Install does?**
A. I do not.

**Q. Do you know if Midwest Dock is a subcontractor or other kind of contracted entity with respect to Dock & Door Install?**
A. I do not.
**Q. Do you know if -- I'm sorry. Did someone have anything? Sorry.**
**I believe you testified you're not aware of an individual named Tony Zarlengo?**
A. No.
**Q. Okay.**
**Were you ever the direct manager or customer service rep for Midwest Dock Solutions?**
A. I do not know. My answer would be the same as it was for Dock & Door. At the time of a small business account manager, I handled hundreds of accounts. If they were a client of ours at that time, I could have been, yes.
**Q. Okay.**
**Are you aware of any time where you were the -- the customer service rep, or whatever position you held at the time -- where you were the direct contact with Midwest**

**Dock Solutions?**
A. I am not aware of it, no.
**Q. Okay.**
**And are you aware of, at any time in your employment at Assured Partners or its predecessor, Esser Hayes, that you were the direct contact person for Dock & Door?**
A. No.
Can I add, I'm hesitant to answer these, on behalf of myself or on behalf of the corporation as Assured Partners? That's where my confusion is coming from.
**Q. Okay.**
**And you're the -- you're what's called the 30(b)(6) witness here, so your -- your testimony is on behalf of your employer, Assured Partners?**
A. Correct.
**Q. Okay.**
A. So as --
**Q. I'm sorry. Go ahead.**
A. But during my time of employment, I have not personally directly overseen the accounts.

**Q. Okay.**
A. My corporation, Assured Partners, has. Correct.
**Q. And have you researched who were the individuals who had direct oversight or connection with Dock & Door Install in -- in relation to preparing for your testimony today?**
A. I did not research, no.
**Q. Okay.**
**And did you research, in preparation for your testimony today, who were the account representatives who were the direct contacts with Dock & Door?**
A. I did not research, no.
**Q. And I'm not sure if I asked about the same company twice, so I'm going to say this. I have the same question with respect to Midwest Dock Solutions.**
A. No. I did not research.
**Q. Have you had any direct communication with Tony Brutti?**
A. No.
MS. TOWNSEND: I'll object. I think that's where the confusion is coming from,

Counsel. If you could rephrase your question -- you know, to be more specific to the company in general as opposed to Ms. O'Connor in her capacity.
MR. HUGHES: Well, I understand that. And my questions go to whether or not in her role for the company she has had any of those communications, so I do think it's appropriate.
MS. TOWNSEND: Same objection, but you can answer.
THE WITNESS: In my current role for the company, I have not had any direct communication with Tony Brutti.
BY MR. HUGHES:
**Q. And have you had any direct communication with Tony Brutti in any of your prior roles with the company?**
A. As I mentioned when I was in a different position, handling hundreds of accounts, I may have had direct communication, yes.
**Q. Okay.**
**Other than the emails that**

**have been put in front of you today by Mr. McJessy, do you have any knowledge of who at Assured Partners would have had direct communication with Tony Brutti?**
A. I do have knowledge of some people, yes.
**Q. Who -- who are those?**
A. You want direct names?
**Q. Yes, please.**
A. The list -- the list could be long, and some of the them are no longer employed here. So I could give you names.
**Q. Well, why don't we start with titles of -- of the individuals.**
A. Okay.
Small business account managers would be the title for all of them.
**Q. Okay.**
**And do you know any specific small business account managers who would -- who had direct contact with Tony Brutti?**
A. Rose Couch, spelled R-o-s-e, last name C-o-u-c-h.
**Q. Okay.**

**Anyone else?**
A. Sarah Hudson, spelled S-a-r-a-h, last name H-u-d-s-o-n.
**Q. Okay.**
**Anybody else?**
A. I can list our certificate department. However, they are overseas, and I don't have their names.
**Q. Okay. Okay.**
**Other than individuals in the certificate department, Rose Couch, and Sarah Hudson, is there anyone else?**
A. Not that I know of. Not other than Margaret Stredde, who we have seen. I'm sorry. I'm trying to remember back on who in the communications we've seen.
**Q. I believe there's a Cathie --**
A. Cathie Demitropoulos. She's no longer employed with us. There was a Susan Steeves. I remember --
**Q. How do you spell that last name?**
A. Sorry, yes. Susan Steeves, S-t-e-e-v-e-s. She was part of that certificate department, but she worked

internally for Assured Partners not overseas.
**Q. Okay.**
**Rose Couch, is she still employed with Assured Partners?**
A. Yes.
**Q. Did -- and did you have any communication on conversations with her in your preparation for your testimony today?**
A. Yes.
**Q. Okay.**
**When did you have that communication or conversation -- or I would say how many. How many times did you talk to Rose Couch about -- in preparation for your testimony today?**
A. Once.
**Q. And when was that?**
A. That was about three weeks ago. I could be off with my dates, so three weeks-ish. I'm trying -- I'm looking at the calendar. I'm sorry. Yes. Three weeks.
**Q. Okay.**
**And what was the subject of the -- was anyone else involved in that**

**conversation?**
A. Yeah. Sarah Hudson.
**Q. Okay.**
**And did you have any other -- did you have any communications or conversations with either Rose or Sarah Hudson, individually, in preparation for your testimony today?**
A. No.
**Q. Okay.**
**And so just one conversation with the two of them?**
A. Yes.
**Q. Okay.**
**And was that in person?**
A. Virtual.
**Q. Okay.**
**And it was just the three of you?**
A. And our attorneys.
**Q. Okay. All right.**
**So I won't ask you what you discussed during that since your attorney was present.**

**Okay. How long did that -- without saying what the substance was, how long did that last?**

A. Twenty minutes.

**Q. Okay.**

**Did you have any conversations or communications with anyone in the certs department in preparation for your testimony today?**

A. No.

**Q. Did you have any conversations with -- let me ask you this because I believe I was asking about Dock & Door.**

**Did you have any communications with anyone related to Midwest Dock Solutions in preparation for your testimony today?**

A. The same two people, Rose Couch and Sarah Hudson, with our attorney.

**Q. And was that the same conversation we talked about before?**

A. Yes.

**Q. Okay. Okay.**

**Did you have any conversation**

**or communications with anyone else in preparation for your testimony today?**

A. No.

**Q. Do you know who the owner or owners of Dock & Door Install are?**

A. We do not. We have the information as the primary contact only.

**Q. Do you know who the owners of Midwest Dock Solutions are?**

A. No, we do not. Just the primary contact.

MR. HUGHES: Okay. I think that's all I have.

Kathleen, do you have any?

MS. CAHILL: I just need one minute, just to let me go through -- no, I don't have any additional questions.

FURTHER EXAMINATION
BY MR. McJESSY:

**Q. The only question I have, Ms. O'Connor, is: Where are you located?**

A. Warrenville, Illinois.

**Q. Okay.**

**So you're local, somewhat local.**

**Where -- and where do you reside?**

A. Oswego, Illinois.

**Q. The last four digits of your social security number?**

MS. TOWNSEND: I'm going to object, and we can go off the record if needed for the --

MR. McJESSY: Yeah. I just need contact information so that if she -- you know, if she changes employment or something when the trial rolls around and we need to be able to contact her, I need that information from the witness. So if you want to send me like her personal address, her date of birth, and the last four digits of her social separately, that's fine. I have no problem doing that off the record.

MS. TOWNSEND: I can do that.

MR. McJESSY: Okay.

That's fine. That works for me.

All right. Then the only thing I think the court reporter needs to know is if you waive signature or reserve signature. I don't know if your counsel wants to waive.

MS. TOWNSEND: Yes. So, Veronica, you have an opportunity to review the transcript. You can't change -- well, you can change, but it's a long process -- substantive responses to your answers, but you can certainly change things such as typos or like misspellings of names.

Would you like an opportunity to review the transcript?

THE WITNESS: No thank you.

MS. TOWNSEND: We'll waive signature.

MR. McJESSY: All right. And I'll order it, Diane.

Ms. O'Connor, subject to the reservation that I put on the record, the right to recall just to authenticate the attachments to those emails, I don't think we'll need to do

that, but I'll follow-up with your -- your counsel, and I think we can make those arrangements. Other than that, thank you for your time.

THE WITNESS: Yep. You're welcome. Thank you.

FURTHER DEPONENT SAITH NOT.

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, DIANE M. NULICK, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That the said deposition was adjourned as stated herein;

That I am not a relative or employee or attorney or counsel, nor a relative or employee

of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand and affix my seal of office at Chicago, Illinois, this 21st day of October, 2025.

Notary Public, Cook County, Illinois.

C.S.R. Certificate No. 084-002029.

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 114

**From:** Tony Brutti
**Sent on:** Thursday, October 22, 2020 4:31:31 PM
**To:** Margaret R. Stredde
**Subject:** COI Needed
**Attachments:** Midwest Dock Sub Agreement.pdf (319.91 KB)


Hi Margaret, I am in need of a COI for this Principle Job.  See attached for details.

--
Yours,

Tony Brutti
Midwest Dock Solutions
Phone: 815-922-5258
Email: tonyb@midwestdocksolutions.com



PLAINTIFF'S
EXHIBIT
287

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 115

**From:** Margaret R. Stredde
**Sent on:** Thursday, October 22, 2020 4:47:39 PM
**To:** Tony Brutti
**Subject:** RE: COI Needed
**Attachments:** Midwest Dock Principle Const #2020-05.pdf (435.02 KB)

Tony, here is the COI that Ira ordered on 10/15/20.

**Margaret Stredde - Commercial Lines Senior Service Associate**
1811 High Grove Lane, Ste 139 | Naperville, IL 60540
T: 630.544-3752
Join us on Twitter | Facebook | LinkedIn | Website

ESSER | HAYES
INSURANCE GROUP

www.esserhayes.com | www.assuredpartners.com

-

**From:** Tony Brutti <tonyb@midwestdocksolutions.com>
**Sent:** Thursday, October 22, 2020 3:32 PM
**To:** Margaret R. Stredde <mrs@esserhayes.com>
**Subject:** COI Needed

Hi Margaret, I am in need of a COI for this Principle Job. See attached for details.

--
Yours,

Tony Brutti
Midwest Dock Solutions
Phone: 815-922-5258
Email: tonyb@midwestdocksolutions.com

PLAINTIFF'S
EXHIBIT
288

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 116

ACORD®

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY): 10/16/2020

**THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.**

**IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).**

**PRODUCER**
AssuredPartners of Illinois, LLC
1811 High Grove, Suite 139
Naperville IL 60540-9100

CONTACT NAME: Certificate Team
PHONE (A/C, No, Ext): 630-355-2077 FAX (A/C, No): 630-355-7996
E-MAIL ADDRESS: COI@esserhayes.com

| INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER A : Cincinnati Insurance Company | 10677 |
| INSURER B : The Cincinnati Indemnity Company | 23280 |
| INSURER C : | |
| INSURER D : | |
| INSURER E : | |
| INSURER F : | |

**INSURED** MIDWDOC-01
Midwest Dock Solutions
27 East 36th Place
Steger IL 60475

**COVERAGES** **CERTIFICATE NUMBER:** 1707263560 **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY; CLAIMS-MADE; X OCCUR; GEN'L AGGREGATE LIMIT APPLIES PER: POLICY; X PRO-JECT; LOC; OTHER: | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | | $ |
| A | AUTOMOBILE LIABILITY; ANY AUTO; OWNED AUTOS ONLY; SCHEDULED AUTOS; X HIRED AUTOS ONLY; X NON-OWNED AUTOS ONLY | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB; X OCCUR; EXCESS LIAB; CLAIMS-MADE; DED; X RETENTION $ N/A | Y | Y | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | | | | | | | AGGREGATE | $ 6,000,000 |
| | | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N; ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) Y; If yes, describe under DESCRIPTION OF OPERATIONS below | N / A | Y | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE; OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)**
Re: Job #2020-05, Code #08360, Contract #3717 - Bridgepoint 355 Lombard.
Primary/Non-Contributory Additional Insured(s) for General Liability, Auto Liability and additional insured's for Umbrella Liability: Principle Construction Corp.; Bridge Development Partners, LLC; BDP Development Services of Illinois, LLC; Harris Architects and Spaceco Inc.
Waiver of Subrogation on General Liability, Auto Liability, Umbrella Liability and Workers Compensation applies in favor of the Additional Insured's.
Endorsement forms attached.

**CERTIFICATE HOLDER**

Principle Construction Corp.
9450 W. Bryn Mawr Ave.
Suite 765
Rosemont, IL 60018

**CANCELLATION**

**SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.**

AUTHORIZED REPRESENTATIVE

© 1988-2015 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

Policy: ENP231-43-06 MIDWEST DOCK SOLUTIONS

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONTRACTORS ADDITIONAL INSURED - AUTOMATIC STATUS AND AUTOMATIC WAIVER OF SUBROGATION WHEN REQUIRED IN WRITTEN CONTRACT, AGREEMENT, PERMIT OR AUTHORIZATION - ILLINOIS

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

**A. Additional Insured - Owners, Lessees Or Contractors - Automatic Status For Other Parties When Required In Written Contract Or Agreement With You**

**1. Section II - Who Is An Insured** is amended to include as an additional insured any person or organization you have agreed in writing in a contract or agreement to add as an additional insured on this Coverage Part. Such person(s) or organization(s) is an additional insured only with respect to liability for:

**a.** "Bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by the performance of your ongoing operations by you or on your behalf, under that written contract or written agreement. Ongoing operations does not apply to "bodily injury" or "property damage" occurring after:

**(1)** All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

**(2)** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project; and

**b.** "Bodily injury" or "property damage" caused, in whole or in part, by "your work" performed under that written contract or written agreement and included in the "products-completed operations hazard", but only if:

**(1)** The Coverage Part to which this endorsement is attached provides coverage for "bodily injury" or "property damage" included within the "products-completed operations hazard"; and

**(2)** The written contract or written agreement requires you to provide additional insured coverage included within the "products-completed operations hazard" for that person or organization.

If the written contract or written agreement requires you to provide additional insured coverage included within the "products-completed operations hazard" for a specified length of time for that person or organization, the "bodily injury" or "property damage" must occur prior to the expiration of that period of time in order for this insurance to apply.

If the written contract or written agreement requires you to provide additional insured coverage for a person or organization per only ISO additional insured endorsement form number **CG 20 10**, without specifying an edition date, and without specifically requiring additional insured coverage included within the "products-completed operations hazard", this Paragraph **b.** does not apply to that person or organization.

**2.** If the written contract or written agreement described in Paragraph **1.** above specifically requires you to provide additional insured coverage to that person or organization:

**a.** Arising out of your ongoing operations or arising out of "your work"; or

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**b.** By way of an edition of an ISO additional insured endorsement that includes arising out of your ongoing operations or arising out of "your work";

then the phrase caused, in whole or in part, by in Paragraph **A.1.a.** and/or Paragraph **A.1.b.** above, whichever applies, is replaced by the phrase arising out of.

**3.** With respect to the insurance afforded to the additional insureds described in Paragraph **A.1.**, the following additional exclusion applies:

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of, or the failure to render, any professional architectural, engineering or surveying services, including:

**a.** The preparing, approving or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**b.** Supervisory, inspection, architectural or engineering activities.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of, or the failure to render, any professional architectural, engineering or surveying services.

**4.** This Paragraph **A.** does not apply to additional insureds described in Paragraph **B.**

**B. Additional Insured - State Or Governmental Agency Or Subdivision Or Political Subdivision - Automatic Status When Required In Written Permits Or Authorizations**

**1. Section II - Who Is An Insured** is amended to include as an additional insured any state or governmental agency or subdivision or political subdivision you have agreed in writing in a contract, agreement, permit or authorization to add as an additional insured on this Coverage Part. Such state or governmental agency or subdivision or political subdivision is an additional insured only with respect to operations performed by you or on your behalf for which the state or governmental agency or subdivision or political subdivision issued, in writing, a contract, agreement, permit or authorization.

**2.** With respect to the insurance afforded to the additional insureds described in Paragraph **B.1.**, the following additional exclusions apply:

This insurance does not apply to:

**a.** "Bodily injury", "property damage" or "personal and advertising injury" arising out of operations performed for the federal government, state or municipality; or

**b.** "Bodily injury" or "property damage" included within the "products-completed operations hazard."

**C.** The insurance afforded to additional insureds described in Paragraphs **A.** and **B.**:

**1.** Only applies to the extent permitted by law; and

**2.** Will not be broader than that which you are required by the written contract, written agreement, written permit or written authorization to provide for such additional insured;

**3.** Does not apply to any person, organization, state, governmental agency or subdivision or political subdivision specifically named as an additional insured for the same project in the schedule of an endorsement added to this Coverage Part; and

**4.** Does not apply to the City of Chicago, its officers, employees and agents with respect to liability caused by or arising from:

**a.** The building or disassembly of scaffolding by or for you; or

**b.** The use of such scaffolding.

**D.** With respect to the insurance afforded to the additional insureds described in Paragraphs **A.** and **B.**, the following is added to **Section III - Limits Of Insurance**:

The most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the written contract, written agreement, written permit or written authorization described in Paragraphs **A.** and **B.**; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**E.** **Section IV - Commercial General Liability Conditions** is amended to add the following:

**Automatic Additional Insured Provision**

This insurance applies only if the "bodily injury" or "property damage" occurs, or the "personal and advertising injury" offense is committed:

**1.** During the policy period; and

**2.** Subsequent to your execution of the written contract or written agreement, or the issuance of a written permit or written authorization, described in Paragraphs **A.** and **B.**

**F.** Except when **G.** below applies, the following is added to **Section IV - Commercial General Liability Conditions, 5. Other Insurance,** and supersedes any provision to the contrary:

**When Other Additional Insured Coverage Applies On An Excess Basis**

This insurance is primary to other insurance available to the additional insured described in Paragraphs **A.** and **B.** except:

**1.** As otherwise provided in **Section IV - Commercial General Liability Conditions**, **5. Other Insurance**, **b. Excess Insurance**; or

**2.** For any other valid and collectible insurance available to the additional insured as an additional insured by attachment of an endorsement to another insurance policy that is written on an excess basis. In such case, this insurance is also excess.

**G.** The following is added to **Section IV - Commercial General Liability Conditions, 5. Other Insurance,** and supersedes any provision to the contrary:

**Primary Insurance When Required By Written Contract, Agreement, Permit Or Authorization**

Except when wrap-up insurance applies to the claim or "suit" on behalf of the additional insured, this insurance is primary to any other insurance available to the additional insured described in Paragraphs **A.** and **B.** provided that:

**1.** The additional insured is a Named Insured under such other insurance; and

**2.** You have agreed in writing in a contract, agreement, permit or authorization described in Paragraph **A.** or **B.** that this insurance would be primary to any other insurance available to the additional insured.

As used in this endorsement, wrap-up insurance means any insurance provided by a consolidated (wrap-up) insurance program.

**Primary And Noncontributory Insurance When Required By Written Contract, Agreement, Permit Or Authorization**

Except when wrap-up insurance applies to the claim or "suit" on behalf of the additional insured, this insurance is primary to and will not seek contribution from any other insurance available to the additional insured described in Paragraphs **A.** and **B.** provided that:

**1.** The additional insured is a Named Insured under such other insurance; and

**2.** You have agreed in writing in a contract, agreement, permit or authorization described in Paragraph **A.** or **B.** that this insurance would be primary and would not seek contribution from any other insurance available to the additional insured.

As used in this endorsement, wrap-up insurance means any insurance provided by a consolidated (wrap-up) insurance program.

**H.** **Section IV - Commercial General Liability Conditions, 9. Transfer Of Rights Of Recovery Against Others To Us** is amended by the addition of the following:

We waive any right of recovery we may have against any additional insured under this endorsement against whom you have agreed to waive such right of recovery in a written contract, written agreement, written permit or written authorization because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a written contract, written agreement, written permit or written authorization. However, our rights may only be waived prior to the "occurrence" giving rise to the injury or damage for which we make payment under this Coverage Part. The insured must do nothing after a loss to impair our rights. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce those rights.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 117

**From:** Tony Brutti
**Sent on:** Friday, October 23, 2020 10:12:49 AM
**To:** Margaret R. Stredde
**Subject:** COI needed
**Attachments:** Hazel Crest permit.pdf (321.71 KB)


Hi Margaret, I am in need of a COI for the village of Hazel Crest.  See attached for criteria.

--
Yours,

Tony Brutti
Midwest Dock Solutions
Phone: 815-922-5258
Email: tonyb@midwestdocksolutions.com



# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 118

## Village of Hazel Crest

## Department of Building & Inspectional Services

## APPLICATION FOR CONTRACTORS REGISTRATION CERTIFICATE

**Company Name:** Midwest Dock Solutions

**Address:** 27 E. 36th Pl.

**City:** Steger **State:** IL **Zip Code:** 60475

**Business Phone:** 708-367-0801 **Emergency Phone:** 708-921-8950

**Type of Contractor :** Subcontractor

**Engaged in the practice of:** Installation of overhead garage doors.

**Officers or Partners with Title:**

Tony Zarlengo - President

**NOTE: A CURRENT CERTIFICATE OF PUBLIC LIABILITY INSURANCE SHALL BE PRESENTED WITH THIS APPLICATION. PLUMBING, ELECTRICAL, ROOFING AND ALARM INSTALLATION CONTRACTORS SHALL PROVIDE A COPY OF THEIR STATE LICENSE PRIOR TO ANY WORK BEING PERFORMED IN THE VILLAGE OF HAZEL CREST.**

A. **WORKMAN'S COMPENSATION & EMPLOYEE LIABILITY** not less than $100,000 per person.
B. **COMPREHENSIVE PUBLIC LIABILITY** not less than $250,000 for injuries, including accidental death to any one person and subject to the same limits for each person in an amount not less than $500,000 an account of any one accident.
C. **PROPERTY DAMAGE** not less than $100,000 for damage to property in any one accident with an aggregate limit of not less than $300,000.

Certificate of all policies showing the "Village of Hazel Crest" as Certificate Holder shall be furnished to the Village. The fee for Contractors Registration is $125.00 annually, expiring each April 30th.

THE UNDERSIGNED SOLEMLY SWEARS (SINCERELY AFFIRMS) THAT THE ABOVE INFORMATION IS TRUE AND CORRECT.

**SIGNATURE:** ______________________ **DATE:** ______________________

**DATE ISSUED:** ______________ **Receipt #:** __________ **Issued By** ______________

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 119

**From:** Margaret Stredde
**Sent on:** Friday, October 23, 2020 10:20:08 AM
**To:** Margaret R. Stredde
**Subject:** Certificate of Insurance was Issued for Midwest Dock Solutions, Inc.
**Attachments:** Certificate.pdf (90.25 KB)

Cert Desc......... 20/21 MASTER
Cert Date......... 10/23/2020
Insured........... Midwest Dock Solutions
Insured Addr1..... 27 East 36th Place
Insured Addr2.....
Insured City...... Steger
Insured State..... IL
Insured Zip....... 60475

Desc of OPs.......

Holder............ Village of Hazel Crest
Address 1......... 3601 W 183rd St
Address 2.........
Address 3.........
Address 4.........
City.............. Hazel Crest
State/Province.....IL
Zip/Postal Code....60429

AUTO
Policy............ ENP 0314304 3/13/2020 - 3/13/2021

EXC
Policy............ ENP 0314304 3/13/2020 - 3/13/2021

GL
Policy............ ENP 0314304 3/13/2020 - 3/13/2021

OTHER
Policy............ ENP 0314304 3/13/2020 - 3/13/2021

WC
Policy............ EWC 0314305 3/13/2020 - 3/13/2021

Delivery Method(s)
Issued By: Margaret Stredde
Viewed On Screen View (View)
Emailed To Tony Brutti (tonyb@midwestdocksolutions.com)
Confirmation Emailed To Midwest Dock Solutions, Inc. (tony@midwestdocksolutions.com)

INSURED NAME
ID: MIDWDOC-01
Contact: Midwest Dock Solutions, Inc.
Contact Phone: 708-367-0801

PLAINTIFF'S
EXHIBIT
291
tabbies

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 120

ACORD®

# CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY): 10/23/2020

**THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.**

**IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).**

**PRODUCER**
AssuredPartners of Illinois, LLC
1811 High Grove, Suite 139
Naperville IL 60540-9100

**CONTACT NAME:** Certificate Team
**PHONE (A/C, No, Ext):** 630-355-2077 **FAX (A/C, No):** 630-355-7996
**E-MAIL ADDRESS:** COI@esserhayes.com

| INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER A : Cincinnati Insurance Company | 10677 |
| INSURER B : The Cincinnati Indemnity Company | 23280 |
| INSURER C : | |
| INSURER D : | |
| INSURER E : | |
| INSURER F : | |

**INSURED** MIDWDOC-01
Midwest Dock Solutions
27 East 36th Place
Steger IL 60475

**COVERAGES** **CERTIFICATE NUMBER:** 68912408 **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY; CLAIMS-MADE; X OCCUR | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 500,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY; X PRO-JECT; LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY; SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS ONLY; X NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | X UMBRELLA LIAB; X OCCUR | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | EACH OCCURRENCE | $ 6,000,000 |
| | EXCESS LIAB; CLAIMS-MADE | | | | | | AGGREGATE | $ 6,000,000 |
| | DED; X RETENTION $ N/A | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N | | | EWC 0314305 | 3/13/2020 | 3/13/2021 | X PER STATUTE; OTH-ER | |
| | ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? Y (Mandatory in NH) | N / A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Leased/Rented Equipment Special Form, ACV | | | ENP 0314304 | 3/13/2020 | 3/13/2021 | Limit: $25,000 | Deductible: $250 |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)**

**CERTIFICATE HOLDER**

Village of Hazel Crest
3601 W 183rd St
Hazel Crest IL 60429

**CANCELLATION**

**SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.**

AUTHORIZED REPRESENTATIVE

© 1988-2015 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 121

**From:** ILCHI-Certs.apil
**Sent on:** Monday, January 11, 2021 12:01:31 PM
**To:** Debbie Burton
**CC:** Cathie M. Demitropoulos
**Subject:** FW: COI and Bond needed
**Attachments:** Contractors_Application.pdf (23.67 KB), Certificate.pdf (90.8 KB)

Midwest Dock Solutions

Bond please... COI is attached for you to send along with the bond.

Have a great day!

**Susan Steeves**
*Certificate Team Lead*

AssuredPartners, Inc.
1811 High Grove Lane, Suite 139
Naperville, IL 60540
O 630.544.3448 F 630.355.7996
susan.steeves@assuredpartners.com

**From:** Tony Brutti <tonyb@midwestdocksolutions.com>
**Sent:** Monday, January 11, 2021 9:54 AM
**To:** Cathie M. Demitropoulos <cdemitropoulos@esserhayes.com>; ILCHI-Certs.apil <certs.apil@assuredpartners.com>
**Subject:** COI and Bond needed

I am in need of a COI and bond for the town of Merrillville, IN. See attached for details.

--
Yours,

Tony Brutti
Midwest Dock Solutions
Phone: 815-922-5258
Email: tonyb@midwestdocksolutions.com

tabbies
PLAINTIFF'S
EXHIBIT
293

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 122

6:12

TZ

Tony

That will give you each a distribution of $53,000. I just rounded mikes up to $53k.

May 11, 2023 at 1:51 PM

Will u or kellen b doin my personal taxes? Just curious

Kellen. I don't do tax work

He just emailed me

Jun 13, 2023 at 3:33 PM

Hey tony - long time no talk. I hope you're well. I'm reviewing Dock and Door for May. I saw that tony took a $5000 distribution. Were you aware of this? Do you want me to notify you in the future?

Yes we told him too. No issue. Thanks We r working on this mile thing also for sales guys

Ok great. Thanks, tony. Let me know if you need anything.

Jul 17, 2023 at 2:03 PM

Hey Tony - we need you to cut another check to yourself to even up the distributions. Mike took another $60K

iMessage

PLAINTIFF'S
EXHIBIT
107
tabbies

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 123



7:46
T
Tony Brutti
Thu, Jul 10 at 5:58 PM
Damn. No way I can do seals in Elwood?
You'd be the 3rd guy. Can you accomplish much by yourself?
I'm talking to Collin rn he said there's 12 sets of sides to throw up then I could prep
How long would that take?
I'd be able to stay busy all day
Ok sounds good. Go ahead and go to Elwood.
Thanks
Tue, Jul 15 at 2:54 PM
uly 3 Dutch farms 8 hours dock doors
uly 4 holiday
uly 7 Dutch farms 8 hours dock doors
uly 8 addison dock install 8 hours
uly 9 university park track guards job
omplete 8 hours
iMessage
PLAINTIFF'S
EXHIBIT
273
tabbies

7:46

T

Tony Brutti

Mon, Jul 28 at 5:30 PM

I finished seals today

Sorry just read the text

Mon, Jul 28 at 6:52 PM

Ok let me see what's going on. Are there restraints you can do?

Yea don't think he's ever done them before tho

Ok maybe go to cherry hill. Still trying to figure it out. Just got off a plane lol

Lmfao you're all good sorry to bother do you want me to call tony z see if he knows

All good. Just work on restraints at Elwood. I think there's instructions, and maybe call Collin or Nico if you have questions. I might have to run some out if you need more.

Okay we got a couple pallets out there I think we should be good I just don't know if he has the tools for them or a hammer drill to be

iMessage



7:46
T
Tony Brutti
I've done them a couple times I got a pretty good idea
Pretty sure Sam has one
Okay I'll find out tommrow. He probably doesn't have the Allen's or anything but we should be able to keep busy
Tue, Jul 29 at 7:37 AM
I just called him he doesn't I gotta stop at Home Depot anyways to get the longer drill bits want me to get him one
Yeah that's fine. Make sure we get it back though.
Is he off after today looked like it on the board
Cause if he is I'll take it back today
Probably. I'll probably know by the afternoon
Okay then I'll get you my hours when I get thee
iMessage

7:46
T
Tony Brutti
They're out of the Bosh should I just grab the Milwaukee
Yeah
Okay
Tue, Jul 29 at 10:05 AM
Message

7:46

Tony Brutti

If they ask I put the j boxes in the south corner for the electricians I didn't want them to get wet

Ok good

We spread out what we got except the strong arms I talked to the painter hee said they're gonna knock out this whole side today so it'll be ready tommrow

Ok that'll work

iMessage

7:46
T
Tony Brutti
Head back then?
I had Sam clean up yesterday not too much to do out here
Besides locks
Yeah
Tue, Aug 5 at 7:38 AM
I'm gonna send my hours in a second I just gotta put them on a sheet. Is Collin coming?
Yeah I think he loaded some stuff at the shop.
Thanks!
iMessage

7:46
T
Tony Brutti
Tue, Aug 5 at 10:41 AM
I think the 29 was actually a half day
I think I only need like 90 hours I called the school to check a couple weeks ago I think it was like august 10th they said till I go journeyman
Yeah I'm trying to figure out which day it rained.
I'll add up the hours again this week. You're probably right on the date.
Either 29 or 30th
I got like 5660 or something like that but yea if you could double check no rush or anything
Wed, Aug 6 at 10:37 AM
You are good on hours. Next check will be journeyman
HA HA
iMessage

7:47
Tony Brutti
31 dock locks 8 hours Elwood
1 dock locks 8 hours Elwood
4 dock locks 8 hours Elwood
5 dock locks 8 hours Elwood
6 dock locks 8 hours Elwood
Don't have any time sheets with me sorry
Job Info Sheet Time In: 7 Time Out: 3:30 40
Collin 7/31
Elwood
Locks (trailer)
Job Info Sheet Time In: 7 Time Out: 3:30
Collin 8/1
Elwood
Locks (trailer)
Job Info Sheet Time In: 7 Time Out: 3:30
Collin 8/4
IDI Kenosha
roll door
Job Info Sheet Time In: 7 Time Out: 3:30
Collin 8/5
Elwood
Locks
Job Info Sheet Time In: 7 Time Out: 3:30
Collin 8/6
Elwood
Locks
Collins time sheet
iMessage

7:47

T

Tony Brutti

So the electricians are taking over everything on the lights? Like installing them too

Yes. Lights and fans

We will be doing the traffic lights for the locks.

That's stupid

Yes I agree. But that order came from Bill the super

I'm interested to know if the actual installing part is our work but plugging them in and putting the light in is electrician

I'm pretty certain it's ours. But I believe bill makes those calls. I bet an electrician complained to him.

Yea that's horseshit because that should be carpenter work

I would just want to make sure before calling the ba to see

Maybe kindly mention it to bill. Keep good diplomacy with Arco.

iMessage

7:47
Tony Brutti
Yea I will obviously I'm not mad at bill the electricians have tried to pull this on another arco job
They called there ba out on us it was me and don and bill told them to gtfo
It was the same guy
It was Connelly that time too
Tue, Aug 19 at 10:47 AM
iMessage

7:47
Tony Brutti
Job Info Sheet Time In: 7 Time Out: 330
Name & Date: Aug 14 RT
Job Location & Contractor: Elwood
Work Performed: Dock lights
Job Info Sheet Time In: Time Out:
Name & Date: Aug 15
Job Location & Contractor: Elwood
Work Performed: Door Brush
Job Info Sheet Time In: 7 Time Out: 330
Name & Date: Aug 18
Job Location & Contractor: Elwood
Work Performed: off load/locks
Job Info Sheet Time In: 7 Time Out: 330
Name & Date: Aug 19
Job Location & Contractor: Elwood
Work Performed: Dock locks
Job Info Sheet Time In: 7 Time Out: 330
Name & Date: Aug 20
Job Location & Contractor: Elwood
Work Performed: Dock locks
Tue, Sep 2 at 11:17 AM
Do we have size large shirts
T shirts
Yeah
Cool I need to get rid of some of my old ones they're destroyed lol
Yeah no problem. I'll set a couple on the break room table.
iMessage

7:47
Tony Brutti
We're gonna need a couple more of these
Wed, Sep 3 at 12:13 PM
I got 2 here. Set them on the break room table. I'll get some more
Tue, Sep 9 at 11:44 AM
Mon, Sep 15 at 2:05 PM
iMessage

7:47
T
Tony Brutti
Work Monday?
Off Monday. Working Tuesday
Okay cool
Starting to get slow now?
It might be spotty for a little while but not totally dead. A lot of work in November December.
Okay sounds good
Mon, Sep 22 at 2:23 PM
Off tomorrow working Wednesday
Schedule change?
Yeah Elwood got done today. Starting a new job on Wednesday
Tue, Sep 23 at 10:01 AM
Send time sheet
Tue, Sep 23 at 11:05 AM
ept 11 Elwood 8 hours door brush
iMessage

7:47
T
Tony Brutti
Sorry completely forgot and don't have sheets with me
Sat, Sep 27 at 9:01 AM
Off Monday?
Sat, Sep 27 at 11:03 AM
Off Monday. Should be working Tuesday
Tue, Sep 30 at 2:40 PM
Off tomorrow
Wed, Oct 1 at 8:08 AM
Sept 18 Elwood 8 hours track guards
Sept 19 elwood 8 hours cleanup
Sept 22 off
Sept 23 of
Sept 24 8 hours drive in manteno
Wed, Oct 1 at 2:39 PM
Off tomorrow
Off all week?
iMessage

7:47
T
Tony Brutti
Off all week?
Possibly I'm not 100 percent sure about Friday yet
Thu, Oct 2 at 2:29 PM
Off tomorrow
Fri, Oct 3 at 10:14 AM
I recommend going on unemployment for a little while. It could be a couple weeks before any work comes in.
Mon, Oct 6 at 10:52 AM
25 10 hours Kenosha guard rail
26 8 hours Kenosha guard rail
29 off
30 8 hours Kenosha guard rail
Thursday 11:36 AM
So there's 0 work on the union side?
Delivered
Thursday 3:18 PM
iMessage

7:47
T
Tony Brutti
Thu, Oct 2 at 2:29 PM
Off tomorrow
Fri, Oct 3 at 10:14 AM
I recommend going on unemployment for a little while. It could be a couple weeks before any work comes in.
Mon, Oct 6 at 10:52 AM
25 10 hours Kenosha guard rail
26 8 hours Kenosha guard rail
29 off
30 8 hours Kenosha guard rail
Thursday 11:36 AM
So there's 0 work on the union side?
Delivered
Thursday 3:18 PM
Nothing right now. I believe it might pick up a bit later in the month or early November.
iMessage



7:46
T
Tony Brutti
iMessage
Tue, Jul 8 at 9:36 AM
Thu, Jul 10 at 3:44 PM
Anything tommrow
Off tomorrow. Hitting to big jobs starting Monday
Thu, Jul 10 at 5:58 PM
Damn. No way I can do seals in Elwood?
iMessage

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 124

**From:** Mara Spring
**To:** Kevin McJessy
**Subject:** Updated DOI list
**Date:** Monday, October 6, 2025 1:42:41 PM
**Attachments:** image006.png
image007.png
Midwest Dock Certs.xlsx

---

Attorney McJessy
Attached please find the updated list of Certificates issued for Midwest Dock Solutions.
As of today there have been none issued for Dock & Door.
I believe that this completes our subpoena response. Please confirm that nothing more is needed from Holden.
In addition, please forward this to the other attorneys who were on the deposition this morning.
Thank you!
Mara

Mara C. Spring
Conway & Josetti, LLC
Attorneys at Law
13555 Bishops Court, Suite 230
Brookfield, WI 53005
Phone: (414) 539-2600
Fax: (414) 446-3531
Email: mspring@conwayjosetti.com

Notice: This email message and any attachment to this e-mail message contains confidential information that may be legally privileged. If you are not the intended recipient, you must not review, retransmit, convert to hard copy, copy or disseminate this e-mail or any attachments to it. If you have received this email in error, please notify us immediately by return e-mail or by telephone at (414) 539-2600 and delete this message. Please note that if this e-mail message contains a forwarded message or is a reply to a prior message, some or all of the contents of this message or any attachments may not have been produced by Conway & Josetti, LLC. Thank you.

# 1:24-cv-06428

# Plaintiffs' Local Rule 56.1 Statement

# EXHIBIT 125

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

MID-AMERICA CARPENTERS REGIONAL )
COUNCIL PENSION FUND; et al., )
)
Plaintiffs, )
)
vs. ) Case No.
) 1:24-cv-06428
DOCK & DOOR INSTALL, INC., an )
Illinois corporation and MIDWEST )
DOCK SOLUTIONS, INC., an Illinois )
corporation, )
)
Defendants. )

The deposition of JACIE ANN OLSON, taken via Zoom before GINA M. CAUSLEY, C.S.R. of the State of Illinois, pursuant to Notice, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions on Monday, October 6th, 2025, commencing at 9:00 o'clock a.m.

APPEARANCES:

MCJESSY, CHING & THOMPSON, LLC
3759 North Ravenswood - Suite 231
Chicago, Illinois 60613
BY: MR. KEVIN P. MCJESSY,
Appeared on behalf of the Plaintiffs;

ALLOCCO, MILLER & CAHILL, PC
20 North Wacker Drive - Suite 3517
Chicago, Illinois 60606
BY: MR. TODD MILLER,
Appeared on behalf of the Defendant Dock & Door Install, Inc.;

AMUNDSEN DAVIS, LLC
3815 East Main Street - Suite A-1
St. Charles, Illinois 60174
BY: MR. MICHAEL HUGHES,
Appeared on behalf of the Defendant Midwest Dock Solutions, Inc.;

CONWAY & JOSETTI, LLC
135555 Bishops Court - Suite 230
Brookfield, Wisconsin 53005
BY: MS. MARA SPRING
Appeared on behalf of the witness.

- - - o0o - - -

Reported for Certified Reporting Company
11 East Adams Street - Suite 1608
Chicago, Illinois 60603

(312) 922-1666

Reported by Gina M. Causley, C.S.R.

- - - o0o - - -

INDEX

WITNESS: JACIE ANN OLSON

PAGE

EXAMINATION BY MR. MCJESSY..................4

EXHIBITS

PLAINTIFFS' EXHIBIT

No. 127..............................8

No. 128..............................45

No. 147..............................70

No. 148..............................63

No. 154..............................54

No. 155..............................71

No. 159..............................14

No. 163..............................37

No. 165..............................32

(WHEREUPON, the witness was first duly sworn remotely.)

JACIE ANN OLSON,

called as a witness in behalf of the Plaintiffs herein, having been first duly sworn remotely, was examined and testified as follows:

EXAMINATION

BY MR. MCJESSY:

Q All right. Hi. Can you state your name for the record, please?

A Jacie Olson.

Q And can you spell your name, if you have a middle name, if you could say that and spell it as well?

A Jacie, J-a-c-i-e, Ann, A-n-n, Olson, O-l-s-o-n.

Q Have you ever been deposed before, Miss Olson?

A No, this is the first time.

Q Okay. Well, let me set forth some ground rules just so things will hopefully go smooth and

quickly this morning.

I'm going to ask you a series of questions. You'll give me hopefully the best most truthful answers that you can. Do you understand you're under oath?

A Yes.

Q And do you understand that that oath has the same force and effect as if you were testifying in court even though in this instance it's a deposition by Zoom?

A Yes.

Q Okay. All of your answers today need to be verbal responses. Yeses and no's are fine, but if you nod or shake your head or say something like uh-huh or huh-uh, I will ask you is that a yes, is that a no. I'll prompt you just so the record is clear about what your answer is. Is that fair?

A Yes.

Q Also, if I ask a question and you don't understand it either because my question is confusing or vague, whatever, will you ask me to explain my question so that you do understand it?

A Yes.

Q Okay. So is it fair then that if you

answer a question that I ask, I can presume you understood my question?

A Yes.

Q And, also, we have a court reporter here today, and she's taking down what everybody says. It's important that we not talk over each other. So if I ask a question, even if you know what my question is going to be, please let me finish asking my question before you start answering. I will try to return that courtesy and not ask a question while you're still giving an answer. Is that fair?

A Yes.

Q All right. And then last but not least there's a number of attorneys here on the call with us, and some of them may make objections to questions as we go along. Unless you're instructed not to answer a question after they make their objection you can go ahead and answer. All right?

A Yes.

Q And lastly, I don't -- I don't presume this deposition will go terribly long this morning, but if as we go along -- if as we go along you need to take a break, just let me know. We can stop and you can do that, and usually we take a break about every

hour, but if you need to take a break in the interim, that's fine. I would ask that if I've asked a question that you answer my question before we take a break. All right?

A Yes.

Q Now, you're represented by an attorney here today, correct?

A Yes.

Q And you are being presented as --

MR. HUGHES: Kevin -- I'm sorry to interpret, Kevin.

MR. MCJESSY: Sure.

MR. HUGHES: Can we introduce who's all here? I just want to make sure everyone knows who everybody is.

MR. MCJESSY: Oh, I'm sorry, sure. Why doesn't everyone just go ahead and introduce themselves?

MR. HUGHES: I'm Mike Hughes. I'm the attorney representing Defendant Midwest Dock Solutions.

MR. MCJESSY: Mr. Miller.

MR. MILLER: I'll go next. I'm Todd Miller. I represent Dock & Door Install.

MS. SPRING: And Mara Spring. I'm here for Holden, for Miss Olson.

BY MR. MCJESSY:

Q And I am Kevin McJessy. I represent the Mid-America Carpenters Regional Council Fringe Benefit Funds, and I'm the one who directed a subpoena to your attention that I would like to show you.

(WHEREUPON, said document was marked as Plaintiffs' Deposition Exhibit No. 127, for identification, as of 10/6/25, so marked by Mr. McJessy.)

BY MR. MCJESSY:

Q Can you see that exhibit on your screen there?

A Yes.

Q I'm showing you what's been marked as Plaintiffs' Exhibit 127 which is the subpoena that was issued to the person most knowledgeable of matters on attached Rider A from Holden Insurance Agency. Do you see that?

A Yes.

Q And have you had a chance to review the subpoena before?

A Yes.
Q All right. The subpoena has a rider attached and it directs Holden to produce the person most knowledgeable about various matters for examination, and one is Subpoena Respondent's effort to gather and produce documents responsive to the subpoena. Are you the person most knowledgeable about that?
A Yes.
Q All right. And the next one is the work, services or products that Subpoena Respondent performed or provided to Dock & Door and Midwest Dock. Do you see that?
A Yes.
Q And are you the person most knowledgeable about that topic?
A Yes.
Q All right. And then the next topic is the information provided by either Dock & Door or Midwest Dock to Subpoena Respondent. Are you the person most knowledgeable about that?
A Yes.
Q And the next item is the persons from Dock & Door and Midwest Dock who were in contact with

Subpoena Respondent regarding the work performed or other products provided to Dock & Door and Midwest Dock by Subpoena Respondent. Again, are you the person most knowledgeable about that?
A Yes.
Q All right. No. 5 is the communications between Subpoena Respondent on the one hand and either Dock & Door or Midwest Dock on the other hand. Are you the person most knowledgeable about that?
A Yes.
Q All right. The relationship between Dock & Door and Midwest Dock, are you the person from Holden most knowledgeable about that?
A Yes.
Q The ownership, management and operation of Dock & Door and Midwest Dock, are you the person most knowledgeable about that?
A Yes.
Q The insurance coverage obtained by Subpoena Respondent for Dock & Door and Midwest Dock, are you the person most knowledgeable about that?
A Yes.
Q All Certificate of Insurance documents that were provided to any general contractor or other

third-party, including any general contractor for insurance carried by either Dock & Door or Midwest Dock and the documents such as e-mails or fax cover pages showing the transmittal of the Certificate of Insurance documents, are you the person most knowledgeable about that?
A Yes.
Q All right. And I think Holden Insurance provided to me a spreadsheet of all the Certificates of Insurance that were produced by Holden at least as of the date that the spreadsheet was provided. Do you recall that?
A Yes.
Q Okay. And I believe all of the Certificates of Insurance on that table that were provided were insurance certificates provided for policies of Midwest Dock. Does that sound right to you?
A Yes.
Q Had Holden Insurance provided Certificates of Insurance on behalf of Dock & Door to any third-party?
A No.
Q Item 10 in the subpoena is all additional

insureds on any policy issued to either Dock & Door or Midwest Dock. Do you see that?
A Yes.
Q Are you the person most knowledgeable about that?
A Yes.
Q And all communications between Subpoena Respondent and any third-party, including any general contractor on behalf of Dock & Door or Midwest Dock. Are you the person most knowledgeable about that?
A Yes.
Q And what, if anything, did you do to prepare for the deposition today?
A Met with Mara Spring.
Q And I don't want to know what she said to you or what you said to her during that meeting, but how long did the meeting last?
A Less than 10 minutes.
Q Okay. And did you just meet with her once or did you meet with her more than once?
A Once.
Q And was anybody else present during that meeting?
A No.

Q And did you review any documents to prepare for the deposition here today?
A No.
Q And other than meeting with Ms. Spring for the 10 minutes did you do anything else to prepare for the deposition today?
A No.
Q All right. Now, the subpoena also asked Holden to produce various documents, correct?
A Yes.
Q And there are six categories of documents that it asked Holden to produce. One is documents showing communications between the Subpoena Respondent on the one hand and either Dock & Door or Midwest Dock or any of their employees or agents on the other hand. Were those documents produced, to the best of your knowledge?
A Yes.
Q And then Item 2 is all Certificates of Insurance documents that were provided to any general contractor or other third-party, and then it goes on from there and it's limited to the period from January 1st, 2020, through the present. Do you see that?

A Yes.
Q Now, you produced a select group of insurance certificates, correct, you didn't produce all of the Certificates of Insurance, do you remember?
A I do remember. Are you asking --
Q Well, I think what I was going to say is we reached an agreement that you produce certain Certificates of Insurance for certain general contractors, correct?
A Yes.

(WHEREUPON, said document was marked as Plaintiffs' Deposition Exhibit No. 159, for identification, as of 10/6/25, so marked by Mr. McJessy.)

BY MR. MCJESSY:
Q All right. I'd like to show you what I've marked as Exhibit 159. Do you see that document?
A Yes.
Q And this document is 80 pages long, and I'm just going to scroll through a few pages so you can see what it looks like.

This is a spreadsheet that you produced, correct?
A Yes.
Q Okay. And you produced it without this (indicating) yellow highlighting, correct?
A Yes.
Q And this spreadsheet that you produced, it was a complete list of all the Certificates of Insurance that had been provided by Holden, is that correct?
A Yes.
Q And all of these Certificates of Insurance were provided just for Midwest Dock Solutions, correct?
A Yes.
Q And there were no Certificates of Insurance that had been provided on behalf of Dock & Door, is that correct?
A Yes.
Q Why is that?
A Midwest Dock is our insured.
Q Midwest Dock is your insured.
Do you also work for Dock & Door?
A Yes.

Q Okay. But you didn't provide any Certificates of Insurance on its behalf?
A Not at the time.
Q Have you since then?
A Yes.
Q And do you recall approximately when was the first time you provided Certificates of Insurance on behalf of Dock & Door?
A I don't recall the exact date.
Q Can you recall an approximation, a month?
A No.
Q Can you recall the year?
A 2025.
Q Do you think it was before June?
A No.
Q All right. Item 3 asks for all documents showing any party added as an additional insured on any policy issued to either Dock & Door or Midwest Dock. Did you produce those documents?
A Yes.
Q Okay. And then all declaration pages for policies providing any insurance coverage to either Dock & Door or Midwest Dock. Do you recall whether those documents were provided?

A Yes.
Q And all invoices, billing statements or account statements for any policy issued to either Dock & Door or Midwest Dock, were those documents provided?
A Yes.
Q And then Item 6 is all documents showing any refund made on any insurance policy or bond providing coverage to either Dock & Door or Midwest Dock. Were those documents provided?
A Yes.
Q All right. And what was your role in gathering the documents responsive to the subpoena?
A I gathered the certificates and none of the other documentation.
Q Who gathered the other documentation?
A The receptionist.
Q And what's her name?
A Shaye Forseth.
Q Shane?
A Shaye Forseth.
Q Can you spell that for me?
A Yes, S-h-a-y-e F-o-r-s-e-t-h.
Q Is that a he or a she?

A She.
Q All right. A couple of background questions, what's the highest level of education you've received?
A High school degree.
Q And when did you get that and from where?
A 2015, Superior High School.
Q And where is that high school located?
A Superior, Wisconsin.
Q Excellent.
And have you had any formal education after high school?
A Some college.
Q And where did you go to college?
A University of Wisconsin-Superior.
Q And when did you attend and did you have a major?
A No major, 2015 until 2019.
Q And did you take enough classes to achieve any degree from there?
A No.
Q What was your first job out of college?
A Holden Insurance Agency.
Q And do you hold any licenses or

certifications of any sort?
A Property and Casualty license and Certified Insurance Counselor designation.
Q And can you tell me what each of those -- are those certifications, licenses, how would you describe them?
A Property and Casualty is a license. Certified Insurance Counselor is a designation.
Q And what did you do to achieve the Property and Casualty license?
A Took a class for a week and took a test.
Q Okay. Who was the class through?
A The PIA of Wisconsin.
Q What does PIA stand for?
A Professional -- don't know.
Q Okay. Just very briefly, what was the nature of the class, what did you learn?
A The basics of insurance.
Q Just property and casualty insurance or all insurance?
A Just property and casualty.
Q And how long ago did you complete that property and casualty class and obtain that license?
A Seven or eight years ago.

Q And what does that license allow you to do?
A Write insurance.
Q And what does write insurance mean?
A I can sell you a policy.
Q Property and casualty policies?
A Correct.
Q And you mentioned the other one was a Certified Insurance Counselor?
A Yes.
Q What did you do to obtain that designation?
A I took five courses that were two days long each, and after each course I took a test.
Q And what were the nature of those courses?
A They were specific to commercial insurance and agency operations.
Q All lines of commercial insurance?
A Yes.
Q Any other licenses, certifications that you've received?
A No.
Q Any other training or classes that you've

taken in the insurance field other than the ones you've told me about?

A No.

Q All right. How were you chosen to be the designee for Holden Insurance for this deposition?

A I'm the account executive for Midwest Dock Solutions.

Q Who is the account executive for Dock & Door?

A Myself.

Q So you're the account executive for both Midwest Dock Solutions and Dock & Door?

A Yes.

Q When did you become the account executive for Midwest Dock Solutions?

A 2022.

Q And when did you become the account executive for Dock & Door?

A 2025.

Q And how did it come about that you became the account executive for Midwest Dock Solutions?

A I was moved to the Commercial Lines Department, and I work directly with the producer that handles the account.

Q What does an account executive do?

A Service the account, issue certificates, file claims, review policies.

Q Anything else?

A No.

MR. MCJESSY: Gina, can you read back that last response? I'm not sure I got everything.

(WHEREUPON, the record was read as follows:

"A Service the account, issue certificates, file claims, review policies.")

MR. MCJESSY: Thank you.

BY MR. MCJESSY:

Q All right. What does the producer do?

A Market the account.

Q What does that mean?

A Send to carriers when we need to move business.

Q Okay. So obtain proposals for insurance from other insurance carriers for that particular client?

A Yes.

Q All right. Who's the producer for Midwest Dock Solutions?

A Tom Downs.

Q All right. And to your knowledge, has he been the producer for Midwest Dock Solutions the entire time its account has been with Holden?

A Yes.

Q And was there another account executive for Midwest Dock before you or were you the first account executive for Midwest Dock?

A There was another account executive before me.

Q And who was that?

A Pam Carlson.

Q Pam, was that a P as in Paul?

A P as in Paul, yes.

Q And how did you take over the account of the account executive?

A She left the agency for medical reasons.

Q And who is the producer for Dock & Door?

A Tom Downs.

Q And do you work with Tom Downs on the Midwest Dock account and the Dock & Door account?

A Yes.

Q Is there a reason that those two -- do you have -- well, strike that.

Are there other account executives that work at Holden?

A Yes.

Q And are there other producers who work at Holden?

A Yes.

Q And are there other account executives who handle commercial insurance lines?

A Yes.

Q And are there other producers that handle commercial insurance lines?

A Yes.

Q Is there a reason that Tom Downs and you are both the producer and account executive for both Midwest Dock Solutions and Dock & Door?

A I handle Tom Downs' entire commercial book.

Q Do you know, is there a reason that Tom Downs is the producer for both Midwest Dock Solutions and for Dock & Door?

A I do not.

Q Do you know when Midwest Dock Solutions started -- became -- well, strike that.
What do you refer to your accounts as, are they accounts, clients, how do you refer to them?
A Accounts or clients.
Q So Midwest Dock is a client of Holden, is that fair?
A Yes.
Q And do you know when Midwest Dock became a client of Holden?
A 2021, I believe.
Q And do you know how that came about?
A No.
Q Do you know when Dock & Door became a client of Holden?
A 2025.
Q And do you know how that came about?
A No.
Q How did you come to be hired by Holden?
A I started off as an intern in 2015.
Q Okay. And then how did you become full-time? Well, strike that.
Are you full-time?

A Yes.
Q Okay. When did you switch from being an intern to being full-time?
A After I decided I was no longer going to college.
Q And did you start out when you became full-time as an account executive?
A No.
Q What was your position before that?
A Processing.
Q And what is processing?
A Processing personal lines, changes and claims.
Q How long were you in that position, from what year to what year?
A 2017 to -- or 2018 to 2021.
Q And what was your next position after processing?
A Commercial account executive.
Q And that's the position you're in now, correct?
A Yes.
Q All right. And in 2021 were you working with Tom Downs?

A Yes.
Q And were you handling his commercial -- just so I have an understanding, you said that you were -- I can't remember exactly how you phrased it. So, perhaps, you can remind me, but I think you said you handle all of Tom Downs' commercial lines, is that correct?
A Yes.
Q What does that mean?
A Any commercial business clients that he has are serviced by me.
Q Okay. And by serviced do you mean those four things you described for me earlier, issuing certificates, reviewing policies -- well, you said servicing the account, and then you also said filing claims, correct?
A Yes.
Q What does servicing the account mean?
A Any questions that they have about coverage, any questions a company has regarding the client, preparing proposals and issuing certificates, filing claims.
Q So general customer service matters?
A Yes.

Q Okay. Now, do Holden clients have any sort of engagement letter or any sort of agreement that shows that Holden represents them?
A No.
Q So when a new client comes in, is there any way that that's documented?
A Just by correspondence between the agent and account executive and the client.
Q So there's nothing that gets filled out or anything like that like a customer/client information sheet or anything like that?
A No.
Q Who is your main contact for Midwest Dock Solutions? And when I say, "your," I mean Holden Insurance generally.
A Tony.
Q Tony Zarlengo?
A Yes.
Q Do you deal with Sherry Webber?
A Yes.
Q Do you deal with anybody else on behalf of Midwest Dock?
A Ira, Steven French and Amber.
Q That's Ira Sugar?

A Yep -- yes.
Q And do you remember Amber's last name?
A I do not.
Q All right. And what kind of things do you deal with Amber about?
A Certificate of Insurance requests.
Q Is that pretty much the only thing you deal with her for?
A Yes.
Q How about Ira Sugar?
A Certificate of Insurance requests.
Q Is that pretty much all you deal with him about?
A Yes.
Q And Steve French, same thing?
A Yes.
Q And Sherry Webber?
A Certificate of Insurance requests and bond requests.
Q What are Certificate of Insurance requests?
A They have a contract and they need to provide proof of insurance to the general contractor.
Q Okay. And what's your role in that, what

do you do?
A Review the certificate insurance requirements and send the certificate to our client.
Q Do you prepare the Certificate of Insurance?
A I do.
Q And you say, "review the insurance requirements." Does that mean you look at the subcontract?
A No, I look at the insurance requirements.
Q What insurance requirements?
A That are outlaid in the contract.
Q So you look at a portion of the contract that talks about what insurance is needed?
A Yes.
Q And do you compare that against the insurance policies that the company has?
A Yes.
Q And what if the insurance differs from what the insurance requirements are required in the subcontract clause?
A I inform the insured and let them know we are providing coverage for coverage that they already have in place.

Q I'm not sure -- so you would reach out to Tony Zarlengo about that or who?
A Whoever sent the request I would just advise that they do not meet the requirements of the contract.
Q I see.
And so it could be Amber, Ira, Steve French, any of them?
A Yes.
Q If they do meet the requirements, what do you do?
A Send the certificate.
Q You have to prepare it first I presume, correct?
A Yes.
Q Is there anybody else at Holden who would prepare the Certificates of Insurance? And in this case I mean for Midwest Dock Solutions.
A In my absence the other commercial account executives would prepare Certificates of Insurance.
Q If you were out of the office, on vacation or something like that or out for the day?
A Yes.

Q Are you the one who is principally responsible for preparing the Certificates of Insurance for the Midwest Dock account?
A Yes.
Q And is the same true for Dock & Door now?
A Yes.

(WHEREUPON, said document was marked as Plaintiffs' Deposition Exhibit No. 165, for identification, as of 10/6/25, so marked by Mr. McJessy.)

BY MR. MCJESSY:
Q All right. I'm going to show you what I've marked as Exhibit 165, and this is a 11-page document. It's a group of insurance certificates that were prepared it looks like for Pepper Construction. Do you see where it says, "Pepper Construction" down here (indicating)?
A Yes.
Q I'm going to flip through them so that you can see both the name of the insured which in this case is Midwest Dock Solutions and the certificate

holder Pepper Construction. Do you see that?
A Yes.
Q All right. So that's the first one. That's Page 1, and it looks like -- is this (indicating) Page 2 of that certificate?
A Yes.
Q Another certificate, another certificate, another certificate. These are all certificates for Pepper Construction, correct?
A Yes.
Q All right. So let's just take a look at the first one. What does a Certificate of Insurance do, what's the purpose?
A It provides a snapshot of coverage that Midwest Dock Solutions has.
Q And it provides that description to Pepper Construction?
A Yes.
Q Does it also add Pepper Construction as an additional insured?
A It is a blanket additional insured, so they are not named on the policy.
Q Does the Certificate of Insurance -- Strike that.

You said they're a blanket additional insured. What does that mean?
A That means they have a blanket form on their policy and they can provide additional insureds to anybody that is required in a written contract.
Q When you say, "they," you mean Midwest Dock Solutions?
A Correct.
Q All right. And does this Certificate of Insurance, is it necessary so that Pepper is an additional insured under their insurance?
A They are not named as an additional insured, but they would be considered an additional insured under the blanket form, yes.
Q Because the Certificate of Insurance is issued?
A Yes.
Q Okay. Does Holden represent a lot of companies, commercial companies that have to provide Certificates of Insurance to general contractors for work that they do?
A Yes.
Q Are the Certificates of Insurance important to the general contractors?

A Yes.
MR. HUGHES: Objection; beyond the scope of the 30(b)(6) topics.
BY MR. MCJESSY:
Q And why is that?
MR. HUGHES: Same objection.
BY MR. MCJESSY:
Q You can answer.
A I don't know.
Q Are you aware that typically a subcontractor is not allowed on a job site unless they provide the general contractor with a Certificate of Insurance?
MR. HUGHES: Objection; beyond the scope of the 30(b)(6) topics and competency.
BY MR. MCJESSY:
Q You can answer.
A I don't know.
Q Now, you mentioned that Sherry Webber, you provide -- I think you said you provide bonds at her request, is that correct?
A Yes.
Q What are the bonds?
A City and township bonds.

Q What are those?
A I don't know why they require them. I just provide them based on the contract requirements.
Q So you look at the contract and see what it requires?
A Yes.
Q All right. What is a city and township bond?
A I don't know how to answer that.
Q And why is that, you do not know what it is or you're not sure what my question is?
A I'm not sure what your question is.
Q Well, can you tell me what a Certificate of Insurance is?
A Provides proof of coverage.
Q All right. And can you provide a similar answer to that for what a city and township bond is, what does it do?
A If they were to do work in a town or a city, they would be bonded up to the bond limit for each specific job.
Q And what does it mean for them to be bonded up to a certain amount for a job?
A If they went default on a contract, the

surety company would provide coverage up to the limit on the bond.

(WHEREUPON, said document was marked as Plaintiffs' Deposition Exhibit No. 163, for identification, as of 10/6/25, so marked by Mr. McJessy.)

BY MR. MCJESSY:

Q Okay. Showing you what's been marked as Exhibit 163, this is a group of Certificates of Insurance that are provided to various municipalities. So do you see that the first one is City of Country Club Hills?

A Yes.

Q And the insured is Midwest Dock Solutions, correct?

A Yes.

Q And the next one is also the City of Country Club Hills, and this is for Midwest Dock Solutions, correct?

A Yes.

Q Is that for like a renewal of an

insurance policy, is that what the -- it looks like they're virtually the same, but it does have different certificate numbers. Can you tell?

A Yes.

Q All right. So is this for like a renewal of a policy and issuing a new certificate for the new policy?

A Yes, or reissued a bond and issue the certificate again.

Q And why would you do that?

A Reissue a certificate?

Q With the bond, yes.

A It's part of the contract requirements for the city or a county.

Q Okay. And then this is -- this (indicating) is Page 3 of that exhibit. This is a certificate for the City of Crown Point. Do you see that?

A Yes.

Q And, again, it's Midwest Dock Solutions, correct?

A Yes.

Q And then there's another -- it looks like this is the same situation. They're both Crown Point,

and it looks like the certificate number is different. Do you see that?

A Yes.

Q Is one certificate for a bond and the other certificate for the insurance policy?

A No.

Q Okay. I'm not sure I understood your answer earlier when you said that you would have issued --

A All --

Q Oh, go ahead.

A All certificates get issued on renewal if the insured requests a certificate. After the renewal certificates are issued it generates a new certificate number.

Q I see.

All right. And then this (indicating) is one to the City of Hammond. Do you see that?

A Yes.

Q And then the City of Joliet, do you see that?

A Yes.

Q All right. And these are all to

different municipalities. This (indicating) one's to the City of Lockport. This (indicating) one's to the City of Wood Dale, Illinois, Town of Cicero, Illinois.

Why would a municipality require a Certificate of Insurance?

MR. HUGHES: Objection; beyond the scope of the 30(b)(6) topics.

BY MR. MCJESSY:

Q You can answer.

A I don't know.

Q Would the insured have asked for these certificates to be issued to these municipalities?

A Yes.

Q Okay. And typically in the process of issuing the certificates to the municipalities would you have reviewed any documents before issuing these certificates?

A Yes.

Q What documents would you typically have reviewed?

A Contract requirements.

Q Anything else?

A No.

Q How about the insurance policies

Page 41

themselves?
A Midwest Dock insurance policies?
Q Any insurance policies, but, sure, Midwest Dock insurance policies, too.
A No.
Q And why not?
A They aren't requiring any additional insured wording.
Q I see.
And are you referring to the box here (indicating) toward the bottom where it says, "Description of Operations, Location/Vehicles," that section there?
A Yes.
Q So back to Exhibit 165, the language here (indicating) in that box at the bottom of the certificate, is that wording that you would consider additional insured wording?
A Yes.
Q Okay. And if this information was -- if it was additional insured wording that was required, then you would review the policies, is that correct?
A Yes.
Q And what does this additional insured

Page 42

wording do, what's the significance of that?
A Provides coverage for any additional insureds on Midwest Dock policies.
Q Okay. So this language here in the Description of Operations, Location/Vehicle section, that's important for the purpose of making sure parties are added as additional insureds, is that correct?
A Yes.
Q What services does Holden Insurance provide to Midwest Dock Solutions?
A Certificate of Insurance. That's really the only service.
Q Does it shop for policies when they need to renew policies?
A Yes.
Q Anything else?
A File claims, answer coverage questions.
Q To your knowledge, has Midwest Dock Solutions had any claims?
A Yes.
Q Do you know how many?
A No.
Q What claims can you recall?

Page 43

A General liability claim.
Q Just one?
A Yes.
Q Was that the result of an auto accident?
A I do not insure the auto.
Q What was the general liability claim that you can recall?
A It happened this year. Our insured started a fire in a contractor's building.
Q Do you know who the contractor was?
A No.
Q Was the contractor listed as an additional insured on a COI?
A I don't know.
Q As best you can recall, what can you recall about the claim other than what you've just told me?
A They were doing work and they started a fire. I turned it into Liberty Mutual, and I haven't heard on the claim since.
Q Do you know where the facility was located?
A Illinois.
Q Do you the name of the facility or any of

Page 44

the parties involved?
A No.
Q Do you know what work was being done when the fire started?
A No.
Q Other than what you've told me are you aware of any other details of the claim?
A No.
Q Do you know, did Dock & Door have any employees on the job site?
A I don't know.
Q Do you know whether the claim was also submitted to Dock & Door's insurance carrier?
A It was not.
Q What services does Holden Insurance provide to Dock & Door?
A Marketing, certificates, handling of claims, answering coverage questions, providing policies.
Q All right. So Holden provides the same services to Midwest Dock Solutions that it provides to Dock & Door, is that correct?
A Yes.
Q Do you know what lines of insurance

coverage Holden Insurance handles for Midwest Dock Solutions?
A Yes.
Q What lines does it provide?
A Commercial general liability, umbrella, workers' compensation.
Q Is inland marine also a line of coverage or is that included within one of those?
A Inland marine is a line of coverage.
Q Does Holden provide inland marine coverage for Midwest Dock Solutions?
A Yes.
Q What about property insurance, is that a separate line from what you've described?
A We do not insure any property coverage.

(WHEREUPON, said document was marked as Plaintiffs' Deposition Exhibit No. 128, for identification, as of 10/6/25, so marked by Mr. McJessy.)

BY MR. MCJESSY:
Q All right. I'm showing you a copy of an

e-mail. It looks like it's an e-mail from you to Tony Zarlengo as Exhibit 128. Do you see that e-mail?
A Yes.
Q That's an e-mail from you to Tony Zarlengo, correct?
A Yes.
Q And it looks like you're forwarding to him a proposal for Midwest Dock Solutions for lines of insurance coverage. Does that look right to you?
A Yes.
Q And your e-mail also references a pollution liability policy, is that correct?
A Yes.
Q Is that another separate line of coverage?
A Yes.
Q And I'm showing you the proposal that's attached to that e-mail, and is this sort of how you normally prepare an insurance proposal for a client?
A Yes.
Q Now, the first page -- or the first page after the cover of the proposal shows general liability. Do you see that?
A Yes.

Q Is that the commercial general liability policy described?
A Yes.
Q In general terms what kind of insurance does that provide to Midwest Dock Solutions?
A Are you asking -- I don't know what you're asking.
Q Well, what's a commercial general liability policy?
A It provides liability coverage to Midwest Dock Solutions.
Q What kind of losses does it cover?
A Property damage, bodily injury.
Q Okay. And then the next coverage there says, "Employment practices liability." Do you see that?
A Yes.
Q Is that a separate coverage?
A It's a part of the general liability coverage.
Q And what is employment practices liability, do you know?
A It provides coverage for things like wrongful termination, employee discrimination.

Q Okay. And is cyber suite also part of the general liability?
A Yes.
Q What does that coverage provide?
A Cyber liability coverage.
Q Like if somebody hacks into their system and takes employee confidential information, that kind of thing?
A It can be, yes.
Q And then the next one here is property at the top on the next page. Do you see that?
A Yes.
Q And is that again part of the general liability policy or is that separate?
A Separate.
Q Okay. You mentioned that you don't provide -- you, meaning Holden doesn't provide property insurance?
A I was referencing building coverage. We do provide business personal property coverage.
Q Is that what this is?
A Yes.
Q So it is property coverage, correct?
A Yes.

Q And what kind of property does this cover?
A Any business personal property, computers, desks. It could be anything that they have at their location that belongs to them.
Q All right. And there's a figure here of $272,500. Do you see that?
A Yes.
Q Is that what the coverage -- is that the coverage limit that was proposed for the property coverage?
A Yes.
Q And then it says, "Property coverage includes property extension endorsement and equipment breakdown." What's that?
A Property extension endorsement provides additional coverages for your business personal property, and equipment breakdown is -- provides coverage for equipment breakdown. I don't know.
Q Okay. Do you know where the $272,500 limit would have come from?
A No.
Q And then the next item there is inland marine coverage. Do you see that?

A Yes.
Q And what's inland marine coverage?
A Equipment coverage.
Q In case it's lost, stolen or destroyed, that kind of thing?
A All risk insurance, yes.
Q And it's got a list of items here and values. Do you see that?
A Yes.
Q Where would that list of items and values come from?
A The client.
Q And why are they included in the Inland Marine coverage section here?
A Because they are part of the inland marine policy.
Q And what does that mean that they're part of that coverage?
A They are the contractor's scheduled equipment coverage which is covered under your inland marine policy.
Q Okay. And are the numbers that are above here (indicating), the $49,000 total scheduled equipment, is that a coverage limit on the equipment

that's covered under the inland marine policy?
A Yes.
Q So if Midwest Dock Solutions wants to add additional equipment to this coverage, they would have to notify you?
A Yes.
Q Do you typically ask a client like Midwest Dock Solutions for a list of equipment they want covered under the inland marine policy?
A Yes.
Q The next item here is contractor's installation. Do you see that?
A Yes.
Q Well, actually, strike that. Let me go back.
Do you know, has Midwest Dock Solutions provided you with a more updated list of equipment that's covered under its inland marine policy?
A No.
Q And the contractor's installation coverage, what's that?
A Covers any equipment that they are installing on a job site.

Q And is this a separate coverage or part of the commercial general liability?
A It's a part of the inland marine.
Q Oh, okay.
And then the next page shows workers' compensation. Is that a line of coverage that you provide?
A Yes.
Q And then the next page is the commercial umbrella that you referred to, correct?
A Yes.
Q And then also there's a notation for excess. Do you see that?
A Yes.
Q Is that in addition to the commercial umbrella or is it part of the commercial umbrella?
A In addition to.
Q All right. So it's another line of coverage that you provide?
A Yes.
Q What's the difference between commercial umbrella and excess?
A The excess policy goes over the umbrella when the umbrella limits are exhausted. The

commercial umbrella goes over the underlying policies, under liability and worker's compensation.

Q And the next item here is pollution liability. Do you see that?

A Yes.

Q And what's the pollution liability policy?

A Provides liability coverage for pollution.

Q All right. Are these all lines of coverage that Holden provides for Midwest Dock Solutions?

A Yes.

Q And Holden doesn't provide automobile coverage to Midwest Dock Solutions, is that correct?

A Yes.

Q And what lines of coverage does Holden provide to Dock & Door?

A I would have to look.

(WHEREUPON, said document was marked as Plaintiffs' Deposition Exhibit No. 154, for identification, as of 10/6/25, so marked by Mr. McJessy.)

BY MR. MCJESSY:

Q All right. I'm showing you what I've marked as Exhibit 154, and this looks like it's forwarding a proposal to Tony Brutti, correct?

A Yes.

Q And this is an e-mail from you to Tony Brutti dated July 18th, 2025, correct?

A Yes.

Q And is this similar to the last e-mail that we looked at where you're forwarding a package or a quote to a client for a proposal?

A Yes.

Q All right. And I'm just going to flip through this briefly so I can get to the proposal and see if that helps refresh your recollection as to what lines of insurance Holden has provided for Dock & Door, and when you've had a chance to review the page, let me know and I'll flip to the next one.

A Okay.

(WHEREUPON, the next page was shown to the witness.)

THE WITNESS: Okay.

(WHEREUPON, the next page was shown to the witness.)

THE WITNESS: Okay.

(WHEREUPON, the next page was shown to the witness.)

THE WITNESS: Okay.

(WHEREUPON, the next page was shown to the witness.)

THE WITNESS: Okay.

(WHEREUPON, the next page was shown to the witness.)

THE WITNESS: Okay.

(WHEREUPON, the next page was shown to the witness.)

THE WITNESS: Okay.

(WHEREUPON, the next page was shown to the witness.)

THE WITNESS: Okay.

(WHEREUPON, the next page was shown to the witness.)

THE WITNESS: Okay.

(WHEREUPON, the next page was shown to the witness.)

THE WITNESS: Okay.

(WHEREUPON, the next page was shown to the witness.)

THE WITNESS: Okay.

(WHEREUPON, the next page was shown to the witness.)

THE WITNESS: Okay.

(WHEREUPON, the next page was shown to the witness.)

THE WITNESS: Okay. Would you like me to tell you what coverage we provide?

BY MR. MCJESSY:

Q Have you seen enough of the documents?

A Yes.

Q Okay. There was this ICW Group proposal, also?

A Yes.

Q You don't need to see that?

A No.

Q Okay. Yes, tell me what lines of coverage you provide.

A General liability, employment practices liability, umbrella and workers' compensation.

Q And do you know who the workers' comp carrier is for Midwest Dock Solutions?

A Yes.

Q Who is it?

A ICW.

Q And do you know who the workers' comp carrier is for Dock & Door?

A Yes.

Q Who is it?

A ICW.

Q And who's the commercial general liability insurance carrier for Midwest Dock Solutions?

A Liberty Mutual.

Q And who is the commercial general liability carrier for Dock & Door?

A Liberty Mutual.

Q And who's the umbrella carrier for Midwest Dock Solutions?

A Liberty Mutual.

Q And who is the umbrella coverage for Dock & Door?

A Liberty Mutual.

Q And who is the employment practices

carrier for Midwest Dock Solutions?

A Liberty Mutual.

Q And who is the employment practices carrier for Dock & Door?

A Liberty Mutual.

Q You don't carry the automobile policy for -- Strike that.

Holden does not handle the automobile policy coverage for Dock & Door, correct?

A Yes.

Q And Holden Insurance doesn't provide an inland marine policy for Dock & Door either, is that correct?

A Yes.

Q Do you know, did Holden ever discuss with Dock & Door whether it should have an inland marine policy?

A Not to my knowledge.

Q Did Holden ever discuss with Dock & Door whether it should have a personal property insurance policy?

A Not to my knowledge.

Q Now, this first e-mail is an e-mail from -- and when I say, "first," I mean the e-mail on

the first page of Exhibit 154 is an e-mail from you to Tony Brutti, copied to Tom Downs dated July 18th, 2025, correct?

A Yes.

Q And if you go further down in this e-mail string, there is an e-mail dated July 1st, 2025, from Tony Brutti. Do you see that?

A Yes.

Q Okay. And now, this is an e-mail that's sort of -- it's part of your e-mail from July 18th. So at some point this had to have been forwarded to you, this e-mail string, correct?

A Yes.

Q And if you look at this, the e-mail from Tony Brutti says, "Hi, Tom. We install commercial overhead doors and loading dock equipment. The door work consists of sectional garage/dock doors, rolling steel doors and high-speed doors. The loading dock equipment consists of dock levelers, dock seals and truck restraints. We mostly do work at precast concrete storage warehouses but occasionally do work at manufacturing facilities and small businesses." Do you see that?

A Yes.

Q Do you know, is there a reason that you would need to know what Dock & Door's business is --
A Yes.
Q -- in order to obtain insurance coverage?
A Yes.
Q Why is that?
A To make sure they are covered correctly.
Q Okay. What does that mean, can you explain to me what you mean by that?
A General liability policies are rated off of the work that the contractor does. So in order to have the correct rating we need to know what they do.
Q So it's important that you know what they do?
A Yes.
Q Now, are you involved at all in obtaining quotes for insurance coverage?
A Sometimes.
Q Okay. How about in this instance with Dock & Door, were you responsible at all for obtaining insurance quotes or for assisting Mr. Downs in obtaining insurance quotes?
A Yes.
Q And did you use this information that was

provided by Mr. Brutti to do that?
A Yes.
Q Is it your understanding that Midwest Dock Solutions provides similar work?
A Yes.
MR. MCJESSY: All right. We've been going a little over an hour now. I would like to take about a five-minute break and then come back and resume.

(WHEREUPON, a short break was had.)

MR. MCJESSY: All right. Back on the record.
BY MR. MCJESSY:
Q Miss Olson, other than yourself and Mr. Downs are there any other persons at Holden who have a responsibility for the Midwest Dock Solutions account concerning some other matters that we haven't talked about?
A No.
Q Okay. And I understand that some other representatives at Holden might perform services for Midwest Dock Solutions like when you're on vacation or when Mr. Downs is on vacation, but absent a situation like that where you or Mr. Downs are not available are

you the two persons who are principally responsible for the Midwest Dock Solutions account?
A Yes.
Q And would the same thing be true for the Dock & Door account?
A Yes.

(WHEREUPON, said document was marked as Plaintiffs' Deposition Exhibit No. 148, for identification, as of 10/6/25, so marked by Mr. McJessy.)

BY MR. MCJESSY:
Q Now, I want to show you what's been marked as Exhibit 148, and this appears to be an e-mail from you to Mr. Zarlengo. I'll turn to the -- the second page of this also looks like an e-mail from you to Mr. Zarlengo and it's attaching the 2025 to '26 renewal proposal. Do you see that?
A Yes.
Q And then this e-mail, though, on the first page it's dated February 28th, and it says, "I will bind coverage and start working on getting

out" -- Strike that. It says, "I will bind coverage and start working on getting renewal COIs out." Is that what it says?
A Yes.
Q And essentially once the policies are renewed you need to send out new COIs with the new policy numbers, correct?
A New policy term, yes.
Q How do you know from the -- from the Certificates of Insurance that you issued previously how do you know which Certificates of Insurance you need to reissue based upon the renewal policies?
A I reissue all certificates.
Q Oh, you reissue all certificates that were previously issued on the prior policies?
A Yes.
Q So if a property wrapped up during the prior policy period, you would still go ahead and issue the renewal COI just what, out of an abundance of caution?
A Agency procedures, yes.
Q Better to reissue a COI for a project that's done than to miss issuing a COI for a project that's still ongoing, that kind of thing?

A Yes.
Q Does Midwest Dock Solutions ever tell you something to the effect like "Hey, you don't need to issue that COI because that project is done," that kind of thing?
A Not to my knowledge.
Q And describe for me your process of reissuing the COIs. What do you do, how do you go about it and who do you send them to?
A I renew the policies and renew the policies in our certificate holders' portal and mail out all of the certificates in an e-mail or upload them if I get a request.
Q Okay. You mentioned a portal. Whose portal?
A Our certificates go to a portal out of our management system.
Q What's the portal?
A Where we issue certificates out of.
Q They go into the portal and where do they go from there?
A Then they get issued and either e-mailed out or uploaded or e-mailed.
Q And how do you know where to send them

to?
A I get a request.
Q From who?
A They either get mailed out or I get a request from a certificate holder asking us to upload or e-mail them a copy of the renewal certificate. If they don't -- if it doesn't come via e-mail or via -- well, e-mail, then it gets mailed.
Q Okay. And you said you get a request from the certificate holder. So do you remember the COIs we looked at for Pepper earlier?
A Yes.
Q Who would be the certificate holder for those COIs?
A Pepper.
Q So the certificate holder is the party that's being added as the additional insured?
A Yes.
Q So you get requests either from them to send the COIs or you just mail it out to them?
A Yes.
Q Do you have any idea of the number of COIs you've issued for Dock & Door so far?
A No.

Q The Excel spreadsheet that you printed out for me to produce in response to the subpoena that we looked at earlier, let me go back to it. Do you see this (indicating) document?
A Yes.
Q How was that generated?
A Exported out of our certificate holder platform.
Q Okay. So this is like a document you just maintain in your system?
A Yes.
Q And is it a fairly simple task to put this document together?
A Yes.
Q Would you have a similar document like this for Dock & Door?
A If I needed to export certificates, yes.
Q And I'll reach out to your counsel. I'd like to get a supplemental response to the subpoena with the COIs for Dock & Door and for Midwest Dock Solutions, and I can reach out to your counsel about that, but is that something that you could actually put together if you were asked to do so?
A Yes.

Q Is it a fairly simple task?
A Yes.
Q Do you have an understanding of the relationship between Dock & Door and Midwest Dock Solutions?
A No.
Q You have no understanding at all of any relationship between them?
A No.
Q Are you aware that Dock & Door's business had largely come from Midwest Dock Solutions?
A No.
Q Have you ever spoken with Tony Brutti?
A No.
Q Have you ever spoken with Tony Zarlengo?
A Yes.
Q And how frequently do you speak with Tony Zarlengo?
A Around renewal time usually, usually an e-mail correspondence.
Q Oh, okay. Maybe my question wasn't clear.
Have you actually spoken with him?
A A few times.

Q Pardon?
A A few times.
Q Since 2022 you've spoken to him a few times, is that a fair description of your communications with him, verbal communications?
A Yes.
Q So I understand you exchange e-mails with him, but I actually wanted to know how frequently you actually speak with him over the phone or that kind of thing.
Have you ever met him in person?
A No.
Q So the only time you've actually communicated with him directly not by e-mail or written communications but verbally is over the phone?
A Yes.
Q And you've had maybe a few conversations with him over the years, is that it?
A Yes.

(WHEREUPON, said document was marked as Plaintiffs' Deposition Exhibit No. 147, for identification, as of 10/6/25, so marked by Mr. McJessy.)

BY MR. MCJESSY:
Q I'm going to show you what I've marked as Exhibit 147, and this is an e-mail that was produced by Holden and it's from Tony Zarlengo to Tom Downs. Do you see that?
A Yes.
Q And it just says, "Call me," and then what's attached to it is a Notice of Attorney's Lien. Do you see that?
A Yes.
Q And it involves an Attorney's Lien that was sent on behalf of Porsha (phonetic) Watson and her attorneys. Do you see that?
A Yes.
Q And it concerns an auto accident that occurred apparently on February 10th, 2025. Were you aware of this claim?
A No.

Q You don't know anything about this?
A No.

(WHEREUPON, said document was marked as Plaintiffs' Exhibit No. 155, for identification, as of 10/6/25, so marked by Mr. McJessy.)

BY MR. MCJESSY:
Q I'm showing you what's been marked as Exhibit 155, and this is an e-mail from Tony Brutti to you, correct?
A Yes.
Q All right. And he's asking you to forward to him a copy of the declaration pages for his new policies so that he can cancel his old policies. Is that in effect what he's saying?
A Yes.
Q And this e-mail is dated July 28th, 2025, correct?
A Yes.
Q And is that approximately when the policies that Holden procured for Dock & Door went into effect, sometime around this time?

A Yes.
Q And were these the first policies that Holden had procured for Dock & Door?
A Yes.
Q So Dock & Door was sort of a new client for Holden at this time, is that fair?
A Yes.
Q What information would Holden gather from a new client coming to place insurance through Holden?
MR. HUGHES: Objection; beyond the scope of the 30(b)(6) topics.
BY MR. MCJESSY:
Q You can answer.
A Copies of their policies from their prior carrier.
Q Does Holden have new clients fill out any sort of information sheet?
A No.
MR. HUGHES: Same objection.
BY MR. MCJESSY:
Q Any sort of questionnaire?
A No.
Q Do you know in this instance did Holden get copies of Dock & Door's prior policies?

A Yes.

Q And do you know who provided those to Holden?

A Tony.

Q Tony Brutti?

A Yes.

MR. MCJESSY: All right. Miss Olson, I don't have any other questions. If either Mr. Miller or Mr. Hughes have questions, I may have some follow-up questions, but other than that I appreciate your time.

MR. MILLER: Won't be any questions from me, Kevin.

MR. MCJESSY: All right.

MR. HUGHES: I don't think I have any, but before I confirm that, Kevin, I know you sent over about, I think, 40 exhibits. Are those to be used like today and tomorrow? I just want to make sure that --

MR. MCJESSY: No, just today, but given the fact that it's a video deposition it's impossible to know what I'm going to use during the deposition.

MR. HUGHES: Understood.

MR. MCJESSY: They have to be labeled in advance.

MR. HUGHES: Understood. I just wanted to just get a sense of what there was. I know there's one missing, too, in the sequence.

MR. MCJESSY: Yes, that was just an error, my error in labeling.

MR. HUGHES: Okay. That's fine. I just wanted to do that kind of housekeeping.

MR. MCJESSY: It's unfortunately a little sloppy, but I will pick up tomorrow with Deposition Exhibit 167 even though we didn't use most of the ones I sent you today, and not that it's relevant, but tomorrow is Gineris. I won't be using any of these tomorrow.

MR. HUGHES: Right. Okay. I haven't opened the bulk of them, so I just wanted to get that sense.

MR. MCJESSY: Fair enough.

Ms. Spring, I would like to get updated COI -- the updated COI list. So I would ask for that sort of a supplement to the subpoena. If you want to talk to your client and see if that's acceptable.

MS. SPRING: I will ask Miss Olson to do that, and then we'll get it to you.

MR. MCJESSY: Okay.

MR. HUGHES: I don't have any questions. I would ask that any of the updated information that Mr. McJessy has requested, if you could send it to us as well, that would be good.

MR. MCJESSY: All right. I guess all the court reporter needs to know now is whether you reserve signature.

THE WITNESS: I don't know what that means.

MS. SPRING: I haven't discussed that with her because we don't do it in Wisconsin normally.

MR. MCJESSY: Oh, okay.

MS. SPRING: So what he's asking is if you want to be able to review the deposition transcript and sign off on it.

MR. MCJESSY: Very well said.

THE WITNESS: So what do I say?

MR. MCJESSY: You could either review the transcript and note any errors you believe occurred in transcription. You can't change your testimony. Like you can't say, you know, I wish I said the light was red and instead I testified the light was green. You can't change your testimony, but you could note any errors you believe occurred in transcription that the court reporter made. So if you said the number was

one and she wrote two, you can note on an errata sheet saying I said --

THE WITNESS: No.

MR. MCJESSY: So you can waive that right or reserve it. I don't care which, but we do that in Illinois. So you need to --

THE WITNESS: I forgot you're in Illinois. I wouldn't know if it was either Wisconsin, but no.

MR. MCJESSY: Okay. Then we're done.

(DEPOSITION CONCLUDED.)

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, GINA M. CAUSLEY, a duly-commissioned, qualified Certified Shorthand Reporter for the County of Cook and State of Illinois, a Certified Shorthand Reporter of said State, do hereby certify:

That prior to the commencement of the examination of JACIE ANN OLSON, she was previously duly sworn remotely to testify the truth, the whole truth, and nothing but the truth concerning the matters herein;

That the said deposition was taken via Zoom before me at the time and place specified and that counsel present were as hereinbefore set forth;

That the testimony so given by said witness was by me recorded stenographically and later transcribed into print by me, and that the foregoing is a true and complete transcription of the testimony given by the witness on said day and date, to the best of my reportorial knowledge, skill and ability;

That the reading and signing of said deposition transcript was waived by the witness;

I FURTHER CERTIFY that I am not related to any of the parties herein, an employee of or counsel for any of the parties herein, and have no interest in the outcome of the litigation.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Chicago, Illinois, this ________day of______________, A.D., .

________________________________________

Certified Shorthand Reporter
County of Cook, State of Illinois.