**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MID-AMERICA CARPENTERS REGIONAL
COUNCIL PENSION FUND; MID-AMERICA
CARPENTERS REGIONAL COUNCIL HEALTH
FUND; MID-AMERICA CARPENTERS REGIONAL
COUNCIL APPRENTICE AND TRAINEE
PROGRAM; and MID-AMERICA CARPENTERS
REGIONAL COUNCIL SUPPLEMENTAL
RETIREMENT FUND,

                        Plaintiffs,

    v.

DOCK & DOOR INSTALL, INC., an Illinois
corporation and MIDWEST DOCK SOLUTIONS,
INC., an Illinois corporation,

                        Defendants.

Case No 1:24-cv-06428

Judge Andrea R. Wood

Magistrate Judge Jeannice W. Appenteng

**DEFENDANT MIDWEST DOCK SOLUTIONS, INC.'S RESPONSE**
**TO PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION**
**FOR SUMMARY JUDGMENT  PURSUANT TO LOCAL RULE 56.1**

Defendant MIDWEST DOCK SOLUTIONS, INC. ("MDS"), through its counsel, and pursuant to

N.D. Ill L.R. 56.1(b)(2), hereby submits its Response to Plaintiffs' Statement of Undisputed Facts in

Support of their Motion for Summary Judgment Pursuant to Local Rule 56.1, and states as follows:

I.   The Audit of Defendants' Fringe Benefit Contributions For The Period January 1, 2020 through
     December 31, 2024 ("Audit Period").

    A.  Organization Of The Trust Funds.

STATEMENT OF FACT NO. 1:
The Mid-America Carpenters Regional Council Pension Fund ("Pension Fund"), the Mid-America
Carpenters Regional Council Health Fund ("Health Fund"), the Mid-America Carpenters Regional
Council Apprentice and Trainee Program ("Trainee Fund"), and the Mid-America Carpenters
Regional Council Supplemental Retirement Fund ("Retirement Fund") hereinafter collectively
referred to as the "Trust Funds," are multi-employer funded trust funds that collect fringe benefit
contributions from employers bound by an agreement with the Mid-America Carpenters Regional
Council ("Union") and then provide pension, welfare, training and promotional benefits to
members of the Union and their families.

    SUPPORT FOR STATEMENT OF FACT NO. 1:

1

Decl. of J. Conklin ¶¶1, 2 & Exhibits A-D (Pension Fund Trust Agreement, Art. III §3.1, Ex. A; Welfare Fund Trust Agreement, Art. III §3.1, Ex. B; Trainee Program Fund Trust Agreement, Art. III, Art. IV §1, Art. VI §2, Ex. C; Supplemental Retirement Fund Trust Agreement, Art. 3 §3.1, Art. VII, Ex. D), EX. 1

**RESPONSE: MDS admits SOF[1] 1.**

STATEMENT OF FACT NO. 2:
The Pension Fund, Welfare Fund, Trainee Fund and Labor/Management Fund are each organized, administered and governed according to a trust agreement which are hereinafter referred to respectively as the "Pension Fund Trust Agreement," the "Welfare Fund Trust Agreement," the "Trainee Program Fund Trust Agreement," and the "Labor/Management Fund Trust Agreement" and are collectively referred to as the "Trust Agreements." The Trust Funds are also administered according to the terms of the Carpenters Agreement ("CBA") negotiated between the Union and the employers' representatives. The Trust Funds are administered by a board of trustees selected by management and labor and the Trustees collect and manage contributions from employers bound by the Carpenters Agreements and trust agreements. Copies of these Trust Agreements are attached as Exhibits A-D and copies of the Carpenters Agreement for the period June 1, 2019 through May 31, 2024 and for the period June 1, 2024 through May 31, 2029 are attached as Exhibits E and F to the Declaration of John Conklin.

> SUPPORT FOR STATEMENT OF FACT NO. 2:
> Decl. of J. Conklin ¶¶1, 3-5 & Exhibits A-F (Pension Fund Trust Agreement, Art. II, Art. III §3.1, Art. VIII, Ex. A; Welfare Fund Trust Agreement, Art. II, Art. III §3.1, Art. IV, Art. VIII, Ex. B; Trainee Program Fund Trust Agreement, Art. III, Art. IV §1, Art. VI §2, Ex. C; Supplemental Retirement Fund Trust Agreement, Art. 3 §3.1, Art. VII, Ex. D; Carpenters Agreement, §§12.2, 13.2, 14.2, Ex. E; Carpenters Agreement, §§12.2, 13.2, 14.2, Ex. F), EX. 1

**RESPONSE: MDS admits SOF 2.**

    B.   Contributions For Bargaining Unit Work.

STATEMENT OF FACT NO. 3:
The Area Agreement provides as follows:

The Employer agrees to be bound by the Agreement and Declaration of Trust establishing the [Chicago Regional Council of Carpenters Welfare Fund / Pension Fund / Apprentice Training Fund] [Mid-America Carpenters Regional Council Health and Welfare Fund / Pension Fund / Apprentice Training Fund] by any present and future amendments thereto and irrevocably designates as its representative on the Board of Trustees such Trustees as are named in said

---

[1] References to "SOF" are to the Fund's respective "Statement of Fact No. __." Moreover, as used herein, "SOF" specifically does <u>not</u> include any of the additional and/or extraneous facts or argument the Fund has improperly included in the respective "Support for Statement of Fact No. __." Accordingly, MDS's admission of a "SOF," or part thereof, does not include an admission of any additional facts or argument contained in the corresponding "Support for Statement of Fact No. __."

Agreement and Declaration of Trust, as Employer Trustees, together with their successors selected in a manner provided in said Agreement and Declaration of Trust as it may be amended from time to time, and agrees to be bound by all action taken by said Employer Trustees pursuant to said Agreement and Declaration of Trust as amended from time to time.

SUPPORT FOR STATEMENT OF FACT NO. 3:
Decl. of J. Conklin ¶5 & Exhibits E, F (Carpenters Agreement, §§12.2, 13.2, 14.2), EX. 1

**RESPONSE: MDS admits SOF 3.**

STATEMENT OF FACT NO. 4:
The Carpenters Agreements defines work falling within the jurisdiction of the Union ("bargaining unit work") to include the following:

1.1 The Bargaining Unit shall consist of all Journeymen, Foremen, Apprentices and Trainees engaged in work at the construction site covered by the occupational jurisdiction of the "Union" including, but not limited to, the milling, fashioning, joining, assembling, erection, fastening or dismantling of all material of wood, plastic, metal, fiber, cork, and composition, and all other substitute materials; scaffolding; overhead sectional doors; concrete forming, gang forms; the handling, erecting, installing and dismantling of machinery and equipment, hydraulic jacking and raising, and the manufacturing of all materials where the skill, knowledge and training of the Employees are required, either through the operation of machine or hand tools. The Bargaining Unit shall also consist of all Journeymen, Foremen, Apprentices and Trainees engaged in work as Carpenters and Joiners, Millwrights, ... Millmen, ... regardless of material used; and all those engaged in the operation of wood working or the machinery required in the fashioning, milling or manufacturing of products used in the trade, or engaged as helpers to any of the above divisions or subdivisions, and the handling, erecting and installing material on any of the above divisions or sub-divisions; burning, welding, rigging and the use of any instrument or tool for layout work, incidental to the trade. When the term "Carpenter and Joiner" is used, it shall mean all the subdivisions of the Trade. However, the Union agrees that it will not interfere with existing practices of other unions affiliated with the Building Trades.

Dock leveler and overhead door service and installation work is bargaining unit work.

SUPPORT FOR STATEMENT OF FACT NO. 4:
Decl. of J. Conklin ¶¶3, 6 & Exhibits E &F (Carpenters Agreements §1.1), EX. 1 (emphasis added)

**RESPONSE: MDS objects to the statement that "Dock leveler and overhead door service and installation work is bargaining unit work," as argumentative and legal conclusion that is improper in a LR 56.1 statement of material facts. MDS further objects that the Fund's**

3

**statements regarding which individuals may belong to the "bargaining unit" also is improper legal argument.**

**MDS disputes that "bargaining unit work" is defined in the cited provision of the Carpenters Agreements, and further disputes that the cited provision of the Carpenters Agreements defines "bargaining unit work" as synonymous with "work falling within the jurisdiction of the Union." MDS further disputes that "dock leveler" service and installation appears anywhere within the cited provision of the Carpenters Agreements; and further disputes that "service" work appears within the cited provision of the Carpenters Agreements.**
*Citation***: EX 1 (at Exhibits E & F, thereto, at §1.1).**

**MDS admits that the block-quoted language appears at §1.1 of the Carpenters Agreements, but without the omissions and underlines added by the Fund.**
*Citation***: EX 1[2] (at Exhibits E & F, thereto, at §1.1).**

STATEMENT OF FACT NO. 5:
Sections 12.1, 13.1 and 14.1 of the Carpenters Agreement state that "Each EMPLOYER shall pay into" the Welfare Fund, the Pension Fund and the Trainee Fund "an amount per hour for each of the first one hundred and seventy-five (175) hours worked for an EMPLOYER during each calendar month by all of its Employees who are covered by this Agreement in amounts determined and allocated by the Executive Committee of the Union effective June 1, 2014, June 1, 2015, June 1, 2016, June 1, 2017 and June 1, 2018."

> SUPPORT FOR STATEMENT OF FACT NO. 5:
> Decl. of J. Conklin ¶5 & Exhibits E, F (Carpenters Agreements §§12.1, 13.1 and 14.1), EX. 1

**RESPONSE: MDS disputes that the language quoted in SOF 5 appears in the cited provisions of the Conklin Declaration and the Carpenters Agreements, and accordingly SOF 5 lacks evidentiary support.**
*Citation***: EX 1, ¶5, and Exhibits E & F thereto, at §§12.1, 13.1 and 14.1.**

C. Employer Liability For Subcontracting Bargaining Unit Work To Non-Union Subcontractors.

STATEMENT OF FACT NO. 6:
Under the Carpenters Agreements, an employer is prohibited from subcontracting bargaining unit work to nonunion subcontractors and if an employer subcontracts bargaining unit work to a nonunion person or company that is not bound by the Carpenters Agreement, then the employer shall either (i) require the subcontractor to become a signatory to the Carpenters Agreement or, (ii) the employer shall maintain daily records of the employees who perform the work and then pay

---

[2] Citations to "EX __" are to the exhibits filed by the Fund as part of its Local Rule 56.1(a)(2) statement of material facts (which range from EX 1 to EX 125), and to the exhibits filed by MDS as part of this Local Rule 56.1(b)(2) thereto (which begin with EX 126). For ease of reference, MDS chose to continue the numbering from the end of the Fund's submission.

the requisite fringe benefit contributions for the work performed by those employees. If the employer fails to do so, then the employer is liable for the amount of unpaid fringe benefit contributions found due by the audit.

    <u>SUPPORT FOR STATEMENT OF FACT NO. 6:</u>
Decl. of J. Conklin ¶5 & Exhibits E, F (Carpenters Agreements §3.2), EX. 1 ("EMPLOYER shall not contract or subcontract any work coming within the jurisdictional claims of the UNION to any person, firm or corporation not covered by a Collective Bargaining Agreement with the UNION, provided, however, that the provisions of this paragraph shall apply only to the contracting and subcontracting of work to be done at the site of construction, alteration, painting or repair of a building, structure or other work")

Decl. of J. Conklin ¶5 & Exhibits E, F (Carpenters Agreements §3.3), EX. 1 ("EMPLOYER shall not contract or subcontract any work coming within the jurisdictional claims of the UNION to any person, firm or corporation not covered by a Collective Bargaining Agreement with the UNION, provided, however, that the provisions of this paragraph shall apply only to the contracting and subcontracting of work to be done at the site of construction, alteration, painting or repair of a building, structure or other work") EMPLOYER, in recognition of the territorial and occupational jurisdiction of the UNION, shall not subcontract or contract out jobsite work coming within the jurisdiction of the Carpenters Union nor utilize on the jobsite the services of any other person, company or concern to perform such work that does not observe the same wages, fringe benefits, hours and conditions of employment as enjoyed by the Employees covered by this Agreement.")

Decl. of J. Conklin ¶5 & Exhibits E, F (Carpenters Agreements §3.3), EX. 1 ("If an Employer, bound by this Agreement, contracts or subcontracts any work covered by this Agreement to be done at the jobsite of the construction, alteration, painting or repair of a building, structure or other work to any person or proprietor who is not signatory to this Agreement, the Employer shall require such subcontractor to be bound by all provisions of this Agreement, or the Employer shall maintain daily records of the subcontractor's or the subcontractor's Employees jobsite hours and be liable for payments to the Chicago Regional Council of Carpenters Welfare Fund, the Chicago Regional Council of Carpenters Pension Fund and the Chicago Regional Council of Carpenters Apprentice and Trainee Program, as provided in Articles XII, XIII, and XIV of this Agreement.")

*Trustees of the Chicago Regional Council of Carpenters Pension Fund et al v. Riteway-Huggins Construction Services, Inc*., 2010 U.S. Dist. LEXIS 25243 *2 (N.D. Ill. Mar. 15, 2010) (Kennelly, J.)

*Chicago District Council of Carpenters v. Simpson Construction*, 2006 U.S. Dist. LEXIS 92163 *23-29 (N.D. Ill. Dec. 18, 2006) (Brown, J.)

*Chicago District Council of Carpenters Pension Fund v. Faith Builders*, 2001 U.S. Dist. LEXIS 1046, 2001 WL 99839 at *2, *3 (N.D. Ill. Jan. 30, 2001) (Gettleman, J.)

**RESPONSE: MDS objects to the inclusion of improper legal argument, by way of citation to case law. MDS further objects to the improper inclusion of lengthy additional facts in the parentheticals to the Fund's purported citations. MDS further objects that SOF 6 violates LR 56.1(d)(1), by failing to be concise, particularly by including additional and redundant facts and extraneous, improper legal argument within the Fund's citations.**

**MDS disputes that the language quoted in the Fund's citations and attributed to §3.3 of the Carpenters Agreements appears in that section, and therefore is unsupported.**
***Citation*: EX 1, & Exhibits E & F thereto, at §3.3.**

**MDS disputes that the case law cited supports the above statement of fact, as all of the cited cases predate the Carpenters Agreements at issue in this case by many years, and relate to other agreements, other parties, and other underlying facts.**
***Citation*: *Huggins Construction Services, Inc*., 2010 U.S. Dist. LEXIS 25243 \*2 (N.D. Ill. Mar. 15, 2010) (Kennelly, J.); *Chicago District Council of Carpenters v. Simpson Construction*, 2006 U.S. Dist. LEXIS 92163 \*23-29 (N.D. Ill. Dec. 18, 2006) (Brown, J.); *Chicago District Council of Carpenters Pension Fund v. Faith Builders*, 2001 U.S. Dist. LEXIS 1046, 2001 WL 99839 at \*2, \*3 (N.D. Ill. Jan. 30, 2001) (Gettleman, J.).**

**MDS admits the remaining facts contained in SOF 6.**

    D. Legacy Professionals, LLP's Audit And The Trust Funds' Damages.

STATEMENT OF FACT NO. 7:
Legacy Professionals, LLP ("Legacy"), an independent auditing firm hired by the Trust Funds to conduct an audit of Dock & Door's fringe benefit contribution's for the period from October 20, 2020 through December 31, 2024, identified Midwest Dock as a related company of Dock & Door. After reviewing the records of Dock & Door and Midwest Dock, Legacy determined that there are unpaid fringe benefit contributions owed to the Trust Funds of $4,037,546.06, of which $994,000.45 is for hours worked by workers with a union history or affiliation who were not reported, $2,840,546.63 was for non-union workers identified as "technicians" who perform bargaining unit work, and $202,998.98 was for bargaining unit work subcontracted to non-union subcontractors. As a result, under the Trust Agreements and the Employee Retirement Income Security Act, Dock & Door and Midwest Dock are also liable for auditor's fees of $13,040.40, attorneys' fees, liquidated damages, and interest.

> SUPPORT FOR STATEMENT OF FACT NO. 7:
> Decl. of J. Conklin ¶¶9, 10 & Exhibit I (Audit Report) at pp. 6-10, 12, EX. 1
>
> Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Interrogatory No. 1, (Exhibit 40), EX. 24 (identifying persons employed by Midwest Dock as "technicians" and the period of their employment)
>
> Richert 16:16- (testifying that a technician does service calls, works on overhead doors and dock levelers, and also installs overhead doors and dock levelers)

6

Declaration of J. Conklin ¶3 & Exhibits A-F (Pension Fund Trust Agreement, Art. VII §7.3(r), Art. VIII, §8.3(a), Ex. A; Welfare Fund Trust Agreement, Art. VII, §7.3(r), §8.3(a), Ex. B; Trainee Program Fund Trust Agreement, Art. IV, §4, Art. VI, Ex. C; Supplemental Retirement Trust Agreement, Art. VIII §8.3(a), Ex. D; Carpenters Agreements §§12.10, 13.8, 14.8, Exs. E, F), EX. 1 (under the Trust Agreements an employer is liable for attorney's fees and costs and auditor's fees)

29 U.S.C. §1132(g)(2)(B) (interest damages)

29 U.S.C. §1132(g)(2)(C) (interest or liquidated damages whichever is greater)

29 U.S.C. §1132 (g)(2)(D) (attorney's fees)

**RESPONSE[3]: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of improper legal argument as relates to statements that contributions are "owed" to the Fund, and the statement that MDS is "liable" for audit fees, attorneys' fees, liquidated damages, and interest. MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations. MDS also objects to the inclusion of legal argument by way of citations to statutes, purportedly to support that MDS is "liable" under those provisions for fees, damages and interest. MDS objects to inadmissible hearsay in the cited Legacy Audit, and lack of competency of Legacy on several factual matters covered in its audit report.**

**MDS disputes that Legacy is an "independent" auditing firm, and nothing in the Fund's citations support that averment. MDS further disputes the assertion of independence because Legacy it is paid by the Fund, and because Legacy utilizes rules, procedures and assumptions directed to it by the Fund in completing its audit.**
*Citation*: **EX 1, at Exhibit I thereto (Audit Report) at PageID[4]## 708-11; EX 1 (Conklin Decl., ¶12).**

**MDS disputes that Legacy determined MDS was a "related company" of Dock & Door; rather, Legacy identified MDS as a "potentially related company." Further, Legacy stated it was "not engaged to, and did not, conduct an audit, the objective of which would be the expression of an opinion. Accordingly, we do not express such an opinion."**
*Citation*: **EX 1, at Exhibit I thereto (Audit Report) at PageID## 708, 711, 713-14.**

---

[3] MDS is loathe to include such lengthy responses to certain Statements of Fact, and has endeavored to be as brief and concise as possible. However, based on the sheer volume and number of independent and often disassociated facts contained within many of the Fund's individual statements, MDS's lengthy responses are necessary, lest any individual fact be deemed admitted for lack of appropriate response.

[4] References to "PageID # __" are to the sequential "PageID" numbers assigned to documents filed in this matter through the CM/ECF system.

**MDS disputes that Legacy determined MDS technicians, or any subcontractor, performed "bargaining unit work." Rather, Legacy included MDS employees in the audit on the basis that their job titles were listed as "technicians." Moreover, the audit report states it had no description of work performed by any listed subcontractor, did not review invoices for the work, and included the subcontractors and alleged amount of discrepancies, based on an assumption of jurisdictional work, and an applied "100% Labor Factor." Nothing in the audit report, or the Fund's citations, supports its averment that MDS technicians and the identified subcontractors performed "bargaining unit work." Further still, Legacy stated it was "not engaged to, and did not, conduct an audit, the objective of which would be the expression of an opinion. Accordingly, we do not express such an opinion."**
***Citation*: EX 1, at Exhibit I thereto (Audit Report) at PageID## 708, 710 (at § III(d)), 714, 716, 730-32.**

**MDS disputes that the cited single line of testimony from Michael Richert's deposition supports any of the numerous alleged facts contained in SOF 7, or in the argumentative characterizations contained in the parenthetical to the Fund's citation.**
***Citation*: EX 4 (M. Richert Dep.) 16:16.**

**MDS disputes that the statutory provisions cited by the Fund support any of the facts or improper argument contained in SOF 7, and disputes that those statutory provisions provide any support for the Fund's improper legal argument that MDS is "liable" for attorneys' fees, costs, or audit fees.**
***Citation*: 29 U.S.C. §1132(g)(2)(B), (C) & (D).**

**MDS admits that the Fund hired Legacy to conduct an audit of Dock & Door's fringe benefit contribution's for the period from October 20, 2020 through December 31, 2024, that Legacy reviewed Dock & Door and MDS's records, and that Legacy issued an audit report showing the dollar amounts listed in SOF 7 as potential discrepancies.**

II.   Relationship Between Dock & Door And Midwest Dock.

    A.   Familial Relationship Between The Owner Of Dock & Door And The Owners Of Midwest Dock.

STATEMENT OF FACT NO. 8:
Tony Zarlengo and Michael Richert, the two owners of Midwest Dock, are related; Richert has been Zarlengo's brother-in-law for approximately the past 10-15 years. Richert and Tony Brutti, the sole owner of Dock & Door, are also related; Brutti and Richert are cousins.

    SUPPORT FOR STATEMENT OF FACT NO. 8:
    Zarlengo 7:20-8:11, EX. 2 (testifying to his relationship with Richert)

    Brutti 17:2-13, EX. 3 (testifying to his relationship with Richert)

    Richert 6:14-20, 7:12-8:7; EX. 4 ("Q. Okay. Sir, are you related to Anthony Brutti? A. Yes. Q. All right. He's here in our conference room today, correct? A. Yes. Q. And how are you related to Anthony Brutti? A. Cousins. ... Q. And are you related to Anthony Zarlengo? A.

8

No. Q. He's not your brother-in-law? A. No, not anymore. Q. Was he your brother-in-law? A. Yes. Q. For what period of time? A. 17 years. Q. And from what time to what time? A. 2006. Q. That's when he married your sister? A. That's when I married his sister. Q. I'm sorry. Strike that. That's when you married his sister? A. Correct. Q. And you got divorced, I take it? A. We're not legally divorced just yet, but have been separated for three years. Q. So legally he's still your brother-in-law? A. Yes.

**RESPONSE: MDS admits SOF 8.**

B. Formation Of Midwest Dock By Zarlengo And Richert On May 16, 2006.

STATEMENT OF FACT NO. 9:
On May 16, 2006 Michael Richert, who is a former member of the Union and had extensive experience working in the overhead door and dock leveler industry, and Tony Zarlengo, who had a degree in business management from St. Louis University, formed Midwest Dock with each owning fifty percent. Zarlengo is principally responsible for Midwest Dock's financials, sales, business development, the insurance, ordering parts, managing payroll, making sure accounts receivable and accounts payable were paid, and Richert was principally responsible for work in the field, including installation of dock levelers and overhead doors and servicing dock levelers and overhead doors, but his job has gradually changed since 2015 to managing and troubleshooting jobs in the field, assessing jobs in the field to assist the sales persons, maintaining Midwest Dock's vehicles, and keeping the warehouse organized.

SUPPORT FOR STATEMENT OF FACT NO. 9:
Zarlengo 31:11-32:6, EX. 2 (testifying that he is a college graduate from St. Louis University with a degree in business management)

Zarlengo 36:2-37:5, EX. 2 (testifying that Midwest Dock was formed in 2006 by himself and Michael Richert and they have both always been equal 50% owners of the company)

Zarlengo 82:14-85:23; 86:17-91:8, EX. 2 (testifying that he is responsible for all of Midwest Dock's financials, including sales, invoicing, managing accounts payable and receivable, dispatching, scheduling, ordering parts, payroll, insurance, and Michael Richert was responsible for working in the field installing and serving overhead doors and dock levelers to more recently troubleshooting jobs in the field, assessing jobs in the field to assist the salespersons, maintaining Midwest Dock's vehicles, and keeping the warehouse organized)

Zarlengo 291:22-292:18, EX. 2 (testifying that Richert had experience working in the overhead door and dock leveler industry before starting Midwest Dock, including union work)

Richert 90:14-24; 94:12-95:23; 97:11-98:6, EX. 4 (testifying that he and Tony Zarlengo started Midwest Dock, that he does not know his title with Midwest Dock other than "owner", and that he owns 50% of Midwest Dock)

9

Richert 68:15-70:8; 74:10-79:2; 84:14-85:7; EX. 4 (testifying he is a former 9-year member of the Union, to his extensive experience working in the overhead door and dock leveler industry)

Richert 126:5-14; 126:22-127:1, EX. 4 ("Q. Okay. What was the -- what's the division of labor between you and Tony Zarlengo at Midwest Dock Solutions? A. I don't understand the question. Q. Are there things that you're primarily responsible for and things that he's primarily responsible for? A Yes. Q What are you primarily responsible for? A Everything outside the office. ... Q. What's the division of labor between you and Tony say over the last five years? A. Tony Zarlengo handles the office and inside and I handle anything outside.")

Richert 128:1-23, EX. 4 (testifying that he fixes overhead doors and dock levelers as part of his work for Midwest Dock, that he worked for J&B Ventures a company that did dock leveler installation in new construction projects, and now he troubleshoots retrofit repair and replacement work for dock levelers and overhead doors)

Midwest Dock Solutions, Inc. Articles of Incorporation, May 16, 2006 (Exhibit 79), EX. 5

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, citations.**

**MDS admits SOF 9.**

C. Nature of Midwest Dock's Business And Its History Performing Union Installation Of Overhead Doors and Dock Levelers In A New Construction Logistics-Type Building.

STATEMENT OF FACT NO. 10:

Midwest Dock's business includes installation of new dock levelers and overhead doors and related products in new and existing construction. The following from Midwest Dock's Facebook page promotes that Midwest Dock performs the following work—*i.e.,* dock levelers, dock seals, dock lights, dock restraints, dock shelters, overhead doors, door operators, and high speed doors, and new and existing construction—and Tony Zarlengo and others testified this accurately reflects the work that Midwest Dock does.



SUPPORT FOR STATEMENT OF FACT NO. 10:
Midwest Dock Solutions, Inc.'s Facebook Page at p.7, (Exhibit 53), EX. 6

Zarlengo 239:21-240:10, EX. 2 ("Q. And then if you turn to the next page, there's a listing on the Facebook page dated October 15, 2016, that says your complete Dock & Door experts. Do you see that? A. Yes. Q. And then it's got the website for Midwest Dock Solutions underneath it, correct? A. Yes. Q. All right. Is that all work that Midwest Dock Solutions performs? A. Yes.")

Zarlengo 247:12-23, EX. 2 ("Q. And if you turn -- if you turn to the page that ends with clients and testimonials -- A. Yes. Q. -- do you see where it says, Midwest Dock Solutions specializes in the service, supply, and installation of loading dock equipment and overhead doors? A. Yes. Q. All right. Would you agree that that's an accurate statement? A. Yes.")

Corrigan 39:3-40:13, EX. 7 ("Q. And how about -- you mentioned installs. What's involved in an install? A. Going to the job -- you would have new doors, usually, on site, or bring it from the shop, and taking down the old doors and installing new doors. Q. Okay. And how about openers? A. The same. Just bring an opener from the shop over there -- or they'd already, you know, be there -- and take down old openers and replace with new ones. Q. Okay. And that would be on commercial jobs? A. Yes. Q. Okay. All right. How about installation of tracks? A. I've done that, yes. Q. Would that be work that you would have done as part of the installation of new -- of new doors? A. Yes. Q. All right. And I'm trying to think of the other components. How about track guards? Would that be something you'd also install? A. Sometimes, yes. Q. Okay. And that would be part of the installation of the doors? A. Yes.")

Corrigan 42:14-43:5, EX. 7 ("Q. No. The first sentence that says Midwest Dock Solutions specializes in the service, supply, and installation of loading dock equipment and overhead doors. A. Yes. Q. Okay. Now, that says loading dock equipment. Do you see that? A. Yes. Q. What kind of loading dock equipment does Midwest install? A. Dock levelers and the seals that go around the opening. Q. Okay. And would you do that kind of work also? Yes. Q. All right. And that was part of your work for Midwest, correct? A. Correct. Q. You said

11

dock seals. What are dock seals? A. If you have the picture, it's the it's the -- it's the black seal that goes on the outside of the opening that the trucks back up into. It seals between the building and the truck -- Q. Okay. A. -- so they don't get any, you know, rain and snow and stuff inside the building. Q. I see. So on Exhibit 3, in that first page, the photo on the bottom, it's the black square around the door? A. Yes. Q. Okay. Would you also repair dock levelers? A. Yes.")

Corrigan 49:10-50:19, EX. 7 ("Q. Did your work change over that period of four years, or was it pretty much the same work? A. I mostly did doors. Q. Okay. A. Sometimes docks, but not -- mostly -- I'd say 90/10 -- mostly doors and openers. Q. Okay. And was that consistent from the time you started until the time you left? A. Yes. Q. Okay. So it was 90/10 the whole time? A. Yes. Q. Okay. And of the service work and installation work for the doors, what percentage, would you say? A. Maybe 70 service 30 install. Q. Okay. And, again, was that roughly the same the whole time you were there? A. Yes. Q. Okay. So 30 percent of the time you were doing new installation, and 70 percent of the time for doors you're doing service work? A. Yes. The new installation would be take down old doors, install new doors."

Cruikshank 38:1-17, EX. 8 (testifying that when he worked for Midwest Dock he performed installation work in new construction buildings—*e.g.,* "Q. Did you do any new installation for Midwest when you were working – A. Yes. Q. -- getting paid through them? A. Yes. Q. Okay. And what kind of projects would that be on? A. Commercial buildings, you know. I mean -- or actually, sometimes firehouses, you know. I mean, it was -- sometimes -- we did a police station one time. You know, commercial buildings. Q. Okay. New -- new construction? A. Yeah.")

Cruikshank 40:9-18, EX. 8 ("Q. Well, you said Midwest Dock also did installation of new doors, correct? A. Yes. Q. And new construction; is that right? A. Yes. Q. Okay. And -- and I understand you were paid through Midwest, and then you were eventually paid through Dock & Door, correct? A. Yes. Q. Okay. And Dock & Door was -- if you were being paid through there, it was only -- you had to be union, right? A. Yes.")
Cruikshank 41:4-42:11, EX. 8 (testifying that there was no difference between a Midwest Dock job and a Dock & Door job: "Q. ... Once you started being paid by Dock & Door and you went out to a project, how do you know it's a Dock & Door project and not a project that Midwest Dock Solutions sold and contracted for? A. I wouldn't have a way of knowing that. Q. Okay. A. It's -- I mean, it's just -- I mean, when you were working for Dock & Door, you were going to companies that -- like Krusinski and -- you know, if it was a big Krusinski job, you knew it was a union job. There was no -- no debating that. Q. It required union labor to be on the job? A. Yes. Q. Okay. So if it required -- basically, if it required union labor, then it had to be a Dock & Door job? A. Yes. Q. Okay.")

Defendant Midwest Dock Solutions, Inc.'s Answer at ¶19, [ECF#18], (Exhibit 120), EX. 9 (Midwest Dock admits that "MIDWEST DOCK is in the business of installing and/or repairing loading dock equipment including dock levelers and doors.")

**RESPONSE: MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, facts or proper citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), that are disguised as part of its citations, but which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF. MDS objects that the above renders it impossible to then know whether the additional facts contained in the citation parentheticals are considered part of the actual SOF that need to be admitted or disputed.**

**MDS disputes that the facebook post from 2016 "promotes" that MDS itself "performs" any work of any kind. Rather, the post does not address the performance of work, but states MDS are experts with respect to the listed items.**
***Citation*: EX 6 (MDS 2016 facebook post), p.7.**

**MDS disputes that the citations to Zarlengo's deposition testimony supports any averment in the SOF that MDS performs installations on new construction.**
***Citaiton*: EX 2 (Zarlengo Dep.) 239:21-240:10; 247:12-23.**

**MDS disputes that its business includes the actual installation of new dock and door products at new construction of commercial buildings.**
***Citation*: EX 2 (Zarlengo Dep.) 80:10-81:4; 196:10 – 197:5; EX 126 (Zarlengo Decl) ¶¶5, 14-20.**

**MDS admits that the picture in the above SOF appears on its facebook page, and that its business includes installation of new dock levelers and overhead doors and related products in existing construction.**

STATEMENT OF FACT NO. 11:
Midwest Dock performed dock leveler and overhead door installation on a new construction building for a union employer when Midwest Dock was awarded a contract by a large general contractor, Principle Construction Corp., that required the use of union labor to install 20 dock levelers and overhead doors for the Winpak Portion Packaging project in Sauk Village, Illinois, a new construction warehouse building that looks like this:



And Midwest Dock also installed overhead doors and dock accessories at a new construction project in Crete Illinois.

SUPPORT FOR STATEMENT OF FACT NO. 11:
GoogleMaps Screenshot, (Exhibit 81), EX. 10

Zarlengo 67:16-68:3; 68:12-23, EX. 2 (testifying that he signed the one jobsite agreement on behalf of Midwest Dock agreeing to be bound by the collective bargaining agreement with the Chicago Regional Council of Carpenters (*i.e.*, the carpenters union) to perform the work for Principle Construction Corp. on the Winpak Portion Packaging project)

Zarlengo 56:9-57:11; 65:3-66:18, EX. 2 (testifying that Midwest Dock performed the installation of 20 overhead doors and dock levelers at the Winpak Portion Packaging Center for Principle Construction Company which was a new construction project that required the use of union workers, that the work was performed by Midwest Dock's employees, and that the GoogleMaps image is an accurate photograph of the Winpak Portion Packaging project—*e.g.*, "Q. And in 2014, Midwest Dock Solutions was awarded a contract with Principal Construction to perform work at the Winpak Portion Packaging facility in Sauk Village, correct? A. Correct. Q. All right. And that was a union project, correct? A. Correct.... Q. All right. And how is it that it – this was a new construction installation project, correct? A. Correct.... Q. And this Exhibit 81, is this a -- and I just want to talk about the first two pages of Exhibit 81 -- is that the one job site agreement that Midwest Dock Solutions signed with the carpenters union? A. Yes.... Q. And this refers to a -- the Winpak Portion Packaging manufacturing facility in Sauk Village at 1111 Winpak Way. Do you see that? A. Yes. Q. And it says, Principal Construction has begun work on the project and will complete the building envelope by November 2011. Do you see that? A. Yes. Q. Was Principal Construction the contractor that you contracted with for the Winpak Portion Packaging Center? A. Yes. Q. All right. And then if you turn to the very last page of this exhibit, does that look to be a -- you have to open it up. Yeah. Does that look to be a photograph of the Winpak Portion Packaging Center? A. Yes. Q. All right. And that's where you did the work, correct? A. Yes....")

14

Richert 142:6-22, EX. 4 ("Q. Were you ever at the jobsite that was done by Midwest Dock Solutions? MR. HUGHES: And before you answer, I'm going to object to foundation on this as well. MR. McJESSY: Okay. BY MR. McJESSY: Q. For this project? A. Yes. Q. And does this look like the facility? A. Yes. Q. And it's a little hard to see, but down the left-hand side of this it looks like it shows trucks pulled up to loading docks. Do you see that? A. Yes. Q. Is that where the work was done? A. Yes.")

Richert 187:17-189:2 ("Q. So the picture on the first page here, did you take that? A. Yes. 20 Q. Where is that taken at? A. Crete, Illinois. Q. Where at in Crete, Illinois? A. In Crete. Q. Where at? I mean, it's a location, correct? A. Like a street? Q. It's a facility, isn't it? A. Yes. Route 1. Q. And what's the facility? A. Al-Amin. ... Q. And this is a project that Midwest Dock Solutions did? A. Yes. Q. And what did it do? A. I put the enclosures up, the doors up and the verticals in. Q. And was this a new construction project? A. Yes. Q. And you did the work? A. Yes. And you say you put the enclosures up. Those are the black things there? A. Correct. Q. And what else did you put up? The doors? A. The doors.")

Zarlengo 217:2-219:24 (testifying that he sold the A-Amin project which was new construction in 2018 and the work was performed by employees paid through Dock & Door—*e.g.*, "Q. 2 Q. And what was it? A. Al-Amin Brothers. ... Q. All right. And do you know who sold that project? A. I did. Q. Okay. But you don't -- do you remember what you sold as part of that project? A. I sold the dock levelers. Q. All right. So installation of dock levelers? A. Correct. Yes. Q. All right. And was that new -- that was new construction installation of dock levelers, then, correct? A. Yes. ... Q. All right. Do you know when that was done, approximately? A. 2018. Q. Okay. And would Midwest Dock employees have done that work? A. No. Q. Okay. This would have been work done by Dock & Door? A. Yes. Q. And -- oh, where is it located? A. Crete. Q. On Route 1? A. Yes.")

One Jobsite Agreement Between Midwest Dock Solutions, Inc. and Chicago Regional Council of Carpenters [now known as Mid-America Carpenters Regional Council], Nov. 11, 2011 and Photograph of Winpak Portion Packaging project in Sauk Village, Illinois (Exhibit 81), EX. 10

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and its alterations and emphasis of certain portions of its quoted material, and such characterizations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of depositions transcripts), that are disguised as part of its citations, but which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF. MDS objects that the above renders it impossible to then know whether the additional facts contained in the citation parentheticals are considered part of the actual SOF that need to be admitted or disputed.**

15

**MDS admits the statements contained in the SOF that appear above the picture. MDS admits the picture looks like the Winpak Portion Packaging project in Sauk Village, Illinois, a new construction warehouse building.**

**MDS disputes that it "also installed overhead doors and dock accessories at a new construction project in Crete Illinois," as the Fund's own citation related to that factual assertion shows it is disputed as to which entity performed the installation work.**
***Citation*: EX 2 (Zarlengo Dep.) 218:9 – 220:4.**

STATEMENT OF FACT NO. 12:
In order for Midwest Dock to perform the work on the Winpak Portion Packaging project for Principle Construction Corp., Midwest Dock signed a One Jobsite Agreement with the Chicago Regional Council of Carpenters, *i.e.*, the carpenters union ("Union") agreeing to be bound by the collective bargaining agreement with the Union, the trust agreements establishing the Trust Funds, and Midwest Dock agreed to report fringe benefit contributions to the Trust Funds for the hours worked by its carpenter employees performing dock leveler and overhead door installation work. Midwest Dock submitted fringe benefit contribution reports and paid fringe benefit contributions to the Trust Funds for hours worked by its union employees at the Winpak Portion Packaging project, including hours worked by its employees David Green and David Richert.

SUPPORT FOR STATEMENT OF FACT NO. 12:
Zarlengo 67:16-73:12, EX. 2 (testifying that Midwest Dock signed the One Jobsite Agreement, that it agreed to be bound by the collective bargaining agreement with the carpenters union and the trust agreement establishing the Trust Funds, and that it agreed to and did report fringe benefit contributions to the Trust Funds—*e.g.*, "Q. Well, you agreed to be bound by the Collective Bargaining Agreement for purposes of this project, correct? A. For one job. Q. Correct. A. Yeah, for one job. Q. Right. I understand. But you had to -- you had to be bound by the Collective Bargaining Agreement in order to do this one job, correct? A. Yes. I'm a little confused on the question, but -- Q. All right. Well, let's go back to Exhibit 81. And I'm not trying to trap you into saying that you were a permanent member of the union when you signed this one job site agreement. The agreement says what it says. So if that's -- there was a long pause when I asked my question. You signed this one job site agreement, correct? A. Yes. Q. And this agreement was entered into between the Chicago Regional Council of Carpenters, Cook, DuPage, Grundy, Iroquois, Kane, Kankakee, Kendall, Lake County, and Will County, Illinois, referred to as the union, correct? A. Yes. Q. And Midwest Dock Solutions, correct? A. Yes. Q. All right. So it's an agreement between you -- your company and the carpenters union, correct? A. For one job, yes.... Q. And so Midwest Dock had to also report fringe benefit contributions to the trust funds referred to for the work performed on this project, correct? A. Yes.... Q. All right. So you submitted these reports and paid the fringe benefit contributions that are identified on these reports, correct? A. Yes. Q. And by that, I mean Midwest Dock Solutions did that, correct? A. Yes.")

One Jobsite Agreement Between Midwest Dock Solutions, Inc. and Chicago Regional Council of Carpenters [now known as Mid-America Carpenters Regional Council], Nov. 11, 2011 (Exhibit 81), EX. 10

Fringe Benefit Contribution Reports by Midwest Dock Solutions, Inc., (Exhibit 85), EX. 11 (reporting fringe benefit contributions for David Richert (November and December 2011) and Green (February to June 2012))

Green 38:10-39:10, EX. 12 (testifying that he was hired by Zarlengo as an employee of Midwest Dock)

Zarlengo 72:5-74:18, EX. 2 (testifying that Midwest Dock reported fringe benefit contributions to the Trust Funds on behalf of Green as an employee of Midwest Dock)

Richert 153:5-154:1 ("Q. 5 So you know he [David Green] was at Midwest Dock Solutions? A. Yes. He did work at Midwest Dock Solutions. Q. And what kind of work did he do for Midwest Dock Solutions? A. Service work. Q. Did he also do installation of overhead doors? A. Yes. Q. New construction? A. No. Q. Would Midwest Dock have been reporting hours on his behalf for any purpose other than work at a jobsite that it signed an agreement for? A. That's what it looks like. Q. It's reporting hours on his behalf, correct? A. Yes. Q. Okay. And that would have been for an agreement with the union, correct? A. Yes. Q. And do you believe that would have been for the work at the Winpak Portion Packaging project? A. Yes.")

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to its citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of depositions transcripts), that are disguised as part of its citations, but which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF. MDS objects that the above renders it impossible to then know whether the additional facts contained in the citation parentheticals are considered part of the actual SOF that need to be admitted or disputed.**

**MDS admits SOF 12.**

STATEMENT OF FACT NO. 13:
On June 11, 2014, Krusinski Construction Company notified Midwest Dock that it was the successful bidder on the contract to install dock levelers at the Heritage Crossing Building #8 project, which was another new construction warehouse building in Lockport, Illinois. The contract was valued at $252,000 for the installation of dock levelers, bumpers, and seals, and required the use of union labor on the project. The contract specifically stated:

11.2 ACCEPT [sic] ABILITY [sic] OF LABOR. All work performed by the Subcontractor under th.is [sic] Agreement shall be by appropriate union labor acceptable to the Contractor.

...
15.B The Subcontractor shall provide sufficient union manpower to maintain the Contractor's construction schedule.

...
15.D Subcontractor shall be responsible for his own cleanup with the proper union labor.

SUPPORT FOR STATEMENT OF FACT NO. 13:
Letter from Michael Metz, Krusinski Construction Company, to Tony Zarlengo, Midwest Dock Solutions, Inc., Jun. 11, 2014, (Exhibit 104), EX. 13 ("We are pleased that your firm is the successful Subcontractor, subject to your agreement with the terms and conditions contained in the enclosed subcontractor agreement, and we are looking forward to working with you on the referenced project. Enclosed is a copy our Subcontractor Agreement, which should be initialed on each page and executed by an officer of your company.")

Subcontract Agreement between Krusinski Construction Company and Midwest Dock Solutions, Inc. at pp. 5, 15, 21, Jun. 11, 2014, (Exhibit 104), EX. 13

Zarlengo 221:16-222:24, EX. 2 (testifying that the contract for the work at Heritage Crossing was awarded to Midwest Dock by Krusinski Construction Company and authenticating award letter and contract)

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its use of the term "another." MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals within citations, and such characterizations are not, themselves, citations.**

**MDS admits SOF 13.**

STATEMENT OF FACT NO. 14:
After Tony Brutti formed Dock & Door, one of the first jobs where the workers paid through Dock & Door worked was the Heritage Crossing project, which was a project bid by Midwest Dock and awarded to Midwest Dock but which required union labor. On its Facebook page, Midwest Dock promotes the Heritage Crossing project as a project completed by Midwest Dock even though the work on that project was performed by employees paid through Dock & Door. One Facebook post states, "Midwest Dock Solutions October 15, 2016 Another job well done! Install of 64 dock levelers, dock seals and 68 overhead doors" and another Facebook post advertises that Midwest Dock is hiring "Loading Dock & Overhead Door Technicians" and both posts feature the same images of the Heritage Crossing project.

18

19



(Exhibit 53), EX. 6



(Exhibit 53), EX. 6



(Exhibit 19 & Exhibit 53), EX. 14, EX. 6

SUPPORT FOR STATEMENT OF FACT NO. 14:

Midwest Dock Solutions, Inc. Facebook Page www.facebook.com/midwestdocksolutions at p.1, (Exhibit 19), EX. 14

Midwest Dock Solutions, Inc. Facebook Page www.facebook.com/midwestdocksolutions at pp. 2, 8, (Exhibit 53), EX. 6

Brutti 43:1-20, EX. 3 ("Q. Okay. And you said there were one or two jobs that were really cooking. What did you mean -- A. Yeah, I'm pretty sure we were doing a job at a college in -- oh, Malcolm X College, I believe, is one of my first jobs right off the bat and that, the one we were talking about in the previous deposition in Lockport. That was a while ago, so I can't remember every job that we were... Q. You mentioned the job that we were talking about in the prior deposition. Was that the -- A. Heritage Crossing. Q. -Heritage Crossing? A. Yeah. Q. Okay. So that was also your recollection one of the early jobs? A. Early, yeah. Q. Okay. And that was one of the jobs that was being considered at the time that you were signing up with the union? A. Yes.")

Tattini 109:9-111:1, EX. 15 ("Q. Okay. And then Exhibit 8, does that look like -- do you recognize that project, by any chance?



A. Oh, wow. It's so hard. They all look the same, but, let's see. This looks like – Q. If you turn to the next page -- A. Ah-huh. Q. -- you can see that it comes from a Facebook post? A. Okay. Q. That's dated July 26, 2016, and it says Midwest Dock Solutions is in Lockport, Illinois. A. Yeah. Well, that's -- well, that's probably -- that's probably more of the job I was talking about off of 355, but not Lockport. I think it was Lemont. July – Q. So this could be an interior photo of the space that we looked at earlier that was the exterior photo, which was -- I can't find it now. A. Six? Q. Yeah. I think you said it was off 355? A. Oh, no. That was a different picture. Yeah, yeah. Most likely, yes. Especially at that time because that's exactly when I started. Wow, yeah. I think I started -- I think I started on like July 6 of 2016, so that makes total sense that we were over there at that time. Q. And -- and -- oh, as a matter of fact, it's here. I know you -- let's see. Were you at that facility, going off of – A. Yes. Q. All right. A. I think there was two of them -- two of them at that time right there.")

Zarlengo 215:2-11, EX. 2 (testifying that Exhibit 53 is Midwest Dock's Facebook Page)

Zarlengo 220:5-19, EX. 2 ("Q. And then if you turn the page, do you see where it says, we are hiring? A. Yes. Q. Is -- is that a picture of a building that Midwest did? A. It is, yes. Q. And where is this building? A. Lockport. Q. And what is this building? A. It's a distribution center. It was a stock distribution center. Q. Was this on Gougar Road? A. Yes. Q. Was this a Krusinski building? A. Yes.")

Zarlengo 225:17-228:7, EX. 2 (testifying the work was performed by Dock & Door for the Heritage Crossing project for Krusinski Construction Company)

Zarlengo 226:10-226:18, EX. 2 ("Q. All right. And if you turn to the next page, this is one -- the screenshot of one of the pages from Midwest Dock Solutions Facebook page. Do you see that? A. Yes. Q. And are those photographs of the ML Realty Heritage Crossing No. 8 project? A. Yes.")

Zarlengo 234:22-235:13; 236:21-24, EX. 2 (testifying that the following photograph in a post dated July 26, 2014 was taken at the Heritage Crossing project where the workers were being paid through Dock & Door: ("Q. And if you turn to the next page in that exhibit, it says Midwest Dock Solutions, July 26, 2016. Do you see that?



A. Yes. Q. And it's another post by Mike Richert, and it says Midwest Dock Solutions is in Lockport, Illinois. Do you see that? A. Yes. Q. July 26, 2016, correct? A. Yes. Q. All right. Is that the Heritage Crossing building? A. One of them, yes.... Q. Would this work have been work performed by employees paid through Dock & Door? A. Yes.")

Krusinski Construction Company Cover Letter, Jun. 11, 2014, Subcontract Agreement, Midwest Dock Solutions, Inc. Certificates of Insurance, Compstak Webpage, Midwest Dock Solutions, Inc. Facebook Page, and GoogleMaps Images of 14907 Gougar Road at p.35, (Group Exhibit 104), EX. 13

22

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its argumentative statements that individuals are "paid through" Dock & Door, that MDS "promotes" a specific job on its facebook page; that MDS claims the project to have been "completed by Midwest Dock even though the work on that project was performed by employees paid through Dock & Door." MDS objects to the inclusion of improper argument by the mischaracterization by the Fund of lumping together the headings of posts and texts of posts, without into one sentence that it places in quotations, without intervening punctuation. MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), that are disguised as part of its citations, but which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF. MDS objects that the above renders it impossible to then know whether the additional facts contained in the citation parentheticals are considered part of the actual SOF that need to be admitted or disputed.**

**MDS admits that Tony Brutti formed Dock & Door, that one of Dock & Door's early jobs was doing the installation work at the Heritage Crossing project depicted in the MDS facebook posts from 2016 shown in the SOF, and that that project was bid by bid by MDS and required union labor. MDS admits the three posts (including the pictures and text) as shown in the SOF were posted by MDS on its facebook page in 2016. MDS admits it advertised it was hiring Loading Dock and Overhead Door Technicians in 2016 on its facebook page.**

**MDS disputes that it promotes that it, itself, completed the installation work on the Heritage Crossing project, as the posts at issue do not state who performed any work and, as such, the Fund's assertion of such promotion or claim of performance of the work is unsupported by its cited record documents.**
*Citation*: **EX 6 (excerpts of MDS facebook page), pp. 2, 8; EX 14, (excerpts of MDS facebook page), p.1.**

STATEMENT OF FACT NO. 15:
Midwest Dock's website also features a photograph of the Heritage Crossing project. Directly under the photograph it states "Midwest Dock Solutions specializes in the services, supply & installation of loading dock equipment and overhead doors. ... We offer a free quote or consultation on any new project."



Midwest Dock's website photograph is an excerpt of the same photograph as shown on Midwest Dock's Facebook page—the excerpt of the Facebook page photograph used on the website is shown by the red rectangle:



SUPPORT FOR STATEMENT OF FACT NO. 15:
See Support for Statement of Fact No. 14.

Midwest Dock Solutions, Inc. Facebook Page
www.facebook.com/midwestdocksolutions, Oct. 15, 2016, (Exhibit 19), EX. 14

Midwest Dock Solutions, Inc.'s Website www.midwestdocksolutions.com at p.5, Oct. 15, 2016, (Exhibit 57), EX. 16 ("Products" page photograph)

Krusinski Construction Company Subcontract Agreement with Midwest Dock Solutions, Inc. for ML Realty Heritage Crossing #8 at p.35 (of 37), (Exhibit 104), EX. 13

Zarlengo 240:18-241:2; 243:11-18, EX. 2 ("Q. I'm going to hand you what was previously marked as Exhibit 57. Do you recognize what this is? A. Yeah, a website. Q. All right. And it's a Midwest Dock Solutions website? A. Correct. Yes. ... Q. All right. And do you review and approve what goes on the website? A. Yes. Q. Okay. So you would have reviewed and approved this before it went on, correct? A. Yes.")

Zarlengo 222:6-223:7, EX. 2 ("Q. And this appears to be a letter to you from Krusinski Construction concerning ML Realty Heritage Crossing No. 8, correct? A. Yes. Q. All right. And it looks like Midwest Dock Solutions was awarded that contract, correct? A. Yes. Q. Okay. And then it refers to a subcontract agreement. Do you see that? A. Yes. Q. And if you turn two pages in, does that look like the subcontract agreement for Heritage Crossing No. 8? A. Yes. Q. All right. And there's pages that have initials on them where it says subcontractor, and it looks likes it's printed AZ. Does that look like your initials? A. It is, yes.")

Zarlengo 227:10-228:7, EX. 2 ("Q. All right. And what was the work that Midwest Dock Solutions did at this location [Heritage Crossing #8]? A. We did 64 dock levelers, dock seals, and 68 doors. Q. All right. And that's what the entry there that says October 15 says, correct? On the right-hand side of the Facebook page? A. Yes. Q. All right. And you believe that to be accurate, correct? A. Yes. Q. All right. And that would have been done by employees of Midwest Dock Solutions, correct? A. No. Q. And this -- who would this have been done by? A. Dock & Door.")

Zarlengo 229:16-230:20; 231:2-22, EX. 2 (testifying that Midwest Dock's contract with Krusinski Construction Company for the Heritage Crossing project required it to use union workers)

Zarlengo 248:1-249:18, EX. 2 ("Q. And then if you turn to the next page where it says, Products, do you know what -- where that picture came from that's superimposed on the word 'Products'? A. I do not. Q. And if you could turn back to the Facebook page for Midwest Dock Solutions that has the Heritage Crossing building on it -- MR. HUGHES: Go back. Go back. MR. McJESSY: 104. No, 104 will work. THE WITNESS: Okay. BY MR. McJESSY: Q. It's part of Exhibit 104. Do you see that photograph? A. Yes. Q. And do you see the top photograph? A. Yes. Q. Does that look to be the same photograph that's shown as 'Products'? A. Yes. Q. Okay. So that photograph looks to be the Heritage Crossing No. 8 building, correct? A. One of the ones at Heritage Crossing, yes. Q. And underneath that picture, it says, Midwest Dock Solutions specializes in the service, supply, and installation of loading dock equipment and overhead doors, correct? A. Yes. Q. And, again, it says -- a little further along in that sentence -- we also offer a free quote or consultation on any new project, correct? A. Yes. Q. And the picture above is construction of a new project that you worked on, correct? A. Yes.")

Brutti 42:23-43:20, EX. 3 ("Q. Okay. So were there jobs that were being bid on at that time? A. I believe there were. Q. Okay. And you said there were one or two jobs that were really cooking. What did you mean -- A. Yeah, I'm pretty sure we were doing a job at a

college in -- oh, Malcolm X College, I believe, is one of my first jobs right off the bat and that, the one we were talking about in the previous deposition in Lockport. That was a while ago, so I can't remember every job that we were... Q. You mentioned the job that we were talking about in the prior deposition. Was that the -- A. Heritage Crossing. Q. -- Heritage Crossing? A. Yeah. Q. Okay. So that was also your recollection one of the early jobs? A. Early, yeah. Q. Okay. And that was one of the jobs that was being considered at the time that you were signing up with the union? A. Yes.")

Zarlengo 225:7-226:18, EX. 2 ("Q. No. Okay. This shows the Heritage Crossing Corporate Center Building 8, and it shows that the property address is 14908 South Gougar Road? Do you see that? A. Yes. ... Q. Does that address sound right for this project? A. Yes. Q. All right. And if you turn to the next page, this is one -- the screenshot of one of the pages from Midwest Dock Solutions Facebook page. Do you see that? A. Yes. Q. And are those photographs of the ML Realty Heritage Crossing No. 8 project? A. Yes.")

**RESPONSE: MDS objects to the improper inclusion of argument in the citations, through the Fund's characterization of testimony.  MDS further objects to the inclusion of lengthy factual statements contained in the Fund's purported citations that have no bearing on, or support for, the facts asserted in the actual SOF 15. MDS objects to the inclusion of such additional, lengthy and unrelated facts within the citations, as violative of LR 56.1(d)(1)'s requirement of concise statements of facts. MDS objects to the additional facts contained in the citations as leading to an excess of the allotted 80 statements of fact.**

**As regards the actual facts asserted in SOF 15 (and not those included in the citations, which would be impossible to respond to on a line-by-line basis), MDS admits that the picture of the Heritage Crossing building, and the quoted language appears on its website, and that the expanded version of the same picture appears as a posting made in 2016 on its facebook page.**

STATEMENT OF FACT NO. 16:
The products and manufacturers that Midwest Dock promotes on its website—including Blue Giant brand dock levelers, dock seals, dock shelters, dock lights, dock restraints and steel canopies, Clopay brand overhead doors, Hormann brand high speed doors, Cornell rolling steel doors, Gateway Industrial Products bug barriers, LiftMaster brand overhead door openers—are the same products and manufacturers of products that Dock & Door employees install on jobsites.

SUPPORT FOR STATEMENT OF FACT NO. 16:
Midwest Dock Solutions, Inc. Website www.midwestdocksolutions.com at pp. 6-12 (Exhibit 57), EX. 16

Midwest Dock Solutions, Inc.'s Website www.midwestdocksolutions.com at pp.6-11, (Exhibit 57), EX. 16 (showing products of Blue Giant, Clopay, Hormann, Gateway Industrial Products, and LiftMaster)

Zarlengo 249:22-255:2, EX. 2 (testifying that Blue Giant brand dock levelers, dock seals, dock shelters, dock lights, dock restraints and steel canopies, Clopay brand overhead doors, Hormann brand high speed doors, Gateway Industrial Products bug barriers, LiftMaster

brand overhead door openers as shown on Midwest Dock's website are all products installed by both Midwest Dock's employees and Dock & Door's employees)

Tattini 52:11-54:21, EX. 15 (testifying that while working for Dock & Door he installed the bug barriers, guardrails, Hormann high speed doors, Cornell rolling doors, and Clopay overhead doors advertised on Midwest Dock' website)

Williams 93:8-100:22, EX. 18 (testifying that while working for Dock & Door he installed Clopay overhead doors, high speed rolling doors, and LiftMaster door operators, like those shown on Midwest Dock's website)

Williams 96:11-16, EX. 18 (working for Dock & Door he installed Clopay doors); 97:1722, 98:4-6 (installed high speed doors); 98:21-99:23 (installed LiftMaster door openers); 100:15-22 (installing bug barriers); 121:11-122:20, 126:18-127:5 (installing dock seals); 128:5-20 (installing dock lights)

**RESPONSE: MDS objects for lack of materiality. MDS objects to improper argument as relates to whether MDS "promotes" any manufacturer or product. MDS objects to the improper inclusion of argument in the citations, through the Fund's improper characterization of testimony. MDS objects that the SOF is not concise, as required by LR 56.1(d)(1). MDS objects to the additional facts and argument contained in the citations as leading to an excess of the allotted 80 statements of fact.**
**As regards the actual facts asserted in SOF 16 (and not those included in the citations, which would be impossible to respond to on a line-by-line basis), MDS admits SOF 16.**

D. Union General Contractors Require The Use Of Union Labor On The Jobsite.

STATEMENT OF FACT NO. 17:
General contractors like Krusinski Construction Company, Clayco Construction, Pepper Construction Company, Meridian Design Build, Opus Design Build, Power Construction that build new construction warehouses require their subcontractors who install overhead doors and dock levelers and related accessories to use union labor on the jobsites and many other large general contractors like ARCO/Murray, Morgan/Harbour, and Peak Construction often require their subcontractors to use union labor. So, when Midwest Dock is awarded a contract with a general contractor that requires union labor, Dock & Door employees are used to perform the work.

SUPPORT FOR STATEMENT OF FACT NO. 17:
Zarlengo 52:16-55:24, EX. 2 (testifying that some general contractors that Midwest Dock contracts with that always require the use of union workers on their jobsites, such as Krusinski Construction Company, Clayco Construction, Pepper Construction Company, Meridian Design Build, Opus Design Build, Power Construction, and other general contractors sometimes require the use of union workers on their jobsites, such as ARCO/Murray, Morgan/Harbour, and Peak Construction)

Pepper Construction Company: Subcontract Agreement Between Pepper Construction Company and Midwest Dock Solutions, Inc. for North American Warehouse Expansion, Glenview, Illinois at 21, 22, May 15, 2020, (Exhibit 61), EX. 19 ("Union Installations are required for all work performed on the jobsite" and "All clean up shall be performed by union labor as required by the union having jurisdiction")

Declaration of S. Oertley, Senior Contract Specialist, Pepper Construction Company, Nov. 4, 2025 at ¶8, EX. 20 (Pepper Construction Company requires the work on the job sites to be performed by union employers)

Krusinski Construction Company: Subcontract Agreement; Jun. 11, 2014; Midwest Dock Solutions, Inc. for ML Realty Heritage Crossing #8 Project at p.17, (Exhibit 104), EX. 13 ("11.2 ACCEPT ABILITY OF LABOR. All work performed by the Subcontractor under th.is Agreement shall be by appropriate union labor acceptable to the Contractor.")

Meridian Design Build: Subcontract between Meridian Design Build and Midwest Dock Solutions, Inc. for 1303 Jack Court Facility Upgrades, Bartlett, IL, May 28, 2024, (Exhibit 65), EX. 21 ("12. All dock equipment and overhead doors shall be installed by union labor.")

Opus Design Build LLC. Subcontract Agreement between Midwest Dock Solutions, Inc. and Opus Design Build LLC for Mokena Industrial Supply Spec Building A at pp. 9, 11, Dec. 9, 2019, EX. 22 ("'22. Includes all union labor' and 'Subcontractor acknowledges that Contractor is a signator to certain collective bargaining agreements entered into between the Associated General Contractors – Mid-America Regional Bargaining Association and local trade unions.'").

Sugar 96:2-98:5, EX 23 ("Q. Huge congratulations on winning Project Nexus Elwood in Elwood, Illinois. Thank you for your cooperation through a long bidding process. Do you see that? A. Yes. Q. And then if you continue down, it looks like the information that's there is information for the project you were bidding on, correct? A. Yes. Q. Okay. And if you go to the last page, it says -- at the very top of it -- paragraph A says, all labor is to be performed by union laborers, correct? A. Yes. Q. Right. So this is a project that Midwest Dock was bidding on, correct? A. Yes. Q. All right. So the union laborers that it's going to use on this project are the employees who are paid through Dock & Door, correct? A. correct. Q. Okay. Is it unusual to get contracts where the company is requiring labor to be performed by union laborers? A. I wouldn't say unusual. Q. Okay. That's sometimes a requirement of the contracts? A. Yes. Q. And is that particularly true of the large general contractors that we were talking about? A. Yes. Q. Okay. And Midwest Dock regularly bids work that requires union labor? A. Yes. Q. Okay. And although this says union laborers -- and I know that the laborers union is a particular union -- you understand that this means like union carpenters doing carpentry work, union electricians doing electrical work, that sort of thing, correct? A. Correct.")

**RESPONSE: MDS objects to the improper inclusion of argument in the citations, through the Fund's improper characterization of testimony, instead of simply citing it, and through**

**the Fund's modification, omissions, emphasis of quoted material within its citaions. MDS objects that the SOF is not concise, as required by LR 56.1(d)(1). MDS objects to the additional facts and argument contained in the citations as leading to an excess of the allotted 80 statements of fact.**

**MDS objects to improper argument an conclusion contained in the SOF, specifically as it relates to the Fund's argumentative/conclusory connecting word, "So" (which argues that the fully separate factual assertion made in the second sentence is conditioned on the factual assertions in the first sentence.**

**MDS disputes that it subcontracts work to Dock & Door only on the condition that a General Contractor requires the use of union labor. EX 2 (Zarlengo Dep.) 196:10 – 197:5.**

**As regards the remainder of actual facts asserted in SOF 17 (and not those included in the citations, which would be impossible to respond to on a line-by-line basis), MDS admits SOF 17.**

STATEMENT OF FACT NO. 18:
Midwest Dock's employees also work on job sites where Dock & Door employees work, including making adjustments to doors, bringing materials to the job sites, and staging overhead doors. Jane Graham, a Midwest Dock employee, would deliver materials to the job sites for Dock & Door employees. Zachery Torkelsen, another Midwest Dock employee, testified that he and other Midwest Dock employees would go with Tony Brutti to union jobsites to deliver and stage materials (*i.e.*, "We would just stage them in the general area of where they would -- like if there was twenty-five doors on the northwest side of the building, we would put twenty-five doors on one side. You know, we would spread them out to set the guys up at the union to do the work."). Corrigan, who worked for both Midwest Dock and Dock & Door, testified that when he worked for Midwest Dock he would go to Dock & Door jobsites to adjust doors after they were installed.

SUPPORT FOR STATEMENT OF FACT NO. 18:
Williams: 53:5-13; 56:13-57:1, EX. 18 (testifying that Janie from Midwest Dock would bring things to the jobsite)

Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Interrogatory No. 1, (Exhibit 40), EX. 24 (identifying Jane Graham, Torkelsen, and Corrigan as employees of Midwest Dock)

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, Interrogatory No. 1, (Exhibit 221), EX. 25 (identifying Corrigan as an employee of Midwest Dock)

Torkelsen 42:6-18, EX. 26 ("Q. And are you familiar with A. company called Dock & Door Install? A. Yes. Q. Okay. And how are you familiar with that company? A. That was the union side of Midwest Dock. Q. And what do you mean by that? A. There was A. side that was union and A. side that was non-union. The non-union would do repairs and new

29

installs on pre-existing buildings. And the union side would do the installs of new construction of warehouses.")

Torkelsen 54:18-55:11, EX. 26 ("Q. When you were sent to new construction jobsites like you see on Exhibit 19 [Heritage Crossing project] there to do the offloading and staging of the material as you described, who would send you to the location to do that? A. Generally we would get the -- the order would come from Tony. Q. Zarlengo? A. Zarlengo, yes. Q. Okay. He would tell you where to go and what to do? A. Yes. Q. Okay. A. And that would be told to, I believe, Anthony Brutti who would be -- when we did the offloads, Anthony Brutti is who, I guess, the lead would be in our group. It would generally be me, Anthony Brutti. Janie Graham would go. And they may have one other person there, depending on who's in the area, if they needed extra. help. Q. So it would be like four people? A. Yes. Q. And Tony Brutti would be one of the people who would be there? A. Correct. Yes.")

Torkelsen 92:16-18, EX. 26 ("Q. You did do offloading and staging at Dock & Door jobsites, correct, at union jobsites? A. Yes.")

Torkelsen 51:18-54:10, EX. 26 ("Q. Now, what is your understanding of the nature of the work that the union side did? A. The union side, to the best of my knowledge, would do installations of newly built warehouses. Q. Like -- A. Like that was on the picture of the Blue Giant that you had showed me in the previous thing. Q. Okay. Let me show you what was previously marked as Exhibit 19 [Heritage Crossing]. Do you see the picture on the right there? A. Yes. Q. Is that the kind of building you're talking about? A. Yes. Newly constructed buildings like this. Q. And have you ever been on jobsites where workers were doing this kind of installation work? A. Have I physically been there? Q. Yes. A. Yes. Q. And what kind of work did you do? And you were on jobsites like this when you were working for Midwest Dock, is that right? A. Correct. Yes. Q. Okay. And what kind of work did you do? A. It would be just to drop off material or anything that the union guys would need. I would do no kind of work as far as any -- you know, any work with tools on union jobs, I didn't do anything with that. It would just be delivery of products. You know, something happened, A. couple pieces got damaged. I would go to -- I can't remember what it was called, but it was the store for door parts. Q. And would you do -would you also unload items at the jobsite? A. Yes. At these kind of buildings? Q. Yes. A. Yes. Q. Okay. And would it be like unloading like overhead doors and things like that that are going to be installed there? A. Correct. Yes. Q. All right. Any other kind of products that you would unload at these kind of jobsites? A. Docks. I mean, doors, docks, the pads. Anything that you would see in the picture could be in the truck. Q. And those would be the kind of things you would unload at the jobsite? A. Yes. For the new builds it would be sometimes where it would be just the shell of the building that's put up and it would be dirt floor. So just A. completely brand new building. Q. And where would you put things then? A. We would just stage them in the general area of where they would -- like if there was twenty-five doors on the northwest side of the building, we would put twenty-five doors on one side. You know, we would spread them out to set the guys up at the union to do the work. Q. Okay. And would other Midwest Dock employees do the same kind of work? A. Yes.")

30

Williams 53:2-24, EX. 18 ("Q. And the service people, did you mention -- did you identify them to me or -- A. Really, there was only one that I remember. And that was because she was the only female service worker, and that's Janie --Q. Okay. A. -- or Jane. Q. Did she work on any jobs with you? A. She would do like delivery. So she had to drop off material, but that was about it. A. Travis, I want to say. Travis is a -- a service guy. He has worked on jobs with me. Q. Okay. And what kind of work would he do on jobs with you? A. If they would send him out, it was probably welding, I believe. Q. Okay. He was a welder? A. Yes.")

Williams 59:4-21, EX. 18 ("Q. Did he [Ryan Mead] work at any of the job locations where you worked, as far as you recall? A. He may have been in one, possibly. But I mostly knew Travis to be the one who come out. Q. To do the service work? A. Right, or to weld. Q. To do the welding? A. Yeah. He should have been doing the service work. But they would send him out to weld, too. Q. All right. And then you mentioned – and that was Travis Woff? A. I believe so. I believe that was his last name.")

Williams 191:23-192:15, EX. 18 ("Q. And the guys who did service did service only? A. They were supposed to. But some of them started -- weren't union guys, and they was coming to do union work, like welding. Q. And where did you learn that from? A. Talking to Collin and learning the relationships of others and what they did for work. Q. What did Collin say, as far as nonunion guys doing union work? A. So -- so seeing certain guys come onto a job site -- well, I mean, I didn't know he was union. And then he was like, no, he was on the service side. But then I talked to the dude, and he was like, you know, I'm here to weld and get up out of here.")

Williams 56:13-18, EX. 18 ("Q What kind of materials did he and Jane bring to the work site? A. So they would bring the actual dock doors, springs and shafts. Q. Anything else? A. Maybe like welding, welding material.")

Corrigan 205:20-206:7, EX. 7 ("Q. When you worked for Midwest Dock during the first time, did you go -- are you saying that you went to logistic big box new construction install jobs and worked? A. I believe so. Q. And what did you do? A. Maybe some small adjustments on doors. Q. Okay. So a repair to the -- to the job needed to be done after the install had been done? A. Yes.")

Green 84:16-86:14, EX. 12 ("Q. How about would anybody show up to deliver tools or supplies, anybody from either Midwest Dock or Dock & Door? A. Yes. Q. And tell me about that. A. If you need a -- need some type of supply, screws, anchors, anything of that sort, I would call Ira, and he would have somebody deliver something. Q. Okay. If the shipment's missing something that you didn't get and you need it to install whatever it is you're doing, you'd call the office, and they would send somebody out with it? A. Yes. Q. Okay. And does it still work that way? A. Yes. Q. Okay. And you'd still call Ira and say, hey, I need whatever fasteners, and he'd send somebody out with them? A. Yes. ... Q. Okay. Can you -- can you give me some examples of people who have brought stuff to you at job sites in the last five years? A. Janie. Tony -- Tony Brutti. I think, Josh. I've seen Josh drop something off. I don't know his last name. Alphabetical order would be -- Q. The last names

31

are alphabetical. A. Oh, all right. Q. Oh, there's a Joshua Sichterman, number 67. A. Yeah. I think that's it.")

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, facts or citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), that are disguised as part of its citations, but which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF. MDS objects that the above renders it impossible to then know whether the additional facts contained in the citation parentheticals are considered part of the actual SOF that need to be admitted or disputed.**

**MDS objects to Williams' testimony regarding someone named Travis, or any other alleged MDS employee, performing work on a Dock & Door installation jobsite because that testimony is inadmissible hearsay and speculation, as his testimony is related to what he claims was told to him by someone else and/or his own speculation about "Travis'" identity as Williams testified he "couldn't remember his face" and conceded "I [Williams] can't really say  that was Travis all of the way"; was not sure he was talking about the same Travis as in the MDS employee roster shown him.**
*Citation*: **EX 18 (Williams Dep.) 191:18-192:15; 205:14-206:10; 207:3-20.**

**MDS disputes that MDS employees performed adjustments, welding, or any other work (other than occasional delivery of supplies or materials) at any jobsites where Dock & Door employees were performing install work.  Corrigan testified, as an MDS employee, he only performed any such "adjustments" at a building that Dock & Door had done an install, "months after" Dock & Door completed the install, and only then as a repair.**
*Citation*: **EX. 7 (Corrigan Dep.) 205:12-206:16; EX 26 (Torkelson Dep.) 52:1-53:3. None of the Fund's citations to admissible evidence support that any MDS employee performed any work of any kind, other than delivery and staging of material, at any active Dock & Door install project.**

**MDS admits that its employees, at times, made deliveries with Brutti to and staged materials at, logistics building jobsites were Dock & Door was performing an install.**

E. Dock & Door Was Formed A Month After Krusinski Construction Notified Midwest Dock It Was Awarded The Heritage Crossing Project.

STATEMENT OF FACT NO. 19:
Dock & Door was formed on July 11, 2014 with Tony Brutti as the sole owner and officer so that Midwest Dock could bid for installation of overhead doors, dock levelers, and related products

32

with general contractors building new construction logistics buildings and warehouses and avoid becoming signatory to the collective bargaining agreement with the Union. Tony Zarlengo testified as follows regarding the formation of Dock & Door:

> we [*i.e.*, Tony Zarlengo and Michael Richert] saw an opportunity in an area to get in new construction. And as a nonunion company, Midwest Dock Solutions, we couldn't do the installation of the equipment. So we were looking for ideas of -- you know, a subcontractor to do the installation work, union work, and so we -- we reached out to Tony Brutti to see if he'd be interested in starting up a subcontracting company. And that's how it got formed.

Midwest Dock could have signed an agreement with the union to become a union contractor but it did not want to be bound by the collective bargaining agreement for work performed by its employees.

SUPPORT FOR STATEMENT OF FACT NO. 19:
Articles of Incorporation of Dock & Door Install, Inc., Jul. 11, 2014, (Exhibit 214), EX. 27

Brutti 19:11-22, EX. 3 (testifying that he is and always has been the sole owner, officer, and director of Dock & Door)

Brutti 22:2-14, EX. 3 ("Q. All right. Now, you were here for Mr. Zarlengo's testimony; correct? A. Yes. Q. And you heard him say that he and Mr. Richert had approached you about starting a company to provide union labor so that Midwest Dock Solutions could bid on jobs; correct? ... A. Sort of, yeah. Me and Michael talked more about it beforehand, and then later on when we got very serious about it, yeah, obviously, Tony was involved in talks.")

Zarlengo 289:10-290:3, EX. 2 (" Q. What do you know about the decision to start Dock & Door? A. So Dock & Door, I guess you'd say -- in, you know, the 2015 range -- we saw an opportunity in an area to get in new construction. And as a nonunion company, Midwest Dock Solutions, we couldn't do the installation of the equipment. So we were looking for ideas of -- you know, a subcontractor to do the installation work, union work, and so we -- we reached out to Tony Brutti to see if he'd be interested in starting up a subcontracting company. And that's how it got formed. You know, Mike Richert had knowledge of this kind of stuff knowing that, you know, he worked as a subcontractor in his past. You know, there's a lot of other nonunion dock and door companies out there who sub out their union installation work. And so we wanted to start selling new construction work, and that's how Dock & Door got founded. Q. Okay. So it was -Midwest Dock wanted to try to take advantage of this -- this new type of business. Is that fair? A. Yes. ... Q. And so did you and Mr. Richert approach Mr. Brutti with the  proposal? A. Yes. Q. Okay. A. I wouldn't say it was a proposal. We talked to him about it and to see his interest, gauge his interest. We didn't give him a proposal and say, oh, we're going to pay you this much money. Like it wasn't like that. It was, you know, would you  be interested in owning a union subcontracting company. It wasn't a proposal like, okay, we're going to pay you this much money to start a company.")

33

Zarlengo 289:23-290:14, EX. 2 ("Q. Midwest Dock wanted to try to take advantage of this -- this new type of business. Is that fair? A. Yes. Q. Okay. And you said you couldn't do the installation of the equipment. Why not? A. Midwest Dock is not union. All of the employees are nonunion. Q. Okay. Well, Midwest Dock could have signed an agreement and become union, correct? A. Yes. But we were more of a service company with service employees who knew how to do service work –")

Zarlengo 77:4-78:9, EX. 2 ("Q. Did you understand -- do you understand that Midwest Dock Solutions, by signing the one job site agreement, had to pay fringe benefit contributions on the workers who worked on the Winpak Portion Packaging Center? A. Yes. Q. And did you understand that if you would have signed up with the union generally that you would have had to pay fringe benefit contributions on any carpenters working for Midwest Dock Solutions? MR. HUGHES: Objection. Competency. Foundation. Competency. BY MR. McJESSY: Q. You can answer. A. Yes. Q. Okay. And a lot of the work that Midwest Dock Solutions did didn't require union labor, correct, at this time? A. Correct. Q. In fact, most of it didn't require union labor, correct? A. Basically all of it, yes, correct. Q. Okay. So you wouldn't want to be bound to pay union obligations and fringe benefit contributions for all of that work, correct? A. For the service work, no.")

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), that are disguised as part of its citations, but which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF. MDS objects that the above renders it impossible to then know whether the additional facts contained in the citation parentheticals are considered part of the actual SOF that need to be admitted or disputed.**

**MDS disputes that Dock & Door was formed to "becoming signatory to the collective bargaining agreement with the Union." Zarlengo testified the reason MDS did not sign an agreement with the Union to perform installation work on new construction logistics buildings and warehouses was because MDS was a service company with service employees who knew how to do service work; MDS's employees "didn't know how to do more of the big installation work…. We didn't have the people to do that type of work" and it "didn't have the correct employees to do the type of work that was needed to be done on these [new construction logistics buildings] job sites."**
*Citation***: EX 2 (Zarlengo Dep.) 290:10 – 291:14.**

**MDS disputes that the Fund's citation of EX 2 (Zarlengo Dep.) 77:4-78:9 (including the Fund's quoted and modified language in its parenthetical thereto) supports the Fund's**

**asserted fact that the formation of Dock & Door was because MDS "did not want to be bound by the collective bargaining agreement for work performed by its employees." That citation, and its quoted, modified language relate to MDS's signing of a one-jobsite agreement to perform a single installation job in 2011, not the formation of Dock & Door in 2014.**
***Citation*: EX 2 (Zarlengo Dep.) 77:4-78:9; *see also*, EX 10, One Jobsite Agreement Between Midwest Dock Solutions, Inc. and Chicago Regional Council of Carpenters [now known as Mid-America Carpenters Regional Council], Nov. 11, (Exhibit 81), EX. 10, pp. 1-2.**

**MDS admits the remainder of SOF 19.**

STATEMENT OF FACT NO. 20:
Prior to starting Dock & Door, Tony Brutti had no training in the trades, no training as a carpenter, and was not capable of doing overhead door installation work himself. Brutti graduated from Eastern Illinois University in 2007 with a degree in education and spent some time student teaching and substitute teaching in approximately 2008. Since 2006 through the date of his deposition in this case in 2025, Brutti has also been employed in the retail automotive parts business part time during the entire past 20 years as either a driver, a counterman, or an assistant manager at Carquest Auto Parts, Lincoln Plaza Auto Parts (which became NAPA Auto Parts), and he currently works at Lang's Auto Parts. From 2009 to 2015 he also worked full time at Interstate Truck and Trailer Repair as a manager from 2009 until 2015.

>    SUPPORT FOR STATEMENT OF FACT NO. 20:
>    Brutti 10:8-11, EX. 3 ("Q. Okay. Have you received any training in the trades, like, you know, plumber, electrician, carpenter, that kind of thing? A. No.")
>
>    Brutti 15:25-18:4; 21:14-21, EX. 3 ("Q. All right. And prior to 2014, other than the four days over Christmas [in 2006 or 2007] that you described for me working for Midwest Dock Solutions, did you have any other experience in the dock and door industry? A. No. Q. Any other experience that would be similar to work in dock and door industry? A. No.")
>
>    Brutti 7:19-22; 8:4-11; 8:24-9:3; 10-20-24; 11:2-15, EX. 3 (testifying that he graduated in 2007 with a degree in education from Eastern Illinois University, that he spent some time student teaching and substitute teaching, that he worked in the automotive parts industry, that he worked for Carquest Auto Parts, and that he has no training as a carpenter)
>
>    Brutti 11:16-20; 12:20-24, EX. 3 (testifying that he worked for Carquest Auto Parts as a counterman and driver while he was in college, he worked at Lincoln Plaza Auto which later became NAPA Auto Parts as a counterman for approximately 20 years through 2024, he worked full time as a manager with Interstate Truck & Trailer from 2009 through 2015.
>
>    Brutti 13:1-14:9, EX. 3 (testifying that he continued working for Lincoln Plaza Auto Part part-time on weekends and occasionally on weekdays until it became NAPA Auto Parts and then he continued working for NAPA Auto Parts until 2024)

Brutti 19:23-20:7; 20:20-22; 21:8-9, EX. 3 (testifying that in 2024, he left NAPA Auto Parts and went to work for Lang's Auto Parts working on Saturdays and occasionally during the week)

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, facts or citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), that are disguised as part of its citations, but which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF. MDS objects that the above renders it impossible to then know whether the additional facts contained in the citation parentheticals are considered part of the actual SOF that need to be admitted or disputed.**

**MDS disputes that that Brutti had no training in trades work. He testified that he had experience as a welder and because of that training, he was capable of completing dock leveler installation work.**
***Citation*: Brutti Dep. 65:8-17 (EX 3).**
**MDS admits the remaining facts contained in SOF 20.**

STATEMENT OF FACT NO. 21:
Tony Brutti is also a competitive race car driver. He started racing in 2003 and continues to race cars competitively through today, racing approximately 10 times per year from March through October which consumes approximately 20 to 25 hours a week of his time. His racing activities generate purse money and sponsorship money, from sponsors such as McDonalds Corporation. Brutti's race cars carry a "Midwest Dock Solutions" branding promotional decal on it across the hood, but his race cars do not carry any "Dock & Door Install" branding or promotional decal of any sort:



(Exhibit 118)

36

SUPPORT FOR STATEMENT OF FACT NO. 21:
Brutti 11:23-12:4; 12:18-19, EX. 3

Brutti 12:11-14, EX. 3

Brutti 99:3-17; 100:9-10; 101:7-10; 101:21-25, EX. 3 (testifying that his race cars have a sponsorship logo for "Midwest Dock Solutions" on them but no logo for Dock & Door)

Brutti 103:5-11; 103:18-104:1, EX. 3 (testifying that from March to October he spends 20 to 25 hours a week on his racing program)

Zarlengo 359:12-19, EX. 2 ("Q. Do you know anything about how Midwest Dock's name came to be on his car? A. I'm going to assume he asked me if you'd like to sponsor the race. Whether I, you know, sponsored and gave him money or didn't or if he asked if I can shoot the logo, I don't know the answer.")

Photograph of Brutti race car, (Exhibit 118), EX. 28

**RESPONSE: MDS objects on the grounds that SOF 21 is not a material fact. MDS further objects on the grounds that the cited deposition testimony of Zarlengo is inadmissible speculation and because Zarlengo lacks competency as relates to the topic.**
**MDS admits SOF 21.**

STATEMENT OF FACT NO. 22:
After Dock & Door was formed, Tony Brutti submitted an application to the Union and then signed the collective bargaining agreement with the union on behalf of Dock & Door and Dock & Door reaffirmed its agreement with the union in 2019. The agreements bind Dock & Door to the terms of the trust agreements establishing the Trust Funds, and to the rules and regulations adopted by the trustees of the Trust Funds. Dock & Door is still bound by to its agreement with the union.

SUPPORT FOR STATEMENT OF FACT NO. 22:
Dock & Door Install, Inc. Answer at ¶¶11-13, [ECF#17], (Exhibit 265), EX. 29

Memorandum of Agreement between Dock & Door Install, Inc. and the Chicago Regional Council of Carpenters, Sep. 18, 2014, (Exhibit 219), EX. 30

Memorandum of Agreement between Dock & Door Install, Inc. and the Chicago Regional Council of Carpenters, Aug. 15, 2019, EX. 31

Brutti ¶¶44:24-45:25; 47:21, EX. 3 (testifying he signed the agreement with the Union and that it is still in effect)

Dock & Door Install Inc. Employer Questionnaire / Application to Chicago Regional Council of Carpenters, Aug. 5, 2014, (Exhibit 218), EX. 37

Brutti 37:15-23, EX. 3 (Q. ... I will hand you Exhibit 218.·So you have the questionnaire that's Exhibit 218 in front of you; correct? A. Correct. Q. And is this the questionnaire that you referred to that you filled out when you went to meet with somebody at the union? A. Yes.")

**RESPONSE: MDS admits SOF 22.**

STATEMENT OF FACT NO. 23:
Dock & Door does not sign any contracts with the general contractors for the projects where employees paid through Dock & Door work, and there are no written contracts between Midwest Dock and Dock & Door for the work performed by Dock & Door. Midwest Dock enters into the contracts with the general contractors like ARCO/Murray, Clayco, Krusinski Construction, Meridian Design Build, Morgan Harbour Construction, Opus Design Build, Peak Construction, Pepper Construction, and Principle Construction, and then union member employees paid through Dock & Door work on the job sites installing overhead doors dock levelers, and related products. Midwest Dock does not use any other "union" company to perform the installation work on projects with general contractors. Tony Brutti testified that he does not get the contracts between Midwest Dock and the general contractors, does not look at the contracts, and he does not maintain a record of the projects that Dock & Door employees have worked on:

> Q. Okay. You never looked at the contracts, you said, between Midwest Dock Solutions and the general contractors; correct?
> A. I did not.
> Q. Okay. So you also don't know the terms of those contracts; is that correct?
> A  I would not.")
> Q. Okay.· And do you get copies of those contracts or is it --
> A. I do not.
>    ...
> Q. Okay. Do you have a list of exactly how many projects Dock & Door has done for each of those general contractors?
> A. I don't.
> Q. Okay.· You don't maintain any record that would show that?
> A. No.

SUPPORT FOR STATEMENT OF FACT NO. 23:
Brutti 68:2-23, 160:6-12; EX. 3 ("Q.·Okay. Now, Dock & Door also performs new installations; correct? A.·Correct. Q.·And installations in new structures; correct?·A.·Correct. Q.·Describe for me the work that you would say Dock & Door principally does. A.·Principally, it definitely does new construction where I believe that in the contract it says union labor is required.·Q.·Okay.·And do you get copies of those contracts or is it --·A.·I do not.·Q.·Okay. So those are contracts that Midwest Dock Solutions has with its customers? A.·Yes.·Q.·Would you refer to them as clients? Customers?·How would you refer to them?·A.·Yeah, clients, yeah.·Q.·Okay. So those are contracts that Midwest Dock Solutions has with its clients? A.·Yes.")

Brutti 160:6-12, EX. 3 ("Q.·Okay. Do you have a list of exactly how many projects Dock & Door has done for each of those general contractors? A.·I don't. Q.·Okay. You don't maintain any record that would show that? A. No.")

38

Brutti 69:7-71:12, EX. 3 ("Q. Sir, I've handed you what's previously marked in this case as Exhibit 65.· And it's a contract or subcontract, rather, between Midwest Dock Solutions and Meridian Design Build; do you see that? A. I do. Q. All right. And if you turn in this document to the page, it's page 3 of Exhibit B, which it says up here (indicating). A. I'm there. Q. Okay. Page 3 of Exhibit B. ·It's got a highlighted paragraph 12; do you see that? And paragraph 12 says: 'All dock equipment and overhead doors shall be installed by union labor.' Do you see that? [Objection]  Q. So if this is a contract between Midwest Dock and Meridian Design Build requiring union labor, would Dock & Door provide the labor for that project? [Objection,] A. They would. ... Q. Okay. But if Midwest Dock contracted to perform the work in this contract with Meridian Design  Build and it required union labor, Dock & Door would have been the company to provide that union labor; correct? A. Correct. Q. Okay. To your knowledge, does Midwest Dock Solutions use any other company to provide union labor on its job sites? A. Not that I'm aware.")

Brutti 150:23-152:3, EX. 3 ("Q. Okay. All right. ·Dock & Door employees work on job sites for large general contractors; correct? A. Correct. Q. And that was for ARCO/Murray, Clayco, Krusinski Construction, Meridian Design Build, Morgan Harbour Construction, Opus Design Build, Peak Construction, Pepper Construction, and Principle Construction; correct? A. Yes. Q. Okay. Do you know what a certificate of insurance is? A. Yes. Q. All right. And what's a certificate of insurance? A. I believe it's just proof that you have insurance, if I'm not mistaken. Q. And are you aware that the general contractors require a certificate of insurance for subcontractors to get on to their job sites? A. Not always. I mean, I'm not aware, no. Q. Okay. A. Not always. Q. Are you aware that that's sometimes the case? A. I am. Q. Okay. You never looked at the contracts, you said, between Midwest Dock Solutions and the general contractors; correct? A. I did not. Q. Okay. So you also don't know the terms of those contracts; is that correct? A. I would not.")

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' Document Requests, Request No. 53, EX. 32 ("53. Produce all contracts or agreements between Dock & Door on the one hand and Midwest Dock on the other hand. RESPONSE: There are no  documents that are responsive to this Request No. 53.")

Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Document Request No. 52 (Exhibit 40), EX. 24 ("52. Produce all contracts or agreements between Midwest Dock on the one hand and Dock & Door on the other hand. RESPONSE: Midwest Dock objects to this Request on the grounds it is vague and ambiguous regarding the terms "contracts or agreements." Subject to and without waiving this objection, none.")

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, facts or citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), that are disguised as part of its citations, but which further**

39

**expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF. MDS objects that the above renders it impossible to then know whether the additional facts contained in the citation parentheticals are considered part of the actual SOF that need to be admitted or disputed.**

**MDS disputes the statement that Dock & Door "does not maintain a record of the projects that Dock & Door employees have worked on." The quoted testimony of Brutti does not support that assertion and instead related to whether Dock & Door had a "list of exactly how many projects Dock & Door has done for each of [certain] general contractors."**
***Citation*****:  EX 3 (Brutti Dep.) 160:6-12.**

**MDS admits the remainder of SOF 23.**

STATEMENT OF FACT NO. 24:
Approximately 50% to 55% of Midwest Dock's revenue comes from new construction work that is bid by Midwest Dock and then the work is performed by employees paid through Dock & Door. For example, in 2022 Midwest Dock had revenue of approximately $20 million. Tony Zarlengo testified as follows:

> Q.     You seem to be -- there are two issues, or you seem to be referencing two things, the revenue, and if I understand correctly, the revenue to Midwest Dock Solutions. About 50 to 55 percent of that comes from new construction work, correct?
> A.     Correct.
> Q.     And that would be work that would -- if I understand your position on how the arrangement works -- would be work performed by employees paid through Dock & Door, correct?
> A.     Correct

SUPPORT FOR STATEMENT OF FACT NO. 24:
Zarlengo 200:24-201:12; 203:4-8; 205;14-20, EX. 2 ("Q. You seem to be -- there are two issues, or you seem to be referencing two things, the revenue, and if I understand correctly, the revenue to Midwest Dock Solutions. About 50 to 55 percent of that comes from new construction work, correct? A. Correct. Q. And that would be work that would - - if I understand your position on how the arrangement works -- would be work performed by employees paid through Dock & Door, correct? A. Correct. ... Q. All right. And that percentage, the 50 to 55 percent, has that been fairly consistent over, maybe, the last five years? A. Five years, yes. ... Q. Does that -- and I have the -- I mean, I can show you your tax return for 2022. We'll mark this later. But I think the tax return shows revenue of that year of how much? The first line. A. Twenty million, yeah, five twenty-four.")

**RESPONSE: MDS admits SOF 24.**

F.  The Funds To Start Dock & Door Came From Midwest Dock.

STATEMENT OF FACT NO. 25:

The start-up funds for Dock & Door came from Tony Zarlengo and Michael Richert and were recorded in Dock & Door's accounting records as a loan from J.D. Brutti, Brutti's father, in order to make it appear that Dock & Door and Midwest Dock are as separate as possible. Brutti sent his accountant Callie Stephens at Gineris & Associates, Ltd. a text message on January 14, 2024 informing her that the loan recorded in Dock & Door's general ledger as "loan from J.D. Brutti" was actually the start-up money from Richert and Zarlengo for Dock & Door and that it was recorded in Dock & Door's general ledger as a loan from J.D. Brutti because they wanted to keep the two businesses as separate as possible. The money was not a loan from J.D. Brutti. The text message exchange between Stephens and Brutti was as follows:



SUPPORT FOR STATEMENT OF FACT NO. 25:
Text Message Exchange Between Callie Stephens (Gineris & Associates) and Tony Brutti (Dock & Door) (Exhibit 106), EX. 33

Brutti 204:22-205:21, EX. 3 ("Q. I'm going to show you what was previously marked as Exhibit 107 -- I'm sorry, 106.·And it's a text message exchange between you and Callie Stephens at Gineris. Can you read to me the exchange that's circled. A. Yeah. So Callie is saying: 'Hey, Tony, we have a loan from J.D. Brutti on the books since the company's inception. Do you know about this?' And I said yeah, I didn't know the details of it, but I had seen it in -- Just read your response into the record, please. A. 'Yeah, it's the original start-up money from Mike and Tony back when I first started. I think they wanted to keep the two businesses as separate as possible, so they just put my dad's name on it.' Q. Were you lying to Callie when you said that? A. No. Q. Okay. That's what you believed at the time you wrote that; right? A. I – Q. Is that what you believed when you wrote that? [Objection] A. Yeah, it was, if you want to call it start-up money, okay. It would be the first couple of weeks of pay that would be needed for the business. Q. Okay. You referred to it as start-up money; right? A. I did. I was probably being vague at the time.  ... Q. All right. You said: "It's the original start-up money from Mike and Tony back when I first started;" correct? A. Correct. Q. All right. And this is a text message you sent to Callie; correct? A. Correct.  Q. But it wasn't a loan from your father; correct? A. No, it was definitely not a loan from my father.")

**RESPONSE: MDS admits the language cited is contained in the text message referenced. MDS disputes that the money referenced as the loan was money paid by Zarlengo and Richert to start Dock & Door's business. Brutti testified the money was MDS paying Dock**

**& Door for the first installation work it subcontracted to Dock & Door, before Dock & Door had any accounting program set up, and Zarlengo testified he had no recollection of making any alleged "start-up" contribution to Dock & Door.**
***Citations*: EX 3 (Brutti Dep.) 204:1-18; EX 2 (Zarlego Dep.) 299:16-301:2.**

    G.  Type/Scope Of Work Dock & Door Performs: Dock & Door Does Services Work And Take Down And Replace.

STATEMENT OF FACT NO. 26:
Employees paid through Dock & Door perform installation of loading dock equipment and overhead doors and dock levelers, and related products including those shown on Midwest Dock's website on union jobsites pursuant to contracts that Midwest Dock has with its clients. Dock & Door also performs service work and retrofit work as well as installation of dock leveler, overhead doors, and related products at new construction buildings and existing buildings. The work performed by Dock & Door does not require different skills than the work performed by Midwest Dock.

    SUPPORT FOR STATEMENT OF FACT NO. 26:
Defendant, Dock & Door Install, Inc.'s Answer To Plaintiffs' Complaint at ¶18, [ECF#17], (Exhibit 265), EX. 29

Brutti 40:20-41:5, EX. 3 (testifying that Dock & Door's application to the Union described its work as installation of loading dock equipment and doors.)

Brutti 68:2-17, EX. 3 ("Q. Okay. Now, Dock & Door also performs new installations; correct? A. Correct. Q. And installations in new structures; correct? A. Correct. Q. Describe for me the work that you would say Dock & Door principally does. A. Principally, it definitely does new construction where I believe that in the contract it says union labor is required. Q. Okay. And do you get copies of those contracts or is it -- A. I do not. Q. Okay. So those are contracts that Midwest Dock Solutions has with its customers? A. Yes.")

Brutti 65:18-25, EX. 3 ("Q. All right. What is service work? A. Service work they generally refer to as just repair work. It's kind of all-encompassing on fixing and swapping out panels and hinges and rollers and springs and any other parts that might be needed. Q. Okay. Is that work that Dock & Door does? A. Dock & Door will on a rare occasion do some service work when it's he really slow.")

Brutti 67:13-68:1, EX. 3 (testifying that invoices from Dock & Door to Midwest Dock for "Service Work" are for repairing overhead doors--*e.g.*, "Q. Okay. But Service Work would mean to you what you just described to me when I asked you what Service Work meant? A. Yes.")

Dock & Door Install, Inc. Invoices to Midwest Dock Solutions, Inc. (Exhibit 223), EX. 34, (sampling of invoices showing "service work")

Williams 133:22-134:16, EX. 18 (testifying that he performed retrofit work while working for Dock & Door Install—*e.g.*, "Q. Okay. What was the Woodfield Mall? A. We went there to install like four new dock doors that were old.... So we would take down the old ones and put up new ones at the Woodfield Mall. Q. Oh, I see. So this wasn't a new construction project? A. No. Q. Okay. You were replacing old doors with new ones? A. Correct. Q. Okay. Was that work that you also did? A. Yes.")

Email from Tony Brutti, Dock & Door, to Tom Downs, Holden Insurance, Jul. 1, 2025, (Exhibit 151), EX. 35 (stating "We [Dock & Door Install] mostly do work at precast concrete storage warehouses but occasionally do work at manufacturing facilities and small businesses.")

Tattini 51:17-52:7, EX. 15 (Anthony Tattini who was only employed by Dock & Door which he knew by the name Midwest Dock testified as follows: "Q. So you and he did dock work together? A. In the beginning, yes. Q. Installation of dock levelers? A. Yes. Q. All right. Tell me, what kind – what kind of work did you do when you were working? A. For Midwest Dock? Q. Yeah. A. Strictly -- 90 percent of the time -- strictly installs. Q. Of what? A. Installs of overhead doors, rolling steel doors, high-speed doors, loading docks. That's pretty much it.")

Tattini 85:3-17, EX. 15 ("Q. All right. Did you also do installations on older buildings? A. Yes, sir. Q. All right. And would the installations involve taking out old stuff and putting in new stuff? A. Yes, sir. Q. All right. And that was part of the work you did -- A. Yes, sir. Q. -- for Dock & Door? A. Yes, sir.")

Cruikshank 31:18-32:14, EX. 8 ("Q. The Dock & Door didn't do any door replacement, correct? A. No. Q. Okay. That was all new construction buildings? A. Yeah. For -- for the most part, yes. Q. Okay. And is the installation of a new garage door, tracks, opener, for -for a new construction building essentially the same work as the installation of a new door, tracks, and opener in an old building once you've taken out the old door? A. Yes. Q. Okay. Basically, you're using the same skills? A. Yes. Q. All right. A. Same tools. Same skill.")

Cruikshank 41:4-42:11, EX. 8 (testifying that there was no difference between a Midwest Dock job and a Dock & Door job: "Q. ... Once you started being paid by Dock & Door and you went out to a project, how do you know it's a Dock & Door project and not a project that Midwest Dock Solutions sold and contracted for? A. I wouldn't have a way of knowing that. Q. Okay. A. It's -- I mean, it's just -- I mean, when you were working for Dock & Door, you were going to companies that -- like Krusinski and -- you know, if it was a big Krusinski job, you knew it was a union job. There was no -- no debating that. Q. It required union labor to be on the job? A. Yes. Q. Okay. So if it required -- basically, if it required union labor, then it had to be a Dock & Door job? A. Yes. Q. Okay.")

Corrigan 196:12-20, EX. 7 ("Q. That type of work is different than installation of doors and docks and new construction, correct? A. Yes. I mean, after you get the old -- after you get the old door or dock out, they're installed the exact same. But starting off -- as far as the new construction, you know -- obviously, you don't have to take anything down.")

43

Corrigan 200:17-201:1, EX. 7 ("Q. Would you say the installs done on – for Midwest Dock are different, then, in that regard from the installs for Dock & Door? A. For the most part. You, obviously, need to take the -- you know, cut the old stuff out. As far as putting the new stuff in, as long as you don't have any obstacles, everything is the same, so –")

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, facts or citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), that are disguised as part of its citations, but which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF. MDS objects that the above renders it impossible to then know whether the additional facts contained in the citation parentheticals are considered part of the actual SOF that need to be admitted or disputed.**

**MDS disputes that Dock & Door performs "service work and retrofit work" as part of its regular operations.**
*Citations***: EX 71 (Bishop Dep.) 73:15-74:4)**

**MDS disputes that the work performed by Dock & Door does not require different skills than the work performed by Midwest Dock. Bishop, Corrigan, and Green all testified that MDS's retrofit work was different than D&D work.**
*Citations***: EX 2 (Zarlengo Dep.) 197:7-198:8; 290:10-20; 291:10-14; EX 71 (Bishop Dep.) 73:15-74:4; 76:7-77:3; 128:2-132:1; EX 7 (Corrigan Dep.) 195:19-201:6: EX 12 (Green Dep) 63:2-69:16; EX 126 (Zarlengo Decl) ¶6.**

**MDS admits the remaining allegations in SOF 26.**

STATEMENT OF FACT NO. 27:
Employees paid through Dock & Door performed work for a contract between Meridian Design Build, Inc. and Midwest Dock at the 1303 Jack Court Facility Upgrade project in Bartlett, Illinois, including installing Z guards, removing and reinstalling dock seals and dock levelers, and installing Clopay overhead doors. These are products that Midwest Dock sells and this is the same work that Midwest Dock's employees can and do perform. The work was only performed by employees paid through Dock & Door because the contract required the use of union labor.

SUPPORT FOR STATEMENT OF FACT NO. 27:
Zarlengo 159:9-162:5, EX. 2 ("Q. And the first paragraph [of Exhibit 65, Exhibit B Overhead Doors] says, subcontractor shall remove one -- one existing nine by ten door and one twelve by fourteen foot drive-in door, including associated track, springs, and operator. Do you see that? A. Yes. Q. All right. So -- so this is retrofit work, correct? A. Yes. That's retrofit work. Q. All right. And is this work that Dock & Door did? A. Yes. Q. Okay. And it says, subcontractor shall furnish and install Z guards at nine dock positions. What are Z

guards? A. They protect the door track from getting hit by forklifts. Q. Okay. A. They're 48 inches tall, and they're just metal that protects the door tracks from getting hit. Q. Okay. And are those products that Midwest Dock sells? A. Yes. Q. And are they products that Midwest Dock employees install? A. Yes. Q. All right. And it also says, paragraph four, subcontractor shall remove dock leveler and dock seal from existing dock position and reinstall at new dock position. Do you see that? A. Yes. All right. What does that work describe? A. Torching the dock out, taking it out of the pit, and applying the dock seal and -- taking the anchors out of the dock seal and taking it down. Q. Okay. And that's work that Dock & Door did on this contract? A. Yes. Q. Okay. But Midwest Dock Solutions, does it also do that kind of work? A. Yes. Q. And if you go down to paragraph 12, paragraph 12 says, all dock equipment and overhead doors shall be installed by union labor, correct? A. Yes. Q. All right. So this was one of those contracts that required union workers on the job site? A. Yes. Q. So the work in this contract is work that could be done by Midwest Dock Solutions, correct, except for the fact that it requires union labor? A. Yes.")

Brutti 69:7-70:5; 71:3-12, EX. 3 ("Q. Sir, I've handed you what's previously marked in this case as Exhibit 65. And it's a contract or subcontract, rather, between Midwest Dock Solutions and Meridian Design Build; do you see that? A. I do. Q. All right. And if you turn in this document to the page, it's page 3 of Exhibit B, which it says up here (indicating). A. I'm there. Q. Okay. Page 3 of Exhibit B. It's got a highlighted paragraph 12; do you see that? And paragraph 12 says:·'All dock equipment and overhead doors shall be installed by union labor.' Do you see that? MR. HUGHES: I'm going to object to the use of this exhibit with this witness. He's not a party to this, and no foundation, lack of competence. BY MR. McJESSY: Q. So if this is a contract between Midwest Dock Page 70 and Meridian Design Build requiring union labor, would Dock & Door provide the labor for that project? MR. HUGHES: Objection, foundation. BY THE WITNESS: A. They would. ... Q. Okay. But if Midwest Dock contracted to perform the work in this contract with Meridian Design Build and it required union labor, Dock & Door would have been the company to provide that union labor; correct? A. Correct. Q. Okay. To your knowledge, does Midwest Dock Solutions use any other company to provide union labor on its job sites? A. Not that I'm aware.")

Brutti 72:2-21, EX. 3 ("Q. And it says in paragraph 1:·'Subcontractor shall remove 1 (one) existing 9 foot by 10 foot dock door and 1 (one) 12 foot by 14 foot Drive-in door, including associated tracks, springs, and operator;' do you see that? A. I do. Q. Okay. So that's a take-down two existing doors; correct? A. Yes. Q. And the operators and the tracks and the springs; correct? A. Correct. Q. All right. And then it says in paragraph 2: 'Subcontractor shall furnish and install 1 21 foot by 16 foot overhead door and drive-in ramp.'·Do you see that? I do. Q. 'Door to be Clopay Model 3720,' and then it goes on from there and talks about a 3 inch vertical track, weather seal and operator; correct? A. Correct.")

Brutti 71:3-73:9, EX. 3 (testifying that Dock & Door provided the workers who performed the take-down-and-replace retrofit work for the contract between Midwest Dock and Meridian Design Build for the Jack Court Facility Upgrades project—*e.g.*, "Q. Okay. But if Midwest Dock contracted to perform the work in this contract with Meridian Design

Build and it required union labor, Dock & Door would have been the company to provide that union labor; correct? A. Correct.")

Brutti 73:22-75:10, EX. 3 (testifying that when Midwest Dock contracted to provide overhead door installation work and dock leveler installation work at existing businesses, such as manufacturing facilities and small businesses that were not new construction but the work required union labor, employees paid through Dock & Door Install would perform that work)

**RESPONSE: MDS objects on the basis of immateriality. MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, facts or proper citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), that are disguised as part of its citations, but which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF. MDS objects that the above renders it impossible to then know whether the additional facts contained in the citation parentheticals are considered part of the actual SOF that need to be admitted or disputed.**

**MDS disputes that the citation of Brutti 73:22-75:10 provides any support whatsoever to the facts contained in the SOF, and further that the parenthetical provides an argumentative mischaracterization of the testimony.**

**MDS admits the remainder of the SOF as relates to the 1303 Jack Court Facility Upgrade project identified.**

    H. Common Vendors.

        1. Common Vendors: Legal, Lawrence Kamin Saunders & Uhlenhop, LLC.

STATEMENT OF FACT NO. 28:
Tony Brutti hired the law firm of Lawrence Kamin Saunders & Uhlenhop, LLC at the recommendation of Tony Zarlengo and Michael Richert because Lawrence Kamin Saunders & Uhlenhop, LLC is also Midwest Dock's attorney. Brutti hired Midwest Dock's attorney as his "general attorney" to help him form Dock & Door and that firm prepared and arranged for the filing of the papers to incorporate Dock & Door, and filed Dock & Door's Annual Reports

    SUPPORT FOR STATEMENT OF FACT NO. 28:
    Brutti 28:11-29:2, EX. 3 ("Q. And you describe -- I'm going to refer, the law firm is Lawrence, Kamin, Saunders & Uhlenhop, U H L E N H O P; correct? A. Correct. Q. But you refer to them as Lawrence Kamin; is that fair? A. Yeah. Q. And did you know Thomas Bennington, Jr.? He's the attorney who signed this letter. Did you know him at this time?

A. No, that was when I met him. Q. Okay. How did you come to meet him? A. I knew that we needed a lawyer to do the Articles.·And I asked Tony and Mike or I think I asked probably Tony, 'Who would you recommend I use?' And he said 'Well, use Lawrence Kamin. They can do that for you.' Q. Okay. So you were aware at this time that he represented them? A. Yes.")

Brutti 24:12-29:14, EX. 3 (hired to act as general attorney and filed Articles of Incorporation), EX. 3

Brutti 29:15-30:21; 31:10-33:16, EX. 3 (prepared and filed Annual Reports); 33:17-34:24 (registered agent services)

Brutti 26:18-28:10, EX. 3 (Brutti, Zarlengo, and Richert all signed the engagement letter from Lawrence Kamin Saunders & Uhlenhop, LLC when Brutti hired that law firm to form Dock & Door)

Zarlengo 313:6-314:17, EX. 2 (testifying that Lawrence Kamin Saunders & Uhlenhop, LLC is Midwest Dock's attorney)

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, Interrogatory No. 5, (Exhibit 221), EX. 25

Defendant Midwest Dock Solutions, Inc.'s Answer And Defenses To Plaintiffs' Complaint at ¶31, [ECF#18], (Exhibit 120), EX. 9 ("Defendant Midwest Dock admits that it utilizes Lawrence Kamin Saunders & Uhlenhop, LLC from time to time for certain legal services")

Letter from Thomas Bennington, Jr. (Lawrence Kamin Saunders & Uhlenhop, LLC) to Anthony Zarlengo, Michael Richert, and Anthony Brutti, Jul. 9, 2014, (Exhibit 215), EX. 36, (engagement letter)

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5).**

**MDS disputes that Brutti hired the law firm of Lawrence Kamin Saunders & Uhlenhop "because Lawrence Kamin Saunders & Uhlenhop, LLC is also Midwest Dock's attorney." Brutti testified he needed a firm to prepare Dock & Door's Articles of Incorporation, and hired that firm on Zarlengo's recommendation, because Zarlengo told Brutti that that firm had the capabilities to do that type of work, despite that law firm has never done corporate work for MDS, and only does collections and lien work for MDS.**
*Citation***: EX 3 (Brutti Dep.), 28:22-29:2; EX 2 (Zarlengo Dep.) 314:6-315:3.**

**None of the Fund's cited records support that Brutti hired Lawrence Kamin "because" it served as MDS's law firm for certain matters.**

47

**MDS admits the remaining allegations in SOF 28.**

STATEMENT OF FACT NO. 29:
When Tony Brutti hired Lawrence Kamin Saunders & Uhlenhop, LLC, the firm sent a conflict letter to Brutti, Tony Zarlengo, and Michael Richert advising them that the firm represented Midwest Dock and Zarlengo in various matters, that it was being engaged by Brutti to start Dock & Door, and that a potential for a conflict of interest could exist between them in the event of any litigation against the companies.
> SUPPORT FOR STATEMENT OF FACT NO. 29:
> Letter from Thomas Bennington, Jr. (Lawrence Kamin Saunders & Uhlenhop, LLC) to Anthony Zarlengo, Michael Richert, and Anthony Brutti, Jul. 9, 2014, (Exhibit 215), EX. 36

**RESPONSE: MDS admits SOF 29.**

> 2. Common Vendors: Insurance, Esser Hayes And Assured Partners And Then Holden Insurance Agency.

STATEMENT OF FACT NO. 30:
When Dock & Door was formed, Tony Brutti used Esser Hayes Insurance Company as its insurance agent at the recommendation of Tony Zarlengo or Michael Richert because it was also Midwest Dock's insurance agent. Esser Hayes subsequently became Assured Partners which continued to be the insurance agent for Dock & Door and Midwest Dock providing them with the same insurance services. After Midwest Dock changed its insurance agent to Holden Insurance Agency, Dock & Door also moved its insurance business to Holden Insurance Agency based on Zarlengo's recommendation and both companies have the same account executive which provides the same services to both companies.

> SUPPORT FOR STATEMENT OF FACT NO. 30:
> Brutti 40:6-14, EX. 3 (testifying that Dock & Door hired Esser Hayes Insurance Company as its insurance agency at Zarlengo's and Richert's recommendation—*e.g.*, "Q. And were you aware that Esser Hayes was the insurance agency also for Midwest Dock Solutions? A. Yes. Q. And did Tony or Mike refer you to them? A. They did.")
>
> Brutti 147:11-148:7, EX. 3 (testifying that Dock & Door used Esser Hayes Insurance Agency which then became Assured Partners at Zarlengo's recommendation)
>
> Brutti 149:10-23, EX. 3 ("Q. Why did you switch to Holden Insurance? A. My general liability rates were going to go up 86 percent. And I said well, I'm going to have to shop. So I asked -- I asked Tony if he recommended a different insurance agency, not necessarily to switch insurances, but just to get to get a price and to say 'This is where I'd like you to be.' So I contacted Holden and got their quote, and it was about $12,000 or $15,000 cheaper than Assured and I showed it to them, and they said okay. So it didn't really work out like I planned. So I switched to Holden. Q. Okay. So you contacted Holden at Tony Zarlengo's recommendation? A. I did, yeah.")

48

Zarlengo 285:19-2861; 308:2-313:1, EX. 2 (testifying that Midwest Dock used the Esser Hayes Insurance Agency which then became Assured Partners, and then Midwest Dock moved to Holden Insurance)

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, Interrogatory No. 5, (Exhibit 221), EX. 25, (insurance agent is Rose Couch of Assured Partners formerly Esser Hayes)

O'Connor (Assured Partners) 74:17-7 ("Q. So all of the same work that it provided to Dock & Door was also provided to Midwest Dock Solutions, correct? A. Yes. Q. Do you know who Assured Partners contact was for Dock & Door? A. Tony Brutti, I believe, is how you say his last name. Q. Anybody else? A. No. Q. And who was Assured Partners' contact for Midwest Dock? A. Tony Brutti as well. Q. Tony Brutti as well? A. Yes.")

Olson (Holden Insurance) 21:4-17, 32:1-6, EX. 125 ("Q. All right. How were you chosen to be the designee for Holden Insurance for this deposition? A. I'm the account executive for Midwest Dock Solutions. Q. Who is the account executive for Dock & Door? A. Myself. Q. So you're the account executive for both Midwest Dock Solutions and Dock & Door? A. Yes.... Q. Are you the one who is principally responsible for preparing the Certificates of Insurance for the Midwest Dock account? A. Yes. Q. And is the same true for Dock & Door now? A. Yes.")

Olson (Holden Insurance) 44:15-23, EX. 125 ("Q. What services does Holden Insurance provide to Dock & Door? A. Marketing, certificates, handling of claims, answering coverage questions, providing policies. Q. All right. So Holden provides the same services to Midwest Dock Solutions that it provides to Dock & Door, is that correct? A. Yes.")

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5).**

**MDS disputes that Brutti used Esser Hayes as its insurance agent when Dock & Door was formed "because it was is also Midwest Dock's insurance agent." Brutti testified Zarlengo recommended Esser Hayes, but there is no support anywhere in the Fund's citations that Brutti selected Esser Hayes "because" it was then MDS's insurance agent.**
**Citation: EX 3 (Brutti Dep.) 40:6-14; 148:3-7.**

**MDS admits Esser Hayes became Assured Partners and continued for a time to be MDS's and Dock & Door's insurance agents.**

**MDS disputes that Dock & Door "also moved its insurance business to Holden Insurance Agency" when MDS changed to Holden. MDS moved to Holden in 2021, but Dock & Door remained with Assured Partners until July of 2025.**
**Citations: EX 3 (Brutti Dep.) 148:1-2; EX 125 (Olson (Holden Insurance) Dep.) 25:10-17; 71:14-72:1.**

**MDS disputes that Brutti changed to Holden Insurance based on Zarlengo's recommendation. Brutti was shopping Dock & Door's insurance because Assured Partners raised Dock & Door's rates 86 percent and Brutti decided to look for better rates; Zarlengo suggested he contact Holden for a quote, which came back $12,000 to $15,000 cheaper than Assured, and Assured refused to match the price, which Brutti testified was the reason Dock & Door changed insurance agent.**
**Citation: EX 3 (Brutti Dep.), 149:10-23.**

**MDS admits the remaining allegations in SOF 30.**

    3.   Common Vendors: Cincinnati Insurance, ICW Group, And Liberty Mutual.

STATEMENT OF FACT NO. 31:
Dock & Door and Midwest Dock have the same insurance companies. Dock & Door has been insured through Cincinnati Insurance, ICW Group, and Liberty Mutual. Likewise, Midwest Dock has been insured through Cincinnati Insurance, ICW Group, and Liberty Insurance.

    SUPPORT FOR STATEMENT OF FACT NO. 31:
    Brutti 150:3-16, EX. 3 ("Q. Who actually are you insured by? A. ICW. Q. Okay. And were you insured by somebody else before them for workers' comp? A. Yeah. Q. Do you remember who? A. First Cincinnati, then BerkleyNet. Q. And how about for general liability? A. Cincinnati and -- oh, shoot, what is it called now?·It's not ICW, it's -- I can't remember the name of the company now. Q. Is it Liberty Insurance? A. It is Liberty. I could see the little mascot guy on the paper.")

    Zarlengo 285:10-286:1, EX. 2 ("A. MD Marketing, marketing. Gineris & Associates are accountants. Koru Consulting, HR work. Lawrence Kamin, attorneys. ADP, bank roll. Media Monkey, consultant work, Amundsen Davis, attorneys. Liberty Mutual, general liability. State Farm, auto insurance. ICW Group, they're our workmen's comp. Cincinnati Insurance, general liability. Holden Insurance is our insurance agent.")

    Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, Interrogatory No. 5, (Exhibit 221), EX. 25 (Cincinnati Insurance for general liability insurance)
    Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Interrogatory No. 2, (Exhibit 40), EX. 24, (Cincinnati Insurance, ICW Group, Liberty Mutual Insurance)

    Olson (Holden Insurance) 58:1-59:5, EX. 125 ("Q. And do you know who the workers' comp carrier is for Midwest Dock Solutions? A. Yes. Q. Who is it? A. ICW. Q. And do you know who the workers' comp carrier is for Dock & Door? A. Yes. Q. Who is it? A. ICW. Q. And who's the commercial general liability insurance carrier for Midwest Dock Solutions? A. Liberty Mutual. Q. And who is the commercial general liability carrier for Dock & Door? A. Liberty Mutual. Q. And who's the umbrella carrier for Midwest Dock Solutions? A. Liberty Mutual. Q. And who is the umbrella coverage for Dock & Door? A.

Liberty Mutual. Q. And who is the employment practices carrier for Midwest Dock Solutions? A. Liberty Mutual. Q. And who is the employment practices carrier for Dock & Door? A. Liberty Mutual.")

Olson (Holden Insurance) 60:14-62:4, EX. 125 ("Q. Okay. How about in this instance with Dock & Door, were you responsible at all for obtaining insurance quotes or for assisting Mr. Downs in obtaining insurance quotes? A. Yes. Q. And did you use this information that was provided by Mr. Brutti to do that? A. Yes. Q. Is it your understanding that Midwest Dock Solutions provides similar work? A. Yes.")

**RESPONSE: MDS objects on the basis of immateriality. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), that are disguised as part of its citations, but which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF. MDS objects that the above renders it impossible to then know whether the additional facts contained in the citation parentheticals are considered part of the actual SOF that need to be admitted or disputed. Likewise**

**MDS admits that, since July 2025, MDS and Dock & Door use two of the same insurance companies (ICW and Liberty). MDS admits that in the past, Dock & Door has been insured through Cincinnati Insurance, ICW Group, and Liberty Mutual. Midwest Dock admits that, in past, has been insured through Cincinnati Insurance, ICW Group, and Liberty Insurance.**

4. Common Vendors: Midwest Bank And ADP Payroll.

STATEMENT OF FACT NO. 32:
Midwest Dock and Dock & Door signed agreements with ADP Payroll Service on the same day—*i.e.*, October 6, 2016—agreeing to use ADP as a payroll service provider and both applications identified First Midwest Bank which subsequently became Old National Bank as each company's bank, both applications identified each company's address as 1249 E. Burville Road, Crete, Illinois.

SUPPORT FOR STATEMENT OF FACT NO. 32:
Defendant Midwest Dock Solutions, Inc.'s Answer And Defenses To Plaintiffs' Complaint at ¶30, [ECF#18], (Exhibit 120), EX. 9 ("Defendant Midwest Dock admits that it utilizes First Midwest Bank for banking services.")

Brutti 39:24-40:1, EX. 3 (testifying that Dock & Door banks at First Midwest Bank)

Brutti 175:18-20, EX. 3 ("Q. Okay. And do you have any reason to think -- and ADP is Dock & Door's payroll provider; correct? A. Correct.")

Zarlengo 285:10-286:1, EX. 2 ("A. MD Marketing, marketing. Gineris & Associates are accountants. Koru Consulting, HR work. Lawrence Kamin, attorneys. ADP, bank roll. Media Monkey, consultant work....Amundsen Davis, attorneys. Liberty Mutual, general

liability. State Farm, auto insurance. ICW Group, they're our workmen's comp. Cincinnati Insurance, general liability. Holden Insurance is our insurance agent.")

Dock & Door Install Inc. Employer Questionnaire / Application to Chicago Regional Council of Carpenters at p.1, Aug. 5, 2024, (Exhibit 218), EX. 37

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, Interrogatory Nos. 4, 5 (Exhibit 221), EX. 25 (ADP Payroll Service and First Midwest Bank/Old National Bank)

Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Interrogatory Nos. 2, 4, 6 (Exhibit 40), EX. 24 (ADP used for payroll services and maintained accounts at First Midwest Bank/Old National Bank)

ADP Client Account Agreement and Authorization to Debit/Credit for Midwest Dock Solutions, Inc. at pp. 1-2, Oct. 6, 2016, EX. 38

ADP Client Account Agreement and Authorization to Debit/Credit for Dock & Door at pp. 1-2, Oct. 6, 2016, EX. 39

**RESPONSE:**

**MDS admits SOF 32.**

5. Common Vendors: Midwest Bank And ADP Payroll [sic].

STATEMENT OF FACT NO. 33:
Tony Brutti hired the accounting firm of Gineris & Associates at the recommendation of Tony Zarlengo and Michael Richert because it was also Midwest Dock's accountant. Gineris handles Midwest Dock's and Dock & Door's business taxes, it handles both companies' payrolls, and it maintains both companies' general ledgers. In responding to the Trust Funds' document production requests, both Midwest Dock and Dock & Door responded to numerous requests that the documents would be produced by Gineris. Midwest Dock and Dock & Door also both use Xero accounting software.

SUPPORT FOR STATEMENT OF FACT NO. 33:
Brutti 61:15-62:13, EX. 3 ("Q. Okay. Now, when Dock & Door started out, its accountant was Gineris & Associates; correct? A. Correct. Q. Still Gineris & Associates? A. It is. Q. So it's always been -- strike that.·Has Gineris always been Dock & Door's accountant? A. It has. Q. Okay. And how did you come to hire Gineris to act as Dock & Door's accountant? A. I took the advice of Tony and Michael. Q. Okay. They recommended him? A. Yeah. I did not know any accountants. Q. And who is your primary contact at Gineris? A. I'll usually talk to Callie Stephens. Q. Okay. And do they also prepare your personal taxes? A. They do. Q. And they prepare your business taxes? A. They do. Q. What other work do

they handle for Dock & Door? A. The payroll, and I believe they just maintain the general ledger, if you want to call it that.")

Zarlengo 305:7-307:4, EX. 2 (testifying that Gineris & Associates, Ltd. was Midwest Dock's accountant from the beginning and that it performs all work not performed in-house by Webber, including preparation of all of the taxes corporate and individually, ADP payroll, maintaining the general ledger, daily ledger balance, financials, and monthly balance sheet)

Stephens (Gineris & Associates) 40:10-24, EX. 62 ("Q. And how about what does the bookkeeping staff do for Midwest Dock Solutions? A. For Midwest Dock our bookkeeping staff reconciles transactions in the bank that Sherry hasn't handled. They reconcile the payroll as it comes in from ADP, and then we review it to make sure that everything is coded properly. Q. And what does your bookkeeping staff do for Dock & Door? A. We reconcile transactions that Anthony hasn't taken care of and, again, reconciling the payroll with the transactions from the bank and then review it for coding errors. Q. So the same work? A. Yep.")

Stephens (Gineris & Associates) 46:2-8, EX. 62 (Q. And now among the documents that Gineris produced in this case were general ledgers for Midwest Dock Solutions and Dock & Door, correct? A. Yes. Q. Are you responsible for maintaining the general ledgers for those companies? A. Yes.")
Stephens (Gineris & Associates) 54:21-55:3, EX. 62 ("Q. All right. And do you get the same information for both Midwest Dock Solutions and Dock & Door? A. Yes. Q. And is it imported into their general ledger accounts the same way? A. Yes.")

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, Interrogatory No. 5, (Exhibit 221), EX. 25 ("Accountant, Bookkeeper, Tax Preparer Gineris & Associates")

Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Interrogatory No. 2, (Exhibit 40), EX. 24 (Gineris & Associates for accounting and tax services)

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' Document Requests, Request Nos. 1-9, 18-23, 25, 26, 29, 31, 33, 35, 56-60, 67, 70-82, 84, 89, EX. 32 (responding that documents available for inspection and copying at Gineris & Associates, Ltd.)

Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Request Nos. 1-10, 12-25, 27, 29, 31-33, 35, 36, 39, 40, 42-44, 46, 48, 53, 54, 57-60, 63-66, 69-80, 87, (Exhibit 40), EX. 24 (responding that documents available for inspection and copying at Gineris & Associates, Ltd.)

Defendant Midwest Dock Solutions, Inc.'s Answer And Defenses To Plaintiffs' Complaint at ¶29, [ECF #18], (Exhibit 120), EX. 9

Brutti 166:18-169:12, EX. 3 (describing use of Xero software which is also used by Midwest Dock to prepare daily invoices for hours worked by each employee)

Webber 104:5-106:23, EX. 63 (testifying about her use of Xero software at Midwest Dock to import the invoices prepared and sent to her by Brutti)

**RESPONSE: MDS objects on the basis of immateriality. MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, facts or proper citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), that are disguised as part of its citations, but which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF. MDS objects that the above renders it impossible to then know whether the additional facts contained in the citation parentheticals are considered part of the actual SOF that need to be admitted or disputed.**

**MDS objects on the basis that none of the Fund's cited records support that Brutti hired Gineris "because" it served as MDS's accountant.**

**MDS disputes that Brutti hired the accounting firm of Gineris & Associates "because it was also Midwest Dock's accountant." Brutti testified he did not know any accountants, so he took the recommendation of Zarlengo and Richert.**
*Citation*: **EX 3 (Brutti Dep.), 61:15-25.**

III. Midwest Dock's And Dock & Door's Interrelated Operations.

    A. Midwest Dock Provides The General Contractors With Certificates Of Insurance Where Dock & Door's Employees Work--Dock & Door Does Not.

STATEMENT OF FACT NO. 34:

General contractors require that subcontractors working on the general contractor's job sites provide certificates of insurance ("COI") naming the general contractor as an additional insured on the subcontractor's insurance policy before the subcontractor's employees are allowed on a jobsite. Any subcontractor that does not provide the general contractor with a certificate of insurance is not allowed to have its employees on the jobsite. Tony Zarlengo acknowledged that general contractors take this requirement very seriously.

    SUPPORT FOR STATEMENT OF FACT NO. 34:

Zarlengo 124:125:17, EX. 2 ("Q. For these new construction contracts with large general contractors like Pepper Construction, are those insurance requirements fairly standard, that you have to have a Certificate of Insurance on file before you can begin work? A. Yes. ... Q. Now, the Certificate of Insurance provisions that you get typically requires that you list the general contractor as an additional insured on your policy, correct? A. Yes. Q. Is that something that's just part and parcel of getting the Certificate of Insurance issued, or is that something that you do separate from getting the insurance certificate issued? Do you understand my question? A. Yeah. They -- they put – my insurance agents adds all of that on the COI.")

Zarlengo 145:18-155:23, EX. 2 ("Q. The contract [with Principle Construction Exhibit 64] says, under subsection A, services and acknowledgements provided by the subcontractor to obtain, maintain, and pay for such insurance as may be required by the general contract, rider A attached hereto or by law. To furnish the contractor satisfactory evidence that subcontractor has complied with this paragraph. Do you see that? A. Yes. Q. And, again, that's the standard sort of sub -- Certificate of Insurance language that's in pretty much all of these general contractor/subcontract agreements for a new contract -or new door installation, correct? A. Correct. Q. And if you turn to the next page -- well, let me ask you. Would Midwest Dock Solutions' employees have performed the work on this project? A. No. Q. Who would have? A. Dock & Door Install employees.")

Zarlengo 137:5-10, EX. 2 ("Q. Is that a -- a requirement you take pretty seriously [to provide a COI]? A. Yes. Q. And is that because the general contractors take it pretty seriously? A. Very seriously.")

Declaration of S. Oertley, Senior Contract Specialist, Pepper Construction Company, Nov. 4, 2025 at ¶¶9-10, EX. 20 (testifying that any company working on a Pepper Construction job site must provide Pepper Construction with a certificate of insurance)

Pepper Construction Company: Subcontract Agreement Between Pepper Construction Company and Midwest Dock Solutions Inc. for North American Warehouse Expansion, Glenview, Illinois, May 15, 2020, (Exhibit 61), EX. 19 ("A COPY OF SUBCONTRACTOR'S UP-TO-DATE INSURANCE CERTIFICATE MUST BE ON FILE WITH PEPPER's SUPERINTENDENT AT THE JOB SITE BEFORE WORK CAN BE STARTED. PLEASE REFER TO ARTICLE 10 AND EXHIBIT C FPR FURTHER INSTRUCTIONS.") (emphasis in original)

Krusinski Construction Company: Subcontract Agreement; Jun. 11, 2014; Midwest Dock Solutions, Inc. for ML Realty Heritage Crossing #8 project, (Exhibit 104), EX. 13 ("13.2.2 CERTIFICATES. Prior to starting the Work and within ten (10) days after execution of the Subcontract Agreement or notice or award, the Subcontractor shall furnish to the Contractor, certificates of insurance from itself and all its subcontractors with additional insured endorsement attached, indicating all required coverages, and also indicating the deductibles on all policies. The Work at the site shall not be started and no payment on the Subcontract Agreement shall be made until all insurance certificates have been delivered to and accepted by the Contractor.")

Clayco Inc.: Subcontract Agreement Between Clayco, Inc. and Midwest Dock Solutions, Inc. for Project Bluepoint, Pleasant Prairie, WI, Jun. 10, 2019, (Exhibit 99), EX. 40 ("B. Certificates of insurance showing required coverage to be in force shall be filed with Contractor prior to commencement of the Subcontract Work, and no payments shall be made to Subcontractor until such time as Subcontractor provides Contractor with a valid certificate of insurance for its coverage and for compliant coverage of its tiered subcontractors.")

Meridian Design Build: Subcontract between Meridian Design Build and Midwest Dock Solutions, Inc. for 1303 Jack Court Facility Upgrades, Bartlett, IL, May 28, 2024, (Exhibit 65), EX. 21 ("6) Subcontractor shall obtain, maintain and pay for such insurance as may be required by law, the Contract Documents, or any exhibit or rider attached hereto, and shall furnish the Contractor satisfactory evidence that it has complied with this paragraph prior to commencing any portion of the Work; and shall obtain and furnish to the Contractor an undertaking by the insurance company issuing each such policy that such policy will not be canceled except after at least thirty (30) days written notice to the Contractor of its intention to so do.")

Opus Design Build LLC: Subcontract Agreement between Midwest Dock Solutions Inc. and Opus Design Build LLC for the Euclid Beverage Expansion Project, Mar. 26, 2024, EX. 41 ("EVIDENCE OF INSURANCE COVERAGE. Fully compliant and complete certificates of insurance (clearly indicating all required additional insured, primary and non-contributory, notice of cancellation and non-renewal, and waiver of subrogation endorsements) for the Applicable Insurance must be uploaded to Contractor's third-party insurance compliance vendor software platform prior to (i) Subcontractor starting the Subcontract Work on the Project Site....")

ARCO/Murray Construction Company: Subcontract Agreement between Midwest Dock Solutions, Inc. and ARCO/Murray National Construction Company, Inc. at p.1, Feb. 27, 2023, EX. 42 ("Contracts will not be considered executed if your Certificate of Insurance is not submitted at the time of signature!")

**RESPONSE: MDS admits SOF 34.**

STATEMENT OF FACT NO. 35:

For the period from January 1, 2020 through December 31, 2024, Dock & Door obtained no certificates of insurance for projects where employees paid through Dock & Door worked on the job sites for contracts between Midwest Dock and large general contractors, such as Pepper Construction Company, Krusinski Construction Company, Opus Design Build LLC, Meridian Design Build LLC, ARCO/Murray Construction Company, and Principle Construction Corp. For example, Midwest Dock obtained 18 COI's to Pepper and Dock & Door obtained none; Midwest Dock obtained 24 COIs to Krusinski and Dock & Door obtained 1; Midwest Dock obtained 18 COI's to Opus and Dock & Door obtained none; and Midwest Dock obtained 23 COI's to Meridian and Dock & Door obtained 1; Midwest Dock obtained 95 COI's for ARCO/Murray and Dock & Door obtained none; and, Midwest Dock obtained 49 COI's to Principle and Dock & Door

obtained none. Shawna Oertley, Pepper Construction's Senior Contract Specialist testified in her declaration:

> According to Pepper's records, Pepper received the required Certificates of Insurance from Midwest Dock for the Subcontract Agreements above. Copies of the Certificates of Insurance listing Pepper as a certificate holder are attached as group Exhibit 4. Under the Subcontract Agreements, Midwest Dock's employees were permitted to work on the jobsites. Pepper did not locate any Certificate of insurance from Dock & Door and, therefore, under the Subcontract Agreements, Dock & Door's employees were not permitted to work on the jobsites.

> SUPPORT FOR STATEMENT OF FACT NO. 35:
> Declaration of S. Oertley, Senior Contract Specialist, Pepper Construction Company at ¶¶9-10, Nov. 4, 2025, EX. 20

> Sugar 86:12-87:15, EX. 23 ("Q. Now, the -- the labor on these projects is for the -- is provided by the guys who are paid through Dock & Door, correct? A. Yeah. Dock & Door provides the labor for those jobs, yes. Q. Okay. So -- and you're providing a Certificate of Insurance for Midwest Dock Solutions, correct? A. Correct.")

> Sugar 105:4-106:15, EX. 23 ("Q. Okay. And, in fact, below that, there's another highlighted section that says a copy of subcontractor's up-to-date insurance certificate must be on file with Pepper's superintendent at the job site before work can be started. Please see article ten in Exhibit C for further instructions. Do you see that? A. Yes. Q. Okay. Do you know, is that also a fairly common provision, that the -- the work can't proceed at the job site before the certificate of service -- strike that. Do you know, is that a fairly common provision, that work cannot proceed at the job site unless the Certificate of Insurance is submitted? A. Yes. Q. Okay. And then if I remember earlier, you described that was one of your functions, was to get that Certificate of Insurance on file, correct? A. Yes. Q. All right. And you would have done that -- or somebody at Midwest Dock would have provided the Certificates of Insurance for Midwest Dock on this job, correct? A. Yes. Q. Okay. Would you have provided a Certificate of Insurance for Dock & Door? A. No. I wouldn't have done that.")

> Brutti 152:4-14, EX. 3 ("Q. Okay. From January of 2020 to the present, who was responsible for obtaining certificates of insurance on behalf of Dock & Door for the projects that its employees worked on? A. I believe -- like a person's name? Q. Well, who at Dock & Door was responsible -- A. Oh, I'm sorry, me, yeah. I thought you meant the agency. Q. Oh, no, I meant like who at Dock & Door would be responsible for getting the certificate of insurance? A. Me.")

> Brutti 153:5-156:1, EX. 3 (testifying that Holden Insurance had issued no certificates of insurance for Dock & Door as of October 9, 2025 and that from January 1, 2020 to the date of his deposition there may have only been 26 certificates of insurance that were issued on behalf of Dock & Door)

Brutti 156:4-157:2, EX. 3 ("Q. ... And I hand you what's been marked as Exhibit 259, which are -- MR. HUGHES: Object to foundation. BY MR. McJESSY: Q. -- which are the Certificates of Insurance that were produced to us by Assured Partners for Midwest Dock Solutions and ARCO/Murray projects. Do you see that the name on the bottom is ARCO/Murray? A. Correct, yes. Q. And since 2020, Dock & Door has done quite a number of projects for ARCO/Murray; correct? A. Correct. Q. Okay. And you have, for Dock & Door there is one Certificate of Insurance that was issued in March of 2025.· And for Midwest Dock Solutions there is, I'll represent to you, 94 Certificates of Insurance for projects that are ARCO/Murray projects. Would Dock & Door have provided the labor on those projects? A. I would have to read through this, but I'm sure some of these. Q. Okay.· Has provided labor on a lot of ARCO/Murray projects; correct? A. Correct.")

Brutti 158:21-160:5, EX. 3 ("Q. I've handed you what is marked as Exhibit 260, and I'll represent to you that those are Certificates of Insurance produced by Assured Partners that were issued on behalf of Midwest Dock Solutions to Pepper Construction; do you see that? A. I do. Q. And Dock & Door provided the labor for the work that was performed on those projects that are referred to there in the description of where it says Description? A. Yeah, probably. Q. You did work for Pepper Construction? A. I have, yeah. Q. On a number of projects? A. I have. Q. Okay. And to your knowledge, did Dock & Door provide Certificates of Insurance for those projects? A. I don't recall. Q. All right. Fair to say Dock & Door has done work on a significant number of projects for Krusinski Construction? A. It is. Q. And for Meridian Design Build same thing? A. It is. Q. And for Morgan Harbour Construction same thing? A. Yes. Q. And for Opus Design Build same thing? A. Yes. Q. Okay. And for Peak Construction same thing? A. Yes. Q. And for Pepper Construction same thing? A. Yes. Q. And for Principle Construction same thing? A. Yes.")

Brutti 153:19-156:1, EX. 3 (testifying that from January 2020 through the present Dock & Door may have only obtained 26 certificates of insurance for its work—*e.g.*, "Q. All right. Well, I guess my question is does the volume, does the number of them-- A. Oh. Q. -- look like the approximate number of Certificates of Insurance that -- A. Yeah, yeah, I would say so. Q. Okay. You think you probably over the last five years maybe asked for 26 Certificates of Insurance to be issued? A. Yeah, that's -- I feel like there could be some more, but I guess that might be true. Q. Okay. You don't think that there were like hundreds of them, for example? A. No, no.")

O'Connor (Assured Partners) 35:20-36:4; 49:1-50:18; 68:21-69:4, EX. 113 (testifying that the number of certificates of insurance produced by Assured Partners for Dock & Door for the period from January 1, 2020 to the date of the subpoena was 26—*e.g.*, "Q. And -- now, do you know offhand approximately how many certificates of insurance you've provided for -- provided in response to the subpoena for Dock & Door? A. Offhand, I do not know. Q. Okay. If I told you the number was 26, does that sound about right? A. Yes.")

O'Connor (Assured Partners) 35:20-36:4; 49:1-50:18; 68:21-69:4, EX. 113 (testifying that the number of certificates of insurance produced by Assured Partners for Midwest Dock (for contractors such as Pepper Construction Company, Meridian Design Build, Krusinski Construction Company, Clayco, Opus Design Build, Peak Construction, and

Morgan/Harbour Construction) for just 2020 and part of 2021 was nearly 800—*e.g.*, "Q. And -- now, do you know offhand approximately how many certificates of insurance you've provided for--provided in response to the subpoena for Dock & Door? A. Offhand, I do not know. Q. Okay. If I told you the number was 26 does that sound about right? A. Yes."... Q. All right. Well, you would agree with me, at the very least, that there are hundreds of certificates of insurance produced for Midwest Dock Solutions -- if not 800, certainly getting close to that number -- during 2020 and part of 2021, correct? A. Yes.")

Email from Mara Spring, Counsel for Holden Insurance, to Kevin McJessy, Plaintiffs' Counsel, Oct. 6, 2025, (Exhibit 253), EX. 124 ("As of today there have been none [no certificates] issued for Dock & Door.")

Midwest Dock Solutions, Inc. Certificates of Insurance to Krusinski Construction Company, (Exhibit 280), EX. 47

Dock & Door Install, Inc. Certificates of Insurance to Krusinski Construction Company, (Exhibit 256), EX. 44

Midwest Dock Solutions, Inc. Certificates of Insurance to Opus Design Build LLC, (Exhibit 282), EX. 48

Midwest Dock Solutions, Inc. Certificates of Insurance to Meridian Design Build LLC, (Exhibit 279), EX. 49
Dock & Door Install, Inc. Certificates of Insurance to Meridian Design Build LLC, (Exhibit 257), EX. 45

Midwest Dock Solutions, Inc. Certificates of Insurance to ARCO/Murray LLC, (Exhibit 259), EX. 50

Dock & Door Install, Inc. Certificates of Insurance to ARCO/Murray LLC, (Exhibit 254), EX. 51 (dated March 20, 2025, after this lawsuit was filed)

Midwest Dock Solutions, Inc. Certificates of Insurance to Principle Construction Company, Inc., (Exhibit 284), EX. 52

**RESPONSE: MDS objects on the grounds that SOF 35 is immaterial. MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, facts or proper citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), that are disguised as part of its citations, but which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF. MDS objects that the**

**above renders it impossible to then know whether the additional facts contained in the citation parentheticals are considered part of the actual SOF that need to be admitted or disputed**

**MDS disputes that D&D did not obtain any COIs for its work. Rather, Plaintiffs themselves acknowledge D&D's obtaining COI's in the language of this SOF**
*Citation*: SOF 35, above.

    B.  Midwest Dock Did Not Inform General Contractors That Dock & Door Would Perform The Work.

STATEMENT OF FACT NO. 36:
The contracts that Midwest Dock signed with various general contractors—such as Pepper Construction, Krusinski Construction Company, Clayco, Inc., Meridian Design Build LLC, ARCO/Murray, Principle Construction—prohibit subcontracting the work to another company without their prior written consent, and Midwest Dock did not disclose to the general contractors that Dock & Door would perform the contracted-for work.

        SUPPORT FOR STATEMENT OF FACT NO. 36:
        Zarlengo 156:1-12, EX. 2 ("Q. And if you look at the second page of this document [Exhibit 64 contract between Principle Construction and Midwest Dock Solutions], paragraph 11 says, not to assign or sublet this subcontract or any part thereof and not to assign any money due or to become due hereunder without first obtaining the written consent of contractor. Do you see that? A. Yes. Q. Did Midwest Dock Solutions get the written consent of Principal Construction to have Dock & Door do this work? A. No.")

        Standard Form of Subcontract Agreement Between Principal Construction Corp. and Midwest Dock Solutions, Inc. for work at General RV Showroom, Huntley, IL, Jan. 25, 2021, (Exhibit 64), EX. 53 ("A. SERVICES & ACKNOWLEDGMENTS PROVIDED BY THE SUBCONTRACTOR...11. Not to assign or sub-let this Subcontract or any part thereof and not to assign any money due or to become due hereunder without first obtaining the written consent of the Contractor.")

        Zarlengo 128:12-23, EX. 2 ("Q. And do you see that -- do you see paragraph 22 there? A. Yes. Q. And it refers to sub-subcontractors. Do you see that? A. Yes. Q. And it says, subcontractor agrees not to sub-subcontract more than five percent of this subcontract agreement without the written consent of Pepper. For all proposed sub-subcontractors in excess of five percent, subcontractor shall furnish Pepper an AIA document A-305 or equal subcontractor's qualification statement not less than five business days prior to the final execution of any sub-subcontractor agreement. Do you see that? A. Yes. Q. Did I read that right? A. Yes. MR. HUGHES: Kevin, objection. Foundation and competency on this document. BY MR. McJESSY: Q. All right. And do you know, did Midwest Dock Solutions' employees perform the work on this subcontractor agreement? A. No. Q. Okay. Who would have done that? A. Dock & Door Install. Q. Okay. And did Dock & Door -did Midwest Dock Solutions give Pepper written notice of that? A. No.")

Sugar 110:3-111:4, EX. 23 ("Q. Okay. Did Midwest, do you know, sign a document with Pepper advising it that it was subcontracting more than five percent of this subcontract to any other company? A. I don't know. Q. Okay. Are you aware of whether that ever happened, whether any of the general contractors were notified about the subcontract -- about any subcontracting to Dock & Door? A. No.")

Pepper Construction Company: Subcontract Agreement Between Pepper Construction Company and Midwest Dock Solutions Inc. for North American Warehouse Expansion, Glenview, Illinois, May 15, 2020, (Exhibit 61), EX. 19 ("22. Sub-Subcontractors Subcontractor agrees not to sub-subcontract more than Five Percent (5%) of this Subcontract Agreement without the written consent of PEPPER.")

Declaration of S. Oertley, Senior Contract Specialist, Pepper Construction Company, Nov. 4, 2025 at ¶¶7-8, EX. 20 (testifying that Pepper Construction Company's contracts with Midwest Dock required it to obtain written consent of Pepper if Midwest Dock were going to subcontract more than 5% of the work to another company and Midwest Dock Solutions gave Pepper no such notice)

Zarlengo 162:13-170:21, EX. 2 ("Q. I'm going to hand you what I've marked as Exhibit 99. And this is a subcontract agreement between Midwest Dock Solutions and Clayco, correct? A. Yes. Q. And Clayco, I think you said, is one of those general contractors that requires union labor; is that right? A. Yes.... Q. Okay. If -- let's see. If you look at the Clayco contract and you go to the fourth page, it says here, list of lower-tier subcontractors and supplies and designer, if any. Do you see that? A. Yes. Q. And it says,  within five days of execution of this subcontract agreement and prior to payment by  contractor on any application for payment defined herein, subcontractor shall complete   and return to contractor Exhibit B, list of lower-tier subcontractors and suppliers and designer, if any, identifying all of subcontractors, lower-tier subcontractors and suppliers  and designer, if any, that subcontractor intends to use on the project together with any  union trade and local with whom subcontractor or its lower-tier subcontractors are  affiliated. Did I read that right? A. Yes. Q. And then it says, contact information, friends, including address, phone number, contract -- contact person, and other available information -- shall be provided for each entity identified. Do you see that? A. Yes. Q. And then it says, subcontractor shall not engage a lower-tier subcontractor with an EMR greater or equal to 1.0 without first obtaining the consent in writing of contractor to such engagement. Do you see that? A. Yes. ... All right. And if you turn to Exhibit B, which is,  maybe, five or six pages from the back of this document, it's a document entitled, Exhibit  B, list of lower-tier subcontractors, suppliers, designers. A. Oh, it's five from the back? Q. Yeah. A. I thought five forward. Okay. Q. Do you see that page? A. Yes. ... Q. And there's no sub-subcontractor listed there, correct? A. Correct. Q. All right. And it's a form that says, list all of your sub-subcontractors, including contact information, with the actual or estimated dollar value you will pay them for this project, correct? A. Correct. Q. And then if you continue on, there's a page that says list all union trades and locals which you will use on this project. Do you see that? A. Yes. Q. And you list carpenters, correct? A. Yes. Q. All right. And you understand that the people who are doing this work are carpenters, correct? They fall under that trade? A. The people doing the work? Q. Yeah. A. Yes.")

Zarlengo 172:14-176:6, EX. 2 ("Q. Sir, if you could look at Exhibit 100 in front of you there, it – it looks like this is a document produced by Midwest Dock Solutions. Do you see the number on the bottom there? A. Yes. Q. And the first three pages look to be a contract -- or a bid summary or something -- well, strike that. What are the first three pages? Tell me what they are. A. A bid. Q. Okay. It's a bid? A. Yes. Q. A bid that you prepared? A. I did prepare this. ... Q. All right. And if you look at the bottom of this, it says union or open shop field labor, question mark. Do you see that? Yes. Q. What is an open shop? A. That is union or nonunion. Q. Okay. So open shop is nonunion? A. Yes. Q. All right. And you circled union, correct? A. Yes. Q. All right. So -- well, did you know, was union -- was union labor required for this project? A. Yes. Q. All right. Who are you bidding on this? Is it -- A. Opus. Q. Opus? Okay. And then if you turn to the next page, the third page, which is labeled four of four on the bid, it says, list any subcontractors to be hired and describe the scope of work and EMR? Do you see that? A. Yes. Q. And there's no nobody listed there, correct? A. Correct. ... Q. This work – This was an awarded bid, correct? A. It was an awarded bid. Q. All right. And did Midwest Dock Solutions' employees perform the work on this project? A. No. Q. Okay. Who did? A.

Dock & Door employees. Q. Okay. And is there a reason Dock & Door isn't disclosed on here? A. No.")

Krusinski Construction Company: Subcontract Agreement; Jun. 11, 2014; Midwest Dock Solutions, Inc. for ML Realty Heritage Crossing #8 project (Exhibit 104), EX. 13 ("2.2 ASSIGNMENT. Subcontractor shall not assign this subcontract, or the rights and obligations of this subcontract, to any other entity without the express written consent of Contractor.")

Clayco Inc.: Subcontract Agreement Between Clayco, Inc. and Midwest Dock Solutions, Inc. for Project Bluepoint, Pleasant Prairie, WI, Jun. 10, 2019, (Exhibit 99), EX. 40 ("Subcontractor shall not engage a lower tier subcontractor with an EMR >= 1.0 without first obtaining the consent in writing of Contractor to such engagement. The notification requirements for Exhibit B is intended to include unions, and collective bargaining unit fringe benefit funds for any lower-tier subcontractor utilized by Subcontractor to complete the Subcontract Work.")

Meridian Design Build: Subcontract between Meridian Design Build and Midwest Dock Solutions, Inc. for 1303 Jack Court Facility Upgrades, Bartlett, IL, May 28, 2024, (Exhibit 65), EX. 21 ("Subcontractor ma not assign or sublet this Subcontract Agreement or any art thereof or assign any money due or to become due hereunder without first obtaining the written consent of the Contractor hereto, which consent may be withheld by Contractor in its sole and absolute discretion.")

**RESPONSE: MDS objects on the grounds that SOF 36 is immaterial. MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the**

62

**inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, facts or proper citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), that are disguised as part of its citations, but which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF. MDS objects that the above renders it impossible to then know whether the additional facts contained in the citation parentheticals are considered part of the actual SOF that need to be admitted or disputed.**

**MDS disputes that every contract with a large general contractor prohibits subcontracting. A subcontract between Pepper and MDS allowed subcontracting.**
***Citation*: EX 2 (Zarlengo Dep) 121:15-122:2; 128:15-129:5: EX 19 (Pepper Construction Company: Subcontract Agreement Between Pepper Construction Company and Midwest Dock Solutions Inc. for North American Warehouse Expansion, Glenview, Illinois, May 15, 2020 (Dep. Exhibit 61).**

### C. Dock & Door Is A Captive Entity.

STATEMENT OF FACT NO. 37:
Tony Brutti admitted in his deposition that Dock & Door has, since it was formed, only ever performed work for Midwest Dock. Since Dock & Door started, its revenue came from solely from Midwest Dock. From 2016 through 2023, Dock & Door was paid each year by Midwest Dock approximately $443,905, $652,445, $813,572, $826,099, $966,443, $935,652, $1,595,662, and $1,633,467 respectively.

> SUPPORT FOR STATEMENT OF FACT NO. 37:
> Brutti 52:19-53:12, EX. 3 ("Q. Okay. Now, when Dock & Door started out, all of its revenue came from Midwest Dock Solutions; correct? A. Correct. Q. Okay. And that was the plan when Dock & Door started out; correct? A. Partially. I can go after other work if I want to.·But Midwest would be my 99 percent account, sure. Q. Okay. Well, at least through December 2024, all of Dock & Door's revenue came from Midwest Dock Solutions; correct? A. Correct. Q. Okay. And is that still true today? A. Correct, yes. Q. Okay. All right, so from the time Dock & Door started out until today, all of its revenue comes from Midwest Dock Solutions; correct? A. It does.")
>
> Stephens (Gineris & Associates) 82:12-83:19, 85:1-4, EX. 62 (testifying that all of Dock & Door's income comes from Midwest Dock, which is also Dock & Door's only accounts receivable)
>
> Stephens (Gineris & Associates) 88:5-11, EX. 62 ("Q. Okay. And then going to Dock & Door it doesn't have a similar account. Is there a reason for that? A. They don't have overpayments. Q. Okay. Its only customer is Midwest Dock Solutions, correct? A Yes.")

63

Dock & Door Install, Inc. 2016 IRS Form 1120-S, (Exhibit 172), EX. 54 (First page only, redacted)

Dock & Door Install, Inc. 2017 IRS Form 1120-S, (Exhibit 175), EX. 55 (First page only, redacted)

Dock & Door Install, Inc. 2018 IRS Form 1120-S, (Exhibit 178), EX. 56 (First page only, redacted)

Dock & Door Install, Inc. 2019 IRS Form 1120-S, (Exhibit 181), EX. 57 (First page only, redacted)

Dock & Door Install, Inc. 2020 IRS Form 1120-S, (Exhibit 184), EX. 58 (First page only, redacted)
Dock & Door Install, Inc. 2021 IRS Form 1120-S, (Exhibit 187), EX. 59 (First page only, redacted)

Dock & Door Install, Inc. 2022 IRS Form 1120-S, (Exhibit 190), EX. 60 (First page only, redacted)

Dock & Door Install, Inc. 2023 IRS Form 1120-S, (Exhibit 193), EX. 61 (First page only, redacted)

Stephens (Gineris & Associates) 84:7-85:4, EX. 62 (testifying that in 2023 all of Dock & Door's revenue came from Midwest Dock)

Dock & Door Install, Inc. Answer at ¶¶24, 25, [ECF#17], (Exhibit 265), EX. 29 (admitting that during the period October 1, 2020 to December 31, 2022, Dock & Door received approximately $473,514.50 from Midwest Dock and during the period July 1, 2017 to December 31, 2018, Dock & Door received approximately $1,149,080.75 from Midwest Dock; during those periods, Dock & Door did not receive payments from other companies for work)

**RESPONSE:  MDS admits SOF 37.**

    D.  Dock & Door And Midwest Dock Shared Office Space But Dock & Door Paid No Rent.

STATEMENT OF FACT NO. 38:
Midwest Dock and Dock & Door have operated from the same office locations since Dock & Door was formed. Dock & Door moved from location to location with Midwest Dock, *i.e.*, from Burville Road, Crete, Illinois to 3211 Holeman, South Chicago Heights, Illinois to 27 West 36th Place, Steger, Illinois, with each location being rented by Midwest Dock, the rent and utilities being paid by Midwest Dock, and with Dock & Door paying no rent or utilities. Dock & Door has never had a lease. The invoices issued by Dock & Door to Midwest Dock show both businesses at the same address:

64



SUPPORT FOR STATEMENT OF FACT NO. 38:

Brutti 105:23-108:15, EX. 3 (testifying that Dock & Door has occupied the same space as Midwest Dock since it was formed, that the offices have always been leased by Midwest Dock, and that Dock & Door has never paid any rent or utilities for any of the office locations it occupied with Midwest Dock)

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set of Interrogatories, Interrogatory No. 3, (Exhibit 221), EX. 25

Corrigan 53:22, EX. 7 ("Q. They're [*i.e.*, Midwest Dock Solutions and Dock & Door Install] both working out of the same location? A. Yes. Q. Okay. Same buildings? A. Yes. Q. All right. And when the buildings change from location to location, there was no difference, correct? A. Correct. Q. Okay.")

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' Document Requests, Request No. 28, EX. 32 ("28. Produce any lease for any space where Dock & Door either maintained an office or operated its business at any time during the period from January 1, 2016 to the present. RESPONSE: There are no documents that are responsive to this Request No. 28.")

Dock & Door Install, Inc. Answer To Plaintiffs' Complaint at ¶34, [ECF#17], (Exhibit 265), EX. 29 ("Defendant Dock & Door admits it and MIDWEST DOCK used the same street address listed above in Paragraph 34 [*i.e.*, 1249 E. Burville Road, Crete, Illinois] at the same time.")

65

Defendant Midwest Dock Solutions, Inc.'s Answer And Defenses To Plaintiffs' Complaint at ¶34, [ECF#18], (Exhibit 120), EX. 9 ("Defendant Midwest Dock admits that both it and Defendant Dock & Door utilized the street address listed in the above paragraph [*i.e.*, 1249 E. Burville Road, Crete, Illinois] at the same time")

Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Interrogatory No. 3, (Exhibit 40), EX. 24

Corrigan 53:16-54:13, EX. 7 ("Q. Okay. And if -- if Dock & Door is going to install doors at those locations, they would use Midwest trucks, correct? A. Correct. Q. Okay. And when you were doing service work or install work for Midwest, you would use the same trucks, correct? A. Correct. Q. Okay. And you said it's really two different groups of guys. One is nonunion, and one is union, correct? A. Yes. Q. Okay. They're both working out of the same location? A. Yes. Q. Okay. Same buildings? A. Yes. Q. All right. And when the buildings change from location to location, there was no difference, correct? A. Correct. Q. Okay. The companies continued to -- the guys continued to work out of the same locations, correct?")

Dock & Door Install, Inc. Answer To Plaintiffs' Complaint at ¶¶37, 38, [ECF#17], (Exhibit 265), EX. 29

Defendant Midwest Dock Solutions, Inc.'s Answer And Defenses To Plaintiffs' Complaint at ¶¶37, 38, [ECF#18], (Exhibit 120), EX. 9

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5).**

**MDS disputes that Dock & Door and MDS at all times utilized the same physical locations. Rather, Brutti testified that Dock & Door remained at the Burville Rd. location for several months after MDS moved out.**
***Citation*: EX 3 (Brutti Dep.), 107:4-22.**

**MDS admits the remaining facts in SOF 38.**

    E.  Brutti's Office And Use Of Office Equipment At No Charge.

STATEMENT OF FACT NO. 39:
Tony Brutti operated Dock & Door out of Midwest Dock's office using Midwest Dock's office equipment such as the copier and printer and using Midwest Dock's office supplies like paper, at no cost.

    <u>SUPPORT FOR STATEMENT OF FACT NO. 39:</u>

Brutti 116:8-14, EX. 3 ("Q. Okay. And your computer can print to the office printer; correct? A. It can, yeah. Q. Okay. There's a shared office copier printer? A. Yes. Q. And you can print to that? A. I can.")

Brutti 182:14-21, EX. 3 ("Q. Okay. And you can print them out from the Xero software program? A. I can. Q. Okay. And again, you do that at the office, I take it? A. I do. Q. Okay. On the copier printer that's there? A. Yes.")

Zarlengo 334:23-335:9, EX. 2 ("Q. And Mr. Brutti has a desk in the offices at 27 East 36th Place, correct? A. Yes. Q. All right. And Mr. Richert has a desk also in the same office as Mr. Brutti, correct? A. Table, desk, yes. Q. Okay. Q. And can Mr. Brutti, do you know, print to the printer copier? A. Yes, he can.")

Webber 79:18-80:11, EX. 63 ("Q. Just one. And can other people print to that same printer? A. Yes. Q. Okay. Do you have a copier in the office? A. It is one in the same, yeah. It's a big one. Q. Okay. That's what I was going to ask. It's all of the rage. So everybody can like print to that same copier? A. Yes. Q. Okay. Does that include Mr. Brutti? A. Yes.")

**RESPONSE: MDS admits SOF 39.**

F. Dock & Door's Mail Is Delivered To Post Office Box 363 Which Is Leased And Controlled By Midwest Dock.

STATEMENT OF FACT NO. 40:
On January 1, 2021, Midwest Dock opened Post Office Box 363 ("P.O. Box 363") at the Steger Post Office and the only persons authorized to access P.O. Box 363 were Tony Zarlengo, Michael Richert, and Sherri Webber; Tony Brutti was not authorized to access P.O. Box 363 and Brutti did not have a key to P.O. Box 363. Midwest Dock paid for the Post Office Box rental; Dock & Door did not pay for the Post Office Box.

SUPPORT FOR STATEMENT OF FACT NO. 40:
Brutti 112:25-113:8, EX. 3 ("Q. Okay. Did you ever retrieve mail from the post office box in Steger, the Post Office Box 363? A. No. Q. You don't have a key to that post office box; correct? A. I don't. Q. Did you ever have any other post office box for Dock & Door? A. I did not.")

Webber 141:12-15, EX. 63 ("Q. Fair to say that Midwest Dock Solutions pays and maintains that post office box? A. Yes.")

Steger, IL Application for Post Office Box Service, Jan. 11, 2021, (Exhibit 49), EX. 64 (stating that only Zarlengo, Richert, and Webber are authorized users of the post office box)

P.O. Box Service Fee Notice to Midwest Dock and Credit Card Payment Receipts, (Exhibit 50), EX. 65

**RESPONSE: MDS admits SOF 40.**

STATEMENT OF FACT NO. 41:
Dock & Door's mail was directed to P.O. Box 363, including its Cincinnati Insurance Policy billing statements, and the blank monthly Fringe Benefit Contribution Reports from the Chicago Carpenters Fringe Benefit Funds that Dock & Door had to complete and submit. Dock & Door's insurance policy with Cincinnati Insurance Company was endorsed to change the address for Dock & Door to P.O. Box 363. Because Tony Brutti did not have access to P.O. Box 363, he depended on Sherri Webber to retrieve Dock & Door's mail from Midwest Dock's P.O. Box 363 and bring it to him at Midwest Dock's office where Brutti also had a desk.

SUPPORT FOR STATEMENT OF FACT NO. 41:
Cincinnati Insurance Company Endorsement for Change of Address, Mar. 24, 2021, (Exhibit 240), EX. 66 (effective change date March 24, 2021)

Cincinnati Insurance Company Billing Statements to P.O. Box 363 from Feb. 28, 2022 to Aug. 29, 2024, (Exhibit 48), EX. 67 (for the sake of brevity, only the first two and last two pages of the original 101-page exhibit are attached here showing statements from February 2022 through December 2024)

Dock & Door Install, Inc. Fringe Benefit Contribution Reports, (Exhibit 47), EX. 68 (showing address of Dock & Door at P.O. Box 363)

Brutti 109:2-112:14, EX. 3 ("Q. Okay. Did you change Dock & Door's address to that post office box? A. No. Q. I'm going to hand you what's been marked as Exhibit 240. This is a document that was produced to us pursuant to a subpoena to Cincinnati Insurance Companies. And this is a Change of Endorsement form that's dated March 24th, 2021. Do you see that it says Effective Change Date on it? A. Yeah. ... Q. Okay. And this is a general Change of Endorsement form that changes the address for Dock & Door to Post Office Box 363, Steger, Illinois; do you see that? A. I do. Q. Did you make that change? A. I don't remember making that change. Q. Okay. Do you know how that change would have come to be made? A. I do not. Q. Let me show you what was previously marked as Exhibit 48, and if you can just sort of flip through those documents just to be familiar with what they are, I'll represent to you that they appear to be monthly invoices issued from Cincinnati insurance to Dock & Door. A. Yes.... Q. And do you see that they're addressed, each one is addressed to Post Office Box 363? A. I do. Q. But that's not a change you recall making; is that correct? A. I don't recall, no. Q. Okay. Would you receive those invoices? A. Yes. Q. All right. And how would you receive them? A. Sherri would hand them to me. Q. Okay. Sherri would leave them on your desk -- A. Yes. Q. or give them to you at the office? A. Correct. Q. Okay. And if you turn to Exhibit 47, and those are Fringe Benefit Contribution Reports; do you see that? A. Yes. ... Q. And the form that you get to fill out, that was mailed to Dock & Door; correct? A. Correct. Q. All right. And it was mailed to the Post Office Box 363; is that correct? A. Correct. Q. All right. So did you make the change to the post office box for Dock & Door with the fringe benefit funds that sent you those contribution reports? A. No. Q. Okay. Do you know who did make that change? A. I do not. Q. Okay.

But you would get those Fringe Benefit Contribution Reports; correct? A. Yes. Q. To fill out and send in? A. Yes....")

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), which further expands the amount of alleged facts past the 80 permitted. MDS objects that the above renders it impossible to then know whether the additional.**

**MDS admits SOF 41.**

G. Dock & Door Used Midwest Dock Solutions' Trucks, Equipment, Tools, And Inventory At No Cost.

STATEMENT OF FACT NO. 42:
Dock & Door and Midwest Dock's business requires the use of trucks, forklifts, equipment (such as welders and scissor lifts), and inventory of parts and supplies. Dock & Door has no truck, forklift, scissor lift, trailer, equipment (such as welders or scissor lifts), or inventory of parts and supplies. Midwest Dock owns trucks, a forklift, a trailer for transporting equipment, equipment (including welding equipment and a scissor lift), and inventory of parts and supplies. The same trucks and equipment are used by both companies. Dock & Door uses Midwest Dock's trucks, trailer, scissor lift, forklift, welding equipment, tools and inventory at no cost. If Dock & Door needs equipment on its jobsite that Midwest Dock cannot provide then someone at Midwest Dock, such as Tony Zarlengo or Ira Sugar, rents the equipment and has it delivered to the jobsite, and then Midwest Dock pays for the rental.

SUPPORT FOR STATEMENT OF FACT NO. 42:
Brutti 75:15-76:3, EX. 3 ("Q. Dock & Door uses Midwest Dock Solutions trucks and equipment for its work; correct? A. It does. Q. Okay. The employees use trucks owned by Midwest Dock for its works? A. It does. Q. And Dock & Door doesn't have any trucks of its own; correct? A. Correct. Q. It never has; correct? A. No. Q. So since Dock & Door has been operating, it's always used Midwest Dock's trucks; correct? A. It has.")

Brutti 163:12-15, EX. 3 ("Q. Does Dock & Door pay Midwest Dock Solutions anything to use its vehicles, forklifts, scissor lifts, welding equipment? A. It does not.")

Brutti 79:1-9, EX. 3 ("Q. Dock & Door employees use welders in their work? A. They do. Q. And are those also owned by Midwest Dock Solutions? A. Yes. Q. Okay. And that's always been the case; correct? A. Correct.")

Brutti 80:24-81:13, EX. 3 (testifying that Dock & Door uses Midwest Dock's trailer and forklift on its jobsites)

Brutti 85:18-86:19, EX. 3 (testifying that Dock & Door uses Midwest Dock's trailer and scissor lift for its work)
Brutti 92:5-93:10, 95:17-24, EX. 3 (testifying that Dock & Door would use Midwest Dock's scissor lift on its jobs)

Brutti 87:4-24, 90:19-91:13, EX. 3 (testifying about taking supplies kept at Midwest Dock's warehouse to use for Dock & Door work, including such items as propane, paint, and angle brackets)

Brutti 88:4-9, EX. 3 (testifying that employees would leave their timesheets for on the break room table at Midwest Dock's office)

Brutti 78:17-22, EX. 3 (testifying that the vehicles identified in Dock & Door's interrogatory responses that it uses in its work are owned by Midwest Dock)

Zarlengo 347:6-349:6, EX. 2 ("Q. You mentioned why your equipment rental is so high. There's a category here, under other deductions, for equipment rental. Do you see that? A. A hundred and twenty-three thousand? Q. Yeah, nine hundred and two dollars. A. Yes. Q. Yeah. $123,902. Is that the equipment rental expense you were referring to? A. Yes. Q. All right. And why is that so high? A. Because the majority of the Dock & Door jobs we need boom lifts and forklifts. Q. Okay. And Midwest Dock supplies those -- that equipment? It rents the equipment? A. Correct. Q. Who makes -- who makes the arrangements for the rental so that the equipment is out on the job site? A. Whoever sells the job. Q. Okay. So it would be either you or Ira, for example? A. Yes. Q. All right. So if you sold a job for installation of loading docks to one of the large general contractors that we've been talking about for a new construction job and you needed to have a forklift out there to move around the large dock levelers, you would -- you personally would make the arrangements for that equipment to be there on the job site? A. Yes. I know when stuff's getting delivered to the job, so I'm the one who arranges the rental equipment. Q. Okay. And if Ira were doing garage doors and he needed a boom lift to do that, he would make those arrangements? A. Yes. Q. And then Midwest Dock would pay for that? A. Yes.")

Sugar 65:2-66:1, EX. 23 ("Q. Okay. And I take it that the supplies for the -- the, like, drill bits and the anchors and things like that, even on the -- for the projects for the larger general contractors, the Dock & Door guys would pick the -- pick those up at the 36th Place, Steger office. Is that fair? A. Yes. Q. Okay. And then they would take them out to the job site, correct? A. Yes. Q. And I take it, those same kind of anchors and hardware and drill bits would also be used even on the smaller jobs for PSI and Chicago Heights, correct? A. Yes. Q. So those -- those materials that are also used by the Dock & Door guys would be picked up from the Midwest Dock Solutions office at 36th Place, correct? A. Yes.")

Dock & Door Install, Inc. Answer To Plaintiffs' Complaint at ¶27, [ECF#17], (Exhibit 265), EX. 29 ("Defendant Dock & Door admits it has no expenses for trucks like that shown above [and] Defendant Dock & Door admits it has used trucks and equipment belonging to MIDWEST DOCK to perform work.")

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' Document Requests, Request Nos. 54, 55, EX. 32 ("54. Produce all documents showing any money transferred by Dock & Door to Midwest Dock. RESPONSE: There are no documents that are responsive to this Request No. 54. 55. Produce all documents related to any transfer of money by Dock & Door to Midwest Dock. RESPONSE: There are no documents that are responsive to this Request No. 55.")

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, Interrogatory No. 9, (Exhibit 221), EX. 25 ("ANSWER: Vehicles owned by Dock and Door: None" and "Vehicles Leased by Dock & Door: None" and listing vehicles owned by Midwest Dock that Dock & Door uses)

Williams 122:13-125:15, EX. 18 (testifying that Sugar would arrange to rent equipment like scissor lifts and arial lifts and make sure it was at the jobsites worked by Dock & Door employees when they needed that equipment for their work)

Corrigan 51:22-52:11, EX. 7 ("Q. And what -- what is your understanding of the relationship between those two companies? A. Midwest does mostly all -- there's, you know, a different group of guys. There was two different groups. Midwest would go do the service. And then the guys in Dock & Door would go to the -- like the bigger box buildings and do the big installs on the union side. Q. Okay. And they're using the same trucks, right? A. Yes.")

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' Document Requests, Request Nos. 42, 44-46, EX. 32 ("42. Produce all documents showing tools and equipment (including for example welding equipment and hand tools) owned or leased by Dock & Door, including for example, any depreciation schedules, insurance schedules, or loan application schedule of assets. RESPONSE: There are no documents that are responsive to this Request No. 42.... 44. Produce all documents showing vehicles owned or leased by Dock & Door, including for example, any depreciation schedules, insurance schedules, or loan application schedule of assets. RESPONSE: There are no documents that are responsive to this Request No. 44. 45. Produce all documents showing lists of tools and equipment (including for example welding equipment and hand tools), office equipment (including office equipment such as computers, desks, furniture and ), and vehicles owned or leased by Dock & Door. RESPONSE: There are no documents that are responsive to this Request No. 45. 46. Produce documents sufficient to show Dock & Door's inventory. RESPONSE: There are no documents that are responsive to this Request No. 46.")

Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Interrogatory No. 9, (Exhibit 40), EX. 24 (listing trucks owned by Midwest Dock)

Defendant Midwest Dock Solutions, Inc.'s Answer And Defenses To Plaintiffs' Complaint at ¶27, [ECF#18], (Exhibit 120), EX. 9

Brutti 148:17-22, EX. 3 ("Q. Okay. And how about automobile insurance? A. No. Q. Does Dock & Door have an automobile insurance policy? A. You know, I've seen it on my policies. I don't know why I have it. I don't have any vehicles.")

Corrigan 53:7-15, EX. 7 ("Q. And if -- if Dock & Door is going to install doors at those locations, they would use Midwest trucks, correct? A. Correct. Q. Okay. And when you were doing service work or install work for Midwest, you would use the same trucks, correct? A. Correct.")

Corrigan 128:17-22, EX. 7 ("Q. And so the trucks are used by -- for both service work and for new install work, correct? A. Yes. Q. Including at the logistics buildings? A. Yes")

Green 76:23-77:78:6, EX. 12 (testifying that he would pick up materials and supplies for his work with Dock & Door at Midwest Dock's warehouse, including items such as doors, dock levelers, track guards, small items, or small orders—*e.g.*, "if you're installing 16 overhead doors at a job site, those will be delivered to the job site. If you're installing three dock seals, you might have to pick those up at the warehouse, something like that.")

Mantoan 56:18-57:3, EX. 69 (testifying that he would load up with supplies from Midwest Dock's warehouse before going out to do work for Dock & Door)

Kelly 58:5-59:2, EX. 70 ("Q. And if you were on a job site and needed concrete anchors or something or drill bits, concrete drill bits, things like that, would you use the credit card to purchase those kind of items? A. No. Q. Okay. Where would you get those kind of items? A. Tony Brutti. Q. Okay. He'd bring them to the job site? A. Yes. Yeah. Q. All right. Would you pick those kind of things up sometimes at the shop? A. Yes. Q. Okay. And that's the -- again, the Midwest Dock Solutions' shop, correct? A. Yes.")

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, facts or proper citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF. MDS objects that the above renders it impossible to then know whether the additional facts contained in the citation parentheticals are considered part of the actual SOF that need to be admitted or disputed.**

**MDS disputes that it and D&D use the same truck; the trucks are not shared between the companies.**
*Citation***: EX 126 (Zarlengo Decl) ¶24.**

**MDS admits the remainder of SOF 42.**

H. Midwest Dock Provided Dock & Door Employees With Midwest Dock's Company Credit Cards To Use; Dock & Door Did Not Provide Credit Cards.

STATEMENT OF FACT NO. 43:

Midwest Dock provided Dock & Door employees, including Richard Mantoan, Nicolas Kelly, David Green, Donald Cruikshank, and Collin Zarlengo, with Midwest Dock company credit cards to use for their work for Dock & Door. Dock & Door provided no credit cards. Tony Brutti was not made aware of which persons employed through Dock & Door carried Midwest Dock credit cards. Brutti was only aware that Green had a Midwest Dock credit card because Green would give Brutti receipts to turn in to Sherri Webber, Midwest Dock's in-house bookkeeper. Dock & Door employees would give their receipts to Brutti to pass through to Webber or they would give their receipts directly to Webber. Midwest Dock pays all the credit card statements.

SUPPORT FOR STATEMENT OF FACT NO. 43:

Brutti 113:15-115:12, EX. 3 ("Q. Okay. How about credit cards? Does Dock & Door supply its employees with credit cards? A. It does not. ... Q. Some of Dock & Door's employees do carry Midwest Dock Solutions credit cards; correct? A. Correct. Q. Okay. And that's Richard Mantone, Nicolas Kelly, David Green, Donald Cruikshank, and Collin Zarlengo, they've all had credit cards that were from Midwest Dock Solutions; correct? A. I'm not a hundred percent sure who, but -- Q. Okay. Do you know anybody who for a hundred percent did have them? A. David. Q. David Green? A. David Green, yeah. Q. Anybody else? A. I know Nico has one. Q. Okay. A. I'm not aware who else would. Q. Okay. You weren't responsible for coordinating to provide them with the credit cards? A. No. Q. Okay. So if I told you that Richard Mantone had a credit card, you don't know that? A. I don't know that. Q. Okay. And if I told you Donald Cruikshank had a credit card, you don't know that? A. No. Q. And if I told you that Collin Zarlengo had a credit card, you don't know that? A. I don't know that, no. Q. Okay. How do you know that Nicolas Kelly and David Green did or do? A. I know David Green will give me gas receipts if he is on the road. I guess I don't know that Nico has one for sure. Q. Okay. A. Yeah. Q. All right. So if they charge and have receipts, they don't give them to you? A. No. Correct. Q. Okay. Who would they give their receipts to? A. David does give his receipts to me. Q. Okay. Do you know why he does? A. He texts them to me and I give them to Sherri. Q. Okay. That's what I was going to ask you, who they ultimately go to. Do you do anything with the receipts other than give them to Sherri? A. I print them or yeah, or just give them to Sherri.")

Zarlengo 355:5-23, EX. 2 ("Q. Midwest Dock Solutions issues credit cards to some of its employees, correct? A. Yes. Q. And those -- it also issues credit cards to -- or among the parties – strike that. Among the parties the credit cards are issued to include Collin Zarlengo, Donald Cruikshank, David, Nicolas Kelly, and Richard Mantoan, correct? A. Correct. Q. All right. And those are all employees of Dock & Door? A. Correct. Q. All right. And does Midwest Dock Solutions pay those credit card bills? A. Yes.")

Stephens (Gineris & Associates) 70:3-71:18, EX. 62 ("Q. Okay. Does Midwest -- I'm sorry. Strike that. Does Dock & Door pay any of the credit card accounts, either the subaccounts

73

or any amounts toward the main account for this Chase Ink credit card? A. No. Q. The Chase Ink credit card is solely paid by Midwest Dock Solutions, correct? A. Yes. ... Q. Okay. And does it make any difference for payment of the credit card invoices whether there has been a receipt provided for the individual expenses? A. That's Sherry's call. Q. What do you mean by that? A. Whether or not she requires the receipt.")

Stephens (Gineris & Associates) 32:13-15, EX. 62 ("Q. To your knowledge, does Dock & Door maintain credit card accounts? A. They do not.")

Bishop 67:3-19, EX. 71 (testifying that he has a credit card that he used for his work at Midwest Dock and that he uses for his work at Dock & Door and that he has always turned in his credit card receipts for charges to Webber at Midwest Dock)

Mantoan 37:1-24, EX. 69 (testifying that he has a credit card from Midwest Dock that he uses that Tony Brutti told him to pick up at Midwest Dock's office)

Mantoan 42:11-43:3, EX. 69 (testifying that he gives the credit card receipts for his Midwest Dock credit card used to make purchases for his work for Dock & Door to Webber, Midwest Dock's in-house bookkeeper)

Kelly 47:4-15; 54:10-22, EX. 70 (testifying that he received a Midwest Dock credit card after his employer changed from Midwest Dock to Dock & Door and that Brutti told him to pick it up at Midwest Dock's office)

Kelly 56:10-23, EX. 70 (testifying that he gives the credit card receipts for his Midwest Dock credit card used to make purchases for his work for Dock & Door to Webber, Midwest Dock's in-house accountant)

Cruikshank 104:13-105:10, EX. 8 (testifying that he received a Midwest Dock credit card that he used when he worked for Dock & Door)

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), that are disguised as part of its citations, but which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF. MDS objects that the above renders it impossible to then know whether the additional facts contained in the citation parentheticals are considered part of the actual SOF that need to be admitted or disputed.**

**MDS admits SOF 43.**

STATEMENT OF FACT NO. 44:

74

Employees paid through Dock & Door use the Midwest Dock credit cards to purchase supplies and equipment and to pay for hotels and per diem expenses when they are working out of town. Midwest Dock pays the credit card charges; Dock & Door never pays the credit card charges and does not reimburse Midwest Dock. David Green uses his credit card to purchase materials and supplies for jobs and to put fuel in Midwest Dock trucks that he uses for Dock & Door.

Although Green is paid through Dock & Door, Tony Brutti described those expenses as Midwest Dock expenses, not Dock & Door expenses.

SUPPORT FOR STATEMENT OF FACT NO. 44:
Brutti 117:7-20, EX. 3 ("Q. Okay.·And to your knowledge, does David Green use his credit card for Dock & Door expenses? A. No. Q. What does he use it for? A. Generally material and fuel. Q. Okay. And what is the material for? A. Those would be for the jobs. Q. Okay. A. If they're short on anchors or caulk or whatever, Dave would run to the hardware store and buy that stuff. Q. Okay. And he'd put it on the Midwest Dock Solutions credit card? A. Yeah.")

Brutti 118:3-12, EX. 3 ("Q. No, no, I'm sorry, maybe any question wasn't clear.· Does Dock & Door pay the charges on the Midwest Dock Solutions credit card? A. Oh, no, no. Q. Okay. That was my question. A. Sorry. Q. Does Dock & Door ever reimburse Midwest Dock Solutions for expenses on the Midwest Dock Solutions credit card? A. No.")

Williams 66:16-68:9, EX. 18 ("A. Collin had one. That's who I used to work with the most going out of town with. So that's how we would get our per diems, so like our eating and everything, our hotel rooms. Q. Okay. He would put it on the company credit card? A. Either him or Ira. Q. Oh, Ira would sometimes pay for it? A. Pay for like the room in advance. Q. Okay. He would take care of that. Any other expenses that he would take care of when you were working out of town? A. Him, himself, the hotel was the most one, commonly. Me and Collin or me and Nico would order food while we were out with the credit card, company credit card. Q. Okay. And how do you know Ira took care of the hotel? A. Because Collin would call Ira to make sure he had the room available. Q. So you'd be there with him, and Collin would call Ira and say, hi, Ira, have you got the room taken care of, that kind of thing? A. We were going to stay in Wisconsin for a time, so, yeah. Q. Okay. And you would -- I take it, you would see the company credit card used to make purchases for food and sometimes -- A. Correct. Q. -- pay for hotels if Ira hadn't taken care of it and that kind of thing? A. Correct.")

Cruikshank 104:15-107:15, EX. 8 (testifying he received a Midwest Dock credit card when he went to work for Midwest Dock and continued to use the credit card after he starting being paid through Dock & Door and that he used the credit card to purchase supplies— *e.g.* "Q. And did you use that card when you worked for Dock & Door Install? A. Yes. .. Q. All right. And would you get the bills for that credit card? Would they come to your house, or would they go to the company? A. The company. Q. Okay. And what kind of purchases would you make using the company credit card? A. Fuel. Fuel and anchors and, you know, hardware stuff. Q. Okay. Whatever supplies you needed for the job and fuel for the company vehicle? A. Yes.")

75

Kelly 47:5-51:19; 55:4-6, EX. 70 (testifying that he did not have a Midwest Dock credit card when he worked for Midwest Dock but then Brutti gave him a Midwest Dock credit card when Kelly was working for Dock & Door—*e.g.*, ("Q. You have a credit card from Midwest Dock Solutions, correct? A. Yes. Q. Okay. And how long have you had that credit card? A. About three, four years, maybe. Q. Okay. Did you have it when you were being paid through Midwest Dock Solutions? A. No. ... Q. And who gave you the credit card? A. Nobody specifically. It was kind of just go pick it up. Q. Okay. And where did you go pick it up? A. At the shop. Q. Then you just show up at Steger and find a credit card sitting somewhere, and you just take it? A. Well, I was told that they set it there. Q. Okay. Who told you that? A. Brutti. Q. Okay. A. Tony Brutti. Q. Tony Brutti told you that who put it there? A. Oh, I guess he gave it to me, then, yes. He left it there. Q. Okay. A. He left it by the back door. Q. And what did Tony Brutti say about the credit card? A. He's like the card's by the back door.... And the credit card is a Midwest Dock Solutions' credit card, correct? A. Yes.")

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), which further expands the amount of alleged facts past the 80 permitted. MDS objects that the above renders it impossible to then know whether the additional facts contained in the citation parentheticals are considered part of the actual SOF that need to be admitted or disputed.**

**MDS admits SOF 44.**

I. Employees.
   1. David Green

STATEMENT OF FACT NO. 45:

The first employee who was listed on Dock & Door's Employer Questionnaire/Application with the Union when Dock & Door was applying to sign an agreement with the Union was David Green, who was at that time an employee of Midwest Dock. Green had been hired by Michael Richert, and he was employed by Midwest Dock doing installation of overhead doors, dock seals, dock bumpers, dock locks, track guards, dock lights, and door operators. Green became an employee of Dock & Door because Richert and Tony Zarlengo told Tony Brutti that he needed to hire Green. Brutti put Green on Dock & Door's payroll without interviewing him. Green went to work for Dock & Door performing the same work he performed for Midwest Dock.

SUPPORT FOR STATEMENT OF FACT NO. 45:

Brutti 43:21-44:7; 47:22-48:14, EX. 3 ("Q. Okay. And if you turn to the second to last page, it's page 340, it shows -- it shows 'List Names of Carpenter Employees;' do you see that? A. I do. Q. Okay. And who is listed there? A. David Green. Q. And he worked for Midwest Dock Solutions at that time; correct? A. I do not know that. Q. Well, how did you come to know Mr. Green? A. He was my first employee. And I was referred to him by

Mike and Tony. Q. Okay. <u>A. I don't know, like I said, I don't know if he worked at  Midwest Dock, but they said 'We need – you need to have him to start off with for sure.'</u>  Q. Okay. And did they tell you why? A. He's good. Q. Okay. A. He knows what he's doing.")

Brutti 53:13-22, EX. 3 ("Q. Now, did you hire Dave Green to work for Dock & Door? A. I did. Q. Did you interview him? A. I believe -- I don't believe I did, no. Q. Okay. You just put him on the payroll? A. Yeah. Q. Okay. And you did that solely at the recommendation of Mr. Zarlengo and Mr. Richert? A. Yes.")

Dock & Door Install Inc. Employer Questionnaire / Application to Chicago Regional Council of Carpenters, p.7, Aug. 5, 2014, (Exhibit 218), EX. 37

Dock & Door Install Inc. Contribution Reports, (Exhibit 220), EX. 72

Green 38:9-39:10, EX. 12 ()"Q. ... So explain to me how it came about that you went to work for Midwest Dock. A. I was out of work and talked to Ira one day, just about anything, and mentioned to him that I was out of work and trying to find a job. The union didn't have anything going on. And he mentioned his neighbor, Mike, had a business and basically asked me if he could give him my number, and he did. And Mike called me, and I went to work for him. ... Q. Okay. And was it Mike Richert who hired you? A. Yes. Q. All right. Did you meet with Tony Zarlengo before you were hired? A. No. Q. Okay. Just Mike? A. Yes.")

Green 39:16-20; 41:12-22; 61:21-62:24; 71:4-17, EX. 12 (testifying that he worked for Midwest Dock installing new overhead doors, dock seals, dock bumpers, dock locks, track guards, dock lights, and door operators and the work he does for Dock & Door includes installation of dock seals, dock bumpers, dock locks, track guards, dock lights, overhead doors, and dock levelers—*e.g.*, "Q. And just so I'm clear, the work that you did for Midwest Dock included installation of dock seals, bumpers, dock locks, track guards, dock lights, overhead doors, dock levelers, but it often involved removal of old before you put in the new? A. Correct. Q. Okay. And just so I'm clear, with Dock & Door, do you install dock seals, dock bumpers, dock locks, track guards, dock lights, overhead doors, and dock levelers? A. Yes.")

Green 71:4-17, EX. 12 ("Q. Okay. And just so I'm clear, the work that you did for Midwest Dock included installation of dock seals, bumpers, dock locks, track guards, dock lights, overhead doors, dock levelers, but it often involved removal of old before you put in the new? A. Correct. Q. Okay. And just so I'm clear, with Dock & Door, do you install dock seals, dock bumpers, dock locks, track guards, dock lights, overhead doors, and dock levelers? A. Yes.")

Green 69:17-70:9, EX. 12 (testifying that the installation for retrofit work and new construction is "pretty much the same" after the old items are removed and that he did not receive any new training when he went from Midwest Dock to work for Dock & Door)

Green 47:21-24, EX. 12 ("Q. Okay. Now, eventually your employment changed, and you weren't paid by Midwest Dock. You were paid by Dock & Door, correct? A. Yes. Q. Okay. Tell me when that happened and how that came about. A. It had to be -- I think it was about 2014 -- Q. Okay. A. -- ish. I was wanting to get back into the union because I was working for Midwest Dock basically temporarily to keep money coming in because the carpenters didn't have work. Q. Sure. A. And I didn't know that Dock & Doors were -that there was union companies that did that. I didn't know what a dock was when I started at Midwest Dock, but there's a training in that. I started with Dock & Door Install. Q. Okay. So you were working for Midwest Dock, and you were doing door installation, loading dock installation. How -- how did you come to be working for Dock & Door? A. Mike knew Tony and gave him my name, and he hired me and –")

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF. MDS objects that the above renders it impossible to then know whether the additional facts contained in the citation parentheticals are considered part of the actual SOF that need to be admitted or disputed.**

**MDS disputes that Green went to work for Dock & Door performing the same work he performed for Midwest Dock. Green specifically testified that his work did not stay the same and required different skills.**
***Citation*: EX12 (Green Dep.) 60:18 – 61:6; 63:2-69:16.**

**MDS admits the remainder of SOF 45.**

STATEMENT OF FACT NO. 46:
David Green was doing installation of overhead sectional doors, loading docks, and coiling doors for Midwest Dock when he started working for Dock & Door. Green had also been employed by Midwest Dock, and Midwest Dock reported and paid contributions to the Trust Funds on behalf of Green when he was working for Midwest Dock on a new construction project installing dock levelers and overhead doors in February, March, April, and June 2012.

SUPPORT FOR STATEMENT OF FACT NO. 46:
Brutti at 48:15-25, EX. 3 ("Q. And do you know what work he was doing for Dock & Door? A. It was new construction.· I couldn't tell you the exact job. Q. Well, aside from new construction, do you know what kind of work he was doing? A. He would do sectional doors, loading docks, and coiling doors. Q. And is that installation of overhead sectional doors? A. Correct.")

Zarlengo 66:6-18, EX. 2 ("Q. And -- and this was -- this was a new construction project; is that right? A. Yes. Q. And did Dock & Door -- I'm sorry. Did Midwest Dock Solutions install docks and doors at this location? A. I believe so, yeah. I believe so. Q. Okay. And do you have any idea of how many? A. Yes. Q. How many? A. Twenty. I've got a good memory.")

Zarlengo 73:4-18, EX. 2 ("Q. So you submitted these reports and paid the fringe benefit contributions that are identified on these reports, correct? A. Yes. Q. And by that, I mean Midwest Dock Solutions did that, correct? A. Yes. Q. All right. Do you know who Rodney Platt is? A. No. Q. All right. And do you know who John Leavitt is, L-e-a-v-i-t-t? A. No. Q. And do you know who David Green is? A. Yes. Q. All right. He's one of the people reported on these reports, correct? A. Yes. Q. All right. Did he work for Midwest Dock Solutions? A. Yes, he did. Q. All right. Does he still work for Midwest Dock Solutions? A. No. Q. Do you know who he works for now? A. Yes. Q. Who does he work for now? A. Dock & Door Install. Q. Did he move to Dock -- from Midwest Dock Solutions to Dock & Door Install when Dock & Door Install was formed? A. Yes.")

Midwest Dock Solutions, Inc. Fringe Benefit Contribution Reports at pp.7-10, (Exhibit 85), EX. 11

**RESPONSE: MDS disputes that David Green was doing installation of overhead sectional doors, loading docks, and coiling doors for Midwest Dock when he started working for Dock & Door. Rather Green was doing service and retrofit work when he worked for MDS.** *Citation***: 60:18 – 61:6**

**MDS admits the remainder of SOF 46.**

STATEMENT OF FACT NO. 47:
Tony Zarlengo, Ira Sugar, and Joe Sheridan, all sales persons from Midwest Dock, would direct David Green's work while he was employed through Dock & Door, including where to go and what to do. Green referred to Zarlengo as his "boss."

SUPPORT FOR STATEMENT OF FACT NO. 47:
Green 72:73:19; 74:20-80:8, EX. 12 (testifying that when he worked for Midwest Dock, Zarlengo or another Midwest Dock sales person would give him directions on where to go and what to do for different jobs and that when he went to work for Dock & Door he continued to take his directions from Zarlengo and from Sugar and Sheridan who were Midwest Dock sales persons where to go for his work—*e.g.*, "Q. Who from the sales staff would tell you? A. Well, I think Tony was also -- Tony Zarlengo was also part of sales. Q. Okay. A. So whosever's job it was is usually who you heard from. Q. All right. And when you say 'whoever's job it was,' you mean whoever sold that job? A. As far as I know, yes. Q. Okay. So if a particular salesperson was responsible for having sold a particular job, they might be the one to call you and say, hey, go here? A. Yes. Q. Okay. And do you -now, you mentioned when Ira Sugar was -- you knew Ira Sugar. A. Ah-huh. Q. Is that a yes? A. Yes.... Q. Okay. And do you know what position he was hired for? A. Sales, I believe, the title would be. Q. Okay. Is he somebody who you would get direction from,

79

where to go on particular jobs? A. Yes. Q. Okay. And is that still the case? A. Yes. Q. All right. He will call you and say, hey, go to this job location? A. Ah-huh. Yes.... Q. Anybody else who you can think of that would give you directions, where to go sort of day to day, like your job assignment? A. Sometimes Tony Zarlengo. Q. Okay. Does he still do that? A. On occasion.")

Green 75:12-22; 80:1-8, EX. 12 ("Q. Is he [Ira Sugar] somebody who you would get direction from, where to go on particular jobs? A. Yes. Q. Okay. And is that still the case? A. Yes. Q. All right. He will call you and say, hey, go to this job location? A. Ah-huh. Yes.... Q. Okay. And Anthony Zarlengo, we talked about that he's the owner of Midwest Dock, correct? A. Yes. Q. All right. And he gives you directions on what job sites to go to? A. Yes.")

Green 193:19-194:12, EX. 12 (testifying that his how Zarlengo, who Green described as his boss, was responsible for trying to figure out a problem at a Dock & Door job site— *e.g.*, "A. Kevin would have been on the job site. Just basically letting my boss know that I spent an hour basically doing nothing. You know, I wasn't installing anything because I'm waiting for Tony and Kevin to figure out where the stuff is going. Q. Okay. Tony Zarlengo? A. Yes.")

Green 112:7-16, EX. 12 (although Green testified Brutti was his boss because he was the owner of Dock & Door, Green testified that his only interaction with Brutti was that he keeps track of time and payroll: "Q. And what -- who is Anthony Brutti? A. He's my boss, as far as the owner of Dock & Door Install as far as I know. Q. Okay. And when you say he's your boss, what did -- what interaction do you have with him on a day-to-day basis? A. He keeps track of time, payroll. And that's about it, as far as I know.")

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1) and leading to an excess of the allotted 80 statements of fact. MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, facts or proper citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), that are disguised as part of its citations, but which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF.**

**MDS objects in that none of the cited testimony supports the contention that, once he worked for Dock & Door, that Green was given any direction on "what to do" by any of the other individuals named in the SOF.**

**MDS admits the remainder of SOF 47.**

2. David Richert

STATEMENT OF FACT NO. 48:

80

David Richert who previously worked for Midwest Dock as a Union carpenter performing dock leveler installation on new construction projects and who is also the brother of Michael Richert (the half owner of Midwest Dock) was also employed by Dock & Door to perform the same dock leveler installation work on new construction projects.

SUPPORT FOR STATEMENT OF FACT NO. 48:
Brutti 54:11-55:1, EX. 3 (testifying that David Richert is his cousin and that he was reported by Dock & Door as an employee)

Green 144:3-20, EX. 12 ("How about David Richert? A. Yes. I know him. Q. And who's David Richert? A. A carpenter, or he might be millwrights. Q. Millwrights? A. Yes. Q. All right. Do you work with him at Dock & Door? A. I have. Q. All right. And what kind of work does he do? A. Same thing. Doors, docks. Q. Okay. Does he still work there? A. No. Q. How long ago did he leave? A. He's kind of been the same, on and off over the last years.")

Dock & Door Install, Inc. Fringe Benefit Contribution Reports June 2016, (Exhibit 220), EX. 72

Midwest Dock Solutions, Inc. Fringe Benefit Contribution Reports, (Exhibit 85), EX. 11 (reporting fringe benefit contributions for David Richert (November and December 2011))

**RESPONSE: MDS Admits SOF 48**

3. Jose Aguirre

STATEMENT OF FACT NO. 49:
Jose Aguirre was also working for Midwest Dock performing installation of overhead doors when he was then employed by Dock & Door to perform installation of overhead doors. When Aguirre was moved from Midwest Dock's payroll to Dock & Door's payroll, it was a matter of Tony Brutti contacting Callie Stephens at Gineris & Associates, the companies' common accounting firm, and having her transfer over his paperwork from one company to the other.

SUPPORT FOR STATEMENT OF FACT NO. 49:
Brutti 55:5-56:4, EX. 3 ("Q. And do you see that Jose Aguirre Garcia is reported there? A. I do. Q. Dock & Door came to employ him in October of 2017; correct? A. Correct. Q. All right. And he was also working for Midwest Dock Solutions at the time that Dock & Door hired him; correct? A. Correct. Q. And what was he doing for Midwest Dock & Door -- or I'm sorry, what was he doing for Midwest Dock Solutions? A. He was doing some service work, and I believe he was also doing some installation work. ... Q. Okay. And installation work, installation of what? A. Like also taking down and installing overhead doors, yeah. Q. Okay. And what was the work that he did for Dock & Door? A. He would do new installations of overhead doors.")

Brutti 56:5 -57:4, EX. 3 ("Q. Okay. I hand you what I've marked as Exhibit 222. And this appears to be on the bottom an e-mail from you to Callie Stephens; correct, Stephens? A.

Correct. Q. All right. And it looks like an e-mail dated October 17th, 2016; do you see that? A. Correct. Q. And it says: 'Hi, Callie. I have a new employee starting this pay period for me. Jose from Midwest Dock is going to work for Dock & Door now. Can you just transfer over all the paperwork or do you need me to get all his info from him?' Do you see that? A. Correct. Q. And Callie responds to you, it looks like on the same day, saying 'What's his hourly rate?' Do you see that? A. Yes. A. It does. Q. Okay. And does that look like the date you would have hired Jose to work for Dock & Door? A. Yes. Q. All right. So is this e-mail on the bottom, does that -- well, strike that. Does this look like an e-mail exchange between you and Callie Stephens? A. It does. Q. Okay. And does that look like the date you would have hired Jose to work for Dock & Door? A. Yes.")

Callie Stephens (Gineris & Associates) Email to Tony Brutti regarding New Employee, Oct. 17, 2016, (Exhibit 222), EX. 73

**RESPONSE: MDS disputes Aguirre was doing "installation work" for MDS, rather Brutti's testimony establishes his work for MDS was service work (taking down and installing). Citation: EX 3(Brutti Dep) 55:5-25.**

**MDS Admits the remainder of SOF 49.**

4. Nicolas Kelly

STATEMENT OF FACT NO. 50:

Nicolas Kelly is a welder and he was employed by Midwest Dock principally doing loading dock leveler work, which requires an ability to weld. When he was employed by Dock & Door, he continued to do principally loading dock leveler work. When Kelly was moved from Midwest Dock' payroll to Dock & Door's payroll, it was a matter of Sherri Webber contacting Callie Stephens at Gineris & Associates, the companies' common accounting firm, and having her transfer over his paperwork from Midwest Dock to "the union side" *i.e.*, Dock & Door. Webber sent Stephens an email on September 26, 2018 advising her that "Nico Kelly is on the union side now...":

From: **Sherri Webber** <sherri@midwestdocksolutions.com>
Date: Wed, Sep 26, 2018 at 2:35 PM
Subject: Payroll changes
To: Callie Stephens <callie@gineristd.com>
Cc: Tony Zarlengo <tony@midwestdocksolutions.com>

Hi Callie,

I paid James Kelly on the weekly payroll this week, but Tony wants him added to the monthly payroll from now on. His yearly salary is going to be $73,500.00. Do you want to make that change in ADP or should I do it?

Also, Nico Kelly is on the union side now so I won't be paying him any longer thru ADP. Should I change anything in ADP so he doesn't show up on the payroll list any longer?

Sherri
Midwest Dock Solutions

Tony Brutti understood that when Callie Stephens referred to the "union side" of Midwest Dock, she was referring to Dock & Door and other employees referred to Dock & Door as the "union side" of Midwest Dock.

SUPPORT FOR STATEMENT OF FACT NO. 50:
Email from Sherri Webber to Callie Stephens (Gineris & Associates) regarding Payroll changes, Sep. 26, 2018, (Exhibit 211), EX. 74

Brutti 57:5-59:2, EX. 3 ("Q. Okay. The e-mail from Sherri Weber to Callie Stephens says:·'Hi, Callie,' and there is a paragraph talking about James Kelly. And then she says: 'Also, Nico Kelly is on the union side now, so I won't be paying him any longer through ADP. Should I change anything in ADP so he doesn't show up on the payroll list any longer?'·Do you see that? A. I see it. Q. And Nico Kelly, is that Nicolas Kelly? A. It is. Q. Does he go by Nico? A. Yeah. Q. Okay. And when she says 'union side now,' do you know what she's referring to? MR. HUGHES:·Objection foundation, objection competency. BY THE WITNESS: A. She would be referring to Dock & Door Install.")

Brutti 59:10-60:19, EX. 3 (testifying that Kelly is a welder who did dock leveler work for Midwest Dock and that he performed dock leveler work for Dock & Door)

Richert 31:9-17 ("Q Okay. How about Nicholas Kelly? It says he's a service technician. Is that right? A When he worked at Midwest Dock Solutions. Q He also worked for Dock & Door? A Correct. Q And who hired Nicholas Kelly? A For Midwest Dock it would have been me and Tony Zarlengo.")
Kelly 33:18-22, EX. 70 (testifying that he performed overhead door installation work for Midwest Dock)

Kelly 36:4-38:10; 44:10-24, EX. 70 (testifying that he was employed by Midwest Dock and then became employed by Dock & Door—*e.g.*, "Q. You stopped working for Midwest Dock Solutions and went to work for Dock & Door, correct? A. Yes. Q. Okay. Did you have to submit a resumé or job application or anything like that? A. No. Q. All right. It was simply Tony Brutti coming to you and saying, hey, do you want to work on the union side? A. Yes.")

Email from Sherri Webber to Callie Stephens (Gineris & Associates) regarding Payroll change, Sep. 26, 2018, (Exhibit 211), EX. 74

Donald Cruikshank 102:1-103:7, EX. 8 ("Q. And you know Anthony Zarlengo who's here today, correct? A. Ah-huh. Q. Is that a yes? A. Yes. Q. Okay. And what was his job with the company? A. He's the owner. Q. Okay. And how about Mike Richert? You didn't mention him, but he's on the list. And you know him, right? A. Yes. They're --Q. What did he do? A. He's also an owner. Q. Okay. And then Anthony Brutti was on the list. You know him as well, correct? A. Yes. Q. What kind of work did he do? A. He was in charge of hours for the union side and paying -- you now, payroll. Q. For the union side? A. Yeah. Yeah. Q. Okay. Okay. Anything else that he did that you're aware of? A. No.")

Kelly 40:16-19:2, EX. 70 ("Q. And then you may have to do other things to prep the space to put in the new door, correct? A. For -- on the union side, no.")

Mantoan 64:2-65, EX. 69 ("Q. And then you sent a text on Thursday. Is that Thursday of last week? A. I'd assume so. Q. Okay. It would be after October 6, so I would assume so, too. It says, so there's zero work on <u>union side</u>, correct? A. Yes. Q. Okay. And what does "union side" mean? <u>A. Like Dock & Door install. Q. Okay. Is there a nonunion side? A. Not for us, but Midwest.</u> Q. That's nonunion? A. Yes. Q. Okay. So when you say there's zero work on the union side, you mean for Dock & Door, correct? 2 A. Correct.")

Text message from R. Mantoan to T. Brutti (Exhibit 273), EX. 123 (Mantoan to Brutti: "So there's 0 work on the <u>union side</u>?")

Tattini 50:10-18, EX. 15 ("Q. And -- all right. Who hired you? A. Mike Richert. Mike Richert. Q. And how did that come about? A. My neighbor at the time was good friends with him, and they were starting the <u>union side of the -- of the company</u>. And my neighbor knew I was a good worker and recommended me.")

Tattini 95:9-96:5, EX. 15 ("Q. Anybody else you can recall that worked in the office at the Steger facility? A. I don't know if Joe -- I don't know if Joe Sheridan was working at the -- at the Steger facility, but -- ... Q. What did he do? A. Joe? He was -- he was a salesman on the union side, so I think he just went on Dodge reports and like construction -- bid construction or whatever. Just threw out bids. Q. Okay. A. Ah-huh. Salesman.")

**RESPONSE: MDS objects on grounds of immateriality. MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, facts or proper citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF. MDS objects that the above renders it impossible to then know whether the additional facts contained in the citation parentheticals are considered part of the actual SOF that need to be admitted or disputed.**

**MDS disputes that Nicolas Kelly, when employed by MDS, was a welder principally doing loading dock leveler work, which requires an ability to weld. Kelly specifically testified at his deposition that he never did dock leveler installation or service work when he was employed by MDS, but only learned how to do that work after working for D&D for two or three years, and that he did not learn how to weld until after he began working for D&D. *Citation*: N. Kelly Dep. 33:23 to 34:24; 45:13 to 47:3 (EX 70).**

84

**MDS admits the remainder of SOF 50.**

    5.   Branden Bishop

STATEMENT OF FACT NO. 51:
Branden Bishop was hired to work for Midwest Dock by Richert. Bishop worked for non-union Midwest Dock installing dock levelers and loading dock equipment and then he went to work for union Dock & Door doing installation of dock levelers and loading dock equipment after asking Michael Richert for a union job.

    SUPPORT FOR STATEMENT OF FACT NO. 51:
    Bishop 48:1-3, EX. 71 (testifying that he was hired to work for Midwest Dock by Richert)

    Bishop 10:4-12; 34:7-11, EX. 71 (testifying that he was employed by Midwest Dock and then by Dock & Door)

    Bishop 51:6-15; 55:4-9, EX. 71 (testifying that he did installation of loading dock equipment and overhead doors and dock seals for Midwest Dock but mostly installation of dock levelers and dock equipment)

    Bishop 29:16-21, EX. 71 ("Q. And how did you come to join the carpenters union? A. I asked Mike Richert for a union job. Q. Okay. And he said yes? A. He did.")

    Brutti 60:20-61:2, EX. 3 ("Q. Okay. Dock & Door also employed Brandon Bishop; correct? A. Correct. Q. And still does? A. It does. Q. Okay. He worked for Midwest Dock Solutions also before going to work for Dock & Door; correct? A. He might have for a very short time.")

    Zarlengo 101:7-21, EX. 2 (testifying that Bishop worked for Midwest Dock)

**RESPONSE: MDS disputes that the Fund's citation to EX 71 (Bishop Dep.) 51:6-15; 55:4-9 supports the Fund's SOF, or the argument improperly contained in the parenthetical to its citation, that while working for MDS, he did installation of loading dock equipment and overhead doors and dock seals for Midwest Dock but mostly installation of dock levelers and dock equipment.  Rather, the cited passages relate to statements from the MDS website, that Bishop had never seen before, and about whether MDS, the type of work that MDS did, generally. Rather, Bishop testified that his work for MDS was as a seasonal helper while he was in high school and that he mainly performed "just like cleaning, like just cleaning out dock pits. That's about it. They didn't -- more so like kind just watching and being a third hand."**
*Citation*: **EX 71 (Bishop Dep.) 43:20 to 45:23.**

**MDS admits the remainder of SOF 51.**

    6.   Zachary Corrigan

STATEMENT OF FACT NO. 52:
Zachary Corrigan was hired by Tony Zarlengo and Michael Richert to work for Midwest Dock where he worked on overhead doors. Then in 2018, Richert told Corrigan that "Midwest needed more guys to do – union guys" to work on the union jobs so Corrigan got a permit from the Iron Workers Union Local 63 so that he would be union and could work on union projects. At that time, he switched from Midwest Dock to Dock & Door where he did overhead door installation installing doors, door tracks, and door openers. After Corrigan's employment was switched to Dock & Door, Corrigan was not showing up for work for a period of time, and Richert terminated him.

SUPPORT FOR STATEMENT OF FACT NO. 52:
Zarlengo 101:23-102:1, EX. 2 (testifying that Corrigan worked for Midwest Dock for a couple of years)

Brutti 61:3-7, EX. 3 (testifying that Corrigan worked for Midwest Dock and Dock & Door)

Richert 21:7-10, EX. 4 ("Q How about Zachary Corrigan, who hired him? A When he worked for Midwest Dock? Q Yes. A Me and/or Tony.")
Richert 57:9-13 ("Q. And Zachary Corrigan, did he start out as a service tech or was he a helper for a period of time? A He came from another company with experience. Q So he started right out as a service tech? A Yes.")

Richert 19:8-12 ("Q Zachary Corrigan, you were here for his testimony you said, correct? A Correct. Q Was he a technician? A Yes.")

Corrigan 19:6-20:7, EX. 7 (testifying that he went from Midwest Dock to Dock & Door because they needed more workers to do union work)

Corrigan 20:22-21:17, EX. 7 (testifying that he had to be in the union to go on the "bigger install jobs—*e.g.*, "Q. Okay. And what does that mean, to go on the bigger install jobs? A. Instead of running service, I guess, through Midwest, I would be doing the big box -- bigger box buildings, longer jobs with Dock & Door Install.")

Corrigan 30:22-32:24; 35:15-23, 36:5-7, EX. 7 (testifying that he was hired by Midwest Dock in approximately 2015 after interviewing with Zarlengo and that Zarlengo and Richert made the decision to hire him to work for Midwest Dock)

Corrigan 54:15-56:2, EX. 7 ("Q. And -- but you understood, to work on the big box jobs, you had to be a union member, correct? A. Yes. Q. And then you'd get paid through Dock & Door, correct? A. Yes. Q. Okay. And they needed more guys to work on the big box doors, correct? A. Correct. Q. Okay. That was your understanding? A. Yes. Q. Who told you that? A. I believe, Mike Richert. Q. Okay. A. I probably talked to -- you know, with Tony Zarlengo also and Tony Brutti. Q. Okay. A. But I'm not sure exactly what individual person I talked to to get in there. Q. Okay. But, collectively, it was sort of agreed you'd switch from Midwest to Dock & Door, correct? A. Yes. Q. Okay. And it was collective

amongst those three individuals, correct? A. Yes. Q. Okay. And so in order to do that, though, you had to be a union member. Is that fair? A. Yes.")

Corrigan 61:1-64:15, EX. 7 ("Q. And some point you had a conversation with Tony Brutti, Tony Zarlengo, and Mike Richert. You think the three of them. And they said they needed more guys to do work for Dock & Door, correct? A. Ah-huh. Yes. Q. Okay. And so you went – you started going to work for Dock & Door, correct? A. Yes. Q. Okay. And so you started getting paid through Dock & Door; is that right? A. Yes. Q. Okay. And that was because you were working on union projects, correct? A. Yes.")

Corrigan 64:10-66:3, EX. 7 ("Q. And why did you leave? A. I wasn't showing up to work. Q. Pardon? A. I kind of was calling off a bit and not being a star employee. Q. All right. Did -- did you leave, or did they ask you to leave? A. I was asked to leave. Q. Okay. And who -- who asked you to leave? A. Mike. Mike Richert. Q. Mike Richert. Okay. And I appreciate your honesty. A. Yep. Q. And what did Mike say? Can you just tell me how it came about? A. Pretty much that was my last day because I wasn't -- I wasn't working up to their par, let's say. Q. Okay. And did -- was it a face-to-face conversation, or was it over the phone? A. I think, over the phone. Q. All right. And just as best you recall, what did -- what did Mike say to you, and what did you -- A. Just that that was my last day. Q. Okay. He just said, essentially, you're done? A. Yes.")

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, facts or proper citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), which further expands the amount of alleged facts past the 80 permitted.**

**MDS disputes that Corrigan meant that "Midwest needed more…union guys"; he corrected his statement to state "Dock and Door needed more guys…"**
**Citation: EX 7 (Corrigan Dep) 19:6-21**

**MDS admits the remainder of SOF 52.**

7. Donald Cruikshank

STATEMENT OF FACT NO. 53:
Donald Cruikshank was hired by Tony Zarlengo in 2009 to perform commercial overhead door installations for Midwest Dock, and Michael Richert made the decision to move Cruikshank to work for Midwest Dock. Cruikshank testified that Richert approached him and asked: "He asked me if I wanted to be in the union." Cruikshank then worked for Dock & Door until October 2023.

SUPPORT FOR STATEMENT OF FACT NO. 53:

87

Cruikshank 19:12-21:5, EX. 8 (testifying that he had experience performing commercial overhead doors and was hired by Zarlengo to work for Midwest Dock)

Cruikshank 60:7-61:14, EX. 8 (testifying that he was moved from Midwest Dock to Dock & Door by Richert because Dock & Door was busy and needed more workers— ("Q. ... And how did it come about that you made the switch from Midwest Dock to -- to Dock & Door? A. They got overwhelmed with -- with work, and they needed another head, another hand. Q. Okay. They were just -- they were just busy? A. Yep. Yes. Q. And did -- who approached you about that, or who did you approach or how did it happen? A. It was Mike Richert. Q. Okay. And what did he say or do? A. He asked me if I wanted to be in the union. Q. And what did you say? A. Yes. Q. Okay. And is that -- that's when you joined Local 272? A. Yes. Q. All right. And is that when you started getting paid through Dock & Door? A. Yes.")

Cruikshank 19:16-20:22; 22:21-23:3, EX. 8 (testifying that he was hired by Zarlengo in 2009 to work for Midwest Dock)

Cruickshank 34:23-35:3, EX. 8 (testifying he worked for Midwest Dock and then Dock & Door from 2009 to 2023)

Richert 21:20-21, EX. 4 ("Q And who would have hired Donald Cruikshank? A Me and/or Tony.)

Brutti 61:8-14, EX. 3 ("Q. And Donald Cruikshank, he worked for Midwest Dock Solutions; correct? A. Correct. Q. And does he still work for Dock & Door? A. He does not. Q. Okay. But he also did work for Dock & Door? A. Yes, he did.")

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, Response to Interrogatory No. 1, (Exhibit 221), EX. 25, (Dock & Door stated that Cruikshank worked for Dock & Door for over five years from October 2017 to January 2023)

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5).**

**MDS disputes that Zarlengo hired Cruikshank "to perform commercial overhead door installations for Midwest Dock." Rather, Cruikshank testified that the work he performed initially upon hire by Midwest Dock was service work (removal and replacement of old overhead doors at an IDOT facility).**
***Citation*: EX 8 (Cruikshank Dep.) 21:21 – 23:22.**

**MDS disputes that "Micheal Richert made the decision to move Cruikshank to work for [Dock & Door]." None of the citations the Fund lists support that Richert made such a**

88

**decision. Rather, the citations only state that Richert approached Cruikshank and asked if he wanted to join the union.**
*Citation***: EX 8 (Cruikshank Dep.) 60:8 – 61:3.**

**MDS admits the remaining facts in SOF 53.**

STATEMENT OF FACT NO. 54:
Tony Zarlengo gives Donald Cruikshank his daily job assignments and that has been true the entire time that Cruikshank worked for Midwest Dock and after he became an employee of Dock & Door. Cruikshank always considered Zarlengo and Michael Richert to be his bosses, even when he worked for Dock & Door. Cruikshank testified as follows:

> Q. Okay. So from the time you – what I'm trying to do is just set up the time period I'm going to ask you about. So you worked there from pretty much 2009 to 2023, either Midwest or then Dock & -- Dock & Door straight through, correct?
> A. Yes.
> Q. Okay. And -- and you didn't go back and forth between the companies – between those companies?
> A. No.
> Q. Okay. You just switched, at some point, and went from Midwest to Dock & Door, correct?
> A. Yes.
> Q. Okay. And during that – during those -- almost 14 years; is that right?
> A. Yes.
> Q. <u>Okay. During that 14 years, was -- was Mr. Zarlengo, Tony Zarlengo, your boss?</u>
> A. <u>Yes.</u>
> Q. <u>Okay. And Mike Richert was your boss during those 14 years?</u>
> A. Y<u>es.</u>
> Q. <u>And Tony Brutti, was he your boss at any point during those 14 years?</u>
> A. <u>No. No.</u>

SUPPORT FOR STATEMENT OF FACT NO. 54:
Cruikshank 34:19-36:4, EX. 8

Cruikshank 35:15-36:4, EX. 8 ("Q. And during that – during those -- almost 14 years; is that right? A. Yes. Q. Okay. During that 14 years, was -- was Mr. Zarlengo, Tony Zarlengo, your boss? A. Yes. Q. Okay. And Mike Richert was your boss during those 14 years? A. Yes. Q. And Tony Brutti, was he your boss at any point during those 14 years? A. No. No.")

Cruikshank 27:11-23; 28:17-22, EX. 8 ("Q. Okay. All right. And tell me about your job with Midwest. Did it change over time? A. No. Q. No? Who did you -- who did you report to? Do you have a boss? A. Tony Zarlengo. Q. Okay. And do you know Mike Richert? A. Yes. Q. Was he your boss? A. Yes. ... Q. If you can remember. Was Tony Brutti your boss? A. No. Q. Okay. At any time? A. No.")

Cruikshank 36:5-22, EX. 8 ("Q. Okay. And when you first started there, how would you get your job assignments, like how would you know where to go on a day-to-day basis? A. Probably text or phone calls. Q. Somebody would call you and tell you where to go or -- A. Texting most of the time, but, yes, phone. Q. Okay. And who would send you those texts, or who would make those calls? A. Tony Zarlengo. Q. Okay. And was that true pretty much for the full 14 years? A. Yes.")

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5).**

**MDS admits the remaining facts in SOF 54.**

8. Quinten Williams

STATEMENT OF FACT NO. 55:
Quinten Williams was a member of the Union who was only paid through Dock & Door (not Midwest Dock) for over a year from August 2022 through September 2023, but he listed his employer on his LinkedIn page as Midwest Dock because he was unaware that Midwest Dock and Dock & Door were two separate companies. Williams testified as follows:

Q. And are you familiar with the companies, Dock & Door Install and Midwest Dock Solutions?
A. I know it as Midwest Dock & Door Solutions.
Q. Okay. That's how you -- that's what you know the company as?
A. Right.
Q. Okay. Say that name again?
A. Midwest Dock & Doors.
Q. Midwest Dock & Doors Solutions?
A. Right.
Q. Okay. All right. Are you aware that there's two separate companies?
A. No, not formally.
Q. Not formally?
A. Yeah.
Q. Okay. You sort of know it as one company?
A. Yes.
...
Q. And I'm going to show you -- now, you mentioned from your perspective, as far as you understood, there was just one company, correct?
A. Yes, sir.
...
Q. ... The company you were working for, can you tell me what kind of work it did?
A. Midwest Dock & Doors?
Q. Yeah.

A. We would install dock doors, which are dock doors and operation doors, so the bigger dock doors, basically.

SUPPORT FOR STATEMENT OF FACT NO. 55:
Williams 35:4-36:3; 46:15-19; 47:17-23; 187:23-188:10, EX. 18

Williams 19:10-14; 20:14-21:8; 23:19-20, EX. 18

Quinten Williams LinkedIn Page, (Exhibit 2), EX. 75

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, Interrogatory No. 1, (Exhibit 221), EX. 25 ("Williams, Quinten 8-122022 — 9-29-2023 Carpenter Direct Deposit Dock & Door")

**RESPONSE: MDS objects to Williams lack of competency and his speculation related to the D&D and/or MDS corporate structure.**

STATEMENT OF FACT NO. 56:
Quinten Williams only spoke to Tony Zarlengo, from Midwest Dock, on the phone and then personally met with Zarlengo and filled out some paper work at the office in Steger, Illinois before he was hired. Williams testified that Zarlengo was the only one he met with when he was hired and that Zarlengo hired him. Williams testified:

Q. You said you believed that you gave the job application to Tony Zarlengo?
A. Tony was the only one that was in my -- it wasn't really an interview. It was just a proper introduction.
Q. Okay. And you're -- you're certain that was Tony Zarlengo?
A. Yes.
Q. Okay. Was Mike Richert involved in any of that hiring process?
A. No, not in the in-person part.
Q. Okay. Was Tony Brutti involved?
A. Tony Brutti? No.
Q. No? You're sure about that?
A. Positive.

SUPPORT FOR STATEMENT OF FACT NO. 56:
Williams 36:10-37:9; 38:8-40:21, EX. 18 ("Q. How did you come to be employed at Midwest Dock & Door Solutions? A. I was referred by my BA, my business rep. Q. All right. And who is your BA? A. Joe. Joe Willis. Q. And after he referred you to them, what did you do? A. I believe the next step was calling -- I believe I talked to Tony Zarlengo over the phone about my start date. Q. Okay. Did you have to introduce yourself to him or anything like that, or did he just know who you were when you called or -- A. I believe that they sent over my information already, so he -- he knew my name. I'm not going to say he knew who I was right off the bat." ... "Q. And tell me about that process. I'm going to call it the onboarding process. Tell me about the onboarding process. How did you -- A. So I had an introduction at their home facility in Steger. Q. Okay. A. Came in. Did my

paperwork the first day. I believe I started the following week after, if I'm not mistaken. Q. Okay. A. So, yeah, after that -- Q. All right. Let me stop you there. So when you came in to do your paperwork, what paperwork do you recall you had to fill out? Zarlengo. Q. Okay. And did he give it to you to complete? A. Yeah. I completed it in the office. Q. Okay. But I mean, was he the one who gave it -- when you showed up at the office, did you meet with Tony? A. Yeah. That's the only person I met with. Q. Okay. Tony Zarlengo was the only one you met with? A. Yes. Q. Okay. Okay. So he had to have given you the papers to fill out? A. Right. Q. And you gave them back to him? A. Right.")

Williams 42:4-10, EX. 18 ("Q. All right. So from the time that you got the call from the union until the time that you started working and Ira sent you the text, was the only person that you had spoken with Tony Zarlengo? A. Yeah. Higher up, yes. Q. Okay. Is it fair to say he hired you? A. Yeah. You can say that.")

Williams 157:19-23, EX. 18 ("Q. And when he says that's what Michael said that's what you said in your interview -- A. Correct. Q. -- he's referring to your interview when you were hired, correct? A. Correct. Which was with Tony Zarlengo. Q. Okay.")

Williams 158:10-12, EX. 18 ("Q. Okay. But the only person you interviewed with was Tony Zarlengo? A. Correct.")

Williams 235:18-236:15, EX. 18 ("Q And do you remember, was Michael there also? A. No. It was just me and him. Q. It was just you and Tony Zarlengo? A. Correct.")

Williams 181:3-9, EX. 18 ("Q. Who -- what is your understanding of who the owners were of the company you worked for? A. Mike and Tony. Q. Okay. Tony Zarlengo? A. Right")

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), which further expands the amount of alleged facts past the 80 permitted.**

**MDS disputes that Zarlengo spoke with Williams on the phone prior to his hire by D&D, and disputes that Zarlengo was in any way involving in hiring Williams to work for Dock & Door.**
*Citation*: **EX 126 (Zarlengo Decl) ¶4`.**

STATEMENT OF FACT NO. 57:
Quinten Williams received his job assignments from Ira Sugar. Williams described Sugar as his supervisor and testified that Sugar would text him his job locations every day consistently during the entire time he worked there. Sugar was employed by Midwest Dock.

SUPPORT FOR STATEMENT OF FACT NO. 57:
Williams 36:10-37:9; 38:8-40:21, EX. 18

Williams 60:24-61:11, EX. 18 ("Q. And then how about Ira Sugar? A. Ira was the super who would give me my destinations. Q. And would you say he was your supervisor? A. Right. Q. And was that true the entire time you were there? A. Yes. Q. He'd give you your instructions, where to go for work? A. Right.")

Williams 202:9-202:23, EX. 18 (testifying that it was Sugar who was the only one who told him what jobs to go to and what he would be doing)

Williams 204:16-205:12, EX. 18 ("Q. And what did you understand, from him telling you where to go, what his job duties were? A. He was my supervisor because that's where we reported everything to. Q. What did you -- you say you reported everything to him? A. So like if we needed a new lift, if we needed materials dropped off, if we needed anything missing that we don't have, Ira. Ira's the guy. Q. Okay. And how did you communicate that to Ira? A. Collin. Q. So you didn't communicate that to Ira? A. Not all of the time. Sometimes I have. Q. Okay. A. Damaged -- damaged parts and stuff like that")

**RESPONSE: MDS objects that none of the citations of the Fund supports the assertion that Sugare gave Williams job assignments "every day," and as such it is unsupported.**

**MDS disputes that Sugar was a supervisor of Williams. Williams testified that other than give him instructions on where to go to work, Sugar did nothing else supervisory. EX 18 (Williams Dep) 61:3-13.**

**MDS admits the remainder of SOF 57.**

STATEMENT OF FACT NO. 58:
Even though Quinten Williams was employed through Dock & Door, Williams understood that the owners of the company he was working for were Tony Zarlengo and Michael Richert. Williams did not meet or communicate with Tony Brutti—who he knew as "payroll Tony"— prior to being hired. Williams knew Brutti as the person he should give his timesheets to. Williams had Brutti's name stored in his cell phone as "Tony Payroll", and he had Zarlengo's name stored in his cell phone as "Tony Midwest Dock Boss" and Richert stored in his cell phone as "Mike Midwest Dock Boss". Williams had the other Dock & Door employees he worked with stored in his phone as "Collin Midwest Dock," "RJ Midwest Dock," "Nico Midwest Dock," "Don Midwest Dock," "Dave Midwest Dock" and "Chris Midwest Dock."

> SUPPORT FOR STATEMENT OF FACT NO. 58:
> Williams 180:9-181:9, EX. 18 ("Q. What was your understanding of Tony Zarlengo's role with the company? A. That was Collin's uncle, and he was one of the owners of the company. Q. Okay. So overall operation of the company? A. Right. Q. Okay. Anything else? A. That was about it. Q. Okay. And how about Michael Richert? What was your understanding of what he did? A. What he did? I just knew that he was one of the owners through Collin. Q. All right. Who -- what is your understanding of who the owners were of the company you worked for? A. Mike and Tony. Q. Okay. Tony Zarlengo? A. Right.")

93

Williams 11:1-20, EX. 18 ("When was the last time -- do you know who Tony Brutti is? ' A. Tony Brutti? I believe that's Payroll Tony. Q. Okay. When you say 'Payroll Tony,' what's that mean? A. That's the person we would send our time sheets, too, I believe. Q. Okay. And you believe -- you called him Payroll Tony? A. Yes. Q. Okay. Do you know his last name? A. Not off the record. Q. Okay. So you're just guessing that that's who you— who that is? A. Yes.")

Williams 142:4-144:17, EX. 18 (testifying as to how the Brutti, Zarlengo, and Richert's numbers were stored in his cell phone)

Williams 145:1-147:15, EX. 18 (testifying as to how the names of the employees he worked with were stored in his cell phone)

**RESPONSE: MDS objects on the basis of Williams lack of competency and his speculation as to ownership or management of either D&D or MDS. MDS further objects to the inadmissible hearsay in the citations the Fund relies upon.**

**MDS admits the remainder of SOF 58.**

9.  Anthony Tattini

STATEMENT OF FACT NO. 59:

Anthony Tattini was employed by Dock & Door, and he was hired and eventually terminated by Michael Richert. Tattini knew the company as "Midwest" or "Midwest Dock", the name that was on the trucks that he used. Tattini understood that there was really just one company. He received his daily job assignments and critiques of his work while working for Dock & Door from Tony Zarlengo, who he described as the person "who ran everything." Tattini's final paycheck came from Midwest Dock. Tattini testified his bosses were Zarlengo and Richert but not Tony Brutti who he described a "straw man":

Q. And then how about Tony Brutti?

...

A. Yeah. Like everybody knew he didn't do nothing. Everybody knew -- everybody knew he was the -- the face or the -- or straw man or whatever you want to call it.

SUPPORT FOR STATEMENT OF FACT NO. 59:

Tattini 36:16-37:3, EX. 15 ("Q. Okay. And when you say 'the operation,' what are you referring to? A. The company. Q. Okay. Meaning both Dock & Door and Midwest Dock? A. Yes, sir. Q. Okay. Which you take as one company, in essence? A. Yes, sir.")

Tattini 50:9-12, EX. 15 ("Q. Okay. And -- all right. Who hired you? A. Mike Richert. Mike Richert.")

Tattini 67:24-69:14, EX. 15 ("Q. Okay. All right. All right. Once you were hired -- and what do you -- I'm sorry. What do you refer to the company as? Do you refer to it as Midwest? A. Yeah. Q. Okay. So when -- when you were hired by Midwest, how would you get your job assignments day to day? How did you know where you were going? A.

94

Tony Zarlengo. Q. Okay. And he would give you your job assignments? A. Yes, sir. Q. And what would he tell you? A. He would say -- he would say, in the beginning, take -come to the shop, take this truck, pick up Jose or Nico, and -- and load up -- load up. Q. Would he tell you what to load? A. Oh, yeah. Q. Okay. A. Oh, yeah. I mean, he -- he even had -- he had -- I'm sure he still does. He has cameras in the shop. So he would be texting us, like what's going on? It's taking too long to load. You guys should be out of there. So, yeah, I mean, he knew what was going on. Yeah, I mean -- and I received all of my work assignments from Tony Zarlengo. I mean, yeah, yeah. All of the time. Q. So he would tell you what -- so would he tell you what you were going to be installing? A. Oh, yeah. Q. Like you're installing a lot of different stuff? A. Oh, yeah.")

Tattini 47:15-48:1215, EX. 15 ("Q. What do you know the company as? You know it as Midwest Dock Solutions, Dock & Door? A. We know it as both, but like the -- the face and branding of it is Midwest Dock. We would show up in Midwest Dock, you know, labeled trucks, but we all knew we were getting paid from Dock & Door Install or whatever it was. Q. Okay. A. Yeah. So we all knew that. Q. Okay. So when you were hired, the first company you were paid through, was it Dock & Door? A. Yes.")

Tattini 96:12-15, EX. 15 ("Q. Okay. And what is your understanding of what Tony Zarlengo did? A. Ran everything.")

Tattini 14:17-15:19, EX. 15 ("Q. Okay. And when was the last time you spoke with Tony Zarlengo? A. The same day Mike fired me. The day I was terminated, yeah. Q. Okay. And when you say 'Mike,' is that Mike Richert? A. Yes. Q. Okay. When was the last time you spoke to Mike Richert? A. The same time. Q. Okay. And you said he fired you? A. Yes, sir.")

Tattini 17:16-20:3, EX. 15 ("Q. Ah-huh. A. And I was like, okay, I'll be back at the shop, get my check, and I'm gone. He tried calling me back on the individual's phone because they brought that individual to the job site, another employee did. I'm like that's it, I'm fired, get in the truck. And then he's trying to call me and communicate through the individual that I had to drive every day. I'm like I have nothing to say. You fired me. I had enough of this. This is fine. You fire me. I go back to the shop. Mike -- Mike's there. I walk in. And Tony's there. Tony's like what's up. Q. Tony? A. Zarlengo. And Mike said, yeah, we need to give him -- Tony -- his check. And he's like what's going on? He's like -he's like I fired him. And -- Q. That's Mike who said that? A. Yeah. And Tony's like, well, we can't give him a check right now. We don't have no money. And Mike said, yeah, you can, and like hold on. So I get all of my tools. I had my wife at the time -- ex-wife -- pick me up. I put my tools in. They gave me a check. I go to the bank. I try cashing it. It bounces. Then I go back -- I call Mike. I was like, hey, Mike, the check just bounced. He said, oh, come back to the shop. I go back to the shop. He -- he meets me in the lobby, won't let me in like. And he's like -- he's like here's another check. He goes, but you just I can't go to my bank and cash that. I go, excuse me? I go, yeah, I can. And -- I know, like - - like I'm like that ignorant? You know what I'm saying? Like -- so whatever. So they gave me a good check, I cash it, and that was it. (WHEREUPON, the document was marked Plaintiff's Exhibit 34 for identification, as of 4/11/25.) BY MR. McJESSY: Q. Okay. And I'm going to show you

95

what I've marked as Exhibit 34 and ask you could those be the checks? A. That bounced? Q. That you got. A. That day? Q. Yes. They're dated, it looks like, September 24, 2019. A. September 24, 2019. Yeah, let me see. How much was it for? Yeah. These are like handwritten checks. What are the dates? Are the days in sequence here? I'm having a hard time seeing this.")

Tattini 25:2-12, EX. 15 ("Q. All right. I'm handing you what's marked as Exhibit 35 just because it's a little easier to see. It's the same two checks that we were looking at -- A. Yeah. Makes total sense. Q. -- but blown up. So you think that the check -- that these checks were related to your last pay? A. Yes, sir. Most definitely.")

Tattini 26:12-14, EX. 15 ("Q. And who gave you these [Midwest Dock Solutions] checks, then, that we've marked as Exhibits 34 and 35? A. Mike [Richert] gave me those in the lobby, in the foyer. Q. Okay. And those are -- that's his signature on the checks? A. Yeah. Q. All right. And this was for your -- basically, your last two weeks of work for Dock & Door? A. Yes, sir.")

Tattini 72:21-73:9, EX. 15 ("Q. Did you consider him [Tony Brutti] your boss? A. No. No. Not at all. Q. Okay. Who -- who did you consider your boss? A. Mike and Tony. Q. Okay. And Tony, you mean Zarlengo? A. Zarlengo. Q. Okay. There's two Tonys, so I just want to be clear. A. Yeah.")

Tattini 98:11-23, EX. 15 ("Q. And then how about Tony Brutti? A. He sat in the office and shot flies with that little salt gun. Q. With a little what? A. Like you ever see that -like it looks like a little gun? It shoots like a blast of salt, and you're supposed to like kill the flies. Q. Oh, no. A. Yeah. Like everybody knew he didn't do nothing. Everybody knew -- everybody knew he was the -- the face or the -- or straw man or whatever you want to call it.")

Check from Midwest Dock Solutions to Tony Tattini for $1,324.68, Sep. 24, 2019 and Check from Midwest Dock Solutions to Tony Tattini for $827.88, Sep. 24, 2019, (Exhibit 35), EX. 76

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF. MDS objects that the above renders it impossible to then know whether the additional facts contained in the citation parentheticals are considered part of the actual SOF that need to be admitted or disputed.**

**MDS objects that Tattini's testimony is based on inadmissible hearsay and speculation regarding what "everybody knew."**

**MDS admits the remainder of SOF 59 solely as to what is stated in the SOF, and not in any of the improperly included block quoting of Tattini's deposition transcript.**

    10. Ira Sugar

STATEMENT OF FACT NO. 60:
Ira Sugar is a sales person employed by Midwest Dock. He would assign specific crews of Dock & Door employees to work on the job sites when Midwest Dock contracted to perform work for general contractors to make sure that the people he was sending out were qualified to do the work and he would instruct them on what the installation for a project involves.

SUPPORT FOR STATEMENT OF FACT NO. 60:
Sugar 75:21-76:23, EX. 23 ("Q. Okay. And then you said you scheduled the labor with Dock & Door, correct? A. Yes. Q. And what does that entail? A. Assigning crews to specific jobs and providing any useful information. That's about it. Q. Okay. And is that something you would do also? A. Yeah, I did. Q. Okay. And does that involve like picking out who you want to do the installations? A. Yeah. Q. All right. A. Yeah. Q. And you need to make sure that the people you're sending out are qualified, correct? A. Correct. Q. Okay. And would you actually talk to them about what the installation involves? A. If I felt it was needed, yes.")

Sugar 108:18-109:16, EX. 23 ("Q. Okay. And then how do you make sure the guys get there to be there for the orientation? A. When they're scheduled for work, they -- I just notify them that they report to the job trailer and meet with so-and-so at a specific time. Q. Okay. And that's a regular part of your job? A. Yes.")

Sugar 147:15-23, EX. 23 ("Q. Okay. How -- how would you know who to send the text to? You'd know who was on the job? A. Right. Q. Okay. Because you assigned them to the job? A. Right.")

Corrigan 174:2-20, EX. 7 (Q. How about Ira Sugar? A. He did sales. Q. Okay. And did you work with him at all? A. If he sold a job, you would kind of talk to him about material or what needs to be done. Q. Okay. So he would -- he would ask you about that? A. Yes. Q. Okay. Or would you ask him about it? I'm trying to understand the dynamics. <u>A. If he sold a job and if we were sent to that job, we might report to him or call him and see exactly what needs to be done or what exactly he sold them so we can install it.</u>")

Green 157:2-18, EX. 12 ("Q. And Anthony Zarlengo, we talked about that he's the owner of Midwest Dock, correct? A. Yes. Q. All right. And he gives you directions on what job sites to go to? A. Yes. Q. All right. And he still does that, right? A. Yes. Q. And does he -like with Ira Sugar, would he also tell you like what the project is and whether you need to pick up any materials before you go there? A. Yes.")

Green 167:20-169:11, EX. 12 (testifying that Ira Sugar would authorize him to put 8 hours on his timesheet for a day even if he worked less than 8 hours)

Williams 41:12-42:3, EX. 18, ("Q. Okay. And how did you get your job assignment? Like how did you know where to go that first week? A. Ira. They have a guide, a superintendent, Ira -- I believe his last name is Sugar, I believe. Q. Okay. A. He -- he would text our locations every day for where we were going. Q. Okay. He would send you a text message? A. Yes, sir. Q. And was that pretty consistent during the entire time you were there? A. Yes. Q. All right.")

Williams 61:1-11, EX. 18 ("A. Ira was the super who would give me my destinations. Q. And would you say he was your supervisor? A. Right. Q. And was that true the entire time you were there? A. Yes. Q. He'd give you your instructions, where to go for work? A. Right.")

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, facts or proper citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF.**

**MDS admits SOF 60.**

STATEMENT OF FACT NO. 61:
Ira Sugar would be the main point of contact on behalf of Dock & Door for general contractor jobs that he sold for Midwest Dock for work being performed on the job site by employees of Dock & Door and he would communicate with the employees paid through Dock & Door while they were on the job sites.

SUPPORT FOR STATEMENT OF FACT NO. 61:
Sugar 111:5-22, EX. 23 ("Q. Okay. And I'm going ask you to turn back through that document. You're going to come across to a page called Exhibit E, scope of work. And if you look at that -- are you on the first -- yes. Excellent. Thank you. Do you see where it says Midwest Dock Solutions/Ira Sugar at the upper right-hand corner? A. Yes. Q. Okay. Are you the person designated there because you're sort of the main contact on behalf of Dock & Door for this project? Is that what your understanding would be? A. I'm the main point of contact for Pepper, as far as material and installation, yes.")

Sugar 147:4-23, EX. 23 ("Q. Okay. That's what I thought. And -- and if they communicate to you, how do you communicate with somebody at Dock & Door to make sure they're out there? A. By text, usually. Q. Okay. And do you have the text numbers for -- or the phone numbers for the workers from Dock & Door? A. Yes. Q. Okay. How -how would you know

who to send the text to? You'd know who was on the job? A. Right. Q. Okay. Because you assigned them to the job? A. Right.")

**RESPONSE: MDS admits SOF 61.**

    J.   Dock & Door Has No Sales Staff Or Office Support Staff—Midwest Dock Employs The Sales Staff Who Sell The Projects Worked By Dock & Door.

STATEMENT OF FACT NO. 62:

Dock & Door has never employed any office support staff, for example a receptionist, secretary, bookkeeper, and Dock & Door has never employed any sales staff, such as salespersons or estimators. The sales staff that bids for the new construction union projects performed by employees paid through Dock & Door is employed by Midwest Dock. Since July 2014 Midwest Dock has employed Joe Sheridan, Ira Sugar, and Tony Zarlengo who bid and sold new construction projects with union general contractors. In addition, Midwest Dock employed other sales persons, like Steven French and James Johnson, and administrative staff, including Sherri Webber, Amber Toigio-Sichterman, and Danny Lietz.

        SUPPORT FOR STATEMENT OF FACT NO. 62:

        Brutti 62:25, EX. 3 ("Q. Okay. Dock & Door does not employ any sales staff; correct? A. Correct. Q. And who are the salespersons that sell the contracts that Dock & Door ultimately works on? A. Ira Sugar. Q. Okay. And anyone else? A. Currently, no. Q. How about in the past? A. Tony Zarlengo. Q. Anybody else in the past? A. No, just those two. Q. Were you here for -- A. Oh, no, Joe Sheridan, I'm sorry, Joe Sheridan. Q. Who? A. Joseph Sheridan, going back further. Q. S H E R I D A N? A. I believe so. Q. All right. And he's no longer there? A. He is not. Q. Okay. So Ira Sugar, Tony Zarlengo, and Joseph Sheridan, they're the three, they're the only three that you're aware of as sales staff that have sold projects that Dock & Door has worked on; correct? A. I believe so, yeah. Q. Has Dock & Door ever paid them any compensation for their work? A. No. Q. And Dock & Door has never employed any sales staff; correct? A. Correct.")

        Zarlengo 82:21-83:3; 93:23-95:10; 95:22-96:20; 98:20-99:23, 117:22-24, EX. 2 (testifying that he (*i.e.*, Zarlengo) works as sales for Midwest Dock, Sugar works as sales for Midwest Dock, Sheridan worked as sales for Midwest Dock, French works as sales for Midwest Dock, David Mortel works as sales for Midwest Dock, and Johnson worked as sales for Midwest Dock—including (Q. And so if you look at Ira Sugar there -- A. Yeah. Q. -- it says -- it says, roughly -- well, it doesn't say roughly -- it says employment from June 28, 2017, to the present. Does that sound about right to you? A. Yes. Q. All right. And was he hired to do new construction overhead door sales? A. Yes. Q. Was there somebody else who was doing that before him? A. Yes. Q. And who was that? A. Joseph Sheridan. ... Q. Okay. All right.... But there were employment issues, and he was terminated? A. Yes. Q. And Mr. Sugar was hired in his place? A. Yes.")

        Zarlengo 93:23-96:20, EX. 2 (testifying that he performed sales of new construction installation of dock levelers)

Zarlengo 117:22-121:6, EX. 2 (testifying that Midwest Dock hired Sugar, French, Mortel, and Johnson as sales persons)

Zarlengo 306:24-307:4, EX. 2 (testifying that Webber is Midwest Dock's in-house bookkeeper)

Richert 49:6-11; 50:1-5, EX. 4 ("Q. ...Ira Sugar, is he sales? A. Inside sales. Q. What's inside sales? A. He bids off of a computer screen. Q. And he bids new construction jobs? A. Yes. Q. Okay. Has Ira always bid those kind of jobs? A. Yes. Q. Does Tony Zarlengo also bid those kind of jobs? A. Yes.")

Webber 66:3-67:4; 76:12-15; 55:13-20; 61:22-62:20, EX. 63 (testifying that Toigio was hired in approximately 2022 and handles billing for service work using the Xero accounting software and entry of bills that Midwest Dock receives as part of its accounts payable, that Lietz works in the office managing service calls and ordering parts, and Johnson who worked in sales)

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, Response to Interrogatory No. 1, (Exhibit 221), EX. 25

Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Interrogatory No. 1, (Exhibit 40), EX. 24 (identifying salespersons and administrative staff and dates of employment by Midwest Dock and periods of employment)

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, facts or proper citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF.**

**MDS admits SOF 62.**


K. Dock & Door Has No Suppliers; All Supplies Are Purchased By Midwest Dock.

STATEMENT OF FACT NO. 63:
Dock & Door has no suppliers of materials. All supplies are purchased and maintained by Midwest Dock, which identified at least 95 suppliers. Supplies are kept in the warehouse and both Midwest Dock's employees and Dock & Door's employees take supplies from there.

SUPPORT FOR STATEMENT OF FACT NO. 63:
Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' First Set Of Interrogatories, Interrogatory No. 6, (Exhibit 221), EX. 25 ("Interrogatory No. 6: Identify each material supplier for Dock & Door from January 1, 2016 to the present (including for example, every supplier of welding equipment and supplies, dock plates, dock levelers, overhead doors, dock canopies, dock shelters, dock seals, overhead door openers, jackshaft operators, trolley operators, slide operators, and parts for any of the forgoing, etc.). ANSWER: Dock & Door has not purchased materials from any material suppliers between January 1, 2016 and the present so there are no suppliers to identify for this Interrogatory No. 6.")

Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Interrogatory No. 6, (Exhibit 40), EX. 24 (identifying approximately 95 suppliers of materials and equipment)

Sugar 65:2-66:1, EX. 23 ("Q. Okay. And I take it that the supplies for the -- the, like, drill bits and the anchors and things like that, even on the -- for the projects for the larger general contractors, the Dock & Door guys would pick the -- pick those up at the 36th Place, Steger office. Is that fair? A. Yes. Q. Okay. And then they would take them out to the job site, correct? A. Yes. Q. And I take it, those same kind of anchors and hardware and drill bits would also be used even on the smaller jobs for PSI and Chicago Heights, correct? A. Yes. Q. So those -- those materials that are also used by the Dock & Door guys would be picked up from the Midwest Dock Solutions office at 36th Place, correct? A. Yes.")

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), which further expands the amount of alleged facts past the 80 permitted.**

**MDS admits SOF 63.**

STATEMENT OF FACT NO. 64:

L. Dock & Door Install Often Lost Money In Any Given Year. Between 2016 And 2023, Dock & Door Lost $70,069.00.

SUPPORT FOR STATEMENT OF FACT NO. 64:
Summary of tax returns and profits/losses and dividend payments.

Dock & Door Install, Inc. 2016 Federal Tax Return (first page only), (Exhibit 172), EX. 54 (loss of $5,174.00)

Dock & Door Install, Inc. 2017 Federal Tax Return (first page only), (Exhibit 175), EX.

55 (loss of $1,791.00)

Dock & Door Install, Inc. 2018 Federal Tax Return (first page only), (Exhibit 178), EX. 56 (income of $6,011.00)

Dock & Door Install, Inc. 2019 Federal Tax Return (first page only) (Exhibit 181), EX. 57 (income $27,419.00)

Dock & Door Install, Inc. 2020 Federal Tax Return (first page only), (Exhibit 184), EX. 58 (loss of $101,409.00)

Dock & Door Install, Inc. 2021 Federal Tax Return (first page only), (Exhibit 187), EX. 59 (income $33,371.00)

Dock & Door Install, Inc. 2022 Federal Tax Return (first page only), (Exhibit 190), EX. 60 (loss of $40,504.00)

Dock & Door Install, Inc. 2023 Federal Tax Return (first page only) (Exhibit 193), EX. 61 (income $12,008.00)

Brutti 195:16-197:5, EX. 3 ("Q. If you could get out Exhibits 184, 187, 190, and 193, they're the tax returns. And if you just look at line 21 on each one of those where it says Ordinary Business Income or Loss; do you see that? A. Which line? Q. Line 22.·For example, for 2020 it shows Ordinary Business Loss, Income Loss minus $101,000; do you see that? A. Yeah. Q. All right. And then if you look at the same line for 2021 on Exhibit 187, it shows 33,000 to the positive; do you see that? A. Correct, yeah. Q. And then if you look at 2022, it shows on that line that's Exhibit 190 a loss of $40,000; do you see that? A. Correct. Q. And then 2023 It shows $12,000 to the good, that's Exhibit 193; correct? A. Correct. Q. All right. So what kind of profit were you looking to make in setting the unit price? A. I wouldn't have any kind of number in my head, but wanting to, like I said, cover costs and hopefully grow the business slowly. That always hasn't been the case. Q. So your hope was as long as you could cover costs and pay yourself the salary you were taking, you were good with that? A. Well, yeah, I would hope to take dividend checks and be able to, yeah. Q. Do you have any idea how much you took in dividends in the last five years? A. I don't know that number off the top of my head. Q. Okay. Would it be $50,000, do you think? A. I don't know. Q. You have no idea? A. I don't.")

**RESPONSE: MDS admits SOF 64.**

M. Brutti Makes Much Less Than Many Of Dock & Door's Employees.

STATEMENT OF FACT NO. 65:

Tony Brutti is paid a salary through payroll using ADP payroll service like the other employees of Dock & Door, and he is paid every week. His total salary for each year from 2017 through 2023 is as follows compared to some of Dock & Door's other employees:

102

|  | Tony Brutti | Don Cruikshank | David Green | Anthony Tattini | Jose Aguirre | Eric Jansma | Nicolas Kelly | Collin Zarlengo |
|---|---|---|---|---|---|---|---|---|
| 2017 | 51,950.00 |  | 73,062.20 | 78,814.95 |  |  |  |  |
| 2018 | 58,352.92 | 66,087.48 | 65,798.72 | 76,718.88 |  |  |  |  |
| 2019 | 61,172.49 |  |  |  |  |  |  |  |
| 2020 | 63,098.36 |  | 93,228.18 |  |  |  |  |  |
| 2021 | 64,396.56 |  | 70,654.94 |  |  |  |  |  |
| 2022 | 71,594.48 | 116,229.74 | 104,170.15 |  | 104,805.85 | 87,796.20 | 93,127.05 | 88,307.40 |
| 2023 | 71,031.76 |  | 98,661.38 |  | 100,892.60 | 93,901.02 | 96,111.72 | 93,227.25 |

Tony Brutti conceded that every year there are employees paid through Dock & Door who make considerably more than he does and work more hours than he does.

> SUPPORT FOR STATEMENT OF FACT NO. 65:
> Brutti 177:17-178:3; 178:24-179:1, EX. 3 ("Q. Okay. Is there any reason as the owner of the company that you don't make more than your employees? A. I never really thought about it. I mean, it's never really been an issue with me. Q. And I have W-2s here for the other years, but would you agree that every year there are employees who work for Dock & Door that make considerably more than you do? A. It appears that way. Q. Would you say they [your employees] work more hours than you do? A. Yeah.")
>
> Brutti 170:15-171:17, EX. 3 (testifying that he is paid a salary every week through ADP payroll service)
>
> Anthony Tattini and David Green W-2s for 2017, (Exhibit 261), EX. 81
>
> Anthony Brutti W-2 for 2017, (Exhibit 173), EX. 82
>
> Anthony Brutti W-2 for 2018, (Exhibit 176), EX. 83
> Donald Cruikshank, David Green and Anthony Tattini W-2s for 2018, (Exhibit 262), EX. 84
>
> Anthony Brutti W-2 for 2019, (Exhibit 179), EX. 85
>
> Anthony Brutti W-2 for 2020 (Exhibit 182), EX. 86
>
> Anthony Brutti W-2 for 2021 (Exhibit 185), EX. 87
>
> Anthony Brutti W-2 for 2022 (Exhibit 188), EX. 88
>
> Jose Aguirre, Don Cruikshank, David Green, Eric Jansma, Nicolas Kelly and Collin Zarlengo W-2s for 2022, (Exhibit 264), EX. 89
>
> Anthony Brutti W-2 for 2023, (Exhibit 191), EX. 90
>
> Jose Aguirre, David Green, Eric Jansma, Nicolas Kelly, and Collin Zarlengo W-2s for 2023, (Exhibit 263), EX. 91

David Green W-2s for 2020-2024, (Exhibit 28), EX. 92

**RESPONSE: MDS objects on grounds of immateriality. MDS admits SOF 65.**

STATEMENT OF FACT NO. 66:
Tony Zarlengo and Michael Richert made the decision for Tony Brutti to a distribution as a "bonus" and Zarlengo is notified by Callie Stephens from Gineris & Associates, Ltd., Midwest Dock Solutions and Dock & Door Install's shared accounting firm when Brutti takes a distribution from Dock & Door Install. Zarlengo testified as follows regarding this text message exchange between him and Stephens:



SUPPORT FOR STATEMENT NO. 66:
Zarlengo 302:10-303:12; 304:8-13, EX. 2 ("Q. I'm handing you what I've marked as Exhibit 107, and I'll represent to you that this is a text message between you and Callie Stephens, and I'd like for you to take a look at the one dated June 13, 2023. Do you see that? A. Yes. Q. And it says, hey, Tony, long time no talk. I hope you're well. I'm reviewing Dock & Door for May. I saw that Tony took a $5,000 distribution. Do you understand that would be Tony Brutti? A. Yes. Q. Were you aware of this? Do you want me to notify you in the future? And you respond, yes, we told him to. No issue. Thanks. We are working on this mile thing, also, for sales guys. Do you see that? A. Yes. Q. <u>All right. Why -- why did you tell Tony Brutti to take a distribution? A. For a bonus. Q. Okay. A. I don't know. I mean, for a bonus. ... Q. Are you ordinarily notified when Mr. Brutti takes a distribution?</u> A. <u>Yes</u>. Q. Okay. And why is that? A. I don't know why that is.

Text Message Between Callie Stephens, Gineris & Associates, Ltd., and Tony Zarlengo, Midwest Dock Solutions, Jun. 13, 2023 (Exhibit 107), EX. 122.

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR**

**56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, facts or proper citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), which further expands the amount of alleged facts past the 80 permitted.**

**MDS object that the Funds' citations do not contain any support for its assertion that Zarlengo and Richert "made the decision" that Brutti take the distribution, and as such it is unsupported.**

**MDS disputes that Gineris or Stephens notifies MDS whenever Brutti takes a distribution. Stephens testified she had never done so before or since.**
***Citation*: EX 62 (Stephens Dep) 104:5-105:2.**

**MDS objects to the Fund's improper argument that MDS and D&D "share" an accounting firm.**

**MDS admits the remainder of SOF 66.**

N. Dock & Door Has No Market Presence.

STATEMENT OF FACT NO. 67:
Dock & Door has never maintained a website, a Facebook marketing page, a dedicated email address, it does not advertise in any industry publications, and it has no sponsorship logo on Tony Brutti's race car.

SUPPORT FOR STATEMENT OF FACT NO. 67:
Brutti 98:13-17, EX. 3 ("Q. Okay. Sir, Dock & Door doesn't have a website; correct? A. Correct. Q. It has never had a website; correct? A. No.")

Brutti 98: 18-21, EX. 3 ("Q. And Dock & Door has no Facebook page; correct? A. Correct. Q. And has never had a Facebook page; correct? A. Correct.")

Brutti 98:22-99:2, EX. 3 ("Q. And Dock & Door doesn't advertise in trade publications; is that correct? A. Correct. Q. All right. Has Dock & Door ever advertised in trade publications? A. Not to my knowledge, no.")

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' Document Requests, Request Nos. 47-51, EX. 32 ("47. Produce all documents related to any social media pages maintained by Dock & Door, including but not limited to Facebook, Instagram, or LinkedIn. RESPONSE: There are no documents that are responsive to this Request No. 47; 48. Produce all documents related to the creation, design, maintenance, updating and hosting of any website owned or controlled by Dock & Door, including but not limited to agreements, invoices, payment records, and the like. RESPONSE: There are no documents that are responsive to this Request No. 48; 49. Produce documents sufficient to show any

105

website maintained by Dock & Door at any time during the period from January 1, 2016 to the present. RESPONSE: There are no documents that are responsive to this Request No. 49; 50. Produce all documents related to any internet URL owned, controlled, or used by Dock & Door. RESPONSE: There are no documents that are responsive to this Request No. 50; 51. Produce all documents related to any email address owned, controlled, or used by Dock & Door. RESPONSE: There are no documents that are responsive to this Request No. 51.")

Brutti 99:3-17; 100:9-10; 101:7-10; 101:21-25, EX. 3 (testifying that his race cars have a sponsorship logo for "Midwest Dock Solutions" on them but no logo for Dock & Door)

**RESPONSE: MDS objects on the basis of immateriality. MDS admits SOF 67.**

O. Midwest Dock Maintains A Market Presence And Holds Itself Out As A Union Company.

STATEMENT OF FACT NO. 68:
Midwest Dock maintains a website, a Facebook marketing page, and a dedicated email address @midwestdocksolutions.com, it advertises in the Blue Book Building & Construction Network, an industry trade publication, and it even has its company logo across the hood of Tony Brutti's race car. Midwest Dock advertised itself in the Blue Book as a "union" company that performs work on new projects:





SUPPORT FOR STATEMENT OF FACT NO. 68:
Zarlengo 259:3-260:10, EX. 2 ("Q. Are you familiar with the Blue Book Construction Network? A. Yes. Q. Okay. What is it? A. Advertising, but for subcontractors. ... So you filled it out about 15 years ago, you think? A. At least, 10. We haven't used it in three years, I don't think. We haven't paid for it. But, yeah, I signed up with that very early on. Q. When you say 'very early on,' very early on when in the formation of Midwest Dock Solutions?

A. I'm trying to think what year ballpark. I think I was at Burville Road. Q. Well, let me direct your attention to -- A. I'm going to guess 2013 or '14.")

Blue Book Building & Construction Network ProView Worksheet and Contract at p.3, EX. 93 ("Labor Affiliation: Union") (emphasis added)

The Blue Book Webpage for Midwest Dock Solutions, Inc. at pp. 1, 2, (Exhibit 105), EX. 94 (highlighting added)

The Blue Book Building & Construction Network Contract For The Period August 2021 through July 2023, Apr. 14, 2021, EX. 95 (signed by Zarlengo)

Zarlengo 267:13-268-24, EX. 2 ("Q. Is all of the -- let me ask my question in a different way. Is all of the information on here -- strike that. Is any of the information on this contact page not accurate? A. No. Q. Okay. And -- let's see. And if you could go to the first page, do you see where it says, project experience, on the right side? A. Yes. Q. The first statement there is – says union. Do you see that? A. Yes. Q. And then it also says, public, private, new projects, alterations/renovations, interior fit-ups. Do you see that? A. Yes. Q. All right. Would you say Midwest Dock Solutions has experience with union projects? A. As of this date -- like I don't know what this date is. Q. As of the last time that the listing was updated by Midwest Dock Solutions for the Blue Book. A. Since it was updated, we've done -- yeah, we have experience with new projects.")

**RESPONSE: MDS objects on the grounds of immateriality. MDS disputes it "maintains" a Blue Book Construction Network entry. Zarlengo testified MDS has not actively updated it, an has not paid for it in a number of years.**
***Citation*: EX 2 (Zarlengo Dep) 259:3-260:10, EX. 2.**

**MDS admits the remainder of SOF 68.**

STATEMENT OF FACT NO. 69:
Midwest Dock identified itself a "union" when it filled out the Subcontractor Prequalification form with Pepper Construction Company, something Midwest Dock had to do in order to bid on subcontracts for installation of overhead doors and dock levelers with Pepper Construction Company. Moreover, when Zack Adkins, a senior project manager with Pepper Construction asked Ira Sugar from Midwest Dock whether Midwest Dock would use union labor on its job, Sugar responded, "Yes, thats [sic] correct, we are union."

SUPPORT FOR STATEMENT OF FACT NO. 69:
Email from Ira Sugar, Midwest Dock, to Zach Adkins, Pepper Construction Company, Nov. 4, 2019, (Exhibit 60), EX. 96

Sugar 100:19-101:13, EX. 23 ("Q. All right. And then on the first page of this, there's a -an email from Zach Atkins to you dated May 1, 2020, and he asks, Ira, union install, correct? Do you see that? A. Yes. Q. And what do you understand him to be asking? A. If I'm going to be using union labor on this job. Q. Okay. And then you respond to him in the email --

107

that's the first email on this page, May 1, 2020 -- saying, hi, Zach. Yes, that's correct. We are union, correct? A. Yes. That's what it says. Q. Okay. That was your email to him? A. Yes.")

Declaration of S. Oertley, Senior Contract Specialist, Pepper Construction Company, at ¶¶3, 4, Nov. 4, 2025, EX. 20

Zarlengo 185:19-187-20, EX. 2 (testifying that he completed the prequalification form for Pepper Construction Company)

**RESPONSE:**
**MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), which further expands the amount of alleged facts past the 80 permitted.**

**MDS admits SOF 69.**

STATEMENT OF FACT NO. 70:
Midwest Dock submitted a bid proposal to Opus Design Build LLC dated January 3, 2022 signed by Tony Zarlengo where it states that Midwest Dock is bidding the job as a Union company and fail to disclose that Midwest Dock will use Dock & Door as a subcontractor to perform any work.

> SUPPORT FOR STATEMENT OF FACT NO. 70:
> Bid Proposal by Midwest Dock Solutions, Inc. to Opus Design Build LLC at p.3, Jan. 3, 2022, (Exhibit 100), EX. 97
>
> Zarlengo 172:14-176:6, EX. 2 ("Q. Sir, if you could look at Exhibit 100 in front of you there, it – it looks like this is a document produced by Midwest Dock Solutions. Do you see the number on the bottom there? A. Yes. Q. And the first three pages look to be a contract -- or a bid summary or something -- well, strike that. What are the first three pages? Tell me what they are. A. A bid. Q. Okay. It's a bid? A. Yes. Q. A bid that you prepared? A. I did prepare this. ... Q. All right. And if you look at the bottom of this, it says union or open shop field labor, question mark. Do you see that? Yes. Q. What is an open shop? A. That is union or nonunion. Q. Okay. So open shop is nonunion? A. Yes. Q. All right. And you circled union, correct? A. Yes. Q. All right. So -- well, did you know, was union -- was union labor required for this project? A. Yes. Q. All right. Who are you bidding on this? Is it -- A. Opus. Q. Opus? Okay. And then if you turn to the next page, the third page, which is labeled four of four on the bid, it says, list any subcontractors to be hired and describe the scope of work and EMR? Do you see that? A. Yes. Q. And there's no nobody listed there, correct? A. Correct.")

**RESPONSE: MDS objects to the inclusion of argument by the Fund in its argumentative statements that MSD "failed to" include a listed subcontractor.**

**MDS objects that the Fund has cited no document or testimony to support the assertion that MDS was "bidding as a union company" and accordingly the fact is unsupported.** *Citation*: EX 2 (Zarlengo Dep) 175:8-15.

**MDS admit the remainder of SOF 70.**

P. D&D Holds Itself Out As Midwest Dock.

STATEMENT OF FACT NO. 71:

Employees of Dock & Door used trucks like the one shown below branded with the name "Midwest Dock Solutions" on union jobsites where Dock & Door employees were working. Testifying about the Facebook post for Midwest Dock showing the "Midwest Dock Solutions" truck on the job site, Tony Zarlengo testified that this was one of the jobs at the Heritage Crossing development that would have been performed by employees of Dock & Door:



(Exhibit 53), EX. 6



(Exhibit 8), EX. 98

SUPPORT FOR STATEMENT OF FACT NO. 71:

Zarlengo 234:22-236:24, EX. 2 ("Q. And if you turn to the next page in that exhibit, it says Midwest Dock Solutions, July 26, 2016. Do you see that? A. Yes. Q. And it's another post by Mike Richert, and it says Midwest Dock Solutions is in Lockport, Illinois. Do you see that? A. Yes. Q. July 26, 2016, correct? A. Yes. Q. All right. Is that the Heritage Crossing building? A. One of them, yes. ... And if the date of the picture is in July of 2016 -- and we had looked at the Krusinski contract earlier and the Certificates of Insurance, and I think they were actually dated 2014 and '15 -- do you know when -do you know approximately when these pictures would have been taken? A. No, I don't. I would assume – I would think about the same time as they were posted, but I can't confirm that. Q. Would this work have been work performed by employees paid through Dock & Door? A. Yes.")

Cruikshank 43:11-44:9, EX. 8 (testifying that he drove trucks that said Midwest Dock on the side when he worked on job sites for Midwest Dock and when he worked for Dock & Door; and, there were no trucks that said Dock & Door on the side)

111

Bishop 73:2-10, EX. 71 ("Q. Okay. And does -- do employees of Dock & Door use trucks like this that have the Midwest Dock branding on the side? A. We do. Q. Okay. And you use those on Dock & Door job sites, correct? A. We do.")



Midwest Dock Solutions Truck, (Exhibit 8), EX. 98 (showing a "Midwest Dock Solutions" truck parked at a new construction jobsite)

Midwest Dock Solutions Truck, (Exhibit 5), EX. 99

Midwest Dock Solutions Truck, (Exhibit 6), EX. 100

Williams 79:17-80:2; 80:22-81:5, EX. 18 ("Q. And you would use a truck like this in your work? A. Yes. Q. Okay. And it would have the Midwest Dock Solutions on the side of it like this? A. Yes.")

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, facts or proper citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), which further expands the amount of alleged facts past the 80 permitted.**

MDS admits SOF 71.

STATEMENT OF FACT NO. 72:
It is often a requirement at union jobsites that the workers on the jobsite wear brightly colored clothing. Midwest Dock purchased brightly colored company branded clothing, including tee-shirts and sweat shirts for employees of both Midwest Dock and Dock & Door to wear on jobsites.

112

Dock & Door does not purchase any company branded clothing. Accordingly, employees of Dock & Door wore shirts like the one shown below branded with "Midwest Dock Solutions" while they were working on union jobsites:



(Exhibit 15), EX. 101

SUPPORT FOR STATEMENT OF FACT NO. 72:
Photograph of Midwest Dock Solutions, Inc. Shirt, (Exhibit 15), EX. 101

Opus Design Build LLC Bid Proposal Requirements at p.9, (Exhibit 100), EX. 97 ("Our subcontract agreement requires you to comply with the safety policies and requirements of Opus Design Build, L.L.C., and those of all local, state and federal agencies. ... 2. You are required to actively participate in the project safety program. Please note the following points: ... b. We require proper work clothing to include high visibility clothing for earthmoving operations.")

Pepper Construction Company: Subcontract Agreement Between Pepper Construction Company and Midwest Dock Solutions, Inc. for North American Warehouse Expansion, Glenview, Illinois at 20, May 15, 2020, (Exhibit 61), EX. 19 ("Subcontractor understands that 100% of all protection, hard hats, protective eye wear, and high visibility clothes are required.")

Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' Second Set Of Interrogatories And Document Production Requests, Document Request No. 14, EX. 102

("Defendant [Dock & Door Install] does not purchase any company branded clothing therefore it does not possess any documents responsive to this request.")

Cruikshank 122:13-123:16, EX. 8 ("Q. And if you -- and if you turn – if you turn to Exhibit 15, do you see the [Midwest Dock Solutions] shirt that Mr. Kelly has on there? A. Yes. Q. Did you have shirts like that? A. Yes. Q. All right. And would you wear those shirts on job sites? A. Yes. Q. And would you wear those same shirts, including when you were on Dock

& Door job sites? A. Yes. Q. All right. And the shirts, are they worn, in part, because of the bright color for safety reasons? A. Yes. Q. Okay. Is that a job site requirement -- A. Yes. Q. -- do you know? It is. Okay. And there were no shirts like that for Dock & Door, correct? A. No.")

Bishop 98:24-99:24, EX. 71 ("Q. Okay. And so have you worn the Midwest Dock Solutions shirts when you've been working on Dock & Door jobs? A. Yes. Q. All right. And part of that is to comply with that requirement of wearing brightly-colored clothing, correct? A. Yeah. As long as you have like -- I mean, it doesn't matter what's on the shirt on those jobs. It's just as long as it's a high vis, so it can also be an orange. Q. Okay. Does Midwest Dock Solutions have orange shirts? A. They have had them before. I don't have any, though. Q. Okay. You have the green ones? A. I do, yes. Q. All right. Are there shirts that are Dock & Door Install branded shirts? A. Not that I know of, no.")

Tattini 47:15-48:12, EX. 15 ("Q. And when did -- did you go -- did you -- strike that. Did you work for Midwest Dock Solutions directly, like -- well, strike that. When did you first go to work for -- strike that. What do you know the company as? You know it as Midwest Dock Solutions, Dock & Door? A. We know it as both, but like the -- the face and Branding of it is Midwest Dock. We would show up in Midwest Dock, you know, labeled trucks, but we all knew we were getting paid from Dock & Door Install or whatever it was. Q. Okay. A. Yeah. So we all knew that. Q. Okay. So when you were hired, the first company you were paid through, was it Dock & Door? A. Yes.")

Tattini 144:6-145:3, EX. 15 ("Q. Were you required to wear Midwest Dock branded shirts on your jobs? A. Yes. Q. You couldn't wear just some like high vis shirt? A. You could. Q. You could wear kind of -- you could wear any high vis shirt -- A. Yes. Q. -- if you wanted to? A. According to meet the compliance of the contractor, yes. Q. Right. A. But to be compliant with my boss, I'd have to wear the Midwest attire. Q. Okay. And when you say your boss, who are you talking about? A. Mike and Tony. Q. Tony who? A. Zarlengo.")

Green 94:15-95:1, EX. 12 ("Q. All right. And do you sometimes wear the Midwest Dock shirts like that that are brightly colored? A. Yes. Q. All right. And are there -- does Dock & Door supply you with shirts like that at all that are bright colored with Dock & Door's name on them? A. No.")

Green 96:19-97:6, EX. 12 ("Q. All right. And do you have sweatshirts like that, also? A. I do have a couple. Q. Okay. And do you wear those on the job site in colder temperatures? A. Yes. Q. Okay. And you do that with your work for Dock & Door, Correct? A. Yes.")

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, facts or proper citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large**

**passages of deposition transcripts), that are disguised as part of its citations, but which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF. MDS objects that the above renders it impossible to then know whether the additional facts contained in the citation parentheticals are considered part of the actual SOF that need to be admitted or disputed.**

**MDS objects as to immateriality. MDS objects as to speculation and lack of competency regarding Tattini's statements as to what other employees "knew".**

**The Fund has failed to cite to any evidence or testimony to support its assertion that MDS purchased clothing "for" Dock & Door employees.**

**MDS disputes that it ever required any individual, whether MDS employee or D&D employee, to wear MDS branded clothing.**
***Citation*: EX 7 (Corrigan Dep) 202:12-204:11; EX. 71 (Bishop Dep) 98:24-99:24.**

**MDS admits the remainder of SOF 72.**

    Q. Brutti Acts As An Employee of Midwest Dock.

STATEMENT OF FACT NO. 73:
Tony Brutti works 32-35 hours a week for Dock &Door. Brutti "might do a little bit of field measuring," he brings supplies from Midwest Dock's shop to the jobsite, unloads and stages materials at the jobsites even though he is not a Union member, prepares safety plans, certified payrolls, gets material at the shop ready for his guys for the next day (*e.g.*, loading the materials on to the trailer), gathers workers' time sheets, prepares invoices to Midwest Dock using the Xero accounting software based on the workers timesheets, and writes checks.

    SUPPORT FOR STATEMENT OF FACT NO. 73:
    Brutti 161:21-169:25, EX. 3 (testifying as to the work that he performs, including "I might do a little bit of field measuring and making sure the openings are the actual right size and making the job site is actually safe. I've run into some jobs where I didn't really feel that it was safe for us to be working there.·So I would maybe bring things up to the superintendent what needs to be done. And then I would do, I would generally go there one more time to offload the trucks. And then if just anything arised where I didn't want them leaving the job site, I would just -- I would say I'll just give it to you, anchors, material, whatever, safety stuff, you know. Q. All right. And would you bring some of those items from the shop? A. Yeah, generally. Q. Anchors and other materials or supplies? A. Yeah. Q. And when you say "offload the trucks," you mean offload the overhead doors and dock levelers? A. I would, yeah. Q. And how would you do that? A. Usually with a forklift. Q. Okay. And would that be the forklift from Midwest Dock Solutions? A. Sometimes. Q. And would sometimes you use one that's at the job site? A. Or a rental, yeah. Q. Rental. Now, if it's a rental, would the rental be arranged by Midwest Dock Solutions? A. Yes. Q. And it would be paid for by Midwest Dock Solutions? A. Yes.")

115

Brutti 160:13-16, EX. 3 ("Q. How many hours would you say you work on average for Dock & Door? A. Oh, 35, 32, something like that. I mean, it varies.")

Cruikshank 90:6-8, EX. 8 (testifying that Brutti collected the timesheets)

Cruikshank 102:18-103:11, EX. 8 ("Q. And then Anthony Brutti was on the list. You know him as well, correct? A. Yes. Q. What kind of work did he do? A. He was in charge of hours for the union side and paying -- you know, payroll. Q. For the union side? A. Yeah. Yeah. Q. Okay. Okay. Anything else that he did that you're aware of? A. No. Q. Okay. Would Anthony Brutti work on the job sites? A. No")

Tattini 71:3-12, EX. 15 ("Q. So he would be at the job site, too? A. Tony Brutti? Q. Yeah. A. Yes. He would even -- I mean, he would -- he would unload. His job was supposedly to unload the semis with the dock levelers, so he would always be doing that. So when we showed up on a job, most of the time the dock levelers would be in the pits because he was out there putting them in there.")

Williams 11:1-13, EX. 18 ("When was the last time – do you know who Tony Brutti is? A. Tony Brutti? I believe that's Payroll Tony. Q. Okay. When you say 'Payroll Tony,' what's that mean? A. That's the person we would send our time sheets, too, I believe.")

Bishop 122:12-19, EX. 71 ("Q. What does Tony Brutti do for Dock & Door? A. As far as I know, he's the president, and he just makes sure we work and make sure like if we have anything, like school wise or anything like that, he lets us know of it. Q. Anything else? A. No.")

Green 111:23-112:21, EX. 12 ("Q. And Anthony Brutti, do you do work with him? A. No. Q. Okay. And did you -- you never worked with him? A. Not on a job site, no. Q. And what -- who is Anthony Brutti? A. He's my boss, as far as the owner of Dock & Door Install as far as I know. Q. Okay. And when you say he's your boss, what did -- what interaction do you have with him on a day-to-day basis? A. He keeps track of time, payroll. And that's about it, as far as I know. Q. All right. And you said he's -- he's delivered stuff to the job site before that you've been on, correct? A. Yes.")

**RESPONSE: MDS objects to the improper argument regarding the phrasing "even though he's not a union member."  MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, facts or proper citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF.**

116

**MDS admit the remainder of SOF 73.**

STATEMENT OF FACT NO. 74:
Tony Brutti testified that the amount that Dock & Door charged Midwest Dock for the hours worked by Dock & Door employees was based upon the union scale that Dock & Door workers were paid, including additional expenses that Dock & Door also had to pay as a result of its existence such as fringe benefit contributions, accounting fees, legal fees, unemployment compensation insurance, and employer's share of social security taxes and Medicare. When union scale increased, the billing rates to Midwest Dock increased accordingly.

    SUPPORT FOR STATEMENT OF FACT NO. 74:
    Brutti 193:9-195:15, EX. 3 (testifying as to how the hourly rate was set for Dock & Door employees)

    Brutti 197:5-201:21, EX. 3 (testifying that hourly rates for Dock & Door employees would change when contribution or wage rates for the unions increased or insurance and accounting costs increased: "Q. Okay. What did your negotiations for the unit price consist of? A. It wasn't much of a negotiation. I would basically just tell him I'm going to have to raise this price. Q. Okay. And that was because the number went up for the fringe benefit contribution and the hourly rate? A. Among others. Among others. And also as, so the more work we had, the more employees we had, the more billable hours we had, which also helped make it easier to make money, as business declined, less billable hours, so the pricing had to go up also. Q. Well, your costs also went down; correct? A. Not -yes, the cost of employment did, but things like insurance and accounting costs and things like that don't go down. Q. They -- A. They usually go up, yeah. Q. Okay. So other than -- how about when you first started out, how was the unit price negotiated? A. Well, I mean, we were kind of flying at the hip, but I think we started at about 100 or 90, 90 or a 100. Q. Okay. A. But we just agreed to that, said let's see how this goes, I mean, we'll change it fast if we need to change it, but let's try this and see how it goes.")

**RESPONSE: MDS admits SOF 74.**

STATEMENT OF FACT NO. 75:
The timesheets used by Dock & Door employees were kept at Midwest Dock's office in the breakroom and when the timesheets were completed by the Dock & Door employees the employees either texted them to Tony Brutti or left them in the lunchroom to be picked up. Brutti would collect the timesheets and then use those timesheets to prepare individual daily invoices to Midwest Dock for each Dock & Door employee. The daily invoices prepared by Brutti are essentially daily timecards for the hours worked by each employee each day; a separate invoice is issued for each employee for each day stating the date, describing the project where the employee worked that day, and the number of hours the employee worked that day:

| Description | Quantity | Unit Price | Amount USD |
|---|---|---|---|
| Don Cruikshank 8-2-22: Clopay Belle Tire Yorkville, Installation of sectional overhead doors. | 8.00 | 105.00 | 840.00 |
| | | Subtotal | 840.00 |
| | | TOTAL USD | 840.00 |

SUPPORT FOR STATEMENT OF FACT NO. 75:

Williams 101:11-103:1, EX. 18 (the blank timesheets for the Dock & Door employees were kept in the lunchroom right off the warehouse part of the building leased by Midwest Dock); 114:2-19 (completed timesheets were left on a table in the lunchroom)

Brutti 187:4-17, EX. 3 ("Q. Okay. Now, to create -- you said when it's payroll day -- you said when it's payroll day, you're in the office for three or four hours; correct? A. It could be, yeah. Q. And that's generating these invoices? A. Yeah. Q. And entering the information that's on them? A. Yes. Q. Okay. And you do that from the timesheets that all the Dock & Door employees e-mail to you or leave in the break room; correct? A. Correct. Q. Okay. So you gather all the timesheets? A. Yeah.")

Cruikshank 89:24-90:8, EX. 8 ("Q. And do you know how you forwarded these time sheets to the company? A. I think, at this point, we were, you know, maybe taking pictures of them and sending them. Q. Okay. And do you know who you would have sent them to? A. It would have gone to Tony Brutti.")

Green 120:10-20, EX, 12 ("Q. And then where would you return the completed time sheets to? A. I'd put them back on the lunchroom table. Q. Okay. And somebody would pick them up there? A. Yes. Q. All right. And do you know who picked them up? A. No.")

Dock & Door, Inc. Deposit Summary, Sep. 1, 2022, (Exhibit 168), EX. 103 (Midwest Dock Solutions Inc. Payment of $10,972, Dock & Door Install Inc. Invoices to Midwest Dock Solutions Inc.)

Dock & Door Install Inc. Invoices to Midwest Dock Solutions Inc., (Exhibit 223), EX. 34 ("service work")

Brutti 166:18-169:12, EX. 3 (describing the daily invoices for each employee and the information in the daily invoice, including the following: "Q. Okay. And then when you're done entering in the information for the invoices, and the invoices generally include, each invoice is a separate employee on a specific day; correct? A. Yes. Q. So you have a separate invoice for each employee for each day? A. Yes. Q. Okay.·And essentially it includes their name and the hours they worked; correct? A. Correct. Q. That's like the quantity is the hour worked? A. Hourly, yeah. Q. Okay. So each invoice is like a separate charge bases on each day they have on their timesheets? A. It's a bill to Midwest Dock Solutions. Q. But you're billing Midwest Dock like for each day for each employee right off like their timesheets? A. Correct.")

118

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund by its argument in the SOF that the "invoices prepared by Brutti are essentially daily timecards."**

**MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), that are disguised as part of its citations, but which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF.**

**MDS admits SOF 75.**

STATEMENT OF FACT NO. 76:
Sherri Webber at Midwest Dock uses the Xero software program to incorporate Dock & Door's deposit summary and invoices directly into Midwest Dock accounting data which is also maintained using the Xero software for Dock & Door to which Gineris & Associates has access. Webber hands Tony Brutti Midwest Dock's check to pay Dock & Door's invoices when Brutti is in the office, Brutti prepares a deposit summary using Xero, prints the deposit summary, attaches the deposit summary to the invoices, an email is generated from the Xero software to Webber for the deposit summary, and Brutti then deposits the check into Dock & Door's account.

> SUPPORT FOR STATEMENT OF FACT NO. 76:
> Dock & Door, Inc. Deposit Summary, Sep. 1, 2022, (Exhibit 168), EX. 103 (Midwest Dock Solutions Inc. Payment of $10,972, Dock & Door Install Inc. Invoices to Midwest Dock Solutions Inc.)
>
> Webber 104:5-106:23, EX. 63 (" Q. ... You do have Zero. And when you click on it, it does copy the invoice in your system? A. Because I log into our system, and it will transfer over, yes. Q. I see. So -- but who does the email come from? A. The email? Q. With the link. A. That comes from Tony Brutti. ... Q. And when -- then when Midwest Dock sends out invoices, when it creates an invoice in Zero, how does that invoice get sent out? A. That invoice is saved as -- like in a Word document or a -- well, a PDF. I'm sorry. Not a Word document. And then that's attached to an email that's outgoing. Q. I see. So you just -- and it's like you're sherri@midwestdocksolutions.com -- A. Yes. Q. -- or amber@midwestdocksolutions.com, that's her email address for your email that's going out? A. Yes. And we're attaching that file to the email. Q. As a PDF? A. Yes. Q. I see. And when the customer gets that invoice, if they have Zero, can they click on it and download it into their system? A. No. Q. Oh, because you're not sending it out that way? A. Right. Q. I see. But Tony Brutti, when he sends the invoices, he does send them in a manner that they can be added to your system if you open them in Zero? A. Yes.... Q. All right. And so -- so Mr. Brutti forwards the invoices, a group of invoices to you in like a single PDF or -- A. He sends those through Zero. So that's where I was saying before, I would have the invoice, and then I can log into my account since I do have Zero. Q. I see. Okay. So you

119

get an email from him, and it has like a tab or something you click on in order to go to Zero and download the invoices into your system? A. Yes.")

Brutti 180:7-183:1, EX. 3 (testifying to the process by which Midwest Dock pays Dock & Door invoices)

Brutti 184:1-21, EX. 3 (Brutti testifying that when the deposit summaries are prepared in Xero, an email is generated and sent to Webber)

Brutti 186:14-187:3, EX. 3 (Brutti testifying that when he takes the check to the bank he generates the deposit summary in Xero to which Gineris & Associates has access through the Xero account)

Brutti 181:4-11, EX. 3 ("Q. Does she [Sherri Webber] generally just hand it to you in the office? A. Yes. Q. Okay. And what do you do with the check when you receive it? A. Deposit it.")

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, facts or proper citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), that are disguised as part of its citations, but which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF. MDS objects that the above renders it impossible to then know whether the additional facts contained in the citation parentheticals are considered part of the actual SOF that need to be admitted or disputed.**

**MDS disputes that any Dock & Door deposit summaries are ever sent to MDS or Webber in any form (neither printed nor electronically). MDS disputes that Dock & Door deposit summaries are ever incorporated into MDS accounting software at any time. MDS disputes that Dock and Door deposit summaries are generated prior to receiving a check from MDS and preparing Dock & Door's bank deposit. Brutti testified that Dock & Door's account system generates the deposit summary after DMS gives him a check for invoices and he prepares Dock & Door's bank deposit. He further testified he prints the deposit summary, places it with the printed invoices and files them in Dock & Door files for his own record keeping. Neither Brutti nor Webber testified at any time that Webber or anyone else at MDS received, imported, or even ever saw the Dock & Door deposit summaries.**
**Citations: EX 3 (Brutti Dep) 181:18-182:8; 182:22-183:9; 185:10-15; 186:14-22; EX 63 (Webber Dep) 243:4-10.**

**MDS disputes that Midwest Dock's has access to any of Dock & Door's accounting data, or vice versa, by virtue of both companies using the same accounting software. MDS disputes**

120

**that it has access to Dock & Door's accounting data, or vice versa, in any other manner. Brutti and Webber testified that Brutti would generate invoices to MDS through Dock & Door's Xero software, which generated an electronic file he emailed to Webber. Because MDS also used Xero, Webber could click the link and the Dock & Door invoices would be uploaded to MDS's software.**
***Citation*: EX 3 (Brutti Dep) 181:18-182:8; 182:22-183:9; 185:10-15; 186:14-22; EX 63 (Webber Dep) 243:4-244:24; 245:21-246:8.**

**MDS admits the remainder of SOF 76.**

    R.  Brutti Works For Midwest Dock And Holds Himself Out To General Contractors As An Employee Of Midwest Dock.

STATEMENT OF FACT NO. 77:
Midwest Dock gave Tony Brutti the Midwest Dock email account "tonyb@midwestdocksolutions.com" which Brutti used when he was performing work for Midwest Dock, including sending emails on behalf of Midwest Dock to general contractors like Pepper Construction and emails to Esser Hayes asking for insurance certificates for Midwest Dock. Those emails included a signature block for Brutti identifying him as a representative of Midwest Dock:



Tony Zarlengo testified that only employees of Midwest Dock were given email addresses with the extension of [name]@midwestdocksolutions.com and Midwest Dock failed to identify Tony Brutti as someone with a Midwest Dock email account in its discovery responses.

    SUPPORT FOR STATEMENT OF FACT NO. 77:
    Zarlengo 21:13-17; 23:1-4; 23:14-19, EX. 2 ("Q. We'll get more into this later in the deposition, but you're aware that Tony Brutti has an email account tonyb@midwestdocksolutions.com? A. Yes. ... Are you aware that Tony Brutti has had that email for more than five years? A. I would think so, yes. ... Q. And has he had that email address ever since Midwest Dock Solutions started using the domain midwestdocksolutions.com? A. Like the day we started it? Q. No, but around that time. A. I would say it was around that time.")

    Sugar 150:10-160:7, EX. 23 ("Q. All right. And if you look at the next page in Exhibit 57, where it says high-speed doors, Hormann -- do you see that? A. Yes. Q. Okay. Is that also a product that Midwest Dock promotes on its website? A. Yes. Q. All right. And it's basically a similar door that's being promoted to Pepper Construction, correct? A. Correct.

121

Q. All right. And your proposal says, a fast opening speed of 80 inches per second. Like six feet a second? A. More than six feet, yeah. Q. All right. So the kind of items that you're going to install for Pepper Construction on this job are the kind of items that are shown on Midwest Dock Solutions' website, correct? A. Yes. Q. And if you look at the email below -- below -- if you go back to Exhibit 71 and look at the second email on this page, it's from Christi Adams dated March 28, 2024, at 12:50 p.m. Do you see that? A. Yep. Q. And it's addressed to Tony Brutti, and his email address is tonyb@midwestdocksolutions.com. Do you see that? A. I do. Q. All right. Is that an email address you're aware that Mr. Brutti uses? A. Yes. Q. Okay. And has he used that email for a long time? A. He did.")

Brutti 119:21-120:11, EX. 3 ("Q. Now, you had an e-mail address of tonyb@midweststocksolutions.com; correct? A. I did. Q. All right. Do you still have that? A. I do not. Q. When did it change? A. I believe in August of 2024. Q. And do you know why? A. I do not. Q. Do you know when you got that e-mail account? A. I couldn't tell you the date or the... Q. Can you tell me the year? A. No. 2000. It would be a guess. Q. What would be your best approximation, even if it were a couple of year period? A. Maybe '18.")

Brutti 121:24-122:3, EX. 3 ("Q. Okay. Now, you used that e-mail account to communicate with some of the general contractors that Page 122 Midwest Dock Solutions was hired to perform work for; right? A. Yes.")

O'Connor 75:16-79:15, EX. 113 (authenticating email exchange between Tony Brutti on behalf of Midwest Dock using his tonyb@midwestdocksolutions.com email and Margaret Stredde on behalf of Esser Hayes where Brutti is asking Stredde for a certificate of insurance on behalf of Midwest Dock for the Principle Construction project and she is sending it to him)

Email from Tony Brutti, Midwest Dock Solutions, to Margaret Stredde, Esser Hayes, Oct. 22, 2020, (Exhibit 287), EX. 114 ("re: COI Needed – Hi Margaret, I am in need of a COI for this Principle Job. See attached for details."); Email from Margarett Stredde, Esser Hayes, to Tony Brutti, Oct. 22, 2020, (Exhibit 288), EX. 115 ("RE: COI Needed – Attachments: Midwest Dock Principle Construction #2020-05.pdf (435.02KB) Tony, here is the COI that Ira ordered on 10/15/20."); Midwest Dock Solutions, Inc. Certificate of Insurance for Principle Construction Corp., Oct. 16, 2020, EX. 116 ("Re: Job #2020-05)

O'Connor 80:-13-86:7, EX. 113 (authenticating email exchange between Tony Brutti on behalf of Midwest Dock using his tonyb@midwestdocksolutions.com email and Margaret Stredde on behalf of Esser Hayes where Brutti is asking Stredde for a certificate of insurance for the Village of Hazel Crest on behalf of Midwest Dock and she is sending it to him)

Email from Tony Brutti, Midwest Dock Solutions, to Margaret Stredde, Esser Hayes, Oct. 23, 2020 (Exhibit 290), EX. 117 ("Subject: COI needed Attachments: Hazel Crest permit.pdf (321.71 KB) Hi Margaret, I am in need of a COI for the village of Hazel Crest. See attached for criteria. Yours, Tony Brutti, Midwest Dock Solutions"); Village of Hazel

Crest Department of Building & Inspectional Services, Application for Contractor's Registration Certificate, Company Name: Midwest Dock Solutions, EX. 118

Email from Margarett Stredde, Esser Hayes to Margarett Stredde, Oct. 23, 2020 (Exhibit 291), EX. 119 ("Subject: Certificate of Insurance was Issued for Midwest Dock Solutions, Inc. Attachments: Certificate.pdf (90.25 KB) ... Delivery Method(s) Issued By: Margaret Stredde Viewed On Screen View (View) Emailed To Tony Brutti (tonyb@midwestdocksolutions.com)..."); Midwest Dock Solutions, Inc. Certificate of Insurance for Village of Hazel Crest, Oct. 23, 2020, EX. 120

Email from Tony Brutti, Midwest Dock Solutions, to Cathie Demitropoulos, Assured Partners, Jan. 11, 2021 (Exhibit 293), EX. 121 ("Subject: COI and Bond needed - I am in need of a COI and bond for the town of Merrillville, IN. See attached for details. Yours, Tony Brutti, Midwest Dock Solutions")

Email from Tony Brutti to Margaret Stredde (Esser Hayes), Apr. 20, 2021, (Exhibit 52), EX. 104

Declaration of S. Oertley, Senior Contract Specialist, Pepper Construction Company at ¶11 and Exhibit 5 at pp.2, 7, 11, 15, 18, 21, Nov. 4, 2025, EX. 20 ("Mr. Brutti held himself out to Pepper as a representative of Midwest Dock by using the email address tonyb@midwestdocksolutions.com, by using a signature block identifying him with 'Midwest Dock Solutions', and by forwarding closeout warranty documents to Pepper on behalf of Midwest Dock.")

Zarlengo 106:13-108:16, EX. 2 (testifying that Midwest Dock failed to disclose in its discovery responses that Brutti had an email address from Midwest Dock—*e.g.*, "Q. And if you go back to the response to interrogatory one, which we've been looking at, you'll see it's the -- it's the list of employee names, and then for many of them, it has email addresses. Do you see that? A. Yes. Q. Tony Brutti isn't listed there as somebody with an email address of @midwestdocksolutions.com, correct? A. Yes. Q. Is there a reason he wasn't identified in response to interrogatory eight as somebody with an email extension @midwestdocksolutions.com? A. He's not -- he's not even on the list. I don't know that answer. He's not even on the list as an employee. Q. All right. Well, he should have been disclosed as somebody with an @midwestdocksolutions.com email address, correct? A. Yes.... Q. And everybody else other than Mr. Brutti who has an email extension at midwestdocksolutions.com, they are an employee of Midwest Dock Solutions, correct? A. Yes. Correct.")

Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Interrogatory No. 1, (Exhibit 40), EX. 24

Decl. of S. Oertley, Senior Contract Specialist, Pepper Construction Company at ¶11 and Exhibit 5 pp.2, 7, 11, 15, 18, 21, EX. 20

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, facts or proper citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), which further expands the amount of alleged facts past the 80 permitted.**

**MDS admits SOF 77.**

STATEMENT OF FACT NO. 78:
Tony Brutti would receive instructions emails from others at Midwest Dock, including Ira Sugar, at his Midwest Dock email address (*i.e.*, tonyb@midwestdocksolutions.com) to send out the closing documents (such as Midwest Dock's warranty letters) to the general contractors that Midwest Dock had contracted with. Brutti prepared Midwest Dock's closeout documents, including Midwest Dock's warranty letters, Brutti would then have Tony Zarlengo sign the warranty letters, and then Brutti would email the closing documents to Midwest Dock's general contractor customers using his tonyb@midwestdocksolutions.com email address with a signature block identifying him as a representative of "Midwest Dock Solutions." Dock & Door never provided the general contractors with warranty letters.

> SUPPORT FOR STATEMENT OF FACT NO. 78:
> Brutti 125:3-21, EX. 3 ("Q. Is there -- now, you also have an e-mail address ajbrutti@gmail.com; is that right? A. Yes. Q. Okay. Is there a reason you use the tonyb@midwestdocksolutions e-mail address instead of the Gmail address? A. The only reason would be because in the chain, I believe this came from Ira, and Ira sent it to me on the Midwest Dock e-mail address. Q. Okay. And as a matter of fact, the e-mail there directly below yours is from Ira; correct? Well, it says 'On Thursday, October 10th.' A. Yeah. Q. All right. He's forwarding this list to you and then you're sending it to Pepper; is that it? A. Yeah. Q. So he would have sent it to you at that e-mail address; is that it? A. Right. Yes.")
>
> Brutti 122:15-124:25; 130:6-21, EX. 3 (testifying that he prepared warranty letters for Midwest Dock, he had Zarlengo sign them, and he sent closeout documents including Midwest Dock's warranty letters to the general contractors, including for example Pepper Construction, using his tonyb@midwestdocksolutions.com account)
>
> Brutti 130:6-21, EX. 3
>
> Brutti 125:22-126:23, EX. 3 (testifying that he prepared and emailed the warranty letter that is part of Exhibit 243 to Zack Adkins at Pepper Construction Company for the Matteson Commerce Center project using his Midwest Dock email address)

124

Brutti 125:22-126:23, EX. 3 (testifying that he prepared and emailed the warranty letter that is part of Exhibit 244 to Zack Adkins at Pepper Construction Company using his Midwest Dock email address)

Brutti 144:23-145:47, EX. 3 ("Q. Okay. I hand you what I have marked Exhibit 250. Now, this is an e-mail from you on August 2nd, 2024; correct? A. Correct. Q. And again, it's from your tonyb@midwestdocksolutions.com e-mail address; correct? A. Correct. Q. And you're forwarding the closeout documents for the McMaster-Carr project; correct? A. Correct. Q. And if you turn to the last page of this, this is the warranty letter that Midwest Dock supplies the template for; correct? A. Yeah. Q. Okay. So you prepared this warranty letter using Midwest Dock Solutions template? A. I did.")

Email Exchange Between Tony Brutti (Midwest Dock), Zack Adkins (Pepper Construction), and Ira Sugar (Midwest Dock), Nov. 4, 2021, (Exhibit 241), EX. 105 (Tony Brutti forwarding Midwest Dock's warranty letter and other closeout documents for Green Era project using his Midwest Dock email account tonyb@midwestdocksolutions.com)

Email Exchange Between Tony Brutti and Zack Adkins (Pepper Construction), Dec. 21, 2021, (Exhibit 242), EX. 106 (Brutti forwarding revised Midwest Dock's warranty letter for Green Era project using his Midwest Dock email account tonyb@midwestdocksolutions.com)

Email Exchange Between Tony Brutti and Christi Adams (Pepper Construction), Aug. 4, 2023, (Exhibit 243), EX. 107 (Brutti forwarding Midwest Dock's warranty letter and other closeout documents for Matteson Commerce Center project using his Midwest Dock email account tonyb@midwestdocksolutions.com)

Email communication between Sherri Webber and Tony Brutti and Tony Zarlengo all using their common @midwestdocksolutions.com email address, Sep. 9, 2022, (Exhibit 244), EX. 108 (directing Brutti to prepare Midwest Dock's warranty papers for the Crow Holdings Joliet Truck Terminal project for ARCO/Murray)

From: Sherri Webber <sherri@midwestdocksolutions.com>
Date: Fri, Sep 9, 2022 at 11:29 AM
Subject: Fwd: Crow Holdings Joliet Truck Terminal
To: Tony Brutti <tonyb@midwestdocksolutions.com>
Cc: Tony Zarlengo <tony@midwestdocksolutions.com>

They need a warranty letter please for the attached contract.

Please email it to: lgeorge@arcomurray.com

Thanks!

Brutti 128:13-129:13, EX. 3

Email Exchange Between Tony Brutti and Christi Adams (Pepper Construction), (Exhibit 246), EX. 109

Brutti 134:9-16, EX. 3 ("Q. Dock & Door never provided a warranty; correct? A. No, we never -- we never provided -- I would send them from my e-mail address, but not provide an actual warranty. Q. Okay. But in sending them, the ones you'd send would be Midwest Dock Solutions warranties; correct? A. Yeah, they would be.")

**RESPONSE: MDS objects to the inclusion of argument that Brutti received "instructions" as stated above. MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, facts or proper citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), which further expands the amount of alleged facts past the 80 permitted.**

**MDS admits SOF 78.**

STATEMENT OF FACT NO. 79:
Tony Brutti prepared warranty letters for all union companies that Midwest Dock contracted with—including ARCO/Murray, Clayco, Krusinski, Meridian Design Build, Morgan Harbour, Opus Design Build, Peak Construction, Pepper Construction, Principle Construction. Brutti would use Midwest Dock's warranty templates to prepare the warranties on behalf of Midwest Dock, he would have Tony Zarlengo sign the warranty letters, and then Brutti would forward the warranty letters to Midwest Dock's customers on behalf of Midwest Dock using his tonyb@midwestdocksolutions.com email account. Dock & Door never provided a warranty for the projects it worked on for Midwest Dock.

SUPPORT FOR STATEMENT OF FACT NO. 79:
Brutti 137:10-138:21, EX. 3 ("Q. Okay. And let me hand you what's been marked as Exhibit 247. And if you look at the last -- this is another one -- this is another's e-mail from you to Cecil Kidenda at Pepper Construction forwarding another warranty letter; correct -- actually, the warranty letter and the other closeout documents; correct? A. Yes. ... Q. Would a letter like this be prepared by Midwest Dock or again, would you get the form text from Pepper and then put it on a Midwest Dock letterhead? A. This is Midwest Dock's template. Q. Okay. So you would have used Midwest Dock's template to prepare this warranty letter? A. Yes. Q. And then again, you'd have given it to Anthony Zarlengo to sign? A. Correct. …… Q. Okay. And this is an e-mail from you forwarding the document to Pepper Construction; correct? A. Yes.")

Brutti 134:20-137:9, EX. 3 (testifying he sent closeout documents to Christi Adams at Pepper Construction using his tonyb@midwestdocksolutions.com e-mail address, and that it was a standard process for him to do the same thing for other large general contractors like ARCO/Murray, Clayco, Krusinski, Meridian Design Build, and Morgan Harbour)

Brutti 134:9-16, EX. 3 ("Q. Dock & Door never provided a warranty; correct? A. No, we never -- we never provided -- I would send them from my e-mail address, but not provide an actual warranty. Q. Okay. But in sending them, the ones you'd send would be Midwest Dock Solutions warranties; correct? A. Yeah, they would be.")

Brutti 144:23-145:14, EX. 3 ("Q. Okay. I hand you what I have marked Exhibit 250. Now, this is an e-mail from you on August 2nd, 2024; correct? A. Correct. Q. And again, it's from your tonyb@midwestdocksolutions.com e-mail address; correct? A. Correct. Q. And you're forwarding the closeout documents for the McMaster-Carr project; correct? A. Correct. Q. And if you turn to the last page of this, this is the warranty letter that Midwest Dock supplies the template for; correct? A. Yeah. Q. Okay. So you prepared this warranty letter using Midwest Dock Solutions template? A. I did.")

Email Exchange Between Tony Brutti and Thomas Braun, Pepper Construction, (Exhibit 250), EX. 110

Declaration of S. Oertley, Senior Contract Specialist, Pepper Construction Company at ¶11 and Exhibit 5, Nov. 4, 2025, EX. 20 (testifying regarding emails sent by Brutti to Pepper Construction holding himself out as a representative of Midwest Dock)

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, SOF facts nor proper citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), that are disguised as part of its citations, but which further expands the amount of alleged facts past the 80 permitted.**

**MDS admits SOF 79.**

STATEMENT OF FACT NO. 80:
Tony Brutti prepared Midwest Dock's "Site Specific Safety Plan" for Pepper Construction Company for the Subcontract Agreement that Midwest Dock signed with Pepper Construction Company to install overhead doors at the RR Donnelley Wallace project in St. Charles, Illinois. The Site Specific Safety Plan does not identify Dock & Door anywhere but provides that Midwest Dock's contacts for the project are Tony Zarlengo, Michael Richert, and David Green (who was a Dock & Door employee) and states that the work will be provided by "Midwest Dock". Brutti then signed Zarlengo's name to the Site Specific Safety Plan as "President Midwest Dock Solutions" and then Brutti emailed the SSSP to Christi Adams at Pepper Construction Company on March

127

28, 2024 using his tonyb@midwestdocksolutions.com email address with a signature block stating "Yours, Tony Brutti, Midwest Dock Solutions Phone: 815922-5258 Email: tonyb@midwestdocksolutions.com."

SUPPORT FOR STATEMENT OF FACT NO. 80:
Site Specific Safety Plan Midwest for Pepper Construction RR Donnelley Wallace for Subcontractor Midwest Dock Solutions, Mar. 27, 2024, (Exhibit 249), EX. 111

Email from Tony Brutti, Midwest Dock, to Christi Adams, Pepper Construction Company, Mar. 28, 2024, (Exhibit 98), EX. 112

Declaration of S. Oertley, Senior Contract Specialist, Pepper Construction Company at, ¶11 and Exhibit 5, Nov. 4, 2025, EX. 20 (testifying that Brutti sent an email and Site Specific Safety Plan to Pepper Construction Company along with numerous other email communications forwarding closeout documents, holding himself out as a representative of Midwest Dock)

Zarlengo 149:4-150:4, EX. 2 (testifying that of the persons identified in the Site Specific Safety Plan, Zarlengo and Richert are employees of Midwest Dock and Green is an employee of Dock & Door)

Zarlengo 150:15-151:4, EX. 2 ("Q. Now, if you look at the email that's on pages one and two, if you look on the second page, it looks like the signature block for Tony Brutti's email is at the bottom on the second page. Do you see that? A. Yes. Q. And it says, Tony Brutti, Midwest Dock Solutions, and then it also has his email, tonyb@midwestdocksolutions.com, correct? A. Yes. Q. And that email address was an email that Tony Brutti had in March of 2024, correct? A. Correct.")

Brutti 140:1-142:20, EX. 3 (testifying that the SSSP provides the "basic rules of the job site and then also like where your nearest hospital would be and then where, the scope of work that we're doing... and that he was given a template that he used to prepare the Site Specific Safety Plan for Midwest Dock Solutions, that he prepared the SSSP, and that he emailed it to Christi Adams at Pepper Construction using his Midwest Dock Solutions email account tonyb@midwestdocksolutions.com")

**RESPONSE: MDS objects that the SOF is not concise and contains numerous disassociated statements, in violation of LR 56.1(d)(1). MDS objects that the excess amount of facts contained in the SOF itself leads to an excess of the allotted 80 statements of fact under LR 56.1(d)(5). MDS objects to the inclusion of argument by the Fund in its improper characterizations made within parentheticals to several of its citations, and such characterizations are not, themselves, SOF facts nor proper citations. MDS objects to the Fund's improper inclusion of additional factual assertions (including by improperly inserting large passages of deposition transcripts), that are disguised as part of its citations, but which further expands the amount of alleged facts past the 80 permitted, and by including facts in its citation parentheticals that introduce testimony or facts wholly unrelated to the facts in the actual SOF.**

128

**MDS disputes that Brutti "then signed Zarlengo's name to the Site Specific Safety Plan as "President Midwest Dock Solutions." Zarlengo's signature does not appear on the Safety Plan and Brutti testified Zarlengo's typed name is preprinted on the form.**
***Citation*: EX 111 (Site Specific Safety Plan); EX 3 (Brutti Dep.) 143:1-9.**
**MDS admits the remainder of SOF 80.**

Dated: April 17, 2026                                       **MIDWEST DOCK SOLUTIONS, INC.,**

                                                   By: /s/ Michael F. Hughes
                                                       One of Defendant's Attorneys

Jeffrey A. Risch, Esq. (ARDC No.: 6271407)
Michael F. Hughes, Esq. (ARDC No.: 6279175)
AMUNDSEN DAVIS, LLC
3815 E. Main Street, Suite A-1
St. Charles, IL 60174
(630) 587-7910 - Telephone
JRisch@amundsendavislaw.com
MHughes@amundsendavislaw.com
***Attorneys for Defendant Midwest Dock Solutions, Inc.***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 17, 2026, **DEFENDANT MIDWEST DOCK SOLUTIONS, INC.'S RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT  PURSUANT TO LOCAL RULE 56.1** was filed electronically with the Clerk of the Court using the CM/ECF system which will send notification to all parties of record.

By: /s/ Michael F. Hughes
One of Defendant's Attorneys

Jeffrey A. Risch, Esq. (ARDC No.: 6271407)
Michael F. Hughes, Esq. (ARDC No.: 6279175)
AMUNDSEN DAVIS, LLC
3815 E. Main Street, Suite A-1
St. Charles, IL 60174
(630) 587-7910 - Telephone
JRisch@amundsendavislaw.com
MHughes@amundsendavislaw.com
*Attorneys for Defendant Midwest Dock Solutions, Inc.*