**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MID-AMERICA CARPENTERS REGIONAL
COUNCIL PENSION FUND; MID-AMERICA
CARPENTERS REGIONAL COUNCIL HEALTH
FUND; MID-AMERICA CARPENTERS
REGIONAL COUNCIL APPRENTICE AND
TRAINEE PROGRAM; and MID-AMERICA
CARPENTERS REGIONAL COUNCIL
SUPPLEMENTAL RETIREMENT FUND,

                    Plaintiffs,

       v.

DOCK & DOOR INSTALL, INC., an Illinois
corporation and MIDWEST DOCK SOLUTIONS,
INC., an Illinois corporation,

                    Defendants.

Case No 1:24-cv-06428

Judge Andrea R. Wood

Magistrate Judge Jeannice
W. Appenteng

## <u>DEFENDANT, MIDWEST DOCK SOLUTIONS, INC.'S, MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

Defendant, Midwest Dock Solutions, Inc. ("MDS"), through its undersigned counsel hereby submits Local Rule 56.1(b)(3) Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgement.

## I. PLAINTIFF'S STATEMENT OF MATERIAL FACTS VIOLATES THE LOCAL RULES AND SHOULD BE DISREGARDED

Local Rule 56.1 governs the procedures for parties moving for and responding to summary judgment. Rule 56.1 "serves an important function by ensuring that the proposed findings of fact are in a form that permits the district court to analyze the admissible evidence supporting particular factual propositions and determine precisely what facts, if any, are material and disputed." *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 630 (7th Cir. 2010).

The Funds' LR 56.1(a)(2) Statement of Material Facts ("SMF") obliterates the letter, spirit and purpose of the rule. LR 56.1(d)(1) requires the SMF to "consist of concise numbered paragraphs." *Id*. "The numbered paragraphs should be short; they should contain only one or two individual allegations, thereby allowing easy response." *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000)). LR 56.1(d) also requires "citation to the specific evidentiary material" that supports each concise fact, and limits the moving party to 80 numbered paragraphs without leave of court. LR56.1(d)(2)&(5) (emphasis added). The concise paragraphs should not contain argument. LR56.1(d)(2(4).

While the Fund's SMF contains exactly 80 paragraphs, that is because a great many of those paragraphs are packed with multiple facts covering disparate subjects. (*See* **F.7[1], 9, 12-15, 18-21, 23, 25-27, 30, 33, 35-36, 38, 41-43, 45-46, 49-50, 50-53, 28-59, 61, 72, 77 & 80**). Taking

---

[1] References herein to: (F.#), are to the Funds' Rule 56.1(a)(2) statement of material facts; to (R.#), are to MDS's Rule 56.1(b)(2) Responses to the Funds' statement of material facts; and to (A.#), are to MDS's Rule 56.1(b)(3) statement of additional material facts. References to (Br.#) are to the Funds memorandum of law in support of its motion for partial summary judgment.

just the first two listed (**F.7** and **F.9**), each of those paragraphs contain at least 7 (if not more) discreet statements of fact. The Fund likely surpassed its 80-fact limit near paragraph 30, if not earlier. All facts asserted by the Funds after that point should be wholly disregarded, if not its entire SMF. *See Rao v. Gondi*, 2017 U.S. Dist. LEXIS 86152, *6 (N.D.Ill. June 5, 2017) (Kendall, J.) (disregarding all paragraphs in non-movant's LR 56.1 statement of additional facts past the fourth paragraph, as each of the first four contained at least 10 discreet facts); *see also, e.g., Aponte v. Ill. Workers' Comp. Comm'n*, 2025 U.S. Dist. LEXIS 218875, * (N.D.Ill. Nov. 6, 2025) (Harjani, J.) (throwing out parties' LR 56.1 statements wholesale for being overladen and unworkable).

Moreover, the Funds' citations are not "citations *to*" specific record material as required by the Local Rule; the citations are another vehicle for the Funds to bring in even more disparate facts (generally, instead of a bluebook-style citation, the Funds follow those citations with lengthy parentheticals that introduce large chunks of deposition testimony—and large chunks of additional facts. Often, the lengthy block quotes of testimony cover many different subjects (sometimes not related to the fact asserted). Many of the block quotes, pictures, etc., span several pages. It would be impossible for MDS to admit or dispute all of the new factual assertions the Funds have marshaled into its SMF by including them as purported citations. The compiling of its SMF in this fashion has turned the process of admitting or disputing the facts, from *Malec*'s envisioned "easy response" into a near impossibility. It is easier to list here the paragraphs of the Funds' SMF that do NOT contain the lengthy block quotes as part of their citations. All paragraphs *other than* the following should be disregarded and or struck in their entirety for improperly including lengthy additional facts in its citations and turning the SMF, and MDS's response thereto, into a cumbersome, tedious morass: F.1-5, 7, 22, 29, 55 (though these, too, may suffer from other issues).

2

To make matters worse, the large swaths of deposition testimony, or other evidence cut-and-pasted into the SMF, are frequently modified by the Funds, including by the use of ellipses, underlining points of emphasis, and the application of yellow highlighting. These "markups" of deposition testimony and other documents (without so much as stating it is applying such modifications), is improper argument. And, there are many passages in the block quotes where the parts the Funds have underlined for emphasis do not relate to, or support, the facts in the actual numbered paragraph. And, the Funds frequently introduce the block quotes with their own characterization of what the Court is about to read—yet another form of argument having no place in a LR56.1 statement. There are instances where the Fund includes only its own characterization in the parenthetical, without the actual block quote. Again this is improper argument and should be struck or disregarded. The Funds' lengthy block quoting (modified or not), and inclusion of its own characterization of what the cited material might say—in addition to the overloaded actual factual assertions—turn the SMF from something that is meant to help guide the Court and streamline the summary judgment process, into the exact opposite. The Funds' Rule 56.1 SMF should be disregarded wholesale.

## II.    FACTUAL BACKGROUND

### A. MDS and Its Operations

MDS began operations in 2006. (**F.9**) Since its inception, MDS's business has constituted "service" and "retrofit" work on overhead doors, door operators, dock levelers and associated items. (**A.2**) MDS's technicians travel to customer locations—generally several each day—and perform any or all of the following tasks, depending on what the customer needs and what prompted the service call: assessing damaged and/or malfunctioning items to determine whether they should be repaired or replaced; assessing the associated surrounding infrastructure to determine if wall, floor or support components, need to be repaired or modified as part of the

service or retrofit needed; performing short-term repairs to render the area safe for individuals and/or to secure the building against the elements or outside individuals; assess parts or other materials needed for repair and retrofit work and report same to MDS for purposes of preparing a quote to the customer; communicating with the customer regarding options for repair and replacement and the benefits and costs of each; dismantling or cutting out old or damaged components associated with overhead doors, dock levelers, tracking, surrounding infrastructure, etc., frequently using acetylene torches, angle grinders, or other cutting tools; troubleshooting malfunctioning dock and door components; repairing or replacing electrical wiring, conduit and other electrical components; dismantling damaged, malfunctioning, or outdated docks, overhead doors, or components thereof; rebuilding or repair of wall or floor infrastructure components in order for replacement or retrofit docks or doors to be installed; and installation of replacement docks, door panels, overhead doors, operators, tracking, and/or associated components thereof. (**A.3**) As part of their service work, MDS technicians also perform periodic inspections and preventive maintenance for customers who hire MDS for those services. (**A.4**)

MDS mainly engages in the above service and retrofit work for end users, as opposed to a general contractor. (**A.5**) MDS technicians come to the MDS shop frequently in order to replenish supplies and materials that they need to have on their trucks, because it often is not clear what any day's repair and service calls may entail. (**A.6**) The vehicles MDS technicians utilize are fitted with the equipment (including torches), and tools they need for their retrofit work. (**A.7**)

In general, MDS does not perform the installation of overhead doors, dock levelers, or associated components on new construction of warehouses or distributions centers (referred to herein as "logistics buildings"). (**A.8**) As the Funds address at length in their summary judgment filings, however, 15 years ago, in 2011, MDS installed docks and overhead doors at a new

4

construction logistics building (the "Winpak Job"). Because the Winpak job was run through a general contractor that required the use of union labor, MDS signed a one-jobsite agreement with the Carpenters Union, covering only MDS's work on the Winpak Job. (**R.11-12**) MDS complied with the terms of the one-jobsite agreement for the Winpak Job, including making contributions to the Plaintiff Funds for the work its employees performed on the Winpak Job. (**R.12**; **A.9**)

MDS offers healthcare and retirement benefits to the MDS employees, including its technicians. (**A.13**)

### B. D&D, Its Operations and Business Relationship with MDS

In 2014, Zarlengo and Richert saw an opportunity for MDS to bid on a new area of business, dock and door projects at new construction of logistics buildings. (**R.19**) Richert and Zarlengo approached Brutti about the opportunity, and whether he would be interested in starting a business to perform installation work on those types of projects. (**R.19**) While the Fund asserts that MDS was motivated in this regard by a desire "to not be bound by the CBA on a permanent basis," (*see* Br.2-3 & F.19), there is no evidentiary support in the record to support that bald assertion. (**R.19**) Rather, MDS made the decision to look for an installation subcontractor for logistics building work because it, itself, was "a service company with service employees who knew how to do service work"; and its technicians did not do the type of work for logistics building installations. (**R.19**) This is a disputed material fact (although the Funds have failed to cite to any record evidence in support of its pure speculation).

Zarlengo and Richert approached Brutti at that time because MDS had bid on, and was awarded, a contract to install overhead doors and docks for a logistics building, the Heritage Crossing #8 Project in Lockport, IL, for general contractor Krusinski Construction Co. (**R.13**) At the time, Brutti had experience as a welder and was capable of performing the work required for dock leveler installation at new construction logistics buildings (**R.20**). Again, however, the Funds

5

make an assertion that Brutti had no capability to do trade work and was incapable of doing installation work, and try to pass that off as undisputed, in an effort to paint Brutti as a "straw man" (*see* Br.3, 14 & F.20). However, the Fund, again cites no supporting evidence or testimony, and ignores the contrary testimony of Brutti. This is another disputed material fact (though MDS has cited record evidence in support of its position, while the Funds have cited nothing.

Brutti legally formed D&D at that time, and thereafter became signatory with the Carpenters union and its collective bargaining agreement (CBA). (**R.22**) D&D performed the installation work at the Heritage Crossing #8 Project, as a subcontractor of MDS. (**R.14**) D&D thereafter continued to perform installation work on new construction logistics building projects as a subcontractor of MDS for jobs MDS bid and was awarded by general contractors. (**A.11**) While many of the logistics buildings are constructed through general contractors who require the use of union labor on their projects, others like ARCO/Murray, Morgan/Harbour, and Peak Construction, only sometimes require the use of union labor. (**R.17**) Importantly, however, whenever MDS is awarded a bid for the installation of dock levelers and/or doors at a logistics building, it subcontracts the work to D&D—regardless if that awarded contract requires union labor or not. (**A.11**) Specifically, many times MDS has been awarded logistics building work by ARCO/Murray that does not require union labor, but MDS nonetheless awarded the installation work to D&D. (**A.12-13**) The reason is because MDS simply does not do that type of work (logistics buildings install work, but D&D does. (**A.2; R.19**) If MDS wanted to "avoid" union work or application of the CBA, and if that was its only motivation as the Funds argue, it would not subcontract that work (i.e., work not requiring use of union labor) to D&D.

The billing arrangement between MDS and D&D is not that unusual: MDS is the up-level subcontractor that bids the jobs by factoring in costs of materials (docks levelers, doors, operators,

and associated components), its own overhead and profit; and D&D's hourly price for installation labor. (**A.14**) For its purposes, D&D sets the hourly rate it charges MDS for all labor work performed as a subcontractor of MDS by taking into consideration several factors: actual labor costs, Brutti's own salary, and overhead, including all costs for taxes, tax preparation, accounting services, legal and other professional fees. (**R.74**) MDS's role as the up-level contractor (who is contracted directly with the general contractor) is not only to bid the jobs, but also to place the order and purchase the dock and door equipment and materials. (**A.15**) That is the part of the contract it performs and does not subcontract to D&D. (**A.15**) MDS, and its sales personnel can leverage their relationships with dock and door vendors with whom it has deep relationships. (**A.16**) MDS sources the materials and equipment, but it subcontracts the installation. *Id.*

While D&D utilizes a portion of MDS's office space for Brutti, D&D employees come to the shop infrequently because all materials for their jobs typically are delivered from the manufacturer directly to the jobsite. (**R.38**; **A.17**) That includes doors, docks, anchors, and all other hardware necessary for the installation. (**A.17**) At times, Brutti delivers materials himself to the logistics building jobsites and stages the materials for use by the D&D employees at the site. (**R.18**) And, MDS concedes that occasionally, MDS employees may also assist in making deliveries of materials to logistics building jobsites. (**R.18**) And, it further concedes that D&D employees utilize trucks owned by MDS, though those trucks are not used interchangeably or shared between MDS and D&D. (**A.18**) Rather, individuals assigned trucks generally take them home overnight, and the MDS and D&D trucks are outfitted differently because of the different type of work done by the two companies. *Id.*

## III.    ARGUMENT

Summary judgment is only appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In

making that determination, a court must view the evidence in the light most favorable to the non-moving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). Because, as discussed below and as is prevalent in MDS's Response to the Funds' Rule 56.1 Statement of Material Facts, as well as MDS's Statement of Additional Material Facts, there are numerous disputed material facts in this case, and the Funds' Motion, therefore, must be denied entirely.

### A. MDS and D&D Are Not Single Employers

To determine whether multiple employers should be deemed a single employer for purposes of contributions under a CBA, Courts examine four factors: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership. *Lippert Tile Co. v. Int'l Union of Bricklayers & Allied Craftsmen*, 724 F.3d 939, 946 (7th Cir. 2013). No single factor controls; instead, the Court must consider the "totality of the circumstances." *Id.* at 946-47. Even if two entities are deemed a single employer, however, that does not automatically mean the non-signatory is responsible for unpaid contributions. The next question that must be answered is whether the CBA actually applies to MDS's technicians. *See Moriarty v. Svec*, 164 F.3d at 323, 334 (7th Cir. 1998).

The relevant time period for determining whether two entities constitute a single employer for claimed contributions is the Audit Period, while matters from outside the Audit Period may be viewed to give color to the companies work, relationship, etc., matters from outside that time is "of only slight relevance to this analysis." *Chi. Reg'l Council of Carpenters Pension Fund v. Carlson Constructors Corp.,* 2022 U.S. Dist. LEXIS 53163, *41-42 (Valderama, J.). Here, the Audit Period ran from October 20, 2020 through December 31, 2024 ("Audit Period"). (**R._**) Yet, the Funds take the position that one job performed by MDS a full nine years prior to the Audit Period (the Winpak Job) somehow proves MDS and D&D should currently be considered to perform the same work in the same market.

8

### 1. *MDS and D&D Operations Are Insufficiently Interrelated*

Under its analysis of the interrelatedness of operations, the Funds first argue, again, that D&D was formed so that MDS could somehow skirt CBA provisions to which it was not bound, or so that it could bid on new construction logistic building projects with general contractors requiring union labor, without being permanently bound to the CBA. (Br.10) However, this motivation is pure speculation by the Fund. The Fund has cited no record evidence or testimony of such motivation—and for good reason: Zarlengo unequivocally testified that was not his motivation, but that MDS simply did not do that type work and its technicians did service work, which is a different kind of work.

Next, the Fund argues interrelatedness should be found because, it claims, "D&D was formed…with funds from Zarlengo and Richert using MDS's attorney, and D&D operates using MDS's attorney, accountant, insurance agent, insurance carriers, bank, and payroll service." (Br.11) The Fund cites *Chi. Reg'l Council of Carpenters Pension Fund v. TMG Corp.,* 206 F. Supp. 3d 1351, 1357 (N.D. Ill. 2016) and *Carlson Constructors Corp*., 2022 U.S. Dist. LEXIS 53163, *38.  However, those cases are not on point.  In *TMG*, one entity had a signature stamp for the director of the other company, and had therefore controlled the ability of the other to issue checks out of the bank account of the other company. *Id*. Nothing at all like that is even alleged here. In fact, it is undisputed that no funds were commingled between MDS and D&D. Moreover, the Funds' allegations related to D&D being formed with funds from Zarlengo and Richert is similarly not supported by the record evidence, or at the very least is a disputed fact. Brutti testified that the alleged "start-up" money was simply the initial payment of subcontract fees from MDS to D&D, before Brutti had any accounting system or software set up. Zarlengo had no recollection at all of any alleged start-up money paid to D&D.  Again, that is a material disputed fact.

9

Further, while D&D used the Lawrence Kamin law firm to prepare its Articles of Incorporation, that firm did not, and has never, done any such corporate work for MDS. (**R.28**) Rather, it does collections and lien work for MDS. *Id*. This is not, as the Fund insinuates, D&D using the same attorney for the same services. Further the Fund is simply wrong about utilizing the same insurance broker. The undisputed facts here demonstrate that for a time before the Audit Period, D&D and MDS both used Assurant Partners as insurance agents. (**R.30**) However, in 2021 (early in the Audit Period, MDS switched to Holden Insurance as its broker. *Id*. D&D however, did not switch. It stayed with Assurant Partners for four more years, until July 2025 (after the Audit Period), and only changed from Assurant when it raised rates by 86%. *Id*. While Zarlengo suggested he get a quote from Holden, Brutti still did not plan to change—only doing so when Assurant declined to match the rates from Holden, which quoted D&D $12,000 to $15.000 less. *Id*. That now, after the Audit period, and for reasons of savings of thousands of dollars, D&D changed to Holden does not in any way show interrelated operations. In fact it shows the opposite. There also is no evidence in the record showing what carriers D&D utilized during the period after MDS left Assurant and D&D stayed. While currently (after the audit period), they both use large carriers (Cincinnati and Liberty Mutual), that, again is of little relevance to the analysis when for the bulk of the relevant time period they used different brokers.

Likewise, that both D&D and MDS use ADP for payroll services, one of the largest national payroll processing companies, is hardly a showing of interrelated operations. (**R.32**) There are no allegations at all that any such finds are intermingled, or that MDS pays for those services. The other case cited by the Funds, *Carlson*, is less on point in the use-of-common-services analysis. In *Carlson*, the two companies' payroll was run through only one of the companies; they shared a corporate controller; their shared outside accountant maintained both companies'

accounts as combined financial statements, they shared a 401k plan. *Constructors Corp.*, 2022 U.S. Dist. LEXIS 53163, *37-38. In the totality of the circumstances, there simply is no similarity to those types of commingled and co-managed assets, money and accounts present in this case.[2]

The Funds also cite several cases to attempt to further show interrelatedness of operations. However, like the above cases, while some factors are present here, there are other factors absent in those other cases, which the Funds downplay or mischaracterize through the use of misleading parentheticals. For example, the Funds cite *Automobile Mechs.' Local No. 701 Union & Industry Pension Fund.* 2018 U.S. Dist. LEXIS 168571, at *15-19 (N.D. Ill. Sep. 30, 2018) (Chang, J.) for the proposition that, among other things, "only one company employing administrative staff," demonstrates that interrelatedness should be found here. However, the Fund is fully aware that Brutti performs all administrative functions for D&D (bookkeeping, invoicing, payroll, accounts reconciliation, banking, dealing with outside professional services, preparing fund contributions, etc.). Moreover, though, there is virtually no administrative task that MDS performs for Brutti or D&D. The Funds cite *Laborers' Pension Fund v. RAI Concrete, Inc.,* 2021 U.S. Dist. LEXIS 172729, at *16-17 (N.D. Ill. Sep. 11, 2021) (Chang, J.), attempting to create a parallel to that case stating "[b]oth companies are run by substantially the same people, doing substantially the same work, out of the same location." (Br. 11). The Funds, however, fail to do any analysis to draw any parallel to the instant case. Here, the same people are not "doing substantially the same work,." While D&D and MDS share office space, they are not doing substantially the same work: they serve different groups of clientele entirely, on different types of projects.

---

[2] MDS must concede however, that certain D&D employees carried credit cards issued from MDS. Again, however, MDS's role as the 1st level subcontractor was to bid on and secure the materials and supplies for the contracted work, and the credit cards largely were used for those purposes (e.g., purchasing supplies from a hardware store for the project, etc.). MDS also concedes Brutti used office space at MDS and, for a period of time used an MDS email account. However, in the totality of the circumstances, the interrelatedness of operations, should be considered, at most, a disputed issue of fact preventing summary judgment

In short, the Funds' reliance on parentheticals, instead of fulsome analysis, when all facts are to be viewed in the light most favorable to MDS, and under a totality-of-the-circumstances is not enough to overcome the Funds' burden on this factor, which, as described above, involves several mischaracterizations by the Fund on the undisputed facts that are in MDS's favor. There is a genuine issue of material fact preventing summary judgment.

### 2. *No Common Management and Control of Labor Relations*

The Funds argue that the common management and control of labor relation factors, similar in nature, and taken together demonstrate single employer status. However, again, the Funds overplay certain aspects of the record evidence, while ignoring other applicable facts that, at a minimum create a genuine issue of material fact that prevents entry of summary judgment.

First, the Funds raise an undeveloped, one-sentence argument in support of the control of labor relations factor. They state because, in 2014, (prior to the relevant Audit Period) Zarlengo and Richert "discussed" with Brutti forming a company "so MDS could obtain union work without MDS signing the CBA" somehow shows control of labor relations. (Br.13) First, it has already been established above that the Funds have failed to cite any evidence or testimony that Zarlengo and Richert were in any way motivated by an avoidance of the application of a CBA. Next, however, the argument makes no logical sense in this context. The case the Funds cite in support is actually the complete opposite from this situation: in *Lippert Tile Co*, 724 F.3d 939, 947, the court found control of labor relations when owners of a UNION company devised a plan to start a non-union company in order to avoid the CBA they were already bound to. Here, it makes no sense (and, again, is unsupported by any evidence) that Richert and Zarlengo would start a union company, if they wanted to avoid application of the CBA. *Lippert Tile* offers no support for the Funds' position, and it offers no further analysis or argument on control of labor relations. This factor weighs against a single employer finding.

Next, the Funds also cite *Lippert Tile* for their argument that when one company "controls the bidding process" that shows "common management." However, Lippert, again, is not on point. There one company decided which of the two would actually prepare a bid for work. Here, MDS always bids the work. It is the direct subcontractor with the general contractors for logistics building work. D&D is a subcontractor of MDS, so it does not bid work from general contractors.

The Funds also argue that Zarlengo, Richert and Sugar ought to be considered the day-to-day *de facto* decision makers of D&D, asserting that Zarlengo hired Williams and Richert hired Tattini. But, Tattini was hired (and terminated) before the Audit Period, so that is of little consequence. The issue of who hired Williams is disputed, with Williams giving vague testimony that it was Zarlengo, and Zarlengo giving an unequivocal denial he hired Williams to D&D (or anyone else). The testimony of Sugar's alleged supervisor status over D&D employees really is nothing supervisory at all. Sugar is given information about the job, its timing, etc., from the general contractor, who coordinates all the various trades and when they will need to be on site. Sugar in effect relays those dates to the D&D employees, so they know when to be at specific projects. D&D, unlike MDS, has employees who work at the same job location for many days in a row, and who know exactly wheat they will be doing. Sugar has never overseen any D&D employee's work at a jobsite, and there is no allegation that he has ever been involved in hiring, firing or discipline of D&D employees.

The Funds call Brutti a "straw man" and that he has no managerial role in the company he solely owns. However, it is undisputed that Brutti is involved in all of the following managerial functions: ensuring employees are paid properly and on time; managing accounts, invoicing and all banking; deciding what insurance agency to utilize and when to make a change thereto; setting his own salary; setting the amount of the hourly fee to charge MDS (after considering overhead

13

costs, his pay, insurance, and professional services fees, and the union scale rates). All of that is managerial in nature, and none of it is decided by anyone employed by MDS. These factors, at a minimum, demonstrate an issue of material fact exists that prevents summary judgment.

### 3. *There Is No Common Ownership*

It is undisputed that there is no overlapping ownership interests between MDS (owned by Richert and Zarlengo) and D&D (owned by Brutti). (**F.19**) Despite that uncontroverted fact, the Funds nonetheless argue that "there is common ownership through family members insofar as Brutti and Richert are cousins." (Br.15) The Funds cite *Central States, Southeast & Southwest Areas Pension Fund v. Sloan*, 902 F.2d 523, 597 (7th Cir. 1990) in support of that contention. *Sloan*, however, says nothing of the sort. *Sloan* was an alter ego case that found an alter ego relationship was established between entities owned separately by a husband and wife, on grounds *other than* common ownership. *Id.* at 597-98. There is no common ownership and this factor, therefore, weighs against the finding of a single employer.

### B. Even if MDS and D&D Are Single Employers, the Funds Have Waived Any Argument that the Contribution Terms of the CBA Apply To Any MDS Employees

Even if MDS and D&D were to be deemed a single employer, that "does not automatically mean MDS is on the hook for the alleged unpaid contributions. *Auto Mechs.' Local No. 701*, 2018 U.S. Dist. LEXIS 168571, at *20. "The next question is whether the CBA actually applies to any of [MDS] employees." *Id.*, citing *Moriarty*, 164 F.3d at 334; *Cent. Illinois Carpenters Health & Welfare Tr. Fund v. Olsen*, 467 F. App'x 513, 518 (7th Cir. 2012) (once determination is made that two entities are single employer, both entities need to make contributions for "covered employees"). In *Auto Mechs.' Local No. 701*, after finding the four-factor single employer test was satisfied, and following the holding of *Moriarty*, the Court then went through a detailed analysis based on the parties' respective evidence and arguments, to determine which employees

14

contributions were owed upon, based on whether the language of the CBA applied to them. *See Auto Mechs.' Local No. 701*, 2018 U.S. Dist. LEXIS 168571, at \*20-\*30 (finding newly determined single employer did not owe contributions for most of the employees at issue).

Here, the Funds have not so much as raised this necessary second step in the single-employer liability analysis. The Funds, instead, gave a mischaracterization of the standard, stating that upon a finding of the four factors analyzed above, MDS ipso facto would be "bound to the CBA as though it had signed the CBA." (Br.9) (mischaracterizing *Moriarity's* holding). Accordingly, as this is a necessary step in the analysis, which the Funds have neglected to raise or analyze in any way, the Funds have failed to marshal any evidence or argument and cannot be found to have prevailed on its burden at summary judgment. Accordingly, summary judgment should be denied on this basis alone. When the movant fails to discharge their initial burden, the nonmoving party may survive a motion for summary judgment without providing a response. *Gerhartz v. Richert*, 779 F.3d 682, 686 (7th Cir. 2015); *see also Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 914-15 (7th Cir. 2022) ("a party opposing a motion for summary judgment needs to respond only to arguments the moving party actually made, not others that the moving party might have made but did not."); *see also Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point."). The Seventh Circuit has repeatedly "made clear that perfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority are waived." *Greenbank v. Great Am. Assurance Co.*, 47 F.4th 618, 629 (7th Cir. 2022).

## IV.    CONCLUSION

For all the foregoing reasons, the Funds' Motion for Partial Summary Judgment should be denied in its entity.

**MIDWEST DOCK SOLUTIONS, INC.**

By:  /s/ Michael F. Hughes
       One of Its Attorneys

Michael F. Hughes, Esq. (ARDC No.: 6279175)
Jeffrey A. Risch, Esq. (ARDC No.: 6271407)
AMUNDSEN DAVIS, LLC
3815 E. Main Street, Suite A-1
St. Charles, IL 60174
(630) 587-7910 – Telephone
JRisch@amundsendavislaw.com
MHughes@amundsendavislaw.com
*Attorneys for Defendant, Midwest Dock Solutions, Inc.*

16

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2026, I caused the foregoing *DEFENDANT, MIDWEST DOCK SOLUTIONS, INC.'S, MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT* to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification to all parties of record.

By: /s/ Michael F. Hughes
One of Its Attorneys

Michael F. Hughes, Esq. (ARDC No.: 6279175)
Jeffrey A. Risch, Esq. (ARDC No.: 6271407)
AMUNDSEN DAVIS, LLC
3815 E. Main Street, Suite A-1
St. Charles, IL 60174
(630) 587-7910 – Telephone
JRisch@amundsendavislaw.com
MHughes@amundsendavislaw.com
*Attorneys for Defendant, Midwest Dock Solutions, Inc.*