# EXHIBIT 126

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MID-AMERICA CARPENTERS REGIONAL COUNCIL PENSION FUND; MID-AMERICA CARPENTERS REGIONAL COUNCIL HEALTH FUND; MID-AMERICA CARPENTERS REGIONAL COUNCIL APPRENTICE AND TRAINEE PROGRAM; and MID-AMERICA CARPENTERS REGIONAL COUNCIL SUPPLEMENTAL RETIREMENT FUND, | Case No 1:24-cv-06428 |
| Plaintiffs, | Judge Andrea R. Wood |
| v. | Magistrate Judge Jeannice W. Appenteng |
| DOCK & DOOR INSTALL, INC., an Illinois corporation and MIDWEST DOCK SOLUTIONS, INC., an Illinois corporation, | |
| Defendants. | |

**DECLARATION OF ANTHONY ZARLENGO**

Pursuant to 28 U.S.C. § 1746, I hereby declare the following:

1. My name is Anthony Zarlengo. I am over the age of 18 and competent to testify regarding all matters addressed below. I am submitting this Declaration in relation to the above-captioned lawsuit (the "Lawsuit").

2. I am one of the owners of Midwest Dock Solutions, Inc. ("MDS").

3. I was present at the deposition of Quentin Williams ("Williams") in this matter. Williams was an employee of Dock & Door Install, Inc. ("D&D"), where he claims that I was involved in his hiring.

4. I did not speak with Williams on the phone prior to his hiring by D&D. I did not interview him or participate in his hiring by D&D in any way.

5. Since its inception, MDS's business has constituted "service" and "retrofit" work on overhead doors, door operators, dock levelers and associated items.

6. MDS's technicians travel to customer locations—generally several each day—and perform any or all of the following tasks, depending on what the customer needs and what prompted the service call: assessing damaged and/or malfunctioning

Docusign Envelope ID: B0446418-8E08-4B6F-9E90-DDCA5426E304

items to determine whether they should be repaired or replaced; assessing the associated surrounding infrastructure to determine if wall, floor or support components, need to be repaired or modified as part of the service or retrofit needed; performing short-term repairs to render the area safe for individuals and/or to secure the building against the elements or outside individuals; assess parts or other materials needed for repair and retrofit work and report same to MDS for purposes of preparing a quote to the customer; communicating with the customer regarding options for repair and replacement and the benefits and costs of each; dismantling or cutting out old or damaged components associated with overhead doors, dock levelers, tracking, surrounding infrastructure, etc., frequently using acetylene torches, angle grinders, or other cutting tools; troubleshooting malfunctioning dock and door components; repairing or replacing electrical wiring, conduit and other electrical components; dismantling damaged, malfunctioning, or outdated docks, overhead doors, or components thereof; rebuilding or repair of wall or floor infrastructure components in order for replacement or retrofit docks or doors to be installed; and installation of replacement docks, door panels, overhead doors, operators, tracking, and/or associated components thereof.

7. As part of their service work, MDS technicians also perform periodic inspections and preventive maintenance for customers who hire MDS for those services.

8. MDS mainly engages in the above service and retrofit work for end users, as opposed to a general contractor.

9. MDS technicians come to the MDS warehouse/shop frequently in order to replenish supplies and materials that they need to have on their trucks, because it often is not clear what any day's repair and service calls may entail.

10. The vehicles MDS technicians utilize are fitted with the equipment (including torches), and tools they need for their retrofit work.

11. In general, MDS does not perform the installation of overhead doors, dock levelers, or associated components on new construction of warehouses or distributions centers (referred to herein as "logistics buildings").

12. In 2011, MDS was awarded a contract to install docks and overhead doors at a new construction logistics building (the "Winpak Job"). Because the Winpak job was run through a general contractor that required the use of union labor, MDS signed a one-jobsite agreement with the Carpenters Union, covering only MDS's work on the Winpak Job. MDS complied with the terms of the one-jobsite agreement for the Winpak Job, including making contributions to the Plaintiff Funds for the work its employees performed on the Winpak Job.

13. MDS offers healthcare and retirement benefits to the MDS employees, including its technicians.

Docusign Envelope ID: B0446418-8E08-4B6F-9E90-DDCA5426E304

14. D&D performed the installation work at a logistics building project awarded to MDS, called the Heritage Crossing #8 Project, as a subcontractor of MDS.

15. D&D thereafter continued to perform installation work on new construction logistics building projects as a subcontractor of MDS for jobs MDS bid and was awarded by general contractors.

16. Importantly, however, <u>whenever</u> MDS is awarded a bid for the installation of dock levelers and/or doors at a logistics building, it subcontracts the work to D&D—regardless if that awarded contract requires union labor or not.

17. Specifically, many times MDS has been awarded logistics building work by ARCO/Murray that does not require union labor, but MDS nonetheless awarded the installation work to D&D.

18. A true and correct copy of a contract awarded to MDS by ARCO/Murray for provision of dock and/or overhead door installation at a logistics building project known as *C555-Crow Hodings Joliet Truck Terminal* is attached as **Exhibit A** hereto. The contract did not call for or require use of union labor. MDS subcontracted the installation work associated with that contract to D&D, who performed the work with D&D union employees.

19. A true and correct copy of a contract awarded to MDS by ARCO/Murray for provision of dock and/or overhead door installation at a logistics building project known as *C686- Bridge Elk Grove Village* is attached as **Exhibit B** hereto. The contract did not call for or require use of union labor. MDS subcontracted the installation work associated with that contract to D&D, who performed the work with D&D union employees.

20. On logistics building projects, MDS is the up-level subcontractor to D&D that bids the jobs by factoring in costs of materials (docks levelers, doors, operators, and associated components), its own overhead and profit, and the hourly price D&D has quoted MDS for installation labor.

21. MDS's role as the up-level contractor (who is contracted directly with the general contractor) to D&D is not only to bid the jobs, but also to price out, order and purchase the dock and door equipment and materials. That is the part of the contract with the general contractors that MDS performs and does not subcontract to D&D.

22. MDS, and its sales personnel are able to leverage their relationships with the dock and door vendors with whom it has established relationships, so MDS sources the materials and equipment needed, but subcontracts the actual installation.

23. D&D employees come to the MDS office/shop infrequently because all materials for their jobs typically are delivered from the manufacturer directly to the jobsite. That includes doors, docks, anchors, and all other hardware necessary for the installation.

24. While D&D employees utilize trucks owned by MDS, those trucks are not used interchangeably or shared between MDS and D&D because individuals assigned trucks generally take them home overnight, and the MDS and D&D trucks are outfitted differently because of the different type of work done by the two companies.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: <u>April 17, 2026</u>

Signed: _____

Anthony Zarlengo

# EXHIBIT A

DocuSign Envelope ID: 3EA925CD-21C7-4569-B5FF-7D231ABE4E52

# IMPORTANT NOTICE

Please execute the contract via DocuSign.  Please DO NOT fax, email, or mail the document back to us.

The process is simple:
1. Click View Documents and Agree to Sign Electronically
2. Type in: Your name, Title, Date
3. For contracts $10,000 or more, complete ALL FIELDS in Exhibit A-Note if all fields are not complete, you cannot submit your signature for the document.  For fields you will not be putting information or a dollar amount in, use "-", "N/A", or something of that nature.
4. For contracts under $10,000, Exhibit A requires only a signature and date.
5. Click Complete Signature

The Project Manager will then sign the contract and a fully executed copy will be emailed automatically to everyone.  Our process is that ALL documents must be signed through DocuSign. Please submit PDF copies of your insurance, via email, to the Liscel Esguerra, (lesguerra@arcomurray.com) in order to be compliant for payment.  If you are not compliant, payment will not be issued.

Contracts **will not** be considered executed if your Certificate of Insurance is not submitted at the time of signature!

All contracts must be executed and received by ARCO/Murray **prior** to starting any work.

Thank you.

Have an address change?

Email: lesguerra@arcomurray.com

DocuSign Envelope ID: 3EA025CD-21C7-4568-B5FF-7D231ABE4F52

Manager ☐
Subcontractor ☐
Superintendent ☐

## ARCO/Murray National Construction Company, Inc.

3110 Woodcreek Drive
Downers Grove, IL  60515
Phone: 331-251-2726

## SUBCONTRACT AGREEMENT

E & O Req'd:  ☐YES or ☒NO

| | | | |
|---|---|---|---|
| Job No: | C555- Crow Holdings Joliet Truck Terminal | Proj. Mgr.: | Jack York |
| Subcontract No: | C555-1011 | Job Sup't: | Jim Henchel |
| Job Phone: | 331-251-2726 | Sup't Cell: | 331-775-8285 |
| Job Fax: | 331-251-2727 | Sup't Email: | jhenchel@arcomurray.com |
| Contractor's Accountant: | Laura Brown lbrown@arcomurray.com | Job Location: | 2901 Channahon Rd. Joliet, IL  60436 |
| Contractor License #: | | Subcontractor License #: | |
| | | Sub License Holder: | |
| Subcontractor PM: | Ira Sugar ira@midwestdocksolutions.com 708.280.2642 | Sub Accountant: | Sherrie Weber sherri@midwestdocksolutions.com |
| Subcontractor: | Midwest Dock Solutions, Inc 3211 Holeman Ave Steger, IL  60475 | Vendor #: PM Firm: | 57639 57639 |
| Subcontractor Phone: | 708-367-0801 | | |
| Subcontractor Fax: | | Date: | 08/31/2021 |

| CSI No: | Description: |
|---|---|
| 08-0900- | Overhead Doors |

This agreement ("Subcontract") is made and entered into between ARCO/Murray National Construction Company, Inc. ("Contractor") and Midwest Dock Solutions, Inc ("Subcontractor") as of 08/31/2021 concerning the following project:   C555- Crow Holdings Joliet Truck Terminal, Joliet, IL (the "Project"):

    (a)  Project Description:  117,024 SF   Trucking Terminal

    (b)  Owner:  CHI Development Operating, LLC

    (c)  Architect:

    (d)  Location of Project:     2901 Channahon Rd.

                                   Joliet, IL  60436

    (e)  SUBCONTRACT SUM: $1,108,581.00

{A0021531.4}                      Page 1

DocuSign Envelope ID: 3EA925CD-21C7-4568-B5FF-7D231ABE4F52

**TERMS & CONDITIONS**

**Article 1**
**SUBCONTRACTOR'S WORK & THE CONTRACT DOCUMENTS**

1.1     Subcontract Work: Subcontractor hereby agrees to perform and furnish all of the labor, services and materials required for the construction and completion of Subcontractor's portion of the Project, as defined in, and in accordance with, the terms and conditions of this Subcontract and the terms, specifications and conditions set forth in the Contract Documents identified in Paragraph 1.2 herein ("Subcontract Work"). Any work performed by Subcontractor with respect to the Project before the date of this Subcontract shall also be governed by the terms of this Subcontract, notwithstanding the terms of any prior agreement.

1.2     Contract Documents:   The Contract Documents shall mean and consist of this Subcontract and all exhibits and addenda now or subsequently attached hereto; the **List of Subcontractors and Suppliers** for the Subcontract Work, prepared by Subcontractor and approved by Contractor as set forth in the attached **Exhibit A**; the **Insurance Requirements and Sample Form of Certificate of Insurance** attached hereto as **Exhibit B**; the **Additional Safety Requirements** attached hereto as **Exhibit C**; the **Application for Payment Form** attached hereto as **Exhibit D**; the **Scope of Work,** including plans, drawings and specifications as to particular elements of the Project, attached hereto as, or as referenced in, **Exhibit E**; the **Drawing Log,** attached hereto as **Exhibit F**; the **Lien Waiver Forms** attached hereto as **Exhibit G**; the state-specific Addendum, if any; all Change Orders and written modifications to this Subcontract executed after the date of this Subcontract by both Contractor and Subcontractor; and any bonds required to be furnished by Subcontractor pursuant hereto, all of which are incorporated herein by this reference. The Contract Documents are complementary and what is required by any one shall be as binding as if required by all. In the event of a conflict between Contract Documents or an internal conflict within a Contract Document, the better quality and greater quantity of work provided for shall govern in accordance with the Contractor's interpretation and no adjustment shall be made to the Subcontract Sum as a result of such conflicts or interpretations. The terms of this Subcontract (including all exhibits) shall be deemed to supersede all other oral or written communications between Contractor and Subcontractor. Subcontractor is solely responsible for notifying Contractor in writing of all such deviations, and such deviations will only be deemed accepted by Contractor to the extent a Change Order is executed by Contractor incorporating the identified deviation from the Contract Documents.   Should added labor, materials, services or other elements not shown in the Contract Documents, but reasonably inferable from the Contract Documents, be necessary to complete Subcontract Work, Subcontractor will furnish the same without any change in the Subcontract Sum (as defined in Paragraph 2.1 herein).

1.3     Performance of Subcontract Work: Subcontractor shall perform and complete the Subcontract Work in accordance with the following standards and requirements: (a) Subcontractor shall furnish efficient business administration and supervision, shall furnish at all times an adequate supply of workers, equipment and materials and shall perform the Subcontract Work in an expeditious and economical manner consistent with the requirements of this Subcontract; (b) the Subcontract Work shall be performed in a good and workmanlike manner, free of any and all liens and claims of any nature, including claims or liens of laborers, labor unions, suppliers and Subcontractor's subcontractors, etc.; (c) all equipment, materials and labor to be furnished by Subcontractor shall conform strictly to the requirements of the Contract Documents, and all materials and equipment to be installed in the Project shall be new, unless otherwise specified, and of good quality; (d) Subcontractor shall be responsible for obtaining and shall pay for all necessary certificates, permits, inspections and tests necessary for completing Subcontract Work on a timely basis, provided that Subcontractor shall not be responsible for obtaining or paying for the Project building permit; (e) Subcontract Work shall be completed at Subcontractor's expense in strict accordance with all applicable state, federal and local laws, regulations, codes and ordinances, including but not limited to the Occupational Safety and Health Act of 1970, as amended from time-to-time, all requirements set forth on Exhibit C, and all applicable environmental laws and regulations, as well as with Contractor's standards and requirements, to the extent more stringent; (f) Subcontractor shall furnish all scaffolding, tools and equipment (including equipment for hoisting) that may be necessary to do Subcontract Work properly and expeditiously; (g) Subcontractor will inspect the conditions at the Project which may impact Subcontract Work in order to confirm that the Project is in proper condition to receive the Subcontract Work, and shall immediately verbally report to the Contractor and confirm in writing any non-conforming Project condition or any discrepancy or errors it discovers in the drawings, specifications, Project or Subcontract Work; (h) the installation and/or construction of the Subcontract Work shall be deemed as Subcontractor's acceptance that conditions at the Project and the plans, specifications and drawings are as they need to be for Subcontractor to perform the Subcontract Work; (i) Subcontractor assumes the risk of ascertaining proper dimensions for prefabrication, as well as the risk of installing any of Subcontract Work where there are on-site conditions or discrepancies or errors in the Contract Documents not caused by Subcontractor but which nevertheless are known or should be known by Subcontractor and which do or may adversely impact such installation; (j) Subcontractor shall remove from the Project site any employee or employees unsatisfactory to the Contractor; (k) Subcontractor shall provide, and shall cause its subcontractors to provide, at all times when the Subcontract Work is being performed, a competent and well trained on-site supervisor acceptable to Contractor who is fluent in spoken and written English; such on-site supervisor shall not be reassigned to a different project without Contractor's prior written consent; (l) Subcontractor shall pay when due for all supplies, fuel, equipment, machinery, repairs, transportation, material, labor, insurance premiums of any kind or description including workers' compensation insurance premiums, sales taxes, salaries, federal and state employment taxes, any similar payroll taxes relating to employees of Subcontractor, union costs and dues including but not limited to required pension, health and welfare fund contributions, and all other expenses whatsoever incurred in or as a result of, the performance of Subcontract Work; (m) Subcontractor shall be solely responsible to contact all appropriate sources in order to accurately determine the location of all underground wiring, plumbing, utilities, telecommunications systems and other similar items, and to have all such items clearly marked prior to commencement of any excavation (if applicable); (n) Subcontractor shall perform the Subcontract Work during normal working hours of normal working days unless otherwise specifically set forth in this Subcontract or directed by Contractor; (o) Subcontractor shall ensure the safety of all persons on the Project in course of and with respect to Subcontractor's operations; (p) Subcontractor shall keep the Project free from accumulation of water, material or rubbish caused by Subcontractor's operations; (q)

that Subcontractor and its employees and subcontractors shall be in compliance with all license and registration requirements imposed under applicable law; (r) Subcontractor and its employees and subcontractors shall not encroach upon property adjacent to the Project for storage of material, nor shall they be permitted on such adjacent properties without the permission of the Contractor and such adjacent property owners; (s) Subcontractor shall repair at its expense any and all damage to adjacent property caused by the Subcontract Work, and shall indemnify and hold harmless Contractor from any liability or responsibility for any claims due to such damage or injury and shall defend any action brought by reason thereof at its cost; (t) Subcontractor shall update and supplement as necessary, the list of sub-subcontractors and suppliers listed on Exhibit A in order to insure that Contractor always has complete and accurate information concerning the identity of who is supplying materials and/or labor for the Project; (u) Subcontractor shall observe when established separate gates for entry into the Project site; and (v) Subcontractor shall exercise that level of expertise and experience that enables it at all times to perform the Subcontract Work with the diligence and care reasonably exercised by experienced and fully competent contractors within Subcontractor's trade and profession (if applicable) on similarly situated projects, including but not limited to properly and timely designing (if applicable) and constructing the Subcontract Work.

1.4     Time for Performance of Subcontract Work:  Time is of the essence of this Subcontract in all respects, including but not limited to delivery, installation, erection and otherwise. Subcontractor shall commence the Subcontract Work upon: ☒ full execution of this Subcontract, and/or ☒ Contractor's notice to proceed ("Commencement"), and shall proceed with sufficient labor and equipment continuously to complete the Subcontract Work within the Subcontract Completion Time, as updated from time-to-time by Contractor. Subcontractor hereby agrees to complete the Subcontract Work within the time period specified in the Scope of Subcontract Work ("Subcontract Completion Time").  Subcontractor shall adjust its scheduling from time-to-time as directed by Contractor, including performing certain parts of the Subcontract Work before other parts.

In the event the Subcontract Work is delayed due to the willful misconduct of Contractor, abnormal and unforeseeable weather or any other cause which Contractor agrees is beyond the control of Subcontractor, and Subcontractor demonstrates in writing that such condition(s) prevented Subcontractor from performing critical-path Subcontract Work ("Delays"), Subcontractor may request an extension of the Subcontract Completion Time.  However, the Subcontract Completion Time shall not be extended for any reason, including Delays, unless the following absolute preconditions are fully and timely satisfied: (i) Subcontractor requests in writing from Contractor an extension of the Subcontract Completion Time, including a detailed explanation of the circumstances of the Delay and actions taken by the Subcontractor to mitigate or overcome the effects of such Delay, no later than three (3) business days after commencement of the Delay; and (ii) Contractor determines that such delay could not have been avoided, recovered or mitigated by reasonable actions taken by the Subcontractor; and (iii) Contractor receives, at a minimum, a corresponding extension of the Contract Time under the General Contract with the Owner (collectively, "Preconditions").  In no event will Contractor be obligated to extend the Subcontract Completion Time if any one or more of the preconditions are not satisfied. Timely, (no later than 5 days after commencement of any such claimed Delay) complete and accurate documentation shall be provided to Contractor to substantiate any equitable claims by Subcontractor for reimbursement of damages incurred by Subcontractor solely due a Delay.  Subcontractor acknowledges its understanding that untimely, incomplete or inaccurate submissions of claims for damages due to Delays may preclude Contractor from seeking reimbursement for such damages from Owner, and that if Contractor is no longer able to seek reimbursement from Owner due to Subcontractor's failure to timely submit and substantiate its Claims, Subcontractor shall be deemed to have waived any such claims.  Except as otherwise set forth herein and agreed in a Change Order executed by Subcontractor and Contractor, an extension of the Subcontract Completion Time shall be Subcontractor's sole and exclusive remedy for Delay.

1.5     Manufacturer's Warranties.  Subcontractor hereby assigns to Contractor and Owner all manufacturer's warranties and guarantees for any and all equipment and fixtures to be installed at or attached to the Project site pursuant to this Subcontract.  Upon final completion of the Subcontract Work, and before Contractor will be obligated to make final payment hereunder, Subcontractor shall deliver to Contractor: (i) originals or copies of all warranty and guarantee documents and all cut sheets and instructions and operating manuals of all equipment and fixtures; (ii) a final listing of serial numbers, if applicable, for all such equipment and fixtures along with the names and addresses of the manufacturers and suppliers of such equipment and fixtures; and (iii) final as-built drawings, if applicable, in hard-copy and electronic format.

1.6     Design-Build Elements:  The parties acknowledge and agree that only if the Subcontract Work includes the furnishing of design elements (the "Design Elements"), will the terms of this Section 1.6 apply. Subcontractor shall provide Contractor with complete and detailed plans and specifications of the Design Elements (the "Design Plans and Specs") that are consistent with: (i) all applicable codes, laws and regulations; (ii) the Contract Documents; (iii) that professional level of care applicable to members of the design profession furnishing design services as required by the Contract Documents ("Standard of Care"); and (iv) the performance and other specifications included in the bid instructions attached to the Subcontract ("Specifications"). All design work shall be performed only by qualified architects, engineers and other design professionals duly licensed, as necessary, in the jurisdictions in which the Project is located. All Design Plans and Specs shall be stamped or sealed by a duly licensed or registered design professional, and, when approved by Contractor, shall become part of the Contract Documents. Modifications to the Design Plans and Specs shall become Contract Documents when incorporated by Change Order into this Subcontract.  Subcontractor will disclose the identity of any engineers or consultants that Subcontractor wishes to retain, and will refrain from hiring anyone to whom Contractor has a reasonable objection. Subcontractor agrees that it shall correct any errors, omissions or other defects in the Design Plans and Specs (either through revised drawings or through written or field modifications or clarifications, as appropriate) with the level of promptness required in order to comply with the Project Schedule, and at no additional cost to Contractor or Owner. However, Contractor shall not have a duty to discover such errors; Subcontractor shall remain solely responsible for producing Design Plans & Specs that are in compliance with the applicable Standard of Care, Specifications and the Contract Documents.  At no additional cost to Owner and Contractor, Subcontractor shall pay all royalties and license fees arising from the Design Plans and Specs, and shall defend any suits or claims for infringement of patent rights or other intellectual property rights, and shall save Contractor and Owner harmless from loss on account thereof.  Contractor's approval of Design Plans and Specs that do not comply with the Contract Documents

{A0021531.4}                                        Page 3

DocuSign Envelope ID: 3EA025CD-21C7-4569-B55E-7D231ABE4E52

shall not constitute approval of any changes from the Contract Documents unless such changes are specifically highlighted in the proposed Design Plans and Specs as changes.

## Article 2
## SUBCONTRACT SUM & PROGRESS PAYMENTS

2.1     Subcontract Sum:  Subject to the terms and conditions contained herein, and to the full and complete performance by Subcontractor as and when required hereunder, of its obligations as specified herein, Contractor shall pay the sum of **One million, one hundred eight thousand, five hundred eighty-one 00/100 dollars $1,108,581.00.**  It is understood and agreed that the Subcontract Sum is a lump sum amount and is not subject to increase under any circumstances unless both Contractor and Subcontractor execute a change order increasing the Subcontract Sum (a "Change Order").

2.2     Required Submittals for Payments: Subcontractor shall not be entitled to any payment for the Subcontract Work unless and until the following are submitted to Contractor on or before the 20th of the calendar month:
   a)  Application for Payment: Subcontractor shall utilize the Application for Payment, to be based upon the schedule of values (shown on Exhibit A), either in the format shown on Exhibit D, and attaching AIA Form G703, or as may be otherwise specified by Contractor; and
   b)  Lien Waivers:  Subcontractor must furnish unconditional lien waivers from itself and all its subcontractors and suppliers, including suppliers for material, equipment and labor, before progress or final payments are due to Subcontractor. Lien waivers provided by Subcontractor and its subcontractors shall be in the form attached hereto as Exhibit G, or as Contractor, Owner, or any lender or title company may otherwise require.  Upon Contractor's request or if required by the General Contract, Subcontractor shall furnish conditional lien waivers with and for the payment sought in the Application for Payment.
   c)  Other Documents:  Contractor may require other documents, in which case Subcontractor shall furnish invoices, statements and other documentation in order to substantiate the amounts claimed due in any Application for Payment.
   d)  Final Payment:  Prior to final payment hereunder, Subcontractor shall deliver all items specified in Section 1.5 herein in addition to all other requirements hereunder, including completion of all punch list items in accordance with all Subcontract requirements.

2.3     Joint Checks:  Contractor reserves the right to issue joint checks to Subcontractor and its subcontractors and suppliers, or to pay such subcontractors and suppliers directly, but this shall not obligate Contractor to see to the proper disposition or application of any money advanced to or on behalf of Subcontractor.  If Subcontractor fails to certify in writing all amounts due to any of its lower tier subcontractors or suppliers within 5 days after Contractor's request for such confirmation, Contractor shall have the right to rely on such lower tier's certification of the amount due it, and upon payment of such amount directly or via joint check, the Subcontract Sum shall be reduced accordingly, without further agreement of Subcontractor.

2.4     Processing of Payment:  Following timely submittal of an Application for Payment, with all other documents as required hereunder or as requested by Contractor, Contractor will begin processing such Application for Payment on the 20th of the following month ().  Processing and payment may be delayed to the following month to the extent that any Application for Payment from Subcontractor is received by Contractor in an incomplete form, without required documentation (including but not limited to required insurance) and/or later than the 20th of the prior month. To the extent enforceable under applicable law, Contractor's obligation to pay Subcontractor  is expressly contingent upon, and subject to, receipt of payment for the Subcontract Work by Contractor from Owner.

2.5     Retention:  Contractor shall retain 10.00% of each payment otherwise due Subcontractor until the later to occur of (i) Contractor's acceptance of the Subcontract Work; and (ii) Contractor is paid its retention withheld by Owner for Contractor's Work.  The retention shall be due within 15 days thereafter, or as otherwise required under applicable state law, upon a separate billing by Subcontractor, after satisfaction of the foregoing conditions in (i) and (ii), and satisfaction of all obligations of Subcontractor in Section 2.2 herein.

2.6     Right to Withhold Payment & Other Remedies:  Contractor shall be entitled, upon notice to Subcontractor, to terminate this Subcontract, reduce or eliminate all or any element of the Subcontract Work (with a corresponding reduction in the Subcontract Sum), withhold payment of all or any part of an Application for Payment or nullify all or any part of a previous Application for Payment and withhold that amount Contractor reasonably deems necessary to protect the interests of Contractor and/or Owner, on account of defective work or default by Subcontractor under this Subcontract or, to the fullest extent permitted by law, any other agreement between Subcontractor and Contractor or Contractor's affiliates. Grounds for exercising Contractor's remedies hereunder include liens and claims arising out of the Subcontract Work, or reasonable evidence indicating the probable filing thereof, reasonable evidence that the Subcontract Work will not be completed within the Subcontract Completion Time, Owner's objection to the payment of the Subcontractor, bankruptcy or insolvency of Subcontractor, defective work, third-party claims arising out of the performance of the Subcontract Work; delays or damage to other contractors' work, Subcontractor's failure to provide sufficient manpower to maintain the required progress of the Subcontract Work; or any other reasonable cause. In addition to withholding payment, Contractor shall have the right to exercise any other remedy available hereunder, at law or equity, including but not limited to (i) requiring Subcontractor to remove and/or replace any defective materials or work upon notice from Contractor, at Subcontractor's sole cost and expense, (ii) removing Subcontractor from the Project, (iii) taking possession of all materials at the job site for purposes of completing the Subcontract Work, (iv) offsetting direct and indirect costs incurred by Contractor to complete, correct or accelerate the Subcontract Work, to the extent arising out of Subcontractor's breach of this Subcontract or, to the fullest extent permitted by law, any other agreement between Subcontractor and Contractor or its affiliates, against any amounts otherwise due from Contractor to Subcontractor, (v) require Subcontractor, Subcontractor's sole costs, to add extra manpower or furnish overtime labor in order to comply with the requirements of the Project Schedule, and (vi) supplement Subcontractor's crew with additional

DocuSign Envelope ID: 3EA025CD-21C7-4569-B55E-7D231ABE4E52

manpower at Subcontractor's sole cost; all without any increase in the Subcontract Sum. While Contractor has the right to execute the foregoing remedies, Contractor does not have the obligation to do so, and Contractor's failure to exercise one of more of its remedies shall not be construed as a waiver by Contractor of its right to do so.

2.7 Taxes and assessments: Subcontractor hereby certifies that the Subcontract Sum includes all sales, use, consumer, franchise, excise and other taxes, and is not subject to any addition or increase on account of such taxes or assessments now or hereafter levied. Subcontractor agrees that it shall be exclusively responsible for the payment of any such additional taxes or assessments.

2.8 Changes: No change in the Subcontract Work, whether by way of alteration or addition to the Subcontract Work, shall be the basis for any increase to the Subcontract Sum or change in the Subcontract Completion Time, unless and until such alteration or addition has been authorized in writing by Contractor or by Change Order executed by Contractor and Subcontractor. Notwithstanding anything contained in the Contract Documents to the contrary, Contractor may reduce or adjust the scope of the Subcontract Work (with corresponding adjustment in Subcontract Sum) by written directive, or terminate the Subcontract, at any time for any reason, without liability for any lost profits or other damages, except that Contractor shall pay Subcontractor for all authorized, accepted and completed Subcontract Work through and including the date of such termination. For any change directed or proposed by Contractor, the Subcontractor's acceptance shall be deemed given, unless Subcontractor delivers to Contractor an itemization of any of the terms with which Subcontractor is not in agreement, the reasons for such disagreement, and Subcontractor's proposed modifications to the Change Order or change directive issued by Contractor, NO LATER THAN SEVEN (7) CALENDAR DAYS after issuance of the Change Order or change directive by Contractor. Accordingly, no course of conduct or dealings between the parties, nor express or implied acceptance of alteration of the Subcontract Work, or claim that the Owner or Contractor has been unjustly enriched by the alteration of the Subcontract Work, whether or not there is in fact any such unjust enrichment, shall be the basis for any claim to increase the Subcontract Sum or change the Subcontract Completion Time. A Change Order signed by Subcontractor indicates Subcontractor's agreement therewith, including the adjustment in the Subcontract Sum or Subcontract Completion Time, as the complete and final compensation for all costs or claims incurred as a consequence of the Change Order.

Subcontractor acknowledges and agrees that Contractor and Owner have relied upon Subcontractor's agreements in this Subcontract in finalizing budgets and schedule, and that Subcontractor shall not be entitled to any increase in the Subcontract Sum or Subcontract Time except to the extent expressly provided in this Section 2.8, and: (i) Owner also agrees to increase the Contract Sum and/or Contract Time under the General Contract in connection with such change; and (ii) Subcontractor submits a timely request for change in strict accordance with the requirements of this Section 2.8. If for any reason Subcontractor believes that it is entitled to a change in the Subcontract Sum or Subcontract Time, Subcontractor shall submit any such request for Change Order NO LATER THAN THREE (3) BUSINESS DAYS after the cause for such proposed change first arises and prior to any additional work being performed. A timely request for a Change must be accompanied by a detailed statement of the conditions giving rise to such a claim, and back-up that fully substantiates such claim. Field or work tickets, or any other documents claimed to be signed by Contractor's Superintendent shall not be construed as acceptance of any proposed change or as evidence of quantities or quality of materials or work performed. Compliance with the requirements set forth in this Section 2.8 shall not entitle Subcontractor to a Change Order if the substance of Subcontractor's claim would not otherwise entitle Subcontractor to the Change. In no event will Subcontractor be entitled to any changes in the Subcontract Sum or Subcontract Time if Subcontractor is otherwise in breach of the all or any part of its obligations under this Subcontract. TIME IS OF THE ESSENCE with respect to all matters relating to claims for changes, Change Orders and change directives. Except as otherwise directed by Contractor in writing, Subcontractor shall continue performance of the Subcontract Work notwithstanding any disagreement concerning proposed changes.

**If timely notices are not given by Subcontractor as and when required under this Section 2.8, or are not backed-up with verifiable documentary evidence supporting such claim, such failures shall be deemed fatal to any such claims, and Subcontractor shall be deemed to have waived any such claims.**

**Article 3**
**INSURANCE & BONDS**

Subcontractor shall furnish the insurance and evidence of such insurance as may be required by Contractor or Owner, the minimum of which shall be as set forth on Exhibit B. Subcontractor agrees to obligate its subcontractors, if any, to maintain the same types, levels and terms of insurance coverage as required of Subcontractor, including but not limited to the waiver of subrogation in favor of Contractor and Owner, and Subcontractor shall indemnify and hold harmless Contractor and Owner for all damages and losses, should it fail to do so. Subcontractor shall furnish a certificate of insurance acceptable in form and substance to Contractor that establishes Subcontractor's compliance with the requirements of Exhibit B. **Acceptance of such certificate shall not serve as a waiver of any requirement in Exhibit B.** Subcontractor shall submit the certificate together with copies of the required Additional Insured endorsements to Contractor, or if applicable, on-line to a third-party administrator designated in writing by Contractor, before Subcontractor starts the Subcontract Work. Notwithstanding any other provision, Contractor shall have no obligation to make any payment to Subcontractor until Contractor has received such certificates, including any required updates. If required by Contractor, Subcontractor shall furnish a performance and/or payment bond at Subcontractor's expense. In the event of a conflict between the requirements of Exhibit B and any other exhibit, the requirements of Exhibit B shall control. Subcontractor shall furnish full and complete copies of all insurance policies and endorsements required by this Subcontract upon request from Contractor.

**Article 4**
**MISCELLANEOUS**

4.1     The parties acknowledge and agree that the Subcontractor is an independent contractor within the purview of the Internal Revenue Code, the Federal Social Security Act and any and all equivalent state or local laws, as well as any and all unemployment insurance and worker's compensation laws, both state and federal, and is solely responsible to the state and federal governments for all payroll taxes, deductions, withholdings and contributions under such laws. The parties further acknowledge and agree that Subcontractor is solely responsible for assessments for unemployment insurance, retirement benefits, union pension and health and welfare funds, annuities, disability benefits or other purposes which are in whole or in part measured by and/or based upon the wages, salaries, or other remuneration paid to persons employed by Subcontractor and its subcontractors on the Subcontract Work under this Subcontract.

4.2     Contractor has a general contract ("General Contract") with Owner concerning the Project, which may include plans, drawings, specifications and other details and documents incorporated into such General Contract. Subcontractor agrees that Subcontractor is fully bound by and is familiar with those terms and provisions of the General Contract that pertain to the Subcontract Work. The Subcontractor hereby expressly assumes and promises to perform for the benefit of the Contractor, Owner and Owner's lenders (as their interests may appear) all of the obligations undertaken by the Contractor towards the Owner in the General Contract, to the extent relevant to the Subcontract Work.

4.3     Subcontractor may not assign this Subcontract or any amounts due under this Subcontract without the prior written consent of Contractor. Contractor may assign this Subcontract in the event it is required to do so under its General Contract. Any such assignment without Contractor's prior written consent shall be null and void and the Subcontract shall be unenforceable by such assignee against Contractor.

4.4     Subcontractor shall not install, use, generate, store, dispose of or treat on or about the Project any Hazardous Substance (as defined below) other than those Hazardous Substances commonly required in the industry for the performance of the Subcontract Work and required under the Contract Documents. Any Hazardous Substances associated with the Subcontract Work must be stored, used and disposed of in accordance with all applicable environmental laws and regulations and Subcontractor must provide the appropriate Material Safety Data Sheets to Contractor prior to commencement of the Subcontract Work. As used in this Subcontract, "Hazardous Substance" means any hazardous, toxic, or radioactive substance, material, waste, pollutant or contaminant as defined, listed or regulated by any federal, state or local law, regulation or order, or as specified in the General Contract. If any portion of the Subcontract Work requires the removal and disposal of any preexisting Hazardous Substance, including without limitation creosote treated wood, Subcontractor shall comply with all federal, state and local laws, ordinances and regulations relating to the disposal of such Hazardous Substance, and shall exercise extra care in site clean-up each day during the removal and disposal of such Hazardous Substance.

4.5     Subcontractor guarantees (the "Warranty") that the Subcontract Work, when completed, will be completed in accordance with the Contract Documents and that the Subcontract Work will be free from any defects or deficiencies, including but not limited to defects or deficiencies resulting from materials, construction or workmanship or improper design by Subcontractor ("Defect"). In the event a Defect is found to exist in violation of this Warranty within one year following the date of final acceptance of the Subcontract Work of the General Contract by the Owner, or other longer period of time as may be required by law or equity, the Contract Documents or General Contract (the "Callback Period"), then Subcontractor shall, at its sole expense, promptly repair and/or replace non-conforming work or materials ("Corrective Action") and any other part of the Project damaged in connection therewith, and shall pay all costs and expenses incurred by Owner or Contractor in connection with such Defect and Corrective Action. Following any Corrective Action, Subcontractor shall, for an additional one-year period thereafter, have a duty to repair or replace such corrective Subcontract Work. If Subcontractor fails to commence and complete Corrective Action within a reasonable time (not to exceed ten (10) days) after notice from Contractor, then Contractor shall have the right to correct such Defect and Subcontractor shall be liable to Contractor for all direct, indirect, special, consequential and other damages, including lost profits and revenue, incurred due to or in connection with such Defect and the curing of such Defect. Any special, extended or other warranties given by the Contractor to the Owner in the General Contract that pertain to the Subcontract Work are hereby expressly assumed and undertaken by the Subcontractor. Nothing in this Section is intended to limit any manufacturer's warranty which provides Owner or Contractor with greater warranty rights than set forth in this Section or the Contract Documents. Establishment of the Callback Period for correction of Subcontract Work relates only to the specific obligation of the Subcontractor to correct the Subcontract Work, and has no relationship to the time within which the obligation to comply with the Contract Documents may sought to be enforced, nor to the time within which proceedings may be commenced to establish the Subcontractor's liability with respect to the Subcontractor's obligations other than specifically to take Corrective Action.

4.6     During a period in which any dispute is outstanding between Contractor and Subcontractor, Subcontractor shall continue to perform the Subcontract Work and otherwise comply with the Subcontract, and Contractor shall pay undisputed amounts otherwise due Subcontractor hereunder.

4.7     To the fullest extent permitted by law, Subcontractor hereby agrees to indemnify, defend and hold Contractor, Owner, any lender with a security interest in the Project, and each of their respective affiliates, subsidiaries, members, managers, partners, agents, representative, trustees, directors, officers, shareholders and employees, and each of them (collectively, "Indemnified Parties") harmless from and against any and all demands, claims, suits and causes of action, liability, costs, and direct, incidental and consequential damages, and costs to satisfy any settlements and judgments arising out of or in connection with the Subcontract Work (collectively or individually, "Claims"), including without limitation court costs, arbitration fees and costs, arbitrator fees and attorney's fees whether arising at law or equity, in connection with or arising out of the performance of the Subcontract Work by Subcontractor or any of its employees, subcontractors, suppliers or anyone else for whom Subcontractor

{A0021531.4}                                    Page 6

is responsible ("Subcontractor Parties"), including but not limited to: (i) any breach by Subcontractor of this Subcontract; (ii) any liens or other encumbrances Contractor's or Owner's property or the Project, arising out of the Subcontract Work and any failure by Subcontractor or the Subcontractor Parties to pay any of its agents, employees, subcontractors or suppliers; or (iii) property damage or destruction (including loss of use resulting therefrom), bodily injury, sickness, disease, or death arising out of or in connection with the Subcontract Work or any action or inaction by the Subcontractor or the Subcontractor Parties. Notwithstanding anything contained herein to the contrary: (a) Subcontractor shall be liable for Claims in connection with consequential damages only to the extent arising out of or in connection with the Subcontract Work and to the extent Contractor is held liable for such damages by Owner or a third party; (b) Subcontractor's duty to defend shall not apply with respect to Claims that arise exclusively from the performance of professional services that are insured only through the Subcontractor's professional liability insurance policy; and (c) whenever a duty to defend applies as to any Claim, such duty shall be triggered when any one or more of the Indemnified Parties tenders their defense to Subcontractor or its insurer.

In claims against any person or entity indemnified under this Section 4.7 by an employee of the Subcontractor or Subcontractor Party, anyone directly or indirectly employed by them, or anyone for whose acts they may be liable, the indemnification obligations under Section 4.7 and Subcontractor's exposure to contribution damages, if any, shall not be capped, limited or reduced in any way, by case-law or by any limitation on the amount or type of damages, compensation, or benefits paid or payable by or for the Subcontractor under workers' or workmen's compensation acts, disability benefits acts, or other employee benefit acts.

4.8     MEDIATION & ARBITRATION OF DISPUTES IS REQUIRED

a)     Except as set forth in Section 4.8(e) below, any controversy or claim arising out of or relating to this Subcontract, or the breach thereof, shall be finally resolved by non-binding mediation or by arbitration in accordance with the requirements of this Section 4.8. Notwithstanding any provision in this Subcontract regarding applicable substantive law, any arbitration shall be governed by the Federal Arbitration Act (9 U.S.C., Secs. 1-16). Nothing in this Section 4.8 shall prohibit Subcontractor from taking the necessary actions to perfect its mechanic's lien rights or payment bond rights, but the parties agree that any judicial action on the lien or bond shall be promptly stayed pending a determination on the underlying facts by the arbitrator. Following arbitration, the successful lien claimant can, as applicable, proceed with its judicial foreclosure using all the factual findings and award from the arbitration in its favor. Except as required for any party to preserve statutory lien rights, mediation and if necessary, arbitration, shall be a precondition to any litigation.

b)     Upon written application of Contractor or Subcontractor, the parties shall mediate claims and disputes prior to arbitration. Any mediation or arbitration shall be administered by JAMS ("Administrator") pursuant to its Engineering and Construction Arbitration Rules & Procedures currently in effect at the time of the proceeding, adjusted as set forth below ("Rules"). If JAMS is not available or is unable to accommodate the agreed upon conditions for mediation and arbitration as set forth in this Section 4.8, the Administrator shall be the American Arbitration Association and the Rules will be its Construction Industry Arbitration Rules and Mediation Procedures. The Rules shall be adjusted as follows: (i) the claiming party shall file a written demand for mediation or arbitration of the dispute with the Administrator, with a copy sent concurrently to the other party, (ii) any mediation or arbitration shall be held in St. Louis, MO, (iii) the arbitrator shall decide the dispute in accordance with the laws of the state where the Project is located (iv) the mediator or, except as set forth in Section 4.8(c) below, the arbitrator shall be chosen pursuant to the Rules from a list of experienced construction lawyers located in Missouri within a 100 mile radius of St. Louis; and (v) the mediation shall be completed within 60 days, arbitration within 120 days, after written demand for mediation or arbitration is made.

c)     To provide for expedited dispute resolution through mediation, by no later than 14 days prior to the mediation, the parties shall serve upon the mediator and each other a written position statement, with exhibits, outlining and supporting their respective claims and defenses. By no later than 3 days prior to the mediation, the parties shall serve upon the mediator and each other a response to each other's written position statement. After eight hours of actual mediation time to be conducted in a single day, if the matter is not resolved, each party shall promptly submit one last, best, and final offer and demand in writing to the mediator before adjourning the mediation. The arbitrator shall disclose to the parties the amounts and details of said last offers and demands ("Last Offers"). If the amount remaining in dispute as disclosed in the Last Offers is less than Two Hundred Thousand Dollars ($200,000.00), the mediator shall immediately assume the role of an arbitrator. The arbitrator shall not consider any item of evidence which was not produced by the parties in their respective statements of position nor disclosed to the other in the course of the mediation, all as determined by the arbitrator. Within fifteen (15) days of having received the Last Offers, the arbitrator shall issue an award which shall adopt one and only one of said Last Offers, without modification or amendment. By execution of this Subcontract, Contractor and Subcontractor specifically consents to the conversion of the mediator to an arbitrator as contemplated herein.

d)     If the amount remaining in dispute as disclosed in the Last Offers is greater than Two Hundred Thousand Dollars ($200,000.00), the mediator shall not become the arbitrator, and instead either party may submit the dispute to arbitration, which shall be administered by the Administrator pursuant to the Rules. The award of the arbitrator shall be final and binding, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof. In any proceeding other than mediation, the prevailing party shall be entitled to recover all of its reasonable attorneys' fees and other costs in addition to any other relief to which it may be entitled. The "prevailing party" shall be determined by reviewing the claims resolved at arbitration, considering the quantum of the claims being prosecuted and defended, and then determining which party achieved the greater success by quantifying the amounts awarded the party recovering damages and comparing same with the amounts that the party paying damages saved (i.e., the damages actually awarded versus those that were claimed).

e)     Notwithstanding anything to the contrary in this Section 4.8, if Subcontractor is joined or named by Contractor or any other party in any judicial proceeding, arbitration or mediation initiated under the terms of the General Contract or in connection with the Project otherwise ("Other Proceeding"), then Contractor and Subcontractor agree that such Other Proceeding shall preclude any proceeding under Sections 4.8(a) thru (d) concerning all claims and/or counterclaims related to the Other Proceeding. To the extent the dispute resolution provisions of the General Contract are different than the foregoing provisions, then at Contractor's option (whether or not there is a current Other Proceeding), which may be exercised at any time, such differing dispute resolution provisions shall be deemed incorporated herein, and Subcontractor agrees to comply with such provisions (if invoked by Contractor) and to participate in and be fully bound by such differing dispute resolution provisions. IF ANY CLAIM

HEREUNDER IS LITIGATED FOR ANY REASON, CONTRACTOR AND SUBCONTRACTOR HEREBY AGREE TO WAIVE ANY RIGHTS THEY MAY HAVE TO A JURY TRIAL AND INSTEAD HAVE SUCH CLAIM HEARD BY A JUDGE.

4.9    Models are not Contract Documents. To the extent that any models or electronic files are provided to Subcontractor, they are, except as otherwise provided in the Contract Documents, provided for reference purposes only, with the understanding that Subcontractor shall have an affirmative duty to verify that such models and electronic files have not been corrupted and are accurate and up-to-date.  Subcontractor acknowledges that it is possible that models and electronic files may be inaccurate, and therefore may not be relied upon. All persons consulting or reviewing models and electronic files should direct any questions about same to the Contractor, in writing, for review and resolution.

4.10    If any provision of this Subcontract is found to be unenforceable or invalid in its entirety, such provision will be severed from this contract, but will not affect the enforceability or validity of any other term or condition.

4.11    This Subcontract may be executed in any number of counterparts, each of which will, for all purposes, be deemed an original, and all of which are identical.  The electronic transmission of any signed original document, and retransmission of any signed electronic transmission, shall be the same as the delivery of an original if sent to the correct email address.  At the request of either party, the parties will confirm electronic transmitted signatures by signing an original document. All of Subcontractor's obligations hereunder shall apply to all or any part of the Subcontract Work performed before and after full execution of the Subcontract.

4.12    CONFIDENTIALITY: Confidential Information shall be deemed to include: (a) any information concerning the Contractor or the Owner (whether prepared by the Owner, Contractor, their advisors or otherwise), including, without limitation, information regarding assets, tangible and intangible, owned, leased or licensed, which is furnished to Subcontractor by or on behalf of the Contractor or Owner (b) this Agreement; (c) the fact that the parties have had, are having or may have discussions concerning the Project; (d) any negotiations that may occur between ARCO and Subcontractor; (e) the content of all plans, specifications, design concepts, design criteria mock-ups, site-specific geotechnical and/or other information related to the Project and/or the Project site; (f) the content of any resulting Bid from Subcontractor, including the individual elements of such Bid; and (g) any notes, copies, reports, analyses, forecasts, compilations, studies, presentations, interpretations or other documents prepared by or for Subcontractor that contain or reflect, in whole or in part, the information or materials furnished to Subcontractor pursuant to this Agreement.  The term "Confidential Information" does not include any information that is in the public domain.  The burden of proving that information falls within (a) through (g) shall rest with Subcontractor.  Subcontractor shall use the Confidential Information solely for the purpose of furnishing the Subcontract Work in connection with the Project, and shall not use the Confidential Information for any other purpose.  Subcontractor shall treat and safeguard all Confidential Information as strictly private and confidential, and Subcontractor shall take all steps reasonably necessary to preserve such confidentiality. Except as specifically provided in this Agreement, Subcontractor shall not disclose any Confidential Information to any person.

4.13    NON-DISPARAGEMENT: Neither Subcontractor nor any of its employees, officers, directors and agents will at any time during or subsequent to performance of Subcontract Work on the Project, make any statements or take any actions which could reasonably be expected to damage the reputation or business of Contractor, including, but not limited to:  any action or statement which may induce any customer, prospective customer, vendor, subcontractor or supplier to cease doing business with Contractor; any action or statement which may induce any independent contractor or employee to cease employment or engagement of services with Contractor; or any other disparaging statement or action regarding the business operations of Contractor.  Nothing contained in this Section 4.13 shall be deemed to preclude Subcontractor from participating in good faith in any dispute resolution proceeding or from responding to lawful court orders.  Contractor shall have all legal and equitable remedies available to enforce Subcontractor's obligations under this Section 4.13, including but not limited to seeking injunctive relief.

4.14.    This Subcontract is a full and complete expression of the parties' agreement and there are no other terms and conditions except as expressly set forth herein.  The agreement of the parties hereto may not be modified or amended except by a written agreement signed by a duly authorized agent of both parties hereto.

**THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES. IN WITNESS WHEREOF,** the parties hereto have executed this Subcontract as of the date stated above.

| Midwest Dock Solutions, Inc | | ARCO/Murray National Construction Company, Inc. | |
|---|---|---|---|
| by: _Tony Earlengo_ | 9/3/2021 \| 8:01 AM CDT | by: _Jack York_ | 9/3/2021 \| 10:49 AM CD |
| **Subcontractor** | Date | **Contractor** | Date |
| Owner | | Project Manager | |
| Title | | Title | |

DocuSign Envelope ID: 3EA025CD-21C7-4569-B55F-7D231ABE4E52

## Illinois Subcontract Addendum

To the extent that the terms of this Addendum conflict with the terms of the Subcontract, the terms of this Addendum shall govern. Except as modified herein, the terms of the Subcontract shall remain in full force and effect. Notwithstanding anything contained in the Subcontract to the contrary, Contractor will retain ten percent (10%) from Subcontractor's Applications for Payment, provided however, that Contractor shall withhold no more retention than allowed under applicable Illinois law. If any portion of retention is required by law to be released before Subcontractor's work is completed and/or before Contractor's work is completed, then notwithstanding anything to the contrary herein, OWNER'S PAYMENT OF SUCH RETENTION TO CONTRACTOR IS A CONDITION PRECEDENT TO SUBCONTRACTOR'S RIGHT TO PAYMENT BY CONTRACTOR and Subcontractor expressly waives all rights under the Illinois Contractor Prompt Payment Act (815 ILCS 603) to the extent necessary to effectuate this sentence. Nothing in this paragraph shall be deemed to limit Contractor's right to withhold funds as otherwise provided under this Subcontract to the extent permitted by law.

DocuSign Envelope ID: 3EA025CD-21C7-4569-B55E-7D231ABE4E52

**EXHIBIT A**
**SUB-SUBCONTRACTORS/SUPPLIERS**

ARCO/Murray National Construction Company, Inc.

| | |
|---|---|
| Job Number: | C555- Crow Holdings Joliet Truck Terminal |
| Date: | 08/31/2021 |
| Subcontractor: | Midwest Dock Solutions, Inc |
| Address: | 3211 Holeman Ave |
| City, State, and Zip: | Steger, IL  60475 |

Please list all material suppliers and sub-subcontractors.

| ITEM | MATERIAL SUPPLIER / Equipment Rental | SUBCONTRACTOR | COST |
|---|---|---|---|
| Overhead doors | Clopay | NA | $ $150,000 |
| Dock equipment | Blue Giant | NA | $ 1,000000 |
| NA | NA | NA | $ NA |
| NA | NA | NA | $ NA |
| NA | NA | NA | $ NA |
| NA | NA | NA | $ NA |
| NA | NA | NA | $ NA |
| NA | NA | NA | $ NA |
| NA | NA | NA | $ NA |
| NA | NA | NA | $ NA |
| Subcontractor Stock Material | NA | NA | $ NA |
| Subcontractor In-House Labor | NA | NA | $ NA |
| **TOTAL CONTRACT AMOUNT** | | | $ 1150000 |

Under penalty of perjury, Midwest Dock Solutions, Inc certifies that the above information is correct and any changes in the above information will be submitted to ARCO/Murray National Construction Company, Inc. in writing. Subcontractor will supply ARCO/Murray National Construction Company, Inc. with all proper material and/or sub-subcontractor affidavits or lien waivers before progress or final payments are due to subcontractor.

_Tony Earlengo_
Subcontractor

9/3/2021 | 8:01 AM CDT
Date

**NOTE: ALL Subcontractors are required to sign this form with the signing of the Subcontract and to update with any additional or different suppliers or subcontractors, with each Application for Payment.**

**EXHIBIT B**
**INSURANCE REQUIREMENTS**

Subcontractor's and its subcontractors' insurance shall be purchased from companies lawfully authorized to do business in the jurisdiction in which the Project is located with a current A.M. Best's rating of not less than "A-", and that is acceptable to Contractor, and shall be written for the minimum types and limits and shall be maintained, at their expense, for the life of this Subcontract, except as otherwise provided herein.

Worker's Compensation: Worker's Compensation in accordance with the statutory requirements for the state in which the Project is located

Employers' Liability: Employers' Liability, whether required by statute or not, for a limit of not less than $500,000 bodily injury by accident, each accident; $500,000 bodily injury by disease, policy limit; $500,000 bodily injury by disease, each employee, or if greater, in the amounts required by statute.

Commercial General Liability (occurrence format), (including Premises-Operations; Products/Completed Operations which remains in force for three (3) years after Final Completion of the Project; Independent Contractors; Broad Form Property Damage. If the Project involves any type of residential work, Subcontractor's Commercial General Liability policy shall not contain any exclusions or restrictions for residential work; and If Subcontractor's work includes the application, maintenance or repair of Exterior Insulation Finish Systems (EIFS) or similar product, Subcontractor's Commercial General Liability policy shall not exclude such work or Subcontractor shall provide separate insurance covering such operations):

$1,000,000................................Per Occurrence
$1,000,000....................................Personal and Advertising Injury
$1,000,000....................................Products/Completed Operations Aggregate
$1,000,000....................................General Aggregate (Per Project)

Automobile Liability:       $1,000,000 per accident; All Owned Automobiles; Liability for Non-owned Automobiles; Liability for Hired Cars/Trucks; Uninsured Motorists

Excess/Umbrella Policy:       $2,000,000 each occurrence and in the aggregate

Pollution Liability:       $1,000,000 each occurrence and in the aggregate (Per Project); (required if Subcontractor or its subcontractor/consultant is providing earthwork, demolition, concrete, plumbing, pile driving, dynamic compaction, drilling services (drillers, geopiers, etc.) and/or electrical services)

Professional Liability: (required if Subcontractor or its subcontractor is providing design services or surveying and layout services):
$1,000,000 each claim
$2,000,000 annual aggregate
The above policies shall not include self-insured retentions in excess of $10,000, and if the Professional Liability is provided on a claims-made basis shall include a three-year reporting period commencing from Final Completion of the Project.

Other Coverage: Subcontractor shall be responsible for any desired coverage against damage or loss to its own materials, facilities, tools, equipment, scaffolds, bracing and similar items. In all cases, Subcontractor is responsible for all deductibles on insurance claims submitted to Owner or Contractor.

Additional Insureds and Required Endorsements: Subcontractor shall endorse Commercial General Liability, Auto Liability, Pollution Liability, and Umbrella Excess Liability policies to name **CHI DEVELOPMENT OPERATING, L.L.C., a Texas limited liability company, Joliet Route 6 Logistics I, LLC, Delaware limited liability company, NFI Real Estate, LLC,** Contractor **ARCO/Murray National Construction Company, Inc.)** and Owner **(CHI Development Operating, LLC)** as additional insureds on a primary and non-contributory basis for current, ongoing and completed operations for three (3) years after Final Completion of the Project. Because Subcontractor does not have a direct contract with the Owner, additional insured status must be provided using forms **CG 2010 04/13, CG 2037 04/13, CG 2033 04/13, CG 2001 04/13, CG 2404 05/09, & WC 00 03/13,** or equivalent. The coverage procured pursuant to this Subcontract, shall stipulate that the insurance afforded to Subcontractor and any additional insureds under Subcontractor's insurance (designated pursuant to this Subcontract) shall apply as primary insurance and that any other insurance carried by the Contractor or other additional insureds will be excess only and not contribute with Subcontractor's insurance.

Subrogation: Subcontractor waives against Owner and Contractor all damages covered by insurance provided by Subcontractor and/or sub-subcontractors of any tier, and Subcontractor and its insurance carrier(s) waive all rights of subrogation against the Owner, Contractor and their officers, directors, shareholders, employees, agents, or appointed representatives unless restricted by state statutes.

Form of Policies:  All policies shall be written on the ISO form CG0001, or equivalent**, and shall be endorsed to include a 30-day prior written notice of cancellation, via EMAIL, to lesguerra@arcomurray.com.**

Certificates:  **INSURANCE CERTIFICATE MUST CONFORM TO THE SAMPLE COI ATTACHED HERETO, AND SHALL SPECIFY JOB NAME AND NUMBER, AND MUST BE ACCOMPANIED BY ENDORSEMENTS IDENTIFYING ADDITIONAL INSUREDS AND THE WAIVER OF SUBROGATION (OR A COPY OF THE POLICY LANGUAGE REGARDING SAME).**

**Job Number: C555-**

**Job Name:  Crow Holdings Joliet Truck Terminal**

{A0021531.4}                    Page 11

DocuSign Envelope ID: 3EA025CD-21C7-4569-B5EE-7D231ABE4E52

## SAMPLE

| CERTIFICATE OF LIABILITY INSURANCE | DATE(MM/DD/YYYY) 2/4/2019 |
|---|---|

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| | PHONE (A/C, No. Ext): | | FAX (A/C, No): |
| | E-MAIL ADDRESS: | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : | | |
| INSURED | INSURER B : | | |
| Subcontractor | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

**COVERAGES**     **CERTIFICATE NUMBER:**\*\*COI for SUBS\*\*     **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| X | COMMERCIAL GENERAL LIABILITY | | | \<enter policy number\> | \<eff date\> | \<exp date\> | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | X | Y | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | \<enter policy number\> | \<eff date\> | \<exp date\> | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| X | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS / SCHEDULED AUTOS | X | Y | | | | BODILY INJURY (Per accident) | $ |
| X | HIRED AUTOS X NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| X | UMBRELLA LIAB X OCCUR | | | \<enter policy number\> | \<eff date\> | \<exp date\> | EACH OCCURRENCE | $ 2,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 2,000,000 |
| | DED RETENTION $ | X | Y | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? Y (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | Y | \<enter policy number\> | \<eff date\> | \<exp date\> | X PER STATUTE / OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |
| | Pollution Liability | X | Y | \<enter policy number\> | \<eff date\> | \<exp date\> | Occurrence | 1,000,000 |
| | Professional Liability | | | \<enter policy number\> | \<eff date\> | \<exp date\> | Occurrence / Aggregate | 1M / 2M |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
\<Project Name\> \<ARCO entity\> and \<Owner name\> are included as Additional Insureds on the General Liability (per form CG 2010 04/13. CG 2037 04/13, CG 2038 04/13, CG 2033 04/13, CG 2404 05/09, CG 2001 04/13, WC 00 03/13). Business Auto Liability, Umbrella, and Pollution Liability. Additional Insured coverage is Primary & Non-Contributory.
Waiver of Subrogation in favor of \<ARCO entity\> and \<Owner\> on the General Liability (CG 2404 05/09), Business Auto, Umbrella, Pollution Liability, and Workers Compensation.
30 Day Notice of Cancellation will be provided for the General Liability, Commercial Auto, Workers Compensation, and Umbrella policies except for nonpayment of premium in which 10 days written notice will be provided if required by written contract.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| \<ARCO entity\> (Insert the name of the ARCO entity company with whom you are contracting) | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. SEE ABOVE. |
| | AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)
INS025 (201401)

The ACORD name and logo are registered marks of ACORD

{A0021531.4}        Page 12

**EXHIBIT C**
**ADDITIONAL SAFETY REQUIREMENTS**

1. **Contractor's Safety & Health Manual**: Subcontractor shall comply with the most stringent safety and health requirements among the federal Occupational Safety and Health Administration (OSHA) regulations (including but not limited to Title 29 of the Code of Federal Regulations), Subcontractor's safety and health plan, and Contractor's Safety & Health Manual, which is available for reviewing at www.arcosafe.com (password: letmein). If Subcontractor is unable at any time, for any reason to access Contractor's Safety & Health Manual, Subcontractor shall notify Contractor in writing, and Contractor will provide Subcontractor with other access to the Manual.

2. **Crystalline Silica Standards**: All Subcontract Work performed shall be in compliance with the Respirable Crystalline Silica Standard under 29 CFR 1926.1153, as amended from time to time. If Subcontractor is engaged in a task identified on Table 1 of 29 CFR 1926.1153(c), Subcontractor shall fully and properly implement the engineering controls, work practices, and respiratory protection specified for that task on Table 1. If (i) Subcontractor does not implement those specified exposure control methods in the manner prescribed or if (ii) any applicable task is not identified on Table 1, Subcontractor shall assess and limit exposure to respirable crystalline silica by using alternative control methods in accordance with 29 CFR 1926.1153(d), in which case Subcontractor shall provide copies of exposure assessments to ARCO before implementing those methods. Prior to commencing any Subcontract Work, Subcontractor shall provide a copy of its written exposure control plan, as required by 29 CFR 1926.1153(g), to ARCO. As used in this paragraph, "employee" has the meaning ascribed to it in 29 CFR 1926.32.

3. **OSHA Citation Costs**: Any OSHA citations received by the Contractor due to a Subcontractor violation of safety and health requirements will be paid by the Subcontractor.

4. **Minimum Reporting Requirements**: All employee accidents, near misses, or hazardous incidents must be reported to the Contractor as soon as possible, but no later than the end of that work shift. If a Contractor associate is not present, the Subcontractor shall call 314-963-0715, and ask to speak to the Contractor's Safety Department or someone in charge of that project. Subcontractor shall submit a formal written report to Contractor within 24 hours of the incident.

5. **HAZCOM & Safety Data Sheets**: Subcontractor shall submit a written safety program and HAZCOM program to Contractor, including all site-specific Safety Data Sheets, prior to beginning the Subcontract Work.

6. **Weekly Safety Talks**: Subcontractor shall perform at least one documented weekly safety talk and submit a copy to the Contractor's superintendent on a weekly basis.

7. **PPE**: All Personal Protective Equipment (PPE) must comply with OSHA and American National Standards Institute (ANSI) standards. PPE shall include, at a minimum: Hard hat, safety glasses, high-visibility shirts or vests, minimum 4" sleeves, long pants, and hard-soled boots or shoes.

8. **English-speaking Competent Person**: Subcontractor shall have at least one English speaking 'competent person' available on site at all times during the performance of Subcontractor's work activities to facilitate communication and help identify and discuss safety and health related issues, as necessary.

9. **Daily Housekeeping**: Subcontractor shall be responsible, on a DAILY basis, to keep the work site free and clear of all debris, dirt and trash, and for generally maintaining its work area in an organized, clean and hazard-free condition. If Subcontractor fails to fulfill its obligations in this regard, Contractor may, in additional to all other remedies under the Subcontract, at law or equity, perform all required cleanup tasks and back-charge the Subcontractor for all time and costs incurred by Contractor in such cleanup activities.

10. **First Aid:** Subcontractor shall provide adequate first-aid and medical supplies for Subcontractor's employees.

11. **GFCI's:** All temporary power utilized by Subcontractor shall be equipped with Ground Fault Circuit Interrupters (GFCI). All generators shall be equipped with GFCIs.

12. **Conditions to Crane Mobilization**: Prior to mobilizing a crane, Subcontractor shall submit annual inspection records, load charts, lifting plan, operator certifications, and any additional documentation related to crane operations.

{A0021531.4}                                              Page 13

DocuSign Envelope ID: 3EA025CD-21C7-4569-B55E-7D231ABE4E52

13. **Rigging/Signaling Qualifications:** Subcontractors engaged in rigging and/or signaling operations shall submit rigger/signalperson qualifications to Contractor prior to beginning Subcontract Work.

14. **Fall Protection**: Subcontractor shall provide adequate fall protection to personnel who are working or present at heights in excess of 6 feet and such personnel shall use such Subcontractor-provided fall protection.

15. **Falling Object Protection**: Subcontractor shall provide falling object protection for all scaffold systems by means of toeboards, and screens or netting when required. Establishing a Limited (or Controlled) Access Zone around the base of a scaffolding system as a means of falling object protection is not permitted.

16. **Safety Monitor System Prohibited**: ARCO prohibits the use of a Safety Monitor System as a means of fall protection for all trades. Subcontractor may use a Warning Line System in accordance with OSHA standards. Anyone outside of the Warning Line System must utilize traditional fall protection methods.

17. **Flammable Liquid Storage**: Subcontractor shall store all flammable liquids in approved metal safety cans.

18. **Temporary Lighting**: Subcontractor is responsible for provided adequate temporary lighting for Subcontractor's scope of work. Lighting levels must be in accordance OSHA 1926.56 Table D-3

19. **Qualified Equipment Operators**: Subcontractor's personnel who operate equipment must be trained and qualified. Documentation of qualifications must be submitted to Contractor before Subcontractor's personnel operate equipment.

20. **Drugs & Alcohol:** Possessing drugs or alcohol while on-site is strictly prohibited. Working under the influence of drugs or alcohol is strictly prohibited.

21. **Notifications:** Subcontractor shall give prompt written notice to the Contractor of any accident involving bodily injury, any property damage exceeding, or any failure that could have resulted in serious bodily injury, regardless of whether such injury was sustained.

**Subcontractor, its employees, subcontractors, suppliers and anyone else for whom Subcontractor is responsible shall comply with federal, state, and local safety standards, the ARCO/Murray National Construction Company, Inc. safety and health program, as well as with Subcontractor's individual safety and health program. Establishment of a safety program by the Contractor shall not relieve the Subcontractor of its safety responsibilities.**

DocuSign Envelope ID: 3EA025CD-21C7-4569-B55E-7D231ABE4E52

**EXHIBIT D**
**REQUEST FOR PAYMENT**

To:    ARCO/Murray National Construction Company, Inc.        Date:    _____
        3110 Woodcreek Drive
        Downers Grove, IL 60515        Invoice No:    _____
        lbrown@arcomurray.com

From:    Midwest Dock Solutions, Inc        Contractor Job: _C555-_ Crow Holdings Joliet Truck
        3211 Holeman Ave        Terminal
        Steger, IL 60475
        Sherrie Weber sherri@midwestdocksolutions.com

| | | |
|---|---|---|
| 1 | Amount of Subcontract | $_____ |
| 2 | Approved Change Orders | $_____ |
| 3 | Total Subcontract Amount (Line 1 + Line 2) | $_____ |
| 4 | Total Work Completed to Date | $_____ |
| 5 | Less 10.00% Retention (Line 4 x 10.00%) | $_____ |
| 6 | Total Billable Amount (Line 4 - Line 5) | $_____ |
| 7 | Billable Amount ( = Line 6) | $_____ |
| 8 | Less Previous Payment Request | $_____ |
| 9 | Net Amount Due This Invoice (Line 7 - Line 8) | $_____ |

I have received and incorporated in this project this month, materials and/or services from the following material suppliers and/or subcontractors for the respective amounts:

| Subcontractor/Material Supplier | Item | Contract Schedule of Value | Paid to Date | To Be Paid This Period |
|---|---|---|---|---|
| _____ | _____ | $ _____ | $ _____ | $ _____ |
| _____ | _____ | $ _____ | $ _____ | $ _____ |
| _____ | _____ | $ _____ | $ _____ | $ _____ |
| _____ | _____ | $ _____ | $ _____ | $ _____ |
| _____ | _____ | $ _____ | $ _____ | $ _____ |
| _____ | _____ | $ _____ | $ _____ | $ _____ |
| _____ | _____ | $ _____ | $ _____ | $ _____ |

Please indicate here if joint checks are requested:   YES \ NO

_____
(Subcontractor signature)

_____
(Title)

_____
(Date)

| |
|---|
| Vendor#  57639 |
| Job/W.O. _C555-_ |
| CSI #  _____ |
| SL#    C555-1011 |
| G/L #  _____5060_____ |
| Approved _____ |

**NOTE TO THE SUBCONTRACTOR**

1.   All Subcontracts over $10,000.00 shall submit a breakdown for invoices per Paragraph 1, Section 3 of the Bid Instructions in a format similar to AIA-G703

2.   Please DO NOT revise this form.

3.   Failure to use this form will result in delay of payment.

4.   ALL PAYMENT REQUESTS MUST BE RECEIVED BY THE 20TH OF THE MONTH

15

**EXHIBIT E**
**SUBCONTRACTOR'S SCOPE OF WORK**

**JOB NAME: Crow Joliet Truck Terminal**

**JOB NO.: C555**

**DATE: 8/31/21**

**SUBCONTRACTOR: Midwest Dock Solutions**

**Scope of Work:**

| | |
|---|---:|
| (140) Blue Giant Dock Levelers | $539,000 |
| (140) Dock Lights | $33,600 |
| (140) Dock Shelters | $173,600 |
| Dock Tax | $32,500 |
| (140) Clopay OH Sectional Doors | $280,000 |
| (1) Clopay Drive-in-Door with motor | $5,250 |
| (140) sets of Z-guards | $31,500 |
| Door Tax | $13,131 |
| **Total Base Contract** | **$1,108,581** |
| Pending Alt: Airbag levelers | $91,000 |
| Pending Alt: Dock restraints | $525,000 |
| Pending Alt: Dock Fan combos | $18,900 |

**Dock Levelers & Equipment**
A. Provide all labor, material, equipment, supervision, layout, expertise, etc., required to provide a turnkey installation of the dock levelers.

B. Special care must be taken with the floor slab. Delivery trucks will not be permitted on the slab and only lifts with wrapped or non-marking tires and diapered under-carriages will be permitted on the slab. Lifts that are leaking any type of fluids will not be permitted on the slab.

C. Furnish and install 20" tall heavy duty laminated steel bumpers with 4" projection for (140) dock positions.

D. Furnish and install (140) dock levelers.
  1. Dock levelers should be mechanical
     a. There is a **PENDING ALTERNATE** to provide airbag levelers
  2. 6' W x 8' L
  3. 40,000 lbs capacity, with 16" hinged lip projection and necessary brackets at each position.
  4. All levelers shall be grey colored
  5. Blue Giant brand
  6. **Pending Alternate:** Provide electric dock restraints at (140) dock positions with red/green backup light and combination control panel.

E. Furnish and install dock shelters at (140) dock positions.
F. Furnish and install LED flex arm dock lights at (140) dock positions.

5/24/19

16

DocuSign Envelope ID: 3EA025CD-21C7-4569-B55F-7D231ABE4E52

1. There is a **PENDING ALTERNATE** to install combination dock lights/fans in lieu of just dock lights.

G. Provide a one (1) year labor and material warranty.

H. This subcontractor shall be responsible to complete layout for this work and clean up. ARCO will provide dumpster.

## Overhead Doors

A. Furnish and install the following overhead doors:
   1. One hundred and forty (140) EA – 9'-0" W x 10'-0" H overhead sectional doors
   2. One (1) 12'-0" W x 14'-0" H overhead section door, with electrical operator

B. Provide and install a "heavy duty" operator with push button control for the door above that an operator is required for (drive in door). Operator to be 480/277V.

C. Control wiring to be included for the push button.

D. All overhead doors shall be counter balanced overhead.

E. All overhead doors shall be internally strutted.

F. Overhead doors shall contain a minimum of R-14 insulation.

G. All doors shall be furnished with a baked on white enamel primer finish on galvanized steel faces. The interior face shall be colored vinyl (white).

H. All doors shall have 3" tracks and wheels and 25,000 cycle springs.

I. All doors shall be high or vertical lift type.

J. Provide two (2) 12" x 24" vision panels on all doors.

K. Provide rubber astragals for all overhead doors.

L. Provide heavy-duty weather-stripping at heads, jambs, and sills.

M. The subcontractor shall be responsible to complete layout for this work and clean up. ARCO will provide dumpster.

N. The floor slab may or may not be poured prior to overhead doors installation.

O. All overhead doors shall be supported from the precast concrete walls. Tracks and tension springs shall be fastened to precast with concrete anchors.

P. Provide a separate lifting handle mounted 18" above finished floor elevation for manually operated sectional overhead doors.

Q. Provide side mounted locks for all overhead doors. Mount these sidelocks greater than the height of the Z-guards as to not interfere. Additionally – provide a slot to allow all overhead doors to be locked at a height of 12" AFF for ARCO to use during construction to "air out" the buildings.

R. Provide Z-guards at each overhead dock door (141 total dock positions including drive in door)

17

5/24/19

DocuSign Envelope ID: 3EA025CD-21C7-4569-B55E-7D231ABE4E52

## Submittals

A.  All shop drawings are to be submitted within five (5) days of contract award.
B.  All product data and samples are to be submitted within five (5) days of contract award.

## Tentative Schedule

A.  Work to start: December 2021

B.  Lead times:
    Doors: 16 weeks
    Dock Levelers: 22 weeks

C.  Durations:
    Doors: 30 days
    Dock Levelers: 12 days
    Dock Shelters: 15 days

## T&M Rates

Straight time: $135/hr
Overtime: $165/hr
Double time: $200/hr

18

5/24/19

**General Requirements:**

A. Claim any extras within 10 calendar days from date of occurrence. No extras can be approved later. Extras must be approved in writing by ARCO/Murray National Construction Company, Inc. representative before work begins.

B. Conform to all OSHA, hazardous communications, and other applicable safety requirements, including but not necessarily limited to the following:

  1. GFI and Assured Grounding of Electrical Outlets

     All extension cords shall have either a GFI receptacle or be routinely checked as part of a written and recorded assured grounding program.

  2. Hazardous Communications Program:

     Each subcontractor on ARCO/Murray National Construction Company, Inc.'s job sites must maintain a hazardous materials file for his own employees. Each file shall contain Material Safety Data Sheets (MSDS) on all material used in that specific project's construction.

     It is the subcontractor's responsibility to notify other Contractor's on the job site of any hazardous materials to which their employees may be exposed.

  3. Any fines or penalties imposed by OSHA for work relating to subcontractor's scope shall be deducted from the subcontractor's compensation.

  4. All workers shall dress in accordance with OSHA regulations and professional standards. Hard hats, long pants and safety shoes will be required of everyone on the project.

  5. Excavations that are four feet or more in depth shall be either slopped or shored according to the specifications set aside in subpart P of the occupational safety and health standards for construction.

  6. Provide backup alarms on all equipment.

  7. It is the subcontractor's responsibility to insure that all equipment utilized to complete its scope of work is inspected and properly maintained per the equipment manufacturers and OSHA's standard. In addition, this subcontractor is responsible for properly training all employees who are operating said equipment including but not limited to lifts, excavation equipment, cranes, fork lifts, welders, etc.

C. If subcontractor's employee(s) arrives at the job site without a hard hat, the employee(s) will be issued a hard hat by ARCO/Murray National Construction Company, Inc. The hard hat will become property of the subcontractor and the subcontractor will be charged $50.00 for each hard hat issued to their employee(s). At no time will a subcontractor's employee be allowed to work at the site without a hard hat.

D. Subcontractor will perform all cleanup associated with subcontractor's work. ARCO/Murray National Construction Company, Inc. will provide dumpsters.

E. Procore:
  1. All subcontractors will be invited to collaborate on Procore, our online construction management tool:
     a. Procore comes at **NO COST** to subcontractors

5/24/19

    b. We suggest taking the Certification course through Procore to familiarize your Project Manager and Project Superintendent with the Procore tools needed. The course is at No COST and can be found on the link below
https://learn.procore.com/series/procore-certification-subcontractor-client

    c. Procore use for Subcontractor/GC coordination will include, but is not limited to:

        i. Drawing/Document Distribution

          1) All drawing revisions, sketches, etc. will be added to Procore in order to ensure a most-current set is always accurate and accessible to everyone on the project.

        ii. Drawing Markups

          1) Each subcontractor's jobsite foreman is required to maintain a Procore account for necessary project coordination.

          2) Procore is accessible via tablet/iPad or computer; therefore, jobsite foreman shall be able to have daily access to a tablet/iPad or computer.

        iii. RFI's

          1) Subcontractors are required to formally submit all RFI's through Procore to ensure that it will be answered by the appropriate party in a timely fashion.

        iv. Submittals

          1) Subcontractors are required to upload all submittals (and revised submittals) to Procore.

E. No exclusions or changes from the drawings, specifications or bid instructions will be permitted without written approval from ARCO/Murray National Construction Company, Inc. project manager or superintendent.

F. ARCO/Murray National Construction Company, Inc. will allow the Subcontractor progress payments at monthly intervals, in the ratio and to the extent of this Subcontractor's completed work. Ten percent (10%) retention will be withheld from each progress payment. Retention withheld may be invoiced thirty (30) days after the completion of the subcontract work. The retention will be released upon completion of the project and after ARCO/Murray National Construction Company, Inc. receives the retention payment from the Owner. All requests by the Subcontractor for progress payments and retention must be originals (faxed copies are unacceptable) delivered to ARCO/Murray National Construction Company, Inc. at its principal office on or before the 25th day of the month in order to be processed for payment on or after the 20th day of the succeeding month. All payment requests should be made on the Contractor payment request form.

G. Insurance Requirements – See Exhibit B.

H. It is the Subcontractor's responsibility to visit the job site prior to bidding to familiarize himself with actual job site conditions.

I. All materials used shall be new and first quality, and shall be installed in accordance with manufacturer's recommendations.

J. On contracts over $10,000, the successful Subcontractor will be required to submit a schedule of values to be approved. Monthly invoices shall be prepared according to the schedule of values. Breakdowns shall include columns showing (1) item (2) value (3) percent completed to date (4) the amount previously invoiced and (5) the amount being invoiced. Breakdowns must be submitted to ARCO/Murray National Construction Company, Inc. for approval within ten (10) days of the date of award.

K. Subcontractor shall include all applicable taxes, fees, permits, freight, hoisting.

DocuSign Envelope ID: 3EA025CD-21C7-4568-B5EF-7B231ABE4F52



**ARCO**
**MURRAY**
| DESIGN BUILD
ARCO/Murray National Construction, Inc.

## EXHIBIT F- DRAWING LOG

Printed on Fri Aug 13, 2021 at 11:31 am CDT

Job #: C555 Crow Holdings Joliet Truck Terminal
2901 Channahon Rd.
Joliet, Illinois 60436
331-251-2726

## Current Drawings

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| **Architectural** | | | | | |
| A2.1.1 | OVERALL FLOOR PLAN | 1 | 07/08/2021 | | Revision 2- 7/8/21 (07/08/21) |
| A2.1.2 | ENLARGED FLOOR PLAN - AREA A | 2 | 07/08/2021 | | Revision 2- 7/8/21 (07/08/21) |
| A2.1.3 | ENLARGED FLOOR PLAN - AREA B | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| A2.1.4 | ENLARGED FLOOR PLAN - AREA C | 1 | 06/02/2021 | | Revision 1- 6/2/21 (06/02/21) |
| A2.2.1 | PLAN DETAILS | 1 | 06/02/2021 | | Revision 1- 6/2/21 (06/02/21) |
| A2.3.1 | ROOF PLAN | 1 | 07/08/2021 | | Revision 2- 7/8/21 (07/08/21) |
| A2.4.1 | ROOF DETAILS | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| A4.1.1 | DOOR SCHEDULE | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| A4.2.1 | DOOR DETAILS | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| A4.3.1 | PARTITION TYPES AND DETAILS | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| A4.4.1 | WINDOW TYPES AND DETAILS | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| A5.1 | EXTERIOR ELEVATIONS | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| A5.2 | EXTERIOR ELEVATIONS | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| A5.3 | EXTERIOR ELEVATIONS | 1 | 06/02/2021 | | Revision 1- 6/2/21 (06/02/21) |
| A6.1 | WALL SECTIONS | 1 | 06/02/2021 | | Revision 1- 6/2/21 (06/02/21) |
| A6.2 | WALL SECTIONS | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| A6.3 | WALL SECTIONS | 1 | 06/02/2021 | | Revision 1- 6/2/21 (06/02/21) |
| A7.1 | SECTION DETAILS | 1 | 07/08/2021 | | Revision 2- 7/8/21 (07/08/21) |
| A7.2 | SECTION DETAILS | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| A8.1 | STAIR DETAILS | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| LS1.1 | LIFE SAFETY PLAN | 1 | 07/08/2021 | | Revision 2- 7/8/21 (07/08/21) |
| T1.1 | TITLE SHEET | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| T1.2 | ENVELOPE COMCHECK | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| T1.3 | PROPOSED GUARDSHACK | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| **Civil** | | | | | |
| C0.0 | CIVIL LEGEND & SITE LOCATION MAP | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C0.1 | GENERAL NOTES & SPECIFICATIONS | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C1.0 | OVERALL EXISTING CONDITIONS & DEMO PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C1.1 | DETAILED EXISTING CONDITIONS & DEMO PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C1.2 | DETAILED EXISTING CONDITIONS & DEMO PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |

DocuSign Envelope ID: 3EA025CD-21C7-4568-B5EF-7D231ABE4F52



ARCO/Murray National Construction, Inc.

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| C1.3 | DETAILED EXISTING CONDITIONS & DEMO PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C1.4 | DETAILED EXISTING CONDITIONS & DEMO PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C2.0 | OVERALL SITE PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C2.1 | DETAILED SITE PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C2.2 | DETAILED SITE PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C2.3 | DETAILED SITE PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C3.0 | OVERALL GRADING & STORMWATER MANAGEMENT PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C3.1 | DETAILED GRADING & STORMWATER MANGEMENT PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C3.2 | DETAILED GRADING & STORMWATER MANGEMENT PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C3.3 | DETAILED GRADING & STORMWATER MANGEMENT PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C3.4 | DETAILED GRADING & STORMWATER MANGEMENT PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C4.0 | OVERALL UTILITY PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C4.1 | DETAILED UTILITY PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C4.2 | DETAILED UTILITY PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C4.3 | DETAILED UTILITY PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C5.0 | CONSTRUCTION DETAILS | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C5.1 | CONSTRUCTION DETAILS | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C5.2 | CONSTRUCTION DETAILS | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C5.3 | CONSTRUCTION DETAILS | 1 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C6.0 | SOIL EROSION & SEDIMENT CONTROL PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C6.1 | SOIL EROSION & SEDIMENT CONTROL PLAN | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |
| C6.2 | SOIL EROSION & SEDIMENT CONTROL DETAILS | 2 | 08/09/2021 | | Civil Permit Drawings 8/9/21 (08/09/21) |

**Electrical**

DocuSign Envelope ID: 3EA025CD-21C7-4568-B5EF-7B231ABE4F52



Printed on Fri Aug 13, 2021 at 11:31 am CDT

Job #: C555 Crow Holdings Joliet Truck Terminal
2901 Channahon Rd.
Joliet, Illinois 60436
331-251-2726

ARCO/Murray National Construction, Inc.

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| E1 | SCHDULES, NOTES, AND DIAGRAMS | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| E1A | Panel Schedules | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| E2 | Warehouse Lighting | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| E3 | Warehouse Power | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| E4 | Site Work | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| **Landscape** | | | | | |
| L1.1 | TREE REMOVAL & PROTECTION PLAN - SW | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L1.2 | TREE REMOVAL & PROTECTION PLAN - NW | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L1.3 | TREE REMOVAL & PROTECTION PLAN - SOUTH CENTER | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L1.4 | TREE REMOVAL & PROTECTION PLAN - NORTH CENTER | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L1.5 | TREE REMOVAL & PROTECTION PLAN - CENTER EAST | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L1.6 | TREE REMOVAL & PROTECTION PLAN - EAST | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L2.0 | LANDSCAPE PLAN SHEET REFERENCE | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L2.1 | LANDSCAPE PLAN SOUTHWEST | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L2.2 | LANDSCAPE PLAN NORTHWEST | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L2.3 | LANDSCAPE PLAN SOUTH CENTER | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L2.4 | LANDSCAPE PLAN NORTH CENTER | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L2.5 | LANDSCAPE PLAN CENTER EAST | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L2.6 | LANDSCAPE PLAN EAST | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| L3.1 | PLANTING DETAILS | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| **Mechanical** | | | | | |
| M0.0 | EQUIPMENT SCHEDULES | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| M1.0 | OVERALL MECHANICAL FLOOR PLAN | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| **Plumbing** | | | | | |
| P100 | OVERALL PLUMBING PLAN | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| P200 | PLUMBING DETAILS AND NOTES | 0 | 05/10/2021 | | For Permit 5/10/21 (05/10/21) |
| **Structural** | | | | | |
| S1.1 | PARTIAL FOUNDATION PLAN | 2 | 08/03/2021 | | Structural Rev 2 – 8/3/21 (08/03/21) |
| S1.2 | PARTIAL FOUNDATION PLAN | 2 | 08/03/2021 | | Structural Rev 2 – 8/3/21 (08/03/21) |
| S2.1 | PARTIAL ROOF FRAMING PLAN | 2 | 08/03/2021 | | Structural Rev 2 – 8/3/21 (08/03/21) |
| S2.2 | PARTIAL ROOF FRAMING PLAN | 2 | 08/03/2021 | | Structural Rev 2 – 8/3/21 (08/03/21) |
| S3.1 | FOUNDATION DETAILS | 2 | 08/03/2021 | | Structural Rev 2 – 8/3/21 (08/03/21) |
| S3.2 | FOUNDATION DETAILS | 2 | 08/03/2021 | | Structural Rev 2 – 8/3/21 (08/03/21) |
| S4.1 | FRAMING DETAILS | 2 | 08/03/2021 | | Structural Rev 2 – 8/3/21 (08/03/21) |
| S4.2 | FRAMING DETAILS | 2 | 08/03/2021 | | Structural Rev 2 – 8/3/21 (08/03/21) |
| S4.3 | JOIST LOADING DIAGRAMS | 2 | 08/03/2021 | | Structural Rev 2 – 8/3/21 (08/03/21) |
| S5.1 | GENERAL NOTES & SCHEDULES | 2 | 08/03/2021 | | Structural Rev 2 – 8/3/21 (08/03/21) |
| S5.2 | SPECIAL INSPECTIONS | 2 | 08/03/2021 | | Structural Rev 2 – 8/3/21 (08/03/21) |

**EXHIBIT G**
**LIEN WAIVER FORMS**

5/24/19

22

## PARTIAL WAIVER AND RELEASE OF LIEN

_____

STATE OF _____    )

COUNTY OF _____   )

TO WHOM IT MAY CONCERN:

The undersigned has been engaged by ARCO/Murray National Construction Company, Inc. ("Contractor") to furnish labor and materials for the premises known as,  C555- Crow Holdings Joliet Truck Terminal, 2901 Channahon Rd. Joliet, IL 60436 (the "Premises"), of which CHI Development Operating, LLC  is the Owner. The undersigned hereby acknowledges receipt of payment in the amount of _____ Dollars ($_____) for all work performed and materials purchased for the Premises.

The undersigned does hereby waive and release all claims against Contractor and Owner, and releases any and all liens, and claims or rights to lien on the above described building and premises under the Statutes of the State of IL relating to Mechanic's Liens, on account of labor,  materials, and extras, including all direct and indirect costs for such Work,  furnished by the undersigned for said building and premises.

Claimant represents and warrants that Claimant has authority to enter into, execute and deliver this Lien Waiver, and this Lien Waiver constitutes the valid and binding obligations of Claimant and that Claimant has no claims against Contractor or Owner other than for the payment amount referenced above.  The undersigned representative acknowledges he or she is the appropriate officer and is authorized to execute this Lien Waiver.

Given under my hand and seal this _____ day of _____, 20__.

Company:

Midwest Dock Solutions, Inc

By: _____

Print Name: _____

Title: _____

Office phone: _____

**Reference Check Number:_____**

**Job Number:_  C555-**

**Job Name:** Crow Holdings Joliet Truck Terminal

5/24/19

23

DocuSign Envelope ID: 3EA025CD-21C7-4569-B55E-7D231ABE4E52

**FINAL WAIVER AND RELEASE OF LIEN**

_____

STATE OF _____        )

                             )

COUNTY OF _____       )

The undersigned has been engaged by ARCO/Murray National Construction Company, Inc. ("Contractor") to furnish labor and materials for the premises known as, C555- Crow Holdings Joliet Truck Terminal, 2901 Channahon Rd. Joliet, IL 60436 (the "Premises"), of which CHI Development Operating, LLC is the Owner.

The undersigned do(es) hereby release Contractor and Owner from claims in connection with the Project, and quit claims to the Owner, their successors and assigns, all liens, lien rights, claims or demands of any kind whatsoever, which the undersigned now has or might have against the building located on the Premises on account of labor performed and/or materials furnished for the construction of any improvements thereon (including all direct and indirect costs for such Work).

Claimant represents and warrants that: (i) Claimant has authority to enter into, execute and deliver this Lien Waiver, (ii) Claimant has paid all claims, invoices and bills for labor and materials (including union pension fund contributions, if applicable) for the Project, and there are no outstanding unpaid claims that could give rise to a lien or claim against Contractor, Owner, or the Project; (iii) Claimant has no other claims against Contractor or Owner in connection with the Project; and (iv) this Lien Waiver constitutes the valid and binding obligations of Claimant. The undersigned representative acknowledges he or she is the appropriate officer and is authorized to execute this Lien Waiver.

Given under my hand and seal this _____ day of _____, 20___.

Company Name:

Midwest Dock Solutions, Inc

By: _____

Print Name:_____

Title:_____

Telephone Number:_____

Reference Check Number:_____

**Job Number:** C555-

**Job Name:** Crow Holdings Joliet Truck Terminal

5/24/19

24

# EXHIBIT
# B

DocuSign Envelope ID: 2C1ED834-FE55-4045-A482-4D8EDECDD7E6

# IMPORTANT NOTICE

Please execute the contract via DocuSign.  Please DO NOT fax, email, or mail the document back to us.

The process is simple:
1. Click View Documents and Agree to Sign Electronically
2. Type in: Your name, Title, Date
3. For contracts $10,000 or more, complete ALL FIELDS in Exhibit A-Note if all fields are not complete, you cannot submit your signature for the document.  For fields you will not be putting information or a dollar amount in, use "-", "N/A", or something of that nature.
4. For contracts under $10,000, Exhibit A requires only a signature and date.
5. Click Complete Signature

The Project Manager will then sign the contract and a fully executed copy will be emailed automatically to everyone.  Our process is that ALL documents must be signed through DocuSign.  Please submit PDF copies of your insurance as well, via email, to the Project Assistant, Shannon Hubman(shubman@arcomurray.com) in order to be compliant for payment.  If you are not compliant, you cannot receive payment.

Contracts **will not** be considered executed if your Certificate of  Insurance is not submitted at the time of signature!

All contracts must be executed and received by  ARCO/Murray **prior** to starting any work.

Thank you.

Have an address change? Email:

shubman@arcomurray.com

Manager ☐
Subcontractor ☐
Superintendent ☐

## ARCO/Murray National Construction Company, Inc.

**3110 Woodcreek Drive,**
**Downers Grove, IL 60515**
**Phone: 331-251-2726**

## SUBCONTRACT AGREEMENT

E & O Req'd: ☐ YES or ☒ NO

| | | | |
|---|---|---|---|
| Job No: | C686- Bridge Elk Grove Village | Proj. Mgr.: | Leah George |
| Subcontract No: | C686-1007 | Job Sup't: | Eric Oja |
| Job Phone: | 331-251-2726 | Sup't Cell: | 630-386-5160 |
| Job Fax: | 331-331-2727 | Sup't Email: | eoja@arcomurray.com |
| Contractor's Accountant: | Laura Brown lbrown@arcomurray.com | Job Location: | 75 & 81 NW. Point Blvd Elk Grove Village, IL 60007 |
| Contractor License #: | | Subcontractor License #: | |
| | | Sub License Holder: | |
| Subcontractor PM: | Tony Zarlengo tony@midwestdocksolutions.com | Sub Accountant: | Sherrie Weber sherri@midwestdocksolutions.com |
| Subcontractor: | Midwest Dock Solutions, Inc 3211 Holeman Ave Steger, IL 60475 | Vendor #: PM Firm: | 57639 57639 |
| Subcontractor Phone: | 708-367-0801 | | |
| Subcontractor Fax: | | Date: | 07/12/2022 |

| CSI No: | Description: |
|---|---|
| 08-0900- | Overhead Doors |

This agreement ("Subcontract") is made and entered into between ARCO/Murray National Construction Company, Inc. ("Contractor") and Midwest Dock Solutions, Inc ("Subcontractor") as of 07/12/2022 concerning the following project: C686- Bridge Elk Grove Village, Elk Grove Village, IL (the "Project"):

    (a)   Project Description:    207,202 SF  (2) Speculative Warehouses

    (b)   Owner:    Bridge Point Elk Grove Village 150, LLC

    (c)   Architect:    Cornerstone Architects, Ltd.

    (d)   Location of Project:    75 & 81 NW. Point Blvd

                              Elk Grove Village, IL 60007

    (e)   SUBCONTRACT SUM:    $176,310.00

{A0021531.4}                          Page 1

**TERMS & CONDITIONS**

**Article 1**
**SUBCONTRACTOR'S WORK & THE CONTRACT DOCUMENTS**

1.1     Subcontract Work:  Subcontractor hereby agrees to perform and furnish all of the labor, services and materials required for the construction and completion of Subcontractor's portion of the Project, as defined in, and in accordance with,  the terms and conditions of this Subcontract and the terms, specifications and conditions set forth in the Contract Documents identified in Paragraph 1.2 herein ("Subcontract Work").  Any work performed by Subcontractor with respect to the Project before the date of this Subcontract shall also be governed by the terms of this Subcontract, notwithstanding the terms of any prior agreement.

1.2     Contract Documents:   The Contract Documents shall mean and consist of this Subcontract and all exhibits and addenda now or subsequently attached hereto; the **List of Subcontractors and Suppliers** for the Subcontract Work, prepared by Subcontractor and approved by Contractor as set forth in the attached **Exhibit A**; the **Insurance Requirements and Sample Form of Certificate of Insurance** attached hereto as **Exhibit B**; the **Additional Safety Requirements** attached hereto as **Exhibit C**; the **Application for Payment Form** attached hereto as **Exhibit D**; the **Scope of Work,** including plans, drawings and specifications as to particular elements of the Project, attached hereto as, or as referenced in, **Exhibit E**; the **Drawing Log,** attached hereto as **Exhibit F**; the **Lien Waiver Forms** attached hereto as **Exhibit G**; the state-specific Addendum, if any; all Change Orders and written modifications to this Subcontract executed after the date of this Subcontract by both Contractor and Subcontractor; and any bonds required to be furnished by Subcontractor pursuant hereto, all of which are incorporated herein by this reference.  The Contract Documents are complementary and what is required by any one shall be as binding as if required by all.  In the event of a conflict between Contract Documents or an internal conflict within a Contract Document, the better quality and greater quantity of work provided for shall govern in accordance with the Contractor's interpretation and no adjustment shall be made to the Subcontract Sum as a result of such conflicts or interpretations. The terms of this Subcontract (including all exhibits) shall be deemed to supercede all other oral or written communications between Contractor and Subcontractor. Subcontractor is solely responsible for notifying Contractor in writing of all such deviations, and such deviations will only be deemed accepted by Contractor to the extent a Change Order is executed by Contractor incorporating the identified deviation from the Contract Documents.   Should added labor, materials, services or other elements not shown in the Contract Documents, but reasonably inferable from the Contract Documents, be necessary to complete Subcontract Work, Subcontractor will furnish the same without any change in the Subcontract Sum (as defined in Paragraph 2.1 herein).

1.3     Performance of Subcontract Work:  Subcontractor shall perform and complete the Subcontract Work in accordance with the following standards and requirements:  (a) Subcontractor shall furnish efficient business administration and supervision, shall furnish at all times an adequate supply of workers, equipment and materials and shall perform the Subcontract Work in an expeditious and economical manner consistent with the requirements of this Subcontract; (b) the Subcontract Work shall be performed in a good and workmanlike manner, free of any and all liens and claims of any nature, including claims or liens of laborers, labor unions, suppliers and Subcontractor's subcontractors, etc.; (c) all equipment, materials and labor to be furnished by Subcontractor shall conform strictly to the requirements of the Contract Documents, and all materials and equipment to be installed in the Project shall be new, unless otherwise specified, and of good quality;  (d) Subcontractor shall be responsible for obtaining and shall pay for all necessary certificates, permits, inspections and tests necessary for completing Subcontract Work on a timely basis, provided that Subcontractor shall not be responsible for obtaining or paying for the Project building permit; (e) Subcontract Work shall be completed at Subcontractor's expense in strict accordance with all applicable state, federal and local laws, regulations, codes and ordinances, including but not limited to the Occupational Safety and Health Act of 1970, as amended from time-to-time, all requirements set forth on Exhibit C, and all applicable environmental laws and regulations, as well as with Contractor's standards and requirements, to the extent more stringent; (f) Subcontractor shall furnish all scaffolding, tools and equipment (including equipment for hoisting) that may be necessary to do Subcontract Work properly and expeditiously; (g) Subcontractor will inspect the conditions at the Project which may impact Subcontract Work in order to confirm that the Project is in proper condition to receive the Subcontract Work, and shall immediately verbally report to the Contractor and confirm in writing any non-conforming Project condition or any discrepancy or errors it discovers in the drawings, specifications, Project or Subcontract Work; (h) the installation and/or construction of the Subcontract Work shall be deemed as Subcontractor's acceptance that conditions at the Project and the plans, specifications and drawings are as they need to be for Subcontractor to perform the Subcontract Work; (i) Subcontractor assumes the risk of ascertaining proper dimensions for prefabrication, as well as the risk of installing any of Subcontract Work where there are on-site conditions or discrepancies or errors in the Contract Documents not caused by Subcontractor but which nevertheless are known or should be known by Subcontractor and which do or may adversely impact such installation; (j) Subcontractor shall remove from the Project site any employee or employees unsatisfactory to the Contractor; (k) Subcontractor shall provide, and shall cause its subcontractors to provide, at all times when the Subcontract Work is being performed, a competent and well trained on-site supervisor acceptable to Contractor who is fluent in spoken and written English; such on-site supervisor shall not be reassigned to a different project without Contractor's prior written consent; (l) Subcontractor shall pay when due for all supplies, fuel, equipment, machinery, repairs, transportation, material, labor, insurance premiums of any kind or description including workers' compensation insurance premiums, sales taxes, salaries, federal and state employment taxes, any similar payroll taxes relating to employees of Subcontractor, union costs and dues including but not limited to required pension, health and welfare fund contributions, and all other expenses whatsoever incurred in or as a result of, the performance of Subcontract Work; (m) Subcontractor shall be solely responsible to contact all appropriate sources in order to accurately determine the location of all underground wiring, plumbing, utilities, telecommunications systems and other similar items, and to have all such items clearly marked prior to commencement of any excavation (if applicable); (n) Subcontractor shall perform the Subcontract Work during normal working hours of normal working days unless otherwise specifically set forth in this Subcontract or directed by Contractor; (o) Subcontractor shall ensure the safety of all persons on the Project in course of and with respect to Subcontractor's operations; (p) Subcontractor shall keep the Project free from accumulation of water, material or rubbish caused by Subcontractor's operations; (q)

DocuSign Envelope ID: 2C1ED834-FE55-4045-A482-4D8EDECDD7E6

that Subcontractor and its employees and subcontractors shall be in compliance with all license and registration requirements imposed under applicable law; (r) Subcontractor and its employees and subcontractors shall not encroach upon property adjacent to the Project for storage of material, nor shall they be permitted on such adjacent properties without the permission of the Contractor and such adjacent property owners; (s) Subcontractor shall repair at its expense any and all damage to adjacent property caused by the Subcontract Work, and shall indemnify and hold harmless Contractor from any liability or responsibility for any claims due to such damage or injury and shall defend any action brought by reason thereof at its cost; (t) Subcontractor shall update and supplement as necessary, the list of sub-subcontractors and suppliers listed on Exhibit A in order to insure that Contractor always has complete and accurate information concerning the identity of who is supplying materials and/or labor for the Project; (u) Subcontractor shall observe when established separate gates for entry into the Project site; and (v) Subcontractor shall exercise that level of expertise and experience that enables it at all times to perform the Subcontract Work with the diligence and care reasonably exercised by experienced and fully competent contractors within Subcontractor's trade and profession (if applicable) on similarly situated projects, including but not limited to properly and timely designing (if applicable) and constructing the Subcontract Work.

1.4     Time for Performance of Subcontract Work:  Time is of the essence of this Subcontract in all respects, including but not limited to delivery, installation, erection and otherwise. Subcontractor shall commence the Subcontract Work upon: ☒ full execution of this Subcontract, and/or ☒ Contractor's notice to proceed ("Commencement"), and shall proceed with sufficient labor and equipment continuously to complete the Subcontract Work within the Subcontract Completion Time, as updated from time-to-time by Contractor. Subcontractor hereby agrees to complete the Subcontract Work within the time period specified in the Scope of Subcontract Work ("Subcontract Completion Time").  Subcontractor shall adjust its scheduling from time-to-time as directed by Contractor, including performing certain parts of the Subcontract Work before other parts.

In the event the Subcontract Work is delayed due to the willful misconduct of Contractor, abnormal and unforeseeable weather or any other cause which Contractor agrees is beyond the control of Subcontractor, and Subcontractor demonstrates in writing that such condition(s) prevented Subcontractor from performing critical-path Subcontract Work ("Delays"), Subcontractor may request an extension of the Subcontract Completion Time.  However, the Subcontract Completion Time shall not be extended for any reason, including Delays, unless the following absolute preconditions are fully and timely satisfied: (i) Subcontractor requests in writing from Contractor an extension of the Subcontract Completion Time, including a detailed explanation of the circumstances of the Delay and actions taken by the Subcontractor to mitigate or overcome the effects of such Delay, no later than three (3) business days after commencement of the Delay; and (ii) Contractor determines that such delay could not have been avoided, recovered or mitigated by reasonable actions taken by the Subcontractor; and (iii) Contractor receives, at a minimum, a corresponding extension of the Contract Time under the General Contract with the Owner (collectively, "Preconditions").  In no event will Contractor be obligated to extend the Subcontract Completion Time if any one or more of the preconditions are not satisfied. Timely, (no later than 5 days after commencement of any such claimed Delay) complete and accurate documentation shall be provided to Contractor to substantiate any equitable claims by Subcontractor for reimbursement of damages incurred by Subcontractor solely due a Delay.  Subcontractor acknowledges its understanding that untimely, incomplete or inaccurate submissions of claims for damages due to Delays may preclude Contractor from seeking reimbursement for such damages from Owner, and that if Contractor is no longer able to seek reimbursement from Owner due to Subcontractor's failure to timely submit and substantiate its Claims, Subcontractor shall be deemed to have waived any such claims.  Except as otherwise set forth herein and agreed in a Change Order executed by Subcontractor and Contractor, an extension of the Subcontract Completion Time shall be Subcontractor's sole and exclusive remedy for Delay.

1.5     Manufacturer's Warranties.  Subcontractor hereby assigns to Contractor and Owner all manufacturer's warranties and guarantees for any and all equipment and fixtures to be installed at or attached to the Project site pursuant to this Subcontract.  Upon final completion of the Subcontract Work, and before Contractor will be obligated to make final payment hereunder, Subcontractor shall deliver to Contractor: (i) originals or copies of all warranty and guarantee documents and all cut sheets and instructions and operating manuals of all equipment and fixtures; (ii) a final listing of serial numbers, if applicable, for all such equipment and fixtures along with the names and addresses of the manufacturers and suppliers of such equipment and fixtures; and (iii) final as-built drawings, if applicable, in hard-copy and electronic format.

1.6     Design-Build Elements:  The parties acknowledge and agree that only if the Subcontract Work includes the furnishing of design elements (the "Design Elements"), will the terms of this Section 1.6 apply. Subcontractor shall provide Contractor with complete and detailed plans and specifications of the Design Elements (the "Design Plans and Specs") that are consistent with: (i) all applicable codes, laws and regulations; (ii) the Contract Documents; (iii) that professional level of care applicable to members of the design profession furnishing design services as required by the Contract Documents ("Standard of Care"); and (iv) the performance and other specifications included in the bid instructions attached to the Subcontract ("Specifications"). All design work shall be performed only by qualified architects, engineers and other design professionals duly licensed, as necessary, in the jurisdictions in which the Project is located. All Design Plans and Specs shall be stamped or sealed by a duly licensed or registered design professional, and, when approved by Contractor, shall become part of the Contract Documents. Modifications to the Design Plans and Specs shall become Contract Documents when incorporated by Change Order into this Subcontract.   Subcontractor will disclose the identity of any engineers or consultants that Subcontractor wishes to retain, and will refrain from hiring anyone to whom Contractor has a reasonable objection. Subcontractor agrees that it shall correct any errors, omissions or other defects in the Design Plans and Specs (either through revised drawings or through written or field modifications or clarifications, as appropriate) with the level of promptness required in order to comply with the Project Schedule, and at no additional cost to Contractor or Owner. However, Contractor shall not have a duty to discover such errors; Subcontractor shall remain solely responsible for producing Design Plans & Specs that are in compliance with the applicable Standard of Care, Specifications and the Contract Documents.  At no additional cost to Owner and Contractor, Subcontractor shall pay all royalties and license fees arising from the Design Plans and Specs, and shall defend any suits or claims for infringement of patent rights or other intellectual property rights, and shall save Contractor and Owner harmless from loss on account thereof.   Contractor's approval of Design Plans and Specs that do not comply with the Contract Documents

{A0021531.4}                                           Page 3

shall not constitute approval of any changes from the Contract Documents unless such changes are specifically highlighted in the proposed Design Plans and Specs as changes.

**Article 2**
**SUBCONTRACT SUM & PROGRESS PAYMENTS**

2.1     Subcontract Sum:  Subject to the terms and conditions contained herein, and to the full and complete performance by Subcontractor as and when required hereunder, of its obligations as specified herein, Contractor shall pay the sum of **One Hundred and Seventy-Six Thousand, Three Hundred and Ten Dollars 00/100 - $176,310.00.**  It is understood and agreed that the Subcontract Sum is a lump sum amount and is not subject to increase under any circumstances unless both Contractor and Subcontractor execute a change order increasing the Subcontract Sum (a "Change Order").

2.2     Required Submittals for Payments: Subcontractor shall not be entitled to any payment for the Subcontract Work unless and until the following are submitted to Contractor on or before the 20th of the calendar month:

    a) Application for Payment:  Subcontractor shall utilize the Application for Payment, to be based upon the schedule of values (shown on Exhibit A), either in the format shown on Exhibit D, and attaching AIA Form G703, or as may be otherwise specified by Contractor; and

    b) Lien Waivers:  Subcontractor must furnish unconditional lien waivers from itself and all its subcontractors and suppliers, including suppliers for material, equipment and labor, before progress or final payments are due to Subcontractor. Lien waivers provided by Subcontractor and its subcontractors shall be in the form attached hereto as Exhibit G, or as Contractor, Owner, or any lender or title company may otherwise require.  Upon Contractor's request or if required by the General Contract, Subcontractor shall furnish conditional lien waivers with and for the payment sought in the Application for Payment.

    c) Other Documents:  Contractor may require other documents, in which case Subcontractor shall furnish invoices, statements and other documentation in order to substantiate the amounts claimed due in any Application for Payment.

    d) Final Payment:  Prior to final payment hereunder, Subcontractor shall deliver all items specified in Section 1.5 herein in addition to all other requirements hereunder, including completion of all punch list items in accordance with all Subcontract requirements.

2.3     Joint Checks:  Contractor reserves the right to issue joint checks to Subcontractor and its subcontractors and suppliers, or to pay such subcontractors and suppliers directly, but this shall not obligate Contractor to see to the proper disposition or application of any money advanced to or on behalf of Subcontractor.  If Subcontractor fails to certify in writing all amounts due to any of its lower tier subcontractors or suppliers within 5 days after Contractor's request for such confirmation, Contractor shall have the right to rely on such lower tier's certification of the amount due it, and upon payment of such amount directly or via joint check, the Subcontract Sum shall be reduced accordingly, without further agreement of Subcontractor.

2.4     Processing of Payment:  Following timely submittal of an Application for Payment, with all other documents as required hereunder or as requested by Contractor, Contractor will begin processing such Application for Payment on the 20th of the following month ().  Processing and payment may be delayed to the following month to the extent that any Application for Payment from Subcontractor is received by Contractor in an incomplete form, without required documentation (including but not limited to required insurance) and/or later than the 20th of the prior month. To the extent enforceable under applicable law, Contractor's obligation to pay Subcontractor  is expressly contingent upon, and subject to, receipt of payment for the Subcontract Work by Contractor from Owner.

2.5     Retention:  Contractor shall retain 10.00% of each payment otherwise due Subcontractor until the later to occur of (i) Contractor's acceptance of the Subcontract Work; and (ii) Contractor is paid its retention withheld by Owner for Contractor's Work.  The retention shall be due within 15 days thereafter, or as otherwise required under applicable state law, upon a separate billing by Subcontractor, after satisfaction of the foregoing conditions in (i) and (ii), and satisfaction of all obligations of Subcontractor in Section 2.2 herein.

2.6     Right to Withhold Payment & Other Remedies:  Contractor shall be entitled, upon notice to Subcontractor, to terminate this Subcontract, reduce or eliminate all or any element of the Subcontract Work (with a corresponding reduction in the Subcontract Sum), withhold payment of all or any part of an Application for Payment or nullify all or any part of a previous Application for Payment and withhold that amount Contractor reasonably deems necessary to protect the interests of Contractor and/or Owner, on account of defective work or default by Subcontractor under this Subcontract or, to the fullest extent permitted by law, any other agreement between Subcontractor and Contractor or Contractor's affiliates. Grounds for exercising Contractor's remedies hereunder include liens and claims arising out of the Subcontract Work, or reasonable evidence indicating the probable filing thereof, reasonable evidence that the Subcontract Work will not be completed within the Subcontract Completion Time, Owner's objection to the payment of the Subcontractor, bankruptcy or insolvency of Subcontractor, defective work, third-party claims arising out of the performance of the Subcontract Work; delays or damage to other contractors' work, Subcontractor's failure to provide sufficient manpower to maintain the required progress of the Subcontract Work;  or any other reasonable cause. In addition to withholding payment, Contractor shall have the right to exercise any other remedy available hereunder, at law or equity, including but not limited to (i) requiring Subcontractor to remove and/or replace any defective materials or work upon notice from Contractor,  at Subcontractor's sole cost and expense, (ii) removing Subcontractor from the Project, (iii) taking possession of all materials at the job site for purposes of completing the Subcontract Work, (iv) offsetting direct and indirect costs incurred by Contractor to complete, correct or accelerate the Subcontract Work, to the extent arising out of Subcontractor's breach of this Subcontract or, to the fullest extent permitted by law, any other agreement between Subcontractor and Contractor or its affiliates, against any amounts otherwise due from Contractor to Subcontractor, (v) require Subcontractor, Subcontractor's sole costs, to add extra manpower or furnish overtime labor in order to comply with the requirements of the Project Schedule, and (vi) supplement Subcontractor's crew with additional

{A0021531.4}                                    Page 4

manpower at Subcontractor's sole cost; all without any increase in the Subcontract Sum.  While Contractor has the right to execute the foregoing remedies, Contractor does not have the obligation to do so, and Contractor's failure to exercise one of more of its remedies shall not be construed as a waiver by Contractor of its right to do so.

2.7     Taxes and assessments:  Subcontractor hereby certifies that the Subcontract Sum includes all sales, use, consumer, franchise, excise and other taxes, and is not subject to any addition or increase on account of such taxes or assessments now or hereafter levied.  Subcontractor agrees that it shall be exclusively responsible for the payment of any such additional taxes or assessments.

2.8     Changes:  No change in the Subcontract Work, whether by way of alteration or addition to the Subcontract Work, shall be the basis for any increase to the Subcontract Sum or change in the Subcontract Completion Time, unless and until such alteration or addition has been authorized in writing by Contractor or by Change Order executed by Contractor and Subcontractor. Notwithstanding anything contained in the Contract Documents to the contrary, Contractor may reduce or adjust the scope of the Subcontract Work (with corresponding adjustment in Subcontract Sum) by written directive, or terminate the Subcontract, at any time for any reason, without liability for any lost profits or other damages, except that Contractor shall pay Subcontractor for all authorized, accepted and completed Subcontract Work through and including the date of such termination.  For any change directed or proposed by Contractor, the Subcontractor's acceptance shall be deemed given, unless Subcontractor delivers to Contractor an itemization of any of the terms with which Subcontractor is not in agreement, the reasons for such disagreement, and Subcontractor's proposed modifications to the Change Order or change directive issued by Contractor,  NO LATER THAN SEVEN (7 ) CALENDAR DAYS after issuance of the Change Order or change directive by Contractor.  Accordingly, no course of conduct or dealings between the parties, nor express or implied acceptance of alteration of the Subcontract Work, or claim that the Owner or Contractor has been unjustly enriched by the alteration of the Subcontract Work, whether or not there is in fact any such unjust enrichment, shall be the basis for any claim to increase the Subcontract Sum or change the Subcontract Completion Time.  A Change Order signed by Subcontractor indicates Subcontractor's agreement therewith, including the adjustment in the Subcontract Sum or Subcontract Completion Time, as the complete and final compensation for all costs or claims incurred as a consequence of the Change Order.

Subcontractor acknowledges and agrees that Contractor and Owner have relied upon Subcontractor's agreements in this Subcontract in finalizing budgets and schedule, and that Subcontractor shall not be entitled to any increase in the Subcontract Sum or Subcontract Time except to the extent expressly provided in this Section 2.8, and:  (i) Owner also agrees to increase the Contract Sum and/or Contract Time under the General Contract in connection with such change; and (ii) Subcontractor submits a timely request for change in strict accordance with the requirements of this Section 2.8.  If for any reason Subcontractor believes that it is entitled to a change in the Subcontract Sum or Subcontract Time, Subcontractor shall submit any such request for Change Order NO LATER THAN THREE (3) BUSINESS DAYS after the cause for such proposed change first arises and prior to any additional work being performed.  A timely request for a Change must be accompanied by a detailed statement of the conditions giving rise to such a claim, and back-up that fully substantiates such claim.  Field or work tickets, or any other documents claimed to be signed by Contractor's Superintendent shall not be construed as acceptance of any proposed change or as evidence of quantities or quality of materials or work performed. Compliance with the requirements set forth in this Section 2.8 shall not entitle Subcontractor to a Change Order if the substance of Subcontractor's claim would not otherwise entitle Subcontractor to the Change.  In no event will Subcontractor be entitled to any changes in the Subcontract Sum or Subcontract Time if Subcontractor is otherwise in breach of the all or any part of its obligations under this Subcontract.  TIME IS OF THE ESSENCE with respect to all matters relating to claims for changes, Change Orders and change directives.  Except as otherwise directed by Contractor in writing, Subcontractor shall continue performance of the Subcontract Work notwithstanding any disagreement concerning proposed changes.

**If timely notices are not given by Subcontractor as and when required under this Section 2.8,  or are not backed-up with verifiable documentary evidence supporting such claim, such failures shall be deemed fatal to any such claims, and Subcontractor shall be deemed to have waived any such claims.**

**Article 3
INSURANCE & BONDS**

Subcontractor shall furnish the insurance and evidence of such insurance as may be required by Contractor or Owner, the minimum of which shall be as set forth on Exhibit B. Subcontractor agrees to obligate its subcontractors, if any, to maintain the same types, levels and terms of insurance coverage as required of Subcontractor, including but not limited to the waiver of subrogation in favor of Contractor and Owner, and Subcontractor shall indemnify and hold harmless Contractor and Owner for all damages and losses, should it fail to do so. Subcontractor shall furnish a certificate of insurance acceptable in form and substance to Contractor that establishes Subcontractor's compliance with the requirements of Exhibit B. **Acceptance of such certificate shall not serve as a waiver of any requirement in Exhibit B.** Subcontractor shall submit the certificate together with copies of the required Additional Insured endorsements to Contractor, or if applicable, on-line to a third-party administrator designated in writing by Contractor, before Subcontractor starts the Subcontract Work. Notwithstanding any other provision, Contractor shall have no obligation to make any payment to Subcontractor until Contractor has received such certificates, including any required updates.  If required by Contractor, Subcontractor shall furnish a performance and/or payment bond at Subcontractor's expense. In the event of a conflict between the requirements of Exhibit B and any other exhibit, the requirements of Exhibit B shall control. Subcontractor shall furnish full and complete copies of all insurance policies and endorsements required by this Subcontract upon request from Contractor.

{A0021531.4}                                                                    Page 5

DocuSign Envelope ID: 2C1ED834-FE55-4045-A482-4D8EDECDD7E6

**Article 4**
**MISCELLANEOUS**

4.1      The parties acknowledge and agree that the Subcontractor is an independent contractor within the purview of the Internal Revenue Code, the Federal Social Security Act and any and all equivalent state or local laws, as well as any and all unemployment insurance and worker's compensation laws, both state and federal, and is solely responsible to the state and federal governments for all payroll taxes, deductions, withholdings and contributions under such laws. The parties further  acknowledge and agree that Subcontractor is solely responsible for assessments for unemployment insurance, retirement benefits, union pension and health and welfare funds, annuities, disability benefits or other purposes which are in whole or in part measured by and/or based upon the wages, salaries, or other remuneration paid to persons employed by Subcontractor and its subcontractors on the Subcontract Work under this Subcontract.

4.2      Contractor has a general contract ("General Contract") with Owner concerning the Project, which may include plans, drawings, specifications and other details and documents incorporated into such General Contract. Subcontractor agrees that Subcontractor is fully bound by and is familiar with those terms and provisions of the General Contract that pertain to the Subcontract Work. The Subcontractor hereby expressly assumes and promises to perform for the benefit of the Contractor, Owner and Owner's lenders (as their interests may appear) all of the obligations undertaken by the Contractor towards the Owner in the General Contract, to the extent relevant to the Subcontract Work.

4.3      Subcontractor may not assign this Subcontract or any amounts due under this Subcontract without the prior written consent of Contractor. Contractor may assign this Subcontract in the event it is required to do so under its General Contract.  Any such assignment without Contractor's prior written consent shall be null and void and the Subcontract shall be unenforceable by such assignee against Contractor.

4.4      Subcontractor shall not install, use, generate, store, dispose of or treat on or about the Project any Hazardous Substance (as defined below) other than those Hazardous Substances commonly required in the industry for the performance of the Subcontract Work and required under the Contract Documents. Any Hazardous Substances associated with the Subcontract Work must be stored, used and disposed of in accordance with all applicable environmental laws and regulations and Subcontractor must provide the appropriate Material Safety Data Sheets to Contractor prior to commencement of the Subcontract Work.  As used in this Subcontract, "Hazardous Substance" means any hazardous, toxic, or radioactive substance, material, waste, pollutant or contaminant as defined, listed or regulated by any federal, state or local law, regulation or order, or as specified in the General Contract.  If any portion of the Subcontract Work requires the removal and disposal of any preexisting Hazardous Substance, including without limitation creosote treated wood, Subcontractor shall comply with all federal, state and local laws, ordinances and regulations relating to the disposal of such Hazardous Substance, and shall exercise extra care in site clean-up each day during the removal and disposal of such Hazardous Substance.

4.5      Subcontractor guarantees (the "Warranty") that the Subcontract Work, when completed, will be completed in accordance with the Contract Documents and that the Subcontract Work will be free from any defects or deficiencies, including but not limited to defects or deficiencies resulting from materials, construction or workmanship or improper design by Subcontractor ("Defect").  In the event a Defect is found to exist in violation of this Warranty within one year following the date of final acceptance of the Subcontract Work of the General Contract by the Owner, or other longer period of time as may be required by law or equity, the Contract Documents or General Contract (the "Callback Period"), then Subcontractor shall, at its sole expense, promptly repair and/or replace non-conforming work or materials ("Corrective Action") and any other part of the Project damaged in connection therewith, and shall pay all costs and expenses incurred by Owner or Contractor in connection with such Defect and Corrective Action.  Following any Corrective Action, Subcontractor shall, for an additional one-year period thereafter, have a duty to repair or replace such corrective Subcontract Work. If Subcontractor fails to commence and complete Corrective Action within a reasonable time (not to exceed ten (10) days) after notice from Contractor, then Contractor shall have the right to correct such Defect and Subcontractor shall be liable to Contractor for all direct, indirect, special, consequential and other damages, including lost profits and revenue, incurred due to or in connection with such Defect and the curing of such Defect. Any special, extended or other warranties given by the Contractor to the Owner in the General Contract that pertain to the Subcontract Work are hereby expressly assumed and undertaken by the Subcontractor.  Nothing in this Section is intended to limit any manufacturer's warranty which provides Owner or Contractor with greater warranty rights than set forth in this Section or the Contract Documents. Establishment of the Callback Period for correction of Subcontract Work relates only to the specific obligation of the Subcontractor to correct the Subcontract Work, and has no relationship to the time within which the obligation to comply with the Contract Documents may sought to be enforced, nor to the time within which proceedings may be commenced to establish the Subcontractor's liability with respect to the Subcontractor's obligations other than specifically to take Corrective Action.

4.6      During a period in which any dispute is outstanding between Contractor and Subcontractor, Subcontractor shall continue to perform the Subcontract Work and otherwise comply with the Subcontract, and Contractor shall pay undisputed amounts otherwise due Subcontractor hereunder.

4.7      To the fullest extent permitted by law, Subcontractor hereby agrees to indemnify, defend and hold Contractor, Owner,  any lender with a security interest in the Project, and each of their respective affiliates, subsidiaries, members, managers, partners, agents, representative, trustees, directors, officers, shareholders and employees, and each of them (collectively, "Indemnified Parties") harmless from and against any and all demands, claims, suits and causes of action, liability, costs, and  direct, incidental and consequential damages,  and costs to satisfy any  settlements and judgments arising out of or in connection with the Subcontract Work (collectively or individually, "Claims"), including without limitation court costs, arbitration fees and costs, arbitrator fees and attorney's fees whether arising at law or equity, in connection with or arising out of the performance of the Subcontract Work by Subcontractor or any of its employees, subcontractors, suppliers or anyone else for whom Subcontractor

{A0021531.4}                                        Page 6

is responsible ("Subcontractor Parties"), including but not limited to: (i) any breach by Subcontractor of this Subcontract; (ii) any liens or other encumbrances Contractor's or Owner's property or the Project, arising out of the Subcontract Work and any failure by Subcontractor or the Subcontractor Parties to pay any of its agents, employees, subcontractors or suppliers; or (iii) property damage or destruction (including loss of use resulting therefrom), bodily injury, sickness, disease, or death arising out of or in connection with the Subcontract Work or any action or inaction by the Subcontractor or the Subcontractor Parties. Notwithstanding anything contained herein to the contrary: (a) Subcontractor shall be liable for Claims in connection with consequential damages only to the extent arising out of or in connection with the Subcontract Work and to the extent Contractor is held liable for such damages by Owner or a third party; (b) Subcontractor's duty to defend shall not apply with respect to Claims that arise exclusively from the performance of professional services that are insured only through the Subcontractor's professional liability insurance policy; and (c) whenever a duty to defend applies as to any Claim, such duty shall be triggered when any one or more of the Indemnified Parties tenders their defense to Subcontractor or its insurer.

In claims against any person or entity indemnified under this Section 4.7 by an employee of the Subcontractor or Subcontractor Party, anyone directly or indirectly employed by them, or anyone for whose acts they may be liable, the indemnification obligations under Section 4.7 and Subcontractor's exposure to contribution damages, if any, shall not be capped, limited or reduced in any way, by case-law or by any limitation on the amount or type of damages, compensation, or benefits paid or payable by or for the Subcontractor under workers' or workmen's compensation acts, disability benefits acts, or other employee benefit acts.

4.8     MEDIATION & ARBITRATION OF DISPUTES IS REQUIRED

        a) Except as set forth in Section 4.8(e) below, any controversy or claim arising out of or relating to this Subcontract, or the breach thereof, shall be finally resolved by non-binding mediation or by arbitration in accordance with the requirements of this Section 4.8. Notwithstanding any provision in this Subcontract regarding applicable substantive law, any arbitration shall be governed by the Federal Arbitration Act (9 U.S.C., Secs. 1-16). Nothing in this Section 4.8 shall prohibit Subcontractor from taking the necessary actions to perfect its mechanic's lien rights or payment bond rights, but the parties agree that any judicial action on the lien or bond shall be promptly stayed pending a determination on the underlying facts by the arbitrator. Except as required for any party to preserve statutory lien rights, mediation and if necessary, arbitration, shall be a precondition to any litigation.

        b) Upon written application of Contractor or Subcontractor, the parties shall mediate claims and disputes prior to arbitration. Any mediation or arbitration shall be administered by the American Arbitration Association ("Administrator") pursuant to its Construction Industry Arbitration Rules and Mediation Procedures currently in effect at the time of the proceeding, adjusted as set forth below ("Rules"). If the American Arbitration Association is not available or is unable to accommodate the agreed upon conditions for mediation and arbitration as set forth in this Section 4.8, the Administrator shall be JAMS and the Rules will be its Engineering and Construction Arbitration Rules & Procedures. The Rules shall be adjusted as follows: (i) the claiming party shall file a written demand for mediation or arbitration of the dispute with the Administrator, with a copy sent concurrently to the other party, (ii) any mediation or arbitration shall be held in St. Louis, MO, (iii) the arbitrator shall decide the dispute in accordance with the laws of the state where the Project is located (iv) the mediator or, except as set forth in Section 4.8(c) below, the arbitrator, shall be chosen pursuant to the Rules from a list of experienced construction lawyers located within a 100 mile radius of St. Louis County, Missouri; and (v) the mediation shall be completed within 60 days, arbitration within 120 days, after written demand for mediation or arbitration is made. Subject to the terms of Section 4.8(f) hereof, the agreements to mediate and arbitrate apply and extend to disputes between Contractor and Subcontractor which also include third parties.

        c) To provide for expedited dispute resolution through mediation, by no later than 14 days prior to the mediation, the parties shall serve upon the mediator and each other a written position statement, with exhibits, outlining and supporting their respective claims and defenses. By no later than 3 days prior to the mediation, the parties shall serve upon the mediator and each other a response to each other's written position statement. After 8 hours of actual mediation time to be conducted in a single day, if the matter is not resolved, each party shall promptly submit one last, best, and final offer and demand in writing to the mediator before adjourning the mediation. The mediator shall disclose to the parties the amounts and details of said last offers and demands ("Last Offers"), which shall be accepted or rejected in a writing directed to the mediator within 2 hours of transmission of the Last Offers. Failure to respond to the Last Offers within 2 hours shall conclusively be deemed a rejection of said Last Offers.

        (i) If the difference in the amounts claimed by the parties at either the commencement of arbitration or following the disclosure of Last Offers is Two Hundred Thousand Dollars ($200,000.00) or less,, the mediator shall immediately assume the role of an arbitrator. The arbitrator shall not consider any item of evidence which was not produced by the parties in their respective statements of position nor disclosed to the other in the course of the mediation, all as determined by the arbitrator. Within fifteen (15) days of having received the Last Offers, the arbitrator shall issue an award which shall adopt one and only one of said Last Offers, without modification or amendment. By execution of this Subcontract, Contractor and Subcontractor specifically consent to the conversion of the mediator to an arbitrator as contemplated herein.

        d) If Section 4.8(c)(i) hereof does not apply, the mediator shall not become the arbitrator, and instead either party may submit the dispute to arbitration, which shall be administered by the Administrator pursuant to the Rules. The award of the arbitrator shall be final and binding, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

e) In any proceeding other than mediation (including the arbitration proceedings contemplated by Sections 4.8(c) and 4.8(d) hereof, as well as any litigation between the parties), the prevailing party shall be entitled to recover all of its reasonable attorneys' fees and other costs in addition to any other relief to which it may be entitled. The "prevailing party" shall be determined by reviewing the claims resolved at arbitration, considering the quantum of the claims being prosecuted and defended, and then determining which party achieved the greater success by quantifying the amounts awarded the party recovering damages and comparing same with the amounts that the party paying damages saved (i.e., the damages actually awarded versus those that were claimed). By way of example and not limitation, if Contractor is deemed the prevailing party (including but not limited to by the arbitrator's selection of Contractor's Last Offer under Section 4.8(c)), Subcontractor shall be responsible for payment of Contractor's reasonable attorneys' fees, together with all other fees and costs associated with any lien proceeding, including but not limited to any bond premium and recording costs paid by Contractor with respect to any release-of-lien bond filing.

f) Notwithstanding anything to the contrary in this Section 4.8, if Subcontractor is joined or named by Contractor or any other party in any judicial proceeding, arbitration or mediation initiated under the terms of the General Contract, or in connection with the Project otherwise ("Other Proceeding"), then Contractor and Subcontractor agree that such Other Proceeding shall preclude any proceeding under Sections 4.8(a) thru (d) concerning all claims and/or counterclaims related to the Other Proceeding. To the extent the dispute resolution provisions of the General Contract are different than the foregoing provisions, then at Contractor's option (whether or not there is a current Other Proceeding), which may be exercised at any time, such differing dispute resolution provisions shall be deemed incorporated herein, and Subcontractor agrees to comply with such provisions (if invoked by Contractor) and to participate in and be fully bound by such differing dispute resolution provisions. IF ANY CLAIM HEREUNDER IS LITIGATED FOR ANY REASON, CONTRACTOR AND SUBCONTRACTOR HEREBY AGREE TO WAIVE ANY RIGHTS THEY MAY HAVE TO A JURY TRIAL AND INSTEAD HAVE SUCH CLAIM HEARD BY A JUDGE.

4.9     Models are not Contract Documents. To the extent that any models or electronic files are provided to Subcontractor, they are, except as otherwise provided in the Contract Documents, provided for reference purposes only, with the understanding that Subcontractor shall have an affirmative duty to verify that such models and electronic files have not been corrupted and are accurate and up-to-date. Subcontractor acknowledges that it is possible that models and electronic files may be inaccurate, and therefore may not be relied upon. All persons consulting or reviewing models and electronic files should direct any questions about same to the Contractor, in writing, for review and resolution.

4.10      If any provision of this Subcontract is found to be unenforceable or invalid in its entirety, such provision will be severed from this contract, but will not affect the enforceability or validity of any other term or condition.

4.11     This Subcontract may be executed in any number of counterparts, each of which will, for all purposes, be deemed an original, and all of which are identical. The electronic transmission of any signed original document, and retransmission of any signed electronic transmission, shall be the same as the delivery of an original if sent to the correct email address. At the request of either party, the parties will confirm electronic transmitted signatures by signing an original document. All of Subcontractor's obligations hereunder shall apply to all or any part of the Subcontract Work performed before and after full execution of the Subcontract.

4.12    CONFIDENTIALITY: Confidential Information shall be deemed to include: (a) any information concerning the Contractor or the Owner (whether prepared by the Owner, Contractor, their advisors or otherwise), including, without limitation, information regarding assets, tangible and intangible, owned, leased or licensed, which is furnished to Subcontractor by or on behalf of the Contractor or Owner (b) this Agreement; (c) the fact that the parties have had, are having or may have discussions concerning the Project; (d) any negotiations that may occur between ARCO and Subcontractor; (e) the content of all plans, specifications, design concepts, design criteria mock-ups, site-specific geotechnical and/or other information related to the Project and/or the Project site; (f) the content of any resulting Bid from Subcontractor, including the individual elements of such Bid; and (g) any notes, copies, reports, analyses, forecasts, compilations, studies, presentations, interpretations or other documents prepared by or for Subcontractor that contain or reflect, in whole or in part, the information or materials furnished to Subcontractor pursuant to this Agreement. The term "Confidential Information" does not include any information that is in the public domain. The burden of proving that information falls within (a) through (g) shall rest with Subcontractor. Subcontractor shall use the Confidential Information solely for the purpose of furnishing the Subcontract Work in connection with the Project, and shall not use the Confidential Information for any other purpose. Subcontractor shall treat and safeguard all Confidential Information as strictly private and confidential, and Subcontractor shall take all steps reasonably necessary to preserve such confidentiality. Except as specifically provided in this Agreement, Subcontractor shall not disclose any Confidential Information to any person.

4.13     NON-DISPARAGEMENT: Neither Subcontractor nor any of its employees, officers, directors and agents will at any time during or subsequent to performance of Subcontract Work on the Project, make any statements or take any actions which could reasonably be expected to damage the reputation or business of Contractor, including, but not limited to: any action or statement which may induce any customer, prospective customer, vendor, subcontractor or supplier to cease doing business with Contractor; any action or statement which may induce any independent contractor or employee to cease employment or engagement of services with Contractor; or any other disparaging statement or action regarding the business operations of Contractor. Nothing contained in this Section 4.13 shall be deemed to preclude Subcontractor from participating in good faith in any dispute resolution proceeding or from responding to lawful court orders. Contractor shall have all legal and equitable remedies available to enforce Subcontractor's obligations under this Section 4.13, including but not limited to seeking injunctive relief.

4.14.     This Subcontract is a full and complete expression of the parties' agreement and there are no other terms and conditions except as expressly set forth herein. The agreement of the parties hereto may not be modified or amended except by a written agreement signed by a duly authorized agent of both parties hereto.

{A0021531.4}                                                    Page 8

DocuSign Envelope ID: 2C1ED834-EE55-4045-A482-4D8EDECDD7E6

**THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES. IN WITNESS WHEREOF,** the parties hereto have executed this Subcontract as of the date stated above.

Midwest Dock Solutions, Inc

ARCO/Murray National Construction Company, Inc.

by: _Tony Zarlengo_    7/26/2022 | 10:54 AM CDT

by: _____    7/26/2022 | 10:54 AM CDT

**Subcontractor**    Date    **Contractor**    Date

Owner    Project Manager

Title    Title

**Illinois Subcontract Addendum**

To the extent that the terms of this Addendum conflict with the terms of the Subcontract, the terms of this Addendum shall govern. Except as modified herein, the terms of the Subcontract shall remain in full force and effect. Notwithstanding anything contained in the Subcontract to the contrary, Contractor will retain ten percent (10%) from Subcontractor's Applications for Payment, provided however, that Contractor shall withhold no more retention than allowed under applicable Illinois law. If any portion of retention is required by law to be released before Subcontractor's work is completed and/or before Contractor's work is completed, then notwithstanding anything to the contrary herein, OWNER'S PAYMENT OF SUCH RETENTION TO CONTRACTOR IS A CONDITION PRECEDENT TO SUBCONTRACTOR'S RIGHT TO PAYMENT BY CONTRACTOR and Subcontractor expressly waives all rights under the Illinois Contractor Prompt Payment Act (815 ILCS 603) to the extent necessary to effectuate this sentence. Nothing in this paragraph shall be deemed to limit Contractor's right to withhold funds as otherwise provided under this Subcontract to the extent permitted by law.

DocuSign Envelope ID: 2C1ED834-FE55-4045-A482-4D8EDECDD7E6

**EXHIBIT A**
**SUB-SUBCONTRACTORS/SUPPLIERS**

ARCO/Murray National Construction Company, Inc.

Job Number: C686- Bridge Elk Grove Village

Date: 07/12/2022

Subcontractor: Midwest Dock Solutions, Inc

Address: 3211 Holeman Ave

City, State, and Zip: Steger, IL 60475

Please list all material suppliers and sub-subcontractors.

| ITEM | MATERIAL SUPPLIER / Equipment Rental | SUBCONTRACTOR | COST |
|---|---|---|---|
| Dock equipment | Blue Giant | NA | $88,000 |
| Overhead Doors | Clopay | NA | $34,000 |
| NA | NA | NA | $ NA |
| NA | NA | NA | $ NA |
| NA | NA | NA | $ NA |
| NA | NA | NA | $ NA |
| NA | NA | NA | $ NA |
| NA | NA | NA | $ NA |
| NA | NA | NA | $ NA |
| NA | NA | NA | $ NA |
| Subcontractor Stock Material | NA | NA | $ NA |
| Subcontractor In-House Labor | NA | Midwest Dock | $ 54,310.00 |
| TOTAL CONTRACT AMOUNT | | | $ 176,310.00 |

Under penalty of perjury, Midwest Dock Solutions, Inc certifies that the above information is correct and any changes in the above information will be submitted to ARCO/Murray National Construction Company, Inc. in writing.  Subcontractor will supply ARCO/Murray National Construction Company, Inc. with all proper material and/or sub-subcontractor affidavits or lien waivers before progress or final payments are due to subcontractor.

_Tony Zarlengo_
_____
Subcontractor

7/26/2022 | 10:54 AM CDT
_____
Date

**NOTE: ALL Subcontractors are required to sign this form with the signing of the Subcontract and to update with any additional or different suppliers or subcontractors, with each Application for Payment.**

{A0021531.4}                                     Page 11

**EXHIBIT B**
**INSURANCE REQUIREMENTS**

Subcontractor's and its subcontractors' insurance shall be purchased from companies lawfully authorized to do business in the jurisdiction in which the Project is located with a current A.M. Best's rating of not less than "A-", that are acceptable to Contractor, and shall be written for the minimum types and limits below and shall be maintained, at their expense, for the life of this Subcontract, except as otherwise provided herein.

Before Subcontractor starts the Subcontract Work, Subcontractor shall submit the certificate of insurance together with additional information requested, including copies of endorsements to Contractor or, if requested, to a third-party administrator designated in writing by Contractor. Notwithstanding any other provision, Contractor shall have no obligation to make any payment to Subcontractor until Contractor has received such documentation, including any required updates. No payment by Contractor will be deemed a waiver of Subcontractor's obligations to satisfy the requirements herein or of Contractor's right to withhold future payments.

1. Worker's Compensation: Minimum of $500,000.

2. Employers' Liability: Employers' Liability, whether required by statute or not, for a limit of not less than $500,000 bodily injury by accident, each accident; $500,000 bodily injury by disease, policy limit; $500,000 bodily injury by disease, each employee, or if greater, in the amounts required by statute.

3. Commercial General Liability (occurrence format), (including: Premises-Operations; Products/Completed Operations which remains in force for three (3) years after Final Completion of the Project; Broad Form Property Damage; and the Subcontractor exception to the 'Your Work' exclusion). Unless Subcontractor provides separate insurance that covers such operations, its insurance shall not contain any exclusions or restrictions related to: contractor limitations, wildfire, height, XCU, residential work (if the Project involves any type of residential work), or Exterior Insulation Finish Systems (EIFS) (if Subcontractor's work includes the application, maintenance or repair of EIFS or similar product):
   $1,000,000 - Per Occurrence
   $1,000,000 - Personal and Advertising Injury
   $2,000,000 - Products/Completed Operations Aggregate
   $2,000,000 - General Aggregate (Per Project)

4. Automobile Liability: $1,000,000 per accident; for Any Auto (Symbol 1) or, in lieu thereof, for Symbols 2, 8, and 9 (All Owned, Non-Owned, and Hired Automobiles).

5. Excess/Umbrella Policy: $2,000,000 each occurrence and in the aggregate

6. Pollution Liability: $1,000,000 each occurrence and in the aggregate (Per Project); (required if Subcontractor or its subcontractor/consultant is providing earthwork, demolition, concrete, plumbing, pile driving, dynamic compaction, drilling services (drillers, geopiers, etc.) and/or electrical services).

7. Professional Liability: (required if Subcontractor or its subcontractor is providing design services):
   $1,000,000 - each claim
   $2,000,000 - annual aggregate

The above policies shall not include self-insured retentions in excess of $10,000, and if the Professional Liability is provided on a claims-made basis shall include a three-year reporting period commencing from Final Completion of the Project.

Other Coverage: Subcontractor shall be responsible for any desired coverage against damage or loss to its own facilities, tools, equipment, scaffolds, bracing and similar items. In all cases, Subcontractor is responsible for all deductibles on insurance claims submitted to Owner or Contractor, to the extent the loss was caused by Subcontractor or those for whom it is responsible.

Additional Insureds and Required Endorsements: Subcontractor shall endorse Commercial General Liability, Auto Liability, Pollution Liability, and Umbrella Excess Liability policies (if required above) to name , Contractor **ARCO/Murray National Construction Company, Inc.),** Owner **(Bridge Point Elk Grove Village 150, LLC),** Owner's lender, and anyone else required to be named an additional insured in the General Contract, as additional insureds (per **CG 2038 12/19, CG 2040 12/19,** or equivalent) for current, ongoing and completed operations for three (3) years after Final Completion of the Project. All coverage procured pursuant to this Subcontract, shall stipulate that the insurance afforded to Subcontractor and any additional insureds under Subcontractor's insurance (designated pursuant to this Subcontract) shall apply as primary insurance and that any other insurance carried by the Contractor or other additional insureds will be excess only and not contribute with Subcontractor's insurance (per **CG 2001 04/13,** or equivalent).

Subrogation: Subcontractor waives against Owner and Contractor all damages covered by insurance provided by Subcontractor and/or sub-subcontractors of any tier, and Subcontractor and its insurance carrier(s) waive all rights of subrogation against the Owner, Contractor and their officers, directors, shareholders, employees, agents, or appointed representatives unless restricted by state statutes. Waiver of subrogation evidenced by endorsement (per **CG 2404 05/09, WC 00 03/13,** or equivalent).

Form of Policies: CGL shall be written on the ISO form CG0001, or equivalent, and all policies shall be endorsed to include a 30-day prior written notice of cancellation**, via EMAIL, to lesguerra@arcomurray.com.**

Certificates: **INSURANCE CERTIFICATE MUST CONFORM TO THE SAMPLE COI IF ATTACHED HERETO, AND SHALL SPECIFY JOB NAME AND NUMBER, AND MUST BE ACCOMPANIED BY ENDORSEMENTS IDENTIFYING ADDITIONAL INSUREDS AND THE WAIVER OF SUBROGATION (OR A COPY OF THE POLICY LANGUAGE REGARDING SAME).**

**Job Number:** C686-
**Job Name:** **Bridge Elk Grove Village**

{A0021531.4} Page 12

# SAMPLE

## CERTIFICATE OF LIABILITY INSURANCE

**DATE(MM/DD/YYYY)** 2/4/2019

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: |
| | PHONE (A/C, No, Ext): | FAX (A/C, No): |
| | E-MAIL ADDRESS: |
| | INSURER(S) AFFORDING COVERAGE | NAIC # |
| | INSURER A : |
| INSURED | INSURER B : |
| Subcontractor | INSURER C : |
| | INSURER D : |
| | INSURER E : |
| | INSURER F : |

**COVERAGES**    **CERTIFICATE NUMBER:**\*\*COI for SUBS\*\*    **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| X | COMMERCIAL GENERAL LIABILITY | | | \<enter policy number\> | \<eff date\> | \<exp date\> | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE  X  OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | X | Y | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY  X  PRO-JECT   LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| | AUTOMOBILE LIABILITY | | | \<enter policy number\> | \<eff date\> | \<exp date\> | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| X | ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ALL OWNED AUTOS   SCHEDULED AUTOS | X | Y | | | | BODILY INJURY (Per accident) | $ |
| X | HIRED AUTOS  X  NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| X | UMBRELLA LIAB  X  OCCUR | | | \<enter policy number\> | \<eff date\> | \<exp date\> | EACH OCCURRENCE | $ 2,000,000 |
| | EXCESS LIAB   CLAIMS-MADE | | | | | | AGGREGATE | $ 2,000,000 |
| | DED   RETENTION $ | X | Y | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY  Y/N | | | \<enter policy number\> | \<eff date\> | \<exp date\> | X  PER STATUTE   OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?  Y | N/A | | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | (Mandatory in NH) | | Y | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |
| | Pollution Liability | X | Y | \<enter policy number\> | \<eff date\> | \<exp date\> | Occurrence | 1,000,000 |
| | Professional Liability | | | \<enter policy number\> | \<eff date\> | \<exp date\> | Occurrence / Aggregate | 1M / 2M |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
\<Project Name\> \<ARCO entity\> and \<Owner name\> are included as Additional Insureds on the General Liability (per form CG 2010 04/13, CG 2037 04/13, CG 2038 04/13, CG 2033 04/13, CG 2001 04/13, WC 00 03/13).
Business Auto Liability, Umbrella, and Pollution Liability. Additional Insured coverage is Primary & Non-Contributory.
Waiver of Subrogation in favor of \<ARCO entity\> and \<Owner\> on the General Liability (CG 2404 05/09), Business Auto, Umbrella, Pollution Liability, and Workers Compensation.
30 Day Notice of Cancellation will be provided for the General Liability, Commercial Auto, Workers Compensation, and Umbrella policies except for nonpayment of premium in which 10 days written notice will be provided if required by written contract.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| \<ARCO entity\> (Insert the name of the ARCO entity company with whom you are contracting) | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. SEE ABOVE. |
| | AUTHORIZED REPRESENTATIVE |

© 1988-2014 ACORD CORPORATION. All rights reserved.

ACORD 25 (2014/01)    The ACORD name and logo are registered marks of ACORD
INS025 (201401)

DocuSign Envelope ID: 2C1ED834-FE55-4045-A482-4D8EDECDD7E6

**EXHIBIT C**
**ADDITIONAL SAFETY REQUIREMENTS**

1. **Contractor's Safety & Health Manual**:  Subcontractor shall comply with the most stringent safety and health requirements among the federal Occupational Safety and Health Administration (OSHA) regulations (including but not limited to Title 29 of the Code of Federal Regulations), Subcontractor's safety and health plan, and Contractor's Safety & Health Manual, which is available for reviewing at www.arcosafe.com (password: letmein).  If Subcontractor is unable at any time, for any reason to access Contractor's Safety & Health Manual, Subcontractor shall notify Contractor in writing, and Contractor will provide Subcontractor with other access to the Manual.

2. **Crystalline Silica Standards**:  All Subcontract Work performed shall be in compliance with the Respirable Crystalline Silica Standard under 29 CFR 1926.1153, as amended from time to time.  If Subcontractor is engaged in a task identified on Table 1 of 29 CFR 1926.1153(c), Subcontractor shall fully and properly implement the engineering controls, work practices, and respiratory protection specified for that task on Table 1.  If (i) Subcontractor does not implement those specified exposure control methods in the manner prescribed or if (ii) any applicable task is not identified on Table 1, Subcontractor shall assess and limit exposure to respirable crystalline silica by using alternative control methods in accordance with 29 CFR 1926.1153(d), in which case Subcontractor shall provide copies of exposure assessments to ARCO before implementing those methods. Prior to commencing any Subcontract Work, Subcontractor shall provide a copy of its written exposure control plan, as required by 29 CFR 1926.1153(g), to ARCO.  As used in this paragraph, "employee" has the meaning ascribed to it in 29 CFR 1926.32.

3. **OSHA Citation Costs**:  Any OSHA citations received by the Contractor due to a Subcontractor violation of safety and health requirements will be paid by the Subcontractor.

4. **Minimum Reporting Requirements**:  All employee accidents, near misses, or hazardous incidents must be reported to the Contractor as soon as possible, but no later than the end of that work shift.  If a Contractor associate is not present, the Subcontractor shall call 314-963-0715, and ask to speak to the Contractor's Safety Department or someone in charge of that project.  Subcontractor shall submit a formal written report to Contractor within 24 hours of the incident.

5. **HAZCOM & Safety Data Sheets**:  Subcontractor shall submit a written safety program and HAZCOM program to Contractor, including all site-specific Safety Data Sheets, prior to beginning the Subcontract Work.

6. **Weekly Safety Talks**:  Subcontractor shall perform at least one documented weekly safety talk and submit a copy to the Contractor's superintendent on a weekly basis.

7. **PPE:** All Personal Protective Equipment (PPE) must comply with OSHA and American National Standards Institute (ANSI) standards.  PPE shall include, at a minimum:  Hard hat, safety glasses, high-visibility shirts or vests, minimum 4" sleeves, long pants, and hard-soled boots or shoes.

8. **English-speaking Competent Person**:  Subcontractor shall have at least one English speaking 'competent person' available on site at all times during the performance of Subcontractor's work activities to facilitate communication and help identify and discuss safety and health related issues, as necessary.

9. **Daily Housekeeping**:  Subcontractor shall be responsible, on a DAILY basis, to keep the work site free and clear of all debris, dirt and trash, and for generally maintaining its work area in an organized, clean and hazard-free condition.  If Subcontractor fails to fulfill its obligations in this regard, Contractor may, in additional to all other remedies under the Subcontract, at law or equity, perform all required cleanup tasks and back-charge the Subcontractor for all time and costs incurred by Contractor in such cleanup activities.

10. **First Aid:** Subcontractor shall provide adequate first-aid and medical supplies for Subcontractor's employees.

11. **GFCI's:** All temporary power utilized by Subcontractor shall be equipped with Ground Fault Circuit Interrupters (GFCI).  All generators shall be equipped with GFCIs.

12. **Conditions to Crane Mobilization**:  Prior to mobilizing a crane, Subcontractor shall submit annual inspection records, load charts, lifting plan, operator certifications, and any additional documentation related to crane operations.

{A0021531.4}                                                  Page 14

13. **Rigging/Signaling Qualifications:** Subcontractors engaged in rigging and/or signaling operations shall submit rigger/signalperson qualifications to Contractor prior to beginning Subcontract Work.

14. **Fall Protection**: Subcontractor shall provide adequate fall protection to personnel who are working or present at heights in excess of 6 feet and such personnel shall use such Subcontractor-provided fall protection.

15. **Falling Object Protection**: Subcontractor shall provide falling object protection for all scaffold systems by means of toeboards, and screens or netting when required. Establishing a Limited (or Controlled) Access Zone around the base of a scaffolding system as a means of falling object protection is not permitted.

16. **Safety Monitor System Prohibited**: ARCO prohibits the use of a Safety Monitor System as a means of fall protection for all trades. Subcontractor may use a Warning Line System in accordance with OSHA standards. Anyone outside of the Warning Line System must utilize traditional fall protection methods.

17. **Flammable Liquid Storage**: Subcontractor shall store all flammable liquids in approved metal safety cans.

18. **Temporary Lighting**: Subcontractor is responsible for providing adequate temporary task specific lighting for Subcontractor's scope of work. Lighting levels must be in accordance OSHA 1926.56 Table D-3

19. **Qualified Equipment Operators**: Subcontractor's personnel who operate equipment must be trained and qualified. Documentation of qualifications must be submitted to Contractor before Subcontractor's personnel operate equipment.

20. **Drugs & Alcohol:** Possessing drugs or alcohol while on-site is strictly prohibited. Working under the influence of drugs or alcohol is strictly prohibited.

21. **Notifications:** Subcontractor shall give prompt written notice to the Contractor of any accident involving bodily injury, any property damage exceeding, or any failure that could have resulted in serious bodily injury, regardless of whether such injury was sustained.

**Subcontractor, its employees, subcontractors, suppliers and anyone else for whom Subcontractor is responsible shall comply with federal, state, and local safety standards, the ARCO/Murray National Construction Company, Inc. safety and health program, as well as with Subcontractor's individual safety and health program. Establishment of a safety program by the Contractor shall not relieve the Subcontractor of its safety responsibilities.**

**EXHIBIT D**
**REQUEST FOR PAYMENT**

To: ARCO/Murray National Construction Company, Inc.          Date: _____
3110 Woodcreek Drive
Downers Grove, IL  60515                                        Invoice No:  _____
lbrown@arcomurray.com

From: Midwest Dock Solutions, Inc                    Contractor Job:  C686-  Bridge Elk Grove Village
3211 Holeman Ave
Steger, IL  60475
Sherrie Weber  sherri@midwestdocksolutions.com

| | | |
|---|---|---|
| 1 Amount of Subcontract | $_____ |
| 2 Approved Change Orders | $_____ |
| 3 Total Subcontract Amount    (Line 1 + Line 2) | $_____ |
| 4 Total Work Completed to Date | $_____ |
| 5 Less 10.00% Retention (Line 4 x 10.00%) | $_____ |
| 6 Total Billable Amount (Line 4 - Line 5) | $_____ |
| 7 Billable Amount ( = Line 6) | $_____ |
| 8 Less Previous Payment Request | $_____ |
| 9 Net Amount Due This Invoice (Line 7 - Line 8) | $_____ |

I have received and incorporated in this project this month, materials and/or services from the following material suppliers and/or subcontractors for the respective amounts:

| Subcontractor/Material Supplier | Item | Contract Schedule of Value | Paid to Date | To Be Paid This Period |
|---|---|---|---|---|
| _____ | _____ | $ _____ | $ _____ | $ _____ |
| _____ | _____ | $ _____ | $ _____ | $ _____ |
| _____ | _____ | $ _____ | $ _____ | $ _____ |
| _____ | _____ | $ _____ | $ _____ | $ _____ |
| _____ | _____ | $ _____ | $ _____ | $ _____ |
| _____ | _____ | $ _____ | $ _____ | $ _____ |
| _____ | _____ | $ _____ | $ _____ | $ _____ |

Please indicate here if joint checks are requested:    YES \ NO

_____
(Subcontractor signature)

_____
(Title)

_____
(Date)

Vendor#   57639

Job/W.O.  C686-

CSI #     _____

SL#      C686-1007

G/L #      _____5060_____

Approved _____

NOTE TO THE SUBCONTRACTOR

1.  All Subcontracts over $10,000.00 shall submit a breakdown for invoices per Paragraph 1, Section 3 of the Bid Instructions in a format similar to  AIA-G703

2.  Please DO NOT revise this form.

3.  Failure to use this form will result in delay of payment.

4.  ALL PAYMENT REQUESTS MUST BE RECEIVED BY THE 20TH OF THE MONTH

16

DocuSign Envelope ID: 2C1ED824-FE55-4045-A482-4D8EDECDD7E6

**EXHIBIT E**
**SUBCONTRACTOR'S SCOPE OF WORK**

| | |
|---|---|
| **JOB NAME:** | **Bridge Elk Grove** |
| **JOB NO.:** | **C686** |
| **DATE:** | **7/13/22** |
| **SUBCONTRACTOR:** | **Midwest Dock Solutions** |

**Scope of Work:**

| | |
|---|---:|
| (18) 6x8 Blue Giant Dock Levelers | $95,400 |
| (18) Dock Lights | $5,310 |
| (18) Dock Seals | $17,100 |
| Dock Tax | Included |
| (18) 9x10 Clopay OH Sectional Doors | $36,900 |
| (3) 12x14 Clopay Drive-in-Door (w/ Motor) | $17,100 |
| (18) Sets of Z-guards | $4,500 |
| Door Tax | Included |
| ***Total Base Contract*** | ***$176,310*** |

**Dock Levelers & Equipment**

A.  Provide all labor, material, equipment, supervision, layout, expertise, etc., required to provide a turnkey installation of the dock levelers for both buildings.

B.  Special care must be taken with the floor slabs.  Delivery trucks will not be permitted on the slab and only lifts with wrapped or non-marking tires and diapered under-carriages will be permitted on the slab.  Lifts that are leaking any type of fluids will not be permitted on the slab.

C.  Furnish and install (18) dock levelers.
1.   (12) at Building #1, (6) at Building #2
2.   Dock levelers should be mechanical
3.   6' W x 8' L
4.   35,000 lbs capacity
5.   Blue Giant brand

D.  Furnish and install dock seals at (18) dock positions.
1.   Seals should be clear of any brand logo
2.   Includes 22 oz. vinyl backing
3.   Includes 40 oz. wear plates

E.  Furnish and install LED flex arm dock lights at (18) dock positions.

F.  Heavy duty laminated bumpers are included.

G.  Provide a one (1) year labor and material warranty.

17

H.     This subcontractor shall be responsible to complete layout for this work and clean up. ARCO will provide dumpster.

**Overhead Doors**

A.     Furnish and install the following overhead doors:
  1.     Eighteen (18) EA – 9'-0" W x 10'-0" H overhead sectional doors
    a.     (12) at Building #1, (6) at Building #2
  2.     Three (3) 12'-0" W x 14'-0" H overhead section door, with electrical operator
    a.     (2) at Building #1, (1) at Building #2

B.     Provide and install a "heavy duty" operator with push button control for the drive in doors. Operator to be 480/277V.
  1.     Powering wiring by others.

C.     All overhead doors shall be counter balanced overhead.

D.     All overhead doors shall be internally strutted.

E.     Overhead doors shall contain a minimum of R-11 insulation.

F.     All doors shall be furnished with a baked on white enamel primer finish on galvanized steel faces. The interior face shall be colored vinyl (white).

G.     All doors shall have 3" tracks and wheels and 25,000 heavy duty cycle springs.

H.     All doors shall be vertical lift type.

I.     Provide one (1) 24" x 8" vision panels on all doors.

J.     Provide rubber astragals for all overhead doors.

K.     Provide heavy-duty weather-stripping at heads, jambs, and sills.

L.     The subcontractor shall be responsible to complete layout for this work and clean up. ARCO will provide dumpster.

M.     The floor slab may or may not be poured prior to overhead doors installation.

N.     All overhead doors shall be supported from the precast concrete walls. Tracks and tension springs shall be fastened to precast with concrete anchors.

O.     Provide a separate lifting handle mounted 18" above finished floor elevation for manually operated sectional overhead doors.

P.     Provide Z-guards at each overhead dock door (18 total dock positions).

Q.     Include all wood blocking required for a complete installation.

18

DocuSign Envelope ID: 2C1ED834-EE55-4045-A482-4D8EDECDD7E6

**Submittals**

A.       All shop drawings are to be submitted within five (5) days of contract award.

B.       All product data and samples are to be submitted within five (5) days of contract award.

**Tentative Schedule**

A.       Work to start: January 2023

B.       Lead times:
1. Doors: 15 weeks
2. Dock Levelers: 27 weeks
3. Dock Seals: 30 weeks

C.       Install Durations:

Building 1
>       Doors: 4 days
>       Levelers: 2 days
>       Seals: 2 days

Building 2
>       Doors: 2 days
>       Levelers: 2 days
>       Seals: 2 days

**T&M Rates**

Straight time: $135/hr
Overtime: $202/hr
Double time: $270/hr

**General Requirements:**

A.  Claim any extras within 10 calendar days from date of occurrence.  No extras can be approved later.  Extras must be approved in writing by ARCO/Murray National Construction Company, Inc. representative before work begins.

B.  Conform to all OSHA, hazardous communications, and other applicable safety requirements, including but not necessarily limited to the following:
1. GFI and Assured Grounding of Electrical Outlets
   a. All extension cords shall have either a GFI receptacle or be routinely checked as part of a written and recorded assured grounding program.
2. Hazardous Communications Program:
   a. Each subcontractor on ARCO/Murray National Construction Company, Inc.'s job sites must maintain a hazardous materials file for his own employees.  Each file shall contain Material Safety Data Sheets (MSDS) on all material used in that specific project's construction.
   b. It is the subcontractor's responsibility to notify other Contractor's on the job site of any hazardous materials to which their employees may be exposed.
3. Any fines or penalties imposed by OSHA for work relating to subcontractor's scope shall be deducted from the subcontractor's compensation.
4. All workers shall dress in accordance with OSHA regulations and professional standards.  Hard hats, long pants and safety shoes will be required of everyone on the project.
5. Excavations that are four feet or more in depth shall be either slopped or shored according to the specifications set aside in subpart P of the occupational safety and health standards for construction.
6. Provide backup alarms on all equipment.

19

7. It is the subcontractor's responsibility to insure that all equipment utilized to complete its scope of work is inspected and properly maintained per the equipment manufacturers and OSHA's standard. In addition, this subcontractor is responsible for properly training all employees who are operating said equipment including but not limited to lifts, excavation equipment, cranes, fork lifts, welders, etc.

C. If subcontractor's employee(s) arrives at the job site without a hard hat, the employee(s) will be issued a hard hat by ARCO/Murray National Construction Company, Inc. The hard hat will become property of the subcontractor and the subcontractor will be charged $50.00 for each hard hat issued to their employee(s).  At no time will a subcontractor's employee be allowed to work at the site without a hard hat.

D. Subcontractor will perform all cleanup associated with subcontractor's work. ARCO/Murray National Construction Company, Inc. will provide dumpsters.

E. Procore:
   1. All subcontractors will be invited to collaborate on Procore, our online construction management tool:
      a. Procore comes at **NO COST** to subcontractors
      b. We suggest taking the Certification course through Procore to familiarize your Project Manager and Project Superintendent with the Procore tools needed. The course is at No COST and can be found on the link below
         https://learn.procore.com/series/procore-certification-subcontractor-client
      c. Procore use for Subcontractor/GC coordination will include, but is not limited to:
         i. Drawing/Document Distribution
            1) All drawing revisions, sketches, etc. will be added to Procore in order to ensure a most-current set is always accurate and accessible to everyone on the project.
         ii. Drawing Markups
            1) Each subcontractor's jobsite foreman is required to maintain a Procore account for necessary project coordination.
            2) Procore is accessible via tablet/iPad or computer; therefore, jobsite foreman shall be able to have daily access to a tablet/iPad or computer.
         iii. RFI's
            1) Subcontractors are required to formally submit all RFI's through Procore to ensure that it will be answered by the appropriate party in a timely fashion.
         iv. Submittals
            1) Subcontractors are required to upload all submittals (and revised submittals) to Procore.

E. No exclusions or changes from the drawings, specifications or bid instructions will be permitted without written approval from ARCO/Murray National Construction Company, Inc. project manager or superintendent.

F. ARCO/Murray National Construction Company, Inc. will allow the Subcontractor progress payments at monthly intervals, in the ratio and to the extent of this Subcontractor's completed work.  Ten percent (10%) retention will be withheld from each progress payment.  Retention withheld may be invoiced thirty (30) days after the completion of the subcontract work.  The retention will be released upon completion of the project and after ARCO/Murray National Construction Company, Inc. receives the retention payment from the Owner.  All requests by the Subcontractor for progress payments and retention must be originals (faxed copies are unacceptable) delivered to ARCO/Murray National Construction Company, Inc. at its principal office on or before the 25th day of the month in order to be processed for payment on or after the 20th day of the succeeding month.  All payment requests should be made on the Contractor payment request form.

G. Insurance Requirements – See Exhibit B.

20

DocuSign Envelope ID: 2C1ED834-EE55-4045-A482-4D8EDECDD7E6

H.  It is the Subcontractor's responsibility to visit the job site prior to bidding to familiarize himself with actual job site conditions.

I.  All materials used shall be new and first quality, and shall be installed in accordance with manufacturer's recommendations.

J.  On contracts over $10,000, the successful Subcontractor will be required to submit a schedule of values to be approved.  Monthly invoices shall be prepared according to the schedule of values.  Breakdowns shall include columns showing (1) item (2) value (3) percent completed to date (4) the amount previously invoiced and (5) the amount being invoiced.  Breakdowns must be submitted to ARCO/Murray National Construction Company, Inc. for approval within ten (10) days of the date of award.

K.  Subcontractor shall include all applicable taxes, fees, permits, freight, hoisting.

21

DocuSign Envelope ID: 2C1ED834-EE55-4045-A482-4D8EDECDD7E6

## ADDENDUM TO SUBCONTRACT

This Addendum to Subcontract ("Addendum") will be and is hereby made a part of the Agreement entered into by and between Contractor and Subcontractor. To the extent that the terms of this Addendum conflict with the terms of the Agreement, the terms of this Addendum shall govern. Except as modified herein, the terms of the Agreement shall remain in full force and effect.  Notwithstanding anything contained in the Agreement to the contrary, Contractor and Subcontractor hereby agree as follows:

1. Without limiting any other term or requirement in the Agreement, (i) the Subcontractor recognizes the rights of Owner under Section 10.4 of the General Contract and agrees, upon notice from Owner that Owner has elected to accept said assignment and to retain the Subcontractor pursuant to the terms of the Subcontract, to complete any unperformed obligations under the Subcontract and, if requested by Owner, to execute a written agreement confirming that the Subcontractor is bound to Owner under the terms of the Subcontract.  Without limiting the foregoing, Subcontractor acknowledges that Owner has the right to accept assignment of this Subcontractor and other applicable Subcontract documents without Subcontractor's consent. Subcontractor shall include this requirements of this Section 1 in all subcontracts executed by Subcontractor with respect to the Work.

2. Confidentiality: Subcontractor expressly agrees to comply with all confidentiality and non-disclosure obligations applicable to Contractor under the Prime Contract, including but not limited to those obligations in Sections 4.8 and 19 of the Prime Contract. Without limiting the foregoing, Subcontractor agrees not to take any photographs or videos of the Project (except for use on the Project), or to use Owner's or any tenant's name, or photographs or videos of the Project, or to refer to Owner or any tenant directly or indirectly in any promotion or advertisement, in any news release or release to any general or trade publication or other media without receiving Contractor's, Owner's and such tenant's prior written approval which may be withheld at the sole discretion of Contractor, Owner and such tenant, as applicable.

3. Commercial general liability insurance: the "Commercial General Liability" insurance requirements of the Subcontract shall be deleted and replaced with the requirements below:

   Commercial General Liability (occurrence format), (including Premises-Operations; Products/Completed Operations which remains in force for three (3) years after Final Completion of the Project; Independent Contractors; Broad Form Property Damage. If the Project involves any type of residential work, Subcontractor's Commercial General Liability policy shall not contain any exclusions or restrictions for residential work; and If Subcontractor's work includes the application, maintenance or repair of Exterior Insulation Finish Systems (EIFS) or similar product, Subcontractor's Commercial General Liability policy shall not exclude such work or Subcontractor shall provide separate insurance covering such operations):

   $2,000,000................................Per Occurrence
   $2,000,000.................................Personal and Advertising Injury
   $2,000,000.................................Products/Completed Operations Aggregate
   $2,000,000.................................General Aggregate (Per Project)

4. Notwithstanding anything to the contrary in Section 3 above, if Subcontractor is performing any of the trades or scopes of Work listed in the chart below, Subcontractor shall provide insurance in the higher of (a) the amount required in Section 3 and (b) the chart below, notwithstanding any lower limits that may be provided in Exhibit B of the Subcontract. Except as expressly modified in this Addendum other terms of Section 3 above and Exhibit B to the Subcontract shall remain in full force and effect.

{A0075297.1}

DocuSign Envelope ID: 2C1ED834-FE55-4045-A482-4D8EDECDD7E6

| Trade/Scope of Work | Commercial General Liability* | Auto* | Employer's Liability* | Workers' Comp | Umbrella Liability |
|---|---|---|---|---|---|
| Shoring, Earthwork, Demolition and Utilities | $1MM Occurrence $2MM Aggregate | $1MM | $500,000 | As Required by Legal Requirements | $4MM |
| Building/Load Bearing: Framing and Masonry | $1MM Occurrence $2MM Aggregate | $1MM | $500,000 | As Required by Legal Requirements | $4MM |
| Crane (Excluding Loader Cranes) | $1MM Occurrence $2MM Aggregate | $1MM | $500,000 | As Required by Legal Requirements | $4MM |
| Roofing | $1MM Occurrence $2MM Aggregate | $1MM | $500,000 | As Required by Legal Requirements | $2MM |

**\*Subcontractors may satisfy the above Subcontractor Minimum Insurance Limits by any combination of primary liability and excess liability coverage.**

{A0075297.1}

**EXHIBIT F**
**DRAWING LOG**

22

DocuSign Envelope ID: 2C1ED834-FE55-404F-A482-4D8EDECDD7E6



ARCO/Murray National Construction, Inc.

## Building #1 - Current Drawings

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| **Architectural** | | | | | |
| A100 | SITE PLAN AND SITE DETAILS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| A100.1 | SITE PLAN AND SITE DETAILS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| A101 | PARTIAL FLOOR PLAN | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| A102 | PARTIAL FLOOR PLAN | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| A103 | ROOF PLAN AND DETAILS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| A104 | ROOF DETAILS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| A200 | EXTERIOR ELEVATIONS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| A201 | EXTERIOR ELEVATIONS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| A202 | EXTERIOR ELEVATIONS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| A300 | WALL SECTIONS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| A301 | WALL SECTIONS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| A302 | WALL SECTIONS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| A303 | WALL SECTIONS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| A304 | WALL SECTIONS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| A305 | WALL SECTIONS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| A306 | WALL SECTIONS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| A307 | WALL SECTIONS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| A500 | ROOM AND DOOR SCHEDULE AND DETAIL | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| A900 | EGRESS PLAN | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| CVR | COVER SHEET AND GENERAL NOTES | 1 | 05/05/2022 | | Building #1 - Permit Comment Set |

Case: 1:24-cv-06428 Document #: 62-1 Filed: 04/17/26 Page 60 of 73 PageID #:2909



ARCO/Murray National Construction, Inc.

Case: 1:24-cv-06428 Document #: 62-1 Filed: 04/17/26 Page 61 of 73 PageID #:2910

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| | | | | | (05/05/22) |
| **Civil** | | | | | |
| C100 | COVER SHEET | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C101 | GENERAL NOTES AND TYPICAL SECTIONS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C200 | OVERALL EXISTING CONDITIONS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C201 | EXISTING CONDITIONS 1 | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C202 | EXISTING CONDITIONS 2 | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C300 | REMOVAL PLAN | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C400 | OVERALL GEOMETRIC PLAN | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C401 | GEOMETRIC PLAN 1 | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C402 | GEOMETRIC PLAN 2 | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C500 | OVERALL GRADING PLAN | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C501 | GRADING PLAN 1 | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C502 | GRADING PLAN 2 | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C600 | OVERALL UTILITY PLAN | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C601 | UTILITY PLAN 1 | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C602 | UTILITY PLAN 2 | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C700 | SOIL EROSION AND SEDIMENT CONTROL 1 | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C701 | SOIL EROSION AND SEDIMENT CONTROL 2 | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C702 | SOIL EROSION AND SEDIMNET CONTROL 3 | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C800 | SPACECO SPECIFICATIONS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C801 | MWRD SPECIFICATIONS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C802 | VILLAGE SPECIFICATIONS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |



**ARCO/Murray National Construction, Inc.**

Case: 1:24-cv-06428 Document #: 62-1 Filed: 04/17/26 Page 62 of 73 PageID #:2911

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| C900 | DETAILS 1 | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C901 | DETAILS 2 | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C902 | DETAILS 3 | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C1000 | PROPOSED DRAINAGE PLAN | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| C1100 | CROSS SECTIONS | 0 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| **Electrical** | | | | | |
| E-000 | TITLE SHEET | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| E-100 | OVERALL WAREHOUSE LIGHTING PLAN | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| E-200 | OVERALL WAREHOUSE POWER PLAN | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| E-400 | ONE LINE RISER & ROOM DETAIL | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| E-401 | PANEL SCHEDULES | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| SE-100 | SITE PLAN | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| SP-100 | SITE PHOTOMETRIC | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| **Mechanical** | | | | | |
| M-1.0 | OVERALL WAREHOUSE HVAC PLAN | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| **Plumbing** | | | | | |
| P1.0 | PLUMBING PLAN | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| P1.1 | PLUMBING PLAN | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| **Structural** | | | | | |
| S100 | PARTIAL FOUNDATION PLAN | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| S101 | PARTIAL FOUNDATION PLAN | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| S200 | PARTIAL ROOF FRAMING PLAN | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| S201 | PARTIAL ROOF FRAMING PLAN | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| S300 | FOUNDATION DETAILS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |

DocuSign Envelope ID: 2C1ED834-FE55-404F-A482-4D8EDECDD7E6

**ARCO**
**MURRAY**
|DESIGN BUILD

ARCO/Murray National Construction, Inc.

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| S301 | FOUNDATION DETAILS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| S400 | FRAMING DETAILS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| S401 | FRAMING DETAILS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| S402 | SPECIAL JOIST LOADING DIAGRAMS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| S500 | GENERAL NOTES & SCHEDULES | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |
| S501 | SPECIAL INSPECTIONS | 1 | 05/05/2022 | | Building #1 - Permit Comment Set (05/05/22) |

Case: 1:24-cv-06428 Document #: 62-1 Filed: 04/17/26 Page 63 of 73 PageID #:2912

DocuSign Envelope ID: 2C1ED834-FE55-404F-A482-4D8EDECDD7E6



ARCO/Murray National Construction, Inc.

## Building #2 - Current Drawings

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| **Architectural** | | | | | |
| A100 | SITE PLAN AND SITE DETAILS | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| A100.1 | SITE DETAILS | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| A101 | PARTIAL FLOOR PLAN | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| A103 | ROOF PLAN AND DETAILS | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| A104 | CANOPY PLAN | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| A105 | ROOF DETAILS | 1 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| A200 | EXTERIOR ELEVATIONS | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| A201 | EXTERIOR ELEVATIONS | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| A300 | WALL SECTIONS | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| A301 | WALL SECTIONS | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| A302 | WALL SECTIONS | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| A303 | WALL SECTIONS | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| A304 | WALL SECTIONS | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| A305 | WALL SECTIONS | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| A500 | ROOM AND DOOR SCHEDULE AND DETAIL | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| A501 | UL DETAILS | 0 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| A900 | EGRESS PLAN | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| CVR | COVER SHEET AND GENERAL NOTES | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| **Civil** | | | | | |
| C100 | COVER SHEET | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |

Case: 1:24-cv-06428 Document #: 62-1 Filed: 04/17/26 Page 64 of 73 PageID #:2913

DocuSign Envelope ID: 2C1ED834-FE55-404F-A482-4D8EDECDD7E6



ARCO/Murray National Construction, Inc.

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| C200 | GENERAL NOTES AND TYPICAL SECTIONS | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| C300 | EXISTING CONDITIONS PLAN | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| C400 | GEOMETRIC PLAN | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| C500 | GRADING PLAN | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| C600 | UTILITY PLAN | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| C700 | SOIL EROSION AND SEDIMENT CONTROL PLAN | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| C701 | SOIL EROSION AND SEDIMENT CONTROL PLAN | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| C702 | SOIL EROSION AND SEDIMENT CONTROL PLAN | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| C800 | SPACECO SPECIFICATIONS | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| C801 | MWRD SPECIFICATIONS | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| C802 | ELK GROVE VILLAGE SPECIFICATIONS | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| C900 | DETAILS - 1 | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| C901 | DETAILS - 2 | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| C902 | DETAILS - 3 | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| C903 | DETAILS - 4 | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| C904 | DETAILS - 5 | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| C905 | DETAILS - 6 | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| C1000 | MWRD EXHIBIT | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| **Electrical** | | | | | |
| E-000 | TITLE SHEET | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| E-100 | OVERALL WAREHOUSE LIGHTING PLAN | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| E-200 | OVERALL WAREHOUSE POWER PLAN | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| E-400 | ONE LINE RISER & ROOM DETAIL | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |

Case: 1:24-cv-06428 Document #: 62-1 Filed: 04/17/26 Page 65 of 73 PageID #:2914

DocuSign Envelope ID: 2C1ED834-FE55-404F-A482-4D8EDECDD7E6



ARCO/Murray National Construction, Inc.

| Drawing No. | Drawing Title | Revision | Drawing Date | Received Date | Set |
|---|---|---|---|---|---|
| E-401 | PANEL SCHEDULES | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| SE-100 | SITE PLAN | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| SP-100 | SITE PHOTOMETRIC | 1 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| **Mechanical** | | | | | |
| M-1.0 | OVERALL WAREHOUSE HVAC PLAN | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| **Plumbing** | | | | | |
| P100 | PLUMBING PLAN | 1 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| **Structural** | | | | | |
| S100 | FOUNDATION PLAN | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| S200 | ROOF FRAMING PLAN | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| S201 | CANOPY FRAMING PLAN | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| S300 | FOUNDATION DETAILS | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| S301 | FOUNDATION DETAILS | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| S400 | FRAMING DETAILS | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| S401 | FRAMING DETAILS | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| S402 | LOADING DIAGRAMS | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| S500 | GENERAL NOTES & SCHEDULES | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |
| S501 | SPECIAL INSPECTIONS | 2 | 07/01/2022 | | Building #2 - Permit Revisions (07/01/22) |

Case: 1:24-CV-06428 Document #: 62-1 Filed: 04/17/26 Page 66 of 73 PageID #:2915

**EXHIBIT G**
**LIEN WAIVER FORMS**
**PARTIAL WAIVER AND RELEASE OF LIEN**

_____

STATE OF _____  )

COUNTY OF _____  )

TO WHOM IT MAY CONCERN:

The undersigned has been engaged by ARCO/Murray National Construction Company, Inc. ("Contractor") to furnish labor and materials for the premises known as, C686- Bridge Elk Grove Village, 75 & 81 NW. Point Blvd Elk Grove Village, IL 60007 (the "Premises"), of which Bridge Point Elk Grove Village 150, LLC  is the Owner. The undersigned hereby acknowledges receipt of payment in the amount of _____ Dollars ($_____) for all work performed and materials purchased for the Premises.

The undersigned does hereby waive and release all claims against Contractor and Owner, and releases any and all liens, and claims or rights to lien on the above described building and premises under the Statutes of the State of IL relating to Mechanic's Liens, on account of labor, materials, and extras, including all direct and indirect costs for such Work, furnished by the undersigned for said building and premises.

Claimant represents and warrants that Claimant has authority to enter into, execute and deliver this Lien Waiver, and this Lien Waiver constitutes the valid and binding obligations of Claimant and that Claimant has no claims against Contractor or Owner other than for the payment amount referenced above. The undersigned representative acknowledges he or she is the appropriate officer and is authorized to execute this Lien Waiver.

Given under my hand and seal this _____ day of _____, 20__.

Company:

Midwest Dock Solutions, Inc

By: _____

Print Name: _____

Title: _____

Office phone: _____

**Reference Check Number:_____**

**Job Number:_ C686-**

**Job Name:** Bridge Elk Grove Village

23

**FINAL WAIVER AND RELEASE OF LIEN**

_____

STATE OF _____                    )

                                         )

COUNTY OF _____                  )

      The undersigned has been engaged by ARCO/Murray National Construction Company, Inc. ("Contractor") to furnish labor and materials for the premises known as,  C686‐  Bridge Elk Grove Village, 75 & 81 NW. Point Blvd Elk Grove Village, IL  60007 (the "Premises"), of which Bridge Point Elk Grove Village 150, LLC  is the Owner.

      The undersigned do(es) hereby release Contractor and Owner from claims in connection with the Project, and quit claims to the  Owner, their successors and assigns, all liens, lien rights, claims or demands of any kind whatsoever, which the undersigned now has or might have against the building located on the Premises on account of labor performed and/or materials furnished for the construction of any improvements thereon (including all direct and indirect costs for such Work).

      Claimant represents and warrants that: (i) Claimant has authority to enter into, execute and deliver this Lien Waiver, (ii) Claimant has paid all claims, invoices and bills for labor and materials (including union pension fund contributions, if applicable) for the Project, and there are no outstanding unpaid claims that could give rise to a lien or claim against Contractor, Owner, or the Project; (iii) Claimant has no other claims against Contractor or Owner in connection with the Project; and (iv) this Lien Waiver constitutes the valid and binding obligations of Claimant.  The undersigned representative acknowledges he or she is the appropriate officer and is authorized to execute this Lien Waiver.

      Given under my hand and seal this _____ day of _____, 20___.

Company Name:

Midwest Dock Solutions, Inc

By: _____

Print Name:_____

Title:_____

Telephone Number:_____

Reference Check Number:_____

**Job Number:**  C686‐

**Job Name:** Bridge Elk Grove Village

24

# Request for Payment Example Packet

Please review the examples provided.  If you have any questions, please feel free to contact your project accountant at 331-251-2706.  You can also email the Project Accountant, Laura Brown, for an Excel copy of the Request for Payment sheet to submit via email ([lbrown@arcomurray.com](lbrown@arcomurray.com)).

Contracts under $10,000 do not require the supplier section to be filled out.

**Don't forget!  ARCO/Murray must receive all payment requests by the 20th of each month.**

ARCO/Murray
Attn:  Accounting Department
3110 Woodcreek Drive
Downers Grove, IL 60515

**Please keep this packet with your
Request for Payment forms.**

Thank you!

DocuSign Envelope ID: 2C1ED834-EE55-4045-A482-4D8EDECDD7E6

# REQUEST FOR PAYMENT

**ARCO/Murray**

To:

Date : 04/03/2013

From:  Subcontractors R Us

12345 Abc Street

Downers Grove, IL 60515

Invoice No: EXAMPLE3

ARCO/Murray's Job # C3000

Job Name XYZ Chicago

*(annotation: Take your Amount of Subcontract; add your approved change orders to reach your Total Subcontract Amount)*

| | |
|---|---|
| Amount of Subcontract | $ 500,000.00 |
| Approved Change Orders | $ 50,000.00 |
| Total Subcontract Amount | $ 550,000.00 |
| Work Completed To Date | $ 550,000.00 |
| Less 10% Retention | $ 55,000.00 |
| Total Amount Billable | $ 495,000.00 |
| Billable Amount | $ 495,000.00 |
| Less Previous Payment Request | $ 270,000.00 |
| Net Amount Due This Invoice | $ 225,000.00 |

*(annotation: Take Work Completed to Date, Subtract 10% for retention to reach total amount Billable.)*

*(annotation: Take the billable amount and subtract your total previous pay amounts to reach Net amount due this invoice.)*

I have received and incorporated in this project this month, materials and/or services from the following material suppliers and or subcontractors for the respective amounts:

| Subcontractor/Material Supplier | Item | Contract Schedule of Value | Paid to Date | To Be Paid This Period |
|---|---|---|---|---|
| United Rentals | Lift | $ 100,000.00 | $ 65,000.00 | $ 35,000.00 |
| ABC Concrete | Concrete | $ 135,000.00 | $ 90,000.00 | $ 45,000.00 |
| ABC Rebar | Rebar | $ 100,000.00 | $ 75,000.00 | $ 25,000.00 |
| Labor | Labor | $ 215,000.00 | $ 40,000.00 | $ 120,000.00 |
| | | $ 550,000.00 | $ 270,000.00 | $ 225,000.00 |
| | | $ | | $ |
| | | $ | | $ |

*(annotation: Lien Waiver not needed for Labor)*

*(annotation: You need to apply your approved change orders to your Contract Schedule of Values to reach your new Total Subcontract Amount.)*

*(annotation: This shows the total you have paid to date to your subs/material suppliers on your previous pay apps.)*

*(annotation: The total amount of this column should equal your Net Amount Due This Invoice.)*

Please indicate here if joint checks are requested:  YES \ NO

(Signature)

*(annotation: b/material supplier is paid 100%, please send in a FINAL lien waiver.)*

(Title)

(Date)

## DO NOT WRITE IN THIS BOX

| | |
|---|---|
| Vendor# | |
| Job/W.O. | |
| CSI # | |
| G/L # | 5060 |
| Approved | |
| Date | |
| CK.# | TRX.# |

## #Note to the Subcontractor

1. Please do not revise this form
2. Failure to use this form will result in delay of payment
3. All payment requests must be received by the 20th.

DocuSign Envelope ID: 2C1ED834-FE55-4045-A482-4D8EDECDD7E6

# REQUEST FOR PAYMENT

**ARCO/Murray**

## Retention Invoice

To:

Date : 04/03/2013

From:  Subcontractors R Us
12345 Abc Street
Downers Grove, IL 60515

*Retention must always be billed separately.*

Invoice No: EXAMPLE4
ARCO/Murray's Job # C3000
Job Name XYZ Chicago

| | | |
|---|---|---|
| Amount of Subcontract | $ | 500,000.00 |
| Approved Change Orders | $ | 50,000.00 |
| Total Subcontract Amount | $ | 550,000.00 |
| | | |
| Work Completed To Date | $ | 550,000.00 |
| Less 10% Retention | $ | 0 |
| Total Amount Billable | $ | 550,000.00 |
| | | |
| Billable Amount | $ | 550,000.00 |
| Less Previous Payment Request | $ | 495,000.00 |
| Net Amount Due This Invoice | $ | 55,000.00 |

*Take the Amount of Subcontract; add your approved change orders to reach your Total Subcontract Amount*

*Zero out to bill retention.*

*Take the billable amount and subtract your total previous pay amounts to reach Net amount due this invoice.*

I have received and incorporated in this project this month, materials and/or services from the following material suppliers and or subcontractors for the respective amounts:

| Subcontractor/Material Supplier | Item | Contract Schedule of Value | Paid to Date | To Be Paid This Period |
|---|---|---|---|---|
| United Rentals | Lift | $ 100,000.00 | $ 100,000.00 | $ 0.00 |
| ABC Concrete | Concrete | $ 135,000.00 | $ 135,000.00 | $ 0.00 |
| ABC Rebar | Rebar | $ 100,000.00 | $ 100,000.00 | $ 0.00 |
| Labor | Labor | $ 215,000.00 | $ 160,000.00 | $ 55,000.00 |
| | | $ 550,000.00 | $ 495,000.00 | $ 55,000.00 |
| | | $ | $ | $ |
| | | $ | $ | |

*Lien Waiver not needed for Labor*

*This shows the total you have paid to date to your subs/material suppliers on your previous pay apps.*

*The total amount of this column should equal your Net Amount Due This Invoice.*

Please indicate here if joint checks are requested: YES \ NO

***Final** Supplier waivers are due before we can release your check for retention!*

_____
(Signature)

_____
(Title)

_____
(Date)

**DO NOT WRITE IN THIS BOX**

Vendor# _____
Job/W.O. _____
CSI # _____
G/L # 5060
Approved _____
Date _____
CK.# _____ TRX.# _____

**#Note to the Subcontractor**

1. Please do not revise this form
2. Failure to use this form will result in delay of payment
3. All payment requests must be received by the 20th.

# REQUEST FOR PAYMENT

To:     ARCO/Murray                                           Date: _____

From: _____                    Invoice No: _____
         _____         ARCO/Murray Job #: _____
         _____                 Job Name: _____

   1 Amount of Subcontract                              $ _____
   2 Approved Change Orders                            $ _____
   3 Total Subcontract Amount    (Line 1 + Line 2)    $ _____

   4 Total Work Completed to Date                     $ _____
   5 Less 10% Retention (Line 4 x 10%)                $ _____
   6 Total Billable Amount (Line 4 - Line 5)          $ _____

   7 Billable Amount ( = Line 6)                      $ _____
   8 Less Previous Payment Request                    $ _____
   9 Net Amount Due This Invoice (Line 7 - Line 8)    $ _____

I have received and incorporated in this project this month, materials and/or services from the following material suppliers and/or subcontractors for the respective amounts:

| Subcontractor/Material Supplier | Item | Contract Schedule of Value | Paid to Date | To Be Paid This Period |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | $ _____ |
| _____ | _____ | _____ | _____ | $ _____ |
| _____ | _____ | _____ | _____ | $ _____ |
| _____ | _____ | _____ | _____ | $ _____ |
| _____ | _____ | $ _____ | $ _____ | $ _____ |
| _____ | _____ | $ _____ | $ _____ | $ _____ |

Please indicate here if joint checks are requested:    YES \ NO    _____

_____
(Signature)

REMINDER:  Subcontractors are to furnish  ALL Unconditional  suppliers'/sub lien waivers BEFORE progress or final payments  are due to Subcontractor.

_____
(Title)

_____
(Date)

        DO NOT  WRITE  IN  THIS  BOX

◆    NOTE TO THE SUBCONTRACTOR

| Vendor# | _____ |
|---|---|
| Job/W.O. | _____ |
| CSI # | _____ |
| G/L # | _____ |
| Approved | _____ |
| Date | _____ |
| CK.# | _____  TRX.# _____ |

1.  Please DO NOT revise this form
2.  Failure to use this form will result in delay of payment
3.  ALL PAYMENT REQUESTS  MUST BE RECEIVED  BY THE 20TH OF THE MONTH

Please remit completed forms to:
ARCO/Murray
3110 Woodcreek Drive Downers Grove, IL 60515
P: (331) 251-2726   F: (331) 251-2727

**ARCO**
M U R R A Y
| DESIGN BUILD

**Insurance Requirements**
*PLEASE FORWARD TO YOUR INSURANCE AGENT*

Job Name:  Bridge Elk Grove                                Contract #:  C686
Job Address:  150 & 81 NW Point Blvd., Elk Grove Village, IL 60007        *Reference number on insurance certificate*

- Certificate Holder must read as follows:
    ARCO/Murray National Construction Company Inc.
    3110 Woodcreek Drive
    Downers Grove, IL 60515

- Endorse Commercial General Liability, Auto Liability, and Umbrella Excess Liability policies to name **ARCO/Murray National Construction Company Inc., Bridge Point Elk Grove Village 150, LLC, Bridge Industrial** and their representatives, constituent partners, members, managers and lenders, all subsidiary or affiliated companies, and all of such parties' employees, partners, stockholders, officers and directors and their respective heirs, executors, administrators, successors and assigns as additional insureds on a primary and non-contributory basis for current, ongoing, and completed operations for three (3) years after final completion of the project.

- Certificate must show the following coverage:
    **Worker's Compensation:** in accordance with the statutory requirements for the state in which the Project is located

    **Employers Liability:** whether required by statute or not, for a limit of not less than $500,000 bodily injury by accident, each accident/ $500,000 bodily injury by disease, policy limit/$500,000 bodily injury by disease, each employee, or if greater, in the amounts required by statute.

    **Commercial General Liability:** (occurrence format), (including Completed Operations, Broad Form Property Damage and Contractual Liability for the indemnification agreements of this Subcontract):
        $2,000,000 each occurrence and $2,000,000 general aggregate

    **Automobile Liability:**     $1,000,000 per accident

    **Excess Umbrella Policy:** $2,000,000 each occurrence and in the aggregate (unless subcontractor/consultant is providing <u>shoring, earthwork, demolition, utilities, building/load bearing, framing, masonry, or crane (excluding loader cranes)</u> – in which case, the limit is $4,000,000 each occurrence and in the aggregate)

    **Pollution Liability:**  $1,000,000 each occurrence and in the aggregate (Per Project); (required if Subcontractor or its subcontractor/consultant is providing earthwork, demolition, concrete, plumbing, pile driving, dynamic compaction, drilling services (drillers, geopiers, etc.) and/or electrical services)

    **Professional Liability:**     (required if Subcontractor is providing design services):
        $1,000,000 each claim and $2,000,000 annual aggregate

- Subrogation:  Subcontractor and its insurance carrier(s) waive all rights of subrogation against the Owner, Design/Builder, and their officers, directors, shareholders, employees, agents, or appointed representatives unless restricted by state statutes.

- **Description box must include:**
    o  Project Name/#: C686 Bridge Elk Grove
    o  Commercial General Liability, Auto Liability, and Umbrella Excess Liability policies to name **ARCO/Murray National Construction Company Inc., Bridge Point Elk Grove Village 150, LLC, Bridge Industrial** and their representatives, constituent partners, members, managers and lenders, all subsidiary or affiliated companies, and all of such parties' employees, partners, stockholders, officers and directors and their respective heirs, executors, administrators, successors and assigns as additional insureds on a primary and non-contributory basis for current, ongoing, and completed operations for three (3) years after final completion of the project.
    o  A Waiver of subrogation applies to the General Liability, Automobile Liability, and Workers Compensation.
    o  Umbrella follows form        **Note: Payment will not be released if insurance is not issued and/or not in compliance.**

{A0069228.2}

**EXPERIENCE A BETTER WAY TO BUILD**

**3110 WOODCREEK DRIVE | DOWNERS GROVE, IL 60515 | 331-251-2726 | WWW.ARCOMURRAY.COM**
ARCO/MURRAY NATIONAL CONSTRUCTION COMPANY, INC.