UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MID-AMERICA CARPENTERS REGIONAL
COUNCIL PENSION FUND; *et al.,*

Plaintiffs,

v.

DOCK & DOOR INSTALL, INC. and MIDWEST
DOCK SOLUTIONS, INC.,

Defendants.

Case No 1:24-cv-06428

Judge Andrea R. Wood

Magistrate Judge Jeannice
W. Appenteng

**PLAINTIFFS' RESPONSE TO DEFENDANT MIDWEST
DOCK SOLUTIONS, INC.'S STATEMENT OF ADDITIONAL FACTS**

Plaintiffs Mid-America Carpenters Regional Council Pension Fund, *et al.* ("Plaintiffs")

through its undersigned counsel McJessy Ching & Thompson, LLC, respond to *Defendant,*

*Midwest Dock Solutions, Inc.'s, Local Rule 56.1(B)(2) Statement Of Additional Material Facts In*

*Opposition To Plaintiff's Motion For Partial Summary Judgment* [ECF #62] (hereinafter

"Statement of Additional Facts") as follows:

> **AMF 1:** Tony Zarlengo ("Zarlengo") did not speak with Quentin *[sic]* Williams
> on the phone at any time prior to Wiliams' *[sic]* hiring by Dock & Door Install, Inc.
> ("D&D"), nor did Zarlengo interview Williams or participate in his hiring by D&D
> in any way.
>
> *Citation*: EX 126 (Declaration of Anthony Zarlengo ("Zarlengo Decl)) ¶4.

**ANSWER: Disputed** because Quinten Williams ("Williams") testified that he spoke to and met

with Tony Zarlengo ("Zarlengo") as part of being hired to work at Dock & Door which he knew

as "Midwest Dock & Door Solutions." Zarlengo was present during Williams' deposition, and

Williams testified he recognized Zarlengo:

> Q. Do you know Tony Zarlengo?
> A. Yes.
> Q. Okay. He's here today, right?
> A. Yeah, he's here. Right.

Q. Okay. And when was the last time you spoke with Mr. Zarlengo?
A. The last time I worked for Midwest Docks was back in October of 2023.

Williams 11:22-12:7, EX. 18[1].

Williams testified that when he was referred by the union to "Midwest Dock & Door Solutions," the person he contacted by phone was Tony Zarlengo. Williams 36:5-21, EX. 18. Williams testified that when he was first hired he met with Zarlengo at Midwest Dock's office in Steger, Illinois and that Zarlengo gave him papers to fill out:

Q. Okay. And tell me about that process. I'm going to call it the onboarding process. Tell me about the onboarding process. How did you –
A. So I had an introduction at their home facility in Steger.
Q. Okay.
A. Came in. Did my paperwork the first day. I believe I started the following week after, if I'm not mistaken.
Q. Okay.
A. So, yeah, after that –
Q. All right. Let me stop you there. So when you came in to do your paperwork, what paperwork do you recall you had to fill out?
A. Just the normal onboarding, so your W-4s and -- really, that's about all I can think of right now.
Q. Okay.
A. It was the normal onboarding paperwork.
Q. All right. Did you have to give him a resumé, fill out a job application, anything like that?
A. I believe I did have to fill out the application for the job. A resumé, no, because I was referred.
Q. Did they give you a copy of the job application?
A. No, not after I completed it.
Q. Okay. Was it handwritten?
A. I believe so.
Q. Okay. And who -- who gave that to you, and who did you give it back to when you finished?
A. I believe I gave it back to Tony Zarlengo.
Q. Okay. And did he give it to you to complete?
A. Yeah. I completed it in the office.
Q. Okay. But I mean, was he the one who gave it -- when you showed up at the office, did you meet with Tony?

---

[1] All of Plaintiffs' citations in this response refer to the exhibits attached to *Plaintiffs' Statement Of Undisputed Fact In Support Of Their Motion For Summary Judgment Pursuant To Local Rule* 56.1 [ECF #53].

2

A. <u>Yeah. That's the only person I met with.</u>
Q. <u>Okay.  Tony Zarlengo was the only one you met with?</u>
A. <u>Yes.</u>

Williams 38:7-40:15, EX. 18.  Williams was unequivocal that it was Zarlengo and not Tony

Brutti ("Brutti") who hired him to work for Dock & Door:

Q. You said you believed that you gave the job application to Tony Zarlengo?
A. Tony was the only one that was in my -- it wasn't really an interview. It was just a proper introduction.
Q. Okay. And you're -- you're certain that was Tony Zarlengo?
A. Yes.
Q. Okay. Was Mike Richert involved in any of that hiring process?
A. No, not in the in-person part.
Q. Okay. Was Tony Brutti involved?
A. Tony Brutti? No.
Q. No? You're sure about that?
A. Positive.

Williams 197:20-198:15, EX. 18.

**AMF 2:**  Since its inception, MDS's business has constituted "service" and "retrofit" work on overhead doors, door operators, dock levelers and associated items.

*Citation*:  EX 126 (Zarlengo Decl) ¶5.

**ANSWER:  Undisputed**.

**AMF 3:** Zarlengo's Declaration contains a comprehensive list of typical job duties for MDS technicians, as follows:

MDS's technicians travel to customer locations—generally several each day—and perform any or all of the following tasks, depending on what the customer needs and what prompted the service call: assessing damaged and/or malfunctioning items to determine whether they should be repaired or replaced; assessing the associated surrounding infrastructure to determine if wall, floor or support components, need to be repaired or modified as part of the service or retrofit needed; performing short-term repairs to render the area safe for individuals and/or to secure the building against the elements or outside individuals; assess parts or other materials needed for repair and retrofit work and report same to MDS for purposes of preparing a quote to the customer; communicating with the customer regarding options for repair and replacement and the benefits and costs of each; dismantling or cutting out old or damaged components associated with overhead doors, dock levelers, tracking, surrounding infrastructure, etc., frequently using acetylene torches, angle

3

grinders, or other cutting tools; troubleshooting malfunctioning dock and door components; repairing or replacing electrical wiring, conduit and other electrical components; dismantling damaged, malfunctioning, or outdated docks, overhead doors, or components thereof; rebuilding or repair of wall or floor infrastructure components in order for replacement or retrofit docks or doors to be installed; and installation of replacement docks, door panels, overhead doors, operators, tracking, and/or associated components thereof.

**Citation**:  EX 126 (Zarlengo Decl) ¶6.

**ANSWER**:  **Undisputed** that Midwest Dock technicians perform this work.

At the summary judgment stage, a deponent cannot tender a declaration to contradict his own testimony at deposition.  *Lafary v. Rogers Group, Inc.*, 591 F.3d 903, 908 (7th Cir. 2010) ("A [party] cannot defeat a motion for summary judgment by 'contradicting deposition testimony with later filed affidavits.'").  Zarlengo testified in his deposition as follows regarding work performed by Midwest Dock technicians.  Zarlengo testified in his deposition that service work and installation work are "pretty similar":

Q. Now, describe for me, when Midwest Dock Solutions first started out back in 2006, what was its business?
A. Service and installation of loading dock equipment and overhead doors.
Q. Okay. Both docks and doors?
A. The first year or so, we just did mostly dock equipment or so. We didn't do much with doors. But after a few years, we started getting doors a little more.
Q. Okay.  You said service and installation of docks and doors. What did the service work entail?
A. Repairing existing equipment.
Q. Okay.  Existing dock levelers?
A. Yeah.
Q. And existing doors?
A. Yes.
Q. Okay. And do you consider service work different from installation work?
A. No. It's pretty similar.

Zarlengo 78:11-79:12, EX. 2.

Zarlengo testified in his deposition that Midwest Dock's employees performed installation of overhead doors and dock levelers at a new construction building known as the WinPak Portion Packaging Center on behalf of Principle Construction:

4

Q. Was Principal [*sic*] Construction the contractor that you contracted with for the Winpak Portion Packaging Center?

A. Yes.

Q. All right. And then if you turn to the very last page of this exhibit, does that look to be a -- you have to open it up. Yeah. Does that look to be a photograph of the Winpak Portion Packaging Center?

A. Yes.

Q. All right. And that's where you did the work, correct?

A. Yes.

Q. And this was work that was done by Midwest Dock Solutions, correct?

A. Yes.

Q. And it was done by Midwest Dock Solutions' employees, correct?

A. Yes.

Q. And -- and this was -- this was a new construction project; is that right?

A. Yes.

Q. And did Dock & Door -- I'm sorry. Did Midwest Dock Solutions install docks and doors at this location?

A. I believe so, yeah. I believe so.

Q. Okay. And do you have any idea of how many?

A. Yes.

Q. How many?

A. Twenty. I've got a good memory.

Zarlengo 65:8-66:18.

> **AMF 4:** As part of their service work, MDS technicians also perform periodic inspections and preventive maintenance for customers who hire MDS for those services.
>
> *Citation*: EX 126 (Zarlengo Decl) ¶7.

**ANSWER: Undisputed**.

> **AMF 5:** MDS mainly engages in the service and retrofit work described in **AMF 3** for end users, as opposed to a general contractor.
>
> *Citation*: EX 126 (Zarlengo Decl) ¶8.

**ANSWER: Undisputed.**

> **AMF 6:** MDS technicians come to the MDS warehouse/shop frequently in order to replenish supplies and materials that they need to have on their trucks, because it often is not clear what any day's repair and service calls may entail.
>
> *Citation*: EX 126 (Zarlengo Decl) ¶9.

**ANSWER: Undisputed.**

**AMF 7:** The vehicles MDS technicians utilize are fitted with the equipment (including torches), and tools they need for their retrofit work.

*Citation*: EX 126 (Zarlengo Decl) ¶10.

**ANSWER: Undisputed.**

**AMF 8:** In general, MDS does not perform the installation of overhead doors, dock levelers, or associated components on new construction of warehouses or distribution centers (referred to herein as "logistics buildings").

*Citation*: EX 126 (Zarlengo Decl) ¶11.

**ANSWER: Undisputed**.

**AMF 9:** MDS fully complied with the terms of the one-jobsite agreement it signed with the Carpenters union for the Winpak Job, including making contributions to the Plaintiff Funds for the work MDS employees performed on the Winpak Job.

*Citation*: EX 126 (Zarlengo Decl) ¶12.

**ANSWER: Undisputed.**

**AMF 10:** MDS offers healthcare and retirement benefits to the MDS employees, including its technicians.

*Citation*: EX 126 (Zarlengo Decl) ¶13.

**ANSWER: Undisputed.**

**AMF 11:** Whenever MDS is awarded a bid for the installation of dock levelers and/or doors at a logistics building, it subcontracts the work to D&D—regardless if that awarded contract requires union labor or not.

*Citation*: EX 126 (Zarlengo Decl) ¶¶16-17.

**ANSWER: Undisputed**, except for Midwest Dock's statement that Midwest Dock "subcontracts the work to D&D" because Midwest Dock and Dock & Door previously denied that there were any such contracts and Midwest Dock has not produced or identified any such contracts.

The undisputed facts establish that there are no contracts between Midwest Dock and Dock & Door for the projects Dock & Door worked on. First, Midwest Dock previously admitted in its discovery response that there are no contracts between Midwest Dock and Dock & Door. In

*Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests, Document Request No. 52*, Midwest Dock responded to Plaintiffs' request 52 asking for "all contracts or agreements between Midwest Dock on the one hand and Dock & Door on the other hand" by stating that there are "none":

> 52.    Produce all contracts or agreements between Midwest Dock on the one hand and Dock & Door on the other hand.
>
> RESPONSE:    Midwest Dock objects to this Request on the grounds it is vague and ambiguous regarding the terms "contracts or agreements." Subject to and without waiving this objection, none.

*See Defendant Midwest Dock Solutions, Inc.'s Objections And Answers To Plaintiffs' First Set Of Interrogatories And Document Production Requests,* Document Request No. 52, EX. 24 (highlighting added). Zarlengo reviewed these responses and testified under oath that Midwest Dock's response was accurate. Zarlengo 13:13-14:14, EX. 2.

Second, Dock & Door acknowledged in its discovery response that it had no contract or agreement with Midwest Dock:

> 53. Produce all contracts or agreements between Dock & Door on the one hand and Midwest Dock on the other hand.
>
> RESPONSE:
>
> There are no documents that are responsive to this Request No. 53.

*See Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' Document Requests*, Document Request No. 53, EX. 32.

Third, Midwest Dock has not produced or identified any contracts with Dock & Door for any of the projects that were bid by Midwest Dock and then staffed by workers paid through Dock & Door.

7

Fourth, Midwest Dock admitted in its response to Plaintiffs' Rule 56.1 Statement of Fact that it did not disclose Dock & Door as a subcontractor to the general contractors that Midwest Dock contracted with even though those contracts required Midwest Dock to disclose any such subcontractor to the general contractor. *See Defendant Midwest Dock Solutions, Inc.'s Response To Plaintiffs' Statement Of Undisputed Facts In Support Of Their Motion For Summary Judgment Pursuant To Local Rule 56.1* [ECF #53] at ¶¶36, 70.

> **AMF 12:** MDS was awarded a contract by ARCO/Murray for provision of dock and/or overhead door installation at a logistics building project known as *C555-Crow Hodings [sic] Joliet Truck Terminal* and the contract did not call for or require use of union labor. MDS subcontracted the installation work associated with that contract to D&D, who performed the work with D&D union employees.
>
> ***Citation***:  EX 126 (Zarlengo Decl) ¶18 & **Exhibit A** thereto (Contract for C555-Crow Hodings [*sic*] Joliet Truck Terminal).

**ANSWER:**  **Undisputed**, except for Midwest Dock's statement that Midwest Dock "subcontracted" the work to Dock & Door.  Plaintiffs hereby incorporate their response to AMF ¶11 above as to Midwest Dock's assertion that it subcontracted work to Dock & Door.

Further responding, Section 4.3 of the *Contract for C555-Crow Holdings Joliet Truck Terminal* attached to Midwest Dock's Statement of Additional Fact as Exhibit 126, Exhibit A expressly prohibits Midwest Dock from subcontracting the work to any other company without the prior written consent of ARCO/Murray:

> **4.3**     Subcontractor may not assign this Subcontract or any amounts due under this Subcontract without the prior written conse
> Contractor may assign this Subcontract in the event it is required to do so under its General Contract.  Any such assignment with
> prior written consent shall be null and void and the Subcontract shall be unenforceable by such assignee against Contractor.

*See Contract for C555-Crow Holdings Joliet Truck Terminal* §4.3*, Exhibit 126, Exhibit A [ECF #62-1].  Midwest Dock admitted that it did not disclose Dock & Door as a subcontractor to any general contractor like ARCO/Murry, which Midwest Dock was obligated to do if it used a subcontractor.  *See Defendant Midwest Dock Solutions, Inc.'s Response To Plaintiffs' Statement*

*Of Undisputed Facts In Support Of Their Motion For Summary Judgment Pursuant To Local Rule 56.1* [ECF #53] at ¶36. Midwest Dock's conclusory statement that there were subcontract agreements between Midwest Dock and Dock & Door is contradicted by its own prior admission.

> **AMF 13:** MDS was awarded a contract by ARCO/Murray for provision of dock and/or overhead door installation at a logistics building project known as *C686- Bridge Elk Grove Village* and the contract did not call for or require use of union labor. MDS subcontracted the installation work associated with that contract to D&D, who performed the work with D&D union employees
>
> ***Citation***: EX 126 (Zarlengo Decl) ¶19 & **Exhibit B** thereto (C686- Bridge Elk Grove Village Contract).

**ANSWER: Undisputed**, except for Midwest Dock's statement that Midwest Dock "subcontracted" the work to Dock & Door. Plaintiffs hereby incorporate their response to AMF ¶11 above as to Midwest Dock's assertion that it subcontracted work to Dock & Door.

Further responding, Section 4.3 of the *Contract for C686- Bridge Elk Grove Village* attached to Midwest Dock's Statement of Additional Fact as Exhibit 126, Exhibit B expressly prohibits Midwest Dock from subcontracting the work to any other company without the prior written consent of ARCO/Murray:

> 4.3    Subcontractor may not assign this Subcontract or any amounts due under this Subcontract without the prior written consent of Contractor. Contractor may assign this Subcontract in the event it is required to do so under its General Contract. Any such assignment without Contractor's prior written consent shall be null and void and the Subcontract shall be unenforceable by such assignee against Contractor.

*See Contract for C686- Bridge Elk Grove Village* §4.3, Exhibit 126, Exhibit B [ECF #62-1]. Midwest Dock admitted that it did not disclose Dock & Door as a subcontractor to general contractors like ARCO/Murry, which Midwest Dock was obligated to do if it used a subcontractor. *See Defendant Midwest Dock Solutions, Inc.'s Response To Plaintiffs' Statement Of Undisputed Facts In Support Of Their Motion For Summary Judgment Pursuant To Local Rule 56.1* [ECF #53] at ¶36.

> **AMF 14:** On logistics building projects, MDS is the up-level subcontractor to D&D that bids the jobs by factoring in costs of materials (docks *[sic]* levelers,

9

doors, operators, and associated components), its own overhead and profit, and the hourly price D&D has quoted MDS for installation labor.

*Citation*:  EX 126 (Zarlengo Decl) ¶20.

**ANSWER:  Undisputed**.  If AMF ¶14 could be construed to imply that Dock & Door submits any bids or quotes for any work, then it is purposefully misleading because Dock & Door stated in its discovery responses that it had no such estimates, proposals, or contracts:

> 61. Produce all estimates, proposals, and contracts for Dock & Door's customers and potential customers for the period from October 1, 2020 to the present.
>
> **RESPONSE:**
>
> There are no documents that are responsive to this Request No. 61.

*See Defendant Dock & Door Install, Inc.'s Responses To Plaintiffs' Document Requests*, Document Request No. 53, EX. 32.  To the extent that AMF ¶14 could be construed to imply that there are any contracts between Midwest Dock and Dock & Door, Plaintiffs hereby incorporate their response to AMF ¶11 above because Midwest Dock and Dock & Door previously denied any such contracts.

> **AMF 15:**  MDS's role as the up-level contractor (who is contracted directly with the general contractor) to D&D is not only to bid the jobs, but also to price out, order and purchase the dock and door equipment and materials.  That is the part of the contract with the general contractors that MDS performs and does not subcontract to D&D.
>
> *Citation*:  EX 126 (Zarlengo Decl) ¶21.

**ANSWER:  Undisputed.**  To the extent that AMF ¶15 could be construed to imply that there are any contracts between Midwest Dock and Dock & Door, Plaintiffs hereby incorporate their response to AMF ¶11 above because Midwest Dock and Dock & Door previously denied any such contracts.

> **AMF 16:**  MDS, and its sales personnel are able to leverage their relationships with the dock and door vendors with whom it has established relationships, so MDS

sources the materials and equipment needed, but subcontracts the actual installation.

*Citation*:  EX 126 (Zarlengo Decl) ¶22.

**ANSWER:  Undisputed.**  To the extent that AMF ¶15 could be construed to imply that there are any contracts between Midwest Dock and Dock & Door, Plaintiffs hereby incorporate their response to AMF ¶11 above because Midwest Dock and Dock & Door previously denied any such contracts.

> **AMF 17:**  D&D employees come to the MDS office/shop infrequently because all materials for their jobs typically are delivered from the manufacturer directly to the jobsite.  That includes doors, docks, anchors, and all other hardware necessary for the installation
>
> *Citation*:  EX 126 (Zarlengo Decl) ¶23.

**ANSWER:  Undisputed**, except for the frequency with which employees paid through Dock & Door come to Midwest Dock's office/shop because the phrase "infrequently" is vague and ambiguous.  Midwest Dock previously admitted in its Response to Plaintiffs' Rule 56.1 Statement of Fact:

> Dock & Door has no suppliers of materials. All supplies are purchased and maintained by Midwest Dock, which identified at least 95 suppliers. Supplies are kept in the warehouse and both Midwest Dock's employees and Dock & Door's employees take supplies from there.

*See Defendant Midwest Dock Solutions, Inc.'s Response To Plaintiffs' Statement Of Undisputed Facts In Support Of Their Motion For Summary Judgment Pursuant To Local Rule 56.1* [ECF #60] ¶63.

> **AMF 18:**  While D&D employees utilize trucks owned by MDS, those trucks are not used interchangeably or shared between MDS and D&D because individuals assigned trucks generally take them home overnight, and the MDS and D&D trucks are outfitted differently because of the different type of work done by the two companies
>
> *Citation*:  EX 126 (Zarlengo Decl) ¶24.

11

**ANSWER: Undisputed.** Although workers who were employed by both Midwest Dock and Dock & Door testified otherwise, Donald Cruikshank, both a former Midwest Dock and former Dock & Door employee, testified to the following:

> Q. And that was a truck -- I don't know if it was that particular truck, but you would, I take it, use trucks like that when you worked for -- when you were being paid by Midwest Dock, correct?
> A. Yes.
> Q. Okay. And you would use those same trucks when you were being paid by Dock & Door on the job, correct?
> A. Yeah. Yes.
> Q. And all -- there weren't any trucks that said Dock & Door Install on them, correct?
> A. No.
> Q. Okay. There were only trucks that said Midwest Dock Solutions, correct?
> A. Yes. Yes.

Cruikshank 43:16-44:9. EX, 8. Zachery Corrigan, a former Midwest Dock and Dock & Door employee, testified to the following:

> Q. And what -- what is your understanding of the relationship between those two companies?
> A. Midwest does mostly all -- there's, you know, a different group of guys. There was two different groups. Midwest would go do the service. And then the guys in Dock & Door would go to the -- like the bigger box buildings and do the big installs on the union side.
> Q. Okay. And they're using the same trucks, right?
> A. Yes.
> …
> Q. Okay. And if -- if Dock & Door is going to install doors at those locations, they would use Midwest trucks, correct?
> A. Correct.
> Q. Okay. And when you were doing service work or install work for Midwest, you would use the same trucks, correct?
> A. Correct.

Corrigan 51:22-11, 53:6-15, EX. 8.

MID-AMERICA CARPENTERS REGIONAL
COUNCIL PENSION FUND *et al.*


By: /s/ Kevin P. McJessy

12

Kevin P. McJessy
McJessy, Ching & Thompson, LLC
3759 N. Ravenswood, Ste. 231
Chicago, Illinois 60613
(773) 880-1260
mcjessy@mcandt.com

13

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on May 8, 2026, the foregoing **Plaintiffs' Response To Defendant Midwest Dock Solutions, Inc.'s Statement Of Additional Facts** was electronically filed with the Clerk of the United States District Court for the Northern District of Illinois by filing through the PACER E-Filing system, which electronically serves a copy of the foregoing upon all parties and counsel of record.

By:  /s/ Kevin P. McJessy

14