UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MID-AMERICA CARPENTERS REGIONAL COUNCIL PENSION FUND; MID-AMERICA CARPENTERS REGIONAL COUNCIL HEALTH FUND; MID-AMERICA CARPENTERS REGIONAL COUNCIL APPRENTICE AND TRAINEE PROGRAM; and MID-AMERICA CARPENTERS REGIONAL COUNCIL SUPPLEMENTAL RETIREMENT FUND, | Case No 1:24-cv-06428 |
| | Judge Andrea R. Wood |
| Plaintiffs, | Magistrate Judge Jeannice W. Appenteng |
| v. | |
| DOCK & DOOR INSTALL, INC., an Illinois corporation and MIDWEST DOCK SOLUTIONS, INC., an Illinois corporation, | |
| Defendants. | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION
FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY**

Midwest Dock Solutions, Inc.'s ("MDS") response ("Response") admits overwhelming material facts establishing that there is no arm's length relationship between MDS and Dock & Door Install, Inc. ("D&D"). (MDS and D&D are also referred to herein as "Companies").

D&D did not file a separate response to Plaintiffs' motion or Rule 56.1 Statement which further demonstrates that D&D has no real existence of its own. D&D's two-page "joinder" of MDS's Response offers no independent defense.[1] Remarkably, D&D merely re-filed MDS's response to *Plaintiffs' Statement Of Undisputed Fact In Support Of Their Motion For Summary Judgment Pursuant To Local Rule 56.1* [**ECF #53**] (hereinafter "**SOF**"), even bearing MDS's counsel's signature.[2] D&D in effect filed no response of its own to Plaintiffs' SOF.

## I.     MDS Admits Nearly All Of Plaintiffs' Statements Of Undisputed Facts.

*Defendant Midwest Dock Solutions, Inc.'s Response To Plaintiffs' Statement Of Undisputed Facts In Support Of Their Motion For Summary Judgment Pursuant To Local Rule 56.1* [**ECF #60**] cited in this brief as "Resp. SOF" outright admits Plaintiffs' SOF ¶¶1, 2, 3, 8, 22, 24, 29, 32, 34, 37, 39, 40, 48, 61, 64, and 74. MDS objects to but then also admits Plaintiffs' SOF ¶¶9, 12, 13, 15, 16, 21, 31, 41, 43, 44, 47, 54, 55, 58, 59, 60, 62, 63, 65, 67, 68, 69, 70, 71, 73, 75, 77, 78, and 79; accordingly, these SOFs are also deemed admitted. *See Naylor v. Dai Environmental, Inc.,* 2004 U.S. Dist. LEXIS 77, at *2 n.1 (N.D. Ill. Jan. 5, 2004); *Bledsoe v. Potter,* 2005 U.S. Dist. LEXIS 19600, at *11 (N.D. Ill. Sep. 7, 2005).

In MDS's response to Plaintiffs' SOF ¶¶17, 18, 26, 28, 30, 33, 35, 36, 38, 53, 57, 66, 72, and 76, MDS denies facts different from those asserted, which also constitutes an admission.

---

[1] *See Defendant Dock & Door Install, Inc.'s Joinder In Co-Defendant Midwest Dock Solutions, Inc's Response In Opposition To Plaintiff's Motion For Summary Judgment* [**ECF #63**].

[2] *See Defendant Midwest Dock Solutions, Inc.'s Response To Plaintiffs' Statement Of Undisputed Facts In Support Of Their Motion For Summary Judgment Pursuant To Local Rule 56.1* [**ECF #64**] (filed by "Defendant Dock & Door Install, Inc.")

*Bakaj v. Franklin Park*, No. 05 CV 5540, 2008 U.S. Dist. LEXIS 22043, at *8 (N.D. Ill. Mar. 19, 2008).  For example, MDS's response to SOF ¶18 disputes that MDS employees did welding at D&D jobsites but Plaintiffs do not assert that they did.  (Resp. SOF ¶18)  MDS also denies that MDS employees made adjustments to the doors at the D&D jobsites but then MDS admits this very point by acknowledging that Corrigan "as an MDS employee" performed "such 'adjustments'" at a building that D&D did installations.  (Resp. SOF ¶18 (emphasis added))

There are only a small number of Plaintiffs' SOF that MDS disputes.  However, "it is thus axiomatic that even in the face of some factual disputes, 'where the undisputed facts demonstrate that one party is entitled to judgment as a matter of law, summary judgment in favor of that party is entirely appropriate…'"  *See Egger v. Phillips*, 710 F.2d 292, 296-97 (7th Cir. 1983).  Moreover, many of MDS's disputes are unsupported.  For example, MDS claims no recollection, akin to no knowledge, of Plaintiffs' SOF ¶25.  (Resp. SOF ¶25)  This is an improper response, and SOF ¶25 should be deemed admitted.  *See Ledesma v. Marriott International, Inc.*, 2020 LX 17390, at *12 (N.D. Ill. Nov. 16, 2020).  Still other disputes from MDS are not properly supported by reference to an affidavit or testimony.  For example, MDS's responses to SOF ¶¶4 and 27 are not supported by any reference to the record.  (Resp. SOF ¶¶4, 27)  Matters that are disputed without support are also deemed admitted.  *See Ammons v. Aramark Uniform Services*, 368 F.3d 809, 817-18 (7th Cir. 2004).

## II.    MDS's Objections Are Not Well Founded And MDS Waived Any Objection.

MDS argues that Plaintiffs' SOF is too lengthy and too detailed because it includes "large chunks of deposition testimony," and "obliterates the letter, spirit and purpose of the rule," which requires the SOF "consist of concise numbered paragraphs."  (Response at 2-4)  There is nothing that prohibits a movant from including the actual cited testimony in the "support" section of a

2

Rule 56.1 Statement, so MDS's objection is without merit. Plaintiffs' statements of fact themselves are reasonable given the fact intensive nature of this case. In *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632-33 (7th Cir. 2009), the Seventh Circuit rejected the two-many-facts argument MDS makes here concluding that it is within the sound discretion of the trial court to determine whether statements of fact include too many details based upon the nature of the issues. The *Cracco* court explained that an employment discrimination case is fact intensive and therefore it was reasonable to include more facts in a Rule 56.1 statement of fact, particularly where the facts related to a common issue. *Id.* at 632-33. A single-employer claim is similarly a fact intensive inquiry and, therefore, Plaintiffs' SOF are consistent with Local Rule 56.1. Moreover, any "objection" to the Plaintiffs' SOF should be considered waived because MDS answered them and did not move to strike.

Neither *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 630 (7th Cir. 2010) nor *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) support MDS's objections. *Schmidt* held that the district court properly deemed defendant Eagle Waste's statements of fact admitted because the plaintiff Schmidt failed to provide separate responses to each statement of fact. *Schmidt*, 599 F.3d at 630. To the extent *Malec* applies, it favors Plaintiffs because the court in that case held that a response which purports to dispute a statement of fact which lacks support is an admission. *Id.* at 584. Finally, the *Aponte v. Ill. Workers' Comp. Comm'n*, 2025 U.S. Dist. LEXIS 218875, *7-8 (N.D.Ill. Nov. 6, 2025) and *Rao v. Gondi*, 2017 U.S. Dist. LEXIS 86152, *5-6 (N.D.Ill. June 5, 2017) decisions are inapplicable because in both of those cases the courts found that the parties' statements of fact and responses were problematic because they included legal arguments and included facts in a single paragraph that were wholly unrelated, which is not the case here.

### III. MDS And D&D Do Substantially The Same Work.

MDS argues that Plaintiffs are not entitled to summary judgment because MDS and D&D perform different work. MDS describes its work as "retrofit" work (*i.e.*, removal of old and installation of new overhead doors, dock levelers and associated items) and service work and describes D&D's work as installation of overhead doors, dock levelers and associated items in new construction logistics buildings. (Response at 3, 5-6, 9) MDS is wrong for many reasons.

First, MDS's work *is* D&D's work. MDS bids for and then signs the subcontract agreements with the general contractors agreeing to install overhead doors, dock levelers, and related items at new construction warehouses. (Resp. SOF ¶¶17, 18) Employees paid by MDS work on the jobsites delivering materials, staging the doors, and going back to make adjustments. (Resp. SOF ¶18) Employees paid by D&D do the installation work using MDS's trucks, equipment, materials, and supplies. (Resp. SOF ¶¶14, 42, 63, 71, 72) When the projects are complete, MDS (not D&D) provides the general contractors with a warranty for its work. (Resp. SOF ¶¶78, 79) For example, MDS bid the Heritage Crossing project with Krusinski Construction, the project was completed with D&D employees, and then MDS featured a photograph of the project on its Facebook page with its logo stating "Midwest Dock Solutions October 15, 2016 Another job well done! Install of 64 dock levelers, dock seals and 68 overhead doors." (Resp. SOF ¶14)

Second, MDS admits it performs substantially the same work *i.e.,* "installation of replacement docks, door panels, overhead doors, operators, tracking, and/or associated components thereof." (Response at 3) "Retrofit" or "replacement" work is the installation of new overhead doors, dock levelers, and accessories after removal of the old. Both companies perform the same work, *i.e.*, installing overhead doors, dock levelers, and accessories. (Resp.

4

SOF ¶¶12, 45, 53; MDS SOF at ¶3)  *See Laborers' Pension Fund v. RAI Concrete, Inc.,* 2021 U.S. Dist. LEXIS 172729, at \*16-17 (N.D. Ill. Sep. 11, 2021).  The fact that MDS may also repair overhead doors and dock levelers does not render the Companies' work different—it is still work related to overhead door, dock leveler, and related accessories installation work.  The relevant inquiry is what *kind* of work the Companies do, not *where* they do it.  The Companies' obligation to pay fringe benefit contributions for its technicians is based upon the nature of the work that the technicians perform, not whether the work is performed in a new or existing building.  (Resp. SOF ¶¶4, 7[3]; MDS SOF ¶8)

Third, MDS does not deny that it performs overhead door installation in new construction.  Instead, MDS equivocates that "*[i]n general*, MDS does not perform the installation of overhead doors, dock levelers, or associated components on new construction" which is itself an acknowledgment that MDS does this work.  (Response at 4 (emphasis added)) Moreover, MDS admitted it did this same work.  (Resp. SOF ¶11)

Fourth, MDS's website and Facebook page represent that MDS performs installation of overhead doors, dock levelers, and related accessories for "New & Existing Construction." (Resp. SOF ¶10)  MDS's website features photographs of the Heritage Crossing warehouse and states "We offer free quote or consultation on any new project."  (Resp. SOF ¶15)  And MDS's Blue Book listing stated that MDS's "Project Experience" included "Union" and "New Projects"

---

[3] MDS admits that its workers perform bargaining unit work which includes "overhead sectional doors" and "the handling, erecting, installing and dismantling of machinery and equipment…." (Resp. SOF ¶4)  Moreover, MDS offers no evidence to refute Plaintiffs' statement of fact that the service and installation of overhead doors and dock levelers is bargaining unit work and that Plaintiffs' auditors included this work in their findings because it is bargaining unit work.  (Resp. SOF ¶7)

and MDS's "What We Do" summary included "New Installations." (Resp. SOF ¶68)[4]

## IV. The Relevant Time Period Is Not Limited To The Audit Period.

MDS argues that this Court should ignore evidence outside of the Audit Period like MDS's work on the WinPak project citing *Chicago Regional Council of Carpenters Pension Fund v. Carlson Constructors Corp.*, 2022 U.S. Dist. LEXIS 53163 (N.D. IL Mar. 24, 2022). (Response at 8)  But the *Carlson* court rejected MDS's position and considered matters outside the arbitrary audit period in granting summary judgment and concluding that the defendants there were a single employer.  *Id.* at *32.  MDS cites no authority to support the existence of some sort of artificial time period limiting facts that the trier of fact may consider.

## V. Intent Or Motive Is Not Part Of Plaintiffs' Single-Employer Claim.

MDS next argues that Plaintiffs have produced insufficient evidence to show Richert and Zarlengo's motive for approaching Brutti to start D&D.  (Response at 5, 9)  However, MDS's motive-arguments are misplaced because Plaintiffs have moved this Court to enter summary judgment on the issue whether MDS and D&D are a single employer, which does not require the Plaintiffs to prove motive or intent.  *Bd. of Trs. of The Pipe Fitters Ret. Fund, Local 597 v. Am. Weathermakers, Inc.*, 150 F. Supp. 3d 897, 908 (N.D. Ill. 2015), *citing Moriarty v. Svec*, 164 F.3d 323, 332 (7th Cir. 1998) (observing that the alter-ego doctrine requires proof of motive and intent but the single-employer doctrine does not).

## VI. MDS Ignores Overwhelming Undisputed Evidence Of Interrelatedness.

MDS next argues that D&D's and MDS's use of the same vendors is insufficient to show that they are interrelated pointing out that the attorney performs different work for the Companies, that the payroll service is a national company, and that D&D stayed with Assurance

---

[4] MDS only disputes that it still advertises in the Blue Book but it admits that it did advertise in the Blue Book and admits the contents of its advertisement as shown.  (Resp. SOF ¶68)

for a longer period before following MDS to Holden. (Response at 10) MDS ignores innumerable other undisputed facts. Brutti hired the attorney after Zarlengo or Richert recommended him. (Resp. SOF ¶¶28-29) The fact that Brutti stayed with Assurance but later switched to Holden—the same firm that MDS switched to—after Zarlengo recommended Holden to Brutti underscores Zarlengo's influence over D&D.[5] While ADP may be a national company, it is striking both Companies signed with ADP the same day (Resp. SOF ¶32) and that *all* of the Companies' vendors are common vendors (Resp. SOF ¶¶28-33). *See, e.g., Chi. Reg'l Council of Carpenters Pension Fund v. TMG Corp.*, 206 F. Supp. 3d 1351, 1357 (N.D. Ill. 2016).

MDS's Response ignores undisputed facts showing integration of the Companies' overall business operations that further proves Plaintiffs' single employer claim. MDS bids for and signs all the contracts for the projects where D&D employees work (Resp. SOF ¶62); MDS employs all the sales staff and D&D employs none (*id.*); MDS provides D&D with all the trucks used by D&D which are branded with the "Midwest Dock Solutions" logo while D&D has no trucks of its own (Resp. SOF ¶¶42, 59, 71); MDS provides D&D with all the equipment (such as forklift, scissor lift, trailer, welding equipment, and tools), materials, and supplies that D&D employees use on the job—(which is also the same equipment used by MDS employees)—and that D&D has no equipment, materials, and supplies of its own (Resp. SOF ¶42)[6]; MDS decides

---

[5] MDS disputes that D&D hired Esser Hayes (aka Assurance) *because* it was MDS's agent. However, what SOF ¶30 asserts is that D&D hired Assurance at the recommendation of Zarlengo and Michael Richert and it was because Esser Hayes was their insurance agent that they recommended it, which is not disputed. SOF ¶30 further asserts that D&D moved its business to Holden based upon Zarlengo's recommendation and that both Companies use the same account executive who provides the same services to both companies, which MDS also admits. (Resp. SOF ¶30)

[6] MDS only asserts that the <u>trucks</u> are not shared back and forth between the Companies but does not dispute that MDS owns all the trucks and provides them to D&D without cost. (Resp. SOF ¶42) ("While D&D employees utilize trucks owned by MDS, those trucks are not used interchangeably or shared between MDS and D&D").

where to rent office space, rents the space, and pays the rent and utilities while D&D then follows MDS from location to location, occupies the same space, has never had a lease, has never paid rent, and uses MDS's office equipment and office supplies without cost (Resp. SOF ¶¶38, 39)[7]; D&D's mail is delivered to a post office box rented and controlled by MDS to which Brutti has no access (Resp. SOF ¶40); only Zarlengo, Michael Richert, and Sherri Webber are authorized to access the post office box where D&D's mail is delivered (Resp. SOF ¶40); D&D's mail, including insurance bills and the monthly fringe benefit contribution reports used to report fringe benefit contributions to Plaintiffs, are mailed to the MDS-controlled P.O. Box and are retrieved by Sherri Webber, MDS's bookkeeper (Resp. SOF ¶41); MDS provides D&D employees with high-visibility "Midwest Dock Solutions" branded clothes to wear on jobsites where high visibility clothing is required while D&D provides no such clothing (Resp. SOF ¶72)[8]; D&D employees drive to union jobsites in "Midwest Dock Solutions" branded trucks wearing "Midwest Dock Solutions" branded clothing (Resp. SOF ¶¶58, 71, 72); MDS provides D&D employees with MDS company credit cards without informing Brutti which D&D employees have them (Resp. SOF ¶43); MDS's bookkeeper collects the receipts and pays the credit card statements for D&D employees (*id.*); D&D has no administrative staff;[9] D&D

---

[7] MDS only asserts that on one occasion D&D followed MDS from the Burville Road location to the Holeman Avenue location a few months later, but does not dispute that it moved from the Burville Road location to the Holeman Avenue location like MDS. (Resp. SOF ¶38)

[8] MDS asserts that it does not <u>require</u> D&D employees to wear MDS branded high visibility clothes, but MDS admits that it provides high visibility "Midwest Dock Solutions" branded clothes to D&D employees to wear and that the D&D employees wear "Midwest Dock Solutions" branded clothes on the union jobsites. (Resp. SOF ¶72)

[9] MDS argues that there is no administrative task that MDS performs for D&D, but that is a patently false statement based upon the undisputed facts. For example, Webber manages the payment of credit card statements of D&D employees (Resp. SOF ¶43), Sugar and Zarlengo order equipment and has it delivered to D&D employees to use on jobsites (Resp. SOF ¶42), MDS pays rent and utilities for D&D (Resp. SOF ¶38), and Webber collects D&D's mail from the post office and brings it to the office (Resp. SOF ¶41).

engages in no advertising (not even on Brutti's own race car as MDS does); and, D&D has counted on MDS for 100% of its revenue. (Resp. SOF ¶¶8, 21, 37, 62, 67)

The daily invoices prepared by Brutti are essentially daily timecards for the hours worked by each employee each day; a separate invoice is issued for each employee for each day stating the date, describing the project where the employee worked that day, and the number of hours the employee worked that day. (Resp. SOF ¶75) The hourly rate that D&D invoices to MDS for the D&D employees is based upon D&D's costs including "the union scale that Dock & Door workers were paid, including additional expenses that Dock & Door also had to pay as a result of its existence such as fringe benefit contributions, accounting fees, legal fees, unemployment compensation insurance, and employer's share of social security taxes and Medicare" and, in this way D&D functions as a pass through entity for MDS to employ union workers. (Resp. SOF ¶74) MDS is the only source of revenue for D&D, and D&D lost $70,069 between 2016 and 2023. (Resp. SOF ¶¶37, 64) Brutti prepares each invoice for each employee's daily hours in Xero. (Resp. SOF ¶73) MDS and D&D use the same Xero accounting software so Sherri Webber can incorporate D&D's daily time sheet "invoices" directly into MDS's Xero accounting system in order to cut an MDS check to D&D so that it can then pay its employees. (Resp. SOF ¶¶33, 73, 76)[10] This is nothing like a normal subcontractor-contractor relationship as MDS argues. (Response at 6-7)

The Companies also conduct their business in an interrelated manner by having Brutti

---

[10] Although MDS's response to Plaintiffs' SOF ¶76 states that MDS disputes that "Midwest Dock's *[sic]* has access to any of Dock & Door's accounting data or vice versa," this dispute is misplaced because Plaintiffs made no such assertion. Instead, Plaintiffs' SOF states that "Sherri Webber at Midwest Dock uses the Xero software program to incorporate Dock & Door's deposit summary and invoices directly into Midwest Dock accounting data which is also maintained using the Xero software," which MDS does not dispute. (Resp. SOF ¶75) The Companies use a common accountant who, of course, has access to both Companies' payroll, general ledger, and other records. (Resp. SOF ¶33)

perform work as if he were an employee of MDS. Brutti would contact the Companies' insurance agent to get MDS insurance certificates for MDS to produce to its general contractors. (Resp. SOF ¶77) MDS provided Brutti with an MDS company email address tonyb@midwestdocksolutions.com that Brutti used for his MDS work. (Resp. SOF ¶77) Zarlengo testified that company email accounts are only given to MDS employees. (*Id.*) D&D has no company email account. (Resp. SOF ¶77) Brutti worked for MDS preparing MDS's project closing documents including MDS's warranty letters to its general contractors (Resp. SOF ¶79), and Brutti prepared MDS's Site Specific Safety Plan ("SSSP") under Zarlengo's name for a Pepper project. (Resp. SOF ¶¶78, 80)[11] When Brutti sent out the closing documents, warranty letters, and the SSSP on behalf of MDS he did so using his MDS email address which Brutti signs, "Yours, Tony Brutti Midwest Dock Solutions Phone: 815-922-[****] Email: tonyb@midwestdocksolutions.com". (Resp. SOF ¶¶78-80) Brutti was paid for this work through D&D. (Resp. SOF ¶65)

Moreover, MDS conducts its operations as though MDS and D&D are one. MDS's contracts with general contractors prohibit MDS from subcontracting the work to another company without their prior written consent but MDS does not disclose any subcontractor. (Resp. SOF ¶36) MDS's contracts with its general contractors require subcontractors working on the projects to provide certificates of insurance ("COIs") naming the general contractor as an additional insured on the subcontractor's insurance policies, which Zarlengo acknowledged is a requirement the general contractors take very seriously. (Resp. SOF ¶34) MDS provides COIs to these insurers for the projects but D&D does not. (Resp. SOF ¶35)

Finally, MDS also holds itself out in the marketplace as the "union" company which

---

[11] MDS only disputes that Brutti signed Zarlengo's signature to the SSSPs but acknowledges that the SSSPs prepared by Brutti included Zarlengo's printed name. (Resp. SOF ¶80)

further demonstrates just how interrelated MDS is with D&D. For example, MDS listed itself as a union company on Pepper's Prequalification form and, when Zack Adkins, a senior project manager with Pepper, asked Sugar if MDS would use union labor on its job, Sugar responded, "Yes, thats *[sic]* correct, we are union." (Resp. SOF ¶69) MDS also advertised in a trade publication that its "Project Experience" included "Union" and "New Projects." (Resp. SOF ¶68)[12]

MDS's argument that the Companies "serve different groups of clientele, on different types of projects" is wholly unsupported. (Response at 11) MDS does not explain who it thinks D&D's clientele is, but the undisputed facts show that 100% of D&D's revenue since it was formed has come from MDS. (Resp. SOF ¶37) D&D is used by MDS to staff projects where MDS has contracted with its general contractor clients to install overhead doors, dock levelers, and related accessories. (Resp. SOF ¶17)[13] D&D does not have "clientele."

## VII. MDS Ignores Undisputed Evidence Of Common Management And Labor Relations.

MDS argues that whenever MDS is awarded a bid from a general contractor for "logistics building work," it subcontracts the work to D&D. (Response at 6, 13) However, MDS and D&D produced no evidence of any contracts between them. Both MDS and D&D answered discovery in this case stating that there were no contracts between them. *See Plaintiffs' Response To Defendant Midwest Dock Solutions, Inc.'s Statement Of Additional Facts* ¶11 [**ECF #65**] ("Pltf. Resp. to MDS SOF"). MDS did not attached a single contract with D&D to its statement of additional fact. MDS expressly admitted that the contracts that MDS signed with

---

[12] MDS disputes that it still maintains its Blue Book listing but admits that it once did and admits that Plaintiffs' SOF is otherwise accurate. (Resp. SOF ¶68)

[13] MDS's response to SOF ¶17 states that D&D is used to staff projects for its general contractor clients if union labor is required and even if the general contractor does not require union labor a particular project. This assertion does not dispute any part of SOF ¶17. (Resp. SOF ¶17)

various general contractors "prohibit subcontracting the work to another company without their prior written consent, and Midwest Dock did not disclose to the general contractors that Dock & Door would perform the contracted-for work." (Resp. SOF ¶36) Finally, D&D does not invoice MDS as if it were a subcontractor; instead, D&D issues daily timecard-like invoices to MDS charging it on a daily basis for the daily hours worked by each employee in effect merely passing through its costs. (Resp. SOF ¶¶74-75)

Even if MDS does have unwritten subcontracts with D&D despite the lack of evidence, this only further supports Plaintiffs' claim that MDS and D&D are interrelated companies because their relationship is so informal that no actual written subcontracts or terms of subcontracts exist. *See Chicago Regional Council of Carpenters Pension Fund v. Schal Bovis, Inc.*, 826 F.3d 397, 404 (7th Cir. 2016) (lack of written contracts between two companies supports the finding that the two companies are a single employer); *Trs. of the Mosaic & Terrazzo Welfare, Pension, Annuity & Vacation Funds v. High Performance Floors, Inc.*, 233 F. Supp. 3d 329, 343 (E.D.N.Y. 2017).

## VIII. MDS's Effort To Distinguish *Lippert Tile* Are Unavailing.

MDS argues that MDS's control over the bidding on new jobs does not show common management. The law is otherwise. *Lippert Tile Co. v. Int'l Union of Bricklayers & Allied Craftsmen, Dist. Council of Wis. & Its Local 5*, 724 F.3d 939, 947 (7th Cir. 2013) ("the same entity not only operates, but also controls, the bidding process and administrative tasks for both companies, the 'common management' factor weighs in favor of a single employer finding.") MDS tries to distinguish *Lippert Tile* because in that case one company decided which of the two would prepare bids. (Response at 13) The facts are more compelling here, however, because MDS does all the bidding and D&D does none. Brutti testified he does not look at the contracts

12

with the general contractor, does not know the terms of the contracts, and has no record of the projects that D&D has done for each of the general contractors. (Resp. SOF ¶23) MDS completely controls the bidding and contracting.

MDS also tries to distinguish *Lippert Tile* because the union company in that case was formed before the non-union company and, therefore, the formation of D&D could not have been for the purpose of avoiding union obligations. (Response at 12) As discussed above, however, intent and motive are not relevant to Plaintiffs' single employer claim. Moreover, for single employer purposes, it makes no difference whether the union or non-union company came first. *Auto Mechs.' Local No. 701 Union & Indus. Pension Fund v. Dynamic Garage, Inc.*, 2018 U.S. Dist. LEXIS 168571 *2, 3, 19 (N.D. Ill. Sept. 30, 2018) (finding single employer relationship where the union company was formed after the non-union company).

## IX. Zarlengo, Richert & Sugar Are The Day-To-Day Decision Makers.

MDS's attempts to downplay Zarlengo, Richert and Sugar's roles as the *de facto* day-to-day decision makers for D&D lack evidentiary support. (Response at 13) Cruikshank, Williams, Tattini, and Green all employed by D&D, considered Zarlengo, Richert, and Sugar to be their bosses (and never Brutti). (Resp. SOF ¶¶47, 54, 58, 59)[14] Sugar would assign specific crews of D&D employees to work on jobsites, and he would instruct them on what the installation for a project involves. (Resp. SOF ¶60) Sugar was also a main point of contact on behalf of D&D for jobs that he sold for MDS, and he would communicate with D&D employees while they were on the jobsites. (Resp. SOF ¶61) Richert terminated Corrigan and Tattini, who were employed by D&D, and Richert and Zarlengo facilitated D&D's hiring of Green, Bishop, and Cruikshank by

---

[14] MDS disputes that Zarlengo hired Williams. (Pltf. Resp. to MDS SOF at ¶1) But this is not outcome determinative in light of the overwhelming undisputed material facts and does not preclude this Court from entering summary judgment. *See Egger*, 710 F.2d at 296-97.

13

D&D.  (Resp, SOF ¶¶45, 51, 52,  53, 59)

Brutti, on the other hand, had little or no managerial role, despite MDS's assertions otherwise.  (Response at 13-14)  The work MDS describes he does is largely administrative or clerical and does not involve managing any employees or making substantive decisions regarding the direction and future of D&D.  Brutti is not responsible for bidding any jobs and he reviews no contracts.  (Resp. SOF ¶¶23, 37, 62)  To the extent Brutti is involved in "deciding" on vendors, his decisions all coincide with what Zarlengo and Richert recommend as evidenced by D&D's use of all of MDS's vendors.  (Resp. SOF ¶¶28-33)  It is undisputed Brutti works only part time doing "a little bit of field measuring," bringing supplies from MDS's shop to the jobsite, unloading and staging materials at the jobsites, getting material at the shop ready for his guys for the next day (*e.g.,* loading the materials on to the trailer), gathering time sheets, preparing invoices to MDS using the Xero accounting software based on the workers timesheets, and writes checks.  (Resp. SOF ¶73)  In sum, labor and clerical work.

## X.      Common Ownership Is Unnecessary.

As Plaintiffs point out in their original memorandum and MDS does not dispute, common ownership is not required and courts have found single employer liability in the absence of common ownership.  However, common family ownership, as here, should be sufficient to satisfy the common ownership element.  *See, e.g., Castaldi v. River Ave. Contr. Corp.*, 2015 U.S. Dist. LEXIS 83567, *18 (S.D.N.Y. Jun. 20, 2015).

## XI.     Plaintiffs' Motion For Partial Summary Judgment Is Not A Waiver.

MDS argues that if this Court were to find MDS and D&D to be a single employer "that does not automatically mean MDS is on the hook for the alleged unpaid contributions" because Plaintiffs have not proven damages.  (Response at 14-15)  MDS is wrong for two reasons.  First,

14

Plaintiffs have moved this Court to enter *partial* summary judgment only on the issue of *liability* against the Companies because the undisputed facts prove that there is no arm's length relationship between them. Should the Court grant Plaintiffs' motion finding the Companies are a single-employer, then Plaintiffs may then move for summary judgment on the issue of damages or the case may be set for trial on the issue of damages. *Chi. Reg'l Council of Carpenters Pension Fund*, 2022 U.S. Dist. LEXIS 53163, *16, 60 (granting plaintiffs' motion for partial summary judgment on the issue of single employer liability; *see also* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—*or the part of each claim or defense*—on which summary judgment is sought."). Second, Plaintiffs have produced undisputed evidence of substantial damages. MDS admits its technicians perform bargaining unit work. ("Pltf. Resp. to MDS SOF at ¶3; *Cf.* Resp. SOF ¶4) MDS further admits that Legacy Professionals LLP ("Legacy") reviewed Dock & Door and MDS's records, and that Legacy issued an audit report showing the dollar amounts listed in SOF 7 as potential discrepancies. (Resp. SOF ¶7) Consequently, based upon the audit report, if this Court finds that the Companies are a single employer, then they may be liable for unpaid contributions of $4,037,546.06. (Resp. SOF ¶7)

## XII. Conclusion.

For the forgoing reasons, this Court should grant Plaintiffs motion for partial summary judgment on the issue of single-employer liability holding that the Companies are a single employer, that MDS is bound to the collective bargaining agreement with the Union, and that the Companies are jointly and severally liable for unpaid fringe benefit contributions for the hours worked by their employees performing bargaining unit work. *See Central Illinois Carpenters Health & Welfare Trust Fund v. Olsen*, 467 Fed. Appx. 513, 517 (7th Cir. 2012).

MID-AMERICA CARPENTERS REGIONAL
COUNCIL HEALTH FUND, *et al.*,

By:  s/ Kevin P. McJessy
            One of Their Attorneys

Kevin P. McJessy
John J. Sopata
MCJESSY, CHING & THOMPSON, LLC
3759 North Ravenswood, Suite 231
Chicago, Illinois 60613
(773) 880-1260 (telephone)
mcjessy@MCandT.com
sopata@MCandT.com

## CERTIFICATE OF SERVICE

I, Kevin P. McJessy, an attorney, certify that I caused the foregoing **PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY** to be served electronically via the Court's CM/ECF service for the U.S. District Court, Northern District of Illinois, Eastern Division, upon all counsel of record May 8, 2026.


       s/ _Kevin P. McJessy

17